___ FILED      ___ LODGED
___ RECEIVED   ___ COPY

APR 0 6 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

1    ELIZABETH A. STRANGE
     First Assistant United States Attorney
2    District of Arizona

3    KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
     DOMINIC LANZA (Cal. Bar No. 225989, dominic.lanza@usdoj.gov)
4    MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
     Assistant U.S. Attorneys
5    40 N. Central Avenue, Suite 1800
     Phoenix, Arizona 85004-4408
6    Telephone (602) 514-7500

7    JOHN P. CRONAN
     Acting Assistant Attorney General
8    Criminal Division, U.S. Department of Justice

9    REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
     Senior Trial Attorney, U.S. Department of Justice
10   Child Exploitation and Obscenity Section
     950 Pennsylvania Ave N.W., Room 2116
11   Washington, D.C. 20530
     Telephone (202) 616-2807
12   Attorneys for Plaintiff

13

14                    IN THE UNITED STATES DISTRICT COURT

15                        FOR THE DISTRICT OF ARIZONA        SEALED

16   United States of America,                CR-18-00422-PHX-SPL (BSB)

17                        Plaintiff,          **UNITED STATES' MOTION FOR**
                                              **DETENTION PENDING THE**
18          v.                                **IMPOSITION OF RELEASE**
                                              **CONDITIONS**
19
     1.  Michael Lacey                        **(UNDER SEAL)**
20

21                        Defendant.
22

23          The United States respectfully seeks the detention of defendant Michael Lacey

24   ("Lacey") unless and until stringent release conditions are imposed.

25          As explained below, Lacey poses a significant risk of flight based on the nature

26   of the charges, his massive financial resources, his frequent international travels, his

27   current possession of a passport, and—perhaps most important—his recent transfer of

28   over $16 million to foreign bank accounts in an apparent attempt to thwart seizure

efforts by the government.   These factors suggest that Lacey could easily flee the country and use the wealth he has stashed overseas to live out the remainder of his life, in lavish style, as a fugitive.

The United States also harbors concerns that Lacey could, if released without conditions, pose a danger to the community.   As noted in the 93-count indictment, *see* Exhibit A, Lacey is one of the masterminds behind Backpage.com, the internet's most notorious destination for prostitution advertisements, including advertisements depicting the prostitution of children.   In its 14-plus years of existence, the website has helped facilitate the victimization of untold thousands of victims of sex trafficking. Paragraphs 122-138 of the indictment provide a powerful snapshot of such victimization, including instances in which women trafficked via Backpage were murdered and had their corpses desecrated.   Furthermore, although Lacey purported to sell his interest in Backpage in 2015, he has continued receiving large Backpage-related distributions since then and also appears to have retained some vestiges of operational control over the company.

On the other hand, the United States also recognizes that Lacey is a United States citizen with no prior criminal convictions who has abided by the release conditions that were previously imposed in a related proceeding in California state court.   Accordingly, the United States believes there are conditions that would likely be sufficient to justify his release from pretrial custody.   Specifically, to ameliorate the risk of flight, Lacey should be required to relinquish his passport, submit to electronic monitoring, post a sizeable bond, provide a complete accounting of his financial holdings, and be precluded from engaging in any financial transactions without prior Court and government approval.   Additionally, to ameliorate any danger to the community, Lacey should be precluded from taking any steps to exercise control over Backpage.   However, unless and until such conditions are imposed, Lacey should remain in custody.

# ARGUMENT

## A.    Legal Standard

As the Court is no doubt aware, "[t]he Bail Reform Act . . . requires a district court to order a defendant detained pending trial if 'no condition or combination of conditions will reasonably assure the appearance of the person as required.'" *United States v. Gentry*, 455 F. Supp. 2d 1018, 1019-20 (D. Ariz. 2006) (quoting 18 U.S.C. § 3142(e)). This analysis involves a "two-step inquiry." *Id.* First, the Court must make a finding as to whether the defendant presents a "serious risk that such person will flee" if not detained. *Id.* at 1020 (quoting 18 U.S.C. § 3142(f)(2)(A)). The government bears the burden of proving such risk of flight by a preponderance of the evidence. *Id.* Second, if the defendant is likely to flee, the Court next must determine whether some set of conditions would sufficiently vitiate that risk. *Id.* (citing 18 U.S.C. § 3142(g)). "In making the determination whether conditions exist that would reasonably assure a defendant's appearance, Section 3142(g) requires the district court to take into account four statutory factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (4) the nature and seriousness of the danger to any person or community that would be posed by the person's release." *Id.*

In addition to seeking detention based on the risk of flight, the United States also may seek detention on the ground that the defendant poses a risk of danger to the community. The government bears the burden of proving such danger by clear and convincing evidence. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) ("A finding that a defendant is a danger to any other person or the community must be supported by 'clear and convincing evidence.'") (quoting 18 U.S.C. § 3142(f)(2)(B)).

**B.    Flight Risk**

The Court should find, for several reasons, that releasing Lacey without conditions would create a significant risk of flight.

Nature And Circumstances Of Charged Offense.  Lacey is charged with a total of 79 felony crimes—specifically, one count of conspiracy, fifty counts of facilitating prostitution in violation of the Travel Act, one count of conspiracy to commit money laundering, ten counts of concealment of money laundering, six counts of international money laundering, and eleven counts of transactional money laundering.  Many of these counts, standing alone, carry a statutory maximum penalty of 20 years in prison.  The indictment also describes the extreme toll that Lacey's conduct took on the many victims who were sex-trafficked via the Backpage website and, separately, details the extensive efforts that Lacey and others took to launder hundreds of millions of dollars of Backpage-related revenues.  If convicted of all (or even a portion of) these charges, Lacey—who is nearly 70 years old—faces the very real possibility of spending the rest of his life in federal prison.  Such exposure creates a powerful incentive to flee.  *See, e.g., United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight."); *United States v. Anderson*, 384 F. Supp. 2d 32, 35 (D.D.C. 2005) (ordering pretrial detention in white collar case, even though the defendant had no prior felony convictions and "no history of violent criminal activity," in part because "[t]he combined statutory maximum penalties for the federal crimes with which Mr. Anderson is charged is 23 years. . . .  At 51 years old, Mr. Anderson potentially could spend most of the remainder of his life in prison if convicted.").

Strength Of The Evidence.  The strength of the evidence also supports a flight-risk finding.  As an initial matter, the fact the grand jury has returned an indictment is enough to meet the government's initial burden as to the strength-of-the-evidence factor.  *See, e.g., United States v. Hamlin*, 2007 WL 2225868, *1 (E.D. Mich. 2007) ("Under subsection (g)(2), from the a grand jury having passed an Indictment, there is

a definite weight of evidence against the Defendant."); *United States v. Bradshaw*, 2000 WL 1371517, *4 (D. Kan. 2000) ("[T]he grand jury's indictment, standing alone, establishes probable cause for purposes of the Bail Reform Act.").

In addition, the indictment in this case is a speaking indictment that sets forth, in extensive detail, some of the evidence supporting the charges against Lacey, including damning emails and internal company documents that Lacey wrote or received. Finally, the strength of the evidence is further bolstered by the fact that, in January 2017, the Senate Permanent Subcommittee on Investigations ("PSI") issued a 50-page report entitled "Backpage.com's Knowing Facilitation of Online Sex Trafficking." This report included, among other things, a finding that "Backpage's public defense is a fiction. Backpage has maintained a practice of altering ads before publication by deleting words, phrases, and images indicative of criminality, including child sex trafficking . . . . Those practices served to sanitize the content of innumerable advertisements for illegal transactions—even as Backpage represented to the public and the courts that it merely hosted content others had created."

Notwithstanding all of this, the United States anticipates Lacey may argue that the trajectory of the criminal case against him in California state court (in which pimping-related charges were previously dismissed) somehow undermines the strength of the evidence in this case. Any such argument should be rejected. In the California case, Lacey was able to secure dismissal of the pimping-related charges by invoking section 230 of the Communication Decency Act ("CDA"), which preempts state law in certain circumstances. Because this is a federal case involving violations of federal criminal law, the CDA has no application. *See* 47 U.S.C. § 230(e)(1) ("Nothing in this section shall be construed to impair the enforcement of . . . [any] Federal criminal statute.").

<u>Defendant's History And Characteristics</u>. Lacey's history and characteristics also support a flight-risk finding. On the one hand, the United States acknowledges that aspects of Lacey's background are favorable to him. He is a United States citizen with community and family ties who has never been convicted of a crime.

Additionally, he has appeared for every required court appearance in the California case, has been permitted to travel internationally by the court in that case, and has surrendered his passport to the California court following each such trip (although it appears he is currently in possession of the passport)

On the other hand, Lacey has access to significant amounts of money, including money in foreign bank accounts, and has made statements suggesting he is attempting to prevent the government from seizing those funds.  For example:

• Paragraph 15 of the indictment explains that Lacey has "engaged in . . . financial transactions designed to conceal [his] misconduct and evade seizure by law enforcement. For example, in November 2016, LACEY asked employees of an Arizona-based bank for advice on how to move his assets 'offshore' to protect them from seizure by the government.  Soon afterward, $16.5 million in Backpage-derived cash was wired from LACEY's bank accounts in the United States to an overseas bank account in Hungary."

• Paragraphs 26 and 139 of the indictment explain that Lacey once owned 45% of Backpage and that Backpage has earned approximately $500 million in illicit revenue since 2004.

• Paragraph 154 of the indictment explains that, "between January 2016 and January 2017, LACEY (and LACEY's family members) received [Backpage-related] distributions totaling over $30.3 million."

• Counts 69-70, 81, 83-84, 86, and 88-92 of the indictment summarize eleven instances in which massive quantities of Backpage-related funds were transferred to or from financial accounts held by Lacey, including instances in which Lacey purchased a $13+ million property in San Francisco and a different property in Sedona.

For all of the reasons, Lacey has both the financial ability and access to foreign bank accounts to allow him to successfully escape prosecution. *See, e.g., Anderson,* 384 F. Supp. 2d at 36 ("Anderson appears to have the ability not only to flee the District of Columbia and the United States without detection, but also to live comfortably and evade capture in foreign jurisdictions.  Mr. Anderson has traveled extensively, . . . has numerous

1   international personal and business contacts, . . . [and] appears to have access to substantial
2   assets overseas.").

3       Lacey also engages in frequent foreign travel. He visited Cabo San Lucas, Mexico
4   as recently as February 2018. He was also scheduled to travel to France, Spain, and
5   Portugal beginning on April 9, 2018. Foreign connections, coupled with access to foreign
6   funds, suggest an ability "to live comfortably" abroad, a consideration that supports a
7   flight-risk finding. *See, e.g., United States v. Hong Vo*, 978 F.Supp.2d 41, 45 (D.D.C.
8   2013) ("Vo's access to substantial assets overseas, combined with her experience living in
9   Vietnam for the past two years, . . . demonstrate her ability not only to flee . . . the United
10  States . . . but also to live comfortably and evade capture in foreign jurisdictions.") (internal
11  quotation marks omitted); *United States v. Saani*, 557 F. Supp. 2d 97, 98-99 (D.D.C. 2008)
12  ("Defendant's alleged access to funds in foreign bank accounts, and Defendant's alleged
13  purposeful and illegal concealment of that access, is directly relevant to Defendant's flight
14  risk.").

15      <u>Danger To Community If Released</u>. The United States also harbors concerns
16  that Lacey could, if released without conditions, pose a danger to the community. The
17  indictment expresses the grand jury's conclusion that Lacey was one of the
18  masterminds behind a website that has contributed to the victimization of untold
19  thousands of victims of sex trafficking. Any future effort by Lacey to exert control
20  over Backpage would result in further victimization—and, thus, pose a danger to the
21  community.

22      <u>Conclusion</u>. In sum, Lacey poses as serious risk of flight due to the severity the
23  charges (and penalties) he faces, his extensive foreign connections and financial resources,
24  and his expressed desire to conceal assets from the government. Although Lacey will
25  presumably argue that this risk is minimal given that he did not flee despite being exposed
26  to charges in California and knowing he was under investigation in this case, "a pre-
27  indictment investigation and a post-indictment trial are two very different things."
28  *Anderson*, 384 F. Supp. 2d at 40 ("The defense has emphasized . . . that Mr. Anderson has

1    left the country and returned many times during the pendency of the government's

2    investigation into his business and investment activities. His willingness to remain in and

3    repeatedly return to the United States despite the risk of indictment, the defense argues,

4    indicates that Mr. Anderson wishes to remain here to defend his good name and reputation

5    against attack in the criminal proceeding, even if it means, ultimately, risking his freedom.

6    The Court does not find this argument convincing. . . . [A] pre-indictment investigation

7    and a post-indictment trial are two very different things.").

8    **C.**    **Danger To The Community**

9        In addition to seeking detention (at least temporarily) based on the risk of flight,

10    the United States also seeks detention on the ground that the Lacey could, if released

11    without conditions, pose a danger to the community. On this point, the United States

12    simply re-incorporates the argument set forth above. Any post-indictment effort by

13    Lacey to exert control over Backpage should be forbidden—the website poses a danger

14    to the community.

15    **D.**    **Potential Release Conditions**

16        Because Lacey poses a serious risk of flight, the remaining question is "whether any

17    condition or combination of conditions" authorized under the Act "will reasonably assure

18    the appearance of [Lacey] as required." 18 U.S.C. § 3142(f). The United States believes

19    that a package of suitable conditions could be crafted here. Those conditions should

20    include (1) relinquishing his passport, (2) travel restrictions, (3) electronic monitoring,

21    (4) a sizeable seven- or eight-figure bond, (5) providing a complete accounting of all

22    financial holdings, and (6) being precluded from engaging in any financial transactions

23    (except routine, day-to-day expenditures and mortgage payments on a primary

24    residence) without prior Court and government approval.

25        Courts have recognized that "there is much subjectivity in determining what amount

26    of bail will assure a defendant's appearance, and much of necessity must be left to the

27    discretion of the judicial officer who makes the initial determination." *See Wright, Leipold,*

28    *et al., Fed. Practice & Proc. Crim.* § 776 (4th ed. 2017 update). Congress has also provided

significant guidance. Under 18 U.S.C. § 3142(c)(1)(B), some of the statutorily-authorized conditions are third-party custody, restrictions on a defendant's associations and travel (including association with potential witnesses), periodic reporting, curfews, a bond with solvent sureties, and "any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community." The Act also contemplates a focus on the defendant's finances as a relevant consideration. 18 U.S.C. § 3142(g)(3)(A) (person's history and characteristics include "financial resources"); *id.* § 3142(c)(1)(B)(xi) and (xii) (authorizing release subject to financial conditions). For those reasons, courts have routinely determined that release conditions in white collar cases should require the posting of substantial cash or other assets, to be accompanied by a range of other restrictions (such as the surrender of passports and travel limitations). *See, e.g., United States v. Brooks*, 872 F.3d 78, 83-84 (2d Cir. 2017) ("The district court held a hearing and determined that Brooks was a flight risk on the basis of his considerable wealth and the potential for access to foreign accounts if he fled the country. . . . The district court issued a Bail Release Order . . . granting Brooks's motion for pre-trial release. The Order included such restrictions as home detention monitored by a private security firm, monitored conversations, independent auditing of bank accounts and assets, and a prohibition on liquid assets being held overseas without the approval of the U.S. Attorney's office. Brooks and his family sureties also provided $48 million in cash as security for the $400 million bond the court ordered."); *United States v. Dreier*, 596 F. Supp. 2d 831, 833 (S.D.N.Y. 2009) (release conditions included "(1) a $10 million personal recognizance bond that, while not secured by cash, will be co-signed by defendant's son, Spencer Dreier, and his mother, Mildred Dreier; (2) home detention, 24/7, in his East Side apartment, secured not only by electronic monitoring but by on-premises armed security guards, supplied by a company acceptable to the Government but paid for by the defendant's relatives; (3) elimination of computer access, surrender of all travel documents, and screening and searching of pre-approved visitors; (4) strict supervision by Pre–Trial Services; and (5) ongoing cooperation with the court-appointed Receiver in

- 9 -

1  identifying and preserving all assets held directly or indirectly by defendant").

2      Finally, to reduce the risk that Lacey may be endangering the community, the Court

3  should impose the following conditions: (1) Lacey shall not engage directly or indirectly

4  in the control or operation of Backpage or a similar website, and (2) Lacey shall not

5  participate in, consult with, or otherwise support any business venture that offers or

6  publishes adult content similar to that available on Backpage.

7      Respectfully submitted this 6th day of April 2018.

8                          ELIZABETH A. STRANGE
                           First Assistant United States Attorney
9                          District of Arizona

10                         JOHN P. CRONAN
                           Acting Assistant Attorney General
11                         Criminal Division, U.S. Department of Justice

12                         _Kevin Rapp / for_

13                         KEVIN M. RAPP
                           DOMINIC LANZA
14                         MARGARET PERLMETER
                           Assistant U.S. Attorneys

15                         REGINALD E. JONES
16                         Senior Trial Attorney
                           U.S. Department of Justice, Criminal Division
17                         Child Exploitation and Obscenity Section

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

```
____ / FILED      ____ LODGED
____ RECEIVED     ____ COPY

MAR 2 8 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ M DEPUTY
```

# SEALED

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-18-00422-PHX-SPL (BSB) |
| Plaintiff, | **INDICTMENT** |
| v. | VIO:  18 U.S.C. § 371 |
| | (Conspiracy) |
| 1. Michael Lacey | Count 1 |
| Counts 1-70, 81, 83-84, 86, 88-92 | |
| | 18 U.S.C. § 1952(a)(3)(A) |
| | (Travel Act—Facilitate Prostitution) |
| | Counts 2-51 |
| | |
| | 18 U.S.C. § 1956(h) |
| | (Conspiracy to Commit Money |
| | Laundering) |
| | Count 52 |
| | |
| | 18 U.S.C. § 1956(a)(1)(B)(i) |
| | (Concealment Money Laundering) |
| | Counts 53-62 |
| | |
| | 18 U.S.C. § 1956(a)(2)(A) |
| | (International Promotional Money |
| | Laundering) |
| | Counts 63-68 |
| | |
| | 18 U.S.C. § 1957(a) |
| | (Transactional Money Laundering) |
| | Counts 69-93 |
| Defendants. | |
| | 18 U.S.C. §§ 981, 982 |
| | 21 U.S.C. § 853, 28 U.S.C. § 2461 |
| | (Forfeiture Allegations) |

THE GRAND JURY CHARGES:

A.    <u>Introduction</u>

    1.    The website www.backpage.com ("Backpage") is notorious for being the

internet's leading source of prostitution advertisements.   Backpage derives the overwhelming majority of its revenue from such ads.   These practices have enabled Backpage to earn over $500 million in prostitution-related revenue since its inception.

2.   Backpage was created in 2004 by defendant MICHAEL LACEY

8.   The defendants identified above are referred to at times in this indictment as the "BACKPAGE DEFENDANTS."

9.   ´ As explained in detail below, the BACKPAGE DEFENDANTS have utilized a variety of strategies to make it appear that the prostitution ads appearing on Backpage are actually ads for "escort" services, "adult" companionship, dating, or other lawful activities.  For example, Backpage purports to bar customers from offering illegal services

- 2 -

1    and has periodically used computerized filters and human "moderators" to edit the wording

2    of (or block) ads that explicitly offer sexual services in return for money.

3    　　　　10.　　These strategies are a fiction designed to conceal the true nature of

4    Backpage's ads and customers.　Indeed, the BACKPAGE DEFENDANTS have

5    admitted—in internal company documents and during private meetings—that they know

6    the overwhelming majority of the website's ads involve prostitution.　In one internal

7    document, LACEY actually bragged about the company's contributions to the prostitution

8    industry: "Backpage is part of the solution.　Eliminating adult advertising will in no way

9    eliminate or even reduce the incidence of prostitution in this country. . . . For the very first

10   time, the oldest profession in the world has transparency, record keeping and safeguards."

11   　　　　11.　　Notwithstanding these private admissions, the BACKPAGE

12   DEFENDANTS have taken pains to mislead the public, regulators, and law enforcement

13   officials concerning the supposed sincerity of Backpage's efforts to prevent the publication

14   of prostitution-related ads.　For example,

15

16

17

18

19

20   　　　　　　　　　　　　　　　And in one internal document, Backpage's media strategy was

21   described simply as "Do not acknowledge the prostitution."

22   　　　　12.　　Many of the ads published on Backpage depicted children who were victims

23   of sex trafficking.　Once again, although Backpage has sought to create the perception that

24   it diligently attempts to prevent the publication of such ads, the reality is that Backpage has

25   allowed such ads to be published while declining—for financial reasons—to take necessary

26   steps to address the problem.　For example, for several years, Backpage's official policy,

27   when presented with an ad featuring the prostitution of a child, was to delete the particular

28

1    words in the ad denoting the child's age and then publish a revised version of the ad.  Such

2    editing, of course, did nothing to change the fact the ad featured the prostitution of a child—

3    it only created a veneer of deniability and helped Backpage's customers (*i.e.,* pimps

4    trafficking children) evade detection.

5         13.    Backpage has also contributed to the proliferation of ads featuring the

6    prostitution of children in other ways.  For example,

7

8

9

10

11

12

13

14

15

16

17                                               In another training document, moderators were instructed

18   not to send emergency alerts to NCMEC in response to complaints filed by the

19   grandparents and other extended family members of children being advertised on the

20   website: "Neice [sic], nephew, grandchild, cousin, etc. doesn't count."

21        14.    Virtually every dollar flowing into Backpage's coffers represents the

22   proceeds of illegal activity.  In fact, by 2015, the major credit card companies stopped

23   processing payments for Backpage and some banks closed Backpage's accounts out of

24   concern they were being used for illegal purposes.  In response, the BACKPAGE

25   DEFENDANTS have pursued an array of money laundering strategies.  These strategies

26   have included (a) instructing customers to send checks and money orders to particular Post

27   Office box, depositing those payments in bank accounts held in the name of entities with

28

1   no apparent connection to Backpage, and then giving customers a corresponding "credit"

2   on Backpage to purchase new ads, (b) wiring the proceeds of Backpage's business to bank

3   accounts held in foreign countries and then redistributing the funds to certain BACKPAGE

4   DEFENDANTS (as compensation) or redepositing the funds in bank accounts held in the

5   United States (to conceal the nature of those funds and promote Backpage's ongoing

6   operations), and (c) converting customer payments, and the proceeds of Backpage's

7   business, into and out of cryptocurrency.

8       15.    The BACKPAGE DEFENDANTS have also engaged in other financial

9   transactions designed to conceal their misconduct and evade seizure by law enforcement.

10   For example, in November 2016, LACEY asked employees of an Arizona-based bank for

11   advice on how to move his assets "offshore" to protect them from seizure by the

12   government.   Soon afterward, $16.5 million in Backpage-derived cash was wired from

13   LACEY's bank accounts in the United States to an overseas bank account in Hungary.

14       16.    For all of these reasons, the BACKPAGE DEFENDANTS are charged in this

15   indictment with the crimes of facilitating prostitution (18 U.S.C. § 1952), concealment,

16   transactional, and international promotional money laundering (18 U.S.C. §§ 1956 and

17   1957), and/or conspiracy to commit these offenses (18 U.S.C § 371 and 1956).

18   B.    Backpage's Origins, Ownership, and Control

19

20

21

22

23

24       18.    The publications within the VVMH newspaper chain routinely featured

25   illegal prostitution ads.   In fact, more than 30 years ago, a federal court affirmed the

26   conviction of the operator of a prostitution business (which masqueraded as a massage

27   parlor) for publishing ads in the classified section of the *Village Voice*. *See United States*

28

1   *v. Sigalow*, 812 F.2d 783 (2d Cir. 1987).  The conviction was for violating 18 U.S.C.

2   § 1952, one of the same crimes charged in this indictment.

3        19.   By 2000, the rise of the internet—and, in particular, the website

4   www.craigslist.com ("Craigslist"), which offered free classified ads—began to

5   significantly disrupt VVMH's business model, which depended on classified advertising

6   revenue for survival.

7        20.   LACEY ███████████████████████████ sought to address this

8   threat by creating Backpage.  Their decision to create Backpage was later described in an

9   internal company document as follows: "In 2004, in response to the Craigslist threat that

10  was decimating daily newspapers, VVM launched its own online classified site,

11  Backpage.com, named after the back page of VVM's print publication."

12       21.   During its first few years of operation, Backpage accounted for only a

13  fraction of VVMH's overall revenue.  In January 2006, for example, VVMH estimated that

14  Backpage supplied only 1% of its overall advertising revenue but also noted that Backpage

15  had "tremendous upside potential."

16       22.   This prediction proved prophetic.  By 2008, Backpage was generating over

17  $5 million in annual profit.  This annual profit figure increased to over $10 million in 2009.

18       23.   In 2010, Craiglist chose to shut down its "adult" section due to the prevalence

19  of ads for prostitution and other illegal services.  The BACKPAGE DEFENDANTS,

20  sensing an opportunity, made an aggressive push for Backpage to capture Craiglist's share

21  of this market. ██████████████████████████████ "Craigslist has folded . .

22  . . It is possible that this will mean a deluge of adult content ads for backpage.com . . . .

23  We have with the Village Voice probably the longest run of adult content advertising in

24  the US and it is, like it or not, in our DNA."

25       24.   This push was successful.  In internal documents, Backpage stated that it

26  experienced "explosive growth" by "capitalizing on displaced Craigslist ad volume."

27  Backpage's annual profits grew to over $26 million in 2010, over $52 million in 2011, and

28

1   over $78 million in 2012.

2       25.    These figures dwarfed the profits that VVMH's print publications were

3   generating.  In fact, Backpage became so profitable that the BACKPAGE DEFENDANTS

4   decided to get rid of VVMH's publishing business so they could focus on Backpage's

5   further development and expansion.  Accordingly, in or around November 2012, the

6   BACKPAGE DEFENDANTS spun off VVMH's print publications and began utilizing

7   several new corporate entities, including Medalist Holdings, Inc. ("Medalist"), Dartmoor

8   Holdings LLC ("Dartmoor"), and Camarillo Holdings, LLC ("Camarillo"), to serve as

9   Backpage's parent companies.

10       26.    Following these transactions, LACEY held an ownership interest in Medalist

11   (and, therefore, in Backpage) of approximately 45%,

12   

13   

14       27.    Backpage's annual profits continued to skyrocket during and after these

15   changes.  They grew to over $112 million in 2013 and over $134 million in 2014.

16   

17   

18   

19   

20   

21   

22   

23   

24   

25   

26   

27   

28

**C.   Backpage's Knowledge And Facilitation Of Prostitution Ads**

31.   By 2008, if not earlier, the BACKPAGE DEFENDANTS were aware that the overwhelming majority of the website's "adult" ads involved prostitution. Nevertheless, the BACKPAGE DEFENDANTS made a financial decision to continue displaying those ads.

32.   The BACKPAGE DEFENDANTS also sought to sanitize the ads by editing them—that is, by removing terms and pictures that were particularly indicative of prostitution and then publishing a revised version of the ad.  This process was sometimes referred to as "moderation."

- 8 -



39.     On September 21, 2010, a group of state attorneys general wrote a letter to Backpage.   This letter observed that "ads for prostitution—including ads trafficking

children—are rampant on the site" and argued that "[b]ecause Backpage cannot, or will not, adequately screen these ads, it should stop accepting them altogether." The letter acknowledged that this step would cause Backpage to "lose the considerable revenue generated by the adult services ads" but stated that "no amount of money can justify the scourge of illegal prostitution, and the misery of the women and children who will continue to be victimized, in the marketplace provided by backpage."

provided guidance on how to "moderate" ads. The first was a Powerpoint presentation that displayed a series of 38 nude and partially-nude photographs, some of which depicted graphic sex acts. Next to each picture was an instruction as to whether it should be

1   approved or disapproved by a Backpage moderator.  These instructions included "Approve.
2   Nude rear shots are okay as long the model is not exposing her anus or genitalia." and
3   "Approve.  Rear shot okay.  Transparent wet panties okay."  The second was an Excel
4   spreadsheet identifying 50 terms (all of which were indicative of prostitution) that should
5   be "stripped" from ads before publication.
6   "[I]t's the language in ads that's really killing us with the Attorneys General.  Images are
7   almost an afterthought to them."

- 11 -



During this meeting, LACEY asked which types of sex ads would be acceptable from NCMEC's perspective. When the NCMEC representative declined to say that any such ads would be acceptable, LACEY made a statement to the effect of "adult prostitution is none of your business."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20 "[The term] implies some exchange of bodily fluids which kills our

21 'companionship' argument, but i don't think we've ever really gotten in trouble for it."

22

23

24

25 The enclosed spreadsheet identified over 660 words or phrases that are

26 indicative of prostitution, including an array of terms that are suggestive of child

27 prostitution (*e.g.,* "lolita," "fresh," "high school," "tight," "young").  The spreadsheet

28

- 14 -



63.   In   March   2011,              LACEY,                          Backpage representatives met with representatives from NCMEC.  During this meeting, the Backpage representatives were again advised that a large portion of the ads on Backpage were blatant prostitution ads.  The Backpage representatives also were advised they could be criminally prosecuted under federal law for their conduct.



add "amber alert" to Backpage's "strip out" list. In other words, did not require all future ads involving this particular coded term for the prostitution of a child to be blocked from Backpage—they merely required such ads to be edited before publication.

1   identical email to ████████ LACEY, concerning the possibility of using age-

2   verification software.  In this email, ████████████████ might be beneficial

3   ("This might be our solution") but recommended against its wholesale adoption because it

4   would cost "79 to 99 cents per query" and would thus cut into Backpage's profits.

5        70.   On July 28, 2011, LACEY ████████ draft editorial entitled "BackPage

6   understood."  In this document, LACEY bragged about Backpage's contributions to the

7   prostitution industry:  "Backpage is part of the solution.  Eliminating our adult advertising

8   will in no way eliminate or even reduce the incidence of prostitution in this country. . . .

9   For the very first time, the oldest profession in the world has transparency, record keeping

10  and safeguards."  LACEY also acknowledged that Backpage used an automatic filter to

11  remove particular phrases from ads that were indicative of prostitution but still published

12  the ads after editing them.

13  ████████████████████████████████████████████

14  ████████████████████████████████████████████

15  ████████████████████████████████████████████

16  ████████████████████████████████████████████

17  ████████████████████████████████████████████

18       72.   On August 5, 2011, Backpage received a letter from the mayor of Seattle.

19  This letter warned that "Seattle Police have identified an alarming number of juvenile

20  prostitutes advertised on Backpage.com since January 2010" and explained that Backpage

21  was dissimilar from other companies whose products and services are "occasionally or

22  incidentally" utilized by criminals because "[y]our company is in the business of selling

23  sex ads" and "your services are a direct vehicle for prostitution."  The letter also

24  recommended that Backpage require in-person age verification for all of the "escorts"

25  depicted in its ads.  Afterward, Backpage declined to adopt these recommendations.

26  ████████████████████████████████████████████

27  version of Backpage's moderation guidelines.  This six-page document provided the

28

following instructions concerning photographs:  "Nude rear shots are okay as long the model is not exposing her anus or genitalia," "Transparent wet panties okay should not be able to see personal private part," and "cherry, Ice-cream keeping in mouth [is okay]."  The document also explained that "Bikini, lingerie, g-string, thong, and hands covering nipples are all allowed," "Hourly rates are OK," and "Sessions are okay. E.g $50 session."

74.   On August 31, 2011, Backpage received a letter from the National Association of Attorneys General.  This letter characterized Backpage as "a hub" for human trafficking, identified "more than 50 instances, in 22 states over three years, of charges filed against those trafficking or attempting to traffic minors on Backpage.com," and noted that "[n]early naked persons in provocative positions are pictured in nearly every adult services advertisement on Backpage.com and the site requires advertisements for escorts, and other similar 'services,' to include hourly rates.  It does not require forensic training to understand that these advertisements are for prostitution."

presentation.  Later, some of the BACKPAGE DEFENDANTS attended a meeting at which the presentation was discussed in more detail.  The presentation warned that Backpage's business practices would inevitably result in legal trouble ("One day the proverbial is going to hit the fan") and characterized Backpage's "media strategy" as "Do not acknowledge the prostitution."  The presentation also noted that the "ads on the backpage.com site" generally fall into three categories, one of which is "Pimps and Men Looking for Kids."



Backpage should limit the number of child-exploitation referrals it was making to NCMEC: "If we don't want to blow past 500 this month, we shouldn't be doing more than 16 a day."

83.     On April 7, 2012, ███████████████████████ contacted Backpage to report that one of the "escorts" depicted on the site was only 17 years old. The woman provided the juvenile's full name and birth year and further stated that the juvenile had been attempting to recruit the complaining party's daughter (who was 15). In response, ██████████████████ refuse to remove the ad because "she's isn't claiming her own daughter is in the ad."

84.     On April 8, 2012, LACEY sent an email ██████████████████████ ██ I believe in legalized prostitution" and stating that Backpage's efforts to prevent the prostitution of children on the site were "not perfect, by any means."

85.     On April 25, 2012, a Backpage representative spoke at a meeting of the New York City Council's Women's Issues Committee.  During this meeting, the representative stated it was better to have ads for sex work appear on Backpage than have them move to other places on the internet.  The representative further stated: "I don't deny that Backpage is part of the problem, but the problem is the internet."

86.     On April 27, 2012, a woman wrote an email to Backpage's support department stating that her underage daughter had been kidnapped, drugged, and was being advertised as a prostitute against her will.  The email identified the specific phone number

1    associated with the ads (754-229-xxxx), stated that the ads appeared on a website called
2    BackpagePics.com, and asked that the ads be removed immediately: "This is a drugged
3    and held against her will child who had photos taken under threat and duress . . . . Please
4    remove." This email ███████████████████████████████████ who asked "should
5    we respond?" ██████████████████████████████████ because the website
6    BackpagePics.com wasn't owned by Backpage, there was no need to respond to the
7    mother.

8        87.    On April 30, 2012 (three days later), the same woman wrote another email
9    to Backpage's support department. In this email, the woman stated that "I have contacted
10   backpage on several occassions [sic] to remove these pictures which were posted against
11   her will and while she was drugged and held captive. I have yet to receive a reply." This
12   time, the woman provided a link to her daughter's ad on Backpage (not
13   BackpagePics.com), which included the same phone number (754-229-xxxx) that had been
14   included in the other ad.

15       88.    On May 1, 2012 (the next day), the same woman wrote a third email to
16   Backpage's support department. In this email, the woman included a link to another ad on
17   Backpage depicting her underage daughter and stated: "I also found a pix of my daughter
18   within this url both girls are in protective custody." Later that day, the woman received an
19   email from Backpage's support department stating: "The post is confirmed removed."

20       89.    Some of these emails were forwarded to LACEY ███████████████████
21   ███████ applauded Backpage's "good solid response" to the woman and remarked: "this
22   whole rigamarole seems a little odd to me."

23       90.    On May 10, 2012, the television news station CNN ran an expose on
24   Backpage that emphasized "how young some of these girls look" and deemed the website
25   "a hub for the sex trade."

26   ████████████████████████████████████████████████████████████████████
27   employees entitled "forbidden planet." Enclosed with the email was an Excel spreadsheet

28

                                           - 21 -

that identified over 600 words and phrases that are indicative of prostitution.  The spreadsheet also specified, for each word and phrase, whether an ad containing the offending language should be banned or whether Backpage should simply "strip term from ad" and then publish it after the revision.

93.    In or around November 2012, a researcher at Arizona State University published a study concluding that most of the ads on Backpage's Phoenix page involved prostitution and that many of the ads depicted juvenile trafficking victims.  On December 19, 2012, LACEY was forwarded a copy of the study's results.  The researcher responsible for the study also met with a Backpage representative to propose various mechanisms for reducing or eliminating the prostitution of children on the website.  Backpage declined to adopt these proposals.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

•      Following these exchanges, between October 2012 and November 2015, the same customer was allowed to post over a dozen new ads on Backpage, many of which utilized the same identifying information, coded prostitution terms, and contact phone number as before.

96.      On June 6, 2013, Backpage received a letter from NCMEC recommending the adoption of several specific security measures to prevent the trafficking of children. The recommended security measures included (a) verifying the age and identity of users who submitted adult ads, (b) verifying the age and identity of individuals depicted in photographs within adult ads, (c) prohibiting the use of anonymous payment sources such

- 24 -

1   as prepaid credit cards, and (d) requiring users to utilize verified email addresses and

2   telephone numbers.    Afterward, Backpage declined to follow any of these

3   recommendations.

4   ████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████

9        98.    On September 11, 2013, a Backpage representative made a presentation to

10   the Arizona Governor's Task Force on Human Trafficking.  Following this presentation

11   (which took place in Phoenix), the representative was asked whether there would be any

12   "cons" to requiring verifiable identification of all escorts being advertised on Backpage's

13   website.  In response, the representative did not identify any financial or logistical hurdles

14   to the adoption of such a requirement.   Instead, the representative stated that such a

15   requirement would simply cause Backpage to lose business to other prostitution websites

16   like myRedBook.com or to overseas prostitution websites.  During this meeting, members

17   of the task force also provided the representative with evidence showing that Backpage's

18   moderation efforts were ineffective at preventing the publication of prostitution ads.

19   ████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████

21   stated that "[w]e have multiple user accounts that are paying for your services for what I

22   understand to be prostitution advertisements" and sought information about "how you are

23   processing these transactions."

24   ████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████

26   █████████████████████████████  This email stated that Backpage had been the

27   beneficiary of "[m]igration of content from other . . . marketplaces to the internet" and

28

1  identified one particular marketplace as a key source of Backpage's customers: "[N]et loss
2  for brick and mortar marketplaces: Strip clubs, hotels, and gathering spots displaced by the
3  internet." In other words, the email acknowledged that the supposed "escorts" advertising
4  on Backpage were actually prostitutes (lawful escorts did not congregate at strip clubs,
5  hotels, and other brick-and-mortar "gathering spots" during the pre-internet age). This
6  email also attributed Backpage's success in part to its adoption of policies that allowed
7  customers to post ads without leaving any meaningful identifying information—in a list of
8  Backpage's advantageous policies, it identified "Anonymous," "Prepaid card friendly,"
9  "User can post paid ads without a valid email address," and "bitcoin."

10
11
12
13

14      102.   On September 4, 2014, Backpage was served with a brief that had been filed
15  by NCMEC in a lawsuit in Washington state court. In this brief, NCMEC criticized the
16  sincerity of Backpage's efforts to prevent child sex trafficking: "Backpage has repeatedly
17  claimed in public statements and court filings that it is working to reduce child sex
18  trafficking on its website. The unpleasant reality is that Backpage publicizes carefully
19  selected operational processes as a subterfuge to avoid increased scrutiny, while providing
20  traffickers with easy access to an online venue to sell children for sex. In practice,
21  Backpage's stated interest in doing something meaningful to stop child sex trafficking ads
22  on its site is apparently overridden by the enormous revenue it generates from its escort
23  ads, including ads selling children for sex."

24      103.   On March 17, 2015, a law enforcement officer with the California
25  Department of Justice spoke with a Backpage representative concerning the prevalence of
26  blatant prostitution ads on Backpage. In response, the representative did not dispute the
27  officer's characterization and said the internet and prostitution were not going away.

28

104.   On July 30, 2015, a document entitled "trainingJuly2015" was distributed to Backpage's moderators. This training manual specifically told moderators that, if they saw a photograph depicting "a person [who] looks young/minor," they should "approve dont delete the ad unless it has a banned term." The training manual also identified, under the heading "THESE ARE ALL OKAY," a long list of terms that are indicative of prostitution, such as "99% CUM BACK FOR MORE," "car service," and "lollipop special."

105.   In or around August 2015, as part of a lawsuit in Illinois, Backpage was served with an affidavit from a detective employed by the Seattle Police Department. In this affidavit, the detective avowed that "[t]o date, no Detective within the Seattle Police Department's Vice/High Risk Victims Unit has ever found a legitimate 'escort' (person who charges simply for companionship with no offer of sex) or 'masseuse' (person offering legitimate and licensed massage therapy rather than sex) while responding to ads placed in these categories on Backpage.com" and that "every time the Seattle Police Department's Vice/High Risk Victims Unit has responded to an ad in the adult section of Backpage.com, we have found that the ad was a posting for illegal activity."

106.   In or around August 2015, during the same lawsuit in Illinois, Backpage was served with a different affidavit from a detective employed by the Boston Police Department. In this affidavit, the detective avowed that "Backpage.com is the number one site in Boston for prostitution and sex trafficking," that his unit had "[s]ince 2010 . . . arrested over 100 buyers of sex of both adults and minors through Backpage.com ads," and that "nearly all the cases we find associated with it [Backpage] involve pimp controlled prostitution."

108.   On December 9, 2015, Backpage received an email from a reporter stating that "[o]f the 359 sex trafficking incidents Toronto Police have been involved in since

- 27 -

2013, every single girl that was rescued was advertised on Backpage." The email also

asked: "Why hasn't Backpage closed down the adult escort ads portion of its site like

Craigslist when it's known that underage girls are being exploited via Backpage?"

110.    Beginning in or around January 2016, Backpage's moderators were

instructed to stop removing ads that contained the phrase "GFE." For example, on January

28, 2016, ████████████████████ Backpage moderator explaining that "As far

as I am aware we are no longer removing ads for GFE." Similarly, on March 9, 2016, a

Backpage moderator sent an email to his coworkers explaining that ████████████████

and I talked about the GFE thing, going forward we will not be removing ads for GFE"

and clarifying "this includes even gfe with price." And again, on March 25, 2016, an email

was sent to Backpage's moderation staff stating that "We are no longer removing ads for

'GFE' or 'PSE.'"

111.    In fact, the BACKPAGE DEFENDANTS repeatedly acknowledged that the

term "GFE" (girlfriend experience) is a coded term for prostitution. For example:

•    On October 26, 2010, ████████████████████████████

████████████████ "No coded sex act for money: GFE, PSE, BBBJ, DATY, etc."

•    On May 4, 2011, ████████████████████████████ identifying

GFE as a "code word" that should be forbidden.

•    On August 31, 2011, ████████████████████████████

discussed a list of 100 "solid sex for money terms." The list included "GFE = girlfriend

experience."

•    On November 2, 2011, ████████████████████████████ from a

co-worker identifying GFE in a list of "sex phrases and coded terms" that are "not

- 28 -

1   allowed."

2       112. &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;   BACKPAGE DEFENDANTS periodically

3   received a "Google alert" when articles discussing Backpage appeared in the news. Many

4   of the news articles identified in these alerts discuss instances in which prostitutes who had

5   been advertised on Backpage were kidnapped, raped, or murdered.

6       113.   In January 2017, after conducting a lengthy investigation, the Senate

7   Subcommittee on Permanent Investigations ("Subcommittee") issued a 50-page report

8   entitled "Backpage.com's Knowing Facilitation of Online Sex Trafficking." This report

9   concluded, among other things, that virtually all of Backpage's "adult" ads are actually

10  solicitations for illegal prostitution services and that "Backpage has maintained a practice

11  of altering ads before publication by deleting words, phrases, and images indicative of

12  criminality, including child sex trafficking . . . . Those practices served to sanitize the

13  content of innumerable advertisements for illegal transactions—even as Backpage

14  represented to the public and the courts that it merely hosted content others had created."

15      114.   In response to the Subcommittee's report, Backpage purported to shut down

16  the "adult" section of its website. However, the prostitution ads simply migrated to other

17  sections of the website, where they remain to this day.

18  D.   Internationai Operations

19      115.   In addition to facilitating prostitution through its U.S. website, Backpage has

20  also facilitated prostitution through its websites in foreign countries. In this context,

21  Backpage often affirmatively creates the content of the illegal prostitution ads being

22  published.

23      116.   Around 2013 or 2014, Backpage hired a Philippines-based company

24  (Company B) in an attempt to increase the profitability of Backpage's international

25  operations. Company B's employees were instructed to (1) visit rival prostitution websites

26  in other countries, (2) obtain the email addresses of prostitutes who were posting ads on

27  those websites (often by falsely posing as prospective customers), (3) use the information

28

- 29 -

from the other website to create a competing prostitution ad on Backpage (a process referred to internally as "preboarding"), and then (4) transmit the new ad to the prostitute, often using the previously-harvested email account information, in an attempt to persuade the prostitute to become a Backpage customer. Company B's employees were paid bonuses based on the amount of ad revenue they generated for Backpage using these techniques.

117.   Backpage's executives were fully aware of the plan to use Company B to create prostitution ads outside the United States. For example, on or around November 6,

████████████████████████████████████████████████████████████████████

████████   One of the plans was to use the Philippines as a "test" market and hire Filipino contractors to "contact by email leads, secure email address, add ad and email address in [computer system] and assign to American staff. American staff makes contact."

118.   ████████████████████████████   stating that Company B was "an efficient and cost effective way for us to bring new users to backpage." This email also contained the following summary of how Company B would operate: "Process after hiring company offering BPO services: 1. Backpage provides BPO with sites, categories & countries to target. Backpage also provides sample 'scripts' and examples of phone calls. 2. BPO contacts users via phone from sites backpage provided, obtains user email address & permission to preboard ad. 3. BPO preboards ad as public user. 4. After ad is preboarded, users receive verification link to verify the ad." This email also stated that Backpage would offer a "bonus per verified authenticated ad."

119.   On April 10, 2015, a "five-year business plan" ████████████████ ████████████████   One of the goals for 2015 was "Off shore marketing staff in the Philippines to grow to 166 and main task is international market content acquisition."

████████████████████████████████████████████████████████████████████

120.    On May 15, 2015, a Company B employee posing as a Backpage employee sent an email to an apparent prostitute.  The subject line was "Offering Free Advertisement from Backpage.com" and the text of the email sought to persuade the prostitute to "upgrade your ad with sponsor placement or automatic repost."  In response, the prostitute wrote back that she had "managed to activate my ad and could buy credits as well. thanks for your help.  I'm traveling today to [London] how can I change my location."  This email exchange was later ███████████████████████ "[I]deal scenario for [Company B] agent – user activates ad, user purchases credit."

ad that had an IP address associated with Company B.  This email contained the following description of Company B's process for creating and selling prostitution ads on Backpage: (1) "Staff found lead in assigned area."  (2)  "Staff entered all relevant into [database] (phone/email/etc.)"  (3)  "Staff called lead to discuss creation of free ad"  (4)  Staff created free ad for lead (verification email sent).  (5)  Staff followed under with an email reminding lead of phone conversation and detailing verification of ad."

E.      Select Victim Summaries

122.    Between in or around 2009 and 2013, Victim 1 was sold for sex, through the use of Backpage ads, in Ohio, Indiana, and Georgia.  Victim 1's Backpage ads often included words and phrases that were indicative of prostitution, such as "roses" (money).  On at least one occasion, Victim 1 contacted Backpage after a proposed ad had been rejected because it contained banned words and phrases.  In response, a Backpage representative coached Victim 1 on how to re-write the ad using different words.  Victim 1's trafficker took all of the money that was earned through her acts of prostitution.

123.    Between in or around 2009 and 2011, Victim 2 was sold for sex, through the

1   use of Backpage ads, in Arizona, Georgia, North Carolina, Texas, New York, New Jersey,

2   and Louisiana. Victim 2's trafficker drafted her Backpage ads and Victim 2 initially did

3   not know she was being offered on Backpage. The ads contained words and phrases to

4   make customers believe Victim 2 was "barely legal" and also contained words and phrases

5   indicative of prostitution, such as "roses" (money).

6       124.   Between in or around 2009 and 2012, Victim 3 was sold for sex, through the

7   use of Backpage ads, in Colorado and North Dakota. Victim 3's pimp instructed her to

8   review existing prostitution ads on Backpage to learn how to draft her own ads. During a

9   portion of this period, Victim 3 was required by her pimp to make week-long trips to North

10  Dakota to work as a prostitute. During these trips, which would generate as much as $2,000

11  in prostitution-derived revenue each day, Victim 3 was forced to leave her children at home

12  in the care of her pimp.

13      125.   In or around 2010, Victim 4 was sold for sex, through the use of Backpage

14  ads, in Washington. During this period, Victim 4 was a juvenile (15 years old). Victim

15  4's pimp drafted the ads that were placed on Backpage. The wording of these ads was

16  edited by Backpage before publication. The ads contained words and phrases such as

17  "W'E'L'L_W'O'R'T'H_I'T***^***150HR" and "IT WONT TAKE LONG AT ALL"

18  and included pictures of Victim 4 in provocative positions showing her breasts and

19  buttocks.

20      126.   Between in or around 2011 and 2016, Victim 5 was sold for sex, through the

21  use of Backpage ads, in Massachusetts and Rhode Island. During much of this period,

22  Victim 5 was a juvenile (14-19 years old). Victim 5's female pimp instructed Victim 5

23  that Backpage was the safest place to advertise because it did not require age verification.

24  On one occasion, Backpage declined to accept a proposed ad that indicated Victim 5 was

25  only 17 years old. In response, the ad was simply resubmitted with a new (false) age of

26  19. On other occasions, Backpage removed provocative pictures of Victim 5 from ads and

27  then allowed edited versions of the ads to be published. Victim 5's Backpage ads included

28

- 32 -

1    words and phrases that were indicative of prostitution, such as "roses" (money) and "back

2    door" (anal sex).  Some of the customers who responded Victim 5's Backpage ads forced

3    Victim 5 to perform sexual acts at gun point, choked her to the point of having seizures,

4    and gang-raped her.

5         127.   In or around June 2012, Victim 6 was sold for sex, through the use of

6    Backpage ads, in Arizona.  Her traffickers utilized Backpage ads that did not offer a

7    specific person but instead generally offered a woman with a particular type of hair color

8    and build.  On June 22, 2012, Victim 6 was dispatched to a customer who had responded

9    to a Backpage ad featuring "Nadia," who was described as a slender brunette woman.

10   Upon her arrival at the location, Victim 6 was stabbed to death.

11        128.   Between in or around 2012 and 2015, Victim 7 was sold for sex, through the

12   use of Backpage ads, in Washington and Oregon.  Victim 7's pimp drafted the ads that

13   were placed on Backpage.  The wording of these ads was edited by Backpage before

14   publication.  The ads contained provocative nude pictures of Victim 7.

15        129.   Between in or around 2013 and 2014, Victim 8 was sold for sex, through the

16   use of Backpage ads, in Maine, Connecticut, and Massachusetts.  During this period,

17   Victim 8 was a juvenile (15 years old).  Victim 8's uncle, as well as his friends, placed the

18   ads on Backpage, which included words and phrases that were indicative of prostitution,

19   such as "roses" (money), "fetish friendly," and 150 for 1/2 hour, 200 for full hour.

20   Through these ads, Victim 8 was forced to do "in-calls" (where she was raped in hotels) as

21   well as "out-calls" (where she was raped at other locations chosen by the men paying for

22   her).

23        130.   In or around 2013, Victim 9 was sold for sex, through the use of Backpage

24   ads, in Florida.  Victim 9's pimp taught her how to use code words in her Backpage ads to

25   indicate how much she was charging for certain sex acts.  Victim 9 was brutally attacked

26   by her trafficker, causing bruises and a fractured cheek bone.

27        131.   Between in or around 2014 and 2015, Victim 10 was sold for sex, through

28

the use of Backpage ads, in California and Arizona. During some of this period, Victim 10 was a juvenile (17 years old). An associate of Victim 10's pimp took pictures of her and drafted the ads that were placed on Backpage. The Backpage ads contained words and phrases such as "NEW IN TOWN," "sexy sweet," and "sweet like honey but super hot like fire" and included pictures of Victim 10 in provocative positions showing her legs, stomach, shoulder, and buttocks.

132.   Between in or around 2014 and 2015, Victim 11 was sold for sex, through the use of Backpage ads, in Arizona, Colorado, Minnesota, Oregon, California, Montana, Nevada, New Mexico, and Utah. The Backpage ads contained words and phrases indicative of prostitution and included pictures of Victim 11 in provocative positions. On some occasions, Backpage would remove certain explicit photos from the ads but publish the remaining text and other photos. Victim 11's trafficker gave her drugs, took her identification documents, sexually assaulted her with a firearm, and forced her to work full-time as a prostitute.

133.   In or around 2015, Victim 12 was sold for sex, through the use of Backpage ads, in California and Arizona. Victim 12 was first advertised on Backpage in San Bernardino, California, but moved to the Phoenix metro area because the Super Bowl was being held there. Victim 12's advertisements on Backpage contained words and phrases such as "New In Town" and "Sexy Dark Asian Bombshell with a Nice & Tight {Booty}" and included pictures showing Victim 12's legs, stomach, shoulders and buttocks.

134.   In or around 2015, Victim 13 was sold for sex, through the use of Backpage ads, in California. During this period, Victim 13 was a juvenile (15 years old). Victim 13 and her trafficker both posted the Backpage ads, which falsely represented that Victim 13 was 19 years old and showed pictures of her face and body. On at least one occasion, a Backpage representative contacted Victim 13 with instructions on how to fix an ad so it could be published.

135.   In or around June 2015, Victim 14 was sold for sex, through the use of a

- 34 -

Backpage ad, in Texas. This ad contained words and phrases such as "fun, young, exotic," "Ready to be your fantasy girl," "OUT CALLS ONLY," and "NO BLACK MEN" and included pictures of Victim 14's stomach, breasts, shoulders, and buttocks. On or around June 20, 2015, Victim 14 was murdered by a customer. Afterward, the customer attempted to destroy Victim 14's corpse by lighting it on fire. Victim 14's father later contacted Backpage to request that the ads showing his deceased daughter be removed. Backpage did not immediately comply with this request.

136.   In or around June 2015, Victim 15 was sold for sex, through the use of Backpage ads, in Texas and Louisiana. These ads contained words and phrases such as "Thick Glass of Chocolate Milk Looking for a GoodTime!!!" and "sexy certified freak" and contained pictures showing Victim 15's legs, shoulders and buttocks. On June 10, 2015, Victim 15 was forced into a vehicle with her trafficker, who was attempting to take her to Texas against her will. In an attempt to escape, Victim 15 jumped out of the vehicle onto Interstate 10 and was killed after being hit by several vehicles at high speeds.

137.   In or around July and August 2015, Victim 16 was sold for sex, through the use of Backpage ads, in Michigan. These ads contained words and phrases such as "OUTCALLS ONLY," "Juicy Caramel Lady On Duty," "Sexy, Erotic Caramel Dream," and "No Thugs, Pimps Or Weirdos" and contained pictures showing Victim 16's breasts, legs, lips, buttocks, and face. On August 15, 2015, Victim 16 was murdered by a customer. Afterward, the customer dumped her corpse in a park.

138.   Between in or around 2015 and 2016, Victim 17 was sold for sex, through the use of Backpage ads, in Arizona and California. Victim 17 averaged ten customers a day during this time and turned over all of her prostitution earnings (approximately $1,500 per day) to her pimp. An associate of Victim 17's pimp took pictures of her and drafted the ads that were placed on Backpage. The Backpage ads contained words and phrases such as "IN/CALLS ONLY," "I'm here to make your wildest fantasies come true!" and "Sorry, but NO BLACK MEN" and included pictures of Victim 17's buttocks and face.

F.     Money Laundering Activities

139.   Backpage's customers have overwhelmingly used the proceeds of criminal activity (*i.e.,* money earned from pimping and prostitution) when purchasing ads on Backpage.  In addition, because Backpage's publication of such ads is an independent crime (*e.g.,* violation of 18 U.S.C. § 1952), the fees it collects from customers posting prostitution ads—estimated at more than $500 million since 2004—constitute the proceeds of unlawful activity.

140.   For these and other reasons, banks and financial institutions have repeatedly refused to do business with Backpage.  In response, the BACKPAGE DEFENDANTS have pursued a variety of money laundering strategies.  For example, ██████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████ proposed, as a "solution" to the problem, that Backpage reconfigure its website to fool credit card companies into believing the charges were being incurred on a different website.

████████████████████████████████████████████████████████████████████████ ██████████████████████ discussed strategies for fooling credit card companies into believing that Backpage-associated charges were being incurred on different websites, including a proposal to set up shell companies without any apparent connection to Backpage ("create new companies with new principals") and use their bank accounts to accept payment. Another "solution" was to "allow users to fund an account thru several other sites" that "have no adult or images."

██████████████████████████████████████████████████████ an email entitled "Options for the future of Backpage."  This email discussed various strategies for creating new entities to process Backpage-related payments "without ever disclosing ties

- 36 -

1   to Backpage."

9   144.   Notwithstanding these strategies, the three major credit card companies

10   stopped doing business with Backpage. On or about April 30, 2015, Backpage learned that

11   American Express would no longer allow its cards to be used for any purchases in

12   Backpage's adult section. In or around July 2015, Backpage learned that Mastercard would

13   no longer allow its cards to be used for Backpage-related transactions. When discussing

14   this decision, MasterCard stated that it "has rules that prohibit our cards from being used

15   for illegal activities." Around the same time, Backpage learned that Visa would no longer

16   allow its cards to be used for Backpage-related transactions.   When discussing this

17   decision, Visa stated that its "rules prohibit our network from being used for illegal

18   activity."

19   145.   Similarly, some banks closed accounts that were held by Backpage (or

20   Backpage-related entities) out of concern the accounts were being used for illegal purposes.

24   146.   Backpage responded to these developments in several ways. One was to

25   encourage customers to send checks and money orders to a Post Office box held in the

26   name of a seemingly-unrelated entity called Posting Solutions LLC ("Posting Solutions")

27   and give such customers a corresponding credit on Backpage. For example, on July 31,

147.   The following episode provides an example of how the Posting Solutions payment process worked.  On October 16, 2015, Backpage received an email from a customer complaining about her inability to pay for ads using a credit card.  In response, a Backpage representative explained ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ that "[i]f you would like to pay for upgrades or buy credits, we suggest posting with alternative payment methods such as Bitcoin.  If you are in the United States, you can also pay by check or money order.  Please make payable to 'Posting Solutions.'  WE CAN ONLY ACCEPT CHECKS OR MONEY ORDERS MADE OUT TO 'POSTING SOLUTIONS.'  Posting Solutions. Attn: Accounts. P.O. Box 192307. Dallas, TX 75219.  Please send through the United States Postal Service.  FedEx, UPS, or other mail delivery alternatives cannot deliver to a P.O. Box.  When sending your payment please be sure to include your email address.  Please do not make your payments out to backpage.com as we will no longer be able to accept them."

148.   Between around September 2015 and June 2016, over $7.1 million of checks and money orders sent by Backpage customers were deposited in bank accounts held by Posting Solutions.

149.   Backpage also utilized a different entity, called Website Technologies, LLC ("Website Technologies"), to process Backpage-related funds and took steps to make it appear that Backpage and Website Technologies were independent entities.  For example,

150.    In many instances, Backpage-related money that was initially deposited into accounts held by Posting Solutions was later transmitted to accounts held by Website Technologies.  For example:

151.    In addition to receiving millions of dollars from Posting Solutions, the Website Technologies accounts also served as the repository for millions of dollars of wires from international bank accounts controlled by Backpage-associated entities.  For example, between January 2015 and December 2016, Website Technologies accounts received over $45.4 million in wire transfers from Backpage-associated bank accounts in Liechtenstein, over $30.1 million in wire transfers from Backpage-associated bank accounts in Iceland,

1   and over $3.9 million in wire transfers from Backpage-associated bank accounts in the

2   Netherlands.

3       152.   In many instances, the next stage of the money-laundering process was for

4   money to be wired from Website Technologies accounts to bank accounts held by a

5   different entity called Cereus Properties LLC ("Cereus Properties").   The authorized

6   signers on the Cereus Properties accounts included ███████████████   Between

7   around December 2015 and October 2016, Website Technologies accounts sent wire

8   transfers totaling over $47 million to accounts held by Cereus Properties.

9       153.   Accounts held by Cereus Properties also received money directly from

10   international bank accounts controlled by Backpage-associated entities.   For example,

11   between around August 2016 and November 2016, Cereus Properties accounts received

12   over $11.3 million in deposits and wire transfers from Backpage-associated accounts in the

13   Netherlands.

14       154.   After money reached Cereus Properties, large portions of it were funneled

15   back to Backpage or to certain BACKPAGE DEFENDANTS.   For example, between

16   January 2016 and January 2017, LACEY (and LACEY's family members) received

17   distributions totaling over $30.3 million ████████████████████████████

18   ████████████████████

19       155.   Backpage also furthered its money laundering efforts through the use of

20   bitcoin processing companies.   Over time, Backpage utilized companies such as CoinBase,

21   GoCoin, Paxful, Kraken, and Crypto Capital to receive payments from customers and/or

22   route money through the accounts of related companies.

23       156.   Backpage also furthered its money laundering efforts by developing ways for

24   customers to purchase ads using gift cards issued by third-party vendors.   This process was

25   described in a July 23, 2015, email exchange between various Backpage employees on

26   ███████████████████████████   This exchange included the following:   "[W]hat if

27   we used a customers [sic] payment method, say visa prepaid card, to buy [bitcoin] from

28

our seller account . . . giving said bitcoin to our catch-all wallet elsewhere (instead of to user), simultaneously adding credits/purchasing paid ad or upsells?   From the user's perspective they just input their prepaid card and get their credits or purchase."

## COUNT 1

### (Conspiracy)

157.   The factual allegations in Paragraphs 1-156 are incorporated by reference and re-alleged as though fully set forth herein.

158.   Beginning in or around 2004, and continuing through the present, in the District of Arizona and elsewhere, ████████████████████████████████ ████████████████████ and others known and unknown to the grand jury, knowingly and intentionally agreed, confederated, and conspired with each other, and with others known and unknown to the grand jury, to commit the following offenses against the United States:

a.   18 U.S.C. § 1952(a)(3)(A) (Travel Act—Facilitate Prostitution).

### OBJECT OF THE CONSPIRACY

159.   The object of the conspiracy was to obtain money.

### MANNER AND MEANS OF THE CONSPIRACY

160.   The manner and means of the conspiracy are described in paragraphs 1-156 above, incorporated by reference and re-alleged as though fully set forth herein.

### OVERT ACTS

161.   Overt acts were committed in furtherance of the conspiracy, including but not limited to those described in paragraphs 1-156 above, incorporated by reference and re-alleged as though fully set forth herein.

In violation of 18 U.S.C. § 371.

- 41 -

## COUNTS 2-51

### (Travel Act—Facilitate Prostitution)

162.   The factual allegations in Paragraphs 1-161 are incorporated by reference and re-alleged as though fully set forth herein.

163.   On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the District of Arizona and elsewhere, ███████████ ████████████████████████████████████ and others known and unknown to the grand jury, used the mail and any facility in interstate and foreign commerce with intent to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit: prostitution offenses in violation of the laws of the State in which they are committed and of the United States, including but not limited to Title 13, Arizona Revised Statutes, Section 13-3214, and thereafter performed and attempted to perform an act that did promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of the unlawful activity, as follows:

| Count | Date | Description |
|---|---|---|
| 2. | Sept. 10, 2013 | Publish ad depicting Victim 5 entitled "Get freaky Tuesday . . Come spend ur day with us – 19," with accompanying text "Doin incalls and outcalls" |
| 3. | Jan. 27, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 4. | Jan. 29, 2014 | Publish ad depicting Victim 8 entitled "Puerto Rican mami in walpole area INCALLS –19" after deleting one picture from the originally-submitted ad |
| 5. | Jan. 31, 2014 | Publish ad depicting Victim 8 entitled "Exotic latina, south portland area, ready to play, INCALLS, 30 min specials!!! – |

| | | 19" after deleting one picture from the originally-submitted ad |
|---|---|---|
| 6. | Feb. 6, 2014 | Publish ad involving P.R. entitled "75 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 7. | Apr. 20, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 8. | May 7, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 9. | May 31, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 10. | July 1, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 11. | Aug. 19, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 12. | Nov. 23, 2014 | Publish ad depicting Victim 10 entitled "New in Town Super Hot Skinny Mixed Cuban Girl With Long Black Hair – 18" after deleting picture from originally-submitted ad |
| 13. | Jan. 29, 2015 | Publish ad depicting Victim 12 entitled "New in Town Sexy Dark Asain Bombshell with a Nice & Tight {Booty} – 23" after deleting one picture from the originally-submitted ad |
| 14. | Jan. 31, 2015 | Publish ad depicting Victim 10 entitled "NEW IN TOWN sexy sweet European mixed Cuban California girl – 21" |
| 15. | Jan. 31, 2015 | Publish ad depicting Victim 12 entitled "New in Town Sexy Dark Asian mixed Bombshell – 23" after deleting one picture from the originally-submitted ad |
| 16. | Feb. 4, 2015 | Publish ad depicting Victim 11 entitled "Upscale Independent BRUNETTE BOMBSHELL 5-Star Fantasy – 26," after |

- 43 -

| | | deleting pictures from originally-submitted ad |
|---|---|---|
| 17. | Feb. 18, 2015 | Publish ad depicting Victim 11 entitled "Alexis Foxx the HOTTEST in town!!!!! – 26," after deleting six pictures from the originally-submitted ad |
| 18. | Feb. 26, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 19. | May 18, 2015 | Publish ad depicting Victim 15 entitled "GORGEOUS ebony PLAYMATE Perfect Curves…Skills to make ur TOES CURL – 19," after removing one picture of originally-submitted ad, with accompanying text "you agree . . . you are not affiliated with any law enforcement agency" and "Incalls & Outcall!!!" |
| 20. | May 19, 2015 | Publish ad depicting Victim 15 entitled "Hot & Driping Submissive Ebony Playmates – 20," after removing one picture of originally-submitted ad, with accompanying text "you agree . . . you are not affiliated with any law enforcement agency" and "We're ready to please and accommodate all of your needs and wants!!  With a mouth that'll ROCK your [] and a [picture of cat] that'll leave you purring for more" |
| 21. | July 1, 2015 | Publish ad depicting Victim 17 entitled "AbSoLuTeLy AmAziNg CoMe PLaY WiTh Me #1 MoST WaNtEd SwEeT SEXii PlAymate – 20," with accompanying text "By contacting me you agree that you are not affiliated with any form of law enforcement," PERFECT & Will satisfy your every need," and "IN/CALLS – ONLY" |
| 22. | July 2, 2015 | Publish ad depicting Victim 17 entitled "SeXy!! Exotic playmate Call me! the girl you NEED to See! – 20," with |

| | | |
|---|---|---|
| | | accompanying text "I DO NOT OFFER 40$, 50$, 60$ SPECIALS" and "IN/CALLS – ONLY" |
| 23. | Aug. 13, 2015 | Publish ad depicting Victim 13 entitled "Young SEXY PUERTO RICAN – 19," which accompanying text "I do half hour sessions that vary in donation prices, 80 for head, 120 for hooking up without head and 150 for hooking up with head" |
| 24. | Aug. 15, 2015 | Publish ad depicting Victim 16 entitled "Outcalls Now Freaky Curvy Caramel Lady OUTCALLS NOW – 23" |
| 25. | Sept. 13, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 26. | Nov. 28, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 27. | Apr. 21, 2016 | Publish ad entitled "Finally!! PSE & GFE – Kimber Rae and MIA Marie Together BOOK NOW" |
| 28. | Nov. 3, 2016 | Publish ad entitled "GFEE New – 18" |
| 29. | Nov. 11, 2016 | Publish ad entitled "Mind blowing Tiffany. Incall in Taunton – 37," with accompanying text "Soft GFE . . . Im real and reviewed" |
| 30. | Nov. 14, 2016 | Publish ad entitled "Top Model 2016 Special 'Best Looking Young Asian' . . . – 22," with accompanying text "Sexy Asian Girl Incall Service" and "GFE" |
| 31. | Nov. 14, 2016 | Publish ad entitled "Sometimes It's All About The Journey, And The Destination…..Erectile Dysfunctional G F E Provider – 44," with accompanying test "You can find a few current reviews at T3R xxxxxx#" and "I have been EROS authenticated" |

| 32. | Nov. 19, 2016 | Publish ad entitled "The True (G)irl (F)riend (E)xperience… Visiting November 27th Sunday ~ PRE-BOOKING SPECIAL ~ - 100," with accompanying text "Let's blur restrictions between financial transaction & Romantic Connection" |
| 33. | Nov. 24, 2016 | Publish ad entitled "Top Asian Grand Opening 100% Young 100% Sexy  . . . – 23," with accompanying text "BEST INCALL IN TOWN!" and "GFE" |
| 34. | Nov. 26, 2016 | Publish ad entitled "I LOVE MEN!! I'm a GFE. OutCall and Incall with exception on the Incall!! – 42" |
| 35. | Dec. 20, 2016 | Publish ad entitled "OMG   Sexy Sensual 36DD-24-36 Stacked College Coed With The Best Mouth Ever! BOOK NOW! -24," with accompanying text "I do ALL the things YOU Wish Your Wife Did!!" and "(G).(F).(E) 30 min/$180" |
| 36. | Jan. 15, 2017 | Publish   ad   entitled   "Real   &   Reviewed   Girlfriend Theonesweet.weebly.com – 30," with accompanying text "250 G F E" |
| 37. | Apr. 4, 2017 | Publish ad entitled "KISSING & GFE KOREAN GIRLS – 20" |
| 38. | Apr. 11, 2017 | Publish ad entitled "Pettit Sexy #Corey# 4407239339 – 39," with accompanying text "complete GFE experience" |
| 39. | July 3, 2017 | Publish ad entitled "WANNA HANG OUT NOW UpScale New In Town! Call ME now for an unforgettable visit – 20," with accompanying text "100% GFE with 100% no Pimps" |
| 40. | July 15, 2017 | Publish ad entitled "Ready for some fun daddy? This is your chance too have a amazing time - 21," with accompanying text "Slim body, nice tits, freaky, GFE" |

- 46 -

| 41. | July 15, 2017 | Publish ad entitled "New in town BiGBubble Booty SWEETLiPS HOT BODY – 24," with "GFE" in accompanying text |
|---|---|---|
| 42. | July 21, 2017 | Publish ad entitled "Pettit Sexy #Corey# 4407239339 – 30," with accompanying text "complete GFE experience" |
| 43. | July 23, 2017 | Publish ad entitled "ASIAN GODDESS young – 20," with accompanying text "100% Discreet service" and "#GFE" |
| 44. | Jan. 26, 2018 | Publish ad entitled "GFE Service Available!   Private Encounters w/ Pampering Beauty" |
| 45. | Jan. 30, 2018 | Publish ad entitled "241 & white plans area Carfun Perfect Treat   Available No Rush," with "Sweet Sexy GFE" in accompanying text |
| 46. | Jan. 30, 2018 | Publish ad entitled "GFE REAL HOT Sweet DREAM AMAZING BEST RELAX" |
| 47. | Jan. 30, 2018 | Publish ad entitled "Tall, Slim & Sexy Luxe Goddess * NARCISA * Sensual Body Rub + Fetish Sessions," with accompanying text "gfe Hh: $160 H: $220" |
| 48. | Jan. 31, 2018 | Publish ad entitled "Exotic Asian Beauty," with accompanying text "I am an independent GFE with excellent massage skills" |
| 49. | Feb. 1, 2018 | Publish ad entitled "Nuru (Best GFE ever) incall only" |
| 50. | Feb. 6, 2018 | Publish ad entitled "Tuesday with Ashleigh. Available now," with "GFE" in accompanying text |
| 51. | Feb. 6, 2018 | Publish ad entitled "GFE   Kisskisspop 100% Real Photo Choice 9Asian girl Nurunude" |

In violation of 18 U.S.C. § 1952(a)(3)(A) and (b)(1)(i).

## COUNT 52

### (Conspiracy To Commit Money Laundering)

164.    The factual allegations in Paragraphs 1-163 are incorporated by reference and re-alleged as though fully set forth herein.

165.    Beginning in or around 2004, and continuing through the present, in the District of Arizona and elsewhere, ███████████████████████████████ ███ and others known and unknown to the grand jury, knowingly and intentionally agreed, confederated, and conspired with each other, and with others known and unknown to the grand jury, to commit the following offenses against the United States:

        a.    18 U.S.C. § 1956(a)(1)(A)(i) (Promotional Money Laundering)

        b.    18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering)

        c.    18 U.S.C. § 1956(a)(2)(A) (Int'l Promotional Money Laundering)

        d.    18 U.S.C. § 1956(a)(2)(B)(i) (Int'l Concealment Money Laundering)

        e.    18 U.S.C. § 1597 (Transactional Money Laundering)

In violation of 18 U.S.C. § 1956(h).

## COUNTS 53-62

### (Concealment Money Laundering)

166.    The factual allegations in Paragraphs 1-165 are incorporated by reference and re-alleged as though fully set forth herein.

167.    On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the District of Arizona and elsewhere, ████████████ ████████████████████████ and others known and unknown to the grand jury, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified

- 48 -

unlawful activity, as follows:

| Count | Date | Amount | Description | |
|-------|------|--------|-------------|---|
| 53. | May 18, 2016 | $1,476,505.00 | Website Technologies (x2008) | to Cereus Properties (x6211) |
| 54. | May 18, 2016 | $264,438.00 | Website Technologies (x2008) | to Cereus Properties (x6211) |
| 55. | May 31, 2016 | $3,171,675.80 | Website Technologies (x2008) | to Cereus Properties (x6211) |
| 56. | May 31, 2016 | $432,961.87 | Website Technologies (x2008) | to Cereus Properties (x6211) |
| 57. | June 20, 2016 | $842,878.00 | Website Technologies (x2008) | to Cereus Properties (x6211) |
| 58. | June 30, 2016 | $3,076,147.75 | Website Technologies (x2008) | to Cereus Properties (x6211) |
| 59. | July 27, 2016 | $3,252,681.62 | Website Technologies (x2008) | to Cereus Properties (x6211) |
| 60. | July 27, 2016 | $438,818.86 | Website Technologies (x2008) | to Cereus Properties (x6211) |
| 61. | Aug. 16, 2016 | $804,250.00 | Website Technologies (x2008) | to Cereus Properties (x6211) |
| 62. | Aug. 31, 2016 | $3,171,264.42 | Website Technologies (x2008) | to Cereus Properties (x6211) |

In violation of 18 U.S.C. § 1956(a)(1)(B)(i).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNTS 63-68

### (International Promotional Money Laundering)

168.   The factual allegations in Paragraphs 1-167 are incorporated by reference and re-alleged as though fully set forth herein.

169.   On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the District of Arizona and elsewhere, █████████ ████████████████████████████ and others known and unknown to the grand jury, transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, as follows:

| **Count** | **Date** | **Amount** | **Description** |
|---|---|---|---|
| 63. | Mar. 4, 2014 | $6,450.00 | U.S. Bank (x1165) to S.B. (web developer in India) |
| 64. | Aug. 5, 2016 | $5,005,732.86 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 65. | Sept, 22, 2016 | $2,916,955.00 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 66. | Oct. 3, 2016 | $354,050.84 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 67. | Nov. 2, 2016 | $2,726,170.00 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 68. | Nov. 15, 2016 | $351,403.54 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |

In violation of 18 U.S.C. § 1956(a)(2)(A).

- 50 -

## COUNTS 69-93

### (Transactional Money Laundering)

170.   The factual allegations in Paragraphs 1-169 are incorporated by reference and re-alleged as though fully set forth herein.

171.   On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the United States and in the District of Arizona and elsewhere, the specified defendant, and others known and unknown to the grand jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, as follows:

| Count | Defendant | Date | Amount | Description |
|-------|-----------|------|--------|-------------|
| 69. | LACEY, ██████ | Aug. 21, 2013 | $30,000.00 | Bank of America (x1793) to Stewart Title (partial payment for Sedona property) |
| 70. | LACEY, ██████ | Sept. 13, 2013 | $62,491.47 | BMO Harris to Stewart Title (partial payment for Sedona property) |
| ██████ | ██████ | ██████ | $300,000.00 | ██████ |
| | | | $200,000.00 | |
| | | | $1,000,000.00 | |
| | | | $250,000.00 | |
| | | | $50,000.00 | |

| | | | | |
|---|---|---|---|---|
| | | | $300,000.00 | |
| | | | $200,000.00 | |
| | | | $133,045.00 | |
| | | | $101,974.00 | |
| | | | $1,507.944.00 | |
| 81. | LACEY, ████ | Mar. 1, 2016 | $1,692,020.00 | Cereus Properties (x6211) to Bank of America (x5554) |
| 83. | LACEY, ████ | June 27, 2016 | $397,9500.00 | Arizona Bank & Trust (x1793) to Fidelity Title (partial payment for San Francisco property) |
| 84. | LACEY, ████ | July 20, 2016 | $12,859,152.57 | Arizona Bank & Trust (x1793) to Fidelity Title (partial payment for San Francisco property) |
| 86. | LACEY, ████ | Aug. 2, 2016 | $16,243.00 | Cereus Properties (x6211) to Wells Fargo (x0495) |

| | | | | |
|---|---|---|---|---|
| ████████████████████████████████████████████ | | | | |
| 88. | LACEY, ██████ | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1967) |
| 89. | LACEY, ██████ | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1972) |
| 90. | LACEY, ██████ | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1986) |
| 91. | LACEY, ██████ | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1991) |
| 92. | LACEY, ██████ | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x2014) |
| ████████████████████████████████████████████ | | | | |

In violation of 18 U.S.C. § 1957.

1

## FORFEITURE ALLEGATION ONE

2 [18 U.S.C. 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

3       1.      Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is

4 hereby given that the United States will seek forfeiture as part of any sentence, pursuant to

5 Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code,

6 Section 2461(c), in the event of any defendant's conviction under Counts 1 through 51 of

7 this Indictment. Each defendant so convicted shall forfeit to the United States the

8 following:

9       a.      All right, title, and interest in any and all property, real or personal,

10 constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of

11 the offense. Such property includes, but is not limited to, the real property located at the

12 following addresses:



23 Such property also includes, but is not limited to, funds held in the following bank

24 accounts:

- 54 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   Such property further includes, but is not limited to, the following domain names:

24       i.     atlantabackpage.com

25       ii.    backpage.be

26       iii.   backpage.com

27       iv.    backpage.com.br

28

| | | |
|---|---|---|
| 1 | v. | backpage.cz |
| 2 | vi. | backpage.dk |
| 3 | vii. | backpage.ee |
| 4 | viii. | backpage.es |
| 5 | ix. | backpage.fi |
| 6 | x. | backpage.fr |
| 7 | xi. | backpage.gr |
| 8 | xii. | backpage.hu |
| 9 | xiii. | backpage.ie |
| 10 | xiv. | backpage.it |
| 11 | xv. | backpage.lt |
| 12 | xvi. | backpage.mx |
| 13 | xvii. | backpage.net |
| 14 | xviii. | backpage.no |
| 15 | xix. | backpage.pl |
| 16 | xx. | backpage.pt |
| 17 | xxi. | backpage.ro |
| 18 | xxii. | backpage.si |
| 19 | xxiii. | backpage.sk |
| 20 | xxiv. | backpage.us |
| 21 | xxv. | backpage-insider.com |
| 22 | xxvi. | bestofbackpage.com |
| 23 | xxvii. | bestofbigcity.com |
| 24 | xxviii. | bigcity.com |
| 25 | xxix. | chicagobackpage.com |
| 26 | xxx. | denverbackpage.com |
| 27 | xxxi. | newyorkbackpage.com |
| 28 | | |

1   xxxii.    phoenixbackpage.com

2   xxxiii.   sandiegobackpage.com

3   xxxiv.    seattlebackpage.com

4   xxxv.     tampabackpage.com

5           b.      To the extent such property is not available for forfeiture, a sum of

6   money equal to the total value of the property described in subparagraph (a).

7           2.      Pursuant to Title 21, United States Code, Section 853(p), as incorporated by

8   Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute

9   property, up to the total value of the property described in the preceding paragraph if, as

10  the result of any act or omission of the defendant, the property described in the preceding

11  paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence;

12  (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond

13  the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been

14  commingled with other property that cannot be divided without difficulty.

15                          **FORFEITURE ALLEGATION TWO**

16                              [18 U.S.C. § 982(a)(1)]

17          1.      Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is

18  hereby given that the United States will seek forfeiture as part of any sentence, pursuant

19  Title 18, United States Code, Section 982(a)(1), in the event of any defendant's conviction

20  under Counts 52 through 93 of this Indictment.  Each defendant so convicted shall forfeit

21  to the United States the following:

22          a.      All right, title, and interest in any and all property, real or personal,

23  involved in or traceable to any transaction set forth in Counts 52 through 93 of this

24  Indictment.  Such property includes, but is not limited to, the real property located at the

25  following addresses:

26

27

28

- 57 -

1
2
3
4
5
6
7
8
9

Such property also includes, but is not limited to, funds held in the following bank

10

accounts:

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

Such property further includes, but is not limited to, the following domain names:

11

12       i.      atlantabackpage.com

13       ii.     backpage.be

14       iii.    backpage.com

15       iv.     backpage.com.br

16       v.      backpage.cz

17       vi.     backpage.dk

18       vii.    backpage.ee

19       viii.   backpage.es

20       ix.     backpage.fi

21       x.      backpage.fr

22       xi.     backpage.gr

23       xii.    backpage.hu

24       xiii.   backpage.ie

25       xiv.    backpage.it

26       xv.     backpage.lt

27       xvi.    backpage.mx

28

xvii.     backpage.net

xviii.    backpage.no

xix.      backpage.pl

xx.       backpage.pt

xxi.      backpage.ro

xxii.     backpage.si

xxiii.    backpage.sk

xxiv.     backpage.us

xxv.      backpage-insider.com

xxvi.     bestofbackpage.com

xxvii.    bestofbigcity.com

xxviii.   bigcity.com

xxix.     chicagobackpage.com

xxx.      denverbackpage.com

xxxi.     newyorkbackpage.com

xxxii.    phoenixbackpage.com

xxxiii.   sandiegobackpage.com

xxxiv.    seattlebackpage.com

xxxv.     tampabackpage.com

      b.     To the extent such property is not available for forfeiture, a sum of money equal to the total value of such property.

      2.     Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), each defendant convicted under Counts 52 through 93 of this Indictment shall forfeit substitute property, if, by any act or omission of that defendant, the property described in the preceding paragraph, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or

1    deposited with a third party; has been placed beyond the jurisdiction of the court; has been

2    substantially diminished in value; or has been commingled with other property that cannot

3    be divided without difficulty.

4                                            A TRUE BILL

5                                            ████████████████████████

6                                            FOREPERSON OF THE GRAND JURY

7                                            Date:  March 28, 2018

8    ELIZABETH A. STRANGE

9    First Assistant United States Attorney
     District of Arizona

10   JOHN P. CRONAN

11   Acting Assistant Attorney General
     Criminal Division, U.S. Department of Justice

12   ████████████████████████████████

13   KEVIN M. RAPP

14   DOMINIC LANZA
     MARGARET PERLMETER

15   JOHN J. KUCERA
     Assistant U.S. Attorneys

16   REGINALD E. JONES

17   Senior Trial Attorney
     U.S. Department of Justice, Criminal Division

18   Child Exploitation and Obscenity Section

19

20

21

22

23

24

25

26

27

28

                                        - 61 -