1   PAUL J. CAMBRIA, JR. (NY 15873, admitted *pro hac vice*)
2   LIPSITZ GREEN SCIME CAMBRIA LLP
    42 Delaware Avenue, Suite 120
3   Buffalo, New York 14202
    Telephone: (716) 849-1333
4   Facsimile:   (716) 855-1580
5   pcambria@lglaw.com

6   James C. Grant (WA 14358, *pro hac vice* application pending)
7   DAVIS WRIGHT TREMAINE LLP
    1201 Third Avenue, Suite 2200
8   Seattle, Washington 98101
    Telephone:  (206)622-3150
9   Facsimile: (206)757-7700
10  Email:  jamesgrant@dwt.com

11  Robert Corn-Revere (DC 375415, *pro hac vice* application pending)
12  DAVIS WRIGHT TREMAINE LLP
    1919 Pennsylvania Ave., NW, Suite 800
13  Washington, D.C. 20006
    Telephone:  (202)973-4200
14  Facsimile:  (202)973-4499
15  Email:  bobcornrevere@dwt.com

16  Attorneys for Defendant
17  MICHAEL LACEY

18                  **UNITED STATES DISTRICT COURT**

19                  **FOR THE DISTRICT OF ARIZONA**

20
    | UNITED STATES OF AMERICA, | CASE NO.   CR-18-00422-PHX-SPL (BSB) |
21  | | |
    |              Plaintiff, | **DEFENDANT MICHAEL LACEY'S** |
22  |         vs. | **OPPOSITION TO THE GOVERNMENT'S** |
    | | **MOTION FOR PRETRIAL DETENTION** |
23  | MICHAEL LACEY, *et al.*, | |
24  | | *FILED UNDER SEAL* |
    |              Defendants. | |
25
26
27
28

1

# **TABLE OF CONTENTS**

2

3    I.    INTRODUCTION ................................................................. 2

4    II.    FACTS ................................................................................. 6

5        A.    Mr. Lacey's Background. ............................................... 6

6        B.    The Charged Offenses. .................................................. 7

7        C.    Mr. Lacey's Criminal History. ...................................... 8

8        D.    Pretrial Services Recommends Release on Recognizance……..……………9

9    III.    ARGUMENTS………………………………………………………...9

10        A.    Under the governing constitutional and statutory framework, pre-trial

11            release is the norm and not the exception…………………………………9

12        B.    This Court should deny the government's motion for detention……………10

13            1. Pretrial Services has recommended release on recognizance…………...10

14            2. It is unlikely that this prosecution will proceed to trial, much less, result in

15                any convictions…………………………………………………...……...11

16            3. Mr. Lacey presents no risk of flight………………………………..……12

17            4. Mr. Lacey's release would pose no danger to the public………………...13

18    IV.    PROPOSED CONDITIONS FOR PRETRIAL RELEASE.................................... 15

19    V.    CONCLUSION ...................................................................... 15

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page**

3

<u>Cases</u>

4

*Adult Video Ass'n v. Reno*,
    41 F.3d 503 (9th Cir. 1994) ...................................................................................... 3

5

*Backpage.com, LLC v. Cooper*,
    939 F. Supp. 2d 805 (M.D. Tenn. 2013) ............................................................ 4, 11

6

*Backpage.com, LLC v. Dart*,
    807 F. 3d 229 (7th Cir. 2015) ............................................................................ 4, 11

7

*Backpage.com, LLC v. Hoffman*,
    2013 WL 4502097 (D.N.J. Aug. 20, 2013) ....................................................... 4, 11

8

9

*Backpage.com, LLC v. McKenna*,
    881 F. Supp. 2d 1262 (W.D. Wash. 2012) ........................................................ 4, 11

10

*Cohen v. Bd. Of Supervisors*,
    707 P. 2d 840 (Cal 1985)........................................................................................ 11

11

12

*Ctr. For Democracy & Tech v. Pappert*,
    337 F. Supp. 2d 606 (E.D. Pa. 2004).................................................................... 3

13

*Dart v. Craigslist, Inc.,*
    665 F. Supp. 2d 961 (N.D. Ill. 2009).................................................................. 4, 11

14

15

*Doe v. Backpage.com, LLC*,
    817 F.3d 12 (1st Cir. 2016) .................................................................................... 3

16

*Doe ex rel. Roe v. Backpage.com LLC*,
    104 F.Supp.3d 139 (D. Mass. 2015).................................................................... 11

17

18

*Doe v. GTE Corp*,
    347 F.3d 655 (7th Cir. 2003) ............................................................................... 11

19

*Fort Wayne Books, Inc. v. Indiana*
    489 U.S. 46 (1989) ................................................................................................ 3

20

21

*Grand Jury Subpoenas to Backpage.com, LLC and Village Voice Media Holdings, LLC*
    No. GJ12-172RAJ (W.D. Wash. Jan 17, 2013)................................................... 11

22

*Jane Doe No. 1 v. Backpage.com LLC*,
    817 F.32d 12 (1st Cir. 2016) ............................................................................... 11

23

24

*Lacey v. Maricopa County*,
    693 F.3d 896 (9th Cir. 2012) ............................................................................. 2, 8

25

*M.A. v. Willage Voice Media Holdings, LLC*,
    809 F. Supp. 2d 961 (N.D. I11. 2009).............................................................. 4, 11

26

27

*People v. Ferrer*,
    No. 16FE024013 (Cal. Super. Ct. Aug 23, 2017) ............................................... 11

28

*United States v. Bobrow,*
    468 F.2d 124 (D.C. Cir. 1951)................................................................ 10

*United States v. Gentry,*
    455 F. Supp. 2d 1018, 1020 (D. Ariz. 2006) ........................................ 9

*United States v. Hir,*
    517 F.3d 1081 (9th Cir. 2008) ............................................................ 9

*United States v. Hoover,*
    2014 U.S. Dist. LEXIS 69735 (D. Ariz. May 20, 2014) ................ 10, 13

*United States v. Motamedi,*
    767 F.2d 1403 (9th Cir. 1985) ........................................................ 9, 10

*United States v. Peeples,*
    630 F.3d 1136 (9th Cir. 2010) .......................................................... 14

*United States v Rueb,*
612 F. Supp. 2d 1068 (D. Neb. 2009).................................................. 13

*United States v. Salerno,*
    481 U.S. 739 (1987) ........................................................................ 9

*United States v. Townsend,*
    897 F.2d 989 (9th Cir. 1990) .......................................................... 9

Codes

18 U.S.C.
    § 371, 1952(a)(3)(A) .................................................................... 7

    § 371, 1956(h) ............................................................................ 7

    § 1956(a)(1)(B)(i) ........................................................................ 7

    § 1956(a)(2)(A) ............................................................................ 7

    § 1957(a) .................................................................................... 7

    § 3141 ........................................................................................ 9

    § 3142(e)(1) ................................................................................ 9

    § 3142(f)(2)(B) .......................................................................... 10

    § 3142(g) .................................................................................. 10

    § 3142(g)(3)(A) .......................................................................... 12

    § 3142(g)(3)(B)........................................................................... 14

iv

1

2 **I.     INTRODUCTION**

3          Michael Lacey is an honored journalist who has been a socially and politically

4 engaged citizen of Arizona for 48 years.  As the editor-in-chief of a chain of alternative

5 weekly newspapers, Mr. Lacey won numerous national awards for his investigative

6 journalism and reporting about social issues, while reporters at the papers won hundreds of

7 awards, including the Pulitzer Prize. In this capacity, and because of his willingness to

8 fight tough First Amendment battles, Mr. Lacey has been no stranger to government

9 overreach and utter disregard of constitutional limits.  *See Lacey v. Maricopa County*, 693

10 F.3d 896 (9th Cir. 2012) (retaliatory arrest for coverage of sheriff's activities is

11 unconstitutional).  The arrest for which the United States now seeks Mr. Lacey's detention

12 likewise flies in the face of numerous First Amendment rulings, none of which were

13 mentioned in the government's pleadings to this Court.

14          The government's failure to apprise this Court of the precarious constitutional basis

15 for its detention request begins with its principal rationale for seeking detention:  ***It claims***

16 ***Mr. Lacey represents a danger to the community because of his connection to a website***

17 ***which he sold in 2015 and which the government closed on April 6, 2018.***   The

18 government argues that Mr. Lacey was "one of the masterminds behind Backpage.com, the

19 internet's most notorious destination for prostitution advertisements," and that despite the

20 fact that he sold his ownership in the company in 2015, it believes Mr. Lacey "appears to

21 have retained some vestiges of operational control over the company." (Gov't Mot. for

22 Detention at 2, 8.)  This is the sum total of the government's claim that Mr. Lacey's release

23 would pose some danger to the community, despite the fact that, at the same time it was

24 arresting Mr. Lacey (and others), it was in the process of seizing domains and closing

25 down the Backpage.com website, the second-largest classified advertising site after

26 Craigslist.  Immediately after the arrests, the government completed its seizure of the

27 website, and notice of the government's seizure was displayed on the website.  (*See*

28 Seizure Notice, attached as Ex. A.)

2

The fact the government removed its own main reason for requesting detention is remarkable, as is its failure to mention it to the Court.  But even more remarkable is its disregard of basic First Amendment principles in pursuing this course.   For more than five decades it has been the law that the government cannot seize or bar distribution of expressive materials until after an adversary hearing and judicial finding that the materials can be suppressed.  *See, e.g.*, *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 62-65 (1989); *accord Adult Video Ass'n. v. Reno*, 41 F.3d 503 (9th Cir. 1994) (authorization of pretrial forfeitures of constitutionally-protected materials in the federal RICO statute "is unconstitutional on its face").  Such constitutional concerns are even more pronounced in the context of Internet communications, where the speech of millions of users is subjected to prior restraint.  *Ctr. for Democracy & Tech. v. Pappert*, 337 F. Supp. 2d 606, 655-68 (E.D. Pa. 2004) (probable cause is not a sufficient basis for blocking a website).  But concern for constitutional limits has not been apparent in the government's pursuit of Mr. Lacey.[1]

The entire thrust of the prosecution, and the asserted basis for Mr. Lacey's detention, is the claim that operators of the Backpage.com website facilitated prostitution by permitting third parties to post ads in sections "synonymous with prostitution," including "adult" and "escorts" categories.  As the Indictment sets forth, such claims have been made against Backpage.com (and other sites, like Craigslist) for the past decade. What it does not mention, however, is that the government's underlying assumptions have

---

[1]   Mr. Lacey was arrested on a sealed indictment and to date has been provided a redacted copy that fails to provide full details of the basis for his arrest.  Yet, at the same time, the government's representatives have been holding press briefings and selectively releasing details to the public.  *See*, *e.g.*, http://www.fox10phoenix.com/news/arizona-news/backpagecom-shut-down-by-federal-agents (last visited Apr. 9, 2018).

been repeatedly litigated, and in each case, rejected on First Amendment grounds.[2]   Case in point:   The Indictment alleges that in 2015 "major credit card companies stopped processing payments for Backpage" (Indict. ¶ 14), but neglects to mention that the card companies had acted in response to a coercive campaign by Sheriff Thomas Dart of Cook County, Illinois that the Seventh Circuit later described as an effort to "crush Backpage" that it enjoined as a "quintessential first-amendment violation." *Backpage.com, LLC v. Dart*, 807 F.3d 229-30, 235 (7th Cir. 2015) (citation omitted).

   Mr. Lacey is confident the current indictment will meet the same fate, and his detention in the meantime cannot be justified.   This would be true even if the government's actions had not been tainted by unconstitutional actions.   Pretrial Services recommended that Mr. Lacey be released on personal recognizance subject to certain conditions.   The government has said nothing that supports the continued pretrial detention of Mr. Lacey, and has sought conditions of release that are more restrictive than necessary to assure his

---

[2]   *See, e.g.*, *Doe v. Backpage.com LLC*, 104 S Supp. 3d 149, 156-157 (D. Mass. 2015), *aff'd*, 817 F.3d 12 (1st Cir. 2016) ("The existence of an escorts section in a classified ad service, whatever its social merits, is not illegal.");   *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1282 (W.D. Wash. 2012) (escort ads have long been permitted and escort services are licensed and regulated in many states);   *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 833-34 (M.D. Tenn. 2013) (ads on Backpage.com are protected speech under the First Amendment); *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097 *9-11 (D.N.J. Aug. 20, 2013)   (rejecting that argument escort ads on the website are unprotected speech);   *M.A. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1049-50 (E.D. Mo. 2011).   *See also Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 968 (N.D. Ill. 2009) ("We disagree . . . that the 'adult services' section is a special case.   The phrase 'adult,' even in conjunction with 'services,' is not unlawful in itself nor does it necessarily call for unlawful content."); *Cohen v. Bd. of Supervisors*, 707 P.2d 840, 852 (Cal. 1985) ("An escort service may very well involve lawful activities relating to sex.") (internal quotation marks omitted).

4

appearance and the safety of the community.  Indeed, contrary to the position taken at Mr. Lacey's initial appearance before this Court, the government has admitted in its motion that conditions exist for Mr. Lacey's release, which could – and should – have been resolved immediately.

Mr. Lacey poses no flight risk or danger to the public with respect to the Indictment.  He has been aware of the investigation in this case for some time and he not only has not fled, but offered, through counsel, to surrender himself at such time and place as directed by the United States Attorney's Office.  The government rejected that offer, choosing instead to proceed with a wholly unnecessary public arrest.  At age 69, Mr. Lacey has no significant criminal history, has never lived abroad, owns considerable real estate in the greater Phoenix area, and has close relationships with his two adult sons who were raised in Arizona.  He has performed successfully on bond in all prior (and ultimately dismissed) cases against him, and is currently in full compliance with his bond conditions in a California state case based on analogous facts to those charged in the instant indictment.  In relation to that case, he surrendered his passport to the Superior Court in Sacramento as part of his bond package.

With due consideration to the requirements of the Bail Reform Act, Mr. Lacey suggests that he be released as recommended on his recognizance on the conditions recommended by Pretrial Services as those conditions are sufficient, but not more restrictive than necessary to assure his appearance and the safety of the community.

## II.     FACTS

### A.     Mr. Lacey's Background.

In 1967, Mr. Lacey moved to Phoenix, Arizona to attend Arizona State University ("ASU").  In 1970, Mr. Lacey and fellow ASU alumni started the *Phoenix New Times*, a weekly newspaper addressing local and national issues, as an alternative to the coverage offered by the mainstream media.  By 2005, the *New Times* was the largest chain of alt-weekly papers in the country – 17 papers with 1.8 million readers operating under the banner of Village Voice Media Holdings, LLC ("VVM").  Mr. Lacey served as the editor-in-chief of the VVM papers until 2012, receiving numerous awards for his journalistic contributions.[3]

In 2004, VVM launched a free classified ad website, Backpage.com ("Backpage"), to counter Craigslist.org, which had largely destroyed newspaper classified advertising. The Backpage website included ad categories typically found in newspapers (*e.g.*, real estate, jobs, buy/sell/trade, rentals), as well as categories for the types of ads displayed in the classified ads of alt-weekly publications, such as personals and "adult" ads (*e.g.*, ads for dating, massage, escorts).[4]  Until the government's seizure of the website, third-party users posted millions of ads to Backpage each month. Users provided all of the content for their ads through an automated interface. Backpage did not dictate or require any content,

---

[3]    For example, Mr. Lacey won the 2011 Clarion Award from the Association for Women in Communications for his story about a diabetic woman who died in jail custody ("What's Mom Worth?," Phoenix New Times Dec. 9, 2010), and he led a VVM series on immigration called "Amongst Us," which won the 2011 James Aronson Award for Social Justice Journalism.  In 2010, Mr. Lacey was awarded first place in the Best of the West competition's Immigration and Minority Affairs reporting category for his collaborative work on the series "Are Your Papers in Order?"  In 2008, Mr. Lacey was honored with the Valley of the Sun Society of Professional Journalists' President's Award for "remarkable efforts in defense of the First Amendment and all Arizona media."

[4]    Craigslist offered similar categories in its "Erotic Services" section, until it shuttered the section in 2010 in response to attacks of government officials.

although it did block and remove content that violated the website's rules or that may be improper.   In January 2017, Backpage terminated all of its "adult" advertisement categories.

Mr. Lacey served as editor-in-chief of VVM until 2012, when VVM sold its interests in the papers to a group of longtime company executives. In May 2015, VVM sold its remaining interests (including all interests in Backpage) to a company headed by Backpage's CEO, Carl Ferrer.   Mr. Lacey has held no ownership interests in Backpage since then.

Mr. Lacey has been an active member of the Phoenix community and has engaged in numerous philanthropic endeavors, as recognized by various community leaders.

**B.**    **The Charged Offenses.**

Mr. Lacey and other unidentified defendants, are charged with one count of conspiracy to facilitate Travel Act – prostitution in violation of 18 U.S.C. §§ 371, 1952(a)(3)(A), separate counts of Travel Act – facilitation of prostitution in violation of 18 U.S.C. § 1952(a)(3)(A), conspiracy to commit money laundering in violation of 18 U.S.C. §§ 371, 1956(h), separate counts of concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), international promotional money laundering in violation of 18 U.S.C. § 1956(a)(2)(A), and transactional money laundering in violation of 18 U.S.C. § 1957(a).

The common foundation to each of these charges is that Mr. Lacey, who previously had a partial ownership interest in the website operated by Backpage, should be held criminally liable for the content of advertisements posted to the website by third-party users.  Critically, it is not alleged that Mr. Lacey or his codefendants had any contact, of any type, with any of the individuals who posted ads by third-party users to the website. More importantly, the indictment's description of Mr. Lacey's conduct reveals that Mr. Lacey was not personally involved in reviewing, posting, or taking payment for any of the alleged advertisements at issue in this case.  Consequently, Mr. Lacey had no contact with

any of the people who placed the advertisements, much less the individuals who allegedly provided the advertised services.

### C.   Mr. Lacey's Criminal History.

Mr. Lacey is 69 years old and has never been charged with a crime of violence. With the exception of one conviction for driving while under the influence, the Pretrial Services Report indicates that Mr. Lacey has no other criminal convictions, federal or state.

Mr. Lacey has, however, been the target of baseless prosecutions by state and federal law enforcement offices.  For example, in 2007, Mr. Lacey and Mr. Larkin were charged in the Maricopa County Court with several felonies related to their publication of unlawful grand jury subpoenas from the Maricopa County Sheriff's investigation of the *New Times*.  The charges stemmed from unfavorable coverage of the Sheriff's Department by the *New Times*.  Within days of Mr. Lacey's arrest, the prosecution dropped all charges. Mr. Lacey and Mr. Larkin then sued Maricopa County and the Sheriff for false arrest and violation of their constitutional rights, which resulted in Mr. Lacey and Mr. Larkin receiving a $3.75 million settlement from the County.  *See Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012).  Mr. Lacey and Mr. Larkin used the entire settlement to create the Frontera Fund, a nonprofit that distributes grants to groups that advocate for civil, human, and migrant rights throughout Arizona.

In September 2016, Mr. Lacey, Mr. Larkin, and current Backpage Chief Executive Officer, Carl Ferrer, were charged in the California Superior Court for Sacramento County with ten felony counts of pimping, based on classified advertisements posted on the Backpage website.[5]  The defendants demurred and the California court dismissed all charges on December 9, 2016.  (*See* Initial Decision on Demurrer, attached as Ex. B.) Apparently undeterred, the State filed an amended criminal complaint, charging the same

---

[5]    The charges were not filed by the Sacramento County District Attorney, which would have been the usual procedure in California.  Instead, the criminal complaint was filed by then-California Attorney General and U.S. Senate candidate, Kamala Harris.

defendants with money laundering, bank fraud, and pimping, on the theory that those charges could be supported by the ads posted by third-party users to the website operated by Backpage.  The defendants again demurred.  The Court granted the demurrer as to the prostitution charges.  (*See* Second Decision on Demurrer, attached as Ex. C.)

Notably, in connection with that prosecution, on April 28, 2017, the Sacramento court re-admitted Mr. Lacey to bail on a $250,000 bond. Mr. Lacey immediately surrendered himself when the California charges were first filed, has appeared at numerous court dates in Sacramento, and has fully and consistently complied with all other conditions of his bond, despite facing a significant potential term of imprisonment.

> **D.    Pretrial Services recommends release on recognizance.**

In connection with the instant indictment, Pretrial Services conducted an investigation into Mr. Lacey's background, familial and community ties, and assets, and issued a report recommending that this Court release Mr. Lacey on personal recognizance with certain specified conditions.  (*See* Pretrial Services Report, attached as Ex. D.)

## III.   ARGUMENT

> **A.    Under the governing constitutional and statutory framework, pre-trial release is the norm and not the exception.**

The Bail Reform Act of 1984 (the "Act"), 18 U.S.C. § 3141 *et seq.*, provides courts with the standards and procedures governing the determination to release or detain a defendant pending trial.  Detention is allowed *only* "[i]f, after a hearing pursuant to subsection (f) of [Section 3142], the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1); *see United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008).   As the Supreme Court has recognized, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."  *United States v. Salerno*, 481 U.S. 739, 755 (1987).  Consequently, '[o]nly in rare circumstances should release be denied," and any "[d]oubts regarding the

1   propriety of release should be resolved in favor of the defendant." *United States v.*

2   *Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985); *see also United States v. Townsend*, 897

3   F.2d 989, 994 (9th Cir. 1990) ("Doubts regarding the propriety of release are to be

4   resolved in favor of defendants.").

5          Courts are to engage in a two-step inquiry to determine whether to release or detain

6   a defendant prior to trial. *See United States v. Gentry*, 455 F. Supp. 2d 1018, 1020 (D.

7   Ariz. 2006).  First, the court must make a finding as to whether there exists "serious risk

8   that [the defendant] will flee" if released from custody. *Id.*  "Second, if the defendant is

9   likely to flee, the district court must determine whether some set of conditions would

10  sufficiently vitiate that risk." *United States v. Hoover*, 2014 U.S. Dist. LEXIS 69735, *6

11  (D. Ariz. May 20, 2014).  The government, *at all times*, bears the burden of establishing

12  the need for pretrial detention.  The government must prove risk of flight by a

13  preponderance of the evidence, and must demonstrate that the defendant is a danger to

14  another person or the community by clear and convincing evidence.   18 U.S.C. §

15  3142(f)(2)(B); *Motamedi*, 767 F.2d at 1406.

16         To determine whether pretrial detention is warranted, the Court must consider the

17  statutory factors set forth in 18 U.S.C. § 3142(g).  In considering these factors, courts must

18  "not [be] unmindful of the presumption of innocence and its corollary that the right to bail

19  should be denied only for the strongest of reasons." *Motamedi*, 767 F.2d at 1407.

20  Moreover, the Act mandates release of a defendant under the "least restrictive" condition

21  or combination of conditions that will reasonably assure the appearance of defendant as

22  required.  18 U.S.C. § 3142(c)(1)(B); *see United States v. Bobrow*, 468 F.2d 124, 126-27

23  & n.16 (D.C. Cir. 1951) (per curiam) (ruling that setting bail "higher than an amount

24  reasonably calculated to adequately assure that the accused will appear" is excessive under

25  the Eighth Amendment).

26

27

28

10

### B.    This Court should deny the government's motion for detention.

The government failed to carry its burden on pretrial detention of Mr. Lacey.  There is no evidence that Mr. Lacey is a risk of flight or a danger to the community.  Any further pretrial detention would be punitive, which is barred under the Eighth Amendment.

#### 1.    Pretrial Services has recommended release on recognizance.

In connection with the instant indictment, Pretrial Services conducted an extensive investigation into Mr. Lacey's personal history, familial and community ties, and finances. Based on its thorough assessment of Mr. Lacey, as well as the crimes charged, Pretrial Services recommended immediate release on recognizance, with certain specified conditions.  Mr. Lacey is able to satisfy each of those conditions and should be released in accordance with Pretrial Services' investigation and recommendation.

#### 2.    It is unlikely that this prosecution will proceed to trial, much less, result in any convictions.

The government's case is so weak that it provides no incentive for Mr. Lacey to flee.  The government seeks to hold Mr. Lacey criminally liable for ads posted to the Backpage website by third-party users; however, this theory has been rejected by *every court* that has considered it.  Courts have uniformly held that Backpage's publishing and receiving payments for online ads is legal, such ads are constitutionally-protected speech, and the government cannot pursue criminal charges against a website operator based on accusations of generalized knowledge, *i.e.*, that it knew or should have known that some individuals misused the site for unlawful purposes. *See, e.g., M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC,* 809 F.Supp.2d 1041 (E.D. Mo. 2011); *Backpage.com, LLC v. McKenna*, 881 F.Supp.2d 1262 (W.D. Wash. 2012); *Backpage.com, LLC v. Cooper*, 939 F.Supp.2d 805, 830 (M.D. Tenn. 2013); *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097 (D.N.J. Aug. 20, 2013); *Backpage.com, LLC v. Dart*, 807 F.2d 229 (7th Cir. 2015), *cert. denied*, 137 S. Ct. 46 (2016); *Doe ex rel. Roe v. Backpage.com, LLC*, 104

F.Supp.3d 139 (D. Mass. 2015), *aff'd sub. nom. Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.32d 12 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 622 (2017); ; *In re Grand Jury Subpoenas to Backpage.com, LLC and Village Voice Media Holdings, LLC*, No. GJ12-172RAJ (W.D. Wash. Jan. 17, 2013); *People v. Ferrer*, No. 16FE019224, 2016 WL 7237305, at *9 (Cal. Super. Ct. Dec. 9, 2016); *People v. Ferrer*, No. 16FE024013 (Cal. Super. Ct. Aug. 23, 2017); *see also Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003), *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 967 (N.D. Ill. 2009).

Mr. Lacey is confident the instant prosecution will end with a similar ruling and intends to meet the government's charges in court rather than flee, as he has done *without exception in every civil or criminal action in the past*.  If released pending trial, he will appear and forcefully contest the government's attack on the First Amendment at each stage of the proceedings.  Because the government's flawed theory of criminal liability underscores every charge in the indictment, money laundering included, it is unlikely that this prosecution will survive pretrial motion practice, let alone result in any convictions. For this reason, alone, the government has failed to satisfy its burden.

3.    **Mr. Lacey presents no risk of flight.**

Mr. Lacey presents no risk of flight.  The single most important factor that would prevent Mr. Lacey from leaving the jurisdiction is his marriage and close relationship with his two sons, both of whom are well established in their own lives in the San Francisco Bay Area.  It is unthinkable that, after vigorously defending a series of cases, brought over a number of years, Mr. Lacey would choose to become a fugitive at age 69 and forfeit his relationship with his children.

Additionally, Mr. Lacey has close personal and philanthropic ties to the Phoenix community.  Among his many other charitable pursuits, he helps operate the Frontera Fund, a 501(c)(3) nonprofit that supports educational, health, human rights, civil liberties,

and arts organizations that benefit the Hispanic community in Arizona.[6]  Through his professional and philanthropic endeavors, he has developed a reputation for being a person of integrity and principle.  (*See* Character References, attached as Ex. E.)

Mr. Lacey's substantial real estate investments in this District and in San Francisco, too, provide a further economic deterrent to flight.

More importantly, Mr. Lacey has a perfect record of pretrial release in the criminal action pending in the State of California, in which he faces charges of similar severity.  That factor, alone, negates any risk of flight in this matter.  *See* 18 U.S.C. § 3142(g)(3)(A) (requiring courts to consider a defendant's "record concerning appearance at court proceedings").  Indeed, the government has acknowledged that Mr. Lacey has sought and obtained permission to travel internationally while under indictment in that case, and that he has returned and surrendered his passport after each such trip.  (*See* Gov't's Mot. at 5-6.)  As part of the procedures for his court-authorized international travel in that case, Mr. Lacey is in possession of his passport.  Mr. Lacey has no objection to surrendering his passport to Pretrial Services as a condition of pretrial release in this case.

Mr. Lacey does have substantial financial resources and there is little doubt the government will assert this provides the opportunity to flee.  However, as recognized in another prosecution in this District, "the mere opportunity to flee is not enough to justify detention as the Act does not require ironclad guarantees against flight."  *Hoover* at *32.  Instead, there must be some indicia of an intent to flee, of which there is none in this case.  In light of Mr. Lacey's close familial and community ties, his prior performance on bond, and other relevant factors, his financial means, alone, do not provide a sufficient basis for his pretrial detention.  To the extent that the government suggests that the $16.5 million held in a trust account in a Hungarian bank reflects Mr. Lacey's intent to flee, the

---

[6]   *See* Frontera Fund website, available at http://www.laceyandlarkinfronterafund.org/ (last visited on Apr. 7, 2018).

government is mistaken.  The trust was formed for the benefit of Mr. Lacey's sons to be held at a bank subject to the rules and regulations of the European Union. Mr. Lacey made no efforts to hide the trust from federal authorities, as it is subject to annual taxation and reporting under the Foreign Bank and Financial Accounts Reporting Form.

4.      **Mr. Lacey's Release Would Pose No Danger to the Public.**

Mr. Lacey is a 69-year-old retiree who, through philanthropic efforts, has sought to improve the Arizona community.  As noted above, no court, state or federal, has accepted the government's asserted theory of criminality in this case.  It is undisputed that Mr. Lacey had no contact with any accuser or with any person engaged in sex trafficking.  If he is released, there is no reason to believe he would engage in conduct that poses a danger to any person or to the community.  *See United States v Rueb*, 612 F. Supp. 2d 1068, 1069-70 (D. Neb. 2009) (after considering fact that defendant was not accused of having personal contact with minor and that government did not present any evidence showing defendant posed risk of offending against minor, magistrate judge removed restrictive release conditions imposing curfew and electronic monitoring from pretrial release order).

Prior to his arrest, Mr. Lacey had been retired for several years.  More importantly, the government has seized and shut down the website operated by Backpage.  *A fortiori*, if he is released, he could not engage in the offense conduct for which he is accused.  There is simply no reason to believe that Mr. Lacey poses any danger to the community if released pending trial.  *See United States v. Patriarca*, 948 F.2d 789, 792 (1st Cir. 1991) (explaining that the clear and convincing standard is not met by proof that defendant is dangerous "in theory," but only by proof that defendant poses an *actual significant danger* that cannot be overcome by appropriate conditions).

Finally, the Court should not consider the pendency of the Sacramento case as a factor weighing against Mr. Lacey's release.  *See* 18 U.S.C. § 3142(g)(3)(B) (courts must consider "whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence

14

for an offense under Federal, State, or local law").  The Sacramento court has dismissed the prostitution-based charges twice.  With respect to the remaining charges (involving allegations of money laundering and bank fraud), the fact that two prosecutors in different jurisdictions have chosen to bring cases at the same time does not tend logically to establish that Mr. Lacey is a greater danger to the community or poses a more serious risk of flight than a defendant who has only been charged in one jurisdiction.

## IV.    PROPOSED CONDITIONS FOR PRETRIAL RELEASE

Mr. Lacey respectfully urges this Court to release him on recognizance with the conditions set forth in the report prepared by Pretrial Services (*see* Ex. D.), because those conditions are sufficient, but not more restrictive than necessary to assure his appearances and the safety of the community.  These conditions are akin to those set by the Sacramento court, with which Mr. Lacey has a perfect record of compliance.

The remainder of the conditions the government seeks are more restrictive than necessary to assure Mr. Lacey's appearances and the safety of the public.  In particular, electronic monitoring, which was not recommended by Pretrial Services, is unduly harsh. Mr. Lacey respectfully requests that the Court exercise its discretion to minimize the extent of any special conditions imposed.  In light of Pretrial Services recommended conditions, which omit imposition of the condition of electronic monitoring, Mr. Lacey respectfully urges this Court to decline to grant the government's request for electronic monitoring.

## V.    CONCLUSION

For all of the foregoing reasons, this Court should release Mr. Lacey pending trial on recognizance with the conditions recommended by Pretrial Services.

DATED:      April 9, 2018          Respectfully submitted,

LIPSITZ GREEN SCIME CAMBRIA LLP

*/s/     Paul J. Cambria, Jr.*
PAUL J. CAMBRIA, JR.
Attorneys for Defendant MICHAEL LACEY

**CERTIFICATE OF SERVICE**

I hereby certify that on April 9, 2018, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to counsel of record, including the following CM/ECF registrants:

Kevin Rapp
Assistant United States Attorney
District of Arizona
Two Renaissance Square
40 N. Central Ave., Suite 1200
Phoenix, AZ 85004-4408
Kevin.rapp@usdoj.gov

Dominc Lanza
Dominic.lanza@usjoj.gov

MARGARET PERLMETER
margaret.perlmeter@usdoj.gov)

Reginald E. Jones
Trial Attorney
United States Department of Justice
Child Exploitation and Obscenity Section
1400 New York Avenue, NW
Washington, DC 20530
Reginald.jones4@usdoj.gov

By:____Clair H. Wendt_____

119103-0007/139355604.1

16

# EXHIBIT A



 

MENU

SIGN UP
LOG IN

MORE

# WHAT'S MOM WORTH?: WHEN A WOMAN BECAME DEATHLY ILL IN SHERIFF JOE ARPAIO'S JAIL, GUARDS AND NURSES IGNORED HER AGONY

 BY MICHAEL LACEY

   

THURSDAY, DECEMBER 9, 2010 | 5 YEARS AGO

98    6    0

Deborah Braillard, mother

**Deborah Braillard, mother**
*(1991)*

*Mom taught me to sew.*

*And I'm going to teach my own baby, Jennylee. Eventually.*

*Jennylee is a quick study for a 6-year-old.*

*She watches as I sew her Minnie Mouse costume. She is double-twice excited, though honestly, I think I like Halloween as much as she does, even if it is a gloomy time of year.*

*Come, sit here, Pumpkin, and watch now how I pin the paper pattern here on the cloth. You see that, sweetie? You cut this out while I trim the red polka dots for your bow.*

*Done.*

*You take a good look at these pieces and try to guess where they'll go. Mommy will be right back.*

As mother and daughter work inside their little trailer, outside, slate-stained cumulonimbus clouds menace, gray anvil domes await the strike.

Deborah ducks, briefly, into the tiny, plywood-framed bathroom for a little pick-me-up. When she emerges, the sweetness of this moment with Jennylee does not escape her notice.

But lightning in the darkness overcomes it.

Deborah shivers in spite of herself.

*Hey there, Pumpkin, here's the last part.*

*I'll just straight-stitch the seams, roll the fabric to make a hem, and secure the bow with a whip-stitch.*

*Let me iron up the white apron and spray it with starch to give it a little oomph.*

*You look perfect.*

*Wait! Wait! . . . Here, a little mascara, we'll make a black dot for your nose and whiskers. Hold still now, a little lipstick.*

*Okay, let's walk over to the community center.*

*Grandma will meet us there.*

*Jennylee, if you aren't the best mouse ever . . .*

**Jennylee Braillard, daughter**
*(2010 interviews)*

"Just about my first memory of my mom was the Minnie Mouse costume she made me at Gold Bar, which is where you can hook up your trailer just outside Monroe, Washington.

"I won first place that Halloween. My prize was a six-pack of root beer."

As Jennylee speaks, her own infant daughter, Kaylynn, coos and looks around, a bow tied to her little, full-moon head.

"My mom was always happy. She was nurturing, caring. She was my mom."

Her mother's ashes sit in a container in Jennylee's home in west Phoenix. The dust is such a small amount inside a little vessel; you'd hardly believe that someone's remains could amount to

so little.

It is a fact that Deborah Braillard did not always make good choices.

She died an agonizing death in a diabetic coma that would wring the life out of her over three weeks that seemed without end.

The bigger truth is that she was hurried on her way.

Deborah Braillard's passing is never far from Jennylee's thoughts; after all, she watched the worst of it.

"I was terrified to open the plastic bag with her ashes. I put mom in a big jewelry box. I think about taking her back to Gold Bar. That's where my grandmother and great grandmother are buried. It's been in the family forever. There are nature trails there . . .

"But I worry if something happens to my uncle who lives there [what would happen to Mom]."

**Consider:** In May 2010, researchers at the University of Wisconsin find that, in stressful situations, cortisol levels in girls soar. But for many of the young women, simply hearing their mother's voice is enough to wash away the anxiety, replacing the stress hormone with feelings of love.

Men have no such relief.

What happens between a mother and daughter comes from God.

**Tamela Harper, inmate**

*(2007 deposition)*

Tamela Harper is detained in Sheriff Joe Arpaio's jail when they put Deborah Braillard into her cell in January 2005.

"She was unconscious [on the evening of the 2nd]. She wasn't hardly there. She walked back to her bunk, and that was the last time I saw that lady walking. People were helping her. She was throwing up constantly. [Next day] that's when she started moaning and groaning and throwing up. She was basically unconscious at the time. She couldn't speak. She couldn't eat. The officers kept saying she was kicking heroin.

"She defecated on herself several times. There was no help for her. We kept telling the officers, you need to help her."

**Brenda Tomanini, inmate**

*(2007 deposition)*

Deborah Braillard threw up on other inmates, from her bunk to theirs. No guards, no nurses. The inmates, and Deborah, were alone on the 3rd.

On the morning of the 4th, medical asked to have Braillard brought into the clinic. But trusties could not wake the unconscious Deborah. She was left vegetating.

"I couldn't get Ms. Braillard up. Couldn't do it. She wouldn't respond to me at all. I could tell that she was breathing, but I couldn't get a response out of her.

"It just freaked me out because I don't think in my experience . . . I don't think she had been on drugs."

But the guards in the jail say different.

"Don't worry about Deborah Braillard. She's getting what she deserves. She's coming off drugs," is how Tomiani remembers it.

The inmates understand the drill, says Tomanini.

Tomanini described a retarded inmate brutalized for her sass.

"It broke my heart. I had to put my head under my blankets, and I cried. It broke my heart to see something like that."

Tomanini's experience with the medical clinic underscores the sense of neglect.

"I got sick and I was running a fever, and I had put a tank order in — that's what they call it for medical. And two months went along, and I didn't get any better. I was waiting for medical to call me . . . You had to fight to get medical attention.

**Consider:** It was standard procedure to collapse on the floor in order to get medical attention. Otherwise you might well be ignored by an overwhelmed medical clinic. Inmates report that guards would actually instruct them to drop, to collapse. Only then would a call — *man down!* — go out to the nurses.

**Deborah Braillard, mother**

*Do I think? I think not.*

*I am aware.*

*I am aware of the I-will-nots:*

*I will not see my granddaughter, Kaylynn, walk. I will not give her my finger to steady her early toddles. I will not go down a slide with her. I will not put a Band-Aid on her owie.*

*I will not get a chance to be a better grandmother than I was a mom. Ever.*

**Consider:** Deputies find methamphetamine in Braillard's purse about midnight on January 1, 2005. She is with a small group of users whose car breaks down in a parking lot on the west side when officers happen upon them.

She is admitted into the jail about 2 a.m. on January 2. Though the entire prison is videotaped around the clock, the sheriff is unable to produce any film of Deborah's early custody.

Historically, when inmates are killed or injured, Sheriff Arpaio loses evidence and incriminating video surveillance or produces video so degraded it is unwatchable.

Almost a full day after her initial booking, Braillard is transferred from the intake jail downtown to the all-female Estrella jail in west Phoenix. For the next 60 hours, guards at Estrella assume, mistakenly, that her wretched condition is the result of her kicking drugs.

This lethal mistake is aided and abetted by a poultice of organizational neglect combined with personal insensitivity that overwhelms thin outbreaks of humanity.

On the afternoon of January 4, 2005, guard Randall Harenberg calls the jail's medical clinic, 40 feet from where Braillard was held. No one comes to assess Braillard. The medical clinic has no record of his call. No jailer has any further contact with the clinic until the morning the ambulance arrives. No guard summons a supervisor.

Though nurses visit the cell twice a day to distribute pills, no deputy asks the nurses to look in on Braillard.

**Sandra Garfias, guard**

*(2007 deposition)*

"There was really nothing going on in the dorm that night [January 4], except we had one inmate kicking drugs. At the time that I worked, [medical] typically did not see inmates that were coming off drugs."

Nor is Garfias trained to differentiate which drug it is that someone might be coming off of.

She does understand that drug withdrawal can be lethal.

Still, she calls no one.

**Dr. Laura Pieri, board certified in psychiatry, neurology, and forensic medicine and past medical director of Arizona's West Yavapai Guidance Clinic and Windhaven Psychiatric Hospital. Currently in private practice.**

*(2010 interview)*

"Anyone in alcohol or barbiturate withdrawal needs medical supervision, and they need it immediately, as soon as you see the first sign. Of those who go into delirium tremens, the DTs, 20 percent die."

Dr. Pieri adds that science is discovering new and alarming facts about another class of drugs that can be lethal in withdrawal: slow-acting benzodiazepines. Commonly prescribed, and abused, such medications as Xanax, Halcium, and Librium, among others, can be toxic for those trying to kick.

**Sandra Garfias, guard**

*(2007 deposition)*

"I heard Braillard vomiting, more than twice, [on the evening of January 4].

"She had been throwing up, and I remember her saying her stomach hurt. I know that the inmates around her changed her bag because they asked me for a bag and also a change of clothing, because she had soiled herself . . . I told her [that] her stomach hurt because she was throwing up and coming off drugs."

In fact, Deborah Braillard is an insulin-dependent diabetic. She has not had insulin since her arrest January 1. Her body is shutting down. She is dying.

Garfias does not call medical. She checks Braillard's identification and moves on.

Did she say she was coming off drugs?

"No."

Was she moving at all?

"Yes, she was."

In what way?

"Squirming in the bed."

She looked uncomfortable?

"Yes."

You thought she was in pain?

"I don't know."

You just said she was holding her stomach. You thought she was in pain?

"Yes.

"I gave the other inmates a change of pants and underwear.

"I had to put them in a biohazard bag because I assumed she had defecated herself."

Was she speaking?

"She was just moaning . . . I don't know when it began. She was moaning when I came on shift . . . It was kind of loud."

You never had any training from the sheriff on inmates kicking drugs?

"No."

In the wee hours of the morning, Garfias extracts Braillard from her cell .

"At around 3 [a.m.], I put Deborah in what we call a boat, in the dayroom."

Garfias fills out the paperwork.

"At approximately 2:45, Deborah was placed in the dayroom due to the fact she's kicking and was groaning, yelling, and keeping the whole dorm up, and the dorm kept yelling at her to shut up."

Although Braillard is moaning, screaming, vomiting repeatedly, and soiling herself, Garfias does not call for medical. Instead, she deposits the woman *in* a blue plastic canoe stuffed with bedding in the empty dayroom.

"As far as her bothering me . . . that wouldn't bother me since I was going to be up all night anyway."

**Tamela Harper, inmate**

*(2007 deposition)*

"We could still hear Deborah in the dayroom making calls out for help. She was moaning. Basically, in a moan, you are wanting help in some sort of way. They wouldn't do anything that morning."

**Jennylee Braillard**

*(2010 interviews)*

"Even when I was little, I knew she was using . . . There was no difference between when Mom was using and when she wasn't. She took care of me. Made my meals. Besides her issues, she was a good mom. When she was in rehab [in Washington state], I'd spend every weekend there. Slept over. It was great. At one point, we went camping. Another time, there was a talent show, and all the people were really nice. All the families got involved. Mom and I and another girl and her mom, we all sang, 'Going to the Chapel.'"

But Jennylee noticed early that her mom always fell for the wrong guy. She collected animals and losers as if she were their patron saint.

"Needless to say, Mom met a guy in rehab, and they left the program. He nearly beat her to death in a hotel. The cleaning lady found her unconscious."

**Brenda Tomanini, inmate**

*(2007 deposition)*

"To think that the staff didn't care that this woman is moaning and groaning and she's pleading for help. I don't know what's wrong with you. There can be a whole lot of things wrong with you, but I would want to try to get you some type of medical attention."

At 7 a.m. on January 5, detention officers Stephanie Lieppert and Lucy Akpan start their shift. Garfias tells them the inmate in the dayroom is kicking drugs. They move Deborah Braillard out of the day room back to her cell.

**Tamela Harper, inmate**

*(2007 deposition)*

"That morning [January 5] they put her back in the main area in her bunk. She had another seizure. She had several seizures, as many as seven."

**Consider:** On January 4, at 8:17 p.m., a friend attempts to visit Braillard but is informed that Deborah is too sick to see anyone. An hour and a half later, at 9:42 p.m., another friend, Debbie Fouts, phones the jail and informs them that Braillard is a diabetic and apparently has not received her insulin.

Deputy Brenda O'Neil takes down the information during the conversation with Fouts about Braillard's insulin and faxes it to the jail's medical clinic, about 40 feet from where the inmate is vomiting and defecating and moaning.

Deputy O'Neil's fax violates all protocol. Because a fax is notoriously unreliable, policy insists the critical information be conveyed personally.

None of the nurses in the clinic looks at the fax. Not when it comes in. Not ever.

At 11 p.m. on January 4, Jennylee gets a call from a woman, a friend of Deborah's. Jennylee learns for the first time that her mom is locked up. She immediately calls the jail.

**Jennylee Braillard, daughter**

*(2010 interview)*

"I called the number they give you and got her booking number, her charges, but it's basically an automated answering machine."

RELATED STORIES

## Prisoners Hang Themselves in Sheriff Joe Arpaio's Jails at a Rate That Dwarfs Other County Lockups

Jennylee then dashes over to her mom's house where she confronts her mom's boyfriend. He was with Deborah when she was arrested three nights earlier.

At 7 the next morning, Jennylee again phones the jail. She is put through to Dennis Flynn, risk manager with County Health. She informs him that her mother is an insulin-dependent diabetic who may not be receiving her medication.

"Was there any way he could get back to me?" she asks.

"No."

"He thanked me for calling and assured me something would be done. When I hung up, I didn't know what to do."

**Stephanie Lieppert, guard**

*(2007 deposition)*

"She threw up again after I moved her back into her cell [from the boat in the dayroom], and just knowing that she had been up that night vomiting and having diarrhea, that would indicate to me that someone needs to be seen."

She calls the medical clinic on the morning of January 5.

Is this the policy of the sheriff?

"No, it is not . . . We were given first-aid training, CPR training. They are very brief on the situation of kicking. We are not told to notify anyone in particular."

**Lucy Akpan, guard**

*(2007 deposition)*

After detention officer Garfias informed her that Braillard was kicking drugs, Akpan called the medical clinic on the morning of January 5.

It is Akpan's experience that the clinic is sometimes reluctant to respond to concerns about inmates' medical conditions.

"She started yelling and screaming — rolling, you know, in the boat . . . I said, 'She has to leave this place. She needs medical attention' . . . It's so devastating because I was, like, how can someone *do this to herself*?

"I'm a mother. I see sick people. I've seen sick children . . . I saw her yelling."

The medical clinic says it has no record of calls from guard Lieppert or guard Akpan.

**Tamela Harper, inmate**

*(2007 deposition)*

At 10 a.m. on January 5, ambulance attendants arrive at Estrella jail for Deborah Braillard.

"I was there for my Accu-Chek because I'm a diabetic.

"I saw her lying on the stretcher, and EMS was there helping her, and I heard one EMS ask the other one what was the vital signs. And when he told her the vital signs [116 over 63], they just looked at each other, like, *wow*. And that's when they took her out.

"The officer started yelling at me for me to sit down, and I started yelling at him, 'You were wrong for all that. You could have helped her.'

"I was told by the guard, 'Sit down and don't be looking at this. This is none of your concern.'

"Us inmates requested medical attention more than half a dozen times.

"They wouldn't do it. 'She's kicking.' 'Get over it. Deal with it. This is jail.' 'It was her fault that she did it to herself. What can we do?'"

**Jennylee Braillard, daughter**

*(2010 interviews)*

"I was living with my grandmother. After my uncle moved to Arizona, he convinced my

grandmother to move to Phoenix to escape Mom's drama. We came here in '95-'96. My mom moved to Spokane, and we all took a trip back to Washington to see her. We went out to dinner, but that was when I was angry with Mom. I didn't want to be apart. Didn't understand why she did the things she did. I ran out to the bathroom. Mom followed me, and we had serious discussion about all this, both crying. The thing I remember is her saying over and over that she loved me. She said she never hit me.

"I vented, and then things were fine between us. I had to accept who she was. She did take care of me. She was good to me.

"She visited Arizona twice, and that's when we learned, at the hospital, that she was a diabetic. It runs in the family.

"Shortly after that, she moved to Arizona. She drove her beat-up Datsun full of her stuff and lived with me and Grandma. We both worked in my uncle's pizza place. At first, there was conflict, because she tried to become boss in the house. But she improved herself in all areas. She was clean."

If Jennylee was content with the status quo, her mom was not. She stage-managed a romance for her daughter.

"She instigated this thing where I went out with [a] driver for the pizzeria. He had a buzzed head with a blue dot."

When the family pizza business closed its doors, mother and daughter went to work at a nearby Kentucky Fried Chicken.

**Consider:** Deputy Cindy Rodriguez does the intake interview of Deborah Braillard about 2 a.m. January 2. Officer Rodriguez is required to interview Braillard about her medical history. This is when the Sheriff's Office should've discovered that the inmate was an insulin-dependent diabetic.

But Rodriguez has no training and is learning on the job. She does not review the police report, which clearly shows Deborah Braillard is on medication.

Because those under arrest are often unreliable, untruthful, or unable to give a full accounting of their health, the national standard is that pre-existing medical records at the jail must be reviewed.

Deputy Rodriguez fails to examine Braillard's medical history on record with the jail, records from previous arrests that show clearly that Deborah is an insulin-dependent diabetic.

Without daily insulin injections, Braillard will go into a coma and die.

But intake officers are under pressure from Sheriff Joe Arpaio to process prisoners more quickly.

Computer records show that Officer Rodriguez entered the information into the database in 59 seconds.

Just as alarming, Sheriff Arpaio's records contain no "receiving screening" form for the time and date of Deborah's actual admission: 2:26 a.m. on January 2, 2005.

Instead, the receiving screening form produced by Maricopa County is dated after her intake. Days later, in fact — after Deborah already had been taken by ambulance to County Hospital, where she died. The receiving screening form is dated January 5, 2005, about 12 hours after Deborah was transported to the hospital.

A nurse in the jail explains why intake paperwork is filled out after a death.

She sees inmates admitted without ever being asked a single question.

"It is a custom, practice, and pattern."

**Deborah Braillard, mother**

*I lived my life thinking I'm a rebel. I'm not like my mother, all moody and sullen about life's hard knocks. Not me. I love the bad boys. I live the life. I did not join the system.*

*Now look at me.*

*Lost my Pumpkin, the only one I truly love.*

*I'm delusional, that's what I am. I'm not outside the system. I am the system. My every move is documented. Every shoplifting report, every security guard, every cop, the juvenile probation officer, the pre-sentence report, the confessions, the plea bargains, the motions, the booking slips, the credit card scams, the mug shots. I am as indelible as a fingerprint. I am the fully revealed cog.*

*A powder sniffer's closet has more willing witnesses than coat hangers. Every friend is weighing betrayal: When do I give up Deborah for a reduced sentence?*

*No one had a real job. We were all chameleons, scoring from each other and ripping each other off. Hell, they bust into my home with masks and guns and grab everything of value. You think those were strangers?*

*The Man owns the paperwork and the rights to my life.*

*My dodge isn't so artful after all.*

**Jennylee Braillard, daughter**

*(2010 interviews)*

"Driving anywhere with my mom was great. She had great taste in music. Once, I got my hair cut and she cut her hair just like mine. She was exciting and fun."

**Elaine Clayton, registered nurse,**

**County Health Services**

*(2007/2010 deposition and interviews)*

When guards Lieppert and Akpan called the medical clinic, they were informed that Deborah would be seen when there was a doctor.

Clayton was in the clinic when Dennis Flynn, acting upon the call from Jennylee regarding her mother's insulin, phoned to warn about Deborah's condition.

But Jennylee's phone call is noted as coming at 7 a.m.

Flynn, the County Health Services risk manager, did not relay her emergency message for two full hours. He phoned the clinic at 9 a.m.

Records show that the clinic did not call for Deborah Braillard until 9:45 a.m., nearly three hours after the daughter notified the county.

"They brought her into the clinic. She sat in the chair. She was very, very lethargic and placed on a stretcher. She was sweating and having a difficult time breathing.

"Breathing became more labored. She looked like death."

Clayton observed that there was no capacity for emergency response.

"The policy was: You called dispatch. Dispatch would then ask a number of questions: identity of inmate, where they were going, could they go in [a] county vehicle, or did they need an ambulance. Then, call [the] sergeant and supply more details. Then, dispatch selects an ambulance company, which must find the jail."

In this case, Clayton argued for the fastest possible response: Call 911.

Instead, CHS followed guidelines and called a commercial ambulance.

"It was the difference between life and death.

"There's a look and sound that people make when they are dying, and she looked and sounded like someone who was dying."

The ambulance arrived at 10 a.m., three hours after Jennylee had raised the red flag.

Clayton worked at CHS for two years before quitting in disgust.

"I saw some incredibly horrible things happen, and I saw no action being taken or visible action being taken to correct the incredible lack of competent healthcare."

**Jennylee Braillard, daughter**

*(2010 interviews)*

"When I got to the hospital [where Deborah was now in a coma], she looked horrible. She was chained to the bed with these big old metal chains. There was a tube down her throat. They said that because of the lack of oxygen she would never be the same. Right from the start, they wanted me to unplug her, but I wouldn't."

**Deborah Braillard, mother**

*By the time I left the sheriff's jail, the pain was much worse than childbirth.*

*Do you think Joe Arpaio understands how I suffered? Shoot, you think Joe Arpaio understands the agony of childbirth. Chop a man's finger off during Lamaze. That would be a start!*

*These guards are Arpaio's women. A wiser woman than me said it right: "Fear was invented by someone who never had the fear."*

*My life left me at both ends of my body: I soiled my pillow and soiled my pants. My body was so torqued it tried to escape in convulsions.*

*They looked past my death rattle and ripped me away from Pumpkin.*

*I scream to Jesus.*

**Elaine Clayton, R.N.**

*(2007/2010 depositions and interviews)*

"Inmates sent tank orders — kites — which were requests for medical care. CHS was supposed to prioritize those requests.

"Oftentimes, it would be days before any of them would be looked at . . . The chances of an appointment for care actually coming to fruition were small . . . They were backlogged by hundreds of appointments."

It wasn't simply that the medical clinic ignored inmates kicking drugs — they ignored everyone."There was a person in the jail with cancer on his tongue, and they made him wait to

see a doctor. He waited four or five months. When you have a cancerous growth, you see a doctor as soon as possible.

"Another one I'll never forget said, 'I need medical attention. I'm bleeding from my nose, rectum, and mouth.' That person came to the clinic, was not seen, and was returned to the jail. Second visit produced no results. Finally, jailers called on Saturday when I was in. I checked urine and bowel samples and found blood. When I went to get oxygen . . . I got the tank and turned it on. Nothing. The tank was empty. Her vital signs were not within normal limits. She was bleeding internally, and I called for an ambulance.

"The place is incredibly understaffed for both nurses and doctors. I was often the only licensed nurse. I had an aide with no skills. We dealt with 1,200 to 1,500 inmates. If a doctor was sick, no one covered. If there was a meeting, no doctor. They'd schedule 150 visits a day. If they saw 30, they felt good. Yeah, nurses did not respond to withdrawals. Any wonder?"

Although they should have known from their own records that Deborah was a diabetic dependent on insulin, that was no guarantee of treatment, according to Clayton.

"Arpaio brags that he only spends 15 cents a day on inmate food. Well, diabetics are costly because of their special diet and insulin. People are not seen when they are supposed to be treated. Chronic becomes acute. People end up in ICU."

Diabetics left for court at 2 in the morning without insulin.

"By evening, their Accu-Chek readings were 400 and above [normal is 80 to 100]."

"When I addressed this with detention . . . it went nowhere. Nurses working that time frame would simply refuse to perform an Accu-Chek or they wouldn't give insulin."

Clayton was depressed but not surprised by the culture she found in the jail.

"Sheriff Joe's personality permeated the jail. It is a Joe cult. He has the image of being tough. Saw [the] same attitude in [the] nursing staff. It was a magnet for bitter people. Inmates wouldn't be in jail if they hadn't done something wrong. They deserved what they got."

**Jennylee Braillard, daughter**

*(2010 interviews)*

"It was just so . . . weird. I talked to my mom on the first of January. Four days later, she's in ICU. She's in coma, and there is all this pressure from the doctors to pull the plug."

Twelve days after arriving at the hospital, on January 17, Deborah Braillard woke up. No one called her daughter, who arrived later that evening to learn the startling news.

"She woke up. She was responsive. She refused water because she wanted soda. She nodded her head to questions."

**Lisa Press, Deborah's friend**

*(2007 deposition)*

Press met Deborah in 2000. They were neighbors in west Phoenix and in the same methamphetamine circle. She bought from Deborah and used with Deborah.

"One thing about Debbie: I liked her as a person. I liked being over there with her, as opposed to the people I was living with. But I'd only see her three times a week because Debbie's house was so chaotic. There'd be 20 people in there sometimes. You know, all through the house."

In 2002, Lisa and everyone she was living with got busted. She quit using. Went cold turkey.

But she didn't lose her old friends. One druggy stole a cross that belonged to her son. It had enormous sentimental value. Debbie found the religious symbol and returned it to Lisa.

Then, Debbie needed a favor. She had to do a drug screening as part of her probation and wondered if the now-clean Lisa would do it for her.

"I just walked into the [Department of Motor Vehicles] and said I needed a duplicate because I lost my driver's license. They gave me a sheet of paper to fill out, and I put Deborah's address on it. They asked if I wanted the same photo they had on file, and I said, 'No, I'll take a new one.'"

Armed with phony identification, she went into a Treatment Assessment Screening Center for a urine analysis posing as Deborah Braillard.

"I was very nervous. I was talking myself out of it because I kept thinking . . . if my sister finds out. But I did it for her because she was a friend. I just felt bad for her. Plus, she gave me $50."

Press described a scene the rest of the world has a hard time coming to grips with.

"Meth makes you lose weight. Some people, it really affects their skin, their arms. People pick at their face. It messes with your teeth. You don't want to eat. You don't want to sleep. We just straighten things up. I mean, I don't know if you've ever seen a lot of people that do drugs. They collect a lot of things. They collect junk. We'd just organize it and listen to music."

Straight or stoned, Press remembered Jennylee.

"Jennifer would come by to see if her mother was okay. I know they had a good relationship, Deborah and her daughter. I know they were very close. That I do know. Debbie spoke highly of Jennifer."

**Jennylee Braillard, daughter**

*(2010 interviews)*

On the evening of January 17, Deborah's daughter arrived at the hospital only to learn that her mom had been awake earlier that same day. But now she was again unconscious.

"When I first got there, I took her hand, as I always did, and started talking to her. And she squeezed my hand."

The daughter's world was spinning out of control.

"I couldn't believe they didn't call me. The person I needed to talk to was her."

**Dr. Todd Wilcox, former director,**

**County Health Services**

*(2008 deposition)*

One month before Deborah Braillard was arrested, Dr. Todd Wilcox was hired by Maricopa County to revitalize and reform the clinic dispensing medical care inside Sheriff Joe Arpaio's jail.

This was the medical clinic, according to Arpaio's guards, whose nurses and doctors refused to see inmates who were kicking drugs.

Dr. Wilcox found a rat's nest but not rats.

"The people who work on the line level with CHS . . . want to do a good job. Nobody comes to work wanting to hurt anybody . . . They really want to take care of their patients . . . They are

heroes for working within the system."

But the system is a beast.

As long ago as 1996, the U.S. Department of Justice's Civil Rights Division found that Sheriff Joe Arpaio's jails violated the Constitution and that healthcare in them was "seriously deficient."

In 1997, Arpaio's jails were the only county jail, to be investigated by Amnesty International, which condemned the conditions in the sheriff's jails.

Yet not only were the details of the federal legal proceedings withheld from Dr. Wilcox, he was misled as to their import.

"The details of the amended judgment were not reviewed with us and, in fact, the information that was presented to us was that this was pretty much a dead case."

He was not shown the March 25, 1996, letter from the Department of Justice that found that detention officers were not responsive, that inmates were not adequately assessed during intake by personnel with sufficient medical training, and that appointments with healthcare were frequently missed.

He was never shown the 1999 binding agreement between the DOJ and the county regarding unconstitutional healthcare conditions. On page 3 of that letter, the sheriff promised that anybody doing intake screening of inmates would be appropriately trained by CHS. Furthermore, intake screeners would take a look at arrest reports as part of screening. (Braillard's intake deputy had not been trained, did not look at the police report that documented her need for medication, and blew through detailed paperwork. The screening process involved seven different computer screens that had to be individually filled out and saved. Yet Deputy Cindy Rodriguez did it, as noted, in 59 seconds)

Dr. Wilcox was not shown the 2000 Moore and Associates report that detailed the continued unconstitutional medical conditions in Arpaio's jails.

Nor was he shown the 2003 Bosch study that, yet again, pointed out the ever-present unconstitutional medical conditions.

"I am shocked at those documents . . . I have never seen any of those."

The Justice Department also determined that the sheriff's recordkeeping was a farce.

Dr. Wilcox found that the medical records were backlogged for a full year.

"When I toured the medical records, I found upwards of 60,000 pages of unfiled documentation in the medical record section."

He was ordered by county liaisons to the Board of Supervisors not to put the incriminating data in writing.

"We owed the county a report about the state of CHS . . . What we found [was not] legal, and we were instructed to pull those from the report and to brief them only verbally."

The report was prepared during the period that Deborah Braillard was incarcerated.

That same year, 2005, the jail saw its medical accreditation put in limbo.

"For the National Commission on Correctional Health Care, this is a remarkable event. NCCHC is a very positive organization. They try very hard to help agencies with changes and compliance.

"For them to put a facility on probation was a rather remarkable step for them," acknowledged

Dr. Wilcox.

**Deborah Braillard, mother**

*(1991)*

*The banging on the door is loud.*

*JESUS LORD!! COPS!*

*They start kicking in the freakin' door. Everyone's yelling. My God, my God, I can't get out. Where do I hide? I can't hide! Fuck, FUCK. Flush the drugs . . . Everyone's running around the house terri-fucking-fied.*

*Before anything could be dumped in the toilet, the cops were inside, and when the yelling settled down, they had all three of us.*

*They found eight bindles in my bedroom closet, and under my bed, a mirror, a cocaine pipe, and a few rocks.*

*Even now, my heart races when I think about it. WHY? WHY? WHY?*

*Thank God my mother's taking care of Jennylee.*

*I live with Jean Yvonne Ford in Kirkland, Washington. In February, Jean bought some cocaine from an undercover cop while carrying additional cocaine and a syringe in her bra, more drugs in every pocket, and a couple of thousand dollars cash — not to mention an accounting sheet with all of her drug transactions. Brilliant, right?*

*Under the circumstances, Jean got real cooperative.*

*Jean told the cops she had another four ounces of coke in her safe at home, as well as three grand in bills. She told the cops they could search her home and that they would find her son, Kenneth Rogers, Rene Duran, and me.*

*I admitted I sold the rocks for my rent. Smoked my fair share, too.*

*They read me my Miranda rights, which was about the first time that happened, but not the last.*

**Jennylee Braillard, daughter**

*(2010 interviews)*

"I have always been the type, if someone is in a coma, I believe they recognize you being there. One nurse told me, 'Just keep talking to her. She can hear you. I've seen some pretty wild things happen.'

"They cut her hair, which would have upset her. It upset me."

"And all the time, the doctors kept up the pressure to unplug her."

"We told them if her heart stopped, don't revive her."

Because Deborah's body retained fluids, she swelled grotesquely.

"The big enormous chain around her ankle . . . it was embedded in her leg. Her organs shut down."

Arpaio's deputy, stationed near Deborah, refused to unshackle the woman, though Jennylee said her mom was released from jail once she was sent to the emergency room.

Her feet had turned black. Her mouth was scabrous.

On January 23, three weeks after her arrest, a priest came into the hospital to visit.

Deborah Braillard had a Bible when she coded.

"I freaked and left the room."

The doctor came around the corner searching for Jennylee.

She screamed, "I know. I *know!"*

**Deborah Braillard, mother**

*There is no shock, but shock. There is no suffering, but suffering. There is no agony but agony. There is no death, but death. There is but death.*

**Dr. Todd Wilcox**

*(2008 deposition)*

Upon his arrival, Dr. Wilcox decided that the two principal reforms necessary to make healthcare in Sheriff Joe Arpaio's jail less deadly involved up-to-date health records and a thorough intake process.

"I firmly believed that."

But every attempt to computerize and improve the lax recordkeeping in the sheriff's jail was vetoed by county administrators working under the Board of Supervisors.

Wilcox's concerns about the intake process fared little better.

"Reviewing past medical history is really a critical element of the booking process."

Deborah Braillard was incarcerated three times in 2003, and in each instance, she was treated for diabetes. In 2005, no one — guard, nurse, doctor — looked at the records already on file with the jail that established, unequivocally, that she was insulin-dependent.

"Reviewing past medical history is so critical to us that we actually have a special box on our intake form that the nurses have to check and initial that they have reviewed past medical history."

Deborah Braillard, instead of being treated for diabetes, was presumed by guards to be kicking drugs.

"It's not an adequate response to attribute [her condition] to drug withdrawal. Absolutely not. That's just not appropriate. Even if it were drug withdrawal, that is serious. Drug withdrawal needs to be treated."

Over the four days Deborah Braillard was in Sheriff Joe Arpaio's custody, six guards would watch Braillard's agony. CHS has no record of any of them calling for medical assistance. Assume that is part of CHS' abysmal recordkeeping. The fact remains that not a single officer viewed her tortured "withdrawal" worthy of intervention. No jailer alerted a supervisor. Not a single guard mentioned Braillard's condition to the nurses who visited the cellblock twice a day to dispense pills. Why?

"I can tell you that the prevailing philosophy here is . . . tough on crime. We want people to be uncomfortable and not enjoy the jail stay. [Guards] are not proactive about making sure that things are going okay within the jails. Inmates have to fend for themselves in these jails . . . The end result [is] these jails are much more violent."

Although Dr. Wilcox focused on the tsunami of lost records and the unconstitutional admissions

process, he was, at times, simply stunned by the culture in Arpaio's lockups.

His medical specialty involved prosthetic limbs, braces, and certain kinds of compression socks used by burn victims.

"We would order them and [Sheriff Arpaio's] SWAT team would do a sweep and take everything away . . . Inmates need that, and those devices are expensive."

After three years, Dr. Wilcox was dispirited and alarmed.

The county did "nothing that was truly effective . . . because to truly fix the mismatch requires a significant investment in staff and resources . . . I felt my medical license was in jeopardy."

He resigned.

"It came to a crisis of conscience."

**Deborah Braillard, mother**

*By the time I got arrested in 2005, I'd had eight run-ins with the law. All petty misdemeanors. You couldn't look at me like a hardened criminal. Mostly, I am helpless and hopeless. Like someone in the shadows of a comic book.*

*I switched off cocaine a long time ago and got into methamphetamine, which is the poor woman's way. Meth is the original sin. Left Courtney Love with the shakes and never gave any woman any better. And yet, you love meth like you love a child: without reservation.*

*Meth makes you feel good. For days on end. You might look like Amy Winehouse but you feel like Grace Kelly — a chatty Grace Kelly.*

**Consider:** On September 25, 2008, the NCCHC moved beyond the censure of probation and formally revoked accreditation of Sheriff Joe Arpaio's jails going back to 2005 (when Braillard was incarcerated). Not only was the medical clinic stripped of certification, the NCCHC declared that the county had "provided false information" in pursuit of validation.

In 2008, U.S. District Judge Neil Wake found Sheriff Joe Arpaio's jail "unconstitutional" on a variety of fronts. In 2010, the 9th U.S. Circuit court of appeals upheld the ruling.

In November of this year, Maricopa County administrators discovered that Sheriff Arpaio maintained two sets of financial records. The data revealed that the sheriff misappropriated as much as $80 million that voters had earmarked for the jails. Instead of alleviating the horrendous conditions in the cells, the money was spent on the sheriff's more politically popular initiatives — like rounding up Mexican immigrants.

**Deborah Braillard, mother**

*Arpaio and his people all say I should have told them I was a diabetic. They claim I purposely didn't speak up, so that I'd end up in the infirmary.*

*Imagine that. I'm wallowing in my own excrement and vomit for days on end, convulsing like the bride of Frankenstein, and if I don't confess I'm a diabetic — then I deserve to die.*

*Did I want to escape into the infirmary?*

*Well, I'm not telling. But if that's my crime, it's a harebrained scheme at worst. Who wouldn't prefer an infirmary to a jail cell?*

*But apparently this wasn't the way to get there.*

**Jennylee Braillard, daughter**

*(2010 interviews)*

"When Mom was in the hospital, I'd go by her home and feed all the animals. She always had good pets and bad boyfriends. She had to mother all these losers. I give her credit for not using and trying her best. There were no drugs in her system, according to the blood test, when she died.

"The drug issue was a disease. I've tried to figure out what the drug addiction was about. It's a way of growing up. When she was young, all her brothers played around with drugs. Even though she was strong-willed, her drugs were a weakness. But also a comfort.

"After she died, our family divided up the animals. I took the pregnant dog. I raised 11 puppies and searched for loving homes. I found seven. Took the rest to Four Paws, a no-kill shelter, and they found homes for the remaining pups. Kept one for myself."

You know that Deborah Braillard took in men who abused her and drugs. It is also a fact that she came from a family that suffered depression and indulged in alcohol and drugs. You might say self-medication was as genetic as the diabetes.

Jennylee is on another path. She is married to Nathan, a manager at T.J. Maxx, and has built a life around her baby, whose full name is Kaylynn Ann. Deborah's middle name was Ann.

"I love being a mom. She is a lot of fun. I could not imagine a day without her."

Jennylee works at the Family Christian Bookstore and cherishes the memory of her mother.

"She didn't get to meet my husband. She hasn't seen my growth. I have a daughter. She has a granddaughter. She's not here physically but she is spiritually. I know she's out there. She gets glimpses of us, watches over us. Sees us."

Jennylee lives in hope.

"I have complete faith she'll have eternal life."

**Consider:** On April 21, 2006, Jennylee sued Sheriff Joe Arpaio, the county, and County Health Services. Those who believe legal actions are a lottery ticket that result in easy paydays do not grasp the particulars. The most brutal behavior in a cell block is legally defended by hard men and hard women; and in this particular case, they put the proposition to this young daughter: She didn't really know her mother all the well, did she?

The sheriff's team informed the court that Jennylee's "social interaction with her mom consisted mostly of alleged visits to her mother's home. Those visits were sporadic."

At most, three times a week and on weekends.

Jennylee "was so out of touch with her mother [that] she actually believed she was not on drugs at the time of her arrest."

In fact, an autopsy revealed no drugs in Braillard's body.

The sheriff's attorneys punctuated their point by shoving a mug shot of Deborah in front of Jennylee during a deposition.

Attorney Dennis Wilenchik then informed Jennylee that she had not tried hard enough to save her mother's life, that, if anything, it was *not* the brutality of the jail guards that killed Deborah Braillard, but rather an ineffectual daughter.

Although Jennylee spoke to the jail's risk manager at 7 a.m. on January 5, 2005, and informed him that her mother was an insulin-dependent diabetic needing immediate attention, the sheriff's

lawyer attacked the daughter for not doing enough.

Questions: "Do you think maybe you could have done something, [that] if you had done that, maybe [something could have been done quicker]? You don't think it would be helpful for you to go down to the jail if your mother's about to die to make sure that somebody does something?

"Maybe go down there and bang on the door and ask for some help?"

On October 21, 2008, the court granted motions for summary judgment, in effect, tossing out the federal aspect of the case after 30 months. The judge offered little comment while leaving the state action intact.

Attorney Michael Manning won a strongly worded reversal on appeal, and the entire Braillard case was reinstated. The sheriff's attorneys filed a petition for review, which will be heard by the Arizona Supreme Court on January 4.

**Consider:** The statements in this account are direct quotes from depositions, transcripts, interviews, and other official documents, though any culling of a record of such Dickensian complexity represents a coarse boiling, at best.

But the words of the dead mother are constructions.

Even a casual reader might ask: Pardon?

Deborah Braillard's thoughts are built, in part, upon personal remembrances, recollections, and a voluminous court record. Deborah Braillard's thoughts are further built by venting sentiments — brutal, yet dormant. when limited by that which is admissible.

The thoughts are my words.

Ralph Waldo Emerson said, "Fiction reveals truth that reality obscures." Deborah Braillard's words in this story, a tiny component of an otherwise verbatim accounting, are a small attempt to give voice to a woman left mute by justice.

**Jennylee Braillard, daughter**

*(2010 interview)*

"At first, there was anger. I could not understand how this could happen. That's why I sued.

"I've learned what happened to her: plain and simple cruelty. Maybe this lawsuit can change the system. That would be the biggest blessing."

"The light shines in the darkness, and the darkness did not overcome it." — John 1:5.

 Michael Lacey    Phoenix New Times    Phoenix New Times

SHARE THIS    

READ MORE |  

---

💬 0 COMMENTS

---

## MORE NEWS


IMMIGRATION ▶

### Arizona Spends Nearly $367K to Honor Muslim Syrian Immigrant

### UPCOMING EVENTS

| TICKETS |
Calgary Flames @ Arizona Coyotes G
*Fri., Nov. 27, 7:00pm*

| TICKETS |
Phoenix Suns vs. Golden State Warric
*Fri., Nov. 27, 7:30pm*

| TICKETS |
Pepsi Family 4 Pack : Arizona Coyote
*Sat., Nov. 28, 8:00pm*


ARIZONA ▶

### Arizona Is One of the Most Dangerous States — but At Least We Beat Out Mississippi


NEWS ▶

### Abused Circus Elephant Nosey Gets Help From Arizona Congressman Raul Grijalva

MORE NEWS 

©2015 Phoenix New Times, LLC. All rights reserved.

# EXHIBIT B



MENU

  

SIGN UP
LOG IN

MORE

# ARE YOUR PAPERS IN ORDER?

 BY MICHAEL LACEY

   

3                    0

THURSDAY, MARCH 12, 2009    |    7 YEARS AGO



One of Joe Arpaio's masked enforcers.

Elaine Sanchez understands Guadalupe, Arizona, as well as she understands her six children. She was born and raised in the village of 5,500 souls hard by the freeway and the conventional suburbs of Tempe and Phoenix.

Sheriff Joe Arpaio put Guadalupe on the nation's map during his anti-immigrant sweep last April.

It is Lent — in fact, a mere five days past Ash Wednesday. Already the Catholic community is deep in preparation for Easter Sunday. But more than piety grips Guadalupe. Elaine bounces Marcus, her toddler, on her knee and despairs of small-town gossip: "Everyone knows everyone here."

The 32-year-old lives in her childhood home. Tired nails, aged wood, and weary plasterboard make up the barest skin against the Sonoran Desert's heat and chill. Streetside, kids' clothing dries along the length of rickety chain-link. (Does anyone have more tops and bottoms than a 2-year-old?)

Nearby, two strapping sons sweep the dirt and rake. Their nascent facial hair cannot disguise a youngster's impulse to bound, or to punch a shoulder. Discovered leaping over a fence recently, they were questioned by law enforcement. Their explanation of their behavior was straightforward: hide-and-seek.

As the teenage boys tidy up, an unbalanced washing machine bangs against the outside of the

home while, yards away in the back, an abandoned van squats.

The broken-down Dodge, fast becoming a rusting rumpus room, is the stuff of story in the Sanchez home, as well as in Guadalupe at large.

Tracked for nearly a mile by Sheriff Joe Arpaio's deputies last May, when the Dodge still ran, Elaine became alarmed, and then terrified, as the lawmen followed closely without ever turning on their lights. Her anxiety surpassed anything associated with an ordinary ticket; her family had already exchanged tales about this sort of enforcement.

For more Joe Arpaio's abuses of power, see our special report section.

Elaine drove the van into her backyard. After banging on the back door and screaming for her own mother, she was wrestled to the ground by the sheriff's men. Sanchez's boys emerged from their home to find their mother flat in the dirt with a deputy's knee in her back as she was roughly handcuffed.

The light over her license plate was out.

This is not an unknown crime in Elaine's neighborhood.

Indeed, Elaine Sanchez was no stranger to the sheriff's deputies who'd wrangled with her on the ground; one of them later volunteered that he recognized her from an earlier visit.

Sanchez and her family believe they have been targeted by Sheriff Joe Arpaio's men as part of the fallout from the lawman's infamous anti-immigrant sweep in Guadalupe.


And here's the rub: In spite of their last name, none of the Sanchezes is Mexican. None of them is in the United States illegally.

All members of the Sanchez family are Yaqui Indians. They are all American citizens. They are as legal as the sheriff's family.

They are, however, brown.

On March 4, Congressman Bennie G. Thompson (D-Mississippi) worried aloud that the 287(g) program — the enabling act that turns cops into immigration officers — was "using minor traffic violations instead of major crimes" to harass Hispanics.

Thompson, chairman of the House Homeland Security Committee, has no idea.

The genteel concerns of an uninformed Mississippi legislator are so beside the point as to be quaint.

Motorists in Maricopa County are confronted today by deputies in ski masks, guns drawn.

Ski masks.

The slightest pretext elicits the question: Are your papers in order?

With this article, we begin an occasional series to introduce the people swept up in this madness. The individuals you will meet in this installment are all Americans. But eventually, you will also shake hands with illegal aliens.

Neighbors, one and all.

Earlier skirmishes at Pruitt's furniture store and the sheriff's illegal alien sweeps on Thomas Road, as well as in Cave Creek, were only warm-up exercises. The thrust to turn immigration enforcement into a reign of terror reached critical mass on April 3, 2008, in Guadalupe, Arizona.

Mounted horsemen, deputies in unmarked cars, and bulked-up lawmen with shaved heads faced off against villagers and protesters.

Sheriff Arpaio set up his massive command post in the parking lot of the Family Dollar store. Demonstrators, mostly Hispanic, ringed the parking lot chanting, holding signs, urging cars to honk. The glare from ubiquitous television lights competed with the flashing decks of squad cars.

Everywhere you looked, people, pedestrians, and drivers alike had been stopped. Are you a United States citizen? Is your car in perfect compliance with the minutiae of the state Motor Vehicle Division?

These are questions that play hell with the poor.

The massive two-day show of force — Arpaio said he employed 200 deputies and posse members — netted nine illegals.

And when the mayor of Guadalupe told Sheriff Joe Arpaio that he wasn't welcome to terrorize her neighbors, the lawman exploded in front of the media.

On April 3, Andrew Sanchez, Elaine's brother, drove friends and family right into the heart of history. Caught up in the moment, he honked his horn.

His show of support for the protest broke the law.

Like John the Baptist, Sanchez prepared the way for the sheriff; the night before the lawmen swooped into Guadalupe, Andrew ringed the town with signs warning the residents that Arpaio was coming.

On the day of the raid, Sanchez posted another hand-painted message: "If you are profiled or harassed, call me."

Andrew works as a resident program specialist at the Arizona State Hospital. More importantly, he has an automobile that functions. In a poor community, a man with a car is a busy fellow.

"Before the sun went below the mountains, people started gathering in anticipation of Arpaio," said Sanchez. "And people called me for rides to work. They were afraid to walk, afraid to drive themselves."

The daughter of a former elected official phoned. She'd been stopped while on foot and forced to produce identification. She asked Sanchez to take her to her home, where she had more anti-Arpaio signs.

"When we got to her house, she grabbed shoe polish," recalled Sanchez. "She wrote on my car window: 'Proud to be brown' and 'Go home, Arpaio.'"

After serving as an impromptu taxi driver, Sanchez picked up his sister Elaine, who was the swing-shift supervisor at Jack in the Box.

As they eased past the Family Dollar store and drove through Arpaio's "crime suppression," Sanchez tooted his horn.

He was promptly pulled over, and after producing registration, license, and proof of insurance, he was interrogated. Sanchez was ticketed for honking his horn. The lawmen commented upon the anti-Arpaio signs in his backseat and the greased windows asking the sheriff to leave Guadalupe.

Although a judge tossed the complaint, Sanchez believes strongly that Arpaio's deputies have targeted him and his family because he dared to speak out.

Later in April, on his way to a graduation party, Sanchez was pulled over once more, this time for a broken taillight.

Sanchez's brother-in-law, Manuel Valenzuela, borrowed Andrew's car in April to take his wife dinner where she works.

He operated the vehicle without a valid driver's license; when the deputies flashed their lights, he turned into his mother's yard instead of promptly pulling over.

Valenzuela claims the officers emerged from their car with guns drawn. They handcuffed and arrested Valenzuela.

He had driven Andrew's car with the high beams on.

Sanchez said that for all the officers knew, the person driving the car was Andrew himself. He is suspicious. His car was impounded, and the deputies made a number of calls to relatives announcing that they'd impounded Andrew's car.

That next month, on May 28, his sister Elaine was confronted in her own yard and arrested.

She was told that the light illuminating her license plate was out. But the officers who put her in jail never charged her with that offense. Indeed, as she drove south on Avenida del Yaqui, the deputies drove north, in the opposite direction. They had to make a U-turn to follow her.

They made the U-turn to follow her before they could see her rear license plate.

Elaine Sanchez was ordered to appear in court on July 1, 2008. A judge dismissed the disorderly conduct charge.

Sanchez and her kin believe that the deputies focused on her family to make a point: Political dissent does not change who runs Guadalupe.

Sheriff Joe Arpaio runs Guadalupe.

It is worth remembering that the mayor of Guadalupe's confrontation with Arpaio was on April 3, the first night of the immigration sweep.

The sheriff told the press that he'd been invited into Guadalupe by the village's administrators.

But on the night of the raid, Mayor Rebecca Jimenez handed Arpaio a press release calling for an end to the roundup. Guadalupe's leaders had not summoned the sheriff.

In front of rolling television cameras, Arpaio erupted.

"Forget the press release!" said the sheriff. "That doesn't matter. Action is what speaks . . . You said you didn't want us back here tomorrow. Is that what you said?"

"Yes," replied the mayor.

"Well, we *will* be back here tomorrow. Full force!"

Arpaio then threatened the mayor.

"If you don't like the way I operate, you go get your own police department," said the sheriff. "You've got 90 days to cancel your contract — 90 days. You wanna cancel it, feel free to."

Arpaio's troops did, indeed, return. The next day, his deputies circled the square during the confirmation ceremony of youngsters at Our Lady of Guadalupe Catholic church. Families terrified of being swept up in the dragnet avoided the religious rite or sent their children with others.

Two weeks later, on April 18, Sheriff Arpaio made good on his threat to Mayor Jimenez. He notified Guadalupe that it had 180 days to "study and research the law enforcement needs of the community and explore other law enforcement alternatives.

"I want nothing to do with [Mayor Jimenez] and the little town of Guadalupe," said Arpaio.

In the weeks that followed, the impoverished community learned that it could not afford to hire either Phoenix or Tempe to patrol its streets; Guadalupe had to swallow its pride. Jimenez was forced out as mayor, in part, by council members offended that she had raised Arpaio's ire and potentially lost the town its police services. A new mayor was installed, and the village approached Arpaio on bended knee and asked that he return.

This vengeance by Sheriff Arpaio was hardly an isolated act.

In an April 3 press release announcing his Guadalupe roundup of illegal immigrants, the sheriff took the time to attack former legislator Alfredo Gutierrez, who had dared to criticize Arpaio on Radio Campesina.

In a recent interview, Gutierrez said the retaliation went beyond words.

Gutierrez said that when he emerged from Portland's, a bar and restaurant on Central Avenue in downtown Phoenix, after his comments on the radio, he found Arpaio's plainclothes deputies waiting for him.

Gutierrez, who no longer drinks, had consumed nothing stronger than alcohol-free O'Doul's.

In any case, Sheriff Arpaio's men do not run sobriety checkpoints in downtown Phoenix, let alone stop individuals in this fashion.

Contacted by *New Times*, the Sheriff's Office did not respond when asked to comment on any of the claims made in this story except to say that the request for reaction "will be processed."

"It is just a fact of life," said Gutierrez. "Those of us who have spoken out are followed by Arpaio's men."

Andrew Sanchez, like Gutierrez, believes he is a target and that Arpaio is going after his family.

Arpaio's behavior during the April immigrant roundup garnered national attention and criticism from the *New York Times*, which noted in an editorial: "The Mayor of Guadalupe implored (Arpaio) to leave her community alone. State and county officials have pointed out that Sheriff Joe has ignored tens of thousands of outstanding criminal warrants while chasing day laborers and headlines."

This is not entirely accurate.

In fact, Arpaio's deputies found one warrant they could execute.

They served it on Elaine Sanchez's husband, Andrew Sanchez's brother-in-law, Manuel Valenzuela.

In January of this year, Valenzeula paid the $135 fine that resulted from the arrest by the Sheriff's Office last April.

One month later, on February 4, as he walked out of Soto's Store in Guadalupe, he was handcuffed and arrested on an outstanding warrant.

Manuel Valenzuela still owed 40 cents on the $135 ticket he'd paid off.

"In Guadalupe, you make a bad name in the town and everybody knows," explained Elaine Sanchez. "I've lived in the same home all my life. My aunt's next door, my uncle. You talk to

someone who's not your husband, they assume something. It's like community policing. There's no point in introducing someone. There are no strangers."

Andrew Sanchez believes that is the problem. In such a tiny place, he and his family are known all too well to Sheriff Arpaio's deputies.

On a recent weekend, he drove past the village square. Inside the dusty field sits a Catholic church. Next door is a Yaqui temple. Residents nearby have erected three crosses in anticipation of Easter.

On Holy Thursday, a Yaqui ceremony will unfold. *Chapayekas*, "long-nosed" soldiers who search for Jesus throughout Lent, will seize an effigy of Christ. The *fariseos* will then re-enact the crucifixion. But the message of resurrection inspires hope, and the Yaqui know how to resist the authorities.

Deer dancers, *caballeros*, *matachines*, and *pascolas* intervene on behalf of the people. You hear their rattles.

Then . . . something wondrous!

The *fariseos* and *chapayekas* are pelted with flowers.

The miracle of Christ's passion grips Guadalupe.

But it is not quite Easter Sunday. Not yet.

Meanwhile, Andrew Sanchez has found his own way to resist authority every Saturday morning in front of the community garden. Little kids ladle out drinks and pass out fliers announcing that they are raising funds "to help people who cannot afford to repair any broken taillights or tag lights, broken windshields, etc."

Everyone knows these children. They're the Sanchez kids: brothers, sisters, nieces, nephews.

The Sanchez family refuses to endure in the barrio's shadows.

They fight back with lemonade.

On Tuesday, March 10, the Civil Rights Division of the United States Justice Department notified Sheriff Arpaio that he was under investigation for "patterns or practices of discriminatory police practices and unconstitutional searches and seizures."

This response follows the call from four congressmen as well as the mayor of Phoenix for a federal probe into the sheriff's immigrant sweeps. One of those four congressmen, House Judiciary Committee Chairman John Conyers (D-Michigan), has promised hearings on Arpaio's immigration sweeps soon.

Belligerent and defiant, Arpaio announced that he would not be intimidated. He vowed to fight in court and, if necessary, to drop out of the federal 287(g) program and use state laws to hunt down immigrants. In a county that rejected Barack Obama and re-elected Joe Arpaio for the fifth time, the sheriff's posture palpitated with rabble-rousing indignation.

You'll have to excuse Huey Long's envy.

Crimson petals and lemonade, prayer and passive resistance — all have withered before Arpaio's reflexive sneer.

A new question is upon us:

Will subpoenas wipe the rictus of contempt for the Constitution from the sheriff's face, or is it Miller time for Mussolini?

 Michael Lacey   Phoenix New Times   Phoenix New Times

# Get the This Week's Top Stories Newsletter

Every week we collect the latest news, music and arts stories — along with film and food reviews and the best things to do this week — so that you'll never miss Phoenix New Times' biggest stories.

**GO**▸

---

SHARE THIS |    

---

READ MORE |  NEWS   NEWS

---

🗨 0 COMMENTS

---

## MORE NEWS

 ARIZANA

Arizona is One of the Most Dangerous States — but at Least We Beat Out Mississippi

UPCOMING EVENTS

 TICKETS
Calgary Flames @ Arizona Coyotes G
*Fri., Nov. 27, 7:00pm*

TICKETS
Phoenix Suns vs. Golden State Warrio
*Fri., Nov. 27, 7:30pm*

TICKETS
Pepsi Family 4 Pack : Arizona Coyote
*Sat., Nov. 28, 8:00pm*

 NEWS

 EDUCATION

Abused Circus Elephant Nosey Gets
Help From Arizona Congressman
Raul Grijalva

Gilbert Anti-Abortion Textbook
Sticker Decision Didn't Violate
Arizona Law

MORE NEWS  ⊕

©2015 Phoenix New Times, LLC. All rights reserved.

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE NO. 1, a minor child, by her parent and next friend MARY ROE, JANE DOE NO. 2, and JANE DOE NO. 3, a minor child, by her parents and next friends, SAM LOE and SARA LOE,<br><br>Plaintiffs,<br><br>v.<br><br>BACKPAGE.COM, LLC, CAMARILLO HOLDINGS, LLC (f/k/a VILLAGE VOICE MEDIA HOLDINGS, LLC) and NEW TIMES MEDIA HOLDINGS, LLC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Civil Action No. 14-13870-RGS |

**DEFENDANTS' RESPONSE TO BRIEFS OF *AMICI CURIAE* COMMONWEALTH OF MASSACHUSETTS AND CITY AND COUNTY OF SAN FRANCISCO, *ET AL.*, IN SUPPORT OF PLAINTIFFS**

BACKPAGE.COM, LLC, et al.

By Their Attorneys,

Robert A. Bertsche (BBO #554333)
Jeffrey J. Pyle (BBO #647438)
PRINCE LOBEL TYE LLP
100 Cambridge Street, Suite 2200
Boston, MA 02114
(617) 456-8000 (tel.); (617) 456-8100 (fax)
rbertsche@PrinceLobel.com
jpyle@PrinceLobel.com

James C. Grant (admitted *Pro Hac Vice*)
Ambika K. Doran (admitted *Pro Hac Vice*)
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101
(206) 622-3150 (tel.); (206) 757-7700 (fax)
jimgrant@dwt.com
ambikadoran@dwt.com

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     ARGUMENT ................................................................................................... 2

        A.    Amici's Assertions and Arguments Are Improper. ................................. 2

        B.    This Court Deserves a More Balanced View of Sex Trafficking than
              Amici's "Understandings." ..................................................................... 3

        C.    Amici's Factual Accusations about Backpage.com Are Improper and
              Contradict Their Laws, Experiences, and Statements. ......................... 11

        D.    Amici Have Conceded Section 230 Bars Enforcement of State Laws. ............... 17

        E.    Amici Cannot Argue that Backpage.com is an "Information Content
              Provider," and Their Argument is Wrong............................................ 21

III.    CONCLUSION............................................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*800-JR Cigar, Inc. v. GoTo.com, Inc.*,
   437 F. Supp. 2d 273 (D.N.J. 2006) ....................................27

*Alvi Armani Med., Inc. v. Hennessey*,
   629 F. Supp. 2d 1302 (S.D. Fla. 2008) ...............................26

*Am. Libraries Ass'n v. Pataki*,
   969 F. Supp. 160, 168 (S.D.N.Y. 1997)...............................18

*Anthony v. Yahoo! Inc.*,
   421 F. Supp. 2d 1257 (N.D. Cal. 2006) ..............................26

*Atl. Recording Corp. v. Project Playlist, Inc.*,
   603 F. Supp. 2d 690 (S.D.N.Y. 2009)................................23

*Backpage.com, LLC v. Cooper*,
   939 F. Supp. 2d 805 (M.D. Tenn. 2013) .............................11

*Backpage.com, LLC v. Hoffman*,
   2013 WL 4502097 (D.N.J. Aug. 20, 2013) ..........................11

*Backpage.com, LLC v. McKenna*,
   881 F. Supp. 2d 1262 (W.D. Wash. 2012)........................11, 17

*Batzel v. Smith*,
   333 F.3d 1018 (9th Cir. 2003) .......................................17

*Cisneros v. Sanchez*,
   403 F. Supp. 2d 588 (S.D. Tex. 2005) ..............................27

*Dart v. Craigslist, Inc.*,
   665 F. Supp. 2d 961 962, 969 (N.D. Ill. 2009) ..................11, 24

*Doe v. City of New York*,
   583 F. Supp. 2d 444 (S.D.N.Y. 2008)................................26

*Doe v. GTE, Corp.*,
   347 F.3d 655 (7th Cir. 2003) .......................................26

*Doe v. MySpace, Inc.*,
   629 F. Supp. 2d 663 (E.D. Tex. 2009)...............................23

*F.T.C. v. Accusearch, Inc.*,
   570 F.3d 1187 (10th Cir. 2009) ...............................................................23, 24, 26

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
   521 F.3d 1157, 1174 (9th Cir. 2008) ................................................21, 22, 23, 24

*Fraley v. Facebook, Inc.*,
   830 F. Supp. 2d 785 (N.D. Cal. 2011) ..................................................................26

*Goddard v. Google, Inc.*,
   640 F. Supp. 2d 1193 (N.D. Cal. 2009) ..........................................................23, 27

*Hy Cite Corp. v. Badbusinessbureau.com, L.L.C.*,
   418 F. Supp. 2d 1142 (D. Ariz. 2005) ...................................................................27

*Jones v. Dirty World Entertainment Recordings LLC*,
   755 F.3d 398 (6th Cir. 2014) ................................................................................25

*Katin v. Nat'l Real Estate Info. Servs., Inc.*,
   2009 WL 929554 (D. Mass. Mar. 31, 2009) ..........................................................19

*L.B. Corp. v. Schweitzer-Mauduit Int'l, Inc.*,
   121 F. Supp. 2d 147, 152 (D. Mass. 2000) ............................................................20

*Lane v. First Nat'l Bank of Bos.*,
   871 F.2d 166 (1st Cir. 1989) .............................................................................3, 21

*Levitt v. Yelp! Inc.*,
   2011 WL 5079526 (N.D. Cal. Oct. 26, 2011), *aff'd*, 765 F.3d 1123 (9th Cir. 2014) ..............27

*M.A. v. Village Voice Media Holdings, LLC*,
   809 F. Supp. 2d 1041 (E.D. Mo. 2011)............................................................11, 26

*McCoy v. Mass. Inst. of Tech.*,
   950 F.2d 13 (1st Cir. 1991) ...................................................................................21

*MCW, Inc. v. Badbusinessbureau.com, L.L.C.*,
   2004 WL 833595 (N.D. Tex. Apr. 19, 2004) .........................................................27

*Moving & Storage, Inc. v. Panayotov*,
   2014 WL 949830 (D. Mass. Mar. 12, 2014)...........................................................26

*Nemet Chevrolet, Ltd. v. ConsumerAffairs.com, Inc.*,
   591 F.3d 250 (4th Cir. 2009) .....................................................................17, 24, 27

*New England Patriots Football Club, Inc. v. Univ. of Colo.*,
   592 F.2d 1196 (1st Cir. 1979) ............................................................................2, 11

3

*Pharm. Research & Mfrs. of Am. v. Concannon*,
  249 F.3d 66 (1st Cir. 2001), *aff'd sub nom. Pharm. Research & Mfrs. of Am.
  v. Walsh*, 538 U.S. 644 (2003) .......................................................................................21

*PSINet, Inc. v. Chapman*,
  362 F.3d 227 (4th Cir. 2004) ..........................................................................................18

*Ray v. Ropes & Gray LLP*,
  961 F. Supp. 2d 344 (D. Mass. 2013) .............................................................................19

*Santos v. SANYO Mfg. Corp.*,
  2013 WL 1868268 (D. Mass. May 3, 2013) ....................................................................19

*Strasser v. Doorley*,
  432 F.2d 567 (1st Cir. 1970) .............................................................................................2

*Swenson v. Yellow Transp., Inc.*,
  317 F. Supp. 2d 51 (D. Mass. 2004) ...............................................................................19

*United States v. Certain Land Located in the Cnty. of Barnstable*,
  674 F.2d 90 (1st Cir. 1982) .............................................................................................11

*Universal Commnc'ns Sys., Inc. v. Lycos, Inc.*,
  478 F.3d 413 (1st Cir. 2007) ...........................................................................................24

*Weaver's Cove Energy, LLC v. R. I. Coastal Res. Mgmt. Council*,
  589 F.3d 458 (1st Cir. 2009) ...........................................................................................21

**State Cases**

*Demetriades v. Yelp, Inc.*,
  228 Cal. App. 4th 294, 175 Cal. Rptr. 3d 131 (2014) .....................................................26

*Gentry v. eBay, Inc.*,
  99 Cal. App. 4th 816, 121 Cal. Rptr. 2d 703 (2002) .......................................................25

*Go-Best Assets Ltd. v. Citizens Bank of Massachusetts*,
  463 Mass. 50, 972 N.E.2d 426 (2012) ............................................................................18

*Hardin v. PDX, Inc.*,
  227 Cal. App. 4th 159, 173 Cal. Rptr. 3d 397 (2014) .....................................................26

*Hill v. StubHub, Inc.*,
  727 S.E.2d 550 (N.C. Ct. App. 2012) .........................................................................25, 26

*Milgram v. Orbitz Worldwide, Inc.*,
  419 N.J. Super. 305, 16 A.3d 1113 (Law Div. 2010) ......................................................25

*NPS LLC v. StubHub, Inc.*,
    2009 WL 995483 (Mass. Super. Ct. Jan. 26, 2009)................................................................25

**Federal Statutes**

47 U.S.C. § 230................................................................................................ *passim*

**State Statutes & Municipal Ordinances**

Atlanta Code of Ordinances § 30-641 to -668 ..........................................................12

Colo. Rev. Stat. § 12.25.5-101 *et seq.*......................................................................12

Denver Mun. Code, § 7-320 ....................................................................................12

Mass. Gen. Laws ch. 93A .......................................................................1, 18, 19, 20

Mass. Gen. Laws ch. 265 ..............................................................................1, 12, 18

San Francisco Police Code Art. 15.6 § 1074.4 .........................................................12

**Rules**

Fed. R. Civ. P. 9(b) ................................................................................................19

Fed. R. Civ. P. 12(b)(6)............................................................................................1

**Other Authorities**

*APA Task Force Report Highlights Problem of Human Trafficking of US Women
    and Girls* (Mar. 12, 2014),
    http://www.apa.org/news/press/releases/2014/03/human-trafficking.aspx ..............................8

Bloomberg Law, News & Law Reports, at 1 ...............................................................4

*Child Prostitution: Raids Rescue 105 Young People*, N.Y. Times (July 29, 2013),
    http://mobile.nytimes.com/aponline/2013/07/29/us/politics/ap-us-child-sex-
    arrests.html?from=us ....................................................................................15

Chris Matyszczyk, *Study:  Facebook replacing Craigslist for prostitutes*, CNET
    (Feb. 7, 2011), http://www.cnet.com/news/ study-facebook-replacing-
    craigslist-for-prostitutes ...............................................................................6

Christina Bain, *et al.*, *How to Responsibly Create Technological Interventions to
    Address the Domestic Sex Trafficking of Minors* (April 8, 2013),
    http://www.danah.org/papers/TechnologistsCSEC.pdf ..........................................4, 8

danah boyd, et al., *Human Trafficking and Technology:  A Framework for understanding the role of technology in the commercial sexual exploitation of children in the U.S.*, (2011), http://research.microsoft.com/en-us/collaboration/focus/education/htframework-2011.pdf .....................................................5, 6

danah boyd, *Combating Sexual Exploitation Online:  Focus on the Networks of People, not the Technology*, Statement to Attorney General Coakley, Hearing on Sexual Exploitation Online (Oct. 19, 2010), http://www.mass.gov/ago/docs/community/testimony/db.pdf .........................................6, 7, 9

danah boyd, *How Censoring Craigslist Helps Pimps, Child Traffickers and Other Abusive Scumbags*, HUFFINGTON POST (Sept. 6, 2010), http://www.huffingtonpost.com/danah-boyd/how-censoring-craigslist-_b_706789.html ...........................................................................................7, 8, 10

Daniel Fisher, *Backpage Takes Heat, But Prostitution Ads Are Everywhere*, FORBES (Jan. 26, 2012), http://www.forbes.com/sites/danielfisher/2012/01/26/backpages-takes-heat-for-prostitution-ads-that-are-everywhere ...........................6

*Domestic Minor Sex Trafficking: Hearing before Senate Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 111th Cong. 297-99 (2010) .....................................................................................................................20

Eliabieta Gozdziak & Micah Bump, Georgetown University Institute for the Study of International Migration, *Data and Research on Human Trafficking: Bibliography of Research-Based Literature* (Oct. 2008), https://www.ncjrs.gov/pdffiles1/nij/grants/ 224392.pdf ...........................................4

Gianna Caserta, *More than 60 men charged in HPD prostitution 'round-up,'* CLICK2HOUSTON (Mar. 4, 2015), http://www.click2houston.com/news/64-charged-in-hpd-prostitution-roundup-investigation/31605082.................................14

http://www.cityofboston.gov/cityclerk/dbasearch/Default.aspx?type_of_business=escort&order_by=file_number ...............................................................................12

http://www.yellowpages.com ...............................................................................12

*Human Trafficking in the United States:  Protecting the Victims*, Hearing Before Senate Judiciary Committee, 114th Cong. (Feb. 24, 2015) .................................4, 11

Institute of Medicine & National Research Council, *Confronting Commercial Sexual Exploitation and Sex Trafficking of Minors in the United States* (Ellen Wright Clayton *et al.* eds., 2013), http://www.iom.edu/~/media/Files/Report%20Files/2013/Sexual-Exploitation-Sex-Trafficking/sextraffickingminors_rb.pdf ...........................................................................9

Jennifer Musto, *Institutionalizing Protection, Professionalizing Victim Management: Explorations of Multi-Professional Anti-Trafficking Efforts in the Netherlands and the United States* (UCLA 2011) ............................................8

Julie Ruvolo, *Sex, Lies and Suicide:  What's Wrong with the War on Sex Trafficking*, FORBES (June 26, 2012), http://www.forbes.com/sites/julieruvolo/2012/06/26/sex-lies-and-suicide-whats-wrong-with-the-war-on-sex-trafficking/ ...................................................6, 7

Letter from AG Coakley, *et al*. to Sen. Rockefeller, *et al.* (July 23, 2013), https://www.eff.org/files/cda-ag-letter.pdf ............................................20

Mark Latonero, *Human Trafficking Online, The Role of Social Networking Sites and Online Classifieds*, USC Annenberg Center on Communication Leadership & Policy (Sept. 2011).................................................................5

Mark Latonero, *The Rise of Mobile and the Diffusion of Technology-Facilitated Trafficking*, USC Annenberg Center on Communication Leadership and Policy (Nov. 2012), https://technologyandtrafficking.usc.edu/files/2012/11/HumanTrafficking2012_Nov12.pdf ........................................................................ *passim*

Mark Masnick, *Oh Look:  Police Can Use Backpage.com To Track Down, Arrest & Convict Pimps & Prostitutes*, TECHDIRT (Oct. 2, 2012), https://www.techdirt.com/articles/20121002/07354820569/oh-look-police-can-use-backpagecom-to-track-down-arrest-convict-pimps-prostitutes.shtml.........................7

Maureen McGough, *Ending Modern-Day Slavery: Using Research to Inform U.S. Anti-Human Trafficking Efforts*, National Institute of Justice, NIJ Journal No. 271 (Feb. 2013), http://www.nij.gov/journals/271/pages/anti-human-trafficking.aspx ............................................................................4

Megan Woolhouse, *Craigslist sex-ad ban doesn't end Web listings*, BOSTON GLOBE (Sept. 8, 2010).................................................................7

Meredith Dank, *et al*., *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*, Urban Institute, at 234 (March 2014), http://www.urban.org/UploadedPDF/413047-Underground-Commercial-Sex-Economy.pdf ............................................................7

Michael Lindenberger, *Craigslist Comes Clean: No More 'Adult Services,' Ever*, TIME, (Sept. 16, 2010), http://content.time.com/time/nation/article/0,8599,2019499,00.html ......................................7

National Institute of Justice, NIJ JOURNAL No. 271 (Feb. 2013), http://www.nij.gov/journals/271/pages/anti-human-trafficking.aspx ........................................4

O'Ryan Johnson, *Coakley reverses stance on site*, BOSTON HERALD, (Aug. 20, 2010) ...............................................................................................20

*Oakland Man Accused Of Listing Teen On Sex Website Pleads Not Guilty*, CBS (Feb. 27, 2015), http://sanfrancisco.cbslocal.com/2015/02/27/oakland-man-who-listed-teen-on-web-for-sex-busted-by-website-pleads-not-guilty ...................................15

Phillip Martin, *Two Years On, Mass. Human Trafficking Law Examined*, WGBH, (Aug. 19, 2013), http://wgbhnews.org/post/two-years-mass-human-trafficking-law-examined..............................................................................................4

Press Release, Washington AG, *McKenna announces agreement with Craigslist to crack down on illegal sex trade ads* (Nov. 6, 2008), http://www.atg.wa.gov/news/news-releases/mckenna-announces-agreement-craigslist-crack-down-illegal-sex-trade-ads..................................................16

Press Release, The White House, Remarks by the President to the Clinton Global Initiative (Sept. 25, 2012), http://www.whitehouse.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative.................................9

Rachel Lewis Hilburn, *Websites with Adult Ads Contribute to Sex Trafficking of Kids; Law Officers Call the Sites Helpful*, WHQR (Mar. 4, 2015), http://whqr.org/ post/websites-adult-ads-contribute-sex-trafficking-kids-law-officers-call-sites-helpfu .........................................................................10

Richard Estes & Neil Alan Weiner, *The Commercial Sexual Exploitation of Children In the U.S., Canada and Mexico*, University of Pennsylvania, Center for the Study of Youth Policy (Sept. 18, 2001, rev. Feb. 20, 2002), *quoted at* http://www.justfacts.com/sexuality.asp#f40 ..............................................5

Ronald Weitzer, *New Directions in Research on Human Trafficking*, 653 ANNALS AM. ACAD. POL. & SOC. SCI. (May 2014)..............................................4

Sadie Gurman, *Six Denver pimps arrested, 9 children saved as part of federal sting*, DENVER POST (July 29, 2013), http://www.denverpost.com/ci_23753147/six-denver-pimps-arrested-nine-children-saved-part ...........................................................................15

Shared Hope International, *2013 Protected Innocence Challenge: A Legal Framework of Protection for the Nation's Children*, http://sharedhope.org/wp-content/uploads/2014/02/2013-Protected-Innocence-Challenge-Report.pdf............9

Sheldon Zhang, *Beyond the 'Natasha' story—a review and critique of current research on sex trafficking*, GLOBAL CRIME vol. 10, no. 3, at 179 (Aug. 2009) ......................4

State Attorney General Letter (Sept. 21, 2010), http://www.illinoisattorneygeneral.gov/pressroom/2010_09/Backpage_com9-20-2010.pdf..................................................................................7

Statement of AG Kamala Harris, *Human Trafficking*, http://oag.ca.gov/human-trafficking...................................................................................................................9

Stephanie Hanes, *Human Trafficking:  a misunderstood global scourge*, Christian Sci. Monitor (Sept. 9, 2012) http://www.csmonitor.com/World/Global-Issues/2012/0909/Human-trafficking-a-misunderstood-global-scourge....................................................4, 5, 8

Steve Johnson, *Sex online: Police target lucrative Internet prostitution trade*, San Jose Mercury News (Jan. 12, 2015) ................................................................15

Vanessa Bouche, Thorn, *A Report on the Use of Technology to Recruit, Groom and Sell Domestic Minor Sex Trafficking Victims* (January 2015), https://www.wearethorn.org/resources-and-research/use-of-technology-in-domestic-minor-sex-trafficking ....................................................6, 8, 10

Women's Commission for Refugee Women and Children, *The U.S. Response to Human Trafficking:  An Unbalanced Approach* (May 2007), http://www.humantrafficking.org/uploads/publications/ustraff.pdf .........................................4

www.craigslist.org/about/help/Adult_Services_Posting_Guidelines ...........................................17

# I.     INTRODUCTION

On the eve of Backpage.com's deadline for its last brief concerning its Motion to Dismiss, the Massachusetts Attorney General ("AG") and six municipalities ("Cities")[1] filed two amicus briefs in support of Plaintiffs.  For the reasons set forth in the accompanying Motion for Leave, Backpage.com respectfully asks the Court to consider this Response, which addresses four points.

*First*, amici offer their "understanding" of the issue of sex trafficking, but the Court should have a more balanced account of the public discourse about the problem and how best to address it.  Although amici advocate shutting down websites such as Backpage.com, many experts agree censorship is a misguided and ineffectual approach to combat the problem, while technology and working with cooperative websites can be an important part of the solution.

*Second*, amici offer their own fact allegations, with the apparent aim of tainting the Court's view of Backpage.com.  Amici's partisan view of the facts is improper, especially here, because Backpage.com's Rule 12(b)(6) motion turns on whether Plaintiffs have sufficiently alleged plausible facts to support a claim (and, indeed, Plaintiffs have admitted the key facts establishing immunity under 47 U.S.C. § 230 ("Section 230")).  Moreover, the fact that amici frequently work with Backpage.com—and often praise the website for its cooperation and support of law enforcement—belie the accusations they now make.

*Third*, amici urge the Court to permit them to enforce state and local laws against Backpage.com, yet the AG has admitted several times that Section 230 preempts such laws in exactly this context.  Further, while the AG's office apparently endorses Plaintiffs' statutory claims (under c. 265 § 50 and c. 93A), the authority it cites supports Backpage.com's arguments for dismissal.

---

[1] City and County of San Francisco, City of Atlanta, City and County of Denver, City of Houston, City of Philadelphia, and City of Portland, Oregon.

*Finally*, amici make a new argument—that Backpage.com is an "information content provider" and thus exempt from Section 230 immunity—even though Plaintiffs expressly disclaimed this position.  This too is an improper amicus argument.  Nonetheless, under well-established authority interpreting Section 230, Backpage.com is not the "information content provider" for the ads about Plaintiffs (which can be the only basis for their claims).  Amici's new argument is simply another variation of the oft-rejected theory that parties can avoid Section 230 by alleging a website, by its nature, "encourages," "promotes" or "induces" content.

The Court should disregard the amicus briefs of the AG and the Cities, but even if it does not, it should reject their arguments.

## II.    ARGUMENT

### A.    Amici's Assertions and Arguments Are Improper.

In general, the briefs of the AG and the Cities consist of (1) amici's own accusations about (*i.e.*, attacks against) Backpage.com and efforts to endorse and embellish Plaintiffs' allegations; and (2) legal arguments Plaintiffs have not raised, and, in fact, have expressly disclaimed.  In both respects, amici's briefs are improper.

The role of amicus is not to offer a "highly partisan account of the facts," *New England Patriots Football Club, Inc. v. Univ. of Colo.*, 592 F.2d 1196, 1198 n.3 (1st Cir. 1979), and, indeed, "an amicus who argues facts should rarely be welcomed," *Strasser v. Doorley*, 432 F.2d 567, 569 (1st Cir. 1970).  This is especially true here because the Court is considering a 12(b)(6) motion, as to which the central issue is whether Plaintiffs have alleged (or can allege) plausible facts to pursue their claims—and Plaintiffs have admitted the only facts needed to decide the motion under Section 230 (*i.e.* third parties created and developed the ads).

Similarly, amici's legal argument that Section 230 does not protect Backpage.com because it is "an information content provider," *see, e.g.*, Cities Br. at 2, is also improper because

Plaintiffs expressly chose **not** to make this argument, *see* Opp. to Mot. to Dismiss at 15 n.5

("Plaintiffs do not contend at this stage of the litigation that Backpage.com is an 'information

content provider' …").  An amicus may not "interject into a case issues which the litigants,

whatever their reasons might be, have chosen to ignore."  *Lane v. First Nat'l Bank of Bos.*, 871

F.2d 166, 175 (1st Cir. 1989).

If the Court considers amici's arguments, it should also consider Backpage.com's

response, as follows.

### B.    This Court Deserves a More Balanced View of Sex Trafficking than Amici's "Understandings."

Both briefs offer amici's views about their "experience and understanding of the problem

of human trafficking generally, and sex trafficking in particular."  AG Br. at 2; *see also id.* at

2-8; Cities Mot. for Leave at 1-4; Cities Br. at 1.  Certainly everyone in this action—Plaintiffs,

their amici, **and** Backpage.com—agrees human trafficking is a horrendous crime that should be

addressed by intelligent laws and policies.  But it is also important to have a full and balanced

understanding of the issue of sex trafficking and experts' analyses of the problem and approaches

to combat it—not merely the "understandings" amici advance to support their arguments.

Sex trafficking has become a high-profile public cause, championed by politicians,

celebrities, non-governmental organizations ("NGOs"), and others.  Although this has helped

raise public awareness, experts caution that laws, policy decisions, and law enforcement efforts

should be based on empirical data, not unsupported claims or anecdotal accounts.  Perhaps "in no

area of the social sciences has ideology contaminated knowledge more pervasively than in

writings on the sex industry.  Too often in this area, the canons of scientific inquiry are

suspended and research deliberately skewed to serve a particular political agenda."[2]  The concern

(and the consensus among experts) is that most writings about sex trafficking are not evidence-

based, but are premised on the views of groups seeking to advance political and moral agendas.[3]

      For example, it is widely recognized there are no accurate estimates of the extent of sex

trafficking in the United States.[4]  Yet government authorities, NGOs, and others (including amici

---

[2] Sheldon Zhang, *Beyond the 'Natasha' story—a review and critique of current research on sex trafficking*, GLOBAL CRIME, vol. 10, no. 3, at 179 (Aug. 2009) (quoting GWU Professor Ronald Weitzer).

[3] Researchers at George Washington University comprehensively reviewed articles about trafficking and found they were not evidence-based, but relied on assertions by government agencies and NGOs advancing their views, while "[m]uch of the popular writing on human trafficking has been anecdotal or sensationalistic."  Ronald Weitzer, *New Directions in Research on Human Trafficking*, 653 ANNALS AM. ACAD. POL. & SOC. SCI., at 6 (May 2014).  *See also* Eliabieta Gozdziak & Micah Bump, Georgetown University Institute for the Study of International Migration, *Data and Research on Human Trafficking: Bibliography of Research-Based Literature*, at 43 (Oct. 2008), https://www.ncjrs.gov/pdffiles1/nij/grants/224392.pdf ("the dominant anti-trafficking discourse is not evidence-based but grounded in the construction of particular mythology of trafficking"); Christina Bain, *et al.*, *How to Responsibly Create Technological Interventions to Address the Domestic Sex Trafficking of Minors*, at 1 (April 8, 2013), http://www.danah.org/papers/TechnologistsCSEC.pdf (key findings from nineteen academic experts: "[A]ll too often, myths and public misunderstandings … drive political and legal agendas...."); Stephanie Hanes, *Human Trafficking:  a misunderstood global scourge*, CHRISTIAN SCI. MONITOR (Sept. 9, 2012), at 3, http://www.csmonitor.com/World/Global-Issues/2012/0909/Human-trafficking-a-misunderstood-global-scourge (quoting director of American University program on trafficking and forced labor: "the anti-domestic-sex-trafficking movement 'just took off and created its own industry,' in part because it touched upon a conservative social nerve"); Women's Commission for Refugee Women and Children, *The U.S. Response to Human Trafficking:  An Unbalanced Approach*, at 1 (May 2007), http://www.humantrafficking.org/uploads/publications/ustraff.pdf ("Another issue throwing trafficking protections off balance is the United States' policy which focuses government trafficking efforts on eradicating prostitution, which it conflates with sex trafficking.").

[4] *Human Trafficking in the United States:  Protecting the Victims*, Hearing Before Senate Judiciary Committee, 114th Cong. (Feb. 24, 2015), text from Bloomberg Law, News & Law Reports, at 1 (statement of Sen. Grassley:  "Reliable data of human trafficking victims within our country's borders is not readily available."); Maureen McGough, *Ending Modern-Day Slavery: Using Research to Inform U.S. Anti-Human Trafficking Efforts*, National Institute of Justice, NIJ JOURNAL No. 271 (Feb. 2013), http://www.nij.gov/journals/271/pages/anti-human-trafficking.aspx ("The data used to estimate the prevalence of human trafficking in the U.S. are lacking in scope and quality at the federal, state and local levels," and, as a result, "challenges also exist in gauging the effectiveness of the criminal justice system's response."); Gozdziak & Bump, *Data and Research on Human Trafficking*, at 13 ("there is little systematic and reliable data on the scale of" human trafficking, yet accurate information "is vital … to craft effective policies"); Phillip Martin, *Two Years On, Mass. Human Trafficking Law Examined*, WGBH, (Aug. 19, 2013), http://wgbhnews.org/post/two-years-mass-human-trafficking-law-examined ("It's not clear how many people in Massachusetts and New England are victims of human trafficking; and officials conceded that making that determination is difficult.").

here, *see* AG Br. at 3; Cities Br. at 1) often assert there are 100,000-300,000 underage sex trafficking victims in the country.  That misstates a 2001 study that suggested only that this many youth might be at risk because of their circumstances.[5]  As commentators have noted, "[h]ype over such high and inaccurate numbers … leads to a misguided response, at best" and, at worst, diverts resources and attention from real solutions to human trafficking.[6]

Similarly, while most agree "technology is increasingly playing a role in the practices and processes surrounding human trafficking," experts acknowledge "[w]e do not know if there are more human trafficking victims as a result of technology."[7]  In fact, no one—neither experts nor websites—can determine whether any given online post concerns sex trafficking.[8]  Experts caution that the increase in visibility due to technology should not lead to misguided decisions:

> Heightened visibility can easily prompt fear, as we become concerned about the things that we see that we don't like.  But the least productive thing that we can do with visibility is use it to generate fear.  While fear and outrage can propel us

---

[5] Hanes, *Human Trafficking*, at 3 (numbers came from 2001 University of Pennsylvania study estimating youths at risk of exploitation "because of an array of negative circumstances, from homelessness to drug addiction").  The Pennsylvania study actually stated that "[r]eliable estimates of the number of commercially sexually exploited children [CSEC] in the United States do *not* exist."  Richard Estes & Neil Alan Weiner, *The Commercial Sexual Exploitation of Children In the U.S., Canada and Mexico*, University of Pennsylvania, Center for the Study of Youth Policy, at 142 (Sept. 18, 2001, rev. Feb. 20, 2002), *quoted at* http://www.justfacts.com/sexuality.asp#f40.

[6] Hanes, *Human Trafficking*, at 3; *see also id.* (quoting American University director:  "You need to tailor your response to the reality [not] to the hype."); *id.* at 8 (funding is diverted, "prevention gets short shrift," and "[c]hildren most at risk of becoming trafficked … have difficulty getting help").

[7] danah boyd, et al., *Human Trafficking and Technology:  A Framework for understanding the role of technology in the commercial sexual exploitation of children in the U.S.*, at 1, (2011), http://research.microsoft.com/en-us/collaboration/focus/education/htframework-2011.pdf.  *See also* Mark Latonero, *Human Trafficking Online, The Role of Social Networking Sites and Online Classifieds*, USC Annenberg Center on Communication Leadership & Policy, at 11 (Sept. 2011), http://technologyandtrafficking.usc.edu/files/2011/09/HumanTrafficking_FINAL.pdf.

[8] Mark Latonero, *The Rise of Mobile and the Diffusion of Technology-Facilitated Trafficking*, USC Annenberg Center on Communication Leadership and Policy, at 19 (Nov. 2012), https://technologyandtrafficking.usc.edu/files/2012/11/HumanTrafficking2012_Nov12.pdf ("How an Internet service provider would actively determine or identify content that might signal human trafficking behavior remains unresolved."); *id.* at 22 (researchers applying analytic techniques cannot ascertain that any given ad concerns minor sex trafficking).

to act, driving policy by fear can easily backfire and harm those that we're trying to help."[9]

In short, "[f]ocusing on whether technology is good or bad misses the point; it is here to stay."[10]

It is also myopic to focus just on the Internet or any one website.  Mobile communications (texting and apps) have "risen in prominence" and "are now of central importance in the sex trafficking of minors in the United States."[11]  Pimps and johns increasingly are using gaming technologies such as Xbox Live and Sony Online Entertainment.[12]  Even looking at just the Internet, traffickers and others misuse ***many*** websites,[13] including Facebook, MySpace, and Craigslist (still), Twitter, Tumbler, and others.[14]

---

[9] danah boyd, *Combating Sexual Exploitation Online:  Focus on the Networks of People, not the Technology*, Statement to Attorney General Coakley, Hearing on Sexual Exploitation Online, at 1 (Oct. 19, 2010), http://www.mass.gov/ago/docs/community/testimony/db.pdf.

[10] boyd, *Human Trafficking and Technology*, at 1.

[11] Latonero, *The Rise of Mobile*, at iv.  *See also* Vanessa Bouche, Thorn, *A Report on the Use of Technology to Recruit, Groom and Sell Domestic Minor Sex Trafficking Victims* (January 2015), https://www.wearethorn.org/resources-and-research/use-of-technology-in-domestic-minor-sex-trafficking (study reporting that while the Internet and cell phones increasingly are used by sex traffickers to meet, groom and exploit victims, they also provide significant opportunities for outreach and help to victims).

[12] boyd, *Human Trafficking and Technology*, at 7; Latonero, *The Rise of Mobile*, at 23 (platforms used to recruit or solicit minors include Mocospace.com and Xbox live).

[13] Latonero, *The Rise of Mobile*, at 28 ("traffickers and trafficked minors are not solely utilizing one ad site but rather draw upon a variety of sites and technologies, such as chat rooms, message boards, and text messages").

[14] For example, a study by a Columbia professor estimated that 83 percent of New York prostitutes have Facebook pages, and Facebook was becoming the leading online recruitment tool.  Chris Matyszczyk, *Study:  Facebook replacing Craigslist for prostitutes*, CNET (Feb. 7, 2011), http://www.cnet.com/news/study-facebook-replacing-craigslist-for-prostitutes.  *See also* Daniel Fisher, *Backpage Takes Heat, But Prostitution Ads Are Everywhere*, FORBES (Jan. 26, 2012), http://www.forbes.com/sites/danielfisher/2012/01/26/backpages-takes-heat-for-prostitution-ads-that-are-everywhere ("Craigslist hasn't really gotten out of the business"); Bouche, *A Report on the Use of Technology*, at 18 (exploited youth reported using Craigslist, Facebook, Myspace and email accounts such as Yahoo Mail and Gmail); Julie Ruvolo, *Sex, Lies and Suicide:  What's Wrong with the War on Sex Trafficking*, FORBES (June 26, 2012), http://www.forbes.com/sites/julieruvolo/2012/06/26/sex-lies-and-suicide-whats-wrong-with-the-war-on-sex-trafficking/ (if "we shut down Backpage, we're going to have to go back to Craigslist, because the sex ads are back," and "we're also going to have to shut down Facebook, Tumblr, Twitter, YellowPages.com and About.com because a research group found sex ads on all of these sites too"); Latonero, *The Rise of Mobile*, at 23, 28 (escort ads on Backpage.com also appeared on EroticMugShots.com, LocalEscortPages.com, MyProviderGuide.com, FindHotEscorts.com, AdultSearch.com, and

Nonetheless, state attorneys general (including the Massachusetts AG) pressured Craigslist to censor its adult services category, and when that campaign succeeded in 2010,[15] immediately (and have since) targeted Backpage.com.[16] But experts and law enforcement officials acknowledged that pressuring Craigslist to shutter adult advertising deprived law enforcement of a cooperative partner and represented a "missed opportunity to explore creative solutions to the problem of trafficking online."[17] They warn now against repeating this mistake with Backpage.com.[18] Closing one site causes content to move elsewhere, further underground and more likely beyond the jurisdiction and reach of law enforcement.[19] This has been referred

---

nsaPals.com; noting use of Facebook, MySpace, and Tagged.com); Meredith Dank, *et al.*, *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*, Urban Institute, at 234 (March 2014), http://www.urban.org/UploadedPDF/413047-Underground-Commercial-Sex-Economy.pdf (sites used by sex workers included "Adam4Adam.com, Eros.com, Adult Search.com, TheEroticReview.com, Cityvibe.com, Myspace.com and a variety of chat lines, escort service websites, and communities like Livelinks.com and LiveJasmin.com").

[15] *See* Michael Lindenberger, *Craigslist Comes Clean: No More 'Adult Services,' Ever*, TIME, (Sept. 16, 2010), http://content.time.com/time/nation/article/0,8599,2019499,00.html.

[16] *See* State Attorney General Letter (Sept. 21, 2010), http://www.illinoisattorneygeneral.gov/pressroom/2010_09/Backpage_com9-20-2010.pdf.

[17] Latonero, *The Rise of Mobile*, at 26-27 (also quoting federal law enforcement agent stating "we don't like" losing Craigslist because they were "very pro-law enforcement" and "[i]f you shut that down, they're going to go somewhere else"); Megan Woolhouse, *Craigslist sex-ad ban doesn't end Web listings*, BOSTON GLOBE (Sept. 8, 2010) at B7 (interview of John Palfrey, Harvard Berkman Center for Internet and Society, noting that "[s]trategically, you have to go to the root causes, and not just focus on the intermediaries [*i.e.*, websites] but directly on the wrongdoers").

[18] Ruvolo, *Sex, Lies and Suicide* ("And now we're about to miss another opportunity with Backpage."); Mark Masnick, *Oh Look: Police Can Use Backpage.com To Track Down, Arrest & Convict Pimps & Prostitutes*, TECHDIRT (Oct. 2, 2012), https://www.techdirt.com/articles/20121002/07354820569/oh-look-police-can-use-backpagecom-to-track-down-arrest-convict-pimps-prostitutes.shtml ("No one seems to recognize that attacking Backpage instead of *those actually responsible* only makes it that much more difficult to track down the real criminals.").

[19] boyd, *Combatting Sexual Exploitation Online*, at 2 ("Going after specific sites … and attempting to eradicate the visibility does nothing to address the networks of supply and demand—and it simply pushes them to evolve and exploiters find new digital haunts and go further underground."); danah boyd, *How Censoring Craigslist Helps Pimps, Child Traffickers and Other Abusive Scumbags*, HUFFINGTON POST (Sept. 6, 2010), http://www.huffingtonpost.com/danah-boyd/how-censoring-craigslist-_b_706789.html (pimps and traffickers will "move on and invade a new service," perhaps "an offshore one that American law enforcement can do nothing about"; "Taking something that is visible and making it invisible makes a politician look good, even if it does absolutely nothing to help victims who are harmed.").

to—and criticized—as a "whack-a-mole" approach that fails to address root causes of the problem and makes efforts to prevent, pursue and prosecute traffickers more difficult.[20]

As the American Psychological Association has written:  "Preventing the trafficking of women and girls is a complex problem that requires cross-disciplinary research, training and education, public awareness and new policies at every level of government."[21]  Thus, many experts—and some lawmakers and NGOs—have come to realize that combatting underage sex trafficking requires a holistic approach addressing the factors that make youth vulnerable, improving outreach and prevention efforts, and providing support and rehabilitative services rather than criminalizing victims.[22]  For example, the National Research Council recently recommended funding to improve multi-sector collaboration to prevent, identify and respond to exploitation and trafficking of minors, focusing on vulnerable populations; enacting safe-harbor laws to treat those harmed by sex trafficking as victims; pursuing legal responses to perpetrators of sex trafficking, with an emphasis on deterring demand; implementing and strengthening laws to respond to and support victims; and setting a national research agenda to improve the evidence

---

[20] Latonero, *The Rise of Mobile*, at 26 (quoting Jennifer Musto, *Institutionalizing Protection, Professionalizing Victim Management: Explorations of Multi-Professional Anti-Trafficking Efforts in the Netherlands and the United States* (UCLA 2011)); *id.* ("shutting down one site does not address the root causes of the problem"); boyd, *How Censoring Craigslist Helps Pimps* ("Censorship online is nothing more than whack-a-mole, pushing the issue elsewhere or more underground.").

[21] *APA Task Force Report Highlights Problem of Human Trafficking of US Women and Girls* (Mar. 12, 2014), http://www.apa.org/news/press/releases/2014/03/human-trafficking.aspx.  *See also* Latonero, *The Rise of Mobile*, at 23.

[22] *See* Bain, *How to Responsibly Create Technological Interventions*, at 2-4 (urging increased emphasis on social services for at-risk youth, treating youth as victims, implementing intervention plans to help victims, and using technology to identify criminal activity and help vulnerable youth); Bouche, *A Report on the Use of Technology*, at 25-31 ("there is clearly a strong need for programs that assist [victims] in getting out," though most victims reported that no one reached out to them, and "[m]ultiple survivors mention the lack of help, understanding and compassion they received from law enforcement"); *see also id.* at 38-39 (recommendations); Hanes, *Human Trafficking*, at 8-9.

base for informed policy-making.[23]  Shared Hope International similarly has emphasized four

issues:  eliminating the demand for trafficking by punishing those who buy sex, prosecuting

traffickers without relying entirely on victim testimony, identifying victims as such rather than

criminals, and providing protection, services, and shelter to victims.[24]

Experts also advocate that technology should be a part of these broader approaches to

combat sex trafficking intelligently.[25]  "Instead of singling out these technologies [*e.g.*, websites,

mobile communications] as a root cause of trafficking," they should be used "to further the anti-

trafficking goals of prevention, protection, and prosecution."[26]  Websites and mobile platforms

are valuable tools in several ways.  They provide a digital trail to identify, track down and

prosecute traffickers (if law enforcement can work with cooperative online providers).[27]  They

---

[23] Inst. of Medicine & Nat'l Research Council, *Confronting Commercial Sexual Exploitation and Sex Trafficking of Minors in the United States*, at 5-16 (Ellen Wright Clayton *et al*. eds., 2013), http://www.iom.edu/~/media/Files/Report%20Files/2013/Sexual-Exploitation-Sex-Trafficking/sextraffickingminors_rb.pdf.  The NRC, the advisory arm of the National Academy of Sciences, conducted this study in response to a request from the Department of Justice.

[24] *See* Shared Hope International, *2013 Protected Innocence Challenge: A Legal Framework of Protection for the Nation's Children*, at 9, http://sharedhope.org/wp-content/uploads/2014/02/2013-Protected-Innocence-Challenge-Report.pdf.  The organization issues an annual report evaluating states based on their respective laws addressing sex trafficking and these policy goals.

[25] As President Obama has stated:  "Just as [traffickers] are now using technology and the Internet to exploit their victims, we're going to harness technology to stop them."  Press Release, The White House, Remarks by the President to the Clinton Global Initiative (Sept. 25, 2012), http://www.whitehouse.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative.

[26] Latonero, *The Rise of Mobile*, at iv (while, "increasingly, the business of human trafficking is taking place online and over mobile phones[,] the same technologies … can become a powerful tool to combat trafficking").  *See also* boyd, *Combatting Sexual Exploitation Online*, at 1 ("When it comes to the Internet and exploitation, most people lament the new opportunities for buyers and sellers to connect, but fail to realize how these very same structures also provide new opportunities to intervene because it's possible to 'see' the trade in entirely new light.").

[27] As California's Attorney General has noted, technology can provide a "digital trail" for law enforcement, prevent and disrupt human trafficking online, and provide new ways of outreach to victims and raising public awareness.  Statement of AG Kamala Harris, *Human Trafficking*, http://oag.ca.gov/human-trafficking.  *See also* Latonero, *The Rise of Mobile*, at iv-v ("Mobile communication may also represent a breakthrough for interventions by law enforcement and the anti-trafficking community" by providing "a trail of information and evidence" for "identifying, tracking, and prosecuting traffickers.").

present a "significant opportunity" to communicate with vulnerable youth "to prevent recruitment in the first place" and "inform young victims once they have been recruited about options to seek help."[28]  And, law enforcement can use websites to set up sting operations and thereby make online spaces too risky for criminals.[29]  Indeed, some have suggested that, because police monitor and use Backpage.com and the website cooperates with authorities, it has become a risky place for traffickers and criminals.[30]

Notably, none of these experts that have examined the role of technology in trafficking—including from Harvard, Wellesley, USC, and TCU—have advocated shutting down websites. Although perhaps not politically popular, some law enforcement officials have stated publicly that this is a bad idea because cooperative sites such as Backpage.com (and Craigslist before) are valuable resources in fighting sex trafficking.[31]  Indeed, in a recent hearing before the Senate Judiciary Committee, the Director of Iowa's Human Trafficking and Enforcement Prosecution Initiative responded to questioning about Backpage.com by saying we should "move cautiously

---

[28] Bouche, *A Report on the Use of Technology*, at 19.  *See also* Latonero, *The Rise of Mobile*, at v (technology can be used as a tool "to reach vulnerable communities and raise public awareness"); boyd, *How Censoring Craigslist Helps Pimps* ("Visibility makes it easier to help victims.").

[29] boyd, *How Censoring Craigslist Helps Pimps* ("Woking with [websites] to collect data and doing systematic online stings can make an online space more dangerous for criminals," "[e]ventually … mak[ing] a space uninhabitable for criminals by making it too risky for them to try to operate there," while "[c]ensoring [a website] does absolutely nothing to hurt the criminals.").

[30] Laterno, *The Rise of Mobile*, at 31 (quoting detective who observed:  "No one uses Backpage anymore. Everyone thinks cops are on there now.").  *See also* Fisher, *Backpage Takes Heat* ("Backpage isn't the best place to run an illegal enterprise, at least if you want to keep your business secret from the cops.").

[31] Latonero, *The Rise of Mobile*, at 26-27 (quoting law enforcement official as saying Craigslist was "always very cooperative" and "we don't like it [that the site was shut down]," because "[i]f you shut that down, they're going to go somewhere else"); Rachel Lewis Hilburn, *Websites with Adult Ads Contribute to Sex Trafficking of Kids; Law Officers Call the Sites Helpful*, WHQR (Mar. 4, 2015), http://whqr.org/post/websites-adult-ads-contribute-sex-trafficking-kids-law-officers-call-sites-helpful (quoting North Carolina detective saying Backpage.com is "an important tool for local law enforcement" and is "extremely cooperative," whereas if it was shut down, law enforcement would "los[e] investigative tools"; also quoting representative of North Carolina AG's office stating that "she's heard similar sentiments from other members of [the] law enforcement" community).

so that we don't remove one of the best tools that law enforcement currently has available."[32]

### C.   Amici's Factual Accusations about Backpage.com Are Improper and Contradict Their Laws, Experiences, and Statements.

Amici go on to offer their own accusations against Backpage.com. As noted, this is improper—the Court should disregard an amicus that offers a "highly partisan account of the facts," *New England Patriots Football Club*, 592 F.2d at 1198 n.3, and briefs of this sort are "as far from an amicus as one can get," *United States v. Certain Land Located in the Cnty. of Barnstable*, 674 F.2d 90, 91 n.1 (1st Cir. 1982). It is not appropriate for an amicus simply to malign a party in hopes of tainting the Court's view. Here, amici's attacks against Backpage.com are not only improper, they are contradicted by amici's own laws, statements, and practices.

First, the AG asserts its "cursory review of the website" reveals that all escort ads "offer sex for sale," AG Br. at 10, and the Cities contend the "actual goods advertised [in the escort category] are illegal sex," Cities Br. at 13. Attorneys General in Washington, Tennessee, and New Jersey made the same argument, and federal courts in those states rejected it, holding that escort ads on Backpage.com are constitutionally protected speech. *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1282 (W.D. Wash. 2012); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 825 (M.D. Tenn. 2013); *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at *7 (D.N.J. Aug. 20, 2013).[33] Moreover, amici's argument is incongruous, given that they **permit** escort services. San Francisco, Atlanta and Denver all license and regulate escort services, and

---

[32] *Human Trafficking in the United States*, Hearing before Senate Judiciary Comm., at 24 (testimony of Mike Ferjak, acknowledging that websites provide "intelligence … to law enforcement to track and obtain data as far as how these people conduct their operations and where they're going to do it and all sorts of things").

[33] *Accord M.A. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1049-50 (E.D. Mo. 2011); *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 962, 969 (N.D. Ill. 2009).

Colorado has an "Escort Service Code."[34]  The City of Boston has granted business name certificates to entities identifying their "type of business" as "escorts," "escort service," and "personal escort."[35]  Indeed, yellow page listings for the cities represented by amici reveal hundreds of escort services.[36]

The AG also attempts to dismiss Backpage.com's role in supporting law enforcement and helping rescue victims,[37] saying the website is responsive only "to varying degrees" and its "monitoring and reporting efforts … rarely yield results."  AG Br. at 10.  This hyperbole ignores the many times Backpage.com has cooperated with the AG's office (and the Cities), including in the very cases the AG cites to criticize Backpage.com.  The AG refers to cases in Dorchester and Everett, *see* AG Br. at 6, yet fails to mention Backpage.com supported both investigations.  In the Dorchester case, prosecutors acknowledged Backpage.com provided credit card information that led to identification of the defendant as well as "over one thousand pages of records related to these prepaid cards."[38]  In the case concerning an Everett massage parlor, agents traced the

---

[34] San Francisco Police Code Art. 15.6 § 1074.4, http://police.sanfranciscocode.org/15.6/1074.4; Atlanta Code of Ordinances § 30-641 to -668, http://atlanta.elaws.us/code/coor_ptii_ch30_artviii; Denver Mun. Code, § 7-320, http://denver-co.eregulations.us/code/coor_titleii_ch7_artxiii_div2_sec7-320; Colo. Rev. Stat. § 12.25.5-101 *et seq*.

[35] Registered names include:  "Exotic Day Dream Escort Service," "Sophistikatts Escort Agency," "A Plus College Escorts," "VIP Escort," "Erotic Pleasures," and "All Kinds of Adult Entertainment."  *See* http://www.cityofboston.gov/cityclerk/dbasearch/Default.aspx?type_of_business=escort&order_by=file_number.

[36] A yellow pages search for "escort service" in the cities represented by amici results in over 350 listings: Boston (61 listings), San Francisco (42), Atlanta (80), Denver (60), Houston (58), Philadelphia (21), Portland (32).  *See* http://www.yellowpages.com.

[37] The AG states that "seventy-five percent of the cases [the office] has prosecuted under our state human trafficking law … involve advertising on Backpage.com."  AG Br. at 7.  But this refers to just six of the eight cases the office has brought since M.G.L. c. 265, § 51 took effect three years ago, and none of the cases involving ads on Backpage.com concerned allegations of underage sex trafficking.  Moreover, pointing to the number of prosecutions that involve ads on Backpage.com speaks more to the fact that law enforcement routinely work with the site because of its help and cooperation.

[38] Commonwealth's Statement of the Case, at 8, *Commonwealth v. Leoney*, SUCR2013-10947.

defendant by locating her phone number on a Backpage.com ad, and the website fully complied with a subpoena, providing records dating back to 2013.[39]

In fact, Backpage.com has voluntarily responded to over 100 subpoenas and requests from Massachusetts law enforcement authorities in 2014 and 2015—including many from the AG's office.  Contrary to the AG's assertion that Backpage.com's "monitoring and reporting … rarely yield results," AG Br. at 10, for many or most subpoenas involving suspected child victims, Backpage.com previously reported the ads to the National Center for Missing and Exploited Children ("NCMEC").  Perhaps more telling, while amici now contend Backpage.com's cooperation is a ruse, more than thirty times law enforcement officials from the AG and the Cities have thanked and commended Backpage.com for its help,[40] as others across the country have done hundreds of times.  Some examples:

> You guys are fantastic thank you [from Massachusetts AG's office]
>
> Thank you so much, you have really gone above and beyond.  I always like working with your group because it is professional and prompt.[41]
>
> Thank you very much for your assistance.  By the way, as a Detective with the … Police, I deal with numerous hospitals, banks, cell phone companies, etc.  You guys have been by far the best and easiest to deal with.
>
> As usual your staff at Backpage.com is awesome!  Thank you for this additional information it helps out tremendously.
>
> Backpage staff.  Great job.  This will help in the investigation.  Thanks for further researching and going the extra mile.
>
> Thank you!  I appreciate your proactive efforts to protect our children.  Again, thank you.

---

[39] Commonwealth's Statement of the Case, at 4, *Commonwealth v. Cipriano*, SUCR2014-1309.

[40] Including from the Massachusetts AG's office, the Houston Police Department, and officials with the Cities of Houston, Portland, Denver, Atlanta, San Francisco and Boston.

[41] Backpage.com typically responds to law enforcement subpoenas and requests within forty-eight hours and often in the same day.

Thank you so much.  We have been waiting to obtain records from some of these sites. … Thank you very much for your assistance and attention to details.  I wish more companies were like this.[42]

Backpage is the very best thank you!!!!!!!!!!!! [from Massachusetts AG's office]

Thanks once again for going above and beyond what we ask of you.  Your team has always been helpful, diligent, and worked with a [sense] of urgency, and it is greatly appreciated.

[Y]our staff did a great job!  We appreciate Backpage's vigilance to help protect kids.  On our team over the weekend were the Secret Service, Department of Homeland Security, the United States Attorney's Office and several local law enforcement agencies and all commented on how effective Backpage was on getting the ads removed quickly and blocking future ads from the same posters.

I can't thank you and your staff enough for being so responsive and supportive of my and other law enforcement efforts concerning these cases.  Your company's level of cooperation is not the norm and makes a huge difference in our ability to target and ultimately arrest the offender. [from Massachusetts AG's office]

Amici further assert that "Backpage has taken various affirmative steps to maximize the security of the website for traffickers and to hinder law enforcement" by "remov[ing] advertisements for support groups or posts by law enforcement officers engaged in sting operations."  AG Br. at 12; Cities Br. at 11.  Again, amici offer no support[43] and their accusations are surprising, given their use of Backpage.com.  For example, the month before joining the Cities' brief, Houston police conducted a sting operation by placing ads on Backpage.com, arresting sixty men for soliciting prostitution.[44]  The week after San Francisco filed the Cities' brief, Bay Area authorities rescued an underage victim based on a tip from Backpage.com to

---

[42] In addition to providing its records, in several cases Backpage.com staff have also voluntarily conducted and provided further research (*e.g.*, concerning other websites where a victim was advertised).

[43] Vaguely alleging that Backpage.com removed some sting ad, without explaining the premise for such an allegation, is particularly unfair.  For example, if amici are referring to an instance when an ad was blocked because Backpage.com's filters or monitors determined it was improper, that would underscore the effectiveness of the website's policing, not that it was trying to hinder law enforcement.

[44] Gianna Caserta, *More than 60 men charged in HPD prostitution 'round-up,'* CLICK2HOUSTON (Mar. 4, 2015), http://www.click2houston.com/news/64-charged-in-hpd-prostitution-roundup-investigation/31605082.  It bears noting the Houston sting operation did not concern sex trafficking.

NCMEC, crediting the website's work for "helping [them] catch the suspect."[45]  Additionally, the FBI (working with local law enforcement) has used Backpage.com for its annual "Operation Cross-Country" efforts to target sex trafficking (including numerous arrests and rescues in San Francisco and Denver), and Backpage.com has stated that it was "very, very pleased" with these efforts.[46]  Indeed, Backpage.com conducts training of law enforcement officials across the country, explaining how the website and its staff can help track down and convict sex traffickers. Finally, although amici repeat the unsupported allegation that Backpage.com removes ads from victim support groups, the website prominently features such ads.[47]

Otherwise, amici endorse and seek to expand on Plaintiffs' allegations.  For example, they assert Backpage.com creates content[48] in "'Sponsored Ads' by choosing images and text from the full advertisement to highlight and by creating new text to summarize portions of the original advertisement …."  Cities Br. at 10; *see also* AG Br. at 12.  In fact, a sponsored ad is one featured in search results for an additional fee, which is common on websites.[49]  The text of such ads on Backpage.com is auto-generated by a function that selects portions of the ad text users

---

[45] *Oakland Man Accused Of Listing Teen On Sex Website Pleads Not Guilty*, CBS (Feb. 27, 2015), http://sanfrancisco.cbslocal.com/2015/02/27/oakland-man-who-listed-teen-on-web-for-sex-busted-by-website-pleads-not-guilty (quoting Santa Clara deputy district attorney).  *See also* Steve Johnson, *Sex online: Police target lucrative Internet prostitution trade*, SAN JOSE MERCURY NEWS, (Jan. 12, 2015), http://www.mercurynews.com/business/ci_27296210/sex-online-police-target-lucrative-internet-prostitution-trade (quoting San Francisco police lieutenant as acknowledging that Backpage.com makes "it easier for police to identify people selling or seeking to buy sex through online solicitations").

[46] *Child Prostitution: Raids Rescue 105 Young People*, N.Y. TIMES (July 29, 2013), http://mobile.nytimes.com/aponline/2013/07/29/us/politics/ap-us-child-sex-arrests.html?from=us; Sadie Gurman, *Six Denver pimps arrested, 9 children saved as part of federal sting*, DENVER POST (July 29, 2013), http://www.denverpost.com/ci_23753147/six-denver-pimps-arrested-nine-children-saved-part.

[47] *See* http://boston.backpage.com/FemaleEscorts (Children of the Night post stating "Want Out? National Free Help 24/7: 1-800-551-1300. Tired of Turning Tricks? Pimps Don't Care. We Do!").  Backpage.com pointed out this ad in its motion to dismiss, *see* Mem. in Supp. of Mot. to Dismiss at 7 n.4.

[48] Amici's argument that Backpage.com is an "information content provider" outside of Section 230—an argument Plaintiffs have eschewed—is discussed in Section II.E, below.

[49] *See* Mem. in Supp. of Mot. to Dismiss at 7 n.4.

create.[50]  This is readily apparent by comparing sponsored ads to the original ads, although amici ignore the obvious to allege Backpage.com itself creates the content—which it does not.

The AG casts aspersions about Backpage.com's charges for ads in the "adult entertainment" section, "unlike the rest of the site," AG Br. at 11-12, and while this is also not true (*e.g.*, fees are also charged for dating and some employment ads), it is more important to note why charges were added in the first place.  Charges for adult-oriented ads were instituted after an agreement between forty-three state attorneys general and Craigslist, when the AGs ***requested*** that charges be imposed to provide information for law enforcement.[51]

Amici also allege Backpage.com "strips 'metadata' from digital photographs uploaded in the Escorts section by using software at an additional expense."  Cities Br. at 10; *see* AG Br. at 12.  This is baseless as well.  Backpage.com does not "strip" metadata, intentionally or otherwise.  Rather, when users upload photos for ads—whether to sell household items, for dating, or in any other category on the website—the photos are resized so they can appear on the site, an automated process that does not capture or retain metadata.  This is also a common process for websites, including Facebook, Instagram, Twitter, Craigslist and others.  Here too, amici offer no plausible basis to show why common website practices are somehow nefarious.

Finally, amici's assertion that Backpage.com supposedly "coach[es]" posters to "facilitate[] illegal activity by helping it go undetected," Cities Br. at 11, is also argument, not fact.  This refers to the website's enforcement of its posting rules to prevent improper ads.[52]

---

[50] There is one exception.  The notice for Children of the Night is presented as a sponsored ad, *see supra* note 47, and the text is created by the organization.  All other sponsored ads are auto-generated.

[51] *See* Press Release, Washington AG, *McKenna announces agreement with Craigslist to crack down on illegal sex trade ads* (Nov. 6, 2008), http://www.atg.wa.gov/news/news-releases/mckenna-announces-agreement-craigslist-crack-down-illegal-sex-trade-ads.

[52] Plaintiffs' allegations apparently are based on efforts by Plaintiffs' lawyers to post numerous fake ads trying to test and evade Backpage.com's automated filters.  Shortly before Plaintiffs filed suit,

Most (or all) websites that host third-party content impose rules and restrictions, and many use filters and screening to block or remove improper content. This includes Facebook, YouTube, Craigslist, and Match.com, which have rules similar to or the same as Backpage.com's, even identifying and disallowing particular terms and phrases, as Backpage.com does.[53] Put simply, to paint Backpage.com's efforts to prevent improper content as a scheme to encourage such content is beyond the pale of fair argument. Moreover, to give credence to this argument would eviscerate Section 230, because, rather than police user content—one of Congress's express purposes—websites would be far better off to impose no rules or restrictions and do no monitoring, because they would only create liability risks by undertaking such efforts.[54]

### D.   Amici Have Conceded Section 230 Bars Enforcement of State Laws.

Amici urge the Court to adopt a "reading of Section 230 [that] preserves the ability of local governments … to make and enforce local and state laws through their police powers." Cities Br. at 14; *see also* AG Br. at 20 (urging the Court apply Section 230 immunity so as not to "undermine laws enacted by the Commonwealth in the exercise of its traditional police powers").

---

Backpage.com's filters blocked a number of ads posted to the Boston website because of improper terms (*e.g.* "high school," "innocent schoolgirl," "sexy teen"). Backpage.com determined the ads came from a single IP address and blocked the address as well. The IP address is assigned to Ropes & Gray LLP.

[53] For example, Craigslist's "Adult Services Posting Guidelines" are essentially identical to Backpage.com's rules; they also prohibit (1) "content that is unlawful, obscene, or which advertises illegal services," (2) ads that "suggest or imply an exchange of sexual favors for money" including by using "any and all code words" (giving sexually explicit examples); (3) any "attempt to avoid detection of forbidden language by using spelling variations" (again providing explicit examples); and (4) "ads containing obscene images." *See* www.craigslist.org/about/help/Adult_Services_Posting_Guidelines. *See also* www.match.com/registration/membagr.aspx; www.facebook.com/communitystandards; www.youtube.com/t/community_guidelines.

[54] *See McKenna*, 881 F. Supp. 2d at 1273 (making Backpage.com or other websites liable for efforts to prohibit content would "create[] an incentive for online service providers *not* to monitor the content that passes through [their] channels[,] precisely the situation that [Section 230] was enacted to remedy"); *see also Nemet Chevrolet, Ltd. v. ConsumerAffairs.com, Inc.*, 591 F.3d 250, 258 (4th Cir. 2009) (plaintiff's claims would thwart Congress's purpose to "remove disincentives for the development and utilization of blocking and filtering technologies" (quoting 47 U.S.C. § 230(b)(4))); *Batzel v. Smith*, 333 F.3d 1018, 1028 (9th Cir. 2003).

17

The short answer is that, in Section 230, Congress **expressly preempted** state laws because its aim was to prevent government regulation of the Internet and eliminate a patchwork of different and potentially inconsistent state regulation.  *PSINet, Inc. v. Chapman*, 362 F.3d 227, 240 (4th Cir. 2004) (state efforts to regulate the Internet "highlights the likelihood that a single actor might be subject to haphazard, uncoordinated, and even outright inconsistent regulation ...." (quoting *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 168 (S.D.N.Y. 1997)).  Indeed, the AG has acknowledged several times that Section 230 preempts enforcement of the Commonwealth's laws against classified ad websites such as Backpage.com and Craigslist.

The AG first purports to endorse Plaintiffs' claim under M.G.L. c. 265, § 50 (the Massachusetts anti-trafficking law), but ultimately supports Backpage.com's position.  Plaintiffs argue that any kind of direct or indirect assistance is enough to allege a business entity "knowingly aids or is a joint venturer in trafficking" under Chapter 265.  *See* Opp. to Mot. to Dismiss at 7; Surreply at 4.  But as Backpage.com has explained, this standard refers to aiding and abetting liability, meaning a defendant must know another party was engaged in sex trafficking, shared the intent to make it succeed, and participated in the illegal activity.  Reply on Mot. to Dismiss at 6-7 & n.10.  The AG actually supports this interpretation by citing *Go-Best Assets Ltd. v. Citizens Bank of Massachusetts*, 463 Mass. 50, 972 N.E.2d 426 (2012), *see* AG Br. at 14, which held that a bank could not be liable for aiding and abetting an attorney's fraudulent use of his bank account where there was no evidence the bank knew or shared his intent to misappropriate funds or actively participated in the misappropriation.  463 Mass. at 64.

The AG's attempt to support Plaintiffs' Chapter 93A claim fares no better.  The AG claims Plaintiffs need only show Backpage.com's website had an "overall effect" on "the relevant market" for "the illegal sale of children for sex" and therefore "[i]t is enough that the

18

plaintiffs were injured as an indirect result of Backpage.com's business conduct."  AG Br. at 15.
The AG bases this argument on cases in which plaintiffs claimed they were injured by unfair
trade practices of competitors in the same market.  *See, e.g.*, *Katin v. Nat'l Real Estate Info.
Servs., Inc.*, 2009 WL 929554, at *5-7, *10 (D. Mass. Mar. 31, 2009) (refusing to dismiss claims
by attorney plaintiffs alleging real estate settlement service providers were engaged in the
unauthorized practice of law, as plaintiffs sufficiently alleged lost business under the competitor
standing doctrine).  Such decisions have nothing to do with this case.  Plaintiffs do not allege
they were competitors of Backpage.com and harmed by its conduct in a market where they
competed.  Rather, they allege that if Backpage.com had not cooperated with law enforcement
and reported to NCMEC, public pressure would have shut down the site, and the pimps would
not have trafficked them.  *See* Mem. in Supp. of Mot. to Dismiss at 23-25.  This "hypothesized
chain of events falls far short of chapter 93A's causation requirement."  *Ray v. Ropes & Gray
LLP*, 961 F. Supp. 2d 344, 361 (D. Mass. 2013).[55]  Plaintiffs' claims also fail because they have
not alleged they suffered any injury as consumers, arising from a business transaction with the
website.  *See Swenson v. Yellow Transp., Inc.*, 317 F. Supp. 2d 51, 56-57 (D. Mass. 2004)
(dismissing Chapter 93A claim arising from auto accident, where plaintiffs contended the
defendant trucking company's policies encouraged speeding; "ch. 93A 'is intended to protect

---

[55] The AG additionally contends the Court should not require particularity for Plaintiffs' Chapter 93A
claims, citing state cases, but recognizing "federal courts have concluded otherwise."  AG Br. at 16 &
n.38.  Of course, Fed. R. Civ. P. 9(b) governs in this Court, no matter the pleading requirements in
Massachusetts courts.  And, in federal court, under the federal rule, Chapter 93A claims that sound in
fraud must be pleaded with particularity.  *See Santos v. SANYO Mfg. Corp.*, 2013 WL 1868268, at *6 (D.
Mass. May 3, 2013) ("Where a Chapter 93A action sounds in fraud, a plaintiff must plead such fraud with
particularity."); *see also* Mem. in Supp. of Mot. to Dismiss at 8.

against unfair and deceptive practices in trade, not unfair practices in general'" (quoting *L.B. Corp. v. Schweitzer-Mauduit Int'l, Inc.*, 121 F. Supp. 2d 147, 152 (D. Mass. 2000)).[56]

Most important, amici's entreaties that the Court should permit Plaintiffs' state-law claims directly contradicts the AG's admissions that Section 230 preempts such laws.  In 2010, when other state attorneys general demanded Craigslist eliminate the "adult services" section of the website, Attorney General Coakley refused to join because she believed Section 230 shielded online providers.[57]  Shortly thereafter, she joined the opposition against Craigslist, insisting the law "must change" to eliminate immunity.[58]  In 2010, the AG wrote to Congress that Section 230 immunity "may no longer be warranted,"[59] and later signed on to another letter to Congress urging amendment of Section 230 to exempt from immunity all state criminal laws.[60]  Now, the

---

[56] In *L.B. Corp.*, the Court granted summary judgment on the plaintiff's Chapter 93A claim against an adjacent landowner because "[i]n essence, plaintiff is complaining of excessive pumping from a well, not of unfair acts or practices in a commercial transaction."  121 F. Supp. 2d at 152.  The Court explained: "Chapter 93A is a consumer protection law that also encompasses business transactions.  It is intended to protect against unfair and deceptive practices in trade, not unfair practices in general.  Apart from claims of unfair competition, a plaintiff must allege some sort of transaction between the parties for liability to attach ….  This is the 'common thread' of 93A cases.  Plaintiff's position, if accepted would run the danger of converting any tort claim against a business into a Chapter 93A claim, because all torts encompass 'acts or practices' that could arguably be considered 'unfair.'  [T]his position tests the limits of common sense."  *Id.* (internal citations and quotation marks omitted).

[57] O'Ryan Johnson, *Coakley reverses stance on site*, BOSTON HERALD, (Aug. 20, 2010), http://nl. newsbank.com/nl-search/we/Archives?p_product=BNHB&p_theme=bnhb&p_action=search&p_ maxdocs=200&p_field_fselect-0=&p_text_fselect-0=coakley%20reverses%20stance&s_dispstring=all (coakley%20reverses%20stance)%20AND%20date(01/01/1970%20to%2003/04/2015)&p_field_date- 0=YMD_date&p_params_date-0=date:B,E&p_text_date-0=01/01/1970%20to%2003/04/2015)&xcal _numdocs=40&p_perpage=20&p_sort=YMD_date:D&xcal_useweights=no.

[58] Warren's Washington Internet Daily (Aug. 23, 2010) (quoting AG Coakley:  "At the present time, Craigslist and other 'providers and users of interactive computer services' are largely shielded from civil and criminal liability by Section 230 of the federal Communications Decency Act.  This must change." "Congress should take action and amend this statute to eliminate the immunity provision.").

[59] *Domestic Minor Sex Trafficking:  Hearing before Senate Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 111th Cong. 297-99 (2010) (letter from AG Coakley to Reps. Scott and Gohmert, dated Sept. 15, 2010, stating "Section 230 provides [immunity] for interactive computer service providers that may no longer be warranted.").

[60] Letter from AG Coakley, *et al*. to Sen. Rockefeller, *et al.* (July 23, 2013), https://www.eff.org/files/cda- ag-letter.pdf.

AG asserts Section 230 does ***not*** preempt Plaintiffs' state-law claims, without explaining all the prior statements that such claims ***are*** preempted.

### E.    Amici Cannot Argue that Backpage.com is an "Information Content Provider," and Their Argument is Wrong.

Amici's central legal argument is that they contend Section 230 "does not apply for the additional reason that Backpage.com [is] an information content provider."  Cities Br. at 2; *id.* at 4-14; *see also* AG Br. at 17-20.  The Court should disregard this argument because Plaintiffs have expressly chosen ***not*** to make it, Opp.  to Mot. to Dismiss at 15 n.5 ("Plaintiffs do not contend at this stage of the litigation that Backpage.com is an 'information content provider' …").  *See Lane*, 871 F.2d at 175; *Weaver's Cove Energy, LLC v. R. I. Coastal Res. Mgmt. Council*, 589 F.3d 458, 467 (1st Cir. 2009) ("Amici cannot insert new arguments, not made by a party, into a case.").[61]  But even so, amici's argument is meritless.  Plaintiffs admit Backpage.com did not create or develop the ads about them (the ads were solely created by the pimps or others at their direction), and so, under well-established law, Backpage.com is not the "information content provider" and is fully entitled to Section 230 immunity.

Amici claim "early decisions … tended to characterize [Section 230] broadly … [but] did not consider or anticipate [websites] that were *also* information content providers," and "[i]n recent years, courts have developed a more nuanced approach."  Cities Br. at 4.  This misstates the law interpreting Section 230, which has been consistent for years.  In fact, in the case on which amici primarily rely, *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, the Ninth Circuit observed that courts have "adopt[ed] a relatively expansive definition of

---

[61] *See also Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 74 n.5 (1st Cir. 2001) ("Because these issues were raised for the first time on appeal by an amicus, not by a party, we do not consider them."), *aff'd sub nom. Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644 (2003); *McCoy v. Mass. Inst. of Tech.*, 950 F.2d 13, 23 n.9 (1st Cir. 1991) ("To the extent that the amicus raises different grounds in support of reversal," a court should "decline to consider those grounds.").

'interactive computer service' and a relatively restrictive definition of 'information content provider.'"  521 F.3d 1157, 1174 (9th Cir. 2008) (en banc) (quoting *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003)).  Since then, **every** federal circuit court that has addressed Section 230 has held it gives online providers broad immunity for claims based on third-party content.  *See* Mem. in Supp. of Mot. to Dismiss at 10-11.

Mischaracterizing parts of the decision in *Roommates.com*, amici contend a website is an information content provider beyond Section 230 protections if it "induce[s]" or "encourages" content in some fashion or "promote[s]" use of the website for "unlawful purposes."  *See* Cities Br. at 5-6; *see also* AG Br. at 18.  Actually, *Roommates.com* held the opposite.

Roommates.com was a website designed to match prospective roommates.  One portion of the site required users to make selections from prescribed menus about their gender, sexual orientation, and whether they lived with children, and to indicate their preferences about living with others based on the same criteria.  521 F.3d at 1161.  The plaintiffs alleged these criteria were discriminatory under federal and state fair housing laws.  *Id.* at 1162.  The Ninth Circuit refused to dismiss under Section 230, because the site authored and ***required*** users to answer questions to elicit discriminatory preferences, *id.* at 1166,[62] thus "materially contributing to [the] alleged unlawfulness" of the content at issue, *id.* at 1168.[63]  Courts applying *Roommates.com*

---

[62] *See, e.g.*, 521 F.3d at 1167 ("Roommate designed its search system … based on the preferences and personal characteristics that Roommate itself forces subscribers to disclose."); *id.* at 1170 n.26 ("it is Roommate that *forces* users to express a preference and Roommate that forces users to disclose the information that can form the basis of discrimination by others"); *id.* at 1172 ("Roommate does not merely provide a framework that could be utilized for proper or improper purposes; rather, Roommate's work in developing the discriminatory questions, discriminatory answers and discriminatory search mechanism is directly related to the alleged illegality of the site.").

[63] The Ninth Circuit stated:  "In other words, a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct." 521 F.3d at 1168.  Amici warp this language to suggest Section 230 immunity does not apply if a website "'materially contributes' to the underlying illegal conduct."  Cities Br. at 4.  As discussed in the text above, the Ninth Circuit said no such thing.

have interpreted it as "carv[ing] out only a narrow exception" that "turned entirely on the website's decision to **force** subscribers to divulge the protected characteristics and discriminatory preferences as a condition of using its services."  *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1198-99 (N.D. Cal. 2009) (internal quotation marks omitted).[64]

However, the Ninth Circuit held that Roommates.com **was** entitled to immunity for a second part of the website, which allowed users to post "Additional Comments" of their own choosing.  521 F.3d at 1174.  The plaintiffs alleged Roommates.com encouraged subscribers to make discriminatory statements in comments by requiring discriminatory preferences in the registration process.  *Id.*  The Ninth Circuit disagreed, emphasizing that courts must reject such "encouragement" theories, as they would gut Section 230:

> [T]here will always be close cases where a clever lawyer could argue that *something* the website operator did encouraged the illegality.  ***Such close cases, we believe, must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged – or at least tacitly assented – to the illegality of third parties***.  Where it is very clear that the website directly participates in developing the alleged illegality – as it is clear here with respect to Roommate's questions, answers and the resulting profile pages – immunity will be lost.  ***But in cases of enhancement by implication or development by inference*** – such as with respect to the "Additional Comments" here – ***section 230 must be interpreted to protect websites*** not merely from ultimate liability, but from having to fight costly and protracted legal battles.

*Id.* at 1174-75 (bold emphasis added).

Amici also rely on *F.T.C. v. Accusearch, Inc.*, 570 F.3d 1187 (10th Cir. 2009).  Cities Br. at 7; AG Br. at 18-19.  The AG claims *Accusearch* held that a website that sold confidential, personal data provided by researchers was not entitled to immunity "even though it essentially

---

[64] *See also Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 701 (S.D.N.Y. 2009) (finding *Roommates.com* "readily distinguishable" because it "was based solely on the fact that the content on the website that was discriminatory was supplied by Roommates.com itself"); *Doe v. MySpace, Inc.*, 629 F. Supp. 2d 663, 665 (E.D. Tex. 2009) (distinguishing *Roommates.com* because "[t]he Ninth Circuit repeatedly stated … that the Roommates.com website *required* its users to provide certain information as a condition of its use ….").

acted as an intermediary between the customers seeking the information and the researchers providing the information."  AG Br. at 19.  This is not a fair reading of *Accusearch* or its holding.  The website defendant in *Accusearch* was not a mere "intermediary" for content posted by third parties.  Rather, the defendant **retained** and **paid** the researchers to obtain the information (and then sold it to customers), which required violating or circumventing the Telecommunications Act by fraud or theft.  570 F.3d at 1192, 1199, 1200 ("By paying its researchers to acquire telephone records, knowing that the confidentiality of the records was protected by law, [the website] contributed mightily to the unlawful conduct of its researchers.").  Backpage.com did not hire or pay anyone to create and post the ads about Plaintiffs.

Fundamentally, *Roommates.com*, *Accusearch*, and the other cases amici cite do **not** support their assertion that application of Section 230 hinges on an "inducement" or "encouragement" test, *i.e.*, that immunity does not apply if plaintiffs allege a website generally encourages, induces, promotes or solicits unlawful content.  *See, e.g.*, Cities Br. at 5-6 & 9 n.5.[65] *Roommates.com* rejected this argument.  521 F.3d at 1174.  The First Circuit said the same in *Universal Communications Systems, Inc. v. Lycos, Inc.*, 478 F.3d 413, 420-21 (1st Cir. 2007), holding that plaintiffs cannot override Section 230 by artful pleading challenging the "construct and operation" of a website.  *See also Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256-57 (4th Cir. 2009) (website does not lose immunity because of allegations about its "structure and design" or that it "solicited" content).  And, contrary to amici's claim that courts' views of Section 230 have changed or become more "nuanced," the Sixth Circuit last

---

[65] For example, the Cities contend *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 (N.D. Ill. 2009), "applied the inducement test to evaluate whether Craigslist had induced the posting of unlawful ads," Cities. Br. at 9 n.5, while, in fact, *Dart* **rejected** any "inducement" test.  *Id.* at 969 (rejecting "conclusory allegations … that Craigslist induces users to post ads for illegal services" because Section 230 "would serve little if any purpose if companies like Craigslist were found liable under state law for 'causing' or 'inducing' users to post unlawful content in this fashion").

year expressly rejected the "encouragement" argument.  In *Jones v. Dirty World Entertainment Recordings LLC*, 755 F.3d 398 (6th Cir. 2014), that court reversed a district court decision refusing to apply Section 230 on the premise that a gossip website "encourage[d] illegal … postings," holding that such an "encouragement" theory would "eclips[e] the immunity from publisher-liability that Congress established."  *Id.* at 413-14.  Amici do not mention *Jones* or any of the many other cases Backpage.com has cited rejecting the "encouragement" theory.  *See* Mem. in Supp. of Mot. to Dismiss at 15-19.

Amici's arguments are also flawed because they claim Plaintiffs can avoid Section 230 by alleging Backpage.com is an "information content provider" in some respect, without regard to whether any information provided by the website had anything to do with Plaintiffs' claims.  *See, e.g.*, Cities Br. at 2; AG Br. at 18.  All websites create content, but that is irrelevant if a site did not create the content that is the basis for a plaintiff's claim.  *See Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 833 n.11, 121 Cal. Rptr. 2d 703 (2002) ("[T]he fact [plaintiffs] allege eBay is an information content provider is irrelevant if eBay did not itself create or develop the content for which [plaintiffs] seek to hold it liable.").  Amici ignore the longstanding interpretation of Section 230 that an "'entire website' approach is fatally flawed," *Hill v. StubHub, Inc.*, 727 S.E.2d 550, 562 (N.C. Ct. App. 2012),[66] and an online provider can be liable only if it created or

---

[66] *Hill* dismissed the plaintiffs' claims asserting the StubHub website is designed to facilitate illegal ticket scalping.  Amici cite a different case, *NPS LLC v. StubHub, Inc.*, 2009 WL 995483, at *13 (Mass. Super. Ct. Jan. 26, 2009), *see* Cities Br. at 8, which refused to enforce Section 230 immunity on summary judgment, stating that "there is evidence in the record that StubHub materially contributed to the illegal 'ticket scalping' of its sellers."  Every court to consider *NPS* has rejected it.  *See, e.g.*, *Milgram v. Orbitz Worldwide, Inc.*, 419 N.J. Super. 305, 16 A.3d 1113, 1126-27 (Law Div. 2010) (finding online ticket marketplace immune; dismissing *NPS* as inconsistent with other cases, and noting it was "quite frankly, unclear … which facts the court used in reaching the conclusion that § 230 did not apply"); *Hill*, 727 S.E.2d at 563 ("declin[ing] to follow" *NPS* as "inconsistent with the decisions concluding that knowledge of unlawful content does not strip a website of [Section 230] immunity").

developed "the specific content that was the source of the alleged liability," *Accusearch*, 570 F.3d at 1198-99.  *See* Mem. in Supp. of Mot. to Dismiss at 14-15.

Amici's attempts to cast Backpage.com as an "information content provider" have nothing to do with the ads about Plaintiffs, which can be the only premise of their claims.  *See* Reply on Mot. to Dismiss at 2 (Plaintiffs have no standing otherwise).  For example, amici cast aspersions about "sponsored ads" on Backpage.com, but no one has alleged anyone posted sponsored ads about Plaintiffs.[67]  Amici incorrectly argue Backpage.com "strips" metadata from photos uploaded on the website, but there is no allegation Plaintiffs' victimization by their pimps was related in any way to missing metadata.  Amici allege (also without any factual basis) that Backpage.com removed law enforcement "sting ads," but, again, no one has pointed to any such ads that could have had anything to do with Plaintiffs.

Otherwise, the cases amici cite to attempt to establish that courts "deny Section 230 immunity when websites create, induce or encourage the development of objectionable content," Cities Br. at 6, actually show only that websites may not be protected when they **create** content that is the basis of plaintiffs' claims.[68]  Here, Plaintiffs admit Backpage.com did **not** create the

---

[67] Amici argue Backpage.com's revenues from sponsored ads "supports a rejection of immunity," Cities Br. at 10, but courts interpreting Section 230 have uniformly rejected this argument too.  *See, e.g.*, *Hill*, 727 S.E.2d at 560 ("[t]he fact that a website elicits online content for profit is immaterial"); *M.A.*, 809 F. Supp. 2d at 1051 ("neither notice or profit make Backpage liable for the content and consequences of the ads posted by [the pimp]"); *see also Doe v. GTE, Corp.*, 347 F.3d 655, 659 (7th Cir. 2003).

[68] *See Alvi Armani Med., Inc. v. Hennessey*, 629 F. Supp. 2d 1302, 1306 (S.D. Fla. 2008) (allowing claim against defendant that "itself created tortious content"); *Doe v. City of New York*, 583 F. Supp. 2d 444, 449 (S.D.N.Y. 2008) (claim of hostile work environment stemming from defendant's emails); *Hardin v. PDX, Inc.*, 227 Cal. App. 4th 159, 170, 173 Cal. Rptr. 3d 397 (2014) (patient education pamphlet provided by defendant online pharmacy that omitted warning about adverse side effects of drug); *Moving & Storage, Inc. v. Panayotov*, 2014 WL 949830, at *2 (D. Mass. Mar. 12, 2014) (claims based on website's statements about the accuracy of third-party reviews on site); *Demetriades v. Yelp, Inc.*, 228 Cal. App. 4th 294, 313, 175 Cal. Rptr. 3d 131 (2014) (claims based on Yelp's "own statements regarding the accuracy of its filter," not "the statements of third parties (i.e., reviewers) on its website"); *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 801 (N.D. Cal. 2011) (Facebook not immune where it allegedly "create[d] new content"); *Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d 1257, 1263 (N.D. Cal. 2006) ( "If …

ads about them, so these cases are inapposite.  Indeed, courts uniformly reject conclusory allegations that a website ***may have*** created the content at issue, recognizing that permitting such claims would defeat Section 230 and its purposes.[69]

Backpage.com is not an "information content provider" for the ads that are the basis of Plaintiffs' claims.  Those ads were created, authored, developed and posted by third-parties, which is exactly what Section 230 immunizes.

## III.   CONCLUSION

Amici's briefs improperly raise new accusations and legal arguments, detracting from (not aiding) this Court's review of Backpage.com's Motion to Dismiss.  The Court should disregard them.  But even if it considers the arguments, they do not support denying Backpage.com's Motion.  Plaintiffs have admitted the facts that establish Section 230, *i.e.*, that third parties created and posted the ads about them on Backpage.com.  As a matter of law, Section 230 bars Plaintiffs' claims.

---

Yahoo! manufactured false profiles, then it is an 'information content provider' itself"); *Hy Cite Corp. v. Badbusinessbureau.com, L.L.C.*, 418 F. Supp. 2d 1142, 1148-49 (D. Ariz. 2005) (defendant had provided content and paid for allegedly defamatory posts).

In fact, some of the cases amici cite did not even hold that websites were "information content providers." *See, e.g.*, *800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273, 295 (D.N.J. 2006) (defendant not an "interactive computer service" eligible for Section 230 immunity); *MCW, Inc. v. Badbusinessbureau.com, L.L.C.*, 2004 WL 833595, at *9-10 (N.D. Tex. Apr. 19, 2004) (defendants were not interactive computer service; stating, in dicta, that even if they were, they did not dispute they "personally write and create numerous disparaging and defamatory messages"); *Cisneros v. Sanchez*, 403 F. Supp. 2d 588, 592 (S.D. Tex. 2005) (deciding whether Section 230 creates federal question jurisdiction; stating, in dicta, that "author" of defamatory statement is not entitled to immunity merely because he also administers the website hosting the content).

[69] *See Nemet Chevrolet*, 591 F.3d at 259 (rejecting allegations that website created content as "pure speculation and a conclusory allegation"); *Levitt v. Yelp! Inc*., 2011 WL 5079526, *1, *5 (N.D. Cal. Oct. 26, 2011) (rejecting as "entirely speculative" allegation that Yelp! posted false reviews to extort businesses to pay for advertising), *aff'd*, 765 F.3d 1123 (9th Cir. 2014); *Goddard*, 640 F. Supp. 2d at 1202 (rejecting plaintiff's "sweeping allegations" of Google's involvement in developing content).

Dated:  March 23, 2015.

Respectfully submitted,


s/      *Robert A. Bertsche*
Robert A. Bertsche (BBO #554333)
Jeffrey J. Pyle (BBO #647438)
PRINCE LOBEL TYE LLP
100 Cambridge Street, Suite 2200
Boston, MA 02114
(617) 456-8000 (tel.); (617) 456-8100 (fax)
rbertsche@PrinceLobel.com
jpyle@PrinceLobel.com

James C. Grant (admitted *pro hac vice)*
Ambika K. Doran (admitted *pro hac vice)*
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101
(206) 622-3150 (tel.); (206) 757-7700 (fax)
jimgrant@dwt.com
ambikadoran@dwt.com

# EXHIBIT D

# U.S. Department of Justice
# **Federal Bureau of Investigation**

## is proud to recognize
### *Carl Ferrer*
**Vice President**
**Backpage.com**

for your outstanding cooperation and assistance in connection with an investigation of great importance. The FBI's ability to carry out its investigative responsibilities to the American people has been greatly enhanced through your help, and you can be very proud of your valuable contributions to the success achieved.

May 2011
*Date*

*Robert S. Mueller, III*
*Director*

# EXHIBIT E

_____ FILED   _____ ENTERED
_____ LODGED _____ RECEIVED

JAN 17 2013

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY_____DEPUTY

HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS TO BACKPAGE.COM, LLC AND VILLAGE VOICE MEDIA HOLDINGS, LLC | CASE NO. GJ12-172RAJ |
| | ORDER |

## I.  INTRODUCTION

This matter comes before the court on the motion (Dkt. # 1) of the United States to compel compliance with three subpoenas that the grand jury issued to Backpage.com, LLC ("Backpage") and Village Voice Media Holdings, LLC ("VVMH").  Backpage and VVMH have moved to quash those subpoenas.  Dkt. # 3.  For the reasons stated below, the court DENIES the motion to compel and GRANTS the motion to quash.

## II.  BACKGROUND

Backpage is an online classified advertisement website that targets consumers in every state in the country.  Visitors to the Backpage.com website first choose the state and city that interest them, after which the website takes them to a list of categories and subcategories.  Visitors may post ads or review ads that others have posted.  According to Backpage, its users posted more than three million ads in April 2012, although there is no evidence that this figure is representative of an average month's traffic.  Ferrer Decl. (Case No. GJ12-111, Dkt. # 1-5) ¶ 4.  Among categories like "automotive," "jobs," and "real estate," visitors may also choose the "adult" category, whose subcategories include

ORDER – 1

1   "escorts," "body rubs," "strippers & strip clubs," "adult jobs," and more.[1]  Visitors who

2   wish to post "adult" ads must pay a fee, whereas visitors in some other categories can

3   post ads for free.  Many ads in the "adult" section appear to be thinly (sometimes very

4   thinly) veiled solicitations for prostitution.  Many others offer ostensibly legal services,

5   including but not limited to exotic dancing and massage.  It is the "adult" category that

6   draws the Government's attention.

7   **A.    The First Two Grand Jury Subpoenas and the Court's Initial Ruling**

8           The grand jury first subpoenaed Backpage on May 11, 2012.  The Government

9   made no secret of the grand jury's purpose, revealing it in a letter accompanying the

10  subpoena:

11          [T]he grand jury . . . has initiated an investigation of [Backpage] for
            violations of federal criminal laws, including, without limitation, Forced
12          Labor, in violation of [18 U.S.C. § 1589], Sex Trafficking of Children or
            By Force Fraud or Coercion, in violation of [18 U.S.C. § 1591], and
13          Transportation for Illegal Sexual Activity and Related Crimes, in violation
            of [18 U.S.C. § 2421], *et seq.*
14

15  Dkt. # 3-1.  This announcement, coupled with the Government's statements in later court

16  filings it served on Backpage, leaves little doubt about the general scope of the grand

17  jury's investigation.  The investigation seeks to determine whether Backpage itself is

18  criminally liable for the unlawful sexual services that the ads on its website offer.

19          The subpoena consisted of 19 requests for documents dating to the beginning of

20  2008.  Some of the requests sought corporate information (*e.g.*, organizational charts,

21  lists of investors and shareholders, document retention policies).  Some sought

22  information on Backpage's revenue from "adult" ads.  Some targeted Backpage's policies

23  for posting ads and reviewing them after they have been posted, including information

24  about Backpage employees who are responsible for ad review.  Others targeted

25  complaints that Backpage has received regarding sex trafficking, child exploitation, and

26  [1] The court visited the Backpage.com website in its review of these motions for the purpose of
    understanding the layout of the website, the interfaces for posting and reporting ads, and a
27  general understanding of the appearance of "adult" ads.

    ORDER – 2
28

1    prostitution. Those requests encompassed not only governmental complaints, but

2    complaints that originate with Backpage.com's visitors. A visitor who views an ad on

3    Backpage.com has the option to click on a "Report Ad" hyperlink, which in turn gives

4    the visitor the option to check boxes for "Inappropriate or Illegal Content," "Over Posted

5    / Spam," or "Wrong Category." The same screen advises visitors that if an ad "involves a

6    threat to a child or an image of child exploitation, please email abuse@backpage.com the

7    URL of the posting." The subpoena sought all documents about every ad in the "adult"

8    category (along with ads in the "personals" category and the "sex" subcategory of the

9    "forums" category) targeting a city in Western Washington that met any of the following

10   criteria: (1) Backpage voluntarily reported the ad to the National Center for Missing and

11   Exploited Children ("NCMEC"), (2) someone used the "Report Ad" link to report the ad

12   to Backpage, (3) Backpage removed the ad, or (4) Backpage rejected the ad prior to

13   publication because it suspected that the ad involved illegal activity. The subpoena

14   requested every email Backpage received at its abuse@backpage.com address. The

15   subpoena also sought documents supporting Backpage's contention that it has prohibited

16   users with certain email addresses or IP addresses from posting ads. The subpoena

17   defined "ad" to include not only the ad itself, but every document related to the ad.

18   Virtually every request required not merely the production of paper documents, but

19   electronic records including database entries, email, text messages, and more.

20           The cover letter accompanying the first subpoena promised that "the grand jury

21   will have an interest in subpoenaing Backpage for additional records . . . over the coming

22   months." The Government fulfilled its promise with a second subpoena on June 18. Dkt.

23   # 3-2. This time, the grand jury demanded all ads containing any entry from list of about

24   240 telephone numbers, email addresses, IP addresses, credit card numbers, and "Post

25   ID" numbers. A "Post ID" is a seven-digit number that Backpage assigns to an ad posted

26   on its website.

27
28   ORDER – 3

1   Backpage produced nothing in response to the subpoenas and moved to quash both

2   of them.  At the conclusion of an August 23 hearing on that motion, the court quashed the

3   first subpoena but ordered Backpage to respond to the second subpoena.  The court

4   explained that the Government had overreached in its quest for documents and Backpage

5   had overreached in its refusal to produce anything.  The court found the first subpoena

6   overbroad, although it acknowledged that some requests within it were likely appropriate.

7   It instructed the Government to redraft the subpoena.  Because it believed that the second

8   subpoena targeted specific advertisements and thus avoided problems of overbreadth, the

9   court required Backpage to respond to it.

10  **B.    Backpage's Response to the Second Subpoena and the Grand Jury's New
            Subpoenas**

11  On August 30, seven days after the hearing, the grand jury issued essentially

12  identical document subpoenas to Backpage and its parent company, VVMH.[2]  Dkt. ## 3-

13  3 to 3-4.  The twin subpoenas are reprises of the first subpoena.  The only requests that

14  the Government withdrew were a request for information on Backpage investors and

15  shareholders and a request for documents revealing the infrastructure of Backpage's

16  network hardware and software.  Every other request in the first subpoena is in the twin

17  subpoenas, although some of them are reworded, combined with other requests, or

18  otherwise repackaged.  The twin subpoenas excluded ads in the "personals" and "sex"

19  categories, focusing solely on the "adult" category.  The Government also limited its

20  requests for ads to those that offered services, but that limitation is likely meaningless in

21  the "adult" category, where virtually every ad is, by design, an offer of services.  The

22  Government limited its request for records relating to the "Report Ad" link to reports

23  targeted at ads for sexual services, but that limit is also likely meaningless where virtually

24  every service that "adult" ads offer is sexual, whether legal or illegal.

25

26  _____

27  [2] Although the court will name VVMH separately where clarity demands, it will typically name
    only Backpage when referring to Backpage and VVMH collectively.

28  ORDER – 4

1  On September 14, Backpage produced more than 7,000 documents in response to

2  the second subpoena. Its counsel wrote a six-page letter describing the production and

3  the burden it imposed on Backpage. Bartlett Decl. (Dkt. # 3-9), Ex. C. Among other

4  things, the letter explained why the Government's requests led Backpage to produce

5  thousands of pages of documents with no bearing on the grand jury's investigation.

6  On September 17, the grand jury issued another document subpoena to VVMH.

7  Dkt. # 3-5. The September 17 subpoena reaches farther, literally, than its predecessors.

8  Whereas many of the requests in the previous subpoenas are limited to Backpage ads

9  targeting cities in western Washington, the September 17 subpoena expands its reach to

10  sixteen cities in California, Texas, Georgia, Illinois, Wisconsin, New York, Michigan,

11  Ohio, Nevada, Florida, and the District of Columbia. Ex. 5. The subpoena also includes

12  several requests for all documents related to 55 additional telephone numbers, email

13  addresses, IP addresses, and "Post ID" numbers extracted from Backpage ads. Several

14  requests in the subpoena seek additional financial information, including information

15  about VVMH's efforts to sell Backpage. Several others seek documents related to

16  Backpage's internal and external responses to various media outlets' stories targeting

17  Backpage. One asks for documents evidencing the use of services in Backpage's "adult"

18  ads by VVMH employees and officers.

19  Neither Backpage nor VVMH has produced anything in response to the three new

20  document subpoenas. The court now considers the Government's motion to compel and

21  Backpage's motion to quash.[3]

22  ### III.  ANALYSIS

23  The Government asks the court to compel Backpage to respond to the three new

24  subpoenas. Its position is essentially that little, if anything, can impede a grand jury

25  ---
26  [3] From September 4 to October 19, the grand jury issued three subpoenas seeking testimony from Backpage employees. Dkt. ## 3-6 to 3-8. Although each subpoena demanded testimony on dates in 2012, the record is silent as to whether any employee appeared before the grand jury.
27  Neither of the motions before the court seeks relief as to these subpoenas.

ORDER – 5

28

1   investigation.  Backpage insists that it should not have to produce any documents.  In its

2   view, the Constitution severely constrains the grand jury's investigation because its

3   subpoenas violate both Backpage's First Amendment right to publish ads and its users'

4   First Amendment rights to post them.

5         The law is more nuanced.  Courts generally do not interfere with grand jury

6   investigations, even investigations that impact First Amendment rights.  That general

7   rule, however, does not prevent courts from exercising oversight of grand jury

8   investigations in a variety of circumstances.  The subpoenas before the court would call

9   for oversight even if they raised no First Amendment concerns.  That they have the

10  potential to trammel First Amendment freedoms only emphasizes the need for oversight.

11  To explain these conclusions, the court begins with an overview of the grand jury's

12  investigative power, discusses the court's authority to restrain a grand jury investigation,

13  then explains why the three subpoenas call for an exercise of the court's discretion to

14  quash them.

15  **A.    A Court Can Limit the Grand Jury's Broad Investigative Power.**

16        The Fifth Amendment makes the grand jury solely responsible for issuing

17  indictments against those suspected of "infamous" federal crimes.  Grand juries may also

18  serve an investigatory role, "determining whether or not a crime has been committed."

19  *United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991).  A grand jury needs little to

20  justify an investigation.  It "can investigate merely on suspicion that the law is being

21  violated, or even just because it wants assurance that it is not."  *Id.* (quoting *United States*

22  *v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950)).  As a general rule, a grand jury does its

23  work without interference from the court.  *United States v. Armstrong*, 781 F.2d 700, 704

24  (9th Cir. 1986) ("[A]lthough the functions of the grand jury are intimately related to the

25  functions of the court, the grand jury is not and should not be a captive to the judiciary.").

26  "Frequent or unnecessary court intervention in grand jury proceedings" is inadvisable,

27

28  ORDER – 6

1    and a court should exercise "supervisory control" over the grand jury "only when there is

2    a clear basis in law and fact for doing so." *Id.*

3         Courts set aside the general rule protecting grand jury autonomy for many reasons.

4    Most often, it is a grand jury's subpoena, and the witness's objection to it, that leads a

5    court to exercise its supervisory power.  Where evidence is not already in the

6    Government's hands, a grand jury can investigate only by issuing subpoenas for

7    testimony or documents.  Federal Rule of Criminal Procedure 17, which applies to all

8    criminal subpoenas, including those from a grand jury, permits a court to "quash or

9    modify the subpoena if compliance would be unreasonable or oppressive." Fed. R. Civ.

10   P. 17(c)(2); *see also R. Enters.*, 498 U.S. at 299 (applying Rule 17 to motion to quash

11   grand jury subpoenas).

12        There is no shortage of ways to characterize a grand jury subpoena as

13   "unreasonable or oppressive" to comply with.  A subpoena is unreasonable on relevance

14   grounds where "there is no reasonable possibility that the category of materials the

15   Government seeks will produce information relevant to the general subject of the grand

16   jury's investigation." *R. Enters.*, 498 U.S. at 301.  A subpoena for documents is

17   unreasonable or oppressive if the effort required to produce the documents unduly

18   burdens the witness.  *In re Grand Jury Proceedings*, 707 F. Supp. 1207, 1217 (D. Haw.

19   1989) (quashing a grand jury subpoena as imposing an undue burden where compliance

20   "would involve virtually [the witness company's] entire staff in document production for

21   months, if not years, grinding [its] business to a complete halt"); *see also R. Enters.*, 498

22   U.S. at 301 (acknowledging potential challenge to subpoena where "compliance would

23   be overly burdensome").  Similarly, where a subpoena seeks more information than is

24   necessary for the grand jury's investigative needs, it is subject to challenge for

25   overbreadth. *In re Grand Jury Proceedings*, 707 F. Supp. at 1216-17 (quashing subpoena

26   that demanded relevant and irrelevant documents).  A court can also quash a subpoena

27

28   ORDER – 7

1  that does not describe the documents it seeks with sufficient particularity. *In re Grand*

2  *Jury Proceedings*, 601 F.2d 162, 165 (5th Cir. 1979) (quashing subpoena for business

3  records that was "so unqualified and pervasive in scope that it required [the witness] to

4  determine at his peril what documents he was required to produce"); *see also R. Enters.*,

5  498 U.S. at 301 (acknowledging potential challenge to subpoena that is "too indefinite").

6  A court can quash a subpoena where the grand jury abuses its power by seeking

7  information beyond its investigative mandate. *In re Grand Jury Subpoena*, 175 F.3d 332,

8  339-40 (4th Cir. 1999) (quashing subpoena whose sole purpose was to obtain evidence

9  for a parallel civil proceeding); *see also United States v. (Under Seal)*, 714 F.2d 347, 350

10  (4th Cir. 1983) (requiring improper purpose to be the "sole or dominant purpose" for

11  which the grand jury seeks evidence).  A court can quash a grand jury subpoena issued

12  arbitrarily or "out of malice or an intent to harass." *R. Enters.*, 498 U.S. at 299 ("Grand

13  juries are not licensed to engage in arbitrary fishing expeditions . . . ."). A court can

14  quash a subpoena because it unreasonably damages privileged relationships.  For

15  example, in *In re Bergeson*, 425 F.3d 1221, 1225-26 (9th Cir. 2005), the court affirmed

16  the decision to quash a subpoena to a lawyer where complying with it would have

17  destroyed her relationship with her client. *Id.* at 1225 ("In determining whether a

18  subpoena of the lawyer is 'unreasonable or oppressive,' the district court may properly

19  consider, among other factors, whether compliance would likely destroy the attorney-

20  client relationship, and whether the information . . . is already available from other

21  sources."). A federal court in Washington quashed a subpoena for records of medical

22  marijuana patients in recognition of "significant State and medical privacy interests." *In*

23  *re Grand Jury Subpoena for THCF Med. Clinic Records*, 504 F. Supp. 2d 1085, 1091

24  (E.D. Wash. 2007). Constitutional concerns are also relevant.  One court quashed a

25  subpoena for records of a police department's internal investigation of an officer accused

26  of a crime, despite available safeguards to protect the officer's Fifth Amendment right not

27

28  ORDER – 8

to incriminate himself, where the grand jury had other means to obtain the information that would steer clear of Fifth Amendment concerns. *In re Grand Jury Doe No. G.J. 2005-2*, 478 F.3d 581, 585-86 (4th Cir. 2007).

Courts have also quashed or limited grand jury subpoenas that infringe First Amendment protections. Grand juries, like any governmental body, "must operate within the limits of the First Amendment . . . ." *Branzburg v. Hayes*, 408 U.S. 665, 708 (1972). Recognizing those limits, courts have, for example, readily quashed grand jury subpoenas seeking evidence about what a citizen reads. The independent counsel investigating President Clinton subpoenaed a bookstore for records of books that Monica Lewinsky bought, to no avail. *In re Grand Jury Subpoena to Kramerbooks Inc.*, 26 Media L. Rep. 1599, 1601 (D.D.C. 1998) (requiring counsel to demonstrate a compelling need for the information and a sufficient connection between it and the grand jury's investigation). A court in Wisconsin designed a procedure to ensure that a grand jury could not obtain the names of book purchasers unless the purchasers agreed. *In re Grand Jury Subpoena to Amazon.com*, 246 F.R.D. 570, 572 (W.D. Wisc. 2007).

Some First-Amendment-based challenges to grand jury investigations do not fare as well. It is settled, for example, that the First Amendment provides no privilege for reporters to refuse to reveal information obtained from confidential sources or to refuse to identify those sources. The Supreme Court established as much in *Branzburg*, where it rejected pleas from three reporters to recognize a privilege to withhold information about criminal activity that they had learned from confidential sources. The reporters argued that their ability to gather news would suffer if they could not promise their sources to keep their identities or other information secret. 408 U.S. at 680. They asked the Court to require a grand jury seeking confidential source information from a reporter to demonstrate that she has relevant information that is not otherwise available, and to show that "the need for the information is sufficiently compelling to override the claimed

ORDER – 9

1    invasion of First Amendment interests occasioned by the disclosure." *Id.* The Court

2    found that a the grand jury's interest in uncovering information about crimes outweighed

3    the incidental infringement on freedom of the press. *Id.* at 682-702.  In *In re Grand Jury*

4    *Proceedings (Scarce)*, 5 F.3d 397, 401 (9th Cir. 1993), the Ninth Circuit applied

5    *Branzburg* to reject a professor's claim of a "scholar's privilege" protecting information

6    gathered in academic work.

7         Both the *Branzburg* and *Scarce* courts acknowledged, however, that the general

8    rules they established would yield where the grand jury acted beyond its legitimate

9    power. *Branzburg*, 408 U.S. at 700 (distinguishing grand jury requests "for a purpose

10   that was not germane to the determination of whether crime has been committed," or that

11   merely "prob[ed] at will and without relation to existing need"); *Scarce*, 5 F.3d at 400

12   (distinguishing questions "posed in bad faith," that had a "tenuous relationship to the

13   subject of the investigation" or that "were posed as a means of harassment," as well as

14   requests where "law enforcement did not have a legitimate need for the information").

15   The *Branzburg* court also found no justification for "[o]fficial harassment of the press

16   undertaken not for purposes of law enforcement . . . ." *Id.* at 707-08.

17        The confluence of First Amendment protections and grand jury investigative needs

18   will receive more attention in Part III.B.4, *infra*. For now, it suffices to remark that First

19   Amendment concerns are among the constitutional issues that can lead a court to quash or

20   modify a grand jury subpoena.

21        There is at least one general principle the court can extract from the many cases

22   invoking disparate grounds for stepping between a grand jury and the target of its

23   subpoena: a court is most likely to stand aside when the grand jury requests information

24   at the core of its investigative purpose, and progressively more likely to intervene as the

25   grand jury seeks information farther afield from that purpose.  For example, even a grand

26   jury request that squarely infringes on the First Amendment right to speak anonymously

27

28   ORDER – 10

1    gives way to a grand jury request for information that is essential to the investigation of a

2    crime. In *In re Grand Jury Subpoena No. 11116275*, the court denied a motion to quash

3    a subpoena to a social media provider seeking the identity of a person who made a threat

4    to assault a congressperson. 846 F. Supp. 2d 1, 9-10 (D.D.C. 2012); *see id.* at 4

5    (discussing First Amendment). The same court, however, quashed a subpoena seeking

6    the identities of video purchasers, in part because there was no indication that the

7    evidence was necessary to pursue the investigation. *In re Grand Jury Investigation of*

8    *Possible Violation of 18 U.S.C. § 1461*, 706 F. Supp. 2d 11, 20 (D.D.C. 2009). Putting

9    aside the First Amendment, a court considering a motion to quash should always consider

10   whether a grand jury needs the information it seeks. *Bergeson*, 425 F.3d at 1225 ("That

11   the government does not need the testimony bears on whether the subpoena is

12   'unreasonable' . . . .").

13       A second general principle is that most, if not all, of the grounds that might justify

14   quashing a grand jury subpoena call for the application of case-specific judgment, not

15   bright-line rules. No mathematical formula separates a subpoena that imposes an undue

16   burden from one that does not, no rule can delineate which requests are too broad in light

17   of the grand jury's legitimate purposes, and no line of demarcation divides permissible

18   infringements on Constitutional rights from those that are unnecessary to serve the grand

19   jury's important investigative function. It is perhaps because of the need for judgment

20   that a court's decision on a motion to quash is reviewable only for abuse of discretion.

21   *Bergeson*, 425 F.3d at 1224. Indeed, even in cases where relatively straightforward rules

22   apply, like rules that repudiate a reporters' privilege to withhold information about

23   confidential sources, courts have independently considered whether to quash a subpoena

24   as a matter of discretion. *See, e.g.*, *In re Grand Jury Subpoena to Fainaru-Wada*, 438 F.

25   Supp. 2d 1111, 1116, 1120-21 (N.D. Cal. 2006).

26

27

28   ORDER – 11

**B.    The Subpoenas Before the Court Are Overly Burdensome and Suggest That the Grand Jury Lacks a Legitimate Need for the Documents They Request.**

The court now turns to the dispute before it.  Although Backpage projects virtually all of its arguments through a First Amendment lens, those arguments invoke many of the grounds for quashing or modifying a subpoena that apply in any case.  The court today applies no standard more or less stringent than the one that applies to any motion to quash or modify a grand jury subpoena.  The court, recognizing the general rule permitting a grand jury to investigate autonomously, considers the grounds that the witness invokes to support its claim that the subpoena is "unreasonable or oppressive" within the meaning of Rule 17(c)(2).  The initial burden is on the witness.  *R. Enters.*, 498 U.S. at 301.  The grounds on which the witness relies may include any of those that the court identified in the previous subsection, including the extent to which the subpoena would impinge on constitutional rights.  The court then decides, in an exercise of discretion, whether to quash or modify the subpoena.  *Bergeson*, 425 F.3d at 1224.

**1.    Complying with the Subpoenas Would Unduly Burden Backpage.**

The court could grant Backpage's motion to quash for the simple reason that it has already granted it once.  The court quashed the first subpoena because it was unduly burdensome and overbroad, in that the burden it imposed was unnecessary in light of the grand jury's legitimate investigative needs.  As to overbreadth, the court observed that complying with the subpoena would require Backpage to produce ads (and all documents related to those ads) that are either solicitations for lawful services or ads that are not solicitations at all.  The parties provided a transcript of the oral ruling, which reveals that the court spoke imprecisely in August in that it did not specifically mention the "burden" the subpoena imposed.  Nonetheless, the Government could not have doubted that the court found the subpoena unduly burdensome.  Among other things, the court noted that Backpage could have had to produce millions of ads to comply with the subpoenas.  The court acknowledged that some of the requests within the subpoena were unobjectionable,

ORDER – 12

1  but rather than edit the subpoena for the Government, the court instructed the

2  Government to redraft it in light of the court's ruling.

3       The Government redrafted the first subpoena, but did not heed the court's ruling.

4  The twin subpoenas to Backpage and VVMH came just seven days after the August

5  hearing.  The court has already described the differences between the twin subpoenas and

6  the first subpoena.  The differences are immaterial, at least for purposes of the court's

7  inquiry today.  The court instructed the Government to reduce both the burden its

8  demands imposed and to tailor those demands to its investigative needs.  It did not.  That

9  is reason enough to grant Backpage's motion to quash.

10       Even if the court were to accept the Government's assertion that it materially

11  amended the first subpoena to address its overbreadth and the burden of complying with

12  it, that assertion would be moot in light of its most recent subpoena for documents.  That

13  subpoena expands the scope of the grand jury's inquiry from western Washington to

14  sixteen other cities in nearly a dozen other states.  Where the court quashed the first

15  subpoena as overbroad and unduly burdensome, why should it not quash three subpoenas

16  that are at least as overbroad and even more burdensome?  The Government does not

17  answer this question.

18       The Government also does not explain its new request for records revealing

19  whether VVMH's officers and employees have used the "adult" services advertised on

20  Backpage.com.  Many of those "adult" services are legal, yet the Government would

21  require VVMH to investigate its own employees to determine if they have purchased

22  them.  Even assuming that this request has a legitimate investigative purpose (there is no

23  evidence or argument that it does), it is overbroad.

24       The Government's reaction to Backpage's production of documents in response to

25  the second subpoena provides more support for the conclusion that the new subpoenas

26  are overly burdensome.  Backpage produced more than 7,000 documents spanning about

27

28  ORDER – 13

23,000 pages.  According to Backpage's counsel, in a letter he wrote to the Government,

Backpage used its own employees and hired an outside vendor, expending hundreds of

hours and about $60,000 to respond to the subpoena.  Bartlett Decl. (Dkt. # 3-9), Ex. C.

The court acknowledges that counsel's letter is a poor substitute for evidence directly

from Backpage itself as to the burden of complying with the subpoena.  Should Backpage

wish to establish burden in the future, it may not rely solely on its counsel's

correspondence.  For present purposes, however, the letter in addition to the content of

the three new subpoenas suffice to convince the court that complying with the subpoenas

would unduly burden Backpage.  The three new subpoenas are far broader than the

subpoena that Backpage has already complied with, and the burden of complying with

them would be much greater.

### 2.      It Appears That The Subpoenas Exceed the Scope of the Grand Jury's Legitimate Authority.

The court's discussion of the aftermath of its August ruling leads naturally to a

discussion of a new concern, that the Government (via the grand jury) has issued these

subpoenas for an improper purpose.  This is so for two reasons.  First, the Government's

conduct in the wake of the August ruling suggests that it is subpoenaing Backpage for the

purpose of burdening it, not for the purpose of investigating a crime.  Second, the

Government implicitly suggests an improper purpose by declining to articulate how the

subpoenas are assisting the grand jury in determining whether Backpage has committed a

crime.

After the oral ruling, the Backpage wrote to the Government requesting

information to help it comply with the second subpoena.  Specifically, it asserted that the

subpoena's list of hundreds of email addresses, IP addresses, and more appeared to be

extracted from previous subpoenas that law enforcement agencies had issued to

Backpage in investigations of specific incidents of allegedly unlawful ads.  Bartlett Decl.

(Dkt. # 3-9), Ex. A.  Even though Backpage explained that the Government's assistance

ORDER – 14

1   would help expedite compliance with the subpoena and lessen its burden, *id.*, the

2   Government refused to provide the information. *Id.*, Ex. B. It is not clear whether the

3   Government knew, at that time, that much of the information it was seeking was

4   irrelevant. When it produced documents, Backpage wrote to explain that the Post IDs, IP

5   addresses, email addresses, and phone numbers that the Government provided were not

6   unique to any single Backpage user. *Id.*, Ex. C. For that reason, about 5,000 of the 7,000

7   documents Backpage produced had nothing to do with the grand jury's investigation. *Id.*

8   Nonetheless, the last of the new subpoenas includes requests for another collection of

9   Post IDs, IP addresses, and the like, without recognition of the concerns Backpage raised.

10  The Government has not challenged Backpage's assertion that the second subpoena led to

11  the production of thousands of irrelevant documents. It has not explained, moreover,

12  what legitimate purpose of the grand jury it serves by insisting on the production of more

13  irrelevant documents.

14         The expanded scope of the new subpoenas also calls the Government's motives

15  into question. The grand jury cannot investigate Backpage for crimes it commits outside

16  its jurisdiction, *see* 18 U.S.C. § 3332(a), but the grand jury now seeks information on

17  Backpage's conduct in sixteen cities outside western Washington. There are

18  circumstances in which conduct outside the grand jury's jurisdictional reach might be

19  relevant to a grand jury's investigation. *See, e.g., In re § 1461 Investigation*, 706 F.

20  Supp. 2d at 22. But the Government has not attempted to explain why it has so greatly

21  expanded the geographical scope of the subpoenas. This is, at best, evidence that the

22  subpoenas seek irrelevant information. It is, at worst, evidence of an improper motive to

23  burden Backpage in the guise of investigating it.

24         The Government's request for records revealing whether VVMH's officers and

25  employees have purchased "adult" services from its ads raises additional questions.

26  There is no suggestion that the Government suspects that any Backpage employee has

27

28  ORDER – 15

1   committed an indictable crime in the Western District of Washington.  On the record

2   before the court, the court cannot help suspecting that this request is intended to

3   embarrass or intimidate Backpage employees for no legitimate grand jury purpose.

4           Lastly, the court questions whether the Government is pursuing an indictment or

5   something unrelated to the grand jury's mandate.  Beginning with the first subpoena, the

6   Government has repeatedly announced that it is investigating whether Backpage is

7   criminally liable for facilitating its users' violations of federal statutes prohibiting sexual

8   commerce.  That theory depends on being able to establish that Backpage has criminally

9   culpable knowledge of those crimes.  So far as the court is aware, there is no suggestion

10  that Backpage itself has conspired to force people to perform sex acts, to require minors

11  to engage in sex acts, or to transport people for unlawful sex acts.

12          Backpage insists that the Government cannot indict it because it cannot be

13  vicariously criminally liable for the crimes its users facilitate.  The court cannot resolve

14  this issue.  Backpage seeks, in effect, to have the court dismiss an indictment that does

15  not yet exist.  *See In re Grand Jury Subpoena No. 11116275*, 846 F. Supp. 2d at 6

16  (acknowledging government's "right to make its case to the grand jury" despite "grave

17  doubts about the likelihood of a grand jury returning an indictment").  The difficulty is

18  that the Government has done nothing to assure the court that it can indict Backpage.

19  The court is aware of no entity that has ever faced criminal liability in a case like this

20  one.  As Backpage points out, efforts to impose even civil liability in similar

21  circumstances have failed.  *See, e.g., Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 (N.D.

22  Ill. 2009); *M.A. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041 (E.D. Mo.

23  2011).  On this record, there is at least an inference that the Government is investigating

24  for the purpose of investigating, not for the purpose of making a decision about an

25  indictable crime.

26

27

28  ORDER – 16

1    If it is possible to indict Backpage on the novel vicarious liability theory the

2    Government espouses, it would appear that the Government already has enough evidence

3    to do so.  Not only has Backpage produced evidence of its role in the publication of ads

4    for sexual services, the Government has information it has gathered from law

5    enforcement agencies' investigations into specific incidents involving Backpage ads.

6    What remains is to weave a viable criminal case from that evidence.  The Government's

7    insistence on pursuing burdensome requests in these circumstances again suggests that

8    the Government is more interested in burdening Backpage than indicting it.  If that is the

9    case, the grand jury is acting beyond the scope of its authority.  The Supreme Court has

10   noted that a governmental body abuses its power when it "expose[s] for the sake of

11   exposure."  *Branzburg*, 408 U.S. at 700 (citation omitted, alteration in *Branzburg*).

12   Similarly, a grand jury abuses its power when it investigates for the sake of investigating.

13       The court emphasizes that while it questions the purposes for which the

14   Government has issued these subpoenas, it draws no conclusions.  It is possible that the

15   Government has a reasonable explanation for forcing Backpage to produce thousands of

16   pages of irrelevant material, it is possible that it has a reason for inquiring into Backpage

17   employee's purchase of "adult" services that does not involve embarrassing them, it is

18   possible that this Seattle grand jury has a good reason to inquire into Backpage's activity

19   in cities outside Washington, and it is possible that the grand jury needs more documents

20   from Backpage to complete its investigation.  And although the Government has not

21   attempted to validate the legal theory on which it hopes to indict Backpage, it is possible

22   that it could do so.  The Government has done little, however, to assure the court that

23   these are legitimate possibilities, and not figments of the court's imagination.  Its strategy

24   in the submissions before the court has been, in large part, to trumpet the grand jury's

25   authority as if it were beyond question.  It is time for the Government to play a different

26   tune.

27

28   ORDER – 17

### 3.   The Court Will Not Incorporate the Content of the Government's Ex Parte Submission Into This Order.

Some of the information missing from the Government's submissions is present in an unsolicited ex parte submission it made to the court in conjunction with its reply brief. Although the court has reviewed the ex parte submission, it has declined to discuss it or its contents before now.

To justify its unsolicited ex parte submission, the Government cites *R. Enterprises*, wherein the Supreme Court suggested that in an appropriate case, "a court may be justified in requiring the Government to reveal the general subject of the grand jury's investigation before requiring the challenging party to carry its burden of persuasion." 498 U.S. at 302.  The Court reasoned that a party challenging a grand jury subpoena as unreasonable would in some cases have no idea of the subject of the grand jury's investigation, and thus would be poorly suited to bring a challenge. *Id.*  The Government persists in interpreting *R. Enterprises* as a carte blanche to file ex parte submissions whenever it prefers.  It did this once already, in advance of the August hearing.  The court informed the Government at the August hearing that it would not consider the ex parte submission because Backpage already knew the general subject of the grand jury's investigation, and thus there was no reason to require the Government to reveal it ex parte.  It should go without saying that the court does not prefer ex parte submissions, which will almost always raise well-founded concerns of fairness.

This time, the Government concluded its reply brief with a statement that its investigation had "evolved substantially since the first subpoena," and promised the court that its ex parte submission would describe the "larger scope of the grand jury's evolving investigation" and "describe the substantial connection between the subpoena requests and the investigation . . . ."  Based on those representations, the court read the ex parte submission.  It wishes that it had not.

ORDER – 18

1   The Government's ex parte submission does not explain anything unknown about

2   the "general subject of the grand jury's investigation," which is the only subject for

3   which an ex parte submission might be appropriate.  The submissions advises the court of

4   a host of details about the investigation that are not publicly known, but those details do

5   not reveal an investigation whose general subject matter is substantially different than the

6   one the Government has already revealed.  It is apparent that the purpose of the ex parte

7   submission is to make argument that belongs in the briefs the Government filed publicly.

8   The Government's public submissions scarcely mention the content of the requests

9   within these subpoenas, whereas the ex parte submission discusses most of them

10  individually.  There is no reason to shield these arguments from Backpage's view, and it

11  is fundamentally unfair to do so.  Backpage has objected to this ex parte submission, just

12  as it objected to the Government's first one.

13       None of the arguments that the Government has hidden from Backpage would

14  have led to a different result today, although if the Government had not hidden those

15  arguments, the court would have at least discussed them in other sections of this order.

16       The court orders the Government to make no further ex parte submissions unless it

17  requests leave from the court and the court grants it.  None of the reasons the

18  Government offered in support of its previous ex parte submissions would have sufficed.

19  If the Government violates this order, the court will provide the submission to Backpage.

20       **4.    The Subpoenas' Impact on the First Amendment Rights of Backpage**
            **and Its Users Is an Additional Reason to Quash Them.**

21       It is not strictly necessary for the court to address the parties' First Amendment

22  concerns.  The reasons the court has already articulated are a sufficient reason to quash

23  the subpoenas.  The court nonetheless discusses the First Amendment, because it

24  provides at least incremental support for the court's decision today.

25       The subpoenas implicate the First Amendment in two ways.  They burden

26  Backpage, whose business is the dissemination of speech.  The Government's insistence

27  ORDER – 19

28

1  that solicitations for prostitution and other unlawful acts do not merit First Amendment

2  protection ignores the lawful solicitations that Backpage users make, even within the

3  "adult" category. Exotic dancers may legally advertise their service. Massages are legal,

4  within certain bounds. Whatever unlawful services might be for sale on Backpage.com,

5  the Government does the grand jury no favors by ignoring the lawful "adult" ads on the

6  site. Putting aside Backpage's First Amendment interests, its users have rights as well.

7  The First Amendment protects not only the right of an exotic dancer or masseur to

8  advertise his services, but his right to do so anonymously. The Government contends that

9  users who post advertisements want to reveal their identity, but most Backpage users

10  identify themselves only with aliases. The right to speak anonymously encompasses the

11  right to use an alias.

12        It would appear that Backpage's motivation for presenting its disputes in First

13  Amendment wrapping paper is its belief that the Government must satisfy a more

14  challenging test to overcome a First Amendment challenge. Courts, however, have

15  struggled to articulate the rules governing contests between grand jury subpoenas and the

16  First Amendment rights of a subpoena's target. *See, e.g., Kramerbooks*, 26 Media L.

17  Rep. at 1600 ("The Supreme Court has never explicitly defined the standard under which

18  a grand jury subpoena that implicates the First Amendment must be examined . . . .");

19  *Amazon.com*, 246 F.R.D. at 572 ("[T]he Supreme Court in cases such as [*R. Enterprises*

20  and *Branzburg*] never directly has imposed a higher standard for reviewing grand jury

21  subpoenas that implicate First Amendment concerns . . . ."); *In re § 1461 Investigation*,

22  706 F. Supp. 2d at 18 (same).

23        According to Backpage, this court need not struggle to articulate a test, because

24  the Ninth Circuit already did so in *Bursey v. United States*, 466 F.2d 1059 (9th Cir.

25  1972). *Bursey* concerned testimonial subpoenas to two members of the staff of a Black

26  Panther newspaper from a grand jury investigating the unlawful activity (including a

27

28  ORDER – 20

1    threat to kill President Nixon) of members of the Black Panther Party. *Id.* at 1065-66.

2    The staffers appeared before the grand jury at least five times, answering some questions,

3    but refusing to answer others. *Id.* at 1066-71. Interspersed between their grand jury

4    appearances were three court appearances. *Id.* At their fourth court appearance, the court

5    held them in contempt for refusing to answer some questions. *Id.* at 1071. After

6    addressing Fifth Amendment Self-Incrimination and Due Process concerns, the *Bursey*

7    court announced that the test that applies to First Amendment infringement outside the

8    grand jury context applies equally to the grand jury. That is, the Government bears the

9    burden of establishing "legitimate and compelling" interests, and that the "incidental

10    infringement upon First Amendment rights is no greater than is essential to vindicate its

11    subordinating interests." *Id.* at 1083. The court held that the district court should have

12    "decide[d] whether the Government has carried its burden almost question by question

13    before . . . compel[ling] answers." *Id.* at 1086.

14        Applying that test, the *Bursey* court held that questions about the identity of high-

15    level Black Panther members and contacts with foreign governments were permissible,

16    because their infringement on associational privacy was minimal and the grand jury's

17    need for the information was substantial. *Id.* at 1086-87. The court found an insufficient

18    foundation for questions inquiring into the publication and distribution of the newspaper.

19    It held that because there was no "substantial possibility" that those responsible for

20    publication or distribution had acted with criminal intent, the infringement on

21    associational and press freedoms was unwarranted. *Id.* at 1087. The court also rejected

22    questions that indirectly sought the identities of newspaper staffers. *Id.* at 1088. Finally,

23    the court rejected questions inquiring into the Black Panthers' funding, finding that they

24    posed too great an infringement on associational freedom for too little benefit to the

25    investigation. *Id.*

26

27

28    ORDER – 21

1    The Government attempts to steer the court away from *Bursey*, relying instead on

2    *Branzburg* and *Scarce*.  The Ninth Circuit, however, already held that *Branzburg*

3    compelled no different result in *Bursey*.  The Supreme Court decided *Branzburg* just a

4    day before the *Bursey* opinion issued, and the *Bursey* court did not cite *Branzburg* except

5    in denying the Government's request for rehearing.  The *Bursey* court rejected the notion

6    that *Branzburg* required a different analysis than the one it employed.  *Bursey*, 466 F.2d

7    at 1090-91.  Although the *Scarce* court mentioned *Bursey*, it did not overrule it.

8    The court rejects the Government's contention that *Scarce* prohibits a First

9    Amendment challenge to a grand jury subpoena except in a case of bad faith or abuse of

10   grand jury power.  At most, *Scarce* prohibits a court from departing from the rule

11   permitting a grand jury to inquire into information obtained in a First-Amendment-

12   protected context absent bad faith.  The First Amendment concerns that Backpage raises

13   are different.  Neither *Scarce* nor *Branzburg* established a general test that applies in

14   every clash of First Amendment rights with grand jury needs.  In addition, there is no

15   indication that a court applying *Bursey*'s test to the question of a reporters' privilege

16   would have come to a different conclusion in either *Branzburg* or *Scarce*.

17   Where a witness would prevail in an application of the *Bursey* test but not in

18   application of the principles announced in *Branzburg, Scarce*, or *R. Enterprises*, it would

19   be necessary to precisely define the conflict (if any) between those cases.  In a case where

20   the discretionary analysis applicable to a Rule 17 motion to quash would lead to a

21   different result than the analysis than *Bursey* dictates, it would be necessary to determine

22   whether *Bursey* governs.  In this case, however, Backpage would succeed in quashing the

23   subpoenas regardless of the court's approach to the First Amendment issues.[4]  For that

---

[4] The parties' disputes include one over who bears the initial burden in challenging these
subpoenas. The Government contends that *R. Enterprises* places that burden on the witness in
any challenge to a grand jury subpoena; Backpage contends that *Bursey* inverts that burden in a
case implicating the First Amendment. *See R. Enters.*, 498 U.S. at 301; *Bursey*, 466 F. 2d at
1083. The court does not resolve this dispute because Backpage has carried any burden it might
bear.

ORDER – 22

1   reason, the court will not answer unsettled First Amendment questions today.  The three

2   subpoenas before the court impact, to some extent, the First Amendment rights of

3   Backpage users to post anonymously as well as Backpage's First Amendment right to

4   publish.  That is an additional reason for the court to exercise its discretion to quash these

5   subpoenas.

6                              **IV.   CONCLUSION**

7          For the reasons stated above, the court GRANTS Backpage's motion to quash

8   (Dkt. # 3) and DENIES the Government's motion to compel (Dkt. # 1).

9          DATED this 17th day of January, 2013.

11

12

13                              The Honorable Richard A. Jones
                                United States District Court Judge

14

28   ORDER – 23

# EXHIBIT F

HONORABLE RICHARD A. JONES

1

2

3       FILED _____ ENTERED
        _____ LODGED _____ RECEIVED

4

        FEB 13 2013

5           AT SEATTLE
        CLERK U.S. DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
6       BY _____ DEPUTY

7                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
8                             AT SEATTLE

9
        IN RE GRAND JURY SUBPOENAS TO          CASE NO. GJ12-172RAJ
10      BACKPAGE.COM, LLC AND VILLAGE
        VOICE MEDIA HOLDINGS, LLC              ORDER
11

12            This matter comes before the court on the motion (Dkt. # 9) of the United States to

13      modify the court's January 17, 2013 order quashing three grand jury subpoenas issued to

14      the corporate entities that operate and control the Backpage.com website.  The court

15      DENIES the motion.

16            The Government concedes that its motion constitutes an "unusual step." Mot. at 1.

17      The court concurs.  The Government does not ask the court to reconsider its decision to

18      quash the subpoenas, it asks the court to "modify its order to make clear that the

19      government did not act in bad faith or misuse the grand jury process." Mot. at 13.

20            The order articulated the court's concern that the Government might have issued

21      the grand jury subpoenas for an improper purpose.  The court explained that concern,

22      which arose from the Government's apparent insistence on the production of irrelevant

23      documents, the Governments' request for documents evidencing Backpage ads in sixteen

24      cities outside Western Washington, the Government's request for information on whether

25      Backpage employees had purchased any "adult" services from Backpage.com, and the

26      Government's failure to articulate how the discovery it sought was reasonably necessary

27
        ORDER – 1
28

1    to complete its investigation, particularly in light of the novel vicarious liability theories

2    on which the Government relied.  Jan. 17 ord. at 14-17.

3           The court articulated those concerns, but "emphasize[d] that while it question[ed]

4    the purposes for which the Government ha[d] issued these subpoenas, it dr[ew] no

5    conclusions."  Jan. 17 ord. at 17.  Instead, the court articulated its concerns as additional

6    support for its decision to quash the subpoenas.  As the order makes clear, the court could

7    have quashed the subpoenas simply because they were overly broad and unduly

8    burdensome.

9           The court labored to explain why it could not draw conclusions about the

10   Government's motives:

11             It is possible that the Government has a reasonable explanation for forcing
               Backpage to produce thousands of pages of irrelevant material, it is
12             possible that it has a reason for inquiring into Backpage employee's
               purchase of "adult" services that does not involve embarrassing them, it is
13             possible that this Seattle grand jury has a good reason to inquire into
               Backpage's activity in cities outside Washington, and it is possible that the
14             grand jury needs more documents from Backpage to complete its
               investigation.  And although the Government has not attempted to validate
15             the legal theory on which it hopes to indict Backpage, it is possible that it
               could do so.  The Government has done little, however, to assure the court
16             that these are legitimate possibilities, and not figments of the court's
               imagination.
17
     Jan. 17 ord. at 17.
18
19          The Government has apparently construed that passage as an invitation to request

20   modification of the court's order.  The motion now before the court contains new

21   argument and explanations that address the possibilities the court raised.  It does not

22   contend that the court erred in its previous order, it contends that the court ought to

23   modify it based on new material that the Government could have submitted in

24   conjunction with the motions that led to the January 17 order.  Future developments in

25   this investigation may require the court to consider anew the possibilities it listed in the

26   January 17 order.  But at present, there are no developments that require anything from

27   the court.

28   ORDER – 2

1      The Government requests a purely advisory opinion.  It asks the court to opine on

2   whether, if the Government had submitted the material it submitted in its new motion in

3   conjunction with the two motions that led to the January 17 order, the court would have

4   had fewer concerns (or different concerns) about the Government's motives.  Because

5   that opinion will have no impact on this litigation (at least not now), the court will not

6   offer it.  To do so would not only violate the longstanding rule against advisory opinions,

7   it would be a disservice to the hundreds of litigants who require opinions from the court

8   that will impact their cases.

9      The court declines to modify the January 17 order.

10     DATED this 13th day of February, 2013.

11

12

13

14     The Honorable Richard A. Jones
       United States District Court Judge
15

16

17

18

19

20

21

22

23

24

25

26

27

28     ORDER – 3

# EXHIBIT G

2016 WL 7237305 (Cal.Super.) (Trial Order)
Superior Court of California.
Sacramento County

PEOPLE of the State of California,

v.

Carl FERRER et al, Defendants.

No. 16FE019224.
December 9, 2016.

**Trial Order**

Michael G. Bowman, Judge.

**Nature of Proceedings: COURT'S FINAL RULING ON DEMURRER**

**Introduction**

**\*1**  Defendants face charges for their respective roles in owning and operating an online classified advertisement website. Allegedly, through third party use of this website, women and young girls were sexually exploited. The Attorney General seeks to hold the Defendants criminally liable for the victimization of these women. The People of the State of California have a strong and legitimate interest in combating human trafficking by all available legal means. Moreover, any rational mind would concur that the selling of minors for the purpose of sex is particularly horrifying and the government has a right and a duty to protect these most vulnerable victims.

The State's legitimate interest is not absolute, however, and must be constrained by the interests and protections of the First Amendment to the U.S. Constitution. In that vein, the United States Congress has created the Communications Decency Act under 47 USC section 230 ("herein CDA"). The CDA forecloses suit against an online publisher when that suit is based on speech provided by a third party. (47 USC §230 (c) (1) and (e) (3).) By enacting the CDA, Congress struck a balance in favor of free speech by providing for both a foreclosure from prosecution and an affirmative defense at trial for those who are deemed an internet service provider.

In fact, this Court garners strength for its ruling from the legislative history (or lack thereof). The CDA was created in direct response to a legal decision holding an online publisher strictly liable for defamatory statements posted by third parties. (*See Stratton Oakmont v. Prodigy Servs. Co.*, 1995 N.Y. Misc. LEXIS 229.) Since the creation of the CDA, several courts have construed the CDA's immunity provision broadly, such that close cases are resolved in favor of immunity. (*Fair Housing Council of San Fernando Valley v. Roommates.com LLC* (9 th Cir. 2008) 521 F.3d 1157, 1170-1171.) Congress has had ample opportunity to statutorily modify the immunity provision if it disagrees with prevailing judicial application of this provision. Congress has not done so, and the current legal framework binds this Court.

The key question in this case is not whether speech in furtherance with human trafficking is protected free speech: clearly it is not. The issue to resolve is whether the Defendants should be entitled to immunity under the CDA for providing a forum for third party speech, or whether the defendants have crossed the line of merely providing a forum for speech to become actual creators of speech, and thus not entitled to immunity under the CDA.

## Background

Backpage.com is one of the largest on-line classified advertisement services, through which users may post advertisements in a variety of categories. Posting an advertisement in the "Adult Services" category requires a fee. Through various levels of involvement with Backpage.com, Defendants find themselves facing criminal charges regarding certain advertisements placed in the "Adult Services" category. Carl Ferrer, Michael Lacey and James Larkin currently face a charge of conspiracy to pimp, and Ferrer faces multiple additional charges of pimping and pimping of a minor.

**\*2** The allegations are that Defendants conspired to create and organize a website that allows sex trafficking to take place. The People assert that Defendants created such a site, knowing that prostitutes and/or pimps use the site to advertise prostitution, and Defendants did so with the intent to derive support and maintenance from the prostitution resulting from the advertisements. The People allege that Defendants' plan has come to fruition and that they have derived financial support and maintenance from the prostitution resulting from the advertisements third parties pay Backpage.com to place. Allegedly, Defendants have also derived support from prostitution resulting from content "created" by Defendants themselves when they took content from the third party advertisements originally placed on Backpage.com and posted new advertisements on EvilEmpire.com and BigCity.com - sites also created and maintained by Defendant Ferrer.

On October 19, 2016, Defendants filed a demurrer to the felony complaint against them. Against the backdrop of unsuccessful attempts by the California and other state Attorneys General to shut down adult online advertising, the Defendants argue that the instant prosecution cannot go forward.

Defendants claim that the complaint and prosecution are: barred by the First Amendment, legally deficient under Section 230 of the Communications Decency Act ("CDA"), and devoid of any facts that constitute public offenses under the criminal statutes.

On November 16, 2016, this Court issued a tentative ruling on the matter, but allowed additional briefing. Both parties have filed additional arguments in response to the tentative ruling.

### Court's legal analysis and ruling

### 1. Complaint states facts that constitute public offenses

The Defendants argue that the court should grant the demurrer because the Complaint fails to allege any public offense. Rather, Defendants maintain, the People are pursuing a theory of prosecution based on allegations that third parties posted content allegedly relating to unlawful conduct. Defendant Ferrer also claims that the pimping charges against him are deficient because there is nothing to connect Ferrer to any of the advertisements associated with the nine victims. (Def. 24-25) All the defendants allege that the complaint's conspiracy charge is deficient because it does not address several elements of conspiracy. (Def. 25-26) The People claim that the complaint expressly alleges that Defendant Ferrer "knowingly and repeatedly took the earnings of victims engaged in prostitution because his livelihood depended on it." (Opp. 18) As to the conspiracy between all the defendants, the People assert that the complaint expressly alleges they conspired together to commit pimping for the purpose of further enriching themselves. (Opp. 19) The People maintain that level of specificity is all that is required to provide notice under Penal Code section 952. (Opp. 18-20) The People argue that Defendants' assertion that the complaint does not adequately state facts that constitute public offenses belies confusion between civil and criminal pleading requirements. (Opp. 20) As stated below, the key issue here is whether Defendants are able to claim immunity under the CDA. Such ability to claim liability would not necessarily render the complaint deficient. The charging instrument however, is sufficient in this case.

## 2. Defendants Challenge is Appropriately Raised in a Demurrer

The People claim that a demurrer is not the appropriate vehicle in which to raise a defense of immunity under the CDA. Rather, the People contend that such immunity may only be raised as an affirmative defense. This Court disagrees.

A demurrer to a criminal complaint lies only to challenge the sufficiency of the pleading and raises only issues of law. (Pen. Code, § 1004; *People v. McConnell* (1890) 82 Cal. 620; *People v. Biane* (2013) 58 Cal.4th 381, 388.) A defendant may demur only on delineated statutory grounds. (Pen. Code, § 1004; *People v. Saffell* (1946) 74 Cal.App.2d supp. 967, 972.) These include the ability to challenge the accusatory pleading on the ground that the pleading includes information that would be a bar to prosecution. (Pen. Code, § 1004(5). *See also People v. Goodman* (2014) 225 Cal.App.4th 950, 956.) The language of the CDA itself states, "*No cause of action may be brought* and no liability will may be imposed under any State or local law that is inconsistent with this section." (47 U.S.C. §230 (e) (3) (emphasis added).) This statutory language clearly demonstrates a legislative intent to provide both a bar to prosecution and an affirmative defense at trial

 **\*3** Stated more succinctly "…close cases, we believe, must be resolved in favor of immunity*, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged--or at least tacitly assented to--the illegality of third parties*." *Fair Housing. Council v. Roommates.com, LLC, 521 F.3d 1157, 1174, 2008 U.S. App. LEXIS 7066, \*45, 36 Media L. Rep. 1545 (*9th Cir. Cal. 2008* (emphasis added).

## 3. The First Amendment is implicated

Defendants contend that the First Amendment bars prosecution, as the People are seeking to prosecute individuals for the act of publishing third party content. However, the instant charges are not based on an overt attempt to criminalize the act of publication, and traditional First Amendment analysis is not required here. That is not to say that the First Amendment is not implicated. As noted, the protections afforded by the First Amendment were the motivating factors behind the enactment of the CDA. Congress expressly intended to relieve online publishers from liability for publishing third-party speech. (47 U.S.C. § 230) Thus, the relevant question in this case is whether, and to what extent, Defendants' activities entitle them to protection of their First Amendment rights through the immunity provision of the CDA.

### a. Immunity Under the Communications Decency Act

The CDA provides immunity for online publishers and distributors of content generated by third parties. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 39.) Protection from the CDA is broken down into three parts. Conduct is shielded if the defendant (1) is a provider or user of an interactive computer service; (2) that the plaintiff seeks to treat as a publisher or speaker; (3) of information provided by another information content provider. (*Fields v. Twitter, Inc.* (2016 U.S. Dist. LEXIS 105768, \*8; *Doe v. Backpage.com LLC* (2016) 817 F.3d 12, 19; 47 U.S.C. §230.) "There has been near-universal agreement that section 230 should not be construed grudgingly." (*Doe, supra*, 817 F.3d at 118 [citations omitted].)

The second component is the instant source of dispute. Defendants assert that Backpage.com is an internet service provider that merely allows third parties to publish their content, and the instant prosecution seeks to impermissibly treat them as the speaker. The People respond that the CDA does not protect those who knowingly commit their own crimes on the internet. The People assert that Defendants should be viewed as content providers, and not entitled to immunity under the CDA.

### b. Content provision versus editorial functions

To determine whether defendant faces a claim that seeks to treat the defendant as a publisher or speaker of information provided by a third party, "'courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker'." (*Fields, supra,* 2016 U.S. Dist. LEXIS 105768, *10, *quoting Barnes v. Yahoo!, Inc.* 570 F.3d 1096, 1101-02.) Moreover, because distributors are included in the publisher category, distributors are also entitled to protection under the CDA. After all, publication includes every repetition and distribution of material. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 45.) Under the CDA, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune." (*Fair Housing Council of San Fernando Valley v. Rommates.com, LLC,* (9th Cir. 2008) 521 F.3d 1157, 1170-1171.) The Ninth Circuit has recognized that although "there will always be close cases where a clever lawyer could argue that something the website operator did encouraged the illegality…Such close cases must be resolved in favor of immunity…" (*Id* at 1174.)

 **\*4**  Although the People acknowledge that third parties provided the content for the original advertisements placed on Backpage.com, the prosecution asserts that Defendants developed the content on BigCity.com and EvilEmpire.com by deliberately manipulating that original content to generate the advertisements placed on BigCity and EvilEmpire. The People assert that Defendants created "fake profiles" when "Backpage staff took images and information from Backpage escort ads and used them to create dating profiles on BigCity.com." (Ex 1, p2) In support of this claim, the People refer to an internal Backpage email that states "The content will be pre-populated with millions of images from backpage where we hope to extract two words of the title, the phone number, and age of the person. The images will need to be processed to where we crop an area most likely to give us a wholesome image." (Ex A) Backpage also added new information, "in line with the alleged purpose of the profile." This information was not taken from the original Backpage ad, and required staff to choose one of the following: "Interested in Men," "Interested in Women," or "Interested in Everyone." (Ex 1, p4) There were no links to the original Backpage ad and Defendants hoped to pitch BigCity as a dating site to Backpage.com escort users.

The People also allege that "Defendants took images and information from Backpage escort ads and used them to create a phone directory for female escorts on EvilEmpire.com." (Ex 1, p3) Customers could contact the escort directly from the number listed on EvilEmpire or through a link to original Backpage ad. The People acknowledge that the escort phone directory used "much of the same data that was selected to create a BigCity profile that was generated for that Backage escort user." (Ex 1, p5) However, EvilEmpire provides no opportunity for users to sign up, modify or contribute to entries. (Ex 1, p5)

In support of its claim that these actions constituted content creation, the People rely on *People v. Bollaert* (2016) 248 Cal.App.4 <sup>th</sup> 699. In *Bollaert*, the defendant was convicted of extortion and unlawful use of personal identifying information. He set up two websites: a revenge porn site and a site which victims of the former could utilize to have their information removed, for a fee. To use the revenge porn site, defendant designed "required fields" that required a user seeking to post a photo of another person to input that other person's full name, age, location and Facebook link. Bollaert had the only user account; he looked at every single post and decided what would get posted, placed watermarks on each photographs to discourage re-posting by third parties, and kept a spreadsheet recording every post. Bollaert would not post pictures that he considered "garbage" which included those that did *not* include nude persons. (*Id* at 706) At trial, the jury rejected defendant's assertion that he was immunized as a service provider under the CDA.

On appeal, the Fourth District affirmed the conviction. The court noted that the immunity under the CDA was limited to interactive computer services that do not retain or acquire personal information with the intent to defraud, or that do not act as content providers. (*Id.* at 709-710.) In Bollaert's case, the evidence showed that he designed the revenge porn site specifically for the purpose of eliciting nude photos and private information of others. Bollaert then used that personal information for his own purposes, *i.e.*, for display on his website, to gain advertising income and to obtain payments from his removal website. The court found there was sufficient evidence that Bollaert retained the personal information with the intent to defraud the victims.

The court also rejected defendant's claim that he was entitled to immunity under the CDA because the evidence demonstrated he was a content provider. The court determined that Bollaert's affirmative acts in designing the website to *require* users to provide content that violated other persons' privacy did not entitle him to immunity under the CDA. The court based its conclusion and reasoning on the Ninth Circuit's *Roommates* decision, which also involved a website that was "designed to solicit" content that was unlawful. These acts were not neutral, but rather "materially contributed to the illegality of the content" such that the defendant became a content provider. (*Bollaert, supra*, 248 Cal.App. 4th at 721.)

**\*5**  Defendants here contend that *Bollaert* is distinguishable from the instant case because in that case, the defendant Bollaert *required* the entry of unlawful information by the user, which fell into the narrow exception to immunity recognized by *Roommates*. (Def. Supp. 3) In contrast, Defendants argue, Backpage.com does not require users to enter unlawful information. This Court agrees with the Defendants.

In *Fair Housing v. Roommates.com* (9th Cir. 2008) 521 F.3d 1157, the defendant ran a website for the purposes of matching potential roommates together. In order to utilize the website, participants were required to answer a series of questions regarding a user's sex, sexual orientation and whether they will bring children to the household. Paid subscriptions provided access to detailed preferences from potential roommates. (*Id* at 1161-1162) The Fair Housing Councils of two cities sued Roommates, and alleged a violation of the Fair Housing Act and California housing discrimination laws. The Councils alleged that the website was acting as a housing broker in ways that it could not lawfully do off-line. (*Id* at 162.) The district court granted Roommate's motion to dismiss based on immunity provided by the CDA. The Ninth Circuit reversed.

The Ninth Circuit found that by creating the questions and choice of answers that a real estate broker was legally prohibited from asking and then requiring subscribers to answer them, Roommate became an information content provider and not immune under the CDA. (*Id* at 1164.) The court contrasted Roommate's impermissible behavior, where it both elicited the allegedly illegal content and made aggressive use of it in conducting its business, with permissible utilization of a neutral classification tool or search engine that does nothing to enhance the illegality of the content. (*Id* at 1172.)

Here, there are no allegations that Backpage required a third-party user to provide any protected information when the original ad is placed. As the information posted on EvilEmpire and BigCity is mostly taken from the original ad, Defendants did not "design to solicit" protected content as a condition to placing the ad. In fact, according to the exhibits attached by the People, Backpage moderators were instructed to look for offending material and remove it. (AG Supp. 6, Ex 9)

The People argue that Defendants actively "manipulated" the content provided by third parties so that they could profit from activity resulting from the ad placement. In light of the People's acknowledgement that the substance of the ads came from the original ad placed on Backpage, the only "manipulation" would be in the act of extracting the content from the original ad and/or from the act of physically posting the extracted content on a new site. This is not prohibited activity.

Indeed, it generally falls within the scope of protected editorial functions. (*See Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12, 20-21 [service providers' decisions on website structure, rules for posting and reposting are protected publisher functions] and *Fields v. Twitter, Inc.* (N.D. Cal 2016), 2016 U.S. Dist. Lexis 105768, \*21 [protected publishing activity included decisions about what third party content may be posted or reposted online].) (*See also Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398-408-409 [Sixth Circuit adopting the "material contribution test" and determining that within the context of web hosting, a service provider must require third-parties to enter unlawful or actionable content to be deemed a content provider].

**\*6**  Undeterred, the People assert that content was created when one piece of information was added to BigCity profiles. In generating a BigCity ad, Backpage staff was required to choose "Interested in Men," "Interested in Women," and

"Interested in Everyone." This information was not taken from the original Backpage ad. Yet, as Defendants note, the People acknowledge that these headings were "in line" with the purpose of each profile. (Def. Supp. 4, fn3) This creation of a headline "in line" with the content of the ad was not a material contribution to the offensive nature of the material. (*See Phan v. Pham* (2010) 182 Cal.App.4 [th] 323 [holding when Defendant's own acts material contribute to the illegality of the material, immunity under the CDA will be lost]. *See also Kimzey v. Yelp! Inc* (9 [th] Cir 2016) 836 F.3d 1263, 1270 (Court found the service provider's creation and addition of a star rating system was best characterized as the kind of "neutral tool" operating on "voluntary inputs" determined to be permissible in *Roommates*.)

The People also accuse Defendants of creating "fake profiles" for BigCity postings, similar to *Anthony v. Yahoo! Inc* (N.D. Cal. 2006) 421 F.Supp.2d 1257. In that case, Plaintiffs belonged to an online dating service through Yahoo. Plaintiffs alleged that Yahoo created false profiles and sent those false and expired profiles to them as enticement to renew their dating service subscription. The court refused Yahoo's claim of immunity under the CDA at the dismissal stage. The court stated that the allegations that Yahoo created false profiles were sufficient to allow the case to go forward.

Here, the People have acknowledged that the content posted on EvilEmpire and BigCity were taken directly from the original Backpage ad. This is different than the allegation *in Anthony* that Yahoo created a profile for a person who did not exist and represented to others that the fictitious person in the profile was available to date.

The People maintain Backpage created content similar to in *J.S. v. Vill. Voice Media Holdings, LLC* (2015) 184 Wn.2d 95J.S. In that case, advertisements featuring three minor girls were posted online on a site owned by Backpage. These girls became victims of sex trafficking and brought suit against Backpage. Backpage moved to dismiss the case on the basis of immunity provided by the CDA. The Washington Supreme Court refused to grant the motion to dismiss. (*Id* at 98-99.) The *J.S.* court stated that the case turned on whether Backpage merely hosted the advertisements or helped develop the content of those advertisements. (*Id* at 101)

Applying the applicable state standard for a motion to dismiss, the *J.S.* court found that the plaintiffs alleged facts that, if proved true, would show that Backpage did more than simply maintain neutral policies prohibiting or limiting certain content. Specifically, those allegations included that Backpage intentionally developed its website to require information that allows and encourages illegal trafficking of underage girls, developed content requirements that it knows will allow solicitors to evade law enforcement and that Backpage knows that the foregoing content requirements are a fraud and ruse actually aimed at helping pimps and prostitutes. (*Id* at 102.) The *J.S.* court found that it did not appear beyond a reasonable doubt that no facts existed that would justify relief, and denied Backpage's motion to dismiss. (*Id* at 103.)

Here, the People allege that Defendants "created" content and are not entitled to immunity. However, on the face of the allegations, Defendants have, at most, republished material that was created by a third party. The People allege that the content was taken from ads placed by Backpage Escort users and posted onto EvilEmpire.com. The declaration in support of Defendants' arrest warrant states that the ads placed in EvilEmpire.com were "essentially identical" to the ads placed by the third party on Backpage.com and that EvilEmpire was an "additional platform for Backpage Escort ads." This demonstrates republication, not content creation. Republication is entitled to immunity under the CDA. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 63.)

 **\*7** Finally, the People assert that the Defendants' acts of pulling information from the original Backpage ad "constituted more than the mere reposting of information with 'slight' modifications." (AG Supp. 5) The People assert that when posting on BigCity, Backpage staff deleted all text, and converted the ad into a dating profile, contrary to the intent of the original ad poster. Yet, reposting content created by a third party is immune from liability for the offensive content under the CDA. (*Barrett v. Rosenthal* (2006) 40 Cal.4 [th] 33, 63.) The act of reformatting original content to be placed on another site is also a traditionally protected editorial function. (*See Fair Housing Council of San Fernando Valley v. Roommates.com LLC* (9 [th] Cir. 2008) 521 F.3d 1157, 1170-1171 [under the CDA, "any activity that can be boiled down

to deciding whether to exclude material that third parties seek to post online is perforce immune."].) Finally, assuming that the People's assertion is true; that the ad went from expressing intent to advertise prostitution to express a desire to "date," the People are essentially complaining that Backpage staff scrubbed [1] the original ad, removing any hint of illegality. (AG Supp. 5-6) If this was the alleged content "manipulation," the content was modified from being illegal to legal. Surely the AG is not seeking to hold Defendants liable for posting a legal ad; this behavior is exactly the type of "good Samaritan" behavior that the CDA encourages through the grant of immunity.

[1]  The internal Backpage email attached by the AG states, "The content [of BigCity] will be pre-populated with millions of images from backpage where we hope to extract two words of the title, the phone number, and age of the person. The images will need to be processed to where we crop an area most likely to give us a wholesome image." (Ex A)

The People's overall theory is that Backpage knew prostitution ads were placed on its main site and, in response, created two additional websites with the goal of encouraging that prostitution through increased ad placement. There are at least two problems with this theory. First, online publishers are not subject to notice liability. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 45-46; *See also Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398, 407-408 [explaining that immunity under the CDA bars notice liability in an effort to maintain the robust nature of the internet and encourage self-regulation].) Next, both the People's "encouragement theory" and suggestion that by reposting the ads, Defendants are ratifying the content of the original ad, thereby becoming a content provider themselves, have been rejected by the courts. (*Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398, 413-414 [under the encouragement or ratification theory, service providers would be liable for inviting and commenting on illegal or actionable content, which impermissibly inflates the meaning of "development" to the point of eclipsing immunity from publisher-liability established by Congress]; *Ascentive LLC v. Opinion Corp.* (EDNY 2011) 842 F. Supp.2d 450, 476 [inviting postings then altering the way postings are displayed is not content development]; *Roommates, supra*, 521 F.3d at 1174 [encouragement, enhancement by implication or development by inference is protected conduct under the CDA]; *Black v. Google Inc* (N.D. Cal 2010) 2010 U.S. Dist. LEXIS 82905, *8 [even if defendants "sponsored or endorsed" an allegedly defamatory comment posted by a user, "the fact remains that Plaintiffs seek to hold it liable for content generated by a third-party" and defendants are entitled to immunity under the CDA].)

This Court finds *Kimzey v. Yelp! Inc* (9th Cir 2016) 836 F.3d 1263 helpful. Plaintiff Kimzey complained about offensive content in a negative business review posted on Yelp! and sought to hold Yelp! liable. Kimzey alleged that Yelp! Found the review on another website, reposted the offensive review on Yelp! and then republished the review as an advertisement or promotion on Google, all in an effort to increase online traffic to Yelp!. Kimzey's theory was that by repeatedly reposting the "found" review for Yelp!'s own use, Yelp! developed the content. (*Id* at 1267) The Ninth Circuit rejected Kimzey's "artful skirting of the CDA's safe harbor provision." (*Id* at 1266.)

**8**  The Ninth Circuit noted that Kimzey never specifically alleged that Yelp! authored the content of the statements posted. Instead, the allegations were that Yelp! adopted the statements from another website and transformed them into its own stylized promotions. The court determined that the allegations were insufficient to avoid immunity under the CDA. (*Id* at 1268) The court also rejected Kimzey's "convoluted" theory that Yelp! transformed the review into its own advertisement with the creation and addition of a star rating system that accompanied the promotion. Although this characterization had "superficial appeal" for the court, the court found that accepting the theory would extend the concept of "content provider" too far and would render the CDA's immunity provision meaningless. (*Id* at 1269.) The court stated that "Nothing in the text of the CDA indicates that immunity turns on how many times an interactive computer service publishes 'information provided by another information content provider.'" (*Ibid*.)

In short, courts have repeatedly held that an online service provider is protected whether he publishes third-party content for the first time, or republishes it for the nth time. To find the source of the liability for the unlawful or actionable

content, one must trace the pedigree of the statement. (*Kimzey, supra*, 836 F.3d at 1268-1269; *Jones, supra*, 755 F.3d at 408-409; *Doe v. Friendfinder Network, Inc*, 540 F.Supp.2d 288, 295-296.)

### 4. Removal from Protection under the CDA

#### a. Victims' Intellectual Property Rights

The People assert that the CDA does not apply because Defendants violated the victims' rights of publicity when Defendants used the victims' likenesses posted in Backpage ads and used them either on BigCity or EvilEmpire sites without the victim's knowledge. In support, the People cite to *Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12. (AG Supp. 9) In that case, plaintiffs brought claims against Backpage alleging an unauthorized use of a person's picture. Plaintiffs alleged that by garnering advertising revenues from advertisements placed by their traffickers, Backpage profited from the unauthorized use of the plaintiffs' photographs. The plaintiffs alleged that Backpage's use of their images cannot be written off as incidental because their pictures were "the centerpieces of commercial advertisements." (*Id* at 27.) The court found that although Backpage profited from the sale of advertisements, "it is not the entity that benefits from the misappropriation." Rather, the party who benefits from the misappropriation is the person who placed the original ad. The court stated "Matters might be different if Backpage had used the pictures to advertise its own services…" (*Ibid*.)

The People assert that the "matters [that] might be different" are present here, when Defendants used pictures and text from Backpage ads to generate new ads on two additional websites. In response, Defendants call attention to the fact that users posting on Backpage.com accept the website's Terms of Use, in which they assign all intellectual property rights and agree that their photos and content may be reposted. (Def. Supp. 10)

The right of publicity derives from the right of privacy. Generally, the right of privacy protects an individual's peace and quiet. The right of publicity, in turn, protects an economic interest a person has in the value of his identity. These privacy rights are personal. (*Hill v. National Collegiate Athletic Assn* (1994) 7 Cal.4th 1, 24.) Thus, the prosecutor does not have standing to assert this right on behalf of the victims. It is on that crucial fact that sets this case apart from *Doe v. Friendfinder Network Inc* (2008) 540 F.Supp. 2d 288, 304. (See AG Supp. 9) *Friendfinder* involved a civil plaintiff seeking damages for the violation of her right to publicity after an unknown person created a profile on her behalf, without her knowledge or consent, and *Friendfinder* used portions of that profile as advertisements to increase the profitability of their business. The court found the allegations sufficient to survive a motion to dismiss. (*Ibid*.)

**\*9** The People lack standing to assert this right. Moreover, existing case law indicates that these additional advertisements are permissible attempts at search engine optimization in an effort to increase the visibility of the information provided by the third party. (*See Asia Econ. Inst. V. Xcentric Ventures LLC* (C.D. Cal. 2011) 2011 U.S. Dist. LEXIS 145380, \*19 [increasing the prominence of a page in internet searches do not amount to "creation or development of information"].) Indeed, the very purpose behind the third party's placing the ad on Backpage was to provide accessibility to the public on a large scale. (*Cf Ibid* [the purpose of consumer reports is to provide accessibility to the public on a grand scale and "increasing the visibility of a statement is not tantamount to altering its message"].)

#### b. Prosecution for pimping under Penal Code section 266H

The People maintain that Defendants' actions were not neutral, and they instead took an active role to further prostitution and seek to hold Defendants responsible for their own misconduct, not for the speech of others. "This is not a case against Backpage, a website; it is a case against three individual defendants who used multiple platforms to commercially sexually exploit vulnerable women and children." (AG, Supp 2)

This Court finds it difficult to see any illegal behavior outside of the reliance upon the content of speech created by others. The whiff of illegality is detected only when considering the alleged content of the statements contained in the ads. Indeed, the theory of prosecution requires the presumption that illegal content was contained in the ads, *i.e.*, that the ads were explicitly for prostitution. Under the prosecution's theory, Defendants would become liable at the point where information provided from third parties was transferred to the additional two websites because, according to the People, Defendants transferred the information intentionally to help to facilitate prostitution. (When prostitution transactions took place as a result of the ads, more ads would be placed.) Yet, the general actions required (absent consideration of speech content) to repost the ads would not be illegal. Thus, the prosecution depends on consideration of speech provided by a third party.

### *i. Theory that Defendant's derived financial support from prostitution*

The People maintain that Defendants may be prosecuted under the theory is that defendants derived support from the earnings of another's act of prostitution. (*See McNulty, supra*, 202 Cal.App.3d at 630 [stating the two theories of prosecution for pimping].) The People assert that the allegations are that the Defendants "knowingly derived support from prostitution earnings, *i.e.*, profited from prostitution" when they created EvilEmpire to improve Backpage's search results (search engine optimization) and created BigCity to expand Backpage's share of "online commercial sex market" and profits. The People maintain that pimping will be shown when the People demonstrate that Defendants acquired income from prostitution resulting from advertisements placed in Backpage.com. The People assert that Defendants agreed upon a business model to maximize the receipt of prostitution earnings and committed many overt acts in furtherance of this objective. (Opp. 3)

In support, the People cite to *People v. Grant* (2011) 195 Cal.App.4th 107. *Grant* discusses a distinction between financial support received by the prostitute (illegal) and funds paid by the prostitute for services rendered or other purposes (legal). The appellate court made clear that "the statutory prohibition does not preclude a person from accepting a known prostitute's funds gained from the prostitute's lawful activities or for purposes other than the person's support and maintenance." (*Id* at 116. *See also Allen v. Stratton* (C.D.Cal. 2006) 428 F.Supp.2d 1064, 1072, fn 7 [a natural reading of the pimping statute does not apply to an individual who provides a legitimate professional service to a prostitute even if paid with proceeds earned from prostitution, the service provider derives support from his own services]; *People v. Reitzke* (1913) 21 Cal.App.740, 742 [a legitimate defense to pimping is that a prostitute loaned the defendant money for the purpose of going into the saloon business, or for any other purpose except the purpose of being supported or maintained by the prostitute].)

 **\*10**  Here, there is no dispute that Backpage charged money for the placement of advertisements. Does this qualify as services rendered for legal purposes? Given the services provided by the online publisher, the answer to that question is yes. Providing a forum for online publishing is a recognized legal purpose that is generally provided immunity under the CDA. This immunity has been extended by the courts to apply to functions traditionally associated with publishing decisions, such as accepting payment for services and editing. (*See e.g., Fields, supra*, 2016 U.S. Dist. LEXIS 105768, \*11-12 [Twitter immune against claims that it provided ISIS material support through use of its services because protected publishing activity included decisions about: what third party content may be posted online; monitoring, screening, and deletion of content; and whether to prevent posting].) In fact, the People acknowledge that the mere act of accepting money for postings is permissible. (Opp. 9) The case law is clear that, as discussed above, immunity is removed when the service provider affirmatively acts to create the offensive content.

This Court draws support for its conclusion from cases in other jurisdictions. In *Doe*, for example, the plaintiffs alleged that, beginning at age 15, they were trafficked through advertisements on Backpage.com and Backpage profited from their victimization. The plaintiffs filed suit against Backpage.com for violating the Trafficking Victims Protection Reauthorization Act ("TVPRA") which prohibits knowingly benefitting financially from sex trafficking. (*Doe, supra*, 817 F.3d at 15.) Plaintiffs' theory was that Backpage engaged in a course of conduct designed to facilitate sex traffickers'

efforts to advertise their victims on the website by only charging for posts made in the "Adult Entertainment" section, and allowing users to pay an additional fee for "Sponsored Ads," which increased the number of times the advertisement appeared. (*Id.* at 17.) Plaintiffs also alleged that Backpage tailored its posting requirements to make trafficking easier by not blocking repeated attempts to post and by allowing users to pay anonymously through prepaid credit cards or digital currencies. (*Id* at 16.)

Backpage moved to dismiss the suit under Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion and found that the CDA provided immunity from the claims. On review, the First Circuit Court of Appeals affirmed the district court's ruling. The First Circuit rejected the plaintiffs' assertion that Backpage participated in an affirmative course of conduct and actual participation in sex trafficking. The court noted that the challenged were traditional publisher functions, and thus immune from suit under the CDA. (*Id.* at 20) The court also noted that the plaintiffs were harmed when they were trafficked through the advertisements. Without the content of those advertisements – which was created by a third party - there would be no harm. (*Id.* at 20.) The court dismissed the plaintiffs' assertion that Backpage's decisions about what measures to implement premise a deliberate attempt to make sex trafficking easier. The court stated, "Whatever Backpage's motivations, those motivations do not alter the fact that the complaint premises liability on the decisions that Backpage is making as a publisher with respect to third-party content." (*Id* at 21.) The court went on to state "even if we assume, for argument's sake, that Backpage's conduct amounts to 'participation in a [sex trafficking] venture' – a phrase that no published opinion has yet interpreted – the TVPRA claims as pleaded premise that participation on Backpage's actions as a publisher or speaker of third-party content. The strictures of section 230(c) foreclose such suits." (*Ibid.*) The First Circuit specifically held that "claims that a website facilitates illegal conduct through its posting rules necessarily treat the website as a publisher or speaker of content provided by third parties and, thus, are precluded by section 230(c)(1)." (*Id.* at 22.)

**\*11** Similarly, in *M.A. ex rel. P.D. v. Village Voice Media Holdings, LLC* (E.D. Mo. 2011) 809 F.Supp.2d 1041, the plaintiff sought to hold Backpage responsible for her victimization through sex trafficking that took place as a result of advertisements placed on Backpage.com. The plaintiff alleged that Backpage accepted a fee for such advertisements, knew that advertisements were for prostitution and "created information" by hosting a search engine, providing instructions for increased visibility of advertisements and allowed for anonymous payment. (M.A., *supra*, 809 F.Supp.2d at 1044.) The court granted the Defendant's motion to dismiss on the basis that the CDA provided immunity. The court reasoned that there was no allegation that Backpage was responsible for the actual development of any portion of the content of the advertisements or specifically encouraged the development of the offensive nature. (*Id* at 1052.) (See also Opp. 21; Def. 21-22)

Even in viewing the offer of proof of the evidence most favorable to the Attorney Generals office, this case is very similar to the above cases. As alleged here, the prostitution took place as a result of an advertisement placed by a third party. Backpage's decision to charge money to allow a third party to post content, as well as any decisions regarding posting rules, search engines and information on how a user can increase ad visibility are all traditional publishing decisions and are generally immunized under the CDA. In short, the victimization resulted from the third party's placement of the ad, not because Backpage profiting from the ad placement.

### Conclusion

The First Amendment "makes the individual, not government, the keeper of his tastes, beliefs, and ideas." *Paris Adult Theater I v. Slaton* (1973) 413 US 49, 73 (Douglas, J., dissenting). At the same time, the Court understands the importance and urgency in waging war against sexual exploitation. Regardless of the grave potential for harm that may result in the exercise of this article of faith, Congress has precluded liability for online publishers for the action of publishing third party speech and thus provided for both a foreclosure from prosecution and an affirmative defense at trial. **Congress has spoken on this matter and it is for Congress, not this Court, to revisit.**

**Court's ruling:**

Defendants' demurrer is GRANTED.

Defendants' request for judicial notice is DENIED.

Further court dates are vacated.

Bond is exonerated for each Defendant.

**Dated: December 9, 2016**

_____

**Honorable Michael G. Bowman**

**Judge of the Superior Court of California**

**County of Sacramento**

End of Document                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT H

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF SACRAMENTO**

| | |
|---|---|
| **DATE**: | **DEPARTMENT**:      8 |
| **JUDGE**:      Lawrence G. Brown | **CLERK**: |
| **REPORTER**: | **BAILIFF**: |

People of the State of California

vs.

Carl Ferrer, Michael Lacey, and
James Larkin,

Defendants

**CASE NO**. 16FE024013

**Nature of Proceedings: Ruling on Defendants' Motion to Dismiss under Penal Code Section 1004**

<u>Introduction</u>

Backpage.com is one of the largest on-line classified advertisement services, through which users may post advertisements in a variety of categories.  Posting an advertisement in the "Adult Services" category requires a fee.  Through various levels of involvement with Backpage.com, Defendants have twice found themselves facing criminal charges in Sacramento County relating to certain advertisements placed in the "Adult Services" category.

The prosecution's theory is that Defendants conspired to create and organize a website that facilitates sex trafficking.  The People assert that Defendants created such a site through Backpage.com, knowing that prostitutes and/or pimps use the site to advertise prostitution, and with the intent to maximize their own profits from the illegal sex trade.   According to the People, this plan also included tricking credit payment processors into processing Backpage transactions, through the use of shell companies and fraudulent billing descriptors.  Allegedly, the credit processors would not have processed the payments had they known they were doing business with Backpage.com.  The People assert that Defendants' plan has come to fruition and they have derived massive financial support and maintenance from the prostitution.

<u>Background</u>

In 2016, Defendants faced various charges of pimping and conspiracy to pimp.  The Honorable Michael G. Bowman SUSTAINED the Defendants' demurrer and dismissed the complaint.  Judge Bowman found that it was apparent from the accusatory pleadings that the prosecution hinged on treating Defendants as the speakers

of the offensive conduct, when they were merely the publisher.  Prosecution under this theory could not go forward, as the Communications Decency Act ("CDA") provides immunity for online publishers and distributors of content generated by third parties.  (*See* 47 U.S.C. §230; *Barrett v. Rosenthal* (2006) 40 Cal.4[th] 33, 39.)

That same month, the Office of the Attorney General filed a new complaint, charging the same Defendants with conspiracy to commit money laundering (count 1), money laundering (counts 2-27), and conspiracy to commit pimping (count 28).  The People also allege three sentencing enhancements based on the amount of money involved in the financial transactions.  Defendant Ferrer also faces charges of pimping a minor under 16 years old (counts 29-31, 40), pimping a minor (count 32), pimping (counts 33-36, 39), and pimping a minor 16 years old (37-38).

On January 19, 2017, Defendants filed a Motion to Enforce the Court's Order of Dismissal; Alternative Demurrer; and Request to Transfer to Judge Bowman and Further Relief.  On January 23, 2017, the People filed an Opposition.  On March 6, 2017, Defendant filed a brief in further support for the above named Demurrer under Penal Code section 1004, and the People responded in further Opposition on March 8, 2017.  The People also filed a Motion to Strike the declaration of defense counsel and Defendants' Exhibits A-J, attached to the Motion of January 19, 2017.  On March 10, 2017, the parties addressed in open court Defendants' concerns of whether the complaint was sufficiently pled such that Defendants have been adequately apprised of the charges.  Of particular concern was the money laundering charges, which charged Defendants with money laundering under the transactional prong but did not specify the underlying criminal activity.  (See Penal Code §186.10(a)(2).)  The Court invited the People to consider amending the complaint.

The People submitted the First Amended Criminal Complaint to the Court on March 24, 2017.  This was deemed filed on April 28, 2017.  The First Amended Complaint added several allegations and overt acts that explained the theory of prosecution.  In particular, the People provided clarification that the money laundering charges are based on bank fraud, wire fraud and prostitution.  On May 26, 2017, Defendants addressed the amended charges in their Continued Demurrer to Dismiss the State's Complaint.  The People filed an Opposition on June 9th, and Defendants filed a Reply on June 23, 2017.

## Court's Legal Analysis and Ruling

The parties have briefed multiple issues that may be grouped into three categories.  Defendants argue that the prosecution constitutes harassment and should be curtailed.  Defendants also make several challenges to the pleadings and argue that procedural and facial defects prohibit the instant prosecution from going forward.  Finally, Defendants argue that the First Amendment bars the instant prosecution because it is based on impermissible interference with publisher functions.

I.    **Nature of the Prosecution**
        A.    Basis for the prosecution

Since at least 2010, public officials and state prosecutors have been pressuring Backpage to remove the "Adult Services" category from the website in an endeavor to combat sex trafficking.   With Backpage's refusal to comply, a philosophical disagreement between public officials and Backpage as to how best to combat sex trafficking is clearly present.   (See *Backpage.com, LLC v. Lynch*, 216 F.Supp.3d 96, 100, fn. 2.)  Defendants note the instant prosecution is one of a recent rash of attempts to assign liability for affiliation with Backpage. Defendants claim that in each case, including the previous prosecution dismissed by Judge Bowman, Backpage successfully argued that it was entitled to immunity under the CDA.  Defendants argue that in light of this clear immunity, the instant charges are brought in bad faith and the prosecution is vindictive.  Defendants argue that this is not the first time a government official has used coercive techniques to attempt to shut them down.  (See e.g., *Backpage.com, LLC v. Dart* (7th Cir. 2015) 807 F.3d 229 [in his professional capacity, Cook County Sheriff threatened Backpage.com business partners in an attempt to dry out Backpage business].)

Yet, perhaps another possible perspective is that there is a growing desire to hold online media accountable for their role in disseminating information leading to condemnable acts by third parties.  (See e.g., *Cohen v. Facebook, Inc.* E.D.N.Y. May 18, 2017) 2017 U.S. Dist. LEXIS 76701, *28-31 [seeking to hold Facebook liable for allowing Hamas to use its platform to encourage terrorist attacks]; and *Fields v. Twitter, Inc* (N.D. Cal. 2016) 217 F.Supp.3d 1116 [seeking to hold Twitter liable for providing ISIS an account to use for spreading extremist propaganda]. )

This Court need not decide whether this prosecution is brought in bad faith, nor is there a sufficient factual basis to do so, at this juncture.  As discussed below, whether this case proceeds depends, in part, on whether Defendants enjoy immunity against these new charges under the CDA.  This immunity was provided by Congress, and regardless of where Backpage floats on the tide of public opinion, the immunity must be modified by Congress.

### B.      The People's Investigation May Continue

Defendants also request this Court to enjoin further investigation by the People and to return the materials already seized as part of the investigation.  This argument is largely based on Defendants claim that this prosecution is brought in bad faith.  At this stage, there is insufficient justification for interference with the prosecutor's functions.  (Compare *Dart, supra,* 807 F.3d at 233 [Court finding letter sent by Sheriff "containing legal threats and demands" to sever contractual ties with Backpage was clear evidence of bad acts by government official].)  Thus, Defendants' request to enjoin the People from further investigation and to return the materials seized is denied.

## II.      Procedural and Facial Challenges to the Charges

### A.      Authority to File New Charges.

The parties dispute whether the instant prosecution may be initiated against Defendants.  Defendants argue the People are prohibited from re-filing charges after the original demurrer was SUSTAINED and maintain that the First Amended Complaint constitutes an improper attempt to reinstate that original complaint. Defendants argue that the People forfeited this opportunity by failing to follow the proper procedure to cure the defects in the previous complaint, as outlined in Penal Code sections 1007-1009.  Defendants also argue that re-

filing of charges is barred because the previous complaint was dismissed on constitutional grounds. (See *People v. Pinedo* (2005) 128 Cal.App.4[th] 968, 972 [state and federal due process clauses limit the People's discretion to re-file charges].)

The People's position is that the granting of a demurrer does not bar the prosecution from filing a new complaint, even where the charges are the same. "Even a dismissal in the superior court following an order setting aside an information or indictment is no bar to a future prosecution for the same offense." (*People v. Uhlemann* (1973) 9 Cal.3d 662, 666, *citing People v. Van Eyk* (1961) 56 Cal.2d 471, 477; Pen. Code, § 999; see also Pen. Code § 1387.) Nevertheless, the People represent that the instant charges are "substantially different" than those contained in the prior complaint and because the prior complaint was not dismissed with prejudice, the new charges are appropriate.

The Court finds the People may file the instant charges. Judge Bowman dismissed the first complaint after finding the Defendants were entitled to immunity from prosecution under the Communications Decency Act. While the CDA was established to protect the constitutional right to free speech, the immunity provision providing online publishers immunity from liability for third-party speech is statutory. Thus, the dismissal was based on statutory legal grounds. Generally, when charges are dismissed based on legal grounds, the prosecution may file a new complaint or seek a grand jury indictment. (*Uhlemann, supra,* 9 Cal. 3d at 666.) Moreover, Judge Bowman's ruling signaled that a prosecution based on treating publishers as the speaker was prohibited under the CDA. This ruling would not prevent a prosecution under theories not subject to the immunity provision. The People assert that the instant charges do not fall under the purview of the CDA.

B.    Jurisdiction

Defendants question whether California has jurisdiction over this prosecution. Defendants argue that the allegation that they conducted transactions "throughout California," is insufficient because the People have not identified a single act actually committed in California. Defendants argue that territorial jurisdiction may be raised in a demurrer and is subjected to pre-trial determination. (See Penal Code §1004(1).)

A state is not prohibited from exercising jurisdiction over criminal acts that take place outside of its borders, if the results of the crime are intended to (and do) cause harm within the state. (*People v Fortner* (2013) 217 Cal.App.4[th] 1360, 1363.) California claims jurisdiction for offenses that fall under specific types of interstate situations. (*Ibid*, citing *People v. Betts* (2005) 34 Cal.4[th] 1039, 1047.) For example, under Penal Code section 27, a defendant may be punished under California law for any crime committed "in whole or in part" of the state. Similarly, under Penal Code section 788, California has jurisdiction for offenses commenced out of state then consummated in California. Finally, under Penal Code section 778a, California has territorial jurisdiction if the defendant does a preparatory act in California that is more than a *de minimis* act toward the completion of the offense. (*Fortner, supra,* 217 Cal.App.4[th] at 1363-1365.) In other words, California has territorial jurisdiction when "with intent to commit a crime" a person "does any act within this state in execution or part execution of that intent, which culminates in the commission of a crime, either within or without this state." (*People v. Renteria* (2008) 165 Cal.App.4th 1108, 1116.)

Here, the People contend that Defendants concocted a scheme to trick credit payment processors into processing payments for Backpage transactions when the processors would have otherwise declined. The People contend that this misrepresentation influenced banks to release money to Defendants. For jurisdictional purposes, the People contend that the acts of hosting a website and accepting credit payments for advertisement placement were non-*de minimis* parts of the overall scheme to defraud the banks. In this way, Defendants arguably committed more preparatory acts in California than what was deemed sufficient in *People v. Betts* (2005) 34 Cal.4th 1039, 1047, where there was sufficient evidence that the defendant's intent to molest his step-granddaughters formed in California when he suggested they go with him on a long haul truck drive. (*Id* at 1054-1056.)

This Court finds that California has jurisdiction over the instant charges. Assuming, without deciding, that Defendants intended to conduct, and participated in, the scheme alleged by the People, hosting the website through which payments were processed under fraudulent conditions was more than a *de minimis* act toward the bank fraud. The scheme would not have been as successful had it not been able to process payments for Backpage advertisements placed in California. For purposes of establishing jurisdiction, these allegations are sufficient.

C.   Case Assignment

Defendants request that this Court transfer the case back to Judge Bowman for the sake of "efficiency and to prevent forum-shopping." Defendants rely upon Penal Code section 1387, which provides exceptions to that general rule that the prosecution has an opportunity to re-file charges after one dismissal. (Pen. Code § 1387(a).) While section 1387 also serves to curtail prosecutorial harassment by placing limits on the number of times charges may be re-filed, these limitations do not dictate judicial assignment. This Court can find no justification for assignment through a method other than through the normal procedure governed by local rules 10.32 and 10.50. Defendants' request to have the case assigned to Judge Bowman is denied.

D.   Judicial Notice

Defendants have also requested this Court to take judicial notice of several documents attached as Exhibits A-J to their Motion filed on January 19, 2017. The People request this Court to strike these exhibits and the accompanying declaration from defense counsel.

This Court has been expressly called upon to review the propriety of the re-filed charges in light of the previous dismissal. Therefore, this Court takes judicial notice of the procedural history of the prior prosecution including the prior complaint and the Order granting Defendants' Demurrer. (See *People v. Putney* (2016) 1 Cal.App.5th 1058, 1063, fn. 4 [taking judicial notice of the prior case's procedural history but not the truth of any facts involving the underlying charge]; *People v. Hill* (1998) 17 Cal.4th 800, 847 [taking judicial notice of unpublished decision in separate case].)

While the previously filed complaint and dismissal order is helpful to the resolution of the matters before this Court at this juncture, Defendants' other documents do not have the same utility. (See *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564 [a court may take judicial notice of the truth of facts asserted in documents such as orders, findings of fact and conclusions of law, and judgments].) The Defendants' request to take

judicial notice for all exhibits attached to the January 19th motion, other than the previous complaint and dismissal order, is denied.  The People's motion to strike these documents is SUSTAINED.

E.       Challenges under Penal Code section 1004.

A defendant may demur on delineated statutory grounds.  (Pen. Code, § 1004; *People v. Saffell* (1946) 74 Cal.App.2d supp. 967, 972.)   These include the ability to challenge: whether the facts stated constitute a public offense; defects on the face of the accusatory pleading; or on the grounds that the pleading includes information that would be a bar to prosecution.  (Pen. Code, § 1004.  *See also People v. Goodman* (2014) 225 Cal.App.4th 950, 956.)  Literal compliance with pleading requirements under Penal Code section 952 is insufficient if the accusation fails to give constitutionally adequate notice of what the accused must defend against.  (*People v. Jordan* (1971) 19 Cal.App.3d 362, 369.)  California's system of criminal pleading under section 952 relies in part upon the transcript of the grand jury hearing or preliminary examination which must be furnished to the defendant to inform him of particular circumstances of his offense not shown by the accusatory pleading. (*People v. Anderson* (1961) 55 Cal.2d 655, 657; *People v. Johnson* (1964) 230 Cal.App.2d 80, 86; *People v. Jordan* (1971) 19 Cal. App. 3d 362, 369-371.)

However, compliance with section 952 does not necessarily overcome a due process attack and may be challenged in a demurrer prior to preliminary hearing.  (*Lamadrid v. Municipal Court* (1981) 118 Cal.App.3d 786, 790; *Choung v. People of State of California* (1970) 320 F.Supp. 625, 629.)  (*See also Lott v. United States* (1962) 309 F.2d 115, 117 [offenses must be accurately described in an indictment; and if necessary to do so, the allegations must be expanded beyond the words of the statute in order to embrace all the ingredients necessary to the offense]; *United States v. Cruikshank* (1875) 92 U.S. 542, 558 [the object of the indictment is to furnish the accused with such a description of the charge against him as will enable him to make his defense and to inform him of the facts alleged; a crime is made up of acts and intent and these must be set forth in the indictment].)  The complaint must be given a reasonable interpretation and read as a whole with its parts considered in their context.  (*People v. Biane* (2013) 58 Cal.4th 381, 388.)

*1.   Money laundering premised on federal offenses.*

Defendants argue that the charges do not constitute a public offense because the People have no authority to base their state prosecution for money laundering upon violations of federal bank or wire fraud laws.  The People respond that California law allows the state to incorporate federal offenses by reference, and the California money laundering statute specifically contains such a reference.  This Court agrees with the People.

Penal Code section 186.10, subdivision (a), provides in pertinent part: "Any person who conducts or attempts to conduct a transaction or more than one transaction within a seven-day period involving a monetary instrument or instruments of a total value exceeding five thousand dollars ($ 5,000), or a total value exceeding twenty-five thousand dollars ($ 25,000) within a 30-day period, through one or more financial institutions (1) with the specific intent  to promote, manage, establish, carry on, or facilitate the promotion, management,

establishment, or carrying on of any criminal activity, or (2) knowing that the monetary instrument represents the proceeds of, or is derived directly or indirectly from the proceeds of, criminal activity, is guilty of the crime of money laundering."

Penal Code section 186.9 defines "criminal activity" as a criminal offense punishable under the laws of the state by imprisonment in the state prison or from a criminal offense committed in another jurisdiction punishable under the laws of that jurisdiction by death or imprisonment for a term exceeding one year.  (Pen. Code §186.9(e).)  Federal bank fraud, in turn, is punishable by imprisonment for a term of not more than 30 years.  (18 U.S.C. §1344.)  Similarly, federal wire fraud is punishable by not more than 20 years, absent special circumstances.  (18 U.S.C. §1343.)  Thus, it appears that federal bank and/or wire fraud may serve as the criminal activity underlying a charge of California money laundering.

### 2.   The First Amended Complaint is Sufficiently Pled.

Defendants also argue that even if a state money laundering prosecution may be predicated on a federal offense, the charges are uncertain and fail to adequately apprise them of the actions against which they must defend.  Despite the amendments to the charges, Defendants continue to assert a lack of specificity as to the transactions and monetary instruments allegedly involved in the money laundering.  Defendants assert that the People may not rely on a simplistic pleading under Penal Code section 952, but must satisfy constitutional due process requirements as well.  The People respond that they have complied with their pleading requirements and the case should be advanced to the preliminary hearing, where the full nature of the charges will become clear.

This Court agrees the complaint is not a model of clarity.  However, the nature of the charges and theories of prosecution are ascertainable from the amended charging instrument.  Specifically, the People now allege that Defendants conspired to orchestrate a bank fraud by misrepresenting to credit payment processors that they were not processing transactions from Backpage, and this misrepresentation would trigger a release of funds from banks.  The overt acts alleged clarify that Defendants created multiple classified websites, and when applying for (at least one) merchant account, Defendant Ferrer omitted any reference to Backpage, despite intending to process Backpage transactions through the account.  The People allege that credit payment processors, along with American Express, would not have knowingly processed the payments for Backpage and the banks would not have released funds absent Defendants' trickery.

These allegations provide sufficient notice for Defendants to understand the nature of the charges and prepare a defense.  Essentially, either Defendants did - or did not - materially represent to credit payment processors in a scheme to fraudulently obtain money from banks.  If Defendants did so, this may form the basis for a money laundering charge.  (Cf. *United States v. Mason* (9th Cir. 1990) 902 F.2d 1434, 1443[1] [federal money laundering conviction supported by evidence that bank would not have opened a merchant account had it known it was laundering credit charges for prostitution; the false representation to the credit processor influenced the bank's release of funds].)  The factual resolution to that question, however, is not at issue here.

---

[1] Overruled, on other grounds in part by *United States v. Doe* (9th Cir. 2013) 705 F.3d 1134, which was later withdrawn.  See also *United States v. Warshak* (6th Cir. 2010) 631 F.3d 266.

What is at issue is whether the First Amended Complaint has been sufficiently pled to meet statutory and due process requirements.

       This Court finds the First Amended Complaint provides Defendants notice of the offenses of which they are accused, and Defendants are adequately apprised of the conduct against which they must defend.  (Penal Code §952; *Lamadrid, supra,* 118 Cal.App.3d at 791.)  In fact, Defendants' knowledge of the nature of the charges and theory of prosecution has been demonstrated throughout the briefing process and during argument to the Court.  Therefore, the First Amended Complaint meets statutory and due process requirements and is sufficiently pled to go forward.

       F.     <u>Purported Defects in the Money Laundering Charges</u>

       To prove that the defendant is guilty of money laundering, the People must ultimately show the act of conducting financial transaction(s) of a minimum amount, within a certain time frame, and that when the defendant did so, he either intended to promote criminal activity or he knew that the money represented the proceeds of criminal activity or was derived directly or indirectly from the proceeds of criminal activity.  (CALCRIM 2997)

       *1.     One Act, One Crime Concerns*

       Defendants argue that even if charges are sufficiently pled, the money laundering charges are fatally flawed because they are premised on the same acts as those allegedly constituting bank or wire fraud. Defendants argue that under the People's theory, the credit payments impermissibly constitute both the bank fraud and the money laundering.

       Notably, the federal bank fraud statute punishes the fraudulent scheme, not necessarily the completion of the scheme.  The offender must acquire (or attempt to acquire) bank property by means of the material misrepresentation.  (*Loughrin v. United States* (2014) 134 S.Ct. 2384, 2393-2394.)  Because bank fraud may be completed upon attempting to effectuate the scheme, there exists a range of punishable behavior that is subject to factual determinations by the trier of fact.  That is separate and apart from the question at bar; *i.e* whether the charges are adequately pled.

       Nevertheless, the parties draw attention to a problem identified by the federal courts that may arise when federal money laundering is based on federal bank or wire fraud, and suggest the same problem is present here. When the activity required to commit the fraud encompasses activity required to commit money laundering, the two offenses should merge into one offense under federal law.  (See e.g., *United States v. Wilkes* (9th Cir. 2011) 662 F.3d 524, 545-546 [if a successful bank fraud requires concealment of financial transactions, the defendants cannot be charged with that same act of concealment a second time, as relating to the commission of money laundering].)  Perhaps the most common "merger" problem arises when the court must parse out (or trace) the money involved in the underlying crime and money involved in the laundering.  As a result, there are a plethora of federal cases that discuss tracing the proceeds of the criminal activity in order to determine when the bank or wire fraud ends, and money laundering begins.  Indeed, the parties spend much time debating this issue.

Included in this discussion is the appropriate federal definition of "proceeds" for tracing purposes.  (Compare *United States v. Santos* (2008) 553 US 507 [plurality decision defining "proceeds" as profits rather than gross receipts] with *United States v. Grasso* (9th Cir. 2013) 724 F.3d 1077, 1091 [recognizing subsequent legislative amendment defining "proceeds" as including gross receipts of criminal activity].)

Despite the parties' request to weigh in on this vexing problem faced by federal courts, the difficulty in defining and tracing proceeds does not appear to so plague the California money laundering statute.  The bench notes in CALCRIM 2997 governing Money Laundering instruct, "If the definition of proceeds is an issue, see *United States v. Santos* – which holds that 'proceeds' in the federal money laundering statute means 'profits.'" There is no recognition of the legislative definition of "proceeds" enacted after *Santos.*  This signals an intentional divergence from federal law and provides us with a clear definition of the *type of money to be traced*.

Additionally, *People v. Mays* (2007) 148 Cal.App.4th 13, the lead case involving money laundering, provides guidance on *how to trace the money* from the underlying criminal activity on its path to be laundered. The *Mays* court determined that our "promotional" money laundering prong under subsection (a)(1) of Penal Code section 186.10 requires monetary transactions to be made with a specific intent to keep the criminal activity alive.  (*Id* at 29.)  Under this section, there is no need to trace any funds, since there is no requirement that the money to be derived from an illegal source in order to promote criminal activity.  (*Id* at 30)

However, under the "transactional" prong of subsection (a)(2), the requisite mens rea is knowledge that a monetary instrument represents criminal proceeds.  Under this subsection, tracing the source(s) of transactions is required.  Monetary instruments must be composed of the minimum statutory amount solely from criminal proceeds; it is insufficient merely to show the transaction was the right amount and from an account with comingled funds.  This requires the government to show: the defendant's entire business was illegal, there were deposits of the minimum statutory amount or more in criminally derived funds, or there was a transfer of all funds out of the account.  (*Mays, supra*, 148 Cal.App.4th at 32.)

Here, Defendants have been charged under both prongs of the money laundering statute.  This means Defendants are being charged with, essentially, either investing money into the underlying criminal scheme, or conducting transaction with profits from the scheme and the People must show that the profits came solely from that underlying criminal activity.  Regardless of whether the People will succeed in meeting their burden of proof, the theory and the charges under which they are proceeding appear to be valid under California law and adequately pled such that any defect does not bar prosecution.

## 2. *Bank Fraud May be Premised on Intent to Defraud a Third Party*

Defendants argue that even if the "criminal activity" underlying a money laundering charge may be based on a federal bank charge, the instant allegations of bank fraud are facially deficient because Defendants had no relationship with the banks named in the First Amended Complaint and therefore could not have been victims of bank fraud.

The federal bank fraud statute states:  "Whoever knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of

false or fraudulent pretenses, representations, or promises; shall be fined not more than $ 1,000,000 or imprisoned not more than 30 years, or both." (18 USC §1344.)

Subsection (1) requires intent to defraud a financial institution. To act with the "intent to defraud" means to act willfully, and with the specific intent to deceive or cheat for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself. (*United States v. Brandon* (1st Cir. 1994) 17 F.3d 409, 425.) Subsection (2) requires that a defendant "knowingly execute[ ], or attempt[ ] to execute, a scheme or artifice" and has two elements. First, the clause requires that the defendant intend "to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution." Second, the clause requires that the envisioned result—i.e., the obtaining of bank property—occur "by means of false or fraudulent pretenses, representations, or promises." (*Loughrin v. United States* (2014) 134 S. Ct. 2384, 2388-2389.) There must be a "relational" connection between the alleged false statements or representations and the obtaining of bank property, such that the misrepresentation is material. (*Loughrin v. United States* (2014) 134 S. Ct. 2384, 2393.)

A material misrepresentation made to a third party may qualify if it induces the bank to depart with its property. (See *United States v. Nguyen* 2017 U.S.Dist. LEXIS 32549, *18-19 and *Loughrin v. United States* (2014) 134 S.Ct. 2384, 2389 [both stating that bank fraud can cover deception of a non-bank custodian with a goal to obtain a bank's property].) This theory of bank fraud has been pursued in other jurisdictions. For example, in *United States v. McNeil* (9th Cir. 2003) 320 F.3d 1034, 1039, the defendant used fake identification to open an account for the purposes of receiving a false tax refund, with the ultimate goal of transferring money from the fake account to his own. The 9th Circuit rejected the argument that the conviction was invalid because the true victim was the IRS and not the bank. The court determined that the plan was two-fold; fraudulently obtain money from the IRS, then (after the bank becomes a holder-in-due-course) misrepresent to the bank that Defendant was ultimately entitled to the money. (See also *United States v. Warshak* (6th Cir. 2010) 631 F.3d 266, 309-310 [jury could find that misrepresentation made to deceive payment processor to continue to process payments when they would otherwise decline constitutes bank fraud]; *United States v. Johnson* (C.D. Ut. 2015) 2015 U.S.Dist. LEXIS 145102, *6 [submitting a fraudulent merchant account applications to a bank so that online sales could be processed can constitute bank fraud].)

By extrapolation, the instant allegations of bank fraud based on the theory that Defendants made a material misrepresentation to a credit payment processor, which induced a bank to depart with its property, may be proper and may serve as the predicate "criminal activity" for a state money laundering charge.

### 3.   *Money Laundering Based on Wire Fraud*

Defendants are also charged with both prongs of money laundering after violating the federal wire fraud statute under 18 USC section 1343. Wire fraud is committed when: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for

the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both…."  (18 USCS § 1343.)

Wire fraud does not require proof that the defendant's conduct violated a separate law or regulation. Rather, wire fraud has only three elements: "(1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and (3) a specific intent to deceive or defraud." (*United States v. Green* (2010) 592 F.3d 1057, 1064, *quoting United States v. Shipsey* (9th Cir. 2004) 363 F.3d 962, 971.)  The scheme to defraud must only include an "affirmative, material misrepresentation." (*Green, supra,* 592 F.3d at 1064).

Here, Defendants are faced with two counts of money laundering based on wire fraud, listing American Express as the victim and describing the fraudulent behavior as "using interstate wires by using various payment entities to disguise the true nature of the transactions."  Factually, the People have alleged that American Express signaled its intent to discontinue processing Backpage's credit payments after May 1, 2015, but Defendants continued to process American Express transactions from Backpage.   The People also allege that Defendants created shell companies and engaged in factoring in order to obscure the nature and/or source of the credit payments.

In light of the general money laundering discussion above, this Court finds no reason to prevent prosecution for money laundering based on wire fraud.

## III.    Application of The First Amendment

In addition to the above facial attacks on the complaint, Defendants contend that the First Amendment bars prosecution for all charges, as the People are seeking to prosecute them for publishing functions.  However, the instant charges are not based on an overt attempt to criminalize the act of publication, and traditional First Amendment analysis is not required here. Indeed, the money laundering charges based on bank and wire fraud, on their face, are not based on publication of third party speech at all.  Rather, they are based on the purported illegality of Defendants financial operations.  This Court finds that the immunity provision of the CDA is not triggered by the money laundering charges based on bank or wire fraud.  Thus, the following discussion is directed at the pimping charges faced by Defendant Ferrer and the money laundering charges based on prostitution.

That is not to say that the First Amendment is not implicated at all.  Indeed, the protections afforded by the First Amendment were the motivating factors behind the enactment of the CDA. Congress expressly intended to relieve online publishers from liability for publishing third-party speech.  (47 U.S.C. § 230)

As noted above, Penal Code section 1004 allows for a demurrer on the basis that the complaint contains matter which, if true would legally bar the prosecution.  (Penal Code §1004.)  The language of the CDA itself states, "No cause of action may be brought and no liability will may be imposed under any State or local law that is inconsistent with this section."  (47 U.S.C. §230 (e) (3) (emphasis added).)  This statutory language clearly demonstrates a legislative intent to provide both a bar to prosecution and an affirmative defense at trial. Thus, the relevant question in this case is whether, and to what extent, Defendants' activity entitles them to protection of their First Amendment rights through the immunity provision of the CDA.

A.    Immunity Under the Communications Decency Act

The CDA provides immunity for online publishers and distributors of content generated by third parties. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 39.)  Protection from the CDA is broken down into three parts. Conduct is shielded if the defendant (1) is a provider or user of an interactive computer service; (2) that the plaintiff seeks to treat as a publisher or speaker; (3) of information provided by another information content provider.  (*Fields v. Twitter, Inc*. (N.D. Cal. 2016) 217 F.Supp.3d 1116, *1121; *Doe v. Backpage.com LLC* (2016) 817 F.3d 12, 19; 47 U.S.C. §230.)  "There has been near-universal agreement that section 230 should not be construed grudgingly."  (*Doe, supra*, 817 F.3d at 118 [citations omitted].)

To determine whether defendant faces a claim that seeks to treat the defendant as a publisher or speaker of information provided by a third party, "courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker."  (*Barnes v. Yahoo!, Inc.* 570 F.3d 1096, 1101-02.)  Moreover, because distributors are included in the publisher category, distributors are also entitled to protection under the CDA.  After all, publication includes every repetition and distribution of material.  (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 45.)  Under the CDA, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune."  (*Fair Housing Council of San Fernando Valley v. Rommates.com, LLC,* (9th Cir. 2008) 521 F.3d 1157, 1170-1171.)  The Ninth Circuit has recognized that although "there will always be close cases where a clever lawyer could argue that something the website operator did encouraged the illegality…Such close cases must be resolved in favor of immunity…" (*Id* at 1174.)

As applied to the instant case, there are two possible theories of prosecuting Defendants for pimping.  A defendant can be convicted of pimping under a theory that involves actual solicitation of prostitution. Alternatively, defendants may be prosecuted under the theory that defendants derived support from the earnings of another's act of prostitution. (*See People v. McNulty* (1988) 202 Cal.App.3d 624, 630 [stating the two theories of prosecution for pimping].)  The People rely on the second theory in asserting that Defendant Ferrer knowingly lived and derived support from prostitution earnings.

### 1.    *Theory that Defendant's derived financial support from prostitution*

The People maintain that pimping will be shown when the People demonstrate that Defendants acquired income from prostitution resulting from advertisements placed in Backpage.com.  Defendants maintain they merely accepted payment for a legitimate publishing function.

This Court finds *People v. Grant* (2011) 195 Cal.App.4th 107 helpful.  *Grant* discusses a distinction between financial support received by the prostitute (illegal) and funds paid by the prostitute for services rendered or other purposes (legal).   The appellate court emphasized that "the statutory prohibition does not preclude a person from accepting a known prostitute's funds gained from the prostitute's lawful activities or for purposes other than the person's support and maintenance." (*Id* at 116.  *See also Allen v. Stratton* (C.D.Cal. 2006) 428 F.Supp.2d 1064, 1072, fn 7 [a natural reading of the pimping statute does not apply to an individual who provides a legitimate professional service to a prostitute even if paid with proceeds earned from prostitution, the service provider derives support from his own services]; *People v. Reitzke* (1913) 21

Cal.App.740, 742 [a legitimate defense to pimping is that a prostitute supplied defendant money for any purpose other than being supported or maintained by the prostitution].)

Here, there is no dispute that Backpage charged money for the placement of advertisements. Providing a forum for online publishing is a recognized legal purpose that is generally provided immunity under the CDA. This immunity has been extended by the courts to apply to functions traditionally associated with publishing decisions, such as accepting payment for services and editing. (*See e.g.,Doe v. Backpage.com, LLC* (817 F.3d 12, 15, *petition for certiorari denied* January 9, 2017[decisions regarding posting standards and requirements, including accepting payments for posting, are not distinguishable from publisher functions].)

However, the People dispute the "services" at issue. The People argue that the Backpage website generated income through its "Escort" section, which invariably contained prostitution advertisements. Because these advertisements are not for legal services and Defendants were well aware of the nature of the advertisements, the People argue that any claim of immunity under the CDA is defeated. (Pre-trial proceedings, July 14, 2017) The People would have this Court determine that the services provided are based on the content of the advertisement rather than the forum on which the advertisement is posted. Yet, to hold Defendant responsible for the content of the advertisement would require holding a publisher liable as if he was the speaker of the content. Contrary to the People's claim, doing so directly triggers, not defeats, the immunity provision of the CDA.

However, that does not end our inquiry. Immunity may be removed if Defendants' conduct went beyond those of a publisher and constituted content creation. This may happen when a provider crosses the line from providing a neutral interactive service that simply replicates offending third party matter and instead takes active control of the content of a web posting. (*Doe v. Backpage.com LLC* (D.C. Mass 2015) 104 F. Sup.3d 149, 156.) In short, if a provider's acts "materially contribute" to the illegality of the material, immunity will be lost. (See *Fair Hous. Council v. Rommates.com, LLC* (9th Cir. 2008) 521 F.3d 1157, 1166 [defendant became a content provider by requiring an answer to discriminatory questions, defendant's unlawful questions sought unlawful answers as a condition to doing business]; *Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398-408-409 [a service provider must require third-parties to enter unlawful or actionable content to be deemed a content provider]; *FTC v. LeadClick Media* (2nd Cir. 2016) 838 F.3d 158, 175 [encouraging and managing another site to post fake news in order to boost web traffic and sales for client results in content creation]; and (*FTC v. Accusearch Inc.* (10th Cir. 2009) 370 F.3d 1187 [no immunity for company that created offensive content by paying researchers to illegally obtain phone numbers, then resold the numbers online].)

The People claim that Defendant Ferrer has gone a step beyond merely accepting payments for advertisements placed online. Allegedly, Defendant Ferrer created content, connected pimps and traffickers with purchasers, and helped them avoid law enforcement. The People allege that, through Backpage's posting guidelines, Defendant Ferrer encouraged, maintained and assisted illegal prostitution for purposes of his own financial gain.

       a.     Editing

The People allege Defendants created a moderation system where terms would be deleted or blocked by Backpage but the user would still be allowed to post the advertisement and compensate Defendants. The People

allege that "such edits would not change the users' intent….but merely create a disguise." (Amend. Comp. 26) The People allege that these actions resulted in blocking certain prostitution terminology, but coded or obscured language and pictures were allowed to be posted.  The People allege that Defendant Ferrer directed staff to delete or block words that were code for underage girls, but allowed the advertisement to be posted for a fee. (Amend. Comp.  26)  The People contend that this constitutes "material contribution" to the offensive material. (Pre-trial proceedings, July 14, 2017, p 26)

In light of the People's acknowledgement that Backpage's edits would not change the user's intent, there can be no material contribution to the offensive content.  Indeed, such actions generally fall within the scope of protected editorial functions.  (See *Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12, 20-21 [service providers' decisions on website structure, rules for posting and reposting - even when previously blocked - are protected publisher functions] and *Fields v. Twitter, Inc.* (N.D. Cal. 2016) 217 F.Supp.3d 1116, 1122 [protected publishing activity included decisions about what third party content may be posted or reposted online].)

Even if the edits or posting rules allow advertisers to use coded language, this is insufficient to render the website operator a content provider.  The crucial distinction is between engaging in actions (traditional to publishers) that are necessary to the display of unwelcome and actionable content, and responsibility for what makes the displayed content illegal or actionable.  (*Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398, 414 [].)  Here, it is the third-party who is responsible for the illegal content of the advertisement.

The People also allege that Defendants knew that the ads placed were for prostitution and Defendants purposefully crafted their posting procedures to maximize their profits from this prostitution.  Yet courts have refrained from presuming to know a publisher's motivations for editorial decisions.  First, "it is well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech."  (*Universal Commun. Sys. v. Lycos, Inc.* (1st Cir. 2007) 478 F.3d 413, 420, citing *Barrett v. Rosenthal* (2006) 40 Cal. 4th 33).  Thus, even if Backpage knew of the unlawfulness of the content of the ads, knowledge is insufficient to render Defendants liable.  This is true regardless of whether Backpage even exercised its editorial discretion and deleted or blocked certain terms from ads.  (See *Doe II v. MySpace Inc,* (2009) 175 Cal.App.4th 561, 571 [immunity under section 230 applies even when self-regulation is unsuccessful or unattempted]; *Doe v. Backpage.com, LLC* (1st Dist. 2016) 817 F.3d 12, 21 [rejecting claim that website operators should be liable for failing to provide sufficient protections to users from harmful content created by others].)

Additionally, in *Backpage.com v. McKenna* (Wash. W.D.C. 2012) 881 F.Supp.2d 1262, the court recognized the difficulty in assigning knowledge of a third-party's intent to a publisher when that third party places an ad with Backpage.  The court acknowledged that the pimp who publishes the advertisement certainly knows whether his offer is implicitly for sex, but expressed serious doubt that one could assign such knowledge to a publisher as to whether an advertisement "implicitly" offered sex.  If an online service provider publishes advertisements that employ coded language, a reasonable person could be misled to believe that facts exist when they do not: an advertisement for escort services may be just that. Moreover, if the offer is "implicit," a third

party cannot ascertain that which is being offered before the transaction is actually consummated – a fact not likely to be known by a publisher.  (*Id* at 1279.)

Finally, courts have stated that the motivation behind editorial decisions "do not alter the fact that the complaint premises liability on the decisions that Backpage is making as a publisher with respect to third-party content."  (*Doe v. Backpage.com, LLC* (1st Dist. 2016) 817 F.3d 12, 21.)  Immunity depends on the source of the information in the injurious statement, not the source of the statement itself.  (*Universal Commun. Sys. v. Lycos, Inc.,* (1st. Cir. 2007) 478 F.3d 413, 419-420 [immunity only applies when the information that forms the basis for the state law claim has been provided by "another information content provider"]; 47 U.S.C. §230 (c)(1).)

Here, the People acknowledge that advertisements are placed by third parties and Backpage's edits "would not change the users' intent."  Nor is there an allegation that Defendant(s) set up the website to require offensive content to be supplied, as in *Roommates, Bollaert* or *Dirty World*.  As such, there is no material contribution to the offensive content in the advertisements, and the allegations reference traditional publisher functions.

### b.    Use of Profile Information

The People also specifically allege that "Defendants created profiles for the victims named in [several] counts [ ] without their knowledge."  (Amend. Comp. 20, overt act 18)  These false or nonexistent profiles were "created from Backpage data and [then] used on other websites."  Allegedly, sometimes content that was edited out on Backpage was displayed on the affiliated websites of BigCity.com or EvilEmpire.com.  In doing so, Defendants unlawfully used another's image "for the Defendants' own commercial gain," and to advertise their own product.  (Amend. Comp. 25)  The People claim that this "misappropriation" of the likeness of Backpage users resulted in content creation.  (Amend. Comp. 25)

Similar allegations were considered in *Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12 and *Anthony v. Yahoo! Inc* (N.D. Cal. 2006) 421 F.Supp.2d 1257.  The People cite *Anthony* as instructive.  (Opp. 12)  In *Anthony*, Plaintiffs belonged to an online dating service through Yahoo!.  Plaintiffs alleged that Yahoo! created false profiles and sent those false profiles to users as enticement to renew their dating subscription.  The court refused Yahoo!'s claim of immunity under the CDA at the dismissal stage.  The court stated that the allegations that Yahoo! actively created false profiles, not merely that Yahoo! failed to delete the expired profiles, were sufficient to allow the case to go forward.

In *Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12 , plaintiffs brought claims against Backpage alleging unauthorized use of a person's picture.  Plaintiffs alleged that Backpage used their photos to garner advertising revenues from their traffickers.  (*Id* at 27.)  The court found that although Backpage profited from the sale of advertisements, it was "not the entity that benefitted from the misappropriation."  Rather, the party who benefitted from the misappropriation was the original advertiser.  The court stated, "Matters might be different if Backpage had used the pictures to advertise its own services…"  (*Ibid.*)  (See also *Perkins v. LinkedIn Corp* (N.D. Cal. 2014) 53 F.Supp.3d 1222, 1247 [defendant was a content provider when defendant, in an effort to increase its own business, unilaterally crafted and sent membership invitation emails to users' contacts].)

15

The People assert that Defendant Ferrer falls under the above exceptions when he created and then used profile information to increase Backpage revenue.  Yet the People acknowledge that the information used was "created from Backpage data."  Thus, it is clear that Defendants did not fabricate the data, as in *Anthony*.  There is no allegation that in taking the data from the Backpage ads, Defendants created the injurious nature of the material.  (See *Doe v. Friendfinder Network, Inc*. (D.C. N.H. 2008) 540 F.Supp.2d 288, 295 [website operator is not a content provider when there is no indication it contributed to the injurious character of the content].)  Moreover, the People's allegation that the purpose of these "new" posts was to direct web traffic back to Backpage demonstrates that if a person was interested in the reposted profile, the person was redirected to the ad on Backpage.  While additional advertisement revenue may have been a byproduct of this redirection, the original poster gained increased visibility of his ad.  Increased visibility to the classified ads posted by third parties permissibly leads to search engine optimization in an effort to increase the visibility of the information provided by the third party.  (See *Asia Econ. Inst. V. Xcentric Ventures LLC* (C.D. Cal. 2011)  2011 U.S. Dist. LEXIS 145380, *19 [increasing the prominence of a page in internet searches do not amount to "creation or development of information"].)  Indeed, the very purpose of the online advertising accessed by the third party in placing an ad in Backpage was to provide accessibility to the public on a large scale.  (See *Ibid* [the purpose of consumer reports is to provide accessibility to the public on a grand scale and "increasing the visibility of a statement is not tantamount to altering its message"];  See also *M.A. ex rel. P.D. v. Village Voice Media Holdings, LLC* (E.D. Mo. 2011) 809 F.Supp.2d 1041 ["Whatever [Backpage] did to increase their profitability ad visibility, did not create the content of the offensive posted information."].)

        c.      Overall Course of Conduct

The People attempt to establish a pattern of an overall course of conduct to indicate Defendants sought to structure their business to obtain maximum profits from the illegal sex trade.  The People allege that Defendants "manipulated" advertisements to evade law enforcement detection.  The People state, "In this way, rather than prevent a child from being sold for sex, the Defendants would knowingly profit from the child's commercial sexual exploitation and assist the trafficker to evade law enforcement."  (Amend. Comp. 26)

The People maintain Backpage's conduct is similar to *J.S. v. Vill. Voice Media Holdings, LLC* (2015) 184 Wn.2d 95.  In that case, advertisements featuring three minor girls were posted online on a site owned by Backpage.  These girls became victims of sex trafficking and later brought suit against Backpage.  Backpage moved to dismiss the case on the basis of immunity provided by the CDA.  The Washington Supreme Court refused to grant the motion to dismiss.  (*Id* at 98-99.)  The *J.S.* court stated that the case turned on whether Backpage merely hosted the advertisements or helped develop the content of those advertisements.  (*Id* at 101)

Applying the applicable state standard for a motion to dismiss, the *J.S*. court found that the plaintiffs alleged facts that, if proved true, would show that Backpage did more than simply maintain neutral policies prohibiting or limiting certain content.  Specifically, those allegations included that Backpage intentionally developed its website to "require" information that allows and encourages illegal trafficking of underage girls, developed content requirements that it knows will allow solicitors to evade law enforcement and that Backpage

knows that the foregoing content requirements are a fraud and ruse actually aimed at helping pimps and prostitutes.  (*Id* at 102.)

Here, however, the factual allegations fall short of those alleged in *J.S.*.  There is no allegation that Defendants required information essential to the illegal trafficking of underage girls.  Instead, the People's allegations attempt to assign criminal liability to Defendants who offered an online forum, on which other people posted advertisements that led to prostitution, and that Defendants realized profits instead of "actively preventing" the sale of sex.  These allegations confuse moral obligations with legal ones and have been rejected in other jurisdictions.  For example, in *M.A. ex rel. P.D. v. Village Voice Media Holdings, LLC* (E.D. Mo. 2011) 809 F.Supp.2d 1041, Defendants were SUSTAINED immunity under the CDA for allegations that Backpage knowingly accepted a fee for advertisements leading to prostitution, and "created information" by hosting a search engine, providing instructions for increased visibility of advertisements and allowed for anonymous payment.  (*Id* at 1044.)  (See also *Doe v. Backpage.com LLC* (2016) 817 F.3d 12, 22 [rejecting the plaintiffs' assertion that Backpage participated in an affirmative course of conduct and actual participation in sex trafficking by charging for advertisements and allowing users to pay an additional fee for increased advertisement visibility and holding that "claims that a website facilitates illegal conduct through its posting rules necessarily treat the website as a publisher or speaker of content provided by third parties and, thus, are precluded by section 230(c)(1)."].)

As alleged here, the prostitution took place as a result of an advertisement placed by a third party. Thus, the only "manipulation" would be in the act of extracting the content from the original ad and/or from the act of physically posting the extracted content on a new site.  Backpage's decision to charge money to allow a third party to post content, as well as any decisions regarding posting rules, search engines and information on how a user can increase ad visibility, are all traditional publishing decisions and are generally immunized under the CDA. In short, the victimization resulted from the third party's placement of the ad, not because Backpage profited from the ad placement.  (See *Doe, supra*, 817 F.3d at 20 [noting that the plaintiffs were harmed when they were trafficked through the advertisements whose content was created by a third party]; *Cohen v. Facebook, Inc.* (E.D.N.Y. May 18, 2017) 2017 U.S.Dist.LEXIS 76701, at *28-31 [Facebook immune from liability for allowing Hamas to use its platform to post offensive content that incited or encouraged terrorist attacks in Israel because although Facebook's role in publishing that content was an essential causal element of the claims, allowing liability to be imposed on that basis would inherently require the court to treat the defendant as the publisher or speaker of content provided by Hamas, and was impermissible under the CDA].)

B.       Money Laundering Based on Prostitution

The People charge Defendants with both prongs of money laundering based on a specific intent to promote prostitution in violation of 18 USC 1952, pimping in violation of Penal Code section 266h, or knowing the monetary instruments represented the proceeds of the prostitution.  (See counts 15-16)

Referred to as the "Travel Act," section 1952 prohibits travel in interstate commerce or use of interstate facilities with intent to promote unlawful activity.   (*United States v Villano* (10th Cir. 1976) 529 F2d 1046.) The Travel Act defines an "unlawful activity" as any crime of prostitution under state law. (See *United States v.*

*Campione* (7th Cir. 1991) 942 F.2d 429, 434.). Section 1952 refers to state law only to identify the defendant's unlawful activity; it does not require that the state crime ever be completed or proved. (*Ibid.*)

Although the parties do not discuss these specific charges at length, the previous discussion of the CDA's immunity provision as it relates to the pimping charges informs the Court's analysis with respect to these charges.  As discussed above, the People are attempting to prosecute Defendants as if they were the speaker of the offensive content leading to prostitution, which is prohibited under the immunity provision of the CDA.  This Court rejected the People's claim that Defendants actually created the content that led to their ability to live and derive support and maintenance from prostitution proceeds, when the face of the complaint demonstrated that Defendants engaged in protected publisher functions.  Because this Court has rejected the prosecution based on the theory that Defendants engaged in pimping, their purported use of proceeds from prostitution cannot now serve as the basis for money laundering charges.  As this Court has already determined, Defendants provide an online forum for third-party speech, and their decision to charge money for such postings constitutes activity protected under the CDA.

### <u>Conclusion</u>

As amply briefed by the parties, federal law provides broad immunity for internet service providers from both federal and state prosecutions. Indeed, the 9th Circuit federal appellate court has instructed such immunity be applied liberally.  The underlying public policy is to permit, and promote, the robust growth of the internet by shielding internet providers from facing suit over the content created by those posting on their sites.  If and until Congress sees fit to amend the immunity law, the broad reach of section 230 of the Communications Decency Act even applies to those alleged to support the exploitation of others by human trafficking.

However, immunity afforded to internet service providers is not without limit. Even the most ardent defenders of a vigorous world wide web would have to concede that if a provider engaged in their own criminal acts, versus those of their customers, immunity must fail.  And so it is in this case.  While the charges relating to pimping will not be allowed to proceed, the offenses pertaining to allegations that the Defendants themselves engaged in financial crimes, to include bank fraud and money laundering to disguise their business dealings, will survive the demurrer stage.

**Court's ruling:**

Defendants' request to enjoin further prosecutorial investigation and return of the materials seized is OVERRULED.

Defendants' request for judicial notice is OVERRULED, except as to the prior charges and orders granting the demurrer and dismissal.  Within that context, the People's motion to strike the remaining exhibits is SUSTAINED.

Defendants' request to assign the case to the Honorable Michael G. Bowman is OVERRULED.

Defendants' demurrer is SUSTAINED for counts 15-16, 28-40, OVERRULED as to the remainder of the charges.

**Dated:**

_____
**Honorable Lawrence G. Brown**
**Judge of the Superior Court of California**
**County of Sacramento**

# EXHIBIT I

# DOMESTIC MINOR SEX TRAFFICKING

# HEARING

BEFORE THE

## SUBCOMMITTEE ON CRIME, TERRORISM, AND HOMELAND SECURITY

OF THE

## COMMITTEE ON THE JUDICIARY

## HOUSE OF REPRESENTATIVES

ONE HUNDRED ELEVENTH CONGRESS

SECOND SESSION

————

SEPTEMBER 15, 2010

————

## Serial No. 111–146

————

Printed for the use of the Committee on the Judiciary



Available via the World Wide Web: http://judiciary.house.gov

214



Suggestion for additional agency listings should be directed to legal@craigslist.org

Still have questions? try our help desk discussion forum or send us a note.

Mr. SCOTT. Thank you. I understand, Mr. Sensley, do you have to leave shortly.

Chief SENSLEY. Sir, I have made other arrangements. Thank you.

Mr. SCOTT. Okay. Thank you. Then I will recognize myself for 5 minutes. And I will begin with Mr. Powell. Mr. Powell, you made a promise to monitor posting. Is it logistically possible, with the number of postings to actually review on an individual basis postings on your site?

Mr. POWELL. Are you referring to the content that appears after we removed the adult services category?

Mr. SCOTT. Either way.

215

Mr. POWELL. We have a number of technological measures that are used, along with some manual review that we feel does a good job at ensuring that the content that had previously appeared in the manually reviewed adult services category does not migrate to the other categories that appear on our site, the personals categories, other services categories. And, in addition to review by our staff of those categories in the past 10 days, the chart that Ms. McDougall referred to with respect to increase in traffic on Backpage seems to support that.

Mr. SCOTT. If someone is communicating with craigslist, can you identify, technologically identify which computer made that contact?

Mr. POWELL. Yes.

Mr. SCOTT. And so you can track the person, if necessary?

Mr. POWELL. Well, in cases where we have received a request from law enforcement, we release the records to the district attorneys, to the police officers, to the FBI agents and they use the information we capture to do that tracking.

Ms. MCDOUGALL. I can further elaborate if that is helpful.

Mr. SCOTT. Okay.

Ms. MCDOUGALL. What craigslist can provide is the e-mail address and IP address of the person that posted the ad. Craigslist can't from there identify the specific computer or individual. What you do then is contact, you can identify online who the service provider is for that IP address, and you can contact the service provider and get from them the information as to who owns that IP address. Law enforcement can do it by subpoena. You can do it in a civil suit by subpoena as well.

Mr. SCOTT. Ms. Hakes what laws apply to Internet providers like craigslist that would make them criminally liable for the postings?

Ms. HAKES. Mr. Chairman, I am not aware of any laws that would make them liable, unless there was evidence that craigslist was a participant specifically, whether they were, for example, conspiring with those who were misusing their site, that is, knowingly conspiring to violate the laws. What we have seen in the past——

Mr. SCOTT. What about if they are not actively conspiring? What about just intentional neglect? Or they just don't care?

Ms. HAKES. Mr. Chairman, I am not aware of any Federal statutes anyway with respect to neglect being the standard. In Federal law, the standard for prosecution would be knowing or willful. And when you are talking about in cases that have come up, the investigations that have been done by the FBI and others, I am not aware of anything that shows us that craigslist might be criminally liable.

Mr. SCOTT. Well I'm not talking about just craigslist. I'm talking about any of them. If there are no laws on the books now, are there any potential laws we could put on the books that would pass constitutional muster that would be helpful in tracking down people that make these postings?

Ms. HAKES. Mr. Chairman, the Department of Justice would be more than happy to work with the Committee and consult with you on whether or not there are tools with respect to the topic that you're discussing. However, I would say that I believe that at this point, we have the proper tools. We have what we need to pros-

216

ecute the guilty, that is, the people who are using the Internet, and
it isn't just craigslist and of course it isn't just prostitution of chil-
dren, it is sexual exploitation of children in all its forms. Many
predators, many of those who would prey on children, utilize the
Internet, misuse the Internet in order to prey on those children, to
traffic in child pornography, to advertise children for child prostitu-
tion. And I don't think anyone would here would propose closing
the Internet.

Mr. SCOTT. You have two parts of this transaction. One is the
posting of the availability of the children, and the other is of the
demand side. Are there any efforts to essentially set people up so
that anyone who goes on the Internet searching for people can get
ensnared in a sting operation?

Ms. HAKES. Yes, sir, Mr. Chairman. As a matter of fact, over the
last year, in the western district of Missouri, Operation Guardian
Angel has en in effect, and that is a law enforcement operation uti-
lizing Internet service providers like craigslist to post adds sug-
gesting that they have children who are underage that they would
provide for sex. In Operation Guardian Angel, several people an-
swered the ads. Several people made arrangements over the tele-
phone to meet with who they thought would be underage children
for sex and they were prosecuted for those crimes. And some of
them received——

Mr. SCOTT. And what is the typical penalty when they get
caught?

Ms. HAKES. They received very substantial sentences depending
on the crime under which they were prosecuted. It ranges any-
where, as I said in my earlier statement for trafficking in children
and child exploitation could be as little as 5 years. It could be as
many as life.

Mr. SCOTT. The Dateline NBC with Chris Hansen——

Ms. HAKES. To Catch a Predator, yes, sir.

Mr. SCOTT. The penalties that they publish are in the matter of
a months, a couple of months; is that not typical?

Ms. HAKES. No, sir. That would be State and local. In my experi-
ence, when I was assistant district attorney, some of the charges
that are utilized in State and local offenses for enticing a child in
certain jurisdictions might be misdemeanors. In Federal law how-
ever, it is a felony. And enticing a child over the Internet carries
a mandatory minimum penalty of 10 years in prison.

Mr. SCOTT. Now how much cooperation is there, Federal State
and local law enforcement in these investigations and prosecutions?

Ms. HAKES. Well, as I said in my statement, we are very strongly
supportive of the Innocence Lost National Initiative. We believe
that it has been extremely successful. And one of the things that
we are doing in the National Strategy for Child Exploitation, Pre-
vention and Interdiction, is working with all of our partners, com-
munity-based, law enforcement-based, industry-based, in order to
establish what are the best practices that we are all engaging in,
expanding our cooperation and collaboration with respect to child
exploitation, and we are looking into whether or not the Innocence
Lost National Initiative should be expanded from 38 task forces
and working groups that exist now to more areas across the coun-
try.

# EXHIBIT J



Office of Legislative Affairs

Office of the Assistant Attorney General          *Washington, D.C. 20530*

JUL 3 0 2014

The Honorable John Barrow
U.S. House of Representatives
Washington, DC 20515

Dear Congressman Barrow:

This responds to your letter to the Attorney General dated May 25, 2011, regarding the commercial sexual exploitation of minors through websites such as Backpage.com. We apologize for our lengthy delay in responding to your letter.

The Department recognizes and shares your grave concerns about the use of Internet sites to facilitate human trafficking, and we are committed to pursuing those who use these websites to illegally exploit minors. The Department is vigorously prosecuting and obtaining convictions against perpetrators who have employed Internet advertising to facilitate human trafficking. For example, in January 2014, the Department obtained a 262-month prison sentence against a Maryland man following his guilty plea to child sex trafficking. In 2008, the defendant recruited a thirteen-year-old girl and prostituted her through advertisements on Craigslist. After being arrested on a federal child sex trafficking charge, the defendant continued his involvement in prostitution by recruiting an adult female to prostitute for him, posting advertisements for her on Backpage.com, and retaining all monies she earned. In April 2014, a Houston man pleaded guilty to two charges of trafficking children for commercial sex. According to the plea agreement, from January through July 2012, the defendant forced young girls, who he knew were minors, into prostitution by using force, intimidation, depriving the victims of food, and supplying them with drugs and alcohol. In order to gain the trust of victims, whom he met on social networking sites, he would tell them he was going to help them become models. Instead, he picked them up, took them to motel rooms, and then raped them. The victims were photographed, and their images were posted in online ads for prostitution.

Using current statutory tools, the Department has prosecuted Internet facilitators as well. For example, last month, the Department filed charges against the operator of "myredbook.com" and seized the website's domain name. According to information available on the publicly accessible website as of the date of its seizure by the FBI, myredbook.com purported to provide "Escort, Massage, and Strip Club Reviews." Instead, however, the website hosted advertisements for prostitutes, complete with explicit photos, lewd physical descriptions, menus of sexual services, hourly and nightly rates, and customer reviews of the prostitutes' services. The website used acronyms for numerous sex acts, which were defined in graphic detail in the website's "Terms and Acronyms" section. Although the website could be accessed for free, myredbook.com charged fees for premier placement of prostitution

The Honorable John Barrow
Page Two

advertisements and for "VIP Memberships," which purportedly allowed customers access to "private forums" and heightened capabilities to search reviews of the prostitution services.  The Department charged two defendants with money laundering and use of mail and the Internet to facilitate prostitution.

We note that as a general matter, any prosecution of a website operator for conduct related to child sex trafficking would require the Department to prove beyond a reasonable doubt that the website operators actually knew or recklessly disregarded the fact that they were accepting an advertisement that offers sex with a child for money or other consideration.  Sufficient evidence of knowledge of a crime against a child is not indicated where an advertisement on its face is for a legal service offered by someone who appears to be an adult.  Where sufficient evidence exists, the Department will aggressively investigate and prosecute, as appropriate.

As the cases above illustrate, the Department is successfully employing the panoply of tools created by Congress to attack human trafficking and Internet facilitation of prostitution.  Congress has given the Department a full range of criminal laws that can be applied to websites hosting advertisements and providing other services that facilitate the sex trafficking of children, so long as there is sufficient proof to establish all of the required elements of a criminal offense.

The protection of vulnerable populations, with special emphasis on child exploitation and civil rights, is one of the Department's four priority goals.  Numerous components and offices work together to create public awareness, deploy prevention programs, provide victim services, facilitate meaningful research, educate and provide resources for state and local law enforcement, investigate cases, and prosecute offenders.  We will continue to use the resources and reach of the Department in our efforts to prevent and respond to human trafficking, whether it takes place online or off.

We hope this information helpful.  Please do not hesitate to contact this office if we may provide additional assistance with this or any other matter.

Sincerely,

Peter J. Kadzik
Assistant Attorney General

# EXHIBIT K



**U.S. Department of Justice**

Office of Legislative Affairs

---

Office of the Assistant Attorney General          *Washington, D.C. 20530*

FEB 2 7 2018

The Honorable Robert W. Goodlatte
Chairman
Committee on the Judiciary
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Chairman:

This letter presents the views of the Department of Justice (Department) on H.R. 1865, the "Allow States and Victims to Fight Online Sex Trafficking Act of 2017." The Department supports H.R. 1865. We applaud House and Senate legislative efforts to address the use of websites to facilitate sex trafficking and to protect and restore victims who were sold for sex online. The Department appreciates this opportunity to provide technical assistance to ensure that these goals are fully met through narrowly tailored legislation. The Department also notes that a provision in the bill raises a serious constitutional concern.

Every day, trafficking victims in America appear in online advertisements that are used to sell them for sex. The Department works diligently to hold the traffickers accountable for their crimes but faces serious challenges. This is due in part to the high evidentiary standard needed to bring federal criminal charges for advertising sex trafficking, but also because the Communications Decency Act (CDA), codified at 47 U.S.C. § 230, bars our state and local partners from bringing any criminal action that is inconsistent with that section. H.R. 1865 addresses both issues and would take meaningful steps to end the industry of advertising trafficking victims for commercial sex.

## TECHNICAL ASSISTANCE

Section 3(a) of the bill creates 18 U.S.C. § 2421A, a new federal offense that prohibits the use or operation of websites (and other means or facilities of interstate commerce) with the intent to promote or facilitate prostitution. The bill also provides for an aggravated felony if the defendant recklessly disregards that the crime contributed to sex trafficking as prohibited by 18 U.S.C. § 1591(a). Section 2421A would stand as a strong complement to existing federal laws.

The Honorable Robert W. Goodlatte
Page Two

However, the Department notes that Section 2421A as originally drafted is broader than necessary because it would extend to situations where there is a minimal federal interest, such as to instances in which an individual person uses a cell phone to manage local commercial sex transactions involving consenting adults.  Therefore, the Department would support amending the language of Section 2421A so that Congress can clarify its intent to target traffickers using or operating interactive computer services, as follows (with a corresponding change to 2421A(b)): "Whoever, using a facility or means of interstate or foreign commerce or in or affecting interstate or foreign commerce, owns, manages, or operates an interactive computer service, as defined in Section 230(f) of Title 47, United States Code, or conspires or attempts to do so, with the intent to promote or facilitate prostitution shall be fined under this title, imprisoned for not more than 15 years, or both."

The Department believes that any revision to 18 U.S.C. § 1591 to define "participation in a venture" is unnecessary.  Section 1591 already sets an appropriately high burden of proof, particularly in cases involving advertising.  Under current law, prosecutors must prove that the defendant knowingly benefitted from participation in a sex trafficking venture, knew that the advertisement related to commercial sex, and knew that the advertisement involved a minor or the use of force, fraud, or coercion.  *See Backpage.com, LLC v. Lynch*, D.D.C., Civil Action No. 15-2155, Docket 16 (Oct. 24, 2016).  While well intentioned, this new language would impact prosecutions by effectively creating additional elements that prosecutors must prove at trial.  In the context of the bill, which also permits states to bring actions for conduct equivalent to Section 1591, we are also mindful that this language could have unintended consequences as applied by the states.

Section 4 of H.R. 1865 also sets forth critical revisions to the CDA to permit state prosecutors to bring criminal actions related to sex trafficking and the use of the internet with the intent to promote or facilitate prostitution.  The Department believes that the existence of this exception to the CDA will alter the landscape of the industry involved in advertising prostitution.

## CONSTITUTIONAL CONCERN

We note that Section 4 of H.R. 1865 states that the changes to the CDA "shall apply regardless of whether the conduct alleged occurred [sic], or is alleged to have occurred, before, on, or after such date of enactment."  This raises a serious constitutional concern.  Insofar as this bill would "impose[] a punishment for an act which was not punishable at the time it was committed" or "impose[] additional punishment to that then prescribed" it would violate the Constitution's Ex Post Facto Clause.  *Cummings v. Missouri*, 4 Wall. 277, 325-326 (1867); *see Beazell v. Ohio*, 269 U.S. 167, 169-170 (1925); U.S. Const. art I, § 9, cl. 3.  The Department objects to this provision because it is unconstitutional.  We would welcome the opportunity to work with Congress to address this serious constitutional concern.

The Honorable Robert W. Goodlatte
Page Three


   Thank you for the opportunity to present our views in support of this legislation.  We
hope this information is helpful, and we look forward to continuing to work with Congress on
this important legislation.  Please do not hesitate to contact this office if we may provide
additional assistance regarding this or any other matter.  The Office of Management and Budget
has advised us that from the perspective of the Administration's program, there is no objection to
submission of this letter.

        Sincerely,

        Stephen E. Boyd
        Assistant Attorney General


cc:  The Honorable Jerrold Nadler
   Ranking Member

   The Honorable Ann Wagner
   U.S. House of Representatives