# **Exhibit M**

Case 2:18-cr-00422-DJH Document 1181-11 Filed 04/25/18 Page 2 of 43

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

Case No. 6:17-cv-218-ORL-28-TBS

|  |  |  |
|---|---|---|
| FLORIDA ABOLITIONIST and JANE DOE, | ) ) ) | |
| Plaintiffs, | ) ) | |
| -against- | ) ) | |
| BACKPAGE.COM, LLC, EVILEMPIRE.COM, BIGCITY.COM, CARL FERRER, MICHAEL LACEY, and JAMES LARKIN, | ) ) ) ) ) | Local R. 3.01(h) – Dispositive Motion |
| Defendants. | ) ) ) | |

## **MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) and (6)**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

    A.    Backpage.com and Affiliated Websites. .......................................... 3

    B.    Plaintiffs' Allegations and Claims. ................................................... 7

STANDARDS UNDER RULES 12(B)(6) AND 12(B)(1) ................................ 8

ARGUMENT ...................................................................................................... 9

I.    SECTION 230 BARS ALL OF PLAINTIFFS' CLAIMS ........................ 9

    A.    Section 230 Was Designed to Promote Free Speech Online and the Unfettered Growth of the Internet. .................................................... 9

    B.    Plaintiffs' Claims are Barred Under Section 230's Three-Part Test. ............. 11

    C.    Plaintiffs Cannot Evade Section 230 Through Artful Pleading. ..................... 16

        1.    Plaintiffs Cannot Evade Section 230 By Alleging That a Website Encourages Posting Unlawful Content. ............................. 16

        2.    Plaintiffs' Content-Creation Allegations Cannot Overcome Section 230 Immunity. ......................................... 18

    D.    Ms. Doe's Right-of-Publicity Claims are Not Saved by Section 230's "Intellectual Property" Exception. .................................. 21

    E.    Imposing Liability on Online Service Providers is Not the Solution to Preventing Trafficking. ................................................... 23

II.    PLAINTIFFS' CLAIMS FAIL AS A MATTER OF LAW ...................... 24

    A.    Plaintiffs Lack Standing. ................................................................. 24

    B.    The Right-of-Publicity Claims Fail. ................................................ 25

    C.    The Defamation Claim Is Time-Barred And Otherwise Defective. ............... 27

    D.    Other Claims Based on Publication of the Ad are Barred by the Single Action Rule. .................................................................... 28

    E.    The Civil Conspiracy Claim Fails. .................................................. 29

    F.    The Section 1591 Claim Fails. ........................................................ 30

CONCLUSION ................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almeida v. Amazon.com, Inc.*,
456 F.3d 1316 (11th Cir. 2006) ...........................................................................11, 26, 27

*Ascentive, LLC v. Opinion Corp.*,
842 F. Supp. 2d 450 (E.D.N.Y. 2011) ...............................................................................17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................................................................8

*Backpage.com, LLC v. Cooper*,
939 F. Supp. 2d 805 (M.D. Tenn. 2013) ................................................................... *passim*

*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015), *cert. denied*, 137 S. Ct. 46 (2016) ...................................2, 4

*Backpage.com, LLC v. Hoffman*,
2013 WL 4502097 (D.N.J. Aug. 20, 2013) .................................................................1, 11

*Backpage.com, LLC v. Lynch*,
2016 WL 6208368 (D.D.C. Oct. 24, 2016) ......................................................................30

*Backpage.com, LLC v. McKenna*,
881 F. Supp. 2d 1262 (W.D. Wash. 2012) ................................................................. *passim*

*Bankers Life Ins. Co. v. Credit Suisse First Boston Corp.*,
2008 WL 1817294 (M.D. Fla. Apr. 22, 2008) ..................................................................29

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) .....................................................................................9, 10

*Bouton v. Ocean Props., Ltd.*,
--- F. Supp. 3d --, 2016 WL 7324145 (S.D. Fla. Dec. 12, 2016) .......................................4

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*,
116 F.3d 1364 (11th Cir. 1997) .........................................................................................4

*Byrd v. Hustler Magazine*,
433 So. 2d 593 (Fla. 4th DCA 1983) ................................................................................28

*Camp v. Alabama Telco Credit Union,*
  2013 WL 2106727 (N.D. Ala. May 13, 2013) .................................................................4

*Carafano v. Metrosplash.com,*
  339 F.3d 1119 (9th Cir. 2003) ..................................................................................20, 22

*Chicago Lawyers' Comm. for Civil Rights Under the Law v. Craigslist, Inc.,*
  519 F.3d 666 (7th Cir. 2008) ........................................................................................17

*Comins v. Vanvoorhis,*
  135 So. 3d 545 (Fla. 5th DCA 2014) .............................................................................27

*Cone Corp. v. Florida Dep't of Transp.,*
  921 F.2d 1190 (11th Cir. 1991) ..................................................................................9, 24

*Dart v. Craigslist, Inc.,*
  665 F. Supp. 2d 961 (N.D. Ill. 2009) .........................................................................12, 17

*Doe II v. MySpace Inc.,*
  175 Cal. App. 4th 561 (2009) ........................................................................................14

*Doe v. AOL,*
  783 So. 2d 1010 (Fla. 2001) ..........................................................................................18

*Doe v. Backpage.com, LLC,*
  104 F. Supp. 3d 149 (D. Mass. 2015), *aff'd*, 817 F.3d 12 (1st Cir. 2016),
  *cert. denied*, 137 S. Ct. 622 (2017) ............................................................... *passim*

*Doe v. Backpage.com, LLC,*
  817 F.3d 12 (1st Cir. 2016) .............................................................................. *passim*

*Doe v. Bates,*
  2006 WL 3813758 (E.D. Tex. Dec. 27, 2006) ................................................................23

*Doe v. MySpace,*
  528 F.3d 413 (5th Cir. 2008) ....................................................................................14, 16

*Dowbenko v. Google Inc.,*
  991 F. Supp. 2d 1219 (S.D. Fla. 2013),
  *aff'd*, 582 F. App'x 801 (11th Cir. 2014) .......................................................................22

*e-ventures Worldwide, LLC v. Google, Inc.,*
  No. 2:14-cv-646-FtM-PAM-CM (M.D. Fla. Feb. 8, 2017) ..............................................10

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC,*
  521 F.3d 1157 (9th Cir. 2008) ..........................................................................11, 12, 18

*Franklin v. Curry,*
    738 F.3d 1246 (11th Cir. 2013) ..................................................................................9, 19, 21

*Fridovich v. Fridovich,*
    598 So. 2d 65 (Fla. 1992)........................................................................................................28

*FTC v. Accusearch, Inc.,*
    570 F.3d 1187 (10th Cir. 2009) ............................................................................................20

*Fuentes v. Mega Media Holdings, Inc.,*
    721 F. Supp. 2d 1255 (S.D. Fla. 2010) ................................................................................26

*Giordano v. Romeo,*
    76 So. 3d 1100 (Fla. 3d DCA 2011) ....................................................................................27

*GoDaddy.com, LLC v. Toups,*
    429 S.W.3d 752 (Tex. App. 2014)........................................................................................18

*Goddard v. Google, Inc.,*
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) ..............................................................................18

*Google v. Hood,*
    822 F.3d 212 (5th Cir. 2016) ..................................................................................................3

*Green v. AOL,*
    318 F.3d 465 (3d Cir. 2003)..................................................................................................14

*Griffin Indus., Inc. v. Irvin,*
    496 F.3d 1189 (11th Cir. 2007) ........................................................................................9, 19

*Haddad v. Dudek,*
    784 F. Supp. 2d 1038 (M.D. Fla. 2011)................................................................................4

*Herrick v. Grindr, LLC,*
    2017 WL 744605 (S.D.N.Y. Feb. 24, 2017)......................................................................16

*J.S. v. Village Voice Media Holdings, LLC,*
    184 Wash. 2d 95 (2015)........................................................................................................20

*Jews for Jesus, Inc. v. Rapp,*
    997 So. 2d 1098 (Fla. 2008)..................................................................................................22

*Jones v. Dirty World Entm't Recordings LLC,*
    755 F.3d 398 (6th Cir. 2014) .................................................................................... *passim*

iv

*Jones v. Dirty World Entm't Recordings, LLC,*
965 F. Supp. 2d 818 (E.D. Ky. 2013) ...........................................................................17

*Kamau v. Slate,*
2012 WL 5390001 (N.D. Fla. Oct. 1, 2012), *adopted,* 2012 WL 5389836
(N.D. Fla. Nov. 5, 2012) ..............................................................................................28

*Kimzey v. Yelp! Inc.,*
836 F.3d 1263 (9th Cir. 2016) ............................................................................3, 16, 19

*LaGrasta v. First Union Secs., Inc.,*
358 F.3d 840 (11th Cir. 2004) ......................................................................................28

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992).......................................................................................................25

*M.A. v. Village Voice Media Holdings, LLC,*
809 F. Supp. 2d 1041 (E.D. Mo. 2011)................................................................. *passim*

*Miljkovic v. Shafritz & Dinkin, P.A.,*
791 F.3d 1291 (11th Cir. 2015) ......................................................................................9

*Mizzaro v. Home Depot, Inc.,*
544 F.3d 1230 (11th Cir. 2008) ....................................................................................21

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,*
591 F.3d 250 (4th Cir. 2009) ...................................................................................9, 30

*Nicklaw v. Citimortgage, Inc.,*
839 F.3d 998 (11th Cir. 2016), *reh'g en banc denied,*
2017 WL 1548204 (11th Cir. May 1, 2017) ..................................................................24

*Obado v. Magedson,*
2014 WL 3778261 (D.N.J. July 31, 2014),
*aff'd,* 612 F. App'x 90 (3d Cir. 2015)...........................................................................21

*People v. Ferrer,*
2016 WL 7237305 (Sup. Ct. Sacramento Cty. Dec. 9, 2016)................................. *passim*

*Pierson v. Orlando Reg'l Healthcare Sys., Inc.,*
2010 WL 1408391 (M.D. Fla. Apr. 6, 2010), *aff'd,* 451 F. App'x 862
(11th Cir. 2012)..............................................................................................................29

*Schurz Commc'ns, Inc. v. FCC,*
982 F.2d 1043 (7th Cir. 1992) ........................................................................................3

*Trujillo v. Banco Cen. Del Ecuador,*
  17 F. Supp. 2d 1334 (S.D. Fla. 1998) ............................................................28

*United States v. Ackerman,*
  831 F.3d 1292 (10th Cir. 2016) ...................................................................6

*Universal Commc'n Sys., Inc. v. Lycos, Inc.,*
  478 F.3d 413 (1st Cir. 2007) ...................................................10, 11, 15

*U.S. ex rel. Osheroff v. Humana Inc.,*
  776 F.3d 805 (11th Cir. 2015) ...................................................................4

*Wagner, Nugent v. Flanagan,*
  629 So. 2d 113 (Fla. 1993) ........................................................................28

*Whitney Info. Net., Inc. v. Xcentric Ventures, LLC,*
  2008 WL 450095 (M.D. Fla. Feb. 15, 2008) ...............................................17

*Wollschlaeger v. Governor of Fla.,*
  848 F.3d 1293 (11th Cir. 2017) .........................................................24, 25

*Zeran v. Am. Online, Inc.,*
  129 F.3d 327 (4th Cir. 1997) ..................................................10, 15, 23

## Constitutional Provisions

U.S. Const. amend. I ...............................................................1, 2, 9, 10

## Federal Statutes

18 U.S.C.
  § 1591.....................................................................................8, 12, 30
  § 1595...........................................................................................22
  § 2255...........................................................................................22

47 U.S.C.
  § 230............................................................................... *passim*
  § 230(c)(1) ............................................................10, 15, 16, 19
  § 230(e)(1) ...................................................................................21
  § 230(e)(2) .............................................................................21, 22
  § 230(e)(3) ...................................................................................10

## State Statutes

Fla. Stat.

§ 95.11(4)(g) ...........................................................................................27

§ 540.08...............................................................................8, 21, 25, 26

§ 540.08(1)..............................................................................................26

§ 770.07..................................................................................................28

## Rules

Fed. R. Civ. P.

9(b)..........................................................................................................21

12(b)(1) .....................................................................................1, 8, 9, 24

12(b)(6) ........................................................................................1, 8, 25

## Other Authorities

*Backpage.com Succumbing to Government Is Blow to Free Speech Online*,
Jan. 10, 2017, Center for Democracy & Technology, available at
https://cdt.org/press/backpage-com-succumbing-to-government-is-blow-
to-free-speech-online/ ........................................................................4

*Black's Law Dictionary* (10th ed. 2014)...............................................22

Danah Boyd, *Combating Sexual Exploitation Online: Focus on
the Networks of People, not the Technology* (Oct. 19, 2010),
http://www.danah.org/papers/talks/2010/CombatingSexualExploitation
Online.pdf .......................................................................................23, 24

Mark Latonero, *The Rise of Mobile and the Diffusion of Technology-
Facilitated Trafficking*, Nov. 2012 (USC Annenberg Ctr. on Commc'ns
Leadership & Policy Research Series on Tech. & Human Trafficking)...........................24

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), Defendants Backpage.com LLC, Evilempire.com, BigCity.com, Carl Ferrer, Michael Lacey, and James Larkin (collectively, "Defendants" or "Backpage") hereby move to dismiss the Complaint.

## INTRODUCTION

The Plaintiffs in this case, an advocacy organization and a young woman (Jane Doe), allege she was victimized by her drug-addicted mother and third-party criminals who involved her in sex trafficking by posting on the classified advertising website Backpage.com. They seek to blame the website, its CEO, and its former owners—not the perpetrators of the abuse and the sex trafficking scheme—despite scores of cases (including decisions involving some of the *same* defendants sued here) that hold such online publishing activities are protected by the First Amendment and immunized from liability under Section 230 of the Communications Decency Act. 47 U.S.C. § 230 ("Section 230"). These new claims add nothing to what is already well-trod ground, and their meritless allegations should be dismissed.

Numerous courts have addressed the allegations raised in this Complaint in various contexts and found them contrary to constitutional law and foreclosed by federal policy. The states of Washington, Tennessee, and New Jersey passed statutes targeting Backpage.com based on the assumption that ads in its adult section were for prostitution, and all were enjoined as violations of the First Amendment and Section 230. *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012); *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097 (D.N.J. Aug. 20, 2013); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013). California attempted to bring a criminal prosecution against Backpage, its principals and former owners, but the court rejected the State's arguments and granted the

1

defendants' demurer, holding the AG impermissibly sought to impose criminal liability for Backpage's actions as a publisher, which are protected by the First Amendment principles embodied in Section 230. *People v. Ferrer*, 2016 WL 7237305, at *1, *4 (Sup. Ct. Sacramento Cty. Dec. 9, 2016). Even informal actions taken by local governments to suppress Backpage have been enjoined as violations of the First Amendment. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015) (enjoining Sheriff's actions as unconstitutional prior restraint), *cert. denied*, 137 S. Ct. 46 (2016).

Particularly relevant here, courts have granted motions to dismiss virtually identical civil claims against Backpage, finding them foreclosed by Section 230's command that that "[n]o provider … of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." In *M.A. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1053-54 (E.D. Mo. 2011), the court dismissed all claims despite allegations that the website's structure and operation, and Backpage's alleged knowledge of illegal activity, made it culpable for sex trafficking. And in *Doe v. Backpage.com, LLC*, 104 F. Supp. 3d 149, 152 (D. Mass. 2015), *aff'd*, 817 F.3d 12 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 622 (2017), the district and appellate courts held Backpage's editorial choices were protected, rejecting claims that the website's policies were intended to promote "illicit sex trade" and "trafficking of children." The district court dismissed all claims, holding Backpage's practices "[s]ingly or in the aggregate … amount to neither affirmative participation in an illegal venture nor active web content creation." *Id.* at 157.

The Plaintiffs here try to avoid this growing body of law by peppering the Complaint with conclusory assertions that Backpage somehow "conspired" with those who purchased

ads on its site or in some way "created" content through editorial practices.  But "[s]tripped of verbiage," the Complaint, "like a Persian cat with its fur shaved, is alarmingly pale and thin."  *Schurz Commc'ns, Inc. v. FCC*, 982 F.2d 1043, 1050 (7th Cir. 1992) (Posner, J.).  The only specific factual allegation about the ad involving Ms. Doe is that it was conceived, created, and posted entirely by her abusers.  Compl. ¶¶ 97-98.  And the various practices that Plaintiffs' assert make Backpage a "conspirator" or "content creator" are all publishing pre-rogatives that courts uniformly have found to be editorial policies that the law immunizes.  The courts have been firm in holding such "artful" pleading cannot be used to "skirt[]" Section 230.  *Kimzey v. Yelp! Inc*., 836 F.3d 1263, 1266 (9th Cir. 2016).

Backpage does not mean to minimize the grievous harms that Plaintiffs allege Ms. Doe suffered.  But Congress made a considered policy judgment that plaintiffs should hold the actual wrongdoers liable rather than rather than cripple the Internet by imposing liability on websites that host third-party-created content.  Cases like this illustrate "the importance of preserving free speech on the internet, even though that medium serves as a conduit for much that is distasteful or unlawful."  *Google v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016).  In accordance with that policy judgment, this case must be dismissed.

## BACKGROUND

### A.    Backpage.com and Affiliated Websites.

Backpage operates an online classified advertising service through which users can post ads in a variety of categories, including local places, buy/sell/trade, automotive, rentals, real estate, jobs, dating, and services.  *See Cooper*, 939 F. Supp. 2d at 813.  The site is

organized geographically, by state and municipality.[1]  Until January 2017, Backpage also included a category for "adult" services (such as escort services), which—following years of pressure from government actors, including a campaign that the Seventh Circuit described as an unconstitutional effort to "crush Backpage," *Backpage.com, LLC v. Dart*, 807 F.3d at 230—has now been shuttered.[2]

Millions of ads are posted on the website every month, making Backpage.com the second-largest online classified ad service in the country, after Craigslist.  *See McKenna*, 881 F. Supp. 2d at 1266.  Users provide all the content for ads they post on the website, using an automated interface; Backpage.com does not dictate or require any content.  Compl. ¶¶ 30, 40, 66, 97-98; *Cooper*, 939 F. Supp. 2d at 813 ("The website works by allowing users to post their own advertisements in a range of categories.").  Until July 2015, the website charged for ads in the adult and dating categories, while users could post ads for free in other categories.

---

[1]  *See* http://southflorida.backpage.com.  *See* Complaint (ECF No. 1) ("Compl.") ¶ 28. Plaintiffs reference the Backpage.com website throughout the Complaint, and the Court may consider it in deciding this motion.  *Bouton v. Ocean Props., Ltd.*, --- F. Supp. 3d --, 2016 WL 7324145, at *4 (S.D. Fla. Dec. 12, 2016) (considering website on 12(b)(6) motion); *Camp v. Alabama Telco Credit Union*, 2013 WL 2106727, at *2 (N.D. Ala. May 13, 2013) (same) (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (complaint's allegations based on documents central to plaintiff's claim may be considered on 12(b)(6) motion)).  The Court may also take judicial notice of court decisions about the site and similar claims.  *See Haddad v. Dudek*, 784 F. Supp. 2d 1308, 1324 (M.D. Fla. 2011); *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811-12 & n.4 (11th Cir. 2015).

[2]  Compl. ¶¶ 27, 74.  *See* http://www.backpage.com/classifieds/Media.  *See also Backpage.com Succumbing to Government Is Blow to Free Speech Online*, Jan. 10, 2017, Center for Democracy & Technology, https://cdt.org/press/backpage-com-succumbing-to-government-is-blow-to-free-speech-online/.

EvilEmpire.com and BigCity.com—websites affiliated with Backpage.com—repost some of the same ads that customers create and post on Backpage.com.  Compl. ¶¶ 79, 82.

Backpage imposes rules for ads posted on its site, and all users must affirmatively accept those posting rules.  *Cooper*, 939 F. Supp. 2d at 813-14.  They are designed to prevent improper ads or misuse of the site.  Before Backpage.com will accept such user-submitted ads, the user must agree to Backpage.com's Terms of Use, and confirm (for ads in the dating section and, while it was active, the adult section) that he or she is 18 or older.  Compl. ¶ 52; *Cooper*, 939 F. Supp. 2d at 813-14; Backpage.com Terms of Use ¶ 4(a)(2), available at http://www.backpage.com/classifieds/termsofuse.  The Terms of Use prohibit illegal acts and nude or lewd photos.  *See id.* ¶¶ 4(b), 5.  They also specifically forbid:  "[p]osting any solicitation directly or in 'coded' fashion for any illegal service exchanging sexual favors for money or other valuable consideration" (*id.* ¶ 4(c)); "[p]osting any material on the Site that exploits minors in any way" (*id.* ¶ 4(d)); "[p]osting any material on the Site that in any way constitutes or assists in human trafficking" (*id.* ¶ 4(e)); and posting any ad for products or services, use or sale of which is prohibited by any law or regulation" (*id.* ¶ 5).  In addition, all Backpage.com users are directed to "report any violations of these Terms to:  abuse@backpage.com."  *Id.* ¶ 18.  *See also Cooper*, 939 F. Supp. 2d at 814.

When a user attempts to post an ad in the dating section (or, while it was active, the adult section), the following notice appears:

**Posting Rules**

You agree to the following when posting in this category:

- I will not post obscene or lewd and lascivious graphics or photographs which depict genitalia, actual or simulated sexual acts or naked images;

5

- I will not post any solicitation directly or in "coded" fashion for any illegal service, including exchanging sexual favors for money or other valuable consideration;
- I will not post any material on the Site that exploits minors in any way;
- I will not post any material on the Site that in any way constitutes or assists in human trafficking;
- I am at least 18 years of age or older and not considered to be a minor in my state of residence.

**Any post exploiting a minor in any way will be subject to criminal prosecution and will be reported to the <u>Cybertipline</u> for law enforcement.**

Postings violating these rules and our Terms of Use are subject to removal without refund.[3]

The "Cybertipline"—included as a hypertext link in the above warning—is an online tool operated by the National Center for Missing and Exploited Children ("NCMEC"), which helps law enforcement locate and rescue missing and exploited children. *United States v. Ackerman*, 831 F.3d 1292, 1294 (10th Cir. 2016). The site also contains numerous hyper-links to a "User Safety" page which includes links to NCMEC and similar resources. *McKenna*, 881 F. Supp. 2d at 1266. Every ad contains a "Report Ad" button, and Back-page.com has an email address (abuse@backpage.com) for users to identify ads they believe improper or suspect. *See Cooper*, 939 F. Supp. 2d at 814.

Backpage takes additional measures to police user posts. *See* Compl. ¶¶ 40-41, 45 (alluding to screening). "In addition to user reports, Backpage.com monitors … ads through automated and manual reviews." *Cooper*, 939 F. Supp. 2d at 814. Through this screening, Backpage blocks and removes posts and refers ads that may involve child exploitation to

---

[3] http://posting.miami.backpage.com/online/classifieds/PostAdPPI.html/mia/posting.miami.backpage.com/?serverName=miami.backpage.com&superRegion=Florida%20Keys&u=mth&section=4383&category=4454.

NCMEC. *See McKenna*, 881 F. Supp. 2d at 1266-67; *Cooper*, 939 F. Supp. 2d at 814. "Backpage.com also regularly works with local, state, and federal law enforcement officials by responding to subpoena requests, providing officials with Internet search tools, and removing posts and blocking users at the request of officials." *Cooper*, 939 F. Supp. 2d at 814.

### B.    Plaintiffs' Allegations and Claims.

Plaintiffs—an anti-trafficking organization and individual who alleges that she was victimized by traffickers who created and posted an ad selling her for sex on Backpage.com—seek to hold Backpage.com and its principals liable for ads on Backpage.com that were created and submitted by third parties. Compl. ¶¶ 1, 17-18, 97-98. Jane Doe alleges that, in March 2013, her mother "sold her daughter for sex to support her addiction," that third party traffickers took photos of her without her consent, "created an advertisement for Ms. Doe," and posted the ad (along with photos of Ms. Doe) on Backpage.com, offering to "sell[] [her] for sex." *Id.* ¶¶ 95-98. Ms. Doe alleges that she was subsequently raped by other third parties who responded to this ad. *Id.* ¶ 98. The institutional Plaintiff, Florida Abolitionist, identifies itself as an organization "whose mission is to end human trafficking," and claims that, because of Backpage, it has "diverted its resources from its main mission" and been "frustrated." *Id*. ¶¶ 17, 103, 110.

Plaintiffs do not allege any of the Defendants created or developed the content of the single ad that allegedly resulted in Ms. Doe's victimization. The Complaint contains only conclusory allegations that "Backpage takes an active role in creating the content of" the ads it hosts, *id.* ¶ 48, and vaguely alleges that Backpage "creates" and "develops" the content of certain "Sponsored Ads." *Id.* ¶ 37. There is no suggestion that the ad that led to Ms. Doe's

victimization was a Sponsored Ad, nor is there any attempt to connect other harms alleged in the Complaint to these ads. Plaintiffs also claim Backpage is liable for "reposting" on EvilEmpire.com and BigCity.com ads created by third-party users that were initially posted on Backpage.com. Compl. ¶¶ 79, 82. However, the Complaint contains no specific or plausible allegation that any of Defendants created the content of these reposted ads. *See*, *e.g.*, *id.* ¶ 79 ("EvilEmpire organizes and reposts advertisements posted on Backpage.").

Plaintiffs' claims target Backpage's editorial functions in general—as opposed to creation of the content of particular ads that allegedly harmed Plaintiffs. Plaintiffs allege, for example, that Backpage failed to take adequate measures to screen ads involving trafficking and deliberately facilitated such trafficking (for instance, by not requiring certain forms of identity verification and by allowing payment using prepaid credit cards and digital currency such as Bitcoin). *See, e.g.*, Compl. ¶¶ 1, 52, 64, 65, 67-69.

Plaintiffs assert seven causes of action. The first claim alleges civil liability based on 18 U.S.C. § 1591 (the criminal anti-trafficking statute). Compl. Count I. The remaining claims are under Florida law: (1) imposing "distributor or publisher liability" for allegedly "defamatory matter" (Count II); (2) "outrage" (Count III); (3) common law invasion of privacy or right of publicity (Count IV); (4) statutory right of publicity (Fla. Stat. 540.08) (Count V); (5) civil conspiracy (Count VI); and (6) negligence (Count VII).

## STANDARDS UNDER RULES 12(B)(6) AND 12(B)(1)

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "'[C]onclusory allegations ... are not entitled to an assumption

of truth—legal conclusions must be supported by factual allegations.'" *Miljkovic v. Shafritz & Dinkin, P.A.*, 791 F.3d 1291, 1297 (11th Cir. 2015) (citation omitted); *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205-06 (11th Cir. 2007). "The plausibility standard is met only where the facts alleged enable 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013) (citation omitted). Where plaintiffs lack standing to assert certain claims, dismissal for lack of subject matter jurisdiction is required under Rule 12(b)(1). *See, e.g.*, *Cone Corp. v. Florida Dep't of Transp.*, 921 F.2d 1190, 1203 (11th Cir. 1991). Here, Plaintiffs' claims are barred by Section 230 of the CDA, enforcement of which at the earliest phase of litigation is vital because it provides "*immunity from suit* rather than a mere defense to liability and it is effectively lost if a case is erroneously permitted to go to trial." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (quotation marks omitted); *accord Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 417 (6th Cir. 2014) ("determinations of immunity … should be resolved at an earlier stage of litigation" given the law's role "in an open and robust internet").

## ARGUMENT

### I.  SECTION 230 BARS ALL OF PLAINTIFFS' CLAIMS

#### A.  Section 230 Was Designed to Promote Free Speech Online and the Unfettered Growth of the Internet.

Section 230 is a statutory embodiment of First Amendment principles for online speech. Congress designed Section 230 to "to encourage the unfettered and unregulated development of free speech on the Internet," *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003), "to promote the development of e-commerce," *id.*, and to encourage online providers

to "self-police" for potentially harmful or offensive material by providing immunity for such efforts, *id.* at 1028. Congress sought to eliminate the "'obvious chilling effect'" that imposing liability on online providers would cause, "'given the volume of material communicated through [the Internet], the difficulty of separating lawful from unlawful speech, and the relative lack of incentives to protect lawful speech.'" *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418-19 (1st Cir. 2007) (citation omitted). "[T]he protections afforded by the First Amendment were the motivating factors behind" Section 230. *People v. Ferrer*, 2016 WL 7237305, at *3; *Batzel*, 333 F.3d at 1028.[4]

To safeguard these important values, Section 230(c)(1) mandates that "[n]o provider … of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Thus, the "plain language" of Section 230 "creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). Additionally, Section 230(e)(3) expressly preempts all civil claims and all state-law claims, whether civil or criminal, barring any state-law claims against an online publisher such as Backpage.com (and

---

[4] Because Section 230 immunity implements First Amendment principles, efforts to impose liability on editorial choices by online intermediaries may be barred even where the technical statutory requirements are not met. *E.g.*, *e-ventures Worldwide, LLC v. Google, Inc.*, No. 2:14-cv-646-FtM-PAM-CM (M.D. Fla., Feb. 8, 2017), slip op. at 9 (ECF No. 153) ("Google's actions in formulating rankings for its search engine and in determining whether certain websites are contrary to Google's guidelines and thereby subject to removal are the same as decisions by a newspaper editor regarding which content to publish, which article belongs on the front page, and which article is unworthy of publication. The First Amendment protects these decisions, whether they are fair or unfair, or motivated by profit or altruism.").

the other Defendants) based on third-party content it publishes.  *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006).

> **B.    Plaintiffs' Claims are Barred Under Section 230's Three-Part Test.**

The consensus is that Section 230 immunity applies expansively, *id.* at 1321; *Lycos*, 478 F.3d at 419, and that "close cases ... must be resolved in favor of immunity."  *Jones*, 755 F.3d at 408 (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008) (*en banc*)).   Immunity must be granted where three conditions are met: "(1) [the defendant] is a provider or user of an interactive computer service, (2) the claim is based on information provided by another information content provider; and (3) the claim would treat [the defendant] as the publisher or speaker of that information."  *Doe No. 1*, 817 F.3d at 19 (quoting *Lycos* at 418).

Applying this test, at least six courts have held that Backpage is immunized under Section 230, and the same conclusion is warranted here.[5]   First, "Backpage.com is the quintessential publisher contemplated by the CDA," *Cooper*, 939 F. Supp. 2d at 823, and the same is true of affiliated websites Evil Empire and BigCity.com.  *People v. Ferrer*, 2016 WL 7237305, at *6.  Second, Plaintiffs base their claims on an advertisement about Jane Doe that they allege third-party traffickers "created" and "posted" on Backpage.com.  *See* Compl. ¶¶ 97-98; *see also infra* § I.C.  Such postings are the essence of "information provided by another content provider," as contemplated in Section 230.  *E.g.*, *Doe No. 1*, 817 F.3d at 17-21; *M.A.*, 809 F. Supp. 2d at 1050-53.  Third, Plaintiffs' claims treat Backpage.com and its

---

[5] *Doe No. 1*, 104 F. Supp. 3d at 157-58, *aff'd*, 817 F.3d at 20-22; *Hoffman*, 2013 WL 4502097, at *8; *Cooper*, 939 F. Supp. 2d at 823-25; *McKenna,* 881 F. Supp. 2d at 1271-75; *M.A.*, 809 F. Supp. 2d at 1050-54; *People v. Ferrer*, 2016 WL 7237305.

affiliated websites "as the publisher or speaker" of the ads, yet the factual allegations take Backpage to task for decisions about "whether to publish, withdraw, postpone or alter content," the traditional editorial functions that Section 230 protects.[6]

In *Doe No. 1*, for example, the plaintiffs invoked the same federal sex trafficking statute (18 U.S.C. § 1591), as well as theories of state tort law based on allegations traffickers posted ads for them on Backpage.com.  Like Plaintiffs here, they alleged that Backpage— "with an eye to maximizing its profits"—had "deliberate[ly] structur[ed] … its website to facilitate sex trafficking" by, among other things, not requiring phone number verification for postings, failing to take sufficient measures to block postings by users who falsely claim to be 18 or older, accepting payment using prepaid credit cards and digital currencies such as Bitcoin, stripping out metadata from photos uploaded by users, editing ads to remove banned terms such as "barely legal" (while allowing users to instead use alternative terms such as "brly legal"), and creating "Sponsored Ads."  817 F.3d at 16-17 & n.2.[7]  The district court dismissed the action, explaining that these general website features "amount to neither

---

[6] *Jones*, 755 F.3d at 407 (citation omitted); *Roommates.com*, 521 F.3d at 1170-71 ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230."); *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 967-68 (N.D. Ill. 2009) ("A claim against an online service provider for negligently publishing harmful information created by its users treats the defendant as the 'publisher' of that information.").  As noted, other courts have rejected the exact same allegations made in this case, that Backpage's editorial practices amount to participation in trafficking.

[7] *Compare* Compl. ¶¶ 68-69 (phone number verification), 52 (postings claiming that user is over 18 after prior attempts blocked), 64-65 (accepting prepaid credit cards and Bitcoin), 67 ("strip[ping] out … metadata"), 40-49 (banning certain terms, but allowing "brly legal"), 37-39 (creating "Sponsored Ads"); *see also* Appendix A (comparing allegations in this case to those in *Doe No. 1*).

affirmative participation in an illegal venture nor active web content creation," and "courts have repeatedly rejected this 'entire website' theory as inconsistent with the substance and policy of section 230." *Doe No. 1*, 104 F. Supp. 3d at 157, 162.[8]

The First Circuit affirmed. It held plaintiffs' claims uniformly "address the structure and operation of the Backpage website"—in other words, "Backpage's decisions about how to treat [third-party] postings." *Doe No. 1*, 817 F.3d at 21. As with the allegations here, the

> claims challenge features that are *part and parcel of the overall design and operation of the website* (such as the lack of phone number verification, the rules about whether a person may post after attempting to enter a forbidden term, and the procedure for uploading photographs). *Features such as these*, which reflect choices about what content can appear on the website and in what form, are *editorial choices that fall within the purview of traditional publisher functions*.

*Id.* (emphasis added).

Likewise, in *M.A.*, the plaintiff alleged she was trafficked by a third party who posted ads on Backpage.com. 809 F. Supp. 2d at 1043-44. As do Plaintiffs here, M.A. attacked the website's general features, alleging Backpage set out to create "a highly tuned marketing site" with a " veil of legality," but "had knowledge" that postings "were advertisements for prostitution" and "illegal sexual contact with minors." *Id.* at 1044. And, like Plaintiffs here, she alleged Backpage sought to profit from the posters' "illegal prostitution activities" and thus aided and abetted sex trafficking of minors. *Id.* at 1045, 1053. The court rejected the plaintiff's arguments challenging general aspects of the site's "construct and operation," *id.* at 1050, observing that a website is "immune under § 230 unless it created the offending

---

[8] The court also dismissed other causes of action (including alleged violations of state consumer protection laws, and alleged violations of the plaintiffs' rights of publicity and copyright interests) for failure to state a claim. *Doe No. 1*, 817 F.3d at 24-29.

ads," and "however horrific the consequences to M.A., … the ads were created by [the pimp]." *Id.* at 1051 (quotation marks and citation omitted). Similarly, it was "immaterial" that Backpage.com allegedly elicit[ed] online content for profit"; what matters is whether the website or third parties create the content at issue. *Id.* at 1050 (quotation marks omitted). The court rejected M.A.'s assertion that she was not seeking to hold Backpage liable as a publisher but rather "as an aider and abettor of minor sex trafficking." *Id.* at 1053-54.

Applying this same view of the law, another court recently dismissed a criminal indictment under Section 230—based on strikingly similar allegations to the Complaint in this case—against the same Backpage principals and former owners that Plaintiffs sued here. *People v. Ferrer*, 2016 WL 7237305, at *1-5. The prosecution alleged the defendants "actively 'manipulated' the content provided by third parties so that they could profit from activity resulting from the ad placement." *Id.* at *5. But because "the substance of the ads came from the original ad placed on Backpage, the only 'manipulation' would be in the act of extracting the content from the original ad and/or from the act of physically posting the extracted content on a new site." *Id.* The court concluded "[t]his is not prohibited activity. Indeed, it generally falls within the scope of protected editorial functions." *Id.* (citing, *inter alia*, *Doe No. 1*, 817 F.3d at 20-21). Numerous other decisions are to the same effect.[9]

---

[9] *See, e.g.*, *Doe v. MySpace*, 528 F.3d 413, 419-20 (5th Cir. 2008) (Section 230 barred claims seeking to hold social networking site Myspace liable for sexual assault of 14-year-old victim by a man who met her on MySpace); *Doe II v. MySpace Inc.*, 175 Cal. App. 4th 561, 573 (2009) (plaintiffs "want MySpace to ensure that sexual predators do not gain access to (*i.e.*, communicate with) minors on its Web site," yet "[t]hat type of activity—to restrict or make available certain material—is expressly covered by section 230."); *Green v. AOL*, 318 F.3d 465, 471 (3d Cir. 2003) (plaintiff was "attempt[ing] to hold AOL liable for decisions relating to the monitoring, screening, and deletion of content from its network—actions quintessentially related to a publisher's role").

The common thread throughout these cases is that plaintiffs may not hold a website operator liable for exercising its traditional editorial functions, including deciding what third-party-created content—including classified ads—to post, delete, or edit. Nor may plaintiffs evade the protections of Section 230 by attacking the fundamental design and configuration of a website. Where "third-party content … appears as an essential component of each and all" of Plaintiffs' claims, *Doe No. 1*, 817 F.3d at 22, Plaintiffs seek to do what Section 230 expressly prohibits: impose liability on Defendants "as the publisher or speaker," 47 U.S.C. § 230(c)(1), of ads created by third parties. *See, e.g.*, Compl. Count II (seeking to subject Defendants to "DISTRIBUTOR OR PUBLISHER LIABILITY").

Nor can Plaintiffs evade Section 230 by alleging that Defendants know (or should know) that third parties may misuse its websites for sex trafficking. *See, e.g.*, Compl. ¶¶ 2, 26. "It is … well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech." *Lycos*, 478 F.3d at 420. The law under Section 230 is clear that, even if an online provider has *actual* knowledge of illegal content posted on its site, a failure to delete the offending content does not make it liable for that content. *See, e.g.*, *Zeran*, 129 F.3d at 331-33. That is because "[l]iability upon notice would defeat the dual purposes advanced by § 230." *Id.* at 333. Thus, in *M.A.*, the court rejected the same argument Plaintiffs make here—that Backpage.com should be denied immunity because it allegedly knows or should know "of minors being sexually trafficked on its website." *M.A.*, 809 F. Supp. 2d at 1050-51; *see also People v. Ferrer*, 2016 WL 7237305, at *7 ("[O]nline publishers are not subject to notice liability.").

## C.   Plaintiffs Cannot Evade Section 230 Through Artful Pleading.

Faced with this overwhelming body of law requiring dismissal of their claims, Plaintiffs—like others before them—resort to creative pleading in an effort to evade Section 230's protections. This Court should "decline to open the door to such artful skirting of the CDA's safe harbor provision." *Kimzey*, 836 F.3d at 1266. Efforts to plead around Section 230 are common but typically fail. *Doe v. MySpace*, 528 F.3d at 419-20 ("No matter how artfully Plaintiffs seek to plead their claims, the Court views Plaintiffs' claims as directed toward MySpace in its publishing, editorial, and/or screening capacities."). *See also Herrick v. Grindr, LLC*, 2017 WL 744605, at *3 (S.D.N.Y. Feb. 24, 2017) ("[P]ast cases suggest strongly that Plaintiff's attempt to artfully plead his case in order to separate the Defendant from the protections of [Section 230] is a losing proposition.").

### 1.   Plaintiffs Cannot Evade Section 230 By Alleging That a Website Encourages Posting Unlawful Content.

Just as Plaintiffs cannot bypass Section 230 by alleging the Backpage.com's overall design "facilitates" unlawful content, they cannot get around the law by recasting their claims under an "encouragement theory." *See, e.g*., Compl. ¶¶ 1, 23, 34, 49. To be clear, Defendants categorically deny these and other accusations in the Complaint—Backpage works to *prevent* misuse of the website and to *combat* sex trafficking. But even if such allegations were true, they would not salvage a defective Complaint. Such claims "*necessarily* treat the website as a publisher or speaker of content provided by third parties and, thus, are precluded by section 230(c)(1)." *Doe No. 1*, 817 F.3d at 22 (emphasis added).

The Sixth Circuit specifically rejected Plaintiffs' "encouragement" theory in *Jones*, 755 F.3d 398. There, the plaintiff sued a gossip website (TheDirty.com) for disparaging user

posts about her, and the district court refused to apply Section 230 because it concluded the site "intentionally encourage[d] illegal or actionable third-party postings." *Jones v. Dirty World Entm't Recordings, LLC*, 965 F. Supp. 2d 818, 821 (E.D. Ky. 2013). The circuit court reversed, noting that "[m]any websites not only allow but also actively invite and encourage users to post particular types of content," which might be "unwelcome to others." *Jones*, 755 F.3d at 414. But such websites cannot be sued on an "encouragement" theory because that would "eclips[e] the immunity from publisher-liability that Congress established." *Id.* "Congress envisioned an uninhibited, robust, and wide-open internet … but the muddiness of an encouragement rule would cloud that vision."[10]

This precedent is essential to preserve Section 230's purpose. Its grant of immunity "would serve little if any purpose if companies like Craigslist [or Backpage] were found liable … for 'causing' or 'inducing' users to post unlawful content in this fashion." *Craigslist*, 665 F. Supp. 2d at 969. In such cases, where "users routinely flout Craigslist's guidelines, it is not because Craigslist has caused them to do so." *Id.* "Or if it has, it is only 'in the sense that no one could post [unlawful content] if craigslist did not offer a forum.'" *Id.* (quoting *Chicago Lawyers' Comm. for Civil Rights Under the Law v. Craigslist, Inc.*, 519

---

[10] *Jones*, 755 F.3d at 415. *See also Whitney Info. Net., Inc. v. Xcentric Ventures, LLC*, 2008 WL 450095, at *10, *13 (M.D. Fla. Feb. 15, 2008) (Section 230 foreclosed defamation claim against operator of www.ripoffreport.com, a website devoted to exposing scams, even where evidence showed operator itself "created categories, such as 'con artists,' 'corrupt companies' and 'false TV advertisements,' from which a poster must make a selection to categorize his or her report as part of the submission process"); *Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450, 476 (E.D.N.Y. 2011) ("[T]here is simply 'no authority for the proposition that [encouraging the publication of defamatory content] makes the website operator responsible, in whole or in part, for the "creation or development" of every post on the site.'") (citation omitted).

F.3d 666, 671 (7th Cir. 2008)).  In many cases, "a clever lawyer could argue that *something*
the website operator did encouraged the illegality," but such cases "must be resolved in favor
of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten
thousand duck-bites, fighting off claims that they promoted or encouraged—or at least tacitly
assented to—the illegality of third parties."  *Roommates.com*, 521 F.3d at 1174.

That principle applies fully here, where Plaintiffs allege the Defendants encourage
criminal conduct by third parties.   In *People v Ferrer*, for example, the court dismissed
charges against the same Backpage executive and former owners sued in this case, rejecting
the prosecution's knowing encouragement theory.   2016 WL 7237305, at *7 (citation
omitted).[11]  Likewise, this Complaint should be dismissed for the same reasons.

### 2.    *Plaintiffs' Content-Creation Allegations Cannot Overcome Section 230 Immunity.*

Plaintiffs fare no better in trying to paint Backpage as a content creator of certain
"Sponsored Advertisements."   *See* Compl. ¶ 37 (alleging "Backpage creates, develops, and
posts illegal content … in the 'Sponsored Ads' part of the 'Adult Services' section of its
website.").   First, the suggestion that Backpage itself is the originator and creator of the
allegedly actionable content is refuted by Plaintiffs' own allegations.  The Complaint's only
specific factual averments make clear that this alleged content creation actually involves

---

[11]  *See also Doe v. AOL*, 783 So. 2d 1010, 1017 (Fla. 2001) (AOL immune from claims it
knowingly hosted chat rooms where users violated child pornography laws); *GoDaddy.com,
LLC v. Toups*, 429 S.W.3d 752, 759-60 (Tex. App. 2014) (rejecting plaintiff's allegations
that a "revenge porn" website published and promoted "obscenity and child pornography");
*Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1196 (N.D. Cal. 2009) (Google immune
despite allegations it "encourages[,] collaborates in the development of [and] effectively,
requires [illegal content]" in ad program).

nothing more than "enhanc[ing]" user-submitted ads by "rewriting" and "reorganizing" those ads (including "adding" and "summarizing" the submitted text)—in other words, editing. Compl. ¶¶ 37-38.   In this regard, the Complaint's specific factual allegations undermine Plaintiffs' efforts to generalize and relabel them.   *See Griffin Indus.*, 496 F.3d at 1205-06 ("Our duty to accept the facts in the complaint as true does not require us to ignore specific factual details of the pleading in favor of general or conclusory allegations."); *Franklin*, 738 F.3d at 1250 ("The district court's … error was finding purely conclusory allegations—*i.e.*, a 'formulaic recitation of the elements of a cause of action'—sufficient ….") (citation omitted).

Plaintiffs' precise argument about content "creation" has been rejected before.   The District Court in *Doe No. 1* explained, "[t]he creation of sponsored ads with excerpts taken from the original posts reflects the illegality (or legality) of the original posts and *nothing more*."   104 F. Supp. 3d at 157 (emphasis added).   The First Circuit affirmed, finding such "attempted end runs" to recast editing as "content creation" "are futile, and do not cast the slightest doubt on our conclusion that the district court appropriately dismissed the appellants' sex trafficking claims as barred by section 230(c)(1)."   *Doe No. 1*, 817 F.3d at 17, 24.   Similarly, here, Plaintiffs cannot circumvent Section 230 by alleging in conclusory fashion that Defendants "create" and "control" the content posted on Backpage-affiliated websites EvilEmpire.com and BigCity.com.   Compl. ¶¶ 77, 82.   As Plaintiffs concede, those websites simply "repost[]" ads posted by users on Backpage.com.   *See id.* ¶¶ 79, 82.   Once again, this same argument has been rejected.   *People v. Ferrer*, 2016 WL 7237305, at *6.[12]

---

[12]   *See also Kimzey*, 836 F.3d at 1268 (plaintiff's "threadbare allegations of fabrication of statements" were "insufficient to avoid immunity" under Section 230 where "careful reading of the complaint reveal[ed] that [plaintiff] never specifically alleged that Yelp authored or

Even more fundamentally, Plaintiffs make no effort to connect any particular ads to any allegedly unlawful conduct by Defendants.  This is fatal to their effort to plead around Section 230, as courts uniformly hold that a website may be held liable only to the extent that it created or developed "*specific content* that was the *source* of the alleged liability."  *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1198-99 (10th Cir. 2009) (emphasis added); *see Jones*, 755 F.3d at 410 (to overcome Section 230 immunity, website must be "responsible for what makes the displayed content allegedly unlawful"); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1125 (9th Cir. 2003) (service provider must have "created or developed particular information at issue).  Specifically with respect to Backpage, the court in *M.A.* agreed the relevant question was whether the website operator is "responsible for the development of the specific content that was the source of the alleged liability."  809 F. Supp. 2d at 1051 (citation omitted).  On that basis, it held Backpage not liable "for the content and consequences of the ads posted by [the pimp]."  *Id*.  The same goes here.[13]

Plaintiffs never allege that the harms asserted resulted from the particular ads that Backpage supposedly created.  To the contrary, the Complaint makes clear that the harms sustained by Plaintiff Doe resulted from a single ad *created by the third-party criminals* who abused and trafficked her.  *See* Compl. ¶¶ 97-98 (pimps "created an advertisement for Ms.

created the *content* of the statements posted …, but rather … adopted them from another website and transformed them into its own stylized promotions on Yelp and Google").

[13] Any suggestion that *J.S. v. Village Voice Media Holdings, LLC*, 184 Wash. 2d 95 (2015), requires a different result would be meritless.  That case, in which the Washington Supreme Court held a plaintiff's complaint contained sufficient allegations that Backpage had created the relevant content at issue to survive a motion to dismiss, was decided under far more lenient pleadings standards than permitted in federal court.  Moreover, the state court's crabbed view of Section 230 immunity—a question of federal law—cannot trump the overwhelming body of federal law clearly establishing Section 230 in cases such as this.

Doe on Backpage.").  It further alleges that Plaintiff had been trafficked since the age of 11

and that, at the time the single ad appeared on Backpage.com in March 2013, Plaintiff was 26

years old and had been victimized by her mother (and perhaps others) for *15 years*.  *See id.*

¶¶ 9, 95-96.  In light of these allegations, Plaintiffs cannot rely on their vague and boilerplate

recitations that "[a]s a direct and proximate cause of Defendants' conduct"—conduct that is

neither specified nor linked to the allegedly Backpage-created ads—"Plaintiff Doe" was

injured.  *See, e.g.*, *id.* ¶¶ 118, 124, 129; *see also infra* at 24-25 (lack of standing to raise

claims).[14]  And, for the same reasons, it is irrelevant whether Backpage creates some *other*

content that Plaintiffs do not plausibly allege harmed them.

> **D.    Ms. Doe's Right-of-Publicity Claims are Not Saved by Section 230's "Intellectual Property" Exception.**

In Count V of the Complaint, Ms. Doe asserts a claim under Florida's right-of-

publicity statute, Fla. Stat. § 540.08, and appears to assert an equivalent claim under Florida

common law in Count IV.  *See* Compl. ¶ 131.  To the extent Ms. Doe asserts these claims in

order to argue Section 230's safe harbor does not apply pursuant to the exception for

"intellectual property" claims, *see* 47 U.S.C. § 230(e)(2), she is mistaken.[15]

---

[14] Nor can Plaintiffs shore up these shortcomings by relying on vague allegations that Defendants made false statements *to third parties*—*i.e.*, unidentified payment processors and a child who was allegedly trafficked.  *See* Compl. ¶¶ 86-88; *see also Doe No. 1*, 817 F.3d at 24-25 (rejecting similar theory as relying on a "causal chain … shot through with conjecture," including speculation regarding the effect of "the alleged misrepresentations on an indeterminate number of third parties").  In any event, Plaintiffs fail to meet the exacting pleading requirements to "state with particularity the circumstances constituting [the] fraud," Fed. R. Civ. P. 9(b)—in other words, "the who, what, when, where, and how of the allegedly false statements."  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).

[15] Section 230 also contains an exception for federal criminal prosecutions.  *See* 47 U.S.C. § 230(e)(1).  That exemption is inapplicable here, however, because it "applies to

While Section 230(e)(2) provides that immunity does not extend to claims pursuant to "any law pertaining to intellectual property," *id.*—such as those under copyright, trademark, and patent law—a right-of-publicity claim is not one "pertaining to intellectual property." "Intellectual property" is a "category of intangible rights protecting commercially valuable products of the human intellect." *Black's Law Dictionary* (10th ed. 2014). Here, Plaintiff Doe's right-of-publicity claims allege misappropriation of her "image" and "personality." Compl. ¶¶ 131, 136. But "a person's image is not a 'product of the human intellect.'" *Doe No. 1*, 104 F. Supp. 3d at 163 n.13. Rather, the right of publicity "'flows from the right to privacy,'" *id.* (citation omitted). Indeed, Plaintiffs appear to acknowledge as much. *See* Count IV (captioned "INVASION OF PRIVACY OR RIGHT TO PUBLICITY").

To the extent Count IV alleges invasion of privacy based on "intrusion into Plaintiff Doe's private affairs," on "public disclosure" of private facts about Ms. Doe, and/or on "false light" (a claim no longer recognized under Florida law, *see Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1114 (Fla. 2008)), *see* Compl. ¶¶ 131-132, those claims are even farther afield from any "law pertaining to intellectual property." 47 U.S.C. § 230(e)(2). They are thus foreclosed by Section 230. *See, e.g.*, *Carafano*, 339 F.3d at 1125; *Dowbenko v. Google Inc.*, 991 F. Supp. 2d 1219, 1220 (S.D. Fla. 2013), *aff'd*, 582 F. App'x 801 (11th Cir. 2014).

---

*government prosecutions*, *not* to civil private rights of action under [statutes] with criminal aspects." *Obado v. Magedson*, 2014 WL 3778261, at *8 (D.N.J. July 31, 2014) (emphasis added), *aff'd*, 612 F. App'x 90 (3d Cir. 2015); *see also M.A.*, 809 F. Supp. 2d at 1053-56 (Section 230 barred civil claims predicated on alleged violations of criminal trafficking statutes, 18 U.S.C. §§ 2255 and 1595).

### E. Imposing Liability on Online Service Providers is Not the Solution to Preventing Trafficking.

Jane Doe's tragic plight cannot help but evoke sympathy and concern, but the Complaint is far off base in alleging she "was repeatedly raped *as a result of Backpage*," when, on the same page that statement appears, Ms. Doe reveals her mother sold her for sex, forced her to provide sexual services, and others then raped her, photographed her, and trafficked her. The bad acts of third parties are the very reason Congress provided immunity for "companies that serve as intermediaries for other parties' potentially injurious messages." *Zeran*, 129 F.3d at 330-31. Respecting Congress' policy judgment does not condone the scourge of trafficking—especially child trafficking—nor does it undermine public safety. *Doe v. Bates*, 2006 WL 3813758, *4 (E.D. Tex. Dec. 27, 2006). Rather, courts applying Section 230 have emphasized that the proper response is for law enforcement to pursue the *actual wrongdoers* (here, the criminals who trafficked Ms. Doe). *M.A.*, 809 F. Supp. 2d at 1046 ("The actual injury suffered by M.A. is … her victimization by [the pimp]."); *Jones*, 755 F.3d at 417 (plaintiff should go after the one who authored and posted the content).

Pursuing intermediaries because of the bad acts of others may satisfy an emotional impulse, but will not deter trafficking. It may even have unintended and counterproductive effects by making it harder for law enforcement to ferret out illegal trafficking and thus more difficult to aid its victims. Censorship of online content is not an effective or permissible approach to combat sex trafficking.[16]

---

[16] Many experts and law enforcement officials agree. *See, e.g.*, Danah Boyd, *Combating Sexual Exploitation Online: Focus on the Networks of People, not the Technology* (Oct. 19, 2010), http://www.danah.org/papers/talks/2010/CombatingSexualExploitationOnline.pdf ("Going after specific sites where exploitation becomes visible and attempting to eradicate

## II. PLAINTIFFS' CLAIMS FAIL AS A MATTER OF LAW

### A. Plaintiffs Lack Standing.

Fundamental principles of Article III standing separately require dismissal of Plaintiffs' claims. "To have standing under Article III, a plaintiff 'must have suffered or be imminently threatened with a concrete and particularized "injury in fact" that is fairly *traceable to the challenged action of the defendant* and likely to be redressed by a favorable judicial decision.'" *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1303-04 (11th Cir. 2017) (*en banc*) (emphasis added; citation omitted); *see also Nicklaw v. Citimortgage, Inc.*, 839 F.3d 998, 1001 (11th Cir. 2016) ("causation" is an element of the "'irreducible constitutional minimum of standing'") (citation omitted), *reh'g en banc denied*, 2017 WL 1548204 (11th Cir. May 1, 2017). Here, there can be no causation where the Complaint alleges third parties created and posted the offending ads, not by any of the Defendants. Thus, even setting aside Section 230, Ms. Doe's claims must be dismissed for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1). *See, e.g.*, *Cone Corp.*, 921 F.2d at 1203.

For the same reasons, plaintiff Florida Abolitionist lacks standing. That organization vaguely alleges that, "[a]s a result of the increase in sex trafficking, Florida Abolitionist has diverted its resources from its main mission to end human trafficking to provide treatment and services to trafficking victims" (Compl. ¶ 110), but it makes no effort to link these

---

the visibility does nothing to address the networks of supply and demand—it simply pushes them to evolve and exploiters find new digital haunts and go further underground."); Mark Latonero, *The Rise of Mobile and the Diffusion of Technology-Facilitated Trafficking*, Nov. 2012 (USC Annenberg Ctr. on Commc'ns Leadership & Policy Research Series on Tech. & Human Trafficking), at 30 ("online classified ad sites like Backpage ... are visible, accessible, and well known to law enforcement staff," and this helps law enforcement investigations); *id.* at 26 ("[L]aw enforcement agents ... suggest[ed] that closing one site runs the risk of sending traffic to other online advertisement and social networking sites.").

alleged resource burdens to any ads specifically posted on Backpage.com. This is fatal. Even assuming the abstract harms Florida Abolitionist alleges were sufficiently "particularized," *see Wollschlaeger*, 848 F.3d at 1303-04, there is no "causal connection between the injury and the conduct complained of." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted). In particular, Florida Abolitionists' claimed injury is not "'trace[able] to the challenged action of the defendant, and not … the independent action of some third party not before the court.'" *Id.* Florida Abolitionists' contention that the specific conduct of defendants resulted in an overall spike in sex trafficking, which, in turn, supposedly caused the diversion of their resources, is entirely speculative and cannot serve as a basis for standing.[17]

### B. The Right-of-Publicity Claims Fail.

As noted above, Ms. Doe's right-of-publicity claims are foreclosed by Section 230. But they fail on their own weight as a matter of law. As in *Doe No. 1*, these claims are premised solely on the claim that ads posted by the third-party traffickers on Backpage.com "displayed" Ms. Doe's "image, photograph, and likeness." Compl. ¶¶ 97-98, 136-137. However, Ms. Doe cannot assert a claim under Fla. Stat. § 540.08 or Florida common law, because she does not (and cannot) allege Backpage.com used her image, photograph, and likenesses for *its own commercial benefit*.

---

[17] Plaintiffs' conceded "estimate[]" that "at least half of the victims" served by Florida Abolitionist "were trafficked via Backpage" (Compl. ¶ 114) is precisely the sort of speculation courts reject on motions to dismiss. *See, e.g.*, *Doe No. 1*, 817 F.3d at 25 (refusing to "credit[] at the Rule 12(b)(6) stage" plaintiffs' alleged "causal chain," which "pyramids speculative inference upon speculative inference," including surmise about "the real impact of Backpage's behavior on the overall marketplace for sex trafficking") (citation omitted).

Like its common law counterpart,[18]  Section 540.08 of the Florida Statutes requires a plaintiff to show her image, photograph, or likeness was published by the defendant "for purposes of trade or for any commercial or advertising purpose."  Fla. Stat. § 540.08(1). Florida "[c]ourts have interpreted the statute's commercial purpose requirement to require that a defendant's unauthorized use 'directly promote' a product or service."  *Almeida*, 456 F.3d at 1325 (citations omitted).  Here, however, the Complaint contains no plausible allegations that Backpage.com published photos of Ms. Doe to "directly promote" its own product or service.  *Id.*  Nor does Ms. Doe allege Backpage.com used her likenesses to advertise or promote the website itself.  Rather, she alleges *third-party traffickers* used her photos "with an advertisement selling Ms. Doe for sex."  Compl. ¶ 97.

Ms. Doe therefore fails to state a legally cognizable claim for the same reasons the First Circuit rejected plaintiffs' right-of-publicity claims in *Doe No. 1*.  There, applying Massachusetts and Rhode Island law—which is in all relevant respects identical to Florida law[19]—the court explained that "there is no basis for an inference that Backpage appropriated the commercial value of the [plaintiffs'] images.  Although Backpage does profit from the sale of advertisements, *it is not the entity that benefits* from the misappropriation."  817 F.3d at 27 (emphasis added).  Rather, "[a] publisher like Backpage is 'merely the conduit through

---

[18]  Florida's statutory and common law rights of publicity are "substantially identical." *Almeida*, 456 F.3d at 1320 n.1; *Fuentes v. Mega Media Holdings, Inc.*, 721 F. Supp. 2d 1255, 1260 (S.D. Fla. 2010).

[19]  Under the laws of all three states, (1) a right of publicity claim lies only when the defendant uses the plaintiff's image or likeness for defendant's *own commercial benefit*; (2) a defendant's "incidental" use is not actionable; and (3) it is irrelevant that defendant is engaged in a profit-making enterprise.  *Compare Doe No. 1*, 817 F.3d at 26-27 (Massachusetts and Rhode Island law), *with Almeida*, 456 F.3d at 1324-26 (Florida law).

which the advertising and publicity matter of customers' is conveyed," while "the party who actually benefits … is *the advertiser*." *Id.* (citation omitted; emphasis added).

The Eleventh Circuit's holding in *Almeida*—which affirmed dismissal of the same right-of-publicity claims under Florida law that Ms. Doe asserts here—is to similar effect.  In that case, the plaintiff sought to hold Amazon.com liable for publishing a photo of her online that appeared on the cover of a book that the website advertised for sale.  456 F.3d at 1318-19.  Rejecting the argument that this was an actionable "commercial" use on a theory that Internet retailers use such content to promote sales and their "brand identity," *id.* at 1325, the court held Amazon's use was "merely incidental to, and customary for, the business of internet book sales."  *Id.* at 1326.  These holdings equally apply here, and for good reason.  As the First Circuit explained, "[t]here would be obviously deleterious consequences to a rule placing advertising media, such as newspapers, television stations, or websites, at risk of liability every time they sell an advertisement to a party who engages in misappropriation of another's likeness."  *Doe No. 1*, 817 F.3d at 27.

## C.    The Defamation Claim Is Time-Barred And Otherwise Defective.

Ms. Doe's claim for defamation (Compl. Count II) must be dismissed on the independent grounds that (1) Plaintiffs never allege that they served Defendants with a retraction notice—a prerequisite for bringing a claim for defamation under Florida law, *see Comins v. Vanvoorhis*, 135 So. 3d 545 (Fla. 5th DCA 2014)—and (2) the claim is time-barred.  As to the latter point, Florida's statute of limitations for defamation is two years.  *See* Fla. Stat. § 95.11(4)(g); *Giordano v. Romeo*, 76 So. 3d 1100 (Fla. 3d DCA 2011).  Here, the events giving rise to the defamation claim allegedly took place *March 30, 2013* (the date on which

the ad about Ms. Doe allegedly was posted). Compl. ¶¶ 96-97. Ms. Doe filed the Complaint on *February 7, 2017*—almost two years too late. Nor can Plaintiffs salvage this by relying on a theory of subsequent publications or continuing publication. *See* Compl. ¶ 121 (alleging Defendants "failed to remove the defamatory matter"). Under Florida's single publication rule, the two-year statute of limitations runs from date of first publication—*not* a subsequent publication or subsequent discovery of alleged defamatory matter. *See* Fla. Stat. § 770.07; *Wagner, Nugent v. Flanagan*, 629 So. 2d 113 (Fla. 1993). This claim must, therefore, be dismissed. *See, e.g.*, *LaGrasta v. First Union Secs., Inc.*, 358 F.3d 840 (11th Cir. 2004).

### D. Other Claims Based on Publication of the Ad are Barred by the Single Action Rule.

Plaintiffs' other causes of action predicated on the same allegations as the defamation claim (*i.e.*, the allegedly defamatory posting of the ad concerning Ms. Doe), also fail under Florida's "single action rule." *See Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983); *Fridovich v. Fridovich*, 598 So. 2d 65, 69-70 (Fla. 1992). The rule "prevents [a plaintiff from] circumventing the short two-year statute of limitations by re-describing a slander action to fit a different category of intentional wrong." *Kamau v. Slate*, 2012 WL 5390001, at *7 (N.D. Fla. Oct. 1, 2012), *adopted*, 2012 WL 5389836 (N.D. Fla. Nov. 5, 2012). For example, a claim for defamation "cannot be re-characterized in additional, separate counts" including "intentional infliction of emotional distress" where "the claim arises from the same publication." *Id. See also Trujillo v. Banco Cen. Del Ecuador*, 17 F. Supp. 2d 1334, 1339-40 (S.D. Fla. 1998) (dismissing false light invasion of privacy claim based on single action rule, even though defamation claims survived dismissal). In this case, Plaintiffs' claims for false light invasion of privacy (*see* Compl. ¶ 132), outrage (*id.* ¶ 126),

right of publicity (*id.* ¶¶ 131, 136), conspiracy (*id.* ¶ 141), and negligence (*id.* ¶ 146), all are predicated on the same facts as Ms. Doe's defamation claim, and must be dismissed under the single action rule.

###### E.    The Civil Conspiracy Claim Fails.

Plaintiffs also fail to plead a cognizable claim for civil conspiracy (Compl. Count VI). "A civil conspiracy requires: (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, 2010 WL 1408391, at *23-24 (M.D. Fla. Apr. 6, 2010), *aff'd*, 451 F. App'x 862 (11th Cir. 2012) (quotation marks and citation omitted). The Complaint falls far short of these basic requirements.

Plaintiffs rest on the vague allegation that "Defendants had an agreement between themselves and an agreement with trafficker co-conspirators to traffic children and coerced adults." Compl. ¶ 140. But they never identify the "who, what, when, where, and how" of this supposed agreement. While the Complaint dubs various third-parties who allegedly committed sex crimes Defendants' "co-conspirators," *see id.* ¶¶ 90-93, Plaintiffs make no effort to identify any specific "agreement(s)" between Defendants and these alleged co-conspirators. Such "[c]onclusory allegations of an agreement are not sufficient to state a cause of action for conspiracy." *Pierson*, 2010 WL 1408391, at *23-24; *accord Bankers Life Ins. Co. v. Credit Suisse First Boston Corp.*, 2008 WL 1817294 (M.D. Fla. Apr. 22, 2008). Thus, even setting aside Section 230, the allegations of civil conspiracy—which are in any event utterly false—must be dismissed.

### F.     The Section 1591 Claim Fails.

For similar reasons, Ms. Doe's claim under 18 U.S.C. § 1591 fails.  Ms. Doe alleges that Backpage is liable for violating that statute because it knowingly posted the ad concerning her.  *See* Compl. ¶¶ 117-118.  But, as the government has acknowledged in another case involving Backpage, "[e]ven if an advertisement for illegal sex trafficking appeared on [its] website, [Backpage] could not be convicted under [Section 1591] without proving that *[it] knew that the advertisement at issue* related to illegal sex trafficking of a minor or of a victim of force, fraud, or coercion."  DOJ's Reply in Support of Motion to Dismiss at 7-8 ("DOJ Brief"), *Backpage.com, LLC v. Lynch*, No. 1:15-2155(RBW), ECF No. 13 (DDC); *accord Backpage.com, LLC v. Lynch*, 2016 WL 6208368, at *9 (D.D.C. Oct. 24, 2016).  Here, the Complaint contains no plausible allegation that, of the millions of ads posted on Backpage.com each month (*see supra* at 4), Defendants saw the ad concerning Ms. Doe and specifically knew it "related to illegal sex trafficking of a minor or of a victim of force, fraud, or coercion," DOJ Brief at 7-8.  Lacking the requisite allegations of scienter, this claim, too, must be dismissed.

### CONCLUSION

Consistent with Congress' binding policy judgment in Section 230 that "plaintiffs may hold liable the person who creates or develops [the] unlawful content, but not the interactive computer service provider who merely enables that content to be posted online," *Nemet Chevrolet*, 591 F.3d at 254, this Court should dismiss the Complaint in its entirety.

Dated:  May 5, 2017

Respectfully submitted,

_____

Lawrence G. Walters
Florida Bar No.: 0776599
**Walters Law Group**
195 W. Pine Ave.
Longwood, FL 32750-4104
Telephone: (407) 975-9150
Facsimile: (407) 774-6151
Email: Larry@FirstAmendment.com
Email: Paralegal@FirstAmendment.com

Robert Corn-Revere *(pro hac vice)*
*Lead Trial Counsel*
Ronald G. London *(pro hac vice)*
**Davis, Wright, Tremaine LLP**
1919 Pennsylvania Ave. NW, Suite 800
Washington, D.C. 20006
Telephone: (202) 973-4200
Facsimile: (202) 973-4499
Email: bobcornrevere@dwt.com
          ronnielondon@dwt.com

Attorneys for Defendants

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed through the CM/ECF system on May 5, 2017, which will serve a copy by email on the following: Karen C. Dyer, Esq., kdyer@bsfllp.com, Boies, Schiller, Flexner, LLP, 121 South Orange Avenue, Suite 840, Orlando, FL 32801; David Boies, Esq., dboies@bsfllp.com, Boies, Schiller, Flexner, LLP, 333 Main Street, Armonk, NY 10504; Karen Chesley, Esq., kchesley@bsfllp.com, Boies, Schiller, Flexner, LLP, 575 Lexington Avenue, New York, NY 10022; Joanna Wright, Esq., jwright@bsfllp.com, Boies, Schiller, Flexner, LLP, 575 Lexington Avenue, New York, NY 10022. Notice will be provided via email to Alexander Boies, Esq. (aboies@bsfllp.com), Boies, Schiller, Flexner, LLP, 575 Lexington Avenue, New York, NY 10022, and via U.S. Mail to Penny Venetis, Esq., Legal Momentum, 16 East 34th Street, New York, NY 10016.

_____
Lawrence G. Walters

## Appendix A
## Allegations in This Case Compared With Allegations in *Doe No. 1 v. Backpage*

| *Florida Abolitionist and Doe v. Backpage.com et al.* | *Doe No. 1 et al. v. Backpage.com et al.* (D. Mass./1st Cir.) |
|---|---|
| "Because Backpage's profitability and survival depends on sex trafficking, it has created tools … to ensure that traffickers are not identified and apprehended by law enforcement." (Compl. ¶63.) | Backpage "assist[ed] in the crafting, placement, and promotion of illegal advertisements offering the plaintiffs for sale that would attract potential customers  yet escape detection by law enforcement." (Compl. ¶ 4.) |
| "Backpage's 'filter' is nothing more than a coaching mechanism intentionally designed by Backpage to facilitate and profit from sex trafficking." (Compl. ¶ 53.) | Backpage.com "attempts to essentially coach individuals about how to advertise the sale of sexual services and the exploitation of underage sex trafficking victims without including terms that will most likely trigger detection by law enforcement." (Compl. ¶ 57.) |
| "As a result of Backpage's actions, trafficking victims regularly report being sold in multiple states in a single day or week." (Compl. ¶ 62.) | Backpage "enables sellers to post advertisements in multiple cities and regions, allowing them to maximize profitability by traveling to the location with the highest amount of Backpage generated interest in their services." (Compl. ¶ 42.) |
| "[T]he Backpage website processes any photograph posted as part of an advertisement in the 'Adult Services' section and automatically strips it of all metadata." (Compl. ¶ 67.) | "The Backpage Defendants deliberately adjusted their server software, at additional expense, to delete the metadata on each uploaded photo." (Comp. ¶ 51.) |
| "Defendants also allow traffickers to evade law enforcement by allowing traffickers to post their phone numbers by spelling out the digits of their telephone numbers instead of using Arabic numbers…. Defendants designed its [*sic*] website so that sex traffickers would not have to verify the phone numbers they post in connection with an advertisement for a trafficked child or adult." (Compl. ¶¶ 68-69.) | "Backpage.com does not require phone number verification and allows posters to include phone numbers in obscured forms that include letters and numbers rather than strictly numeric characters." (Compl. ¶ 49.) |
| "Defendants knowingly advertised, and financially benefitted from, ventures that they know (a) involved a person under 18 years of age engaging in 'commercial sex acts' and (b) involved persons (including under the age of 18) engaging in 'commercial sex acts' as the result of force, threats of force, fraud, and coercion in violation of 18 U.S.C. § 1591." (Compl. ¶ 117.) | "The Backpage Defendants knowingly participated in and benefitted financially from the unlawful sexual exploitation suffered by the plaintiffs…. Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 are victims of child sex trafficking within the meaning of 18 U.S.C. § 1591." (Compl. ¶¶ 4, 109.) |
| "Traffickers are coached to use code words such as 'high schl' and 'brly legal' rather than words that would explicitly state that a child being trafficked is under [legal age]." (Compl. ¶ 49.) | "Despite creating the appearance that it prohibits certain transactions, Backpage.com allows a poster to include close synonyms and misspellings of the non-permitted terms after receiving the advisory 'Oops!' message. For example, rather than 'teenage' or 'schoolgirl,' the poster may include the terms 'girl,' 'young,' 'underage,' or 'fresh.' Similarly, while a poster may not include 'barely legal' or 'high school,' which are known to be code words for underage, Backpage.com permits 'brly legal' (as shown below) and 'high schl.'<br><br>By flagging certain terms for posters and allowing the |

**Appendix A**
**Allegations in This Case Compared With Allegations in *Doe No. 1 v. Backpage***

| | |
|---|---|
| | posters to adjust those terms and continue posting their advertisements, Backpage.com attempts to essentially coach individuals about how to advertise the sale of sexual services and the exploitation of underage sex trafficking victims without including terms that will most likely trigger detection by law enforcement."  (Compl. ¶¶ 56-57.) |
| "Backpage also provides a 'filter' for traffickers who attempt to include in the advertisement that the child being sold is under 18 years of age… Backpage allows traffickers to input a different age for the same person in the same advertisement repeatedly—with absolutely no form of age verification—until the trafficker inputs an age of 18 or older."  (Compl. ¶ 52.) | "Backpage.com also does not require any age verification to post an advertisement in the 'Escorts' section. While a poster must enter his or her age as part of the advertisement drafting interface prior to paying for and posting an advertisement in the 'Escorts' section, if the poster enters an age under 18, he or she receives a message that reads: 'Oops! Sorry, the ad poster must be over 18 years of age.' Then, no matter how many times the poster has entered an age under 18 along with other information necessary to complete the advertisement, the poster has the option to then enter an age above 18, but to otherwise use the same information entered previously, without being blocked from completing the advertisement."  (Compl. ¶ 48). |
| "Backpage enabled traffickers to pay for advertisements in a covert manner by permitting the use of prepaid credit cards that did not need to be linked to a name, address, or any other identifying information."  (Compl. ¶ 64.) | "Backpage.com allows users to pay for advertisements using prepaid credit cards that need not be linked to a name, address, or any other identifying information. This makes it more difficult to track these transactions, and allows users to maintain anonymity and evade law enforcement."  (Compl. ¶ 47.) |
| "Backpage emphasized its other anonymous payment options so that traffickers could pay to post their advertisements using the digital currency Bitcoin. Because Bitcoin is not linked to a bank and is largely untraceable, it allows traffickers to provide payment for advertisement enhancements without leaving any evidence of their identity."  (Compl. ¶ 65.) | "Backpage Defendants now accept Bitcoin as payment. Bitcoin is a digital currency that permits transactions to be completed without a bank. Backpage.com is the first adult website in the country to accept Bitcoin. The Backpage Defendants accept Bitcoin because they know that such payments are largely untraceable and therefore attractive to traffickers and other predators."  (Compl. ¶ 47.) |

4851-3617-7223v.5 -