Paul J. Cambria, Jr. (NY 15873, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:  (716) 855-1580
pcambria@lglaw.com

Erin E. McCampbell (NY 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:  (716) 855-1580
emccampbell@lglaw.com

*Attorneys for Defendant Michael Lacey*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | NO. CR-18-00422-PHX-SPL (BSB) |
| Plaintiff, | |
| vs. | DEFENDANT LACEY'S OPPOSITION TO GOVERNMENT'S MOTION TO DISQUALIFY HENZE COOK MURPHY PLLC |
| Michael Lacey, *et al.*, | |
| Defendants. | (Oral argument requested) |

The government has moved to disqualify the law firm of Henze Cook Murphy PLLC ("HCM") from any further representation of Michael Lacey on the basis of HCM's prior representation of Carl Ferrer, whom the government intends to call as a witness against Mr. Lacey in the instant prosecution ("Government's Motion"). (Doc. 118.) Mr. Lacey, by and

through Paul J. Cambria, Jr., files the instant memorandum in opposition to the Government's Motion.  This Court should deny the Government's Motion because Mr. Ferrer waived his attorney-client privilege with respect to HCM and has declined to participate in the Government's Motion (which purportedly seeks to protect the duties HCM owes to him as a former client).  Further, even if Mr. Ferrer had not waived privilege, HCM has proposed a limited representation of Mr. Lacey which does not present an actual or potential conflict with HCM's prior representation of Mr. Ferrer.  The unique facts and circumstances of this case indicate that the government has failed to demonstrate that disqualification of HCM is necessary, let alone that "extreme circumstances" justify the government's interference with Mr. Lacey's Sixth Amendment right to counsel of choice.

## BACKGROUND

Attorneys Tom Henze and Janey Henze Cook of HCM have represented Mr. Lacey on personal and professional legal matters for over a decade.  Their institutional knowledge of Mr. Lacey's affairs and the company he co-founded, Backpage, LLC ("Backpage"), as well as their First Amendment expertise are invaluable to Mr. Lacey as he defends himself in the instant prosecution.  HCM is Mr. Lacey's counsel of choice on this prosecution and on most matters.  Mr. Lacey does not want to replace HCM as counsel on any matters for which HCM is representing him and, due to the government's pretrial seizure efforts, has no funds to retain replacement counsel.

In response to the Government's Motion, HCM met with the government and proposed a more limited representation of Mr. Lacey, which would include HCM's continued representation of Mr. Lacey on compliance with conditions of release, forfeiture, and unrelated

personal matters.   The government declined to stipulate to HCM's proposed, limited representation of Mr. Lacey.

In light of this impasse, the undersigned provided independent counsel to Mr. Lacey on his potential conflict with HCM.   Mr. Lacey understands that HCM cannot participate in his defense at trial because HCM could not cross-examine Mr. Ferrer, while at the same time, the failure to do so would constitute a failure to effectively defend him against the government's charges.   Nonetheless, Mr. Lacey wants HCM to continue their representation of him on compliance with conditions of release, forfeiture, and personal matters as his counsel of choice on those matters.   Mr. Lacey has waived any conflict with respect to HCM's representation of him on those matters as evidenced in his declaration.   (A true and correct copy of Mr. Lacey's written waiver is attached hereto as Exhibit A.)

Mr. Lacey respectfully requests that this Court to deny the Government's Motion to the extent that it would interfere with the proposed, limited representation by HCM on compliance with conditions of release, forfeiture, and unrelated personal matters.   Under this proposed, limited representation, Mr. Lacey will continue to benefit from HCM's institutional knowledge of his business and professional affairs; however, HCM's representation would not involve acting as trial counsel or sharing any confidential information with Mr. Lacey's trial counsel in this prosecution, including the undersigned.

The government has no ground for seeking disqualification of HCM's proposed, limited representation of Mr. Lacey.   Although it is not stated in the Government's Motion, it is possible that the government believes that HCM has provided or will provide the undersigned with privileged information Mr. Ferrer disclosed to HCM during its prior representations of him.   Rest

assured, there is no risk of such disclosures.  HCM has indicated that it will not provide such information to the undersigned.  Our firms are separate and our representation of Mr. Lacey in this prosecution involves little overlap on the substantive issues of the government's case.  For example, HCM has been instrumental in providing detailed information about Mr. Lacey's assets to the undersigned in connection with the government's wholesale pretrial seizure of Mr. Lacey's assets to enable defense counsel to evaluate whether the particular seizures at issue were appropriate under the law.  None of the communications between HCM and the undersigned on this issue have had anything to do with Mr. Ferrer.

**ARGUMENT**

The Sixth Amendment guarantees the right to assistance of counsel in a trial for any serious crime. *See Gideon v. Wainwright*, 372 U.S. 335, 343 (1963). A critical element of that assistance is "the right of the defendant who does not require appointed counsel to *choose who will represent him.*" *United States v. Gonzalez-Lopez,* 548 U.S. 140, 144 (2006) (emphasis added).  For this reason, when "the right to be assisted by counsel of one's choice is wrongly denied . . . it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation." *Id.* at 148.

The right to counsel of one's choice is not absolute; however, it is well-settled that a court analyzing a motion for disqualification must start with a "presumption in favor of petitioner's counsel of choice," which can be overridden only by an actual conflict of interest or a serious potential for conflict. *Wheat v. United States*, 486 U.S. 153, 159, 164 (1988).  Because of the potential for abusive tactics, the Ninth Circuit has cautioned courts to review motions for disqualification brought by opposing counsel with "particularly strict scrutiny." *Optyl Eyewear*

4

*Fashion Int'l Corp. v. Style Cos., Ltd.*, 760 F.2d 1045, 1050 (9th Cir. 1985). The risk of abusive use of disqualification by the government in a criminal prosecution is particularly troubling, as the Supreme Court has recognized that, under the guise of the integrity of the courts, the government "may seek to 'manufacture' a conflict in order to prevent a defendant from having a particularly able defense counsel at his side." *Wheat*, 486 U.S. at 163.

In light of the risk of abusive use of disqualification of defense counsel on the grounds of concern for the integrity of the courts, the Ninth Circuit has explained that "the government bears a heavy burden of establishing that concerns about the integrity of the judicial process justify the disqualification." *United States v. Washington*, 797 F.2d 1461, 1465 (9th Cir. 1986). Similarly, the Arizona Supreme Court has cautioned that "[o]nly in extreme circumstances should a party to a lawsuit be allowed to interfere with the attorney-client relationship of his opponent." *Alexander v. Superior Court*, 141 Ariz. 157, 161 (1984) (citations omitted).

Against the backdrop of this fundamental constitutional right, essential to an effective defense, the Government has moved for disqualification of HCM under Rule 1.9 of the Arizona Rules of Professional Conduct. (*See* Gov't's Mot. Doc. 118 at 8.)[1] Rule 1.9 governs a lawyer's responsibility to former clients, protecting former clients from disclosure or use of confidential information in the course of a representation of a current client "in the same or substantially

---

[1]      It does not appear that the government has moved for disqualification of HCM under Rule 1.7 because that rule addresses concurrent conflicts, which are not applicable to HCM's prior representation of Mr. Ferrer. Indeed, HCM concluded its representation of Mr. Ferrer in October 2017.

related matter in which [the current client's] interests are materially adverse to the interests of the former client."[2]

As the foregoing demonstrates, the government has failed to demonstrate "extreme circumstances" meriting its attempt to interfere with Mr. Lacey's Sixth Amendment right to counsel of choice under Rule 1.9.

**I.      HCM is Mr. Lacey's counsel of choice on certain issues in this prosecution and on other, unrelated matters.**

HCM is Mr. Lacey's counsel of choice on compliance with conditions of release and forfeiture issues in this prosecution, as well as unrelated personal matters. HCM's institutional knowledge of Mr. Lacey's personal affairs, which is at the heart of HCM's representation of Mr. Lacey on these issues, is irreplaceable. HCM's knowledge was gained through over a decade of representation of Mr. Lacey with respect to his personal and commercial interests, as well as representation of his family in personal matters. Mr. Lacey has waived any potential conflict with respect to HCM's continued representation of him on these isolated matters. (*See* Ex. A.)

---

[2]      In greater detail, Rule 1.9 states:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

\* \* \*

(c) A lawyer who has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

It would be fundamentally unfair and cause an undue hardship to Mr. Lacey and his family, if he is required to find new counsel on these isolated matters, unrelated to the merits of the government's case.  Moreover, Mr. Lacey would struggle to retain new counsel on these matters because the government's pretrial restraint of his assets has rendered Mr. Lacey unable to meet basic financial obligations regarding his living expenses, let alone sufficient funds to retain new counsel.

**II.     Mr. Ferrer waived the right to challenge any potential conflict regarding HCM's continued representation of Mr. Lacey when he waived his attorney-client privilege with HCM in writing in his proffer agreement.**

Critical to the government's efforts to purportedly protect Mr. Ferrer's interests with respect to HCM under Rule 1.9, conflicts arising under Rule 1.9 are waivable through "informed consent, confirmed in writing."  RPC 1.9(a).  Mr. Ferrer has done just that.

On April 5, 2018, Mr. Ferrer signed a proffer agreement.  (A true and correct copy of the proffer agreement is attached hereto as Exhibit B.)  In the proffer agreement, Mr. Ferrer waived any conflict arising out of HCM's personal or professional representation of him by virtue of his waiver of "all claims of attorney-client privilege" as to all of his former attorneys except with respect to his "current attorneys, Nanci Clarence, Jonathan Baum and anyone working on their behalf."  (Ex. B ¶ 2.)  Mr. Ferrer's blanket waiver as to privilege with respect to HCM, alone, should result in the denial of the Government's Motion because Mr. Ferrer would have no basis to complain about the potential risk of use of privileged information when he, himself, has disclaimed, in writing, any privilege with HCM.[3]

---

[3]     Further, Mr. Ferrer's communications with HCM were also pursuant to a joint-defense agreement, which can be provided to the Court *in camera*, if needed.

Moreover, it cannot be underscored enough that Mr. Ferrer declined to participate in the Government's Motion as the government conceded in its May 14, 2018 letter to Mike Piccarreta. (A true and correct copy of the Government's May 14, 2018 Letter is attached hereto as Exhibit C.) If Mr. Ferrer was at risk for a legitimate breach of the duties owed to him by HCM under Rule 1.9, he could have joined in the Government's Motion to protect his interests. Instead, he declined the government's offer to safeguard his rights under Rule 1.9. His failure to join the Government's Motion strongly suggests the government is seeking disqualification for its own tactical reasons.

**III.    The proposed limited role for HCM's representation of Mr. Lacey presents no actual or potential conflict that would run afoul of Rule 1.9.**

HCM has proposed to limit its representation of Mr. Lacey in a manner that presents no actual or potential conflict with its prior representation of Mr. Ferrer under Rule 1.9. With respect to the instant prosecution, HCM intends to limit the scope of its representation of Mr. Lacey to assisting Mr. Lacey with compliance with this Court's conditions of release, and any forfeiture issues. This aspect of HCM's representation in this prosecution is personal to Mr. Lacey and cannot be said to be "materially adverse" to Mr. Ferrer or related to the allegations Mr. Ferrer made against Mr. Lacey during his plea allocution.

With respect to HCM's continued representation of Mr. Lacey on personal matters unrelated to the instant prosecution, there can be no credible claim that this representation violates Rule 1.9.

Separate and apart from the fact that these limited representations do not involve an actual conflict or pose the risk of a potential conflict, HCM has indicated that it has

8

established a screen to prevent disclosure of any purportedly privileged information regarding Mr. Ferrer from being disseminated to Mr. Lacey's defense counsel in this prosecution (even though Mr. Ferrer has waived privilege in writing). Critically, an attorney's good faith statement that he or she has erected and will abide by a screen is sufficient to dispel any concerns about disclosure of confidential communications. *See United States v. Caramadre*, 892 F. Supp. 2d 397, 405 (D.R.I. 2012) (rejecting the government's argument that an attorney's erection of a screen, and statement that he would comply with the screen was insufficient to fend off disqualification because "[w]ithout evidence to the contrary, this Court will rely upon the good faith and judgment of counsel"); *see also United States v. Lorenzana-Cordon*, 125 F. Supp. 3d 129, 136-39 (D.C.D.C. 2015) (denying government's motion to disqualify defense counsel because defense counsel erected an ethical screen and based on the court's knowledge of counsel's practice and integrity, the screen was sufficient to dispel any concerns about counsel's intentional or unintentional disclosure of confidential information to the attorney cross-examining counsel's former client).

Further, HCM has stated that it will not participate in any aspects of the instant prosecution other than compliance with conditions of release and forfeiture, which means that HCM will not be involved with the merits of the instant prosecution or the preparation for or cross-examination of any of the government's witnesses. These limitations on HCM's representation make it clear that there will be no actual or potential conflict with Mr. Ferrer rendering the Government's Motion insufficient.

Finally, the government's conclusory concerns about the integrity of the judicial system are insufficient to justify disqualification of Mr. Lacey's counsel of choice, HCM. As the Ninth Circuit has recognized:

> It is easy to express vague concerns about public confidence in the integrity of the judicial process. It is quite a different matter to demonstrate that public confidence will in fact be undermined if criminal defendants are permitted to retain lawyers who worked for the government in the field of law implicated by an indictment. We are unwilling to sacrifice a defendant's Sixth Amendment right to counsel of his choice on such an unsubstantiated premise.

*Washington*, 797 F.2d at 1466 (vacating conviction and remanding for reconsideration of the government's motion for disqualification).

## IV.   None of the cases upon which the government relies support disqualification under these circumstances.

The government has not provided this Court with a single case that supports disqualification of HCM under these unique facts and circumstances. None of the cases in which the government has prevailed on disqualification of defense counsel on the basis of defense counsel's prior representation of a government witness involved that witness's blanket waiver of privilege in writing.

Further, each of the cases cited by the government supports disqualification of criminal defense attorneys from appearing as trial counsel due to the expected participation of former clients as cooperators when the attorney or firm at issue would be involved in *cross-examination* of the former client(s). Here, HCM has stated that it will not participate in the trial of the instant action, nor will HCM provide any privileged information gained through its prior representation of Mr. Ferrer to Mr. Lacey's trial counsel. The government has not provided any cases that

result in the duty to a former client trumping a current client's Sixth Amendment right to counsel of choice under these circumstances.

For example, in *United States v. Ross*, 33 F.3d 1507 (11th Cir. 1994), the defendant retained an attorney at a law firm which, in the past, had represented one of the key prosecution witnesses on similar charges. *See id.* at 1522. The Eleventh Circuit explained that "if the conflict could cause the defense attorney to use privileged communications in cross-examination, then disqualification is appropriate." *Id.* at 1523. In finding that "there were actual, and potential, conflicts that could have impeded the trial," the Court focused on issues that might arise during examination at trial. *See id.* Under this standard, the Court concluded that potential questioning of the government's witness about a prior retainer payment he made to the defense attorney "would have opened the door to potential conflict" because that questioning would have been necessary to an effective defense of the current client but would have violated the duty of confidences and loyalty to the prior client, the government witness. *See id.* Critically, the Court's decision turned on the fact that the attorney's effective cross-examination of the government's witness would have turned a potential conflict into an actual conflict. *See id.*

*United States v. Moscony*, 927 F.2d 742 (3d Cir. 1991) is equally unavailing to the Government's Motion. In that case, defense counsel had represented several employees from the same company, including the defendant, on RICO and fraud charges related to operation of defendant's real estate business. *See id.* at 747. Prior to trial, the government moved for disqualification of defense counsel on the ground that two of its witnesses, employees of the same company as defendant whom had been represented by the attorney, would be called as witnesses against the defendant. *See id.* The Third Circuit noted that "an attorney who cross-

examines former clients inherently encounters divided loyalties," and that defendant's counsel could not cross-examine the former clients "without revealing information 'relating to' his representation of them." *Id.* at 750. Again, the Court's determination that disqualification was appropriate turned on the actual conflict that would arise when the attorney cross-examined his prior clients.

Similarly, *United States v. Williams*, 81 F.3d 1321 (4th Cir. 1996) lends no support to the Government's Motion regarding disqualification of HCM. In that case, the attorney at issue had been retained, previously, by the defendant's girlfriend; however, the government declined to charge the girlfriend, and, instead, sought indictment of the defendant. *See id.* at 1322-23. Citing *Ross*, the Fourth Circuit explained that "the lawyer would have faced exactly the same potential conflict that properly concerned the *Ross* court." *Id.* at 1325. Further, the Court declined to endorse the retention of auxiliary counsel for the purpose of cross-examining the government's witness, the girlfriend, because the risk of potential conflict remained too great to allow the continued representation. Again, in this case, there is no risk of potential conflict involving cross-examination of Mr. Ferrer because HCM will not serve as trial counsel and will not share any privileged or confidential information obtained from Mr. Ferrer with Mr. Lacey's trial counsel.

In *United States v. Alfonzo-Reyes*, 592 F.3d 280 (1st Cir. 2010), cited by the government, the defendant's attorney had previously represented a government witness who was scheduled to testify at trial. See id. at 293. The court found that the attorney's "representation may have placed her in the position of having to cross-examine her former client, a witness with whom she shared confidences protected by attorney-client privilege." Id. at 294. Here, no such risk

exists because HCM will not appear as trial counsel and there is no possibility, even remote, that attorneys from HCM will cross-examine Mr. Ferrer at trial.

In an attempt to bolster its disqualification motion on the basis of future appellate concerns, the government cites two cases in which neither the government nor a witness raised disqualification pre-trial, but an appellate court reversed the convictions due to ineffective assistance of counsel because trial counsel labored under a conflict. (*See* Gov't's Mot. at 13-14 (citing *United States v. Iorizzo*, 786 F.2d 52 (2d Cir. 1986), and *United States v. Henke*, 222 F.3d 633 (9th Cir. 2000).)  Those cases are readily distinguishable because Mr. Lacey has retained *independent* trial counsel for this prosecution.  Indeed, the undersigned has had no prior contact with Mr. Ferrer.

## CONCLUSION

In sum, there will be no actual or potential conflict with HCM's continued representation of Mr. Lacey in the limited, proposed capacity because there is no potential for HCM's cross-examination of Mr. Ferrer and no potential for HCM's conveyance of privileged information obtained from representation of Mr. Ferrer to Mr. Lacey's defense counsel in this action.  Even if there was a risk of conflict, Mr. Ferrer waived pursuit of the conflict in writing.  Tellingly, Mr. Ferrer declined to participate in the Government's Motion.  Under these circumstances, disqualification is not only improper, but has been deployed as an abusive tactic, which this Court should reject.

Mr. Lacey respectfully requests that this Court deny the Government's Motion and allow HCM to continue representing him in the proposed capacity as his counsel of choice.  The

government has presented no facts or law that support a contrary ruling and his Sixth Amendment rights would be eviscerated by disqualification of HCM.

RESPECTFULLY SUBMITTED this 6th day of June, 2018,

/s/     *Paul J. Cambria, Jr.*
LIPSITZ GREEN SCIME CAMBRIA LLP
Attorneys for Defendant Michael Lacey

On June 6, 2018, a PDF version
of this document was filed with
Clerk of the Court using the CM/ECF
System for filing and for Transmittal
Of a Notice of Electronic Filing to the
Following CM/ECF registrants:

Dominic Lanza, dominic.lanza@usdoj.gov
Kevin Rapp, kevin.rapp@usdoj.gov

**EXHIBIT A**

## <u>DECLARATION OF MICHAEL LACEY</u>

I, Michael Lacey, declare:

1. I am a defendant in the above captioned matter.

2. My lead trial counsel in this matter is Paul Cambria of the Buffalo, New York law firm of Lipsitz Green Scime Cambria.

3. I am also represented in this matter by Tom Henze and Janey Henze Cook of Henze Cook Murphy, a Phoenix, Arizona law firm.

4. I understand that Tom and Janey previously represented a non-party to this case, Carl Ferrer, who was the CEO of Backpage.com, a company I co-founded.

5. I further understand that Mr. Ferrer has pled guilty to crimes related to his work for Backpage.com, is cooperating with the Government, and is likely to be a witness in this case.

6. I have discussed with Mr. Cambria my understanding of Tom and Janey's prior representation of Mr. Ferrer and the issues raised by that representation.

7. Mr. Cambria explained the potential risks of Tom and Janey continuing to represent me in a limited capacity notwithstanding their previous representation of Mr. Ferrer. In particular, we discussed the fact that Tom and Janey would not be able to reveal any confidences of Mr. Ferrer, would not be able to cross examine Mr. Ferrer or others in the trial, and could only represent me in a limited capacity, specifically on forfeiture matters, limited administrative matters, and with respect to conditions of my pretrial release.

8. I understand that Tom and Janey owe continuing duties to Mr. Ferrer, as their former client.

9. I continue to want to be represented by Tom and Janey after having thoroughly discussed the matter with Mr. Cambria and considered my alternative options.

10. I would like the court to understand why I want Tom and Janey to be part of my legal team. Because of my former co-ownership of the controversial website, Backpage.com, I have had to select a legal team for a complicated and seemingly endless courtroom battle.

11. I chose attorneys believing that in the face of threats at both the state and federal level, I would, at a minimum, choose who spoke on my behalf.

12. In the strongest terms possible, I would like the court to understand that I want Tom and Janey Henze. They are my family firm: the counseled my oldest son when his teenage years overtook him; they did the legal review of exposes I wrote about the notorious Maricopa County Sheriff, Joe Arpaio.  They bailed me out of jail when the Sheriff arrested me for articles I published about his ethical lapses. When the FBI arrested me, they swept up my wife's jewelry, jewelry she owned prior to our engagement, prior to our first date. Now the Henze's are also helping my wife.

13. When the State of California had a warrant out for my detention, the Henze's turned me over.

14. Now, I want Tom and Janey to be part of the legal team in the latest legal chapter.

15. The firm is also managing my assets and administering the paying of my bills. This is not a simple accounting task because the government seized my bank accounts.  They are the interface between creditors, on the one hand, and federal authorities on the other, all stakeholders in my financial affairs.

16. Finally, they not only have my confidence, they are friends. This is not a small point in a large confrontation.

17. I hereby give my written consent to Tom Henze and Janey Henze Cook representing me.

EXECUTED this 6 day of June , 2018.

Michael Lacey

# EXHIBIT B

## PROFFER/INTERVIEW AGREEMENT

The ground rules and conditions for any proffer/interview are set forth in this document, which is 3 pages.

The parties to this Agreement are the First Assistant United States Attorney through her Assistant U.S. Attorneys, Kevin M. Rapp, Dominic Lanza, Margret Perlmeter and Reginald Jones, Trial Attorney, Department of Justice, Kirsta Leeburg Melton, Assistant Attorney General, State of Texas, Randy Mailman, Deputy Attorney General, Office of the Attorney General, State of California, ("the Prosecution") and Carl Ferrer and Mr. Ferrer's counsel, Nanci Clarence and Jonathan Baum.

This Agreement binds the U.S. Department of Justice, and the Attorney Generals' Offices for the States of California and Texas.

1.  The purpose of any proffer/interview is to evaluate oral and written statements and proffered information given by Mr. Ferrer and his agents (including but not limited to his attorneys) concerning his involvement with Backpage.com and related entities. Mr. Ferrer agrees to proffer information or participate in any interview on an entirely voluntary basis. Mr. Ferrer also understands and agrees that he is not compelled in any way to participate in this interview.

2. Mr. Ferrer voluntarily waives all claims of attorney-client privilege, whether in his personal or official capacity as the Chief Executive Officer of Backpage.com, LLC as to communications with any attorney or law firm that represented Backpage.com, or any related entity, where such communications concerned or related to Backpage.com or any related entity. This waiver does not apply to Mr. Ferrer's current attorneys, Nanci Clarence, Jonathan Baum and anyone working on their behalf. Mr. Ferrer voluntarily agrees to provide all documents and other material that may be relevant to the investigation and that are in his possession or control. However, Mr. Ferrer shall not disclose any documents or information protected by the Joint Defense Agreement in this matter. Mr. Ferrer understands that his proffer/interview and any benefit he may receive from information he provides to the prosecution does not depend on his waiver of the attorney-client privilege.

3.  The agreement is explicitly contingent upon Mr. Ferrer providing truthful statements and truthful information.   In any interview or proffer, Mr. Ferrer and his agents will completely and truthfully answer all questions, will provide complete and truthful information relating to any and all matters, and will make no material misstatements or omissions of facts.   Mr. Ferrer further understands that he will neither attempt to protect any person or entity nor falsely implicate any person or entity, through false information or omission. Nevertheless, no truthful statements made by or truthful information provided by Mr. Ferrer or his agents during the interview, or otherwise proffered, will be used directly against Mr. Ferrer during any litigation or proceeding instituted by the Prosecution.   The Prosecution will be the ultimate arbiter of the truthfulness of any statement or information.

4. Nothing in paragraph 4 above, however, prevents the Prosecution from making derivative use of and pursuing any investigative leads (i.e. fruits) suggested by any statements made by or other information proffered or provided by Mr. Ferrer or his agents. In other words, except as expressly stated above, Mr. Ferrer understands and agrees that there are no limitations whatsoever on the use the Prosecution can make of the testimony and information provided in any interview or otherwise proffered by Mr. Ferrer or his agents, either orally or in writing, both before and after any interview of Mr. Ferrer. Mr. Ferrer expressly waives any right to challenge the derivative use of any statements or information provided during the interview or otherwise proffered by Mr. Ferrer or his agents. It is the intent of this agreement that such derivative use is proper and the Prosecution and Mr. Ferrer hereby agree that Federal Rule of Criminal Procedure 11(f), and Federal Rules of Evidence 408 and 410 and, do not govern such derivative use in any litigation or other proceedings. This provision is necessary to eliminate any need or argument for a *Kastigar* hearing at which the Prosecution would have to prove that the evidence it would introduce at trial, or any other proceedings, is not associated with or tainted by any statements made by or other information provided by Mr. Ferrer during any interview, or was otherwise proffered to the Prosecution by Mr. Ferrer or his agents.

5. If Mr. Ferrer is a witness at any trial or other proceeding relating to the information he provides to investigating agents, and offers testimony materially different from any statements or other information provided during the interview or otherwise proffered by Mr. Ferrer or his agents, the Prosecution may cross-examine witnesses (including Mr. Ferrer) and introduce rebuttal evidence concerning any statements or other information provided during any interview or otherwise proffered by Mr. Ferrer or his agents. In addition, the Prosecution reserves the right to prosecute Mr. Ferrer for perjury, false official statement or obstruction of justice to the fullest extent provided by law. If such a prosecution occurs, the Prosecution can use directly, and derivatively, in their case-in-chief, in cross-examination and in rebuttal, any statements and information provided by Mr. Ferrer, whether directly or indirectly through his agents, or derivatively linked to the statements and other information Mr. Ferrer or his agents supplied in any interview or other proffer by Mr. Ferrer or his agents. This provision is needed to ensure that Mr. Ferrer does not abuse the opportunity for an interview or proffer of information, does not make materially false statements to a government agency either orally or in writing (directly or indirectly), and does not commit perjury when testifying at trial or in any other legal proceeding

6. Mr. Ferrer understands that the law (specifically, *Brady v. Maryland*) requires that the Prosecution provide any person against whom charges are brought, all information which tends to mitigate or negate the person's guilt as to the offenses charged. Therefore, Mr. Ferrer understands that if *Brady* material is developed or produced from the interview or in any proffer, then the Prosecution would be required to disclose this information to the appropriate defendants and/or their attorneys at the time the obligation is imposed on the Prosecution. This provision is included to permit the Prosecution to comply with its discovery obligations and is not intended to discourage Mr. Ferrer from providing information to the Prosecution.

7. With the exception of providing required notice under the Joint Defense Agreement in this case, Mr. Ferrer will not, personally or through any other person (including but not limited to his attorneys), disclose the existence of this agreement or any interview or proffer, or anything otherwise said during the interview or proffered to the Prosecution, or any information relating to

Mr. Ferrer's cooperation with the Prosecution (except that if an attorney for another putative or actual defendant asks Mr. Ferrer's counsel or successors whether Mr. Ferrer is cooperating with the United States, counsel or successors may confirm the fact that Mr. Ferrer is cooperating, but will not disclose any other information about Mr. Ferrer's cooperation).

      8.  This document is the full and complete Agreement of the parties with regard to any interview or proffered information.  No other promises, representations or agreements have been made by or between the parties with regard to any proffer/interview or the underlying matters referenced in this written agreement. The parties shall at all times act in good faith to accomplish their intent in entering into this Agreement. Any dispute between the parties as to whether either party has failed to fulfill any of its obligations under this Agreement shall be submitted to and decided by the United States District Court for the District of Arizona.


AGREED:

ELIZABETH A. STRANGE
First Assistant United States Attorney

4/5/18
DATE

KEVIN M. RAPP
DOMINIC LANZA
MARGRET PERLMETER
Assistant U.S. Attorneys

DATE

REGINALD E. JONES, Trial Attorney
U.S. Department of Justice
Child Exploitation and Obscenity Section

4/5/18
DATE

KIRSTA LEEBURG MELTON
Assistant Attorney General,
Office of the Attorney General, State of Texas

4/5/18
DATE

RANDY MAILMAN,
Deputy Attorney General,
Office of the Attorney General, State of California

4/5/18
DATE

CARL FERRER

4/5/18
DATE

NANCI CLARENCE, ESQ.
JONATHAN BAUM, ESQ.

## WAIVER OF ATTORNEY CLIENT PRIVILEGE

I, Carl Ferrer, state the following in my capacity as sole owner and manager of Dartmoor Holdings LLC, which wholly owns and operates Backpage.com LLC (of which I am Chief Executive Officer), Website Technologies LLC, IC Holdings LLC, Posting Solutions LLC, and Postfaster LLC, hereafter referred to as "the Companies." I am authorized to waive each of the Companies' attorney-client privilege and am doing so because I believe executing such waiver is in each of the Companies' best interest.

I further state that, being represented by counsel and being fully advised as to this matter, I hereby voluntarily waive all aspects of the attorney-client privilege on behalf of the Companies, which otherwise may have applied to communications, documents and information that I or the Companies have provided to law enforcement or which law enforcement may already have in its possession from other sources, as follows:

a. All communications related to the "adult," "escort," "dating" and "services" sections of the Companies' websites, including but not limited to company policies, moderation practices, age verification practices, legality, content, and compliance with law enforcement.

b. All communications related to the Companies' financial activity, including but not limited to the sale of Backpage.com in 2015, all loans and financing agreements related to the sale of that company in 2015, monetization of the Companies' websites, payment processing, credit card processing, banking, and payment of loans.

c. All communications regarding the relationship between the Companies (including their current owner and employees) and their former owners and officers, including but not limited to, James Larkin, Michael Lacey, John ("Jed") Brunst and Scott Spear, as well as communications between the Companies (including their current owner and employees) and Don Bennett Moon.

I further state that, in addition to the foregoing waiver I hereby voluntarily waive, on behalf of the Companies, all aspects of the attorney-client privilege which otherwise may have applied to the Companies' relationship with any attorney ("previous attorneys") who was retained to represent the Companies in connection with various matters related to the subjects listed above. This attorney-client privilege waiver is meant to apply to all communications between the Companies and any attorney representing them at any time, all acts undertaken by others acting on the Companies' attorneys' behalf taken in connection with representing the

Companies related to the subjects listed above, and any and all documents generated through their representation of the Companies that belong to the Companies.

I further state that this waiver does not apply in any respect to any aspect of the Companies' representation by David Botsford of Botsford & Roark LLP, or to any aspect of my personal attorney-client relationship with attorneys who have represented me in the past or who currently represent me in an individual capacity, including, but not limited to, Nanci Clarence, Jonathan Baum and Shaneeda Jaffer of Clarence, Dyer & Cohen, and the Law Offices of E.G. Morris.

4/5/2018
DATED

Carl Ferrer

**EXHIBIT C**



**U.S. Department of Justice**

United States Attorney
District of Arizona

| | |
|---|---|
| Two Renaissance Square | Main: (602) 514-7500 |
| 40 N. Central Ave., Suite 1800 | Main Fax: (602) 514-7693 |
| Phoenix, AZ 85004-4408 | Direct Fax: (602) 514-7450 |

May 14, 2018

Mike Piccarreta, Esq.
Piccarreta Davis Keenan Fidel PC
2 East Congress Street, Suite 1000
Tucson, AZ 85701

<u>VIA EMAIL</u>

      Re:   *Your Letter of May 1, 2018*

Dear Mike:

      I wish to respond to a letter you sent on May 1, 2018, requesting the production of certain categories of documents. As an initial matter, and as discussed during our May 4 meeting, the relevance of the materials you are requesting is unclear. The motion pending before the Court seeks to determine whether the DWT and HCM law firms have a conflict of interest. The materials you have requested do not, in many instances, have any apparent connection to that topic. We are happy to provide additional consideration to your request if you can articulate why they might be subject to discovery under the relevant rules of criminal discovery.

      I would further note that it appears, based on the nature of your requests, that you believe it was improper for the United States to enter into a cooperation-based plea agreement with Mr. Ferrer because he was a member of a joint defense agreement ("JDA") and/or you suspect the United States has improperly obtained JDA-protected information from Mr. Ferrer. Through this letter, I wish to explain why neither premise is valid.

      The courts have recognized that a JDA participant must retain the ability to plead guilty and cooperate and that the government has a strong, legitimate interest in considering such requests. For example, in *United States v. LeCroy*, 348 F. Supp. 2d 375 (E.D. Pa. 2005), the court recognized that "[a] JDA is not an escape-proof prison" and that "the right of the grand jury to get the facts, and the right of [a JDA participant] to decide to cooperate with the grand jury, are paramount." *Id.* at 382, 386. The courts have further recognized that a JDA participant is free to disclose liability-generating matters in which he personally participated, even if those matters are also the subject of JDA-related sharing and discussion. *See, e.g., In re Grand Jury Subpoena*, 274 F.3d 563, 572 (1st Cir. 2001) ("[W]hat the parties call a 'joint

defense' privilege is more aptly termed the 'common interest' rule. Even when that rule applies, however, a party always remains free to disclose his own communication."); *United States v. Balsiger*, 2013 WL 3490873, *11 (E.D. Wisc. 2013) ("Balsiger and Currey cannot stop . . . another person . . . from waiving its privilege as to its own communications simply because the communication was shared with them or their counsel as part of the joint defense."); *United States v. Bekaert Steel Wire Corp.*, 1985 WL 25747, *3 (D. Md. 1985) (rejecting JDA-related claim where cooperator "Neri was not called before the grand jury to answer questions about what he may have learned through defense counsel; he was called to testify about events in which he had actively participated. . . . Neri participated in several meetings and had an ongoing relationship with the principals in the case for several years. It was that information that the government sought, not the substance of any communications between counsel.").

For these reasons, the courts have stated that, when engaging in cooperation-related discussions with a JDA participant, the government should simply take reasonable steps to prevent the receipt of any JDA-protected information. *See, e.g., United States v. Salvagno*, 306 F. Supp. 2d 258, 272-73 (N.D.N.Y. 2004). Here, the United States has taken extensive efforts to do so. The United States' first meeting with Mr. Ferrer did not take place until the morning of April 5, 2018. The proffer agreement (enclosed as Exhibit A) specifically stated that Mr. Ferrer should not discuss JDA-protected material, this instruction was reiterated on several occasions during the proffer, and Mr. Ferrer's attorneys have confirmed that no such material was discussed on April 5. The requirement not to disclose any JDA-protected material was also reiterated in the cooperation addendum to Mr. Ferrer's plea agreement (which is currently under seal but will be produced to you in the future), and Mr. Ferrer's counsel have confirmed that no JDA-protected material has been discussed during Mr. Ferrer's subsequent interviews by the government. Finally, the government also has not received a copy of the actual JDA or any other common interest agreement (we have avoided doing so, in an abundance of caution, precisely because we wish to avoid any grey areas).

Furthermore, even if (contrary to the government's best efforts) Mr. Ferrer had somehow disclosed JDA-protected information during his discussions with the government, the timing of his proffer undermines any claim of prejudice. As noted, the United States did not meet with Mr. Ferrer, or receive a proffer of information from Mr. Ferrer's counsel, until April 5, 2018. As a result, no information from Mr. Ferrer was used to obtain the March 28, 2018 indictment or obtain any of the search warrants in this case. Moreover, as you know from our extensive "reverse proffer" to you in December 2017, the theory underlying the indictment has long been transparent.

Courts have concluded that when (as here) the government establishes that it has taken steps to avoid the disclosure of JDA-protected information, the cooperator's counsel has averred that no such disclosure has occurred, and the defendant merely suspects (notwithstanding those avowals) that he was prejudiced by an improper disclosure, there is no entitlement to an evidentiary hearing. *See, e.g., United States v. Aulicino*, 44 F.3d 1102, 1117 (2d Cir. 1995) (affirming district court's denial of evidentiary hearing, where defendants

alleged that government had obtained JDA-protected information from a cooperator, because the "government presented evidence of the steps it took to insulate the [prosecutors] from any knowledge gained by [the cooperating witness] from his contact with the codefendants after he agreed to cooperate" and the defendants "did not present any evidence to suggest that [the cooperating witness] revealed any privileged information to the government"); *Salvagno*, 306 F. Supp. 2d at 272 ("[T]he court denies defendants' motion requesting an order directing an evidentiary hearing.   Defendants have failed to allege specific facts that indicate communication of privileged information to the Government and prejudice resulting therefrom.   Moreover, the government avers that it neither sought nor accepted any [such] information."); *United States v. Anderson*, 288 F.3d 335, 338 (7th Cir. 2002) (affirming denial of evidentiary hearing, where defendant alleged that cooperators shared privileged information with the prosecution, because the defendant had "not alleged with sufficient detail, definitiveness, or specificity" the privileged matters that were allegedly disclosed).

Finally, to the extent your letter reflects a belief that the government's decision to file the disqualification motion was somehow improper, that belief is incorrect.   The potential conflict-of-interest issues in this case did not even come to my attention until April 8, during a phone call with Mr. Larkin's former attorneys (who simply inquired if the government had any concerns about the anticipated representation arrangements in the case).   We did not initially recognize the seriousness of those issues, as evidenced by the fact that the government did not object when the HCM firm represented Mr. Lacey during various hearings on the week of April 9-13 or when various DWT lawyers filed notices of appearance during the week of April 9-13.

Once the conflict-of-interest issues became more apparent to us, we conducted legal research.   This research confirmed that the DWT and HCM firms were, in fact, laboring under deep conflicts of interest.   Nevertheless, due to the sensitivity of the issues, we sought to engage in a meet-and-confer process before filing anything with the Court.   Among other things, we mentioned our concerns to Mr. Cambria and Ms. Henze Cook during a phone call on April 23, sent an email to Mr. Cambria and Ms. Henze Cook on April 24 identifying the various cases and ethical rules supporting our concerns, and participated in a conference call with you and other members of the defense team on April 25.   During this call, we specifically asked if there were any written agreements in which Mr. Ferrer had agreed to waive the DWT and HCM firms' conflicts of interests so they could represent Messrs. Lacey and Larkin.   None were mentioned.

The case law makes clear that prosecutors should bring conflict-of-interest issues to the Court's attention as soon as they become apparent, and courts have faulted prosecutors (and reversed convictions) for failing to do so or waiting to do so until the eve of trial.   *See, e.g.*, *United States v. Iorizzo*, 786 F.2d 52, 59 (2d Cir. 1986) ("We add a final note.   The reversal here is the direct result of the prosecution's using defense counsel's conflict of interest as a means of affecting the evidence going before the jury instead of moving for his disqualification before the trial. . . .   We trust that this decision will ensure that a pretrial disposition of such issues will occur in the future."); *United States v. Henke*, 222 F.3d 633, 638 (9th Cir. 2000).

May 14, 2018
Page 4 of 4

That is simply what we have done here. Indeed, before filing the motion, the United States consulted with Mr. Ferrer's counsel, primarily to confirm that the factual representations contained in the motion were accurate. During these discussions, Mr. Ferrer's counsel stated that Mr. Ferrer did not wish to be a party to the motion. As a result, the United States filed the motion on its own behalf, in the interest of protecting the integrity of the trial. *See, e.g., United States v. Kight*, 2017 WL 4619024, *13 n.19 (N.D. Ga. 2017) ("[T]he Court rejects Kight's argument that the Government, without Lankford's permission, is precluded from seeking Armstrong's disqualification or that Lankford was required to join in the Government's Motion."); *United States v. Culp*, 934 F. Supp. 394, 399 (M.D. Fla. 1996) (granting government's disqualification motion and stating that defense counsel's "argument that the Government lacks standing to raise the issue of a potential conflict gives short shrift to the respective interests of the Government and the Court in ensuring that judgments remain intact on appeal. . . . [Counsel's] challenges to the Government's standing betray a conception of the interests at stake in this motion which is both unduly narrow and overly simplistic.").

Sincerely,

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*/s Kevin Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

KMR/zs