**EXHIBIT C**



**U.S. Department of Justice**

United States Attorney
District of Arizona

| | |
|---|---|
| Two Renaissance Square | Main: (602) 514-7500 |
| 40 N. Central Ave., Suite 1800 | Main Fax: (602) 514-7693 |
| Phoenix, AZ 85004-4408 | Direct Fax: (602) 514-7450 |

May 14, 2018

Mike Piccarreta, Esq.
Piccarreta Davis Keenan Fidel PC
2 East Congress Street, Suite 1000
Tucson, AZ 85701

<u>VIA EMAIL</u>

     Re:   *Your Letter of May 1, 2018*

Dear Mike:

     I wish to respond to a letter you sent on May 1, 2018, requesting the production of certain categories of documents. As an initial matter, and as discussed during our May 4 meeting, the relevance of the materials you are requesting is unclear. The motion pending before the Court seeks to determine whether the DWT and HCM law firms have a conflict of interest. The materials you have requested do not, in many instances, have any apparent connection to that topic. We are happy to provide additional consideration to your request if you can articulate why they might be subject to discovery under the relevant rules of criminal discovery.

     I would further note that it appears, based on the nature of your requests, that you believe it was improper for the United States to enter into a cooperation-based plea agreement with Mr. Ferrer because he was a member of a joint defense agreement ("JDA") and/or you suspect the United States has improperly obtained JDA-protected information from Mr. Ferrer. Through this letter, I wish to explain why neither premise is valid.

     The courts have recognized that a JDA participant must retain the ability to plead guilty and cooperate and that the government has a strong, legitimate interest in considering such requests. For example, in *United States v. LeCroy*, 348 F. Supp. 2d 375 (E.D. Pa. 2005), the court recognized that "[a] JDA is not an escape-proof prison" and that "the right of the grand jury to get the facts, and the right of [a JDA participant] to decide to cooperate with the grand jury, are paramount." *Id.* at 382, 386. The courts have further recognized that a JDA participant is free to disclose liability-generating matters in which he personally participated, even if those matters are also the subject of JDA-related sharing and discussion. *See, e.g., In re Grand Jury Subpoena*, 274 F.3d 563, 572 (1st Cir. 2001) ("[W]hat the parties call a 'joint

defense' privilege is more aptly termed the 'common interest' rule.  Even when that rule applies, however, a party always remains free to disclose his own communication."); *United States v. Balsiger*, 2013 WL 3490873, *11 (E.D. Wisc. 2013) ("Balsiger and Currey cannot stop . . . another person . . . from waiving its privilege as to its own communications simply because the communication was shared with them or their counsel as part of the joint defense."); *United States v. Bekaert Steel Wire Corp.*, 1985 WL 25747, *3 (D. Md. 1985) (rejecting JDA-related claim where cooperator "Neri was not called before the grand jury to answer questions about what he may have learned through defense counsel; he was called to testify about events in which he had actively participated. . . .  Neri participated in several meetings and had an ongoing relationship with the principals in the case for several years. It was that information that the government sought, not the substance of any communications between counsel.").

For these reasons, the courts have stated that, when engaging in cooperation-related discussions with a JDA participant, the government should simply take reasonable steps to prevent the receipt of any JDA-protected information.  *See, e.g., United States v. Salvagno*, 306 F. Supp. 2d 258, 272-73 (N.D.N.Y. 2004).  Here, the United States has taken extensive efforts to do so.  The United States' first meeting with Mr. Ferrer did not take place until the morning of April 5, 2018.  The proffer agreement (enclosed as Exhibit A) specifically stated that Mr. Ferrer should not discuss JDA-protected material, this instruction was reiterated on several occasions during the proffer, and Mr. Ferrer's attorneys have confirmed that no such material was discussed on April 5.  The requirement not to disclose any JDA-protected material was also reiterated in the cooperation addendum to Mr. Ferrer's plea agreement (which is currently under seal but will be produced to you in the future), and Mr. Ferrer's counsel have confirmed that no JDA-protected material has been discussed during Mr. Ferrer's subsequent interviews by the government.  Finally, the government also has not received a copy of the actual JDA or any other common interest agreement (we have avoided doing so, in an abundance of caution, precisely because we wish to avoid any grey areas).

Furthermore, even if (contrary to the government's best efforts) Mr. Ferrer had somehow disclosed JDA-protected information during his discussions with the government, the timing of his proffer undermines any claim of prejudice.  As noted, the United States did not meet with Mr. Ferrer, or receive a proffer of information from Mr. Ferrer's counsel, until April 5, 2018.  As a result, no information from Mr. Ferrer was used to obtain the March 28, 2018 indictment or obtain any of the search warrants in this case.  Moreover, as you know from our extensive "reverse proffer" to you in December 2017, the theory underlying the indictment has long been transparent.

Courts have concluded that when (as here) the government establishes that it has taken steps to avoid the disclosure of JDA-protected information, the cooperator's counsel has averred that no such disclosure has occurred, and the defendant merely suspects (notwithstanding those avowals) that he was prejudiced by an improper disclosure, there is no entitlement to an evidentiary hearing.  *See, e.g., United States v. Aulicino*, 44 F.3d 1102, 1117 (2d Cir. 1995) (affirming district court's denial of evidentiary hearing, where defendants

alleged that government had obtained JDA-protected information from a cooperator, because the "government presented evidence of the steps it took to insulate the [prosecutors] from any knowledge gained by [the cooperating witness] from his contact with the codefendants after he agreed to cooperate" and the defendants "did not present any evidence to suggest that [the cooperating witness] revealed any privileged information to the government"); *Salvagno*, 306 F. Supp. 2d at 272 ("[T]he court denies defendants' motion requesting an order directing an evidentiary hearing.   Defendants have failed to allege specific facts that indicate communication of privileged information to the Government and prejudice resulting therefrom.   Moreover, the government avers that it neither sought nor accepted any [such] information."); *United States v. Anderson*, 288 F.3d 335, 338 (7th Cir. 2002) (affirming denial of evidentiary hearing, where defendant alleged that cooperators shared privileged information with the prosecution, because the defendant had "not alleged with sufficient detail, definitiveness, or specificity" the privileged matters that were allegedly disclosed).

Finally, to the extent your letter reflects a belief that the government's decision to file the disqualification motion was somehow improper, that belief is incorrect.   The potential conflict-of-interest issues in this case did not even come to my attention until April 8, during a phone call with Mr. Larkin's former attorneys (who simply inquired if the government had any concerns about the anticipated representation arrangements in the case).   We did not initially recognize the seriousness of those issues, as evidenced by the fact that the government did not object when the HCM firm represented Mr. Lacey during various hearings on the week of April 9-13 or when various DWT lawyers filed notices of appearance during the week of April 9-13.

Once the conflict-of-interest issues became more apparent to us, we conducted legal research.   This research confirmed that the DWT and HCM firms were, in fact, laboring under deep conflicts of interest.   Nevertheless, due to the sensitivity of the issues, we sought to engage in a meet-and-confer process before filing anything with the Court.   Among other things, we mentioned our concerns to Mr. Cambria and Ms. Henze Cook during a phone call on April 23, sent an email to Mr. Cambria and Ms. Henze Cook on April 24 identifying the various cases and ethical rules supporting our concerns, and participated in a conference call with you and other members of the defense team on April 25.   During this call, we specifically asked if there were any written agreements in which Mr. Ferrer had agreed to waive the DWT and HCM firms' conflicts of interests so they could represent Messrs. Lacey and Larkin.   None were mentioned.

The case law makes clear that prosecutors should bring conflict-of-interest issues to the Court's attention as soon as they become apparent, and courts have faulted prosecutors (and reversed convictions) for failing to do so or waiting to do so until the eve of trial.   *See, e.g.,* *United States v. Iorizzo*, 786 F.2d 52, 59 (2d Cir. 1986) ("We add a final note.   The reversal here is the direct result of the prosecution's using defense counsel's conflict of interest as a means of affecting the evidence going before the jury instead of moving for his disqualification before the trial. . . .   We trust that this decision will ensure that a pretrial disposition of such issues will occur in the future."); *United States v. Henke*, 222 F.3d 633, 638 (9th Cir. 2000).

May 14, 2018
Page 4 of 4

That is simply what we have done here. Indeed, before filing the motion, the United States consulted with Mr. Ferrer's counsel, primarily to confirm that the factual representations contained in the motion were accurate. During these discussions, Mr. Ferrer's counsel stated that Mr. Ferrer did not wish to be a party to the motion. As a result, the United States filed the motion on its own behalf, in the interest of protecting the integrity of the trial. *See, e.g., United States v. Kight*, 2017 WL 4619024, *13 n.19 (N.D. Ga. 2017) ("[T]he Court rejects Kight's argument that the Government, without Lankford's permission, is precluded from seeking Armstrong's disqualification or that Lankford was required to join in the Government's Motion."); *United States v. Culp*, 934 F. Supp. 394, 399 (M.D. Fla. 1996) (granting government's disqualification motion and stating that defense counsel's "argument that the Government lacks standing to raise the issue of a potential conflict gives short shrift to the respective interests of the Government and the Court in ensuring that judgments remain intact on appeal. . . . [Counsel's] challenges to the Government's standing betray a conception of the interests at stake in this motion which is both unduly narrow and overly simplistic.").

Sincerely,

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*/s Kevin Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

KMR/zs