Lee Stein (#12368)
lee@mscclaw.com
Anne M. Chapman (#025965)
anne@mscclaw.com
Anna H. Finn (#026738)
afinn@mscclaw.com
MITCHELL | STEIN | CAREY | CHAPMAN, PC
One Renaissance Square
2 North Central Avenue, Suite 1450
Phoenix, AZ 85004
Telephone:  (602) 358-0292
Facsimile:   (602) 358-0291
Attorneys for Henze Cook Murphy, PLC

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | ) CR-18-00422-PHX-SPL (BSB) |
| Plaintiff, | ) |
| v. | ) **HENZE COOK MURPHY'S** |
| | ) **RESPONSE TO THE UNITED** |
| 1.  Michael Lacey, and | ) **STATES' MOTION TO DISQUALIFY** |
| 2.  James Larkin, | ) **COUNSEL** |
| Defendants. | ) [Oral Argument Requested] |

### Preliminary Statement

Entirely disqualifying Henze Cook Murphy ("HCM") would deprive Defendant Michael Lacey of his Sixth Amendment right to be represented by the counsel of his choice, namely lawyers who have a long and complex history of representing Mr. Lacey and his former company.  Mr. Lacey has been charged with very serious crimes and now more than ever, he needs the assistance of lawyers he trusts.  Depriving him of that assistance at the most critical time would deprive him of his Sixth Amendment rights. The courts have made clear that interfering with an accused's choice of counsel should

only be done as a last resort and that the courts should endeavor to reach a solution that is least burdensome upon the client or clients.[1] While it is true that HCM's former client Carl Ferrer has not consented to HCM's limited representation of Mr. Lacey, the role HCM proposes to play addresses all of the concerns embodied in ER 1.9, the ethical rule applying to former clients. Accordingly, the Government's Motion to Disqualify should be denied, and HCM should be permitted to continue to represent Mr. Lacey in the limited fashion described below.

**Background**

1. **Historical Representation of Mr. Lacey and His Companies**

Tom Henze and Janey Henze Cook are highly respected Arizona criminal defense lawyers and founding members of HCM.   Before starting HCM, they were both shareholders at the law firm of Gallagher & Kennedy, P.A. While at Gallagher & Kennedy, Mr. Henze and Ms. Henze Cook represented Mr. Lacey, his former companies The New Times, Village Voice Media, and Backpage.com, as well as Mr. Ferrer, the former CEO of Backpage.com.   Mr. Henze and Ms. Henze Cook represented Village Voice Media, the Phoenix New Times, Jim Larkin and Michael Lacey in matters wholly unrelated to Backpage.com.   In addition, Mr. Henze and Mr. Lacey have been personal friends for 35 years, a relationship grounded in mutual respect and trust.  Ms. Henze Cook was an intern at New Times as a teenager, and, together with her father, has represented Mr. Lacey and his companies in one capacity or another since she began practicing law in 2006.[2]

---

[1] *See United States v. Diozzi*, 807 F.2d 10, 12 (1st Cir. 1986); *Alexander v. Super. Ct.*, 141 Ariz. 157, 161, 685 P.2d 1309, 1313 (1984) (internal citations omitted). Disqualification motions should be subjected to "particularly strict judicial scrutiny." *Optyl Eyewear Fashion Int'l Corp. v. Style Cos.*, 760 F.2d 1045, 1050 (9th Cir. 1985) (internal citations omitted).

[2] Ms. Henze Cook was admitted to practice law in 2003.  From 2003-2004, she clerked for the Honorable Stephen M. McNamee in this district.  From 2004-2006 she clerked for the Honorable William Q. Hayes in the Southern District of California.  She joined Gallagher & Kennedy in October of 2006, and her first representation of Michael Lacey was in December of 2006.

Beginning in 2006, Mr. Henze and Ms. Henze Cook represented Mr. Lacey and the New Times, in connection with myriad matters.  The most notable representation started with a constitutional challenge to a state statute prohibiting the online publication of a law enforcement officer's address, under the vagueness doctrine and the First Amendment.  Amid litigation of that case, Messrs. Lacey and Larkin were arrested, which received widespread media attention and led to further litigation.[3]  The Henzes, and specifically Tom Henze, went on to play a major role in the settlement negotiations in the civil lawsuit against Maricopa County and Sheriff Arpaio arising out of the arrests.  Later, Tom Henze represented Lacey and Larkin in a formal interview by the Department of Justice relating to the Sheriff's actions in the above described case.  The defense of that case, which involved the extraordinary abuse of power by the then-sitting Maricopa County Attorney and Maricopa County Sheriff, fundamentally changed the relationship between Mr. Lacey and his counsel, Mr. Henze and Ms. Henze Cook.  After they saved Mr. Lacey from being jailed for exercising his First Amendment rights, Mr. Lacey developed a deep trust and confidence in Mr. Henze and Ms. Henze Cook that animates his desire to have them by his side as he once again faces great risk.

The Henzes' early representation of Mr. Lacey was not limited to issues pertaining to his newspaper.  On several occasions, the Henzes were retained to represent Mr. Lacey and his family members in various personal matters.  In some instances, the Henzes helped to retain and guide specialized counsel for Mr. Lacey and his family.   In other matters, the Henzes assumed total responsibility for the representations.  Through the Henzes' representation of the New Times and the personal representations, Mr. Lacey developed immense trust in the Henzes.  It was because of that trust that Village Voice Media asked the Henzes to represent Backpage.com.

---

[3] *See, e.g.*, Michelle Ye Hee Lee and Michael Kiefer, *Maricopa County supervisors settle lawsuits filed by 'New Times' founders, Stapley*, Ariz. Republic, Dec. 18, 2013 (available at http://archive.azcentral.com/news/politics/articles/20131218maricopa-county-supervisors-settle-lawsuit-new-times-founders.html), attached hereto as Ex. 1.

As part of that representation, in 2011, Mr. Lacey and Mr. Larkin, then owners of Backpage.com, hired the Henzes and other lawyers at Gallagher & Kennedy to advise them as to certain matters regarding Backpage.com.  That representation was not limited to a particular case; rather, it involved providing legal advice on a broad range of issues, including First Amendment law, criminal law, forfeiture, and the Communications Decency Act, 47 U.S.C. § 230.  The Henzes interacted with other Backpage counsel throughout the United States and worked on many projects in both the civil and criminal context.

In 2012, a grand jury sitting in the Western District of Washington issued a series of subpoenas related to Backpage.com.  Village Voice Media Holdings, which then owned Backpage.com, hired the Henzes to represent Mr. Ferrer in his corporate capacity as Chief Operating Officer of Backpage.   The parties entered into a joint defense agreement, and the Henzes worked closely with other counsel in challenging the subpoenas.  Notably, during the course of the proceedings, the court quashed all the subpoenas.  It was during this representation that the Henzes first met and represented Carl Ferrer.  After the conclusion of this representation, the Henzes continued to provide advice to Messrs. Lacey, Larkin, and Ferrer, Village Voice Media Holdings, and Backpage.com.

### 2.  Recent Representation of Mr. Lacey, Backpage.com, and Mr. Ferrer

By June of 2015, Mr. Lacey and Mr. Larkin no longer owned Backpage.com; however, the Henzes continued to represent Backpage.com on numerous matters. During the Henzes' representation of Backpage.com, they gave legal advice to Carl Ferrer, who had purchased Backpage.com and had become its CEO.  During this period, Mr. Henze and Ms. Henze Cook functioned principally as attorneys for Backpage.com, interacting primarily with the company's general counsel and sometimes providing advice to Mr. Ferrer in his role as CEO of the company.  HCM attorneys provided legal advice on all aspects of the company, from human resources issues to First Amendment research and advice.

Their representation of Backpage.com occurred in courts all over the country and regularly involved Mr. Henze and Ms. Henze Cook coordinating a team of lawyers, locating appropriate specialized and local counsel and overseeing complex and rapidly-evolving work.  When the company was involved in litigation, as it often was, Mr. Henze and Ms. Henze Cook assumed roles ranging from document management to coordination of other counsel to direct involvement in preparing for and defending depositions.  The Henzes worked very closely with the General Counsel and other Backpage.com personnel as necessary.

During this time period, the Henzes, and specifically Ms. Henze Cook, provided counsel to Mr. Lacey on a number of personal matters.  She essentially became Mr. Lacey's personal lawyer, assuming responsibility for a wide range of legal issues.  Ms. Henze Cook has advised Mr. Lacey on HOA matters, neighborhood disputes, insurance work, personal taxes, registration of vehicles and other MVD matters, as well as administrative matters pertaining to his assets and residences.  From time to time, Ms. Henze Cook was assisted by Mr. Henze and other counsel at HCM in these endeavors, and in some matters, Ms. Henze Cook retained specialized counsel for Mr. Lacey.  Ms. Henze Cook assisted with the acquisition of real estate, and obtained insurance coverage for his vehicles, homes, art collection, and family members.  In addition, Ms. Henze has advised Mr. Lacey with regard to banking issues.  She has also occasionally arranged for private investigator services for a wide-ranging set of questions.

Mr. Lacey relies on Ms. Henze Cook for legal and quasi-legal advice for virtually all aspects of his life, separate and apart from his prior ownership of Backpage.com.  Ms. Henze Cook is Mr. Lacey's "first phone call" on all matters legal and quasi-legal.  Through her representation of Mr. Lacey on administrative matters, including banking and insurance work, Ms. Henze Cook has gained a wealth of knowledge of Mr. Lacey's affairs.  More importantly, Ms. Henze Cook has gained Mr. Lacey's trust when it comes to the most personal aspects of his life.

### a. The California Case

In October of 2016, Mr. Ferrer, Mr. Lacey and Mr. Larkin were arrested in California in connection with an investigation into Backpage.com.  Mr. Henze helped arrange for retention of separate counsel for each defendant.  HCM worked with other attorneys on the representation of the defendants.  In the division of clients and labor, HCM took on primary responsibility for Mr. Ferrer, and it entered an appearance on his behalf in that case.  With the assistance of the Henzes, Mr. Ferrer retained Nanci Clarence and Jonathan Baum of Clarence Dyer & Cohen as his lead counsel in that case.  HCM assisted Ms. Clarence and gave advice to Mr. Ferrer personally, as well as in his capacity as CEO and owner of Backpage.com.

In addition to the representation of Mr. Ferrer, the defendants entered into a joint defense agreement, and HCM regularly performed tasks for each of the defendants in that case.  For example, HCM coordinated the posting of bond for Mr. Ferrer, Mr. Lacey and Mr. Larkin.  HCM performed other tasks for Mr. Lacey, including arranging for self-surrender, communicating with Mr. Lacey's family regarding his incarceration, and meeting with Mr. Lacey in jail in Sacramento.  They were also involved in Mr. Lacey's representation in that case by Lyn Agre, Mr. Lacey's California criminal counsel.  The Henzes provided Ms. Agre with background information and documents, gathered documents for tracing purposes, and generally assisted with client-related issues.  At all times during HCM's representation of Mr. Ferrer, a joint defense agreement was in place.

### b. The Arizona Case

On October 17, 2016, a grand jury sitting in this District issued a subpoena to Carl Ferrer and Backpage.com.  Along with other counsel, HCM represented both Backpage.com and Mr. Ferrer in challenging the subpoena. Again, this representation was pursuant to a written joint defense agreement.[4]  While Messrs. Lacey, Larkin, and Ferrer

---

[4] At the Court's request, HCM will provide the joint defense/common interest and confidentiality document for review *in camera*.

had their own defense counsel, the defense of the case was very much a group effort. Each of the parties were aligned with one another at that stage, and collaborative representation benefitted everyone. HCM worked closely with other counsel and performed many tasks for the benefit of Backpage.com and Messrs. Lacey, Larkin, Ferrer. On October 17, 2017, HCM withdrew from its representation of Backpage.com and Carl Ferrer.[5] As of that date, Mr. Ferrer and Backpage.com became former clients of the firm.

On April 5, 2018, Mr. Ferrer pled guilty in the instant prosecution. Critical to this Motion, Mr. Ferrer waived the attorney-client privilege personally and in his capacity as CEO of Backpage.com as to all lawyers who had worked on the Backpage.com matter, other than Nanci Clarence and Jonathan Baum of Clarence Dyer & Cohen in a written proffer agreement. Mr. Lacey was arrested on April 6, 2018, along with several other defendants. Mr. Ferrer was not arrested, and instead entered into a cooperation agreement with the Government. Mr. Ferrer is not a party to the instant prosecution.

The Henzes have provided assistance to Mr. Lacey in the Arizona case, including arranging for bail, providing background documents to Mr. Lacey's lead attorney, meeting with Mr. Lacey while he was incarcerated in Florence, Arizona, appearing on Mr. Lacey's behalf at the detention hearing, gathering data for Pretrial Services regarding assets, navigating banking and personal financial issues, and assisting with securing the return of specific property in the parallel forfeiture matter.

On April 5, 2018, Mr. Ferrer wrote to Mr. Henze stating that he had withdrawn from the joint defense agreement and returned a number of defense materials, as required by the terms of the JDA. Mr. Ferrer also wrote to HCM, asking that it comply with its ethical obligation under ethical Rule 1.9. To date, Mr. Henze and Ms. Henze Cook have not shared any confidential information about or from their former client Carl Ferrer with the other lawyers in this matter.

---

[5] HCM informed the Government of its withdrawal via email on October 24, 2017. On January 30, 2018, Ms. Henze Cook filed a Notice of Change in Counsel in California Case 16FE024013. On May 9, 2018, the Judge in *Backpage.com, LLC v. Dart* granted HCM's Motion to Withdraw.

In the Arizona case, Mr. Lacey is primarily represented by Paul Cambria of Lipsitz Green Scime Cambria.  Mr. Cambria's office is in Buffalo, New York.  Mr. Cambria will conduct all of the cross examination, including the cross examination of Mr. Ferrer, in this matter.  The lawyers at HCM have not shared any of Mr. Ferrer's confidences with Mr. Cambria and will not do so.  HCM has established a screen between itself and all other counsel on this matter.  In his role as lead counsel, Mr. Cambria's defense of Mr. Lacey will be made much more difficult if he is not assisted in at least a limited fashion by Mr. Henze and Ms. Henze Cook, given their long history with his client.

### c. *The Government's Motion to Disqualify HCM*

On April 25, 2018, the Government filed a Motion to Disqualify HCM and the law firm Davis Wright Tremaine.  Mr. Ferrer declined to join in the Government's Motion to Disqualify.  *See* Ex. 2, May 14, 2018 Letter from Kevin Rapp to Mike Piccarreta, at page 4 ("Mr. Ferrer's counsel stated that Mr. Ferrer did not wish to be a party to the motion."). HCM retained counsel to represent the firm[6] and on May 2, 2018, their counsel, Lee Stein, met with counsel from the Government, to explore a negotiated resolution of the disqualification of HCM that protected Mr. Lacey's Sixth Amendment rights as well as honored the firm's obligations to its former client, Mr. Ferrer.  During that meeting, the Government was willing to entertain HCM performing a limited role as counsel for Mr. Lacey, which was not adverse to Mr. Ferrer.  That discussion focused primarily on forfeiture and Mr. Lacey's compliance with release conditions.  Mr. Stein offered to provide the Government with more details as to the areas they believed were not adverse to Mr. Ferrer, which they did in a letter dated May 14, 2018.

After sending its letter regarding the role HCM hoped to play going forward, HCM became aware that Mr. Ferrer had waived his and Backpage.com's attorney-client privilege.  The waiver is contained in Mr. Ferrer's Proffer/Interview Agreement dated April 5, 2018. It reads:

---

[6] Mr. Henze and Ms. Henze Cook have also consulted with independent ethics counsel, Edward Novak of Polsinelli, P.C.

Mr. Ferrer voluntarily **waives all claims of attorney-client privilege, whether in his personal or official capacity as the Chief Executive Officer of Backpage.com, LLC** as to communications with any attorney or law firm that represented Backpage.com, or any related entity, where such communications concerned or related to Backpage.com or any related entity.  This waiver does not apply to Mr. Ferrer's current attorneys, Nanci Clarence, Jonathan Baum and anyone working on their behalf.[7]

*See* Ex. 2, May 14, 2018 Letter from Kevin Rapp to Mike Piccarreta, Exhibit A at page 1 (emphasis added).   On May 16, 2018, the Government notified Mr. Stein that, notwithstanding Mr. Lacey's Sixth Amendment right to counsel of his choice, the Government was no longer willing to agree to any role for HCM in the Arizona case.

**Argument**

HCM recognizes that Mr. Ferrer is a former client and that he has not consented in writing to HCM's representation of Mr. Lacey in this matter.   Nevertheless, by narrowly crafting HCM's representation of Mr. Lacey, HCM has ensured that its former client, Mr. Ferrer, will receive the benefit of ER 1.9.  In deciding whether to disqualify HCM from participating in the case in any capacity, the Court should consider the limited proposed role, Mr. Ferrer's waiver of the attorney-client privilege, the fact that Mr. Ferrer chose not to join the Government's Motion to Disqualify, HCM's long history of representing Mr. Lacey, and most importantly, Mr. Lacey's Sixth Amendment constitutional right to the counsel of his choice.  *See Research Corp. Tech., Inc. v. Hewlett-Packard Co.*, 936 F. Supp. 697, 703 (D. Ariz. 1996) (outlining factors to consider in ruling on a motion to disqualify).[8]

---

[7] By specifically excepting Mr. Ferrer's current counsel, who only ever represented him personally, from the waiver, it is clear that the waiver applies to communications with HCM, which represented Backpage.com as well as him personally.  Had Mr. Ferrer intended to exempt communications with HCM as well, HCM would have been identified like Nanci Clarence and Jonathan Baum were.

[8] Arizona law governs this Court's consideration of the disqualification motion.  *See Roosevelt Irr. Dist. v. Salt River Project Agr. Imp. & Power Dist*, 810 F. Supp. 2d 929, 944 (D. Ariz. 2011).

The Court should "endeavor to reach a solution that is least burdensome" on Mr. Lacey and permit Mr. Henze and Ms. Henze Cook to continue in the closely circumscribed manner outlined herein.  *See Alexander*, 141 Ariz. at 161, 685 P.2d at 1313.   Namely, HCM proposes to represent Mr. Lacey in the following closely circumscribed ways: (1) representation in the parallel forfeiture matter; and (2) assistance with compliance with his conditions of release.  In those narrow roles, HCM will not be acting in a manner that is materially adverse to Mr. Ferrer's interests, and the ethical screen put in place by the firm with respect to communications with the defense team will ensure that Mr. Ferrer's confidential communications with HCM are protected.

Mr. Lacey has a Sixth Amendment right to the counsel of his choice, and he wants HCM to continue in the limited role outlined above.  Mr. Lacey relies heavily on HCM to help him navigate this complicated and treacherous legal terrain.  He is 69 years old and is fighting for his life – a conviction in this case will likely result in a significant prison term and a forfeiture would likely leave him penniless.  He very much needs and wants to surround himself with counsel in whom he has confidence, who know him and who he is confident have his best interests at heart.  A core component of that team is the lawyers from HCM.  If there is a way to allow Mr. Lacey to receive the counsel of his choice without offending the principles underlying ER 1.9, the Court should do so. *See id.*

The Sixth Amendment guarantees the right to the assistance of counsel in a trial for any serious crime. *Gideon v. Wainwright*, 372 U.S. 335, 343 (1963).  An element of that right is "the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006).  Although the right to counsel of one's choice is not unlimited because conflicts of interest may circumscribe that right, courts recognize "a presumption in favor of petitioner's counsel of choice," overcome only by an actual conflict of interest or a serious potential for conflict. *Wheat v. United States*, 486 U.S. 153, 159, 164 (1988).  Moreover, as noted in *United States v. Locascio*, 357 F. Supp. 2d 536, 553 (E.D.N.Y.

2004), motions to disqualify opposing counsel are viewed with disfavor because they impinge on a defendant's rights to choose his own counsel and because of the strong potential for abuse.  Because of this, motions to disqualify "are subjected to particularly strict judicial scrutiny."  *Optyl Eyewear*, 760 F.2d at 1050 (internal quotation and citation omitted); *see also Alexander*, 141 Ariz. at 161, 685 P.2d at 1313 ("Only in extreme circumstances should a party to a lawsuit be allowed to interfere with the attorney-client relationship of his opponent.").

Cases examining the interplay between ER 1.9 (and analogues) and the Sixth Amendment focus on the purposes of the rule: (1) the risk of improperly using privileged or confidential client communications against a former client; (2) the risk associated with an attorney cross-examining a former client (either to the benefit or detriment of the non-witness client); and (3) the public interest in preserving trust that attorneys will maintain client confidences and not turn them against clients in the future.  *See, e.g.*, *United States v. Ross*, 33 F.3d 1507, 1523 (11th Cir. 1994) (outlining goals of ethical rule); Ariz. Ethics Op. 91-05 (explaining that the former client is "entitled to freedom from apprehension that confidences will be revealed in a succeeding representation" and that there is a public interest in assuring all clients that lawyers can be trusted to preserve confidences).

HCM's proposed limited role achieves each of these goals.  *See* Ex. 3, Novak Declaration at ¶ ("the interests of their former client as articulated in ER 1.9 are well protected").  Mr. Ferrer has waived the attorney-client privilege with respect to all attorneys except his current counsel.  Although Mr. Henze and Ms. Henze Cook have maintained Mr. Ferrer's confidences and will continue to do so, Mr. Ferrer's waiver lessens the import of this factor.  Crucially, Mr. Henze and Ms. Henze Cook will have no role in cross-examination or preparation for cross-examination.  In fact, Mr. Henze and Ms. Henze Cook will not be trial counsel.  They propose to work exclusively on forfeiture and assisting Mr. Lacey with complying with his terms of release.

By way of comparison, in *United States v. Cheshire*, 707 F. Supp. 235, 240 (M.D. La. 1989), which the Government's Motion discusses at length, the court noted its

concern that the attorney would be constrained in his ability to analyze and repudiate the testimony of his former client when making a closing argument.  Since Mr. Henze and Ms. Henze Cook propose a role in which they would not be trial counsel, this concern is not present here.  Furthermore, HCM has established an ethical screen between itself and the other members of the defense team and has sought outside ethics counsel, who has approved this proposal.  *See* Ex. C, Decl. of Edward Novak.  Courts considering disqualification motions have observed that it is appropriate to "rely upon the good faith and judgment of counsel" in these instances and to trust that they will comply with their ethical obligations.  *United States v. Lorenzana-Cordon*, 125 F. Supp. 3d 129, 137 (D.D.C. 2015); *see also United States v. Caramadre*, 892 F. Supp. 2d 397, 405 (D.R.I. 2012) ("Without evidence to the contrary, this Court will rely upon the good faith and judgment of counsel.").

The narrowness of the proposed role and the fact that Mr. Ferrer waived the attorney-client privilege in his proffer distinguish this case in important ways from those cited by the Government.  *See United States v. Alfonzo-Reyes*, 592 F.3d 280, 294 (1st Cir. 2010); *United States v Henke*, 222 F.3d 633, 637-38 (9th Cir. 2000); *United States v. Williams*, 81 F.3d 1321, 1324-25 (4th Cir. 1996); *Ross*, 33 F.3d at 1523; *United States v. Moscony*, 927 F.2d 742 (3d Cir. 1991); *United States v Iorizzo*, 786 F.2d 52, 57-58 (2d Cir. 1986).  In addition to the distinctions listed above, it is important to note that Mr. Ferrer did not join the Government's Motion.  *Cf. United States v. Falzone*, 766 F. Supp. 1265, 1273 (W.D.N.Y. 1991) (court considered it significant that the witness joined the government's disqualification motion).  Mr. Ferrer's interests are protected by the proposed arrangement, and the proposal also preserves the public trust in attorneys by dramatically limiting HCM's role while permitting Mr. Lacey to have the counsel of his choice, attorneys whom he relies upon greatly and who have represented him for many years in all aspects of his life.

The Ninth Circuit has not adopted a rule of automatic disqualification.  *See Research Corp.*, 936 F. Supp. at 703.  Courts deciding disqualification motions consider a variety of factors, including:

> "(1) the nature of the [potential] ethical violation, (2) the prejudice to the parties, including the extent of actual or potential delay in the proceedings, (3) the effectiveness of counsel in light of the violations, . . . (4) the public's perception of the profession' and "whether or not a motion to disqualify has been used as a tactical device or a means of harassment."

*Plotts v. Chester Cycles LLC*, No. CV-14-00428-PHX-GMS, 2016 WL 614023, at *6 (D. Ariz. Feb. 16, 2016) (quoting *Research Corp.*, 936 F. Supp at 703).  Here, the risk of prejudice to Mr. Ferrer is ameliorated through the proposed narrow role for HCM and the ethical screen in place already.  The Henzes are not lead counsel in this prosecution, and their effectiveness on Mr. Lacey's behalf in the forfeiture case or assisting him with complying with his release conditions will not be impacted by their prior representation of Mr. Ferrer.  The nature of Mr. Henze and Ms. Henze Cook's relationship with Mr. Lacey, and his constitutional right to the counsel of his choice, weigh heavily in favor of permitting HCM to participate in the limited scope representation proposed herein.

## Relief Requested

Mr. Lacey has expressed his desire for Mr. Henze and Ms. Henze Cook to continue to serve as his lawyers, the way they have for many years.  They have his confidence, and they are his friends.  He is faced with threats at both the state and federal level, and he chooses them (in the strongest terms possible) to speak on his behalf and advise him, where appropriate. This is a complicated, multi-defendant case involving more than 9 million documents and important constitutional issues with great risk to the defendants, and Mr. Lacey wants to have the assistance of lawyers with a deep understanding of his personal and professional history.

Mr. Henze and Ms. Henze Cook are profoundly aware of their obligations under the ethical rules governing attorneys, and they have no desire to cause any harm whatsoever to their former client, Mr. Ferrer.  With these obligations in mind, they have

consulted with ethics counsel and formulated a proposed role for themselves in which they can honor Mr. Lacey's wish that they continue to represent him while still satisfying their obligations to Mr. Ferrer.  Mr. Henze and Ms. Henze Cook of course will abide scrupulously by any order of this Court, and they respectfully request that they be permitted to serve as counsel for Mr. Lacey in the narrow fashion described here.

RESPECTFULLY SUBMITTED on June 6, 2018.

MITCHELL | STEIN | CAREY | CHAPMAN, PC

By:   */s/ Anna H. Finn*
Lee Stein
Anne M. Chapman
Anna H. Finn
Attorneys for Henze Cook Murphy, PLC

## **CERTIFICATE OF SERVICE**

I certify that on this 6th day of June, 2018, I electronically transmitted a PDF version of this document to the Clerk of Court, using the CM/ECF System, for filing and for transmittal of a Notice of Electronic Filing to the attorneys of record.

*/s/  Julie Greenwood*



**EXHIBIT 1**

6/6/2018
Case 2:18-cr-00422-SPL Document 176 Filed 06/06/18 Page 2 of 17
Maricopa County supervisors settle lawsuits filed by 'New Times' founders, Stapley

News  »  Politics  »  Article

0 Comments

# Maricopa County supervisors settle lawsuits filed by 'New Times' founders, Stapley

SHARE URL    EMAIL    FONT: A A A    Recommend 1    Tweet    G+1

### RELATED INFO

## Cost breakdown

The following costs relate to lawsuits or legal claims filed by political targets of former County Attorney Andrew Thomas, Sheriff Joe Arpaio, Thomas' former deputy Lisa Aubuchon, former Sheriff's Chief Deputy David Hendershott and Maricopa County. All of these cases related to the bungled government-corruption investigation into judges, county supervisors and administrators between 2008 and 2010. Ultimately, all criminal charges and the federal racketeering lawsuit were dropped.

**Gary Donahoe,** retired Superior Court judge: $1,275,000 settlement. County legal expenses: $767,127.

**Kenneth Fields,** retired Superior Court judge: $100,000 settlement. County legal expenses: $81,040.

**Barbara Mundell,** retired Superior Court judge: $500,000 settlement. County legal expenses: $134,273.

**Anna Baca,** retired Superior Court judge: $100,000 settlement. County legal expenses: $112,588.

**Stephen Wetzel,** former

**By Michelle Ye Hee Lee and Michael Kiefer**
The Republic | azcentral.com
Fri Dec 20, 2013 4:08 PM

The last two lawsuits filed by political targets of Sheriff Joe Arpaio and former County Attorney Andrew Thomas were settled by the Maricopa County Board of Supervisors Friday, ending a long bout of litigation that has cost the county millions of dollars over the past few years.

Supervisors voted to settle for $3.75 million a federal lawsuit filed against the county by Phoenix *New Times* founders Michael Lacey and Jim Larkin. The news executives were arrested in 2007 after publishing details of a rogue prosecutor's misdeeds.

Later Friday, supervisors also voted to settle for $3.5 million a federal lawsuit filed by former County Supervisor Don Stapley, who was arrested during the so-called war on political corruption waged by Thomas, Arpaio and their deputies.

The two settlements bring to at least $17 million the final taxpayer cost of lawsuits relating to Arpaio's and Thomas' politically-motivated legal attacks. That tab is likely to grow, but that's because of a separate settlement that was approved last year but is currently under appeal.

"What brought us here today is the shameful, expensive, almost incomprehensible story of Andrew Thomas' abuse of power," Board of Supervisors Chairman Andy Kunasek said before the vote.

Lacey applauded the decision, saying, "This judgment proves there's a God in heaven, but I think that God might be a trial lawyer."

Arpaio said he would not criticize the Board of Supervisors for making what amounted to a business decision to settle the cases.

Stapley's was the last of 10 lawsuits filed against Arpaio, Thomas and their deputies, by judges, county supervisors and other county officials.

Earlier this month, Stapley's case seemed to be headed to a jury trial in January, with a strong statement of support for Stapley from the federal judge handling the case.

"I still think it's a good deal for the family (of Stapley), but I think we would have gotten more out of a jury," said Michael Manning, Stapley's attorney.

Manning also represented Lacey and Larkin, and several of the other plaintiffs who sued the county.

The size of Stapley's settlement is partially due to his out-of-pocket attorney fees, totaling more than $1.6 million, Manning said.

Supervisor Steve Chucri said he would've preferred taking the case to trial.

"As someone who believes in process and transparency," he said, "my preference in this case was to have it go to trial and decided by Maricopa County residents ... not an insurance actuary or abacus."

### Most Popular    Top Videos

Fourth of July quiz: How 'American' are you?

Quiz: Can you pass the civics test for U.S. citizenship?

Women executed in the U.S. since 1976

Arizona wildfires: Road closures

Phoenix-area investigations reveal shadowy porn industry

Bikers Against Child Abuse make abuse victims feel safe

Holy sightings: Jesus, Virgin Mary and others spotted in unusual places

Former porn actress makes new start as Chandler mom

List of Arizona K-12 Online schools

Nude photos: A new way for teens to flirt?

county technology director: $75,000 settlement. County legal expenses: $107,647.

**Sandi Wilson,** deputy county manager and county budget director: $122,000 settlement. County legal expenses: $458,318.

**Don Stapley,** former county supervisor: $3.5 million settlement. County legal expenses: $1,682,020.

**Mary Rose Wilcox,** county supervisor: $975,000 settlement, which is pending and under appeal. The county has paid her $9,938 in court-ordered legal costs. County legal expenses to date: $375,442.

**Susan Schuerman,** Stapley's executive assistant: $500,000 settlement. County legal expenses: $200,201.

**Conley Wolfswinkel,** Stapley's business associate: $1,400,000 settlement. County legal expenses: $1,586,152.

**Andy Kunasek,** county supervisor: $123,110 settlement for his 2010 legal claim. County legal expenses: $1,150.

*Source: Maricopa County*

---

### RELATED NEWS

Court: News execs can sue Arpaio for arrest

County to settle another lawsuit over Thomas-Arpaio corruption probes

Maricopa County feuds cost taxpayers $28 million

Thomas, Aubuchon to be stripped of legal licenses

But County Manager Tom Manos said the county incurred more costs to litigate the Stapley case than in other similar lawsuits because it was headed to trial mid-January. Depositions were finished, and the county paid five external law firms to represent each of the five defendants in Stapley's case.

The county's legal costs and the settlement cost in the Stapley case were projected to exceed the $5 million deductible for an external insurance carrier, Manos said. Since the county's total costs in settlements and litigating the case would exceed the deductible, the insurance company had discretion to settle the case, he said. The insurance carrier opted to settle rather than pay a jury verdict, Manos said.

Not settling the case could have jeopardized the county's contract with future insurance carriers, Manos said.

The county has insurance carriers that cover legal claims that exceed the $5 million limit placed on payouts from its self-insured risk trust fund.

"If there's any good news today, it's that we're getting just about the last two cases behind us," Manos said. "This has been a long and painful process and journey for the county."

The *New Times* case was settled because that was the best business decision for the county, Manos said.

"I look at all the things we could do in the county with the amount of money we're spending today, and I'm disappointed that's how I have to use the taxpayers' money," Manos said.

Both settlements approved by the Board of Supervisors on Thursday stem from arrests by the Maricopa County Sheriff's Office while working in conjunction with Thomas. The *New Times* lawsuit preceded the political-corruption investigations.

The courts determined that Thomas had prosecutorial immunity since he had turned the case over to a special prosecutor, Dennis Wilenchik. Wilenchik and Arpaio were the defendants in the *New Times* lawsuit.

Thomas and his former deputy Lisa Aubuchon were disbarred in 2012 for ethical violations over the course of the political-corruption campaign. Another former deputy county attorney, Rachel Alexander, was suspended from practice. And Arpaio's former chief deputy, David Hendershott, was fired.

The $17 million total does not include tangential costs the county incurred defending itself, elected officials and other employees against lawsuits, investigations and legal claims related to the actions of Thomas, Arpaio, Aubuchon, Alexander and Hendershott. An *Arizona Republic* analysis found those additional costs added up to at least $24.9 million as of April 2012.

**New Times lawsuit**

Lacey and Larkin founded Phoenix *New Times* and built it into a chain of 13 alternative newspapers that included *The Village Voice,* which they sold in September 2012.

On October 18, 2007, Lacey and Larkin were arrested for revealing details of a grand jury matter by publishing a story in Phoenix *New Times* about ongoing charges and legal disputes with the Maricopa County Attorney's and Sheriff's offices.

The initial dispute was over publishing the home address of Arpaio online, which is against the law. The stories, which came out in 2004 and 2005, alleged that Arpaio was using the statute to hide his real estate assets.

Then, in 2007, while ostensibly in the midst of secret grand jury proceedings, a special prosecutor appointed by Thomas filed an over-reaching subpoena against the newspaper, asking that they reveal the internet identities of anyone who read the paper online, including information about what other sites they had visited before and after reading the *New Times.* An appointed independent prosecutor also attempted to set up an improper private meeting with the judge overseeing the case.

Lacey and Larkin published a story about the subpoena and the attempted meeting with the judge on October 18, 2007. That evening, plain clothes sheriff's deputies came to their houses, handcuffed them, put them in dark SUV's with tinted windows — of which at least one bore Mexican license plates — and drove them to jail.

The public outcry was immediate, and an embarrassed Thomas dropped the charges five days later.

### TOP JOBS



Watch for Top Jobs coming to this space soon.

### TOP HOMES



**Cave Creek** - $1,695,000
MLS 5276117
5 bed / 6 bath
4389 / 1988
Janet Mohr,CCIM,CRS,Associate Broker, Realty Executives



**Cave Creek** - $1,650,000
MLS 5275247
4 bed / 5 bath
5122 / 2004
Janet Mohr,CCIM,CRS,Associate Broker, Realty Executives



**Phoenix** - $384,895
MLS 5333440
4 bed / 3 bath
2371 / 2015
Fredda Swetloff, Rosewood Sales Group, Llc

Agents! Display your listings here! »
Thousands more home listings »

### GET AZCENTRAL ANYWHERE

**azcentral.com mobile editions**

Get azcentral.com on your phones and tablets for the latest news, sports, video, photos and much more from azcentral, The Arizona Republic and 12 News.

» Get azcentral.com mobile!

| Android | iPad | iPhone | iPhone Sports | AZ

*From our sponsor*

**Banner Children's Total Kid for iPad**



Download your free copy of Total Kid, an interactive digital parenting magazine filled with trending health topics, videos, tips and activities. Sponsored by Banner Health.

Lacey and Larkin sued, and initially a U.S. District Court judge in Phoenix ruled that Thomas and Arpaio enjoyed absolute immunity from lawsuits because of their law enforcement status. The 9th U.S. Circuit Court of Appeals, however, in rulings in 2011 and 2012, restored the lawsuits with regard to Arpaio and Maricopa County.

**Stapley lawsuit**

Stapley was indicted in November 2008 on 118 criminal counts stemming from omissions on his annual financial-disclosure forms as county supervisor. But the case fell apart when his defense attorneys realized that Maricopa County had never formalized disclosure rules.

Those charges were dismissed in August 2009. A month later, the Sheriff's Office arrested Stapley without a warrant, alleging fraudulent schemes, perjury and theft, among other charges, based on allegations he committed mortgage, loan and campaign account fraud. He was later indicted on some of the second set of charges.

Before the year was over, Thomas had filed criminal charges against Supervisor Mary Rose Wilcox, alleging conflict of interest, and against former Superior Court Judge Gary Donahoe, accusing him of bribery related to construction of a court tower in downtown Phoenix. Thomas and Arpaio also filed a federal racketeering lawsuit against several judges, county officials and county supervisors.

The cases began unraveling when a Superior Court judge threw out the Wilcox charges in February 2010 and accused Thomas of retaliation for political reasons. All of the cases were subsequently dismissed.

Thomas asked Gila County Attorney Daisy Flores to review the charges against Stapley. She concluded there was "sufficient evidence to prove that Stapley committed seven separate felony offenses of false swearing," but the investigation had been so mismanaged that it would be impossible to take to court.

**Earlier settlements**

All of the other targets of the government-corruption crusade settled out of court. They are retired Superior Court judges Donahoe, Kenneth Fields, Barbara Mundell and Anna Baca; former county technology director Stephen Wetzel; county budget director and deputy county manager Sandi Wilson; Stapley's executive assistant, Susan Schuerman; and Stapley business associate Conley Wolfswinkel.

Wilcox reached a settlement with the county for $975,000, which has been contested by the county and is under appeal.

County Board Chairman Kunasek in January 2013 settled his notice of claim against the county for $123,110 in attorneys' fees and defense costs relating to the same failed corruption probes by Arpaio and Thomas.

In March 2013, former County Schools Superintendent Sandra Dowling settled for $250,000 her lawsuit against the Board of Supervisors and Arpaio, accusing them of malicious prosecution after a three-year legal battle that included several civil suits over alleged mismanagement, as well as criminal charges including theft, procurement fraud and misuse of public funds. Thomas was not involved in those suits.

Dowling was cleared of felony criminal charges and settled the civil lawsuits. She entered a plea agreement and in 2008 was sentenced to four months of probation for a misdemeanor.



**EXHIBIT 2**



**U.S. Department of Justice**

United States Attorney
District of Arizona

| | |
|---|---|
| Two Renaissance Square | Main:   (602) 514-7500 |
| 40 N. Central Ave., Suite 1800 | Main Fax:   (602) 514-7693 |
| Phoenix, AZ  85004-4408 | Direct Fax:   (602) 514-7450 |

May 14, 2018

Mike Piccarreta, Esq.
Piccarreta Davis Keenan Fidel PC
2 East Congress Street, Suite 1000
Tucson, AZ  85701

<u>VIA EMAIL</u>

      Re:   *Your Letter of May 1, 2018*

Dear Mike:

      I wish to respond to a letter you sent on May 1, 2018, requesting the production of certain categories of documents.  As an initial matter, and as discussed during our May 4 meeting, the relevance of the materials you are requesting is unclear.  The motion pending before the Court seeks to determine whether the DWT and HCM law firms have a conflict of interest.  The materials you have requested do not, in many instances, have any apparent connection to that topic.  We are happy to provide additional consideration to your request if you can articulate why they might be subject to discovery under the relevant rules of criminal discovery.

      I would further note that it appears, based on the nature of your requests, that you believe it was improper for the United States to enter into a cooperation-based plea agreement with Mr. Ferrer because he was a member of a joint defense agreement ("JDA") and/or you suspect the United States has improperly obtained JDA-protected information from Mr. Ferrer.  Through this letter, I wish to explain why neither premise is valid.

      The courts have recognized that a JDA participant must retain the ability to plead guilty and cooperate and that the government has a strong, legitimate interest in considering such requests.  For example, in *United States v. LeCroy*, 348 F. Supp. 2d 375 (E.D. Pa. 2005), the court recognized that "[a] JDA is not an escape-proof prison" and that "the right of the grand jury to get the facts, and the right of [a JDA participant] to decide to cooperate with the grand jury, are paramount."  *Id.* at 382, 386.  The courts have further recognized that a JDA participant is free to disclose liability-generating matters in which he personally participated, even if those matters are also the subject of JDA-related sharing and discussion.  *See, e.g., In re Grand Jury Subpoena*, 274 F.3d 563, 572 (1st Cir. 2001) ("[W]hat the parties call a 'joint

May 14, 2018
Page 2 of 4

defense' privilege is more aptly termed the 'common interest' rule.  Even when that rule
applies, however, a party always remains free to disclose his own communication."); *United
States v. Balsiger*, 2013 WL 3490873, *11 (E.D. Wisc. 2013) ("Balsiger and Currey cannot
stop . . . another person . . . from waiving its privilege as to its own communications simply
because the communication was shared with them or their counsel as part of the joint
defense."); *United States v. Bekaert Steel Wire Corp.*, 1985 WL 25747, *3 (D. Md. 1985)
(rejecting JDA-related claim where cooperator "Neri was not called before the grand jury to
answer questions about what he may have learned through defense counsel; he was called to
testify about events in which he had actively participated. . . .  Neri participated in several
meetings and had an ongoing relationship with the principals in the case for several years. It
was that information that the government sought, not the substance of any communications
between counsel.").

For these reasons, the courts have stated that, when engaging in cooperation-related
discussions with a JDA participant, the government should simply take reasonable steps to
prevent the receipt of any JDA-protected information.  *See, e.g., United States v. Salvagno*,
306 F. Supp. 2d 258, 272-73 (N.D.N.Y. 2004).  Here, the United States has taken extensive
efforts to do so.  The United States' first meeting with Mr. Ferrer did not take place until the
morning of April 5, 2018.  The proffer agreement (enclosed as Exhibit A) specifically stated
that Mr. Ferrer should not discuss JDA-protected material, this instruction was reiterated on
several occasions during the proffer, and Mr. Ferrer's attorneys have confirmed that no such
material was discussed on April 5.  The requirement not to disclose any JDA-protected
material was also reiterated in the cooperation addendum to Mr. Ferrer's plea agreement
(which is currently under seal but will be produced to you in the future), and Mr. Ferrer's
counsel have confirmed that no JDA-protected material has been discussed during Mr. Ferrer's
subsequent interviews by the government.  Finally, the government also has not received a
copy of the actual JDA or any other common interest agreement (we have avoided doing so,
in an abundance of caution, precisely because we wish to avoid any grey areas).

Furthermore, even if (contrary to the government's best efforts) Mr. Ferrer had
somehow disclosed JDA-protected information during his discussions with the government,
the timing of his proffer undermines any claim of prejudice.  As noted, the United States did
not meet with Mr. Ferrer, or receive a proffer of information from Mr. Ferrer's counsel, until
April 5, 2018.  As a result, no information from Mr. Ferrer was used to obtain the March 28,
2018 indictment or obtain any of the search warrants in this case.  Moreover, as you know
from our extensive "reverse proffer" to you in December 2017, the theory underlying the
indictment has long been transparent.

Courts have concluded that when (as here) the government establishes that it has taken
steps to avoid the disclosure of JDA-protected information, the cooperator's counsel has
averred that no such disclosure has occurred, and the defendant merely suspects
(notwithstanding those avowals) that he was prejudiced by an improper disclosure, there is no
entitlement to an evidentiary hearing.  *See, e.g., United States v. Aulicino*, 44 F.3d 1102, 1117
(2d Cir. 1995) (affirming district court's denial of evidentiary hearing, where defendants

alleged that government had obtained JDA-protected information from a cooperator, because the "government presented evidence of the steps it took to insulate the [prosecutors] from any knowledge gained by [the cooperating witness] from his contact with the codefendants after he agreed to cooperate" and the defendants "did not present any evidence to suggest that [the cooperating witness] revealed any privileged information to the government"); *Salvagno*, 306 F. Supp. 2d at 272 ("[T]he court denies defendants' motion requesting an order directing an evidentiary hearing. Defendants have failed to allege specific facts that indicate communication of privileged information to the Government and prejudice resulting therefrom. Moreover, the government avers that it neither sought nor accepted any [such] information."); *United States v. Anderson*, 288 F.3d 335, 338 (7th Cir. 2002) (affirming denial of evidentiary hearing, where defendant alleged that cooperators shared privileged information with the prosecution, because the defendant had "not alleged with sufficient detail, definitiveness, or specificity" the privileged matters that were allegedly disclosed).

Finally, to the extent your letter reflects a belief that the government's decision to file the disqualification motion was somehow improper, that belief is incorrect. The potential conflict-of-interest issues in this case did not even come to my attention until April 8, during a phone call with Mr. Larkin's former attorneys (who simply inquired if the government had any concerns about the anticipated representation arrangements in the case). We did not initially recognize the seriousness of those issues, as evidenced by the fact that the government did not object when the HCM firm represented Mr. Lacey during various hearings on the week of April 9-13 or when various DWT lawyers filed notices of appearance during the week of April 9-13.

Once the conflict-of-interest issues became more apparent to us, we conducted legal research. This research confirmed that the DWT and HCM firms were, in fact, laboring under deep conflicts of interest. Nevertheless, due to the sensitivity of the issues, we sought to engage in a meet-and-confer process before filing anything with the Court. Among other things, we mentioned our concerns to Mr. Cambria and Ms. Henze Cook during a phone call on April 23, sent an email to Mr. Cambria and Ms. Henze Cook on April 24 identifying the various cases and ethical rules supporting our concerns, and participated in a conference call with you and other members of the defense team on April 25. During this call, we specifically asked if there were any written agreements in which Mr. Ferrer had agreed to waive the DWT and HCM firms' conflicts of interests so they could represent Messrs. Lacey and Larkin. None were mentioned.

The case law makes clear that prosecutors should bring conflict-of-interest issues to the Court's attention as soon as they become apparent, and courts have faulted prosecutors (and reversed convictions) for failing to do so or waiting to do so until the eve of trial. *See, e.g., United States v. Iorizzo*, 786 F.2d 52, 59 (2d Cir. 1986) ("We add a final note. The reversal here is the direct result of the prosecution's using defense counsel's conflict of interest as a means of affecting the evidence going before the jury instead of moving for his disqualification before the trial. . . . We trust that this decision will ensure that a pretrial disposition of such issues will occur in the future."); *United States v. Henke*, 222 F.3d 633, 638 (9th Cir. 2000).

May 14, 2018
Page 4 of 4

That is simply what we have done here.  Indeed, before filing the motion, the United States consulted with Mr. Ferrer's counsel, primarily to confirm that the factual representations contained in the motion were accurate.  During these discussions, Mr. Ferrer's counsel stated that Mr. Ferrer did not wish to be a party to the motion.  As a result, the United States filed the motion on its own behalf, in the interest of protecting the integrity of the trial.  *See, e.g., United States v. Kight*, 2017 WL 4619024, *13 n.19 (N.D. Ga. 2017)  ("[T]he Court rejects Kight's argument that the Government, without Lankford's permission, is precluded from seeking Armstrong's disqualification or that Lankford was required to join in the Government's Motion."); *United States v. Culp*, 934 F. Supp. 394, 399 (M.D. Fla. 1996) (granting government's disqualification motion and stating that defense counsel's "argument that the Government lacks standing to raise the issue of a potential conflict gives short shrift to the respective interests of the Government and the Court in ensuring that judgments remain intact on appeal. . . .  [Counsel's] challenges to the Government's standing betray a conception of the interests at stake in this motion which is both unduly narrow and overly simplistic.").

Sincerely,

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*/s Kevin Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

KMR/zs

**EXHIBIT A**

## PROFFER/INTERVIEW AGREEMENT

The ground rules and conditions for any proffer/interview are set forth in this document, which is 3 pages.

The parties to this Agreement are the First Assistant United States Attorney through her Assistant U.S. Attorneys, Kevin M. Rapp, Dominic Lanza, Margret Perlmeter and Reginald Jones, Trial Attorney, Department of Justice, Kirsta Leeburg Melton, Assistant Attorney General, State of Texas, Randy Mailman, Deputy Attorney General, Office of the Attorney General, State of California, ("the Prosecution") and Carl Ferrer and Mr. Ferrer's counsel, Nanci Clarence and Jonathan Baum.

This Agreement binds the U.S. Department of Justice, and the Attorney Generals' Offices for the States of California and Texas.

1.   The purpose of any proffer/interview is to evaluate oral and written statements and proffered information given by Mr. Ferrer and his agents (including but not limited to his attorneys) concerning his involvement with Backpage.com and related entities. Mr. Ferrer agrees to proffer information or participate in any interview on an entirely voluntary basis. Mr. Ferrer also understands and agrees that he is not compelled in any way to participate in this interview.

2. Mr. Ferrer voluntarily waives all claims of attorney-client privilege, whether in his personal or official capacity as the Chief Executive Officer of Backpage.com, LLC as to communications with any attorney or law firm that represented Backpage.com, or any related entity, where such communications concerned or related to Backpage.com or any related entity. This waiver does not apply to Mr. Ferrer's current attorneys, Nanci Clarence, Jonathan Baum and anyone working on their behalf. Mr. Ferrer voluntarily agrees to provide all documents and other material that may be relevant to the investigation and that are in his possession or control. However, Mr. Ferrer shall not disclose any documents or information protected by the Joint Defense Agreement in this matter. Mr. Ferrer understands that his proffer/interview and any benefit he may receive from information he provides to the prosecution does not depend on his waiver of the attorney-client privilege.

3.   The agreement is explicitly contingent upon Mr. Ferrer providing truthful statements and truthful information.   In any interview or proffer, Mr. Ferrer and his agents will completely and truthfully answer all questions, will provide complete and truthful information relating to any and all matters, and will make no material misstatements or omissions of facts.   Mr. Ferrer further understands that he will neither attempt to protect any person or entity nor falsely implicate any person or entity, through false information or omission. Nevertheless, no truthful statements made by or truthful information provided by Mr. Ferrer or his agents during the interview, or otherwise proffered, will be used directly against Mr. Ferrer during any litigation or proceeding instituted by the Prosecution.   The Prosecution will be the ultimate arbiter of the truthfulness of any statement or information.

4. Nothing in paragraph 4 above, however, prevents the Prosecution from making derivative use of and pursuing any investigative leads (i.e. fruits) suggested by any statements made by or other information proffered or provided by Mr. Ferrer or his agents. In other words, except as expressly stated above, Mr. Ferrer understands and agrees that there are no limitations whatsoever on the use the Prosecution can make of the testimony and information provided in any interview or otherwise proffered by Mr. Ferrer or his agents, either orally or in writing, both before and after any interview of Mr. Ferrer. Mr. Ferrer expressly waives any right to challenge the derivative use of any statements or information provided during the interview or otherwise proffered by Mr. Ferrer or his agents. It is the intent of this agreement that such derivative use is proper and the Prosecution and Mr. Ferrer hereby agree that Federal Rule of Criminal Procedure 11(f), and Federal Rules of Evidence 408 and 410 and, do not govern such derivative use in any litigation or other proceedings. This provision is necessary to eliminate any need or argument for a *Kastigar* hearing at which the Prosecution would have to prove that the evidence it would introduce at trial, or any other proceedings, is not associated with or tainted by any statements made by or other information provided by Mr. Ferrer during any interview, or was otherwise proffered to the Prosecution by Mr. Ferrer or his agents.

5. If Mr. Ferrer is a witness at any trial or other proceeding relating to the information he provides to investigating agents, and offers testimony materially different from any statements or other information provided during the interview or otherwise proffered by Mr. Ferrer or his agents, the Prosecution may cross-examine witnesses (including Mr. Ferrer) and introduce rebuttal evidence concerning any statements or other information provided during any interview or otherwise proffered by Mr. Ferrer or his agents. In addition, the Prosecution reserves the right to prosecute Mr. Ferrer for perjury, false official statement or obstruction of justice to the fullest extent provided by law. If such a prosecution occurs, the Prosecution can use directly, and derivatively, in their case-in-chief, in cross-examination and in rebuttal, any statements and information provided by Mr. Ferrer, whether directly or indirectly through his agents, or derivatively linked to the statements and other information Mr. Ferrer or his agents supplied in any interview or other proffer by Mr. Ferrer or his agents. This provision is needed to ensure that Mr. Ferrer does not abuse the opportunity for an interview or proffer of information, does not make materially false statements to a government agency either orally or in writing (directly or indirectly), and does not commit perjury when testifying at trial or in any other legal proceeding

6. Mr. Ferrer understands that the law (specifically, *Brady v. Maryland*) requires that the Prosecution provide any person against whom charges are brought, all information which tends to mitigate or negate the person's guilt as to the offenses charged. Therefore, Mr. Ferrer understands that if *Brady* material is developed or produced from the interview or in any proffer, then the Prosecution would be required to disclose this information to the appropriate defendants and/or their attorneys at the time the obligation is imposed on the Prosecution. This provision is included to permit the Prosecution to comply with its discovery obligations and is not intended to discourage Mr. Ferrer from providing information to the Prosecution.

7. With the exception of providing required notice under the Joint Defense Agreement in this case, Mr. Ferrer will not, personally or through any other person (including but not limited to his attorneys), disclose the existence of this agreement or any interview or proffer, or anything otherwise said during the interview or proffered to the Prosecution, or any information relating to

Mr. Ferrer's cooperation with the Prosecution (except that if an attorney for another putative or actual defendant asks Mr. Ferrer's counsel or successors whether Mr. Ferrer is cooperating with the United States, counsel or successors may confirm the fact that Mr. Ferrer is cooperating, but will not disclose any other information about Mr. Ferrer's cooperation).

8.   This document is the full and complete Agreement of the parties with regard to any interview or proffered information.   No other promises, representations or agreements have been made by or between the parties with regard to any proffer/interview or the underlying matters referenced in this written agreement. The parties shall at all times act in good faith to accomplish their intent in entering into this Agreement. Any dispute between the parties as to whether either party has failed to fulfill any of its obligations under this Agreement shall be submitted to and decided by the United States District Court for the District of Arizona.

AGREED:                           ELIZABETH A. STRANGE
                                  First Assistant United States Attorney

4/5/18
DATE                              KEVIN M. RAPP
                                  DOMINIC LANZA
                                  MARGRET PERLMETER
                                  Assistant U.S. Attorneys


DATE                              REGINALD E. JONES, Trial Attorney
                                  U.S. Department of Justice
                                  Child Exploitation and Obscenity Section

4/5/18
DATE                              KIRSTA LEEBURG MELTON
                                  Assistant Attorney General,
                                  Office of the Attorney General, State of Texas

4/5/18
DATE                              RANDY MAILMAN,
                                  Deputy Attorney General,
                                  Office of the Attorney General, State of California

4/5/18
DATE                              CARL FERRER


4/5/18
DATE                              NANCI CLARENCE, ESQ.
                                  JONATHAN BAUM, ESQ.



**EXHIBIT 3**

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>v.<br><br>1.  Michael Lacey, and<br>2.  James Larkin,<br><br>    Defendants | CR-18-00422-PHX-SPL (BSB) |

**DECLARATION OF EDWARD F. NOVAK**

I, Edward F. Novak, declare:

1. I am an attorney located in Phoenix, Arizona, where I have been in practice since 1979. A portion of my practice involves legal and professional ethics, and I regularly provide ethical advice to lawyers in private practice. I also practice in the area of criminal defense.

2. I received a bachelor's degree from Knox College in 1969 and a law degree from DePaul University in 1976, where I served as the Note and Comment Editor on the DePaul University Law Review. I was licensed in Illinois in 1976 and in Arizona in 1979. In 1985 I was admitted to the District of Columbia Bar.

3. I served as President of the Board of Governors of the State Bar of Arizona in 2008-2009. I have taught legal ethics and professional responsibility on an adjunct basis at Arizona State University's Sandra Day O'Connor College of Law. I have been on the Arizona Supreme Court Committee on Character and Fitness since 2009 and currently serve as chair. I am familiar with the Arizona Rules of Professional Conduct governing lawyers practicing in Arizona.

4. I have written and presented on ethical issues including conflicts issues on numerous occasions for both the State Bar of Arizona and the Arizona Prosecuting Attorneys' Advisory Council.

5. I have no professional or personal relationship that prevents me from providing independent ethical advice to Tom Henze and Janey Henze Cook in this matter.

1

6. I met with Mr. Henze, Ms. Henze Cook, and Mr. Stein, and we thoroughly discussed the ethical issues presented by the Government's pending Motion to Disqualify Counsel. Specifically, I understand the Government contends that Mr. Henze and Ms. Henze Cook may not continue to represent Michael Lacey in any capacity because they previously represented a potential witness against Mr. Lacey, Carl Ferrer in a substantially related matter as that term in used in ER 1.9.

7. I understand that Mr. Henze and Ms. Henze Cook propose a continuing, limited representation of their longtime client, Mr. Lacey, in which capacity they would represent him in the following ways: (1) in connection with forfeiture proceedings that are taking place in parallel to the criminal case; and (2) in connection with compliance with the conditions of Mr. Lacey's pretrial release.

8. In meeting with Mr. Henze and Ms. Henze Cook, it is clear to me that they fully understand and respect their obligations to their former client and that they have no intention of taking any action detrimental to his interests. In particular, they have been and will be vigilant about not sharing Mr. Ferrer's confidential communications. In further recognition of their obligations, Henze Cook Murphy, their law firm, has implemented an ethical screen between themselves and the other members of the defense team in the pending criminal case to make it clear to everyone involved in the case the limitations on their continuing involvement in the matter.

9. With these protections in place, the interests of their former client as articulated in ER 1.9 are well protected. While the matters of forfeiture and pretrial release are related, they are not substantially related. As stated in the comment to ER 1.9, "Matters are 'substantially related' for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information would materially advance the client's position in the subsequent matter." If either the forfeiture proceeding, or a pretrial release violation hearing were to put confidential client information at risk, then continued representation would need to be reconsidered. At this time, it is my opinion that the limited scope of the proposed representation and the ethical safeguards in place effectively mitigate the risks presented by the proposed representation. I have also considered Mr. Lacey's Sixth Amendment right to the counsel of his choice but believe that the Court is capable of that evaluation without expert assistance.

*[Signature on following page.]*

2

EXECUTED this 6th day of June, 2018.

_____
Edward F. Novak

*with permission*