

**EXHIBIT 1**

News  »  Politics  »  Article                                    0 Comments

# Maricopa County supervisors settle lawsuits filed by 'New Times' founders, Stapley

SHARE URL    EMAIL    FONT: A A A    Recommend 1    Tweet    G+1

### RELATED INFO

## Cost breakdown

The following costs relate to lawsuits or legal claims filed by political targets of former County Attorney Andrew Thomas, Sheriff Joe Arpaio, Thomas' former deputy Lisa Aubuchon, former Sheriff's Chief Deputy David Hendershott and Maricopa County. All of these cases related to the bungled government-corruption investigation into judges, county supervisors and administrators between 2008 and 2010. Ultimately, all criminal charges and the federal racketeering lawsuit were dropped.

**Gary Donahoe,** retired Superior Court judge: $1,275,000 settlement. County legal expenses: $767,127.

**Kenneth Fields,** retired Superior Court judge: $100,000 settlement. County legal expenses: $81,040.

**Barbara Mundell,** retired Superior Court judge: $500,000 settlement. County legal expenses: $134,273.

**Anna Baca,** retired Superior Court judge: $100,000 settlement. County legal expenses: $112,588.

**Stephen Wetzel,** former

**By Michelle Ye Hee Lee and Michael Kiefer**
The Republic | azcentral.com
Fri Dec 20, 2013 4:08 PM

The last two lawsuits filed by political targets of Sheriff Joe Arpaio and former County Attorney Andrew Thomas were settled by the Maricopa County Board of Supervisors Friday, ending a long bout of litigation that has cost the county millions of dollars over the past few years.

Supervisors voted to settle for $3.75 million a federal lawsuit filed against the county by Phoenix *New Times* founders Michael Lacey and Jim Larkin. The news executives were arrested in 2007 after publishing details of a rogue prosecutor's misdeeds.

Later Friday, supervisors also voted to settle for $3.5 million a federal lawsuit filed by former County Supervisor Don Stapley, who was arrested during the so-called war on political corruption waged by Thomas, Arpaio and their deputies.

The two settlements bring to at least $17 million the final taxpayer cost of lawsuits relating to Arpaio's and Thomas' politically-motivated legal attacks. That tab is likely to grow, due to a separate settlement that was approved last year but is currently under appeal.

"What brought us here today is the shameful, expensive, almost incomprehensible story of Andrew Thomas' abuse of power," Board of Supervisors Chairman Andy Kunasek said before the vote.

Lacey applauded the decision, saying, "This judgment proves there's a God in heaven, but I think that God might be a trial lawyer."

Arpaio said he would not criticize the Board of Supervisors for making what amounted to a business decision to settle the cases.

Stapley's was the last of 10 lawsuits filed against Arpaio, Thomas and their deputies, by judges, county supervisors and other county officials.

Earlier this month, Stapley's case seemed to be headed to a jury trial in January, with a strong statement of support for Stapley from the federal judge handling the case.

"I still think it's a good deal for the family (of Stapley), but I think we would have gotten more out of a jury," said Michael Manning, Stapley's attorney.

Manning also represented Lacey and Larkin, and several of the other plaintiffs who sued the county.

The size of Stapley's settlement is partially due to his out-of-pocket attorney fees, totaling more than $1.6 million, Manning said.

Supervisor Steve Chucri said he would've preferred taking the case to trial.

"As someone who believes in process and transparency," he said, "my preference in this case was to have it go to trial and decided by Maricopa County residents ... not an insurance actuary or abacus."

Most Popular | Top Videos

Fourth of July quiz: How 'American' are you?
Quiz: Can you pass the civics test for U.S. citizenship?
Women executed in the U.S. since 1976
Arizona wildfires: Road closures
Phoenix-area investigations reveal shadowy porn industry
Bikers Against Child Abuse make abuse victims feel safe
Holy sightings: Jesus, Virgin Mary and others spotted in unusual places
Former porn actress makes new start as Chandler mom
List of Arizona K-12 Online schools
Nude photos: A new way for teens to flirt?

county technology director: $75,000 settlement. County legal expenses: $107,647.

**Sandi Wilson,** deputy county manager and county budget director: $122,000 settlement. County legal expenses: $458,318.

**Don Stapley,** former county supervisor: $3.5 million settlement. County legal expenses: $1,682,020.

**Mary Rose Wilcox,** county supervisor: $975,000 settlement, which is pending and under appeal. The county has paid her $9,938 in court-ordered legal costs. County legal expenses to date: $375,442.

**Susan Schuerman,** Stapley's executive assistant: $500,000 settlement. County legal expenses: $200,201.

**Conley Wolfswinkel,** Stapley's business associate: $1,400,000 settlement. County legal expenses: $1,586,152.

**Andy Kunasek,** county supervisor: $123,110 settlement for his 2010 legal claim. County legal expenses: $1,150.

*Source: Maricopa County*

---

### RELATED NEWS

Court: News execs can sue Arpaio for arrest

County to settle another lawsuit over Thomas-Arpaio corruption probes

Maricopa County feuds cost taxpayers $28 million

Thomas, Aubuchon to be stripped of legal licenses

But County Manager Tom Manos said the county incurred more costs to litigate the Stapley case than in other similar lawsuits because it was headed to trial mid-January. Depositions were finished, and the county paid five external law firms to represent each of the five defendants in Stapley's case.

The county's legal costs and the settlement cost in the Stapley case were projected to exceed the $5 million deductible for an external insurance carrier, Manos said. Since the county's total costs in settlements and litigating the case would exceed the deductible, the insurance company had discretion to settle the case, he said. The insurance carrier opted to settle rather than pay a jury verdict, Manos said.

Not settling the case could have jeopardized the county's contract with future insurance carriers, Manos said.

The county has insurance carriers that cover legal claims that exceed the $5 million limit placed on payouts from its self-insured risk trust fund.

"If there's any good news today, it's that we're getting just about the last two cases behind us," Manos said. "This has been a long and painful process and journey for the county."

The *New Times* case was settled because that was the best business decision for the county, Manos said.

"I look at all the things we could do in the county with the amount of money we're spending today, and I'm disappointed that's how I have to use the taxpayers' money," Manos said.

Both settlements approved by the Board of Supervisors on Thursday stem from arrests by the Maricopa County Sheriff's Office while working in conjunction with Thomas. The *New Times* lawsuit preceded the political-corruption investigations.

The courts determined that Thomas had prosecutorial immunity since he had turned the case over to a special prosecutor, Dennis Wilenchik. Wilenchik and Arpaio were the defendants in the *New Times* lawsuit.

Thomas and his former deputy Lisa Aubuchon were disbarred in 2012 for ethical violations over the course of the political-corruption campaign. Another former deputy county attorney, Rachel Alexander, was suspended from practice. And Arpaio's former chief deputy, David Hendershott, was fired.

The $17 million total does not include tangential costs the county incurred defending itself, elected officials and other employees against lawsuits, investigations and legal claims related to the actions of Thomas, Arpaio, Aubuchon, Alexander and Hendershott. An *Arizona Republic* analysis found those additional costs added up to at least $24.9 million as of April 2012.

**New Times lawsuit**

Lacey and Larkin founded Phoenix *New Times* and built it into a chain of 13 alternative newspapers that included *The Village Voice*, which they sold in September 2012.

On October 18, 2007, Lacey and Larkin were arrested for revealing details of a grand jury matter by publishing a story in Phoenix *New Times* about ongoing charges and legal disputes with the Maricopa County Attorney's and Sheriff's offices.

The initial dispute was over publishing the home address of Arpaio online, which is against the law. The stories, which came out in 2004 and 2005, alleged that Arpaio was using the statute to hide his real estate assets.

Then, in 2007, while ostensibly in the midst of secret grand jury proceedings, a special prosecutor appointed by Thomas filed an over-reaching subpoena against the newspaper, asking that they reveal the internet identities of anyone who read the paper online, including information about what other sites they had visited before and after reading the *New Times*. An appointed independent prosecutor also attempted to set up an improper private meeting with the judge overseeing the case.

Lacey and Larkin published a story about the subpoena and the attempted meeting with the judge on October 18, 2007. That evening, plain clothes sheriff's deputies came to their houses, handcuffed them, put them in dark SUV's with tinted windows — of which at least one bore Mexican license plates — and drove them to jail.

The public outcry was immediate, and an embarrassed Thomas dropped the charges five days later.

**TOP JOBS**



Watch for Top Jobs coming to this space soon.

**TOP HOMES**



Cave Creek - $1,695,000
MLS 5276117
5 bed / 6 bath
4389 / 1988
Janet Mohr,CCIM,CRS,Associate
Broker, Realty Executives



Cave Creek - $1,650,000
MLS 5275247
4 bed / 5 bath
5122 / 2004
Janet Mohr,CCIM,CRS,Associate
Broker, Realty Executives



Phoenix - $384,895
MLS 5333440
4 bed / 3 bath
2371 / 2015
Fredda Swetloff, Rosewood Sales
Group, Llc

Agents! Display your listings here! »
Thousands more home listings »

**GET AZCENTRAL ANYWHERE**

**azcentral.com
mobile editions**

Get azcentral.com on your phones and tablets for the latest news, sports, video, photos and much more from azcentral, The Arizona Republic and 12 News.
» Get azcentral.com mobile!
» Android | iPad | iPhone | iPhone Sports | AZ

From our sponsor
**Banner Children's Total Kid for iPad**



Download your free copy of Total Kid, an interactive digital parenting magazine filled with trending health topics, videos, tips and activities. Sponsored by Banner Health.

Lacey and Larkin sued, and initially a U.S. District Court judge in Phoenix ruled that Thomas and Arpaio enjoyed absolute immunity from lawsuits because of their law enforcement status. The 9th U.S. Circuit Court of Appeals, however, in rulings in 2011 and 2012, restored the lawsuits with regard to Arpaio and Maricopa County.

**Stapley lawsuit**

Stapley was indicted in November 2008 on 118 criminal counts stemming from omissions on his annual financial-disclosure forms as county supervisor. But the case fell apart when his defense attorneys realized that Maricopa County had never formalized disclosure rules.

Those charges were dismissed in August 2009. A month later, the Sheriff's Office arrested Stapley without a warrant, alleging fraudulent schemes, perjury and theft, among other charges, based on allegations he committed mortgage, loan and campaign account fraud. He was later indicted on some of the second set of charges.

Before the year was over, Thomas had filed criminal charges against Supervisor Mary Rose Wilcox, alleging conflict of interest, and against former Superior Court Judge Gary Donahoe, accusing him of bribery related to construction of a court tower in downtown Phoenix. Thomas and Arpaio also filed a federal racketeering lawsuit against several judges, county officials and county supervisors.

The cases began unraveling when a Superior Court judge threw out the Wilcox charges in February 2010 and accused Thomas of retaliation for political reasons. All of the cases were subsequently dismissed.

Thomas asked Gila County Attorney Daisy Flores to review the charges against Stapley. She concluded there was "sufficient evidence to prove that Stapley committed seven separate felony offenses of false swearing," but the investigation had been so mismanaged that it would be impossible to take to court.

**Earlier settlements**

All of the other targets of the government-corruption crusade settled out of court. They are retired Superior Court judges Donahoe, Kenneth Fields, Barbara Mundell and Anna Baca; former county technology director Stephen Wetzel; county budget director and deputy county manager Sandi Wilson; Stapley's executive assistant, Susan Schuerman; and Stapley business associate Conley Wolfswinkel.

Wilcox reached a settlement with the county for $975,000, which has been contested by the county and is under appeal.

County Board Chairman Kunasek in January 2013 settled his notice of claim against the county for $123,110 in attorneys' fees and defense costs relating to the same failed corruption probes by Arpaio and Thomas.

In March 2013, former County Schools Superintendent Sandra Dowling settled for $250,000 her lawsuit against the Board of Supervisors and Arpaio, accusing them of malicious prosecution after a three-year legal battle that included several civil suits over alleged mismanagement, as well as criminal charges including theft, procurement fraud and misuse of public funds. Thomas was not involved in those suits.

Dowling was cleared of felony criminal charges and settled the civil lawsuits. She entered a plea agreement and in 2008 was sentenced to four months of probation for a misdemeanor.



**EXHIBIT 2**



**U.S. Department of Justice**

United States Attorney
District of Arizona

| | |
|---|---|
| Two Renaissance Square | Main: (602) 514-7500 |
| 40 N. Central Ave., Suite 1800 | Main Fax: (602) 514-7693 |
| Phoenix, AZ 85004-4408 | Direct Fax: (602) 514-7450 |

May 14, 2018

Mike Piccarreta, Esq.
Piccarreta Davis Keenan Fidel PC
2 East Congress Street, Suite 1000
Tucson, AZ 85701

<u>VIA EMAIL</u>

Re:   *Your Letter of May 1, 2018*

Dear Mike:

I wish to respond to a letter you sent on May 1, 2018, requesting the production of certain categories of documents. As an initial matter, and as discussed during our May 4 meeting, the relevance of the materials you are requesting is unclear. The motion pending before the Court seeks to determine whether the DWT and HCM law firms have a conflict of interest. The materials you have requested do not, in many instances, have any apparent connection to that topic. We are happy to provide additional consideration to your request if you can articulate why they might be subject to discovery under the relevant rules of criminal discovery.

I would further note that it appears, based on the nature of your requests, that you believe it was improper for the United States to enter into a cooperation-based plea agreement with Mr. Ferrer because he was a member of a joint defense agreement ("JDA") and/or you suspect the United States has improperly obtained JDA-protected information from Mr. Ferrer. Through this letter, I wish to explain why neither premise is valid.

The courts have recognized that a JDA participant must retain the ability to plead guilty and cooperate and that the government has a strong, legitimate interest in considering such requests. For example, in *United States v. LeCroy*, 348 F. Supp. 2d 375 (E.D. Pa. 2005), the court recognized that "[a] JDA is not an escape-proof prison" and that "the right of the grand jury to get the facts, and the right of [a JDA participant] to decide to cooperate with the grand jury, are paramount." *Id.* at 382, 386. The courts have further recognized that a JDA participant is free to disclose liability-generating matters in which he personally participated, even if those matters are also the subject of JDA-related sharing and discussion. *See, e.g., In re Grand Jury Subpoena*, 274 F.3d 563, 572 (1st Cir. 2001) ("[W]hat the parties call a 'joint

May 14, 2018
Page 2 of 4

defense' privilege is more aptly termed the 'common interest' rule.  Even when that rule applies, however, a party always remains free to disclose his own communication."); *United States v. Balsiger*, 2013 WL 3490873, *11 (E.D. Wisc. 2013) ("Balsiger and Currey cannot stop . . . another person . . . from waiving its privilege as to its own communications simply because the communication was shared with them or their counsel as part of the joint defense."); *United States v. Bekaert Steel Wire Corp.*, 1985 WL 25747, *3 (D. Md. 1985) (rejecting JDA-related claim where cooperator "Neri was not called before the grand jury to answer questions about what he may have learned through defense counsel; he was called to testify about events in which he had actively participated. . . .  Neri participated in several meetings and had an ongoing relationship with the principals in the case for several years. It was that information that the government sought, not the substance of any communications between counsel.").

For these reasons, the courts have stated that, when engaging in cooperation-related discussions with a JDA participant, the government should simply take reasonable steps to prevent the receipt of any JDA-protected information.  *See, e.g., United States v. Salvagno*, 306 F. Supp. 2d 258, 272-73 (N.D.N.Y. 2004).  Here, the United States has taken extensive efforts to do so.  The United States' first meeting with Mr. Ferrer did not take place until the morning of April 5, 2018.  The proffer agreement (enclosed as Exhibit A) specifically stated that Mr. Ferrer should not discuss JDA-protected material, this instruction was reiterated on several occasions during the proffer, and Mr. Ferrer's attorneys have confirmed that no such material was discussed on April 5.  The requirement not to disclose any JDA-protected material was also reiterated in the cooperation addendum to Mr. Ferrer's plea agreement (which is currently under seal but will be produced to you in the future), and Mr. Ferrer's counsel have confirmed that no JDA-protected material has been discussed during Mr. Ferrer's subsequent interviews by the government.  Finally, the government also has not received a copy of the actual JDA or any other common interest agreement (we have avoided doing so, in an abundance of caution, precisely because we wish to avoid any grey areas).

Furthermore, even if (contrary to the government's best efforts) Mr. Ferrer had somehow disclosed JDA-protected information during his discussions with the government, the timing of his proffer undermines any claim of prejudice.  As noted, the United States did not meet with Mr. Ferrer, or receive a proffer of information from Mr. Ferrer's counsel, until April 5, 2018.  As a result, no information from Mr. Ferrer was used to obtain the March 28, 2018 indictment or obtain any of the search warrants in this case.  Moreover, as you know from our extensive "reverse proffer" to you in December 2017, the theory underlying the indictment has long been transparent.

Courts have concluded that when (as here) the government establishes that it has taken steps to avoid the disclosure of JDA-protected information, the cooperator's counsel has averred that no such disclosure has occurred, and the defendant merely suspects (notwithstanding those avowals) that he was prejudiced by an improper disclosure, there is no entitlement to an evidentiary hearing.  *See, e.g., United States v. Aulicino*, 44 F.3d 1102, 1117 (2d Cir. 1995) (affirming district court's denial of evidentiary hearing, where defendants

May 14, 2018
Page 3 of 4

alleged that government had obtained JDA-protected information from a cooperator, because the "government presented evidence of the steps it took to insulate the [prosecutors] from any knowledge gained by [the cooperating witness] from his contact with the codefendants after he agreed to cooperate" and the defendants "did not present any evidence to suggest that [the cooperating witness] revealed any privileged information to the government"); *Salvagno*, 306 F. Supp. 2d at 272 ("[T]he court denies defendants' motion requesting an order directing an evidentiary hearing.   Defendants have failed to allege specific facts that indicate communication of privileged information to the Government and prejudice resulting therefrom.   Moreover, the government avers that it neither sought nor accepted any [such] information."); *United States v. Anderson*, 288 F.3d 335, 338 (7th Cir. 2002) (affirming denial of evidentiary hearing, where defendant alleged that cooperators shared privileged information with the prosecution, because the defendant had "not alleged with sufficient detail, definitiveness, or specificity" the privileged matters that were allegedly disclosed).

Finally, to the extent your letter reflects a belief that the government's decision to file the disqualification motion was somehow improper, that belief is incorrect.   The potential conflict-of-interest issues in this case did not even come to my attention until April 8, during a phone call with Mr. Larkin's former attorneys (who simply inquired if the government had any concerns about the anticipated representation arrangements in the case).   We did not initially recognize the seriousness of those issues, as evidenced by the fact that the government did not object when the HCM firm represented Mr. Lacey during various hearings on the week of April 9-13 or when various DWT lawyers filed notices of appearance during the week of April 9-13.

Once the conflict-of-interest issues became more apparent to us, we conducted legal research.   This research confirmed that the DWT and HCM firms were, in fact, laboring under deep conflicts of interest.   Nevertheless, due to the sensitivity of the issues, we sought to engage in a meet-and-confer process before filing anything with the Court.   Among other things, we mentioned our concerns to Mr. Cambria and Ms. Henze Cook during a phone call on April 23, sent an email to Mr. Cambria and Ms. Henze Cook on April 24 identifying the various cases and ethical rules supporting our concerns, and participated in a conference call with you and other members of the defense team on April 25.   During this call, we specifically asked if there were any written agreements in which Mr. Ferrer had agreed to waive the DWT and HCM firms' conflicts of interests so they could represent Messrs. Lacey and Larkin.   None were mentioned.

The case law makes clear that prosecutors should bring conflict-of-interest issues to the Court's attention as soon as they become apparent, and courts have faulted prosecutors (and reversed convictions) for failing to do so or waiting to do so until the eve of trial.   *See, e.g., United States v. Iorizzo*, 786 F.2d 52, 59 (2d Cir. 1986) ("We add a final note.   The reversal here is the direct result of the prosecution's using defense counsel's conflict of interest as a means of affecting the evidence going before the jury instead of moving for his disqualification before the trial. . . .   We trust that this decision will ensure that a pretrial disposition of such issues will occur in the future."); *United States v. Henke*, 222 F.3d 633, 638 (9th Cir. 2000).

May 14, 2018
Page 4 of 4

That is simply what we have done here.  Indeed, before filing the motion, the United States consulted with Mr. Ferrer's counsel, primarily to confirm that the factual representations contained in the motion were accurate.  During these discussions, Mr. Ferrer's counsel stated that Mr. Ferrer did not wish to be a party to the motion.  As a result, the United States filed the motion on its own behalf, in the interest of protecting the integrity of the trial.  *See, e.g., United States v. Kight*, 2017 WL 4619024, *13 n.19 (N.D. Ga. 2017)  ("[T]he Court rejects Kight's argument that the Government, without Lankford's permission, is precluded from seeking Armstrong's disqualification or that Lankford was required to join in the Government's Motion."); *United States v. Culp*, 934 F. Supp. 394, 399 (M.D. Fla. 1996) (granting government's disqualification motion and stating that defense counsel's "argument that the Government lacks standing to raise the issue of a potential conflict gives short shrift to the respective interests of the Government and the Court in ensuring that judgments remain intact on appeal. . . .  [Counsel's] challenges to the Government's standing betray a conception of the interests at stake in this motion which is both unduly narrow and overly simplistic.").

Sincerely,

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*/s Kevin Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

KMR/zs

**EXHIBIT A**

## PROFFER/INTERVIEW AGREEMENT

The ground rules and conditions for any proffer/interview are set forth in this document, which is 3 pages.

The parties to this Agreement are the First Assistant United States Attorney through her Assistant U.S. Attorneys, Kevin M. Rapp, Dominic Lanza, Margret Perlmeter and Reginald Jones, Trial Attorney, Department of Justice, Kirsta Leeburg Melton, Assistant Attorney General, State of Texas, Randy Mailman, Deputy Attorney General, Office of the Attorney General, State of California, ("the Prosecution") and Carl Ferrer and Mr. Ferrer's counsel, Nanci Clarence and Jonathan Baum.

This Agreement binds the U.S. Department of Justice, and the Attorney Generals' Offices for the States of California and Texas.

1.   The purpose of any proffer/interview is to evaluate oral and written statements and proffered information given by Mr. Ferrer and his agents (including but not limited to his attorneys) concerning his involvement with Backpage.com and related entities. Mr. Ferrer agrees to proffer information or participate in any interview on an entirely voluntary basis. Mr. Ferrer also understands and agrees that he is not compelled in any way to participate in this interview.

2. Mr. Ferrer voluntarily waives all claims of attorney-client privilege, whether in his personal or official capacity as the Chief Executive Officer of Backpage.com, LLC as to communications with any attorney or law firm that represented Backpage.com, or any related entity, where such communications concerned or related to Backpage.com or any related entity. This waiver does not apply to Mr. Ferrer's current attorneys, Nanci Clarence, Jonathan Baum and anyone working on their behalf. Mr. Ferrer voluntarily agrees to provide all documents and other material that may be relevant to the investigation and that are in his possession or control. However, Mr. Ferrer shall not disclose any documents or information protected by the Joint Defense Agreement in this matter. Mr. Ferrer understands that his proffer/interview and any benefit he may receive from information he provides to the prosecution does not depend on his waiver of the attorney-client privilege.

3.   The agreement is explicitly contingent upon Mr. Ferrer providing truthful statements and truthful information.   In any interview or proffer, Mr. Ferrer and his agents will completely and truthfully answer all questions, will provide complete and truthful information relating to any and all matters, and will make no material misstatements or omissions of facts.   Mr. Ferrer further understands that he will neither attempt to protect any person or entity nor falsely implicate any person or entity, through false information or omission. Nevertheless, no truthful statements made by or truthful information provided by Mr. Ferrer or his agents during the interview, or otherwise proffered, will be used directly against Mr. Ferrer during any litigation or proceeding instituted by the Prosecution.   The Prosecution will be the ultimate arbiter of the truthfulness of any statement or information.

4. Nothing in paragraph 4 above, however, prevents the Prosecution from making derivative use of and pursuing any investigative leads (i.e. fruits) suggested by any statements made by or other information proffered or provided by Mr. Ferrer or his agents. In other words, except as expressly stated above, Mr. Ferrer understands and agrees that there are no limitations whatsoever on the use the Prosecution can make of the testimony and information provided in any interview or otherwise proffered by Mr. Ferrer or his agents, either orally or in writing, both before and after any interview of Mr. Ferrer. Mr. Ferrer expressly waives any right to challenge the derivative use of any statements or information provided during the interview or otherwise proffered by Mr. Ferrer or his agents. It is the intent of this agreement that such derivative use is proper and the Prosecution and Mr. Ferrer hereby agree that Federal Rule of Criminal Procedure 11(f), and Federal Rules of Evidence 408 and 410 and, do not govern such derivative use in any litigation or other proceedings. This provision is necessary to eliminate any need or argument for a *Kastigar* hearing at which the Prosecution would have to prove that the evidence it would introduce at trial, or any other proceedings, is not associated with or tainted by any statements made by or other information provided by Mr. Ferrer during any interview, or was otherwise proffered to the Prosecution by Mr. Ferrer or his agents.

5. If Mr. Ferrer is a witness at any trial or other proceeding relating to the information he provides to investigating agents, and offers testimony materially different from any statements or other information provided during the interview or otherwise proffered by Mr. Ferrer or his agents, the Prosecution may cross-examine witnesses (including Mr. Ferrer) and introduce rebuttal evidence concerning any statements or other information provided during any interview or otherwise proffered by Mr. Ferrer or his agents. In addition, the Prosecution reserves the right to prosecute Mr. Ferrer for perjury, false official statement or obstruction of justice to the fullest extent provided by law. If such a prosecution occurs, the Prosecution can use directly, and derivatively, in their case-in-chief, in cross-examination and in rebuttal, any statements and information provided by Mr. Ferrer, whether directly or indirectly through his agents, or derivatively linked to the statements and other information Mr. Ferrer or his agents supplied in any interview or other proffer by Mr. Ferrer or his agents. This provision is needed to ensure that Mr. Ferrer does not abuse the opportunity for an interview or proffer of information, does not make materially false statements to a government agency either orally or in writing (directly or indirectly), and does not commit perjury when testifying at trial or in any other legal proceeding

6. Mr. Ferrer understands that the law (specifically, *Brady v. Maryland*) requires that the Prosecution provide any person against whom charges are brought, all information which tends to mitigate or negate the person's guilt as to the offenses charged. Therefore, Mr. Ferrer understands that if *Brady* material is developed or produced from the interview or in any proffer, then the Prosecution would be required to disclose this information to the appropriate defendants and/or their attorneys at the time the obligation is imposed on the Prosecution. This provision is included to permit the Prosecution to comply with its discovery obligations and is not intended to discourage Mr. Ferrer from providing information to the Prosecution.

7. With the exception of providing required notice under the Joint Defense Agreement in this case, Mr. Ferrer will not, personally or through any other person (including but not limited to his attorneys), disclose the existence of this agreement or any interview or proffer, or anything otherwise said during the interview or proffered to the Prosecution, or any information relating to

Mr. Ferrer's cooperation with the Prosecution (except that if an attorney for another putative or actual defendant asks Mr. Ferrer's counsel or successors whether Mr. Ferrer is cooperating with the United States, counsel or successors may confirm the fact that Mr. Ferrer is cooperating, but will not disclose any other information about Mr. Ferrer's cooperation).

8.   This document is the full and complete Agreement of the parties with regard to any interview or proffered information.   No other promises, representations or agreements have been made by or between the parties with regard to any proffer/interview or the underlying matters referenced in this written agreement. The parties shall at all times act in good faith to accomplish their intent in entering into this Agreement. Any dispute between the parties as to whether either party has failed to fulfill any of its obligations under this Agreement shall be submitted to and decided by the United States District Court for the District of Arizona.


AGREED:                          ELIZABETH A. STRANGE
                                 First Assistant United States Attorney

4/5/18
DATE                             KEVIN M. RAPP
                                 DOMINIC LANZA
                                 MARGRET PERLMETER
                                 Assistant U.S. Attorneys


DATE                             REGINALD E. JONES, Trial Attorney
                                 U.S. Department of Justice
                                 Child Exploitation and Obscenity Section

4/5/18
DATE                             KIRSTA LEEBURG MELTON
                                 Assistant Attorney General,
                                 Office of the Attorney General, State of Texas


4/5/18
DATE                             RANDY MAILMAN,
                                 Deputy Attorney General,
                                 Office of the Attorney General, State of California

4/5/18
DATE                             CARL FERRER


4/5/18
DATE                             NANCI CLARENCE, ESQ.
                                 JONATHAN BAUM, ESQ.



**EXHIBIT 3**

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR-18-00422-PHX-SPL (BSB) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| 1.  Michael Lacey, and | ) | |
| 2.  James Larkin, | ) | |
| | ) | |
| Defendants | ) | |

## <u>DECLARATION OF EDWARD F. NOVAK</u>

I, Edward F. Novak, declare:

1.  I am an attorney located in Phoenix, Arizona, where I have been in practice since 1979.  A portion of my practice involves legal and professional ethics, and I regularly provide ethical advice to lawyers in private practice.  I also practice in the area of criminal defense.

2.  I received a bachelor's degree from Knox College in 1969 and a law degree from DePaul University in 1976, where I served as the Note and Comment Editor on the DePaul University Law Review.  I was licensed in Illinois in 1976 and in Arizona in 1979.  In 1985 I was admitted to the District of Columbia Bar.

3.  I served as President of the Board of Governors of the State Bar of Arizona in 2008-2009.  I have taught legal ethics and professional responsibility on an adjunct basis at Arizona State University's Sandra Day O'Connor College of Law. I have been on the Arizona Supreme Court Committee on Character and Fitness since 2009 and currently serve as chair.  I am familiar with the Arizona Rules of Professional Conduct governing lawyers practicing in Arizona.

4.  I have written and presented on ethical issues including conflicts issues on numerous occasions for both the State Bar of Arizona and the Arizona Prosecuting Attorneys' Advisory Council.

5.  I have no professional or personal relationship that prevents me from providing independent ethical advice to Tom Henze and Janey Henze Cook in this matter.

1

6. I met with Mr. Henze, Ms. Henze Cook, and Mr. Stein, and we thoroughly discussed the ethical issues presented by the Government's pending Motion to Disqualify Counsel.  Specifically, I understand the Government contends that Mr. Henze and Ms. Henze Cook may not continue to represent Michael Lacey in any capacity because they previously represented a potential witness against Mr. Lacey, Carl Ferrer in a substantially related matter as that term in used in ER 1.9.

7. I understand that Mr. Henze and Ms. Henze Cook propose a continuing, limited representation of their longtime client, Mr. Lacey, in which capacity they would represent him in the following ways: (1) in connection with forfeiture proceedings that are taking place in parallel to the criminal case; and (2) in connection with compliance with the conditions of Mr. Lacey's pretrial release.

8. In meeting with Mr. Henze and Ms. Henze Cook, it is clear to me that they fully understand and respect their obligations to their former client and that they have no intention of taking any action detrimental to his interests.  In particular, they have been and will be vigilant about not sharing Mr. Ferrer's confidential communications.  In further recognition of their obligations, Henze Cook Murphy, their law firm, has implemented an ethical screen between themselves and the other members of the defense team in the pending criminal case to make it clear to everyone involved in the case the limitations on their continuing involvement in the matter.

9. With these protections in place, the interests of their former client as articulated in ER 1.9 are well protected.  While the matters of forfeiture and pretrial release are related, they are not substantially related.  As stated in the comment to ER 1.9, "Matters are 'substantially related' for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information would materially advance the client's position in the subsequent matter."  If either the forfeiture proceeding, or a pretrial release violation hearing were to put confidential client information at risk, then continued representation would need to be reconsidered.  At this time, it is my opinion that the limited scope of the proposed representation and the ethical safeguards in place effectively mitigate the risks presented by the proposed representation.  I have also considered Mr. Lacey's Sixth Amendment right to the counsel of his choice but believe that the Court is capable of that evaluation without expert assistance.

*[Signature on following page.]*

2

EXECUTED this 6th day of June, 2018.

_____
Edward F. Novak

*with permission*