ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

JOHN J. KUCERA (Cal. Bar No. 274184,john.kucera@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1200
Los Angeles, CA 90012
Telephone (213) 894-3391

JOHN P. CRONAN
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-18-422-PHX-SPL (BSB) |
| Plaintiff, | **UNITED STATES' REPLY IN SUPPORT OF MOTION TO DISQUALIFY COUNSEL (HCM FIRM)** |
| v. | |
| Michael Lacey, et al., | **[Reply to CRs 174 and 176]** |
| Defendants. | |

## INTRODUCTION AND SUMMARY OF ARGUMENT

From 2012-17, the law firm of Henze Cook Murphy ("HCM") has served as Carl Ferrer's personal criminal counsel and represented Ferrer in an array of lawsuits.  Over this span, the HCM firm has prepared Ferrer to be deposed, obtained confidences from Ferrer,

and otherwise shaped Ferrer's legal strategy.  The crux of that strategy was to deny that Backpage had engaged in any wrongdoing with respect to the publication of advertisements for child and adult prostitution.

Recently, Ferrer chose to obtain new counsel, terminate his relationship with the HCM firm, plead guilty to Backpage-related charges, and cooperate in the pursuit of criminal charges against other Backpage principals, including Michael Lacey. Remarkably, the HCM firm responded by filing a notice of appearance on behalf of Lacey. This prompted the United States to file a motion to disqualify.  In response, Lacey (CR 174) and the HCM firm (CR 176) have filed opposition briefs.

Notably, both of the HCM-related briefs concede the HCM firm cannot ethically serve as trial counsel in this case due to the firm's prior representation of Mr. Ferrer.  For example, Lacey acknowledges "that HCM cannot participate in his defense at trial because HCM could not cross-examine Mr. Ferrer." *See* CR 174 at 3.  Similarly, the HCM firm acknowledges that its role must be "closely circumscribed" and "dramatically limit[ed]" and that it cannot participate in any way "in cross-examination or preparation for cross-examination." *See* CR 176 at 10-12.  Despite these important concessions, however, Lacey and the HCM firm urge the Court to deny the disqualification motion because (1) the HCM firm will agree to limit its representation to a handful of discrete issues that are purportedly not adverse to Mr. Ferrer, (2) Ferrer purportedly waived his attorney-client privilege with respect to HCM, and (3) Ferrer did not explicitly join in the disqualification motion.

As explained below, these arguments are unavailing.  *First*, this Court's rules do not permit the sort of "limited representation" arrangement being proposed by the defense.  An attorney who enters an appearance in a criminal case is responsible for all issues in the case and cannot seek to carve out a preferred subset of issues to litigate while disclaiming responsibility for everything else.  The law of the Ninth Circuit, the applicable ethical rules, and common sense all make clear that, once the sort of stark ethical conflict at issue here (*i.e.,* defense counsel served for five years as the cooperator's personal attorneys) arises, the only remedy is disqualification.  Furthermore, it is simply not true that, by limiting its

role to litigating forfeiture-related issues on Lacey's behalf, the HCM firm can avoid any adversity with Ferrer.  The forfeiture proceedings are virtually certain to involve a sustained attack by the defense on Ferrer's credibility and an attempt to impeach Ferrer with prior statements he made while being represented by the HCM firm.

*Second*, the claim that Ferrer waived the privilege as to the HCM firm is both inaccurate and irrelevant.  Ferrer's waiver only applied to Backpage's corporate attorney-client privilege, not his personal privilege with current or former counsel.  Moreover, even if there were a personal waiver, disqualification is mandated because the HCM firm owes a duty of loyalty to Ferrer—a duty that is more expansive than the duty to maintain the confidentiality of privileged information.

*Third*, and finally, the fact Ferrer did not formally "join" in the disqualification motion is a red herring.  Multiple courts have recognized that such a joinder is unnecessary—the United States and the Court have an independent interest in ensuring the integrity of judicial proceedings.  In any event, Ferrer's conduct should not be viewed as some tacit acknowledgement that the HCM's continued participation in this case is acceptable to him.  Ferrer previously wrote a letter to the HCM firm objecting to its representation of Lacey and has further explained, in a declaration filed concurrently with this reply, that he didn't join in the government's motion simply because he didn't think it was necessary to do so.

## ARGUMENT

A.    The Proposed "Limited Representation" Arrangement Is Improper And Would Not Cure The Conflict

The primary argument developed in the two HCM-related briefs is that the HCM firm shouldn't be disqualified because it will agree to provide "limited representation . . . on compliance with conditions of release, forfeiture, and unrelated personal matters" and will agree not to "act[] as trial counsel or shar[e] any confidential information with Mr. Lacey's trial counsel in this prosecution."  *See* CR 174 at 3-4.  The defense contends that, once the scope of the HCM firm's representation is limited in this fashion, its participation

will "present[] no actual or potential conflict with its prior representation of Mr. Ferrer under Rule 1.9." *See* CR 174 at 8-9. *See also* CR 176 at 9 ("By narrowly crafting HCM's representation of Mr. Lacey, HCM has insured that its former client, Mr. Lacey, will receive the benefit of ER 1.9.").

These arguments lack merit. As an initial matter, this Court's rules do not permit a law firm to make a limited appearance on behalf of a criminal defendant, designate the subset of issues it wishes to be responsible for handling, and disclaim any responsibility for the remaining issues in the case. To the contrary, when an attorney or law firm enters a notice of appearance, it "*shall be deemed responsible as attorney of record in all matters* before and after judgment until the time for appeal expires or until there has been a formal withdrawal from or substitution in the case." *See* Ariz. L.R. Civ. P. 83.3(a) (emphasis added). *See also* Ariz. L.R. Crim. P. 57.14 (adopting same rule in criminal cases).[1]

The defense's unusual proposal would also create practical difficulties. Put simply, there would be no way for the United States, Ferrer, or the Court to verify whether the HCM firm was actually limiting its representation to the three topics identified in the opposition brief (*i.e.,* forfeiture, release conditions, and "personal matters"). During the parties' meet-and-confer process, the HCM firm's proposed areas of representation were not limited to those three topics but also encompassed other areas, such as managing the defense team's document database and "developing legal arguments," that are amorphous and could easily be adverse to Ferrer. *See* Exhibit A (letter from defense counsel). The defense's recent change in position only underscores the intractable monitoring problems that would arise if its proposal were accepted.

It is also notable that, despite providing 29 pages' worth of briefing and argument,

---

[1]    Furthermore, although some other Districts authorize limited scope representation in certain circumstances, such representation is particularly disfavored in criminal cases. *See* District of Colorado's website ("Limited Scope Representation (LSR). . . is permitted in the U.S. District Court for the District of Colorado in all civil cases . . . but NOT criminal cases . . . .").

the two HCM-related briefs barely acknowledge—let alone attempt to distinguish—Arizona Ethics Opinion 91-05, which was discussed in extensive detail in the United States' motion.  This opinion forbids exactly what the defense is attempting to do here (*i.e.,* attempt to cure a conflict of interest by limiting the scope of the conflicted attorney's representation).  *See* Az. Ethics Op. 91-05 ("[The former client] will thus be confronted with the uncomfortable fact that her former lawyers are cooperating closely with a lawyer who will cross examine her at trial.  ER 1.9(a) is designed to prevent precisely such discomfort from arising.").  *See also Roosevelt Irr. Dist. v. Salt River Project Agr. Imp. & Power Dist.*, 810 F. Supp. 929, 950-57 (D. Ariz. 2011) (analyzing interplay between Arizona Ethical Rules 1.9 and 1.10, expressing "grave concerns" about efficacy of screening, and emphasizing that a screened attorney must, in any event, have no role in the new case posing the conflict).

The defense's proposal also fails under Ninth Circuit law, which, like Arizona law, recognizes that the remedy for a conflict under ER 1.9(a) is disqualification, not using ethical screens or having conflicted counsel promise to limit its work to some subset of issues.  *See, e.g., United States v. Stites*, 56 F.3d 1020, 1025 (9th Cir. 1995) (affirming disqualification order in criminal case and emphasizing that the district court was correct to "treat . . . skeptically" the defense's proposal to set up an internal screen because such "an unusual arrangement [would be] almost impossible to monitor.  The Chinese wall might have crumbled.  It was within the discretion of the district court to reject it."); *United States v. Vargas-Martinez*, 569 F.2d 1102, 1104 (9th Cir. 1978) (affirming disqualification of defense attorney due to prior representation of cooperating witness in state-court proceeding: "While a defendant's choice of counsel should not be subject to unnecessary interference, this right is not unlimited. . . . *[T]he only possible method of adequately resolving the problem was to order substitution of counsel . . . .*") (emphasis added).  *Cf. United States v. Stepney*, 246 F. Supp. 2d 1069, 1085 (N.D. Cal. 2003) (recognizing "the general principle that where an attorney has actually obtained confidential information relevant to her representation of a client, the law presumes that she cannot avoid relying on

1   the information—however indirectly or unintentionally—in forming legal advice and trial

2   strategy"). [2]

3        Finally, the HCM firm's "limited representation" proposal also should be rejected

4   because one of the issues the HCM firm wishes to continue litigating—forfeiture—would

5   create a significant risk of adversity with Ferrer.  One of the key disputed issues in the

6   forfeiture proceedings will be whether the Backpage-derived money that was routed

7   through Lacey's bank accounts was tainted.  Ferrer's guilty plea, and the guilty plea that

8   Ferrer entered on behalf of Backpage, provide strong support for the government's view

9   that the money is tainted.  As a result, it is a virtual certainty that Lacey will seek to attack

10  Ferrer's credibility (and the admissions contained in his plea agreements) as part of the

11  forfeiture proceedings.

12       Indeed, it is anticipated that such forfeiture-related impeachment efforts will include

13  impeaching Ferrer with prior testimony he provided *while being represented by the HCM*

14  *firm*.  In August 2015, Ferrer was deposed as part of the *Backpage v. Dart* case.  The

15  attorneys representing Ferrer during that deposition were Tom Henze and Janey Henze

16  Cook, and Mr. Henze explained at the outset that, in an effort to prepare Ferrer to be

17  deposed, he had spent "four to six hours . . . where we had Mr. Ferrer in the room."  *See*

18  Exhibit B at 12:1-10 (deposition excepts).  Moreover, during recent proceedings in the *Dart*

19  case, the law firm of Davis Wright Tremaine ("DWT") announced that it intends to use

20  this deposition testimony to impeach Ferrer's guilty plea.  *See* Exhibit C at 13 ("Mr.

---

23  [2]     Although the defense has identified two decisions from outside the Ninth Circuit

24  that approved the use of internal screens within the defense team to cure ethical conflicts,
    *see United States v. Lorenzana-Cordon*, 125 F. Supp. 3d 129 (D.D.C. 2015), *and United
    States v. Caramadre,* 892 F. Supp. 2d 397 (D.R.I. 2012), these non-binding decisions

25  obviously cannot override Arizona and Ninth Circuit law.  Moreover, those decisions are
    distinguishable because the former client in each case consented to the representation

26  arrangement.  *Lorenzana-Cordon*, 125 F. Supp. 3d at 138-39 ("[M]ost of the cases . . . in
    which courts rejected similar 'Chinese Wall' arrangements were complicated by the fact

27  that either the defendant or the witness or both did not provide voluntary and knowing
    consent to . . . the 'Chinese Wall' arrangement. [Here], the witness consented to conflicted

28  representation . . . and to the arrangement with Mr. Katzoff as second counsel.");
    *Caramadre*, 892 F. Supp. 2d at 401 (same).

1   Ferrer's statements in connection with his negotiated plea agreements are inconsistent with

2   his prior sworn testimony in certain respects, and he will have to answer for the

3   contradictions on his own.").[3]

4        It is difficult to imagine a scenario where the conflicts of interest could be more

5   stark.  HCM wishes to represent Lacey in a forfeiture proceeding in which Lacey will seek

6   to use Ferrer's previous deposition testimony—testimony the HCM firm helped develop

7   and defend while serving as Ferrer's criminal counsel—to undermine Ferrer's credibility.

8   Disqualification is required to avoid this unseemly spectacle.

9   B.    The Privilege Waiver Arguments Are Inaccurate And Irrelevant

10       Lacey argues—in a section of his brief conspicuously devoid of any supporting case

11  law—that the disqualification motion must be denied because Ferrer has waived his

12  attorney-client privilege with the HCM firm.  *See* CR 174 at 7-8.  *See also* CR 176 at 7

13  (same).

14       This argument is easily rejected.  As a threshold matter, it is not true that Ferrer has

15  waived his personal attorney-client privilege with the HCM firm.  On April 5, 2018, Ferrer

16  executed a two-page document entitled "Waiver of Attorney Client Privilege."  It is

17  enclosed as part of Exhibit B to Lacey's motion.  In the last paragraph of this document,

18  Ferrer made clear that he was only waiving Backpage's corporate attorney-client privilege

19  and was not waiving his personal attorney-client privilege, either with his current attorneys

20  (from the Clarence Dyer law firm) or with any attorneys who previously represented him

21  on an individual basis: "*I further state that this waiver does not apply to any aspect . . . of*

22

23

24  [3]    During a recent hearing in *R.O. v. Medalist Holdings* (a tort lawsuit brought by a
    trafficking victim against Ferrer, Lacey, and Larkin), the DWT firm made similar

25  statements.  *See* Exhibit D at 53:24 – 54:1 ("Mr. Ferrer may be subject to cross-examination
    or discovery about his prior inconsistent statements.").  Notably, at the conclusion of the

26  *R.O.* hearing, the trial judge disqualified DWT from representing Larkin and Lacey, finding
    that the case posed such "intertwined" conflicts of interest that DWT's continued

27  participation would "create an injustice on the administration of justice."  *See* Exhibit D at

28  61:12-19.

*my personal attorney-client relationship with attorneys who have represented me in the past or who currently represent me . . . .*" *Id.* (emphasis added).  The United States explained this distinction in a letter to defense counsel.  *See* Exhibit E.

Ignoring this document, Lacey points to a separate document—a "proffer agreement" that Ferrer executed on April 5, 2018—as the basis for his claim that Ferrer has waived his personal attorney-client privilege with the HCM firm.  In particular, Lacey points to the proffer agreement's second paragraph, which states:

> Mr. Ferrer voluntarily waives all claims of attorney-client privilege, whether in his personal or official capacity as the Chief Executive Officer of Backpage.com, LLC ***as to communications with any attorney or law firm that represented Backpage.com, or any related entity***, where such communications concerned or related to Backpage.com or any related entity.

*See* CR 174, Exhibit B, at 2 ¶ B (emphasis added).  Although this language is not a model of clarity, it was the parties' intention that it would simply track the approach set forth in the formal "Waiver of Attorney Client Privilege" document—that is, it would only waive Backpage's corporate attorney-client privilege but not Ferrer's personal privilege.  *See* Exhibit F, ¶ 45 (Ferrer declaration).  This is why the waiver only applied to "communications with any attorney or law firm that represented Backpage.com, or any related entity."  It was not meant to apply to attorneys and law firms that represented Ferrer in a personal capacity (such as the HCM firm).  The prefatory language at the beginning of the paragraph, discussing Ferrer's "personal or official capacity," was simply meant to demonstrate that Ferrer had a basis for effectuating the corporate privilege waiver.

Furthermore, even if the language in the proffer agreement could be construed as encompassing Ferrer's personal attorney-client privilege with the HCM firm, the waiver was not an irrevocable or permanent one—it was simply a conditional agreement that, during Ferrer's proffer sessions with the government, he would agree to discuss matters related to the HCM firm *if asked to do so*.  This topic, however, has never been broached during Ferrer's proffer sessions.  Accordingly, nothing has been waived.

Finally, the defense's waiver arguments also fail for a more fundamental reason.

Disqualification is required in this circumstance because the HCM firm owes a duty of loyalty to Ferrer, which is broader than the duty to maintain confidences. As the Ninth Circuit has explained: "Disqualification does not depend upon proof of the abuse of confidential information. Because of the sensitivity of client confidence and the profession's institutional need to avoid even the appearance of a breach of confidence, disqualification is required when lawyers change sides in factually related cases." *Trone v. Smith*, 621 F.2d 994, 1001 (9th Cir. 1980). For this reason, courts have ordered disqualification under Rule 1.9 even where the former client's communications with counsel have lost their confidentiality. *See, e.g., United States v. Fawell*, 2002 WL 1284388 (N.D. Ill. 2002) ("[T]he court does not agree that the [loss of confidentiality] eliminates the conflict resulting from Altheimer's prior representation . . . . That suggestion assumes that the purpose of Rule 1.9(a) is limited to protecting the former client's secrets. Other courts and commentators do not view the purpose so narrowly; they conclude instead that the prohibition against representation of another person in a same or substantially related matter relates both to the lawyer's duty of confidentiality and his or her duty of loyalty to that former client.").[4] Put simply, under Rule 1.9, and absent informed consent,[5] "[a] lawyer who has formerly represented a client in a matter *shall not* thereafter represent

---

[4]    *See also Touchcom, Inc. v. Bereskin & Parr*, 299 Fed. App'x 953, 955 (Fed. Cir. 2008) (granting disqualification motion and emphasizing that Rule 1.9 "safeguards not only confidentiality, but also the client's expectation of the attorney's loyalty and public confidence in the integrity of the bar"); *Sec. Investor Protection Corp. v. R.D. Kushnir & Co.*, 246 B.R. 582, 589 (N.D. Ill. Bkr. Ct. 2000) ("Rule 1.9 is not limited to situations where a former client would be harmed by the divulgence of confidential information. . . . [T]he loyalty principle is an independent and sufficient basis for precluding a lawyer from accepting an adverse subsequent representation."); *Selby v. Revlon Consumer Prods. Corp.*, 6 F. Supp. 2d 577, 582 (N.D. Tex. 1997) ("[T]he ethical obligations embodied in ABA Rule 1.9 go far beyond the preservation of client confidences. The rule also concerns the duty of loyalty to a former client.").

[5]    Lacey suggests the proffer agreement is tantamount to an "informed consent" authorizing the HCM firm to represent Lacey. *See* CR 174 at 7. This claim requires little discussion. A privilege waiver is not the same thing as a conflict waiver.

1    another person in the same or a substantially related matter in which that person's interests

2    are materially adverse to the interests of the former client." *See generally Foulke v. Knuck*,

3    794 P.2d 723, 728 (Ariz. Ct. App. 1989) ("ER 1.9(a) . . . does not require that confidences

4    and secrets be divulged in order for a conflict to exist or for disqualification to be proper.

5    Regardless of what was communicated during the representation of the former client, the

6    rule prohibits subsequent representation of an individual whose interests are substantially

7    adverse to those of the former client."); Ariz. R. Prof. Conduct 1.9, comment 2 ("The

8    underlying question is whether the lawyer was so involved in the matter that the subsequent

9    representation can be justly regarded as a changing of sides in the matter in question.").

10   C.    The Absence Of A Formal "Joinder" Is A Red Herring

11          The defense's final argument is that the Court should refrain from ordering

12   disqualification "because Mr. Ferrer . . . declined to participate in the Government's

13   motion." *See* CR 174 at 2. *See also* CR 176 at 12 (same).  Lacey contends that the "failure

14   to join the Government's Motion strongly suggests the government is seeking

15   disqualification for its own tactical reasons." *See* CR 174 at 8.

16          This argument misses the mark.  Time and again, the courts have rejected the notion

17   that a cooperator must formally "join" in the government's disqualification motion.  *See,*

18   *e.g., United States v. Kight*, 2017 WL 4619024, *13 n.19 (N.D. Ga. 2017)  ("[T]he Court

19   rejects Kight's argument that the Government, without Lankford's permission, is precluded

20   from seeking Armstrong's disqualification or that Lankford was required to join in the

21   Government's Motion.").  As one court has explained, this argument "gives short shrift to

22   the respective interests of the Government and the Court in ensuring that judgments remain

23   intact on appeal" and "betray[s] a conception of the interests at stake . . . which is both

24   unduly narrow and overly simplistic." *United States v. Culp*, 934 F. Supp. 394, 399 (M.D.

25   Fla. 1996).  Indeed, even if the government hadn't filed a motion, the Court would possess

26   the independent authority to inquire into the potential conflicts posed by the representation

27   arrangements in this case and, if necessary, order disqualification. *Stepney*, 246 F. Supp.

28   2d at 1077 ("These supervisory powers unquestionably allow courts to require disclosure

1    of the precise nature of a criminal defendant's representation to ensure that no conflict of

2    interest exists . . . .  Courts have routinely intervened—prior to any controversy arising—

3    where the circumstances of a criminal defendant's representation raises the potential for

4    conflict of interest during the course of the proceedings, even before intervention is

5    required by statutory or constitutional rule.").

6            Finally, the defense should know better than to suggest that Ferrer is somehow

7    agnostic to the issues presented here.  On April 13, 2018, Ferrer wrote a letter to the HCM

8    firm in which he practically begged Mr. Henze and Ms. Henze Cook to comply with their

9    ethical duties under ER 1.9, emphasized that there was "a direct, incurable conflict between

10   me and Mr. Lacey and Mr. Larkin," and made clear that he was not consenting to their

11   continued participation in this case.  That letter was enclosed as Exhibit B to the United

12   States' disqualification motion.  It is disingenuous for the defense to ascribe some nefarious

13   motive to the government under these circumstances.  Furthermore, Ferrer has now

14   explained, in paragraphs 3-8 of the declaration enclosed as Exhibit F, that he strongly

15   opposes the HCM firm's efforts to represent Lacey and simply didn't think it was necessary

16   to join in the government's motion.

17           Respectfully submitted this 13th day of June, 2018.

18                                          ELIZABETH A. STRANGE
                                            First Assistant United States Attorney
19                                          District of Arizona

20                                          /s Kevin Rapp
                                            KEVIN M. RAPP
21                                          MARGARET PERLMETER
                                            PETER S. KOZINETS
22                                          ANDREW C. STONE
                                            Assistant U.S. Attorneys
23
                                            JOHN J. KUCERA
24                                          Special Assistant U.S. Attorney

25                                          JOHN P. CRONAN
                                            Acting Assistant Attorney General
26                                          Criminal Division, U.S. Department of Justice

27                                          REGINALD E. JONES
                                            Senior Trial Attorney
28                                          U.S. Department of Justice, Criminal Division

- 11 -

Child Exploitation and Obscenity Section

**<u>Certificate of Service</u>**

I hereby certify that on this date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants: Anne Chapman, Erin McCampbell, James Grant, Lee Stein, Paul Cambria, Robert Corn-Revere, Ronald London, Janey Henze Cook, John Littrell, Kenneth Miller, Thomas Bienart, Jr., Bruce Feder, Michael Kimerer, Rhonda Neff, KC Maxwell, David Wakukawa, Michael Piccarreta, Stephen Weiss.

*s/ Sally Hawley*
U.S. Attorney's Office

# **<u>Exhibit A</u>**



**MITCHELL STEIN CAREY CHAPMAN** PC

ATTORNEYS AT LAW

**Lee Stein**
P 602 358 0292 | M 602 478 1772 | F 602 358 0291
lee@MSCCLaw.com

One Renaissance Square
2 North Central Ave., Suite 1450
Phoenix, AZ 85004
MSCCLaw.com

May 14, 2018

**VIA EMAIL**

Dominic Lanza
Kevin Rapp
Assistant United States Attorneys
United States Attorney's Office
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, AZ 85004
Dominic.Lanza@usdoj.gov
Kevin.Rapp@usdoj.gov

Re: Backpage/Henze Matter

Dear Dom and Kevin:

Thank you for your willingness to discuss with us the possibility of Henze Cook Murphy, PLLC participating in a limited fashion, consistent with its ethical obligations, in the representation of Mr. Lacey in criminal case number 2018-CR-00422-SPL. When we spoke last week, I told you that I intended to engage ethics counsel to help guide this discussion. I have done so. Ed Novak is serving that role and has assisted us in evaluating the competing interests at work here. You know his criminal defense credentials well, but he also has significant ethics experience as the Chair of the State Bar Committee on Character and Fitness, past President of the Arizona State Bar, and as an adjunct ethics professor. The combination of his experiences seemed to make him a good fit for helping us with this matter.

Tom and Janey fully appreciate that they may not ethically play a role in the case that is materially adverse to their former client Carl Ferrer, and they do not intend to do so. Admittedly, that leaves a rather limited role for them. Despite these limitations, Mr. Lacey very much wants them to be involved to whatever extent they can. Given what is at stake for Mr. Lacey in this matter, it makes sense to see if we can agree on a role for Henze Cooke Murphy; and if so, to present the proposed role to the Court so the Court can conduct an independent inquiry, if it wishes to do so. As part of such an inquiry, the Court can ensure that Mr. Ferrer's interests are protected and that Mr. Lacey's Sixth Amendment right to the counsel of his choice is respected as well. As Dom said when we met, the devil will be in the details. We agree. We think the roles can be separated out into

Dominic Lanza
Kevin Rapp
May 14, 2018
P a g e  | 2

categories, but before we do that, let me make clear what Tom and Janey will *not* do (and have not done):

- Disclose to anyone confidential information obtained from Mr. Ferrer
- Participate in the preparation of the examination of Mr. Ferrer at trial or any evidentiary hearing, or in the preparation to rebut his testimony
- Draft documents using facts provided by Mr. Ferrer which were not shared under the JDA
- Conduct the examination at trial of any witness for any party in 2018-CR-00422-SPL
- Participate in any tasks, research, discussion or drafting that relies on information provided by Mr. Ferrer and not shared pursuant to the JDA.

Our intent is to make clear that Tom and Janey have no intention of: (1) doing anything to the detriment of their former client; or (2) using information provided to them by their former client to his detriment. They understand their ethical obligations and have worked hard to maintain them.

There are five categories of work we think they can perform and that are consistent with their ethical obligations, which we would like to discuss with you.

**1.  Work for Michael Lacey Unconnected to the Government's Case**

There is a substantial body of work performed primarily by Janey for Mr. Lacey that has nothing to do with the case, some of which may not even constitute legal work. This includes things like dealing with a dispute with Mr. Lacey's HOA and his personal insurance and banking issues. None of this appears to even implicate ER 1.9 and therefore should not be an issue for the Government. If you disagree, let us know.

**2.  Compliance with Conditions of Release**

On Mr. Lacey's behalf, Janey has taken the lead on assisting him in complying with the terms of his release. This work includes interacting with Pretrial Services on issues such as travel, obtaining permission for financial expenditures above $1,000, recordkeeping, and maintaining contact with his Pretrial Services officer. In the event that the Government sought to modify the terms of his release or if there were an allegation that he violated a condition, Janey would be the person to address the matter, at least in the first instance. We do not see any adversity to Mr. Ferrer in this role, but if you do, we can discuss further.

**3.  Forfeiture**

When we met last week, the one specific area we discussed was assisting Mr. Lacey with respect to asset forfeiture. To a great extent, Mr. Ferrer would seem to have no interest in whether assets seized by the Government or identified for forfeiture and claimed by Mr. Lacey are subject to forfeiture. The exception to that general proposition might be the one we discussed when we met – if there were an argument that the assets are not subject to forfeiture because they are not proceeds of a crime because no crime was committed, as opposed to them not being proceeds because they can be traced to an entirely legitimate source. Excluding arguments regarding whether a crime was

committed, our analysis is that Tom and Janey may ethically participate in the forfeiture case by doing things such as identifying and tracing Mr. Lacey's assets, conducting legal research, drafting motions pertaining to the seizure and/or forfeiture of Mr. Lacey's assets, and analyzing constitutional issues implicated by the seizure of Mr. Lacey's assets.  Notably, Janey has been functioning in this role with Mr. Kucera and with Dom for some time and we expect that the Government might prefer to interact with someone who is knowledgeable about the identity and location of assets.

####     4.  Purely Legal Matters

As you know, Tom and Janey have been involved in matters relating to Village Voice Media, New Times, and Backpage for many years and as a consequence, they have previously considered many of the legal and constitutional issues presented by this case.  They would like to be able to continue to participate on Mr. Lacey's behalf with respect to purely legal matters, by conducting legal research, drafting and revising legal memoranda, and consulting with other lawyers on exclusively legal issues.  It is important to note that they would be conducting legal research, not applying the research to the facts.  (As an example and to put this in context, assuming the Government agrees that legal research related to forfeiture issues is not adverse to Mr. Ferrer, there would be additional research in the area of First Amendment law, as it relates to forfeiture.)  Mr. Ferrer cannot be adverse to Mr. Lacey with respect to the law, so we hope this is an area that the Government will not object to as well, provided that the work is limited to developing legal arguments and not relying on Mr. Ferrer's confidences.

####     5.  Administrative Tasks

Janey has played a central administrative role on the defense team, doing things such as scheduling calls with counsel, coordinating meetings and logistics, managing documents and the database and providing counsel with documents as requested.  None of this involves information obtained from Mr. Ferrer or is adverse to his interests.  It is, though, enormously helpful to the defense team because of Janey (and Tom's) institutional memory; they know what documents exist and how to put their hands on them.  They, of course, would not do anything that reveals confidential communications from Mr. Ferrer.  Instead, they (primarily Janey) would simply facilitate the orderly administration of this potentially unwieldy case, something that is especially helpful for people new to the case.  They would be receiving or retrieving the documents and disseminating them, not performing the analysis of them.

* * *

Neither Tom nor Janey see their roles going forward as being part of the trial team.  They understand that their prior representation of Mr. Ferrer precludes that.  If we can come to an agreement and if the Court agrees, they will draft a limited engagement letter and set up all of the necessary shields and screens to prohibit participation adverse to Mr. Ferrer.  We think they can serve a role that allows them to use the long history they have representing Village Voice Media, the New Times, Mr. Lacey personally and Backpage to the benefit of Mr. Lacey, without doing anything that is adverse to Mr. Ferrer or reveals his client confidences.  We think such a role nicely balances Mr.

Dominic Lanza
Kevin Rapp
May 14, 2018
P a g e  | **4**

Ferrer's legitimate interest in ensuring that confidential information he shared with his lawyers will not be revealed and used to his detriment and Mr. Lacey's Sixth Amendment interest in having counsel of his choice.  *See In re Grand Jury Proceedings*, 859 F.2d 1021, 1026 (1st Cir. 1988) ("While we have recognized that a district court has some discretion to limit the exercise of the right to counsel of choice when insistence upon it would ... interfere with the ethical and orderly administration of justice, ... we have also warned that disqualification of ... counsel should be a measure of last resort") (internal citations omitted).  As you undoubtedly recognize, such a resolution avoids the litigation of difficult issues and eliminates potential appellate issues.  In that regard, if we can come to an agreement concerning the role Henze Cook Murphy will play, Mr. Lacey will execute appropriate waivers upon the advice of independent counsel.

Thank you again for your willingness to engage with us on these issues.  We all appreciate it.

Sincerely,

MITCHELL | STEIN | CAREY | CHAPMAN, PC

By:

Lee Stein
Anne Chapman

# **<u>Exhibit B</u>**

0818FERRER.txt

⌂

```
 1                IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF ILLINOIS

 3                       EASTERN DIVISION

 4
     BACKPAGE.COM, LLC,,                )
 5                                       )
                                         )
 6            Plaintiff,                 )
                                         )
 7   VS.                                 ) Case No.
                                         ) 1:15-cv-06340
 8   THOMAS J. DART, Sheriff of Cook     )
     County, Illinois,                   )
 9                                       )
                                         )
10            Defendant.                 )
     _____      )
11

12

13           VIDEOTAPED DEPOSITION OF CARL FERRER

14                  Tuesday, August 18, 2015

15                   Los Angeles, California

16

17   REPORTED BY:

18   GRACE CHUNG, CSR No. 6426, RMR, CRR, CLR

19   FILE NO.: 445

20

21

22

23
```

0818FERRER.txt

24

25

1

♠

1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF ILLINOIS

3                    EASTERN DIVISION

4
   BACKPAGE.COM, LLC,,              )
5                                   )
                                    )
6           Plaintiff,              )
                                    )
7   VS.                             ) Case No.
                                    ) 1:15-cv-06340
8   THOMAS J. DART, Sheriff of Cook )
   County, Illinois,               )
9                                   )
                                    )
10          Defendant.              )
   _____

11

12

13

14          Videotaped Deposition of CARL FERRER

15   taken on behalf of Defendant, at 333 South Hope

16   Street, 29th Floor, Los Angeles, California,

17   beginning at 4:13 p.m. and ending at 7:53 p.m., on

18   Tuesday, August 18, 2015, before GRACE CHUNG, CSR

19   No. 6246, RMR, CRR, CLR.

```
                          0818FERRER.txt
20

21

22

23

24

25


                                                            2

↑


 1                      A P P E A R A N C E S

 2

 3    For the Plaintiff:

 4
      HENZE COOK MURPHY
 5    BY: TOM HENZE, ESQ.
          JANEY HENZE COOK, ESQ
 6    4645 North 32nd Street
      Suite 150
 7    Phoenix, Arizona 85018
      (602) 956-1730
 8    tom@henzecookmurphy.com
      janey2henzecookmurphy.com
 9    (602) 956-1730

10
      For the Defendant:
11
      KIRKLAND & ELLIS
12    BY:  ZACHARY D. HOLMSTEAD, ESQ.
      300 North LaSalle
13    Chicago, Illinois 60654
      (312) 862-2392
14    zachary.holmstead@kirkland.com

15

16    Also Present:    TOM BISHEL, Videographer
                          Page 3
```

0818FERRER.txt

17                      LIZ McDOUGALL

18

19

20

21

22

23

24

25

                                              3
♠

1                           INDEX

2    WITNESS    EXAMINATION                     PAGE

3      CARL FERRER

4            BY MR. HOLMSTEAD                     6

5            BY MS. COOK                        127

6

7                          EXHIBITS

8    NO.        DESCRIPTION                     PAGE

9    Exhibit 25   Letter from Bank Frick to Payment    38
                  Solutions, dated June 30, 2015
10
     Exhibit 26   E-mail to Yoni (Privilege            47
11                Redaction)

12   Exhibit 27   E-mail chain, with top e-mail from   61
                  Julie Rottenberg to Thomas Brown,

Page 4

0818FERRER.txt

13              dated July 9, 2015

14  Exhibit 28    E-mail chain, with top e-mail from    86
                  Carl Ferrer to Trent Voigt, dated
15                July 21, 2015

16  Exhibit 29    Declaration of Carl Ferrer in         99
                  support of motion for temporary
17                restraining order

18  Exhibit 30    E-mail chain, with top e-mail from    106
                  Mickey Jansen to Carl Reffer, dated
19                July 21, 2015

20

21              QUESTIONS INSTRUCTED NOT TO ANSWER

22                      PAGE  LINE

23                       95    21

24

25

                                                    4

♠

1              THE VIDEOGRAPHER:  Good afternoon.  We are

2   now going on the record.  Today's date is August

3   18th, 2015.  And the time is approximately 4:13

4   p.m.  The location is 333 South Hope Street, 29th

5   floor, Los Angeles, California 90071.  My name is

6   Tom Bishel, video specialist representing Certus

7   Deposition Services.  The civil action number is

8   115-CV-06340 in the matter of Backpage.com, LLC

9   versus Thomas J. Dart, et al.  The deponent is Carl

0818FERRER.txt

10   Ferrer.  The video deposition is requested by the

11   law offices of Kirkland & Ellis.

12          Will all counsel please identify

13   yourselves and state whom you represent.

14          MR. HOLMSTEAD:  Zach Holmstead on behalf

15   of Sheriff Dart.

16          MS. COOK:  Janey Henze Cook of Henze Cook

17   Murphy on behalf of Backpage.com.

18          MR. HENZE:  Tom Henze on behalf of

19   Backpage.com.   MS. McDOUGALL:  Liz McDougall on

20   behalf of Backpage.com.

21          MR. HENZE:  Yeah.  And I think we ought to

22   state for the record that in her capacity as

23   general counsel, Liz McDougall is in the room.  She

24   is not going to participate in lawyering the

25   deposition, however.

                                                5

♠

1                    CARL FERRER,

2        having been first duly sworn, was examined

3               and testified as follows:

4                    EXAMINATION

5   BY MR. HOLMSTEAD:

0818FERRER.txt

6      Q.   Good afternoon.

7      A.   Good afternoon.

8      Q.   Will you state your name for the record?

9      A.   Carl Ferrer.

10     Q.   And how many times have you testified in

11  open court, Mr. Ferrer?

12     A.   Four times.

13     Q.   Were any of those civil matters?

14     A.   No.

15     Q.   How many times have you been deposed?

16     A.   One time.

17     Q.   Was that in a civil matter?

18     A.   Yes.

19     Q.   What was the nature of the case?

20     A.   It was two newspapers suing each other.

21     Q.   Do you remember what court it was in or

22  what state?

23     A.   I recall the case was in either Midland,

24  Texas or Odessa, Texas, I'm not sure which one.

25     Q.   Thank you.

                                                    6
♠

1            And do you remember what year it was that

2  you were deposed?

0818FERRER.txt

3        A.   I don't.  It was a long time ago.

4        Q.   More than ten years ago?

5        A.   Yes.

6        Q.   Okay.  And having testified before and

7    given a deposition before, you understand that you

8    are under oath?

9        A.   I do.

10       Q.   And the most important thing this

11   afternoon is that you and I understand each other.

12   So if at any point I ask a question that's unclear,

13   or you don't understand what you heard, just let me

14   know.  I am happy to re-ask it or rephrase it.

15   Okay?

16       A.   Agreed.

17       Q.   And if you go ahead and answer the

18   question, then I'll assume that you heard it and

19   that you understood it.  Is that fair?

20       A.   Yes.

21       Q.   And I also wanted to just state for the

22   record that in accordance with the hearing that we

23   had last week, we will be covering a limited number

24   of topics at your deposition today, and we can

25   cover the remaining topics at the next deposition.

0818FERRER.txt

7

1    Okay?

2         A.   Yes.

3         Q.   And, in -- in general, unless I state

4    otherwise, my questions are limited to the time

5    period January 1st, 2015, through the present.

6         A.   Okay.

7         Q.   Great.  What did you do to prepare for

8    your deposition today?

9         A.   Today, I read the -- my declaration and

10   some of the exhibits.

11        Q.   That was what you did today?

12        A.   That's what I did today, yes.

13        Q.   What else have you done to prepare for

14   your deposition?

15        A.   Yesterday I met with counsel.

16        Q.   Who was that?

17        A.   The counsel that's present here today, Tom

18   Henze, Janey Henze.

19        Q.   Was Ms. McDougall there?

20        A.   I'm sorry?

21        Q.   Was Ms. McDougall present at that --

22        A.   And -- and Liz McDougall.

0818FERRER.txt

23      Q.   Approximately, how long did that meeting

24   last?

25      A.   We met in -- during the day.  There was a

                                                        8

break.  There was a series of breaks so I'm trying

1    break.  There was a series of breaks so I'm trying

2    to put together the time.

3       Q.   Sir, just to the nearest part.

4       A.   I -- I would estimate eight to ten hours.

5       Q.   And did you personally review any

6    documents outside your declaration and the

7    exhibits?

8       A.   Say -- I'm sorry.

9       Q.   Sure.  You mentioned that you reviewed

10   today your declaration and some of the exhibits.

11   Have you reviewed any other documents to prepare

12   for your deposition?

13      A.   No.

14      Q.   You didn't, for example, open your e-mail

15   account and go -- scroll through all the e-mails to

16   try to refresh your memory about things that had

17   happened?

18      A.   I did not go through my e-mails today to

19   refresh my memory.

0818FERRER.txt

20      Q.    How about since the time that you -- your

21  deposition was noticed last week?

22      A.    Yesterday I went through old e-mails with

23  counsel.

24      Q.    And you are aware that Ms. McDougall was

25  deposed this morning?

                                                          9

1       A.    Yes.

2       Q.    Have you discussed Ms. McDougall's

3   deposition with anyone?

4       A.    I have not discussed -- I'm sorry, I

5   didn't understand that question.

6       Q.    Sure.  Did -- did you discuss any of

7   the -- for example, the topics that Ms. McDougall

8   was deposed about this morning?

9       A.    No.

10      Q.    Did you have any conversations regarding

11  any of the substance of Ms. McDougall's deposition?

12      A.    No.

13            MR. HENZE:  Counsel, can I make a

14  statement for the record, just -- just because I

15  think Mr. Ferrer's not a lawyer.  As you know, from

0818FERRER.txt

16   the previous deposition, Ms. McDougall fulfilled

17   some of her 30(b)(6) witness duties by sitting down

18   with Carl and trying to gain corporate knowledge.

19   But I -- I don't want you to be misunderstood.

20   Ms. McDougall was not preparing Mr. Ferrer for his

21   deposition, although we met -- we met yesterday, we

22   did both things in the same day, I guess, is what

23   I'm trying to say.

24           MR. HOLMSTEAD:  Same day, same people,

25   same room.

                                              10

1            MR. HENZE:  Yeah, but -- but, for example,

2   we had a number of hours, five, six hours, four --

3   four to six hours without Ms. McDougall in the room

4   where we had Mr. Ferrer in the room.  And we had

5   some other substantial periods of time without

6   Mr. Ferrer in the room when we had Ms. McDougall in

7   the room, and then there was some time when we had

8   Ms. McDougall and Mr. Ferrer together.  That was

9   the subject matter of Ms. McDougall's 30(b)(6)

10   preparation.

11           MR. HOLMSTEAD:  Thank you.

12               I appreciate that.

                        Page 12

0818FERRER.txt

13          A.   Zach, can I just -- just so that I'm

14     accurate, how many hours did I say that I met?

15     BY MR. HOLMSTEAD:

16          Q.   Eight to ten.

17          A.   Eight to ten.  Okay.  It's probably more

18     like ten.

19          Q.   More like ten, okay.

20               Was there anyone present besides the three

21     attorneys in the room today and your -- and

22     yourself?

23          A.   No.

24          Q.   What's your understanding of what an

25     acquiring bank is?

                                                        11

1          A.   My understanding of the acquiring bank is

2     that they are the bank that you need to facilitate

3     a credit card transaction or to secure a merchant

4     account.

5          Q.   And you used the word "you need."  Who --

6     who are you referring to when you said "you"?

7          A.   The -- a business would need.

8          Q.   A merchant?

Page 13

# **<u>Exhibit C</u>**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BACKPAGE.COM, LLC, | |
| Plaintiff, | Case No. 1: 15-cv-06340 |
| v. | Judge John J. Tharp, Jr. |
| THOMAS J. DART, Sheriff of Cook County, Illinois, | Magistrate Judge Young B. Kim |
| Defendant. | |

**NON-PARTY DAVIS WRIGHT TREMAINE LLP'S**
**OPPOSITION TO DEFENDANT'S MOTION FOR SANCTIONS**

Non-party respondent, Davis Wright Tremaine LLP ("DWT"), by counsel, respectfully submits this response in opposition to the motion of defendant Thomas J. Dart, Sheriff of Cook County ("Sheriff Dart"), for sanctions against Backpage.com ("Backpage") and its attorneys ("Motion").[1] DWT formerly represented Backpage in this action, but withdrew from that representation with the Court's approval on April 26, 2018. (Dkt. No. 228.) Backpage and Carl Ferrer (its CEO and owner) have been notified of Sheriff Dart's Motion, DWT's withdrawal, and the Court's May 17, 2018 deadline for responses, so that they may respond to the Motion as they choose through substitute counsel.

**INTRODUCTION**

Sheriff Dart's Motion is legally and factually baseless. From a legal perspective, the Motion flows from the same flawed premise Sheriff Dart has advanced in multiple forms at various

---

[1] Under Rule 1.6(b)(5) of the ABA Model Rules of Professional Conduct, an attorney may use privileged communications in defense of a claim challenging the attorney's conduct. *See* N.D. Ill. L.R. 83.50. However, DWT is not using privileged information in response to the Motion at this time; it is unnecessary because Sheriff Dart has established no basis for the Motion under the law or the facts. However, DWT respectfully reserves all rights, including rights under Rule 1.6(b)(5).

stages of the litigation—that there could be no constitutional claim if he could show that advertisements posted on Backpage.com related to or resulted in illegal conduct.  (Dkt. Nos. 126, 130, 143, 145, 157, 189.)  Sheriff Dart now asks this Court to impose sanctions, under its inherent authority and 28 U.S.C. § 1927, based on plea agreements entered April 5, 2018 by Carl Ferrer on behalf of himself and Backpage that, Sheriff Dart claims, show that this case was a "hoax" from the beginning.  (Mot. at 1.)  This argument is fundamentally wrong, and is no more than a reincarnation of the same "illegality" defense Sheriff Dart has attempted to advance and the Court has rejected repeatedly because it is based on a fatally flawed premise.  (*See* Aug. 9, 2016 Tr., at 7:19-7:21, 9:12-9:15, Dkt. No. 174; Dkt. No. 192.)  Sheriff Dart wants to put Backpage (and its lawyers) on trial, but this case is about *his* improper and unconstitutional efforts to use pressure tactics to impose an informal prior restraint, an illegitimate exercise of governmental power that has been condemned under the First Amendment for over half a century.  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015).

Whatever else may be the legal significance of Mr. Ferrer's plea agreement in 2018, it cannot retroactively cure the Sheriff's illegal actions in 2015 or override the constitutional claims that formed the basis of this case.  More to the point here, Sheriff Dart's *post hoc* challenges cannot serve as a rationale for imposing sanctions on the lawyers who successfully advanced the constitutional claims.  This Court should reject this argument once again, just as it did when it explained that "the sheriff's theory completely ignores the law of prior restraint as the Seventh Circuit has interpreted it in this case specifically," (Aug. 9, 2016 Tr., at 7:19-7:21, Dkt. No. 174), and concluded "in the context of [this] case where the claim is that the sheriff has imposed an informal prior restraint on speech, the illegality defense isn't a viable defense."  (*Id.* at 9:12-9:15.)

Sheriff Dart's Motion is also factually baseless. The sole bases for Sheriff Dart's argument are (1) to pit Mr. Ferrer's statements in the recent plea agreements against his earlier sworn statements in declarations and deposition testimony in this case, and (2) to raise (really, raise again) certain alleged "red flags," previously known to the Sheriff and the Court, which are nothing more than legally appropriate actions in this and other cases (like objecting to subpoenas, hiring counsel, and asserting one's constitutional defenses). Whatever inducements may have led to Mr. Ferrer's recent plea agreements, the fact that the April 5, 2018 plea agreements differ from Mr. Ferrer's earlier statements cannot provide a basis for sanctions against DWT. Sheriff Dart offers no evidence—none at all—to support his request for sanctions. Sheriff Dart provides nothing but innuendo, intemperate invective, and speculation to assert that DWT "must have known" or "should have known" that Mr. Ferrer would change and contradict averments he made not just in this case but in a half dozen others.

The Sheriff's Motion is unprecedented under the law and the standards in this Court and the Seventh Circuit to impose sanctions on counsel because Sheriff Dart does not come close to showing that legal counsel acted with the requisite bad faith or that legal counsel "acted in an objectively unreasonable manner by engaging in a serious and studied disregard for the orderly process of justice." *See Secure Leverage Group, Inc. v. Bodenstein*, 558 B.R. 226, 249 (N.D. Ill. 2016) (Tharp, J.); *see also Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 799 (7th Cir. 2013) (finding that courts use their inherent authority and section 1927 to sanction "bad-faith conduct" or raising baseless claims "despite notice of the frivolous nature of these claims"). This Court should deny the Motion.

## BACKGROUND

Because the Court has presided over this litigation for nearly three years, the background for the Motion can be summarized briefly.

On June 29, 2015, Sheriff Dart sent letters to the CEOs of Visa and MasterCard making numerous threats and demanding that the companies "immediately cease and desist from allowing your credit cards to be used to place ads on . . . Backpage.com." (Compl., Exs. B, C, Dkt. No. 2.) Within 48 hours, the card companies announced they would cease doing business with Backpage. (Ferrer Decl. ¶ 25, Dkt. No. 6; Zycherman Decl., Ex. G, Dkt. No. 7-1.) The Sheriff then issued a press release announcing that his demands to Visa and MasterCard had compelled them to "defund" and sever ties with Backpage. (Compl., Ex. A, Dkt. No. 2.)

Backpage filed suit on July 21, 2015, seeking injunctive and declaratory relief because the Sheriff's actions constituted an unconstitutional prior restraint under *Bantam Books*. (Compl., Dkt. No. 1.) Backpage also sought a temporary restraining order. (Dkt. Nos. 4, 5.) Backpage's complaint and TRO motion were supported by a twelve-page declaration from Mr. Ferrer that was supported with roughly 60 pages of exhibits. (*See* Ferrer Decl., Dkt. No. 6.) Mr. Ferrer's declaration attested to facts concerning Backpage and its operations, averring that users provided all content for ads they posted on the website; Backpage had long imposed and enforced rules to prevent improper content or misuse of the site; Backpage employed more than 100 people in moderation efforts and blocked more than 1 million ads per month; Backpage had regularly worked with and supported law enforcement; Mr. Ferrer and others representing Backpage previously met and communicated with the Sheriff's office to explain efforts to "prevent misuse of our website and to partner with law enforcement"; and, because of Sheriff Dart's actions,

Backpage removed charges for ads on the website, cutting off essentially all of the website's revenues. (*Id.* at ¶¶ 4, 7-11, 14-15, 16-17, 18-21, 27-28.)

Mr. Ferrer's declaration was one of many he filed in several cases starting in 2012 (three years before he executed the declarations in this case), in which he similarly explained Backpage's efforts to screen third-party content, to prevent misuse of the site, to cooperate with law enforcement, and to regularly report ads of concern to authorities.[2]

This Court granted a Temporary Restraining Order (Dkt. No. 33), but denied Backpage's request for a preliminary injunction. (Dkt. Nos. 59, 63, 66.) The Seventh Circuit reversed and entered a preliminary injunction, concluding that ads on Backpage.com were constitutionally protected speech, rejecting the Sheriff's arguments that all such ads were criminal, and holding that "a public official who tries to shut down an avenue of expression of ideas and opinions through actual or threatened imposition of government power or sanction is violating the First Amendment." *Dart*, 807 F.3d at 230, 234, 239 (internal quotation marks omitted).

After the case returned to this Court, six times Sheriff Dart filed motions and other pleadings attempting to advance his theory that all ads on the Backpage.com website were illegal and therefore his actions could be excused even if they did infringe First Amendment rights. (*See* Mot. Strike, at 3-6, Dkt. No. 126; Mot. Compel Disc., Dkt. No. 130; Bench Mem., at 1-11, Dkt. No. 143; Supp. Mem. Re Mot. Compel, at 5-11, Dkt. No. 145; Mot. Leave to Amend Affirm.

---

[2] Several of these declarations (without exhibits) are attached as Exhibits 1-3, including Mr. Ferrer's declarations from *Backpage.com, LLC v. McKenna*, No. 2:12-00954-RSM (W.D. Wash.) (declaration filed June 4, 2012) (Ex. 1); *Backpage.com, LLC v. Cooper*, No. 3:12-cv-00654 (M.D. Tenn.) (declaration filed June 27, 2012) (Ex. 2); and *Backpage.com, LLC v. Hoffman*, No. 2:13-cv-03952-DMC (D.N.J.) (declaration filed June 26, 2013) (Ex. 3). Mr. Ferrer filed similar declarations in two other actions, *Backpage.com, LLC v. Healey*, No. 16-CV-10236-ADB-SEALED (D. Mass.) (declaration filed Feb. 4, 2015); *In re In re Subpoenas to Produce Documents to Grand Jury Nos. 15823 and 16093*, No. GJ12-172 (W.D. Wash.) (declaration filed June 27, 2012).

Defenses, Dkt. No. 155; Mot. Leave to File Sur-Resp., Dkt. No. 189.)  The Court rejected the Sheriff's arguments every time, correctly concluding that "the sheriff's theory completely ignores the law of prior restraint as the Seventh Circuit interpreted it in this case specifically," and "the illegality defense isn't a viable defense" in this case.  (Aug. 9, 2016 Tr., at 7:19-7:21, 9:12-9:15, Dkt. No. 174; Dkt. No. 192.)

On April 5, 2018, in the federal action in Arizona Mr. Ferrer entered a plea agreement to one count of conspiracy (18 U.S.C. § 371) and entered a plea agreement on behalf of Backpage and other corporate entities controlled by Mr. Ferrer to one count of money laundering (18 U.S.C. § 1956(h)).  (*See* Plea Agreements, *United States v. Ferrer*, No. 18-464-PHX-DJH (D. Ariz.); *United States v. Backpage.com, LLC*, No. 18-465-PHX-DJH (D. Ariz.), Mot., Exs. A, B.)  DWT was not counsel to Mr. Ferrer or Backpage in connection with these plea agreements.

DWT and Schiff Hardin LLP moved to withdraw from representation of Backpage in this action on April 24, 2018.  (Dkt. No. 220.)[3]  The Court conducted a hearing, including *in camera* proceedings with counsel for the two firms to address the withdrawal request, and thereafter granted the motion. (Dkt. No. 228.)

## ARGUMENT

### I.    Sheriff Dart's Arguments Are Legally Irrelevant and Merely Attempt to Resurrect His Oft-Rejected "Illegality" Defense.

Sheriff Dart asserts that this lawsuit constituted a fraud on the court, claiming that it was based on "untrue facts from the beginning, and thus a hoax." (Mot. at 1.)  Citing Mr. Ferrer's plea agreement, Sheriff Dart argues (contrary to his own July 1, 2015 press release) that "the reason credit cards companies [sic] stopped doing business with Backpage was due to the illegal nature

---

[3] In addition to DWT, lawyers from Schiff Hardin LLP, Paul Hastings LLP and Henze Cook Murphy, PLLC filed appearances on behalf of Backpage in this matter.

of Backpage's business, and not the Sheriff's letters to the credit card companies." (*Id*. at 2.) Based on this, Sheriff Dart concludes that "[f]rom day one, Backpage's complaint against the Sheriff was a fraud, neither grounded in fact nor [sic] law." (*Id*. at 3.) This hyperbolic claim fails to acknowledge the most elementary principles of First Amendment law (as well as the high standard for imposing sanctions), and it ignores the application of that precedent here.

Any sanction pursuant to 28 U.S.C. § 1927 or the court's inherent authority would require an explicit finding that Backpage's counsel acted with "subjective bad faith" or that counsel's conduct was extremely negligent, reckless, or indifferent. *See Grochocinski*, 719 F.3d 785 at 799; *Mi-Jack Products v. Int'l Union of Operating Engineers, Local 150*, No. 94 C 6676, 1996 WL 149133, at *5 (N.D. Ill. Mar. 28, 1996). As this Court and the Seventh Circuit have acknowledged, sanctions are warranted "when an attorney has acted in an objectively unreasonable manner by engaging in a serious and studied disregard for the orderly process of justice." *Secure Leverage Group, Inc.*, 558 B.R. at 249 (Tharp, J.). The Seventh Circuit has recognized that the imposition of attorneys' fees is appropriate only where the attorney intentionally acts without a plausible legal or factual basis. *Knorr Brake Corp. v. Harbil, Inc.*, 738 F.2d 223, 227 (7th Cir. 1984). Here, Sheriff Dart cannot demonstrate that Backpage's claim—supported by Supreme Court First Amendment precedent and the Seventh Circuit's decision in this case—lacks "a colorable basis in the law" to support sanctions.

The Seventh Circuit articulated the straightforward legal principle that controls this case: "[A] public official who tries to shut down an avenue of expression and ideas and opinions through 'actual or threatened imposition of government power or sanction' is violating the First Amendment." *Dart*, 807 F.3d at 230 (quoting *Am. Family Ass'n, Inc. v. City and Cty. of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002)). This has been the law for more than five decades.

7

*See Bantam Books*, 372 U.S. at 72. From its early First Amendment cases the Supreme Court has described prior restraints as "the essence of censorship," *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713 (1931), and "the most serious and the least tolerable infringement on First Amendment rights," *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Accordingly, the Seventh Circuit applied those principles in this case and held that "[t]hreatening penalties for future speech goes by the name of 'prior restraint,' and a prior restraint is the quintessential first-amendment violation." *Dart*, 807 F.3d at 235 (quoting *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009)). Given this well-established legal doctrine, Sheriff Dart's assertion that Plaintiff's arguments were legally unsupported is frivolous.

It has never been disputed that Sheriff Dart assembled a team "to take down Backpage.com" "legally or otherwise," and that they developed "an out-of-the-box idea" to use "the financial route" of pressuring Visa and MasterCard. (*See* Zycherman Decl., Ex. G, Dkt. No. 7; *see also* Aug. 20, 2015 Prelim. Inj. Hr'g Tr., at 51:13-22, 75:3-75:8, Dkt. No. 65.) This resulted in the June 29, 2015 letters to the CEOs of Visa and MasterCard demanding that they "immediately cease and desist from allowing your credit cards to be used to place ads on . . . Backpage.com." (Compl., Exs. B, C, Dkt. 2.) The companies capitulated within 48 hours, and Sheriff Dart was quick to claim credit for this outcome, issuing a press release proclaiming that his demand compelled Visa and MasterCard to sever ties with Backpage. (Compl., Ex. A.) Given the law of prior restraint, Sheriff Dart's argument that the constitutional claims lacked any basis in fact or law cannot be taken seriously.

Sheriff Dart points to Mr. Ferrer's April 5, 2018 plea agreement to argue that "the speech at issue was never protected by the first amendment, and Backpage was a content provider and distributor of illegal, non-protected speech." (Mot. at 4.) This is simply another pass at Sheriff

Dart's "illegality defense," which this Court has considered and rejected multiple times already.[4]

Its premise is that Sheriff Dart cannot be held responsible for any unconstitutional behavior if, in the end, his beliefs about the illegality of the material are borne out (at least according to the statements of one party in a negotiated plea agreement). It is a philosophy that would bar constitutional claims against law enforcement officials who conduct illegal searches or beat confessions out of prisoners and then claim justification based on their results. But it is bedrock law that the government cannot retroactively justify unconstitutional acts in this way. *See, e.g.*, *Ft. Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 65-67 (1989) (prior restraint without advance adversary hearing cannot be justified by later findings); *A Quantity of Books v. Kansas*, 378 U.S. 205, 211-12 (1964) (invalidity of illegal search cannot be purged by subsequent finding that books were obscene).

Sheriff Dart's citation to Mr. Ferrer's plea agreement does not change this basic law or its application here. Not even Mr. Ferrer's current statement that he believed "most" ads related to prostitution can cloak Sheriff Dart's censorship campaign with a veneer of legality. As the Seventh Circuit explained:

> Nor is Sheriff Dart on solid ground in suggesting that everything in the adult section of Backpage's website is criminal, violent, or exploitive. Fetishism? Phone sex? Performances by striptease artists? (Vulgar is not violent.) . . . The district judge remarked that "the majority of the advertisements [in Backpage's adult section] are for sex"—but a majority is not all, and not all advertisements for sex are advertisements for illegal sex.

*Dart*, 807 F.3d at 234. Mr. Ferrer's plea agreement—and the Sheriff's current argument—also does not take into account the millions of ads posted in non-adult categories. As a consequence, nothing in the plea agreement addresses the essence of the constitutional claim, that Sheriff Dart

---

[4] The last time Sheriff Dart repeated this argument the Court instructed the parties not to submit any further briefing unless the Court requested it. (Dkt. No. 192.)

9

was "using the power of his office to threaten legal sanctions against the credit-card companies for facilitating future speech, and by doing so he is violating the First Amendment unless there is *no* constitutionally-protected speech in the ads on Backpage's website—and no one is claiming that." *Id*. at 231 (emphasis in original).

Sheriff Dart also attempts to revive his "causality" argument, claiming there was no basis for the Plaintiff to argue that the credit card companies severed ties to Backpage in response to his letters and that they instead withdrew service because of the nature of the advertisements on the site. (Mot. at 17.) This generalization is incorrect, but more importantly, it misses the point. The constitutional violation occurred when Sheriff Dart issued the threat in the first place. The Seventh Circuit explained that "such a threat is actionable and thus can be enjoined even if it turns out to be empty—the victim ignores it, and the threatener folds his tent." *Dart*, 807 F.3d at 231.

None of the cases Sheriff Dart cites even remotely supports the imposition of sanctions in these circumstances because the sanctioned attorneys in those cases pursued legal theories they knew or should have known were meritless. In *Reichmann v. Neumann*, the district court awarded sanctions pursuant to its inherent authority because the plaintiff and his counsel pursued the case even though it was clear from the outset that plaintiff's claim to recover a previously-settled debt was "utterly devoid of a legal of factual basis." 553 F.Supp.2d 307, 320 (S.D.N.Y. 2008). In *In re Narragansett Clothing Corp*., the bankruptcy court awarded sanctions against a Chapter 11 trustee's attorney under Bankruptcy Rule 9011 because at no time during the matter, including at a hearing on the merits, was there a justifiable reason to litigate the claim. 143 B.R. 582, 584 n. 2 (Bankr. D.R.I. 1992).

In *In re Evergreen Sec., Ltd.*, the bankruptcy court awarded sanctions pursuant to its inherent powers after finding that respondents had engaged in bad faith by filing a frivolous recusal

10

motion with false allegations. 384 B.R. 882, 933 (Bankr. M.D. Fla). In *Kotsilieris v. Chalmers,* the Seventh Circuit affirmed the district court's finding that counsel acted in bad faith due to extreme negligence where counsel failed to protect its client's right to a jury trial, but then proceeded with the case as if that right had been preserved and forced the other side to litigate the jury demand issue. 966 F.2d 1181, 1183 (7th Cir. 1992). Similarly, in *Lightspeed Media Corp. v. Smith*, the Seventh Circuit affirmed the district court's award of sanctions under section 1927 where counsel pursued claims that had no conceivable merit. 761 F.3d 699, 708-09 (7th Cir. 2014). These cases bear no resemblance to this case.[5]

Both the Supreme Court and the Seventh Circuit have cautioned that the exercise of inherent powers and sanctions under section 1927 should be strictly construed and used sparingly. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991); *Indianapolis Colts v. Mayor & City Council of Baltimore*, 775 F.2d 177, 182 (7th Cir. 1985). Accordingly, courts should refrain from imposing sanctions when a legal theory is plausible or has been accepted by another judge. *See Old Republic Ins. Co. v. Chuhak & Tecson, P.C.*, 84 F.3d 998, 1003-04 (7th Cir. 1996) (reversing award of sanctions and finding no bad faith where plaintiff's counsel relied on an unreversed district judge's decision); *Tuf-Flex Glass v. N.L.R.B.*, 715 F.2d 291, 298 (7th Cir. 1983) (denying motion for sanctions under section 1927 where the challenged legal basis, although unsuccessful,

---

[5] Sheriff Dart also string cites several decisions from the Northern District of Illinois that do not support the application of sanctions pursuant to this Court's inherent powers or Section 1927; indeed, the opinions cited by Sheriff Dart all involve sanctions under Rules 11 and 37. (Mot. at 11-12.) Rule 11 places a lower burden on movants requiring only a showing of objective unreasonableness on the part of the attorney signing the offending paper. *Pacific Dunlop Holdings, Inc. v. Barosh*, 22 F.3d 113, 118 (7th Cir. 1994). Because invoking the court's inherent authority is a higher burden that requires a showing of subjective or objective bad faith, these cases are not relevant to the Court's inquiry. *Id.* at 120. Similarly, the conduct in the Rule 37 cases has no bearing on this case because its addresses discovery orders and failing to timely supplement or correct a previous disclosure. Fed. R. Civ. P. 37(b), (c). In the first instance, Sheriff Dart cannot proceed under Rule 11 because he has not complied with the required safe harbor provision. More importantly, for the reasons discussed in this response, Sheriff Dart could not meet his burden under Rule 11 or Rule 37.

was plausible).  For example, in *Harriston v. Chicago Tribune Co.*, Judge Norgle declined to impose sanctions under section 1927 when the court could not find that the filing of a motion to disqualify was "so lacking in legal or factual basis as to be implausible."  136 F.R.D. 482, 485 (N.D. Ill. 1991); *see Sommerfield v. City of Chicago*, No. 08 C 3025, 2012 WL 13069769, at *2 (N.D. Ill. July 18, 2012) (Gottschall, J.) (declining to award sanctions under section 1927 against counsel who was "mistaken and somewhat negligent in interpreting the relevant case law" when filing a summary judgment motion); *see also Specht v. Google, Inc.*, 805 F. Supp. 2d 551, 559-60 (N.D. Ill. 2011) (Leinenweber, J.) (denying motion for sanctions under section 1927 and the court's inherent authority where counsel acted unreasonably but not vexatiously by pursuing injunctive relief that had a plausible legal basis).

In this case, Backpage's allegations—supported by decades of First Amendment precedent—were far more than plausible; they were strong and they were meritorious.  As he has done throughout this litigation, Sheriff Dart fails to explain why Backpage's First Amendment claims lack merit under applicable law, nor has Sheriff Dart provided any reason to disregard the Supreme Court's prior restraint precedent or the Seventh Circuit's decision.

## II.     Sheriff Dart's Efforts to Impose Sanctions on DWT Are Factually Baseless.

Sheriff Dart's Motion offers invective, innuendo, and gross speculation but no factual basis to impose sanctions on DWT.[6]  The Sheriff disregards the record evidence supporting the claims and arguments advanced about Backpage in this and other cases.  Sheriff Dart instead argues that the Court should impose sanctions based on the recent plea agreements and alleged "red flags"

---

[6] (*See, e.g.*, Mot. at 8 ("counsel **must have known** [Ferrer's sworn statements] were lies when stated"); 11 ("counsel **may well have known** all along about their client's lies"); 14 ("Backpage's attorneys … **had to know** that Backpage was a part author in a great majority of the prostitution ads on the website"); 18 ("Once Backpage's attorneys **learned** that the factual basis for the entire amended complaint was false, … they had a duty and obligation to inform the Court …")) (emphasis added)).

from this and other proceedings (which are nothing more than the same incorrect and rejected premises for Sheriff Dart's prior "illegality" defense).

Sheriff Dart's Motion is largely founded on Mr. Ferrer's statements in connection with his plea agreements. The Sheriff asserts that everything said in the plea agreements must be true and therefore everything Mr. Ferrer said in prior declarations, testimony and elsewhere (including in meetings with the Sheriff's office) must have been false. (*See* Mot. at 2-7.) Mr. Ferrer's statements in connection with his negotiated plea agreements are inconsistent with his prior sworn testimony in certain respects, and he will have to answer for the contradictions on his own.[7] Regardless, Mr. Ferrer's recent decision to plead as he has—and whatever may be his motivations for doing so— cannot establish that it was inappropriate to rely on his six-plus years of prior sworn statements.

Sheriff Dart does not point to any record evidence, any extant statement of Mr. Ferrer, or anything else that is inconsistent with positions taken by Backpage in this case (and advanced by DWT) when they were asserted. Sheriff Dart cannot offer any such evidence, because there is none.

Instead, Sheriff Dart contends there were "red flags," from which counsel should have inferred that Mr. Ferrer was lying, and, apparently, that he would later contradict his averments. (*See* Mot. at 11-18.) Sheriff Dart's attempts to cast aspersions based on his argued inferences, rather than actual evidence underscores why his Motion is improper. Additionally, the Sheriff's "red flag" accusations are things he has asserted before in his failed attempts to pursue an "illegality" defense, and are inaccurate in any event. In brief:

---

[7] Mr. Ferrer's inconsistent statements undoubtedly will be subject to cross-examination in other proceedings. For present purposes, however, it is not necessary for DWT to use any privileged communications in defense of Sheriff Dart's Motion, although it reserves its rights under Rule 1.6(b)(5) of the Model Rules of Professional Conduct.

Sheriff Dart suggests "red flags" based on Backpage's challenge to subpoenas issued by the U.S. Senate Permanent Subcommittee on Investigations ("PSI") demanding information about Backpage's editorial practices.  (*See* Mot. at 12 ("Backpage sent the Subcommittee a letter stating it was refusing to answer its subpoena."))  Yet, the Sheriff previously made the same argument that the Court should have regarded the PSI's investigation and subpoena as proof that ads on the website were illegal.[8]  Sheriff Dart asserts that opposition to the subpoena was nothing more than "legal theatrics," (Mot. at 16), which again reflects the Sheriff's reliance on hyperbole rather than an understanding of free speech principles.  DWT and two other law firms[9] raised significant First Amendment challenges to the PSI's subpoenas and process seeking to compel discovery of an online publisher's editorial practices and decisions.[10]

Sheriff Dart goes on to hoist another spurious "red flag" by claiming that the PSI subpoenaed Mr. Ferrer but he "did not show up at the Subcommittee's hearing as he had fled the country."  (Mot. at 13.)  We will accord the Sheriff and his counsel the benefit of the doubt that perhaps they are not familiar with the actual record, as Backpage's counsel (Akin Gump) informed the PSI before the hearing that Mr. Ferrer was already out of the country and could not attend, and offered to make him available on other dates.  (Exs. 4, 5.)

---

[8] (*See* Bench Mem., at 2-3, Dkt. 143; Supp. Mem. re Mot. to Compel, at 6-8, Dkt. 145; Mot. to Strike, Dkt. 126).

[9] Akin Gump Strauss Hauer & Feld LLP and Paul Hastings LLP, including two attorneys who formerly served as general counsel to the United States House of Representatives.

[10] The First Amendment and other objections ultimately were never resolved, because the PSI issued its report and then declared its investigation at an end.  *See Ferrer v. Permanent Subcommittee on Investigations*, 856 F.3d 1080, 1083, 1086-87 (D.C. Cir. 2017) (vacating district court decision and dismissing Backpage's appeal as moot).

Sheriff Dart next argues that the various motions and other pleadings his office previously submitted to attempt to pursue the "illegality" defense were more red flags (Mot. at 14-15), despite the Court's rulings (which the Sheriff's Motion does not mention) that his theory was irrelevant under First Amendment prior restraint law.[11]  In this vein, the Sheriff returns to another rejected argument that Backpage allegedly revised the fake "Red Beauty" ad submitted by a member of his staff to hide that the "subject was a child."  But, the evidence actually showed that staff person tried to evade the website's protections, Backpage actually flagged and reported the ad to the FBI, and the Sheriff's office ultimately admitted the ad was "bogus."  (*See* Opp. Mot. Leave to Amend Affirm. Defenses, at 4-6, Dkt. 160.)

The Sheriff also contends that "Carl Ferrer was indicted" in California proceedings.  (Mot. at 16.)  But, the Sheriff fails to state that two courts dismissed the criminal complaints filed by the California attorney general based on charges virtually the same as Sheriff's Dart's "illegality" theory (*i.e.*, that publishing and accepting payments for ads amounted to pimping or promotion of prostitution).  *See People v. Ferrer*, No. 16FE019224, 2016 WL 7237305 (Cal. Super. Ct. Dec. 9, 2016); *People v. Ferrer*, No. 16FE024013 (Cal. Super. Ct. Aug. 23, 2017).

Sheriff Dart goes on to claim that the December 2016 indictments in the California case "detailed efforts that Backpage had undertaken to set up sham companies to bypass detection by American Express" and conduct transactions in May 2015 of some $48,000.  (Mot. at 16.)  This is simply not accurate, as Sheriff Dart knows from the actions of his office and discovery in this case.

---

[11] Aside from misstating facts and prior motions and rulings in this case, Sheriff Dart also attempts to ascribe motives to Backpage and its attorneys—contending they filed an amended complaint to drop damage claims because they "knew . . . the Court would allow discovery into Backpage's . . . moderation practices for purposes of determining which 'contracts' were illegal." (Mot. at 15.)  As explained, however, Backpage sought to simplify the case (in contrast to Sheriff Dart's tack in the litigation), as the legal and factual issues were undisputed, making summary judgment appropriate to bring the case to its end.  (*See* Mot. Renew Req. for Summ. J., Dkt. 169.)

(*See* Dkt. No. 82, Exs. PX33, PX34; Ferrer Dep., at 100:8-19, 109:12-19; Aug. 20, 2015 Prelim. Inj. Hr'g Tr., at 118:10-119:11; Dkt. No. 65.)  In fact, in or about April 2015, American Express asked Backpage to cease charges to its cards for adult ads on the website and Backpage complied with this request.  (Ferrer Dep., at 100:8-19, 106:7-11, 109:12-19.)  However, after Sheriff Dart's July 1, 2015 letters to "defund" Backpage, his "Backpage team" determined that users could purchase general credits on the website using American Express cards.  (*See id.* at 107:7-108:25.) The Sheriff then contacted American Express executives to demand that this too had to stop.  (*See* Aug 20, 2015 Prelim. Inj. Hr'g Tr., at 118:10-119:11, Dkt. No. 65; *see also* Dkt. No. 82, Exs. PX33, PX34.)  When American Express asked Backpage to bar use of its cards for general credits too (after the Sheriff's pressure), Backpage complied.  (Ferrer Dep., at 107:7-109:19.)

More generally, Sheriff Dart contends Backpage and its counsel "lied to this Court" in asserting that Visa's and MasterCard's terminations in response to Sheriff Dart's threat letters cut off virtually all revenues, because, the Sheriff alleges, "*if* Backpage was still running transactions though the credit card companies, albeit illegally, Backpage was never suffering the harm it alleged . . . ."  (Mot. at 17 (emphasis added.))  The Sheriff's argument is sophistry.  It is undisputed that "the credit card companies broke with Backpage" "within days of receiving [Sheriff Dart's] letter[s]." *Dart*, 807 F.3d at 233.  It likewise is undisputed that Backpage stopped charging for ads on the website shortly after that and lost the vast majority of its revenues at the time.  (Ferrer Decl. ¶ 27-28, Dkt. 6.)  Sheriff Dart instead mischaracterizes the statements in Mr. Ferrer's plea agreement that *after* the credit card companies and certain banks declined to permit charges through Backpage, he made arrangements to process payments through other banks, processors and other alternate means.  (*See* Mot., Ex. B, at ¶ 10.a.)

Sheriff Dart's Motion is replete with accusations that DWT "lied to the Court," "learned that the factual basis for the entire amended complaint was false," and "knew or should have known that Backpage was engaged in a criminal conspiracy," (Mot. at 17, 18, 20.) These are serious accusations that should be countenanced only if a party presents proof of misrepresentations, misconduct or bad faith. This Court has cautioned against making such accusations and using the type of loose and intemperate language that permeates Sheriff Dart's Motion. *Martin v. Living Essentials, LLC*, 2017 WL 4572499 *5 (N.D. Ill. 2017). Your Honor has warned that "fraud on the Court is a serious accusation" that is particularly inappropriate where the allegations take issue with legal positions that "both this Court and the Seventh Circuit found to be meritorious." *Id.* Moreover, "[m]oving for sanctions based on scurrilous, unsupported allegations of bad faith is itself bad faith conduct, rendering it sanctionable." *Id.*

Sheriff Dart does not even attempt to meet the high "bad faith" standard for sanctions. "[T]he underlying rationale of 'fee shifting' is, of course, punitive, and the essential element in triggering the award of fees is therefore the existence of 'bad faith.'" *Adams v. Carlson*, 521 F.2d 168, 170 (7th Cir. 1975). Bad faith is a high threshold and "[t]he standards for bad faith are necessarily stringent." *Id.*; *see Satoskar v. Indiana Real Estate Comm'n*, 517 F.2d 696, 698 (7th Cir. 1975).

Decisions from this district illustrate that the actions of DWT lawyers are not sanctionable under section 1927 or the Court's inherent powers.[12] In *Goldberg v. 401 N. Wabash Venture LLC*,

---

[12] While Sheriff Dart references sanctions (at 1) under Rule 26(g)(3), he fails to cite any authority supporting this position and fails to make any argument as to why sanctions pursuant to this rule are appropriate. Consequently, Sheriff Dart has waived this argument. *Giffney Perret, Inc. v. Matthews*, No. 07C0869, 2009 WL 792484, at *16 (N.D. Ill. Mar. 24, 2009) (quoting *Weinstein v. Schwartz,* 422 F.3d 476, 477 n. 1 (7th Cir. 2005) (finding that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived"). To the extent Sheriff Dart is pursuing sanctions under Rule 26, the argument fails because Sheriff Dart must show that Backpage's attorneys' conduct was objectively unreasonable at the time the discovery submissions were filed. *See Thompson v. Duke*, 940

Judge St. Eve denied the defendants' motion for sanctions under section 1927 and the court's inherent powers predicated on the same type of allegations raised in this case. No. 09 C 6455, 2013 WL 5376556, at *5 (N.D. Ill. Sept. 25, 2013). It was argued that Plaintiff's counsel acted in bad faith because it submitted claims and sought damages based on information provided by its client that was later contradicted by its witnesses' testimony. *Id.* The court found that counsel did not act in bad faith by pressing claims later contradicted by its witness's testimony because the defendants failed to show that counsel knew the testimony would contradict his client's statements. *Id.* Judge St. Eve also found that the claims needed to be wholly implausible or baseless to justify an award of fees. *Id.* at *6. S*ee also Mi-Jack Products*, 1996 WL 149133, at *10 (denying sanctions pursuant to section 1927 and the court's inherent authority because counsel did not act with objective or subjective bad faith when there were inconsistencies between plaintiff's affidavit and statements from plaintiff's attorneys that were explainable).[13]

Sheriff Dart erroneously relies upon *Kapco Mfg. Co., Inc. v. C & O Enterprises, Inc.*, 886 F.2d 1485, 1490 (7th Cir. 1989), *Intellect Wireless, Inc. v. Sharp Corp.*, 87 F.Supp.3d 817, 848-49 (N.D. Ill. 2015), and *Cleveland Hair Clinic, Inc. v. Puig*, 200 F.3d 1063 (7th Cir. 2000), where the attorneys pursued claims that were known to be meritless. In *Kapco*, the court imposed sanctions under section 1927 against the plaintiff's attorney because the claims were frivolous,

---

F.2d 192, 195 (7th Cir. 1991); *see also* Fed. R. Civ. P. 26(g) advisory committee note (1983). Here, Sheriff Dart has made no attempt to make the required showing.

[13] Similarly, in *Fifth Third Bank v. Hirsch*, Judge Kendall denied sanctions under section 1927 and the court's inherent power. No. 10 C 5484, 2011 WL 24 70643, at *4 (N.D. Ill. 2011). The movant alleged that third-party plaintiff's counsel did not adequately investigate the factual basis for the claim because counsel merely adopted the allegations made by the plaintiff. *Id.* According to the movant, counsel's inadequate prefiling investigation multiplied the proceedings in an "unreasonable and vexatious" way. *Id.* Judge Kendall held that sanctions were improper even though the third party complaint failed to state a claim due to counsel's failure to investigate. *Id.* According to Judge Kendall, that is not the type of extreme conduct that warrants sanctions. *Id.*

baseless, and asserted for the purposes of harassment.  *Id*. at 1493.  In *Intellect Wireless*, the court awarded sanctions because the attorneys pursued litigation even though it was clear to the attorney that its client's declarations were false and the claims were meritless before the complaint was filed.  *Intellect*, 87 F.Supp.3d at 848-49.  In *Cleveland Hair Clinic, Inc.*, the Seventh Circuit affirmed sanctions against an attorney who failed to disclose a state court lawsuit (that he prepared and filed) at a hearing to determine whether counsel's client in the undisclosed state court action should have been added as a party in the federal case and whether to enjoin any state action. 200 F.3d at 1067-68.  Again, these cases bear no resemblance to the Backpage matter.

Citing no evidence, Sheriff Dart fails to demonstrate that Backpage's complaint was improperly filed, and (as outlined above) he cannot do so based on controlling Seventh Circuit law, including the decision in this case.

## III.    Sheriff Dart's Request for Discovery Lacks Any Legal Basis.

At the very end of his Motion, Sheriff Dart requests some unspecified "limited discovery to prove that Backpage's counsel knew the pleadings, discovery requests, filings and statements in open Court were false when made."  (Mot. at 21-22.)  In addition to the undefined request for "limited discovery," he requests "supplemental briefing on the appropriateness and amount of sanctions," and "an evidentiary hearing on sanctions."  These requests for a new proceeding focused on sanctions is nothing more than a fishing expedition in which Sheriff Dart essentially admits that he has failed to make the requisite showing.  The Seventh Circuit has recognized that courts should "limit the scope of sanctions proceedings to the record and allow discovery only in extraordinary circumstances."  *Indianapolis Colts*, 775 F.2d at 183 (citing Fed. R. Civ. P. 11 advisory committee note (1983)) (denying defendants request for remand to the district court for discovery related to its Rule 11 and section 1927 claims); *In re Central Ice Cream Co.*, No. 85 C

19

10073, 1986 WL 13635, at *6 (N.D. Ill. Nov. 21, 1986) (recognizing that the court must limit the scope of sanctions proceedings under section 1927, Rule 11, and the court's inherent authority to the record and only grant leave for additional discovery in extraordinary circumstances).

Sheriff Dart fails to make any showing that could warrant discovery in this case, much less any showing of extraordinary circumstances.[14] Just as before, Sheriff Dart's discovery request is a continuation of his rejected "illegality defense." Sheriff Dart's request would result in prolonged "satellite litigation" in the vain hope of turning up something that he things might support his Motion, which again is based on his fallacious illegality theory. *See Retired Chicago Police Ass'n v. City of Chicago*, No. 90 C 407, 1997 WL 51673, at *5 (N.D. Ill. Feb. 5, 1997), *aff'd sub nom. Retired Chicago Police Ass'n v. Firemen's Annuity & Benefit Fund of Chicago*, 145 F.3d 929 (7th Cir. 1998) (denying Rule 11 sanctions and section 1927 motion that required determining the merits of claims that were unrelated to the sanctions motion).[15] Sheriff Dart has attempted to lead the Court down this path before, and it quite properly denied discovery requests it found would be "a goose chase or a fishing expedition or a snipe hunt." (*See* Aug. 9, 2016 Tr., at 11:17-19, 7:21-8:3, 9:12-15, 12:9-11, 12:19-13:1, Dkt. 174.) The Court should do the same here.

---

[14] Sheriff Dart's failure to articulate the scope and nature of the "limited discovery" he would seek, from whom and in what format, deprives DWT the ability to adequately respond to the request, and is alone reason to deny it. *See United States v. Auston*, 35 Fed. App'x 251, 255 (7th Cir. 2002) (finding discovery request was vague and overbroad and failed to explain with any specificity why the materials were needed); *Vardon Golf Co., Inc. v. BBMG Golf Ltd.*, 156 F.R.D. 641, 648 (N.D. Ill. 1994) (denying discovery requests that were too vague to support any motion for production or motion to compel).

[15] Sheriff Dart offers no explanation for how discovery could be limited. If the Court were to permit discovery based on allegations made in the Motion, as a matter of fundamental fairness it would become necessary to allow discovery into all communications between Mr. Ferrer and the government related to his plea agreement and to provide an opportunity to depose and cross-examine Mr. Ferrer. The prospect of such expanded litigation is one reason courts avoid engaging in collateral litigation to explore speculative allegations.

## CONCLUSION

For the foregoing reasons, this Court should deny Sheriff Dart's Motion for Sanctions without any further proceedings.

Respectfully submitted,


By:  s/John R. Storino
Jeffrey D. Colman
John R. Storino
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
Telephone:  +1 312 222 9350
Facsimile:  +1 312 527 0484

21

## CERTIFICATE OF SERVICE

I certify that on May 17, 2018 I caused to be served a copy of DWT's Response in Opposition to Sheriff Dart's Motion for Sanctions via the Court's ECF system on all counsel of record registered through that system to receive electronic filings in this case.

By: s/John R. Storino_____
    Jeffrey D. Colman
    John R. Storino
    Jenner & Block LLP
    353 N. Clark Street
    Chicago, IL 60654-3456
    Telephone:  +1 312 222 9350
    Facsimile:  +1 312 527 0484

# <u>Exhibit D</u>

1

2

3

4

5

6          IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
                 IN AND FOR THE COUNTY OF PIERCE
7    _____

8    R.O., by and through her mother,    )
     S.H., and K.M., by and through      )
9    her mother, L.M.,                    )
                                          )
10                   Plaintiffs,          ) No. 17-2-04897-1
                                          )
11        vs.                             )
                                          )
12   MEDALIST HOLDINGS, INC., et al.      )
                                          )
13                   Defendants.          )
14   _____

15            VERBATIM TRANSCRIPT OF PROCEEDINGS

16   _____

17
                    **Wednesday, May 23, 2018**
18            Before The Honorable G. Helen Whitener
                    Pierce County Courthouse
19                    Tacoma, Washington

20
                      <<<<<<  >>>>>>
21

22

23
                 Kimberly A. O'Neill, CCR #1954
24                   Official Court Reporter
                   Department 11, Room 202-A
25                     (253) 798-7281

```
 1                    A P P E A R A N C E S

 2

 3       For the Plaintiffs:   MICHAEL T. PFAU
                               JASON P. AMALA
                               Attorneys at Law
 4                             PFAU COCHRAN VERTETIS AMALA PLLC
                               403 Columbia Street, Suite 500
 5                             Seattle, Washington 98104
                               (206) 462-4334
 6

 7       For the Plaintiffs:   ERIK L. BAUER
                               Attorney at Law
 8                             THE LAW OFFICE OF ERIK L. BAUER
                               215 Tacoma Avenue South
 9                             Tacoma, WA 98402

10

11       For the Defendant:    ERIC M. STAHL
                               JAMES GRANT
                               Attorneys at Law
12                             Davis Wright Tremaine LLP
                               1201 Third Avenue, Suite 2200
13                             Seattle, WA 98101-3045
                               (206) 622-3150
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         TABLE OF CONTENTS

 2                 R.O. vs. MEDALIST HOLDINGS, LLC

 3                      No. 17-2-04897-1

 4


 5                  Proceedings of May 23, 2018

 6

 7                                                Page:

 8      Plaintiffs' Motion to Compel Compliance with
            Court's Order..................................6
 9
        Plaintiffs' Motion for Sanctions.................45
10
        Defendant's Motion to Withdraw...................45
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    BE IT REMEMBERED that on Wednesday, the
 2      23rd day of May, 2018, the above-captioned cause came on
 3      duly for hearing before THE HONORABLE G. HELEN WHITENER,
 4      Judge of the Superior Court in and for the county of Pierce,
 5      state of Washington; the following proceedings were had, to
 6      wit:
 7
 8                              <<<<<<  >>>>>>
 9
10                    THE COURT:  All right.  Good morning,
11      everyone.
12                    MR. AMALA:  Good morning, Your Honor.
13                    MR. PFAU:  Good morning, Your Honor.
14                    MR. BAUER:  Good morning, Your Honor.
15                    MR. STAHL:  Good morning, Your Honor.
16                    MR. GRANT:  Good morning, Your Honor.
17                    THE COURT:  Go ahead and be seated.  All
18      right.  We're on the record on R.O. vs. Medalist Holdings,
19      LLC, Cause No. 17-2-04897-1.  Go ahead and introduce
20      yourselves for the record.
21                    MR. PFAU:  Michael Pfau on behalf of the
22      Plaintiffs, Your Honor.
23                    THE COURT:  Good morning.
24                    MR. AMALA:  And good morning, Your Honor.
25      Jason Amala on behalf of Plaintiffs.
```

```
1                      THE COURT:  Good morning.

2                      MR. BAUER:  Good morning, Your Honor.

3        Erik Bauer for the Plaintiffs.

4                      THE COURT:  Good morning.

5                      MR. STAHL:  Good morning, Your Honor.

6        Eric Stahl, Davis Wright Tremaine, here for the Medalist

7        defendants.

8                      THE COURT:  All right.  Good morning.

9                      MR. GRANT:  And good morning, Your Honor.

10       Jim Grant on behalf of the Medalist defendants as well.

11                     THE COURT:  All right.  Counsels, we have

12       the motions that were brought previously set over to be

13       resolved today.  We have the motion to withdraw.  We also

14       have the objection to the withdrawal, and we have motions

15       for sanctions and attorney fees against Backpage pursuant to

16       CR 11.  And, of course, we still have the issue regarding

17       the motion to compel; would that be accurate?

18                     MR. PFAU:  That's accurate, Your Honor.

19                     MR. STAHL:  Yes, Your Honor.

20                     THE COURT:  Okay.  Any particular order?

21                     MR. PFAU:  Your Honor, we would like to

22       start with the motion to compel and then take the sanctions

23       motion separately.  Mr. Amala is going to argue the motion

24       to compel, and I'm going to argue the motion for sanctions.

25                     THE COURT:  And, Counsel, what is your
```

1    preference?

2              MR. STAHL:  I think it makes sense to

3    start with the motion to withdraw first to make clear who we

4    are representing.

5              THE COURT:  Well, I'd like to start with

6    the motion to compel as you were -- "you" being the

7    attorneys for the Defense -- representing the Defendants as

8    a whole at the time my order went into effect.  The

9    withdrawal does not affect the decision in regards to

10   compliance on my motion -- or, actually, my order and the

11   motion to compel; so let's hear that one first.

12             MR. AMALA:  Your Honor, may we approach?

13             THE COURT:  Of course.

14             MR. AMALA:  Good morning, Your Honor.

15   Jason Amala on behalf of the Plaintiffs, R.O. and K.M.  And

16   I'll keep this somewhat succinct, Your Honor, because there

17   really wasn't much of an opposition to the motion, at least

18   substantively.  In January, you entered a very clear order

19   that compelled these defendants to search for responsive

20   documents to our discovery requests and those discovery

21   requests had been issued months earlier.  We finally came to

22   you for relief to get them to answer discovery or at least

23   to get the ball rolling.  Those search terms and what they

24   were ordered to produce was very similar to what these

25   defendants -- or, actually, was identical to the search that

1    these defendants had done in the *J.S.* litigation which was

2    litigated for five-plus years.

3        The Court's order was entered in January and over the

4    next five months until we filed this motion, we met and

5    conferred with the Defendants multiple times, trying to get

6    them to comply with the Court's order.  It got to the point

7    where we asked them to at least start producing responsive

8    information on a rolling basis and what we were told was:

9    "We're still looking, and we don't know what records we

10   have; We're trying to identify what sources there are; We

11   haven't started our review yet."  And we filed this motion

12   because the Defendants -- at least two of them pleaded

13   guilty.  Their assets are being seized, and we still don't

14   have any documents in response to your order.

15       And I'll say what's most troubling is that we filed this

16   motion and in response, the representation to the Court was

17   the same representation that we had been hearing for five

18   months.  And I think it's highlighted on Page 3 of their

19   opposition where they say, quote -- at Line 3, quote, "nor

20   have these documents been reviewed for privilege, privacy

21   concerns, or confidentiality," end quote.  So in our reply,

22   we focused on this argument about reviewing for privilege

23   because that, really cutting to the chase, seemed like that

24   would be the one argument the Court might find somewhat

25   compelling, saying that these folks should have an

1    opportunity to review for privilege; and it occurred to us

2    that the U.S. Senate had had a subpoena to which these folks

3    were ordered to comply.  They were held in contempt of

4    Congress, and they litigated some of these issues before a

5    federal judge in D.C., and so we thought "let's go look at

6    the docket to see if there had been any court orders on this

7    privilege issue because if they have litigated the issue

8    somewhere else, they shouldn't get to relitigate it here."

9       And that's where we found -- what we provided in the

10   supplemental declaration of Mr. Pfau are the declarations by

11   counsel for these defendants, representing to the Court in

12   D.C. the exact opposite of what they're telling this Court,

13   and that is, that they spent 30,000 attorney hours reviewing

14   these same documents for these same issues and produced them

15   to the U.S. Senate.  I believe the cost was around three

16   million dollars that they paid to their lawyers.  What was

17   even more troubling is that Davis Wright Tremaine, the same

18   law firm who is here today -- and I'm going to give them the

19   benefit of the doubt to the extent we can.  Ms. Roos'

20   declarations indicate that Davis Wright Tremaine was counsel

21   of record and oversaw that entire review and production; so

22   at some point, there had been this -- I think an argument

23   that, well, gosh, we've got to pretend like we don't know

24   what Perkins Coie did and now their own declarations from

25   Perkins Coie indicate that Davis Wright Tremaine oversaw

1       that entire review for these same issues.  They've already

2       done the review for privilege.  They've already done the

3       review for responsiveness, and so that's why we'd ask that

4       the motion to compel be granted.  The order that we've

5       provided to the Court allows them to withhold documents that

6       they have flagged for privilege as long as they haven't

7       litigated the issue and lost elsewhere and that seems

8       entirely appropriate.

9          And I will flag for the Court, because I understand at

10      the last hearing there was some arguments about, well, now

11      they want this stuff from the Senate, and we're going to

12      have to cross that bridge a different day because I'm very

13      concerned that we issued these discovery requests at the end

14      of last year.  We have an order from you and now it appears

15      that they have reviewed all of these and cataloged them for

16      responsiveness, and yet we didn't get any of those in

17      response to our discovery requests, yet have we received any

18      documents in response to your order.  So, we will cross that

19      bridge a different day; but for today, we ask the documents

20      that they have identified as being responsive to your order

21      be produced within a week.  They know what documents are

22      privileged.  They've flagged those in a prior case.  My

23      understanding is they provided the U.S. Senate with a

24      privilege log, so that work has been done and there's no

25      reason that they can't comply with your order and produce to

1      us what they flagged, withholding what they claim is

2      privileged as long as they haven't litigated that issue

3      somewhere else and lost.  Thank you, Your Honor.

4                      MR. STAHL:  Your Honor --

5                      THE COURT:  Counsel?

6                      MR. STAHL:  Thank you, Your Honor.  The

7      issue before the Court is whether there's any basis for the

8      overreaching remedy they're asking for in this case, for us

9      to turn over 1.1 million documents that we had identified as

10     having certain search terms in responding to this Court's

11     order, not in *J.S.*, not in the Senate hearing.  It's an

12     overreaching remedy, and they're conflating two different --

13     three different things.

14        The documents we reviewed for this --

15                      THE COURT:  Let me stop you there.  It's

16     an "overreaching remedy" to comply with my order?

17                      MR. STAHL:  No, they're not asking -- it's

18     an overreaching remedy for them to ask for us to turn over

19     these 1.1 million documents, which, contrary to what

20     Mr. Amala just said, have not been flagged as responsive.

21     They have been flagged as having certain search terms.  This

22     is not work that was done for the Senate cases.  This is the

23     period of time after *J.S.*, so it's not work that was done

24     for the *J.S.* case.

25        Let me just take a step back and --

```
 1                     THE COURT:  Well, before you get there --
 2        because you tend to talk pretty fast so that's why I tried
 3        to slow you down, not because I'm not hearing you.  It's
 4        because I'd like to hear and understand what you're saying.
 5        What I'm asking is based on your review of all of the
 6        documents you have and the order that I entered, you were
 7        not able to find any documents, whatsoever, that needed to
 8        be turned over to be complied with my order?
 9                     MR. STAHL:  No.
10                     THE COURT:  Because what I heard Counsel
11        state is as of today's date, they have not received any
12        documents in response to my order; so just answer that.
13                     MR. STAHL:  That's not true.  First of
14        all, they received 95,000 pages that we have previously
15        produced in J.S., number one.  Number two, they received
16        some number of documents specific to this case -- to the
17        case -- specific terms -- search terms that they asked us to
18        run which we did and which we have produced.
19                     THE COURT:  And these were produced after
20        my order?
21                     MR. STAHL:  Correct.
22                     THE COURT:  Okay.
23                     MR. STAHL:  The part of your order that we
24        are here discussing is the part that said go around these
25        500-plus search terms on data not from J.S. but from the
```

1    period after *J.S.*, from 2012 to the present.  We worked

2    diligently to comply with that.  Let me tell you what we

3    did.  When we ran those 500-plus search terms against two

4    terabytes of data that had been gathered in the Spring of

5    2016 -- and just for some perspective, I looked this up.

6    Two terabytes of data is something like 150 million pages of

7    data; it's a vast amount of material.  If printed out, it

8    would be more than anyone in this room could read in a

9    lifetime.

10    We ran those search terms.  The results that came back

11    from just the search terms was 1.1 million documents.  We

12    acted diligently and transparently going to the Plaintiffs

13    and saying "here's what we've got; it is going to take eight

14    to twelve months to search this material."  And their own --

15    their own declaration, what Mr. Amala just said, kind of

16    makes the point.  For a similar volume of documents, it took

17    a year to produce in the Senate case.  I was not involved in

18    *J.S.*, but the discovery there took thousands of hours and

19    several years and cost millions of dollars.

20    We went to the Plaintiffs and we said, "Can we discuss

21    how you want us to search these documents; Can we be more

22    precise?  Can we narrow the search terms, or can we make

23    them, you know, more tailored to a way that actually

24    generates responsive material?"  So, the 1.1 million

25    documents are documents that just have words like

1    "requirement" or "terms of use" in them.  They're not

2    necessarily responsive to any discovery request.

3        My May 20th letter, which is in the record and which I

4    believe the Court has read, sets out what we did and what

5    we're asking the Plaintiffs to discuss.  It was a diligent

6    attempt to cooperate with them to get the discovery done in

7    the time that we had under the case schedule.  We sent that

8    letter on May 20th, and we asked to confer with them.  It

9    took us, I'll tell you, ten days to even get them to agree

10   to speak to us.  They put all kinds of conditions on wanting

11   to speak to us in terms of additional information we wanted.

12   We conferred on -- Friday, I believe, was the -- March 30th.

13   They asked for some additional information which we provided

14   in e-mails on May 3rd -- and I'm sorry, April 3rd and April

15   6th which are in the record, also, in Mr. Pfau's

16   declaration.  They never responded to that, and literally

17   until the day that we got Mr. Ferrer's communication that

18   caused us to -- the need to withdraw from representing the

19   Backpage defendants, we were communicating with them; and we

20   were trying to figure out a way to make this workable.  The

21   last communication and last attempt to confer among the

22   parties was that April 6th e-mail until we got the motion to

23   compel.

24       So, this notion that we were not trying to comply or

25   ignoring the motion is just not true.  It's not born out by

1    the record.  It's false, and we were diligently trying to

2    figure out a way to get this job done in the time that we

3    provided.  So when I say there's no basis for the remedy

4    they're proposing, we've got 1.1 million documents that have

5    a search term that have not been determined to be either

6    responsive or privileged or not.  They have not been

7    reviewed.  We currently don't have a client we can

8    represent.  These are Backpage.com documents gathered by

9    Backpage for the *J.S.* case.  We no longer are able to

10   represent or to produce documents on their behalf or to

11   review them.

12       In terms of where we are now, they're asking for an order

13   that would compel our firm to turn over a million documents,

14   to turn over the larger database in which they are situated

15   in and which the motion documents are located.  We can't

16   turn over documents on behalf of a client we don't represent

17   without knowing what's in them, whether they have

18   confidential or privileged material.  The Court can

19   certainly order us to preserve those records, order us to

20   cooperate with Backpage or with Counsel, which we're going

21   to do, anyway.  And we are officers of the court, and we're

22   not going anywhere; but in terms of an order for us to start

23   reviewing and producing materials, much less to produce it

24   in a week, is not -- it's not realistic.

25       I'll also say that we have not met or conferred over the

1    remedy they sought in this motion.  The last communication,

2    again, was April 6th when we were trying to figure out how

3    to comply with the order generally.  There was no meet and

4    confer over this idea that they can seize the 2-terabyte

5    database.  There was no meet and confer over the idea that

6    we should turn over 1.1 million records in a week.  The

7    request raises all kinds of practical problems and just

8    physically how those records would be copied, who would pay

9    for it, who would do the review, this sort of stuff the

10   parties are supposed to meet and confer over before

11   burdening the Court with a motion like this.

12       And, you know, I'll just add that the meet and confer

13   requirement is mandatory in Division II.  *Clarke vs. State*

14   says you have to confer before you bring this to the Court.

15   They cite a Division I case, *Amy vs. Kmart*, that says, well,

16   in some circumstances, you don't need to confer.  That's not

17   the rule in this division.

18       The documents -- the motion is not properly directed to

19   the clients that I'm standing here for today, the Medalist

20   parties.  Again, these were collected by Backpage in the

21   course of the *J.S.* case.  The Medalist parties were not

22   defendants, and so we would ask that the Court either deny

23   the motion or direct the parties to preserve the records and

24   to confer further.

25                    THE COURT:  So your remedy that you're

*R.O. vs. Medalist Holdings, LLC*

1    requesting the Court to do today, Counsel, if I heard you

2    correctly, is to deny the motion and direct you to preserve

3    the records, which I believe I've already done, and direct

4    you to confer further for a client that you're indicating

5    you no longer represent.

6                    MR. STAHL:  My request is that you deny

7    the motion.  I'm suggesting, if the Court is inclined to do

8    so, that it could extend the existing preservation order;

9    and beyond that, again, we will cooperate with Backpage.com

10   or its new counsel, but what I think is improper is to

11   conflate the obligations of the clients with their attorneys

12   or former attorneys which is what they're asking the Court

13   to do.

14                   THE COURT:  Okay.

15                   MR. GRANT:  Your Honor --

16                   THE COURT:  One second, Counsel.

17                   MR. GRANT:  Sure.

18                   THE COURT:  Counsel, I'd like to hear from

19   you in regards to the response given that they have not

20   fully complied but substantially complied within their

21   capabilities.

22                   MR. AMALA:  And I appreciate you asking

23   that, Your Honor, because that's where I wanted to start.

24   That is not accurate and even remotely close to accurate.

25   What has been produced to us -- and let me back up.  If the

1    Court may recall, when we came on the motion to compel

2    before you entered your order, the issue is that in the *J.S.*

3    case, those documents ended in January of 2012.  The

4    Plaintiffs in this case -- and that's because the girls in

5    that case had been sold on the website in 2010, so the

6    Court, in *J.S.*, had limited the discovery, the scope of

7    discovery until -- I think it was January 1, 2012.

8        When we -- the girls in this case were sold in late 2014

9    and early 2015, so when we came to you on the motion to

10   compel, it was because the discovery we had received in *J.S.*

11   ended in 2012; and so we essentially asked you to require

12   them to do the same search and production that had been

13   ordered in *J.S.*

14       The 95,000 documents we've received are the documents

15   from *J.S.*, not the documents we came asking you to compel.

16   They're basically asking for credit for the documents that

17   took us a half a dozen or more motions to compel in the *J.S.*

18   case and that was plainly not the focus of why we came to

19   you in this case.  They basically just gave us what they

20   gave us in *J.S.* and now they want credit for it, but

21   obviously, the focus of your order was -- I mean, does it

22   include those?  Yes.  But the focus is making sure we got

23   the documents for the time period that's at issue in this

24   case.  So have they given us the *J.S.* documents or regiven

25   them to us?  Yes.  But that was plainly not the primary

1      focus of the motion or the focus of your order.

2          The only other documents we have received are a relative

3      handful and those are about the advertisements for our own

4      clients, and we're talking -- I mean, I don't know the total

5      off the top of my head, Your Honor, but it is a very, very

6      small amount, and we had to kick and scream to get them to

7      give them to us by literally telling them you've already --

8      you've got this because in the criminal cases for these

9      girls, those documents had been produced, so we essentially

10     said, "Well, we know you gave them to law enforcement; Can

11     you at least give us what you gave to law enforcement?"

12     That is the extent to what we've received and that's why

13     I've made the statement your search, which you ordered, they

14     have not complied with.  They've essentially given us

15     documents on our own clients that they gave to law

16     enforcement and then the documents from *J.S.*  The purpose of

17     your order has not been complied with nor have we received

18     anything in response to your order we will get in that

19     context.  To put it simply, we've received nothing from them

20     from after January 2012 other than the documents about our

21     own clients.

22         And I'll just -- unless the Court has any pointed

23     questions for me, I do want to address just a couple of

24     issues.  We met and conferred --

25                    THE COURT:  One second.

```
 1                    MR. AMALA:  Yes, Your Honor.

 2                         (Pause.)

 3                    THE COURT:  I'm looking at the -- and both

 4       counsels were referring to the January 12th court order I

 5       signed; correct?

 6                    MR. AMALA:  Yes, Your Honor.  And, Your

 7       Honor, if I -- I know you asked me to pause.  Mr. Pfau

 8       pointed out something I should have probably made clear.

 9       They actually didn't give us any new documents.  The J.S.

10       documents, they basically said you can keep what you already

11       have.  I guess I should make that clear.  There was no new

12       search.  They just said you can keep what you've already

13       got.

14                    THE COURT:  All right.  Counsel?

15                    MR. AMALA:  And, Your Honor, may I --

16       two --

17                    THE COURT:  Are you finished?

18                    MR. AMALA:  Just the last two points, Your

19       Honor.  We're here on a motion to compel compliance with

20       your order.  The parties have met and conferred in good

21       faith multiple times, and I will add -- I want to make

22       something very -- I think there's a point at issue here, and

23       I'm a little concerned about some semantics, that the

24       language that is being used appears to be very careful which

25       is saying the documents haven't been reviewed in this case,
```

*R.O. vs. Medalist Holdings, LLC*

1       and that is --

2                      THE COURT:  Well, you heard that too?

3                      MR. AMALA:  Yeah.

4                      THE COURT:  Okay.  Go ahead.

5                      MR. AMALA:  And that is obviously not the

6       issue because they -- we know they have reviewed these to

7       the tune of 30,000 hours and multi-million dollars and that

8       this law firm is the one that oversaw that review.  I don't

9       think there's case law that says you can review all of your

10      documents in one case and in the next case pretend like you

11      don't know what's in your documents.

12          Regarding the withdrawal, as the Court pointed out, this

13      is the firm that has overseen the entire process, and we

14      have grave concerns that they have tried to -- I want to be

15      careful with my words.  They have tried to not -- they've

16      distanced themselves, pretending like they don't know what

17      Perkins Coie did.  We know now -- we now know that's not

18      true and now this firm is saying we want to withdraw and

19      punt to the next law firm, and this is the firm that has

20      overseen the entire process and that's why I think the Court

21      started with this motion correctly, which is they're the

22      firm that should be ordered to compel or to comply with the

23      order.  Thank you.

24                     THE COURT:  All right.

25                     MR. STAHL:  Mr. Grant was involved in the

1      earlier --

2                    MR. GRANT:  Well, I wanted to point out

3      and respond to some of Mr. Amala's comments which are not

4      accurate, Your Honor, and let me just put it this way.  The

5      requests in the PSI production are different than the

6      requests here.  As is true in any document production, you

7      deal with the collection requests that you get in that -- in

8      that context, so -- that we reviewed documents -- I should

9      step back; I'll correct that.  Actually, the other parties

10     reviewed documents.  In the context of the PSI production

11     does not mean that that's the same exercise that will be

12     done here.  It's a very different exercise now that has to

13     be based on the search terms and --

14                    THE COURT:  But you represent all of them?

15                    MR. GRANT:  We actually did not handle

16     the -- this is the other point I have to correct.  We did

17     not handle the review and production of documents of the

18     PSI.  That was done by the Perkins Coie firm and by other

19     contractors with Perkins Coie.  We represented one of my

20     partners who is a First Amendment expert.  We represented

21     parties in that context having to do with the First

22     Amendment issues of the PSI subpoena; it's overbroad in its

23     violation.

24                    THE COURT:  And when you took over from

25     Perkins Coie, you were aware of what was already completed

```
1        and how it was completed?
2                    MR. GRANT:  Your Honor, we did not take
3        over from Perkins Coie in the PSI list.
4                    THE COURT:  All right.
5                    MR. GRANT:  Perkins Coie had --
6                    THE COURT:  Just this --
7                    MR. GRANT:  Perkins Coie had the document
8        responsibilities in the PSI case; that was not ours.  We
9        certainly coordinated with cocounsel, including Akin Gump --
10                   THE COURT:  Well, that's what I was
11       asking.
12                   MR. GRANT:  -- including Paul Hastings and
13       including Perkins Coie, so there was coordination but that
14       was not our role; and we were not the ones responsible for
15       the document collection there.
16                   THE COURT:  Right, but you were privy to
17       what was covered by Perkins Coie in that representation --
18                   MR. GRANT:  I'll be honest.  I don't want
19       to overstate because I'm not sure we were privy as to what
20       Perkins Coie was producing in that context.  We relied on
21       our cocounsel for that work; so as I'm saying, that's not
22       our work.  It's not -- it's not what we were doing, and it's
23       really -- you know, it's sort of reflective of -- the
24       responsibilities for document productions fall to the
25       client, as was true in that matter and as is true here, so
```

1      the client here or the party here that has the obligations

2      to produce documents is Backpage.com.  We did previously

3      represent them.  Now, this is where the two motions sort of

4      become intertwined.  Now, we have the difficulty that we

5      don't represent them.  We don't have authority to represent

6      them.  We don't even have communications with them, so the

7      problem is the next stage in the -- in the compliance would

8      be virtually impossible given the lack of relationship, but

9      I wanted to make sure it was clear that the involvement in

10     the PSI has a completely different set of requests, a

11     completely different review that was done.  You can't say

12     that because, you know, we or our cocounsel fulfilled our

13     obligations in another case, that means, de facto, we did

14     not fulfill our obligations in this case.

15                    MR. AMALA:  Your Honor, I'm going to --

16                    MR. GRANT:  That's an unfair

17     characterization.

18                    MR. AMALA:  I'm going to -- I want to --

19     and I'm sorry to interrupt.  I'm going to object and move to

20     strike Mr. Grant's -- he's essentially conceded he has no

21     foundation or personal knowledge for the statements he just

22     made regarding his firm's involvement, and I'm very

23     concerned because the representations he just made, to which

24     he says he doesn't have personal knowledge because he wasn't

25     involved, directly conflict with the evidence that's before

1      the Court in Ms. Roos' declaration; and I can read the Court

2      the excerpts, but it's in the record.

3                         THE COURT:  Will you read it into the

4      record.

5                         MR. AMALA:  I will.  This is Ms. Roos'

6      declaration from November 8, 2016.

7                         THE COURT:  And just read the portions

8      that are applicable.

9                         MR. AMALA:  Thank you, Your Honor.  And

10     this was Exhibit 3 to Mr. Pfau's supplemental declaration

11     that was filed for this motion.  Ms. Roos begins in her

12     declaration and says that, quote, "On" -- this is paragraph

13     (2), quote, "On August 10, 2016, Perkins Coie was engaged to

14     conduct a document review and production in connection with

15     Request Nos. 1, 2, and 3 of the October 1, 2015, subpoena

16     duces tecum (the 'Subpoena') issued to Carl Ferrer (CEO of

17     Backpage) by the Senate Permanent Subcommittee on

18     Investigations," and parentheses, "('PSI')," end

19     parentheses.  "With regard to the PSI proceeding, Backpage

20     and Mr. Ferrer have been represented at all times by the

21     firms of Akin Gump and Davis Wright Tremaine," end quote;

22     and she then refers to those firms as "Counsel of Record."

23         Then in paragraph (4), Ms. Roos states, quote, "Perkins

24     Coie's work on this matter, including the identification of

25     particular custodians and other sources of records

1    potentially responsive to the Subpoena, as well as the

2    selection of particular search terms utilized in the review,

3    was performed at the direction of Backpage, in consultation

4    with Counsel of Record," end quote, which she identified as

5    including Davis Wright Tremaine.  She then goes on in her

6    declaration, in both this declaration and the other

7    declaration as Exhibit 1 to Mr. Pfau's supplemental

8    declaration, to state how Davis Wright Tremaine helped to

9    collect data sources that were, then, given to Perkins Coie

10   and was actively involved in the search and the review that

11   Perkins Coie did at the behest of Davis Wright Tremaine

12   acting as counsel.

13       Thank you, Your Honor, and I apologize for the

14   interruption.

15                MR. GRANT:  And I apologize, Your Honor,

16   but that is not what I just said.  The quotes are accurate

17   and it is true, as I've just explained to the Court, that

18   Davis Wright was one of the counsel of record along with

19   Akin Gump and along with Paul Hastings and along with

20   Perkins Coie, but Davis Wright -- and Ms. Roos says it in

21   her declaration that Perkins Coie did a review.  Perkins

22   Coie collected the documents to the extent that they were

23   collections that others had, including what we had from the

24   *J.S.* case, but it is absolutely not true that Davis Wright

25   was responsible for that review and collection.  Davis

1    Wright was counsel of record in the PSI case on First

2    Amendment issues, not in regard to the document production;

3    and I take offense to that because there's a suggestion that

4    I misrepresented that to the Court.

5                    THE COURT:  Well, I read it so I'm

6    familiar with what's in it; but what I'm trying to figure

7    out, Counsel from Davis Wright Tremaine, is that even though

8    your firm, you're stating, did not necessarily review the

9    documents, since you were counsel of record, part of the

10   threesome, for lack of a better word, are you saying that

11   you were not aware of what documents had been reviewed in

12   this case or in that case?

13                   MR. GRANT:  In the PSI case?

14                   THE COURT:  In the PSI case.

15                   MR. GRANT:  I would say in a general

16   sense, Your Honor, we were aware of what kinds of documents

17   were being reviewed.  We certainly knew the three requests

18   that the Permanent Subcommittee on Investigations had posed,

19   the requests that they had made.  We knew that the review

20   was taking place.  We were not involved in doing a review,

21   but we did know generally what the kinds of documents were

22   and what the collections were.

23                   THE COURT:  And given that knowledge base,

24   when you were compelled to produce documents in this case,

25   having that information, are you saying you were not aware

```
1     of the likelihood that many of those documents would be

2     relevant to this case?

3                      MR. GRANT:  I would say we were aware of

4     the likelihood that that collection of documents would be

5     part of the big pot that would have to be reviewed for

6     purposes of this case.

7                      THE COURT:  Okay.

8                      MR. GRANT:  And one set of document

9     requests there in the PSI, the Perkins firm did the review

10    and collected and produced the documents that were relevant,

11    another set of requests here that are a different set of

12    requests; so the process that has to happen is you go find

13    the full collection of materials you have to work with,

14    which, I suspect, subsumed the PSI materials and more, then

15    you run the search terms against that collection because now

16    you have to focus on the specific requests in this case, not

17    some request from some other case, and determine from that

18    what kinds of hits you get.

19                     THE COURT:  But here's where I'm having a

20    little problem following your reasoning.  You have the PSI

21    case --

22                     MR. GRANT:  Mm-hmm.

23                     THE COURT:  -- and you have certain

24    documents that you are aware were reviewed, and you just

25    indicated from that subset you were aware that some of them
```

1      may be relevant in this case, so you don't have to go review

2      the whole amount to come up with the PSI amount.  You're now

3      reviewing a small subset to see whether or not it's relevant

4      to this case; and afterwards, as you're doing your

5      compliance with the Court's order, you can, then, go beyond

6      it.  But what I'm hearing is nothing was turned over;

7      whereas, what I'm saying is couldn't you have looked at the

8      subset that was already reviewed in the PSI case and see if

9      you can comply with this Court's order, see what's relevant

10     in that subset -- it's not the big picture here; we're just

11     dealing with the subset -- and, after complying with this

12     Court's order, indicate to Counsel, hey, there might be some

13     more in the bigger scheme of documents.  And, of course, my

14     terminology isn't as great as all of you because you've been

15     dealing with it, but I'm trying to make it as reasonable as

16     possible.  You didn't have to go, so we're looking at the

17     small subset, just the PSI stuff that very likely, based on

18     what you said, would have documents relevant to this case

19     and would be relevant to complying with my court order; but

20     that wasn't even done.

21               MR. GRANT:  Your Honor, those materials

22     may or may not be relevant to the request here.

23               THE COURT:  But you never checked.

24               MR. GRANT:  Because the process is that

25     you need to have the collective whole in order to work from

1       it, and here's why.

2                       THE COURT:  Why?

3                       MR. GRANT:  If we had gone off with

4       just -- I can see the motion coming from the Plaintiffs now.

5       If we had gone off just to re-review the collection of

6       materials that had been produced with the PSI and nothing

7       else, I can guarantee you we would have had a motion to

8       compel by the Plaintiffs against us saying that's not the

9       request we made and that's not the Court's order.  What you

10      have to do is go back to your old collection of documents

11      and make sure you encompass all those materials for all the

12      search terms that were subject to the Court's order, so

13      that's why -- and this is just the logical progression that

14      you always do in a process like this.

15                      THE COURT:  So what I'm hearing is you're

16      saying you could not comply with the Court's order on a

17      rolling basis --

18                      MR. GRANT:  No.

19                      THE COURT:  -- that you had to comply with

20      the Court's order by reviewing all of the documents again.

21      So every time -- what I'm hearing and correct me if I'm

22      wrong -- so every time you get a Court, whether it's this

23      Court or another Court in regards to these issues, you would

24      have to go back from scratch to look at the whole; whereas,

25      you reference the PSI case and that case had documents

1      relevant to this one and a letter indicating this is just

2      the first of many on a rolling basis; we're going to give

3      you this amount so that we can, at least, start complying

4      with the Court's order.  You're saying that couldn't be done

5      is what I'm hearing.

6                      MR. GRANT:  No, I'm not saying that, Your

7      Honor.  What I'm saying is that, first of all, that's not --

8      that's not a rolling basis review.  That would be taking a

9      subset of materials, re-reviewing it, having to run these

10     search terms against that subset of materials; but it's a

11     process, then, we would have to duplicate for the source

12     materials from which that came.  This is what I mean; you've

13     got the small pot which is the -- which is the production

14     that came out of the PSI.  You've got the bigger pot which

15     is the production -- or which is the collection of materials

16     from the PSI.  Then you've got a bigger pot, still, which is

17     the collection of all the documents from Backpage that is

18     potentially responsive, the 2 terabytes.  So what you're

19     suggesting is you have to search all that once through a

20     PSI.  Then you have to search the same materials all over

21     again because I can't segregate them back out just for the

22     PSI pot.  Then you've got to search them all over again for

23     the -- for the entire collective pot.

24        What I'm saying, Your Honor -- I've been doing this 35

25     years and some pretty big document productions back in my

1    earlier days, I can attest, but I don't do much of it now,

2    but that is not --

3              THE COURT:  Back then you didn't have the

4    ability to do quick search terms on databases.

5              MR. GRANT:  I can tell you a story about

6    20 million pages of documents in the *Exxon Valdez* case; but

7    in any event, that is not how you undertake a process like

8    this.  I believe what I wanted to say, too, that had that

9    been the issue in the -- in the communications with

10   Mr. Amala and Mr. Pfau about how to go about doing this, had

11   there been a suggestion that that's how you should have

12   proceeded, we could have addressed that suggestion.  That's

13   not what happened in the course of this meet and confer.

14   What happened was, as is typical in a process like this, we

15   had gotten to the stage where we knew there was a huge

16   collection of documents and that the search term hits were

17   vastly overbroad.  They were going to get lots and lots of

18   junk information.  That's the way this process works.  We

19   were trying to work out that issue with them.  That comes to

20   the point when Mr. Ferrer indicates to us -- gives us an

21   indication that we can no longer represent him as counsel.

22   That's where we stand.

23              THE COURT:  So the Court's order was

24   January 12, 2018, and what I'm hearing you say is at that

25   point in time, you knew it was not going to be realistic to

1    comply for many months with the Court's order.

2                    MR. GRANT:  I'm not saying that, Your

3    Honor, and Mr. Stahl has been more directly involved in

4    this, certainly, than I have, but my understanding is that

5    in that process, we went out to collect the materials to

6    find out exactly what we had.  This is not easy stuff; it

7    takes some time.

8                    THE COURT:  Well, okay.  For

9    clarification --

10                    MR. GRANT:  Sorry.

11                    THE COURT:  -- when I say "comply,"

12    meaning, produce the documents to the other side within a

13    relatively short period of time is what I'm hearing.  It

14    would have taken many, many, many, many months.

15                    MR. GRANT:  Given the volume of materials

16    we were talking about, given the problem of too many hits

17    with the search hits, it would have taken many months and a

18    vast amount of work, and Mr. Amala's example of the PSI

19    matter is exact proof of that --

20                    THE COURT:  And that --

21                    MR. GRANT:  -- and in order to do it

22    there, it took -- I'm sorry, Your Honor.

23                    THE COURT:  And that the more efficient

24    way of approaching this by utilizing search terms that were

25    previously done that produced documents of similar discovery

*R.O. vs. Medalist Holdings, LLC*

1    requests, or if not similar, the same in different cases,

2    you're saying you could not do that on a rolling basis; you

3    had to, then, review the whole.

4                    MR. GRANT:  Again, Your Honor, I don't

5    want to misstate.  I'm not saying we couldn't do things on a

6    rolling basis in one fashion or another.  I'm saying the way

7    we were approaching this is the way that is traditionally

8    done in a document production like this.  We were trying to

9    determine how many hits there were going to be against those

10   search terms.  When we did and we found out that it was a

11   problem, Mr. Stahl conferred with him about that.

12                   THE COURT:  And you're saying

13   traditionally done by way of Davis Wright Tremaine or in the

14   industry?

15                   MR. GRANT:  In the industry.

16                   THE COURT:  Okay.

17                   MR. GRANT:  I'm saying -- and I've worked

18   for other law firms as well, and I've dealt with a lot of

19   document productions in my day; that's how you do it.

20                   THE COURT:  Okay.

21                   MR. AMALA:  Your Honor, if I --

22                   THE COURT:  I'm sure Counsel --

23                   MR. AMALA:  Yeah, briefly.

24                   THE COURT:  -- probably would not agree.

25                   MR. AMALA:  You know, and I appreciate

1      Mr. Grant may have a few years on me, but I appreciate the

2      reference to the traditional litigation and paper copy,

3      using the *Exxon Valdez*.   I don't imagine a Court ever in the

4      country endorsed the idea that Exxon reviews those 20

5      million pages of documents, catalogs them, does a privilege

6      log in one case and then when the next case is filed

7      involving the same oil spill, they get to say, we need to

8      re-review those 20 million documents and pretend like we

9      don't know what of those 20 million are responsive; and that

10     is the issue here.   These documents are not a mystery;

11     they're just not.   And Ms. Roos' declaration makes that

12     clear.   The PSI Subcommittee was focused on these same

13     issues that we are in this case, and that is the fundamental

14     problem.

15       We also repeatedly asked them to produce documents on a

16     rolling basis and at no point did Mr. Stahl or Davis Wright

17     Tremaine tell us that these documents had already been

18     reviewed for confidentiality and for privilege.   And

19     confidentiality, Ms. Roos talks about the 40,000 documents

20     that they had redacted for confidentiality.   At no point

21     during our meet and confers did they tell us, oh, by the

22     way, we've already overseen the review of all these

23     documents.   That would have been a very different

24     discussion, and that's why we're asking the Court to order

25     them to produce the documents that were responsive to the

1    search terms.  They can withhold documents that they have

2    already flagged for privilege because they've already done

3    that.  That is a fair way to proceed and balance the

4    interests of the parties and especially since they've

5    already reviewed these, there's no risk.  I guess if there's

6    a little risk of overbreadth, the Court is well within its

7    discretion to allow that to happen so long as its privilege

8    is protected which it can do by allowing them to withhold

9    documents that they already flagged as privilege, after

10   that, is completely fair.  To the extent it's over --

11   slightly overbroad somehow, we'll have to review those

12   documents, but we'll take that burden at this point because

13   we are very afraid that we're, essentially, asking to

14   re-review the 20 million "Exxon" documents that have already

15   been reviewed.

16              MR. GRANT:  Your Honor --

17              THE COURT:  Counsel, what I'd like to know

18   is, just for the record, in regards to Defendants Ferrer,

19   Larkin, and Lacey from Backpage.com and Medalist Holdings,

20   how many of these cases, nationwide, does Davis Wright

21   Tremaine participate in as counsel?

22              MR. GRANT:  For which parties, those four

23   that you mentioned or five?

24              THE COURT:  Correct.

25              MR. AMALA:  And, Your Honor, may I -- just

1    so you get a -- I think the question you're asking, to make

2    sure we're clear here, this -- and I think they've referred

3    to this.  The Court may want to ask as of the date of the

4    Court's order in January, how many cases throughout the

5    country did Davis Wright represent these defendants because

6    we have this issue about them trying to withdraw in

7    different cases; so if the Court is trying to get a sense

8    for how involved has this law firm been involved in

9    representing these defendants across the country, the

10   answer, I think, will be -- if you're asking the time when

11   you entered your order, you'll probably get a different

12   answer than if Counsel tries to answer based on today.

13              MR. GRANT:  I was going to give the Court

14   a complete answer and --

15              THE COURT:  My question went to overall

16   and that includes cases you may have recently been allowed

17   to withdraw from so that we're clear.

18              MR. GRANT:  Right, so I was going to

19   answer by saying as things stand right now, maybe six or

20   eight because of the withdrawals.  Virtually, every court

21   has signed off on withdrawal notices or orders of

22   withdrawal.

23      In terms of going back in time, there were as many as 17

24   cases total, this one being one of the 17.  There are

25   different varieties, Your Honor.  So, for example, there are

1       instances where the firm represented Backpage.com against

2       the Sheriff of Cook County, obtained an order there

3       declaring that his action of cutting off credit card

4       services was an unlawful, unconstitutional prior restraint;

5       and we have some other cases that also involve actions

6       against governmental parties and then some cases, as are

7       civil matters, most of which, apparently, have been brought

8       by Mr. Pfau's firm.

9                   THE COURT:  So overall from the first

10      time, I guess, Davis Wright Tremaine started representing

11      one or more parties that are connected somehow to

12      Backpage.com and Medalist Holdings, the largest amount of

13      cases would have been 17.

14                  MR. GRANT:  We've represented the parties

15      in other prior cases as well, some of which have terminated.

16                  THE COURT:  Okay.  So I want to know

17      overall to include terminated cases.

18                  MR. GRANT:  Yeah, it would go back to the

19      proceedings against the State of Washington where we

20      invalidated the laws.  I'm sorry.  I'm scratching my memory.

21      I would say 25, Your Honor, is my estimate.

22                  THE COURT:  And, of course,

23      representations were for different types of things, but

24      overall from day one when someone walked in that's connected

25      to these parties to Davis Wright Tremaine for

```
 1          representation, about 25.
 2                          MR. GRANT:  Approximately.
 3                          THE COURT:  Approximately.
 4                          MR. GRANT:  And, Your Honor, because there
 5          are differences of organizations in time here, you have to
 6          bear in mind that up through April of 2015 --
 7                          THE COURT:  '15.
 8                          MR. GRANT:  -- that was all one company;
 9          they were all collectively owned.  Well, that's not accurate
10          to say one company --
11                          THE COURT:  Well --
12                          MR. GRANT:  -- but then ownership changes
13          April of 2015.
14                          THE COURT:  Correct, and I'll deal with
15          that when I get to the withdrawal.  Now, presently after
16          various withdrawals over time, Davis Wright Tremaine has
17          about six or eight of these cases approximately.
18                          MR. GRANT:  It's a rough number, Your
19          Honor.
20                          THE COURT:  Okay.  All right.  At the end
21          of the day, I entered an order on January 12, 2018, and the
22          order was specific in regards to the motion brought to
23          compel full and complete responses from Backpage corporate
24          defendants with regards to discovery requests outlined in
25          what was deemed Appendix A; the pleadings were 72 pages.
```

1    The order was relatively straightforward, requiring full and

2    complete responses from the Backpage corporate defendants

3    regarding the discovery requests outlined, full and complete

4    responses regarding discovery requests outlined, including

5    declarations and evidence submitted in support thereof; and

6    then production of all records in the *J.S.* matter required

7    that the same search methodology employed in the *J.S.* case

8    be utilized which is why my questioning in regards to PSI

9    was along those lines, that you could do a search to, at

10   least, start complying with the Court's order and not wait

11   to get everything when you have been representing the

12   parties before this Court over a number of years in

13   different phases but most specifically in regards to this

14   case and the *J.S.* case and cases throughout the U.S.,

15   addressing very similar issues.

16       To require the Plaintiff to wait for a review of

17   discovery that the Defense is privy to, has been analyzing,

18   has been reviewing throughout the states, not just even

19   Washington State but throughout the states in response to

20   very similar requests, I don't find that to be efficient.  I

21   don't find that to be comporting with the technology we can

22   use today.

23       The *Exxon* case, kind of dated, Counsel, there.

24                   MR. GRANT:  Agreed, Your Honor.

25                   THE COURT:  But we have many ways of

1    responding more timely to discovery involving a vast amount

2    of documents, and it's time to change the responses to these

3    requests so that they're more timely by utilizing those

4    search engines a little more efficiently; and I'm finding

5    that wasn't done in this case.

6        January 12th -- we're now at May 23rd, five months later,

7    and documents that were turned over in response to my order

8    with documents that were, previously, available and could

9    have been turned over before that hearing; so to say that

10   you were complying with my order by turning over something

11   that was already available, packaged and ready to be shipped

12   out, so to speak, is not complying with this Court's order.

13   That is not in response to the arguments I heard, the

14   pleadings I reviewed, and the request that was made which

15   resulted in my order, so I'm finding there was not

16   compliance.

17       In regards to a remedy, it's a little difficult, so

18   before I give a decision in regards to remedy, I'm going to

19   hear the motion to withdraw.

20                    MR. AMALA:  Thank you, Your Honor.

21                    MR. GRANT:  May I add one comment, Your

22   Honor?

23                    THE COURT:  Sure.

24                    MR. GRANT:  The first we have heard of

25   this idea of producing the PSI documents as though they're

*R.O. vs. Medalist Holdings, LLC*

```
 1        supposed to be the same thing, without further review, is in
 2        this motion.
 3                        MR. STAHL:  The reply.
 4                        MR. GRANT:  The reply.  It is tantamount
 5        to a complete, new, and different discovery request to us;
 6        and Monday morning quarterbacking, you should have done it
 7        this way, though we never asked for it this way, Your Honor,
 8        I submit that's entirely unfair to us to say that looking at
 9        this backwards, we should have done the production that way
10        when the way we were going about doing the production was
11        entirely reasonable and was an effort to work in good faith
12        with Plaintiffs' Counsel, so doing it this way effectively
13        lets the Plaintiffs bring in brand-new discovery requests,
14        brand-new approaches about how these things should be
15        reviewed and produced.  And then, because it's never been
16        asked for before, convince a Court to, in some fashion,
17        impose a remedy against the law firm rather than against the
18        party on whose behalf the law firm was acting, I suggest
19        it's unfair, Your Honor.
20                        THE COURT:  Thank you, Counsel.
21                        MR. AMALA:  And, Your Honor --
22                        THE COURT:  I will note -- I don't need a
23        response.
24                        MR. AMALA:  Thank you, Your Honor.
25                        THE COURT:  I will note, Counsel, that
```

your terminology that the way you went about producing the

documents was "entirely reasonable" does not comport with my

decision here today, and I'm finding that it was not

reasonable given the technology that was available to Davis

Wright Tremaine, given the history Davis Wright Tremaine had

with these defendants, not just in this case, not just

locally in Washington State but nationally, and it was

foreseeable to Davis Wright Tremaine to, basically, respond

to this Court's order of January 12, 2018, in a more

expeditious manner than the manner in which it was done to

the point where, as we sit here today, May 23rd, there has

been no response comporting with my order of January 12,

2016; so, therefore, this Court cannot find that it was

reasonable.

   All right.  Counsels, let's get to the next motion

because we have three which would be --

                  (Interruption.)

               THE COURT:  All right.  The motion to

withdraw, Counsel, I'll hear that motion at this time.  I

will note for the record, and I'm not going to hear any new

arguments other than -- well, I'm going to allow you to

supplement the record, if needed, briefly.  However, I have

received the pleadings filed by Davis Wright Tremaine in

regards to their motion to withdraw.  I've reviewed those in

camera, and I'll allow both sides to make a brief record,

1    and then I will give my ruling in regards to my in-camera

2    review on the case.

3                    MR. GRANT:  Your Honor, I will, briefly.

4    I think we covered the background, the relationship, the

5    nature of the agreements that's between Davis Wright and the

6    respective clients, the distinction between the Medalist

7    parties and the Backpage.com parties; and Mr. Ferrer pointed

8    out the issues under the Rules of Professional

9    Responsibility and, in particular, the inability for us to

10   continue to represent Mr. Ferrer and the Backpage.com

11   parties for lack of authority, lack of communication, and

12   other problems that we've identified.

13                   THE COURT:  All right.

14                   MR. GRANT:  I'll answer other questions if

15   the Court has any, but I'll just leave it at that for now.

16                   THE COURT:  Thank you.  Counsel?

17                   MR. PFAU:  I'll address this, Your Honor,

18   and if there are any issues specifically in the motion to

19   compel, I'll let Mr. Amala -- or I'll ask the Judge to let

20   Mr. Amala comment.

21     We object to their withdrawing at this point in the

22   litigation.  Your Honor has the discretion to allow them to

23   withdraw or not.  I want to point out that this is a very

24   unusual situation in that we have their corporate counsel

25   for over a decade that has been intimately involved in the

1    issues pertaining both to the motion to compel and the

2    motion for sanctions and also to point out that we're

3    shooting in the dark a little bit because we weren't privy

4    to what they filed; although, we have a long history with

5    this firm and this defendant.

6       Your Honor, I think eventually, if they're allowed to

7    withdraw or if they are forced to be disqualified from

8    representing the remaining defendants, those may be issues

9    down the road; but you'll recall, Your Honor, I said Carl

10    Ferrer is not showing up.  There won't be an attorney here.

11    I speculated about that.  Carl Ferrer is not here.  There's

12    no attorney here, and it puts the Plaintiffs in a highly

13    prejudicial position if they're allowed to withdraw before

14    the issues on the documents and the sanctions are sorted

15    out, and that's all I can say without having been privy to

16    why they claim they feel the need to withdraw.

17            THE COURT:  All right.  So given that and

18    your request, it appears, Counsel, you'd like to have the

19    motion regarding sanctions addressed first before I do the

20    motion for withdrawal.

21            MR. PFAU:  I would, Your Honor, and

22    also -- yes, Your Honor, I would.

23            THE COURT:  Okay.

24            MR. PFAU:  And one more point with regard

25    to the motion to withdraw, we would ask that any portion of

1        what they filed that is not clearly privileged, if need be,

2        Plaintiffs be allowed to receive some information about

3        that.   Joint Defense agreements, for example, are not

4        generally privileged.

5            On the motion for sanctions, Your Honor, and I'm going to

6        argue this but there may be different ways that we can

7        divide this, so to speak, based on what you ultimately do on

8        the motion to withdraw; but for the record, and I know

9        you've read our pleadings, and I appreciate that, but again,

10       because these situations are so extraordinary, I want to

11       read a small portion of the plea agreement into the record

12       because I think it's very relevant; and this is cited on

13       our -- in our brief on Page 3 of 16.   It's a direct quote

14       from Mr. Ferrer's plea agreement:   "In 2004, I co-founded

15       the website www.Backpage.com," open quote -- or open

16       paren/open quote, "('Backpage')," closed quote/closed paren,

17       "along with M.L.," Michael Lacey, "and J.L.," James Larkin,

18       who, I will point out, are the principals behind the

19       Medalist defendants.   "Backpage eventually became the

20       second-largest classified advertising website in the world

21       and, during its 14 years of existence, has derived the great

22       majority of its revenue from fees charged in return for

23       publishing advertisements for," quote, "'adult'," unquote,

24       "and," quote, "'escort'," closed quote, "services."

25           Importantly, next paragraph:   "I have long been aware

1      that the great majority of these advertisements are, in

2      fact, advertisements for prostitution services (which are

3      not protected by the First Amendment)."  Skipping ahead a

4      little here, and may I also point out that that has always

5      been Plaintiffs' position in our allegations, "Acting with

6      this knowledge, I conspired with other Backpage principals,"

7      open paren, "(including but not limited to M.L. and J.L.),"

8      Larkin and Lacey, the Medalist principals, and he names

9      others, "to find ways to knowingly facilitate the state-law

10     prostitution crimes being committed by Backpage customers."

11        That is Plaintiffs' theory of the case.  It's what we

12     have alleged and in various ways, it's what they've denied.

13     For example, specifically, he says, "I worked with my

14     co-conspirators," which include Larkin and Lacey, the

15     principals for the Medalist defendants, "to create," open

16     quote, "'moderation' process -- or processes through which

17     Backpage would remove terms and pictures that were

18     particularly indicative of prostitution and then publish a

19     revised version of the ad.  Such editing did not, of course,

20     change the essential nature of the illegal service being

21     offered in the ad -- it was merely intended to create a

22     veneer of deniability for Backpage.  These editing practices

23     were only one component of an overall, company-wide culture

24     and policy of concealing and refusing to officially

25     acknowledge the true nature of the services being offered in

1    Backpage's 'escort' and 'adult' ads."

2        I read that into the record, Your Honor, to emphasize not

3    only how sanctionable the actions have been but also how

4    extraordinary it is vis-a-vis this law firm and their

5    defendant.  And I want to make very clear, because I

6    understand these things, I am not suggesting that Davis

7    Wright Tremaine conspired and -- but corporate defendants

8    through -- it starts up here, corporate owners; corporate

9    CEO; corporate counsel, Liz McDougall; corporate lawyers,

10   Davis Wright; litigation lawyers, Perkins Coie.  Clients

11   don't always tell lawyers what's going on.  I'm talking

12   here, we're not moving for sanctions against Davis Wright

13   Tremaine.  We're set at moving for sanctions against all the

14   Backpage defendants.

15       And in my motion, Your Honor, and I'm happy to talk more

16   about any specific issue, a global picture is we have fought

17   in the seven or eight lawsuits we have across the country,

18   and others have fought, arguing these very points that this

19   is just -- there is a co-conspiracy basically to whitewash

20   prostitution ads; and as a result of that, whether escort is

21   legal or not, children were trafficked.  That's the heart of

22   our case, and we're -- let's not forget this, you know -- we

23   get involved in all these lawyer arguments -- children were

24   gravely, gravely, gravely hurt while men who started out in

25   the journalist field made hundreds of millions of dollars

1    and paid lawyers millions of dollars across this country to

2    basically deny what we are alleging.

3        I used four examples in our brief.  One was their

4    corporate counsel in, I think, March of 2017, importantly --

5    while in the *J.S.* case -- importantly, while our case was

6    pending, filed a motion to dismiss essentially denying all

7    we've alleged and creating a fiction about how Backpage was

8    actually trying to protect children.  Then in a hard-fought

9    battle to actually get a corporate representative to

10   testify -- because all of the principals pled the Fifth,

11   refused to testify.  As we prepared the *J.S.* case for trial,

12   their corporate lawyer, Liz McDougall, basically, and we've

13   set out segments of her deposition, again reinforced the

14   same fiction.

15       Now, in this case as litigation goes on, we filed

16   requests for admissions asking them to admit basically the

17   facts that we now see in Ferrer's plea agreement; and on

18   behalf of all corporate defendants, they deny that the

19   banned terms were used for the purposes we allege.

20       And again, Your Honor, if you can bear with me, Request

21   for Admission No. 11, part of our materials, "Admit that by

22   January 1, 2014, you knew that the majority of the escort

23   advertisements in the --", quote, "in the -- in the Seattle

24   escort section of Backpage.com were advertisements for

25   prostitution."  Subject to their objection, corporate

1      defendants deny request for -- Request No. 11.

2          We go on to ask them of the banned terms, really

3      masking -- I'll read it -- Request for Admission 58:  "Admit

4      that you removed 'banned terms' from advertisements posted

5      in the 'Seattle escorts' and 'Tacoma escorts' sections of

6      Backpage.com in 2015," the relevant time period, "to mask

7      illegal activity on the website, such as prostitution."

8          "On behalf of the corporate defendants, we deny this."

9          I submit to you, Your Honor, I, in my career, have not

10     seen a case where sanctions are more appropriate, where a

11     corporate defendant misrepresented to opposing party,

12     misrepresented to the courts here and around the country

13     what was really a criminal activity; and I have said in the

14     past in oral argument, this is akin to a criminal activity.

15     We now know, based on Ferrer's plea agreement, that it was

16     criminal activity.

17         I am sure what you're going to hear from the Davis Wright

18     attorneys is we crafted a long objection that said not all

19     defendants know all the information involved, and I want to

20     address that specifically, perhaps in rebuttal; but what's

21     really, really important, and I know we mentioned this when

22     we were here on Friday, there is nothing in their response

23     brief that amounts to critical evidence.  All you have is

24     lawyers' discussions about what this particular defendant

25     may or may not have known.  There is not one signed

1    declaration from a representative of Backpage or of the

2    Defendants that they -- well, Backpage -- any Backpage

3    defendants; and if we're going to split them in two, the

4    Backpage.com defendants or the Medalist defendants, there's

5    nothing in their statements that says what -- from a

6    witness -- what Carl Ferrer is saying is not true, nothing,

7    not a shred of evidence.

8        Also, Your Honor, while they make a distinction that

9    maybe some of the corporate defendants didn't know what the

10   Backpage defendants were doing, there's really no evidence

11   that says I, CEO of Medalist defendants, or I, owner,

12   Michael Lacey, had no idea that there was prostitution

13   occurring.  We have a declaration that has gone unchallenged

14   that says these were all criminal activities.

15       Your Honor, I ask that all the Backpage defendants be

16   sanctioned, and we're asking for a sanction of $300,000, a

17   hundred thousand to each of these girls, a hundred thousand

18   to the court, and reasonable attorney's fees; and I would

19   submit that that is a tiny sanction when you consider the

20   grave harm that occurred to these girls and the hundreds of

21   millions of dollars that these corporate owners made.

22       Your Honor, if your intent is to let them withdraw before

23   they're sanctioned, I think there are avenues we can look

24   at, for example, to sanction the Backpage.com -- the

25   Backpage.com defendants now as opposed to the Medalist

1    defendants, but if that -- I think, when you answer a

2    discovery response, you need to do it truthfully; and the

3    Medalist defendants did not do that.  I ask that all the

4    defendants be sanctioned.  But in rebuttal, I'm happy to

5    address your thoughts if the motion to withdraw becomes

6    relevant.

7                    THE COURT:  All right.  Counsel, I'm aware

8    of the conflict you've raised in regards to Backpage.com;

9    so, I believe, in responding, and you let me know if I'm

10   right, you'll probably be responding for Medalist at this

11   juncture.

12                    MR. STAHL:  That's correct, Your Honor,

13   and let me start there.  First of all, the motion for

14   sanctions, here, is really premised on an entirely post-hoc

15   view that everything Mr. Ferrer said in his negotiated plea

16   agreement is true and all the prior representations are,

17   necessarily, false; and by the way, there is evidence in the

18   record contradicting Mr. Ferrer's plea agreement.  We

19   submitted, I think, four of the several additional

20   declarations that Mr. Ferrer submitted in prior proceedings.

21     But more to the point for the Medalist parties, they are,

22   essentially, asking for a finding of liability without

23   coming forward with any admissible evidence.  Mr. Ferrer's

24   plea agreement, as to the Medalist parties, is classic

25   hearsay.  It's an out-of-court statement offered for the

1       truth of what's in that statement against a different party.

2       A representation by Mr. Ferrer is not a representation by

3       the Medalist parties.  They try to conflate them.  Mr. Pfau

4       made a vertical chart with his hands as if to indicate the

5       Medalist parties are somehow responsible for Backpage.com.

6       I think we've explained in our papers and in our

7       declaration, and it's also in the record that the Medalist

8       parties don't own Backpage.  They haven't had operating --

9       they haven't had operating control of it since 2015, so as

10      to the Medalist parties, you can't hold Mr. Ferrer's latest

11      statement as a basis to hold them liable.

12          The three representations that they rely on as the basis

13      for finding sanctionable conduct here, it's really three

14      things.  Two of them were in the *J.S.* case.  They point to a

15      Backpage.com corporate deposition given in the *J.S.* case in

16      2016 and also a Backpage declaration that was submitted in

17      *J.S.* in 2016 or 2017.  The Medalist parties were not

18      defendants in that case.  The Medalist parties did not make

19      those representations.  There's no basis for tabbing or

20      sanctioning the Medalist parties for what happened in the

21      *J.S.* case.

22          I'll also add, and this is relevant to, I think, all the

23      defendants, there's no basis under the Court's inherent

24      authority, or Rule 11, to sanction a party in the proceeding

25      before the Court for something that happened in a different

1    case which resolved, was dismissed by agreement and settled,

2    so we don't think the *J.S.* representations have anything to

3    do with -- or can provide any support for sanctions in this

4    case but certainly not as to the Medalist defense.

5    Mr. Lacey and Mr. Martin [sic] were not in that case nor

6    were the parties.

7        As for the requests for admission, there was no

8    misrepresentation by the Medalist parties.  We were very

9    upfront in those discovery responses where we said in a

10   portion of the responses that they neglected to cite or to

11   mention in their motion that the discovery responses were

12   based on knowledge and information available to Backpage.com

13   because the other parties did not have the knowledge to

14   answer the discovery generally.  They are requests for

15   admission that were denied that the Medalist parties

16   continued to deny.  And, frankly, if that's the basis for

17   the sanctions motion, then this is really just another

18   discovery motion that we -- that also fails because there

19   was no meet and confer basis; but the Medalist parties

20   expressly disclaimed knowledge and did not make those

21   responses in the request for admission.

22       There's no basis to hold that a civil -- that a party in

23   a civil action can be sanctioned because a codefendant pled

24   guilty in a criminal case.  Mr. Ferrer may be subject to

25   cross-examination or discovery about his prior inconsistent

1    statements, but that's not a basis for essentially trying to

2    bring a backdoor finding of liability against all the

3    defendants based on the recent developments.  We would ask

4    that the sanction motion be denied.

5                    THE COURT:  As to Medalist Holdings.

6                    MR. STAHL:  As to the Medalist parties,

7    but I think that there's -- it would be grounds for the

8    Court to deny it on behalf of all the parties that are --

9                    THE COURT:  So who are you representing?

10                    MR. STAHL:  I'm representing the Medalist

11    parties, Your Honor, and I want to be clear about that; but

12    I do think some of the grounds apply generally as well.

13                    THE COURT:  Now, in regards to the

14    Backpage defendants, what notice was given to them in

15    regards to -- given the information you received that made

16    you want to file your notice of intent to withdraw, what

17    information was given to the Backpage defendants in regards

18    to the motion?

19                    MR. STAHL:  I can represent to the

20    Court --

21                    MR. GRANT:  You mean the motion for

22    sanctions, Your Honor?

23                    THE COURT:  Say that again?

24                    MR. GRANT:  You mean the motion for

25    sanctions?

```
 1                    THE COURT:  Correct.  All the motions that
 2       we had --
 3                    MR. GRANT:  Right.
 4                    MR. STAHL:  They were forwarded to
 5       Mr. Ferrer's criminal counsel as well as to the addresses we
 6       had for Backpage.com and Mr. Ferrer.
 7                    THE COURT:  And that was done when?
 8                    MR. STAHL:  More or less contemporaneous
 9       with -- our papers, I know, were served on Ms. Clarence when
10       we -- when we served them on the court.  The responses may
11       have trailed by a day or so.
12                    THE COURT:  And the Backpage defendants
13       were notified in regards to the proceeding and the various
14       motions that are before the Court?
15                    MR. STAHL:  I can represent that I
16       forwarded the papers to Mr. Ferrer's criminal lawyer and
17       mailed them to the address we had for Mr. Ferrer and
18       Backpage.com.
19                    MR. GRANT:  And, Your Honor, we've done
20       that consistently throughout even as to the hearing last
21       Friday.  We sent notice of this hearing today, so we've
22       tried to continue to make sure that they know what's going
23       on in this and other matters.
24                    THE COURT:  All right.  Thank you.
25       Counsel, the last word, it's your motion.
```

1          MR. PFAU:  The last word is this:  The

2     Medalist defendants, in a sense, did not exist until the

3     motion to withdraw.

4        And as to the now new Backpage defendants --

5          THE COURT:  Counsel, what do you mean they

6     did not exist?

7          MR. PFAU:  Well, in this sense, Your

8     Honor, when they answered the discovery and Counsel made the

9     distinction of what's in *J.S.* and what's not.  I won't

10    reargue that other than to say I don't need to because there

11    are answers to interrogatories that are misrepresentations,

12    and there are requests for admissions that are

13    misrepresentations and those misrepresentations are answered

14    on behalf of the corporate defendants.  This law firm has

15    represented all the defendants in this litigation until the

16    plea deal.

17         THE COURT:  So let me ask you this:  In

18    regards to the interrogatories, did you receive separate

19    responses, one from Backpage.com, the Backpage defendants,

20    and one from Medalist Holdings?

21         MR. PFAU:  No, we did not, Your Honor.

22         THE COURT:  So throughout this proceeding,

23    responses and representations have been made to -- from the

24    defendants, which were Backpage.com and Medalist Holdings,

25    represented by Davis Wright Tremaine as a whole.

1          MR. PFAU:  That's right, Your Honor, with

2     the caveat, as Counsel pointed out, that in an objection,

3     they said not all defendants have the knowledge but what --

4     that's not an appropriate response because, as Counsel

5     knows, counsel and client have a duty of reasonable inquiry;

6     so, Larkin and Lacey and the Medalist defendants have been

7     defendants in this case.  They've been defendants in other

8     cases, and they have watched as the United States Senate

9     voted, you know, 96-0 to hold them in contempt.  It has

10    always been the Backpage defendants.  That's why there's

11    grounds to sanction both.

12        If you're inclined to separate them, Your Honor, I would

13    point out that with the -- what I'll call -- now, we're

14    calling the Backpage defendants, we have filed a motion for

15    sanctions.  No lawyer has showed up.  No response has been

16    filed because there won't be one.  It's essentially

17    unopposed.  The motion, if we're going to now at least

18    conceive of them as different defendants, I think there is

19    grounds on this record to sanction the Medalist defendants

20    for their -- for the false discovery responses; and if Your

21    Honor, for some reason, is not willing to sanction them, we

22    need discovery responses from them telling them what of the

23    various Medalist Holdings or Medalist defendants knew about

24    this, didn't know about this, not giving us evidence that's,

25    basically, Ferrer's contradictory statements.  We know he

1          lied previously, and that's why we're here before you but
2          declarations from the Medalist principals denying what
3          Ferrer said is true and perhaps depositions for the
4          limited -- and I mean limited because we're not talking
5          about liability here; that comes later -- limited purpose of
6          proving what I believe is true; which is, the coconspirators
7          knew what was going on, were part of the whole process and
8          should be sanctioned, too, and made hundreds of millions of
9          dollars with that knowledge.
10                        THE COURT:  Counsel, briefly.
11                        MR. STAHL:  The discovery responses were
12         responded to on behalf of all the corporate defendants
13         because that's how they were drafted and directed.  They
14         were directed to all corporate defendants.  We responded on
15         behalf of --
16                        THE COURT:  Whoa, whoa, whoa, Counsel, one
17         second.
18                        MR. STAHL:  When --
19                        THE COURT:  They were drafted --
20                        MR. STAHL:  No, when we received --
21                        THE COURT:  Well, one second.  You're
22         saying you were drafting a response because it came to you
23         as one but wouldn't it have been the onus placed on you, if
24         you thought there was a distinction between the two, to
25         identify it as such and respond separately?

1          MR. STAHL:  And we did that, and we said

2    these responses are on behalf of Backpage.com which is the

3    operating entity that has the knowledge, so -- and I think I

4    heard Mr. Pfau just say --

5          THE COURT:  So -- slow down -- so if

6    that's the case, are you saying, then, that Medalist

7    Holdings has not responded to anything in this case if it

8    was only just Backpage.com because in one instance, I'm

9    hearing you represented both.  You were responding as one or

10   separately, but then I also just heard you say, when I asked

11   that question, that your responses were on behalf of

12   Backpage.  So where were your responses on behalf of

13   Medalist Holdings?

14         MR. STAHL:  The actual -- the actual

15   discovery requests that we received were directed to all the

16   corporate defendants with no distinction, so we responded in

17   turn by saying these objections and responses are submitted

18   by all the defendants; however, the answers and the parties

19   will be operating with the ownership of the website.  The

20   operating entity of the business is Backpage.com, so to the

21   extent we are giving substantive responses, that's the

22   entity that has the knowledge, that's --

23         THE COURT:  In regards to the website.

24         MR. STAHL:  Correct.

25         THE COURT:  Okay.  I'm following.

*R.O. vs. Medalist Holdings, LLC*

1          MR. STAHL:  The request for admission, had

2     we received separate requests, and I think I heard Mr. Pfau

3     say they need additional discovery to determine exactly what

4     Medalist did and did not know.

5          MR. PFAU:  That's not what I said, but --

6          MR. STAHL:  Well, you said there may be --

7     there may be the need for additional discovery about their

8     knowledge.  That's not in the record and certainly not the

9     basis for sanctions.

10    The sanctions motion also did not identify any false

11    representation in any interrogatories.  They're talking

12    about the denial of the request for admission.

13         MR. GRANT:  May I just pick up one point

14    on your question, Your Honor?  So the answer is that, yes,

15    we responded on behalf of all the corporate defendants

16    making the distinction, as Mr. Stahl has pointed out, about

17    the information obtained from Backpage, and that's also true

18    in the individual responses to the request for admission

19    where there is information that we provided -- it said

20    Backpage.com, LLC, provides the information; but as is true

21    in lots of corporate parent settings, the corporate parent

22    is not the one who has that information and, therefore,

23    denies the request on the subject of the objections.

24         THE COURT:  All right.  I'm going to give

25    a ruling that combines the motion to withdraw with the

*R.O. vs. Medalist Holdings, LLC*

1    sanctions against Backpage and the Backpage defendants and

2    the Medalist Holdings defendants, and the reason I'm doing

3    that is Counsels for the Defendants pretty much have

4    provided the Court with pleadings that the Court has

5    reviewed in camera to support their motion to withdraw, and

6    they have made a record today and at the last hearing to

7    support their motion to withdraw; and after reviewing the

8    pleadings filed in camera, I am going to grant the motion to

9    withdraw as to the Backpage defendants.

10       In regards to the pleadings I've reviewed and the

11   arguments I've heard at the last hearing, as well as this

12   hearing, I am also going to disqualify Davis Wright Tremaine

13   from representing Medalist Holdings in this matter.  The two

14   entities are intertwined in such a manner that to allow

15   Davis Wright Tremaine to continue to represent Medalist

16   Holdings will create an injustice on the administration of

17   justice but will also, more probable than not, create

18   conflicts of interest that this Court will have to address

19   moving forward.

20       My review has indicated that the request by Mr. Ferrer to

21   terminate the attorney-client relationship created a -- I

22   guess the word is "revoked," the consent given to Davis

23   Wright Tremaine to allow them to represent these multiple

24   parties.  There's a nature of the conflict that I saw that

25   continued representation would be prohibited even if the

1    other clients were to give consent.  Mr. Ferrer revoked his

2    consent because of his -- I think the term used in the case

3    law is "material changed circumstances," the federal

4    conviction being a major one; that and the facts pertaining

5    to that are related to the facts intertwined in this case

6    significantly or similar to the facts in this case.

7        This Court finds that there would be material detriment

8    to the other clients and a high possibility that the lawyers

9    would encounter conflicts proceeding forward.

10       Pursuant to GR 15, I am going to seal the pleadings to

11   include the declaration provided; and I'm talking about the

12   pleadings that were filed for my in-camera review.

13       I am finding that this case, up to this point, started

14   with an 83-page Complaint for Damages.  Answers were filed

15   by the Defendants as a whole, no material distinction was

16   made between Davis Wright Tremaine and -- sorry -- between

17   the Backpage defendants and Medalist Holdings in regards to

18   the responses to pleadings and the motions brought before

19   the Court and the arguments that were made up until the

20   request for the motion to terminate.

21       We have a scheduling order that was in place with a trial

22   date, I believe, in October.  Discovery was delayed due to

23   the lack of compliance or substantial or significant

24   compliance with my court order in January, and now we're

25   five months away from an October 16, 2018, confirmed trial

1    date.  Prejudice can flow both ways in litigation.  It can

2    flow to the Defense or from the Defense to the Plaintiff,

3    and I'm finding that there's grave prejudice flowing to the

4    Plaintiffs in this case due to no actions of their own but

5    due to multiple issues, which, some of which we have

6    addressed here today.  The administration of justice,

7    because of my ruling to allow Davis Wright Tremaine to be

8    allowed to withdraw from representing the Backpage

9    defendants and my disqualification of them proceeding

10   forward, representing the Medalist Holdings company, has

11   placed the Court in operating and moving forward this case

12   less efficiently at this late stage in the game.

13       I am going to require, however, that my protective order

14   regarding the documents in this case continue for 60 days.

15   Within that time frame, the documents need to be placed in

16   trust.  Davis Wright Tremaine will be required to comply

17   with my previous order, will be required to secure all

18   documents pursuant to that order or a new order and to work

19   with the Plaintiffs to secure those documents for future

20   litigation in this matter.

21       Davis Wright Tremaine will remain counsel to secure the

22   interests of their clients and that being Medalist Holdings

23   as the Backpage defendants previously, because of

24   Mr. Ferrer's request, are no longer their client which

25   brings me to the motion for sanctions.

*R.O. vs. Medalist Holdings, LLC*

1      I am going to grant the motion for sanctions.  I believe

2      an adequate record has been made supporting sanctions in

3      this case for a number of reasons, all listed by Plaintiffs,

4      but also the Court looks at what constitutes a bad faith,

5      and there are three ways the Court can look at it.

6          Pre-litigation misconduct:  I'm finding that given the

7      history of the defendants in this case in the multiple cases

8      they've had, not just before this Court -- I have two -- not

9      just in this state but nationally, it is clear to this Court

10     that their conduct was to necessitate delay where there were

11     what appears to be clearly valid claims or rights being

12     asserted by the Plaintiff which, months and years later, is

13     now being disclosed by Mr. Ferrer as seen by his plea and

14     the statements made in those pleadings in the Arizona case

15     which I reviewed.

16         Another one that the Court can consider in regards to bad

17     faith is procedural bad faith and that is vexatious conduct

18     during the course of litigation, wasting private and

19     judicial resources, making claims that, months later, were

20     found to be untruthful.  Many of the statements that I'm not

21     placing into the record can be seen in the pleadings the

22     Court reviewed in camera provided by the Defense which will

23     be placed under seal if there is further review of this

24     matter.

25         And a third factor that can constitute bad faith is

1    substantive bad faith, and I'm not finding that in this

2    case.

3        I will say, also, supporting my position regarding the

4    pre-litigation misconduct and procedural bad faith were the

5    Court's review of the Interrogatory No. 2 and the Request

6    for Production No. 1.  The various requests for admission

7    were taken into consideration and Exhibit 3, the declaration

8    of Attorney Elizabeth McDougall.

9        I will note that Mr. Ferrer's condition of his plea in

10   March 2018 in Arizona were for overriding conspiracy with a

11   start date of 2004 through March of 2018 during the time

12   period not only when this case was filed but the *J.S.* case,

13   that this Court also had, was filed.

14       Sanctions in the amount of $100,000 for each plaintiff is

15   being ordered.  That needs to be paid within 30 days of

16   today's date.  Failure to comply, the Court will issue

17   sanctions in the amount of one dollar for every page of the

18   1.2 million documents -- and, actually, not page, for the

19   documents.  So, there were 1.2 million documents, one dollar

20   for every document, so that will be $1.2 million for every

21   14 days of noncompliance.

22       Reasonable attorney fees will be allowed and granted,

23   subject, of course, to any objections to the amount.  If not

24   objected to, that needs to be paid within 30 days, as well,

25   of production of the billings.

1          The question, then, becomes what happens to the R.O. vs.

2      Medalist Holdings case as we have a trial date of October

3      2018?  And I'll hear from Counsel.

4                     MR. PFAU:  Your Honor, Plaintiffs, at this

5      juncture, would like to hold the trial date until we can --

6      obviously, there has been a sea shift in terms of lawyers

7      involved and our ability to get discovery.  If Your Honor

8      would indulge us and let us hold the trial date until we can

9      determine who's going to appear on behalf of the Medalist

10     Holdings.  I'm confident no one will appear on behalf of the

11     Backpage defendants, and we can address that later; but I

12     would like to hold the trial date, Your Honor.

13                     THE COURT:  And what I'd like, Counsels,

14     is because my ruling came on a special-set, I am going to

15     ask that we set a hearing for presentation of an order for

16     me to review so that my findings are entered into the

17     record, so I will be on recess next week, so I would ask

18     that it be set upon my return.

19                     MR. PFAU:  And, Your Honor, just so I'm

20     clear, sanctions were applied against all defendants;

21     correct?

22                     THE COURT:  Correct.

23                     MR. PFAU:  Okay.  Thank you, Your Honor.

24                     THE COURT:  I did not separate; it's one

25     as far as my order goes.

```
 1                      MR. PFAU:  I understand.  I just wanted to

 2           clarify.

 3                      MR. AMALA:  Your Honor, so that we make

 4           sure we note the presentation properly, may I ask when the

 5           court reporter believes a transcript would be available so

 6           that we can present an order properly?

 7                      THE COURT:  Okay.  That will be up to Miss

 8           Kim.

 9                      (Discussion off the record.)

10                      MR. AMALA:  Your Honor, the court reporter

11           has indicated two weeks from today as the Court is on recess

12           next week.

13                      THE COURT:  Okay.

14                      MR. AMALA:  So if it's acceptable to the

15           Court, we'll get the transcript and put it into the proposed

16           order and try to work it out with Counsel and then go to

17           presentation.

18                      THE COURT:  So I'd like to schedule the

19           presentation; I don't want to lose parties.

20                      MR. AMALA:  Sure.

21                      (Discussion off the record.)

22                      MR. AMALA:  So, Your Honor, two weeks from

23           today would be June 6th, and I think, just to make sure we

24           proceed, we have no issues with the procedure.  I think if

25           we gave everyone -- I would suggest that a week to,
```

1    basically, absorb the transcript in an order and that way,

2    we could note it -- if we -- if we filed it and noted it for

3    presentation -- filed it on the 12th and -- or, I guess, it

4    would be the 13th and note it for presentation, whatever the

5    Court would have available that would fit within the five

6    days for a presentation which, I think, would either be

7    the --

8                    MR. GRANT:  One suggestion, Your Honor,

9    will you allow a little bit more time there for getting the

10   transcript -- I'm sure it's two weeks but to be sure -- and

11   to give us an opportunity to deal with this.  Honestly,

12   we've got a lot of things to digest and chew on.

13                    THE COURT:  Exactly, before that order is

14   entered, in addition to which the 30- and 60-day time frame

15   that I've given Davis Wright Tremaine does not start until

16   that order is entered, so it doesn't start today.  It starts

17   when that order is entered --

18                    MR. GRANT:  I appreciate that.

19                    THE COURT:  -- so the sooner we can get

20   that order done.

21                    MR. GRANT:  I was just trying to allow

22   enough of a window of time, once we get the transcript, to

23   deal with the draft of the order and the presentation; and,

24   obviously, we're going to have -- I think we're going to

25   have further issues still but -- so I would suggest sometime

1      the week of the 18th, perhaps, for a return hearing.

2                      MR. PFAU:  The 18th of June?

3                      MR. GRANT:  Yeah, exactly.

4                      MR. PFAU:  Okay.

5                      THE COURT:  That's fine.

6                      MR. GRANT:  All right.

7                          (Discussion off the record.)

8                      THE COURT:  So let's special-set it for

9      9:00.

10                     MR. PFAU:  On the 21st.

11                     MR. STAHL:  9:00 a.m. on the 21st?

12                     THE COURT:  Yes.  Now, Counsels, we need

13     to fashion an order which I will do regarding sealing the

14     documents for -- that I reviewed in camera.  I don't think I

15     need your signatures for that.  However, I believe your

16     objections, if any, need to be noted.

17                     MR. AMALA:  Your Honor, the only, I guess,

18     objection we would file, just to reiterate Mr. Pfau's

19     request, that to the extent there's any information that's

20     not -- that should not be sealed or redacted that that be

21     accounted for.  Obviously, we haven't seen it so we don't

22     know, so we'll probably file something very short, unless

23     the Court can -- is there anything in there that may not be

24     sealed, if that makes sense?  I don't want to file an

25     objection to the file, but if you need that to be able to

1   say I'm not redacting X, Y, and Z.

2                   MR. PFAU:  Let me -- let me just step in.

3   I think it would be helpful if we filed a one-page, no more,

4   objection so Your Honor understands our objection.  If for

5   some reason this is appealed, then the appellate court would

6   understand our objection.

7                   THE COURT:  Yes.

8                   MR. PFAU:  Okay.

9                   THE COURT:  So I think that would be the

10  best way to proceed; however, we're in open court at this

11  time.  I've indicated that I will be ordering the document

12  sealed subject to reconsideration, of course, Counsel, from

13  your motion.

14      My question is:  Is there anyone in the courtroom that is

15  objecting to the sealing of the pleadings filed and the

16  motion to withdraw as well as the declaration other than the

17  litigants involved in this case?  I will note that there are

18  individuals in the courtroom.  No one has indicated that

19  there is any objections, and I will be sealing it subject to

20  a Bone-Club analysis.  All right?

21                  MR. AMALA:  Okay.

22                  MR. PFAU:  Thank you.

23                  THE COURT:  Anything else, Counsel?

24                  MR. PFAU:  No, Your Honor.

25                  MR. AMALA:  No, Your Honor.  Thank you.

```
1                      MR. STAHL:  No, Your Honor.
2                      THE COURT:  I'll see everyone on the --
3                      MR. PFAU:  21st.
4                      THE COURT:  The 21st at 9:00.  Court will
5          be in recess.
6                           (Proceedings concluded.)
7          / / /
8          / / /
9          / / /
10         / / /
11         / / /
12         / / /
13         / / /
14         / / /
15         / / /
16         / / /
17         / / /
18         / / /
19         / / /
20         / / /
21         / / /
22         / / /
23         / / /
24         / / /
25         / / /
```

```
 1

 2

 3

 4              IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
                   IN AND FOR THE COUNTY OF PIERCE
 5       _____

 6    R.O., by and through her mother,      )
      S.H., and K.M., by and through        )
 7    her mother, L.M.,                      )
                                             )
 8                    Plaintiffs,            )  No. 17-2-04897-1
                                             )
 9          vs.                              )
                                             )
10    MEDALIST HOLDINGS, INC., et al.        )
                                             )
11                    Defendants.            )
      _____
12
                      REPORTER'S CERTIFICATE
13    _____

14
      STATE OF WASHINGTON    )
15                           )  ss.
      COUNTY OF PIERCE       )
16
            I, Kimberly A. O'Neill, Court Reporter in the state
17    of Washington, county of Pierce, do hereby certify that
      the foregoing transcript is a full, true, and accurate
18    transcript of the proceedings and testimony taken in the
      matter of the above-entitled cause.
19
            DATED this 5th day of June, 2018.
20

21                    Kimberly A. O'Neill
                      _____
22                    KIMBERLY A. O'NEILL, CCR
                      License No. 1954
23

24

25
```

# **Exhibit E**



**U.S. Department of Justice**

United States Attorney
District of Arizona

| | |
|---|---|
| Two Renaissance Square | Main:  (602) 514-7500 |
| 40 N. Central Ave., Suite 1800 | Main Fax:  (602) 514-7693 |
| Phoenix, AZ  85004-4408 | Direct Fax:  (602) 514-7450 |

May 3, 2018

Mike Piccarreta, Esq.
Piccarreta Davis Keenan Fidel PC
2 East Congress Street, Suite 1000
Tucson, AZ  85701

<u>VIA EMAIL</u>

Re:   *Your Letter of April 26, 2018*

Dear Mike:

We wish to respond to your April 26, 2018, letter.  The letter begins with the following statement:   "It is my understanding that Carl Ferrer has indicated to the government that he is waiving the attorney-client privilege on behalf of himself, Backpage, and the other entities he controls.  If that is not the case, please let me know."

On this issue, your understanding is not fully accurate.  It is true that Mr. Ferrer has executed a broad waiver of the *corporate* attorney-client privilege possessed by Backpage.com, LLC and various other Backpage-related entities.  Enclosed with this letter is a copy of the waiver agreement.  However, as you will see, the waiver agreement makes clear that Mr. Ferrer has not waived his *individual* attorney-client privilege, either as to his current criminal defense attorneys or to the prior attorneys who represented him on an individual basis.

Your letter also states that "regardless of whether Mr. Ferrer and the entities he controls waive the attorney-client privilege as to themselves, such a waiver or waivers would not waive the privilege of other individuals or entities, nor would it waive any privileges held jointly by Mr. Ferrer and/or his entities and other individuals or entities, whether in materials seized by the government or as to other privileged communications."

Once again, we do not fully agree.  On the one hand, it is true that, to the extent Mr. Ferrer or any of the Backpage entities entered into a joint defense agreement ("JDA") with others, there may be restrictions on the ability to unilaterally waive JDA-derived privileges.  For this reason, we have taken steps to avoid the disclosure of any JDA-protected material.  However, when it comes to communications covered by Backpage's corporate attorney-client privilege (or by the corporate attorney-client privilege held by any of Backpage's

May 3, 2018
Page 2 of 3

predecessor/related entities), the law makes clear that Mr. Ferrer—as Backpage's CEO and 100% owner since 2015—is empowered to waive the corporation's privilege, as he has done here. *See generally Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 349 (1985) ("[W]hen control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well.  New managers . . . may waive the attorney-client privilege with respect to communications made by former officers and directors.  Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties.").

Furthermore, once the corporate privilege has been so waived, it is very difficult for an individual corporate employee (such as your client, Mr. Padilla) to prevent the disclosure of communications that were previously covered by the privilege.  In *United States v. Graf*, 610 F.3d 1148 (9th Cir. 2010), the Ninth Circuit addressed this issue in detail, noting that "[o]ne of these special problems" that arises in the context of the corporate attorney-client privilege "is that corporate officers, directors, and employees who communicate with corporate counsel on behalf of the corporation may later attempt to claim a personal attorney-client privilege regarding those communications after the corporation has waived its own privilege." *Id.* at 1156.  The *Graf* court held that a corporation is ordinarily "*free to obtain information from its officers, employees, and consultants about company matters and then control the attorney-client privilege, waiving it when necessary to serve corporate interests*," and that an employee may prevent such a disclosure only under limited circumstances.  *Id.* at 1160-61 (emphasis added).  Specifically, once the corporate privilege has been waived, an individual employee may prevent disclosure only by establishing the following five factors:  "*First*, they must show they approached counsel for the purpose of seeking legal advice.  *Second*, they must demonstrate that when they approached counsel they made it clear that they were seeking legal advice in their individual rather than in their representative capacities.  *Third*, they must demonstrate that the counsel saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise.  *Fourth*, they must prove that their conversations with counsel were confidential.  And *fifth*, they must show that the substance of their conversations with counsel did not concern matters within the company or the general affairs of the company."  *Id.* at 1160 (citation omitted) (emphasis in original).

Here, we have not seen any evidence suggesting these five factors are satisfied.  If you are aware of any such evidence (such as proof that Mr. Padilla, while working at Backpage, had discussions with corporate counsel about purely personal matters unrelated to the general affairs of Backpage and made clear he was seeking legal advice in an individual capacity), please let us know.

Finally, you may also be aware (through your discussions with co-counsel) that Backpage has, in the past, voluntarily shared certain privileged materials with third parties.  Such disclosure provides an independent basis, apart from the written waiver agreement, for concluding that the corporate attorney-client privilege has been waived.  *See, e.g., In re Pac.*

May 3, 2018
Page 3 of 3

*Pictures Corp.*, 679 F.3d 1121, 1126-27 (9th Cir. 2012) ("[V]oluntarily disclosing privileged documents to third parties will generally destroy the privilege.").


Sincerely,

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona


*/s Kevin Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney


KMR/zs

## WAIVER OF ATTORNEY CLIENT PRIVILEGE

I, Carl Ferrer, state the following in my capacity as sole owner and manager of Dartmoor Holdings LLC, which wholly owns and operates Backpage.com LLC (of which I am Chief Executive Officer), Website Technologies LLC, IC Holdings LLC, Posting Solutions LLC, and Postfaster LLC, hereafter referred to as "the Companies." I am authorized to waive each of the Companies' attorney-client privilege and am doing so because I believe executing such waiver is in each of the Companies' best interest.

I further state that, being represented by counsel and being fully advised as to this matter, I hereby voluntarily waive all aspects of the attorney-client privilege, on behalf of the Companies, which otherwise may have applied to communications, documents and information that I or the Companies have provided to law enforcement or which law enforcement may already have in its possession from other sources, as follows:

a. All communications related to the "adult," "escort," "dating," and "services" sections of the Companies' websites, including but not limited to company policies, moderation practices, age verification practices, legality, content, and compliance with law enforcement.

b. All communications related to the Companies' financial activity, including but not limited to the sale of Backpage.com in 2015, all loans and financing agreements related to the sale of that company in 2015, monetization of the Companies' websites, payment processing, credit card processing, banking, and payment of loans.

c. All communications regarding the relationship between the Companies (including their current owner and employees) and their former owners and officers, including but not limited to, James Larkin, Michael Lacey, John ("Jed") Brunst and Scott Spear, as well as communications between the Companies (including their current owner and employees) and Don Bennett Moon.

I further state that, in addition to the foregoing waiver, I hereby voluntarily waive, on behalf of the Companies, all aspects of the attorney-client privilege which otherwise may have applied to the Companies' relationship with any attorney ("previous attorneys") who was retained to represent the Companies in connection with various matters related to the subjects listed above. This attorney-client privilege waiver is meant to apply to all communications between the Companies and any attorney representing them at any time; all acts undertaken by others acting on the Companies' attorneys' behalf taken in connection with representing the

Companies related to the subjects listed above; and any and all documents generated through their representation of the Companies that belong to the Companies.

I further state that this waiver does not apply in any respect to any aspect of the Companies' representation by David Botsford of Botsford & Roark LLP, or to any aspect of my personal attorney-client relationship with attorneys who have represented me in the past or who currently represent me in an individual capacity, including, but not limited to, Nanci Clarence, Jonathan Baum and Shaneeda Jaffer of Clarence, Dyer & Cohen, and the Law Offices of E.G. Morris.

_4/5/2018_
DATED

Carl Ferrer

# **Exhibit F**

1
2
3
4
5
6           IN THE UNITED STATES DISTRICT COURT

7             FOR THE DISTRICT OF ARIZONA

8  UNITED STATES OF AMERICA,          CR-18-00422-PHX-SPL (BSB)

9            Plaintiff,               **DECLARATION OF CARL FERRER**

10 v.

11 1.     MICHAEL LACEY, and

12 2.     JAMES LARKIN,

13          Defendants.

14       I, Carl Ferrer, declare:

15       1.     I am the sole owner and Chief Executive Officer of Backpage.com, LLC

16 ("Backpage.com"). I have personal knowledge of the matters set forth in this

17 declaration and am competent to testify to them.

18       2.     The briefs filed by counsel for Michael Lacey, James Larkin, and the

19 other defendants in this case misrepresent my relationship with Davis Wright Tremaine

20 LLP ("DWT") and Henze Cook Murphy PLLC ("HCM"), and the nature of the

21 agreements I signed.

22       3.     As an initial matter, it is incorrect that I "refused" to join the

23 government's motion to disqualify DWT and HCM. I chose not to join the motion

24 because I thought my participation was unnecessary.

25       4.     I have long viewed both DWT and HCM as my personal lawyers. I am

26 concerned that they continue to represent Messrs. Lacey and Larkin, who are now

27 directly adverse to me. I expected that my personal lawyers would maintain allegiance

28 and loyalty to me and not to anyone adverse to me.

- 1 -

**Henze Cook Murphy**

5.    Tom Henze and Janey Henze Cook started representing me in 2012, in connection with a federal grand jury investigation in Seattle. At that time, I believed Mr. Henze and Ms. Henze Cook were serving as my personal counsel. I believed I could communicate with them and they would protect my confidences, and at all times maintain loyalty to me and protect my interests.

6.    Over the past five years, Mr. Henze and Ms. Henze Cook have represented me in a variety of criminal and civil matters.

7.    Mr. Henze represented me in my deposition in August 2015 in Backpage's case involving Cook County, Ill. Sheriff Tom Dart.

8.    From 2012-2017, I looked to Mr. Henze as my lead personal lawyer. In October 2016, after the California charges were filed, the Clarence Dyer & Cohen firm also came in to represent me.  During this time, I was also represented personally by DWT.

**Davis Wright Tremaine**

9.    James Grant and his colleagues at DWT were brought on as lead counsel representing Backpage.com in the federal grand jury matter in Washington in 2012. In that role, they interviewed me about the facts in that investigation. I also understood that DWT was meeting with the prosecution in that investigation.

10.    DWT has represented me, personally, in at least nine civil suits across the country, and in criminal matters in state court in California and federal court in Arizona.

11.    My understanding has been that DWT represented me personally, even when they were also representing others, including Messrs. Larkin and Lacey. I believed DWT would be loyal to me and would protect my interests during and after this joint representation.

12.    Over the past six years, I have worked closely with several DWT lawyers, including James Grant, Robert Corn-Revere, Andrew Lorentz, Dsu-Wei Yuen, Zana

1   Bugaighis, Eric Stahl, and others.

2         13.   As part of this representation, I have had scores of phone conversations

3   with Mr. Grant and his colleagues at DWT.

4         14.   I have also exchanged hundreds of emails with Mr. Grant and other DWT

5   lawyers. I never hesitated to send confidential communications seeking legal advice

6   directly to DWT, and I did not feel the need to include other lawyers representing me

7   on those communications.

8         15.   I met in person at least 12 times with Mr. Grant and other DWT lawyers.

9   We met in person in Phoenix, Dallas, Seattle, San Diego, Tucson, San Francisco,

10   Washington, DC, Vancouver, British Columbia, and other cities. Tom Henze and Janey

11   Henze Cook were sometimes present at those meetings, but other times, I met just with

12   DWT.

13         16.   During the six years they represented me, DWT's role has not been

14   limited to providing representation relating to the First Amendment or the

15   Communications Decency Act. In my role as CEO of Backpage.com, DWT provided

16   legal advice concerning a range of additional legal issues, including credit card payment

17   processing issues and cryptocurrency issues.

18         17.   In the course of representing me in civil litigation, Mr. Grant and his

19   colleagues at DWT drafted declarations for me to sign.

20         18.   When they sent me draft declarations, neither Mr. Grant nor his

21   colleagues at DWT advised me to discuss the declarations with separate counsel.

22   Rather, Mr. Grant's practice was to direct me to sign the declarations DWT had drafted.

23   More often than not, DWT only gave me a few hours between when they sent the draft

24   declarations and when they needed me to return them signed.

25         19.   Mr. Grant and his colleagues at DWT also personally represented me in

26   the criminal case in California, starting in October 2016.

27         20.   DWT's role in the California criminal case was not limited to First

28   Amendment or CDA issues. It was my belief that James Grant was acting as counsel in

the California criminal case on behalf of all the defendants, and he interacted with the California Attorney General's Office in that matter on my behalf as well as on behalf of other defendants. I do not believe his role as counsel ended when the court ruled on the First Amendment/CDA issues.

21.     Rather, Mr. Grant continued to serve as my personal counsel in that prosecution.

22.     I believed DWT represented me and had a duty of loyalty to me.

**Conflict Waivers**

23.     During the first several years when DWT represented me jointly with Backpage.com, Mr. Lacey and Mr. Larkin, I do not remember being advised about the scope and risks of joint representation. To the best of my recollection, I did not sign any engagement letter or advisement informing me of the risks of joint representation before I agreed to the joint representation.

24.     The first engagement letter outlining the scope of DWT's joint representation of me, and Messrs. Larkin and Lacey, was signed on December 12, 2016.

25.     I have reviewed the opposition brief filed by Messrs. Larkin and Lacey (Dkt. No. 180). In that brief, Larkin and Lacey assert that I gave informed written consent to DWT's joint representation of me, Mr. Larkin, and Mr. Lacey, even if we were to become adverse in a later criminal case. This is not true.

26.     It was my understanding, after the signing of the joint representation agreement with DWT, that if any of the individual defendants became adverse to one another, that DWT would immediately cease representing all the previously represented individual defendants. I never agreed to waive all conflicts regarding such joint representation, and, especially, regarding criminal charges that may be brought against me in the future.

27.     I did not consult with any independent lawyer before signing the joint representation letter with DWT, and no DWT attorney ever recommended that I do so.

- 4 -

1   I also do not recall ever discussing the nature of potential conflicts that may arise, or

2   the potential impact on my interests with DWT or any other lawyer before signing this

3   engagement letter.

4        28.    I signed a second agreement with Mr. Lacey and Mr. Larkin on Dec. 30,

5   2016. This 10-page, single-spaced contract purports to manage civil, administrative or

6   criminal actions that were pending then, or at any time in the future, including multiple

7   state court civil matters, state criminal prosecution, attorney general criminal

8   investigations, a federal grand jury investigation in this Court, and ongoing federal

9   appeals.

10        29.    That second agreement did not include DWT or any other lawyer, and

11   DWT was not a party to that agreement. It only included me and the entities I controlled,

12   and Messrs. Larkin and Lacey, and entities they controlled.

13        30.    That second agreement was sent to me on Dec. 29, 2016, along with other

14   documents, as part of a larger re-negotiation of the debt that I owed Mr. Lacey and Mr.

15   Larkin from the sale of Backpage.com in April 2015.

16        31.    The circumstances of that agreement were extremely stressful for me. I

17   was a few days away from defaulting on the massive debt that I owed Mr. Larkin and

18   Mr. Lacey as part of their sale of Backpage.com. I was having trouble making

19   payments, and the "forbearance" that Mr. Larkin and Mr. Lacey had given me was

20   about to run out. I felt I was about to lose the company and was facing financial ruin.

21        32.    I remember feeling rushed and thinking that, because the document was

22   being sent to me by Mr. Larkin's and Mr. Lacey's lawyers, I had no choice but to sign

23   it.

24        33.    There is a lot of verbiage in that 10-page agreement that I did not

25   understand, but I understood that one purpose of that document was to strip me of my

26   ability to control management of litigation that was described in the agreement.

27        34.    I was given approximately 48 hours to review that agreement before it

28   needed to be signed and returned to counsel for Mr. Larkin and Mr. Lacey.

35.     When I signed that contract, I did not intend to waive any conflict of interest between me and my lawyers that existed at the time or could come to exist in the future, especially in a criminal case.

36.     The possibility of future conflicts of interest among the parties was never discussed before I signed that agreement.

37.     I never consulted with any independent attorney about this agreement.  In fact, I was encouraged by Don Moon, an attorney who represented Mr. Larkin, not to discuss the agreement with my personal lawyers, because he said that doing so would be "a waste of time."

38.     To the best of my recollection, I have never seen an executed version of that agreement that was signed by Mr. Larkin or Mr. Lacey.

39.     Separate from those two agreements, both signed in December 2016 between me and Messrs. Larkin and Lacey, I signed a written joint defense agreement ("JDA") in June 2017, after the California prosecution was well underway and while the federal investigation in Arizona was intensifying.

40.     The June 2017 JDA included a broad range of individuals who were targets and subjects of ongoing criminal investigations into Backpage. It was my understanding that this agreement was formed to allow the lawyers for the individual targets and subjects to share materials and access a shared database of Backpage.com documents.

41.     It was not my understanding that, by signing the June 2017 JDA, I would be waiving any future conflicts of interest involving my own personal attorneys.

42.     My understanding is that Mr. Grant, acting for DWT, expressly declined to sign the June 2017 JDA, and that DWT attorneys were never a part of that agreement.

43.     My understanding of the June 2017 JDA is that it did not include any waiver of future conflicts based on ethical duties that a lawyer owed to former clients.

44.     In sum, I never gave informed consent for DWT or HCM to continue representing others who are directly adverse to me in a criminal case.

1

**Privilege Waiver**

2    45.    On April 5, 2018, I signed a Proffer/Interview Agreement. My intent in

3  that agreement was to waive Backpage.com's corporate attorney-client privilege, not

4  any personal privilege.

5

6      EXECUTED this  13th   day of June, 2018.

7

8                               Carl Ferrer

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28