1  ELIZABETH A. STRANGE
   First Assistant United States Attorney
2  District of Arizona

3  KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
   MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
4  PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
   ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
5  Assistant U.S. Attorneys
   40 N. Central Avenue, Suite 1800
6  Phoenix, Arizona 85004-4408
   Telephone (602) 514-7500
7
   JOHN J. KUCERA (Cal. Bar No. 274184,john.kucera@usdoj.gov)
8  Special Assistant U.S. Attorney
   312 N. Spring Street, Suite 1200
9  Los Angeles, CA 90012
   Telephone (213) 894-3391
10
   JOHN P. CRONAN
11 Acting Assistant Attorney General
   Criminal Division, U.S. Department of Justice
12
   REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
13 Senior Trial Attorney, U.S. Department of Justice
   Child Exploitation and Obscenity Section
14 950 Pennsylvania Ave N.W., Room 2116
   Washington, D.C. 20530
15 Telephone (202) 616-2807
   Attorneys for Plaintiff
16
17            IN THE UNITED STATES DISTRICT COURT

18              FOR THE DISTRICT OF ARIZONA

19 | United States of America,        |  CR-18-422-PHX-SPL (BSB)

20 |                Plaintiff,         |  **UNITED STATES' MOTION TO
                                          RESOLVE ATTORNEY-CLIENT
21 |        v.                         |  PRIVILEGE ISSUES**

22 | Michael Lacey, et al.,            |

23 |                Defendants.        |

24        **INTRODUCTION AND SUMMARY OF ARGUMENT**

25         During the investigation in this case, the United States obtained search warrants for

26 several email accounts belonging to the defendants and other Backpage personnel.

27 Because it was suspected those accounts might contain some communications with

28 Backpage's attorneys (*i.e.,* communications potentially covered by Backpage's corporate

attorney-client privilege), the United States utilized a "filter team" to conduct an initial review of the materials seized via the search warrants.  During this process—which was expressly authorized by magistrate judges—the filter team identified certain communications that were suspected to be privileged and removed them from the subset of materials that was later turned over to the prosecution team.

Ordinarily, the next step in the process would be for the filter team to individually analyze the withheld emails and litigate whether some or all of them may be turned over to the prosecution team.  This process can be very time-consuming and resource-intensive (not only to the parties, but also to the Court) and, in this case, could significantly slow down the discovery process.  Additionally, the defense recently voiced objections to the continued use of filter teams in this case.

The Court should find, for three reasons, that no additional filter review is necessary here.  *First*, Carl Ferrer has executed a written waiver of the corporate attorney-client privilege possessed by Backpage and related entities.  This waiver obviates the need for the continued segregation of the withheld communications—Ferrer was authorized to execute the waiver (he is Backpage's 100% owner and CEO) and Ninth Circuit law makes clear that, once such a waiver has been executed, individual corporate employees (such as the defendants in this case) cannot contest the disclosure of their previously-privileged communications.  *Second*, individual review is also unnecessary because Judge Campbell recently determined, during the course of now-unsealed litigation, that Backpage waived its corporate attorney-client privilege by voluntarily sharing privileged materials with third parties.  *Third*, individual review is also unnecessary because a judge in Washington State previously ruled that Backpage waived its privilege by placing the content of privileged communications at issue while defending a lawsuit brought by a trafficking victim.

For these reasons, the United States seeks an order confirming that (1) Backpage's corporate attorney-client privilege has been waived and (2) the prosecution team may therefore gain access to the emails and other communications that were previously withheld by the filter team.

## FACTUAL AND PROCEDURAL HISTORY

A.   <u>The Activities Of The Filter Team In This Case</u>

    1.   **The Warrant For Ferrer's Email Account**

In July 2016, the United States obtained a warrant compelling Google to produce the contents of an email account held by Carl Ferrer.  Afterward, the United States obtained a court order authorizing the use of a filter team to review the account's contents.  *See* Exhibit A.  The order provided that "the Filter Team will review Backpage CEO Carl Ferrer's emails for potentially privileged and protected materials, and will keep all legitimately protected materials, as well as materials suspected to be protected, segregated from the Investigative Team unless the Court rules they can be disclosed."  *Id.*

    2.   **The Warrant For Nine Additional Email Accounts**

In April 2017, the United States obtained a warrant to search nine email accounts held by Backpage personnel (including accounts held by defendants Lacey, Larkin, Padilla, and Vaught).  *See* Exhibit B at 2.[1]  The judge issuing this warrant also authorized the use of a filter team to review the accounts' contents.  Specifically, Attachment B to the warrant provided that "the Filter Team will review the documents for privilege or protection only and will disseminate non-privileged and non-protected documents to the Investigative Team.  The Investigative Team will determine which documents constitute evidence of unlawful activity.   Because the Filter Team will be properly walled off from the Investigative Team, it may review emails to and from Elizabeth McDougall [Backpage's in-house counsel] or other Backpage attorneys to determine if they properly qualify for privilege or protections, in accordance with procedures set forth above.  This will eliminate the risk that protected information from or to Ms. McDougall or other Backpage attorneys will reach the Investigative Team."  *Id.* at 3.

---

[1]   The April 2017 warrant was directed to the California Department of Justice, which had previously (and independently) obtained the contents of the email accounts.

3.     **The Filter Team's Activities To Date**

The attorney responsible for coordinating the filter-team review in this case is not a member of the prosecution team—she works within the Criminal Division of the Department of Justice in Washington, D.C.

As part of the review process, the filter team created a list of the attorneys and law firms whose communications may have been covered by Backpage's corporate attorney-client privilege during the time periods in question. This list included (1) Elizabeth McDougall, an attorney who has served as Backpage's general counsel since February 2012, (2) Steve Suskin, an attorney who served as Backpage's in-house counsel (via his work as counsel to Village Voice Media Holdings, which was, at the time, Backpage's parent company) from 2010-12, (3) Hemanshu Nigam, an attorney whose consulting company ("SSP Blue") served as outside counsel to Backpage between September 2010 and December 2011, (4) Don Bennett Moon, an attorney who previously served as a board member of Village Voice Media Holdings and who represented Backpage during certain interactions with regulators, (5) the law firm of Davis Wright Tremaine ("DWT"), which has served as Backpage's outside counsel in various matters since 2010, and (6) the law firm of Rusing Lopez & Lizardi, which has also served as Backpage's outside counsel.

Using this list, the filter team identified 1,832 emails from the Ferrer email warrant, and an additional 8,901 emails from the subsequent email warrant, that might be privileged. These emails have not been provided to the prosecution team (and were not disclosed to the defense as part of the first wave of discovery that was produced in May 2018).

The filter team has also started the process of individually reviewing the segregated emails (to determine whether they are, in fact, privileged). To date, approximately 6,500 of the segregated emails have been reviewed. However, the filter team temporarily stopped conducting this review in May 2018, after the prosecution team received a letter from the defense attorneys in this case raising concerns about the propriety of filter-team review. In response to that letter, the prosecution team proposed that the parties seek a ruling from the

Court concerning the privilege issues in this case (*i.e.,* this motion).[2]

B.     The Written Waiver Of Backpage's Corporate Attorney-Client Privilege

On April 5, 2018, Carl Ferrer executed a written waiver of the corporate attorney-client privilege possessed by Backpage.com, LLC and various other Backpage-related entities. *See* Exhibit C.

The document begins by explaining that "I am authorized to waive each of the Companies' attorney-client privilege and am doing so because I believe executing such waiver is in each of the Companies' best interest." *Id.* at 1. As for the scope of the waiver, the document provides: "I hereby voluntarily waive all aspects of the attorney-client privilege, on behalf of the Companies, which otherwise may have applied to communications, documents and information that I or the Companies have provided to law enforcement or which law enforcement may already have in its possession from other sources, as follows:

> a.     All communications related to the "adult," "escort," "dating," and "services" sections of the Companies' websites, including but not limited to company policies, moderation practices, age verification practices, legality, content, and compliance with law enforcement.
>
> b.     All communications related to the Companies' financial activity, including but not limited to the sale of Backpage.com in 2015, all loans and financing agreements related to the sale of that company in 2015, monetization of the Companies' websites, payment processing, credit card processing, banking, and payment of loans.
>
> c.     All communications regarding the relationship between the Companies (including their current owner and employees) and their former owners and officers, including but not limited to, James Larkin, Michael Lacey, John ("Jed") Brunst and

---

[2]     To be clear, the filter-team did not limit its review to the materials gathered in response to the two email search warrants. In addition to the 10,733 emails discussed above, the filter team has also segregated 54 documents that were previously produced by Backpage pursuant to a subpoena and thousands of additional documents that were produced pursuant to various subpoenas.

Scott Spear, as well as communications between the Companies (including their current owner and employees) and Don Bennett Moon."

*Id.*

The document also states that, "in addition to the foregoing waiver, I hereby voluntarily waive, on behalf of the Companies, all aspects of the attorney-client privilege which otherwise may have applied to the Companies' relationship with any attorney ("previous attorneys") who was retained to represent the Companies in connection with various matters related to the subjects listed above. This attorney-client privilege waiver is meant to apply to all communications between the Companies and any attorney representing them at any time; all acts undertaken by others acting on the Companies' attorneys' behalf taken in connection with representing the Companies related to the subjects listed above; and any and all documents generated through their representation of the Companies that belong to the Companies." *Id.* at 1-2.

C.   Judge Campbell's Ruling That Backpage Waived The Privilege

1.   **The Initial Litigation Over The 108 Subpoena**

In October 2016, during the pre-indictment stage of the investigation, the grand jury issued a subpoena ("the 108 subpoena") to Ferrer and Backpage for an array of internal documents.  This subpoena was the catalyst for extensive litigation—litigation that has now been unsealed and may be publicly disclosed.[3]

In February 2017, following expedited briefing and a lengthy oral argument, Judge Campbell rejected Ferrer's and Backpage's First Amendment-based objections to the subpoena and ordered them to comply.  *See* Exhibit D (transcript of February 22, 2017 hearing).  In support of this ruling, Judge Campbell made factual findings that "this grand jury investigation . . . is a good faith investigation and not being undertaken for bad faith purposes" (*id.* at 65), that there was a reasonable basis to suspect "that Backpage has

---

[3]   On May 17, 2018, Judge Campbell issued an order authorizing the United States to disclose, during the proceedings in this case, the materials enclosed as exhibits D-H to this pleading.

knowingly been involved with the posting of illegal advertisements" (*id.* at 63), and that the subpoena was properly tailored "to determine whether or not Backpage and its personnel knew that advertisements posted on its website were for illegal activity . . . which is a key question in whether or not crimes have been committed" (*id.* at 66).  Notably, Judge Campbell also confirmed that 18 U.S.C. § 1952—which is the statute underlying many of the charges in the current indictment—"criminalize[s] the knowing publication of an advertisement for illegal prostitution or other illegal activity" and noted that Backpage's then-counsel (from the DWT firm) had conceded this point during oral argument.  *Id.* at 65.  *See also* Exhibit D at 37 (DWT concession); Exhibit E (minute entry).

In June 2017, following expedited briefing, the Ninth Circuit issued a unanimous unpublished decision affirming Judge Campbell's decision.  *See* Exhibit F.

### 2.      **The Litigation Over Backpage's Waiver Of The Privilege**

In September 2017, Backpage purported to comply with the subpoena, producing over 500,000 documents, but also withheld over 7,000 documents based on invocations of the attorney-client privilege.  In December 2017, after reviewing Backpage's privilege log, the United States filed a motion to compel Backpage to produce many of the withheld documents on the grounds that Backpage had voluntarily shared them with third-party public relations firms and investment banks—acts of dissemination that destroyed the privilege.  *See* Exhibit G (transcript of February 9, 2018 hearing).

On April 2, 2018, following a hearing and several rounds of briefing, Judge Campbell issued a 14-page order concluding that Backpage had, in fact, waived its corporate attorney-client privilege by sharing hundreds of privileged documents with third-party public relations firms and investment banks.  *See* Exhibit H (order).

### 3.      **The Documents Produced In Response To Judge Campbell's Order**

On or around April 16, 2018, Backpage produced to the United States the documents that were the subject of Judge Campbell's April 2 waiver finding (*i.e.,* the once-privileged documents that Backpage had shared with public relations firms and investment banks).

One of the documents included in this production was an April 2011 email that

several Backpage principals (including Ferrer, Larkin, and Spear) had received from SSP Blue (the firm operated by attorney Hemanshu Nigam).  *See* Exhibit I.  The subject matter of the legal advice contained in this email was how to moderate and review ads submitted by customers.  Among other things, the email advised the recipients (in Action Item 12 of the enclosed spreadsheet) that Backpage should prevent customers from publishing ads using the phrase "New In Town" because this phrase "***is often used by pimps who shuttle children to locations where they do not know anyone and cannot get help***."  *Id.* (emphasis added).  The Court will note that the indictment alleges the defendants ignored this advice and continued allowing ads using the phrase "New In Town" to be published.  *See, e.g.,* Counts 12-15 of the indictment.

Another document included in this production was a January 2012 email whose recipients included several Backpage principals (including Lacey, Larkin, and Ferrer) and a Backpage attorney.  *See* Exhibit J.  The subject matter of the email concerned whether/how to acknowledge the prevalence of prostitution ads on the Backpage website. Among other things, the email advised that, if the recipients were ever confronted with such questions, they shouldn't issue a denial but, instead, should attempt to change the subject and accuse the questioner of being a "prude."  *Id.*

D.  <u>The Washington Judge's Ruling That Backpage Waived The Privilege</u>

1.  **Background Concerning The *J.S.* Case**

In July 2012, three minor girls who had been "bought and sold for sexual services online on Backpage.com" filed a civil lawsuit against Backpage in Washington state court. *See J.S. v. Village Voice Media Holdings, Inc.*, 359 P.3d 714, 715-16 (Wash. 2015). Backpage moved to dismiss, arguing it was immune from civil liability under the Communications Decency Act ("CDA"), 47 U.S.C. § 230, because it merely provided a forum for the illicit ads created by the girls' pimps.  *Id.*  The girls, in turn, argued the CDA should be deemed inapplicable because Backpage does "more than just provide a forum for illegal content" and affirmatively shapes the content of its users' ads through "posting rules [that are] 'designed to help pimps develop advertisements that can evade the

unwanted attention of law enforcement, while still conveying the illegal message.'" *Id.*

In September 2015, the Washington Supreme Court ruled 6-1 in the girls' favor and denied Backpage's motion to dismiss. The court explained: "This case turns on whether Backpage merely hosted the advertisements that featured J.S., in which case Backpage is protected by CDA immunity, or whether Backpage also helped develop the content of those advertisements, in which case Backpage is not protected." *Id.* at 717). The court concluded the girls should be permitted to conduct discovery "to ascertain whether in fact Backpage designed its posting rules to induce sex trafficking." *Id.* at 718.

2. **The *J.S.* Waiver Ruling**

Following remand from the Washington Supreme Court, the girls' attorney propounded an array of discovery requests to Backpage seeking information about its moderation practices. In response, Backpage identified its in-house counsel, Elizabeth McDougall, as its 30(b) witness, allowed her to be deposed concerning Backpage's moderation practices, and submitted a declaration from her in an attempt to obtain summary judgment. The plaintiffs, in turn, filed a motion asserting that Backpage had waived its corporate attorney-client privilege on an array of topics by attempting to rely on Ms. McDougall in this fashion.

In an order issued in August 2017, the trial court agreed with the plaintiffs and held Backpage had waived the privilege. *See* Exhibit K. Specifically, the court explained that, because Backpage had "put the assertions and representations of Ms. McDougall at issue in this litigation," it would be unfair to deny the plaintiffs access to other material that might bear on the validity of her claims. *Id.* at 1-3. Thus, the court concluded Backpage had "waived the attorney-client privilege and work-product protection with respect to . . . [all of] the topics identified in Plaintiffs' 30(b)(6) deposition notice." *Id.* This notice, in turn, broadly encompasses a variety of topics, including (1) Backpage's moderation practices, (2) Backpage's policies and procedures for reviewing, screening, moderating, and/or editing ads submitted by customers, and (3) Backpage's knowledge and awareness that sex trafficking was occurring on the website. *See* Exhibit K, Appendix B.

**ARGUMENT**

A.    <u>Further Segregation Is Unnecessary In Light Of The Written Waiver</u>

There is no reason to continue withholding, from the prosecution team, the emails that had been segregated by the filter team.  Based on Mr. Ferrer's execution of a written waiver of Backpage's corporate attorney-client privilege, those emails are no longer privileged.

As an initial matter, Mr. Ferrer—as Backpage's CEO and 100% owner since 2015—had the authority to waive the corporation's privilege.  *See generally Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 349 (1985) ("[W]hen control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well.  New managers . . . may waive the attorney-client privilege with respect to communications made by former officers and directors.  Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties.").

Furthermore, the Ninth Circuit makes clear that, once a corporate privilege waiver has been executed, individual corporate employees (such as the defendants in this case) cannot contest the disclosure of their previously-privileged communications.  In *United States v. Graf*, 610 F.3d 1148 (9th Cir. 2010), the Ninth Circuit addressed this issue in detail, noting that "[o]ne of these special problems" that arises in the context of the corporate attorney-client privilege "is that corporate officers, directors, and employees who communicate with corporate counsel on behalf of the corporation may later attempt to claim a personal attorney-client privilege regarding those communications after the corporation has waived its own privilege."  *Id.* at 1156.  The *Graf* court held that a corporation is ordinarily "*free to obtain information from its officers, employees, and consultants about company matters and then control the attorney-client privilege, waiving it when necessary to serve corporate interests,*" and that an employee may prevent such a disclosure only under limited circumstances.  *Id.* at 1160-61 (emphasis added).

Specifically, once the corporate privilege has been waived, an individual employee may prevent disclosure only by establishing the following five factors:

> *First*, they must show they approached counsel for the purpose of seeking legal advice. *Second*, they must demonstrate that when they approached counsel they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. *Third*, they must demonstrate that the counsel saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. *Fourth*, they must prove that their conversations with counsel were confidential.   And *fifth*, they must show that the substance of their conversations with counsel did not concern matters within the company or the general affairs of the company.

*Id.* at 1160 (citation omitted) (emphasis in original).

Here, the United States has not seen any evidence suggesting these five factors could be satisfied with respect to any of the withheld emails.  Thus, unless a particular defendant produces evidence that he or she, while working at Backpage, had discussions with corporate counsel about purely personal matters unrelated to the general affairs of Backpage and made clear he or she was seeking legal advice in an individual capacity, the Court should hold that Mr. Ferrer's privilege waiver is valid and authorize the filter team to produce the withheld materials to the prosecution team.

B.    Further Segregation Is Unnecessary In Light Of Judge Campbell's Ruling

Judge Campbell's order of April 2, 2018, provides an independent basis for concluding that Backpage's corporate attorney-client privilege has been waived and that the segregated emails may therefore be produced to the prosecution team.

It is black-letter law that "voluntarily disclosing privileged documents to third parties will generally destroy the [attorney-client] privilege."  *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126-27 (9th Cir. 2012).  *See generally Chevron Corp. v. Penzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (agreeing that "Pennzoil had waived the attorney-client privilege by disclosing to an outside auditor documents which discussed" legal advice it had received, because "voluntary disclosure of a privileged attorney communication to a third party constitutes waiver of privilege"); *United States v. Ruehle*, 583 F.3d 600, 612

(9th Cir. 2009) ("[A]ny voluntary disclosure of information to a third party waives the attorney-client privilege, regardless of whether such disclosure later turns out to be harmful."); *Southern Union Co. v. Southwest Gas Corp.*, 205 F.R.D. 542, 548 (D. Ariz. 2002) ("[I]f the documents containing confidential communications are disclosed to third parties, the privileged status of the communications within the documents is lost.").

Here, Judge Campbell already has determined that Backpage waived its corporate attorney-client privilege by voluntarily sharing hundreds of privileged communications with third-party public relations firms and investment banks.  Moreover, although the only remedy the United States sought during the previous proceeding (before Judge Campbell) was the disclosure of those particular emails, the law in the Ninth Circuit is that "voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other such communications on the same subject."  *Weil v. Investment/Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981).  *See also Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010) ("Disclosing a privileged communication . . . results in waiver as to all other communications on the same subject.").

The privileged emails that Backpage disclosed to third-party public relations firms and investment banks addressed an array of different "subjects," including how to moderate and review ads submitted by customers and whether/how to acknowledge the prevalence of prostitution ads on the Backpage website.  These are the same "subjects" addressed in the communications that have been segregated by the filter team.  Accordingly, those communications have lost their privileged status and may be shared with the prosecution team.

C.   Further Segregation Is Unnecessary In Light Of The *J.S.* Ruling

Finally, the ruling issued in the J.S. case in August 2017 provides yet another independent basis for concluding that Backpage's corporate attorney-client privilege has been waived and that the segregated emails may therefore be produced to the prosecution team.

The Ninth Circuit has recognized that "[e]ven when a party does not explicitly

disclose the content of an attorney-client communication, he may waive the privilege implicitly.  A person cannot always claim that he relied on counsel, while protecting what was said between them from disclosure." *United States v. Ortland*, 109 F.3d 539, 543 (9th Cir. 1997).  *See also Chevron Corp.*, 974 F.2d at 1162 ("Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived."); 2 Rice, Attorney-Client Privilege § 9:24 at 89 ("When the client makes the communications with counsel a substantive issue in the litigation, courts have consistently held that the attorney-client privilege protecting those communications is waived.  Courts often refer to this type of waiver as an 'at issue' waiver or an implied waiver.").  This is exactly what occurred in the *J.S.* case, and the "subject matters" that the *J.S.* court determined to be encompassed by its waiver ruling (*i.e.,* Backpage's moderation practices, Backpage's policies and procedures for reviewing, screening, moderating, and/or editing ads submitted by customers, and Backpage's knowledge and awareness that sex trafficking was occurring on the website) are the same subjects addressed in the communications that have been segregated by the filter team.

## CONCLUSION

The Court should issue an order confirming that (1) Backpage's corporate attorney-client privilege has been waived, at least with respect to Elizabeth McDougall, Steve Suskin, Hemanshu Nigam, the consulting firm SSP Blue, Don Bennett Moon, the law firm of Davis Wright Tremaine, and the law firm of Rusing Lopez & Lizardi, and (2) the prosecution team may therefore gain access to the emails and other communications that were previously withheld by the filter team.

Respectfully submitted this 14th day of June, 2018.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*/s Kevin Rapp*
KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW C. STONE

Assistant U.S. Attorneys

JOHN J. KUCERA
Special Assistant U.S. Attorney

JOHN P. CRONAN
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

## Certificate of Service

I hereby certify that on this date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants: Anne Chapman, Erin McCampbell, James Grant, Lee Stein, Paul Cambria, Robert Corn-Revere, Ronald London, Janey Henze Cook, John Littrell, Kenneth Miller, Thomas Bienart, Jr., Bruce Feder, Michael Kimerer, Rhonda Neff, KC Maxwell, David Wakukawa, Michael Piccarreta, Stephen Weiss.

*s/ Sally Hawley*
U.S. Attorney's Office

# **<u>Exhibit A</u>**

SEALED

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: In the Matter of the Search of Carl.Feerrer@backpage.com | Case No. 16-305MB |
| | **ORDER FOR CHANGE IN THE PROTOCOL OF THE FILTER TEAM REVIEW OF POTENTIALLY PRIVILEGED MATERIALS** |
| | **(Filed Under Seal)** |

On this ___27___ day of ___Oct___, 2016, comes for the attention of the court the United States' request to change the protocol of the Filter Team review of potentially privileged materials in the above entitled action.

IT IS ORDERED that the Filter Team will review Backpage CEO Carl Ferrer's emails for potentially privileged and protected materials, and it will keep all legitimately protected materials, as well as materials suspected to be protected, segregated from the Investigative Team unless the Court rules that they can be disclosed.

IT IS FURTHER ORDERED that the Application of the United States Attorney and this Order shall be sealed until further order of the Court.

___10/27/2016___
DATE

_Eileen S. Willett_
Honorable Eileen S. Willett
UNITED STATES MAGISTRATE JUDGE

# **<u>Exhibit B</u>**

AO 106 (Rev. 04/10) Application for a Search Warrant

SEALED

# UNITED STATES DISTRICT COURT
for the

Eastern District of California

ORIGINAL
FILED

APR 1 8 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| | |
|---|---|
| In the Matter of the Search of ) | |
| ) | |
| Information associated with email accounts identified ) | Case No. |
| in Attachment A that is stored at premises controlled by ) | |
| the California Attorney General's Office ) | 2: 1 7 - SW - 0 2 7 5   AC |
| ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1952(a) | Interstate and foreign travel or transportation in aid of racketeering enterprises |
| 18 U.S.C. § 1956(h) | Conspiracy to launder monetary instruments |
| 18 U.S.C. § 1956(a)(1)(A)(i) | Laundering of monetary instruments |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☑ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Amy L. Fryberger, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/18/17

_____
*Judge's signature*

City and state: Sacramento, California

Allison Claire, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Description of Property to be Searched

This warrant applies to information associated with the following email addresses for the time period of, 2010-2016:

      carl.ferrer@backpage.com,

      carl@backpage.com,

      ferrer.carl@gmail.com,

      andrew@backpage.com,

      joye@backpage.com,

      adam@backpage.com,

      abuse@backpage.com,

      jim.larkin@villagevoicemedia.com, and

      michael.lacey@villagevoicemedia.com,

that is stored at the California Attorney General's Office, located at 1300 I Street, Sacramento, California, 95814.

**ATTACHMENT B**

**Items to be Searched and Seized**

I.  **Items to be seized by the government**

All information, in whatever form it exists, that constitutes fruits, evidence, and instrumentalities of violations of Title 18, United States Code §§ 1952(a) (Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises); 1956(a)(1)(A)(i) (Promotional Money Laundering); and 1956(h) (Conspiracy to Commit Money Laundering) involving Backpage.com, including, for each account, address, or identifier listed in Attachment A, information pertaining to the following matters:

    a.    Any information related to Backpage.com matters;

    b.    Any communications to, from, or concerning Backpage.com;

    c.    Records relating to who created, used, or communicated with the account or identifiers, including records about their identities and whereabouts.

II.  **Search Procedure**

    a.    Upon receipt of the items described in Attachment A, the Filter Team will review the documents for privilege or protection only and will disseminate non-privileged and non-protected documents to the Investigative Team. The Investigative Team will determine which documents constitute evidence of unlawful activity. Because the Filter Team will be properly walled off from the Investigative Team, it may review emails to and from Elizabeth McDougall or other Backpage attorneys to determine if they properly qualify for privilege or protections, in accordance with procedures set forth above. This will eliminate the risk that protected information from or to Ms. McDougall or other Backpage attorneys will reach the Investigative Team.

# **<u>Exhibit C</u>**

## WAIVER OF ATTORNEY CLIENT PRIVILEGE

I, Carl Ferrer, state the following in my capacity as sole owner and manager of Dartmoor Holdings LLC, which wholly owns and operates Backpage.com LLC (of which I am Chief Executive Officer), Website Technologies LLC, IC Holdings LLC, Posting Solutions LLC, and Postfaster LLC, hereafter referred to as "the Companies."  I am authorized to waive each of the Companies' attorney-client privilege and am doing so because I believe executing such waiver is in each of the Companies' best interest.

I further state that, being represented by counsel and being fully advised as to this matter, I hereby voluntarily waive all aspects of the attorney-client privilege, on behalf of the Companies, which otherwise may have applied to communications, documents and information that I or the Companies have provided to law enforcement or which law enforcement may already have in its possession from other sources, as follows:

 a. All communications related to the "adult," "escort," "dating," and "services" sections of the Companies' websites, including but not limited to company policies, moderation practices, age verification practices, legality, content, and compliance with law enforcement.

 b. All communications related to the Companies' financial activity, including but not limited to the sale of Backpage.com in 2015, all loans and financing agreements related to the sale of that company in 2015, monetization of the Companies' websites, payment processing, credit card processing, banking, and payment of loans.

 c. All communications regarding the relationship between the Companies (including their current owner and employees) and their former owners and officers, including but not limited to, James Larkin, Michael Lacey, John ("Jed") Brunst and Scott Spear, as well as communications between the Companies (including their current owner and employees) and Don Bennett Moon.

I further state that, in addition to the foregoing waiver, I hereby voluntarily waive, on behalf of the Companies, all aspects of the attorney-client privilege which otherwise may have applied to the Companies' relationship with any attorney ("previous attorneys") who was retained to represent the Companies in connection with various matters related to the subjects listed above. This attorney-client privilege waiver is meant to apply to all communications between the Companies and any attorney representing them at any time; all acts undertaken by others acting on the Companies' attorneys' behalf taken in connection with representing the

Companies related to the subjects listed above; and any and all documents generated through their representation of the Companies that belong to the Companies.

I further state that this waiver does not apply in any respect to any aspect of the Companies' representation by David Botsford of Botsford & Roark LLP, or to any aspect of my personal attorney-client relationship with attorneys who have represented me in the past or who currently represent me in an individual capacity, including, but not limited to, Nanci Clarence, Jonathan Baum and Shaneeda Jaffer of Clarence, Dyer & Cohen, and the Law Offices of E.G. Morris.

4/5/2018
DATED

Carl Ferrer

# **<u>Exhibit D</u>**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

)
In Re Grand Jury 16-4,                    ) Phoenix, Arizona
                                          )
                                          ) **February 22, 2017**
_____)

**BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**Motion to Compel and Cross-Motion to Quash Grand Jury Subpoena**

**<u>SEALED</u>**

Official Court Reporter:
Patricia Lyons, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Ste. 312
401 West Washington Street, SPC 41
Phoenix, Arizona  85003-2150
(602) 322-7257

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared with Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2


3    For the Government:

4              US Attorney's Office
               By: **DOMINIC LANZA**, ESQ.
5              40 N. Central Ave., Ste. 1200
               Phoenix, AZ  85004
6
               Department of Justice
7              By: **REGINALD JONES**, ESQ.
               Washington DC
8


9


10   For Backpage.com and Mr. Ferrer:

11             Henze Cook Murphy
               By: **TOM HENZE**, ESQ.
12             By: **JANEY HENZE COOK**, ESQ.
               4645 N. 32nd St., Ste. 150
13             Phoenix, AZ  85018

14
               Davis Wright Tremaine
15             By: **JAMES C. GRANT**, ESQ.
               1201 Third Ave., Ste. 2200
16             Seattle, WA  98101

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

14:09:11   1

           2

           3          THE COURTROOM DEPUTY:  Grand Jury Number 16-4, on

           4   motion for hearing, motion to compel.  Will the parties please

14:09:20   5   announce.

           6          MR. LANZA:  Afternoon, Your Honor.  Dominic Lanza and

           7   Reggie Jones on behalf of the United States.

           8          MR. HENZE:  Good afternoon, Judge Campbell.  Tom

           9   Henze and Janey Henze Cook from Henze Cook Murphy appearing.

14:09:31  10          Let me introduce Your Honor, the Court, to Jim Grant

          11   from Davis Wright Tremaine.  He is appearing pro hoc vice and

          12   he will be addressing the Court today.

          13          I also have one housekeeping matter.  I think I

          14   covered it.  Also present in the courtroom --

14:09:51  15          THE COURT:  Mr. Henze, could you pull the mic over

          16   just so we can hear you a little more clearly.

          17          MR. HENZE:  Excuse me.  Also present in the courtroom

          18   is Backpage LLC's general counsel, Liz McDougall.  She's not

          19   appearing, but we would like the Court's permission for her to

14:10:07  20   remain.

          21          THE COURT:  Any objection?

          22          MR. LANZA:  No objection.

          23          THE COURT:  All right.  Good afternoon everybody.

          24          Counsel, we're here on the government's motion to

14:10:21  25   compel.  We've sealed the courtroom since this proceeding is a

14:10:24  1   grand jury proceeding and the materials have been filed under

      2   seal.

      3            This was originally in front of Judge Rayes but was

      4   reassigned to me a couple of weeks ago.  I have read the

14:10:35  5   briefs.  I have read many of the cases that you all have

      6   cited.  So I think I understand the arguments being made on

      7   both sides, but I want to give you an opportunity to address

      8   anything that you think is important so that I'm fully

      9   informed when I make the decision.

14:10:50 10            And since this is the government's motion, let's have

     11   government counsel go first.

     12            MR. LANZA:  Thank you, Your Honor.  May I approach

     13   the podium?

     14            THE COURT:  Yes.

14:11:13 15            MR. LANZA:  Thank you.  I'd like to focus -- the

     16   Court said it's read the pleadings.  I know they're

     17   voluminous.  We thank the Court for getting to this on an

     18   expedited basis.

     19            I want to focus on five topics this afternoon.  First

14:11:25 20   is the interplay between the First Amendment and what the

     21   standard of review is here.

     22            The second is Backpage's argument that this

     23   investigation isn't being conducted in bad faith and that's a

     24   ground for quashing the subpoena.

14:11:37 25            The third is Backpage's argument that there's no

14:11:41  1    connection between the materials being sought and the

2    underlying scope of the investigation.

3         Fourth is whether the subpoena is unreasonable or

4    oppressive under Rule 17(c).

14:11:50  5         And the fifth is the extent to which this Court

6    permissibly can consider the contents of a PSI report when

7    addressing the issues that are before it.

8         So, first, the interplay between the First Amendment

9    and the standard of review.

14:12:05 10        The pleadings contain a great deal of discussion

11   concerning a very interesting and complicated issue, which is

12   whether a grand jury subpoena is subject to heightened level

13   of review when the recipient claims complying with it would

14   chill or implicate its First Amendment rights in the future.

14:12:23 15        I think ultimately the Court doesn't need to address

16   that issue with certainty because we should prevail even under

17   Backpage's expansive view of what *Bursey* means.  It's in our

18   briefs, but I want to talk briefly why we think we have the

19   better side of this argument, that in fact the standard the

14:12:39 20   Court should apply is very similar to the traditional standard

21   under Rule 17(c), which is that the subpoena is presumptively

22   enforceable unless there's a showing that the investigation is

23   being conducted in bad faith or there's no connection between

24   the requested materials and the investigation.

14:12:56 25        In my view, the four key cases here are *Bursey*,

14:13:00  1    *Branzburg*, the 1993 *In Re Grand Jury Subpoena* case, which is

2    referred to as *Scarce* sometimes, and the 1971 Ninth Circuit

3    decision in *Weinberg*.

4          Our position, it is true that at first blush this

14:13:14  5    *Bursey* decision from 1972 seems to articulate the test that

6    Backpage claims it articulates, which is the burden's on the

7    government, when the First Amendment is implicated there's

8    these three factors, et cetera.  But I find it significant

9    that *Bursey* was decided almost simultaneously with *Branzburg*,

14:13:30  10    which had a very different approach that was more favorable to

11    the enforcement of subpoenas in the First Amendment context.

12          And *Bursey* itself doesn't even mention *Branzburg*, and

13    the only mention of *Branzburg* came when government then filed

14    a petition for rehearing, and that's addressed on the very

14:13:49  15    last page or two of the *Bursey* decision.  They say on the one

16    hand, the Ninth Circuit, that *Branzburg* doesn't overrule the

17    result they reached here, but the way I read it and the way I

18    think this 1993 *Scarce* opinion construes it is it says that

19    the *Bursey* approach is consistent with *Branzburg* so long as

14:14:07  20    the focus is simply on whether the materials being sought by

21    the grand jury are actually relevant to the underlying

22    investigation.  Which really isn't any different from a

23    traditional Rule 17(c) standard that the Court would apply

24    irrespective of whether the First Amendment was implicated.

14:14:25  25          So we've shown in our brief several decades afterward

14:14:29   1   the Ninth Circuit has considered First Amendment challenges to

2   subpoenas.  It's never struck one down under *Bursey*, It's

3   never interpreted or applied *Bursey* the way Backpage argues.

4         Now, in their surreply Backpage argues all these

14:14:44   5   cases we've cited, the *Lewis cases, Scarce*, 2006 case, they're

6   distinguishable because they dealt with reporter's privilege

7   claims, not the same sort of full-throated First Amendment

8   claim that was present at *Bursey*.  I don't think that's the

9   right way to interpret those cases.  The reason for that is in

14:15:01  10   that 1993 decision in *Scarce*, the researcher in that case also

11   claimed that *Bursey* supported his position that he shouldn't

12   have to comply with the subpoena.

13         If it were true, as Backpage asserts, that the reason

14   his reliance on *Bursey* was misplaced is because he had a much

14:15:20  15   lesser First Amendment basis than was present in *Bursey*, they

16   would have dismissed it on that ground.  But they didn't do

17   that.

18         Instead, in 1993 the Ninth Circuit said this

19   researcher didn't prevail under *Bursey* because it sort of

14:15:33  20   dismissed and narrowly construed *Bursey* as a pre-*Lewis* case

21   that in any event simply dealt with no connection between the

22   materials sought and the scope of the investigation.

23         So all of that, I think, is then punctuated by this

24   1971 case that we cited in our reply, *Weinberg*, which says in

14:15:51  25   the Ninth Circuit the chilling effect of grand jury

14:15:53  1    questions -- any chilling effect grand jury questions may have

        2    on the future exercise of First Amendment rights isn't

        3    generally a recognized ground for refusing to comply with a

        4    subpoena.

14:16:03  5         So for all those reasons, we're not denying that

        6    Backpage, their conduct, might implicate the First Amendment.

        7    It's difficult to articulate precisely how the First Amendment

        8    applies here.  But the test nevertheless, we believe the

        9    burden should be on Backpage to show that subpoena is not

14:16:22 10    enforceable either by showing a lack of good faith or no

       11    connection.  And as I'll address in a second, they haven't

       12    made that showing either way.

       13         As on the bad faith issue, they've primarily cited

       14    two grounds for saying this isn't a good faith investigation,

14:16:39 15    we're just trying to harass them.  The first is this order

       16    from the Western District of Washington and the other is the

       17    Communications Decency Act.

       18         With respect to the Washington order, I can't

       19    emphasize strongly enough how different this investigation is

14:16:55 20    and the facts and circumstances are here than they were in

       21    Washington.

       22         In brief, in Washington there was litigation over a

       23    subpoena and the U.S. Attorneys Office up there, for whatever

       24    reason, refused to explain to the court in the course of those

14:17:10 25    proceedings why it thought the materials it was seeking were

14:17:13   1   relevant to its investigation.  During the first round, the

2   court ordered them to narrow the scope of their subpoenas.

3   They didn't do that; they reissued in the same scope.  They

4   then added categories seeking information that had no

14:17:26   5   relevance to their investigation.  It was simply meant to

6   embarrass Backpage's employees by seeing if they had used some

7   of the prostitution and escort services.

8          And, finally, there was investigation in that case

9   that the U.S. Attorneys Office knew, because they were the

14:17:41  10   first party who had ever subpoenaed this stuff from Backpage,

11   they were causing Backpage to incur tens of thousands of

12   dollars of costs to comply.

13          Given that set of facts, it's perhaps not surprising

14   the judge in Washington found it just didn't seem right, it

14:17:55  15   had a bad smell about what the office was doing there.

16   Without reaching the First Amendment -- without endorsing the

17   First Amendment arguments that Backpage is making there, or

18   here, he said I'm not going to enforce it because it just

19   looks like U.S. Attorneys Office is trying to harass Backpage.

14:18:12  20          Here, on every one of those key grounds, the exact

21   opposite is true.  We've gone out of our way in our pleadings,

22   at length, to try to explain why we have a good faith basis

23   for believing that the evidence, if it turns out the way we

24   think it might, could support criminal liability against

14:18:30  25   Backpage.

14:18:30  1          We have identified other cases where website

2      operators have been recently criminally prosecuted

3      successfully.  I acknowledge the cases aren't on all fours,

4      but the broader point is that the First Amendment doesn't give

14:18:43  5      a blanket shield to website operators that they can never be

6      held liable.

7          I can also represent to this Court that my office has

8      four AUSA's assigned to this matter.  Mr. Jones is here from a

9      DOJ component working on this matter.  We have three different

14:19:00 10      federal agencies with agents working very hard on this

11      investigation.  This is not some sham investigation simply

12      meant to harass Backpage.

13          Second, our subpoenas here don't seek any

14      embarrassing information simply meant to harass.  In fact, the

14:19:15 15      third one, we put in italics we specifically don't want any

16      personally identifying information because we don't even want

17      to go down that road of having that be an issue.

18          And, finally, the cost issue.  I think it's

19      tremendously relevant and helpful for our position that our

14:19:33 20      subpoena's mirrored on the PSI subpoena.  And the reason for

21      that, we chose to do it that way in large part so that

22      Backpage couldn't raise any complaints about the costs of

23      compliance or need to start from scratch and get attorneys and

24      private firms to start billing and reviewing documents and all

14:19:51 25      those things, because the work has already been done.

14:19:53  1      That is very different from Washington where there

2   was evidence that the U.S. Attorneys Office was trying to run

3   up costs.

4          If we're trying to harass Backpage here, we're doing

14:20:02  5   a really poor job of it.  We picked the quickest and easiest

6   way possible for them to comply by defining what we're

7   seeking.

8          Other argument about good faith or bad faith is the

9   CDA.  I think Backpage's reliance on the CDA here is the

14:20:18 10   weakest part of their argument.  They asked this Court to

11   conjure up, based on its views of the spirit and purpose of

12   the statute, that it should apply in the federal criminal

13   context, too.  And with all respect, statutes don't have

14   spirits and don't have purposes, they have text.

14:20:35 15      The analysis of the statute should start and end with

16   the plain language of the statute, and here the plain language

17   of the CDA could not be clearer:  Nothing in this section

18   shall be construed to impair the enforcement of any criminal

19   statute.  No effect on criminal law.  It would turn the rules

14:20:53 20   of statutory construction on their head to conclude that

21   notwithstanding that language Congress secretly wanted the

22   courts to not enforce grand jury subpoenas in the criminal

23   context.

24          If Congress had wanted the CDA to provide protection

14:21:05 25   from federal criminal investigations, they could have said so.

14:21:09   1   They pointedly didn't.

       2           Finally, we also cited the *roommates.com* case in our

       3   reply.  Again, even putting aside federal criminal context

       4   where we feel like we're on very good footing on the CDA, even

14:21:20   5   in civil damages lawsuit in state and criminal prosecutions,

       6   the rule in the Ninth Circuit, which a lot of website

       7   operators don't like, is that if an operator edits its users

       8   content in a way that contributes to the illegality of the

       9   content, the CDA no longer provides a defense.  That is --

14:21:38  10   again, that's the exact thing we want to investigate here.

      11   I'll talk about it in a moment.  We have good faith reasons

      12   for believing that Backpage has engaged in moderation

      13   practices to scrub out illegal -- scrub out terms from illegal

      14   prostitution ads in a way to make them less obvious to law

14:21:57  15   enforcement.  That's right what *roommates.com* gets at and says

      16   CDA doesn't apply.

      17           Third issue, connection.  Their position is that we

      18   can't show a connection between what we're seeking and any

      19   legitimate chance of ever having a criminal prosecution

14:22:13  20   because under the First Amendment they could never be liable

      21   for just running -- being a conduit for other people's

      22   content.

      23           As an initial matter, I think it is important to note

      24   there's a tension between the positions Backpage is taking.

14:22:28  25   On the one hand they say we're just a conduit for other

14:22:32   1   people's content, we don't have anything to do with their

2   content.  On the other hand, they're saying that the First

3   Amendment gives us this broad protection because we're making

4   active editorial decisions about what not to print and what to

14:22:42   5   print.  And I think that that smacks of having it both ways,

6   to say I'm both a mere conduit and a First Amendment actor who

7   is making editorial decisions.

8         But putting that aside, these arguments about them

9   being liable criminally for merely re-posting others' ads are

14:23:00  10   a straw man.  We tried to be as clear about this as we could

11   in our briefs.  Our theory here is not that Backpage could be

12   held liable for merely re-posting other people's ads or being

13   negligent, or strict liability negligence type of theory.

14         The theories here are, one, Backpage acquired actual

14:23:16  15   knowledge of the illegality of ads and continued to post them

16   despite that knowledge, or, second, and even worse, they

17   affirmatively edited and wordsmithed their clients' ads in an

18   effort to, as one of the Backpage moderators told the PSI,

19   sanitize them.  That is not merely acting as a conduit.

14:23:37  20         And it's telling that just a few months ago the

21   district court for the District of Columbia, Backpage had

22   brought a constitutional challenge to a newly amended statute

23   that makes knowingly running advertising involving child sex

24   trafficking victims a crime.  The court there rejected

14:23:54  25   Backpage's arguments and endorsed the very theory we're

14:23:58 1    propounding here, which is if a website operator knowingly

2    runs ads that are soliciting illegal services, the First

3    Amendment doesn't apply in that context.

4            So all that gets to the connection here.  Because

14:24:12 5    we're trying to investigate what Backpage knew about the

6    legality of its users' ads and whether it was editing them, it

7    follows that the three categories of things we're trying to

8    get are subpoenaed.  There couldn't be a tighter fit.  They go

9    to the heart of what we're trying to investigate, the

14:24:27 10    knowledge and editing practices.

11            The fourth issue I wanted to address is, putting

12    aside the First Amendment issues under Rule 17(c), should the

13    subpoena be deemed oppressive or unreasonable?  Backpage has

14    used colorful language in its briefs.  It likens this

14:24:50 15    investigation to the Star Chamber and talks about it being a

16    dragnet search, makes an analogy to law enforcement doing a

17    search of an entire bookstore in hope of finding maybe one

18    illegal book.

19            Those analogies don't work because the facts matter.

14:25:05 20            There's ample evidence here that virtually all of

21    Backpage's ads are illegal prostitution ads and not lawful

22    escort ads.  We cited in our briefs law enforcement officers

23    in Chicago and Seattle have both put in evidence in other

24    lawsuits that they've done hundreds of investigations arising

14:25:22 25    from ads on Backpage and 100 percent of the time, hundreds and

14:25:27  1    hundreds of times, it's always a prostitution ad, not on

       2    escort ad.

       3            Backpage received a letter from the National

       4    Association of Attorneys General in 2011 making the common

14:25:38  5    sense point that of course these are prostitution ads.  We

       6    don't check our common sense at the door.

       7            The PSI report contains an e-mail from Backpage's

       8    CEO, Mr. Ferrer, in 2011 where he acknowledges they were

       9    stripping out banned terms from quote, unquote, almost every

14:25:55 10    adult ad on the website.  Which, again, gives the lie to the

      11    notion that nearly all of these are lawful escort ads.

      12            And, finally, the moderators who testified in the PSI

      13    proceeding also talked about everybody knew these were all

      14    prostitution ads.  It was no secret.

14:26:14 15            One other consideration under Rule 17(c) is cost.  We

      16    acknowledge that in some circumstances if a federal grand jury

      17    subpoena were issued to a company and it would cost millions

      18    of dollars and a ton of attorney time to compile the

      19    materials, there might be an argument about oppressiveness or

14:26:32 20    unreasonableness.  But here, those costs were already incurred

      21    before we got involved.  The test under Rule 17(c) is whether

      22    complying with this subpoena would be unreasonable or

      23    oppressive, and it wouldn't.  It would cost virtually nothing

      24    and take virtually no time.

14:26:49 25            Final issue I wanted to address is the consideration

14:26:51   1    of the PSI report.  They've asked this Court to essentially

       2    blind itself to the report and not consider it when evaluating

       3    this motion, and we would submit there are four reasons why

       4    that's not an approach the court should take.

14:27:07   5          First, tellingly, they have cited zero cases to

       6    support their position.  And that's telling because, of

       7    course, the Court should consider all of the relevant evidence

       8    before it.  Courts should always try to make the best

       9    decisions they can based on all the available evidence.  And

14:27:23  10    the available evidence here includes the PSI report and its

      11    appendix.

      12          The Court can see from the appendix exactly what's in

      13    some of these e-mails and how they fit into our theory of

      14    investigation and it would be anomalous for the Court to not

14:27:38  15    look at evidence when deciding whether to evaluate a motion.

      16          A related point is that I was trying to search for

      17    the right analogy to think about this.  Sometimes in criminal

      18    cases the government ultimately comes into possession of

      19    evidence that was ultimately obtained by some third party

14:27:55  20    through some improper means.  The government didn't have

      21    anything to do with how it was improperly obtained, but it

      22    later comes into the government's hands.  In that

      23    circumstance, a defendant can't suppress that evidence by

      24    pointing to how the evidence was initially obtained because

14:28:08  25    the person prosecuting them didn't have anything to do with

14:28:10 1  that process.  It's not a perfect analogy, but I think it's a

2  rough analogy for what happened here.

3       The Department of Justice has nothing to do with

4  these PSI proceedings.  The e-mails, for better or worse, are

14:28:22 5  out there and they powerfully show why things we're seeking

6  have a tight connection with the grand jury's investigation.

7  And, again, it would be anomalous for the Court to ignore this

8  evidence when deciding this motion.

9       A third point is that although it's true that the PSI

14:28:39 10  report was based in part on the e-mails that the senate

11  obtained through the subpoena, which are the same thing we're

12  trying to obtain here, it wasn't only based on the e-mails and

13  the documents, it was also based on testimony.  Testimony both

14  from former employees of Backpage and from victims of

14:28:55 15  Backpage.  And that also formed part of the report.

16       So even if Backpage later somehow prevailed in the DC

17  circuit, I'm not sure exactly what remedy they're trying to

18  get there, but if the court rules that the district court in

19  that matter shouldn't have enforced the subpoena in the first

14:29:11 20  place, nevertheless the PSI report is out there with all this

21  moderator testimony talking about how widespread the knowledge

22  was within Backpage that virtually all these ads are illegal,

23  how moderators viewed the marching orders from management as

24  trying to sanitize prostitution ads, the victims testifying

14:29:29 25  that they located their underage daughters on Backpage would

14:29:33  1    call the company begging to get the ads taken down and

2    Backpage would refuse to do it, which, again, is knowingly

3    running ads once they've subjectively acquired knowledge of

4    its illegality.

14:29:46  5         Finally, separate from everything that's in the PSI

6    report, there's loads of predication here showing this isn't

7    some fishing expedition.  We've got these investigations from

8    local law enforcement agencies, we've got the NAAG letter,

9    we've got the First Circuit's finding last year in the civil

14:30:03 10    case that even though it found the CDA barred the victims in

11    that case from seeking civil damages, there was compelling

12    evidence that Backpage had created its moderation practices so

13    as to enhance the ability of sex traffickers to ply their

14    trade.

14:30:22 15         The bottom line is that grand jury subpoenas carry

16    with them a heavy presumption of validity.  Now we're not

17    coming before the Court disputing that subpoenas are subject

18    to judicial review.  There are circumstances where the

19    government overreaches, and courts have the ability to strike

14:30:35 20    down subpoenas when they overreach.  But this one doesn't.

21    This subpoena, which would cost Backpage virtually nothing to

22    comply with, goes to the heart of legitimate criminal

23    theories.

24         Backpage at times seems like they're arguing a

14:30:52 25    summary judgment or Rule 29 motion about whether the evidence

14:30:56  1    is ultimately going to be sufficient to sustain a criminal

        2    conviction.  That's the wrong way to look at this.  We're at

        3    the grand jury stage.  The grand jury is simply trying to get

        4    information so it can make an informed choice about how to

14:31:07  5    proceed.  So we ask the Court to enforce the subpoena.

        6              THE COURT:  All right.  Thank you, Mr. Lanza.

        7         Counsel, I wasn't paying close enough attention when

        8    Mr. Henze introduced you.  Are you Mr. Grant?

        9              MR. GRANT:  Mr. Grant.

14:31:30 10              THE COURT:  Okay.  Go ahead, Mr. Grant.

       11              MR. GRANT:  Thank you, Your Honor.

       12         I'd like to focus on three points and respond to any

       13    questions the Court has, and also respond to the government's

       14    position.

14:31:41 15              THE COURT REPORTER:  Excuse me, Counsel, could you

       16    pull the mic over.

       17              THE COURT:  Actually, you can kind of pull them both

       18    in and everybody will be able to hear you.

       19              MR. GRANT:  I have a low voice.  Can you hear me

14:31:53 20    okay?

       21         I think there are three central issues here and at

       22    least three central problems with the government subpoena.

       23    The first is that this unquestionably challenges and

       24    implicates First Amendment rights.  When the government sets

14:32:10 25    out to investigate a publisher for publishing and making

14:32:13  1    editorial decisions and what those decisions are, that's the

       2    heart of the First Amendment.  That's why the law *Bursey* in

       3    this circuit applies.

       4           Second, there's a very real concern here, Your Honor,

14:32:27  5    about the process how we got here.  Listening to the

       6    government's argument that this is merely copying the PSI

       7    subpoena, that makes it all more permissible, they think.  I

       8    think it raises a serious constitutional question about

       9    investigating under PSI initially and then using that as the

14:32:47 10    hook for a grand jury subpoena.  That's the second point.

      11           And the third is that the subpoena here, I think it's

      12    unreasonable, overbroad, and burdensome under any standard.

      13    There I'd like to talk again about the Western District of

      14    Washington's ruling, but also in connection with the

14:33:05 15    constitutional standards which should be applicable here.

      16           Let me start with the First Amendment issues.

      17           The argument that we hear from the government today

      18    is the same argument that Backpage has heard and courts have

      19    heard in countless cases now dating back over eight years.

14:33:30 20    It's an argument that's been rejected over and over again.

      21    This notion that all the ads on Backpage are for illegal

      22    conduct and they're all just prostitution ads.  Your Honor,

      23    nine different courts have now held that the content of escort

      24    ads on Backpage are, in fact, protected speech.

14:33:50 25           And there's a very real difference between -- an

14:33:53  1    escort ad, it is permissible and has been permissible, whether

       2    in the yellow pages or in newspapers, for scores of years.

       3    Escort services are regulated within the state of Arizona and

       4    many, many other states and cities.  So escort ads are

14:34:11  5    permissible.

       6         The courts have held, as I say, that that's also

       7    protected speech.  The Seventh Circuit in the *Dart* case, the

       8    district courts of Washington, Tennessee, and New Jersey, each

       9    in instances where states tried to pass laws to target

14:34:30 10    Backpage.  So it's established now that not only is there a

      11    presumption in favor of speech being protected, but in this

      12    case there's actually established law that the speech on

      13    Backpage is protected.  And that's the premise for the

      14    applicable standard to determine the appropriateness of the

14:34:50 15    grand jury subpoenas here.

      16         The government criticizes the *Bursey* case, suggests

      17    it's no longer good law.  I submit, Your Honor, it is in fact

      18    very much good law, and there are several cases.  We didn't

      19    have an opportunity in our surreply to cite the balance of

14:35:11 20    other cases that have upheld *Bursey* and have applied *Bursey*

      21    within the Ninth Circuit, and outside the Ninth Circuit, since

      22    it's been decided, but the government's position is all based

      23    on a series of cases that arose from *Branzburg* that have held

      24    there is no constitutional reporter's privilege.

14:35:31 25         When the government suggests that the Ninth Circuit

14:35:33   1   in *Bursey* did not take into account the analysis of *Branzburg*,

2   they really overlooked the rehearing statement from the Ninth

3   Circuit saying they expressly considered *Branzburg* and they

4   expressly say this does not change our analysis.

14:35:51   5        And there's a very real difference between the

6   reporter's privilege cases and the circumstances of *Bursey*

7   itself.

8        Reporter's privilege cases had to do with the

9   question of whether or not there's an absolute constitutional

14:36:04   10   privilege not to reveal confidential sources which have to do

11   with witnessing or evidence of a crime.  Directly going to a

12   criminal investigation and evidence of that crime.

13        The situation in *Bursey* is very different, and the

14   cases that have applied the *Bursey* standard are different.

14:36:21   15   They're situations where the government is going after an

16   organization, the press, or a publisher, and they're going

17   after them for those kinds of activities.  That directly

18   implicates the First Amendment and it does so in such a way

19   that the *Bursey* test applies.  Substantial relationship,

14:36:39   20   compelling interest to the government, substantial connection

21   in order to show that the information the government seeks is

22   directly relevant to its investigation.  And that this is the

23   least intrusive means the government can pursue for its

24   investigation.

14:36:56   25        So I respectfully disagree with the government that

14:36:58  1    *Bursey* is not the governing standard here.  I believe it is.

       2           And in this circumstance, what we're talking about

       3    really is very plainly an investigation of the public.

       4           If you look at the three requests that the government

14:37:10  5    has made, and the breadth of those requests, they cover

       6    effectively all editorial decisions throughout the country for

       7    any ads on Backpage over the course of the last seven years,

       8    plus any determinations about rules, about monitoring content,

       9    about barring users, about screening content, about words that

14:37:33 10    are to be permitted or not permitted on the website.  All of

      11    those things are exactly what websites do and exactly what

      12    publishers do.  So it's the heart of what the First Amendment

      13    should protect and *Bursey* should protect.

      14           THE COURT:  Let me ask you a question because I know

14:37:53 15    I'll forget it if I wait until the end of your comments.

      16           You distinguished *Bursey* a moment ago from *Lewis* and

      17    other Ninth Circuit cases by saying -- I think you said that

      18    *Bursey* was an instance of the government going after an

      19    organization.  *Bursey* specifically was the government trying

14:38:17 20    to compel two women to testify about what they knew regarding

      21    the publishing activities of the Black Panther newspaper.

      22    Now, there's no doubt the ultimate target was the Black

      23    Panther party and their activities, but the subpoenas were to

      24    individuals about what they knew or observed in their role in

14:38:44 25    the Black Panther publication.

14:38:48  1      *Branzburg* was quite similar in that it was the

       2  government going after individuals to find out what they knew

       3  about various criminal activities that were ultimately the

       4  target of the government there.  And *Lewis and Scarce* and *Wolf*

14:39:07  5  were all sort of the same.  So I'm not understanding,

       6  Mr. Grant, the distinction you're drawing between *Bursey* and

       7  those other cases.  Could you explain that?

       8      MR. GRANT:  Glad to, Your Honor.  The difference

       9  between the two being -- and there is a piece of *Bursey*, in

14:39:23 10  fact, remember, where the Ninth Circuit did permit

      11  questioning.  There were four different categories of

      12  questions.  It wasn't solely, though, that the two individuals

      13  who were testifying were reporters and they weren't solely

      14  being asked about information they had witnesses or obtained

14:39:39 15  from confidential sources.

      16      So remember that the one thing that the government

      17  said was permissible to ask, and they allowed the questions,

      18  had to do with -- I think the statement was "We are going to

      19  kill the president."  It was a statement within an editorial.

14:39:54 20  And they asked questions about who the "we" were that was

      21  referred to in that editorial.  As I recall, the government

      22  said -- the Ninth Circuit has said those kinds of questions

      23  are permissible.

      24      But what the government did in *Bursey* went well

14:40:08 25  beyond that because the rest of the questions had to do with

14:40:11  1    who makes the editorial decisions within the Black Panther

2    newspaper, what kind of decisions are there, who are these

3    people who are involved with the newspaper, and, much broader,

4    having to do with all of the publication of the newspaper and

14:40:23  5    the association of people within the Black Panther party as

6    well.  That's what the Ninth Circuit said could not be the

7    subject of investigation.  That was going too far.  That's the

8    component of *Bursey* that's all about the publishing conduct.

9              So, yes, there is an element of if the reporter has

14:40:42 10    witnessed a crime and a grand jury asks the reporter about

11    that, the reporter is not privileged to not disclose the

12    information.  Likewise, if the reporter's gotten the

13    information from a confidential source, there is no absolute

14    constitutional privilege.  There are various other privileges

14:40:58 15    as well.

16              Does that answer the Court's question?

17              THE COURT:  I think I understand.

18              MR. GRANT:  It really is a publishing function that

19    happened in *Bursey*.

14:41:06 20              THE COURT:  I understand the point you've made, I

21    think.

22              MR. GRANT:  If I may, let me turn to the second very

23    real concern here.

24              As I say, the government's view is that the grand

14:41:18 25    jury subpoena here is more permissible, more acceptable,

14:41:22   1   because it's patterned on -- it's actually verbatim duplicate

2   of the PSI subpoena.  And that raises the very serious

3   concern.

4         Remember that the PSI subpoena was issued by the

14:41:38   5   senate from its subcommittee on investigations subject to its

6   investigative powers.  Now, while I can't necessarily -- I

7   won't necessarily concede the government's position in that

8   case because that's pending appeal before the DC circuit, the

9   government's position is that the breadth of its subpoena

14:41:55  10   powers for legislative purposes is as broad as the United

11   States Code.  It's any subject that Congress could legislate

12   on.  The DC district court accepted that argument.  And based

13   on that threat, enforced the subpoena against Backpage and the

14   respondents there.

14:42:11  15         The government's purpose here is anything but

16   legislation.  The government's purpose here is punitive.  It's

17   to investigate targeting backpage.com.  They've said that.

18         So the requirements that the government has to

19   satisfy here are those that are applicable to a grand jury.

14:42:30  20   Here's the problem though.  If the PSI gets all of its

21   information under this ostensibly broader purpose and merely

22   says -- and the government merely comes in and says we want

23   the exact same information because they got it, that

24   completely messes the purpose -- the differences of the

14:42:49  25   purposes of the two different entities and completely can

14:42:51  1   override the constitutional protections that should be

2   applicable in the grand jury context.

3         In fact, really works out to be a recipe for how the

4   government can evade the constitutional protections that

14:43:05  5   should apply in the context of grand jury.  Congressional

6   committee goes out, does its broad investigation, then the

7   government turns around and says, the DOJ, we want the same

8   information because it's already been disclosed.

9         This is actually a very real concern in connection

14:43:20 10   with the investigation that the PSI did.  And I note it's one

11   of the issues that's pending before the DC circuit, is whether

12   in fact the purpose of that was legislative at all or,

13   instead, was a purpose of gathering information for possible

14   prosecutions.

14:43:41 15         And in that regard, just recently, this is from

16   February 14, the minority chairperson, Senator McCaskill,

17   issued a statement that after the PSI had finished their final

18   report, which said nothing about legislation, said nothing

19   about any sort of possible remedies or proposals about sex

14:44:07 20   traffic but merely focused on attacks on Backpage, then most

21   recently Senator McCaskill said "I'm hopeful the results of

22   our investigation will give future cases against Backpage the

23   legal ammunition to more effectively pursue justice against

24   the company and we didn't need to pass a new law to achieve

14:44:28 25   it."

14:44:29   1           The concern is this mechanism can be used, if you use

           2   the broader powers, or arguably broader powers, of a PSI and

           3   then use that for punitive purposes.  That's the concern in

           4   connection with the PSI subpoena.

14:44:43   5           The government also argues it should be fair game for

           6   the Court to consider all of that information.  I suggest,

           7   Your Honor, it should not.  In part because the decision by

           8   the DC district court is currently pending before the DC

           9   circuit court of appeals.  There are very significant problems

14:45:00  10   in that case about First Amendment, about the DC district

          11   courts shifting the burden backwards.  Remember, under the

          12   First Amendment it should be that the government has the

          13   burden to show the compelling interest for its investigations.

          14   That's true for the legislative context as it is in the grand

14:45:16  15   jury context.  The DC district court flipped it and put the

          16   burdens on the respondents instead.  And, as I say, there are

          17   serious questions that are still pending.

          18           THE COURT:  Before you leave that point, let me make

          19   sure I understand it.

14:45:34  20           It seems to me what you're saying, Mr. Grant, is that

          21   if a legislative committee is permitted to obtain information

          22   under its very broad subpoena powers, that fact should never

          23   be used to justify a grand jury subpoena that simply tracks

          24   the legislative subpoena because they have very different

14:45:59  25   purposes and powers.  Is that your argument?

14:46:04  1          MR. GRANT:  It's my argument that that should not per

2     se justify the grand jury subpoena.

3          THE COURT:  Right.

4          MR. GRANT:  I don't believe you can do that.  What

14:46:11  5     I'm suggesting is this court has an independent obligation to

6     look at the grand jury subpoena anew.  You can't take the PSI

7     subpoena as justification whether this is proper or improper.

8          THE COURT:  Well, that gets to my next question,

9     which I think you just answered, but I assume it's also your

14:46:27 10     position that if a legislative body undertakes a broad

11     subpoena and obtains information, that fact does not preclude

12     a grand jury from obtaining the same information if the grand

13     jury meets the appropriate test for grand jury subpoenas.

14          MR. GRANT:  I think I was answering that question as

14:46:48 15     well, Your Honor.  What I was suggesting was the grand jury

16     needs to satisfy the grand jury standards, can't bootstrap in

17     from the governmental standards.

18          But the other thing to keep in mind here is it's also

19     inappropriate, though, to say because the government obtained

14:47:04 20     that information -- and it's still subject to question whether

21     the government obtained it properly in the PSI context, that

22     is not a final decision, that's currently pending appeal -- to

23     use that information and to use the PSI's report in particular

24     here as justification for why this grand jury subpoena should

14:47:19 25     be permitted, I think it's entirely backwards and a serious

14:47:25  1  challenge to due process.  Because that's sort of taking if

2  you got the information improperly in the first instance and

3  then you choose to use it for some other purpose, then that's

4  permissible.

14:47:37  5       I listened to the government's suggestion that that's

6  like some third party has inappropriately obtained evidence

7  and the government could still use that.  Well, this is not a

8  third party.  This is one government body and another

9  government body which, at least from Senator McCaskill, was

14:47:58 10  one that was intending to help prosecutions by the other.  So

11  this is not a situation where it was inadvertently disclosed

12  information.

13       And the difficulty with the PSI report itself, I

14  don't have a fraction of the time I would need to go through

14:48:12 15  all of the inaccuracies and how much of a, really, just an

16  argumentative document that is.  But let me just sort of

17  summarize, because effectively what it's talking about --

18       THE COURT:  Let me interrupt you for a minute and

19  tell you this -- I don't know if this will help your

14:48:26 20  argument -- I have not read it.  I have deliberately chosen

21  not to read it because what I did before I decided whether or

22  not to read it is I read your surreply where you suggested I

23  shouldn't be looking at it.  And I thought until I'd heard the

24  argument here, I ought not read it.

14:48:43 25       So you can talk about what's wrong with it if you

14:48:46  1   want, but you don't need to do that to persuade me to

2   disregard what's in it because I haven't read it yet.  I'll

3   obviously decide after the hearing whether I should.  But I

4   just wanted you to be aware of that fact as you proceed.

14:48:58  5          MR. GRANT:  I appreciate that.  And there is still

6   pieces of the report and statements from the report that are

7   included within the government's briefs, and I just listened

8   to the government's arguments again focusing on pieces of

9   that.  So let me respond very briefly about that.

14:49:13  10          THE COURT:  That's fine.

11          MR. GRANT:  The real concern is this is all an attack

12   on Backpage's efforts to moderate, to review, to screen ads,

13   to block ads, make sure the content that's going on the

14   website is not offensive, not unlawful, and going through lots

14:49:36  15   of different mechanisms to do that.  It's an enormous job.

16   They use automated filters, they use multiple levels of manual

17   review.

18          But the gist of what the government is arguing about

19   this is, well, let's talk about this term that they banned or

14:49:54  20   that term they banned, and that must mean the underlying ads

21   are illegal and they must have been trying to intentionally

22   scrub illegality.

23          Your Honor, I can get into the particulars why that

24   makes no sense at all, that in fact what they were trying to

14:50:08  25   do is to make sure the ads that were submitted were not

14:50:11  1    offensive, not improper, and going through means to do that.

2    That's -- this is where my point about the CDA comes in.  That

3    is exactly what Congress intended.

4         Congress set out to say to websites, knowing that

14:50:23  5    there's such an enormous volume of information that comes

6    through them, they wanted to encourage websites to come up

7    with means to screen content, to do so voluntarily, and

8    whether that is automated or whether it's by manual review,

9    that is what Congress set out to do.

14:50:42  10        They also said -- and admittedly this is in the civil

11   context.  I'll take the government's point that there is an

12   exemption for federal criminal charges within the CDA.  I

13   accept that.  But the idea was that if we were to impose

14   liability on websites if they were imperfect in their

14:51:03  15   screening practices or if someone thought the screening

16   practices were inadequate, that would be exactly backwards

17   from what we intend to do to encourage websites to police

18   their content.  That's the problem.

19        What the government really is attacking is coming up

14:51:20  20   with characterizations and castigations of ways that were

21   being used to screen to try to suggest that those things were

22   nefarious when, in fact, they were intended for every good

23   purpose to try to make sure the content on the website was not

24   offensive and not improper.

14:51:37  25        Your Honor, if I may, let me turn to my last point.

14:51:43  1          The subpoena, I suggest, here is unreasonable and

2      burdensome under any standard, whether we're talking about a

3      First Amendment standard or Rule 17 standard.

4          If you look at the three categories of information --

14:51:56  5      the government seems to think because we only have three

6      requests, that's not very extensive.  In fact, that's -- if

7      you look at the breadth of those three requests, they're

8      enormously extensive, and if you look at all eight requests of

9      the subpoena, they effectively ask for everything about

14:52:13  10     editorial practices, ads, whatever's been posted nationwide

11     for seven years and all the decisions of the website about how

12     to do that, how to edit, how to publish, as well as revenue

13     information and a variety of other things in the other five

14     requests.

14:52:33  15         If you were to draw a comparison of those requests to

16     ones that the Western District of Washington considered, in

17     fact Western District of Washington requests were narrower.

18     There, the request had to do with specific ads for the most

19     part, although one piece was broader.  But they were ads

14:52:48  20     within specific markets:  State of Washington, Western

21     Washington, and later the government expanded it to say 16

22     other cities in the country.  Here, the request is for the

23     entire nation.  So all communications about editorial

24     decisions, monitoring and screening across the country.  So

14:53:10  25     the requests in Western District of Washington were actually

14:53:12   1    narrower rather than broader here.

2              The Court's decision in that case was that whether

3         you applied a First Amendment standard or not, the requests

4         that the government made were oppressive and burdensome, and I

14:53:32   5    suggest, Your Honor, the Western District of Washington, in

6         all fairness, did not find the government in bad faith.  The

7         issue that the Court raised was a real concern about whether

8         the government had shown any basis to prosecute, whether there

9         was any theory here to prosecute.

14:53:48  10             And what the court said was if the government's

11        theory is that all ads on Backpage are unlawful, they don't

12        need to undertake this investigation to pursue that theory.

13        They already know that argument, they already know the ads on

14        Backpage, they could already pursue that theory if they

14:54:03  15    thought they had a basis to do it.

16             But the problem is, this is a fundamental problem

17        under the First Amendment.  This notion is that you can argue

18        that simply because an improper ad appears that that somehow

19        infers knowledge.  And the Western District recognized that

14:54:26  20    the idea was sort of backwards.  What the government was

21        trying to do was investigate every ad posted on the website to

22        try to find something that was illegal about those ads.

23             That's the same problems we have here.  In effect

24        what the government is doing is boil the ocean approach.  We

14:54:44  25    want to know about every editorial decision that's ever been

14:54:48   1   made concerning ads over the last about seven years, and from

           2   that we'd like to find something to infer there was something

           3   improper or some knowledge of illegality.

           4            That's backwards.

14:54:58   5            And that's the case law we've suggested that dates

           6   back to *Smith versus California*.  It is the same case law that

           7   the government can't go seize all the books of a bookstore and

           8   try to find something that's obscene or unlawful in it.

           9            But the problem here is even greater than that.  If

14:55:15  10   the government could adopt this kind of theory, then virtually

          11   any website, any website, that screens content would be

          12   vulnerable.  Google screens content.  They block web pages all

          13   the time.  Hundreds of millions of them.  And, in fact,

          14   they've been investigated by government authorities

14:55:34  15   challenging whether their blocking techniques and screening

          16   techniques are good enough or not.

          17            Amazon does the same.

          18            EBay has all sorts of rules about what can and cannot

          19   be posted on their website.

14:55:48  20            So this theory that the government pursues here, we

          21   can go investigate about anyone's rule if there's something on

          22   the website that we don't like, it's a dangerous theory, a

          23   chilling theory for free speech interest.  That's the

          24   fundamental problem.

14:56:09  25            Your Honor, I would suggest the approach taken by the

14:56:11  1    Western District of Washington is instructive and I recommend;

2    the Court's attention to that --

3          THE COURT:  I've read both of Judge Jones' orders.

4          MR. GRANT:  Thank you.

14:56:21  5          But -- and I say that because what he did was he

6    looked very closely at the actual request the government was

7    making.  He said I'm not going to redraft your subpoenas for

8    you, but you can't do this; this is too broad.  There may be

9    some permissible request, there may not be, but come back to

14:56:43 10   me with something else.  That was the first of the subpoenas

11   he eliminated.

12         Then afterward, when the government did come back

13   with further subpoenas and had no better connection for their

14   cause of their investigation, he said, in effect, enough's

14:57:00 15   enough.

16         So I think his sort of measured approach as to how to

17   address the subpoenas and to recognize the real flaw was this

18   vast overbreadth of the subpoena in the first place, that it

19   recommends itself and Rule 17 suggests that is exactly the way

14:57:19 20   the analysis should go.

21         Are there other questions?

22         THE COURT:  Yeah.  Hold on just a minute.

23         MR. GRANT:  Sure.

24         THE COURT:  If a website operator republishes an

14:58:05 25   advertisement knowing, completely knowing and understanding

14:58:09  1    that the advertisement is for underage prostitution, meeting

2    the scienter requirement that was addressed in the briefing,

3    is it Backpage's position that that -- either that that is not

4    a crime or, if it could be characterized as a crime, it can't

14:58:34  5    be prosecuted because it's committed in a First Amendment

6    context?

7                MR. GRANT:  To take the Court's question, I'm

8    assuming they have knowledge not simply because somebody

9    submitted an ad, but they know something?

14:58:47 10                THE COURT:  Yeah, they know something more --

11                MR. GRANT:  Actual mens rea, actual knowledge?

12                THE COURT:  Right.  That's my hypothetical.

13                MR. GRANT:  So the situation of the hypothetical is

14    if there is actual knowledge, say through participation in a

14:58:58 15    venture, you're conspiring with somebody, you know they posted

16    an ad, you know the person involved is underaged, that's a

17    prosecutable crime, Your Honor.

18                THE COURT:  Let's assume, then, hypothetically, that

19    the government has reason to believe that a website operator

14:59:16 20    is doing that.  Is knowingly engaging in illegal activity by

21    publishing these advertisements, and let's say that the

22    government serves a grand jury subpoena on the website

23    operator to obtain information from the operator as to how the

24    ads are received and processed and revised and what

14:59:45 25    communications occur with the advertisers to try to figure out

14:59:49 1    whether or not the website operator does in fact know this is

2    illegal conduct.  Is it Backpage's position that that subpoena

3    is improper?

4              MR. GRANT:  The subpoena that the government issued

15:00:08 5    had to do with an incident of sex trafficking and they had a

6    basis -- I'm not sure --

7              THE COURT:  Let's say not even an incident.  Let's

8    say they have reason to believe, from various sources of

9    information, that this particular operator is knowingly

15:00:21 10   publishing advertisements for underaged prostitution.  So they

11   serve a subpoena saying we want documents showing how these

12   things get on your website, what editing you do, what

13   communications you have with the advertisers, because we want

14   to find out if you know, as we think you do, that this is

15:00:42 15   prostitution.

16             Is that subpoena an improper subpoena in some way?

17             MR. GRANT:  That's --

18             THE COURT:  I know it's a general question, but I'm

19   trying to get at the heart of what your argument is.

15:00:53 20            MR. GRANT:  I understand, but I think that's where

21   there's the distinction between what I was suggesting.  If

22   it's a specific incident and the government has information

23   that there was conspiracy, somebody was participating with the

24   website to traffic somebody underaged, that's an investigation

15:01:08 25   I think they can pursue.

15:01:10    1          The hypothetical Your Honor just gave me, though,

           2    suggests this more -- this broader sense of the government

           3    thinks that there's some basis to think that the website has

           4    knowledge that underaged people might be trafficked through

15:01:26    5    ads.  And that's where the problem comes in, because given

           6    that Backpage, for example, cooperates routinely with law

           7    enforcement about investigations, and, in fact, Backpage

           8    itself reports suspect ads, if the inference of knowledge is

           9    because something has happened that there have been incidents

15:01:49   10    and that Backpage knows of those incidents despite its best

          11    efforts to prevent them, then that becomes an improper basis,

          12    I think, to issue a subpoena to investigate a website.

          13          THE COURT:  Why?

          14          MR. GRANT:  Because the same theory would apply to

15:02:06   15    every website and every publisher.  Because improper content

          16    does go out over the web and it goes out over almost every

          17    website.  And the fact that you would be taking the

          18    cooperation, the efforts by a website publisher to prevent

          19    that from happening and turning that around to say that's the

15:02:27   20    basis for an inference of knowledge would be completely

          21    backwards.

          22          And, this is where I think the First Amendment

          23    concern comes into play, that's a very, very dangerous

          24    precedent for the First Amendment.  That's why what I'm

15:02:42   25    suggesting is under all the case law that has to do with

15:02:46  1    scienter and mens rea, the way that First Amendment

2    investigations have been done, the way that First Amendment

3    laws, regulations, prosecutions have been done, needs to be

4    done on the basis of a specific incident. It needs to be done

15:03:01  5    on something that's a much more significant and better

6    connection or basis for the government to pursue it.

7         The idea that if you set out to try to prevent it,

8    that shows your knowledge -- and by the "it" I mean some form

9    of sex trafficking -- that shows your knowledge that sex

15:03:22  10   trafficking can occur and therefore I can investigate you?

11   Every website's at risk now.  And that, I suggest, is exactly

12   the First Amendment backwards.

13        THE COURT:  How would you articulate what the

14   government needs to know before it can launch that kind of

15:03:42  15   investigation of a website operator?

16        MR. GRANT:  I've thought about that question and it's

17   a little difficult for me to articulate because I'm not the

18   one to suggest to the government how it should pursue its

19   investigations --

15:03:56  20        THE COURT:  Maybe I can ask it differently.  I don't

21   want to have you create the government standard.

22        *Branzburg*, which I do think is a relevant case, has a

23   fairly relevant discussion, in my view, on page 701 of 408

24   U.S. where it talks about what kinds of thing a grand jury may

15:04:33  25   investigate.  And Justice White in this decision says that,

15:04:42   1   I'm now reading from page 701:  "The role of the grand jury as

2   an important instrument of effective law enforcement

3   necessarily includes an investigatory function with respect to

4   determining whether a crime has been committed and who

15:05:01   5   committed it.  To this end, it must call witnesses in the

6   manner best suited to perform its task.

7          "When the grand jury is performing its investigatory

8   function into a general problem area, society's interest is

9   best served by a thorough and extensive investigation.  A

15:05:21  10   grand jury investigation is not fully carried out until every

11   available clue has been run down, et cetera."

12          But then he says, "Such an investigation may be

13   triggered by tips, rumors, evidence proffered by the

14   prosecutor, or the personal knowledge of the grand jurors."

15:05:42  15          He seems to be saying you don't have some sort of

16   probable cause threshold that the jury has to conclude before

17   it launches an investigation.  And this is in the context of

18   talking about when the grand jury function collides with the

19   First Amendment.

15:06:00  20          So what I'm wrestling with is the argument I think

21   you're making, that there is some threshold that has to be

22   cleared before a grand jury can investigate a website

23   operator's posting of information.  If you could address that.

24          MR. GRANT:  So let me address it in two respects.

15:06:17  25   First of all as to *Branzburg* itself.  As you'll recall,

15:06:17  1   *Branzburg* said in the decision, this is not -- we're not

2   deciding a First Amendment issue here.  They're deciding a

3   separate issue having to do with the reporter's privilege.

4   And, secondly, concurrence --

15:06:32  5            THE COURT:  Well, what they're deciding is whether

6   the First Amendment creates a reporter's privilege.

7            MR. GRANT:  And the decision is that it does not.

8            THE COURT:  Right.

9            MR. GRANT:  So there is not a First Amendment issue

15:06:42 10   for the privilege, claim privilege that they're addressing

11   there.

12            And recall that the occurrences say, and *Branzburg*

13   itself says, we have no doubt that grand juries are

14   constrained by the First Amendment and by the Fourth

15:06:56 15   Amendment, and Fifth, and that if there are circumstances

16   where the government goes beyond this kind of situation, that

17   courts are not without power to step in and monitor their

18   activities.

19            And that's where I think we come back to *Bursey*.  I

15:07:15 20   appreciate the Court's point *Branzburg* is at least on the

21   periphery of the First Amendment, it does relate to reporters,

22   that is true.  But it is a different circumstance.  When we

23   come back to *Bursey*, which still controls in this circuit,

24   your question about is there a need for a threshold of some

15:07:34 25   kind now comes into play.  So the quote, for example, the

15:07:37  1   Court was just reading, that's very certainly a good and

2   accurate description of the broad powers of the grand jury.

3        I suspect I could find you 20 or 30 more because,

4   obviously, grand juries do have broad powers and do have a

15:07:53  5   right to investigate for the sake of investigating to

6   determine whether a crime -- sorry.  That's a misstatement.

7   They have a right to investigate for purposes of determining

8   whether or not a crime was committed.

9        But, but, when they intrude on areas of First

15:08:10  10  Amendment speech, publisher's association rights, and the

11  press, then they have to show an immediate, substantial,

12  subordinating need, they have to show substantial relationship

13  of that information, and they have to show there isn't another

14  means to obtain the information.  And I suggest on the third

15:08:29  15  category in particular, Your Honor, this is where the

16  government can investigate in many, many other ways.  But

17  issuing a subpoena says give me -- in effect.  I realize this

18  isn't exactly what the subpoena says, but in effect, give me

19  everybody you've ever published and everything you've ever

15:08:49  20  decided about your publication and let me go through that.

21  I'll rummage through all that information and I'll see if I

22  can find something to suggest that you actually knowingly are

23  promoting some sort of illegality.

24        That's backwards.  That's the problem.

15:09:03  25        And I'm back to the Court's question about how would

15:09:05  1   I structure what the government should do. I don't know the

2   answer to that, but I do know it's considerably narrower than

3   the tact we've taken here.

4           THE COURT:  Let me ask you another question about

15:09:16  5   *Bursey*.

6           As you know, Judge Hufstedler and her panel issued

7   the *Bursey* decision, I think it was the day after *Branzburg*

8   came down.  No Westlaw to post it that day for them, so they

9   didn't know about it for a week.

15:09:38  10          MR. GRANT:  In fact, Shepardized it.

11          THE COURT:  Right.  *Branzburg* comes down, there's a

12   petition for rehearing, and she says in her opinion

13   accompanying the denial of the petition for hearing *Branzburg*

14   doesn't change the result.

15:09:58  15          Two years later we get the *Lewis* decision, *Lewis I*.

16   A member of the panel in the *Lewis* case is Judge Koelsch,

17   K-O-E-L-S-C-H, who was also on the panel in the *Bursey* case.

18   So he's well aware of *Bursey*.

19          MR. GRANT:  He's from my neck of the woods, Seattle.

15:10:19  20          THE COURT:  And he -- it's a procuring opinion so we

21   don't know if he wrote it, but *Lewis* addresses the clash

22   between the grand jury subpoena and First Amendment rights.

23   This was, as you well know, a radio station manager who

24   wouldn't turn over certain information it had obtained.

15:10:35  25   Doesn't even mention *Bursey*.  Cites *Branzburg* for the

15:10:40    1    controlling test.

2        Next year *Lewis II* comes down with three other

3    judges, including one from your neck of the woods, Judge

4    O'Scannlain, which doesn't even mention *Bursey*; relies

15:10:53    5    entirely on *Branzburg*.

6        We then get to 1993, the opinion that's sometimes

7    called the *Scarce* decision where yet another panel addresses

8    the colliding of grand jury powers and First Amendment, and

9    doesn't rely on *Bursey*.  It relies upon *Branzburg*.  And, in

15:11:17 10    fact, it says *Bursey* can be explained as falling within the

11    narrow exception that Justice Powell described in his

12    concurrence in *Branzburg*.

13        And then there's a 2006 decision, which I don't know

14    that we can even cite because it's unpublished and it's before

15:11:34 15    2007, which is sort of the trigger date for citing, but it is

16    a case that relies on *Branzburg* again.

17        Given that history, why isn't it a fair reading of

18    Ninth Circuit law to conclude that *Branzburg* is an example of

19    Justice Powell's, and also Justice White's, sort of exception

15:12:00 20    to the general rule that people can't refuse to turn over

21    information to a grand jury on the basis of the First

22    Amendment?

23        MR. GRANT:  That *Bursey* is an exception to --

24        THE COURT:  No, that *Bursey* falls within Powell's

15:12:13 25    exception.  That's what *Scarce* said.

15:12:15   1          MR. GRANT:  I think there's a concern about reading

2      too much into the series of cases, reporter's privilege cases

3      from *Lewis* all the way through *Scarce* and the 2006 decision.

4      They all fall squarely within *Branzburg*.  As a matter of fact,

15:12:28   5      I think it was *Scarce* itself that says that.  This is

6      controlled by that.

7          So the fact that they don't address the *Bursey*

8      circumstance is pretty obvious.  Because there's no need to.

9      There's no absolute reporter's privilege.  *Scarce* extends it

15:12:46  10      to the scholar's privilege.  It's effectively the same thing.

11      Radio station, largely the same thing.

12          So you've got very clearcut law, *Branzburg* is the

13      law.  There isn't a need to consider the *Bursey* analysis

14      because we're not outside the realm of someone simply claiming

15:13:04  15      the reporter's privilege.

16          So I don't think it's appropriate, given the holdings

17      of this cases don't affect a situation where there is

18      investigation of a publisher for publishing.  They don't

19      affect the kind of associational rights issues that were

15:13:20  20      involved in *Bursey*.  Given their holdings have nothing to do

21      with that, it's not surprising that they don't mention *Bursey*.

22          And saying *Bursey* is sort of a unique carve-out,

23      whether you do it in terms of Justice Powell's concurrence or

24      you say simply *Bursey* stands and it stands and as Judge

15:13:40  25      Hufstedler decided it, I agree it is a unique circumstance.

15:13:45  1   And it doesn't arise very often.  But it does arise here, and

2   it would arise in every situation where the government decides

3   it's going to investigate editorial practices of a website

4   because it doesn't like the content on the website.

15:14:04  5       THE COURT:  Are you aware of any Ninth Circuit case

6   or district court case within the Ninth Circuit that has

7   recognized what you just said, namely that *Bursey* is not a

8   reporter's privilege case, it's really a different kind of

9   case and it has continuing vitality in that area?

15:14:23  10      MR. GRANT:  Trying to recall whether it's Ninth

11  Circuit or not.  I know cases that have followed *Bursey* and

12  its analysis since *Bursey* was decided.  I don't recall, Your

13  Honor, whether they're in the Ninth Circuit or not.  I can

14  tell you they're in, for instance, circumstances of

15:14:36  15  investigating information about what books someone read, going

16  to a book seller and asking for that information, *Bursey*

17  applies and the analysis applies there.  So, yes.  And there

18  have been other circumstances as well.

19      So there's situations where we're not talking about

15:14:53  20  the straight reporter's privilege, but we're talking about

21  press, speech, book sellers, rights to decide what to read.

22  I'd be happy to give you a list of those cases.  I have it

23  from prior briefing I don't have it in front of me now.

24      THE COURT:  That's okay.  They're easy to find if

15:15:12  25  they've cited *Bursey*.

15:15:15    1          Last question for you when I looked over the eight or

2    nine cases you cited, the Seventh Circuit and all of the

3    district court cases, it appeared to me that the only one of

4    them that's a grand jury case is Judge Jones from the Western

15:15:28    5    District of Washington.  Am I right about that?

6          MR. GRANT:  That is correct, Your Honor.  The others

7    arise in different contexts.  I think the point we were trying

8    to make from all the cases is they're all consistent for the

9    notion that the government can't presume the speech is

15:15:44   10    illegal, that in fact escort ads are protected speech and that

11    efforts by the government to try to establish otherwise, the

12    burden always falls to the government in order to establish

13    its subordinating need and the connection for that, and that

14    there's no less-intrusive means to get the information.

15:16:03   15          That's -- let me just say this sort of in closing.

16    *Bursey* is entirely consistent with all First Amendment law.

17    It is the notion that it is always the government's burden in

18    a circumstance that directly infringes speech or implicates

19    speech rights.  The government has the burden to establish

15:16:24   20    something along the lines of what the *Bursey* test proposes.

21          THE COURT:  Okay.  Thanks, Mr. Grant.

22          MR. GRANT:  Thank you.

23          THE COURT:  Mr. Lanza.

24          MR. LANZA:  Couple points in responding to

15:16:42   25    Mr. Grant's arguments.  Talked about the state lawsuits that

15:16:46  1    they'd previously won where they challenged states that were

2    trying to bring criminal actions, and articulated that as a

3    broad judicial recognition that the First Amendment shields

4    what they do here.  I disagree.  Those were CDA cases not

15:17:00  5    First Amendment cases, and they beg the question what happens

6    here when the CDA doesn't apply.

7              There's discussion on how the fact that the senate

8    had a different legislative purpose in using its subpoena

9    power to get the documents than we have.  That may be true,

15:17:16 10    but our position here is not that because the senate got these

11    documents, we get them automatically without making any

12    showing whatsoever.  That's not our position.

13              Our position is we also have a compelling reason for

14    getting these.  We're conducting a federal criminal

15:17:33 15    investigation, which the Ninth Circuit has found time again is

16    a compelling interest of the government, and these documents

17    are relevant to what we're investigating.

18              We're not just trying to coast on the fact that the

19    PSI obtained them to show they're fair game for anybody.  But

15:17:47 20    here, they meet even the heightened *Bursey* test you just

21    talked to.  We do have a compelling need and they do go to the

22    heart and have substantial fit in connection with what we're

23    investigating.

24              I think that the most salient points I want to

15:18:05 25    address, even though Mr. Grant had some others, were right at

15:18:08  1   the end when the Court asked the two hypotheticals.  I think

2   those hypotheticals get exactly to the heart of the issues

3   here.

4        One, can a website operator be held criminally liable

15:18:18  5   for knowingly publishing advertisements with the knowledge

6   that they're for criminal activities?  Yes.  He admitted that.

7   That's what the *Lynch* case from DC came out with last year,

8   and that's exactly what we're trying to investigate here.

9   We're trying to figure out what they knew.

15:18:35  10        Then the Court's question was if the government

11   reasonably believes this is happening, can they subpoena it?

12   I think it was telling his answer was no, but I didn't really

13   see much of a principled reason for that other than "it would

14   be bad for my client here."

15:18:51  15        Of course.

16        Under *Branzburg* the court hit the nail on the head.

17   Grand juries have wide latitude when they think something is

18   afoot to investigate.  There is no requirement of a

19   preliminary showing of probable cause or anything like that.

15:19:03  20        But I'd further note that even though *Branzburg* sets

21   the bar very low, we would meet even a higher bar here.

22   There's all sorts of predication and evidence here on the

23   record justifying why the grand jury is conducting this

24   investigation.  There's statements from Backpage moderators

15:19:22  25   that everybody knows this is prostitution.  There's these

15:19:23  1   findings from law enforcement folks back in 2011 and 2012.

2   There's the First Circuit's findings.  So this isn't some

3   blind fishing expedition.

4        *Branzburg* sets a very low bar.  Wherever the bar is,

15:19:34  5   even if it's true -- I don't agree, but even if it's true that

6   somehow different sort of First Amendment claims raise the bar

7   a little bit in the First Amendment context, we've still

8   greatly exceeded wherever that bar is.

9        Unless the Court has any questions --

15:19:48 10   THE COURT:  I do have a couple of questions.

11        What statute, in your view, is violated if a website

12   operator knowingly publishes an advisement that is for illegal

13   activity?

14        MR. LANZA:  There's at least two of them that we're

15:20:04 15   focusing on here.  First is 1952 the Travel Act, which makes

16   it a crime to use interstate --

17        THE COURT:  Is that 18 USC?

18        MR. LANZA:  18 USC 1952.

19        THE COURT:  I thought that was part of racketeering.

15:20:18 20   MR. LANZA:  The Travel Act -- I'll give the Court a

21   chance to look it up.  I don't have the statute book in front

22   of me, but I'm pretty sure that's it.

23        THE COURT:  Well, 18 USC 1951 is in chapter 95 on

24   racketeering.  And 1952, maybe that's what you're focusing on

15:20:39 25   as part of the racketeering statute, is interstate and foreign

15:20:42   1    travel or transportation in aid of racketeering?

2         MR. LANZA:  And then I think subdivision -- I'm

3    going -- I don't have it in front of me.  There's a

4    subdivision that says it's a crime to knowingly facilitate

15:20:52   5    prostitution committed in violation of state law.

6         THE COURT:  Unfortunately, like all other

7    racketeering sections, this has got about a thousand words in

8    it.

9         Mr. Lanza -- Traci, would you hand this to him --

15:21:35  10    point out to me, if you would, what you're talking about, but

11    do it in the mic so the other counsel can hear you.

12         MR. LANZA:  So 1952(a)(3) makes it a crime whoever

13    uses any facility in interstate commerce, which would be the

14    internet, to otherwise promote, manage, establish, carry on,

15:22:17  15    or facilitate the promotion, management, establishment, or

16    carrying on of any specif- -- excuse me, of any unlawful

17    activity.  And the term "unlawful activity" is defined further

18    on in the statute.

19         So in our view we'd be focusing on using a facility

15:22:33  20    in interstate commerce to facilitate the promotion,

21    management, establishment, or carrying on of an unlawful

22    activity.

23         Then in 1952 subdivision (b)(1), "As used in this

24    section, 'unlawful activity' means," and then it goes on to

15:22:54  25    say "prostitution offenses in violation of the laws of the

15:22:57   1   state in which they're committed or of the United States."

2   THE COURT:  And what was the second statute that you

3   mentioned?

4   MR. LANZA:  Then 15 -- 18 USC 1591, which I believe

15:23:11   5   formed the basis for the hypothetical that the Court asked

6   earlier.  That's --

7   THE COURT:  I wish I had a statute in mind when I

8   asked it, but I didn't.

9   MR. LANZA:  That is the statute -- one of the cases

15:23:23   10   we cited in our brief is the District Court for the District

11   of Columbia *Backpage v Lynch*, which was decided last year.

12   Backpage brought a constitutional challenge to this statute

13   and the statute makes it a crime whoever knowingly in or

14   affecting interstate or foreign commerce recruits, entices

15:23:41   15   harbors, transports, provides, obtains, advertises, or

16   maintains by any means a person that the person has not

17   obtained the age of 18 be caused to engage in a commercial sex

18   act.  So that statute expressly makes it a crime for a person

19   to knowingly advertise an underaged sex trafficking victim.

15:24:12   20   THE COURT:  Okay.  Would you comment on the

21   distinction that Mr. Grant drew between *Bursey* and the

22   reporter privilege cases.

23   MR. LANZA:  Yeah.  I think the key case here is that

24   1993 case *In Re Grand Jury*, or *Scarce*, where the court

15:24:32   25   directly addressed the reporter's claim in that case -- or,

15:24:35  1    excuse me, the researcher's claim in that case that *Bursey*

2    supported his position.  And if the distinction they're

3    drawing were the correct distinction, the Ninth Circuit would

4    have said, you know, Mr. Researcher, you're out of luck here

15:24:49  5    because *Bursey* was a full-blooded First Amendment claim,

6    you're a researcher trying to rely on the reporter's privilege

7    and that is some lesser species of First Amendment claim, so

8    that's why you don't win under *Bursey*.  And that's not what

9    they said.

15:25:02  10        Instead they distinguish *Bursey* along the grounds

11    that we've laid out in our brief and that the court was

12    discussing.  They dismissed it as that was a case that was

13    decided before *Lewis*, and in any event it's consistent with

14    Justice Powell's concurrence in *Branzburg*.

15:26:20  15        THE COURT:  What is your response to Backpage's

16    argument that the three categories in the subpoena that you

17    want me to enforce are broader than the categories that Judge

18    Jones found overly broad in the Washington case because these

19    are nationwide, they go back four years, they uncover all

15:26:43  20    documents within these three categories during that entire

21    period?

22        MR. LANZA:  I disagree.  I think in part I disagree

23    because in Backpage they weren't simply -- excuse me, in

24    Washington they weren't simply seeking information about the

15:26:55  25    moderation practices, they were also seeking about information

about a host of other issues, including information about

whether Backpage employees had personally used the services,

which really seemed to be one of the things that caught the

judge's attention up there as improper and isn't present here.

But separately the question of whether or not it's

okay to seek nationwide evidence, of course it is.  Backpage

is a nationwide company.  A charge here would presumably

involve an allegation of a conspiracy between two or more

people to commit these statutes that I've mentioned earlier,

and perhaps some money laundering statutes that the violations

of 1591 and 1952 could be underlying SUA for.

A criminal prosecution in that case would include

everything Backpage did across the country.  Although the

conspiracy would have to take place, in part, in Arizona for

venue to be here, the crimes have nationwide applicability.

So we're -- it would be improper, and we're certainly

aren't limited in only investigating acts of advertising or

sex crimes that happened to occur within Arizona when the

grand jury has a legitimate basis under *Branzburg* and for

other reasons to think this was a conspiracy that stretched

outside of Arizona's borders.

THE COURT:  Okay.

Counsel, what I want to do is take a 15-minute break

to go back and review my thoughts and my notes and see if I

can give you a ruling today.  Or, if not, then I'll just come

15:28:29  1    in and tell you that, but I want to think through that before

       2    I just dismiss you.  So we'll break until 3:45.

       3         (Recess taken from 3:28 to 3:52.)

       4              THE COURT:  Thank you.  Please be seated.

15:52:30  5              Thank you for your patience, everybody.

       6         I am going to give you my decision now.  In an ideal

       7    world, I would write a more thorough written basis for the

       8    decision, but, frankly, the press of business right now in my

       9    other cases just doesn't afford me the time to do it, and I

15:52:48 10    don't want to wait a month or two to get you a decision.  So

      11    I'm going to give you the most complete description I can now

      12    on the record so that there's at least, hopefully, a

      13    reasonably clear basis for my decision.

      14         And to avoid undue suspense, I'm going to rule in

15:53:06 15    favor of the government and grant the motion to compel.  And I

      16    will try to explain my reasons as carefully as I can.

      17         The key issue, in my judgment, is what test applies,

      18    whether it is the test under the *Bursey* case from the Ninth

      19    Circuit that the respondent has argued or it is the test under

15:53:31 20    the *Branzburg*, B-R-A-N-Z-B-U-R-G, case and subsequent Ninth

      21    Circuit cases that the government has discussed.

      22         The *Branzburg* case, which is a 1972 decision from the

      23    Supreme Court, as we all know, held that the First Amendment

      24    does not create a privilege for news gatherers, newspaper

15:53:57 25    reporters, to refuse to turn over information subpoenaed by a

15:54:01  1   grand jury.  And the Supreme Court specifically declined to

2   recognize a First Amendment right to refuse to turn over

3   information.

4         Near the end of the decision, Justice White put a

15:54:17  5   caveat into the majority opinion where he said that if a grand

6   jury proceeding is being instituted or conducted other than in

7   good faith, or if it constitutes official harassment of the

8   press, undertaken not for purposes of law enforcement but to

9   disrupt a reporter's relationship, then the First Amendment

15:54:43 10   would prevail.  At least that is what he implied.  He said it

11   would be a different outcome.  And that's at pages 707 and 708

12   of the *Branzburg* decision, which is at 408 U.S.

13         Justice Powell, who concurred and who was the fifth

14   vote in the majority, and therefore arguably his concurrence

15:55:05 15   would have some influence on the scope of the ruling, was a

16   bit more specific on this caveat.

17         Justice Powell said that if a grand jury proceeding

18   is not be being conducted in good faith, or if it seeks

19   information bearing only remotely and tenuously on the subject

15:55:24 20   of the investigation, or if it implicates confidential source

21   relationships without a legitimate need of law enforcement,

22   then a court could step in with a motion to quash.

23         The *Bursey* case, decided by the Ninth Circuit the day

24   after *Branzburg*, adopted quite a different test, which has

15:55:49 25   been outlined by the parties in this case.  And as you well

15:55:53  1    know, and I won't take time to repeat it, it requires a

2    showing of a compelling government interest, and there's other

3    adjectives used to describe the strength of that interest that

4    has to be established.  In addition, the government showed --

15:56:25  5    the government must show that there is a substantial

6    connection between the information it seeks and the overriding

7    government interest.  And, third, the government must use a

8    means that is not more drastic than necessary to achieve the

9    government's purposes.

15:56:43  10        *Bursey* didn't mention *Branzburg* for obvious reasons,

11   but did say, as we've already indicated in this discussion, in

12   a petition or in denying a petition for re-hearing that the

13   different analysis in *Branzburg* would not have changed the

14   outcome in *Bursey*.

15:57:01  15        *Bursey* was decided in 1972.  It's at 466 F.2d 1059.

16   Two years later, the Ninth Circuit decided *Lewis versus United*

17   *States*, 501 F.2d 418.  As I've already mentioned, Judge

18   Koelsch was on the panel in the *Lewis* case.  He had also been

19   on the panel in the *Bursey* case.  The question was whether a

15:57:26  20   radio manager could refuse to turn over an audiotape and

21   document he had received for inspection by a grand jury, or

22   whether the First Amendment protected him from having to do

23   so.

24        The Ninth Circuit ruled that he could not assert the

15:57:45  25   First Amendment to oppose the grand jury subpoena, affirmed

15:57:49  1   his contempt citation for failing to do so.  Significantly,

2   the panel in *Lewis* did not cite *Bursey*.  They relied instead

3   on the good faith test that's set forth in *Branzburg*.  And at

4   501 F.2d, page 423, the Ninth Circuit said, "There was no

15:58:14  5   evidence that the request of the grand jury -- that the

6   requests of the grand jury were in the course of official

7   harassment of the press and not for legitimate purposes of law

8   enforcement."  And therefore ruled against the First Amendment

9   argument made by Mr. *Lewis*.

15:58:33  10   The next year Mr. *Lewis* was back in front of the

11   Ninth Circuit again in another contempt citation for having

12   failed to turn over another document that he obtained from a

13   confidential source.  A different panel of the Ninth Circuit

14   reviewed his contempt citation and affirmed it, and looked to

15:58:52  15   *Branzburg* as the controlling test.

16   It noted, and I'm now reading from page 238 at 517

17   F.2d, "The opinion of the court in *Branzburg* stated that a

18   reporter will be protected where a grand jury investigation is

19   instituted or conducted other than in good faith.  The court

15:59:21  20   continued, official harassment of the press undertaken not for

21   purposes of law enforcement but to disrupt a reporter's

22   relationship with his news sources would have no

23   justification.  A similar area of protection was suggested in

24   Justice Powell's concurring opinion."

15:59:42  25   So the Ninth Circuit was recognizing the caveat that

15:59:46  1  Justice White had recognized in *Branzburg* in saying it did not

2  compel protection of the First Amendment interests of

3  Mr. Lewis in this case, which was a 1975 decision.

4       After writing what I just read, the Ninth Circuit

16:00:04  5  said, "Appellate has shown no basis for relief under these

6  standards."  So that was clearly the standard it was looking

7  to.

8       In 1993 the Ninth Circuit decided In Re Grand Jury

9  Proceedings, 5 F.3d 397, also sometimes cited as *Scarce*,

16:00:23 10  S-C-A-R-C-E, versus United States.  We've talked about this

11  case today.  It was a Ph.D student who asserted a scholar's

12  privilege against turning over -- against describing

13  information he had learned from individuals who may have

14  conducted vandalism at the University of Washington.  He was

16:00:42 15  held in contempt for refusing to do so.  He made a First

16  Amendment argument that he was collecting information for his

17  Ph.D work and his studies that was protected by the First

18  Amendment.  And the Ninth Circuit rejected that argument and

19  affirmed the contempt citation.

20       Again, the Ninth Circuit looked to *Branzburg* to

16:01:00

21  decide whether or not the First Amendment could be asserted as

22  a defense against the grand jury subpoena and held that it

23  could not.  The Ninth Circuit again looked to the caveat that

24  Justice White had identified in the majority opinion.  And

16:01:18 25  then the Ninth Circuit said, on page 401, "Justice Powell

16:01:25  1   underscored this point in a separate concurrence in which he

2   noted that news gatherers may be entitled to First Amendment

3   protection where the information sought bears only a remote

4   and tenuous relationship to the subject of the investigation,

16:01:42  5   or where there is some other reason to believe that the

6   testimony implicates confidential source relationships without

7   a legitimate need of law enforcement."

8        The Ninth Circuit said that was the controlling test.

9   It wasn't satisfied by Mr. Scarce.  The Ninth Circuit then

16:02:04 10  said this test is consistent with *Lewis I* and *Lewis* II, that

11  I've already discussed.  And the individual in the *Scarce* case

12  who had been held in contempt argued that *Bursey* controlled

13  with its higher standard.  The Ninth Circuit disagreed and

14  said *Bursey*, "Is consistent with the limited area for

16:02:30 15  balancing of interests described by Justice Powell and

16  consistent with our discussion thereafter in the *Lewis* cases."

17  That's page 402 at 5 F.3d.

18        The Ninth Circuit in that decision seemed clearly to

19  me to say that *Bursey* is limited to the caveat that Justice

16:02:55 20  White identified in *Branzburg* and that Justice Powell

21  articulated more fully in his concurrence in *Branzburg*.  The

22  Ninth Circuit did not say in the *Scarce* case that *Bursey* was

23  inapplicable because it applies to a different kind of First

24  Amendment right.  Namely, publisher's rights or associational

16:03:20 25  rights.  It seemed clearly to put *Bursey* into the category of

16:03:24   1   the *Branzburg* caveat.

2        Finally, as already mentioned in *In Re Grand Jury*

3   *Subpoena*, sometimes referred as the *Wolf* case, at 201 Fed

4   Appendix 430, the Ninth Circuit 2006 memorandum decision, the

16:03:45   5   Ninth Circuit followed *Scarce*.  It didn't mention *Bursey*.

6   That's not a precedential decision so I can't rely on it, but

7   to me it at least shows the Ninth Circuit was consistent with

8   what apparently had been established in *Scarce* and in the two

9   *Lewis* cases.

16:04:03   10        So my conclusion is -- and, incidentally, I did,

11   while I was out, look at cases that have cited the *Bursey*

12   test, the compelling standards test.  There were six of them

13   cited.  None of them entered a holding consistent with *Bursey*.

14   Most were not even quite on point, they were citing it for

16:04:21   15   other First Amendment purposes.

16        So my conclusion is that the test that applies in

17   this case is the *Branzburg* test, and that Backpage's First

18   Amendment refusal to comply with the subpoena is valid only

19   if, as described by Justice Powell, I can conclude that the

16:04:44   20   grand jury investigation is not being conducted in good faith,

21   or that the information sought from Backpage bears only a

22   remote and tenuous relationship to the subject of the

23   investigation, or if I conclude that the grand jury is looking

24   into sensitive First Amendment information without a

16:05:06   25   legitimate need of law enforcement.

16:05:10   1        When I apply that test, I conclude that the subpoena

       2   is appropriate.  My conclusion is that this grand jury

       3   investigation, on the basis of the information that I have in

       4   front of me, is a good faith investigation and not being

16:05:28   5   undertaken for bad faith purposes.

       6        I still have not read what's been referred to as the

       7   PSI report that was attached to the government's reply in this

       8   case, so I'm not relying upon that.

       9        Rather, I'm relying upon the fact that the government

16:05:58  10   has cited other sources of information to suggest that there

      11   is reason to believe that Backpage has been knowingly involved

      12   with the posting of illegal advertisements.  I say "reason to

      13   believe."  I should -- that's probably too strong.  There's

      14   reason to at least have a suspicion about that.  I don't want

16:06:24  15   to characterize this as somehow being substantial proof, but

      16   it is certainly enough, in my view, to warrant a grand jury

      17   investigation.

      18        The examples are the statement in *Backpage.com versus

      19   *Dart,* 127 F.Supp. 3rd 919, and specifically page 922.  This is

16:06:44  20   a 2015 decision from the Northern District of Illinois noting

      21   that in over 800 sting operations responding to Backpage ads

      22   since 2009, law enforcement officers have made arrests for

      23   prostitution, child trafficking, or related crimes 100 percent

      24   of the time.

16:07:08  25        Similarly, in the *McKenna* case that's discussed by

both parties, 881 F.Supp. 2d, pages 1267 and '68, that

decision notes that many child prostitutes are advertised

through online escort advertisements displayed on Backpage.com

and that a Seattle vice detective has never contacted any

person, juvenile or otherwise, posting advertisements on the

escorts section of backpage.com who was advertising for

legitimate escort services.

       Third, there is the letter from the National

Association of Attorneys General to Backpage in August of 2011

noting that "Nearly naked persons in provocative positions are

pictured in nearly every adult services advertisement on

backpage.com, and the site requires advertisement for escorts

and other similar services to include hourly rates.  It does

not require forensic training to understand that these

advertisements are for prostitution."

       Again, I'm not reaching any conclusions as to whether

or not these suggestions of improper conduct by Backpage are

valid or warranted, but my judgment is, given that

information, the grand jury or a grand jury clearly has the

power to conduct an investigation.

       I won't take time to read it again, but I read

earlier in the discussion the quotation from *Branzburg*.  I

will read one sentence.  This, again, is at 408 U.S., page

701.  "Such an investigation may be triggered by tips, rumors,

evidence proffered by the prosecutor, or the personal

16:09:04  1    knowledge of grand jurors."  And that is citing another

2    Supreme Court case of *Costello versus United States.*

3         My conclusion based on this information is that

4    there's a good faith basis for the government to conduct an

16:09:20  5    investigation and I cannot conclude the investigation is being

6    conducted in bad faith, which would bring it within the first

7    criteria of Justice Powell's concurrence in *Branzburg.*

8         The second circumstance identified by Justice

9    Powell -- actually it's the third, but I'm going to take them

16:09:42 10    out of order.  The third circumstance is the First Amendment

11    prevents grand jury activity if the information sought is not

12    legitimately linked to a legitimate government purpose.

13         I cannot conclude that that circumstance exists in

14    this case.  It does appear to me that if an online website

16:10:10 15    operator knows that information that it is posting as

16    advertisements is for illegal activity, then a crime is being

17    committed.  And I don't think Backpage contests that based on

18    the exchange I had with Mr. Grant.  But specifically, it does

19    appear to me that 18 USC Section 1952(a)(3) and (b)(1), and

16:10:34 20    Section 1591, would criminalize the knowing publication of an

21    advertisement for illegal prostitution or other illegal

22    activity.

23         So it does appear to me that there is a legitimate

24    basis for the investigation into criminal activity.

16:10:53 25         The government has been clear, and I think they've

16:10:57  1    substantiated it, they're not doing this investigation on some

       2    theory of strict liability, that a website operator can be

       3    held criminally liable merely because somebody else gives it

       4    an ad that's promoting criminal activity.  The government

16:11:12  5    seems clearly to agree there has to be a scienter requirement,

       6    knowledge on the part of the website operator.  If there is,

       7    it appears to me there is the possibility of criminal conduct,

       8    and, therefore, that the objective for which the investigation

       9    is being undertaken is a legitimate objective and does not

16:11:36 10    fall within the caveat Justice Powell identified where

      11    information intrudes in the First Amendment without a

      12    legitimate need for law enforcement.

      13         The final category that Justice Powell identified is

      14    when a grand jury seeks information that bears only a remote

16:11:57 15    and tenuous relationship to the subject of the investigation.

      16    I've read the three subpoena categories the government seeks

      17    to enforce several times.  It does appear to me that this

      18    information is designed to determine whether or not Backpage

      19    and its personnel knew that advertisements posted on the

16:12:28 20    website were for illegal activity.  It appears to me each

      21    category is designed to get at information that will go to

      22    that specific question, which is a key question in whether or

      23    not crimes have been committed.

      24         I cannot conclude that this information bears only a

16:12:47 25    remote and tenuous connection to that inquiry, which I think

16:12:53  1    is a legitimate inquiry.  And, therefore, I don't find that

2    the scope of the three categories of information the

3    government seeks fall within one of Justice Powell's

4    exceptions to the general rule that the First Amendment is not

16:13:13  5    a bar to grand jury information.

6        I do want to add that I did read carefully the

7    decisions by Judge Jones from the Western District of

8    Washington, which are attached as Exhibits A and B to

9    Backpage's opposition to the government's motion to compel.

16:13:40 10        Judge Jones quashed the subpoenas in that case, not

11    on First Amendment grounds, as was pointed out, but because

12    they were unduly burdensome and overly broad.  And in fact, in

13    his first decision, which is Exhibit A, he specifically said

14    "In this case, however," I'm reading now at the bottom of page

16:14:10 15    22 of his opinion at Exhibit A.  "In this case, however,

16    Backpage would succeed in quashing the subpoenas regardless of

17    the Court's approach to the First Amendment issues.  For that

18    reason, the Court will not answer unsettled First Amendment

19    questions today."

16:14:27 20        And Judge Jones found the subpoenas overly broad in

21    part, I think, out of his exasperation with the fact that the

22    government wouldn't tailor them as he had instructed them to

23    do and came back with broader subpoenas than he had found

24    appropriate.

16:14:44 25        But it was also clear that Judge Jones didn't find

16:14:47   1   the First Amendment a bar to appropriately tailored inquiries

2   because he enforced the second subpoena and Backpage produced

3   7,000 pages of documents in response to it.

4          So I view the situation in front of Judge Jones as

16:15:02   5   different from the situation here, and his decision is not

6   directly relevant to what I'm having to decide.

7          A final couple of points.

8          The authorities relied upon by Backpage, the nine or

9   so cases that are cited, as mentioned during our exchange, are

16:15:33  10   not grand jury cases with the exception of Judge Jones'

11   decision.  I think that's a significant consideration.

12          I agree with Backpage's point that they do recognize

13   there are First Amendment rights implicated by the things

14   Backpage does.  I think that's clearly correct.  But there

16:15:50  15   were First Amendment rights implicated by all of the people

16   who were before the courts in *Branzburg*, in *Lewis*, in *Scarce*,

17   in *Wolf*, and the question was what happens when First

18   Amendment rights and grand jury investigative powers collide?

19   And none of those cases address that issue, with the exception

16:16:12  20   of Judge Jones, and I've already explained why I think that is

21   distinguishable.

22          So although I agree those cases stand for the

23   proposition that Backpage has First Amendment rights with

24   respect to what it does, they don't control, in my judgment,

16:16:27  25   what happens when those rights collide with a grand jury

16:16:30  1   subpoena.  That is decided, in my judgment, under the

2   *Branzburg* test, and, for the reasons I've described, I don't

3   believe that test calls for the subpoenas to be quashed here.

4        I've said it a couple of times but I'll say it again,

16:16:46  5   I have not read the PSI report.  I haven't relied on anything

6   in it.  I don't know whether it would be appropriate for me to

7   do so or not, but it's not necessary for me to do so, so I've

8   set that aside and I have not considered it.

9        The last point -- I keep saying that.  I think this

16:17:02  10  is the last point.  I am not concluding that the subpoena in

11  this case is appropriate because the legislative subpoena was

12  appropriate.  That, to me, is an apples and oranges issue.  It

13  would be inappropriate for me to say the subpoena from the

14  grand jury in this case is proper because another judge found

16:17:25  15  the legislative subpoena proper.  I agree with what Mr. Grant

16  said, they're different inquiries, they're different tests,

17  and I've tried to apply what I believe to be the grand jury

18  test under *Branzburg*.

19        The legislative subpoena is factually relevant in the

16:17:48  20  sense that Backpage has already gone through the process of

21  finding and collecting these documents and so there hasn't

22  been an argument made in this case that it would be unduly

23  burdensome in the sense of time and expense to respond.  But

24  that is merely a fact.  That's not in any way a controlling

16:18:08  25  factor in the analysis applied to the First Amendment.

16:18:12  1    So that's my best description of the reasons for the

2    decision.  Obviously you can get a copy of the transcript if

3    you decide to appeal this, and hopefully the Court of Appeals

4    will be able to tell how I got to the conclusion that I did.

16:18:25  5    Are there any questions?

6    MR. LANZA:  Could I have just a moment?

7    THE COURT:  Yeah.

8    MR. LANZA:  Your Honor, only thing we'd ask is now

9    that the order's been entered, technically they need to comply

16:18:56 10    because the compliance date has already past.  We don't expect

11    them to comply right now, they need to evaluate it and figure

12    out what their next step is going to be, but it might make

13    sense for the Court to set a reasonable date, I don't know,

14    maybe a week or two out where compliance would be expected --

16:19:12 15    THE COURT:  That's a fair point.  I was thinking we

16    should say in the minute entry that comes out that compliance

17    is required within X period of time to give some limit to my

18    order.  But I'm interested in your thoughts about what that

19    ought to be.

16:19:26 20    MR. GRANT:  Yes, Your Honor.  To give us reasonable

21    period of time to determine how we want to respond to the

22    Court's ruling.  I'm sort of shooting blind.  I would say I

23    would ask for a month if that's possible.

24    THE COURT:  Well, today is the 22nd.  I'm going to

16:19:52 25    say I'm going to require compliance by Friday, March 17th.

16:20:09  1   That's a little over three weeks.  Seems to me that's enough

2   time to sort through the legal issue and decide what strategy

3   you want to follow.  And if production is required, it seems

4   to me it could happen within that amount of time as well.

16:20:21  5   Unless, Mr. Grant, you see any particular problem with three

6   and a half weeks.

7          MR. GRANT:  No.  The only thing that comes to mind,

8   Your Honor, is if we do pursue appellate rights, we may be

9   back to suggest compliance be stayed.

16:20:35  10         THE COURT:  Sure.  I recognize if you decide you're

11  going to appeal my decision that we'll need to address stay

12  issues, and you would certainly have the right to do it.

13         I'll tell you what I would suggest if we get there,

14  though, is if you decide you're going to appeal and you want a

16:20:50  15  stay, confer with the government.  If you can't reach

16  agreement, call me and let's talk about how best to tee up

17  that issue, rather than just have everybody launch into

18  briefing.  If I need briefing on it, then we can do some

19  focused briefing.  But that would be more efficient, to me,

16:21:07  20  than just having a motion to stay filed.

21         MR. GRANT:  Thank you, Your Honor.

22         THE COURT:  Okay.  Thank you all for your patience.

23         MR. LANZA:  Thank you, Your Honor.

24      (End of transcript.)

16:21:27  25                    *  *  *  *  *

1                        **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4  appointed and qualified to act as Official Court Reporter for

5  the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8  a full, true, and accurate transcript of all of that portion

9  of the proceedings contained herein, had in the above-entitled

10 cause on the date specified therein, and that said transcript

11 was prepared under my direction and control, and to the best

12 of my ability.

13

14         DATED at Phoenix, Arizona, this 27th day of February,

15 2017.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter

21

22

23

24

25

# **<u>Exhibit E</u>**

1

2

3

4

5

6

7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

8

9    In the Matter of                                    )    GJ 16-4
                                                         )
10   MOTION TO COMPEL AND CROSS        )    **MINUTES**
     MOTION TO QUASH GRAND JURY )    Hearing held on 2/22/2017 at 2:00 p.m.
11   SUBPOENA                                            )
                                                         )
12                                                       )
                                                         )
13                                                       )
                                                         )
14   ———————————————————————)

15   PRESIDING JUDGE: HONORABLE DAVID G. CAMPBELL

16   Present: AUSA Dominic Lanza, DOJ Reginald Jones; Attorneys for Backpage.com and
17   Carl Ferrer, Tom Henze, James Grant, Janey Henze Cook and General Counsel Liz
     McDougall; Court Reporter Patricia Lyons; Courtroom Deputy Traci Abraham

18   Hearing held on motion to compel filed on 12/8/2016 by the Government and cross motion
19   to quash grand jury subpoena filed on 1/23/2017 by respondent Backpage.com, LLC and
     Carl Ferrer.

20   Court grants the motion to compel and denies the motion to quash for the reasons stated on
21   the record.

22   Court will require respondent to comply with the grand jury subpoena by 3/17/2017.

23   If the respondent intends to file an appeal and wishes to stay the compliance with the
     subpoena, respondent to confer with the government. If the parties are unable to reach an
24   agreement contact the Court by phone to set a hearing.

25   Time in Court: 2:08 pm to 3:28 pm
                           3:52 pm to 4:21 pm
26   cc: Counsel

27

28

# **<u>Exhibit F</u>**

1  ELIZABETH A. STRANGE
   Acting United States Attorney
2  District of Arizona

3  KEVIN M. RAPP, AUSA (Arizona Bar No. 14249, kevin.rapp@usdoj.gov)
   DOMINIC LANZA, AUSA (Cal. Bar No. 225989, dominic.lanza@usdoj.gov)
4  Two Renaissance Square
   40 N. Central Avenue, Suite 1200
5  Phoenix, Arizona 85004-4408
   Telephone (602) 514-7500
6
   REGINALD E. JONES, Trial Attorney (Miss. No. 102806, reginald.jones4@usdoj.gov)
7  U.S. Department of Justice
   Child Exploitation and Obscenity Section
8  1400 New York Avenue NW Suite 600
   Washington, DC 20530
9  Telephone (202) 616-2807
   Attorneys for Plaintiff
10
11              IN THE UNITED STATES DISTRICT COURT
12               FOR THE DISTRICT OF ARIZONA

13  In re Grand Jury Subpoena No. 16-04-108        GJ No. 16-4

14                                          **PARTIES' JOINT NOTICE RE:**
                                            **SUBPOENA COMPLIANCE**
15
                                               **(Filed Under Seal)**
16
                                      **Assigned to Hon. David G. Campbell**
17

18         The parties wish to provide a status update to the Court in this matter.  On June 29,

19  2017, the Ninth Circuit affirmed this Court's order requiring Mr. Ferrer and Backpage to

20  comply with subpoena number 16-04-108. On September 7, 2017, the Ninth Circuit issued

21  its mandate.  On September 15, 2017—well before the 14-day deadline imposed by this

22  Court's compliance order—Mr. Ferrer and Backpage produced a hard drive to the United

23  States containing documents responsive to subpoena number 16-04-108.

24         The United States is currently reviewing the hard drive, and working with

25  Backpage's counsel on some logistical issues, to ensure that compliance is complete.

26
27
28

1    Respectfully submitted this 21st day of September, 2017.

2                                    ELIZABETH A. STRANGE
                                     Acting United States Attorney
3                                    District of Arizona

4

5                                    KEVIN RAPP
                                     DOMINIC LANZA
6                                    Assistant U.S. Attorneys

7                                    REGINALD E. JONES
                                     Trial Attorney, CEOS
8

9    I hereby certify that on this date, I hand-delivered an original of the foregoing under-seal
     document to the Clerk of the U.S. District Court and sent copies via electronic mail to:
10

11   James C. Grant
     DAVIS WRIGHT TREMAINE LLP
12   1201 Third Avenue, Suite 2200
     Seattle, WA 98101
13   jamesgrant@dwt.com

14

15   Robert Corn-Revere
     DAVIS WRIGHT TREMAINE LLP
16   1919 Pennsylvania Avenue, NW, Suite 800
     Washington, D.C. 20006
17   bobcornrevere@dwt.com

18

19   Tom Henze
     Janey Henze Cook
20   HENZE COOK MURPHY, PLLC
     4645 North 32nd Street
21   Phoenix, Arizona 85018
     tom@henzecookmurphy.com
22   janey@henzecookmurphy.com

23

24

25

26

27

28

                                    - 2 -

# **<u>Exhibit G</u>**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

In re Grand Jury Subpoenas     )   GJ No. 16-04
16-04-108,                     )   February 9, 2018
_____)   2:30 p.m.

BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION HEARING

APPEARANCES:
For the Government:
    U.S. Attorney's Office
    By:  **Dominic William Lanza**, Esq.
         **Kevin M. Rapp**, Esq.
    40 North Central Avenue, Suite 1800
    Phoenix, Arizona 85004

    U.S. Department of Justice:
    By:  **Reginald E. Jones**, Esq.
    1400 New York Avenue NW Suite 600
    Washington, DC 20530

For Backpage:
    Davis Wright Tremaine
    By:  **Zana Z. Bugaighis**, Esq.
    1201 Third Avenue, Suite 2200
    Seattle, Washington 98101

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1          (Proceedings begin at 2:30 p.m.)

2          THE CLERK:  In the matter of the Grand Jury 16-4, on

3    for a motion hearing.

4          Will the parties please announce?

5          MR. LANZA:  Good afternoon, Your Honor, Dominic Lanza          14:31:06

6    with Reggie Jones and Kevin Rapp on behalf of the United

7    States.

8          THE COURT:  Good afternoon.

9          MS. BUGAIGHIS:  Good afternoon, Your Honor, Zana

10   Bugaighis on behalf of Backpage.                              14:31:13

11         THE COURT:  Good afternoon.

12         All right.  I have -- I've read the motion, the

13   response and the reply.  I've looked at some, not all of the

14   attachments.  I have read the *Graf* case and the *Beiter* or

15   Beater case, B-E-I-T-E-R.  And *Graf* is G-R-A-F.  So I         14:32:17

16   understand the issues that have been presented by the parties.

17         This is the Government's motion.  Why don't we get

18   your comments, Mr. Lanza, in light of the briefing that's been

19   completed.

20         MR. LANZA:  Thank you, Your Honor.                       14:32:35

21         I'll start first with the public relations firms.

22         I think the way to think about this issue is, the

23   general rule, the presumption in the Ninth Circuit everywhere

24   is that generally when there's a attorney/client privilege

25   between a corporation and its outside counsel, the sharing of   14:32:48

UNITED STATES DISTRICT COURT

1    privileged information with a third party destroys the

2    privilege.

3           Now, there are exceptions to that.  There's this

4    developing body of law that suggests there are certain very

5    narrow factual circumstances where, even though the disclosure          14:33:01

6    of privileged information goes to a third-party consultant, if

7    there's specific things about the nature of that consultant's

8    relationship with counsel and the client, there's a way to

9    thread that needle and have that not effectuate a waiver of the

10   privilege.                                                             14:33:19

11          But I think, when canvassing all the law on this, two

12   principles emerge.

13          The first is that this is a very fact-intensive test.

14   The evidentiary burden always falls on the party claiming an

15   attorney/client privilege to submit evidence to meet their             14:33:33

16   burden.  But in this area, because this is such an exception to

17   a widely-held rule, because it requires so many specific

18   factual showings, that the proponent really needs to come

19   forward with affidavits, with contracts, to give the Court a

20   very well-developed sense of exactly what the relationship was         14:33:52

21   between these parties.  How big the firms were, what their role

22   was, what exactly they were doing, who hired them, whether they

23   exercised independent judgment.  A host of different factors

24   that come out time and again from the cases.

25          The other principle that emerges is that there's               14:34:07

1   actually two different that are analytically pretty distinct

2   tests that a party that's trying to claim privilege as to a

3   third-party consultant can travel under.

4        One of them is called the *Kovel* theory and the other

5   one is the functional equivalent.  *Kovel*, in a nutshell, is        14:34:23

6   that the outside attorneys had to hire a specialist to educate

7   the attorneys about some specific PR-related function that was

8   so intertwined with the legal representation that the attorneys

9   really needed to rely on these people to do their job better.

10        You know, the sort of concept is the same way that if        14:34:42

11  documents need to be translated, when you bring in a

12  translator, they may not be the client or the attorney.  There

13  are certain specialized services that in the right

14  circumstances the attorneys just need this help in order to do

15  their job correctly.                                                 14:34:55

16        And so that's one band of cases where there hasn't

17  been found to be a waiver with PR firms, is where the outside

18  counsel hired the firm in order to help counsel do its job

19  better.

20        The Martha Stewart case, also known as *In re Grand*          14:35:07

21  *Jury Subpoenas* is sort of one of the quintessential examples of

22  that one.

23        The other theory, which is just totally different

24  analytically, is the functional equivalent theory.  And that's

25  that the third-party consultant wasn't hired by the attorneys       14:35:19

1    to help the attorneys, they were actually essentially the same

2    thing as an employee of the company.  And even though they

3    might seem like an outside consultant or an independent

4    contractor on paper, when you really look at what they do on

5    day-to-day basis, there's no distinction between what they do          14:35:37

6    and a full-blown employee of the company.

7            So where are we here in this motion?

8            Backpage has elected to go down solely on this

9    functional equivalent theory and it hasn't submitted any

10   evidence.  And I think that we should prevail for both of those        14:35:51

11   reasons, but I really can't get past the lack of evidence here.

12           When you look at the key cases that they rely on, the

13   Court's read *Beiter*, they submitted all sorts of affidavits in

14   that case to really prove up exactly what this relationship was

15   like.  And you see these courts time and again, the few courts         14:36:08

16   that have ruled for the privileged proponent, have emphasized

17   how they were only able to get there because they had such a

18   well-developed evidentiary record.

19           And in contrast, a couple of the cases we've cited

20   where courts have rejected privileged claims, they've gone out         14:36:22

21   of their way -- you know, there's a case cited on page 6 of our

22   reply, the *Energy Capital* case, that I think in sort of common

23   sense language hits the nail right on the head where they say,

24   you know, it's possible to have the privilege extend to

25   third-party consultants, but it's really unusual.  And the            14:36:42

UNITED STATES DISTRICT COURT

1    party that wants to travel on this unusual ground really needs

2    to prove it up and submit all the evidence to get there.  And

3    when they fail to do that, they just lose for that reason.

4         So here Backpage, we've been pleading for four months

5    for them to turn over the contracts that were used to hire          14:36:58

6    Sitrick, JMS, and Culloton Strategies.

7         Parenthetically, for Backpage to have put these

8    documents on their privilege log in the first place years ago,

9    they ought to have done this analysis and convinced themself

10   there was a good-faith basis for invoking this very narrow         14:37:16

11   exception.

12        Nevertheless, we've been asking all this time.  They

13   haven't turned them over.  They didn't turn them over during

14   the meet and confer process.  And then surprisingly, they

15   didn't even turn them over as evidence in support of their         14:37:28

16   motion here.

17        So the Court is just left with a barren record about

18   anything about the specifics of these relationships.  And when

19   you're the privileged claimant that have the burden, that's a

20   big problem.                                                       14:37:40

21        But stepping aside from that, the other reason why

22   with respect to the public relations firms I think we should

23   prevail, when you -- I think there's a certain irony to their

24   reliance on *Beiter*, because it shows factual circumstances that

25   are just so dramatically different from what we have here.         14:37:56

1          *Beiter* was this case where you've got a two-person

2     closely-held partnership that doesn't even have employees, it's

3     this sort of single-purpose vehicle just set up to develop a

4     parcel of land.  They executed an independent contractor

5     agreement with this third party, but he is the closest thing          14:38:13

6     you could have to an employee.  He works out of their office.

7     He has an equity stake in the partnership.  He's there every

8     day.  This is basically what he does with 100 percent of his

9     time to the point that two or three years later they actually

10    tear up the independent consultant agreement and hire him as an       14:38:30

11    employee.

12          I can see why under those circumstances, which I would

13    add the parties established through affidavits and contracts

14    and a rich evidentiary showing at the hearing, you might

15    consider that type of person a functional employee even though       14:38:43

16    on paper they were characterized as an independent contractor.

17          Similarly, in *Graf*, it's the founder of the company

18    that's the face of the company.  And the only reason they

19    pretend that he's an independent contractor is because there's

20    this cease and desist order from the State of California that        14:39:00

21    says you can't work in the insurance industry.  So they say,

22    okay, we won't employ him, we'll just pretend that he's an

23    independent contractor.

24          Again, those are very extreme and unusual facts.  And

25    with the appropriate evidentiary record you can see how we'll        14:39:13

1    treat that person as the functional equivalent of an employee.

2           This case couldn't be more different.  Backpage, at

3    the time these PR firms we believe were hired -- and, again,

4    how to we know when they were hired?  There's no evidence --

5    had at least 70 plus employees in the U.S., 50 contractors in        14:39:31

6    India.  They had offices in Phoenix and Dallas.  They're

7    earning tens of millions of dollars a year.  They have, as

8    we've established through our reply, in-house people issuing

9    press releases, drafting editorials, going on CNN to do

10   PR-related things.                                                   14:39:51

11          And on top of all of that, they engage these three big

12   PR firms.  This isn't like the consultant in *Beiter* who was

13   just one guy, who this is what he did with 100 percent of his

14   time is work for the company.

15          I would note, one of the firms is Sitrick & Company.         14:40:06

16   How to we know that Sitrick is a big PR firm with a lot of

17   different clients?  It's because in the *O'Hara* case that we

18   cited, which is another case where a court found that a

19   disclosure to a PR firm resulted in a waiver, Sitrick was the

20   PR firm in that case too.                                           14:40:23

21          These are big firms with clients all over the place.

22   They happen to be providing consulting services to another huge

23   company.  That is just so far afield from what a functional

24   equivalent could possibly be under *Beiter* and *Graf*, that for

25   those two reasons we'd ask the Court to find that Backpage         14:40:38

1    hadn't met its burden and that they should be ordered to

2    disclose all of the PR firm related documents that are on their

3    log.

4           I'm happy now to go into SSP Blue and Duff & Phelps.

5    Or if you think it's better to go one at a time, whatever you          14:40:54

6    want.

7           THE COURT:  No, go ahead.

8           MR. LANZA:  With respect to SSP Blue, I think this is

9    the closest one of the three on the record.

10          The principal of SSP Blue, Mr. Nigam, is an attorney,          14:41:06

11   he was a former AUSA.  And Backpage has asserted in their

12   privilege log that the documents they've withheld contain

13   privileged information.

14          But this isn't a -- this case is still closer because

15   SSP Blue is engaging in unusual functions that sure seem to          14:41:28

16   blur the line between business functions and legal advice.

17   It's not registered as a law firm.  It doesn't hold itself out

18   as a law firm.  When you look at the things it advertises and

19   touts on its website, it's all business advice.  It's

20   e-security, it's privacy, it's crisis management.  It's -- you        14:41:44

21   know, I can't remember the exact word, but it's sort of

22   leveraging its relationships to set up meetings.

23          We actually -- one of the things that's come out in

24   this case is it appears that Mr. Nigam used his contacts as a

25   former DOJ employee to set up a meeting between Backpage and          14:42:01

1    the National Center for -- NCMEC, the Center For Abused

2    Children, which that's not legal services, that's using

3    relationships and leveraging business things.  That's not the

4    same type of behavior that would ordinarily be treated as legal

5    advice.                                                          14:42:18

6           So we've identified a good body of case law suggesting

7    that when there are -- it's not just a fishing expedition, but

8    when there are articulable reasons that are grounded in good

9    faith and actual things that are out there in the record that

10   make the party opposing the privilege claim suspect that this   14:42:38

11   may not have been legal advice, that again you go back to the

12   attorney/client privilege is a privilege that the proponent who

13   wants to invoke has the burden of establishing.  And it's meant

14   to be construed narrowly, because it's in derogation of the

15   Grand Jury's right to know what the facts are and get to a      14:42:59

16   search for the truth.

17          And so here, the record is murky on exactly what

18   Mr. Nigam was doing.  And we think that Backpage could have

19   easily cleared this up by, for example, coming forward with

20   their retainer agreement that they actually used to hire        14:43:16

21   SSP Blue.  That's the step that was noted in some of the cases

22   we've cited.  That should say pretty much what he was retained

23   to do.

24          It's -- we think it was their burden to do that.  We

25   asked for it for three months during the meet and confer        14:43:29

process.  Had they just produced it to us and it looked like he

was providing legal services, we very well may not have even

moved on this ground.  But the fact that they won't produce it

when they're the privileged proponent, they just haven't met

their burden here.                                                    14:43:45

So I do think this is a closer call than the PR firms,

but I think the Court would be fair based on how this record's

developed and why we're here today to say that they were the

privileged proponent, they had the burden of showing that

Mr. Nigam was providing legal advice, and because they declined    14:44:01

to submit any affidavits to prove that up or declined to submit

the retainer agreement, they haven't met their burden.  And

that could be the end of it and you could rule in our favor.

But I also think it would be reasonable for the Court

to think that that is a -- even though fair and legally              14:44:16

defensible, perhaps harsh outcome, and at a minimum the Court

could conduct its own in camera review of all or some of the

documents to assure itself or get its own view on whether or

not these withheld documents actually contain privileged

material.                                                             14:44:35

And I guess one final point on that, why I think that

it's fair to us to have some skepticism here and to ask them to

meet their burden.  You know, what led up to us getting here?

We wrote this e-mail to Backpage in October raising questions

about their privilege log.  And when they looked at it, even         14:44:52

though they really kind of gave us the run around on some

things, I think it's telling that when we just pointed out some

flaws in their privilege log they acknowledged that 150 e-mails

right off the bat were improperly put on there.  And these were

e-mails that really aren't even defensible to have been in

there in the first place.

The type of stuff they initially had on the privilege

log, which they didn't give Congress and initially tried to not

give us, are things such as e-mails that their PR firm

forwarded to a 1400-member law enforcement list serve.  I would

suggest that that doesn't suggest that a lot of care and

precision went into the formulation of the privilege log in the

first instance.  And that further underscores why we think it's

not enough for them to say, Mr. Nigam is an attorney, take our

word for it and we don't need to prove it up under these

circumstances.

Finally, to Duff & Phelps, you know, where do we

start?  The baseline principle is, when material that may be

privileged between a corporate client and its attorney gets

turned over to a third party, that's a waiver unless the

privilege proponent can first articulate one of these two

tests, *Kovel* or the functional equivalent, and then come

forward with a bunch of evidence to show how it really fits

here.

They didn't put forth any evidence yet again here.

1   And instead, all they've done is assert that this should remain

2   privileged because Duff & Phelps, it appears from their briefs,

3   was retained by their outside counsel to provide advice

4   concerning complex regulatory matters.

5          We don't have any evidence of that.  And I would note          14:46:29

6   that the one piece of evidence we submitted in our reply

7   suggests that Duff & Phelps was just a regular old investment

8   bank.  They were out there helping to -- in the process to spin

9   off Backpage from Village Voice Media by findings folks who

10  might be willing to make this big loan and provide money in the          14:46:47

11  spinoff process.

12         That is very different from some investment bank that

13  a law firm privately hires just so that the law firm can get

14  advice on how regulatory matters works.  And at a minimum, it

15  was their burden to show that that was the actual relationship          14:47:03

16  between Duff & Phelps and their outside counsel, and they

17  didn't meet it.

18         So for those reasons, I think that the Duff & Phelps

19  is more like the PR firms, they had a clear burden and they

20  didn't meet it.          14:47:15

21         THE COURT:  Okay.  Thank you.

22         Tell me your name again, I'm sorry, I missed it the

23  first time.

24         MS. BUGAIGHIS:  Zana Bugaighis, Your Honor.

25         THE COURT:  And how do you spell it, the last name?          14:47:23

UNITED STATES DISTRICT COURT

1          MS. BUGAIGHIS:  B-U-G-A-I-G-H-I-S.

2          THE COURT:  And it's pronounced?

3          MS. BUGAIGHIS:  Bughaigis, Your Honor.

4          THE COURT:  Bughaigis?

5          MS. BUGAIGHIS:  Bughaigis.                          14:47:38

6          THE COURT:  All right.  Go ahead.

7          MS. BUGAIGHIS:  Your Honor, I'm going to start with

8     the PR firm issue.

9          The Government starts off attacking -- well, Backpage

10    believes that its privilege log and the publically-available  14:48:00

11    information regarding the legal and political climate towards

12    Backpage in the time period in question, 2010 to 2012,

13    demonstrates that Backpage hired the PR firms for a legal

14    purpose.

15         At the time Backpage had no in-house PR department,     14:48:20

16    which the Government does not refute.  Backpage had a pressing

17    need to neutralize public opinion in order to avoid certain law

18    enforcement scrutiny and public prosecution.

19         The consultants worked with Backpage to develop

20    strategies and approaches in the face of threats from State   14:48:40

21    attorneys, private litigants, and legislative officials.

22         Under the Ninth Circuit Backpage's work with these

23    public relations consultants remains privileged because it was

24    done so in conjunction with attorneys.

25         The Government points to Backpage's evidentiary         14:49:00

1    burden.  But it fails to note that this is a criminal

2    prosecution.  This is not a civil case, Your Honor.  The

3    Government points almost exclusively to civil cases.  This is a

4    case that involves Fifth Amendment rights against prosecution.

5    The Government is not only seeking to prosecute Backpage, but        14:49:21

6    also multiple of its employees.  This is not a case where the

7    burden is on the criminal defendant to come forward in

8    violation of its own Fifth Amendment rights and present the

9    evidence that the Government is seeking.  The defendant,

10   Backpage, has no obligation to provide evidence that will be        14:49:41

11   used against it in a criminal prosecution.

12          Instead, Your Honor, we believe that our privilege log

13   and the public information available, some of which the

14   Government has pointed to, provides the basis on which you can

15   find the public -- the PR consultants worked as functional        14:49:58

16   equivalents in this context.

17          I also want to note that -- two things.

18          One, the Government's motion to compel made improper

19   generalized unsupported challenges.  On reply the Government

20   attempts to dial this back by shifting completely its legal        14:50:17

21   theory and providing some documents.  But it didn't provide

22   those in its motion to compel, and it only provided them on

23   reply, in which case Backpage did not have the opportunity to

24   respond.

25          So if Your Honor requests or feels that it needs more        14:50:32

1    evidence, we would request that Your Honor ask Backpage to make

2    that showing.

3           Additionally, we feel that the Government is narrowly

4    construing or even misrepresenting the case law regarding what

5    may be a functional equivalent and how these tests are laid out          14:50:55

6    in the case law.

7           Your Honor, the Government states there are two tests,

8    the *Kovel* analysis and the *Graf* analysis, of functional

9    equivalent.  But it's really, Your Honor, it's kind of a

10   sliding scale or continuum.  There's also -- the Government          14:51:09

11   says that *In re Grand Jury* is the quintessential *Kovel*

12   representation.  But *In re Grand Jury*, which we think is most

13   analogous to the facts here regarding Backpage's PR consultants

14   is not analyzed under *Kovel* or under the *Graf* functional

15   equivalent test.  Instead it states its own test for when          14:51:33

16   courts may find PR firms to be included within the privilege.

17          And, Your Honor, we believe that Backpage meets its

18   burden under *Graf* and under the *Grand Jury Subpoenas*' test for

19   finding that these PR consultants come within the privilege,

20   and privileged communications, including these consultants,          14:51:56

21   remain privileged.

22          In *In re Grand Jury Subpoenas* the Court held that

23   confidential communications between lawyers and public

24   relations consultants hired by the lawyers to assist them in

25   dealing with the media in cases such as this, that are made for          14:52:10

1    the purpose of giving or receiving advice directed at handling

2    the client's legal problems, are protected by the

3    attorney/client privilege.

4         That test is even broader than *Kovel* or *Graf*.  It

5    states, if these attorneys are necessary to the legal                    14:52:27

6    strategy -- or these PR consultants are necessary to the legal

7    strategy and work closely with the attorneys in effectuating

8    that strategy, the communications remain privileged.

9         Your Honor, I don't believe that there can be any

10   dispute regarding the climate that Backpage faced in 2010               14:52:50

11   through 2012.  This climate had just forced Craigslist to shut

12   its doors, and immediately the scrutiny turned to Backpage.

13   And Backpage was forced to suddenly address this challenge, and

14   it lacked the internal resources to do it.

15        The Government states that Backpage is this huge              14:53:21

16   corporation with 120 employees, but the fact is -- and the

17   Government knows that the majority of those employees were

18   moderators who were hired to review ads and try to make sure

19   that the information being posted publically was legal and was

20   compliant with Backpage rules and regulations.                    14:53:37

21        In fact, the Backpage governance, the management,

22   numbered in less than a dozen.  And within that dozen people

23   there were no PR consultants, there were no PR department.  The

24   fact is the Government's pointed to a couple documents that

25   show that Backpage used its in-house counsel as its             14:53:57

spokesperson on some occasions, and that just goes to show how

necessarily intwined the legal issues were with the PR issues

that Backpage faced.  And goes to show the need to hire expert

public relation consultants.

This was not -- this was a situation, such as that

faced in *Grand Jury Subpoenas* where the need for public

relations consultants was great, and the need for experts was

great.

I think *In re Grand Jury Subpoenas* said it best, and

we quoted it in our brief.  But questions as to whether the

client should speak to the media at all, whether to do so

directly or through representatives, whether and to what extent

comment on specific allegations, and a host of others can be

decided without careful legal input only at the client's

extreme peril.  Dealing with the media in a high profile case

probably is not a matter for amateurs.  Target and her lawyers

can not be faulted for concluding that professional public

relations advice was needed.

And that was necessary here to develop and pursue a

coordinated approach for Backpage to respond to legal threats

and public accusations by Government officials.  Backpage knew

that every statement it made would be scrutinized by officials

and law enforcement that were seeking to pursue the website.

And indeed they were.  And we've seen these statements, news

articles come against Backpage time and time again in civil

1    lawsuits, in Grand Jury investigations, in the Senate report.

2    These public statements by Backpage were scrutinized and used

3    against it.

4        Not only that, Backpage had to use its PR consultants

5    to attempt to neutralize the environment surrounding the media

6    portrayal that it was implicated in sex trafficking.  Without

7    some kind of other side to that story that Backpage needed to

8    portray, that it needed to put forth First Amendment

9    considerations and Section 230 grounds, without that Backpage

10   would have faced even greater scrutiny from public officials

11   which lead to law enforcement prosecution.

12       Your Honor, we think the *In re Grand Jury Subpoenas*

13   provides the most perilous circumstances in which Backpage

14   finds itself.  In that case the target, Martha Stewart, found

15   herself facing a criminal prosecution, and she hire -- her

16   attorneys hired a PR firm on her behalf to try to color public

17   opinion and to avoid an Indictment.

18       And that's precisely what happened here.  And these PR

19   professionals were hired for their expertise to work in

20   conjunction with Backpage's attorneys to avoid further legal

21   detriment to the client.

22       There was no allegation here that Backpage used these

23   PR firms for any purpose other than for a legal need.  Backpage

24   didn't use PR professionals to advertise its services in any

25   other capacity.  These professionals were used specifically to

1    address media scrutiny regarding the Backpage legal

2    considerations.

3            The DOJ does not deny that the communications were

4    made in confidence.  Every single communication on that

5    privilege log was with an attorney and a PR professional.                14:58:09

6            Although the Government claims that Backpage has not

7    been circumspect in making its privileged determinations, I

8    think that the fact that Backpage counsel produced those 153

9    communications shows the opposite.

10           Prior Backpage counsel made the initial determinations     14:58:36

11   regarding privilege.  I think that reasonable minds can differ

12   on those.  But Backpage -- when the Government brought this

13   information to Backpage's attention, Backpage undertook a

14   careful review of every single document line by line and made

15   careful privileged determinations and released 153 documents.         14:58:54

16           But every single document that remains on the

17   privilege log includes an attorney -- with respect to the PR

18   professionals includes an attorney, and demonstrates a close

19   and continuous working relationship between Backpage and -- the

20   PR consultants with Backpage's legal counsel.                             14:59:11

21           The DOJ points to press releases and statements made

22   by Backpage public relations consultants on its behalf showing

23   these PR professionals were in the public making statements on

24   behalf of Backpage necessitating the need for consultation with

25   Backpage's legal counsel because they were making independent         14:59:33

1    statements and decisions regarding PR strategy.  And they were

2    finally doing a crucial job necessary to avoid any further law

3    enforcement scrutiny.

4         The Government states -- says that these PR

5    professionals were not integrated into Backpage such that they          14:59:55

6    were employees, but they were in the essence that Backpage was

7    relying on them as its own employees.  Backpage lacked an

8    internal PR department, and so it relied on these professionals

9    as if they were Backpage employees, it incorporated into

10   discussions with its principals and its legal counsel to make          15:00:16

11   decisions on behalf of the company.  They acted as the

12   spokespeople for the company in order to do that.  They

13   performed an internal function and were relied on as if they

14   were employees.

15        Additionally, some aspects of the test to which the               15:00:30

16   Government points to, especially in its reply, it states that

17   this test is reserved -- the functional equivalent test is

18   reserved for a small company.  That's just not true.  *Hadijh v.*

19   *Evenflo* -- Evenflo, a large corporation, makes car seats and

20   bouncy seats for babies, a large corporation, engaged a PR firm        15:01:00

21   when it didn't have the internal resources to have its own

22   public relations when it needed experts.  And the Court there

23   found that the PR firm was functionally equivalent and upheld

24   the privilege, because it performed an internal function for

25   which Evenflo had a need.                                               15:01:25

1     The Government also makes a 180 between its motion and

2     its reply stating -- it stated in its motion that it believed

3     that Backpage did not -- that Backpage directly hired these PR

4     consultants and said that was a basis on which to deny

5     privilege.  When Backpage said in its opposition that its legal        15:02:02

6     counsel hired these PR consultants, the Government made a 180

7     in its reply and said, now that Backpage legal counsel hired

8     these consultants, these consultants cannot be functionally

9     equivalent.

10    One, that shows that the Government is acting on pure        15:02:21

11    speculation here.  It doesn't know.  And it's speculating and

12    attempting to get this Court to move to have an in camera

13    review based on pure speculation.

14    Two, it's misunderstanding the tests and the

15    functional equivalent test.  Neither one of those tests rose or        15:02:43

16    fell or who hired the PR consultants.  That the PR consultants

17    were hired by attorneys goes to show that the PR consultants

18    were hired for a specific legal need and served a legal

19    purpose.  But that fact doesn't -- had the PR consultants been

20    hired by the actual client, the target, such as in the Martha        15:03:13

21    Stewart case, that fact was underscored by the Court in *In re*

22    *Grand Jury* because it was stated that the PR consultants were

23    not hired for a general PR relations purpose.  They weren't

24    hired to be just public relations consultants for the company.

25    Here we don't have that distinction.  The PR        15:03:38

consultants were hired by the law firms.  And the Government

tries to use that fact to say that they then cannot be

functionally equivalent to employees.

However, the law firms themselves are agents of

the -- of Backpage.  The fact that they hired legal

professionals to be agents of Backpage does not make them any

less functionally equivalent.  We're not saying that the PR

consultants were employees of Backpage, we're saying that they

were functionally equivalent to employees.  They were agents,

and they can be functionally equivalent, especially if they

were hired for specific legal need.

Finally, that Backpage had in-house counsel that it

used as spokespeople from time to time only serves to

underscore that in-house counsel was the one coordinating the

legal strategy with the PR strategy, and underscores the point

that we're making, that Backpage needed to hire experts in the

PR field because of the onslaught of legal scrutiny.

So as to SSP Blue, Your Honor, it's almost

inconceivable that the Government can admit that Backpage had

an attorney and claims privilege, admit that Government

investigators interviewed the attorney and the attorney

confirmed that he was working as an attorney for Backpage, that

this is a former federal prosecutor, and persists nonetheless

in demanding these communications by saying that maybe he

wasn't based on a present day search of his website.

1        There is a standard in the Ninth Circuit for when even

2    these documents are subject to an in camera review.  And under

3    *In re Grand Jury* investigation a privilege log satisfies

4    Backpage's prima facie burden if it identifies the attorney and

5    the client, the nature of the document, the persons who sent or          15:06:11

6    received the documents, all persons who knew about the document

7    and the date it was generated.  Backpage has more than met that

8    burden.  In fact, it also includes information on the subject

9    matter of each document, the occupation of the authors of the

10   document, and all recipients of the document.                           15:06:29

11       The Government says that affidavits are necessary in

12   order to meet that burden, and that's just not what the case

13   law holds.

14       The case *In re Grand Jury* investigations mentions that

15   an affidavit had been provided, but only with respect to the            15:06:48

16   fact that that affidavit cleared up any remaining questions

17   regarding to whom the documents were shown or intended to be

18   shown.  That was the only purpose in which the Court relied on

19   that affidavit.  And here there are no questions regarding who

20   the documents were shown or intended to be shown.  It's not the         15:07:10

21   DOJ's basis for attacking the privilege here.

22       And we believe at this point the burden shifts to the

23   DOJ, and they just haven't met it.  They cite this test about a

24   factual basis sufficient to support a reasonable good faith

25   belief that an in camera inspection may reveal information that         15:07:27

1    the material is not privileged on reply.

2          This test comes from *United States v. Zolin,* which

3    sets forth the standard for a court to determine the

4    applicability of the crime fraud exception before making an in

5    camera review.                                              15:07:47

6          But even under the standard, they have not shown a

7    factual basis sufficient to support a reasonable good faith

8    belief.  They've shown rampant speculation at best.  They've

9    searched on the website and pulled down a few documents stating

10   that much of that information seems like it could be business   15:08:04

11   rather than legal advice.

12         They state that Mr. Nigam made an introduction to

13   NCMEC, and they claim that this shows that Mr. Nigam is not

14   working in a legal function.  But *In re Grand Jury Subpoenas*

15   cited to the Supreme Court, to a plurality opinion by          15:08:28

16   Mr. Justice Kennedy in *Gentile v. State Bar of Nevada* that

17   explained that the role of an attorney is not so narrow as to

18   argue in front of a court or to advise a client.

19         Justice Kennedy said an attorney's duties do not begin

20   inside the courtroom door.  He or she cannot ignore the        15:08:55

21   practical implications of a legal proceeding for the client.

22   Just as an attorney may recommend a plea bargain or civil

23   settlement to avoid the adverse consequences of a possible loss

24   after trial, so too an attorney may take reasonable steps to

25   defend a client's reputation and reduce the adverse            15:09:16

consequences of Indictment, especially in the face of a
prosecution deemed unjust or commenced with improper motives.
A defense attorney my pursue lawful strategies to obtain
dismissal of Indictment or reduction of charges, including an
attempt to demonstrate in the court of public opinion that the
client does not deserve to be tried.

We think that the Government proffer for why to invade
the attorney/client privilege of Backpage and Mr. Nigam and his
firm is improper, that they've not met their burden, and that
it is rampant speculation.

As to Duff & Phelps, Your Honor, Duff & Phelps, we're
talking about one e-mail and one attachment. And Duff & Phelps
were financial advisors to Backpage that assisted counsel in a
corporate restructuring.

The Government attaches to its reply only a
member -- a confidential information memorandum that was
delivered to a number of limited parties who might be
interested in providing funding for Backpage. This document
was not withheld. It was produced. And -- however, the facts
that went into creating this document, the consultations
between Backpage attorneys and Duff & Phelps and company
principals that went into creating that document, that
information is privileged. That information falls under the
*Kovel* test. It falls into the course of an agent assisting
counsel in advising regarding legal risks to the company.

1          And we assert that the information that went into the

2     preparation of the confidential legal -- the confidential

3     information memorandum remains privileged with Duff & Phelps.

4          Thank you, Your Honor.

5          THE COURT:  All right.  Thanks.                          15:11:36

6          Mr. Lanza, I've got a pretty good sense of what you'd

7     say in response to all of those points.  Let me give you both

8     my thoughts and allow you to react.

9          With respect to the public relation firm issue,

10    Miss Bugaighis, you started with a Fifth Amendment argument.   15:12:00

11    There was no mention of the Fifth Amendment in your response to

12    the Government's motion, that I can recall.  Is that an

13    argument somehow different from the functional equivalent or

14    the *In re Grand Jury* arguments that you've made?

15         MS. BUGAIGHIS:  Your Honor, we didn't make that          15:12:16

16    argument in opposition because in the Government's initial

17    motion they had put forth this *Kovel* test claiming that

18    Backpage cannot rely on its translator.  We didn't feel it

19    necessary to move in our opposition because they had not

20    highlighted the burden that they believed that Backpage faced.  15:12:36

21    They did that only in reply.

22         THE COURT:  Are you arguing that production of

23    nonprivileged documents, if I find them nonprivileged, would be

24    a violation of your protection against self-incrimination?

25    What's the argument that you're making?                        15:12:55

```
 1            MS. BUGAIGHIS:  No, Your Honor, I'm arguing that the
 2   evidentiary burden for bringing fourth evidence in this context
 3   in opposition to a motion to compel privileged information,
 4   unlike the civil context where we could have Backpage or any
 5   number of its employees provide a declaration stating the          15:13:16
 6   purpose of the PR professionals or how they were used or
 7   integrated into Backpage, is not possible or necessary in the
 8   criminal context where providing that kind of declaration from
 9   Backpage or its principals would be -- would require them to
10   invoke their Fifth Amendment rights.                               15:13:44
11            THE COURT:  Have you got any case for that
12   proposition?  Namely that the person asserting a privilege in a
13   criminal context has a different or less burden than a person
14   asserting it in a civil context?
15            MS. BUGAIGHIS:  Not in this context, Your Honor.  I       15:13:58
16   looked and did not find any criminal cases that addressed the
17   burden for a functional equivalent test in the criminal
18   context.
19            There were two cases that were criminal cases that --
20            THE COURT:  The one you've relied on, the Martha          15:14:22
21   Stewart case, was a criminal case; right?
22            MS. BUGAIGHIS:  You are correct, that was a criminal
23   case.  And in re *Graf* was also a criminal case.  And in both
24   those cases there had been prior evidentiary -- there had been
25   an evidentiary hearing in *Graf*.  And *In re Grand Jury Subpoenas*  15:14:35
```

1    the Grand Jury had previously called a witness, the PR

2    professional.

3         THE COURT:  Well, are you suggesting that if I

4    conclude that Backpage needs to provide evidentiary support for

5    the various factual assertions it's made about the role of          15:14:54

6    these PR firms, Backpage is going to invoke the Fifth

7    Amendment?

8         MS. BUGAIGHIS:  Your Honor, if you rule that Backpage

9    needs to provide further evidentiary support, Backpage would

10   proffer the declarations from the PR professionals.                 15:15:12

11        THE COURT:  All right.  Thank you for your responses.

12        My conclusion with respect to the PR firm issue is

13   that I cannot conclude that Backpage has met its burden of

14   showing either that the PR firms were the functional equivalent

15   of Backpage employees, as required by *Graf*, or that they were     15:15:45

16   filling the role described for the PR firms in the *In re Grand

17   Jury* case without some evidentiary support.  There's nothing in

18   the response that establishes that other than plain assertions.

19        The Ninth Circuit law is clear in *Graf*, which is a

20   criminal case, that the burden is on the person asserting the       15:16:08

21   privilege to establish the privilege.  And there just isn't any

22   evidence at all that's submitted with the response.

23        So I think there needs to be that evidence before I

24   can sustain the privilege.  And we'll talk in a minute about

25   when and how we get that produced.                                  15:16:26

1          I think it's clear that it's the functional

2     equivalent's argument that Backpage relied on its response and

3     then also in the *In re Grand Jury* case, so that will be the

4     focus.  But there's no evidence.  And Backpage clearly has the

5     burden, in my view.                                                      15:16:47

6          With respect to SSP Blue, Backpage is correct that the

7     Ninth Circuit *In re Grand Jury* case, which is at 974 F.2d 1068,

8     says that a privilege log establishes a prima facie case of a

9     right to a privilege.  But as we all know, a prima facie case

10    can be called into question by evidence from the other side.            15:17:16

11         The Government has come forward with evidence that

12    Mr. Nigam, N-I-G-A-M, engages in a lot of nonlegal functions in

13    the operation of SSP Blue.  I think that is enough to shift the

14    burden back to Backpage to come forward with some evidence that

15    he was functioning as a lawyer in the work that he did with             15:17:38

16    respect to these 350 e-mails.  So it's essentially the same

17    conclusion that I reach with respect to the PR firms.

18         With regard to Duff & Phelps, it boils down to the

19    same issue.  There are assertions about their role,

20    characterizations about their role, but no evidence.  And               15:17:57

21    although there's an assertion that -- in the privileged log

22    that it's privileged, that to me isn't the same as making an

23    assertion when there's a lawyer involved.

24         I understood *In re Grand Jury*, the Ninth Circuit case,

25    to be saying if you have a lawyer in the communication, the log         15:18:17

```
 1    creates a prima facia case of privilege.  But when it's a
 2    nonlawyer, I don't think merely putting it on a log establishes
 3    that.  I think the burden is on Backpage to come forward with
 4    some evidence that Duff & Phelps was acting in a way that was
 5    necessary to the rendering of legal advice, which is the way       15:18:34
 6    that the Yasmin court characterized it that was cited by the
 7    parties.
 8          So my view is that there needs to be evidence on all
 9    three categories provided by Backpage to support its
10    characterization of what was happening when these                  15:18:51
11    communications occurred.
12          I think that was evident with the motion being filed,
13    but Backpage chose not to submit it.  There were requests made
14    before the motion was filed for it, and Backpage chose not to
15    provide that to the Government.                                     15:19:12
16          So I understand why the Government is asking me to
17    simply rule that Backpage has not met its burden and enter an
18    order compelling.  But I don't think I should do that without
19    giving Backpage one other opportunity to come forward with the
20    evidence that will establish the privilege.                        15:19:28
21          Part of the problem I have is that starting on the
22    12th of March I am basically fully booked until the end of May.
23    And so if we're going to get this matter decided, we need to do
24    it in the next couple of weeks, or otherwise it gets bumped to
25    the Summer, and I don't want to do that.                           15:19:50
```

1          So my intention would be -- and this is what I'm

2    interested in the responses to -- to require that Backpage

3    submit whatever evidence it chooses to, and I understand if you

4    want to get it from the PR firms, in the form of declarations

5    or affidavits or such other evidence as you think you ought to          15:20:06

6    submit to substantiate the factual arguments that have been

7    made with respect to the role of the PR firms, the role of SSP

8    Blue, the role of Duff & Phelps, and then give the Government

9    an opportunity to respond to whatever the submission is.

10         If that's going to happen and us get a decision          15:20:26

11   by -- well, before March 12th, there's not a lot of time.  And

12   that's what I wanted to raise with you all.

13         I suppose another alternative would be me to ask

14   another judge to do it if you think it will take longer.  I've

15   never done that, I've never given an issue to another judge,          15:20:44

16   and I'm not of a mind to because they're all plenty busy.

17         So I guess I'm interested in your thoughts.  And,

18   Miss Bugaighis, particularly whether you have thoughts about

19   that schedule and the kind of material you can pull together to

20   submit to me.          15:21:01

21         MS. BUGAIGHIS:  Your Honor, just looking at the

22   calendar, I don't know how much time that provides.

23         THE COURT:  I mean, what we could do is something

24   like, give you until -- well, we could give you two weeks until

25   the 23rd.  I don't know if that's enough time to pull it          15:21:27

1   together.  And then get the response from the Government the

2   next week.  I could look at it.  If I think we need a hearing,

3   we could try to set it the week of March 5th.  Or otherwise I

4   might be able to just rule.

5         Is that enough time or do you think you'll need more          15:21:41

6   time, Miss Bughaigis, to pull this together?

7         MS. BUGAIGHIS:  Your Honor, I think we can do it.

8         THE COURT:  Okay.  Thank you.

9         Mr. Lanza, do you have thoughts on all of this?

10        MR. LANZA:  Thank you, Judge.                                 15:21:53

11        I'm just trying to -- so what do you anticipate then

12  submitting on February 23rd?  Is it just affidavits or is it

13  another -- I think that it should just be limited to whatever

14  evidence they want, they submit.  I don't think we need another

15  round of briefing or case citations.                               15:22:09

16        THE COURT:  I really don't want another round of

17  briefing.  I think we've framed the issues.  I understand the

18  arguments.  I think -- I need to find out if there's facts to

19  support the position that Backpage is taking.  And the idea

20  would be to come forward with those facts.                         15:22:21

21        I don't want to foreclose Backpage from submitting a

22  short memo, a three- or four-page memo, sort of explaining

23  things if they think they need to.  But we don't need to go

24  through the briefing and citing of cases again.

25        MS. BUGAIGHIS:  Your Honor, I would ask that Backpage        15:22:36

1    be allowed to submit a memorandum, if the Government is going

2    to submit a memorandum in opposition.

3            THE COURT:  That would be right after you've heard

4    from them; right?  You're not suggesting with your affidavit,

5    you mean after you've received their memorandum?          15:22:52

6            MS. BUGAIGHIS:  That would be preferred, Your Honor.

7            THE COURT:  Right.

8            All right.  So assuming they submit whatever evidence

9    they want to submit with a short explanation, three or four

10   pages, but not rebriefing, that would be the idea by the 23rd.   15:23:07

11           MR. LANZA:  Okay.  And then by --

12           THE COURT:  Well, then I'm thinking by probably

13   Thursday, March 1st, to get the Government's comments on that

14   evidence.

15           MR. LANZA:  Okay.                                 15:23:27

16           THE COURT:  Because I will try -- the week of the 5th

17   is not great either.  But I would try to look at it quickly, in

18   part to decide whether we need to have a hearing, in which

19   event we'd do it the next week, the week of the 5th.

20           I suppose I could even, Miss Bugaighis, look at it and   15:23:45

21   tell you whether you need to file a response.  I wouldn't do it

22   if I'm going to -- I wouldn't deny you that opportunity if I'm

23   going to rule against you.  But I'm just trying to think of how

24   we get this work done.

25           MS. BUGAIGHIS:  Thank you, Your Honor.            15:24:03

UNITED STATES DISTRICT COURT

1          THE COURT:  So this is what I suggest:  The additional

2     evidence by the 23rd, the Government response by March 1st.

3        (Discussion off the record between the Court and courtroom

4     deputy.)

5          THE COURT:  Well, I think what we need to do is this:          15:24:57

6     I have no time on the 2nd.  I'm in a hearing all day.  I think

7     what we ought to do is get your response in, Mr. Lanza, on the

8     1st.  I'll look at it on Saturday the 3rd, and I'll do a text

9     only order, which I can do, which will come out to you all --

10          THE CLERK:  It's a Grand Jury matter.                         15:25:23

11          THE COURT:  Oh, I can't do it in a Grand Jury matter,

12     can I?

13          Well, I will then have an order ready to come out

14     Monday morning saying whether or not I think we need a hearing

15     the week of the 5th.  And saying whether I think Backpage needs  15:25:35

16     to respond to the Government's memorandum.

17          And if so, what I'll do is we'll probably call you and

18     try to find the best time, figure out timing.  Because as I

19     say, the following week, starting on Monday, there's nothing

20     available for weeks after that.                                   15:25:58

21          Does that make sense?

22          MR. LANZA:  Yes, Your Honor.

23          MS. BUGAIGHIS:  Yes, Your Honor.

24          THE COURT:  Okay.

25          MR. LANZA:  I just want to be clear.  It may be             15:26:06

```
 1   possible that -- I'm just trying to anticipate -- that when we
 2   see the evidence they've submitted, the submission we have on
 3   March 1st isn't just limited to discussion, but it also -- we
 4   might need to submit some countervailing evidence that we're
 5   aware of at that point.                                            15:26:22
 6           THE COURT:  Yeah.  I understand that.  And I'll
 7   certainly give Backpage a chance to respond if you're going to
 8   do that.
 9           MR. LANZA:  Okay.
10           THE COURT:  Okay.  That's our plan.  Thank you.           15:26:29
11           MR. LANZA:  Thank you, Your Honor.
12           MS. BUGAIGHIS:  Thank you, Your Honor.
13        (Proceedings concluded at 3:26 p.m.)
14
15                            -oOo-
16
17
18
19
20
21
22
23
24
25
```

```
 1

 2

 3

 4                    C E R T I F I C A T E

 5

 6         I, CANDY L. POTTER, do hereby certify that I am duly

 7  appointed and qualified to act as Official Court Reporter for

 8  the United States District Court for the District of Arizona.

 9         I FURTHER CERTIFY that the foregoing pages constitute

10  a full, true, and accurate transcript of all of that portion of

11  the proceedings contained herein, had in the above-entitled

12  cause on the date specified therein, and that said transcript

13  was prepared under my direction and control.

14         DATED at Phoenix, Arizona, this 27th day of February,

15  2018.

16

17

18                              s/Candy L. Potter_____
19                              Candy L. Potter, RMR, CRR

20

21

22

23

24

25
```

# Exhibit H

1
2
3
4
5
6                    **IN THE UNITED STATES DISTRICT COURT**
7                          **FOR THE DISTRICT OF ARIZONA**
8
9
10                                                        **ORDER**
11   *In re* Grand Jury Subpoena No. 16-04-108          **(SEALED)**
12
13
14

15          The government has filed a motion to compel Backpage.com, LLC and its CEO,
16   Carl Ferrer (collectively, "Backpage"), to produce certain documents that have been
17   withheld in response to a grand jury subpoena.  Backpage has withheld the documents on
18   the basis of the attorney-client privilege.  Backpage responded to the motion, the
19   government filed a reply, and the Court held a hearing on February 9, 2018.  As a result
20   of the hearing, the Court required Backpage to produce evidence to support factual
21   assertions made in its response to the motion and at the hearing.  Backpage provided five
22   declarations and two documents for *in camera* review.  The parties dispute whether this
23   evidence is sufficient to establish the attorney-client privilege.
24          Three categories of documents are at issue.  Backpage has withheld documents
25   reflecting communications between its attorneys and three public relations ("PR") firms:
26   Culloton Strategies, Sitrick & Company, and JMS Public Relations.  Backpage has also
27   withheld communications with SSP Blue, a company established and operated by
28   Hemanshu Nigam, a former federal prosecutor.  Finally, Backpage has withheld one

email between outside counsel and Duff & Phelps, an investment bank.  For the reasons that follow, the court will grant the motion in part.

## I.     Legal Standard.

The attorney-client privilege protects confidential communications that reflect or facilitate legal advice from an attorney.  *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981).  The Supreme Court has explained the privilege's purpose:

> Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.  The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.

*Id.* at 389.  "[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."  *Id.* at 390.

Application of the privilege requires case-by-case analysis, *id.* at 396-97, and the party asserting the privilege "has the burden of establishing the existence of an attorney-client relationship *and* the privileged nature of the communication," *United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010) (emphasis in original) (internal quotation marks omitted).  Privilege issues generally are resolved under federal common law, with exceptions not applicable here.  Fed. R. Evid. 501.  In the Ninth Circuit, an eight-part test determines whether information is covered by the attorney-client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*Graf*, 610 F.3d at 1156.  Disclosure of attorney-client communications to third parties generally waives the privilege.  *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126-27 (9th Cir. 2012).

1   **II.     PR Firms.**

2          Backpage has withheld communications among the PR firms, Backpage

3   employees, and Backpage attorneys.  U.S. Mot. Compel at 9-10.  Backpage contends that

4   it did not waive the privilege by communicating with these firms because they are the

5   functional equivalents of Backpage employees.  Backpage Opp'n Mot. Compel at 8-13.

6   Backpage alternatively relies on a district court holding that such communications are

7   protected where the PR and litigation strategies are inextricably intertwined.  Court's

8   Livenote Tr. (Feb. 9, 2018); Backpage Reply Evid. Sub. at 2, 13-17.  Backpage does not

9   argue that the firms acted as agents of outside counsel.  Court's Livenote Tr.

10  (Feb. 9, 2018); Backpage Opp'n Mot. Compel at 8-13.

11         **A.     Background.**

12         Backpage presents evidence that government executives, law enforcement

13  agencies, and the media began to pressure Backpage in 2010 to improve its efforts to

14  combat sex trafficking activity on its website.  McNally Decl. ¶ 2; Suskin Decl. ¶ 6;

15  Bugaighis Decl. Exs. C-I.  At that time, Backpage lacked an in-house PR department to

16  handle its response.  McNally Decl. ¶ 3; Suskin Decl. ¶ 5.

17         Backpage's outside counsel therefore hired the PR firms to provide that service.

18  Outside counsel retained Culloton in March 2011 and Sitrick in November 2011 as

19  "expert consultants" who provided "confidential consulting advice and PR services to

20  facilitate legal advice" to Backpage.  McNally Decl. ¶ 2; *see also* Suskin Decl. ¶ 8.

21  Outside counsel supervised their work.  Suskin Decl. ¶ 8.  Culloton and Sitrick worked

22  directly with outside counsel and Backpage principals "to plan and implement strategies

23  addressing legal issues and public communications . . . and to ensure that public

24  statements and responses to inquiries, demands and criticisms from public officials, law

25  enforcement, the media and others were as accurate and as effective as possible and

26  consistent with the law and [Backpage's] legal positions and strategies."  McNally Decl.

27  ¶ 3; *see also* Suskin Decl. ¶ 8.  Outside counsel rendered confidential advice to Culloton

28  and Sitrick "concerning draft communications, public statements and press releases, and

meetings with public officials, NGOs and others as regarded legal issues, [Backpage's] legal positions, and related issues." McNally Decl. ¶ 4. Culloton and Sitrick "provided confidential advice, including regarding [Backpage's] legal media strategy and how to best implement it." McNally Decl. ¶ 4. "Both firms were a significant part of [Backpage's] legal teams, addressing certain risks to and opportunities for [Backpage], and the possibility of litigation or other government actions or proceedings." McNally Decl. ¶ 4.

Outside counsel SSP Blue "sub-contracted . . . JMS Public Relations to vet, under [SSP Blue's] direct supervision, any media inquiries. Along with other internal and external legal counsel, Backpage and [SSP Blue] determined what response, if any, was provided and what statements, if any, would be made." Nigam Decl. ¶ 12. JMS "worked at [SSP Blue's] direction and at the direction of other legal counsel representing Backpage specifically to vet only those media inquiries that were related to matters for which [SSP Blue] was retained to provide legal advice and counsel." Nigam Supp. Decl. ¶ 2. JMS "had no independent authority and discretion to make business decisions on Backpage's behalf." Nigam Supp. Decl. ¶ 2.

### B.    Functional Equivalence Doctrine.

In *Graf*, the Ninth Circuit held that a third party can be the "functional equivalent" of a corporate employee and therefore entitled to communicate with corporate legal counsel under the attorney-client privilege. 610 F.3d at 1159. The outside consultant in *Graf* was an individual who helped form the company, "regularly communicated with [customers] and others on behalf of [the company], marketed the company's insurance plans, managed its employees, and was the company's voice in its communications with counsel." *Id.* at 1152-53, 1157. *Graf* noted that the outside consultant was "the company's primary agent in its communications with corporate counsel" and was "empowered to act on behalf of the corporation." *Id.* at 1159 (internal quotation marks omitted). The Ninth Circuit found the consultant to be "a functional employee" of the company, and that his communications with outside counsel were therefore entitled to the

1    same privilege protection as communications by regular employees.  *Id.*  In so holding,

2    the Ninth Circuit followed the Eighth Circuit's decision in *In re Bieter Co.*, 16 F.3d 929

3    (8th Cir. 1994).  *Id.* at 1158-59.  *Bieter* had also found that the individual before it "was

4    in all relevant respects the functional equivalent of an employee."  *Bieter*, 16 F.3d at 938.

5                              **1.    Legal Standard.**

6           The government asks the Court to interpret the functional equivalence doctrine

7    narrowly, identifying multiple elements that must be present for functional equivalence.

8    U.S. Resp. Evid. Sub. at 3-9.  Backpage counters that the government's argument is

9    inconsistent with the way in which courts have applied the doctrine.  Backpage Reply

10   Evid. Sub. at 7-12.

11          Neither *Graf* nor *Bieter* identified the relevant factors to consider in applying the

12   functional equivalence doctrine.  And many district courts simply consider the unique

13   circumstances of each case, without adopting any particular standard, in determining

14   whether the third party is the functional equivalent of an employee.  *See, e.g.*, *Sierra Dev.*

15   *Co. v. Chartwell Advisory Grp., Ltd.*, No. 3:13-CV-0602-RTB (VPC), 2016

16   WL 4107680, at *4-5 (D. Nev. Aug. 1, 2016) (proponent failed to make the detailed

17   factual showing necessary to establish functional equivalence); *United States v. Ormat*

18   *Indus., Ltd.*, No. 3:14-cv-00325-RCJ-VPC, 2016 WL 4107682, at *7 (D. Nev.

19   Aug. 1, 2016) (proponent failed to provide a detailed factual showing of similarity of

20   duties or possession of relevant information about the client); *United States v. Lonich*,

21   No. 14-cr-00139-SI-1, 2016 WL 1733633, at *6-7 (N.D. Cal. May 2, 2016) (party failed

22   to provide sufficient evidence to justify functional equivalence); *Obesity Research Inst.,*

23   *LLC v. Fiber Research Int'l, LLC*, No. 15-cv-0595-BAS-MDD, 2016 WL 931077, at *3

24   (S.D. Cal. Mar. 11, 2016) (raw material supplier was not a functional employee of a

25   company that purchased from him); *W. Sugar Coop. v. Archer-Daniels-Midland Co.*, No.

26   CV 11-3473-CBM (PJWx), 2015 WL 12696192, at *2 (C.D. Cal. Nov. 4, 2015) (PR firm

27   was a functional equivalent because it provided the same services an in-house PR

28   department would); *Medversant Techs., L.L.C. v. Morrisey Assocs., Inc.*, No.

CV 09-05031 MMM (FFMx), 2011 WL 13124128, at *4-5 (C.D. Cal. July 20, 2011) (PR firm was a functional equivalent because it acted as the client's "public relations department").

The District of Nevada appears to have adopted a broad approach:  "the pivotal question is 'whether the consultant performs duties similar to those performed by an employee and whether by virtue of that relationship, he or she possesses information about the company that would assist the company's attorneys in rendering legal advice.'" *See Sierra Dev. Co.*, 2016 WL 4107680, at *3 (quoting *Fosbre v. Las Vegas Sands Corp.*, Nos. 2:10-cv-00765-APG-GWF, 2:10-cv-01210-APG-GWF, 2016 WL 183476, at *5 (D. Nev. Jan. 14, 2016)); *see also United States ex. rel. Strom v. Scios, Inc.*, No. C05-3004 CRB (JSC), 2011 WL 4831193, at *4 (N.D. Cal. Oct. 12, 2011) (the "dispositive question is the consultant's relationship to the company and whether by virtue of that relationship he possesses information about the company that would assist the company's attorneys in rendering legal advice").

Other courts have identified limiting factors.  Most notably, the court in *Export-Import Bank of the United States v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. 103 (S.D.N.Y. 2005), explained:

> To determine whether a consultant should be considered the functional equivalent of an employee, courts look to whether the consultant had primary responsibility for a key corporate job, whether there was a continuous and close working relationship between the consultant and the company's principals on matters critical to the company's position in litigation, and whether the consultant is likely to possess information possessed by no one else at the company.

*Id.* at 113 (internal citations omitted).

In *Upjohn*, the Supreme Court extended the attorney-client privilege to a low-level employee outside the "control group" at the highest levels of management.  449 U.S. at 394-95.  Finding no reason to distinguish between corporate executives and lower-level corporate employees, the *Upjohn* Court emphasized that the employees (1) spoke on

behalf of the company to counsel, (2) at the direction of superiors, and (3) possessed helpful information about the corporation.  *Id.* at 394.

Looking to *Upjohn*, the *Bieter* court saw no reason to distinguish between an employee and a third party consultant who (1) had daily interaction with corporate employees, (2) was involved in the principal mission of the business, (3) was authorized to represent the company, (4) possessed unique information about the company, and (5) acted at the direction of corporate superiors. 16 F.3d at 938, 940.  "It is only natural that, just as middle-level – and indeed lower-level – employees would have the relevant information needed by corporate counsel if he is adequately to advise the client with respect to actual or potential difficulties, so too would nonemployees who possess a significant relationship to the client and the client's involvement in the transaction that is the subject of legal services."  *Id.* at 938 (internal quotation marks omitted).

The Ninth Circuit also looked to *Upjohn* in adopting *Bieter*'s reasoning and the functional equivalence doctrine.  *Graf*, 610 F.3d at 1158-59.  "The *Bieter* court reasoned that 'too narrow a definition of 'representative of the client' will lead to attorneys not being able to confer confidentially with nonemployees who, due to their relationship to the client, possess the very sort of information that the privilege envisions flowing most freely.'"  *Id.* at 1158 (quoting *Bieter*, 16 F.3d at 937-38).  *Graf* found no reason to distinguish between a corporate employee and an independent contractor who (1) had authority to represent the company, (2) managed corporate employees, and (3) communicated with corporate counsel on behalf of the company.  *Id.* at 1159.

These cases suggest that a third party is the functional equivalent of a corporate employee when he or she (1) has authority to speak on behalf of the corporation to counsel, (2) performs duties associated with the corporation's ordinary course of business, (3) works under the supervision of the corporation, and (4) possesses helpful information about the corporation due to his or her relationship with it.  These factors strike an appropriate balance between the traditionally narrow attorney-client privilege and the reality of today's corporate workplace.  *Compare Graf*, 610 F.3d at 1156

("Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." (internal quotation marks omitted)) *with Fosbre*, 2016 WL 183476, at *4 ("corporations increasingly conduct their business not merely through regular employees but also through a variety of independent contractors retained for specific purposes" (internal quotation marks omitted)).

## 2. Analysis.

Looking to these factors, the Court concludes that Backpage has failed to establish the functional equivalence of the three PR firms.

First, Backpage has not established that the firms had authority to speak on behalf of the corporation to counsel. The evidence shows that the PR firms participated in discussions with Backpage principals and counsel regarding appropriate public communications strategy, but Backpage has presented no evidence that the firms were empowered to represent Backpage or make decisions on its behalf in communications with counsel. *See Graf*, 610 F.3d at 1159 ("[A]s fictitious entities, corporations can seek and receive legal advice and communicate with counsel only through individuals *empowered to act on behalf of* the corporation[.]" (emphasis added) (internal quotation marks omitted)).

Second, Backpage has not shown that the PR firms performed duties associated with the corporation's ordinary course of business. Backpage's evidence instead makes clear that the firms were retained for a narrow set of litigation-related PR tasks. The evidence does not demonstrate that Backpage hired these firms to act as its PR department in the regular course of business.

Third, Backpage has not shown that the PR firms worked under the supervision of the corporation. The declarations clearly state that outside counsel supervised each PR firm.

Finally, Backpage has not shown that the PR firms possessed helpful information about the corporation due to their relationship with it. The evidence shows that the firms

1    provided consulting advice regarding PR strategy, but there is no indication that they

2    provided information *about* Backpage.

3           For these reasons, the Court finds that Culloton, Sitrick, and JMS were not the

4    functional equivalents of Backpage employees.[1]

5           C.    *In re Grand Jury Subpoenas*.

6           Backpage alternatively relies on *In re Grand Jury Subpoenas*, 265 F. Supp. 2d 321

7    (S.D.N.Y. 2003), for the proposition that communications with PR firms are subject to

8    the attorney-client privilege.  Court's Livenote Tr. (Feb. 9, 2018).  That case concerned

9    the target of a grand jury investigation whose counsel retained a PR firm to assist in

10   crafting a strategy to influence publicity about a criminal investigation.  265 F. Supp. 2d

11   at 323.   The target's counsel was concerned that negative publicity would pressure

12   prosecutors to seek a significant indictment.  *Id.*  The target produced evidence that the

13   PR firm's assignment differed from standard PR work: "its target audience was not the

14   public at large.  Rather, [the PR firm] was focused on affecting the media-conveyed

15   message that reached the prosecutors and regulators responsible for charging decisions in

16   the investigations concerning" the target.  *Id.* at 323-24.  The district court concluded:

17           the ability of lawyers to perform some of their most fundamental client
18           functions – such as (a) advising the client of the legal risks of speaking
             publicly and of the likely legal impact of possible alternative expressions,
19           (b) seeking to avoid or narrow charges brought against the client, and
             (c) zealously seeking acquittal or vindication – would be undermined
20           seriously if lawyers were not able to engage in frank discussions of facts
21           and strategies with the lawyers' public relations consultants.

22   *Id.* at 330.  The court accordingly held that "(1) confidential communications (2) between

23   lawyers and public relations consultants (3) hired by the lawyers to assist them in dealing

24

25   _____

26           [1] This conclusion is buttressed by several additional considerations identified in
     the cases cited above: (1) whether the third-party relationship existed before the
     litigation, (2) whether the third party has primary responsibility for a key corporate
27   function, (3) whether the third party manages corporate employees, (4) whether the third
     party performs duties already performed by the corporation, (5) whether the third party
28   works at the corporation's office, and (6) whether the third party has daily interaction
     with corporate employees.  Backpage has not satisfied any of these considerations.

with the media in cases *such as this* (4) that are made for the purpose of giving or receiving advice (5) directed at the handling of the client's problems are protected by the attorney-client privilege." *Id*. at 331 (emphasis added).  Backpage cites no Ninth Circuit decision that has adopted this holding.

The Court need not decide whether the holding in *In re Grand Jury Subpoenas* is good law because the Court concludes that the holding is narrow and Backpage has not shown it would apply here.  The case marked only a narrow expansion of the attorney-client privilege, specifically emphasizing that it applied to PR firms "hired by the lawyers to assist them in dealing with the media in cases *such as this*." *Id*. (emphasis added).  The precise challenge faced by the lawyers in that case was to prevent media pressure from causing or expanding their client's indictment.  265 F. Supp. 2d at 323.  Backpage, which has the burden of establishing the existence of the privilege, *Graf*, 610 F.3d at 1156, has not shown that a similar situation existed in this case.

Backpage's declarations speak only in general terms about its repeated criticism in the media.  McNally Decl. ¶ 2 (Backpage was "facing an increasing number of public and other criticisms and challenges from government officials and others"); Suskin Decl. ¶ 6 ("Backpage faced an increasing number of public and other criticisms and challenges from public officials and others").  Of the news articles provided by Backpage, three were negative and one was positive.  Bugaighis Decl. Exs. E (July 2011 article describing local government efforts to persuade Backpage to strengthen its policies to prevent illegal advertising), F (May 2012 article describing Backpage as "the foremost classified advertising website for adult services – even if the ages and circumstances of some of the people selling those services remain questionable"), G (June 2012 article arguing that criticism of Backpage is misplaced), H (January 2012 article describing pimp's use of Backpage to prostitute a minor).  And letters from state attorneys general requested that Backpage improve policies and mechanisms to combat sex trafficking.  Bugaighis Decl. Exs. C (September 2010 request that Backpage take additional steps to prevent or screen illegal advertisements), D (August 2011 request for information – in lieu of a subpoena – to substantiate Backpage's assertions regarding efforts to prevent illegal advertisements).

To be sure, Backpage faced public scrutiny and calls to improve its efforts to combat sex trafficking.  But Backpage does not show that an indictment was imminent as in *In re Grand Jury Subpoenas*, or that the public scrutiny affected its legal position in any way.  The evidence instead suggests that the public scrutiny affected Backpage's business interests.  *See* Bugaighis Decl. Exs. F ("Major brands such as H&M, IKEA and Barnes & Noble recently pulled ads from publications owned by Backpage.com parent company Village Voice Media."), G (quoting calls for American Apparel, Best Buy, Disney, Dominos, H&M, IKEA, REI, and T-Mobile to stop advertising on Backpage), G (Goldman Sachs sold its stake in Backpage after receiving negative publicity for its association with the website).

More importantly, the evidence does not substantiate Backpage's assertion that the public scrutiny affected its criminal liability.  Court's Livenote Tr. (Feb. 9, 2018).  Backpage relies on the enactment of three state laws that would expose Backpage to criminal liability.  *See* Backpage Opp'n Mot. Compel at 5-6.  But Backpage concedes that enforcement of each law was enjoined on *legal* grounds as a likely violation of the First Amendment and as preempted by the federal law granting it immunity.  *Id.* (citing *Backpage.com, LLC v. Hoffman*, No. 13-cv-03952 (DMC)(JAD), 2013 WL 4502097, at *5-11 (D.N.J. Aug. 20, 2013) (granting preliminary injunction against enforcement of New Jersey law that prohibited sale of advertisements for commercial sex abuse of minors); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 828, 840 (M.D. Tenn. 2013) (granting preliminary injunction against enforcement of Tennessee law that prohibited the sale of sex-related advertisements); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1278, 1284 (W.D. Wash. 2012) (same with respect to a Washington law)).  Backpage also appears to rely on a July 2013 letter from state attorneys general to U.S. congressmen requesting an amendment to a federal law that immunizes Backpage from state criminal liability for the actions of its users.  Bugaighis Decl. Ex. I.  But this evidence from July 2013 could not have motivated Backpage's 2010, 2011, and 2012 communications with the PR firms.  U.S. Mot. Compel Exs. I, J, K.

1     In short, Backpage has presented insufficient evidence to show that it would fall

2 within the narrow holding of *In re Grand Jury Subpoenas* – that it faced the same kind of

3 imminent criminal prosecution as the target in that case.  Thus, even if that case is good

4 law, the Court cannot conclude that its narrow holding would apply here.

5     Companies often face public scrutiny and potential criminal and civil liability.

6 The Court cannot conclude that *In re Grand Jury Subpoenas* extends the attorney-client

7 privilege to PR firms whenever serious public challenges arise.  Courts, including the

8 Ninth Circuit, construe the attorney-client privilege narrowly.  Backpage has not shown

9 that *In re Grand Jury Subpoenas* would extend it to the communications with the PR

10 firms in this case.

11 **III.    SSP Blue.**

12     Backpage withheld approximately 350 emails reflecting communications with SSP

13 Blue.  U.S. Mot. Compel at 13.  The government does not dispute that SSP Blue was

14 founded and is operated by Hemanshu Nigam, an attorney who formerly worked as a

15 federal prosecutor.  U.S. Mot. Compel at 13.  The government argues, however, that SSP

16 Blue "does not hold itself out as a law firm and states in its marketing materials that it

17 specializes in the provision of security, privacy, and crisis management services –

18 amorphous terms that often connote business (as opposed to legal) advice."  U.S. Reply

19 at 10; *see also* U.S. Mot. Compel at 13-14.  The Court agreed at the February 9 hearing

20 that this evidence shifted the burden to Backpage to "come forward with some evidence

21 that he was functioning as a lawyer in the work that he did with respect to these 350

22 emails."  Court's Livenote Tr. (Feb. 9, 2018).

23     Backpage has provided the Court with a declaration from Mr. Nigam which states

24 that he provided legal advice and services to Backpage.  Nigam Decl. ¶¶ 9-11.  The

25 government contests this assertion and offers evidence that at least part of Mr. Nigam's

26 role was to facilitate introductions.  U.S. Resp. Evid. Sub. at 11-12.  In light of this mixed

27 role, the government asserts, Mr. Nigam must attest that each of the 350 emails reflects

28

legal advice.  U.S. Resp. Evid. Sub. at 11-12.  The government asks the Court to conduct an *in camera* review of the emails.  U.S. Resp. Evid. Sub. at 12.

The Ninth Circuit has stated that a privilege log and supporting affidavits can be sufficient to establish the existence of the attorney-client privilege.  *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992).  Backpage has satisfied this standard. Mr. Nigam clearly is an attorney, and his declaration establishes that he provided legal advice to Backpage.  The government does not dispute that the privilege log characterizes the 350 emails as legal advice.  The Court will not require further production of communications with SSP Blue.

**IV.    Duff & Phelps.**

Backpage relied on the attorney-client privilege to withhold an email between its outside counsel and Duff & Phelps.  U.S. Mot. Compel at 8-9.  The government contests this assertion of privilege, arguing that Duff & Phelps is an investment bank that helped Backpage secure corporate financing.  U.S. Mot. Compel at 8-9.  Backpage counters that its outside counsel "required the assistance of a corporate financial advisor, Duff & Phelps," to advise Backpage concerning corporate restructuring and ensure "compliance with statutory and regulatory requirements."  Backpage Opp'n Mot. Compel at 14-15 (internal quotation marks omitted).

Although disclosure of attorney-client communications to third parties generally waives the privilege, *In re Pac. Pictures Corp.*, 679 F.3d at 1126-27, an exception applies to third parties "engaged to assist the attorney in providing legal advice," *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011).  "If the advice sought is not legal advice, but, for example, accounting advice from an accountant, then the privilege does not exist." *Id.*  The Court therefore directed Backpage to substantiate its argument "with some evidence that Duff & Phelps was acting in a way that was necessary to the rendering of the legal advice" from an attorney.  Court's Livenote Tr. (Feb. 9, 2018).

Backpage has submitted the two privilege log entries and the two associated documents for *in camera* review.  It contends that the 14 days allowed by the Court made

1   it impossible for Backpage to procure other evidence to support its assertion of privilege.

2   Backpage Supp. Mem. at 2-3.  But when the Court asked if Backpage would like more

3   time to assemble its evidence, Backpage's counsel responded:  "I think we can do it" by

4   the Court's deadline.  Court's Livenote Tr. (Feb. 9, 2018).

5        Having reviewed the document in camera, the Court cannot accept the privilege

6   log's characterization of the email and attachment as "information to facilitate legal

7   advice from outside counsel . . . regarding regulatory issues."  U.S. Mot. Compel Ex. H.

8   Duff & Phelps does not appear to be providing any information at all.  Outside counsel

9   simply forwards to Duff & Phelps and certain Backpage employees a list of questions and

10  answers that appear to include both legal and business advice.  The email does not

11  indicate who prepared the questions and answers.  Backpage has supplied no evidence

12  from which the Court can find that Duff & Phelps was anything other than a third party

13  whose receipt of an alleged attorney-client communication waived the privilege.

14       **IT IS ORDERED:**  The government's motion to compel is **granted in part** and

15  **denied in part**.  Backpage shall produce the Culloton Strategies, Sitrick & Company,

16  JMS Public Relations, and Duff & Phelps documents to the government by

17  **April 16, 2018**.

18       Dated this 2nd day of April, 2018.

19

20

21  _____

22                David G. Campbell
              United States District Judge

23

24  cc: All counsel by cd on 4/2/2018

25

26

27

28

- 14 -

# Exhibit I

| | |
|---|---|
| **From:** | Simrin Hooper [shooper@sspblue.com] on behalf of Simrin Hooper |
| **Sent:** | Wednesday, April 27, 2011 5:17 PM |
| **To:** | Carl Ferrer; Jim Larkin; Scott Spear |
| **Cc:** | Hemanshu Nigam; Jamie Schumacher |
| **Subject:** | BP NCMEC-Polaris Action Items |
| **Attachments:** | Backpage NCMEC-Polaris Action Items v1.xlsx |

Hi there,

Attached is a tracking document for the agreed upon changes and initiatives based on the meetings with NCMEC and Polaris, as well as our subsequent call.  I'll coordinate with Carl on the details.

Please let me know if you have any questions!

Thanks,
Simrin

1

BP-AZGJ_01110845

Confidential

SSP Blue | Backpage | NCMEC | Polaris
Action Items

Internal Document
Attorney-Client Privileged

Based on meetings 3/1/11

|  | A | B | C | D | E |
|---|---|---|---|---|---|
| | Area | Issue | Change | Owner | Date |
| 1 | | | | | |
| 2 | NCMEC Reports | Appearance that reports are coming from users instead of moderators | Appearance that reports are coming from users instead of moderators | | |
| 3 | NCMEC Reports | | Train moderators that while they are reviewing images for compliance with Terms, they should be reviewing images to ensure that there aren't any users under 18 in these photos. | | |
| 4 | NCMEC Reports | | Inform moderators they need to amp up review in terms of reporting possible under 18 images. | | |
| 5 | NCMEC Reports | Appearance that reports are coming from users instead of moderators | Inform moderators that they should be reporting these images NCMEC. | | |
| 6 | NCMEC Reports | Appearance that reports are coming from users instead of moderators | Tell moderators in how to report images to NCMEC. | | |
| 7 | NCMEC Reports | Appearance that reports are coming from users instead of moderators | Send vendor sample photos of under 18 images. | | |
| 8 | NCMEC Reports | Blurred images causing difficulty in identifying underage photos | Remove password entry requirement to increase ease of moderator reporting. | | |
| 9 | NCMEC Reports | User Reports | Use blurred images as a flag for moderators that the ad/image may be indicative of under age user, so look at that more closely. If it's obvious the image is not of an under 18, then do not report (obvious = individual appears to be 30+). | | |
| 10 | Partnerships | Join "Demi & Ashton Foundation" | Carl to send Simin examples of user reports to see what similarities there are in the user reports to see if that info can be given to moderators to assist in identifying potential under-age ads/images. | | |
| 11 | Partnerships | Join "Demi & Ashton Foundation" | Hemu to draft letter to the foundation for Scott to send, expressing their interest in joining the foundation and explaining the reasons for the slow response. | | |
| 12 | Finding Illegal Ads | Key Words | Determine requirements of foundation members. | | |
| | | | "New in Town" terminology is often used by pimps who shuttle children to locations where they do not know anyone and cannot get help. When this phrase is used, moderators should be told to be on heightened alert that the images may belong to an under 18. | | |

BP-AZGJ_01110846

Confidential

SSP Blue | Backpage | NCMEC | Polaris
Action Items

Internal Document
Attorney-Client Privileged

Based on meetings 3/1/11

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 13 | Finding Illegal Ads | Credit Cards and Phone Numbers | Determine if there is a way to see if one credit card is used to post numerous ads for different girls, and flag these ads for moderators; this could indicate a prostitution situation or a human trafficking situation. | | |
| 14 | Finding Illegal Ads | Credit Cards and Phone Numbers | Create a way to figure out if one phone number is being used on numerous different ads and flag these for moderators and put these in a separate review queue, this could indicate a prostitution situation or a human trafficking situation. | | |
| 15 | Finding Illegal Ads | Credit Cards and Phone Numbers | Determine if there is a way to figure out if a card being used is prepaid; this could be one indicator (of many) to moderators to pay closer attention to the ad as a potential trafficking ad. | | |
| 16 | Finding Illegal Ads | The Erotic Review: TER.com | Automate a periodic flush out of TER ID's. | | |
| 17 | Finding Illegal Ads | The Erotic Review: TER.com | Inform moderators that all ID numbers that are not clearly marked as massage license authentication numbers should be removed upon discovery. | | |
| 18 | Finding Illegal Ads | The Erotic Review: TER.com | Ads visited directly from TER should be indentified and removed. | | |
| 19 | Finding Illegal Ads | User Reporting to Polaris | Add the Polaris 1-800 # in the "Report Ad" Area. | | |
| 20 | Human Trafficking | User Reporting to Polaris | Add a link to Polaris that also explains trafficking and encourages reporting. | | |
| 21 | Human Trafficking | Moderator Reporting | Set up trainings between Backpage moderators and Polaris on how to identify potential victims in ads. | | |
| 22 | Human Trafficking | Moderator Reporting | Provide moderators with human trafficking terms/situations: Use of fake names, like "Diamonds". Pictures that are taken in obvious hotel rooms (as opposed to homes), Massage Parlors with terms like "Grand Opening" or "New Management", Ads written from masculine perspective or with particularly graphic photos or text. | | |
| 23 | Human Trafficking | Moderator Reporting | Inform moderators to pay increased attention to "Body Rubs" section in terms of human trafficking. | | |
| 24 | Human Trafficking | Partnerships | Backpage needs to meet with Byron Fassett in Dallas (High Risk Victim Technology Creator). | | |

BP-AZGJ_0111084?

Confidential

SSP Blue | Backpage | NCMEC | Polaris
Action Items

Internal Document
Attorney-Client Privileged

Based on meetings 3/1/11

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 25 | User Education | Increase user awareness of human trafficking through iniative across BP | Target Audience: Anyone who believes they are a victim of human trafficking, Users who may have knowledge of a victim, General users<br><br>Methods: Banners ads on partner sites, Sponsor ads on the Backpage sites, Links on top of the page in the adult and personals section, Announcement in Backpage blog, Additional methods to be identified | | |
| 26 | User Education | Increase user awareness of human trafficking through iniative across BP | | | |
| 27 | User Education | Safety, Security and Privacy Section | Create and develop content for SSP section on BP | | |

BP-AZGJ_01110848

# **<u>Exhibit J</u>**

| | |
|---|---|
| **From:** | Tony Knight [Tony_Knight@sitrick.com] |
| **Sent:** | Saturday, January 07, 2012 1:43 AM |
| **To:** | Edward E. McNally |
| **Cc:** | jim.larkin@villagevoicemedia.com; michael.lacey@villagevoicemedia.com; Mike Sitrick; Carl Ferrer |
| **Subject:** | Following up on the AC360 postmortem... |
| **Attachments:** | Messaging and QA for Adult Services Advertising v1.0 1-6-12.docx |

Everyone – As I said in my analysis of the AC360 story, Ed did a brilliant job, but Cooper spent too much time harping on the content of advertising that has been in the alternative press since I was skateboarding to class and covering the first Earth Day for the Ohio State Lantern.

I suggested earlier that we should develop more robust messaging on this issue. I've tried to distill not only what Ed said in the interview, but added a few flourishes that I hope might help.

This is an effort to delink prattle about the ad content from the real problem which is violent crime. One of the tactics here is to imply that the questioner/critic is a prude. In this day and age, not many journalists want to be in that category. Hopefully, we can get them to shift sooner to the issue of trafficking and interdicting it by leveraging Internet technologies.

1

BP-AZGJ_01111026

## Q and A – Messaging for Questions Adult Services Advertising on BP

*Private and confidential/ attorney-client work product*

**Q1: Why pander to sleazy customers offering what are obviously illegal services?**

A: Backpage is unapologetic about its Adult Services advertising. This type of advertising has been carried in the Village Voice and the company's other newspapers for decades. It meets the applicable legal standards, and it is consistent with the long tradition of the alternative press, which has its roots in the counter culture movement of the 1960s.

**Q2: But these are obviously ads for prostitution and that's illegal isn't it?**

A: There is nothing illegal about this advertising. Backpage reviews all ads for compliance with its terms of use and many are rejected. No nudity is allowed and as many as 22,000 words are banned. What Backpage doesn't do is judge the lifestyles of adults who use the service to find other like-minded adults.

**Q3: Your terms of use say ads for illegal activities are prohibited. That's hypocritical isn't it?**

A:  The ads are legal and this type of advertising in the alternative press has been accepted in communities throughout the U.S. for more than 50 years. You're ignoring the real problem which is violent criminals using the Internet to commit violent crimes. Backpage is a leader in policing its web site and has been praised by local law enforcement across the nation for its efforts.

**Q4: Why don't you just admit that you are enabling prostitution?**

A: Look, the Village Voice was founded by Norman Mailer in Greenish Village in 1955 and went citywide in the 1960s as a part of the counter culture movement. This movement was a revolt against what was seen as the uptight and prudish moral values of the previous generation. The Voice and other alternative newspapers have won numerous Pulitzer Prizes for aggressive and innovative reporting and brilliant writing. Far from being just tolerated, the alternative press is respected and praised in the communities it serves, and throughout its entire history it has carried Adult Services advertising.

**Q5: Then why say you're against illegal activity?**

A: Let's not get sidetracked on this issue when we should be confronting a much graver phenomenon of violent criminals using the Internet to commit their crimes. Censorship and banning web sites does nothing to address this problem. Backpage is a leader in leveraging Internet technologies in an effort to prevent these crimes and to help law enforcement identify and capture these criminals. Literally millions of ads for Adult Services are posted on tens of thousands of Internet pages every day. If you want to be uptight about Adult Services advertising, fine. But you're not doing anything to get violent predators off of the Internet.

###

BP-AZGJ_01111027

# **Exhibit K**



12-2-11362-4    49730435    ORCD    08-11-17



HONORABLE KATHRYN J. NELSON
Hearing date: August 4, 2017, at 9:00 a.m.
With oral argument

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR PIERCE COUNTY

J.S., et al.,

        Plaintiffs,

    v.

VILLAGE VOICE MEDIA HOLDINGS,
L.L.C., d/b/a Backpage.com;
BACKPAGE.COM, L.L.C.; NEW TIMES
MEDIA, L.L.C., d/b/a Backpage.com; and,
BARUTI HOPSON,

        Defendants.

NO. 12-2-11362-4

[PROPOSED] ORDER GRANTING
PLAINTIFFS' MOTION TO COMPEL
DISCOVERY RE: WAIVER OF
ATTORNEY-CLIENT PRIVILEGE AND
ABSENCE OF WORK-PRODUCT
PROTECTION

        THIS MATTER came before the Court on Plaintiffs' Motion to Compel Discovery re Waiver of Attorney-Client Privilege and Absence of Work Product Protection. The Court has considered the oral argument of the parties, the existing record, and the materials submitted by the parties, including:

        1.    Plaintiffs' Motion to Compel Discovery re Waiver of Attorney-Client Privilege and Absence of Work Product Protection, including the Declaration of Jason P. Amala submitted in support thereof;

        2.    The opposition of Defendants Village Voice Media Holdings, LLC, Backpage.com, LLC, and New Times Media, LLC's (collectively "Defendants") to Plaintiffs' Motion to Compel Discovery re Waiver of Attorney-Client Privilege and Absence of Work Product Protection, if any, and the evidence submitted in support thereof, if any; and,

[PROPOSED] ORDER GRANTING PLAINTIFFS'
MOTION TO COMPEL DISCOVERY
Page 1

PFAU COCHRAN VERTETIS AMALA PLLC
911 Pacific Ave., Ste. 200
Seattle, Washington 98402
Phone: (253) 777-0799  Fax:  (253) 627-0654

3.     Plaintiffs' Reply in Support of Plaintiffs' Motion to Compel Discovery re Waiver of Attorney-Client Privilege and Absence of Work Product Protection, including the evidence submitted in support thereof;

4.     _____

5.     _____

6.     _____

7.     _____

Based on the foregoing, it is hereby **ORDERED** that Plaintiffs' Motion to Compel Discovery re: Waiver of Attorney-Client Privilege and Absence of Work Product Protection is **GRANTED** for the reasons outlined in Plaintiffs' briefing.  The Court further **FINDS** and **CONCLUDES** as follows:

1.     The assertion of attorney-client privilege and work-product protection presently at issue is the result of Defendants' affirmative reliance on Backpage.com general counsel, Elizabeth McDougall, as a factual declarant in support of their summary judgment motion, designating her as their CR 30(b)(6) corporate representative, and allowing her to make factual assertions and representations in her personal deposition and in her CR 30(b)(6) deposition. The assertions and representations made by Ms. McDougall were submitted in support of Plaintiffs' motion and are attached hereto as Appendix C.

2.     Defendants have put the assertions and representations made by Ms. McDougall at issue in this litigation by relying on her declaration in support of their summary judgment motion, by designating her as their CR 30(b)(6) corporate representative, and by allowing her to make factual assertions and representations in her personal deposition and in the CR 30(b)(6) deposition.

3.     Plaintiffs' inability to obtain testimony and discovery regarding the assertions and representations made by Ms. McDougall on the Defendants' behalf denies Plaintiffs access

[PROPOSED] ORDER GRANTING PLAINTIFFS'
MOTION TO COMPEL DISCOVERY
Page 2

PFAU COCHRAN VERTETIS AMALA PLLC
911 Pacific Ave., Ste. 200
Seattle, Washington 98402
Phone: (253) 777-0799  Fax:  (253) 627-0654

to information vital to effectively litigating their claims, particularly where Backpage designated Ms. McDougall as its CR 30(b)(6) representative.

4.      Based on the foregoing, as well as the arguments in Plaintiffs' motion and reply brief, the Court concludes that Defendants have waived the attorney-client privilege and work-product protection with respect to (1) the assertions and representations made by Ms. McDougall in her declaration submitted in support of the Defendants' summary judgment motion, in her personal deposition dated April 25, 2017, and in the CR 30(b)(6) deposition dated April 26, 2017; and (2) the topics identified in Plaintiffs' CR 30(b)(6) deposition notice.

5.      The Court orders that Plaintiffs are entitled to full and complete discovery regarding the topics in the CR 30(b)(6) notice and the assertions and representations made by Ms. McDougall in her declaration and deposition testimony, including:

a.      Any and all topics or representations attested to in the Declaration of Elizabeth McDougall Submitted in Support of the Backpage Defendants' Motion for Summary Judgement, dated March 23, 2017, and attached to this Order as Appendix A.

b.      Any and all matters designated in the Second Amended Notice of CR 30(b)(6) Video Deposition of Defendant Village Voice Media Holdings, LLC, d/b/a Backpage.com; Backpage.com, LLC; and New Times Media, LLC, dated April 5, 2017, and attached to this Order as Appendix B.

c.      The topics, assertions, and representations outlined in Appendix C, which tabulates numerous material assertions and representations made by Ms. McDougall in her declaration, in her personal deposition, and in her CR 30(b)(6) deposition.

d.      Defendants' waiver of the attorney-client privilege and work-product protection as to the matters set forth above is limited in scope, As stated above to include only that privilege or protection that would have existed because of Ms. McDougall's status as general counsel of Backpage.com or with prior general counsel for Defendants. This waiver does not extend to privileged and/or

[PROPOSED] ORDER GRANTING PLAINTIFFS'
MOTION TO COMPEL DISCOVERY
Page 3

PFAU COCHRAN VERTETIS AMALA PLLC
911 Pacific Ave., Ste. 200
Seattle, Washington 98402
Phone: (253) 777-0799  Fax: (253) 627-0654

protected communications, information, and documents that currently exists between Defendants and their counsel in this litigation or with other outside counsel.

e. _____

_____

_____

_____

_____

6.      Plaintiffs are entitled to test Ms. McDougall's answers regarding the foregoing topics and the assertions and representations in her declaration, her personal deposition testimony, and her CR 30(b)(6) testimony, including the purported foundation for those answers and representations.

7.      The Court **ORDERS** Ms. McDougall to appear for a continuation of her personal deposition and for a continuation of the CR 30(b)(6) deposition and to provide answers that are consistent with this Order.

8.      The Court **ORDERS** Defendants to adequately prepare Ms. McDougall to testify regarding the matters designated in the Second Amended Notice of CR 30(b)(6) Video Deposition. Such preparation shall include good-faith, reasonable efforts to account for the institutional knowledge of the Defendants that is known or reasonably available to Defendants.

9.      The Court **ORDERS** that the continuation of Ms. McDougall's individual and CR 30(b)(6) depositions shall occur within 30 days from the date of this Order at mutually agreeable days/times ~~at the below listed location:~~

☐   In chambers, before the Court.

☐   Before a discovery master, as assigned by the Court.

☐   _____

_____

[PROPOSED] ORDER GRANTING PLAINTIFFS'
MOTION TO COMPEL DISCOVERY
Page 4

PFAU COCHRAN VERTETIS AMALA PLLC
911 Pacific Ave., Ste. 200
Seattle, Washington 98402
Phone: (253) 777-0799 Fax: (253) 627-0654

~~10.    Given the Court's order that the attorney/client privilege and work product~~
doctrine have been waived as to certain topics, assertions, and representations, as more fully
detailed herein, the Court **ORDERS** Defendants to supplement their prior discovery responses
and to provide any additional information or records that have been withheld based on an
assertion of privilege or work product that would be inconsistent with this Order.

11. _____

_____

_____

DONE IN OPEN COURT this 8th day of _August_ 2017. *

_____
THE HONORABLE KATHRYN J. NELSON

**FILED**
DEPT. 13
IN OPEN COURT

AUG 0 8 2017

By_____
DEPUTY

PRESENTED BY:
PFAU COCHRAN VERTETIS AMALA PLLC

By: /s/ Jason P. Amala
    Michael T. Pfau, WSBA # 24649
    michael@pcvalaw.com
    Jason P. Amala, WSBA # 37054
    jason@pcvalaw.com
    Vincent T. Nappo, WSBA # 44191
    vincent@pcvalaw.com
    Attorneys for Plaintiffs

* Court received defendants proposed revisions on 8/8/17. Court received response by Plaintiffs and Request for Defendant to delay until noon Court's preparation of the order. Court did not insert factual as ~~plaintiff~~ ~~revisions on~~ defendant requested. Court did make other changes as those were agreed.

[PROPOSED] ORDER GRANTING PLAINTIFFS'
MOTION TO COMPEL DISCOVERY
Page 5

PFAU COCHRAN VERTETIS AMALA PLLC
911 Pacific Ave , Ste. 200
Seattle, Washington 98402
Phone: (253) 777-0799 Fax: (253) 627-0654

8/11/2017   1654   0101

# Appendix A

E-FILED
IN COUNTY CLERK'S OFFICE
PIERCE COUNTY, WASHINGTON

March 23 2017 4:14 PM

KEVIN STOCK
COUNTY CLERK
NO: 12-2-11362-4

THE HONORABLE KATHRYN J. NELSON

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR PIERCE COUNTY

| | |
|---|---|
| J.S., et al., | No. 12-2-11362-4 |
| Plaintiffs, | **DECLARATION OF ELIZABETH MCDOUGALL SUBMITTED IN SUPPORT OF THE BACKPAGE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| VILLAGE VOICE MEDIA HOLDINGS LLC, d/b/a Backpage.com, et al. | |
| Defendants. | |

I, Elizabeth McDougall, declare as follows:

1.      I am General Counsel for Defendant Backpage.com, LLC ("Backpage.com").
I am over 18 years of age and competent to provide testimony under oath.

2.      As part of my role as General Counsel for Backpage.com, I have reviewed
documents sufficient to testify regarding the below.  If called as a witness, I could and
would testify thereto.

MCDOUGALL DECLARATION
NO. 12-2-11362-4  – 1

134656896.4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

3.      Except where otherwise noted, the policies and practices described below apply to the relevant period in this case, between June 2010 and September 2010 (the "Relevant Period").

4.      Backpage.com operates an online classified advertising service, located at the web address www.backpage.com.

5.      The Backpage.com website is available in all 50 states and the District of Columbia.  Backpage.com is organized geographically by states and municipalities.  For example, users interested in Washington State may post and view ads specific to Bellingham, Everett, Moses Lake, Mount Vernon, Olympia, Pullman, Seattle, Spokane, Tacoma, Tri-Cities, Wenatchee, and Yakima.  Attached as **Exhibit A** is a true and correct copy of the homepage for the Washington edition of the website (washington.backpage.com), as it appeared in August 2010.

6.      Backpage.com is the second largest classified advertising website in the country, after Craigslist.  Users post millions of classified ads on the Backpage.com website.  By way of example, in the month of September 2010, users posted more than 3.4 million ads on Backpage.com.  Users could post ads in numerous categories, including local places, community, buy/sell/trade, automotive, musician, rentals, real estate, jobs, dating, adult, and services (and various subcategories within these categories).  The adult category included several sub-categories, including the escorts category.

7.      Advertisements on Backpage.com were (and are) created entirely by users.  Backpage.com did not require any specific content in escort ads (although the site did require age certification and compliance with posting rules, as discussed below).  Rather, to post an advertisement in the adult category, after the age certification described in paragraph 11 below and agreeing to the Posting Rules described in paragraph 12 below,

MCDOUGALL DECLARATION
NO. 12-2-11362-4 – 2

134656896.4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

users created all content of ads they posted.  The interface allowed users to compose a title

for the advertisement, compose the text of the advertisement, and required input of an age

and email address.  All of these items were entered in blank fields, into which the user typed

the information he or she wants to appear in the advertisement.  The user could also upload

photographs to be included in the advertisement.  After the user created the content for the

advertisement, he or she could view a "preview" of the advertisement before he or she

submitted it for posting to the website.

8.      I understand that the Plaintiffs allege that pimps placed advertisements on

Backpage.com allegedly offering Plaintiffs for prostitution.  Backpage.com has searched its

records and has located advertisements that may relate to Plaintiffs that were placed between

June 27, 2010 and September 22, 2010.  Backpage.com did not draft the text of the

advertisements or post any of the photographs used in the ads.  Nor is there any evidence

that Backpage removed any text or photographs from any of the ads.  All decisions as to the

contents of the ads and regarding whether to post were made by the users who posted them

and not Backpage.com personnel.  Backpage.com had no role in and did not participate in

the creation of the ads relating to Plaintiffs in any way.  Backpage.com personnel also did

not solicit or encourage in any way the users who posted ads about Plaintiffs, and had no

contacts or dealings with these individuals—the individuals merely used the automated

systems to upload ads. Backpage.com personnel did not collude or conspire with the users

who posted the ads.  Backpage.com had no knowledge, or any way of knowing, at the time

the ads were posted, who the Plaintiffs were, whether they were minors or whether they

were being exploited.

9.      Backpage.com expressly prohibits illegal content and activity on its site.

MCDOUGALL DECLARATION
NO. 12-2-11362-4 – 3

134656896.4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

10.     Backpage.com's Terms of Use prohibit ads for illegal services or posting "any material . . . that exploits minors in any way." The Terms of Use in place during the Relevant Period stated in part:

> **User Conduct:**
>
> Without limitation, you agree to refrain from the following actions while using the Site: . . .
>
> 2. Transmitting any information, data, text, files, links, software, chats, communication or other materials that is unlawful, false, misleading, harmful, threatening, abusive, invasive of another's privacy, harassing, defamatory, vulgar, obscene, hateful or racially or otherwise objectionable, including without limitation material of any kind or nature that encourages conduct that could constitute a criminal offense, give rise to civil liability or otherwise violate any applicable local, state, provincial, national, or international law or regulation, or encourage the use of controlled substances; . . .
>
> 4. (a) Posting adult content or explicit adult material unless: (i) such material is specifically permitted in designated adult categories and permitted under applicable federal, state, and local law; and (ii) you are at least 18 years of age or older and not considered to be a minor in your state of residence; (b) Posting, anywhere on the Site, obscene or lewd and lascivious graphics or photographs which depict genitalia or actual or simulated sexual acts, as determined in the sole discretion of backpage.com; (c) Posting any solicitation directly or in "coded" fashion for any illegal service exchanging sexual favors for money or other valuable consideration; (d) Posting any material on the Site that exploits minors in any way; (e) Posting any material on the Site that in any way constitutes or assists in human trafficking.
>
> 5. Posting any ad for products or services, use or sale of which is prohibited by any law or regulation;

Attached as **Exhibit B** is a true and correct copy of the complete Terms of Use effective from May 18, 2010 to January 8, 2014.

MCDOUGALL DECLARATION
NO. 12-2-11362-4 – 4

134656896.4

**Perkins Coie** LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

11. Backpage.com required users seeking access to the adult category to first affirm they are at least 18 years old and agree to the Terms of Use. If a user clicked on the category, a page appeared explaining and requiring this age certification. This page required users to agree to report any posting that may relate to suspected exploitation of minors or human trafficking, and provided a link to the website of the National Center for Missing and Exploited Children ("NCMEC"), www.cybertipline.com. Attached as **Exhibit C** is a true and correct copy of the age certification page from July 2010. Attached as **Exhibit D** is a true and correct copy of the page that appeared through this link.

12. In addition, Backpage.com had specific "Posting Rules" for the adult category. These Posting Rules were added to the Backpage.com website in September 2010. Before a user could post an ad in the adult category on Backpage.com, he or she was required to review and agree to the Posting Rules, which emphasized that postings for commercial sex acts are prohibited; that all forms of human trafficking or exploitation are prohibited and would not be tolerated; and that any potential child exploitation would be reported for law enforcement investigation. The Posting Rules in place in September 2010 stated:

> **Posting Rules**
>
> You agree to the following when posting in this category:
>
> - I will not post obscene or lewd and lascivious graphics or photographs which depict genitalia or actual or simulated sexual acts;
> - I will not post any solicitation directly or in "coded" fashion for any illegal service exchanging sexual favors for money or other valuable consideration;
> - I will not post any material on the Site that exploits minors in any way;

MCDOUGALL DECLARATION
NO. 12-2-11362-4 – 5

134656896.4

**Perkins Coie** LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

- I will not post any material on the Site that in any way constitutes or assists in human trafficking;
- I am at least 18 years of age or older and not considered to be a minor in my state of residence.

A post exploiting a minor in any way is subject to criminal prosecution and may be reported to the Cybertipline {links to www.cybertipline.com}. The poster will be caught and the police will prosecute the poster to the full extent of the law.

Any post with terms or misspelled versions of terms implying an illegal service will be rejected. Examples of such terms include without limitation: 'greek', "gr33k", bbbj', 'blow', 'trips to greece', etc.

Postings violating these rules and our Terms of Use are subject to removal without refund.

I will abide by these rules and the Site's Terms of Use.

Attached as **Exhibit E** is a true and correct copy of a screenshot of the Posting Rules as of September 2, 2010.

13.     In addition, the posting flow to the escorts category of Backpage.com included a notice that repeated some of the prohibitions from the Backpage.com Terms of Use and, after they were implemented, the Posting Rules.  That notice stated:

### POST LEGAL ESCORT AND MASSAGE ADS HERE

Do not suggest an exchange of sex acts for money.

Do not use code words such as 'greek', 'bbbj', 'blow', 'trips to greece', etc.

Do not post obscene images.

Do not post content which advertises an illegal service.

Postings not complying with the **terms of use** are subject to removal.

Attached as **Exhibit F** is a true and correct copy of a screenshot of this message as of September 2, 2010.

MCDOUGALL DECLARATION
NO. 12-2-11362-4 − 6

134656896.4

**Perkins Coie** LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

14.     Before a user placed an ad on the escort section of Backpage.com, the user was required to agree to the following:

> By placing this ad I agree to the terms of use. I confirm and represent that I am at least 18 years of age or older (and am not considered to be a minor in my state of residence) and that I am not located in a community or local jurisdiction where nude pictures or explicit adult materials are prohibited by any law. I further represent and warrant that this posting does not contain any obscene or lewd and lascivious graphics or photographs or graphics or photographs with depict or simulate sexual acts.

Attached as **Exhibit G** is a true and correct copy of a screenshot of the portion of the Backpage.com website containing this message as of September 2, 2010.

15.     Backpage.com also employed extensive, voluntary monitoring to prevent and remove improper user postings, practices that evolved throughout 2010. First, Backpage.com used (and regularly updated) an automated filtering system that scanned millions of potential posts each month, before they appeared on Backpage.com's website, for "red-flag" terms, phrases, codes, email addresses, URLs and IP addresses. Some advertisements containing prohibited terms and phrases were rejected from publication to the website. In other instances, rather than reject the entire ad, Backpage.com removed the prohibited terms or phrases from the ad, either via an automated system or manually.

16.     Second, users could report potential violations of the Backpage.com Terms of Use or Posting Rules, or any other concerns, by sending an email directly to abuse@backpage.com. Backpage.com personnel reviewed emails sent to the address abuse@backpage.com to determine whether ads should be removed or reported to appropriate authorities. Attached as **Exhibit H** is a true and correct copy of a screenshot of this feature as of September 2, 2010.

MCDOUGALL DECLARATION
NO. 12-2-11362-4 – 7

134656896.4

**Perkins Coie** LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

17.     Third, Backpage.com also operated a two-tiered manual (human) review system (called "moderation") of ads submitted for posting to the adult category. During the first-level manual review, Backpage.com personnel assessed proposed posts to the adult category before they were allowed to appear on Backpage.com and endeavored to prevent postings that concerned illegal conduct and other activity prohibited by the Terms of Use or Posting Rules. During the second-level manual review, Backpage.com personnel examined nearly every posting in the adult category that appeared on the website as a double check for potential illegal or prohibited activity.

18.     Moderators were never authorized to add content to ads. Moderators were instructed to reject (or delete) ads that directly suggested an exchange of sex for money or that included images depicting sexual acts. Moderators were instructed to remove images or photographs that violated Backpage.com's Posting Rules prohibiting the posting of any nude photographs. Finally, moderators were also instructed to remove certain obscene or sexual terms or phrases from ads.

19.     If, during the manual review discussed above, Backpage.com personnel believed that an advertisement might relate to the exploitation of a minor, Backpage.com reported the posting to NCMEC. Attached as **Exhibit I** is a true and correct copy of a June 8, 2010 internal Backpage.com email communication setting out the procedures for reporting advertisements to NCMEC (referred to in the email as Cybertipline), produced at BACKPAGE00006284-85.

20.     Backpage.com's policies, rules and restrictions for the website were not designed or intended to induce sex trafficking or exploitation of any sort. Backpage.com imposed and enforced rules, screened and blocked ads, and took other actions (as described above) to prevent and preclude such misuse of the website. Attached are the following

MCDOUGALL DECLARATION
NO. 12-2-11362-4 – 8

134656896.4

**Perkins Coie** LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

documents, which relate to Backpage.com's efforts to prevent misuse of the website and help law enforcement.

a.  Attached as **Exhibit J** is a true and correct copy of a May 25, 2011 email communication between Backpage.com and an officer from the Texas Office of the Attorney General, produced at BACKPAGE00017104-05.

b.  Attached as **Exhibit K** is a true and correct copy of a June 8, 2011 email between Backpage.com and an FBI agent from Chicago, produced at BACKPAGE00017085.

c.  Attached as **Exhibit L** is a true and correct copy of an August 29, 2011 email communication between Backpage.com and law enforcement from Longview, Texas, produced at BACKPAGE00009081-82.

d.  Attached as **Exhibit M** is a true and correct copy of a May 19, 2011 presentation given by Backpage.com to the U.S. Department of Justice, produced at BACKPAGE00027616-52.

e.  Attached as **Exhibit N** is a true and correct copy of Backpage.com's Law Enforcement Guide, produced at BACKPAGE00012427-28.

21.  I know of no other website in the country that has instituted and applied such extensive measures to prevent and block improper content (especially concerning sex trafficking or exploitation of minors) or to cooperate with law enforcement.

//

//

//

//

MCDOUGALL DECLARATION
NO. 12-2-11362-4 – 9

134656896.4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

I declare that the foregoing is true and correct to the best of my knowledge and subject to the penalty of perjury under the laws of the state of Washington.

Dated this 23rd day of March, 2017, at Los Angeles, California.

_____
Elizabeth McDougall

MCDOUGALL DECLARATION
NO. 12-2-11362-4 – 10

134656896.4

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# CERTIFICATE OF SERVICE

On March 23, 2017, I caused to be served upon counsel of record, at the address stated below, via the method of service indicated, a true and correct copy of the following documents: **DECLARATION OF ELIZABETH MCDOUGALL SUBMITTED IN SUPPORT OF THE BACKPAGE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| Erik L. Bauer<br>The Law Office of Erik L. Bauer<br>215 Tacoma Avenue South<br>Tacoma, WA 98402<br>Email: erik@erikbauer.com<br>**Attorney for Plaintiffs** | ☐ Via hand delivery<br>☐ Via U.S. Mail, 1st Class, Postage Prepaid<br>☐ Via Overnight Delivery<br>☐ Via Facsimile<br>☒ Via E-Mail |
| Michael T. Pfau<br>Darrell L. Cochran<br>Jason P. Amala<br>Vincent T. Nappo<br>Pfau Cochran Vertetis Amala PLLC<br>911 Pacific Avenue, Suite 200<br>Tacoma, WA 98402<br>Email: Michael@pcvalaw.com<br>Darrell@pcvalaw.com<br>jason@pcvalaw.com<br>Vincent@pcvalaw.com<br>**Attorneys for Plaintiffs** | ☐ Via hand delivery<br>☐ Via U.S. Mail, 1st Class, Postage Prepaid<br>☐ Via Overnight Delivery<br>☐ Via Facsimile<br>☒ Via E-Mail |
| James Condon Grant<br>Davis Wright Tremaine LLP<br>Email: jamesgrant@dwt.com<br>**Attorney for Defendants,**<br>Village Voice Media Holdings, LLC,<br>Backpage.com LLC, New Times Media, LLC | ☐ Via hand delivery<br>☐ Via U.S. Mail, 1st Class, Postage Prepaid<br>☐ Via Overnight Delivery<br>☐ Via Facsimile<br>☒ Via E-Mail |

CERTIFICATE OF SERVICE
NO. 12-2-11362-4 – 1

134656896.4

**Perkins Coie** LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.**

EXECUTED at Seattle, Washington, on March 23, 2017.

<u>s/ *Erin J. Weinkauf*</u>
Erin J. Weinkauf
Legal Secretary

CERTIFICATE OF SERVICE
NO. 12-2-11362-4 – 2

134656896.4

**Perkins Coie** LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

0114

1654

8/11/2017

# Appendix B

Court reporter and videographer requested 4/6/17 (bh)
(Byers & Anderson)

0115

1654

8/11/2017

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR PIERCE COUNTY

J.S., et al.,

               Plaintiffs,

    v.

VILLAGE VOICE MEDIA HOLDINGS,
L.L.C., d/b/a Backpage.com, et al.,

               Defendants.

NO. 12-2-11362-4

SECOND AMENDED NOTICE OF CR
30(b)(6) VIDEO DEPOSITION OF
DEFENDANT VILLAGE VOICE MEDIA
HOLDINGS, L.L.C., d/b/a
BACKPAGE.COM; BACKPAGE.COM,
LLC; AND, NEW TIMES MEDIA, LLC

TO:       DEFENDANTS VILLAGE VOICE MEDIA HOLDINGS, L.L.C., d/b/a
             BACKPAGE.COM; BACKPAGE.COM, LLC; and, NEW TIMES MEDIA,
             LLC

AND TO:   ALL ATTORNEYS OF RECORD

     YOU AND EACH OF YOU will please take notice that a videotaped deposition of the

following individual will be taken on behalf of Plaintiffs before a Notary Public as follows:

     NAME:      PERSON(S) MOST KNOWLEDGEABLE OF DEFENDANTS
                  VILLAGE VOICE MEDIA HOLDINGS, L.L.C., d/b/a
                  BACKPAGE.COM; BACKPAGE.COM, LLC, and NEW TIMES
                  MEDIA, LLC.

     DATE:      April 26, 2017

     TIME:      9:00 A.M.

     PLACE:    PERKINS COIE LLP
                 1201 Third Ave., Ste. 4900

NOTICE OF 30(b)(6) DEPOSITION - 1 of 10

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia St., Ste. 500
Seattle, Washington 98104
(206) 462-4334 - FACSIMILE (206) 623-3624
http://www.pcvalaw.com

Seattle, WA 98101

The Washington Supreme Court concluded in this case that "[i]t is important to ascertain whether in fact Backpage designed its posting rules to induce sex trafficking to determine whether Backpage is subject to suit under the CDA because 'a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct.'" *J.S. v. Vill. Voice Media Holdings, L.L.C.*, 184 Wn.2d 95, 103 (2015) (citing *Fair Hous. Council*, 521 F.3d at 1168).

Further, the Court highlighted the following factual allegations from Plaintiffs' First Amended Complaint as warranting further fact-finding and discovery:

(1) "Backpage.com ... has intentionally developed its website to require information that allows and encourages ... illegal trade to occur through its website, including the illegal trafficking of underage girls,"

(2) "Backpage.com has developed content requirements that it knows will allow pimps and prostitutes to evade law enforcement,"

(3) "Backpage.com knows that the foregoing content requirements are a fraud and a ruse that is aimed at helping pimps, prostitutes, and Backpage.com evade law enforcement by giving the [false] appearance that Backpage.com does not allow sex trafficking on its website,

(4) "the content requirements are nothing more than a method developed by Backpage.com to allow pimps, prostitutes, and Backpage.com to evade law enforcement for illegal sex trafficking, including the trafficking of minors for sex,"

(5) Backpage's "content requirements are specifically designed to control the nature and context of those advertisements so that pimps can continue to use Backpage.com to traffic in sex, including the trafficking of children, and so Backpage.com can continue to profit from those advertisements," and

(6) Backpage has a "substantial role in creating the content and context of the advertisements on its website." CP at 6, 8, 10, 12, 13. According to J.S., Backpage's advertisement posting rules were not simply neutral policies prohibiting or limiting certain content but were instead "specifically designed ... so that pimps can continue to use Backpage.com to traffic in sex."

NOTICE OF 30(b)(6) DEPOSITION - 2 of 10

Additionally, the defendants have previously claimed that they led the industry in efforts to prevent sex trafficking on the www.backpage.com website through a process referred to as "moderation" practices, which entails screening and reviewing escort advertisements that are submitted for publication by users of www.backpage.com.

In light of the foregoing, Plaintiffs ask that the CR 30(b)(6) representative(s) with the most knowledge from DEFENDANTS VILLAGE VOICE MEDIA HOLDINGS, L.L.C., d/b/a BACKPAGE.COM; BACKPAGE.COM, LLC, and NEW TIMES MEDIA, LLC be prepared to testify regarding:

1) The "moderation" practices that have been used for advertisements on www.backpage.com since such practices were first implemented until present. You should be prepared to discuss the following subjects for each version of such "moderation practices," including the version(s) that existed when each Plaintiff alleges she was sexually abused and exploited on www.backpage.com.

a. How, when, and why each version of the "moderation practices" were implemented.

b. Whether any version of the "moderation practices" was implemented to help prevent sex trafficking of women and children on www.backpage.com, and if so, how each version was intended to help accomplish that goal.

c. Each person who was involved with creating or implementing each version of the "moderation practices," including the role of each person in creating or implementing the "moderation practices" and their last known contact information.

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia St., Ste. 500
Seattle, Washington 98104
(206) 462-4334 - FACSIMILE (206) 623-3624
http://www.pcvalaw.com

**d.**     Whether any third parties assisted in creating, implementing, or modifying the "moderation practices," and if so, the identity of each third party and their role in creating, implementing, or modifying the "moderation practices."

**e.**     What control, if any, you had over how each version of the "moderation practices" was implemented, including any control you had over the day-to-day implementation of the "moderation practices" and individual advertisements that were "moderated."

**f.**     How and why the "moderation practices" have been modified over time, including each person who was involved with modifying the "moderation practices" and their role in modifying the "moderation practices," and the reason for each modification.

**g.**     A detailed explanation of the step-by-step process that has been used for "moderating" advertisements on www.backpage.com since the "moderation practices" were first implemented.  For each version of the "moderation practices," you should be prepared to discuss the step-by-step process from the point that a user first visited www.backpage.com until the user's advertisement was visible to other users of www.backpage.com.

**h.**     A detailed explanation of how each version of the "moderation practices" were implemented   in   conjunction   with   the   process   for   posting   an   advertisement   on www.backpage.com, including a detailed explanation of the step-by-step process for posting an advertisement on www.backpage.com and how the "moderation practices" integrated with that process.

**i.**     A detailed explanation of how each version of the "moderation practices" allowed an advertisement to be viewed, modified, edited, and/or published, including the ability to keep track of changes or edits to an individual advertisement.

NOTICE OF 30(b)(6) DEPOSITION - 4 of 10

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia St., Ste. 500
Seattle, Washington 98104
(206) 462-4334  •  FACSIMILE (206) 623-3624
http://www.pcvalaw.com

**j.**     A detailed explanation of how each version of the "moderation practices" allowed you to view a user's history on www.backpage.com, including prior advertisements posted by the same user and any edits to the user's prior advertisements.

**k.**     Your document retention policies for records regarding your "moderation practices," including who was responsible for carrying out your document retention policies and any written documentation you have regarding such policies.

**l.**     Your document retention policies for records regarding individual advertisements that have been posted on www.backpage.com, including who was responsible for carrying out your document retention policies and any written documentation you have regarding such policies.

2) Your policies, practices, and procedures for reviewing, screening, moderating, and/or editing an advertisement on www.backpage.com, including ads in the section that became known as the "escorts" section, from when advertisements were first allowed on the website until present.  You should be prepared to discuss the following subject for each version of such policies, practices, and procedures, including whatever policies, practices, and procedures were in place when each Plaintiff alleges she was sexually abused and exploited on www.backpage.com.

a.     Your policies, practices, and procedures relating to reviewing an advertisement before publication and after publication.

b.     Your policies, practices, and procedures relating to screening an advertisement before publication and after publication.

c.     Your policies, practices, and procedures relating to moderating an advertisement before publication and after publication.

NOTICE OF 30(b)(6) DEPOSITION - 5 of 10

d.      Your policies, practices, and procedures relating to editing the content of an advertisement before publication and after publication.

e.      Your policies, practices, and procedures relating to removing the content from an advertisement before publication and after publication.

f.      Your policies, practices, and procedures relating to editing an advertisement's written or photographic content before publication and after publication.

g.      Your policies, practices, and procedures relating to deleting or "failing" an advertisement before publication and after publication.

h.      A detailed explanation of any third party that you have used for implementing the policies, practices, and procedures for reviewing, screening, moderating, and/or editing an advertisement on www.backpage.com, including ads in the section that became known as the "escorts" section. For each third party, please be prepared to provide the identity of each third party, the last known contact information for each third party, the date(s) they helped to implement your policies, practices, and procedures, their role in implementing your policies, practices, and procedures, and any oversight or control you had over how they implemented your policies, practices, and procedures.

i.      Your document retention policies for records regarding your policies, practices, and procedures, including who was responsible for carrying out your document retention policies and any written documentation you have regarding such policies.

3)      Your involvement with each of the ads that were posted of each Plaintiff on www.backpage.com, including whether you or someone on your behalf:

a.      Reviewed each ad, and if so, how each ad was reviewed; and,

b.      Edited each ad, and if so, how each ad was edited.

NOTICE OF 30(b)(6) DEPOSITION - 6 of 10

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia St., Ste. 500
Seattle, Washington 98104
(206) 462-4334  -  FACSIMILE (206) 623-3624
http://www.pcvalaw.com

4)     Whether anyone was responsible for moderating the "escort section" of www.backpage.com where each Plaintiff's ads were posted, and if so, the name of the person(s) responsible for moderating that section at the time each Plaintiff's ads were posted.

5)  A detailed explanation of all information that has been available to you regarding each Plaintiff's ad that was posted on www.backpage.com, including the information that is visible on the documents you have produced in discovery regarding each Plaintiff's ad.

6)  A detailed explanation of all information that has been available to you regarding each user who posted ads of each Plaintiff on www.backpage.com, including the information that is visible on the documents you have produced in discovery regarding each Plaintiff's ad.

7)   To the extent you assert that you no longer have information regarding each Plaintiff's ad, or each user who posted ads of each Plaintiff, when that information was destroyed, why it was destroyed, and who destroyed it.

8) Any consideration or material benefit you received for each of the ads that were posted of each Plaintiff on www.backpage.com, including whether you profited from each ad, and if so, how much you profited and how you earned those profits.

9)  Each version of the "posting rules" that were implemented for advertisements posted in the "escort" section of www.backpage.com, including when each version was created, why each version was created, and who was involved with creating each version.

10)    Each version of the "content requirements" that were implemented for advertisements posted in the "escort" section of www.backpage.com, including when each version was created, why each version was created, and who was involved with creating each version.

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia St., Ste. 500
Seattle, Washington 98104
(206) 462-4334 • FACSIMILE (206) 623-3624
http://www.pcvalaw.com

11) Before and during the time that each Plaintiff was advertised on www.backpage.com, your knowledge that children were being trafficked for sex in the "escort" section of www.backpage.com; whether you required photo identification or proof of age for an ad posted in the "escort" section of www.backpage.com, and if not, why not; whether you required photo identification or proof of age for an adult ad posted in the Seattle Weekly during the time that each Plaintiff was advertised on www.backpage.com, and if so, why; whether you required photo identification or proof of age for an adult ad posted in print media owned or managed by you during the time that each Plaintiff was advertised on www.backpage.com, and if so, why; and, what steps you took, if any, to prevent children from being advertised for sex in the "escort" section of www.backpage.com.

12) Before and during the time that each Plaintiff was advertised on www.backpage.com, whether you knew that your moderation practices were helping to promote sex trafficking on www.backpage.com by effectively sanitizing ads for sex, and whether you knew that your moderation practices were helping sex traffickers evade law enforcement by effectively sanitizing ads for sex.

A stenographic and videotaped record of the deposition shall be made at the expense of the noting party. This oral examination will be subject to continuance or adjournment from time to time or place to place until completed.

DATED this 5th day of April 2017.

PFAU COCHRAN VERTETIS AMALA PLLC

By: _____
    Michael T. Pfau, WSBA No. 24649
    mike@pcvalaw.com
    Jason P. Amala, WSBA No. 37054
    jason@pcvalaw.com

NOTICE OF 30(b)(6) DEPOSITION - 8 of 10

1   Vincent T. Nappo, WSBA No. 44191
    vnappo@pcvalaw.com
2   Attorneys for Plaintiffs

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

NOTICE OF 30(b)(6) DEPOSITION - 9 of 10

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia St., Ste. 500
Seattle, Washington 98104
(206) 462-4334 - FACSIMILE (206) 623-3624
http://www.pcvalaw.com

## Certificate of Service

I, Vincent Nappo, hereby declare under penalty of perjury under the laws of the State of Washington that that I am employed at Pfau Cochran Vertetis Amala PLLC and that on this 5th day of April 2017, I served the foregoing document via e-mail, first class mail, ABC Legal Messenger, and/or facsimile by directing delivery addressed to:

*Counsel for the above-captioned Defendants:*

Breena Roos
Harry Schneider
Perkins Coie LLP
1201 Third Ave., Suite 4900
Seattle, WA 98101

_____
Vincent Nappo

4850-3606-4813, v. 2

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia St., Ste. 500
Seattle, Washington  98104
(206) 462-4334  -  FACSIMILE (206) 623-3624
http://www.pcvalaw.com

## APPENDIX C
## Material Assertions and Representations by Elizabeth McDougall

### Backpage's Removal of Terms From Ads Indicative of Sex Trafficking

Backpage.com also employed extensive, voluntary monitoring to prevent and remove improper user postings, practices that evolved throughout 2010. First, Backpage.com used (and regularly updated) an automated filtering system that scanned millions of potential posts each month, before they appeared on Backpage.com's website, for "red-flag" terms, phrases, codes, email addresses, URLs and IP addresses. Some advertisements containing prohibited terms and phrases were rejected from publication to the website. In other instances, rather than reject the entire ad, Backpage.com removed the prohibited terms or phrases from the ad, either via an automated system or manually. (McDougall Decl. ¶ 15)

Backpage.com also operated a two-tiered manual (human) review system (called "moderation") of ads submitted for posting to the adult category. During the first-level manual review, Backpage.com personnel assessed proposed posts to the adult category before they were allowed to appear on Backpage.com and endeavored to prevent postings that concerned illegal conduct and other activity prohibited by the Terms of Use or Posting Rules. During the second-level manual review, Backpage.com personnel examined nearly every posting in the adult category that appeared on the website as a double check for potential illegal or prohibited activity. (McDougall Decl. ¶ 17)

If, during the manual review discussed above, Backpage.com personnel believed that an advertisement might relate to the exploitation of a minor, Backpage.com reported the posting to NCMEC." (McDougall Decl. ¶ 19)

Q: Was there a period of time where Backpage had a practice of removing certain terms from ads before they were posted on the website?
A: There was a period of time when Backpage did remove certain terms from ads before they were posted on the website.
(McDougall Dep. 59:1-6)

Q: You are aware that Backpage had an automatic filter in place to remove certain terms that the company defined as being terms reflecting sex for money, correct?
A: The company had a filter in place for removing terms, phrases, URLs, phone numbers, IP addresses, e-mail addresses, things like that, for many purposes, including primarily spam, fraud, scams, that kind of thing. At a point in time terms related to adult content were added to that filter.
(McDougall Dep. 60:8-18)

Q: So do you agree with me that Backpage.com included hundreds of words in its automatic filter because the company had concluded that those terms reflected sex for money?
A: No.
Q: You don't agree with that?
A: No.
(McDougall Dep. 61:18-24)

Q: You also understand that in addition to its automatic filter, there was a period of time where Backpage also had moderators who would review ads after they had been filtered by the automatic filter who would then manually remove terms that the company identified as reflecting sex for money? . . .

A: [T]here was a period of time where Backpage also had moderators who would review ads after they had been filtered by the automatic filter--there was a period of time where Backpage also had moderators who would review ads after they had been filtered by the automatic filter who would then manually remove terms that the company identified as potentially reflecting sex for money or other content that violated the terms of use or was objectionable to the company.

(McDougall Dep. 62:1-17)

Q: The moderator also could have seen language suggesting that this was an ad for sex for money and edited the content that suggested it was an ad for sex for money, correct, and then posted the remainder, correct? . . .

A: A moderator had a technical ability to edit the content of the ad for any reason that the moderator deemed appropriate and pursuant to the rules that they were required to follow.

Q: And one of those rules that they were required to follow allowed them to remove text that was suggestive of sex for money and then post the remainder, correct?

A: No.

Q: What's the basis for that testimony?

A: There was a brief period of time when moderators were permitted to remove terms that were deemed inappropriate or objectionable by the company, beginning in, I believe, 22 July 2009, although I'm not certain about that date, that included-- you know, I'm not sure about that date. I would have to check that. That included adult-related terms, so they could remove a term that referred to a sex act, but the inclusion of a term that reflects a sex act does not necessarily mean that it is a request for sex for money.

(30(b)(6) Dep. 46:9-47:3)

## The Purpose of Backpage's Automatic Filters and Manual Moderation Practices

Backpage.com's policies, rules and restrictions for the website were not designed or intended to induce sex trafficking or exploitation of any sort. Backpage.com imposed and enforced rules, screened and blocked ads, and took other actions (as described above) to prevent and preclude such misuse of the website. . . . I know of no other website in the country that has instituted and applied such extensive measures to prevent and block improper content (especially concerning sex trafficking or exploitation of minors) or to cooperate with law enforcement. (McDougall Decl. ¶¶ 20–21)

Q: Am I correct that it's the company's position that the automatic filter was intended, in part, to prevent sex trafficking?

A: Yes.

Q: Then if the automatic filter was at least in part supposed to prevent sex trafficking, were any of the terms that were being removed by the automatic filter terms that prevented sex trafficking? . . .

A: I'm unaware of any specific term that reflects sex trafficking.

Q: So tell me, how did the automatic filter help to prevent sex trafficking if you are not aware of any terms that the automatic filter used to address sex trafficking?

A: There is no certainty with any particular term. We used the automated filter as an efficient method to try to remove content that could potentially involve sex for money or sex trafficking or, in particular, the sex trafficking of minors.

Q: Was that also true with regard to the manual moderating that was done on these ads?

A: Yes.

Q: How does it help to prevent sex trafficking if a website has an automatic filter that removes terms that may reflect an ad is for sex trafficking?

A: The way the filter operated, the ad would be posted. After about five minutes, the objectionable term would be removed. The presumption was the user would think they had made some kind of mistake, they would go back, add the term again. After five minutes, the term would be removed again, and the intention was to--to frustrate the user so that they would stop posting. Also, with the term removed from the text, the goal was to-- one of the goals was to render the ad meaningless, essentially, something that a user reading it would not respond to because they had no understanding of what it was trying to advertise.

(30(b)(6) Dep. 49:15-51:5)

Q: Do you think it's misleading to represent to the public that that triple-tiered policing system was an effort to prevent sex trafficking when in reality that system removed content that indicated an ad was sex for money and then posted the sanitized ad? . . .

A: I do not think it's at all misleading to represent to the public that Backpage's triple-tiered policing system was an effort to prevent trafficking.

. . . .

Q: How does it help to prevent sex trafficking if Backpage.com is removing terms that suggest an ad is for sex and then posting the rest of the ad? . . .

A: Unfortunately I can't answer that question without divulging attorney-client privileged information.

(McDougall Dep. 94:4-95:14)

## Backpage's Treatment of Plaintiffs' Ads

Backpage.com did not draft the text of the advertisements or post any of the photographs used in the ads. Nor is there any evidence that Backpage removed any text or photographs from any of the ads. All decisions as to the contents of the ads and regarding whether to post were made by the users who posted them and not Backpage.com personnel. Backpage.com had no role in and did not participate in the creation of the ads relating to Plaintiffs in any way. Backpage.com personnel also did not solicit or encourage in any way the users who posted ads about Plaintiffs, and had no contacts or dealings with these individuals—the individuals merely used the automated systems to upload ads. Backpage.com personnel did not collude or conspire with the users who posted the ads. Backpage.com had no knowledge, or any way of knowing, at the time the ads were posted, who the Plaintiffs were, whether they were minors or whether they were being exploited." (McDougall Decl. ¶ 8)

Q: In the second to last sentence in Paragraph No. 8 of your declaration, that is Exhibit No. 6, you state, "Backpage.com personnel did not collude or conspire with the users who posted the ads." Do you see that?

A: I do.

Q: Did you ask anyone at Backpage.com whether or not, during the period of June 27th, 2010 through September 22nd, 2010, they had implemented any policies or procedures to help pimps post sex trafficking ads on Backpage.com?

A: I can't answer that question without divulging attorney-client communication, but I can refer you to the documents produced in this case that address that issue.

(McDougall Dep. 122:25-123:14)

Q: The representation in your declaration that you submitted in support of Backpage's motion for summary judgment is that there's no evidence that Backpage removed any text or photographs from any of the ads, correct?

A: I believe that's correct.

(McDougall Dep. 122:11-13)

Q: What is the basis for your representation that there is no evidence that Backpage removed any text or photographs from any of the ads of the plaintiffs?

A: The basis is the ads that I reviewed myself, but other members of the legal team reviewed all of the ads, and it's based-- it's also based largely on the evidence from the testimony of the former employees and the testimony and defense interviews provided in the criminal cases regarding Hopson and Shabazz and Shadina Rice. That's the best of my recollection right now. There may have been other things at the time. . . .

Q: Backpage did not store copies of what ads looked like before and after they were edited by either the automatic filtering system or the manual moderation system, correct?

A: Yes, that's my understanding.

(McDougall Dep. 119:22-120:14)

Q: Did you ask anyone at Backpage.com whether or not there was any evidence in its possession regarding whether any of these ads were edited before they were posted on the website?

A: I don't think I can answer--I don't think I can answer that question without divulging attorney-client communications.

Q: So are you declining to answer that question?

A: I am.

Q: Based on Privilege?

A: Yes.

(McDougall Dep. 122:14-24)

Q: Did you ever ask any of the management of Backpage.com whether there ever existed evidence as to whether or not Backpage removed any text or photographs from any of the ads of the plaintiffs? . . .

A: I don't believe I can answer that question without divulging attorney-client communications.

(McDougall Dep. 133:24-134:6)

Q: Did you ask anyone at Backpage.com whether there was something the company could do to try to determine whether or not the ads of any of these Plaintiffs had been manually or automatically edited by Backpage.com? . . .

A: I cannot answer that question without divulging privileged communications.

(McDougall Dep. 142:7-15)

Backpage Did Not Collude or Conspire with Pimps

Q:  In the second to last sentence in Paragraph No. 8 of your declaration, that is Exhibit No. 6, you state, "Backpage.com personnel did not collude or conspire with the users who posted the ads." Do you see that?
A:  I do.
Q:  Did you ask anyone at Backpage.com whether or not, during the period of June 27th, 2010 through September 22nd, 2010, they had implemented any policies or procedures to help pimps post sex trafficking ads on Backpage.com?
A:  I can't answer that question without divulging attorney-client communication, but I can refer you to the documents produced in this case that address that issue.
(McDougall Dep. 122:25-123:14)