Paul J. Cambria, Jr. (NY Bar No. 15873 admitted *pro hac vice*)
pcambria@lglaw.com
Erin McCampbell (NY 4480166, admitted *pro hac vice*)
emccampbell@lglaw.com
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite #120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile: (716) 855-1580

*Counsel for Defendant Michael Lacey*

Thomas H. Bienert, Jr. (Cal. Bar No. 135311, admitted *pro hac vice*)
tbienert@bmkattorneys.com
Kenneth M. Miller (Cal. Bar No. 151874, admitted *pro hac vice*)
kmiller@bmkattorneys.com
Anthony R. Bisconti (Cal. Bar No. 269230, admitted *pro hac vice*)
tbisconti@bmkattorneys.com
BIENERT, MILLER & KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700
Facsimile: (949) 369-3701

*Counsel for Defendant James Larkin*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br> v.<br><br>Michael Lacey, et al.,<br><br>    Defendants. | No. 18-CR-00422-PHX-SPL (BSB)<br><br>**OPPOSITION TO UNITED STATES' MOTION TO RESOLVE PRIVILEGE ISSUES AND CROSS-MOTION TO OBTAIN DISCOVERY AND ADDRESS PRIVILEGE ISSUES**<br><br>**Oral argument requested** |

TABLE OF CONTENTS

I.    INTRODUCTION ................................................................ 1

II.   BACKGROUND .................................................................. 3

    A.   Relationships of VVMH, Backpage.com, LLC, and Other Parties. ................. 3

    B.   Counsel Retained by VVMH to Address Backpage Matters Through
         April 2015. ............................................................... 4

    C.   The Parties' Joint Representation and Joint Defense Agreements After
         Ferrer Purchased Backpage.com in April 2015. ............................. 5

    D.   Ferrer's Guilty Pleas and Privilege Waivers. ............................... 9

    E.   The Government's Search Warrants and Subpoenas Seizing Millions of
         Documents. ............................................................... 10

    F.   Defendants' Objections to the Government's Review of Privileged
         Materials and Request for Discovery. ..................................... 12

    G.   Judge Campbell's Order Requiring Production of Documents Provided
         to Public Relations Consultants. ........................................ 13

    H.   *J.S. v. Village Voice Media Holdings, LLC* and the Ruling Relating to
         Privilege in that Case. ................................................. 14

III.  ARGUMENT ..................................................................... 15

    A.   Ferrer Cannot Waive Privileges He Does Not Hold Or That Are Shared
         Jointly By Other Parties. ............................................... 15

    B.   Judge Campbell's Ruling Provides No Basis to Impose a Blanket
         Waiver of Privileges. ................................................... 18

    C.   The *J.S.* Ruling Does Not Establish Any Privilege Waiver Applicable
         Here. ................................................................... 19

    D.   Use of a "Taint Team" Is Improper and Prejudicial. ..................... 20

    E.   The Court Should Order Discovery to Consider Privilege Issues and
         Breaches That May Have Occurred. ........................................ 23

IV.   CONCLUSION ................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Backpage.com, LLC v. Cooper*,
 939 F. Supp. 2d 805 (M.D. Tenn. 2013) ........................................................................4

*Backpage.com, LLC v. Dart*,
 807 F.3d 229 (7th Cir. 2015), *cert. denied*, 137 S. Ct. 46 (2016) ................................6

*Backpage.com, LLC v. Hawley*,
 No. 17-CV-1951 (E.D. Mo.) ...........................................................................................6

*Backpage.com, LLC v. Hoffman*,
 2013 WL 4502097 (D.N.J. Aug. 20, 2013) ....................................................................4

*Backpage.com, LLC v. Lynch*,
 216 F. Supp. 3d 96 (D.D.C. 2016) .............................................................................7, 14

*Backpage.com, LLC v. McKenna*,
 881 F. Supp. 2d 1262 (W.D. Wash. 2012) ......................................................................4

*Bittaker v. Woodford*,
 331 F.3d 715 (9th Cir. 2003) ...................................................................................19, 20

*Branzburg v. Hayes*,
 408 U.S. 665 (1972) .......................................................................................................13

*Commodity Futures Trading Comm'n v. Weintraub*,
 471 U.S. 343 (1985) .......................................................................................................15

*Dart v. Craigslist, Inc.*,
 665 F. Supp. 2d 961 (N.D. Ill. 2009) ..............................................................................4

*Doe ex rel. Roe v. Backpage.com, LLC*,
 104 F. Supp. 3d 149 (D. Mass. 2015), *aff'd sub nom.*, *Jane Doe No. 1
 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016), *cert. denied*, 137
 S. Ct. 622 (2017) ..........................................................................................................5, 6

*Glidden Co. v. Jandernoa*,
 173 F.R.D. 459 (W.D. Mich. 1997) ...............................................................................16

*Hernandez v. Tanninen*,
 604 F.3d 1095 (9th Cir. 2010) ...................................................................................15, 19

*In re Grand Jury Subpoenas*,
    902 F.2d 244 (4th Cir. 1990)................................................................17

*In re Grand Jury Subpoenas to Backpage.com, LLC and Village Voice
    Media Holdings, LLC*, No. GJ12-172RAJ (W.D. Wash. Jan. 17, 2013) ....................5

*In re Teleglobe Commc'ns Corp.*,
    493 F.3d 345 (3d Cir. 2007) ...............................................................17

*In Roosevelt Irrigation Dist. v. Salt River Project Agric. Improvement &
    Power Dist.*, 810 F. Supp. 2d 929 (D. Ariz. 2011) ......................................8

*John Morrell & Co. v. Local Union 304A*,
    913 F.2d 544 (8th Cir. 1990) ...............................................................17

*M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC*,
    809 F. Supp. 2d 1041 (E.D. Mo. 2011)................................................4, 14

*Magnetar Tech. Corp. v. Six Flags Theme Park Inc.*,
    886 F. Supp. 2d 466 (D. Del. 2012) .....................................................18

*Newsome v. Lawson*,
    286 F. Supp. 3d 657 (D. Del. 2017) .......................................................9

*Polycast Tech. Corp. v. Uniroyal, Inc.*,
    125 F.R.D. 47 (S.D.N.Y.1989) ...........................................................16

*Senate Permanent Subcomm. on Investigations v. Ferrer*,
    No. 1:16-mc-00621-RMC (D.D.C.) ........................................................6

*United States v. BDO Seidman, LLP*,
    492 F.3d 806 (7th Cir. 2007) ...............................................................17

*United States v. Ferrer*,
    No. CR 18-464-PHX-DJH (Doc. 7) ........................................................9

*United States v. Gonzalez*,
    669 F.3d 974 (9th Cir. 2012) ...............................................................17

*United States v. Graf*,
    610 F.3d 1148 (9th Cir. 2010)..........................................................16, 18

*United States v. Neill*,
    952 F. Supp. 834 (D.D.C. 1997) ..........................................................23

*United States v. Pedersen*,
    2014 WL 3871197 (D. Or. 2014) ..........................................................21

*United States v. Renzi*,
    722 F. Supp. 2d 1100 (D. Ariz. 2010).........................................................21

*Upjohn Co. v. United States*,
    449 U.S. 383 (1981) ...................................................................................15

**State Cases**

*J.S. v. Village Voice Media Holdings, LLC*,
    No. 12-2-11362-4 (Pierce Cty. Wash. Super. Ct.) .....................6, 14, 19, 20

*People v. Ferrer*,
    No. 16FE019224, 2016 WL 72373505 (Cal. Super. Ct. Dec. 9, 2016) .......7

*People v. Ferrer*,
    No. 16FE024013 (Cal. Super. Ct. Aug. 23, 2017) .......................................7

*Squealer Feeds v. Pickering*,
    530 N.W.2d 678 (Iowa 1995) ....................................................................20

**Federal Statutes**

18 U.S.C. § 371............................................................................................9

18 U.S.C. § 1591.......................................................................................5, 7

18 U.S.C. § 1595............................................................................................4

18 U.S.C. § 1952..........................................................................................13

18 U.S.C. § 1956(h) ......................................................................................9

**State Statutes**

Cal. Penal Code § 266h .................................................................................7

Cal. Pen. Code §§ 1546-1546.4 ...................................................................11

**Other Authorities**

Loren E. Weiss & Gregory S. Osborne, *Taint Teams and the Attorney-
    Client Privilege*, American Bar Association (Dec. 2015)...........................21

## I.    INTRODUCTION

The government's Motion to Resolve Attorney-Client Privilege Issues (Doc. 195; "Mot.") asks the Court to issue a blanket ruling that the attorney-client privilege effectively does not apply in this case, so as to allow the government *carte blanche* to review tens of thousands of attorney-client communications in connection with its prosecution of James Larkin, Michael Lacey, and five other Defendants.  More specifically, the government asks the Court to void virtually all privileges that Messrs. Larkin and Lacey could assert, while allowing Carl Ferrer—the CEO of Backpage.com, LLC who pleaded guilty and is now cooperating with the government—to continue to assert privileges as he selectively chooses.

Similar to its Motion to Disqualify Counsel (Doc. 118; "DQ Mot."), the government confuses the relationships of the parties over time—referring to all entities ever associated with Backpage.com as "Backpage."  *See, e.g.*, Mot. at 1.  The government also disregards which parties retained counsel and held privileges, as well as the parties' express agreements about joint representation, joint defense, and sharing and preserving attorney-client privilege and work product protections.

From its formation in 2004 through April 2015, Backpage.com, LLC[1] was a subsidiary of Village Voice Media Holdings, LLC ("VVMH"), which was owned, through other companies, by Messrs. Larkin and Lacey.  In this period, VVMH retained counsel and Ferrer was an employee who worked with counsel as a corporate representative.  As such, neither he nor Backpage.com, LLC controlled the privilege for legal representation relating to Backpage.com, and he has no basis to claim that Davis Wright Tremaine LLP ("DWT") or any other counsel representing the companies through April 2015 were his "personal" counsel.  VVMH and its parent company

---

[1] In this brief, "Backpage.com" refers to the website and Backpage.com, LLC, the company that operated the site.

remain in existence (with different names), and the controlling interests and rights of the companies are still held by Larkin and Lacey.[2]

After Backpage.com was sold to Mr. Ferrer in April 2015 (through various corporate entities), he, Larkin, Lacey, and their respective companies entered into agreements providing that they would be represented jointly and would share privileges, while precluding disclosure of attorney-client communications or other privileged information to third parties.  Jointly represented parties cannot waive privileges without the consent of *all* such parties.  Thus, Mr. Ferrer was and is precluded from unilaterally disclosing any privileged information relating to Backpage.com through April 6, 2018, the date when he provided notice that he was withdrawing from his agreements for joint representation and joint defense.

The Court *does* need to address issues concerning appropriate application and protection of attorney-client privileges and work product in this litigation.  It would be entirely inappropriate for the Court to enter a blanket order, divorced from the facts, holding that all privileges have been waived.[3]  Rather, the government's submissions raise concerns that privileges may not have been respected, given the government's misunderstandings (or perhaps having been misled) about the relationships and agreements among the parties.

Accordingly, the Court should first block the government's review of privileged materials through its putative "filter team" to prevent improper disclosure or prejudice.  The Court should also require the government to provide discovery of all communications with Mr. Ferrer, his counsel, or third parties about joint representation

---

[2] VVMH is now known as Camarillo Holdings, LLC, which is, in turn, a subsidiary of Medalist Holdings, Inc. ("Medalist," formerly New Times, Inc.).  Messrs. Lacey and Larkin own the controlling interests in Medalist, and defendants John Brunst and Scott Spear hold small interests.

[3] Such an order would be improper, as well, because numerous parties that hold privilege rights—notably Medalist and its subsidiaries—are not before the Court in this action.

2

1    and attorney-client communications or work product.  After such disclosures, the Court

2    should allow further briefing regarding privileges and appropriate remedies, to the

3    extent that privileges have been breached.

## II.    BACKGROUND

### A.    Relationships of VVMH, Backpage.com, LLC, and Other Parties.

6        The Court cannot assess the attorney-client privilege issues related to

7    Backpage.com without understanding the various entities and individuals involved with

8    the website over its 14-year existence, and their respective interests and roles over

9    time—all of which the government fails to mention.

10       The Backpage.com website was launched in 2004 by New Times, Inc. ("NTI"),

11   the parent company of the *Phoenix New Times* and a dozen other weekly newspapers.

12   NTI was founded by Mr. Lacey (as chief editor) and Mr. Larkin (as publisher).  Mr.

13   Ferrer had been the classified advertising manager for NTI's Dallas paper, and he was

14   tapped to lead the development and operations of the website.  Backpage.com, LLC

15   was formed as a subsidiary of NTI in 2004.

16       In 2005, NTI acquired Village Voice Media and its newspapers and took on the

17   Village Voice name.  From that time to April 22, 2015, Backpage.com, LLC was a

18   subsidiary of VVMH, and Mr. Ferrer was an employee, serving as a vice president of

19   Backpage.com and later as its CEO.  Messrs. Larkin and Lacey still retain control of

20   VVMH today (after a name change).[4]

21       On April 22, 2015, VVMH sold Backpage.com, LLC and the website to a group

22   of companies owned and controlled by Ferrer.  This was a self-financed transaction,

23   with companies held by Larkin and Lacey acting as lenders (and retaining security

24   interests for payments), and Mr. Ferrer and his companies assuming all responsibilities

---

26   [4] VVMH sold its newspapers to Voice Media Group, Inc. (a company made up of
27   several longtime executives of the papers) in 2013, and changed its name at that time to
     Camarillo Holdings, LLC.  For ease of reference, VVMH/Camarillo is referred to here
28   as "VVMH."

for operation of the website.  By this time, Backpage.com had been targeted by government authorities and others, resulting in a number of lawsuits, and the parties agreed that they would work together jointly in retaining counsel, asserting positions, and protecting privileged information (discussed below).

## B.    Counsel Retained by VVMH to Address Backpage Matters Through April 2015.

Beginning in 2008, public officials and others launched attacks on online classified ad websites for publishing adult-oriented ads, first targeting Craigslist and then Backpage.com.  For example, the Cook County Sheriff brought suit alleging that Craigslist facilitated prostitution and sex trafficking by allowing escort ads on its site, charges that an Illinois U.S. district court summarily dismissed.  *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 962-63, 967-68 (N.D. Ill. 2009).  Numerous state attorneys general also publicly demanded that Craigslist shut down its adult category, and when Craigslist succumbed to this pressure in September 2010, the AGs turned their sights to Backpage.com, demanding that it do the same. VVMH retained counsel to address these demands and accusations, including SNR Denton (now Dentons), Kasowitz Benson Torres LLP, and others.

VVMH hired the firm of Thompson Coburn LLP to defend a civil action, *M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1053-54 (E.D. Mo. 2011), in which the court rejected all of the plaintiff's claims seeking to hold the company liable for state tort claims and under 18 U.S.C. §§ 1595 and 2255 for allegedly aiding or abetting sex trafficking or abuse of minors.

In 2012, VVMH engaged DWT to bring suit challenging a Washington state statute enacted to target Backpage.com by seeking to make the website criminally responsible for ads posted by third-party users.  DWT also represented VVMH and Backpage.com, LLC in two successive cases concerning similar statutes, winning injunctions in all three cases:  *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012), *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013), and *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at *8 (D.N.J. Aug. 20,

2013).  VVMH also retained DWT in connection with a federal grand jury proceeding in the Western District of Washington, *In re Grand Jury Subpoenas to Backpage.com, LLC and Village Voice Media Holdings, LLC*, No. GJ12-172RAJ (W.D. Wash. Jan. 17, 2013), in which the court quashed subpoenas issued to VVMH and Backpage.com, LLC. Also in 2012, VVMH contracted with Elizabeth McDougall to act as general counsel to VVMH to advise about issues relating to Backpage.com.[5]

DWT continued to represent VVMH and Backpage.com in other cases, including *Doe ex rel. Roe v. Backpage.com, LLC*, 104 F. Supp. 3d 149 (D. Mass. 2015), *aff'd sub nom.*, *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 622 (2017), where the district court and the First Circuit dismissed plaintiffs' claims and held that Backpage's actions in publishing third-party ads did not provide a basis for claims under 18 U.S.C. § 1591 or Massachusetts criminal trafficking laws.

Throughout this 2008-2015 period, VVMH engaged and managed all counsel defending and prosecuting matters concerning Backpage.com.  Mr. Ferrer interacted with outside counsel as an employee and corporate representative, and he never asked (or engaged) DWT or any of the counsel VVMH retained to represent him personally.

## C.   The Parties' Joint Representation and Joint Defense Agreements After Ferrer Purchased Backpage.com in April 2015.

As noted, Ferrer purchased the Backpage.com website in April 2015 from VVMH.[6]  All of the parties involved—*i.e.*, Ferrer and his companies, which bought the website (the "Ferrer Parties"), and the entities controlled by Messrs. Larkin and Lacey

---

[5] Ms. McDougall was retained by VVMH as an independent contractor.

[6] This is simplified description for purposes of this brief (not mentioning the various corporate entities involved).

5

that sold their interests (collectively, "the Medalist Parties")[7]—recognized the importance of having joint representation for ongoing and potential cases and challenges, and they continued to work together to coordinate defense and prosecution of cases through joint counsel.

For example, Perkins Coie LLP continued to represent VVMH and Backpage.com, LLC in *J.S. v. Village Voice Media Holdings, LLC*, No. 12-2-11362-4 (Pierce Cty. Wash. Super. Ct.), a private civil case (later settled, as discussed below), and DWT continued representing VVMH and Backpage.com, LLC in the *Doe* case in Massachusetts (mentioned above).  DWT also acted as lead counsel in *Backpage.com, LLC v. Hawley*, No. 17-CV-1951 (E.D. Mo.), challenging a civil investigative demand the Missouri AG's office served in May 2017, and several firms (Akin Gump Strauss Hauer & Feld LLP, Paul Hastings LLP, Perkins Coie, and DWT) represented Backpage.com in connection with a subpoena issued by the United States Senate Permanent Subcommittee on Investigations ("PSI"), *Senate Permanent Subcomm. on Investigations v. Ferrer*, No. 1:16-mc-00621-RMC (D.D.C.).  In the latter two cases, the subpoenas solely sought records of Backpage.com, although they were nominally directed to Mr. Ferrer in his representative capacity as CEO.  Counsel entered appearances in Ferrer's name to represent the company.

DWT also prosecuted *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015), *cert. denied*, 137 S. Ct. 46 (2016), in which the Seventh Circuit enjoined the Cook County Sheriff's threats to Visa and MasterCard to terminate use of their cards on Backpage.com, holding that the Sheriff's actions constituted an unconstitutional prior

---

[7] The "Ferrer Parties" are Carl Ferrer and Backpage.com, LLC; Dartmoor Holdings, LLC; IC Holdings, LLC; UGC Tech Corp. Group C.V.; Website Technologies, LLC; Atlantische Bedrijven, C.V.; Amstel River Holdings, LLC; Lupine Holdings, LLC; Kickapoo River Investments, LLC; CF Holdings GP, LLC; and CF Acquisitions, LLC, all of which are companies Ferrer owns and controls.  The "Medalist Parties" are Medalist Holdings, Inc., Leeward Holdings, LLC, Camarillo Holdings, LLC, and their shareholders of Medalist, James Larkin and Michael Lacey (the majority owners) and John Brunst and Scott Spear (minority owners).

restraint in violation of the First Amendment.  In *Backpage.com, LLC v. Lynch*, No.
1:15-2155(RBW) (D.D.C.), DWT also represented the Medalist Parties and the Ferrer
Parties in challenging a congressional amendment to 18 U.S.C. § 1591—the "SAVE
Act," which added "advertising" as a predicate act for sex trafficking—in which the
government conceded that a website operator such as Backpage.com could not be liable
absent proof it knew a specific ad was for sex trafficking and participated in a venture to
bring about the trafficking.  *See Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96, 109-
10  (D.D.C. 2016) (Backpage.com faced no credible threat of prosecution given its
practices).  In all of these cases, counsel represented the Ferrer Parties *and* the Medalist
Parties jointly, given their common positions and interests.

   No one asserted claims or charges against Ferrer, Larkin, or Lacey personally (or
any other individual associated with Backpage.com) until October 2016.  Then, the
California Attorney General's office arrested and jailed Ferrer, Lacey and Larkin,
alleging charges that they had engaged in "pimping" under Cal. Pen. Code § 266h,
because the Backpage.com website published and received payments for escort ads
posted by users.  In two rulings, two California state court judges rejected and dismissed
these charges on demurrer (as well as alleged money laundering claims based on the
same premise), holding that "charg[ing] money for the placement of advertisements" and
"[p]roviding a forum for online publishing is a recognized legal purpose" under
California and federal law.  *See People v. Ferrer*, No. 16FE019224, 2016 WL
72373505, at *9 (Cal. Super. Ct. Dec. 9, 2016); Order, *People v. Ferrer*, No.
16FE024013, at 13 (Cal. Super. Ct. Aug. 23, 2017).

   Shortly after the California AG's office brought charges, Messrs. Ferrer, Larkin
and Lacey each engaged counsel to represent them personally,[8] while agreeing to
continue to be jointly represented by DWT to address common issues, such as the
successful demurrers discussed above.  The parties entered into agreements to

---

[8] Ferrer retained Nanci Clarence of Clarence Dyer Cohen LLP as his personal counsel.

memorialize the joint representation and agreeing to continue sharing confidential and privileged information among themselves, while precluding disclosure to third parties. More specifically, Ferrer, Larkin and Lacey entered into an engagement agreement with DWT; a Common Interest and Litigation Management Agreement (on behalf of themselves and their respective companies); and a joint defense agreement ("JDA") with all Defendants in this action and their respective counsel.

Defendants previously explained and provided the joint representation agreements to the Court in connection with the governments' motion to disqualify counsel. *See* Opp. to DQ Mot. at 6-8 (Doc. 180); Grant Decl. Exs. A, B, C (*in camera*).[9] Yet, when the government filed its "privilege issues" motion a week later, it completely disregarded the agreements. To summarize: The joint representation agreements recognized that Messrs. Ferrer, Lacey and Larkin (and all the Ferrer Parties and Medalist Parties) shared interests in defending claims related to Backpage.com. They memorialized the parties' prior joint representation arrangements, so that all dealings and communications from April 22, 2015 and afterward were encompassed and protected by the parties' joint privilege undertakings. They spelled out the parties' undertakings to retain joint counsel, coordinate joint defenses, share confidential information, and waive potential conflicts of interest as to any claims—civil or criminal, whether past, present or future. Grant Decl. ¶ 16. Ferrer and the other parties agreed they would share privileged information with one another and with joint counsel, and would maintain and protect all privileges and confidentiality as to third parties. *Id.* ¶ 18. The agreements acknowledged that the parties' interests could diverge in the future, and so allowed that a party could withdraw from the joint representation but could not unilaterally waive privileges or seek to disqualify counsel from continuing to represent

_____

[9] These materials were filed *in camera* because the parties' agreements about joint representation and the underlying arrangements and rationales are privileged communications in their own right. *See In Roosevelt Irrigation Dist. v. Salt River Project Agric. Improvement & Power Dist.*, 810 F. Supp. 2d 929 (D. Ariz. 2011).

other parties. *See id.* ¶¶ 19, 24.  Mr. Ferrer entered into the joint representation agreements with the advice of and opportunity to consult with his own personal counsel and corporate counsel, including Ms. Clarence. *Id.* ¶¶ 7, 10, 11, 21.

        **D.**      **Ferrer's Guilty Pleas and Privilege Waivers.**

On April 5, 2018, Ferrer mailed notice that he was withdrawing from the JDA (the notice was received by Mr. Padilla's counsel on April 9) and a day later gave notice to DWT and others that he was withdrawing from the joint representation agreements. Grant Decl. ¶¶ 27, 28 & Exs. D, E.  Contrary to his commitments in the JDA, Ferrer did not provide any notice or withdraw from the JDA when he began negotiating with the government.

Also on April 5, Ferrer pleaded guilty to one count of conspiracy (18 U.S.C. § 371) and entered a plea on behalf of Backpage.com, LLC (and other Ferrer Parties) to one count of money laundering (18 U.S.C. § 1956(h)), committing to cooperate with the government in its prosecution of Lacey, Larkin and others in exchange for a maximum five-year sentence. *See United States v. Ferrer*, No. CR 18-464-PHX-DJH (Doc. 7). The next day the government released an indictment against Larkin and Lacey and the five other Defendants, charging various crimes under the Travel Act and federal money laundering statutes (18 U.S.C. §§ 371, 1952, 1956, 1957).

On April 25, 2018, the government moved to disqualify DWT from representing Larkin and Lacey in this action.  DQ Mot. (Doc. 118).  The focus of the government's motion is that Ferrer's interests supposedly would be harmed by use or disclosure of privileged information he had previously shared with counsel.[10]  *See id.* at 9-14.

---

[10] The government's motion ignores the presumption in a joint representation that all communications will be shared with all joint clients, such that no individual client will have confidences to be protected from other members of the group.  *See Newsome v. Lawson*, 286 F. Supp. 3d 657, 664 (D. Del. 2017) ("A joint client 'cannot reasonably expect that the [joint attorney] will keep information from other [joint clients].' The only people joint clients can reasonably expect to withhold privileged communications from are third parties or strangers to the joint representation.").

However, after the government filed its motion, Defendants learned that Ferrer had entered into agreements with the government waiving privilege protections for communications with any counsel who had represented him in "his personal or official capacity" (except Ms. Clarence and her firm).  *See* Grant Decl. Exs. J, K; DQ Opp. at 9-10 (noting the government failed to disclose these waivers until Defendants persisted in their demands for information).[11]  Of course, Ferrer's concessions to the government cannot waive privileges held by others or privileges he held jointly with the Medalist Parties regarding information he previously agreed not to disclose to third parties.

**E.     The Government's Search Warrants and Subpoenas Seizing Millions of Documents.**

The government has obtained over 10 million pages of documents through grand jury subpoenas and search warrants.  *See* Ex. 1, attached hereto (May 24, 2018 letter describing government's "initial disclosure" of documents).  This included 2.1 million pages of documents produced by Backpage.com in response to a grand jury subpoena (No. 16-04-108), which were accompanied by a privilege log listing approximately 7,000 withheld documents and identifying over 75 attorneys that had represented VVMH, Backpage.com, LLC, and related parties.

The government's motion focuses on two other document collections, containing millions of emails seized through two search warrants.  Mot. at 3.  The first warrant was issued in July 2016 to Google for emails from the account "carl.ferrer@backpage.com" (resulting in a collection of 574,000 pages of documents).[12]  *See* Mot. Ex. A.  The second warrant, issued in April 2017, was directed to the California Attorney General's

---

[11] For example, Ferrer's Proffer/Interview Agreement states:  "Mr. Ferrer voluntarily waives all claims of attorney-client privilege, whether in his personal or official capacity as the Chief Executive Officer of Backpage.com, LLC as to any communications with any attorney or law firm that represented Backpage.com or any related entity.  This waiver does not apply to Mr. Ferrer's current attorneys, Nanci Clarence and Jonathan Baum and anyone working on their behalf."  Grant Decl. Ex. K, at 5.

[12] Like many companies, Backpage.com, LLC and VVMH contracted with Google to provide email services through its Gmail platform.

office ("AGO"), Mot. Ex. B, which has coordinated with the federal authorities for several years in investigating and pursuing charges relating to Backpage.com (resulting in the criminal complaints and the numerous charges dismissed on demurrer, as discussed above), and had seized millions of emails through five warrants issued to Google.  The federal warrant directed the AGO to produce emails for a six-year period from nine different accounts "@backpage.com" and "@villagevoicemedia.com" (totaling 1.7 million pages).  *See* Ex. 1; Mot. Ex. B.  In the California case, Defendants have moved to invalidate the AGO's warrants under the Fourth Amendment and for violations of California's Electronic Communications Privacy Act, Cal. Pen. Code §§ 1546-1546.4.

Additionally, in that case Defendants provided the AGO a list of 52 attorneys who had represented parties related to Backpage.com, *see* Ex. 2, attached (October 18, 2016 letter), and the AGO agreed not to review any documents containing attorney names but instead to provide them to defendants' counsel for review.  The AGO segregated over 64,000 documents containing attorney names.  Defendants have invested substantial time and expense in conducting a privilege review of these materials, which encompass the same documents the federal government has obtained and seeks to review here.[13]

In connection with its warrant applications in this case, the federal government did not mention the privilege review procedure agreed upon in California.  The government also did not mention to issuing magistrates the scores of attorneys who had worked with VVMH, Backpage.com, LLC, and related parties over the years, but instead proposed a "filter team" protocol segregating only communications to or from Ms. McDougall.  In its motion now, the government says its "filter team" has segregated

---

[13] The privilege review in the California case has not been completed, in large part because the federal government has seized essentially all financial accounts and assets of Defendants, depriving them of the funds needed to complete this work.

documents as to four individual attorneys and two law firms,[14] which the government incorrectly asserts were all "Backpage" counsel—also incorrectly suggesting that Ferrer controlled and could waive the privilege for communications with those attorneys. *See* Mot. at 4.[15]  Based on its narrow parsing, the federal government asserts it has identified 10,733 potentially privileged documents, *id.*, as compared to the 64,000 the California AGO found.

**F.     Defendants' Objections to the Government's Review of Privileged Materials and Request for Discovery.**

From the first indication that the government was proposing to review seized documents through a "filter team," Defendants objected.  Defendants explained that Ferrer could not waive privileges held by or jointly with other parties, gave notice that Defendants expressly reserve and assert all privilege and work product claims, asserted it was improper for the government to disregard the California agreement, and insisted that the government cease any review of potentially privileged materials through its "filter team" or otherwise.  *See* Ex. 3, attached (letters dated April 26, May 1, May 2, May 15, May 23, and June 12, 2018).

Defendants also asked the government to provide disclosures of communications with Ferrer, his counsel or others concerning joint representation, attorney-client privilege or waivers, or attempts to allege conflicts or seek disqualification of Defendants' counsel.  *Id.* (letter dated May 1, 2018).  Defendants sought this information because it bears directly on the government's motion to disqualify counsel (as well as

---

[14] As discussed above, VVMH and the Backpage parties have been represented by many more attorneys and firms, including Akin Gump Strauss Hauer & Feld LLP; Paul Hastings LLP; Perkins Coie LLP; SNR Dentons; Kasowitz Benson Torres LLP; Schiff Hardin LLP; Thompson Coburn LLP; Prince Lobel Tye LLP; Adams and Reese LLP; McCusker, Anselmi, Rosen & Carvelli, P.C.; and others.

[15] For example, Steve Suskin was outside counsel to VVMH, DWT represented VVMH and the Medalist and Ferrer Parties jointly, and Rusing Lopez & Lizardi represented the Medalist Parties and coordinated with Ferrer and Backpage.com, LLC under the joint representation agreements.

the present motion).  *See* Defendant Lacey's Motion for Disclosure at 6-7 (Doc. 202).

Moreover, while the government maintains that it has not reviewed or had access to the

joint representation agreements, this assertion is at least subject to question.  For

example, Ferrer and his counsel have sent unsolicited letters to courts in numerous civil

cases misstating the agreements in an effort to interfere with DWT's continued

representation of the Medalist Parties in those cases, *see* Ex. 4, attached (April 26, 2018

letter from N. Clarence to Hon. Leo Sorokin, U.S. District Court for the District of

Massachusetts), and by all appearances have coordinated with government in doing so.

The government has also provided in this case a declaration from Mr. Ferrer in which he

discusses his dealings and communications with counsel during periods when privileges

were held by VVMH and also when privileges were jointly held with the Medalist

Parties.  *See* Ferrer Decl. ¶¶ 9-22 (Doc. 192-6).

The government has refused to provide discovery.  Its motion indicates that the

government has "temporarily stopped" its review, albeit after reading some 6,500 likely

privileged documents.  Mot. at 4.

### G.   Judge Campbell's Order Requiring Production of Documents Provided to Public Relations Consultants.

The government notes two rulings of Judge Campbell concerning GJ Subpoena

No. 16-04-108, which sought production of documents Backpage.com had previously

produced to the PSI.  Mot. at 6-8.  Judge Campbell enforced the subpoena, but did not

(as the government tries to suggest) issue any sort of imprimatur that the government's

prosecution is proper or raises no First Amendment concerns.  Rather, the Court held

that, under *Branzburg v. Hayes*, 408 U.S. 665 (1972), a grand jury subpoena is invalid

only upon a showing that the government is proceeding in bad faith.[16]

---

[16] The government asserts that "Judge Campbell also confirmed that 18 U.S.C. § 1952
… criminalize[s] the knowing publication of an advertisement for illegal prostitution"
and that Backpage's counsel conceded this point.  Mot. at 7.  Counsel actually said that
if a website knew of and intended to cause a specific act of sex trafficking and
participated in a venture, conspiring with users of the website to bring it about, that

After Backpage.com complied with the Court's order, the government brought a motion challenging documents that had been withheld on grounds of privilege. More specifically, the government challenged privilege claims regarding communications between counsel and public relations consultants, and communications with Hemanshu Nigam, an attorney and former federal prosecutor who provided expertise and advice concerning the system for the review and moderation of user-submitted ads. Judge Campbell ruled that all communications with Mr. Nigam were privileged and properly withheld, but concluded that the challenged communications with PR consultants should be produced. *See* Mot. Ex. H. Judge Campbell ordered production of a small collection of specific documents exchanged with the PR consultants. *See id.* at 14. He did not rule (or suggest) that privileges as to any other materials or communications had been waived.

### H.    *J.S. v. Village Voice Media Holdings, LLC* and the Ruling Relating to Privilege in that Case.

The government also points to a ruling from a Washington State superior court in a case brought by three individual plaintiffs who claimed they were victimized because pimps and others posted ads on Backpage.com, *J.S. v. Village Voice Media Holdings, LLC*; *see* Mot. Ex. K. There, the superior court held that the defendants in that case had put privileged communications with Ms. McDougall at issue by submitting a declaration from her supporting a summary judgment motion and by virtue of her deposition testimony, personally and as a 30(b)(6) witness. *Id.* at 2. The court ordered that plaintiffs would be entitled to continue Ms. McDougall's deposition to inquire about attorney-client communications allegedly put at issue. *Id.* at 4. However, the deposition never happened, as shortly thereafter the parties entered into a

---

might be a basis for prosecution. *See* Mot. Ex. D at 38-41. This is, incidentally, the same standard the DOJ itself has said is required under federal law (although the government has disregarded the standard in this case). *See Lynch*, 216 F. Supp. 3d at 96.

confidential settlement of the case, before any privileged communications were disclosed.

### III.    ARGUMENT

**A.    Ferrer Cannot Waive Privileges He Does Not Hold Or That Are Shared Jointly By Other Parties.**

The government offers a grossly simplistic view that Ferrer, as CEO of Backpage.com, LLC can waive all privileges at any time related in any way to the website or its operations.[17]  In fact and in law, Ferrer cannot waive privileges held by other parties or that he and Backpage.com agreed were shared and would be protected jointly with the Medalist Parties.

"The attorney–client privilege is the oldest of the privileges for confidential communications known to the common law," long respected by courts "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  Analysis of the privilege necessarily turns on the facts concerning the specific attorney-client relationships and communications at issue.  *See id.* at 396-97 (application of the privilege must be determined on a "case-by-case" basis).  An improper ruling finding a blanket waiver of privileges is "particularly injurious" and constitutes clear error.  *Hernandez v. Tanninen*, 604 F.3d 1095, 1101-02 (9th Cir. 2010) (granting mandamus relief where district court ordered blanket disclosure of privileged communications).

The government cites one case as supposed support for its claim that Ferrer controls all privileges in this case: *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 349 (1985), *see* Mot. at 10, which held that "when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well."  That much is true, but it ignores the central issues here

---

[17] The government's motion never mentions the work product doctrine and so presumably is not seeking an order that such protections have been waived.

concerning the relationship of Backpage.com, LLC and VVMH, the privileges they held, and their agreements to jointly share and protect privileges.

First, as discussed above, prior to the April 22, 2015 sale, Backpage.com, LLC was a subsidiary of VVMH, which chose, retained, and directed outside counsel.  Ferrer worked with counsel as well, but he did so as an employee and a corporate representative.  In this regard, the government's citation to *United States v. Graf*, 610 F.3d 1148 (9th Cir. 2010), is telling.  *See* Mot. at 10.  *Graf* sets forth a five-factor analysis to determine if corporate counsel represented an employee personally, including whether the employee specifically asked for representation as to his personal interests (and not in his representative capacity).  610 F.3d at 1161.  The government attempts to confuse the parties' relationships and Ferrer's role before 2016, *see, e.g.*, Ferrer Decl. ¶¶ 11-16 (referring to dealings before 2015 and stating:  "My understanding has been that DWT represented me personally"), but offers no showing that Ferrer ever consulted DWT or any joint corporate counsel about personal representation or potential liability—that simply did not happen.[18]

For the period before the 2015 sale, it is clear that Backpage.com (as a subsidiary) and Ferrer (as a corporate representative) had no separate authority to control or waive privileges.  It well established "that the parent and subsidiary share a community of interest, such that the parent (as well as the subsidiary) is the 'client' for purposes of the attorney-client privilege."  *Glidden Co. v. Jandernoa*, 173 F.R.D. 459, 472–73 (W.D. Mich. 1997).  A subsidiary and a parent are at least joint clients, each of which has an interest in the privileged communications.  *Id.*; *see also Polycast Tech. Corp. v.*

---

[18] The government's reliance on *Graf* is also confusing because it contends that case demonstrates that "individual corporate employees (such as the defendants in this case) cannot contest the disclosure of their previously-privileged communications."  Mot. at 10.  But the Defendants—Messrs. Larkin, Lacey, Spear and Brunst—are not and were never "corporate employees" of Backpage.com, they are the principals and owners of the Medalist Parties that jointly held privileges before the sale and were parties to the joint representation agreements after the sale.  And the Medalist Parties have not waived the privilege.

*Uniroyal, Inc.,* 125 F.R.D. 47, 49 (S.D.N.Y.1989).  Thus, in 2015 Ferrer could not have decided unilaterally to waive privilege protections, and his purchase of Backpage.com in April of that year did not vest him with authority he did not have before.

Ferrer also has no unilateral rights to waive attorney-client privilege for communications after the April 2015 sale.  The Ferrer Parties and the Medalist Parties collectively recognized that they shared common interests, decided to continue being jointly represented, and agreed to jointly share and protect privileged communications. *See* Grant Decl. Ex. A, B.[19]  Here again, the law is well established that, where parties agree to joint representation or enter into a joint defense agreement, one party cannot waive privileges "without the consent of all parties who share the privilege."  *In re Grand Jury Subpoenas*, 902 F.2d 244, 248 (4th Cir. 1990) ("we hold that all documents … are subject to a joint defense privilege that Subsidiary may not waive unilaterally"); *accord United States v. BDO Seidman, LLP*, 492 F.3d 806, 817 (7th Cir. 2007) ("the privileged status of communications falling within the common interest doctrine cannot be waived without the consent of all parties"); *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 363 (3d Cir. 2007) ("When co-clients and their common attorneys communicate with one another, those communications are 'in confidence' for privilege purposes.  Hence, the privilege protects those communications from compelled disclosure to persons outside the joint representation.  [W]aiving the joint-client privilege requires the consent of all parties."); *John Morrell & Co. v. Local Union 304A*,

---

[19] The government claims elsewhere that the parties did not agree to joint representation and shared privileges until December 2016, when the parties memorialized the agreements.  *See* Reply on DQ Mot. at 5 (Doc. 193).  The government's argument is baseless.  Shared privileges are inherent in joint representation, and courts have long recognized oral joint defense agreements are fully enforceable, *United States v. Gonzalez*, 669 F.3d 974, 979 (9th Cir. 2012) ("it is clear that no written agreement is required, and that a JDA may be implied from conduct and situation, such as attorneys exchanging confidential communications from clients who are or potentially may be codefendants or have common interests in litigation").  More to the point, both the Common Interest Agreement and the JDA stated that they confirmed prior agreements and arrangements already in effect.  Grant Decl. Exs. B, C.

913 F.2d 544, 556 (8th Cir. 1990) ("It is fundamental that the joint defense privilege cannot be waived without the consent of all parties to the defense."); *Magnetar Tech. Corp. v. Six Flags Theme Park Inc.*, 886 F. Supp. 2d 466, 479 (D. Del. 2012) (a "joint privilege prevents … communications from compelled disclosure to persons outside the joint representation [without] the consent of all joint clients").

By executing the joint representation agreements, Ferrer expressly agreed that he (and Backpage.com, LLC and all Ferrer Parties) would preserve all privileged information from disclosure to third parties. Here too, Ferrer expressly disclaimed any rights to waive attorney-client privilege unilaterally.

Ferrer is entitled to waive privileges as to his communications with counsel after the date when he withdrew from the joint representation agreements and the JDA, *i.e.,* after April 6, 2018. He is also entitled to waive privilege protections as to his personal counsel, Ms. Clarence and her firm, although he asserts he has not done so. He has no authority otherwise to waive privileges unilaterally as to VVMH or any other privileges held by the Medalist Parties or any other jointly represented parties.

### B.   Judge Campbell's Ruling Provides No Basis to Impose a Blanket Waiver of Privileges.

The government also bases its blanket waiver claim on Judge Campbell's ruling requiring production of a group of documents reflecting communications among attorneys and public relations consultants representing VVMH and Backpage.com, LLC in 2010-2011. Mot. at 12-13. In fact, Judge Campbell ruled only that these specific documents had to be produced, as he disagreed with Backpage.com's interpretation of the case law that consultants hired by counsel to assist in addressing legal issues fall within the scope of the attorney-client privilege as "functional equivalents" of employees. *See* Mot. Ex. H (Doc. 195-8); *see also Graf*, 610 F.3d at 1159.

The government now tries to stretch this ruling into a broad subject-matter waiver covering "an array of different 'subjects,' including how to moderate and review ads … and whether/how to acknowledge the prevalence of prostitution ads on the Backpage website." Mot. at 12. This is a mischaracterization of the two documents the

government cites.  The PR consultants provided input about messaging and communications; they had no role in establishing moderation and review practices and certainly did not say there was a "prevalence of prostitution ads" on the website.  The government's view of subject-matter waiver is absurdly broad—tantamount to saying that, because the PR consultants communicated about the Backpage.com website, all attorney-client privileged communications relating to the website were thus waived.  *See, e.g.*, *Hernandez*, 604 F.3d at 1101-02 (holding that district court committed clear error in ordering production of all documents withheld as privileged where waiver by attorney and client concerned only communications with a given individual).

Judge Campbell's ruling applied only to specific communications with PR consultants, and all such communications have since been produced.  That Judge Campbell did not invalidate privilege claims generally is made clear by the other half of his ruling, upholding privilege claims as to some 350 documents reflecting communications with Mr. Nigam, the attorney and former AUSA who advised concerning Backpage.com's review and moderation procedures.  Mot. Ex. K at 12-13.  The government cannot morph Judge Campbell's ruling into a blanket privilege waiver.

## C.  The *J.S.* Ruling Does Not Establish Any Privilege Waiver Applicable Here.

The Washington superior court's ruling in the *J.S.* case provides no basis for the government's assertion that all privileges relating to Backpage.com should be deemed waived.  First, as the government acknowledges, the issue in *J.S.* was not an *express* waiver of privilege (*i.e.* the sharing of privileged information with third parties), but an *implied* waiver, allegedly by putting privileged communications "at issue" in that case.  "[W]aivers by implication differ materially from the more traditional express waivers" as implied waivers are designed to give the "opponent a fair opportunity to defend against" claims or defenses implicating privileged communications.  *Bittaker v. Woodford*, 331 F.3d 715, 719, 720 (9th Cir. 2003).  Because implied waivers are premised on a "fairness principle," the waiver must be "no broader than needed to ensure the fairness of the proceedings before it."  *Id.*  As such, even after an at-issue

1    waiver, "the holder of the privilege may preserve the confidentiality of the privileged

2    communications by choosing to abandon the claim that gives rise to the waiver

3    condition." *Id.* at 721.

4        In *J.S.*, the parties settled the litigation shortly after the Court's ruling and before

5    any privileged communications were disclosed.  The settlement eliminated the alleged

6    waiver condition and "preserve[d] the confidentiality of the privileged

7    communications." *Id.*; *accord Squealer Feeds v. Pickering*, 530 N.W.2d 678, 685 (Iowa

8    1995) ("the waiver of a privileged communication may be withdrawn at any time before

9    it has been acted on, where no advantage has accrued to either litigant on account

10   thereof") (quoting 81 Am.Jur.2d Witnesses § 294, at 281 (1992)).  The government has

11   no basis to claim that a waiver that did not occur in the *J.S.* case entitles it to transgress

12   privileges now.

13       **D.    Use of a "Taint Team" Is Improper and Prejudicial.**

14       The government takes as a given that its review of privileged documents through

15   a "filter team" is permissible, whatever may be the procedures or processes employed.

16   *See, e.g.*, Mot. at 4.  The only relief the government seeks by its motion is an order

17   holding that "Backpage's [sic] corporate attorney-client privilege has been waived" so

18   that the "prosecution team may therefore gain access to the emails and other

19   communications that were previously withheld by the filter team." *Id.* at 13.  As

20   discussed, there has been no privilege waiver.  In any event, Defendants object to the

21   government's review of potentially privileged communications under the circumstances

22   and hereby move for an order halting any such review and directing the government to

23   set aside all such documents pending discovery and further proceedings to address

24   possible violations of the attorney-client privilege and work product protections.

25       The government's use of "taint teams" to substantively review attorney-client

26   communications has been criticized by courts and commentators.  The practice

27   inherently invades the attorney-client privilege and work product protections because it

28   does not prevent the government from reviewing privileged documents, it merely

"changes the identity of the government attorneys and agents who first review that information."  *See* Loren E. Weiss & Gregory S. Osborne, *Taint Teams and the Attorney-Client Privilege*, American Bar Association (Dec. 2015).   These practices have been called into question because government agents cannot be expected to just ignore material because it is not responsive or contains privileged communications.  If agents find information they think may help a prosecution, their natural tendency is to try to find ways to disclose and use the information.  Such "conscious knowledge" can "lead investigators to unconsciously alter the course of investigation and prosecution for other criminal matters."  *Id.* at 5.

As Judge Bury of this Court has written:  "[L]iberal use of taint teams should be discouraged because they present 'inevitable and reasonably foreseeable risks that privileged information may be leaked to prosecutors.'"  *United States v. Renzi*, 722 F. Supp. 2d 1100, 1112 (D. Ariz. 2010) (quoting *In re Grand Jury Subpoenas*, 454 F.3d 511, 523 (6th Cir. 2006)).

> "[T]he government taint team may have an interest in preserving privilege, but it also possesses a conflicting interest in pursuing the investigation, and, human, nature being what it is, occasionally some taint team attorneys will make mistakes or violate their ethical obligations."

*Id.*

Other courts have been equally critical of the practice, if not more so.  "When considering the purposes of the attorney-client privilege, it is obvious that no governmental entity should intentionally review privileged material without the express approval of the court."  *United States v. Pedersen*, 2014 WL 3871197, at *29 (D. Or. 2014).  "It would be a rare defendant who would feel comfortable speaking openly with his defense attorney knowing that somebody from the government, even a filter team attorney, was reviewing those communications."  *Id.*  Moreover, "taint team" procedures should only be used as a last resort.  *Id.* at *31 ("If there is a feasible means to segregate privileged material without risk of accidental review and without use of a taint team, such means should be employed.").

21

The government has disclosed little about what its "filter team" has done, but what it has said raises serious concerns. The search warrants drafted and submitted by the government merely indicated that a review team would be used in some fashion to identify "legitimately protected materials," without any indication of how that would be determined. *See* Mot. Ex. B; *see also* Mot. Ex. A. While the government knows of more than 20 law firms and 75 attorneys who have represented VVMH, Backpage.com and related parties, it indicates that its filter team has segregated documents naming just four attorneys and two firms. Mot. at 4. Notwithstanding that communications to or from attorneys would almost certainly be privileged, the government says it has reviewed "approximately 6,500 of the segregated emails." *Id.* With electronic imaging and computer search technology, it is a straightforward exercise to identify and segregate documents containing attorney names, as the California AGO did for the same documents the federal government has decided to review. That the AGO segregated over 64,000 documents, while the government here says it has found only 10,733 potentially privileged documents, raises further concerns. It is also troubling why the government decided to embark on its "taint team" process when the California AGO— with which the federal government has been coordinating for several years—had agreed that it would not review potentially privileged documents but would provide them to defendants for review and preparation of a privilege log.

The government's filings on this motion and others (*e.g.*, the Disqualification Motion (Doc. 118) and Motion for Disclosure (Doc. 202)) reflect that it fundamentally misunderstands relationships between the parties and their agreements and dealings concerning joint representation by counsel, joint defenses, and protection of privileges. It is impossible to see how agents on the "filter team" could possibly assess privilege and work product protections without understanding the actual relationships and agreements (or based on misconceptions provided by the prosecution team). Moreover, the government's motion actually acknowledges coordination between its "prosecution team" and "filter team," disclosing that the "'subjects' addressed in the communications

that have been segregated by the filter team" include "how to moderate and review ads" and the alleged "prevalence of prostitution ads."  Mot. at 12.  Obviously, the point of setting aside potentially privileged documents is to ensure the government's prosecutors *do not know* the subjects or substance of communications between attorneys and their clients.

In *United States v. Neill*, 952 F. Supp. 834 (D.D.C. 1997), the court held that "the government's affirmative decision to invoke [taint team] procedures constitutes a *per se* intentional intrusion" into the attorney-client relationship.  *Id.* at 840-41.

> Where the government chooses to take matters into its own hands rather than using the more traditional alternatives of submitting disputed documents under seal for *in camera* review by a neutral and detached magistrate or by court-appointed special masters, … it bears the burden to rebut the assumption that tainted material was provided to the prosecution team.

*Id.* at 841 (internal citations omitted).

The government's actions here justify thorough consideration of whether it has properly protected privileges or has transgressed them.  Among other things, Defendants request that the Court direct the government to (1) halt its "filter team" review; (2) run searches of all documents against a comprehensive list of attorneys who have represented VVMH, Backpage.com or related parties and segregate all such materials without further review; and (3) provide complete information about processes and any review of potentially privileged documents or information that has occurred to date.

### E.     The Court Should Order Discovery to Consider Privilege Issues and Breaches That May Have Occurred.

The government's positions and actions demonstrate the need for disclosures about its communications with Ferrer, his counsel, or others about privileges, joint representation, and/or steps to target attorney-client relationships of Messrs. Lacey, Larkin or Medalist Parties.  Defendants have requested discovery in connection with the Disqualification Motion (Doc. 202), but the government's positions in the present motion underscore this need.

The government clearly has already communicated with Ferrer about his dealings and communications with counsel, which are protected by privilege.  For example, Ferrer's declaration submitted with the government's reply brief on the Disqualification Motion (Doc. 192-6), discusses his communications with DWT and advice provided during times when Backpage.com was a subsidiary of VVMH and Ferrer acted as a corporate representative, though he attempts to suggest DWT acted as his personal lawyer.  The government insists that, pursuant to his Proffer Agreement, Mr. Ferrer agreed that he would discuss "communications with any attorney or law firm that represented Backpage.com, or any related entity" (Doc. 216 at 3), but that itself is a violation of privileges held by VVMH and other parties, which Ferrer cannot unilaterally waive.  To the extent the government avers it has abided by the parties' joint representation and joint defense agreements based on what it may have been told, it seems clear the government was not informed accurately.  And yet the government has refused to provide any discovery, in effect asserting that Defendants should take its word that it has not improperly obtained privileged information.

Thus, to address the government's actions fairly and to have opportunity to protect privileges or address possible violations, the Court should require the government to provide complete disclosures.

## IV.    CONCLUSION

Defendants request that the Court:

1.    Deny the government's motion and reject its assertions attempting to create a blanket waiver of privilege in this action;

2.    Order that the government's review of potentially privileged documents immediately cease;

3.    Direct the government to run a search of all documents in its possession and segregate all documents that contain any attorney or law firm names (based on lists of such names provided previously);

1        4.     Require the government to provide disclosures of all communications with

2   Ferrer, his counsel, or others about representation of or communications with counsel,

3   the parties' agreements regarding joint representation or defense, and/or any efforts to

4   influence or affect counsel's representation of Messrs. Lacey and Larkin or any of the

5   Medalist Parties;

6        5.     Require the government to provide complete information about processes

7   and any review of potentially privileged documents or information that has occurred to

8   date; and

9        6.     After the requisite disclosures, permit the parties an opportunity to bring

10  further motions, as appropriate, to address protection of attorney-client privileges and

11  work product protections or to seek remedies for violations.

12

13  DATED:  July 20, 2018         Respectfully submitted,

14

15

16                     */s/ Paul J. Cambria, Jr.*

17                     LIPSITZ GREEN SCIME CAMBRIA LLP

18                     Attorneys for Defendant Michael Lacey

19                     */s/ Thomas Henry Bienert, Jr.*

20                     BIENERT MILLER & KATZMAN PLC

21                     Attorneys for Defendant James Larkin

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

I certify that on this 20th day of July, 2018, I electronically transmitted a

3

PDF version of this document to the Clerk of Court, using the CM/ECF System,

4

for filing and for transmittal of a Notice of Electronic Filing to the attorneys of

5

record. See attached service list.

6

7

        *s/ Toni Thomas*
        Toni Thomas

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| COUNSEL | REPRESENTING |
| --- | --- |
| Anne M. Chapman<br>Mitchell Stein & Carey PC<br>1 Renaissance Sq.<br>2 N Central Ave., Ste. 1900<br>Phoenix, AZ 85004<br>Email: anne@mscclaw.com | Henze Cook Murphy, PLC |
| Lee Stein<br>Mitchell Stein & Carey PC<br>1 Renaissance Sq.<br>2 N Central Ave., Ste. 1900<br>Phoenix, AZ 85004<br>lee@mscclaw.com | Henze Cook Murphy, PLC |
| James C. Grant<br>Davis Wright Tremaine LLP<br>1201 3rd Ave., Ste. 2200<br>Seattle, WA 98101-3045<br>jimgrant@dwt.com | Michael Lacey |
| Robert Corn-Revere<br>Davis Wright Tremaine LLP<br>1919 Pennsylvania Ave. NW, Ste. 800<br>Washington, DC 20006<br>bobcornrevere@dwt.com | Michael Lacey |
| Ronald G. London<br>Davis Wright Tremaine LLP<br>1919 Pennsylvania Ave. NW, Ste. 800<br>Washington, DC 20006<br>ronnielondon@dwt.com | Michael Lacey |
| Paul J. Cambria, Jr.<br>Liptsitz Green Scime Cambria LLP<br>42 Delaware Ave., Ste. 120<br>Buffalo, NY 14202<br>pcambria@lglaw.com | Michael Lacey |

| COUNSEL | REPRESENTING |
|---------|--------------|
| Janey Henze Cook<br>Henze Cook Murphy PLLC<br>4645 N 32nd St., Ste. 150<br>Phoenix, AZ 85018<br>janey@henzecookmurphy.com | Michael Lacey |
| Bruce Feder<br>Feder Law Office PA<br>2930 E Camelback Rd., Ste. 160<br>Phoenix, AZ 85016<br>bf@federlawpa.com | Scott Spear |
| Michael D. Kimerer<br>Kimerer & Derrick PC<br>1313 E Osborn Rd., Ste. 100<br>Phoenix, AZ 85014<br>mdk@kimerer.com | John Brunst |
| Rhonda E. Neff<br>Kimerer & Derrick PC<br>1313 E Osborn Rd., Ste. 100<br>Phoenix, AZ 85014<br>rneff@kimerer.com | John Brunst |
| Gary S. Lincenberg<br>Bird Marella<br>1875 Century Park E # 23<br>Los Angeles, CA 90067<br>glincenberg@birdmarella.com | John Brunst |
| Ariel A. Neuman<br>Bird Marella<br>1875 Century Park E # 23<br>Los Angeles, CA 90067<br>aneuman@birdmarella.com | John Brunst |

| COUNSEL | REPRESENTING |
|---|---|
| Gopi Panchapakesan<br>Bird Marella<br>1875 Century Park E # 23<br>Los Angeles, CA 90067<br>gpanchapakesan@birdmarella.com | John Brunst |
| KC Maxwell<br>Maxwell Law, PC<br>899 Ellis Street<br>San Francisco, CA 94109<br>kcm@kcmaxlaw.com | Dan Hyer |
| Michael L. Piccarreta<br>Piccarreta Davis Keenan Fidel PC<br>2 E Congress St., Ste. 1000<br>Tucson, AZ 85701<br>mlp@pd-law.com | Andrew Padilla |
| Jefferson Keenan<br>Piccarreta Davis Keenan Fidel PC<br>2 E Congress St., Ste. 1000<br>Tucson, AZ 85701<br>jlk@pd-law.com | Andrew Padilla |
| Stephen M. Weiss<br>Karp & Weiss PC<br>3060 N Swan Rd.<br>Tucson, AZ 85712<br>sweiss@karpweiss.com | Joye Vaught |
| Andrew Stone<br>US Attorney's Office<br>40 N Central Ave, Ste 1800<br>Phoenix, AZ 85004<br>andrew.stone@usdoj.gov | USA |

SERVICE LIST

| COUNSEL | REPRESENTING |
|---|---|
| John Jacob Kucera<br>US Attorney's Office - Los Angeles, CA<br>312 N Spring St., Ste. 1200<br>Los Angeles, CA 90012<br>john.kucera@usdoj.gov | USA |
| Kevin M. Rapp<br>US Attorney's Office - Phoenix, AZ<br>2 Renaissance Square<br>40 N Central Ave., Ste. 1800<br>Phoenix, AZ 85004-4408<br>kevin.rapp@usdoj.gov | USA |
| Margaret Wu Perlmeter<br>US Attorney's Office - Phoenix, AZ<br>2 Renaissance Square<br>40 N Central Ave., Ste. 1800<br>Phoenix, AZ 85004-4408<br>margaret.perlmeter@usdoj.gov | USA |
| Peter Kozinets<br>US Attorney's Office - Phoenix, AZ<br>2 Renaissance Square<br>40 N Central Ave., Ste. 1800<br>Phoenix, AZ 85004-4408<br>peter.kozinets @usdoj.gov | USA |

SERVICE LIST