Paul J. Cambria, Jr. (NY 15873, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:  (716) 855-1580
pcambria@lglaw.com

Erin E. McCampbell (NY 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:  (716) 855-1580
emccampbell@lglaw.com

*Attorneys for Defendant Michael Lacey*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | NO. CR-18-00422-PHX-SPL (BSB) |
| Plaintiff, | |
| vs. | DEFENDANT LACEY'S MOTION FOR RELEASE OF FUNDS UNRELATED TO BACKPAGE AND REQUEST FOR EXPEDITED RELIEF |
| Michael Lacey, *et al.*, | |
| Defendants. | (Oral argument requested) |

Defendant Michael Lacey, by and through his undersigned attorney, hereby moves for an order directing the government to release funds held in three bank accounts (Republic Bank accounts ending in 2485, 1897, and 3126).  Those funds are not derived from the website formerly operated by Backpage.com, LLC and are needed to fund his defense to the charges against him.  The government's pretrial seizure of these assets is unsupported and has interfered

with Mr. Lacey's Sixth Amendment right to counsel. This motion is based on the legal reasoning and authority set forth in the attached Memorandum of Points and Authorities.

In light of Mr. Lacey's mounting financial difficulties, an accelerated hearing of the motion is respectfully requested.

It is expected that excludable delay under 18 U.S.C. § 3161(h)(1)(D) will occur as a result of this motion or an order based thereon.

RESPECTFULLY SUBMITTED this 16th day of November, 2018,

/s/    *Paul J. Cambria, Jr.*

LIPSITZ GREEN SCIME CAMBRIA LLP

Attorneys for Defendant Michael Lacey

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Michael Lacey respectfully moves this Court for an order requiring the government to immediately release the funds held in three of his bank accounts which are unrelated to Backpage.com LLC ("Backpage").  Mr. Lacey accumulated substantial wealth prior to the creation of Backpage.  In its scorched-earth approach to this case, the government has seized all of Mr. Lacey's financial accounts and real estate holdings, including considerable assets unrelated to Backpage.  Further, the government has done everything that it can to evade review of its unlawful seizures on the merits.  As a result, Mr. Lacey is unable to maintain the properties that the government has seized, unable to pay for living expenses, and unable to fund his defense to the instant charges.

At this time, Mr. Lacey has incurred penalties for unpaid property taxes for some of his properties.  Further, his counsel of choice has no retainer and has not been paid for their work for some time.  Without expedited relief from this Court, Mr. Lacey is at risk of further penalties from taxing authorities and for loss of his counsel of choice.  For these reasons, Mr. Lacey respectfully requests that this Court hear the instant motion on an accelerated basis and grant the relief requested.

## BACKGROUND

**I.    Mr. Lacey accumulated substantial wealth prior to existence of Backpage.**

Mr. Lacey is an award-winning journalist and the newspapers he oversaw won hundreds of awards, including a Pulitzer Prize.  Mr. Lacey is the former co-owner of Village Voice Media Holdings, LLC ("VVM"), a newspaper conglomerate that, at one time, distributed 17 weekly newspapers across the country, including the Phoenix New Times, SF Weekly, and New York's Village Voice.  During his tenure at VVM, and long before inception of Backpage, Mr. Lacey had accumulated significant wealth.  Moreover, in 2012, VVM sold its subsidiary, New Times Media, LLC ("NTM"), which owned the newspapers

and that sale generated significant wealth for Mr. Lacey that is unrelated to Backpage. Further, Mr. Lacey received rental income from rental of the Phoenix New Times Building, located on Washington Street in Phoenix, which is unrelated to Backpage.

Mr. Lacey did not receive distributions from the sale of NTM or the rental income directly from the purchasers of the newspaper or from the tenants of the Phoenix New Times Building. Instead, those payments were made to Cereus Properties LLC ("Cereus"), and Mr. Lacey subsequently received payments from Cereus on behalf of its ultimate parent, in which Mr. Lacey was a stockholder. Two of these distributions are at issue in this motion.

## II. The government sought and obtained pretrial restraint of the vast majority of Mr. Lacey's assets regardless of their origins.

On March 28, 2018, a grand jury issued an indictment ("Indictment") against Mr. Lacey and his co-defendants in this case. (*See* Indict., Doc. 3.) The government charged Mr. Lacey with conspiracy to facilitate prostitution (18 U.S.C. §§ 371, 1952(a)(3)(A)), facilitation of prostitution (18 U.S.C. §§ 1952(a)(3)(A), (b)(1)(i)), conspiracy to commit money laundering (18 U.S.C. § 1956(h)), concealment money laundering (18 U.S.C. § 1956(a)(1)(B)(i)), international promotional money laundering (18 U.S.C. § 1956(a)(2)(A)), and transactional money laundering (18 U.S.C. § 1957). (*See id.* at ¶¶ 157-71.) These charges purportedly arise out of Mr. Lacey's ownership interest in the former ultimate parent of Backpage, a web-publishing entity that operated a website that provided third-party users with an online forum to post classified advertisements. (*See id.* at ¶¶ 1-16.) The government's novel theory is that Mr. Lacey should be held criminally liable for the publication of classified advertisements posted to Backpage by third-party users, where the ads purportedly related to prostitution or sex-trafficking. (*See id.*) On July 25, 2018, a grand jury sitting in this District issued a superseding indictment ("Superseding Indictment"), which included additional charges based on the same theory of liability. (*See* Super. Indict., Doc. 230.)

Mr. Lacey pleaded not guilty to the crimes charged in both Indictments and has mounted a vigorous defense to the government's case.

4

But the litigation among the parties is not limited to this District.  Apparently for the convenience of a prosecutor, the government pursued the pretrial restraint of the defendants' assets in the Central District of California.  Indeed, by the time the original Indictment was unsealed, the government had seized the vast majority of Mr. Lacey's assets (even though he must be presumed to be innocent of the crimes charged at this stage and the conduct at issue involves presumptively protected First Amendment activities) through civil seizure warrants authorized by the Central District of California.  Because those seizures violated the First, Fourth, Fifth, and Sixth Amendment rights of Mr. Lacey and his co-defendants, they moved to vacate the seizure warrants.  While that motion was pending, the government filed dozens of civil forfeiture actions in the Central District of California seeking pretrial restraint of the assets already seized by the civil seizure warrants as well as the majority of Mr. Lacey's real estate holdings.  Then, the government obtained a stay of all litigation concerning the pretrial restraint of the assets owned by Mr. Lacey and his co-defendants, which Mr. Lacey and his co-defendants have appealed to the Ninth Circuit.

It is unclear when the parties can expect a decision from the Ninth Circuit and that uncertainty has rendered the instant motion of vital importance for Mr. Lacey.  At this time, the government has obtained the pretrial restraint of eleven financial accounts, nine properties, three vehicles, and numerous other valuable assets such as works of fine art.  The only financial account the government has not seized is an IOLTA account of an attorney not associated with this case.  However, these funds are not available to Mr. Lacey to fund his defense to this prosecution because the government has indicated that, if he were to transfer any funds, he is at risk for additional money laundering charges.[1]  Because Mr. Lacey does not have access to any of his funds or real properties, the expedited resolution of this motion is critical to his ability to retain counsel of choice.

---

[1]     Mr. Lacey will provide the court with information pertaining to this account *in camera*, if requested.

5

**III.     The government's pretrial seizure efforts are troubling and interfere with Mr. Lacey's ability to fund his defense to the charges against him.**

The government's strangle-hold approach to the pretrial restraint of the defendants' assets is unprecedented and troubling.

**A.     The government's conduct created unnecessary confusion.**

The government has pursued seizure on multiple and overlapping fronts.  Mr. Lacey's assets have been subjected to pretrial restraint through:  (1) the Superseding Indictment's forfeiture allegations; (2) the California civil seizure warrants; (3) the California civil forfeiture actions; (4) administrative forfeiture proceedings undertaken by the United States Postal Inspection Service; and (5) notices of *lis pendens*.  Each of his assets is subject to three or four distinct methods of pretrial restraint.  The government's overlapping and scattered efforts at pretrial restraint have caused great confusion and expense to defendants as their attorneys seek to challenge the seizures on multiple fronts.

**B.     The government avoided transparency for as long as possible.**

The government's efforts at the pretrial restraint of Mr. Lacey's assets has been anything but transparent.  Instead, the government has stymied attempts to unfurl its pretrial restraint of his assets.  For example, shortly after the original Indictment was issued, Mr. Lacey's counsel requested that the government provide the seizure warrants, warrant applications, and forfeiture orders issued in connection with the seizure of his assets.  Initially, the government denied that it had the ability to produce those documents any earlier than the end of May, even though the government had been told that each day that Mr. Lacey's assets remained subject to seizure caused undue hardship on him.  Unable to wait for the government's end-of-May disclosure, Mr. Lacey moved for the prompt disclosure of those documents and for the accelerated hearing of the motion.  (*See* Defs.' Mot. for Discl., Doc. 141.)  On May 18, 2018, the date the government's opposition should have been filed with this Court, the government finally disclosed the requested documents to Mr. Lacey.  Aside from mooting this Court's review of Mr. Lacey's discovery motion, the government's mid-

May disclosure indicated that its claimed inability to disclose the documents any earlier than the end of May rang hollow.

In an effort to maintain their pretrial restraint of defendants' assets, the government has pursued numerous *ex parte* filings and has filed civil forfeiture actions without serving defendants or their counsel. The defendants learned about these actions by searching electronic dockets. This process is expensive and could be avoided by service of the complaints as they are filed.

Further, when Mr. Lacey and his co-defendants have sought judicial review of the government's unlawful pretrial restraint, the government has sought orders allowing it to evade prompt judicial review of its actions.

### C.     The government's seizures are unlawful.

As set forth above, the government has evaded any efforts at a review of the propriety of the seizures. Mr. Lacey has asserted that none of his assets are traceable to crime because his assets were generated from participation in First Amendment activities. Mr. Lacey's position is well-supported because courts have uniformly ruled that adult classified advertisements are protected under the First Amendment as is the publishing of such advertisements. *See, e.g.*, *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015), *cert. denied*, 137 S.Ct. 46 (2016) (recognizing that the adult advertisements posted to Backpage by third-party users constituted protected expression under the First Amendment); *Doe ex rel. Roe v. Backpage.com, LLC*, 104 F. Supp. 3d 149 (D. Mass. 2015), *aff'd sub nom.*, *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016) (both courts holding that Backpage's actions in publishing third-party ads could not establish that it was a participant in a sex trafficking venture under 18 U.S.C. § 1591 or Massachusetts criminal law).

However, separate and apart from the First, Fourth, and Fifth Amendment problems with the government's pretrial restraint of Mr. Lacey's assets, which is not before this Court on this limited motion, the government has refused to acknowledge or account for its pretrial restraint of assets that Mr. Lacey has established have *no relationship to Backpage* and thus,

cannot be deemed to be properly subject to seizure even under the government's novel theory of this case.  The continued seizure of this class of assets has rendered Mr. Lacey unable to maintain his properties, cover his living expenses, and fund his defense to the instant charges, which violates his Sixth Amendment rights.  That limited issue is before this Court on this motion; namely, the government's brazen claim that it can seize bank accounts that contain funds unrelated to Backpage on the basis of a third party's accidental, unauthorized transfer of Backpage-related funds into those accounts, even though Mr. Lacey had no knowledge of the transfer, it was contrary to standing instructions with the third party, the third-party is willing to speak with the government to explain the circumstances of her mistaken wire transfer, and the clerical error was corrected as soon as it was discovered and within twenty-four hours.

### 1.   The government has seized bank accounts containing funds unrelated to Backpage.

The government has seized all funds held in Mr. Lacey's Republic Bank accounts ending in 2485, 1897, and 3126.  The history of those accounts demonstrates that they cannot be restrained prior to trial because they do not hold funds traceable to Backpage.

### a. Mr. Lacey provided Cereus with standing instructions for handling his distributions.

Cereus had an account into which income generated from the 2012 sale of NTM and the rental income from the Phoenix New Times Building was deposited.  The account ended in 4862 (the "4862 Cereus Account").  The 4862 Cereus Account held funds that were 100% unrelated to Backpage.  Cereus had a separate account into which income generated from Backpage was deposited—an account ending in 3873 (the "3873 Cereus Account"). Periodically, Cereus made payments from those accounts to Mr. Lacey.

Mr. Lacey authorized Cereus to issue payments (checks or wire transfers) from the 4862 Cereus Account (which held only money unrelated to Backpage) to his Republic Bank

account ending in 2485.  For accounting purposes, Cereus had no authority to wire funds into that account from any other Cereus accounts, including its account that held funds generated from Backpage, the 3873 Cereus Account.  For accounting purposes, distributions from those business interests were deposited into other accounts held by Mr. Lacey.

### b.    Cereus accidentally violates Mr. Lacey's standing instructions.

On May 5, 2017, Cereus Account 4862 issued a check payable to Mr. Lacey in the amount of $451,205.36.  (*See* May 5, 2017 Check, a true and correct copy of which is attached as Ex. A.)  On May 23, 2017, Cereus Account 4862 issued a check payable to Mr. Lacey in the amount of $225,602.68.  (*See* May 23, 2017 Check, a true and correct copy of which is attached as B.)  The total of those two checks is $676,808.04.  (*See* Exs. A, B.)  These checks constituted two of Mr. Lacey's distributions from the 2012 sale of NTM and rental income from the Phoenix New Times Building.  Those funds are not traceable to Backpage and are untainted regardless of any government allegations.

When Mr. Lacey received those checks, he voided them because he was unable to visit his bank to deposit them.  Instead, he contacted Cereus and asked that the funds from the 4862 Cereus Account (funds unrelated to Backpage) be wired to his Republic Bank account ending in 2485 (a bank account that solely held funds unrelated to Backpage).

At this point, Cereus made a mistake.  Michele McSherry, the Office Manager for Cereus, transferred $676,808.04 from the 3873 Cereus Account into Mr. Lacey's Republic Bank account ending in 2485 instead of transferring $676,808.04 from the 4862 Cereus Account.  Ms. McSherry recognized that she had issued payment from the wrong account almost immediately and rectified her mistake by transferring $676,808.04 from the 4862 Cereus Account into the 3873 Cereus Account to replenish the funds mistakenly transferred. A contemporaneous bank statement for the 4862 Cereus Account indicates that Ms. McSherry fixed the mistake on June 1, 2017.  (*See* June 2017 Statement for 4862 Cereus Account, a true

and correct copy of which is attached as Ex. C.)  Moreover, the accidental nature of the transfer is corroborated by the checks that Cereus had originally issued Mr. Lacey for the payment.  Those checks were issued from the 4862 Cereus Account, not the 3873 Cereus Account.

**c.      With no knowledge of the mistaken transfer, Mr. Lacey transfers money from the Republic Bank account ending in 2485 to accounts ending in 1897 and 3126.**

After his arrest, and without knowledge of Ms. McSherry's clerical error, Mr. Lacey transferred funds from the Republic Bank account ending in 2485 to two other bank accounts held at Republic Bank (accounts ending in 1897 and 3126).  As a result of Ms. McSherry's accidental wire transfer, and Mr. Lacey's subsequent transfer of funds from the account ending in 2485 into his accounts ending in 1897 and 3126 (again, with no knowledge that Ms. McSherry had ever transferred funds related to Backpage into his account ending in 2485), the government has seized the entire contents of those three accounts.  Those three accounts hold approximately $1.1 million which Mr. Lacey earned separate and distinct from Backpage.  The government maintains that all accounts are subject to pretrial restraint because Ms. McSherry mistakenly mixed the funds.

**d.      Counsel established that the funds are unrelated to Backpage.**

On May 16, 2018, Mr. Lacey's counsel contacted the government to seek the immediate release of the funds held in Republic Bank accounts ending in 2485, 1897, and 3126 on the basis that those accounts did not intentionally include Backpage-related funds and that Backpage-related funds had been deposited into the 2485 account without Mr. Lacey's knowledge or permission.  (*See* May 16, 2018 Email from J. Cook to J. Kucera, a true and correct copy of which is attached as Ex. D.)  To allay the government's concern about the propriety of those funds, counsel provided the government with a declaration from Ms. McSherry documenting her accidental deposit of Backpage-related funds into the account

ending in 2485. (*See* May 14, 2018 Michele McSherry Decl., a true and correct copy of which is attached as Ex. E.)  Counsel provided the government with copies of the voided checks, which demonstrated that those checks were issued from the 4862 Cereus Account. (*See* Exs. A, B.)  Counsel provided the government the June 2017 statement for the 4862 Cereus Account, which documents Ms. McSherry's assertion that she rectified the error internally between the two Cereus accounts. (*See* Ex. C.)  Additionally, Mr. Cambria informed the government that Ms. McSherry was willing to speak with them about the clerical error.

### e.      The government refused to investigate the clerical error.

The government refused to conduct an investigation into the error, to interview Ms. McSherry or to release the funds held in Republic Bank accounts ending in 2485, 1897, and 3126, even though these funds represented revenue generated from sources unrelated to Backpage and were accidentally mixed with revenue generated from Backpage by a third party, contrary to Mr. Lacey's instructions, and through no act or knowledge of his whatsoever.  The government's reason for refusing to meet with Ms. McSherry or to investigate the accounts was that the government wanted to avail itself of civil discovery in California.  However, when it came time to litigate this unlawful seizure in a civil action in California, the government moved for a stay of all litigation of its pretrial restraint of these accounts, as well as every other seized asset of Mr. Lacey and his co-defendants. Consequently, Mr. Lacey remains unable to use the funds held in these three accounts, which are unrelated to Backpage, for his defense.  The government knows or refuses to learn that these funds are not tainted through any act of Mr. Lacey's.  Once again, the government simply appears to want to deprive Mr. Lacey of all funds necessary to defend the charges against him, including funds *unrelated* to Backpage.

2.     **The government has seized other substantial assets unrelated to Backpage.**

Because Mr. Lacey accumulated substantial assets prior to creation of Backpage, Mr. Lacey is in the process of conducting tracing analysis of those other assets.   Mr. Lacey respectfully reserves the opportunity to supplement the instant motion to include a challenge to the pretrial restraint of additional assets.

## III.    **Mr. Lacey is unable to fund his defense.**

Mr. Lacey is unable to fund his defense to the instant charges and has been unable to do so for some time.   Currently, Mr. Lacey owes legal fees to the law firms of Henze Cook Murphy PLLC, and Lipsitz Green Scime Cambria LLP for work performed prior to the filing of this motion.   Due to the complexity of this case, involving constitutional defenses, millions of pages of discovery, and serious charges, Mr. Lacey will continue to incur legal fees on a daily basis and require a substantial amount of money to adequately defend the instant charges with the retained attorneys of his choice.   Because Mr. Lacey's attorneys have no retainer fees and are not being paid for their current or prior work, Mr. Lacey is at risk of losing counsel.

In an effort to meet some of his obligations, Mr. Lacey borrowed money from his siblings.   His sister supports herself on social security, and his brother is undergoing chemotherapy and has significant medical costs.   Simply put, his siblings do not have deep pockets.   The money that they lent Mr. Lacey paid for a portion of his legal fees, but was quickly depleted in light of the complexity of this case and the multiple venues the prosecution has chosen to seek seizure of his assets.   His siblings are unable to loan him any further funds.

Mr. Lacey is unable to maintain his seized properties because he is unable to pay for utilities, property taxes, maintenance, and insurance.   He owes significant property taxes and has already incurred penalties on some of his unpaid property taxes.   Several of his properties have significant monthly home owners' association fees and all of his properties have monthly utility bills.   In addition to these expenses, one of his properties has an orchard, which accounts for a substantial portion of the value of the property, which he is unable to maintain.

**ARGUMENT**

It is well-settled that the government has no authority to seize so-called untainted assets prior to trial. *See Luis v. United States*, 578 U.S. ___, 136 S.Ct. 1083, 1094 (2016) ("We have found no decision of this Court authorizing unfettered, pretrial forfeiture of the defendant's own 'innocent' property—property with no connection to the charged crime."); *cf. United States v. Ripinsky*, 20 F.3d 359, 363 (9th Cir. 1994) ("[S]ubstitute assets are not subject to pretrial restraint."). Instead, "the pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment" because such restraint undermines a defendant's right to counsel of choice. *Luis*, 136 S.Ct. at 1088. In reaching this conclusion, the Court expressed concern for innocent defendants and their ability to prove their innocence when their funds had been incorrectly frozen and they were unable to retain counsel of choice. *See id.* at 1095. Further, the Court expressed concern for defendants who had been "rendered indigent" by pretrial restraint of their assets who would then "fall back upon publicly paid counsel, including overworked and underpaid public defenders." *Id.*

To allay these concerns, the Court indicated that district courts should conduct a tracing analysis to determine whether a particular asset is tainted or untainted and could be used to pay for counsel. *See id.* at 1095-96. The Court recognized that district courts "have experience separating tainted assets from untainted assets" and such analysis should be undertaken to enable a defendant to access and use untainted funds to pay for defense counsel. *Id.* at 1095. Indeed, holding a hearing to make the government demonstrate that an asset is subject to pretrial restraint and cannot be used to pay for attorneys' fees has become routine. *See Kaley v. United States*, 571 U.S. 320, 324 (2014) (recognizing that, "[s]ince *Monsanto*, the lower courts have generally provided a hearing to any indicted defendant seeking to lift an asset restraint to pay for a lawyer").

The government's continued pretrial restraint of Mr. Lacey's funds held in Republic Bank accounts ending in 2485, 1897, and 3126 does not withstand scrutiny of any kind. The funds at issue are derived from the sale of NTM, one of the many sources of income

distributed to Mr. Lacey separate and distinct from Backpage.  Consequently, the government's continued restraint of Mr. Lacey's assets derived from the sale of NTM is unjustifiable.  The government's continued use of the "nuclear weapon of the law," *see Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 329 (1999) (alteration omitted), to deprive Mr. Lacey of funds unrelated to Backpage to pay for defense counsel violates his Sixth Amendment right to counsel.  *See Luis*, 136 S.Ct. at 1088-96.

Here, Mr. Lacey had no involvement with or knowledge of the clerical error that led to the accidental deposit of Backpage-related funds into an account that held solely funds derived from newspapers and rental properties.  In fact, Ms. McSherry's clerical error was contrary to Mr. Lacey's long-standing instructions to Cereus to limit its wire transfers into his Republic Bank account ending in 2485 to revenues generated from the sale of NTM and rent from the Phoenix New Times Building.  Therefore, Mr. Lacey could not have had the requisite specific intent to launder the $676,808.04 at issue in violation of the money laundering statutes charged in the Indictment or Superseding Indictment (18 U.S.C. § 1956(a)(1)(B)(i) and 18 U.S.C. § 1957(a)) when he had *no prior knowledge* of the actions Ms. McSherry undertook to cause the error and the error was *contrary to* the instructions he had given Cereus.

As the Ninth Circuit has explained, "[m]oney laundering is a specific intent crime, and it requires *knowledge on the part of the defendant.*"  *United States v. Gurolla*, 333 F.3d 944, 957 (9th Cir. 2003) (emphasis added).  In particular, to establish money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), the government must establish that a defendant "*knowing* that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . *knowing* that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."  *Id*. (emphasis added).  Similarly, under 18 U.S.C. § 1957, to establish money laundering, the government must prove that a

14

defendant "*knowingly* engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." *Id*. (emphasis added). Neither of these statutes permit conviction for money laundering when the defendant is oblivious to the purported unlawful financial transaction at issue. Further, there are no known cases of money laundering under these charges that result in a conviction when a third party engages in a transaction unknown to a defendant and *contrary to the specific instructions given by the defendant*. The government relies on this accidental mixing of funds which occurred contrary to Mr. Lacey's instructions to continue to restrain these assets.

Finally, the government's novel theory for imposing liability on Mr. Lacey for his prior involvement with Backpage—which is the government's basis for restraining the vast majority of his assets pre-trial—has never been upheld in a contested proceeding. *See, e.g.*, *Doe ex rel. Roe*, 104 F. Supp. 3d 149 (D. Mass. 2015), *aff'd sub nom.*, *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016) (both courts holding that Backpage's actions in publishing third-party ads could not establish that it was a participant in a sex trafficking venture under 18 U.S.C. § 1591 or Massachusetts criminal law).

Critically, the government has seized *all* of the revenue generated by Backpage under the theory that *all* of that revenue represents the proceeds of crime. That bold premise cannot be reconciled with rulings from courts holding that there are numerous categories of adult advertisements that are protected under the First Amendment and not in any way indicative of criminality. *See Dart*, 807 F.3d at 234 (recognizing that ads posted to Backpage by "strip tease artists" or those pertaining to services offered by a "professional dominatrix" do not appear to be advertisements for criminal conduct which suggests that "not *everything* in the adult section of Backpage's website is criminal, violent, or exploitive" (emphasis in original)); *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 968-69 (N.D. Ill. 2009) (explaining that an adult services section of Craigslist "is not unlawful in itself nor does it necessarily call for unlawful conduct because not all ads posted to that section are for unlawful conduct and some ads, such

as ads for erotic dancing were entitled to protection under the First Amendment).   Any revenue generated by those advertisements is not subject to seizure, even under the government's novel theory of liability.   The government has made no showing as to which revenue was generated by these lawful advertisements and which revenue was not.   As set forth in greater detail in other pleadings filed with this Court, the government's blanket seizure of all revenue generated by Backpage without a hearing at which the government meets the heightened showing necessary to seize proceeds of First Amendment activities prior to conviction violates the First Amendment.   *See Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989); *see also Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd.*, 502 U.S. 105, 115 (1991).

**CONCLUSION**

In light of the foregoing, Mr. Lacey respectfully requests an order directing the government to release the funds held in Republic Bank accounts ending in 2485, 1897, and 3126.   These funds, of approximately $1.1 million, are wholly unrelated to Backpage.   The government has refused to release these funds or to investigate their origins, which would enable Mr. Lacey to maintain his properties and to fund his defense to the instant charges. Without immediate access to these funds, Mr. Lacey will be unable to mount a defense with private counsel of his choice in violation of his Due Process and Sixth Amendment rights. Due to the tenuous financial position in which the government has placed Mr. Lacey, Mr. Lacey respectfully requests the accelerated hearing of this motion.

RESPECTFULLY SUBMITTED this 16th day of November, 2018,

*/s/      Paul J. Cambria, Jr.*
LIPSITZ GREEN SCIME CAMBRIA LLP
Attorneys for Defendant Michael Lacey

On November 16, 2018, a PDF version
of this document was filed with
Clerk of the Court using the CM/ECF
System for filing and for Transmittal
Of a Notice of Electronic Filing to the
Following CM/ECF registrants:

Kevin Rapp, kevin.rapp@usdoj.gov
Reginald Jones, reginald.jones4@usdoj.gov
Peter Kozinets, peter.kozinets@usdoj.gov
John Kucera, john.kucera@usdoj.gov
Margaret Perlmeter, margaret.perlmeter@usdoj.gov
Patrick Reid, Patrick.Reid@usdoj.gov
Andrew Stone, andrew.stone@usdoj.gov
Amanda Wick, Amanda.Wick@usdoj.gov

# EXHIBIT A



CASH ONLY IF ALL SECURITY AND SECURITY FEATURES LISTED ON BACK INDICATES NO TAMPERING OR COPYING.

**Cereus Properties LLC**
VMG Depository Account
7150 E Camelback Rd, Suite 320
Scottsdale, AZ 85251
480-800-3282

Compass Bank
91-574/1221

1007

05/05/2017

PAY TO THE
ORDER OF   Michael G Lacey                                    $  **451,205.36

Four hundred fifty-one thousand two hundred five and 36/100********************************  DOLLARS

Michael G Lacey
3300 E STELLA LANE
PARADISE VALLEY, AZ 85253

MEMO   04/27/2017 distribution

⑈001007⑈ ⑆122105744⑆ 6

---

Cereus Properties LLC                                              1007
05/05/2017          Michael G Lacey
                            04/27/2017 distribution                451,205.36

VOID

Compass VMG Depository          04/27/2017 distribution            451,205.36

Cereus Properties LLC                                              1007
05/05/2017          Michael G Lacey
                            04/27/2017 distribution                451,205.36

PAYMENT RECORD

Compass VMG Depository          04/27/2017 distribution            451,205.36

**EXHIBIT B**



**Cereus Properties LLC**
c/o VMG Depository
7150 E Camelback Rd, Suite 320
Scottsdale, AZ 85251
480-800-3282

Compass Bank
01-574/1221

1010

05/23/2017

PAY TO THE ORDER OF   Michael G Lacey                                    $  **225,602.68

Two hundred twenty-five thousand six hundred two and 68/100********************************************   DOLLARS

Michael G Lacey
3300 E STELLA LANE
PARADISE VALLEY, AZ 85253

MEMO   05/23/2017 distribution

⑈0010101⑈ ⑆122105744⑆ 6745

Cereus Properties LLC                                                   1010
   05/23/2017          Michael G Lacey
                                        05/23/2017 distribution          225,602.68

Compass VMG Depository            05/23/2017 distribution          225,602.68

Cereus Properties LLC                                                   1010
   05/23/2017          Michael G Lacey
                                        05/23/2017 distribution          225,602.68

Compass VMG Depository            05/23/2017 distribution          225,602.68

# EXHIBIT C

**BBVA** Compass

# TREASURY MANAGEMENT ANALYSIS CHECKING

Account Number: 6745314862 - CEREUS PROPERTIES LLC

## Activity Summary

| | |
|---|---|
| Beginning Balance on 6/1/17 | $768,029.17 |
| Deposits/Credits (4) | + $417,712.71 |
| Withdrawals/Debits (5) | - $847,350.11 |
| Ending Balance on 6/30/17 | $338,391.77 |

## Deposits and Other Credits

| Date * | Check/Serial # | Description | Deposits/Credits |
|---|---|---|---|
| 6/1 | | INCOMING WIRE REF 20170601F2QCZ60C00257606011345FT01 ORG VOICE MEDIA GROUP, | $234,940.39 |
| 6/9 | | INCOMING WIRE REF 20170609F2QCZ60C00270206091439FT01 ORG VOICE MEDIA GROUP, | $66,666.66 |
| 6/29 | | DEPOSIT | $49,438.99 |
| 6/30 | | INCOMING WIRE REF 20170630F2QCZ60C00367106301306FT01 ORG VOICE MEDIA GROUP, | $66,666.67 |

Please note, certain fees and charges posted to your account may relate to services and/or activity from the prior statement cycle.
* The Date provided is the business day that the transaction is processed.

## Withdrawals and Other Debits

| Date * | Check/Serial # | Description | Withdrawals/Debits |
|---|---|---|---|
| 6/1 | | E-ACCESS BOOK TRSF DR TO REIMB CEREPROP FOR 5 31 DIST. THAT S B FROM VMG | $676,808.04 |
| 6/8 | | OUT WT E-ACCESS CSTREP REF 20170608F2QCZ60C003088 BNF Michael G. Lacey | $135,361.61 |
| 6/8 | | OUT WT E-ACCESS CSTREP REF 20170608F2QCZ60C003089 BNF Scott Spear | $12,281.08 |



Please note, certain fees and charges posted to your account may relate to services and/or activity from the prior statement cycle.
* The Date provided is the business day that the transaction is processed.

## End of Business Day Balance Summary

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 6/1 | $320,257.84 | 6/9 | $222,286.11 | 6/30 | $338,391.77 |
| 6/8 | $172,615.15 | 6/29 | $271,725.10 | | |

## Summary of Checks

| Date | Check # | Amount | Date | Check # | Amount | Date | Check # | Amount |
|---|---|---|---|---|---|---|---|---|
| 6/1 | 1012 | $5,903.68 | 6/9 | 1014 * | $16,995.70 | | | |

* Indicates break in check sequence

**EXHIBIT D**

**April Kelly**

| | |
|---|---|
| **From:** | Janey Henze Cook <Janey@henzecookmurphy.com> |
| **Sent:** | Friday, May 25, 2018 6:39 AM |
| **To:** | Erin E. McCampbell |
| **Subject:** | Fwd: Clerical error |

HENZE
MURPHY

**PLEASE NOTE OUR NEW ADDRESS!!!**

**Janey Henze Cook**
722 E. Osborn Road, Ste 120
Phoenix, Arizona 85014
Direct: 602.956.1930
Cell: 602.402.9576
Main: 602.956.1730
Fax: 602.956.1220
www.henzecookmurphy.com

This email message contains information from the law firm of Henze Cook Murphy, PLLC. The contents of this message and any attachments are intended solely for the addressee(s), and may contain confidential and/or privileged information that is legally protected from disclosure. If you are not the intended recipient of this message, or if you receive this message in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited

Begin forwarded message:

> **From:** "Kucera, John (USACAC)" <John.Kucera@usdoj.gov>
> **Date:** May 16, 2018 at 3:06:45 PM MST
> **To:** Janey Henze Cook <Janey@henzecookmurphy.com>
> **Cc:** "pcambria@lglaw.com" <pcambria@lglaw.com>, "Lanza, Dominic (USAAZ)" <Dominic.Lanza@usdoj.gov>, "Rapp, Kevin (USAAZ)" <Kevin.Rapp@usdoj.gov>, "Jones, Reginald (CRM)" <Reginald.Jones4@usdoj.gov>, "Perlmeter, Margaret (USAAZ)" <Margaret.Perlmeter@usdoj.gov>
> **Subject: RE: Clerical error**
>
> Janey,
>
> We will look into the issue, but it seems unlikely that we will be able to thoroughly investigate the matter and come to a conclusion this week.
>
> -John
>
> _____
>
> John Kucera | AUSA
> (213) 894-3391

1

From: Janey Henze Cook <Janey@henzecookmurphy.com>
Sent: Wednesday, May 16, 2018 8:48 AM
To: Kucera, John (USACAC) <jkucera@usa.doj.gov>
Cc: pcambria@lglaw.com
Subject: Clerical error

John,

This email is to confirm our conversation yesterday regarding Mr Lacey's Republic account. In that call you stated that you need to "investigate" the clerical error, and that there is no way you can discuss that issue this week. I urge you to reconsider the timing. Each day that goes by, Mr Lacey suffers undue harm.

I recognize that you are working on unsealing the documents we have been requesting and thus are busy. Nevertheless, I'm requesting that you/the agent/the team look into the issue of the clerical error as soon as possible, ie, this week.

As it currently stands, Mr Lacey has more bills than he has money.  He does not have a bank account or a credit or debit card. Because of the pressure put on Republic bank by the postal agents, he not only has no funds, he has no bank.

Existing in today's world without a debit or credit card is nearly impossible. His lack thereof is impacting his ability to live, including his ability to comply with his release conditions. For example- his cars were seized, his wife was out of town at a funeral, and he has no ubur account. He couldn't get to a meeting with Pretrial services officer.  I had to get him there. Another example is this- he has a bill to pay for electronic monitoring anklet, and the company wants payment right now via credit card. (They are in Colorado). He, as noted, doesn't have a credit card.

Mr lacey needs to pay legal bills and he needs to pay regular bills regarding his properties. Mr lacey needs to make decisions <u>daily</u> that turn on <u>when</u> his funds will be available.

I know that your position is that by releasing his 401(k) check, the government eliminated the time sensitive nature of these issues. First- that check has not cleared and is not available to him yet- so we are still frozen. (I'm hoping it will clear this week).  Additionally and unfortunately, his bills (including legal bills and bills that have come in since our meeting) far exceed the $111,000 from the 401(k) check.

Mr lacey committed no act to commingle the monies. He didn't even know this was an issue until we met with you last week. I have given you everything you need to make that determination. You don't need to rely on the declaration to know that the funds were not supposed to be mingled- you can look at the wire sent within 24 hours to replace the funds. But the declaration and attached checks also clearly show the intent- for him to be paid from the VMG account (the account the checks were drawn from) and that it was an act by a third party which resulted in the mistaken wire being sent.

I can list 50 more reasons why time is of the essence on this if you need them. I know you are busy. I respect that. But it has been <u>**six weeks**</u> without the use of his account. Please, I urge you to look at this issue as soon as possible so that he doesn't continue to suffer undue harm.  If you prefer that we file a motion, I can do that. Just let me know your preference.

Thank you for your assistance.

Best,

Janey

**HENZE**
**MURPHY**
AT LIP KAT ZETWEK

**PLEASE NOTE OUR NEW ADDRESS!!!**

**Janey Henze Cook**
722 E. Osborn Road,  Ste 120
Phoenix, Arizona 85014
Direct: 602.956.1930
Cell: 602.402.9576
Main: 602.956.1730
Fax: 602.956.1220
www.henzecookmurphy.com

This email message contains information from the law firm of Henze Cook Murphy, PLLC.  The contents of this message and any attachments are intended solely for the addressee(s), and may contain confidential and/or privileged information that is legally protected from disclosure. If you are not the intended recipient of this message, or if you receive this message in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited

3

**EXHIBIT E**

I, Michele McSherry, do declare as follows:

1. I am the office manager at Cereus Properties, LLC;

2. My telephone number is 480-800-3286;

3. On May 5th, 2017, Cereus Properties made a distribution from its account ending in 4862 (into which Cereus deposits payments from Voice Media Group) to Michael Lacey in the amount of $451,205.36 (*see* Check No. 1007 attached);

4. On May 23rd, 2017, Cereus Properties made a distribution from its account ending in 4862 to Michael Lacey in the amount of $225,602.68 (*see* Check No. 1010 attached);

5. The total of these two checks was $676,808.04;

6. Mr. Lacey subsequently returned the two checks, which were voided, and asked us to instead wire the distributions to his account at Republic Bank ending in 2485;

7. I initiated a wire to Mr. Lacey's account ending in 2485. I intended to send the wire from Cereus' account ending in 4862, but, due to a clerical error on my part, I sent the wire from a Cereus account ending in 3873. To explain, I used a template that had been created the day before, and did not catch that it had the wrong account number on it;

8. I had been instructed to wire the funds from Cereus' account ending in 4862, and had intended to do so;

9. When I recognized my mistake later on May 31st, 2017, I attempted to cancel or reverse the wire transfer, but was unable to do so;

10. The next day, June 1st, 2017, I transferred money from Cereus' account ending in 4862 to its account ending in 3873 to correct my mistake;

11. I thought I had corrected my mistake by reimbursing Cereus' account ending in 3873 with funds from the account ending in 4862;

12. I swear under penalty of perjury that this information is true and correct.

*Michele Mc Sherry*          5/14/18

Michele McSherry            Date