Paul J. Cambria, Jr. (NY 15873, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:  (716) 855-1580
pcambria@lglaw.com

Erin E. McCampbell (NY 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:  (716) 855-1580
emccampbell@lglaw.com

*Attorneys for Defendant Michael Lacey*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br>vs.<br><br>Michael Lacey, *et al.*,<br><br>                    Defendants. | NO. CR-18-00422-PHX-SPL (BSB)<br><br>DEFENDANT LACEY'S MOTION TO STRIKE THE GOVERNMENT'S UNTIMELY OPPOSITION TO HIS MOTION FOR RELEASE OF FUNDS UNRELATED TO BACKPAGE AND REQUEST FOR EXPEDITED RELIEF<br><br>(Oral argument requested) |

        Defendant Michael Lacey, by and through his undersigned attorney, hereby moves for an order striking the government's untimely opposition (Doc. 412) to Mr. Lacey's Motion for Release of Funds Unrelated to Backpage and Request for Expedited Relief (Doc. 385).  The government's opposition was untimely under LRCiv 7.2(c) and the government has provided no excusable basis for its failure to file a timely opposition or for seeking an extension of its

deadline.  Based on the legal reasoning and authority set forth in the attached Memorandum of Points and Authorities, Mr. Lacey respectfully requests that this Court strike the government's opposition and grant the Motion for Release of Funds as unopposed.

It is expected that excludable delay under 18 U.S.C. § 3161(h)(1)(D) will occur as a result of this motion or an order based thereon.

RESPECTFULLY SUBMITTED this 12th day of December 2018,

/s/      *Paul J. Cambria, Jr.*
LIPSITZ GREEN SCIME CAMBRIA LLP
Attorneys for Defendant Michael Lacey

## **MEMORANDUM OF POINTS AND AUTHORITIES**

As this Court his aware, the defendants have brought challenges in this Court and elsewhere to the government's pretrial seizure of their assets.  On November 8, 2016, defendants Andrew Padilla and Joye Vaught filed an Emergency Motion to Stay Seizure of Attorneys' Fees and Immediate Hearing seeking an order from this Court staying execution of seizure warrants directed at funds held in their attorneys' IOLTA accounts for their defense.  (Doc. 360.)  On November 9, 2018, defendants James Larkin, Michael Lacey, John Brunst, and Scott Spear filed an emergency motion seeking stay of execution of seizure warrants directed at funds held in their attorneys' IOLTA accounts for the same reasons articulated in the motion filed by defendants Padilla and Vaught.  (Doc. 365.)  Additionally, Mr. Larkin filed a Supplemental Brief in Support of Defendants' Emergency Motion to Stay.  (Doc. 377.)  In the Supplemental Brief, Mr. Larkin asserted that, in a recent communication with the government, the government claimed that two bank accounts that Mr. Larkin had understood to contain funds unrelated to Backpage had been traced to Backpage, and that use of those funds would constitute criminal conduct.  (*See id*.)  Mr. Larkin indicated that the government was unwilling to reveal its basis for claiming that the funds were traceable to Backpage and requested an immediate evidentiary hearing.  (*See id.*)

On November 16, 2018, Mr. Lacey filed his Motion for Release of Funds Unrelated to Backpage and Request for Expedited Relief ("Motion).  (Doc. 385.)  In the Motion, Mr. Lacey requested that this Court issue an order directing the government to release funds held in three bank accounts (Republic Bank accounts ending in 2485, 1897, and 3126) because the government sought pretrial restraint of those funds on the basis that Mr. Lacey had comingled funds related to Backpage with funds unrelated to Backpage thereby rendering all of the funds held in those accounts subject to pretrial restraint under the government's theory of the case against Backpage.  (*See id*.)  Mr. Lacey demonstrated to this Court, as he had to the government many months earlier, that he had no knowledge of or involvement with the single deposit of funds related to Backpage into those three accounts, which did not otherwise contain funds related to Backpage.  Because the government refused to review Mr. Lacey's bank records or

interview the administrative personnel involved with the purportedly improper transaction, Mr. Lacey came to this Court to seek the equitable release of the funds that were unrelated to Backpage for use for his defense as a matter of fundamental fairness.

On November 16, 2018, this Court held a hearing on the motions that had been briefed by the time of the hearing—the motions filed at Docket Numbers 360, 365, 376, and 377. (*See* 11/16/18 Transcript, a true and correct copy of which is attached hereto as Ex. A.)  During the hearing, there was no discussion or mention of Mr. Lacey's Motion. (*See id*.)  At the conclusion of the hearing, this Court announced an oral decision and order on the motions that had been argued ("Order"). (*See id*. at 55-60.)  The Court stated that the Order related to the motions filed at Docket Numbers 360, 365, 376, and 377 and that those motions were denied because there were no "persuasive reasons as to why the Court should interfere with the Central District of California's issuance of the seizure warrants." (*Id*. at 57.).

The Order did not mention or rule on Mr. Lacey's Motion. (*See id*.)

With Mr. Lacey's Motion still active and pending after issuance of the Order, the government's opposition was due on November 30, 2018.  However, that date passed and the government did not file an opposition or a request an extension of its deadline.  On December 3, 2018, Mr. Lacey filed a Notice of the Government's Non-Opposition to his Motion. (Doc. 403.) More than one week later, on December 11, 2018, the government filed its Response in Opposition to the Motion ("Opposition"). (Doc. 412.)  The Opposition does not provide any excuse for why the government was unable to file an opposition or a request for an extension by November 30, 2018. (*See id*.)

## ARGUMENT

### I.    This Court should strike the Opposition as untimely and grant the Motion because there was no timely opposition filed.

This Court should strike the Opposition as untimely and grant the Motion as unopposed. Under the Local Rules, a party opposing a motion must file its responsive memorandum no later

than fourteen days after service of the motion. *See* LRCiv 7.2(c). However, when "counsel does not serve and file the required answering memoranda . . . such non-compliance may be deemed a consent to the . . . granting of the motion." LR Civ 7.2(i). When a party fails to timely file an opposition and offers no excusable basis for its untimely filing, courts have the authority strike the untimely pleading. *See United States v. Picou*, 2015 WL 6163423, at *2-3 (E.D. Cal. Oct. 19, 2015) (granting defendant's motion to strike the government's untimely oppositions because the government did not offer a "plausible" excuse for filing out of time or for failing to request an extension of its deadline). This Court has consistently applied the Local Rules which is in line with the application of similar rules by other courts. *See United States v. Warren*, 601 F.2d 417, 473-74 (9th Cir. 1979) (affirming district court's decision to grant unopposed motion to dismiss the indictment); *United States v. Farias*, 2009 WL 2485730, at *1 (N.D. Cal. Aug. 11, 2009) (granting defendant's unopposed motion for return of property because "[t]he government has not endeavored to meet its burden, and the Court is aware of no legitimate reason to withhold the property at issue in Defendant's motion"); *see also United States v. Nunez*, 223 F.3d 956, 958 (9th Cir. 2000) ("As a general matter, the government may waive certain defenses by not raising them in a timely manner.");

Here, Mr. Lacey filed and served the Motion on November 16, 2018. (Doc. 385.) The Opposition should have been filed and served no later than November 30, 2018. *See* LRCiv 7.2(c). However, that date passed and no opposition was filed. Further, the government did not contact defense counsel to request consent for an extension of the deadline or file any such request with this Court. As a result, on December 3, 2018, Mr. Lacey filed a Notice of Government's Non-Opposition to the Motion. (Doc. 403.) More than a week passed before the government filed its Opposition. (Doc. 412.) Critically, the Opposition does not include an explanation for why it was filed eleven days late. (*Id.*) The Opposition should be struck.

Although the government admits no fault on its part, it appears that the government did not file an opposition because the government *assumed* that the Motion would be denied for the same reasons that this Court denied other motions in the Order, and that this Court would reach

that determination *sua sponte* without *any submission* from the government *requesting* such an outcome.  (*See id*. at 3-5.)  Aside from the obvious risks associated with a litigation approach that proceeds on the assumption that a court will rule in the party's favor *sua sponte*, something the government has not risked with respect to any other motion filed by the defendants, the government's claim does not withstand scrutiny of any kind.  It is clear from the transcript of this Court's November 16, 2018 hearing that the Order did not resolve, let alone mention, the Motion.  (*See* Ex. A.)

Mr. Lacey has suffered and continues to suffer each day that he is deprived of access to his assets that are unrelated to Backpage.  His bills continue to mount and he is unable to meet his financial obligations, including funding his defense to the instant action.  The government's untimely response to the Motion, which requested expedited relief on the basis of Mr. Lacey's unsustainable financial situation, has further compounded that harm by delaying the hearing of the Motion.  For all these reasons, Mr. Lacey respectfully requests that this Court strike the Government's Opposition as untimely and grant the Motion as unopposed.

## II.     This Court should grant the Motion on its merits as a matter of this Court's equitable jurisdiction and inherent authority.

To the extent that this Court is not inclined to strike the Opposition and grant the Motion as unopposed, Mr. Lacey nonetheless should prevail on the Motion.  Under the Local Rules, Mr. Lacey's reply brief would be due on December 18, 2018, which he will file if the instant motion is denied.  In such a reply, Mr. Lacey would more fully assert several bases for granting his Motion, including the following:

First, contrary to the government's main argument, the doctrine of the law of the case is no barrier to this Court granting the Motion.  In contrast with the motions resolved by the Order, Mr. Lacey's Motion does not ask this Court to invalidate a seizure warrant issued by another Court.  (*See* Doc. 385.)  Instead, the Motion asks this Court to exercise its equitable jurisdiction and inherent authority to order the government to separate funds unrelated to Backpage from

funds related to Backpage to enable Mr. Lacey to fund his defense.  Consequently, the Motion does not challenge the issuance of the seizure warrant directed at Republic Bank accounts ending in 2485, 1897, and 3126.   Quite differently, the Motion seeks to hold the government accountable for its conduct after obtaining the seizure warrant which included, among other things:   (1) delaying disclosure of the seizure warrant for as long as possible to make it impossible for defense counsel to analyze the validity of the seizure of those accounts; and (2) after disclosing the seizure warrant, refusing to review and/or investigate the validity of the ongoing restraint of those accounts in light of the bank records that defense counsel procured demonstrating the government's flawed theory on comingling and offering to provide the opportunity to interview the administrative assistant who incorrectly and accidentally transferred Backpage related funds into those accounts without Mr. Lacey's knowledge or permission.  (*See id.*)  Because this Motion presents this Court with a very different issue from that presented by the other motions, the Order is no barrier to this Court's resolution and granting of the Motion.

Second, even if this Court determines that the Motion would have been denied on the same bases as the motions resolved by the Order, had the Motion been fully briefed and argued before the Court by the time the Court announced the Order, there is good cause for declining to apply the holding in the Order to this Motion under the doctrine of the law of the case because since issuance of the Order, the government has attempted to stop the very litigation it told this Court the defendants could pursue and that pursuit of that litigation justified denial of the motions before this Court.  At the November 16, 2018 hearing, the government told this Court that any challenge to the pretrial restraint of defendants' assets other than a *Monsanto* hearing, including a challenge brought under *Franks v. Delaware*, 438 U.S. 154 (1978), should be brought in the Central District of California.[1]  (*See* Ex. A at 7.)  Days later, defendants pursued their challenge

---

[1]    Defendants found this statement to be surprising in light of the history of the parties' litigation of the government's pretrial restraint of defendants' assets in the Central District of California.  On August 1, 2018, Defendants filed a Motion to Vacate or Modify Seizure Warrants, which challenged the seizure warrants on a variety of grounds, including violations of *Franks* under the docket 18-CV-06742.  The government responded by telling

to the seizure warrants that the government obtained to seize the attorney IOLTA accounts at issue in this Court's Order in the Central District of California by filing an Application and Motion to (1) Stay Execution of Seizure Warrants; and (2) Provide Notice to the Court of First Amendment and *Franks* Violations under the eight sealed dockets pertaining to those seizure warrants (18-MJ-02872, 18-MJ-02873, 18-MJ-02874, 18-MJ-02875, 18-MJ-02876, 18-MJ-02878, 18-MJ-02880, and 18-MJ-02883). Defendants did exactly what the government told this Court they should do. Unsurprisingly, the government's opposition to the Application and Motion evades review of its conduct by asking the court to deny the motion as moot because the seizure warrants had expired by the time the Application and Motion was filed (even though the government was silent as to whether it would refrain from seeking new seizure warrants for the same accounts which would eviscerate their mootness argument).

The government's secretive and heavy-handed approach to pretrial restraint of the defendants' assets is unparalleled and should not continue to evade judicial review. This Motion, which challenges the government's pretrial restraint of Mr. Lacey's assets on bases different from those addressed in the motions resolved in this Court's Order, gives this Court the opportunity to revisit the government's claim that defendants would be able to seek review of the seizures in the Central District of California, which, to date, is nothing more than an empty promise, conveniently asserted to evade this Court's review of the government's conduct.

## CONCLUSION

In light of the foregoing, Mr. Lacey respectfully requests an order striking the Opposition as untimely and granting the Motion as unopposed. To the extent that this Court

---

the Central District of California that the defendants' challenges should not be heard in that District, but instead should be heard in the District of Arizona. Shortly thereafter, the government sought a stay of all litigation in the Central District of California, which was granted and which is on appeal to the Ninth Circuit. There is nothing about the way the government litigated the pretrial restraint of defendants' assets in that case that suggests that the government is receptive to judicial review of the merits of its actions.

is not inclined to strike the Opposition, Mr. Lacey intends to submit a reply brief to more fully develop the arguments set forth herein because his Motion should be entertained and granted.

RESPECTFULLY SUBMITTED this 12th day of December, 2018,

/s/     *Paul J. Cambria, Jr.*
LIPSITZ GREEN SCIME CAMBRIA LLP
Attorneys for Defendant Michael Lacey

On December 12, 2018, a PDF version
of this document was filed with
Clerk of the Court using the CM/ECF
System for filing and for Transmittal
Of a Notice of Electronic Filing to the
Following CM/ECF registrants:

Kevin Rapp, kevin.rapp@usdoj.gov
Reginald Jones, reginald.jones4@usdoj.gov
Peter Kozinets, peter.kozinets@usdoj.gov
John Kucera, john.kucera@usdoj.gov
Margaret Perlmeter, margaret.perlmeter@usdoj.gov
Patrick Reid, Patrick.Reid@usdoj.gov
Andrew Stone, andrew.stone@usdoj.gov
Amanda Wick, Amanda.Wick@usdoj.gov

Exhibit A

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,      )
                               )
              Plaintiff,       )      CR-18-0422-PHX-SPL
                               )
        vs.                    )      Phoenix, Arizona
                               )      November 16, 2018
Michael Lacey,                 )         9:06 a.m.
James Larkin,                  )
Scott Spear,                   )
John Brunst,                   )
Andrew Padilla,                )
Joye Vaught,                   )
                               )
              Defendants.      )
                               )
_____)


BEFORE:  THE HONORABLE STEVEN P. LOGAN, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTIONS HEARING


Official Court Reporter:
Elva Cruz-Lauer, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 33
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    A P P E A R A N C E S

2     For the Government:

3                 U.S. Attorney's Office
                  By: PETER SHAWN KOZINETS, ESQ.
4                     KEVIN M. RAPP, ESQ.
                  40 North Central Avenue, Suite 1200
5                 Phoenix, AZ  85004

6                 U.S. Attorney's Office
                  By: JOHN JACOB KUCERA, ESQ.
7                 312 North Spring Street, Suite 1200
                  Los Angeles, CA  90012

8

9     For the Defendant Lacey:

10                Lipsitz Green Scime Cambria
                  By: PAUL JOHN CAMBRIA, JR., ESQ.
11                42 Delaware Avenue, Suite 120
                  Buffalo, NY  14202

12

      For the Defendants Lacey and Larkin:

13

14                Davis Wright Tremaine
                  By: JAMES C. GRANT, ESQ.
15                1201 3rd Avenue, Suite 2200
                  Seattle, WA  98101

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

```
 1   For the Defendant Larkin:

 2               Bienert Miller & Katzman
                 By: THOMAS HENRY BIENERT, JR., ESQ.(Telephonic)
 3                   WHITNEY Z. BERNSTEIN, ESQ.
                 903 Calle Amanecer, Suite 350
 4               San Clemente, CA  92673

 5               Schulte Roth & Zabel
                 By: SEETHA RAMACHANDRAN
 6               919 Third Avenue
                 New York, NY  10022

 7
     For the Defendant Spear:
 8
                 Feder Law Office
 9               By: BRUCE S. FEDER, ESQ.
                 2930 East Camelback Road, Suite 205
10               Phoenix, AZ  85016

11   For the Defendant Brunst:

12               Kimerer & Derrick
                 By: MICHAEL D. KIMERER, ESQ.
13               1313 East Osborn Road, Suite 100
                 Phoenix, AZ  85014
14
                 Bird Marella Boxer Wolpert Nessim
15                Drooks Lincenberg & Rhow
                 By: ARIEL A. NEUMAN, ESQ.
16               1875 Century Park E, Suite 2300
                 Los Angeles, CA  90067
17
     For the Defendant Padilla:
18
                 Piccarreta Davis Keenan Fidel
19               By: MICHAEL L. PICCARRETA, ESQ.
                 2 East Congress Street, Suite 1000
20               Tucson, AZ  85701

21   For the Defendant Vaught:

22               Karp & Weiss
                 By: STEPHEN M. WEISS, ESQ.
23               3060 North Swan Road
                 Tucson, AZ  85712
24

25
```

UNITED STATES DISTRICT COURT

For Henze Cook Murphy, PLLC:

            Mitchell Stein Carey Chapman
            By: ANNE MICHELLE CHAPMAN, ESQ.
            2 North Central Avenue, Suite 1450
            Phoenix, AZ  85004

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | THE CLERK:  Criminal case 18-422, United States of |
| 3 | America versus Michael Lacey and others. |
| 4 | This is time set for hearing on pending motions. |
| 5 | MR. KUCERA:  Good morning, Your Honor.  John Kucera on |
| 6 | behalf of the United States.  With me at counsel table is |
| 7 | Assistant United States Attorneys Kevin Rapp and Peter |
| 8 | Kozinets. |
| 9 | THE COURT:  Good morning to all of you. |
| 10 | MR. NEUMAN:  Good morning, Your Honor.  Ariel Neuman |
| 11 | and Mike Kimerer on behalf of Defendant Brunst, who is present |
| 12 | in court. |
| 13 | THE COURT:  Good morning. |
| 14 | MR. FEDER:  Bruce Feder for Scott Spear, who is also |
| 15 | present. |
| 16 | THE COURT:  Good morning. |
| 17 | MR. CAMBRIA:  Good morning, Your Honor.  Paul Cambria |
| 18 | on behalf of Michael Lacey, who is present as well. |
| 19 | THE COURT:  Good morning. |
| 20 | MR. GRANT:  Good morning, Your Honor.  Jim Grant on |
| 21 | behalf of Michael Lacey and Jim Larkin. |
| 22 | THE COURT:  Good morning to you. |
| 23 | MS. BERNSTEIN:  Good morning, Your Honor.  Whitney |
| 24 | Bernstein on behalf of Mr. Larkin, who is present in court.  On |
| 25 | the phone is Mr. Bienert and Ms. Ramachandran. |

1          THE COURT:  And, ma'am, you are prepared to make

2     arguments on behalf of your client?

3          MS. BERNSTEIN:  I am, Your Honor.

4          THE COURT:  Thank you.

5          MR. WEISS:  Your Honor, good morning.  Steve Weiss on

6     behalf of Joye Vaught, and I will waive her presence.

7          THE COURT:  Good morning.

8          MR. PICCARRETA:  Good morning, Judge Logan.  Mike

9     Piccarreta on behalf of Andrew Padilla, who is not present.  I

10    waive his presence.

11         THE COURT:  Good morning.

12         MS. CHAPMAN:  Good morning, Your Honor.  Anne Chapman

13    on behalf of various movants identified in the docket.

14         THE COURT:  Good morning, Ms. Chapman.

15         This is the time set for the motions hearing.  I need

16    to hear from the government first.  I'm just a little confused.

17         Please approach the lectern.

18         Sir, in your Document Number 282, you argue that your

19    forfeiture matter should be addressed by this Court.

20         Do you recall that?

21         MR. KUCERA:  I recall making that statement at various

22    points, Your Honor.  I don't recall it in 282 specifically.

23         THE COURT:  Well, what's your position now?

24         MR. KUCERA:  The government still agrees with that.

25         To the extent Your Honor is getting into why it is

1    that we are asking that certain matters be brought before the

2    CDCA court and certain matters be brought before this Court, I

3    am happy to address that.

4           In going through defendants' motions, it's hard to

5    suss out exactly what they are asking for and where and what

6    relief they are asking for.

7           But in focusing on just their request for relief, they

8    are asking to stay the execution of the seizure warrants that

9    were obtained in CDCA.

10          Our position is that any attack on the warrants, the

11   affidavits themselves, should be brought before the CDCA court.

12   Those attacks are properly brought before that.  Whether it is

13   in a *Franks* hearing or whatever motions they feel appropriate.

14   To attack those affidavits are appropriate there.

15          Any request for relief in the forfeiture matter by way

16   of a *Monsanto*-type hearing, which is what the government

17   believes is appropriate, given the type of relief the defense

18   is requesting, that is more appropriate here.  All of the type

19   of relief that implicate the ultimate decisions this Court is

20   going to have to make, those decisions should be made here in

21   Arizona.

22          THE COURT:  Thank you very much.

23          MR. KUCERA:  Certainly.

24          THE COURT:  I want to address Docket Number 360 right

25   now, which is the Emergency Motion to Stay Seizures of

1    Attorneys' Fees and Request for Immediate Hearing.  It's an

2    eight-page document.

3              Which counsel would like to make an argument?

4              And for the record, since we have so many lawyers in

5    the courtroom, please announce who you are before you start

6    arguing.

7              Go ahead, sir.

8              MR. PICCARRETA:  Mike Piccarreta representing

9    Mr. Padilla.

10             Judge, in order to what we thought would be best to

11   move it smoothly is we have divided the argument by areas and

12   levels of expertise.

13             I will make the main argument, and with the Court's

14   permission, Mr. Grant and Mr. Cambria will discuss the First

15   Amendment implications and Ms. Bernstein will discuss

16   particulars of forfeiture.  I will provide the Court with

17   background and discuss the Sixth Amendment issues with the

18   Court.

19             THE COURT:  You know, I am fine with that, but I just

20   want to make sure it is done in an orderly way.  This is the

21   way we need to do it.

22             I am going to address Document Number 360, which I

23   stated before, this emergency motion, and we'll also talk about

24   the government's response, which is Document Number 371.  The

25   defendants' joint reply, which is Document Number 382.  The

1    joinders and supplements to those joinders, which are Document

2    Numbers 363, 365, 366, and 370, and then we will go on to the

3    next matter.

4         Because the next matter will be Docket Number 365,

5    which is the motion to stay the seizure, the different one, and

6    then the last item we will take up is Document Number 376.  So

7    just to make sure we keep everything in order.

8         But, go ahead, sir.

9         MR. PICCARRETA:  Okay.  Judge, this issue here is

10   unique for me.  I have been practicing law 40-plus years and

11   never been placed or had my client placed in this position, and

12   I think it's unique to most if not all of the other counsel,

13   and the Court can rest on its own experience to understand how

14   often these things come up.

15        But I think it's important to recognize that this

16   issue involves very serious constitutional issues relating to

17   the Sixth Amendment, the First Amendment, the Fifth Amendment

18   and a quintello with the Fourth Amendment, and possibly later

19   on including the Eighth Amendment.  So these are issues that

20   need to be raised before this Court for case management

21   functions and for the orderly flow of the case.

22        Now, in terms of history, this investigation began in

23   2013 in Washington and eventually was subsumed here in Arizona.

24   We began representing Mr. Padilla in January of 2017 and began

25   to get up on the case.

1          Mr. Padilla's agreement, and as an employee of

2     Backpage and related entities, he was essentially an editor,

3     which is what we call a moderator.  His job was to enforce

4     third-party postings on their web platform to make sure they

5     conform with the terms of use of the website.

6          He was not agreed and never agreed to be the monitor

7     of unknown people's behavior at some unknown date at some

8     unknown location, and never wanted or accepted that

9     responsibility.

10          As part of his employment, the agreement is that legal

11     fees, if civil or criminal matters arose, would be advanced to

12     the employee.  And in this case, legal fees were advanced to

13     the employee in 2017.

14          The funds came from a Backpage-related entity and were

15     placed in my trust account, and I always viewed those funds,

16     although coming from the employer, were essentially my

17     obligations were to Mr. Padilla and viewed those funds as part

18     of his employment compensation.

19          Now, a case goes on, we meet with the government.

20     Mr. Padilla listens to the government's theory of prosecution.

21     We found it unpersuasive and declined to resolve the case.

22          We did offer to make a proffer if it was immunized and

23     tell them everything we know and explain where we felt they

24     were off on the wrong tangent.  That did not -- and offered to

25     voluntarily surrender ourselves because he has medical issues.

1      Instead there's early morning raids, arrest warrants,

2  he's incarcerated for the weekend, and then essentially

3  released to supervision to Pretrial Services.

4      The indictment comes in March of 2018.  I was advised

5  by two defense counsel that the government had represented to

6  them that they would not be seizing trust accounts.  I had no

7  such conversations with the government.

8      The indictment, we have a status conference in April

9  --

10     THE COURT:  Sir, just to make sure you are aware and

11 everyone else, I am very, very familiar with the history of the

12 case.  So you can just cut through all of that, if you will.

13     I need to know positions as it relates to interfering

14 with warrants issued by a different federal court, Article III

15 court in California.

16     MR. PICCARRETA:  Yes, Your Honor.

17     All right.  Well, the point is, we are representing,

18 and literally the first time the government mentions fees is in

19 May.  And we -- and we exchange letters and we handle the case.

20 There's no mention after an exchange of letters of seizure of

21 fees and we proceed accordingly.

22     You will note in the order of forfeiture for

23 defendants who cooperated, their attorneys are permitted to

24 keep the same fees from similar sources since they have

25 apparently worked out an agreement.

1          We then learn for the first time in November, with a

2    phone call saying that they had executed seizure warrants.

3    Then for the court's warrants, we were not parties to the Los

4    Angeles civil forfeiture matters, however -- because it didn't

5    impact our rights.

6          Mr. Padilla's home is threatened with seizure after

7    conviction, so -- and we haven't really had to do much for

8    that.  But now we are in a position where the government

9    literally seven months indictment, almost two years after my

10   representation began, has now executed an ex parte seizure

11   warrant to seize the fees.

12         And we come to you because we are -- you are the judge

13   in the criminal case.  You are the case where it appears.  You

14   are the case that has equitable jurisdiction over this.  You

15   are the person who has control over case management.  And as

16   the government has indicated, they are agreeable, although they

17   try and parse their words to having the forfeiture matters

18   handled here.

19         And I think it is important in that, Judge, to look at

20   the order in the United States District Court for the Central

21   District when the Judge stayed all of those matters relating to

22   the seizure warrant.

23         In that case, the matters were stayed and he did not

24   want to rule on the motion to challenge the seizure of the

25   warrant.  So the government knows that if this goes back, this

1    matter will be stayed.  We will file motions to withdraw,

2    eventually other lawyers will all file motions to withdraw, and

3    the whole shape of the case and tenor of raising all the issues

4    that need to be raised will be over for myself, Mr. Weiss, and

5    likely the other counsel.

6           Now, when you look at the Judge's order, and I urge

7    the Court to look at that, the Court there indicated, A, that

8    the District Court citing the Landis case, has the power to

9    stay proceedings incidental to the power inherent in every

10   court to control the disposition of the causes on its docket

11   with economy and time and effort from counsel and litigants.

12   So their order cites a Supreme Court case granting district

13   courts have power.

14          Secondly, he says determinations made by that court

15   there would ultimately have conclusion effect here.  So they

16   indicate there that the Court saw no reason why the pending

17   motions relating to the seizure warrants could not be brought

18   in the criminal action.

19          The Court stayed it, and by court order, suggested

20   this is the place to deal with the seizure warrants.  And now

21   you are in that position because it's going to impact the case,

22   the litigants, and Mr. Padilla's Sixth Amendment right to

23   counsel of choice.

24          THE COURT:  Just one moment, sir.  My apologies for

25   interrupting you.

1    Mr. Rapp, is that the government's position on the

2    Central District's order?

3    MR. KUCERA:  No, Your Honor.  That is -- John Kucera

4    on behalf of the United States.  That is not the government's

5    position.  I am happy to address that more fully, if you would

6    like.

7    THE COURT:  No, I will allow you to once the defense

8    has finished, but I just wanted to clarify that issue.

9    I'm sorry, sir.  Go ahead.

10    MR. PICCARRETA:  Would the Court like a copy?

11    THE COURT:  I have a copy.  It is right in front of

12    me.

13    MR. PICCARRETA:  Okay.  So you are faced with a

14    situation where a defendant comes to you and says, unless this

15    seizure order is stayed, I can't have the lawyer of my choosing

16    who has been with me for two years, and for a moment, I try to

17    put myself in my client's shoes as to what that feels like.

18    And the Court, I think, has -- well, discretion to

19    handle matters that have been presented to it for decision that

20    affect the constitutional rights and potentially outcome of the

21    case that's pending before it.

22    And, Your Honor, I think the other issue is the Court

23    has the power also, under laches as to the government's delay

24    in doing this until all of us have spent considerable time and

25    energy, including this Court, trying to work through issues.

1          And you can't look at this in isolation, Your Honor.

2     And that's why we are suggesting to the Court that -- I thought

3     we said that in our pleadings -- that the Court continue the

4     stay order and set a briefing schedule.  Because all of us did

5     this as best we can under tight circumstances, including the

6     government.

7          As to what type of hearing should the Court hold, as

8     to what sanction, if any, is going to be appropriate, whether

9     or not to resolve the legal issues relating to the First

10    Amendment seizure of -- excuse me, the seizure of First

11    Amendment proceeds and how the Court wishes to handle that as

12    it does.

13         I think once the stay order is in effect and the funds

14    unseized, then the Court can proceed with how to handle the

15    situation.

16         Now, in terms of history.  I know the Court is aware

17    of it, but from our perspective, there has been overreaching in

18    this case, from the execution of the search warrants, to the

19    seizure of personal property, to the seizure of unrelated

20    assets and other things related to Mr. Padilla, related to

21    others, to -- after motions are filed in California, federal

22    seizures of the trust account of our First Amendment counsel,

23    there, attempts to conflict counsel, get them off the case, we

24    held a whole hearing, we spent a lot of energy and the Court

25    wisely permitted him to stay, and then lo and behold, within a

1    week or two of the Court's order, there's seizure warrants for

2    IOLTA trust accounts of a variety of lawyers, some of those

3    were held in trust to be used to defend these defendants in

4    these cases.

5            So I think, Your Honor, this is not an isolated, what

6    we view, as attack on our clients' Sixth Amendment rights.  And

7    I mentioned last time that there were issues that were

8    occurring, occurring, occurring, occurring, but this now, has

9    elevated it to a matter that impacts your case before your

10   court for these defendants and particularly, my client.

11           And we view it, essentially as a motion to remove

12   Mr. Padilla's counsel of choice and Ms. Vaught's counsel of

13   choice, and if successful, eventually all of the counsel of

14   choice.

15           Now -- and I think in terms of case law, we are

16   getting close to the issue that was raised in *U.S. v. Stein,*

17   where the Court -- where the government had interference with

18   advancement of legal fees for a variety of defendants.  And

19   here, that is what is going on.

20           And the *Stein* court, in the Second Circuit, felt the

21   remedy was dismissal of the prosecution.

22           Now, we haven't filed that motion, but *Stein* is very

23   good authority for the Court to review and decide it.

24           So, Your Honor, I think what you have here is a

25   presumed innocent defendant.  A defendant who has asserted his

1     innocence.  A defendant who has rejected plea bargains, who has

2     litigated the case, I think fairly but vigorously with these

3     seven months, and after raising issues with the government,

4     some successful, some unsuccessful, trust accounts get seized,

5     which would remove counsel.

6             And I think under those circumstances, we have -- we

7     have alleged a prima facie case for the Sixth Amendment.

8             The Court clearly has jurisdiction over the

9     forfeitures as indicated by the government.  They want to

10    bounce us back and forth like a ping pong ball going back to

11    California so there they can get a stay and get the same result

12    that they got for the other ones.

13            And interestingly, when they got a stay, it didn't

14    stay them, they continued with more and more seizure warrants

15    of lawyers' IOLTA accounts.

16            THE COURT:  And, sir, my apologies again for

17    interrupting you, but it is my understanding that the arguments

18    being advanced this morning have already been fully briefed in

19    the Central District of California.  Is that correct?

20            MR. PICCARRETA:  Not the Sixth Amendment, I believe --

21    actually, I wasn't a party to that.

22            THE COURT:  But you are very familiar with the

23    litigation.

24            MR. PICCARRETA:  Yes.  But the Sixth Amendment issue

25    that I am discussing relates to the criminal case.  I don't

| | |
|---|---|
| 1 | believe that there's Sixth Amendment issues in forfeiture |
| 2 | cases, but I haven't studied them quite yet.  But what I am |
| 3 | raising has not been briefed and studied by the judge in |
| 4 | California.  But I do think that issues were raised and other |
| 5 | people who are familiar with that will speak to that, that |
| 6 | resulted in the order that we -- that I referred to earlier. |
| 7 | THE COURT:  Do you know of any other districts where |
| 8 | the proceedings on the same warrants have already been decided? |
| 9 | MR. PICCARRETA:  The only -- I don't think it has been |
| 10 | decided really anywhere.  I think the Central District, which |
| 11 | is the home to Mr. Kucera, which seems to be why that district |
| 12 | was chosen for these as opposed to here, litigated that and |
| 13 | there's the issue where essentially no result, we can't get a |
| 14 | hearing which implicates all of the First Amendment issues, |
| 15 | which I would like to have -- Mr. Grant will address on my |
| 16 | behalf. |
| 17 | Finally, Judge, I urge you to continue the stay.  The |
| 18 | Court clearly has discretionary jurisdiction for the reasons |
| 19 | that I've already indicated.  Release the seizure warrant and |
| 20 | set a briefing schedule where we can brief all of the issues |
| 21 | that are subsumed by this and are presented to this Court. |
| 22 | Because if not here, where?  If not now, when?  And as |
| 23 | of right now, we can't in the Central District, which is why |
| 24 | they are suggesting let's take it to the Central District, I |
| 25 | have no reason to believe that it won't be the same order where |

1    the Central District writes what they wrote and indicates that

2    it might be best heard over here, and then we'll come back here

3    again.  So we have spent a lot of time and drained a lot of

4    money on collateral issues, conflicts, disclosure, document

5    dumps, now seizure of attorneys' fees, and in the interim, we

6    haven't even really gotten to the merits of the case.  And if

7    we start over with new counsel, this thing gets pushed further,

8    further away.

9            It might -- you know, it may not be done for tactical

10   advantage, but the result is identical from our point of view

11   that these pleadings and these motions and these seizures of

12   IOLTA counsel in the middle of our case, do give them great

13   tactical advantage, disrupts the process, and implicate

14   Mr. Padilla's Sixth Amendment right, and I will let --

15   Mr. Grant can fill you in on the First Amendment issues.

16           Thank you, Judge.

17           THE COURT:  Thank you very much.

18           Mr. Grant.

19           MR. GRANT:  Sir.  Jim Grant on behalf of Mr. Larkin

20   and Lacey.

21           Let me start with trying to address the question the

22   Court had asked about why we are here in this court raising

23   these issues, as we have raised similar issues in the Central

24   District of California.

25           And, Your Honor, the answer is because the seizures

UNITED STATES DISTRICT COURT

1    that occurred here related to the attorney trust accounts stem

2    from a profound constitutional violation.  That is true of

3    other seizures as well that the government has effected.

4         But the question in the first instance is, can the

5    government seize First Amendment protected assets, and by doing

6    so, in this case, inhibit, restrict, or prohibit the

7    defendant's right to defend the case?

8         So here we have a combination not only of the First

9    Amendment issues, but also the Sixth Amendment issues, as well

10   as the Fourth and the Fifth.  And they are issues that directly

11   affect this Court and its ability to proceed with this case,

12   and directly affect the defendants' ability to defend this

13   case.  That's why we are here.

14        Constitutional issue and constitutional violation

15   should be raised in any court in which it is affecting the

16   proceedings of that court.  That's why we are here.

17        We sort of have given the Court a preview of the First

18   Amendment issues in this case, and yes, they have been briefed

19   as well in the Central District of California.  And I wanted to

20   touch on that.  Because the point of our motion today is to

21   continue the stay to allow the Court to fully consider whether

22   the government had any power to effect these seizures in the

23   first place.  And under the First Amendment, the government did

24   not have the power to effect these seizures.

25        The premise of the First Amendment and the premise of

1    *Fort Wayne Books*, is that the government cannot seize First

2    Amended related materials, First Amendment related assets,

3    cannot do that absent an adversary proceeding that finds that

4    the materials are illegal speech or that there is illegal

5    conduct that derives from those materials as to specific

6    materials and specific defendants.  We don't have that in this

7    case.  All we have is a probable cause determination of a --

8    based on a warrant that's been issued by the Central District

9    of California.

10            *Fort Wayne Books* tells us that a probable cause

11   determination is not sufficient for seizure of First Amendment

12   related materials and assets.

13            And that makes abundant sense.  Because the law is,

14   that it is always the government's burden to prove the

15   illegality of speech.  It is never permissible for the

16   government to presume that speech is unconstitutional or

17   violates the First Amendment.

18            And so the presumption is that in all instances, the

19   speech is constitutionally protected, first until the

20   government proves otherwise, and the government must do so by a

21   conclusive finding, not simply a determination of probable

22   cause.  That's what *Fort Wayne Books* holds.

23            We don't have any determination to that effect here.

24   What we have merely is the government saying that we allege

25   that the speech somehow led to some sort of illegal conduct.

1          The government's presumption is that every ad ever to

2     have run on Backpage was illegal, that therefore, every dollar

3     that was ever derived and revenues from Backpage is illegal and

4     therefore the government can seize every dollar related in any

5     way, directly or indirectly, to Backpage.

6          Your Honor, I suggest that that is such an overbroad

7     interpretation of any version of seizure that it would be

8     struck down and should be struck down in a heartbeat.

9          So the problem we face is, we need to present that

10    constitutional issue.  We need to present the violation of the

11    First Amendment to this court here in order to protect not only

12    the rights of the defendants under the Fifth Amendment or the

13    Sixth Amendment, but to protect her abilities to defend this

14    case at all.  That's the reason that we are here in this case.

15         As I say, Your Honor, we have given you sort of a

16    preview of the First Amendment issues here.  In effect, the

17    government's response to that has all been about, this should

18    be heard in another court, it shouldn't be heard at all until

19    after there's some sort of criminal conviction, that we have

20    essentially no right to challenge the seizures in the first

21    instance.  And I suggest that's entirely wrong.

22         Because the constitutional flaw, which has occurred at

23    the outset here of the seizures occurring in the first

24    instance, the constitutional flaw trumps whatever statutory

25    gamesmanship they want to play about, we should be in the

```
 1    Central District of California, we should be in the District of
 2    Arizona.  The statute should preclude us from bringing any kind
 3    of challenges until later.  The constitutional flaw here is
 4    that they couldn't accomplish the seizures in the first
 5    instance.
 6              The gist of what the government has effectively
 7    accomplished is to shut down a website, to pursue the
 8    defendants and every dollar the defendants have, to do that all
 9    based on a presumption of theirs that some speech, somewhere
10    perhaps was illegal and that something maybe was directly
11    related to that illegality.  Your Honor, I suggest that that's
12    not permissible.  That's not a basis that they can pursue.
13              I think where we are in the process at this stage is
14    the Court unfortunately has stayed the ongoing seizures of the
15    government as to the attorney retainer accounts, I urge the
16    Court should maintain that status quo for present purposes,
17    that we should turn to a more complete briefing.  It is
18    effectively like the Court has entered a TRO for the time
19    being.  Now we should move for preliminary injunction to
20    continue that stay and to fully address the First Amendment
21    issues, the Fourth Amendment issues, Sixth Amendment issues as
22    well.  I can go further as to the constitutional flaws, or if
23    the Court has questions, I can respond as well.
24              THE COURT:  Mr. Grant, I don't have any questions.
25              MR. GRANT:  All right.
```

1          THE COURT:  Thank you very much.

2          Who is next?

3          MR. WEISS:  Your Honor, Steve Weiss on behalf of Joye

4     Vaught.  I will be very brief.  I concur with the remarks made

5     by Mr. Piccarreta, particularly with respect to the Sixth

6     Amendment issue here.

7          I differ in terms of my relationship with Ms. Vaught,

8     in terms of the time, because I have only been representing her

9     since the end of March of this year.

10         In fact, I was meeting with her in April, early April,

11    when by happenstance we learned that there was arrest warrants

12    out and I then voluntarily surrendered her and she was released

13    to the custody and supervision of Pretrial Services.  And I

14    will come back to that in a moment as to why I think it is

15    important.

16         If the money that I hold in trust for her for fees is

17    seized, Ms. Vaught is, and I will state to the Court, unable to

18    afford attorney of her choice, which is the essence of the

19    Sixth Amendment.

20         And it seems to me, in the government's papers, there

21    was some reference to the fact that we, when I say "we,"

22    Mr. Padilla and Ms. Vaught, had not made any showing that they

23    would be unable to retain counsel.

24         So what I say to the Court is that I think it is

25    apparent as to Joye Vaught, from her Pretrial Services Report,

| | |
|---|---|
| 1 | that she would be unable to obtain, afford counsel, I think |
| 2 | even just in a felony case, let alone a case, a monumental case |
| 3 | of this nature.  The government has a copy of that, and so they |
| 4 | know that she is unable to retain counsel. |
| 5 | However, if the Court feels it appropriate or |
| 6 | necessary, I am prepared under seal and ex parte with the |
| 7 | Court's permission to file an affidavit with the court to |
| 8 | establish that, and I believe that's the same as to |
| 9 | Mr. Piccarreta's client, that he is prepared to submit an |
| 10 | affidavit to substantiate their inability to retain counsel, |
| 11 | which is the essence of the Sixth Amendment issue. |
| 12 | I mention the recency of my representation only to |
| 13 | underscore the fact that the government could have taken this |
| 14 | action months ago and did not, and it would have been, I |
| 15 | believe, potentially less disruptive to this Court's |
| 16 | functioning and overseeing of this case. |
| 17 | I don't know why they waited seven months to do this, |
| 18 | and -- I don't know.  Perhaps they will tell us. |
| 19 | In any event, I also will say to the Court that |
| 20 | Ms. Vaught has filed a claim for money of the fees in the |
| 21 | ancillary proceedings.  She believes that as an employee -- and |
| 22 | she was a low-level employee.  She was for a couple of years an |
| 23 | editor, essentially, called a moderator, and then she became a |
| 24 | liaison with the national association -- National Center for |
| 25 | Missing and Exploited Children. |

1    She believes that she has a legal right to the fees

2    that she has received.  And that's obviously, though, a matter

3    for another day.

4    So I join in the request made by Mr. Piccarreta to

5    stay the seizure of the fees until there's a definitive ruling

6    on the legality of the seizure.  Thank you.

7    THE COURT:  Thank you.

8    MR. CAMBRIA:  Morning, Your Honor.  If I may, Paul

9    Cambria on behalf of Mr. Lacey.

10   Your Honor, we would urge you to continue the stay for

11   several simple and clear reasons.

12   There's no doubt, number one, that this is a First

13   Amendment case.  These are publishing activities.  We have had

14   case after case of litigation, both state and federal,

15   indicating that these are First Amendment activities.

16   And the second thing is, since they are First

17   Amendment activities, any forfeiture of the proceeds of First

18   Amendment activities under the Supreme Court's decision in the

19   *Simon & Schuster* case, are protected and a special, if you

20   will, set of rules apply before there can be a lawful seizure

21   of those proceeds.

22   And the government has never denied, and I submit to

23   you today that they cannot deny and if -- and I know Your Honor

24   is familiar with the *Fort Wayne Books* case now, but that case

25   makes it clear that when we are talking about First Amendment

1    proceeds, there are special rules.

2            You cannot have a lawful seizure unless there has been

3    a adversary proceeding.  There has been no adversary proceeding

4    that has occurred as a result of any seizure of any of the

5    funds.  So the government clearly has violated the *Fort Wayne*

6    *Books* rules with regard to First Amendment proceeds, because

7    they have never engaged in an adversary proceeding.

8            They say in their papers repeatedly, well, there's

9    probable cause.  There was probable cause before the grand

10   jury.  They allege there was probable cause and that the

11   District Court in California found probable cause.

12           When we read the *Fort Wayne Books* case, the case

13   clearly says probable cause alone is not sufficient to seize

14   First Amendment proceeds.

15           THE COURT:  Sir, let me just stop you for a minute.

16           Mr. Kucera, is that your read on *Fort Wayne Books*?

17           MR. KUCERA:  No, Your Honor.

18           THE COURT:  Tell me what your thoughts are.

19           MR. KUCERA:  Your Honor, I will defer to AUSA Rapp,

20   but in general the government's position is that all the cases

21   that defense counsel have been citing relate to specifically

22   books themselves or speech itself and the facilitating funds

23   that are used to allow that very speech, not the profits that

24   have been derived from any type of alleged First Amendment --

25           THE COURT:  Since Mr. Rapp is the resident expert for

1    the government, I will let him speak.

2            MR. RAPP:  Well, so, the *Fort Wayne Books, Inc. versus*

3    *Indiana,* if it is the same *Fort Wayne* case that Mr. Cambria is

4    referring to, that talks about the pretrial seizure of

5    thousands of books and films.  It doesn't apply to the seizure

6    of the proceeds of a criminal enterprise after the CEO has pled

7    guilty.

8            The case he is citing is inapposite.  The case --

9            THE COURT:  Mr. Rapp, when it's the government's turn,

10   I will let you finish up.  That's all I needed.

11           Go ahead, sir.

12           MR. CAMBRIA:  Yes, sir.  What Mr. Rapp was leaving out

13   is the *Simon & Schuster* case.  That case makes it clear that

14   proceeds generated from publishing activities, which is what we

15   have here, are 100 percent protected by the First Amendment.

16           And what the government is failing to see is number

17   one, they are not acknowledging, and I think it's quite

18   interesting and telling that every single time we have alleged

19   a First Amendment violation, they have never discussed it or

20   met it or tried to convince a judge somewhere that that rule

21   didn't apply.

22           But it's as follows, *Simon & Schuster* covers proceeds.

23   Here the monies that they have seized are proceeds of First

24   Amendment activity.  The publishing, et cetera, by Backpage.

25   *Fort Wayne* makes it clear that anything that's related to the

1      First Amendment requires a prior adversary hearing.

2              So we have never had a prior adversary hearing.  We

3      clearly have proceeds under *Simon & Schuster*.  They have not

4      distinguished *Simon & Schuster*.  It doesn't matter if

5      Mr. Ferrer or somebody else pleads guilty as part of a plea

6      bargain, the Supreme Court made it clear, in order to take

7      First Amendment proceeds, you must have more than probable

8      cause and it must be an adversary proceeding.  That's what

9      those two cases say.

10             And I would submit, Your Honor, that has not happened.

11     And so each seizure here is unlawful.

12             And, Your Honor, we are in front of you -- my client

13     is here indicted in this courtroom.  You stand between my

14     client and the government.  We come here for your assistance.

15             When we were in California, they said we should be

16     here.  When we are here, they say we should be there.  They

17     picked California.  We didn't pick California.  We are

18     satisfied being here and asking you to apply *Fort Wayne Books*

19     and *Simon & Schuster*.  And we see that each of these seizures

20     are unlawful.

21             As we sit here today, they are unlawful and they

22     should be reversed, and we should be able to come to a court

23     and have relief when there's a clear constitutional violation,

24     which there is here under those two cases.

25             Thank you.

1        THE COURT:  Thank you very much.

2        MS. BERNSTEIN:  Whitney Bernstein, Your Honor.

3        I think the issues of the asset forfeiture are well

4   addressed in all of the pleadings that the Court has mentioned

5   it's taking under submission this morning as well as in the

6   response.

7        The government's opposition, and in other filings the

8   government has made, the government attempts to continue to

9   shoehorn and mischaracterize defendants' motions as a 41(g) and

10  request for the return of property.  That's not what it is, and

11  that's never what we have alleged.

12       The government has engineered this entire situation to

13  relegate defendants to the realm of third-party claimants.  The

14  government went and forfeited, seized and is attempting to

15  forfeit these attorney fees that were intended for the defense

16  of Mr. Larkin, Mr. Lacey, Mr. Brunst, and Mr. Spears.

17       Even if 41(g) would be a remedy that might have been

18  able to apply, it is certainly not the only one.  And as a

19  matter of constitutional rights, the government cannot seize

20  all of the money and the attorneys' fees intended for the

21  defense of these defendants that the government has seized

22  without making the requisite showings as been laid out by my

23  colleagues.

24       Whether there's another avenue under 41(g) is not the

25  issue here, and the government continues to raise the strawman

1    argument to mischaracterize our pleadings because that's what

2    they want to fight about instead of addressing the issues that

3    have been raised.

4          No one has raised 41(g) other than the government.  It

5    is inapplicable as an equitable remedy.  Because there are

6    remedies at law available.  The remedies at law available might

7    be an ancillary hearing, and the government has taken the

8    position in at least three pleadings, in their response in this

9    case, as well as their response to our motion to stay the

10   ancillary hearing and the related dockets of 18-CR-465 and

11   18-CR-464, the government has taken the position that the

12   remedy at law is also indefinitely unavailable.

13         Like my colleagues that have come before me, Your

14   Honor, we are here asking this Court to permit us to access

15   money, both money that is clean, which I assume the Court wants

16   to take up later, and that relates directly to Mr. Larkin's

17   motion at 377, we are asking this Court to permit us to access

18   money that is unrelated to Backpage and money that is in the

19   attorney retainer accounts that is designated and intended for

20   the use of these defendants.

21         I'm happy to respond to further questions or take up

22   377 now if the Court would like.

23         THE COURT:  We will take up 377 later.

24         Thank you very much.

25         MS. BERNSTEIN:  Thank you.

1          MR. FEDER:  Bruce Feder.

2          While I was listening to the arguments, and then I

3    heard Mr. Rapp start talking about how the First Amendment

4    doesn't apply to the proceeds that they claim, I was reading

5    their response, which is 371, and nowhere in that response is

6    there any discussion about the First Amendment and how *Fort*

7    *Wayne Books* or *Simon & Schuster* does not apply to this

8    situation.

9          And I would ask the Court, as has already been

10   requested, that if the Court has any question at all about

11   whether or not those two Supreme Court decisions apply to this

12   situation, and require the government to prove in an

13   adversarial hearing that they have lawfully seized these

14   assets, we can have a briefing schedule that the Court would

15   think -- and we could at least have the benefit of hearing,

16   other than Mr. Rapp's assertion, the benefit of the

17   government's position in writing with case law cited.

18         And but for the interim, the Court should continue the

19   stays of the fees.

20         MR. NEUMAN:  Good morning, Your Honor.  Ariel Neuman

21   for Mr. Brunst.

22         And I just want to briefly address the perspective

23   that the Court hasn't heard.  And why we joined in Mr. Padilla

24   and Vaught's motion is, essentially, we have an interest in

25   this case proceeding a pace, and the Court controlling its

1    docket, controlling the case, and the orderly administration of

2    justice.

3              It will affect Mr. Brunst and the other defendants

4    significantly if counsel is forced to withdraw.  We are now

5    however many months into this case, significantly down the road

6    with complicated issues, as the Court is getting a small taste

7    of today.

8              And we are going to start all over, or at least two

9    counsel potentially are going to start all over, which is going

10   to cause the rest of us to start all over.

11             And why does that matter?  It matters more than in a

12   typical case.  This is not the typical case for a whole host of

13   reasons.

14             The Court has again got a brief taste of why that is.

15   We have these First Amendment issues layered on top of many

16   complicated issues, the whole history of litigation, court

17   decisions behind us.

18             But beyond that, it's not typical in the way that the

19   government has treated the defendants.  It is not typical in

20   the way that the government has essentially tried to

21   financially strangle these defendants at every turn.  And I

22   will just give the Court one example.

23             Our client had an account seized where there was

24   literally maybe 10, 20 dollars that could be traced back to

25   Backpage-derived proceeds.  We're talking millions of dollars

1    seized.

2              Our client is unable essentially to fund his life.

3    And, yeah, that's a bit more extreme, but that's where we are

4    at this point, that if we are talking about a case that's going

5    to proceed, at this point, into January of 2020, potentially

6    longer given our conversation at the last hearing, our client

7    needs to have some resolution here.  And our client needs to

8    see this thing resolved expeditiously.

9              Because what we expect is that at the end of the day,

10   those funds are going to be returned, whether through this

11   proceeding that we are asking for here, or whether at the end

12   of this case when everything is resolved.

13             And so we need to see this forward, and that's our

14   request, Your Honor, that the Court -- yeah, there's no reason,

15   we haven't yet heard a single reason for this delay.

16             And one of my colleagues brought it up, this has been

17   kind of -- it would be a different situation if we were back in

18   March and the government came in and seized.  There's been no

19   change in circumstances.  They were well aware of these funds

20   in the attorney accounts several months ago.  We have no

21   explanation for why this is suddenly occurring.  There's

22   theories that we have about what's happened in the interim, in

23   terms of what's happened in this courtroom in the interim.

24             But putting that aside, there's no reason for this

25   delay.  No justification.  Further delay, essentially starting

1    over say another eight months ago, putting us back there, will

2    cause significant hardship to our client and quite frankly

3    interferes with this Court's administration of justice in this

4    case.

5             So we would ask the stay be extended and as well, that

6    the Court hold the further hearing that has been discussed

7    today.

8             Thank you, Your Honor.

9             MS. CHAPMAN:  Good morning, Your Honor.  Anne

10   Chapman.

11            Your Honor, I don't have much to add other than that

12   the movants who are at issue in the pleading that I filed,

13   which was 365, have Sixth Amendment implicated rights, which I

14   think Your Honor has been provided with.

15            And the constitutional infirmities that affect the

16   seizures by all the defendants apply with equal force to the

17   movants.  And so the Sixth Amendment issues I think are

18   properly addressed at a later time.  I can answer questions

19   about those if you have them, but I do think you were provided

20   that information with the pleading.

21            THE COURT:  Ms. Chapman, I just need you to clarify

22   your position that you are bringing the motion on behalf of the

23   witnesses in this case.  Why do these parties have standing to

24   challenge the warrants in a different district?

25            MS. CHAPMAN:  Well, Your Honor, the warrant is with

| | |
|---|---|
| 1 | respect to funds that were -- are in our account in the |
| 2 | District of Arizona, which would require service of the warrant |
| 3 | in the District of Arizona, Your Honor.  And I think the |
| 4 | government acknowledges that in their response. |
| 5 | THE COURT:  Thank you. |
| 6 | MS. CHAPMAN:  So, Your Honor, we essentially are |
| 7 | requesting the same relief, that Your Honor hold a hearing -- |
| 8 | continue the stay, hold hearing on the constitutionality of the |
| 9 | seizure, and, again, we can address any related issues with |
| 10 | respect to the Sixth Amendment or indigency at an appropriate |
| 11 | time if it's appropriate, but it's premature at this point when |
| 12 | the constitutionality of the seizure remains in question. |
| 13 | THE COURT:  Thank you very much. |
| 14 | Is there anyone else from the defense? |
| 15 | Government? |
| 16 | MR. KUCERA:  Thank you, Your Honor. |
| 17 | John Kucera on behalf of the United States.  There has |
| 18 | been a lot of questions about the government's intent and what |
| 19 | has been called inexcusable delay, laches, sort of efforts to |
| 20 | obstruct this Court's calendar and docket by bringing these |
| 21 | seizure warrants at different dates. |
| 22 | THE COURT:  What they're basically trying to say is |
| 23 | that you're trying to choke out their clients, to take funds |
| 24 | away from them representing their clients and starting the case |
| 25 | over. |

1      MR. KUCERA:  Understood, and I will respond to that.

2  But I think it is important to first address their concerns

3  about and their allegations that we are doing this tactically

4  in stages in order to make them have to reset.  That is not the

5  case.

6      When they are asking why it is that the government has

7  done this several months later, the grand jury returned

8  indictments alleging, among other things, concealment money,

9  money laundering, and defendants were successful to varying

10  degrees at concealing it.

11      We have been actively pursuing and tracing assets as

12  they moved all around the world, sometimes overseas, frequently

13  overseas --

14      THE COURT:  But surely you are not making an argument

15  that part of the concealment is through attorney-client funds?

16      MR. KUCERA:  Part of the concealment resulted in funds

17  being deposited into IOLTA accounts, and so we have had a hard

18  time, because of the efforts to conceal, to trace these assets.

19      THE COURT:  So by making that kind of argument, are

20  you also saying that there's a potential that the United States

21  Government might find these lawyers complicit and they might be

22  part of the conspiracy if you can show direct knowledge of

23  that?

24      MR. KUCERA:  Your Honor, the government is not

25  prepared to say that.  Is there some theoretical possibility

1   that some attorneys somewhere could have been engineering this

2   and part of the conspiracy?  I supposed so, but no one from the

3   government is saying that now.  No one -- there's nothing that

4   anyone is saying that any of -- the government is in no way

5   alleging that there's any knowledge of wrongdoing now on the

6   part of any of the attorneys before you today.

7           The only thing that I am saying is that, addressing

8   defendants' argument that this has been some sort of tactic by

9   the government to delay and to hold out, draw out the time that

10  we were effecting these seizures, that is not the case.

11          This is a complicated case involving the movement of

12  money across multiple countries, multiple jurisdictions and

13  tracing these assets is a complicated and time-consuming

14  endeavor that frequently requires MLATs to other countries and

15  participation by other countries and being able to see where

16  assets are moving.

17          As you have seen, part of the reason why we delayed

18  executing these warrants immediately was because we had

19  problems with another IOLTA account previously.  Because while

20  we concede the hopping of money from bank to bank, very often

21  we can't see the internal transfer of money from one account at

22  say Bank of America to another account at Bank of America.

23  That's not information that is immediately apparent.

24          And so in a previous matter, previous seizure, the

25  government inadvertently seized the wrong funds.  And so in an

1    effort to avoid that type of confusion and avoid any type of

2    hardship to these attorneys, the government got the seizure

3    warrants, called up the attorneys and said, we are hoping to do

4    this in the least disruptive way possible.

5            Our effort is to try and do what we are allowed to do

6    by law but nothing further.  We want to minimize any collateral

7    damage, any collateral consequences.  And in some ways, the

8    government believes that no good deed goes unpunished and we

9    are here now in what the government believes is the wrong venue

10   for this fight.

11           That brings me to the next point.  Had defendants

12   initially framed their position in CDCA, not as a request for

13   the return of funds but as a *Franks* motion, saying that there

14   was something defective about the affidavit, that the affidavit

15   included material misrepresentations or omissions and should

16   have more fully fleshed out the First Amendment issues and

17   neglected to inform the Court in California of these issues, we

18   might not be here today.  We might have had that issue resolved

19   in CDCA.  That is the proper venue for this motion now.

20           Before the Court is only a question about staying the

21   execution of these warrants until such time as a decision can

22   be made.

23           The government has agreed to stay it.  My suggestion

24   going forward is that we would continue to agree to stay to

25   allow the defendants to bring whatever motions they feel

1    appropriate in CDCA to challenge this affidavit, if that's what

2    they believe needs to be done.  We would not object to such a

3    request.

4         But any extension of a stay, the government believes

5    needs to be analyzed under an injunctive theory.

6         I don't want to get too deep into the weeds on any of

7    the issues regarding the First Amendment, because I don't

8    believe that's properly before this Court.  I don't think

9    that's what these motions were set out to accomplish, and I

10   think that they have been piggybacked into the court for

11   today's purposes.

12        There's a proper proceeding for that.  It is a

13   *Monsanto* hearing, or if they want to attack it in a *Franks*-type

14   proceeding in California on the affidavit, that's fine.

15        Defense has characterized those cases as being stayed.

16   Very specific cases have been stayed.  None of the affidavits

17   that are seeking seizure of assets that are before the Court

18   today have been stayed.

19        Defendants are free to go into California and

20   challenge those affidavits by whatever proceeding they see fit.

21        The one point I would like to highlight for the Court

22   is that defense counsel has got up again and again and said

23   frequently, there is no money.  There is no more money for

24   defense if the government seizes this.

25        *And that may or may not be true.  There's a proceeding*

1    *to be able to find that out.  There is a hearing that the*

2    *government has been suggesting repeatedly could be brought*

3    *before this Court if defense counsel chooses to do so.  That is*

4    *a tried and true path to do exactly what defense is trying to*

5    *do.*

6             They have mischaracterized the law in so many ways

7    that I won't begin to try and disabuse the Court of it.  The

8    Court is capable of reading *Stein* on its own.  *Stein* has almost

9    literally nothing to do with the case that's before the Court

10   today.

11            *Stein* is about assets that everyone agrees were not

12   tainted, were not subject to forfeiture.  No one at any point

13   in *Stein* said that the assets that were being used to pay

14   defense counsel in that case were in any way illicit.  That

15   case has absolutely nothing to do with the matter before the

16   Court today.

17            I am happy to address any other questions, but the

18   Court has all of the pleadings.  I am confident the Court has

19   read them.

20            THE COURT:  I don't have any questions for you.  Thank

21   you.

22            MR. KUCERA:  Thank you.

23            THE COURT:  I will allow one defense counsel to

24   address the government's argument.

25            You all can meet and confer and let me know.

```
 1          (Discussion between defense counsel held off the record.)
 2              THE COURT:  Lauren.
 3          (Discussion between the Court and law clerk held.)
 4              MR. PICCARRETA:  Judge --
 5              THE COURT:  Can you speak into a microphone and tell
 6    me who you are.
 7              MR. PICCARRETA:  I'm sorry.  Mike Piccarreta.
 8              Judge, would it be permissible if we had two people
 9    just talk for no more than two minutes each?
10              THE COURT:  Yes.
11              MR. PICCARRETA:  Mr. Cambria will speak after me.
12              Judge, the government tells you that all this --
13              THE COURT:  I'm sorry, sir.  Can you speak into one of
14    the microphones?  Just pick one.  I have very poor hearing.  I
15    want to make sure I hear everything.
16              MR. PICCARRETA:  Me, too.
17              Judge, the government talks about they needed this
18    time to trace the funds.
19              I met with them May 4th of this year where we had our
20    initial discussion of my funds, and they told me about the
21    funds.  And there was no mystery, it went from account A, a
22    Backpage subsidiary, to my trust account.
23              And they have that in their seizure warrant.  There's
24    an arrow.  This was no international entry.  It just went boom,
25    boom, just like every other transaction that comes into my
```

1    trust account.  And they were well aware of that in May, and

2    it's in their seizure warrant that shows that.

3          And, you know, Judge, Mr. Cambria will talk about

4    *Monsanto*, but I have been told that the issues they want to

5    send us back to L.A. to do again, when you read the judge's

6    order, you saw his response to raising these issues, which I

7    was told have been raised there.

8          And, yes, they have mountains of deficiencies in their

9    seizure warrant, from *Franks* issues to omissions to withholding

10   and noncompliance with the local rules.

11         THE COURT:  Well, let me ask you, do you recall any

12   *Franks* issues being brought to the attention of the Central

13   District Court?

14         MR. PICCARRETA:  They were -- in some of them, for

15   that seizure warrant, were in the papers that the judge had and

16   were stayed, and according to what he wrote, did not want to

17   rule on because didn't want to prejudice the government and

18   thought they would be best raised here.  So here we are.

19         MR. GRANT:  Your Honor, Jim Grant again.

20         I just wanted to briefly touch on I think what

21   Mr. Rapp was saying, because I think it's a profound

22   misunderstanding of how the First Amendment works and what *Fort

23   Wayne Books* holds and how it applies.

24         His position was that only has to do with actually

25   seizing books or videos, it doesn't apply to seizing proceeds

1    from the activities of a publisher or distributor that are for

2    First Amendment protected materials.  That's flatly wrong.

3           The First Amendment protections apply to all sorts of

4    different stages within the process.  This is from Chief

5    Justice Roberts in *Citizens United.*  "Suppressing speech may

6    operate at different points in the speech process, including

7    restrictions from requiring a permit from the outset, imposing

8    a burden by impounding proceeds on receipts or royalties,

9    seeking to exact a cost after the speech occurs, or subjecting

10   the speaker to criminal penalties."

11          It's the equivalent here, Your Honor, of saying that,

12   well, we didn't seize all of the ads on the website, although

13   in fact the government did seize the website and that's the

14   start of the whole process of their seizures, on the same

15   probable cause assertions, but they are saying, well, we'll

16   just take all the money from the publisher so the publisher

17   can't act any longer, and that's okay.  We can do that, but

18   because we are not seeking the actual books or videos.

19   Fundamentally, that's wrong.

20          If the government seizes the printing press, the

21   government taxes the operation, if the government seizes all of

22   the bank accounts of the publisher, all of those things

23   infringe our First Amendment.  All of those things are

24   protected.

25          As Mr. Cambria points out, that's part of what *Simon &*

1      *Schuster* holds.  But it's fundamentally a First Amendment

2      proposition.  That it's not simply the seizure of the

3      suppressed materials by themselves, it applies as well in the

4      seizure of the proceeds.

5              I also wanted to make one note about Mr. Kucera's

6      comment about accidentally seizing an incorrect account.  He's

7      talking about the seizure that the government did of my firm's

8      trust account.  This was some months ago.  Shortly after the

9      disqualification motion.

10             But in the process of doing that, they served the

11     seizure warrant on our bank.  The bank actually then put a

12     freeze on the entire trust account having to do with all of our

13     various clients and obviously causing very severe problems for

14     my firm.

15             We contacted the government immediately and said, what

16     are you doing?  And managed to work out an arrangement shortly

17     thereafter, but it was a process that can be draconian, and

18     that's exactly what the government did as to us.

19             THE COURT:  Mr. Grant, how -- if you don't mind, how

20     long did it take to resolve that mistake?

21             MR. GRANT:  As to the -- well, I am not sure I can

22     call it as mistake, Your Honor.  But as to the initial change,

23     we managed to do that in a couple of days.

24             As to the entire process from when the government

25     first effected its seizure until most recently, when the

1   government finally indicated that -- they froze everything,

2   including all of the amounts we earned for prior work and had

3   yet not been paid.  It took us two and a half months before the

4   government actually released those funds for us to be able to

5   use them.

6               THE COURT:  Thank you very much.

7               MR. GRANT:  You're welcome.

8               MR. KUCERA:  If I may, Your Honor, just respond to

9   that one last point?  I think that mischaracterized what

10  happened.

11              THE COURT:  Go ahead, please.

12              MR. KUCERA:  Thank you.

13              When the United States executed seizure warrants on

14  the account that we were just discussing, the bank on its own

15  decided to freeze all of the IOLTA accounts for that law firm.

16              THE COURT:  Well, how is that possible when the

17  government in its pleading, seizure pleading, specifically

18  provides the bank with information with specific account

19  numbers that will only be seized?

20              MR. KUCERA:  My understanding of what happened is that

21  the bank decided that the law firm was an anti-money laundering

22  risk.  That it was a risk under the Bank Secrecy Act.  That's

23  my understanding.  They did not discuss it with me.  That's the

24  best of my knowledge.

25              THE COURT:  Are you speculating that that's what the

1    bank thought?

2         MR. KUCERA:  I am speculating, Your Honor, yes.  Yes.

3    That's my guess.  There's nothing that we did that indicated --

4    there's nothing in the government's seizure warrant that

5    indicated that all of the IOLTA accounts should be seized.

6         In discussing with opposing counsel, we came to a very

7    quick agreement, I think this might have happened on a Thursday

8    or a Friday, and we worked as quickly as we could.  Our intent

9    was not to do this, was not to shut them down, to make it as

10   painless a process as possible.

11        THE COURT:  Mr. Grant said it took two and a half

12   months.

13        MR. KUCERA:  And that's the part that I find a bit

14   disingenuous.  What took two and a half months was the

15   government agreed to allow that money to -- the money the

16   government was seeking, the undisputed portion that both

17   parties agreed was subject to the seizure warrant, was handed

18   over to the government.

19        There was another portion of funds that we -- the

20   parties decided to analyze.  The government explained that it

21   had no interest in seizing earned funds.

22        We did not seek to seize any funds that counsel had

23   said they already earned.  And some portion of the funds that

24   had been left in the account, counsel said were earned.

25        We asked counsel to provide documentation of how that

1   was earned, what it was.  Said redact whatever you feel needs

2   to be redacted in order to protect attorney-client or any other

3   privilege you feel you need to assert, and after that we will

4   then go ahead, if we agree with your conclusions, we will agree

5   that you can keep those funds.

6          Those funds stayed in their IOLTA account, by

7   agreement of the parties, pending this discussion.

8          The way that it was just characterized was much more

9   jack-booted thuggish than what actually happened.  This was --

10          THE COURT:  Sorry, I'm not familiar.  Maybe that's a

11   Central District term.  "Jack-booted thuggish," I don't

12   understand that.  What does that mean?

13          MR. KUCERA:  It's a term that I think came out of Ruby

14   Ridge, where government employees were construed as jack-booted

15   thugs for the way they handled various actions.

16          I didn't mean to use a colloquialism.  We were accused

17   of being very heavy-handed by counsel.  I don't think that

18   that's what happened.  I don't know that that's the proper

19   construction of how the government treated this.

20          THE COURT:  Thank you very much.

21          Mr. Grant, if you will speak into the microphone,

22   please.

23          MR. GRANT:  Thank you, Your Honor.  I appreciate the

24   opportunity.

25          Absolutely there was no suggestion by our bank that

1    there was any issue of money laundering or any concerns about

2    that.

3            What actually happened was, when the government served

4    the seizure warrant unannounced on our bank, the bank then puts

5    a hold on all funds in the IOLTA account.

6            And we immediately went to the government and said,

7    what is this?  They said, oh, that often happens.  That you

8    will find out that the banks will freeze everything just

9    because they received a warrant as to some piece of it.

10           And so, yeah, that can happen on occasion.  So it was

11   something apparently that they were familiar with.  We were

12   able to work out an arrangement in the near turn.  Then it took

13   us two and a half months of back and forth with the government

14   to actually free up funds that we had recently applied.

15           THE COURT:  I appreciate that.  Thank you.

16           Next, I want to move to the second issue I have here.

17   It's Document Number 365, which is the Emergency Motion to Stay

18   Seizure of Attorneys' Fees and Joinder in defendants Padilla

19   and Vaught's emergency motion.

20           I have the government's response, which is Document

21   Number -- I'm sorry, Docket Number 371.  Counsel's reply to the

22   response, which is Docket Number 379.  And I am prepared to

23   hear arguments on that.  If you have any at this point.

24           Defense?

25           MS. CHAPMAN:  Your Honor, Anne Chapman.  If I am

1   correct, this is the emergency motion to stay on behalf of the

2   movants, which was essentially asking Your Honor to determine

3   the same constitutionality of the seizure as has been

4   previously been discussed this morning and addressed in my

5   earlier comments.

6          THE COURT:  Correct.

7          MS. CHAPMAN:  So I don't have anything to add, Your

8   Honor.  I can answer any questions.  I think we also provided

9   you with information about the Sixth Amendment interests of

10  these movements.  If Your Honor has questions about that, I can

11  answer them, but essentially the issues are as discussed by

12  other counsel this morning, that we are in a pre-seizure

13  process.

14         The government, I understand, has suggested several

15  times we had to move to a post-seizure process.  But we are

16  asking that Your Honor consider the constitutionality of the

17  seizure and the issues that have been previously discussed this

18  morning with respect to the First, Fourth, and the Sixth

19  Amendments.  It would have the same effect on the movements --

20  or the movants, rather, as it would on the defendants.

21         THE COURT:  Thank you very much.  I was just giving

22  you another opportunity.

23         MS. CHAPMAN:  I appreciate it, Your Honor.

24         THE COURT:  Government?

25         MR. KUCERA:  Nothing further unless the Court wants to

1    inquire, Your Honor.

2             THE COURT:  I don't have any questions for the

3    government on that either.

4             This is actually a perfect time to take our morning

5    recess.  Court will be in recess until 10:35.

6             (Recess taken at 10:18 a.m.; resumed at 10:37 a.m.)

7             THE COURT:  This Court will come to order.  All

8    parties present when the court last closed are present again.

9             The last thing I want to take up is Document Number

10   376.  I know we have the arguments that have already been

11   presented in the earlier 360; however, I will give the defense

12   an opportunity.

13            376 is the Defendants' Emergency Motion to Stay

14   Seizure of Attorneys' Fees, and that's Defendant Michael Lacey,

15   James Larkin, John Brunst, Scott Spears.  Emergency Motion to

16   Stay Seizure of Attorneys' Fees and Request for an Immediate

17   Hearing.  The supplemental brief is Document Number 377.

18            And Mr. Kucera, I am treating the government's

19   response as Document Number 371, since 371 was filed in the 360

20   original emergency motion to stay the seizure.  Is that what

21   you would like?

22            MR. KUCERA:  Notwithstanding the fact that these other

23   documents were filed after the response --

24            THE COURT:  Correct.

25            MR. KUCERA:  -- yes, Your Honor.

```
 1              THE COURT:  I mean, would your response be pretty much
 2     the same?  It's the same issue.
 3              MR. KUCERA:  Certainly along those same lines, yes,
 4     Your Honor.
 5              THE COURT:  Okay.  Well, I will allow you an
 6     opportunity to present on the record any additional information
 7     you would like to as it relates to Docket Number 376, after I
 8     hear from the defense.
 9              MR. KUCERA:  Thank you, Your Honor.
10              THE COURT:  You're welcome.
11              Is there anyone from the defense that wishes to place
12     anything else on the record as it relates to Document Number
13     376?
14              MR. GRANT:  Briefly, Your Honor.  376 is the motion as
15     to Mr. Larkin, Lacey, Brunst, and Spear.
16              THE COURT:  For the record, Mr. Grant.  I just wanted
17     to make sure I had your name.
18              MR. GRANT:  I'm sorry, Your Honor.  I forgot.
19              THE COURT:  Go ahead.
20              MR. GRANT:  It raises very similar issues, the same
21     impropriety of the government's seizure in the first instance.
22     The basic proposition here that -- we are not here to talk
23     about *Monsanto* issues until we first establish whether the
24     government's seizures in the first instance were permissible.
25     You don't begin to talk about Monsanto until we find out if
```

1    they are legal in the first instance.

2            And I want to point out one other -- and that is not

3    the case here because the government couldn't effect the

4    seizures under the First Amendment.

5            I wanted to point out one other thing as well, that

6    the nature of the request here, of course, is we are asking the

7    Court to permit us to proceed with the stay and be able to

8    brief further and argue further about the government's

9    seizures.

10           And the issue is not so much looking at the exact

11   warrants that have been issued by the Central District of

12   California, it would simply be -- tell the government at this

13   stage, we are going to maintain the status quo, there will be

14   no seizures of attorney trust accounts going forward, in order

15   to be able to address that issue.  Without having to, you know,

16   parse through the warrants in the Central District of

17   California.

18           THE COURT:  Thank you very much.

19           Anyone else?

20           Mr. Kucera?

21           MR. KUCERA:  Yes, Your Honor, just briefly.

22           Defense counsel cites to Monsanto and points out just

23   essentially generally to several pages of Monsanto, that

24   Monsanto stands for the proposition that the government must

25   first establish the legality of its seizure prior to having

1    Monsanto hearing.

2           This isn't really found anywhere specifically.  There

3    is certainly no holding to that.  But the government takes the

4    point that there has to be some sort of legal mechanism by

5    which the government takes hold of this property.  The

6    government submits that that's exactly what it did by going out

7    and obtaining the seizure warrants based on probable cause from

8    a federal magistrate.

9           This isn't a function of like a PC arrest or a PC

10   seizure by an agent just at the discretion of the agent and

11   then having a decision made by a court after the fact.

12          The government went through the procedure that it

13   always goes through when it obtains a seizure warrant and does

14   have lawful possession of the asset pursuant to a seizure

15   warrant, or would have but for the stay.

16          THE COURT:  Thank you very much.

17          This is an oral decision.

18          After consideration of Defendant Andrew Padilla, Joye

19   Vaught's Emergency Motion to Stay Seizure of Attorneys' Fees

20   and Request for Immediate Hearing, which is Document Number

21   360, the government's response, which is Document Number 371,

22   the Defendants' Joint Reply, which is Docket Number 382, the

23   joinders and supplements, which are Docket Numbers 363, 365,

24   363, and 370, this Court's also taken into consideration the

25   arguments presented by counsel, and I rule as follows:

1          As it relates to Docket Number 360, this Court
2     declines to exercise jurisdiction over the seizure warrants at
3     issue in the emergency warrant -- I'm sorry, the emergency
4     motion.
5          It is well settled that a court should rarely
6     interfere with the order of another Court as any such
7     interference usurps the power of the rendering court.
8          Although courts have held that justice may
9     occasionally demand this type of interference, the
10     identification of those rare situations is committed to the
11     sound discretion of the District Court.
12          See *Ord versus United States* and also *Treadway versus*
13     *Academy of Motion Picture Arts and Sciences.*
14          Furthermore, the Ninth Circuit Court of Appeals has
15     held that considerations of comity and orderly administration
16     of justice demand that the nonrendering court should decline
17     jurisdiction of an action and remand the parties for their
18     relief to the rendering court.
19          See *Delson Group Incorporated versus GSM Association,*
20     which is also a Ninth Circuit case.
21          Through the emergency motion, the defendants are
22     seeking an order from this Court to interfere with two criminal
23     seizure warrants that were issued upon findings of probable
24     cause by a magistrate judge in the Central District of
25     California.

1          This Court finds that the defendants have not set

2     forth any persuasive reasons as to why this Court should

3     interfere with the Central District of California's issuance of

4     the search warrants, and this Court finds that the defendants

5     have a sufficient legal remedy for any challenges to the

6     seizure warrants issued by the Central District of California

7     in that district.

8          Accordingly, the relief requested in the Defendants'

9     Emergency Motion to Stay Seizure of Attorneys' Fees and Request

10    for Immediate Hearing, which is Document Number 360, is denied.

11         The temporary stay imposed by this Court's order,

12    which is Document Number 361, is lifted and the government may

13    move forward with execution of the seizure warrants at issue if

14    so ordered.

15         As it relates to Docket Number 365, again, I have

16    carefully considered the pleadings, which are the Emergency

17    Motion to Stay the Seizure of Attorneys' Fees, which is

18    Document Number 365.  The government's response, which is

19    Document Number 371.  Counsel's reply to the response, which is

20    document -- I'm sorry, Docket Number 379, and the arguments of

21    counsel.

22         Again, this Court declines to exercise jurisdiction

23    over the seizure warrants at issue in this emergency warrant,

24    as already stated before, but since this is a different order

25    because there was a different filing under Document Number 365,

| | |
|---|---|
| 1 | it's well settled that a court should rarely interfere with the |
| 2 | order of another court, as any such interference usurps the |
| 3 | power of the rendering court. |
| 4 | Although courts have held that justice may |
| 5 | occasionally demand this type of interference, the |
| 6 | identification of those rare situations is committed to the |
| 7 | sound discretion of the District Court. |
| 8 | See *Ord versus United States* or *Treadway versus the* |
| 9 | *The Academy of Motion Picture and Arts and Sciences,* both Ninth |
| 10 | Circuit cases. |
| 11 | Furthermore, the Ninth Circuit Court of Appeals has |
| 12 | held that considerations of comity and orderly administration |
| 13 | of justice demand that the nonrendering court should decline |
| 14 | jurisdiction of an action and remand the parties for their |
| 15 | relief to the rendering court. |
| 16 | See *Delson Group Incorporated versus GSM,* which is a |
| 17 | Ninth Circuit 2014 case. |
| 18 | Through the emergency motion, counsel seeks an order |
| 19 | from this court to interfere with one criminal seizure warrant |
| 20 | that was issued upon a finding of probable cause by a |
| 21 | magistrate judge in the Central District of California. |
| 22 | The movant has not set forth any persuasive reasons as |
| 23 | to why this Court should interfere with the Central District of |
| 24 | California's issuance of the seizure warrant, and this Court |
| 25 | finds that the movant has sufficient legal remedy for any |

1    challenges to the seizure warrant issued by the Central

2    District of California in that district.

3           Accordingly, counsel's Emergency Motion to Stay

4    Seizure of Attorneys' Fees, which is Docket Number 365, is

5    denied.

6           The temporary stay imposed by this Court's order,

7    Docket Number 369, is lifted and the government may move

8    forward with executing the seizure warrants at issue if so

9    ordered.

10          And last, as it relates to Docket Number 376, this is

11   the Court's oral decision, after consideration of defendant

12   Michael Lacey, James Larkin, John Brunst, and Scott Spears'

13   Emergency Motion to Stay Seizure of Attorneys' Fees and Request

14   for Immediate Hearing, which is Document Number 376, the

15   supplemental brief, which is Document Number 377, and the

16   government's response, which is nearly identical to the

17   response 371, in the docket filing 360, this Court declines to

18   exercise jurisdiction over the seizure warrants at issue in the

19   emergency motion.

20          It is well settled that the court should rarely

21   interfere with the order of another court as any such

22   interference usurps the power of the rendering court.  Although

23   courts have held that justice may occasionally demand this type

24   of interference, the identification of those rare situations is

25   committed to the sound discretion of the District Court.

1       See *Ord versus United States*, or *Treadway versus The*

2   *Academy of Motion Picture, Arts and Sciences,* both Ninth

3   Circuit cases.

4       Furthermore, the Ninth Circuit Court of Appeals has

5   held that considerations of comity and orderly administration

6   of justice demand that the nonrendering court should decline

7   jurisdiction of an action and remand parties for their relief

8   to the rendering court.

9       See *Delson Group Incorporated versus GSM,* which is a

10  Ninth Circuit 2014 case.

11      Through the emergency motion the defendants are

12  seeking an order from this Court to interfere with nine

13  criminal seizure warrants that were issued upon a finding of

14  probable cause by a magistrate judge in the Central District of

15  California.

16      The defendants have not set forth any persuasive

17  reasons as to why the Court should interfere with the Central

18  District of California's issuance of the seizure warrants, and

19  the Court finds that the defendants have sufficient legal

20  remedy for any challenges to the seizure warrants issued by the

21  Central District of California in that district.

22      Accordingly, the Defendants' Emergency Motion to Stay

23  Seizure of Attorneys' Fees and Request for Immediate Hearing,

24  which is Document Number 376, is denied.  The temporary stay

25  imposed by this Court's order, which was Document Number 384,

1    is lifted and the government may move forward with the

2    execution of the seizure warrants at issue, if so ordered.

3              The hearing is adjourned.

4              MR. PICCARRETA:  Judge, may I say one thing?

5              THE COURT:  I'm sorry?

6              MR. PICCARRETA:  May I say one thing?

7              THE COURT:  Sure.  Go ahead.

8              MR. PICCARRETA:  I would ask the Court to continue

9    this stay --

10             THE COURT:  Can you speak into the microphone and tell

11   me who you are?

12             MR. PICCARRETA:  Mike Piccarreta.

13             Judge, we would ask the Court to stay these orders for

14   seven days to allow us time to consider bringing motions in the

15   Central District.

16             THE COURT:  Your request is denied.

17             The hearing is adjourned.

18             MS. BERNSTEIN:  Your Honor, may I address 377?  I

19   didn't have an opportunity to do that.  That was Mr. Larkin's

20   supplemental brief.

21             THE COURT:  I specifically asked you if there was any

22   defense counsel that wished to address that issue.

23             MS. BERNSTEIN:  I understood that to be about 376.  I

24   apologize.

25             THE COURT:  Go ahead.

1          MS. BERNSTEIN:  Thank you, Your Honor.

2          Especially in light of the Court's ruling just now,

3    we -- I do want to just highlight the issues that were raised

4    by Mr. Larkin in Document Number 377.

5          He is in an untenable position that the government has

6    seized nearly all of his assets through Central District of

7    California seizure warrants, which we did challenge.  We raised

8    and briefed the serious Franks issues that were present there.

9    The government never responded to that on the merits.  Instead

10   said they could file a civil complaint.  Filed a civil

11   complaint.  They sought the stay and obtained a stay.  Now, the

12   government has obtained the seizure of funds, of all other

13   funds that were earmarked for Mr. Larkin's defense.

14         And additionally has put Mr. Larkin on notice that

15   should he spend other money that he has from newspaper print

16   proceeds, the government views that as somehow criminal,

17   subjecting him to possible further charges, as well as further

18   bond revocation.

19         Mr. Larkin owned a newspaper empire with the Phoenix

20   New Times, SF Weekly, LA Weekly, Village Voice, Denver

21   Westword, Dallas Observer, Miami New Times, many print

22   newspapers.  He had a history of running those.  He -- they

23   made millions of dollars.

24         They were sold and he continues to generate income

25   from the sale of the newspaper.  That is not Backpage money.

1    The government has -- and has not seized that money, but the

2    government has told Mr. Larkin that it will move to indict if

3    he does spend that money.  So he is in an untenable position

4    that he can't use money that was earmarked for his defense as

5    it was just restrained and seized, and he can't spend newspaper

6    print proceeds without any repercussions.

7            And so we are seeking clarity as to what money

8    Mr. Larkin, if he is able to use those newspaper print proceeds

9    to fund his legal defense and his life.

10           THE COURT:  Mr. Kucera, do you wish to respond to

11   that -- or Mr. Rapp?

12           MR. RAPP:  Well, first, this motion came in quite

13   late, and our response to the previous dockets doesn't really

14   address this.  We haven't had a chance to respond.  But in a

15   word, I don't know what she is talking about.

16           THE COURT:  I just asked co-counsel minutes ago if

17   there was some additional information that the government

18   wanted to place on the record and he had that opportunity.  I

19   don't know why -- what's your name again, ma'am?

20           MS. BERNSTEIN:  Whitney Bernstein.

21           THE COURT:  I don't know how you didn't understand

22   when I asked the question about the emergency motion, Document

23   Number 376, when I pointed to defense counsel if anyone had

24   anything to place on the record.  I don't know how you didn't

25   understand my question.

1              But Mr. Rapp, your co-counsel indicated that 371,

2    the -- when I asked the question, should it serve as the

3    response, he did say they had some additional information -- I

4    don't recall what you said exactly, Mr. Kucera, but I provided

5    the government with an opportunity to flush out the issue.

6              So go ahead.

7              MR. RAPP:  Well, I think there's some confusion.  You

8    were talking about 371.  This is 377.  This came in --

9              THE COURT:  No, there's no confusion.  My question

10   was, the issues raised in Docket Number 376 were similar to the

11   issues raised in 360.  I asked your co-counsel if he wanted to

12   use 371 to serve as a response.

13             Is that what I asked you, Mr. Kucera?

14             MR. KUCERA:  Yes, Your Honor.

15             THE COURT:  So where's the confusion?

16             MR. RAPP:  This is 377, not 376.  Maybe I could just

17   cut to the chase.

18             THE COURT:  Did you hear what I just told you?

19             MR. RAPP:  I --

20             THE COURT:  We are here to address document number --

21   Docket Number 376.  I understand 377 -- is her supplemental

22   brief, which is 377.  That's why I asked Mr. Kucera that exact

23   question, because I didn't receive a response from the

24   government.

25             MR. KUCERA:  Can we have a moment, Your Honor?

1          THE COURT:  Of course.

2      (Discussion between government counsel held off the

3  record.)

4          MR. RAPP:  Judge, if the Court has any questions about

5  this motion, we are happy to respond to them.

6          THE COURT:  Go ahead.  Is there anything from you?

7          MS. BERNSTEIN:  We are seeking the government's

8  position that if Mr. Larkin accesses, utilizes money that is

9  newspaper print proceeds for his legal defense or his life, we

10  have been put on notice from the government that they would

11  find that to be criminal.

12          THE COURT:  Okay.  Is this relief that you are

13  requesting outside of what we were here for today?

14          MS. BERNSTEIN:  No, Your Honor.  I think it implicates

15  many of the same issues, it's just now, especially in light of

16  the fact that the money earmarked for the defense has been

17  restrained, Mr. Larkin -- we need some clarity as to whether he

18  can spend money that is not restrained and not related to

19  Backpage without incurring additional criminal charges.

20          THE COURT:  Is the government prepared to respond to

21  that?

22          MR. KUCERA:  The government is not prepared to respond

23  to it and I cannot imagine any situation where the government

24  ever would respond to the possibility of prospective action and

25  take a position on whether or not that action is subject to

1    indictment.

2            THE COURT:  Is there anything else you would like to

3    place on the record?

4            MS. BERNSTEIN:  Would the Court entertain an

5    evidentiary hearing upon further briefing at a later date as to

6    this issue?

7            THE COURT:  No.  This Court has ruled on the matters

8    that were pending, which is Docket Number 360, Docket Number

9    365, and Docket Number 376.  My ruling is on the record and the

10   hearing is adjourned.

11           MS. BERNSTEIN:  Thank you, Your Honor.

12           (Proceedings conclude at 10:58 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       **C E R T I F I C A T E**

2

3           I, ELVA CRUZ-LAUER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6           I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11          DATED at Phoenix, Arizona, this 17th day of November,

12   2018.

13

14                           s/Elva Cruz-Lauer
                               Elva Cruz-Lauer, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT