ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Michael Lacey, et al.,<br><br>Defendants. | No. CR-18-00422-PHX-SPL<br><br>**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTIONS TO DISMISS DUE TO GOVERNMENT INTERFERENCE WITH RIGHT TO COUNSEL AND REQUEST FOR DISCLOSURE OR, IN THE ALTERNATIVE, MOTION TO WITHDRAW**<br>**(Docs. 456, 463, 464, 465, 467)** |

**SUMMARY OF ARGUMENT**

After unsuccessfully moving for a four-month continuance of the case management deadlines (Doc. 443), Defendants Padilla and Vaught (joined by Defendants Lacey, Larkin, Spear and Brunst) (collectively, "Defendants") recycle the exact same arguments in an attempt to seek the even more extreme remedy of dismissal of the Superseding Indictment. For several reasons, Defendants' motion should be denied.

*First*, Defendants do not have the right to use tainted funds for attorneys' fees. *Second*, Defendants have been given numerous opportunities to demonstrate that they do not have sufficient untainted funds for their legal defense to trigger a *Monsanto* hearing, and they still have not availed themselves of this opportunity.  *Third*, Defendants have repeatedly refused to address the considerable evidence that Backpage was a criminal enterprise engaged in numerous illegal business practices (*e.g*., moderation, a financial relationship (to increase revenue) with *The Erotic Review*, aggregation (copying ads from other known prostitution websites), giving preference to ads posted by known "super" pimps, engaging in money laundering activities by concealing Backpage as the recipient of ad fees, etc.). None of these activities implicate First Amendment protections.  *Last and importantly*, funds deposited in attorneys' trust accounts (before the original March 2018 indictment) were seized *after* the Backpage website was closed, the CEO pleaded guilty to operating an illegal business, and all related Backpage entities similarly pleaded guilty to being a criminal enterprise.  In short, neither expressive materials nor revenue from an ongoing publishing business were ever seized.  The motion should be denied.

I.    **PROCEDURAL BACKGROUND**

A.    **Backpage Sends Millions in Proceeds to Attorney IOLTAs**

Following a torrent of civil and criminal litigation[1] and a Senate Subcommittee Report,[2] Defendants directed Backpage CEO Carl Ferrer to wire millions of dollars in Backpage proceeds to a number of attorneys and law firms for "future litigation."

---

[1] *See* Doc. 230 at ¶¶ 140, 144.
[2] *See* Doc. 230 at ¶ 151.

Specifically, between approximately February 2017 and March 2018, in anticipation of "future legal services" and potential government seizure of Backpage-held bank accounts, Backpage directed more than $16 million in large and widespread retainer payments to lawyers and law firms around the country.[3]   For example, one law firm that previously represented Defendant Larkin received $5,279,173.07 in Backpage proceeds for prepayment of "future legal services."   Between May 2017 and January 2018, that law firm received more than $3.2 million in wires directly from one of Backpage's foreign bank accounts, and then $2 million directly from Backpage LLC's operating account.

On March 28, 2018, Defendants were indicted on charges of conspiracy, Travel Act violations to facilitate prostitution, conspiracy to commit money laundering, concealment money laundering, transactional money laundering, and international promotional money laundering.   (Doc. 3.)   In that Indictment, the Government included notice of the Government's intent to forfeit "[a]ll right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offenses" and "any and all property, real or personal, *involved in or traceable to*" any money laundering offenses.  (Doc. 3 at 57 (emphasis added).)  Those assets included certain assets identifiable at that time as well as funds placed in Interest on Lawyers Trust Accounts ("IOLTAs") around the country as criminal proceeds and/or property involved in money laundering offenses.

**B.     Backpage and CEO Carl Ferrer Plead Guilty and Forfeit All Assets**

On April 5, 2018, prior to arrests and the unsealing of the Indictment, and pursuant to plea agreements, Backpage.com, LLC ("Backpage") and its related entities[4], and Carl Ferrer, Backpage, LLC's CEO, (collectively, the "Backpage Defendants"), pleaded guilty to various charges including conspiracy to commit a violation of the Travel Act and conspiracy to launder funds.  (*See* CR18-00465 at Docs. 4, 8, 10; CR18-00464, at Doc. 4,

---

[3] These facts were not known during the investigation, but were provided by CEO Carl Ferrer *after* he entered a guilty plea and cooperated in the Government's case.

[4] The related entities are Website Technologies, LLC, Posting Solutions, LLC, Amstel River Holdings, LLC, Ad Tech BV, and UGC Tech Group BV.

7, 12, 20.)  As part of their plea, the Backpage Defendants admitted guilt and consented to the forfeiture of all corporate assets and other property owned or controlled by Backpage. Preliminary Orders of Forfeiture were issued in both cases.  (Docs. 22, 23, respectively.) The Preliminary Orders of Forfeiture incorporated the list of forfeitable assets set forth in the Backpage Defendants' Plea Agreements and expressly provided that the court would "retain jurisdiction to enforce this Order, and to amend it as necessary pursuant to Fed. R. Criminal. P. 32.2(e)."  (*See* CR18-00465, Doc. 22.)  In all, between seizure warrants issued by the Central District of California, and the assets specifically identified in the later-returned Superseding Indictment,[5] 26 locations in real property, 89 bank accounts, and 268 domain names were seized in total, all related to the conviction of the Backpage Defendants.

On June 29, 2018 and July 1, 2018, several, if not all of Defendants filed verified third-party claims, asserting their interests in property listed in the Preliminary Orders of Forfeiture and requesting hearings to determine the matter.  (*See* Docs. 28-40 in CR18-00465, and Docs. 29-41 in CR18-00464.)  Because the three criminal cases in this district were still ongoing, the Government sought claimants' position on the Government's impending motion to stay; all of them objected.

Shortly after, on August 1, 2018, Defendants filed a Motion to Vacate or Modify Seizure Warrants ("Motion to Vacate or Modify") in the CDCA.  (CV 18-06742-RGK-PJW, Doc. 6.)  Relying on previous assertions, the Motion to Vacate or Modify argued the seizures were void because the assets constituted proceeds of a publishing enterprise protected by the First Amendment, and sought an evidentiary hearing.  *Id*.  A hearing was originally scheduled for August 29, 2018, but was later taken off the calendar because the court ruled that it could decide on the pleadings.  (CV 18-06742-RGK-PJW, Doc. 55.)

## C.    The Government Executes Its First Seizure Warrant on an IOLTA

On August 8, 2018, pursuant to seizure warrants issued out of the CDCA, the

---

[5] On July 25, 2018, a Grand Jury in the District of Arizona returned a Superseding Indictment that charged Defendants with largely the same offenses, but added additional assets for forfeiture. (Doc. 230.)

Government seized $6,292,201.67 of funds alleged to be involved in Backpage's money laundering scheme, which were held in an IOLTA maintained by the law firm of Davis Wright Tremaine ("DWT").[6]  The Government served the warrant on the bank, and then worked with DWT to accept a wire of the seized funds in an effort to minimize disruption to the firm's operations.

### D. Defendant Brunst's Request to Sell Restrained House for Attorneys' Fees

That same week, Defendant Brunst requested that the Government stipulate to the interlocutory sale of a parcel of real property upon which counsel for Defendant Brunst had recorded a lien in order to secure attorney's fees related to this matter.  The Government agreed to stipulate upon the condition that any proceeds in excess of the lien would be deposited into a Government account and held as substitute *res* pending the criminal forfeiture proceedings.[7]  Counsel for Defendant Brunst agreed but never submitted a proposed sale agreement. *See*, Correspondence between the Government and Counsel for Defendant Brunst, dated August 8, 2018, attached hereto as Exhibit 2.  Upon information and belief, Defendant Brunst still owns the property (through his personal trust, JMB Trust), and the mortgage/lien for attorneys' fees remains on the property.

### E. Delaware Advancement Proceedings

On notice that the Government intended to seize criminal proceeds alleged to be held in IOLTAs, on August 16, 2018, Defendants Lacey, Larkin, Spear, and Brunst (and several

---

[6] At the time of seizure, DWT already had earned $1,088,715.63, however, out of an "abundance of caution" and "to avoid any dispute," DWT never transferred its earned fees into its operating account. *See*, Email Correspondence from DWT to the Government, dated August 8, 2018, attached hereto as Exhibit 1.

[7] In correspondence with the Government, counsel for Defendant Brunst indicated they had recorded an attorneys' fee lien on the property.  However, a search of public records indicates that BIRD MARELLA BOXER WOLPERT NES PRIVATE INDIVIDUAL granted the owner of the property, JMB Trust (John and Mary Brunst Trust), a mortgage in the amount of $1,925,000 on June 21, 2018.

of their related entities[8], collectively, the "Delaware Plaintiffs"[9]) filed *under seal* an 84-page civil complaint in Delaware State Chancery Court against the Backpage Defendants and their related entities, attempting to collaterally and preemptively collect assets that they knew were subject to federal forfeiture—in direct contravention of 21 U.S.C. § 853(n). (*Camarillo Holdings, LLC vs. Amstel River Holdings, LLC*, Del. Ct. of Chancery, Case No. 2018-0606-SG, Aug. 16, 2018, Doc. 1.)

The same day, the Delaware Plaintiffs filed a Motion for Expedited Proceedings, requesting "trial be scheduled as soon as the Court's calendar permits in the 45-60 day time-frame [sic]." (*Id.* at Doc.15.)  The Delaware Plaintiffs sought two forms of relief from the Delaware Court: 1) advancement of attorneys' fees for the "defense costs and expenses that have been and [may] be incurred by [Delaware] Plaintiffs with respect to claims that have been asserted against them in numerous civil, criminal, administrative, and investigative matters;" and 2) permission to use certain funds held by [the Delaware Plaintiffs'] counsel".[10]

Despite their attempts to expedite the case and secure an order from the Delaware Chancery Court granting them attorneys' fees, the Delaware Plaintiffs were not able to get an immediate summary ruling, and the matter remains pending.  While a detailed summary of the proceedings is not necessary here, it is important to note that the Government filed a Motion to Intervene, which was granted on February 18, 2019, and joined in the Backpage Defendants' Motion for Stay of Proceedings on February 22, 2019.  (*Camarillo Holdings,*

---

[8] The related entities include Camarillo Holdings, LLC, Cereus Properties, LLC, Medalist Holdings, Inc., Leeward Holdings, LLC, Vermillion Holdings, LLC and Shearwater Investments, LLC.

[9] The Delaware Plaintiffs include Lacey, Larkin, Spear and Brunst, but *not* Padilla and Vaught.

[10] According to the Verified Complaint, "certain funds held by [Plaintiffs'] counsel" include advanced fee deposits at Davis Wright Tremaine, LLP (¶ 176), Perkins Coie LLP (¶ 183), Prince Lobel Tye LLP (¶ 189), Copeland, Franco, Screws & Gill, P.A. (¶ 194), Wayne B. Giampietro LLC (¶ 199), Walters Law Group (¶ 204), Akin Gump Strauss Hauer & Feld LLP  (¶ 209), Thompson Coburn LLP (¶ 213), and Rusing Lopez & Lizardi, PLLC Trust Funds (¶ 218).  *Camarillo Holdings, LLC vs. Amstel River Holdings, LLC*, Del. Ct. of Chancery, Case No. 2018-0606-SG, Doc. 49.

*LLC vs. Amstel River Holdings, LLC*, Del. Ct. of Chancery, Case No. 2018-0606-SG.)  Oral argument is scheduled for March 8, 2019.

### F.     The CDCA Civil Forfeiture Proceedings

Between October 5 and 11, 2018, in CDCA, the Government filed civil forfeiture complaints concerning almost the exact same Backpage-related assets identified in the District of Arizona criminal indictments.  On October 23, 2018, the CDCA district court granted the Government's motion to stay all of the civil forfeiture proceedings that were directly related to the criminal proceedings in the District of Arizona.  (CV 18-06742-RGK-PJW, Doc. 85.)  In so doing, the CDCA court expressed concern that the "[d]eterminations made by [the CDCA court, including the same First Amendment claims Defendants now reassert] on the pending motions could ultimately have preclusive effect on the criminal matter [pending in the District of Arizona]."  (CV 18-08420-RGK-PJW, Doc. 15.)  The CDCA court saw "no reason why [Defendants'] pending motions [and First Amendment claims] could not be brought in the criminal action."  *Id.*  Six days later, Defendants Larkin, Lacey, Spear and Brunst filed a notice of appeal to the Ninth Circuit from the CDCA order granting the stay.  (CV 18-06742-RGK-PJW, Doc. 86.)  That appeal is pending.

### G.     The Government Obtains Additional Seizure Warrants on IOLTAs

On October 31, 2018, the Honorable Rozella A. Oliver, United States Magistrate Judge for the CDCA, issued 12 additional seizure warrants for funds held in 17 different bank accounts, which were held in the names of 15 different law firms (collectively, the "IOLTA Seizure Warrants").  The IOLTA Seizure Warrants were issued upon the CDCA Court's probable cause finding that, pursuant to 18 U.S.C. § 981(a)(1)(A) and (C), the funds were property involved in or traceable to money laundering, or were proceeds of violations of 18 U.S.C. §§ 1952, 1956, and 1957 (interstate and foreign travel or transportation in aid of racketeering enterprises, and money laundering offenses).

The Government had intended to serve the seizure warrants on the banks to which they were issued, but because of what had occurred with DWT (where service of seizure warrants initially prompted the bank to freeze all of the firm's accounts), the Government

attempted to take a more collaborative approach to executing the warrants.  To prevent similar interruptions, the Government contacted the 15 law firms affected by the Seizure Warrants before executing the warrants at the respective banks.  Beginning on November 6, 2018, the Government began making courtesy calls to these law firms to offer a wire-in-lieu-of-execution of the seizure warrants.  (*See*, Doc. 360, Ex. C at 1.)  The Government explained to each law firm that while normally these warrants would be served on the bank, the Government was attempting to minimize interruption by allowing the firms to wire the funds to the Government instead.  Many of the law firms accepted the Government's offer and wired the funds without incident.

Two days after the Government notified the affected firms, on November 8, 2018, counsel for Defendants Padilla and Vaught challenged the warrants issued by the CDCA court, but filed their Emergency Motion to Stay Seizure of Attorneys' Fees and Request for Immediate Hearing in the District of Arizona.  (*See* Doc. 360.)  Shortly after, counsel for defendants Lacey, Larkin, Brunst, and Spear filed a motion to join (Doc. 366), despite the fact that the warrants were not directed to their counsel and they had no standing to contest them.  On November 16, 2018, this Court denied their motions.  (Doc. 393.)

However, challenges to the IOLTA Seizure Warrants were also filed in CDCA, where the warrants were issued.  On November 21, 2018, Defendants and other parties who were affected by the IOLTA Seizure Warrants renewed their efforts to stay execution of the IOLTA Seizure Warrants; they also sought a *Franks* hearing on the affidavits.[11]   On December 12, 2018, the Honorable Magistrate Judge Rozella A. Oliver heard argument regarding the pending motions to stay execution of the seizure warrants.  (CDCA 2:18-MJ-02875, Doc. 23.[12])  Judge Oliver has not yet ruled on the motions.

---

[11] The warrant matters in CDCA are MJ 18-2872; MJ 18-2873; MJ 18-2874; MJ 18-2875; MJ 18-2876; MJ 18-2878; MJ 18-2880; and MJ 18-2883.

[12] During the hearing, Judge Oliver noted that the parties should maintain the "status quo" while she was taking the matter under submission.  Because the Government interpreted this to mean that things should remain exactly as they were at that point, i.e., the Government would not obtain any new warrants, and those firms to whom the warrants were issued

**H.   Defendants File Motions to Stay the Ancillary Proceedings**

On November 7 and 9, 2018, Defendants filed motions to stay and postpone the ancillary proceedings in the Backpage Defendants' criminal cases.  (*See* CR18-00465 at Docs. 51-57; CR18-00464, at Docs. 44-50.)  Despite having previously objected to the Government's request for a stay, Defendants now asked this Court to stay the ancillary proceedings so that the Delaware Chancery Court could rule first on the request to advance attorneys' fees.  (*See* CR18-00465, Doc. 51 at 3.)  Acknowledging that in the ancillary proceeding this Court's "determination of who 'owns' or has an interest in property is governed by state law," Defendants argued that "it makes sense[13] to stay the Ancillary Hearing until [the Delaware Court] renders its decision."  *Id.*  The Court held a hearing on all of the pending motions, including Defendants' motion to continue the trial on January 25, 2019.  (CR-18-00465-PHX-SPL, Doc. 75.)  The Court denied Defendants' motion to continue the trial and declined to rule on the fee issue, noting that if the Ninth Circuit Court of Appeals issued an opinion, the Court would proceed accordingly.  (Doc 459 at 67.)  The Court reset the hearing on the motions to stay ancillary proceedings for June 21, 2019.

---

would not move any funds, the Government asked counsel to leave the funds in their IOLTAs until litigation over this matter was resolved by the court.  *See* Doc. 456, Ex. 8. Counsel for Defendant Padilla, however, had already offered and agreed to this.  *See*, Correspondence between the Government and Piccarreta, attached hereto as Exhibit 3.

[13] It is surprising that this "made sense" to Defendants given that nearly every court to hear the issue has held that neither a third party claiming an interest in property subject to federal forfeiture, nor a defendant in a criminal case, may file any action in another court to circumvent the forfeiture procedure.  If such an action is filed, the court where that action is pending must find that it lacks subject matter jurisdiction over the matter.  *See, United States ex rel. Chepurko v. E-Biofuels, LLC*, 2019 WL 162607, *9-10 (S.D. Ind. Jan. 10, 2019) (because § 853 gives the criminal court exclusive jurisdiction over questions of title to the forfeited property, court where qui tam action is pending lacks subject matter jurisdiction over relator's claim);  *In re Guildmaster, Inc.*, 2013 WL 1331392, *6 (D. Maine Mar. 29, 2013) (bankruptcy court lacks jurisdiction under § 853(k) to decide ownership issues on which forfeiture in a pending criminal case will turn); *JP Morgan Chase Bank N.A. v. Khalil*, 2006 WL 87599 (N.D. Ill 2006) (granting Rule 12(b)(1) motion to dismiss a foreclosure action for lack of subject matter jurisdiction where § 853(k) bars a third party from attempting to litigate his interest in property, or the forfeitability of the property, in a foreclosure action in another forum).

1

2

## II.    ARGUMENT

### A.    Defendants are Not Entitled to Use Criminal Proceeds for Their Defense

Neither the Fifth nor the Sixth Amendment requires Congress to permit a defendant to use tainted assets adjudged to be forfeitable to pay legal fees.  *See Caplin & Drysdale v. United States*, 491 U.S. 617, 633 (1989) (post-trial); *United States v. Monsanto*, 491 U.S. 600, 616 (1989) (pretrial).  Congress' rationale for this was clear: "[p]ermitting a defendant to use assets for his private purposes that ... will become the property of the United States if a conviction occurs cannot be sanctioned."  *Monsanto*, 491 U.S. at 613.

Defendants rely heavily on *United States v. Stein* for the proposition that, because they were former employees of Backpage, and they had an expectation to receive attorneys' fees as a benefit or prerequisite of employment, the Government's seizure of funds they intended to use for their defense constitutes "improper interference"[14] with their Sixth Amendment right to obtain counsel. *Stein*, 541 F.3d 130, 155 (2nd Cir. 2008).  However, there was no allegation in *Stein* that the funds intended to be used as attorneys' fees were tainted—to the contrary, it was uncontested that the defendants were claiming clean, untainted funds from KPMG, and the government's interference with their use of *untainted funds* was a violation of their Sixth Amendment rights.  *Id.*  The Second Circuit specifically noted that "there is no Sixth Amendment right for a defendant to obtain counsel using tainted funds," and a defendant's Sixth Amendment right to hire the attorney of his choice only applies to the right "to use *wholly legitimate funds*".  *Id.* (citing *United States v. Farmer*, 274 F.3d 800, 804 (4th Cir. 2001) (emphasis in original).

---

[14] Defendants, who have all joined in Sections I and II of Doc. 456, accuse the Government of "bad-faith wrongful prosecution," making threats, and claim that the Government's "'ends justify the means' approach is unseemly and unworthy of the United States government."  Doc. 456, *passim*.  These are thinly veiled accusations of government misconduct.  Counsel for Defendant Padilla has already been warned by this Court that, should he wish to make allegations of government misconduct, he "should be prepared to have an affidavit signed by [him] and notarized to a state bar" because, unless he is seeking a remedy from the Court "for some form of misconduct … [he should] leave the name calling out of this litigation."  Doc. 459 at 64-65 (excerpts attached hereto as Exhibit 4).

Defendants attempt to cloak their criminal conspiracy to facilitate prostitution and child sex trafficking, and their extensive laundering of those proceeds, as a "First Amendment right." That is not the law.

### 1. Defendants Do Not Have a "First Amendment Right" to Commit or Facilitate Criminal Activity

The Supreme Court has long recognized that speech proposing an illegal transaction falls entirely outside of First Amendment protection. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563-64 (1980). The First Amendment does not protect advertising adult or underage prostitution. *See, e.g., Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973) ("We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad…soliciting prostitutes."); *United States v. Stevens*, 559 U.S. 460, 468-69 (2010) ("From 1791 to the present…the First Amendment has permitted restrictions upon the content of speech in a few limited areas" including "speech integral to criminal conduct…the prevention and punishment of which have never been thought to raise any Constitutional problem.").

For these reasons - and as discussed in some of the earliest pleadings in this case - a website or website operator may be prosecuted under federal law for knowingly facilitating prostitution or other types of illegal conduct. (Doc. 42 at 2-5, incorporated herein by this reference); *see also United States v. Omuro*, N.D. Cal. No. CR 14-CR-336 (18 U.S.C. § 1952 conviction of the founder of www.myRedBook.com; Omuro (like Ferrer) admitted that "[t]he website hosted advertisements, the vast majority of which were posted by prostitutes containing … the sexual services they offered, and their rates … As such, the website promoted and facilitated … prostitution..."); *United States v. Hurant*, E.D.N.Y No. CR 16-45 (18 U.S.C. § 1952 conviction for the founder of www.Rentboy.com, who admitted he "was well aware … that the escort ads he posted … were thinly-veiled proposals of sexual services in exchange for money."); *cf. United States v. Ulbricht*, 31 F. Supp. 3d 540, 556 (S.D.N.Y. 2014) (founder of "Silk Road" website prosecuted for allegedly creating and operating "an expansive [online] black market for selling and purchasing narcotics and malicious software," separating his alleged conduct "from the mass of others whose

websites may - without their planning or expectation - be used for unlawful purposes").

Ignoring these prosecutions, Defendants repeatedly assert that courts "[i]n numerous cases" have held that Backpage.com and ads posted on the website are subject to blanket First Amendment protection—and the website's operator and owners have broad immunity from civil or criminal liability.  While some Defendants prevailed in cases seeking *civil* remedies or turning on whether Backpage could be prosecuted under *state* law, those cases are all distinguishable because Section 230 of the Communications Decency Act of 1996, 47 U.S.C. § 230 ("CDA"), provided a broad grant of immunity in such contexts.  The charges against Defendants in this case, however, are brought under *federal* criminal law— a context in which the CDA has no application.  47 U.S.C. § 230(e)(1) ("Nothing in this section shall be construed to impair the enforcement of . . . [any] Federal criminal statute.").

Moreover, nearly all of the cases Defendants cite regarding Backpage were decided long before the release of the U.S. Senate's Permanent Subcommittee on Investigations 50-page Report in 2017, BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING,[15] which was accompanied by an 840-page appendix largely consisting of incriminating Backpage documents.[16]  The Senate obtained these documents, in part, pursuant to a subpoena it issued in 2015 to Ferrer.  After Ferrer declined to comply, the Senate held him in contempt and initiated a lawsuit against him in federal court.  During this litigation, Ferrer advanced an array of First Amendment-based challenges to the subpoena, which the district court rejected, holding that the "First Amendment does not protect speech that is itself criminal because it is too intertwined with illegal activity.'"  *Senate Perm. Subcommittee on Inv. v. Ferrer*, 199 F. Supp. 3d 125, 138, 140 (D.D.C. 2016), *vacated as moot*, 856 F.3d 1080 (D.C. Cir. 2017).[17]

---

[15] https://www.hsgac.senate.gov/imo/media/doc/Backpage%20Report%202017.01.10%20FINAL.pdf.

[16] https://www.hsgac.senate.gov/imo/media/doc/Final%20Appendix%202017.01.09.pdf

[17] Congress amended the CDA in April 2018, putting Defendants on further notice that the CDA: "was never intended to provide legal protection to websites that unlawfully promote and facilitate prostitution and … facilitate traffickers in advertising the sale of unlawful sex

The Senate's subpoena - which started the process of pulling back the curtain on Backpage's internal workings - was followed by other cases that highlighted Backpage's facilitation of prostitution and child sex trafficking.  *See, J.S. v. Village Voice Media Holdings, Inc.*, 359 P.3d 714, 715-16 (Wash. 2015) (denying Backpage's motion to dismiss in a lawsuit brought by three minor girls alleging they had been "bought and sold for sexual services online on Backpage.com"; after extensive discovery, Backpage lost a motion for summary judgment and entered a confidential settlement); *see also, e.g.*, *Jane Doe No. 1 v. Backpage.com, LLC*, 2018 WL 1542056, at *1 (D. Mass. 2018) (denying, in part, motion to dismiss on First Amendment and CDA grounds, in a civil case brought by a different underage victim; because the plaintiff plausibly alleged Backpage had "redrafted [her] advertisement … to suggest she was an adult," the CDA did not apply).

As detailed in the Superseding Indictment, previous motions and correspondence, the United States has highlighted an array of Backpage business practices that facilitated prostitution.  (*See e.g.*, Doc. 230 at ¶¶ 35-152; Doc. 197; Doc. 446; Exhibit 5). These practices include a financial relationship (Backpage defendants paid a monthly fee of $10,000) with a known prostitution website called *The Erotic Review*.  (*Id.*)  Moreover, Defendants engaged in a practice known as "moderation" that removed words indicative of prostitution (including child sex trafficking) and then posted the "sanitized" ad.  In addition, Defendants engaged in an activity known as "aggregation" where they trolled other prostitution websites, copied ads from those sites, posted the ads on Backpage for free, and then contacted the pimp or prostitute in an attempt to convert them to a paying client. Finally, to conceal Backpage has the ultimate recipient of proceeds from prostitution, Defendants engaged in a variety of concealment money laundering activities.  Defendants, however, consistently avoid addressing these practices in any of their pleadings or correspondence to the United States.  (*See generally, e.g.*, Doc. 446 at 9-14, incorporated herein by this reference.)

acts with sex trafficking victims … and [that] clarification of [the CDA was] warranted to ensure that such section does not provide such protection to such websites."  Pub. L. 115–164, § 2, Apr. 11, 2018, 132 Stat. 1253.  *See also note 1, supra.*

## 2.   Defendants Do Not Have a "First Amendment Right" to Proceeds of a Crime

Defendants' objections to the Government's seizures of property in this case, including funds held in IOLTAs, are based on several cases that have no persuasive value to this Court.  Importantly, this is not a case that involves a prior restraint on speech or the seizure of any expressive materials.[18]  Nor is this a case that involves the seizure of the funds or other assets of an ongoing publishing business.[19]  As described herein, Backpage and its CEO have pleaded guilty and have agreed to forfeit and/or facilitate the forfeiture of the assets at issue.  Backpage has effectively ceased operations and is no longer in the publishing business.  The assets at issue all consist of funds that originated at Backpage, are proceeds of crime or are involved in the laundering of proceeds, and that are subject to forfeiture under the plea agreements.

Here, Defendants knew or had reason to know that the millions of dollars deposited into IOLTAs around the country constituted illicit proceeds subject to forfeiture because of their intimate knowledge of and access to Backpage's business operations, and the fact that they directed and/or retained significant operational control over Backpage's business activities.  (*See, e.g.,* Doc. 230 at ¶ 31); *see also United States v. 141st Street Corp.*, 911 F.2d 870, 876-77 (2d Cir. 1990) (corporate officer's knowledge of drug trafficking at corporation's building could be imputed to the corporation to defeat innocent owner

---

[18] The law draws a critical distinction between pretrial seizures of expressive materials (e.g., books, films, videotapes) versus non-expressive assets (e.g., bank accounts).  *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 62-67 (1989) (holding that while the pretrial seizure of allegedly obscene books and films, based merely on a probable cause finding, constituted a prior restraint on speech prohibited by the First Amendment, the pretrial seizure of petitioner's non-expressive property did not).  (*See also* Doc. 446 at 5-9, incorporated herein by this reference.)

[19] In *Am. Lib. Ass'n v. Thornburgh*, 713 F. Supp. 469, 484 n.19 (D.D.C. 1989), *vacated sub nom. Am. Lib. Ass'n v. Barr*, 956 F.2d 1178 (D.C. Cir. 1992), the court invalidated the pretrial seizure of non-expressive material, but did so only on the rationale that pretrial seizure of assets of an *ongoing* publishing business may determine whether the business can continue to publish or not.  Here, Backpage has already ceased operations and Defendants have not identified any case law that suggests it is improper to seize the proceeds of a business that constituted a criminal enterprise.

defense).  The Government's seizures in this case were all conducted pursuant to probable cause findings made by a Grand Jury, Magistrate Judge, or District Court Judge. Defendants will have an opportunity to contest the seizures or assert related claims in the Backpage and Ferrer ancillary proceedings pending in this District.  Moreover, Defendants Lacey, Larkin, Spear and Brunst are continuing to pursue litigation relating to these assets in the CDCA and Ninth Circuit (and even in the Delaware Chancery Court), as described above.  For these and other reasons, Defendants' instant motion to dismiss should be denied.

### B. Defendants Have Not, and Cannot, Meet the Threshold Showing Required to Make a *Monsanto* Claim

A post-restraint, pretrial hearing to recover funds seized by the Government is available as an exception to the ancillary proceeding remedy, but only if (1) the Sixth Amendment is implicated, and (2) the defendant makes a prima facie showing that there is no probable cause for the forfeiture of the restrained property.  *Monsanto*, 491 U.S. 600, 616 (1989).  Neither the Fifth nor the Sixth Amendment requires Congress to permit a defendant to use tainted assets adjudged to be forfeitable to pay legal fees.  *See Caplin & Drysdale v. United States*, 491 U.S. 617, 633 (1989) (post-trial); *Monsanto*, 491 U.S. at 616 (pretrial). Congress' rationale for this was clear: "[p]ermitting a defendant to use assets for his private purposes that ... will become the property of the United States if a conviction occurs cannot be sanctioned."  *Monsanto*, 491 U.S. at 613.

To seek relief from seizure, a defendant must first make a showing that they do not possess sufficient assets to obtain counsel.  Only where all of a defendant's assets have been seized or restrained are the defendant's Fifth and Sixth Amendment rights violated.  *See United States v. Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir. 1993) ("Unimex's right to counsel under the Sixth Amendment and to Due Process under the Fifth Amendment were violated by taking away all of its assets, denying it an opportunity to show cause prior to its criminal trial that an amount it could have used for attorneys' fees was non-forfeitable.").  "To even be entitled to the hearing, defendants must first show a genuine need to use the assets to retain counsel of choice."  *See Kaley v. United States*, 571 U.S. 320, 353-54 (2014) (Roberts,

C.J., dissenting) (citing *United States v. Bonventre*, 720 F.3d 126, 133 (2d Cir. 2013) (holding that to qualify for a post-restraint *Monsanto* hearing, the defendant must disclose his net worth, provide a comprehensive list of his assets, and explain how he has been paying his significant living expenses; it is not enough to contrast his income stream and bank account balances with his living expenses and legal fees)).

Courts put the initial burden upon the defendant to show that he lacks sufficient funds. *See United States v. McCray*, 113 F. App'x. 770, 772 (9th Cir. 2004) (holding defendant has no Sixth Amendment right to a hearing unless he offers evidence as to the source of the restrained property, and "his inability to compensate counsel from other funds available to him") (citing *Unimex*, 991 F.2d at 551). After making a showing of financial necessity,[20] a defendant may make a *prima facie* showing that there is no probable cause for the forfeiture of the restrained property in order to be entitled to a *Monsanto* hearing. At the probable cause hearing, a defendant cannot challenge the grand jury's finding of probable cause with respect to the underlying crime, but he retains the right to challenge the probable cause regarding the nexus between the property and the offense. *Cf. Kaley v. United States*, 571 U.S. 320, 341 (2014). However, to be entitled to this remedy, the defendant must first have his assets seized or restrained, and prove that he otherwise has insufficient funds to mount a defense.

Defendants argue that the Government should have to litigate the merits of the forfeiture case now, and prove the Government's theory of forfeitability prior to restraint. But that is not the law and importantly, Defendants have made no threshold showing of

---

[20] "Perhaps recognizing that *Monsanto* hearings might be used only to gain a sneak peak of the Government's case and witnesses, thereby wasting prosecutorial resources, a majority of courts have held that such hearings are necessary, only where the criminal defendant makes at least an initial showing that he has no other assets with which to retain private counsel." *United States v. Kramer*, No. 1:06CR200-ENV-CLP, 2006 WL 3545026, at *4 (E.D.N.Y. Dec. 8, 2006) (citing *United States v. Jamieson*, 427 F.3d 394, 406 n. 3 (6th Cir.2005) (cataloguing other circuit's approaches)).

financial need that would entitle them to such a hearing at this point.[21]

The Government has made countless offers to Defendants that it would be willing to consider a request to release attorneys' fees, without the need for a formal *Monsanto* hearing, if Defendants provided evidence of financial need.[22]  But what Defendants actually want from this Court, and what they have sought in the Delaware Proceedings, is clear - an end-run around lawful forfeiture proceedings and a means to avoid the threshold showing requirements of *Monsanto*.  Evidence of this is the smokescreen they raise regarding Ferrer's fees[23] and the fact that Defendants *still* have not come to the Government - or this Court - and made any attempt to properly request a *Monsanto* hearing.

---

[21] Defendants Padilla and Vaught offered to "submit evidence of their indigency [*sic*] to the Court under seal".  Doc. 456 at 18, n. 18.  While that arguably may be in compliance with this Court's local rules, it is not sufficient as a matter of law.  *United States v. Bonventre*, 720 F.3d 126, 133 (2d Cir. 2013).  Furthermore, the Government does not address the request made by counsel for Defendants' Padilla and Vaught to withdraw if this Court does not order the release of attorneys' fees.  It is the Government's understanding that, should Defendants Padilla and Vaught sufficiently make the threshold showing of indigence to be entitled to a *Monsanto* hearing, but fail to make a prima facie showing that there is no probable cause, Defendants Padilla and Vaught could petition this Court for their counsel of choice to be paid by the CJA Panel of the District of Arizona.  Understanding that Messrs. Piccarreta and Weiss may wish to withdraw instead, the Government takes no position on whatever decision Defendants Padilla and Vaught reach with their counsel.

[22] *See, e.g.*, Ex. 3; *see, also* Doc. 360, Ex. C at 5.  None of Defendants have attempted to make such a showing.  Counsel for Defendant Larkin expressed interest in doing so, and said they would provide general financial information showing need.  However, to date, nothing has been provided. *See* Correspondence between the Government and Counsel for Larkin, attached hereto as Exhibit 6.

[23] Defendants argue that the Government's willingness to allow Ferrer, a cooperating defendant, to use allegedly tainted assets for attorneys' fees is "unseemly and undermines the workings of the adversary system."  Doc. 456, at 12.  Defendants are certainly entitled to argue at trial that *any* benefit the Government provides to a cooperating co-conspirator to secure his cooperation - whether it be attorneys' fees or anything else - affects the validity and potential bias of Ferrer's testimony.  *Giglio v. United States*, 405 U.S. 150 (1972) (the government must produce evidence to the defense that affects a government witness's credibility). But the Government's duty is *disclosure* that a benefit has been provided in exchange for cooperation, a common occurrence in the justice system, so that the defense can prepare adequately for trial. Here, that obligation has been met, and no constitutional violation has occurred.

Evidence gathered during the course of the Government's investigation suggests the reason for this is because Defendants *cannot* make a showing of financial need to this Court without, at a minimum, taking serious liberties with the truth of their actual financial situation.   Financial records obtained during the investigation of this case show that Defendants, particularly Lacey, Larkin, Spear, and Brunst[24], have been receiving hundreds of thousands of dollars - sometimes monthly - from business sources wholly unrelated to Backpage.  Specifically, since the April 6, 2018 closure of Backpage.com, the company that purchased Defendant Lacey and Larkin's alternative press newspapers (such as the Phoenix New Times, LA Weekly, and the Village Voice, hereafter, the "Company"), has continued to make monthly debt service payments to Cereus Properties (one of Defendants' related entities), and later, directly to an IOLTA.  In total, between August 2018 and early January 2019, the IOLTA held by Daniel J. Quigley PLC, received about $1,560,449.92 in allegedly untainted funds via wire transfers from the Company. That same IOLTA paid out about $1,242,783 to Quigley and other law firms via wire transfers and checks.  The account also paid out about $392,666.62 to Lacey, Larkin's spouse, Brunst, and Spear's spouse.  *See* Versoza Declaration, attached hereto as Exhibit 7.  Defendants cannot make the required threshold showing, and the Sixth Amendment is not implicated.

## III.   CONCLUSION

Despite Defendants' contention that this case is somehow different from every other federal case that involves the seizure of proceeds and funds involved in money laundering, as the Grand Jury of the District of Arizona and the Honorable Judges of the CDCA determined in their probable cause findings - it is not.  Rather than any of Defendants attempting to make the requisite threshold showing of financial need to be entitled to a

---

[24] Because Defendants Padilla and Vaught are the only two Defendants who could make even a colorable claim of financial need, the Government - in a phone call with defense counsel Michael L. Piccarreta and Stephen M. Weiss - specifically invited them to submit financial records evidencing financial need, and the Government would consider releasing attorneys' fees, without requiring them to request a formal *Monsanto* hearing from this Court.  In response, Defendants Padilla and Vaught provided nothing, and filed this Motion to Dismiss, claiming "improper interference."

1    *Monsanto* hearing, they raise meritless arguments and request dismissal of the Superseding

2    Indictment.  There is no valid legal basis for their claims and this Court should deny their

3    continued attempts to end-run the proper federal forfeiture process.  Because Defendants

4    have failed to state a legal basis for any of their requests for relief, the Motions to Dismiss

5    Due to Government Interference with Right to Counsel and Request for Disclosure, or in

6    the Alternative, Motion to Withdraw (Docs. 456, 463, 464, 465, 467) should be denied in

7    its entirety.

8           Respectfully submitted this 25th of February, 2019.

9                                        ELIZABETH A. STRANGE
                                         First Assistant United States Attorney
10                                       District of Arizona

11                                       BRIAN BENCZKOWSKI
                                         Assistant Attorney General
12                                       U.S. Department of Justice
                                         Criminal Division, U.S. Department of Justice
13

14                                       KEVIN RAPP
                                         MARGARET PERLMETER
15                                       ANDREW STONE
                                         PETER KOZINETS
16                                       Assistant United States Attorneys

17                                       REGINALD E. JONES
                                         Senior Trial Attorney
18

19                                       *s/ John J. Kucera*
                                         JOHN J. KUCERA
20                                       Special Assistant United States Attorney

21                                       Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

22

23

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

2

I hereby certify that on this date, February 25, 2019, I transmitted the foregoing under-seal document for filing to the Clerk of the United States District Court and sent a copy via electronic mail to: Paul J. Cambria Jr. Esq. and Erin e. McCambell, Esq., Lipsitz Green Scime Cambria, LLC, 42 Deleware Ave, Suite 120, Buffalo, NY 14202, **pcambria@lglaw.com** and **emccampbell@lglaw.com**, Thomas H. Bienert, Jr., Esq., Anthony R. Bisconti, Esq., Kenneth M. Miller, Esq., and Whitney Bernstein, Esq., Bienert, Miller & Katzman, PLC, 903 Calle Amanecer, Suite 350, San Clemente, CA 92673, **tbienert@bmkattorneys.com, tbisconti@bmkattorneys.com, kmiller@bmkattorneys.com, wbernstein@bmkattorneys.com**; Mike Piccarreta, Esq., Piccarreta Davis Keenan Fidel, PC, 2 East Congress Street, Suite 1000, Tucson, AZ 85701, **mlp@pd-law.com**; Jim Grant Esq., Davis Wright Termaine, LLP, 1201 Third Avenue, Suite 2200, Seattle, WA 98101, **jimgrant@dwt.com**; Michael D. Kimerer, Esq. and Rhonda Elaine Neff, Esq., 1313 E. Osborn Road, Suite 100, Phoenix, AZ 85014, **MDK@kimerer.com** and **rneff@kimerer.com**; Steve Weiss Esq., Karp & Weiss, PC, 3060 North Swan Rd., Tucson, AZ 85712, **sweiss@karpweiss.com;** Robert Corn-Revere Esq., Davis Wright Termaine, LLP, 1919 Pennsylvania Avenue N.W., Suite 800, Washington, D.C., 20006, **bobcornrevere@dwt.com**; Bruce Feder, Esq., 2930 East Camelback Road, Suite 160, Phoenix, AZ 85016, **bf@federlawpa.com**; Gary Linenberg, Esq., Ariel Neuman, Esq., Gopi K. Panchapakesan, Esq., Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C., 1875 Century Park East, 23rd Floor, Los Angeles, CA 90067, **glincenberg@birdmarella.com, aan@birdmarella.com, gkp@birdmarella.com.**

3

4

5

6

7

8

9

10

11

12

13

14

*s/ Angela Schuetta*
Angela Schuetta
U.S. Attorney's Office

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# __Exhibit 1__

**Wick, Amanda (CRM)**

| | |
|---|---|
| **From:** | Kucera, John (USACAC) <John.Kucera@usdoj.gov> |
| **Sent:** | Wednesday, August 8, 2018 11:24 PM |
| **To:** | Coopersmith, Jeff |
| **Cc:** | Weinstein, Joe; Wick, Amanda (CRM); Rapp, Kevin (USAAZ) |
| **Subject:** | Re: Davis Wright Tremaine/Seizure or Freezing of IOLTA Trust Account |

Jeff,

Thanks. Without commenting now on everything in your email below, I will confer with my colleagues and get back to you in the morning.

Please feel free to contact me should you need anything in the interim.

-John

Sent from my iPhone

On Aug 8, 2018, at 8:08 PM, Coopersmith, Jeff <JeffCoopersmith@dwt.com> wrote:

John, thank you again for your time this evening.  My office and cell phone numbers are below, and you can call me anytime of you want to discuss any questions you may have after reviewing this email.

Although we disagree with the seizure and reserve all rights on behalf of our clients and our law firm, we appreciate your willingness to work with us to resolve the immediate issues.  We understand from our phone conversation today that the government meant to seize the balance of our client trust account specifically relating to Backpage matters, and not client trust funds relating to unrelated matters or funds relating to Backpage matters that were earned by our firm.  We recognize that the government may not always have complete information, so this email provides the accurate data concerning the client trust account relating to Backpage matters for your review.  We also appreciate your consideration in telling Bank ██████ to hold off on transmitting funds to the government until we can get the numbers right, and confirming with the bank that other than the correct amount of funds to be transmitted by Bank ██████ to the government, no other funds in any Davis Wright Tremaine accounts should be frozen or are subject to seizure.  As discussed in our call, we heard from Bank ██ ██████ this afternoon that *all funds* held in the firm's IOLTA accounts have been seized or frozen, which obviously causes very serious problems for the firm and our many clients with rights and obligations.

We had our accounting department pull the data relating to the particular client trust account that holds funds relating to Backpage.  The total balance of that account is $6,292,201.67.  This is an interest-bearing account at Bank ██████ and the account number is ██████.  The chart below shows the complete transaction history for this account:

<image002.png>

As shown in the chart, the account was established with the first deposit on May 10, 2017.  Davis Wright Tremaine did not draw any fees or costs from the account during its entire history.  Please note that on December 29, 2017, we received a refund from a litigation support vendor in the amount of $3,945.00

1

related to Backpage work. Those funds were inadvertently deposited in our general client trust account and should therefore not be at issue. There are no other Backpage-related funds held in any client trust account at Davis Wright Tremaine other than the $6,292,201.67 held in account number ███████.

Again, we appreciate that the government is not seeking forfeiture of fees and costs that were earned by our firm. Up to April 6, 2018 (we understand Mr. Ferrer entered into guilty pleas on April 5, 2018), DWT had earned $1,088,715.63 in fees and costs which were never paid. We did not withdraw this earned fee amount from our client trust account, in an abundance of caution to avoid any dispute, but nevertheless we believe that any seizure would not include these $1,088,715.63 in fees and costs. This would reduce the amount to be seized to $5,203,486.04, which would be consistent with the government's aim not to seize earned fees. We would hold the $1,088,715.63 in our trust account before taking it to cover earned fees and costs until we could be sure that no other parties claim a right to these funds.

Further, in lieu of any seizure, we would of course be willing to keep segregated and hold the entire balance of the Backpage-related trust account, and allow the funds to continue earning interest, under an agreement that we would not transfer any funds out of the trust account pending resolution of the matter with the government and any other interested parties. Please let us know if the government is amenable to this option. Like other law firms, we have entered into similar agreements with government agencies in the past when funds have been in dispute.

If holding the funds in lieu of seizure is not an option, the maximum amount of the seizure should be $6,292,201.67, but as explained above we believe it should be a maximum of $5,203,486.04. Again, we must reserve all rights on behalf of our clients and our law firm, but we appreciate your assistance in resolving the immediate issues associated with the seizure warrant.

Best,

<image003.jpg>
**Jeffrey B. Coopersmith | Partner**
**1201 Third Avenue, Suite 2200 | Seattle, WA 98101**
**Tel: (206) 757-8020 | Fax: (206) 757-7020 | Mobile: (206) 708-9396**

**865 South Figueroa Street, Suite 2400 | Los Angeles, CA  90017**
**Tel: (213) 633-8637 | Fax: (213) 633-8699 | Mobile: (206) 708-9396**
**Email: jeffcoopersmith@dwt.com| Website: www.dwt.com**

**Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.**

**Admitted in Washington, California, and the District of Columbia**

**Disclaimer: This message may contain confidential communications protected by the attorney client privilege. If you received this message in error, please delete it and notify the sender.**

---

**From:** Kucera, John (USACAC) [mailto:John.Kucera@usdoj.gov]
**Sent:** Wednesday, August 08, 2018 5:37 PM
**To:** Coopersmith, Jeff
**Cc:** Weinstein, Joe; Grant, James; Wick, Amanda (CRM); Rapp, Kevin (USAAZ)
**Subject:** RE: Davis Wright Tremaine/Seizure or Freezing of IOLTA Trust Account

FYI

Please find the attached face page of the warrant you requested.

Also, my understanding is that the government has not yet received the funds, and I've requested that ███ hold off on transferring any funds pursuant to the warrant until the government gets back to them.  I will have further conversations with ███ tomorrow during business hours to discuss further.

Thanks,
John

_____

**John Kucera | AUSA**
(213) 894-3391

---

**From:** Coopersmith, Jeff <JeffCoopersmith@dwt.com>
**Sent:** Wednesday, August 08, 2018 5:06 PM
**To:** Kucera, John (USACAC) <jkucera@usa.doj.gov>
**Cc:** Weinstein, Joe <joeweinstein@dwt.com>; Grant, James <jimgrant@dwt.com>
**Subject:** RE: Davis Wright Tremaine/Seizure or Freezing of IOLTA Trust Account

Please dial 888-757-0729 and use passcode ███████   thanks

---

**From:** Kucera, John (USACAC) [mailto:John.Kucera@usdoj.gov]
**Sent:** Wednesday, August 08, 2018 5:04 PM
**To:** Coopersmith, Jeff
**Cc:** Weinstein, Joe; Grant, James
**Subject:** RE: Davis Wright Tremaine/Seizure or Freezing of IOLTA Trust Account

It seems that my colleagues are unavailable, but I'll call you now.  What number should I call?

I've attached our previous correspondence on this matter.

_____

**John Kucera | AUSA**
(213) 894-3391

---

**From:** Coopersmith, Jeff <JeffCoopersmith@dwt.com>
**Sent:** Wednesday, August 08, 2018 4:53 PM
**To:** Kucera, John (USACAC) <jkucera@usa.doj.gov>
**Cc:** Weinstein, Joe <joeweinstein@dwt.com>; Grant, James <jimgrant@dwt.com>
**Subject:** Davis Wright Tremaine/Seizure or Freezing of IOLTA Trust Account

John, thank you for taking our call just now.  As stated, I am a partner at Davis Wright Tremaine and a former AUSA.  Joe Weinstein is the General Counsel of our firm.  We received information from Bank ██ ███████ this afternoon that the government has frozen or seized (we are not sure which)  all funds held in our law firm client trust account.  We are a law firm of over 500 lawyers and this will obviously immediately impact the rights and obligations of countless clients who have nothing whatsoever to do with the Backpage matters.  Funds in trust relating to Backpage are held in a segregated account, and

we are happy to cooperate with the government with respect to those funds by holding them or sending them to the government as required by any warrant (reserving all rights of our clients).

As we discussed, we need to discuss this with you and your team immediately to lift the seizure or freeze with respect to unrelated clients.  As discussed, we would like a call today.  My contact information is below. Thank you.

Best regards,



**Jeffrey B. Coopersmith | Partner**
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
Tel: (206) 757-8020 | Fax: (206) 757-7020 | Mobile: (206) 708-9396

865 South Figueroa Street, Suite 2400 | Los Angeles, CA  90017
Tel: (213) 633-8637 | Fax: (213) 633-8699 | Mobile: (206) 708-9396
Email: jeffcoopersmith@dwt.com| Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

Admitted in Washington, California, and the District of Columbia

Disclaimer: This message may contain confidential communications protected by the attorney client privilege.  If you received this message in error, please delete it and notify the sender.

# **<u>Exhibit 2</u>**

**From:** "Gary S. Lincenberg" <glincenberg@birdmarella.com>
**Date:** August 8, 2018 at 8:32:27 PM PDT
**To:** "Kucera, John (USACAC)" <John.Kucera@usdoj.gov>, "Ariel A. Neuman"
<aneuman@birdmarella.com>
**Cc:** "Gopi K. Panchapakesan" <gpanchapakesan@birdmarella.com>, "Rapp, Kevin (USAAZ)"
<Kevin.Rapp@usdoj.gov>
**Subject:** RE: Brunst Real Property

John,

Your proposal is accepted.  Thank you for your professional courtesy in dealing with this issue.

Sincerely,

**Gary S. Lincenberg** | *Principal*
**O**: 310.201.2100, Ext. 224  |  **E**:  glincenberg@birdmarella.com

**Bird, Marella, Boxer, Wolpert, Nessim,**
**Drooks, Lincenberg & Rhow, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
BirdMarella.com

---

**From:** Kucera, John (USACAC) <John.Kucera@usdoj.gov>
**Sent:** Wednesday, August 8, 2018 1:25 PM
**To:** Ariel A. Neuman <aan@birdmarella.com>; Gary S. Lincenberg <gsl@birdmarella.com>
**Cc:** Gopi K. Panchapakesan <gkp@birdmarella.com>; Rapp, Kevin (USAAZ) <Kevin.Rapp@usdoj.gov>
**Subject:** Brunst Real Property

Gary and Ariel,

Regarding your client's real property located at 5830 E. Calle Del Media, Phoenix, AZ, the government will agree to recognize the full amount of your recorded lien on condition that the government be allowed to approve the sale of the property (which approval will not be unreasonably withheld) and any proceeds in excess of your recorded lean will then be deposited into a government account to be treated as substitute *res* in the criminal forfeiture proceeding.  Please let us know your position.

Thank you,
John

_____
**John Kucera | AUSA**
(213) 894-3391

# **Exhibit 3**

**Wick, Amanda (CRM)**

| | |
|---|---|
| **From:** | Barbara Polowetz <bpolowetz@pd-law.com> |
| **Sent:** | Thursday, November 8, 2018 11:36 AM |
| **To:** | Wick, Amanda (CRM) |
| **Cc:** | Michael Piccarreta |
| **Subject:** | Padilla: seizure warrants issued for IOLTA funds to defend Mr. Padilla / request for seizure affidavit - response to Amanda from MLP |
| **Attachments:** | 36A 37 38 40 JPMC.PDF; 36B GrandPoint.pdf |

Amanda:

Thank you for your prompt response to my request for the search warrant affidavits. However, I am a little perplexed. When I reviewed the seizure warrant and matched them up the PDKF firm accounts, the $10,000 seizure warrant is from my operating account which contains nothing but earned fees from all of the law firm's cases. The second account named for $740,000 from the Grand Point bank account was closed approximately one year ago. The other named accounts do not belong to our law firm. We do have an IOLTA trust account which only contains unearned funds relating to Mr. Padilla. That account was segregated from our other trust account.

I, too, am not sure who "they" is. However, you may check with Patrick Reid as he is the source of that information and that information was not only provided to myself and Mr. Keenan who was present, but also to Steve Weiss who represents Ms. Vaught. However, as long as we receive the affidavit promptly, it is not important now who recommended it and who did not, only that we receive it. As you indicated, you anticipate having an answer today that should resolve that portion of the problem.

I am willing to stipulate to a deadline extension for the execution of the warrants since they have been served upon me. We do appreciate that you provided the warrants to us rather than serve the banks as it would cause disruption not only to our law firm but numerous clients. However, in the absence of a brief extension, we will need to address this issue with the court immediately due to the impact on Mr. Padilla's and Ms. Vaught's First, Fifth and Sixth Amendment rights.

We understand that the government is not attempting to seize earned fees that have been moved from the IOLTA prior to the receipt of the warrant. The law firm normally issues billings on the first business day of the month for work performed the previous month so regardless of the seizure warrant, no funds would be, nor now will they be, removed from the IOLTA account. In light of this recent development, I do not intend, without court or government approval, to transfer any funds from the Padilla IOLTA account until this issue is resolved.

Finally, I think the government should be aware by now that Mr. Padilla and Ms. Vaught do not have sufficient assets or income to defend themselves and thus if the government is successful in its seizure, they will be denied their counsel of choice and forced to undertake indigent representation. That will undoubtedly have an impact on the pending criminal proceedings.

After you review this email, please get back to me with your thoughts. In the interim, we will continue preparing our pleadings. Best wishes.

Mike Piccarreta

**From:** Wick, Amanda (CRM) <Amanda.Wick@usdoj.gov>
**Sent:** Wednesday, November 07, 2018 6:17 PM
**To:** Michael Piccarreta <mlp@pd-law.com>
**Cc:** Reid, Patrick (CRM) <Patrick.Reid@usdoj.gov>
**Subject:** RE: Andrew Padilla: seizure warrants issued for IOLTA funds to defend Mr. Padilla / request for seizure affidavit

Mike,

Kevin forwarded me your email so that I could address your concerns. First, it might help for me to clarify a few things as some of the information in your email isn't quite accurate. We actually obtained two seizure warrants for funds contained within two different IOLTA accounts, both held in the name of Piccarreta Davis Keenan Fidel PC. One (attached hereto as "36A 37 38 40 JPMC") is for $10,000 from a JP Morgan Chase bank account ending in -9285. The second (attached hereto as "36B Grand Point") is for $740,000 from a Grand Point bank account ending in -3985.

I'm not sure who the "they" is that you reference in your email below, but my supervisor at DOJ has told any counsel that inquired that this case is being prosecuted out of the District of Arizona and MLARS is assisting on asset recovery issues only. As a result, we would have to consult with the prosecutors in Arizona to confirm what the status of the criminal case was, whether discovery had been provided, whether the warrant was under seal and, if not, whether we could provide it upon request. Given that the warrant affidavit would likely be produced at some point during discovery, we didn't think the prosecutors in Arizona would object, but we needed to check with them before sending out the warrant affidavit. I anticipate having an answer on that tomorrow.

Finally, the warrant needs to be executed within 14 days, the deadline for which is Wednesday, November 14th. We give law firms the opportunity to wire funds to the United States, in lieu of serving the warrants on the banks, because we are trying to minimize any disruption the warrant could have on your IOLTA accounts. I'm sure Patrick told you that, often when we serve a seizure warrant on a bank to seize funds from an IOLTA account, the bank freezes the accounts entirely and sometimes more accounts than the ones listed in the warrant. Because of the adverse effects that can cause, we work very hard to coordinate with law firms to effectuate the turnover of the funds with as little impact on the firms as possible. However, some firms do decline to wire funds in lieu, and in that situation, we serve the warrants on the bank, as authorized by the court, prior to the 14th day.

To the extent a law firm has earned fees that have not been moved from the IOLTA to an operating account, we request that substantiating bills (redacted for attorney-client privilege) be submitted to us for due diligence review, and once reviewed, we subtract that amount from the seizure amount, as we are not seeking to seize earned fees.

Should you wish to make a Monsanto claim, we offer every defendant the opportunity to show that they are financially unable to pay for their defense without the funds we are seizing. Because of the timeliness of the warrant, we will be seizing the funds before the 14th, but if you can make a showing that your client has no other funds with which to pay for his defense, we are happy to review those materials and consider releasing some amount back to pay legal fees.

I hope that answers your questions, but if not, please do not hesitate to call me at my direct line below. Thank you for your time and assistance with this matter.

Sincerely,

**Amanda Schlager Wick**
Trial Attorney, Asset Forfeiture & Money Laundering Unit
Money Laundering & Asset Recovery Section (MLARS)
1400 New York Ave. NW, 10th Floor

U.S. Dept. of Justice, Washington, D.C. 20004
(202) 514-2842
(202) 597-0435 (cell)
(202) 514-5522 (fax)

**CONFIDENTIALITY NOTICE**:  This communication with its contents and attachments, if any, may contain confidential, law enforcement sensitive, privileged attorney/client communications or work products, and is not subject to disclosure.  It is solely for the use of the intended recipient(s).  Unauthorized interception, review, use, or disclosure is prohibited.  If you believe that you have received this communication in error, please notify the sender immediately and permanently delete the email, any attachments, and all copies from your computer.

---

Barbara Polowetz, Legal Assistant
**PICCARRETA DAVIS KEENAN FIDEL PC**
2 East Congress Street, Ste 1000, Tucson, AZ 85701
t 520.622.6900, ext. 137 | f 520-622-0521 | www.pd-law.com

# Exhibit 4

```
1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3                    _____

4       United States of America,    )
                                      )
5                    Plaintiff,       )      CR-18-0422-PHX-SPL
                                      )
6            vs.                      )      Phoenix, Arizona
                                      )      January 25, 2019
7       Michael Lacey,               )          9:35 a.m.
        James Larkin,                 )
8       Scott Spear,                  )
        John Brunst,                  )
9       Andrew Padilla,               )
        Joye Vaught,                  )
10                                    )
                     Defendants.      )
11                                    )
        _____)

12

13          BEFORE:  THE HONORABLE STEVEN P. LOGAN, JUDGE

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                    STATUS CONFERENCE

17

18

19

20

21
        Official Court Reporter:
22      Elva Cruz-Lauer, RMR, CRR
        Sandra Day O'Connor U.S. Courthouse, Suite 312
23      401 West Washington Street, Spc. 33
        Phoenix, Arizona  85003-2151
24      (602) 322-7249

25      Proceedings Reported by Stenographic Court Reporter
        Transcript Prepared by Computer-Aided Transcription
```

1                        A P P E A R A N C E S

2      For the Government:

3                      U.S. Attorney's Office
                       By: KEVIN M. RAPP, ESQ.
4                          ANDREW C. STONE, ESQ.
                           MARGARET WU PERLMETER, ESQ.
5                      40 North Central Avenue, Suite 1200
                       Phoenix, AZ  85004
6
                       U.S. Attorney's Office
7                      By: JOHN JACOB KUCERA, ESQ.
                       312 North Spring Street, Suite 1200
8                      Los Angeles, CA  90012

9                      U.S. Attorney's Office
                       By:  REGINALD E. JONES, ESQ.
10                     1400 New York Ave. NW, Ste. 600
                       Washington, DC  20530
11

12     For the Defendant Lacey:

13                     Lipsitz Green Scime Cambria
                       By: PAUL JOHN CAMBRIA, JR., ESQ.
14                     42 Delaware Avenue, Suite 120
                       Buffalo, NY  14202
15
       For the Defendants Lacey and Larkin:
16
                       Davis Wright Tremaine LLP
17                     By: ROBERT CORN-REVERE, ESQ.
                       1919 Pennsylvania Ave. NW, Ste. 800
18                     Washington, DC  20006

19     For the Defendant Larkin:

20                     Bienert Miller & Katzman
                       By: THOMAS HENRY BIENERT, JR., ESQ.
21                     903 Calle Amanecer, Suite 350
                       San Clemente, CA  92673
22

23     For the Defendant Spear:

24                     Feder Law Office
                       By: BRUCE S. FEDER, ESQ.
25                     2930 East Camelback Road, Suite 205
                       Phoenix, AZ  85016

3

```
1    For the Defendant Brunst:

2              Kimerer & Derrick
               By: MICHAEL D. KIMERER, ESQ.
3              1313 East Osborn Road, Suite 100
               Phoenix, AZ  85014
4
               Bird Marella Boxer Wolpert Nessim
5               Drooks Lincenberg & Rhow
               By: GOPI K. PANCHAPAKESAN, ESQ.
6              1875 Century Park E, Suite 2300
               Los Angeles, CA  90067
7
     For the Defendant Padilla:
8
               Piccarreta Davis Keenan Fidel
9              By: MICHAEL L. PICCARRETA, ESQ.
               2 East Congress Street, Suite 1000
10             Tucson, AZ  85701

11   For the Defendant Vaught:

12             Karp & Weiss
               By: STEPHEN M. WEISS, ESQ.
13             3060 North Swan Road
               Tucson, AZ  85712
14

15

16

17

18

19

20

21

22

23

24

25
```

1    argue they are not getting money from Backpage.  They are

2    getting money, clean money from Backpage.  Clean money.

3         They got 100,000 in August.  We are not taking that.

4    That's clean money.  So Spear, Brunst, Lacey, and Larkin, have

5    separate money from the sale of the alternative weeklies.  They

6    are getting money that we view as clean, legitimate money, and

7    they are funneling it through another lawyer's account and

8    disbursing it out.

9         THE COURT:  Why do you use the funneling through

10   analogy?  Because that just sounds unseemly.

11        MR. RAPP:  Well, it's a con move, however you want

12   to -- look, here's the point.  They are getting money, and

13   under Monsanto, come to us, show us your financials, we will

14   look at your financials, and if you have no legitimate money,

15   then maybe we can have a discussion.  But they won't do that.

16   They won't do that.

17        So you have to know the history of the case.  These --

18   many of the attorneys on this case who came to us shortly after

19   arrest, they knew that the tracing of illegitimate and

20   legitimate money was a problem.  And some of them said, look,

21   we have an account, we think this is legitimate money.  This

22   doesn't -- should not come as a surprise to them.

23        If by analogy, if this was a drug trafficking case,

24   and the kingpin of the cartel gave drug revenue out to various

25   attorneys before being arrested and indicted, and that same

1    kingpin was arrested and indicted and pled guilty and agreed

2    that he was running a criminal enterprise and that the revenue

3    from the criminal enterprise was dirty, and then he pled

4    guilty, the entire cartel, anybody looking at this would know

5    that there's a good chance that the money is all tainted.

6            That's the same case here.  It is no different.

7    Backpage was a criminal enterprise from its inception.

8            Now, they don't want to address the First Amendment

9    arguments that we responded to in 446, but if you look at the

10   business practices they were engaging in, and they have never

11   ever responded to those, in any of the letters I have sent

12   them, in any of the pleadings, they won't stand up here and try

13   to defend the financial relationship with the Erotic Review,

14   with the aggregation of ads from other prostitution websites,

15   because they can't.

16           Because they are running a criminal enterprise, and

17   every dollar that they make is dirty or it's commingled with

18   the very de minimis amount of money that is legitimate -- that

19   they say is legitimate, I guess, from selling bicycles and

20   couches, which was such an incredibly small fraction of

21   Backpage's business model that it is not even worth talking

22   about.

23           So they have a remedy, Monsanto.  Come to us, show us

24   your financials.  Maybe you can trigger a Monsanto hearing, and

25   we can look at your financials, or don't.  And then find money

1      from your legitimate source to fund your defense.

2              THE COURT:  Mr. Rapp, I appreciate that.

3              Mr. Piccarreta, since you are the one that basically

4      filed 443, I will give you the last word.  I will give you

5      three minutes.

6              MR. PICCARRETA:  Judge, we haven't had a factual

7      hearing yet to defend the allegations of the government, so for

8      them to assume we haven't defended yet, we haven't gotten to

9      that stage.  We have plenty of defenses.

10             Two, they know under United States versus Vera, the

11     Ninth Circuit is very clear that a guilty plea cannot -- facts

12     contained in it cannot be used against other defendants because

13     it's inherently unreliable.  I can give you the cite on Vera.

14             THE COURT:  I am familiar with it.

15             MR. PICCARRETA:  And finally, Judge, there's been a

16     lot of slander of Davis Wright Tremaine.  They seem to be the

17     target of these guys, but they are a very reputable --

18             THE COURT:  Another fire bomb legal term when you

19     start throwing away slander and -- bring out slander and

20     prosecutorial misconduct and threats and all of this.  You all

21     are senior enough that when you start launching these different

22     types of allegations and accusations, you should be prepared to

23     have an affidavit signed by you and notarized to a state bar

24     that this person is engaging in this conduct.

25             If you are not prepared to do that, in this case -- I

UNITED STATES DISTRICT COURT

1    don't know if it is your practice some other place -- but save

2    that for when you leave the courtroom.  Because when you place

3    it on the record like this, it's very difficult to unring that

4    bell.

5            And I'm pretty confident that all of you are very

6    proud about what you have accomplished as lawyers, prosecutors,

7    defenders, whatever you have taken on as a lawyer.  And you

8    don't want to have your reputation sullied that way, so if you

9    could take this outside of the courtroom.

10           But if you are seeking a remedy from me for some form

11   of misconduct, please bring it up in this courtroom.  If you

12   are not, leave the name calling out of this litigation.

13           Go ahead.

14           MR. PICCARRETA:  I wasn't trying to call names, I was

15   just responding to what was --

16           THE COURT:  When you talk about slander, that's

17   exactly what you are doing.  Go ahead.

18           MR. PICCARRETA:  All right.  I did not believe it was

19   fair to make those accusations.  But put that all aside, we are

20   all here today as a result of the government's seizure of IOLTA

21   accounts in November of this year.

22           And that has wreaked havoc on my client, my defense,

23   and my ability to get funds.  And that's why we are here today

24   asking you to stay the proceeding, at least for the defense

25   obligations until the next status conference so we can

UNITED STATES DISTRICT COURT

1    determine whether we have adequate funds to defend or whether

2    we have to file pleadings and go from there.  That's all we are

3    asking.

4           I am not involved in the other cases or whatever they

5    are referring to.  We are here with a legitimate gripe.  We

6    didn't serve the warrant on ourselves.  That wasn't discussed

7    with us.  It was dropped on our lap on November 7th, and that's

8    why we are here today, Judge.

9           THE COURT:  I really appreciate that.

10          First of all, I want to thank all of you for your well

11   thought out arguments that you've presented to the Court.  It

12   is all very, very helpful.

13          This Court is in receipt of Document Number 443, which

14   is the defendants' joint status report.  This Court, after

15   reading the 15-page document several times, I will consider it

16   as a motion requesting a continuance or as was described

17   earlier by Mr. Piccarreta, a request to stay the defendants'

18   obligations.

19          This Court is also in receipt of Document Number 444,

20   which is the United States Government's memorandum, and I also

21   have Document Number 446 that I have also considered, which is

22   the United States' response to defendants' joint status report.

23          After careful consideration of all of the arguments of

24   counsel, and I certainly understand the issues concerning both

25   sides and the litigation generally and some of the hardships

1    that the defense counsels may be going through to adequately

2    make sure that their clients are prepared for trial.

3         After carefully considering all of the issues, the

4    motion, which is Document Number 443, will be denied.

5         The current deadlines in the scheduling order that are

6    spelled out in Document Number 131, the government and defense,

7    I am ordering you both to continue to meet those deadlines.

8         In the event that the Ninth Circuit Court of Appeals

9    comes out with a decision, and that decision is one in which

10   this District Court needs to act on it based on if funds are

11   freed or whatever way that they decide the case and send it

12   back to the District Court, I look forward to weighing in on

13   those issues.

14        Mr. Feder, I appreciate you providing me with a copy

15   of this document that is currently under seal.  I don't want

16   it.  It's a sealed document.

17        Lisa, if you can return that to Mr. Feder.

18        And the hearing is adjourned.

19        (Proceedings conclude at 11:28 a.m.)

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3          I, ELVA CRUZ-LAUER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 6th day of February,

12   2019.

13

14                                    s/Elva Cruz-Lauer
                                   Elva Cruz-Lauer, RMR, CRR
15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

# **Exhibit 5**



**U.S. Department of Justice**

United States Attorney
District of Arizona

| | |
|---|---|
| Two Renaissance Square | Main:   (602) 514-7500 |
| 40 N. Central Ave., Suite 1800 | Main Fax:   (602) 514-7693 |
| Phoenix, AZ  85004-4408 | Direct Fax:   (602) 514-7450 |

<u>VIA EMAIL</u>                                      November 16, 2018

Mike Piccarreta, Esq.
Piccarreta Davis Keenan Fidel PC
2 East Congress Street, Suite 1000
Tucson, AZ  85701

          Re:     *Your Letter of October 26, 2018*

Dear Mike:

          We wish to respond to your October 26, 2018 letter.  The letter requests disclosure of *Brady* material and appears to be a standard letter that you send prosecutors in other cases with a few categories specific to this case.  A *Brady* determination in this case, however, is particularly difficult based on the defense theories that the joint defense has advanced in pleadings (in this case and others), correspondence, and meetings with the prosecution team.

          As you well know, you and other defense counsel have repeatedly asserted that the activities on the Backpage.com website, including the conduct detailed in the Superseding Indictment, was somehow immunized by the First Amendment and/or Section 230 of the Communications Decency Act ("CDA").  We disagree.  First, Section 230 of the CDA does not apply, on its face, to a federal prosecution.  47 U.S.C. § 230(e)(1) ("Nothing in this section shall be construed to impair the enforcement of … [any] Federal criminal statute.").  The defense has not provided any counter-arguments to this position.  Second, the evidence demonstrates considerable content creation on the part of the principals and employees of Backpage.  The following three activities constitute, at a minimum, content creation by Backpage:

          **Moderation**: Backpage engaged in the practice of sanitizing ads by editing them—specifically, removing terms and pictures that are indicative of prostitution and then publishing a revised version of the ad.  Unfortunately, this also included child sex trafficking victims.

          **Aggregation**: This was accomplished by identifying prostitutes advertising on other similar prostitution websites.  Backpage would then post a free ad and contact the pimp or prostitute and solicit them to Backpage with the incentive of a free ad for six weeks or with similar financial incentives.

November 16, 2018
Page 2 of 5

**Reciprocal Link and Affiliate Program**: This refers to Backpage's business arrangement with a website known as The Erotic Review (TER). Backpage and TER posted reciprocal ads on each other's websites. As you know, TER is a website that allows clients of prostitutes to provide written reviews of the prostitutes' various attributes. By inserting TER link in particular ads, Backpage was manipulating or creating content. In addition, Backpage entered into a financial arrangement with a person known as "Dollar Bill" who earned fees in return for arranging for numerous prostitutes and pimps to post ads on Backpage.

In light of the above, we do not share your view that there "is abundant information in the government's possession and/or generated by the government that is favorable and exculpatory to the defendants." Quite the opposite. It is noteworthy that neither you nor any of the other defense attorneys, in any of the pleadings and correspondence filed to date, have made any effort to address the above areas of content creation – all of which are described in detail in the Superseding Indictment. Nevertheless, we will attempt to address your *Brady* requests.

*First*, as set forth in the October 29, 2018 response to your letter ("USA response") requesting the inadvertently disclosed material, again we do not agree with your general assessment that there is an abundance of *Brady* material. As a reminder, we met in December 2017 and explained our legal theory, provided incriminating emails exchanged by your client, and identified witnesses that will be testifying against your client in a pending prosecution. In response, you asked that your client be provided immunity (this suggests that you recognized he had criminal exposure) but never provided any evidence that contradicts the emails and the witnesses expected to testify against your client. Instead, you took the position that your client maintains he had a First Amendment right to his activities at Backpage and alternatively, did not have the *mens rea* to commit the specific offenses contained in the indictment. Again, you have neither provided us any authority in support of that legal theory nor any counter evidence. And, that exchange occurred before both Backpage CEO Carl Ferrer and Backpage Sales and Marketing Director Dan Hyer agreed to cooperate and testify against your client and the remaining defendants.

*Second*, your request involving 2010 statements from Francey Hakes regarding whether Craigslist could be held criminally liable for content in their adult section eight years ago is not relevant to the Superseding Indictment in this case for several reasons. First, it is important to appreciate the distinctions between Craigslist and Backpage and what has occurred since 2010. Craigslist voluntarily shut down its adult section, presumably recognizing that it faced exposure to both criminal and civil liability for facilitating prostitution. Second, and more importantly, we are unaware of Craigslist engaging in the same business practices that Backpage employed to increase revenue from prostitution ads. For example, Craigslist did not have similar moderation practices employed by Backpage (*e.g.*, stripping out words or terms indicative of prostitution and then posting the ads (including ads indicative of child sex trafficking), etc.). We also have no evidence that Craigslist engaged in the solicitation and "aggregation" of prostitution ads from a competing prostitution websites. Furthermore, we

November 16, 2018
Page 3 of 5

know of no financial relationship between Craigslist and "Dollar Bill" or someone similarly situated.  As you know, in an email exchange between your client and another Backpage employee, "Dollar Bill" was characterized as a "super affiliate" who received considerable fees for arranging for prostitutes and pimps to post ads on Backpage. (*See* Superseding Indictment, ¶¶ 60-62.)  In a related email, your client directed that 4200 [prostitution] ads posted by Dollar Bill be reinstated. (*Id.*)  Finally, Craigslist did not have a financial relationship with the website TER or a similar site.

*Third,* we are also unaware of Craigslist engaging in activities designed to circumvent conventional banking and credit card processing to disguise the true nature of their adult services category.  In contrast, Backpage was conspiring with others (e.g., "Dollar Bill", TER, and numerous other obvious pimps to facilitate prostitution.  In short, whatever position a DOJ representative might have taken 10 years ago regarding the *mens rea* required by a website operator has little relevance to this prosecution.  Lastly, the statement that you attribute to Ms. Hakes also predated the successful prosecutions of myRedBook.com, Rentboy.com, escorts.com and Ross William Ulbricht (the "Silk Road" prosecution).  It is noteworthy that the defense, here, has made no meaningful attempt to distinguish the successful prosecutions of these websites from the activities engaged in by Backpage.

Next, you cite to a statement in the Congressional record that is relevant to concerns about legislation proposed to combat sex trafficking on prostitution websites similar to Backpage *by State and local prosecutors.*  This is in the context of the application of the CDA.  Yet this federal prosecution is exempted from the restrictions of the CDA.  That was the point of the legislation referenced in the Congressional record—to allow states to prosecute websites like Backpage in the same manner a federal prosecution can be achieved.  But again, the Backpage employees that are cooperating acknowledge that the Backpage defendants knew for years that they were facilitating prostitution, and the internal emails and public statements of Lacey and Larkin bear this out.  Even James C. Grant, representing Backpage in the Arizona federal grand jury litigation, conceded that if the website knew "through participation in a venture, you're conspiring with somebody, you know they posted an ad, you know the person involved is underage [of course, the illegality of prostitution is not limited to underage sex trafficking victims] that's a prosecutable crime..." (GJ RT 2/22/17, p. 38 )  Here, because of the aggregation, affiliation and reciprocal link ventures and other conduct summarized above, Backpage knew that *every* ad had the potential for facilitating prostitution services, including child sex trafficking.[1]

*Fourth*, you cite a nearly forty-year old, out-of-circuit civil case,that stands for the proposition that a federal court can enjoin a *state court prosecution* if it was brought for

---

[1] As with our prior correspondence, the discussion in this letter is not meant to be an exhaustive statement of the reasons why the apparent defenses referenced by the joint defense defense team to date lack merit, particularly in view of the limited amount of information known so far about Defendants' theories and defenses.

November 16, 2018
Page 4 of 5

improper purposes. *Fitzgerald v. Peek,* 636 F.2d 943, 945 (5th Cir.1981) ("conduct allegedly retaliated against or sought to be deterred is constitutionally protected and that the state's bringing of the criminal prosecution is motivated at least in part by a purpose to retaliate against or deter that conduct, and the state fails to show that it would have decided to prosecute even had the impermissible purpose not been considered."). This case has no relevance to the facts here and it does not even stand for the proposition that you are apparently citing it for, namely a discovery requirement. Although your request is based on mere speculation you are—in a manner of speaking—barking up the wrong tree. Categorically no such evidence exists. We are aware that Larkin and Lacey have publicly decried the late Senator John McCain and his wife Cindy as the architects of the federal Backpage prosecution, arguing that this case is politically motivated. The decision to investigate Backpage that resulted in the Superseding Indictment was made by the United States Attorney's Office in the District of Arizona, the DOJ Criminal Division, and no one else.   The same analysis applies to your overly-broad request contained in paragraph 5.

*Fifth,* you are requesting all documents and commendations from law enforcement to Backpage relating to Backpage's cooperation in any criminal investigation. (Your October 26 letter, ¶¶ 6,7,11.) This request is unclear for several reasons. If you are asking for all subpoenas issued to Backpage in the course of state and federal investigations where Backpage complied with subpoenas, we do not share the view (nor is there any legal support) that this would be *Brady* material. Backpage was merely complying with a court order. Moreover, any documents or testimony at a trial or a hearing provided by Backpage in response to a subpoena would be in furtherance of court-ordered compliance. This isn't exculpatory—it's just avoiding contempt.

You also seek commendations Backpage received from law enforcement. These aren't *Brady* material either.   Backpage was engaged in a veneer of cooperation with law enforcement. They hid their true business model that included moderation, aggregation, and affiliated programs. Moreover, after banks no longer would do business with Backpage they concealed payments from pimps posting prostitution ads and concealed Backpage as the payee, etc. We expect that at trial former Backpage employees (including but not limited to Ferrer and Hyer) will testify that Backpage's business model was concealed from law enforcement in variety of ways. We also expect at trial that law enforcement, including those that provided commendations to Backpage, will testify that had they known of Backpage's actual business practices (*e.g.,* stripping out words and posting the ads, inserting the link to TER, etc.) and financial relationships (*e.g.,* affiliated relationships with "Dollar Bill" and others, etc.) they would not have provided the commendations. In sum, we do not view commendations from law enforcement as *Brady* material.

*Sixth,* without providing any authority, you demand various communications between the prosecution team and attorneys representing cooperators, various law enforcement agencies, civil attorneys representing victims, NCMEC etc. (Your October 26 letter, ¶¶ 6-11) Without more, it is difficult to respond to such a request. Although you have provided some

November 16, 2018
Page 5 of 5

authority for other requests (which we do not concede are necessarily on point), you provide no authority for this overbroad request. In short, this appears to be a wish list, based on speculation, in an effort to engage in a fishing expedition.

*Seventh*, you request all documents to and from Backpage and NCMEC relating to possible unlawful activity involving underage individuals. (Your October 26 letter, ¶ 10.) )It is unclear what you mean by "documents" nor do you articulate why you believe these are exculpatory. In any event, if you are asking for emails between Backpage and NCMEC, those are readily available based on emails we received via search warrants and subpoenas. They are also contained in the PSI Appendix, which is available on the U.S. Senate website. Any other documents we received from NCMEC has been provided or will be provided based on the scheduling order.

*Eight*, paragraph 12 of your October 26 letter requests internal Justice Department memoranda "relating the understanding of the applicable law government Backpage." Again, you provide no authority for this request. And, case law makes clear that material encompassing only an attorney's mental impressions or legal theories does not constitute *Brady*. *See, e.g., Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006). "Extending the *Brady* rule to opinion work product would greatly impair the government's ability to prepare for trials." *Id.* Indeed, "if opinion work product were accessible by opposing counsel 'much of what is now put down in writing would remain unwritten.'" *Williamson v. Moore*, 221 F.3d 1177, 1182 (11th Cir. 2000) (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)).

*Ninth and last*, paragraphs 4-31 make various general *Brady* requests, non-specific to this case, citing some authority (mainly from the 1980s). We will examine your specific requests and, to the extent we have information covered by the requests and supported by the cases you cite, we will make it available. Finally, in the event you are unsatisfied with our responses to your October 23 and 26 letters and file a discovery motion, please include our responses to both letters as attachments so the court has an understanding of our efforts to be responsive to your various requests.

Sincerely,

ELIZABETH A. STRANGE
First Assistant U.S. Attorney
District of Arizona

*s/ Kevin Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

# **<u>Exhibit 6</u>**

# DECLARATION OF LYNDON VERSOZA

A.    Background of Postal Inspector Lyndon Versoza

1.    I am a United States Postal Inspector employed by the United States Postal Inspection Service ("USPIS").  I have been so employed since June 2005.  Currently, I am responsible for investigating criminal violations of money laundering and structuring, such as when United States Postal Service ("USPS") Money Orders or the United States Mail are used as a means to launder or structure criminal proceeds or instrumentalities.  During my career as a Postal Inspector, I have conducted (or otherwise participated in) a variety of investigations, including financial crimes (such as money laundering, cash structuring and bank fraud), fraud (including wire and mail fraud, mail theft, identity theft), drug trafficking, child exploitation, homicides, rapes, assaults, and armed robberies.  In addition, I have received both formal and informal training from the USPIS and other agencies regarding money laundering and financial crimes.  From 2002 to 2005, prior to my appointment as a Postal Inspector, I was employed as a law enforcement officer with the U.S. Immigration and Naturalization Service, which later became U.S. Customs and Border Protection where I was tasked with various details and assignments to assist in detecting, interdicting or mitigating terrorism, drug trafficking and human trafficking.

2.    I am one of the case agents conducting the Backpage.com investigation.  The information contained in this declaration is based on my personal knowledge, information I received from other law enforcement officials assisting in the investigation, and information I have gathered from other sources.

B.    Background of Voice Media Group and Village Voice Media Holdings

3.    Village Voice Media Holdings ("VVMH") was a company founded by James Larkin ("Larkin") and Michael Lacey ("Lacey").  VVMH controlled alternative press newspapers such as the Phoenix New Times, LA Weekly and the Village Voice and eventually founded Backpage.com to compete with the predominant online classifieds website, Craigslist.com.  On or about January 17, 2013, VVMH divested its ownership of the alternative print newspapers and sold these assets to Voice Media Group ("VMG") for

about $29,935,771.  Backpage.com assets were not included in this sale.  The sale of the alternative press assets to VMG was financed by the owners of VVMH, which include Larkin, Lacey, John Brunst ("Brunst"), and Scott Spear ("Spear", collectively, the "Criminal Defendants") under the name Camarillo Holdings, with payments made to Cereus Properties.   To date, VMG has an outstanding principal balance of over $22,850,000 still owed to Camarillo Holdings.

C.      Untainted Funds from Voice Media Group Pays for Legal Defense and Other Expenses.

4.      I have reviewed financial records related to the financing and sale of the alternative newspaper assets to VMG.  Based on my review to date, the Government's evidence suggests that the funds Cereus Properties receives from VMG are not criminal proceeds and therefore are not subject to forfeiture.

5.      Since the April 6, 2018 takedown of Backpage.com, VMG has continued to pay its debt to the previous owners of the VMG assets at Cereus Properties, as well as provide additional funds to pay for fees of rental properties.   These payments were deposited into accounts held by Cereus Properties, and later, directly to accounts of attorneys:

a.  Approximate Rental Property Payments Since April 2018: $202,000

b.  Approximate Principal and Interest Payments Since April 2018: $2,697,513.57

6.      Upon information and belief, in August 2018, VMG was instructed to divert payments from Cereus Properties and instead make them to an Interest Only Lawyers Trust Account ("IOLTA") held by Daniel J Quigley PLC at BBVA Compass Bank in Tucson, AZ (the "Quigley IOLTA").   I have reviewed records from the Quigley IOLTA and determined that these VMG payments are directly funding law firms representing defendants in this case.  For example:

a.  On August 3, 2018 a wire from VMG for $50,000 was received by the Quigley IOLTA.

- 2 -

b.  On August 10, 2018 a wire from VMG for $342,338.59 was received by the Quigley IOLTA.

7.  These funds were then disbursed to firms representing the Criminal Defendants.  On August 17, 2018, the following wires were sent from the Quigley IOLTA:

a.  $56,273.73 to Copeland Franco

b.  $50,000.00 to Lipsitz Green Scime Cambria

c.  $41,058.68 to Akin Gump Strauss

d.  $13,174.65 to Lawrence G Walters

e.  $6,700.00 to Smith Katzenstein

f.  $2,040.00 to Booth Sweet LLP

g.  $16,447.50 to Taylor Maurer PLC

h.  $100,000.00 to Davis Wright Tremaine

i.  $15,000.00 to Henze Cook Murphy

j.  $7,232.50 to Wayne B Giampietro

k.  $50,000.00 to Lipsitz Green Scim

8.  A similar pattern was repeated in September 2018.  On September 10, 2018 the Quigley IOLTA received a $390,561.97 wire from VMG.  The following funds were then disbursed to other law firms:

a.  September 10, 2018, $100,000 wire to Davis Wright Tremaine

b.  September 14, 2018, $12,500 wire to Henze Cook Murphy

c.  September 14, 2018, $45,000.00 wire to Lipsitz Green Scime Cambria

d.  September 14, 2018, $6,372.70 wire to Wayne B Giampietro

e.  September 14, 2018, $5,000.00 wire to Taylor Maurer PLC

f.  September 14, 2018, $4,106.20 wire to Lawrence G Walters

g.  September 19, 2018, $8,601.85 wire to Smith Katzenstein

9.  Records show that Quigley received $259,463.06 in October; $200,000 in November; $250,000 in December, and then $68,000 on or about, January 4, 2019.  Account records also showed similar outgoing payments for October through January as

demonstrated above.  In early January, Quigley shifted his banking activities to another bank and VMG was directed to wire funds to the new account at the different bank.

10.    In total, between August 2018 and early January 2019, the Quigley IOLTA received about $1,560,449.92 in allegedly untainted funds from VMG via wire transfers. The same account paid out about $1,242,783 to Quigley and other law firms via wire transfers and checks.  The account also paid out about $392,666.62 to Lacey, Larkin's spouse, Brunst, and Spear's spouse.  The funds were also used to pay for other expenses.

D.    Assets and Income for Andrew Padilla

11.    On February 22, 2019, I conducted record searches for assets and income for Andrew Padilla ("Padilla") and his spouse.  Based on my review, I learned that in or about July, 2017, Padilla and his spouse purchased a home in Plano, Texas for $222,687, of which they financed about $178,150.  In 2018 the tax assessor calculated the total value of this property to be $243,788.  Based on the mortgage price and the assessed value, and without calculations to the principal payments to the mortgage, I believe the property has at least $65,000 in equity.

12.    I also reviewed payroll records for Padilla and his spouse.  Padilla earned $60,470.92 in the first quarter of 2018 and has not had any reported income since the seizure of Backpage.com.  Padilla's spouse earned about $87,000 in 2018.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.  Respectfully submitted this 25th day of February, 2019.

Lyndon Versoza
Postal Inspector
United States Postal Inspection Service

- 4 -