1   ELIZABETH A. STRANGE
    First Assistant United States Attorney
2   District of Arizona

3   KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
    MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
4   PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
    ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
5   Assistant U.S. Attorneys
    40 N. Central Avenue, Suite 1800
6   Phoenix, Arizona 85004-4408
    Telephone (602) 514-7500
7
    JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
8   Special Assistant U.S. Attorney
    312 N. Spring Street, Suite 1200
9   Los Angeles, CA 90012
    Telephone (213) 894-3391
10
    BRIAN BENCZKOWSKI
11  Assistant Attorney General
    Criminal Division, U.S. Department of Justice
12
    REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
13  Senior Trial Attorney, U.S. Department of Justice
    Child Exploitation and Obscenity Section
14  950 Pennsylvania Ave N.W., Room 2116
    Washington, D.C. 20530
15  Telephone (202) 616-2807
    Attorneys for Plaintiff
16

17              IN THE UNITED STATES DISTRICT COURT

18                 FOR THE DISTRICT OF ARIZONA

19

20  | United States of America, | CR-18-422-PHX-SPL (BSB) |
    |---|---|
21  | Plaintiff, | **UNITED STATES' RESPONSE TO MOTION TO AMEND THE RELEASE CONDITIONS OF LACEY'S PRETRIAL RELEASE (Doc. 503)** |
22  | v. | |
23  | Michael Lacey, | |
24  | Defendant. | |
25

26                **INTRODUCTION AND SUMMARY OF ARGUMENT**

27          The United States responds to defendant Michael Lacey's motion to amend his

28  conditions of release (Doc. 503).  The United States argued at the early stage of these

proceedings that Lacey is a risk of flight in light of the serious charges against him, the weight of the evidence, his financial status and ties abroad, and his recent movement of $16.5 million of dollars to an offshore account in anticipation of his indictment.  The United States argued he should be released only on conditions or a combination of conditions sufficient to reasonably assure his appearances as required by law.  For a variety of reasons, Lacey's recent request to remove electronic monitoring is unavailing and the government is not prepared to consent to, and indeed, opposes a change in the current conditions of release.

*First,* Lacey has not articulated any change of circumstances to warrant amending his release conditions.  He claims he would like to swim and the electronic monitoring prevents him from doing so (and may otherwise interfere with a Hawaiian vacation).  These reasons were previously known and are insufficient to support his motion.

*Second*, Lacey has been sanctioned by a court in Washington State—and his former company, Backpage.com, LLC, was recently sanctioned by an Illinois federal court—for making false claims in Backpage-related litigation.  As discussed below, this raises concerns about whether Lacey would be candid with the Court (including Pretrial Services) when responding to questions about travel, finances, etc.

*Third*, Lacey has a history of moving money offshore ($16.5 million transferred to an undisclosed account in Hungary) to prevent the government from seizing tainted money generated from illegal Backpage revenue.  These funds have not been located abroad and could presumably be used by Lacey if he chooses to flee.

*Fourth*, since his arrest, the weight of the evidence against Lacey has increased—and so has his exposure to a lengthy sentence if convicted.  As detailed below, Lacey, in his capacity as a Backpage owner, employed several business strategies to increase revenue by expanding Backpage's volume of prostitution ads. These acts rebut his claim that Backpage was simply a neutral platform for the posting of advertisements created by third parties.  Lacey has also acknowledged that Backpage's advertisements included child sex trafficking.  The motion should be denied.

# ARGUMENT

## A.    Lacey Fails to Articulate Changed Circumstances to Warrant a Modification of His Conditions

Lacey has recycled his original opposition to pretrial detention (Doc. 23) and is now attempting to re-litigate his release conditions after having agreed to certain terms in exchange for his release.  (Doc. 67.)  Lacey had the opportunity to have a detention hearing but instead opted to be released on certain conditions.  Indeed, his co-defendant—James Larkin—made the same request (to remove electronic monitoring) after agreeing to release on certain conditions, and that request was denied by this Court.  (*See* Docs. 197, 224.)  The Court found Larkin failed (as Lacey does here) to identify circumstances not known when he agreed to the release conditions.  For this reason alone, Lacey's motion should be denied.

Under the Bail Reform Act of 1984, the "judicial officer may at any time amend the [release] order to impose additional or different conditions of release." 18 U.S.C. § 3142(c)(3). The legislative history of this provision is clear that Congress intended to require **a showing of changed circumstances to justify a modification of conditions**: "[t]his authorization is based on the possibility that a changed situation or new information may warrant altered release conditions."  S. Rep. 98-225, *available at* 1983 WL 25404, at *16 (Aug. 3, 1983); *see also United States v. Lafrance*, 2016 WL 3882845, at *1 (D. Mass. July 13, 2016) ("Defendant has failed to show a substantial change in circumstances that warrants such a significant change in the conditions of his release, and the developments in this case, as described in the summary of the docket (set out above) similarly shows no qualifying change in circumstances for the modification sought. To the contrary, Defendant's case has progressed closer to trial: he has been indicted, discovery has been provided, and a superseding indictment broadens the scope of potential liability and increases the potential penalties.").

Courts reviewing requests to amend bond conditions under Section 3142(c)(3) read the provision "in conjunction with §3142(f)." *United States v. Merola*, 2008 WL 4449624, at *2 (D.N.J. Sept. 30, 2008) ("Under § 3142(f) of the Bail Reform Act of 1984, the Court

is expressly authorized to reopen the detention hearing of a defendant when material information **'that was not known to the movant at the time of the hearing'** comes to light. Courts have interpreted this provision strictly, holding that hearings should not be reopened if the evidence was available at the time of the hearing. Thus, the definition of 'changed circumstances.'"); *see also United States v. Wei Seng Phua*, 2015 WL 127715, at *1-2 (D. Nev. Jan. 8, 2015) ("Contrary to defendants' assertions, the government's factual support and reliance on 18 U.S.C. § 3142(f) are justified because this Court must consider whether new information exists that was not previously known or presented at the detention hearing to determine whether to modify the pretrial release condition at issue."). As the statute provides, a defendant awaiting trial may reopen a detention hearing "if the judicial officer finds that information exists *that was not known* to the movant at the time of the hearing and that has a material bearing on the issue" of whether he will flee or is a danger. 18 U.S.C. §3142(f)(2) (emphasis added).

Here, there was no detention hearing. Instead, the parties negotiated over several days and settled on mutually acceptable terms for release. One important term insisted upon by the United States was active Global Positioning System (GPS) electronic monitoring. Defendant agreed to this term. Lacey is now reneging on that agreement by urging facts that were known at the time of his arrest (*e.g*., he has been a swimmer for "his entire life" and occasionally takes beach vacations) to change his release conditions. (Doc. 503 at 2.) In short, Lacey is asking for a "do over" by asserting that electronic monitoring is an inconvenience. This is not a materially changed circumstance justifying modification under the Bail Reform Act.

Co-defendant Larkin previously made the same request to remove the electronic monitoring, albeit for different reasons. After agreeing to certain release conditions in exchange for his release, Larkin argued that he needed to travel unencumbered by the ankle bracelet because of a need to visit his wife and daughter residing in California. The Court found that the circumstances that precipitated his request were known at the time he reached the agreement on his release conditions. Magistrate Judge Bridget S. Bade's

analysis of the lack of changed circumstances that applied to Larkin's request applies with equal force to Lacey:

> So on April 16, 2018, when the order was entered with those conditions of release, he knew all of that information. He knew those facts. So what you've described or what it appears to me that you've described is that he's having second thoughts, that he, after having entered into this agreement, realizes that he doesn't like it. *That to me is not a changed circumstance.*

(Doc. 237 at 7) (emphasis added.)

Magistrate Judge Bade denied Larkin's request to remove the ankle bracelet and observed:

> [W]hat you're arguing for are serial detention hearings. Same circumstances, let's just present them over and over again and see what the Court will do this time. Let's judge shop. Let's get a different judge. Let's appeal to the district judge. You want to go back and revisit all the issues of flight and danger and the things that would be decided at a detention hearing.

(*Id.* at 33.) Because Lacey likewise presents no changed circumstances, this request should be denied.

## B.   Lacey's Recent Court Sanctions

On March 25, 2019, a district court in the Northern District of Illinois imposed a $250,000 sanction against Backpage for "its fraudulent representations during the course of this litigation." (*See* Order dated March 25, 2019, in *Backpage.com, LLC v. Dart*, CV-15-06340, attached as Ex. A; *see also* 446-1 at 14-35.) This is the same case that resulted in a Seventh Circuit decision in 2015 that Lacey cited in his motion for the proposition that courts have recognized Backpage as "an avenue of expression of ideas and opinions." (Doc. 503 at 6 (citing *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015).) We now know that the Seventh Circuit's decision was premised on Backpage's fraudulent representations. The district court's recent order recognized that "Backpage.com knowingly took positions that were factually unsupported and made numerous false statements to advance its claim against Sheriff Dart." (Ex. A at 5.) "Indeed, it is difficult to imagine how Backpage.com could have advanced its claim if, in lieu of the false allegations identified above, it had included the admissions it made in the plea agreement."

(*Id.*)  The district court rewrote Backpage's complaint to demonstrate how it would have read if Backpage hadn't made false representations to the court:

> The Sheriff has infringed Backpage's First Amendment rights by accurately advising credit card companies (two of them, anyway) that the great majority of ads on Backpage's adult services web site are for prostitution and that Backpage routinely doctors those ads to conceal their unlawful nature.  When told about these facts by Sheriff Dart, those credit card providers decided that they did not want to be publicly linked to a company like Backpage and stopped accepting payments for ads placed on Backpage.com.  Or at least they thought they had stopped accepting such payments.  In reality, however, Backpage.com devised ways to deceive the card companies about its continued used of their cards as payment for access to its adult services advertising.  It also devised additional means to collect payments for those ads and continued to receive substantial revenues from such advertising.

(Ex. A at 5.)

In addition, on May 23, 2018, in the Superior Court of the State of Washington, a judge imposed sanctions of two $100,000 awards against Lacey, co-defendant James Larkin and others for, among other things, making claims [to the court] that were untruthful:

> Another one that the Court can consider in regards to bad faith is procedural bad faith and that is vexatious conduct during the course of litigation, wasting private and judicial resources, **making claims that, months later, were found to be untruthful.**

(*See R.O. v. Medalist Holdings, Inc.*, No. 17-2-04897, Superior Court State of Washington, May 23, 2018, Tr. attached as Ex. B, p. 64-65.)  (Lacey has appealed that order.)

Given this recent history, Lacey does not inspire confidence that he would be candid to the Court (and his assigned Pretrial Services Officer).  The precaution of electronic monitoring is warranted for this further reason.  *See, e.g., United States v. Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008) (for release orders to be effective, "they depend on [the defendant's] good faith compliance") (quoting *United States v. Tortora*, 922 F.2d 880, 886 (1st Cir. 1990) (concluding that similar release conditions contained "an Achilles' heel . . . virtually all of them hinge on the defendant's good faith compliance" and "the

- 6 -

conditions as a whole are flawed in that their success depends largely on the defendant's good faith—or lack of it. They can be too easily circumvented or manipulated.")).

### C. Lacey Moved $16.5 Million Off-Shore to Avoid Government Seizure

As detailed in the superseding indictment, Lacey has obstructed the government's interest in seizing tainted funds by using his attorney's IOLTA to move money offshore in anticipation of being indicted. (*See* Doc. 230, Counts 99, 100 and ¶ 16; *see also* Email dated July 29, 2016, from Lacey to John Becker, attached as Ex. C.) Lacey did this *after* he was charged by the State of California with various offenses related to his ownership of Backpage and learning Backpage's CEO, Carl Ferrer, had received an Arizona federal grand jury subpoena. Lacey sought advice not only from his attorney in placing funds ($16.5 million) offshore, but also requested advice from his bank on how to avoid a government seizure. (*Id.*) Lacey did this well before he was facing arrest, an 86-count superseding indictment, and, now, considerable evidence implicating him in a 14-year criminal enterprise that facilitated prostitution, including child sex trafficking. These funds have not been located abroad and presumably may be available to Lacey if he chooses to flee.

### D. Nature of the Offense and Strength of the Evidence

Lacey's rehash of the nature of the offense and the strength of the evidence is inaccurate and should be rejected. (*See* Doc. 503 at 5-7, 12.) The United States argued in its original detention motion that the strength-of-the-evidence factor supported a flight-risk determination because the grand jury had already returned a 93-count indictment that summarized incriminating evidence against Lacey (Doc. 3), and the United States Senate had separately issued a 50-page report recognizing the criminal nature of Lacey's contributions to Backpage.[1] (*See* Doc. 13 at 4-5.) The Senate reported Backpage's internal documents revealed that nearly all of Backpage's "adult" advertisements were solicitations for prostitution, Backpage was fully aware of the true nature of these ads, and Backpage

---

[1] https://www.hsgac.senate.gov/imo/media/doc/Backpage%20Report%202017.01.10%20FINAL.pdf.

had taken an array of affirmative steps to help its customers (pimps and traffickers) "sanitize" and conceal the ads' illegality.

Since Lacey's release on conditions in April 2018, the strength of the evidence has increased, as supported by the July 2018 Superseding Indictment (Doc. 230, which contains a detailed account of additional incriminating evidence).  Much of this evidence is summarized in Doc. 446 at 9-14, which is incorporated by this reference.  As these filings explain, Defendants, including Lacey, pursued numerous business practices to increase Backpage's volume of prostitution ads and conceal its activities from law enforcement. These practices included "moderation" (redrafting prostitution ads to make them less obvious to law enforcement, and posting the revised ads without altering the true nature of the illegal transactions they promoted), reciprocal-link programs (cross-referral business arrangements with websites like The Erotic Review, which contained "reviews" of adult and child prostitutes advertised on Backpage), aggregation/pre-boarding (trolling the web for prostitution ads, copying and posting the ads on Backpage, and then contacting the pimps or prostitutes involved and offering them free trial periods of advertising), financial relationships with "super pimps" (business deals with individuals who placed large volumes of prostitution ads on Backpage), and concealment money laundering.  (Doc. 446 at 9-14; *see also* Doc. 446-1 at 1-76.)  Lacey's motion not only ignores this evidence, but is also silent regarding the fact that Backpage's CEO, Carl Ferrer, and Backpage's Sales and Marketing Director, Dan Hyer, have both pleaded guilty to conspiring to promote prostitution in violation of 18 U.S.C. § 1952 (Travel Act).  *See* D. Ariz. No 18-CR-464, Doc. 7-2 (Ferrer plea agreement); Doc. 271 (Hyer plea agreement).  Lacey's motion also ignores that Backpage.com, LLC and four related entities have pleaded guilty to money laundering conspiracy.  *See, e.g.*, D. Ariz. No. 18-CR-465, Doc. 8 and attachments.

In response to the United States' detention motion and, again, in the instant motion to amend conditions, Lacey cursorily argues that the strength-of-the-evidence factor favors him because the indictment "fails to take into consideration the law regarding protected First Amendment activities, and fails to plead the requisite heightened *mens rea*, among

other errors." (Doc. 503 at 12.)  The United States has repeatedly pointed out that these assertions are incorrect and have been consistently rejected in recent years. *First*, Lacey does not (and cannot) take the position that Backpage was not knowingly promoting prostitution on its website, including child sex trafficking.  The evidence of Lacey's involvement in the operation and management of Backpage was considerable such that he cannot plausibly claim he had no knowledge of the true purpose of Backpage's business model: to derive revenue from prostitution, including child sex trafficking.  Lacey certainly cannot claim he was unaware of Backpage's facilitation of prostitution especially in light of Ferrer's, Hyer's, and Backpage's recent guilty pleas.

*Second*, Lacey's argument that he did not have the *mens rea* is belied by the substantial evidence the United States will present at trial.  Below are illustrative instances where Lacey was intimately involved and had knowledge of Backpage's facilitation of prostitution, including child sex trafficking:

### i.    The Detroit Backpage Murders

In December 2011, four woman were murdered as a result of advertising on Backpage for prostitution.  (*See Murdered Women in Detroit Linked to Backpage.com, Cops Say*, published Dec. 27, 2011, attached as Ex. D.)  In response to law enforcement inquiries into the business practices of Backpage, Lacey (and Larkin and Ferrer) engaged the services of a public relations company (Sitrick) to handle the fallout from the negative publicity surrounding the quadruple murder.[2]  Lacey exchanged emails with the public relations firm to formulate a response that included deflecting the blame on other prostitution websites.  This is evidenced by an email to Lacey and others, where an attorney (Ed McNally) stated "were better off just muddying the waters out there today with the news of the 22 websites." (Email dated Dec. 29, 2011, from McNally to Lacey, among

---

[2] In response to a grand jury subpoena seeking email exchanges between Lacey (and other Backpage owners) and the public relation companies, Backpage attorneys took the position that these communications were protected by the attorney client privilege. Senior Judge David C. Campbell found that many of these emails were not afforded these protections and ordered the emails disclosed.

others, attached as Ex. E.) At trial, the United States expects to introduce testimony that these websites aggregated or copied their content from Backpage.  Moreover, one of the 22 websites, The Erotic Review, had a longstanding financial and business relationship with Backpage.  The Erotic Review was a website where "Johns" provided reviews of the services of prostitutes, including underage trafficking victims.  (*See* Doc. 446 at 11-12; Doc. 446-1 at 40-76.)  Against this background, Lacey knew that the Backpage website was used for prostitution (resulting in a quadruple murder), and wasn't just a "neutral content platform."  In 2015, four years after Lacey attempted to deflect blame for the Detroit quadruple murder, another victim was murdered in the Detroit area by a customer who responded to her ad on Backpage. (*See* Doc. 230 (Victim 16) ¶ 175.)  This evidence, and similar emails and witnesses presented at trial, likely will increase Lacey's prison exposure—giving him further incentive to flee.  The witnesses include Backpage CEO Carl Ferrer, among others.[3]

### ii.  Lacey Knew He Was Facilitating Prostitution and Child Sex Trafficking

Lacey's argument that Backpage was merely a neutral content platform is at odds with additional evidence.  Evidence that Lacey knew of Backpage's promotion of prostitution advertising is summarized throughout the Indictment and Superseding Indictment.  (*See generally* Docs. 3 and 230.)  Moreover, from his emails and numerous witnesses, Lacey knew Backpage was used to facilitate prostitution, including child sex

---

[3] That Carl Ferrer will be testifying about Lacey's knowledge of Backpage's efforts to facilitate prostitution (including child sex trafficking) underscores the government's rationale for seeking disqualification of Ferrer's former attorneys at the firm of Henze, Cook and Murphy (HCM).  (Doc. 118.)  HCM co-authored the instant motion, which includes arguments contrary to the factual basis of the plea agreement of HCM's former client, Ferrer.  In connection with the United States' Motion to Disqualify HCM, the Court ordered that HCM will "only participate in the limited capacity set forth in the pleadings." (Doc. 338.)  Counsel representing HCM in responding to the Motion to Disqualify represented that HCM would participate in *compliance* with Lacey's conditions of release. (Doc. 176 at 10.)  There was no mention of trying to modify the conditions of release by undermining the government's case, which is at odds with their former client's cooperation against Lacey and the other Backpage owners.  HCM further represented "in this narrow role, HCM will not be acting in a manner that is materially adverse to Mr. Ferrer's interests."  (Doc. 176 at 10.)  HCM's involvement in this filing appears to be contrary to the Court's ruling.

trafficking. For example, in May 2011 he employed a different public relations media company (Culloton) to address a CNN news story critical of Backpage. In an email exchange, Lacey referred to the FBI's "arrest numbers for all hookers" that the reporter used. (Email dated May 1, 2011, from Lacey to Larkin and McNally, attached as Ex. F.) Lacey also acknowledged that child sex trafficking occurred on Backpage, but equated underage sex trafficking victims to "drug dealers us[ing] cell phones, fed-x, underage people using phony I.D. to get into bars. Thousands of people patronize local bar [sic] legally. You don't close it when someone underage deceives the owner of the bar." (Email dated January 31, 2012, attached as Ex. G.) Moreover, Backpage's principals were well aware that the moderation practices stripped out coded terms indicative of child sex trafficking (*e.g.*, Lolita, new in town, sweet young thing, amber alert, among others) and continued to post the ad and receive revenue from the posting. (*See* Doc. 230 at 16-37.)

There's more. Lacey responded to a column by *New York Times* reporter Nicholas Kristoff entitled "*Where Pimps Peddle Their Goods*" that detailed a Backpage child sex trafficking victim's story.[4] Lacey acknowledged in a January 23, 2012 email that Backpage ran ads that involved child sex trafficking, stating, "of course there are kids who get through the system, as there are in bars." (Email dated January 23, 2012, from Lacey to Suskin, attached as Ex. H) Again, Lacey seemed to equate Backpage child sex trafficking victims (several of whom were murdered) to underage individuals who sneak into bars.

### iii. Lacey Through His Attorneys Misled Courts About Backpage's Business Practices

Lacey, of course, is wrong in his claim that no court has ever accepted the theory that a website or website operator may be criminally prosecuted under federal law for knowingly facilitating prostitution. (Doc. 503 at 6 n.4.) In *United States v. Omuro*, the

---

[4] https://www.nytimes.com/2012/03/18/opinion/sunday/kristof-where-pimps-peddle-their-goods.html

1   founder of the website www.myRedBook.com was convicted of the same crime charged

2   in this case—18 U.S.C. § 1952.  Omuro's website hosted thousands of ads posted by

3   prostitutes, and Omuro generated $5 million from fees paid by escorts to post their ads

4   more prominently on the website.  *See United States v. Omuro*, N.D. Cal. No. 14-CR-336,

5   Doc. 70 at 1-3.   Similarly, in *United States v. Hurant*, the founder of the website

6   www.Rentboy.com was convicted of violating 18 U.S.C. § 1952.  In his sentencing memo,

7   Hurant admitted he "was well aware . . . that the escort ads he posted . . . were thinly-veiled

8   proposals of sexual services in exchange for money."  *United States v. Hurant*, E.D.N.Y

9   No. 16-CR-45, Doc. 117 at 6, Doc. 107 at 39.[5]  And again, in 2012, the Department of

10   Justice   obtained   the   forfeiture   of   the   website   www.escorts.com   based   on   similar

11   conduct.   *See*   https://archives.fbi.gov/archives/philadelphia/press-releases/2012/internet-

12   escort-services-firms-charged-with-money-laundering-sentenced-in-federal-court.      (*See*

13   *also* Doc. 42 at 2-5; Doc. 476 at 10-12.)

14        The results in these cases are hardly surprising and easy to harmonize with the First

15   Amendment.  Long ago, the Supreme Court recognized that "[w]e have no doubt that a

16   newspaper   constitutionally   could   be   forbidden   to   publish   a   want   ad . . .   soliciting

17   prostitutes."  *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973).

18   Put simply, the First Amendment does not protect speech promoting criminal conduct.  *See,*

19   *e.g., United States v. Stevens*, 559 U.S. 460, 468-69 (2010) ("From 1791 to the present,

20   . . . the First Amendment has permitted restrictions upon the content of speech in a few

21   limited areas, and has never include[d] a freedom to disregard these traditional limitations.

22   These historic and traditional categories long familiar to the bar—including obscenity,

23   defamation, fraud, incitement, and *speech integral to criminal conduct*—are well-defined

24   and narrowly limited classes of speech, the prevention and punishment of which have never

25

26   [5] *Hurant* has other parallels to this case.  In its *Hurant* sentencing memo, the government
     stated that although the Rentboy.com website "had disclaimers that claimed that the
     advertisements on the site were for companionship only and not for prostitution," the
27   company's employees would often reject ads containing explicit offers of sex for money
     "but allow the ad to be resubmitted with different language.  In many cases, Rentboy.com
28   employees would just edit the advertisement's language and approve it."

been thought to raise any Constitutional problem.") (citations omitted); *United States v. Meredith*, 685 F.3d 814, 819-20 (9th Cir. 2012) (applying "the First Amendment exception that allows the government to regulate speech that is integral to criminal conduct"); *United States v. Rahman*, 189 F.3d 88, 116-17 (2d Cir. 1999) ("[F]reedom of speech . . . do[es] not extend so far as to bar prosecution of one who uses a public speech . . . to commit crimes."). *See also Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563-64 (1980) ("[T]here can be no constitutional objection [under the First Amendment] to the suppression of . . . commercial speech related to illegal activity.").

Moreover, numerous recent cases against Backpage and Lacey show that Backpage wasn't merely a passive conduit for third-party content, but actively facilitated prostitution. In 2015, the Washington Supreme Court denied Backpage's and Lacey's motion to dismiss a civil lawsuit brought by three minor girls who had been "bought and sold for sexual services online on Backpage.com." *See J.S. v. Village Voice Media Holdings, Inc.*, 359 P.3d 714, 715-16 (Wash. 2015). This was the same court that later (in a different case) sanctioned Lacey and the other Backpage defendants. The court held that, because the plaintiffs had plausibly alleged that Backpage does "more than just provide a forum for illegal content" and affirmatively shapes the content of users' ads through "posting rules [that are] 'designed to help pimps develop advertisements that can evade the unwanted attention of law enforcement, while still conveying the illegal message,'" the plaintiffs should be permitted to conduct discovery "to ascertain whether in fact Backpage designed its posting rules to induce sex trafficking." *Id.* at 718. In 2017, following extensive discovery, the trial judge in the *J.S.* case denied Backpage's motion for summary judgment. Afterward, Backpage entered a confidential settlement with the plaintiffs.[6] In light of these

---

[6] The October 2017 settlement in *J.S. v. Village Voice Media Holdings et. al* was sealed. Nevertheless, it apparently was substantial enough to prompt Travelers Property Casualty Co. to seek to deny Backpage's related insurance claim; Travelers argued it had no duty to indemnify Backpage, citing exclusions that bar coverage for *intentional acts*, among other things. (*See Traveler Property Casualty Company of America v. Village Voice Media Holdings LLC, et al*, D. Ariz. No. 2:17-CV-03994.)

1   various courts denying Backpage's arguments, it is difficult to understand how Lacey can
2   argue that the government's case is travelling under a "novel theory."  (CR 503 at 5.)

3          A recent decision from the District of Massachusetts further undermines Lacey's
4   representation that he has prevailed in all previous Backpage-related cases.  Last year—on
5   March 29, 2018—the Hon. Leo Sorokin issued a five-page order denying in part a motion
6   to dismiss that Lacey had filed in a civil case brought by a different underage victim who
7   had been trafficked via Backpage.  *See Jane Doe No. 1 v. Backpage.com, LLC*, 2018 WL
8   1542056 (D. Mass. 2018).  The ruling explained that, because the plaintiff had made a
9   plausible allegation that Backpage had "redrafted [her] advertisement . . . to suggest she
10  was an adult," the alleged conduct was not covered by the CDA's grant of immunity.  *Id.*
11  at *1.  Here, similarly, the indictment and further investigation *after* indictment
12  demonstrate that Backpage helped edit and redraft prostitution advertisements.

13         Although it is true that Lacey and Backpage have prevailed in a number of prior
14  cases that sought civil remedies or that turned on whether Backpage could be prosecuted
15  under state criminal law, those cases are easily distinguishable.  (*See* Doc. 503 at 6-7 at
16  n.4.)  First, those cases differ for the obvious reason that Section 230 of the Communication
17  Decency Act of 1996 ("CDA") provides a broad grant of immunity in such contexts.  This,
18  however, is a case brought under federal criminal law—a context in which the CDA has
19  no application.  *See* 47 U.S.C. § 230(e)(1) ("Nothing in this section shall be construed
20  to impair the enforcement of . . . [any] Federal criminal statute.").   Indeed, the
21  successful prosecutions in the myRedBook.com, Rentboy.com, and escorts.com cases
22  demonstrate that federal criminal liability may be imposed under these circumstances.

23         Second, those cases are also distinguishable because, with one exception
24  (*People v. Ferrer*), they were decided prior to the release of the Senate Report in 2017.
25  That report resulted from the review of hundreds of thousands of internal Backpage
26  documents and other evidence that were not available when the cited cases were decided.

27         Third, those cases were decided before the District of Arizona grand jury litigation
28  that preceded the indictment in this case—litigation in which Senior Judge David C.

Campbell and a unanimous three-judge panel of the Ninth Circuit rejected Backpage's First Amendment-based challenges to the government's investigation and theory of the case. (*See* Doc. 194 at 7-8, incorporated by this reference.)[7]   The Arizona grand jury investigation resulted in the production of still more previously undisclosed Backpage documents shedding additional light on the company's internal operations.

Fourth, Lacey's cases were all decided before Backpage.com, LLC and its CEO pleaded guilty and admitted that the "great majority" of Backpage's "adult" ads were for prostitution services.  As Ferrer admitted, during its 14-year existence, Backpage "derived the great majority of its revenue from fees charged in return for publishing advertisements for 'adult' and 'escort' services."  (D. Ariz. No. 18-CR-464, Doc. 7-2 at 12-13.)  Ferrer further admitted:

> I have long been aware that the great majority of these advertisements are, in fact, advertisements for prostitution services (which are not protected by the First Amendment and which are illegal in 49 states and in much of Nevada). Acting with this knowledge, I conspired with other Backpage principals (including but not limited to M.L, J.L, S.S., D.H., A.P, and J.V.) to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers.  For example, I worked with my co-conspirators to create "moderation" processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad. Such editing did not, of course, change the essential nature of the illegal service being offered in the ad—it was merely intended to create a veneer of deniability for Backpage.

(D. Ariz. No. 18-CR-464, Doc. 7-2 at 13.)   In the factual basis of its plea agreement, Backpage.com, LLC confirmed it "derived the great majority of its revenue" from fees charged for "adult" and "escort ads," and "the great majority of these advertisements [were] for prostitution services. . . ."  (D. Ariz. No. 18-CR-465, Doc. 8-2 at 11.)

Backpage Sales and Marketing Director Hyer similarly corroborated Ferrer's account and described the moderation process as follows:

> Over time, I also became involved (along with Ferrer, Andrew Padilla, and Joye Vaught) in Backpage's efforts to "moderate" the content of the website's escort and adult ads.  Once again, I knew that the great majority of the ads being "moderated" were actually offering illegal prostitution services—our removal of explicit words and pictures did nothing to change

---

[7]   On May 17, 2018, Judge Campbell issued an order authorizing the United States to disclose the Grand Jury proceedings in this case.

1
2
3

> the services being offered.  In fact, Padilla and I agreed that I and other Backpage sales and marketing employees use the term "models" in intra-company emails when referring to persons in Backpage ads who appeared to be underage.  The use of this term was to avoid looking bad in a lawsuit.

4
5
6
7

(CR 271, Hyer plea agreement at 10.)  In short, "moderation" involved the deliberate and knowing publication of prostitution ads.  As discussed above, these developments have undercut the basis for decisions such as *Backpage.com, LLC. v. Dart*, upon which Lacey heavily relies.  (*Compare* Doc. 503 at 6 *with* Ex. A hereto.)

8
9
10
11
12
13
14
15
16
17
18
19
20

Lacey (through his numerous civil and criminal attorneys) misled courts across the United States about Backpage business practices that were well known to him.  Lacey and other Backpage owners failed to disclose Backpage's financial relationship with The Erotic Review, its affiliate relationship with a "super pimp" known as Dollar Bill, and moderation practices that included stripping out terms indicative of prostitution (including child sex trafficking) and posting millions of ads.  (*See* Doc. 230 at 9-37; Doc. 446 at 9-14.)  Lacey further concealed Backpage efforts at circumventing conventional banking and payment processors by concealing Backpage as the recipient of revenue from postings of millions of prostitution ads.  (*See* Doc. 230 at 44-49; Doc. 446 at 13-14.)  It is noteworthy that the Backpage defendants have never attempted to address these business practices in their various pleadings and correspondence.  As noted above, both the Northern District of Illinois and the Superior Court in the State of Washington imposed sanctions for Backpage's misleading statements and obstructive litigation behavior.

21
22
23
24
25
26
27
28

In sum, if convicted of all (or even a portion of) these charges, Lacey—who is 70 years old—faces the very real possibility of spending the rest of his life in prison.  Such exposure creates a powerful incentive to flee.  *See, e.g., United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight."); *United States v. Anderson*, 384 F. Supp. 2d 32, 35 (D.D.C. 2005) (ordering pretrial detention in white collar case, even though the defendant had no prior felony convictions and "no history of violent criminal activity," in part because "[t]he

combined statutory maximum penalties for the federal crimes with which Mr. Anderson is charged is 23 years. . . . At 51 years old, Mr. Anderson potentially could spend most of the remainder of his life in prison if convicted.").  In addition to the instant federal prosecution, Lacey is facing charges in the State of California, is under investigation by the Attorney General in the State of Texas, and is defending numerous civil cases across the country.  This onslaught of criminal and civil cases provides ample motive to flee.

Lacey's motion to revisit his release conditions raises facts that were well known at the time the parties negotiated his release conditions.  The only changed circumstances is that the evidence is now stronger against Lacey than it was in April 2018.  Lacey's motion to amend release conditions by removing electronic monitoring should be denied.

Respectfully submitted this 2nd day of April, 2019.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona


*/s Kevin Rapp*
KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW C. STONE
Assistant U.S. Attorneys

JOHN J. KUCERA
Special Assistant U.S. Attorney

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

1

2

3

**<u>Certificate of Service</u>**

4

I hereby certify that on this date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants: James Grant, Paul Cambria, Robert Corn-Revere, Janey Henze Cook.

5

6

7

8

*s/Angela Schuetta*

U.S. Attorney's Office

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>Exhibit A</u>

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BACKPAGE.COM, LLC,

               Plaintiff,

    v.

THOMAS J. DART,
Sheriff of Cook County, Illinois,

               Defendant.

Civil No. 1:15-cv-06340

Judge John J. Tharp, Jr.

## ORDER

The Sheriff's motion for sanctions against Backpage.com and its attorneys [226] is granted in part and denied in part. Based on its fraudulent representations during the course of this litigation, the Court imposes a sanction of $250,000 against Backpage as a partial offset of fees and costs incurred by the Sheriff in responding to Backpage's misrepresentations. The motion for sanctions against Backpage's counsel, however, is denied. See Statement for details.

## STATEMENT

This motion represents the last installment in this case, which concerns the efforts of Thomas Dart, the Sheriff of Cook County, to end advertising for prostitution and human trafficking in the adult services section of Backpage.com ("Backpage") by seeking to convince credit card companies not to do business with Backpage as long as it accepted such ads. While claiming that it engaged in efforts to cooperate with law enforcement and to identify problematic ads, Backpage sued Sheriff Dart, alleging that the Sheriff' was threatening official action against the credit card companies and thereby imposing a prior restraint on Backpage's free speech rights.

Backpage sought and obtained a temporary restraining order from this Court, but after an evidentiary hearing, this Court denied a preliminary injunction.[1] *Backpage.com, LLC v. Dart,*

---

[1] Backpage's complaint included a Due Process claim as well as a First Amendment claim, but the sole focus of its motion for preliminary injunctive relief was the First Amendment claim. In *Black Earth Meat Mkt., LLC v. Vill. of Black Earth*, 834 F.3d 841 (7th Cir. 2016), the Seventh Circuit expressed significant doubt as to whether the conduct alleged in this case would give rise to a violation of the Due Process clause. "The First Amendment," it noted, "forbids a public official to attempt to suppress the protected speech of private persons by threatening that

127 F. Supp. 3d 919 (N.D. Ill. 2015). This Court found that "Backpage.com's adult services section overwhelmingly contains advertisements for prostitution, including the prostitution of minors," *id.* at 922; that Backpage had not adequately demonstrated that the Sheriff's threat to cause the credit card companies to be investigated for facilitating Backpage's conduct actually caused the companies' decision to sever their ties with Backpage, *id.* at 930-33; and that Backpage had not adduced evidence that it would be irreparably harmed by the Sheriff's conduct, because it was speculative as to whether the company would fail if customers could not pay for adult services ads with credit cards, *id.* at 934-35.

The Seventh Circuit reversed the denial of the requested preliminary injunction. *Backpage.com, LLC v. Dart,* 807 F.3d 229 (7th Cir. 2015). The Court of Appeals, finding instead that "it is unclear that Backpage is engaged in illegal activity, *id.* at 233;"[2] that the credit card companies had capitulated to the Sheriff's threat, *id.*, that Backpage was merely an intermediary between advertisers of adult services and their customers, *id.* at 234, and that the Sheriff's actions "would be bound to cause irreparable injury" to Backpage, *id.* at 238. The Court of Appeals directed the entry of a preliminary injunction that required, *inter alia*, the Sheriff to notify the credit card companies that no action would be taken against them. Despite the opportunity to do so, however, none of the credit card companies resumed processing transactions for ads on Backpage.

When discovery in this case subsequently continued after entry of the preliminary injunction, the Sheriff sought, among other things, information relating to Backpage's finances (as relevant to the question of the monetary damages Backpage was seeking). In response, Backpage amended its complaint to eliminate any claim for damages and pressed forward seeking only permanent injunctive relief. First Amended Complaint, ECF No. 173.

Contemporaneously, Backpage was embroiled in litigation and controversy elsewhere, including a Congressional investigation. Two weeks before it filed this suit, Backpage had been subpoenaed by the United States Senate Permanent Subcommittee on Investigations for information regarding advertising on its adult services section. After the Senate subcommittee issued its report, titled "Backpage.com's Knowing Facilitation of Sex Trafficking," on January 9, 2017, Backpage shut down its adult services section the next day.

---

legal sanctions will at his urging be imposed unless there is compliance with his demands." [citing *Backpage.com LLC v. Dart,* 807 F.3d 229, 231 (7th Cir. 2015)]. It is less clear that the Due Process Clause does so. The First Amendment is concerned with the chilling effect government action may have on speech; procedural due process is not."

[2] The Seventh Circuit has since recognized that Backpage's web site "contained an adult section advertising different categories of sex work." *United States v. Jackson,* 865 F.3d 946, 949 (7th Cir. 2017), *cert. granted, judgment vacated on other grounds,* 138 S. Ct. 1983 (2018).

Subsequently, both Backpage and its CEO, Carl Ferrer, were charged with, and pled guilty to, federal conspiracy charges relating to money laundering and the Travel Act, respectively. In his plea agreement, Ferrer admitted that he had known that "the great majority" of ads placed on Backpage's adult services section were ads for prostitution, and that he conspired with other Backpage principals "to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers." Ferrer admitted that one of the ways that the conspirators facilitated advertising for prostitution was to create so-called "moderation" processes by which Backpage would edit ads submitted to remove terms and pictures that were particularly indicative of prostitution. Ferrer also admitted that credit card companies stopped doing business with Backpage based on the illegal nature of its business (not, then, because of any official action threatened by the Cook County Sheriff or others). In response to the actions of the credit card companies, Ferrer admitted that Backpage devised means to deceive the credit card companies as to the source of credit card charges submitted in payment for Backpage.com services and to continue receiving payments for those ads.

As part of its plea agreement, Backpage agreed, among other things, to cease operations and its web site was shut down. Because Backpage is no longer an extant entity, and given the crippling restitution owed by the company and its principals, which effectively eliminates any possibility that the company could arise from the ashes, the Court dismissed the suit against the Sheriff as moot.

In the wake of Backpage's demise, Sheriff Dart filed this motion seeking sanctions against Backpage and its attorneys. The premise of the Sheriff's motion is that throughout the litigation, Backpage and its attorneys falsely claimed that Backpage "prohibits illegal content and activity on its website and takes extensive steps to prevent such misuse" and that the credit card companies stopped doing business with Backpage because of the Sheriff's actions rather than the unlawful nature of Backpage's business. The Sheriff seeks reimbursement of its attorneys' fees and costs incurred in this litigation, including on appeal and in petitioning for certiorari. In response to the motion, Backpage's counsel, Davis Wright Tremaine LLP ("DWT") and Schiff Hardin LLP,[3] moved to withdraw from their representation of Backpage.com; that motion was granted. Backpage was given additional time to respond to the motion but has not done so; DWT, however, has responded.

Based on the guilty pleas entered by Backpage and Ferrer, its CEO, there is no question that Backpage has, from the filing of its complaint, knowingly presented false information to this Court in support of its claim against Sheriff Dart. A brief comparison of some of the principal claims asserted by Backpage in this litigation and admissions by Backpage and Ferrer in their plea agreements suffices to make the point incontrovertible:

_____

[3] Backpage.com's lead counsel in this case has been Richard Corn-Revere and James Grant of DWT. Charles H.R. Peters of Schiff Hardin LLP has served as local counsel. Other lawyers also filed appearances on behalf of Backpage.com, but did not play a substantial role in this case. The Court understands that, with respect to Backpage's counsel, the Sheriff's motion is directed at DWT, and only DWT responded to the motion.

3

| *Backpage's Original Complaint* | *Backpage/Ferrer Plea Admissions (¶ 10)* |
|---|---|
| ¶ 23: "Backpage.com prohibits illegal content and activity on its website and takes extensive steps to prevent such misuse . . . ." | "The great majority of these advertisements [for 'adult' and 'escort' services] are, in fact, advertisements for prostitution services (which are not protected by the First Amendment and which are illegal in 49 states and in much of Nevada)." |
| ¶ 25: "Backpage.com also takes extensive measures to police user posts." | Backpage worked "to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers." |
| ¶¶ 19, 34: "Users provide all the content for ads they post on Backpage.com"; Sheriff's actions violate Section 230 of the Communications Decency Act because Backpage is merely a publisher of content provided by others. | Backpage "utilized 'moderation' processes through which [it] would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad. Such editing did not, of course, change the essential nature of the illegal service being offered in the ad—it was merely intended to create a veneer of deniability for Backpage." |
| ¶ 44: "[B]ecause of Sheriff Dart's actions, Backpage.com is barred from credit card services of any of the three largest card companies . . . ." | "Over time, many banks, credit card companies, and other financial institutions refused to do business with Backpage due to the illegal nature of its business." |
| ¶ 45: "Sheriff Dart's actions . . . have cut off nearly all revenue to Backpage.com (leaving only Bitcoin as a means of payment, which accounts for a small percentage of purchases on the website)." | Backpage "found ways to fool credit card companies into believing that Backpage-associated charges were being incurred on different websites, to route Backpage-related payments sand proceeds through bank accounts held in the name of seemingly unconnected entities" |

These false statements are plainly material to issues implicated by Backpage.com's complaint and motions for preliminary injunctive relief—that is why Backpage made them. Its complaint put at issue whether speech on the site was protected, whether Backpage.com policed, rather than promoted, unlawful solicitations, and otherwise merely published, rather than authored, content in the ads (a claim critical to Backpage's assertion that the Communications Decency Act shielded its actions from liability). The question of whether Dart's actions caused the credit card companies to stop accepting payments from Backpage.com was a central question on which the viability of Backpage's claim against Dart rested; Backpage's admission that it was the unlawful nature of Backpage's adult advertising that prompted the card companies to stop accepting payments (rather than a threat of investigation by Dart) was utterly at odds with its contentions in this Court and the Court of Appeals; that even Backpage acknowledged that there

was no causality between threat and the actions of the card companies may have prompted the Court of Appeals to reconsider its view that "[t]he causality is obvious." 807 F.3d at 233. And, of course, Backpage's claim that its inability to accept credit card payments threatened its very existence was central to the issue of irreparable harm; that it found ways to work around that limitation would have further confirmed this Court's view that it had not established that irreparable harm was likely, and certainly would have challenged the Court of Appeals' conclusion that Backpage "was bound" to suffer irreparable harm.

The Court therefore has no difficulty in concluding that in conducting this litigation, Backpage.com knowingly took positions that were factually unsupported and made numerous false statements to advance its claim against Sheriff Dart. Indeed, it is difficult to imagine how Backpage.com could have advanced its claim if, in lieu of the false allegations identified above, it had included the admissions it made in its plea agreement. The complaint would then have read something like this:

> The Sheriff has infringed Backpage's First Amendment rights by accurately advising credit card companies (two of them, anyway) that the great majority of ads on Backpage's adult services web site are for prostitution and that Backpage routinely doctors those ads to conceal their unlawful nature. When told about these facts by Sheriff Dart, those credit card providers decided that they did not want to be publicly linked to a company like Backpage and stopped accepting payments for ads placed on Backpage.com. Or at least they thought they had stopped accepting such payments. In reality, however, Backpage.com devised ways to deceive the card companies about its continued use of their cards as payment for access to its adult services advertising. It also devised additional means to collect payments for those ads and continued to receive substantial revenues from such advertising.

***That*** complaint would have made the prospect of obtaining injunctive relief substantially more difficult.

To be clear, however, the Court's ruling does not rest on a determination that Backpage's misrepresentations render its claim frivolous; the point is merely that the misrepresentations involved facts that were, or would have been, material to the evaluation of Backpage's claim for preliminary injunctive relief in this Court and in the Court of Appeals. Even if Backpage could have prevailed absent its misrepresentations, it nevertheless made false statements that were material, even if not dispositive, and in doing so defrauded this Court. Sanctions against Backpage are unquestionably warranted.

That Backpage and its principals acted in bad faith, however, does not compel the conclusion that its attorneys did so as well. Although his briefs frequently employ the formulation that "Backpage and its attorneys" lied to the court, elsewhere the Sheriff stops short of definitively claiming that Backpage's attorneys actually knew that Backpage was lying about its conduct and the effects of Dart's conduct. *See, e.g.*, Motion at 11 ("Backpage's counsel may

5

well have known all along about their client's lies"). Whether or not its counsel had actual knowledge of the company's fraud, however, Backpage contends that Backpage's lawyers actively avoided the truth by sticking their heads in the sand.

For its part, DWT maintains that there is no basis to impose sanctions on attorneys who successfully advanced constitutional claims on behalf of Backpage. The Sheriff, they argue, is merely reasserting his discredited "illegality" defense. They further deny that the Sheriff has demonstrated that they knew that Carl Ferrer "would change and contradict averments he made not just in this case but in a half dozen others."

The first argument can be dispatched essentially for the reasons already set forth. If the Sheriff's motion focused only on Backpage's admission that "the great majority" of ads on its adult services site were for prostitution, DWT might have a point, because the Seventh Circuit's opinion seems to hold that the presence of even a single lawful ad on Backpage's adult services site would have made the site a protected "avenue of expression of ideas and opinions entitled to First Amendment protection." 807 F.3d at 231-32. But the misrepresentations by Backpage go not only to the extent to which the Backpage adult services site served as a medium for unlawful solicitation of criminal conduct but also to elements such as causation and irreparable harm, which the court of appeals considered and resolved in Backpage.com's favor. Knowing that Backpage had successfully devised work arounds to compensate for the loss of credit card transactions, for example, would plainly be material to the question of irreparable harm. So, too, Backpage's admission that Dart's "threats" had not caused the card companies to disassociate themselves from Backpage. *Id.* at 233. There is, in short, more to Backpage's misrepresentations than the viability of the Sheriff's "illegality defense." And even if there weren't, that would not give Backpage, or its counsel, the green light to make false statements in an effort to cast the company in a better light generally.

DWT's second argument, however, is more substantial. Pointing out that the Sheriff relies entirely on the admissions of Backpage and Ferrer in their plea agreements to establish the falsity of the positions taken in this litigation, DWT essentially asks why it was not entitled to rely on the prior version of the facts that their client supplied to them. They point not only to fact that Ferrer supplied a declaration in support of Backpage's motion for preliminary injunctive relief but also to the other, consistent, declarations he made in other cases in which similar issues were being litigated.

In answer, Backpage points to what it calls the "red flags" that also surfaced before and during the litigation that should have put DWT on notice that facts alleged in the complaint were not accurate. Most of these warning signals relate to the congressional investigation that was going forward during the pendency of this case, but the fact that Backpage's attorneys knew about ongoing investigations does not demonstrate that Backpage's attorneys knew that the claims of Backpage's executives about its practices were false. Plainly, there was a lot of smoke, and Backpage's attorneys should have been looking closely to see if there was a fire, but as the most prominent incident on which the Sheriff focuses—the "Red Beauty"—posting—suggests, DWT appears to have looked closely at the purportedly revealing information.

6

The "Red Beauty" incident involved an undercover posting to Backpage's adult services site. An investigator in the Sheriff's office reported that he had created an online post advertising the services of a girl between 14 and 18 years old who had just graduated from grade school. According to the investigator's report, he paid for and submitted the ad but when it posted, the references to grade school and the age range of 14-18 had been deleted. The Sheriff cites this incident as a smoking gun that revealed the "moderation" practices Backpage employed to conceal the fact that ads were for child prostitution. When the incident was revealed in discovery, however, DWT pointed out that the dates on the documents appeared to suggest that the version that had purportedly been edited was dated a day before the version that had purportedly been the original posting. DWT also pointed out that the investigator's report further muddied the waters because it documented that the investigator had gone back online and was, in fact, able to post the ad with the original language. Given the ambiguities, if this incident demonstrates anything, it is that the Sheriff has not come up with the smoking gun showing that DWT knew, or was deliberately avoiding, the truth about Backpage's practices.

The premise of the Sheriff's motion for sanctions against Backpage's counsel is essentially that counsel failed to discover the transgressions that Backpage and Ferrer admitted to when they pled guilty. Even accepting arguendo that there was reason to doubt representations that Ferrer and other Backpage officials made to them, the Sheriff's motion falls short in documenting any instance in which counsel (as distinguished from Backpage) made or facilitated a specific representation of fact that was known to be untrue when it was made. And when Backpage and Ferrer acknowledged under oath that their prior representations about Backpage's operation and content of its "adult" classified section were false, DWT promptly moved to withdraw as counsel. Based on the record presented, the Court does not find a sufficient basis to conclude that DWT's conduct warrants the imposition of sanctions or the conduct of an evidentiary hearing.

* * * * *

For the reasons set forth above, the Court concludes that during this litigation, Backpage knowingly and repeatedly made false representations of fact concerning relevant aspects of its operations. This fraudulent conduct has been pervasive throughout this law suit. Federal courts have the inherent power "to punish by an award of reasonable attorneys' fees or other monetary sanction" misconduct by parties and attorneys appearing before it. *Carr v. Tillery*, 591 F.3d 909, 919 (7th Cir. 2010) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991)). In *Chambers* the Supreme Court recognized that where a party's "entire course of conduct throughout the lawsuit evidenced bad faith and an attempt to perpetrate a fraud on the court, and the conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address," it is appropriate to rely principally on the court's inherent power to address the conduct in its entirety rather than first applying Rules and statutes containing sanctioning provisions to discrete occurrences. *Chambers*, 501 U.S. at 50-51.

The Court recognizes, however, that the efficacy of a sanctions award at this juncture is compromised by the termination of Backpage's operations and the criminal sanctions that will

likely be imposed as a result of its conviction for money laundering conspiracy.[4] Backpage faces significant fines and, pursuant to its plea agreement, potential restitution payments up to $500 million. It appears, in short, unlikely that a payment of sanctions will ever be collectible from Backpage. There is little reason, therefore, to engage in protracted proceedings to determine the appropriate monetary sanction to impose. Given the centrality of Backpage's fraudulent conduct in this litigation, the Court has no difficulty concluding that Backpage's conduct has resulted in substantial attorneys' fees and litigation costs to the Sheriff measured in the hundreds of thousands of dollars that would not have been required absent Backpage's fraudulent representations. The Court therefore orders Backpage to pay to the Sheriff of Cook County a sanction in the amount of $250,000. This award is, however, subordinate to all criminal fines and restitution awards imposed as part of Backpage's sentence. Accordingly, the Sheriff may not attempt to collect the award until Backpage's sentence is final.

Date: March 25, 2018

_John J. Tharp, Jr._
John J. Tharp, Jr.
United States District Judge

---

[4] Sentencing is presently scheduled for July 9, 2019.

# EXHIBIT B

1

2

3

4

5

6          IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
                 IN AND FOR THE COUNTY OF PIERCE
7

8     R.O., by and through her mother,        )
      S.H., and K.M., by and through          )
9     her mother, L.M.,                       )
                                              )
10                     Plaintiffs,             )  No. 17-2-04897-1
                                              )
11          vs.                                )
                                              )
12    MEDALIST HOLDINGS, INC., et al.          )
                                              )
13                     Defendants.             )

14

15             VERBATIM TRANSCRIPT OF PROCEEDINGS

16

17

18                   **Wednesday, May 23, 2018**
               Before The Honorable G. Helen Whitener
19                     Pierce County Courthouse
                        Tacoma, Washington
20

21                      <<<<<<  >>>>>>

22

23

24            Kimberly A. O'Neill, CCR #1954
                   Official Court Reporter
25            Department 11, Room 202-A
                      (253) 798-7281

1    I am going to grant the motion for sanctions.  I believe

2    an adequate record has been made supporting sanctions in

3    this case for a number of reasons, all listed by Plaintiffs,

4    but also the Court looks at what constitutes a bad faith,

5    and there are three ways the Court can look at it.

6    Pre-litigation misconduct:  I'm finding that given the

7    history of the defendants in this case in the multiple cases

8    they've had, not just before this Court -- I have two -- not

9    just in this state but nationally, it is clear to this Court

10   that their conduct was to necessitate delay where there were

11   what appears to be clearly valid claims or rights being

12   asserted by the Plaintiff which, months and years later, is

13   now being disclosed by Mr. Ferrer as seen by his plea and

14   the statements made in those pleadings in the Arizona case

15   which I reviewed.

16   Another one that the Court can consider in regards to bad

17   faith is procedural bad faith and that is vexatious conduct

18   during the course of litigation, wasting private and

19   judicial resources, making claims that, months later, were

20   found to be untruthful.  Many of the statements that I'm not

21   placing into the record can be seen in the pleadings the

22   Court reviewed in camera provided by the Defense which will

23   be placed under seal if there is further review of this

24   matter.

25   And a third factor that can constitute bad faith is

*R.C. vs. Medalist Holdings, LLC*

```
 1        substantive bad faith, and I'm not finding that in this
 2        case.
 3            I will say, also, supporting my position regarding the
 4        pre-litigation misconduct and procedural bad faith were the
 5        Court's review of the Interrogatory No. 2 and the Request
 6        for Production No. 1.  The various requests for admission
 7        were taken into consideration and Exhibit 3, the declaration
 8        of Attorney Elizabeth McDougall.
 9            I will note that Mr. Ferrer's condition of his plea in
10        March 2018 in Arizona were for overriding conspiracy with a
11        start date of 2004 through March of 2018 during the time
12        period not only when this case was filed but the J.S. case,
13        that this Court also had, was filed.
14            Sanctions in the amount of $100,000 for each plaintiff is
15        being ordered.  That needs to be paid within 30 days of
16        today's date.  Failure to comply, the Court will issue
17        sanctions in the amount of one dollar for every page of the
18        1.2 million documents -- and, actually, not page, for the
19        documents.  So, there were 1.2 million documents, one dollar
20        for every document, so that will be $1.2 million for every
21        14 days of noncompliance.
22            Reasonable attorney fees will be allowed and granted,
23        subject, of course, to any objections to the amount.  If not
24        objected to, that needs to be paid within 30 days, as well,
25        of production of the billings.
```

R.C. vs. Medalist Holdings, LLC

# Exhibit C

| Filters Used: | | |
|---|---|---|
| | **Email Report** | Date Printed: **12/08/2017** |
| | Form Format | Time Printed: **10:37AM** |
| | | Printed By: **SJR** |

The information transmitted by the following e-mail is intended only for the
addressee and may contain confidential and/or privileged material. Any interception,
review, retransmission, dissemination, or other use of, or taking of any action upon
this information by persons or entities other than the intended recipient is
prohibited by law and may subject them to criminal or civil liability. If you received
this communication in error, please contact us immediately at 480.240-4020, and
delete the communication from any computer or network system.

From: Michael Lacey [mailto:mgl@qamer.net]
Sent: 07/29/2016 8:14 AM
To: John Becker
Subject:

dear john

i think i am ready to move forward with the visit to the Los Angeles lawyer you
mentioned who has expertise in off-shore.

to revisit for just a moment, i am not interested in any tax avoidance. i just
want to put some assets in place where litigious parties, including government
parties, can not access my accounts.

i know this is short notice, but was hoping that Aug 4 or 5 might work. and for
the sake of getting out of Arizona's boiler, hoping this works for your calendar.

if this is not feasible because of schedules and such short notice, then i
would look at either Oct 13-14 or Oct 27-28.

finally, what do i need to do to set up an account through your office in order
to send checks to former writers and editors? I have one of my colleagues
assembling the names and addresses of former staff. while the individual checks are under
the amount that creates consequences, there are about 400 individuals.

i would think a note from your office confirming whereabouts would precede a check.

michael lacey

BCKR 02319

# <u>Exhibit D</u>

# Murdered Women in Detroit Linked to Backpage.com, Cops Say

## ABC Digital

### National

**Published at 2:36 am, December 27, 2011**

SHARE THIS

iStockphoto/Thinkstock(DETROIT) — Three of four women whose dead bodies were found in the trunks of burning cars in Detroit over the past eight days had profiles on the adult services section of Backpage.com, police said on Monday, warning women that the killer may be trolling the site for more victims.

The bodies of two women were found in a burning car on Dec. 19, and then another pair were found on Christmas, police said.  They were both found within blocks of one another on the city's east side.

Detroit police chief Ralph Godbee Jr. stopped short of saying the crimes were the work of a serial killer, but said he felt it was important to get the word out about the link investigators had found.

"This tie for us is disconcerting," Godbee Jr. said Monday at a news conference.  "We're stopping short of calling it a serial pattern."

"We are not passing judgment on any individual who is utilizing this website, yet we felt it was imperative to alert the public that deciding to meet unknown persons via the Internet can be extremely dangerous," he said.

Investigators have not determined a cause of death for the four women.

Backpage.com, like craigslist.com, is an Internet bulletin board with listings for everything from child care to auto parts and forums on numerous topics.

Craigslist.com took down its "adult services" section after several widely publicized cases, including the so-called "Craigslist Killer" case, in which Phillip Markoff was charged with the armed robbery and murder of a masseuse he had hired through the

website, and the armed robbery of two other women he also found through the site.  Markoff committed suicide in jail awaiting trial.

Copyright 2011 ABC News Radio

# Exhibit E

> Thanks Lacey.
>
> Tony, Re: Detroit Free Press, and your guidance on how we should best
> use this play:
>
> I suppose Suskin could encourage her to ask DPD why they held a press
> conf on Monday to single out Backpage -- and then have SAT on issuing
> any public warnings re: these 22 other websites for now, 2 or 3 days?
>
> The risk is be careful what we ask for.  DPD could feel compelled to
> respond w/ info they are otherwise not giving out.  Like "we have texts
> or computer or other evidence that it was the BP sites that were
> actually used to contact these victims".
>
> Obviously, we're much better off just muddying the waters out there
> today with the news of the 22 websites ... And not putting DPD on the
> spot, re: making them feel compelled to justify why they didn't issue
> the other 22 names.
>
> So, this analysis makes me think that, as you enter your own edits, we
> should tone down anything re: DPD.  We just need to get the reality of
> the 22 websites out there.
>
>
>
>
> Edward E. McNally
> Kasowitz, Benson, Torres & Friedman LLP
> 1633 Broadway
> New York, New York 10019
> Tel. (212) 506-1708
> Fax (212) 835-5279
> EMcNally@kasowitz.com
>
> -----Original Message-----
> From: Michael Lacey [mailto:michael.lacey@villagevoicemedia.com]
> Sent: Thursday, December 29, 2011 9:51 AM
> To: Edward E. McNally
> Cc: Jim Larkin; Tony Knight; Steve Suskin; Mike Sitrick; Carl Ferrer
> Subject: Re: List of 22 other websites -- draft statement by
> Backpage.com (priv + conf)
>
> folks
>
> attached suggested edits ( prepared to be corrected re importance of
> tech data) lacey
>
> On 12/29/11, Edward E. McNally <EMcNally@kasowitz.com> wrote:
>> priv & conf -- atty-client comms & work product
>>
>> Larkin, Lacey, Steve and Tony --

4

                                                                    BP-AZGJ_01110671

# Exhibit F

| | |
|---|---|
| **From:** | Dennis Culloton [dc@cullotonstrategies.com] on behalf of Dennis Culloton |
| **Sent:** | Monday, May 02, 2011 2:14 PM |
| **To:** | Michael Lacey; emcnally@kasowitz.com; Jim Larkin |
| **Cc:** | Carl Ferrer; srajoo@kasowitz.com |
| **Subject:** | CNN response  (PRIV. & CONF.) |
| **Attachments:** | CNN May statement.doc |

Team,

If we decide to provide CNN with a statement for their rebroadcast ( or if we push for this to be provided on video) here is a first crack.

We could issue this from Carl again or, if we want, we can issue it from Tracey as a backpage.com spokesperson.


   Please support the Bear Necessities Pediatric Cancer Foundation, www.bearnecessities.org


Dennis Culloton
CEO and President
Culloton Strategies
Chicago Office  312.228.4780
Mobile 630.699.8811
Naperville Office 630.544.3387
dc@cullotonstrategies.com
http://www.cullotonstrategies.com

-----Original Message-----
From: Michael Lacey [mailto:Michael.Lacey@VillageVoiceMedia.com]
Sent: Sunday, May 01, 2011 7:53 PM
To: EMcNally@kasowitz.com; Jim Larkin
Cc: Carl Ferrer; Dennis Culloton; SRajoo@kasowitz.com
Subject: Re: Closing credits Re: copies of letters to CNN & transcripts (PRIV. & CONF.)

folks

running into a question as i look at the numbers.

the reporter has overall FBI arrest numbers for all hookers. then FBI uses 1.5% to 2% to quantify juvenile arrests.

but, when i look at the individual cities from this reporter for 14 cities the juvenile count is much lower than FBI's 1700 a year.

this reporter, ellis, had 14 cities that had roughly 230 juvenile arrests for 2010 second reporter, kristin, had 12 cities with roughly 100 juvenile arrest for 2010

26 cities, 300 plus juvenile arrests.

how did FBI get to 1700? i think the 1.5% to 2% estimate by FBI is wildly rounding off.

ive asked for explanation.

1

Confidential

lacey

2

Confidential

BP-AZGJ_01110838

# Exhibit G

>
> On Jan 31, 2012, at 8:51 AM, Michael Lacey wrote:
>
>> guys
>>
>> couple of points:
>>
>> 1) we need a statement from moon that sums up our on-going meetings
>> with attorney generals. it is not accurate to say we arent
>> co-operating. not only are we meeting with them, they have told us
>> they have not identified law breaking on our part. (but they continue
>> to drag out and not provide confidentiality as part of a process to
>> turn over documents)
>>
>> 2) we need to fish or cut bait with craig. once again we are getting
>> hit over the head with the big lie that craig got out of adult. this
>> is doubly destructive: it makes craig look like he quit; it makes it
>> look like we should quit too. i dont believe attorney from perkins
>> coie can represent us nor do i believe she is the only attorney that
>> can represent us. as in Detroit, for all we know, these people used
>> many services not just backpage, maybe even craig.
>>
>> 3)within the responcewe need to note that as deplorable as this case
>> is, and it is appalling, it is one bad case amongst how many millions
>> of ads that involve no one under age.
>>
>> 4) drug dealers use cell phones, fed-x. when you bust them you do not
>> advocate shutting down phone service, overnight deliveries. underage
>> people use phony I.D. to get into bars. thousands of people patronize
>> local bar legally, you dont close it when someone underage deceives
>> the owner of the bar.
>>
>> 5) in time period covered in this story, this is only the second case
>> developed by the attorney general. the case is awful, but with two
>> cases it is not yet a tsunami of underage trafficking. prosecute this
>> case, these individuals, get care and treatment for the victims and
>> stop pandering to yahoos.
>>
>> (how long to determine the Detroit Analysis ie where else these hoods
>> operated besides backpage)
>>
>> shouldnt sitrick have a responce prepared?
>>
>>
>> On 1/31/12, Scott Tobias <scott.tobias@villagevoicemedia.com> wrote:
>>> Guys:
>>>
>>> Link below.
>>>

Confidential

# <u>Exhibit H</u>

On Jan 23, 2012, at 10:03 PM, Tony Knight wrote:

> I think he's expecting Pablum from us and figures it doesn't matter how much time he gives us to respond. We'll look for a more recent case involving another web site. If we have three or four, particularly on sites like Tumbler and Facebook -- sites that no one is going to demand be taken down -- maybe that will turn him.
>
> Consider that he's really only heard from the other side and he's formulating his plan for the column based on that. The sooner we can reframe the premise the better.
>
> -----Original Message-----
> From: Michael Lacey [mailto:michael.lacey@villagevoicemedia.com]
> Sent: Monday, January 23, 2012 6:56 PM
> To: Steve Suskin
> Cc: Jim Larkin; Mike Sitrick; Tony Knight; Edward E. McNally; Carl Ferrer
> Subject: Re: backpage
>
> we do how many million ads and he picks out one, tells us at end of
> day and wants our total responce by am?
> of course there are kids who get through system. as there are in bars.
> this makes pursuit of solution, ie usc study, more critical rather
> than scoring political points
>
> On 1/23/12, Steve Suskin <steve.suskin@villagevoicemedia.com> wrote:
>> See below note back from Kristof when I told the info would be to him
>> tomorrow.
>>
>> CARL: any knowledge of the case to which he refers?
>>
>> ---------- Forwarded message ----------
>> From: Kristof, Nicholas <kristof@nytimes.com>
>> Date: Mon, Jan 23, 2012 at 7:12 PM
>> Subject: RE: backpage
>> To: Steve Suskin <steve.suskin@villagevoicemedia.com>
>>
>>
>> Okay, please try to get it to me early tomorrow if you can.****
>>
>> One case in particular that I'll write about is one of a 13-year-old girl
>> who was marketed late last year on backpage before being rescued by police
>> in Brooklyn. Kendale "Ace" Judge has been charged in that case. Anything
>> you can say about that case?****
>>
>> ** **
>>
>> *From:* Steve Suskin [mailto:steve.suskin@villagevoicemedia.com]
>> *Sent:* Monday, January 23, 2012 9:10 PM
>> *To:* Kristof, Nicholas
>> *Subject:* Re: backpage****
>>
>> ** **
>>
>> Unfortunately, circumstances overwhelmed today but we will have info for
>> you tomorrow. ****
>>
>> On Mon, Jan 23, 2012 at 4:14 PM, Kristof, Nicholas <kristof@nytimes.com>
>> wrote:****
>>
>> Thanks; that's fine. I also gather that you're turning over suspicious ads
>> to the authorities; any information about that would be helpful.****
>>
>> ****
>>

Confidential                                                                 BP-AZGJ_01111109