Paul J. Cambria, Jr. (NY 15873, admitted *pro hac vice*)
Erin E. McCampbell (NY 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:   (716) 855-1580
pcambria@lglaw.com

*Attorneys for Defendant Michael Lacey*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| United States of America, | NO. CR-18-00422-PHX-SMB |
|---|---|
| Plaintiff, | **DEFENDANT MICHAEL LACEY'S REPLY IN FURTHER SUPPPORT OF HIS MOTION TO AMEND HIS CONDITIONS OF PRETRIAL RELEASE AND MOTION FOR EXPEDITED RELIEF** |
| vs. | |
| Michael Lacey, *et al.*, | |
| Defendants. | (Expedited oral argument requested) |

Defendant Michael Lacey, by and through his undersigned attorneys, hereby submits the instant reply in further support of his Motion to Amend his Conditions of Pretrial Release ("Motion") (Doc. 503) in which Mr. Lacey seeks an order from this Court vacating the requirement that he wear an electronic monitoring anklet.  Mr. Lacey's Pretrial Services officer, who has monitored him for one year, does not oppose the Motion.

The government opposes the Motion (*see* Doc. 516), claiming it was not properly brought before this Court because Mr. Lacey to failed allege changed circumstances.  The government is wrong on the law and the facts.  Pretrial Services has monitored Mr. Lacey for a year and does not oppose his Motion.  Observation and supervision for over a year is new factual information and,

combined with other changed circumstances, demonstrates that this Motion is properly before this Court, even under the government's interpretation of the law.

The remainder of the government's opposition focused on one issue—its belief that its case against Mr. Lacey is strong and its suggestion that this factor, alone, supports denial of the Motion. The government wants this Court to ignore Mr. Lacey's career, contributions to this District, and his strong personal and professional ties to this District. Further, it appears that the government wants this Court to ignore the most salient factor in ruling on the Motion—the fact that Mr. Lacey's Pretrial Services officer, who has monitored him for a year, does not oppose the Motion. The government's invitation to ignore the full range of statutory factors should be rejected. The relevant statute directs courts to consider: the defendant's history and characteristics; danger to the community; and nature of the offense and weight of the evidence, *see* 18 U.S.C. § 3142(g), each of which weigh in favor of granting the Motion.

**I.     Mr. Lacey's Motion is properly before this Court.**[1]

There is no binding authority that restricts this Court's ability to amend Mr. Lacey's conditions of release absent changed circumstances.[2]   Indeed, the plain language of the relevant statute indicates that a "judicial officer may at any time amend the order to impose additional or different conditions of release." 18 U.S.C. § 3142(c)(3). "[L]egislative history—no matter how clear—can't override statutory text." *Hearn v. Western Conf. of Teamsters Pension Trust Fund*, 68 F.3d

---

[1]     Ms. Henze Cook took no part in drafting the merits of the Motion. She signed the pleading because she drafted the paragraph about the interlocutory sales and contacted Mr. Lacey's Pretrial Services officer about his position on the Motion.

[2]     Additionally, this Motion is not a request for a second detention hearing. Previously, when the parties appeared for the detention hearing, the parties informed the Court that they had reached an agreement on conditions of release. Instead of holding a hearing, taking evidence, and issuing an opinion addressing the § 3142(g) factors, the Court accepted the parties' agreement. (*See* Am. Min. Entry, Doc. 62.) That proceeding does not qualify as a detention hearing under § 3142(f). *See United States v. Gourley*, 936 F. Supp. 412, 415 (S.D. Tex. 1996) (concluding that a preliminary hearing in which there was no evidence presented or issuance of a ruling on the § 3142(g) factors did not qualify as a hearing under § 3142(f) and pursuit of a hearing afterwards did not require presentation of changed circumstances). Consequently, Mr. Lacey's instant Motion does not constitute a request to "reopen[]" a detention hearing under § 3142(f), meaning that Mr. Lacey was under no obligation to show changed circumstances.

301, 304 (9th Cir. 1995). Nor should this Court abandon the plain language of this statute based on unpublished decisions from other courts. (*See* Gov't's Opp'n at 3-4.) Instead, the plain text of this statute vests this Court with the authority to amend conditions of release "at any time." 18 U.S.C. § 3142(c)(3).

That said, even if this Court determines that Mr. Lacey must present changed circumstances, he has done so. First, there has been a material development in this case—one that the government completely ignores: **Mr. Lacey's Pretrial Services officer does not believe that continued use of an electronic monitoring anklet is necessary**. This recommendation is based on one year of monitoring Mr. Lacey, which was not available at the time Mr. Lacey agreed to the government's proposed conditions of pretrial release. Second, Mr. Lacey's health has been impacted as this case has progressed. He has gained weight; he experiences significantly more stress on a day-to-day basis than he did prior to his arrest; he was briefly hospitalized, and now takes a blood pressure medication, all of which was a wake-up call on the importance of maintaining good health. To do so, he seeks ability to swim, which his doctor recommends. (*See* Mot. Ex. A.) These health-related developments, too, were not known at the time the original conditions of release were set. Further, at the time these conditions were set, Mr. Lacey understood that he would be able to shower while wearing the anklet and, based on that fact, did not understand the anklet to preclude swimming. In any event, at this time, regaining the ability to swim is critical to his overall health.

## II. This Court should grant the Motion.

### A. Mr. Lacey's personal characteristics and history (which the government ignored) weigh in favor of removal of the anklet.

The government has ignored (and wants this Court to ignore) Mr. Lacey's character, professional accomplishments, charitable contributions, and his strong familial ties to this District and the United States. As set forth in greater detail in the Motion and incorporated herein by reference, Mr. Lacey is seventy years old and has resided in Arizona for fifty-three years. He owns

property in this District and lives in this District with his wife, also a long-term Arizona resident.[3] Many decades ago, Mr. Lacey began his career as a journalist in this District.  He achieved great success, culminating in co-ownership of a nationwide newspaper conglomerate that received numerous awards including the Pulitzer Prize.  He generously invested in this District, donating funds to various non-profit organizations and creating paid digital fellowships for minority journalists, among other philanthropic endeavors.  The government has not disputed these facts. Nor has the government disputed Mr. Lacey's well-documented history of litigating cases to their conclusion.  As is consistent with his litigation history (*see* Mot. at 4 n.2, 7, 11), Mr. Lacey has mounted and will continue to mount a vigorous defense to the instant charges.

Most importantly, the government was silent as to the fact that Mr. Lacey's Pretrial Services officer does not oppose this Motion based on monitoring Mr. Lacey for one year.

Instead of addressing these factors, the government attempts, unconvincingly, to cast Mr. Lacey as a liar.  In an effort to cast aspersions on Mr. Lacey, the government points to sanctions imposed against the corporation Backpage.com, LLC in the case captioned *Backpage.com, LLC v. Dart*, CV-15-06340 after remand from the Seventh Circuit.  (*See* Gov't's Opp'n at 5-6.)  According to the government, because the corporate entity Backpage.com, LLC pleaded guilty in a criminal case in this District (*United States v. Backpage.com, LLC*, 18-CR-465, Doc. 8-001), and because the court in *Backpage.com, LLC v. Dart*, CV-15-06340 sanctioned the corporation for making statements in that earlier litigation that, at first blush, appear to be at odds with the guilty plea the corporation took in this Court, Mr. Lacey, who was not a party to that litigation, is a liar.  (*See id.*)  Notably, the government's claim fails to take into account that the civil litigation in *Backpage.com, LLC v. Dart*, CV-15-06340, was commenced months after Backpage.com, LLC was sold to Carl Ferrer, its long-time Chief Executive Officer (now the government's chief witness), that the sanctions motion was unopposed by Ferrer, and was based on an affidavit Ferrer had submitted to the court.  Therefore, at the time this action began (and at the time of Backpage's guilty plea), Mr. Lacey no longer had any

---

[3]       During the briefing on this Motion, Mr. Lacey and his wife completed a trip outside the continental United States, traveling to Hawaii on March 27, 2019 and returning as planned.

interest in the company and made no submissions to the court. The imposition of sanctions in a case to which Mr. Lacey was a stranger does nothing to impugn his character, much less his honesty and integrity, and to claim otherwise is misleading.

In the government's second attempt to cast Mr. Lacey as a liar, the government points to sanctions that were imposed in a civil action litigated in the State of Washington in the case captioned *R.O. v. Medalist Holdings, Inc.*, No. 17-2-04897-1. Again, the details of this litigation and the sanctions imposed do not impugn Mr. Lacey's honesty or integrity. In that case, the plaintiff sued several corporations and individuals, including Mr. Lacey. On May 18, 2018, a few weeks after Ferrer pleaded guilty in a criminal action in this Court (*United States v. Ferrer*, 18-CR-464, Doc. 7-2), the plaintiffs in the *R.O.* civil action brought a motion for sanctions. In the motion, they assail the deposition testimony of the general counsel for Backpage.com, LLC as well as the discovery responses of the corporation for being at odds with Ferrer's guilty plea. (*See* Pls.' Mot. for Sanctions, *R.O. v. Medalist Holdings, Inc.*, attached hereto as Ex. A, at 5-9.) Critically, the motion indicates that Mr. Lacey made no substantive statements in response to the complaint or discovery demands, instead asserting his Fifth Amendment rights. (*See id.* at 8.) Consequently, Mr. Lacey's submissions played no role in the court's determination to impose sanctions based on false statements. (*See* Jun. 28, 2018 Order, *R.O. v. Medalist Holdings, Inc.* at 7-11.) Instead, the court's ruling was based on Mr. Ferrer's guilty plea and the substantive discovery responses of the corporation. Again, this claim is baseless and misleading.

Additionally, the government claims that Mr. Lacey's creation of a foreign trust renders him a risk of flight. Mr. Lacey created the trust with the assistance of counsel for the benefit of his sons at a time when the California prosecution had been dismissed and there were no charges pending against him in this District. The creation of foreign trusts does not violate any law. Further, the government's complaint that it has been unable to "locate[]" the trust is disingenuous. (Gov't's Opp'n at 7.) Shortly after forming the trust, Mr. Lacey declared it in a filing with the Internal Revenue Service ("IRS"). Subsequently, he filed a Report of Foreign Bank and Financial Accounts (commonly referred to as an FBAR); which identified the bank, trustee, and other information on

the trust, and included a copy of the trust.  The government (through the IRS), has had documents declaring the existence and location of the trust since March 7, 2018.  The government obtained documents related to the trust a second time by subpoenaing them from the attorney who assisted Mr. Lacey with its formation, and a third time as part of reciprocal discovery in this case.  Consequently, it is unclear why the government is claiming to be unable to "locate[]" the trust, particularly because the government has subjected the trust to four different forms of pretrial forfeiture.  (*See* Mot. at 11.)  Mr. Lacey has not been deceptive about his formation of a lawful trust for his sons, formed when there were no charges pending against him, and which has been reported to the government several times.

In sum, Mr. Lacey has strong familial and professional ties to this District and does not present a risk of flight.  His pretrial services officer does not oppose the Motion.  The government has said nothing to dispute these facts and they weigh heavily in favor of granting the Motion.

**B.      Risk of danger to the public (which the government failed to address) weighs in favor of removal of the anklet.**

Although vocal in the past, the government was silent as to how discontinuation of use of the anklet presented a risk of danger to the public.  In light of this concession, and because the purported harm that Mr. Lacey is alleged to have caused was related solely to operation of the Backpage website, which has not operated for over a year, this factor is a non-issue.

**C.      Nature of the offense and weight of the evidence (the sole focus of the government's opposition) does not outweigh the other factors.**

The government's brief suggests that the only factor this Court should consider is the nature of the offenses and purported weight of the evidence against Mr. Lacey.  (*See* Gov't's Opp'n at 7-17.)  The government's exclusive reliance on this factor is misplaced because the law requires consideration of this factor *in addition to* Mr. Lacey's personal characteristics and history, and the risk of danger to the public, and the Ninth Circuit has repeatedly explained that the nature of offenses and weight of the evidence is "the *least important* of the various factors."  *E.g.*, *United States v. Motamedi*,

767 F.2d 1403, 1407 (9th Cir. 1986) (reversing denial of pretrial release) (emphasis added).  More importantly, the government has overstated the weight of its purported case against Mr. Lacey.[4]

As set forth in greater detail in other submissions and incorporated herein by reference, the government's case—which seeks to punish publishers not for their own speech but for providing a platform that publishes the speech of third parties—presents significant First Amendment issues. (*See, e.g.*, Defs.' Joint Reply to Resp. to Mot. to Dismiss, Doc. 507, at 8-21.)  Numerous courts have held that the First Amendment bars the government from criminalizing Internet advertising based on the assumption that some of the ads may propose illegal transactions.  *See, e.g., Backpage v. McKenna*, 881 F. Supp. 2d 1262, 1281-82 (W.D. Wash. 2012) (invalidating criminal statute targeting internet ads and recognizing Backpage as a platform for speech).  Indeed, "[t]he government may not suppress lawful speech as a means to suppress unlawful speech.  Protected speech does not become unprotected merely because it resembles the latter.  The Constitution requires the reverse." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2000).  Thus, speech is *presumed to be protected* and must be treated as such *until* the government has proved its case.  *See Ashcroft v. A.C.L.U.*, 535 U.S. 564, 573 (2002).  Under these well-settled principles, the central theme of the indictment—the assumption that ads for lawful adult services can be equated with ads for illegal transactions—is impermissible.

Moreover, when the government seeks to hold a publisher criminally liable for the speech of third parties, the government must prove that the defendant-publisher knew that the *specific speech* that is the basis for criminal charges was unlawful and that the defendant-publisher had the *specific intent* to violate the law.  *See, e.g., Smith v. California*, 361 U.S. 147, 153-54 (1959) (striking law imposing criminal sanctions on the sale of obscene books without any required scienter, because absent proof that a seller had knowledge, "he will tend to restrict the books he sells" and the law would "impose a severe limitation on the public's access to constitutionally protected matter").  The indictment

---

[4]     Although the government's case will be challenged in greater detail and on more extensive grounds in other submissions to this Court, a brief discussion of the shortcomings of the government's case is provided herein.

contains no allegations that satisfy the scienter requirement for prosecution of publishers for publishing third-party speech.  (*See* Joint Repl. at 17-20.)

Further, there is no indication in *any* public filing that the government can establish the specific intent required to obtain a conviction under the Travel Act, 18 U.S.C. § 1952, for facilitating prostitution.[5]  To establish a Travel Act violation, the government must establish that the "accused formed a specific intent to . . . facilitate" a violation of state law.  *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974).  In *Gibson Specialty*, a punchboard/pulltab manufacturer sold and shipped its products to buyers located in Montana, where it was unlawful to possess punchboards and pulltabs.  The manufacturers were charged with facilitating the commission of games of chance in Montana in violation of Montana law under the Travel Act.  The Court explained that, to establish that a manufacturer violated the Travel Act through sale of products to Montanans, "the prosecutor must show that the manufacturer in some significant manner associated himself with the purchaser's criminal venture for the purpose of its advancement."  *Id.*  In affirming dismissal of the Travel Act charges, the Court "assumed" that the defendants were aware of the Montana law and that the prosecutors' construction of it was correct; however, even with those assumptions, the Court could not "find that the defendants by selling to Montanans intended, within the meaning of the [T]ravel [A]ct, to facilitate a violation of state law."  *Id.* at 450; *accord United States v. Prince*, 529 F.2d 1108, 1112 (6th 1976) ("[T]he Travel Act only reaches those who engage in interstate activities with intent to perform other illegal acts.  Thus there is a requirement of a separate intent related to the use of interstate facilities which is different from the intent required to commit the underlying State offense.").

---

[5]      Defendants are charged under 18 U.S.C. § 1952(a)(3)(A), which states:  "Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to . . . (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform-- (A) an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both . . . ."

Under *Gibson Specialty*, it is not enough for the government to show that defendants knew that prostitution was a state crime or that defendants learned, after publication, that some of the website's users had placed ads that appeared to be for lawful adult services such as escorting, massage, or erotic dance, but were, instead, ads for prostitutes.  *Gibson Specialty* mandates that the government must prove that the defendants (1) knew that a particular ad was an ad for prostitution; (2) published the ad with the specific intent to use the internet to facilitate prostitution; and (3) intended to facilitate prostitution in "significant" association with the ad's author (the website user).

There is not a single allegation in the indictment that meets this standard.  Instead, the indictment alleges that defendants were aware that:

- the "vast" or "overwhelming" majority of the ads posted to the website were for prostitution (Indict. at ¶¶ 9, 34);
- government agencies and non-profits believed that ads had been posted to the website by prostitutes (*id.* at ¶¶ 74, 86, 97, 141, 144); and,
- prosecutions for pimping or other crimes had occurred which involved ads that had been posted to the website (although indictment does not allege that the ads at issue offered sex acts in exchange for money) (*id.* at ¶¶ 71, 76, 92).

In its opposition, the government points to Mr. Lacey's correspondence with public-relations consultants after learning that murder victims had placed ads on Backpage (among other sites) or in anticipation of media coverage of Backpage as "proof" he knew that Backpage facilitated prostitution.  (Gov't's Opp'n at 10-11.)  None of these allegations tie a specific defendant (Mr. Lacey or otherwise) to a specific ad pre-publication or allege that a defendant authorized publication of an ad for illegal conduct with the specific intent to facilitate illegal conduct via the internet or show that any of the defendants worked in "significant" association with the ad author (let alone that they knew any of the users who posted ads on the website).  Instead, these allegations purport to establish insufficient general intent.[6]

_____

[6]     *See Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003) ("Even entities that know the information's content do not become liable for the sponsor's deeds.  Does a newspaper that carries an advertisement for 'escort services' or 'massage parlors' aid and abet . . . prostitution,

Indeed, the government has repeatedly conceded that it is proceeding on a theory of general intent.[7]

Against this backdrop, the government has trotted out arguments that have already been refuted in other pleadings. For example, the government criticizes Mr. Lacey for omitting discussion of the pleas of Carl Ferrer and Dan Hyer; however, those pleas do nothing to advance the government's case. Carl Ferrer stated that he had "long been aware that the great majority of these advertisements are, in fact, advertisements for prostitution services." (*United States v. Ferrer*, 18-CR-464, Doc. 7-2 at 13.) Dan Hyer stated that he knew "that the great majority of the ads . . . were actually offering illegal prostitution services." (*United States v. Lacey*, 18-CR-422, Doc. 271 at 10.) These statements suggest, at best, general knowledge and not the requisite specific intent. Moreover, this Court should reject the government's invitation to accept these pleas, which have never been tested, as substantive evidence against Mr. Lacey.[8]

The government points to two prosecutions related to the website www.redbook.com to claim that website operators can be held liable for third-party speech. (Govt's' Opp'n at 11-12.) As previously noted, those cases have no bearing on the First Amendment issues in this case because those defendants pleaded guilty, raised no First Amendment defenses, and were accused of conduct

---

if it turns out that some (or many) of the advertisers make money from that activity? How about Verizon, which furnishes pagers and cell phones to drug dealers?").

[7]       *See* Nov. 29, 2018 Ltr. from R. Jones to M. Piccarreta, attached hereto as Ex. B at 3 ("Backpage knew that *every* ad had the potential for facilitating prostitution services . . . ."); *see also* Excerpts from Oct. 5, 2018 Transcript, attached hereto as Ex. C at 102 ("[W]hat's at issue in this case . . . Did [defendants] know that the vast majority of these advertisements that went up on this Web site were for prostitution."). *Gibson Specialty* makes it clear that a defendant cannot be convicted because an ad for legal adult services had the "potential" to be an ad for prostitution or because the government or its witnesses claim that "the vast majority" of the ads were for prostitution.

[8]       A guilty plea of a codefendant "may not be used by the government and received over objection as substantive evidence of the guilt of those on trial." *United States v. Halbert*, 640 F.2d 1000, 1004 (9th Cir. 1981). Further, courts should be skeptical of plea agreements because "plea agreement[s] may adopt facts the government wants to hear in exchange for some benefit." *United States v. Vera*, 893 F.3d 689, 692-93 (9th Cir. 2018); *see also Lee v. Illinois*, 476 U.S. 530, 541 (1986) (explaining that accomplices' confessions and arrest statements are "presumptively unreliable," "presumptively suspect," and "less credible than ordinary hearsay").

vastly different from what is alleged in this case.  (Joint Reply at 11-12.)  Similarly, the government's reliance on the U.S. Senate's Permanent Subcommittee on Investigations report on Backpage as substantive proof against Mr. Lacey is misplaced.  A report of a political body cannot be used as a proxy for a judicial finding of guilt and does not trump judicial opinions based on constitutional principles, particularly when the report if patently flawed.  (*Id.* at 14-16.)

Further, the government points to content aggregation, reciprocal link programs, and moderation to argue that defendants must have known that the true purpose of Backpage's business model was to derive revenue from prostitution.  (*See* Gov't's Opp'n at 8-9.)  Setting aside that the government cannot assume knowledge and that this argument, too, alleges insufficient generalized knowledge, the government is wrong about these practices as will be discussed in greater detail in future submissions.  Content aggregation and reciprocal links are standard marketing tools that publishers of classified ads have used for decades.  Moderation falls under "traditional editorial functions," even when terms or images are deleted and the remaining portion of the ad is published. (*See People v. Ferrer*, Case No. 16FE024013 (Sup. Ct. Sacramento Cnty. Aug. 23, 2015), slip op., attached hereto as Ex. D at 13-14 ("[E]ven if Backpage knew of the unlawfulness of the content of the ads, knowledge is insufficient to render Defendants liable.  This is true regardless of whether Backpage even exercised its editorial discretion and deleted or blocked certain terms from ads.").)

## CONCLUSION

Because each of the Section 3142(g) factors weighs in favor of removal of the anklet, and the Pretrial Services officer who has monitored Mr. Lacey for more than one year does not oppose the Motion, Mr. Lacey respectfully requests that this Court grant the Motion.

RESPECTFULLY SUBMITTED this 16th day of April, 2019,

/s/     *Paul J. Cambria, Jr.*
LIPSITZ GREEN SCIME CAMBRIA LLP
Attorneys for Defendant Michael Lacey

On April 16, 2019, a PDF version
of this document was filed with
Clerk of the Court using the CM/ECF
System for filing and for Transmittal
Of a Notice of Electronic Filing to the
Following CM/ECF registrants:

Kevin Rapp, kevin.rapp@usdoj.gov
Reginald Jones, reginald.jones4@usdoj.gov
Peter Kozinets, peter.kozinets@usdoj.gov
John Kucera, john.kucera@usdoj.gov
Margaret Perlmeter, margaret.perlmeter@usdoj.gov
Patrick Reid, Patrick.Reid@usdoj.gov
Andrew Stone, andrew.stone@usdoj.gov
Amanda Wick, Amanda.Wick@usdoj.gov

HONORABLE G. HELEN WHITENER
HEARING DATE:  MAY 18, 2018, AT 9:00 A.M.
WITH ORAL ARGUMENT

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR PIERCE COUNTY

R.O. and K.M.,

                Plaintiffs,

v.

MEDALIST HOLDINGS, INC., et al.,

                Defendants.

NO.  17-2-04897-1

PLAINTIFFS' MOTION FOR SANCTIONS
AGAINST BACKPAGE DEFENDANTS

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington  98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

## I.     RELIEF REQUESTED

After years of flouting liability, Backpage.com CEO, Carl Ferrer, has pled guilty to a range of crimes and admits Plaintiffs' allegations have been true all along:  the Backpage defendants[1] (1) knew that the "great majority" of the escort ads on Backpage.com were for prostitution; (2) conspired to "knowingly facilitate state-law prostitution crimes being committed by Backpage customers" to profit from these illicit acts; (3) removed "banned terms" from advertisements posted in the "seattle escorts" and "tacoma escorts" sections of Backpage.com to mask illegal activity on the website, including prostitution, and (4) designed and maintained "an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's 'escort' and 'adult' ads."

While Ferrer awaits sentencing for criminal charges of sex trafficking, facilitating prostitution, conspiracy, and money laundering, the United States government has taken complete control of the Backpage.com website and permanently shut it down.

Ferrer's admissions show the Backpage defendants have intentionally and repeatedly made misrepresentations in discovery, depositions, and pleadings to the Court in an attempt to obstruct the civil justice system and unnecessarily increase the costs of litigation to minor trafficking victims.  Under the inherent equitable powers of the Court, CR 11, CR 26(g), and CR 37(c), Plaintiffs respectfully ask the Court to impose sanctions against the Backpage defendants to punish them and discourage such bad faith litigation tactics, including 1) $100,000 to each Plaintiff as a penalty and to reimburse them for reasonable attorneys' fees and costs to prove facts that should have been admitted; 2) $100,000 to the Court, as a penalty and to reimburse the Court for time and resources spent as a result of the Backpage defendants' misconduct; and 3) Plaintiffs' reasonable attorneys' fees and costs to bring this motion.  Such sanctions are warranted to deter future

---

[1] The "Backpage defendants" referenced herein include Defendants Medalist Holdings Inc., Leeward Holdings, L.L.C., Camarillo Holdings, L.L.C., Dartmoor Holdings, L.L.C., IC Holdings, L.L.C., Backpage.com, L.L.C., UGC Tech Group C.V., Website Technologies, LLC, Atlantische Bedrijven C.V., Amstel River Holdings LLC, Lupine Holdings LLC, Kickapoo River Investments LLC, CF Holdings GP LLC, CF Acquisitions LLC, Carl Ferrer, Michael Lacey, and James Larkin.

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington  98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

misconduct by the defendants, particularly where, according to Ferrer, Backpage has made <u>hundreds of millions of dollars</u> in illegal commercial sex advertising revenue that resulted in the sexual exploitation of Plaintiffs and countless other women and children that it used to fund its bad faith litigation tactics.

## II.     STATEMENT OF FACTS

**A.      Backpage Co-Founder and CEO, Carl Ferrer, Pled Guilty on Behalf of Himself and the Backpage.com Entity to State and Federal Crimes of Human Sex Trafficking, Facilitating Prostitution, Conspiracy, and Money Laundering**

On April 5, 2018, and April 9, 2018, Backpage co-founder and CEO, Carl Ferrer, pled guilty, individually and on behalf of Backpage.com corporate entities, [2] to federal and state crimes of human sex trafficking, facilitating prostitution, criminal conspiracy, and money laundering.[3]

Ferrer's admissions are spelled-out in his federal guilty plea:

In 2004, I co-founded the website www.Backpage.com ("Backpage"), along with M.L. [Michael Lacey] and J.L. [James Larkin].  Backpage eventually became the second-largest classified advertising in the world, during its 14 years of existence, has **derived the great majority of its revenue** from fees charged in return for publishing advertisements for 'adult' and 'escort' services.

**I have long been aware that the great majority of these advertisements are, in fact, advertisements for prostitution services** (which are not protected by the First Amendment and which are illegal in 49 states and in much of Nevada).  **Acting with this knowledge, I conspired with other Backpage principals** (including but not limited to M.L., J.L., S.S., D.H., A.P., and J.V.)[4] to find ways **to knowingly facilitate state-law prostitution crimes being committed by Backpage customers.**   For example, **I worked with my co-conspirators to create 'moderation' processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad.**  Such editing did not, of course, change the essential nature of the illegal service being offered in the ad—it was merely intended to create a veneer of deniability for Backpage.   **These editing practices were one component of an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's 'escort' and 'adult' ads.**[5]

---

[2] Backpage.com LLC, Ad Tech BV, Amstel River Holdings, LLC, Website Technologies, LLC, Posting Solutions, LLC, and UGC Tech Group BV.

[3] Guilty pleas, Pfau Decl. at Ex. 1.

[4] "M.L." is defendant Michael Lacey and "J.L." is defendant James Larkin.

[5] Ferrer Guilty Plea in United States District Court of Arizona Case No. 2:18-cr-000464-DJH, Pfau Decl. at Ex. 1.

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington  98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

As part of the plea agreement, Ferrer gave immediate ownership and control of www.backpage.com and related assets to the United States government, which promptly and permanently shut down the website.[6]

**B.      Plaintiffs R.O. and K.M. Filed Their Lawsuit in January 2017 Based on Allegations that the Defendants Knowingly and Intentionally Facilitated Online Prostitution and Human Sex Trafficking**

In January 2017, Plaintiffs filed suit against Backpage and several co-conspirator traffickers, alleging claims under Washington's Criminal Profiteering Act, RCW 9A.82 et seq.; Washington's Sexual Exploitation of Children Act, RCW 9.68A, et seq.; negligence; outrage; assault and battery; and unjust enrichment.  *Id.*  R.O. and K.M. alleged the Backpage defendants are liable for the sexual exploitation they endured because the defendants (1) intentionally created an online marketplace for illegal prostitution and sex trafficking, and (2) facilitated and promoted these illicit transactions by helping traffickers create and develop commercial sex advertisements on the website, primarily through the use of so called "posting rules," "content requirements," and "moderation practices."  *Id.*  In October 2017, Plaintiffs served interrogatories, requests for production, and requests for admission that asked the defendants to provide information regarding their knowledge of prostitution and sex trafficking on www.backpage.com, as well as their supposed efforts to prevent such illegal activity through various business practices.[7]

**C.      The Backpage Defendants Repeatedly Acted in Bad Faith and Made Misrepresentations to Plaintiffs and the Court**

As evidenced by Ferrer's guilty pleas, Plaintiffs and the Court have been subjected to a long pattern of bad faith litigation by the Backpage defendants, including intentionally and repeatedly making misrepresentations in discovery responses, depositions, and pleadings, in an attempt to obstruct the civil justice system and unnecessarily increase the costs of litigation to Plaintiffs.

---

[6] *Id.*

[7] Plaintiffs' First Set of Interrogatories, Requests for Production, and Requests for Admissions to Backpage Defendants, Pfau Decl. at Ex. 2.

PLAINTIFFS' MOT FOR SANCTIONS
Page 4 of 16

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington  98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

**First**, in March 2017, shortly after R.O. and K.M. filed their lawsuit, Backpage attempted to obtain an order from Pierce County Superior Court Judge Kathryn Nelson in the case, *J.S., et al. v. Village Voice Media Holdings, LLC, et al.*, Case No. 12-2-11362-4, dismissing identical claims brought by three minor trafficking victims represented by the same legal counsel as R.O. and K.M. The motion relied heavily on a declaration signed by Backpage's general counsel, Elizabeth McDougall, swearing under oath that Backpage's business practices were intended to *prevent* prostitution and sex trafficking, not facilitate and encourage such illegal activity:

> Backpage.com also operated a two-tiered manual (human) review system (called "moderation") of ads submitted for posting to the adult category. During the first-level manual review, Backpage.com personnel assessed proposed posts to the adult category before they were allowed to appear on Backpage.com and **endeavored to prevent postings that concerned illegal conduct and other activity prohibited by the Terms of Use or Posting Rules.** During the second-level manual review, **Backpage.com personnel examined nearly every posting in the adult category that appeared on the website as a double check for potential illegal or prohibited activity.**
>
> **Backpage.com's policies, rules, and restrictions for the website were not designed or intended to induce sex trafficking or exploitation of any sort.** Backpage.com imposed and enforced rules, screened and blocked ads, and took other actions (as described above [moderation practices] **to prevent and preclude such misuse of the website.**[8]

**Next**, in April 2017, Backpage's general counsel, Elizabeth McDougall, testified as Backpage's designated CR 30(b)(6) representative and furthered Backpage's fictitious defense that the website was intended only for lawful activity. She represented that the website's editing practices were intended to prevent prostitution and sex trafficking, not promote it, testimony that was at odds with the fact that Ferrer and some of the company's other executives had recently pled the Fifth Amendment and refused to answer questions on those same topics. Her testimony is directly at odds with Ferrer's recent guilty plea:

> Q.   During the time these girls were advertised on Backpage.com [2010], do you agree that the majority of the individuals who were advertised as escorts in the section of the website were individuals who were trying to sell sex for money?

---

[8] Declaration of Elizabeth McDougall In Support of Backpage Defendants' Motion for Summary Judgment, Pfau Decl. at Ex. 3.

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington  98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

A.    No, I have no way to know that. [9]

***

Q.    We know that the company was both automatically and manually editing ads to remove terms that may indicate an ad was for sex for money, correct?

A.    No, we didn't agree on that.[10]

***

A.    We used the automated filter as an efficient method to try to remove content that could potentially involve sex for money or sex trafficking or, in particular, the sex trafficking of minors.

Q.    Was that also true with regard to the manual moderating that was done on these ads?

A.    Yes.

Q.    How does it help prevent sex trafficking if a website has an automatic filter that removes terms that may reflect an ad is for sex trafficking?

Q.    The way the filter operated, the ad would be posted.  After about five minutes, the objectionable term would be removed.  The presumption was the user would think they had made some kind of mistake, they would go back, add the term again.   After five minutes, the term would be removed again, and the intention was to – to frustrate the user so that they would stop posting.  Also, with the term removed from the text, the goal was to – one of the goals was to render the ad meaningless, essentially, something that a user reading it would not respond to because they had no understanding of what it was trying to advertise.[11]

***

A.    As I said previously, if a term, like "Lolita" is included in an advertisement in the adult category, it may attract someone who is looking to have sex with a minor.

If the term "Lolita" is removed, then it's less likely that someone who is looking to have sex with a minor will be ale to or, rather, will respond to that

---

[9] CR 30(b)(6) Deposition of Backpage.com, p 64, Pfau Decl. at Ex. 4.

[10] *Id*. at 98.

[11] *Id*. at 50-51.

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington  98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

ad and be able to achieve that end, so it helps to prevent the instance of the sexual exploitation of a minor.

In addition to that, when certain terms are removed, it can render an ad meaningless.

For example, "A Lolita experience for $100," if the term "Lolita" is removed, then the ad simply says, "Experience for $100."

Q.    An adult might still respond to such an ad with the hope of having sex with the person for $100, correct?

A.    I can't answer that in the vague hypothetical.

Q.    So is it your testimony that if someone posted an ad in the escort section, "An experience for $100" that might not be an indication that the person who is the subject of the ad is willing to have sex for $100?

A.    Escorting is not sex.  Escorting is a legally recognized profession, career option, and an ad saying, "An experience for $100" in an escort category, on its face, is by no means an advertisement for sex for money.

Q.    You understand though that often the term "escort" is synonymous with "prostitute," correct?

A.    No, I wouldn't agree with that statement.[12]

***

Q.    Do you agree that looking at this advertisement of Plaintiff S.L., the subject line is, "Cum enjoy a night with a new girl :) on the block. Nichole" do you see that?

A.    I do.

Q.    Do you agree with me that this is an indication—using the term "cum" in this context, in an ad in the escort section, is an indication that this may be an advertisement for sex?

A.    No.

Q.    Why not?

---

[12] *Id.* at 60-62.

PLAINTIFFS' MOT FOR SANCTIONS
Page 7 of 16

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington  98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

A.    For many reasons.   There's very little context here to understand what service is being advertised.  Furthermore, there's a large number of our users who are not particularly good spellers, and the spelling of "cum" could simply be a typo.[13]

**Next**, in November 2017, individual defendants Carl Ferrer, James Larkin, and Michael Lacey asserted the Fifth Amendment and refused to respond to Plaintiffs' Requests for Admission. However, the corporate defendants did not hesitate to flatly deny that Backpage used editing practices to conceal illegal activity, including prostitution, answers that plainly contradict Ferrer's guilty plea:

**REQUEST FOR ADMISSION NO. 53:** Admit that you removed "banned terms" from advertisements posted in the "seattle escorts" and "tacoma escorts" sections of Backpage.com in 2010 to mask illegal activity on the website, such as prostitution.

**RESPONSE:**  Subject to their objections, Corporate Defendants deny Request for Admission No. 53.

**REQUEST FOR ADMISSION NO. 54:** Admit that you removed "banned terms" from advertisements posted in the "seattle escorts" and "tacoma escorts" sections of Backpage.com in 2011 to mask illegal activity on the website, such as prostitution.

**RESPONSE:**  Subject to their objections, Corporate Defendants deny Request for Admission No. 54.

**REQUEST FOR ADMISSION NO. 55:** Admit that you removed "banned terms" from advertisements posted in the "seattle escorts" and "tacoma escorts" sections of Backpage.com in 2012 to mask illegal activity on the website, such as prostitution.

**RESPONSE:**  Subject to their objections, Corporate Defendants deny Request for Admission No. 55.

**REQUEST FOR ADMISSION NO. 56:** Admit that you removed "banned terms" from advertisements posted in the "seattle escorts" and "tacoma escorts" sections of Backpage.com in 2013 to mask illegal activity on the website, such as prostitution.

**RESPONSE:**  Subject to their objections, Corporate Defendants deny Request for Admission No. 56.

**REQUEST FOR ADMISSION NO. 57:** Admit that you removed "banned terms" from advertisements posted in the "seattle escorts" and "tacoma escorts" sections of Backpage.com in 2014 to mask illegal activity on the website, such as prostitution.

**RESPONSE:**  Subject to their objections, Corporate Defendants deny Request for Admission No. 57.

---

[13] *Id.* at 83.

PLAINTIFFS' MOT FOR SANCTIONS
Page 8 of 16

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington  98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

**REQUEST FOR ADMISSION NO. 58:** Admit that you removed "banned terms" from advertisements posted in the "seattle escorts" and "tacoma escorts" sections of Backpage.com in 2015 to mask illegal activity on the website, such as prostitution.

**RESPONSE:**  Subject to their objections, Corporate Defendants deny Request for Admission No. 58.[14]

Similarly, the corporate defendants denied that the "escort" advertisements in the Seattle "escorts" section of Backpage.com were mostly advertisements for prostitution:

**REQUEST FOR ADMISSION NO. 11:** Admit that by January 1, 2014, you knew that the majority of the escort advertisements in the "seattle escorts" section of Backpage.com were advertisements for prostitution.

**RESPONSE:**  Subject to their objections, Corporate Defendants deny Request for Admission No. 11.

**Finally**, in March 2018, after months of delay and forcing Plaintiffs to file a motion to compel with the Court, Backpage finally answered interrogatories.  The answers touted Backpage's "moderation" system and supposed efforts to prevent prostitution and sex trafficking on the website despite knowing that (1) these efforts were "merely intended to create a veneer of deniability for Backpage;" (2) Backpage was "conspiring to knowingly facilitate the state-law prostitution offenses being committed by Backpage's customers;" and (3) the "editing practices were [just] one component of an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's 'escort' and 'adult' ads."[15]

### III.   EVIDENCE RELIED UPON

This motion relies upon the Declaration of Michael T. Pfau in Support of Plaintiffs' Motion for Sanctions ("Pfau Decl."), the documents and evidence attached thereto, and the existing pleadings.

---

[14] Backpage Corporate Defendants' Responses to Plaintiffs' Requests for Admission; Carl Ferrer's Responses to Plaintiffs' Requests for Admission; James Larkin's Responses to Plaintiffs' Requests for Admission; and Michael Lacey's Responses to Plaintiffs' Requests for Admission, Pfau Decl. at Ex. 5.

[15] Pfau Decl. at ¶ 6.

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

## IV.   LEGAL AUTHORITY

**A.   The Court Should Impose Sanctions Under CR 11 and its Inherent Equitable Power to Discourage Bad Faith Litigation**

"Every court of justice has power . . . [t]o enforce order in the proceedings before it… [and] [t]o provide for the orderly conduct of proceedings before it[.]"  RCW 2.28.010(2)-(3).  Where sanctions are not expressly authorized, "the trial court is not powerless to fashion and impose appropriate sanctions under its inherent authority to control litigation." *In re Firestorm 1991*, 129 Wn.2d 130, 139 P.2d 411 (1996) (applying the principles embodied in CR 11, CR 26(g), and CR 37 to CR 26(b) violations).  "[D]ecisions either denying or granting sanctions… are generally reviewed for abuse of discretion." *Physicians Ins. Exch. & Ass'n v. Fisons Corp.,* 122 Wn.2d 299, 338, 858 P.2d 1054 (1993).

Washington courts have frequently endorsed a trial court's authority to sanction bad faith conduct in litigation.  For example, in *State v. S.H.*, 102, Wn. App. 468 (2000), the Court relied on a range of cases to explain a trial court's authority to issue sanctions if it believes a party has acted in bad faith:

> In *Wilson v. Henkle*, 45 Wash.App. 162, 174, 724 P.2d 1069 (1986), this court explained that Federal Rule 11 permits a court to award expenses to a litigant whose opponent acts in bad faith. It then noted that Washington's CR 11 incorporates essentially the same language as its federal counterpart. *Id.*; see CR 11; JuCR 1.4(a) (incorporating Superior Court Civil Rules in juvenile proceedings). The court stated that such a sanction is within the scope of a court's authority: "A Washington court has the inherent power to assess the litigation expenses, including attorney fees, against an attorney for bad faith litigation conduct." *Wilson*, 45 Wash.App. at 174–75, 724 P.2d 1069 (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980)).
>
> The *Wilson* court acknowledged that the trial court has "the inherent power to impose sanctions against an attorney for inappropriate and improper conduct." *Wilson*, 45 Wash.App. at 173, 724 P.2d 1069. It then discussed federal Rule 11 and CR 11, noting that both rules were amended to permit a court to award attorney fees for bad faith litigation. *Id.* at 173–74, 724 P.2d 1069. Without specifying a pleading, motion, or legal memorandum that was in violation of CR 11, the court concluded— apparently under the court's inherent authority —that the sanctions imposed by the trial court were appropriate. *Id.*; see CR 11 (authorizing sanctions for a pleading, motion, or legal memorandum that is not well grounded in fact and warranted by

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

existing law); *see also Jemison v. National Baptist Convention USA, Inc.*, 720 A.2d 275, 287 (D.C.1998) ("[A] court may nevertheless impose sanctions (albeit not under Rule 11) when it finds that the attorney or the party has engaged in bad faith litigation.").

Although no Washington case has expressly held that a finding of bad faith is required before a court may invoke its inherent authority to sanction litigation conduct, the *Wilson* court cited a U.S. Supreme Court case that set forth such a requirement: "[A] specific finding as to whether counsel's conduct ... constituted or was tantamount to bad faith ... [has] to precede any sanction under the court's inherent powers." *Roadway Express*, 447 U.S. at 767, 100 S.Ct. 2455, cited in *Wilson*, 45 Wash.App. at 175, 724 P.2d 1069; *see also Goldin v. Bartholow*, 166 F.3d 710, 722 (5th Cir. 1999) ("The imposition of sanctions using inherent powers must be accompanied by a specific finding of bad faith."); *DLC Management Corp. v. Hyde Park*, 163 F.3d 124, 136 (2d Cir.1998) (same); *In re Keegan Management Co.*, 78 F.3d 431, 436 (9th Cir.1996) (same). The Ninth Circuit "insist[s] on the finding of bad faith because it ensures that restraint is properly exercised... and it preserves a balance between protecting the court's integrity and encouraging meritorious arguments." *Primus Automotive Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir.1997) (internal quotation marks and citation omitted).

Following Wilson and case law from other jurisdictions, we hold that a trial court's inherent authority to sanction litigation conduct is properly invoked upon a finding of bad faith. A party may demonstrate bad faith by, inter alia, delaying or disrupting litigation. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). The court's inherent power to sanction is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* at 43, 111 S.Ct. 2123 (citation omitted). Sanctions may be appropriate if an act affects "the integrity of the court and, [if] left unchecked, would encourage future abuses." *Gonzales v. Surgidev*, 120 N.M. 151, 899 P.2d 594, 600 (1995); *see also Chambers*, 501 U.S. at 46, 111 S.Ct. 2123 (explaining that sanctions are appropriate if the "very temple of justice has been defiled" by the sanctioned party's conduct); *Goldin*, 166 F.3d at 723 (same).

This Court has the inherent equitable authority to award fees and costs where justice requires doing so, *Hsu v. Ying Li v. Tang*, 87 Wn.2d 796, 799, 557 P.2d 342 (1976); *Bassett v. Bassett*, 110 N.M. 559, 798 P.2d 160, 165 (1990) (following *Hsu* to award attorney fees in costs as "bad faith" exception to the American rule on attorney fee awards), and this case presents a prime example of why such awards are sometimes necessary.

The Court should sanction the Backpage defendants because they acted in bad faith by providing false and misleading interrogatory responses and denying requests for admissions on key factual inquiries that should have been admitted.  They then amplified their discovery misconduct

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington  98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

by intentionally and repeatedly misleading Plaintiffs' counsel and the Court through deposition testimony, declarations, and pleadings where they falsely claimed the website was intended only for lawful use and sought to prevent illegal activity. The defendants made these false and misleading representations when it is now beyond dispute that they knew the opposite was true.

For roughly five years, the defendants knew that the central allegations of those seeking to hold them liable, including Plaintiffs, were that the defendants (1) <u>intentionally</u> created an online marketplace for illegal prostitution and sex trafficking, and (2) <u>intentionally</u> facilitated and promoted these illicit transactions by helping traffickers create and develop commercial sex advertisements on the website through the use of so called "posting rules," "content requirements," and "moderation practices." Despite knowing these were the fundamental allegations in this case and other cases, the defendants repeatedly denied these allegations in depositions, discovery responses, sworn declarations, and pleadings that denied liability and/or sought to dismiss the claims. Even worse, they affirmatively represented that the website was intended only for lawful purposes and their business practices were designed to prevent prostitution and sex trafficking.

But Backpage's CEO, Carl Ferrer, now admits that all of these representations were false and misleading, and more importantly, admits that Plaintiffs' allegations have been true all along. According to Ferrer, the Backpage defendants (1) knew the "great majority" of the escort advertisements on Backpage.com were advertisements for prostitution; (2) conspired to "knowingly facilitate state-law prostitution crimes being committed by Backpage customers" to profit from these illicit acts; (3) removed "banned terms" from advertisements posted in the "seattle escorts" and "tacoma escorts" sections of Backpage.com to mask illegal activity on the website, including prostitution, and (4) designed and maintained "an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's 'escort' and 'adult' ads."

PLAINTIFFS' MOT FOR SANCTIONS
Page 12 of 16

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

In light of Ferrer's admissions, it is beyond dispute that the false and misleading representations of the Backpage defendants were intended to obstruct and delay justice. Given this blatant disregard for candor, honesty, and the truth, the Court has ample authority under CR 11 and its inherent authority to award sanctions to punish the defendants and to discourage them from such bad faith litigation tactics in the future.

**B.     The Court Should Impose Sanctions Under CR 26(g) and CR 37(c) For Unjustly Withholding Highly Probative Evidence**

While sanctions are appropriate under CR 11 and the inherent equitable power of the Court, the Court also has authority to award sanctions under CR 26(g) and CR 37(c).

> The purposes of sanctions orders are to deter, to punish, to compensate, and to educate. Where compensation to litigants is appropriate, then sanctions should include a compensation award. . . . [S]anctions need to be severe enough to deter these attorneys and others from participating in this kind of conduct in the future.

*Washington State Physicians Ins. Exchange & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 341-42 (1993).

In line with *Fisons*, CR 26(g) is specifically designed to reduce "delaying tactics, procedural harassment and mounting legal costs." *Fisons,* 122 Wn.2d at 341. CR 26(g) explains the significance of an attorney or party signing discovery responses:

> The signature of the attorney or party constitutes a certification that he has read the request, response, or objection, and that to the best of his knowledge, information, and belief formed after a reasonable inquiry it is:
>
> (1) consistent with these [discovery] rules and warranted by existing law or a good faith argument for the extension, modification, or reversal or existing law;
>
> (2) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and
>
> (3) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation. ...
>
> If a certification is made in violation of the rule, the court, upon motion or upon its own initiative, <u>shall impose upon the person who made the certification, the party</u>

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

<u>on whose behalf the request, response, or objection is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney fee.</u>

CR 37(c) provides the Court with authority to issue sanctions in the event of a false, misleading, or bad faith answer or denial of a request for admission: "[i]f a party fails to admit . . . the truth of any matter as requested under rule 36, and if the party requesting the admissions thereafter proves . . . the truth of the matter, the party may apply to the court for an order requiring the other party to pay the requesting party the reasonable expenses incurred in making that proof, including reasonable attorney fees." *See Clausing v. Kassner*, 60 Wn.2d 12 (1962) (holding sanctions appropriate where defendant denied violation of restraining order and later admitted violation); *Simpson v. Thorslund*, 151 Wn. App. 276 (2009) (holding attorney fees were warranted as a discovery sanction under CR 37(c) because defendant refused to make certain admissions when requested, which led to substantial additional and unnecessary litigation costs).

The Court should award sanctions under both CR 26(g) and CR 37(c) because the Backpage defendants submitted false and misleading interrogatory responses and denied requests for admission that narrowly targeted key factual issues that should have been admitted, including (1) their knowledge of prostitution and sex trafficking on the website, and (2) their efforts to facilitate such illegal activity through various business practices, such as editing ads. Moreover, like in *Fisons*, the defendants not only made false and misleading discovery responses, but they compounded that misconduct by denying such evidence existed and going so far as to manufacture evidence to the contrary through deposition testimony and declarations by claiming the website was intended only for lawful use and sought only to prevent illegal activity.

As a result of Backpage's false and misleading efforts, Plaintiffs and their counsel have been forced to devote substantial time and effort to prove facts that should have been admitted. The Court has ample authority to sanction the Backpage defendants for their violations of CR 26(g) and CR 37(c) and to compensate Plaintiffs and their counsel for reasonable attorneys' fees and costs incurred.

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

## V.   CONCLUSION

After years of flouting liability, Backpage's CEO Carl Ferrer now admits Plaintiffs' allegations have been true all along:  the Backpage defendants (1) knew that the "great majority" of the escort advertisements on Backpage.com were advertisements for prostitution; (2) conspired to "knowingly facilitate state-law prostitution crimes being committed by Backpage customers" to profit from these illicit acts; (3) removed "banned terms" from advertisements posted in the "seattle escorts" and "tacoma escorts" sections of Backpage.com to mask illegal activity on the website, including prostitution, and (4) designed and maintained "an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's 'escort' and 'adult' ads."

Plaintiffs respectfully ask the Court impose sanctions against the Backpage defendants for their misconduct in this litigation as follows:  1) $100,000 to each Plaintiff as a penalty and to reimburse them for some of the reasonable attorneys' fees and costs to prove facts that should have been admitted; 2) $100,000 to the Court, as a penalty and to reimburse the Court for time and resources spent as a result of the Backpage defendants' misconduct; and 3) Plaintiffs' reasonable attorneys' fees and costs to file the underlying motion.

DATED this 26th day of April, 2018.

PFAU COCHRAN VERTETIS AMALA PLLC


By _____
    Michael T. Pfau, WSBA No. 24649
    michael@pcvalaw.com
    Jason P. Amala, WSBA No. 37054
    jason@pcvalaw.com
    Vincent Nappo, WSBA No. 44191
    vincent@pcvalaw.com
    Attorneys for Plaintiffs

PLAINTIFFS' MOT FOR SANCTIONS
Page 15 of 16

1

**CERTIFICATE OF SERVICE**

I, Bernadette Hacker, hereby declare under penalty of perjury under the laws of the State of Washington that I am employed at Pfau Cochran Vertetis Amala PLLC and that on this date I served the foregoing, and the supporting Declaration of Michael T. Pfau, on all parties or their counsel of record via email, legal messenger, and/or facsimile by directing delivery to:

Eric Stahl
Davis Wright Tremaine LLP
1201 Third Ave., Ste. 2200
Seattle, WA 98101
Email: ericstahl@dwt.com

DATED this 26th day of April, 2018.

Bernadette Hacker
Legal Assistant to Michael T. Pfau

4849-0250-8643, v. 1

PLAINTIFFS' MOT FOR SANCTIONS
Page 16 of 16

**U.S. Department of Justice**

United States Attorney
District of Arizona

---

|  |  |
|---|---|
| Two Renaissance Square | Main:  (602) 514-7500 |
| 40 N. Central Ave., Suite 1800 | Main Fax:  (602) 514-7693 |
| Phoenix, AZ  85004-4408 | Direct Fax:  (602) 514-7450 |

<u>VIA EMAIL</u>                        November 29, 2018

Mike Piccarreta, Esq.
Piccarreta Davis Keenan Fidel PC
2 East Congress Street, Suite 1000
Tucson, AZ  85701

> Re:  *Your Letter of October 26, 2018*

Dear Mike:

We wish to respond to your October 26, 2018 letter.  The letter requests disclosure of *Brady* material and appears to be a standard letter that you send prosecutors in other cases with a few categories specific to this case.  A *Brady* determination in this case, however, is particularly difficult based on the defense theories that the joint defense has advanced in pleadings (in this case and others), correspondence, and meetings with the prosecution team.

As you well know, you and other defense counsel have repeatedly asserted that the activities on the Backpage.com website, including the conduct detailed in the Superseding Indictment, was somehow immunized by the First Amendment and/or Section 230 of the Communications Decency Act ("CDA").  We disagree.  First, Section 230 of the CDA does not apply, on its face, to a federal prosecution.  47 U.S.C. § 230(e)(1) ("Nothing in this section shall be construed to impair the enforcement of ... [any] Federal criminal statute.").  The defense has not provided any counter-arguments to this position.  Second, the evidence demonstrates considerable content creation on the part of the principals and employees of Backpage.  The following three activities constitute, at a minimum, content creation by Backpage:

**Moderation**: Backpage engaged in the practice of sanitizing ads by editing them—specifically, removing terms and pictures that are indicative of prostitution and then publishing a revised version of the ad.  Unfortunately, this also included child sex trafficking victims.

**Aggregation**: This was accomplished by identifying prostitutes advertising on other similar prostitution websites.  Backpage would then post a free ad and contact the pimp or prostitute and solicit them to Backpage with the incentive of a free ad for six weeks or with similar financial incentives.

**Reciprocal Link and Affiliate Program**: This refers to Backpage's business arrangement with a website known as The Erotic Review (TER). Backpage and TER posted reciprocal ads on each other's websites. As you know, TER is a website that allows clients of prostitutes to provide written reviews of the prostitutes' various attributes. By inserting TER link in particular ads, Backpage was manipulating or creating content. In addition, Backpage entered into a financial arrangement with a person known as "Dollar Bill" who earned fees in return for arranging for numerous prostitutes and pimps to post ads on Backpage.

In light of the above, we do not share your view that there "is abundant information in the government's possession and/or generated by the government that is favorable and exculpatory to the defendants." Quite the opposite. It is noteworthy that neither you nor any of the other defense attorneys, in any of the pleadings and correspondence filed to date, have made any effort to address the above areas of content creation – all of which are described in detail in the Superseding Indictment. Nevertheless, we will attempt to address your *Brady* requests.

*First*, as set forth in the October 29, 2018 response to your letter ("USA response") requesting the inadvertently disclosed material, again we do not agree with your general assessment that there is an abundance of *Brady* material. As a reminder, we met in December 2017 and explained our legal theory, provided incriminating emails exchanged by your client, and identified witnesses that will be testifying against your client in a pending prosecution. In response, you asked that your client be provided immunity (this suggests that you recognized he had criminal exposure) but never provided any evidence that contradicts the emails and the witnesses expected to testify against your client. Instead, you took the position that your client maintains he had a First Amendment right to his activities at Backpage and alternatively, did not have the *mens rea* to commit the specific offenses contained in the indictment. Again, you have neither provided us any authority in support of that legal theory nor any counter evidence. And, that exchange occurred before both Backpage CEO Carl Ferrer and Backpage Sales and Marketing Director Dan Hyer agreed to cooperate and testify against your client and the remaining defendants.

*Second*, your request involving 2010 statements from Francey Hakes regarding whether Craigslist could be held criminally liable for content in their adult section eight years ago is not relevant to the Superseding Indictment in this case for several reasons. First, it is important to appreciate the distinctions between Craigslist and Backpage and what has occurred since 2010. Craigslist voluntarily shut down its adult section, presumably recognizing that it faced exposure to both criminal and civil liability for facilitating prostitution. Second, and more importantly, we are unaware of Craigslist engaging in the same business practices that Backpage employed to increase revenue from prostitution ads. For example, Craigslist did not have similar moderation practices employed by Backpage (*e.g.*, stripping out words or terms indicative of prostitution and then posting the ads (including ads indicative of child sex trafficking), etc.). We also have no evidence that Craigslist engaged in the solicitation and "aggregation" of prostitution ads from a competing prostitution websites. Furthermore, we

know of no financial relationship between Craigslist and "Dollar Bill" or someone similarly situated. As you know, in an email exchange between your client and another Backpage employee, "Dollar Bill" was characterized as a "super affiliate" who received considerable fees for arranging for prostitutes and pimps to post ads on Backpage. (*See* Superseding Indictment, ¶¶ 60-62.) In a related email, your client directed that 4200 [prostitution] ads posted by Dollar Bill be reinstated. (*Id.*) Finally, Craigslist did not have a financial relationship with the website TER or a similar site.

*Third,* we are also unaware of Craigslist engaging in activities designed to circumvent conventional banking and credit card processing to disguise the true nature of their adult services category. In contrast, Backpage was conspiring with others (e.g., "Dollar Bill", TER, and numerous other obvious pimps to facilitate prostitution. In short, whatever position a DOJ representative might have taken 10 years ago regarding the *mens rea* required by a website operator has little relevance to this prosecution. Lastly, the statement that you attribute to Ms. Hakes also predated the successful prosecutions of myRedBook.com, Rentboy.com, escorts.com and Ross William Ulbricht (the "Silk Road" prosecution). It is noteworthy that the defense, here, has made no meaningful attempt to distinguish the successful prosecutions of these websites from the activities engaged in by Backpage.

Next, you cite to a statement in the Congressional record that is relevant to concerns about legislation proposed to combat sex trafficking on prostitution websites similar to Backpage *by State and local prosecutors.* This is in the context of the application of the CDA. Yet this federal prosecution is exempted from the restrictions of the CDA. That was the point of the legislation referenced in the Congressional record—to allow states to prosecute websites like Backpage in the same manner a federal prosecution can be achieved. But again, the Backpage employees that are cooperating acknowledge that the Backpage defendants knew for years that they were facilitating prostitution, and the internal emails and public statements of Lacey and Larkin bear this out. Even James C. Grant, representing Backpage in the Arizona federal grand jury litigation, conceded that if the website knew "through participation in a venture, you're conspiring with somebody, you know they posted an ad, you know the person involved is underage [of course, the illegality of prostitution is not limited to underage sex trafficking victims] that's a prosecutable crime..." (GJ RT 2/22/17, p. 38 ) Here, because of the aggregation, affiliation and reciprocal link ventures and other conduct summarized above, Backpage knew that *every* ad had the potential for facilitating prostitution services, including child sex trafficking.[1]

*Fourth,* you cite a nearly forty-year old, out-of-circuit civil case, that stands for the proposition that a federal court can enjoin a *state court prosecution* if it was brought for

---

[1] As with our prior correspondence, the discussion in this letter is not meant to be an exhaustive statement of the reasons why the apparent defenses referenced by the joint defense defense team to date lack merit, particularly in view of the limited amount of information known so far about Defendants' theories and defenses.

improper purposes. *Fitzgerald v. Peek,* 636 F.2d 943, 945 (5th Cir.1981) ("conduct allegedly retaliated against or sought to be deterred is constitutionally protected and that the state's bringing of the criminal prosecution is motivated at least in part by a purpose to retaliate against or deter that conduct, and the state fails to show that it would have decided to prosecute even had the impermissible purpose not been considered."). This case has no relevance to the facts here and it does not even stand for the proposition that you are apparently citing it for, namely a discovery requirement. Although your request is based on mere speculation you are—in a manner of speaking—barking up the wrong tree. Categorically no such evidence exists. We are aware that Larkin and Lacey have publicly decried the late Senator John McCain and his wife Cindy as the architects of the federal Backpage prosecution, arguing that this case is politically motivated. The decision to investigate Backpage that resulted in the Superseding Indictment was made by the United States Attorney's Office in the District of Arizona, the DOJ Criminal Division, and no one else. The same analysis applies to your overly-broad request contained in paragraph 5.

*Fifth,* you are requesting all documents and commendations from law enforcement to Backpage relating to Backpage's cooperation in any criminal investigation. (Your October 26 letter, ¶¶ 6,7,11.) This request is unclear for several reasons. If you are asking for all subpoenas issued to Backpage in the course of state and federal investigations where Backpage complied with subpoenas, we do not share the view (nor is there any legal support) that this would be *Brady* material. Backpage was merely complying with a court order. Moreover, any documents or testimony at a trial or a hearing provided by Backpage in response to a subpoena would be in furtherance of court-ordered compliance. This isn't exculpatory—it's just avoiding contempt.

You also seek commendations Backpage received from law enforcement. These aren't *Brady* material either. Backpage was engaged in a veneer of cooperation with law enforcement. They hid their true business model that included moderation, aggregation, and affiliated programs. Moreover, after banks no longer would do business with Backpage they concealed payments from pimps posting prostitution ads and concealed Backpage as the payee, etc. We expect that at trial former Backpage employees (including but not limited to Ferrer and Hyer) will testify that Backpage's business model was concealed from law enforcement in variety of ways. We also expect at trial that law enforcement, including those that provided commendations to Backpage, will testify that had they known of Backpage's actual business practices (*e.g.,* stripping out words and posting the ads, inserting the link to TER, etc.) and financial relationships (*e.g.,* affiliated relationships with "Dollar Bill" and others, etc.) they would not have provided the commendations. In sum, we do not view commendations from law enforcement as *Brady* material.

*Sixth,* without providing any authority, you demand various communications between the prosecution team and attorneys representing cooperators, various law enforcement agencies, civil attorneys representing victims, NCMEC etc. (Your October 26 letter, ¶¶ 6-11) Without more, it is difficult to respond to such a request. Although you have provided some

authority for other requests (which we do not concede are necessarily on point), you provide no authority for this overbroad request. In short, this appears to be a wish list, based on speculation, in an effort to engage in a fishing expedition.

*Seventh*, you request all documents to and from Backpage and NCMEC relating to possible unlawful activity involving underage individuals. (Your October 26 letter, ¶ 10.) )It is unclear what you mean by "documents" nor do you articulate why you believe these are exculpatory. In any event, if you are asking for emails between Backpage and NCMEC, those are readily available based on emails we received via search warrants and subpoenas. They are also contained in the PSI Appendix, which is available on the U.S. Senate website. Any other documents we received from NCMEC has been provided or will be provided based on the scheduling order.

*Eight*, paragraph 12 of your October 26 letter requests internal Justice Department memoranda "relating the understanding of the applicable law government Backpage." Again, you provide no authority for this request. And, case law makes clear that material encompassing only an attorney's mental impressions or legal theories does not constitute *Brady*. *See, e.g., Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006). "Extending the *Brady* rule to opinion work product would greatly impair the government's ability to prepare for trials." *Id.* Indeed, "if opinion work product were accessible by opposing counsel 'much of what is now put down in writing would remain unwritten.'" *Williamson v. Moore*, 221 F.3d 1177, 1182 (11th Cir. 2000) (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)).

*Ninth and last*, paragraphs 4-31 make various general *Brady* requests, non-specific to this case, citing some authority (mainly from the 1980s). We will examine your specific requests and, to the extent we have information covered by the requests and supported by the cases you cite, we will make it available. Finally, in the event you are unsatisfied with our responses to your October 23 and 26 letters and file a discovery motion, please include our responses to both letters as attachments so the court has an understanding of our efforts to be responsive to your various requests.

Sincerely,

ELIZABETH A. STRANGE
First Assistant U.S. Attorney
District of Arizona

*s/ Kevin Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | CR-18-0422-PHX-SPL |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | October 5, 2018 |
| Michael Lacey, | ) | 10:50 a.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE STEVEN P. LOGAN, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

HEARING ON PENDING MOTIONS – VOLUME I

(Pages 1 through 60, inclusive.)

Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2     For the Government:

 3               U.S. Attorney's Office
                 By: PETER SHAWN KOZINETS, ESQ.
 4                   ANDREW C. STONE, ESQ.
                     MARGARET WU PERLMETER, ESQ.
 5                   KEVIN M. RAPP, ESQ. (Telephonic)
                 40 North Central Avenue, Suite 1200
 6               Phoenix, AZ  85004

 7               U.S. Attorney's Office
                 By: JOHN JACOB KUCERA, ESQ. (Telephonic)
 8               312 North Spring Street, Suite 1200
                 Los Angeles, CA  90012
 9
                 U.S. Department of Justice
10               By: REGINALD E. JONES, ESQ. (Telephonic)
                 1400 New York Avenue NW, Suite 600
11               Washington, DC  20530

12     For the Defendant Lacey:

13               Liptsitz Green Scime Cambria
                 By: PAUL JOHN CAMBRIA, JR., ESQ.
14               42 Delaware Avenue, Suite 120
                 Buffalo, NY  14202
15
       For the Defendants Lacey and Larkin:
16
                 Davis Wright Tremaine
17               By: ROBERT CORN-REVERE, ESQ.
                 1919 Pennsylvania Avenue NW, Suite 800
18               Washington, DC  20006

19               Davis Wright Tremaine
                 By: JAMES C. GRANT, ESQ.
20               1201 3rd Avenue, Suite 2200
                 Seattle, WA  98101
21

22

23

24

25
```

UNITED STATES DISTRICT COURT

3

```
 1      For the Defendant Larkin:

 2                  Bienert Miller & Katzman
                    By: THOMAS HENRY BIENERT, JR., ESQ.
 3                      WHITNEY Z. BERNSTEIN, ESQ.
                    903 Calle Amanecer, Suite 350
 4                  San Clemente, CA  92673

 5                  Schulte Roth & Zabel
                    By: SEETHA RAMACHANDRAN, ESQ.
 6                  919 Third Avenue, Suite 2013
                    New York, NY  10022
 7
        For the Defendant Spear:
 8
                    Feder Law Office
 9                  By: BRUCE S. FEDER, ESQ.
                    2930 East Camelback Road, Suite 160
10                  Phoenix, AZ  85016

11      For the Defendant Brunst:

12                  Kimerer & Derrick
                    By: MICHAEL D. KIMERER, ESQ.
13                  1313 East Osborn Road, Suite 100
                    Phoenix, AZ  85014
14
                    Bird Marella Boxer Wolpert Nessim
15                   Drooks Lincenberg & Rhow
                    By: ARIEL A. NEUMAN, ESQ.
16                  1875 Century Park E, Suite 2300
                    Los Angeles, CA  90067
17
        For the Defendant Padilla:
18
                    Piccarreta Davis Keenan Fidel
19                  By: MICHAEL L. PICCARRETA, ESQ.
                    2 East Congress Street, Suite 1000
20                  Tucson, AZ  85701

21      For the Defendant Vaught:

22                  Karp & Weiss
                    By: STEPHEN M. WEISS, ESQ.
23                  3060 North Swan Road
                    Tucson, AZ  85712
24

25
```

UNITED STATES DISTRICT COURT

4

```
1    For Henze Cook Murphy, PLLC:

2              Mitchell Stein Carey Chapman
             By: LEE DAVID STEIN, ESQ.
3                ANNE MICHELLE CHAPMAN, ESQ.
             2 North Central Avenue, Suite 1450
4            Phoenix, AZ  85004

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1    received awards from various law enforcement officials.  There

2    was some communications and some relationships with Backpage

3    and various other organizations in terms of the National Child

4    Exploitation Center, NCMEC.  They responded to subpoenas when

5    subpoenas were provided and things like that.  That's all -- I

6    don't think they need us to show them those documents.  I mean,

7    that's something they're very familiar with.  They cite them

8    back to us in a lot of the various pleadings.

9            Now, what's at issue in this case -- and let's set

10   aside this First Amendment issue that they have raised because

11   that's a legal issue that the Court will rule on at some

12   point -- is a factual issue.  Did they know that the vast

13   majority of these advertisements that went up on this Web site

14   were for prostitution.

15           So that is what is clearly articulated in the

16   90-plus-page superseding indictment.  And there's lots of

17   material that's given as support for that.  And I think as

18   Mr. Piccarreta is going to get to, some of those documents have

19   already been turned over with respect to the superseding

20   indictment.  And there are others that we were turning over,

21   and I think today there's a disclosure.

22           So there's a continuing disclosure from the government

23   to defense on all these particular issues.  But with respect to

24   Brady or exculpatory, we're unsure what that would look like,

25   Your Honor.

*L Ast Decision*

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SACRAMENTO

DATE:                    DEPARTMENT:    8

JUDGE:     Lawrence G. Brown       CLERK:

REPORTER:                   BAILIFF:

---

People of the State of California            CASE NO. 16FE024013

vs.

Carl Ferrer, Michael Lacey, and
James Larkin,

Defendants

---

**Nature of Proceedings: Ruling on Defendants' Motion to Dismiss under Penal Code Section 1004**

## Introduction

Backpage.com is one of the largest on-line classified advertisement services, through which users may post advertisements in a variety of categories. Posting an advertisement in the "Adult Services" category requires a fee. Through various levels of involvement with Backpage.com, Defendants have twice found themselves facing criminal charges in Sacramento County relating to certain advertisements placed in the "Adult Services" category.

The prosecution's theory is that Defendants conspired to create and organize a website that facilitates sex trafficking. The People assert that Defendants created such a site through Backpage.com, knowing that prostitutes and/or pimps use the site to advertise prostitution, and with the intent to maximize their own profits from the illegal sex trade. According to the People, this plan also included tricking credit payment processors into processing Backpage transactions, through the use of shell companies and fraudulent billing descriptors. Allegedly, the credit processors would not have processed the payments had they known they were doing business with Backpage.com. The People assert that Defendants' plan has come to fruition and they have derived massive financial support and maintenance from the prostitution.

## Background

In 2016, Defendants faced various charges of pimping and conspiracy to pimp. The Honorable Michael G. Bowman SUSTAINED the Defendants' demurrer and dismissed the complaint. Judge Bowman found that it was apparent from the accusatory pleadings that the prosecution hinged on treating Defendants as the speakers

the offensive conduct, when they were merely the publisher.  Prosecution under this theory could not go forward, as the Communications Decency Act ("CDA") provides immunity for online publishers and distributors of content generated by third parties.  (*See* 47 U.S.C. §230; *Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 39.)

That same month, the Office of the Attorney General filed a new complaint, charging the same Defendants with conspiracy to commit money laundering (count 1), money laundering (counts 2-27), and conspiracy to commit pimping (count 28).  The People also allege three sentencing enhancements based on the amount of money involved in the financial transactions.  Defendant Ferrer also faces charges of pimping a minor under 16 years old (counts 29-31, 40), pimping a minor (count 32), pimping (counts 33-36, 39), and pimping a minor 16 years old (37-38).

On January 19, 2017, Defendants filed a Motion to Enforce the Court's Order of Dismissal; Alternative Demurrer; and Request to Transfer to Judge Bowman and Further Relief.  On January 23, 2017, the People filed an Opposition.  On March 6, 2017, Defendant filed a brief in further support for the above named Demurrer under Penal Code section 1004, and the People responded in further Opposition on March 8, 2017.  The People also filed a Motion to Strike the declaration of defense counsel and Defendants' Exhibits A-J, attached to the Motion of January 19, 2017.  On March 10, 2017, the parties addressed in open court Defendants' concerns of whether the complaint was sufficiently pled such that Defendants have been adequately apprised of the charges.  Of particular concern was the money laundering charges, which charged Defendants with money laundering under the transactional prong but did not specify the underlying criminal activity.  (See Penal Code 86.10(a)(2).)  The Court invited the People to consider amending the complaint.

The People submitted the First Amended Criminal Complaint to the Court on March 24, 2017.  This was deemed filed on April 28, 2017.  The First Amended Complaint added several allegations and overt acts that explained the theory of prosecution.  In particular, the People provided clarification that the money laundering charges are based on bank fraud, wire fraud and prostitution.  On May 26, 2017, Defendants addressed the amended charges in their Continued Demurrer to Dismiss the State's Complaint.  The People filed an Opposition on June 9th, and Defendants filed a Reply on June 23, 2017.

### Court's Legal Analysis and Ruling

The parties have briefed multiple issues that may be grouped into three categories.  Defendants argue that the prosecution constitutes harassment and should be curtailed.  Defendants also make several challenges to the pleadings and argue that procedural and facial defects prohibit the instant prosecution from going forward.  Finally, Defendants argue that the First Amendment bars the instant prosecution because it is based on impermissible interference with publisher functions.

I.      **Nature of the Prosecution**

    A.      <u>Basis for the prosecution</u>

Since at least 2010, public officials and state prosecutors have been pressuring Backpage to remove the "Adult Services" category from the website in an endeavor to combat sex trafficking.   With Backpage's refusal to comply, a philosophical disagreement between public officials and Backpage as to how best to combat sex trafficking is clearly present.  (See *Backpage.com, LLC v. Lynch*, 216 F.Supp.3d 96, 100, fn. 2.)  Defendants note the instant prosecution is one of a recent rash of attempts to assign liability for affiliation with Backpage.  Defendants claim that in each case, including the previous prosecution dismissed by Judge Bowman, Backpage successfully argued that it was entitled to immunity under the CDA.  Defendants argue that in light of this clear immunity, the instant charges are brought in bad faith and the prosecution is vindictive.  Defendants argue that this is not the first time a government official has used coercive techniques to attempt to shut them down.  (See e.g., *Backpage.com, LLC v. Dart* (7th Cir. 2015) 807 F.3d 229 [in his professional capacity, Cook County Sheriff threatened Backpage.com business partners in an attempt to dry out Backpage business].)

Yet, perhaps another possible perspective is that there is a growing desire to hold online media accountable for their role in disseminating information leading to condemnable acts by third parties.  (See e.g., *Cohen v. Facebook, Inc.* E.D.N.Y. May 18, 2017) 2017 U.S. Dist. LEXIS 76701, *28-31 [seeking to hold Facebook liable for allowing Hamas to use its platform to encourage terrorist attacks]; and *Fields v. Twitter, Inc* (N.D. Cal. 2016) 217 F.Supp.3d 1116 [seeking to hold Twitter liable for providing ISIS an account to use for spreading extremist propaganda]. )

This Court need not decide whether this prosecution is brought in bad faith, nor is there a sufficient factual basis to do so, at this juncture.  As discussed below, whether this case proceeds depends, in part, on whether Defendants enjoy immunity against these new charges under the CDA.  This immunity was provided by Congress, and regardless of where Backpage floats on the tide of public opinion, the immunity must be modified by Congress.

B.    The People's Investigation May Continue

Defendants also request this Court to enjoin further investigation by the People and to return the materials already seized as part of the investigation.  This argument is largely based on Defendants claim that this prosecution is brought in bad faith.  At this stage, there is insufficient justification for interference with the prosecutor's functions.  (Compare *Dart, supra,* 807 F.3d at 233 [Court finding letter sent by Sheriff "containing legal threats and demands" to sever contractual ties with Backpage was clear evidence of bad acts by government official].)  Thus, Defendants' request to enjoin the People from further investigation and to return the materials seized is denied.

## II.    Procedural and Facial Challenges to the Charges

A.    Authority to File New Charges.

The parties dispute whether the instant prosecution may be initiated against Defendants.  Defendants argue the People are prohibited from re-filing charges after the original demurrer was SUSTAINED and maintain that the First Amended Complaint constitutes an improper attempt to reinstate that original complaint.  Defendants argue that the People forfeited this opportunity by failing to follow the proper procedure to cure the defects in the previous complaint, as outlined in Penal Code sections 1007-1009.  Defendants also argue that re-

ing of charges is barred because the previous complaint was dismissed on constitutional grounds. (See *People Pinedo* (2005) 128 Cal.App.4th 968, 972 [state and federal due process clauses limit the People's discretion to re-file charges].)

The People's position is that the granting of a demurrer does not bar the prosecution from filing a new complaint, even where the charges are the same. "Even a dismissal in the superior court following an order setting aside an information or indictment is no bar to a future prosecution for the same offense." (*People v. Uhlemann* (1973) 9 Cal.3d 662, 666, *citing People v. Van Eyk* (1961) 56 Cal.2d 471, 477; Pen. Code, § 999; see also Pen. Code § 1387.)   Nevertheless, the People represent that the instant charges are "substantially different" than those contained in the prior complaint and because the prior complaint was not dismissed with prejudice, the new charges are appropriate.

The Court finds the People may file the instant charges.   Judge Bowman dismissed the first complaint after finding the Defendants were entitled to immunity from prosecution under the Communications Decency Act.   While the CDA was established to protect the constitutional right to free speech, the immunity provision providing online publishers immunity from liability for third-party speech is statutory.   Thus, the dismissal was based on statutory legal grounds.   Generally, when charges are dismissed based on legal grounds, the prosecution may file a new complaint or seek a grand jury indictment. (*Uhlemann, supra,* 9 Cal. 3d at 666.) Moreover, Judge Bowman's ruling signaled that a prosecution based on treating publishers as the speaker was prohibited under the CDA.   This ruling would not prevent a prosecution under theories not subject to the immunity provision.   The People assert that the instant charges do not fall under the purview of the CDA.

B.   Jurisdiction

Defendants question whether California has jurisdiction over this prosecution.   Defendants argue that the allegation that they conducted transactions "throughout California," is insufficient because the People have not identified a single act actually committed in California.   Defendants argue that territorial jurisdiction may be raised in a demurrer and is subjected to pre-trial determination. (See Penal Code §1004(1).)

A state is not prohibited from exercising jurisdiction over criminal acts that take place outside of its borders, if the results of the crime are intended to (and do) cause harm within the state. (*People v Fortner* (2013) 217 Cal.App.4th 1360, 1363.)   California claims jurisdiction for offenses that fall under specific types of interstate situations. (*Ibid*, citing *People v. Betts* (2005) 34 Cal.4th 1039, 1047.)   For example, under Penal Code section 27, a defendant may be punished under California law for any crime committed "in whole or in part" of the state.   Similarly, under Penal Code section 788, California has jurisdiction for offenses commenced out of state then consummated in California.   Finally, under Penal Code section 778a, California has territorial jurisdiction if the defendant does a preparatory act in California that is more than a *de minimis* act toward the completion of the offense. (*Fortner, supra,* 217 Cal.App.4th at 1363-1365.)   In other words, California has territorial jurisdiction when "with intent to commit a crime" a person "does any act within this state in execution or part execution of that intent, which culminates in the commission of a crime, either within or without this state." (*People v. Renteria* (2008) 165 Cal.App.4th 1108, 1116.)

Here, the People contend that Defendants concocted a scheme to trick credit payment processors into processing payments for Backpage transactions when the processors would have otherwise declined. The People contend that this misrepresentation influenced banks to release money to Defendants. For jurisdictional purposes, the People contend that the acts of hosting a website and accepting credit payments for advertisement placement were non-*de minimis* parts of the overall scheme to defraud the banks. In this way, Defendants arguably committed more preparatory acts in California than what was deemed sufficient in *People v. Betts* (2005) 34 Cal.4th 1039, 1047, where there was sufficient evidence that the defendant's intent to molest his step-granddaughters formed in California when he suggested they go with him on a long haul truck drive. (*Id* at 1054-1056.)

This Court finds that California has jurisdiction over the instant charges. Assuming, without deciding, that Defendants intended to conduct, and participated in, the scheme alleged by the People, hosting the website through which payments were processed under fraudulent conditions was more than a *de minimis* act toward the bank fraud. The scheme would not have been as successful had it not been able to process payments for Backpage advertisements placed in California. For purposes of establishing jurisdiction, these allegations are sufficient.

C.    Case Assignment

Defendants request that this Court transfer the case back to Judge Bowman for the sake of "efficiency and to prevent forum-shopping." Defendants rely upon Penal Code section 1387, which provides exceptions to that general rule that the prosecution has an opportunity to re-file charges after one dismissal. (Pen. Code § 1387(a).) While section 1387 also serves to curtail prosecutorial harassment by placing limits on the number of times charges may be re-filed, these limitations do not dictate judicial assignment. This Court can find no justification for assignment through a method other than through the normal procedure governed by local rules 10.32 and 10.50. Defendants' request to have the case assigned to Judge Bowman is denied.

D.    Judicial Notice

Defendants have also requested this Court to take judicial notice of several documents attached as Exhibits A-J to their Motion filed on January 19, 2017. The People request this Court to strike these exhibits and the accompanying declaration from defense counsel.

This Court has been expressly called upon to review the propriety of the re-filed charges in light of the previous dismissal. Therefore, this Court takes judicial notice of the procedural history of the prior prosecution including the prior complaint and the Order granting Defendants' Demurrer. (See *People v. Putney* (2016) 1 Cal.App.5th 1058, 1063, fn. 4 [taking judicial notice of the prior case's procedural history but not the truth of any facts involving the underlying charge]; *People v. Hill* (1998) 17 Cal.4th 800, 847 [taking judicial notice of unpublished decision in separate case].)

While the previously filed complaint and dismissal order is helpful to the resolution of the matters before this Court at this juncture, Defendants' other documents do not have the same utility. (See *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564 [a court may take judicial notice of the truth of facts asserted in documents such as orders, findings of fact and conclusions of law, and judgments].) The Defendants' request to take

dicial notice for all exhibits attached to the January 19th motion, other than the previous complaint and dismissal order, is denied.  The People's motion to strike these documents is SUSTAINED.

E.    Challenges under Penal Code section 1004.

A defendant may demur on delineated statutory grounds.  (Pen. Code, § 1004; *People v. Saffell* (1946) 74 Cal.App.2d supp. 967, 972.)  These include the ability to challenge: whether the facts stated constitute a public offense; defects on the face of the accusatory pleading; or on the grounds that the pleading includes information that would be a bar to prosecution.  (Pen. Code, § 1004.  *See also People v. Goodman* (2014) 225 Cal.App.4th 950, 956.)  Literal compliance with pleading requirements under Penal Code section 952 is insufficient if the accusation fails to give constitutionally adequate notice of what the accused must defend against.  (*People v. Jordan* (1971) 19 Cal.App.3d 362, 369.)  California's system of criminal pleading under section 952 relies in part upon the transcript of the grand jury hearing or preliminary examination which must be furnished to the defendant to inform him of particular circumstances of his offense not shown by the accusatory pleading.  (*People v. Anderson* (1961) 55 Cal.2d 655, 657; *People v. Johnson* (1964) 230 Cal.App.2d 80, 86; *People v. Jordan* (1971) 19 Cal. App. 3d 362, 369-371.)

However, compliance with section 952 does not necessarily overcome a due process attack and may be challenged in a demurrer prior to preliminary hearing.  (*Lamadrid v. Municipal Court* (1981) 118 Cal.App.3d 786, 790; *Choung v. People of State of California* (1970) 320 F.Supp. 625, 629.) (*See also Lott v. United States* (1962) 309 F.2d 115, 117 [offenses must be accurately described in an indictment; and if necessary to do so, the allegations must be expanded beyond the words of the statute in order to embrace all the ingredients necessary the offense]; *United States v. Cruikshank* (1875) 92 U.S. 542, 558 [the object of the indictment is to furnish the accused with such a description of the charge against him as will enable him to make his defense and to inform him of the facts alleged; a crime is made up of acts and intent and these must be set forth in the indictment].)  The complaint must be given a reasonable interpretation and read as a whole with its parts considered in their context.  (*People v. Biane* (2013) 58 Cal.4th 381, 388.)

*1.   Money laundering premised on federal offenses.*

Defendants argue that the charges do not constitute a public offense because the People have no authority to base their state prosecution for money laundering upon violations of federal bank or wire fraud laws.  The People respond that California law allows the state to incorporate federal offenses by reference, and the California money laundering statute specifically contains such a reference.  This Court agrees with the People.

Penal Code section 186.10, subdivision (a), provides in pertinent part: "Any person who conducts or attempts to conduct a transaction or more than one transaction within a seven-day period involving a monetary instrument or instruments of a total value exceeding five thousand dollars ($ 5,000), or a total value exceeding twenty-five thousand dollars ($ 25,000) within a 30-day period, through one or more financial institutions (1) with the specific intent  to promote, manage, establish, carry on, or facilitate the promotion, management,

establishment, or carrying on of any criminal activity, or (2) knowing that the monetary instrument represents the proceeds of, or is derived directly or indirectly from the proceeds of, criminal activity, is guilty of the crime money laundering."

Penal Code section 186.9 defines "criminal activity" as a criminal offense punishable under the laws of the state by imprisonment in the state prison or from a criminal offense committed in another jurisdiction punishable under the laws of that jurisdiction by death or imprisonment for a term exceeding one year. (Pen. Code §186.9(e).)  Federal bank fraud, in turn, is punishable by imprisonment for a term of not more than 30 years. (18 U.S.C. §1344.)  Similarly, federal wire fraud is punishable by not more than 20 years, absent special circumstances. (18 U.S.C. §1343.)  Thus, it appears that federal bank and/or wire fraud may serve as the criminal activity underlying a charge of California money laundering.

### 2. The First Amended Complaint is Sufficiently Pled.

Defendants also argue that even if a state money laundering prosecution may be predicated on a federal offense, the charges are uncertain and fail to adequately apprise them of the actions against which they must defend.  Despite the amendments to the charges, Defendants continue to assert a lack of specificity as to the transactions and monetary instruments allegedly involved in the money laundering.  Defendants assert that the People may not rely on a simplistic pleading under Penal Code section 952, but must satisfy constitutional due process requirements as well.  The People respond that they have complied with their pleading requirements and the case should be advanced to the preliminary hearing, where the full nature of the charges will become clear.

This Court agrees the complaint is not a model of clarity.  However, the nature of the charges and theories of prosecution are ascertainable from the amended charging instrument.  Specifically, the People now allege that Defendants conspired to orchestrate a bank fraud by misrepresenting to credit payment processors that they were not processing transactions from Backpage, and this misrepresentation would trigger a release of funds from banks.  The overt acts alleged clarify that Defendants created multiple classified websites, and when applying for (at least one) merchant account, Defendant Ferrer omitted any reference to Backpage, despite intending to process Backpage transactions through the account.  The People allege that credit payment processors, along with American Express, would not have knowingly processed the payments for Backpage and the banks would not have released funds absent Defendants' trickery.

These allegations provide sufficient notice for Defendants to understand the nature of the charges and prepare a defense.  Essentially, either Defendants did - or did not - materially represent to credit payment processors in a scheme to fraudulently obtain money from banks.  If Defendants did so, this may form the basis for a money laundering charge.  (Cf. *United States v. Mason* (9ᵗʰ Cir. 1990) 902 F.2d 1434, 1443[1] [federal money laundering conviction supported by evidence that bank would not have opened a merchant account had it known it was laundering credit charges for prostitution; the false representation to the credit processor influenced the bank's release of funds].)  The factual resolution to that question, however, is not at issue here.

---

[1] Overruled, on other grounds in part by *United States v. Doe* (9ᵗʰ Cir. 2013) 705 F.3d 1134, which was later withdrawn.  See also *United States v. Warshak* (6ᵗʰ Cir. 2010) 631 F.3d 266.

What is at issue is whether the First Amended Complaint has been sufficiently pled to meet statutory and due process requirements.

This Court finds the First Amended Complaint provides Defendants notice of the offenses of which they are accused, and Defendants are adequately apprised of the conduct against which they must defend. (Penal Code §952; *Lamadrid, supra,* 118 Cal.App.3d at 791.) In fact, Defendants' knowledge of the nature of the charges and theory of prosecution has been demonstrated throughout the briefing process and during argument to the Court. Therefore, the First Amended Complaint meets statutory and due process requirements and is sufficiently pled to go forward.

F.   Purported Defects in the Money Laundering Charges

To prove that the defendant is guilty of money laundering, the People must ultimately show the act of conducting financial transaction(s) of a minimum amount, within a certain time frame, and that when the defendant did so, he either intended to promote criminal activity or he knew that the money represented the proceeds of criminal activity or was derived directly or indirectly from the proceeds of criminal activity. (CALCRIM 2997)

1.   One Act, One Crime Concerns

Defendants argue that even if charges are sufficiently pled, the money laundering charges are fatally flawed because they are premised on the same acts as those allegedly constituting bank or wire fraud. Defendants argue that under the People's theory, the credit payments impermissibly constitute both the bank fraud and the money laundering.

Notably, the federal bank fraud statute punishes the fraudulent scheme, not necessarily the completion of the scheme. The offender must acquire (or attempt to acquire) bank property by means of the material misrepresentation. (*Loughrin v. United States* (2014) 134 S.Ct. 2384, 2393-2394.) Because bank fraud may be completed upon attempting to effectuate the scheme, there exists a range of punishable behavior that is subject to factual determinations by the trier of fact. That is separate and apart from the question at bar; *i.e* whether the charges are adequately pled.

Nevertheless, the parties draw attention to a problem identified by the federal courts that may arise when federal money laundering is based on federal bank or wire fraud, and suggest the same problem is present here. When the activity required to commit the fraud encompasses activity required to commit money laundering, the two offenses should merge into one offense under federal law. (See e.g., *United States v. Wilkes* (9th Cir. 2011) 662 F.3d 524, 545-546 [if a successful bank fraud requires concealment of financial transactions, the defendants cannot be charged with that same act of concealment a second time, as relating to the commission of money laundering].) Perhaps the most common "merger" problem arises when the court must parse out (or trace) the money involved in the underlying crime and money involved in the laundering. As a result, there are a plethora of federal cases that discuss tracing the proceeds of the criminal activity in order to determine when the bank or wire fraud ends, and money laundering begins. Indeed, the parties spend much time debating this issue.

Included in this discussion is the appropriate federal definition of "proceeds" for tracing purposes.  (Compare *United States v. Santos* (2008) 553 US 507 [plurality decision defining "proceeds" as profits rather than gross receipts] with *United States v. Grasso* (9th Cir. 2013) 724 F.3d 1077, 1091 [recognizing subsequent legislative amendment defining "proceeds" as including gross receipts of criminal activity].)

Despite the parties' request to weigh in on this vexing problem faced by federal courts, the difficulty in defining and tracing proceeds does not appear to so plague the California money laundering statute.  The bench notes in CALCRIM 2997 governing Money Laundering instruct, "If the definition of proceeds is an issue, see *United States v. Santos* – which holds that 'proceeds' in the federal money laundering statute means 'profits.'"  There is no recognition of the legislative definition of "proceeds" enacted after *Santos*.  This signals an intentional divergence from federal law and provides us with a clear definition of the *type of money to be traced*.

Additionally, *People v. Mays* (2007) 148 Cal.App.4th 13, the lead case involving money laundering, provides guidance on *how to trace the money* from the underlying criminal activity on its path to be laundered.  The *Mays* court determined that our "promotional" money laundering prong under subsection (a)(1) of Penal Code section 186.10 requires monetary transactions to be made with a specific intent to keep the criminal activity alive.  (*Id* at 29.)  Under this section, there is no need to trace any funds, since there is no requirement that the money to be derived from an illegal source in order to promote criminal activity.  (*Id* at 30)

However, under the "transactional" prong of subsection (a)(2), the requisite mens rea is knowledge that a monetary instrument represents criminal proceeds.  Under this subsection, tracing the source(s) of transactions is required.  Monetary instruments must be composed of the minimum statutory amount solely from criminal proceeds; it is insufficient merely to show the transaction was the right amount and from an account with comingled funds.  This requires the government to show: the defendant's entire business was illegal, there were deposits of the minimum statutory amount or more in criminally derived funds, or there was a transfer of all funds out of the account.  (*Mays, supra*, 148 Cal.App.4th at 32.)

Here, Defendants have been charged under both prongs of the money laundering statute.  This means Defendants are being charged with, essentially, either investing money into the underlying criminal scheme, or conducting transaction with profits from the scheme and the People must show that the profits came solely from that underlying criminal activity.  Regardless of whether the People will succeed in meeting their burden of proof, the theory and the charges under which they are proceeding appear to be valid under California law and adequately pled such that any defect does not bar prosecution.

## 2.     *Bank Fraud May be Premised on Intent to Defraud a Third Party*

Defendants argue that even if the "criminal activity" underlying a money laundering charge may be based on a federal bank charge, the instant allegations of bank fraud are facially deficient because Defendants had no relationship with the banks named in the First Amended Complaint and therefore could not have been victims of bank fraud.

The federal bank fraud statute states:  "Whoever knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of

false or fraudulent pretenses, representations, or promises; shall be fined not more than $ 1,000,000 or imprisoned not more than 30 years, or both." (18 USC §1344.)

Subsection (1) requires intent to defraud a financial institution.  To act with the "intent to defraud" means to act willfully, and with the specific intent to deceive or cheat for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself.  (*United States v. Brandon* (1st Cir. 1994) 17 F.3d 409, 425.)  Subsection (2) requires that a defendant "knowingly execute[ ], or attempt[ ] to execute, a scheme or artifice" and has two elements. First, the clause requires that the defendant intend "to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution." Second, the clause requires that the envisioned result—i.e., the obtaining of bank property—occur "by means of false or fraudulent pretenses, representations, or promises."  (*Loughrin v. United States* (2014) 134 S. Ct. 2384, 2388-2389.)  There must be a "relational" connection between the alleged false statements or representations and the obtaining of bank property, such that the misrepresentation is material.  (*Loughrin v. United States* (2014) 134 S. Ct. 2384, 2393.)

A material misrepresentation made to a third party may qualify if it induces the bank to depart with its property.  (See *United States v. Nguyen* 2017 U.S.Dist. LEXIS 32549, *18-19 and *Loughrin v. United States* (2014) 134 S.Ct. 2384, 2389 [both stating that bank fraud can cover deception of a non-bank custodian with a goal to obtain a bank's property].)  This theory of bank fraud has been pursued in other jurisdictions. For example, in *United States v. McNeil* (9th Cir. 2003) 320 F.3d 1034, 1039, the defendant used fake identification to open an account for the purposes of receiving a false tax refund, with the ultimate goal of transferring money from the fake account to his own.  The 9th Circuit rejected the argument that the conviction was invalid because true victim was the IRS and not the bank.  The court determined that the plan was two-fold; fraudulently obtain money from the IRS, then (after the bank becomes a holder-in-due-course) misrepresent to the bank that Defendant was ultimately entitled to the money. (See also *United States v. Warshak* (6th Cir. 2010) 631 F.3d 266, 309-310 [jury could find that misrepresentation made to deceive payment processor to continue to process payments when they would otherwise decline constitutes bank fraud];  *United States v. Johnson* (C.D. Ut. 2015) 2015 U.S.Dist. LEXIS 145102, *6 [submitting a fraudulent merchant account applications to a bank so that online sales could be processed can constitute bank fraud].)

By extrapolation, the instant allegations of bank fraud based on the theory that Defendants made a material misrepresentation to a credit payment processor, which induced a bank to depart with its property, may be proper and may serve as the predicate "criminal activity" for a state money laundering charge.

### 3.   Money Laundering Based on Wire Fraud

Defendants are also charged with both prongs of money laundering after violating the federal wire fraud statute under 18 USC section 1343.  Wire fraud is committed when: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for

the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both...." (18 USCS § 1343.)

Wire fraud does not require proof that the defendant's conduct violated a separate law or regulation. Rather, wire fraud has only three elements: "(1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and (3) a specific intent to deceive or defraud." (*United States v. Green* (2010) 592 F.3d 1057, 1064, quoting *United States v. Shipsey* (9th Cir. 2004) 363 F.3d 962, 971.) The scheme to defraud must only include an "affirmative, material misrepresentation." (*Green, supra,* 592 F.3d at 1064).

Here, Defendants are faced with two counts of money laundering based on wire fraud, listing American Express as the victim and describing the fraudulent behavior as "using interstate wires by using various payment entities to disguise the true nature of the transactions." Factually, the People have alleged that American Express signaled its intent to discontinue processing Backpage's credit payments after May 1, 2015, but Defendants continued to process American Express transactions from Backpage. The People also allege that Defendants created shell companies and engaged in factoring in order to obscure the nature and/or source of the credit payments.

In light of the general money laundering discussion above, this Court finds no reason to prevent prosecution for money laundering based on wire fraud.

## III.   Application of The First Amendment

In addition to the above facial attacks on the complaint, Defendants contend that the First Amendment bars prosecution for all charges, as the People are seeking to prosecute them for publishing functions. However, the instant charges are not based on an overt attempt to criminalize the act of publication, and traditional First Amendment analysis is not required here. Indeed, the money laundering charges based on bank and wire fraud, on their face, are not based on publication of third party speech at all. Rather, they are based on the purported illegality of Defendants financial operations. This Court finds that the immunity provision of the CDA is not triggered by the money laundering charges based on bank or wire fraud. Thus, the following discussion is directed at the pimping charges faced by Defendant Ferrer and the money laundering charges based on prostitution.

That is not to say that the First Amendment is not implicated at all. Indeed, the protections afforded by the First Amendment were the motivating factors behind the enactment of the CDA. Congress expressly intended to relieve online publishers from liability for publishing third-party speech. (47 U.S.C. § 230)

As noted above, Penal Code section 1004 allows for a demurrer on the basis that the complaint contains matter which, if true would legally bar the prosecution. (Penal Code §1004.) The language of the CDA itself states, "No cause of action may be brought and no liability will may be imposed under any State or local law that is inconsistent with this section." (47 U.S.C. §230 (e) (3) (emphasis added).) This statutory language clearly demonstrates a legislative intent to provide both a bar to prosecution and an affirmative defense at trial. Thus, the relevant question in this case is whether, and to what extent, Defendants' activity entitles them to protection of their First Amendment rights through the immunity provision of the CDA.

A.   Immunity Under the Communications Decency Act

The CDA provides immunity for online publishers and distributors of content generated by third parties. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 39.) Protection from the CDA is broken down into three parts. Conduct is shielded if the defendant (1) is a provider or user of an interactive computer service; (2) that the plaintiff seeks to treat as a publisher or speaker; (3) of information provided by another information content provider. (*Fields v. Twitter, Inc.* (N.D. Cal. 2016) 217 F.Supp.3d 1116, *1121; *Doe v. Backpage.com LLC* (2016) 817 F.3d 12, 19; 47 U.S.C. §230.) "There has been near-universal agreement that section 230 should not be construed grudgingly." (*Doe, supra*, 817 F.3d at 118 [citations omitted].)

To determine whether defendant faces a claim that seeks to treat the defendant as a publisher or speaker of information provided by a third party, "courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker." (*Barnes v. Yahoo!, Inc.* 570 F.3d 1096, 1101-02.) Moreover, because distributors are included in the publisher category, distributors are also entitled to protection under the CDA. After all, publication includes every repetition and distribution of material. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 45.) Under the CDA, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune." (*Fair Housing Council of San Fernando Valley v. Rommates.com, LLC*, (9th Cir. 2008) 521 F.3d 1157, 1170-1171.) The Ninth Circuit has recognized that although "there will always be close cases where a clever lawyer could argue that something the website operator did encouraged the illegality...Such close cases must be resolved in favor of immunity..." (*Id* at 1174.)

As applied to the instant case, there are two possible theories of prosecuting Defendants for pimping. A defendant can be convicted of pimping under a theory that involves actual solicitation of prostitution. Alternatively, defendants may be prosecuted under the theory that defendants derived support from the earnings of another's act of prostitution. (*See People v. McNulty* (1988) 202 Cal.App.3d 624, 630 [stating the two theories of prosecution for pimping].) The People rely on the second theory in asserting that Defendant Ferrer knowingly lived and derived support from prostitution earnings.

### 1.   *Theory that Defendant's derived financial support from prostitution*

The People maintain that pimping will be shown when the People demonstrate that Defendants acquired income from prostitution resulting from advertisements placed in Backpage.com. Defendants maintain they merely accepted payment for a legitimate publishing function.

This Court finds *People v. Grant* (2011) 195 Cal.App.4th 107 helpful. *Grant* discusses a distinction between financial support received by the prostitute (illegal) and funds paid by the prostitute for services rendered or other purposes (legal). The appellate court emphasized that "the statutory prohibition does not preclude a person from accepting a known prostitute's funds gained from the prostitute's lawful activities or for purposes other than the person's support and maintenance." (*Id* at 116. *See also Allen v. Stratton* (C.D.Cal. 2006) 428 F.Supp.2d 1064, 1072, fn 7 [a natural reading of the pimping statute does not apply to an individual who provides a legitimate professional service to a prostitute even if paid with proceeds earned from prostitution, the service provider derives support from his own services]; *People v. Reitzke* (1913) 21

Cal.App.740, 742 [a legitimate defense to pimping is that a prostitute supplied defendant money for any purpose other than being supported or maintained by the prostitution].)

Here, there is no dispute that Backpage charged money for the placement of advertisements. Providing a forum for online publishing is a recognized legal purpose that is generally provided immunity under the CDA. This immunity has been extended by the courts to apply to functions traditionally associated with publishing decisions, such as accepting payment for services and editing. (*See e.g.,Doe v. Backpage.com, LLC* (817 F.3d 12, 15, *petition for certiorari denied* January 9, 2017[decisions regarding posting standards and requirements, including accepting payments for posting, are not distinguishable from publisher functions].)

However, the People dispute the "services" at issue. The People argue that the Backpage website generated income through its "Escort" section, which invariably contained prostitution advertisements. Because these advertisements are not for legal services and Defendants were well aware of the nature of the advertisements, the People argue that any claim of immunity under the CDA is defeated. (Pre-trial proceedings, July 14, 2017) The People would have this Court determine that the services provided are based on the content of the advertisement rather than the forum on which the advertisement is posted. Yet, to hold Defendant responsible for the content of the advertisement would require holding a publisher liable as if he was the speaker of the content. Contrary to the People's claim, doing so directly triggers, not defeats, the immunity provision of the CDA.

However, that does not end our inquiry. Immunity may be removed if Defendants' conduct went beyond those of a publisher and constituted content creation. This may happen when a provider crosses the line from providing a neutral interactive service that simply replicates offending third party matter and instead takes active control of the content of a web posting. (*Doe v. Backpage.com LLC* (D.C. Mass 2015) 104 F. Sup.3d 149, 156.) short, if a provider's acts "materially contribute" to the illegality of the material, immunity will be lost. (See *Fair Hous. Council v. Rommates.com, LLC* (9th Cir. 2008) 521 F.3d 1157, 1166 [defendant became a content provider by requiring an answer to discriminatory questions, defendant's unlawful questions sought unlawful answers as a condition to doing business]; *Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398-408-409 [a service provider must require third-parties to enter unlawful or actionable content to be deemed a content provider]; *FTC v. LeadClick Media* (2nd Cir. 2016) 838 F.3d 158, 175 [encouraging and managing another site to post fake news in order to boost web traffic and sales for client results in content creation]; and (*FTC v. Accusearch Inc.* (10th Cir. 2009) 370 F.3d 1187 [no immunity for company that created offensive content by paying researchers to illegally obtain phone numbers, then resold the numbers online].)

The People claim that Defendant Ferrer has gone a step beyond merely accepting payments for advertisements placed online. Allegedly, Defendant Ferrer created content, connected pimps and traffickers with purchasers, and helped them avoid law enforcement. The People allege that, through Backpage's posting guidelines, Defendant Ferrer encouraged, maintained and assisted illegal prostitution for purposes of his own financial gain.

   a.   Editing

The People allege Defendants created a moderation system where terms would be deleted or blocked by Backpage but the user would still be allowed to post the advertisement and compensate Defendants. The People

lege that "such edits would not change the users' intent....but merely create a disguise." (Amend. Comp. 26) The People allege that these actions resulted in blocking certain prostitution terminology, but coded or obscured language and pictures were allowed to be posted. The People allege that Defendant Ferrer directed staff to delete or block words that were code for underage girls, but allowed the advertisement to be posted for a fee. (Amend. Comp. 26) The People contend that this constitutes "material contribution" to the offensive material. (Pre-trial proceedings, July 14, 2017, p 26)

In light of the People's acknowledgement that Backpage's edits would not change the user's intent, there can be no material contribution to the offensive content. Indeed, such actions generally fall within the scope of protected editorial functions. (See *Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12, 20-21 [service providers' decisions on website structure, rules for posting and reposting - even when previously blocked - are protected publisher functions] and *Fields v. Twitter, Inc.* (N.D. Cal. 2016) 217 F.Supp.3d 1116, 1122 [protected publishing activity included decisions about what third party content may be posted or reposted online].)

Even if the edits or posting rules allow advertisers to use coded language, this is insufficient to render the website operator a content provider. The crucial distinction is between engaging in actions (traditional to publishers) that are necessary to the display of unwelcome and actionable content, and responsibility for what makes the displayed content illegal or actionable. (*Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398, 414 [].) Here, it is the third-party who is responsible for the illegal content of the advertisement.

The People also allege that Defendants knew that the ads placed were for prostitution and Defendants purposefully crafted their posting procedures to maximize their profits from this prostitution. Yet courts have refrained from presuming to know a publisher's motivations for editorial decisions. First, "it is well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech." (*Universal Commun. Sys. v. Lycos, Inc.* (1st Cir. 2007) 478 F.3d 413, 420, citing *Barrett v. Rosenthal* (2006) 40 Cal. 4th 33). Thus, even if Backpage knew of the unlawfulness of the content of the ads, knowledge is insufficient to render Defendants liable. This is true regardless of whether Backpage even exercised its editorial discretion and deleted or blocked certain terms from ads. (See *Doe II v. MySpace Inc,* (2009) 175 Cal.App.4th 561, 571 [immunity under section 230 applies even when self-regulation is unsuccessful or unattempted]; *Doe v. Backpage.com, LLC* (1st Dist. 2016) 817 F.3d 12, 21 [rejecting claim that website operators should be liable for failing to provide sufficient protections to users from harmful content created by others].)

Additionally, in *Backpage.com v. McKenna* (Wash. W.D.C. 2012) 881 F.Supp.2d 1262, the court recognized the difficulty in assigning knowledge of a third party's intent to a publisher when that third party places an ad with Backpage. The court acknowledged that the pimp who publishes the advertisement certainly knows whether his offer is implicitly for sex, but expressed serious doubt that one could assign such knowledge to a publisher as to whether an advertisement "implicitly" offered sex. If an online service provider publishes advertisements that employ coded language, a reasonable person could be misled to believe that facts exist when they do not: an advertisement for escort services may be just that. Moreover, if the offer is "implicit," a third

party cannot ascertain that which is being offered before the transaction is actually consummated – a fact not likely to be known by a publisher. (*Id* at 1279.)

Finally, courts have stated that the motivation behind editorial decisions "do not alter the fact that the complaint premises liability on the decisions that Backpage is making as a publisher with respect to third-party content." (*Doe v. Backpage.com, LLC* (1st Dist. 2016) 817 F.3d 12, 21.)  Immunity depends on the source of the information in the injurious statement, not the source of the statement itself. (*Universal Commun. Sys. v. Lycos, Inc.,* (1st. Cir. 2007) 478 F.3d 413, 419-420 [immunity only applies when the information that forms the basis for the state law claim has been provided by "another information content provider"]; 47 U.S.C. §230 (c)(1).)

Here, the People acknowledge that advertisements are placed by third parties and Backpage's edits "would not change the users' intent." Nor is there an allegation that Defendant(s) set up the website to require offensive content to be supplied, as in *Roommates, Bollaert* or *Dirty World*. As such, there is no material contribution to the offensive content in the advertisements, and the allegations reference traditional publisher functions.

### b.    Use of Profile Information

The People also specifically allege that "Defendants created profiles for the victims named in [several] counts [ ] without their knowledge." (Amend. Comp. 20, overt act 18)  These false or nonexistent profiles were "created from Backpage data and [then] used on other websites." Allegedly, sometimes content that was edited out on Backpage was displayed on the affiliated websites of BigCity.com or EvilEmpire.com. In doing so, Defendants unlawfully used another's image "for the Defendants' own commercial gain," and to advertise their own product. (Amend. Comp. 25)  The People claim that this "misappropriation" of the likeness of Backpage users resulted in content creation. (Amend. Comp. 25)

Similar allegations were considered in *Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12 and *Anthony v. Yahoo! Inc* (N.D. Cal. 2006) 421 F.Supp.2d 1257. The People cite *Anthony* as instructive. (Opp. 12)  In *Anthony*, Plaintiffs belonged to an online dating service through Yahoo!. Plaintiffs alleged that Yahoo! created false profiles and sent those false profiles to users as enticement to renew their dating subscription. The court refused Yahoo!'s claim of immunity under the CDA at the dismissal stage. The court stated that the allegations that Yahoo! actively created false profiles, not merely that Yahoo! failed to delete the expired profiles, were sufficient to allow the case to go forward.

In *Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12 , plaintiffs brought claims against Backpage alleging unauthorized use of a person's picture. Plaintiffs alleged that Backpage used their photos to garner advertising revenues from their traffickers. (*Id* at 27.) The court found that although Backpage profited from the sale of advertisements, it was "not the entity that benefitted from the misappropriation." Rather, the party who benefitted from the misappropriation was the original advertiser. The court stated, "Matters might be different if Backpage had used the pictures to advertise its own services…" (*Ibid.*)  (See also *Perkins v. LinkedIn Corp* (N.D. Cal. 2014) 53 F.Supp.3d 1222, 1247 [defendant was a content provider when defendant, in an effort to increase its own business, unilaterally crafted and sent membership invitation emails to users' contacts].)

The People assert that Defendant Ferrer falls under the above exceptions when he created and then used profile information to increase Backpage revenue. Yet the People acknowledge that the information used was "created from Backpage data." Thus, it is clear that Defendants did not fabricate the data, as in *Anthony*. There is no allegation that in taking the data from the Backpage ads, Defendants created the injurious nature of the material. (See *Doe v. Friendfinder Network, Inc.* (D.C. N.H. 2008) 540 F.Supp.2d 288, 295 [website operator is not a content provider when there is no indication it contributed to the injurious character of the content].) Moreover, the People's allegation that the purpose of these "new" posts was to direct web traffic back to Backpage demonstrates that if a person was interested in the reposted profile, the person was redirected to the ad on Backpage. While additional advertisement revenue may have been a byproduct of this redirection, the original poster gained increased visibility of his ad. Increased visibility to the classified ads posted by third parties permissibly leads to search engine optimization in an effort to increase the visibility of the information provided by the third party. (See *Asia Econ. Inst. V. Xcentric Ventures LLC* (C.D. Cal. 2011) 2011 U.S. Dist. LEXIS 145380, *19 [increasing the prominence of a page in internet searches do not amount to "creation or development of information"].) Indeed, the very purpose of the online advertising accessed by the third party in placing an ad in Backpage was to provide accessibility to the public on a large scale. (See *Ibid* [the purpose of consumer reports is to provide accessibility to the public on a grand scale and "increasing the visibility of a statement is not tantamount to altering its message"]; See also *M.A. ex rel. P.D. v. Village Voice Media Holdings, LLC* (E.D. Mo. 2011) 809 F.Supp.2d 1041 ["Whatever [Backpage] did to increase their profitability ad visibility, did not create the content of the offensive posted information."].)

c.      Overall Course of Conduct

The People attempt to establish a pattern of an overall course of conduct to indicate Defendants sought to structure their business to obtain maximum profits from the illegal sex trade. The People allege that Defendants "manipulated" advertisements to evade law enforcement detection. The People state, "In this way, rather than prevent a child from being sold for sex, the Defendants would knowingly profit from the child's commercial sexual exploitation and assist the trafficker to evade law enforcement." (Amend. Comp. 26)

The People maintain Backpage's conduct is similar to *J.S. v. Vill. Voice Media Holdings, LLC* (2015) 184 Wn.2d 95. In that case, advertisements featuring three minor girls were posted online on a site owned by Backpage. These girls became victims of sex trafficking and later brought suit against Backpage. Backpage moved to dismiss the case on the basis of immunity provided by the CDA. The Washington Supreme Court refused to grant the motion to dismiss. (*Id* at 98-99.) The *J.S.* court stated that the case turned on whether Backpage merely hosted the advertisements or helped develop the content of those advertisements. (*Id* at 101)

Applying the applicable state standard for a motion to dismiss, the *J.S.* court found that the plaintiffs alleged facts that, if proved true, would show that Backpage did more than simply maintain neutral policies prohibiting or limiting certain content. Specifically, those allegations included that Backpage intentionally developed its website to "require" information that allows and encourages illegal trafficking of underage girls, developed content requirements that it knows will allow solicitors to evade law enforcement and that Backpage

knows that the foregoing content requirements are a fraud and ruse actually aimed at helping pimps and prostitutes. (*Id* at 102.)

Here, however, the factual allegations fall short of those alleged in *J.S.*. There is no allegation that Defendants required information essential to the illegal trafficking of underage girls. Instead, the People's allegations attempt to assign criminal liability to Defendants who offered an online forum, on which other people posted advertisements that led to prostitution, and that Defendants realized profits instead of "actively preventing" the sale of sex. These allegations confuse moral obligations with legal ones and have been rejected in other jurisdictions. For example, in *M.A. ex rel. P.D. v. Village Voice Media Holdings, LLC* (E.D. Mo. 2011) 809 F.Supp.2d 1041, Defendants were SUSTAINED immunity under the CDA for allegations that Backpage knowingly accepted a fee for advertisements leading to prostitution, and "created information" by hosting a search engine, providing instructions for increased visibility of advertisements and allowed for anonymous payment. (*Id* at 1044.) (See also *Doe v. Backpage.com LLC* (2016) 817 F.3d 12, 22 [rejecting the plaintiffs' assertion that Backpage participated in an affirmative course of conduct and actual participation in sex trafficking by charging for advertisements and allowing users to pay an additional fee for increased advertisement visibility and holding that "claims that a website facilitates illegal conduct through its posting rules necessarily treat the website as a publisher or speaker of content provided by third parties and, thus, are precluded by section 230(c)(1)."].)

As alleged here, the prostitution took place as a result of an advertisement placed by a third party. Thus, the only "manipulation" would be in the act of extracting the content from the original ad and/or from the act of physically posting the extracted content on a new site. Backpage's decision to charge money to allow a third party to post content, as well as any decisions regarding posting rules, search engines and information on how a user can increase ad visibility, are all traditional publishing decisions and are generally immunized under the CDA. In short, the victimization resulted from the third party's placement of the ad, not because Backpage profited from the ad placement. (See *Doe, supra,* 817 F.3d at 20 [noting that the plaintiffs were harmed when they were trafficked through the advertisements whose content was created by a third party]; *Cohen v. Facebook, Inc.* (E.D.N.Y. May 18, 2017) 2017 U.S.Dist.LEXIS 76701, at *28-31 [Facebook immune from liability for allowing Hamas to use its platform to post offensive content that incited or encouraged terrorist attacks in Israel because although Facebook's role in publishing that content was an essential causal element of the claims, allowing liability to be imposed on that basis would inherently require the court to treat the defendant as the publisher or speaker of content provided by Hamas, and was impermissible under the CDA].)

B.   <u>Money Laundering Based on Prostitution</u>

The People charge Defendants with both prongs of money laundering based on a specific intent to promote prostitution in violation of 18 USC 1952, pimping in violation of Penal Code section 266h, or knowing the monetary instruments represented the proceeds of the prostitution. (See counts 15-16)

Referred to as the "Travel Act," section 1952 prohibits travel in interstate commerce or use of interstate facilities with intent to promote unlawful activity. (*United States v Villano* (10th Cir. 1976) 529 F2d 1046.) The Travel Act defines an "unlawful activity" as any crime of prostitution under state law. (See *United States v.*

*Campione* (7th Cir. 1991) 942 F.2d 429, 434.). Section 1952 refers to state law only to identify the defendant's unlawful activity; it does not require that the state crime ever be completed or proved. (*Ibid.*)

Although the parties do not discuss these specific charges at length, the previous discussion of the CDA's immunity provision as it relates to the pimping charges informs the Court's analysis with respect to these charges. As discussed above, the People are attempting to prosecute Defendants as if they were the speaker of the offensive content leading to prostitution, which is prohibited under the immunity provision of the CDA. This Court rejected the People's claim that Defendants actually created the content that led to their ability to live and derive support and maintenance from prostitution proceeds, when the face of the complaint demonstrated that Defendants engaged in protected publisher functions. Because this Court has rejected the prosecution based on the theory that Defendants engaged in pimping, their purported use of proceeds from prostitution cannot now serve as the basis for money laundering charges. As this Court has already determined, Defendants provide an online forum for third-party speech, and their decision to charge money for such postings constitutes activity protected under the CDA.

## Conclusion

As amply briefed by the parties, federal law provides broad immunity for internet service providers from both federal and state prosecutions. Indeed, the 9th Circuit federal appellate court has instructed such immunity be applied liberally. The underlying public policy is to permit, and promote, the robust growth of the internet by shielding internet providers from facing suit over the content created by those posting on their sites. If and until Congress sees fit to amend the immunity law, the broad reach of section 230 of the Communications Decency Act even applies to those alleged to support the exploitation of others by human trafficking.

However, immunity afforded to internet service providers is not without limit. Even the most ardent defenders of a vigorous world wide web would have to concede that if a provider engaged in their own criminal acts, versus those of their customers, immunity must fail. And so it is in this case. While the charges relating to pimping will not be allowed to proceed, the offenses pertaining to allegations that the Defendants themselves engaged in financial crimes, to include bank fraud and money laundering to disguise their business dealings, will survive the demurrer stage.

**Court's ruling:**

Defendants' request to enjoin further prosecutorial investigation and return of the materials seized is OVERRULED.

Defendants' request for judicial notice is OVERRULED, except as to the prior charges and orders granting the demurrer and dismissal. Within that context, the People's motion to strike the remaining exhibits is SUSTAINED.

Defendants' request to assign the case to the Honorable Michael G. Bowman is OVERRULED.

Defendants' demurrer is SUSTAINED for counts 15-16, 28-40, OVERRULED as to the remainder of the charges.

**Dated:**

_____

**Honorable Lawrence G. Brown**
**Judge of the Superior Court of California**
**County of Sacramento**