HONORABLE G. HELEN WHITENER
HEARING DATE: MAY 18, 2018, AT 9:00 A.M.
WITH ORAL ARGUMENT

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR PIERCE COUNTY

| | |
|---|---|
| R.O. and K.M., <br><br> Plaintiffs, <br><br> v. <br><br> MEDALIST HOLDINGS, INC., et al., <br><br> Defendants. | NO. 17-2-04897-1 <br><br> PLAINTIFFS' MOTION FOR SANCTIONS AGAINST BACKPAGE DEFENDANTS |

PLAINTIFFS' MOT FOR SANCTIONS
Page 1 of 16

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

## I.   RELIEF REQUESTED

After years of flouting liability, Backpage.com CEO, Carl Ferrer, has pled guilty to a range of crimes and admits Plaintiffs' allegations have been true all along: the Backpage defendants[1] (1) knew that the "great majority" of the escort ads on Backpage.com were for prostitution; (2) conspired to "knowingly facilitate state-law prostitution crimes being committed by Backpage customers" to profit from these illicit acts; (3) removed "banned terms" from advertisements posted in the "seattle escorts" and "tacoma escorts" sections of Backpage.com to mask illegal activity on the website, including prostitution, and (4) designed and maintained "an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's 'escort' and 'adult' ads."

While Ferrer awaits sentencing for criminal charges of sex trafficking, facilitating prostitution, conspiracy, and money laundering, the United States government has taken complete control of the Backpage.com website and permanently shut it down.

Ferrer's admissions show the Backpage defendants have intentionally and repeatedly made misrepresentations in discovery, depositions, and pleadings to the Court in an attempt to obstruct the civil justice system and unnecessarily increase the costs of litigation to minor trafficking victims. Under the inherent equitable powers of the Court, CR 11, CR 26(g), and CR 37(c), Plaintiffs respectfully ask the Court to impose sanctions against the Backpage defendants to punish them and discourage such bad faith litigation tactics, including 1) $100,000 to each Plaintiff as a penalty and to reimburse them for reasonable attorneys' fees and costs to prove facts that should have been admitted; 2) $100,000 to the Court, as a penalty and to reimburse the Court for time and resources spent as a result of the Backpage defendants' misconduct; and 3) Plaintiffs' reasonable attorneys' fees and costs to bring this motion. Such sanctions are warranted to deter future

---

[1] The "Backpage defendants" referenced herein include Defendants Medalist Holdings Inc., Leeward Holdings, L.L.C., Camarillo Holdings, L.L.C., Dartmoor Holdings, L.L.C., IC Holdings, L.L.C., Backpage.com, L.L.C., UGC Tech Group C.V., Website Technologies, LLC, Atlantische Bedrijven C.V., Amstel River Holdings LLC, Lupine Holdings LLC, Kickapoo River Investments LLC, CF Holdings GP LLC, CF Acquisitions LLC, Carl Ferrer, Michael Lacey, and James Larkin.

PLAINTIFFS' MOT FOR SANCTIONS
Page 2 of 16

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

misconduct by the defendants, particularly where, according to Ferrer, Backpage has made <u>hundreds of millions of dollars</u> in illegal commercial sex advertising revenue that resulted in the sexual exploitation of Plaintiffs and countless other women and children that it used to fund its bad faith litigation tactics.

## II. STATEMENT OF FACTS

**A.  Backpage Co-Founder and CEO, Carl Ferrer, Pled Guilty on Behalf of Himself and the Backpage.com Entity to State and Federal Crimes of Human Sex Trafficking, Facilitating Prostitution, Conspiracy, and Money Laundering**

On April 5, 2018, and April 9, 2018, Backpage co-founder and CEO, Carl Ferrer, pled guilty, individually and on behalf of Backpage.com corporate entities,[2] to federal and state crimes of human sex trafficking, facilitating prostitution, criminal conspiracy, and money laundering.[3]

Ferrer's admissions are spelled-out in his federal guilty plea:

> In 2004, I co-founded the website www.Backpage.com ("Backpage"), along with M.L. [Michael Lacey] and J.L. [James Larkin]. Backpage eventually became the second-largest classified advertising in the world, during its 14 years of existence, has **derived the great majority of its revenue** from fees charged in return for publishing advertisements for 'adult' and 'escort' services.
>
> **I have long been aware that the great majority of these advertisements are, in fact, advertisements for prostitution services** (which are not protected by the First Amendment and which are illegal in 49 states and in much of Nevada). **Acting with this knowledge, I conspired with other Backpage principals** (including but not limited to M.L., J.L., S.S., D.H., A.P., and J.V.)[4] to find ways **to knowingly facilitate state-law prostitution crimes being committed by Backpage customers.** For example, **I worked with my co-conspirators to create 'moderation' processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad.** Such editing did not, of course, change the essential nature of the illegal service being offered in the ad—it was merely intended to create a veneer of deniability for Backpage. **These editing practices were one component of an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's 'escort' and 'adult' ads.**[5]

---

[2] Backpage.com LLC, Ad Tech BV, Amstel River Holdings, LLC, Website Technologies, LLC, Posting Solutions, LLC, and UGC Tech Group BV.

[3] Guilty pleas, Pfau Decl. at Ex. 1.

[4] "M.L." is defendant Michael Lacey and "J.L." is defendant James Larkin.

[5] Ferrer Guilty Plea in United States District Court of Arizona Case No. 2:18-cr-000464-DJH, Pfau Decl. at Ex. 1.

PLAINTIFFS' MOT FOR SANCTIONS
Page 3 of 16

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

As part of the plea agreement, Ferrer gave immediate ownership and control of www.backpage.com and related assets to the United States government, which promptly and permanently shut down the website.[6]

### B. Plaintiffs R.O. and K.M. Filed Their Lawsuit in January 2017 Based on Allegations that the Defendants Knowingly and Intentionally Facilitated Online Prostitution and Human Sex Trafficking

In January 2017, Plaintiffs filed suit against Backpage and several co-conspirator traffickers, alleging claims under Washington's Criminal Profiteering Act, RCW 9A.82 et seq.; Washington's Sexual Exploitation of Children Act, RCW 9.68A, et seq.; negligence; outrage; assault and battery; and unjust enrichment. *Id.* R.O. and K.M. alleged the Backpage defendants are liable for the sexual exploitation they endured because the defendants (1) intentionally created an online marketplace for illegal prostitution and sex trafficking, and (2) facilitated and promoted these illicit transactions by helping traffickers create and develop commercial sex advertisements on the website, primarily through the use of so called "posting rules," "content requirements," and "moderation practices." *Id.* In October 2017, Plaintiffs served interrogatories, requests for production, and requests for admission that asked the defendants to provide information regarding their knowledge of prostitution and sex trafficking on www.backpage.com, as well as their supposed efforts to prevent such illegal activity through various business practices.[7]

### C. The Backpage Defendants Repeatedly Acted in Bad Faith and Made Misrepresentations to Plaintiffs and the Court

As evidenced by Ferrer's guilty pleas, Plaintiffs and the Court have been subjected to a long pattern of bad faith litigation by the Backpage defendants, including intentionally and repeatedly making misrepresentations in discovery responses, depositions, and pleadings, in an attempt to obstruct the civil justice system and unnecessarily increase the costs of litigation to Plaintiffs.

---

[6] *Id.*

[7] Plaintiffs' First Set of Interrogatories, Requests for Production, and Requests for Admissions to Backpage Defendants, Pfau Decl. at Ex. 2.

PLAINTIFFS' MOT FOR SANCTIONS
Page 4 of 16

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

**First**, in March 2017, shortly after R.O. and K.M. filed their lawsuit, Backpage attempted to obtain an order from Pierce County Superior Court Judge Kathryn Nelson in the case, *J.S., et al. v. Village Voice Media Holdings, LLC, et al.*, Case No. 12-2-11362-4, dismissing identical claims brought by three minor trafficking victims represented by the same legal counsel as R.O. and K.M. The motion relied heavily on a declaration signed by Backpage's general counsel, Elizabeth McDougall, swearing under oath that Backpage's business practices were intended to *prevent* prostitution and sex trafficking, not facilitate and encourage such illegal activity:

> Backpage.com also operated a two-tiered manual (human) review system (called "moderation") of ads submitted for posting to the adult category. During the first-level manual review, Backpage.com personnel assessed proposed posts to the adult category before they were allowed to appear on Backpage.com and **endeavored to prevent postings that concerned illegal conduct and other activity prohibited by the Terms of Use or Posting Rules**. During the second-level manual review, **Backpage.com personnel examined nearly every posting in the adult category that appeared on the website as a double check for potential illegal or prohibited activity**.
>
> **Backpage.com's policies, rules, and restrictions for the website were not designed or intended to induce sex trafficking or exploitation of any sort.** Backpage.com imposed and enforced rules, screened and blocked ads, and took other actions (as described above [moderation practices] **to prevent and preclude such misuse of the website.**[8]

**Next**, in April 2017, Backpage's general counsel, Elizabeth McDougall, testified as Backpage's designated CR 30(b)(6) representative and furthered Backpage's fictitious defense that the website was intended only for lawful activity. She represented that the website's editing practices were intended to prevent prostitution and sex trafficking, not promote it, testimony that was at odds with the fact that Ferrer and some of the company's other executives had recently pled the Fifth Amendment and refused to answer questions on those same topics. Her testimony is directly at odds with Ferrer's recent guilty plea:

> Q.   During the time these girls were advertised on Backpage.com [2010], do you agree that the majority of the individuals who were advertised as escorts in the section of the website were individuals who were trying to sell sex for money?

---

[8] Declaration of Elizabeth McDougall In Support of Backpage Defendants' Motion for Summary Judgment, Pfau Decl. at Ex. 3.

PLAINTIFFS' MOT FOR SANCTIONS
Page 5 of 16

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

A. No, I have no way to know that.[9]

\*\*\*

Q. We know that the company was both automatically and manually editing ads to remove terms that may indicate an ad was for sex for money, correct?

A. No, we didn't agree on that.[10]

\*\*\*

A. We used the automated filter as an efficient method to try to remove content that could potentially involve sex for money or sex trafficking or, in particular, the sex trafficking of minors.

Q. Was that also true with regard to the manual moderating that was done on these ads?

A. Yes.

Q. How does it help prevent sex trafficking if a website has an automatic filter that removes terms that may reflect an ad is for sex trafficking?

Q. The way the filter operated, the ad would be posted. After about five minutes, the objectionable term would be removed. The presumption was the user would think they had made some kind of mistake, they would go back, add the term again. After five minutes, the term would be removed again, and the intention was to – to frustrate the user so that they would stop posting. Also, with the term removed from the text, the goal was to – one of the goals was to render the ad meaningless, essentially, something that a user reading it would not respond to because they had no understanding of what it was trying to advertise.[11]

\*\*\*

A. As I said previously, if a term, like "Lolita" is included in an advertisement in the adult category, it may attract someone who is looking to have sex with a minor.

If the term "Lolita" is removed, then it's less likely that someone who is looking to have sex with a minor will be ale to or, rather, will respond to that

---

[9] CR 30(b)(6) Deposition of Backpage.com, p 64, Pfau Decl. at Ex. 4.
[10] Id. at 98.
[11] Id. at 50-51.

PLAINTIFFS' MOT FOR SANCTIONS
Page 6 of 16

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

> ad and be able to achieve that end, so it helps to prevent the instance of the sexual exploitation of a minor.
>
> In addition to that, when certain terms are removed, it can render an ad meaningless.
>
> For example, "A Lolita experience for $100," if the term "Lolita" is removed, then the ad simply says, "Experience for $100."
>
> Q. An adult might still respond to such an ad with the hope of having sex with the person for $100, correct?
>
> A. I can't answer that in the vague hypothetical.
>
> Q. So is it your testimony that if someone posted an ad in the escort section, "An experience for $100" that might not be an indication that the person who is the subject of the ad is willing to have sex for $100?
>
> A. Escorting is not sex. Escorting is a legally recognized profession, career option, and an ad saying, "An experience for $100" in an escort category, on its face, is by no means an advertisement for sex for money.
>
> Q. You understand though that often the term "escort" is synonymous with "prostitute," correct?
>
> A. No, I wouldn't agree with that statement.[12]
>
> \*\*\*
>
> Q. Do you agree that looking at this advertisement of Plaintiff S.L., the subject line is, "Cum enjoy a night with a new girl :) on the block. Nichole" do you see that?
>
> A. I do.
>
> Q. Do you agree with me that this is an indication—using the term "cum" in this context, in an ad in the escort section, is an indication that this may be an advertisement for sex?
>
> A. No.
>
> Q. Why not?

---

[12] *Id.* at 60-62.

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

    A.    For many reasons. There's very little context here to understand what service is being advertised. Furthermore, there's a large number of our users who are not particularly good spellers, and the spelling of "cum" could simply be a typo.[13]

**Next**, in November 2017, individual defendants Carl Ferrer, James Larkin, and Michael Lacey asserted the Fifth Amendment and refused to respond to Plaintiffs' Requests for Admission. However, the corporate defendants did not hesitate to flatly deny that Backpage used editing practices to conceal illegal activity, including prostitution, answers that plainly contradict Ferrer's guilty plea:

> **REQUEST FOR ADMISSION NO. 53:** Admit that you removed "banned terms" from advertisements posted in the "seattle escorts" and "tacoma escorts" sections of Backpage.com in 2010 to mask illegal activity on the website, such as prostitution.
>
> **RESPONSE:** Subject to their objections, Corporate Defendants deny Request for Admission No. 53.
>
> **REQUEST FOR ADMISSION NO. 54:** Admit that you removed "banned terms" from advertisements posted in the "seattle escorts" and "tacoma escorts" sections of Backpage.com in 2011 to mask illegal activity on the website, such as prostitution.
>
> **RESPONSE:** Subject to their objections, Corporate Defendants deny Request for Admission No. 54.
>
> **REQUEST FOR ADMISSION NO. 55:** Admit that you removed "banned terms" from advertisements posted in the "seattle escorts" and "tacoma escorts" sections of Backpage.com in 2012 to mask illegal activity on the website, such as prostitution.
>
> **RESPONSE:** Subject to their objections, Corporate Defendants deny Request for Admission No. 55.
>
> **REQUEST FOR ADMISSION NO. 56:** Admit that you removed "banned terms" from advertisements posted in the "seattle escorts" and "tacoma escorts" sections of Backpage.com in 2013 to mask illegal activity on the website, such as prostitution.
>
> **RESPONSE:** Subject to their objections, Corporate Defendants deny Request for Admission No. 56.
>
> **REQUEST FOR ADMISSION NO. 57:** Admit that you removed "banned terms" from advertisements posted in the "seattle escorts" and "tacoma escorts" sections of Backpage.com in 2014 to mask illegal activity on the website, such as prostitution.
>
> **RESPONSE:** Subject to their objections, Corporate Defendants deny Request for Admission No. 57.

---

[13] *Id.* at 83.

PLAINTIFFS' MOT FOR SANCTIONS
Page 8 of 16

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

**REQUEST FOR ADMISSION NO. 58:** Admit that you removed "banned terms" from advertisements posted in the "seattle escorts" and "tacoma escorts" sections of Backpage.com in 2015 to mask illegal activity on the website, such as prostitution.

**RESPONSE:** Subject to their objections, Corporate Defendants deny Request for Admission No. 58.[14]

Similarly, the corporate defendants denied that the "escort" advertisements in the Seattle "escorts" section of Backpage.com were mostly advertisements for prostitution:

**REQUEST FOR ADMISSION NO. 11:** Admit that by January 1, 2014, you knew that the majority of the escort advertisements in the "seattle escorts" section of Backpage.com were advertisements for prostitution.

**RESPONSE:** Subject to their objections, Corporate Defendants deny Request for Admission No. 11.

**Finally**, in March 2018, after <u>months of delay and forcing Plaintiffs to file a motion to compel with the Court</u>, Backpage finally answered interrogatories. The answers touted Backpage's "moderation" system and supposed efforts to prevent prostitution and sex trafficking on the website despite <u>knowing</u> that (1) these efforts were "merely intended to create a veneer of deniability for Backpage;" (2) Backpage was "conspiring to knowingly facilitate the state-law prostitution offenses being committed by Backpage's customers;" and (3) the "editing practices were [just] one component of an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's 'escort' and 'adult' ads."[15]

### III.   EVIDENCE RELIED UPON

This motion relies upon the Declaration of Michael T. Pfau in Support of Plaintiffs' Motion for Sanctions ("Pfau Decl."), the documents and evidence attached thereto, and the existing pleadings.

---

[14] Backpage Corporate Defendants' Responses to Plaintiffs' Requests for Admission; Carl Ferrer's Responses to Plaintiffs' Requests for Admission; James Larkin's Responses to Plaintiffs' Requests for Admission; and Michael Lacey's Responses to Plaintiffs' Requests for Admission, Pfau Decl. at Ex. 5.

[15] Pfau Decl. at ¶ 6.

PLAINTIFFS' MOT FOR SANCTIONS
Page 9 of 16

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

## IV. LEGAL AUTHORITY

### A. The Court Should Impose Sanctions Under CR 11 and its Inherent Equitable Power to Discourage Bad Faith Litigation

"Every court of justice has power . . . [t]o enforce order in the proceedings before it... [and] [t]o provide for the orderly conduct of proceedings before it[.]" RCW 2.28.010(2)-(3). Where sanctions are not expressly authorized, "the trial court is not powerless to fashion and impose appropriate sanctions under its inherent authority to control litigation." *In re Firestorm 1991*, 129 Wn.2d 130, 139 P.2d 411 (1996) (applying the principles embodied in CR 11, CR 26(g), and CR 37 to CR 26(b) violations). "[D]ecisions either denying or granting sanctions... are generally reviewed for abuse of discretion." *Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 338, 858 P.2d 1054 (1993).

Washington courts have frequently endorsed a trial court's authority to sanction bad faith conduct in litigation. For example, in *State v. S.H.*, 102, Wn. App. 468 (2000), the Court relied on a range of cases to explain a trial court's authority to issue sanctions if it believes a party has acted in bad faith:

> In *Wilson v. Henkle*, 45 Wash.App. 162, 174, 724 P.2d 1069 (1986), this court explained that Federal Rule 11 permits a court to award expenses to a litigant whose opponent acts in bad faith. It then noted that Washington's CR 11 incorporates essentially the same language as its federal counterpart. *Id.*; see CR 11; JuCR 1.4(a) (incorporating Superior Court Civil Rules in juvenile proceedings). The court stated that such a sanction is within the scope of a court's authority: "A Washington court has the inherent power to assess the litigation expenses, including attorney fees, against an attorney for bad faith litigation conduct." *Wilson*, 45 Wash.App. at 174–75, 724 P.2d 1069 (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980)).
>
> The *Wilson* court acknowledged that the trial court has "the inherent power to impose sanctions against an attorney for inappropriate and improper conduct." *Wilson*, 45 Wash.App. at 173, 724 P.2d 1069. It then discussed federal Rule 11 and CR 11, noting that both rules were amended to permit a court to award attorney fees for bad faith litigation. *Id.* at 173–74, 724 P.2d 1069. Without specifying a pleading, motion, or legal memorandum that was in violation of CR 11, the court concluded— apparently under the court's inherent authority —that the sanctions imposed by the trial court were appropriate. *Id.*; see CR 11 (authorizing sanctions for a pleading, motion, or legal memorandum that is not well grounded in fact and warranted by

PLAINTIFFS' MOT FOR SANCTIONS
Page 10 of 16

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

existing law); *see also Jemison v. National Baptist Convention USA, Inc.*, 720 A.2d 275, 287 (D.C.1998) ("[A] court may nevertheless impose sanctions (albeit not under Rule 11) when it finds that the attorney or the party has engaged in bad faith litigation.").

Although no Washington case has expressly held that a finding of bad faith is required before a court may invoke its inherent authority to sanction litigation conduct, the *Wilson* court cited a U.S. Supreme Court case that set forth such a requirement: "[A] specific finding as to whether counsel's conduct ... constituted or was tantamount to bad faith ... [has] to precede any sanction under the court's inherent powers." *Roadway Express*, 447 U.S. at 767, 100 S.Ct. 2455, cited in *Wilson*, 45 Wash.App. at 175, 724 P.2d 1069; *see also Goldin v. Bartholow*, 166 F.3d 710, 722 (5th Cir. 1999) ("The imposition of sanctions using inherent powers must be accompanied by a specific finding of bad faith."); *DLC Management Corp. v. Hyde Park*, 163 F.3d 124, 136 (2d Cir.1998) (same); *In re Keegan Management Co.*, 78 F.3d 431, 436 (9th Cir.1996) (same). The Ninth Circuit "insist[s] on the finding of bad faith because it ensures that restraint is properly exercised... and it preserves a balance between protecting the court's integrity and encouraging meritorious arguments." *Primus Automotive Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir.1997) (internal quotation marks and citation omitted).

Following Wilson and case law from other jurisdictions, we hold that a trial court's inherent authority to sanction litigation conduct is properly invoked upon a finding of bad faith. A party may demonstrate bad faith by, inter alia, delaying or disrupting litigation. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). The court's inherent power to sanction is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* at 43, 111 S.Ct. 2123 (citation omitted). Sanctions may be appropriate if an act affects "the integrity of the court and, [if] left unchecked, would encourage future abuses." *Gonzales v. Surgidev*, 120 N.M. 151, 899 P.2d 594, 600 (1995); *see also Chambers*, 501 U.S. at 46, 111 S.Ct. 2123 (explaining that sanctions are appropriate if the "very temple of justice has been defiled" by the sanctioned party's conduct); *Goldin*, 166 F.3d at 723 (same).

This Court has the inherent equitable authority to award fees and costs where justice requires doing so, *Hsu v. Ying Li v. Tang*, 87 Wn.2d 796, 799, 557 P.2d 342 (1976); *Bassett v. Bassett*, 110 N.M. 559, 798 P.2d 160, 165 (1990) (following *Hsu* to award attorney fees in costs as "bad faith" exception to the American rule on attorney fee awards), and this case presents a prime example of why such awards are sometimes necessary.

The Court should sanction the Backpage defendants because they acted in bad faith by providing false and misleading interrogatory responses and denying requests for admissions on key factual inquiries that should have been admitted. They then amplified their discovery misconduct

PLAINTIFFS' MOT FOR SANCTIONS
Page 11 of 16

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

by intentionally and repeatedly misleading Plaintiffs' counsel and the Court through deposition testimony, declarations, and pleadings where they falsely claimed the website was intended only for lawful use and sought to prevent illegal activity. The defendants made these false and misleading representations when it is now beyond dispute that they knew the opposite was true.

For roughly five years, the defendants knew that the central allegations of those seeking to hold them liable, including Plaintiffs, were that the defendants (1) <u>intentionally</u> created an online marketplace for illegal prostitution and sex trafficking, and (2) <u>intentionally</u> facilitated and promoted these illicit transactions by helping traffickers create and develop commercial sex advertisements on the website through the use of so called "posting rules," "content requirements," and "moderation practices." Despite knowing these were the fundamental allegations in this case and other cases, the defendants repeatedly denied these allegations in depositions, discovery responses, sworn declarations, and pleadings that denied liability and/or sought to dismiss the claims. Even worse, they affirmatively represented that the website was intended only for lawful purposes and their business practices were designed to prevent prostitution and sex trafficking.

But Backpage's CEO, Carl Ferrer, now admits that all of these representations were false and misleading, and more importantly, admits that Plaintiffs' allegations have been true all along. According to Ferrer, the Backpage defendants (1) knew the "great majority" of the escort advertisements on Backpage.com were advertisements for prostitution; (2) conspired to "knowingly facilitate state-law prostitution crimes being committed by Backpage customers" to profit from these illicit acts; (3) removed "banned terms" from advertisements posted in the "seattle escorts" and "tacoma escorts" sections of Backpage.com to mask illegal activity on the website, including prostitution, and (4) designed and maintained "an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's 'escort' and 'adult' ads."

PLAINTIFFS' MOT FOR SANCTIONS
Page 12 of 16

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

In light of Ferrer's admissions, it is beyond dispute that the false and misleading representations of the Backpage defendants were intended to obstruct and delay justice. Given this blatant disregard for candor, honesty, and the truth, the Court has ample authority under CR 11 and its inherent authority to award sanctions to punish the defendants and to discourage them from such bad faith litigation tactics in the future.

**B.     The Court Should Impose Sanctions Under CR 26(g) and CR 37(c) For Unjustly Withholding Highly Probative Evidence**

While sanctions are appropriate under CR 11 and the inherent equitable power of the Court, the Court also has authority to award sanctions under CR 26(g) and CR 37(c).

> The purposes of sanctions orders are to deter, to punish, to compensate, and to educate. Where compensation to litigants is appropriate, then sanctions should include a compensation award. . . . [S]anctions need to be severe enough to deter these attorneys and others from participating in this kind of conduct in the future.

*Washington State Physicians Ins. Exchange & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 341-42 (1993).

In line with *Fisons*, CR 26(g) is specifically designed to reduce "delaying tactics, procedural harassment and mounting legal costs." *Fisons*, 122 Wn.2d at 341. CR 26(g) explains the significance of an attorney or party signing discovery responses:

> The signature of the attorney or party constitutes a certification that he has read the request, response, or objection, and that to the best of his knowledge, information, and belief formed after a reasonable inquiry it is:
>
> (1) consistent with these [discovery] rules and warranted by existing law or a good faith argument for the extension, modification, or reversal or existing law;
>
> (2) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and
>
> (3) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation. …
>
> If a certification is made in violation of the rule, the court, upon motion or upon its own initiative, <u>shall impose upon the person who made the certification, the party</u>

PLAINTIFFS' MOT FOR SANCTIONS
Page 13 of 16

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

<u>on whose behalf the request, response, or objection is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney fee.</u>

CR 37(c) provides the Court with authority to issue sanctions in the event of a false, misleading, or bad faith answer or denial of a request for admission: "[i]f a party fails to admit . . . the truth of any matter as requested under rule 36, and if the party requesting the admissions thereafter proves . . . the truth of the matter, the party may apply to the court for an order requiring the other party to pay the requesting party the reasonable expenses incurred in making that proof, including reasonable attorney fees." *See Clausing v. Kassner*, 60 Wn.2d 12 (1962) (holding sanctions appropriate where defendant denied violation of restraining order and later admitted violation); *Simpson v. Thorslund*, 151 Wn. App. 276 (2009) (holding attorney fees were warranted as a discovery sanction under CR 37(c) because defendant refused to make certain admissions when requested, which led to substantial additional and unnecessary litigation costs).

The Court should award sanctions under both CR 26(g) and CR 37(c) because the Backpage defendants submitted false and misleading interrogatory responses and denied requests for admission that narrowly targeted key factual issues that should have been admitted, including (1) their knowledge of prostitution and sex trafficking on the website, and (2) their efforts to facilitate such illegal activity through various business practices, such as editing ads. Moreover, like in *Fisons*, the defendants not only made false and misleading discovery responses, but they compounded that misconduct by denying such evidence existed and going so far as to manufacture evidence to the contrary through deposition testimony and declarations by claiming the website was intended only for lawful use and sought only to prevent illegal activity.

As a result of Backpage's false and misleading efforts, Plaintiffs and their counsel have been forced to devote substantial time and effort to prove facts that should have been admitted. The Court has ample authority to sanction the Backpage defendants for their violations of CR 26(g) and CR 37(c) and to compensate Plaintiffs and their counsel for reasonable attorneys' fees and costs incurred.

PLAINTIFFS' MOT FOR SANCTIONS
Page 14 of 16

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

## V.   CONCLUSION

After years of flouting liability, Backpage's CEO Carl Ferrer now admits Plaintiffs' allegations have been true all along: the Backpage defendants (1) knew that the "great majority" of the escort advertisements on Backpage.com were advertisements for prostitution; (2) conspired to "knowingly facilitate state-law prostitution crimes being committed by Backpage customers" to profit from these illicit acts; (3) removed "banned terms" from advertisements posted in the "seattle escorts" and "tacoma escorts" sections of Backpage.com to mask illegal activity on the website, including prostitution, and (4) designed and maintained "an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's 'escort' and 'adult' ads."

Plaintiffs respectfully ask the Court impose sanctions against the Backpage defendants for their misconduct in this litigation as follows: 1) $100,000 to each Plaintiff as a penalty and to reimburse them for some of the reasonable attorneys' fees and costs to prove facts that should have been admitted; 2) $100,000 to the Court, as a penalty and to reimburse the Court for time and resources spent as a result of the Backpage defendants' misconduct; and 3) Plaintiffs' reasonable attorneys' fees and costs to file the underlying motion.

DATED this 26th day of April, 2018.

PFAU COCHRAN VERTETIS AMALA PLLC

By _____
Michael T. Pfau, WSBA No. 24649
michael@pcvalaw.com
Jason P. Amala, WSBA No. 37054
jason@pcvalaw.com
Vincent Nappo, WSBA No. 44191
vincent@pcvalaw.com
Attorneys for Plaintiffs

PLAINTIFFS' MOT FOR SANCTIONS
Page 15 of 16

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com

## CERTIFICATE OF SERVICE

I, Bernadette Hacker, hereby declare under penalty of perjury under the laws of the State of Washington that I am employed at Pfau Cochran Vertetis Amala PLLC and that on this date I served the foregoing, and the supporting Declaration of Michael T. Pfau, on all parties or their counsel of record via email, legal messenger, and/or facsimile by directing delivery to:

Eric Stahl
Davis Wright Tremaine LLP
1201 Third Ave., Ste. 2200
Seattle, WA 98101
Email: ericstahl@dwt.com

DATED this 26th day of April, 2018.

*/s/ Bernadette Hacker*
Bernadette Hacker
Legal Assistant to Michael T. Pfau

4849-0250-8643, v. 1

PLAINTIFFS' MOT FOR SANCTIONS
Page 16 of 16

PFAU COCHRAN VERTETIS AMALA PLLC
403 Columbia Street, Suite 500
Seattle, Washington 98104
Phone: (206) 462-4334 / Fax: (206) 623-3624
http://www.pcvalaw.com