Thomas H. Bienert, Jr. (CA State Bar No. 135311, admitted *pro hac vice*)
Whitney Z. Bernstein (CA State Bar No. 304917, admitted *pro hac vice*)
BIENERT, MILLER & KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone:      (949) 369-3700
Facsimile:      (949) 369-3701
Email:          tbienert@bmkattorneys.com
                wbernstein@bmkattorneys.com
*Counsel for James Larkin*

Paul J. Cambria, Jr. (NY State Bar No. 15873, admitted *pro hac vice*)
Erin McCampbell (NY State Bar No. 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone:      (716) 849-1333
Facsimile:      (716) 855-1580
Email: pcambria@lglaw.com
                emccampbell@lglaw.com
*Counsel for Defendant Michael Lacey*


Additional counsel listed on next page

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | No. CR-18-00422-PHX-SMB |
| Plaintiff. | **DEFENDANTS' JOINT STATUS REPORT FOR APRIL 23, 2019 STATUS HEARING** |
| v. | |
| Michael Lacey, *et al.*, | |
| Defendants. | |

James C. Grant (WA State Bar No. 14358, admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1201 Third Ave, Suite 2200
Seattle, Washington 98101
Telephone:     (206) 757-8096
Facsimile:     (206) 757-7096
Email:         jimgrant@dwt.com
*Counsel for Michael Lacey and James Larkin*

Robert Corn-Revere (DC Bar No. 375415, admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave. NW, Suite 800
Washington, D.C. 20006
Telephone:     (202) 973-4225
Facsimile:     (206) 973-4499
Email:         bobcornrevere@dwt.com
*Counsel for Michael Lacey and James Larkin*

Bruce Feder (AZ State Bar No. 004832)
FEDER LAW OFFICE, P.A.
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone:     (602) 257-0135
Email:         bf@federlawpa.com
*Counsel for Defendant Scott Spear*

Gary S. Lincenberg (CA State Bar No. 123058, admitted *pro hac vice*)
Ariel A. Neuman (CA State Bar No. 241594, admitted *pro hac vice*)
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067-2561
Telephone:     (310) 201-2100
Facsimile:     (310) 201-2110
Email:         glincenberg@birdmarella.com
               aneuman@birdmarella.com
*Counsel for John Brunst*

<u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................1

II.    PROCEDURAL HISTORY REGARDING DISCOVERY ........................4

III.   THE GOVERNMENT HAS NOT FULFILLED ITS DISCOVERY
       OBLIGATIONS................................................................................5

       A.     DISCOVERY PRODUCED TO DATE IS INADEQUATE.......................5

       B.     SIGNIFICANT DISCOVERY HAS NOT YET BEEN PRODUCED........8

              1.     The Government Has Not Produced the Backpage Servers ................8

              2.     The Government Has Not Provided Key *Jencks* and Impeachment
                     Materials..................................................................10

IV.    GOVERNMENT'S DISRUPTIONS TO DEFENSE PREPARATION ...............11

       A.     THE GOVERNMENT SOUGHT TO DENY DEFENDANTS LONG-
              TIME FIRST AMENDMENT COUNSEL ......................................11

       B.     THE GOVERNMENT IS REPEATEDLY OBTAINING AND
              SEEKING TO REVIEW ATTORNEY CLIENT INFORMATION........11

       C.     THE GOVERNMENT HAS ILLEGALLY SEIZED DEFENDANTS
              ASSETS AND ATTORNEYS FEES ...........................................12

              1.     Initial Seizure of Defendants' Assets...............................12

              2.     Subsequent Seizure of Attorney IOLTA Accounts.............................13

              3.     The Government's Seizures are Indefensible.......................14

V.     OUTSTANDING MOTIONS ...............................................................16

VI.    ADDITIONAL MOTION PRACTICE ....................................................17

VII.   CONCLUSION ................................................................................17

DEFENDANTS' JOINT STATUS REPORT

I.   INTRODUCTION

Defendants Larkin, Lacey, Brunst, and Spear ("Defendants") formerly owned Backpage.com ("Backpage"), an online classified advertising website.[1]  Backpage published millions of classified ads each month, in a wide range of categories, including employment ads, housing and real estate ads, ads for cars and other personal property for sale, dating ads, and ads for adult services.[2]  Defendants sold Backpage to one of the government's cooperating witnesses (Carl Ferrer) in April 2015.

The government's case against Defendants seeks to hold them criminally responsible for adult ads posted by third-party users on Backpage, with the government alleging Defendants knew that most (if not all) adult ads on Backpage related to unlawful activities by users of the site (with that knowledge based in part on Backpage's cooperation with law enforcement in the prosecution of some users of the site).  The indictment does not allege that Defendants ever saw the adult ads identified in the indictment, that Defendants knew those ads related to unlawful activity, or that Defendants decided Backpage would run those ads to facilitate the unlawful activities of the users posting those ads—nor could it.  Not only were most of the ads identified in the indictment placed *after* Defendants sold Backpage, but Defendants *never* were involved in the day-to-day operations of the website, such as deciding whether specific ads (whether adult or otherwise) would be permitted to run.

Although the indictment identifies 51 specific adult ads, the indictment is not premised on those ads *per se*, but on the premise that Backpage "facilitated" prostitution crimes generally through its operation and overall editorial policies.  The indictment fails to allege the necessary *mens rea* as to any specific acts, including as to the 51 adult ads.  As the government has acknowledged in other cases, the government must prove not just that Defendants knew that particular adult ads were for prostitution and ran them anyway, but also that Defendants had the specific intent to facilitate the

---

[1]  Defendants Padilla and Vaught are former employees of Backpage.

[2]  The adult services section had subcategories including "escorts, body rubs, strippers and strip clubs, dom[ination] and fetish, ts (transsexual escorts), male escorts, phone [sex], and adult jobs (jobs related to services offered in other adult categories . . . ."  *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015).  Defendants will refer to dating ads and adult services ads, collectively, as "adult ads."

particular acts of prostitution relating to those specific ads.  For instance, in *Woodhull Freedom Foundation v. United States*, the government argued that, for prosecutions under the Travel Act, the prosecutor must prove "not simply that the defendant was aware of a potential result of the criminal offense, but instead that the defendant intended to 'explicitly further[]' a specified unlawful act." *Woodhull Freedom Foundation v. United States*, 334 F.Supp.3d 185, 199-201 (D.D.C. 2018).  The court agreed with the government and held that the Travel Act applies only to "specific unlawful acts with respect to a particular individual, not the broad subject matter of prostitution." *Id.*[3]  Here, however, the government seeks to do exactly what it acknowledged it could not do in *Woodhull*—basing its indictment on allegations that Defendants had a generalized knowledge of ads relating to unlawful activities on Backpage, not that Defendants had specific knowledge about specific ads or that they intended to facilitate specific unlawful acts.

The flaws in the government's aggressive and unprecedented prosecution will be the subject of an upcoming motion to dismiss the superseding indictment, but the flaws infect the entirety of this case, including the government's discovery and disclosure obligations discussed below.  Ignoring the need to prove "specific unlawful acts with respect to particular individual" and premising the indictment on the erroneous view that criminality can be based on "the broad subject matter of prostitution," the government contends, among other things:

- all of the tens of millions of adult ads run on Backpage over its 14-year history are at issue;
- all editorial decisions (and discussions) relating to which adult ads would be permitted to run on the site and which would not (whether broad policy decisions or the decisions to run or delete particular ads) are at issue;
- all of Backpage's marketing strategies aimed at increasing the number of adult ads on the website (including ads in foreign countries) are at issue; and
- Defendants' after-the-fact knowledge of unlawful acts related to Backpage ads is at issue.

---

[3]   The government's admissions, and the court's holding, in *Woodhull* comport with the Ninth Circuit's interpretation of the Travel Act.  *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974) (dismissing indictment under the Travel Act against a manufacturer of gambling devices because the "intent to facilitate a criminal venture" under the Travel Act requires the government to show "that the manufacturer in some significant manner associated himself with the purchaser's criminal venture for the purpose of its advancement;" allegations that the manufacturer shipped gambling devices to the purchaser knowing the purchaser would violate state law by possessing the devices was insufficient).

Having staked out this ground, the government then dumped millions of documents related to the foregoing on Defendants, patting itself on the back for its prompt disclosures, while drowning Defendants in an ocean of (likely irrelevant) disclosures.

The government has suggested that Defendants should know what is in these nearly eleven million pages of disclosures—as many of them were produced by Backpage—but the government conveniently fails to note that *all* the documents produced by Backpage were collected and produced by Backpage *after* Defendants sold the business to the government's cooperating witness.  Mr. Ferrer may know what's in those documents, but Defendants do not.  Defendants have poked around in the millions of documents to try to get an understanding of what is there, but what they've found is millions of pages of random, disorganized, and redundant documents, with the government's so-called "indexes" providing little or no guidance.  Defendants have spent quite a bit of time in these disclosure haystacks, but have yet to find any needles.

Moreover, the government's back-patting about its disclosures appears to be designed to distract from what it has *not* produced.  For example, the government has produced some of Mr. Ferrer's email that it seized from Google, but only recently has offered to provide Defendants access to emails from Backpage's email server and from an online email backup service used by Backpage.  Defendants expect the government's upcoming production of these emails will be millions of pages of documents.  Defendants also believe the government has substantial amounts of *Brady* material, and have identified the type of *Brady* material they believe the government has, but the government has yet to identify any.  The government also has yet to identify any *Jencks* Act information regarding its key cooperator, Backpage owner and CEO Carl Ferrer, or others.  And, while attempting to make the universe of Backpage documents pertinent, the government has made it next to impossible to review those documents, by tearing apart Backpage's computer systems so they no longer are functional, making it at best extremely difficult, if not impossible, to effectively review that data.  The government now acknowledges that it controls over 100 Backpage servers, with over 500 *terabytes* of data—a data collection that utterly dwarfs the more than ten million pages produced to date.  The government has yet to produce most of this data—none of which will operate as a functional database as it did prior to the government's dismantling and seizures—and the

government has yet to provide a master list of what is on the servers.

At the same time, the government has engaged in a pattern of obstructing Defendants' relationship with counsel of choice, and obstructing defense counsel, including by making illegal seizures aimed at depriving Defendants of the assets they need to defend the case (while also repeatedly seeking to evade judicial review of its improper tactics until after the trial in this case).  As a result of the government's tactics, Defendants have not been able to adequately prepare for trial and Defendants do not expect to be able to adequately prepare for trial in January 2020.  Defendants submit that the Court should address with the government the dates by which it will actually comply with its discovery obligations, allow time for the Ninth Circuit Court of Appeals and the Central District of California to address Defendants' pending challenges to the government's improper seizures, schedule a status conference after those have occurred, and thereafter set an appropriate new trial date that allows Defendants to adequately prepare for trial.

## II.   PROCEDURAL HISTORY REGARDING DISCOVERY

Defendants were arraigned on the indictment in this matter on April 6 & 9, 2018.  On April 24, 2018, the parties proposed a scheduling order to govern the case (Doc. 121), which the Court adopted on April 30, 3018 (Docs. 127 & 131).[4]  At that time, the Court set a trial date of January 15, 2020, based on the expectation that the parties would meet the following case schedule and deadlines (among others):

| | |
|---|---|
| Government Initial Compliance with Rule 16 Discovery | Dec. 3, 2018 |
| Government Initial Expert Disclosure | Dec. 14, 2018 |
| Production of *Jencks* material and witness impeachment material, if not produced sooner | Feb. 25, 2019 |
| Substantive Motions Deadline | July 15, 2019 |

Doc. 131.

The government thus far has made discovery productions between May 24, 2018 and April 11, 2019.  *See* Discovery Production Chart Prepared by Defendants, attached as Exhibit A.  The

---

[4] The government brought a Superseding Indictment on July 25, 2018.  The Scheduling Order remained the same, as it envisioned the government returning a Superseding Indictment by July 30, 2018.  Doc. 131.

government has acknowledged possession of at least 46 Backpage servers that have not been imaged or produced to the Defendants, and is in the process of obtaining approximately 60 additional servers, which will thereafter have to be produced to the Defendants.

## III.   THE GOVERNMENT HAS NOT FULFILLED ITS DISCOVERY OBLIGATIONS

### A.   DISCOVERY PRODUCED TO DATE IS INADEQUATE

The scheduling order required the government to make materially complete Rule 16 discovery by December 3, 2018.  Doc. 131.  The government has made ten discovery productions up through its last production on April 11, 2019.  To date, it has produced over 10,800,000 pages and dozens of hours of audio and video recordings, plus one copy of portions of hard drives from five imaged Backpage servers, comprised of approximately 60 *terabytes* of data.[5]  *See* Ex. A.

Much of the production has been late.  Since the December 3, 2018 Rule 16 deadline in the Scheduling Order, the government has produced 136,750 pages and nearly 38 hours of recordings; much of that information was available long before it was produced.  In its February 22, 2019 production, the government produced recorded statements of two defendants from April 2018, discovery which was clearly in the government's possession for almost a year before it was produced. Despite requests by Defendants, the government failed to make available defendant Larkin's computer and phone taken from him when arrested in April 2018, until March 18, 2019.  Further, as recently as April 11, 2019, the government made another production of over 66,000 pages, which contained numerous files flagged as containing viruses and malware requiring that they be quarantined to avoid corrupting counsel's networks.  *See* Exhibit B.  Defendants cannot even access this late-produced discovery.

A significant volume of documents was produced before the December 3 deadline, but in

---

[5]  These 60 terabytes of data occupy over 50 hard drives. It takes somewhere between 40 to 100 hours to forensically analyze one hard drive; to analyze just these five servers is expected to take over 2,200 hours. Further, although it is not possible to directly translate terabytes to a number of documents, the range typically is 5,000 documents per gigabyte to 25,000 documents per gigabyte— with 10,000 documents per gigabyte being the accepted norm. David Degnan, Accounting for the Costs of Electronic Discovery, *Minnesota Journal of Law, Science & Technology*, 2011, Vol. 12:1, p. 163. Even using the 5,000 documents per gigabyte figure, with 60 *terabytes* of data, the server data can be presumed to include at least 300,000,000 documents.

ways that made it difficult or impossible to use.  For example, the government produced millions of pages of documents in a format designed for use in a specialized computer database, such as Relativity.  To review this volume of documents, Defendants need access to a Relativity vendor and the funds to pay for uploading, processing and hosting these vast amounts of data, which can then be searched by defense counsel based on search terms.  The cost to Defendants for using Relativity will be several million dollars.  *See, e.g.*, Doc. 443 at n.3.  As set forth below, Defendants had the funds to engage a Relativity vendor, but the government improperly seized those funds, leaving Defendants no ability to review the discovery the government produced in Relativity.  Without access to Relativity, Defendants can only review the discovery one page at a time, an impossible task to do timely with the millions of pages of discovery in play.

The government also failed to produce documents with appropriate indexes.  Although the government claims to have indexed the documents, the government's "indices" typically do not give specific identification as to what the production contains, such that focused review can occur.  For example, in one production, the government "indexed" over one million pages of documents simply as "USAO 108 Subpoena" without any further identification or indexing.  *See* Ex. A.  (The subpoena itself had only three document requests, so it likewise provides no guidance.)  This is similar for the rest of the government's productions.  *Id.*  Defendants are therefore forced to peruse huge volumes of documents and hope to wander upon something relevant.  And spot page-by-page searches reveal that Defendants cannot simply skim voluminous productions that appear immaterial, as isolated emails that appear relevant are sprinkled among large volumes of documents that are not.

Finally, the government's production thus far does not seem to include significant discovery required under Rule 16, including: full copies of Defendant's emails from servers, Backpage's email, *Brady*, *Giglio*, and *Jencks* Act materials, and reasonable identification of items the government intends to use in its case in chief at trial.

Even if somehow the government has interspersed such materials without identification in the millions of pages of discovery noted above, it still has not provided appropriate discovery.  It would be improper for the government to obscure obligated discovery materials in massive productions.  The government's refusal and failure to itemize or index any of the nearly eleven

million pages of discovery or to identify any *Brady* material is especially obstructionist against the backdrop of the government's tactical seizures of all funds earmarked for defense of the case, including attorney's trust accounts.  The government is in a good position to itemize and identify these materials since it has been investigating this case for over five years and is certainly aware of *Brady/Giglio* materials it has that contradict or undermine its positions and are not helpful to its case.

Defendants previously moved for the itemization of *Brady/Giglio* materials when the government had made just three discovery production.  *See* Doc. 273, with Joinders at Docs. 275-279.  At a hearing on the motion on October 5, 2018, the government said that "it's a little unclear what the exculpatory material would look like." *See* Reporter's Transcript, October 5, 2018 Hearing, at 101.  The government then said that, putting aside the issue of the First Amendment, "what is at issue in this case…is a factual issue. Did [Defendants] know that the vast majority of these advertisements that went up on this Web site were for prostitution." *Id.* at 102.  The government said it was disclosing documents supporting its allegations, but "with respect to *Brady* or exculpatory, we're unsure what that would look like." *Id.*  The Court asked if the government's position was that it did not know if any *Brady* or *Giglio* materials exists, and the government responded: "we don't know." *Id.* at 103-04.  The government went on to assure the Court that it would turn over any *Brady*/Giglio materials to the Defendants immediately after learning of it.  *See* Reporter's Transcript, October 5, 2018 Hearing, at 104.  The Court's order denying Defendants' motion for itemization specifically "notes that at the October 5th hearing the government stipulated that it will turn over any *Brady/Giglio* material that it comes across in the future to the Defendants within 10 days. The court implores the Government to abide by this stipulation, without an order from the court." Doc. 399 at 5-6.  After the hearing, counsel for Padilla even sent the government follow up correspondence laying out specific examples of evidence that would constitute *Brady/Giglio* materials in this case.  *See* Exhibit C.  However, despite all of this, the government has not produced any *Brady/Giglio* materials.  Given the current volume of discovery, this Court should specifically order the government to identify and itemize not only its voluminous discovery productions but also particularly identify documents it intends to use in its case in chief, as well as any *Brady* materials.

B.     SIGNIFICANT DISCOVERY HAS NOT YET BEEN PRODUCED

As noted above, the government should produce full copies of Defendants' emails, Backpage's emails, all *Brady*, *Giglio*, and *Jencks* Act materials, and the items it intends to use in its case in chief.  Additionally, the government has yet to produce voluminous and significant discovery that is central to defense preparation of the case.

1.     The Government Has Not Produced the Backpage Servers

Defendants understand that Backpage kept much of its business information on servers, including key information like emails, financial information, payment processing data,[6] and ads and the history of particular ads.  On March 7, 2019, the government represented to the defense that it had 46 Backpage servers in its possession obtained from (i) Amsterdam, Netherlands, (ii) Tucson, Arizona, and (iii) Dallas, Texas.  The government also represented that it was awaiting receipt of 60 additional servers from Amsterdam through the MLAT process.  *See* Exhibit D.  In March the government made available for pickup hard drives from 5 servers, which occupies more than 50 hard-drives and 60 terabytes of data, and is expected to take at least 2,200 hours to forensically review and analyze. The government did not image and produce any other servers, instead offering it would make these servers "available for inspection" by the defense at an FBI data center in Pocatello, Idaho.  The government also claimed that once it receives the 60 additional servers from Amsterdam through the MLAT process, those servers, too, will be "available for inspection" by the defense in Pocatello, Idaho.  *Id.*  Last week, the government modified this information, saying that it actually has 39 servers located in Phoenix and 14 servers located in Pocatello, and would make them "available" for defense review at FBI facilities in those respective states.  *See* Exhibit E.  The government has refused to provide the defense complete forensic images of each of the servers in its possession.

---

[6] Given the money laundering charges in the Superseding Indictment, the payment processing data is critical Rule 16 discovery. While the government previously thought the payment processing servers were in Dallas, upon retrieving five servers from Dallas, it learned that the payment processing data was not there. Accordingly, the government now represents to the Defendants that the payment processing servers are forthcoming with the 60 outstanding servers whose date of arrival remains unknown.

In addition to requiring defense counsel to travel to Arizona and Idaho to review the servers, the government is further requiring that the defense provide names, dates of birth, and social security numbers of members of the defense team who will participate in the review and inspection of the servers.   And as a condition precedent to viewing the "available" hard drives and servers, the government is requiring each person to submit to and pass an FBI background check.   The government also apparently intends to have members of the prosecution team present while the defense conducts its review and inspection of the hard drives and servers to oversee and "facilitate" the process.

The government's willingness to make servers "available" to the defense for inspection and copying with these conditions, including out-of-district travel to a government facility and a review subject to government oversight, is unreasonable and improperly hinders the defense.   Given the large number of servers and the large volume of data they contain, as well as the fact that the government apparently does not have a master list describing the data contained on each server, the defense anticipates that the review and inspection process will be time consuming and require lengthy forensic and other analysis.   The defense is also informed that it could take up to several weeks to image a single server. Moreover, having members of the government present while the defense conducts its review and inspection would necessarily reveal to the government the defenses' strategy and mental impressions, which must be protected.   The "review and inspection" process proposed by the government is not simply feasible.

The Court should require the government to provide the defense with imaged copies of each of the servers in its possession, custody, or control, for it to comply with its Rule 16 obligations. Courts have regularly required the government to provide imaged copies of data to the defense, rather than simply making the data available for review and inspection, to satisfy Rule 16.   *See, e.g.*, *United States v. Cadet*, 423 F.Supp.2d 1 (E.D.N.Y. 2006) (finding government's proposal to allow the defense to inspect material at government facility, on government computer, subject to government supervision, insufficient; government required to produce copies of computer files at issue to the defense); *United States v. Aldeen*, No. CR-06-31, 2006 WL 752821 (E.D.N.Y. March 22, 2006) (requiring the government to provide the defense a copy of the hard drive to be inspected where,

among other factors, the type of analysis planned by the defense team was complex and would be burdensome to perform at government office, the government would have unfair access to defense work product, and the defense team would bear the cost of transportation to and from the government facility and for those who needed access); *United States v. Hill*, 322 F.Supp.2d 1081 (C.D. Cal. 2004) (concluding that defendant would be "seriously prejudiced" absent production by the government to defendant of mirror image copies of computer data, where defendant's counsel represented that an in-depth analysis of data was required for issues relevant to both guilt and sentencing, and requiring out-of-state members of defense team to travel to government facility for review and inspection would be "unreasonably burdensome"); *United States v. Frabizio*, 341 F.Supp.2d 47 (D. Mass. 2004); *United States v. Kirzhner*, No. 02-CR-38, slip op. (E.D.N.Y. June 14, 2002).[7]

>    2.    The Government Has Not Provided Key *Jencks* and Impeachment Materials

The government's deadline to produce *Jencks* and impeachment materials was February 25, 2019.  Doc. 131.  The government has not met that deadline.  Indeed, it has failed to provide *Jencks* and impeachment information regarding the primary cooperating witness in the case, owner and CEO of Backpage Carl Ferrer.  Without any notice to Defendants, the government moved *in camera* to withhold Carl Ferrer's *Jencks* materials.  As soon as Defendants learned of the government's *in camera* filing, Defendants opposed the government's *in camera* motion and incorporate its arguments herein.  *See* Motion in Opposition to Government's Motion to Defer Disclosure of Carl Ferrer's *Jencks* Act Statements and Objections to In Camera Filing of the Same, and Request for Disclosure of the Same (Doc. 477; Joinders at Docs. 486, 487, 488, 489, 490).  Defendants cannot meaningfully investigate and prepare the defense without information about the key cooperating witness, Carl Ferrer.

Moreover, despite providing a witness list containing over 100 witnesses, *see, e.g.*, Doc. 511, the government has not provided *Jencks* materials for all of them.  Defendants have not been able to

---

[7] Note that these cases pre-dated the enactment of 18 U.S.C. § 3509, which courts have applied as a statutory exception to Rule 16 limiting the government's ability to produce copies of certain contraband material to the defense, so long as the government gives the defendant "ample opportunity" to review the material. This statutory exception is inapplicable in this case.

find any materials in the discovery for numerous witnesses, including: M.G., former CFO of Backpage.com; various Backpage.com moderators (e.g. J.D., B.P., C.P., and D.B.); and various law enforcement (e.g. D.S., Q.T. J.H., D.E., S.C. M.D., J.R., M.R., Detective D.G., Di.G., D.M.G., T.M.).[8]  Defendants need all *Jencks* Act and impeachment materials in order to properly prepare the case.

IV.     GOVERNMENT'S DISRUPTIONS TO DEFENSE PREPARATION

        Instead of properly fulfilling discovery obligations to the defense, the government has spent its time repeatedly taking steps to put defense counsel in difficult positions, to deprive Defendants of counsel of choice, and to preclude the defense from focusing on the substance of the case.

        A.     THE GOVERNMENT SOUGHT TO DENY DEFENDANTS LONG-TIME FIRST AMENDMENT COUNSEL

        The government first sought to remove Defendants' long term First Amendment counsel, Davis Wright Tremaine LLP ("DWT"), which had repeatedly and successfully represented Defendants, their entities, and their employees in multiple lawsuits and prosecutions making similar allegations to the instant Indictment.  The government filed a motion to disqualify DWT on April 25, 2018 (Doc. 118), Defendants filed oppositions in June 2018 (Docs. 174, 176, 177, 178, 180, 181), the court held a hearing on the issue on October 5, 2018, and the Court thereafter denied the government's motion (Doc. 338).  Notwithstanding this ruling, a motion to disqualify DWT on the same grounds is still pending in a related California state prosecution.

        B.     THE GOVERNMENT IS REPEATEDLY OBTAINING AND SEEKING TO REVIEW ATTORNEY CLIENT INFORMATION

        The government has also taken the unusual and questionable steps of using grand jury and trial subpoenas to repeatedly obtain defense counsel's attorney-client trust account banking records for all clients, not just those in this case.  The government then disclosed this client financial information for these counsel to all counsel in the case.  This conduct not only raises ethical and procedural concerns, but places certain defense counsel in a difficult position as it relates to all of

---

[8]     For purposes of this motion, Defendants use initials for these witnesses.  The government clearly should know who they are, since they are in the government's Witness List, but should the Court or government want them identified by name, Defendants will supplement.

their clients, not just those in this case.  These actions will be the subject of a separately filed motion.

The government has also repeatedly sought to invade defendants' attorney-client privileges and work product protections.  The government moved for an order allowing it to review *all* privileged communications within the materials it has collected by warrants and other process, but the Court denied that motion, holding that Ferrer could not waive privilege protections held by Defendants.  (Doc. 345.)  The government then sought "clarification" that it could continue to review privileged materials through use of a "taint team," which the Court allowed (Doc. 452), although it has not addressed Defendants' request for clarification that the "taint" team must identify to Defendants any documents it proposes to disclose to the prosecution team, so that Defendants may have an opportunity to object (as is customary, *see* Docs. 452, 479-1).

At the same time, the government also sought to compel Defendants to produce their privileged joint representation agreements, which the Court also rejected (Doc. 441), but Defendants have reason to believe the government has been coordinating with Ferrer and/or plaintiff's counsel in civil cases to obtain access to these agreements, notwithstanding the Court's ruling.  Defendants have learned that the government's cooperating witness Ferrer now is seeking in a separate civil case in Texas to make the same documents public records, even though Ferrer already has access to the documents.  This appears to be an attempt to end run this Court's decision denying the government access to the documents.

C.      THE GOVERNMENT HAS ILLEGALLY SEIZED DEFENDANTS ASSETS AND ATTORNEYS FEES

Additionally, the government has engaged in a seemingly endless series of seizures of assets of the Defendants, as well as attorney IOLTA account funds deposited before the indictment to provide defense fees and costs.  It has continually avoided addressing Defendants' challenges to these illegal pre-trial seizures, making contradictory arguments to different courts as part of a pattern of delaying substantive addressment of its conduct and continuing to deprive Defendants of assets and attorneys' fees.

1.      Initial Seizure of Defendants' Assets

From late March 2018 through November 2018, the government seized tens of millions of

dollars of assets from Defendants, through presentation to judges in the Central District of California of over 20 *ex parte* seizure warrants.  In essence, the government alleged that the assets derived from Backpage, which the government argued made them illegal proceeds.  Upon learning of the seizures, Defendants challenged them as improper, filing a motion in the Central District seeking to vacate the government's seizures as impermissible under the First, Fourth, Fifth, and Sixth Amendments, and noting that the supporting affidavits for the warrants contained material misstatements and omissions amply sufficient to also vacate the warrants under *Franks v. Delaware*, 438 U.S. 154 (1978). The government responded, not by defending the legality of its seizures, but by seeking a stay of all proceedings as to the civil seizures and forfeiture actions, asserting that challenges to the warrants should be heard in the District of Arizona.  The Central District Court accepted the government's position and, on October 23, 2018, stayed all proceedings concerning the challenged seizure warrants and civil forfeiture actions, stating that there was "no reason" challenges to the seizures and the warrants "could not be brought in the [Arizona] criminal action."  *In the Matter of the Seizure of Any and All Funds Held in Republic Bank of Arizona Account(s) XXXX1889, XXXX2592, XXXX1938, XXXX2912, and XXXX2500*, No. 2:18-cv-06742-RGK-PJW, *et al.* (Doc. 85) ("*In re Funds in Republic Bank*").

Defendant appealed the stay and the illegality of the seizures to the Ninth Circuit Court of Appeals.  After multiple filings by the government trying to convince the Circuit not to hear and/or delay the appeal, the Ninth Circuit ordered the government to file an Answering Brief by May 1, 2019, and indicated there would be no further continuances.  The Ninth Circuit also ordered the matter for expedited oral argument in July 2019.

2.     Subsequent Seizure of Attorney IOLTA Accounts

One week after the district court's stay ruling in the CDCA, in late October 2018 the government filed applications in the CDCA for another round of 12 warrants, this time primarily to seize funds from IOLTA trust accounts held by counsel for representation in this case and other related matters.  The government obtained these warrants based on affidavits that were near carbon copies of those submitted for the prior warrants, repeating the same misstatements and omissions, and without any mention of the prior challenges.  Defendants immediately moved to stay this second

round of seizures, this time following the government's earlier suggestion that its warrants should be challenged in this district; Defendants moved in this district that the recent seizures violated the First, Fourth and Fifth Amendments, as well as the Sixth Amendment because the government seized attorney retainers. The government again failed to respond to the motions substantively, and only put forth procedural arguments; but this time the government responded that it was improper for the court in this district to address the seizure warrants because they were issued by the CDCA. In an oral ruling on November 16, the Arizona federal court (Judge Logan) declined to rule on the propriety of the government's seizure warrants on the basis that such challenges should be heard in "the rendering court," *i.e.*, in the CDCA.

In late November 2018, Defendants then went back to the CDCA and challenged the second round of warrants there. The court there received briefing from the parties, with the government yet again raising procedural arguments but not addressing Defendants' substantive positions that the seizures were illegal. The court in the CDCA ordered further briefing by late December and early January, and indicated that it would issue a ruling. It has yet to issue its ruling.

### 3.   The Government's Seizures are Indefensible

Despite the many motions by Defendants, the government has yet to substantively defend the legality of its pre-trial seizures. That is because it can't, because the law is clear when it comes to addressing seizure of proceeds from a publisher, like Backpage.

First, the government may not effect seizures of assets derived from publishing activities that are presumptively protected by the First Amendment without an adversary hearing in which the government proves that the material at issue is unprotected. In *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989), the Supreme Court invalidated a section of the Indiana RICO law that authorized pretrial seizure of assets "subject to forfeiture" upon a showing of probable cause that the assets were "used in the course of, intended for use in the course of, derived from, or realized through . . . racketeering activity." *Id.* at 51. Even though the defendant in that case had 39 prior convictions for violating the state's obscenity laws, and even assuming the materials seized ultimately would be forfeitable upon conviction, the Court held "the seizure at issue here is unconstitutional." *Id.* at 65. Consistent with long-established principles that heightened protections apply when the government

takes actions that may burden or suppress speech, the Court held that a showing of probable cause is not sufficient to effect seizures.  *Id.* at 66 ("mere probable cause to believe a legal violation has transpired is not adequate to remove books or films from circulation").

The Ninth Circuit followed and extended *Fort Wayne Books* in invalidating the pretrial forfeiture provisions of the federal RICO statute (18 U.S.C. § 1963(d)) in *Adult Video Ass'n v. Barr*, 960 F.2d 781 (9th Cir. 1992), *readopted after rehearing, Adult Video Ass'n v. Reno*, 41 F.3d 503 (9th Cir. 1994).  Finding the RICO provision for pretrial seizures unconstitutional on its face as to publishers' or distributors' assets, the Ninth Circuit reiterated that it is not enough for the government to show probable cause to support a forfeiture order.  960 F.2d at 788.  "The First Amendment will not tolerate such seizures until the government's reasons for seizure weather the crucible of an adversary hearing."  *Id.*

Here, the government seized assets pre-trial based on nothing more than probable cause. And the government's rationale for doing so is entirely premised on its allegations that the targeted assets came from publishing activities, *i.e.*, Backpage's provision of a website where individual users could post ads and communicate with others.  The government's seizure efforts continue to violate fundamental First Amendment law.

The government's seizure efforts also violated Fourth and Fifth Amendment principles. Even assuming the government could seize publishing proceeds based on a showing of probable cause (which it cannot do), the government's applications and the supporting affidavits used for the seizures are rife with material misstatements and omissions.  In short, the affidavits said nothing about the 11 prior rulings of courts in cases involving Backpage holding that ads on Backpage were presumptively protected speech under the First Amendment, government authorities may not justify actions by offering broad-brush opinions that all ads related to unlawful conduct, and earning revenues from user payments for ads is a legal activity.  The affidavit also mischaracterized Backpage internal emails, selectively quoting from them when a reading of the actual email did not say what was represented.  Remarkably, when seeking the second round of seizure warrants, the government never even informed the new judges of Defendants' prior challenges, raising additional issues about the government's compliance with its duty of candor in *ex parte* proceedings before the Court.

Because the government's second round of seizures targeted attorney retainers, they additionally infringe Sixth Amendment rights of Movants to have counsel of their choice and use funds to which they are entitled for that purpose. The "Sixth Amendment right to counsel of choice … commands, not that a trial be fair, but that a particular guarantee of fairness be provided – to wit, that the accused be defended by the counsel he believes to be best." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006). Erroneous denial of the right to counsel of choice is structural error and requires automatic reversal, even in the absence of any prejudice. *Id.* at 148. A defendant in a criminal case is entitled to use "untainted" assets for his defense. *See Luis v. United States*, 136 S. Ct. 1083 (2016). Given the First Amendment principles discussed above, the government cannot presume that proceeds from publishing are unlawful or "tainted," and a probable cause finding is insufficient to satisfy the government's burden of proof. *See id.* at 1088 ("the pretrial restraint of legitimate untainted assets needed to retain counsel of choice violates the Sixth Amendment"). Thus, the government's efforts to seize attorney retainer accounts cannot stand under the Sixth Amendment, because funds earmarked for legal defense are untainted and available in this context until the government *proves* otherwise. *See also Luis*, 136 S. Ct. at 1093 (that funds may be found forfeitable to the government at some point does not outweigh a defendant's constitutional right to use assets to which he is entitled to fund counsel of choice).

In short, the government has consciously worked to improperly deprive Defendants of assets and fees made available to them to defend this case. Such actions are improper. *See United States v. Stein,* 435 F. Supp. 2d 330, 372 (S.D.N.Y. 2006) (dismissing indictment where government sought to influence a company to preclude payment of employees' counsel fees fees), *aff'd*, 541 F.3d 130 (2d Cir. 2008); Motion to Dismiss (Doc. 456) (government's interference with payment of counsel warrants dismissal of the case).

V.     OUTSTANDING MOTIONS

The following motions are briefed and awaiting a ruling from the Court (or hearing date):

1. Motion for Further Clarification Re Order Allowing the Government to Continue Review of Privileged Communications (Doc. 452, filed Feb. 5, 2019; Government Opposition at Doc. 462; Reply ISO at Docs. 478-1 & 479-1)

2. Motion for Designation of 39 Documents Subject to This Court's Destruction Order to be Preserved (Doc. 453, filed Feb. 6, 2019; Government Opposition at Doc. 466; Reply ISO at Doc. 468)

3. Motion to Dismiss due to Government Interference with Right to Counsel and Request for Disclosure or, in the alternative, Motion to Withdraw (Doc. 456, filed Feb. 11, 2019; Joinders at Docs. 463, 4654, 465, 467; Government Opposition at Doc. 476; Reply ISO at Doc. 507)

4. Opposition to Government Motion to Defer Disclosure of Ferrer *Jencks* Statements (Doc. 471) and Objection to In Camera Filing of the Same, and Request for Disclosure of the Same (Doc. 477, filed Feb. 27, 2019)

5. Motion for Extension of Time to Comply with Initial Expert Notice Disclosure Deadline (Doc. 498, filed March 12, 2019)

6. Motion for Hearing on Motion to Dismiss due to Government Interference with Right to Counsel and Request for Disclosure or, in the alternative, Motion to Withdraw (Doc. 501, filed March 15, 2019)

7. Mr. Lacey's Motion to Modify Conditions of Release (Doc. 503, filed March 19, 2019; Government Opposition at Doc. 516; Reply ISO at Doc. 522) (hearing on this Motion is scheduled for April 23, 2019, *see* Doc. 526)

VI.   ADDITIONAL MOTION PRACTICE

Defendants anticipate significant additional motions before trial, including but not limited to motions: for discovery violations, to dismiss (on different grounds than the current pending Motion to Dismiss, Doc. 456), for bill of particulars, for suppression of evidence, and for spoliation of evidence. Defendants' motion practice has been delayed and impacted by the inability to adequately review discovery, and the need to address significant side issues, like the government's improper pre-trial seizures depriving them of assets and designated attorney's fees.

VII.   CONCLUSION

At the upcoming status hearing, Defendants respectfully request that this Court: address the government's delinquent discovery compliance; order the government to meet its obligations in a timely manner; order the government to produce the outstanding 106 servers in a timely manner; and hear argument and/or rule on the outstanding motions. Given the severely incomplete state of discovery, Defendants request that the Court issue a new scheduling order and revisit the viability of the upcoming deadlines and jury trial date. Finally, Defendants request that the Court set another status hearing approximately four months from now when the pending related litigation in the Ninth Circuit Court of Appeals and the Central District of California may be decided.

Respectfully submitted,

Dated: April 17, 2019

BIENERT, MILLER & KATZMAN, PLC
*s/ Thomas H. Bienert, Jr.*
Thomas H. Bienert
Whitney Z. Bernstein
Attorneys for James Larkin

LIPSITZ GREEN SCIME CAMBRIA LLP
*s/ Paul J. Cambria, Jr.*
Paul J. Cambria, Jr.
Erin McCampbell
Attorneys for Michael Lacey

DAVIS WRIGHT TREMAINE LLP
*s/ James C. Grant*
James C. Grant
Robert Corn-Revere
Attorneys for James Larkin and Michael Lacey

BIRD MARELLA BOXER WOLPERT NESSIM
DROOKS LINCENBERG AND RHOW
*s/ Gary S. Lincenberg*
Gary S. Lincenberg
Ariel A. Neuman
Attorneys for John Brunst

FEDER LAW OFFICE, P.A.
*s/ Bruce Feder*
Bruce Feder
Attorneys for Scott Spear

DEFENDANTS' JOINT STATUS REPORT FOR APRIL 23, 2019 STATUS HEARING

# CERTIFICATE OF SERVICE

I certify that on this 17th day of April 2019, I electronically transmitted a PDF version of this document to the Clerk of the Court, using the CM/ECF System, for filing and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants listed below.

*/s/ Garrison M. Giali*

Garrison M. Giali

Anne Michelle Chapman, anne@mscclaw.com

Erin E. McCampbell, emccampbell@lglaw.com

Anthony R. Bisconti, tbisconti@bmkattorneys.com

Ariel A. Neuman, aan@birdmarella.com

Bruce S. Feder, bf@federlawpa.com

James C. Grant, jimgrant@dwt.com

Lee David Stein, lee@mscclaw.com

Paul J. Cambria, pcambria@lglaw.com

Robert Corn-Revere, bobcornever@dwt.com

Ronald Gary London, ronnielondon@dwt.com

Janey Henze Cook, janey@henzecookmurphy.com

John Lewis Littrell, jlittrell@bmkattorneys.com

Seetha Ramachandran, Seetha.Ramachandran@srz.com

Thomas H. Bienert, Jr. tbienert@bmkattorneys.com

Whitney Z. Bernstein, wbernstein@bmkattorneys.com

Gary S. Lincenberg, glincenberg@birdmarella.com

Gopi K. Panchapakesan, gpanchapakesan@birdmarella.com

Michael D. Kimerer, mdk@kimerer.com

Rhonda Elaine Neff, rneff@kimerer.com

Michael L. Piccarreta, mlp@pd-law.com

Stephen M. Weiss, sweiss@karpweiss.com

John Jacob Kucera, john.kucera@usdoj.gov

Kevin M. Rapp, Kevin.Rapp@usdoj.com

Margaret Wu Perlmeter, Margaret.perlmeter@usdoj.gov

Reginald E. Jones, reginald.jones4@usdoj.gov

Peter Shawn Kozinets, Peter.Kozinets@usdoj.gov

Andrew C. Stone, andrew.stone@usdoj.gov

**United States v. Lacey, et al.**

**Case No. 18-CR-0422-PHX-SMB**

**INDEX OF EXHIBITS**

| EXHIBIT | DESCRIPTION |
|---|---|
| A | Discovery production chart prepared by Defendants |
| B | Virus & malware report generated by TrendMicro security software |
| C | Letter from M. Piccarreta to K. Rapp dated October 26, 2018 |
| D | Letter from R. Jones to W. Bernstein dated March 7, 2019 |
| E | Email chain between R. Jones and W. Bernstein dated April 10, 2019 |

# EXHIBIT A

*United States v. Lacey, et al.,* Case No. 18-CR-0422-PHX-SMB
**PRODUCTION CHART**

| Production # | Date | Pages | Bates Range | Government's Purported "Index" | Assorted Summary of Actual Contents |
|---|---|---|---|---|---|
| 1 | May 24, 2018 | 4,426,710 | 1-4426710 | Hard Drive #1:<br>  "USAO 108 Subpoena;<br>  PSI;<br>  USAO 359 Subpoena;<br>  CA Dep't of Justice;<br>  Carl Ferrer Gmail;<br>  Add'l Co-Star;<br>  SW Applications/Affidavits and Sealed GJ Pleadings/Orders;<br>  USAO 108 Subpoena (supplemental)" | "USAO 108 Subpoena" refers to 1,037,594 pages, with no other identification or indexing;<br>  "PSI" refers to over one million pages from a U.S. Senate subcommittee, with no other identification or indexing;<br>  "CA Dep't of Justice" refers to over 34,000 pages obtained from California, with no other identification or indexing;<br>  "Carl Ferrer Gmail" refers to over 1.7 million pages, with no other identification or indexing (including many irrelevant documents, like emails about Ferrer's children's activities and school);<br>  "USAO Subpoena 108 (supplemental) refers to an additional 1,089 pages, with no other identification or indexing. |
|  |  | 5,948,910 | 1-5901038 & 1-47872 | Hard Drive #2:<br>  "Co-Star records" | "Co-Star Records" refers to nearly 6 million pages, with no other identification or indexing (including many irrelevant documents, like documents relating to customers of Co-Star other than Backpage, computer system files, and documents relating to Backpage operations in foreign countries. The data has not been loaded to an electronic database because of the costs associated with readying the files for loading and because many of the files may contain viruses and malware. |

*United States v. Lacey, et al.,* Case No. 18-CR-0422-PHX-SMB
**PRODUCTION CHART**

| 2 | July 2, 2018 | 174,326 | 4426712-4601038 | "Released Records; Civil Seizure Warrants" (Clawed Back) | This production contained over 174,000 pages, with no other identification or indexing. The production included large numbers of documents from previous civil litigation ("J.S."), as well as copies of civil seizure warrants, documents from NCMEC, and FBI 302s and other investigation documents, among others.  (The government clawed back portions of this production.) |
| 3 | July 19, 2018 | 1.071 | 4601039-4602110 | "Hot Docs" | This production contained over 1,000 pages, with no other identification or indexing.  The government asserts these documents are "hot docs" supporting its charges—although defendants don't understand this claim. |
| 4 | September 24, 2018 | 81,433 | 4602111-4683544 | "Backpage Agendas; Backpage Superseding Indictment 'Hot Docs'; Co-Star 'Hot Docs'; Financial Records" | "Backpage Agendas" refers to 397 pages of meeting agendas from 2006 through 2015, with no other identification or indexing; "Backpage Superseding Indictment 'Hot Doc'" refers to 344 pages purportedly supporting the superseding indictment, with no other identification or indexing; "Co-Star 'Hot Docs'" refers to a training manual for Co-Star and a several page contract between Avion and Backpage from October 2013; "Financial Records" refers to over 80,000 pages of bank records for Michael Gage, Posting Solutions, Website Technologies, and others, with no identification or indexing. |

2

**PRODUCTION CHART**

| 5 | October 4, 2018 | | | Reproduction of 79 documents from the July 2, 2018 production | This production reproduced, with redactions, several thousand pages of the documents from production no. 2 that the government previously clawed back. |
|---|---|---|---|---|---|
| 6 | October 10, 2018 | 2,260 | 4683545-4685805 | "Victim Records" | This production contained over 2,200 pages of so-called "victim records," with no other identification or indexing. The documents include FBI 302s, police reports, copies of Backpage ads, and documents from previous civil litigation against Backpage. |
| 7 | November 30, 2018 | 34,730 | 4685806-4720536 | "Add'l Superseding 'Hot Docs'; Backpage Historical Ads; Erick Bauer Civil Case; John Becker Documents; Add'l CA Dep't of Justice; Add'l Financial Records; Add'l Search Warrants and Affidavits; Add'l Victim Records; WDWA BP GJ Transcripts" | "Add'l Superseding 'Hot Docs'" refers to 71 additional "hot docs," with no other identification or indexing; "Backpage Historical Ads" refers to over 2,800 pages of ads (spanning from 2006-2013), apparently selected by the government from among the tens of millions of ads that ran on Backpage during that period, with no other identification or indexing; "Erick Bauer Civil Case" refers to a document dump from previous civil litigation against Backpage (the J.S. case), with no other identification or indexing; "John Becker Documents" refers to 2,785 pages of documents obtained via a grand jury subpoena to an attorney for one of the defendants, with no other identification or indexing; "Add'l CA Dep't of Justice" refers to over 8,700 pages of documents, with no other identification or indexing; |

*United States v. Lacey, et al.,* Case No. 18-CR-0422-PHX-SMB

**PRODUCTION CHART**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | "Add'l Financial Records" refers to over 16,000 pages of documents, with no other identification or indexing;<br><br>  "Add'l Search Warrants and Affidavits" refers to over 2,700 pages of documents, with no other identification or indexing;<br><br>  "Add'l Victim Records" refers to 376 pages of documents, many duplicative of previously produced documents, with no other identification or indexing;<br><br>  "WDWA BP GJ Transcripts" refers to 826 pages of transcripts of various witnesses from a grand jury investigation in Washington, with no other identification or indexing. |
| 8 | February 22, 2019 | 26,033<br><br>*plus* | 4720537-4746570 | "BDO Consulting Documents;<br>  Reports of Interviews;<br>  Subpoena Compliance,<br>  Reports of Interviews, and other FBI Case Documents" | This production contained over 26,000 pages, with no other identification or indexing, plus thousands of pages of "victim records" and over 37 hours of recorded audio/video.<br><br>  The numbered portion of the production appears to include documents produced by BDO (an accounting/consulting firm), documents relating to research conducted by one of the government's noticed experts, grand jury subpoenas, and documents related to the government's seizure and review of electronic devices.<br><br>  The "victim records" includes thousands of pages of documents and lengthy recordings of interviews pertaining to crimes having no apparent connection to the charges in this |
| | | Unnumbered "victim records" | 6 add'l DVDs | "ROIs for Dan Hyer;<br>  Jail Calls for Lacey and Larkin; | |

**PRODUCTION CHART**

| | | | | interview from local investigation of James C. Brown;<br>local investigation of Victim #4;<br>local investigation of Victim #15" | case—except that someone connected to the crimes may, at some time, have placed an ad on Backpage. |
|---|---|---|---|---|---|
| | | &<br><br>Unnumbered audio/video recordings of at least 37:54:22 | | | |
| 9 | March 14, 2019 | 44,669 | 4746571-4791240 | "Add'l Financial Records;<br>Add'l Reports of Interview;<br>Add'l Subpoena Compliance, Reports of Interviews, and other FBI Case Documents" | This production contained nearly 45,000 pages, with no other identification or indexing. The production appears to include FBI 302s, financial records from Backpage, unredacted bank records from attorney trust accounts for defense counsel for defendants and their entities, and unredacted records from banks and other financial institutions for defendants. |
| 10 | April 11, 2019 | 66,048 | 4791241-4857289 | "Add'l BDO Consulting Docs;<br>EPIQ data;<br>Sampling of Backpage Ads with Associated Databases and Images" | This production contained more than 66,000 pages, with no other identification or indexing. This production was recently received and contained viruses and malware. |
| TOTAL | | 10,806,199 & unnumbered records & nearly 38 hours of audio/video | | | |

# EXHIBIT B

Export

| Date/Time ▼ | File Name/Target | Threat | Result | Scan Type | Path |
|---|---|---|---|---|---|
| 4/12/2019 (Fri) 13:10 | DOJ-BP-0004827945.msg | TSC_GENCLEAN | Cleaned | DCS | E:\190408 - Backpage Discovery\VOL000002\NATIVES\NATIVE000001\ |
| 4/12/2019 (Fri) 13:10 | DOJ-BP-0004827945.msg | TSC_GENCLEAN | Cleaned | DCS | E:\190408 - Backpage Discovery\VOL000002\NATIVES\NATIVE000001\ |
| 4/12/2019 (Fri) 13:10 | DOJ-BP-0004827945.msg | WORM_CRIDEX.TN | Quarantined | Scheduled Scan | E:\190408 - Backpage Discovery\VOL000002\NATIVES\NATIVE000001\ |
| 4/12/2019 (Fri) 13:09 | DOJ-BP-0004824343.msg | TSC_GENCLEAN | Cleaned | DCS | E:\190408 - Backpage Discovery\VOL000002\NATIVES\NATIVE000001\ |
| 4/12/2019 (Fri) 13:09 | DOJ-BP-0004824343.msg | TSC_GENCLEAN | Cleaned | DCS | E:\190408 - Backpage Discovery\VOL000002\NATIVES\NATIVE000001\ |
| 4/12/2019 (Fri) 13:09 | DOJ-BP-0004824343.msg | JS_REDIR.EX | Quarantined | Scheduled Scan | E:\190408 - Backpage Discovery\VOL000002\NATIVES\NATIVE000001\ |
| 4/12/2019 (Fri) 12:24 | DOJ-BP-0004827945.msg | TSC_GENCLEAN | Cleaned | DCS | C:\Users\cboyd\Desktop\190408 - Backpage Discovery\VOL000002\NATIVES\NATIVE000001\ |
| 4/12/2019 (Fri) 12:24 | DOJ-BP-0004827945.msg | TSC_GENCLEAN | Cleaned | DCS | C:\Users\cboyd\Desktop\190408 - Backpage Discovery\VOL000002\NATIVES\NATIVE000001\ |
| 4/12/2019 (Fri) 12:24 | DOJ-BP-0004827945.msg | WORM_CRIDEX.TN | Quarantined | Scheduled Scan | C:\Users\cboyd\Desktop\190408 - Backpage Discovery\VOL000002\NATIVES\NATIVE000001\ |
| 4/12/2019 (Fri) 12:23 | DOJ-BP-0004824343.msg | TSC_GENCLEAN | Cleaned | DCS | C:\Users\cboyd\Desktop\190408 - Backpage Discovery\VOL000002\NATIVES\NATIVE000001\ |
| 4/12/2019 (Fri) 12:23 | DOJ-BP-0004824343.msg | TSC_GENCLEAN | Cleaned | DCS | C:\Users\cboyd\Desktop\190408 - Backpage Discovery\VOL000002\NATIVES\NATIVE000001\ |
| 4/12/2019 (Fri) 12:23 | DOJ-BP-0004824343.msg | JS_REDIR.EX | Quarantined | Scheduled Scan | C:\Users\cboyd\Desktop\190408 - Backpage Discovery\VOL000002\NATIVES\NATIVE000001\ |
| 4/12/2019 (Fri) 12:16 | DOJ-BP-0004827945_2336280.msg | TSC_GENCLEAN | Cleaned | DCS | C:\Users\cboyd\AppData\Local\Box\Box\unsyncedFiles\ |
| 4/12/2019 (Fri) 12:16 | DOJ-BP-0004827945_2336280.msg | TSC_GENCLEAN | Cleaned | DCS | C:\Users\cboyd\AppData\Local\Box\Box\unsyncedFiles\ |
| 4/12/2019 (Fri) 12:16 | DOJ-BP-0004827945_2336280.msg | WORM_CRIDEX.TN | Quarantined | Scheduled Scan | C:\Users\cboyd\AppData\Local\Box\Box\unsyncedFiles\ |
| 4/12/2019 (Fri) 12:15 | DOJ-BP-0004824343_2332683.msg | JS_REDIR.EX | Quarantined | Scheduled Scan | C:\Users\cboyd\AppData\Local\Box\Box\unsyncedFiles\ |
| 4/12/2019 (Fri) 12:15 | DOJ-BP-0004824343_2332683.msg | TSC_GENCLEAN | Cleaned | DCS | C:\Users\cboyd\AppData\Local\Box\Box\unsyncedFiles\ |
| 4/12/2019 (Fri) 12:10 | b1e283b5-e2d5-4742-be7e-5399d3cfd0ef | JS_REDIR.EX | Quarantined | Scheduled Scan | C:\Users\cboyd\AppData\Local\Box\Box\cache\ |
| 4/12/2019 (Fri) 12:10 | b1e283b5-e2d5-4742-be7e-5399d3cfd0ef | TSC_GENCLEAN | Cleaned | DCS | C:\Users\cboyd\AppData\Local\Box\Box\cache\ |
| 4/12/2019 (Fri) 12:05 | 12019b82-7b80-4c62-9d60-9f4a1542ba82 | TSC_GENCLEAN | Cleaned | DCS | C:\Users\cboyd\AppData\Local\Box\Box\cache\ |
| 4/12/2019 (Fri) 12:05 | 12019b82-7b80-4c62-9d60-9f4a1542ba82 | TSC_GENCLEAN | Cleaned | DCS | C:\Users\cboyd\AppData\Local\Box\Box\cache\ |
| 4/12/2019 (Fri) 12:05 | 12019b82-7b80-4c62-9d60-9f4a1542ba82 | WORM_CRIDEX.TN | Quarantined | Scheduled Scan | C:\Users\cboyd\AppData\Local\Box\Box\cache\ |

# EXHIBIT C

PICCARRETA DAVIS KEENAN FIDEL PC
LAWYERS

MICHAEL L. PICCARRETA
JEFFERSON KEENAN
LOUIS S. FIDEL

BARRY M. DAVIS
(1948-2016)

2 EAST CONGRESS STREET, SUITE 1000
TUCSON, ARIZONA 85701
(520) 622-6900
FAX (520) 622-0521
WWW.PD-LAW.COM

October 26, 2018

**VIA EMAIL: <u>kevin.rapp@usdoj.gov</u>**
**AND U.S. FIRST CLASS MAIL**

Kevin Rapp, Esq.
United States Attorney's Office
Two Renaissance Square
40 N. Central Avenue, Ste. 1200
Phoenix, AZ 85004-4408

Re:   United States v. Lacey, *et al.*, No. CR-18-00422-PHX-SPL (BSB)

Dear Kevin:

I am writing to request that the government comply with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), and to provide you with an enumerated list of documents we believe fall within this mandate.[1] As acknowledged in Judge Logan's order on our request for itemization of *Brady/Giglio* material: "*Brady* places an affirmative duty on the prosecutor to seek out information in the government's possession that is favorable to the defendant; here, the Government has the duty to affirmatively review its discovery materials in order to determine and acquire those materials which would be considered *Brady* exculpatory and *Giglio* impeaching materials." Doc. 339, p. 3.

This part of Judge Logan's order is, of course, based on well-settled case law. *See Kyles v. Whitley*, 514 U.S. 419, 435 (1995); *United States v. Price*, 566 F.3d 900, 908-09 (9th Cir. 2009); *United States v. W. R. Grace*, 401 F.Supp.2d 1069, 1075-76 (D. Mont. 2005), *id.*, as well as the Justice Manual which requires federal prosecutors to conduct a

---

[1] My October 23, 2018, letter to Reginald Jones specifically addressed the *Brady* and *Giglio* issues relating to the government's request to claw back "inadvertently" disclosed *Brady/Giglio* materials in specific government memoranda. This letter supplements that separate request.

PICCARRETA DAVIS KEENAN FIDEL PC

"review process" of investigative agency files, witness files, evidence and information gathered during the investigation, substantive case-related communications, potential *Giglio* information relating to witnesses, and information obtained in witness interviews. Justice Manual, § 9-5.002(B). The Justice Manual also states that "[h]aving gathered the information described above, prosecutors must ensure that the material is reviewed to identify discoverable information." *Id.*[2] Importantly, for the purposes of the *Brady/Giglio* material in this case, "[a] prosecutor must disclose information that is *inconsistent with any element of any crime charged* against the defendant or that establishes a recognized affirmative defense, regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal of the defendant for a charged crime." *Id.*, § 9-5.001(C)(1) (emphasis added). "[T]his policy encourages prosecutors to err on the side of disclosure in close questions of materiality and identify standards that favor greater disclosure in advance of trial through the production of exculpatory information that is *inconsistent with any element of any charged crime* and impeachment information that casts a substantial doubt upon either the accuracy of any evidence the government intends to rely on to prove an element of any charged crime or that might have a significant bearing on the admissibility of prosecution evidence." *Id.*, § 9-5.001(F) (emphasis added). As the defendants have previously noted, the Travel Act and money laundering offenses charged against the defendants are both specific intent crimes.[3] Therefore, any information in the government's possession that would tend to negate this *mens rea* is *Brady* material that must be disclosed to the defendants.

There appears to be no fundamental disagreement regarding your constitutional obligations. At the hearing on the motion for itemization of the *Brady/Giglio* materials, the government assured the court that the government understood and would comply with its *Brady/Giglio* obligations:

THE COURT:        If you do have exculpatory information, I'm sure it's your position that you'll turn that over immediately.

MR. STONE:        100 percent. The exculpatory material is absolutely going over to the extent there is anything exculpatory. And we are doing our review as required under *Brady*,

---

[2] Internal Department of Justice memoranda also "command an *actual review* of the materials acquired during investigation of a criminal case for the purpose of disclosing *Brady/Giglio* materials." *United States v. Salyer*, 2010 WL 3036444, *3 (E. D. Cal. 2010) (citing *Memorandum for Department Prosecutors*, dated January 4, 2010).

[3] *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974); *United States v. Gurolla*, 333 F.3d 944, 957 (9th Cir. 2003).

2

PICCARRETA DAVIS KEENAN FIDEL PC

> *Giglio*, and Rule 16 to determine what we might have
> in our investigative files, and that's going over.

Reporter's Transcript, October 5, 2018, p. 104.

However, after providing those assurances to the court, the government also stated that the agents working on this case have not pulled out anything that they consider exculpatory. *Id.* at 114 ("[W]e have not identified or segregated a document or subset of documents that would be identified as *Brady*"). The government added: "If we come across documents that fall into *Brady* or exculpatory, just to identify those to the defendants, we could do that, Your Honor." *Id.* As noted above, the government assured the court that the government would turn over any *Brady/Giglio* material that it comes across in the future to the defendants immediately. As a consequence, Judge Logan's order specifically "notes that at the October 5th hearing the Government stipulated that it will turn over any *Brady/Giglio* material that it comes across in the future to the Defendants within 10 days. The court implores the Government to abide by this stipulation, without an order from the court." Doc. 339, pp. 5-6.

Despite this pledge to adhere to legal obligations, the government made repeated statements to the court that the government is purportedly "unclear" or "unsure" about what exculpatory *Brady/Giglio* material "would look like." The government stated that, with respect to each specific defendant:

> here are the documents that relate to your defendant, why we think the allegations and the facts support the charges in the superseding indictment.
>
> What they have asked for is the converse of that, which is give us all the documents that help our clients that would be *Brady* material or possibly *Giglio*. And that's where the government's having difficulty identifying those documents, because we're not sure what those particular documents would look like.

*Id.* at 103. *See also id.* at 101 ("it's a little unclear what the exculpatory material would look like"), and 102 ("with respect to *Brady* or exculpatory, we're unsure what that would look like, Your Honor").

These statements are puzzling to the defendants because there is abundant information in the government's possession and/or generated by the government that is favorable and exculpatory to the defendants. Accordingly, by this letter, the defendants specifically advise the government as to areas that are *Brady/Giglio* materials and that

PICCARRETA DAVIS KEENAN FIDEL PC

we believe are subject to your office's pledge (and the Court's order) to be turned over immediately.

First, it is imperative that you produce some of the documents the government is attempting to claw back, identified as the initial category of *Brady/Giglio* materials, which the previous prosecutors readily identified as areas of exculpatory evidence. The memoranda coupled with the underlying documents and any other documents that the government locates relative to those issues should assist the government as a beginning point as to identifying additional *Brady/Giglio* material.

1.   My October 23 letter to Mr. Jones explained that the government has already disclosed exculpatory materials that it now claims were inadvertently produced and seeks to claw back. It is the defendants' position that the government "inadvertently" disclosed *Brady* material that it was legally, ethically, and constitutionally required to disclose in the first place.[4] Although counsel for the defendants ceased their review of the purportedly inadvertently disclosed documents when the government made its claw-back request, counsel for the defendants had been in possession of these documents for weeks and had already reviewed the clearly exculpatory material. From memory, two internal government memoranda[5] contained *Brady/Giglio* material contradicting, legally and factually, the government's theory of the case, including statements made by the government at the hearing regarding the level of knowledge required for criminal prosecution. These *Brady/Giglio* memoranda also contain witness statements favorable to the defense, contain information contradicting representations made to federal magistrates, and contain material relevant to defendants' challenges to the grand jury proceedings and to the searches and seizures in this prosecution, the filing of additional pretrial motions, the cross-examination of government witnesses, and other purposes relating to the present criminal proceedings. The documents undoubtedly will be exhibits at multiple pretrial hearings and will be exhibits at trial.

---

[4] Indeed, it appears the primary reason the government seeks to claw back these materials is that they *are* very favorable to the defendants, and therefore, by definition, constitute *Brady* material. This is demonstrated quite clearly by the fact that the government previously disclosed (without any claim of work product privilege) an internal memorandum on the viability of prosecuting the defendants under 18 U.S.C. § 1591 containing conclusions unfavorable to the defense, but now seeks to withhold memoranda that are clearly favorable to the defense.

[5] *See* Declaration of Reginald E. Jones in support of United States' Motion to Compel Destruction of Inadvertently Produced Documents, p. 6 ¶ 20, and Privilege Log attached as Exhibit I.

4

PICCARRETA DAVIS KEENAN FIDEL PC

> *Brady/Giglio* materials would also include documentation backing up these government memoranda, *i.e.* interviews, documents, investigative memoranda, and other documents and materials referred to, or contributing to, the memoranda.

In addition to these specific documents, I list below some general areas that implicate the government's obligations under *Brady* and *Giglio*, followed by additional enumerated areas.

2. High-ranking Department of Justice officials have informed Congress that similar activities involving the posting of third-party advertisements by the website Craigslist could not be prosecuted under federal criminal law. The DOJ's National Coordinator for Child Exploitation, Prevention, and Interdiction, Francie Hakes, testified that "I am not aware of any laws that would make them [criminally] liable [for third-party postings], unless there was evidence that Craigslist was a participant…conspiring with those who were misusing their site, that is, knowingly conspiring to violate laws….I am not aware of anything that shows us that Craigslist might be criminally liable…." Domestic Minor Sex Trafficking: Hearing Before Subcommittee on Crime, Terrorism, & Homeland Security of the House Committee on the Judiciary, 111th Cong. 215-16 (2010). Any similar materials in the government's possession also constitute *Brady* material and must be disclosed immediately.

3. Key legislators very recently admitted (a little over a month before the government obtained its initial indictment in this matter) that "current federal criminal law…lacks proper prosecutorial tools to combat these websites" and "*general knowledge that sex trafficking occurs on a website will not suffice as the knowledge element must be proven as to a specific victim.*" House of Representatives Report 115-572 Part 1, p. 5, February 20, 2018 (emphasis added). Any similar information also constitutes *Brady* material that must be disclosed immediately.

In light of these examples, it is simply difficult for the defendants to fathom the government's claim that it would not know what *Brady/Giglio* materials "would look like." It is clear that *any* factual or legal matters that contradict the prosecution's theory of the case are, by definition, *Brady* materials that must be disclosed to the defendants. *See, e.g., Bies v. Sheldon*, 775 F.3d 386, 398-403 (6th Cir. 2014) (upholding the district court's finding of a *Brady* violation due to the state's suppression of "Evidence Undermining the State's Theory of the Case"); *Wolfe v. Clarke*, 819 F.Supp.2d 538, 558

PICCARRETA DAVIS KEENAN FIDEL PC

(E. D. Va. 2011) (vacating capital defendant's conviction after finding that the prosecution violated *Brady* by withholding investigation reports and interviews "undermining its theory of the case"). *See also United States v. Avellino,* 1995 WL 228352, *1 (E. D. N. Y. 1995) ("The government agreed to submit to the Court for determination any evidence which may contradict its theory of the case and about which it questions whether the evidence properly falls within the scope of *Brady* and/or *Giglio* and their progeny").

The defendants believe that these and similar materials are clearly *Brady/Giglio* materials that the government is legally, ethically, and constitutionally obligated to turn over to the defendants within 10 days, in accordance with the government's assurances to Judge Logan and the terms of his order. To be clear: we are not requesting that the government has to conduct searches or investigation other than what they have already done or will do in regards to prosecution of this matter. We do request, however, while conducting its normal investigation and pretrial preparation in accordance with its obligations under *Brady/Giglio* and the Justice Manual, that if this information is located, that it then be segregated and provided. None of us want this case to turn into another Ted Stevens fiasco.

Accordingly, and pursuant to the above authority, Mr. Padilla additionally requests the government to disclose the following additional information:[6]

4.    All communications to and from any federal, state, or local elected officials relating to the possible criminal prosecution of Backpage and its employees and officers. *Fitzgerald v. Peek*, 636 F.2d 943, 945 (5th Cir. 1981) (due process prohibits prosecution based on improper influence exerted on the prosecutor to seek the indictments).

5.    All communications to and from any civil plaintiff's lawyers or advocates for alleged sex trafficking victims and local, state, and federal law enforcement agents, officers, investigators, prosecutors, and other officials involved in any manner with the investigation or prosecution of the website Backpage.com ("Backpage"). *Fitzgerald v. Peek*, 636 F.2d 943, 945 (5th Cir. 1981) (due process prohibits prosecution based upon improper outside influences).

---

[6] Although "the duty to disclose such evidence is applicable even though there has been no request by the accused," *Strickler v. Greene*, 527 U.S. 263, 280 (1999), "[w]hen the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *United States v. Bagley*, 473 U.S. 667, 681 (1985).

6

PICCARRETA DAVIS KEENAN FIDEL PC

6.      All documents and commendations from law enforcement to Backpage relating to Backpage's cooperation in any criminal investigations.[7]

7.      All communications to and from local, state, and federal law enforcement agents, officers, investigators, prosecutors, and other officials involved in any matter with the investigation or prosecution relating to Backpage.

8.      All communications to and from Nanci Clarence, or any lawyers representing Mr. Ferrer or Backpage, that relate in any manner to plea negotiations or the plea agreement and all documents to or from the government and any other local, state, or federal law enforcement agents, officers, investigators, prosecutors, and other officials relative to Mr. Ferrer that relate to the plea negotiations or plea agreement and all writings subsequent to said plea agreement.

9.      All communications to and from K.C. Maxwell or any lawyers representing Mr. Hyer or Backpage that relate in any manner to plea negotiations or the plea agreement and all documents to or from the government and any other local, state, or federal law enforcement agents, officers, investigators, prosecutors, and other officials relative to Mr. Hyer that relate to the plea negotiations or plea agreement and all writings subsequent to said plea agreement.

10.     All documents to and from Backpage and the National Center for Missing and Exploited Children (NCMEC) relating to possible unlawful activity involving underage individuals.

11.     All documents sent by Backpage to law enforcement relating to cooperation with law enforcement efforts.

12.     All Department of Justice memoranda relating to the department's understanding of the applicable law governing Backpage during the relevant time periods.

I am also requesting specific *Brady/Giglio* material relating to government witnesses, including cooperating individuals and co-defendants:

13.     Any plea bargain, immunity agreement, explicit or implied agreement, or any other promises any witness has received or will receive from any federal, state or local authority in exchange for his or her testimony or cooperation in this case or in any other case.

---

[7] For reference, documents and communications include both tangible and electronic.

7

PICCARRETA DAVIS KEENAN FIDEL PC

14. Any information suggesting any bias, prejudice or motive that the witness may have for testifying falsely against the defendant. *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987); *United States v. Strifler*, 851 F.2d 1197 (9th Cir. 1988); *United States v. Abel*, 469 U.S. 45 (1984).

15. All promises, agreements, benefits, monies or anything of value whatsoever made to or provided to the witness, his/her family or friends by federal, state or local authorities in this matter or any other matter. *See United States v. Uramoto*, 638 F.2d 84, 86 (9th Cir. 1980); *United States v. Leja*, 568 F.2d 493 (6th Cir. 1977).

16. Any monies paid, or any other benefit provided, to any of the government's witnesses by the United States government or any other governmental agency that was in any way contingent upon the outcome of this or any other investigation as a result of information provided by any such witnesses. *United States v. Bagley*, 473 U.S. 667, 683 (1985).

17. All documents between the witness, or his/her representative and the government relating to the negotiations of the plea bargain agreement or where the witness has offered or proposed testimony. *Brown v. Dugger*, 831 F.2d 1547 (11th Cir. 1987) (evidence that witness sought plea bargain is to be disclosed even if no deal struck); *Haber v. Wainwright*, 756 F.2d 1520, 1524 (11th Cir. 1985).

18. Proffers and statements made by an accomplice witness in negotiating a cooperation agreement with the government, along with information revealing the negotiation process, including but not limited to any and all variations in the accomplice witness' statements. *United States v. Sudikoff*, 36 F.Supp.2d 1196 (C.D. Cal. 1999).

19. All documents, including the government's reports which indicate instances of illegal behavior of the witness or specific instances of misconduct which relate in any manner whatsoever to the witness' credibility. *See* Rule 608(b), Federal Rules of Evidence. This request includes any law enforcement reports relating to these instances. *See United States v. Ray*, 731 F.2d 1361 (9th Cir. 1984).

20. Any prior contrary statements made by the government witness. *Giles v. Maryland*, 386 U.S. 66 (1967); *Spicer v. Roxbury Correctional Institute*, 194 F.3d 547 (4th Cir. 1999).

21. The existence of any witnesses or witness statements favorable to the defendant. *United States v. Wilkins*, 326 F.2d 135 (2d Cir. 1964); *Jackson v. Wainwright*, 390 F.2d 288 (5th Cir. 1968).

8

>Dx

PICCARRETA DAVIS KEENAN FIDEL PC

30. Any reports prepared by prosecution experts relating to the legality of the procedure used by government agents in the course of their investigation. *United States v. Gerena*, 116 F.R.D. 596 (D. Conn. 1987).

31. Evidence that is inconsistent with the witness' testimony. *United States v. Fisher*, 106 F.3d 622, 634-35 (5th Cir. 1997); *Ballinger v. Kerby*, 3 F.3d 1371, 1375-76 (10th Cir. 1993); *Derden v. McNeel*, 938 F.2d 605, 617 (5th Cir. 1991).

I would request that a copy of this letter be sent to your case agent or agents so that each agency is aware of this request.

Sincerely,

Michael L. Piccarreta

JK:mh
cc: Brian Benczkowski, brian.benczkowski@usdoj.gov
Peter Kozinets, peter.kozinets@usdoj.gov
John Kucera, John.Kucera@usdoj.gov
Reginald Jones, reginald.jones4@usdoj.gov
Margaret Perlmeter, margaret.perlmeter@usdoj.gov
Andrew Stone, andrew.stone@usdoj.gov
Tom Bienert, tbienert@bmkattorneys.com
Paul Cambria, pcambria@lglaw.com
Robert Corn-Revere, bobcornrevere@dwt.com
Bruce Feder, bf@federlawpa.com
James Grant, jimgrant@dwt.com
Michael Kimerer, mdk@kimerer.com
Stephen Weiss, sweiss@karpweiss.com

# EXHIBIT D



**U.S. Department of Justice**

United States Attorney
District of Arizona

| | | |
|---|---|---|
| Two Renaissance Square | Main: | (602) 514-7500 |
| 40 N. Central Ave., Suite 1800 | Main Fax: | (602) 514-7693 |
| Phoenix, AZ  85004-4408 | | |

March 7, 2019

<u>Via E-Mail</u>
Whitney Z. Bernstein
Bienart, Miller & Katzman PLC
EMail:wbernstein@bmkattorneys.com
(attorney for Defendant James Larkin)

Re:    <u>Your letter of February 26, 2019</u>

Dear Ms. Bernstein:

We write in response to your February 26, 2019 letter summarizing our February 20, 2019 phone call regarding Backpage server data. Your letter contains a number of inaccuracies.  However, instead of addressing each inaccuracy contained within the letter, we believe it would be most fruitful to provide you with the below written summary of the government's handling of the Backpage server data to date.

<u>Total Servers</u>

The government has 46 Backpage servers in its possession obtained from Amsterdam, Netherlands ("Amsterdam"), Tucson, Arizona ("Tucson"), and Dallas, Texas ("Dallas").  We are currently awaiting receipt of approximately 60 additional servers from Amsterdam through the Mutual Legal Assistance Treaty ("MLAT") process.

<u>Amsterdam Servers</u>

We currently have in our possession nine servers obtained from Amsterdam through the MLAT process.  Of these nine servers, three are slave database servers, three are image servers, two are master database servers, and one is a backup server.  Backpage operated

March 7, 2019
Page 2

as a classified advertising website for approximately 14 years so we're certain you are aware of the content hosted on the site. However, we extracted all of the Backpage marketplace database files (i.e. all of the ads that were on Backpage.com) from these servers and have imaged the server containing all of the Backpage images in order to help facilitate any review you would like to conduct of this data. As I indicated in my March 4, 2019 email to you, the hard drives containing this data are available for pick-up at an FBI facility in Phoenix. Additionally, in accordance with Federal Rule of Criminal Procedure 16(a)(1)(E), these nine servers are available for your inspection at an FBI data center facility in Pocatello, Idaho. Our forensic examiners located at this facility are available to facilitate your review of these servers and answer any technical questions you may have regarding this particular data.

In addition to the aforementioned nine servers currently in the government's possession, we are awaiting receipt of approximately 60 servers from Dutch officials through the MLAT process. We have been advised by a former Backpage employee who managed these servers that these 60 servers contain payment processing data and data redundancy from the nine Amsterdam servers currently in the government's possession. These servers will also be available for your inspection at an FBI data center facility in Pocatello, Idaho when we receive them.

Dallas Servers

We currently have in our possession five Backpage servers seized from Dallas. Of these five servers, we were advised by a former Backpage employee who managed these servers that two of these servers contain Backpage-related email data. These two servers have been imaged and the hard drives containing this data are available for pick-up at an FBI facility in Phoenix. The former Backpage employee who managed these servers also advised us that the remaining three Dallas servers in our possession contain antivirus servers, asset tracking/inventory software, a backup server, web user interface, virtual private network for end point, VM servers, and WSUS. In accordance with Federal Rule of Criminal Procedure 16(a)(1)(E), these three servers are available for your inspection at an FBI data center facility in Pocatello, Idaho. Our forensic examiners located at this facility are available to facilitate your review of these servers and answer any technical questions you may have regarding this particular data.

Tucson Servers

We currently have in our possession 32 servers and three hard drives seized from Tucson. We were advised by a former Backpage employee who managed these servers that they contain data redundancy of the marketplace database files and images from the

March 7, 2019
Page 3

Amsterdam servers.  We have imaged the master marketplace database and image servers. The hard drives containing this data are available for pick-up at an FBI facility in Phoenix. In accordance with Federal Rule of Criminal Procedure 16(a)(1)(E), these 32 servers are available for your inspection at an FBI data center facility in Pocatello, Idaho.  Our forensic examiners located at this facility are available to facilitate your review of these servers and answer any technical questions you may have regarding this particular data.

<u>Sampling of Ad data and Ad data the Government Might Utilize at Trial</u>

During our February 20, 2019 phone conversation (and again in your February 26, 2019 letter), you requested samples of "[Backpage] advertisements as such ads now appear in the data the government has imaged."  You also requested "discrete parts of all advertisements that are the subject of counts in the Superseding Indictment."  To be clear, the government has previously produced to you in discovery ads that are referenced in counts in the Superseding Indictment.  However, we are willing to produce samples of Backpage ads as the ads appear in the server data the government has imaged, to include ads referenced in counts in the Superseding Indictment.  Although we had hoped to have this sampling to you this week, our forensic examiner culling this data was unexpectedly away from the office for a number of days, so we will need additional time to compile the requested sampling.  We will send this sampling to you as soon as possible.  Also, as previously noted, the entire marketplace of Backpage ads have been extracted for you and is available for pick-up at your convenience.

Additionally, given the voluminous amount of server data, the government agrees to provide to you with exhibits of any server data that we might utilize at trial.  This should greatly assist you in focusing your efforts and attention on server data relevant to the case.

Please reach out to me with additional questions.  We will continue to work diligently to answer them and facilitate your review of materials in this case.

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division
U.S. Department of Justice

s/Reginald E. Jones
REGINALD E. JONES
Senior Trial Attorney, CEOS
(202) 616-2807
reginald.jones4@usdoj.gov

March 7, 2019
Page 4

ELIZABETH A. STRANGE
First Assistant U.S. Attorney

KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW STONE
Assistant United States Attorneys

JOHN J. KUCERA
Special Assistant U.S. Attorney

# EXHIBIT E

## Whitney Bernstein

**From:**        Jones, Reginald (CRM) <Reginald.Jones4@usdoj.gov>
**Sent:**        Wednesday, April 10, 2019 4:54 PM
**To:**        Whitney Bernstein
**Subject:**        RE: US v. Lacey et al., 18-CR-0422-PHX-SMB
**Attachments:**        Response to W. Bernstein's 2.26.19 letter.pdf

**Follow Up Flag:**        Follow up
**Flag Status:**        Flagged

Hi Whitney:

I've been out of the office today on work-related travel.  I spoke with FBI personnel in Pocatello, Idaho today and unfortunately we are unable to meet with you this Thursday.  The FBI datacenter in Pocatello is required to run background checks on all non-FBI personnel who enter the building and thus require 48-72 hour notice before non-FBI personnel can enter the building.    That being said, we are available to meet with you to inspect the Backpage server data next Wednesday April 17, 2018 at 1pm in Pocatello.  The nine servers seized from Amsterdam and three of the five servers seized from Dallas are located in Pocatello.  The 37 servers seized from Tucson and two of the five servers seized from Dallas are now available for your review at an FBI facility in Phoenix, Arizona.  Since you will be in Phoenix later this month and indicated you plan to pick-up Defendant Larkin's personal devices from FBI Phoenix during your visit, we are happy to facilitate your inspection of the servers located in Phoenix on April 23rd or April 24th.   As I articulated in my March 7, 2019 email to you (email is attached) per Federal Rule of Criminal Procedure Rule 16, the Backpage server data located in Pocatello and Phoenix is available for you to <u>inspect</u> and <u>copy</u>.

If next Wednesday April 17, 2019, still works for you to travel to Pocatello, please provide me the name, date of birth, and social security number of everyone who will be traveling to the datacenter so FBI can start conducting the necessary background investigation.

Also, I'm currently on work-related travel, but will plan to send you the chain of custody for all servers when I'm back in the office on Friday.  The chain of custody will provide a list of all servers in the government's possession.  As we indicated to you previously, there is no master list that describes what data is on each server, but as you know, we've imaged several servers and have spoken with the former Backpage employee who managed the server data and described to you in the attached March 7 letter the data contained on the servers currently in our possession.  We were informed by this same former Backpage employee that the payment processing data is located on the remaining servers in Amsterdam.  As per your request (and as we indicated in our March 7 letter to you), we will make that data as well as any other data contained on those remaining servers available to you when it is received via the MLAT process.

Backpage operated as a classified website for more than 14 years so we're sure your client, as owner of the company, is aware of the data that was hosted on the website.  So, if there is specific data other than ads, images, emails, and payment processing data that you believe is material to your defense, please let us know and we will attempt to locate that data for you.
We've worked diligently to image and make available to you server data currently in our possession that you might find relevant to the case and have even agreed to provide you with exhibits of any server data we might utilize at trial to assist you in focusing your efforts and attention.

Again, in accordance with the Federal Rules of Criminal Procedure, all Backpage server data in the government's possession is available for your inspection; however, we believe it would be most efficient for all parties if you could consult with Defendants and provide the government specific server data other than the ad, image, and email data we've imaged and made available to you (and payment processing data we will make available to you when we receive it), that you believe is material to your defense.

Please send me the names, dates of birth, and social security numbers for next Wednesday as soon as possible, and I will get you the chain of custody documents by the end of the week.

Best,
Reggie

---

**From:** Whitney Bernstein [mailto:wbernstein@bienertkatzman.com]
**Sent:** Wednesday, April 10, 2019 5:01 PM
**To:** Jones, Reginald (CRM) <Reginald.Jones@CRM.USDOJ.GOV>
**Subject:** RE: US v. Lacey et al., 18-CR-0422-PHX-SMB

Hi Reggie:

I am following up again.  I also left you a voicemail this morning.  You've explained that the servers are only available for review at the FBI facility in Pocatello and won't be imaged or otherwise produced.  We'd like to go to Pocatello.  You've explained that we have to clear our request for an appointment through you and not through the FBI tech agent directly.  As discussed with you yesterday, we'd like to go this Thursday or sometime next week (with the exception of Tuesday, as I said in my voicemail this morning).  I've still yet to hear back from you about this.  I would really appreciate the courtesy of a reply, so we can sort this visit out, obtain travel arrangements if necessary, and generally plan our schedules.

I can be reached at 949-369-3700 or via email here anytime.

Thank you in advance for a prompt reply,

Whitney

**Whitney Z. Bernstein** | Attorney
Bienert | Katzman PC
Tel.: (949) 369-3700

---

**From:** Whitney Bernstein
**Sent:** Tuesday, April 9, 2019 1:23 PM
**To:** 'Jones, Reginald (CRM)' <Reginald.Jones4@usdoj.gov>
**Subject:** RE: US v. Lacey et al., 18-CR-0422-PHX-SMB

Sorry, one more logistics email! – please let me know about Thursday 4/11, and if that doesn't work, please let me know if next week—Monday 4/15, Tuesday 4/16, Wednesday 4/17, Thursday 4/18, or Friday 4/19—works.

Thank you, I'm at 949-369-3700,

Whitney

**Whitney Z. Bernstein** | Attorney
Bienert | Katzman PC
Tel.: (949) 369-3700

---

**From:** Whitney Bernstein
**Sent:** Tuesday, April 9, 2019 1:02 PM
**To:** 'Jones, Reginald (CRM)' <Reginald.Jones4@usdoj.gov>
**Subject:** RE: US v. Lacey et al., 18-CR-0422-PHX-SMB

Hi Reggie:

Additionally, if Thursday afternoon is not available, please let me know if Monday 4/15 is.

Thank you, I'll wait to hear back from you,

Whitney

**Whitney Z. Bernstein** | Attorney
Bienert | Katzman PC
Tel.: (949) 369-3700

---

**From:** Whitney Bernstein
**Sent:** Tuesday, April 9, 2019 12:05 PM
**To:** 'Jones, Reginald (CRM)' <Reginald.Jones4@usdoj.gov>
**Subject:** RE: US v. Lacey et al., 18-CR-0422-PHX-SMB

Hi Reggie,

Thanks for speaking just now.

Thank you for following up with the Pocatello folks and getting back to me as soon as you can.  I'd like to come this Thursday, April. 12, afternoon (~1pm until close of business) to inspect, view, turn on, manipulate, copy, etc. the 46 servers that are there now.  (As discussed, you indicated that no court order is needed to be able to inspect, view, turn on, manipulate, copy, etc. the servers—just that the forensic FBI people would need to supervise the process; and that regarding imaging of any servers, we can coordinate that process once we identify the servers we'll need imaged copies of).  Please let me know whether this visit can occur as soon as you can.

Thank you as well for sending, or redirecting me to, the (i) evidence logs, (ii) detailed inventories, and (iii) chain of custody logs for all 46 servers in Pocatello as soon as you can.  This will allow us to answer your request as to which items in particular we want to inspect in Pocatello to make it most efficient for everyone.

Additionally, it would help us to tell you which servers we want to inspect if you could provide a list of all servers, what is on each server, where each server came from, etc.  I believe when I asked for a list like this on our February 20, 2019 phone call, Matt Frost said one did not exist, but perhaps it now does.  Especially since I now understand that the government does not intend to image or produce any additional servers of the 46 in Pocatello and the 60 forthcoming in

3

the MLAT process, and only intends to make this discovery of 106 servers available to us for our inspection in Pocatello, I would hope to be able to get a list of what the servers contain, where they're from, etc. so we can expedite and streamline future review.

Regarding future trips to Pocatello, I will check my calendar and get back to you shortly with some dates this month and next that we'll need to view the servers.

You indicated that the government expects to receive the additional 60 servers currently in the MLAT process in the next one to two months.  The payment processing data is expected to be included in these 60 servers.  Once the government gets these 60 additional servers, please send (i) an evidence log, (ii) detailed inventory, (iii) chain of custody, and (iv) list of all servers, what is on each server, where each server came from, etc. so we can coordinate our review of these 60 servers.

Finally, regarding the data available for pick up in Phoenix (Backupify data and Larkin's personal devices), I will plan to pick these up either April 22, 23, or 24.

Thank you again for speaking, and please let me know about Thursday as soon as you can.

Thank you,

Whitney

**Whitney Z. Bernstein** | Attorney
Bienert | Katzman PC
Tel.: (949) 369-3700

---

**From:** Whitney Bernstein
**Sent:** Monday, April 8, 2019 3:22 PM
**To:** 'Jones, Reginald (CRM)' <Reginald.Jones4@usdoj.gov>
**Subject:** RE: US v. Lacey et al., 18-CR-0422-PHX-SMB

Great, please call me at 949-369-3700 then.  Thank you.

**Whitney Z. Bernstein** | Attorney
Bienert | Katzman PC
Tel.: (949) 369-3700

---

**From:** Jones, Reginald (CRM) <Reginald.Jones4@usdoj.gov>
**Sent:** Monday, April 8, 2019 3:13 PM
**To:** Whitney Bernstein <wbernstein@bienertkatzman.com>
**Subject:** Re: US v. Lacey et al., 18-CR-0422-PHX-SMB

Tomorrow morning 11am PST works for me.

On Apr 8, 2019, at 5:41 PM, Whitney Bernstein <wbernstein@bienertkatzman.com> wrote:

Anytime tomorrow* morning.

**From:** Whitney Bernstein
**Sent:** Monday, April 8, 2019 2:38 PM
**To:** 'Jones, Reginald (CRM)' <Reginald.Jones4@usdoj.gov>
**Subject:** RE: US v. Lacey et al., 18-CR-0422-PHX-SMB

Hi Reggie:

I just tried you again and left a VM.  I'm at my desk for the rest of the afternoon, so now would be a good time for this call.  Otherwise, I can speak anytime morning.  I appreciate speaking ASAP regarding logistics of picking up/viewing discovery at both Phoenix and Pocatello offices.

Thanks,

Whitney

**Whitney Z. Bernstein** | Attorney
Bienert | Katzman PC
Tel.: (949) 369-3700

---

**From:** Whitney Bernstein
**Sent:** Monday, April 8, 2019 2:26 PM
**To:** 'Jones, Reginald (CRM)' <Reginald.Jones4@usdoj.gov>
**Subject:** RE: US v. Lacey et al., 18-CR-0422-PHX-SMB

Hi Reggie:

Can you call me at 949-369-3700 regarding Phoenix and Pocatello?

Thank,

Whitney

**Whitney Z. Bernstein** | Attorney
Bienert | Katzman PC
Tel.: (949) 369-3700

---

**From:** Jones, Reginald (CRM) <Reginald.Jones4@usdoj.gov>
**Sent:** Monday, April 8, 2019 2:25 PM
**To:** Whitney Bernstein <wbernstein@bienertkatzman.com>
**Subject:** RE: US v. Lacey et al., 18-CR-0422-PHX-SMB

Hi Whitney:

I received today the voicemail you left for me after business hours EST on Friday regarding pick-up of the personal device data.  Please let me know a good time to schedule a call or let me know some times that work for your schedule to pick-up the data from FBI Phoenix.

Thanks,
Reggie

**From:** Jones, Reginald (CRM)
**Sent:** Friday, April 5, 2019 2:29 PM
**To:** 'Whitney Bernstein' <wbernstein@bienertkatzman.com>
**Subject:** RE: US v. Lacey et al., 18-CR-0422-PHX-SMB

No problem.

Also, I checked with FBI and unfortunately the personal devices and documents data cannot be picked-up this weekend, however, they can be picked up on Monday morning.  Let me know if you'd like to pick-up these items Monday morning.  They are contained in one small box.

Thanks,

Reggie

**From:** Whitney Bernstein [mailto:wbernstein@bienertkatzman.com]
**Sent:** Friday, April 5, 2019 2:24 PM
**To:** Jones, Reginald (CRM) <Reginald.Jones@CRM.USDOJ.GOV>; Rapp, Kevin (USAAZ) <KRapp@usa.doj.gov>; Kucera, John (USACAC) <jkucera@usa.doj.gov>; Perlmeter, Margaret (USAAZ) <MPerlmeter@usa.doj.gov>; Kozinets, Peter (USAAZ) <PKozinets@usa.doj.gov>
**Cc:** Tom Bienert <tbienert@bienertkatzman.com>; Toni Thomas <tthomas@bienertkatzman.com>
**Subject:** RE: US v. Lacey et al., 18-CR-0422-PHX-SMB

Thanks, Reggie.

**Whitney Z. Bernstein** | Attorney
Bienert | Katzman PC
Tel.: (949) 369-3700

**From:** Jones, Reginald (CRM) <Reginald.Jones4@usdoj.gov>
**Sent:** Friday, April 5, 2019 11:18 AM
**To:** Whitney Bernstein <wbernstein@bienertkatzman.com>; Rapp, Kevin (USAAZ) <Kevin.Rapp@usdoj.gov>; Kucera, John (USACAC) <John.Kucera@usdoj.gov>; Perlmeter, Margaret (USAAZ) <Margaret.Perlmeter@usdoj.gov>; Kozinets, Peter (USAAZ) <Peter.Kozinets@usdoj.gov>
**Cc:** Tom Bienert <tbienert@bienertkatzman.com>; Toni Thomas <tthomas@bienertkatzman.com>
**Subject:** RE: US v. Lacey et al., 18-CR-0422-PHX-SMB

Hi Whitney,

We provided you with search warrants and affidavits (Bates labeled) in our November 30, 2018 production.  However, I'm happy to resend you these warrants – they are attached.   Please let us know if we can further assist.

Thanks,
Reggie

6

**From:** Whitney Bernstein [mailto:wberstein@bienertkatzman.com]
**Sent:** Thursday, April 4, 2019 2:57 PM
**To:** Jones, Reginald (CRM) <Reginald.Jones@CRM.USDOJ.GOV>; Rapp, Kevin (USAAZ)
<KRapp@usa.doj.gov>; Kucera, John (USACAC) <jkucera@usa.doj.gov>; Perlmeter, Margaret (USAAZ)
<MPerlmeter@usa.doj.gov>; Kozinets, Peter (USAAZ) <PKozinets@usa.doj.gov>
**Cc:** Tom Bienert <tbienert@bienertkatzman.com>; Toni Thomas <tthomas@bienertkatzman.com>
**Subject:** RE: US v. Lacey et al., 18-CR-0422-PHX-SMB

Hi Reggie:

Thank you for sending this.  As previously requested, please include wbernstein@bmkattorneys.com
and tthomas@bmkattorneys.com on all case-related electronic correspondence sent to Tom Bienert.

We will make arrangements to have the hard drives and CDs containing data seized from Mr. Larkin
picked up from the Phoenix FBI facility and reach out to you separately as requested in the letter to
schedule a time.

Finally, your letter also indicates that the government obtained court-authorized search warrants for the
devices.  Please also send us copies of the applications, affidavits, and warrants related to these
searches and seizures, as we don't believe we've previously received those.

Thank you,

Whitney

**Whitney Z. Bernstein** | Attorney
Bienert | Katzman PLC
Tel.: (949) 369-3700

**From:** Jones, Reginald (CRM) <Reginald.Jones4@usdoj.gov>
**Sent:** Thursday, April 4, 2019 10:41 AM
**To:** Whitney Bernstein <wbernstein@bienertkatzman.com>; Rapp, Kevin (USAAZ)
<Kevin.Rapp@usdoj.gov>; Kucera, John (USACAC) <John.Kucera@usdoj.gov>; Perlmeter, Margaret
(USAAZ) <Margaret.Perlmeter@usdoj.gov>; Kozinets, Peter (USAAZ) <Peter.Kozinets@usdoj.gov>
**Cc:** Tom Bienert <tbienert@bienertkatzman.com>; Toni Thomas <tthomas@bienertkatzman.com>
**Subject:** RE: US v. Lacey et al., 18-CR-0422-PHX-SMB

Hi Whitney:

Please find attached an email and letter sent to Tom Bienert of your firm on March 18, 2019, regarding
the personal devices and documents seized from your client, Defendant James Larkin.

Please reach out with additional questions.

Best,

Reggie

**Reginald E. Jones**
**U.S. Department of Justice, Criminal Division**

T: 202.616.2807 | reginald.jones4@usdoj.gov

---

**From:** Whitney Bernstein [mailto:wbernstein@bienertkatzman.com]
**Sent:** Thursday, April 4, 2019 1:26 PM
**To:** Rapp, Kevin (USAAZ) <KRapp@usa.doj.gov>; Kucera, John (USACAC) <jkucera@usa.doj.gov>; Perlmeter, Margaret (USAAZ) <MPerlmeter@usa.doj.gov>; Jones, Reginald (CRM) <Reginald.Jones@CRM.USDOJ.GOV>; Kozinets, Peter (USAAZ) <PKozinets@usa.doj.gov>
**Cc:** Tom Bienert <tbienert@bienertkatzman.com>; Toni Thomas <tthomas@bienertkatzman.com>
**Subject:** US v. Lacey et al., 18-CR-0422-PHX-SMB

Kevin,

Please see attached.

Thank you,

Whitney

**Whitney Z. Bernstein**
**Attorney**
Bienert | Katzman PLC
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
Main (949) 369-3700
Website: www.bmkattorneys.com

<image001.jpg>

The foregoing message is confidential and intended for the designated recipient only.  The foregoing information may be protected by attorney-client and/or work product privileges.  Accordingly, if you have received this message in error, please contact BIENERT | KATZMAN, PLC at (949) 369-3700 immediately, and delete the message without reviewing, copying, or making further use of the information contained herein.