Robert Corn-Revere (D.C. Bar No. 375415, admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-3401
Telephone:   (202) 973-4225
Facsimile:   (202) 973-4499
Email:        robertcornrevere@dwt.com

James C. Grant (Wash. Bar No. 14358, admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave, Suite 3300
Seattle, WA 98104-1610
Telephone:   (206) 757-8096
Facsimile:   (206) 757-7096
Email:        jamesgrant@dwt.com

*Counsel for Michael Lacey and James Larkin*

Additional counsel listed on following pages

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-422-PHX-SMB |
| Plaintiff, | **DEFENDANTS' MOTION TO DISMISS INDICTMENT** |
| v. | |
| Michael Lacey, *et al.*, | |
| Defendants. | |

Paul J. Cambria, Jr. (Cal. Bar No. 177957, admitted *pro hac vice*)
Erin E. McCampbell (N.Y. Bar No. 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite #120
Buffalo, NY 14202
Telephone:    (716) 849-1333
Facsimile:    (716) 855-1580
Email:        pcambria@lglaw.com
              emccampbell@lglaw.com

*Counsel for Defendant Michael Lacey*

Thomas H. Bienert, Jr. (Cal. Bar No. 135311, admitted *pro hac vice*)
Whitney Z. Bernstein (Cal. Bar No. 304971, admitted *pro hac vice*)
BIENERT KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
Telephone:    (949) 369-3700
Facsimile:    (949) 369-3701
Email:        tbienert@bmkattorneys.com
              wbernstein@bmkattorneys.com

*Counsel for Defendant James Larkin*

Gary S. Lincenberg (Cal. Bar No. 123058, admitted *pro hac vice*)
Ariel A. Neuman (Cal. Bar No. 241594, admitted *pro hac vice*)
Gopi K. Panchapakesan (Cal. Bar No. 279586, admitted *pro hac vice*)
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067-2561
Telephone:    (310) 201-2100
Facsimile:    (310) 201-2110
Email:        glincenberg@birdmarella.com
              aneuman@birdmarella.com

Michael Kimerer (Ariz. Bar No. 002492)
KIMERER & DERRICK, P.C.
1313 E. Osborn Road, Suite 100
Phoenix, AR 85014
Telephone:    (602) 279-5900
Facsimile:    (602) 264-5566
Email:        mdk@kimerer.com

*Counsel for Defendant John Brunst*

1

Bruce Feder (Ariz. Bar No. 004832)
Feder Law Office, P.A.
2930 E. Camelback Road, Suite 160
Phoenix, AR 85016
Telephone:     (602) 257-0135
Facsimile:      (602) 954-8737
Email:          bf@federlawpa.com
                fl@federlawpa.com

*Counsel for Defendant Scott Spear*

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ................................................................................. 1

II.   BACKGROUND ................................................................................. 3

      A.    History of Backpage.com. ........................................................ 3

      B.    Court Decisions Rejecting Government and Other Challenges to
            Adult-Oriented Advertising on Craigslist and Backpage.com. .............. 4

      C.    Criminal Prosecution in Arizona and Asset Seizures in the Central
            District of California. ................................................................ 8

      D.    Progress of the Prosecution and Litigation to Date. ............................ 10

III.  LEGAL STANDARDS ...................................................................... 11

      A.    Motion to Dismiss Indictment. .............................................. 11

      B.    First Amendment Requirements Governing Prosecution of
            Publishers. ......................................................................... 13

      C.    *Mens Rea* Requirements ........................................................ 15

IV.   ARGUMENT ................................................................................... 15

      A.    The Indictment and the Government's Theory of Prosecution Are
            Fatally Deficient. ................................................................. 15

            1.    Impermissibly Presuming that Ads Are Illegal. ........................ 16

            2.    Repeating Others' Accusations. ................................. 18

            3.    Attacking Traditional, Protected Publisher Functions............... 20

            4.    Attacking Efforts to Promote or Advertise a Website to Users.. 24

      B.    The Indictment Fails to Allege Any Requisite *Mens Rea*. .................. 26

            1.    The Government's Prosecution is Governed by a Specific Intent
                  Standard. ...................................................................... 26

            2.    The Indictment Fails to Allege Specific Intent........................... 31

            3.    Case Law Compels Dismissal of the Indictment....................... 34

      C.    The Travel Act is Unconstitutional as Applied in the Indictment......... 37

1.     Indictment Bases Travel Act Allegations as Generalized Crimes 38

2.     Government's Broad Reading of the Travel Act Conflicts With the First Amendment. ................................................................. 39

3.     The Indictment Must be Dismissed Because it is Predicated on an Unconstitutional Application of the Travel Act ........................ 41

V.    CONCLUSION ................................................................................. 43

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ACLU v. Reno*,
    929 F. Supp. 824 (E.D. Pa. 1996), *aff'd*, 521 U.S. 844 (1997) ................................41

*Amusement Devices Ass'n v. Ohio*,
    443 F. Supp. 1040 (S.D. Ohio 1977).......................................................................40

*Ashcroft v. Free Speech Coalition*,
    535 U.S. 234 (2002) ........................................................................................ 14, 16

*Backpage.com, LLC v. Cooper*,
    939 F. Supp. 2d 805 (M.D. Tenn. 2013) ........................................................ *passim*

*Backpage.com, LLC v. Dart*,
    807 F.3d 229 (7th Cir. 2015), *cert. denied*, 137 S. Ct. 46 (2016) ................... *passim*

*Backpage.com, LLC v. Hoffman*,
    2013 WL 4502097 (D.N.J. Aug. 20, 2013) ..................................................... 6, 18

*Backpage.com, LLC v. Lynch*,
    216 F. Supp. 3d 96 (D.D.C. 2016) ................................................................. 29, 41

*Backpage.com, LLC v. McKenna*,
    881 F. Supp. 2d 1262 (W.D. Wash. 2012) ...................................................... *passim*

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009) .................................................................................21

*Barrett v. Rosenthal*,
    40 Cal. 4th 33, 146 P.3d 510 (2006) ......................................................................25

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003) .................................................................................21

*Bd. of Trs. v. State Univ. of N.J. v. Fox*,
    492 U.S. 469 (1989) .................................................................................................16

*Bennett v. Google, Inc.*,
    2017 WL 2692607 (D.D.C. June 21, 2017), *aff'd sub nom.*, *Bennett v. Google, LLC*, 882 F.3d 1163 (D.C. Cir. 2018).............................................................21

*Craigslist, Inc. v. McMaster*,
    2010 WL 11640195 (D.S.C. 2010) ......................................................... 19, 23, 36

iii

*Dart v. Craigslist, Inc.*,
    665 F. Supp. 2d 961 (N.D. Ill. 2009)................................................ *passim*

*Doe ex rel. Roe v. Backpage.com, LLC*,
    104 F. Supp. 3d 149 (D. Mass. 2015), *aff'd sub nom.*, *Jane Doe No. 1
    v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016), *cert. denied*, 137
    S. Ct. 622 (2017) ................................................................ 8, 17, 23, 24

*Doe v. GTE Corp.*,
    347 F.3d 655 (7th Cir. 2003) ............................................... 14, 36

*Doe v. MySpace, Inc.*,
    528 F.3d 413 (5th Cir. 2008) ........................................................23

*Elonis v. United States*,
    135 S. Ct. 2001 (2015) ................................................................39

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ...................................................................41

*Green v. Am. Online (AOL)*,
    318 F.3d 465 (3d Cir. 2003) .......................................................21

*In re Aimster Copyright Litig.*,
    334 F.3d 643 (7th Cir. 2003) .......................................................36

*Jane Doe No. 1 v. Backpage.com, LLC*,
    817 F.3d 12 (1st Cir. 2016) .........................................................23

*Jones v. Dirty World Entm't Recordings LLC*,
    755 F.3d 398 (6th Cir. 2014) .......................................................21

*Lacey v. Maricopa Cty.*,
    693 F.3d 896 (9th Cir. 2012) .........................................................3

*Langdon v. Google, Inc.*,
    474 F. Supp. 2d 622 (D. Del. 2007) .............................................21

*M.A. ex rel. P.K v. Village Voice Media Holdings, LLC*,
    809 F. Supp. 2d 1041 (E.D. Mo. 2011) ....................................... *passim*

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974) ............................................................... 14, 20

*Mishkin v. New York*,
    383 U.S. 502 (1966) ............................................................... 15, 28

*NAACP v. Button*,
   371 U.S. 415 (1963) ............................................................... 40, 41

*Packingham v. North Carolina*,
   137 S. Ct. 1730 (2017) ...................................................... 13, 16, 41

*People v. Ferrer*,
   2016 WL 7237305 (Cal. Super. Ct. Dec. 9, 2016) ........................... *passim*

*People v. Ferrer*,
   No. 16FE024013 (Cal. Super. Ct. Aug. 23, 2017) .................................8

*Reno v. ACLU*,
   521 U.S. 844 (1997) ...............................................................20

*Russell v. United States*,
   369 U.S. 749 (1962) ........................................................... 12, 13

*Search King, Inc. v. Google Tech., Inc.*,
   2003 WL 21464568 (W.D. Okla. 2003)............................................21

*Smith v. California*,
   361 U.S. 147 (1959) ....................................................... 14, 15, 28, 39

*Smith v. Goguen*,
   415 U.S. 566 (1974) ...............................................................40

*United States v. Bennett*,
   95 F.3d 1158 (9th Cir. 1996).....................................................38

*United States v. Brown*,
   186 F.3d 661 (5th Cir. 1999) .................................................. 15, 27

*United States v. Buddenberg*,
   2010 WL 2735547 .........................................................*passim*

*United States v. Carbajal*,
   42 F. App'x 954 (9th Cir. 2002)..................................................37

*United States v. Cassidy*,
   814 F. Supp. 2d 574 (D. Md. 2011) ........................................... 13, 42

*United States v. Cecil*,
   608 F.2d 1294 (9th Cir. 1979).....................................................12

*United States v. Coia*,
   719 F.2d 1120 (11th Cir. 1983) ...................................................12

*United States v. Du Bo*,
    186 F.3d 1177 (9th Cir. 1999) ........................................................37

*United States v. Gibson Specialty Co.*,
    507 F.2d 446 (9th Cir. 1974) ........................................ 15, 26, 27, 39

*United States v. Kaiser*,
    660 F.2d 724 (9th Cir. 1981) ........................................................27

*United States v. Keith*,
    605 F.2d 462 (9th Cir. 1979) ........................................................12

*United States v. Landham*,
    251 F.3d 1072 (6th Cir. 2001) .................................................. 13, 42

*United States v. Miller*,
    379 F.2d 483 (7th Cir. 1967) ........................................................38

*United States v. Morrison*,
    536 F.2d 286 (9th Cir. 1976) ........................................................37

*United States v. P.H.E., Inc.*,
    965 F.2d 848 (10th Cir. 1992) ......................................................12

*United States v. Perkins*,
    850 F.3d 1109 (9th Cir. 2017) ......................................................17

*United States v. Pernillo-Fuentes*,
    252 F.3d 1030 (9th Cir. 2001) ......................................................37

*United States v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000) ....................................................................16

*United States v. Sineneng-Smith*,
    910 F.3d 461 (9th Cir. 2018) ........................................................41

*United States v. Stevens*,
    559 U.S. 460 (2010) ....................................................................40

*United States v. Stock*,
    728 F.3d 287 (9th Cir. 2013) ........................................................13

*United States v. Trejo*,
    610 F.3d 308 (5th Cir. 2010) .................................................. 15, 27

*United States v. X-Citement Video, Inc.*,
    513 U.S. 64 (1994) ............................................................... 28, 39

*Washington Post v. McManus*,
    355 F. Supp. 3d 272 (D. Md. 2019) ........................................................20

*Watts v. United States*,
    394 U.S. 705 (1969) .............................................................................13

*Wayte v. United States*,
    470 U.S. 598 (1985) .............................................................................12

*Woodhull Freedom Found. v. United States*,
    No. 18-5298 (D.C. Cir. Apr. 15, 2019) ...................................... 31, 35, 41

*Worldwide, LLC v. Google, Inc.*,
    2017 WL 2210029 (M.D. Fla. Feb. 8, 2017)................................... 14, 21

*Zeran v. Am. Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) ........................................................ 20, 21

*Zhang v. Baidu.com Inc.*,
    10 F. Supp. 3d 433 (S.D.N.Y. 2014) ....................................................20

**Federal Statutes**

18 U.S.C. § 2 .................................................................................. 7, 23

18 U.S.C. § 371 ....................................................................................9

18 U.S.C. § 1591 ...................................................................... 23, 29, 36

18 U.S.C. § 1595 ............................................................... 7, 8, 18, 23

18 U.S.C. § 1952 ...................................................................... 9, 27, 38

18 U.S.C. § 1956 .......................................................................... 9, 27

18 U.S.C. § 1957 ..................................................................................9

18 U.S.C. § 2252 ................................................................................28

18 U.S.C. § 2261A ..............................................................................42

47 U.S.C. § 230 ......................................................................... 5, 8, 30

**State Statutes**

Ala. Code § 13A-6-184 .....................................................................17

Ariz. Rev. Stat. § 13-1422 ...............................................................17

Ark. Code Ann. § 14-1-302(9), (10) .......................................................17

Kan. Stat. Ann. § 12-770(a)(8), (9) .......................................................17

Tenn. Code Ann. §§ 7-51-1102(11) & (12) ...........................................17

Utah Code Ann. §§ 59-27-101 to 108 ...................................................17

# I.    INTRODUCTION

The government seeks to prosecute the former publishers of an online classified advertising service, Backpage.com, under a novel theory of vicarious liability never embraced by any federal court.  The government is seeking to punish the providers of the platform because of the content of ads posted by its users, and is a claiming it may accomplish this objective without *any* consideration of the First Amendment implications of its actions.  Beginning with the premise that it can close down the website and criminally prosecute all who were involved with it, the government has attempted to build a case based on broad generalizations and invective that starts with the improper assumption the First Amendment does not apply and fails to allege any criminal acts by the Defendants.[1]

This case is the culmination of a decade's worth of efforts by law enforcement officials and policymakers at various levels of government to prohibit adult-oriented online advertising.  It began with actions by state attorneys general and other officials to intimidate the website Craigslist, which succumbed to the pressure and closed its erotic services section in 2010.  The campaign immediately turned to Backpage.com, then the second-largest classified ad website, with similar demands to shutter categories for adult content.  Backpage.com, however, challenged the government's unconstitutional claims that equate advertising for escorts and other adult services with prostitution, and won a series of court victories affirming that providing such a platform for third-party speech is protected by the First Amendment.  Federal courts struck down state legislation that sought to prohibit such advertising, enjoined governmental use of nuisance suits and veiled threats to close down adult ad sections, and dismissed state prosecutions based on the same vicarious liability theory upon which this federal case is based.

---

[1] Movants Michael Lacey, James Larkin, John Brunst, and Scott Spear are referred to here as "Defendants."

These decisions only led authorities to escalate their efforts to "crush Backpage." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015), *cert. denied*, 137 S. Ct. 46 (2016). Here, federal prosecutors are proceeding under the same flawed vicarious liability theory that California courts rejected twice in dismissing criminal charges against two of the Defendants. The 100-count Indictment[2] starts from the erroneous assumption that all ads on the platform are constitutionally unprotected, that government may presume the ads relate to unlawful conduct simply by looking at them and by parroting accusations often repeated (and rejected) in previous cases, and that the government can prosecute based on a theory of generalized awareness that does not depend on specific knowledge or intent. The government's conduct of this case reflects an alarming disregard for the rule of law and constitutional norms. It seized Defendants' assets presumptively protected by the First Amendment without a hearing, has sought to deprive the Defendants of assistance of counsel, has distorted the record and refused to disclose exculpatory information, and has resisted efforts to subject its overreaching to judicial oversight.

The Indictment must be dismissed because it fails to set forth facts constituting the offenses charged, as required by the Fifth and Sixth Amendments. Additionally, because this prosecution targets publishing activities, the government must more specifically identify the precise conduct alleged to fall outside the First Amendment's protection. Rather than allege specific requisite facts to meet this obligation, the Indictment is a tapestry of generalized claims, recycled accusations, and miscellaneous assertions regarding activities that are constitutionally protected. The Indictment charges Defendants with crimes that require a showing of specific intent (even in cases not implicating the First Amendment), yet utterly fails to allege *mens rea*. The absence of this essential element is especially remarkable because the government previously has acknowledged the specific intent requirements applicable to publishers

---

[2] The operative pleading in this case is the superseding indictment (Doc. 230), which, for simplicity, is referred to in this motion as the "Indictment" and is cited as "SI."

of third-party content in numerous other settings – including in other pending litigation where it currently is touting those requirements as the controlling standard for Travel Act prosecutions implicating the First Amendment.  These defects in the Indictment are fatal; it must be dismissed.

## II.      BACKGROUND

### A.      History of Backpage.com.

Defendants are former owners of a newspaper conglomerate that, at one time, published and distributed 17 weekly papers across the country, including the *Phoenix New Times*, the *SF Weekly*, and New York's *Village Voice.*  Lacey and Larkin founded and built the *Phoenix New Times*, SI ¶ 18, which began publication in 1970 to "ke[ep] the Valley of the Sun's feet to fire" through independent investigative journalism, *see Lacey v. Maricopa Cty.*, 693 F.3d 896, 907 (9th Cir. 2012) (*en banc*) (upholding Civil Rights Act complaint against Sheriff Joe Arpaio and special prosecutor for pursuing and arresting Larkin and Lacey in retaliation for publishing critical articles).  The newspapers featured articles on political and cultural issues not typically covered by mainstream media sources and received numerous awards for excellence in journalism, including the Pulitzer Prize.[3]

Lacey and Larkin are the majority owners of the corporate parent of Village Voice Media Holdings, LLC ("VVMH"),[4] and Brunst and Spear hold minority interests in the company.  Lacey served as Chief Editor of the VVMH papers, Larkin was CEO of VVMH, Scott Spear was an Executive Vice President, and John Brunst was the CFO.  SI ¶ 18.

Like other alternative weeklies, the VVMH papers were free to readers, so they depended on advertising revenues, including from classified ads.  By the early 2000s, the Internet – and particularly Craigslist – was undermining the economic viability of

---

[3] *See* https://en.wikipedia.org/wiki/Village_Voice_Media#Philosophy_of_journalism.

[4] The company is now known as Camarillo Holdings, LLC, but is referred to here (as it is in the Indictment) as "VVMH" for clarity.

newspaper classified advertising.  SI ¶ 20.  In response, in 2004 VVMH launched a

website ("Backpage.com") to publish third-party classified ads online.  *Id.* ¶ 21.

Categories of advertisements on the site spanned the full spectrum – including for

auto sales, real estate, apartment rentals, and jobs, as well as adult categories

including dating, massage, and escort services – as had been published in newspapers,

yellow pages and other media for decades.  *See Backpage.com, LLC v. McKenna*, 881

F. Supp. 2d 1262, 1282 (W.D. Wash. 2012) (noting "numerous states license, tax and

otherwise regulate escort services as legitimate businesses").  Over time,

Backpage.com grew to become the second largest online classified advertising

website in the United States (after Craigslist), with users posting millions of ads each

month.  *See id.* at 1266.

   In 2013, VVMH sold its interests in the newspapers to a group of long-time

executives from the papers.  In April 2015, VVMH sold its interests in Backpage.com

to entities owned by Carl Ferrer (Backpage.com's CEO).  SI ¶ 29-30.  Both of these

transactions were seller-financed.  VVMH ceded ownership and control of the papers

and the website, respectively, to the new owners, and in return VVMH received (and

holds) installment promissory notes for the purchase prices of the sales, secured by

security interests in the businesses and assets sold.  *See* SI ¶ 30-31.

   **B.    Court Decisions Rejecting Government and Other Challenges to Adult-Oriented Advertising on Craigslist and Backpage.com.**

   As Internet advertising grew, various government authorities and interest

groups attacked adult-oriented advertising, first targeting Craiglist.org ("Craigslist")

and then Backpage.com.  Cook County Sheriff Thomas Dart brought a nuisance suit

against Craigslist, alleging that all adult services ads on the site were for prostitution

or sex trafficking and that Craigslist violated federal and state laws prohibiting the

facilitation of prostitution, including the Travel Act.  *Dart v. Craigslist, Inc.*, 665 F.

Supp. 2d 961, 963 (N.D. Ill. 2009).  The U.S. District Court for the Northern District

of Illinois rejected the sheriff's claims under Section 230 of the Communications

Decency Act, 47 U.S.C. § 230 ("CDA"), but also because websites are intermediaries

4

like phone companies and ISPs, which "are not culpable for 'aiding and abetting' their customers who misuse their services to commit unlawful acts." *Id.* at 967.

Nonetheless, a group of state attorneys general continued to pressure Craigslist to eliminate its adult services category, and in September 2010 Craigslist relented, removing the category from the website and declaring that it had been "censored."[5] Less than a week later, the AGs targeted Backpage.com, demanding that it too shut down its adult category.[6]  Backpage.com attempted to work with the attorneys general – explaining its review and moderation of user content and cooperation with law enforcement – but the AGs continued to make publicized demands that the website eliminate all adult services ads, as Craigslist had done.[7]  Backpage.com was unwilling to succumb to censorship, and its position was upheld repeatedly in a number of lawsuits.

In 2012, the Washington State legislature enacted a statute targeting Backpage.com and creating a new state-law felony for disseminating content online if it contained a "depiction of a minor" and any "explicit or implicit offer" of sex for "something of value." *McKenna*, 881 F. Supp. 2d at 1268.  The U.S. District Court for the Western District of Washington enjoined enforcement of the statute, rejecting the state's arguments that the law affected only unprotected speech proposing illegal transactions based on the assumption that all adult ads on Backpage.com were for prostitution or trafficking. *Id.* at 1282.  The court struck down the law under the First Amendment because it would have "chill[ed] a substantial amount of protected speech." *Id.* at 1282.

---

[5] Claire Miller, "Craigslist Says It Has Shut Its Section for Sex Ads," N.Y. TIMES (Sept. 15, 2010), https://www.nytimes.com/2010/09/16/business/16craigslist.html.

[6] *See* Connecticut Attorney General press release (Sept. 21, 2010), https://portal.ct.gov/-/media/AG/Other/Backpageletterpdf.pdf?la=en.

[7] *See* Letter of National Ass'n of Attorneys General (Aug. 31, 2011), https://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/Home/News/Press_Releases/2011/NAAG_Backpage_Signon_08-31-11_Final.pdf.

Tennessee passed a similar law shortly after Washington, but the U.S. District Court for the Middle District of Tennessee enjoined enforcement of that statute as well, likewise holding that third-party ads on Backpage.com were protected speech under the First Amendment.  *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 833-34 (M.D. Tenn. 2013) (rejecting state's argument that the statute "[did] not implicate First Amendment scrutiny because it criminalize[d] only offers to engage in illegal transactions").  Despite invalidation of the Washington and Tennessee laws, the New Jersey legislature enacted a similar statute, which the U.S. District Court for the District of New Jersey struck down, again rejecting arguments that adult-oriented ads on the website were unprotected speech.  *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at *9-11 (D.N.J. Aug. 20, 2013).

At the same time, the DOJ also pursued a grand jury investigation of Backpage.com in the Western District of Washington, but the U.S. District Court there quashed a number of grand jury subpoenas premised on the government's novel theory of vicarious liability.[8]

After Washington, Tennessee, and New Jersey failed in their efforts to censor Backpage.com, Sheriff Dart came up with a new tack, threatening Visa and MasterCard to cut off use of their cards on the website.[9]  The Seventh Circuit directed entry of an injunction against the sheriff, holding that he imposed an unconstitutional informal prior restraint.  *Backpage.com v. Dart*, 807 F.3d at 231 (citing *Bantam*

---

[8] The court's orders in that case, *In re Grand Jury Subpoenas to Backpage.com, LLC and Village Voice Media Holdings, LLC*, No. GJ12-172RAJ (W.D. Wash.), are provided in an accompanying submission under seal.

[9] The Indictment alleges that the "credit card companies stopped processing payments for Backpage … out of concern they were being used for illegal purposes," SI ¶ 15, but fails to mention the Seventh Circuit found that Visa and MasterCard blocked use of their cards "within days of receiving the [Sheriff Dart's] letter," and "were victims of government coercion aimed at shutting up or shutting down Backpage's adult section [or] more likely aimed at bankrupting Backpage …."  *Backpage.com v. Dart*, 807 F.3d at 233.

*Books, Inc. v. Sullivan*, 372 U.S. 58, 64-72 (1963)).  Again in that case, the court rejected the contention that all ads in the adult section of Backpage.com were unlawful and held, to the contrary, that First Amendment protections applied.  *Id.* at 234 ("Nor is Sheriff Dart on solid ground in suggesting that *everything* in the adult section of Backpage's website is criminal, violent, or exploitive.... [N]ot all advertisements for sex are advertisements for illegal sex.") (emphasis in original).  As Judge Posner wrote, "a public official who tries to shut down an avenue of expression of ideas and opinions through actual or threatened imposition of government power or sanction is violating the First Amendment."  *Id.* at 230 (citation and internal quotation marks omitted).

Private plaintiffs also sued Backpage.com for tort claims premised on the website's alleged violation of federal criminal law, asserting that all adult ads on the website were for prostitution or sex trafficking and that the site's design and practices were meant to promote such unlawful activity.  Courts summarily rejected these claims too.  In *M.A. ex rel. P.K v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011), the U.S. District Court for the Eastern District of Missouri dismissed the plaintiff's claims (based on alleged violations of 18 U.S.C. §§ 2, 1595, and 2255) asserting that Backpage.com's posting rules and editorial practices were designed to veil illegal ads, that Backpage.com was "made aware of minors being trafficked on their website," and that it therefore "facilitated" trafficking.  809 F. Supp. 2d at 1044-45, 1050 (plaintiff alleged "no reasonable person could review the postings in the adult categories and deny prostitution was the object of almost each and every ad").  Even under liberal civil pleading standards, the court held that the plaintiff's allegations failed to "describe the specific intent required for aiding and abetting," *i.e.*, that a defendant acted with the intent to bring about "a *certain* crime" and "participated in an unlawful venture … to bring it about."  809 F. Supp. 2d at 1054 (internal quotation marks omitted; emphasis in original).

In *Doe ex rel. Roe v. Backpage.com, LLC*, 104 F. Supp. 3d 149 (D. Mass. 2015), *aff'd sub. nom.*, *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 622 (2017), the U.S. District Court for the District of Massachusetts reached a similar result in dismissing plaintiffs' claims brought under 18 U.S.C. § 1595 attacking Backpage.com's practices (including as to review and editing of ads), stating: "Singly or in the aggregate, the allegedly sordid practices of Backpage … amount to neither affirmative participation in an illegal venture nor active web content creation."  104 F. Supp. 3d at 157.

And, most recently, the California Attorney General's Office – which has been working in concert with the DOJ for many years to pursue Backpage.com for many years – twice brought criminal charges against Defendants Larkin and Lacey (and Ferrer) for promoting and receiving proceeds from prostitution, but two different state judges dismissed the charges on demurrer.  *People v. Ferrer*, 2016 WL 7237305 (Cal. Super. Ct. Dec. 9, 2016); *People v. Ferrer*, No. 16FE024013 (Cal. Super. Ct. Aug. 23, 2017).[10]  These courts rejected the same presumptions (*e.g.*, that all ads on Backpage.com were for prostitution) and the same vicarious liability theory that other courts rejected before, and held that the defendants could not be prosecuted for facilitating or promoting prostitution or for money laundering based on users' payments for ads.  As the courts held, "[p]roviding a forum for online publishing is a recognized legal purpose" and "charg[ing] money for the placement of advertisements … qualif[ies] as services rendered for legal purposes."  2016 WL 7237305, at *10; *see also id.* at *3 (court's rulings enforcing Section 230 implicate and enforce First Amendment rights).

**C.    Criminal Prosecution in Arizona and Asset Seizures in the Central District of California.**

---

[10] The second of these opinions is unpublished, and so is provided with the attachments to this motion as Exhibit A.

Undeterred by the numerous rulings discussed above, the government commenced a prosecution against Defendants and three other individuals for their respective roles with Backpage.com.[11]   On March 28, 2018, the government obtained a 93-count grand jury indictment charging these defendants with violations of the Travel Act (18 U.S.C. § 1952), money laundering (18 U.S.C. §§ 1956, 1957), and conspiracy (18 U.S.C. § 371), all based on the defendants' prior involvement, in general, with Backpage.com (Doc. 3).

At the same time, the government negotiated and entered into a plea agreement with Backpage.com's owner and CEO, Carl Ferrer.  On April 5, 2018, Ferrer pled guilty to one count of conspiracy to launder money and violate the Travel Act, *see United States v. Ferrer*, No. CR-18-464-PHX-DJH (Doc. 7), and caused Backpage.com and his other corporate entities to plead guilty to one count of money laundering, *see United States v. Backpage.com, LLC, et al*., No. CR-18-465-PHX-DJH (Doc. 8).  Ferrer agreed to cooperate with the government in its prosecution of Defendants.

On April 6, 2018, the government seized and shut down the Backpage.com website, *see* http://www.backpage.com (government's notice of seizure).  Also on that day, the government arrested Defendants and searched Lacey's and Larkin's homes, seizing computers, jewelry, artwork and other assets (using warrants authorizing the seizure of, among other things, any "evidence of wealth").  On a parallel track, in the Central District of California, the government obtained *ex parte* warrants to seize bank accounts and personal assets of Defendants and their families.  Through multiple waves of such warrants (issued from March 28 through November 2018), the government has seized many millions of dollars from Defendants and has encumbered

---

[11] The other individuals named as defendants in the Indictment are Andrew Padilla (Backpage.com's former operations manager), Joye Vaught (its former assistant operations manager), and Dan Hyer (its former sales and marketing manager).  SI ¶¶ 5-7.  Hyer has since entered into a plea agreement with the government (Doc. 271).

their real property through *lis pendens* filings.  The government's theory for its vast seizures is that any and all revenues of Backpage.com (and any assets directly or indirectly connected to those revenues) constitute criminal proceeds.

On July 25, 2018, the government filed a superseding indictment, which added seven counts (making the total now 100 counts) and additional forfeiture allegations (Doc. 230).  The Indictment now runs to 92 pages, containing 211 paragraphs of allegations and additional forfeiture allegations.  It purports to rely on documentary evidence, but the government has not identified the documents cited.  The Indictment asserts 50 counts of alleged violations of the Travel Act premised on 50 user-submitted ads that appeared on Backpage.com (most of which the government alleges were posted *after* VVMH sold Backpage.com to Ferrer), but the overnment does not allege that any Defendant ever saw or knew of any of those ads, that any Defendant ever had anything to do with any of the ads, or that any Defendant knew anything about the persons who posted the ads.  *See* SI ¶ 201 (counts 2-51).  Similarly, the Indictment's money laundering counts merely (which are predicated on the Travel Act counts) allege that funds were transferred from one party to another, with no alleged knowledge, participation or involvement of any Defendant in any specific unlawful activity.  *See* SI ¶¶ 205, 207, 209, 210.

**D.      Progress of the Prosecution and Litigation to Date.**

Since commencing this prosecution, the government has pursued a number of actions that have occupied Defendants, requiring them to devote considerable efforts to preserve their rights and ability to defend the case.  This is discussed in more detail in Defendants' Joint Status Report (Doc. 527), but it is relevant to note here that, among other things, the government has (1) seized nearly all of Defendants' assets and used procedural machinations to prevent judicial review of the First Amendment

and other constitutional violations of the seizures;[12] (2) also seized retainer funds held by counsel for Defendants (and others);[13] (3) sought to disqualify Defendants' longstanding counsel for First Amendment and Internet speech issues (motion denied by the Court, Doc. 338); (4) repeatedly sought to invade Defendants' attorney-client privileges by accessing privileged communications and joint representation agreements (largely rejected by the Court, *see* Docs. 345, 441); and (5) refused to provide any *Brady* or *Giglio* material or all of the *Jencks* Act materials in its possession (including, notably, the statements of its key cooperator, Ferrer), despite court deadlines, requiring Defendants to pursue such disclosures (*see, e.g.*, Doc. 273).

With the recent reassignment of this case following Judge Logan's recusal, Defendants bring the present motion, because, before addressing issues of *how* this case might proceed (*e.g.*, resolving the government's disclosure obligations, delaying tactics, and other issues) it is logical to address, first, *whether* the case can proceed at all.

## III.    LEGAL STANDARDS

### A.    Motion to Dismiss Indictment.

"In all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation," and a defendant may be charged based only on matters actually presented to the grand jury.  U.S. CONST. amends. V, VI.  The Federal Rules implement these guarantees by requiring an indictment to set forth "a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  Pursuant to Rule 12, a defective

---

[12] These issues are pending before the Ninth Circuit in *In re:  Any and All Funds Held in Republic Bank of Arizona Accounts XXXX1889, XXXX2592, XXXX1938, XXXX2912, and XXXX2500*, No. 18-56455 (9th Cir.), in which the court has ordered expedited argument for July 2019.

[13] These seizures are also subject to pending motions, in *In re:  The Seizure Up to and Including $10,000 in Bank Funds Held in JP Morgan Chase Account #XXXXX9285, etc.*, No. 18-MJ-02875 (C.D. Cal.).

indictment must be dismissed if:  (1) it fails to allege a crime on its face, taking into account statutory elements and constitutional requirements; or (2) there is grave doubt that the grand jury's decision to indict was based on errors in the process, such as where the government's instruction on the law was wrong or misleading, or the prosecutor's conduct improperly sought to infringe speech rights.  *See United States v. Buddenberg*, 2010 WL 2735547, at *2-6; Fed. R. Crim. P. 12(b)(3)(A)-(B).[14]  "It is perfectly proper, and in fact mandated, that the district court dismiss an indictment if the indictment fails to allege facts which constitute a prosecutable offense." *United States v. Coia*, 719 F.2d 1120, 1123 (11th Cir. 1983).

To be sufficient, an indictment must "set forth the elements of the offense charged and contain a statement of the facts and circumstances that will inform the accused of the specific offense with which he is charged." *United States v. Cecil*, 608 F.2d 1294, 1296 (9th Cir. 1979); *see United States v. Keith,* 605 F.2d 462, 464 (9th Cir. 1979) ("The failure of an indictment to detail each element of the charged offense generally constitutes a fatal defect.").  The indictment "must furnish the defendant with a sufficient description of the charges against him to enable him to prepare his defense, to ensure that the defendant is prosecuted on the basis of facts presented to the grand jury, to enable him to plead jeopardy against a later prosecution, and to inform the court of the facts alleged so that it can determine the sufficiency of the charge." *Cecil*, 608 F.2d at 1296.  It is thus essential "that every ingredient of the offense charged must be clearly and accurately alleged in the indictment" so that the court can decide "whether the facts alleged are sufficient in law to withstand a motion

---

[14] *See Russell v. United States*, 369 U.S. 749, 764 (1962); *Wayte v. United States,* 470 U.S. 598, 608 (1985) ("[T]he decision to prosecute may not be 'deliberately based upon an unjustifiable standard' ... including the exercise of protected statutory and constitutional rights."); *United States v. P.H.E., Inc.*, 965 F.2d 848, 857-58 (10th Cir. 1992) (indictment dismissed where it was a step in a "pattern of prosecutorial conduct dating back some five years that suggests a persistent and widespread campaign to coerce the appellants into surrendering their First Amendment rights").

to dismiss the indictment or to support a conviction in the event one should be had." *Russell*, 369 U.S. at 768 n.15.  To be sufficient, an indictment must set forth what each defendant is alleged to have done in violation of a specified statute, to whom, and where or when it occurred.  *Buddenberg*, 2010 WL 2735547, at *3.

In addition to Fifth and Sixth Amendment requirements set forth above, it is also necessary under Rule 12(b)(3)(B) to review the sufficiency of an indictment in light of First Amendment considerations.  *United States v. Stock*, 728 F.3d 287, 301 (9th Cir. 2013).  While the court cannot evaluate the evidence upon which an indictment is based, it must review whether the alleged statements at issue constitute unprotected speech.  It is not enough for an indictment merely to claim speech is unprotected; it is "incumbent on the Government to make that context clear in such an indictment."  *United States v. Landham*, 251 F.3d 1072, 1080 (6th Cir. 2001).  Where charges have First Amendment implications, as they do here, the government must "more specifically identify the precise conduct" alleged to fall outside constitutional protection.  *Buddenberg*, 2010 WL 2735547 at *9; *accord United States v. Cassidy*, 814 F. Supp. 2d 574, 582-83 (D. Md. 2011).  And, given the government's theory of prosecution, the Court must consider whether the stated charges render the statute at issue unconstitutional facially or as applied.  *E.g.*, *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737-38 (2017); *Watts v. United States*, 394 U.S. 705, 707 (1969) (charge "must be interpreted with the commands of the First Amendment clearly in mind").

**B.      First Amendment Requirements Governing Prosecution of Publishers.**

The Indictment in this case requires particular First Amendment scrutiny because government is seeking to prosecute Defendants for their roles as publishers of third-party speech.  The government is *not* prosecuting the individuals who authored and posted ads on Backpage.com for unlawful activities they might have committed, but is instead seeking to impose vicarious liability on the parties who owned the online forum where the ads were posted.  No reported (or contested) case has ever accepted such a theory of vicarious criminal liability, while many courts have rejected

13

it, including numerous cases concerning Backpage.com (as discussed below).

In the context of a prosecution such as this – seeking to impose criminal liability on a publisher for publishing – several fundamental First Amendment principles apply and govern the Court's role in determining whether the Indictment impermissibly challenges protected speech rights.  More specifically:

- Adult-oriented online ads, including escort ads, are presumptively legal and constitutionally protected speech.  *See McKenna*, 881 F. Supp. 2d at 1282; *People v. Ferrer*, 2016 WL 7237305, at *10.

- The government may not presume that protected speech is unprotected "merely because it resembles the latter.  The Constitution requires the reverse." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002).  Whether made by the government or by third-parties, claims that adult-oriented ads are "obviously" prostitution ads fall far short of this First Amendment standard.

- The government cannot base criminal liability on a publisher's exercise of "editorial control and judgment," including decisions about whether to allow, block or edit third-party content, as this is protected conduct under the First Amendment.  *See Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *e-ventures Worldwide, LLC v. Google, Inc.*, 2017 WL 2210029, at *4 (M.D. Fla. Feb. 8, 2017).

- The government cannot impose vicarious liability based on allegations that a publisher had notice that third parties had misused a website for unlawful conduct.  *See Backpage.com v. Dart*, 807 F.3d at 231; *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003).  The First Amendment does not permit civil or criminal liability based on allegations of generalized knowledge of illegal third-party conduct.

- To hold a party liable for publishing a third-party's speech, the First Amendment requires that the government allege (and ultimately prove) the defendant knew the specific speech involved illegality, the defendant nonetheless published that speech, *and* that the defendant intended to participate in and further the illegality.  *See Smith v. California*, 361 U.S. 147 (1959).

- The government cannot satisfy its obligation to allege specific facts sufficient to satisfy First Amendment pleading standards by repeating conclusory claims made by politicians, advocacy organizations, and some law enforcement officials asserting that Backpage.com was "known" for promoting prostitution.

The Indictment in this case violates each and all of these principles.

14

### C.    *Mens Rea* Requirements

Both statutory and First Amendment considerations require the indictment to meet a specific intent standard of *mens rea* requiring showings that defendants knew the content of a *specific* ad was illegal and intended to further that particular crime.  A prosecution under the Travel Act requires the government to allege "that the accused formed a specific intent to promote, manage, establish, carry on or facilitate one of the prohibited activities."  *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974).  The same *mens rea* standard governs allegations of money laundering.  *See United States v. Brown*, 186 F.3d 661, 670 (5th Cir. 1999); *United States v. Trejo*, 610 F.3d 308, 314, 317 (5th Cir. 2010).  In addition, it is a basic proposition of First Amendment law that the government cannot criminally punish publishers or distributors of speech without sufficient proof of *scienter*, *i.e.*, that a defendant knew the *specific* speech that is the basis for criminal charges was unlawful and had specific *intent* to violate the law.  *Smith v. California*, 361 U.S. at 153-54; *Mishkin v. New York*, 383 U.S. 502, 511 (1966); *Cooper*, 939 F. Supp. 2d at 830.

## IV.    ARGUMENT

### A.    The Indictment and the Government's Theory of Prosecution Are Fatally Deficient.

The government's Indictment is a prolix pleading that is long on aspersions and innuendo but devoid of any bases to charge crimes against Defendants.  In terms of actual fact allegations, the Indictment attacks First Amendment-protected conduct common among websites – *e.g.*, screening and editing third-party content, reposting user-created content – and the only whiff of illegality is the government's improper presumptions (and mischaracterizations) that all adult ads on Backpage.com were for prostitution.  The Indictment is also completely bereft of any constitutionally sufficient basis to allege *mens rea*.  It asserts no fact allegations that any Defendant ever even saw any of the specific ads the government alleges were for criminal activities (*see* SI ¶ 201), much less that any Defendant intended to participate in and further illegal conduct of the third-party posters.

15

1

### 1.   *Impermissibly Presuming that Ads Are Illegal.*

The Indictment assumes from the outset – and throughout – that all advertisements in the adult or escort categories on Backpage.com were illegal and unprotected by the First Amendment.  This ignores the principle that speech must be presumed to be protected unless and until the government proves otherwise.  "The government may not suppress lawful speech as the means to suppress unlawful speech.  Protected speech does not become unprotected merely because it resembles the latter." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002); *accord Packingham*, 137 S. Ct. at 1738.  The burden of proving that speech is unlawful *always* falls to the government.  *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *id.* at 818 ("When First Amendment compliance is the point to be proved, the risk of nonpersuasion … must rest with the Government, not with the citizen."); *Bd. of Trs. v. State Univ. of N.J. v. Fox*, 492 U.S. 469, 480 (1989) ("the State bears the burden of justifying its restrictions").  Just as the government cannot assume books are obscene if they are sold in an adult bookstore, it cannot presume escort ads are for prostitution.[15]

The government simply cannot assume its conclusion that speech is unlawful or unprotected, nor can an Indictment based on such an unconstitutional presumption survive.  The Indictment does not allege that any specific ads on Backpage.com were facially illegal.[16]  Instead it offers the government's characterizations (scores of times)

---

[15] This is true regardless of the form of regulation or proscription of speech the government pursues – whether enacting legislation, *see, e.g.*, *Cooper*, 939 F. Supp. 2d at 837; threatening punishment because of published speech, *see Backpage.com v. Dart*, 807 F.3d at 229; or pursuing criminal charges, *see, e.g.*, *People v. Ferrer*, 2016 WL 7237305, at *3.

[16] The Indictment alleges that ads on Backpage.com contained "provocative" photos of women showing "buttocks" or "breasts" (albeit clothed) or terms such as "sexy," "fun," "young," and "exotic," *see, e.g.*, SI ¶¶ 163, 168, 173, 174, 175, 176.  Perhaps

that all ads in adult categories on Backpage.com were for "prostitution" or "obviously for prostitution" or "indicative of prostitution."  *See, e.g.*, SI ¶¶ 1, 9, 34, 68, 74, 78, 86, 87, 90, 91, 95, 96, 97, 104, 107, 109, 111, 128, 131, 132, 136, 141, 143, 144, 151, 152, 153, 154, 159, 160, 161, 162, 164, 167, 170, 177.[17]

The First Amendment prohibits the government from declaring that online classified ads for adult services or escorts are unprotected simply because it thinks they "look like" ads for illegal prostitution.  Yet that is the mistaken premise of the government's case.  *Every court* to address this question – and this includes eight courts addressing Backpage.com – has held that the government cannot presume such ads are unprotected.  As the Seventh Circuit put it:  Backpage.com was "an avenue of expression of ideas and opinions" protected by the First Amendment, including its "classified ads for 'adult' services."  *Backpage.com v. Dart*, 807 F.3d at 230-31, 234. As the court recognized in *McKenna*, 881 F. Supp. at 1282, escort ads have long been permitted, and escort services are licensed and regulated in many states.[18]  Having an escorts section in a classified ad service is legal.  *Doe v. Backpage.com LLC*, 104 F. Supp. 3d at 156-57.[19]  "Providing a forum for online publishing" and "charg[ing] money for the placement of advertisements," as Backpage.com did, are "services rendered for legal purposes."  *People v Ferrer*, 2016 WL 7237305, at *10; *accord People v. Ferrer*, No. 16FE024013, slip op. at 13.

_____

obviously, speech containing sexual references or innuendo has been protected for decades.

[17] *Cf. United States v. Perkins*, 850 F.3d 1109, 1118 (9th Cir. 2017) (vacating conviction after *Franks* hearing, holding that search warrant affidavit was deficient and misleading where agent described his conclusion that images found on defendant's computer were child pornography but withheld the images, thus "usurp[ing] the magistrate's duty to conduct an independent evaluation of probable cause").

[18] *See, e.g.*, Tenn. Code Ann. §§ 7-51-1102(11) & (12); 7-51-1116; Utah Code Ann. §§ 59-27-101 to 108; Ariz. Rev. Stat. § 13-1422; Ala. Code § 13A-6-184; Kan. Stat. Ann. § 12-770(a)(8), (9); Ark. Code Ann. § 14-1-302(9), (10).

[19] *See also Dart v. Craigslist*, 665 F. Supp. 2d at 968 (Craiglist's "adult services" section "is not unlawful in itself nor does it necessarily call for unlawful content").

In sum, courts have uniformly held that escort and other adult ads on Backpage.com were protected under the First Amendment, providing a forum for such ads is likewise protected, and *the government cannot presume otherwise.  See Backpage.com, LLC v. Dart*, 807 F.3d at 234 (rejecting sheriff's presumption that ads on Backpage.com were illegal); *McKenna*, 881 F. Supp. 2d at 1281-82 (rejecting similar presumption of state AG defending law targeting Backpage, and noting that publication of third-party ads – even if they concern illegal transactions – "does not fall within [the] 'well-defined and narrowly limited classes of speech' that fall outside of First Amendment protection" (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)); *Cooper*, 939 F. Supp. 2d at 816, 833-34 (rejecting state's argument that escort ads on Backpage.com were unprotected speech); *Hoffman*, 2013 WL 4502097, at *9-11 (same); *M.A.*, 809 F. Supp. 2d at 1049-50 (rejecting similar presumption in dismissing plaintiff's civil claims based on 18 U.S.C. §§ 2, 1595, and 2255); *People v Ferrer*, 2016 WL 7237305, at *9 (dismissing state's pimping charges against Larkin and Lacey; noting that the only "whiff of illegality" in the AG's complaint improperly "require[ed] the presumption that illegal content was contained in the ads," yet the website's actions in posting the ads "would not be illegal").[20]

Despite that courts have uniformly rejected the government's presumption that all (or the "vast majority") of escort ads on Backpage.com must have been illegal ads for prostitution, the Indictment trots out the same theory again.  This is a direct and impermissible attack on First Amendment-protected speech and publishing activities.

### 2.     *Repeating Others' Accusations.*

The Indictment recycles and repeats government officials' and others' condemnations of Backpage.com in years past.  *See, e.g.*, SI ¶ 74 (2010 letter from

---

[20] The presumption the government offers now was also addressed in the earlier decision of the U.S. District Court of the Western District of Washington in *In re Grand Jury Subpoenas*, No. GJ12-172RAJ (W.D. Wash.), at 19-20, which is submitted with this motion under seal.

state AGs); ¶ 109 (letter from Seattle mayor); ¶ 111 (letter from National Association of Attorneys General); ¶ 140 (amicus brief filed by NCMEC); ¶ 131 (ASU publication).  Such assertions are improper and, in any event, cannot constitute fact allegations necessary to satisfy First Amendment standards.

For many years, government officials have made publicized accusations about online content they dislike, for example, attacking Craigslist[21] and then Backpage about adult ads,[22] and more recently pressuring Facebook and Twitter about violent videos, allegations of fake news, liberal bias, and other charges.[23]  If merely repeating officials' accusatory press releases about online content could provide bases for a criminal indictment, speech across the Internet would be at risk.

Indeed, the same public accusations noted in the Indictment (including, specifically, the 2010 letter from state AGs, *see* SI ¶ 74) have been cited before by government authorities seeking to impose criminal penalties on Backpage.  *See, e.g.*, *Cooper*, 939 F. Supp. 2d at 815-16.  But courts have rejected such "evidence" and struck down state efforts aimed at Backpage.com as being inconsistent with the First Amendment, *see id*. at 831-32, *McKenna*, 881 F. Supp. 2d at 1280-83.  Politicians' denunciations cannot substitute for allegations of fact sufficient to satisfy First Amendment scrutiny that charges do not target or infringe protected speech.

---

[21] *Attorneys General Want Craigslist 'Adult Services' Shut Down*, Reuters (Aug. 26, 2010), https://www.reuters.com/article/urnidgns002570f3005978d80025778b004b29ff/attorneys-general-want-craigslist-adult-services-shut-down-idUS419264813320100826; *see also Craigslist, Inc. v. McMaster*, 2010 WL 11640195 (D.S.C. 2010).

[22] *Attorney General Leads 21 States In Calling On Backpage To Close Adult Services Section* (Sept. 21, 2010), https://portal.ct.gov/AG/Press-Releases-Archived/2010-Press-Releases/Attorney-General-Leads-21-States-In-Calling-On-Backpage-To-Close-Adult-Services-Section.

[23] *See, e.g.*, Zach Wichter, *2 Days, 10 Hours, 600 Questions: What Happened When Mark Zuckerberg Went to Washington*, N.Y. TIMES (Apr. 12, 2018), https://www.nytimes.com/2018/04/12/technology/mark-zuckerberg-testimony.html; Cecilia Kang, et al., *Twitter's Dorsey Avoids Taking Sides in Partisan House Hearing*, N.Y. TIMES (Sept. 5, 2018), https://www.nytimes.com/2018/09/05/technology/facebook-twitter-congress.html.

3.      *Attacking Traditional, Protected Publisher Functions.*

The Indictment contains numerous allegations attacking Backpage.com's efforts to screen, block or edit content – attempting to cast these practices as nefarious and criminal.  However, screening and editing third-party content is common among websites; Congress has expressly encouraged such self-policing (by enacting the CDA).  More importantly, website's editorial decisions about what third-party content to allow, block or edit are recognized publisher functions protected under the First Amendment.  Here again, the Indictment fails because it attacks First Amendment-protected conduct.

The Supreme Court long ago made clear that the First Amendment protects "editorial control and judgment." *Tornillo*, 418 U.S. at 258.  This principal applies to speech on the Internet. *Reno v. ACLU*, 521 U.S. 844, 868-70 (1997) ("[O]ur cases provide no basis for qualifying the level of First amendment scrutiny that should be applied to this medium.").  Such protection is particularly important for online publishers, which have millions of users and cannot possibly be charged with an obligation to screen "each of their millions of postings for possible problems." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997).  As has become well recognized, editorial activities of online intermediaries are protected by the First Amendment.  *See*, *e.g.*, *Washington Post v. McManus*, 355 F. Supp. 3d 272, 300 (D. Md. 2019) (enjoining Maryland statute that required social media and news websites to self-publish information about political ads, holding that the statute infringed editorial judgments; "This respect for a publisher's right to exercise 'editorial control and judgment' … applies with equal force to outlets that publish content on the Internet") (quoting *Tornillo*, 418 U.S. at 258), *appeal filed*, No. 19-1132 (4th Cir. Feb. 4, 2019); *Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 438 (S.D.N.Y. 2014) ("a 'search engine's editorial judgment is much like many other familiar editorial judgments,'

1  such as the newspaper editor's judgment of which wire-service stories to run and

2  where to place them in the newspaper").[24]

3        A website's "decisions relating to the monitoring, screening, and deletion of

4  content [are] actions quintessentially related to a publisher's role."  *Green v. Am.*

5  *Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003).  "[D]eciding whether to publish,

6  withdraw, postpone, or alter content" is the "exercise of a publisher's traditional

7  editorial functions."  *Zeran*, 129 F.3d at 330; *accord Jones v. Dirty World Entm't*

8  *Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014) ("a publisher's traditional editorial

9  functions" include "deciding whether to publish, withdraw, postpone or alter content");

10  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1103 (9th Cir. 2009) ("removing content is

11  something publishers do").  In fact, 23 years ago, Congress set out not only to protect

12  but to encourage online providers to engage in such editorial practices of monitoring,

13  limiting, and/or editing user-submitted content, with the intent that self-policing would

14  better "maintain the robust nature of Internet communication, and … keep government

15  interference in the medium to a minimum."  *Batzel v. Smith*, 333 F.3d 1018, 1027-28

16  (9th Cir. 2003) (quoting *Zeran*, 129 F.3d at 330).[25]

17

18  ───────────────

19  [24] *See also e-ventures Worldwide, LLC v. Google, Inc*., 2017 WL 2210029, at *4 (M.D.
Fla. Feb. 8, 2017) ("A search engine is akin to a publisher, whose judgments about
20  what to publish and what not to publish are absolutely protected by the First
Amendment"; holding that "Google's actions in … determining whether certain
21  websites are contrary to Google's guidelines and thereby subject to removal are the
same as decisions by a newspaper editor regarding which content to publish, which
22  article belongs on the front page, and which article is unworthy of publication.  The
First Amendment protects these decisions, whether they are fair or unfair, or motivated
23  by profit or altruism."); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629-630 (D.
Del. 2007) (First Amendment protects decisions about placement, ranking, or rejection
24  of online advertisements); *Search King, Inc. v. Google Tech., Inc*., 2003 WL 21464568
*4 (W.D. Okla. 2003) ("Google's PageRanks are entitled to 'full constitutional
25  protection.'").

26  [25] *See Bennett v. Google, Inc.*, 2017 WL 2692607, at *2 (D.D.C. June 21, 2017)
27  ("holding Google liable for establishing standards and guidelines would ultimately
28  create a powerful disincentive for service providers to establish any standards or ever

The government ignores all of this established law to allege that protected editorial practices for reviewing and blocking user-submitted content should instead be the basis for criminal liability.  In terms of fact allegations, the Indictment alleges that "Backpage periodically used computerized filters and human 'moderators' to edit the wording of (or block) ads," but then adds the conclusory assertion that this was done to "remov[e] particular terms that were indicative of prostitution."  SI ¶¶ 11, 68.  This is a mischaracterization contrary to the very documents upon which the government purports to rely.[26]  *See McKenna*, 881 F. Supp. 2d at 1266-67 (Backpage used automated filters to screen for 26,000 terms, phrases, email addresses, URLs and IP addresses, and employed 100 personnel to review and block ads violating the website's terms of use); *Cooper*, 939 F. Supp. 2d at 814 (Backpage.com's monitoring blocked or removed one million ads in April 2012).  But, regardless, these and similar allegations of the Indictment[27] reflect that the government impermissibly disregards First

_____

decide to remove objectionable content, which the CDA was enacted to prevent"), *aff'd sub nom.*, *Bennett v. Google, LLC*, 882 F.3d 1163 (D.C. Cir. 2018).

[26] For example, the Indictment refers to an April 2008 email from Ferrer as allegedly stating that "he was unwilling to delete prostitution ads" and so instructed staff to "edit the wording of such ads, by removing particular terms that were indicative of prostitution, and then allow the remainder of the ad to be featured on Backpage's website."  SI ¶ 68.  However, the actual email does not say this, does not refer to "prostitution ads" nor that the terms to be blocked were "indicative of prostitution," but rather stated that blocking ads could lead to user complaints and chargebacks.  *See* DOJ-BP-0000192778.

Additionally, the Indictment's allegations about Backpage.com editing ads (to eliminate words and photos that violated the website's terms of use) concern only a period of months at the end of 2010, *see* SI ¶¶ 72-87 (allegations all from September 1, 2010 to December 2010), which was immediately after Craigslist removed its category for "adult services" in response to pressure from government officials, and Backpage.com significantly expanded its moderation efforts to deal with an influx of submissions.  Significantly, none of the ads that are the bases for the Indictment's Travel Act counts were published during this time period.

[27] The Indictment similarly casts aspersions that Backpage.com failed to adopt other rules or review practices for user content.  *See, e.g.*, SI ¶¶ 14, 90, 100, 101, 106, 131.  But, deciding *not* to implement practices are protected editorial decisions every bit as

Amendment principles to base charges on editorial practices that are common among websites[28] and constitutionally protected.

In fact, courts have expressly rejected the government's theory in others' attempts to ascribe criminal liability to Backpage.com.  In *M.A.*, 809 F. Supp. 2d at 1041, the court dismissed outright the plaintiff's claims against Backpage.com predicated on 18 U.S.C. § 2 (for allegedly aiding and abetting sex trafficking by users who posted ads on the site).  *Id.* at 1054.  Rejecting accusations that Backpage.com was designed to promote prostitution and sex trafficking, *id.* at 1044, the court held that Backpage.com could not be liable based on users' misuse of its services, and merely asserting that such misuse occurred could not establish that the website had the requisite specific intent, *i.e.*, that it knew of and shared the user's intent to commit specific sexual offenses, *id.* at 1054.  In *Doe v. Backpage.com,* the court rejected claims based on the federal Trafficking Victims Protection Act (18 U.S.C. § 1591, *see* 18 U.S.C. § 1595), noting that allegations about Backpage.com's editorial practices (much the same as the Indictment's allegations here), whether viewed "[s]ingly or in

_____

much as decisions *to* implement practices.  *See Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th Cir. 2008) (allegations seeking to hold MySpace liable for not adopting safety measures were merely another way of improperly claiming the website operator was liable for its "role as a publisher of third-party-generated content"); *accord Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 21 (1st Cir. 2016).

[28] For example, Craigslist's posting rules for adult ads were essentially the same as Backpage.com's, prohibiting terms that "suggest or imply an exchange of sexual favors for money" including use of "any and all code words" (providing examples) or any "attempt to avoid detection of forbidden language by using spelling variations" (again providing examples), https://web.archive.org/web/20100526124651/www.craigslist.org/about/help/Adult_Services_Posting_Guidelines (Craigslist Adult Service Posting Guidelines, May 26, 2010); *see also craigslist, Inc. v. McMaster*, 2010 WL 11640195, at *2 (D.S.C. Aug. 6, 2010) (quoting rules); Match.com, https://web.archive.org/web/20100627072807/www.match.com/registration/membagr.aspx (June 27, 2010 Terms of Use:  "Match.com may review and delete any content, messages … photos or profiles …, in each case in whole or in part, that in the sole judgment of Match.com violate this Agreement or which might be offensive, illegal, or that might violate the rights, harm, or threaten the safety of Members.").

the aggregate" cannot "amount to … affirmative participation in an illegal venture." 104 F. Supp. 3d at 157; *see also People v. Ferrer*, 2016 WL 7237305, at \*3, \*10 (taking into account First Amendment interests, holding that Backpage.com's provision of "a forum for online publishing" and receiving payments for ads "qualify as services rendered for legal purposes," insufficient to support charges of pimping, facilitating prostitution or money laundering).

> ### 4.   *Attacking Efforts to Promote or Advertise a Website to Users.*

In a similar vein, the Indictment offers accusations about efforts Backpage.com made in its early years to promote customer usage through advertising and by offering free ads to users.  There is nothing illegal about such practices, and here again the government's allegations are based entirely on its assumptions that all adult ads are for prostitution.

For example, the Indictment attacks a Backpage.com marketing effort in 2007 whereby representatives contacted individuals who had posted ads elsewhere (*e.g.*, Craigslist), asked if they would be interested in posting their ads on Backpage.com, and, if the user agreed, the representative would upload the same ad (as written by the user) to Backpage.com.  SI ¶ 36; *see generally id.* ¶¶ 35-44 (referring to this as "aggregation").  Purporting to rely on Backpage.com emails and other documents, the Indictment alleges, however, that "Backpage employees would … *identify prostitutes* advertising on other websites" and seek to post their ads.  SI ¶ 36 (emphasis added); *see also id.* ¶ 9.  Yet the cited documents say nothing of the sort, instead referring to identifying leads from "employment," "therapeutic massage," and "adult" ads posted elsewhere.  DOJ-BP-0004602206.  Otherwise, the Indictment merely alleges that this marketing effort was successful and helped generate "new adult content" to the website. *See, e.g.*, SI ¶ 39.

The Indictment further presumes that adult ads on Backpage were for prostitution because the website received page views from individuals who had visited

another site – theeroticreview.com – and, for a time,[29] Backpage.com ran banner ads on that site. SI ¶ 10 (referring to this as a "reciprocal link" arrangement).  The Indictment then notes that a May 2009 newspaper article referred to theeroticreview.com as a "prostitution website," SI ¶ 54, and from this premise asserts that Backpage.com "employed … business strategies that were specifically intended to promote and facilitate prostitution," SI ¶ 10.[30]  Here, the government's accusations amount to presumptions piled atop presumptions – in effect charging Backpage.com (and therefore Defendants) with complicity not only for everything that persons posting ads on the website might have done (albeit unknown) but also based on which other websites individuals reading ads on Backpage.com might have visited.

        As noted, online adult content is presumptively protected speech, and the government cannot equate it to prostitution or unlawful speech.  As is true throughout the Indictment, stripping out the government's improper presumptions, these allegations describe actions that are legal *and* recognized publisher functions.  Reposting third-party content from another website is "a traditionally protected editorial function."  *People v. Ferrer*, 2016 WL 7237305, at *7; *see also Barrett v. Rosenthal*, 40 Cal. 4th 33, 63, 146 P.3d 510, 517 (2006).  Banner ads on websites are ubiquitous and one of the largest forms of online advertising.[31]  Successful marketing to online customers is legal and common for websites.  In its role of ensuring that the

---

[29] Again, this was in the early days of Backpage.com, from 2007-2009, according to the Indictment, *see* SI ¶¶ 45-55, years before any of the alleged ads and transactions that form the Indictment's Travel Act and money laundering counts.

[30] The rest of what the Indictment alleges about theeroticreview is that Backpage ran banner ads on that site for a few years and believed that they helped increase user visits and page views.  *See* SI ¶¶ 46-53.  Of course, the government no more assume that all content on theeroticreview.com was unlawful than it can make such an assumption as to Backpage.com.

[31] *US Digital Display Ad Spending to Surpass Search Ad Spending in 2016* (Jan. 11, 2016), https://www.emarketer.com/Article/US-Digital-Display-Ad-Spending-Surpass-Search-Ad-Spending-2016/1013442 (2016 spending on online display advertising was $32.17 billion, with banners and similar ads accounting for the largest percentage).

Indictment is not based on challenges to protected speech or practices, the Court should reject these allegations as well.

**B.      The Indictment Fails to Allege Any Requisite *Mens Rea*.**

The premise of the Indictment is that Backpage.com "facilitated" prostitution by providing an online forum where third-party users could post adult ads, and Defendants can be held criminally liable if they knew that some (or many) users used the website for prostitution.  The government's theory – that Defendants may be criminally responsible for *general awareness* that third parties used Backpage.com for criminal purposes – has been universally rejected.  Under both First Amendment and statutory standards, the government cannot prosecute on this basis – the law requires the government allege and prove specific intent.  The Indictment contains no allegations of the requisite *mens rea*, or anything remotely close.

**1.      *The Government's Prosecution is Governed by a Specific Intent Standard.***

A prosecution under the Travel Act requires the government to allege "that the accused formed a specific intent to promote, manage, establish, carry on or facilitate one of the prohibited activities."  *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974).  In *Gibson*, the government asserted charges under the Travel Act against several manufacturers that sold punchboards and pulltabs to businesses in Montana, where the mere possession of those items was illegal under the state's gambling laws.  Even assuming the defendants knew their customers would violate Montana law by purchasing those items, the Ninth Circuit affirmed dismissal of the charges, holding that such knowledge could not satisfy the specific intent requirement of the Travel Act.  *Id.* at 450.[32]  Instead, the Ninth Circuit held that, to show specific intent, "the prosecutor must show that the manufacturer in some significant manner

---

[32] As the Ninth Circuit explained, and *apropos* to the government's prosecution theory here:  "It is as likely as not that a vendor similar to the defendants in this proceeding is totally indifferent to the actions of his purchaser."  507 F.2d at 450 n.8.

associated himself with the purchaser's criminal venture for the purpose of its

advancement." *Id.* at 449.[33]  No lesser showing of *mens rea* can be sufficient under

the Travel Act, because otherwise "the act would be plagued by the very

overexpansiveness which Congress sought to rule out …." *Id.*

Similar *mens rea* standards of intent (rather than generalized awareness)

govern allegations of money laundering.  *See United States v. Brown*, 186 F.3d 661,

670 (5th Cir. 1999) ("This element is not satisfied by mere evidence of promotion, or

even knowing promotion, but requires evidence of *intentional* promotion."); *United

States v. Trejo*, 610 F.3d 308, 314, 317 (5th Cir. 2010) ("Nor may the government rest

on proof that the defendant engaged in "knowing promotion" of the unlawful

activity."  ""[K]nowing promotion' is not enough for a conviction under the federal

money laundering statute."); *see also* R. Jones, Becker, K., *Whoever Knowingly

Advertises: Considerations in Prosecuting Sex Trafficking*, U.S. Attorneys' Bulletin

(Nov. 2017), https://www.justice.gove/usao/page/file/108856/download (DOJ counsel

for this case explaining that "[t]he specific intent to promote requirement" is "the

gravamen" of a money laundering charge under 18 U.S.C. § 1956 and is subject to a

"stringent" *mens rea* requirement (internal quotations and citations omitted).

---

[33] With respect to prostitution offenses, the Travel Act requires not only that a defendant intended and took action to promote or facilitate a prostitution offense or offenses; but that the promotion or facilitation was of a "business enterprise" involved in prostitution.  18 U.S.C. § 1952(b)(1); *see Gibson*, 507 F.2d at 449.  A "business enterprise" is a continuous course of criminal conduct, not just a single incident.  This element of the Travel Act thus requires a showing that a defendant knew of the *criminal enterprise* and intended to promote or facilitate it.  *See United States v. Kaiser*, 660 F.2d 724, 731 (9th Cir. 1981) ("The Travel Act proscribes … interstate travel to promote unlawful 'business enterprises' [and] "[t]he words 'business enterprise' refer to a continuous course of criminal conduct rather than sporadic or casual involvement in a proscribed activity." (internal citations omitted).  As discussed above, the Indictment does not allege that any Defendant knew anything about any of the ads that are the bases of the government's charges or had any dealings with the third parties who posted the ads, much less that any Defendant knew of any "business enterprise" of an individual poster (whom they did not know) and intended to further that enterprise (through the publication of ads they never saw).

More fundamentally, it is a basic proposition of First Amendment law that the government cannot criminally punish publishers or distributors of speech without sufficient proof of *scienter*, *i.e.*, that a defendant knew the *specific* speech that is the basis for criminal charges was illegal.  This basic principle dates back 60 years, to *Smith v. California*, 361 U.S. at 147, in which the Supreme Court struck down a Los Angeles ordinance making it a crime for booksellers to possess obscene books.  Even though the First Amendment does not protect obscene speech, the Court held that a bookseller could not be prosecuted without proof it had knowledge of the contents of *a given book*. *Id.* at 153-54.  Absent such scienter, First Amendment rights would be severely chilled – the bookseller could not fairly be charged with "omniscience" as to everything in its store, and the bookseller's burden "would become the public's burden" because speech would be suppressed for fear of liability.  *Id.*; *see also Mishkin v. New York*, 383 U.S. 502, 511 (1966) ("The Constitution requires proof of scienter to avoid the hazard of self-censorship of constitutionally protected material ...."); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994) (interpreting 18 U.S.C. § 2252 to require proof that defendant knew that one or more specific performers in video were under 18, because a statute "bereft of [such] a scienter requirement … would raise serious constitutional doubts").[34]

The DOJ itself has admitted that a website operator cannot be liable under federal criminal laws absent proof that it knew of, and intentionally participated in, illegal conduct of *specific* individuals using the website.  The DOJ has said this not once, but many times.

In 2010, the DOJ's National Coordinator for Child Exploitation, Prevention, and Interdiction was asked in Congressional hearings:  "[W]hat laws apply to Internet

---

[34] As courts have also recognized, the First Amendment burden imposed by self-censorship is magnified on the Internet, because "websites … will bear an impossible burden to review all of their millions of postings or, more likely, shut down their adult services section entirely."  *Cooper*, 939 F. Supp. 2d at 830.

providers like craigslist that would make them criminally liable for the postings?" She responded:

> I am not aware of any laws that would make them liable [for third-party postings], unless there was evidence that craigslist was a participant … conspiring with those who were misusing their site, that is, knowingly conspiring to violate the laws.… I am not aware of any Federal statutes anyway with respect to neglect being the standard. In Federal law, the standard for prosecution would be knowing or willful…. I am not aware of anything that shows us that craigslist might be criminally liable…. [A]t this point, we have the proper tools. We have what we need to prosecute the guilty, that is, the people who are using the Internet …. And I don't think anyone … here would propose closing the Internet."

*Domestic Minor Sex Trafficking: Hearing Before Subcomm. on Crime, Terrorism, & Homeland Security of the H. Comm. on the Judiciary*, 111th Cong. 215-16 (2010)), attached as Exhibit B.

More recently, in 2016, when Congress amended 18 U.S.C. § 1591 in what was called the "SAVE Act," (which added "advertising" as a predicate act for sex trafficking if done "knowingly"), in order to withstand Backpage.com's constitutional challenge to the act, the government insisted that a website publisher could not be liable absent specific knowledge of and participation in an incident of sex trafficking:

> Even if an advertisement for illegal sex trafficking appeared on [its] website, [Backpage] could not be convicted under [the law] without proving that [it] knew that the advertisement at issue related to illegal sex trafficking of a minor or of a victim of force, fraud, or coercion.

DOJ Reply in Support of Motion to Dismiss, at 7-8, *Backpage.com, LLC v. Lynch*, No. 1:15-2155(RBW (D.D.C. Apr. 15, 2016) (ECF No. 13). The district court agreed with this interpretation and dismissed Backpage.com's challenge, concluding the website faced no credible threat of prosecution given its practices and that the statutory amendments *increased* the *mens rea* requirement for liability so as to protect websites. *Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96, 108-09 (D.D.C. 2016); *see also* 161 Cong. Rec. H596, H598-H600 (daily ed. Jan. 27, 2015) (intent of amendments was to "raise the bar" by requiring proof that websites had knowledge that given ads were unlawful, so as to avoid constitutional problems).

29

In Congress's most recent attempt to target Backpage.com – the "Fight Online Sex Trafficking Act" (or "FOSTA"), which amended federal sex trafficking laws and Section 230 – legislators also recognized that the law does not allow criminal liability based on allegations of "generalized knowledge."

> Though under 18 U.S.C. § 1591, a website may be held criminally liable for knowingly advertising sex trafficking, this knowledge standard is difficult to prove beyond a reasonable doubt. This is so because online advertisements rarely, if ever, indicate that sex trafficking is involved. The advertisements neither directly nor implicitly state that force, fraud, or coercion was used against the victim, nor do they say that the person depicted being prostituted is actually under the age of 18. … Further, *general knowledge that sex trafficking occurs on a website will not suffice as the knowledge element must be proven as to a specific victim.*

Report on H.R. 1865, No. 115-572 at 5, https://www.congress.gov/115/crpt/hrpt572/CRPT-115hrpt572-pt1.pdf (emphasis added). And writing to the House about that legislation, DOJ acknowledged the high burden of proof for advertising, given First Amendment implications:

> Section 1591 already sets an appropriately high burden of proof, particularly in cases involving advertising. Under current law, prosecutors must prove that the defendant knowingly benefitted from participation in a sex trafficking venture, knew that the advertisement related to commercial sex, and knew that the advertisement involved a minor or the use of force, fraud, or coercion.

Letter from DOJ Assistant Attorney General Stephen E. Boyd to Congressman Robert W. Goodlatte (Feb. 27, 2018)), Exhibit C.

The government has acknowledged in other cases it has the burden to prove not just that the Defendants knew that *particular ads* were for prostitution, but that they had the *specific intent to facilitate those particular acts* of prostitution. In *Woodhull Freedom Foundation v. United States*, the government argued that for prosecutions under the Travel Act, the prosecutor must prove "not simply that the defendant was aware of a potential result of the criminal offense, but instead that the defendant intended to 'explicitly further[]' a specified unlawful act." 334 F. Supp. 3d 185, 199-201 (D.D.C. 2018), *appeal filed*, No. 18-5298 (D.C. Cir. Oct. 12, 2018). The court

agreed with the government and held that the law applies only to "specific unlawful acts with respect to a particular individual, not the broad subject-matter of prostitution." *Id.* Most recently, in defending the district court decision in that case, DOJ repeated its position that in a prosecution under the Travel Act, the government must allege that the defendant acted to intentionally promote or facilitate a "specific, unlawful instance of prostitution." Brief for the United States in *Woodhull Freedom Found. v. United States*, No. 18-5298 (D.C. Cir. Apr. 15, 2019) (Doc. #1782997) at 21-22.

### 2. *The Indictment Fails to Allege Specific Intent.*

The essential premise of the Indictment is that the Defendants had general knowledge that Backpage.com was used by third parties to advertise prostitution and that they took steps to encourage and promote such uses. The charges are false, but for the purpose of reviewing the indictment under Rule 12(b)(3)(B), the allegations are defective as a matter of law because the government fails to allege the necessary *mens rea* as to any specific acts, either for the website or for any of the individual Defendants.

The overwhelming premise of the Indictment is that the Defendants had a general awareness that "the vast majority" of advertisements in the adult and escort sections of Backpage.com were for prostitution and a general intent to promote such ads. SI ¶¶ 1, 9, 10, 11, 13, 15, 19, 24, 34, 52, 59, 68, 69, 71, 75, 91, 92, 98, 114. The Indictment lists a series of specific instances involving seventeen individuals it describes as "victims," SI ¶¶ 160-176, but in no case does it assert that any Defendant had any awareness of ads involving the alleged victims, or any intent to facilitate prostitution of those persons. Rather than specific knowledge or intent, the Indictment claims the requisite *mens rea* can be imputed to the Defendants because of general allegations leveled by law enforcement officials, SI ¶¶ 74, 105, 109, 111, 136, 141, 144; characterizations in news stories, *id.* ¶¶ 127, 146; statements by advisory bodies and advocacy groups, *id.* ¶¶ 122, 134, 136, 140; allegations by congressional

committees, *id*. ¶ 151, and others.  *Id*. ¶¶ 69, 131, 135.  The Indictment even suggests that the fact Backpage.com's former CEO cooperated with law enforcement and testified in criminal prosecutions of individual pimps somehow supports an allegation of *mens rea* for all other ads on the website.  SI ¶¶ 71, 76, 91.  None of these allegations are relevant to the type of showing required for *mens rea* that the government has acknowledged repeatedly – just not in this case.

Nor do allegations against the individual Defendants attempt to satisfy the specific intent requirement.  Even apart from the government's distortions about what the Defendants purportedly said or did, the Indictment fails even to allege that any Defendant was aware of any of the ads identified in the Indictment, SI ¶ 201, that any Defendant knew any of those ads was for prostitution, that any Defendant was involved in the decision to publish any such ad, or that any Defendant made such a decision with the intent to further any illegal acts.

For Michael Lacey, for example, the Indictment alleges that various groups or individuals had told him (or forwarded their claims) that they believed that a high proportion of ads on Backpage.com were for prostitution.  SI ¶¶ 97, 131, 146, 147.  After one such allegation was made in a meeting with representatives from the National Center for Missing and Exploited Children ("NCMEC"), Lacey is alleged to have told them "adult prostitution is none of your business." [35]  Lacey also is alleged to have once received a letter from an organization that represents sex workers thanking Backpage.com "for continuing to permit sex workers 'to advertise in the 'Adult' area.'"  SI ¶ 142.  Finally, Lacey allegedly was on an email chain in which Backpage staff members reported deleting an ad for which a complaint had been received

---

[35] SI ¶ 89.  The Indictment also alleges that Lacey "believe[s] in legalized prostitution," SI ¶ 121, and that he once drafted an editorial that the government characterizes as "brag[ging] about the company's contributions to the prostitution industry."  SI ¶ 11, 107.  According to the Indictment, Lacey wrote that Backpage.com was "part of the solution" because it provides "transparency, recordkeeping and safeguards."  SI ¶ 11, 107.

1   (although the removal apparently was not made quickly enough in the government's

2   estimation), SI ¶ 126, and allegedly was sent an email in which the former CEO

3   recommended against adopting one of NCMEC's suggested reforms.  SI ¶ 106.  The

4   Indictment also alleges that Lacey once transferred funds to an overseas bank at a time

5   when charges in a California case had been dismissed, and no other charges were

6   pending.  SI ¶ 16.  That's it.

7          The allegations regarding James Larkin likewise fail to include any suggestion

8   that he was aware of any of the ads identified, that he knew any of those ads was for

9   prostitution, that he was involved in deciding to publish any such ad, or that he made a

10   decision with the intent to further any illegal acts.  As with Lacey, the Indictment

11   alleges that various groups of individuals made general claims to Larkin that

12   prostitution ads were prevalent on Backpage.com.  SI ¶¶ 86, 89, 97, 100, 135.  The

13   Indictment alleges that Larkin was aware of efforts to grow the business of

14   Backpage.com through "aggregation," "reciprocal links" and banner advertising on

15   other websites that contained adult content.  SI ¶¶ 41-43, 47, 49, 50, 56-58, 138.  It

16   alleges that Larkin was aware of, and helped edit the editorial in which Lacey claimed

17   Backpage.com was "part of the solution."  SI ¶¶ 12, 107, 108.  The Indictment claims

18   that Larkin also was a recipient of the "thank you letter" allegedly sent by an

19   organization that represents sex workers, SI ¶ 142, and that he, too, was on the email

20   chain in which Backpage staff members reported deleting an ad that purportedly

21   involved a minor.  SI ¶ 126.  Likewise, the Indictment alleges that the former CEO

22   copied Larkin on an email in which he recommended against adopting one of

23   NCMEC's suggested reforms.  SI ¶ 106.  It also alleges Larkin agreed to have a

24   contractor assist with enforcing website rules that banned posting nude photos.  SI

25   ¶ 103.

26          The Indictment's allegations against John Brunst, as CFO, are entirely barren of

27   anything that resembles *mens rea*.  He allegedly was sent documents describing the

28   "Backpage strategic plan" and other presentations that discussed plans to grow the

business through "aggregation" and "reciprocal links" with other sites that contained adult content, SI ¶¶ 42, 49, 138, 155, 157, and allegedly attended meetings in which Google Analytics analyses of web traffic were discussed.  SI ¶¶ 57-58.  The Indictment also alleges that Brunst received an email saying that Chase Bank was discontinuing accepting transactions from Backpage.com due to allegations about the site.  SI ¶ 135.[36]  The Indictment contains no other allegations regarding Brunst.

Finally, nothing in the Indictment alleges *mens rea* on the part of EVP Scott Spear.  Most of the allegations focus on claims that Spear was involved in efforts to expand Backpage.com's business through "aggregation" and "reciprocal links" with other sites with adult content.  SI ¶¶ 35, 38, 41, 42, 45, 46, 47, 49, 50, 51, 56, 57, 58, 65.  The Indictment also alleges that Spear heard or was sent general claims that prostitution ads were prevalent on Backpage.com.  SI ¶¶ 97, 100, 135.  It claims that Spear received emails describing Backpage.com's enforcement of terms of service, including the banning of images depicting sex acts, SI ¶¶ 70, 73, 81, 103, and that he was on email chains in which certain recommended changes in website policies were rejected.  SI ¶ 90.  Finally, without reference to any particular ad, the Indictment alleges that Spear was aware that certain words are "code" for prostitution.  SI ¶ 149.  As with all the other Defendants, there are no allegations that Spear was aware of any of the ads identified, that he knew any of those ads were for prostitution, that he was involved in any decision to publish the such ads, or that he made a decision with the intent to further any illegal acts.

### 3.    *Case Law Compels Dismissal of the Indictment.*

The Indictment is a mash-up of broad, generalized allegations coupled with a complete absence of specific allegations that go to the essential element of *mens rea*.

---

[36] Allegations about banks or credit card issuers deciding not to process transactions on Backpage.com, *see, e.g.*, SI ¶¶ 178, 179, 181, 183, presumably for perceived reputational reasons, do not suffice as allegations that Brunst specifically intended to promote or facilitate publishing ads for prostitution, let alone that he ever had any knowledge of or involvement with any of the ads cited in the Indictment.

There is not a single allegation of fact against any Defendant that shows awareness of a particular illegal ad, much less the necessary intent to facilitate any illegality.  An indictment must be dismissed where the government attempts to "rely on the defendants' conduct as a whole." *Buddenberg*, 2010 WL 2735547 at *10.  Especially in this context, where the government is seeking to impose criminal liability on a publisher for content provided by others, given the First Amendment implications, it must "more specifically identify the precise conduct upon which it seeks to hold each defendant criminally liable." *Id.* at *9.  Even without regard to First Amendment principles, the indictment must be dismissed in any event based on a failure to allege specific intent, given the *mens rea* standard under the Travel Act and money laundering statute.  *E.g.*, *Woodhull Freedom Found.*, 334 F. Supp. 3d at 199-201.  *See supra* Sections III.C, IV.B.1.

The essential allegations of the Indictment are that Backpage.com provided a platform for escort and adult-themed ads (which the government equates with illegality), that it actively sought to promote that aspect of the business, that the Defendants failed to heed warnings or take adequate steps to prevent such postings, and that moderation practices implementing Backpage.com's terms of service generally "facilitated" prostitution.  Even if the Indictment contained specific allegations of fact to support such claims against each Defendant (which it does not), none of this amounts to culpable criminal behavior, or that Defendants had the necessary *mens rea*, as numerous courts have held.

In *Dart v. Craigslist*, 665 F. Supp. 2d 961, for example, the sheriff of Cook County charged that the "erotic services" section of Craigslist constituted a "public nuisance" that violated "federal, state, and local prostitution laws," including specifically, the Travel Act.  *Id.* at 963.  Sheriff Dart made the very familiar-sounding allegations that Craigslist was "the single largest source for prostitution, including child exploitation, in the country," that users posted "obvious" ads for prostitution using coded language with "nude or nearly nude pictures," that Craigslist assisted

these postings through its moderation process, and that the overall allegations were supported by the opinions of advocacy groups and other law enforcement bodies.  *Id.* at 962-63.  Like the Indictment in this case, "Sheriff Dart's lengthy complaint relie[d] heavily on a few conclusory allegations to support the contention that [the website] induces users to post ads for illegal services."  *Id.* at 969.  Nevertheless, the court held that "[t]he phrase 'adult,' even in conjunction with 'services,' is not unlawful in itself nor does it necessarily call for unlawful content," and websites that host such content "are not culpable for 'aiding and abetting' their customers who misuse their services to commit unlawful acts."  *Id.* at 967-68 ("Plaintiff is simply wrong when he insists that these terms are synonyms for illegal sexual services.").  The court observed that these types of allegations may be characterized as "negligent publishing," *id.* at 967, a notion that could never satisfy the strict criminal pleading standard of specific intent. [37]

Other courts have made the same point that some level of "general awareness" does not satisfy the *mens rea* requirement.  *See*, *e.g.*, *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003) ("Even entities that know the information's content do not become liable for the sponsor's deeds.  Does a newspaper that carries an advertisement for 'escort services' or 'massage parlors' aid and abet … prostitution, if it turns out that some (or many) of the advertisers make money from that activity?  How about Verizon, which furnishes pagers and cell phones to drug dealers…?");  *In re Aimster Copyright Litig.*, 334 F.3d 643, 651 (7th Cir. 2003) ("A retailer of slinky dresses is not

---

[37] *See*, *e.g.*, *M.A.*, 809 F. Supp. 2d at 1054 (Backpage could not be liable based on allegations it aided violations of federal criminal statutes such as 18 U.S.C. § 1591, because publishing third-party ads cannot establish the specific intent required); *McKenna*, 881 F. Supp. 2d at 1277-79 ("[W]here an online service provider publishes advertisements that employ coded language, a reasonable person could believe that facts exist that do not in fact exist: an advertisement for escort services may be just that.…  However, if the offer is implicit, how can a third party ascertain that which is being offered before the transaction is consummated?"); *cf. McMaster*, 2010 WL 11640195, at *10 (dismissing as moot constitutional challenge to threatened prosecution of Craigslist after Attorney General abandoned "generalized" theory of prosecution).

guilty of aiding and abetting prostitution even if he knows that some of his customers are prostitutes….").  Of particular relevance here, the Seventh Circuit observed that "Backpage is an intermediary between the advertisers of adult services and visitors to Backpage's website," and intermediaries "do not become liable for the sponsor's [*i.e.*, advertiser's] deeds" "[e]ven [if they] know the information's content." *Backpage.com v. Dart*, 807 F.3d at 234.

The Indictment contains no allegations as to Backpage.com as a website, and certainly not for any of the individual Defendants, that could satisfy a specific intent standard.  This "complete failure to recite an essential element of the charged offense is not a minor or technical flaw subject to harmless error analysis, but a fatal flaw requiring dismissal of the indictment."  *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999) (an indictment failing to allege the requisite *mens rea* "on its face is deficient" because "implied, necessary elements, not present in the statutory language, must be included in an indictment"); *accord United States v. Pernillo-Fuentes*, 252 F.3d 1030, 1032 (9th Cir. 2001) (indictment dismissed for failure to allege specific intent); *United States v. Carbajal*, 42 F. App'x 954, 954-55 (9th Cir. 2002) (same).  Without an express statement of the required level of *mens rea*, an indictment fails to ensure that the defendant is being prosecuted only "on the basis of the facts presented to the grand jury."  *Du Bo*, 186 F.3d at 1179 (quoting *United States v. Rosi*, 27 F.3d 409, 414 (9th Cir. 1994)).  In the absence of specific allegations, it is impossible to know "if the grand jury would have been willing to ascribe criminal intent" to the Defendants.  *Id.* at 1179-80.  *See Buddenberg*, 2010 WL 2735547, at *9.  Such a defective indictment requires dismissal because it fails to "properly allege an offense against the United States."  *United States v. Morrison*, 536 F.2d 286, 289 (9th Cir. 1976).

**C.**     **The Travel Act is Unconstitutional as Applied in the Indictment**

### 1.     Indictment Bases Travel Act Allegations as Generalized Crimes

As set forth in detail above, the Indictment alleges that the Defendants had general knowledge that Backpage.com was used by third parties to advertise prostitution and that they took steps to encourage and promote such uses. The Indictment makes no allegations that any Defendant was aware of any of the ads identified, that he knew in advance that any of those ads was for prostitution, or that he was involved in decisions to publish any of the ads and did so with the intent to further illegal acts. If the Travel Act could be interpreted and applied so expansively, there would be no clear restrictions on its scope and no way to understand its terms. The Travel Act would thus be plainly unconstitutional, as the government seeks to apply it in this case.

The theory of prosecution is that the Defendants used facilities in interstate commerce (a website) to promote or facilitate prostitution as prohibited by state law. If the Travel Act can be applied to such generalized actions, there are few limits to its reach. The statutory language is expansive, potentially prohibiting any action in interstate commerce that would "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity" as identified by the law. 18 U.S.C. § 1952(a)(3). The terms "promote" or "facilitate the promotion of" have been interpreted quite broadly to mean doing "any act that would cause the unlawful activity to be accomplished or to assist in the unlawful activity in any way." *United States v. Bennett*, 95 F.3d 1158, at \*5 (9th Cir. 1996). *See also United States v. Miller*, 379 F.2d 483, 485-86 (7th Cir. 1967) (the term "facilitate" in the Travel Act interpreted to mean "to make easy or less difficult"). As the court observed in *Dart v. Craigslist*, "'[f]acilitating' and 'assisting' encompass a broad[] range of conduct, so broad in fact that they include the services provided by intermediaries like phone companies, ISPs, and computer manufacturers." 665 F. Supp. 2d at 967. However, that court rejected such an expansive reading and

concluded that such intermediaries "are not culpable for 'aiding and abetting' their customers who misuse their services to commit unlawful acts." *Id*.

The Ninth Circuit likewise has rejected such a broad reading of the Travel Act, explaining that "intent to facilitate a criminal venture is expressly made part of the offense," and concluding "we cannot extend the statute by holding that proof of a lesser mens rea is sufficient to establish the crime." *Gibson Specialty Co.*, 507 F.2d at 449. The scope of the Travel Act is thus cabined by the requirement that the prosecutor show that the defendant had specific knowledge of, and associated himself with a criminal venture for the purpose of its advancement. If not so limited, the court found "the act would be plagued by the very overexpansiveness which Congress sought to rule out by inclusion of an express mens rea requirement." *Id*.

### 2. Government's Broad Reading of the Travel Act Conflicts With the First Amendment.

Major First Amendment problems arise if the Travel Act can be applied to the operation of a website as set forth in the Indictment. As noted above, the failure to incorporate and apply a specific intent requirement is a First Amendment problem in its own right.[38] In addition, if the law is applied without this important limiting principle, the statutory terms become boundless, and the law itself is invalid as being both vague and overly broad. As applied in this case, the Travel Act would allow the prosecution of any website operator whose actions could be said to "make easier" or to "assist in the unlawful activity in any way." That cannot be the law.

As applied in this Indictment, the Travel Act is unconstitutionally overbroad. The law does not define what it means to "promote" or "facilitate the promotion" of prostitution, and without some enforceable limits it could be applied to a broad range

---

[38] *See supra* Section IV.B.1. Laws used to target expressive activity require a heightened *mens rea*, *Smith v. California*, 361 U.S. at 151-53; *X-Citement Video*, 513 U.S. at 78 ("It is [] incumbent upon us to read the statute to eliminate [constitutional] doubts"), and in particular, knowing conduct, *i.e.*, that any "wrongdoing must be conscious to be criminal." *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) .

of communicative activities – as the government is seeking to do here.  *See Dart v. Craigslist*, 665 F. Supp. 2d at 967 (*e.g.*, "they include the services provided by intermediaries like phone companies, ISPs, and computer manufacturers").  Such unbounded application runs afoul of the principle that a law is "may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'"  *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).  First Amendment freedoms need "breathing space" to survive, and this means the "government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).  In reading the Travel Act to impose vicarious liability on a website for hosting online content without a specific intent requirement, the government has made the law overbroad as applied.

The government's interpretation of the Travel Act is also unconstitutionally vague as applied.  In this Indictment, the government is seeking to impose massive criminal liability on the Defendants by applying the Travel Act's undefined terms "promote" or "facilitate the promotion" of prostitution.[39]  This application of the Travel Act to expressive activities raises particular First Amendment concerns.  As the Supreme Court has explained, "[w]here a statute's literal scope … is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts."  *Smith v. Goguen*, 415 U.S. 566, 573 (1974).  When applied to speech, vague laws offend due process because they fail to give people of ordinary intelligence fair warning of what conduct is prohibited, allow arbitrary and discriminatory enforcement, and delegate basic policy matters to policemen, judges and juries for resolution on an ad hoc and

---

[39] *E.g.*, *Amusement Devices Ass'n v. Ohio*, 443 F. Supp. 1040, 1043, 1051 (S.D. Ohio 1977) (invalidating state law prohibiting provision of legal services to criminal syndicate with a purpose of "establishing or maintaining" the syndicate or "facilitating any of its activities" because the language "fails to specify with reasonable clarity which kind or kinds of conduct it prohibits.").

subjective basis. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Where penal statutes are involved as they are here, "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP v. Button*, 371 U.S. at 433. Of particular importance to this case, the "unique nature of the [Internet] medium cannot be overemphasized in discussing and determining the vagueness issue." *ACLU v. Reno*, 929 F. Supp. 824, 865 n.9 (E.D. Pa. 1996), *aff'd*, 521 U.S. 844 (1997).

The Department of Justice has avoided overbreadth and vagueness problems in other cases by interpreting the challenged statutes narrowly and by insisting that strict *mens rea* requirements limit the respective statutes' applications. As noted above, in First Amendment challenges to the SAVE Act and FOSTA, the government took the position that those laws were consistent with the First Amendment *because of these specific limits*.[40] In both cases, the courts agreed that these narrow readings of the law and strict *mens rea* requirements were essential to the constitutional analysis. *See Lynch*, 216 F. Supp. 3d at 109; *Woodhull Freedom Found.*, 334 F. Supp. 3d at 199-201 (under the Travel Act, the prosecutor must prove that the "defendant intended to 'explicitly further[]' a specified unlawful act"). In this case, however, by abandoning any such requirement, the government is applying the Travel Act in a way that is unconstitutionally vague and overbroad.

### 3.   *The Indictment Must be Dismissed Because it is Predicated on an Unconstitutional Application of the Travel Act*

An indictment based on an unconstitutional law, either on its face or as applied, must be dismissed. *Packingham*, 137 S. Ct. at 1737-38; *United States v. Sineneng-Smith*, 910 F.3d 461, 479-85 (9th Cir. 2018). To be legally sufficient, an indictment "must assert facts which in law constitute an offense; and which, if proved, would

---

[40] *See* DOJ Reply in Support of Motion to Dismiss at 7-8, *Backpage.com, LLC v. Lynch*, No. 1:15-2155(RBW), (D.D.C. Apr. 15, 2016) (ECF No. 13); Brief for the United States at 21-22, *Woodhull Freedom Found. v. United States*, No. 18-5298 (D.C. Cir. Apr. 15, 2019) (Doc. #1782997).

establish prima facie the defendant's commission of that crime." *Landham*, 251 F.3d at 1079 (citations omitted).  This requires the government to specify "the precise conduct upon which it seeks to hold each defendant criminally liable" so that the court can determine "whether the specific conduct charged is protected by the First Amendment." *Buddenberg*, 2010 WL 2735547, at *9.  A charge that is brought under an overly broad application of a law regulating speech cannot satisfy this standard.

The court applied this principle to dismiss an indictment in *United States v. Cassidy*, 814 F. Supp. 2d 574 (D. Md. 2011).  The government had charged the defendant with violating a federal law against "cyber stalking," 18 U.S.C. § 2261A (2)(A), through a series of postings on Twitter and on a blog.  The law had been amended so that it did not require a showing of intent to kill or injure the subject of the online postings, but instead included the intent to "harass or place under surveillance with intent to … harass, or intimidate, *or cause substantial emotional distress*." *Cassidy*, 814 F. Supp. 2d at 581.  So broadened, the court found that "the Government's Indictment is not limited to categories of speech that fall outside of First Amendment protection" and held that the statute was unconstitutional as applied.  *Id*. at 583, 587.  Because it resolved the constitutional question as applied, the court found it unnecessary to rule on the law's facial validity.  *Id*. at 587.

This Court should reach the same conclusion about the government's misuse of the Travel Act and money laundering statute to prosecute publishers.  The issue here does not go to the statute's facial validity because the Travel Act, on its face, does not criminalize speech.  But the government has indicted the Defendants using the Travel Act by targeting their actions as publishers, and doing so without alleging specific intent.  The use of the statute in this case violates both the *mens rea* standard that must be applied in First Amendment cases, and it removes the boundaries that otherwise prevent the Travel Act from being unconstitutionally vague and overbroad.  Accordingly, the Court should hold that the Travel Act is unconstitutional as applied and dismiss the Indictment.

1

## V.    CONCLUSION

2        For the foregoing reasons, the Defendants respectfully request that the Court

3  dismiss the Indictment.

4        DATED this 22nd day of April, 2019.

5                                DAVIS WRIGHT TREMAINE LLP
                                 *s/ James C. Grant*
6                                *s/ Robert L. Corn-Revere*
7                                Attorneys for Michael Lacey and James Larkin

8                                LIPSITZ GREEN SCIME CAMBRIA LLP
                                 *s/ Paul J. Cambria, Jr.*
9                                Attorneys for Michael Lacey

10                               BIENERT KATZMAN, PLC
11                               *s/ Thomas H. Bienert, Jr.*
                                 Attorneys for James Larkin
12

13                               BIRD MARELLA BOXER WOLPERT NESSIM
                                 DROOKS LINCENBERG AND RHOW
14                               *s/ Ariel A. Neuman*
                                 Attorneys for John Brunst
15

16                               FEDER LAW OFFICE PA
                                 *s/ Bruce Feder*
17                               Attorney for Scott Spear

18

19

20

21

22

23

24

25

26

27

28

43

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2019, a true and correct copy of the foregoing document was electronically filed with the Clerk of the United States District Court of the District of Arizona by using the CM/ECF system, and that service will be accomplished by the CM/ECF system to all counsel of record.

_s/ James C. Grant_
Attorney for Michael Lacey and James Larkin