**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | CR-18-0422-PHX-SMB |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | April 23, 2019 |
| Michael Lacey, | ) | 2:30 p.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
| Defendants. | ) | |
| _____ | ) | |


**BEFORE:  THE HONORABLE SUSAN M. BRNOVICH, JUDGE**


**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**STATUS CONFERENCE/MOTION TO MODIFY RELEASE CONDITIONS**


Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

| | |
|---|---|
| 1 | **A P P E A R A N C E S** |
| 2 | FOR THE GOVERNMENT |
| 3 | U.S. ATTORNEY'S OFFICE |
| | By:  **Mr. Kevin M. Rapp** |
| 4 | **Mr. Andrew C. Stone** |
| | **Ms. Margaret Wu Perlmeter** |
| 5 | **Mr. Peter Kozinets** |
| | 40 North Central Avenue, Suite 1200 |
| 6 | Phoenix, Arizona 85004 |
| 7 | U.S. ATTORNEY'S OFFICE. |
| | By:  **Mr. John Jacob Kucera** |
| 8 | 312 North Spring Street, Suite 1200 |
| | Los Angeles, California 90012 |
| 9 | |
| | U.S. ATTORNEY'S OFFICE |
| 10 | By:  **Mr. Reginald E. Jones** |
| | 1400 New York Avenue, NW, Suite 600 |
| 11 | Washington, D.C. 20530 |
| 12 | FOR THE DEFENDANT LACEY: |
| 13 | LIPSITZ GREEN SCIME CAMBRIA |
| | By:  **Mr. Paul John Cambria, Jr.** |
| 14 | 42 Delaware Avenue, Suite 120 |
| | Buffalo, New York 14202 |
| 15 | |
| 16 | FOR THE DEFENDANTS LACEY AND LARKIN: |
| 17 | DAVIS WRIGHT TREMAINE, LLP - Washington, D.C. |
| | By:  **Mr. Robert Corn-Revere** |
| 18 | 1919 Pennsylvania Avenue NW, Suite 800 |
| | Washington, D.C. 20006 |
| 19 | FOR THE DEFENDANT LARKIN: |
| 20 | BIENERT MILLER & KATZMAN, PLC |
| | By:  **Mr. Thomas Henry Bienert, Jr.** |
| 21 | 903 Calle Amanecer, Suite 350 |
| | San Clemente, California 92673 |
| 22 | |
| 23 | FOR THE DEFENDANT SPEAR: |
| 24 | FEDER LAW OFFICE, PA |
| | By:  **Mr. Bruce S. Feder** |
| | 2930 East Camelback Road, Suite 160 |
| 25 | Phoenix, Arizona 85016 |

```
 1   FOR THE DEFENDANT BRUNST:

 2           BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
             LINCENBERG & RHOW, PC
 3           By:  Mr. Gary Lincenberg
             1875 Century Park E, Suite 2300
 4           Los Angeles, California 90067

 5           KIMERER & DERRICK, PC
             By:  Ms. Rhonda Neff
 6           1313 East Osborn Road, Suite 100
             Phoenix, Arizona 85014

 7
     FOR THE DEFENDANT PADILLA:
 8
             PICCARRETA DAVIS KEENAN FIDEL
 9           By:  Mr. Michael L. Piccarreta
             2 East Congress Street, Suite 1000
10           Tucson, Arizona 85701

11   FOR THE DEFENDANT VAUGHT:

12           KARP & WEISS
             By:  Mr. Stephen M. Weiss
13           3060 North Swan Road
             Tucson, Arizona 85712
14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

COURTROOM DEPUTY:  Criminal Case 2018-422, United States of America versus Michael Lacey and others on for a status conference and motion hearing.

Will the parties please announce.

MR. RAPP:  Good afternoon, Kevin Rapp, Reginald Jones, John Kucera, Peter Kozinets, Andy Stone, and Peg Perlmeter for the United States.

THE COURT:  Okay.

MR. CAMBRIA:  Good afternoon, Your Honor, Paul Cambria and Janey and Tom Henze-Cook also appearing for Michael Lacey.

THE COURT:  Okay.

MS. BERNSTEIN:  Good afternoon, Your Honor.  Whitney Bernstein and Tom Bienert on behalf of James Larkin, who is also present before the Court on bond.

MR. GRANT:  Good afternoon, Your Honor.  Jim Grant and my partner Bob Corn-Revere on behalf of defendants Michael Lacey and James Larkin.

MR. FEDER:  Bruce Feder for Scott Spear who is also present in the courtroom.

THE COURT:  Okay.

MR. LINCENBERG:  Good afternoon, Your Honor.  Gary Lincenberg on behalf of Mr. Brunst who is present in the courtroom.

MR. WEISS:  Good afternoon, Your Honor.  Steve Weiss

1    on behalf of Joye Vaught, and I'll waive her presence.

2              THE COURT:  Okay.

3              MR. PICCARRETA:  Good afternoon, Judge Brnovich.  Mike

4    Piccarreta on behalf of Andrew Padilla, and I'd waive his

5    presence.

6              THE COURT:  Okay.  All right.  So we're set for a

7    status conference that was obviously scheduled before Judge

8    Logan recused himself, so I've done what I can to get up to

9    speed on where we're at.

10             The status reports were helpful.  I worked on a couple

11   of things yesterday.  Let me just get my --

12             Okay.  So we have some things pending.  I have some

13   questions about some of them.  I know Docket Number 403 is

14   Defendant Lacey's motion to modify, but I figure we'll take

15   that up at the end so that the rest of them can leave if they

16   want.

17             The Docket 456 is the motion to dismiss brought by

18   Defendants Padilla and Vaught, but joined by, I think,

19   everybody else.

20             I have reviewed the motion, the response, the reply,

21   and done some research on that.  I've decided I'm not going to

22   hold oral argument.  I don't think it will be necessary.  So

23   I'll get a ruling out as soon as I can on that.

24             On Docket 452, which is the first motion for further

25   clarification of the Order 455.  I have a couple of questions

1    on that.

2           And, Mr. Rapp, maybe you can answer, because I think I

3    understand the filter process, and I'm not sure where the

4    defense differs from you guys so -- or at least their

5    understanding of it.  So let me just go through my

6    understanding of it.

7           There is a search of the documents.  There are

8    documents that are flagged because they contain one of the

9    search terms.  There are documents that are not flagged.  The

10   documents that are not flagged go to the investigative team.

11   The documents that are flagged are reviewed by the filter team,

12   or whatever it's called, the review team.  Then from that group

13   it's split again into ones that the review team determines are

14   privileged, ones they determine are not privileged, or

15   potentially not privileged.

16          The ones that they determine are privileged are not

17   distributed and those aren't -- shouldn't be at issue.  The

18   ones that they determine potentially are not privileged, then

19   my understanding from reviewing the pleadings is that the

20   review team would send them to the defense attorneys to see if

21   you could work out some -- I'm not sure who is dealing with

22   this response but --

23          MR. RAPP:  Actually, Mr. Stone is.

24          MR. STONE:  I'm happy to approach, Your Honor, if

25   that's helpful.

1          THE COURT:  Sure.  Then if there is an agreement

2    reached on what to do with those documents, then those

3    documents are no longer at issue.  If there is no agreement

4    reached, then the defense is allowed to file an objection for

5    the Court to determine whether it should be disclosed or not.

6          Is that accurate?

7          MR. STONE:  Close, Your Honor, but I think there is

8    some slight differences on how the filter team -- how the

9    protocol would work.

10         And the documents that are helpful to Your Honor on

11   this would be 462-1 and dash 2.  Those are search warrants that

12   have been issued previously by magistrate judges within this

13   courthouse.  Judge Willett issued an order in 462-1 and

14   Magistrate Judge Boyle issued a couple other warrants.  And one

15   of them --

16         THE COURT:  I think I read Judge Willett's.

17         MR. STONE:  -- is on 462-2.

18         So all we're asking in response to the motion for

19   further clarification that was filed by defendants is just for

20   an affirmation on what magistrate judges in this courthouse

21   have already found to be a good protocol in this matter.  And

22   that's laid out on page 6 of 462-2.  And the second sentence of

23   the search procedure reads that the filter team will review the

24   documents for privilege or protection only and will disseminate

25   the non privileged and non protected documents to the

1    investigative team.

2            So you were right, Your Honor, in that there will be a

3    review by the filter team, which is made up of some agents and

4    attorneys.  They will put the documents, basically, into three

5    categories:  One documents that are not protected whatsoever;

6    one documents that are potentially protected; and one that they

7    deem to be protected by the attorney-client privilege.

8            Now, the two categories, one and three, shouldn't be

9    an issue.  The ones that are definitely privileged will be sent

10   back to the appropriate defendants or destroyed.  The first

11   category that are certainly not protected by any privilege

12   would be sent to the investigative team.  And the documents

13   that are potentially protected then would go, under this

14   protocol, to the defense attorneys for the appropriate

15   defendant, and then there would need to be an order from the

16   Court before they're ever disseminated to the investigative

17   team.

18           So that's really what we're talking about is the

19   potentially protected.  If they're not, they come to us, if

20   they are, they go back to them.

21           THE COURT:  Okay.  So that's -- maybe I didn't say it

22   correctly, because that's exactly how I have it drawn out on my

23   little chart, so I think that I'm on the same page as you.

24           MR. STONE:  Perfect.  The only reason I took time is

25   that defendants in their reply brief suggest that, no, every

1    document should go to them first.  And that even if there is no

2    privilege whatsoever but -- from the -- from the filter team,

3    in terms of what they analyze, it still should go to them and

4    they still should get an opportunity to object and eventually

5    would go to Your Honor for the review.  And we just don't think

6    that's an efficient system, and it certainly wasn't the system

7    or the protocol that was signed off by Judge Willett and Judge

8    Boyle.

9              THE COURT:  Okay.  I understand how it's done, and

10   that's how I understood it to be done.  So I guess that is my

11   clarification that I need from the defense.

12             Is it Mr. Cambria or who is going to respond?

13             MR. GRANT:  Jim Grant, Your Honor.

14             THE COURT:  Okay.

15             MR. GRANT:  And listening to Mr. Stone, I think we may

16   be relatively close.  The distinction, and I think this is the

17   issue that we were trying to ensure was clarified, is, as the

18   Court described it, the first pass through of the documents, of

19   course, is to identify whether there is any attorney name

20   there -- and we've given them a list of several hundred

21   different names to search for -- if in that review the

22   government's filter team identifies that there is a document

23   with an attorney name on it which they believe is not

24   privileged, that's a document then now that they must turn over

25   to the defendants so that we have an opportunity to object to

1  that.

2           So that first cut review, as the Court described, and

3  I think accurately, is anything that is within the potentially

4  privileged category that the filter team thinks is not

5  privileged and should be produced, that then has to go to the

6  defendants to give us an opportunity to object to that.  And

7  assuming that that is the basis, I think we're probably

8  describing the same thing.

9           THE COURT:  I think you are.

10          MR. GRANT:  The only distinction, and the reason that

11  I asked for the clarification, is listening to Mr. Stone

12  describe it, he had this category of things that would be

13  declared to be not privileged at all, well, we don't know if

14  they're -- if they fall within the potentially privileged

15  category first, then the government can't make that

16  determination that they're just simply not privileged and turn

17  them over to the investigative team.

18          THE COURT:  I don't think that's at all what the

19  government's protocol says at all.  The protocol clearly

20  separates the documents that don't have any flag because none

21  of the search terms come up, those are handed over without

22  anything else.

23          Everything else is further reviewed and then split

24  into those two sections, the ones that they deem privileged

25  don't really matter because they're not going to be disclosed,

1    the ones that there is a question about are the ones that

2    they're sending over to you, per their own protocol.

3              MR. GRANT:  And that's what we --

4              THE COURT:  Not you, but, you know.

5              MR. GRANT:  I'm sorry, Your Honor.  And that's what we

6    want to ensure, because what the order, whether it was Judge

7    Willett's from 462-1 actually said, was before the filter team

8    submits any materials to the Court in camera and moves for

9    their disclosure to the investigative team, the filter team

10   will confer with counsel for the targets of the investigation

11   and counsel will have an ability to file objections with the

12   Court.

13             We were seeking the clarification, and it sounds as

14   though we're there, that that effort -- that that exercise

15   would require the government to produce to us all of those

16   documents that they believe potentially are not privileged, we

17   would have the opportunity to go through them.  And I think

18   that really is the efficient process.

19             THE COURT:  Okay.  So thank you.

20             MR. GRANT:  Thank you, Your Honor.

21             THE COURT:  Based on what we've just discussed, I'm

22   denying defendant's motion for further clarification because

23   you're really talking about the same thing.  There is no need

24   for further clarification.  They -- they have said exactly what

25   I outlined here, that the documents that are flagged that there

1    is some question about whether they're privileged will go to

2    the -- the attorney that represents that defendant to review.

3    You're either going to agree whether they're protected or not

4    or they're going to give you an opportunity to file an

5    objection and the Court is going to review it for decision.

6           MR. GRANT:  If I may, Your Honor.  I appreciate that

7    and I ask only one thing, we actually sort of laid this out on

8    the last page of our reply brief, that the Court enter an order

9    directing that what the government is committed is the process

10   it will follow is the process it needs to follow so that it's

11   pursuant to court order as well.  That's pretty standard in a

12   privilege review process.  And I think we cited to the Court

13   eight or ten cases where courts have done exactly this and said

14   that needs to be a component of the order that's directing the

15   review process.

16          THE COURT:  What does?  What's missing?

17          MR. GRANT:  That they will turn over to us the

18   documents that need to be reviewed.  It's not -- as the current

19   version of the order says, somewhat ambiguous whether they will

20   or they won't.  My suggestion is that we make that express.  As

21   I said, the last page of our reply brief lays out specifically

22   what I believe the government has now agreed to, so I don't

23   understand why there would be any objection for the Court to

24   order that they do those things in express terms.

25          THE COURT:  All right.  Well, I'll re-look at 462-1

```
1    and 462.  I just don't like clarifying things that are not
2    unclear.
3            MR. GRANT:  Well, I appreciate that, Your Honor.  Let
4    me suggest you also look at 479-1 which is the list of the
5    seven items that I believe now are agreed to, and, as I say, I
6    would request that that be part of the Court's order.
7            THE COURT:  Okay.
8            MR. GRANT:  Thank you.
9            THE COURT:  Mr. Stone.
10           MR. STONE:  To further clarify the clarification, the
11   government does not agree to the seven or eight points that
12   Mr. Grant laid out, because it's different than what the orders
13   were previously.  And we're just asking for the orders that the
14   magistrate judges issued previously to stand.
15           THE COURT:  Okay.  Then 498.  498 was a motion filed
16   on March 12th for an extension of time to disclose initial and
17   rebuttal expert testimony by the defense to April 1st, which
18   is, of course, passed now.  And, as I review the docket, I see
19   some disclosures of experts so -- let's see, who filed this?
20   Mr. Feder.
21           Is this now moot?  What's the status?
22           MR. FEDER:  Judge, I'm happy to answer that, but it
23   is, I think, needs to be discussed in the context of where we
24   are from a discovery standpoint, which is going to be addressed
25   very soon.
```

1          I filed a supplemental expert opinion yesterday.

2     We're, as you can tell from the memorandum for this hearing,

3     we're pretty far apart as far as our understanding of what

4     discovery is out there and what isn't, what's been disclosed

5     and what has not been disclosed, and expert opinions derived

6     from, at least from a defense standpoint, us having all of the

7     materials that we're entitled to.  So I -- it's moot in the

8     sense that whatever has been filed has been filed, but I think

9     we're going to be asking today, or at least discussing today

10    further extensions of time for the defense to file various

11    types of things, including further expert opinions.

12          THE COURT:  Okay.  So we will be talking about the

13    status of discovery in a few minutes.

14          Okay.  Docket 531 is a recently filed motion for

15    discovery.  I just want to put on the record, to the extent

16    that there was -- seemed like there was a request for some

17    expedited handling, but I've reviewed the motion and I'm not

18    going to expedite that in any way.  The normal response and

19    reply time will apply.

20          Before we get into discovery, I just -- in looking at

21    the motion to dismiss, there is some mention -- and the

22    transcript from a December hearing in California -- and the

23    pleadings say that no rulings issued.  Is that still the

24    status?  You still don't have anything from that judge?

25          MR. KUCERA:  That's correct, Your Honor.

1          John Kucera on behalf of the United States.

2          I don't know the magistrate judge's reasons for

3    delaying ruling, but I suspect that it is because a large part

4    of the issues to be resolved there were First Amendment issues,

5    and those very same issues are currently being appealed to the

6    Ninth Circuit.  I believe that both defense and the government

7    supplemented the record before Magistrate Judge Oliver to make

8    her aware of the fact that these issues were pending before the

9    Ninth, and my suspicion is that she did not want to get ahead

10   of the Ninth Circuit.

11         THE COURT:  And I don't know if the government has

12   anything to do with the Delaware case?

13         MR. KUCERA:  I, unfortunately, do know a little bit

14   about that case, Your Honor.

15         THE COURT:  Is there anything happening in that?

16         MR. KUCERA:  The parties are trying to reach a

17   resolution on a proposed order to the Delaware court.  I don't

18   believe -- I believe that the government has proposed

19   something, but I -- and defense has as well, but I don't think

20   that there has been a complete agreement yet.  I'm not handling

21   that but I can get that information.

22         THE COURT:  But the government is a party to the case?

23         MR. KUCERA:  The government made a motion to intervene

24   which the Delaware Court did grant.

25         THE COURT:  Does anybody have anything to add about

1    the Delaware?  I was just curious because it's mentioned in

2    some of the pleadings.

3            MR. BIENERT:  Your Honor, I think that is a fair

4    characterization of where things stand in the Delaware matter.

5            THE COURT:  Okay.  Could you state your name?

6            MR. BIENERT:  I'm sorry.  Yes, Your Honor.  Thomas

7    Bienert.

8            THE COURT:  Thank you.  Okay.  I want to ask some

9    specific questions about discovery, because there is a lot of

10   you, and just from the status reports I know everybody wants to

11   say something, but you've all put it in your status reports.

12           Let me ask Mr. Cambria.  There is some discussion

13   about the -- I'm going to blank on the name -- what's the

14   program that's used to open the documents?

15           MR. BIENERT:  Relativity.

16           THE COURT:  Relativity.  Thank you.  The defense seems

17   to complain about the program.  The government says that's the

18   format that everybody agreed these documents would be delivered

19   in.

20           Was it, in fact, the agreement that these documents be

21   delivered in this format?

22           MR. CAMBRIA:  Would you mind, Your Honor, if we have

23   the best person answer that who has been dealing with that?

24           THE COURT:  Yes.  Who is that?

25           MS. BERNSTEIN:  Whitney Bernstein, Your Honor.

1          And we don't have a collective recollection of

2    agreeing to Relativity being the format in which files would be

3    produced.

4          THE COURT:  What is your recollection of the

5    agreement, because at the beginning of a case like this there

6    is surely some discussion and agreement.  I didn't go back to

7    the very early filings, I was only going over the past year,

8    but I am sure that there was some agreement.

9          MR. BIENERT:  Thomas Bienert again, Your Honor.

10         THE COURT:  Thank you.

11         MR. BIENERT:  I don't have a recollection of an

12   agreement to it, but I think context is everything, Your Honor.

13   At the time when we were first discussing everything with the

14   government at the first appearance, which if I have my dates

15   right, it would have been at the very beginning, I believe, of

16   May of last year, whether they put it in Relativity or a

17   different type format would not have been an issue to us,

18   because at that time we had all just come into the case, we had

19   ample attorney's fees to address what we knew was going to be

20   huge volumes, many millions of pages.

21         And I agree with the government that if you're turning

22   over many millions of pages, typically the way that is done, if

23   that's the type of production they're going to do, here's

24   everything but the kitchen sink, it's voluminous, as a

25   practical matter, you can only do it by having things loaded

1    in, made searchable, everybody gets passwords and licenses and

2    everybody accesses the many millions of pages through term

3    searches.

4         So I guess it's an indirect way of saying I don't

5    remember us agreeing to Relativity, but because at the time we

6    would have expected to be able to search with search terms, it

7    wouldn't have struck, certainly me, and I'm assuming my

8    colleagues, as unusual or strange if we were going to be

9    getting what turns out to be many, many millions of pages in

10   that format.

11        And I can expound, of course, Your Honor, on why

12   things are different, but that at least answers, I think, the

13   question of what we thought at the time.

14        THE COURT:  Well, so by May of 2018, if I -- I guess

15   my concern is that, by reading the status report, I was under

16   the impression that the defense had not yet utilized

17   Relativity, or some other program, and was now complaining

18   about the cost when discovery has been ongoing for a year.

19        MR. BIENERT:  Well, first of all, we complained about

20   the cost several times.  This has been an ongoing issue that's

21   been raised on multiple occasions in the past.

22        I would say it really came to a head, Your Honor,

23   when, over the course of last summer, the government was

24   seizing assets through seizures mostly out -- I think

25   exclusively, frankly, out of the Central District of California

1    that were the assets that the defendants would use to defendant

2    the case, including Relativity.

3        So what happened was, as items are coming in over the

4    span of time, assets that would have been used to defend the

5    case, and, again, something like Relativity, are seized and no

6    longer available.  So in the continuum of that, I think it was

7    by August, if I'm remembering correctly, when we were aware of

8    several seizures and complaining and then filing things saying

9    that the money was improperly seized and we were entitled to a

10   hearing to get the funds to then handle the case, which would

11   have included dealing with database searches.

12       THE COURT:  So maybe I'm not asking the right

13   question.

14       Prior to August when the funds or assets started being

15   seized, had the defense team set up your own protocol about

16   receiving this -- these documents, because by that point you

17   had received millions of documents?

18       MR. BIENERT:  We had set up -- we were getting quotes

19   from vendors.  And we had gotten some vendors who had given us

20   some samples of what they could do and what they would charge.

21   I don't remember the details but I know that was generally

22   happening.

23       We were able to load some of the discovery, a smaller

24   amount, and try it out, in essence.  And then we had the money

25   issues and we were not able to do the rest.  That's where we've

1    been.  And so, in a nutshell, in essence, we've been sort of,

2    from our perspective at least, fighting money issues relative

3    to the defense fees and costs on a continuum throughout the

4    case.

5              THE COURT:  Okay.  Okay.  Then --

6              MR. JONES:  Your Honor, if I may address one of the

7    Relativity issues?

8              THE COURT:  Sure.  And I'll just say, it sounds to me

9    like the defense complaint isn't that you're presenting it in a

10   manner that can be used by Relativity, it's that you're taking

11   all their money and they can't use Relativity because they

12   can't afford it.

13             MR. JONES:  Your Honor, you're exactly right in the

14   fact that we stated that we provided them the vast majority,

15   more than 90 percent of discovery, in May of 2018, you know, in

16   electronic format, you know, easily searchable by name, date,

17   and other metadata fields, Your Honor.

18             We were all here, you know, in the district court on

19   April 30th of 2018, Your Honor, and we all knew the volume, the

20   amount of discovery would be produced in this case, and also

21   how it would be produced, that we all agreed to discovery being

22   produced in Relativity format, Your Honor.  I'll have -- and

23   the transcript -- we can cite to the transcript as well, Your

24   Honor, from that hearing, the defense did agree to that.

25             And to the government's knowledge, Your Honor, the

1    only technical issue that defense have brought to our attention

2    as it comes to accessing this discovery, other than in their

3    most recent status memo they state that the government's most

4    recent production contained a virus and they weren't able to

5    access some of those documents, this is the first time we've

6    heard of that in reading that memo, Your Honor.  Now that we

7    know about it, we're happy to work with them to resolve this

8    issue.  But the only issue they have brought to our attention,

9    Your Honor, as it pertains to accessing discovery, is a

10   February 28, 2019, letter, which is Exhibit I to our CR 524,

11   our status memo, Your Honor, where they assert that 2,700

12   documents -- 2,700 documents that we provided them nine months

13   prior, Your Honor, could not be loaded into their database.

14        We promptly looked into this matter, Your Honor,

15   informed them that we provided these 2,700 documents to them in

16   the exact same manner they were provided to us, Your Honor.

17        We went a step further, Your Honor, and viewed a

18   sampling of these documents, of these 2,700 documents in our

19   database without issue.  Promptly responding to them, Your

20   Honor, we have not heard anything else in regards to these

21   2,700 documents.  But that is the extent of the issues that

22   defense has brought to the government's attention since over a

23   year that this case has been guided as it pertains to excessive

24   discovery.

25        THE COURT:  Okay.

1            MR. BIENERT:  Your Honor, may I follow up?

2            THE COURT:  Briefly.

3            MR. BIENERT:  Well, if it's easier -- I mean, you're

4    going to guide me with questions, so I can wait.

5            THE COURT:  I'm going to ask about some other

6    discovery issue.

7            MR. BIENERT:  Okay.

8            THE COURT:  I think it was the government's status

9    report indicated that there was going to be some access to the

10   servers within the last week.  Did that occur?

11           MR. JONES:  Yes, Your Honor.

12           Yes, Your Honor.  The defendants inspected the servers

13   in Pocatello, Idaho, on last Wednesday, Your Honor.  I believe

14   this morning they inspected the servers that were located in

15   Arizona, from Desert Net, they inspected those this morning.

16           If I may briefly, Your Honor, just as it pertains to

17   the discovery data, as defense contends in their motion that

18   there is all these millions of pages of outstanding server data

19   that the government has yet to turn over, Your Honor.  Your

20   Honor, that's just not the case, Your Honor.  The government

21   submits that the defendant, you know, they threw out this

22   argument, Your Honor, about the server data in the January

23   hearing and it was rejected, and then they're attempting to

24   throw it out again, Your Honor.

25           We sent the defense a letter, which is Exhibit H to

1   our status memo, 524, highlighting the government's handling of

2   the server data to date, Your Honor.  One correction I would

3   like to make, Your Honor, is that we indicated that all of the

4   servers were located in Pocatello, where there are some servers

5   located in Arizona, but to date they have inspected all of the

6   servers.

7          Your Honor, this isn't any new discovery.  We brought

8   this out at the last status conference and the Court agreed and

9   said the same, Your Honor.  It's not new discovery.  We have

10  given defendants -- extracted, you know, out of, you know --

11  one thing I would like to point out as far as the servers, Your

12  Honor, not only, you know, have we, um, allowed them to inspect

13  the server data, we have also extracted, you know, all of the

14  ads that were on Backpage.com and given them to the defendants,

15  we've also extracted all of the images on Backpage.com and

16  given it to them, we've also extracted all of the e-mails that

17  were on the server and made those available to them, Your

18  Honor.

19         Not only that, Your Honor, we have about 60 additional

20  outstanding servers that we should be receiving from Amsterdam

21  within the next six weeks.  They have requested payment

22  processing data from those servers.  As soon as we have that

23  payment processing data in our possession, Your Honor, we will

24  make that data available to them as well, Your Honor.

25         Also, Your Honor, we have even went a step further

1    than that, Your Honor, in fulfilling our obligations, Your

2    Honor.  We provided them, as per their request, we had already

3    given them the ads that were referenced in our superseding

4    indictment, but we went a step further, per their request, and

5    gave them a sampling of over 70 ads as those ads appear in the

6    server data.

7           We also have agreed, Your Honor, to provide them with

8    any exhibits of the server data that the government might

9    utilize at trial, so they'll have those as exhibits, Your

10   Honor, months before trial.  But the government would just like

11   to just make this clear, Your Honor, that, you know, the server

12   data, Your Honor, that's not new discovery, Your Honor.  We

13   have -- we asked -- we went a step further and asked defense,

14   hey, is there any additional data other than the ads, the

15   images, the e-mails, you know, millions of documents of data,

16   Your Honor, that they would be able to view each of those

17   documents if they had five or ten years to prepare for trial

18   and 50 attorneys, Your Honor, but we went a step further.  We

19   said, hey, can you articulate to us what else on these servers

20   that you would like extracted and we can look for it and

21   provide it to you.  They have given us nothing, Your Honor.

22          But what they did do, Your Honor, shortly after

23   viewing the server data in Pocatello, they send us an e-mail

24   about three days ago requesting that we image all of the

25   servers in our possession and provide them copies of that, Your

1    Honor, and a reasonable, highly unduly burdensome request, Your

2    Honor, that's not required under the Rules of Criminal

3    Procedure.

4          Your Honor, they bear the burden of determining how

5    that data is material to their defense, Your Honor.  We've

6    asked them repeatedly, hey, is there anything that we haven't

7    provided you that we can, but they haven't, Your Honor.

8          THE COURT:  Let me just stop you for a second because

9    I am not dealing with any specific motion to compel.  At this

10   point I'm just trying to get an idea of the status of

11   discovery.  I understand they have disagreements about what you

12   have and haven't done in compliance with the rules so -- but

13   was there anything else --

14         MR. JONES:  That's it.

15         THE COURT:  -- other than defending the government?

16         MR. JONES:  That's it, Your Honor.  Thank you.

17         THE COURT:  Thank you.

18         Did anybody want to say something about the servers?

19         MR. BIENERT:  Yes, Your Honor.  Thomas Bienert again.

20   And I'm just going to talk about the significance of the

21   servers, and then Ms. Bernstein who actually went to see the

22   servers this morning and last week can just tell you the state

23   of them.

24         First of all, just from the standpoint of where are we

25   on discovery.  What the government has acknowledged, that they

1    just sort of glossed over, is they say that they have given us

2    hard drive copies of five servers so far, and all that happened

3    fairly recently, and then they acknowledge that there are

4    another 100 servers, Your Honor, that they haven't given us

5    yet.  And that even if we accept what they say they have done,

6    they've made it available to us in Idaho, several of them last

7    week, and they made others available to us this morning here in

8    Phoenix.  And Ms. Bernstein will tell you the status they're

9    in, which is unusable.

10            But the main thing is the government is saying they've

11   given us most of the discovery, they haven't.  The vast

12   majority of the discovery, the servers, the things that contain

13   the business and all aspects of it, they haven't even given us

14   the majority of it.  They've given us backup hard drives, they

15   claim, of five out of a hundred and something, so right there

16   there is a problem.

17            The servers are significant because the servers, among

18   other things, will show the history of any particular ad.  And

19   so if the government whips out an ad and says, ah-ha, we think

20   this is a bad ad, the servers where that ad was hosted will

21   tell us a bunch of things about the ad, like who got

22   information on the ad; what changes, if any, were made for the

23   ad; what correspondence were done on the ad; did they try to

24   follow protocols to ensure that the ad wasn't an improper ad.

25   All of that is on the servers.  And by the government just

1      handing us 70 pieces of paper that represent 70 ads where we

2      don't know what server they're on and we don't have the severs

3      anyway, and we can't see the history of the ad, we're not

4      allowed to prepare.

5             Secondly, as --

6             THE COURT:  Let me ask you this.  Prior to them

7      saying, we have the servers, they're available to you, did you

8      proactively say we want access to the servers?

9             MR. BIENERT:  Yes.  And Ms. Bernstein can address it.

10     There has been a lot of discovery -- or not discovery --

11     discussion about the servers over time.

12            And the other thing that they acknowledge is on one of

13     the servers they don't even have yet, I believe, if I'm

14     remembering correctly, one of the 60 servers they're waiting on

15     from Amsterdam has the merchant card information.  And a

16     significant issue in the case is the government claims that our

17     clients were laundering money, hiding things, misleading the

18     public, misleading banks as to who they were, what was being

19     done with merchant accounts.  We have a right to get that

20     information.

21            And then, finally, just in the big picture, and then

22     I'll let Ms. Bernstein tell you the status of the servers, I

23     would submit, Your Honor, that it's not appropriate for the

24     government to, in essence, say, tell us everything you need and

25     we'll get it to you, because, obviously, Your Honor, we're

1    allowed to prepare our own case.  And I appreciate that the

2    government is willing to go get us things, but that really

3    doesn't allow us to be defense attorneys in the way we

4    traditionally would.

5          The reality is we should be given access to the

6    servers in the functioning condition that they were when the

7    government seized them.  And then I'll address some other

8    issues that I think we should get in discovery, but that's how

9    we see the servers.  And Ms. Bernstein can tell Your Honor

10   about the condition of them.

11         THE COURT:  Okay.

12         MS. BERNSTEIN:  Thank you, Your Honor.  And the

13   government is correct that, in fact, I was physically present

14   in Idaho and physically present at the Phoenix facility this

15   morning, but the characterization of inspecting the servers I

16   don't think is appropriate.

17         The servers are -- and I can't provide the Court with

18   a visual, because, despite requesting it, I was not permitted

19   to bring a camera into the facility.  The servers are on

20   tables.  This morning -- and with appreciation to the FBI

21   agents, they were in a -- laid out in the order of the chain of

22   custody so we could go through them much faster than we were

23   able to last week.

24         But the servers are sitting in a room.  They are --

25   they just sit there.  I can't turn them on.  I can't copy them.

1    I can't take a photograph of them.  And a photograph would be

2    very helpful, because when you look at a server, you take the

3    front of it off and there is rows of hard drives, and so it

4    helps us to know what order those hard drives go in.  Can't

5    look at -- can't take photos of the hard drives, can't turn

6    them on, can't view the contents of the server, can't have a

7    copy of the server.

8            So to inspect them, yes, I walk into a room and I see

9    that there are servers there, but that's the full extent of

10   what we're able to do while we're there.  And we have just

11   spent our time trying to figure out what servers have come from

12   where.

13           The way the servers in a database run is that they're

14   all stacked in a room and they're all connected with code and

15   with a relational database which existed at the time that the

16   government took the servers down.

17           The Court inquired as to whether we had previously

18   made this request of the government, and I'm not sure if it's a

19   part of the record, I'm happy to pass it up, but there is a

20   May 1st letter that was filed by Attorney Piccarreta and was

21   sent to counsel, to the U.S. attorneys in this case, asking

22   specifically -- stating that we understand that the seizures,

23   that the items contain evidence which we believe is

24   exculpatory, and that it's critical when we gain access to

25   these items, that we are able to access the servers in the same

1    condition and configuration as when they were seized.

2          To date the government has provided us with five

3    imaged servers.  They've represented that there is

4    approximately 60, give or take, overseas tied up in the M-Lab

5    process, and there is 46 in their possession.  So we have

6    copies of five of them but we don't have copies of the other

7    41.

8          The server data is over 500 gigabytes.  The government

9    continues to bandy about the fact that they've complied with

10   their discovery obligations and produced 90 percent of

11   discovery, or a substantial portion of discovery by the

12   disclosure deadline of December 3rd.  Thus far the DOJ

13   productions we've received in this case, excluding the most

14   recent April production which we haven't had a chance to look

15   at, owing to the viruses and owing to the time, excluding the

16   March production which included a lot of attorney IOLTA

17   information that we've stopped reviewing, and excludeing a hard

18   drive that was produced in May of 2018, it's called the Costar

19   hard drive, and that has over a terabyte of data on it, with

20   those three exclusions, the DOJ productions to date are about

21   673 gigabytes.

22         The servers are over 500 terabytes of data.  So a low

23   guesstimate of the amount of data that's out there in this

24   case, because of those exclusions I mentioned, is about 500,673

25   gigabytes.  The 673 gigabytes we have from the government

1    represents .134 percent of the total data that's out there.

2    And so we have been able to look at the servers in a room, but

3    we're not able to turn them on.  And we've requested copies of

4    at least the 14 servers that are in Pocatello, and having

5    viewed them in Phoenix this morning, haven't yet had a chance

6    to request copies, but we will be requesting copies of those so

7    we can have a meaningful forensic review of that information.

8          THE COURT:  Okay.  So I know the -- I'm sorry, I

9    forget who said it earlier, that you would be requesting some

10   extension of discovery deadlines, you are free to bring that

11   up, although it seems a little premature to me when it is

12   unclear to me how much more -- I know -- I understand

13   Ms. Bernstein's characterizations of what's out there, but

14   what's out there doesn't mean it's relevant and discoverable.

15   So it seems to me until the government gets those servers in

16   their possession, seems premature to talk about where -- what

17   is realistic.

18         MS. BERNSTEIN:  Well, Your Honor, as to the 41 servers

19   that are in the government's possession that we don't have

20   copies of, we do -- we do need a copy of those.  And I guess it

21   sounds like the Court's asking for, like, the materiality of --

22   of the servers that's out there.  I mean, we aren't -- we don't

23   have an ability to review the Web site -- and this is a

24   prosecution based on the Web site -- until we can look at the

25   data that they have.  And for the government to tell us this

1    hard drive matters, this hard drive doesn't matter, we just

2    want the opportunity to determine the evidentiary value of the

3    servers that the government has seized for this prosecution.

4           And the government is in possession of 41 servers that

5    have not yet been imaged, with 33 of those at the Phoenix

6    facility, and the remainder at the Pocatello facility, so while

7    we are still waiting for the 60, they have 41 right now.

8           THE COURT:  Yes, I understand that.

9           And, I don't know, Mr. Jones, if you want to respond.

10   Is the government planning on -- how did you determine that you

11   were going to copy these five that you did copy?

12          MR. JONES:  We were able to work with the former chief

13   technology officer at Backpage, Your Honor, and determine

14   where, you know, the marketplace, the database ads, they were

15   located on, Backpage were located, so we've given them all of

16   the ads, tens of millions of ads and tens of millions of

17   images, and also made the e-mail data available, Your Honor.

18          As well as we were told by the former chief technology

19   officer that the payment processing data is located -- it's

20   currently located in Amsterdam, which we should have in our

21   possession within the next six weeks, it's located in this

22   data, along with mostly other duplicate data.  As soon as we

23   receive this, Your Honor, we will make this available to them

24   as well, Your Honor.

25          I don't want to get into argument, Your Honor, but,

1    you know, we're well aware the defendants, you know, ran this

2    company for over 14 years, Your Honor, so they are very much

3    aware of the data that was hosted on this Web site, Your Honor,

4    as the Court articulated in January.  You know, we don't want

5    to get into any delay tactics or anything like that, but I will

6    say that the government has complied with its discovery --

7    discovery order as it pertains to the server data.

8            And we have asked them on multiple occasions is there

9    anything else that you would like for us to look, you know, in

10   regards to the server data that you would like to see

11   extracted, Your Honor, and they haven't named anything else,

12   Your Honor, because it's the government's position that we've

13   given them everything that could even be remotely material to

14   their defense, Your Honor.

15           THE COURT:  And that's based on your information from

16   the chief technology officer?

17           MR. JONES:  Correct, Your Honor, and also the FBI

18   forensics folks who have been able to extract the pertinent

19   data off of the servers.

20           THE COURT:  Is the stuff that you copied to give to

21   the defense off of those five servers?

22           MR. JONES:  Correct, Your Honor.  Most of the Backpage

23   servers -- may be a bit hard to explain, but a lot of the

24   servers contained duplicate and backup data, Your Honor.  So

25   just say the servers -- the outstanding servers in Amsterdam

1     now, those 60, Your Honor, we've been told by the chief

2     technology officer -- the former chief technology officer that

3     most of that data is also duplicate data, but the payment

4     processing data, the only other data that they requested and we

5     will extract and provide to them, Your Honor, we'll get that to

6     them hopefully within the next six weeks.

7          THE COURT:  Okay.  So with respect to the 41 other

8     servers that you don't have copies of, Ms. Bernstein, I know

9     you just were visibly able to look at them and not inspect

10    them, have you had a conversation with the government about

11    copying those other ones for you and have they denied your

12    request?

13         MS. BERNSTEIN:  Yes, Your Honor, and I believe that's

14    what Mr. Jones was referencing at the beginning.  Subsequent --

15    it only became clear that the government had no intention of

16    imaging these and providing them to us in preparation for the

17    visit to Idaho, so however many weeks ago those, kind of, phone

18    calls began.

19         After we visited the facility in Idaho, I did send

20    Mr. Jones an e-mail, which I believe is a part of the record --

21    oh, no, I apologize.  It's not a part of the record because it

22    was submitted to Mr. Jones on April 17th.  And we can file this

23    with the Court as well.

24         I specifically said, of the 14 servers we looked at

25    today, we've previously received image copies of five.  We need

1    image copies of the remaining nine servers and are requesting

2    as much.  The same request would be made as to all of the

3    servers that were -- that I have looked at the outside of in

4    Phoenix this morning, but I haven't had a chance to make that

5    request yet.

6             THE COURT:  Okay.

7             MS. BERNSTEIN:  But, I'm sorry, to answer the Court's

8    question directly, yes, we did request at least the Pocatello

9    servers, and as I understand from statements today, that the

10   government doesn't intend to provide those.

11            THE COURT:  Okay.  So I understand there is an issue

12   with the servers.  It sounds like the discussion about copying

13   these other 41 is relatively recent.  I can foresee

14   circumstances where, yes, it would be obvious that the defense

15   should get copies, other circumstances where it's not or maybe

16   there is some other way to get the information to the defense.

17   So after you have had those conversations about if there is

18   some alternative to copying and you still feel you need it and

19   the government is not going to agree, then you can file

20   something with the Court.  That is a little bit more complex

21   than ordering the government to hand over some documents so.

22            MS. BERNSTEIN:  Thank you, Your Honor.

23            THE COURT:  Any other discovery things that you want

24   to advise me on?

25            MR. BIENERT:  Yes, Your Honor, because in addition to

1    what we haven't gotten, there are a couple other -- there is

2    some issues with what we have gotten, and namely the lack of

3    indexes that really help us look for things.  And so what I

4    would specifically ask that you order is that given the volume

5    of the discovery that already produced, millions and millions,

6    that they would be ordered to give us a specific Bates number

7    of each exhibit -- because they gave us, I think on the 1st, a

8    lengthy exhibit list.  I think it has 1,100 exhibits.  And of

9    the 1,100, about half of them do not have any Bates

10   nomenclature on them that aligns with the Bates numbers that

11   the government lists for us in the cover e-mails or letters

12   that come with their discovery.

13          So stated in reverse, what we get from the government

14   in terms of indexes on each discovery round is a letter that,

15   in essence, at one point says, enclosed are documents from

16   grand jury subpoena 38, and it will give a Bates range.

17          THE COURT:  I've looked at the indexes that you

18   attached.

19          MR. BIENERT:  Okay.  So the bottom line is many, if

20   not most, of the exhibits listed don't have a Bates number that

21   corresponds to the discovery they've produced.

22          So, number one, we would ask that they be ordered to

23   identify the -- by Bates number in the discovery where each

24   exhibit is by Bates number, and, secondly, where that document

25   came from, in other words, it came from a server in Pocatello,

1    it came from a search warrant issued to Bank of America, and

2    the like.  Because we need to be able to find the document,

3    which when there is no designation, it's just one document

4    among the millions of pages, and then we need to be able to

5    assess what we need to do defense investigation of the facts or

6    whatever the point is of the document, and that's where we need

7    to know where it is in the government's possessed items,

8    servers, documents, et cetera, because we have no idea where to

9    look for things to investigate whatever the document purports

10   to be.

11          THE COURT:  If they give you the Bates number, isn't

12   that going to tell you where it came from according to these

13   indexes?

14          MR. BIENERT:  No.  Because depending on the index,

15   Your Honor, some of them are very, very general.  Some of them

16   will say something like a grand jury and it will have a number.

17   Some of them will have --

18          THE COURT:  It gives you the whole range of numbers.

19          MR. BIENERT:  Right, but it doesn't --

20          THE COURT:  Every document in there.

21          MR. BIENERT:  Correct.

22          THE COURT:  Right?

23          MR. BIENERT:  But it doesn't tell us -- in other

24   words, all that tells us is somewhere in the, what we have so

25   far, I think, 11 million pages, that document is in there, but

1   we don't know where in the other 11 million pages other

2   documents related to it are.

3           So, for example, it makes a difference if this came

4   from the e-mails -- the server that contains the Backpage

5   e-mails of Bienert, because we need to look at the server that

6   contains the e-mails of Bienert, or if they got it from

7   discovery subpoena produced on, you know, ACME Company, that's

8   why we can't -- so there are two steps to this.  One is being

9   able to identify where the document is in our discovery so we

10  can look at it and figure out what it is, and two is to be able

11  to understand where it comes from so we can figure out how we

12  go about looking into it.

13          So, for example, of course, Your Honor, if we get one

14  e-mail, there could be 10 or 15 other e-mails that are related

15  to that e-mail and give it context.  And so I'll give you an

16  example of the troubles we're having.  One of the few times

17  where I think they at least facially give a descriptor that

18  seems pretty detailed, it's the only batch of e-mails that, to

19  my knowledge, they're produced.  And there is an entry that

20  says, Carl Ferrer's, their main cooperator, the owner and CEO

21  of Backpage, Carl Ferrer's Google e-mails.  And when you look

22  at that, Your Honor, if you pull it up, there is a very large

23  number of them, tens of thousands, as I recall, but when you go

24  to try to look at them, we can't search because we don't have

25  the money for the Relativity and all that, but if you go and

1    look at them, it's as though somebody took pages and just

2    literally threw them up.

3            So the first e-mail might be whatever, a February 5,

4    19 -- 2014, e-mail, the next e-mail behind that will be a

5    December 31, 2015, e-mail, and the next one and so on and so on

6    and so on.  There is no rhyme or reason to the e-mails.  There

7    is no way that we can, other than literally looking at each

8    page, can look into this.  So I --

9            THE COURT:  Getting Relativity and using the search

10   terms.

11           MR. BIENERT:  Correct.  What we would want to do --

12   well, that's a funding issue, but assuming that we could afford

13   it, we would want -- all the discovery that comes in, we would

14   load into a big database that would get put in searchable

15   formatting and we would use search terms.

16           And I was going to make that point, Your Honor.  You

17   know, I'm an older guy now.  I've done a lot of these federal

18   cases.  And what we usually see, in fact, pretty well across

19   the board, is one of two things.  Either the government gives a

20   little more particularized discovery, a much smaller batch of

21   stuff that really does seem to be what they think is relevant

22   to their case, Brady material, Jencks material, or they give us

23   everything.  Here it is, it's all there, but it's done in a way

24   that you can, as a practical matter, look into it, because it's

25   not 10 to 100 million pages.

1          And in this case what's unusual, the government hasn't

2     gone in and, frankly, seized the funds of the defense that you

3     would use to do that after getting into the case.  And so what

4     I would say here is either the government needs to give us

5     specific discovery so we can meaningfully look at it, or they

6     need to give us detailed information so we know how to go find

7     things to at least get a leg up on the discovery, but then all

8     of this ties into -- and I don't -- it's a whole other issue,

9     we've briefed it, so I'm not going to get into it unless you

10    have questions of me -- then we get into the whole other issue,

11    which it is not appropriate, I would submit, for the government

12    to bury us in an avalanche of documents that by the time we're

13    done with will be 100 million pages, but then at the same time

14    be seizing all the money in a way that we think is illegal and

15    then not agreeing to have a hearing to address the legality or

16    not.  So that's the whole other side of where we are.

17              THE COURT:  Okay.

18              MR. BIENERT:  Thank you, Your Honor.

19              THE COURT:  Thank you.

20              MR. PICCARRETA:  Judge, may I say something?

21              MR. JONES:  Can I just respond briefly?

22              THE COURT:  Yes.  Let me just hear from him first.

23              MR. JONES:  Okay.  Sure.

24              MR. PICCARRETA:  I'm in a little bit different

25    position.  I represent Andrew Padilla who was an employee, a

1   salaried employee.  And in representing him, one of the

2   benefits of being an employee was receiving advancements for

3   attorney's fees.

4           THE COURT:  Right.

5           MR. PICCARRETA:  When we discussed this agreement,

6   there was no mention of the government to me that, oh, by the

7   way, the funds you're holding to defend the case, we will be

8   seizing in the future.  It was only after this agreement was

9   entered into that we had a discussion -- very cordial,

10  exchanged letters -- I presented my position as to why they

11  were non seizable, they presented their position, and then

12  radio silence for months.

13          After there is litigation, then they -- they put the

14  seizure warrant which changed the landscape.

15          THE COURT:  Okay.

16          MR. PICCARRETA:  So I'm in a position where entering

17  into an agreement with funds, not enough for Relativity unless

18  we went into other areas, but funds to defend, and now none.

19  And for the last five months not only don't we have funds for

20  Relativity or to look at the documents or really defend, we've

21  been in collateral deficit.

22          So the Court understands, this agreement was entered

23  into prior to decisions being made that were very successful

24  strategies but have essentially made me, for the last five

25  months, not receiving any funds don't we have to do -- but no

1    funds to even delve into what we have so far, so that's a

2    particular difficulty that Mr. Padilla is experiencing with the

3    seizures, apart from subpoenas for my operating account which

4    contains checks from all my clients.  So there has been a

5    change in the landscape since this case began that has,

6    essentially, stolen from Mr. Padilla, not so much the money,

7    but five months of our time and continuing until that issue

8    gets resolved.

9            THE COURT:  Okay.

10           MR. JONES:  Just briefly, Your Honor.

11           THE COURT:  Mr. Jones.

12           MR. JONES:  I wanted to briefly address a couple

13   points that defense made.

14           First, Your Honor, I just wanted to make sure the

15   record is clear that the government has provided the defendants

16   with discovery in the exact same format as it was provided to

17   us.  We've given it to them in the exact same format, Your

18   Honor.

19           We've also, as Your Honor notes, we've given them a

20   witness list, as well as an exhibit list more than ten months

21   before trial that we'll continue to periodically update, Your

22   Honor, and provide them as well.  And we will provide them with

23   Bates numbers for each of our exhibits in our case, Your Honor.

24           But just so we're clear, Your Honor, more than

25   80 percent -- the vast majority of all of the government's

1   exhibits in this case are documents that the defendants

2   provided to us, Your Honor.  They talk about this USA O 108

3   subpoena, Your Honor, the defendants provided these documents

4   to us as part of the grand jury litigation as they were

5   compelled to by the Arizona District Court.  Not only have they

6   provided these documents to us, they provided these documents

7   to the U.S. Senate as part of this investigation into Backpage

8   for knowingly facilitating sex trafficking in 2016, Your Honor,

9   so they have been in possession of these -- the vast majority

10  of our exhibits for at least the past two-and-a-half years,

11  Your Honor.

12          THE COURT:  So you don't have a problem giving them

13  the Bates numbers for the exhibits?

14          MR. JONES:  Correct.  We will do that, Your Honor.

15          THE COURT:  Okay.  And then my understanding of the

16  disclosure, and I wanted to clarify with you, is that you guys

17  disclosed stuff, even stuff you might not use at trial, and

18  then the hot docs, that you label hot docs are things that you

19  think are important and want to highlight for them, correct?

20          MR. JONES:  The hot documents are documents

21  specifically related to the allegations in the superseding

22  indictment.  The 90-page superseding indictment, Your Honor,

23  any e-mail, any document referenced in the superseding

24  indictment, we provided them as hot docs, as well as some other

25  documents as it pertains to the government's key evidence in

1    the case.  We provided them with these, approximately, 1,500

2    pages, will be about 18 months before trial, Your Honor.

3            We've also, as some of these defense counsel has

4    requested, Your Honor, they asked for us to segregate and

5    provide them subsets of the hot docs specifically related to

6    their client, and we have done this for defense counsel, as

7    well as offered to meet and have met with several of them and

8    participated in hour-long conference calls to discuss the

9    government's key evidence in the case and some of these hot

10   documents in great detail, Your Honor, as well as our theory of

11   the case.

12           THE COURT:  And let me see if I can find -- I'm not

13   sure I can find it, but there was something I recall in the

14   government's memoranda about access to the government's

15   discovery person.

16           MR. JONES:  Oh, correct.  Correct.  That's correct,

17   Your Honor.  We have offered to provide a Relativity or DOJ

18   support specialist to assist them with any technical issues.

19           THE COURT:  Okay.

20           MR. JONES:  And we -- at the outset of this case,

21   briefly after the scheduling order was set, we had an hour or

22   two conference call with our litigation support specialist in

23   D.C. with defense counsel to go over the Relativity and as well

24   as how discovery would, you know, would be produced, Your

25   Honor.

1          THE COURT:  Okay.  I just wanted to understand what

2     that person did, so that helps.  Thank you.

3          MR. JONES:  Thank you.

4          MR. WEISS:  May I just address the Court for a moment?

5          THE COURT:  Yes.

6          MR. WEISS:  Your Honor, Steve Weiss on behalf of Joye

7     Vaught, and very briefly.

8          She's, essentially, in the same position as

9     Mr. Padilla, an employee.  And when I got into the case right

10    around the time the indictment came down, I had no reason to

11    believe that any of the funds that were provided to me and put

12    in trust to defend Ms. Vaught would be seized by the

13    government, and, in fact, began working on the case for a

14    period of about seven to eight months.  And then in November is

15    when we were first notified that these seizure warrants were

16    issued.

17         We challenged that.  And I won't belabor the fact that

18    we challenged those in -- in Arizona -- we challenged them in

19    California, then we were told to come to Arizona to challenge

20    them, we were told, no, you've got to go back to California,

21    searching around for some jurisdiction, someone will lend us an

22    ear.  And they are, in fact, the issue about the fee seizures

23    are still before the magistrate judge in California.

24         But the point that I make is that we are without

25    funds.  My client is indigent.  We have provided information to

1    the Court under seal and we believe this is a clear violation

2    of the Sixth Amendment.  I just wanted to make sure the Court

3    understands that's Ms. Vaught's position.

4              THE COURT:  I do.

5              MR. WEISS:  Thank you.

6              THE COURT:  Okay.  So the government's going to

7    provide the Bates numbers, that will at least facilitate

8    finding the exhibits.

9              I also know that there was filed yesterday, or today,

10   a new motion to dismiss and a request for leave, but I have yet

11   to look at it, except I did see that the request for leave was

12   to file a 45-page motion, so I'll take a look at that.

13             Other than that, is there anything that anybody thinks

14   we could resolve today?

15             MR. LINCENBERG:  Your Honor, Gary Lincenberg for

16   Mr. Brunst.  There is one other point I wanted to raise on the

17   discovery issues.

18             We had learned, apparently, inadvertently, that the

19   government was looking to delay disclosure of Mr. Ferrer's

20   Jencks material.

21             THE COURT:  Yep.

22             MR. LINCENBERG:  And the Court ordered that it would

23   not be disclosed, now it would be disclosed by June 25th.

24             THE COURT:  Correct.

25             MR. LINCENBERG:  So in connection with that, since I

1    haven't seen the government's reasoning, I just wanted to bring

2    to the Court's attention a few factors that might affect

3    whether the Court would modify that.

4             THE COURT:  Would modify that order?

5             MR. LINCENBERG:  Would modify that order, for this

6    reason.

7             THE COURT:  No.  I've already read the response.  I've

8    already ruled.  So I'm not -- I'm not set for oral argument on

9    that.  I don't know why, other than to supplement the record,

10   which seems inappropriate to me.

11            MR. LINCENBERG:  Well, it's -- it's -- if I may

12   briefly?  I'll take less than a minute on this, Your Honor.

13            THE COURT:  Okay.

14            MR. LINCENBERG:  The -- the -- if the government is

15   not prepared to turn that over because of ongoing

16   investigations or whatever, that's fine.  We don't know what's

17   in their papers and so we can't comment on it, but there is a

18   lot of statements that were taken from Mr. Ferrer before the

19   original indictment.  And it may be that there is no reason to

20   delay turning over those statements.  And those statements, I

21   would presume, are going to be the most important evidence that

22   we see.

23            I am presuming that there is a lot in those statements

24   that would help index what documents are relevant and what the

25   government's twist is on those documents.  And in the context

1   of dates and trying to move the process forward with discovery,

2   and -- and the delays that we're already undergoing with the

3   servers and so forth, I just wanted to raise with the Court

4   that it may be that the Court could slice the baby here and

5   that there may be some Jencks material that there is no reason

6   to delay it.

7           THE COURT:  I thought you raised that in your

8   response.

9           MR. LINCENBERG:  I don't think we did.  I mean, even

10  in terms of --

11          MR. RAPP:  Judge, maybe I can short circuit this.

12          THE COURT:  Sure.

13          MR. RAPP:  If I understood counsel, he's saying that

14  there were statements taken from Mr. Ferrer prior to the first

15  indictment?

16          MR. LINCENBERG:  Prior to the ultimate superseding --

17  the indictment that we're facing, the superseding indictment in

18  July of 2018.

19          MR. RAPP:  I misunderstood.  There were no statements

20  taken before the first indictment.

21          MR. LINCENBERG:  But it sounds like there were prior

22  to the superseding indictment that we're operating under.

23          And for the Court's benefit, what Judge Logan had told

24  the parties a year ago, told the government that if you're

25  going to supersede, it needs to be done by such and such a

1   date, I think it was July, the government met that date, so

2   there should be no further superseding indictments in this

3   case.

4           THE COURT:  Okay.  I understand what you're

5   requesting.

6           MR. LINCENBERG:  Thank you, Your Honor.

7           THE COURT:  Thank you.

8           Did the government want to put anything on the record

9   about that?

10          MR. RAPP:  No, Your Honor.

11          THE COURT:  In as much as that was an oral motion to

12   reconsider the Court's ruling, that motion is denied.

13          If there is nothing else in general, then I'll take up

14   Mr. Lacey's motion to modify release conditions, and whoever

15   wishes to leave may or you can stay.

16          MR. BIENERT:  Your Honor, may I just ask one

17   clarification, because -- and I realize I think we started

18   talking about something else and Your Honor was -- a little

19   while ago I thought you started to say something about, well,

20   should we -- making a reference to dates in light of the fact

21   that we still were trying to get more information from the

22   government on when they could get certain things.  I just

23   didn't know if it was your intention, because obviously this is

24   a status conference, but we do at least ask at the end that we

25   consider taking some things off calendar until we know more

1   about discovery.  So I didn't know if Your Honor was intending

2   to make a ruling on that, whether you want us to address it

3   orally, or are you just going to do it on the papers, or there

4   would be no, in essence, order coming forth with -- regarding

5   scheduling.

6            THE COURT:  My -- I guess I didn't finish my

7   statement, but I think it's premature for the defense to ask me

8   to move these deadlines, or at least it's premature for me to

9   move them.  At this point, I'm not sure I agree with the

10  defense characterization of how much discovery has been

11  disclosed versus how much there is to disclose that is actually

12  relevant.  I understand that there is a lot out there, but I am

13  not clear on how much the defense actually has to look at or

14  needs access to, which I think had to do with the discussion

15  about the servers.

16           MR. BIENERT:  That's certainly a big part of the

17  server issue, yes, Your Honor.  Just as a practical matter,

18  though, there are other dates.  So I think, for example, under

19  the current schedule, on, I think it's 7-1, so that's July 1,

20  is defense preliminary exhibit and witness list, substantive

21  motion deadline at July 15th, and there are some dates that go

22  from there.  I mean, I can say to Your Honor we don't believe

23  we should have to be considering a motion deadline in a couple

24  of months when we don't have all the government's discovery, or

25  know what we have and don't have, which I assume at a minimum

1    we would be entitled for the government to give us some

2    descriptors of what's in the things they didn't give us so we

3    can at least have something to address as to whether we have a

4    reason to need it or not.

5             And, similarly, I can't begin to do an exhibit or

6    witness list when I haven't gotten through the discovery and we

7    haven't gotten a lot of the discovery yet.  We, obviously,

8    don't have Jencks materials -- this part is all in the papers,

9    I'll just hit the highlights -- but Jencks materials, we don't

10   have e-mails of our clients and other people other than

11   Mr. Ferrer.  There are many things we don't have that I would

12   submit are sort of basic things we're entitled to get before we

13   have to make the strategic decisions of identifying witnesses,

14   exhibits, and finalizing all of our motions.  And so I'm a

15   little concerned about the July 1 and July 15 dates given where

16   we are on discovery.

17            THE COURT:  Well, there is some wiggle room in this

18   scheduling order that Judge Logan signed because your trial is

19   not until January, but he has your final pretrial management at

20   the end of September, which leaves some leeway in there.  But

21   it's -- I think your latest request for a four-month stay in

22   all of the -- or a four-month move in all the deadlines,

23   right --

24            MR. BIENERT:  Yes, Your Honor.

25            THE COURT:  -- which was initially denied by Judge

1      Logan, but now you're saying, given the status of the servers,

2      you want it moved again?

3              MR. BIENERT:  Correct, Your Honor, but I also just --

4      and I don't know if it's something you want us to kind of wait

5      and see what happens in the next few weeks with discovery and

6      then we submit something to you, but I am just flagging that I

7      believe in the current state of discovery I don't believe I can

8      adequately represent my client such that I can identify the

9      exhibits and witnesses by July 1 or know that I'm in the

10     position to decide all motions we should bring and file by

11     July 15th.  Although, as you've seen, we've filed some, and

12     there are others that we likely would file, and there are

13     others we don't even know whether we can because we need to

14     understand the discovery better to do that.

15             THE COURT:  So why don't we do this, because I --

16     there is too many of you to do a telephonic conference.  I

17     don't really want to drag you all in just to say, where are you

18     with the server discovery?  Have you gotten them from

19     Amsterdam?  Why don't you, by June 1st, submit a statement

20     about the status of the servers and -- well, the Jencks stuff

21     -- well, my understanding is the government was going to

22     disclose other Jencks material, it was just the delay for the

23     one witness, right?

24             MR. JONES:  And we have, Your Honor, other than Carl

25     Ferrer.  They've already been disclosed.

1          THE COURT:  Okay.  And then in the defense status

2     report you can put your request for the deadlines and the

3     government can put their request, or just an objection, we want

4     everything to stay the same, and then we can go from there.

5          MR. BIENERT:  Thank you, Your Honor.

6          THE COURT:  Okay.  Thank you.

7          Yes, sir.

8          MR. CAMBRIA:  Good afternoon.  Paul Cambria on behalf

9     of Mr. Lacey who is present here, Your Honor.

10         THE COURT:  And, just to add, for the record, I read

11    the motion and the following pleadings and then I did get an

12    abbreviated violation report -- did you get that -- filed --

13         MR. CAMBRIA:  Yeah, we did.

14         THE COURT:  -- April 17th?

15         MR. CAMBRIA:  We did.  But, with regard to that, Your

16    Honor, that was more of a technical thing.  And I think it's

17    clear that the -- the officer, Mr. Lauby, who is here today,

18    did not recommend that anything change status wise.  That was a

19    situation where, apparently, and I'm not familiar with the

20    county, but there is an area where you can't tell that you've

21    crossed the line at the county, and that's where they were.

22    And I think that was understood.  And from what I've seen of

23    that report, there wasn't any action to be requested.  And,

24    more importantly, we have, through Ms. Cook, confirmed through

25    the probation officer, pretrial officer, if you will, that he

1    has no objection to this monitoring being lifted.  And I think

2    that's very important for a number of reasons.

3           First of all, he's had over a year's experience with

4    my client.  The first thing that the government says is, well,

5    you know, you can't change or remove one of these.  Well,

6    clearly the statute, under (c)(3), makes it clear that you can

7    change the requirements at any time.  There is no issue about

8    that.

9           And we actually cited for you the Gourley case, where

10   the government's point about, well, this is another detention

11   hearing, there has never been a detention hearing.  Originally,

12   as in that Gourley case, there was never a hearing.  There was

13   never a finding.  There was, at the time, an agreement with

14   regard to the bail.  What we didn't realize was we were told

15   that this bracelet, if you will, was waterproof, that you could

16   shower in it and so on.  And my client assumed that he would be

17   able to submerge it, if you will, and it turns out that that's

18   not true.

19          And so we, obviously, have accessed the officer,

20   Mr. Lauby, and he indicates that he has no objection to this.

21   And I think that it's important because the original bail is

22   certainly more than sufficient, the million dollar bond, the

23   two properties, the removal of a passport.  And coupled with

24   the fact that we're talking about a 70-year-old individual who

25   is ensconced in this community and has been for years, recently

1    married to a lady who is also ensconced in the community, the

2    last thing that Mr. Lacey would do is not show up in this

3    courtroom.

4         He has spent his life defending his principles under

5    the First Amendment.  This is a, if you will, a groundbreaking

6    case, Your Honor.  This is a unique case.  There has been no

7    prosecution like this prosecution ever in the past.  There has

8    never been an attempt to apply the Travel Act to First

9    Amendment activities, especially a third-party platform.  That

10   has not happened.  A couple of cases that the government cites

11   are cases where the First Amendment wasn't even in issue.  This

12   is a one-of-a-kind case.

13        We did file today a motion to dismiss.  In that motion

14   -- I'm not going to get into the motion, but I'm saying in

15   there there are a number of cases and other things that

16   indicate the unique nature of this client -- of this case.

17        Now, how is that relevant to my client?  He has spent

18   his life defending the First Amendment.  He is an award winning

19   nationally -- a Pulitzer prize winning editor and writer, an

20   individual who in the past was the subject of an unlawful

21   arrest by the prior sheriff where that was litigated and he was

22   here and he was part of that.  And he would never be anything

23   but part of that.

24        And this case is a groundbreaking case, Your Honor.

25   The last thing he would do is give up every asset that he has

1     and give up every piece of property that he has and all of his

2     connections to the community and everything that he's been a

3     part of in this community and not show up at this courthouse to

4     be part of this and to defend his rights and the rights of

5     others under the First Amendment.  It just isn't something that

6     would happen.

7          And I think that the government first says, oh, well,

8     there aren't changed circumstances.  That assumes that there

9     was a detention hearing.  There wasn't.  The Gourley case which

10    I cited to you makes it clear there was none.  But assume there

11    was, we do have changed circumstances.  We have a whole year of

12    a federal officer who is very experienced in handling

13    individuals who are out on bail, who is saying to the Court,

14    I've monitored this person, I have dealt with him with regard

15    to his expenses and his travel and all the rest of it, and I

16    don't object to removal of this bracelet.

17         I mean, we have a 70-year-old person here who has used

18    swimming, if you will, as his way of keeping healthy.  You

19    know, he has hip problems and knee problems, all the rest of

20    the things that happen to people who are of that age, and I'm

21    not trying to sleight anybody who is in their seventies, since

22    I am, but it seems to me, Your Honor, that we have satisfied

23    all of the various requirements under the statute, under 3142.

24         Now, the government, two things that they say.  The

25    first one is they say there is this 16-and-a-half million

1    dollar account, if you will, overseas.  And they say we haven't

2    been able to locate that.  I find that to be just unbelievable.

3    And here's the reason.

4         First of all, they have four separate seizure orders

5    on that account.  They have an administrative one, they have

6    two in court, they have civil.  In addition, they have the

7    trust.  They have what -- we gave them a copy of this -- it's a

8    trust for my client's sons.  It was established when there were

9    no charges pending in this case or in the state case, when

10   there were no restrictions on the utilization of this money to

11   establish a lawful trust.

12        In addition, the IRS requires that certain documents

13   be filed when a trust like this is established overseas, so-

14   called FBAR records.  All of those were filed with the IRS. My

15   client did all of this open and above board at a time when

16   there were no charges, through attorneys, exactly the way it

17   should be.  For the government to say we haven't been able to

18   locate something, which I gave them a copy of, they subpoenaed

19   from the lawyer who made it, and we have a document that we

20   gave the IRS completely disclosing it, is -- is something that

21   I just don't understand.  And that is one of their allegations.

22        There is no passport that my client has.  He is not

23   someone who is going to be able to go somewhere and access this

24   money.  They have four, as I say, separate attempts to seize

25   these funds.  They clearly know where they are.  They've

1   clearly located them.  And all of the records have been filed

2   as they should have been with the IRS with full affirmative

3   disclosure by my client in lawful channels.  This is lawful

4   money set up as a trust for his sons.

5           The other thing is that -- the last thing that they

6   say is that they say their case is stronger now for my client.

7   Well, first of all, the Ninth Circuit has indicated in the case

8   which is called Motamedi, M-O-T-A-M-E-D-I, that the so-called

9   strength of the evidence is the weakest and least considered of

10  the various categories under 3142.  There is a reason for that.

11  Because to try to come into court and argue about the strength

12  of evidence is contrary to the presumption of innocence, and so

13  that's why that particular requirement, if you will, or

14  consideration, is considered to be the weakest of all.

15          And, in addition to that, Your Honor, the case against

16  my client has gotten no stronger.  In the motion to dismiss,

17  which you'll have the opportunity to look at, the law is as

18  clear as clear can be.  There has to be a specific intent,

19  there has to be specific knowledge of a specific ad, and there

20  has to be specific conduct to carry forth a crime.  The Gibson

21  case which is cited in that memo says so.

22          This case, where the motion that we filed challenges

23  the very sufficiency of the indictment because there is no

24  specific ad identified as to any specific defendant with any

25  specific allegation of assisting, if you will, in the Travel

1    Act, under the Ninth Circuit law as it's established.  So when

2    you look at the cases like the Motamedi case that I suggested,

3    there the Ninth Circuit said, the government claims it's a

4    strong case; on the other hand, the defense has a number of

5    allegations which challenge that, so it's neutralized and it's

6    out.  And that wouldn't be an overriding factor anyway.  It

7    would never override all the other factors, which is, you know,

8    connection to the community, no passport, pretrial services

9    officer's indication that he has no problem, that would not

10   outweigh all of these other conditions, if you will, that my

11   client clearly satisfies.

12          The last thing that he's going to do is not be here to

13   defend this case.  This is a groundbreaking First Amendment

14   case.  We are convinced that the government does not understand

15   what the First Amendment law is, and that's been spelled out in

16   that motion that we filed, which, clearly, I think is

17   compelling.

18          So, bottom line, we don't need a bracelet, if you

19   will, most respectfully, on my client to have enough conditions

20   that are already in place to assure that he is going to be

21   here.  They've had random tests.  He's passed all the tests.

22   We have no issues on the part of the pretrial services officer.

23   And the last thing my client is going to do is give up every

24   asset he earned in his entire life and every piece of property

25   and his family and every other connection.  This is a person

1    who has been ensconced in this community as a philanthropist,

2    as a force, if you will, with regard to the truth.  He has

3    stood up in the past in the face of being wrongfully arrested,

4    and he clearly would do the same now.

5         And so I submit to you that it's reasonable to remove

6    that one, if you will, requirement of this bracelet so he can

7    go about exercise and so on.  We submitted a doctor's letter.

8    It's clearly something that's relevant.  And, frankly, I don't

9    think it's, you know, unreasonable for us to make that request,

10   given all the circumstances and what the law is with regard to

11   so-called strength of the case and the ability to change the

12   conditions, so I submit, Your Honor, that it should be

13   released.

14        THE COURT:  Okay.  Let me ask you.  This really boils

15   down -- I have the letter from the doctor -- and it really

16   boils down to the fact that your client wants to swim.

17        MR. CAMBRIA:  For exercise and it's really important

18   for him, because, as the doctor indicates, his -- there is a

19   history there of cardiac issues in the family, that he's

20   gaining weight and other things.  This has been the exercise

21   that helps him, you know, stay healthy so that he can come in

22   here and defend this case.

23        THE COURT:  But the letter doesn't say that's the only

24   thing he can do.

25        MR. CAMBRIA:  I'm sorry?

1          THE COURT:  The letter doesn't say that's the only

2     thing he can do, it's just that that's the exercise he seems to

3     enjoy and participate in on a regular basis.

4          MR. CAMBRIA:  That is the exercise that works for him.

5     And, as I've indicated, he's a 70-year-old man, he has, you

6     know, issues with knees and other things.  And that is, again,

7     it boils down to is that a necessity to have him come here to

8     court.  And I submit there is so much at stake for him that the

9     last thing he would do is not be here.

10          THE COURT:  Okay.  Thank you.

11          MR. CAMBRIA:  Thank you.

12          MR. RAPP:  So how is this any different than

13     Mr. Larkin?  Mr. Larkin made the same request.  Actually, his

14     request was for him to travel to San Francisco.  He wanted his

15     ankle bracelet off.  We went back in front of Judge Bade and

16     Judge Bade found that, look, you entered into this agreement

17     with these conditions, now you're just sort of coming back and

18     wanting a do over.  This is the same situation.  Actually,

19     Mr. Larkin's was actually a little bit more compelling.  But I

20     think my counsel for defense misunderstands the posture of

21     pretrial's recommendation.

22          First of all, pretrial never recommended electronic

23     monitoring when he was arrested.  They actually -- if you look

24     at the pretrial service report, they just add some conditions

25     to secure his attendance.  We filed a detention motion and said

1    we want a detention hearing.  And the defense said, you know

2    what, we don't want a detention hearing.  They filed a

3    response:  We would like to agree to a certain package of

4    conditions.  Okay.

5          They came to us with some property.  Some of the

6    property is what we believe is traceable to tainted funds.  We

7    allowed them to use it even though we are also simultaneously

8    seeking to forfeit it, but the ankle bracelet was an important

9    and material condition to that release.

10          So there are no changed circumstances.  And Mr. Lauby

11   is here.  He's not going to say that he called up the defense

12   and said, you know, I really don't think an ankle bracelet is

13   necessary.  He's not going to say that.  All he said was, look,

14   if you file the motion, I won't object, but there is no changed

15   circumstances in this case.

16          With respect to the $16.5 million that the defendant

17   first went to a bank officer and said, look, I need to move

18   money offshore, how can I do that, I don't want the government

19   to get to it, and then hired an attorney and said I want to use

20   your IOLTA account to funnel the money offshore, we don't know

21   where that money is.  I know that the defense thinks that we

22   can find money all over the world, we try our best, but in this

23   case we don't know where that money is.  We have used what's

24   called a Mutual Legal Assistance Treaty through Hungary to try

25   to see if we can find out where it is.  The receipt that we

1   have received from Hungary, compliance on that MLAT does not

2   demonstrate where that money is.

3           Even in advance of counsel filing this motion I said,

4   well, you know, why don't you tell us where that money is?

5   Tell us exactly what account it is in.  Nothing.  So we don't

6   know where that money is, but definitely their position on that

7   $16.5 million has evolved.  If you look at the pretrial service

8   report, Document 29, he tells the pretrial service officer that

9   he has $16 million in Europe, but he doesn't breathe a word

10  about the trust.  The defendant informed he has a total of

11  $16 million in funds throughout Europe.  That's what he says in

12  his pretrial service report.

13          Then when you get into -- when he starts setting up

14  this trust, he says in his pleadings, the creation of the

15  foreign trust does not violate any law.  Well, it does if

16  you're trying to obstruct or conceal the money.  In this case a

17  grand jury found that this transaction did violate the law.

18  It's section -- or paragraph 16 of the superseding indictment.

19          He also says, shortly after forming the trust,

20  Mr. Lacey declared it in a filing with the IRS.  Well,

21  according to the documents they provided, at least the best way

22  we can read it, they only filed an extension on March 7th of

23  2018.  The extension does not say anything about trust or about

24  the foreign transactions, it only asks for a delay in filing.

25  All other dates in the reciprocal discovery shows filing dates

1    are post superseding indictment.

2          So we filed a superseding indictment.  Paragraph 16

3    lays out this transaction where he uses his attorney to funnel

4    the money overseas.  He then says, subsequently we filed the

5    report of a foreign bank and financial account, this is

6    commonly known as the FBAR, which identified the bank, trustee

7    and other information on the trust, and included a copy of the

8    trust.  According to the thin scent and the records the defense

9    provided, this was filed in September 2018 post superseding

10   indictment.  We don't know where this money is, so that gives

11   us some concern.

12         Now, with respect to the defense's arguments regarding

13   the strength of the evidence, we agree that under Motamedi

14   that's the least important factor, but in this case, the

15   defendants -- the evidence against the defendant has increased

16   substantially, gives him a motivation to flee.

17         They argue that they've litigated cases to their

18   conclusion, not -- not exactly.  They've settled cases for

19   millions of dollars with underage victims.

20         With respect to some of these cases that they've been

21   sanctioned on, this is the one in Washington State and the

22   Northern District of Illinois, sanctioned for misleading the

23   Court.  And so the defense is being disingenuous when they say

24   in the Northern District of Illinois case, well, that was just

25   Backpage being sanctioned, but the defense knows that the money

1  flowing to these attorneys came from Backpage funds, and he

2  stood silently by while the attorneys on his behalf were

3  misrepresenting the business practices of Backpage.

4         We have again and again in correspondence and

5  pleadings before this court laid out certain internal business

6  practices, their financial relationship with the Erotic Review,

7  no response.  Yesterday I filed a 45-page motion to dismiss,

8  they don't respond to that.  They don't respond to the

9  affiliate program where they packaged up bulk postings from

10  prostitutes and were giving preference to a self-described

11  super pimp by the name of Dollar Bill.  They don't respond to

12  that.  They don't respond to our arguments about the moderation

13  practices where they removed terms indicative of child sex

14  trafficking, like Lolita, Amber Alert, Sweet Young Thing, New

15  in Town, and then continue to post the ads.  They don't respond

16  to that.  They didn't respond in their papers to this Detroit

17  murder, which clearly Mr. Lacey understood was a result of the

18  postings on Backpage.  So there has been many an instance where

19  this defendant has misrepresented the business practices of

20  Backpage to numerous courts.

21         He even has such a disdain for the truth that in his

22  own public comments on this case in this online paper he has

23  called Front Page Confidential, Mr. Backpage -- Mr. Lacey,

24  rather, says, finally, the prosecutors told the judge they

25  needed to delay the trial until January of 2020.  I mean,

1    that's just a demonstrably untrue statement.  Mr. Lacey knows

2    that it was his own attorneys who wanted to delay the trial in

3    this case.  And, of course, they've already been sanctioned by

4    courts for obstructive and delaying tactics.  That's just an

5    untrue statement that he has made publically.  So one would

6    question Mr. Lacey's credibility, and that's the key to his

7    compliance with these release conditions.

8            Other statements he makes, he has no control over

9    Backpage after the 2015 sale.  That is also demonstrably false.

10   He was meeting with many of the principles on Backpage and

11   fomenting the strategy for Backpage.  He knows that the sale of

12   Backpage was a sham, $600 million to Carl Ferrer so Mr. Ferrer

13   would pay him back all the proceeds.  So the weight of the

14   evidence is strong against this defendant.  He has an incentive

15   to flee.

16           He has money over in Europe that we don't know where

17   it's at.  He has other options, as the Court has pointed out,

18   for aerobic, I guess, activity.  He can walk.  He can use a

19   treadmill.  I know that when we first arrested him, it was an

20   issue about his use of alcohol and marijuana.  He did have a

21   DUI.  He said that he consumed three glasses of wine.  On

22   April 5th, he consumes two glasses of wine four times weekly.

23   He uses marijuana twice monthly.  I mean, these are things that

24   he can modify to assist in his health concerns, but he has

25   other things available to him to address this concern.

1          The ankle bracelet was a key and important condition

2   that he agreed to.  There has been no change of circumstances.

3   There wasn't any -- the circumstances at the time that he was

4   arrested was pretrial was recommending release, we agreed to

5   this.  The pretrial officer is not saying now that he is urging

6   and believes that the ankle bracelet is no longer appropriate,

7   he's not saying that, and so, for that reason, it should be

8   denied.

9          THE COURT:  Okay.  I have a couple of questions.

10          MR. CAMBRIA:  May I just respond?

11          THE COURT:  Wait.  I have some questions for Mr. Rapp.

12          MR. CAMBRIA:  I'm sorry?

13          THE COURT:  I have some questions for Mr. Rapp.

14          MR. CAMBRIA:  Oh, I'm sorry.

15          THE COURT:  I was trying to pull it up, but it's

16   probably easier just to ask you.  Right now he's apparently

17   able to travel because he just went to Hawaii?

18          MR. RAPP:  Yes.

19          THE COURT:  Do theses conditions say that the

20   probation officer approves that?

21          MR. RAPP:  Yes.

22          THE COURT:  Okay.  And where is his passport, because

23   there was an issue with them saying that the California court

24   gave it back to him so that he could go to Mexico.  I think

25   that might have been before this case was --

1              MR. RAPP:  It was.

2              THE COURT:  -- charged.  So does Arizona have his

3     passport or California, do you know?

4              MR. RAPP:  We have the passport.

5              THE COURT:  We have the passport.

6              MR. RAPP:  Yeah.

7              THE COURT:  Arizona has the passport.  Okay.

8              And I understand from reading the transcript from

9     Mr. Larkin's hearing that there is a difference between the

10    monitoring of the bracelets, one is a constant GPS monitoring

11    but it's only through Maricopa County, and then I'm not sure

12    what the difference is.

13             Do you know what his monitoring is, what

14    Mr. Lacey's --

15             MR. RAPP:  I presume it's the precise same monitoring,

16    because, as the Court knows, they both went to this casino

17    that's outside of Maricopa County.  They both -- they both

18    received alerts and both contacted Mr. Lauby, so I think that

19    is evidence that they have the same type of monitoring.

20             THE COURT:  Okay.  All right.  The pretrial services

21    officer is here, you said?

22             MR. RAPP:  He is.  Yes.

23             THE COURT:  So, Mr. Cambria, I'm going to have -- let

24    you have the last word, but I just have a question for the

25    probation officer.

1           Could you come up?

2           Thank you, sir.  Could you state your full name.

3           MR. LAUBY:  Yes.  Justin Lauby, J-U-S-T-I-N,

4    L-A-U-B-Y.  I serve as an intensive supervision specialist with

5    the United States Pretrial Services here in the District of

6    Arizona.

7           THE COURT:  Okay.  So is his bracelet GPS monitored?

8           MR. LAUBY:  Correct, it is GPS.

9           THE COURT:  But only within Maricopa County?

10          MR. LAUBY:  No.  Like, when he traveled to Hawaii, I

11   could map him at any time.  There are a few locations within

12   the United States, because it's based on cell coverage, where

13   there are issues.  Even in northern Arizona we have GPS issues.

14   But, yes, as long as there is adequate cell coverage, then the

15   GPS points work anywhere in the world.

16          THE COURT:  And what happens if he cuts it off?

17          MR. LAUBY:  We would be alerted instantly that the

18   strap had been cut.

19          THE COURT:  And you would be able to tell his last

20   known location before he cut it off?

21          MR. LAUBY:  Yes, we get the last point.  I mean,

22   wherever that -- the bracelet will still give GPS points, so

23   even when you cut it off, we would still know where it was.

24          THE COURT:  Thank you.

25          MR. LAUBY:  No problem.

1          MR. BIENERT:  Your Honor, Thomas Bienert.  I just want

2    to clarify something.  I don't believe Mr. Rapp was suggesting

3    this way, but I don't want Your Honor to be confused.

4          He made reference to a detention hearing of

5    Mr. Larkin, which I handled.  I just want to make clear,

6    because I don't want Your Honor to get the wrong impression,

7    and I think in fairness to Mr. Cambria, when we had the

8    detention hearing, the judge said, come back after more time

9    has gone by, like six months or more, and maybe I will

10   reconsider.

11         THE COURT:  I read the transcript.

12         MR. BIENERT:  So I just didn't want to suggest that

13   they were saying you can't ever come back.

14         THE COURT:  No.  I understood that, because I think it

15   was -- I think it might have been Mr. Cambria who said, well,

16   that was only six or seven weeks after the first -- the first

17   conditions were set, and Magistrate Judge Bade said, yeah,

18   essentially.

19         MR. BIENERT:  Right.  It was too soon, in essence, is

20   what she said.

21         THE COURT:  Okay.

22         MR. CAMBRIA:  Couple of things.  Originally the, at

23   that time, pretrial services officer, Mr. Lauby, recommended OR

24   for my client.  We then had this discussion.  As I say, we

25   thought that this thing was waterproof and it wouldn't be an

1     issue.

2            As far as identifying the account, the pretrial

3     officer has the bank account number.  He has that information.

4     We -- when we -- the reason that the FBAR was delayed is the

5     lawyer who handled that at the time is the one who delayed it.

6     It wasn't anything on the part of Mr. Lacey.  It was filed

7     appropriately, timely.  It clearly identifies everything.  We

8     have no problem identifying -- and I cannot believe that the

9     government says they do not know where this money is or what

10    the number is on the account.  I do not believe that.  But we

11    have no problem sharing that.  We already shared it with the

12    pretrial officer.

13           And this statement that my client in some way was

14    involved in the sanctions situation.  My client had no

15    statements in that lawsuit.  He took the Fifth Amendment in the

16    second lawsuit.  And there is no way that any of those

17    sanctions could be based on anything that my client did or

18    said.  And so the government takes liberties with the truth

19    here with regard to my client and this so-called sanction

20    situation, Your Honor.  He had no part of that.  There is

21    nothing that says that he misled the court.

22           There was -- there is litigation going on, civil

23    litigation and so on, he wasn't part of it as somebody who made

24    any representation.  And so for them to say that, I just don't

25    understand that.

1            And the part about not knowing where the money is,

2    we -- we gave them a copy of the trust.  They have a copy of

3    the trust.  It was part of our filing for our exhibits

4    according to the schedule.  We filed the FBAR and we filed the

5    trust.  We filed everything.  They have it all.  And they --

6    I've already not disputed the fact that they have four separate

7    opportunities, and they've tried -- not tried, but they have

8    filed four separate actions to seize this money.  They have had

9    a warrant.  They've had an administrative warrant.  They've had

10   a civil case.  They had a second warrant out of the Central

11   District.  So for them to make some claim here that in some way

12   they don't know where this money is or what the trust says or

13   anything else is totally just not true.

14           And the other part is, and they talk about, you know,

15   this -- the money in making the trust, there were no charges

16   pending against my client when he made this trust.  They've

17   never denied that because they can't deny it.  There was

18   nothing pending.  He is free to do whatever he wanted with that

19   money at that particular time, and he chose to have a trust for

20   his two sons.  So this is simply about whether or not we need

21   that to ensure his turning up in this courtroom.

22           Starting off with an OR recommendation, we now have a

23   million dollars, we have property, and we have no passport, we

24   have no ability to travel.  And, by the way, after these

25   charges were pending, he was allowed by the court in -- in

1    Sacramento to make a trip to Mexico.  He knew that this was

2    pending, that there was a superseding indictment in the wings

3    and so on, and he went to Mexico, came back, nobody had a

4    problem with that.  He's demonstrated now for a solid year that

5    he is someone that not only will show up, but you couldn't stop

6    him from showing up in this particular case because this is

7    what he is made of.  This is his fabric, this First Amendment

8    situation.

9           And, again, you'll have the benefit of reading all the

10   motion and all the cases we've cited, when they talk about

11   moderation, all of that, we addressed all that.  That's all in

12   that motion.  It's all addressed in there as to how this is

13   protected activity.  It is not evidence of guilt or evidence of

14   some kind of commission of a crime.

15          And, in addition, and you notice that there was no

16   statement by the government in any of their written papers that

17   they could ever identify a specific ad and say that my client

18   had specific knowledge of it and that he then took a specific

19   step to further some kind of crime by third parties who simply

20   advertised on a platform, because that's what the cases

21   require.  That's what the Ninth Circuit requires for the Travel

22   Act.

23          This is a special case, and the government has not

24   come to grips with the fact that it requires special scienter,

25   special knowledge and allegation of the same.

1              But, again, not to torture this, but if we look at all

2    the, if you will, the categories under 3142, my client fits

3    clearly into that and he's proved for an entire year that he's

4    responsive to all of this.  He just wants to be able to stay

5    healthy and keep himself healthy enough to defend this case.

6    It's a big deal, and it's the biggest deal of his life.

7              If you think about it, for him not to show up, he

8    would give up everything that he's ever achieved in his life,

9    every dime, every piece of property, every connection to this

10   community he would give up.  That's not about to happen, Your

11   Honor.

12             And I submit it is reasonable to withdraw this one

13   condition.  And I think it is important that the pretrial

14   services officer does not object to it, because if he thought

15   there was even a chance that that would make a difference, he

16   would be telling you that, and he hasn't said that.  So I think

17   that speaks volumes, a lot more than these other allegations,

18   especially the ones about sanctions which are untrue.

19             THE COURT:  Okay.  With respect to the motion to

20   modify release conditions, just a couple of comments.

21             One, I understand that the defendant may find it

22   easier to get his exercise by swimming, but it -- there is no

23   discussion about other activities, like biking, something

24   that's non -- that doesn't have the trauma of running, or other

25   exercise that could facilitate.  The government mentioned some

1    other steps the government -- or that Mr. Lacey could take to

2    take care of that issue, which is really the only basis for the

3    motion.  Other than that, you're relitigating everything that

4    was done at the original hearing.

5           I did consider, and I think your argument about the --

6    Mr. Lacey's ties to the community were the strongest for me to

7    consider this motion.

8           The Court also considered -- or doesn't find it very

9    compelling that he's complied with his release conditions over

10    the past year, because he's had a bracelet on.  It's not hard

11    for someone to comply with it when they know that they're

12    monitored and that the probation officer gets notified if he's

13    not where he's supposed to be.  I did consider whether or not

14    that added a whole lot given he doesn't have his passport, but

15    he does have to seek court approval to travel.

16           Whether or not the government knows where this money

17    is isn't really as important as the fact that there is all this

18    money, which makes the possibility of flight stronger.

19           So I'm denying your motion to modify release

20    conditions.  I don't think there is a compelling reason to

21    change what was agreed to at the beginning of the case.  So

22    that motion is denied.

23           I think that's it.  Is there anything else?

24           MR. RAPP:  Not from the United States.  Thank you.

25           THE COURT:  Thank you.

1          MS. HENZE-COOK:  Excuse me, Your Honor.

2          THE COURT:  Yes, ma'am.

3          MS. HENZE-COOK:  Your Honor, may I approach?

4          THE COURT:  Who are you?  Sorry.

5          MS. HENZE-COOK:  Janey Henze-Cook, Your Honor, and I

6  represent Mr. Lacey in a limited capacity.

7          At the end of the motion there was a paragraph about a

8  modification that the government does not oppose.

9          THE COURT:  You're right.

10          MS. HENZE-COOK:  I was just hoping that the record

11  could reflect that the Court -- if the Court is so inclined, to

12  allow us to lift the UCC filing so that he can move forward

13  with an interlocutory sale in the Central District of

14  California.

15          THE COURT:  Yes.  You submitted -- or Mr. Cambria, I

16  think, submitted a proposed order with the language, right?

17          MS. HENZE-COOK:  Correct, Your Honor.

18          THE COURT:  So on defendant's motion to amend his

19  conditions of pretrial release, it is ordered that the motion

20  is denied as to removing the condition requiring the continued

21  use of an electronic monitoring device.

22          The motion is granted modifying release conditions to

23  allow property bond, Document 65, to be replaced with

24  substitute res of the net proceeds from the interlocutory sale

25  of 1100 Union Street, San Francisco, California.

1          MS. HENZE-COOK:  Thank you, Your Honor.

2          MR. CAMBRIA:  Your Honor, may I have a word?

3          THE COURT:  Yes.

4          MR. CAMBRIA:  Your Honor, would the Court consider an

5   arrangement where Mr. Lacey could contact the probation officer

6   and maybe remove this for an hour or for 30 minutes or whatever

7   and then with a specific time to put it back on so that he

8   could take the swim?  And, I mean, if the period is short

9   enough, it's pretty impossible that he's going anywhere.

10          THE COURT:  Is that even feasible?

11          PROBATION OFFICER:  Not at all, Your Honor, because we

12   have to remove it.  I would have to go back and put it back on.

13   That would --

14          THE COURT:  Yeah, my understanding was that --

15          PROBATION OFFICER:  -- during the day.

16          THE COURT:  -- Mr. Lacey wouldn't be able to just do

17   that, that the probation department has to physically be

18   present to take it off, because I've had people who had to take

19   it off for medical appointments or something and it's a lot of

20   work.

21          MR. CAMBRIA:  Okay.

22          THE COURT:  Okay.  We're at recess.  Thank you.

23          (Proceedings concluded at 4:25 p.m.)

24                      *         *         *

25

```
1              C E R T I F I C A T E

2

3         I, CHRISTINE M. COALY, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7         I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 3rd day of May, 2019.

13

14

15
                    /s/ Christine M. Coaly_____
16                  Christine M. Coaly, RMR, CRR

17

18

19

20

21

22

23

24

25
```