Thomas H. Bienert, Jr. (CA State Bar No. 135311, *admitted pro hac vice*)
  tbienert@bmkattorneys.com
Whitney Z. Bernstein (CA State Bar No. 304917, *admitted pro hac vice*)
  wbernstein@bmkattorneys.com
BIENERT KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
Telephone: (949) 369-3700
Facsimile: (949) 369-3701

*Attorneys for James Larkin*

Robert Corn-Revere (D.C. State Bar No. 375415, *admitted pro hac vice*)
  robertcornrevere@dwt.com
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-3401
Telephone: (202) 973-4225
Facsimile: (202) 973-4499

James C. Grant (WA State Bar No. 14358, *admitted pro hac vice*)
  jamesgrant@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Ave, Suite 3300
Seattle, WA 98104-1610
Telephone: (206) 757-8096
Facsimile: (206) 757-7096

*Attorneys for Michael Lacey and James Larkin*

Additional counsel listed on following page

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>Michael Lacey, *et al.*,<br><br>　　　　　Defendants. | CASE NO. 2:18-CR-00422-SMR<br><br>**DEFENDANTS' SUPPLEMENTAL JOINT STATUS REPORT**<br><br>Date: June 24, 2019<br>Time: 11:00 a.m.<br><br>Assigned to Hon. Susan M. Brnovich, Courtroom 506 |

Paul J. Cambria, Jr. (NY State Bar No. 1430909, *admitted pro hac vice*)
  pcambria@lglaw.com
Erin E. McCampbell (NY State Bar No. 4480166, *admitted pro hac vice*)
  emccampbell@lglaw.com
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite #120
Buffalo, NY 14202
Telephone: (716) 849-1333
Facsimile: (716) 855-1580

*Attorneys for Michael Lacey*

Bruce Feder (AZ State Bar No. 004832)
  bf@federlawpa.com
FEDER LAW OFFICE, P.A.
2930 E. Camelback Road, Suite 160
Phoenix, AZ 85016
Telephone: (602) 257-0135
Facsimile: (602) 954-8737

*Attorneys for Scott Spear*

Gary S. Lincenberg (CA State Bar No. 123058, *admitted pro hac vice*)
  glincenberg@birdmarella.com
Ariel A. Neuman (CA State Bar. No. 241594, *admitted pro hac vice*)
  aneuman@birdmarella.com
Gopi K. Panchapakesan (CA State Bar No. 279586, *admitted pro hac vice*)
  gpanchapakesan@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

*Attorneys for John Brunst*

David Eisenberg (AZ State Bar No. 017218)
  david@deisenbergplc.com
DAVID EISENBERG, P.L.C.
3550 N. Central Avenue, Ste. 1550
Phoenix, Arizona 85012
Arizona State Bar No. 017218
Telephone: (602.237.5076

*Attorneys for Andrew Padilla*

Additional counsel listed on following page

ii

DEFENDANTS' SUPPLEMENTAL JOINT STATUS REPORT

Joy Bertrand (AZ State Bar No. 024181)
joyous@mailbag.com
JOY BERTRAND, ESQ.
PO Box 2734
Scottsdale, Arizona 85252-2734
Telephone: 602-374-5321
Fax: 480-361-4694

*Attorneys for Joye Vaught*

## I. **INTRODUCTION**

Defendants submit this supplemental joint status report to address discovery issues raised by the government's status report (Doc. 626) and to address new developments since Defendants filed their status report (Doc. 627).

## II. **DEFENDANTS' REQUEST FOR SPECIFIC DATA FROM BACKPAGE'S SERVERS AND SYSTEMS**

During the April 23, 2019, status conference, the government represented it would provide data from the Backpage.com servers and systems to Defendants upon request. *See* Transcript of April 23, 2019 Hearing, Doc. 577 at 24 ("Your Honor, but we went a step further. We said, hey, can you articulate to us what else on these servers that you would like extracted and we can look for it and provide it to you."); *see id.* at 25 ("We've asked them repeatedly, hey, is there anything that we haven't provided[?]").

On May 23, 2019, Defendants wrote to the government requesting 29 categories of data from the Backpage.com servers and systems (providing a justification for each request—even though under no obligation to do so). *See* Doc. 627-3. The government had not yet responded to Defendants' requests when Defendants filed their Joint Status Report on June 1, 2019 (Doc. 627), but did respond subsequently.

Despite the government's representations to the Court that it would extract information from the Backpage.com servers and systems if Defendants identified the information they sought, the government responded to Defendants' 29 requests by disclaiming any obligation to "identify this information . . . in the available discovery and provide the requested analysis of the servers." *See* Exhibit A, June 3, 2019 Letter from AUSA Rapp to W. Bernstein. Instead, the government offered to provide nothing to Defendants. For example:

- Defendants asked the government to extract information on the numbers of ads Backpage.com reported to the National Center for Missing and Exploited Children (NCMEC) or other law enforcement each month, and to provide copies of the ads reported. Doc. 627-3. This request was made because the government has not produced this information and/or has produced it in an unusable format.

The government responded saying (a) Defendants could review "the interviews of NCMEC employees" (which don't contain the requested information) and (b) "you are free to conduct your own analysis of the servers' data." Exh. A.

- Defendants asked the government to extract records and data documenting Backpage.com's cooperation with law enforcement authorities—such as subpoena responses, communications related to those subpoenas/responses, and testimony provided by Backpage.com at criminal trials. Doc. 627-3. This request was made because the government has not produced this information and/or has produced it in an unusable format. The government responded by disputing that Backpage.com cooperated with law enforcement, claiming "whether Backpage was sincerely cooperating with law enforcement is ultimately a jury question," and inviting Defendants to present any evidence they may have at trial. Exh. A.

- Defendants asked the government to extract data showing the numbers of ads Backpage.com hosted in each category (e.g., "buy/sell/trade," "jobs," "rentals," "adult," etc.) each month and for each subcategory within the "adult" category (e.g., "escorts," "massage," "dating," etc.), as well as data showing the revenues for ads in all categories and subcategories.[1] Doc. 627-3. This request was made because the government has not produced this information and/or has produced it in an unusable format. The government's only response was to dispute that Backpage.com hosted large numbers of ads in categories other than adult and to assert that most of Backpage.com's revenues came from adult ads. Exh. A.

- Defendants asked the government to extract data showing the number of ads Backpage.com blocked by category and subcategory each month—noting that

---

[1] Backpage.com was the second largest classified advertising website in the United States, "allowing users to post their own advertisements in a range of categories: local places, community, buy/sell/trade, automotive, musician, rentals, real estate, jobs, forums, dating, adult, and services." *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 813 (M.D. Tenn. 2013). "Users posted more than 3.3 million ads on the website in the month of April 2012." *Id.*

2

DEFENDANTS' SUPPLEMENTAL JOINT STATUS REPORT

Backpage.com blocked a large numbers of ads.[2]  Doc. 627-3.  This request was made because the government has not produced this information and/or has produced it in an unusable format.  The government responded saying "we do not agree with your position, but you are free to conduct your own analysis." Exh. A.

The bottom line is that Defendants articulated the information from the Backpage.com servers and systems that they wished for the government to extract, but the government has refused to look for that data or to provide it to Defendants.  Defendants expect to file a motion to compel the government to produce information to Defendants, including the information identified in their May 23, 2019, letter to the government.

### III. INFORMATION THE GOVERNMENT RECENTLY PRODUCED OR HAS YET TO PRODUCES

#### A. Bates Numbers for the Government's Exhibits

The government represented at the April 23, 2019, status conference that it would provide Bates numbers for all the documents on its list of potential trial exhibits.  The government provided Bates numbers for many of the exhibits on May 29, 2019, but has yet to identify the balance of the documents by Bates number—despite the passage of nearly two months since the April 23, 2019, status conference.  Further, the government's most recent exhibit list rearranged its ordering from the original exhibit list, rendering defense counsels' extensive work done off of the prior list useless.  The most recent exhibit list also added new exhibits, some of which the government has still not produced to defendants despite repeated requests following receipt of the new exhibit list.  Finally, the most recent exhibit list denotes exhibits 1062-1064, which are comprised of 141,226 pages of bank records.  Given the volume of records, defense counsel requested that the government identify the records that relate to the transactions underlying the money laundering counts alleged in the Superseding Indictment or

---

[2] "Through its monitoring, Backpage.com blocked or removed more than one million user submissions and reported approximately 400 submissions to the [National Center for Missing and Exploited Children] in April 2012." *Backpage.com, LLC v. Cooper*, at 814.

otherwise indicate the actual pages that the government intends to reference at trial. The government has yet to respond.

### B. Historical Archived Backpage.com Email

On April 23, 2019, the government produced to counsel for one of Defendants a hard disk containing a large volume of email that Backpage.com had archived. The government obtained the email in October 2018 and has not explained why it did not produce the emails by the government's disclosure deadline nor justified its six-month delay in producing the email to Defendants. Moreover, despite the government's repeated representations to the Court that it agreed to produce all documents in Relativity format, the government did not do so. Accordingly, Defendants have not yet been able to access the emails, but, based on information their IT consultant recently provided about the volume of data on the hard disk, Defendants estimate that the disk may contain several million emails comprising many millions of pages of data.

### C. Current Backpage.com Email

On March 8, 2019, the government produced to counsel for one of Defendants a hard disk containing Backpage.com's non-archived email. The government seized the server with these emails in April 2018 and has not explained why it did not produce the email by the government's disclosure deadline nor justified its eleven-month delay in producing the email to Defendants. Again, the government did not produce these documents in Relativity format. Thus, Defendants have not yet been able to access these emails and have asked their IT consultant to assess what is on the hard disk. As Backpage.com relied heavily on email for communication, Defendants expect the hard disk will contain hundreds of thousands (if not millions) of email comprising many millions of pages of data.

### D. Law Enforcement Cooperation Data

In its status report, the government disclosed that it seized a Backpage.com server containing "subpoena data preservation requests" (*i.e.* documentation of Backpage.com's extensive cooperation with law enforcement). Doc. 626-4 at 8. Defendants believe the government seized this data in April 2018. The government does not state that it has produced

this data to Defendants, and Defendants do not believe the government has done so. The government has not explained why it did not produce the law enforcement cooperation data by the government's disclosure deadline nor justified its delay of more than a year in producing these documents to Defendants. Defendants believe this data will be extensive given the history of Backpage.com's cooperation with law enforcement, and in light of the government's statement that the email data discussed immediately above and the law enforcement cooperation data are on a 120 Terabyte (120,000 Gigabyte) disk.

### E. Payment Processing Data

In its status report, the government said it expected to transfer Backpage.com's payment processing data from where it seized the data in Europe to the United States by no later than last week, and to produce that data to Defendants next month. It is unclear why it has taken more than a year for this data to come to the United States given the date of the government's seizures, and the government has not confirmed that it has actually even yet transferred the data to the U.S. As Backpage.com hosted hundreds of millions of ads over the years, with many of those ads being paid ads, Defendants expect the payment data will include tens of millions of records. In its status report, the government appears to admit that the data it proposes to produce to Defendants next month will not be in a usable format: "There was a way to associates ads or users with their related transactions in the PPI [Payment Processing Island], but details of how that worked are not readily available." Doc. 626-4 at 17. Defendants interpret this statement to mean that the government will produce records of tens of millions of payments, but that Defendants will have no ability to associate any payment with a particular user or a particular ad—meaning the data will be useless to Defendants.

### F. BDO Discovery

In its seventh disclosure, the government's cover letter stated that the "government has in its possession copies of tax returns and related transmittals prepared by BDO USA Consulting for Backpage and related clients." Doc. 627-5 at 22. The government stated that it would not share these documents with Defendants. *Id.* In order for Defendants to determine whether to seek access to these documents, defense counsel wrote to the government on May

13, 2019 requesting an index of the documents it was withholding. The government has yet to respond.

### G.   Ad Data

In its status report, the government states that, in March 2019, it produced to Defendants certain data related to the ads hosted on Backpage.com. The government seized this data in April 2018 and the government has not explained why it did not produce the ad data by the government's disclosure deadline nor justified its delay of nearly a year in producing the ad data.

Moreover, in its status report the government admits the ad data it belatedly produced is deficient. That is, the hard disk images the government has produced cannot be used to search or display ads and ad data in the manner that was possible before the government's seizure. Meaning, it is difficult or impossible for Defendants to find the data underlying particular ads despite the fact that this data was easily accessible and searchable before the government seized and disassembled the website. As the government's expert Special Agent Richard Robinson admits:

- "No one server contains web pages as they were presented to the user when the site was active. Elements would need to be pulled from a database server and an image server for a web server to be able to generate an ad as it would have been displayed to the user." Doc. 626-4 at 4[3], ¶ 7(B).
- "[FBI Information Technology Specialist Examiner Matthew] Frost has been able to identify database entries and images that were included in ads specified in the indictment in the form of database entries and individual image files, rather than rendered as a single coherent webpage." Doc. 626-4 at 9, ¶ 18.

The government then goes on to admit:

- "Because of this manner of operation, any given ad is not saved on any of the

---

[3]   This and the following page numbers refers to the page number (of 22) assigned to Document 626-4 by the ECF system.

servers as a user would have seen it. Viewing a page as it would have appeared would require interaction with all three basic types of servers. . . . Even though the any one [sic] of the Database Servers and Image Servers contain data for all Backpage.com ads at the time that the site was taken down, simulating the function of the website would require extensive time and expertise, *if it is possible at all*." Doc. 626-4 at 13 (emphasis supplied).

The government also tacitly admits that it understood the importance of maintaining the functionality of the website. Special Agent Robinson says that the government "hoped" to keep the website functional in Amsterdam after it rendered the system non-functional in the United States "to improve the possibility of being able to easier search and display ads as they would have appeared when the Backpage.com site was live." Doc. 626-4 at 9, ¶ 19.

## IV.  CONCLUSION

Defendants expect to address these issues further in a forthcoming motion to compel.

DATED:  June 18, 2019

Thomas H. Bienert, Jr.
Whitney Z. Bernstein
BIENERT KATZMAN, PLC

By: */s/ Whitney Z. Bernstein*
Whitney Z. Bernstein
Attorneys for James Larkin

DATED:  June 18, 2019

Gary S. Lincenberg
Ariel A. Neuman
Gopi K. Panchapakesan
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.

By: */s/ Ariel A. Neuman*
Ariel A. Neuman
Attorneys for John Brunst

| | |
|---|---|
| DATED: June 18, 2019 | Robert Corn-Revere<br>James C. Grant<br>DAVIS WRIGHT TREMAINE LLP<br><br>By: _/s/ James C. Grant_<br>James C. Grant<br>Attorneys for Michael Lacey and James Larkin |
| DATED: June 18, 2019 | Paul J. Cambria, Jr.<br>Erin E. McCampbell<br>LIPSITZ GREEN SCIME CAMBRIA LLP<br><br>By: _/s/ Paul J. Cambria, Jr._<br>Paul J. Cambria, Jr.<br>Attorneys for Michael Lacey |
| DATED: June 18, 2019 | Bruce Feder<br>FEDER LAW OFFICE, P.A.<br><br>By: _/s/ Bruce Feder_<br>Bruce Feder<br>Attorneys for Scott Spear |
| DATED: June 18, 2019 | David Eisenberg<br>DAVID EISENBERG, P.L.C.<br><br>By: _/s/ David Eisenberg_<br>David Eisenberg<br>Attorneys for Andrew Padilla |
| DATED: June 18, 2019 | Joy Bertrand<br>JOY BERTRAND, ESQ.<br><br>By: _/s/ Joy Bertrand_<br>Joy Bertrand<br>Attorneys for Joye Vaught |

**CERTIFICATE OF SERVICE**

I certify that on this 18th day of June 2019, I electronically transmitted a PDF version of this document to the Clerk of the Court, using the CM/ECF System, for filing and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants listed below.

*/s/ Toni Thomas*
Toni Thomas

Anne Michelle Chapman, anne@mscclaw.com
Erin E. McCampbell, emccampbell@lglaw.com
Anthony R. Bisconti, tbisconti@bienertkatzman.com
Ariel A. Neuman, aan@birdmarella.com
Bruce S. Feder, bf@federlawpa.com
James C. Grant, jimgrant@dwt.com
Lee David Stein, lee@mscclaw.com
Paul J. Cambria, pcambria@lglaw.com
Robert Corn-Revere, bobcornever@dwt.com
Ronald Gary London, ronnielondon@dwt.com
Janey Henze Cook, janey@henzecookmurphy.com
John Lewis Littrell, jlittrell@bmkattorneys.com
Seetha Ramachandran, Seetha.Ramachandran@srz.com
Thomas H. Bienert, Jr. tbienert@bienertkatzman.com
Whitney Z. Bernstein, wbernstein@bienertkatzman.com
Gary S. Lincenberg, glincenberg@birdmarella.com
Gopi K. Panchapakesan, gpanchapakesan@birdmarella.com
Michael D. Kimerer, mdk@kimerer.com
Rhonda Elaine Neff, rneff@kimerer.com
David S. Eisenberg, david@deisenbergplc.com
Joy Malby Bertrand, joyous@mailbag.com
John Jacob Kucera, john.kucera@usdoj.gov
Kevin M. Rapp, Kevin.Rapp@usdoj.com
Margaret Wu Perlmeter, Margaret.perlmeter@usdoj.gov
Reginald E. Jones, reginald.jones4@usdoj.gov
Peter Shawn Kozinets, Peter.Kozinets@usdoj.gov
Andrew C. Stone, andrew.stone@usdoj.gov

9

DEFENDANTS' SUPPLEMENTAL JOINT STATUS REPORT

# Exhibit A



U.S. Department of Justice

United States Attorney
District of Arizona

| Two Renaissance Square | Main: (602) 514-7500 |
| 40 N. Central Ave., Suite 1800 | Main Fax: (602) 514-7693 |
| Phoenix, AZ 85004-4408 | |

June 3, 2019

Whitney Z. Bernstein
Thomas H. Bienert, Jr.
903 Calle Amanecer, Suite 350
San Clemente, CA 92673

<u>VIA EMAIL</u>

   Re: *Your letter of May 23, 2019*

Dear Ms. Bernstein:

  We wish to respond to your May 23, 2019 letter. You request that the United States not only identify certain subsets of disclosed Electronically Stored Information ("ESI") (*e.g.*, specific data, email chains, lists of prohibited terms, certain ads, etc.), but conduct an independent analysis of specific data the Defense views as relevant and material to the case.

  *First*, the artificial deadline of responding to your May 23rd (12-page) correspondence within a week (admittedly this was preferable to the original 24 hours you gave us to respond) is unreasonable particularly in light of the fact that you have had the discovery for over a year and, as detailed below, most all of these issues were well known to the Defense *before* the April 2018 indictment and the months that followed. Although you did not start representing Mr. Larkin until several weeks after arrest, many of the attorneys that are parties to a Joint Defense Agreement have been representing Mr. Larkin for years prior to indictment and have been involved in various litigation where the same discovery has been implicated. Simply put, we are struggling to understand why you waited over a year after indictment and discovery to make these urgent requests now.

  *Second*, in our status memorandum filed on May 31 we have provided the defense a concise explanation of the status of the servers. In addition, we provide a detailed explanation as to why the government does not intend to image the various web servers because they contain no unique data. In other words, the web servers stored neither website content nor images. (*See* CR 626.)

June 3, 2019
Page 2

*Third*, for several reasons we do not agree that we are obligated to identify this information (we are not conceding that your characterization of the evidence is accurate) in the available discovery and provide the requested analysis of the servers. In short, Rule 16 does not obligate the government to even attempt to identify the categories of evidence in discovery that you believe exists and/or conduct analysis of the data on behalf of the defense. As you know, the Court, in this case, has already opined on this issue. *United States v. Lacey, et. al*., 2018 WL 4963292, at *1 (D. Ariz. Oct. 15, 2018) ("*The Government has limited discovery obligations*. Rule 16 of the Federal Rules of Criminal Procedure requires the Government to, upon a defendant's request, provide or allow the defendant access to documents and objects in the Government's possession. Under Rule 16, the Government must disclose any oral or written statements made by a defendant, the defendant's prior record, any items that are material to preparing the defense, items that the Government intends to use in its case-in-chief, and items that were obtained from or belong to the defendant. Fed. R. Crim. Pro. 16.") (emphasis added).

As you well know, the evidence and data that you seek has been the subject of discovery in previous litigation and investigations. For example, the data contained in the discovery that you are requesting (*e.g*., Backpage's supposed cooperation with law enforcement, the percentage of revenue generated by the adult category compared to other categories, moderation that involved editing offending words and continuing to post an ad obviously soliciting prostitution, etc.), has been exchanged in related civil cases since 2012. These same issues were implicated in the U.S. Senate's investigation of Backpage and the resulting PSI report, the prosecution by the California Department of Justice, numerous articles, television exposes, and even a documentary movie. And, Mr. Larkin has had the same counsel (either noticed or consulting) since 2012.

*Importantly*, notwithstanding the availability of this information in other litigation and in discovery that the United States has provided, the United States has no duty to identify exculpatory portions (again we are neither conceding that the evidence sought exists nor is exculpatory) of disclosed material; that is part of the defendant's "reasonable diligence" requirement. We are, however, aware that more may be required where the number of documents is voluminous. *United States v. Skilling*, 554 F.3d 529, 576 (5th Cir. 2009). In such cases, the government satisfies its obligations, as we have here (*i.e*., by providing a detailed indictment, a witness and an exhibit list months before trial, "hot" docs, witness statements before we are obligated, etc.), where it takes extra steps to help the defense manage the discovery, and the defense fails to show that the disclosure was done in bad faith or with the intent to hide documents. In *Skilling*, the court rejected the argument that the government should have located and turned over exculpatory evidence within the file, finding that "the government was in no better position to locate any potentially exculpatory evidence than was Skilling." *Id.* at 577. The court instead found that "[a]s a general rule, the government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence," and rejected the defense's argument that the government concealed favorable information amidst millions pages of information. *Id.* at 576. While the government is not permitted to act in bad faith in performing its obligations under *Brady*, such as purposely hiding

June 3, 2019
Page 3

*Brady* information in a huge open file, the affirmative steps the government took beyond merely providing Skilling with the open file demonstrated the government's good faith efforts to comply with *Brady*. *Id.; see, e.g.*, *United States v. Salyer*, 271 F.R.D. 148, 158 (E.D. Cal. 2010) (finding that defendant was only entitled to discovery of government materials relevant to mounting a defense and rejecting defendant's "'all documents' civil type discovery request"), *aff'd with modifications by United States v. Salyer*, 2010 WL 3036444 (E.D. Cal. Aug. 2, 2010); *Lacey*, 2018 WL 4963292, at *2 (citing *Rhoads v. Henry*, 638 F.3d 1027, 1039 (9th Cir. 2011), as "stating that there is no authority for the proposition that the government's *Brady* obligations require it to point the defense to specific documents within a larger mass of material that it has already turned over").

In addition, much of the evidence was provided to the government *by* the defense. In *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010), the court ruled that the provision of massive amounts of ESI seized from defendant-corporation in an allegedly unsearchable format was proper, in part because (as is also the case here) the government was giving the defendant back its own information. *Id.* at 296. The court rejected the notion that Federal Rule of Civil Procedure 34(b)(2)(E)(i), which requires documents to be produced in a specific format, is applicable to criminal cases. *Id.* at 296 n.26. The Sixth Circuit noted that federal criminal discovery is governed by Federal Rule of Criminal Procedure 16, which contains no similar requirement. *Id.* at 296. The court found that the trial court had not abused its discretion in ruling that defendants were not deprived of a fair trial by the manner of discovery production, given that the "overwhelming majority" of discovery was taken from defendants' computers, and the government had provided "something of a guide to the electronic discovery," including a detailed "room-by-room inventory" of all items seized from defendants' company. *Id.* at 296–97. Similarly, in *United States v. W.R. Grace*, 401 F. Supp. 2d 1069, 1080 (D. Mont. 2005), the district court refused to order the government to conduct a *Brady/Giglio* identification review of the massive amounts of information acquired in that case. First noting that much of the produced information was text searchable (as is the case here), the court found "most importantly" that the individual defendants had access to corporate assistance in the search for exculpatory evidence, the vast majority of documents at issue were corporate documents, and civil litigation had been ongoing for years, making the search for documents that much easier. The United States has provided a preliminary witness and exhibit list, "hot docs," a comprehensive superseding indictment, evidence (emails, agendas, etc.), *Jencks* Act statements, and extensive document discovery disclosed in industry-standard, text-searchable format. The United States also has discussed the government's case and supporting evidence (and its relevance) in meetings with some Defense lawyers and in several pleadings. (*See, e.g.*, Docs. 446, 512.) In *United States v. Slade,* 2011 WL 5291757, at *2 (D. Ariz. Sept. 30, 2011), the court approved of substantially similar discovery efforts:

> The Government early on provided Defendants with its list of proposed witnesses, experts, and trial exhibits, and the discovery relating to that disclosure was provided. The fact that the Government's discovery provided is vastly larger than

June 3, 2019
Page 4

>these documents, or the fact of this "surplusage" is of consequence because it divides the Defendants' argument into two parts: (1) the Government has an obligation to organize and make readily searchable documents it has identified as documents supporting its prosecution, and (2) with respect to other documents in the Government's possession and provided to Defendants, the Government has an obligation to organize that discovery and make it readily searchable. With respect to the former argument, this Court finds that the Government has complied with that obligation, and to the extent the Government's organization and search features were inadequate, the Court granted Defendants' request for discovery assistance.

As in *Slade*, counsel for Joy Vaught (Stephen Weiss) investigated whether the Defense could receive financial assistance for discovery review, and he advised the Court that such discovery assistance is "not only available for indigent defendants but also retained defendants." (*See* Doc. 348, 10/5/18 Hr'g Tr., Vol II at 115-18.)

Moreover, the Defendants and in many cases their counsel are intimately familiar with the United States' discovery for a couple of reasons. The Defendants authored, sent or received the subject emails, appeared on management agendas, and discussed news and articles in emails (including Nicholas Kristof's coverage of Backpage in the *New York Times*, the clergy letter by Auburn Seminary in the *Times*, and extensive news coverage of the December 2011 Detroit Backpage quadruple murders, among numerous others). Further, the Defendants were aware of and discussed television and other news media exposes (including broadcasts on CNN and MSNBC) condemning Backpage's business practices. Moreover, Backpage's affiliate and reciprocal link relationships (with The Erotic Review and "Dollar Bill") were discussed at various management meetings.

*Fourth*, Defendants have had some of the same attorneys since at least 2012 (including attorneys from Davis Wright Tremaine and Daniel Quigley), and Defendants and their attorneys have been involved in assembling discovery in response to U.S. Senate subpoenas, federal and state grand jury subpoenas, and numerous civil discovery requests during that time. And, again, the documents (particularly the "hot docs") are familiar to Mr. Larkin and other Backpage defendants because they largely consist of internal Backpage documents that were authored, sent or received by them. Moreover, as noted above, the government has voluntarily provided indexes, "hot docs," a preliminary witness list and a preliminary exhibit list with corresponding Bates numbers for each exhibit. *See, e.g., United States v. Kennedy,* 64 F.3d, 1465, 1470-71 (10th Cir. 1995) (in affirming order denying defendants' request for paralegals, the court noted that defense counsel could rely on the assistance of defendant, who had "intimate familiarity" with many of the documents because of his position as the former company CFO; additionally, "the government provided extraordinary assistance during discovery…to enable the defense to review the repository materials efficiently," including indices and hot documents).

With this background in mind, we address the subject matter of your requests as follows:

June 3, 2019
Page 5

### A. Backpage.com Website Generally

Regarding the information you seek about the website, many of your requests for specific information about data contained within the website have already been addressed by the United States in previous correspondence or pleadings, or we have no obligation to conduct the search and analysis you request. For example, we obviously do not share your view that Backpage engaged in cooperation with law enforcement in screening and blocking ads. As set forth in the Superseding Indictment, the PSI Report, numerous interviews (and plea agreements) of moderators and other Backpage employees (including Hyer and Ferrer, among others), internal emails, and other evidence, Backpage merely removed offending words, text or photos and posted the ad knowing that the ad promoted prostitution. This practice was unknown to many law enforcement agencies that contacted Backpage for assistance. Similarly, Backpage's compliance with subpoenas and providing testimony at criminal trials of sex traffickers (including child sex traffickers) is hardly cooperation. It is (as we explained in previous correspondence) merely avoiding contempt. (*See* Nov. 16, 2018 Letter to Michael Piccarreta.) Notably, we never received a response to our position on this issue. In the final analysis, whether Backpage was sincerely cooperating with law enforcement is ultimately a jury question.

In addition, at trial, the United States will present evidence of the numerous subpoenas served on Backpage and trial testimony by Backpage employees at various criminal trials, as it is relevant to demonstrate the Defendants' knowledge that they were operating a prostitution website. If you have evidence, however, that contradicts the testimony and the evidence above, the Defendants will have the opportunity to present it at trial.

Also, law enforcement witnesses who provided commendations to Backpage for their assistance on cases will testify at trial. We expect them to testify that had they known about Backpage's internal business practices (the financial relationship with The Erotic Review, aggregation, moderation, other reciprocal link relationships, etc.) they would not have praised Backpage but instead would have condemned the website and its operators.

Your claim that Backpage was "a general purpose classified ad website and only a fraction of the ads were posted in the adult categories" is a position, to put it mildly, at odds with numerous internal emails and documents, PowerPoints prepared by Backpage employees (and often at the direction of Mr. Lacey and Mr. Larkin), analytics tracking the volume of prostitution ads prepared by Mr. Spear and discussed at management meetings, meeting agendas, witness interviews, the PSI Report, revenue statements and bank records, among other evidence. In short, this position is demonstrably false. As you well know, the adult section and "therapeutic" massage were the *only* categories that charged for posting ads. After 2015, one could post an ad for free, but one paid to repost it or make it more visible (*e.g.*, pay for it to be a sponsored ad). Indeed, we expect the evidence at trial to demonstrate that Mr. Larkin, in particular, acknowledged in several forums (*e.g.*, meetings with NCMEC, management meetings, internal emails, statements to employees, or

other owners, etc.) that Backpage could not survive without the adult section and acknowledged it was Backpage's primary source of revenue.

Lastly, regarding your requests regarding referrals to NCMEC, we direct you to the interviews of NCMEC employees and Backpage's internal emails (many of which were provided by the Defendants to the United States, the Senate PSI, the California Department of Justice, and others). But, again, you are free to conduct your own analysis of the servers' data.

### B. Moderation

Regarding Backpage's moderation practices, you are requesting data about blocked, revised and removed ads. Once again, we do not agree with your position, but you are free to conduct your own analysis. Your request, however, is based on the false premise that each original ad is available in the database for review to determine what changes, if any, were made to it. However, as stated on p. 26 (fn. 161) of the PSI Report, the original ads generally were not retained by Backpage. In addition, your request for blocked ads, etc., ignores the fact documented on pp. 34-36 of the PSI Report that, beginning in 2012, the primary method for keeping banned terms off of the site was educating the users by keeping them from posting the ad if it contained a banned term. In any event, you will need to conduct your own analysis to determine what specific terms or photos were flagged for editing.

As you know, moderation (in the domestic markets) largely ceased in 2015 when most of the moderators were terminated. There was moderation, however, located in the Philippines, but those moderators primarily reviewed ads (and aggregated ads from other prostitution websites) posted in international markets. From 2015 until the seizure of the website in April 2018, moderation was drastically reduced, along with staffing. In other words, ads resembling the ads pre-2015, that contained terms that were obviously solicitations for prostitution, remained on the website. In 2017, the adult category was shut down and the prostitution ads migrated to the personals section where, again, little to no moderation was conducted. We expect the evidence at trial to show that ads lacking moderation were much more explicit and there was no doubt that they were solicitations for prostitution. Lastly, shortly before the shut down of Backpage in April 2018, Backpage decided (likely based on increased civil and criminal pressure and financial considerations) to allow posters to include just a photo, a link, and a phone number.

### C. Reciprocal Link and Affiliate Programs

Similar to our response above, you will need to conduct your own analysis of the data to determine the frequency of the affiliate program. Mr. Larkin's knowledge of The Erotic Review, however, is detailed in Doc. 446. As you know, he was confronted with several Backpage ads for trafficked children that included links or references to TER reviews, and with corresponding TER reviews, during a March 2011 meeting at NCMEC. At the meeting, Mr. Larkin disavowed any knowledge of the TER website. (Doc. 446 at 11-12; Doc. 446-1 at 40-62.) Yet, years *prior* to that meeting, Mr. Larkin alerted both Mr. Spear and Mr. Ferrer to TER's owner (David Elms) February

2009 arrest for prostitution activity by forwarding a newspaper article detailing his arrest. (Doc. 446 at 11-12; Doc. 446-1 at 70-72.) Lastly, his own paper published an article about the arrest. (Doc. 446-1 at 65-69.) Despite Elm's arrest, Backpage's relationship with TER continued unabated for a couple of more years. Based on pressure from NCMEC and others, Backpage discontinued this relationship but still allowed posters to include their TER identification numbers (without a blatant reference to TER) and/or state, for example, that the poster been "well reviewed" or "google my reviews." (*See* Doc. 446-1 at 73-74.) As for your request for data regarding Backpage's affiliate relationship with "Dollar Bill," once again we are under no obligation to retrieve and analyze this data from the available discovery on behalf for the defense.

### D. Ads Supporting Substantive Counts

Your understanding is not fully accurate regarding the origin of the subject ads in the indictment, as it is based on a false premise. Most of the ads were not obtained by the "Wayback Machine," but rather from various law enforcement agencies *via* subpoena. Those law enforcement witnesses are expected to testify and will detail how they obtained the subject ads from Backpage during the course of their criminal investigations of prostitution on Backpage, pimps and/or child sex traffickers. The irony that you are asking for instances of cooperation by Backpage by providing compliance with various subpoenas and then disputing authenticity of ads provided by Backpage (in response to a subpoena) is disingenuous. In any event, either the victim or a former Backpage employee will testify to the authenticity of the victim's ad or to the posting of the ad. Unfortunately, in some cases, a family member (where the victim is no longer alive) may testify to the ad.

In addition, some of the victims were the subject of civil litigation where attorneys representing Mr. Larkin in this case and other Backpage defendants had the opportunity to depose the victim regarding their ad, among other topics. In short, we have directed you to relevant evidence in the available discovery involving the subject victims. Any further analysis of the ads will need to be conducted by the defense.

Our response to the May 23rd letter may not—in your view—be satisfactory. If you choose to file some type of pleading regarding discovery (or a response to our status memo), in fairness, please attach this letter so that the Court has an understanding of our efforts to be responsive to your requests and the authority we relied upon in addressing your various requests.

Sincerely,

MICHAEL BAILEY
U.S. Attorney
District of Arizona

*s/ Kevin Rapp*
KEVIN RAPP
Assistant U.S. Attorney