# Exhibit A



**U.S. Department of Justice**

United States Attorney
District of Arizona

Two Renaissance Square  Main: (602) 514-7500
40 N. Central Ave., Suite 1800  Main Fax: (602) 514-7693
Phoenix, AZ  85004-4408

June 3, 2019

Whitney Z. Bernstein
Thomas H. Bienert, Jr.
903 Calle Amanecer, Suite 350
San Clemente, CA 92673

<u>VIA EMAIL</u>

  Re: *Your letter of May 23, 2019*

Dear Ms. Bernstein:

  We wish to respond to your May 23, 2019 letter. You request that the United States not only identify certain subsets of disclosed Electronically Stored Information ("ESI") (*e.g.*, specific data, email chains, lists of prohibited terms, certain ads, etc.), but conduct an independent analysis of specific data the Defense views as relevant and material to the case.

  *First*, the artificial deadline of responding to your May 23rd (12-page) correspondence within a week (admittedly this was preferable to the original 24 hours you gave us to respond) is unreasonable particularly in light of the fact that you have had the discovery for over a year and, as detailed below, most all of these issues were well known to the Defense *before* the April 2018 indictment and the months that followed. Although you did not start representing Mr. Larkin until several weeks after arrest, many of the attorneys that are parties to a Joint Defense Agreement have been representing Mr. Larkin for years prior to indictment and have been involved in various litigation where the same discovery has been implicated. Simply put, we are struggling to understand why you waited over a year after indictment and discovery to make these urgent requests now.

  *Second*, in our status memorandum filed on May 31 we have provided the defense a concise explanation of the status of the servers. In addition, we provide a detailed explanation as to why the government does not intend to image the various web servers because they contain no unique data. In other words, the web servers stored neither website content nor images. (*See* CR 626.)

June 3, 2019
Page 2

*Third*, for several reasons we do not agree that we are obligated to identify this information (we are not conceding that your characterization of the evidence is accurate) in the available discovery and provide the requested analysis of the servers. In short, Rule 16 does not obligate the government to even attempt to identify the categories of evidence in discovery that you believe exists and/or conduct analysis of the data on behalf of the defense. As you know, the Court, in this case, has already opined on this issue. *United States v. Lacey, et. al*., 2018 WL 4963292, at *1 (D. Ariz. Oct. 15, 2018) ("*The Government has limited discovery obligations*. Rule 16 of the Federal Rules of Criminal Procedure requires the Government to, upon a defendant's request, provide or allow the defendant access to documents and objects in the Government's possession. Under Rule 16, the Government must disclose any oral or written statements made by a defendant, the defendant's prior record, any items that are material to preparing the defense, items that the Government intends to use in its case-in-chief, and items that were obtained from or belong to the defendant. Fed. R. Crim. Pro. 16.") (emphasis added).

As you well know, the evidence and data that you seek has been the subject of discovery in previous litigation and investigations. For example, the data contained in the discovery that you are requesting (*e.g*., Backpage's supposed cooperation with law enforcement, the percentage of revenue generated by the adult category compared to other categories, moderation that involved editing offending words and continuing to post an ad obviously soliciting prostitution, etc.), has been exchanged in related civil cases since 2012. These same issues were implicated in the U.S. Senate's investigation of Backpage and the resulting PSI report, the prosecution by the California Department of Justice, numerous articles, television exposes, and even a documentary movie. And, Mr. Larkin has had the same counsel (either noticed or consulting) since 2012.

*Importantly*, notwithstanding the availability of this information in other litigation and in discovery that the United States has provided, the United States has no duty to identify exculpatory portions (again we are neither conceding that the evidence sought exists nor is exculpatory) of disclosed material; that is part of the defendant's "reasonable diligence" requirement. We are, however, aware that more may be required where the number of documents is voluminous. *United States v. Skilling*, 554 F.3d 529, 576 (5th Cir. 2009). In such cases, the government satisfies its obligations, as we have here (*i.e*., by providing a detailed indictment, a witness and an exhibit list months before trial, "hot" docs, witness statements before we are obligated, etc.), where it takes extra steps to help the defense manage the discovery, and the defense fails to show that the disclosure was done in bad faith or with the intent to hide documents. In *Skilling*, the court rejected the argument that the government should have located and turned over exculpatory evidence within the file, finding that "the government was in no better position to locate any potentially exculpatory evidence than was Skilling." *Id.* at 577. The court instead found that "[a]s a general rule, the government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence," and rejected the defense's argument that the government concealed favorable information amidst millions pages of information. *Id.* at 576. While the government is not permitted to act in bad faith in performing its obligations under *Brady*, such as purposely hiding

June 3, 2019
Page 3

*Brady* information in a huge open file, the affirmative steps the government took beyond merely providing Skilling with the open file demonstrated the government's good faith efforts to comply with *Brady*. *Id.; see, e.g.*, *United States v. Salyer*, 271 F.R.D. 148, 158 (E.D. Cal. 2010) (finding that defendant was only entitled to discovery of government materials relevant to mounting a defense and rejecting defendant's "'all documents' civil type discovery request"), *aff'd with modifications by United States v. Salyer*, 2010 WL 3036444 (E.D. Cal. Aug. 2, 2010); *Lacey*, 2018 WL 4963292, at *2 (citing *Rhoads v. Henry*, 638 F.3d 1027, 1039 (9th Cir. 2011), as "stating that there is no authority for the proposition that the government's *Brady* obligations require it to point the defense to specific documents within a larger mass of material that it has already turned over").

In addition, much of the evidence was provided to the government *by* the defense. In *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010), the court ruled that the provision of massive amounts of ESI seized from defendant-corporation in an allegedly unsearchable format was proper, in part because (as is also the case here) the government was giving the defendant back its own information. *Id.* at 296. The court rejected the notion that Federal Rule of Civil Procedure 34(b)(2)(E)(i), which requires documents to be produced in a specific format, is applicable to criminal cases. *Id.* at 296 n.26. The Sixth Circuit noted that federal criminal discovery is governed by Federal Rule of Criminal Procedure 16, which contains no similar requirement. *Id.* at 296. The court found that the trial court had not abused its discretion in ruling that defendants were not deprived of a fair trial by the manner of discovery production, given that the "overwhelming majority" of discovery was taken from defendants' computers, and the government had provided "something of a guide to the electronic discovery," including a detailed "room-by-room inventory" of all items seized from defendants' company. *Id.* at 296–97. Similarly, in *United States v. W.R. Grace*, 401 F. Supp. 2d 1069, 1080 (D. Mont. 2005), the district court refused to order the government to conduct a *Brady/Giglio* identification review of the massive amounts of information acquired in that case. First noting that much of the produced information was text searchable (as is the case here), the court found "most importantly" that the individual defendants had access to corporate assistance in the search for exculpatory evidence, the vast majority of documents at issue were corporate documents, and civil litigation had been ongoing for years, making the search for documents that much easier. The United States has provided a preliminary witness and exhibit list, "hot docs," a comprehensive superseding indictment, evidence (emails, agendas, etc.), *Jencks* Act statements, and extensive document discovery disclosed in industry-standard, text-searchable format. The United States also has discussed the government's case and supporting evidence (and its relevance) in meetings with some Defense lawyers and in several pleadings. (*See, e.g.*, Docs. 446, 512.) In *United States v. Slade,* 2011 WL 5291757, at *2 (D. Ariz. Sept. 30, 2011), the court approved of substantially similar discovery efforts:

> The Government early on provided Defendants with its list of proposed witnesses, experts, and trial exhibits, and the discovery relating to that disclosure was provided. The fact that the Government's discovery provided is vastly larger than

>these documents, or the fact of this "surplusage" is of consequence because it divides the Defendants' argument into two parts: (1) the Government has an obligation to organize and make readily searchable documents it has identified as documents supporting its prosecution, and (2) with respect to other documents in the Government's possession and provided to Defendants, the Government has an obligation to organize that discovery and make it readily searchable. With respect to the former argument, this Court finds that the Government has complied with that obligation, and to the extent the Government's organization and search features were inadequate, the Court granted Defendants' request for discovery assistance.

As in *Slade*, counsel for Joy Vaught (Stephen Weiss) investigated whether the Defense could receive financial assistance for discovery review, and he advised the Court that such discovery assistance is "not only available for indigent defendants but also retained defendants." (*See* Doc. 348, 10/5/18 Hr'g Tr., Vol II at 115-18.)

Moreover, the Defendants and in many cases their counsel are intimately familiar with the United States' discovery for a couple of reasons. The Defendants authored, sent or received the subject emails, appeared on management agendas, and discussed news and articles in emails (including Nicholas Kristof's coverage of Backpage in the *New York Times*, the clergy letter by Auburn Seminary in the *Times*, and extensive news coverage of the December 2011 Detroit Backpage quadruple murders, among numerous others). Further, the Defendants were aware of and discussed television and other news media exposes (including broadcasts on CNN and MSNBC) condemning Backpage's business practices. Moreover, Backpage's affiliate and reciprocal link relationships (with The Erotic Review and "Dollar Bill") were discussed at various management meetings.

*Fourth*, Defendants have had some of the same attorneys since at least 2012 (including attorneys from Davis Wright Tremaine and Daniel Quigley), and Defendants and their attorneys have been involved in assembling discovery in response to U.S. Senate subpoenas, federal and state grand jury subpoenas, and numerous civil discovery requests during that time. And, again, the documents (particularly the "hot docs") are familiar to Mr. Larkin and other Backpage defendants because they largely consist of internal Backpage documents that were authored, sent or received by them. Moreover, as noted above, the government has voluntarily provided indexes, "hot docs," a preliminary witness list and a preliminary exhibit list with corresponding Bates numbers for each exhibit. *See, e.g., United States v. Kennedy,* 64 F.3d, 1465, 1470-71 (10th Cir. 1995) (in affirming order denying defendants' request for paralegals, the court noted that defense counsel could rely on the assistance of defendant, who had "intimate familiarity" with many of the documents because of his position as the former company CFO; additionally, "the government provided extraordinary assistance during discovery…to enable the defense to review the repository materials efficiently," including indices and hot documents).

With this background in mind, we address the subject matter of your requests as follows:

### A. Backpage.com Website Generally

Regarding the information you seek about the website, many of your requests for specific information about data contained within the website have already been addressed by the United States in previous correspondence or pleadings, or we have no obligation to conduct the search and analysis you request. For example, we obviously do not share your view that Backpage engaged in cooperation with law enforcement in screening and blocking ads. As set forth in the Superseding Indictment, the PSI Report, numerous interviews (and plea agreements) of moderators and other Backpage employees (including Hyer and Ferrer, among others), internal emails, and other evidence, Backpage merely removed offending words, text or photos and posted the ad knowing that the ad promoted prostitution. This practice was unknown to many law enforcement agencies that contacted Backpage for assistance. Similarly, Backpage's compliance with subpoenas and providing testimony at criminal trials of sex traffickers (including child sex traffickers) is hardly cooperation. It is (as we explained in previous correspondence) merely avoiding contempt. (*See* Nov. 16, 2018 Letter to Michael Piccarreta.) Notably, we never received a response to our position on this issue. In the final analysis, whether Backpage was sincerely cooperating with law enforcement is ultimately a jury question.

In addition, at trial, the United States will present evidence of the numerous subpoenas served on Backpage and trial testimony by Backpage employees at various criminal trials, as it is relevant to demonstrate the Defendants' knowledge that they were operating a prostitution website. If you have evidence, however, that contradicts the testimony and the evidence above, the Defendants will have the opportunity to present it at trial.

Also, law enforcement witnesses who provided commendations to Backpage for their assistance on cases will testify at trial. We expect them to testify that had they known about Backpage's internal business practices (the financial relationship with The Erotic Review, aggregation, moderation, other reciprocal link relationships, etc.) they would not have praised Backpage but instead would have condemned the website and its operators.

Your claim that Backpage was "a general purpose classified ad website and only a fraction of the ads were posted in the adult categories" is a position, to put it mildly, at odds with numerous internal emails and documents, PowerPoints prepared by Backpage employees (and often at the direction of Mr. Lacey and Mr. Larkin), analytics tracking the volume of prostitution ads prepared by Mr. Spear and discussed at management meetings, meeting agendas, witness interviews, the PSI Report, revenue statements and bank records, among other evidence. In short, this position is demonstrably false. As you well know, the adult section and "therapeutic" massage were the *only* categories that charged for posting ads. After 2015, one could post an ad for free, but one paid to repost it or make it more visible (*e.g.*, pay for it to be a sponsored ad). Indeed, we expect the evidence at trial to demonstrate that Mr. Larkin, in particular, acknowledged in several forums (*e.g.*, meetings with NCMEC, management meetings, internal emails, statements to employees, or

June 3, 2019
Page 6

other owners, etc.) that Backpage could not survive without the adult section and acknowledged it was Backpage's primary source of revenue.

Lastly, regarding your requests regarding referrals to NCMEC, we direct you to the interviews of NCMEC employees and Backpage's internal emails (many of which were provided by the Defendants to the United States, the Senate PSI, the California Department of Justice, and others). But, again, you are free to conduct your own analysis of the servers' data.

### B. Moderation

Regarding Backpage's moderation practices, you are requesting data about blocked, revised and removed ads. Once again, we do not agree with your position, but you are free to conduct your own analysis. Your request, however, is based on the false premise that each original ad is available in the database for review to determine what changes, if any, were made to it. However, as stated on p. 26 (fn. 161) of the PSI Report, the original ads generally were not retained by Backpage. In addition, your request for blocked ads, etc., ignores the fact documented on pp. 34-36 of the PSI Report that, beginning in 2012, the primary method for keeping banned terms off of the site was educating the users by keeping them from posting the ad if it contained a banned term. In any event, you will need to conduct your own analysis to determine what specific terms or photos were flagged for editing.

As you know, moderation (in the domestic markets) largely ceased in 2015 when most of the moderators were terminated. There was moderation, however, located in the Philippines, but those moderators primarily reviewed ads (and aggregated ads from other prostitution websites) posted in international markets. From 2015 until the seizure of the website in April 2018, moderation was drastically reduced, along with staffing. In other words, ads resembling the ads pre-2015, that contained terms that were obviously solicitations for prostitution, remained on the website. In 2017, the adult category was shut down and the prostitution ads migrated to the personals section where, again, little to no moderation was conducted. We expect the evidence at trial to show that ads lacking moderation were much more explicit and there was no doubt that they were solicitations for prostitution. Lastly, shortly before the shut down of Backpage in April 2018, Backpage decided (likely based on increased civil and criminal pressure and financial considerations) to allow posters to include just a photo, a link, and a phone number.

### C. Reciprocal Link and Affiliate Programs

Similar to our response above, you will need to conduct your own analysis of the data to determine the frequency of the affiliate program. Mr. Larkin's knowledge of The Erotic Review, however, is detailed in Doc. 446. As you know, he was confronted with several Backpage ads for trafficked children that included links or references to TER reviews, and with corresponding TER reviews, during a March 2011 meeting at NCMEC. At the meeting, Mr. Larkin disavowed any knowledge of the TER website. (Doc. 446 at 11-12; Doc. 446-1 at 40-62.) Yet, years *prior* to that meeting, Mr. Larkin alerted both Mr. Spear and Mr. Ferrer to TER's owner (David Elms) February

2009 arrest for prostitution activity by forwarding a newspaper article detailing his arrest. (Doc. 446 at 11-12; Doc. 446-1 at 70-72.) Lastly, his own paper published an article about the arrest. (Doc. 446-1 at 65-69.) Despite Elm's arrest, Backpage's relationship with TER continued unabated for a couple of more years. Based on pressure from NCMEC and others, Backpage discontinued this relationship but still allowed posters to include their TER identification numbers (without a blatant reference to TER) and/or state, for example, that the poster been "well reviewed" or "google my reviews." (*See* Doc. 446-1 at 73-74.) As for your request for data regarding Backpage's affiliate relationship with "Dollar Bill," once again we are under no obligation to retrieve and analyze this data from the available discovery on behalf for the defense.

### D. Ads Supporting Substantive Counts

Your understanding is not fully accurate regarding the origin of the subject ads in the indictment, as it is based on a false premise. Most of the ads were not obtained by the "Wayback Machine," but rather from various law enforcement agencies *via* subpoena. Those law enforcement witnesses are expected to testify and will detail how they obtained the subject ads from Backpage during the course of their criminal investigations of prostitution on Backpage, pimps and/or child sex traffickers. The irony that you are asking for instances of cooperation by Backpage by providing compliance with various subpoenas and then disputing authenticity of ads provided by Backpage (in response to a subpoena) is disingenuous. In any event, either the victim or a former Backpage employee will testify to the authenticity of the victim's ad or to the posting of the ad. Unfortunately, in some cases, a family member (where the victim is no longer alive) may testify to the ad.

In addition, some of the victims were the subject of civil litigation where attorneys representing Mr. Larkin in this case and other Backpage defendants had the opportunity to depose the victim regarding their ad, among other topics. In short, we have directed you to relevant evidence in the available discovery involving the subject victims. Any further analysis of the ads will need to be conducted by the defense.

Our response to the May 23rd letter may not—in your view—be satisfactory. If you choose to file some type of pleading regarding discovery (or a response to our status memo), in fairness, please attach this letter so that the Court has an understanding of our efforts to be responsive to your requests and the authority we relied upon in addressing your various requests.

                                        Sincerely,

                                        MICHAEL BAILEY
                                        U.S. Attorney
                                        District of Arizona

                                        *s/ Kevin Rapp*
                                        KEVIN RAPP
                                        Assistant U.S. Attorney