Paul Nathanson (*pro hac vice*)
Erik Herron (*pro hac vice*)
Davis Polk & Wardwell LLP
901 15th St. NW
Washington, D.C. 20005
(202) 962-7055
paul.nathanson@davispolk.com
*Attorneys for Equality Now*

David Boies (*pro hac vice*)
Boies Schiller Flexner LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200
dboies@bsfllp.com
*Attorney for Legal Momentum, Sanctuary for
Families, United Abolitionists, Inc., and
National Coalition Against Domestic Violence*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | NO. CR-18-422-PHX-SMB |
| Plaintiff, | **UNCONTESTED MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* EQUALITY NOW, LEGAL MOMENTUM, SANCTUARY FOR FAMILIES, UNITED ABOLITIONISTS, INC., AND NATIONAL COALITION AGAINST DOMESTIC VIOLENCE** |
| - v - | |
| Michael Lacey, *et al.*, | |
| Defendants. | |

Equality Now, Legal Momentum, Sanctuary for Families, United Abolitionists, Inc., and National Coalition Against Domestic Violence ("*Amici*") move this Court for an order allowing the filing of a proposed brief, which *Amici* have lodged concurrently with this Motion, concerning the issues raised by Defendants' Motion to Dismiss the Indictment.  Counsel for the United States has stated that the United States has no objection to the filing of the proposed brief from *Amici*.  The Defendants take no position on the filing.

The decision to grant, or deny, *amicus* briefing lies solely within a district court's jurisdiction, *Center for Biological Diversity v. United States Bureau of Land Management*, No. 09-cv-8011-PCT-PGR, 2010 WL 1452863, at *2 (D. Ariz. Apr. 12, 2010), but "[a]n *amicus* brief should normally be allowed when . . . the *amicus* has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide," *Cmty. Ass'n for Restoration of Env't (CARE) v. DeRuyter Bros. Dairy*, 54 F. Supp. 2d 974, 975 (E.D. Wash. 1999) (internal citations omitted).  *Amici curiae* often assist in cases "of general public interest, supplementing the efforts of counsel, and drawing the court's attention to law that escaped consideration." *Miller-Wohl Co. v. Comm'r of Labor & Indus. of Mont.*, 694 F.2d 203, 204 (9th Cir. 1982).  As further explained below, *Amici* are nonprofit organizations dedicated to protecting and advocating for women and children.

Equality Now is an international human rights organization that advocates for the protection and promotion of the rights of women and girls worldwide, with a membership network of individuals and organizations in more than 160 countries.  Founded in 1992, Equality Now has a long history of working on issues of sex trafficking and sexual exploitation and has been involved in advocating for action against websites that facilitate sex trafficking for over 10 years.

Legal Momentum, the Women's Legal Defense and Education Fund, is a national nonprofit gender justice advocacy organization.  For nearly 50 years, Legal Momentum has been advancing equal rights for girls and women through legislative efforts, impact litigation, and direct representation of clients.  Its areas of focus have included employment law, campus safety, sports, and all forms of gender-based violence.  Legal Momentum considers sex trafficking to be one of the most extreme forms of violence against women and is involved in efforts to end gender-based violence perpetrated online. As part of these efforts, Legal Momentum has partnered with nonprofit organizations and cities throughout the country to end online commercial sexual exploitation of women and girls, including sex trafficking on Backpage.com ("Backpage").  Additionally, for four

decades, through its award-winning National Judicial Education Project, Legal Momentum has been educating judges and court officials on issues related to gender-based violence against girls and women, including cyber-related violence.

Sanctuary for Families ("Sanctuary") is New York's largest dedicated service provider and advocate for victims of domestic violence, human trafficking, and related forms of gender violence.  Every year, Sanctuary provides legal, clinical, shelter and economic empowerment services to over 15,000 victims and their children.  Sanctuary provides training on domestic violence and sex trafficking to community advocates, pro bono attorneys, law students, service providers and the members of the judiciary. Sanctuary seeks to advance and protect the rights and interests of sex trafficking victims, and to prevent future victimization. Sanctuary thus has a substantial interest in preventing the illegal marketing and sale of sex trafficking victims on Backpage.com. Because Sanctuary has extensive experience assisting sex trafficking victims and addressing ways to eliminate sex trafficking, Sanctuary is uniquely positioned to inform the Court regarding issues relevant to this case. In addition, owing to the public interest nature of the case as well as the important effects that this case may have on the momentum gained to ensure that websites that facilitate and profit from sex trafficking are no longer free from liability, Sanctuary for Families has a strong interest in the outcome of the case.

United Abolitionist, Inc., d.b.a. Florida Abolitionist, Inc. ("Florida Abolitionist"), is a non-profit, antitrafficking organization committed to the prevention of sex trafficking and to crisis intervention for sex trafficking victims.

The National Coalition Against Domestic Violence ("NCADV") is the nation's oldest national grassroots domestic violence organization.  NCADV's mission is to lead, mobilize, and raise our voices to support efforts that demand a change of conditions that lead to domestic violence such as patriarchy, privilege, racism, sexism, and classism—the same conditions that perpetuate commission of crimes such as sex trafficking.  Domestic violence and sex trafficking can overlap, with survivors of domestic violence also being

victims of sex trafficking.  NCADV is dedicated to supporting survivors and holding offenders accountable.

The *Amici* maintain a strong interest in the outcome of the case because of the public interest nature of the suit, and the important effects that this case may have on the ability to ensure that websites that facilitate and profit from sex trafficking are no longer free from liability.

The proposed brief reflects *Amici*'s extensive experience with the harms to women and children caused by sex trafficking linked to Backpage.  *Amici* submit that their experience on these issues will assist the Court in deciding Defendants' Motion to Dismiss the Indictment.


Dated this 19th day of June, 2019                    DAVIS POLK & WARDWELL LLP


                                                By: /s/ Paul J. Nathanson
                                                     Paul J. Nathanson (*pro hac vice*)
                                                     Erik Herron (*pro hac vice*)
                                                     Davis Polk & Wardwell LLP
                                                     901 15th St. NW
                                                     Washington, D.C. 20005
                                                     (202) 962-7055
                                                     paul.nathanson@davispolk.com
                                                     *Attorney for Equality Now*


                                                BOIES SCHILLER FLEXNER LLP


                                                By: /s/ David Boies
                                                     David Boies (*pro hac vice*)
                                                     Boies Schiller Flexner LLP
                                                     333 Main Street
                                                     Armonk, NY 10504
                                                     (914) 749-7200
                                                     dboies@bsfllp.com
                                                     *Attorney for Legal Momentum,
                                                     Sanctuary for Families, United
                                                     Abolitionists, Inc., and National
                                                     Coalition Against Domestic Violence*

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on June 19, 2019, I electronically transmitted the attached

3 document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4 Notice of Electronic Filing to all CM/ECF registrants.

5 *s/ Paul Nathanson*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Paul Nathanson (*pro hac vice*)
Erik Herron (*pro hac vice*)
Davis Polk & Wardwell LLP
901 15th St. NW
Washington, D.C. 20005
(202) 962-7055
paul.nathanson@davispolk.com
*Attorneys for Equality Now*

David Boies (*pro hac vice*)
Boies Schiller Flexner LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200
dboies@bsfllp.com
*Attorney for Legal Momentum,*
*Sanctuary for Families, United*
*Abolitionists, Inc., and National*
*Coalition Against Domestic Violence*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | NO. CR-18-422-PHX-SMB |
| Plaintiff, | **[PROPOSED] BRIEF OF *AMICI CURIAE* EQUALITY NOW, LEGAL MOMENTUM, SANCTUARY FOR FAMILIES, UNITED ABOLITIONISTS, INC., AND NATIONAL COALITION AGAINST DOMESTIC VIOLENCE** |
| - v - | |
| Michael Lacey, *et al.*, | |
| Defendants. | |

## <u>INTEREST OF THE AMICI CURIAE</u>

Equality Now is an international human rights organization that advocates for the protection and promotion of the rights of women and girls worldwide.  Founded in 1992, Equality Now has a long history in working on issues of sex trafficking and sexual exploitation and has been involved in advocating for action against websites for over 10 years.  Equality Now has a strong interest in the outcome of the case because of the public interest nature of the suit, and the important effects that this case may have on the

ability to ensure that websites that facilitate and profit from sex trafficking are no longer free from liability.

Legal Momentum, the Women's Legal Defense and Education Fund, is a national nonprofit gender justice advocacy organization. For nearly 50 years, Legal Momentum has been advancing equal rights for girls and women through legislative efforts, impact litigation, and direct representation of clients. Its areas of focus have included employment law, campus safety, sports, and all forms of gender-based violence. Legal Momentum considers sex trafficking to be one of the most extreme forms of violence against women and is involved in efforts to end gender-based violence perpetrated online. As part of these efforts, Legal Momentum has partnered with nonprofit organizations and cities throughout the country to end online commercial sexual exploitation of women and girls, including sex trafficking on Backpage.com ("Backpage"). Additionally, for four decades, through its award-winning National Judicial Education Project, Legal Momentum has been educating judges and court officials on issues related to gender-based violence against girls and women, including cyber-related violence.

Sanctuary for Families ("Sanctuary") is New York's largest dedicated service provider and advocate for victims of domestic violence, human trafficking, and related forms of gender violence. Every year, Sanctuary provides legal, clinical, shelter and economic empowerment services to over 15,000 victims and their children. Sanctuary provides training on domestic violence and sex trafficking to community advocates, pro bono attorneys, law students, service providers and the members of the judiciary. Sanctuary seeks to advance and protect the rights and interests of sex trafficking victims, and to prevent future victimization. Sanctuary thus has a substantial interest in preventing the illegal marketing and sale of sex trafficking victims on Backpage.com. Because Sanctuary has extensive experience assisting sex trafficking victims and addressing ways to eliminate sex trafficking, Sanctuary is uniquely positioned to inform the Court regarding issues relevant to this case. In addition, owing to the public interest nature of the case as well as the important effects that this case may have on the momentum gained

to ensure that websites that facilitate and profit from sex trafficking are no longer free from liability, Sanctuary for Families has a strong interest in the outcome of the case.

United Abolitionist, Inc., d.b.a. Florida Abolitionist, Inc. ("Florida Abolitionist"), is a non-profit, antitrafficking organization committed to the prevention of sex trafficking and to crisis intervention for sex trafficking victims.

The National Coalition Against Domestic Violence ("NCADV") is the nation's oldest national grassroots domestic violence organization.  NCADV's mission is to lead, mobilize, and raise our voices to support efforts that demand a change of conditions that lead to domestic violence such as patriarchy, privilege, racism, sexism, and classism—the same conditions that perpetuate commission of crimes such as sex trafficking.  Domestic violence and sex trafficking can overlap, with survivors of domestic violence also being victims of sex trafficking.  NCADV is dedicated to supporting survivors and holding offenders accountable.

**SUMMARY OF THE ARGUMENT**

While the rapid growth of the Internet has enabled people to become increasingly connected, it has also created opportunities for criminals to abuse those connections to facilitate illegal activities.  The Internet has had a particularly profound effect on the market for sex trafficking, including the sale of children and other victims without their consent.  *Amici* and many other organizations have witnessed firsthand the horrific stories told by these victims.

Many of the stories come from victims of crimes perpetuated by Backpage, which for years, actively facilitated the sex trafficking of children and other victims. [1]   Not only

---

[1] Although Defendants were not indicted for sex trafficking directly, the Superseding Indictment details stories of sex trafficking, including of a child (Victim 5) who first appeared in a Backpage ad when she was 14 and was forced to "perform sexual acts at gunpoint, choked [] to the point of having seizures, and gang-raped."  (Superseding Indictment ¶ 164.)  Moreover, the crimes that Defendants were indicted for—conspiracy under 18 U.S.C. § 371, facilitating prostitution under 18 U.S.C. § 1952(a)(3)(A), conspiracy to commit money laundering and related crimes under 18 U.S.C. § 1956— made sex trafficking possible by creating an accessible marketplace for trafficked women and children and helping to ensure that traffickers were able to pay for advertisements without detection by third parties.  They also ensured that Defendants could profit from their facilitation of sex trafficking.

did Backpage profit from this conduct, it purposely thwarted law enforcement efforts to stop it.  A two-year investigation by the Senate Subcommittee on Investigations revealed that Backpage welcomed illegal content on its website and actively worked to ensure that traffickers would not face criminal liability for their actions.  Despite the immense harms they suffered for nearly a decade, victims were unable to access justice, and states were unable to prosecute these crimes, due to immunities that are unavailing in this case.

Although Defendants argue that their prosecution improperly infringes on their First Amendment rights, this case is not about free speech.  It is about real crimes that happened to real people.  Defendants ignore the role that Backpage has played in sex trafficking and the profound effect it has on its victims.   *Amici* submit this brief to bring these stories, and Backpage's involvement in them, to the Court's attention.  *Amici* respectfully request that the Defendants' motion be denied, and that this case move forward so that Backpage's victims can finally access justice.

## ARGUMENT

### I.     VICTIMS HAVE SUFFERED SUBSTANTIAL INJURIES FROM BEING TRAFFICKED ON BACKPAGE.

The horrors that Backpage helped to inflict on young women and children is now well documented in both court filings and the media.  Also well documented is the fact that Backpage knew its website was helping, and at times actively aiding, sex traffickers sell children and other victims, but did nothing to prevent that conduct and continued profiting from those sales.  Given the egregiousness of the conduct that the Government has alleged here, it is paramount that courts acknowledge the deep harm suffered by victims of that conduct.  We write to provide the Court with the stories of multiple victims of crimes perpetuated by Backpage, who represent just a small fraction of the people who have been sold for sex on the marketplace that Backpage created for that very purpose.  The notion that Backpage's knowing facilitation of these crimes is somehow

protected by the First Amendment is offensive both to the thousands of victims sold on Backpage and any reasonable notion of justice.

One civil case that Legal Momentum has brought against Backpage and its enablers involves two victims, "Alice" and "Sarah."[2]  Alice was a 15-year-old honors student when her traffickers created an online advertisement on Backpage that offered her for sex.[3]  Her traffickers kept her confined, branded her, and took numerous photographs of her to continue creating ads on Backpage that would attract new "customers."[4]  Over the course of two weeks, Alice was raped by numerous individuals who responded to the Backpage advertisement posted by her traffickers.[5]  Fortunately, Alice was able to escape by calling her mother to tell her where she was being held by her traffickers.[6]  Immediately upon her return home, Alice and her family reported her traffickers to law enforcement and emailed Backpage, requesting that the advertisement be removed.[7]  Backpage ignored their pleas, and allowed the advertisement to remain on its website.[8]

Sarah was a high-functioning college student when she was trafficked through Backpage.[9]  By the time Sarah was abducted by her traffickers, they had already repeatedly used Backpage to traffic other women, and had become experienced using the website.[10]  Sarah's traffickers confined her to a hotel room and created an advertisement

---

[2] Evidence on file with *amici curiae*.  We have used aliases to protect the identities of the victims described herein.

[3] *Florida Abolitionist, Inc., et al., v. Backpage.com LLC, et al.*, No. 17-cv-218, Dkt. 86 at 7 (M.D. Fla. Apr. 30, 2018).

[4] *Id.*

[5] *Id.*

[6] *Id.* at 49.

[7] *Id.*

[8] *Id.*

[9] *Id.* at 48.

[10] *Id.*

offering her for sexual services on Backpage without her consent.[11]  In only 12 hours, Sarah was raped by five different individuals who responded to the Backpage advertisement placed by her traffickers.[12]  She still suffers immense trauma from those attacks today.[13]

These two stories are emblematic of the stories of thousands of other victims who were trafficked on Backpage.  While Defendants tout their success in civil litigation (Defs.' Br. at 4-8), the facts of these cases are shocking and the victims' inability to seek justice for the crimes against them is an outrage.  For example, in another civil case against Backpage, the 15-year-old female plaintiffs who were trafficked via Backpage had been raped 900 to 1,000 times each.[14]  Again, the parents of one of the fifteen-year-old girls reported to Backpage that she was being trafficked on the site throughout New England.  They provided Backpage with the information to locate the advertisements and demanded that the illegal advertisements be taken down.  Just as with Alice, Backpage failed to respond to the report.[15]  In *Backpage.com, LLC v. McKenna*, law enforcement in Seattle asked Backpage to remove an advertisement of a confirmed minor and any other advertisements by that poster.[16]  While Backpage actually removed the advertisement, only a few days later, the same child appeared in six more advertisements, with the same phone number and same pictures.[17]  In *R.O. v. Backpage.com, LLC*, "Emily" was

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 17 (1st Cir. 2016).

[15] *Id.* at 17 n.3.

[16] 881 F. Supp. 2d 1262, 1267 (W.D. Wash. 2012).

[17] *Id.* at 1267–68.

trafficked at 14-years-old.  Emily's traffickers paid Backpage a fee to "moderate" each ad of Emily to obscure that the ads were for sex.[18]

A daily stream of news articles further details the crimes facilitated by Backpage. In Detroit, a man kept three women that he trafficked on Backpage locked in a cage in his basement, and confined a 15-year-old and a 16-year-old girl upstairs.[19]  The man would assault the women if they refused to be sold on Backpage—breaking a victim's arm more than once—and would inject them with drugs so that they would cooperate.  Another man advertised a 15-year-old on Backpage and forced her to have sex with adult men an average of 15 times a day, while also beating her regularly.[20]  Ultimately she was beaten so severely that she ended up in the hospital, where she was able to get help from the police.  In New Orleans, a man advertised a 13-year-old girl on Backpage.[21]  He forced her to pose naked for ads on Backpage, regularly raped her, and forced her to take drugs. One trafficker in Brooklyn sold a 13-year-old girl on Backpage.[22]  When she attempted to flee, he kicked her down a stairwell.  Despite her wounds from this incident and repeated rapes, the trafficker continued to sell her on Backpage.

---

[18] No. 17-2-04897-1, (Super. Ct. Wash. filed Jan. 25, 2017).

[19] Phyllis Asinyanbi, *Sixty-Seven-Year-Old Man Accused of Sex Trafficking Women and Pimping Them out on Backpage.com*, INQUISITR (Nov. 19, 2016), https://www.inquisitr.com/3729264/sixty-seven-year-old-man-accused-of-sex-trafficking-women-and-pimping-them-out-on-backpage-com/.

[20] David J. Neal, *He Pimped out a 15-Year-Old on Backpage.com. Prison Next for Sex Trafficking, Porn*, MIAMI HERALD (May 13, 2019), https://www.miamiherald.com/news/state/florida/article229968649.html.

[21] Emily Lane, *Accused Pimp Forced Girl Since Age 13 to Walk Bourbon Street, Soliciting Sex: Warrant*, NOLA MEDIA GROUP (July 26, 2016), https://www.nola.com/traffic/2016/07/pimp_bourbon_street_rape_nine.html.

[22] Nicholas Kristof, *How Pimps Use the Web to Sell Girls*, N.Y TIMES, (Jan. 25, 2012), https://www.nytimes.com/2012/01/26/opinion/how-pimps-use-the-web-to-sell-girls.html?_r=2&ref=opinion%20

The full scope of the damage Backpage inflicted on victims of trafficking, like Alice, like Sarah, and so many others, is enormous.  It will likely never be fully quantified, but the criminal charges that the Government has brought against Defendants is a good place to start the process of obtaining justice for these victims.

## II.   FOR NEARLY A DECADE, PLAINTIFFS WHO SUFFERED GRIEVOUS HARMS DUE TO BACKPAGE'S CONDUCT WERE UNABLE TO ACCESS JUSTICE DUE TO IMMUNITIES THAT ARE UNAVAILING IN THIS CASE.

Despite these horrific stories and the abhorrent conduct of Backpage and its personnel, private plaintiffs could not hold Backpage responsible for its pernicious business model because of the immunity granted by Section 230(c)(1)[23] of the Communications Decency Act ("CDA"), which shielded websites "from being 'treated as the publisher or speaker' of material posted by users of the site . . . meaning that 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred[.]'"[24]

Failed lawsuits against Backpage vividly illustrate the perverse results of Section 230 as it existed before the 2018 enactment of the Fight Online Sex Trafficking Act ("FOSTA").[25]  In *Jane Doe No. 1 v. Backpage.com, LLC*, the court denied relief to the 15-year-old plaintiffs who had been raped up to 1,000 times, finding that Congress "chose to grant broad protections to internet publishers" and "[w]hatever Backpage's motivations, those motivations do not alter the fact that the complaint premises liability on the decisions that Backpage is making as a publisher with respect to third-party content."[26]

---

[23]  47 U.S.C. § 230(c)(1) (2012).

[24] *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 18 (1st Cir. 2016) (citing *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)).

[25] Pub. L. No. 115-164, 132 Stat. 1253 (2018).

[26]  817 F.3d at 21, 29.

Similarly, a 2010 lawsuit alleged that traffickers manipulated an emotionally distraught 15-year-old girl into joining them and then sold her for sex on Backpage across the United States.  Section 230 immunized Backpage from liability for this "horrific victimization" as well.[27]

State criminal prosecutions were likewise stymied by the CDA, enabling the online advertisement of child trafficking to "go[] unchecked, . . . [and] magnifying the problem," as attested by the attorneys general of nearly all states in 2013.[28]  For instance, the State of California charged Backpage with sex trafficking offenses in 2016, linking specific payments to the company to the rape of five children,[29] but a state court dismissed the charges, citing the CDA.[30]

Additionally, Backpage waged a campaign of pre-enforcement legal challenges to state statutes enacted in Washington, Tennessee, and New Jersey that sought to criminalize the advertisement of minors for sex, invoking the CDA and claiming Backpage was only a conduit for third-party content.  Federal courts found Section 230 preempted all three of these statutes.[31]

---

[27] *M.A. ex rel. P.K. v. Vill. Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011).

[28] *See* Letter from the National Ass'n of Attorneys Gen. to Senator John Rockefeller IV, et al. (July 23, 2013), https://digitalcommons.law.scu.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1465&context=historical.

[29] Complaint at 2016 WL 6091120, *People v. Ferrer*, No. 16FE019224, 2016 WL 7237305 (Cal. Super. Ct. Dec. 9, 2016).

[30]  2016 WL 7237305 at *3–5.  Federal criminal prosecutions fell outside Section 230's immunity provisions, but the Department of Justice reported "serious challenges" meeting the "high evidentiary standard needed to bring federal criminal charges for advertising sex trafficking."  Letter from Steven E. Boyd, Asst. Att'y Gen., to Hon. Robert W. Goodlatte, Chairman, Comm. on Judiciary (Feb. 27, 2018), https://www.eff.org/files/2018/03/19/doj-sesta.pdf.

[31] *See* Staff of Perm. Subcomm. on Investigations of the S. Comm. on Homeland Sec. & Governmental Affairs, 115th Cong., Staff Rep. on Backpage.com's

- 9 -

1    This state of affairs—in which state and local authorities (which in some instances

2    may be better-positioned to address sex trafficking than federal counterparts) were

3    effectively powerless vis-à-vis companies such as Backpage that facilitated and enabled

4    sex trafficking on a grand scale—was widely recognized as untenable.[32]  Accordingly,

5    Congress amended the CDA by enacting FOSTA, which allows civil litigants to file

6    claims against websites that, like Backpage, knowingly facilitated sex trafficking.  While

7    this was a necessary step to ensure that victims could seek justice against those websites

8    that profited from their harm, the Government has always held the power to file criminal

9    charges against sites like Backpage that facilitate prostitution and trafficking of minors

10   and obscure the sources of their money to hide the illicit proceeds of their crimes.  The

11   Government was well within its rights to exercise that power here.

12   As discussed further in the Government's Response to Defendants' Motion to

13   Dismiss the Indictment, Backpage and its executives have claimed their conduct is

14   protected by the First Amendment, in part by citing to cases in which Backpage was in

15   fact found to be immune from civil and/or state-law claims under CDA Section 230.  As

16   the Court is aware, Section 230 does not immunize online service providers from federal

17   criminal prosecution.  Further, as the Government notes in its response, many of the cases

18   cited by Defendants were decided prior to the "sea-change in the availability of evidence"

19   concerning Backpage's conduct owed to subsequently completed congressional and

20   grand-jury investigations.[33]

21

22   KNOWING FACILITATION OF ONLINE SEX TRAFFICKING 9–10 & nn.48–50 (2017)
23   [hereinafter "Backpage Report"].

24   [32] *See generally id.*; *The Latest Developments in Combating Online Sex Trafficking:*
     *Hearing Before the Subcomm. on Commc'ns  & Tech. of the H. Comm. on Energy  &*
25   *Commerce*, 115th Cong. (2017) [hereinafter "Online Sex Trafficking Hearing"]; *Human*
26   *Trafficking Investigation Before the Perm. Subcomm. on Investigations of the S. Comm.*
     *on Homeland Sec. & Governmental Affairs*, 114th Cong. (2015) [hereinafter "Human
27   Trafficking Hearing"].

28   [33] United States' Response to Defendants' Motion to Dismiss Indictment at 21–26,
     *United States v. Lacey*, No. 18-cr-00422-SMB (D. Ariz. June 12, 2019).

- 10 -

**III.    BACKPAGE ACTIVELY FACILITATED TRAFFICKING THOUSANDS OF VICTIMS.**

Until Backpage was seized by the Government and shut down in April 2018, it monopolized the sex trafficking industry, becoming the highly profitable go-to website for sex trafficking.[34]  Service providers across the country, when asked how many of the victims they serve were trafficked on Backpage, reported percentages ranging from 70 to 100%.  When the National Center for Missing and Exploited Children ("NCMEC") received a report of a missing child, it first searched Backpage, as over 73% of cases that the public reported to NCMEC relating to child sex trafficking are of children listed on the site.[35]  NCMEC received approximately 10,000 reports of suspected child sex trafficking each year—meaning that there were more than 7,300 **reported** incidents of child sex trafficking involving Backpage.[36]  The number of unreported incidents is presumably much higher.

Backpage dominated the sex trafficking market by making it easy for traffickers to use the website and evade law enforcement.  Backpage's guilty plea in the District of Arizona shows both that Backpage was keenly aware of the sex trafficking rampant on its website and that Backpage did not monitor advertisements in good faith.  A report by the Permanent Subcommittee on Investigations ("PSI Staff Report") suggests that Backpage

---

[34] STAFF OF PERM. SUBCOMM. ON INVESTIGATIONS OF THE S. COMM. ON HOMELAND SEC. & GOVERNMENTAL AFFAIRS, 114TH CONG., STAFF REP. ON RECOMMENDATION TO ENFORCE A SUBPOENA ISSUED TO THE CEO OF BACKPAGE.COM, LLC 6 (2016) [hereinafter "PSI Staff Report"] (quoting Testimony of Yiota G. Souras, Senior Vice President & General Counsel, National Center for Missing & Exploited Children, before Perm. Subcomm. on Investigations, at 3 (Nov. 19, 2015)).

[35] Backpage Report at 6.

[36] NAT'L CTR. FOR MISSING & EXPLOITED CHILDREN, SESTA-FOSTA: MOVING FORWARD WITH A NEW LAW TO COMBAT ONLINE CHILD SEX TRAFFICKING 2 (2018), http://endsextrafficking.az.gov/sites/default/files/meeting-documents/Human%20Trafficking/materials/final_htc_presentation_053018.pdf.

- 11 -

altered advertisements for the purpose of concealing evidence of criminality.[37]  More so, in its plea agreement submitted in the District of Arizona, Backpage admitted not only that it knew that "the great majority of these advertisements are, in fact, advertisements for prostitution services" but that Backpage "knowingly facilitate[ed]" prostitution.[38] Backpage admitted to using "'moderation' processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad . . . [as part of a] company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's 'escort' and 'adult' ads."[39]

These processes and policies have resulted in an incredibly lucrative business model for Backpage.  While Backpage has repeatedly refused to disclose its profitability, the PSI Staff Report found that Backpage was valued at over $600 million in 2015 and was estimated to be roughly nine times more profitable than the average Internet services company.[40]  Backpage's staggering profitability appears to be based almost entirely on its advertisements for sex.  While Backpage was a private company and did not disclose its financial information, the then-California Attorney General reported that from January 2013 to March 2015, 99% of Backpage's income worldwide was derived from its "adult"

---

[37] *See* PSI Staff Report at 21 ("Backpage's moderation process operated to remove explicit references to the likely illegality of the underlying transaction—not to prevent illegal conduct from taking place on its site.").

[38] *United States v. Backpage.com, LLC*, Case No. 18-cr-465, Dkt. 8-1 at 11 (D. Ariz. Apr. 5, 2018).

[39] *Id.*

[40] PSI Staff Report at 26.

section.[41]  During that same time, Backpage received $51 million in revenue from California alone.[42]

Backpage consistently chose to protect its revenue stream rather than to respond to pleas to take even the most basic steps to prevent trafficking.  On September 16, 2011, the National Association of Attorneys General ("NAAG") sent a letter to Backpage, eventually signed by all 51 state Attorneys General, expressing grave concern over its practices.[43]  NAAG noted that when Missouri investigators flagged 25 postings advertising children in July 2011, four days later, Backpage had removed only five of those postings.[44]  NAAG requested that Backpage substantiate its claims that it systematically moderates and removes illegal content.  Backpage refused.  In refusing, Backpage continued to facilitate trafficking victims.

## IV.   CONGRESS SPENT YEARS INVESTIGATING BACKPAGE'S FACILITATION OF SEX TRAFFICKING AND CLEARLY CONCLUDED THAT BACKPAGE'S CONDUCT WAS CULPABLE.

Drawing on a variety of sources, including social-science research and reports from law enforcement, Congress investigated sex trafficking on the Internet for years and found that this "[growing] debasement of our common humanity"[45] was brazenly enabled

---

[41] Press Release, *Attorney General Kamala D. Harris Announces Criminal Charges Against Senior Corporate Officers of Backpage.com for Profiting from Prostitution and Arrest of Carl Ferrer, CEO* (Oct. 6, 2016), https://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-announces-criminal-charges-against-senior.

[42] *Id.*

[43] Letter from the National Ass'n of Attorneys Gen. to Samuel Fifer, Counsel for Backpage.com, LLC (Sept. 16, 2011), https://www.naag.org/assets/files/pdf/signons/Backpage.com%20FINAL%209-16-11.pdf.

[44] *Id.*

[45] *In Our Own Backyard: Child Prostitution and Sex Trafficking in the United States: Hearing Before the Subcomm. on Human Rights & the Law of the S. Comm. on the Judiciary*, 111th Cong. 1 (2010) (statement of Sen. Richard J. Durbin, Chairman, S. Subcomm. on Human Rights and the Law, quoting President-elect Barack Obama).

by web platforms that were, until recently, largely exempt from liability for these crimes as a consequence of Section 230 of the CDA.[46]

Traffickers coerce their victims in a variety of ways, including through threats of physical violence, isolation, psychological manipulation, and induced drug dependency.[47] Children are especially vulnerable to manipulation by traffickers because they are generally economically dependent on adults and not fully developed emotionally and intellectually.[48]

Researchers have found it impossible to reliably measure the prevalence of child sex trafficking in the United States.[49]  However, it is clear that the Internet has made this unconscionable trade easier and more prevalent by allowing traffickers to control their operations, including by grooming, recruiting, and advertising their victims anonymously, at low cost, and to a wider audience with a lower risk of encountering law enforcement.[50]

---

[46] *See generally* PSI Staff Report.

[47] *See generally* Backpage Report; Human Trafficking Hearing; *see also* Linda A. Smith et al., *The National Report on Domestic Minor Sex Trafficking: America's Prostituted Children*, SHARED HOPE 37–40 (May 2009).

[48] *See* Megan Annitto, *Consent, Coercion, and Compassion: Crafting a Commonsense Approach to Commercial Sexual Exploitation of Minors*, 30 YALE L. & POL'Y REV. 1, 7, 13–14 (2011).

[49] *See generally* Backpage Report; Online Sex Trafficking Hearing; *see also* Ellen Wright Clayton et al., *Confronting Commercial Sexual Exploitation and Sex Trafficking of Minors in the United States*, NAT'L ACAD. OF SCIENCES, 2013, pp. 42–57, https://www.ojjdp.gov/pubs/243838.pdf.

[50] Online Sex Trafficking Hearing at 2, 15, 22; *see also* DOJ, THE NAT'L STRATEGY FOR CHILD EXPLOITATION PREVENTION AND INTERDICTION 77 (2016), https://www.justice.gov/psc/file/842411/download ("As escort and social networking websites have grown in number, they have gained popularity with pimps and have become the most popular platform to advertise sex trafficking victims.  These websites provide anonymity and 24-hour accessibility to a large pool of clients, thus increasing revenue to traffickers.").

NCMEC reported an 846% increase in reports of suspected child sex trafficking from 2010 to 2015, which the organization found to be "directly correlated to the increased use of the Internet to sell children for sex."[51]  A report covering all criminal and civil human trafficking cases handled by federal courts in 2017 recorded 661 active sex trafficking cases—65.8% involving child victims, 84.3% involving the use of the Internet to solicit customers, and 72.3% involving classified advertisements posted on Backpage.[52]

As found in the course of these congressional investigations, sites like Backpage have presented themselves as broad platforms for classified advertising, but they have allowed users to post advertisements for sexual services, operating with almost complete impunity, even when their actions reflected a clear intent to facilitate child sex trafficking.  For instance, Backpage was not simply turning a blind eye to child sex trafficking; it actively promoted it by (1) systematically sanitizing advertisements to conceal evidence of children being sold for sex;[53] (2) removing phone numbers, email addresses, IP addresses, and metadata from sex ads to frustrate the pursuit of sex traffickers by law enforcement;[54] (3) waiving verification requirements for sex advertisements, even though they were required for other advertisements;[55] (4) deliberately removing advertisements posted by anti-trafficking groups and law

---

[51] Backpage Report at 16.

[52] THE HUMAN TRAFFICKING INSTITUTE, 2017 FEDERAL HUMAN TRAFFICKING REPORT 3, 14 (2017), https://www.traffickingmatters.com/wp-content/uploads/2018/05/2017-Federal-Human-Trafficking-Report_hi-res.pdf.

[53] Backpage Report at 59–61.

[54] Human Trafficking Hearing at 17–22.

[55] *Id.* at 8.

enforcement agencies seeking to aid sex trafficking victims;[56] and (5) allowing traffickers to pay for ads with prepaid credit cards and cryptocurrencies to evade law enforcement.[57]

As an example of Backpage's flagrant connivance, it used an ad filter that automatically deleted terms from advertisements suggesting that child sex trafficking was afoot, such as "Lolita," "rape," "little girl," or "Amber Alert."[58]  In another instance, a Backpage content moderator reported that he was told by Backpage's COO that "[l]eaving notes on our site that imply we are aware of prostitution, or in any position to define it, is enough to lose your job."[59]

Indeed, investigations by Congress, including that of the Permanent Subcommittee on Investigations of the Senate's Committee on Homeland Security and Governmental Affairs, helped to partly pave the way for Backpage and its executives to be held legally accountable, unearthing hundreds of thousands of internal emails and documents that demonstrate Backpage's knowing facilitation of sex trafficking.[60]

## CONCLUSION

Backpage has facilitated illegal sex trafficking on a horrific scale, including the rape of innumerable underage girls.  In light of the academic research, legal filings, and congressional investigation material cited above, *Amici* respectfully submit that the

---

[56] Second Am. Compl. ¶ 40, *Doe ex rel. Roe v. Backpage.com, LLC*, 104 F. Supp. 3d 149 (D. Mass. 2014) (No. 14-13870), *aff'd sub nom. Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016).

[57] *Id.* ¶ 47; Compl. ¶¶ 77–78; *Sojourner Ctr. v. Backpage.com, LLC*, 2:17-cv-00399 (D. Ariz. Feb. 7, 2017).

[58] Backpage Report at 2–3.

[59] *Id.* at 4.

[60] United States' Response to Defendants' Motion to Dismiss Indictment at 21–24, *United States v. Lacey*, No. 18-cr-00422-SMB (D. Ariz. June 12, 2019); *see also* Backpage Report at 10–16 (detailing subcommittee investigation and subpoena-related litigation).

1  indictment against Defendants should not be dismissed, and that this case should move

2  forward.

3

4  Dated this 19th day of June, 2019                   DAVIS POLK & WARDWELL LLP

5

6                                                      By: /s/ Paul J. Nathanson
                                                           Paul J. Nathanson (*pro hac vice*)
7                                                          Erik Herron (*pro hac vice*)
                                                           Davis Polk & Wardwell LLP
8                                                          901 15th St. NW
                                                           Washington, D.C. 20005
9                                                          (202) 962-7055
10                                                         paul.nathanson@davispolk.com
                                                           *Attorney for Equality Now*
11

12                                                     BOIES SCHILLER FLEXNER LLP

13

14                                                     By: /s/ David Boies
                                                           David Boies (*pro hac vice*)
15                                                         Boies Schiller Flexner LLP
                                                           333 Main Street
16                                                         Armonk, NY 10504
                                                           (914) 749-7200
17                                                         dboies@bsfllp.com
                                                           *Attorney for Legal Momentum,*
18                                                         *Sanctuary for Families, United*
                                                           *Abolitionists, Inc., and National*
19                                                         *Coalition Against Domestic Violence*

20

21

22

23

24

25

26

27

28

- 17 -

United States of America,

                  Plaintiff,

- v -

Michael Lacey, *et al.*,

                 Defendants.

NO. CR-18-422-PHX-SMB

**[PROPOSED] ORDER GRANTING MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* EQUALITY NOW, LEGAL MOMENTUM, SANCTUARY FOR FAMILIES, UNITED ABOLITIONISTS, INC., AND NATIONAL COALITION AGAINST DOMESTIC VIOLENCE**

Having reviewed Equality Now, Legal Momentum, Sanctuary for Families, United Abolitionist, Inc., and National Coalition Against Domestic Violence's Motion for Leave to File Brief of *Amici Curiae* Equality Now and Legal Momentum, and good cause appearing,

IT IS HEREBY ORDERED that the Motion for Leave to File Brief of *Amici Curiae* Equality Now, Legal Momentum, Sanctuary for Families, United Abolitionist, Inc., and National Coalition Against Domestic Violence is GRANTED.

IT IS FURTHER ORDERED that Equality Now, Legal Momentum, Sanctuary for Families, United Abolitionist, Inc., and National Coalition Against Domestic Violence's *Amici Curiae* Brief, which was lodged with the Motion for Leave, shall be deemed properly filed.