MICHAEL BAILEY
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1200
Los Angeles, CA 90012
Telephone (213) 894-3391

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Michael Lacey, et al.,<br><br>Defendants. | No. CR-18-422-PHX-SMB<br><br>**UNITED STATES' RESPONSE TO DEFENDANTS' MOTION TO DISMISS INDICTMENT** |

# **TABLE OF CONTENTS**

Table of Contents .................................................................................................... i

Table of Authorities................................................................................................ ii

Preliminary Statement ........................................................................................... 1

Background............................................................................................................. 4

      A.    Overview of Backpage ................................................................... 4

      B.    Backpage's Knowing and Intentional Facilitation of Prostitution............... 5

      C.    Victim Summaries.................................................................... 11

      D.    Money Laundering Operations .................................................. 11

      E.    Substantive Counts .................................................................. 12

Argument ............................................................................................................. 12

I.    The Superseding Indictment Far Surpasses the Minimal Constitutional
Requirements for Sufficiency Under Rules 7 and 12............................................ 12

      A.    Conspiracy to Violate Travel Act—Facilitate Prostitution – Count 1 ........ 13

      B.    Travel Act—Facilitate Prostitution – Counts 2-51 ..................................... 13

      C.    Money Laundering ................................................................... 14

II.    Defendants Cannot Pretend that Backpage's "Adult" Ads Were for Legitimate
"Escort" Services, Rather than Illegal Prostitution.. ............................................. 16

III.    Backpage's Litigation History Undermines Defendants' Claim that
Backpage's "Adult" Ads Were Protected By the First Amendment...................... 21

IV.    Backpage's Prostitution-Promoting Practices Were Not "Protected Editorial
Functions." ............................................................................................................ 26

V.    The SI's *Mens Rea* Allegations Are Sufficient. ................................................... 30

      A.    The SI Alleges the Requisite Elements for a Travel Act Violation,
Including *Mens Rea*..................................................................... 30

      B.    Defendants' Constitutional *Mens Rea* Claims are Unavailing.................. 32

      C.    The SI Alleges Defendants Each Possessed the Requisite Specific
Intent.......................................................................................... 38

            1.    Lacey and Larkin................................................................. 38

            2.    Spear and Brunst ................................................................. 40

      D.    Defendants' Cases Are Inapposite. ............................................ 41

VI.    The Travel Act is Constitutional As Applied......................................................... 43

Conclusion ........................................................................................................... 44

1

## Table of Authorities

2

## CASES

3   *Anthony v. Yahoo, Inc.*, 421 F. Supp. 2d 1257 (N.D. Cal. 2006)  ..................................... 26

4   *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986)  ........................................................ 35

5   *Backpage.com LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015)  ..................................... 3, 21-23

6   *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012)  ............... 22

7   *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009)  .................................................. 27

8   *Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003)  ............................................................ 27

9   *Braun v. Soldier of Fortune Magazine, Inc.*, 968 F.2d 1110 (11th Cir. 1992)  ................ 17

10  *Coyote Pub., Inc. v. Miller*, 598 F.3d 592 (9th Cir. 2010)  ..................................... 2, 17, 27

11  *Dart v. Craigslist*, 665 F. Supp. 2d 961 (N.D. Ill. 2009)  ............................................. 25-26

12  *Doe ex rel. Roe v. Backpage.com, LLC*, 104 F. Supp. 3d 149 (D. Mass. 2015)  .............. 28

13  *Erotic Service Provider Legal Ed. and Research Project v. Gascon*,

14      880 F.3d 450 (9th Cir. 2018)  ................................................................. 2, 17, 29

15  *Hy Cite Corp. v. badbusinessbureau.com*,

16      418 F. Supp. 2d 1142 (D. Ariz. 2005)  ............................................................ 26

17  *J.S. v. Village Voice Media Holdings, Inc.*, 359 P.3d 714 (Wash. 2015)  ............... 3, 25, 27

18  *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016)  ................... 25, 35-36

19  *Jane Doe No. 1 v. Backpage.com, LLC*,

20      2018 WL 1542056 (D. Mass. 2018)  .................................................... 3, 25, 27

21  *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398 (6th Cir. 2014)  .................... 26

22  *M.A. v. Village Voice Media Holdings, LLC*,

23      809 F. Supp. 2d 1041 (E.D. Mo. 2011)  .................................................... 21, 28

24  *Manual Enterprises, Inc. v. Day*, 370 U.S. 478 (1962)  ................................................ 35

25  *MCW, Inc. v. badbusinessbureau.com*,

26      2004 WL 833595 (N.D. Tex. Apr. 19, 2004)  ............................................... 26

27  *Miller v. California*, 413 U.S. 15 (1973)  ..................................................................... 32

28

1    *Mishkin v. State of New York*, 383 U.S. 502 (1966) ...................................... 33-35

2    *Morissette v. United States*, 342 U.S. 246 (1952) ............................................ 38

3    *People v. Ferrer*, 2016 WL 7237305 (Cal. Super. Ct. Dec. 16, 2016) ...................... 21, 22

4    *Pinkerton v. United States*, 328 U.S. 640 (1946) .............................................. 14

5    *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376 (1973) .................. 2, 17

6    *Salinas v. United States*, 522 U.S. 52 (1997) .................................................. 13

7    *Senate Permanent Subcommittee v. Ferrer*, 199 F. Supp. 3d 125 (D.D.C. 2016) ........... 22

8    *Smith v. California*, 361 U.S. 147 (1959) ......................................................... 33

9    *Takahashi v. United States*, 143 F.2d 118 (9th Cir. 1944) ................................... 38

10   *Turf Center, Inc. v. United States*, 325 F.2d 793 (9th Cir. 1963) ..................... 32

11   *United States v. Blinder*, 10 F.3d 1468 (9th Cir. 1993) ................................... 28-29

12   *United States v. Boren*, 278 F.3d 911 (9th Cir. 2002) ...................... 2, 4, 12, 28

13   *United States v. Buddenberg*, 2010 WL 2735547 (N.D. Cal. July 12, 2010) ............. 16, 41

14   *United States v. Cassidy*, 814 F. Supp. 2d 574 (D. Md. 2011) ........................... 43

15   *United States v. Gibson Specialty Co.*, 507 F.2d 446 (9th Cir. 1974) .................. 31-32, 38

16   *United States v. Graham*, 581 F.2d 789 (9th Cir. 1978) ...................................... 38

17   *United States v. Gray*, 2017 WL 3675383 (D. Ariz. Aug. 25, 2017) ...................... 13

18   *United States v. Jackson*, 865 F.3d 946 (7th Cir. 2017) .................................. 3, 25, 35-36

19   *United States v. Jensen*, 93 F.3d 667 (9th Cir. 1996) ................................ 1, 12, 27

20   *United States v. Kaiser*, 660 F.2d 724 (9th Cir. 1981) ................................... 32

21   *United States v. Kilbride*, 507 F. Supp. 2d 1051 (D. Ariz. 2007) ...................... 16

22   *United States v. Landham*, 251 F.3d 1072 (6th Cir. 2001) .............................. 16

23   *United States v. Meredith*, 685 F.3d 814 (9th Cir. 2012) .............................. 17

24   *United States v. Montague*, 29 F.3d 317 (7th Cir. 1994) .............................. 14

25   *United States v. Moreland*, 622 F.3d 1147 (9th Cir. 2010) ........................... 15

26   *United States v. Nukida*, 8 F.3d 665 (9th Cir. 1993) .................................. 12

27   *United States. v. O'Donnell*, 608 F.3d 546 (9th Cir. 2010) ......................... 13, 32

28   *United States v. P.H.E., Inc.*, 965 F.2d 848 (10th Cir. 1992) ......................... 36

*United States v. Palfrey*, 499 F. Supp. 2d 34 (D.D.C. 2007) ................................ 14, 30, 32

*United States v. Phillips*, 367 F.3d 846 (9th Cir. 2004) ..................................... 38

*United States v. Polizzi*, 500 F.2d 856 (9th Cir. 1974) ............................... 32, 43

*United States v. Resendiz-Ponce*, 549 U.S. 102 (2007) ......................... 12, 14-16

*United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997) ......................... 15

*United States v. Schiff*, 379 F.3d 621 (9th Cir. 2004) ......................... 17

*United States v. Tavelman*, 650 F.2d 1133 (9th Cir. 1981) ..................... 13-14, 30, 32, 43

*United States v. Ulbricht*, 31 F. Supp. 3d 540 (S.D.N.Y. 2014) ............................. *passim*

*United States v. Welch*, 327 F.3d 1081 (10th Cir. 2003) ..................................... 30, 32, 43

*United States v. White*, 610 F.3d 956 (7th Cir. 2010) ..................................... 41-42

*United States v. White*, 638 F. Supp. 2d 935 (N.D. Ill. 2009) ......................... 41

*United States v. Williams*, 553 US. 285 (2008) ................................... 2, 17, 29, 33

*United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994) ........................... 5

*Woodhull Freedom Found. v. United States*,

   334 F. Supp. 3d 185 (D.D.C. 2018) ................................. 37

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) ................................ 27

## **STATUTES**

18 U.S.C. § 371 ............................................................. 4, 13

18 U.S.C. § 875(c) ......................................................... 16

18 U.S.C. § 1591 ........................................................... 37

18 U.S.C. § 1952 ........................................................ 4, 14-15

18 U.S.C. § 1952(a)(3)(A) ............................................ 13, 20, 30

18 U.S.C. § 1956 ........................................................... 14

18 U.S.C. § 1956(a)(1)(B) ................................................. 15

18 U.S.C. § 1956(a)(2)(A) ................................................. 15

18 U.S.C. § 1956(a)(2)(B) ................................................. 15

18 U.S.C. § 1957(a) ....................................................... 15

18 U.S.C. § 2421(A)(a) .......................................................................... 37

34 U.S.C. § 11293(b)(1)(B) ................................................................... 10

47 U.S.C. § 230 ....................................................................................... 21

47 U.S.C. § 230(e)(1) ..................................................................... 2, 22, 28

**RULES**

Fed. R. Crim. P. 7 and 12 ............................................................... 1, 12-13

**MISCELLANEOUS**

9th Cir. Model Crim. J. Instr. 8.25 ......................................................... 14

BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING, U.S. Senate
Permanent Subcommittee on Investigations, Jan. 2017, available at:
https://www.hsgac.senate.gov/imo/media/doc/Backpage%20Report%202017.01.10%20FI
NAL.pdf  ............................................................................................... 11

Monica J. DeLateur, FROM CRAIGSLIST TO BACKPAGE.COM: CONSPIRACY AS A STRATEGY
TO   PROSECUTE THIRD-PARTY WEBSITES FOR SEX TRAFFICKING,
56 Santa Clara L. Rev. 531 (2016) ......................................................... 33

Lawrence G. Walters, SHOOTING THE MESSENGER: AN ANALYSIS OF THEORIES OF
CRIMINAL LIABILITY USED AGAINST ADULT-THEMED ONLINE SERVICE PROVIDERS, 23
Stan. L. & Pol'y Rev. 171 (2012) ........................................................... 34

Urban Dictionary, https://www.urbandictionary.com/ ................................. 18

**Preliminary Statement**

Despite their ownership, oversight and control of the internet's largest prostitution advertising website for more than a decade, Defendants claim that the superseding indictment (SI) is an unprecedented attempt to impose "vicarious liability" on website operators who did not have the faintest idea that their services were being "misused" by third parties to facilitate prostitution. (Doc. 561 (Mot.) at 1, 14.) Defendants make this claim in the face of a 92-page, 100-count, 211-paragraph SI alleging Defendants knew the vast majority of the "adult" ads on Backpage were prostitution solicitations; intentionally pursued numerous business practices to expand Backpage's volume of prostitution ads and promote their customers' illegal ventures; and generated a half-billion dollars in prostitution ad revenue. (*See, e.g.*, SI ¶¶ 1-17, 177.) For several reasons, the SI abundantly puts Defendants on notice of the offenses charged and comports with constitutional requirements, and Defendants' Motion should be denied.[1]

First, the SI easily meets the constitutional pleading requirements in Fed. R. Crim. P. 7 and 12. The SI sets out the elements of the charged statutes and provides dozens of factual allegations that illustrate Defendants' criminal conduct. The SI is nothing like the bare-bones indictments dismissed in several of Defendants' cases. (*Cf.* Mot. at 12-13.) Moreover, while Defendants attempt to write-off the SI as a "prolix" statement based on "improper presumptions (and mischaracterizations)," and try to minimize their conduct by insisting www.Backpage.com (Backpage) operated just like any other general-purpose website (Mot. at 15), a motion to dismiss is not the appropriate place for Defendants to contest the facts alleged in the SI. *See United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996) (defendant may not challenge indictment on the basis that the allegations are not supported by adequate evidence). Defendants will have an opportunity to argue that Backpage operated similarly

---

[1] Michael Lacey, James Larkin, Scott Spear, John "Jed" Brunst, Dan Hyer, Andrew Padilla and Joye Vaught were indicted on March 28, 2018. (Doc. 3.) On July 25, 2018, the grand jury returned a Superseding Indictment (SI) (Doc. 230). As used herein, "Defendants" refers to the movants—Lacey, Larkin, Spear and Brunst.

to other websites and dispute other allegations when they have their day in court—at trial. For purposes of this Motion, the Court must accept the truth of all the allegations in the SI. *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002).

Second, Defendants' assertion that the SI is an undifferentiated attack on "adult-oriented" advertising is flatly wrong.  (Mot. at 1.)  The SI alleges that Backpage was a prostitution advertising website, identifies scores of blatant prostitution ads that appeared on Backpage, and provides information—including from Backpage's documents—showing that Backpage ads offered the sale of adults (and in many cases children) for sex.  Counts 2-51 of the SI identify 50 such ads by date and description, and additional prostitution ads are discussed throughout the SI.  (*See, e.g.*, SI¶¶64, 71, 76, 91, 92, 96, 104, 118-119, 120, 123-126, 132, 148-149, 160-176, 201.)  The SI also identifies numerous business practices Defendants pursued to expand prostitution advertising.  (*See, e.g.*, SI¶¶1, 9-11, 34.)

The First Amendment "extends no protection" at all to speech that "concerns illegal activity or is misleading," *Erotic Service Provider Legal Ed. and Research Project v. Gascon*, 880 F.3d 450, 459-60 (9th Cir. 2018), and speech proposing an illegal transaction is "categorically excluded from First Amendment protection."  *United States v. Williams*, 553 US. 285, 297 (2008).  This exclusion applies to Backpage's prostitution ads.  *See, e.g., Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973) ("We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad…soliciting prostitutes."); *Coyote Pub., Inc. v. Miller*, 598 F.3d 592, 603-04 (9th Cir. 2010) (upholding Nevada ban on prostitution advertising); *Erotic Service Provider*, 880 F.3d at 459-60 (rejecting First Amendment challenge to ordinance outlawing prostitution solicitations).

Third, Defendants' assertion that Backpage's litigation history supports dismissal is unavailing.  (*See* Mot. at 14-25.)  Most of the cases Defendants cite were decided under Section 230 of the Communications Decency Act—a statute that has no applicability in this federal criminal prosecution.  *See* 47 U.S.C. § 230(e)(1).  Moreover, Defendants' cases were almost all decided before Backpage was compelled—by the U.S. Senate and the grand jury— to turn over more than 500,000 internal documents.  After these disclosures and related

developments, courts imposed some $450,000 in sanctions based on Backpage's false and fraudulent misrepresentations about its operations.  One of the cases Defendants cite most, *Backpage.com LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) (Mot. *passim*), has taken a remarkable U-turn—resulting in dismissal and the imposition of a $250,000 sanction.  The Seventh Circuit now recognizes that Backpage "contained an adult section advertising different categories of sex work," and other courts have rejected the notion that Backpage's prostitution advertising deserves protection.  *United States v. Jackson*, 865 F.3d 946, 949 (7th Cir. 2017), *cert. granted, judgment vacated on other grounds*, 138 S. Ct. 1983 (2018); *see also, e.g., J.S. v. Village Voice Media Holdings, Inc.*, 359 P.3d 714, 715-16 (Wash. 2015) (denying motion to dismiss claim by three minor girls who had been "bought and sold for sexual services" on Backpage); *Jane Doe No. 1 v. Backpage.com, LLC*, 2018 WL 1542056, at *1 (D. Mass. 2018) (allowing claim to proceed against Backpage).

Fourth, Defendants' assertion that the SI is based on a "novel" legal theory likewise misses the mark.  (Mot. at 1.)  The SI does not allege that Defendants are criminally liable because they innocently operated a website that was—unknown to and unplanned by them—used to advertise illegal prostitution services.  Rather, the SI alleges that Defendants knowingly and intentionally operated an expansive illegal online marketplace for advertising prostitutes and laundering money.  (*See* SI ¶¶ 12, 16.)   This knowing and intentional conduct "separates [Defendants] from the mass of others whose websites may— without their planning or expectation—be used for unlawful purposes."  *United States v. Ulbricht*, 31 F. Supp. 3d 540, 556 (S.D.N.Y. 2014).  Several courts have recently recognized that prostitution websites operators like Defendants may be prosecuted under federal law.

Fifth, Defendants' *mens rea* arguments are unavailing.  The SI amply alleges that Defendants specifically intended to facilitate illegal activity—namely, prostitution.  The caselaw and Defendants' *amici* both recognize that this is enough to satisfy the scienter required under the law.  Moreover, intent is fundamentally a jury question, and the SI alleges more than enough to permit the jury to decide whether Defendants possessed the requisite specific intent for the charged crimes.  Defendants' Motion should be denied.

**Background**

The SI's allegations, which must be taken as true in considering the instant motion, *Boren*, 278 F.3d at 914, include the following:

**A.    Overview of Backpage**

Backpage was, until shut down in April 2018, notorious for being the internet's leading source of prostitution advertisements.  (SI¶1.)  Backpage derived the overwhelming majority of its revenue from such ads, and earned over a half-billion dollars in prostitution-related revenue during its 14 years of existence.  (SI¶1.)

Lacey and Larkin co-founded Backpage in 2004 with Carl Ferrer[2] in response to declining revenue experienced by Lacey and Larkin's alternative newspaper conglomerate. (SI¶¶2, 18-21.)  From 2004-15, Lacey and Larkin oversaw Backpage's policies and strategic direction.  (SI¶2.)  Spear served as the Executive Vice President of one of Backpage's parent companies.  (SI¶3.)  Brunst served as the Chief Financial Officer of Backpage and several parent companies.  (SI¶4.)  Padilla and Vaught served as the Backpage's Operations Manager and Assistant Operations Manager, respectively.  (SI¶¶6-7.)  Hyer served as Backpage's Sales and Marketing Director.  (SI¶5.)[3]

When Craigslist closed its "adult" section in 2010 after learning that many of the ads in that section were for prostitution, Backpage made an aggressive push to capture Craigslist's share of this market.  (SI¶24.)  This push was successful.  In internal documents, Backpage stated it experienced "explosive growth" by "capitalizing on displaced Craigslist ad volume."  (SI¶25.)  Backpage's annual profits skyrocketed to over $26 million in 2010, over $52 million in 2011, and over $78 million in 2012.  (SI¶25.)

---

[2] On April 5, 2018, pursuant to plea agreements, Backpage.com, LLC and four related entities pleaded guilty to one count of money laundering conspiracy.  (CR18-00465, Docs. 4-1, 8, 10.)  The same day, Ferrer—Backpage.com, LLC's CEO and 100% owner—pleaded guilty to a charge of 18 U.S.C. § 371 conspiracy to violate 18 U.S.C. §§ 1952 (Travel Act—Facilitate Prostitution) and 1956-1957 (Money Laundering).  (CR18-00464, Doc. 4-1 at 1-2, and Doc. 7-1 at 1, 12-14.)

[3] On August 18, 2018, Hyer pleaded guilty to Count 1 of the SI (18 U.S.C. § 371 Conspiracy to Violate 18 U.S.C. § 1952 (Travel Act—Facilitate Prostitution).  (Doc. 271.)

Backpage became so profitable that in November 2012 its owners decided to spin off their publishing business and focus on Backpage's growth.  (SI¶26.)  Thereafter, Lacey held an ownership interest in Backpage's new corporate parent, Medalist Holdings, Inc., of approximately 45%; Larkin held approximately 43%; Brunst held approximately 6%; and Spear held approximately 4%.  (SI¶27.)  Backpage's profits climbed from over $112 million in 2013 to over $134 million in 2014.  (SI¶28.)

In April 2015, Lacey, Larkin, Spear and Brunst purported to sell Backpage and related entities for around $600 million to entities controlled by Ferrer.  (SI¶29.)  Ferrer borrowed most of the sales price from entities controlled by the sellers.  (SI¶30.)  Post-sale, Lacey and Larkin retained control over various aspects of Backpage's business and continued receiving tens of millions of dollars of Backpage distributions.  (SI¶¶31-32.)

### B.        Backpage's Knowing and Intentional Facilitation of Prostitution

Defendants knew the vast majority of the "adult" ads appearing on Backpage "were actually ads for prostitution" and they "took a variety of steps to intentionally facilitate that illegal activity" (SI¶34), including the following:

**Content Aggregation:**  In its early years, Backpage's employees were trained to—and paid bonuses for—identifying prostitutes who were posting ads on rival websites, creating free ads on Backpage for them, and using the resulting Backpage ads (which would only remain free for a trial period) in an attempt to secure the prostitutes' business.  (SI¶9.)  These content-creation efforts, described internally as "content aggregation" or the "Dallas Plan," were vital to the company's early growth and success.  (SI¶9.)  In April 2007, for example, Spear sent an email to Hyer and Ferrer regarding a "blueprint" for "moving that process [from Dallas] to other cities."  (SI¶ 35.)  An attachment entitled "Dallas success in other markets" explained how Backpage employees would run Google searches to identify prostitutes advertising on other websites, then "Call clients.  Ask them if they have tried backpage.com.  If not, post a free ad with an auto repost for free for six weeks."  (SI¶ 36; *see also* SI¶37.)  Larkin, Spear, Ferrer, Hyer and other Backpage principals continued to execute or monitor expanding these content-creation efforts to other U.S. cities.  (SI¶¶ 38-44.)

1    **Reciprocal Link and Affiliate Programs:**   Backpage entered formal business
2    arrangements with known prostitution services and websites to increase Backpage's volume
3    of prostitution advertising; these efforts "were specifically intended to promote and facilitate
4    prostitution." (SI¶10; *see also* SI¶ 34.)  For years, Backpage had a reciprocal link agreement
5    with The Erotic Review, a website on which "johns" posted explicit "reviews" of prostitutes
6    they had purchased on websites like Backpage, including descriptions of prices charged for
7    specific sex acts.  (SI¶10.)  Backpage paid The Erotic Review for assistance in getting The
8    Erotic Review's customer base to use Backpage.  (SI¶10.)  In late 2007, Ferrer provided a
9    "2008 Budget and Business Plan" to Larkin and Spear that explained: "[W]e struck a deal
10   with TheEroticReview (TER) with reciprocal links.  It created huge brand awareness in this
11   niche industry and increased page views from TER by 120,000 per day." (SI¶50.)  At this
12   point, Backpage was paying nearly $50,000 per year to The Erotic Review.  (SI¶51.)  In
13   December 2008, Ferrer identified Backpage's top marketing strategy as "TER-high page
14   view per referral." (SI¶52; *see also* SI¶¶53-56.)

15       Defendants routinely received or were briefed about "Google Analytics" reports
16   showing which other websites were referring users to Backpage, and these reports confirmed
17   The Erotic Review's crucial role in driving traffic to Backpage.  (SI¶¶57-58.)  The January
18   2009 monthly report stated The Erotic Review was the #1 outside source of referrals and was
19   responsible for over half a million visits that month.  (SI¶58.)  The daily report for March
20   22, 2010 showed The Erotic Review was responsible for referring more than 40,000 daily
21   visits to Backpage—more than six times as many as the next-biggest referral source.  (SI¶58.)
22   The August 2013 monthly report showed The Erotic Review was responsible for nearly 1
23   million visits each month.  (SI¶58.)  The November 2014 report showed The Erotic Review
24   was the #1 source of non-search engine referrals.  (SI¶58.)  Larkin, Spear, Brunst, Ferrer and
25   Hyer had ongoing discussions about the importance of Backpage's relationship with The
26   Erotic Review.  (*See, e.g.*, SI¶¶45-58.)

27       Backpage also formed "affiliate" partnerships with other organizations and
28   individuals in the prostitution industry.  (SI¶59; *see also* SI¶¶60-67.)  One individual, "Dollar

Bill," earned fees in return for arranging for prostitutes and pimps to post ads on Backpage. (SI¶59.)  In one email, Padilla explained "[t]his is one of our largest adult accounts and the restoration [of thousands of Dollar Bill's ads]…is a high priority for us."  (SI¶61.)

**Moderation:**  Defendants utilized several intentional measures to help pimps, prostitutes and sex traffickers avoid detection by law enforcement when posting ads online for commercial sex.  (SI¶11.)  These strategies included removing terms and pictures particularly indicative of adult and child prostitution—and then publishing a revised version of the ad without blocking the ad itself.  (SI¶ 34.)  Such editing did nothing to change the purpose of the ad (soliciting prostitution)—it only created a veneer of deniability and helped Backpage's customers evade detection.  (SI¶13; *see also* SI¶¶68-152.)

In October 2010, for example, Padilla sent an email to a large group of Backpage employees (including Hyer and Vaught) with two attachments providing guidance on how to "moderate" ads.  (SI¶78.)  The first was a PowerPoint that displayed 38 nude and partially-nude photographs.  (SI¶78.)  Next to each picture was an instruction about moderator approval.  (SI¶78.)  These instructions included "Approve.  Nude rear shots are okay as long the model is not exposing her anus or genitalia." and "Approve.  Rear shot okay.  Transparent wet panties okay."  (SI¶78.)  The second was a spreadsheet with 50 terms (all indicative of prostitution) that should be "stripped" from ads before publication.  (SI¶78.)

The same month, Padilla sent an email (cc'ing Vaught) threatening to fire any Backpage employee who acknowledged in writing that a customer was a prostitute: "Leaving notes on our site that imply that we're aware of prostitution, or in any position to define it, is enough to lose your job over…This isn't open for discussion.  If you don't agree with what I'm saying completely, you need to find another job."  (SI¶77.)

In November 2010, Hyer and Padilla received an email acknowledging "Lolita" is "code for under aged girl" but explaining the term could simply be stripped from ads (as opposed to refusing to publish the ad).  (SI¶85.)  The email also stated customers should be allowed to include their identification numbers from The Erotic Review ("[A]llow users to put in TER IDs (just no live links)."  (SI¶85.)

1     In February 2011, Padilla sent an Excel spreadsheet that identified over 660 code

2     words or phrases indicative of prostitution, including an array of terms that are suggestive of

3     child prostitution (*e.g.*, "lolita," "fresh," "high school," "tight," "young"). (SI¶95.) Most

4     such terms were simply to be "filtered" from the ads. (SI¶95.)

5     On July 28, 2011, Lacey sent Larkin a draft editorial entitled "BackPage understood,"

6     in which Lacey bragged about Backpage's contributions to the prostitution industry:

7     "Backpage is part of the solution….For the very first time, the oldest profession in the world

8     has transparency, record keeping and safeguards." (SI¶107.) Lacey also acknowledged

9     Backpage used an automatic filter to remove particular phrases indicative of prostitution but

10    still published the ads after editing. (SI¶107.) Larkin instructed Ferrer to avoid making some

11    of Lacey's statements "public" because "we need to stay away from the very idea of 'editing'

12    the posts, as you know." (SI¶¶12, 108.)

13    In September 2011, certain Defendants assisted in creating a PowerPoint to describe

14    Backpage's business to potential buyers. The presentation acknowledged the non-adult

15    sections of Backpage were simply intended to "allow[] 'plausible deniability,'" make the

16    website more palatable to "regulatory and law enforcement" officials, and otherwise make

17    Backpage's adult section more "defensible." (SI¶112.)

18    In February 2012, Ferrer was forwarded a legal notice claiming that several of

19    Backpage's ads included copyrighted content from two competing websites called

20    RubMaps.com and EroticMP.com. (SI¶118.) In one such ad, a customer stated that, in return

21    for $45 and a $5 tip, he had received a "Blow Job…w/ condom" from a woman who "had

22    nice breasts." (SI¶118.) In another ad, a customer stated that, in return for $60, he had oral

23    and vaginal sex with a prostitute. (SI¶118.) When asked by Backpage staff, Ferrer instructed

24    that these ads should remain on Backpage for another few weeks. (SI¶118.) A month later,

25    Hyer received an email stating the ads shouldn't be deleted. (SI¶119.)

26    On July 30, 2015, a training document distributed to Backpage's moderators

27    instructed that if the moderators saw a photograph depicting "a person [who] looks

28    young/minor," they should "approve dont delete the ad unless it has a banned term."

- 8 -

1   (SI¶143.)  The document also identified, under the heading "THESE ARE ALL OKAY," a

2   long list of terms that are indicative of prostitution, such as "99% CUM BACK FOR

3   MORE," "car service," and "lollipop special."  (SI¶143.)

4        In early 2016, Backpage's moderators were instructed to stop removing ads that

5   contained "GFE," "even gfe with price."  (SI¶148.)  Defendants had long known, and had

6   repeatedly acknowledged in internal Backpage documents, that GFE was a "coded sex act

7   for money" and a "solid sex for money term[]."  (SI¶149.)

8        The SI also describes several examples of Backpage employees coaching or assisting

9   customers regarding ads that promoted or facilitated the customers' prostitution ventures.

10  For example, in February 2011, the Backpage customer "Licks Alot" emailed to complain

11  that all of the pictures in one of her ads had been deleted.  (SI¶91.)  Ferrer responded by

12  explaining that one of her photos had been removed because "[o]ur crazy internet safety

13  experts do not want any genitalia showing up around the thong."  (SI¶91.)  He apologized,

14  allowed her prostitution ad to remain on the website and offered a free upgrade.  (SI¶91.)

15       Between September 2010 and October 2012, Ferrer became aware that Backpage

16  customer P.R. was posting prostitution ads.  (SI¶132.)  Ferrer repeatedly restored her posting

17  privileges and gave her advice on how to conform to Backpage's publication standards.

18  (SI¶132.)  Padilla and Vaught were also aware of P.R.'s ads.  (SI¶132.)  From October 2012

19  to November 2015, P.R. was allowed to post over a dozen new prostitution ads.  (SI¶132.)

20       In 2010 and 2011, Ferrer and Padilla worked on restoring ads placed by Dollar Bill,

21  and Ferrer advised Dollar Bill "on how to wordsmith ads so they wouldn't be rejected by

22  Backpage's moderators."  (SI¶¶59-67.)  Other Backpage employees provided customers

23  advice on how to revise ads so that they could be featured on Backpage.  (SI¶¶160, 172.)

24       **Notice:**  Backpage faced widespread criticism as it grew its prostitution advertising

25  business.  For example, in August 2011, the National Association of Attorneys General stated

26  that "[n]early naked persons in provocative positions are pictured in nearly every adult

27  services advertisement on Backpage.com and the site requires advertisements for escorts,

28  and other similar 'services,' to include hourly rates.  It does not require forensic training to

understand that these advertisements are for prostitution." (SI¶111.)  In March 2015, a California Department of Justice law enforcement officer spoke with a Backpage representative concerning the prevalence of blatant prostitution ads on Backpage; the representative did not dispute this characterization.  (SI¶141.)  In August 2015, Backpage was served with an affidavit from a Seattle Police Department detective avowing no detective in the Department's Vice/High Risk Victims Unit "ha[d] ever found a legitimate 'escort'…or 'masseuse'…while responding to ads placed in these categories on Backpage.com" and "every time the [Unit] has responded to an ad in the adult section of Backpage.com, we have found that the ad was a posting for illegal activity."  (SI¶144.)  A Boston Police Department detective similarly avowed "Backpage.com is the number one site in Boston for prostitution and sex trafficking" and "nearly all the cases we find associated with [it] involve pimp controlled prostitution."  (SI¶144.)

News organizations, anti-trafficking groups and others similarly reported the prevalence of prostitution ads on Backpage.  For example, in May 2012, CNN ran an expose deeming Backpage "a hub for the sex trade." (SI¶127.)  In November 2012, an Arizona State University researcher published a study concluding that most of the ads on Backpage's Phoenix page involved prostitution and many depicted juvenile trafficking victims. (SI¶131.)  In calls and meetings, representatives from the National Center for Missing and Exploited Children (NCMEC)—designated by Congress as the "official national resource center and information clearinghouse for missing and exploited children," 34 U.S.C. § 11293(b)(1)(B)—informed Lacey, Larkin and Spear that a large portion of the ads on Backpage were blatant prostitution ads, many featuring children.  (*See, e.g*., SI¶¶86, 97.) Backpage declined to follow NCMEC's recommendations to prevent child trafficking. (SI¶134.)  In 2014, NCMEC filed an amicus brief repudiating any suggestion that Backpage was an ally against sex trafficking.  (SI¶140.)[4]

After lengthy investigation, in 2017 the U.S. Senate Subcommittee on Permanent

---

[4] http://www.missingkids.com/content/dam/pdfs/legal-briefs/amicusncmecbackpage.pdf.

Investigations issued a 50-page report, BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING. (SI¶151.) The report concluded that virtually all of Backpage's "adult" ads were solicitations for prostitution and "Backpage has maintained a practice of altering ads before publication by deleting words, phrases, and images indicative of criminality, including child sex trafficking….Those practices served to sanitize the content of innumerable advertisements for illegal transactions—even as Backpage represented to the public and the courts that it merely hosted content others had created." (SI¶151.)[5]

### C.     **Victim Summaries**

The SI contains 17 victim summaries. (SI¶¶160-173.) Five victims were juveniles when trafficked on Backpage. (SI¶¶163, 164, 167, 169, 172.) Many were raped repeatedly; one was choked to the point of having seizures and gang-raped. (*See* SI¶ 164.) Three were murdered by Backpage customers; another was killed when, attempting to escape her trafficker, she jumped out of a vehicle on a freeway and was hit by several other vehicles travelling at high speeds. (SI¶¶165, 173-75.)

### D.     **Money Laundering Operations**

By 2015, the major credit card companies stopped processing payments for Backpage and some banks closed Backpage's accounts out of concern they were being used for illegal purposes. (SI¶15.) Defendants pursued an array of money laundering strategies in response, including: depositing customer payments in accounts held in the name of entities with no apparent connection to Backpage and giving customers a corresponding "credit" to purchase new ads; wiring business proceeds to foreign banks and redistributing the funds to certain Defendants or redepositing them in other accounts (to conceal the nature of those funds); and converting payments into cryptocurrencies. (SI¶15.) Moreover, in July 2016, Lacey sought assistance "put[ting] some assets in place[s] where…government parties…can not access my

---

[5] https://www.hsgac.senate.gov/imo/media/doc/Backpage%20Report%202017.01.10%20FINAL.pdf (hereinafter SR). The Report's 840-page Appendix is available at https://www.hsgac.senate.gov/imo/media/doc/Final%20Appendix%202017.01.09.pdf.

accounts." (SI¶16.)  He later asked an Arizona-based bank for advice on how to move assets "offshore" to protect them from government seizure.  (SI¶16.)  Soon after, $16.5 million in Backpage-derived cash was wired from Lacey's U.S. bank accounts to Hungary.  (SI¶16.)  At the time, he was facing criminal charges in California and was aware of the grand jury investigation here.  (SI¶16; *see also* SI¶¶177-194.)

E.    **Substantive Counts**

The SI includes 100 substantive counts, detailed below.  (SI¶¶195-211.)

**Argument**

I.    **The Superseding Indictment Far Surpasses the Minimal Constitutional Requirements for Sufficiency Under Rules 7 and 12.**

In ruling on Defendants' Rule 12 motion to dismiss for failure to state an offense, this Court is bound by the four corners of the indictment.  *Boren*, 278 F.3d at 914.  The Court must "accept the truth of the allegations in the indictment in analyzing whether a cognizable offense has been charged."  *Id.* (citing *Jensen*, 93 F.3d at 669).  Moreover, Defendants may not challenge the indictment on the basis that the allegations are not supported by adequate evidence.  *Jensen*, 93 F.3d at 669 (motion to dismiss may not be used as a device for summary trial of the evidence).  The unavailability of a Rule 12 motion in determining factual guilt or innocence helps ensure that the respective provinces of the judge and jury are respected.  *United States v. Nukida*, 8 F.3d 665, 670 (9th Cir. 1993).

An indictment is sufficient if it meets two constitutional requirements: first, it contains the elements of the offense charged to fairly inform the defendant of the crime against which he or she must defend; and second, it safeguards the defendant from a subsequent prosecution of the same offense.  *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007).  Further, "[w]hile detailed allegations might well have been required under common-law pleading rules…they surely are not contemplated by Rule 7(c)(1), which provides that an indictment 'shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'"  *Id.*  In considering sufficiency, the indictment "should be read in its entirety, construed according to common sense, and interpreted to include facts which are

- 12 -

1    necessarily implied." *United States. v. O'Donnell*, 608 F.3d 546, 555 (9th Cir. 2010).  And
2    while statutory language in an indictment "'must be accompanied with such a statement of
3    the facts and circumstances as will inform the accused of the specific [offense],' a 'defendant
4    is not entitled to know all the *evidence* the government intends to produce[,] but only the
5    *theory* of the government's case.'"  *United States v. Gray*, 2017 WL 3675383, at *8 (D. Ariz.
6    Aug. 25, 2017) (citations omitted).

7            As shown below, the SI sets forth the applicable statutory language *and* provides
8    dozens of statements "of the facts and circumstances [to] inform the accused of the specific
9    [offenses]" with which they are charged.  *Gray*, 2017 WL 3675383, at *8.  Accordingly, the
10   SI far surpasses the minimal pleading requirements of Rules 7 and 12.

11           **A.      Conspiracy to Violate Travel Act—Facilitate Prostitution – Count 1**

12           The SI provides the statutory elements for Count 1 along with the time-period for
13   when the conspiracy occurred.  (SI¶¶195-99.)  It cites both applicable criminal statutes—18
14   U.S.C. §§ 1952(a)(3)(A) and 371—and alleges that the conspiracy began in or around 2004
15   and continued through April 2018.  (*Id.*)  It informs Defendants of the object of the
16   conspiracy (to make money), and notifies them that the manner and means of the conspiracy,
17   and the overt acts in furtherance thereof, are described in paragraphs 1-194.  (SI¶¶197-98.)
18   A conspiracy charge can be proved even if Defendants did not commit the underlying
19   substantive crime.  *Salinas v. United States*, 522 U.S. 52, 64 (1997).  The SI's allegations are
20   sufficient to support Count 1 under Rules 7 and 12.

21           **B.      Travel Act—Facilitate Prostitution – Counts 2-51**

22           The SI provides the statutory elements for the violations charged in Counts 2-51.  For
23   each count, Defendants are charged with violating the Travel Act, 18 U.S.C. § 1952(a)(3)(A)
24   (*i.e.*, intentionally facilitating a state-law prostitution offense) by publishing the prostitution
25   ads identified in paragraph 201 of the SI.  The SI's factual allegations, incorporated into
26   Counts 2-51, show that Defendants worked together to facilitate prostitution by publishing
27   these and similar ads.  (*E.g.*, SI¶¶34, 195-201.)  These allegations track the language of the
28   statute and are sufficient under Rules 7 and 12.  *See, e.g.*, *United States v. Tavelman*, 650

F.2d 1133, 1138 (9th Cir. 1981) (Travel Act indictment sufficient when it alleged: "[O]n July 20, 1979: (1) the defendants traveled interstate…(2) with the intent to promote a violation of 21 U.S.C. § 841(a)…and (3) thereafter knowingly performed acts facilitating that unlawful activity"); *United States v. Palfrey*, 499 F. Supp. 2d 34, 43 (D.D.C. 2007) (denying motion to dismiss; holding that "an indictment that tracks the language of the Travel Act is sufficient because the Act itself clearly sets out the essential elements of the offense"). The sufficiency of these allegations is discussed more fully in Part V.A, *infra*.[6]

In addition to the SI alleging sufficient facts to support the Travel Act counts against each Defendant, Defendants are also accountable under *Pinkerton v. United States*, 328 U.S. 640 (1946). At trial, the government will establish that even if a Defendant may not have personally been aware of the specifics of each ad or may not have been personally involved in that ad's publication process (Backpage employed dozens of low-level moderators to individually review ads before publication) (*see, e.g.,* SI¶¶78, 84, 93, 99, 117), it was reasonably foreseeable—in light of the policies Defendants implemented as part of the conspiracy charged in Count 1—that such violations would be committed in furtherance of the conspiracy. *See* 9th Cir. Model Crim. J. Instr. 8.25 ("Each member of the conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy. If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.").

### C.   Money Laundering

Count 52 charges Lacey, Larkin, Spear, Brunst and Hyer with conspiracy under 18 U.S.C. § 1956 to commit several different money laundering crimes. (SI¶¶202-03.) The count is constitutionally sufficient because it provides the applicable statutory language and fairly informs Defendants of the alleged crime. *Resendiz-Ponce*, 549 U.S. at 108.

---

[6] Whether the state law offense used to support the Travel Act charge is ever accomplished is irrelevant to a prosecution for violating the Act. *See, e.g., United States v. Montague*, 29 F.3d 317, 322 (7th Cir. 1994) ("[T]he federal crime to be proved in Section 1952 is use of the interstate facilitates in furtherance of the unlawful activity, not the violation of the state law; therefore Section 1952 does not require that the state crime ever be completed.").

Counts 53-62 charge the same five Defendants with Concealment Money Laundering in violation of 18 U.S.C. § 1956(a)(1)(B).  (SI¶¶204-05.)  The SI alleges (1) these Defendants knew the revenues Backpage earned from publishing prostitution-related ads (over $500 million since 2004) (*see* SI¶177) constituted the proceeds of a specified unlawful activity (*i.e.*, violations of 18 U.S.C. § 1952), and (2) they thereafter took steps to conceal the true source of money by routing it through a web of domestic bank accounts held in the name of seemingly-unrelated entities.  (SI¶¶184-190.)

In Counts 63-68, the same five Defendants are also charged with International Promotional Money Laundering in violation of 18 U.S.C. § 1956(a)(2)(A).  (SI¶¶206-07.) This crime occurs when money from any source is transmitted to or from an overseas account with the intent of promoting a specified unlawful activity.  *United States v. Moreland*, 622 F.3d 1147, 1167 (9th Cir. 2010).  Count 63 identifies a wire transfer from one of Backpage's domestic bank accounts to a web developer in India who was helping refine Backpage's website—and therefore promoting the alleged conspiracy to violate 18 U.S.C. § 1952. Counts 64-68 allege transfers from Backpage overseas accounts to Cereus Properties, which then "funneled" millions of dollars to Lacey and Larkin.  (SI¶¶190-192, 207.)

Various Defendants are charged in Counts 69-99 with Transactional Money Laundering in violation of 18 U.S.C. § 1957(a).  (SI¶¶208-09.)  For this crime, it doesn't matter why the money was transferred, so long as Defendants knew the money was derived from an unlawful activity and the transaction involved at least $10,000 in such funds.  *See, e.g., United States v. Rutgard,* 116 F.3d 1270, 1291 (9th Cir. 1997) ("the proceeds cannot enter the banking system without a new crime being committed").  Counts 69-99 represent instances where various Defendants used Arizona-based banks to engage in financial transactions involving more than $10,000 in Backpage-derived money.

Lacey is charged with a single count of International Concealment Money Laundering in violation of 18 U.S.C. § 1956(a)(2)(B), which criminalizes transporting money from a place within the United States to a place outside the United States with knowledge that (a) the funds represent the proceeds of some unlawful activity, and (b) the transportation is

designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the specified unlawful activity. *United States v. Kilbride*, 507 F. Supp. 2d 1051, 1071 (D. Ariz. 2007). The SI alleges these elements and describes the underlying transaction by the date, amount, and banks involved. (SI¶211.)

In sum, these counts are sufficient under Rules 7 and 12 because they provide the applicable statutory language and fairly inform Defendants of the alleged crimes. *Resendiz-Ponce*, 549 U.S. at 108.

## II. Defendants Cannot Pretend that Backpage's "Adult" Ads Were for Legitimate "Escort" Services, Rather than Illegal Prostitution.

While Defendants argue that the First Amendment imposes additional pleading requirements, the cases they cite involve indictments that were insufficient to satisfy even the minimal standards described above. *See* Mot. at 13; *United States v. Buddenberg*, 2010 WL 2735547, at *3, *9 (N.D. Cal. July 12, 2010) (dismissing "generic" indictment lacking "a statement of facts and circumstances that will inform the defendants of the specific [charged] offense"); *United States v. Landham*, 251 F.3d 1072, 1080, 1082 (6th Cir. 2001) (indictment failed to allege conduct constituting a criminal threat; one of the charges was "missing two of the three essential elements").[7] The SI, in contrast, is nothing like the bare-bones indictments dismissed in Defendants' cases. It contains more than 200 paragraphs of allegations showing how Defendants worked together to facilitate prostitution and launder money, and provides more than 50 examples of prostitution ads published on Backpage. These solicitations for illegal activity are entirely excluded from First Amendment protection—they are no different than ads offering to sell heroin or other illegal goods or services.

---

[7] Several of Defendants' cases involve prosecutions for making threats in violation of 18 U.S.C. § 875(c). (Mot. at 13.) These cases involve unique contextual considerations of the relationship between the parties involved. *See, e.g.*, *United States v. Landham*, 251 F.3d 1072, 1080 (6th Cir. 2001) ("[T]he alleged threatening statement must be viewed from the objective perspective of the recipient, which frequently involves the context of the parties' relationship. For this reason, it is incumbent on the Government to make that context clear in such an indictment, unless the alleged threat is direct."). Because this is not a threats case under § 875(c), these unique challenges are not involved here.

It is black-letter law that the First Amendment "extends no protection" to speech that "concerns illegal activity or is misleading." *Erotic Service Provider*, 880 F.3d at 459-60 (citing *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564-64 (1980)). Thus, speech proposing an illegal transaction is "categorically excluded from First Amendment protection." *Williams*, 553 US. at 297. This exclusion applies to prostitution advertising. *See, e.g., Pittsburgh Press*, 413 U.S. at 388; *Coyote Pub.*, 598 F.3d at 603-04 (9th Cir. 2010); *Erotic Service Provider*, 880 F.3d at 459-60. Accordingly, advertising the sale of adults for sex is illegal in every jurisdiction in the United States except parts of Nevada; child prostitution advertising is illegal throughout the country. *See Coyote Pub.*, 598 F.3d at 603-04 (The Thirteenth Amendment "enshrines the principle that people may not be bought and sold as commodities.").[8]

Despite this settled law, Defendants claim the SI "impermissibly assum[es]" the great majority of Backpage's "adult" and "escort" ads were for prostitution and "does not allege that any specific ads…were facially illegal." (Mot. at 16.) Not so. The SI alleges Backpage was a prostitution advertising website, identifies scores of blatant prostitution ads that appeared on Backpage, and provides information—including from Backpage's documents— showing Backpage's ads offered the sale of adults (and in many cases children) for sex.

Counts 2-51 identify 50 such ads by date and description. (SI¶201.) The 50 ads fall into three categories. First, 15 of the 50 depict specific victims. (SI Counts 2, 4-5, 12-17, 19-24.) The narratives associated with these victims are set forth in ¶¶160-176 of the SI. Second, 10 of the 50 ads were posted by a particular prostitute named P.R. who had extensive communications with Ferrer, a co-conspirator. (SI Counts 3, 6-11, 18, 25-26; SI¶132.) The allegations in the SI—accepted as true for the purposes of this motion—demonstrate that Backpage became aware as early as 2010 that P.R. was a prostitute, and nevertheless assisted

---

[8] Speech integral to other types of illegal activity, such as tax fraud and murder-for-hire, is likewise excluded from First Amendment protection. *See also, e.g., United States v. Meredith*, 685 F.3d 814, 819-20 (9th Cir. 2012) (First Amendment inapplicable to defendants who coached others on defrauding IRS); *United States v. Schiff*, 379 F.3d 621, 625 (9th Cir. 2004) (same); *Braun v. Soldier of Fortune Magazine, Inc.*, 968 F.2d 1110, 1119 (11th Cir. 1992) (murder-for-hire ads unprotected by First Amendment).

her in posting ads.  (SI¶132.)   Third, the remaining 25 ads involve instances in which Backpage allowed ads containing "GFE" (shorthand for "girlfriend experience") to be published.  (SI Counts 27-51.)  By way of example, these ads include the following:

- Victim 15 ad, "GORGEOUS ebony PLAYMATE Perfect Curves…Skills to make ur TOES CURL – 19"; "you agree . . . you are not affiliated with any law enforcement agency" and "Incalls & Outcall!!!" (Count 19);

- Victim 13 ad, "Young SEXY PUERTO RICAN – 19"; "I do half hour sessions that vary in donation prices, 80 for head, 120 for hooking up without head and 150 for hooking up with head" (Count 23);

- P.R. ad, "50 Red R*O*S*E*S  S*P*E*C*I*A*L – DON'T MISS OUT!!!!!" (Count 26);

- "Sometimes It's All About The Journey, And The Destination…..Erectile Dysfunctional G F E Provider – 44"; "You can find a few current reviews at T3R [The Erotic Review] xxxxxx#" (Count 31);

- "OMG Sexy Sensual 36DD-24-36 Stacked College Coed With The Best Mouth Ever! BOOK NOW! -24"; "I do ALL the things YOU Wish Your Wife Did!!" and "(G).(F).(E) 30 min/$180" (Count 35);

- "WANNA HANG OUT NOW UpScale New In Town! Call ME now for an unforgettable visit – 20"; "100% GFE with 100% no Pimps" (Count 39).

(SI¶201.)  The SI describes several other obvious prostitution ads featured on Backpage, including ads describing specific sex acts (*e.g*., "blow jobs") with prices.  (SI¶118.)

As Defendants knew, these ads explicitly offered or readily implied sex for hire. Defendants repeatedly acknowledged in internal emails that "GFE" ("girlfriend experience") is synonymous with prostitution, variously referring to it as a "coded sex act for money" term and one of several "solid sex for money terms" or "sex phrases and coded terms." (SI¶49.)  Defendants were informed that "New In Town" often indicates a trafficked child shuttled to different locations; it appears in numerous ads in the SI.  (SI¶¶13, 100, 169, 171, 201.)  "Roses" is a common prostitution synonym for money.  (SI¶¶132, 160-61, 164, 167, 201.)  "Incalls" (the customer goes to the prostitution's location) and "outcalls" (prostitute goes to customer) are also common prostitution terms.[9]

---

[9] Urban Dictionary, https://www.urbandictionary.com/, also defines many of these terms.

While legitimate escort services may be licensed and regulated in some jurisdictions (*cf.* Mot. at 17), one would be hard-pressed to find a legitimate escort ad that offers prices for "hooking up" with or without "head"; references "current reviews" on The Erotic Review, where johns rate sex acts performed by specific prostitutes; requires customers to affirm they are not law enforcement; contains known prostitution slang like "GFE," "Roses," "Incalls," or "Outcalls," and "New in Town"; states "with 100% no Pimps"; or contains other references to prostitution.  These were not offers for legitimate services.

More fundamentally, the SI describes Backpage's entire "adult" section as a hub for prostitution ads.  (*See, e.g.* SI¶1 (Backpage was "notorious for being the internet's leading source of prostitution advertisements"), ¶9 (Defendants "were aware that the vast majority of the 'adult' and 'escort' ads appearing on Backpage were actually ads for prostitution and took steps to intentionally facilitate that illegal activity"); ¶11 (Defendants "admitted—in internal company documents and during private meetings—that, despite [moderation], they knew the overwhelming majority of the website's ads still involved prostitution"); ¶11 (Lacey even "bragged about the company's contributions to the prostitution industry").)  The SI alleges "Backpage derived the overwhelming majority of its revenue" from prostitution ads.  (SI¶¶1, 15, 177.)  The SI also alleges the rest of the website served as a falsely-legitimate cover for Backpage's "adult" ads.  (SI¶112.)

The SI also contains a litany of allegations demonstrating that law enforcement, the national news media, anti-trafficking organizations, Senate investigators and others similarly concluded—and informed Defendants—that the vast majority of Backpage's "adult" ads were for prostitution.  (*See* SI¶¶74, 86, 97, 105,109, 111, 127, 131, 134, 140, 141, 144, 146, 151.)  While Defendants attempt to discount these allegations as merely "recycling" "politicians' denunciations" (Mot. at 18-19), Defendants cannot deny that Backpage and its principals were repeatedly notified that Backpage was the internet's leading place to shop for adult and child prostitutes.  (*See, e.g.*, SI¶¶144.)

1    Moreover, these notifications mirrored Backpage's internal admissions.  (*See, e.g.,*
2    SI¶¶11, 36, 54, 59, 68, 69, 75, 81, 82, 85, 92, 94-96, 98, 107-108, 112, 114, 116, 118-119,
3    128, 132, 138, 139, 143, 145, 148-149.)

4    Website operators like Defendants have been prosecuted for facilitating and
5    promoting the sale of other types of illegal goods and services.  For example, Ross Ulbricht,
6    the founder of the website "Silk Road," was prosecuted for creating an online advertising
7    marketplace for illegal narcotics and malicious software.  Rejecting a motion to dismiss, the
8    court found Ulbricht was "alleged to have knowingly and intentionally constructed and
9    operated an expansive black market for selling and purchasing narcotics and malicious
10   software," separating his alleged conduct "from the mass of others whose websites may—
11   without their planning or expectation—be used for unlawful purposes."  *United States v.*
12   *Ulbricht*, 31 F. Supp. 3d 540, 556 (S.D.N.Y. 2014).  Like Ulbricht, the SI alleges Defendants
13   knowingly and intentionally operated (and aggressively expanded) a massive online
14   marketplace where willing buyers could easily find offers to sell adults and children for sex.

15   Moreover, at least three federal district courts have recognized that prostitution
16   website operators may be prosecuted under the Travel Act.  First, in *United States v. Omuro*,
17   the Northern District of California accepted the guilty plea and convicted the founder of
18   www.myRedBook.com, Eric Omuro, under the Travel Act, 18 U.S.C. § 1952(a)(3)(A).  (*See*
19   N.D. Cal. No. 14-CR-336, Doc. 70 at 1-2.)  Omuro's website hosted thousands of ads posted
20   by prostitutes in the western United States and Canada, and Omuro generated some $5
21   million in profits from fees paid by "escorts" to post their ads more prominently and
22   "membership" fees.  (N.D. Cal. No. 14-CR-336, Doc. 70 at 2-3.)

23   Second, in *United States v. Hurant*, the Eastern District of New York accepted the
24   guilty plea and convicted the founder of www.Rentboy.com, Jeffrey Hurant, for violating
25   the Travel Act.  (E.D.N.Y. No. 16-CR-45, Doc. 117 at 1, 13-14.)  Hurant admitted he "was
26   well aware…that the escort ads he posted…were thinly-veiled proposals of sexual services
27   in exchange for money."  (E.D.N.Y. No. 16-CR-45, Doc. 117 at 6.)  Like Backpage, his
28   employees often rejected ads with explicit offers of sex for money "but allow[ed] the ad to

be resubmitted with different language.  In many cases, Rentboy.com employees would just edit the advertisement's language and approve it."  (E.D.N.Y. No. 16-CR-45, Doc. 125 at 2.)

Third, during grand jury proceedings in this case, Senior District Judge David Campbell recognized that federal law "criminalize[s] the knowing publication of an advertisement for illegal prostitution or other illegal activity."  (Doc. 194-1 at 66.)  Even Defendants' attorney agreed with Judge Campbell about when Defendants could be held criminally liable.  (Doc. 446-1 at 39 ("[I]f there is actual knowledge, say through participation in a venture, you're conspiring with somebody, you know they posted an ad, you know the person involved is underage, that's a prosecutable crime, Your Honor.").)

In sum, the SI doesn't "presume" anything; it provides ample allegations demonstrating that Defendants knowingly promoted and facilitated prostitution in its "adult" section by publishing blatant prostitution ads like those described above.

### III.    Backpage's Litigation History Undermines Defendants' Claim that Backpage's "Adult" Ads Were Protected By the First Amendment.

Citing a string of cases—starting with *Backpage.com LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015)—Defendants erroneously assert "courts have uniformly held that escort and other adults ads on Backpage.com were protected under the First Amendment" and "providing a forum for such ads is likewise protected."  (Mot. at 18.)  Defendants fail to mention that they misled courts across the United States in these cases, and that recent subpoenas have unlocked hundreds of thousands of internal documents undermining their claims.

In most of these cases, Backpage invoked Section 230 of the Communications Decency Act of 1996, 47 U.S.C. § 230 (CDA), which courts have construed to provide immunity from *civil* and *state criminal* claims for websites that publish content created by third-parties.  *See, e.g.*, *M.A. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1058 (E.D. Mo. 2011) (dismissing trafficking victim's civil case against Backpage's then-parent; "Congress has declared such websites to be immune from suits arising from such injuries."); *People v. Ferrer*, 2016 WL 7237305, at *11 (Cal. Super. Ct. Dec. 16, 2016)

(dismissing state law criminal charges against Lacey, Larkin and Ferrer; recognizing "it is for Congress, not this Court, to revisit" the CDA); *People v. Ferrer*, No. 16FE024013 (Cal. Super. Ct. Aug. 23, 2017) (after Lacey, Larkin and Ferrer were indicted on new counts, the court again found itself compelled to dismiss pimping-related charges "until Congress sees fit to amend…the broad reach of section 230") (Doc. 561-1 at 19).

Many of these cases—including the Seventh Circuit's opinion in *Dart*—were based on the notion that Backpage was merely a passive "intermediary between the advertisers of adult services and visitors to Backpage's website." *Dart*, 807 F.3d at 233-34; *see also, e.g.*, *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012) (using similar First Amendment and CDA rationales to invalidate state law that attempted to regulate the online advertising of minors for sex); (Mot. at 4-7, 14, 17-19, 37).

These cases are thoroughly inapposite.  First, nearly all involved the CDA's broad immunity provision, which does not apply to the federal criminal prosecutions of Backpage and its operators—including this case.  47 U.S.C. § 230(e)(1) ("Nothing in this section shall be construed to impair the enforcement of…[any] Federal criminal statute.").

Second, since these cases were decided, there has been a sea-change in the availability of evidence concerning Backpage.  In April 2015, the U.S. Senate Permanent Subcommittee on Investigations issued a subpoena to Backpage for documents concerning Backpage's "screening and reviewing [of] advertisements to avoid posting illegal ads, such as ads for sex trafficking." *Senate Permanent Subcommittee v. Ferrer*, 199 F. Supp. 3d 125, 129 (D.D.C. 2016).  After Backpage objected on First Amendment grounds, the Senate—by a 96-0 vote—authorized legal action to enforce the subpoena.  (SR 12 and nn.61-62.)  In 2016, the district court ordered compliance.  *Ferrer*, 199 F. Supp. 3d at 140.  Backpage ultimately produced 552,983 documents to the Subcommittee, which formed the basis of the January 2017 Senate Report.  (*See* SI¶151; SR 16.)[10]  Meanwhile, in 2016, the grand jury investigated whether

---

[10] The Subcommittee obtained testimony from current and former Backpage moderators.  (SR 31-37.)  One testified that all of the employee-moderators knew that the ads they reviewed offered sex for money, and that moderators "'went through the motions of putting lipstick on a pig, because when it came down to it, it was what the business was about." (SR

Backpage knowingly published advertisements for prostitution or otherwise intentionally facilitated its customers' crimes.  Senior Judge Campbell and a unanimous three-judge panel of the Ninth Circuit rejected Backpage's First Amendment challenges to the government's investigation and theory of the case, resulting in the disclosure of still more documents.  (*See* Doc. 194 at 7-8; Doc. 194-1, Exs. A-D.)

As alleged in the SI, evidence obtained pursuant to the Senate and grand jury investigations reveals that Backpage misrepresented itself in the above-referenced cases as merely a passive "conduit" for third-party content, *cf. Dart*, 807 F.3d 229, 233-34, and exposed its supposed efforts to police unlawful ads on its site as a fiction, *cf. McKenna*, 881 F. Supp. 2d at 1266-67.  Rather, the evidence shows Backpage facilitated its customers' prostitution ventures through "moderation" practices that edited or shaped pimps' ads to reduce the risk of detection while still conveying the illegal message; business relationships with prostitution websites (*e.g*., The Erotic Review) and "super-affiliates" (*e.g*., Dollar Bill) calculated to increase the volume of prostitution ads on Backpage; "aggregation" practices that involved creating prostitution ads and soliciting pimps and prostitutes to advertise on Backpage; and money laundering.  (*See generally* SI ¶¶ 9-11, 34-159.)  Defendants failed to disclose this evidence to the courts that previously ruled in Backpage's favor.

Third, Defendants' cases were decided before Backpage and its CEO pleaded guilty in April 2018 and admitted the "great majority" of Backpage's revenue-generating ads were "for prostitution services."  (18-CR-464, Doc. 7-2 at 12-13; 18-CR-465, Doc. 8-2 at 11.) Ferrer further admitted that he "conspired with other Backpage principals (including but not limited to M.L, J.L, S.S., D.H., A.P, and J.V.)" "to create 'moderation' processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad.  Such editing did not, of course, change the essential nature of the illegal service being offered in the ad—it was merely intended to create a veneer of deniability for Backpage."  (18-CR-464, Doc. 7-2 at 13.)

36-37.)  Another testified "everyone" knew that Backpage's adult advertisements were for prostitution, and "[a]nyone who says [they] w[ere]n't, that's bullshit."  (SR 37.)

Ferrer also admitted to conspiring with Defendants to engage in money laundering, including "fool[ing] credit card companies into believing that Backpage-associated charges were being incurred on different websites…."  (18-CR-464, Doc. 7-2 at 13-14.)

Sales and Marketing Director Hyer corroborated Ferrer's account of Backpage's "moderation" practices, as follows:

> I also became involved (along with Ferrer, Andrew Padilla, and Joye Vaught) in Backpage's efforts to "moderate" the content of the website's escort and adult ads.  Once again, I knew that the great majority of the ads being "moderated" were actually offering illegal prostitution services—our removal of explicit words and pictures did nothing to change the services being offered. In fact, Padilla and I agreed that I and other Backpage sales and marketing employees use the term "models" in intra-company emails when referring to persons in Backpage ads who appeared to be underage. The use of this term was to avoid looking bad in a lawsuit.

(Doc. 271 at 10.)

Following these developments, the Northern District of Illinois dismissed *Dart* and sanctioned Backpage.  (Doc. 516-1 at 2-9; *see also* Doc. 446-1 at 14-35.)  The court held Backpage and Ferrer's admissions provide "incontrovertible" proof that Backpage misled the Seventh Circuit about whether "speech on the site was protected, whether Backpage.com policed, rather than promoted, unlawful solicitations, and otherwise merely published, rather than authored, content on its site."  (Doc. 516-1 at 4-5; *see id*. at 8 ("Backpage knowingly and repeatedly made false representations of fact concerning relevant aspects of its operations.").  The court attempted to rewrite Backpage's complaint truthfully, as follows:

> The Sheriff has infringed Backpage's First Amendment rights by accurately advising credit card companies…that the great majority of ads on Backpage's adult services web site are for prostitution and that Backpage routinely doctors those ads to conceal their unlawful nature.  When told about these facts by Sheriff Dart, those credit card providers decided that they did not want to be publicly linked to…Backpage and stopped accepting payments for ads placed on Backpage.com.  Or at least they thought they had stopped accepting such payments.  In reality, however, Backpage.com devised ways to deceive the card companies about its continued use of their cards as payment for access to its adult services advertising….

(Doc. 516-1 at 6.)[11]

---

[11] *See also* Doc. 207-1, attaching *R.O. and K.M. v. Medalist Holdings, Inc., et al*, Wash. Super. Ct., Pierce County, No. 17-2-04897-1, June 28, 2018 Order at 7-12 (imposing

The Seventh Circuit now recognizes Backpage's website "contained an adult section advertising different categories of sex work." *Jackson*, 865 F.3d at 949.  Other courts have reached similar conclusions.  In 2015, for example, the Washington Supreme Court denied Backpage's motion to dismiss a civil lawsuit brought by three minor girls who had been "bought and sold for sexual services" on Backpage.  *See J.S.*, 359 P.3d at 715-16.  The court held that, because the plaintiffs had plausibly alleged that Backpage does "more than just provide a forum for illegal content" and affirmatively shapes the content of users' ads through "posting rules [that are] 'designed to help pimps develop advertisements that can evade the unwanted attention of law enforcement, while still conveying the illegal message,'" the plaintiffs should be permitted to conduct discovery "to ascertain whether in fact Backpage designed its posting rules to induce sex trafficking."  *Id.* at 718.[12]  *See also Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 17, 29 (1st Cir. 2016) (three minor girls who had been raped more than 1,900 times as a result of being trafficked via Backpage "made a persuasive case" that "Backpage has tailored its website to make sex trafficking easier"; nevertheless dismissing case under CDA, which does not a apply here); *Jane Doe No. 1*, 2018 WL 1542056, at *1 (D. Mass. 2018) (allowing claim where victim plausibly alleged Backpage "redrafted [her] advertisement…to suggest she was an adult").

*Dart v. Craigslist*, 665 F. Supp. 2d 961 (N.D. Ill. 2009), provides an instructive counterexample.  (Mot. at 17 n.19.)  The court found Craigslist protected by the CDA because it operated as merely a passive host for ads created and posted by third parties, and did not create, solicit or cause or induce anyone to create or post illegal ads.  665 F. Supp. at 969 and n.9.  The allegations in the SI, in contrast, demonstrate that the Backpage created prostitution ads by copying them from other prostitution websites and soliciting pimps and prostitutes with free trial offers; solicited business from and included cross-references to prostitution websites like The Erotic Review; solicited bulk prostitution advertising from

---

$200,000 sanction on Lacey, Larkin and others for perpetuating a fraud on the court).

[12] In 2017, the trial judge in the *J.S.* case denied Backpage's motion for summary judgment. Afterward, Backpage entered a confidential settlement with the plaintiffs.

super-affiliates like "Dollar Bill"; and helped edit and redraft, or "doctored," its customers' ads to conceal their unlawful nature.  (*See, e.g.*, SI¶¶9-11, 33-152; *see also* Doc. 516-1 at 6.) These facts far surpass anything considered in *Craigslist*.[13]

## IV.  Backpage's Prostitution-Promoting Practices Were Not "Protected Editorial Functions."

**Moderation:**  Defendants' assertion that moderation at Backpage was a "protected publisher function" is based on several false premises.  (Mot. at 20-24.)  First, Defendants claim Backpage was merely a passive "intermediary" for content created by third parties, and suggest the SI is based on allegations regarding those third parties' "misuse" of Backpage.  (Mot. at 20, 23-24.)  This fundamentally misapprehends the SI's allegations. Among other things, the SI alleges Defendants used moderation to remove terms or images most-obviously indicative of adult or child prostitution, and then published the revised ads with full knowledge that the ads still offered the sale of adults or children for sex.  (SI¶¶11, 13, 34, 68-152.)  Through this process, Defendants helped customers conceal illegality while facilitating their illegal ventures.  (*E.g.*, SI¶¶11, 13, 34, 82, 85, 68, 95, 104, 116, 128.)  Ferrer and others also coached customers on how to wordsmith their ads so they would be accepted by Backpage moderators.  (*E.g.*, SI¶¶67, 91, 132, 160, 172.)  Moreover, through moderation, Backpage edited and posted revised versions of many of the ads associated with the victims described in the SI.  (*E.g.*, SI¶¶163, 164, 166, 170.)  Defendants engaged in a series of other business practices—including aggregation, reciprocal links and affiliate agreements— calculated to expand Backpage's volume of prostitution advertising.  (*See, e.g.*, SI¶34.)

---

[13] Defendants' conduct evokes several cases distinguished in footnote 9 of *Dart v. Craigslist*, 665 F. Supp.2d 961, 969 (N.D. Ill. 2009), including *Anthony v. Yahoo, Inc.*, 421 F. Supp. 2d 1257, 1262-63 (N.D. Cal. 2006) (CDA did not apply where plaintiff alleged defendant created fake user profiles to persuade users to renew their subscriptions to defendant's online dating service); *Hy Cite Corp. v. badbusinessbureau.com*, 418 F. Supp. 2d 1142, 1148-49 (D. Ariz. 2005) (CDA not applicable where plaintiff alleged defendant created allegedly defamatory content); *MCW, Inc. v. badbusinessbureau.com*, 2004 WL 833595, at *10 (N.D. Tex. Apr. 19, 2004) (defendant could be held liable for actively soliciting defamatory content).  *Cf. Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 414 (6th Cir. 2014) (where "website operators provided a forum for user posts [but] did not compensate for the posting of actionable speech [or] post actionable content themselves," CDA applied).

These practices are nothing like the protected editorial functions in Defendants' cases. (*See* Mot. at 20-22.)  For example, unlike the newsletter editor in *Batzel v. Smith*, 333 F.3d 1018, 1035 (9th Cir. 2003), Backpage went far beyond merely making changes to the length and spelling of third-party content.  Nor is this case like *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1103-09 (9th Cir. 2009), and *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997), where websites failed to remove or screen defamatory content posted by third parties. There was no allegation in those cases of any affirmative conduct by the websites to conceal and otherwise facilitate its users' illegal conduct, let alone to solicit illegal postings or create illegal content directly.

Second, advertising sex for money is not protected speech.  *See, e.g.*, *Coyote Pub.*, 598 F.3d at 603-04.  Backpage's efforts to modify or rewrite ads proposing illegal sex-for-hire transactions is just as undeserving of protection as the original content—particularly where, as here, Backpage's moderation efforts were pursued to conceal the ads' illegality and thereby facilitate its customers' illegal ventures.  *E.g.*, SI¶¶11, 13, 34; *see also J.S.*, 359 P.3d at 715-16 (plaintiffs plausibly alleged Backpage affirmatively shapes the content of users' illegal ads); *Jane Doe No. 1*, 2018 WL 1542056, at \*1 (Backpage allegedly redrafted ad to suggest minor victim was an adult).

Third, Defendants' assertions regarding supporting facts alleged in the SI are incorrect and beside the point.  (Mot. at 22.)  Defendants assert that an April 3, 2008 email from Ferrer should not be construed as discussing prostitution ads or terms "indicative of prostitution." (Mot. at 22 n.26; SI¶68.)  Defendants' opinions are irrelevant; at this stage, the SI's factual allegations must be taken as true.  *See Jensen*, 93 F.3d at 669.  Defendants also assert the SI's allegations "about Backpage.com editing ads…concern only a period of months at the end of 2010, *see* SI¶¶72-87."  (Mot. at 22 n.26.)  This ignores several SI paragraphs alleging that Backpage continued to edit ads and/or coach users about how to wordsmith their prostitution ads for several years (*e.g.*, SI¶¶95, 104, 128, 139, 145, 148)—and it again wrongly seeks to contest factual allegations.

Fourth, citing *M.A.*, *Doe*, and *People v. Ferrer*, Defendants argue "courts have

expressly rejected the government's theory." (Mot. at 23-24.) But the cited cases were dismissed pursuant to the CDA's immunity provision, which does not apply to this federal criminal prosecution. 47 U.S.C. § 230(e)(1); *M.A.*, 809 F. Supp. 2d at 1058 ("Congress has declared such websites to be immune"); *Doe ex rel. Roe v. Backpage.com, LLC*, 104 F. Supp. 3d 149, 165 (D. Mass. 2015) ("this court has no choice but to adhere to the law that Congress has seen fit to enact"); *Ferrer*, 2016 WL 7237305, at *11 ("Congress has spoken on this matter"). Moreover, these cases predate Backpage's compelled disclosure of hundreds of thousands of internal documents, the Senate Report, more recent decisions, the Backpage, Ferrer and Hyer guilty pleas—and the recent dismissal and imposition of sanctions in *Dart*. (*See* Part III, *supra*.) These cases provide no support for Defendants' Motion.

**Aggregation:** Defendants assert "[t]here is nothing illegal" about "offering free ads to users" or "reposting third-party content." (Mot. at 24-25.) These assertions are based on the false premise that these practices didn't involve prostitution ads. Defendants do not argue—nor can they—that prostitution advertising is lawful and constitutionally protected.

The SI expressly alleges that Backpage's aggregation practices were calculated to increase Backpage's volume of *prostitution* advertising: "[D]uring Backpage's early years of operation, the company's employees were actually trained to—and paid bonuses for— identifying prostitutes who were posting ads on rival websites, creating free ads on Backpage for them, and using the resulting Backpage ads (which would only remain free for a trial period) in an attempt to secure the prostitutes' future business. These affirmative content-creation efforts, which were described internally as 'content aggregation' or the 'Dallas Plan,' were vital to Backpage's early growth and success." (SI¶9.) The SI further alleges that Backpage employees ran "Google searches to identify prostitutes advertising on other websites," and then solicited their advertising business with free ad offers. (SI¶ 36.) These allegations are taken as true here. *Boren*, 278 F.3d at 914.

While the SI discusses supporting evidence, it does not—and need not—serve as a compendium of all evidence the government intends to present at trial. *United States v.*

1   *Blinder*, 10 F.3d 1468, 1476 (9th Cir. 1993).[14]  In view of the SI's allegations that Backpage's

2   aggregation involved deliberately targeting prostitutes for advertising solicitations on

3   Backpage, and creating free ads for such "users," Defendants' assertion that Backpage

4   employees were not involved in illegal activity cannot bear scrutiny.

5   **Reciprocal Links:**  As alleged in the SI, Defendants knew that The Erotic Review is

6   a website on which customers posted explicit "reviews" of their encounters with prostitutes,

7   including descriptions of prices charged for particular sex acts.  (SI¶10; *see also* SI¶¶ 34,

8   54.)  Backpage's involvement with The Erotic Review was not limited to "banner ads."  (*Cf.*

9   Mot. at 25.)  Rather, around 2007, Backpage recognized that inserting reciprocal links to The

10  Erotic Review in Backpage postings would increase ad revenue.  (SI¶¶49-50.)  Larkin, Spear,

11  Brunst, Hyer and Ferrer were forwarded or briefed about "Google Analytics" reports

12  consistently showing, even through November 2014, that The Erotic Review was the #1

13  outside source of non-search engine referrals for Backpage.  (SI¶¶57-58.)[15]

14  Publishing prostitution ads with links or cross-references to prostitution reviews is

15  not a "traditionally protected editorial function."  (*Cf.* Mot. at 25); *see, e.g., Williams*, 553

16  U.S. at 297 (speech proposing an illegal transaction is "categorically excluded from First

17  Amendment protection"); *Erotic Service Provider*, 880 F.3d at 459-60 (prostitution

18  solicitations not protected).  By establishing an ongoing business relationship with The

19  Erotic Review, inserting The Erotic Review links into Backpage ads, and creating ads based

20  on content from websites like The Erotic Review, Backpage was facilitating prostitution.

---

[14] At trial, the government will present additional evidence and testimony.  For example, in his plea agreement, Hyer confirmed that "the majority of the ads that I and others at Backpage were creating through the aggregation process were actually offering illegal prostitution services," and they "sometimes used ads containing links to The Erotic Review (a website where customers would post 'reviews' of their encounters with prostitutes, including descriptions of prices charged for particular sex acts) as the source of the content for the new Backpage ads we were creating."  (Doc. 271 at 8-9.)

[15] In 2011, Larkin, Lacey, Spear and other Backpage representatives met with NCMEC and were advised that a large portion of the ads on Backpage were for prostitution.  (*See* SI¶97.)  During the meeting, NCMEC provided a PowerPoint detailing how The Erotic Review links were inserted into Backpage ads.  (Doc. 446 at 12; Doc. 446-1 at 40-62.)

**V.     The SI's *Mens Rea* Allegations Are Sufficient.**

The SI alleges that Defendants intentionally facilitated prostitution through a number of deliberate acts.  (*E.g.*, SI¶¶1, 9-11, 34.)  Defendants read these allegations and somehow conclude the government's charges rest on Defendants' "general awareness" that Backpage was used for criminal purposes.  (Mot. at 26.)  Defendants are wrong.  The SI's allegations clearly distinguish Backpage—whose revenue-generating business model was based on the sale of prostitution ads—from other websites that may unknowingly be utilized for criminal purposes.  At trial, Defendants can argue to the jury how creating free ads for prostitutes, linkage and referral relationships with The Erotic Review, bulk prostitution ad buying from "super-affiliates" like Dollar Bill, and publication of ads with known coded prostitution terms didn't promote or facilitate prostitution.  *Cf. United States v. Welch*, 327 F.3d 1081, 1097 (10th Cir. 2003) ("At trial, Defendants will be free to argue before the jury that they facilitated [wire] transfers…absent the requisite intent to promote bribery.").  But at this stage, the SI's allegations provide more than sufficient facts to support specific intent.

**A.     The SI Alleges the Requisite Elements for a Travel Act Violation, Including *Mens Rea*.**

The SI alleges that Defendants used an interstate facility with intent to promote and facilitate the carrying on of prostitution.  (SI¶201); 18 U.S.C. § 1952(a)(3)(A).  This is sufficient.  "An indictment under the Travel Act requires allegations of each of the three elements of the crime:  (1) interstate commerce or use of an interstate facility (2) with intent to promote an unlawful activity and (3) a subsequent overt act in furtherance of that unlawful activity."  *Tavelman*, 650 F.2d at 1138.  *Tavelman* found the government's indictment sufficiently stated Travel Act violations when it alleged: "[O]n July 20, 1979: (1) the defendants traveled interstate…(2) with the intent to promote a violation of 21 U.S.C. § 841(a)…and (3) thereafter knowingly performed acts facilitating that unlawful activity."  *Id.*  The SI's allegations are similarly sufficient.  *See also Palfrey*, 499 F. Supp. 2d at 43 ("an indictment that tracks the language of the Travel Act is sufficient because the Act itself clearly sets out the essential elements of the offense").

- 30 -

Defendants' reliance on *United States v. Gibson Specialty Co.*, 507 F.2d 446 (9th Cir. 1974), is misplaced.  (Mot. at 26-27.)  *Gibson* involved Chicago manufacturers of punchboards and pulltabs charged with Travel Act violations for selling the products to distributors in Montana.  507 F.2d at 448-49.  The punchboards and pulltabs were gambling paraphernalia that was not federally prohibited, but violated Montana law.  *Id.*  The extent of the non-Montana manufacturers' conduct included (a) producing catalogues, (b) filling orders for punchboards and pulltabs from Montana companies, (c) billing the buyers, and (d) receiving payment.  *Id.* at 450.  The Chicago manufacturers had no financial interest or control over the Montana distributorships to which their products were sold.  *Id.*  *Gibson* concluded "[t]here is no evidence in the record, direct or circumstantial, from which one could infer that the defendants associated with, participated in or sought to make succeed the Montana operations."  *Id.*

Contrary to *Gibson*'s assessment, the SI provides ample allegations, taken as facts for the purpose of this motion, to support Defendants' association, participation in, promotion, and facilitation of prostitution.  (*See, e.g.,* SI¶34.)  Perhaps if the Chicago manufacturers had engaged in any of the following the Ninth Circuit would have reached a different conclusion: (a) giving away free products to known illegal gambling businesses in order to induce them to purchase from the manufacturers; (b) entering into formal business arrangements with known illegal gambling outfits in Montana in order to increase sales; or (c) attempting to sanitize their products to make it harder for law enforcement to detect the illegality, without actually changing the nature of the products.

In their motion, Defendants discuss "specific intent" as if it's some extraordinary hurdle for the government to overcome.  It isn't.  *Gibson* defined the standard as a showing that defendant "in some significant manner associated himself with the purchaser's criminal venture for the purpose of its advancement."  507 F.2d at 449.  This definition tracks the statutory language.  The Ninth Circuit has also described the intent required to prove a Travel Act violation as "specific intent to facilitate an activity which the accused knew to be

unlawful under state law."[16]  *United States v. Polizzi*, 500 F.2d 856, 876-77 (9th Cir. 1974); *see also Turf Center, Inc. v. United States*, 325 F.2d 793, 797 n.5 (9th Cir. 1963) (court found no error in jury instruction about a Travel Act count after defendants claimed district court erred "in refusing to give and in giving of certain instructions on specific intent" when instruction largely tracked the statutory language); *Welch*, 327 F.3d at 1095 ("the Travel Act requires a defendant act not only with knowledge of what he is doing, but also with the objective of promoting some unlawful activity").  Seven years after *Gibson*, the Ninth Circuit found that an indictment alleging a Travel Act count was sufficient if it merely alleged defendant had an "intent to promote an unlawful activity."  *Tavelman*, 650 F.2d at 1138.  The SI's allegations demonstrate Defendants acted with the required intent.  *Id.*; *see also Palfrey*, 499 F. Supp. 2d at 43 (indictment that tracks language of the Travel Act is sufficient); *Welch*, 327 F.3d at 1097 (trial court went beyond four corners of indictment when it didn't accept allegations that international wire transfers were made with intent to promote bribery).[17]

## B.    Defendants' Constitutional *Mens Rea* Claims Are Unavailing.

For several reasons, Defendants mistakenly rely on obscenity cases for the position that the First Amendment requires "that a defendant knew the *specific* speech that is the basis for criminal charges was illegal."  (Mot. at 28.)  First, obscenity prosecutions call for a delicate assessment of several factors.  *See, e.g., Miller v. California*, 413 U.S. 15, 24 (1973) ("obscenity" requires assessing whether the work (a) under "contemporary community standards…appeals to the prurient interest"; (b) depicts sexual conduct "in a patently offensive way"; and (c) "lacks serious literary, artistic, political, or scientific value").  Here,

---

[16] "[F]acilitate" means "to make easy or less difficult."  *Gibson*, 507 F.3d at 450.

[17] The SI also alleges facts sufficient to show that Defendants' actions facilitated or promoted the ongoing prostitution enterprises of Backpage's customers.  (*Cf.* Mot. at 27 n.33.)  *See, e.g., United States v. Kaiser*, 660 F.2d 724, 731 (9th Cir. 1981) (The Travel Act "requires only that the [promoted or facilitated] business enterprise be continuous….Here, the evidence of repeated sales of heroin was sufficient to establish a continuous course of criminal conduct.").  The SI includes allegations of Defendants' involvement with prostitutes and pimps who posted multiple ads, including P.R. (SI¶132) and Dollar Bill (SI¶61).  The identified victims were sold through multiple ads.  (SI¶¶160-176.)  Even single ads identified in the SI did not advertise one-time services; rather, each ad was meant to generate many "sales" of the featured prostitute.  *See* SI¶201; *see also United States. v. O'Donnell*, 608 F.3d 546, 555 (9th Cir. 2010) (indictment must be "construed according to common sense").

in contrast, Defendants are charged with advertising sex-for-hire solicitations—speech that is absolutely excluded from First Amendment protection without any need to evaluate "community standards," "offensive[ness]" or "value." *See, e.g., Williams*, 553 US. at 297. Defendant's obscenity-based *mens rea* cases thus are of limited value here.

Second, Defendants' cases provide a more generous *mens rea* standard than Defendants suggest. In *Smith v. California*, the Supreme Court invalidated an obscenity ordinance that contained no *mens rea* standard whatsoever; the ordinance imposed criminal sanctions on a bookseller "if in fact there is to be found in his shop an obscene book," "even though [he] had not the slightest notice of the character of the books [that he] sold." 361 U.S. 147, 152 (1959). In requiring some *mens rea* requirement, *Smith* expressly did not adopt a specific standard: "We need not and most definitely do not pass today on what sort of mental element is requisite to a constitutionally permissible prosecution of a bookseller for carrying an obscene book in stock; [including] whether there might be circumstances under which the State constitutionally might require that a bookseller investigate further, or might put on him the burden of explaining why he did not, and what such circumstances might be." *Id*. at 154. *Smith* accordingly contemplates that *mens rea* may be satisfied by something other than knowledge of the contents of a specific book (or ad), especially where, as here, Defendants knew the vast majority of their "adult" ads were for prostitution and engaged in practices specifically intended to increase such advertising.[18]

*Mishkin v. State of New York*, similarly recognizes a broader scienter standard. In *Mishkin*, the Court noted the constitution requires proof of scienter to "avoid the hazard of self-censorship of constitutionally protected material and to compensate for the ambiguities inherent in the definition of obscenity." 383 U.S. 502, 511 (1966). The Court declined to set a firm rule on what *mens rea* was required under *Smith*, and found more than sufficient the scienter required by the New York Court of Appeals in interpreting the state law at issue:

---

[18] *See* Monica J. DeLateur, *From Craigslist to Backpage.com: Conspiracy as a Strategy to Prosecute Third-Party Websites for Sex Trafficking*, 56 Santa Clara L. Rev. 531, 581 (2016) (intent can be proven by showing "the illegal activity was a high proportion of the business, the presence of a stake in the venture, or deliberate ignorance").

namely, that defendants were "in some manner aware of the character of the material they attempt to distribute" such that the punished behavior was a "calculated purveyance of filth" and not innocent behavior. *Id.* at 510-11.[19] *Mishkin* then rejected the defendant's argument that the evidence was insufficient to show such awareness, where the evidence included that the defendant had instructed artists and writers regarding the contents of most of the 50 books at issue, his efforts to conceal his role in the enterprise, and "the massive number of obscene books [he] published, hired others to prepare, and possessed for sale." *Id.* at 504, 511-12.

Here, the SI's allegations likewise demonstrate that Defendants were "in some manner aware of the character of the material" they distributed such that their conduct involved the "calculated purveyance of filth" and not innocent behavior. *Id.* at 510-11. The SI alleges Defendants and their co-conspirators coached users, including P.R. and Victim 13, regarding the contents of their ads, including many of the 50 ads identified in SI¶ 201 (*see, e.g.*, SI¶132, 172); concealed their roles in facilitating prostitution (*see, e.g*., SI¶16 (Defendants misled the public, regulators and law enforcement), ¶77 (Padilla threatened to fire any employee who acknowledged in writing that a customer was a prostitute), ¶¶107-08 (Larkin warned Ferrer about making "public" Lacey's statements lauding Backpage's contributions to the prostitution industry); knew the vast majority of their "adult" ads were for prostitution (SI¶¶1, 9, 11, 15, 34); and sold massive numbers of such ads by operating the internet's leading website for prostitution advertising and collecting approximately $500 million in fees from such sales (*see* SI¶¶1, 177). Combined with Defendants' intentional efforts to expand Backpage's prostitution advertising, and the repeated notices Defendants received from law enforcement, anti-trafficking organizations, the news media and other sources concerning the predominance of prostitution ads in Backpage's "adult" section (*see*

---

[19] The article cited by the ACLU similarly states: "[T]he government is not required, in an obscenity case, to prove that the defendant knew the material being transmitted or received was 'obscene.' The government need only show that the defendant was aware of the nature and character of the materials; i.e., that they involved sexually-explicit subject matter." Lawrence G. Walters, *Shooting the Messenger: An Analysis of Theories of Criminal Liability Used Against Adult-Themed Online Service Providers*, 23 Stan. L. & Pol'y Rev. 171, 204 and n.174 (2012); *id.* at 206 (referring to "the generous standard...for proving intent").

1   *generally* SI¶¶9-11, 34-159), the SI demonstrates Defendants were well "aware of the

2   character" of Backpage's "adult" ads such that their activity was "not [the] innocent but

3   calculated purveyance of" prostitution solicitations.  *Mishkin*, 383 U.S. at 512.

4        Third, Defendants' reliance on *United States v. X-Citement Video, Inc.*, 513 U.S. 64

5   (1994), is misplaced.  (Mot. at 28.)  In that case, the Supreme Court rejected a reading of a

6   child pornography statute that would have imposed criminal liability regardless of whether

7   the defendant knew the age of persons shown.  513 U.S. at 78.  This commonsense holding

8   does not mean that the operator of a website designed to facilitate unlawful prostitution must

9   know that each and every item posted on the website concerns illegal activity.   If the

10  website's revenue is based almost entirely on speech integral to illegal conduct, and the

11  website is knowingly operated to promote such conduct, the Constitution does not impose

12  the near-impossible burden of proving that every single ad sold on the website proposed an

13  illegal transaction.  Under that interpretation, posting even one licit ad—among millions of

14  illicit ones—would immunize the website from prosecution.

15       That is not the law.  Rather, just as "[b]ookselling in an establishment used for

16  prostitution does not confer First Amendment coverage to defeat a valid statute aimed at

17  penalizing and terminating illegal uses of premises," *Arcara v. Cloud Books, Inc.*, 478 U.S.

18  697, 707 (1986), so too may the government seek to prosecute a website whose revenue-

19  generating business model consisted of operating a massive online marketplace for illegal

20  prostitution—even if the website also gave away free ads for legal goods and services for the

21  sake of "plausible deniability." (SI¶112); *see Ulbricht*, 31 F. Supp. 3d at 556 (unlike other

22  online businesses, defendant "knowingly and intentionally constructed and operated an

23  expansive black market for selling and purchasing narcotics and malicious software");

24  *Jackson*, 865 F.3d at 949 (Backpage "advertis[ed]…sex work"); *Jane Doe*, 817 F.3d at 28

25  ("Backpage has tailored its website to make sex trafficking easier"); SI¶109 (Backpage is "a

26  direct vehicle for prostitution").

27       Fourth, nor does *Manual Enterprises, Inc. v. Day*, 370 U.S. 478 (1962), assist

28  Defendants.  According to the ACLU, *Manual Enterprises* held that the president of a

- 35 -

company that distributed magazines with allegedly illegal advertisements "could not be liable…where there was 'no evidence that any of this material was shown to him.'" (ACLU Br. at 3.)  However, the quoted "holding" was endorsed only by two members of the Court; none of the other six justices who participated in the case signed on to this view.  *See Manual Enterprises*, 370 U.S. at 479-529.  Moreover, the two judges who did agree characterized the scienter standard as having "knowledge of the character of the advertisements included in the magazine."  *Id*. at 492.  They did not hold that knowledge of the specific contents of the specific advertisements was the only way of establishing scienter.

Perhaps for this reason, the ACLU and DKT recognize scienter can be established by showing Defendants either "specifically intended to further unlawful activity *or* knew the content of each allegedly illegal post."  (ACLU Br. at 2 (emphasis added); DKT Br. at 10 (arguing SI didn't allege "Defendants *intended* to further any illegality")).)  Here, the SI alleges Defendants "specifically intended to promote and facilitate prostitution" (SI¶10), "intentionally solicit[ed] prostitution-related business" (SI¶11), conspired to facilitate illegal prostitution (SI Count 1), and used the internet "with intent" to "promote…and facilitate" the "promotion…and carrying on of an unlawful activity, to wit: prostitution" by publishing each of the 50 ads in Counts 2-51 (SI¶201).  For these and other reasons discussed above, the SI amply satisfies the *mens rea* standards articulated by *amici*.[20]

Fifth, Defendants assert that the DOJ's statements in other contexts somehow support their arguments here.  (*See* Mot. at 28.)  They cite a 2010 statement by a DOJ official at a Congressional hearing about what laws might make providers like Craigslist criminally liable for postings.  The DOJ representative stated "neglect" isn't the standard; rather, the government would need evidence that Craigslist "knowingly conspired" with "those who

---

[20] This is not a case "motivated by the improper purpose of interfering with…constitutionally protected speech."  (DKT Br. at 11-12, citing *United States v. P.H.E., Inc*., 965 F.2d 848, 849 (10th Cir. 1992).)  As alleged throughout the SI, and as numerous courts have recognized, Backpage trafficked in prostitution ads.  *Jackson*, 865 F.3d at 949 (Backpage "advertis[ed]…sex work"); *Jane Doe*, 817 F.3d at 28 ("Backpage has tailored its website to make sex trafficking easier"); *Dart* Order at 6 ("the great majority of ads on Backpage's adult services web site are for prostitution and…Backpage routinely doctor[ed] those ads to conceal their unlawful nature") (Doc. 516-1 at 6).

were misusing their site…to violate laws….” (Mot. at 29.) That *is* what the SI alleges. (*See, e.g.,* SI¶¶91, 132, 196-97, 201); *see also Ulbricht*, 31 F. Supp. 3d at 555 (design and operation of website can result in legally-cognizable conspiracy). Defendants next discuss cases and testimony involving 18 U.S.C. § 1591, which criminalizes the sex trafficking of a minor or a victim of force, fraud, or coercion—and requires knowledge of the age or coerced status of the victim. (Mot. at 30.) Section 1591 is not charged in the SI, and the cited cases and testimony do not apply.

Defendants also cite *Woodhull Freedom Found. v. United States*, 334 F. Supp. 3d 185 (D.D.C. 2018) (Mot. at 30-31, 35, 45), which dismissed on standing grounds a facial challenge by sex worker advocacy groups to the Allow States and Victims to Fight Online Sex Trafficking Act of 2017 (FOSTA). FOSTA created a new federal offense for operating “an interactive computer service…with the intent to promote or facilitate *the prostitution of another person*.” 18 U.S.C. § 2421(A)(a) (emphasis added). The court held the plaintiffs lacked a credible threat of prosecution because “key textual indications…make clear that FOSTA targets specific acts of illegal prostitution,” not abstract advocacy. 334 F. Supp. 3d at 200. These “textual indications” include FOSTA’s reference to the “‘prostitution of another person,’ which denotes specific unlawful acts.” *Id.* at 199-200. While the court found the plaintiffs’ standing arguments flawed for the “additional reason []” that § 2421A “mirrors” the Travel Act, which had never been used to prosecute advocacy, *id.* at 199-200, the Travel Act contains no text specifically referencing “the prostitution of another person.” Even if it did, the SI identifies numerous Backpage ads that promoted prostitution of specific individuals. SI¶201 (Counts 2-51), SI¶ 91 (Licks Alot), ¶¶120, 123-26 (ads with minors), ¶132 (P.R.’s ads), ¶¶160-76 (ads for Victims 1-17).[21]

---

[21] Defendants also assert the “DOJ repeated [in the *Woodhull* appeal] that in a prosecution under the Travel Act, the government must allege that the defendant acted to intentionally promote or facilitate a ‘specific, unlawful instance of prostitution.’” (Mot. at 31.) However, the quoted text refers not to the government’s discussion of the Travel Act, but to § 2421A. (Gov’t Br., *Woodhull Freedom Found. v. United States*, No. 18-5298 (D.C. Cir. Apr. 15, 2019) (Doc.#1782997) at 20-21.) To be sure, the government went on to characterize § 2421A as “substantially similar” to the Travel Act in that both statutes “prohibit[ ] using the internet ‘with intent to’ ‘promote…or facilitate the promotion’ of illegal ‘prostitution

**C.** **The SI Alleges Defendants Each Possessed the Requisite Specific Intent.**

Particularly at this motion to dismiss stage, Defendants' *mens rea* arguments are unavailing.  Whether a defendant had the requisite *intent* to commit the alleged crime "is a question of fact which must be submitted to the jury." *Morissette v. United States*, 342 U.S. 246, 274 (1952).  The "intent can never be ruled as a question of law, but must always be submitted to the jury." *Id.*; *see also Takahashi v. United States*, 143 F.2d 118, 122 (9th Cir. 1944) ("[q]uestions of knowledge and intent are always questions of fact for the jury").  This maxim applies to Travel Act cases. *United States v. Graham*, 581 F.2d 789, 790 (9th Cir. 1978) (intent in Travel Act prosecution was a question of fact for the jury).[22]

To defeat the Motion to Dismiss, the government need not detail all the evidence supporting Defendants' specific intent to promote prostitution.  Nevertheless, the SI includes numerous intent allegations about the individual Defendants, including the following:[23]

1. Lacey and Larkin

Defendants Lacey and Larkin are alleged to have overseen Backpage's policies and strategic direction (SI¶2), which included oversight of Backpage's aggregation and moderation practices and the company's relationship with The Erotic Review. (SI¶¶33-152.)  These allegations alone provide more than sufficient facts supporting specific intent to facilitate prostitution.  Still more allegations in the SI add to the weight of the evidence.

For example, the SI alleges Lacey did the following:

- Hid $16.5 million in an overseas bank account so "government parties" couldn't access the funds (SI¶16);

- Told NCMEC that adult prostitution was "none of their business" (SI¶89);

offenses.'" *Id*.  The SI alleges Defendants did just that. (*See, e.g.*, SI Counts 1-52.)

---

[22] *Gibson* only reached intent at the motion to dismiss stage because the parties had stipulated to all facts. 507 F.2d at 449 n.5; *see also United States v. Phillips*, 367 F.3d 846, 855 n.25 (9th Cir. 2004) (only when facts are essentially undisputed may a district court dismiss an indictment for insufficient evidence).

[23] At trial, the government will present additional evidence of Defendants' guilt, including, without limitation, testimony from Backpage's CEO Ferrer and Sales and Marketing Director Hyer, evidence about the "Detroit Backpage murders," Lacey's acknowledgements that child sex trafficking occurred on Backpage, and Lacey's statements equating trafficking victims to underage children who sneak into bars. (Doc. 516 at 9-11.)

- Received an email from Ferrer acknowledging the possibility of using software to ensure children weren't posting ads on Backpage, but ultimately the company didn't adopt the software because it would cut into Backpage's profits (SI¶106);

- Bragged that, because of Backpage, "[f]or the very first time, the oldest profession in the world has transparency, record keeping and safeguards" (SI¶107);

- Acknowledged Backpage used an automatic filter to remove particular phrases from ads indicative of prostitution but still published the ads (SI¶107);

- Stated "jim [Larkin] and I believe in legalized prostitution" (SI¶121);

- Reviewed a published study concluding that most of Backpage's Phoenix page ads involved prostitution, including juvenile trafficking victims (SI¶131);

- Received a Sex Worker's Outreach Project letter thanking Backpage for continuing to permit sex workers to "advertise in the 'Adult' area" (SI¶142);

- Received, with his family members, over $30.3 million in distributions funneled through Cereus Properties between January 2016 and January 2017 (SI¶192).

Larkin is alleged to have taken many of the same actions as Lacey, and also to have engaged in, among others, the following:

- Instructed Ferrer to prevent information related to Backpage's contributions to the prostitution industry and editing practices from being made public (SI¶12);

- Commented that because Craigslist stopped hosting "adult content ads" it would likely mean a deluge of such ads for Backpage (SI¶24);

- Met regularly with Ferrer after selling Backpage to discuss and direct the operation of the company's business (SI¶32);

- Exerted post-sale control over Backpage's banking relationships, among other things (*id.*);

- Strategized about implementing the Dallas Plan (SI¶¶40-43);

- Discussed strategic development of Backpage's "reciprocal link relationships" with The Erotic Review, a website he knew rated prostitutes, and assisted in expanding relationship with The Erotic Review (SI¶¶47-50, SI¶¶54, 56);

- Understood and discussed that The Erotic Review was the number one referral source for Backpage (SI¶¶57-58);

- Participated in meetings where NCMEC stated a large portion of Backpage's ads were blatant prostitution ads, many featuring children (SI¶¶86, 97);

- Received an email with a list of recommended "action items" to pursue to decrease human trafficking; Larkin disregarded the suggestions (SI¶¶100-01);

- Received an email discussing whether Backpage should include a warning message on its website concerning the prostitution of children (SI¶115);

- Received notice that "Chase [Bank] was no longer accepting transactions from

Backpage.com, due to their involvement in human trafficking" (SI¶135);

- Strategized about reconfiguring Backpage.com to fool credit card companies into believing charges were incurred on a different website (SI¶178-80);

- Received over $21 million funneled through Cereus Properties (SI¶192).

These allegations demonstrate Lacey and Larkin's specific intent both to facilitate prostitution and engage in the money laundering offenses alleged against them.

### 2.   Spear and Brunst

The SI includes numerous allegations identifying Spear's and Brunst's specific intent to facilitate prostitution. First, both were involved in Backpage's aggregation efforts and business relationship with The Erotic Review. Second, Spear was heavily involved with Backpage's moderation practices. And third, both Brunst and Spear were integral to Backpage's efforts to fool credit card companies into processing Backpage-related funds.

Spear and Brunst specifically understood Backpage's aggregation efforts. (SI¶42.) As company executives, they helped implement the process of identifying prostitutes advertising on rival websites who were then contacted and given free advertising on Backpage. (*Id*; *see also* ¶¶35-36, 40-41, 44.) In addition, both were involved in strategizing about efforts to expand Backpage's relationship with The Erotic Review and attempts to find similar business relationships. (SI¶49.) They endorsed Backpage's growth through reciprocal links like those embedded on The Erotic Review. (*Id.*) They met with Ferrer to discuss Google Analytics reports that demonstrated that The Erotic Review was the number one outside source of referrals to Backpage. (SI¶¶57-58.) Spear also was involved in Backpage's decision to maintain a relationship with "Dollar Bill," an individual who earned fees for arranging for prostitutes and pimps to post ads on Backpage. (SI¶¶59-67.)

Spear was also heavily involved in Backpage's moderation efforts. (SI¶¶70,73,80-81.) He understood that Backpage's moderators were removing sex act pictures and coded terms, but then posting the ad. (*Id.*) Indeed, he instructed Ferrer to inform moderators to concentrate on coded terms and "lighten up on the images moderation." (SI¶80.)

Finally, both Brunst and Spear played a direct role in Backpage's efforts to fool financial companies into accepting payments directed to Backpage. For example they:

- 40 -

- Received notice that Chase Bank would "no longer accept[] transactions from Backpage.com, due to their involvement in human trafficking" (SI¶135);

- Strategized with Larkin and Ferrer about reconfiguring Backpage's website to "fool credit card companies into believing the charges were being incurred on a different website" (SI¶178);

- Discussed a proposal to set up shell companies without any apparent connection to Backpage and use these companies' accounts to accept payment (SI¶¶179-80);

- Strategized about using an ostensibly independent entity—Website Technologies, LLC—to process Backpage-related funds (SI¶187); and

- Were the two authorized signers on bank accounts held by Cereus Properties LLC, which received wire transfers totaling over $47 million from Website Technologies accounts between December 2015 and October 2016 (SI¶190).

The SI's allegations detail Defendants' specific intent to promote prostitution, which provides the requisite *mens rea* for all crimes alleged against them.[24]

  **D. Defendants' Cases Are Inapposite.**

  Defendants cite *Buddenberg* in arguing for dismissal, but it lends no support. (Mot at 35.) *Buddenberg* dismissed a two-count indictment that wholly failed to "allege what the [threatening] statements [at issue] were or course of conduct was that involved or constituted the alleged threats, harassment or intimidation, thus precluding any meaningful review of the legal sufficiency of the charged conduct." 2010 WL 2735547 at *4. In the *Buddenberg* indictment: "[N]o specific dates are given. No target person is identified. No specific threat, act of vandalism, property damage, criminal trespass, harassment, or act of intimidation is identified." *Id*. at *8. As an example of a sufficient indictment, the court pointed to *United States v. White*, 638 F. Supp. 2d 935, 937-41 (N.D. Ill. 2009), where the solicitations at issue "were postings on the defendant's website and the indictment identified the website, the specific date of postings, and the specific content of the posts which were alleged to constitute the proscribed solicitations." *Id*. at *7. The SI contains precisely the type of detail

---

[24] Padilla and Vaught were not originally part of the Motion to Dismiss but have since filed Notices of Joinder. (Docs. 615, 617.) The SI includes copious factual allegations showing their *mens rea*. (SI¶¶6-7,12, 60, 72, 77-85, 87-88, 93-96, 99, 102, 104, 106, 110, 115-117, 120, 123, 128-129, 132, 133, 137, 139, 145, 148-150, 157, 185, 188.)

that the *White* indictment possessed.  (*See, e.g.*, SI ¶ 201.)[25]

Defendants cannot fit the square-peg of the SI's allegations into the round-hole of previous cases involving other websites.  For example, Defendants argue that the SI is similar to a civil complaint filed by Sheriff Dart against Craigslist, where the trial court characterized the complaint's allegations as demonstrating that Craigslist engaged in "negligent publishing."  (Mot. at 36 (citing *Craigslist*, 665 F. Supp. 2d at 967).)  No fair reading of the SI can lead to a similar conclusion.  (*See also* Part III, *supra*.)

Citing *Doe v. GTE Corp*, 347 F.3d 655 (7th Cir. 2003) (Mot. at 36), Defendants again liken their website to a newspaper that unknowingly carried an advertisement for "escort services," or a company like Verizon whose cellphones were used by drug dealers.  (*Id.*)  The analogy doesn't work.  The SI paints a starkly different picture of Backpage than that of an unknowing third party.  At trial, Defendants can attempt to persuade the jury that their partnerships with The Erotic Review and "Dollar Bill," their aggregation and moderation practices, and their deliberate publication of prostitution ads is the same as Verizon selling cell phones to the general public; for now, the SI's allegations must be accepted as facts.

Finally, Defendants' reliance on the Seventh Circuit's *Dart* decision is unavailing.  (Mot. at 37.)  Following Backpage's compelled disclosures of documents detailing its internal operations, *Dart* was dismissed and a $250,000 sanction imposed based on Backpage's false and fraudulent misrepresentations.  Defendants' Motion expresses a strong desire to return to a world where the facts about Backpage's business practices remain unknown.  That world no longer exists.

---

[25] While the district court in *White* dismissed the indictment on First Amendment grounds, the Seventh Circuit reversed and remanded for trial, holding that: (1) the indictment sufficiently alleged the elements of criminal solicitation and supporting facts; (2) criminal solicitations—invitations to engage in illegal conduct—are categorically outside First Amendment protection; and (3) whether the solicitation was made with intent to further illegal activity must be submitted to the jury.  *United States v. White*, 610 F.3d 956, 960-962 (7th Cir. 2010); *see id*. at 962 ("The government has laid out the elements of the crime and the statute that White is accused of violating, along with some specific factual allegations for support, and that is all it is required to do.  The question of White's intent and the inferences that can be drawn from the facts are for a jury to decide.").

1    **VI.    The Travel Act Is Constitutional As Applied.**

2          Defendants' final argument is that the Travel Act is unconstitutional as applied in the

3    SI.   (Mot. at 37-42.)   This argument, which is based on the same faulty premises as

4    Defendants' other arguments, is easily dispatched.

5          First, as detailed above, the SI is premised on Defendants' specific conduct and intent

6    to facilitate prostitution, not their "general knowledge that Backpage.com was used by third

7    parties to advertise prostitution."  (Mot. at 38.)

8          Second, the SI's allegations conform to the requisite elements to prove a Travel Act

9    violation.   The allegations demonstrate Defendants had a "specific intent to facilitate an

10   activity which the accused knew to be unlawful under state law." *Polizzi*, 500 F.2d at 876-

11   77.  At the motion to dismiss stage, simply alleging Defendants had an "intent to promote an

12   unlawful activity" is sufficient, though the SI alleges Defendants' specific intent in far

13   greater detail. *See Tavelman*, 650 F.2d at 1138.

14         Third, because SI's allegations support the requisite *mens rea* for Travel Act crimes,

15   there's no concern that the indictment conflicts with the First Amendment.  Defendants were

16   not just "any website operator[s]."  (Mot. at 39.)  Rather, they were much more like the

17   operator of Silk Road—who *knew* "his facilities would be used for illicit purposes and, in

18   fact…operated them for that purpose." *Ulbricht*, 31 F. Supp. 3d at 561.

19         Fourth, the Travel Act is not "unconstitutionally vague as applied." (Mot. at 40.)  The

20   government has alleged Defendants acted with specific intent, and a vagueness challenge

21   "rarely succeeds where the requisite mental state is one of purpose or specific intent"—as is

22   the case with the Travel Act. *Welch*, 327 F.3d at 1096; *see also Tavelman*, 650 F.2d at 1138.

23         Fifth, for all the reasons stated above, and unlike *United States v. Cassidy*, 814 F.

24   Supp. 2d 574, 583 (D. Md. 2011) (Mot. at 42), the SI is squarely directed at "speech integral

25   to criminal conduct"—including Defendants' deliberate operation of the internet's leading

26   marketplace for illegal offers to sell adults and children for sex.

27

28

1

## __Conclusion__

2          For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

3          Respectfully submitted this 12th day of June, 2019.

4                                    MICHAEL BAILEY
                                     United States Attorney
5                                    District of Arizona

6                                    *s/ Peter S. Kozinets*

7                                    KEVIN M. RAPP
                                     MARGARET PERLMETER
8                                    PETER S. KOZINETS
                                     ANDREW C. STONE
9                                    Assistant U.S. Attorneys

10                                   JOHN J. KUCERA
                                     Special Assistant U.S. Attorney
11

12                                   BRIAN BENCZKOWSKI
                                     Assistant Attorney General
13                                   U.S. Department of Justice
                                     Criminal Division, U.S. Department of Justice

14                                   REGINALD E. JONES
                                     Senior Trial Attorney
15                                   U.S. Department of Justice, Criminal Division
                                     Child Exploitation and Obscenity Section
16

17

18

19

20

21

22

23

24

25

26

27

28

- 44 -

1

## **CERTIFICATE OF SERVICE**

2          I hereby certify that on June 12, 2019, I electronically transmitted the attached

3  document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4  Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance

5  as counsel of record.

6

7  *s/ Angela Schuetta*
   Angela Schuetta

8  U.S. Attorney's Office

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28