# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | CR-18-0422-PHX-SMB |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | August 19, 2019 |
| Michael Lacey, | ) | 9:15 a.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE SUSAN M. BRNOVICH, JUDGE**

**<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>**

**<u>MOTIONS HEARING</u>**

Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

## **A P P E A R A N C E S**

FOR THE GOVERNMENT

        U.S. ATTORNEY'S OFFICE
        By:  **Mr. Kevin M. Rapp**
             **Mr. Andrew C. Stone**
             **Ms. Margaret Wu Perlmeter**
             **Mr. Peter Kozinets**
        40 North Central Avenue, Suite 1200
        Phoenix, Arizona 85004


FOR THE DEFENDANT LACEY:

        LIPSITZ GREEN SCIME CAMBRIA
        By:  **Mr. Paul John Cambria, Jr.**
        42 Delaware Avenue, Suite 120
        Buffalo, New York 14202

FOR THE DEFENDANTS LACEY AND LARKIN:

        DAVIS WRIGHT TREMAINE, LLP - Washington, D.C.
        By:  **Mr. Robert Corn-Revere**
        1919 Pennsylvania Avenue NW, Suite 800
        Washington, D.C. 20006

FOR THE DEFENDANT LARKIN:

        BIENERT MILLER & KATZMAN, PLC
        By:  **Mr. Thomas Henry Bienert, Jr.**
             **Ms. Whitney Z. Bernstein**
        903 Calle Amanecer, Suite 350
        San Clemente, California 92673

FOR THE DEFENDANT SPEAR:

        FEDER LAW OFFICE, PA
        By:  **Mr. Bruce S. Feder**
        2930 East Camelback Road, Suite 160
        Phoenix, Arizona 85016

FOR THE DEFENDANT BRUNST:

        BIRD MARELLA BOXER WOLPERT NESSIM
        DROOKS LINCENBERG & RHOW, PC
        By:  **Mr. Ariel Neuman**
        1875 Century Park E Suite 2300
        Los Angeles, CA 90067

FOR THE DEFENDANT PADILLA:

       DAVID EISENBERG, PLC
       By:  **Mr. David S. Eisenberg**
       3550 North Central Avenue, Suite 1155
       Phoenix, Arizona 85012

FOR THE DEFENDANT VAUGHT:

       JOY BERTRAND, ESQ., LLC
       By:  **Ms. Joy M. Bertrand**
       P.O. Box 2734
       Scottsdale, Arizona 85252

**P R O C E E D I N G S**

1  COURTROOM DEPUTY:  Criminal case 2018-422, United

2  States of America versus Michael Lacey and others, on for a

3  motion hearing.

4  Will the parties please announce.

5  MR. RAPP:  Kevin Rapp, Peter Kozinets, Andy Stone, and

6  Peg Perlmeter on behalf of the United States.

7  MR. CORN-REVERE:  Robert Corn-Revere for James Larkin

8  and Michael Lacey.

9  MR. CAMBRIA:  Paul Cambria for Michael Lacey.

10  MR. FEDER:  Bruce Feder for Scott Spear.

11  MR. NEUMAN:  Good morning, Your Honor.  Ariel Neuman

12  for John Brunst, who is present.

13  MR. BIENERT:  Good morning, Your Honor.  Thomas

14  Bienert and Whitney Bernstein for James Larkin, who is present.

15  MS. BERNSTEIN:  Good morning.

16  MR. EISENBERG:  Good morning, Your Honor.  David

17  Eisenberg on behalf of Andrew Padilla.  He has waived his

18  appearance.

19  MS. BERTRAND:  Good morning, Your Honor.  Joy Bertrand

20  appears for Ms. Vaught.  She waives her appearance this

21  morning.

22  THE COURT:  Okay.  And we're set for oral argument on

23  several motions.

24  We'll take the motion for sanctions and the motion to

compel first.  Those are related.  The government wants to

restrict access to certain documents because of some alleged

disclosure of confidential documents and the defense wants

disclosure of those documents that were withheld.

   Mr. Rapp, are you --

   MR. RAPP:  I am.

   THE COURT:  -- handling that for the government?

   MR. RAPP:  Yes.

   THE COURT:  Okay.

   MR. RAPP:  So, Judge, when we went into this

scheduling order, went in with good faith to lay out some

deadlines where the parties could make disclosures all in an

effort to not delay this trial.  As the Court knows from the

orders, we actually wanted an October 2019 trial date, and

Judge Logan actually ordered that it be in January.  Obviously,

with new counsel, it was moved to May 5th over our objection.

   So we -- we went into the scheduling order in an

effort to try to make sure that both sides were prepared to go

to trial.  And, in doing so, we disclosed a lot of documents.

In those documents, as the Court knows from the pleadings, is

these internal memorandum.  We made great efforts to try to

resolve this issue with the defense.  Look, these were

inadvertently disclosed.  Please cease review of them.  We

explained that we have not disseminated them to anybody else.

We tried to demonstrate to the defense why they didn't

constitute Brady, but, obviously, that didn't work out and we filed our motion on October 22nd of 2000 -- of 2019 -- 2018 to -- to order they -- they be destroyed. And then Judge Logan issues an order in the middle of November finding a couple things.

One, these should have been destroyed. This issue should not have even come to the court. Out of professional courtesy, the defense should have complied. He also found, and, by the way, I don't find these documents to be Brady. So the defense did not, in the time to respond, they hadn't filed the response, and so the Court allowed them to file the response, and then basically issued the same order.

Well, let me -- let me -- the judge issued the order somewhat prematurely and then allowed the defense to respond, and then the court issued the same order.

We made every effort to try to resolve this with the defense. So their response to our motion for sanctions is -- basically, raises more issues for us and more concerns. The response is basically this: On the day you gave us 175,000 documents -- despite claims throughout this litigation that they've had so much difficulty in reviewing the documents and the like -- they were able to identify these internal memoranda that were inadvertently disclosed in that 25 days, which included a July 4th weekend and two -- July 4th holiday and two weekends. They then disclose this to a third party, and that

1     third party, in turn, gave it to the author of this article.

2     That is wholly outlandish and implausible.

3          Their second argument is, well, you know what,

4     maybe -- maybe you gave it to the -- to somebody, even after we

5     avowed in an affidavit that we hadn't disseminated it, in a

6     declaration, we hadn't disseminated it.  The only offices that

7     had this information was the Western District of Washington,

8     the criminal division, and the U.S. Attorney's Office in

9     Arizona.  Nobody else had it.  So we didn't give it to a third

10    party.

11         Their third, sort of as an aside in a footnote is --

12    and this is even -- even -- even more outlandish -- is that the

13    author, who has showed up almost at every court appearance,

14    certainly early on with the defense, and is -- has come up to

15    myself and Judge Lanza and asked for comments, this person was

16    an AUSA back in the early 2000s for a very brief time.  And

17    because of that service with the Justice Department, she might

18    have cultivated some sources, I guess the argument is, to

19    obtain those documents.  And that's absurd.

20         So, obviously, the defense is not -- the defendants

21    are not acting in good faith.  They took those documents

22    knowing that they were the subject of litigation, knowing that

23    the government had asked that they be destroyed.  And, worse,

24    they may have done this even with a court order in place and

25    gave it to this author.

1          The reality is we could ask for a lot of remedies

2     here.  One, we could just ask for a gag order on the defense,

3     which, obviously, we're -- we're not willing to do.  We don't

4     have any problem with the defense talking to the press about

5     this case.  We have no concerns that they would pollute a

6     potential jury pool, so they can do that, but they can't

7     discuss evidence or discovery that does not exist independent

8     of this prosecution, and so that is our concern.

9          I can't tell you how many Backpage employees who will

10    be testifying against the defendants in this case, some under

11    the grants of immunity, have expressed concerns for their

12    safety because of their cooperation.  They have, as the Court

13    knows from the Senate Subcommittee report, they were concealed,

14    and they asked that their names be concealed in that report.

15         There was a documentary that chronicled Backpage's

16    running a criminal enterprise, it's on Netflix, those former

17    Backpage employees who were willing to be interviewed for that

18    movie wanted to be concealed and expressed concerns about the

19    disclosure that they are cooperating.

20         Obviously, the child sex trafficking victims, or the

21    victims who were trafficked on Backpage as children and who are

22    represented in many cases by attorneys, have the attorneys --

23    through their attorneys they have expressed concern, not only

24    about their safety in this case, but also about the fact that

25    some pretty sensitive things are being disclosed to the defense

and how the defense would be using those postings.  Many of these postings are when they were 14, 15 years old.

And so now we come to the cooperators, particularly, Dan Hyer and Carl Ferrer.  Dan Hyer from the very outset expressed grave concern about when his reports would be disclosed and when they would find out the details of what he was going to testify to.  And so they have that concern.  And this is not -- this is no different than any other case where we have cooperators.  We take -- we take measures to protect their identity.  And the defense may say, well, their pleas are public and it is well-known that they are cooperating, but it is the hard copies of those reports that we are concerned about.

We don't trust the defendants and we don't trust how they will handle these sensitive items.  And so we -- we're willing to produce it to them, but we're willing to have -- we are insisting upon restrictions on how they are produced.  They're not going to get hard copies of them.  There are many cases that we have, particularly in the drug trafficking arena, where we, frankly, just make the defense come over to our office and review their cooperating statements.  And they are given it sometimes 72 hours, sometimes 48 hours, sometimes the night before that witness testifies.  And the Jencks Act doesn't require anything less than that.

In fact, the Jencks Act, as the Court knows, only

1  obligates the United States to turn those statements over after

2  the witness testifies.  So we've been very generous in our

3  agreements, but the defense can't be trusted to handle these

4  documents.

5        With respect to some of the -- Mr. Brunst, for

6  example.  Mr. Brunst somehow views his situation different,

7  argues, hey, my guy didn't disclose these statements.  The fact

8  of the matter is all these defendants are in a joint defense

9  agreement.  We don't know how this -- how these -- these items

10 of discovery are being shared.  We have no idea who is getting

11 all these discovery.

12       This gentleman right here says, hey, can I stay in the

13 courtroom?  I have no idea who this person is.  He's not a

14 noticed attorney on the case.  He says, I'm an attorney, help

15 me out.  I don't know who is getting this discovery.  I don't

16 know where the discovery is going.  And I don't know where the

17 internal memorandum are right now.  Where is it?

18       THE COURT:  Let me ask you a question about that,

19 because you mention this joint defense agreement.  I looked at

20 the document that you cited and it doesn't appear to relate to

21 all the defendants and it related to some other case.

22       MR. RAPP:  The joint defense agreement?

23       THE COURT:  Yeah.

24       MR. RAPP:  I haven't seen it, so I don't know.  We --

25 we haven't been given it.

1          THE COURT:  Well, I know, but the document you

2    referred to talks about an agreement, and I didn't write down

3    who -- wait.  Let me look at my notes.

4          But I think it involved Lacey, Larkin, and Backpage in

5    a separate case.  And it was pretty clear from what -- whatever

6    you cited that it was limited to three defendants.

7          MR. RAPP:  Well, I think there is two documents.  I

8    think one --

9          THE COURT:  Okay.

10          MR. RAPP:  And, again, I haven't seen them.  So one

11    is what has been referred to as a common litigation management

12    agreement.  It's also referred to as a joint representation

13    agreement.  And I don't know who is part of that.  I know

14    that -- I believe, that Carl Ferrer was asked to sign on, and

15    that's going to be the subject of testimony at trial.

16          But there is then the second document that I believe

17    is a joint defense agreement where all the defendants are

18    involved in that.  All I know is that the defendants are all

19    joined at the hip in this case.  They -- you know, Mr. Brunst

20    is the only one who has filed a motion arguing that he

21    shouldn't be lumped in with Mr. Lacey and Larkin, but he's --

22    factually, he was the CFO.  He's the architect of the

23    concealment money laundering.  He was percentage owner of the

24    business.  He has joined the defense in every single motion.

25    He -- he was present at the Ninth Circuit for their argument

1    regarding the seizure of assets.  He is being treated -- he's

2    received the same plea offer as Lacey and Larkin, which is

3    none.  He'll be sitting shoulder-to-shoulder with them at

4    trial.  So we view him, and the other defendants, frankly, in

5    the same vein.  They're part of a joint defense.

6         THE COURT:  Okay.  Then the other question I had is

7    you talked about the 25 days between -- in addressing their

8    arguments, the 25 days which they actually say, well, it was

9    actually a lot longer than that before Judge Logan actually

10   entered the order.

11        MR. RAPP:  Well, no, because we e-mailed them and they

12   immediately said we have ceased reviewing these documents.  The

13   implication is we are standing down on these documents, but we

14   have some -- and I don't begrudge them -- they had some

15   questions about them.  Okay.  Did you give them to anybody

16   else?  No.  They had a couple other questions.  Well, we think

17   these are Brady.  We disagreed.  And Judge Logan disagreed.

18        They just -- they kind of slow play.  It went back and

19   forth.  It's sort of disingenuous, frankly, for them to say,

20   well, they didn't file the motion until October 22nd.  This

21   goes to the bad faith.  Look, we were trying to work this out.

22   And, you know, they have inadvertently disclosed some things to

23   us, e-mails and the like, and we've destroyed them promptly.

24   But here they were sort of slow playing this, and then they

25   turn around and say, well, you didn't file this motion until

1  October 22nd.  And, again, as I noted, Judge Logan said, this

2  should never have even come to me.  So it's absurd to think

3  that in that 25 days, despite all the difficulties that they

4  have trumpeted with the discovery, that they seized upon these

5  documents immediately and then disclosed them out.

6        THE COURT:  Okay.  And I kind of interrupted you when

7  you were talking about the joint defense agreement.  So is

8  there anything else you wanted to add?

9        MR. RAPP:  No, just that we view them all jointly

10  together.

11        You know, this isn't the first time that the defense

12  has been sanctioned.  They've been sanctioned for lying to the

13  court in Washington state.  They've been sanctioned for lying

14  to the court in the Northern District of Illinois.  I love

15  this.  This is really disingenuous.  They always say, well,

16  Mr. Lacey and Larkin, they weren't parties to that suit, except

17  for the same attorneys being on the case from Davis Wright

18  Tremaine, except for paying the legal fees, except having the

19  most at stake in that suit because they -- they continue -- I

20  think what they're trying to say is, well, this is Backpage.

21  And we had sold Backpage in 2015, so the sanctions that have

22  been imposed for lying to the court, the $250,000, that really

23  had nothing to do with us.  That really gives us concern about

24  whether they are dealing in good faith.

25        They were running Backpage.  They were making all the

money from Backpage. And when I say they were running
Backpage, the testimony at trial and the evidence will be they
were having, even after the sale, they were having numerous
meetings about the management of Backpage. They were paying
for all the attorney's fees. It's why they -- I guess, I don't
know if you have this common litigation management agreement --
it's why they were so concerned about coordinating the legal
strategy, because they were the ones who had sold Backpage in
sort of a sham sale to Carl Ferrer for $600 million, and they
were getting paid monthly for that. So for them to say in
their pleadings, well, you can't really attribute the sanctions
to Lacey and Larkin, it really is just misleading, at a
minimum.

So our request for protective order is -- is
appropriate in this case. Again, they -- they have violated a
court order. We could have a hearing on it and -- and they --
we could petition for a violation of the release conditions for
violating the court order. They can be taken into custody.
That's not what we're asking for. We're simply asking for a
protective order that is fairly routine in large complex cases
with sensitive information.

We're asking that they just certify, which almost
seems -- they even oppose that. They spend most of their time
in their response saying the court doesn't have the authority
to sanction a party for violation of a court order, but they

should file an affidavit certifying that those internal

memorandum that a federal judge ordered destroyed are actually

destroyed.  And we are imposing a -- going forward, a

production of our Jencks Act will take place at our office so

we know who is seeing these reports.  We have no idea.  I have

no idea who is getting all this discovery.  And the discovery

is sensitive, and, for that reason, a protective order should

be in place.

        THE COURT:  Okay.  Thank you.

        And who filed the response?

        MR. BIENERT:  Mr. Bienert.  I'm over here.  I'll be

addressing the Court, if that's okay.

        THE COURT:  Okay.

        MR. BIENERT:  Good morning, Your Honor.  Once again,

my name is Thomas Bienert and I represent James Larkin, but

I'll be speaking on behalf of the defense, primarily, for the

group.

        What we really have here is duelling allegations of

violation of court orders.  And there is a couple things that

aren't in dispute.  One, the standard.  You can't just come in

here and just sort of say a bunch of things you don't like, but

there are standards that the accusing party has to meet when

they're accusing a party of violating a court order.  And the

bottom line is they have to establish it by at least clear and

convincing evidence.  And that depends on whether it's civil,

1　but if it's criminal, and he's now alluding to things like

2　taking away bond, I don't think we're there, but then it would

3　be a higher standard, I submit.

4　　　　But, here's the thing.  On the terms of the

5　government's proving by clear and convincing evidence that any

6　defendant has violated a court order, this is a nonstarter, for

7　at least six different reasons.

8　　　　Number one, timing.  The government's opening line in

9　their motion that they filed with you is Defendants Larkin and

10　Lacey, quote, appear to have violated the Court's order by

11　disclosing internal DOJ documents to a third party after this

12　court ordered the documents destroyed.  The court ordered the

13　documents destroyed in January of this year.

14　　　　The government has submitted zero evidence that

15　anything was disseminated after January of this year.  In fact,

16　if I follow their sometimes moving-around argument, what they

17　claim in their motion is that we, according to the offending

18　article, that our clients sat down with a reporter in November

19　of last year.  That's three months before the order.  As a

20　matter of law, you can't establish that someone violated an

21　order that happened three months after the only evidence you

22　can cite to.  So they don't have it there.

23　　　　Number two.  They cannot show that what was disclosed

24　violated the terms of the order.  Judge Logan's order says, you

25　are -- you are to destroy the documents and you are not to use

1  the documents in the trial or proceedings in the case.

2  Regardless of how the information did or didn't get to the

3  reporter, it was not being used in the case.

4          THE COURT:  Okay.  But it also said destroy it.

5          MR. BIENERT:  It did.

6          THE COURT:  So that's a little --

7          MR. BIENERT:  As of January.

8          THE COURT:  You're saying they could give it to the

9  reporter before they destroyed it and that's not violating the

10 court order because it wasn't used at trial?

11         MR. BIENERT:  Well, first of all, Your Honor, I'm

12 certainly not saying they gave it to the reporter, but if it

13 was -- if the information, whether in a document, a viewing, or

14 a discussion, got to the reporter before January of 2019, then

15 there is no violation of a court order.  If you destroy the

16 document when you get the order post January of 2019, it, as a

17 practical and legal matter, cannot apply to something that,

18 arguably, happened several months before.

19         Number three.  They have certainly never established

20 who sent the documents.  And I'll talk about each of these in a

21 little more detail as we go through, but any number of people

22 could have sent the documents.  I mean, in addition to the

23 lawyers here, I'm looking at four agents.  We know DOJ is

24 involved in this case.  I bet that there are dozens, if not,

25 north of 100 people within the government who would have access

1  to any of this information, which is, as I understand it, from

2  2011.  It's eight years old.  It's in a matter that's been in

3  Main Justice, Washington, Arizona, Texas, California, just to

4  name a few.

5          Number four.  The substance of the documents is

6  available elsewhere.  And I will point Your Honor to that.

7          Number five.  The sanctions they seek are simply

8  unrelated to what we're talking about.  Their concern is about

9  a reference to a reporter about an internal DOJ memo, and yet

10  their remedy has to do with, yet again, not providing us their

11  witness statements and information of the key witness in the

12  case, Carl Ferrer, who a year-and-a-half ago they agreed they

13  would provide, by February.  Then they asked Your Honor, I

14  forget if it was Judge Logan and then Your Honor, or just Your

15  Honor, to go to June, they got June 25th, and now they're just

16  doing another delay tactic.

17          Number six.  There is simply no harm to the government

18  here.  None of this stuff was put in front of a witness.  None

19  of this stuff was put in front of a trial jury.  No trier of

20  fact got it.  It doesn't involve the names of any witnesses or

21  anyone who could be a security issue.  And that's before we

22  even talk about the avalanche of ugly press that our clients

23  have been dealing with for a year-and-a-half just on this case

24  that was put out by the government.

25          At the end of the day, Your Honor, what it feels like,

regardless of what they actually intended, it feels like yet another effort to make sure that we, the defense, don't get what we need to defend the case and move this thing towards trial, if it ever gets to trial -- and, of course, we don't believe it should, and that will come up in the motion in a half an hour -- but it's just another effort to make sure that we're not working on the case.

As I stand here right now, Your Honor, it is almost a year-and-a-half since the case was indicted. All the litigation is on side issues: Taking money, whether we'll ever get to address whether they could take the money; fights over whether they did or didn't give us the discovery that we need to look at the case, which we still don't have. I would submit to Your Honor that the single most important things that we need to prepare this case are a working system that contains the database of Backpage so we can see all the history of any ads that they're alluding to, as well as others, and what is going on with the guy who made the whole case, according to the government, Carl Ferrer? The guy who has spent seven or eight times under oath basically saying none of these guys are guilty of anything, Backpage was acting legally, and now the government has a plea agreement and we have no idea what he says. And they promised to give it to us and there is a court order that says they were required to.

So what should happen here, Your Honor, is there just

1    simply is no legal basis to find that our clients, any client,

2    defendant did anything wrong, and we should get the discovery

3    that we've been waiting on for many, many months, and that the

4    government is sort of unilaterally holding on their own.

5           Touching on a couple of these things in a little more

6    detail.  First of all, Your Honor is aware of the order,

7    January 28th, and it basically says two things.  The order

8    says, destroy the 39 inadvertently disclosed documents, and

9    you're prohibited from using this information gathered from

10   them, quote, at trial and in any future proceedings or

11   pleadings in this case, unquote.

12          Contrary to what the government says about my client

13   and Mr. Lacey, we did, not only destroy the documents, but we

14   submitted a filing from Mr. Larkin, it's Docket 475, that

15   attests to the fact that we destroyed the documents.  It was in

16   February -- February 23, 2019.  And I know Mr. Lacey filed one

17   a couple of days before that, and the other defendants sent

18   e-mails to the government saying that, all in that early

19   February time frame.

20          The bottom line is you can't violate an order that

21   hasn't come out yet when you met with the reporter, according

22   to the government's theory, and you can't violate an order when

23   the offending conduct is something said to a reporter,

24   arguably, but wasn't used in the case itself.  It's not part of

25   a trial.  It's not part of a pleading.  So we simply didn't

1   violate the order.

2          The government can't cite any cases that stand for its

3   novel theory that because of a sense and an impression and a

4   maybe and speculation, our clients have violated a court order.

5   The closest they come to it is the Hunt case.  And I think

6   Mr. Cambria is going to talk about it in more detail.  But the

7   bottom line is the Hunt case shows what you do need to prove

8   that a party violated an order.  Totally different than our

9   scenario.

10         Next point, the government says that this conduct --

11  they don't even really articulate how they're harmed by what's

12  in the article.  To me, I read the article and it's basically,

13  here's the history of the guys at Backpage, and this case is a

14  real interesting one because it kind of pits two very different

15  theories.  The government is saying look at all the bad things

16  they've done, which, by the way, is what Mr. Rapp just did with

17  you, and the defense is saying, wait a minute, we're

18  publishers.  You need to show specific bad things that we did

19  with specific knowledge about that specific article, or, I'm

20  sorry, ad.  That's the standard.  We're ships passing in the

21  night.  And you're going to have to decide that.  I believe

22  Mr. Corn-Revere will address it with you in a little while.  I

23  think the law is overwhelming that they are wrong in their

24  theory, but that's basically what the article says is the fight

25  here, and they cite a few things.  The government doesn't even

1    allege any harm that comes from the article.  But let's look at

2    what is really going on.

3          And, Your Honor, and I appreciate that your clerk was

4    helpful to us in taking a copy.  We have three exhibits that, I

5    don't know how we add them to the record, but --

6          THE COURT:  Well, have you shown them to the

7    government?

8          MR. BIENERT:  Yes.  We gave them to them this morning.

9    I got these this weekend.  Actually, I got them this morning

10   but learned about them this weekend.

11         And the bottom line is this is what's in the public

12   domain.  And I would ask Your Honor just to have it in mind

13   when you're looking at what the government alleges was

14   improperly shared.  The first -- and I guess -- I don't know if

15   I should refer to this as just attachment A, or Exhibit A to

16   the hearing, for purposes of the record.  And we'll file it,

17   Your Honor.

18         THE COURT:  So let me just ask you.  So there is an

19   article, which I understand what that is, there is a

20   certificate, there is this FBI request for certificate, which

21   is all sort of self-explanatory.

22         MR. BIENERT:  Yes.

23         THE COURT:  But I don't know what this last -- it's an

24   e-mail but I don't know who these people are.

25         MR. BIENERT:  Yeah, the e-mail, which I would say is,

1  frankly, the most significant, if you look at --

2         THE COURT:  Why do you say that this is public domain?

3         MR. BIENERT:  Well, whether it's public or not, it's

4  from a private party.  It's not the government's confidential

5  memo.  That's my point.

6         THE COURT:  Okay.

7         MR. BIENERT:  This is an e-mail from a person at

8  NCMEC, which is this organization that looks out for children

9  and worked a lot with Backpage and Backpage's efforts to figure

10 out how to stop underage sex peddlers on its Web site.  So it's

11 not government.  It's certainly not a confidential memo from

12 DOJ.

13        And so if Your Honor looks -- and I probably should

14 have highlighted yours.  I highlighted mine.  But I'm going to

15 the bottom of the first page where there is an e-mail from

16 Ernie Allen, Monday, January 30, 2012.  And it's -- if you look

17 at the very bottom line of the page, there is a sentence that

18 starts with, several weeks later.  And that sentence says,

19 several weeks later, the AG sent prosecutors from his criminal

20 division, along with -- and we turn the page -- several FBI

21 agents to NCMEC to meet with me.  What they said was that they

22 didn't think that Backpage's actions rose to the level of

23 criminal culpability.  They warned users about misuse of the

24 site, made people click on answers promising not to do anything

25 wrong, et cetera.  DOJ felt that their activities did not

1    generate the requisite, quote, intent, unquote, to hold them

2    criminally accountable.

3           So I would submit, Your Honor, that those, as well as

4    I -- in particular, the newspaper article -- and just to make

5    it easier on Your Honor, it's on the sixth page of the article.

6    It's a page that starts with the words, with the attorney

7    general's office at the top.

8           THE COURT:  Yeah.

9           MR. BIENERT:  And if you go to the second full

10   paragraph, Backpage has 123 employees who screen about 20,000

11   ads every day and they report suspicious ads to NCMEC,

12   according to an article published by The Village Voice in July.

13   To its credit, Backpage this year took major steps to police

14   its ads to help curb sex trafficking, said Allen with the

15   center.  Backpage has been aggressively reviewing their ads and

16   trying to remove those ads that are unlawful and suggest they

17   involve the sale of kids for sex, Allen said.

18          Backpage has reported to us 1,600 ads that they

19   believe are suspicious.  Allen said Backpage management appears

20   to be genuinely committed to helping stop sex trafficking, but

21   he is unsure how effective their efforts will be at eliminating

22   the problem because traffickers are good at adapting to

23   enforcement efforts.

24          And I realize that when this printed, it did not have

25   the date of the article, but I -- and we can submit a follow-up

1    to make it clear.  It was September 27, 2011, in the Dayton

2    Daily News.  So I would submit to Your Honor that not only does

3    the government not say how they're harmed by this reference in

4    this article, but there is a reason why.  The information was

5    out there already.

6         Then we get to bigger harm -- oh, and, by the way, one

7    of the other things I wanted to just comment on.  In addition

8    to Main Justice and the dozens, if not over a hundred lawyers,

9    who would have had access to all this and been involved in

10   it -- and I will say this because I know Mr. Rapp has said a

11   lot of things not in the record.  I worked at the U.S. Attorney

12   for ten years.  I did stints at Main Justice.  Main Justice

13   releases a lot of information that isn't supposed to be

14   released, for press purposes and others.  It is certainly

15   plausible that over the eight years that these memos have been

16   kicking around, someone at Main Justice would have leaked them.

17        I would also note --

18        Yes, Your Honor.

19        THE COURT:  Go ahead.

20        MR. BIENERT:  I would also, note even within this

21   case, the wired article wasn't the first article that came out

22   about Backpage and kind of talking about the case that had our

23   clients and others interviewed.  There was an article from

24   Reason.com that came out in August of last year as well, so --

25        THE COURT:  The issue is not that your clients were

1  interviewed or that this information in general about the

2  conflicting views is out there.  The issue is that it was, at

3  least from the Court's perspective, is that it was direct

4  quotes from an internal memo.  And the concern may not be that

5  that information was harmful, but the concern is for the safety

6  of the witnesses whose statements are about to be disclosed.

7       MR. BIENERT:  Let me address that head-on.

8       THE COURT:  Okay.

9       MR. BIENERT:  First of all, let's talk about what's

10  not out there.  This is one of the few times that they didn't

11  throw out the number about the millions of pages of discovery

12  that they've given us in this case.  And we have a lot of

13  discovery quarrels, but one thing that is not in dispute, they

14  have given us thousands, if not millions, of articles, I should

15  say, classified ads, ads from Backpage.  We have access to

16  them.  All the things that they're claiming they're worried

17  about:  Children being identified, personal privacy, none of

18  that stuff has been released by our clients.  We're not talking

19  about that.  And we've had it.

20       There is no -- nowhere has it been any suggestion that

21  our clients have said anything about witnesses to anyone, or in

22  any effort to try to intimidate, or the like.  The only thing

23  they have cited, again, is this comment about the eight-year-

24  old memo in an article from the DOJ.  So I feel like it's a

25  little bit of a bait-and-switch, Your Honor.

1          I would submit that Your Honor should want and need to

2    find some nexus between these so-called offending disclosure

3    and the types of things that the government is saying that

4    they're looking out for.  And there is just simply none.

5    Notwithstanding that they haven't shown a disclosure by our

6    clients that violates the order, even if you assume they have,

7    what was disclosed was something that basically says, you know,

8    there are two sides to this story.  We don't think it's a valid

9    prosecution for legal reasons.  And the government seems to --

10   to know that.

11         So I would submit that this concern about witnesses,

12   not only -- if this were the only thing we were talking about

13   in a vacuum, it doesn't get you to witness concern, because it

14   didn't happen.  But we have a year-and-a-half track record of

15   us getting documents that do name witnesses, that do name

16   supposedly underage people, that do name people that the

17   government claims are victims, and there is no issue with that.

18   So that's why it shouldn't be addressed that way.

19         Then we get to what is this -- what is this quote, or

20   these comments in the big picture?  Again, they haven't been

21   presented in court.  They haven't been presented to a trier of

22   fact.  They haven't been used to cross examine anyone or do

23   anything with.  What they are is in a newsprint article, and

24   that is against an avalanche of news and articles that is

25   favorable for the government and extremity detrimental to our

1  clients.

2          For example, on the day this indictment came down, the

3  press release by the Department of Justice, not just the U.S.

4  Attorney here, but Main Justice, then Attorney General Jeff

5  Sessions, the acting assistant attorney general of the U.S.,

6  the heads of the U.S. Attorney here, the FBI, et cetera, was

7  touting the indictment, but what they're really touting is the

8  allegation that our children -- that our clients earned money

9  and benefited over children who are exploited, raped, murder,

10 and the list.

11         Now, let's talk about that, Your Honor.  I don't

12 think --

13         THE COURT:  Let's not.

14         MR. BIENERT:  I'm sorry?

15         THE COURT:  We don't need to talk about that.

16         MR. BIENERT:  Okay.  The point is there is nothing out

17 there that in any way should be viewed as, wow, the government

18 has really been hindered here.  There is a lot out there that

19 has hindered us, and those will be motions in limine if we get

20 passed the dismissal stages.

21         THE COURT:  Okay.

22         MR. BIENERT:  And then just make sure I haven't missed

23 any of the points I wanted to make.

24         That's it on that side.  And then just two minutes on

25 what is clear is the government just violated your order.  Now,

1    I do have a bit of a question to ask -- and I don't know if the

2    Court wants to address it or maybe the government can in their

3    reply.  Assuming that we have everything in terms of the

4    briefing, there -- it is just a no-brainer, it is clear as day

5    that the government unilaterally violated your order to produce

6    to us the Jencks materials on the 25th.

7           It is also clear as day that they stood in this very

8    courtroom the day before and we spent a good hour talking about

9    discovery and what was going on, and they never mentioned that

10   the next day they weren't going to give us the main discovery

11   we've been arguing about.

12          Now, what I don't know, Your Honor, is this.  We've

13   had an ongoing issue in this case with not getting served with

14   documents or notice of documents.  And when we count the docket

15   sheet, there are over 100 documents that it looks like things

16   were filed and we've never gotten notice of or copies of.  Now,

17   that's an ongoing discussion and we're trying to get to the

18   bottom of it.  It's interesting that Mr. Rapp uses the term

19   slow play because it's been going on for eight or nine months,

20   but as it relates to this, when I look at the document

21   preparing for this argument, since we filed the motion -- or

22   since they filed the motion, there are 13 missing docket

23   entries in the document numerical sequencing.

24          And just so Your Honor will know, at least how I'm

25   thinking, when you look at the docket, they typically follow in

1   numerical order.  When there is a number missing, so if the

2   docket goes from number 668 to 678, for example, in my

3   experience, that typically means that there was some ex parte

4   or under seal or sort of off-the-grid filings that took up the

5   numbers, in my hypothetical, 669 through 677.

6          In this particular instance, since the filing of these

7   motions, there are 16 missing docket numbers.  So, as an aside,

8   I just want to make sure I'm not missing something that is

9   relevant to this issue.  And that's something we're going to

10  have to figure out going forward, how it is that there is so

11  many things that we haven't gotten.  And even if there is an

12  under seal ex parte, I think we normally get a notice of that

13  in every district I've ever practiced in, but we haven't gotten

14  that at all.

15         But as it relates to the record, there is simply no

16  question that they were required to turn over the Jencks

17  materials to us.  They didn't.  They did it the day after they

18  stood here with you and didn't mention it.  You know, they cite

19  the fact -- I think they have a quote in their pleading that

20  court orders are intended to be followed and parties need to

21  understand that.  It just feels like, from the defense side,

22  that the government doesn't seem to feel that way.  We need

23  this information.

24         There is a court order that was entered last April or

25  May that says we should have gotten it, extended by Your Honor,

1   and they need to follow the rules.  And that is a pretty easy

2   order, I would submit, that they did not follow the rules.  It

3   is clear and convincing that they violated an order, unless

4   there is a filing that I somehow missed, and we would ask that

5   you order them to produce to us the Jencks material.

6       And the final point I would just make is, again, I'm

7   not saying the government is intending this, but this case

8   feels like a slog through mud.  It was indicted last April.

9   And in a normal case, you know, we get discovery, we file

10  motions, we argue over things relevant to what the legal issues

11  are, the trial will look like.  That's not what this case is.

12  We've spent the last year-and-a-half trying to address money

13  being seized, trying to get the discovery that we think we're

14  entitled to that are clearly the big-ticket items in the case.

15      Now, coming in here -- the time and effort to come in

16  here and address a sanctions motion with Your Honor that is

17  based, even facially, on speculation, that is not about the

18  merits of the case, and I would submit to Your Honor that the

19  time should end for that.

20      We, obviously, have a huge motion that we're about to

21  argue, but if the case doesn't get dismissed, and I think it

22  should, we need to start lawyering on the case and not all

23  these side issues.  And I would submit that when you take it

24  all together, this looks like a motion that even the government

25  knew it couldn't prove, but chose it as a convenient reason to

1   try to justify yet again not giving us the discovery that we

2   need and they've been ordered to give us.

3         So, on that basis, I would submit there certainly has

4   not been a showing of a violation by any of the defendants, and

5   I would ask that Your Honor order the government to give us the

6   Ferrer Jencks materials right away.

7         I have thoughts if Your Honor -- if I need to address

8   what I view as they are just totally inappropriate requests

9   that we have to come here to look at documents, get a

10  protective order, I can address those if Your Honor wishes, but

11  if we're not at a point where there is a violation of an order

12  or a sanction or that we might not be entitled to the

13  discovery, then I don't know that there is anything to

14  addresses.  But, clearly, having the documents so we can work

15  in our office and go over this 12-plus year, I think it is,

16  history of alleged wrongdoing is important.  We're entitled to

17  it.  And there is no basis to deprive us of that needed and

18  ordered discovery.

19        THE COURT:  Okay.  Thank you.

20        MR. BIENERT:  Thank you, Your Honor.

21        MR. CAMBRIA:  May I, Your Honor?

22        If I could, just a couple of things on behalf of

23  Mr. Lacey.

24        First of all, Your Honor, I don't think the government

25  has, obviously, proven that a sanction should be imposed.  It's

interesting that they rely on the Hunt case.  And if we look at

the Hunt case, it actually lays out the procedure, it lays out

the burden of proof as clear and convincing, like in a contempt

situation, and, of course, none of that's here.

It is also interesting that the government claims that

they've accounted for the documents on their side.  First we

need to recognize the fact that these memos have been in

existence for six to seven years without any order saying that

they need to be confidential.

We know that the government has been collaborating,

not only with Washington, but with the state of California, and

also Texas, and certainly the government has in no way

accounted for six or seven years of these memos being out

there.  And, in fact, Judge Logan finds in his decision that

they've been out there for six or seven years.  And the

government even says that they've been out there for years in

their argument that, you know, they're not relevant, they're

not Brady material, that sort of thing.

So there has been no establishment, if you will --

even the government at one point represented that they were

going to verify the information concerning Washington, and we

haven't received anything that indicates that that's been

verified.  So if there -- if it's a circumstantial try on their

part, the dates don't line up, because the 28th is the order,

and November previous to that is when the reporter says that

1    she had meetings with our clients.

2            So, it seems to me, that there is an abject failure of

3    proof on the part of the government.  There is no purpose -- I

4    mean, there is no basis to have a sanction based on that.  And,

5    you know, their statement about our clients being sanctioned,

6    it's interesting because their chief witness is Carl Ferrer.

7    The courts that impose sanctions impose them principally

8    because Ferrer's testimony was now inconsistent with the claims

9    before, because now he's a government witness and he's singing

10   a different tune, if you will, for obvious reasons.  And so the

11   sanctions were based on, well, Ferrer now says this and that's

12   inconsistent with what happened before.

13           The case in the Northern District of Illinois, Lacey

14   and Larkin were not even parties to that case.  So there is

15   clearly no basis to say that they were sanctioned.  The

16   lawyers, the Davis Wright Tremaine firm, was not sanctioned.

17   The Washington state case is on appeal with regard to the

18   sanctions.  So to try to indicate, oh, well, they have a

19   pattern here, if you will, of abusing court orders, it's not

20   so.

21           And it's interesting the silence on the part of the

22   government.  Are there two sets of rules?  Clearly, the proof

23   is 100 percent that they violated a court order and in no way

24   attempted to ask the court if they could delay their filing,

25   and so they just blew it off, if you will, and come in here at

1    the same time and say in their written papers, court orders

2    need to be respected.  That's -- that's the, you know, the

3    standard.  Well, we agree with that.  But the government can't

4    be in a position where they completely blow off a court order

5    and then come in here and say, on the other hand, you know, we

6    are suspicious that one of these two individuals violated a

7    court order.  They have failed 100 percent in proving this.

8         Now, they refer at one point to the Hunt case.  I'm

9    not quite sure what they're asking for.  If we read what their

10   sanction request is, the first one, to me, is ambiguous.  I

11   think today that Mr. Rapp said that he's looking for a

12   declaration that the memos are destroyed, like in this present

13   tense.  That's what happened in Hunt.

14        In Hunt, first of all, there was total proof on the

15   part of the government, the moving party, that Mr. Hunt

16   violated the court order.  They had an oral admission from him

17   on tape.  They had an FBI agent who said that he interviewed

18   him and he admitted it.  The document that he put on his blog

19   had a -- a notice on it saying that it was under court order.

20   So there wasn't any doubt the government there proved -- or the

21   parties there proved that he had violated the sanction.  But,

22   nevertheless, what the court's remedy was, was to say, okay,

23   I'm going to now today enter another order, and I'm requiring

24   you, Mr. Hunt, to certify that you're going to follow -- that

25   you have followed this order, which was to take it off his blog

and destroy it.

It sounds like that's what he was asking for here today and -- but the point is that there is no authority in Hunt to have an accused come in and have to prove that they didn't do something. And that was an impression I got at first when I was reading their papers. There is no authority for that whatsoever. This is a criminal case. The government can't come in and say, prove you didn't do something. That -- you know, there is no case that supports that, and they couldn't ask the Court to do that either.

So the bottom line here is no matter what case they cite in their papers or we cited in ours, you had to carry a burden of proof, and they have not. And they have admitted that they have not. They say that they don't have sufficient proof to have this sanction be against these two individuals or either one of them. They admit that.

And I agree with Mr. Bienert. It seems to be the court can address issues with regard to witnesses, but it is not in any way fair to believe that that has in any way been violated to date. There is no accusation that the lawyers can't be trusted, that there is any belief that the lawyers have done something wrong, that any of their representations that we have made have been false. And, certainly, there is no reason to say to us that we have to go to their offices in order to look at millions of documents. It would be

1  impossible.

2      I mean, we're already in a situation where they've

3  taken all the money that we need to defend ourselves and to

4  even read the discovery, we're fighting about that, but to tell

5  us we have to go to their office to look at millions of

6  documents --

7      THE COURT:  I don't think that's what they asked.

8      MR. CAMBRIA:  That's part of what they're asking for,

9  that we have to go to their office.

10      THE COURT:  Only for the Jencks Act.

11      MR. CAMBRIA:  I'm sorry?

12      THE COURT:  Only for the Jencks Act material.

13      MR. CAMBRIA:  But the point is there that, still, why

14  would we have to do that?  There is no basis to say that any of

15  us cannot be trusted to follow the court's orders with regard

16  to witnesses and sensitive information.

17      What they have moved for here today isn't about

18  witnesses, it's not about, you know, people underage or

19  anything like that.  It was about a memo by attorneys who

20  basically were saying why they didn't think they had a case.

21  And it is relevant.  I know there has been a ruling that it's

22  not Brady and so on, but when you look at the memos and they

23  talk about witnesses who are going to be common to this case

24  and the frailties of those witnesses, it clearly is important,

25  it clearly is Brady, and we've always maintained that.

1    But the bottom line is they haven't in any way

2  established the level of proof necessary to sanction either one

3  of our clients.  It's one thing about court management on

4  witnesses and so on, that's one thing, but clearly there is no

5  basis for sanctions here on our clients.

6    MR. NEUMAN:  On behalf of Mr. Brunst, if the Court is

7  thinking about imposing something, I would like to be heard; if

8  the Court has heard enough and is not going to, I don't need to

9  take the time, but I would like to be heard if the Court is

10  entertaining the government's motion.

11    THE COURT:  Well, okay, at this point, let me tell

12  you.  I haven't heard the reply from the government, but the

13  only limit that I am considering is ordering -- ordering that

14  the Jencks Act material be disclosed, but that it remain with

15  the attorneys, that copies not be made for your clients, and

16  you have to keep it in the office.

17    MR. NEUMAN:  Your Honor, then very briefly, Your

18  Honor.  I'll let Mr. Bienert talk further if he wants to.  But

19  I think the only issue with that for us, Your Honor, is that

20  despite what Mr. Rapp said here today about the defendants not

21  being able to be trusted and the defendants did this or that,

22  they have conceded that Mr. Brunst did nothing wrong.  He

23  conceded that in the e-mail that we supplied to the Court.  And

24  any sanctions imposed, as we cited in our cases to Your Honor,

25  must be proportional to the purported violation.

1    Here the violation by Mr. Brunst is zero.  Even they

2  agree, he's done nothing wrong.  And so there shouldn't be any

3  sanctions if they're going to be proportional.  And even what

4  Your Honor is considering at this moment, which I understand

5  and I appreciate that you're not considering what the

6  government has asked for in its totality, but even that is a

7  sanction on Mr. Brunst's ability to work with us on the case.

8  If, for instance, we're counsel in California, Mr. Brunst is,

9  obviously, located here in Arizona, for me not to be able to,

10  for instance, show him a document here and send it to him, for

11  instance, impedes our ability to work with him and discuss it.

12  And this is going to be for Mr. Brunst in particular.

13    THE COURT:  Well, I understand that, but I think that,

14  not necessarily as a sanction, but as any -- in any criminal

15  case, the Court can impose limits on -- on where that discovery

16  goes, especially when it's with sensitive information.  And, I

17  mean, it happens all the time, especially with people who are

18  in custody, because they can't keep the documents.

19    MR. NEUMAN:  I don't disagree with Your Honor that the

20  Court -- I'm not saying the Court cannot.  I'm asking the Court

21  not to impose it, at least as to us.  Because, first of all,

22  there is no allegation that we've done anything wrong, and so

23  changing the game in the middle here, it's not fair and it's

24  not consistent with the case law.

25    As to Mr. Brunst in particular, Mr. Brunst wasn't

charged with any of the Travel Act violations in the original

indictment.  He's only been charged with them since Carl Ferrer

started cooperating.  And my understanding, from a conversation

with my co-counsel, is that prosecutors have admitted that

Mr. Ferrer's statements are critical to understanding the

supposed documents that implicate Mr. Brunst in those Travel

Act violations, because on their face, I've looked at them, the

supposed hot documents, not inculpatory.  They just are

meaningless.  So maybe there are statements from Mr. Ferrer.

But for us to meaningfully prepare with our client, when our

resources are extremely limited as it is to go back and forth

between the states, I would ask Your Honor not even to impose

that sanction which the Court is considering.

I do think it's notable that the government

unilaterally violated the court order here, with no permission,

no warning, no authority from the court.  Even today he says,

this is how we're going to do it going forward.  Now, that's

not how things work, they shouldn't work in court, Your Honor.

The Court has issued an order.  The government should comply.

And if they think there is a reason not to comply, they should

have said it at the time.  And it is, quite frankly, astounding

that we're standing here with them, not even acknowledging in

any of their briefs that they violated the Court's order.

So I would ask that Mr. Brunst be treated

appropriately, consistent with the government's

1  characterization of him, which is that he did nothing wrong.

2          THE COURT:  Thank you.

3          MR. CORN-REVERE:  Your Honor, if I might for just one

4  minute.

5          MR. RAPP:  No.  I'm going to object to this.

6          MR. CORN-REVERE:  You can object all you want.

7          THE COURT:  Well, I'm objecting.  Somebody already

8  spoke on behalf of your client, correct?

9          MR. CORN-REVERE:  This is more a point of personal

10  privilege, Your Honor, because of Mr. Rapp, as he often does,

11  trying to bring my firm's name into this and drag it through

12  the mud and suggest that we were subject to sanctions in

13  another court.  I just want to take one minute to correct the

14  record.

15          THE COURT:  I don't think he said your firm was

16  sanctioned.  I thought he said you represented Backpage.

17  That's all he said.

18          MR. CORN-REVERE:  Okay.  Well, just to be perfectly

19  accurate about what the order was in the Northern District of

20  Illinois, it was --

21          THE COURT:  The order is not at issue here, right?

22          MR. CORN-REVERE:  As long as it's clear on this record

23  that Mr. Rapp, in attempting to bring my firm's name into it,

24  was not successful in persuading the Court that my firm has

25  been sanctioned.

1          THE COURT:  No, because he didn't say that.  He said

2   your firm was involved in that case.

3          MR. CORN-REVERE:  Okay.  Thank you, Your Honor.

4          THE COURT:  Thank you.

5          Mr. Rapp.

6          MR. RAPP:  Just to be clear, the -- the plaintiffs in

7   that -- in that case filed a motion for reconsideration of

8   sanctions against Davis Wright Tremaine.

9          I just want to clear something up.  Mr. Bienert went

10  on about the fact that there is all these missing documents

11  that -- the implication, I guess, is that somehow the

12  government is filing a bunch of documents that are under seal

13  or in camera and -- or we're sealing them from the defense.  We

14  were sent an e-mail about this where Mr. Bienert's co-counsel,

15  Ms. Bernstein, sent us an e-mail, said, hope you're well and

16  surviving the Arizona heat.  Attached is a list of over a

17  hundred pleadings in this case that we are missing.  In

18  accordance with AZECF Administrative Policies and Procedures

19  Manual, please provide us with the copies of the government's

20  under seal filings.  We intend to file a motion to receive

21  access to these documents that were not accepted in camera, so

22  we appreciate your prompt sending of any or all government

23  filings on this list that were not accepted in camera.  Please

24  let us know your position by the end of the day.

25          And Mr. Stone on behalf of the United States says,

1   Whitney, a motion on this issue is unnecessary.  For example,

2   Document 578 was our motion, ex parte, to lodge all 39 of the

3   inadvertently disclosed documents with the court, preserve them

4   for the record.  This was at the defendant's request.

5            THE COURT:  Mr. Rapp, let me just stop you, because I

6   don't think you need to respond to that.  I don't know why they

7   brought it up.

8            MR. RAPP:  I don't know either.

9            THE COURT:  I don't know why they wouldn't see stuff.

10  They haven't asked for any relief.  I just want to hear what

11  you have to say about the sanctions.

12           MR. RAPP:  Well, look, in their own pleading at

13  Document 180, this had to do with the Davis Wright Tremaine

14  disqualification, they write in their own document, Ferrer

15  cannot assert the prior communications with Davis Wright

16  Tremaine under the parties' joint representation agreements are

17  somehow personal confidences of Mr. Ferrer and require DWT's

18  disqualifications.  The agreements allowed that all

19  confidential and privileged communications could be shared

20  among Ferrer, Lacey, Larkin, and other Backpage parties.  And

21  so that was our concern about all the other defendants other

22  than Lacey and Larkin, and that there is -- in their own

23  statement, they had an agreement.

24           We feel like we can't trust the defense in -- in

25  handling this discovery.  They said, in good faith, that they

1  would stop reviewing these documents.  We went back and forth.

2  We had to file a motion.  The court issued an order.  And the

3  court issued an order that they were under in November, mid

4  November of 2018, and so that's when they had the interview.

5  Our point is, is that we don't know what they're going to do

6  with these Jencks Act statements.

7          Here's an example.  They keep -- and I just want to

8  bookmark this for the Court, because they keep talking about

9  this.  And this is going to come up in a motion for

10 reconsideration.  But Mr. Ferrer did give signed declarations

11 that were used in all these cases that Davis Wright Tremaine

12 represented him in, one they settled for millions of dollars on

13 the eve of trial.

14          The attorneys for Davis Wright Tremaine were the

15 authors of those declarations.  And what will come out at trial

16 is they wrote them and had Mr. Ferrer sign them.  Now,

17 Mr. Ferrer knew they were false because they had all these

18 internal business practices, relationships with the Erotic

19 Review, the moderation practices where they were just stripping

20 out words indicative of child sex trafficking and posting the

21 site, these relationships with these super pimps, they knew

22 about that, as did all these other defendants.  The question is

23 whether the attorneys knew about those practices when they were

24 writing these declarations.  So I just want to bookmark that

25 issue because it's going to come up later.

1      We object to the procedure the Court has outlined.  We

2  think that they can come to the U.S. Attorney's Office in Los

3  Angeles, look at the reports, the attorneys here can come and

4  look at the reports, they'll get them close to trial.  Because

5  we cannot take a chance -- because all they're going to do is

6  say, oh, well, geez, somehow they got out, or they'll do an

7  interview and they'll talk about the details of those reports.

8  That's our concern.  There is nothing here -- there is nothing

9  the Court has imposed that will prevent the defendants from

10 acting on their own.

11     THE COURT:  Okay.  Okay.  So I understand the

12 government's concern.  I understand why the government withheld

13 it pending this, although I think you probably should have said

14 something when we were here last time, and you definitely

15 should have -- well, I guess by filing your motion for

16 sanctions, you, theoretically, asked for an extension.  And I

17 understand the government's concern that the very sensitive and

18 important information that is about to be disclosed will be

19 mishandled.

20     However, this memo -- I have no doubt that the article

21 quoted from this memo.  The question is how the author got the

22 memo.  Because the memo is so old and has clearly been

23 distributed to many people at the government level, at the

24 defense level, because they were all, apparently, given it

25 accidentally, there is some indication that other people that

1   the government was working with had seen the memo, not that

2   they had actual access to it, and there is certainly -- the

3   Court has concern that someone on the defense may have -- may

4   have disclosed it.  But that's the Court's speculation and the

5   government's speculation.  And I'm not prepared to issue the

6   overwhelming request of the government based on that memo.  So

7   the government's motion for sanction is denied.

8           The defense motion to compel is granted, with the

9   Court's own order, which is as I stated earlier.

10          So it is ordered that the government disclose the

11  Jencks Act information by the end of the day tomorrow, that the

12  defense is prohibited from providing copies to their clients.

13  That information is to remain at the attorney's office, and any

14  review of that information has to occur at the attorney's

15  office.  I would think it goes without saying, but I'm going to

16  include it in the order that the Jencks Act information not be

17  disclosed to any outside parties.

18          Are there any questions about that that need to be

19  clarified?

20          MR. BIENERT:  Couple questions.  First of all, and

21  I'll just say for the record, even the government's proposed

22  order attached to its pleading would have allowed our clients

23  to have it but then they can't disseminate it or talk to it, so

24  I would ask Your Honor to consider that.

25          But, independent of that, I would at least ask if Your

1    Honor is going to not allow the clients to have copies, allow

2    us to review it with the clients, for example, at their house.

3    My client has --

4             THE COURT:  Yeah.

5             MR. BIENERT:  Well, you said at the attorney's office.

6    I live in California.

7             THE COURT:  Oh, you're right.  I did say that.  I'm

8    sorry.

9             MR. BIENERT:  So we can review them in person with our

10   client wherever, even as Your Honor is phrasing it, currently,

11   right, in other words --

12            THE COURT:  Yes.  I just mean it needs to -- I guess,

13   when I said stay at the attorney's office, I don't want you

14   going to your client's office, reviewing it and then leaving it

15   with them, because it's the only copy.

16            MR. BIENERT:  Correct.

17            THE COURT:  So I want one copy to be maintained at the

18   attorney's office.  If you need to go review it with your

19   client, you can take it with you, but it needs to return to the

20   attorney's office.

21            MR. BIENERT:  And then the last thing, and I would ask

22   you just to track the language in the government's proposed

23   order.  When it comes to interviewing other people, experts,

24   witnesses, et cetera, I would just want the limitations in

25   their order, namely, anyone who is going to review them or be

1    able to read them has to be given the order, can't disseminate

2    it.

3          Because here's what I'm getting at, Your Honor.  I

4    have no idea how extensive this is, but I have a feeling it's

5    going to be pretty thick.  And I would like to think that we

6    don't have to have me, or an attorney from our office, sitting

7    physically with someone who is reading documents to go over

8    things with us as part of the case for however many hours it

9    takes for them to do that.  It seems to me, that if the

10   government's order, as attached, is followed, it gives Your

11   Honor the protection that would be reasonable under the

12   circumstances.

13          THE COURT:  Okay.

14          MR. CAMBRIA:  Might I just add, Your Honor.  I assume

15   this is just for the Jencks material, as opposed to other

16   discovery, because we may have --

17          THE COURT:  Right.

18          MR. CAMBRIA:  -- experts or others, and we have

19   voluminous documents we'd like them to review.  Clearly, they

20   could have copies, and so on, of those.  We're just talking

21   about Jencks.

22          And is there a way for the government to at least

23   specify categories of Jencks?  Because, obviously, not every

24   witness falls into that category that they're concerned about.

25   I mean, there is so much here that it just -- it's -- it's

1    tough enough now to manage all this, without a situation where

2    a lawyer has to be present no matter what's happening with

3    discovery.  Seems to me it's discrete types of Jencks material

4    that they're concerned with.  If it's about, you know, underage

5    people or something like that, fine.  At least we could have

6    some kind of guidance.

7              THE COURT:  I'm not sure I understand that request.

8              MR. CAMBRIA:  I'm sorry?

9              THE COURT:  I'm not sure I understand your request.

10             MR. CAMBRIA:  Well, if the -- if -- if the Court's

11   order is that certain types of materials can be reviewed only

12   in the presence of attorneys or in their office without copies

13   being made, I am saying is there a way for us to have what

14   those categories are?  Because there is lots of different

15   information that we're going to have in this case that isn't in

16   any way sensitive, and that's what the government's been

17   talking about, things supposedly sensitive.

18             THE COURT:  Okay.

19             MR. NEUMAN:  Your Honor, if you look at the

20   government's proposed order to their motion for sanctions -- I

21   can read it to the Court if the Court can access --

22             THE COURT:  Can you give me the document number,

23   because I didn't print it out?

24             MR. NEUMAN:  The motion, I believe, is Docket Number

25   679.

1          THE COURT:  Okay.  Thank you.

2          MR. NEUMAN:  And the proposed order is attached to

3    that.  And it's paragraph 2, as it relates to, I think we

4    should -- you should be limited to specified Jencks material,

5    which is what Mr. Cambria is talking about, not all Jencks

6    material.

7          And if the Court is there, if not, I can read it to

8    Your Honor.  It says, defendants and defendants' counsel shall

9    not disclose -- I would say the designated Jencks Act

10   material -- directly or indirectly to any person or entity,

11   other than persons employed to assist in the defense, persons

12   who are interviewed as potential witnesses, counsel for

13   potential witnesses -- I would add in, the defendants -- and

14   other persons to whom the court may authorize disclosure,

15   collectively authorized persons.  Potential witnesses and their

16   counsel may be shown copies of the material as necessary to

17   prepare the defense, but may not retain copies without prior

18   permission of the court.

19         And it says, defendants, defendants' counsel, and

20   authorized persons shall not copy or reproduce the -- I would

21   say, the designated material -- except in order to provide

22   copies of the materials for use in connections with this case

23   by defendants, defendants' counsel, and authorized persons.

24         THE COURT:  Okay.  Mr. Rapp, do you want to be heard?

25         MR. RAPP:  Well, the only thing I would say is the

1 protective order just applied to the stuff that had already

2 been disclosed, it didn't apply to the Jencks of Mr. Ferrer and

3 any other Jencks going forward so...

4         THE COURT:  Okay.  Here's what I'm going to do.  We

5 need to move on.  So I will issue a written order this

6 afternoon after incorporating some of the language you're

7 talking about, but I'll do it this afternoon so that the

8 government doesn't have any reason not to disclose it.  Okay.

9         MR. NEUMAN:  Thank you, Your Honor.

10         THE COURT:  We have the motion to dismiss, which I

11 assume will take a while.  Does anybody need a break?

12         MS. BERTRAND:  Yes.

13         THE COURT:  All right.  We'll take a five-minute

14 break.

15         (Recess taken, 10:28 a.m. - 10:36 a.m.)

16         THE COURT:  Okay.  We are back on the record to talk

17 about the motion to dismiss.

18         Who will be handling it from the defense?  Are there

19 going to be multiple, because we're going to have to put some

20 time limits.

21         MR. CORN-REVERE:  Your Honor, I'll start out.  I'm

22 Robert Corn-Revere.  And then I expect others will want to

23 chime in as well.

24         THE COURT:  Well, some of you merely joined, I think.

25 So who specifically is going to want to talk?

1          Obviously, you.

2          MR. BIENERT:  Your Honor, on behalf of Mr. Brunst, we

3   did file a separate reply brief, to the extent that we need to

4   address that, I would like to.

5          THE COURT:  Okay.  So you get a half an hour per side.

6   So if you want to save some of your time for reply, that's up

7   to you.  Okay.

8          MR. CORN-REVERE:  Okay.

9          THE COURT:  All right.  Go ahead.

10          MR. CORN-REVERE:  Good morning, Your Honor.  As I

11   said, I was Robert Corn-Revere.  I'm opposing the motion to

12   dismiss the case, because this is an unprecedented effort to

13   impose vicarious criminal liability on a Web publisher for

14   third-party speech.  Judge Jones said as much in the Western

15   District of Washington.  We quote that language in the reply

16   brief at pages 13 to 14, saying this kind of prosecution has

17   not happened before.

18          The cases that the government refers to,

19   notwithstanding that, are simply in opposite.  Two of them are

20   basically press releases and plea bargains.  The Omuro and Hunt

21   cases were simply cases where the government brought charges

22   and then the cases went away.

23          The third case that they talk about as being somewhat

24   like this, the Ulbricht case, simply doesn't fall into the same

25   category.  This was not a Travel Act prosecution.  The decision

itself said that the court noted that the indictment did not

allege liability for launching a Web site that others misused,

because if that were ultimately the case, he would lack the

mens rea for criminal liability.  What was at issue in Ulbricht

was the fact that they operated the Web site, was actually

involved in participating in sales of drugs, hacking software,

and things like that, in fact, taking a commission on each of

the sales.  So there are no prior cases that pave the way for

this prosecution.

Contrary to that, there are many cases in which the

identical allegations have been brought and courts have

rejected this theory of prosecution.  The two California

prosecutions, for example, Ferrer I and Ferrer II, while they

are ostensibly denied under Section 230 of the Communications

Act, which is not at issue here, the court in both cases

explained that it was -- it applied the defendant's First

Amendment rights through Section 230.  But, more to the point,

the court rejected the theory of prosecution that you could

prosecute a Web site for supposedly -- as pimps, supposedly,

for profiting from the sale of advertisements for prostitution.

The only argument the government makes contrary to

that is to say, well, that was then and this is now.  There has

been a mountain of evidence and a sea change in the case, but

not if you look at the indictment.  The indictment, the

allegations don't show any kind of significant sea change or

1    anything that distinguishes it from the evidence and the

2    allegations that were made in either of the California cases.

3    The Ferrer II case happened after the Senate investigation, the

4    PSI report.  There is really nothing to suggest that anything

5    has changed from the denial of that theory of prosecution in

6    those cases.

7         Now, it's rare that you can pinpoint the exact place

8    in an opposition brief in which the government, or your

9    opponent, makes the telling concession, or basically gives away

10   the case, but I would identify that as page 17, note 8 of the

11   opposition brief, where the government says that their

12   prosecution is based on a theory that the defendants were

13   engaged in speech integral to criminal activity.

14        Now, what's missing from the government's argument,

15   and has always been missing, is any reference to what the

16   standard is for alleging speech integral to criminal activity.

17   They don't cite the leading Supreme Court case on it, they

18   don't cite the leading Ninth Circuit case on it, which is odd

19   because the Ninth Circuit addressed this at length last

20   December in United States versus Sineneng-Smith.

21        It made clear that there are three essential elements

22   that have to be met to suggest that speech is unprotected and

23   you can prosecute it based on a theory of speech integral to

24   criminal activity.

25        First, citing the Supreme Court precedent of Giboney

1  versus Empire Storage, it said that the sole immediate purpose

2  of the speech is to further crime.  That's the first element.

3  The second is that it has to be targeted at a specific

4  instance of speech.  In Sineneng-Smith, the case had to do with

5  the crime of inducing or encouraging someone to violate

6  immigration laws.  And the court made clear that you had to

7  identify the specific person, the specific alien that was being

8  encouraged.  You have to have that specificity, a specific

9  intent issue.

10  And, third, you have to show active assistance in the

11  illegality.  And, again, that means active participation in the

12  crime.  It cites the -- in Sineneng-Smith cites the Ninth

13  Circuit case of the United States versus Freeman, which is a

14  tax evasion case.  It says that it's not enough to know about

15  tax evasion.  It's not enough to even encourage tax evasion.

16  In that case what made the difference was the third element,

17  was the -- the active participation in filing fraudulent tax

18  returns.

19  And so those are the elements of speech integral to

20  criminal activity.  The government has finally agreed to the

21  fact that that is the prevailing standard, but nowhere in this

22  superseding indictment does the government even attempt to meet

23  that standard.  Instead, it argues that this is based on a

24  course of conduct that, generally, that the Web site promoted

25  prostitution as a general concept.

1          At page 14, of the opposition brief it even says that

2     we can impose liability because the fact that prostitution ads

3     would show up was reasonably foreseeable.  Again, nowhere does

4     this superseding indictment actually even allege the elements

5     that would be necessary to show speech is unprotected under a

6     theory of speech integral to criminal activity.

7          Against that you have eight different courts that have

8     looked at the question of whether or not you can presume the --

9     a Web site that has an adult section, has an escort section, is

10     unprotected speech and you can prosecute on that basis.  Those

11     courts have uniformly held that it is protected speech and is

12     presumably protected until the government makes the allegations

13     necessary to suggest otherwise.

14          Now, the government at various points in its brief

15     argues that those are all cases having to do with Section 230,

16     the Communications Act, not the First Amendment.  And that's

17     simply false.  Most of those cases were specifically holdings

18     on the First Amendment.  And for those that did deal with

19     Section 230, as I mentioned with Ferrer I and Ferrer II in the

20     California courts, the court explained that it was applying

21     First Amendment rights and analyzing through the protections

22     provided by the Communications Decency Act, so the standards do

23     apply.  And the indictment has to meet the standard under the

24     First Amendment for it to be, on its face, an indictment that

25     can survive the motion to dismiss.

1          As I mentioned, whenever the government alleges that

2    speech is unprotected, it has to meet the requisite First

3    Amendment requirements.  Those requirements are spelled out in

4    the area of substantive law, given whatever the allegation is.

5    The government has tried to argue that the cases we've cited on

6    that, United States versus Buddenberg, United States versus

7    Cassidy, are different because they are threats cases, but that

8    isn't the point.  The point here is that when you are alleging

9    a -- wanting to make a crime out of speech, or in this case out

10   of publishing, the First Amendment sets the bar.  And the area

11   at which you're bringing the prosecution, you have to look at

12   the elements that are necessary to meet in order to survive the

13   motion to dismiss.  In this case, as I've said, the requisite

14   elements are set forth in the speech integral to criminal

15   activity area.

16         Now, what is it that the superseding indictment

17   actually alleges here?  We went through that in our motion and

18   we talked specifically about the various allegations that have

19   been made, none of which identify --

20         THE COURT:  Well, I would like to hear more about

21   that, because your motion has about three pages, of 44 pages,

22   that actually talk about the indictment.

23         MR. CORN-REVERE:  I'm sorry?

24         THE COURT:  Your motion only has about three pages

25   that actually talks about the language in the indictment, of

1   the 44 pages that you filed.

2          MR. CORN-REVERE:  Well, that's right.  One of the

3   reasons why it was possible to group together the various

4   allegations that are made is that most of the allegations are

5   just generalized statements that people were aware that there

6   were prostitution advertisements on the Web site.  That is not

7   something that meets the First Amendment standard.

8          So, for example, at page 17 of the motion, we cite 36

9   paragraphs from the -- from the superseding indictment that are

10  based on that generalized allegation.  At page 31, we mention

11  here another 19 examples.  So, yeah, it's a lengthy indictment,

12  has a lot of allegations in it, but they are not allegations

13  that go to the elements that are relevant to the First

14  Amendment defense.

15         So, you know, for example, they talk about generalized

16  allegations being made by congressional committees, advocacy

17  groups, media reports, 16 paragraphs are devoted to repeating

18  those kinds of third-party allegations.  They talk about prior

19  testimony by Carl Ferrer.  And, again, as we pointed out in the

20  reply brief, Carl Ferrer, whatever he is alleged to have done,

21  cannot be imputed to the other defendants.  And so if you

22  compare it to the specific requirements of the First Amendment,

23  the -- the indictment is especially -- especially thin.

24         So, for example, again, they talk about the sea change

25  of evidence that has happened since those earlier cases finding

1  First Amendment rights.  And, yet, if you look at the

2  individual defendants, that sea change amounts to saying that

3  Backpage wanted to grow its business, that they were aware they

4  wanted to grow their business, that there was an article being

5  edited, Messrs. Larkin and Lacey said they were in favor of

6  legalized prostitution.  This is not the stuff of a sea change

7  in an avalanche of evidence, and it is simply missing from --

8  from the superseding indictment.

9        What you have, if you look at the particular things

10  that seem to be in Mr. Rapp's favor, he talks about aggregation

11  and the Dallas plan.  In fact, that was really, again, nothing

12  other than efforts to expand the number of ads that were on

13  Backpage.com.  It does not meet the test for whether or not

14  this is encouraging some sort of criminal activity.

15        Example in the Freeman case again where you have to be

16  the one who is actually preparing the tax turns.  Selling a

17  product for someone else to use or a service, like an ad

18  platform, doesn't meet that test.  Simply to say that Backpage

19  was interested in having more ads simply falls short of that.

20        Most of those allegations, particularly if you look at

21  paragraph 39 of the superseding indictment, simply equate adult

22  sections or escort sections with prostitution, which is a

23  tactic that the government uses throughout.  It tries to say

24  that if it can allege that something that is protected is the

25  same thing as something that's not protected, that they've met

1     their -- they've met their burden. But this was exactly the

2     kind of allegation that courts rejected in Buddenberg and in

3     Cassidy. Calling something a threat doesn't mean it's a threat

4     unless the government alleges the facts necessary underlying

5     that. And that's not what they have done here.

6        Mr. Rapp also continually talks about allegations of

7     the Erotic Review, reciprocal arrangements. Again, this is

8     nothing more than an allegation that Backpage took steps to

9     increase traffic to its site. This is nothing that suggests

10     that any of the ads at Backpage had anything to do or in any

11     way participated in a scheme of illegality.

12        If you look at the specific allegations in the

13     indictment, paragraph 50, for example, says that this was done

14     for purposes of brand awareness, to make more people aware of

15     Backpage.com, or paragraph 85 it says that you can include user

16     IDs for ads that were from the Erotic Review. Once again, this

17     is not the kind of activity that falls within the exception.

18        Next Mr. -- Mr. Rapp talks about Dollar Bill as a

19     super affiliate that he was -- and the only reference in the

20     entire superseding indictment is in paragraph 59 where he says

21     that Dollar Bill was, quote, known to be involved in the

22     prostitution industry. The rest of the allegations in the

23     superseding complaint talk about Dollar Bill being someone who

24     wanted to run escort ads, or who wanted to have an escort ad

25     roundup. Nothing else. There is simply nothing in the

indictment that points to the content of the ads that Dollar
Bill was supposed to have wanted to run.

The allegations go to his discussions with Carl Ferrer
about wanting to have ads restored, but, again, nothing that
shows the kind of cooperative venture that is necessary to fall
into the speech integral to crime exception.

The point is there is -- actually, I -- I neglected --
neglected one point.  And that is that the superseding
indictment lists examples of 50 ads that it says were
prostitution ads.  Doesn't link any of them to any of the
defendants, doesn't show that any of the defendants either had
knowledge, had either read them or were even aware of them.
There is no link between the allegations regarding supposed
moderation practices and any of those ads.

If you look at the text of those ads that are
paragraph 201 of the superseding indictment, only about nine of
them suggest there is anything involving moderation that
involved any of those ads.  None of them talk about moderating
any text.  There are, of those nine, some that say that
photographs were removed subject to Backpage.com's terms of
service, but they say nothing about the content of what was
removed, how that in any way promoted illegal activity or how
it supported anyone's illegal business.  There are simply no
facts involved, no allegations of fact involving how that
supposed moderation had in any way promoted criminal activity.

1     The government has essentially conceded that it can't

2  meet the standard of specific intent either under the speech

3  integral exception or the others.  And there are about five

4  different reasons why the court would require the government to

5  show that kind of specific intent, that is specific knowledge

6  of a specific ad and an intent to further criminal activity

7  through that ad.  The first, as I have mentioned, is the speech

8  integral exception.

9     The second is just basic First Amendment law through

10  cases like Smith versus California, Mishkin versus New York.

11  The government has tried to argue that under those precedence

12  specific intent is not directly required, but what is true is

13  that none of those cases support the government's view that you

14  can prosecute someone who has never seen and never heard of the

15  specific content for which they are being prosecuted.  The

16  government simply acknowledges that would be too high a burden

17  to meet.

18     Third, the Travel Act itself requires specific intent,

19  and that's established in Gibson versus Specialty -- U.S.

20  versus Gibson Specialty Company.  Both the Travel Act and the

21  money laundering statute require the showing of connection to a

22  specific content and specific intent to further the criminal

23  activity through that content.

24     We've also made the point that if you interpret the

25  Travel Act to apply to speech, then specific intent, as a

matter of constitutional law, would be required, otherwise the law would be unconstitutionally overbroad.  The government simply argues that, again, it would be too high a burden to meet.

If the government were held to the same standard that the Court applied in Ulbricht -- United States versus Ulbricht, then we wouldn't be here.  There is no allegation anywhere that there was involvement in illegal ads, to the extent that Ulbricht was actually bankrolling it and being the escrow agent for illegal activity.  That simply isn't present here.

The cases that have applied the First Amendment and Section 230 to Backpage have identified what kinds of activities would be required to find that kind of complicity. One would be in Doe No. 1.  The court said, if the Web site were accused of going out and actually procuring the girls, then that would be the kind of activity that would be in support of criminal activity.  There is nothing like that here, never even the slightest suggestion of it, and there couldn't be.

Secondly, MA versus Village Voice Media Company says that if that kind of activity for speech integral were to require people to place illegal activity or illegal content on the Web, that would be something else.  Again, there are no allegations of that and no pretense that the government can meet that standard in this case.

1          It -- I'm sorry.

2          THE COURT:  I didn't say anything.

3          MR. CORN-REVERE:  I will leave time for -- for my

4   compatriots to add anything that I've overlooked, but the point

5   is that the government, now that it has acknowledged what the

6   constitutional standard is, when you compare the superseding

7   indictment to the standard they have now acknowledged, there is

8   no way that it meets that standard.

9          And you can see that, if you look at paragraph 33 of

10  the superseding indictment, for example, they have had to hang

11  their entire hat on the allegation that ads for prostitution

12  are not protected by the First Amendment.  We've never

13  contested that choice and that is not the issue here.  The

14  issue is whether someone can be held criminally liable as a

15  third party for ads someone else places, and that's where the

16  standard for speech integral to criminal activity comes into

17  play, it's one they finally acknowledged and one the

18  superseding indictment does not meet.

19         THE COURT:  Okay.  Let me ask you this.  The

20  superseding indictment, if you -- because, yes, there are

21  generalized allegations, but then there are a number of very

22  specific allegations over a number of pages.  Taking the

23  indictment as a whole, if the facts as alleged show that there

24  is specific intent on the part of these defendants to

25  facilitate prostitution, and there is specific allegations that

show that these ads are for prostitution, that these people

knew that that specific language was for prostitution, then the

only, I guess, link that could potentially be missing is that a

particular defendant had a part in placing that ad, not -- they

didn't place the ad, somebody outside placed the ads -- but a

specific link to that particular ad.  Is that what you're

saying has to be --

          MR. CORN-REVERE:  No.  There are two things.  One is

that -- you're right, Your Honor, there is no link to any of

the specific ads that they have proposed showing that any

defendants had either any knowledge, awareness, effort to

support, anything of that nature.

          But the second thing, and this is sort of an

overarching point, and this goes to the, sort of, pattern and

practice, the overall operation of the Web site, this is the

very kind of thing that cases like Buddenberg and Cassidy

rejected, saying that you can't simply allege, as a general

practice, someone has an intent to make threats, or an intent

to, you know -- you know, violate the law in some way, you have

to allege the facts that demonstrate that intent.

          And here what you have are sort of generalized

allegations that suggest that the defendants should have been

aware that there are prostitution ads on the Web site, that

they were rampant, and they did nothing to stop them.  But that

isn't the standard.  The standard isn't whether or not they

1   allowed it to happen, the standard is their actual purpose,

2   their sole purpose, according to Giboney, was to promote

3   criminal activity; secondly, it was to be specifically

4   identified, for -- again, Sineneng-Smith is a good example

5   here, because that cases talks about the Immigration Act, and

6   it, like in this case, has to do with encouragement.

7        And that's a case where the law in question was one

8   that prohibited inducing or encouraging a person to either come

9   into this country or stay in this country knowing that it's a

10   violation of the immigration laws.  And in interpreting that

11   under the relevant constitutional provision in the First

12   Amendment, the court said this must be interpreted to apply to

13   a specific statement.  It can't be a generalized statement, it

14   has to apply to a particular alien.  That's the second element.

15        And the third element is that then that has to be

16   combined, with respect to that specific statement, with an

17   intent to further the criminal enterprise.  Here, what the

18   government has alleged in all of its general arguments, is that

19   there was an intention to sell ads, not an intention to -- to

20   further criminal activity.

21        And all of this, if you look at their allegations

22   about the Dallas plan or aggregation, all of those allegations

23   go to the fact that they are claiming Backpage wanted to build

24   business.

25        Now, they may make a moral judgment whether or not

1   this is the kind of business that they think Backpage should

2   have been in.  They equate illegality with anything having to

3   do with adult ads and -- and escort ads and treat those terms

4   as synonymous, but that does not meet the requisite First

5   Amendment standard that says that they have to show that the

6   intention is married to specific statements and then efforts to

7   further that specific illegality.  And that -- if there is one

8   case that you read about this, Your Honor, it should be United

9   States versus Sineneng-Smith, because it has the most detailed

10  discussion of this exception to the First Amendment of any that

11  have been cited.  And it's one the government ignores

12  completely.

13          THE COURT:  Okay.  Thank you.

14          Mr. Cambria, I specifically asked before we started

15  who wanted to speak, and other than Mr. Brunst's counsel,

16  nobody said anything.  So you can speak but it's going to eat

17  up the defense time.

18          MR. CAMBRIA:  I'll be brief, but I think that what's

19  so important here is to first recognize that unlike a usual

20  indictment where you can just repeat the language of the

21  statute and the cases say it's fine and so on, in the First

22  Amendment area, we have special rules and they require an

23  allegation as to each defendant showing specific facts that

24  show specific scienter as to a specific ad, and specific facts

25  that support an allegation that they intentionally attempted or

1  participated in making a crime happen.  All those specific

2  things need to be there.

3        With regard to Mr. Lacey who I represent, there is

4  hardly any allegations in this indictment at all concerning

5  him, some generalizations, but there is no factual connection

6  between him and a specific ad and a specific crime that

7  supposedly is trying to be achieved as a result of that ad.

8  And that's what's required here.  The appreciation has to be

9  that in the First Amendment area there are specific rules with

10  regard to pleading.

11        That's all I have to say, Your Honor.  Thank you.

12        THE COURT:  Okay.

13        MR. NEUMAN:  Thank you, Your Honor.  Ariel Neuman for

14  Mr. Brunst.

15        Your Honor, just briefly, using the Court's question

16  as a starting point of did these people know that the ads were

17  for prostitution?  I think we have to step back and note, of

18  course, that escort ads, or escort services are legal.  And you

19  can't tell from the face of an ad, necessarily, what's going

20  on.  That is many of the cases that are cited in our brief,

21  including the order from the Western District of Washington,

22  specifically talks about -- about that, and the Seventh Circuit

23  does as well.

24        And so the question is, is has the indictment set

25  forth that particular defendants knowingly published particular

ads that that defendant knew at the time was for illegal
prostitution with the intent of furthering that act of
prostitution.  That's the standard that we should be looking
at.  And I think the government cannot point to any ad that
involved prostitution that any of the defendants knew,
specifically knew about that ad specifically, and specifically
knew it involved prostitution and intended to further it.  It's
just not in the indictment.

And this both -- we talked about the First Amendment,
but it's also under the Travel Act.  They have to allege
specific intent.  So that's where I wanted to start.  But I
think for Mr. Brunst in particular, even taking the
government's allegations as true in the indictment, even taking
their standard of specific intent to facilitate prostitution
generally, which we don't agree is the right standard, but even
taking that, they haven't met the test that the Court just
articulated.  They haven't met their own test, because they
build their case on three pillars, essentially, this idea of
content aggregation, moderation, and this reciprocal link
program.  That's sort of where they get this generalized
knowledge from and generalized participation idea.  And they
say things about what the indictment says as to Mr. Brunst, but
when we actually go look at what the indictment says, it
doesn't say what the government said it says.

So, for instance, on the aggregation issue, the

1    indictment, at paragraph 42, says, Mr. Brunst received a

2    document that talked about creating additional Dallas revenue

3    models in Los Angeles and New York, and gave the following,

4    quote, detailed summary of how that aggregation process worked:

5    Quote, set up free user posting, 250 to 500 postings per

6    market.  Somehow, in the government's telling, that becomes

7    that Mr. Brunst specifically understood Backpage's aggregation

8    efforts.

9         Same thing when they say that he, in their motion --

10   or their opposition, excuse me, said that he helped implement

11   the process of identifying prostitutes advertised on rival Web

12   sites who were then contacted and given free advertising on

13   Backpage.  That's at page 40, lines 13 to 15 of their motion --

14   of their opposition.  They cite that same paragraph, 42, that I

15   just read to the Court about setting up free user postings for

16   unknown people not identified as prostitutes.  And then they

17   cite, one, two, three, four, five paragraphs that don't even

18   mention Mr. Brunst.  That's what they've got on aggregation.

19        On moderation in their opposition they put a heading,

20   Spear and Brunst, as if Mr. Brunst is involved in it, but when

21   you actually read what they wrote, there is no allegations that

22   Mr. Brunst was involved in moderation.  And that's appropriate

23   because he wasn't.  He's a CFO.  Far removed from what we're

24   talking about here.  So there is no allegation of knowledge or

25   participation or agreement in aggregation.  There is no

1    allegation of moderation by Mr. Brunst.

2         And on the third point, this reciprocal link idea with

3    what they call the Erotic Review, they say he was involved in

4    strategizing about efforts to expand that relationship, and,

5    quote, endorsed such efforts, but when you actually look at

6    what they allege in the indictment, it says that he received a

7    document from Mr. Ferrer that referenced TER.

8         There is no allegation that Mr. Brunst as the CFO even

9    knew what that was, and that it said there was a Google

10   analytics report, which is like this report, I guess, I

11   understand, of referrals from one Web site to another.  Well,

12   years after this supposed relationship with TER ended,

13   Mr. Brunst got some report that somewhere buried in it says TER

14   is a big referral source.  That's it.  So how that leads to,

15   first of all, the correct standard of specific intent to

16   further prostitution and knowingly publish an ad that knew at

17   the time was for illegal prostitution, it doesn't.  But even

18   meeting their standard of specifically intending to facilitate

19   prostitution, it doesn't meet that standard.

20        I can go through the same thing in the money

21   laundering counts, but I think the Travel Act is where it's

22   really important to focus, because, obviously, without an

23   underlying crime, much harder on the money laundering to keep

24   going.  And we set that forth in our brief.

25        And I think it's -- I mentioned earlier when I spoke

1    before that the Travel Act charges against Mr. Brunst weren't

2    -- Mr. Brunst were not included in the first indictment.  And I

3    think what -- their efforts to stretch what's actually included

4    in the indictment in their opposition brief and make it appear

5    as if much more is alleged against him than actually is alleged

6    against him probably stem from that fact, that they've really

7    tried to bootstrap these in against Mr. Brunst, and

8    inappropriately so, because they don't have the evidence and

9    they don't -- more importantly, for the purposes of this

10   motion, they don't have the allegations even.

11          And the indictment against Mr. Brunst has to fall

12   apart on that basis under the correct standard that

13   Mr. Corn-Revere and Mr. Cambria have talked about, or under the

14   incorrect standard that the government wants to push today.  So

15   I would ask the Court to dismiss the charges against Mr. Brunst

16   on those basis.

17          THE COURT:  Okay.  Thank you.

18          Who is arguing for the government?

19          MR. KOZINETS:  I am, Your Honor.

20          THE COURT:  Okay.

21          MR. KOZINETS:  Thank you, Your Honor.  Peter Kozinets

22   appearing for the government.

23          The motion to dismiss this 92-page superseding

24   indictment should be denied.  It should be denied for three

25   basic reasons.

1          First, the superseding indictment far exceeds the

2    minimal constitutional and rule-based requirements for noticed

3    pleading.

4          Secondly, the First Amendment does not apply at all to

5    the publication at issue.  And even to the extent -- even if it

6    might be argued that there isn't any First Amendment

7    application here, any pertinent standards are far met and

8    exceeded by this very detailed pleading.

9          And, thirdly, with respect to any further questions

10   about specificity or intent, the superseding indictment's

11   details, again, far exceed any required standard.

12         With respect to notice pleading, we know that the

13   purpose of the indictment is to put the defendants on notice of

14   the crimes they're charged with and enable them to defend, and

15   enable them to plead jeopardy in the future, if warranted.  All

16   that is required in a Travel Act case is to set forth the

17   elements of the Travel Act offense in some basic factual

18   account to orient the defense, to give them notice of what they

19   need to defend against.  That's set forth in the Tavelman case

20   from the Ninth Circuit, 1981, from the Palfrey case from the

21   D.C. District Court, which cites circuit court cases from the

22   Fifth Circuit, the Seventh Circuit, and the Eighth Circuit.

23   It's also a standard embraced by the Tenth Circuit in the Welch

24   case.

25         All that you need to do is give this sort of basic

1  notice pleading here.  And this document, this -- the 92-page

2  superseding indictment, has 194 paragraphs of detailed factual

3  allegations that set the stage for the 100 substantive criminal

4  charges that follow.  And it's hard -- very difficult to

5  imagine an indictment, in this district, or anywhere else, that

6  could be more detailed than this one.

7          The Gibson Specialty case that they've alluded to, an

8  earlier Ninth Circuit Travel Act case, does not apply here.  It

9  doesn't apply because that case actually veered into a

10  sufficiency of the evidence analysis, not a sufficiency of the

11  indictment.  The parties had stipulated to all the pertinent

12  facts, and the court specifically held that the evidence in the

13  record is insufficient to sustain a claim for a Travel Act

14  violation.

15          That's not the inquiry that applies to this pleading

16  on this motion here.  On a motion to dismiss the indictment,

17  all the factual allegations are taken as true and the

18  sufficiency of the evidence is not weighed at all.  That is

19  left for trial.  So Gibson does not apply here, for that

20  reason.

21          And the -- the items sold in Gibson were legal in some

22  states, illegal in others.  What was for sale here,

23  prostitution solicitation advertising, is illegal everywhere in

24  this country except for a tiny part of Nevada.  And, as the

25  superseding indictment alleges, these defendants consciously

and deliberately designed their Web site to facilitate these

prostitution ads and to earn upwards of a half billion dollars

from the sale of those ads.

This leads to -- one other note on this.  They've

cited the Buddenberg case, which they hold up as sort of giving

you the controlling standard for how this motion to dismiss

should be assessed.  Buddenberg really does not apply at all

here.  It's an unpublished district court case from the

Northern District of California, and it addresses an entirely

different situation, a wholly generic indictment that merely

parrots the statutory elements but provides next to no factual

framework from which to be able to determine what the

defendants were actually charged with.

So the statute in question there, the animal

terrorism -- Animal Enterprise Terrorism Act said that the

defendants could be liable for violating any number of criminal

prohibitions, making threats, harassment, engaging in property

damage, intimidation, and so forth.  And the indictment there

just gave no notice whatsoever as to what these defendants were

really being charged with.  To the extent that any sort of

threat might have been alleged in that case, there was just no

threat stated in the indictment, so there was really nothing to

judge -- nothing to -- from which the defendants could

determine what they were charged with.

That is just worlds away from the superseding

1  indictment that we have here.  Again, 194 paragraphs of

2  detailed specific allegations showing at length how this

3  criminal enterprise operated and what these defendants' role in

4  the enterprise was.

5       And there has been some discussion of what some of

6  those business practices were.  I think they were really kind

7  of glossed over.  It's important to focus on what is actually

8  alleged in the indictment.  And, as Your Honor noted, the

9  motion to dismiss only spends a few pages there, but the

10  indictment itself speaks volumes as to what these defendants

11  did in order to violate the Travel Act and facilitate

12  prostitution.

13       They adopted this aggregation plan, or the Dallas

14  plan, which involved affirmatively publishing their own

15  prostitution ads, copying them from competitor Web sites and

16  posting them themselves.  This wasn't third-party content that

17  a prostitute came to Backpage and said, hey, I'd like to buy an

18  ad.  Please publish this.  No.  This was Backpage, sua sponte,

19  as it were, affirmatively publishing these ads, then calling

20  the prostitutes and offering them free trial periods to try to

21  get their business as repeat Backpage customers.

22       And the allegations made clear that this was an

23  integral part of the Backpage business plan.  It was discussed

24  at management meetings.  It was shared with management.  And it

25  was rolled out to many major cities.  That's aggregation.

1          Then we have the relationship with the Erotic Review.

2    The Erotic Review, as the indictment makes clear, is -- it's

3    basically a Yelp for prostitutes.  It's a site where Johns can

4    go in and write reviews of their experiences, including

5    information about pricing and so forth.  And what Backpage did

6    for several years with the, you know, knowledge and at the

7    direction of management, was to pay thousands of dollars per

8    month to this Web site so that they could have a business

9    partnership so -- so as to allow ads being posted on Backpage

10   to have links to these reviews.

11         And when you marry what's offered on Backpage with

12   what's married on the Erotic Review, you get something that's

13   almost akin to a customer experience that somebody using Amazon

14   might have, where you're looking at a product or a service,

15   you're reading reviews, and then with the ease of a couple of

16   clicks, you order a person who then can actually, essentially,

17   be delivered to your house to engage in these illegal services.

18   That's the Erotic Review.

19         And all of these defendants, including Mr. Brunst,

20   were briefed on this practice and were keenly aware of the fact

21   that the relationship with the Erotic Review supplied the

22   number one source of outside referrals, excluding general

23   search engines, to Backpage for many, many years.

24         Then we have this business practice of entering into

25   partnerships with super affiliates, individuals like Dollar

1  Bill.  These people were bulk purchasers of prostitution ads.

2  They earned commissions or fees from Backpage to conduct this

3  business and to increase the volume of prostitution advertising

4  on Backpage.  Once again, this isn't some sort of, you know,

5  Web site that's innocently operating and just passively

6  accepting third-party ads, it's a business that is

7  affirmatively going out into the marketplace and seeking

8  prostitution ads for publication on Backpage, paying for them.

9       The third major business practice is moderation, which

10  is discussed at length in the superseding indictment.  And just

11  to briefly summarize, as Backpage's management was keenly aware

12  of for years, Backpage would -- let me put it this way.  When

13  somebody bought an ad on Backpage, the ad wouldn't just

14  automatically appear.  First it would be reviewed.  It would be

15  reviewed through an automated Backpage process, and then over

16  time human moderators would look at it as well.  At certain

17  points, Backpage touted the fact that it had two levels of

18  human moderation.

19       What was happening during this period is that Backpage

20  was looking at the ad and was trying to figure out, well, are

21  there terms or images in the ad that are really blatantly

22  indicative of prostitution?  And they had this policy of

23  sometimes taking those words out but still publishing the

24  underlying ad, thereby creating this veneer of deniability for

25  Backpage and assisting its customers in avoiding too much law

1   enforcement scrutiny.  And, over time, as Backpage became aware

2   of terms like teen, Lolita, AMBER Alert, things that signified

3   child sex trafficking, they would say, let's add these to the

4   guidelines for our moderators, take out those words, let's

5   still publish the ad.

6          The indictment goes on in detail to explain that

7   Mr. Lacey, Mr. Larkin, Mr. Spear, and Mr. Brunst all owned

8   Backpage at various points in time; that Mr. Lacey and

9   Mr. Larkin oversaw the business's policies and strategic

10  direction; that Mr. Spear was an executive vice president of

11  the parent company and really directed Carl Ferrer and Dan

12  Hyer.  He's noted on -- on one e-mail that's quoted as

13  directing them to roll out this aggregation plan to other

14  cities in the country.

15         And then we have Mr. Brunst.  Mr. Brunst has argued

16  that, you know, well, he was just the -- the chief financial

17  officer.  That's right.  In paragraph 4, he's identified as a

18  part owner of Backpage and the CFO for Backpage and several

19  corporate entities.  The CFO knows where the money is coming

20  from and knows where the money is going.  And as further

21  alleged in the superseding indictment, Mr. Brunst was briefed

22  on many of Backpage's business activities and was involved in

23  one of the architects of the company's efforts to reconfigure

24  its Web site to fool credit card companies and financial

25  institutions with respect to whether payments were being

1    associated with the posting of ads on Backpage.  And that's

2    explained towards the end of the factual allegations section,

3    under the money laundering section as well.  So this is an

4    incredibly extensive indictment.

5         I haven't even mentioned Padilla and Vaught, but the

6    indictment is ripe with allegations of how they, in particular,

7    helped to manage and operate the moderation process.

8    Mr. Padilla also involved in the Dollar Bill relationship as

9    well.

10        So then let's discuss the First Amendment and how it

11   might operate here.  It's black letter law that there is no

12   First Amendment protection for speech proposing an illegal

13   activity.  And in the Pittsburgh Press case, the Supreme Court

14   explained that the publication of ads soliciting unlawful

15   activity are not protected at all by the First Amendment.

16        So, in that case, the court was dealing with unlawful

17   employment ads that promoted gender discrimination, but the

18   Supreme Court specifically said that the same rule would apply

19   to want ads soliciting the sale of narcotics or soliciting the

20   sale of prostitutes.  And then in the very next sentence of the

21   decision the court goes on to say, it doesn't matter whether

22   these ads are placed under a category entitled prostitution or

23   narcotics, or whether within the four corners of the ad itself

24   this unlawful solicitation is advertised, either way, the

25   publication is barred by the First Amendment.  It falls outside

of the First Amendment.

And I would particularly commend the Coyote Publishing decision from the Ninth Circuit from 2010 to -- to this analysis, because what Coyote Publishing does is it affirms Nevada's criminalization of certain forms of prostitution advertising. And it explains that prostitution has always been linked to the, of course, the commodification of people, the sale of people for sexual services. A practice that is universally disfavored in the United States because it is outlawed everywhere except for a tiny part of Nevada. And even in Nevada it is -- where it's legalized, there are problems with enforcing protections for sex workers.

The court then goes on to say that advertising is an integral part of the harm to be avoided, because advertising is what alerts consumers, as it were, to the fact that there are prostitutes that are soliciting business, and so this advertising harm is an integral part of the crime itself. If you look at the criminal -- the state criminal law cited in section -- in paragraph 201 of the superseding indictment, the Travel Act counts state that these defendants had an intent to violate state law prostitution crimes, including, but not limited to, Arizona's prostitution statute, A.R.S. 13-3214(A). That statute says prostitution is a crime in the state of Arizona.

But, what's interesting, is that A.R.S. 13-3211,

1 subparagraph 5, defines prostitution in the state of Arizona.

2 And it defines it as engaging in, agreeing to, or offering to

3 engage in the sale of sexual services for money.  So, in a

4 sense, by publishing these prostitution ads, these -- these

5 defendants were actively engaged in the direct violation of

6 Arizona law, and at the very least were actively promoting and

7 facilitating others' violations of Arizona law.

8 Stated differently, every time Backpage sold a

9 prostitution ad to a prostitute, a pimp, or a sex trafficker,

10 Backpage entered into a contract with those customers, which

11 basically said, for good and valuable consideration, we will

12 disseminate your prostitution ad.  And that had a huge impact,

13 because Backpage became the number one go-to site for

14 prostitution solicitations across the country.  As we alleged

15 in paragraph one of the superseding indictment, it became

16 notorious as the internet's leading source of prostitution

17 advertisements.

18 So where does that get us here?  It gets us to the

19 point that, under the First Amendment, these publications

20 aren't protected at all.  And it's enough to allege that these

21 defendants consciously and deliberately operated and --

22 designed and operated a Web site for the purpose of selling

23 these illegal prostitution ads to have liability attach here.

24 And that is basically the point of the Ulbricht case.

25 Now, Ulbricht, not a Travel Act case, was a narcotics

conspiracy case and other conspiracies, but the principle was the same. The court was concerned about differentiating between innocent Web site operators and those involved in criminal activity. And the court said that what differentiates Ulbricht's conduct from the mass of other Web sites who are operating lawfully, is that he intentionally devised this Web site to facilitate these unlawful transactions of illegal goods and services. And that's precisely what the superseding indictment alleges here.

Now, they have said that Ulbricht isn't on all fours here because Mr. Ulbricht would draw a commission from sales. Well, here, as we've been discussing, Backpage got paid for every single prostitution ad it published. It had a direct stake in the unlawful conduct by broadcasting these unlawful prostitution ads for good and valuable consideration. And that it really, as Coyote Publishing says, is an integral part of the crime. If nobody knows that a child is for sale for sexual services, no one is going to buy that child. Without dissemination of that solicitation on Backpage, criminal activity becomes much harder to accomplish.

They've talked a little bit about prior cases where Backpage had some success turning back civil tort challenges and state criminal challenges, I think that's fairly well covered in our response brief, but contrary to what we've heard today, the Ferrer California state Court cases are really

1    squarely decided under the Communications Decency Act.

2            And if you look at the final paragraphs of the first

3    Ferrer decision, in bold print the court basically says, it's

4    not for us, it's up to Congress to revisit whether this kind of

5    conduct should be immune.  And the Ferrer II decision ends with

6    similar language.

7            The Communications Decency Act, though, has no

8    application here whatsoever.  Under 47 U.S.C. Section

9    230(e)(1), it states that the sections, the Communications

10   Decency Act, you know, shall not be construed to impair any

11   prosecution under federal criminal law, so it's just a

12   nonfactor here.

13           To the extent that -- and really that applies to,

14   essentially, all of the cases they've cited.  To the extent

15   that they have a few cases that involve challenges to state

16   laws seeking to limit Backpage's advertising of minors for

17   sexual services, the First Amendment issues in those cases

18   generally discussed overbreadth concerns with individual parts

19   of the statutes at issue.  To the extent that they suggest that

20   these solicitations are protected by the First Amendment at

21   all, those cases were just wrongly decided for the reasons that

22   we've covered with respect to Pittsburgh Press and Coyote

23   Publishing.

24           Finally, we get to this notion that there is not a

25   sufficient nexus, they allege, between the individual

defendants and the publications at issue.  So really I think
one way of breaking that down is, two ways, you can look at the
actus reus of the crime and the mens rea.  The substantive
counts, Travel Act counts of the superseding indictment,
paragraph 201, directly allege that these defendants committed
these acts.  And under the liberal pleading standards,
essentially, that apply to criminal indictments at the motion
to dismiss stage, that is sufficient, particularly when
bolstered by all of the allegations that we have in the
superseding indictment regarding all of the business practices
that Backpage pursued to specifically foster the publication of
prostitution-related advertisements.

But even if that weren't enough, we also have the
Pinkerton doctrine which applies here because of count 1,
because of the conspiracy count.  There has been very little
discussion of the conspiracy count.  But count 1 very clearly
alleges that these defendants knowingly and intentionally
entered into an agreement, a conspiracy to commit violations of
the Travel Act.  They did it for the purpose of making money
and they did it through the manner and means and through the
overt acts described elsewhere in the indictment, paragraphs 1
through 194.

Where you have a conspiracy claim, the law states that
the acts of coconspirators are the acts of all of the
conspirators.  The overt acts of one are the overt acts of all.

1  The declarations of coconspirators are also attributable to all

2  the coconspirators.  So every time that somebody -- a lower-

3  level employee at Backpage actually posted a prostitution ad,

4  they were doing so at the behest of Backpage's management, they

5  were following the policies specifically adopted by Backpage's

6  management, they were following their marching orders issued by

7  Backpage's management, and their acts are attributable to all

8  of the Backpage conspirators.

9        Same with whatever Mr. Ferrer was doing as alleged in

10  the indictment.  We see Mr. Ferrer actually engaging with some

11  of these prostitution customers, like Looks a Lot, and the

12  prostitute known as PR, and Dollar Bill, where he's guiding

13  them, kind of coaching them on how they can submit ads that

14  comply with Backpage's standards and will actually get

15  published.  He's helping them wordsmith these ads.  Those acts

16  and his declarations in pursuing that conduct are all

17  attributable to the coconspirators under Pinkerton.

18        So let's now -- so we have direct allegations of their

19  actus reus and we have conspiracy-related Pinkerton actus reus

20  as well.  Then we get to mens rea.  They say that we have to do

21  more to allege intent, but, once again, at the pleading stage,

22  the requirement to allege intent is not high at all.  Under the

23  Du Bo case from the Ninth Circuit, which they cited in their

24  motion papers, intent is a key ingredient.  It has to be in the

25  indictment, and if it's not, if the word intent is not there,

then, sure, the indictment can be dismissed. But, here, that's

not the case.

The indictment specifically alleges that these

defendants acted with intent in all of the counts set forth in

the indictment. And then throughout the factual allegations,

too, the indictment makes clear that these defendants adopted

these various business practices that we've been discussing for

this specific intent to facilitate prostitution and make money

from the sale of prostitution-related ads.

To the extent that they claim that there has to be a

more specific -- some sort of more specific showing, the cases

that they cite generally involve sufficiency of the evidence

challenges. This isn't a sufficiency of the evidence exercise

that we're engaged in today, it's merely -- today we're merely

looking at whether this indictment meets the notice pleading

standards that apply at the motion to dismiss stage. And

courts again and again have held in Tavelman and Du Bo, in

Palfrey and Welch, that alleging intent is what you need to do.

If the defense want to argue, we didn't have intent, we didn't

have specific intent, we weren't, you know, involved in the

publication of ads, we never asked anybody to publish ads that

facilitated prostitution, if they want to make those arguments,

they can make those arguments at trial. The function of the

analysis at the motion to dismiss stage is just to look at

whether the indictment itself contained -- states the elements

1    of the offense and gives some factual description of what the

2    government's case is about.  There is no requirement that the

3    government include a comprehensive statement.

4              THE COURT:  Okay.  Let me ask you a couple of

5    questions because we're running out of time.

6              MR. KOZINETS:  Okay.

7              THE COURT:  First of all, do you agree with the

8    defense on the standard that they propose?

9              MR. KOZINETS:  No.  So the defense standard --

10             THE COURT:  Is that because you believe that because

11   this indictment alleges specific ads that are for prostitution,

12   it's not covered by the First Amendment?

13             MR. KOZINETS:  Yes.  That's -- that's part of our

14   response.

15             THE COURT:  Okay.

16             MR. KOZINETS:  Also the Sineneng-Smith case that they

17   cite, it's not a motion to dismiss case.  It really doesn't

18   have anything to do with what needs to be pled in an

19   indictment.  That case is a case that entertains a facial

20   constitutional challenge to the -- to a provision of the

21   Immigration and Nationality Act that criminalizes encouraging

22   aliens to come into or stay in the United States without

23   authorization.

24             One of the key points of that decision is that the

25   court held that provision was overbroad because it wasn't

1    limited to criminal conduct.  It also reached civil immigration

2    violations.  So, for that reason alone, you don't even get into

3    the speech integral to criminal conduct analysis.

4          That's clearly not the case here.  The speech involved

5    here is 100 percent based on prostitution solicitations.  So

6    that's one point.

7          Another point is that the three-point test that

8    they're pointing to, I'm not sure where they're pulling it

9    from.  There is some discussion in Sineneng-Smith of what has

10   to be shown to make an aiding and abetting claim, perhaps

11   that's what they're relying on.  I know that the Sineneng-Smith

12   case also relies heavily on the Freeman case from the Ninth

13   Circuit.  Freeman, once again, not a sufficiency of the

14   indictment case, instead it addresses what jury instructions

15   might be called for at trial.  So to summarize there, we don't

16   agree that that's the test.

17         But even if you were to indulge them that this is the

18   test, let's look at it for a second.  They say the first

19   standard is was the sole -- was there a sole imminent purpose

20   to further a crime involved in the publication of these

21   solicitations?  The answer is yes.  I mean, that was the only

22   reason why these prostitution solicitations were purchased and

23   published at all, it was to advertise actual prostitution

24   crimes.  There was no other -- these weren't editorials about

25   -- or -- or political protests or anything.  They were just

proposals for illegal transactions, that was their only
purpose.  Those proposals are illegal everywhere in the United
States except for a small part of Nevada.

The second standard, were they targeted at some sort
of specific instance of speech, like encouraging an alien to
stay?  Well, the specific instances were these actual
prostitution solicitations.

The third point:  Was there active assistance in the
illegality?  And as I kind of started off arguing, every time
Backpage sold an ad, it entered into a contract with the pimp,
prostitute, or sex trafficker to publish their solicitation
for -- for money, for good and valuable consideration.  And
that publication alone, either directly violates state law, or
is just one small step removed from an actual violation of the
state law and it, in any event, clearly facilitates and
promotes the violation of the state law.

THE COURT:  Okay.  I had another question specific to
Mr. Brunst, because he filed a more specific pleading.

And, as he pointed out when he spoke earlier, a lot of
the allegations -- putting the money laundering allegations
aside, the Travel Act allegations with respect to Mr. Brunst
are really him receiving information or documents but not
actively participating like other defendants.

MR. KOZINETS:  So -- right.  So --

THE COURT:  Is that enough?

1          MR. KOZINETS:  It -- it is enough, but I think that

2     the -- the allegations really go further than that in that

3     paragraph 4 kind of sets the stage of the superseding

4     indictment.  He was the CFO for Backpage.  He owned part of

5     Backpage.

6          Paragraphs 30 and 31 kind of continue and say, after

7     the sale of Backpage, he, along with other upper, you know,

8     management and owners, continued to retain a significant stake

9     in the company and continued to exercise and retain significant

10    operational control.

11         These allegations that -- that you did just allude to

12    directly show that Mr. Brunst was part of the management team

13    that was routinely briefed on the -- on Backpage's business

14    practices, practices that were calculated to facilitate

15    prostitution.

16         Also, paragraph 138 of the superseding indictment

17    shows that he received an explanation from Carl Ferrer as to

18    why the company was growing at such an exponential rate.  And

19    the e-mail, essentially, describes that the reason for growth

20    was because of its ability to capitalize on the prostitution

21    advertising market.

22         And then that leads into these efforts, these money

23    laundering schemes.  Why were the money laundering schemes even

24    necessary?  They were necessary because all of these financial

25    institutions were giving notice to Backpage that, as best as

1  they could tell, Backpage was facilitating unlawful

2  transactions.  So you have Mr. Brunst receiving notice, I think

3  in 2013 from Chase Bank, the company in 2014 received notice

4  from U.S. Bank, in 2015 it received notice from American

5  Express, Master Card, and Visa, and then in 2016 notice from a

6  payment processor identified only as Company A, I believe in

7  paragraph 147 of the superseding indictment, saying, we've

8  looked at your Web site, and you're facilitating unlawful

9  transactions.  We don't want to have anything to do with this.

10      So the money laundering schemes were all in response

11  to all of this illegality, and they were designed to enable the

12  company to continue profiting from the illegality by creating

13  these shell companies or companies with names that didn't sound

14  anything like Backpage, like, you know, Web Site Technologies

15  or -- and whatnot, where they would then be the entities that

16  received the payments from these prostitutes and sex

17  traffickers and pimps for the ads, and the financial

18  institutions wouldn't necessarily know or see a direct

19  connection with Backpage.

20      So, for all of those reasons, we think the allegations

21  are more than sufficient here.  And to the extent that

22  Mr. Brunst has -- I know in his separate reply he kind of took

23  issue with the evidentiary significance of some of these

24  allegations.  Once again, that's an issue for trial.  The key

25  point is does the indictment meet its notice function?  Does it

1    provide the elements of the offense and some factual discussion

2    sufficient to put the defendant on notice of what the

3    government is -- what the grand jury has charged them with so

4    that they can make their arguments at trial.

5           And, again, if he wants to get up at trial and say, I

6    had no idea that Backpage was publishing prostitution

7    solicitations, I had no involvement in any of the management

8    steps regarding these practices, and I really didn't know what

9    was going on at the company at all, he can make those arguments

10   there, but this isn't the time to make those arguments.

11          THE COURT:  Okay.  Thank you.

12          So both of you used up all your time, so I am going to

13   rely on the pleadings for anything else I need.

14          I do have a couple of other things, however, that I

15   wanted to discuss.

16          Mr. Bienert, when you were up, you mentioned that

17   there is a lot of extraneous stuff going on other than

18   litigating the case, which I agree with.  And I -- you don't

19   have to stand.  I didn't mean to address you other than to say

20   I agree with you.  And, for that reason, I am entering an order

21   that there be no further motions to compel or other discovery

22   motions unless and until you contact the court and we have a

23   little less formal discussion, because there -- I know we have

24   another motion to compel scheduled already, but this is a lot

25   of effort on things that should not take this much time.

1          And then just for scheduling purposes, I reset trial

2    to January 5th.  I wasn't present for the discussion when you

3    set the original trial date.  Any anticipation of how long I

4    should block on the calendar?

5          MR. RAPP:  Judge, just to correct you, you rescheduled

6    it for May 5th.

7          THE COURT:  Yes, I rescheduled it to May 5th.

8          MR. RAPP:  Rescheduled it.

9          THE COURT:  Yes.

10          MR. RAPP:  I think this is probably a six to

11    eight-week trial.  We have a lot of witnesses.  I think that's

12    a fair --

13          THE COURT:  Okay.  Does anyone else --

14          MR. BIENERT:  Of course, our --

15          THE COURT:  I mean, obviously, when we get closer,

16    we'll have more discussions about it.  I just kind of wanted to

17    get a general idea.

18          MR. BIENERT:  I certainly think -- obviously, we never

19    know how much gets in through the government's case, but I've

20    got to think we're at least a couple of weeks of a defense, in

21    all likelihood, but it will get easier once we know more about

22    what we're dealing with.

23          THE COURT:  Okay.  Those were the two additional

24    things.  Is there anything else that I need to know about?

25          MR. RAPP:  Not from the United States, no.

MR. FEDER:  Judge, Number 531 is a motion that's been pending since April regarding yet another issue with the government's subpoenaing trust accounts of lawyers, been fully briefed.  I think we need to put that on the calendar for the motion to compel in September.

THE COURT:  All right.  Let me take a look at it.  It mentions an evidentiary hearing.  Is it going to need an evidentiary hearing?

MR. FEDER:  It could.

THE COURT:  Okay.  I'll take a look at it and I'll issue a text only either setting it or setting it at a different time.

That reminds me.  At some point there was a mention of defense not having access to certain documents and there was -- well, I just want to take a minute to discuss that, because there are a number of sealed documents which are sealing a motion to seal, sealing the document that was filed by defense -- these are all defense -- a sealed joinder in a response, a sealed order granting the motion to seal the joinder, so there is a bunch of things like that, but wouldn't you be able to see that there was --

MS. BERNSTEIN:  Your Honor, when we look at the docket, we don't see if something is sealed, it simply skips numbers.  We've contacted the clerk's office, as well as the government.  I think at last count, which I did this morning,

1  we are missing 123 docket entries.  I think many -- not many,

2  but I think a handful of those are going to relate to pretrial

3  services reports, which we don't contend we have any right to

4  be receiving.  But we are concerned that -- and the government

5  did represent that they lodged each of the 39 inadvertently

6  disclosed documents individually.

7          THE COURT:  Yes.

8          MS. BERNSTEIN:  But we do have a concern that that

9  still leaves a world of, roughly, 50 to 60 to 80 documents that

10  we haven't seen.

11          And we do have the orders that the Court was just

12  referring to, and when an under seal filing is made, it does

13  generate a number of entries beyond just the one that's filed.

14  We do think that we've pooled our resources and have those that

15  have been filed by the defendants.  We've asked the government

16  for the ones that we're missing.  And we can provide that same

17  list to the Court to see what we're missing that we're entitled

18  to.

19          THE COURT:  Okay.  Yeah, if you can -- because it

20  doesn't appear that there is anything sinister going on or

21  anything missing that you should be seeing, because it's 39

22  documents, and then a bunch of it is sealing things filed by

23  the defense, which you should have.  So if after you discuss it

24  with the government, you feel that there are still things

25  missing, yes, contact my division and -- it's harder, because

1 there is so many of you, we can't just easily get on the phone,

2 but we can try to figure it out.

3          MS. BERNSTEIN:  Thank you.  We'll do that.

4          THE COURT:  All right.

5          MR. BIENERT:  Your Honor, just to clarify, because I

6 think this could be extraordinarily helpful, but are you

7 envisioning in the order -- when you're alluding to not having

8 to have hearings over these discovery disputes, is it your

9 practice then that when we have a dispute that we can't agree

10 on, we could leave a message with your court clerk to try to

11 just schedule a phone conference to address it?

12          THE COURT:  Yes.

13          MR. BIENERT:  That would be perfect.  Thank you.

14          THE COURT:  Yes.  Because this process is not

15 particularly conducive, especially in a criminal case which

16 should move a little bit faster.

17          All right.  We're at recess.  Thank you.

18          (Proceedings concluded at 11:50 a.m.)

19                    *          *          *

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, CHRISTINE M. COALY, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 26th day of August,

13   2019.

14

15

16                    /s/ Christine M. Coaly_____

17                    Christine M. Coaly, RMR, CRR

18

19

20

21

22

23

24

25