Paul J. Cambria, Jr. (NY 1430909, admitted *pro hac vice*)
Erin E. McCampbell (NY 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:  (716) 855-1580
pcambria@lglaw.com
emccampbell@lglaw.com
*Attorneys for Defendant Michael Lacey*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | NO. CR-18-00422-PHX-SMB |
| Plaintiff, | **DEFENDANTS' MOTION TO COMPEL PRODUCTION OF *BRADY* MATERIAL** |
| vs. | |
| Michael Lacey, *et al.*, | (Oral argument requested) |
| Defendants. | |

Defendants James Larkin, Michael Lacey, John Brunst, Scott Spear, Andrew Padilla, and Joye Vaught, by and through their undersigned attorneys, hereby move for an order compelling production of *Brady* material in a manner that will enable counsel to effectively use such material in preparation for trial.  This Motion is based on the attached Memorandum of Points and Authorities, the Court's file, and any evidence or argument presented at the hearing on this matter.  This is the Defendants' first such motion.

Excludable delay under 18 U.S.C. § 3161(h)(1) may occur as a result of this Motion or of an order based thereon.

DATED: October 18, 2019 Paul J. Cambria, Jr.
Erin E. McCampbell
LIPSITZ GREEN SCIME CAMBRIA LLP

By: /s/ Paul J. Cambria, Jr.
Paul J. Cambria, Jr.
Attorneys for Michael Lacey

DATED: October 18, 2019 Thomas H. Bienert, Jr.
Whitney Z. Bernstein
BIENERT KATZMAN, PLC

By: /s/ Whitney Z. Bernstein
Whitney Z. Bernstein
Attorneys for James Larkin

DATED: October 18, 2019 Bruce Feder
FEDER LAW OFFICE, P.A.

By: /s/ Bruce Feder
Bruce Feder
Attorneys for Scott Spear

DATED: October 18, 2019 Gary S. Lincenberg
Ariel A. Neuman
Gopi K. Panchapakesan
BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.

By: /s/ Ariel A. Neuman
Ariel A. Neuman
Attorneys for John Brunst

2

DATED: October 18, 2019          David Eisenberg
                                 DAVID EISENBERG, P.L.C.

                                 By:    /s/ David Eisenberg
                                        David Eisenberg
                                        Attorneys for Andrew Padilla

DATED: October 18, 2019          Joy Bertrand
                                 JOY BERTRAND, ESQ.

                                 By:    /s/ Joy Bertrand
                                        Joy Bertrand
                                        Attorneys for Joye Vaught

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants James Larkin, Michael Lacey, John Brunst, Scott Spear, Andrew Padilla, and Joye Vaught ("Defendants") move for an order compelling prompt production of *Brady* material in a manner that will enable counsel to effectively use such material in preparation for trial.

## I.   The government must make broad disclosures under *Brady.*

Under *Brady v. Maryland*, 373 U.S. 83 (1963), *United States v. Agurs*, 427 U.S. 97 (1976), *United States v. Bagley*, 473 U.S. 667 (1985), and *Kyles v. Whitley*, 514 U.S. 419 (1995), the government must promptly disclose all exculpatory and/or impeaching material in the prosecution's possession, custody or control or which is otherwise known to the prosecution.  This broad disclosure obligation includes, but is not limited to, disclosure of:

    a.    Any written or recorded statements, admissions or confessions made by any witness, and the name and address of any such individual, which may be exculpatory, non-incriminatory, or otherwise favorable to the Defendants, or any summaries, synopsis, notes, memoranda, or resumes thereof, regardless of whether such statements are reduced to writing and regardless of whether the prosecution intends to use such statements at the trial herein;

    b.    The name and address of any other witness who might have favorable evidence as to the Defendants, which are known, or which by the exercise of due diligence shall or should become known to the Government;

    c.    Any notes, memoranda, summaries, reports, or statements of any kind prepared in connection with the investigation of this case which are in any way favorable to the defense including notes prepared by the Government or any of its agents in connection with either the review of documents or the interview or other conversations with witnesses or other individuals contacted in connection with this case;

    d.    Any and all prior criminal records of any witnesses intended to be used in any fashion by the prosecution, or any other such information demonstrating the commission on their part, or participation therein, of any so-called "bad acts" or other instances of immoral or criminal conduct, or conduct indicating a lack of veracity;

e.    Any and all statements, memoranda or other similar notations or information which would in any way reflect inconsistent statements made by any witness contacted by the Government, or any such individual engaged in lying or other conduct calculated to conceal the truth or improperly reflect facts;

f.    Any information tending to indicate that information supplied by a particular document or witness contradicts or is contradicted by a different document or witness; and;

g.    Any and all consideration or promises of consideration given during the course of the investigation and preparation of this matter by any law enforcement officials, including prosecutors or agents, police or informers, to or on behalf of any witness.

The list set forth above is not exclusive because the defense cannot anticipate all areas which may lead to a *Brady* disclosure; however, the government's disclosure obligation is broad and includes any information which in any way leads to favorable or impeaching material, even if the disclosed material is not directly admissible in a court proceeding.  Due process requires that the government not suppress evidence favorable to a defendant or discrediting to its own case, and, upon request, that it disclose to the defense all such information.  *See Brady*, 373 U.S. at 87; *Agurs*, 427 U.S. at 105-06; *Pyle v. State of Kansas*, 317 U.S. 213, 216 (1942). The requirement of disclosure extends to candor by the government witnesses as well as matters which relate more directly to guilt or innocence. *See Giglio v. United States*, 405 U.S. 150, 153 (1972); *Napue v. Illinois*, 360 U.S. 264, 265 (1959); *see also Williams v. Dutton*, 400 F.2d 797, 799 (5th Cir. 1968), *cert. denied*, 393 U.S. 1105 (1969).

The *Brady* rule grew out of a realization by the Supreme Court that a defendant's ability for acquiring evidence is disproportionate to that of the government. Most defendants have neither the manpower nor the access and contacts available to the government in its investigation. Thus, the prosecution is obliged to share the proceeds of its discovery with the defense when that evidence is favorable to the defendant's case.

5

Indeed, the importance of *Brady* has been so strongly enforced that the Supreme Court, in *United States v. Bagley*, 473 U.S. 667, 676 (1985), unequivocally extended the duty of disclosure to information which may be used by the accused for impeachment at trial.

Further, the government must promptly disclose such material so it can be used for effective trial preparation. Indeed, effective preparation for trial is the cornerstone of effective representation of criminal defendants and disclosure of information which, in any of a variety of ways, impeaches a witness's credibility is required before trial to enable *effective* preparation. As the D.C. Circuit has recognized:

> Disclosure by the government must be made at such a time as to allow the defense to use the favorable material *effectively in the preparation* and presentation of its case, even if satisfaction of this criterion requires pre-trial disclosure.

*United States v. Pollack*, 534 F.2d 964, 973 (D.C. Cir. 1976) (emphasis added) (citations omitted).

The need for pre-trial disclosure of *Brady* material has been highlighted in several cases. In *United States v. Bernal-Obeso*, 989 F.2d 331 (9th Cir. 1993), irreconcilable discrepancies between the informer's actual record and government's representation about the prior record indicated the informer had misled his government handlers. The Court vacated the defendant's conviction and remanded for an evidentiary hearing "to restore the parties" to their "pre-trial" position and to ascertain whether the informer had lied to the government. *Id.* at 336-337; *see also United States v. Bejasa*, 904 F.2d 137, 140 (2d Cir. 1990), *cert. denied*, 498 U.S. 921 (1990) (concluding that a government file which contained impeachment material regarding a prosecution witness should have been produced prior to the witness's testimony); *Gorham v. Wainwright*, 588 F.2d 178, 180 (5th Cir. 1979) (recognizing that, under certain circumstances, delayed revelation of discoverable evidence may deny a defendant an effective defense); *United States v. Opager*, 589 F.2d 799, 805 (5th Cir. 1979) (harm was done by the pre-trial failure of the

government to disclose the whereabouts of the informant; crucial importance was given to pretrial opportunity to interview and/or investigate potential witness); *Grant v. Alldredge*, 498 F.2d 376, 381-382, n.5 (2d Cir. 1974) (failure of government to disclose before trial that bank teller picked out photograph of another individual was error); *United States v. Baxter*, 492 F.2d 150, 174 (9th Cir. 1973), *cert. denied*, 416 U.S. 940 (1974) (delay in turning over requested favorable evidence is unconstitutional when delay in disclosure substantially prejudiced the preparation of the defense); *Clay v. Black*, 479 F.2d 319, 320 (6th Cir. 1973) (per curiam) (pre-trial disclosure of an FBI scientific report would have permitted defense to establish necessary claim of custody to introduce certain blood stains); *United States v. Polisi*, 416 F.2d 573, 577 (2d Cir. 1969) (the importance of *Brady* is to measure the effects of the suppression upon the defendant's preparation for trial); and *Hamric v. Bailey*, 386 F.2d 390, 393 (4th Cir. 1967) (to be effective, disclosure must be made at a time when disclosure would be of value to the accused).

Numerous district courts have ordered pretrial disclosure of such material well before the start of trial to enable defense counsel to effectively prepare the defense. *See United States v. Thevis*, 84 F.R.D. 47, 54 (N.D. Ga. 1979) (delaying disclosure of *Brady* materials useful for impeachment until the night preceding the testimony is insufficient); *United States v. Five Persons*, 472 F. Supp. 64, 69 (D.N.J. 1979) (by adoption of a standard order, district judges declared that the rights to due process and a fair trial require availability of *Brady* material within *10 days after arraignment*) (emphasis added); *United States v. Goldman*, 439 F. Supp. 337, 349 (S.D.N.Y. 1977) (if exculpatory evidence is produced for the first time at trial, defendant may not have an adequate opportunity to effectively utilize the material; all *Brady* material to be provided "immediately"); *United States v. Dillard*, 419 F. Supp. 1000, 1002 (N.D. Ill. 1976) (in light of complex decisions of strategy and preparation, it is better practice to require disclosure in advance of trial); *United States v. Quinn*, 364 F. Supp. 432, 441 (N.D. Ga. 1973), *aff'd on other grounds*,

514 F.2d 1250 (5th Cir. 1975), *cert. denied*, 424 U.S. 955 (1976) (*Jencks* Act timetable cannot control release of information to which defendant is constitutionally entitled).

Recognizing the importance of the immediate disclosure of such material to the effective preparation of the defense, Judge Logan noted that the government stipulated to disclose *Brady* and *Giglio* materials to the defense within ten days of discovery and "implored" the government to "abide by its stipulation" without making the Court order it to do so. (*See* Doc. 339 at 5-6.) The government has failed to do what it told Judge Logan it would do.

## II. The government has withheld categories of *Brady* material.

Defendants move for an order requiring immediate disclosure of all such evidence, to the extent that it has not yet been disclosed. Defendants believe that there are large categories of *Brady* material that the government has withheld. For example, Backpage undertook significant efforts to rid its site of child-sex trafficking, including working with various non-governmental organizations, law enforcement, and elected officials, as well as hiring an internet safety expert to advise Backpage on measures to prevent underage users from posting ads. Backpage promptly responded to requests from law enforcement and blocked users associated with law enforcement requests. This evidence stands in stark contrast with the government's repeated claim that Defendants intentionally facilitated child sex trafficking, but has not been disclosed to Defendants.

Further, Backpage users regularly created and posted ads for lawful adult services, such as ads for dating, body rubs, strippers and strip clubs, phone and websites, adult jobs, domination and fetishes, and escorts. The posting of those ads was lawful because advertisement for those services is lawful and protected under the First Amendment. *See Backpage.com, LLC v. Dart*, 807 F.3d 229, 234 (7th Cir. 2015) ("[N]ot all advertisements for sex are advertisements for illegal sex.").[1] Consequently, each and every such ad is *Brady*

---

[1]     *Accord Doe v. Backpage.com LLC*, 104 F Supp. 3d 149, 156-57 (D. Mass. 2015), *aff'd*, 817 F.3d 12 (1st Cir. 2016) ("The existence of an escorts section in a classified ad

material because such ads contradict the government's claim that the "vast majority" of ads posted to Backpage were ads for illegal prostitution.  Again, the government has not provided this material.

Based on the foregoing, Defendants respectfully request that this Court order the government to immediately disclose any and all witnesses, documents, and information indicating that:

- Backpage reported ads involving potential underage users to the National Center for Missing and Exploited Children (NCMEC) or law enforcement.

- Employees of Backpage and its affiliates said they took affirmative steps to keep off the website any ads they knew related to sex trafficking or prostitution and had no knowledge of the website knowingly running any such ads.

- Users posted or attempted to post ads to Backpage for lawful adult activities in the adult categories (including, but not limited to, dating, body rubs, strippers and strip clubs, phone and websites, adult jobs, domination and fetishes, and escorts.

Finally, nearly a year ago, Defendants wrote to the government seeking the disclosure of dozens of categories of *Brady* evidence, including the authority for requesting

---

service, whatever its social merits, is not illegal."); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 1262, 1282 (W.D. Wash. 2012) (escort ads have long been permitted and escort services are licensed and regulated in many states); *Backpage. com, LLC v.Cooper*, 939 F. Supp. 805, 816, 833-34 (D. Tenn. 2013) (ads on Backpage.com are protected speech under the First Amendment); *Backpage.com, LLC v. Hoffman,* 2013 WL 4502097, at *9-11 (D.N.J. 2013) (rejecting argument that escort ads on the website are unprotected speech); *M.A. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1049-50 (E.D. Mo. 2011); *see also Dart v. Craigslist,* Inc., 665 F. Supp. 2d 961, 968 (N.D. Ill. 2009) ("We disagree . . . that the 'adult services' section is a special case.  The phrase 'adult,' even in conjunction with 'services,' is not unlawful in itself nor does it necessarily call for unlawful content."); *Cohen v. Bd. of Supervisors*, 707 P.2d 840, 852 (Cal. 1985) ("An escort service may very well involve lawful activities relating to sex." (internal quotations omitted)).

such evidence.  (A true and correct copy of the Oct. 26, 2018 Letter from M. Piccarreta to K. Rapp is attached hereto as Ex. A.)  The government has not, yet, disclosed this evidence or affirmatively stated that it has searched for such evidence but was unable to locate evidence subject to the requests.  Consequently, it is unclear whether this evidence exists, but the government must search for it and either disclose it or indicate to Defendants that it does not exist.  Defendants respectfully request that this Court order the government to immediately disclose any and all witnesses, documents, and information relating to the following:

- High-ranking Department of Justice officials have informed Congress that websites publishing advertisements posted by third parties could not be prosecuted under federal criminal law absent specific knowledge about specific ads and an intent to facilitate crimes related to those specific ads. For example, in response to the question "what laws apply to Internet providers like craigslist that would make them criminally liable for the postings," the DOJ's National Coordinator for Child Exploitation, Prevention, and Interdiction, Francie Hakes, testified "I am not aware of any laws that would make them liable, unless there was evidence that Craigslist was a participant ... conspiring with those who were misusing their site, that is, knowingly conspiring to violate the laws. . . .  I am not aware of anything that shows us that craigslist might be criminally liable." Domestic Minor Sex Trafficking: Hearing Before Subcommittee on Crime, Terrorism, & Homeland Security of the House Committee on the Judiciary, 111th Cong., p. 215 (Sept. 15, 2010).  Any similar materials in the government's possession also constitute *Brady* material and must be disclosed immediately.

- Legislators recently admitted (a month before the government obtained its initial indictment in this matter) that "current federal criminal law . . . presently lacks proper prosecutorial tools to combat [Backpage]" and "*general knowledge that sex trafficking occurs on a website will not suffice as the knowledge element must be proven as to a specific victim.*" Allow States And Victims To Fight Online Sex Trafficking Act of 2017, House of Representatives Rept. 115-572 Part 1, p. 5, Feb. 20, 2018 (emphasis added).  Any similar materials in the government's possessionni also constitute *Brady* materials and must be produced.

- All communications to and from any federal, state, or local elected officials relating to the possible criminal prosecution of Backpage or its directors, officers, or employees. *Fitzgerald v. Peek,* 636 F.2d 943, 945 (5th Cir. 1981) (due process prohibits prosecution based on improper influence exerted on the prosecutor to seek the indictments).

- All communications to and from any local, state, or federal law enforcement agents, officers, investigators, prosecutors, and other officials involved in any manner with the investigation or prosecution of Backpage or its directors, officers, or employees. *Fitzgerald v. Peek,* 636 F.2d 943, 945 (5th Cir. 1981) (due process prohibits prosecution based upon improper outside influences).

- All communications to and from m NCMEC relating to the possible criminal prosecution of Backpage or its directors, officers, or employees.

- All communications to and from any civil plaintiff's lawyers representing alleged sex trafficking victims, or advocacy organizations involved with sex trafficking, relating to the possible criminal prosecution of Backpage or its directors, officers, or employees.

- All communications to and from local, state, and federal law enforcement agents, officers, investigators, prosecutors, and other officials involved with the investigation or prosecution of Backpage or its directors, officers, or employees.

- All documents from NCMEC relating to Backpage, the posting of advertisements for unlawful purposes (including sex trafficking) on Backpage, and the inability of a website operator such as Backpage to determine whether adult-oriented postings relate to lawful activities or unlawful activities or to determine whether adult-oriented postings relate to adults or minors.

- All communications between Backpage and NCMEC relating to reports by Backpage of possible unlawful activity involving minors.

- All documents evidencing, and all commendations from law enforcement relating to, Backpage's cooperation in any criminal investigations.

- All communications to and from Nanci Clarence, or any lawyers representing Mr. Ferrer or Backpage, that relate in any manner to plea negotiations or the plea agreement and all documents to or from the government and any other local, state, or federal law enforcement agents, officers, investigators, prosecutors, and other officials relative to Mr. Ferrer

that relate to the plea negotiations or plea agreement and all writings subsequent to said plea agreement.

- All communications to and from K.C. Maxwell or any lawyers representing Mr. Hyer that relate in any manner to plea negotiations or the plea agreement and all documents to or from the government and any other local, state, or federal law enforcement agents, officers, investigators, prosecutors, and other officials relative to Mr. Hyer that relate to the plea negotiations or plea agreement and all writings subsequent to said plea agreement.

- All documents sent by Backpage to law enforcement (or *vice versa*) relating to Backpage cooperating with law enforcement efforts.

- All Department of Justice memoranda relating to the department's understanding of the applicable law governing Backpage during the relevant time periods.

- Any plea bargain, immunity agreement, explicit or implied agreement, or any other promises any witness has received or will receive from any federal, state or local authority in exchange for his or her testimony or cooperation in this case or in any other case—including, but not limited to, any express or impled agreements not to seek to seize or forfeit assets that would be forfeitable under the theories the government is asserting to seize and seek to forfeit the Defendants' assets.

- Any information suggesting any bias, prejudice or motive that a witness may have for testifying falsely against the Defendants. *Pennsylvania v. Ritchie,* 480 U.S. 39 (1987); *United States v. Strifler,* 851 F.2d 1197 (9th Cir. 1988); *United States v. Abel,* 469 U.S. 45 (1984).

- All promises, agreements, benefits, monies or anything of value whatsoever made to or provided to a witness, his/her family or friends by federal, state or local authorities in this matter or any other matter—including, but not limited to, any express or impled agreements not to seek to seize or forfeit assets that would be forfeitable under the theories the government is asserting to seize and seek to forfeit the Defendants' assets. *See United States v. Uramoto,* 638 F.2d 84, 86 (9th Cir. 1980); *United States v. Leja,* 568 F.2d 493 (6th Cir. 1977).

- Any monies paid, or any other benefit provided, to any of the government's witnesses by the United States government or any other governmental agency that was in any way contingent upon the outcome of this or any other investigation as a result of information provided by

any such witnesses. *United States v. Bagley,* 473 U.S. 667, 683 (1985).

- All documents between a witness, or his/her representative, and the government relating to the negotiations of the plea bargain agreement or where the witness has offered or proposed testimony. *Brown v. Dugger,* 831 F.2d 1547 (11th Cir. 1987) (evidence that witness sought plea bargain is to be disclosed even if no deal struck); *Haber v. Wainwright,* 756 F.2d 1520, 1524 (11th Cir. 1985).

- Proffers and statements made by an accomplice witness in negotiating a cooperation agreement with the government, along with information revealing the negotiation process, including but not limited to any and all variations in the accomplice witness' statements. *United States v. Sudikoff,* 36 F.Supp.2d 1196 (C.D. Cal. 1999).

- All documents, including the government's reports which indicate instances of illegal behavior of a witness or specific instances of misconduct which relate in any manner whatsoever to the witness' credibility. *See* Rule 608(b), Federal Rules of Evidence. This request includes any law enforcement reports relating to these instances. *See United States v. Ray,* 731 F.2d 1361 (9th Cir. 1984).

- Any prior contrary statements made by the government witness. *Giles v. Maryland,* 386 U.S. 66 (1967); *Spicer v. Roxbury Correctional Institute,* 194 F.3d 547 (4th Cir. 1999).

- The existence of any witnesses or witness statements favorable to the Defendants. *United States v. Wilkins,* 326 F.2d 135 (2d Cir. 1964); *Jackson v. Wainwright,* 390 F.2d 288 (5th Cir. 1968).

- Negative exculpatory statements, such as statements by informed witnesses that fail to implicate the Defendants in any criminal activity. *See, e.g., United States v. Torres,* 719 F.2d 549, 555-56 (2d. Cir. 1983); *Jones v. Jago,* 575 F.2d 1164, 1168 (6th Cir. 1978); *Clemmons v. Delo,* 124 F.3d 944, 952 (8th Cir. 1997); *White v. Helling,* 194 F.3d 937, 944 (8th Cir. 1999).

- Any threats, express or implied, direct or indirect, or other coercion made or directed against the witnesses, including but not limited to, criminal prosecutions, investigations, other incidents which are pending or could be brought against the witnesses.

- The existence and notification of each occasion upon which the witnesses testified before a Court, grand jury, or other tribunal or made other

statements so defendant can order transcripts for use in cross-examination or investigation. *See* Rules 801(d)(l) and 806, Federal Rules of Evidence. *See also Davis v. Heyd,* 479 F.2d 446 (5th Cir. 1973).

- Any grand jury statements of any witnesses which are favorable to the Defendants. *United States v. Sink,* 56 F.R.D. 365 (E. D. Pa. 1972).

- The identity of any witnesses who testified before the grand jury and who will be unavailable to testify at trial. Arizona State Bar Ethics Opinion No. 94-07 (March 1994). *See* LRCiv 83.2(e), Rules of Practice of the United States District Court for the District of Arizona.

- The names and addresses of any witnesses to offenses charged in the indictment whom the government does not intend to call at trial. *United States v. Cadet,* 727 F.2d 1453, 1469 (9th Cir. 1984) (it is appropriate "to conclude from the fact that the government did not intend to call a witness to the crime that there was a reasonable possibility that such person would be able to provide evidence favorable to the defense").

In regard to law enforcement agents in this case, whether there have been any prior instances of untruthful statements by the agents or any complaints filed with their governmental employer at any time relating to any incidents which relate in any manner whatsoever to the agent's credibility. *See* Rule 608(b), Federal Rules of Evidence; *United States v. Henthorn,* 931 F.2d 29 (9th Cir. 1991); *Milke v. Ryan,* 711 F.3d 998 (9th Cir. 2013). It is further requested that the prosecutor further personally review the personnel files for *Brady* material.

- Any reports prepared by prosecution experts relating to the legality of the procedure used by government agents in the course of their investigation. *United States v. Gerena,* 116 F.R.D. 596 (D. Conn. 1987).

- Evidence that is inconsistent with a witness' testimony. *United States v. Fisher,* 106 F.3d 622, 634-35 (5th Cir. 1997); *Ballinger v. Kerby,* 3 F.3d 1371, 1375-76 (10th Cir. 1993); *Derden v. McNeel,* 938 F.2d 605,617 (5th Cir. 1991).

III. **The government must seek and disclose materials in possession of organizations that function as an arm of the government.**

In this case, the government's obligations under *Brady* include procuring and disclosing any *Brady* material in the possession of organizations that function as an arm of

the government.  It is well settled that under *Brady*, the prosecutor is "deemed to have knowledge of and access to anything in the custody of any federal agency participating in the same investigation of the defendant." *United States v. Zuno-Arce*, 44 F.3d 1420, 1427 (9th Cir. 1995) (citing *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989)).  Furthermore, knowledge is imputed to the prosecutor where the "evidence is known to other members of the prosecution team . . . includ[ing] information in the hands of the police or *other investigative agencies* involved in the prosecution." *Odle v. Calderon*, 65 F. Supp. 2d 1065, 1071 (N.D. Cal. 1999) (emphasis added); *see also Avila v. Quartermain*, 560 F.3d 299, 307 (5th Cir. 2009) ("It is well settled that if a member of the prosecution team has knowledge of *Brady* material, such knowledge is imputed to the prosecutors.").

In this case, the government must seek and disclose any *Brady* material in the possession of the National Center for Missing and Exploited Children ("NCMEC").  It is well-settled that NCMEC is an agent of the government.  *See United States v. Ackerman*, 831 F.3d 1292, 1308 (10th Cir. 2016); *United States v. Cameron*, 699 F.3d 621, 645 (1st Cir. 2012); *United States v. Keith*, 980 F. Supp. 2d 33, 41 (D. Mass. 2013); *United States v. Coyne*, 2018 WL 8667649 at *9 (D. Vt. Apr. 10, 2018).  First, NCMEC alone is statutorily obliged to maintain an electronic tip line for internet service providers ("ISPs") to report potential internet child exploitation violations.  *See Ackerman*, 831 F.3d at 1296.  Second, ISPs must report any such violations only to NCMEC, and no other governmental agencies; ISP's who fail to comply with this obligation face federal criminal penalties.  *See id*.  Third, when NCMEC confirms receipt of a report from an ISP, that ISP must treat such confirmation as a request to preserve evidence as if it was issued by the government itself.  *See id*. at 1297.  Fourth, in furtherance of its tip line functions, NCMEC is statutorily authorized to receive contraband (child pornography) knowingly and to review its contents intentionally.  *See id*.  Finally, NCMEC receives direct aid from the government in the form of monetary and personnel contributions.  Law enforcement agents participate in NCMEC's daily operations and government officials occupy seats on NCMEC's board.

*See id*. at 1298.  And as much as seventy-five percent of NCMEC's budget comes from the federal government.  *See id.*

In effect, NCMEC performs a traditional police function by collecting crime tips, reviewing those tips, and forwarding them to law enforcement agencies.  *See Coyne*, 2018 WL 8667649 at *8.  NCMEC undertakes its clearinghouse role "in partnership with the government," and is required to conduct and report its searches through various statutory provisions.  *Keith*, 980 F. Supp. 2d at 41.  The agency exists for no private purpose other than to assist law enforcement.  *See id*.

In *United States v. Rosenschein*, 2019 WL 2298810 (D.N.M May 30, 2019), the court examined the more narrow issue of whether NCMEC was part of the "prosecution team" for purposes of discovery.  *See id*. at *1.  Through the use of "PhotoDNA," a program which identifies potential child exploitation images, an ISP identified two images distributed by defendant.  *See id*.  The ISP submitted these images to NCMEC, which identified the location of the defendant and alerted the appropriate geographical law enforcement agency.  *See id*.  Defendant moved to compel disclosure of various documentation from NCMEC, including discovery pursuant to *Brady*.  *See id*. at *2.  The court held NCMEC was part of the prosecution team for discovery purposes, noting that "NCMEC did conduct, as it is charged to do by statute, a limited investigation into the facts of this case.  This included an investigation to identify the location of the suspected internet user."  *Id*. at *7.  Based upon this finding, the court granted defendant's motion to compel.  *See id*. at *10.

Here, NCMEC is clearly an agent of the government and has acted as a member of the "prosecution team" for *Brady* purposes.  NCMEC's former President, Ernie Allen, met and communicated with representatives of the Department of Justice ("DOJ") on numerous occasions, urging the DOJ to prosecute the Defendants for their former interest in the

company that operated Backpage.[2]  (True and correct copies of documents confirming Mr. Allen's meetings with the DOJ and a subsequent meeting among the DOJ and others at NCMEC relating to the prosecution of Backpage are attached hereto as Exs. B, C.)  Further, NCMEC voluntarily provided information to the prosecution team in this case as NCMEC produced documents in response to a letter from the DOJ, rather than a grand jury subpoena.  (A true and correct copy of a Letter from Linda Engstrom to Yiota Souras dated May 16 , 2017 is attached hereto as Ex. D).  Finally, the prosecution has identified four current or former NCMEC employees or board members as witnesses against the Defendants on the government's Witness List.  Indeed, because NCMEC's day-to-day operations coordinate with the DOJ, and NCMEC officials have functioned as an arm of the DOJ in this particular case, the government must obtain any information subject to disclosure under *Brady* and *Bagley* from NCMEC and promptly disclose that information to the Defendants.

Further, the government must seek and disclose any *Brady* evidence in the possession of the Offices of the Attorney Generals for the States of California and Texas. Critically, the government has stated that it "partner[ed]" with those Offices and that DOJ's investigation and seizure of Backpage was based on "significant support" from those Offices.  *See* April 9, 2018 DOJ Press Release, available at https://www.justice.gov/opa/pr/justice-department-leads-effort-seize-backpagecom-internet-s-leading-forum-prostitution-ads (last visited on Oct. 16, 2019).  Based on this admission of a partnership with those Offices, the government must seek and promptly disclose any *Brady* material in their possession, custody or control.

## CONCLUSION

For all these reasons, Defendants respectfully request that this Court order the government to seek and promptly disclose all *Brady* material, including all material that is

---

[2]     Mr. Allen had similar meetings and communications with state law enforcement officials.

in the possession, custody or control of the DOJ that has not yet been disclosed, as well as all material in possession, custody or control of organizations that function as an arm of the DOJ, including, but not limited to NCMEC, and the Offices for the Attorney Generals for the States of California and Texas.

Counsel specifically reserves the right to make additional requests for the material covered above at the time this motion is argued, or at such other time as the existence of such materials shall become known to counsel for the Defendants, and it is respectfully requested that the prosecution be admonished that its duty under *Brady/Giglio* is a continuing one.

RESPECTFULLY SUBMITTED this 18th day of October, 2019,

/s/     Paul J. Cambria, Jr.
LIPSITZ GREEN SCIME CAMBRIA LLP
Attorneys for Defendant Michael Lacey

On October 18, 2019, a PDF version
of this document was filed with
Clerk of the Court using the CM/ECF
System for filing and for Transmittal
Of a Notice of Electronic Filing to the
Following CM/ECF registrants:

Kevin Rapp, kevin.rapp@usdoj.gov
Reginald Jones, reginald.jones4@usdoj.gov
Peter Kozinets, peter.kozinets@usdoj.gov
John Kucera, john.kucera@usdoj.gov
Margaret Perlmeter, margaret.perlmeter@usdoj.gov
Patrick Reid, Patrick.Reid@usdoj.gov
Andrew Stone, andrew.stone@usdoj.gov
Amanda Wick, Amanda.Wick@usdoj.gov

PICCARRETA DAVIS KEENAN FIDEL PC
LAWYERS

MICHAEL L. PICCARRETA
JEFFERSON KEENAN
LOUIS S. FIDEL

BARRY M. DAVIS
(1948-2016)

2 EAST CONGRESS STREET, SUITE 1000
TUCSON, ARIZONA 85701
(520) 622-6900
FAX (520) 622-0521
WWW.PD-LAW.COM

October 26, 2018

**VIA EMAIL: <ins>kevin.rapp@usdoj.gov</ins>**
**AND U.S. FIRST CLASS MAIL**

Kevin Rapp, Esq.
United States Attorney's Office
Two Renaissance Square
40 N. Central Avenue, Ste. 1200
Phoenix, AZ  85004-4408

    Re:    United States v. Lacey, *et al.*, No. CR-18-00422-PHX-SPL (BSB)

Dear Kevin:

    I am writing to request that the government comply with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), and to provide you with an enumerated list of documents we believe fall within this mandate.[1] As acknowledged in Judge Logan's order on our request for itemization of *Brady/Giglio* material: "*Brady* places an affirmative duty on the prosecutor to seek out information in the government's possession that is favorable to the defendant; here, the Government has the duty to affirmatively review its discovery materials in order to determine and acquire those materials which would be considered *Brady* exculpatory and *Giglio* impeaching materials." Doc. 339, p. 3.

    This part of Judge Logan's order is, of course, based on well-settled case law. *See Kyles v. Whitley*, 514 U.S. 419, 435 (1995); *United States v. Price*, 566 F.3d 900, 908-09 (9th Cir. 2009); *United States v. W. R. Grace*, 401 F.Supp.2d 1069, 1075-76 (D. Mont. 2005), *id.*, as well as the Justice Manual which requires federal prosecutors to conduct a

---

[1] My October 23, 2018, letter to Reginald Jones specifically addressed the *Brady* and *Giglio* issues relating to the government's request to claw back "inadvertently" disclosed *Brady/Giglio* materials in specific government memoranda. This letter supplements that separate request.

PICCARRETA DAVIS KEENAN FIDEL PC

"review process" of investigative agency files, witness files, evidence and information gathered during the investigation, substantive case-related communications, potential *Giglio* information relating to witnesses, and information obtained in witness interviews. Justice Manual, § 9-5.002(B). The Justice Manual also states that "[h]aving gathered the information described above, prosecutors must ensure that the material is reviewed to identify discoverable information." *Id.*[2] Importantly, for the purposes of the *Brady/Giglio* material in this case, "[a] prosecutor must disclose information that is *inconsistent with any element of any crime charged* against the defendant or that establishes a recognized affirmative defense, regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal of the defendant for a charged crime." *Id.*, § 9-5.001(C)(1) (emphasis added). "[T]his policy encourages prosecutors to err on the side of disclosure in close questions of materiality and identify standards that favor greater disclosure in advance of trial through the production of exculpatory information that is *inconsistent with any element of any charged crime* and impeachment information that casts a substantial doubt upon either the accuracy of any evidence the government intends to rely on to prove an element of any charged crime or that might have a significant bearing on the admissibility of prosecution evidence." *Id.*, § 9-5.001(F) (emphasis added). As the defendants have previously noted, the Travel Act and money laundering offenses charged against the defendants are both specific intent crimes.[3] Therefore, any information in the government's possession that would tend to negate this *mens rea* is *Brady* material that must be disclosed to the defendants.

There appears to be no fundamental disagreement regarding your constitutional obligations. At the hearing on the motion for itemization of the *Brady/Giglio* materials, the government assured the court that the government understood and would comply with its *Brady/Giglio* obligations:

> THE COURT:  If you do have exculpatory information, I'm sure it's your position that you'll turn that over immediately.
>
> MR. STONE:  100 percent. The exculpatory material is absolutely going over to the extent there is anything exculpatory. And we are doing our review as required under *Brady*,

---

[2] Internal Department of Justice memoranda also "command an *actual review* of the materials acquired during investigation of a criminal case for the purpose of disclosing *Brady/Giglio* materials." *United States v. Salyer*, 2010 WL 3036444, *3 (E. D. Cal. 2010) (citing *Memorandum for Department Prosecutors*, dated January 4, 2010).

[3] *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974); *United States v. Gurolla*, 333 F.3d 944, 957 (9th Cir. 2003).

PICCARRETA DAVIS KEENAN FIDEL PC

> *Giglio*, and Rule 16 to determine what we might have
> in our investigative files, and that's going over.

Reporter's Transcript, October 5, 2018, p. 104.

  However, after providing those assurances to the court, the government also stated that the agents working on this case have not pulled out anything that they consider exculpatory. *Id.* at 114 ("[W]e have not identified or segregated a document or subset of documents that would be identified as *Brady*"). The government added: "If we come across documents that fall into *Brady* or exculpatory, just to identify those to the defendants, we could do that, Your Honor." *Id.* As noted above, the government assured the court that the government would turn over any *Brady/Giglio* material that it comes across in the future to the defendants immediately. As a consequence, Judge Logan's order specifically "notes that at the October 5th hearing the Government stipulated that it will turn over any *Brady/Giglio* material that it comes across in the future to the Defendants within 10 days. The court implores the Government to abide by this stipulation, without an order from the court." Doc. 339, pp. 5-6.

  Despite this pledge to adhere to legal obligations, the government made repeated statements to the court that the government is purportedly "unclear" or "unsure" about what exculpatory *Brady/Giglio* material "would look like." The government stated that, with respect to each specific defendant:

> here are the documents that relate to your defendant, why we think the allegations and the facts support the charges in the superseding indictment.
>
> What they have asked for is the converse of that, which is give us all the documents that help our clients that would be *Brady* material or possibly *Giglio*. And that's where the government's having difficulty identifying those documents, because we're not sure what those particular documents would look like.

*Id.* at 103. *See also id.* at 101 ("it's a little unclear what the exculpatory material would look like"), and 102 ("with respect to *Brady* or exculpatory, we're unsure what that would look like, Your Honor").

  These statements are puzzling to the defendants because there is abundant information in the government's possession and/or generated by the government that is favorable and exculpatory to the defendants. Accordingly, by this letter, the defendants specifically advise the government as to areas that are *Brady/Giglio* materials and that

PICCARRETA DAVIS KEENAN FIDEL PC

we believe are subject to your office's pledge (and the Court's order) to be turned over immediately.

First, it is imperative that you produce some of the documents the government is attempting to claw back, identified as the initial category of *Brady/Giglio* materials, which the previous prosecutors readily identified as areas of exculpatory evidence. The memoranda coupled with the underlying documents and any other documents that the government locates relative to those issues should assist the government as a beginning point as to identifying additional *Brady/Giglio* material.

1.  My October 23 letter to Mr. Jones explained that the government has already disclosed exculpatory materials that it now claims were inadvertently produced and seeks to claw back. It is the defendants' position that the government "inadvertently" disclosed *Brady* material that it was legally, ethically, and constitutionally required to disclose in the first place.[4] Although counsel for the defendants ceased their review of the purportedly inadvertently disclosed documents when the government made its claw-back request, counsel for the defendants had been in possession of these documents for weeks and had already reviewed the clearly exculpatory material. From memory, two internal government memoranda[5] contained *Brady/Giglio* material contradicting, legally and factually, the government's theory of the case, including statements made by the government at the hearing regarding the level of knowledge required for criminal prosecution. These *Brady/Giglio* memoranda also contain witness statements favorable to the defense, contain information contradicting representations made to federal magistrates, and contain material relevant to defendants' challenges to the grand jury proceedings and to the searches and seizures in this prosecution, the filing of additional pretrial motions, the cross-examination of government witnesses, and other purposes relating to the present criminal proceedings. The documents undoubtedly will be exhibits at multiple pretrial hearings and will be exhibits at trial.

---

[4] Indeed, it appears the primary reason the government seeks to claw back these materials is that they *are* very favorable to the defendants, and therefore, by definition, constitute *Brady* material. This is demonstrated quite clearly by the fact that the government previously disclosed (without any claim of work product privilege) an internal memorandum on the viability of prosecuting the defendants under 18 U.S.C. § 1591 containing conclusions unfavorable to the defense, but now seeks to withhold memoranda that are clearly favorable to the defense.

[5] *See* Declaration of Reginald E. Jones in support of United States' Motion to Compel Destruction of Inadvertently Produced Documents, p. 6 ¶ 20, and Privilege Log attached as Exhibit I.

4

PICCARRETA DAVIS KEENAN FIDEL PC

> *Brady/Giglio* materials would also include documentation backing up these government memoranda, *i.e.* interviews, documents, investigative memoranda, and other documents and materials referred to, or contributing to, the memoranda.

In addition to these specific documents, I list below some general areas that implicate the government's obligations under *Brady* and *Giglio*, followed by additional enumerated areas.

2. High-ranking Department of Justice officials have informed Congress that similar activities involving the posting of third-party advertisements by the website Craigslist could not be prosecuted under federal criminal law. The DOJ's National Coordinator for Child Exploitation, Prevention, and Interdiction, Francie Hakes, testified that "I am not aware of any laws that would make them [criminally] liable [for third-party postings], unless there was evidence that Craigslist was a participant…conspiring with those who were misusing their site, that is, knowingly conspiring to violate laws….I am not aware of anything that shows us that Craigslist might be criminally liable…." Domestic Minor Sex Trafficking: Hearing Before Subcommittee on Crime, Terrorism, & Homeland Security of the House Committee on the Judiciary, 111th Cong. 215-16 (2010). Any similar materials in the government's possession also constitute *Brady* material and must be disclosed immediately.

3. Key legislators very recently admitted (a little over a month before the government obtained its initial indictment in this matter) that "current federal criminal law…lacks proper prosecutorial tools to combat these websites" and *"general knowledge that sex trafficking occurs on a website will not suffice as the knowledge element must be proven as to a specific victim."* House of Representatives Report 115-572 Part 1, p. 5, February 20, 2018 (emphasis added). Any similar information also constitutes *Brady* material that must be disclosed immediately.

In light of these examples, it is simply difficult for the defendants to fathom the government's claim that it would not know what *Brady/Giglio* materials "would look like." It is clear that *any* factual or legal matters that contradict the prosecution's theory of the case are, by definition, *Brady* materials that must be disclosed to the defendants. *See, e.g., Bies v. Sheldon*, 775 F.3d 386, 398-403 (6th Cir. 2014) (upholding the district court's finding of a *Brady* violation due to the state's suppression of "Evidence Undermining the State's Theory of the Case"); *Wolfe v. Clarke*, 819 F.Supp.2d 538, 558

PICCARRETA DAVIS KEENAN FIDEL PC

(E. D. Va. 2011) (vacating capital defendant's conviction after finding that the prosecution violated *Brady* by withholding investigation reports and interviews "undermining its theory of the case"). *See also United States v. Avellino*, 1995 WL 228352, *1 (E. D. N. Y. 1995) ("The government agreed to submit to the Court for determination any evidence which may contradict its theory of the case and about which it questions whether the evidence properly falls within the scope of *Brady* and/or *Giglio* and their progeny").

The defendants believe that these and similar materials are clearly *Brady/Giglio* materials that the government is legally, ethically, and constitutionally obligated to turn over to the defendants within 10 days, in accordance with the government's assurances to Judge Logan and the terms of his order. To be clear: we are not requesting that the government has to conduct searches or investigation other than what they have already done or will do in regards to prosecution of this matter. We do request, however, while conducting its normal investigation and pretrial preparation in accordance with its obligations under *Brady/Giglio* and the Justice Manual, that if this information is located, that it then be segregated and provided. None of us want this case to turn into another Ted Stevens fiasco.

Accordingly, and pursuant to the above authority, Mr. Padilla additionally requests the government to disclose the following additional information:[6]

4.    All communications to and from any federal, state, or local elected officials relating to the possible criminal prosecution of Backpage and its employees and officers. *Fitzgerald v. Peek*, 636 F.2d 943, 945 (5th Cir. 1981) (due process prohibits prosecution based on improper influence exerted on the prosecutor to seek the indictments).

5.    All communications to and from any civil plaintiff's lawyers or advocates for alleged sex trafficking victims and local, state, and federal law enforcement agents, officers, investigators, prosecutors, and other officials involved in any manner with the investigation or prosecution of the website Backpage.com ("Backpage"). *Fitzgerald v. Peek*, 636 F.2d 943, 945 (5th Cir. 1981) (due process prohibits prosecution based upon improper outside influences).

---

[6] Although "the duty to disclose such evidence is applicable even though there has been no request by the accused," *Strickler v. Greene*, 527 U.S. 263, 280 (1999), "[w]hen the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *United States v. Bagley*, 473 U.S. 667, 681 (1985).

6

PICCARRETA DAVIS KEENAN FIDEL PC

6.   All documents and commendations from law enforcement to Backpage relating to Backpage's cooperation in any criminal investigations.[7]

7.   All communications to and from local, state, and federal law enforcement agents, officers, investigators, prosecutors, and other officials involved in any matter with the investigation or prosecution relating to Backpage.

8.   All communications to and from Nanci Clarence, or any lawyers representing Mr. Ferrer or Backpage, that relate in any manner to plea negotiations or the plea agreement and all documents to or from the government and any other local, state, or federal law enforcement agents, officers, investigators, prosecutors, and other officials relative to Mr. Ferrer that relate to the plea negotiations or plea agreement and all writings subsequent to said plea agreement.

9.   All communications to and from K.C. Maxwell or any lawyers representing Mr. Hyer or Backpage that relate in any manner to plea negotiations or the plea agreement and all documents to or from the government and any other local, state, or federal law enforcement agents, officers, investigators, prosecutors, and other officials relative to Mr. Hyer that relate to the plea negotiations or plea agreement and all writings subsequent to said plea agreement.

10.  All documents to and from Backpage and the National Center for Missing and Exploited Children (NCMEC) relating to possible unlawful activity involving underage individuals.

11.  All documents sent by Backpage to law enforcement relating to cooperation with law enforcement efforts.

12.  All Department of Justice memoranda relating to the department's understanding of the applicable law governing Backpage during the relevant time periods.

I am also requesting specific *Brady/Giglio* material relating to government witnesses, including cooperating individuals and co-defendants:

13.  Any plea bargain, immunity agreement, explicit or implied agreement, or any other promises any witness has received or will receive from any federal, state or local authority in exchange for his or her testimony or cooperation in this case or in any other case.

---

[7] For reference, documents and communications include both tangible and electronic.

7

PICCARRETA DAVIS KEENAN FIDEL PC

14. Any information suggesting any bias, prejudice or motive that the witness may have for testifying falsely against the defendant. *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987); *United States v. Strifler*, 851 F.2d 1197 (9th Cir. 1988); *United States v. Abel*, 469 U.S. 45 (1984).

15. All promises, agreements, benefits, monies or anything of value whatsoever made to or provided to the witness, his/her family or friends by federal, state or local authorities in this matter or any other matter. *See United States v. Uramoto*, 638 F.2d 84, 86 (9th Cir. 1980); *United States v. Leja*, 568 F.2d 493 (6th Cir. 1977).

16. Any monies paid, or any other benefit provided, to any of the government's witnesses by the United States government or any other governmental agency that was in any way contingent upon the outcome of this or any other investigation as a result of information provided by any such witnesses. *United States v. Bagley*, 473 U.S. 667, 683 (1985).

17. All documents between the witness, or his/her representative and the government relating to the negotiations of the plea bargain agreement or where the witness has offered or proposed testimony. *Brown v. Dugger*, 831 F.2d 1547 (11th Cir. 1987) (evidence that witness sought plea bargain is to be disclosed even if no deal struck); *Haber v. Wainwright*, 756 F.2d 1520, 1524 (11th Cir. 1985).

18. Proffers and statements made by an accomplice witness in negotiating a cooperation agreement with the government, along with information revealing the negotiation process, including but not limited to any and all variations in the accomplice witness' statements. *United States v. Sudikoff*, 36 F.Supp.2d 1196 (C.D. Cal. 1999).

19. All documents, including the government's reports which indicate instances of illegal behavior of the witness or specific instances of misconduct which relate in any manner whatsoever to the witness' credibility. *See* Rule 608(b), Federal Rules of Evidence. This request includes any law enforcement reports relating to these instances. *See United States v. Ray*, 731 F.2d 1361 (9th Cir. 1984).

20. Any prior contrary statements made by the government witness. *Giles v. Maryland*, 386 U.S. 66 (1967); *Spicer v. Roxbury Correctional Institute*, 194 F.3d 547 (4th Cir. 1999).

21. The existence of any witnesses or witness statements favorable to the defendant. *United States v. Wilkins*, 326 F.2d 135 (2d Cir. 1964); *Jackson v. Wainwright*, 390 F.2d 288 (5th Cir. 1968).

PICCARRETA DAVIS KEENAN FIDEL PC

22.    Negative exculpatory statements, such as statements by informed witnesses that fail to implicate the defendants in any criminal activity. *See, e.g., United States v. Torres*, 719 F.2d 549, 555-56 (2d. Cir. 1983); *Jones v. Jago*, 575 F.2d 1164, 1168 (6th Cir. 1978); *Clemmons v. Delo*, 124 F.3d 944, 952 (8th Cir. 1997); *White v. Helling*, 194 F.3d 937, 944 (8th Cir. 1999).

23.    Any threats, express or implied, direct or indirect, or other coercion made or directed against the witnesses, including but not limited to, criminal prosecutions, investigations, other incidents which are pending or could be brought against the witnesses.

24.    The existence and notification of each occasion upon which the witnesses testified before a Court, grand jury, or other tribunal or made other statements so defendant can order transcripts for use in cross-examination or investigation. *See* Rules 801(d)(1) and 806, Federal Rules of Evidence. *See also Davis v. Heyd*, 479 F.2d 446 (5th Cir. 1973).

25.    Any grand jury statements of any witnesses which are favorable to the defendant. *United States v. Sink*, 56 F.R.D. 365 (E. D. Pa. 1972).

26.    The identity of any witnesses who testified before the grand jury and who will be unavailable to testify at trial. Arizona State Bar Ethics Opinion No. 94-07 (March 1994). *See* LRCiv 83.2(e), Rules of Practice of the United States District Court for the District of Arizona.

27.    Names and addresses of any witnesses to offenses charged in the indictment whom the government does not intend to call at trial. *United States v. Cadet*, 727 F.2d 1453, 1469 (9th Cir. 1984) (it is appropriate "to conclude from the fact that the government did not intend to call a witness to the crime that there was a reasonable possibility that such person would be able to provide evidence favorable to the defense").

28.    In regard to law enforcement agents in this case, counsel requests to know whether there have been any prior instances of untruthful statements by the agents or any complaints filed with their governmental employer at any time relating to any incidents which relate in any manner whatsoever to the agent's credibility. *See* Rule 608(b), Federal Rules of Evidence; *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991); *Milke v. Ryan*, 711 F.3d 998 (9th Cir. 2013).

29.    It is further requested that the prosecutor further personally review the personnel files for *Brady* material.

PICCARRETA DAVIS KEENAN FIDEL PC

30.   Any reports prepared by prosecution experts relating to the legality of the procedure used by government agents in the course of their investigation. *United States v. Gerena*, 116 F.R.D. 596 (D. Conn. 1987).

31.   Evidence that is inconsistent with the witness' testimony. *United States v. Fisher*, 106 F.3d 622, 634-35 (5th Cir. 1997); *Ballinger v. Kerby*, 3 F.3d 1371, 1375-76 (10th Cir. 1993); *Derden v. McNeel*, 938 F.2d 605, 617 (5th Cir. 1991).

I would request that a copy of this letter be sent to your case agent or agents so that each agency is aware of this request.

Sincerely,

Michael L. Piccarreta

JK:mh

cc:   Brian Benczkowski, brian.benczkowski@usdoj.gov
      Peter Kozinets, peter.kozinets@usdoj.gov
      John Kucera, John.Kucera@usdoj.gov
      Reginald Jones, reginald.jones4@usdoj.gov
      Margaret Perlmeter, margaret.perlmeter@usdoj.gov
      Andrew Stone, andrew.stone@usdoj.gov
      Tom Bienert, tbienert@bmkattorneys.com
      Paul Cambria, pcambria@lglaw.com
      Robert Corn-Revere, bobcornrevere@dwt.com
      Bruce Feder, bf@federlawpa.com
      James Grant, jimgrant@dwt.com
      Michael Kimerer, mdk@kimerer.com
      Stephen Weiss, sweiss@karpweiss.com

| | |
|---|---|
| **From:** | Ernie Allen |
| **Sent:** | Friday, July 19, 2013 2:49 PM |
| **To:** | 'Yeager, Joyce' |
| **Cc:** | 'Sheree Reece'; 'jonathan.bell@cor.org' |
| **Subject:** | RE: Kansas Contacts on Slavery and Human Trafficking |
| **Attachments:** | Talking Points.NAAG Letter on CDA July 24, 2013.docx; NAAG Letter on CDA.Sample Release July 24, 2013.docx |

Joyce:

Thank you for the introduction.

Sheree, Jonathan:

It is great to meet you, albeit via e-mail.  Let me provide a little background on what we are trying to accomplish.  As Joyce mentioned, I am trying to assist Missouri AG Chris Koster and his office through informing and mobilizing anti-trafficking NGOs and concerned organizations in connection with the release of a letter next week calling upon Congress to amend the Communications Decency Act (CDA).

I retired as President of the National Center for Missing & Exploited Children last November after 28 years.  I am continuing to serve as President of our International Centre.  For many years, I have focused on the movement of human trafficking from the streets to the Internet.  Five years ago, I worked closely with the AGs in the effort to address the sale of kids for sex on Craigslist, ultimately leading to the shut-down of their adult ads.

Two years ago I met with the owners of Backpage, the next largest site, in an effort to undertake a similar process.  After a tense exchange, one of their owners said to me, "we will do everything we can to keep kids off our site, but adult prostitution is none of your business."  I responded, "well, at least you know what business you are in."  Backpage is not going to do what Craigslist did.  In fact, in my multiple meetings with their owners, board members, legal counsel, etc., they make it very clear that they will not.  In fact, they just announced that they are taking Backpage global.  They also feel that they are bullet-proof, effectively having both civil and criminal immunity.  And there are many other sites in the same business.

Two years ago, I met with Attorney General Eric Holder on this.  The sites were blatant.  The young women in the ads were nude, there were graphic images of sex acts, and there was advertising and links to the so-called "John boards," like Erotic Review, which provide detailed reviews of the services provided by each young woman.  I asked how anyone could argue that the operators of these sites didn't know the purpose for which they were used.  The Attorney General sent some Criminal Division prosecutors over to meet with me, and I laid out my arguments.  They concluded that the mens rea standard (the legal standard that requires that an act be knowing and intentional) could not be overcome for a site like Backpage which by that time had eliminated nudity in the ads, eliminated pornographic images, stopped links to the John boards, and was making a good faith effort to screen, monitor and report.  However, they indicated that they agreed with my analysis regarding some of the smaller, sexually oriented, more blatant sites, and they agreed to investigate.  However, I was also told that they felt that state prosecutors could do this more easily than the federal government.

So, I began to speak to state AGs and District Attorneys.  I met with a lot of them.  What I found is that there are a number of prosecutors who are eager to bring these prosecutions and think they are a "slam dunk."  However, they feel that they are barred by the language of Section 230 of the Communications Decency Act, which effectively creates preemption for the federal government and precludes state prosecutions.   The latest estimate is that Backpage alone is

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000212

making $5 million per month on these ads, and have become the information infrastructure for the prostitution and child trafficking industry in this country, and increasingly the world.

There is not great enthusiasm in Congress for touching the CDA.  However, Joyce's boss, Chris Koster, the AG of Missouri, has drafted a letter, joined by the AGs of Washington and South Dakota, which proposes a narrow, surgical, two-word amendment, simply to make it clear that states are able to proceed criminally in these cases if the facts make it appropriate.  That letter is being circulated via NAAG to every state AG.  General Koster's staff asked if I would mobilize anti-trafficking NGOs to generate statements in support of the letter on the day it is released, July 24th.  I am trying to do that.

A number of the NGOs with whom I have spoken asked for talking points, and several even asked that I give them a sample release.  I have done that (attached).

I am very hopeful and encouraged about this effort.  The letter has already been joined by the Attorney General of Kansas, and more than 30 other AGs.  I hope you will do what you can to help us mobilize NGOs and the faith-based community to issue statements and releases in support of this important action.

Thanks,

Ernie

Ernie Allen
President & CEO
International Centre for Missing & Exploited Children
1700 Diagonal Road, Suite 625
Alexandria, VA 22314
(703)837-6305
Eallen@icmec.org


-----Original Message-----
From: Yeager, Joyce [mailto:Joyce.Yeager@ago.mo.gov]
Sent: Wednesday, July 17, 2013 1:11 PM
To: Ernie Allen
Cc: 'Sheree Reece'; 'jonathan.bell@cor.org'
Subject: RE: Kansas Contacts on Slavery and Human Trafficking

Ernie, I also hoped to put you in contact with Sheree Reece and Jonathan Bell at UMC Church of the Resurrection (COR). I am copying them on this message.  COR has multiple congregations in Kansas and Missouri.

Sheree and Jonathan, Ernie Allen is coordinating information flow among non-profits and the faith community pertaining to the potential amendment of the Communications Decency Act (CDA).  I spoke briefly with Sheree about the largest advertiser in this field, Backpage.  (Sheree, I also spoke with Debie Nixon about this.)  I thought of the involvement of COR and the UMC in the human trafficking arena and thought you might be interested in connecting to discuss the way in which these issues overlap with this potential amendment of the CDA.

Best personal regards to all.


Joyce Yeager
joyce.yeager@ago.mo.gov
573.751.6733

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*                    NCMEC 000213

Assistant Attorney General, Consumer Protection Division Missouri Attorney General's Office PO Box 899 Jefferson City, MO  65102

This email message, including the attachments, is from the Missouri Attorney General's Office. It is for the sole use of the intended recipient(s) and may contain confidential and privileged information, including that covered by § 32.057, RSMo.  Any unauthorized review, use, disclosure or distribution is prohibited.

If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.  Thank you.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

**NCMEC 000214**

**From:**      Ernie Allen
**To:**         Robert Allen
**Subject:**   RE: Backpage Meeting
**Date:**      Wednesday, March 02, 2011 2:34:00 PM

Robert:

The legal analysis will be sent to you by Stephen Hill.  Steve is an attorney with Husch & Blackwell in Kansas City.  He is the former US Attorney for the Western District of Missouri, and has been working as legal counsel on these issues for Harold Anderson of Anderson Publishing in Atlanta, whom I mentioned to you and General Abbott.  Steve is a great resource and has really delved into this issue for Mr. Anderson and me.  Finally, he joined Anderson and me for our recent meeting with Attorney General Holder.

I wanted to make sure that you recognized the name and knew that he is responding on my behalf.  Let me know how we can help.

Is General Abbott coming to the NAAG meeting next week?  I am speaking to the AGs Wednesday morning and have fifteen minutes to cover four or five different issues, of which this is one.  Of course, I will not mention our conversation.

Ernie

---

**From:** Robert Allen [mailto:robert.allen@oag.state.tx.us]
**Sent:** Wednesday, March 02, 2011 10:54 AM
**To:** Ernie Allen
**Subject:** Re: Backpage Meeting

Ernie,
Thank you for the update on the meeting.  I will keep my eyes out for the additional information we visited about.

Regards,
Robert

>>> Ernie Allen <EALLEN@ncmec.org> 3/1/2011 1:43 PM >>>
Robert:

First, thank you for the opportunity to speak with you and General Abbott Friday.  We are working on the analysis I promised you and will get it to you shortly.

Second, as I mentioned during our conversation, I met this morning with the Jim Larkin, the CEO; the Executive VP; and the co-owner and editor of Village Voice Media, as well as their pointman for Backpage.  I wanted to give you and General Abbott a brief report.

They did a presentation for me on all they have done, and the steps they are taking.  The CEO said that they are changing all of their ads to conform with a "print standard."  Their Backpage head said that they have implemented two levels of moderation and now have 90 people reviewing ads.  They said that their primary source of guidance and review on the ads is "user moderation," and that they are getting lots of reports from their users.  They said that they have banned nudity and hundreds of terms and are continually monitoring to keep illegal content from appearing.

I responded with several basic points:

(1) That we appreciated the steps they were taking, but they aren't working.  I mentioned Erotic Review, the site where you can get detailed reviews of the "services" provided by the young women in the ads.  I



**U.S. Department of Justice**

Federal Bureau of Investigation

---

In Reply, Please Refer to
File No. PX-9247052

21711 N. 7th Street
Phoenix, Arizona 85024

May 16, 2017

Yiota G. Souras
Senior Vice President
General Counsel
National Center for Missing & Exploited Children
699 Prince Street
Alexandria, Virginia 22314-3175
Email: ysouras@ncmec.org

Re:     Request for records and evidence relating to Backpage.com

Dear Ms. Souras,

     This written request for records and documents is being made in the lawful performance of my official duties as an investigator of the Federal Bureau of Investigation. As part of an ongoing criminal investigation into the activities of Backpage.com, it is requested that NCMEC provide the following:

     Notes and emails documenting communication NCMEC had with Backpage.com, documents prepared for meetings and discussions with Backpage.com, recommendations NCMEC made to Backpage.com, communications regarding discussions regarding Backpage.com, research packets NCMEC prepared documenting instances of child sex trafficking or missing and exploited children related to Backpage.com, documents and records provided to the Senate's Permanent Subcommittee on Investigations related to Backpage.com.

     The records can be provided in paper or electronic format. Please send the documents to the attention of Special Agent Desirae K. Tolhurst, FBI, Phoenix Division, telephone (623) 466-1481 or via email at the email address: desirae.tolhurst@ic.fbi.gov.

     Thank you for time and attention to this matter.

                              Sincerely,

                              Michael D. DeLeon
                              Special Agent in Charge

                              By:
                              Linda Engstrom
                              Supervisory Special Agent