Paul J. Cambria, Jr. (NY 15873, admitted *pro hac vice*)
Erin E. McCampbell (NY 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:   (716) 855-1580
pcambria@lglaw.com
emccampbell@lglaw.com
*Attorneys for Defendant Michael Lacey*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | NO. CR-18-00422-PHX-SMB |
| Plaintiff, | **DEFENDANTS' MOTION TO SUPPRESS** |
| vs. | |
| Michael Lacey, *et al.*, | (Oral argument requested) |
| Defendants. | |

Defendants Michael Lacey, James Larkin, John Brunst, Scott Spear, Andrew Padilla, and Joye Vaught, by and through their undersigned attorneys, move to suppress evidence obtained from search warrants served on email providers because those warrants were facially invalid under the Fourth Amendment.  This Motion is based on the attached Memorandum of Points and Authorities, the Court's file, and any evidence or argument presented at the hearing on this matter.

Excludable delay under 18 U.S.C. § 3161(h)(1) may occur as a result of this Motion or of an order based on this Motion.

DATED: October 18, 2019     Paul J. Cambria, Jr.
Erin E. McCampbell
LIPSITZ GREEN SCIME CAMBRIA LLP

By:    /s/ Paul J. Cambria, Jr.
Paul J. Cambria, Jr.
Attorneys for Michael Lacey

DATED: October 18, 2019     Thomas H. Bienert, Jr.
Whitney Z. Bernstein
BIENERT KATZMAN, PLC

By:    /s/ Whitney Z. Bernstein
Whitney Z. Bernstein
Attorneys for James Larkin

DATED: October 18, 2019     Bruce Feder
FEDER LAW OFFICE, P.A.

By:    /s/ Bruce Feder
Bruce Feder
Attorneys for Scott Spear

DATED: October 18, 2019     Gary S. Lincenberg
Ariel A. Neuman
Gopi K. Panchapakesan
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.

By:    /s/ Ariel A. Neuman
Ariel A. Neuman
Attorneys for John Brunst

2

DATED: October 18, 2019          David Eisenberg
                                 DAVID EISENBERG, P.L.C.

                                 By:     /s/ David Eisenberg
                                         David Eisenberg
                                         Attorneys for Andrew Padilla

DATED: October 18, 2019          Joy Bertrand
                                 JOY BERTRAND, ESQ.

                                 By:     /s/ Joy Bertrand
                                         Joy Bertrand
                                         Attorneys for Joye Vaught

## MEMORANDUM OF POINTS AND AUTHORITIES

Michael Lacey, James Larkin, John Brunst, Scott Spear, Andrew Padilla, and Joye Vaught move for an order suppressing evidence obtained from execution of warrants that authorized the government to seize and search certain email accounts.  The warrants at issue were facially invalid for several reasons as set forth below.

## BACKGROUND

The government has sought and obtained several warrants authorizing the government to seize and search information associated with email addresses, including email addresses for the Defendants, various former Backpage employees, and Carl Ferrer, the former Chief Executive Officer of Backpage.  Defendants had an expectation of privacy in their email, regardless of whether their email was the target of the warrant or seized due to the Defendants' communication with an email account that was the target of a warrant.

## I.       Ferrer-Google Warrant

On July 14, 2016, the government obtained a search warrant authorizing it to obtain all information associated with the email address carl.ferrer@backpage.com from the internet service provider ("ISP") Google, Inc. ("Ferrer-Google Warrant").[1]  (A true and correct copy of the Ferrer-Google Email Warrant is attached hereto as Ex. A.)  The Ferrer-Google Warrant ordered Google to disclose the contents of all email associated with the account, information regarding the identification of the account, records stored by the user such as address books, contact and buddy lists, calendar data, pictures, and files, and records related to communications between Google and any person concerning the account.  (*Id.* Attachment B.)  Once the government received the data from Google, the Ferrer-Google Warrant authorized the government to seize all information that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 1952 and 1956 involving Backpage, from October 2010 through the present, including any information related to Backpage matters, communications to, from, or

---

[1]      The Ferrer-Google Warrant was issued under Arizona Docket No. 16-305 MB.

concerning Backpage, and records concerning the creation and use of the email account.  (*Id*.)  The Ferrer-Google Warrant authorized Google to search and image the content, records, files, and communications associated with the email account and then once imaged, law enforcement searched for the data subject to seizure, copied it, and provided it to the prosecution team.  (*Id*.)  The prosecution team was prohibited from reviewing email to/from attorney Elizabeth McDougall (but not emails to/from the numerous other attorneys the government knew to represent Defendants, their entities, Ferrer, or Backpage).  (*Id*.)

The government's application for the Ferrer-Google Warrant included an affidavit from F.B.I. Special Agent Amy L. Fryberger.  (A true and correct copy of the Fryberger Affidavit for the Ferrer-Google Warrant is attached hereto as Ex. B.)  Fryberger stated that she had probable cause to believe that Backpage violated 18 U.S.C. §§ 1952 and 1956.  (*Id*. ¶ 3.)  She claimed that "most" of "the paid advertisements" were for prostitution, "most" of "the individuals advertising those services have no other legitimate source of income," and that "most" of "the money used to pay for those advertisements" was derived from illegal prostitution in violation of the Travel Act.[2]  (*Id*. ¶ 10.)  Further, she stated that there was probable cause to believe that "the ownership, management and other employees of Backpage know that much, if not most, of the money Backpage receives for such paid advertisements represents proceeds from illegal activities" in violation of the Money Laundering Statute.  (*Id*. ¶ 11.)

To establish Backpage's purported intent to violate 18 U.S.C. §§ 1952 and 1956, Fryberger referenced various proceedings, including:

---

[2]      The Fryberger Affidavit provided no information to allow the magistrate to assess whether Fryberger had any factual basis for the sweeping allegations she made about millions of ads posted to Backpage.com, the users who posted those ads, the activities engaged in by those users, or the financial circumstances of those uers.  Moreover, even if Fryberger had a factual basis to make those sweeping allegations, the Fryberger Affidavit makes no allegations that Defendants knew what Fryberger claims to have known about the millions of ads, the users who posted them, and the like.

- noting that it was "largely publicized" that law enforcement had successfully prosecuted pimps and others in connection with adult and child sex trafficking based on ads that had been posted to Backpage (*Id.* ¶¶ 32-36; 118-122);

- indicating that the Attorney General's Office for the State of California conducted an undercover investigation which involved posting ads to Backpage, and the investigator contacted Ferrer and Backpage's General Counsel about the ad that he had created for the site, which the investigator claimed was for prostitution (*Id.* ¶¶ 37-58);

- discussing the findings of the investigation and report of the United States Senate, Permanent Subcommittee on Investigations on Backpage ("PSI") (*Id.* ¶¶ 59-71); and

- discussing the allegations raised in civil lawsuits filed against Backpage (*Id.* ¶¶ 72-87).

To further her effort to establish Backpage's alleged intent to violate 18 U.S.C. §§ 1952 and 1956, Fryberger referenced three ads which she claimed "appear[ed] to be criminal on their face." (*Id.* ¶¶ 88-98.)  Additionally, she pointed to Backpage's moderation process as evidence of intent to violate the law.  (*Id.* ¶¶ 99-117.)

## II.    Warrant for CA AG's Data

On April 18, 2017, the government obtained a search warrant to search and seize information associated with various email accounts, including accounts for Defendants Michael Lacey, James Larkin, Joye Vaught, and Andrew Padilla, that was stored at the California Attorney General's Office ("Warrant for CA AG's Data").  (A true and correct copy of the Warrant for CA AG's Data is attached hereto as Ex. C.)[3]  Once the government received the data from the California Attorney General's Office, the Warrant for CA AG's Data authorized the government to seize all information that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 1952 and 1956 involving Backpage, from October 2010 through the present, including any information related to Backpage matters, communications to, from, or concerning Backpage, and records concerning the creation and use of the email account.  (*Id.* Attachment B.)  Once the government received the evidence, the Warrant for CA AG's Data authorized a Filter Team to review the documents and to disseminate only non-privileged and non-protected documents to the Investigation Team, which then would determine which

---

[3]    The Warrant for CA AG's Data was issued under Eastern District of California docket 17-SW-0275 AC.

documents constituted evidence of unlawful activity.  (*Id.*)  The Filter Team was authorized to review email to and from Backpage attorneys to determine whether or not a document was privileged or protected.  (*Id.*)

The government's application for the Warrant for CA AG's Data included an affidavit from Fryberger.  (A true and correct copy of the Fryberger Affidavit for the Warrant for CA AG's Data is attached hereto as Ex. D.)  Fryberger stated that she had probable cause to believe that Backpage violated 18 U.S.C. §§ 1952 and 1956.  (*Id.* ¶ 3.)  She claimed that "most" of "the paid advertisements," were for prostitution, "most" of "the individuals advertising those services have no other legitimate source of income," and that "most" of "the money used to pay for those advertisements" was derived from illegal prostitution in violation of the Travel Act.  (*Id.* ¶ 10.)

She stated that "there is probable cause that James Larkin and Michael Lacey are the true beneficial owners of Backpage," notwithstanding the sale of Backpage to its creator and long-time Chief Executive Officer, Ferrer.  (*Id.* ¶ 11.)  She stated that classified ad websites like Backpage "facilitate the commercial sex trade by providing an easily accessible forum that matches buyers of sex with the individuals providing sex acts for a fee."  (*Id.* ¶ 14.)  She noted that Backpage's adult entertainment section included sub-categories such as "adult jobs," "body rubs," "domination & fetish," "escorts," "male escorts," "phone & websites," "strippers/strip clubs," and "transsexual escorts."  (*Id.* ¶ 19.)

With respect to establishing Backpage's purported intent to violate 18 U.S.C. §§ 1952 and 1956, this affidavit largely tracked the affidavit that Fryberger submitted in connection with the Ferrer-Google Warrant.  She cited to prior prosecutions (*id.* ¶¶ 23-27), the California Attorney General's undercover investigation (*id.* ¶¶ 28-50), the allegations raised in civil lawsuits against Backpage (*id.* ¶¶ 51-66); the three isolated ads that appeared to be "criminal on their face" (*id.* ¶¶ 67-77); and the PSI (*id.* ¶¶ 78-105).

### III.     Arizona Email Warrant

As referenced on an FD-302 Form, on an unknown date, the government obtained a search warrant in this District to seize and search email addresses associated with Defendants Vaught and Padilla, as well as former Backpage employees.  (A true and correct copy of the FD-302 is attached hereto as Ex. E.)  Defendants have been unable to locate this warrant (and related application) within the discovery.  As a result, Defendants requested that the government provide a copy of the warrant (and related application) or the Bates Numbers of those documents, if they had been disclosed.  (A true and correct copy of Defendants' request is attached hereto as Ex. F.)  The government has not yet responded.

Because Defendants have been unable to review the Arizona Email Warrant (and related application), Defendants respectfully reserve the right to bring challenges to that warrant upon receipt and review of it.

### ARGUMENT

The Fourth Amendment mandates that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  To be valid, a reviewing court must find that the warrant meets four separate requirements:  (1) it must be based on probable cause; (2) supported by a sworn affidavit; (3) particularly describe the place to be searched; and (4) particularly describe the persons or things to be seized.  *See Groh v. Ramirez*, 540 U.S. 551, 557 (2004).  A failure to satisfy even one of these requirements renders a warrant facially invalid. *See id*.  In addition to these requirements, in *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court recognized that a search conducted pursuant to a warrant is invalid if the supporting affidavit contains material misstatements of fact or omissions.

Under these standards, the Ferrer-Google Warrant and Warrant for CA AG's Data are facially invalid.  First, the warrants fail the probable-cause requirement because the underlying affidavits contain no factual information that would enable the issuing magistrate to make a neutral and detached probable-cause determination.  Second, Defendants are entitled to a *Franks*

hearing because the Ferrer-Google Warrant and Warrant for CA AG's Data contain material omissions and misrepresentations.

**I.    The Ferrer-Google Warrant and Warrant for CA AG's Data violate the probable cause requirement.**

    **A.    The Fourth Amendment requires that an issuing judge independently assess facts before finding probable cause to search.**

      For a search warrant to be valid, it must describe the place to be searched and things to be seized with sufficient particularity and "be no broader than the probable cause on which it is based." *United States v. Weber*, 923 F.2d 1338, 1342 (9th Cir. 1990). A search warrant is supported by probable cause if the issuing judge finds that "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). A search is invalid where "the issuing judge lacked a substantial basis for concluding that probable cause existed." *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013) (quotations and alterations omitted). When an affiant's statements are "unsupported by underlying facts," a warrant lacks probable cause. *Id.*; *accord Gates*, 462 U.S. at 239 (noting that "wholly conclusory" statements of officers are insufficient to establish probable cause); *United States v. Cervantes*, 703 F.3d 1135, 1139 (9th Cir. 2012) (recognizing that a "conclusory allegation, without any foundational facts . . . [is] entitled to little weight"). If an affidavit fails to provide foundational facts, an issuing judge cannot fulfill his or her duty to complete an independent review of the warrant *See United States v. Leon*, 468 U.S. 897, 914 (1984) (explaining that the lack of neutral and detached review makes a reviewing judge "merely a rubber stamp for the police."); *United States v. Ventresca*, 380 U.S. 102, 108-09 (1965) (recognizing that magistrate must be provided foundational facts "to perform his detached function and not serve merely as a rubber stamp for the police").

      The basis for probable cause must be contained within the application without reference to outside information. *United States v. Rubio*, 727 F.2d 786, 795 (9th Cir. 1984)

("The facts upon which the magistrate bases his probable cause determination must appear within the four corners of the warrant affidavit; the warrant cannot be supported by outside information."). The "Fourth Amendment requires that warrants may issue only upon a determination of probable cause by *a neutral and detached magistrate*." *Id*. at 794-95. Thus, the purported factual findings of a law enforcement agency, legislature, or civil litigant cannot serve as a proxy for a probable cause determination by a magistrate issuing a warrant. *See Gates*, 462 U.S. at 238; *see also Rubio*, 727 F.2d at 795 ("[W]arrant affidavit's mere recitation of the indictment is precisely that—the conclusion of another body, and a body whose function differs substantially from the magistrate's constitutional duty to assess probable cause."). If the government contends that the magistrate should consider evidence presented during an unrelated proceeding or investigation, the government must present that evidence in its warrant application. *Cf. Rubio*, 727 F.2d at 795

**B.      The Ferrer-Google Warrant and Warrant for CA AG's Data were not supported by probable cause so the magistrate erred in approving them.**

The magistrate lacked a substantial basis to find probable cause because the affidavits underlying the warrants provided no facts supporting the crimes allegedly committed by the Defendants. Rather than outlining facts known to the affiant as is required, the affidavits summarize findings from "largely publicized" prosecutions, the findings of an investigation conducted by another law enforcement office, the investigation and purported findings of a legislative body, and even the pre-trial allegations of civil litigants. *See Rubio*, 727 F.2d at 795 (reversing convictions because search warrant affidavit that referred to the indictment "furnished no basis whatsoever for believing the defendants" had engaged in a pattern of racketeering); *United States v. Bailey*, 327 F. Supp. 802, 806 (N.D. Ill. 1979) (denying order to compel defendants to provide government with handwriting exemplars because government failed to establish probable cause and recognizing that "the finding of probable cause for arrest of an individual that accrues from his being indicted does not . . . become the

equivalent of a finding of probable cause for a warrant to search that person's home, his car, or his business office").

Additionally, the search warrant applications do not include any facts establishing that the owners, managers, or employees of Backpage had the heightened scienter required to establish probable cause that they engaged in any Travel Act (or money laundering) violations. (*See* Defs.' Mot. to Dismiss, Doc. 561 at 37-48 and Brunst's Mot. To Dismiss, Doc. 746 at 9-11 (incorporated herein by reference and explaining why the indictment is facially insufficient because it fails to provide any allegations on the requisite scienter for the charged crimes).)  Because the warrant applications contain conclusory statements about generalized intent rather than *facts* establishing specific knowledge and intent to engage in unlawful activity, the search warrants are facially invalid.  *See United States v. Weber*, 923 F.2d 1338, 1345-46 (9th Cir. 1990) (reversing conviction and ruling that suppression was warranted where affidavit in support contained only generalized conclusions about the behavior of child pornographers rather than particular evidence suggesting that the defendant was a child pornographer); *Underwood*, 725 F.3d at 1082-84 (affirming suppression where affidavit contained only expert opinion and conclusory statements that defendant trafficked ecstasy); *Cervantes*, 703 F.3d at 1139-40 (reversing denial of suppression due to affiant's failure to offer facts establishing probable cause to believe that defendant's home was a "narcotics stash location").

Finally, the affidavits are void of any facts that establish probable cause to believe that Defendants knowingly and intentionally promoted/facilitated a "business enterprise" involving prostitution.  (*See* John Brunst's Motion to Dismiss Indictment Based on Failure to Allege Necessary Elements of the Travel Act, Doc. 746 (incorporated herein by reference).)  Critically, the government must provide facts to the issuing magistrate indicating that the targets of the warrants knowingly and intentionally engaged in "unlawful activity."  18 U.S.C. § 1952(a)(3).  The plain text of the Travel Act defines "unlawful activity" as "any business enterprise involving . . . prostitution offenses."  18 U.S.C. § 1952(b).  The affidavits contain

no facts concerning a specific criminal "business enterprise" or that the targets of the warrants knowingly and specifically intended to facilitate or promote a particular "business enterprise." As a result, the issuing magistrate erred in authorizing the warrants.

### III. Defendants are entitled to a *Franks* hearing because the Ferrer-Google Warrant and Warrant for CA AG's Data contain material misstatements and omissions.

Because the affidavits omitted significant information material to the issuing magistrate's probable-cause determination, Defendants are entitled to a hearing on the validity of the affidavits under *Franks v. Delaware*, 438 U.S. 154 (1978). In *Franks v. Delaware*, the Supreme Court held that a defendant is entitled to an evidentiary hearing where there is evidence that a search conducted pursuant to a warrant was based on a supporting affidavit that contains intentional or reckless material misstatements of fact or omissions. *See Franks*, 438 U.S. at 171-72.

Since *Franks*, the Ninth Circuit held that a defendant is entitled to an evidentiary hearing to challenge the veracity of an affidavit when the defendant preliminarily demonstrates that an affidavit contains "intentionally or recklessly false statements" and that without those falsities the government cannot support a probable cause finding sufficient to issue a search warrant. *United States v. Stanert*, 762 F.2d 775, 780 (9th Cir. 1985) (quotations omitted). Clear proof of deliberate or reckless falsity is not required. *See United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1111 (9th Cir. 2005). Instead, to trigger a hearing, a defendant must offer evidence supporting "a finding of intent or recklessness". *Id.* Once a defendant makes that preliminary showing, the district court "must hold a hearing to determine if any false statements deliberately or recklessly included in the affidavit were material to the magistrate's finding of probable cause." *United States v. Johns*, 851 F.2d 1131, 1133 (9th Cir. 1988).

Half-truths like those in the affidavits offered in support of the Ferrer-Google Warrant and Warrant for CA AG's Data improperly allow a search warrant affiant to "manipulate the inferences a magistrate will draw." *Stanert*, 762 F.2d at 781; *see also Chism v. Washington*

12

*State*, 661 F.3d 380, 388 (9th Cir. 2011) (recognizing that an officer acts recklessly when the affidavit does not report important factual information that was within the officer's knowledge at the time the affidavit was prepared).  When an omission is essential to the finding of probable cause, recklessness may be inferred from the omission itself.  *See Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1994). A defendant is entitled to a *Franks* hearing even if the misstatements or omissions are not the affiant's fault.  *See United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir. 1992); *accord Johns*, 851 F.2d at 1134 n.1.

If a defendant prevails on a *Franks* challenge, the evidence seized must be suppressed without application of the "good faith" rule.  *See United States v. Leon*, 468 U.S. 897, 922 (1984); *accord United States v. DeLeon*, 979 F.2d 761, 763 (9th Cir. 1992).

Here, Defendants are entitled to a *Franks* hearing challenging the veracity of the affidavits underlying both the Ferrer-Google Warrant and Warrant for CA AG's Data because they contain material misrepresentations and omissions.  The most serious omission is that the affidavits ignore cases holding that the First Amendment protects online classified advertising sites generally, and Backpage in particular.  This omission is critical because ***all*** allegations of unlawful conduct hinge on claims that advertisements posted to Backpage violated state prostitution laws.  If publishing third-party advertisements for purported illegal activities is not  unlawful (without more), there is no predicate for the affiant's claims that publishing third-party adult ads violated the Travel Act or that resulting financial transactions violated federal money laundering laws.

At the time the affidavit for the Warrant for the CA AG's Data was written, the government knew that courts in California had rejected the specific theory on which all of the allegations in the affidavits are based; that is, that publishing classified ads for adult services violates state law prohibiting prostitution.[4]  *See People v. Ferrer*, 2016 WL 7237305, at *3

---

[4]    Indeed, the government has stated that it "partner[ed]" with the California Attorney General's Office in their efforts to shut down Backpage.  *See* April 9, 2018 DOJ Press

(Sup. Ct. Sacramento Cnty. Dec. 9, 2016) ("*Ferrer I*") (recognizing that "the relevant question in this case is whether, and to what extent, Defendants' activities entitle them to protection *of their First Amendment rights* through the immunity provision of the CDA" (emphasis added)).

The affidavits disingenuously claim that Defendants' mere publishing of the ads establish probable cause that Backpage facilitated prostitution in violation of state law. (*See* Ex. B; D.)  However, the government knows that publishing and editing third-party ads is protected under the First Amendment.  Indeed, moderation falls under "traditional editorial functions," and constitutes protected speech, even when terms or images are deleted and the remaining portion of an advertisement is published.  *See Ferrer I*, 2016 WL 7237305, at *3.

The search warrant affidavits also intentionally fail to disclose that numerous courts have rejected claims that adult advertisements are synonymous with prostitution or trafficking.  *See Backpage.com, LLC v. Dart*, 807 F.3d 229, 234 (7th Cir. 2015) ("[N]ot all advertisements for sex are advertisements for illegal sex.").[5]  The government's suppression

---

Release, available at https://www.justice.gov/opa/pr/justice-department-leads-effort-seize-backpagecom-internet-s-leading-forum-prostitution-ads (last visited on Oct. 9, 2019).

[5]    *Accord Doe v. Backpage.com LLC*, 104 F Supp. 3d 149, 156-57 (D. Mass. 2015), *aff'd*, 817 F.3d 12 (1st Cir. 2016) ("The existence of an escorts section in a classified ad service, whatever its social merits, is not illegal."); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 1262, 1282 (W.D. Wash. 2012) (escort ads have long been permitted and escort services are licensed and regulated in many states); *Backpage. com, LLC v.Cooper*, 939 F. Supp. 805, 816, 833-34 (D. Tenn. 2013) (ads on Backpage.com are protected speech under the First Amendment); *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at *9-11 (D.N.J. 2013) (rejecting argument that escort ads on the website are unprotected speech); *M.A. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1049-50 (E.D. Mo. 2011); *see also Dart v. Craigslist*, Inc., 665 F. Supp. 2d 961, 968 (N.D. Ill. 2009) ("We disagree . . . that the 'adult services' section is a special case.  The phrase 'adult,' even in conjunction with 'services,' is not unlawful in itself nor does it necessarily call for unlawful content."); *Cohen v. Bd. of Supervisors*, 707 P.2d 840, 852 (Cal. 1985) ("An escort service may very well involve lawful activities relating to sex." (internal quotations omitted)).

of this information, which should have been weighed by the judge considering probable cause for the warrants, renders the warrants materially misleading.  Indeed, the government knew and should have advised the issuing magistrate that, when the government seeks to hold a party accountable for third-party speech, the First Amendment constrains the government and imposes heightened scienter requirements separate from those in any applicable statutes.

Similarly, the affidavits allege that Defendants, Ferrer, and former Backpage employees knowingly facilitated prostitution.  (*See* Ex. B; E.)  This assertion ignores the long line of cases requiring a heightened proof of scienter when the government seeks to hold a publisher liable for publishing the speech of a third party as well as cases indicating that a heightened proof of scienter is required for Travel Act violations.  (*See* Defs.' Mot. to Dismiss, Doc. 561; Brunst's Mot. To Dismiss, Doc. 746 at 9-11.)  These omissions, too, are materially misleading.

Due to the government's material misstatements and omissions in materials supporting its request for the search warrants, Defendants are entitled to a *Franks* hearing.  This hearing will establish the veracity of the affidavits underlying the Ferrer-Google Warrant and the Warrant for the CA AG's Data and show that the government's material omissions would have undermined the magistrate's probable-cause finding.  *See United States v. Perkins*, 583 F. App'x 796, 797 (9th Cir. 2014) (vacating conviction and remanding for *Franks* hearing where affidavit to search home for child pornography omitted information that Canadian officials had indicated that the images "had no obvious sexual purpose" and failed to provide that magistrate with the images).

**CONCLUSION**

For all these reasons, this Court should:  (1) suppress the evidence obtained from execution of the Ferrer-Google Warrant and Warrant for the CA AG's Data and any evidence derived from them; and, to the extent required, (2) hold a *Franks* hearing for Defendants to

demonstrate that the Ferrer-Google Warrant and Warrant for the CA AG's Data contain material misstatements and omissions in violation of the Fourth Amendment.

RESPECTFULLY SUBMITTED this 18th day of October, 2019,

/s/    *Paul J. Cambria, Jr.*
Paul J. Cambria, Jr.
Erin E. McCampbell
LIPSITZ GREEN SCIME CAMBRIA LLP
Attorneys for Defendant Michael Lacey

On October 18, 2019, a PDF version
of this document was filed with
Clerk of the Court using the CM/ECF
System for filing and for Transmittal
Of a Notice of Electronic Filing to the
Following CM/ECF registrants:

Kevin Rapp, kevin.rapp@usdoj.gov
Reginald Jones, reginald.jones4@usdoj.gov
Peter Kozinets, peter.kozinets@usdoj.gov
John Kucera, john.kucera@usdoj.gov
Margaret Perlmeter, margaret.perlmeter@usdoj.gov
Patrick Reid, Patrick.Reid@usdoj.gov
Andrew Stone, andrew.stone@usdoj.gov
Amanda Wick, Amanda.Wick@usdoj.gov

EXHIBIT A

# UNITED STATES DISTRICT COURT

for the
District of Arizona

| In the Matter of the Search of | |
|---|---|
| Information associated with the email address listed in Attachment A: carl.ferrer@backpage.com | Case No. 16-305 MB |

## APPLICATION AND AFFIDAVIT FOR A SEARCH AND SEIZURE WARRANT

I, Amy L. Fryberger, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**As further described in Attachment A.**

Located in the _____ Northern _____ District of _ California _, there is now concealed (*identify the person or describe the property to be seized*):

The person or property to be searched, described above, is believed to conceal (identify the person or describe the property to be seized):

**As set forth in Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 18:1952(a) & (b) | Interstate and Foreign or Transportation in Aid of Racketeering Enterprise |
| 18:1956(a)(1)(A)(i) & (h) | Promotional Money Laundering; Conspiracy to Commit Money Laundering |

The application is based on these facts:

**The Affidavit of FBI Special Agent Amy L. Fryberger is incorporated herein by reference.**

☒ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____
_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached

sheet.

Reviewed by AUSA  Kevin M. Rapp
                AUSA Christine D. Keller
                AUSA Robert I.  Brooks

*Applicant's Signature*

    Amy L. Fryberger, FBI Special Agent
    *Applicant's printed name and title*

Date and time issued:  July 15 2014

*Judge's signature*

City and State:  Phoenix, Arizona

Honorable Michelle H. Burns
U.S. Magistrate Judge
        *Printed name and title*

**ATTACHMENT A**
**DESCRIPTION OF LOCATION TO BE SEARCHED**

This warrant applies to information associated with the following Google Mail account ending in @backpage.com: carl.ferrer@backpage.com, which is stored at premises owned, maintained, controlled, or operated by Google, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043, for the time period of October, 2010 to the present.

## ATTACHMENT B

### Particular Things to be Seized and Search Procedure

### I.     Information to be disclosed by Google, Inc.

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, Inc. ("Google"), Google is required to disclose the following information to the government the account or identifier listed in Attachment A:

a.     The contents of all e-mails stored in the account, including copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.     All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

1

d.    All records pertaining to communications between Google and any person regarding the account, including contacts with support services and records of actions taken.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code (U.S.C.) §§ 1952(a) (Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises);1956(a)(1)(A)(i) (Promotional Money Laundering); and 1956(h) (Conspiracy to Commit Promotional Money Laundering) involving Backpage.com, including, for each account or identifier listed on Attachment A, information pertaining to the following matters from October, 2010 to the present:

a.    Any information related to Backpage.com matters.

b.    Any communications to, from, or concerning Backpage.com;

c.    Records relating to who created or used the account or identifiers, including records about their identities and whereabouts.

## III.    Search Procedure

a.    In order to ensure that agents search only those computer accounts and/or files described in Attachment A, only employees of Google will conduct the initial search authorized by this warrant. This search will be conducted without the presence of a law enforcement officer. To further ensure that only those computer

2

accounts and/or files described in Attachment A are obtained pursuant to this warrant, the following procedures will be implemented:

i.      It is requested this Court authorize the search warrant be sent by facsimile or email to Google personnel who will be directed to isolate the account and files described in Attachment A. Google personnel are familiar with this procedure, as it is a normal practice for them to receive and "execute" search warrants in this manner. Since this warrant seeks to include the content of an email account, the actual search will be conducted by Google personnel only. Title 18, United States Code, Section 2703(g) expressly permits the service and execution of a search warrant without the presence of the law enforcement officer;

ii.     In order to minimize any disruption of computer service to innocent third parties, Google employees trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Attachment A, including an exact duplicate of all information stored in the computer accounts and fields described in Attachment A. Google employees will not use any independent discretion and will comply with the express terms of the search warrant;

iii.    Google employees will provide the duplicate in electronic form of the account and files described in Attachment A and all information stored in those accounts and files to the agent who serves this search warrant;

iv.     Upon receipt of such information from Google, law enforcement personnel **not involved in this investigation** will thereafter review the information and identify and copy the information contained in those accounts and files which

3

are authorized to be further seized and copied in Section II above.  The personnel conducting this review will not seize and copy any emails to/from attorney Elizabeth McDougall, formerly of Perkins Coie LLP (.com) and now attorney for Brentwood, Inc. f/k/a Village Voice Media Holdings. She has and is currently acting as counsel to Backpage and such emails therefore may contain privileged information.

EXHIBIT B

## AFFIDAVIT IN SUPPORT OF PROBABLE CAUSE

1.      I, Amy L. Fryberger, a Special Agent with the Federal Bureau of Investigation, being duly sworn, depose and state as follows: I am currently assigned to the FBI's Phoenix, Arizona Field Office.  I have been employed by the FBI as a Special Agent for eight and half years.  As part of my responsibilities, I am charged with investigating violations of statutes applying to human trafficking.  I have collaborated with other squads that specialize in money laundering investigations as well as the Internal Revenue Service. Prior to working human trafficking cases, I was assigned to work national security, gang, and drug investigations.

2.      I make this affidavit in support of an application for a search warrant for content and records associated with www.Backpage.com ("Backpage") email account described in Attachment A, which is stored at premises owned, maintained, controlled, or operated by Google Inc., an e-mail provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.  The information and account to be searched are described in the following paragraphs and in Attachments A and B.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the account referenced in this affidavit and further in Attachment A, including the contents of the communications.

1

3.      I have probable cause to believe that evidence of violations of 18 U.S.C. §
§1952(a), 1956(a)(1)(A)(i) and 1956(h), is located in and within the aforementioned
Backpage email account showing that Backpage intentionally promotes and profits from
prostitution activity through its operation and management of the online "Escort" section,
which is routinely tied to sex trafficking and other prostitution activity throughout the
United States. I have reason to believe that the account that is the subject of the instant
application will have stored information and communications that are relevant to this
investigation.  Thus, as outlined below, and based on my training and experience, there is
probable  cause  to  believe  that  evidence,  fruits  and/or  instrumentalities  of  the
aforementioned crimes are located in the account.

4.      I am familiar with the information contained in this Affidavit based upon the
investigation I have conducted, along with my conversations with law enforcement officers
and others and review of reports, grand jury transcripts, agent notes, and database records,
along with other public documents. This Affidavit is submitted for the limited purpose of
securing a search and seizure warrant.  It does not include each and every fact known to
me or the government about the investigation. I have set forth only those facts that I believe
are necessary to establish probable cause.

## STATUTORY AUTHORITY

5.      The "Travel Act," pursuant to 18 U.S.C. § 1952(a), prohibits the use of the
mail or any facility in interstate or foreign commerce with the intent to otherwise promote,
manage, establish, carry on, or facilitate the promotion, management, establishment or

2

carrying on of any unlawful activity, and thereafter performs or attempts to perform such unlawful activity.

6.    "Unlawful activity," as defined in 18 U.S.C. § 1952(b), includes prostitution offenses in violation of the laws of the State in which they are committed or of the United States.

7.    Sex trafficking of juveniles, or any person by means of force, fraud or coercion, is a violation of 18 U.S. C. § 1591. Additionally, prostitution is illegal in the State of Arizona. (*See e.g.*, A.R.S. §§ 13-3201-13-3214).

8.    18 U.S.C. §1956(h) prohibits a conspiracy to commit money laundering and the prosecution is obliged to establish that: (1) an agreement to commit money laundering existed between one or more persons; (2) the defendant knew that the money laundering proceeds had been derived from an illegal activity; and (3) the defendant knowingly and voluntarily became part of the conspiracy.

9.    18 U.S.C. § 1956(a)(1)(A)(i) prohibits what the case law calls "Promotional Money Laundering."  Specifically, 1956(a) prohibits the following: (a)(1) "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity – (A)(i) with the intent to promote the carrying on of specified unlawful activity." "Financial transaction" is defined under 18 U.S.C. 1956(a)(1) as follows: "a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of

a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement."

10.     The investigation shows that many, if not most, of the paid advertisements on the Backpage website are for prostitution activities in violation of 18 U.S.C. § 1952. Furthermore, the investigation indicates that many, if not most, of the individuals advertising those services have no other legitimate source of income, and, accordingly, that much, if not most, of the money used to pay for those advertisements is derived from illegal prostitution activity in violation of 18 U.S.C. § 1952, which is a Specified Unlawful Activity.

11.     The investigation also shows there is probable cause that the ownership, management and other employees of Backpage know that much, if not most, of the money Backpage receives for such paid advertisements represents proceeds from illegal activities. Similarly, the investigation shows that the monies paid for the advertisements are used to facilitate illegal prostitution, as well as to perpetuate Backpage's business by, among other things, paying moderation employees to sanitize the submission of advertisements, maintaining the servers used to promote Backpage's Adult internet site, paying managers and other employees, maintaining a headquarters, and paying the owners of the website. In sum, as detailed below, there is probable cause that the ownership, managers and employees of Backpage are engaging in promotional money laundering and a conspiracy to commit promotional money laundering.

4

### TECHNICAL INFORMATION REGARDING GOOGLE

12.     In my training and experience, I have learned that Google provides a variety of on-line services, including electronic mail ("e-mail") access, to the general public. Google allows subscribers to obtain e-mail accounts at the domain name "gmail.com," like the email account listed in Attachment A.  Subscribers obtain an account by registering with Google.  During the registration process, Google asks subscribers to provide basic personal information.  Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and un-retrieved e-mail for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, e-mail transaction information, and account application information.

13.     In general, an e-mail that is sent to a Google subscriber is stored in the subscriber's "in-box" on Google servers until the subscriber deletes the e-mail.  If the subscriber does not delete the message, the message can remain on Google servers indefinitely.  The user can move and store messages in personal folders such as a "sent folder."  In recent years, Google and other ISPs have provided their users with larger storage capabilities associated with the user's email account.  Google and other ISPs have allowed users to store up to ten (10) gigabytes of information associated with the account on ISP servers.  Based on conversations with other law enforcement officers with experience in executing and reviewing search warrants of email accounts, I have learned that search warrants for email accounts and computer systems have revealed stored emails sent and/or received many years prior to the date of the search.

5

14.     When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to Google's servers, and then transmitted to its end destination. Google often saves a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the Google server, the e-mail can remain on the system indefinitely.

15.     A sent or received e-mail typically includes the content of the message, source and destination addresses, the date and time at which the e-mail was sent, and the size and length of the e-mail. If an e-mail user writes a draft message but does not send it, that message may also be saved by Google but may not include all of these categories of data.

16.     A Google subscriber can also store files, including e-mails, address books, contact or buddy lists, calendar data, pictures, and other files on servers maintained and/or owned by Google. Subscribers to Google might not store on their home computers copies of the e-mails stored in the Google account. This is particularly true when they access their Google account through the web, or if they do not wish to maintain particular e-mails or files in their residence.

17.     In general, e-mail providers like Google ask each of their subscribers to provide certain personal identifying information when registering for an e-mail account. This information could include the subscriber's full name, physical address, telephone numbers and other identifiers, such as alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

18.     E-mail providers typically retain certain transaction information about the creation and use of each account on their systems. This information can include the date

6

on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website), and other log files that reflect usage of the account.  In addition, e-mail providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

19.     In some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  E-mail providers typically retain records about such communications, including records of contacts between the user and the providers support services, as well as records of any actions taken by the provider or user as a result of the communications.

20.     In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

21.     In my training and experience, company employees use company email accounts to routinely communicate about the company business, i.e., the operation, management, finances, reports, and daily activities that occur within the company.

7

## PROSTITUTION AND THE INTERNET

22.     Based on my training and experience, your Affiant knows the internet has transformed the commercial sex trade.

23.     Prior to the rise of the internet, commercial sex took place on the streets, at casinos, truck stops, and other physical locations.

24.     With the internet, individuals involved in advertising commercial sex now post advertisements online on various websites, including classified ad websites. Such online sites facilitate the commercial sex trade by providing an easily accessible forum that matches buyers of sex with the individuals providing sex acts for a fee. The individuals providing sex acts for a fee include minor and adult victims of sex trafficking and adult individuals voluntarily engaging in prostitution.

## UNDERLYING INVESTIGATION INTO BACKPAGE.COM

25.     Backpage is a company that provides online classified advertising at the website www.Backpage.com. Backpage can be accessed throughout the United States and in foreign countries. It was created around 2004.

26.     Backpage has offices and employees in Phoenix, Arizona, and Texas. Carl Ferrer is the creator and CEO of Backpage, and remains active within Backpage to this day.

27.     Beginning in 2004, Backpage was owned by a parent company called New Times Media ("NTM"), later called Village Voice Media ("VVM"). In September 2012, Michael Lacey and Jim Larken decided to sell other holdings within VVM and retain

8

ownership of Backpage. Around December 2014, Lacey and Larkin sold Backpage to a Dutch company called Atlantische Bedrijven CV.

28.     Backpage allows users to post classified ads under numerous categories including, inter alia, automotive, buy/sell/trade, jobs, real estate for sale, rentals, and adult entertainment. The ads are categorized by location, allowing a user to decide the city and country to post ads in or to browse. Numerous cities throughout the United States are provided, along with cities in foreign countries.

29.     The adult entertainment section is broken up into different categories, including "adult jobs," "body rubs," "domination & fetish," "escorts," "male escorts," "phone & websites," "strippers/strip clubs," and "transsexual escorts."

30.     Backpage had an adult section offering "services" and "body rubs" starting in 2004. Backpage had an "escorts" section starting as early as 2006.

31.     Beginning in 2010, Backpage began making large profits per year for ads posted in the Escorts section of the site after its competitor Craigslist shut down its own adult services section. Craigslist was an online classified ad site similar to Backpage. Craigslist faced public pressure from numerous state attorney generals to shut down its adult services section because it was commonly linked to sex trafficking and prostitution. Once Craigslist shut down its adult services section, Backpage began to see a spike in the escort ads posted on its site, along with a spike in profits. In 2011 alone, Backpage began making more than $30 million a year.

## LAW ENFORCEMENT INVESTIGATIONS INVOLVING SEX TRAFFICKING AND PROSTITUTION

32.     Ads posted within the escort section of Backpage are routinely tied to sex trafficking and prostitution crimes.  For the past seven years, law enforcement at the local, state, and federal level have repeatedly investigated and charged pimps and other individuals in connection with adult and child sex trafficking on Backpage.  Within the FBI Phoenix filed office alone, numerous defendants have been charged and convicted of sex trafficking and other prostitution offenses involving Backpage.

33.     The charging and prosecution of pimps and other traffickers who utilize Backpage are largely publicized.  A review of the FBI's website alone reveals over 200 press releases specifically mentioning Backpage in connection with individuals charged and/or convicted of sex trafficking and other prostitution related offenses.

34.     Over the past several years, law enforcement has been involved in operations targeting the customers of commercial sex on Backpage ("Johns").   Law enforcement has posted numerous undercover ads in the escort section as thinly veiled advertisements for prostitution.  Hundreds of Johns have been arrested in the process.

35.     Operations targeting Johns on Backpage have also been widely publicized. For example, in "Operation Flush the Johns," law enforcement in Nassau County posted undercover prostitution advertisements on Backpage from April 18 to May 24, 2013. The ads included a fictitious woman known as "Amber," age "27," in scantily clad photographs claiming to be "the girl next door," who is "420 friendly" (slang for marijuana use), and "very open minded." After reviewing the ads, the customers arranged to meet the fictitious

10

individuals advertised. Each meeting was captured on hidden cameras where Johns agreed to pay undercover female agents between $50 and $100 for sex acts. As a result of the operation, 104 Johns were arrested. (*See* http://www.nydailynews.com/new-york/104-johns-nabbed-nassau-county-pay-sex-article-1.1361717).

36.     A similar operation was conducted throughout the country in 2014 in an operation dubbed "National Day of Johns Arrests." Undercover escort ads were posted on sites including Backpage, resulting in the arrests of 496 Johns. The operation involved law enforcement in Arizona, Colorado, Illinois, Massachusetts, Minnesota, Nevada, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, Texas, Virginia, and Washington. (*See*   http://www.cookcountysheriff.com/press_page/press_   NationalSex   Traffickng Sting2014_08_06_2014.html).

### CALIFORNIA DEPARTMENT OF JUSTICE UNDERCOVER INVESTIGATION INTO BACKPAGE.COM

37.     Your Affiant is aware of an undercover operation conducted in California targeting Backpage's facilitation of prostitution by posting ads. In March 2015, California Department of Justice Special Agent Tera Mackey and SA Brian Fichtner began an undercover investigation into Backpage.com. SA Tera Mackey was assigned to the California DOJ Sexual Predator Apprehension Team in 2001. The California DOJ is a state criminal investigative agency. Her duties included the investigation of the sexual exploitation of children, which often involves the use of the internet. As of April 2013, SA Mackey was assigned to the California DOJ eCrime Unit, where she engages in investigative work for crimes committed on the internet. SA Brian Fichtner has been a

member of the eCrime unit and has received extensive training on computer related crimes since 2012. Prior to being assigned to the eCrime unit, he was with the Bureau of Narcotic Enforcement for twelve years.

38.     On March 6, 2015, SA Fichtner posted two fictitious undercover ads in the Sacramento region of Backpage. One ad offered adult companionship for money in the Escort Section and the other ads listed a sofa for sale in the "Buy, Sell, Trade" section. In both ads, SA Fichtner used the same account information – a state funded credit card to pay Backpage.com to post the ad, an undercover cell phone number, and the email address katiecatt19@gmail.com.

39.     To post the Escort ad, SA Fichtner went to the Backpage homepage. The first page displayed eleven (11) sections with sub-categories; for instance, the "Adult" section contains the "Escort" sub-category and users can click directly on the Escort category from the homepage. At the top of the page, there was a "Post Ad" link. He clicked on this link and it displayed a page that listed eleven (11) sections similar to the homepage. He clicked on the category of "Escorts" and a page was displayed with "Posting Rules." After clicking a button at the bottom of the page, he continued the posting process.

40.     The next page displayed a blank template for entering the title, description, age, location, email address, and photos or videos for the ad. Backpage listed a fee of $10 for the Escort category. Toward the bottom of the page, upgrades to the ad were offered for additional fees. Upgrades included automatically reposting the ad to the top of the page or highlighting the ad with a "thumbnail." Users could pay anywhere from $40 to repost an ad several times a day, to $960 to repost an ad 104 times a day.

12

41.   To draft the fictitious ads, SA Fichtner used Backpage ads reviewed during the investigation as templates.  He included a photograph of a woman dressed in lingerie who described herself as "clean, safe, and 100% independent" and offered to make users' "dreams come true," mentioning an hourly rate of $175.  Once the template was completed, he clicked on the "Continue" button at the bottom of the page; next to the "Continue" button was the statement "By placing this ad I agree to the terms of use and privacy policy." He then clicked on the linked terms and policy.

42.   SA Fichtner continued to the next page of the process where he displayed a preview of her advertisement and listed the cost of $111.20 to post the ad; he paid to auto-repost eight (8) times and $21.20 for a Sponsored ad thumbnail on the side banner.  At about 8:52 am, he clicked on the "Post Ad Now" button and was forwarded to the payment page requesting payment by credit card or Bitcoin.  He paid with a credit card utilizing state provided funds.  Below the "Submit" payment button, there was a message stating, "The charge will appear on your statement as: BP NATIONAL, Payment Solutions BV., Stawinskylaam 601, 1077XX, Amsterdam, Netherlands."  After clicking on the "Submit" button, he received a "Thank you" message.

43.   Immediately after posting the ad, an email was sent on behalf of sacramento.backpage.com to the email address SA Fichtner provided when posting the ad.  The email thanked SA Fichtner for posting the ad and explained that the ad was "Pending" and "will be released soon."  The email noted the posting date, the expiration date, and the cost of the ad.  The ad was posted on Backpage at about 9:00 am.

44.     SA Fichtner went through a similar process to post the non-Adult ad -- a couch for sale in the "Buy, Sell, Trade" section on Backpage.com; there was no minimum fee required for the non-Adult ad, but he paid $1.22 to promote the ad via a Sponsored side banner thumbnail, as well as 26 auto-reposts.

45.     SA Mackey was assigned to monitor and document all calls and texts sent to the undercover cell phone used in the ads.

46.     Within minutes of the Escort Ad going live, SA Mackey began receiving calls and texts.   Between the 6th and 16th of March 2015, SA Mackey received approximately 197 text messages and 134 phone calls inquiring about the Escort Ad.   SA Mackey received one text message inquiring as to the availability of the couch.

47.     While working in her undercover capacity, SA Mackey communicated with several of the potential customers tied to the escort ad, sending and receiving a total of 747 text messages.   Most of the potential customers used slang terms in their messages and phone calls commonly seen in the commercial sex context.   Based on your Affiant's training and experience, along with the training and experience of SA Mackey and SA Fichtner, the slang used by the customers' in their messages was understood as follows:

a.     Incalls and/or Outcalls: An "incall" is where the customer comes to the "escort's" location and an "outcall" is where the escort goes to the customer's location. Many users asked SA Mackey about her incall/outcall policy.

b.     Donation: "Donation" in the "escort" context means the fee an escort would charge for sex acts; in researching commercial sex cases, particularly those on

Backpage.com, both prostitutes and customers seem to believe that by saying "donation" rather than fee, they are protected from possible criminal charges.

     c.      BBBJ: "Bare Back Blow Job" – Fellatio without a condom.

     d.      FS: "Full Services" – Sexual intercourse to completion

     e.      GFE: "Girlfriend Experience" – a session that is more like lovemaking with a girlfriend than a commercial service.

     f.      Greek: anal sexual intercourse

     48.     Of the 747 text messages that were sent and received, SA Mackey received one video, via text message, of an adult male having intercourse with a "blow up doll" and photographs of two potential customers' faces.

     49.     Based on the number of phone calls and text messages, a large number of individuals viewed the ad posted as a prostitution ad. Because numerous individuals viewed the ads as prostitution ads, there is probable cause to believe that Backpage knows that these types of ads are indeed for prostitution.

     50.     On March 16, 2015, SA Fichtner called Backpage to notify them of the prostitution related ad. SA Fichtner called Elizabeth McDougall, an attorney for Backpage, and left a voicemail with her identifying himself as an agent with the California DOJ, and explaining that he wanted Backpage to remove a known prostitution ad in the Escort section. SA Fichtner left his cell phone number.

     51.     On March 16, 2015, SA Fichtner also called Carl Ferrer the CEO of Backpage. SA Fichtner reached Carl Ferrer and identified himself and asked him about removing a known prostitution ad. Carl Ferrer initially told him to report the ad by email

to abuse@backpage.com but then asked for the ad's details. SA Fichtner provided the Post ID for the ad. Ferrer seemed to be looking up the ad on a computer stating, "the other ads from this user don't appear to be illegal." Ferrer was able to link the Escort ad to the non-Adult couch ad. Ferrer said that he would personally report the prostitution ad and "lock it out." The ad was in fact removed by Backpage thereafter.

52.     Carl Ferrer also communicated with the agents via the email account carl.ferrer@backpage.com regarding preservation of ads pursuant to law enforcement request.

53.     On March 17, 2015, McDougall called SA Fichtner. SA Fichtner told her he had spoken with Carl Ferrer and that he had removed the ad. McDougall asked how I knew the ad was for prostitution. SA Fichtner said he could not provide details of his investigation. SA Fichtner mentioned that he had seen numerous other ads on Backpage that seemed to be for prostitution and asked why they were not being removed. McDougall said that Backpage does not restrict a users' First Amendment right to post ads. She said Backpage has a filtering process in place to prevent the posting of illegal ads. McDougall explained Backpage's four step filtering process. First, ads are screened by a computer program that looks for flagged terms. If the ad passes the computer screening, it is then screened twice by a human moderator – once before it gets posted and again after it is posted. The final level of filtering comes from the public, who can report an ad directly to Backpage via a link on the site.

54.     SA Fichtner said he noticed several photos in the Escort section showing breasts and genitalia. SA Fichtner asked McDougall if there are restrictions on the types

16

of photos that can be posted. McDougall said photos of that nature are not allowed and should not make it through the filtering process. She said if those types of photos are making it through the filtering process, then Backpage would need to identify the moderator who screened the ad and correct the problem.

55.    SA Fichtner asked McDougall to explain why the Escort section charged a significantly higher fee than any other section on the website. She said the higher cost to post adult escort ads was a recommendation to Craigslist.com by the Attorney General to deter criminals from posting illegal ads, and that Backpage followed suit. McDougall stated that Backpage works closely with law enforcements.

56.    SA Fichtner reiterated that many Backpage ads appear to be blatant prostitution ads. McDougall did not dissuade him from this impression, and returned to her point about the First Amendment. She said that the internet and prostitution were not going away and if Backpage were to restrict postings of Adult services on their website, it would only drive the industry underground, making it more difficult for law enforcement to investigate.

57.    Through its investigation, the California Department of Justice Special Agents learned that numerous email accounts are used by Carl Ferrer and other Backpage.com employees to conduct its business.    Such email accounts include: carl.ferrer@backpage.com, joe@backpage.com, dan@backpage.com, rock@backpage.com, carl@backpage.com, andrew@backpage.com, bailey@backpage.com, andrewa@backpage.com, chris.kempel@backpage.com, jasona@backpage.com, stefan@backpage.com, nathank@backpage.com,

17

support@backpage.com,          records@backpage.com,          abuse@backpage.com,

reconciliation@backpage.com,          help@backpage.com,          kellyh@backpage.com,

craig@backpage.com; void@backpage.com, nobody@backpage.com.

58.     California DOJ's investigation revealed the above email accounts were being

stored on Google's servers.  Beginning in July, 2015, California DOJ obtained search

warrants for the above listed accounts in California Superior Court in Placer County.

California DOJ obtained search warrant returns for the Backpage email accounts from

Google.

### UNITED STATES SENATE, PERMANENT SUBCOMMITTEE ON INVESTIGATIONS, COMMITTEE ON HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS, RECOMMENDATION TO ENFORCE A SUBPOENA ISSUED TO CEO CARL FERRER OF BACKPAGE.COM.

59.     Your affiant is aware of a November 19, 2015, report issued by the United

States Senate, Permanent Subcommittee on Investigations, Committee on Homeland

Security and Governmental Affairs ("PSI Report") recommending enforcement of an

October 1, 2015, subpoena issued to Carl Ferrer.

60.     The subpoena requested, among other items, documents concerning

Backpage's moderation efforts, including information related to editing or modifying ads

before publishing.   The subpoena also requested documents concerning metadata,

document retention, basic corporate information, and revenue derived from adult

advertisements. (PSI Report, p. 30.)

61.     On the return date, Backpage produced twenty-one pages of publicly

available documents and submitted a letter objecting to certain document request in the

subpoena on the grounds that they violated the First Amendment and were not pertinent to a proper legislative investigation. (*Id.* at 30.) Backpage declined to produce the many internal documents it possesses that are responsive to the subpoena's request for information about its moderation procedures, data-retention policies, and financial information. (*Id.* at 32.)

62.     The Subcommittee overruled Backpage's objection explaining that Backpage's vague and underdeveloped First Amendment arguments lacked merit. (*Id.* at 31.) The Subcommittee further rejected Backpages' entirely unexplained contention that the document request in the October 1, 2015, subpoena was not pertinent to a proper investigation. (*Id.* at 32) Undeterred by Backpage's noncompliance with its process, the Subcommittee pursued its fact-finding through other means. The PSI Report detailed the Subcommittee's preliminary findings.

63.     The Subcommittee found substantial evidence that Backpage edits the content of some ads, including by deleting words and images, before publication. The record indicates that in some cases, the deletions likely served to remove evidence of the illegality of the underlying transactions. (*Id.*) Specifically, as part of its moderation process, it appears that Backpage will delete particular words or images that violate its terms of service. (*Id.*) Backpage's General Counsel Elizabeth McDougall told the Subcommittee of this practice in a staff interview, but the company has so far refused to provide additional documents about it. (*Id.*) The subcommittee attempted to take the testimony of two Backpage employees in charge of its moderation practices, but they refused to testify on the grounds that it might incriminate them. (*Id.*)

19

64.     The subcommittee, however, obtained evidence that from 2010-2012, Backpage outsourced its moderation practices to a California-based company that employed moderators in India.  During this time, the moderators deleted certain images, words, or phrases from "adult" ads.  (*Id.*)  Specifically, Backpage issued specific content guidelines and instructions to the moderators and continuously updated these instructions. (*Id.*)  Content guidance from Backpage typically took one of three forms:  First, Backpage provided descriptions of images it would accept, decline, or edit, including specific examples.   Second, Backpage's guidance included lists of words that should prompt moderators to either fail or edit an ad.  Finally, Backpage, often through Operations Manager Andrew Padilla or Carl Ferrer would, in some instances, answer questions from the company's moderators about failing, approving, or editing specific content in specific ads.  (*Id.*)

65. ·  Carl Ferrer, Andrew Padilla, among other Backpage employees, were in regular email contact with the moderators about the speed of the moderation process. Backpage had the ability to monitor the number of ads awaiting review in each queue, including whether certain ads had exceeded a certain amount of time from posting to approval.  (*Id.*)  Automatic email alerts notified Backpage managers when ads were waiting in the queue for longer than the target wait times.  On occasion, Andrew Padilla or another Backpage employee emailed persons when ads sat too long in the queue to urge them to process the ad.  (*Id.*)

66.     Backpage mangers, including Carl Ferrer and Andrew Padilla, were intimately involved in communicating the content policies the California-based company

20

that it outsourced its moderation practices were to apply. For example, guidelines in October 2010 flagged for scrutiny not only certain sexual images, but also text that conveyed an offer of sex for money ("no pricing for services less than an hour"). (*Id.* at 18.) With respect to these particular changes in guidance, Mr. Ferrer wrote (via email), "Better to edit by removing bad text or removing bad language. We will do this for a few weeks to give users a chance to adjust." (*Id.* at 18.) In another email, Mr. Ferrer communicated with the company it outsourced its moderation practice to about how to deal with ads that offer services based on time increments –e.g. 15 or 30 minutes that are standard in the illegal sex trade. Mr. Ferrer explained: "Removing bad pics and removing bad text like 15 min ½ hour is critical. I think [the moderators] will be busy." (*Id.* at 19.)

67.     Quality control for the screening and editing process was also an important concern for Backpage during its contract with the California-based company. Backpage encouraged the company's moderators to review ads quickly, but to not cut corners." (*Id.* at 21.) Backpage attempted to monitor the moderators to provide "constructive feedback" when a moderator failed an ad that should have been approved or vice versa. At least as of 2010, the editing platform did not provide Backpage the ability to monitor the specific edits a moderator made to a post; Backpage could only see the final product. (*Id.*)

68.     In some instances, Backpage took corrective action after ads containing violations of Backpage content policies were published even after going through the screening and editing process. (*Id.*) In these cases, Backpage sent the violation to the company with the ID number of the moderator who "missed" the particular violation. (*Id.*)

The company would then retrain the moderator and explain why the particular item needed editing. (*Id.*)

69.     Quality control was important to Backpage not only to ensure compliance with its policies, but also to ensure customer satisfaction. Backpage's revenue depends on user's willingness to pay to post ads, the cost of which can range from a few dollars to more than one hundred dollars as users buy upgrades to promote or sponsor ads to receive more views. (*Id.*) In some instances, users complained to Backpage's customer service department when images were deleted that the user knew should have been approved. Mr. Ferrer reacted to that personally. (*Id.* at 21.) In one email, Mr. Ferrer noted "an increase in users complaining about false positives" and urged the moderators to "exercise care when removing images." In at least one instance, Mr. Ferrer offered a customer $1,000 in "freebies" when an ad was erroneously edited. (*Id.* at 21.)

70.     Statements publicly made by Backpage, California DOJ's undercover investigation of Backpage, and the PSI Report show that email is used to discuss the criminality of various Backpage ads, including discussions on (1) its moderation process and whether various ads should be removed for violating its policies and/or whether various account holders should be permanently banned from posting on Backpage.com; (2) law enforcement subpoenas seeking ads tied to criminal activity, including prostitution; (3) complaints by the public regarding live ads on Backpage; and (4) reports by Backpage to NCMEC related to individuals who appear to be under 18 or even slightly above 18 years old.

71.     Because Backpage is making millions of dollars a year on advertisements that it knows are routinely tied to sex trafficking and prostitution, your Affiant believes the email account carl.ferrer@backpage.com contains evidence relevant to the investigation. The Backpage business model is largely based on the fees it obtains from its escort section, and there is probable cause to believe that the email account carl.ferrer@backpage.com will have communications showings Carl Ferrer's knowledge of prostitution-related criminal activity, how Backpage advances such criminal activity through its moderation process, the money Backpage makes through advancing such activity, and other relevant evidence. Based on my training, experience, and facts of this case, I believe probable cause exists that the account carl.ferrer@backpage.com contains the fruits, instrumentalities, and evidence of the above stated crimes.

## BACKPAGE HAS KNOWLEDGE OF THE ILLEGAL ACTIVITY OCCURRING IN ITS ESCORT SECTION

### Lawsuits

72.     Many groups and individuals have discussed with Backpage the prostitution activity occurring on its Escort section on multiple occasions. By letter dated September 21, 2010, twenty-one state Attorney Generals informed the then lawyer for Backpage the following: "We believe that ads for prostitution, including ads trafficking children, are rampant on the site and that the volume of ads will grow in light of Craigslist's recent decision to eliminate the adult services section of the website." Backpage continued to provide its "Escort" section to the general public. By letter dated August 31, 2011, forty-five state Attorney Generals sent a letter to Backpage's then counsel discussing various

cases the offices were prosecuting where children were trafficked on Backpage. (*See* http://attorneygeneral.tn.gov/cases/backpage/ backpageletter.pdf; *see also* Craig GJ transcript). Despite repeated warnings about facilitating prostitution, Backpage still continued to provide its "Escort" section to the public.

73.      While continuing to run its "Escort," section, Backpage has been served with civil complaints providing it additional notice of serious allegations involving sex trafficking. For example, in 2010 Backpage was sued in *M.A. ex. rel. P.K. v. Vill. Voice Media Holdings, LLC and Backpage*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011).  According to the court papers, a juvenile of sex trafficking sued Backpage for her victimization after ads were posted of her on Backpage.  Specifically, from 2009 to 2010, Plaintiff M.A., a 14-year-old, was being sexually trafficked by Latasha Jewell McFarland, an adult, who pled guilty in a separate criminal case to using a facility in interstate commerce to promote prostitution pursuant to 18 U.S.C. §1952(a)(3).   Defendant McFarland, while in open court, admitted to photographing M.A. displaying her private body parts in sexual pornographic poses and posting the child pornography on Backpage as advertisements seeking payment for sex.  McFarland further admitted to paying Backpage for these postings, and transporting M.A. for the purposes of multiple sexual liaisons for money with adult male customers obtained through Backpage's website. *Id.* at 1041-42.

74.      In seeking to hold Backpage liable, the lawsuit against Backpage alleged the following:

* In 2009 and 2010, [Backpage] posted many advertisements which included explicit nude photographs of Plaintiff, M.A., a minor, advertising her services as an escort for sex on backpage.com and received fees for each posting.

* [Backpage] had knowledge that: explicit sexual pornographic photographs were being posted on its website; that postings on their website were advertisements for prostitution; that numerous minors were included in these postings for prostitution on its website; that sex trafficking of minors is prolific in the United States of America; that the internet, including their website, was used for advertisements for illegal sexual contact with minors; that on numerous prior occasions [Backpage was] made aware of minors being trafficked on their website; that according to [Backpage], on five prior occasions [Backpage] responded to subpoenas involving the trafficking of minors on backpage.com and this does not include other cases involving minors of which [Backpage is] aware wherein [Backpage] cooperated with authorities without subpoenas.

* By posting explicit nude photographs of Plaintiff, M.A., a minor, in an advertisement which advertised her services as an escort for sex on backpage.com, [Backpage] facilitated child sex trafficking and aided and abetted McFarland in violating each criminal statute and United States Treaty Optional Protocol herein alleged, in that: [Backpage] had a strong suspicion that the aforementioned crimes were being committed yet was so indifferent that [it] failed to investigate for fear of what it would learn; [Backpage] had a desire that these posters accomplished their nefarious illegal prostitution activities so that the posters would return to the website and pay for more posting; and [Backpage] continued to maintain their website so as to participate in these illegal transactions....

*Id.* at 1045.

75.     Backpage, through its lawyers, moved to dismiss the lawsuit and argued immunity under the Communications Decency Act, 47 U.S.C. § 230. After reviewing the allegations and the Communications Decency Act ("CDA"), which serves as a bar for many civil lawsuits and state criminal prosecutions against internet-related entities, the district court dismissed the lawsuit. *Id.* at 1058.

76.     In October, 2014, Backpage was again sued by child sex trafficking victims in *Doe ex rel. Roe v. Backpage.com, LLC.*, 104 F. Supp. 3d 149, 149-65 (D. Mass. 2015). According to that lawsuit, Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 were juvenile victims of sex trafficking advertised repeatedly on Backpage.  Jane Doe No. 1 was first trafficked by pimps on Backpage in February of 2012, when she was 15 years old. She was again sold on Backpage in March of 2013. Between June of 2013 and September 10, 2013, her "services" were advertised on Backpage each and every day. As a result of the ads, she engaged in 10 to 12 sex transactions daily with adult men in Massachusetts and Rhode Island. Her pimp moved her from town to town every two days to avoid detection. Jane Doe No. 1 appeared in some 300 ads on Backpage and was raped over 1,000 times. *Id.* at 153.

77.     Backpage listed each ad featuring Jane Doe No. 1 as an offer of "escort" services, a common euphemism for prostitution. According to the district court, the Jane Doe No. 1 ads included known signifiers for child prostitution such as "young," "girl," "fresh," "tiny," "roses," and "party." Jane Doe No. 1's pimp provided a prepaid mobile phone and a prepaid credit card to conceal Jane Doe No. 1's identity when Jane Doe No. 1 placed ads on Backpage at the direction of her pimp. When Jane Doe No. 1 attempted to enter her true age (which was under 18) during the purchase of an ad, Backpage would instruct her to enter her age as 18 or older. Photographs of Jane Doe No. 1 (with her facial features obscured, but at least on one occasion displaying a unique tattoo) accompanied all of her ads. *Id.* at 153.

78.     Jane Doe No. 2 was trafficked on Backpage by her pimp during various periods between 2010 and 2012 at different locations in Massachusetts. She was first advertised on Backpage when she was 15 years old. Ads featuring Jane Doe No. 2 were posted either by her pimp or an older woman who worked with him (his "bottom"). The ads would appear on Backpage an average of six times per day. Jane Doe No. 2 was given a prepaid mobile phone to answer calls from would-be customers generated by the Backpage ads. As a result of the ads, she was coerced into 5–15 sex transactions every day. Like the ads of Jane Doe No. 1, those of Jane Doe No. 2 featured her photograph. The ads were placed using a prepaid credit card. Altogether, Jane Doe No. 2 was raped over 900 times while being trafficked by her pimp. *Id.* at 153.

79.     Jane Doe No. 3 was trafficked on Backpage in December of 2013 by her pimp and one or more of his associates. The Backpage solicitations for the underage Jane Doe No. 3 described her as "new," "sweet," and "playful." As with the other Jane Does, the ads were paid for with a prepaid credit card. Jane Doe No. 3 was also given a mobile phone to take calls and texts from customers. She was taken to a hotel in Foxborough, Massachusetts, where she was raped by men who responded to the ads. Photos of Jane Doe No. 3, including one that she had taken of herself, appeared with the ads on Backpage. *Id.* at 153.

80.     Backpage, through its lawyers, again moved to dismiss the civil complaint pursuant to the CDA. The district court granted the motion to dismiss.

81.     In 2012, Backpage was sued by three additional juvenile victims of sex

trafficking in *J.S. v. Village Voice Media Holdings, LLC, d/b/a Backpage.com LLC*, 359

P.3d 714 (Wash. S. Ct. 2015), after their advertisements were placed on Backpage and they

were raped by adult customers who responded to the advertisements. According to the

Second Amended Complaint, in 2010 "J.S.", a 15-year-old minor, was advertised on

Backpage along with multiple lascivious photographs of the minor.  J.S.'s pimp paid

Backpage a fee for such advertisements.  Advertisements of J.S. appeared in the escort

section over 100 different times.  J.S. engaged in sexual intercourse with multiple adults a

day for a fee for several months.  (Am. Compl. 4.1-4.4)

82.     According to the Amended Complaint, "S.L." was advertised on Backpage

in September 2010 when she was 13 years old.  Her pimps dressed her up in lingerie and

took photographs of her to include in the ad.  The pimps paid Backpage a fee for the

advertisements. S.L. was repeatedly trafficked to adult men and provided sex for a fee.

(Am. Compl. 5.1-5.4)

83.     "L.C." was 13 years old when she was advertised for prostitution by her

pimps on Backpage.  From July 2010 until September 23, 2010, the pimps paid for multiple

advertisements on Backpage and included ad titles such as "80 DOLLAR DAY SPECIAL,

ask for Tasha."   In another ad, it stated "Face down Ass Up," while another ad stated "Let

Em BLOW YOUR MIND."  The ads included photos of the under-aged victim.  After

being advertised on Backpage, L.C. was raped by hundreds of adult men.  (Am. Compl.

6.1-6.5)

84.     Backpage, through its attorneys, moved to dismiss under the CDA.  Unlike other jurisdictions, the Washington Supreme Court held the CDA did not serve as a bar and the lawsuit is going forward. 359 P.3d 714, 717-718.

85.     Multiple anti-trafficking organizations filed amicus curiae briefs in the Washington law suit, including the National Center for Missing and Exploited Children ("NCMEC") and Shared Hope International, which is a non-profit, NGO funded by a U.S. Congresswoman in 1998 to help eradicate sex trafficking.

86.     According to NCMEC, numerous family members found their relatives being advertised on Backpage and provided feedback directly to Backpage through the "Report" feature on Backpage's site.  The following communications were sent directly to Backpage in response to various ads posted:

> * "No the girl ...is 16 shes my cousin she ra[n] away from home two months ago...The cops r trying to get her and her pimp.  She is a runaway  She got tattoos of her pimp on her lower stomach and upper right eyebrow."
>
> *"This ad has photos of my 16 year old sister who currently being trafficked and we are trying to get home.  We have an active investigation going on and am trying to get her away from her pimp and bring her home.  Please stop allowing whoever it is to post her.  She['s] only a minor and we want her home."
>
> * "How dare you allow a post of my juvenile daughter being used in a sex trafficking post! Shame on you backpage – you know what you're really all about and I am on a mission to take you down...Shame shame shame!"

(*See* Amicus Curiae Brief Of The National Center For Missing And Exploited Children, In The Supreme Court Of The State Of Washington, pg. 7.)

87.     According to published statements made by Shared Hope International, at least 495 minor victims of sex trafficking have been linked to Backpage as of July 14,

2015. (*See* http://sharedhope.org/2015/07/14/495-child-sex-trafficking-victims-linked-to-backpage-com-visa-mastercard-amex-cut-ties-with-site/ ).

### BACKPAGE HAS KNOWLEDGE OF THE ILLEGAL ACTIVITY OCCURRING IN IT'S ESCORT SECTION – DESCRIPTIVE ADS

88.      In various interviews throughout the years, Backpage employees and/or counsel have claimed that "Escort" ads are not necessarily criminal and are protected by the First Amendment. A review of various advertisements that Backpage has permitted to go live and remain live on its site show that the ads appear criminal on their face.

89.      By way of just a few examples,[1] on March 25, 2016, an individual posted the following advertisement for the Athens Georgia area:

> COLLEGE who Loves Ana$l Crem$pies – 25
> Hi guys, it's YOUR GIRL MIYA AND I'm best head suc*ker it is an I'm not from here but I just moved here from Atl… I HOST ONLY AN PRIVATE AN DISCREET…Location. I love those OLDER WHITE MEN WHO LOVE THOSE BLACK FREAKY college student girls who REM a*ss and who's dominant..Take control $$is req. No rushin no time limit.  If the offers fair enough…(((706-389-5223)))

90.      Attached to the ad is a picture of a young female posing in a black and white printed bra and underwear. A second picture is a partial image of her face. (*See* Exhibit 1.)

91.      The above ad remained live on Backpage as of April 22, 2016.

92.      Based on your Affiant's training and experience, I am familiar with the following terminology and expressions commonly used in the prostitution context and seen

---

[1] Each ad is attached as exhibits 1-3 to this affidavit to fully illustrate the different symbols and pictures used that cannot be adequately conveyed with Microsoft Word.

in the above ad: Ana$l Crem$pies appears to be slightly coded to mean "anal cream pies."

"Anal cream pies" relates to sexual activity involving a person's anus, including

ejaculation.   "Head sucker" is a slang term for oral sex performed on a man's genitals.

Your affiant interprets "req" to be shorthand for "required" and the individual is stating

that money is required for the sex acts.   Your affiant has probable cause to believe that this

is a prostitution advertisement on Backpage and that Backpage knows such an

advertisement is connected to prostitution.

93.   On April 16, 2016, an individual posted an ad in the Arizona escort section

of Backpage, that read as follows:

> 100 incalls * Phat @$$!  100$ incall – A*N*A*L *Queen  PorN  No. available –
> 22
> Hey KeLLY 415 602 6537
> Im Young, Sexy, Sweet, Mature, Playful, & im Amazingly Talented. I'm
> Available 24/7
> *100% INDEPENDENT
> *Upscale Gentlemen ONLY
> *Always Safe & very Clean
> *No Police/Pimps
> *Must Be Clean & Respectful
> *Professional & Discrete * Upscale Beauty * 100% REAL
> Gf Exp, Behind Door, All Fetish Welcome
> B:*A*C*K*…D*O*O*R pLAY… CALL NOW  KeLLY 415 602 6537

94.   Attached to the ad were several pictures of a young women in various

lingerie.  For example, one image shows her wearing a black bra, waist garter, and black

underwear while standing up taking a "selfie" with her phone.  Another image shows her

wearing a black thong and orange bra while exposing her buttocks to the camera, along

with a partial side shot of her face.  Another image shows her laying on her stomach

wearing cream colored underwear.  Her buttocks are the focal point of the camera.  This ad remained live on Backpage as of April 22, 2016. (*See* Exhibit 2.)

95.    Based on your Affiant's training and experience, I am familiar with the following terminology and expressions commonly used in the prostitution context: "Incalls" is a term commonly associated with prostitution ads, and it means a customer must come to the female's location; as opposed to "outcalls" where the female will go to the customer's location. 100$ incalls refers to charging $100 for the customer to come to the female's location. "Gf Exp" is shorthand for "Girlfriend Experience."  "Girlfriend Experience" refers to a customer wanting to have sexual intercourse as if they were have sexual intercourse with their girlfriend.  "A*N*A*L and B:*A*C*K*…D*O*O*R pLAY" relate to the female's willingness to engage in anal sex and other commercial sexual activity involving the anus.  Your Affiant has probable cause to believe that this is an advertisement for prostitution and that Backpage knows it constitutes an advertisement for prostitution.

96.    On April 18, 2016, an individual posted an ad for the Long Island, New York area:

SEXY  - BEAUTIFUL – K!nKy B.B.W. BOMBSHELL  - DaNgeRouS CuRveS –

24

Good morning. Up and ready…. Juicy Thick Mami – Respectful and Mature Gents Only – 5'5 BBW Freaky Lil Mama – Available Now – INCSLLS ONLY – Sorry NO ANAL – 100000000% Real – No Games !! Discrete and Very Clean !! SERIOUS CALLERS ONLY – RUDENESS will not be tolerated – Please NO PIMPS.  NO LAW ENFORCEMENT! No THUGS! No Drama! Just Good Safe and Clean Fun! No Explicate talk!! No extra pictures – 6074815436 – Hauppauge Smithtown Commack Sayville Massapequa Ronkonkoma

32

97.     Attached to the post is a woman wearing black underwear and black fishnet patterned nylons while bending over a toilet. Her buttocks are the focal point of the camera. A second picture shows her sitting on a toilet and straddling the toilet while wearing the same black lingerie outfit described above. The focal point is again on her buttocks. A third pictures shows her in the same black lingerie outfit while kneeling on top of a bed. Her back is facing the camera while she plays with her long hair. The above ad remained online as of April 22, 2016. (*See* Exhibit 3.)

98.     Based on your Affiant's training and experience, "BBW" stands for Big Beautiful Woman. "Freaky" relates to the sexual adventurousness of the individual. "No Anal" is interpreted to mean no anal sex. No LEO is clearly stated and gives notice to Backpage that the purpose of the ad is to engage in illegal activity. Your Affiant has probable cause to believe that this is an advertisement for prostitution where the individual will engage in commercial sex acts and Backpage knows this is an advertisement for prostitution.

## BACKPAGE'S POSTING AND "MODERATION" PROCESS INTENTIONALLY PROMOTES PROSTITUTION IN VIOLATION OF 18 U.S.C. §1952(a)

99.     Historically, Backpage required users to pay a fee to post any ad in the Escort Section, while the non-adult sections were free. The fees for the escort section varied in price depending on geographic location. Users would often provide a major credit card or prepaid credit card to Backpage in order to upload the escort ads.

100.   Starting around June 30, 2015, the major credit card companies stopped processing payments for Backpage ads.  In response, Backpage issued an online statement stating it would no longer require a flat fee to post in the Escort section.  However, Backpage does require fees via credit card or bitcoin for any upgrades that a user may want with the escort ads (described more fully below).  Bitcoin is a form of digital currency and its harder for law enforcement to track.

101.   If a person wants to post an ad in the escort section, the following posting rules display:

> You agree to the following when posting in this category:
> I will not post obscene or lewd and lascivious graphics or photographs which depict genitalia, actual or simulated sexual acts or naked images,
> I will not post any solicitation directly or in "coded" fashion in any illegal service, including exchanging sexual favors for money or other valuable consideration;
> I will not post any material on the Site that exploits minors in any way;
> I will not post any material on the Site that in any way constitutes or assists in human trafficking;
> I am at least 18 years of age or older and not considered to be a minor in my state of residence.
> Any post exploiting a minor in any way will be subject to criminal prosecution and will be reported to the Cybertipline for law enforcement.
> Postings violating these rules and our Terms of Use are subject to removal without refund.

102.   After reviewing the rules, a person must press continue.

103.   After pressing continue, the user sees a screen titled "Step 1: Write Ad."  A number of fields are provided to be completed in creating an ad, including a title, description, the poster's age, location, email address, an optional mobile notification, and an option to show links to the user's other postings.  There is also a field to insert up to 12 images and a video.

34

104.   After completing the relevant fields, the poster then sees a section for "Upgrades" to keep the ad near the top of the list.   For example, to post an ad in Washington, D.C., a person can pay money to move their ad to the top every set number of hours.   A person can also pay extra to have their ad categorized with nearby additional areas/cities, such as Northern Virginia and Southern Maryland.   A person can also pay more to "auto repost [the] ad", which allows their ad to advance to the top of the listings a certain number of times every set number of days.   A person can also pay extra to have a "Sponsor Ad", where the ad will appear highlighted in thumbnails.   A person can pay $26.55 to have a sponsor ad for one week, $79.65 for four weeks, and $213.46 for 12 weeks.

105.   After selecting payment options, the poster must press "Continue."   Next to the "Continue" button is a phrase that states, "By placing this ad I agree to the terms of use and privacy policy."

106.   The user is then taken to a screen to preview their ad.   Once the user is satisfied with the ad, the user submits the ad for upload to Backpage.

107.   Once an advertisement is uploaded to Backpage, the ad is placed in a queue and it is not live yet.   A computer program is run against the ad, checking to make sure at least 26,000 various explicit words and code words associated with prostitution and other criminal activity is not included in the ad.   Explicit terms that are banned by Backpage include terms such as anal, girlfriend experience, blow job, BBBJ (bare back blow job), greek (relating to anal sex) and countless other terms that Backpage knows are indicative

35

of prostitution. If an ad contains such explicit terms, the ad may be rejected and will not be posted live.

108.    After the computer program is run against the ad, an employee in charge of moderation is required to review the ad prior to it going live to make sure the ad is not for prostitution and complies with Backpage's policies. If the ad complies with Backpage's policies, the ad then goes live for the general public to see.

109.    After the ad goes live for others to see, additional moderators review the ads as an additional layer of review to make sure the ads comply with Backpage's policies. This is referred to as the second tier of moderation.

110.    Based on the moderation process Backpage employs, there is probable cause to believe that Backpage knows it is posting ads for prostitution.

111.    As seen in the advertisements *supra*, people posting ads often insert symbols between words that Backpage knows are tied to prostitution such as "anal." People also shorten expressions that Backpage knows are tied to prostitution by converting "girlfriend experience" to "gf exp." The ads still went live despite Backpage's "moderation" process. There is probable cause to believe that Backpage knew the ad was an ad for prostitution during the moderation process yet still allowed the ad to go live.

112.    Historically, Backpage would also engage in an editing process of ads after the ads went live online. Employee Jaala Joye Vaught testified in the Western District of Washington grand jury that she started working at Backpage around July, 2009. She started off as a moderator and she was involved with second tier moderation after the ad went live online. While working as a moderator, at times she would delete certain pictures or words

36

from an ad and then allow the ad to remain live. For example, if an ad contained an image showing full nudity, that image would sometimes be deleted and then the ad would remain live for the general public to see online. If the ad contained an offer for a "blow job" for money, she would edit out the offer or other offending language and then allow the ad to be live for the general public to see. She testified that she edited the language of ads for about a year until she was told not to do so anymore. Other times, the ad would be rejected in whole and the ad would never go live online.

113.   Employee interviews conducted by IRS SA J. Lopez also reveal Backpage editing ads and allowing them to then be live on their site. One interview involved former employee Brian Alstadt, who worked for Backpage as a moderator from December, 2010, through October, 2011. As a moderator, he would fix ad violations and then repost the ads. A majority of the violations were for nudity and fetish words in the ads. If ads contained only adults, the ad was cleaned and reposted. If the ads were for something other than escorts, he was instructed to clean it up and make it appear that it was just for an escort and not prostitution. Mr. Alstadt believed that about 75% of the ads were for prostitutes and needed to be cleaned up. He further noted that people must be pretty stupid to not know that the ads were for prostitution.

114.   Another interview involved La Tamara Barlow, who worked for Backpage for a couple of months in 2011 before being let go by Backpage. According to her interview, she deleted inappropriate pictures and terms from ads. She thought it was obvious prostitution was occurring with the ads.

115.   During an interview of former employee Justin Dew, he informed IRS that he was a moderator for Backpage from May, 2010, to November, 2011.  He reviewed ads for term and photo violations.  If the ad was violating too many policies, the ad was deleted. If the ad did not violate too many policies, it was merely cleaned and reposted.

116.   During an interview of Brian Paterge, he informed IRS that he worked for Backpage from February, 2011, to February, 2012.  While reviewing ads, he would remove words, pictures, and links that were deemed inappropriate.  He estimated that 60-75% of the ads were prostitution related.

117.   Based on Backpage's moderation practices, there is probable cause to believe that Backpage knows many the ads found on its site historically and today are for prostitution.   There is also probable cause to believe that Backpage has intentionally promoted prostitution by allowing ads to be posted or remain online after they were reviewed, and in several instances edited, while collecting the fee posted by the users to post such ads.

## DISTRICT OF ARIZONA PROSTITUION INVESTIGATIONS INVOLVING BACKPAGE

118.   Your Affiant is aware of numerous federal cases involving prostitution involving the use of Backpage. Below I have summarized some recent cases.

119.   On November 26, 2013, a federal grand jury indicted Kenneth Wayne Becketts, Jr. ("Becketts") on multiple charges for actual or attempted Sex Trafficking of a Minor in violation of 18 USC § 1951. *See United States v. Kenneth Wayne Becketts, Jr.*, CR-13-01637-PHX-SRB (DKD).  On October 29, 2014, Becketts pleaded guilty to one

count of Conspiracy to Commit Sex Trafficking of a Minor. As set forth in the factual basis of his plea agreement, Becketts and others recruited the juvenile victim, took sexually suggestive photographs of her, and posted advertisements for her online, including on Backpage. *Id.* at Dkt. 31. Individuals who wanted to engage in commercial sex acts with the victim called the number associated with the advertisement, and the victim ultimately engaged in commercial sex acts with some of those individuals. *Id.* On March 30, 2015, Becketts was sentenced to 96 months' imprisonment. *Id.* at Dkt. 49.

120. On December 18, 2013, Cory Deshaun Marshall was indicted in the District of Arizona for Conspiracy to Commit Sex Trafficking (18 U.S.C § 1594), Interstate Transportation of a Minor for Prostitution (18 USC § 2423), Interstate Transportation for Prostitution (18 U.S.C. § 2421), Sex Trafficking and Attempted Sex Trafficking of a Minor and by Force, Fraud, and Coercion (18 U.S.C. §§ 1591 and 1594), and Attempted Sex Trafficking by Force, Fraud, and Coercion (18 U.S.C. §1594). Marshall recruited and enticed females to travel from Montana to Utah and Arizona with the intent to have those females engage in prostitution. Marshall made false promises, threatened females with physical force to control and coerce them into prostitution, and used physical force on at least one known victim. Marshall photographed the females he recruited and utilized the photographs in advertisements for prostitution that were posted on various Internet websites, including Backpage.com. Marshall pled guilty on June 3, 2014, to a Class A Felony violation of Conspiracy to Commit Sex Trafficking (Title 18 U.S.C. § 1594) and was sentenced to 132 months and 5 year supervised release.

121.    On August 20, 2014, Derrick Malik Patterson and Jessamy Eve Bennington were indicted in the District of Arizona for Conspiracy to Commit Sex Trafficking (18 U.S.C. § 1594), Sex Trafficking of a Minor (18 U.S.C. § 1591(a)), Sex Trafficking by Force, Fraud, or Coercion (18 U.S.C. § 1591(a)), and Transportation of Minor for Prostitution (18 U.S.C. 2423). Patterson and Bennington instructed females on how to engage in commercial sex activities in order to increase their proceeds. Patterson and Bennington were provided with the proceeds derived from the acts of females engaging in commercial sex acts. Patterson and Bennington photographed females and used such photographs in advertisements for commercial sex acts that Patterson and Bennington posted on various Internet websites, including Backpage.com. Benington pled guilty on July 17, 2015, to a Class E Felony violation of Misprision of a Felony (18 U.S.C. 4) and is awaiting sentencing. Patterson pled guilty on February 11, 2016, to a Class A Felony violation of Sex Trafficking of Children or by Force, Fraud, and Coercion (18 U.S.C. §1591(a)) and is awaiting sentencing.

122.    On or about March 24, 2015, a federal grand jury returned a superseding indictment charging A'Bram Kyle O'Bannon ("O'Bannon") with, among other things, Sex Trafficking of a Minor and Sex Trafficking by Force, Fraud or Coercion in violation of 18 U.S.C. § 1951. *See United States v. A'Bram Kyle O'Bannon*, CR-14-01530-PHX-JJT (MHB). On October 20, 2015, O'Bannon pleaded guilty to Sex Trafficking of a Minor. As set forth in the factual basis of his plea agreement, O'Bannon caused the victim to be advertised on Backpage for the purpose of soliciting individuals to engage in commercial sex acts with the victim. Interested individuals would call the phone number associated

with the advertisement. *Id.* at Dkt. 74. As a result, the juvenile victim engaged in commercial sex acts. *Id.* On February 8, 2016, O'Bannon was sentenced to 168 months' imprisonment. *Id.* at Dkt. 76.

## PROMOTIONAL MONEY LAUNDERING

### Backpage's Revenue Stream and Employees

123.    In terms of how Backpage generates revenue it has guarded the details of its total revenue and the revenue it generates from online escort advertising. In an interview with ABC News that aired in April 2012, McDougall repeatedly refused to answer questions about the revenue Backpage makes from adult advertisements. (*See* United States Senate, Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs, Recommendation to Enforce a Subpoena Issued to the CEO of Backpage.com, LLC, dated November 19, 2015 ("PSI")). Based on PSI''s investigation to date, however, Backpage's Corporate group had the following net yearly revenue:

| Year | Net Revenue |
|------|-------------|
| 2012 | $71.2M |
| 2013 | $112.7M |
| 2014 | $135M |

124.    Your Affiant also reviewed a September 2013 statement by McDougall that was submitted to the Arizona Governor's Task Force on Human Trafficking. She stated that the Adult ads accounted "for less than 2% of overall content posted to the service." I compared that figure to an internal chart I found in the email records which showed that in August 2013, Adult ads were 1 % of the total count but 95% of the paid count, amounting

41

to more than $10 million in revenue, while non-Adult ads like jobs were 47% of the total count but amounted to only $526.60 in revenue.

125.   I know from the investigation that Backpage used a payment processor to process the payments for the adult section advertisements. The user is provided a form to enter their credit card information. Once that credit card has been validated and approved, Backpage sends a response back to the main ad system that payment was received and the user can create the ad. The payment processing system is hosted on servers located in Phoenix, Arizona. For a number of years Backpage accepted Mastercard, Visa and Discover card. As noted above, those credit card companies disallowed the use of their cards for Backpage due to concerns over prostitution related advertisements.

126.   I know that Backpage has numerous employees needed to monitor the website, conduct moderation, combat fraud, etc. In 2009, Craigslist ceased operations which caused most of their prior customers to use Backpage. As a result, Backpage increased the hiring of moderators to handle the increase in volume of adult ads. The number of moderators doubled in size due to surge of ads as a result of Craigslist no longer accepting adult advertisements. Backpage has been hiring regularly since 2009 with very little turnover.

127.   To accommodate the increase in volume of adult ads, Backpage contracted with a company whose employees were based in India to handle the first tier of moderation review. Charles Craig, CEO of Craig Capital, found that there were approximately 50 people in India employed to conduct the first tier moderation. There were 64 people doing

42

moderation in Phoenix.  In terms of employee compensation, some of the senior moderators were being paid a $105,000 annual salary. They would also receive a bonus equal to 10% of their salary.

128.  Your Affiant knows from investigations conducted in Arizona and nationwide involving the monies used to pay for adult ads on Backpage, that most if not all advertisers had no legitimate income. For example, in the cases investigated in Arizona, investigators routinely checked with the Department of Economic Security to determine whether the individuals submitting ads had a reported income. In most cases, your Affiant found that they had little-to-no other income other than monies derived from prostitution.

129. There is probable cause to believe that Backpage knows many prostitution ads were historically purchased with proceeds from prostitution activity (prior to the credit card companies refusing to process such ads).  There is also probable cause to believe that Backpage knows many ads are currently being automatically reposted for a fee or featured as thumbnails for a fee via proceeds from prostitution.  Many ads note that the females are available "24/7," demonstrating that prostitution activity is a full time job for that individual.   Additionally, many prostitution ads have been repeatedly purchased or automatically reposted on a daily basis over the course of weeks and/or months.  Backpage is able to track the number of ads posted, reposted, and featured as thumbnails for any given account holder.  Based on the full time nature of the job described in the advertisements and the frequent use of Backpage by an account holder, there is probable cause to believe that Backpage knows the fees it has collected historically and today come from prostitution-related proceeds.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

130.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require Google to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

131.    Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the computer systems in control of Google there exists evidence of a crime, contraband and/or fruits of a crime.    Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that the Google E-Mail account described in Attachment A contains the fruits, instrumentalities, and evidence of crimes described in Attachment B.    Accordingly, a search warrant is requested.

132. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711(3) and 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(I).

133.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer

44

is not required for the service or execution of this warrant.

## **REQUEST TO SEAL**

134.   The investigation into Backpage and the collection of relevant evidence is ongoing.

135.   Agents fear that public disclosure of the e-mail account under investigation in this affidavit will tip off Backpage and other individuals engaged in criminal activity with or through Backpage.  Agents fear that evidence will be destroyed if individuals are tipped off.

136.   Because the Investigation is ongoing, I would request the Court to seal the Application for Search Warrant, the Search Warrant, and supporting Affidavit in this matter.

Respectfully submitted,

FBI SA Amy L. Fryberger

Federal Bureau of Investigations

SUBSCRIBED TO AND SWORN TO
BEFORE ME THIS 15th DAY
OF _____ 2016.

The Honorable Michelle H. Burns
United States Magistrate Judge

EXHIBIT C

AO 93 (Rev. 11/13) Search and Seizure Warrant


SEALED

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of ) | |
| ) | |
| Information associated with email accounts identified in ) | Case No. |
| Attachment A that is stored at premises controlled by the ) | |
| California Attorney General's Office ) | 2:17 - SW - 0 2 7 5    AC |
| ) | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location):*

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized):*

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____May 2, 2017_____ *(not to exceed 14 days)*
☒ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for ____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   **4/18/17  9:40 a**        _____
                                                            *Judge's signature*

City and state:     Sacramento, California _____        Allison Claire, U.S. Magistrate Judge
                                                            *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed:<br>4/18/2017   10:42am | Copy of warrant and inventory left with:<br>Special Agent Supervisor Reye Diaz |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____     _____
Signature of Judge                              Date

## ATTACHMENT A

### Description of Property to be Searched

This warrant applies to information associated with the following email addresses for the time period of, 2010-2016:

carl.ferrer@backpage.com,

carl@backpage.com,

ferrer.carl@gmail.com,

andrew@backpage.com,

joye@backpage.com,

adam@backpage.com,

abuse@backpage.com,

jim.larkin@villagevoicemedia.com, and

michael.lacey@villagevoicemedia.com,

that is stored at the California Attorney General's Office, located at 1300 I Street, Sacramento, California, 95814.

**ATTACHMENT B**

**Items to be Searched and Seized**

I.      **Items to be seized by the government**

All information, in whatever form it exists, that constitutes fruits, evidence, and instrumentalities of violations of Title 18, United States Code §§ 1952(a) (Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises); 1956(a)(1)(A)(i) (Promotional Money Laundering); and 1956(h) (Conspiracy to Commit Money Laundering) involving Backpage.com, including, for each account, address, or identifier listed in Attachment A, information pertaining to the following matters:

        a.      Any information related to Backpage.com matters;

        b.      Any communications to, from, or concerning Backpage.com;

        c.      Records relating to who created, used, or communicated with the account or identifiers, including records about their identities and whereabouts.

II.     **Search Procedure**

        a.      Upon receipt of the items described in Attachment A, the Filter Team will review the documents for privilege or protection only and will disseminate non-privileged and non-protected documents to the Investigative Team.  The Investigative Team will determine which documents constitute evidence of unlawful activity.  Because the Filter Team will be properly walled off from the Investigative Team, it may review emails to and from Elizabeth McDougall or other Backpage attorneys to determine if they properly qualify for privilege or protections, in accordance with procedures set forth above.  This will eliminate the risk that protected information from or to Ms. McDougall or other Backpage attorneys will reach the Investigative Team.

EXHIBIT D

AO 106 (Rev. 04/10) Application for a Search Warrant

SEALED

## United States District Court
### for the
Eastern District of California

**ORIGINAL FILED**

APR 1 8 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| | |
|---|---|
| In the Matter of the Search of )<br><br>Information associated with email accounts identified )<br>in Attachment A that is stored at premises controlled by )<br>the California Attorney General's Office )<br>_____ ) | Case No.<br><br>**2 : 17 - SW - 0 2 7 5   AC** |

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____Eastern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | *Offense Description* |
|---|---|
| 18 U.S.C. § 1952(a) | Interstate and foreign travel or transportation in aid of racketeering enterprises |
| 18 U.S.C. § 1956(h) | Conspiracy to launder monetary instruments |
| 18 U.S.C. § 1956(a)(1)(A)(i) | Laundering of monetary instruments |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

- ☑ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Amy L. Fryberger, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  4/18/17

City and state:  Sacramento, California

_____
*Judge's signature*

Allison Claire, U.S. Magistrate Judge
*Printed name and title*

1 PHILLIP A. TALBERT
United States Attorney
2 NIRAV K. DESAI
Assistant United States Attorney
3 501 I Street, Suite 10-100
Sacramento, CA 95814
4 Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

**ORIGINAL
FILED**

APR 1 8 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

5

6 Attorneys for Plaintiff
United States of America

# SEALED

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11 IN THE MATTER OF THE APPLICATION
OF THE UNITED STATES OF AMERICA
TO SEARCH INFORMATION ASSOCIATED
12 WITH EMAIL ACCOUNTS IDENTIFIED IN
ATTACHMENT A THAT IS STORED AT
13 PREMISES CONTROLLED BY THE
CALIFORNIA ATTORNEY GENERAL'S
14 OFFICE

CASE NO.  2:17 - SW - 0 2 7 5   AC

[PROPOSED] ORDER RE: REQUEST TO SEAL
DOCUMENTS

**UNDER SEAL**

15

16                         **SEALING ORDER**

17        Upon application of the United States of America and good cause having been shown,

18        IT IS HEREBY ORDERED that the search warrant and search warrant affidavit underlying the

19 search warrant in the above-entitled proceeding shall be filed under seal and shall not be disclosed to

20 any person, unless otherwise ordered by this Court.

21

22 Dated:  __4/18/17_____          _____

23                                     Hon. Allison Claire
                                        U.S. MAGISTRATE JUDGE
24

25

26

27

28

SEALING ORDER                                1

1   IN THE MATTER OF THE SEARCH OF:
2   INFORMATION ASSOCIATED WITH
    EMAIL ACCOUNTS DESCRIBED IN
3   ATTACHMENT A

4   ALL STORED AT:

5
6   CALIFORNIA ATTORNEY GENERAL'S OFFICE
    1300 I STREET
7   SACRAMENTO, CALIFORNIA 95814

8
9   <u>**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**</u>

10      I, Amy L. Fryberger, being duly sworn, depose and state as follows:

11                                **INTRODUCTION**

12      1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"),

13   currently assigned to the FBI Field Office in Phoenix, Arizona.  I have been employed by

14   the FBI as a Special Agent for eight and a half years.  As part of my responsibilities, I am

15   charged with investigating violations of statutes applying to human trafficking.  I have

16   collaborated with other squads that specialize in money laundering investigations as well

17   as with the Internal Revenue Service ("IRS").  Prior to working human trafficking cases,

18   I was assigned to work national security, gang, and drug investigations.

19      2.      I make this affidavit in support of an application for a search warrant for

20   content and records associated with the email accounts described in Attachment A, which

21   are stored at the California Attorney General's Office, 1300 I Street, Sacramento,

22   California, 95814.

23      3.      I have probable cause to believe that evidence of violations of 18 U.S.C.

24   §§ 1952(a), 1956(a)(1)(A)(i), and 1956(h), are located in and within the email accounts

25   described in Attachment A, which is attached hereto and incorporated by reference.  I

26   have reason to believe that the aforementioned email accounts that are the subject of the

27   instant application will contain evidence that the "adult" advertisements Backpage.com

28   ("Backpage") and its officers chooses to accept and publish are actually for illegal

1     services. Thus, as outlined below, and based on my training and experience, there is

2     probable cause to believe that evidence, fruits and/or instrumentalities of the

3     aforementioned crimes, as further described in Attachment B, which is attached hereto

4     and incorporated by reference, are located in the accounts.

5         4.    I am familiar with the information contained in this Affidavit based upon

6     the investigation I have conducted, along with my conversations with law enforcement

7     officers and others and review of reports, grand jury transcripts, agent notes, and database

8     records, along with other public documents. This Affidavit is submitted for the limited

9     purpose of securing a search and seizure warrant. It does not include each and every fact

10     known to me or the government about the investigation. I have set forth only those facts

11     that I believe are necessary to establish probable cause.

12                                   **STATUTORY AUTHORITY**

13         5.    The "Travel Act," pursuant to 18 U.S.C. § 1952(a), prohibits, in part, the

14     use of the mail or any facility in interstate or foreign commerce with the intent to

15     otherwise promote, manage, establish, carry on, or facilitate the promotion, management,

16     establishment, or carrying on of any unlawful activity, and thereafter performs or

17     attempts to perform an act to promote, manage, establish, carry on, or facilitate the

18     promotion, management, establishment and carrying on of such unlawful activity.

19         6.    "Unlawful activity," as defined in 18 U.S.C. § 1952(b), includes

20     prostitution offenses in violation of the laws of the State in which they are committed or

21     of the United States. Prostitution is illegal in the State of California. (*See, e.g.*, Cal.

22     Penal Code § 647(b).)

23         7.    Sex trafficking of juveniles, or any person by means of force, fraud or

24     coercion, is a violation of 18 U.S.C. § 1591.

25         8.    Title 18, United States Code, Section 1956(h) prohibits a conspiracy to

26     commit money laundering, and the prosecution is obliged to establish that: (1) an

27     agreement to commit money laundering existed between one or more persons; (2) the

28

1   defendant knew that the money laundering proceeds had been derived from an illegal

2   activity; and (3) the defendant knowingly and voluntarily became part of the conspiracy.

3       9.   Title 18, United States Code, Section § 1956(a)(1)(A)(i) prohibits what the

4   case law calls "Promotional Money Laundering."  Specifically, Section 1956(a) prohibits

5   the following: (a)(1) "Whoever, knowing that the property involved in a financial

6   transaction represents the proceeds of some form of unlawful activity, conducts or

7   attempts to conduct such a financial transaction which in fact involves the proceeds of

8   specified unlawful activity – (A)(i) with the intent to promote the carrying on of specified

9   unlawful activity."  "Financial transaction" is defined under 18 U.S.C. § 1956(a)(1) as

10  follows: "a financial transaction shall be considered to be one involving the proceeds of

11  specified unlawful activity if it is part of a set of parallel or dependent transactions, any

12  one of which involves the proceeds of specified unlawful activity, and all of which are

13  part of a single plan or arrangement."

14      10.   The investigation shows that many, if not most, of the paid advertisements

15  on the Backpage website are for prostitution activities in violation of 18 U.S.C.

16  § 1952.  Furthermore, the investigation indicates that many, if not most, of the individuals

17  advertising those services have no other legitimate source of income, and, accordingly,

18  that much, if not most, of the money used to pay for those advertisements is derived from

19  illegal prostitution activity in violation of 18 U.S.C. § 1952.

20      11.   The investigation also shows there is probable cause that James Larkin and

21  Michael Lacey are the true beneficial owners of Backpage, and that Carl Ferrer, Larkin,

22  Lacey, Andrew Padilla, Adam Padilla, Joye Vaught, and other officers and employees of

23  Backpage know that much, if not most, of the money Backpage receives for such paid

24  advertisements represents proceeds from illegal activities.  Similarly, the investigation

25  shows that the monies paid for the advertisements are used to facilitate illegal prostitution

26  and to perpetuate Backpage's business by, among other things, paying moderation

27  employees to sanitize the submission of advertisements, maintaining the servers used to

28

-3-

1  promote Backpage's Adult internet site, paying managers and other employees,

2  maintaining a headquarters, and paying the owners of the website.  In sum, as detailed

3  below, there is probable cause that Larkin, Lacey, Andrew Padilla, Adam Padilla,

4  Vaught, and other officers and employees of Backpage are engaging in promotional

5  money laundering and conspiracy to commit promotional money laundering.

6        **PROSTITUTION AND SEX TRAFFICKING ON THE INTERNET**

7        12.   Based on my training and experience, I know that the internet has

8  transformed the commercial sex trade.

9        13.   Prior to the rise of the internet, commercial sex took place on the streets, at

10  casinos, truck stops, and other physical locations.

11        14.   With the internet, individuals involved in advertising commercial sex now

12  post advertisements online on various websites, including classified ad websites.  Such

13  online sites facilitate the commercial sex trade by providing an easily accessible forum

14  that matches buyers of sex with the individuals providing sex acts for a fee.  The

15  individuals providing sex acts for a fee include minor and adult victims of sex trafficking

16  and adult individuals voluntarily engaging in prostitution.

17        **UNDERLYING INVESTIGATION INTO BACKPAGE.COM**

18        15.   Backpage is a company that provides online classified advertising at the

19  website www.Backpage.com.  Backpage can be accessed throughout the United States

20  and in foreign countries.  It was created around 2004.

21        16.   Backpage has offices and employees in Phoenix, Arizona, and Dallas,

22  Texas.  Carl Ferrer is the CEO of Backpage, and remains active within Backpage to this

23  day.

24        17.   Beginning in 2004, Backpage was owned by a parent company called New

25  Times Media ("NTM"), later called Village Voice Media ("VVM").  In September 2012,

26  Lacey and Larkin decided to sell other holdings within VVM and retain ownership of

27  Backpage.

28                              - 4 -

18.     Backpage allows users to post classified ads under numerous categories including, among others, automotive, buy/sell/trade, jobs, real estate for sale, rentals, and adult entertainment.  The ads are categorized by location, allowing a user to decide the city and country to post ads in or to browse.  Numerous cities throughout the United States are provided, along with cities in foreign countries.

19.     The adult entertainment section is broken up into different categories, including "adult jobs," "body rubs," "domination & fetish," "escorts," "male escorts," "phone & websites," "strippers/strip clubs," and "transsexual escorts."

20.     Backpage had an adult section offering "services" and "body rubs" starting in 2004.  Backpage had an "escorts" section starting as early as 2006.

21.     Beginning in 2010, Backpage began making large profits per year for ads posted in the Escorts section of the site after its competitor, Craigslist, shut down its own adult services section.  Craigslist was an online classified ad site similar to Backpage.  Craigslist faced public pressure from numerous state attorneys general to shut down its adult services section because it was commonly linked to sex trafficking and prostitution.  Once Craigslist shut down its adult services section, Backpage began to see a spike in the escort ads posted on its site, along with a spike in profits.  In 2011 alone, Backpage began making more than $30 million a year.

22.     In January 2017, Backpage closed its adult advertising section in the United States, asserting years of government pressure left it no choice but to shutter its most popular and lucrative feature.  The decision came shortly after a U.S. Senate panel released a report alleging Backpage concealed criminal activity by removing words from ads that would have exposed child sex trafficking and prostitution.

## LAW ENFORCEMENT INVESTIGATION INVOLVING SEX TRAFFICKING AND PROSTITUTION

23.     Ads posted within the escort section of Backpage are routinely tied to sex trafficking and prostitution crimes.  For the past seven years, law enforcement at the

1    local, state, and federal level have repeatedly investigated and charged pimps and other

2    individuals in connection with adult and child sex trafficking on Backpage.  Within the

3    FBI Phoenix field office alone, numerous defendants have been charged and convicted of

4    sex trafficking and other prostitution offenses involving Backpage.

5         24.    The charging and prosecution of pimps and other traffickers who utilize

6    Backpage are largely publicized.  A review of the FBI's website alone reveals over 200

7    press releases specifically mentioning Backpage in connection with individuals charged

8    and/or convicted of sex trafficking and other prostitution related offenses.

9         25.    Over the past several years, law enforcement has been involved in

10   operations targeting the customers of commercial sex on Backpage ("Johns").   Law

11   enforcement has posted numerous undercover ads in the escort section as thinly veiled

12   advertisements for prostitution.  Hundreds of Johns have been arrested in the process.

13        26.    Operations targeting Johns on Backpage have also been widely publicized.

14   For example, in "Operation Flush the Johns," law enforcement in Nassau County, New

15   York, posted undercover prostitution advertisements on Backpage from April 18, 2013,

16   to May 24, 2013.  The ads included a fictitious woman known as "Amber," age "27," in

17   scantily clad photographs claiming to be "the girl next door," who is "420 friendly"

18   (slang for marijuana use), and "very open minded."  After reviewing the ads, the

19   customers arranged to meet the fictitious individuals advertised.  Each meeting was

20   captured on hidden cameras where Johns agreed to pay undercover female agents

21   between $50 and $100 for sex acts.  As a result of the operation, 104 Johns were arrested.

22   (*See* http://www.nydailynews.com/new-york/104-johns-nabbed-nassau-county-pay-sex-

23   article-1.1361717).

24        27.    A similar operation was conducted throughout the country in 2014, in an

25   operation dubbed "National Day of Johns Arrests."  Undercover escort ads were posted

26   on sites including Backpage, resulting in the arrests of 496 Johns.  The operation

27   involved law enforcement in Arizona, Colorado, Illinois, Massachusetts, Minnesota,

28                                        - 6 -

1   Nevada, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, Texas, Virginia,

2   and Washington. (*See* http://www.cookcountysheriff.com/press_page/press_

3   NationalSex Traffickng Sting2014_08_06_2014.html).

### CALIFORNIA DEPARTMENT OF JUSTICE
### UNDERCOVER INVESTIGATION INTO BACKPAGE.COM

6   28.   I am aware of an undercover operation conducted in California targeting

7   Backpage's facilitation of prostitution by posting ads.  In March 2015, California

8   Department of Justice ("California DOJ") Special Agent ("SA") Tera Mackey and SA

9   Brian Fichtner began an undercover investigation into Backpage.com.  SA Mackey was

10   assigned to the California DOJ Sexual Predator Apprehension Team in 2001.  Her duties

11   included the investigation of the sexual exploitation of children, which often involves the

12   use of the internet.  SA Mackey is currently assigned to the California DOJ eCrime Unit,

13   where she engages in investigative work for crimes committed on the internet.  SA Brian

14   Fichtner has been a member of the eCrime unit and has received extensive training on

15   computer related crimes since 2012.  Prior to being assigned to the eCrime unit, he was

16   with the Bureau of Narcotic Enforcement for twelve years.

17   29.   On March 6, 2015, SA Fichtner posted two fictitious undercover ads in the

18   Sacramento region of Backpage.  One ad offered adult companionship for money in the

19   Escort Section and the other ads listed a sofa for sale in the "Buy, Sell, Trade" section.  In

20   both ads, SA Fichtner used the same account information – a state funded credit card to

21   pay Backpage.com to post the ad, an undercover cell phone number, and the email

22   address katiecatt19@gmail.com.

23   30.   To post the Escort ad, SA Fichtner went to the Backpage homepage.  The

24   first page displayed eleven (11) sections with sub-categories; for instance, the "Adult"

25   section contains the "Escort" sub-category and users can click directly on the Escort

26   category from the homepage.  At the top of the page, there was a "Post Ad" link.  He

27   clicked on this link and it displayed a page that listed eleven (11) sections similar to the

28

1    homepage.  He clicked on the category of "Escorts" and a page was displayed with

2    "Posting Rules."  After clicking a button at the bottom of the page, he continued the

3    posting process.

4        31.    The next page displayed a blank template for entering the title, description,

5    age, location, email address, and photos or videos for the ad.  Backpage listed a fee of

6    $10 for the Escort category.  Toward the bottom of the page, upgrades to the ad were

7    offered for additional fees.  Upgrades included automatically reposting the ad to the top

8    of the page or highlighting the ad with a "thumbnail."  Users could pay anywhere from

9    $40 to repost an ad several times a day, to $960 to repost an ad 104 times a day.

10       32.    To draft the fictitious ads, SA Fichtner used Backpage ads reviewed during

11   the investigation as templates.  He included a photograph of a woman dressed in lingerie

12   who described herself as "clean, safe, and 100% independent" and offered to make users'

13   "dreams come true," mentioning an hourly rate of $175.  Once the template was

14   completed, he clicked on the "Continue" button at the bottom of the page; next to the

15   "Continue" button was the statement, "By placing this ad I agree to the terms of use and

16   privacy policy."  He then clicked on the linked terms and policy.

17       33.    SA Fichtner continued to the next page of the process where he displayed a

18   preview of his advertisement and listed the cost of $111.20 to post the ad; he paid to auto-

19   repost eight (8) times and $21.20 for a Sponsored ad thumbnail on the side banner.  At

20   about 8:52 am, he clicked on the "Post Ad Now" button and was forwarded to the

21   payment page requesting payment by credit card or Bitcoin.  He paid with a credit card

22   utilizing state provided funds.  Below the "Submit" payment button, there was a message

23   stating, "The charge will appear on your statement as: BP NATIONAL, Payment

24   Solutions BV., Stawinskylaam 601, 1077XX, Amsterdam, Netherlands."  After clicking

25   on the "Submit" button, he received a "Thank you" message.

26       34.    Immediately after posting the ad, an email was sent on behalf of

27   sacramento.backpage.com to the email address SA Fichtner provided when posting the

28

1    ad. The email thanked SA Fichtner for posting the ad and explained that the ad was
2    "Pending" and "will be released soon." The email noted the posting date, the expiration
3    date, and the cost of the ad. The ad was posted on Backpage at about 9:00 am.

4         35.    SA Fichtner went through a similar process to post the non-Adult ad – a
5    couch for sale in the "Buy, Sell, Trade" section on Backpage.com; there was no
6    minimum fee required for the non-Adult ad, but he paid $1.22 to promote the ad via a
7    Sponsored side banner thumbnail, as well as 26 auto-reposts.

8         36.    SA Mackey was assigned to monitor and document all calls and texts sent
9    to the undercover cell phone used in the ads.

10        37.    Within minutes of the Escort Ad going live, SA Mackey began receiving
11   calls and texts. Between the 6th and 16th of March 2015, SA Mackey received
12   approximately 197 text messages and 134 phone calls inquiring about the Escort Ad. SA
13   Mackey received one text message inquiring as to the availability of the couch.

14        38.    While working in her undercover capacity, SA Mackey communicated with
15   several of the potential customers tied to the escort ad, sending and receiving a total of
16   747 text messages. Many potential customers used terms in their messages and phone
17   calls commonly seen in the commercial sex context. Based on my training and
18   experience, along with the training and experience of SA Mackey and SA Fichtner, the
19   terms used by the customers' in their messages was understood as follows:

20        a.  Incalls and/or Outcalls: An "incall" is where the customer comes to the
              "escort's" location and an "outcall" is where the escort goes to the
21            customer's location. Many users asked SA Mackey about her
22            incall/outcall policy.
         b.  Donation: "Donation" in the "escort" context means the fee an escort
23            would charge for sex acts; in researching commercial sex cases,
              particularly those on Backpage.com, both prostitutes and customers
24            seem to believe that by saying "donation" rather than fee, they are
25            protected from possible criminal charges.
         c.  BBBJ: "Bare Back Blow Job" – Fellatio without a condom.
26       d.  FS: "Full Services" – Sexual intercourse to completion
27

28
                                        - 9 -

e. GFE: "Girlfriend Experience" – a session that is more like lovemaking with a girlfriend than a commercial service.

f. Greek: anal sexual intercourse

39.    Of the 747 text messages that were sent and received, SA Mackey received one video, via text message, of an adult male having intercourse with a "blow up doll" and photographs of two potential customers' faces.

40.    Based on the number of phone calls and text messages, I infer that a large number of individuals viewed the ad posted as a prostitution ad. Because numerous individuals viewed the ads as prostitution ads, there is probable cause to believe that Backpage knows that these types of ads are indeed for prostitution.

41.    On March 16, 2015, SA Fichtner called Backpage to notify them of the prostitution related ad. SA Fichtner called Elizabeth McDougall, an attorney for Backpage, and left a voicemail with her identifying himself as an agent with the California DOJ, and explaining that he wanted Backpage to remove a known prostitution ad in the Escort section. SA Fichtner left his cell phone number.

42.    On March 16, 2015, SA Fichtner also called Carl Ferrer, the CEO of Backpage. SA Fichtner reached Carl Ferrer and identified himself and asked him about removing a known prostitution ad. Carl Ferrer initially told him to report the ad by email to abuse@backpage.com, but then asked for the ad's details. SA Fichtner provided the Post ID for the ad. Ferrer seemed to be looking up the ad on a computer stating, "the other ads from this user don't appear to be illegal." Ferrer was able to link the Escort ad to the non-Adult couch ad. Ferrer said that he would personally report the prostitution ad and "lock it out." The ad was in fact removed by Backpage thereafter.

43.    Carl Ferrer also communicated with agents Fichtner and Mackey via the email account carl.ferrer@backpage.com regarding requests to preserve various Backpage ads agents believed to be indicative of prostitution.

44.    On March 17, 2015, Elizabeth McDougall, an attorney for Backpage, called SA Fichtner. SA Fichtner told her he had spoken with Carl Ferrer and that he had

- 10 -

1 removed the ad.  McDougall asked how SA Fichtner knew the ad was for prostitution.

2 SA Fichtner said he could not provide details of his investigation.  SA Fichtner

3 mentioned that he had seen numerous other ads on Backpage that seemed to be for

4 prostitution and asked why they were not being removed.  McDougall said that Backpage

5 does not restrict a users' First Amendment right to post ads.  She said Backpage has a

6 filtering process in place to prevent the posting of illegal ads.  McDougall explained

7 Backpage's four step filtering process.  First, ads are screened by a computer program

8 that looks for flagged terms.  If the ad passes the computer screening, it is then screened

9 twice by a human moderator – once before it gets posted and again after it is posted.  The

10 final level of filtering comes from the public, who can report an ad directly to Backpage

11 via a link on the site.

12        45.      SA Fichtner said he noticed several photos in the Escort section showing

13 breasts and genitalia.  SA Fichtner asked McDougall if there are restrictions on the types

14 of photos that can be posted.  McDougall said photos of that nature are not allowed and

15 should not make it through the filtering process.  She said if those types of photos are

16 making it through the filtering process, then Backpage would need to identify the

17 moderator who screened the ad and correct the problem.

18        46.      SA Fichtner asked McDougall to explain why the Escort section charged a

19 significantly higher fee than any other section on the website.  She said the higher cost to

20 post adult escort ads was a recommendation that had been made to Craigslist.com by the

21 Attorney General to deter criminals from posting illegal ads, and that Backpage followed

22 suit.  McDougall stated that Backpage works closely with law enforcement.

23        47.      SA Fichtner reiterated that many Backpage ads appear to be blatant

24 prostitution ads.  McDougall did not dissuade him from this impression, and returned to

25 her point about the First Amendment.  She said that the internet and prostitution were not

26 going away and if Backpage were to restrict postings of Adult services on their website, it

27

28

- 11 -

1  would only drive the industry underground, making it more difficult for law enforcement

2  to investigate.

3       48.    Through its investigation, the California DOJ Special Agents learned that

4  the email accounts described in Attachment A, among others, were used by

5  Backpage.com officers and employees to conduct its business. California DOJ's

6  investigation revealed the above email accounts were being stored on Google's servers.

7  Beginning in July 2015, California DOJ obtained search warrants for the accounts listed

8  in Attachment A, among others, in the California Superior Court in Placer County.

9  California DOJ obtained search warrant returns for the email accounts from Google.

10       49.    As part of its investigation, California DOJ reviewed an email sent from

11  Mariel Lubeck to Jim.Larkin@villagevoicemedia.com, and

12  Michael.Lacey@villagevoicemedia.com. The email's subject read "Conference call this

13  week – Confidential." From California DOJ's review of Ferrer's emails, as well as

14  corporate records, it learned that Ferrer regularly reports to an apparent Board of

15  Directors. For example, in January 2014, Ferrer sent an email to members of the board,

16  including Larkin, about an upcoming meeting they all appeared to be attending. Ferrer

17  attached a file named "Agendas_jan_2014_PHXBD," which California DOJ believed

18  meant Phoenix Board. Among other items, the agenda stated that some payment

19  processors were "out because of pot and guns," which I believe refers to the "Sporting

20  Equipment" and "Farm" sections on Backpage.com that often feature pot and guns for

21  sale. The agenda also mentioned improving the "UX" or user experience by removing

22  "state and name from credit card form," and stopping "pre-pub moderation in CA." The

23  agenda also stated that to "compete with free you have to be easier and more

24  anonymous," and mentioned allowing "users to post without an email address" and only

25  storing an IP address. This evidence supports my belief that Ferrer and Backpage staff

26  know that Backpage is used for commercial sex and that Ferrer and Backpage

27  intentionally furthers that criminal activity by helping users remain anonymous.

28

1   California DOJ's investigation also revealed that starting in 2010, Lacey and Larkin used
2   their VVM email addresses (Jim.Larkin@villagevoicemedia.com, and
3   Michael.Lacey@villagevoicemedia.com) to communicate with the National Center for
4   Missing and Exploited Children about measures Backpage could adopt to curb child sex
5   trafficking on its site.

6          50.     California DOJ's investigation also found additional email addresses Ferrer
7   used to communicate regarding Backpage's business.  For instance, in April 2015, Ferrer
8   forwarded an email from his Backpage account to his ferrer.carl@gmail.com Gmail
9   account about "detective work" he and his staff had been doing on a "hitlist" [sic] of
10  competing sites.

## BACKPAGE HAS KNOWLEDGE OF THE ILLEGAL ACTIVITY OCCURRING IN ITS ESCORT SECTION

### A.    LAWSUITS

14         51.     Many groups and individuals have discussed with Backpage the
15  prostitution activity occurring on its Escort section on multiple occasions.  By letter dated
16  September 21, 2010, twenty-one state Attorneys General informed the then-lawyer for
17  Backpage of the following: "We believe that ads for prostitution, including ads
18  trafficking children, are rampant on the site and that the volume of ads will grow in light
19  of Craigslist's recent decision to eliminate the adult services section of the website."
20  Backpage continued to provide its "Escort" section to the general public.  By letter dated
21  August 31, 2011, forty-five state Attorneys General sent a letter to Backpage's then
22  counsel discussing various cases the offices were prosecuting where children were
23  trafficked on Backpage.  (See http://attorneygeneral.tn.gov/cases/backpage/
24  backpageletter.pdf; see also Craig GJ transcript).  Despite repeated warnings about
25  facilitating prostitution, Backpage still continued to provide its "Escort" section to the
26  public.

27

28

1       52.     While continuing to run its "Escort" section, Backpage has been served

2 with civil complaints providing it additional notice of serious allegations involving sex

3 trafficking.  For example, in 2010 Backpage was sued in *M.A. ex. rel. P.K. v. Vill. Voice*

4 *Media Holdings, LLC and Backpage*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011).  According

5 to the court papers, a juvenile of sex trafficking sued Backpage for her victimization after

6 ads were posted of her on Backpage.  Specifically, from 2009 to 2010, Plaintiff M.A., a

7 14-year-old, was being sexually trafficked by Latasha Jewell McFarland, an adult, who

8 pled guilty in a separate criminal case to using a facility in interstate commerce to

9 promote prostitution pursuant to 18 U.S.C. §1952(a)(3).  Defendant McFarland, while in

10 open court, admitted to photographing M.A., displaying her private body parts in sexual

11 pornographic poses, and posting the child pornography on Backpage as advertisements

12 seeking payment for sex.  McFarland further admitted to paying Backpage for these

13 postings, and transporting M.A. for the purposes of multiple sexual liaisons for money

14 with adult male customers obtained through Backpage's website.  *Id.* at 1041-42.

15       53.     In seeking to hold Backpage liable, the lawsuit against Backpage alleged

16 the following:

17     * In 2009 and 2010, [Backpage] posted many advertisements which
        included explicit nude photographs of Plaintiff, M.A., a minor, advertising

18         her services as an escort for sex on backpage.com and received fees for
        each posting.

19     * [Backpage] had knowledge that: explicit sexual pornographic

20         photographs were being posted on its website; that postings on their
        website were advertisements for prostitution; that numerous minors were

21         included in these postings for prostitution on its website; that sex

22         trafficking of minors is prolific in the United States of America; that the
        internet, including their website, was used for advertisements for illegal

23         sexual contact with minors; that on numerous prior occasions [Backpage

24         was] made aware of minors being trafficked on their website; that
        according to [Backpage], on five prior occasions [Backpage] responded to

25         subpoenas involving the trafficking of minors on backpage.com and this

26         does not include other cases involving minors of which [Backpage is]
        aware wherein [Backpage] cooperated with authorities without subpoenas.

27     * By posting explicit nude photographs of Plaintiff, M.A., a minor, in an

28

- 14 -

advertisement which advertised her services as an escort for sex on backpage.com, [Backpage] facilitated child sex trafficking and aided and abetted McFarland in violating each criminal statute and United States Treaty Optional Protocol herein alleged, in that: [Backpage] had a strong suspicion that the aforementioned crimes were being committed yet was so indifferent that [it] failed to investigate for fear of what it would learn; [Backpage] had a desire that these posters accomplished their nefarious illegal prostitution activities so that the posters would return to the website and pay for more posting; and [Backpage] continued to maintain their website so as to participate in these illegal transactions....
*Id.* at 1045.

54.     Backpage, through its lawyers, moved to dismiss the lawsuit and argued immunity under the Communications Decency Act, 47 U.S.C. § 230.  After reviewing the allegations and the Communications Decency Act ("CDA"), which serves as a bar for many civil lawsuits and state criminal prosecutions against internet-related entities, the district court dismissed the lawsuit.  *Id.* at 1058.

55.     In October, 2014, Backpage was again sued by child sex trafficking victims in *Doe ex rel. Roe v. Backpage.com, LLC*, 104 F. Supp. 3d 149, 149-65 (D. Mass. 2015).  According to that lawsuit, Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 were juvenile victims of sex trafficking advertised repeatedly on Backpage.  Jane Doe No. 1 was first trafficked by pimps on Backpage in February of 2012, when she was 15 years old.  She was again sold on Backpage in March of 2013.  Between June of 2013 and September 10, 2013, her "services" were advertised on Backpage each and every day.  As a result of the ads, she engaged in 10 to 12 sex transactions daily with adult men in Massachusetts and Rhode Island.  Her pimp moved her from town to town every two days to avoid detection.  Jane Doe No. 1 appeared in some 300 ads on Backpage and was raped over 1,000 times.  *Id.* at 153.

56.     Backpage listed each ad featuring Jane Doe No. 1 as an offer of "escort" services, a common euphemism for prostitution.  According to the district court, the Jane Doe No. 1 ads included known signifiers for child prostitution such as "young," "girl,"

1  "fresh," "tiny," "roses," and "party." Jane Doe No. 1's pimp provided a prepaid mobile

2  phone and a prepaid credit card to conceal Jane Doe No. 1's identity when Jane Doe No.

3  1 placed ads on Backpage at the direction of her pimp. When Jane Doe No. 1 attempted

4  to enter her true age (which was under 18) during the purchase of an ad, Backpage would

5  instruct her to enter her age as 18 or older. Photographs of Jane Doe No. 1 (with her

6  facial features obscured, but at least on one occasion displaying a unique tattoo)

7  accompanied all of her ads. *Id.* at 153.

8      57.    Jane Doe No. 2 was trafficked on Backpage by her pimp during various

9  periods between 2010 and 2012 at different locations in Massachusetts. She was first

10  advertised on Backpage when she was 15 years old. Ads featuring Jane Doe No. 2 were

11  posted either by her pimp or an older woman who worked with him (his "bottom"). The

12  ads would appear on Backpage an average of six times per day. Jane Doe No. 2 was

13  given a prepaid mobile phone to answer calls from would-be customers generated by the

14  Backpage ads. As a result of the ads, she was coerced into 5-15 sex transactions every

15  day. Like the ads of Jane Doe No. 1, those of Jane Doe No. 2 featured her photograph.

16  The ads were placed using a prepaid credit card. Altogether, Jane Doe No. 2 was raped

17  over 900 times while being trafficked by her pimp. *Id.* at 153.

18      58.    Jane Doe No. 3 was trafficked on Backpage in December of 2013 by her

19  pimp and one or more of his associates. The Backpage solicitations for the underage Jane

20  Doe No. 3 described her as "new," "sweet," and "playful." As with the other Jane Does,

21  the ads were paid for with a prepaid credit card. Jane Doe No. 3 was also given a mobile

22  phone to take calls and texts from customers. She was taken to a hotel in Foxborough,

23  Massachusetts, where she was raped by men who responded to the ads. Photos of Jane

24  Doe No. 3, including one that she had taken of herself, appeared with the ads on

25  Backpage. *Id.* at 153.

26      59.    Backpage, through its lawyers, again moved to dismiss the civil complaint

27  pursuant to the CDA. The district court granted the motion to dismiss.

28

- 16 -

1    60.    In 2012, Backpage was sued by three additional juvenile victims of sex

2    trafficking in *J.S. v. Village Voice Media Holdings, LLC, d/b/a Backpage.com LLC*, 359

3    P.3d 714 (Wash. S. Ct. 2015), after their advertisements were placed on Backpage and

4    they were raped by adult customers who responded to the advertisements. According to

5    the Second Amended Complaint, in 2010 "J.S.," a 15-year-old minor, was advertised on

6    Backpage along with multiple lascivious photographs of the minor. J.S.'s pimp paid

7    Backpage a fee for such advertisements. Advertisements of J.S. appeared in the escort

8    section over 100 different times. J.S. engaged in sexual intercourse with multiple adults a

9    day for a fee for several months. (Am. Compl. 4.1-4.4)

10    61.    According to the Amended Complaint, "S.L." was advertised on Backpage

11    in September 2010 when she was 13 years old. Her pimps dressed her up in lingerie and

12    took photographs of her to include in the ad. The pimps paid Backpage a fee for the

13    advertisements. S.L. was repeatedly trafficked to adult men and provided sex for a fee.

14    (Am. Compl. 5.1-5.4)

15    62.    "L.C." was 13 years old when she was advertised for prostitution by her

16    pimps on Backpage. From July 2010 until September 23, 2010, the pimps paid for

17    multiple advertisements on Backpage and included ad titles such as "80 DOLLAR DAY

18    SPECIAL, ask for Tasha." In another ad, it stated "Face down Ass Up," while another ad

19    stated "Let Em BLOW YOUR MIND." The ads included photos of the under-aged

20    victim. After being advertised on Backpage, L.C. was raped by hundreds of adult men.

21    (Am. Compl. 6.1-6.5)

22    63.    Backpage, through its attorneys, moved to dismiss under the CDA. Unlike

23    other jurisdictions, the Washington Supreme Court held the CDA did not serve as a bar

24    and the lawsuit is going forward. 359 P.3d 714, 717-718.

25    64.    Multiple anti-trafficking organizations filed amicus curiae briefs in the

26    Washington law suit, including the National Center for Missing and Exploited Children

27

28

- 17 -

("NCMEC") and Shared Hope International, which is a non-profit, NGO funded by a U.S. Congresswoman in 1998 to help eradicate sex trafficking.

65.     According to NCMEC, numerous family members found their relatives being advertised on Backpage and provided feedback directly to Backpage through the "Report" feature on Backpage's site. The following communications were sent directly to Backpage in response to various ads posted:

> * "No the girl …is 16 shes my cousin she ra[n] away from home two months ago…The cops r trying to get her and her pimp. She is a runaway She got tattoos of her pimp on her lower stomach and upper right eyebrow."
> * "This ad has photos of my 16 year old sister who currently being trafficked and we are trying to get home. We have an active investigation going on and am trying to get her away from her pimp and bring her home. Please stop allowing whoever it is to post her. She['s] only a minor and we want her home."
> * "How dare you allow a post of my juvenile daughter being used in a sex trafficking post! Shame on you backpage – you know what you're really all about and I am on a mission to take you down…Shame shame shame!"
>
> (*See* Amicus Curiae Brief Of The National Center For Missing And Exploited Children, In The Supreme Court Of The State Of Washington, pg. 7.)

66.     According to published statements made by Shared Hope International, at least 495 minor victims of sex trafficking have been linked to Backpage as of July 14, 2015. (*See* http://sharedhope.org/2015/07/14/495-child-sex-trafficking-victims-linked-to-backpage-com-visa-mastercard-amex-cut-ties-with-site/ ).

## B.     ADS DESCRIPTIVE OF ILLEGALITY

67.     In various interviews throughout the years, Backpage employees and/or counsel have claimed that "Escort" ads are not necessarily criminal and are protected by the First Amendment. A review of various advertisements that Backpage has permitted to go live and remain live on its site show that the ads appear criminal on their face.

- 18 -

1    68.    By way of just a few examples,[1] on March 25, 2016, an individual posted

2  the following advertisement for the Athens, Georgia area:

3

4         COLLEGE who Loves Ana$l Crem$pies – 25
          Hi guys, it's YOUR GIRL MIYA AND I'm best head suc*ker it is an I'm
5         not from here but I just moved here from Atl… I HOST ONLY AN
          PRIVATE AN DISCREET…Location.  I love those OLDER WHITE MEN
6         WHO LOVE THOSE BLACK FREAKY college student girls who REM
7         a*ss and who's dominant..Take control $$is req.  No rushin no time limit.
          If the offers fair enough…(((706-389-5223)))
8

9    69.    Attached to the ad is a picture of a young female posing in a black and

10  white printed bra and underwear.  A second picture is a partial image of her face.  (*See*

11  Exhibit 1.)

12    70.    The above ad remained live on Backpage as of April 22, 2016.

13    71.    Based my training and experience, I am familiar with the following

14  terminology and expressions commonly used in the prostitution context and seen in the

15  above ad: Ana$l Crem$pies appears to be slightly coded to mean "anal cream pies."

16  "Anal cream pies" relates to sexual activity involving a person's anus, including

17  ejaculation.  "Head sucker" is a slang term for oral sex performed on a man's genitals.  I

18  interpret "req" to be shorthand for "required" and the individual is stating that money is

19  required for the sex acts.  I have probable cause to believe that this is a prostitution

20  advertisement on Backpage and that Backpage knows such an advertisement is connected

21  to prostitution.

22    72.    On April 16, 2016, an individual posted an ad in the Arizona escort section

23  of Backpage, which read as follows:

24      100 incalls * Phat @$$!  100$ incall – A*N*A*L *Queen  PorN  No.

25  _____

26

27      [1] Each ad is attached as exhibits 1-3 to this affidavit to fully illustrate the different symbols
    and pictures used that cannot be adequately conveyed with Microsoft Word.
28

available – 22
Hey KeLLY 415 602 6537
Im Young, Sexy, Sweet, Mature, Playful, & im Amazingly Talented. I'm
Available 24/7
*100% INDEPENDENT
*Upscale Gentlemen ONLY
*Always Safe & very Clean
*No Police/Pimps
*Must Be Clean & Respectful
*Professional & Discrete * Upscale Beauty * 100% REAL
Gf Exp, Behind Door, All Fetish Welcome
B:*A*C*K*...D*O*O*R pLAY... CALL NOW  KeLLY 415 602 6537

73.     Attached to the ad were several pictures of a young women in various

lingerie.  For example, one image shows her wearing a black bra, waist garter, and black

underwear while standing up taking a "selfie" with her phone.  Another image shows her

wearing a black thong and orange bra while exposing her buttocks to the camera, along

with a partial side shot of her face.  Another image shows her laying on her stomach

wearing cream-colored underwear.  Her buttocks are the focal point of the camera.  This

ad remained live on Backpage as of April 22, 2016.  (See Exhibit 2.)

74.     Based on my training and experience, I am familiar with the following

terminology and expressions commonly used in the prostitution context: "Incalls" is a

term commonly associated with prostitution ads, and it means a customer must come to

the female's location; as opposed to "outcalls" where the female will go to the customer's

location.  100$ incalls refers to charging $100 for the customer to come to the female's

location. "Gf Exp" is shorthand for "Girlfriend Experience."  "Girlfriend Experience"

refers to a customer wanting to have sexual intercourse as if they were have sexual

intercourse with their girlfriend.  "A*N*A*L and B:*A*C*K*...D*O*O*R pLAY"

relate to the female's willingness to engage in anal sex and other commercial sexual

activity involving the anus.  I have probable cause to believe that this is an advertisement

for prostitution and that Backpage knows it constitutes an advertisement for prostitution.

- 20 -

75.     On April 18, 2016, an individual posted an ad for the Long Island, New York area:

> SEXY - BEAUTIFUL – K!nKy B.B.W. BOMBSHELL - DaNgeRouS CuRveS – 24
> Good morning. Up and ready…. Juicy Thick Mami – Respectful and Mature Gents Only – 5'5 BBW Freaky Lil Mama – Available Now – INCSLLS ONLY – Sorry NO ANAL – 100000000% Real – No Games !! Discrete and Very Clean !! SERIOUS CALLERS ONLY – RUDENESS will not be tolerated – Please NO PIMPS.  NO LAW ENFORCEMENT! No THUGS! No Drama! Just Good Safe and Clean Fun! No Explicate talk!! No extra pictures – 6074815436 – Hauppauge Smithtown Commack Sayville Massapequa Ronkonkoma

76.     Attached to the post is a woman wearing black underwear and black fishnet patterned nylons while bending over a toilet.  Her buttocks are the focal point of the camera.  A second picture shows her sitting on a toilet and straddling the toilet while wearing the same black lingerie outfit described above.  The focal point is again on her buttocks. A third picture shows her in the same black lingerie outfit while kneeling on top of a bed.  Her back is facing the camera while she plays with her long hair.  The above ad remained online as of April 22, 2016.  (*See* Exhibit 3.)

77.     Based on my training and experience, "BBW" stands for Big Beautiful Woman.  "Freaky" relates to the sexual adventurousness of the individual.  "No Anal" is interpreted to mean no anal sex.  No LEO is clearly stated and gives notice to Backpage that the purpose of the ad is to engage in illegal activity.  I have probable cause to believe that this is an advertisement for prostitution where the individual will engage in commercial sex acts and Backpage knows this is an advertisement for prostitution.

1    **UNITED STATES SENATE, PERMANENT SUBCOMMITTEE ON**
2    **INVESTIGATIONS, COMMITTEE ON HOMELAND SECURITY AND**
     **GOVERNMENTAL AFFAIRS ("PSI"), INVESTIGATION OF BACKPAGE.COM**

3    A.    **November 2015 PSI Report - Recommendation to Enforce a Subpoena Issued**
4          **to the CEO of Backpage.com, LLC**

5          78.    I am aware of a November 19, 2015, report issued by the United States

6    Senate, Permanent Subcommittee on Investigations, Committee on Homeland Security

7    and Governmental Affairs ("PSI Report") recommending enforcement of an October 1,

8    2015, subpoena issued to Carl Ferrer.

9          79.    The subpoena requested, among other items, documents concerning

10   Backpage's moderation efforts, including information related to editing or modifying ads

11   before publishing.  The subpoena also requested documents concerning metadata,

12   document retention, basic corporate information, and revenue derived from adult

13   advertisements.  (PSI Report, p. 30.)

14         80.    On the return date, Backpage produced twenty-one pages of publicly

15   available documents and submitted a letter objecting to certain document request in the

16   subpoena on the grounds that they violated the First Amendment and were not pertinent

17   to a proper legislative investigation.  (*Id.* at 30.)  Backpage declined to produce the many

18   internal documents it possesses that are responsive to the subpoena's request for

19   information about its moderation procedures, data-retention policies, and financial

20   information.  (*Id.* at 32.)

21         81.    The Subcommittee overruled Backpage's objection explaining that

22   Backpage's vague and underdeveloped First Amendment arguments lacked merit.  (*Id.* at

23   31.)  The Subcommittee further rejected Backpage's entirely unexplained contention that

24   the document requests in the October 1, 2015, subpoena were not pertinent to a proper

25   investigation.  (*Id.* at 32.)  Undeterred by Backpage's noncompliance with its process, the

26   Subcommittee pursued its fact-finding through other means.  The PSI Report detailed the

27   Subcommittee's preliminary findings.

28

- 22 -

82.     The Subcommittee found substantial evidence that Backpage edits the content of some ads, including by deleting words and images, before publication. The record indicates that in some cases, the deletions likely served to remove evidence of the illegality of the underlying transactions. (*Id.*) Specifically, as part of its moderation process, it appears that Backpage will delete particular words or images that violate its terms of service. (*Id.*) Backpage's General Counsel, Elizabeth McDougall, told the Subcommittee of this practice in a staff interview, but the company has so far refused to provide additional documents about it. (*Id.*) The subcommittee attempted to take the testimony of two Backpage employees in charge of its moderation practices, but they refused to testify on the grounds that it might incriminate them. (*Id.*)

83.     The subcommittee, however, obtained evidence that from 2010 through 2012, Backpage outsourced its moderation practices to a California-based company that employed moderators in India. During this time, the moderators deleted certain images, words, or phrases from "adult" ads. (*Id.*) Specifically, Backpage issued specific content guidelines and instructions to the moderators and continuously updated these instructions. (*Id.*) Content guidance from Backpage typically took one of three forms: First, Backpage provided descriptions of images it would accept, decline, or edit, including specific examples. Second, Backpage's guidance included lists of words that should prompt moderators to either fail or edit an ad. Finally, Backpage, often through Operations Manager Andrew Padilla or Carl Ferrer would, in some instances, answer questions from the company's moderators about failing, approving, or editing specific content in specific ads. (*Id.*)

84.     Carl Ferrer, Andrew Padilla, among other Backpage employees, were in regular email contact with the moderators about the speed of the moderation process. Backpage had the ability to monitor the number of ads awaiting review in each queue, including whether certain ads had exceeded a certain amount of time from posting to approval. (*Id.*) Automatic email alerts notified Backpage managers when ads were

- 23 -

1    waiting in the queue for longer than the target wait times.  On occasion, Andrew Padilla

2    or another Backpage employee emailed persons when ads sat too long in the queue to

3    urge them to process the ad.  (*Id.*)

4         85.   Backpage CEO Carl Ferrer was intimately involved in communicating the

5    content policies the California-based company that it outsourced its moderation practices

6    were to apply.  For example, guidelines in October 2010 flagged for scrutiny not only

7    certain sexual images, but also text that conveyed an offer of sex for money ("no pricing

8    for services less than an hour").  (*Id.* at 18.)  With respect to these particular changes in

9    guidance, Mr. Ferrer wrote (via email), "Better to edit by removing bad text or removing

10   bad language.  We will do this for a few weeks to give users a chance to adjust."  (*Id.* at

11   18.)  In another email, Mr. Ferrer communicated with the company it outsourced its

12   moderation practice to about how to deal with ads that offer services based on time

13   increments, *e.g.*, 15 or 30 minutes that are standard in the illegal sex trade.  Mr. Ferrer

14   explained: "Removing bad pics and removing bad text like 15 min ½ hour is critical.  I

15   think [the moderators] will be busy."  (*Id.* at 19.)

16        86.   Quality control for the screening and editing process was also an important

17   concern for Backpage during its contract with the California-based company.  Backpage

18   encouraged the company's moderators to review ads quickly, but to not cut corners."  (*Id.*

19   at 21.)  Backpage attempted to monitor the moderators to provide "constructive

20   feedback" when a moderator failed an ad that should have been approved or vice versa.

21   But at least as of 2010, the editing platform did not provide Backpage the ability to

22   monitor the specific edits a moderator made to a post; Backpage could only see the final

23   product.  (*Id.*)

24        87.   In some instances, Backpage took corrective action after ads containing

25   violations of Backpage content policies were published even after going through the

26   screening and editing process.  (*Id.*)  In these cases, Backpage sent the violation to the

27   company with the ID number of the moderator who "missed" the particular violation.

28
                                    - 24 -

1    (*Id.*) The company would then retrain the moderator and explain why the particular item

2    needed editing. (*Id.*)

3          88.    Quality control was important to Backpage not only to ensure compliance

4    with its policies, but also to ensure customer satisfaction. Backpage's revenue depends

5    on user's willingness to pay to post ads, the cost of which can range from a few dollars to

6    more than one hundred dollars as users buy upgrades to promote or sponsor ads to

7    receive more views. (*Id.*) In some instances, users complained to Backpage's customer

8    service department when images were deleted that the user knew should have been

9    approved. Mr. Ferrer reacted to that personally. (*Id.* at 21.) In one email to Backpage

10   staff, Mr. Ferrer noted "an increase in users complaining about false positives" and urged

11   the moderators to "exercise care when removing images." In at least one instance, Mr.

12   Ferrer offered a customer $1,000 in "freebies" when an ad was erroneously edited. (*Id.* at

13   21.)

14          89.    Statements publicly made by Backpage, California DOJ's undercover

15   investigation of Backpage, and the PSI Report show Backpage employees including

16   Ferrer, Padilla, and Vaught, use email to discuss the criminality of various Backpage ads,

17   including discussions on: (1) its moderation process and whether various ads should be

18   removed for violating its policies and/or whether various account holders should be

19   permanently banned from posting on Backpage.com; (2) law enforcement subpoenas

20   seeking ads tied to criminal activity, including prostitution; (3) complaints by the public

21   regarding live ads on Backpage; and (4) reports by Backpage to NCMEC related to

22   individuals who appear to be under 18 or even slightly above 18 years old.

23   **B.    January 2017 PSI Report – Backpage.com's Knowing Facilitation of Online**

24   **Sex Trafficking.**

25          90.    I am also aware of a January 10, 2017, PSI Report titled "Backpage.com's

26   Knowing Facilitation of Online Sex Trafficking." The report contained three principle

27   findings. First, Backpage knowingly concealed evidence of criminality by systematically

28

                                        - 25 -

1    editing its "adult" ads. (Jan. 2017 PSI Report, p. 2.) As early as 2006, Backpage
2    executives began instructing moderators to edit the text of adult ads to conceal the true
3    nature of the underlying transaction. (*Id.*) By October 2010, Backpage executives
4    formalized a process of both manual and automated deletion of incriminating words and
5    phrases, primarily through a feature called the "Strip Term From Ad Filter." (*Id.*) At the
6    direction of CEO Carl Ferrer, the company programmed this electronic filter to "strip" –
7    that is, delete – hundreds of words indicative of sex trafficking (including child sex
8    trafficking) or prostitution from ads before their publication. (*Id.*) The terms that
9    Backpage has automatically deleted from ads before publication include "lolita,"
10   "teenage," "rape," "young," "amber alert," "little girl," "teen," "fresh," "innocent,"
11   and "school girl." When a user submitted an adult ad containing one of these "stripped"
12   words, Backpage's Strip Term From Ad filter would immediately delete the discrete
13   word and the remainder of the ad would be published. (*Id.*) By Backpage's own internal
14   estimate, by late-2010, the company was editing 70 to 80% of ads in the adult section
15   either manually or automatically. (*Id.*)

16        91.    Second, Backpage knows that it facilitates prostitution and child sex
17   trafficking. In addition to the evidence of systematic editing described above, additional
18   evidence shows that Backpage is aware that its website facilitates prostitution and child
19   sex trafficking. Backpage moderators told the Subcommittee that everyone at the
20   company knew the adult-section ads were for prostitution and that their job was to "put[]
21   lipstick on a pig" by sanitizing them. (*Id.* at 3.)

22        92.    Third, despite the reported sale of Backpage to an undisclosed foreign
23   company in 2014, the true beneficial owners of the company are Larkin, Lacey, and
24   Ferrer. (*Id.*) Acting through a complex chain of domestic and international shell
25   companies, Lacey and Larkin lent Ferrer over $600 million to purchase Backpage from
26   them. (*Id.*) The Letter of Intent subjects Ferrer to significant restrictions on his
27   management of the company until the loan is repaid. (*Id.* at 48.) Ferrer cannot sell
28

- 26 -

1    Backpage, assign the loan to another borrower, or even change accountants or outside

2    counsel without approval from Lacey and Larkin. (*Id.*) The sale was conditional on

3    Ferrer providing a "five-year business plan satisfactory to Seller in its sole and absolute

4    discretion," and Ferrer also committed to submit to Lacey and Larkin for approval an

5    annual budget, monthly and quarterly balance sheets, and annual audited financial

6    statements. (*Id.*)

7         93.    Ferrer also made covenants to give Lacey and Larkin electronic access to

8    Backpage's bank accounts and full access to its books and records. In addition, Ferrer

9    could not without approval change the company's organizational structure, salaries,

10   banking relationships, or place of domicile. (*Id.*) Moreover, according to a loan

11   agreement later executed in connection with the sale, Ferrer could not "engage in any line

12   of business other than businesses engaged in on the date" of the sale. (*Id.*) According to

13   the consultant that structured the deal, moreover, this transaction appears to provide no

14   tax benefits. Instead, it serves only to obscure Ferrer's U.S.-based ownership and conceal

15   Lacey and Larkin's continued beneficial ownership. (*Id.*)

16        94.    Based on my review of the PSI Reports and accompanying appendixes, as

17   well as my conversations with law enforcement officers and others, and review of other

18   records, there is probable cause to believe that Ferrer, Lacey, Larkin, Andrew Padilla,

19   Adam Padilla, and Vaught, among other Backpage employees, are aware that Backpage's

20   posting and moderation process intentionally promotes prostitution. There is also

21   probable cause to believe that Ferrer, Lacey, Larkin, Andrew Padilla, Adam Padilla, and

22   Vaught, among other Backpage employees, used email communication to facilitate the

23   promotion of prostitution and child sex trafficking on Backpage.

24        95.    On January 21, 2011, Lacey sent Ferrer an email requesting guidelines

25   moderators use when reviewing ads in the "adult" services section to assist him in what

26   appears to be an upcoming meeting he (Lacey) had scheduled with NCMEC. (Jan. 2017

27   PSI Report, App. 759.) Ferrer responded with an email stating, "our guidelines are vague

28

- 27 -

1   but at least easy to remember." Ferrer also indicates, "They have a hash list of porn pics
2   and list of child porn URL sites to ban. Nothing on runaways. . .yet." (*Id.*) Based on my
3   training and experience, and the facts of this case, I know that hashing is an important
4   tool available to law enforcement. Hashing gives photos a unique fingerprint that enables
5   one to search for identical photos in other places, including on different web pages. In an
6   interview with the Subcommittee, Backpage counsel Elizabeth McDougall claimed that
7   Backpage had implemented hashing, although NCMEC, in testimony submitted to the
8   Subcommittee, stated that Backpage "does not appear to utilize free browser add-ons or
9   hashing technology to match images in ads of known children. (Nov. 2015 PSI Report,
10   23.)

11        96.   On January 31, 2012, Lacey responded to an email sent to him from Scott
12   Tobias where he (Lacey) seemed to be replying to a story Tobias sent him regarding child
13   sex trafficking occurring on Backpage. (Jan. 2017 PSI Report, App. 759.) In Lacey's
14   response to Tobias, he states, "within the response we need to note that as deplorable as
15   this case is, and it is appauling, it is one bad case amongst how many millions of ads that
16   involve no one under age." Lacey continued stating "drug dealers use cell phones, fed-x,
17   when you bust them you do not advocate shutting down phone service, overnight
18   deliveries, underage people use phony I.D. to get into bars thousands of people patronize
19   local bar legally, you don't close it when someone underage deceives the owner of the
20   bar. in time period covered by this story, this is only the second case developed by the
21   attorney general. the case is awful, but with two cases it is not yet a tsunami of underage
22   trafficking, prosecute this case, these individuals, get care and treatment for the victims
23   and stop pandering to yahoos." (*Id.*) Based on my training and experience, and the facts
24   of this case, I believe that this email indicates Lacey's knowledge that Backpage's adult
25   services section is being used to facilitate the promotion of prostitution and child sex
26   trafficking.

27

28

- 28 -

1    97.   On July 28, 2011, Larkin emailed to Ferrer cautioning him against
2    Backpage's moderation practices "being made public." (Jan. 2017 PSI Report, App.
3    432.) Larkin states, "we need to stay away from the very idea of 'editing' the posts, as
4    you know." (*Id.*) Information I have reviewed from the PSI Reports demonstrates that
5    senior Backpage executives, including Larkin and Lacey, are aware that the site's adult
6    section is used extensively to advertise prostitution.  On March 1, 2011, for example,
7    Ernie Allen, NCMEC's then President and CEO, met with Larkin and Lacey.  Allen's
8    notes summarizing this meeting, produced to the Subcommittee, reflect that when Allen
9    asked about adult prostitution, Lacey "lit into me with vengeance. . . .He said his
10   company agreed to eliminate underage kids on their site being sold for sex. . . .However,
11   he said that adult prostitution is none of my business." (Jan. 2017 PSI Report, 36.)
12   Based on my training and experience, and the facts of this case, I believe that there is
13   probable cause to believe that Larkin has knowledge that Backpage knowingly conceals
14   evidence of criminality by systematically editing its ads in its adult services section. .
15   98.   In May 2009, in response to a news article regarding potential criminal
16   investigation of Craigslist in South Carolina, Ferrer sent an email to Andrew Padilla
17   instructing him to scrub local Backpage ads that South Carolina authorities might review:
18   "Sex act pics remove . . .In South Carolina, we need to remove any sex for money
19   language also." (Jan. 2017 PSI Report, App. 15.)  Andrew Padilla replied to Ferrer that
20   he would "implement the text and pic cleanup in South Carolina only." (*Id.*)  In a
21   December 1, 2010 email addressed to Backpage moderators and copying Ferrer, Andrew
22   Padilla touted the success of the Strip Term From Ad filter, solicited ideas for additional
23   words to be stripped, and attached the list of words then-programmed to be stripped from
24   adult ads by the Strip Term From Ad filter before ads were published. (*Id.* at 158.)  The
25   words (among others) that were automatically deleted from ads included "lolita,"
26   "teenage," "rape," and "young." (*Id.*)

27

28

1          99.     Backpage executives also took affirmative steps to ensure that subpoena

2 responses did not disclose too much information about Backpage's moderation practices.

3 In a July 22, 2015 email addressed to a Backpage employee, Vaught asked the employee

4 whether Backpage's subpoena response team "normally send[s] out evil empire and

5 naked city links when [they] reply to cops? If you do, can you stop? We own those sites

6 too."). Based on my knowledge and experience, and the facts of this case, I have

7 knowledge that the websites EvilEmpire.com and NakedCity.com are solely devoted to

8 commercial sex advertising. Both websites contain graphic male and female nudity,

9 which Backpage purports not to allow on its website. (Jan. 2017 PSI Report, 27.)

10         100.   Backpage moderators also manually deleted incriminating language that

11 company filters missed. Manual editing involved the deletion of language similar to the

12 words and phrases that the Strip Term From Ad filter automatically deleted – including

13 words and phrases indicative of criminality. (*Id.* at 2.) In an October 26, 2010 email to a

14 moderation supervisor, copying Ferrer and Vaught, Andrew Padilla outlined some of the

15 types of words and images that moderators should delete. (Jan. 2017 PSI Report, App.

16 432.) In the personals section, moderators were to delete "rates for service" and

17 "mention[s] of money." (*Id.*) In the "Adult jobs" section, moderators were to delete

18 indications of "sex act[s] for money." (*Id.*)

19         101.   There is also evidence that, as a matter of policy, Backpage often chose to

20 err against reporting potential child exploitation. In an email exchange with a moderator

21 dated July 11, 2013, Vaught took issue with the moderator's decision to report an ad to

22 NCMEC due to "inappropriate content" and the moderator's belief that the person in the

23 ad "look[ed] young." (Jan. 2017 PSI Report, 40.) Vaught explained that she "probably

24 wouldn't have reported this one." (*Id.*) The moderator responded that the girl or woman

25 in the ad "look[ed] young." (*Id.*) Vaught went on to explain that she "probably wouldn't

26 have reported this one." (*Id.*) The moderator responded that the girl or woman in the ad

27 "looked drugged and has bruises." Vaught replied that the person in the ad did not look

28

1   under 18 years old, adding that "[t]hese are the kind of reports the cops question us about.
2   I find them all the time, it's just usually you who sends them [(to NCMEC)]." (*Id.*)

3        102.    As Backpage changed its content guidelines, the company recognized that
4   users would need time to adjust their word choice and therefore refrained from removing
5   or blocking users for failing to immediately comply. For example, after prohibiting users
6   from posting rates for services lasting under one hour, Andrew Padilla, in an October
7   2010 email, stated that Backpage would only be editing the offending text and not
8   removing ads altogether. Padilla explained to the moderators, "We have to be fair to the
9   users and give them time to adapt." (Jan. PSI Report, App. 138.)

10       103.    In September of 2009, Adam Padilla was copied on an email Ferrer sent to
11  Backpage employees with the subject, "Why was this ad removed in San Antonio." (*Id.*
12  at 22.) Ferrer states in the email, "Sorry, I did not want to make this too big of a deal. I
13  want us to avoid getting craig's reputation of removing ads for no reason. Regarding
14  minor complaints in escorts: - Users posting in escorts are paying clients. If they look to
15  young, remove the ad. If they don't look like minors, we can refer the email to Dallas for
16  further verification. Regarding minor complaints in personals, if we get a complaint in
17  personals and the pic look to young, we can make a judgement call and remove the ad."
18  (*Id.*) In October 2010, less than a month after Craigslist shut down its Adult advertising
19  section, Andrew Padilla sent an email to Backpage employees, including Adam Padilla,
20  with the subject "New Moderation Standards." (Jan. 2017 PSI Report, App. 124.)
21  Andrew Padilla states in the email, "Perhaps indefinitely, and certainly over the next four
22  days, we need to intensify our efforts in cleaning Escorts, Body Rubs, Male Escorts and
23  Dom & Fetish. This intensification will come in the form of extra staff and overtime but
24  most importantly in stricter standards for language and images in ads. I'd like to still
25  avoid Deleting ads when possible, but if an ad makes a clear reference to sex for money
26  or an image displays a sex act, don't hesitate deleting it. These are not the types of ads
27  we want on our site at all. In the case of lesser violation, editing should be sufficient.
28

- 31 -

1   We're still allowing phrases with nuance but if something strikes you as crude or

2   obvious, remove the phrase.  We're still allowing HBO type of nudity but if an images

3.  make you think twice, remove the image.  There is zero tolerance for closeups of exposed

4   genitalia." (*Id.*)

5           104.    Additionally, according to the January 2017 PSI report, in August of 2016,

6   Adam Padilla testified before the Senate PSI Committee under oath that he removed

7   words that "clearly stated that that person wanted to have sex with somebody for money."

8   According to Adam Padilla, Backpage instructs moderators during training that "those

9   are the words you need to pull." (*Id.* at 31.)  Asked if he was told why he should remove

10  those terms, Adam Padilla explained that "those terms made it clear that the person was

11  asking for, you know, money for prostitution." (*Id.*)  Adam Padilla further explained that

12  deleting ads for illegal conduct, rather than editing out the indicia of illegality, would

13  have cut into company profits. (*Id.*)  Adam Padilla further testified that moderators even

14  edited live ads that were reported for "Inappropriate Content" by users. (*Id.* at 32.)

15  According to Adam Padilla, if moderators saw "an ad that had inappropriate content that

16  suggested sex for money," they would remove the offending language and repost the ad.

17  (*Id.*)  Adam Padilla testified that it was "common knowledge" that removing sex-for-

18  money language before posting does not change the illegal nature of the advertised

19  transaction. (*Id.*)

20          105.    Because Backpage is making millions of dollars a year on advertisements

21  that it knows are routinely tied to sex trafficking and prostitution, I believe that Ferrer,

22  Lacey, Larkin, Andrew Padilla, Adam Padilla, and Vaught's Backpage and VVM email

23  accounts contains evidence relevant to the investigation.  The Backpage business model

24  is largely based on the fees it obtains from its escort section, and there is probable cause

25  to believe that the email accounts will have communications showing the aforementioned

26  individuals knowledge of prostitution-related criminal activity, how Backpage advances

27  such criminal activity through its moderation process, the money Backpage makes

28

- 32 -

1   through advancing such activity, and other relevant evidence.  Based on my training,

2   experience, and facts of this case, I believe probable cause exists that the aforementioned

3   email accounts contains the fruits, instrumentalities, and evidence of the above-stated

4   crimes.

5                    **PROMOTIONAL MONEY LAUNDERING**

6                    **Backpage's Revenue Stream and Employees**

7          106.   In terms of how Backpage generates revenue, it has guarded the details of

8   its total revenue and the revenue it generates from online escort advertising.  In an

9   interview with ABC News that aired in April 2012, McDougall repeatedly refused to

10  answer questions about the revenue Backpage makes from adult advertisements.  (*See*

11  November 19, 2015 PSI Report.)  Based on PSI's investigation to date, however,

12  Backpage's Corporate group had net yearly revenue of more than 71 million dollars in

13  2012, more than 112 million dollars in 2013, and at least 135 million dollars in 2014.

14         107.   I also reviewed a September 2013 statement by McDougall that was

15  submitted to the Arizona Governor's Task Force on Human Trafficking.  She stated that

16  the Adult ads accounted "for less than 2% of overall content posted to the service."  I

17  compared that figure to an internal chart I found in the email records, which showed that

18  in August 2013, Adult ads were 1% of the total count but 95% of the paid count,

19  amounting to more than $10 million in revenue, while non-Adult ads like jobs were 47%

20  of the total count but amounted to only $526.60 in revenue.

21         108.   I know from the investigation that Backpage used a payment processor to

22  process the payments for the adult section advertisements.  The user is provided a form to

23  enter their credit card information.  Once that credit card has been validated and

24  approved, Backpage sends a response back to the main ad system that payment was

25  received and the user can create the ad.  The payment processing system is hosted on

26  servers located in Phoenix, Arizona.  For a number of years Backpage accepted

27  Mastercard, Visa, and Discover card.  However, around July 2015, those credit card

28

- 33 -

1    companies disallowed the use of their cards for Backpage due to concerns over

2    prostitution related advertisements.

3         109.   I know that Backpage has numerous employees needed to monitor the

4    website, conduct moderation, combat fraud, etc.  In 2009, Craigslist ceased operations,

5    which caused most of their prior customers to use Backpage.  As a result, Backpage

6    increased the hiring of moderators to handle the increase in volume of adult ads.  The

7    number of moderators doubled in size due to surge of ads as a result of Craigslist no

8    longer accepting adult advertisements.  Backpage has been hiring regularly since 2009.

9         110.   To accommodate the increase in volume of adult ads, Backpage contracted

10   with a company whose employees were based in India to handle the first tier of

11   moderation review. Charles Craig, CEO of Craig Capital, found that there were

12   approximately 50 people in India employed to conduct the first tier moderation. There

13   were 64 people doing moderation in Phoenix.  In terms of employee compensation, some

14   of the senior moderators were being paid a $105,000 annual salary.  They would also

15   receive a bonus equal to 10% of their salary.

16        111.   I know from investigations conducted nationwide involving the monies

17   used to pay for adult ads on Backpage, that most if not all advertisers had no legitimate

18   income.  For example, in the cases investigated in Arizona, investigators routinely

19   checked with the Department of Economic Security to determine whether the individuals

20   submitting ads had a reported income.  In most cases, I found that they had little-to-no

21   other income other than monies derived from prostitution.

22        112.   There is probable cause to believe that Backpage knows many prostitution

23   ads were historically purchased with proceeds from prostitution activity (prior to the

24   credit card companies refusing to process such ads).  There is also probable cause to

25   believe that Backpage knows many ads are currently being automatically reposted for a

26   fee or featured as thumbnails for a fee via proceeds from prostitution.  Many ads note that

27   the females are available "24/7," demonstrating that prostitution activity is a full time job

28

- 34 -

1  for that individual.  Additionally, many prostitution ads have been repeatedly purchased

2  or automatically reposted on a daily basis over the course of weeks and/or months.

3  Backpage is able to track the number of ads posted, reposted, and featured as thumbnails

4  for any given account holder.  Based on the full time nature of the job described in the

.5  advertisements and the frequent use of Backpage by an account holder, there is probable

6  cause to believe that Backpage knows the fees it has collected historically and today

7  come from prostitution-related proceeds.

8                                   **CONCLUSION**

9           Based on my training and experience, and the facts as set forth in this affidavit,

10  there is probable cause to believe that 18 U.S.C. §§1952(a), 1956(a)(1)(A)(i), and

11  1956(h) have been violated and that information associated with the email accounts,

12  addresses, and identifiers described in Attachment A will contain the fruits, evidence,

13  contraband, and instrumentalities of such violations, as more fully described in

14  Attachment B.

15                              **REQUEST FOR SEALING**

16          It is respectfully requested that this Court issue an order sealing, until further order

17  of the Court, all papers submitted in support of these applications including the

18  application, Affidavit, and search warrant.  Disclosure of the search warrant materials at

19  this time would seriously jeopardize the ongoing investigation as the subjects of the

20  investigation would not otherwise be aware of the warrants or that their activities are

21  necessarily the subject of an ongoing criminal investigation.  Disclosure at this time

22  would provide the subjects with the opportunity to destroy evidence, change patterns of

23  behavior, notify other confederates, flee or allow confederates to flee.  Further, the

24  ///

.25  ///

26  ///

27  ///

28

1    investigation in this matter is continuing, and disclosure would likely preclude or impede

2    the agents and investigators working on this matter from investigating new criminal

3    activity or leads.

4

5                                                    Special Agent Amy L. Fryberger, Affiant

6                                                    Federal Bureau of Investigation

7    Approved as to form:

8

9    Reginald E. Jones, Trial Attorney

10   U.S. Department of Justice, Criminal Division

11   Child Exploitation and Obscenity Section

12

13   SUBSCRIBED AND SWORN before me this 18 day of April 2017.

14

15

16                                                   HONORABLE ALLISON CLAIRE

17                                                   United States Magistrate Judge

18

19

20

21

22

23

24

25

26

27

28

                                          - 36 -

**Exhibit 1 to Affidavit of Special Agent Amy L. Fryberg**





backpage.com > Athens adult entertainment > Athens escorts

# COLLEGE who Loves Ana$l Crem$pies - 25


Report Ad

Posted: Friday, March 25, 2016 1:34 PM

Reply

Hi guys it's YOUR GIRL MIYA AND
I'm best head suc*ker it is and I'm not from here but I just moved here
from Atl..
I HOST ONLY AN PRIVATE AN DISCREET.. Location.
I love those OLDER WHITE MEN WHO LOVE THOSE BLACK
FREAKY college student/girls who REM a*SS and who's dominant..
Take control
$$is req.
No rushin no time limit.
If the offers fair enough..
(((706-389-5223)))

Poster's age: 25

- Location: Athens, Downtown area

- Post ID: 37492919 athensga


Enlarge Picture

email to friend

My Account | Buy Credits | Help | Privacy | Terms | Safety

athensga.backpage.com is an interactive computer service that enables access by multiple users and should not be treated as the publisher or speaker of any information provided by another information content provider. © 2016 backpage.com

**Exhibit 2 to Affidavit of Special Agent Amy L. Fryberg**

backpage.com > Arizona adult entertainment > Arizona escorts

Report Ad

# ✳100 incalls ●Phat @$$? 100$ incall ☼♀A*N*A*L *Queen ☼ * ••?●☼PorN**:•✳.•No : * •✳♥✳avaiɭabɭɛ → - 22

Posted: Saturday, April 16, 2016 2:41 PM

Reply





4/22/2016   ✴100 Incalls ●Phat @$$T 100$ Incall ⚘A*N*A*L *Queen ⚘ * •●?●☆PorN**:•✴.•No : * •#⊕☀avail2ablz → - Arizona escorts - backpage.com







♡ ✳☙Hey, KeLLẎ 415 602 6537☙✳ ♡
Im Young, Sexy, Sweet, Mature, Playful, & im Amazingly Talented. ★I'm Available 24/7"
★100% INDEPENDENT
★Upscale Gentlemen ONLY
★Always Safe & very Clean
★No Police/Pimps
★Must Be Clean&Respectful
★*♡Professional & Discrete♡*★ ★ ♡Upscale Beauty♡ ★100%REAL★
☑Gf Exp,Behind Door, All Fetish Welcome
•B☙:A*.•C•:K*.:*.D•:*.•O•:O.R pLAY.... ♡⊘ CALL NOW⊘ KeLLY 415 602 6537

Poster's age: 22

   • Location: East Valley, Phoenix, Phx Incall...

   • Post ID: 39434323 arizona

email to friend

4/22/2016    ✱100 Incalls ●Phat @$$$ 100$ Incall ✡☼A°N°A°L °Queen ✪ * ••Ÿ•✄PorN**:-✸.•No : ° •✱⊛✱avaitabtt → - Arizona escorts - backpage.com

My Account | Buy Credits | Help | Privacy | Terms | Safety

arizona.backpage.com is an interactive computer service that enables access by multiple users and should not be treated as the publisher or speaker of any information provided by another information content provider. © 2016 backpage.com

**Exhibit 3 to Affidavit of Special Agent Amy L. Fryberg**



backpage.com > Long Island adult entertainment > Long Island escorts


Report Ad

# SEXY ✪❤✦✗✦ Beautiful✦✗✦ ✪✦✪ KInKy B.B.W BOMBSHELL ⚠✦ DaNgeRouS ✦CuRveS ✦ - 24

Posted: Monday, April 18, 2018 7:30 AM

Good Morning, Up and ready...

❤✪ Juicy Thick Mami ✪❤

★Respectful And Mature
Gents Only★

5'5 BBW Freaky Lil Mama
★ Available Now ★
★ INCSLLS ONLY ★
Sorry NO ANAL
✓100000000% Real✓
No Games !! Discrete And
Very Clean !!

🔲SERIOUS CALLERS
ONLY✓
⚠RUDENESS will not be
tolerated⚠

⊘ Please NO PIMPS. NO
LAW ENFORCEMENT ! No
THUGS ! ⊘

No Drama! Just Good Safe
And Clean Fun!

No Explicate talk !!

✪6074815436✪ Hauppauge
Smithtown Commack Sayville
Massapequa Ronkonkoma

Poster's age: 24

• Location: Babylon,





4/22/2016    SEXY ◇❀✿✗❀ Beautiful✖❀ ◇❀❀◇ KinKy B.B.W BOMBSHELL ⚠✦ DaNgeRouS ✗CuRveS✦ - Long Island escorts - backpage.com

**BAYSHORE DEER PARK COMMACK, Huntington, Long Island**

· Post ID: 77446321
longisland

email to friend





4/22/2016    SEXY ❖💋❣χ❧ Beautiful❣χ❧ ❖ᴛ❖ KinKy B.B.W BOMBSHELL ▲ ⚡ DaNgeRouS ⚡CuRveS ⚡ - Long Island escorts - backpage.com

longisland.backpage.com is an interactive computer service that enables access by multiple users and should not be treated as the publisher or speaker of any information provided by another information content provider. © 2016 backpage.com

## ATTACHMENT A

### Description of Property to be Searched

This warrant applies to information associated with the following email addresses for the time period of, 2010-2016:

carl.ferrer@backpage.com,

carl@backpage.com,

ferrer.carl@gmail.com,

andrew@backpage.com,

joye@backpage.com,

adam@backpage.com,

abuse@backpage.com,

jim.larkin@villagevoicemedia.com, and

michael.lacey@villagevoicemedia.com,

that is stored at the California Attorney General's Office, located at 1300 I Street, Sacramento, California, 95814.

## ATTACHMENT B
### Items to be Searched and Seized

I.    **Items to be seized by the government**

All information, in whatever form it exists, that constitutes fruits, evidence, and instrumentalities of violations of Title 18, United States Code §§ 1952(a) (Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises); 1956(a)(1)(A)(i) (Promotional Money Laundering); and 1956(h) (Conspiracy to Commit Money Laundering) involving Backpage.com, including, for each account, address, or identifier listed in Attachment A, information pertaining to the following matters:

   a.    Any information related to Backpage.com matters;

   b.    Any communications to, from, or concerning Backpage.com;

   c.    Records relating to who created, used, or communicated with the account or identifiers, including records about their identities and whereabouts.

II.   **Search Procedure**

   a.    Upon receipt of the items described in Attachment A, the Filter Team will review the documents for privilege or protection only and will disseminate non-privileged and non-protected documents to the Investigative Team. The Investigative Team will determine which documents constitute evidence of unlawful activity. Because the Filter Team will be properly walled off from the Investigative Team, it may review emails to and from Elizabeth McDougall or other Backpage attorneys to determine if they properly qualify for privilege or protections, in accordance with procedures set forth above. This will eliminate the risk that protected information from or to Ms. McDougall or other Backpage attorneys will reach the Investigative Team.