EXHIBIT B

**AFFIDAVIT IN SUPPORT OF PROBABLE CAUSE**

1.      I, Amy L. Fryberger, a Special Agent with the Federal Bureau of Investigation, being duly sworn, depose and state as follows: I am currently assigned to the FBI's Phoenix, Arizona Field Office.  I have been employed by the FBI as a Special Agent for eight and half years.  As part of my responsibilities, I am charged with investigating violations of statutes applying to human trafficking.  I have collaborated with other squads that specialize in money laundering investigations as well as the Internal Revenue Service. Prior to working human trafficking cases, I was assigned to work national security, gang, and drug investigations.

2.      I make this affidavit in support of an application for a search warrant for content and records associated with www.Backpage.com ("Backpage") email account described in Attachment A, which is stored at premises owned, maintained, controlled, or operated by Google Inc., an e-mail provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.  The information and account to be searched are described in the following paragraphs and in Attachments A and B.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the account referenced in this affidavit and further in Attachment A, including the contents of the communications.

1

3.      I have probable cause to believe that evidence of violations of 18 U.S.C. §
§1952(a), 1956(a)(1)(A)(i) and 1956(h), is located in and within the aforementioned
Backpage email account showing that Backpage intentionally promotes and profits from
prostitution activity through its operation and management of the online "Escort" section,
which is routinely tied to sex trafficking and other prostitution activity throughout the
United States. I have reason to believe that the account that is the subject of the instant
application will have stored information and communications that are relevant to this
investigation.  Thus, as outlined below, and based on my training and experience, there is
probable  cause  to  believe  that  evidence,  fruits  and/or  instrumentalities  of  the
aforementioned crimes are located in the account.

4.      I am familiar with the information contained in this Affidavit based upon the
investigation I have conducted, along with my conversations with law enforcement officers
and others and review of reports, grand jury transcripts, agent notes, and database records,
along with other public documents. This Affidavit is submitted for the limited purpose of
securing a search and seizure warrant.  It does not include each and every fact known to
me or the government about the investigation. I have set forth only those facts that I believe
are necessary to establish probable cause.

## STATUTORY AUTHORITY

5.      The "Travel Act," pursuant to 18 U.S.C. § 1952(a), prohibits the use of the
mail or any facility in interstate or foreign commerce with the intent to otherwise promote,
manage, establish, carry on, or facilitate the promotion, management, establishment or

carrying on of any unlawful activity, and thereafter performs or attempts to perform such unlawful activity.

6.     "Unlawful activity," as defined in 18 U.S.C. § 1952(b), includes prostitution offenses in violation of the laws of the State in which they are committed or of the United States.

7.     Sex trafficking of juveniles, or any person by means of force, fraud or coercion, is a violation of 18 U.S. C. § 1591. Additionally, prostitution is illegal in the State of Arizona. (*See e.g.*, A.R.S. §§ 13-3201-13-3214).

8.     18 U.S.C. §1956(h) prohibits a conspiracy to commit money laundering and the prosecution is obliged to establish that: (1) an agreement to commit money laundering existed between one or more persons; (2) the defendant knew that the money laundering proceeds had been derived from an illegal activity; and (3) the defendant knowingly and voluntarily became part of the conspiracy.

9.     18 U.S.C. § 1956(a)(1)(A)(i) prohibits what the case law calls "Promotional Money Laundering."   Specifically, 1956(a) prohibits the following: (a)(1) "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity – (A)(i) with the intent to promote the carrying on of specified unlawful activity." "Financial transaction" is defined under 18 U.S.C. 1956(a)(1) as follows: "a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of

3

a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement."

10.     The investigation shows that many, if not most, of the paid advertisements on the Backpage website are for prostitution activities in violation of 18 U.S.C. § 1952. Furthermore, the investigation indicates that many, if not most, of the individuals advertising those services have no other legitimate source of income, and, accordingly, that much, if not most, of the money used to pay for those advertisements is derived from illegal prostitution activity in violation of 18 U.S.C. § 1952, which is a Specified Unlawful Activity.

11.     The investigation also shows there is probable cause that the ownership, management and other employees of Backpage know that much, if not most, of the money Backpage receives for such paid advertisements represents proceeds from illegal activities. Similarly, the investigation shows that the monies paid for the advertisements are used to facilitate illegal prostitution, as well as to perpetuate Backpage's business by, among other things, paying moderation employees to sanitize the submission of advertisements, maintaining the servers used to promote Backpage's Adult internet site, paying managers and other employees, maintaining a headquarters, and paying the owners of the website. In sum, as detailed below, there is probable cause that the ownership, managers and employees of Backpage are engaging in promotional money laundering and a conspiracy to commit promotional money laundering.

## TECHNICAL INFORMATION REGARDING GOOGLE

12.     In my training and experience, I have learned that Google provides a variety of on-line services, including electronic mail ("e-mail") access, to the general public. Google allows subscribers to obtain e-mail accounts at the domain name "gmail.com," like the email account listed in Attachment A. Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and un-retrieved e-mail for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, e-mail transaction information, and account application information.

13.     In general, an e-mail that is sent to a Google subscriber is stored in the subscriber's "in-box" on Google servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on Google servers indefinitely. The user can move and store messages in personal folders such as a "sent folder." In recent years, Google and other ISPs have provided their users with larger storage capabilities associated with the user's email account. Google and other ISPs have allowed users to store up to ten (10) gigabytes of information associated with the account on ISP servers. Based on conversations with other law enforcement officers with experience in executing and reviewing search warrants of email accounts, I have learned that search warrants for email accounts and computer systems have revealed stored emails sent and/or received many years prior to the date of the search.

5

14. When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to Google's servers, and then transmitted to its end destination. Google often saves a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the Google server, the e-mail can remain on the system indefinitely.

15. A sent or received e-mail typically includes the content of the message, source and destination addresses, the date and time at which the e-mail was sent, and the size and length of the e-mail. If an e-mail user writes a draft message but does not send it, that message may also be saved by Google but may not include all of these categories of data.

16. A Google subscriber can also store files, including e-mails, address books, contact or buddy lists, calendar data, pictures, and other files on servers maintained and/or owned by Google. Subscribers to Google might not store on their home computers copies of the e-mails stored in the Google account. This is particularly true when they access their Google account through the web, or if they do not wish to maintain particular e-mails or files in their residence.

17. In general, e-mail providers like Google ask each of their subscribers to provide certain personal identifying information when registering for an e-mail account. This information could include the subscriber's full name, physical address, telephone numbers and other identifiers, such as alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

18. E-mail providers typically retain certain transaction information about the creation and use of each account on their systems. This information can include the date

6

on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website), and other log files that reflect usage of the account.  In addition, e-mail providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

19.     In some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  E-mail providers typically retain records about such communications, including records of contacts between the user and the providers support services, as well as records of any actions taken by the provider or user as a result of the communications.

20.     In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

21.     In my training and experience, company employees use company email accounts to routinely communicate about the company business, i.e., the operation, management, finances, reports, and daily activities that occur within the company.

## PROSTITUTION AND THE INTERNET

22.    Based on my training and experience, your Affiant knows the internet has transformed the commercial sex trade.

23.    Prior to the rise of the internet, commercial sex took place on the streets, at casinos, truck stops, and other physical locations.

24.    With the internet, individuals involved in advertising commercial sex now post advertisements online on various websites, including classified ad websites. Such online sites facilitate the commercial sex trade by providing an easily accessible forum that matches buyers of sex with the individuals providing sex acts for a fee. The individuals providing sex acts for a fee include minor and adult victims of sex trafficking and adult individuals voluntarily engaging in prostitution.

## UNDERLYING INVESTIGATION INTO BACKPAGE.COM

25.    Backpage is a company that provides online classified advertising at the website www.Backpage.com. Backpage can be accessed throughout the United States and in foreign countries. It was created around 2004.

26.    Backpage has offices and employees in Phoenix, Arizona, and Texas. Carl Ferrer is the creator and CEO of Backpage, and remains active within Backpage to this day.

27.    Beginning in 2004, Backpage was owned by a parent company called New Times Media ("NTM"), later called Village Voice Media ("VVM"). In September 2012, Michael Lacey and Jim Larken decided to sell other holdings within VVM and retain

8

ownership of Backpage. Around December 2014, Lacey and Larkin sold Backpage to a Dutch company called Atlantische Bedrijven CV.

28.     Backpage allows users to post classified ads under numerous categories including, inter alia, automotive, buy/sell/trade, jobs, real estate for sale, rentals, and adult entertainment. The ads are categorized by location, allowing a user to decide the city and country to post ads in or to browse. Numerous cities throughout the United States are provided, along with cities in foreign countries.

29.     The adult entertainment section is broken up into different categories, including "adult jobs," "body rubs," "domination & fetish," "escorts," "male escorts," "phone & websites," "strippers/strip clubs," and "transsexual escorts."

30.     Backpage had an adult section offering "services" and "body rubs" starting in 2004. Backpage had an "escorts" section starting as early as 2006.

31.     Beginning in 2010, Backpage began making large profits per year for ads posted in the Escorts section of the site after its competitor Craigslist shut down its own adult services section. Craigslist was an online classified ad site similar to Backpage. Craigslist faced public pressure from numerous state attorney generals to shut down its adult services section because it was commonly linked to sex trafficking and prostitution. Once Craigslist shut down its adult services section, Backpage began to see a spike in the escort ads posted on its site, along with a spike in profits. In 2011 alone, Backpage began making more than $30 million a year.

**LAW ENFORCEMENT INVESTIGATIONS INVOLVING SEX
TRAFFICKING AND PROSTITUTION**

32.     Ads posted within the escort section of Backpage are routinely tied to sex trafficking and prostitution crimes.  For the past seven years, law enforcement at the local, state, and federal level have repeatedly investigated and charged pimps and other individuals in connection with adult and child sex trafficking on Backpage.  Within the FBI Phoenix filed office alone, numerous defendants have been charged and convicted of sex trafficking and other prostitution offenses involving Backpage.

33.     The charging and prosecution of pimps and other traffickers who utilize Backpage are largely publicized.  A review of the FBI's website alone reveals over 200 press releases specifically mentioning Backpage in connection with individuals charged and/or convicted of sex trafficking and other prostitution related offenses.

34.     Over the past several years, law enforcement has been involved in operations targeting the customers of commercial sex on Backpage ("Johns").   Law enforcement has posted numerous undercover ads in the escort section as thinly veiled advertisements for prostitution.  Hundreds of Johns have been arrested in the process.

35.     Operations targeting Johns on Backpage have also been widely publicized. For example, in "Operation Flush the Johns," law enforcement in Nassau County posted undercover prostitution advertisements on Backpage from April 18 to May 24, 2013. The ads included a fictitious woman known as "Amber," age "27," in scantily clad photographs claiming to be "the girl next door," who is "420 friendly" (slang for marijuana use), and "very open minded." After reviewing the ads, the customers arranged to meet the fictitious

10

individuals advertised. Each meeting was captured on hidden cameras where Johns agreed to pay undercover female agents between $50 and $100 for sex acts. As a result of the operation, 104 Johns were arrested. (*See* http://www.nydailynews.com/new-york/104-johns-nabbed-nassau-county-pay-sex-article-1.1361717).

36.     A similar operation was conducted throughout the country in 2014 in an operation dubbed "National Day of Johns Arrests." Undercover escort ads were posted on sites including Backpage, resulting in the arrests of 496 Johns. The operation involved law enforcement in Arizona, Colorado, Illinois, Massachusetts, Minnesota, Nevada, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, Texas, Virginia, and Washington. (*See* http://www.cookcountysheriff.com/press_page/press_ NationalSex Traffickng Sting2014_08_06_2014.html).

### CALIFORNIA DEPARTMENT OF JUSTICE UNDERCOVER INVESTIGATION INTO BACKPAGE.COM

37.     Your Affiant is aware of an undercover operation conducted in California targeting Backpage's facilitation of prostitution by posting ads. In March 2015, California Department of Justice Special Agent Tera Mackey and SA Brian Fichtner began an undercover investigation into Backpage.com. SA Tera Mackey was assigned to the California DOJ Sexual Predator Apprehension Team in 2001. The California DOJ is a state criminal investigative agency. Her duties included the investigation of the sexual exploitation of children, which often involves the use of the internet. As of April 2013, SA Mackey was assigned to the California DOJ eCrime Unit, where she engages in investigative work for crimes committed on the internet. SA Brian Fichtner has been a

11

member of the eCrime unit and has received extensive training on computer related crimes since 2012. Prior to being assigned to the eCrime unit, he was with the Bureau of Narcotic Enforcement for twelve years.

38.     On March 6, 2015, SA Fichtner posted two fictitious undercover ads in the Sacramento region of Backpage.  One ad offered adult companionship for money in the Escort Section and the other ads listed a sofa for sale in the "Buy, Sell, Trade" section.  In both ads, SA Fichtner used the same account information – a state funded credit card to pay Backpage.com to post the ad, an undercover cell phone number, and the email address katiecatt19@gmail.com.

39.     To post the Escort ad, SA Fichtner went to the Backpage homepage.  The first page displayed eleven (11) sections with sub-categories; for instance, the "Adult" section contains the "Escort" sub-category and users can click directly on the Escort category from the homepage.  At the top of the page, there was a "Post Ad" link.  He clicked on this link and it displayed a page that listed eleven (11) sections similar to the homepage. He clicked on the category of "Escorts" and a page was displayed with "Posting Rules." After clicking a button at the bottom of the page, he continued the posting process.

40.     The next page displayed a blank template for entering the title, description, age, location, email address, and photos or videos for the ad.  Backpage listed a fee of $10 for the Escort category.  Toward the bottom of the page, upgrades to the ad were offered for additional fees. Upgrades included automatically reposting the ad to the top of the page or highlighting the ad with a "thumbnail." Users could pay anywhere from $40 to repost an ad several times a day, to $960 to repost an ad 104 times a day.

12

41.   To draft the fictitious ads, SA Fichtner used Backpage ads reviewed during the investigation as templates.  He included a photograph of a woman dressed in lingerie who described herself as "clean, safe, and 100% independent" and offered to make users' "dreams come true," mentioning an hourly rate of $175.  Once the template was completed, he clicked on the "Continue" button at the bottom of the page; next to the "Continue" button was the statement "By placing this ad I agree to the terms of use and privacy policy." He then clicked on the linked terms and policy.

42.   SA Fichtner continued to the next page of the process where he displayed a preview of her advertisement and listed the cost of $111.20 to post the ad; he paid to auto-repost eight (8) times and $21.20 for a Sponsored ad thumbnail on the side banner.  At about 8:52 am, he clicked on the "Post Ad Now" button and was forwarded to the payment page requesting payment by credit card or Bitcoin.  He paid with a credit card utilizing state provided funds.  Below the "Submit" payment button, there was a message stating, "The charge will appear on your statement as: BP NATIONAL, Payment Solutions BV., Stawinskylaam 601, 1077XX, Amsterdam, Netherlands."  After clicking on the "Submit" button, he received a "Thank you" message.

43.   Immediately after posting the ad, an email was sent on behalf of sacramento.backpage.com to the email address SA Fichtner provided when posting the ad.  The email thanked SA Fichtner for posting the ad and explained that the ad was "Pending" and "will be released soon."  The email noted the posting date, the expiration date, and the cost of the ad.  The ad was posted on Backpage at about 9:00 am.

44.     SA Fichtner went through a similar process to post the non-Adult ad – a couch for sale in the "Buy, Sell, Trade" section on Backpage.com; there was no minimum fee required for the non-Adult ad, but he paid $1.22 to promote the ad via a Sponsored side banner thumbnail, as well as 26 auto-reposts.

45.     SA Mackey was assigned to monitor and document all calls and texts sent to the undercover cell phone used in the ads.

46.     Within minutes of the Escort Ad going live, SA Mackey began receiving calls and texts.   Between the 6th and 16th of March 2015, SA Mackey received approximately 197 text messages and 134 phone calls inquiring about the Escort Ad.  SA Mackey received one text message inquiring as to the availability of the couch.

47.     While working in her undercover capacity, SA Mackey communicated with several of the potential customers tied to the escort ad, sending and receiving a total of 747 text messages.   Most of the potential customers used slang terms in their messages and phone calls commonly seen in the commercial sex context.   Based on your Affiant's training and experience, along with the training and experience of SA Mackey and SA Fichtner, the slang used by the customers' in their messages was understood as follows:

a.      Incalls and/or Outcalls: An "incall" is where the customer comes to the "escort's" location and an "outcall" is where the escort goes to the customer's location. Many users asked SA Mackey about her incall/outcall policy.

b.      Donation: "Donation" in the "escort" context means the fee an escort would charge for sex acts; in researching commercial sex cases, particularly those on

Backpage.com, both prostitutes and customers seem to believe that by saying "donation" rather than fee, they are protected from possible criminal charges.

    c.     BBBJ: "Bare Back Blow Job" – Fellatio without a condom.

    d.     FS: "Full Services" – Sexual intercourse to completion

    e.     GFE: "Girlfriend Experience" – a session that is more like lovemaking with a girlfriend than a commercial service.

    f.     Greek: anal sexual intercourse

    48.    Of the 747 text messages that were sent and received, SA Mackey received one video, via text message, of an adult male having intercourse with a "blow up doll" and photographs of two potential customers' faces.

    49.    Based on the number of phone calls and text messages, a large number of individuals viewed the ad posted as a prostitution ad. Because numerous individuals viewed the ads as prostitution ads, there is probable cause to believe that Backpage knows that these types of ads are indeed for prostitution.

    50.    On March 16, 2015, SA Fichtner called Backpage to notify them of the prostitution related ad. SA Fichtner called Elizabeth McDougall, an attorney for Backpage, and left a voicemail with her identifying himself as an agent with the California DOJ, and explaining that he wanted Backpage to remove a known prostitution ad in the Escort section. SA Fichtner left his cell phone number.

    51.    On March 16, 2015, SA Fichtner also called Carl Ferrer the CEO of Backpage. SA Fichtner reached Carl Ferrer and identified himself and asked him about removing a known prostitution ad. Carl Ferrer initially told him to report the ad by email

to abuse@backpage.com but then asked for the ad's details.  SA Fichtner provided the Post
ID for the ad. Ferrer seemed to be looking up the ad on a computer stating, "the other ads
from this user don't appear to be illegal."  Ferrer was able to link the Escort ad to the non-
Adult couch ad.  Ferrer said that he would personally report the prostitution ad and "lock
it out."  The ad was in fact removed by Backpage thereafter.

52.     Carl Ferrer also communicated with the agents via the email account
carl.ferrer@backpage.com regarding preservation of ads pursuant to law enforcement
request.

53.     On March 17, 2015, McDougall called SA Fichtner.  SA Fichtner told her he
had spoken with Carl Ferrer and that he had removed the ad.  McDougall asked how I knew
the ad was for prostitution.   SA Fichtner said he could not provide details of his
investigation.  SA Fichtner mentioned that he had seen numerous other ads on Backpage
that seemed to be for prostitution and asked why they were not being removed.  McDougall
said that Backpage does not restrict a users' First Amendment right to post ads.  She said
Backpage has a filtering process in place to prevent the posting of illegal ads.  McDougall
explained Backpage's four step filtering process.  First, ads are screened by a computer
program that looks for flagged terms.  If the ad passes the computer screening, it is then
screened twice by a human moderator – once before it gets posted and again after it is
posted.  The final level of filtering comes from the public, who can report an ad directly to
Backpage via a link on the site.

54.     SA Fichtner said he noticed several photos in the Escort section showing
breasts and genitalia.  SA Fichtner asked McDougall if there are restrictions on the types

of photos that can be posted.  McDougall said photos of that nature are not allowed and should not make it through the filtering process.  She said if those types of photos are making it through the filtering process, then Backpage would need to identify the moderator who screened the ad and correct the problem.

55.    SA Fichtner asked McDougall to explain why the Escort section charged a significantly higher fee than any other section on the website.  She said the higher cost to post adult escort ads was a recommendation to Craigslist.com by the Attorney General to deter criminals from posting illegal ads, and that Backpage followed suit.  McDougall stated that Backpage works closely with law enforcements.

56.    SA Fichtner reiterated that many Backpage ads appear to be blatant prostitution ads.  McDougall did not dissuade him from this impression, and returned to her point about the First Amendment.  She said that the internet and prostitution were not going away and if Backpage were to restrict postings of Adult services on their website, it would only drive the industry underground, making it more difficult for law enforcement to investigate.

57.    Through its investigation, the California Department of Justice Special Agents learned that numerous email accounts are used by Carl Ferrer and other Backpage.com employees to conduct its business.    Such email accounts include: carl.ferrer@backpage.com,          joe@backpage.com,          dan@backpage.com, rock@backpage.com,          carl@backpage.com,          andrew@backpage.com, bailey@backpage.com,     andrewa@backpage.com,     chris.kempel@backpage.com, jasona@backpage.com,          stefan@backpage.com,          nathank@backpage.com,

support@backpage.com,          records@backpage.com,          abuse@backpage.com,

reconciliation@backpage.com,          help@backpage.com,          kellyh@backpage.com,

craig@backpage.com; void@backpage.com, nobody@backpage.com.

58.     California DOJ's investigation revealed the above email accounts were being

stored on Google's servers.  Beginning in July, 2015, California DOJ obtained search

warrants for the above listed accounts in California Superior Court in Placer County.

California DOJ obtained search warrant returns for the Backpage email accounts from

Google.

### UNITED STATES SENATE, PERMANENT SUBCOMMITTEE ON INVESTIGATIONS, COMMITTEE ON HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS, RECOMMENDATION TO ENFORCE A SUBPOENA ISSUED TO CEO CARL FERRER OF BACKPAGE.COM.

59.     Your affiant is aware of a November 19, 2015, report issued by the United

States Senate, Permanent Subcommittee on Investigations, Committee on Homeland

Security and Governmental Affairs ("PSI Report") recommending enforcement of an

October 1, 2015, subpoena issued to Carl Ferrer.

60.     The subpoena requested, among other items, documents concerning

Backpage's moderation efforts, including information related to editing or modifying ads

before publishing.   The subpoena also requested documents concerning metadata,

document retention, basic corporate information, and revenue derived from adult

advertisements. (PSI Report, p. 30.)

61.     On the return date, Backpage produced twenty-one pages of publicly

available documents and submitted a letter objecting to certain document request in the

subpoena on the grounds that they violated the First Amendment and were not pertinent to a proper legislative investigation. (*Id*. at 30.) Backpage declined to produce the many internal documents it possesses that are responsive to the subpoena's request for information about its moderation procedures, data-retention policies, and financial information. (*Id*. at 32.)

62.     The Subcommittee overruled Backpage's objection explaining that Backpage's vague and underdeveloped First Amendment arguments lacked merit. (*Id*. at 31.) The Subcommittee further rejected Backpages' entirely unexplained contention that the document request in the October 1, 2015, subpoena was not pertinent to a proper investigation. (*Id*. at 32) Undeterred by Backpage's noncompliance with its process, the Subcommittee pursued its fact-finding through other means. The PSI Report detailed the Subcommittee's preliminary findings.

63.     The Subcommittee found substantial evidence that Backpage edits the content of some ads, including by deleting words and images, before publication. The record indicates that in some cases, the deletions likely served to remove evidence of the illegality of the underlying transactions. (*Id*.) Specifically, as part of its moderation process, it appears that Backpage will delete particular words or images that violate its terms of service. (*Id*.) Backpage's General Counsel Elizabeth McDougall told the Subcommittee of this practice in a staff interview, but the company has so far refused to provide additional documents about it. (*Id*.) The subcommittee attempted to take the testimony of two Backpage employees in charge of its moderation practices, but they refused to testify on the grounds that it might incriminate them. (*Id*.)

64.     The subcommittee, however, obtained evidence that from 2010-2012, Backpage outsourced its moderation practices to a California-based company that employed moderators in India.  During this time, the moderators deleted certain images, words, or phrases from "adult" ads.  (*Id.*)  Specifically, Backpage issued specific content guidelines and instructions to the moderators and continuously updated these instructions. (*Id.*)  Content guidance from Backpage typically took one of three forms:  First, Backpage provided descriptions of images it would accept, decline, or edit, including specific examples.  Second, Backpage's guidance included lists of words that should prompt moderators to either fail or edit an ad.  Finally, Backpage, often through Operations Manager Andrew Padilla or Carl Ferrer would, in some instances, answer questions from the company's moderators about failing, approving, or editing specific content in specific ads.  (*Id.*)

65. ·  Carl Ferrer, Andrew Padilla, among other Backpage employees, were in regular email contact with the moderators about the speed of the moderation process. Backpage had the ability to monitor the number of ads awaiting review in each queue, including whether certain ads had exceeded a certain amount of time from posting to approval. (*Id.*) Automatic email alerts notified Backpage managers when ads were waiting in the queue for longer than the target wait times.  On occasion, Andrew Padilla or another Backpage employee emailed persons when ads sat too long in the queue to urge them to process the ad.  (*Id.*)

66.     Backpage mangers, including Carl Ferrer and Andrew Padilla, were intimately involved in communicating the content policies the California-based company

that it outsourced its moderation practices were to apply.  For example, guidelines in October 2010 flagged for scrutiny not only certain sexual images, but also text that conveyed an offer of sex for money ("no pricing for services less than an hour").  (*Id.* at 18.)  With respect to these particular changes in guidance, Mr. Ferrer wrote (via email), "Better to edit by removing bad text or removing bad language.  We will do this for a few weeks to give users a chance to adjust."  (*Id.* at 18.)  In another email, Mr. Ferrer communicated with the company it outsourced its moderation practice to about how to deal with ads that offer services based on time increments —e.g. 15 or 30 minutes that are standard in the illegal sex trade.  Mr. Ferrer explained: "Removing bad pics and removing bad text like 15 min ½ hour is critical.  I think [the moderators] will be busy."  (*Id.* at 19.)

67.     Quality control for the screening and editing process was also an important concern for Backpage during its contract with the California-based company.  Backpage encouraged the company's moderators to review ads quickly, but to not cut corners."  (*Id.* at 21.)  Backpage attempted to monitor the moderators to provide "constructive feedback" when a moderator failed an ad that should have been approved or vice versa.  At least as of 2010, the editing platform did not provide Backpage the ability to monitor the specific edits a moderator made to a post; Backpage could only see the final product.  (*Id.*)

68.     In some instances, Backpage took corrective action after ads containing violations of Backpage content policies were published even after going through the screening and editing process.  (*Id.*)  In these cases, Backpage sent the violation to the company with the ID number of the moderator who "missed" the particular violation.  (*Id.*)

21

The company would then retrain the moderator and explain why the particular item needed editing. (*Id.*)

69.     Quality control was important to Backpage not only to ensure compliance with its policies, but also to ensure customer satisfaction. Backpage's revenue depends on user's willingness to pay to post ads, the cost of which can range from a few dollars to more than one hundred dollars as users buy upgrades to promote or sponsor ads to receive more views. (*Id.*) In some instances, users complained to Backpage's customer service department when images were deleted that the user knew should have been approved. Mr. Ferrer reacted to that personally. (*Id.* at 21.) In one email, Mr. Ferrer noted "an increase in users complaining about false positives" and urged the moderators to "exercise care when removing images." In at least one instance, Mr. Ferrer offered a customer $1,000 in "freebies" when an ad was erroneously edited. (*Id.* at 21.)

70.     Statements publicly made by Backpage, California DOJ's undercover investigation of Backpage, and the PSI Report show that email is used to discuss the criminality of various Backpage ads, including discussions on (1) its moderation process and whether various ads should be removed for violating its policies and/or whether various account holders should be permanently banned from posting on Backpage.com; (2) law enforcement subpoenas seeking ads tied to criminal activity, including prostitution; (3) complaints by the public regarding live ads on Backpage; and (4) reports by Backpage to NCMEC related to individuals who appear to be under 18 or even slightly above 18 years old.

71.     Because Backpage is making millions of dollars a year on advertisements that it knows are routinely tied to sex trafficking and prostitution, your Affiant believes the email account carl.ferrer@backpage.com contains evidence relevant to the investigation. The Backpage business model is largely based on the fees it obtains from its escort section, and there is probable cause to believe that the email account carl.ferrer@backpage.com will have communications showings Carl Ferrer's knowledge of prostitution-related criminal activity, how Backpage advances such criminal activity through its moderation process, the money Backpage makes through advancing such activity, and other relevant evidence. Based on my training, experience, and facts of this case, I believe probable cause exists that the account carl.ferrer@backpage.com contains the fruits, instrumentalities, and evidence of the above stated crimes.

## BACKPAGE HAS KNOWLEDGE OF THE ILLEGAL ACTIVITY OCCURRING IN ITS ESCORT SECTION

### Lawsuits

72.     Many groups and individuals have discussed with Backpage the prostitution activity occurring on its Escort section on multiple occasions.  By letter dated September 21, 2010, twenty-one state Attorney Generals informed the then lawyer for Backpage the following: "We believe that ads for prostitution, including ads trafficking children, are rampant on the site and that the volume of ads will grow in light of Craigslist's recent decision to eliminate the adult services section of the website."  Backpage continued to provide its "Escort" section to the general public. By letter dated August 31, 2011, forty-five state Attorney Generals sent a letter to Backpage's then counsel discussing various

23

cases the offices were prosecuting where children were trafficked on Backpage. (*See* http://attorneygeneral.tn.gov/cases/backpage/ backpageletter.pdf; *see also* Craig GJ transcript). Despite repeated warnings about facilitating prostitution, Backpage still continued to provide its "Escort" section to the public.

73.   While continuing to run its "Escort," section, Backpage has been served with civil complaints providing it additional notice of serious allegations involving sex trafficking. For example, in 2010 Backpage was sued in *M.A. ex. rel. P.K. v. Vill. Voice Media Holdings, LLC and Backpage*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011). According to the court papers, a juvenile of sex trafficking sued Backpage for her victimization after ads were posted of her on Backpage. Specifically, from 2009 to 2010, Plaintiff M.A., a 14-year-old, was being sexually trafficked by Latasha Jewell McFarland, an adult, who pled guilty in a separate criminal case to using a facility in interstate commerce to promote prostitution pursuant to 18 U.S.C. §1952(a)(3). Defendant McFarland, while in open court, admitted to photographing M.A. displaying her private body parts in sexual pornographic poses and posting the child pornography on Backpage as advertisements seeking payment for sex. McFarland further admitted to paying Backpage for these postings, and transporting M.A. for the purposes of multiple sexual liaisons for money with adult male customers obtained through Backpage's website. *Id.* at 1041-42.

74.   In seeking to hold Backpage liable, the lawsuit against Backpage alleged the following:

* In 2009 and 2010, [Backpage] posted many advertisements which included explicit nude photographs of Plaintiff, M.A., a minor, advertising her services as an escort for sex on backpage.com and received fees for each posting.

* [Backpage] had knowledge that: explicit sexual pornographic photographs were being posted on its website; that postings on their website were advertisements for prostitution; that numerous minors were included in these postings for prostitution on its website; that sex trafficking of minors is prolific in the United States of America; that the internet, including their website, was used for advertisements for illegal sexual contact with minors; that on numerous prior occasions [Backpage was] made aware of minors being trafficked on their website; that according to [Backpage], on five prior occasions [Backpage] responded to subpoenas involving the trafficking of minors on backpage.com and this does not include other cases involving minors of which [Backpage is] aware wherein [Backpage] cooperated with authorities without subpoenas.

* By posting explicit nude photographs of Plaintiff, M.A., a minor, in an advertisement which advertised her services as an escort for sex on backpage.com, [Backpage] facilitated child sex trafficking and aided and abetted McFarland in violating each criminal statute and United States Treaty Optional Protocol herein alleged, in that: [Backpage] had a strong suspicion that the aforementioned crimes were being committed yet was so indifferent that [it] failed to investigate for fear of what it would learn; [Backpage] had a desire that these posters accomplished their nefarious illegal prostitution activities so that the posters would return to the website and pay for more posting; and [Backpage] continued to maintain their website so as to participate in these illegal transactions....

*Id.* at 1045.

75.     Backpage, through its lawyers, moved to dismiss the lawsuit and argued immunity under the Communications Decency Act, 47 U.S.C. § 230. After reviewing the allegations and the Communications Decency Act ("CDA"), which serves as a bar for many civil lawsuits and state criminal prosecutions against internet-related entities, the district court dismissed the lawsuit. *Id.* at 1058.

25

76.     In October, 2014, Backpage was again sued by child sex trafficking victims in *Doe ex rel. Roe v. Backpage.com, LLC.*, 104 F. Supp. 3d 149, 149-65 (D. Mass. 2015). According to that lawsuit, Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 were juvenile victims of sex trafficking advertised repeatedly on Backpage. Jane Doe No. 1 was first trafficked by pimps on Backpage in February of 2012, when she was 15 years old. She was again sold on Backpage in March of 2013. Between June of 2013 and September 10, 2013, her "services" were advertised on Backpage each and every day. As a result of the ads, she engaged in 10 to 12 sex transactions daily with adult men in Massachusetts and Rhode Island. Her pimp moved her from town to town every two days to avoid detection. Jane Doe No. 1 appeared in some 300 ads on Backpage and was raped over 1,000 times. *Id.* at 153.

77.     Backpage listed each ad featuring Jane Doe No. 1 as an offer of "escort" services, a common euphemism for prostitution. According to the district court, the Jane Doe No. 1 ads included known signifiers for child prostitution such as "young," "girl," "fresh," "tiny," "roses," and "party." Jane Doe No. 1's pimp provided a prepaid mobile phone and a prepaid credit card to conceal Jane Doe No. 1's identity when Jane Doe No. 1 placed ads on Backpage at the direction of her pimp. When Jane Doe No. 1 attempted to enter her true age (which was under 18) during the purchase of an ad, Backpage would instruct her to enter her age as 18 or older. Photographs of Jane Doe No. 1 (with her facial features obscured, but at least on one occasion displaying a unique tattoo) accompanied all of her ads. *Id.* at 153.

78.     Jane Doe No. 2 was trafficked on Backpage by her pimp during various periods between 2010 and 2012 at different locations in Massachusetts. She was first advertised on Backpage when she was 15 years old. Ads featuring Jane Doe No. 2 were posted either by her pimp or an older woman who worked with him (his "bottom"). The ads would appear on Backpage an average of six times per day. Jane Doe No. 2 was given a prepaid mobile phone to answer calls from would-be customers generated by the Backpage ads. As a result of the ads, she was coerced into 5–15 sex transactions every day. Like the ads of Jane Doe No. 1, those of Jane Doe No. 2 featured her photograph. The ads were placed using a prepaid credit card. Altogether, Jane Doe No. 2 was raped over 900 times while being trafficked by her pimp. *Id.* at 153.

79.     Jane Doe No. 3 was trafficked on Backpage in December of 2013 by her pimp and one or more of his associates. The Backpage solicitations for the underage Jane Doe No. 3 described her as "new," "sweet," and "playful." As with the other Jane Does, the ads were paid for with a prepaid credit card. Jane Doe No. 3 was also given a mobile phone to take calls and texts from customers. She was taken to a hotel in Foxborough, Massachusetts, where she was raped by men who responded to the ads. Photos of Jane Doe No. 3, including one that she had taken of herself, appeared with the ads on Backpage. *Id.* at 153.

80.     Backpage, through its lawyers, again moved to dismiss the civil complaint pursuant to the CDA. The district court granted the motion to dismiss.

81.    In 2012, Backpage was sued by three additional juvenile victims of sex trafficking in *J.S. v. Village Voice Media Holdings, LLC, d/b/a Backpage.com LLC*, 359 P.3d 714 (Wash. S. Ct. 2015), after their advertisements were placed on Backpage and they were raped by adult customers who responded to the advertisements. According to the Second Amended Complaint, in 2010 "J.S.", a 15-year-old minor, was advertised on Backpage along with multiple lascivious photographs of the minor.  J.S.'s pimp paid Backpage a fee for such advertisements.  Advertisements of J.S. appeared in the escort section over 100 different times.  J.S. engaged in sexual intercourse with multiple adults a day for a fee for several months.  (Am. Compl. 4.1-4.4)

82.    According to the Amended Complaint, "S.L." was advertised on Backpage in September 2010 when she was 13 years old.  Her pimps dressed her up in lingerie and took photographs of her to include in the ad.  The pimps paid Backpage a fee for the advertisements. S.L. was repeatedly trafficked to adult men and provided sex for a fee. (Am. Compl. 5.1-5.4)

83.    "L.C." was 13 years old when she was advertised for prostitution by her pimps on Backpage.  From July 2010 until September 23, 2010, the pimps paid for multiple advertisements on Backpage and included ad titles such as "80 DOLLAR DAY SPECIAL, ask for Tasha."  In another ad, it stated "Face down Ass Up," while another ad stated "Let Em BLOW YOUR MIND."  The ads included photos of the under-aged victim.  After being advertised on Backpage, L.C. was raped by hundreds of adult men.  (Am. Compl. 6.1-6.5)

28

84.     Backpage, through its attorneys, moved to dismiss under the CDA.  Unlike other jurisdictions, the Washington Supreme Court held the CDA did not serve as a bar and the lawsuit is going forward.  359 P.3d 714, 717-718.

85.     Multiple anti-trafficking organizations filed amicus curiae briefs in the Washington law suit, including the National Center for Missing and Exploited Children ("NCMEC") and Shared Hope International, which is a non-profit, NGO funded by a U.S. Congresswoman in 1998 to help eradicate sex trafficking.

86.     According to NCMEC, numerous family members found their relatives being advertised on Backpage and provided feedback directly to Backpage through the "Report" feature on Backpage's site.  The following communications were sent directly to Backpage in response to various ads posted:

> * "No the girl ...is 16 shes my cousin she ra[n] away from home two months ago...The cops r trying to get her and her pimp.  She is a runaway  She got tattoos of her pimp on her lower stomach and upper right eyebrow."
>
> *"This ad has photos of my 16 year old sister who currently being trafficked and we are trying to get home.  We have an active investigation going on and am trying to get her away from her pimp and bring her home.  Please stop allowing whoever it is to post her.  She['s] only a minor and we want her home."
>
> * "How dare you allow a post of my juvenile daughter being used in a sex trafficking post! Shame on you backpage – you know what you're really all about and I am on a mission to take you down...Shame shame shame!"

(See Amicus Curiae Brief Of The National Center For Missing And Exploited Children, In The Supreme Court Of The State Of Washington, pg. 7.)

87.     According to published statements made by Shared Hope International, at least 495 minor victims of sex trafficking have been linked to Backpage as of July 14,

2015. (*See* http://sharedhope.org/2015/07/14/495-child-sex-trafficking-victims-linked-to-backpage-com-visa-mastercard-amex-cut-ties-with-site/).

### BACKPAGE HAS KNOWLEDGE OF THE ILLEGAL ACTIVITY OCCURRING IN IT'S ESCORT SECTION – DESCRIPTIVE ADS

88.     In various interviews throughout the years, Backpage employees and/or counsel have claimed that "Escort" ads are not necessarily criminal and are protected by the First Amendment. A review of various advertisements that Backpage has permitted to go live and remain live on its site show that the ads appear criminal on their face.

89.     By way of just a few examples,[1] on March 25, 2016, an individual posted the following advertisement for the Athens Georgia area:

> COLLEGE who Loves Ana$l Crem$pies – 25
> Hi guys, it's YOUR GIRL MIYA AND I'm best head suc*ker it is an I'm not from here but I just moved here from Atl… I HOST ONLY AN PRIVATE AN DISCREET…Location. I love those OLDER WHITE MEN WHO LOVE THOSE BLACK FREAKY college student girls who REM a*ss and who's dominant..Take control $$is req. No rushin no time limit. If the offers fair enough…(((706-389-5223)))

90.     Attached to the ad is a picture of a young female posing in a black and white printed bra and underwear. A second picture is a partial image of her face. (*See* Exhibit 1.)

91.     The above ad remained live on Backpage as of April 22, 2016.

92.     Based on your Affiant's training and experience, I am familiar with the following terminology and expressions commonly used in the prostitution context and seen

---

[1] Each ad is attached as exhibits 1-3 to this affidavit to fully illustrate the different symbols and pictures used that cannot be adequately conveyed with Microsoft Word.

in the above ad: Ana$l Crem$pies appears to be slightly coded to mean "anal cream pies."
"Anal cream pies" relates to sexual activity involving a person's anus, including
ejaculation.   "Head sucker" is a slang term for oral sex performed on a man's genitals.
Your affiant interprets "req" to be shorthand for "required" and the individual is stating
that money is required for the sex acts.   Your affiant has probable cause to believe that this
is a prostitution advertisement on Backpage and that Backpage knows such an
advertisement is connected to prostitution.

93.    On April 16, 2016, an individual posted an ad in the Arizona escort section
of Backpage, that read as follows:

> 100 incalls * Phat @$$!  100$ incall – A*N*A*L *Queen  PorN  No. available –
> 22
> Hey KeLLY 415 602 6537
> Im Young, Sexy, Sweet, Mature, Playful, & im Amazingly Talented. I'm
> Available 24/7
> *100% INDEPENDENT
> *Upscale Gentlemen ONLY
> *Always Safe & very Clean
> *No Police/Pimps
> *Must Be Clean & Respectful
> *Professional & Discrete * Upscale Beauty * 100% REAL
> Gf Exp, Behind Door, All Fetish Welcome
> B:*A*C*K*…D*O*O*R pLAY… CALL NOW  KeLLY 415 602 6537

94.    Attached to the ad were several pictures of a young women in various
lingerie.  For example, one image shows her wearing a black bra, waist garter, and black
underwear while standing up taking a "selfie" with her phone.  Another image shows her
wearing a black thong and orange bra while exposing her buttocks to the camera, along
with a partial side shot of her face.  Another image shows her laying on her stomach

31

wearing cream colored underwear. Her buttocks are the focal point of the camera. This ad remained live on Backpage as of April 22, 2016. (*See* Exhibit 2.)

95.    Based on your Affiant's training and experience, I am familiar with the following terminology and expressions commonly used in the prostitution context: "Incalls" is a term commonly associated with prostitution ads, and it means a customer must come to the female's location; as opposed to "outcalls" where the female will go to the customer's location. 100$ incalls refers to charging $100 for the customer to come to the female's location. "Gf Exp" is shorthand for "Girlfriend Experience." "Girlfriend Experience" refers to a customer wanting to have sexual intercourse as if they were have sexual intercourse with their girlfriend. "A*N*A*L and B:*A*C*K*…D*O*O*R pLAY" relate to the female's willingness to engage in anal sex and other commercial sexual activity involving the anus. Your Affiant has probable cause to believe that this is an advertisement for prostitution and that Backpage knows it constitutes an advertisement for prostitution.

96.    On April 18, 2016, an individual posted an ad for the Long Island, New York area:

SEXY  - BEAUTIFUL – K!nKy B.B.W. BOMBSHELL  - DaNgeRouS CuRveS –

24

Good morning. Up and ready…. Juicy Thick Mami – Respectful and Mature Gents Only – 5'5 BBW Freaky Lil Mama – Available Now – INCSLLS ONLY – Sorry NO ANAL – 100000000% Real – No Games !! Discrete and Very Clean !! SERIOUS CALLERS ONLY – RUDENESS will not be tolerated – Please NO PIMPS.  NO LAW ENFORCEMENT! No THUGS! No Drama! Just Good Safe and Clean Fun! No Explicate talk!! No extra pictures – 6074815436 – Hauppauge Smithtown Commack Sayville Massapequa Ronkonkoma

97.     Attached to the post is a woman wearing black underwear and black fishnet patterned nylons while bending over a toilet. Her buttocks are the focal point of the camera. A second picture shows her sitting on a toilet and straddling the toilet while wearing the same black lingerie outfit described above. The focal point is again on her buttocks. A third pictures shows her in the same black lingerie outfit while kneeling on top of a bed. Her back is facing the camera while she plays with her long hair. The above ad remained online as of April 22, 2016. (*See* Exhibit 3.)

98.     Based on your Affiant's training and experience, "BBW" stands for Big Beautiful Woman. "Freaky" relates to the sexual adventurousness of the individual. "No Anal" is interpreted to mean no anal sex. No LEO is clearly stated and gives notice to Backpage that the purpose of the ad is to engage in illegal activity. Your Affiant has probable cause to believe that this is an advertisement for prostitution where the individual will engage in commercial sex acts and Backpage knows this is an advertisement for prostitution.

### BACKPAGE'S POSTING AND "MODERATION" PROCESS INTENTIONALLY PROMOTES PROSTITUTION IN VIOLATION OF 18 U.S.C. §1952(a)

99.     Historically, Backpage required users to pay a fee to post any ad in the Escort Section, while the non-adult sections were free. The fees for the escort section varied in price depending on geographic location. Users would often provide a major credit card or prepaid credit card to Backpage in order to upload the escort ads.

100.   Starting around June 30, 2015, the major credit card companies stopped processing payments for Backpage ads.  In response, Backpage issued an online statement stating it would no longer require a flat fee to post in the Escort section.   However, Backpage does require fees via credit card or bitcoin for any upgrades that a user may want with the escort ads (described more fully below).  Bitcoin is a form of digital currency and its harder for law enforcement to track.

101.   If a person wants to post an ad in the escort section, the following posting rules display:

> You agree to the following when posting in this category:
> I will not post obscene or lewd and lascivious graphics or photographs which depict genitalia, actual or simulated sexual acts or naked images,
> I will not post any solicitation directly or in "coded" fashion in any illegal service, including exchanging sexual favors for money or other valuable consideration;
> I will not post any material on the Site that exploits minors in any way;
> I will not post any material on the Site that in any way constitutes or assists in human trafficking;
> I am at least 18 years of age or older and not considered to be a minor in my state of residence.
> Any post exploiting a minor in any way will be subject to criminal prosecution and will be reported to the Cybertipline for law enforcement.
> Postings violating these rules and our Terms of Use are subject to removal without refund.

102.   After reviewing the rules, a person must press continue.

103.   After pressing continue, the user sees a screen titled "Step 1: Write Ad."  A number of fields are provided to be completed in creating an ad, including a title, description, the poster's age, location, email address, an optional mobile notification, and an option to show links to the user's other postings.  There is also a field to insert up to 12 images and a video.

104.   After completing the relevant fields, the poster then sees a section for "Upgrades" to keep the ad near the top of the list.   For example, to post an ad in Washington, D.C., a person can pay money to move their ad to the top every set number of hours.   A person can also pay extra to have their ad categorized with nearby additional areas/cities, such as Northern Virginia and Southern Maryland.   A person can also pay more to "auto repost [the] ad", which allows their ad to advance to the top of the listings a certain number of times every set number of days.   A person can also pay extra to have a "Sponsor Ad", where the ad will appear highlighted in thumbnails.   A person can pay $26.55 to have a sponsor ad for one week, $79.65 for four weeks, and $213.46 for 12 weeks.

105.   After selecting payment options, the poster must press "Continue."   Next to the "Continue" button is a phrase that states, "By placing this ad I agree to the terms of use and privacy policy."

106.   The user is then taken to a screen to preview their ad.   Once the user is satisfied with the ad, the user submits the ad for upload to Backpage.

107.   Once an advertisement is uploaded to Backpage, the ad is placed in a queue and it is not live yet.   A computer program is run against the ad, checking to make sure at least 26,000 various explicit words and code words associated with prostitution and other criminal activity is not included in the ad.   Explicit terms that are banned by Backpage include terms such as anal, girlfriend experience, blow job, BBBJ (bare back blow job), greek (relating to anal sex) and countless other terms that Backpage knows are indicative

of prostitution. If an ad contains such explicit terms, the ad may be rejected and will not be posted live.

108. After the computer program is run against the ad, an employee in charge of moderation is required to review the ad prior to it going live to make sure the ad is not for prostitution and complies with Backpage's policies. If the ad complies with Backpage's policies, the ad then goes live for the general public to see.

109. After the ad goes live for others to see, additional moderators review the ads as an additional layer of review to make sure the ads comply with Backpage's policies. This is referred to as the second tier of moderation.

110. Based on the moderation process Backpage employs, there is probable cause to believe that Backpage knows it is posting ads for prostitution.

111. As seen in the advertisements *supra*, people posting ads often insert symbols between words that Backpage knows are tied to prostitution such as "anal." People also shorten expressions that Backpage knows are tied to prostitution by converting "girlfriend experience" to "gf exp." The ads still went live despite Backpage's "moderation" process. There is probable cause to believe that Backpage knew the ad was an ad for prostitution during the moderation process yet still allowed the ad to go live.

112. Historically, Backpage would also engage in an editing process of ads after the ads went live online. Employee Jaala Joye Vaught testified in the Western District of Washington grand jury that she started working at Backpage around July, 2009. She started off as a moderator and she was involved with second tier moderation after the ad went live online. While working as a moderator, at times she would delete certain pictures or words

from an ad and then allow the ad to remain live. For example, if an ad contained an image showing full nudity, that image would sometimes be deleted and then the ad would remain live for the general public to see online. If the ad contained an offer for a "blow job" for money, she would edit out the offer or other offending language and then allow the ad to be live for the general public to see. She testified that she edited the language of ads for about a year until she was told not to do so anymore. Other times, the ad would be rejected in whole and the ad would never go live online.

113.    Employee interviews conducted by IRS SA J. Lopez also reveal Backpage editing ads and allowing them to then be live on their site. One interview involved former employee Brian Alstadt, who worked for Backpage as a moderator from December, 2010, through October, 2011. As a moderator, he would fix ad violations and then repost the ads. A majority of the violations were for nudity and fetish words in the ads. If ads contained only adults, the ad was cleaned and reposted. If the ads were for something other than escorts, he was instructed to clean it up and make it appear that it was just for an escort and not prostitution. Mr. Alstadt believed that about 75% of the ads were for prostitutes and needed to be cleaned up. He further noted that people must be pretty stupid to not know that the ads were for prostitution.

114.    Another interview involved La Tamara Barlow, who worked for Backpage for a couple of months in 2011 before being let go by Backpage. According to her interview, she deleted inappropriate pictures and terms from ads. She thought it was obvious prostitution was occurring with the ads.

115.   During an interview of former employee Justin Dew, he informed IRS that he was a moderator for Backpage from May, 2010, to November, 2011.  He reviewed ads for term and photo violations.  If the ad was violating too many policies, the ad was deleted. If the ad did not violate too many policies, it was merely cleaned and reposted.

116.   During an interview of Brian Paterge, he informed IRS that he worked for Backpage from February, 2011, to February, 2012.  While reviewing ads, he would remove words, pictures, and links that were deemed inappropriate.  He estimated that 60-75% of the ads were prostitution related.

117.   Based on Backpage's moderation practices, there is probable cause to believe that Backpage knows many the ads found on its site historically and today are for prostitution.   There is also probable cause to believe that Backpage has intentionally promoted prostitution by allowing ads to be posted or remain online after they were reviewed, and in several instances edited, while collecting the fee posted by the users to post such ads.

## DISTRICT OF ARIZONA PROSTITUION INVESTIGATIONS INVOLVING BACKPAGE

118.   Your Affiant is aware of numerous federal cases involving prostitution involving the use of Backpage. Below I have summarized some recent cases.

119.   On November 26, 2013, a federal grand jury indicted Kenneth Wayne Becketts, Jr. ("Becketts") on multiple charges for actual or attempted Sex Trafficking of a Minor in violation of 18 USC § 1951. *See United States v. Kenneth Wayne Becketts, Jr.*, CR-13-01637-PHX-SRB (DKD).  On October 29, 2014, Becketts pleaded guilty to one

count of Conspiracy to Commit Sex Trafficking of a Minor. As set forth in the factual basis of his plea agreement, Becketts and others recruited the juvenile victim, took sexually suggestive photographs of her, and posted advertisements for her online, including on Backpage. *Id.* at Dkt. 31. Individuals who wanted to engage in commercial sex acts with the victim called the number associated with the advertisement, and the victim ultimately engaged in commercial sex acts with some of those individuals. *Id.* On March 30, 2015, Becketts was sentenced to 96 months' imprisonment. *Id.* at Dkt. 49.

120.    On December 18, 2013, Cory Deshaun Marshall was indicted in the District of Arizona for Conspiracy to Commit Sex Trafficking (18 U.S.C § 1594), Interstate Transportation of a Minor for Prostitution (18 USC § 2423), Interstate Transportation for Prostitution (18 U.S.C. § 2421), Sex Trafficking and Attempted Sex Trafficking of a Minor and by Force, Fraud, and Coercion (18 U.S.C. §§ 1591 and 1594), and Attempted Sex Trafficking by Force, Fraud, and Coercion (18 U.S.C. §1594). Marshall recruited and enticed females to travel from Montana to Utah and Arizona with the intent to have those females engage in prostitution. Marshall made false promises, threatened females with physical force to control and coerce them into prostitution, and used physical force on at least one known victim. Marshall photographed the females he recruited and utilized the photographs in advertisements for prostitution that were posted on various Internet websites, including Backpage.com. Marshall pled guilty on June 3, 2014, to a Class A Felony violation of Conspiracy to Commit Sex Trafficking (Title 18 U.S.C. § 1594) and was sentenced to 132 months and 5 year supervised release.

121.   On August 20, 2014, Derrick Malik Patterson and Jessamy Eve Bennington were indicted in the District of Arizona for Conspiracy to Commit Sex Trafficking (18 U.S.C. § 1594), Sex Trafficking of a Minor (18 U.S.C. § 1591(a)), Sex Trafficking by Force, Fraud, or Coercion (18 U.S.C. § 1591(a)), and Transportation of Minor for Prostitution (18 U.S.C. 2423). Patterson and Bennington instructed females on how to engage in commercial sex activities in order to increase their proceeds. Patterson and Bennington were provided with the proceeds derived from the acts of females engaging in commercial sex acts. Patterson and Bennington photographed females and used such photographs in advertisements for commercial sex acts that Patterson and Bennington posted on various Internet websites, including Backpage.com. Benington pled guilty on July 17, 2015, to a Class E Felony violation of Misprision of a Felony (18 U.S.C. 4) and is awaiting sentencing. Patterson pled guilty on February 11, 2016, to a Class A Felony violation of Sex Trafficking of Children or by Force, Fraud, and Coercion (18 U.S.C. §1591(a)) and is awaiting sentencing.

122.   On or about March 24, 2015, a federal grand jury returned a superseding indictment charging A'Bram Kyle O'Bannon ("O'Bannon") with, among other things, Sex Trafficking of a Minor and Sex Trafficking by Force, Fraud or Coercion in violation of 18 U.S.C. § 1951. *See United States v. A'Bram Kyle O'Bannon*, CR-14-01530-PHX-JJT (MHB). On October 20, 2015, O'Bannon pleaded guilty to Sex Trafficking of a Minor. As set forth in the factual basis of his plea agreement, O'Bannon caused the victim to be advertised on Backpage for the purpose of soliciting individuals to engage in commercial sex acts with the victim. Interested individuals would call the phone number associated

40

with the advertisement. *Id.* at Dkt. 74. As a result, the juvenile victim engaged in commercial sex acts. *Id.* On February 8, 2016, O'Bannon was sentenced to 168 months' imprisonment. *Id.* at Dkt. 76.

## PROMOTIONAL MONEY LAUNDERING

### Backpage's Revenue Stream and Employees

123. In terms of how Backpage generates revenue it has guarded the details of its total revenue and the revenue it generates from online escort advertising. In an interview with ABC News that aired in April 2012, McDougall repeatedly refused to answer questions about the revenue Backpage makes from adult advertisements. (*See* United States Senate, Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs, Recommendation to Enforce a Subpoena Issued to the CEO of Backpage.com, LLC, dated November 19, 2015 ("PSI")). Based on PSI''s investigation to date, however, Backpage's Corporate group had the following net yearly revenue:

| Year | Net Revenue |
|------|-------------|
| 2012 | $71.2M |
| 2013 | $112.7M |
| 2014 | $135M |

124. Your Affiant also reviewed a September 2013 statement by McDougall that was submitted to the Arizona Governor's Task Force on Human Trafficking. She stated that the Adult ads accounted "for less than 2% of overall content posted to the service." I compared that figure to an internal chart I found in the email records which showed that in August 2013, Adult ads were 1 % of the total count but 95% of the paid count, amounting

41

to more than $10 million in revenue, while non-Adult ads like jobs were 47% of the total count but amounted to only $526.60 in revenue.

125.   I know from the investigation that Backpage used a payment processor to process the payments for the adult section advertisements. The user is provided a form to enter their credit card information. Once that credit card has been validated and approved, Backpage sends a response back to the main ad system that payment was received and the user can create the ad. The payment processing system is hosted on servers located in Phoenix, Arizona. For a number of years Backpage accepted Mastercard, Visa and Discover card. As noted above, those credit card companies disallowed the use of their cards for Backpage due to concerns over prostitution related advertisements.

126.   I know that Backpage has numerous employees needed to monitor the website, conduct moderation, combat fraud, etc. In 2009, Craigslist ceased operations which caused most of their prior customers to use Backpage. As a result, Backpage increased the hiring of moderators to handle the increase in volume of adult ads. The number of moderators doubled in size due to surge of ads as a result of Craigslist no longer accepting adult advertisements. Backpage has been hiring regularly since 2009 with very little turnover.

127.   To accommodate the increase in volume of adult ads, Backpage contracted with a company whose employees were based in India to handle the first tier of moderation review. Charles Craig, CEO of Craig Capital, found that there were approximately 50 people in India employed to conduct the first tier moderation. There were 64 people doing

moderation in Phoenix. In terms of employee compensation, some of the senior moderators were being paid a $105,000 annual salary. They would also receive a bonus equal to 10% of their salary.

128. Your Affiant knows from investigations conducted in Arizona and nationwide involving the monies used to pay for adult ads on Backpage, that most if not all advertisers had no legitimate income. For example, in the cases investigated in Arizona, investigators routinely checked with the Department of Economic Security to determine whether the individuals submitting ads had a reported income. In most cases, your Affiant found that they had little-to-no other income other than monies derived from prostitution.

129. There is probable cause to believe that Backpage knows many prostitution ads were historically purchased with proceeds from prostitution activity (prior to the credit card companies refusing to process such ads). There is also probable cause to believe that Backpage knows many ads are currently being automatically reposted for a fee or featured as thumbnails for a fee via proceeds from prostitution. Many ads note that the females are available "24/7," demonstrating that prostitution activity is a full time job for that individual. Additionally, many prostitution ads have been repeatedly purchased or automatically reposted on a daily basis over the course of weeks and/or months. Backpage is able to track the number of ads posted, reposted, and featured as thumbnails for any given account holder. Based on the full time nature of the job described in the advertisements and the frequent use of Backpage by an account holder, there is probable cause to believe that Backpage knows the fees it has collected historically and today come from prostitution-related proceeds.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

130.   I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require Google to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.   Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

131.   Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the computer systems in control of Google there exists evidence of a crime, contraband and/or fruits of a crime.   Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that the Google E-Mail account described in Attachment A contains the fruits, instrumentalities, and evidence of crimes described in Attachment B.   Accordingly, a search warrant is requested.

132. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711(3) and 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).   Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated."   18 U.S.C. § 2711(3)(A)(I).

133.   Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer

is not required for the service or execution of this warrant.

## REQUEST TO SEAL

134.   The investigation into Backpage and the collection of relevant evidence is ongoing.

135.   Agents fear that public disclosure of the e-mail account under investigation in this affidavit will tip off Backpage and other individuals engaged in criminal activity with or through Backpage.  Agents fear that evidence will be destroyed if individuals are tipped off.

136.   Because the Investigation is ongoing, I would request the Court to seal the Application for Search Warrant, the Search Warrant, and supporting Affidavit in this matter.

Respectfully submitted,

FBI SA Amy L. Fryberger

Federal Bureau of Investigations

SUBSCRIBED TO AND SWORN TO
BEFORE ME THIS _15th_ DAY
OF _January_ 2016.

The Honorable Michelle H. Burns
United States Magistrate Judge