MICHAEL BAILEY
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1200
Los Angeles, CA 90012
Telephone (213) 894-3391

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR-18-00422-PHX-SMB |
|---|---|
| Plaintiff, | **UNITED STATES' RESPONSE TO DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT FOR GRAND JURY ABUSE OR, IN THE ALTERNATIVE, FOR DISCLOSURE OF GRAND JURY TRANSCRIPTS** (Doc. 780) |
| vs. | |
| Michael Lacey, et al., | |
| Defendants. | |

## Preliminary Statement

To obscure substantial evidence of their facilitation of underage prostitution via Backpage, Defendants have filed a motion to dismiss the Superseding Indictment (Doc. 230 or SI) for grand jury "abuse" that is marked by fundamental misunderstandings of the

law and the facts.   Defendants are charged with Travel Act and money laundering violations arising from their operation of a criminal enterprise—Backpage.com, LLC— that facilitated and promoted prostitution, including adult and child prostitution.   The SI and an abundance of intertwined evidence (which Defendants will have the opportunity to challenge at trial) shows how Backpage made child prostitution easier.   While much of that evidence was uncovered as a result of U.S. Senate and grand jury subpoenas enforced over Backpage's objections in 2016 and 2017, Backpage and its executives were long aware of it.   For nearly a decade, Backpage was under enormous pressure to reduce child sex trafficking on its website; and while the company took some steps that would not seriously impact its bottom line, Backpage's executives viewed child prostitution as an inevitable cost of doing business as a prostitution website.   As the President of the Auburn Theological Seminary wrote to Defendants Lacey and Larkin in early January 2011: "We understand from the statements you made in our meeting that your company takes it as a given that a certain number of teens and children will be trafficked for sex—in spite of the safeguards you have put in place—by those who pay your Web site a fee, and that is unacceptable to us."  (Exh. D at 5.)

In the ensuing years, Backpage's executives refused to adopt numerous recommended measures to reduce child prostitution on their website.  In 2011, for example, they declined to implement steps such as: (1) not publishing ads with the phrase "New in Town"—a widely-recognized code "used by pimps who shuttle children to different locations where they do not know anyone and cannot get help"; (2) identifying the use of prepaid credit cards as indicative of potential trafficking ads; and (3) determining if the same phone number was used in numerous different ads, another indicator of potential prostitution or trafficking.  (SI¶¶100-101.)  In 2013, Backpage failed to follow several recommendations from the National Center for Missing and Exploited Children (NCMEC) to prevent the trafficking of children, including age-verification measures and prohibiting anonymous payment methods and unverified email addresses and phone numbers.  (SI¶134.)  In 2014, NCMEC repudiated any suggestion that Backpage was a sincere anti-

trafficking ally, stating in an amicus brief that "Backpage publicizes carefully selected operational processes as a subterfuge to avoid increased scrutiny, while providing traffickers with easy access to an online venue to sell children for sex. . . .  Backpage's stated interest in doing something meaningful to stop child sex trafficking ads on its site is apparently overridden by the enormous revenue it generates from its escort ads, including ads selling children for sex." (SI¶140.)  In 2016, the First Circuit recognized that three minor victims who had been raped more than 1,900 times as a result of being trafficked via Backpage had "made a persuasive case" that "Backpage has tailored its website to make sex trafficking easier." *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 17, 29 (1st Cir. 2016).  In 2017, the U.S. Senate Subcommittee on Permanent Investigations issued a 50-page report, BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING, which concluded that virtually all of Backpage's "adult" ads were solicitations for prostitution and "Backpage has maintained a practice of altering ads before publication by deleting words, phrases, and images indicative of criminality, including child sex trafficking. . . .   Those practices served to sanitize the content of innumerable advertisements for illegal transactions—even as Backpage represented to the public and the courts that it merely hosted content others had created." (SI¶151.)[1]  In 2018, Backpage.com, LLC and its CEO, Carl Ferrer, entered guilty pleas and admitted that the great majority of Backpage's revenue-generating ads were for prostitution; soon thereafter, Backpage's Sales and Marketing Director Daniel Hyer pleaded guilty to Travel Act conspiracy and admitted, *inter alia*, that he and other Backpage employees (including co-defendant Andrew Padilla) used the term "models" in intra-company emails to refer to persons in Backpage ads who appeared to be underage—this was "to avoid looking bad in

---

[1] https://www.hsgac.senate.gov/imo/media/doc/Backpage%20Report%202017.01.10%20FINAL.pdf (hereinafter SR).   The Report's 840-page Appendix is available at https://www.hsgac.senate.gov/imo/media/doc/Final%20Appendix%202017.01.09.pdf.

a lawsuit." (CR 271 at 10.)  As explained below, the discovery in this case is replete with even more evidence concerning Backpage's facilitation of adult and underage prostitution.

Nevertheless, throughout the instant motion, Defendants cherry-pick paragraphs from the SI, construe them out of context, juxtapose them with excerpts from reports of witness interviews, and then attempt to argue that the Grand Jury was misled.  In addition, Defendants rehash several arguments from their prior motions based on First Amendment and *mens rea* considerations—arguments this Court recently rejected.  (*See* Doc. 793.) Moreover, Defendants fail to articulate a particularized need for the disclosure of the Grand Jury transcripts.  Defendants' motion should be denied.

## **Factual Background**

On March 28, 2018, the Grand Jury returned a 61-page Indictment.  (Doc. 3.)  On July 25, 2018, the Indictment was supplanted by the 92-page, 100-count SI.  The first 48 pages of the SI describes in great detail who was charged, the elements of the offenses, what entities were used by Defendants, the illegal objects of the charged Travel Act and money laundering conspiracies, the manner and means used by Defendants to achieve those illegal ends, and 156 overt acts in furtherance of the conspiracies.  The remainder of the SI details specific Travel Act and money laundering substantive counts.  As explained above and further developed in the Argument below, Defendants were repeatedly placed on notice that their criminal enterprise facilitated both adult and child prostitution.

## **Argument**

## **I.      Defendants' Assertions of Grand Jury "Abuse" Are Unavailing.**

Defendants' request that the SI be dismissed for grand jury "abuse" should be denied.  "The Court's power to dismiss an indictment on the ground of prosecutorial misconduct is frequently discussed but rarely invoked."  *United States v. Samango,* 607 F.2d 877, 881 (9th Cir. 1979).  The prosecution may exercise wide discretion in grand jury proceedings.  *United States v. Kaplan,* 554 F.2d 958, 970 (9th Cir. 1977).  Critically here, a district court "cannot grant a motion to dismiss an indictment if the motion is 'substantially *founded upon and intertwined with evidence concerning the alleged*

*offense*.'"  *United States v. Lunstedt,* 997 F.2d 665, 667 (9th Cir. 1993) (emphasis added) (quoting *United States v. Shortt Accountancy Corp.,* 785 F.2d 1448, 1452 (9th Cir. 1986) (alterations omitted)).  Rather, a court can only grant such a dismissal if it is "'entirely segregable' from the evidence to be presented at trial." *Lunstedt*, 997 F.2d at 667 (citation omitted).  Otherwise, "the motion falls within the province of the ultimate finder of fact and must be deferred [to the jury]." *Id.*  "[A] motion requiring factual determinations may be decided before 'trial [*only*] *if* trial of facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense.'" *Id.* (quoting *United States v. Covington,* 395 U.S. 57, 60, (1969)).

Moreover, "the law presumes, absent a showing to the contrary, that a grand jury acts within the legitimate scope of its authority." *United States v. R. Enterprises, Inc*., 498 U.S. 292, 300 (1991) (citing *United States v. Mechanik,* 475 U.S. 66, 75, (1986) (O'Connor, J., concurring) ("The grand jury proceeding is accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process.")); *United States v. Ruppel,* 666 F.2d 261, 268 (5th Cir. 1982) (applying "the presumption that the grand jury and the prosecutor have properly performed their duties" to reject defendant's claim of grand jury abuse); *cf. In re Antitrust Grand Jury Investigation,* 714 F.2d 347, 350 (4th Cir. 1983) ("What governs the decision of this case is the polestar that a court should not intervene in the grand jury process absent a compelling reason.").  A presumption of regularity attaches to grand jury proceedings, and a defendant carries a heavy burden when claiming an abuse occurred before the grand jury. *See United States v. Al Mudarris,* 695 F.2d 1182, 1185 (9th Cir. 1983); *United States v. Ferreboeuf*, 632 F.2d 832, 835 (9th Cir. 1980).  Bare allegations, or unsubstantiated or speculative claims of impropriety, are insufficient. *United States v. Ferreboeuf*, 632 F.2d 832, 835 (9th Cir. 1980).[2]

---

[2] Furthermore, prosecutors are not constitutionally obligated to present exculpatory evidence to the grand jury.  In *United States v. Williams*, 504 U.S. 36 (1992), the Supreme Court held that the federal court's supervisory powers over the grand jury did not include the power to make a rule allowing the dismissal of an otherwise valid indictment where the

Despite the heavy burden in showing irregularities in the Grand Jury proceedings, Defendants erroneously assert the government abused the grand jury process when presenting this case to the Grand Jury in three ways: (1) by wrongfully accusing Defendants of facilitating child sex trafficking; (2) misrepresenting documentary evidence; and (3) incorrectly and/or incompletely instructing the grand jury on the law.  (Doc. 780, Mot. at 1.)  These assertions are incorrect.

### A.      Defendants Knowingly Allowed Ads Facilitating Child Sex Trafficking.

Defendants' primary argument is that the government presented "explosive and irrelevant evidence of child sex trafficking to the Grand Jury."  (Doc. 780, Mot. at 11.) Defendants cherry-pick paragraphs from the SI and juxtapose them with reports of interviews in a futile effort to show that the Grand Jury was prejudiced and misled.  (Doc. 780, Mot. at 6-11.)  Yet Defendants fail to address an avalanche of "intertwined" evidence demonstrating that they *knew* they were facilitating child sex trafficking.

Defendants were repeatedly notified by law enforcement, researchers, the news media, the U.S. Senate and others about the prevalence of prostitution ads—including child sex trafficking ads—on Backpage's "adult" section.  (*See, e.g.*, SI¶¶74, 86, 89, 97,105, 109, 111, 127, 131, 134, 140-141, 144, 151, 155; Doc. 271 at 9-10).)  Moreover, Defendants were repeatedly sued by underage trafficking victims, and confronted by religious and anti-child sex trafficking organizations urging them to adopt particular safeguards or shutter the "adult" section of their website.  (*See, e.g.*, Exhs. C, D and E; SI¶134.)  Despite numerous requests, Defendants refused to adopt proposals or implement software that could identify underage trafficking victims.  (*See, e.g.* SI¶¶100-101, 106, 109, 113, 130-131, 134, 136; *see also* Preliminary Statement, *supra*.)  In addition, countless

---

prosecutor failed to introduce substantial exculpatory evidence to a grand jury.  Following *Williams*, other courts have rebuffed efforts to challenge indictments because of an alleged failure to present exculpatory evidence.  *See, e.g.*, *Lapena v. Grigas*, 736 F. App'x 651, 655 (9th Cir. 2018) ("There is no federal right to have exculpatory evidence presented before a grand jury."); *United States v. Isgro*, 974 F.2d 1091, 1096 (9th Cir. 1992) (government under no duty to disclose exculpatory testimony from former trial); *United States v. Casas*, 425 F.3d 23, 38 (1st Cir. 2005); *United States v. Waldon*, 363 F.3d 1103 (11th Cir. 2004); *United States v. Byron*, 994 F.2d 747, 748 (10th Cir. 1993).

cases and arrests appeared in press reports on a regular basis involving prostitution or trafficking linked to Backpage.  (*See, e.g.*, SI¶ 150.)  What follows is a non-exhaustive sampling of that evidence that the government will present at trial.

       1.    *Law Enforcement, Non-Governmental and Religious Organizations*

References to Defendants' knowledge of child sex trafficking was properly included in the SI because Defendants were repeatedly confronted by organizations seeking to persuade them to shut down Backpage's "adult" section and/or adopt safeguards in response to the prevalence of underage prostitution ads on their website.  For example, Defendants had meetings and exchanged correspondence with law enforcement, religious and anti-trafficking organizations about these topics, including: (1) Auburn Theological Seminary (*see* Exh. D); (2) Polaris (*see* Exh. E); and (3) the National Association of Attorneys General (NAAG).  (SI¶¶74, 111).[3]  Defendants cannot plausibly claim that they were not aware that the website included postings of trafficked children.

In 2011, Backpage hired former U.S. Department of Justice attorney Hemu Nigam of SSP Blue (Safety, Security & Privacy Consulting Services) in an effort to address, among other things, the proliferation of ads that featured child sex trafficking on Backpage. Nigam accompanied Defendants Lacey, Larkin and Spear to meetings with NCMEC and/or Polaris on March 1, 2011.[4]  During these meetings, Defendants were confronted with ads featuring underage trafficking victims.  (*See, e.g.*, Doc. 446 at 12; Doc. 446-1 at 41-62.) Following those meetings, on April 25, 2011, Nigam provided Defendants a matrix of action items recommended by SSP Blue to minimize illegal postings.  (*See* SI¶100).  One of those action items was that the phrase "New in Town" was indicative of child sex

---

[3] The August 31, 2011 letter from NAAG, "Re: Backpage.com's ongoing failure to effectively limit prostitution and sexual trafficking activity on its website," is available at http://www.naag.org/assets/files/pdf/signons/Backpage%20WG%20Letter%20Aug%202011Final.pdf.

[4] NCMEC helps locate children reported missing and assists physically and sexually abused children.  It distributes photos of missing children, accepts tips and information from the public, and coordinates these activities with state and federal law enforcement agencies. http://www.missingkids.org/.  Polaris is a Washington, D.C.- based organization that combats human trafficking, including child sex trafficking. https://polarisproject.org/.

trafficking and should put moderators on heightened alert that the ad may involve underage prostitution.  (SI¶100.)   Defendants failed to implement this action item and others recommended by Nigam.  (SI¶101.)  Many of the ads referenced in the SI and included as substantive counts included the term "New in Town" years *after* Nigam recommended this term be banned.  (*See* SI¶¶169, 171, 201, Counts 12-15, 29.)

### 2. *Civil Lawsuits*

Defendants were further on notice of the spread of underage trafficking ads on Backpage as evidenced by numerous civil suits filed by underage victims.  At trial, the government expects at least six victims (some referenced in the SI) to testify that they were trafficked repeatedly when underage after being posted on Backpage.  Several of these victims are known to Defendants because they filed civil suits against several of them in an array of jurisdictions.[5]  For example**,** Backpage was sued in 2012 in *J.S. v. Village Voice Media Holdings et al.*, a case involving three plaintiffs who were underage when they were trafficked on Backpage.  After losing a motion for summary judgment, Backpage settled on the eve of trial.[6]  Numerous other civil cases involving child victims have been filed against Backpage or its executives since 2012.  (*See* Exh. C (listing several cases).)

### 3. *Lacey Repeatedly Acknowledged Child Sex Trafficking on Backpage*

Defendant Lacey's knowledge of Backpage's facilitation of child sex trafficking is evidenced in part by his response to numerous press reports that criticized Backpage as a trafficking hub.  He characterized such trafficking as isolated instances and acknowledged that Backpage's efforts to prevent child sex trafficking was "not perfect, by any means." (SI¶121.)  He repeatedly complained to other Backpage principals and public relations

---

[5] *See* e.g., *J.S., v. VVMH ,LLC*, No. 12-2-11362-4 (Wash. Super. Ct., Pierce Cty.) (Victim 4, age 15); *Jane Doe v. Medalist Holdings*, No. MCC1700068 (Cal. Super. Ct., Riverside Cty.) (Victim 13, age 15); and *Jane Doe Nos. 1,2 & 3 v. Backpage.com, LLC* , 17-cv-11069 (D. Mass) (Victim 8, age 15).

[6] Travelers Property Casualty Co. later sought to deny Backpage's claim of indemnification of the settlement amount, arguing that it had no duty to indemnify and citing exclusions that bar coverage for *intentional acts*.  (*See Traveler Property Casualty Company of America v. Village Voice Media Holdings LLC, et al.*, 2:17cv03994 (D. Ariz.), Doc. 1.)

firms about the onslaught of negative publicity from numerous murders and the proliferation of child sex trafficking cases linked to Backpage.

For example, in response to a CNN news report critical of Backpage, Lacey attempted in May 2011 to argue that the FBI child sex trafficking statistics referenced in the story were inflated, writing: "[T]he reporter has overall FBI arrests for all hookers," and the "FBI uses 1.5% to 2% to qualify juvenile arrests." (*See* Doc. 516-6 at 2.) In discussing how to respond to an inquiry by *New York Times* reporter Nicholas Kristoff about a 13-year-old who had been trafficked on Backpage, Lacey acknowledged in January 2012 that child sex trafficking occurred on Backpage but equated underage sex trafficking victims to "underage people using phony I.D. to get into bars"; he wrote that "thousands of people patronize local bar [sic] legally, you dont [ sic] close it when someone underage deceives the owner of the bar." (Doc. 516-7 at 2.) Later that month, in complaining about a highly-publicized Kristoff column entitled "*Where Pimps Peddle Their Goods*" that detailed a Backpage child sex trafficking victim's story,[7] Lacey acknowledged that Backpage ran ads that involved child sex trafficking, stating, "of course there are kids who get through the system, as there are in bars." (Doc. 516-8 at 2.) Again, Lacey seemed to equate Backpage child sex trafficking victims (several of whom were murdered) to underage individuals who sneak into bars. References to child sex trafficking in the SI are further supported by this intertwined evidence and did not, as argued by the defense, "unfairly and unduly taint the grand jury proceedings."

> **B.   Defendants' Disagreements with the Import and Weight of Various Items of Evidence Underscore Precisely Why Trial Is Necessary.**

Defendants' assertion that the government "misled" the Grand Jury with respect to the SI's descriptions of certain items of evidence or information is unavailing. (Doc. 780, Mot. at 5-11.) Defendants cite SI¶81 as an example, and discuss an October 16, 2010 email from Padilla insisting that "if an ad makes a clear reference for sex a moderator should

---

[7]    https://www.nytimes.com/2012/03/18/opinion/sunday/kristof-where-pimps-peddle-their-goods.html

delete the ad." (Doc. 780, Mot. at 10.) But this misses the point, as Backpage's "moderation" practices sanitized such ads by removing only the most overt references to sex-for-money terms or images while still conveying the illegal message. Indeed, in the same email discussed by Defendants, Padilla wrote: "I'd still like to avoid Deleting ads when possible," "we're still allowing phrases with nuance," and "in the case of lesser violations, editing should be sufficient." (Doc. 780, Exh. 16.) The Senate Report is replete with additional incriminating Padilla emails. (*See, e.g.*, SR 28 (describing October 25, 2010 email to a moderation supervisor in which Padilla wrote: "[Your team] should stop Failing ads…. Your crew has permission to edit out text violations and images and then approve the ad."); SR 28-31.) In all events, by late October 2010, Backpage's default response to ads proposing illegal transactions was simply to edit out the evidence of illegality and approve the ad. (SR 28; *see also* Doc. 271 at 10 (Hyer plea agreement).) Put simply, the SI's discussion of "moderation" was not misleading or inaccurate.[8]

The SI properly included allegations that Defendants' moderation practices made child sex trafficking easier. Defendants were well aware that the moderation practices stripped out coded terms indicative of child sex trafficking (*e.g.*, 'Lolita,' 'new in town,' 'sweet young thing,' 'young,' 'amber alert,' among others) and continued to post the underlying ads and receive revenue from the postings. (*See* SI¶¶13-14, 85, 95, 104, 116.) For example, Defendants Andrew Padilla and Joye Vaught (with the knowledge of other Defendants) routinely removed terms indicative of child sex trafficking but continued to publish the ad (as opposed to refusing to publish the ad all together) or even refused to remove the ad when a complaint was lodged that the person featured in the ad was underage. (*See* SI¶¶85, 95, 116, 120, 123-125, 133.)

---

[8] The Senate Subcommittee on Permanent Investigations also obtained testimony from current and former Backpage moderators. One former moderator testified that all of the employee-moderators knew that the ads they reviewed offered sex for money, and that moderators "went through the motions of putting lipstick on a pig, because when it came down to it, it was what the business was about"; another former moderator testified "everyone" knew that Backpage's adult advertisements were for prostitution, and "[a]nyone who says [they] w[ere]n't, that's bullshit." (SR 36-37.)

1    Defendants' criticisms of other items of evidence discussed in the SI are similarly

2    unavailing.  By way of a few examples only, Defendants assert that certain recent

3    statements from Ferrer and three Backpage emails (from July, September and October

4    2011) provide "overwhelming" evidence that Defendants did not facilitate underage

5    prostitution and fully cooperated with organizations like NCMEC.  (Doc. 780, Mot. at 7.)

6    The three emails—all from 2011—substantially predate the developments outlined in the

7    Preliminary Statement and additional evidence summarized above (which is not

8    exhaustive) showing NCMEC's repudiation of Backpage (*see* SI¶140), Lacey's

9    acknowledgements that child prostitution existed on Backpage, and the deluge of notice

10   and criticism Backpage executives received for years regarding Backpage's facilitation of

11   child sex trafficking and refusal to adopt to numerous recommended safeguards.

12   As an example of additional evidence demonstrating Defendants' failure to

13   regularly report underage trafficking ads to NCMEC, Victim 13 was fifteen years old when

14   she was trafficked between April and September 2015. (*See* SI¶ 172 and Count 23; Victim

15   13's posting is attached as Exh. A and FBI 302 interview attached as Exh. B.)  Victim 13's

16   postings were not referred to NCMEC by a Backpage moderator.  At trial, the government

17   will demonstrate that Victim 13 was not an anomaly; rather, numerous underage victims,

18   including other victims detailed in the SI, were advertised for sex on Backpage—and their

19   ads were not referred to NCMEC.

20   Victim 13's posting explicitly solicited prostitution, stating, "I do half hour sessions

21   that vary in donation prices, 80 for head, 120 for hooking up without head and 150 for

22   hooking up with head." (SI¶¶172 and 201, Count 23.)  Her ad included coded terms

23   indicative of underage trafficking, namely mentioning "young" four times within the text

24   of the posting and a reference to "lil mama."  (*See* Exh. A.)

25   Victim 13 is expected to testify that in September 2015, after having been trafficked

26   at the age of 15 for several weeks, she began to receive emails from Backpage in response

27   to her posts.  The emails directed her to remove the term "young"; she followed that

28   direction and simply reposted her ad without the prohibited term.  In addition to Victim

13's ad, the SI contains references to sixteen other victims, many underage, whose Backpage ads included explicit or veiled references to sex for money.  (*See* SI¶¶160-176.) Many of these victims are expected to provide similar testimony regarding their postings that included terms indicative of being underage, and that they engaged in numerous sex acts on a daily basis and received compensation that mostly went to their pimp or trafficker. Other victims discussed in the SI were murdered by their customers; one was killed while attempting to escape from her trafficker.  (SI¶165, 173 174, 175.)

Further, Defendants' assertions that Backpage documents addressing, for example, the "Dallas Plan" were inaccurately described in the SI are unavailing.  Other evidence intertwined with that discussed in the SI demonstrates that the Dallas/aggregation plan involved the creation of prostitution ads in an effort to expand Backpage's prostitution advertising business.  (*See, e.g.*, Doc. 271 at 9 (Hyer plea agreement) ("I knew that the majority of the ads that I and others at Backpage were creating through the aggregation process were actually offering illegal prostitution services.").)  Similarly, Defendants' spin on what phrases like "plausible deniability" meant in other Backpage documents, or their refusal to acknowledge that they understood "GFE" (Girlfriend Experience) as a coded sex-for-money term, are quintessential disagreements about the evidence that Defendants can advance at trial—and not indicia of grand jury "abuse."  (*See* Doc. 780, Mot. at 8-10.)

Defendants' quibbles with the government's descriptions of certain items of evidence are not the stuff of grand jury "abuse"; if Defendants take a different view of the import or weight or meaning of evidence, the proper forum for resolving their disputes is trial—not a motion to dismiss.  *See United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996) (a motion to dismiss cannot be used as a vehicle for challenging the government's proof); *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002); *United States v. Nukida*, 8 F.3d 665, 670 (9th Cir. 1993).  *Cf. United States v. Hoeffener*, 2018 WL 2996317, at *8 (E.D. Mo. May 9, 2018) ("[s]omething more is needed than mere disagreement with the agent's descriptions of the images or the desire for a greater context" to trigger a *Franks* hearing).

**C.      Defendants' Motion to Dismiss Based on First Amendment and *Mens Rea* Concerns Should Also Be Denied**.

Next, Defendants rehash their First Amendment, *mens rea* and Travel Act arguments from their prior motions.  (*Compare* Doc. 561, Mot. to Dismiss at 14-37 and n.33, *and* Doc. 746, Mot. to Dismiss at 1-12, *with* Doc. 780, Mot. to Dismiss at 11-15.) The government incorporates by reference its responses to those motions—specifically Docs. 649 and 776.  In its October 24, 2019 Order, this Court considered and rejected Defendants' theories.  (*See* Doc. 793 at 12-20 (denying Doc. 561).)  As explained in Docs. 649, 776 and 793, the prostitution solicitations that Defendants published were categorically excluded from First Amendment protection; Defendants' operation of the internet's leading prostitution advertising website and related business practices (which were calculated to increase Backpage's volume of prostitution advertising and conceal or otherwise launder resulting revenues) were not protected editorial or publishing functions; Defendants intentionally promoted or facilitated prostitution, and took several overt steps in furtherance of such promotion or facilitation; and Defendants' prostitution advertising customers (including pimps, prostitutes and traffickers) were in the business of prostitution. Moreover, the SI and evidence at trial will demonstrate that Defendants deliberately operated or managed Backpage.com, LLC in an effort to increase its prostitution advertising profitability, resulting in exponential increases in profits and with full knowledge that the overwhelming majority of Backpages' revenue-generating ads promoted or facilitated prostitution.  (*See, e.g.,* SI¶¶1, 9-11, 15, 22-32, 177, 192; 18-CR-464, Doc. 7-2 at 12-13 (Ferrer plea agreement); 18-CR-465, Doc. 8-2 at 11 (Backpage.com, LLC plea agreement); Doc. 271 at 8-10 (Hyer plea agreement).)

**II.      Defendants Have Not Established a Particularized Need for the Grand Jury Transcripts.**

Defendants' alternative request for disclosure of the Grand Jury transcripts should be denied.[9]  A court may permit disclosure of grand jury materials under Rule 6(e)(3)(E)(i)

---

[9]  Defendants assert the government never provided a reason for not disclosing the transcripts.  (*See* Doc. 780, Mot. at 17 n.8.)  That's incorrect.  Despite the volume of

[formerly 6(e)(3)(C)(i)] only when the requesting party has demonstrated a "particularized need." *Douglas Oil Co. of Calif. v. Petrol Stops Northwest*, 441 U.S. 211, 223 (1979). Under this standard, the movant must demonstrate that the material sought is:

> [N]eeded to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that [the] request is structured to cover only material so needed . . . . [Moreover], in considering the effects of disclosure of grand jury proceedings, the courts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries.

*Id*. at 222; *see also United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986) (emphasizing that the "trial judge should order disclosure of grand jury transcripts only when the party seeking them has demonstrated that a 'particularized need exists which outweighs the policy of secrecy'" and holding that "the district court was correct in denying Walczak's motion to discover the grand jury transcripts" because "Walczak gave two reasons why he sought discovery of the transcripts" but "[n]either reason constitutes 'particularized need'").

Disclosures will not be allowed upon a mere showing of relevance, nor for general discovery. *See United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958) ("This 'indispensable secrecy of grand jury proceedings' must not be broken except where there is a compelling necessity. There are instances when that need will outweigh the countervailing policy. But they must be shown with particularity. No such showing was made here. The relevancy and usefulness of the testimony sought were, of course, sufficiently established. . . . Yet these showings fall short."); *United States v. Evans & Associates Const. Co., Inc.*, 839 F.2d 656, 658 (10th Cir. 1988) ("The party seeking disclosure must demonstrate . . . there is a particular, not a general, need for the material. The rule is not to be used as a substitute for general discovery."); *Petrol Stops Northwest v. United States*, 571 F.2d 1127, 1129 (9th Cir. 1978), *rev'd on other grounds sub nom.*,

---

exhibits attached to their motion, Defendants neglected to include government's May 16, 2019 letter explaining (with authority) why Defendants had failed to meet their heavy burden of justifying disclosure of grand jury materials. (*See* Exh. F.) Defendants never provided any counter authority, and they failed to include the government's correspondence as an attachment to their motion—as the government requested. (*See* Exh. F at 3.)

*Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211(1979).   In most cases, considerations such as convenience, avoidance of delay, case complexity, the passage of time, and expense, also are insufficient reasons to justify disclosure.  *See Smith v. United States*, 423 U.S. 1303, 1304 (1975) (holding, where movant sought disclosure of grand jury transcripts to preserve "investigatory . . . resources" and because transcripts would be "generally useful," that "it is doubtful whether either of these reasons . . . meets the 'compelling necessity' standard of Rule 6(e)"); *United States v. Procter & Gamble*, 356 U.S. at 677, 683 (1958); *In re Sells*, 719 F.2d 985, 991 (9th Cir. 1983).

Defendants have not met their burden of demonstrating the particularized, specific need for grand jury materials required by *Douglas Oil* and its progeny.   *First*, Defendants rely upon speculative factual misstatements before the Grand Jury as a basis for the Court to order the disclosure of the transcripts.   These theoretical arguments do not establish the particularized need required for disclosure and for that reason alone Defendants' request should be denied.   And, their arguments regarding the government supposedly misstating the elements of the Travel Act have already been rejected by the Court.  (*See* Doc. 793.)

*Second*, Defendants argue that the Grand Jury transcripts should be produced pursuant to *Jencks, Giglio* or *Brady*.   This ground lacks merit as well.   Defendants presuppose that a parade of witnesses testified before the grand jury, but only two law enforcement witnesses provided testimony.   It is anticipated that the government will not even call these Grand Jury witnesses to testify at trial as they have not been noticed as witnesses.   Thus, no *Jencks* obligation is expected to arise.

*Third*, the request for the transcripts of the charge or instructions to the Grand Jury should be denied because Defendants have failed to articulate a basis for disclosure.  *See, e.g., United States v. Barry*, 71 F.3d 1269, 1274 (7th Cir. 1995) (rejecting defendant's argument that legal instructions given to the grand jury are merely "ministerial in nature and are not 'matters occurring before the grand jury'; denying motion for disclosure); *United States v. Smith,* 105 F. Supp. 3d 255, 261 (W.D.N.Y. 2015) ("The absence of detailed allegations regarding Defendant's alleged knowledge of the conspiracy is

insufficient to create a particularized need [for the government's legal instructions to the grand jury].");  *United States v. Faltine*, 2014 WL 4370811, at *6 (E.D.N.Y. Sept. 2, 2014); (denying motion for disclosure of jury empanelment instructions).

Defendants cite *United States v. Belton* as authority for the disclosure of the charge to the Grand Jury.  2015 WL 1815273, at *3 (N.D. Cal. Apr. 21, 2015).  (Doc. 780, Mot. at 16 n.6.)  *Belton* recognized that courts have reached different conclusions on this issue, but it adopted the view that to obtain the instructions to the grand jury the defendants do not have to demonstrate a particularized need.  2015 WL 1815273, at *3.  *Belton* was recently rejected by *United States v. Chambers*, 2019 WL 1014850, at *3 (D. Conn. Mar. 4, 2019), which wrote:

> The Court is not persuaded that such a relaxed approach adequately protects the long-recognized goals of grand jury secrecy. . . .[10]  Indeed, "[legal] instructions [given to the Grand Jury] ..., or the existence of such instructions goes to the substance of the charge being laid before the Grand Jury as well as how the Grand Jury is to proceed regarding the type and manner of produced evidence before the panel."  *United States v. Larson*, 2012 WL 4112026, at *5 (W.D.N.Y. Sept. 18, 2012).  Accordingly, affording these instructions the same level of secrecy as other grand jury materials is, in this Court's view, appropriate.

Other courts—including those within the Ninth Circuit—have taken a similar view.  *See, e.g.*, *United States v. Stepanyan*, 2016 WL 4398281, at *2 (N.D. Cal. Aug. 18, 2016) ("courts have uniformly rejected the argument that the government's instructions or remarks to the grand jury are not entitled to secrecy"); *United States v. Morales*, 2007 WL 628678, at *4 (E.D. Cal. Feb. 28, 2007) (denying defendant's request for disclosure of government's instructions to the grand jury).  Here, granting the request for the grand jury instructions would do nothing but enable Defendants to "engage in a fishing expedition in hopes of uncovering an impropriety or defect in the proceeding where they have no basis to conclude that an impropriety or defect exists."  *Faltine*, 2014 WL 4370811, at *5.

## Conclusion

Having been provided both a lengthy and thorough speaking indictment and extensive discovery evidencing numerous instances in which Defendants were put on

---

[10] Citing *In re Grand Jury Subpoena*, 103 F.3d 234, 237 (2d Cir. 1996).

notice of Backpage's facilitation of underage prostitution, Defendants cannot plausibly claim that references in the SI (and "intertwined" evidence the government will present at trial) to that evidence constitute grand jury "abuse."  Defendants' alternative request to obtain grand jury transcripts and/or instructions should be rejected because Defendants have failed to articulate a particularized need.  Accordingly, Defendants' Motion (Doc. 780) should be denied.

Respectfully submitted this 27th day of November, 2019.

MICHAEL BAILEY
United States Attorney
District of Arizona

*s/ Kevin M. Rapp*

KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW C. STONE
Assistant U.S. Attorneys

JOHN J. KUCERA
Special Assistant U.S. Attorney

BRIAN BENCZKOWSKI
Assistant Attorney General
U.S. Department of Justice
Criminal Division, U.S. Department of Justice

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

1

## **CERTIFICATE OF SERVICE**

2        I hereby certify that on November 27, 2019, I electronically transmitted the attached

3  document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4  Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance

5  as counsel of record.

6

7  *s/ Angela Schuetta*
Angela Schuetta

8  U.S. Attorney's Office

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

# (Filed Under Seal)

# <u>Exhibit B</u>

# (Filed Under Seal)

# Exhibit C

| **Case Name, Court, and Number** |
|---|
| *Jane Doe #1 v. Backpage.com, LLC and CF, et al., 270th Dist. Ct., Harris Co., Texas; No. 2018-04501* |
| *Jane Doe #2 v. Backpage.com, LLC and CF, et al., 270th Dist. Ct. Harris Co., Texas; No. 2018-09781* |
| *Jane Doe #3 v. Backpage.com, LLC and CF, et al., 125th Dist. Ct. Harris Co., Texas; No. 2018-12781* |
| *Jane Doe #4 v. Backpage.com, LLC and CF, et al., 157th Dist. Ct., Harris Co., Texas; No. 2018-12747* |
| *Jane Doe #5 v. Backpage.com, LLC and CF, et al., 189th Dist. Ct., Harris Co., Texas; No. 2018-27018* |
| *Jane Doe #6 v. Backpage.com, LLC and CF, et al., 189th Dist. Ct., Harris Co., Texas; No. 2018-30176* |
| *Jane Doe #7 v. Backpage.com, LLC and CF, et al, 165th Dist. Ct. Harris Co., Texas; No. 2018-32490* |
| *Jane Doe v. Facebook, Inc., et al., 334th Dist. Ct., Harris Co., Texas; No. 2018-69816 (FB 1)* |
| *Jane Doe v. Facebook, Inc. d/b/a Instagram Inc., et al., 334th Dist. Ct., Harris Co., Texas; No. 2018-82214 (FB 2)* |
| *Janiece Charlez v. Plainfield Inn a/k/a Virani & Manav, LLC, 190th Dis. Ct., Harris Co., Texas; No. 2018-15356* |

| |
|---|
| *Jane Doe #12 v. Backpage.com, LLC,*<br>*113th Dist. Ct., Harris Co., Texas; No. 2019-61706* |
| *Doe v. Medalist Holdings, LLC and CF, et al.,*<br>*Super. Ct., Riverside Co., California; No. MCC1700068* |
| *O.L. v. Village Voice Media Holdings, LLC d/b/a Backpage.com, et al.,*<br>*Super. Ct., Pierce Co., Washington; No. 13-2-13382-8* |
| *R.O. and K.M. v. Medalist Holdings LLC, Super. Ct., Pierce Co., Washington; No. 17-2-04897-1* |
| *XXX v. Medalist Holdings, Inc. and CF, et al.,*<br>*44th Dist. Ct., Dallas Co., Texas; No. DC-17-00951* |
| *Ambrose v. Backpage.com, LLC and CF, et al., Cook Co. Cir. Ct., Illinois; No. 17 L 4979* |
| *K.R. (Kristy Rodgers) v. Backpage.com, LLC, et al.,*<br>*Houston Cty. Cir. Ct., Alabama; No. 38-CV-2017-900041.00* |
| *T.T. v. Jupiter Enterprises, LLC et al.,*<br>*Jefferson-Birmingham Co. Cir. Ct., Alabama; CV-2018-901853.00* |
| *Florida Abolitionist and Jane Doe v. Backpage.com LLC, et al.,*<br>*M.D. Fla. Orlando Div., Florida; No. 6:17-cv-218-Orl-28TBS* |
| *Jane Doe Nos. 1, 2 & 3 v. Backpage.com, LLC and CF, et al.,*<br>*U.S. Dist. Ct., Massachusetts; No. 17-cv-11069-LTS* |
| *Kocher v. Hilton Worldwide Holdings, Inc. and CF, et al.,*<br>*Multnomah Co. Cir. Ct., Oregon; No. 17-cv-55605* |

# **<u>Exhibit D</u>**

January 5, 2011

Jim Larkin, Village Voice Media CEO and Board Chair
Mike Lacey, Village Voice Media Editor-In-Chief
Carl Ferrer, Vice President, Backpage.com
Edward McNally, Legal Counsel & Law Enforcement Advisor to Village Voice Media and
Backpage.com

Dear Messrs. Larkin, Lacey, Ferrer, and McNally,

Thank you again for taking the time to meet with representatives of Auburn's clergy
coalition last month regarding the issue of child sex trafficking and Village Voice Media's
website, Backpage.com.

I want to personally commend each of you on behalf of the clergy coalition for coming
to see us. We appreciated hearing your views and perspective on Village Voice's
engagement with law enforcement on the matters at hand and support for legislation
that would provide funding for services to help victims of sex trafficking. Your
presentation and our review of your materials have provided a better sense of the
positions of both the Village Voice and the clergy coalition. Please be assured that since
we met last month, we have diligently reviewed the information that was provided in
your legal counsel's letters and that you shared with us during your presentation. For
our part, while we always have a willingness to meet, we think the immediate action of
permanently shutting down Backpage's adult section is required.

As has been publicly reported, you have heard concerns regarding the operation of
Backpage.com from 51 of the nation's 56 attorneys general, mayors across the country,
and over 50 leading anti-trafficking experts and organizations, among others and have
received the same request from all – to shut down the adult section of the site.

We are coming at this from a different perspective – not as lawyers, government
officials, or NGOs, but as moral and religious leaders who have a calling and
responsibility to protect our children.

For us, fighting child sex trafficking is a moral imperative. As a Christian, for me
personally, my commitment to this issue has a Biblical basis. I believe we are meant to
care for the most vulnerable in our society and to protect all people's human dignity.
This view is shared by our broad based clergy coalition, which is comprised of Christians,
Muslims, Jews, Buddhists, Sikhs and Humanists.

Child sex trafficking is not just an "issue" for us, but a matter of basic justice. We feel we
need to give a voice to the voiceless, and we are taking action on behalf of human
beings – our children. Our commitment is rooted in the belief that all children are our

BP-PSI-074934

DOJ-BP-0000052545

children, that the person that appears in a Backpage ad could be any one of our daughters or sons.

Interestingly, the text of the week of our meeting was from the Prophet Isaiah. It forecasts the coming of a Messiah who would be sent to "bring good news to the oppressed, to bind up the brokenhearted, to proclaim liberty to the captives, and release to the prisoners...For I the Lord love justice, and I hate robbery and wrongdoing."

This is the context out of which we as religious leaders are making our views known about child sex trafficking generally and what happens on Backpage.com more specifically.

We believe we were and are being truthful when we say that these advertisements constitute a platform whereby boys and girls can be offered by others for commercial sex, even if it is without your expressed consent and against your clearly defined policies. As we have clarified previously, we do NOT believe and have not stated that Village Voice is intentionally and proactively endangering children. We take you at your word that your company is making considerable efforts to prevent sex trafficking. Your work to implement safeguards on Backpage.com and your engagement with law enforcement are evidence of that.

However, the security enhancements you have implemented on your site – such as no nudity, stricter image content standards, ad monitoring, and investigating and reporting possible ads featuring minors to the National Center for Missing and Exploited Children – are insufficient.

In fact, the terms of use on your website explicitly prohibit "posting any ad for products or services, use or sale of which is prohibited by any law or regulation"[1] and a Backpage.com spokesperson has stated that Village Voice is focused on "preventing those who are intent on misusing the site for illegal purposes"[2] – but a cursory glance at Backpage.com reveals that paying customers are regularly posting ads that sell sex, an activity that is illegal in all but a few counties in the United States.

Minors continue to be sold for sex by others posting advertisements on Backpage, including, most recently in Michigan where a 16-year old was sent on hundreds of sex dates by a woman who marketed her on Backpage, and also in Washington State, New York, and Tennessee. These are just the cases that made it into the news. That Village Voice representatives appeared not to be aware of two of these specific cases that we

---

[1] http://newyork.backpage.com/online/classifieds/Terms
[2] http://blog.backpage.com/2011/02/safety-and-security-enhancements.html

CONFIDENTIAL

cited in our meeting was surprising given your stated commitments. Those cases did not result in murder as unfortunately the one involving the two Detroit women who were found dead in the trunk of a burning car on Christmas Day did. But they could have.

We are concerned that some Backpage advertisements, such as the ones that were used in the criminal activity of others in the aforementioned states, are examples of advertisements that were not initially declined for posting on the website – either because they were not caught by your company's safeguards or, at the point of sale, a different individual was sold for sex than was advertised.

Even if advertisements are flagged by Backpage.com, it is possible that they were online and active for a period of time during which the advertised potential minor could be sold, perhaps repeatedly, before law enforcement is alerted. Additionally, when law enforcement is alerted, it is not immediately clear that local police departments or vice divisions in the areas where advertisements are flagged have the resources to respond in a reasonable timeframe, make arrests, and rescue victims. Given that "Backpage.com reported to the National Center for Missing and Exploited Children (NCMEC) 1,595 cases of suspected use of juveniles in sex ads, as NCMEC has publicly stated,"[3] the sheer volume of cases likely means that there will continue to be incidents that slip through the cracks.

We know that if you decide to shut down the adult section of Backpage.com that sex trafficking would not end in America – nor would it end entirely on Backpage.com itself. You stated in your presentation that when Craigslist shut down its adult section, pimps and johns began to employ other sections of the site to sell and buy sexual services, including from minors. Even so, when the adult section of the site was closed down, we believe a large volume of Craigslist's adult-oriented ads migrated to your website, based on an Advanced Interactive Media Group report[4] entitled "Sex ads: Where the money is" of Sept. 14, 2010.[5] The same claim was made by Ernie Allen, President of the

---

[3] NGO Letter to Village Voice Media, 12/2/2011
http://www.scribd.com/doc/74493197/NGO-Letter-to-Village-Voice-Media-re-Backpage-com
[4] We understand that your company disputes the accuracy of the AIM reports. We are not convinced by your conclusion, in part because we were not given any analysis demonstrating erroneous results. But perhaps, given that you dispute the accuracy of the data, it would be worthwhile for the public conversation on this issue for your company to publish its version of the market share that Backpage.com holds in the adult advertising industry as it compares to actual industry competitors like Craigslist, EroticReview, MyRedBook, CityVibe, and SipSap as well as the total annual revenue from Backpage.com's adult section. We do not agree that your company is in the same industry vertical as Google, Facebook, Twitter, and others, as those sites are largely free to use and compile content from many other sites, including your own.
[5] http://aimgroup.com/files/2010/09/sex-ad-report-summary.pdf

CONFIDENTIAL

BP-PSI-074936

DOJ-BP-0000052547

National Council on Missing and Exploited Children, during questioning following his congressional testimony on the issue of the sex trafficking of minors in March of 2011.[6]

We also realize it is going to take more than one or two Web sites doing the right thing to end sex trafficking in America. We will need a groundswell of support from businesses, non-profit organizations, government, and religious communities to protect our kids.

We believe, based on case reports and related news accounts, that pimps and johns use Backpage's adult advertising in near anonymity, making it easier for them to sell and buy sex, including with minors. If you commit to taking a simple action – shutting down the adult section of your website – you would put up an important roadblock at the start of their efforts to find a venue to buy and sell sex and put a stop to a large venue for this activity, which the 51 Attorneys General have called an "accelerant" for the sex trafficking of minors.[7]

While we acknowledge that trafficking remains a problem on other Web sites and print publications, that doesn't change the fact that Backpage remains a "hub"[8] for this activity, or that your business earns considerable revenue from the adult section of your site.[9] The latter in particular we find morally objectionable.

By continuing to operate Backpage.com's adult section, you are sending a message that a storied American brand like the Village Voice is thumbing its nose at basic moral precepts.

For the above reasons, we are convinced that action by Village Voice Media – while no panacea – would have a real impact in the fight against child sex trafficking.

Morally, the case is clear. If your company could do anything more to help stop the sex trafficking of minors, a heinous crime that robs girls and boys of their childhood and perhaps even their adulthood, it should be done immediately. Just because the problem is hard to solve doesn't mean that you are morally free to profit from a site, on which, despite your implementation of safety standards, children may be trafficked.

There is very little moral wiggle room when one is aware of the real possibility that a terrible crime may occur, but decides to be satisfied with approaches that are revealed

---

[6] March 2011 Congressional Briefing, Ernie Allen.
http://www.missingkids.com/missingkids/servlet/NewsEventServlet?LanguageCountry=en_US&PageId=4522
[7] Letter by National Association of Attorneys General to Backpage.com, August 31, 2011.
http://www.atg.wa.gov/uploadedFiles/Home/News/Press_Releases/2011/NAAG_Backpage_Signon_08-31-11_Final.pdf
[8] Ibid.
[9] http://articles.latimes.com/2011/nov/28/entertainment/la-et-village-voice-media-20111129

to be unable to completely address the problem. And as you have yourself acknowledged in our meeting and in the past to others, "not every instance of [sex trafficking] can be quickly and successfully interdicted."[10]

At the root of our efforts is questioning the morality of continuing to operate a part of your business where the cost of doing so is providing advertisements for people who may be involved in buying and selling of minors for sex, or for children and minors to self-advertise for sex, which Mr. Lacey claimed is a significant number of the situations.[11] Whether it is true or not, it has no bearing on the case. Our moral responsibility is to prevent all child trafficking that results from advertisements on Backpage.com.

As we have said previously, including in our meeting, we want your business to thrive. We admire the legacy of the Village Voice and progressive weeklies around the country, and value your mission to provide independent editorial content.

But we believe – and cannot understand how this belief is objectionable to the Village Voice, as you made clear at our meeting – that a single child sold for sex, anywhere and under any circumstances, is one too many. We believe that any business that does not do everything it can to end all child sex trafficking is committing the type of wrongdoing that the Prophet Isaiah was speaking of. This wrongdoing robs boys and girls of their childhoods and also their rights. As the Jewish tradition teaches, if you can save a single life, it is as if you have saved a whole world.[12]

We understand from the statements you made in our meeting that your company takes it as a given that a certain number of teens and children will be trafficked for sex – in spite of the safeguards you have put in place – by those who pay your Web site a fee, and that is unacceptable to us.

The sex trafficking of minors generally and the use of your website by others to place advertisements are public matters and the public needs to be aware of them.  As clergy, it is our responsibility to educate people on issues of pressing moral concern, this being one of them. We echo the views of 51 of the nation's 56 Attorneys General, many mayors, and over 50 anti-trafficking groups and experts in the fight against child sex

---

[10] Backpage.com's letter to the National Association of Attorney Generals, August 31, 2011. http://www.atg.wa.gov/uploadedFiles/Another/News/BACKPAGE_com%20RESPONSE%20TO%20NAAG.PDF

[11] It was particularly surprising to see Mr. Lacey suggest during our meeting that these circumstances involved underage kids self-prostituting themselves. The assertion provides no moral cover whatsoever for Village Voice's conduct.

[12] Talmud, Sanhedrin 37a states: "for this reason was man created alone, to teach thee that whosoever destroys a single soul... Scripture imputes [guilt] to him as though he had destroyed a complete world; and whosoever preserves a single soul... scripture ascribes [merit] to him as though he had preserved a complete world."

CONFIDENTIAL

trafficking. We've mobilized over 475 clergy and over 80,000 citizens and counting who share our moral outrage at this status quo. This is the moral underpinning for our educational outreach to third parties affiliated with the Village Voice, including advertisers.

We were pleased to read in the first formal communication to the clergy coalition of September 27 Mr. Ferrer's statement that "we share and respect your view that one child harmed by sex trafficking is one too many." Accordingly, we have been surprised to see Village Voice backpedal on that commitment in repeated statements by Mr. McNally and Mr. Lacey, and particularly to hear Mr. Lacey assert that the clergy's moral commitment to our children amounts to a simple "bumper sticker." This position seems to be at odds with Mr. Ferrer's statement and your previously stated position that "Village Voice supports the effort to halt human trafficking...utterly and without qualification," according to a November 23 letter by Mr. McNally.

Respectfully, religious leaders, and indeed people of faith or people of moral conviction, are called to imagine a world that may appear difficult to achieve, but must be strived for. We cannot be satisfied – ever – in a world where a single child is trafficked. Our moral imagination and our various faith traditions demand better, and we believe the public shares this view.

One of my colleagues has a simple ethical test: Ask yourself how you would feel telling your family what happens on your Web site. What would your mother or your child say about the 15 and 16 year-olds in Memphis, Tennessee who were lured under the pretext of going to a water park but instead were sold for sex by pimps who placed ads on Backpage.com? And what would they say about the mentally handicapped high school student in Kent, Washington who was sold for sex because she wanted to receive a Thanksgiving meal? Or about the 13-year old in Brooklyn, New York who was beaten, advertised with photos on Backpage and forced into prostitution, and who, when she tried to escape, was tracked down and thrown down a flight of stairs?

The aforementioned cases of minors being advertised on Backpage were not detected by Backpage's safeguard system prior to the advertisements appearing on the website, and as a result allowed those who prey on children to abuse them. This is what we are fighting to stop. Consider it this way – if you operated an airline or a company that produced jet engines, you would have no choice but to ground your planes if your current safeguards did not prevent life-threatening engine trouble or your repairs weren't sufficient to ensure a level of safety that the public would endorse. Sometimes voluntary and expensive standards just don't work to ensure an acceptable level of safety for the public.

I imagine that a reversal by Village Voice at this stage is unlikely. I hope I am wrong. Doing the right thing is not easy, but we, and the broader community, would surely applaud you for shutting down the adult section of your site.

If Village Voice Media takes the right action, we pledge to write to the public at large, including every organization, business, clergy member, and petition signer we have contacted, to alert them to the fact that Village Voice has reversed course and no longer will operate an adult section of its website where it is possible that the presence of ads of kids might lead to their sale for sex.

It's not often that a company or individual is afforded an opportunity to do something really good in the world. But Village Voice has this power in its hands and the opportunity to do the right thing.

Please seize this opportunity. During the start of this New Year, it would be an especially fitting time for such a decision.

Sincerely,

Rev. Dr. Katharine Henderson
President
Auburn Seminary

CONFIDENTIAL

BP-PSI-074940

DOJ-BP-0000052551

# <u>Exhibit E</u>

# (Filed Under Seal)

# Exhibit F



**U.S. Department of Justice**

United States Attorney
District of Arizona

| | | |
|---|---|---|
| Two Renaissance Square | Main: | (602) 514-7500 |
| 40 N. Central Ave., Suite 1800 | Main Fax: | (602) 514-7693 |
| Phoenix, AZ 85004-4408 | | |

May 16, 2019

Ariel A. Neuman, Esq.
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
(Attorneys for Jed Brunst)

<u>VIA EMAIL</u>

  Re: *Your letter of May 9, 2019*

Dear Mr. Neuman:

  We wish to respond to your May 9, 2019 letter. *First*, the letter requests the disclosure of certain witness statements. You have provided us a list of witnesses from the government's preliminary witness list but advise that you do not have any Jencks Act statements from these witnesses. On this issue, your understanding is not fully accurate. There are a number of emails involving Culloton, Fitcher, Nigam, Gage, etc. Also, we are in the process of disclosing the articles written and a video produced by Nicholas Kristof (they are publicly available on the NYT website) and you already have the email exchanges with Kristof and Suskin (these were actually disclosed to us by DWT). In short, I think you are confusing Jencks Act statements as only reports prepared by investigating agents and ignoring that numerous emails between the Defendants (and noticed witnesses) are also Jenks Act material.

  That said, if you do not have a witness statement from any witness on our preliminary witness list than there are no Jencks Act statements available or the witness has yet to adopt a statement provided to an investigating agent. As you know, the Jencks Act requires the government produce statements that have been *adopted* by a witness *after* the witness testifies (we have agreed to produce well before their testimony). *See United States v. Claiborne*, 765 F.2d 784, 801 (9th Cir. 1985) ("[t]he Jencks Act restrictively defines those 'statements' by a witness that are subject to disclosure."); 18 USC §3500(e)(1); *see also United States v. Jackson,* 978 F.2d 903, 913 (5th Cir.1992) ("To adopt a statement under the Jencks Act a witness must read the entire statement and formally approve the statement."); *United States v. Newman,* 849 F.2d 156, 160 (5th Cir. 1988)

May 16, 2019
Page 2

(Witness did not adopt a DEA report when he told the DEA agent that he did not disagree with anything in the report.). In addition, many of our witnesses are out of state and they will likely not have an opportunity to adopt their statement until we meet with them closer to trial and have them review their previous statements.

*Second*, in addition to statements (*e.g*., depositions, grand jury testimony, etc.) you also request notes of interviews. However, the agent's notes concerning the interview generally are not Jencks statements under § 3500(e)(1). *See Claiborne*, 765 F.2d 784, 801 (9th Cir. 1985) (FBI "302" reports are not statements by interviewee who did not draft or approve their contents); *United States v. Griffin*, 659 F.2d 932, 937 (9th Cir. 1981). If, however, the notes are reviewed by, or read back to and then approved by the witness, they are subject to disclosure under the Jencks Act. *Campbell v. United States*, 373 U.S. 487, 492-93 (1963); *United States v. Boshell*, 952 F.2d 1101, 1105 (9th Cir. 1991). An agent's notes or report also normally are not subject to disclosure under § 3500(e)(2) as a "substantially verbatim" recital of an oral statement made by the interviewee. Summaries of a witness interview contained in notes or a report are not a verbatim summary where they reflect the agent's selection of pertinent information. *See United States v. Augenblick*, 393 U.S. 348, 355 (1969) (notes by agent not "substantially verbatim" statement where they did not cover entire interview); *United States v. Palermo*, 360 U.S. 343, 352-3 (1959) (agent's summary report of interview not "substantially verbatim" statement). The fact that an agent is required by *United States v. Harris*, 543 F.2d 1247 (9th Cir. 1976), to preserve original interview notes made when a potential governmental witness is questioned does not mean that such notes are subject to Jencks disclosure. *See United States v. Spencer*, 618 F.2d 605, 606 (9th Cir. 1980). Finally the government's voluntary disclosure of an agent's investigative reports does not require the government also to produce any notes that may relate to the reports. *United States v. Pisello*, 877 F.2d 762, 768 (9th Cir. 1989).

*Third*, regarding your request for specific witnesses from the credit card companies, we are in the process of meeting with those companies to identify the appropriate person who will testify at trial and will promptly disclose this information once it's known.

*Fourth*, you request various grand jury transcripts. If there is a grand jury transcript that constitutes Jencks Act material it has already been disclosed. For example, you should have in your possession a number of transcripts from the grand jury investigation conducted by the USAO WDWA of witnesses who may testify at trial. You also have in your possession trial transcripts from various victims' civil depositions and/or trial testimony. We are unaware of any other grand jury transcripts that exist of any other *testifying* witnesses, including from any witness that testified in the District of Arizona grand jury.

*Fifth,* your request for "instructions" provided to the Arizona federal grand jury is unclear as you fail to provide a relevant basis for your request. In support, you cite a forty-six year old case that has nothing to do with the facts here. In *United States v. Alter*, the case involved a grand jury witness adjudged in a civil contempt violation. 482 F.2d 1016, 1029 n.21 (9th Cir. 1973). In such a case, the instructions would arguably be relevant to the actual charge of contempt. That is not the case here. Moreover you seem to misunderstand the proposition for which the *Alter* case stands for (and also *United States v. Fuentes*, 2008 WL 2557949, for that matter), namely the

May 16, 2019
Page 3

disclosure of the *court's* instructions and charge to the grand jury.[1] We are struggling to understand how the charge to the grand jury provided by the judge presiding over the subject grand jury (upon empanelment) would be relevant to the instant case. In any event, without more, we are not inclined to produce the transcript.

If, however, you are requesting the transcript where the prosecutor reads both the elements of the offense(s) to the grand jury and the indictment, that request is also denied for similar reasons. Here, the superseding indictment fairly informs the Defendants of the charges against them and is not otherwise deficient so as to raise any inference that the grand jury instructions were incorrect. *See United States v. Smith,* 105 F. Supp. 3d 255, 261 (W.D.N.Y. 2015) ("The absence of detailed allegations regarding Defendant's alleged knowledge of the conspiracy is insufficient to create a particularized need [for the government's legal instructions to the grand jury].").

Lastly, you request certain documents related to your client. As you know, we have provided you (on a couple of occasions) "hot" documents that included emails where Brunst was included and also management agendas that demonstrate he was present during the discussion of certain internal business practices (*i.e.*, The Erotic Review). In short, we have gone beyond our Rule 16 obligations in this regard. Here, you have not articulated any basis or provided any legal authority supporting the government's obligation to provide you discovery specific to your client. In fairness, if you are not satisfied with our response and file some type of motion seeking relief, please include this letter as an attachment so the Court has an understanding of our efforts to resolve this issue without a hearing.

<div style="margin-left:50%;">

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division
U.S. Department of Justice

REGINALD E. JONES
Senior Trial Attorney, CEOS
(202) 616-2807
reginald.jones4@usdoj.gov

MICHAEL BAILEY
United States Attorney

</div>

---

[1] *See* http://www.ndd.uscourts.gov/jury/jury_handbook_grand_jurors.pdf ("After the grand jurors have been sworn, the presiding judge advises the grand jury of its obligations and how best to perform its duties. This is called the charge to the grand jury. Careful attention must be paid to the charge, for it and any additional instructions that may be given by the court contain the rules and directions the grand jury must follow during its term of service.")

May 16, 2019
Page 4

<div style="text-align: right;">

<u>s/ Kevin M. Rapp</u>
KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW STONE
Assistant United States Attorneys

JOHN J. KUCERA
Special Assistant U.S. Attorney

</div>