## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Richard Robinson, being duly sworn, hereby depose and state as follows:

1. I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises controlled by Datto, Inc., an email provider headquartered at 101 Merritt 7, Norwalk, Connecticut 06851. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Datto, Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

I.  Training and Experience

1. I am a Special Agent-Computer Information Specialist (SA-CIS) in the Internal Revenue Service-Criminal Investigation (IRS-CI) E-Crimes Program for the South Pacific Area and stationed in Glendale, Arizona. I have been employed by IRS-CI as a Special Agent for 14 years. I underwent a six-week training program in 2017 to become an SA-CIS and studied computer systems, electronic storage and prior to joining the E-Crimes Program, I spent 13 years as a Special Agent investigating violations of criminal statutes including money laundering offenses, tax evasion and other financial crimes. During the course of my career as a Special Agent and SA-CIS with IRS-CI, I have participated in the execution of numerous search warrants, seizure warrants, and arrests of individuals for violations of federal law.

2. I am familiar with the facts and circumstances described herein. This affidavit is based upon my personal involvement in this investigation, my training and experience, and information obtained from various law enforcement personnel and witnesses, including information that has been reported to me either directly or indirectly, but does not purport to set forth my complete knowledge or understanding of the facts related to this investigation. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

II.     Background for Backupify, Inc. and Datto, Inc.

      1.   Backupify, Inc. (Backupify) was founded as a company in 2008 in Massachussets. The company offered a way for companies to backup and recover cloud service data. A cloud service is an Internet-based service (such as Google's Gmail, Google Drive or Microsoft Outlook files in Microsoft's Office 365) where user data is stored on remote "cloud" servers rather than on the user's own local computer. This allows users to access data such as e-mail messages from multiple locations or devices. Backupify offered a service where they would periodically store a copy of data that a customer had stored with a cloud service to protect against data loss resulting from a user deleting data from the cloud account, intentionally or unintentionally.

      2.   The company Backupify was acquired by Datto, Inc (Datto), in December 2014 and Datto has owned that business ever since.

III.    The Federal Indictment

      1.   On July 25, 2018, a Federal Grand Jury in Arizona returned a 100 count superseding indictment charging seven individuals, including the co-founders and former owners of the website Backpage.com, MICHAEL LACEY and JAMES LARKIN, with violations of Title 18, United States Code, Section 371 (Conspiracy); Title 18, United States Code, Sections 1952(a)(3)(A) (Travel Act – Facilitating Prostitution); and Title 18 U.S.C. Sections 1956 and 1957 (Concealment, International Promotional, Transactional, and International Concealment Money Laundering and Conspiracy to Commit Money Laundering). *USA v. Michael Lacey, et al.*, CR18-422-PHX-SPL.

      2.   The superseding indictment, which is enclosed as Exhibit A and whose contents and allegations are incorporated by reference, alleges that LACEY, LARKIN, and others conspired to use the internet to commit violations of the Travel Act, specifically, that they knowingly facilitated the commission of prostitution related offenses that are in violation of state or local laws though the internet by operating Backpage.com. The next 50 counts allege individual violations of the Travel Act. Each count relates to a specific advertisement that was posted on Backpage where LACEY, LARKIN, and others are alleged to have knowingly attempted to facilitate prostitution crimes. The remaining counts in the indictment allege several types of money laundering as well as a conspiracy to commit money laundering.

IV.  Facts in Support of Probable Cause

1. In approximately May 2016, the U.S. Postal Inspection Service, the Federal Bureau of Investigation, and the Internal Revenue Service – Criminal Investigation began an investigation of Backpage.com. The focus of the investigation has been on violations by Backpage, its associated entities, and its principals, of Title 18, United States Code, Sections 1952 (Travel Act – Facilitating Prostitution) and Title 18, United States Code Sections 1956 and 1957 (Money Laundering). During the course of the investigation, investigators learned that Backpage, during certain years, was realizing tens of millions of dollars in profit from adult advertisements. Through victim and witness interviews, and data gathered from warrants and subpoenas, investigators have determined that Backpage.com and its principals were knowingly involved in the facilitation of prostitution and were engaged in money laundering activities.

2. On April 5, 2018 CARL FERRER (FERRER), Chief Executive Officer (CEO) of Backpage, pleaded guilty to Title 18, United States Code 371, Conspiracy. In the factual basis of his plea agreement, Ferrer admitted:

> In 2004, I co-founded the website www.Backpage.com ("Backpage"), along with M.L. and J.L. Backpage eventually became the second-largest classified advertising website in the world and, during its 14 years of existence, has derived the great majority of its revenue from fees charged in return for publishing advertisements for "adult" and "escort" services.
>
> I have long been aware that the great majority of these advertisements are, in fact, advertisements for prostitution services (which are not protected by the First Amendment and which are illegal in 49 states and in much of Nevada). Acting with this knowledge, I conspired with other Backpage principals (including but not limited to M.L. [LACEY], J.L.[LARKIN], S.S. [SCOTT SPEAR], D.H. [DANIEL HYER], A.P. [ANDREW PADILLA], and J.V. [JOYE VAUGHT]) to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers. For example, I worked with my co-conspirators to create "moderation" processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad. Such editing did not, of course, change the essential nature of the illegal service being offered in the ad—it was merely intended to create a veneer of

deniability for Backpage. These editing practices were only one component of an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's "escort" and "adult" ads.

In addition to conspiring to knowingly facilitate the state-law prostitution offenses being committed by Backpage's customers, I also conspired with other Backpage principals (including but not limited to M.L, J.L, S.S., J.B. [JOHN "JED" BRUNST], and D.H.) to engage in various money laundering offenses. Since 2004, Backpage has earned hundreds of millions of dollars in revenue from publishing "escort" and "adult" ads. Over time, many banks, credit card companies, and other financial institutions refused to do business with Backpage due to the illegal nature of its business. In response, I worked with my co-conspirators to find ways to fool credit card companies into believing that Backpage-associated charges were being incurred on different websites, to route Backpage-related payments and proceeds through bank accounts held in the name of seemingly unconnected entities (including but not limited to Posting Solutions, Website Technologies, and Cereus Properties), and to use cryptocurrency-processing companies (including but not limited to CoinBase, GoCoin, Paxful, Kraken, and Crypto Capital) for similar purposes.

3. As part of the plea agreement, FERRER agreed to take all steps within his power to shut down the website Backpage.com in the United States and all other countries in which the website operates. As the CEO of Backpage, FERRER also entered corporate guilty pleas on behalf of Backpage.com, LLC, Website Technologies, LLC, Posting Solutions, LLC, Amstel River Holdings, LLC, Ad Tech BV, and UGC Tech Group CV. Amstel River Holdings, LLC is the parent company and the other corporations are subsidiary corporate entities that were created in part to secure banking solutions to process payments on behalf of Backpage.com. As part of the corporate plea agreements, FERRER agreed to forfeit all corporate assets and other property owned or controlled by Website Technologies, LLC, which owns and operates the Backpage website, as well as all corporate assets and other property owned and controlled by Backpage.com, LLC, Posting Solutions LLC, Amstel River Holdings, LLC, Ad Tech BV, and UGC Tech Group CV.

4.     On August 17, 2018, DANIEL HYER (HYER), the Sales and Marketing Director for Backpage, pleaded guilty to Title 18, United States Code 371, Conspiracy. In the factual basis of his plea agreement, Hyer admitted:

> In 1998, I started working at the Dallas Observer, an alternative newspaper that later became part of the Village Voice Media Holdings ("VVMH") chain. During my early years at the Dallas Observer, I was an account executive responsible for selling print ads.
>
> In 2006 or 2007, I was asked to help grow Backpage.com ("Backpage"), which was VVMH's attempt to create a classified advertising website to compete with Craigslist. During my first few years in this position, my primary responsibility was to increase the number of ads being posted on Backpage. To do so, I helped develop a process called "preboarding" or "aggregation." In general, this process consisted of identifying so-called "escort" and "adult" ads on other websites and creating ads on Backpage for the individuals depicted in those ads in the hope of securing their future business. These aggregation efforts, which I discussed with my bosses Carl Ferrer and Scott Spear, resulted in large revenue and traffic growth for Backpage. As a result, Ferrer and Spear authorized the expansion of the aggregation team I was supervising and authorized me to repeat the aggregation process (which was initially concentrated in Dallas) in other major U.S. markets.
>
> I knew that the majority of the ads that I and others at Backpage were creating through the aggregation process were actually offering illegal prostitution services. Among other things, the true nature of the ads was obvious and we sometimes used ads containing links to The Erotic Review (a website where customers would post "reviews" of their encounters with prostitutes, including descriptions of prices charged for particular sex acts) as the source of the content for the new Backpage ads we were creating. In addition, I and other Backpage employees were deluged with near-constant reminders—in the form of news articles discussing prostitution busts on Backpage, warning letters from Attorneys General, and other sources—of the reality of what was being offered. For a period of time, I even received daily "Google alerts" that summarized the new prostitution-related stories about Backpage that kept appearing in the news. Nevertheless, I kept working for Backpage, and

kept facilitating these prostitution offenses, because I was afraid of losing my job and because VVMH and Backpage operated in a culture of denial. I also participated in later efforts to expand Backpage's aggregation efforts to overseas markets, where we often did not even bother with taking out code words to conceal the fact that prostitution services were being offered.

Over time, I also became involved (along with Ferrer, Andrew Padilla, and Joye Vaught) in Backpage's efforts to "moderate" the content of the website's escort and adult ads. Once again, I knew that the majority of the ads being "moderated" were actually offering illegal prostitution services—our removal of explicit words and pictures did nothing to change the underlying nature of the services being offered. In fact, Padilla and I agreed that I and other Backpage sales and marketing employees use the term "models" in intra-company emails when referring to persons in Backpage ads who appeared to be underage. The use of this term was to avoid looking bad in a lawsuit.

5. Additionally, a review of interviews and documents, including e-mail correspondence, conducted both prior to and since issuance of the indictment lead me to believe the five servers will contain evidence of the crimes discussed above. For example:

    a.    Beginning in or around 2007, to increase its user base, Backpage developed a plan, which became known within Backpage as "aggregation" or the "Dallas plan," to create free ads for prostitutes in an attempt to secure future advertising revenues from them. Specifically, Backpage classified ad sales representatives would search competing websites, call the numbers listed on the postings for erotic or adult services, offer the users free ads on Backpage, and create the resulting ads. This plan was developed to draw users to Backpage in an attempt to increase its ad revenue; the thought was that the recipients of free ads would eventually become paying users. The "Dallas plan" was successful and contributed greatly to Backpage's early growth and success.

    b.    Also beginning around 2007 or 2008, Backpage paid referral fees to its own sales staff and to users for referring new customers and ads through what were called "affiliate programs." This was another marketing technique used to develop Backpage's user base. Backpage was making referral payments of this sort of about $500,000 per year, at one point.

    c.    Backpage also employed other business strategies that were specifically intended to promote and facilitate prostitution. For example, for several years, Backpage had a

reciprocal link agreement with The Erotic Review ("TER"), a website that permitted customers to post explicit "reviews" of their encounters with prostitutes, including descriptions of prices charged for particular sex acts. Backpage paid tens of thousands of dollars to TER in return for assistance in getting TER's customer base to start using Backpage.

        d.     Extensive analysis of Backpage's operations, revenue streams and future value preceded the 2015 sale of Backpage from companies controlled primarily by LACEY and LARKIN to companies legally controlled by FERRER. However, LARKIN still exercised substantial control and oversight over Backpage and FERRER after that transaction was completed. LACEY did not attend some meetings regarding monitoring and oversight of Backpage after the sale, but was briefed either before or after the meetings.

        e.     In addition to Backpage.com and other business entities directly controlled by LACEY, LARKIN and FERRER, Backpage.com used partner sites such as MobilePosting.com or Easypost.com to allow its customers to post ads and pay for the ads in a way that kept financial institutions from knowing that the transaction was a purchase of a Backpage ad. Backpage customers would purchase and post ads on the partner sites knowing that the ad would also appear on Backpage. Backpage would receive the majority of the revenue derived from the sale of these ads, with the partner sites keeping a small percentage for its services.

        f.     Former owners of Backpage, including LARKIN, met with FERRER prior to the anticipated release of the U.S. Senate Permanent Subcommittee on Investigations report on January 9, 2017 to determine how Backpage would respond.

V.    Facts Regarding Backup Accounts for Backpage Employees

    1.    On April 9, 2018 FERRER offered the assistance of the Backpage's Chief Technology Officer (CTO), Chris Kempel (Kempel) to investigating agents in gathering data from Backpage computerized systems.

    2.    On April 24, 2018, Kempel submitted a service ticket to the Backupify customer support team asking for a quote of what it would cost to export the entirety of Backpage-related accounts. Kempel also included a screenshot image with the ticket that listed the following domain names associated with Backpage that had accounts receiving service from Backupify:

        a.     adpost24.com
        b.     adreputation.com
        c.     adtechbv.com

    d. backpage.com
    e. bigcity.com
    f. cracker.com
    g. cracker.com.au
    h. easypost123.com
    i. evilempire.com
    j. guliettagroup.nl
    k. mobileposting.com
    l. nakedcity.com
    m. petseekr.com
    n. postfaster.com
    o. postfastr.com
    p. postfree.com
    q. postsol.com
    r. postzone24.com
    s. rentseekr.com
    t. truckrjobs.com
    u. universads.nl
    v. websitetechnologies.com
    w. ymas.com

  3. On April 27, 2018, Kempel received a reply saying that a 2 terabyte drive (2 TB) would be needed to store the requested data.

  4. On June 6, 2018, I participated in a conference call with Datto personnel and learned the following facts:

    a. Backpage's account with Backupify, now Datto, was created on June 8, 2012. After the account was setup, the service would do an initial ingestion, backing up data that was stored in the user accounts at that time, some of which could date farther back than June 2012.

    b. After initial ingestion of files, Datto would create a cumulative archive by storing new items, such as e-mail messages or documents, added to client accounts. Datto maintained a cumulative archive of the items backed up from the date when the user signed up for the service.

  c. Backupify provides no facility for its users to modify or delete data items once they have been backed up.

  d. As of June 2018, Datto had about 51 million items backed up for Backpage and related domains totaling 1.37 TB in data storage. The contents were mostly e-mail and most of the data was related to the top 20 or so accounts.

 5. On June 12, 2018, I submitted a preservation request to Datto for accounts in the various domains listed above. On June 18, I received a letter in response advising that appropriate steps had been taken to comply with that request.

 6. On June 29, 2018, I received a spreadsheet provided by Datto that detailed e-mail accounts from the domains listed above for which they had data stored. This list included the following accounts believed to be related to named defendants:

  a. joye@backpage.com
  b. joye@postfaster.com
  c. dan@backpage.com
  d. dan@websitetechnologies.com
  e. andrew@backpage.com
  f. andrew@postfaster.com
  g. carl@postsol.com
  h. carl.ferrer@backpage.com
  i. carl@adtechbv.com

 7. Also noted on that same spreadsheet were other accounts believed to belong to other employees of Backpage and related entities whose positions at Backpage suggest that their correspondence would likely contain facts relevant to the investigation. (Association of the email addresses with the names and job duties or titles of the related individuals is based on my review of other documents and knowledge of the case in general.):

  a. Michael Gage, CFO of AdTech BV/Website Technologies
   i. michael@postsol.com
   ii. michaelg@postsol.com
   iii. michael@adtechbv.com
   iv. michael@websitetechnologies.com
  b. Stefanie Parks, Controller at Website Technologies

      i. stefanie@postsol.com
      ii. stefaniep@websitetechnologies.com
   c. Issa Martin, Subpoena Compliance at Backpage
      i. issa@backpage.com
   d. Nathan Yockey, Subpoena Compliance at Backpage
      i. nathan@backpage.com
   e. Tamara Nickel, Subpoena Compliance at Backpage
      i. tamara@backpage.com
   f. Stefano [Ciaravella], Data Analyst at Website Technologies
      i. stefan@postsol.com
      ii. stefan@websitetechnologies.com
   g. Bailey Kobs, Integrated Marketing Manager at Website Technologies
      i. bailey@postsol.com
   h. National Center for Missing and Exploited Children
      i. ncmec@backpage.com
   i. Omar Lopez Castrillo, Owner, UniversAds BV
      i. omar@universads.nl
      ii. omar@easypost123.com
   j. Julia Dorst, Owner, Gulietta Group BV
      i. julia@guliettagroup.nl
      ii. juliad@mobileposting.com

VI. <u>Search Methodology to be Employed</u>

  1. The service provider, Datto, will be required to produce data backed up related to the accounts described in Attachment A, including e-mail messages, attachments and other documents stored in connection with those accounts.

  2. Upon receipt of the files and data obtained from the servers using the techniques described above, the Filter Team will review the documents for privilege or protection only and will disseminate non-privileged and non-protected documents to the Investigative Team. Although Carl Ferrer, CEO of Backpage, as well as Backpage.com, LLC,

have pleaded guilty to Backpage related crimes, some (but not all) of files contained in the accounts to be searched may be covered by the attorney-client privilege or otherwise protected from disclosure. The United States has been utilizing a Filter Team throughout the course of its investigation of Backpage and plans to continue utilizing the Filter Team to review materials and documents that may result from a search of the items described in Attachment A. (It should be noted that the defendants in *United States v. Lacey*, CR 18-422-SPL, have recently sent letters to the prosecution and filed pleadings with the Court objecting to the use of filter teams.)

       3. The Filter Team will review the documents for privilege or protection only and will disseminate non-privileged and non-protected documents to the Investigative Team. The Investigative Team will determine which documents constitute evidence of unlawful activity. Because the Filter Team will be properly walled off from the Investigative Team, it may review emails and communications between the account holders and their attorneys, to determine if they properly qualify for privilege or protections, in accordance with procedures set forth above. This will eliminate the risk that protected information will reach the Investigative Team. The separation between the Investigative Team from the Filter Team serves two purposes: (1) it allows the Filter Team to review documents for privilege and protection only and insulates the Filter Team from the substantive investigation and prosecution of Backpage and its principals and (2) it allows the Investigative Team, which is more familiar with the details and specifics of the investigation, to determine which documents constitute evidence of unlawful activity.

       4. Once the Filter Team has identified any potential privileged or protected material, and before the Filter Team submits any materials to the Court *in camera* and moves for their disclosure to the Investigative Team, the Filter Team will confer with counsel for the affected parties, as appropriate, and counsel will have the ability to file objections with the Court.

       5. A similar procedure for the Filter Team was approved by Magistrate Judge Willett in October 2016 in 16-mb-305-MHB. Exhibit B.

       6. Further, because investigators cannot anticipate all potential defenses to the offenses in this affidavit, and as such, cannot anticipate the significance of the evidence to be obtained pursuant to this warrant, it is requested that all seized evidence be retained by law enforcement until the conclusion of legal proceedings or until other order of the court.

VII.   Conclusion

Based on the facts and circumstances stated above, there is probable cause to believe that items of evidence derived from illicit activity is located in the aforementioned electronic devices.

_____
Richard Robinson
Special Agent-CIS, IRS-CI


Subscribed to and sworn to me
this 31 day of August, 2018

_____
Honorable John Z. Boyle
United States Magistrate Judge