MICHAEL BAILEY
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1200
Los Angeles, CA 90012
Telephone (213) 894-3391

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-18-422-PHX-SMB |
|---|---|
| Plaintiff, | |
| v. | **UNITED STATES' RESPONSE TO DEFENDANTS' MOTION TO SUPPRESS THE DATTO WARRANT** (Doc. 827) |
| Michael Lacey, et al., | |
| Defendants. | |

The United States responds to Defendants' Motion to Suppress (Doc. 827) and

respectfully requests this Court deny Defendants' motion and request for a *Franks* hearing

because (1) the motion was untimely filed, without leave or permission from the Court, (2)

four of the six defendants joining in this motion do not have standing to challenge it, and

(3) because the warrant comports with the requirements under the Fourth Amendment. Additionally, Defendants have failed to preliminarily demonstrate that the affidavit contains any false statements to warrant a *Franks* hearing.  *Franks v. Delaware,* 438 U.S. 154 (1978).

## PRELIMINARY STATEMENT

On December 23, 2019, approximately nine weeks after the substantive motions deadline, Defendants' filed their Motion to Suppress the "Datto warrant." (Doc. 827).  The motion was signed by counsel for Defendants Lacey, Larkin, Spear, Vaught, and Padilla and later joined by Defendant Brunst (Doc. 835.)  Because this motion comes after the substantive motions deadline without the Court granting leave or permitting an extension of time to file this motion, the motion is untimely and need not be considered by the Court. Fed. R. Crim. P. 12(c).  *See also United States v. McMillian,* 786 F.3d 630, 636 (7th Cir. 2015) (a criminal defendant forfeits an argument if he negligently fails to assert a right in a timely fashion).  Defendants are subject to a due diligence standard.  *United States v. Ruhe,* 191 F.3d 376, 386 (4th Cir. 1991).  Even if the defendant did not know all of the information establishing the basis for a claim, the court will not excuse a forfeiture if the defendant, by due diligence, could have or should have discovered the basis for the claim. *Id.*  As Defendants have conceded, they were in possession of the Datto warrant prior to the substantive motions deadline.  Additionally, the government made the data from the Datto warrant available to all Defendants seven months prior.

Next, even if Defendants' Motion is to be considered, Defendants Lacey, Larkin, Spear and Brunst lack standing to challenge the Datto warrant.  Datto was a cloud service that provided companies with backup and recovery cloud service data.  (Doc. 827-2, ¶ II(2).)  This warrant authorized the search for all emails associated with 26 email accounts. Nine of the 26 email accounts were believed to belong to Carl Ferrer, Daniel Hyer, and Defendants Padilla and Vaught.  The remaining 17 email accounts were believed to be accounts for Backpage employees or employees for a specific Backpage related entity. Because this warrant did not involve the search of any email accounts belonging to

Defendants Lacey, Larkin, Brunst or Spear, they do not have standing to challenge it.  *See United States v. Lifshitz*, 369 F.3d 173, 190 (2nd Cir. 2004) (individuals may not enjoy an expectation of privacy in transmissions over the Internet or email that have already arrived at the recipient); *see also United States v. Lusty*ik, 57 F. Supp.3d 213, 223 (S.D.N.Y. 2014) (a person has no expectation of privacy in another person's email account).   Although Defendants claim to have an expectation of privacy in their email, regardless of whether their email account was a target in the warrant or because their email was seized due to their communication with a targeted email account, they have failed to cite a case in support of their theory.

Finally, the Datto warrant is valid.  It was properly presented to a neutral and detached magistrate judge, with probable cause, describing in particularity the place to be searched (Datto), and particularly described the person or things to be seized (26 email accounts).  The application for this warrant was accompanied by an eleven-page affidavit of Special Agent (SA) Robinson, along with the 100 count superseding indictment.  Defendants' Motion to Suppress and request for a *Franks* hearing should be denied.

## MEMORANDOM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

In 2016, a federal grand jury in Arizona began investigating the website www.backpage.com along with its owners, principals, and employees for violations of federal criminal statutes.  In April 2018, a federal grand jury in Arizona returned an indictment against Defendants in the instant case.  During the course of the investigation, the government applied for, and obtained evidence through several search and seizure warrants, including the Datto warrant.  Defendants previously filed Motions to Suppress several of these warrants.  (Doc. 775, 778, and 786.)   The arguments set forth in Defendants' Motion to Suppress the Datto warrant are virtually identical to the arguments set forth previously.   Accordingly, the government incorporates by reference its

Consolidated Response to Defendants' Motions to Suppress (Doc. 811.)  Relevant case activities are as follows:

### a.  The Indictment.

On March 28, 2018, an Arizona federal grand jury charged Backpage's owners, principals, and employees with conspiracy, violations of the Travel Act, and money laundering, and included criminal forfeiture allegations.  (Doc. 3.)

### b.  Carl Ferrer and Backpage Plead Guilty to Conspiracy.

On April 5, 2018, Backpage and its CEO and 100% owner, Carl Ferrer, pleaded guilty to conspiracy, admitted the great majority of Backpage's paid ads were for prostitution, consented to shut down the Backpage website, and forfeited all assets traceable to or involved in the crimes.  (CR18-464-PHX-SMB, Doc. 7.)  Also on April 5, 2018, Mr. Ferrer, as the 100% owner and CEO of Backpage, pleaded guilty to a money laundering conspiracy on behalf of Backpage and its corporate entities: Backpage.com LLC; Website Technologies LLC; Posting Solutions LLC; Amstel River Holdings, LLC; Ad Tech BV PA; and UGC Tech Group BV.  (CR18-465-PHX-SMB, Doc. 8-1 through 8-6.)

### c.  The Superseding Indictment

On July 25, 2018, an Arizona federal grand jury returned a 100 count superseding indictment charging Defendants Lacey, Larkin, Brunst, Spear, Padilla, Vaught and Hyer with conspiracy, violations of the Travel Act, and money laundering.  (Doc. 230.)

### d.  Daniel Hyer Pleads Guilty to Conspiracy.

On August 17, 2018, Daniel Hyer, Backpage's Sales and Marketing Director, pleaded guilty to conspiracy and admitted that one of his primary responsibilities was to increase the number of ads posted in Backpage, a process referred to by Backpage as "preboarding" or "aggregation," where they would identify "escort" and "adult" ads on other websites and invite them to post ads on Backpage's website in hopes of securing their future business.  (Doc. 271.)  Mr. Hyer admitted knowing that the majority of ads that he and others at Backpage were creating through aggregation were actually offering illegal

prostitution services and that his efforts, along with others at Backpage, resulted in large revenue and website traffic growth for Backpage.  *Id*.

### e.  18-8364 MB – Datto Warrant.

On August 31, 2018, United States Magistrate Judge John Z. Boyle granted the government's application and authorized the search of Datto, Inc, for the contents of 26 email accounts related to Backpage and Backpage related entities.  Datto is a cloud service that provides companies with a way to backup and recover cloud service data.  This warrant sought emails and correspondence that involved Defendants and related to backpage.com, the sale of backpage.com, client payment information, aggregation (the Dallas Plan), moderation, The Erotic Review, and bank statements and financial records for Lacey and Larkin.

### f.  Disclosure of the Datto Warrant

On March 18, 2019**,** the government informed Defendants that the data from the Datto warrant was available.  (Exhibit A, March 18, 2019 email from Reginald Jones with attached correspondence.)  Defendants arranged to pick up the data on April 23, 2019, and it was hand-delivered to counsel for Mr. Larkin on that date.  (Exhibit B, Signed Property Receipt.)  Seven months after disclosure was made available and one week prior to the substantive motions deadline, on October 11, 2018, counsel for Mr. Lacey emailed the government seeking a copy of the Datto warrant.  The government responded within minutes, attaching a courtesy copy of the Datto warrant along with its Bates numbers. (Doc.  811-1.) Counsel for Lacey now claim they never received the government's email and that it must have been rejected by the firm's server security service or quarantined for containing a potential threat.  (Doc. 827 at 6, Doc. 827-3.)

Interestingly, the government has communicated with Mr. Lacey's counsel at the same email addresses, both before and after the October 11 email without issue.  The government's October 11 email was from the counsel's Department of Justice email account, in direct response to defense counsel's email, contained the same subject line, and referenced the same words and topics discussed by the defense.     Additionally, the

government did not receive any error or undeliverable notices after this message was sent. Even assuming that the government's October 11 email was never received; defense counsel made no effort to follow up with the government to obtain another copy of this warrant, despite the upcoming substantive motions deadline.   Instead, Defendants elected to do nothing but declare in a separate motion that it was "reserving [its] right to challenge…upon receipt and review" a warrant that it already had.[1]  (Doc. 778, 827 at 7.)

## II.   ARGUMENT

### a.   The Meaning of Probable Cause.

A successful application and affidavit to search a person or property requires probable cause.  Probable cause requires only a reasonable belief that a subject has committed a crime, which reflects a balance between the privacy interests of individuals and the community's need for protection from criminal activity.  *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).  Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, have no place in a judge's decision on whether there is a probability of criminal activity.  *Illinois v. Gates*, 462 U.S. 213, 235 (1983); *see also United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (finding "*Gates* itself marked a return to the 'totality of the circumstances' test and emphasized that probable cause means 'fair probability,' not certainty or even a preponderance of the evidence").  Once a search warrant is approved, a judge's determination of probable cause is entitled to great deference.  *Id.* at 236; *United States v. Reeves*, 210 F.3d 1041, 1046 (9th Cir. 2000).  In fact, even in cases where probable cause is doubtful or marginal, preference is to be accorded to warrants.  *United States v. Ventresca*, 380 U.S. 102, 109 (1965).

The Fourth Amendment requires that no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched

---

[1] Defendants concede knowledge of the Datto warrant's existence, but claim they could not locate it.  Indeed, Defendants were informed of the warrant's existence, by the very latest, in March 2019 when the government advised the data was ready for pick up.  Additionally, Defendants agree they received the warrant application on September 23, 2019, as part of a larger disclosure.  (Doc. 827 at 6.)  A simple keyword search for "Datto" or "Backupify" in the Relativity database would have quickly produced the warrant.

and the person or things to be seized.   U.S. Const. amend. IV.   Governing case law describes this requirement as one of "specificity" and cases have distinguished its "two aspects" as particularity and breadth.   *United States v. SDI Future Health Inc.*, 568 F.3d 684, 702 (9th Cir. 2009).  Particularity is the requirement that the warrant must clearly state what is sought; breadth deals with the requirement that limits the scope of the warrant to the probable cause that served as the basis for the warrant.  *Id.*  Defendants present three arguments as to how the magistrate judge erred in approving the Datto warrant. First, Defendants argue the warrant lacks probable cause because the affidavit contains "no factual information" that would allow a magistrate to make a neutral and detached probable cause determination.   (Doc. 827 at 8.)   Second, Defendants argue the warrant is insufficiently particular and overbroad.  *Id.*  Third, Defendants argue the warrant contains material omissions and misrepresentations, which entitles them to a *Franks* hearing.  *Id.*  It is important to note, however, that while Defendants challenge some aspects of the Datto warrant, they do not challenge the fact that this warrant application was properly sworn, nor do they contest that this warrant described with particularity the specific location to be searched.

> **b.   The Federal Magistrate Judge Correctly Found Probable Cause for the Datto Warrant.**

Defendants recycle the same arguments in challenging the Datto warrant as they have in their previous motions challenging four other warrants obtained by the government. First, Defendants argue it was improper for the magistrate judge to consider the superseding indictment and that the affidavit improperly summarized and incorporated the superseding indictment instead of outlining facts known to the affiant[2].  (Doc. 827 at 9.) Second, Defendants argue the affidavit lacked probable cause because it did not contain facts showing Defendants had the "heightened scienter" or knowingly and intentionally promoted or facilitated a business enterprise involving prostitution, to establish violations of the Travel Act.  (Doc. 827 at 10-11.)  Third, Defendants argue the affidavit does not

---

[2] Defendants refer to the indictment in their motion but the superseding indictment was charging instrument at the time of the Datto warrant was authorized.

provide any factual information showing how two lawful marketing techniques, "aggregation and affiliation" served as the basis for criminal acts. (Doc. 827 at 11.) Finally, Defendants argue the affidavit does not explain how the 26 email accounts subject to the warrant contained evidence of criminality. (Doc. 827 at 11.) Many of these claims are foreclosed by previous Court Orders and should be summarily denied. (Doc. 793, 840.) But should the Court revisit the issues again, each of the claims are without merit.

### i. Carl Ferrer, Daniel Hyer, and Backpage Pleaded Guilty to Conspiracy; Ferrer's and Hyer's Admissions Are Contained Within the Affidavit for the Datto Warrant.

Special Agent (SA) Richard Robinson was the affiant for the Datto warrant and he included the factual basis from Ferrer's and Hyer's plea agreements in his affidavit. (Doc. 827-2 ¶ IV(2).) Ferrer admitted that he originally co-founded the website with Lacey and Larkin and conspired with Lacey, Larkin, Spear, Brunst, Padilla and Vaught, among others, to find ways to knowingly facilitate the state law prostitution crimes being committed by the website's customers and to engage in various money laundering offenses. *Id.* Ferrer admitted he worked with his co-conspirators to create "moderation" processes where terms and photos particularly indicative of prostitution would be removed or edited before the ad was published. Ferrer admitted this was intended merely to create a veneer of deniability for Backpage and did not change the illegal services being offered in the ad. *Id.*

Additionally, Ferrer admitted conspiring with all Defendants to engage in money laundering offenses. *Id.* Because banks and credit card companies over time refused to do business with Backpage, Ferrer stated "I worked with my co-conspirators to find ways to fool credit card companies into believing that Backpage associated charges were being incurred on different websites, to route Backpage-related payments and proceeds through back accounts held in the name of seemingly unconnected entities…and to use cryptocurrency-processing companies…for similar purposes." *Id.* Ferrer, as CEO of Backpage, also entered corporate guilty pleas on behalf of Backpage.com LLC, Website Technologies LLC, Posting Solutions LLC, Amstel River Holdings LLC, Ad Tech BV,

and UGC Tech Group CV. *Id.* Website Technologies LLC owned and operated the Backpage website as well as all corporate assets and property owned by the other corporations that pleaded guilty. *Id.* Amstel River Holdings LLC was the parent company and its subsidiaries were created in part to secure banking solutions to process payments on behalf of Backpage. *Id.*

Similarly, Daniel Hyer admitted developing a process called "preboarding" or "aggregation" where Backpage would identify and reach out to customers posting "adult" and "escort" ads on other websites and create ads for them on Backpage, in hopes of securing their future business. (Doc. 827-2, ¶ IV(4).) Hyer admitted knowing the majority of the ads created through the aggregation process were offering illegal prostitution services. *Id.* Over time, Hyer become involved (along with Ferrer, Padilla and Vaught) in Backpage's efforts to "moderate" the contents of the escort and adult ads;  knew the removal of explicit words and pictures did nothing to change the underlying nature of what was being offered—illegal prostitution services. *Id.* Finally, Hyer also admitted that he and other Backpage employees were deluged with near-constant reminders of the reality of what [the website] was offering, including daily "Google alerts" summarizing new prostitution-related stories about Backpage that kept appearing in the news. *Id.*

The admissions provided by co-conspirators Carl Ferrer and Daniel Hyer, are sufficient in and of themselves to establish probable cause for the Datto warrant.   But, in addition, the application also included facts from SA Robinson's knowledge of the investigation.   Taken together, it's clear that Magistrate Judge Boyle correctly found sufficient probable cause to authorize the warrant.

### ii. Reviewing the Indictment Alongside an Affidavit in an Application for a Search Warrant is Permissible.

Defendants' arguments that the Datto warrant is insufficient because the affidavit summarized and incorporated the superseding indictment rather than outlining facts to establish probable cause is foreclosed by *United States v. Seybold*, 726 F.2d 502, 504 (9th Cir. 1984).  The Ninth Circuit in *Seybold* held that a judge may consider the information

contained in an indictment in making a probable cause determination. *Id.* at 504 (citing *United States v. Ellsworth*, 647 F.2d 957, 963 (9th Cir. 1981)). In *Seybold*, a special agent of the Drug Enforcement Administration (DEA) applied to a federal magistrate judge for a warrant authorizing the search of Seybold's residence two days after a grand jury indicted Seybold for drug trafficking offenses. *Id.* at 502. The judge authorized the application, which included a seven-page affidavit and incorporated a copy of the indictment, and issued the warrant. *Id.* at 503. The Ninth Circuit found that a judge would understand that a grand jury's determination—the fact that there was sufficient evidence to indict an individual may not necessarily mean that evidence of that person's guilt would likely be found in his residence—and determined that the judge could apply his independent judgment to determine whether probable cause exists. *Id.* at 505.

Here, the government proceeded in a similar manner. In his sworn affidavit, SA Robinson incorporated by reference the superseding indictment in the application to the magistrate judge. But in addition to the superseding indictment, the affidavit itself presented sufficient facts (including admissions made by Ferrer and Hyer in their written plea agreements) that would allow the judge to determine that there was a fair probability of finding evidence of conspiracy, money laundering, and Travel Act violations in the 26 email counts saved on Datto's cloud servers.

Defendants' reliance on *United States v. Rubio*, 727 F.2d 786 (9th Cir. 1983) is misplaced and out of context. In *Rubio*, the Ninth Circuit held, as it did in *Ellsworth*, that while the indictment can be considered along with other facts by a magistrate in determining probable cause, it is not, by itself, an adequate substitute for articulable facts in the warrant affidavit. *Id.* Here, in its application for a warrant to obtain data stored by Datto, the government acted consistent with *Seybold,* and as approved by *Rubio* and *Ellsworth*, with an affidavit from an agent containing facts about the case to establish probable cause accompanied by the indictment.

In his eleven-page affidavit for the Datto Warrant, SA Robinson described his and other agents' review of interviews and documents, including emails that led him to believe

the emails retained by Datto cloud service would contain evidence of conspiracy, money laundering and Travel Act violations.  Specifically, SA Robinson described Backpage's development of a plan called "aggregation" or the "Dallas Plan," where Backpage representatives would reach out to customers of competing websites and offer them free ads on Backpage, in an effort to increase users and ad revenue; the thought was that the recipients of free ads would eventually become paying customers.  (Doc. 827-2, ¶ 5.)  This "Dallas Plan" was successful and contributed greatly to Backpage's early growth and success.  *Id.*

SA Robinson stated beginning around 2007 or 2008, Backpage began "affiliate programs" a marketing technique designed to increase Backpage's user base.  *Id.*  At one point, Backpage was making referral payments of approximately $500,000 per year.  *Id.* SA Robinson also explained other business strategies employed by Backpage specifically intended to promote and facilitate prostitution.  For example, Backpage had a reciprocal link agreement with The Erotic Review ("TER"), a website that allowed customers to post explicit reviews of their prostitutes.  Backpage paid tens of thousands of dollars to TER in exchange for assistance in getting TER's customers to use Backpage.  *Id.*

SA Robinson stated extensive analysis of Backpage's operations, revenue streams and future value preceded the 2015 sale of Backpage from companies controlled primarily by Lacey and Larkin to companies legally controlled by Ferrer and noted that Larkin continued to exercised substantial control and oversight over Backpage and Ferrer even after the sale was complete.  *Id.*  SA Robinson also explained that Backpage.com used partner sites like MobilePosting.com or Easypost.com to allow its customers to post ads and pay for ads in a way that kept financial institutions from knowing that the transaction was for the purchase of a Backpage ad.  *Id.*  Backpage customers would purchase and post ads on the partner sites knowing that their ads would also appear on Backpage.  Backpage received the majority of the revenue derived from these types of ads and the partner site would keep a small percentage for their service.  *Id.*

Thus, the affidavit contained sufficient facts from which the magistrate judge could conclude that under the totality of the circumstances there was a fair probability that evidence of money laundering, conspiracy, and Travel Act would be present in the data of 26 email accounts held at Datto.

### iii. The Warrant Application Does Not Need to Establish a Heightened Scienter or the Facilitation/Promotion of a Business Enterprise Before a Finding of Probable Cause Can be Found.

Defendants argue the warrant application lacks probable cause because the affidavit failed to include a heightened scienter or facts showing how Defendants knowingly facilitated or participated in a business enterprise involving prostitution. (Doc. 827 at 10.) Defendants have raised these arguments in other pleadings and the Court has denied their motions. Specifically, this Court has found "Defendants' arguments that the First Amendment demands a scienter requirement beyond specific intent to promote prostitution are unavailing." (Doc. 793 at 23.) Moreover, the heightened standard and additional facts Defendants argue are required run contrary to *Gates*, where probable cause was defined as a "fair probability," without any consideration of any standard of proof. *Gates*, 462 U.S. at 235.

Defendants also argue the warrant application does not contain facts showing they knowingly and intentionally promoted and facilitated a "business enterprise" involving prostitution. This argument is part of a Motion to Dismiss the Indictment Based on Failure to Allege Necessary Elements of the Travel Act. (Doc. 746). This argument is not applicable here, as warrants require only a finding of probable cause—a reasonable belief that a subject has committed a crime. *Pringle*, 540 U.S. at 371. Furthermore, courts are to interpret warrants in a commonsense rather than in a hyper-technical manner.. *Ventresca*, 380 U.S. at 109. Even if this case were marginal (it isn't), the Supreme Court has made clear its preference not to invalidate warrants. *Id.*

### iv. SA Robinson's Affidavit Sets Forth Facts Showing How Backpage's and Defendants' Actions Were For Criminal Purposes and How Their Email Accounts Contain Evidence of Their Crimes.

Defendants claim the Datto warrant fails to provide factual information indicating that Defendants were involved in or facilitating criminal activity. (Doc. 827 at 11.) Their position is based upon Defendants' fundamental failure and complete unwillingness to acknowledge or appreciate that their conduct is or could be criminal conduct. While moderation, aggregation, or the use of reciprocal and affiliate links could all be lawful practices, Backpage's use of these techniques were for the purposes of promoting and facilitating prostitution for financial gain—in violation of the law.

According to Ferrer and Hyer, Backpage engaged in moderation to remove only the most offensive or explicit conduct before allowing the ad to go live, which they admitted did nothing to change the underlying purpose of the ad—usually to offer prostitution services. In efforts to grow Backpage, Ferrer and Hyer discussed aggregation and how they attempted to steal customers from competing websites and offered them free ads on Backpage in hopes they would become future paying customers. Hyer discussed affiliate and reciprocal links with TER, where a prostitute's reviews could be linked to her Backpage ad. And as time went on, Ferrer and Hyer explained how they helped Backpage develop a complicated banking process in an effort to deceive banks and credit card companies that were reluctant to serve Backpage customers. SA Robinson stated he reviewed interviews, documents, and email correspondence in addition to conducting and reviewing an extensive analysis of Backpage's operations, revenue streams and future value that show Lacey and Larkin remained very much involved with Backpage, even after they sold it to Ferrer.

### c. The Warrants Detailed the Items to be Seized and the Items Seized Are Evidence of the Crimes.

Defendants argue the warrants do not clearly state what is to be searched and seized and that the items seized exceeded the scope of the probable cause. While a warrant must make clear to the executing officer exactly what is authorized to search for and seize, the level of detail necessary in a warrant is related to the particular circumstances and the nature of the evidence sought. *SDI Future Health Inc*., 568 F.3d at 702; *United States v.*

*Adjani*, 452 F.3d 1140, 1147 (9th Cir. 2006).  The search and seizure of large quantities of material is justified if the material is within the scope of the probable cause underlying the warrant.  *Id.* at 684, *United States v. Hayes*, 794 F.2d 1348, 1355 (9th Cir. 1986).  Here, the warrant sought and Magistrate Judge Boyle authorized, the seizure of the 26 accounts identified in Attachment A and all content associated with those accounts from 2004 through 2018.  (Doc. 827-1.)  The warrant application is clear as to the information being sought from Datto.

### d. Defendants Have Failed to Make the Substantial Preliminary Showing Necessary to Obtain a *Franks* Hearing.

To challenge the validity of a warrant affidavit, a defendant must make a substantial preliminary showing that (1) the affiant officer intentionally or recklessly made false or misleading statements or omissions in support of the warrant, and (2) the false or misleading statements or omissions were material, *i.e.*, necessary to finding probable cause. *United States v. Norris*, 942 F.3d 902, (9th Cir. 2019), (citing *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017)).  If a defendant satisfies both prongs, he or she is entitled to an evidentiary hearing.  *Franks*, 438 U.S. at 172.  But to mandate an evidentiary hearing, the challenger's attack [on the affidavit] must be more than conclusory and must be supported by more than a mere desire to cross-examine.  *Id.* at 171.  On the other hand, a defendant's substantial preliminary showing of recklessness or deliberate falsity is of no consequence and requires no hearing "when material that is the subject of the alleged falsity or reckless disregard is set to one side [and] there remains sufficient content in the warrant affidavit to support a finding of probable cause."  *Id*.  Additionally, evidence obtained from a warrant should not be suppressed so long as the officer was objectively reasonable and acted with good-faith reliance on the judge's finding of probable cause.  *United States v. Leon*, 468 U.S. 897, 899 (1984).

Defendants argue the Datto warrant contains misleading statements or omissions because it: (1) failed to discuss cases where Backpage has defeated civil claims or successfully challenged state legislative or law enforcement actions; (2) failed to inform

the magistrate judge that violations of the Travel Act require a heightened proof of scienter; and (3) failed to disclose how not all advertisements for sex are advertisements for illegal sex, and improperly equated "erotic" and "adult services" with prostitution  (Doc. 827 at 15-16.)

To meet *Franks'* first prong, Defendants must make specific allegations of deliberate falsehoods or demonstrate the affiant's reckless disregard for the truth, accompanied by an offer of proof—negligence is not enough.  *Franks*, 438 U.S. at 171. Alternatively, Defendants must show the affiant(s) deliberately or recklessly omitted material information.  *United States v. Tham*, 960 F.2d 1391, 1395 (9th Cir. 1991). Defendants have failed to meet this prong.

### i.   No Need to Cite to Inapposite Case Law

Defendants argue a *Franks* hearing is appropriate because the government failed to include in its affidavit that the First Amendment protects online classified advertising sites like Backpage.  (Doc. 827 at 15.)  This is an argument that has been soundly rejected by the Court.  (Doc. 793 at 13.)  In its Order denying Defendants' motion to dismiss, the Court held: "this case, however, does not concern civil liability, and the CDA has 'no effect' on any other Federal criminal statute."  (Doc. 793 at 13.)  This argument has also been similarly rejected in the civil forfeiture proceedings before U.S. District Court Judge R. Gary Klausner in the Central District of California.  On December 20, 2019, Judge Klausner rejected a similar request for a *Franks* hearing and found that the government was not required to disclose cases where Backpage had escaped liability primarily due to Section 230 of the Communications Decency Act.  (Exhibit C, December 20, 2019 Order in 18-cv-06742-RGK-PJW, CDCA)[3].

Interestingly, Defendants failed to mention Judge Klausner's Order when they filed the instant motion three days later.  In both cases, Defendants' motions list several cases

---

[3] Four of the defendants in the instant case, Defendants Larkin, Lacey, Brunst and Spear are currently pursuing an appeal of Judge Klausner's Order, which also address a variety of civil forfeiture issues.

where they were successful in civil or state court—none of which involved federal criminal charges.  As Defendants are well aware, Section 230 of the Communication Decency Act (CDA) simply does not apply to federal criminal prosecutions.  47 U.S.C. § 230(e)(1); (*see also* Doc. 840).

### ii.    A *Franks* Hearing is Not Necessary Because Heightened Scienter is Not Required

Next, Defendants again persist in their mistaken argument that facilitating crimes of prostitution requires a heightened scienter.  (Doc. 827 at 16.)  As this Court has previously found "Defendants' arguments that the First Amendment demands a scienter requirement beyond specific intent to promote prostitution are unavailing." (Doc. 793 at 18, 23; Doc. 840.)

### iii.    Nearly All or Most Ads Are for Prostitution

While the government fully expects its witnesses will testify at trial that the overwhelming majority of the ads posted in the "adult" or "escort" section of Backpage were ads for illegal prostitution, it did not unequivocally equate "adult" or "escort" to prostitution in the warrant application, as Defendants complain.  (Doc. 827 at 16.)  In actuality, Carl Ferrer stated, "the great majority of ads are ads for prostitution services" and Backpage derived the "great majority" of its income from those ads.  (Doc. 827-2, ¶ IV(2).)  Similarly, Daniel Hyer stated, "many of the ads created through aggregation offered illegal prostitution services." (Doc. 827-2, ¶ IV(4).)   Accordingly, there are no false, misleading, or omitted facts here that would trigger a *Franks* hearing.

In sum, Defendants fail to cite any *Franks* violations based on (1) an affiant's failure to present a legal analysis of reported case law or (2) an affiant's failure to discuss a particular *mens rea* not applicable to the offense.  They have failed to submit an affidavit or present any offer of proof in support of their allegations.  *Franks*, 438 U.S. at 171.  Most notably, the affidavit here contained the factual admissions of two co-conspirators:  Carl Ferrer and Daniel Hyer.  Defendants completely fail to address or even acknowledge their admissions in their motion.

But even if Defendants' positions were included or if the superseding indictment was omitted, the Datto warrant application includes an affidavit containing substantial independent evidence supporting probable cause.  Defendants have failed to make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the warrant affidavit and that the allegedly false statement was necessary for a finding of probable cause.  Defendants' assertions here are merely conclusory and not supported by any offer of proof.  The Court should deny Defendants' request for a *Franks* hearing.

## III.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Suppress (Doc. 827) and request for a *Franks* hearing should be denied.

Respectfully submitted this 21st day of January, 2020.

MICHAEL BAILEY
United States Attorney
District of Arizona

*s/ Margaret Perlmeter*

KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW C. STONE
Assistant U.S. Attorneys

JOHN J. KUCERA
Special Assistant U.S. Attorney

BRIAN BENCZKOWSKI
Assistant Attorney General
U.S. Department of Justice
Criminal Division, U.S. Department of Justice

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

## CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Margaret Perlmeter*
Margaret Perlmeter
U.S. Attorney's Office

# EXHIBIT A

| From: | Jones, Reginald (CRM) |
|---|---|
| To: | "Paul Cambria"; jimgrant@dwt.com; "bobcornrevere@dwt.com"; Tom Bienert; mdk@kimerer.com; bf@federlawpa.com; Michael Piccarreta; "Steve Weiss"; glincenberg@birdmarella.com |
| Cc: | Rapp, Kevin (USAAZ); Perlmeter, Margaret (USAAZ); Kozinets, Peter (USAAZ); Stone, Andrew (USAAZ); Kucera, John (USACAC) |
| Subject: | 3.18.19 Letter to Defense Counsel |
| Date: | Monday, March 18, 2019 5:22:39 PM |
| Attachments: | letter to defense counsel 3.18.19.pdf |

Dear Counsel:

Please find attached a letter regarding Backupify and Backpage server data.

Thanks,
Reggie

**Reginald E. Jones**
**U.S. Department of Justice, Criminal  Division**
T:  202.616.2807  |  reginald.jones4@usdoj.gov



**U.S. Department of Justice**

United States Attorney
District of Arizona

| | |
|---|---|
| Two Renaissance Square | Main:   (602) 514-7500 |
| 40 N. Central Ave., Suite 1800 | Main Fax:   (602) 514-7693 |
| Phoenix, AZ  85004-4408 | |

March 18, 2019

**VIA E-MAIL**

Paul J. Cambria Jr.
Attorney at Law
Lipsitz Green Scime Cambria,
LLC
(attorney for Michael Lacey)

Jim Grant
Davis Wright Tremaine, LLP
(attorney for Lacey and Larkin)

Robert Corn-Revere
Davis Wright Tremaine, LLP
 (attorney for Lacey and Larkin)

Thomas H. Bienert, Jr., Esq.
Bienert, Miller & Katzman,
PLC
(attorney for James Larkin)

Michael D. Kimerer, Esq.
1313 E. Osborn Road,
 (attorney for Jed Brunst)

Bruce Feder, Esq.
2930 East Camelback Road,
(attorney for Scott Spear)

Mike Piccarreta, Esq.
Piccarreta Davis Keenan Fidel,
PC
(attorney for Andrew Padilla)

Steve Weiss
Attorney at Law
Karp & Weiss, PC
(attorney for Joye Vaught)

Gary Lincenberg
Bird, Marella, Boxer, Wolpert,
Nessim, Drooks, Lincenberg & Rhow,
P.C.
(attorney for Jed Brunst)

    Re:    U.S. v. Michael Lacey, et.al.
           CR-18-00422-PHX-SMB

Dear Counsel:

    We write to inform you that data seized from Backupify (a company Backpage utilized to backup and recover its cloud service data) pursuant to a court-authorized search warrant is available for pick-up at an FBI facility in Phoenix. Additionally, as per my March 7, 2019 letter to counsel for James Larkin (letter attached as Exhibit A), hard drives containing Backpage-related email data seized from Backpage servers located in Dallas, Texas are also available for pick-up.[1] As you are aware, the government's filter protocol was recently approved by the Court on January 22, 2019 (*see* CR 445); thus, the aforementioned data is being processed for our review in accordance with the approved filter procedures. However, in order to avoid delay of any review you may want to conduct of these materials, we are providing them to you at this time. We will also provide you with exhibits of any of the above-mentioned data the government might utilize at trial.

---

[1] On March 8, 2019 we provided Counsel Bruce Feder with hard drives containing the entire marketplace of Backpage ads (i.e. all of the ads that were on Backpage.com at the time the website was seized).

Lacey, et. al. Discovery Letter 8
March 18, 2019
Page 2

       Please reach out to me to schedule a time to pick-up these materials.

                                  Sincerely,

                                  BRIAN BENCZKOWSKI
                                  Assistant Attorney General
                                  Criminal Division
                                  U.S. Department of Justice

                                  */s Reginald Jones*
                                  REGINALD E. JONES
                                  Senior Trial Attorney, CEOS
                                  (202) 616-2807
                                  reginald.jones4@usdoj.gov

                                  ELIZABETH A. STRANGE
                                  First Assistant U.S. Attorney

                                  KEVIN M. RAPP
                                  MARGARET PERLMETER
                                  PETER S. KOZINETS
                                  ANDREW STONE

                                  JOHN J. KUCERA
                                  Special Assistant U.S. Attorney

# EXHIBIT B

FD-597 (Rev. 4-13-2015)

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
# Receipt for Property

Case ID:  PX-9247052

On (date)  04/23/2019

item (s) listed below were:

- ☐ Collected/Seized
- ☐ Received From
- ☐ Returned To
- ☐ Released To

(Name)  Whitney Bernstein

(Street Address)

(City)

Description of Item (s):  1) Western Digital hard drive containing images of server documents and emails 2) Seagate hard drive S/N: 9VS1HZY5 containing image of Datto data.

Received By: *(signature)*

Printed Name/Title:  Whitney Bernstein

Received From: *(signature)*

Printed Name/Title:  Desiree L Tolhurst  SA  FBI

DOJ-BP0004895888

# EXHIBIT C

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:18-cv-06742-RGK-PJW | | Date | December 20, 2019 |
|---|---|---|---|---|
| Title | *In the Matter of Seizure of: Any and all funds held in Republic Bank of Arizona Accounts* | | | |

| Present: The Honorable | R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Sharon L. Williams | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiff: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**     **(IN CHAMBERS) Order re: Claimants' Motion to Vacate or Modify Seizure Warrants [DE 6]**

## I. INTRODUCTION

On August 1, 2018, Claimants James Larkin, Michael Lacey, Scott Spear, and John Brunst (collectively, "Claimants," or "Defendants") filed the instant action challenging the Government's warrants for civil forfeiture of numerous assets in connection with the ongoing criminal matter *United States of America v. Michael Lacey, et al.,* No. 18-CR-00422-PHX-SPL (D. Ariz.) ("the Arizona Proceeding"). The indictment in that case includes charges for money laundering and facilitation of prostitution arising from Claimants' relationship to the third-party advertising website backpage.com ("Backpage"). The seized assets in this case are proceeds of the allegedly illegal activities associated with Backpage and other funds commingled with those proceeds.

On October 23, 2018, this Court ordered a stay of civil forfeiture proceedings pending resolution of the criminal case in the Arizona District Court (ECF No. 85). On September 23, 2019, the Ninth Circuit vacated this Court's Stay Order and remanded for further proceedings (ECF No. 99). On October 4, 2019, this Court ordered the case reopened and directed Claimants to provide additional briefing to explain the legal basis for relief under which they brought their Motion, as well as the appropriate legal standard for the Court to apply in deciding it (ECF No. 101 and 102.) On October 11, 2019, Claimants filed the requested additional briefing (ECF No. 106), and on October 28, the Government filed its response (ECF No. 114).

Presently before the Court is Claimants' Motion to Vacate or Modify Seizure Warrants (ECF No. 6.) For the following reasons, the Court **DENIES** Claimant's Motion.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| Case No. | 2:18-cv-06742-RGK-PJW | Date | December 20, 2019 |
|---|---|---|---|
| Title | *In the Matter of Seizure of: Any and all funds held in Republic Bank of Arizona Accounts* | | |

### II. **FACTUAL BACKGROUND**

On March 28, 2018, a grand jury in the District of Arizona returned an indictment charging Lacey and the other Defendants in the Arizona proceeding with conspiring to facilitate prostitution through their operation of the third-party advertising website Backpage.com. Thereafter, four Magistrate Judges in the Central District of California issued seizure warrants for civil forfeiture of certain assets related to that indictment. The magistrates' findings of probable cause for these warrants were based in part on affidavits[1] from Postal Inspector Lyndon Versoza ("Versoza").

On July 25, 2018, a grand jury returned a superseding indictment ("SI"), which charged Claimants with conspiracy to facilitate prostitution, facilitation of prostitution, conspiracy to commit money laundering, concealment of money laundering, international promotional money laundering, and transactional money laundering. The SI also included criminal forfeiture allegations that largely mirror the civil forfeiture actions in this case, under which the Government seeks forfeiture of specific assets derived from or commingled with proceeds from Backpage in which the Claimants hold interest.

### III. **JUDICIAL STANDARD**

Under Federal Rule of Criminal Procedure ("Rule") 41(g), "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." To prevail on a motion for return of property, the moving party must "demonstrate that (1) he is entitled to lawful possession of the seized property; (2) the property is not contraband; and (3) either the seizure was illegal or the Government's need for the property as evidence has ended." *United States v. Crow*, 651 Fed. Appx. 686, 688–89 (9th Cir. 2016) (citing *United States v. Van Cauwenberghe*, 827 F.2d 424, 433 (9th Cir. 1987)).

Claimants assert that several different Constitutional violations have occurred or are occurring. Where applicable, the Court addresses each one according to the relevant legal standard.

### IV. **DISCUSSION**

Claimants make five principal arguments challenging the validity of the Government's warrants: (1) the seizures are void because the First and Fourth Amendments bar pre-conviction seizures of publishing assets, (2) in the alternative, if such seizures are allowed, the First and Fourth Amendments require a hearing in which the Government must meet a higher standard of proof than probable cause,

---

[1] This case involves numerous distinct but highly similar affidavits. For simplicity, all references to the "Versoza Affidavit" are to the affidavit attached as Exhibit 1 to Defendant's Motion (ECF No. 6.)

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | 2:18-cv-06742-RGK-PJW | Date | December 20, 2019 |
|----------|----------------------|------|-------------------|
| Title | *In the Matter of Seizure of: Any and all funds held in Republic Bank of Arizona Accounts* | | |

(3) even apart from any First Amendment concerns, the warrants are invalid because they were obtained through knowing or recklessly false statements and material omissions, (5) Claimants are being denied their Sixth Amendment right to counsel due to lack of funds, and (6) the seizures are over-inclusive because the Government failed to trace seized assets to specific instances of alleged criminal activity.

The Court addresses Claimants' arguments in order.

### A. The Seized Property Is Not Protected Under the First Amendment

Claimants argue that "the First Amendment prohibits pretrial *ex parte* seizures of publishing assets and proceeds based on nothing more than a showing of probable cause that the assets are linked to criminal activity." (Claimant's Legal Authority in Support of Opposition, "Claimant's Auth." 2:13–15.) They further assert that "the Government always has the burden to prove speech is unprotected by the First Amedment *before* it may impose burdens, even financial ones." *Id.* at 15–17. As the Court finds that the assets in question do not merit special protection under the First Amendment, the Court disagrees.

As a threshold issue, commercial speech related to illegal activity is not protected under the First Amendment. "The First Amendment's concern for commercial speech is based on the informational function of advertising. Consequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 563–64 (1980) (internal citations omitted). However, as Claimants point out, "[n]umerous courts have established that at least some of Backpage's adult content is legal in the United States." (Motion to Vacate or Modify Seizure Warrants, "Mtn. to Vacate," 40:7–10, ECF No. 6); *Backpage.com LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015). As some of Backpage's seized funds may have originated from legitimate activity, the Court will address whether those funds are entitled to heightened protection under the First Amendment.

Claimants base their argument on a line of cases that have prohibited the pre-trial seizure of expressive content and publishing assets as an impermissible form of prior restraint. As described below, Claimants attempt to stretch these cases too far.

Claimants first cite to the Supreme Court's ruling in the obscenity case *Fort Wayne Books, Inc. v. Indiana,* in which the Court held that "[w]hile a single copy of a book or film may be seized and retained for evidentiary purposes based on a finding of probable cause, the publication may not be taken out of circulation completely until there has been a determination of obscenity after an adversary hearing." *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 63 (1989). The Court further explained that "[i]t is the risk of prior restraint which is the underlying basis for the special Fourth Amendment

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | 2:18-cv-06742-RGK-PJW | Date | December 20, 2019 |
| --- | --- | --- | --- |
| Title | *In the Matter of Seizure of: Any and all funds held in Republic Bank of Arizona Accounts* | | |

protections accorded searches for and seizures of First Amendment materials that motivates this rule." *Id.* (internal citation omitted). The *Fort Wayne* Court intended this heightened standard to apply to a seizure which "interrupt[ed] the flow of expressive materials." *Id.* at 67.

Claimants seek to extend the above principle of heightened protection from expressive content to publishing proceeds via *American Library Association v. Thornburgh*, in which the District Court for the District of Columbia applied *Fort Wayne Books* to prohibit the *ex parte* seizure of the non-expressive material required to maintain the operation of a publishing business. *Am. Library Ass'n v. Thornburgh*, 713 F. Supp. 469, 484 (D.D.C. 1989), *vacated sub nom. Am. Library Ass'n v. Barr*, 956 F.2d 1178 (D.C. Cir. 1992). As in *Fort Wayne Books*, however, the Court's principal concern in *American Library* remained avoiding the suppression of expressive content:

> Because the Court in the instant case concludes that the seizure of non-expressive assets—such as printing presses, bank accounts, etc.—of a business engaged in distributing expressive material may determine whether the business is able to continue functioning or not, the Court concludes that pre-trial seizure of non-expressive material *ex parte* from a business engaged in distributing expressive material also is unconstitutional.

*Id* at n. 19. As the two cases above make clear, the fundamental concern when determining whether First Amendment considerations prohibit an *ex parte* seizure based on probable cause is whether the flow of expressive materials will be interrupted, or, put another way, whether arguably protected speech will in fact be stifled.

Here, Defendants make no argument that the Government's seizure will "interrupt the flow of expressive materials." Backpage had already ceased operation at the time these seizures took place. The funds in question were not themselves expressive material and could not have been used to continue the dissemination thereof. Furthermore, the large majority of the seizure warrants targeted funds that were no longer related to the operation of Backpage in any way, including some invested in real property. The Court rejects Claimants' theory that any profits extracted from a publishing business acquire a heightened status under the First Amendment regardless of where or how they are subsequently used.

Claimants' citation to *Simon & Schuster v. Members of the N.Y. State Crime Board* is likewise inapposite here. In *Simon* the Supreme Court invalidated New York's "Son of Sam" law, which required any "person convicted of a crime" to place any income derived from works he authored "on any subject, provided that they contained the author's thoughts and recollections about his crime, however tangentially or incidentally" into an escrow account overseen by the New York State Crime Victims Board. The proceeds were then used to compensate victims who submitted claims. *Simon & Schuster*,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:18-cv-06742-RGK-PJW | | Date | December 20, 2019 |
|---|---|---|---|---|
| Title | *In the Matter of Seizure of: Any and all funds held in Republic Bank of Arizona Accounts* | | | |

502 U.S. 105, 121 (1991). The Supreme Court invalidated the statute on the ground that it was substantially overbroad, particularly in light of the fact that "person convicted of a crime" was defined to include "any person who has voluntarily and intelligently admitted the commission of a crime for which such person is not prosecuted." *Id.* at 105. The Court also held, however, that the statute was an impermissible content-based regulation under the long-established principle that "[a] statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech." *Id.* at 115.

That is unlike this case. The "Son of Sam" law was invalidated because it specifically extended the mechanism of civil forfeiture to target legal and undeniably protected First Amendment activity, such as publishing a memoir, on the basis that the content of the work *discussed* a crime. There was never a suggestion that the work or its publication was itself a criminal act.

Here, the law seized proceeds that were allegedly directly implicated in criminal activity. As the Government points out, these funds have been seized under the ordinary legal mechanism for civil forfeiture, which the Supreme Court expressly left unchanged in *Simon & Schuster*, not under a statutory scheme that targets speech due to its content. Furthermore, the funds in this case, which were seized upon the issuance of a warrant, are not being placed into an escrow account to pay victims of human trafficking. They are frozen while the Claimants have the full opportunity to dispute their seizure. The exercise of the ordinary law of civil forfeiture in this case places no burden on any party's right to protected First Amendment expression.

As the Court finds that none of Claimants' arguments support a heightened protection for the seized funds under the First Amendment, the Court denies the Motion insofar as it rests on this theory.

### B. First Amendment Concerns Do Not Require a Hearing

Claimants next argue that if the Court does not invalidate the seizure warrants outright, then it should hold a hearing to determine the validity of the seizures under a heightened standard required by the First and Fourth Amendments. Claimants cite to *Southeastern Promotions, Ltd. v. Conrad* for the proposition that "[w]here materials or proceeds are even arguably protected by the First Amendment, the Government is required to employ procedural safeguard designed to obviate the dangers of a censorship system." (Claimants' Legal Authority 5:26–6:2) *citing Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975) (internal quotations omitted). As the Court finds that the funds at issue do not merit any special First Amendment protection, it disagrees that a hearing on the issue is warranted.

As above, Claimants' seek to support their argument with citations to cases directed toward avoiding the dangers of prior-restraint. *Southeastern Promotions* is a case in which members of a local

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | 2:18-cv-06742-RGK-PJW | Date | December 20, 2019 |
|---|---|---|---|
| Title | *In the Matter of Seizure of: Any and all funds held in Republic Bank of Arizona Accounts* | | |

municipal board denied a concert promoter permission to use a civic auditorium to perform the musical *Hair*. *Stanford v. Texas*, which describes the "constitutional impossibility" of leaving the protection of First Amendment freedoms to the "whim of the officers charged with executing the warrant," is a case about the "scrupulous exactitude" with which warrants must describe the things to be seized "when the things to be seized are books, and the basis for their seizure is the ideas they contain." *Stanford v. State of Tex.*, 379 U.S. 476, 485 (1965).

Plaintiffs fail to draw any link between the funds at issue and potential expressive activity, and they make no argument that the Government's seizure of these funds could chill such activity. As such, they are not entitled to special protection under the First Amendment.

### C. Defendants Have Not Made the Substantial Preliminary Showing Necessary to Justify a *Franks* Hearing

Claimants contend that even apart from any First Amendment issues, the seizure warrants were defective and should be vacated as a result. Specifically, Claimants argue that (1) the Versoza affidavits failed to include controlling caselaw, and (2) they misrepresented the contents of internal Backpage communications. On those two bases, Claimants assert that they have made the "substantial preliminary showing" of Government misconduct to require an evidentiary hearing under the rule in *Franks v. Delaware*, 438 U.S. 154, 156 (1978).

"A defendant is entitled to an evidentiary hearing on the validity of the affidavit underlying a search warrant if the defendant can make a substantial preliminary showing that (1) the affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the affidavit cannot support a finding of probable cause without the allegedly false information." *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000). As the Court finds that the Versoza affidavits do not contain false statements or misleading omissions that would impact a probable cause determination, the Court finds that no hearing is required.

As a preliminary matter, the Court notes that the Grand Jury in the Arizona Proceeding has issued a superseding indictment that includes criminal forfeiture allegations closely corresponding to the civil forfeiture allegations in this case. *See U.S. v. Lacey*, No. 18-CR-00422-PHX-SPL (D. Ariz.) (ECF No. 230 at pp. 63–92.) The charges in the superseding indictment are a strong indication that probable cause supports the seizures at issue here: "[a]n indictment fair upon its face, and returned by a properly constituted grand jury . . . conclusively determines the existence of probable cause to believe the defendant perpetrated the offense alleged." *Kaley v. United States*, 571 U.S. 320, 328 (2014). However, as this is a separate civil proceeding based on its own warrants, the Court will address Claimants' arguments for a *Franks* hearing.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | 2:18-cv-06742-RGK-PJW | Date | December 20, 2019 |
|---|---|---|---|
| Title | *In the Matter of Seizure of: Any and all funds held in Republic Bank of Arizona Accounts* | | |

1. *Caselaw*

Claimants argue that Versoza's "most serious omission was his failure to mention any of the cases finding the First Amendment protects online classified advertising sites generally, and Backpage.com in particular." (Mtn. to Vacate 22:2–5.) Claimants cite to an extensive list of cases in which Backpage and similar services avoided liability, but they are incorrect that these prior decisions contradict the legal basis for the affidavits at issue.

A number of Claimant's cases were decided in whole or in part on the basis of the Communications Decency Act ("CDA"), 47 U.S. Code § 230(c)(1), which provides immunity from civil liability for providers and users of an "interactive computer service" who publish information provided by third-parties. Claimants cited cases include: *People v. Ferrer ("Ferrer I")*, No. 16FE019224 (Cal. Super. Ct. Dec. 9, 2016); *People v. Ferrer ("Ferrer II")*, No. 16FE024013 (Cal. Super. Ct. Aug. 23, 2017); *M.A. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011); *Backpage.com LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012); *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 (N.D. Ill. 2009); and *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016).

The Government dismisses these cases as inapposite because, as the Arizona District Court noted in the corresponding criminal case, "the CDA does not apply to federal criminal prosecutions." 47 USC 230(e)(1); (Gov. Combined Response at 10:14–17 *citing Lacey,* No. 18-CR-00422-PHX-SPL (D. Ariz.)). However, the Government provides no legal authority for its conclusion that civil forfeiture actions are likewise outside of the CDA's grant of immunity simply because they are related to an ongoing federal prosecution. The fact that a civil enforcement action is "related" to a criminal statute does not necessarily place it beyond the scope of the CDA's application. *See Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 23 (1st Cir. 2016); *Force v. Facebook, Inc.*, 934 F.3d 53, 72 (2d Cir. 2019). Moreover, courts have consistently held in other contexts that civil forfeiture actions are not criminal in nature. *See United States v. Ursery,* 518 U.S. 267, 292 (1996) (finding civil forfeitures under 18 U.S.C. § 981(a)(1)(A) to be "neither punishment nor criminal for purposes of the Double Jeopardy Clause") (internal quotations omitted).

The Court need not undertake that determination here, however, as the conduct Versoza describes in the affidavits would fall outside the scope of the CDA's immunity even if such immunity applied, and Claimant's cited cases are therefore distinguishable.

The CDA does not provide immunity for participation in illegal activity. *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1169 (9th Cir. 2008); *see also United States v. Ulbricht*, 31 F. Supp. 3d 540, 568 (S.D.N.Y. 2014). In *Roommates.com*, the Ninth Circuit

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | 2:18-cv-06742-RGK-PJW | | Date | December 20, 2019 |
|---|---|---|---|---|
| Title | *In the Matter of Seizure of: Any and all funds held in Republic Bank of Arizona Accounts* | | | |

articulated a threshold for when the operator of an interactive computer service performing editorial functions, such as Backpage, crosses the line into performing the dual role of a non-immune "information content provider:"

> A website operator who edits user-created content—such as by correcting spelling, removing obscenity or trimming for length—retains his immunity for any illegality in the user-created content, provided that the edits are unrelated to the illegality. **However, a website operator who edits in a manner that contributes to the alleged illegality. . . is directly involved in the alleged illegality and thus not immune.**

*Roommates*, 521 F.3d at 1169 (emphasis added). This is what the affidavits claim took place. The affidavits do not suggest that Backpage merely allowed third-parties to post ads for prostitution while it stood back and collected the profits, or even that it actively structured its website in a way that incentivized such posts. Nor do they assert that Backpage deleted only some ads for prostitution while failing to delete others. They also do not claim that Backpage operated an automated filter which excluded certain terms but could be easily circumvented. These theories of liability might be blocked by the CDA's blanket of immunity. *See, e.g, Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 23 (1st Cir. 2016).

The affidavit asserts, rather, that Backpage employees, with Claimants' knowledge and as a matter of policy, actively worked to facilitate prostitution by concealing it from law enforcement through Backpage's "moderation" policy. As an example, the affidavit asserts that Ferrer received an email from law enforcement expressing concern about ads containing the term "amber alert." (Versoza Aff. ¶ 30(g)). Ferrer acknowledged that the term might be "some kind of bizarre new code word for an under aged person." *Id.* He then instructed Backpage employees to remove the term "amber alert" from subsequent ads, but he did not instruct them to block the ads themselves or to report them. *Id.* In so doing, Backpage is alleged to have willfully assisted in concealing child prostitution from law enforcement. Had Backpage done nothing, law enforcement could have monitored its site for ads using the term "amber alert." Had it deleted ads containing the term, it would have denied sex traffickers a forum for their operations. What it is accused of doing instead, however, is editing the ads with the purpose of concealing the illegal activity. This activity is illegal in itself, and therefore it is outside the CDA's grant of immunity. Claimants, through their control of Backpage, are accused of being "directly involved in the alleged illegality, and thus is not immune." *Roommates*, 521 F.3d at 1169.

The affidavit likewise asserts that this was done not in isolated instances, but as a matter of policy. (Versoza Aff. at ¶ 30(f)) ("On October 27, 2010, a . . . Backpage manager sent an internal email stating that Backpage was "editing 70 to 80%" of the ads it received from customers."); (*Id.* at ¶ 30(h)) ("On August 31, 2011, Backpage managers exchanged emails in which they discussed a list of 100 'solid sex

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:18-cv-06742-RGK-PJW | Date | December 20, 2019 |
|---|---|---|---|
| Title | *In the Matter of Seizure of: Any and all funds held in Republic Bank of Arizona Accounts* | | |

for money terms.'"). Versoza describes the end result as follows: "Based on my review of several thousand Backpage ads and internal Backpage documents and correspondence, I believe that Backpage's policy of 'moderation' only caused ads explicitly promoting sex trafficking to become more coded and implicit in the ads' purpose." (*Id.* at ¶ 31.)

The question here is not whether the Government will ultimately prevail in its civil forfeiture actions. The issue is only whether the Versoza affidavit contained knowing or recklessly false or misleading omissions because it did not cite to Claimant's specified case law. The Government correctly notes that Claimants have presented no cases in which a warrant was invalidated for this reason. (Gov. Resp. 11:1-7.) Furthermore, the affidavits in this case are based on a different theory from those in Claimant's cited cases, which is in turn premised on evidence that was unavailable when those cases were decided. Claimant's cases may be relevant as legal background, but failure to include additional background in a warrant affidavit is not recklessly misleading.

    *2. Emails*

As a secondary source of misconduct, Claimants argue that Versoza supported the assertions in his affidavit "by cherry-picking isolated phrases from certain emails, while omitting adjacent text that changed the import of the quoted material, sometimes entirely reversing their meaning." (Mtn. to Vacate 26:16–18.) The Court disagrees. Claimants identify quotations in four of the eight internal Backpage emails cited in paragraph 30 of the affidavit that they assert were taken out of context in a way that misrepresented their meaning. The Court will not analyze each of the four emails here for the simple reason that even if they were found to be wholly misleading (which they are not), the other emails (not to mention the other evidence in the affidavit) would still contain adequate evidence to support a finding of probable cause without them. Furthermore, while Claimants are not incorrect that the Versoza affidavits include only the excerpts from certain emails that best supported its theory, the Court does not find any instance where the inclusion of the additional content would have directly contradicted the message of what was excerpted.

For instance, paragraph 30(d) of the Versoza affidavit contains only the bold text from the below email:

> **I'd still like to avoid Deleting ads when possible**, but if an ad makes a clear reference to sex for money or an image displays a sex act,, [sic] don't hesitate deleting it. These are not the types of ads we want on our site at all.
>
> **In the case of lesser violations, editing should be sufficient. We're still allowing phrases with nuance** but if something strikes you as crude or obvious, remove the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:18-cv-06742-RGK-PJW | Date | December 20, 2019 |
|---|---|---|---|
| Title | *In the Matter of Seizure of: Any and all funds held in Republic Bank of Arizona Accounts* | | |

phrase. We're still allowing HBO type nudity but if an image makes you think twice, remove the image. There is zero tolerance for closeups of exposed genitalia.

Claimants are correct in that the Versoza affidavit included the text about what Backpage wanted to retain while leaving out the text about what it did not. However, the text that was omitted remains consistent with the affidavit's overall assertion: that Backpage wanted to get rid of "clear reference[s]" to "sex for money" and "closeups of exposed genetalia," but it wanted to edit rather than delete the ads where possible, and to retain prostitution advertisements that were "nuanced." Notably, the non-included text states that "if something strikes you as crude or obvious, remove the *phrase*." (emphasis added). This supports the Government's assertion that Backpage sought to edit even posts that were "obvious" ads for prostitution where possible to the point that they no longer were so, while knowingly retaining the ad.

For the above reasons, the Court finds that defendants have failed to make the "substantial preliminary showing" that the affidavit contains intentional or recklessly false statements, and that it would not support a finding of probable cause without those statements. The Court therefore declines to order a *Franks* hearing.

### D. Defendants Have Not Made a Prima Facie Showing that Their Sixth Amendment Right to Counsel is Threatened by Lack of Funds

Defendants next argue that the pre-trial restraint of their assets is depriving them of their right to counsel of their choice as guaranteed under the Supreme Court's holding in *Luis v. United States*, 136 S. Ct. 1083, 1088 (2016). As Defendants have made no showing in this motion that they lack other funds to pay counsel, the Court disagrees.

"The Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire." *Luis v. United States*, 136 S. Ct. 1083, 1089 (2016). The Supreme Court has held that the pre-trial seizure of untainted assets can violate a defendant's Sixth Amendment right to counsel if lack of funds prevents the defendant from hiring the attorney of their choice. *Id.* at 1090. If a Defendant makes a prima facie showing that their Sixth Amendment rights are implicated, the Court must hold a hearing to determine whether release of funds is necessary. *United States v. Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir. 1993). Such a hearing is not automatic, however, and will be held only upon a properly supported motion by a Defendant. "Due process does not automatically require a hearing and a defendant may not simply ask for one." *United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:18-cv-06742-RGK-PJW | Date | December 20, 2019 |
|---|---|---|---|
| Title | *In the Matter of Seizure of: Any and all funds held in Republic Bank of Arizona Accounts* | | |

The Court must hold a hearing on whether release of funds is necessary to pay for counsel if "the moving papers filed, including affidavits, are sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented." *Unimex*, 991 F.2d at 551. Although the Ninth Circuit has not spoken directly to the issue, numerous other circuits have required at least some showing that the Defendant lacks other funds to pay counsel. *United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998) ("[a]s a preliminary matter, a defendant must demonstrate to the court's satisfaction that she has no assets, other than those restrained, with which to retain private counsel[.]"); *United States v. Bonventre*, 720 F.3d 126, 128 (2d Cir. 2013) ("a defendant seeking a . . . hearing must demonstrate, beyond the bare recitation of the claim, that he or she has insufficient alternative assets to fund counsel of choice.")

Here, Claimants have made no attempt at such a showing. Their motion makes no reference to their present availability of funds, and the Court cannot find anything in the hundreds of pages of exhibits that they have submitted from which it can draw any inference on the subject. As such, the Court finds that Defendants have failed to make the necessary prima facie showing to justify a hearing on release of funds to pay for counsel.

### E. Claimants' Motion for Return of Property Under Rule 41(g) Is Foreclosed by the Present Forfeiture Action

Finally, Claimants argue that "if the Court does not vacate the seizures in their entirety . . . it should nonetheless vacate them to the extent the Government has failed to trace the proceeds it seized to specific alleged criminal acts." (Claimants' Auth. 9:18–20). Specifically, Claimants argue that the Government has not adequately connected the seizures with specific illegal acts, and they oppose the Government's decision to seize the entire balances of accounts in which Backpage funds had been commingled with non-Backpage funds on the theory that the "untainted funds were purportedly used to 'facilitate' the laundering of Backpage-related funds." *Id.* at 10:3–5. Claimants therefore request a hearing in which the Government will bear the burden of tracing the seized funds to illegal activity. *Id.* at 18–23. As the Court finds that such a hearing is foreclosed by the ongoing civil forfeiture proceedings, Claimants' request for an additional preliminary tracing hearing is denied.

Despite the opportunity for additional briefing, Claimants have not identified what the legal mechanism for this requested relief is, nor have they suggested what legal standard the Court should apply. The Court therefore treats this aspect of the present Motion as a motion for the return of property under Rule 41(g).

General challenges to the seizure warrants are foreclosed by the ongoing civil forfeiture action, which provides Claimants the appropriate avenue through which to pursue the return of their property.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | 2:18-cv-06742-RGK-PJW | | Date | December 20, 2019 |
|---|---|---|---|---|
| Title | *In the Matter of Seizure of: Any and all funds held in Republic Bank of Arizona Accounts* | | | |

*See United States v. Fitzen*, 80 F.3d 387, 389 (9th Cir. 1996) ("[T]he federal Government may defeat a Rule 41(e)[2] motion by demonstrating that the property is subject to federal forfeiture."); *United States v. Van Cauwenberghe*, 934 F.2d 1048, 1061 (9th Cir.1991) ("[A] Rule 41(g) motion is properly denied if . . . the property is contraband or subject to forfeiture[.]").

The Court agrees that further proceedings are necessary, but they are available through continuation of this case. In this action, Claimants will have the opportunity to present evidence, identify with specificity the funds which they assert are improperly seized, and make a full argument for their return. The Court will not at this point, however, simply "vacate" the seizure warrants to the extent that Claimants argue they are unjustified. The Court therefore denies Claimant's Motion insofar as it requests relief that would be properly brought under Rule 41(g).

The Court notes that its holding in this order does not extend to Claimant Lacey's separate Motion for Return of Untainted Funds (ECF No. 22), which it will address separately.

**V.    CONCLUSION**

For the foregoing reasons, Claimants' Motion is **DENIED**.

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer
_____

---

[2] A previous version of Rule 41 included "Motion to Return Property" under subsection 41(e).