1   MICHAEL BAILEY
    United States Attorney
2   District of Arizona

3   KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
    MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
4   PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
    ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
5   Assistant U.S. Attorneys
    40 N. Central Avenue, Suite 1800
6   Phoenix, Arizona 85004-4408
    Telephone (602) 514-7500

7   JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
    Special Assistant U.S. Attorney
8   312 N. Spring Street, Suite 1200
    Los Angeles, CA 90012
9   Telephone (213) 894-3391

10  BRIAN BENCZKOWSKI
    Assistant Attorney General
11  Criminal Division, U.S. Department of Justice

12  REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
    Senior Trial Attorney, U.S. Department of Justice
13  Child Exploitation and Obscenity Section
    950 Pennsylvania Ave N.W., Room 2116
14  Washington, D.C. 20530
    Telephone (202) 616-2807
15  Attorneys for Plaintiff

16              IN THE UNITED STATES DISTRICT COURT

17                 FOR THE DISTRICT OF ARIZONA

18

19  United States of America,              No. CR-18-422-PHX-SMB

20                 Plaintiff,
                                           **MOTION TO ADMIT EVIDENCE OF**
21        v.                               **MURDERS IMPLICATING**
                                           **BACKPAGE**
22  Michael Lacey, et al.,

23                 Defendants.

24

25              **SUMMARY OF ARGUMENT**

26        Defendants' knowledge that prostitution proliferated on Backpage.com is a central

27  issue in this prosecution.   At trial, the government will demonstrate that Backpage

28  facilitated prostitution through an array of business practices.   These practice included,

                              - 1 -

among others, a financial relationship with The Erotic Review, aggregating content from competing prostitution websites, and moderation practices that sanitized prostitution ads.

The Court has held that, as alleged in the Superseding Indictment, the First Amendment is not a viable defense for Defendants.  (Doc. 793.)  Accordingly, Defendants' primary defense at trial likely will focus on whether they possessed specific intent to violate the Travel Act.  To support their defense, Defendants likely will argue that they did not know that Backpage.com was used almost exclusively for prostitution, let alone intend to promote or facilitate that unlawful activity.  The evidence, however, belies this argument.

As discussed below, Defendants knew that a number of prostitutes who advertised on Backpage were murdered.  Defendants knew about these murders through a variety of mediums, including their own internal tracking of news stories, search warrants and subpoenas from law enforcement, high-profile news programs and newspaper articles, and civil lawsuits.  The publicity generated by these violent crimes led Defendants to strategize about the company's response and attempt to minimize the negative impact of these stories.  This evidence is highly probative in supporting the government's theory that Defendants knew about the website's true nature, and helps demonstrate how the company's business practices facilitated the criminal activities of the prostitutes and pimps who used the website.  The evidence shows that despite receiving repeated news stories and other notice of these violent crimes, Defendants persisted in their efforts to expand Backpage's volume of prostitution advertising and related revenue growth.  The probative value of this evidence is not substantially outweighed by the danger of unfair prejudice.  The evidence should be admitted.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Defendants' Knowledge About Relevant Murders

Defendants knew about the violent crimes that occurred to women advertised on its website.  The best evidence of their knowledge is that they maintained their own internal spreadsheet that catalogued news articles that referenced Backpage.  In 2014, Defendant Scott Spear directed internal Backpage staff to track stories that implicated the company.

1   The result was a spreadsheet that categorized the stories as negative, neutral, or positive.

2   (Spreadsheet attached as Exhibit B.)  Various public relations firms retained by Backpage

3   utilized this list.  Backpage general counsel Elizabeth McDougall and others attempted to

4   identify stories that cast Backpage in a positive light.  This list contained numerous articles

5   of prostitution stings, arrests of pimps for child sex trafficking, and murders implicating

6   Backpage. Some of the more high profile cases (many referenced in the Superseding

7   Indictment) are detailed below.  Beyond cataloguing these stories internally, many of the

8   Defendants were made aware of these violent crimes in other ways as well, including press

9   accounts, law enforcement inquiries, and subpoenas—both for documents and to testify at

10  a murder trial.

11          **A.      The Detroit Backpage Murders**

12          In December 2011, four woman were murdered after being advertised on Backpage

13  for prostitution.  (*Murdered Women in Detroit Linked to Backpage.com, Cops Say*,

14  published Dec. 27, 2011, attached as Ex. C.)   Defendants knew about these murders as

15  evidenced through their work with public relations firms, receipt of Google Alerts, internal

16  email exchanges, and a brand analysis report prepared by an outside firm.

17                  i.      Defendants' Coordination with Public Relations Firms

18          To handle the fallout from the negative publicity that resulted from this quadruple

19  murder, Defendants Lacey and Larkin engaged the services of Sitrick—a public relations

20  firm.[1]   Lacey exchanged emails with Sitrick to formulate a response that included

21  deflecting the blame to other prostitution websites.   This is evidenced by an email to Lacey

22  and others, where an attorney (Ed McNally) stated "were [sic] better off just muddying the

23  waters out there today with the news of the 22 websites."  (Email dated December 29, 2011,

24  from McNally to Lacey and others, attached as Ex. E.)

25          At trial, the government believes the evidence will show that the content on these

26  ───────────
27          [1] In response to a grand jury subpoena seeking email exchanges between Lacey (and
    other Backpage owners) and the public relation companies, Backpage took the position
    that these communications were protected by the attorney-client privilege. Senior Judge
28  David C. Campbell found that many of these emails were not afforded these protections
    and ordered the emails disclosed. (*See* April 2, 2018 Order, attached as Exhibit D.)

22 websites often originated from Backpage.  This fact was also well known to Defendants Lacey, Larkin and Spear.  Further, The Erotic Review was also one of these 22 websites, which had a longstanding financial and business relationship with Backpage.  The Erotic Review was a website where "Johns" provided reviews of the services of prostitutes, including underage trafficking victims.  (*See* Doc. 446 at 11-12; Doc. 446-1 at 40-76.)  Backpage made monthly payments to The Erotic Review in accordance with invoices that referred to the company as "Elms Web Services, Inc." (Ex. F).  When the owner of The Erotic Review (David Elms) was arrested in a prostitution sting, Larkin emailed Spear and Ferrer alerting them to Elms's arrest.  (Ex. G.)  Simply put, the effort to deflect blame on other websites including The Erotic Review is, at a minimum, highly misleading, but nevertheless, relevant to knowledge of prostitution occurring on Backpage.com.

In addition to the email exchanges between Lacey and Larkin shortly after the murders, Lacey and Larkin's apparent personal attorney Don Bennett Moon ("Moon") and McDougall had email exchanges with another public relations firm.  In these emails, they discussed contacting the Detroit Free Press in an effort to discourage the newspaper from referring to the quadruple murders as the "Backpage murders."  (Email dated June 9, 2012 attached as Ex. H.)  They apparently decided not to approach the newspaper with this request.

ii.     Google Alerts

At trial, the government will present evidence that many of the Defendants set up Google Alerts to keep informed of any news stories about Backpage.[2]  Defendants received an average of three to four articles per day detailing arrests of pimps and prostitutes, rescues of child sex trafficking victims, murders, and many other news stories about Backpage.  Several alerts featured articles that chronicled the arrest, trial, and appeal in the Detroit Backpage murder case.  (*See* Exs. I and J; Google alerts for Spear dated January 2, 2012 and Larkin dated May 5, 2012.)

---

[2] Google Alerts is a service that sends emails to the user when it finds new results—such as web pages, newspaper articles, blogs, or scientific research—that match the user's search term(s).

### iii.    Internal Emails Between Lacey and Larkin

Lacey and Larkin, as Backpage's majority owners, had the most to lose financially from bad publicity.  They would often ruminate about various strategies to counter negative publicity.   In one such exchange, Larkin asks Lacey "why can't we admit these are prostitutes" and concludes by wondering, "how long before cops catch someone in Detroit."  (Email attached as Ex. K.)

### iv.    Brand Analysis Report

In 2011, Defendants hired public relations firm Goddard Global to help devise a public relations strategy for Backpage.  Goddard recommended that Backpage retain Greenberg Quinlan Rosner ("GQR"), a strategic advice consulting firm, to conduct a "brand analysis" of Backpage.  Larkin agreed and entered into a contract with GQR.  (Contract attached as Ex. L.)   In June 2012, Greenberg issued a report entitled "Backpage.com Media and Digital Brand Analysis." (Report attached as Ex. M.)  In the report, GQR finds that media coverage about Backpage breaks down into five major categories.  (*Id.* at 2.)  One of those categories is "Police Blotter," which is described as "stories about someone getting busted for using Backpage.com," including news stories about police stings, prostitution arrests, and murders.  (*Id.*)  The report further notes that "the very end of 2011 saw a huge news spike related to the Detroit murders.  This spike related to the Detroit murders also appears in Twitter, but is only nominally apparent in the blogs and other social media." (*Id.* at 7-8.)   In short, the brand analysis report further demonstrates Defendants' knowledge about the Detroit Backpage murders.

## B.    Murder of Victim 6, C.M.

On June 22, 2012, a "john" stabbed Victim 6, C.M., to death at an apartment complex in Scottsdale, Arizona.  This murder is alleged in the Superseding Indictment.  (Doc. 230 ¶ 165; *see also* Ex. N.)  On the same day, law enforcement contacted Backpage's CEO Carl Ferrer, and requested that Backpage "freeze" C.M.'s ads.  (Email dated June 22, 2012, attached as Ex. O; Victim 6's Backpage ads are attached as Ex. P.)  On July 4, 2012, the Scottsdale Police Department served a search warrant on Backpage seeking all the ads

1   associated with C.M.  (Search Warrant attached as Ex. Q.)

2       **C.**    **Strangulation and Murder of A.H.**

3       On October 14, 2014, A.H. was murdered at a Motel 6 in Hammond, Indiana.  (Ex.

4   R.)  The murderer, Darren Vann, had arranged to meet A.H. through an advertisement

5   posted on Backpage.com.  (*Id.*)  Vann's case received extensive national coverage because

6   Vann admitted to killing *six* other woman.  Backpage catalogued this murder on an internal

7   spreadsheet it maintained to track press stories.  (Ex. B at 92, 134, 139, 141, 150, 160, 167,

8   171, 173, 177, 179.)  In addition, Backpage's general counsel—McDougall—was asked to

9   comment on Backpage's connection to the murder, but she declined. (*See* Ex. S.)

10       **D.**    **Murder of Victim 15, J.W.**

11       On June 10, 2015, Victim 15, J.W., was murdered after she fled from her assailant's

12   vehicle and was struck by oncoming traffic.  (*See* Ex. T; Doc. 230 at ¶ 174.)  J.W. was

13   working as prostitute and her assailant was her pimp.  She was posted on Backpage shortly

14   before her murder.  (*See* Ex. U.)  In addition to publicity surrounding this murder

15   Defendants were on notice of this murder because the investigating Detective subpoenaed

16   J.W.'s ads and a Backpage custodian was subpoenaed to appear at trial and authenticate

17   the ads.  The New Orleans Deputy District attorney made efforts to locate a witness at

18   Backpage that could authenticate the Backpage postings at trial.  First, she contacted

19   attorney Steve Ross from Akin Gump.[3]  (Ex. V.)  Ultimately, she filed a motion to secure

20   the attendance of an out-of-state witness from Backpage and advised the company that a

21   witness was required.  She also exchanged emails with a Backpage employee regarding the

22   need for a records custodian to authenticate the victim's postings on Backpage.  (Ex. W.)

23   A Backpage employee provided a declaration certifying the authenticity of the postings.

24   (*Id.*)

25       **E.**    **Murder of Victim 14**

26       On June 20, 2015, Victim 14's body was found inside a car in northwest Dallas

27

---

28       [3]Akin Gump  represented Defendants Lacey, Larkin and Ferrer in litigation related to the U.S. Senate investigation of Backpage.

about ten miles from Backpage's corporate headquarters.  (*See* Doc. 230 ¶ 173.)  The Dallas Morning News publicized the murder.  (Ex. X.)  At trial, the investigating detective will testify about the crime's connection to Backpage.  The victim's father is expected to testify that he contacted Backpage by email following the murder and requested that they remove his daughter's postings from the website.  (Doc. 230 ¶ 173; Ex. Y.)  Despite his efforts, Backpage did not immediately comply.

### F.    Murder of Victim 16, C.W.

On August 17, 2015, the body of Victim 16, C.W., was found in an alley on Detroit's west side, four years after the Detroit quadruple murder.  (Ex. Z; Doc. 230, ¶ 175.)  It was later determined that the assailant was Jerome Moore and he met Victim 16 on Backpage.com.  (*Id*.)  Investigating detectives subpoenaed Backpage for the victim's ads and a custodian testified at trial.  (*See* Ex. AA.)

### G.    Murder of D.R.

On Christmas Eve 2016, in a Chicago suburb, the body of 16-year-old D.R. was found in a garage.  She was beaten to death.  (*Slain Teen's Mom Seeks Answers About Alleged Sex Trafficking*, attached as Ex. BB.)  D.R. was advertised on Backpage.  (Ex. CC.)  A highly-publicized investigation and subsequent prosecution determined that she was trafficked by a pimp on Backpage.  D.R.'s family sued Backpage.  An article detailing the lawsuit asked Backpage for a comment and none was forthcoming.  (*See* Ex. DD.)  On May 17, 2017, the victim's mother, Y.A., sued Backpage in state court and held a press conference. (*See* Complaint, attached as Ex. EE.)

On July 11, 2017, the Washington Post published a front-page article detailing newly-discovered documents concerning Backpage and including statements from Y.A. (Article attached as Ex. FF.)  Y.A. discussed the facts of her lawsuit against Backpage. The article noted that Y.A.'s lawsuit was just one of eight civil cases filed by sex trafficking victims filed against Backpage in 2017.  (*Id*.)  On September 19, 2017, Y.A. testified before the Senate Subcommittee overseeing the investigation of Backpage.  McDougall was asked for comment but declined.

## II.     Federal Rules of Evidence and Applicable Law Support Admission

The Federal Rules of Evidence and applicable case law support the admission of this evidence at trial.  Clearly, the evidence discussed above is relevant, so the question before the Court will be, under Rule 403, is the evidence unfairly prejudicial.  In making evidentiary determinations, a trial court is "accorded a wide discretion in determining the admissibility of evidence under the Federal Rules."  *United States v. Abel*, 469 U.S. 45, 54 (1984).  Under Rule 403, however, "the balance in close cases is struck in favor of admission" of the evidence.  *Id.*

Unfair prejudice is "prejudice of the sort which clouds impartial scrutiny and reasoned evaluation of the facts, which inhibits neutral application of principles of law to the facts as found."  *United States v. Starnes*, 583 F.3d 196, 215 (3d Cir. 2009).  "[U]nfair prejudice does not simply mean damage to the opponent's cause.  If it did, most relevant evidence would be deemed [unfairly] prejudicial."  *Id.*

Consequently, courts have admitted extremely prejudicial evidence when its probative value is significant.  *See United States v. LeMay*, 260 F.3d 1018, 1027-29 (9th Cir. 2001) (evidence that the defendant had previously molested other young relatives under similar circumstances properly admitted under Rule 403); *United States v. Cardena*, 842 F.3d 959, 992 (7th Cir. 2016) (offer to cooperate); *United States v. Moore*, 641 F.3d 812, 827 (7th Cir. 2011) (dogfighting evidence to show control of premises); *United States v. Green*, 617 F.3d 233, 251-52 (3d Cir. 2010) (attempted murder properly admitted in drug trial to prove motive and bias); *United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998) (evidence that the defendant inserted gun into girlfriend's vagina properly admitted under Rule 403 to prove the defendant's intent and role in scheme).

While Rule 403 recognizes that relevant evidence may, on occasion, impede the search for truth, it requires a careful assessment of probative value and its countervailing concerns—and tips the scales decidedly in favor of admitting relevant evidence.  The Rule also provides the judge with discretion to remedy potential prejudice by instruction.  The Rule embodies a respect for jury resolution of fact disputes that is grounded in long history

and experience.  Here, in light of the defense that Defendants had no knowledge of the true nature of the postings, evidence of these highly-publicized murders should be admitted, leaving to the jury the task of assessing the relative weight of evidence as it resolves fact issues about Defendants' knowledge and makes a fully-informed decision about guilt.

**III.    Conclusion**

Evidence of the murders detailed above is relevant and probative with respect to the question of Defendants' guilt and should be admitted at trial.

Respectfully submitted this 17th day of April, 2020.

MICHAEL BAILEY
United States Attorney
District of Arizona

*s/ Kevin M. Rapp*

KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW C. STONE
Assistant U.S. Attorneys

JOHN J. KUCERA
Special Assistant U.S. Attorney

BRIAN BENCZKOWSKI
Assistant Attorney General
U.S. Department of Justice
Criminal Division, U.S. Department of Justice

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

1

**<u>CERTIFICATE OF SERVICE</u>**

2

I hereby certify that on April 17, 2020, I electronically transmitted the attached

3

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4

Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance

5

as counsel of record.

6

*s/Zachry Stoebe*
U.S. Attorney's Office

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT

# C

# Murdered Women in Detroit Linked to Backpage.com, Cops Say

## ABC Digital

**National**

**Published at 2:36 am, December 27, 2011**

SHARE THIS

iStockphoto/Thinkstock(DETROIT) — Three of four women whose dead bodies were found in the trunks of burning cars in Detroit over the past eight days had profiles on the adult services section of Backpage.com, police said on Monday, warning women that the killer may be trolling the site for more victims.

The bodies of two women were found in a burning car on Dec. 19, and then another pair were found on Christmas, police said.  They were both found within blocks of one another on the city's east side.

Detroit police chief Ralph Godbee Jr. stopped short of saying the crimes were the work of a serial killer, but said he felt it was important to get the word out about the link investigators had found.

"This tie for us is disconcerting," Godbee Jr. said Monday at a news conference.  "We're stopping short of calling it a serial pattern."

"We are not passing judgment on any individual who is utilizing this website, yet we felt it was imperative to alert the public that deciding to meet unknown persons via the Internet can be extremely dangerous," he said.

Investigators have not determined a cause of death for the four women.

Backpage.com, like craigslist.com, is an Internet bulletin board with listings for everything from child care to auto parts and forums on numerous topics.

Craigslist.com took down its "adult services" section after several widely publicized cases, including the so-called "Craigslist Killer" case, in which Phillip Markoff was charged with the armed robbery and murder of a masseuse he had hired through the

website, and the armed robbery of two other women he also found through the site.  Markoff committed suicide in jail awaiting trial.

Copyright 2011 ABC News Radio

# EXHIBIT

# D

1
2
3
4
5
6                    **IN THE UNITED STATES DISTRICT COURT**
7                        **FOR THE DISTRICT OF ARIZONA**
8
9
10                                              |   **ORDER**
11   *In re* Grand Jury Subpoena No. 16-04-108  |   **(SEALED)**
12                                              |
13
14

15        The government has filed a motion to compel Backpage.com, LLC and its CEO,
16   Carl Ferrer (collectively, "Backpage"), to produce certain documents that have been
17   withheld in response to a grand jury subpoena.  Backpage has withheld the documents on
18   the basis of the attorney-client privilege.  Backpage responded to the motion, the
19   government filed a reply, and the Court held a hearing on February 9, 2018.  As a result
20   of the hearing, the Court required Backpage to produce evidence to support factual
21   assertions made in its response to the motion and at the hearing.  Backpage provided five
22   declarations and two documents for *in camera* review.  The parties dispute whether this
23   evidence is sufficient to establish the attorney-client privilege.
24        Three categories of documents are at issue.  Backpage has withheld documents
25   reflecting communications between its attorneys and three public relations ("PR") firms:
26   Culloton Strategies, Sitrick & Company, and JMS Public Relations.  Backpage has also
27   withheld communications with SSP Blue, a company established and operated by
28   Hemanshu Nigam, a former federal prosecutor.  Finally, Backpage has withheld one

email between outside counsel and Duff & Phelps, an investment bank.  For the reasons that follow, the court will grant the motion in part.

## I.      Legal Standard.

The attorney-client privilege protects confidential communications that reflect or facilitate legal advice from an attorney.  *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981).  The Supreme Court has explained the privilege's purpose:

> Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.  The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.

*Id.* at 389.  "[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."  *Id.* at 390.

Application of the privilege requires case-by-case analysis, *id.* at 396-97, and the party asserting the privilege "has the burden of establishing the existence of an attorney-client relationship *and* the privileged nature of the communication," *United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010) (emphasis in original) (internal quotation marks omitted).  Privilege issues generally are resolved under federal common law, with exceptions not applicable here. Fed. R. Evid. 501.  In the Ninth Circuit, an eight-part test determines whether information is covered by the attorney-client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*Graf*, 610 F.3d at 1156.  Disclosure of attorney-client communications to third parties generally waives the privilege.  *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126-27 (9th Cir. 2012).

1  **II.     PR Firms.**

2          Backpage has withheld communications among the PR firms, Backpage

3  employees, and Backpage attorneys.  U.S. Mot. Compel at 9-10.  Backpage contends that

4  it did not waive the privilege by communicating with these firms because they are the

5  functional equivalents of Backpage employees.  Backpage Opp'n Mot. Compel at 8-13.

6  Backpage alternatively relies on a district court holding that such communications are

7  protected where the PR and litigation strategies are inextricably intertwined.  Court's

8  Livenote Tr. (Feb. 9, 2018); Backpage Reply Evid. Sub. at 2, 13-17.  Backpage does not

9  argue that the firms acted as agents of outside counsel.   Court's Livenote Tr.

10  (Feb. 9, 2018); Backpage Opp'n Mot. Compel at 8-13.

11          **A.     Background.**

12          Backpage presents evidence that government executives, law enforcement

13  agencies, and the media began to pressure Backpage in 2010 to improve its efforts to

14  combat sex trafficking activity on its website.  McNally Decl. ¶ 2; Suskin Decl. ¶ 6;

15  Bugaighis Decl. Exs. C-I.  At that time, Backpage lacked an in-house PR department to

16  handle its response.  McNally Decl. ¶ 3; Suskin Decl. ¶ 5.

17          Backpage's outside counsel therefore hired the PR firms to provide that service.

18  Outside counsel retained Culloton in March 2011 and Sitrick in November 2011 as

19  "expert consultants" who provided "confidential consulting advice and PR services to

20  facilitate legal advice" to Backpage.  McNally Decl. ¶ 2; *see also* Suskin Decl. ¶ 8.

21  Outside counsel supervised their work.  Suskin Decl. ¶ 8.  Culloton and Sitrick worked

22  directly with outside counsel and Backpage principals "to plan and implement strategies

23  addressing legal issues and public communications . . . and to ensure that public

24  statements and responses to inquiries, demands and criticisms from public officials, law

25  enforcement, the media and others were as accurate and as effective as possible and

26  consistent with the law and [Backpage's] legal positions and strategies."  McNally Decl.

27  ¶ 3; *see also* Suskin Decl. ¶ 8.  Outside counsel rendered confidential advice to Culloton

28  and Sitrick "concerning draft communications, public statements and press releases, and

1    meetings with public officials, NGOs and others as regarded legal issues, [Backpage's]

2    legal positions, and related issues."  McNally Decl. ¶ 4.  Culloton and Sitrick "provided

3    confidential advice, including regarding [Backpage's] legal media strategy and how to

4    best implement it."   McNally Decl. ¶ 4.   "Both firms were a significant part of

5    [Backpage's] legal teams, addressing certain risks to and opportunities for [Backpage],

6    and the possibility of litigation or other government actions or proceedings."  McNally

7    Decl. ¶ 4.

8          Outside counsel SSP Blue "sub-contracted . . . JMS Public Relations to vet, under

9    [SSP Blue's] direct supervision, any media inquiries.  Along with other internal and

10   external legal counsel, Backpage and [SSP Blue] determined what response, if any, was

11   provided and what statements, if any, would be made."  Nigam Decl. ¶ 12.  JMS "worked

12   at [SSP Blue's] direction and at the direction of other legal counsel representing

13   Backpage specifically to vet only those media inquiries that were related to matters for

14   which [SSP Blue] was retained to provide legal advice and counsel."  Nigam Supp. Decl.

15   ¶ 2.  JMS "had no independent authority and discretion to make business decisions on

16   Backpage's behalf."  Nigam Supp. Decl. ¶ 2.

17         **B.    Functional Equivalence Doctrine.**

18         In *Graf*, the Ninth Circuit held that a third party can be the "functional equivalent"

19   of a corporate employee and therefore entitled to communicate with corporate legal

20   counsel under the attorney-client privilege.  610 F.3d at 1159.  The outside consultant in

21   *Graf* was an individual who helped form the company, "regularly communicated with

22   [customers] and others on behalf of [the company], marketed the company's insurance

23   plans, managed its employees, and was the company's voice in its communications with

24   counsel."  *Id.* at 1152-53, 1157.  *Graf* noted that the outside consultant was "the

25   company's primary agent in its communications with corporate counsel" and was

26   "empowered to act on behalf of the corporation."  *Id.* at 1159 (internal quotation marks

27   omitted).  The Ninth Circuit found the consultant to be "a functional employee" of the

28   company, and that his communications with outside counsel were therefore entitled to the

1    same privilege protection as communications by regular employees.  *Id.*  In so holding,

2    the Ninth Circuit followed the Eighth Circuit's decision in *In re Bieter Co.*, 16 F.3d 929

3    (8th Cir. 1994).  *Id.* at 1158-59.  *Bieter* had also found that the individual before it "was

4    in all relevant respects the functional equivalent of an employee."  *Bieter*, 16 F.3d at 938.

5                       **1.    Legal Standard.**

6             The government asks the Court to interpret the functional equivalence doctrine

7    narrowly, identifying multiple elements that must be present for functional equivalence.

8    U.S. Resp. Evid. Sub. at 3-9.  Backpage counters that the government's argument is

9    inconsistent with the way in which courts have applied the doctrine.  Backpage Reply

10   Evid. Sub. at 7-12.

11            Neither *Graf* nor *Bieter* identified the relevant factors to consider in applying the

12   functional equivalence doctrine.  And many district courts simply consider the unique

13   circumstances of each case, without adopting any particular standard, in determining

14   whether the third party is the functional equivalent of an employee.  *See, e.g.*, *Sierra Dev.*

15   *Co. v. Chartwell Advisory Grp., Ltd.*, No. 3:13-CV-0602-RTB  (VPC), 2016

16   WL 4107680, at *4-5 (D. Nev. Aug. 1, 2016) (proponent failed to make the detailed

17   factual showing necessary to establish functional equivalence); *United States v. Ormat*

18   *Indus., Ltd.*, No. 3:14-cv-00325-RCJ-VPC, 2016 WL 4107682, at *7 (D. Nev.

19   Aug. 1, 2016) (proponent failed to provide a detailed factual showing of similarity of

20   duties or possession of relevant information about the client); *United States v. Lonich*,

21   No. 14-cr-00139-SI-1, 2016 WL 1733633, at *6-7 (N.D. Cal. May 2, 2016) (party failed

22   to provide sufficient evidence to justify functional equivalence); *Obesity Research Inst.,*

23   *LLC v. Fiber Research Int'l, LLC*, No. 15-cv-0595-BAS-MDD, 2016 WL 931077, at *3

24   (S.D. Cal. Mar. 11, 2016) (raw material supplier was not a functional employee of a

25   company that purchased from him); *W. Sugar Coop. v. Archer-Daniels-Midland Co.*, No.

26   CV 11-3473-CBM (PJWx), 2015 WL 12696192, at *2 (C.D. Cal. Nov. 4, 2015) (PR firm

27   was a functional equivalent because it provided the same services an in-house PR

28   department would); *Medversant Techs., L.L.C. v. Morrisey Assocs., Inc.*, No.

CV 09-05031 MMM (FFMx), 2011 WL 13124128, at *4-5 (C.D. Cal. July 20, 2011) (PR firm was a functional equivalent because it acted as the client's "public relations department").

The District of Nevada appears to have adopted a broad approach: "the pivotal question is 'whether the consultant performs duties similar to those performed by an employee and whether by virtue of that relationship, he or she possesses information about the company that would assist the company's attorneys in rendering legal advice.'" *See Sierra Dev. Co.*, 2016 WL 4107680, at *3 (quoting *Fosbre v. Las Vegas Sands Corp.*, Nos. 2:10-cv-00765-APG-GWF, 2:10-cv-01210-APG-GWF, 2016 WL 183476, at *5 (D. Nev. Jan. 14, 2016)); *see also United States ex. rel. Strom v. Scios, Inc.*, No. C05-3004 CRB (JSC), 2011 WL 4831193, at *4 (N.D. Cal. Oct. 12, 2011) (the "dispositive question is the consultant's relationship to the company and whether by virtue of that relationship he possesses information about the company that would assist the company's attorneys in rendering legal advice").

Other courts have identified limiting factors.  Most notably, the court in *Export-Import Bank of the United States v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. 103 (S.D.N.Y. 2005), explained:

> To determine whether a consultant should be considered the functional equivalent of an employee, courts look to whether the consultant had primary responsibility for a key corporate job, whether there was a continuous and close working relationship between the consultant and the company's principals on matters critical to the company's position in litigation, and whether the consultant is likely to possess information possessed by no one else at the company.

*Id.* at 113 (internal citations omitted).

In *Upjohn*, the Supreme Court extended the attorney-client privilege to a low-level employee outside the "control group" at the highest levels of management.  449 U.S. at 394-95.  Finding no reason to distinguish between corporate executives and lower-level corporate employees, the *Upjohn* Court emphasized that the employees (1) spoke on

behalf of the company to counsel, (2) at the direction of superiors, and (3) possessed helpful information about the corporation.  *Id.* at 394.

Looking to *Upjohn*, the *Bieter* court saw no reason to distinguish between an employee and a third party consultant who (1) had daily interaction with corporate employees, (2) was involved in the principal mission of the business, (3) was authorized to represent the company, (4) possessed unique information about the company, and (5) acted at the direction of corporate superiors. 16 F.3d at 938, 940.  "It is only natural that, just as middle-level – and indeed lower-level – employees would have the relevant information needed by corporate counsel if he is adequately to advise the client with respect to actual or potential difficulties, so too would nonemployees who possess a significant relationship to the client and the client's involvement in the transaction that is the subject of legal services."  *Id.* at 938 (internal quotation marks omitted).

The Ninth Circuit also looked to *Upjohn* in adopting *Bieter*'s reasoning and the functional equivalence doctrine.  *Graf*, 610 F.3d at 1158-59.  "The *Bieter* court reasoned that 'too narrow a definition of 'representative of the client' will lead to attorneys not being able to confer confidentially with nonemployees who, due to their relationship to the client, possess the very sort of information that the privilege envisions flowing most freely.'"  *Id.* at 1158 (quoting *Bieter*, 16 F.3d at 937-38).  *Graf* found no reason to distinguish between a corporate employee and an independent contractor who (1) had authority to represent the company, (2) managed corporate employees, and (3) communicated with corporate counsel on behalf of the company.  *Id.* at 1159.

These cases suggest that a third party is the functional equivalent of a corporate employee when he or she (1) has authority to speak on behalf of the corporation to counsel, (2) performs duties associated with the corporation's ordinary course of business, (3) works under the supervision of the corporation, and (4) possesses helpful information about the corporation due to his or her relationship with it.  These factors strike an appropriate balance between the traditionally narrow attorney-client privilege and the reality of today's corporate workplace.  *Compare Graf*, 610 F.3d at 1156

("Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." (internal quotation marks omitted)) *with Fosbre*, 2016 WL 183476, at *4 ("corporations increasingly conduct their business not merely through regular employees but also through a variety of independent contractors retained for specific purposes" (internal quotation marks omitted)).

### 2.    Analysis.

Looking to these factors, the Court concludes that Backpage has failed to establish the functional equivalence of the three PR firms.

First, Backpage has not established that the firms had authority to speak on behalf of the corporation to counsel.  The evidence shows that the PR firms participated in discussions with Backpage principals and counsel regarding appropriate public communications strategy, but Backpage has presented no evidence that the firms were empowered to represent Backpage or make decisions on its behalf in communications with counsel.  *See Graf*, 610 F.3d at 1159 ("[A]s fictitious entities, corporations can seek and receive legal advice and communicate with counsel only through individuals *empowered to act on behalf of* the corporation[.]" (emphasis added) (internal quotation marks omitted)).

Second, Backpage has not shown that the PR firms performed duties associated with the corporation's ordinary course of business.  Backpage's evidence instead makes clear that the firms were retained for a narrow set of litigation-related PR tasks.  The evidence does not demonstrate that Backpage hired these firms to act as its PR department in the regular course of business.

Third, Backpage has not shown that the PR firms worked under the supervision of the corporation.  The declarations clearly state that outside counsel supervised each PR firm.

Finally, Backpage has not shown that the PR firms possessed helpful information about the corporation due to their relationship with it.  The evidence shows that the firms

provided consulting advice regarding PR strategy, but there is no indication that they provided information *about* Backpage.

For these reasons, the Court finds that Culloton, Sitrick, and JMS were not the functional equivalents of Backpage employees.[1]

## C.    *In re Grand Jury Subpoenas*.

Backpage alternatively relies on *In re Grand Jury Subpoenas*, 265 F. Supp. 2d 321 (S.D.N.Y. 2003), for the proposition that communications with PR firms are subject to the attorney-client privilege.  Court's Livenote Tr. (Feb. 9, 2018).  That case concerned the target of a grand jury investigation whose counsel retained a PR firm to assist in crafting a strategy to influence publicity about a criminal investigation.  265 F. Supp. 2d at 323.   The target's counsel was concerned that negative publicity would pressure prosecutors to seek a significant indictment.  *Id.*  The target produced evidence that the PR firm's assignment differed from standard PR work: "its target audience was not the public at large.  Rather, [the PR firm] was focused on affecting the media-conveyed message that reached the prosecutors and regulators responsible for charging decisions in the investigations concerning" the target.  *Id.* at 323-24.  The district court concluded:

> the ability of lawyers to perform some of their most fundamental client functions – such as (a) advising the client of the legal risks of speaking publicly and of the likely legal impact of possible alternative expressions, (b) seeking to avoid or narrow charges brought against the client, and (c) zealously seeking acquittal or vindication – would be undermined seriously if lawyers were not able to engage in frank discussions of facts and strategies with the lawyers' public relations consultants.

*Id.* at 330.  The court accordingly held that "(1) confidential communications (2) between lawyers and public relations consultants (3) hired by the lawyers to assist them in dealing

---

[1] This conclusion is buttressed by several additional considerations identified in the cases cited above: (1) whether the third-party relationship existed before the litigation, (2) whether the third party has primary responsibility for a key corporate function, (3) whether the third party manages corporate employees, (4) whether the third party performs duties already performed by the corporation, (5) whether the third party works at the corporation's office, and (6) whether the third party has daily interaction with corporate employees.  Backpage has not satisfied any of these considerations.

with the media in cases *such as this* (4) that are made for the purpose of giving or receiving advice (5) directed at the handling of the client's problems are protected by the attorney-client privilege." *Id*. at 331 (emphasis added).  Backpage cites no Ninth Circuit decision that has adopted this holding.

The Court need not decide whether the holding in *In re Grand Jury Subpoenas* is good law because the Court concludes that the holding is narrow and Backpage has not shown it would apply here.  The case marked only a narrow expansion of the attorney-client privilege, specifically emphasizing that it applied to PR firms "hired by the lawyers to assist them in dealing with the media in cases *such as this*." *Id*. (emphasis added). The precise challenge faced by the lawyers in that case was to prevent media pressure from causing or expanding their client's indictment.  265 F. Supp. 2d at 323.  Backpage, which has the burden of establishing the existence of the privilege, *Graf*, 610 F.3d at 1156, has not shown that a similar situation existed in this case.

Backpage's declarations speak only in general terms about its repeated criticism in the media.  McNally Decl. ¶ 2 (Backpage was "facing an increasing number of public and other criticisms and challenges from government officials and others"); Suskin Decl. ¶ 6 ("Backpage faced an increasing number of public and other criticisms and challenges from public officials and others").  Of the news articles provided by Backpage, three were negative and one was positive.  Bugaighis Decl. Exs. E (July 2011 article describing local government efforts to persuade Backpage to strengthen its policies to prevent illegal advertising), F (May 2012 article describing Backpage as "the foremost classified advertising website for adult services – even if the ages and circumstances of some of the people selling those services remain questionable"), G (June 2012 article arguing that criticism of Backpage is misplaced), H (January 2012 article describing pimp's use of Backpage to prostitute a minor).  And letters from state attorneys general requested that Backpage improve policies and mechanisms to combat sex trafficking.  Bugaighis Decl. Exs. C (September 2010 request that Backpage take additional steps to prevent or screen illegal advertisements), D (August 2011 request for information – in lieu of a subpoena – to substantiate Backpage's assertions regarding efforts to prevent illegal advertisements).

To be sure, Backpage faced public scrutiny and calls to improve its efforts to combat sex trafficking.  But Backpage does not show that an indictment was imminent as in *In re Grand Jury Subpoenas*, or that the public scrutiny affected its legal position in any way.  The evidence instead suggests that the public scrutiny affected Backpage's business interests.  *See* Bugaighis Decl. Exs. F ("Major brands such as H&M, IKEA and Barnes & Noble recently pulled ads from publications owned by Backpage.com parent company Village Voice Media."), G (quoting calls for American Apparel, Best Buy, Disney, Dominos, H&M, IKEA, REI, and T-Mobile to stop advertising on Backpage), G (Goldman Sachs sold its stake in Backpage after receiving negative publicity for its association with the website).

More importantly, the evidence does not substantiate Backpage's assertion that the public scrutiny affected its criminal liability.  Court's Livenote Tr. (Feb. 9, 2018).  Backpage relies on the enactment of three state laws that would expose Backpage to criminal liability.  *See* Backpage Opp'n Mot. Compel at 5-6.  But Backpage concedes that enforcement of each law was enjoined on *legal* grounds as a likely violation of the First Amendment and as preempted by the federal law granting it immunity.  *Id.* (citing *Backpage.com, LLC v. Hoffman*, No. 13-cv-03952 (DMC)(JAD), 2013 WL 4502097, at *5-11 (D.N.J. Aug. 20, 2013) (granting preliminary injunction against enforcement of New Jersey law that prohibited sale of advertisements for commercial sex abuse of minors); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 828, 840 (M.D. Tenn. 2013) (granting preliminary injunction against enforcement of Tennessee law that prohibited the sale of sex-related advertisements); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1278, 1284 (W.D. Wash. 2012) (same with respect to a Washington law)).  Backpage also appears to rely on a July 2013 letter from state attorneys general to U.S. congressmen requesting an amendment to a federal law that immunizes Backpage from state criminal liability for the actions of its users.  Bugaighis Decl. Ex. I.  But this evidence from July 2013 could not have motivated Backpage's 2010, 2011, and 2012 communications with the PR firms.  U.S. Mot. Compel Exs. I, J, K.

1    In short, Backpage has presented insufficient evidence to show that it would fall

2 within the narrow holding of *In re Grand Jury Subpoenas* – that it faced the same kind of

3 imminent criminal prosecution as the target in that case.  Thus, even if that case is good

4 law, the Court cannot conclude that its narrow holding would apply here.

5    Companies often face public scrutiny and potential criminal and civil liability.

6 The Court cannot conclude that *In re Grand Jury Subpoenas* extends the attorney-client

7 privilege to PR firms whenever serious public challenges arise.  Courts, including the

8 Ninth Circuit, construe the attorney-client privilege narrowly.  Backpage has not shown

9 that *In re Grand Jury Subpoenas* would extend it to the communications with the PR

10 firms in this case.

11 **III.    SSP Blue.**

12    Backpage withheld approximately 350 emails reflecting communications with SSP

13 Blue.  U.S. Mot. Compel at 13.  The government does not dispute that SSP Blue was

14 founded and is operated by Hemanshu Nigam, an attorney who formerly worked as a

15 federal prosecutor.  U.S. Mot. Compel at 13.  The government argues, however, that SSP

16 Blue "does not hold itself out as a law firm and states in its marketing materials that it

17 specializes in the provision of security, privacy, and crisis management services –

18 amorphous terms that often connote business (as opposed to legal) advice."  U.S. Reply

19 at 10; *see also* U.S. Mot. Compel at 13-14.  The Court agreed at the February 9 hearing

20 that this evidence shifted the burden to Backpage to "come forward with some evidence

21 that he was functioning as a lawyer in the work that he did with respect to these 350

22 emails."  Court's Livenote Tr. (Feb. 9, 2018).

23    Backpage has provided the Court with a declaration from Mr. Nigam which states

24 that he provided legal advice and services to Backpage.  Nigam Decl. ¶¶ 9-11.  The

25 government contests this assertion and offers evidence that at least part of Mr. Nigam's

26 role was to facilitate introductions.  U.S. Resp. Evid. Sub. at 11-12.  In light of this mixed

27 role, the government asserts, Mr. Nigam must attest that each of the 350 emails reflects

28

legal advice.  U.S. Resp. Evid. Sub. at 11-12.  The government asks the Court to conduct an *in camera* review of the emails.  U.S. Resp. Evid. Sub. at 12.

The Ninth Circuit has stated that a privilege log and supporting affidavits can be sufficient to establish the existence of the attorney-client privilege.  *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992).  Backpage has satisfied this standard.  Mr. Nigam clearly is an attorney, and his declaration establishes that he provided legal advice to Backpage.  The government does not dispute that the privilege log characterizes the 350 emails as legal advice.  The Court will not require further production of communications with SSP Blue.

**IV.  Duff & Phelps.**

Backpage relied on the attorney-client privilege to withhold an email between its outside counsel and Duff & Phelps.  U.S. Mot. Compel at 8-9.  The government contests this assertion of privilege, arguing that Duff & Phelps is an investment bank that helped Backpage secure corporate financing.  U.S. Mot. Compel at 8-9.  Backpage counters that its outside counsel "required the assistance of a corporate financial advisor, Duff & Phelps," to advise Backpage concerning corporate restructuring and ensure "compliance with statutory and regulatory requirements."  Backpage Opp'n Mot. Compel at 14-15 (internal quotation marks omitted).

Although disclosure of attorney-client communications to third parties generally waives the privilege, *In re Pac. Pictures Corp.*, 679 F.3d at 1126-27, an exception applies to third parties "engaged to assist the attorney in providing legal advice," *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011).  "If the advice sought is not legal advice, but, for example, accounting advice from an accountant, then the privilege does not exist." *Id.*  The Court therefore directed Backpage to substantiate its argument "with some evidence that Duff & Phelps was acting in a way that was necessary to the rendering of the legal advice" from an attorney.  Court's Livenote Tr. (Feb. 9, 2018).

Backpage has submitted the two privilege log entries and the two associated documents for *in camera* review.  It contends that the 14 days allowed by the Court made

1   it impossible for Backpage to procure other evidence to support its assertion of privilege.

2   Backpage Supp. Mem. at 2-3.  But when the Court asked if Backpage would like more

3   time to assemble its evidence, Backpage's counsel responded:  "I think we can do it" by

4   the Court's deadline.  Court's Livenote Tr. (Feb. 9, 2018).

5          Having reviewed the document in camera, the Court cannot accept the privilege

6   log's characterization of the email and attachment as "information to facilitate legal

7   advice from outside counsel . . . regarding regulatory issues."  U.S. Mot. Compel Ex. H.

8   Duff & Phelps does not appear to be providing any information at all.  Outside counsel

9   simply forwards to Duff & Phelps and certain Backpage employees a list of questions and

10  answers that appear to include both legal and business advice.  The email does not

11  indicate who prepared the questions and answers.  Backpage has supplied no evidence

12  from which the Court can find that Duff & Phelps was anything other than a third party

13  whose receipt of an alleged attorney-client communication waived the privilege.

14         **IT IS ORDERED:**  The government's motion to compel is **granted in part** and

15  **denied in part**.  Backpage shall produce the Culloton Strategies, Sitrick & Company,

16  JMS Public Relations, and Duff & Phelps documents to the government by

17  **April 16, 2018**.

18         Dated this 2nd day of April, 2018.

19

20

21  _____

22  David G. Campbell
    United States District Judge

23

24  cc: All counsel by cd on 4/2/2018

25

26

27

28

- 14 -

# EXHIBIT

# E

| | |
|---|---|
| **From:** | Tony Knight [Tony_Knight@sitrick.com] |
| **Sent:** | Thursday, December 29, 2011 3:49 PM |
| **To:** | Jim Larkin; Edward E. McNally |
| **Cc:** | Michael Lacey; Steve Suskin; Mike Sitrick; Carl Ferrer |
| **Subject:** | RE: Tony pls make any edits in Lacey's draft (att'd) (priv + conf) |
| **Attachments:** | Tlk Pts and QA for AC360 v3.0 12-28-11.docx |

Attached please find a revised talk pts and QA with a point added about today's release and a couple of new questions and answers at the bottom.

-----Original Message-----
From: Jim Larkin [mailto:jim.larkin@villagevoicemedia.com]
Sent: Thursday, December 29, 2011 7:33 AM
To: Edward E. McNally
Cc: Tony Knight; Michael Lacey; Steve Suskin; Mike Sitrick; Carl Ferrer
Subject: Re: Tony pls make any edits in Lacey's draft (att'd) (priv + conf)

Ed:
We DO not need to pick a fight with DPD, the websites are the story. The story is calming down around the country, let's not create another news hook.
Larkin

Sent from my iPhone

On Dec 29, 2011, at 8:01, "Edward E. McNally" <EMcNally@kasowitz.com> wrote:

> Thanks Lacey.
>
> Tony, Re: Detroit Free Press, and your guidance on how we should best
> use this play:
>
> I suppose Suskin could encourage her to ask DPD why they held a press
> conf on Monday to single out Backpage -- and then have SAT on issuing
> any public warnings re: these 22 other websites for now, 2 or 3 days?
>
> The risk is be careful what we ask for.  DPD could feel compelled to
> respond w/ info they are otherwise not giving out.  Like "we have
> texts or computer or other evidence that it was the BP sites that were
> actually used to contact these victims".
>
> Obviously, we're much better off just muddying the waters out there
> today with the news of the 22 websites ... And not putting DPD on the
> spot, re: making them feel compelled to justify why they didn't issue
> the other 22 names.
>
> So, this analysis makes me think that, as you enter your own edits, we
> should tone down anything re: DPD.  We just need to get the reality of
> the 22 websites out there.
>
>
>
>
> Edward E. McNally
> Kasowitz, Benson, Torres & Friedman LLP

1

Highly Confidential

> 1633 Broadway
> New York, New York 10019
> Tel. (212) 506-1708
> Fax (212) 835-5279
> EMcNally@kasowitz.com
>
> -----Original Message-----
> From: Michael Lacey [mailto:michael.lacey@villagevoicemedia.com]
> Sent: Thursday, December 29, 2011 9:51 AM
> To: Edward E. McNally
> Cc: Jim Larkin; Tony Knight; Steve Suskin; Mike Sitrick; Carl Ferrer
> Subject: Re: List of 22 other websites -- draft statement by
> Backpage.com (priv + conf)
>
> folks
>
> attached suggested edits ( prepared to be corrected re importance of
> tech data) lacey
>
> On 12/29/11, Edward E. McNally <EMcNally@kasowitz.com> wrote:
>> priv & conf -- atty-client comms & work product
>>
>> Larkin, Lacey, Steve and Tony --
>>
>> Would appreciate any edits to the attached proposed statement,
>> releasing the names of the 22 other websites that link to the Detroit
>> investigations.
>>
>> Chief Godbee texted me on my cell at 7:46 a.m. this morning to
>> acknowledge that he had received last night's Notice re: "speak now
>> or
>
>> forever hold your peace".  By their acknowledgement and silence, DPD
>> has indicated that there is no information from our proposed Notice
>> that they have asked us to withhold.  Carl is running some final
>> checks this a.m. on the five url links that BP has proposed for
>> release (they are currently in the draft).
>>
>> The att'd draft includes many of the strong talking points that were
>> in Steve's first statement on Tuesday.  We can't assume that
>> reporters
>
>> will go back and check to see what else Steve has said, previously,
>> so
>
>> we are including all the original strong statements about BP in here.
>>
>> At Don Moon's excellent suggestion, the first paragraph includes an
>> acknowledgement that there are real world grieving families in
> Detroit.
>>
>> My suggestion, subject to improvements by you and Tony, is that
>> Suskin
>
>> should first provide this statement and list to his contact at the
>> Detroit Free Press right away this morning.  And let them break it as
>> an exclusive, on a release we will not release more generally until

2

Highly Confidential                                                    BP-AZGJ_01110826

```
>> (say?) 12:00 noon.  Something like that.  But if Tony or you see a
>> better play, feel free to jump in.
>>
>> Then at noon Steve would send it to AP and all the others he
>> transmitted Tuesday's statement to --
>>
>> Your edits and suggestions are welcome --
>>
>> thanks -- McNally
>>
>>
>>
>>
>>
>>
>>
>> Edward E. McNally
>> Kasowitz, Benson, Torres & Friedman LLP
>> 1633 Broadway
>> New York, New York 10019
>> Tel. (212) 506-1708
>> Fax (212) 835-5279
>> EMcNally@kasowitz.com
>>
>>
>> This e-mail and any files transmitted with it are confidential and
>> may
>
>> be subject to the attorney-client privilege. Use or disclosure of
>> this
>
>> e-mail or any such files by anyone other than a designated addressee
>> is unauthorized. If you are not an intended recipient, please notify
>> the sender by e-mail and delete this e-mail without making a copy.
>>
>>
> <Detroit.DOC>
```

Highly Confidential                                          BP-AZGJ_01110827

# EXHIBIT

# EE

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| YVONNE AMBROSE, individually and as Administrator for the  Estate of Desiree Robinson, Deceased, | ) ) ) ) | |
| Plaintiffs, | ) ) | 2017L004979 CALENDAR/ROOM R TIME 00:00 FI Other |
| V. | ) ) ) | No. |
| BACKPAGE.COM, L.L.C.; BACK PAGE, L.L.C.; MEDALIST HOLDINGS, L.L.C.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO HOLDINGS, L.L.C.; DARTMOOR HOLDINGS, L.L.C.; IC HOLDINGS, L.L.C.; NEW TIMES MEDIA, L.L.C., UGC TECH GROUP C.V.; and ANTONIO ROSALES | ) ) ) ) ) ) ) ) ) ) | **PLAINTIFFS DEMAND TRIAL BY JURY** |
| Defendants. | ) ) | |

**JURY DEMAND**

The undersigned demands a jury trial.

Respectfully Submitted,
ROMANUCCI & BLANDIN, LLC

By: _B Raveendran_

Bhavani Raveendran
Attorney for the Plaintiff

Bhavani Raveendran
ROMANUCCI & BLANDIN
321 N. Clark St.; Ste 900
Chicago, IL  60654
Tel: (312) 458-1000
Fax: (312) 458-1004
Email: nward@rblaw.net
Attorney No.: 35875

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, Deceased, | ) ) ) ) | 2017L004979 CALENDAR/ROOM R TIME 00:00 PI Other |
| Plaintiffs, | ) ) | |
| V. | ) ) | No. |
| BACKPAGE.COM, L.L.C.; BACK PAGE, L.L.C.; MEDALIST HOLDINGS, L.L.C.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO HOLDINGS, L.L.C.; DARTMOOR HOLDINGS, L.L.C.; IC HOLDINGS, L.L.C.; NEW TIMES MEDIA, L.L.C., UGC TECH GROUP C.V.; and ANTONIO ROSALES | ) ) ) ) ) ) ) ) ) ) ) | **PLAINTIFFS DEMAND TRIAL BY JURY** |
| Defendants. | ) | |

**AFFIDAVIT REGARDING DAMAGES SOUGHT**

BHAVANI RAVEENDRAN, being first duly sworn under oath, states as follows:

1.      That your affiant is one of the attorneys of record for the party in this matter.

2.      That the total money damages sought in this civil action exceeds $50,000.

FURTHER AFFIANT SAYETH NOT.

_B. Raveend_

Bhavani Raveendran

Bhavani Raveendran
ROMANUCCI & BLANDIN
321 N. Clark St.; Ste 900
Chicago, IL 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
Email: nward@rblaw.net
Attorney No.: 35875

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| YVONNE AMBROSE, individually and as Administrator for the   Estate of Desiree Robinson, Deceased, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| V. | ) ) ) | No. 2017L004979  CALENDAR/ROOM R  TIME 00:00  FI Other |
| BACKPAGE.COM, L.L.C.; BACK PAGE, L.L.C.; MEDALIST HOLDINGS, L.L.C.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO HOLDINGS, L.L.C.; DARTMOOR HOLDINGS, L.L.C.; IC HOLDINGS, L.L.C.; NEW TIMES MEDIA, L.L.C., UGC TECH GROUP C.V.; and ANTONIO ROSALES | ) ) ) ) ) ) ) ) ) ) ) ) | **PLAINTIFFS DEMAND**  **TRIAL BY JURY** |
| Defendants. | ) | |

## COMPLAINT AT LAW

Now comes the Plaintiff YVONNE AMBROSE, individually and as Administrator for

the Estate of Desiree Robinson, deceased, by her attorneys, Romanucci & Blandin, LLC, and for

their Complaint against Defendants, BACKPAGE.COM, L.L.C.; BACK PAGE, L.L.C.;

MEDALIST HOLDINGS, L.L.C.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO

HOLDINGS, L.L.C.;  DARTMOOR HOLDINGS, L.L.C.;  IC HOLDINGS, L.L.C.; NEW

TIMES MEDIA, L.L.C., UGC TECH GROUP C.V.; and ANTONIO ROSALES; state as

follows:

## NATURE OF THE ACTION

1.    DESIREE ROBINSON was a minor girl who was sold for sex on the website

1

www.backpage.com. On December 24, 2016, using www.backpage.com, 32 year old Defendant

Anthony Rosales met and raped DESIREE ROBINSON, a 16 year old minor. Upon information

and belief, after the rape, Anthony Rosales punched ROBINSON in the face, strangled her as she

tried to call for help, and/or used a knife to slash ROBINSON's throat.  In addition to claims

against Anthony Rosales, DESIREE ROBINSON's mother and next of kin, YVONNE

AMBROSE, is bringing this case against the Backpage.com defendants because the

Backpage.com defendants knowingly created and managed an online marketplace for sex

trafficking on www.backpage.com, and then helped sex traffickers create and develop their sex

ads so the Backpage.com defendants could profit from the ads. The Backpage.com defendants

not only told sex traffickers how to avoid detection by law enforcement, but they actively

sanitized sex ads to make it less obvious that the ads were for sex. The Backpage.com defendants

have generated tens of millions of dollars in profit from the illegal sex ads posted on

www.backpage.com.

## PARTIES, JURISDICTION, AND VENUE

### Plaintiff

2.　　　At all relevant times, decedent DESIREE ROBINSON was a citizen of the United

States and a resident of the City of Chicago, County of Cook, State of Illinois.

3.　　　At the time of her death on December 24, 2016, DESIREE ROBINSON was a

minor girl who was 16 years old.

4.　　　At all relevant times, YVONNE AMBROSE was the biological mother of

ROBINSON and a citizen of the United States, residing in the City of Chicago, County of Cook,

State of Illinois.

5.     On May 16, 2017, the Circuit Court of Cook County appointed Plaintiff, YVONNE AMBROSE, as the Administrator to Collect for the Estate of DESIREE ROBINSON. (Court No.: 2017 P 2614).

6.     Plaintiff YVONNE AMBROSE is the next of kin to DESIREE ROBINSON.

**Defendants**

7.     Defendant Backpage.com L.L.C. is a Delaware limited liability company. During the time that DESIREE ROBINSON was exploited and advertised for sex on www.backpage.com, Backpage.com, L.L.C., owned, operated, designed and controlled the website, including its content. Defendant Backpage.com L.L.C., also profited from the website www.backpage.com, including the sex ads posted of DESIREE ROBINSON and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant Backpage.com, L.L.C., transacted business in Cook County, Illinois, and purposefully availed itself of Cook County, Illinois, and the citizens of Cook County, Illinois, including through the www.backpage.com website.

8.     Defendant Back Page, L.L.C. is a Delaware limited liability company. During the time that DESIREE ROBINSON was exploited and advertised for sex on www.backpage.com, Back Page, L.L.C. owned, operated, designed and controlled the website, including its content. Defendant Back Page L.L.C., also profited from the website www.backpage.com, including the sex ads posted of DESIREE ROBINSON and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant Back Page, L.L.C., transacted business in Cook County, Illinois, and purposefully availed itself of Cook County, Illinois, and the citizens of Cook County, Illinois, including through the www.backpage.com website.

3

9.     Defendant Medalist Holdings L.L.C., is a Delaware limited liability company. During the time that DESIREE ROBINSON was exploited and advertised for sex on www.backpage.com, Medalist Holdings, L.L.C., owned, operated, designed and controlled the website, including its content. Defendant Medalist Holdings L.L.C. also profited from the website www.backpage.com, including the sex ads posted of DESIREE ROBINSON and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant Medalist Holdings, L.L.C., transacted business in Cook County, Illinois, and purposefully availed itself of Cook County, Illinois, and the citizens of Cook County, Illinois, including through the www.backpage.com website.

10.    Defendant Leeward Holdings, L.L.C., is a Delaware limited liability company. During the time that DESIREE ROBINSON was exploited and advertised for sex on www.backpage.com, Leeward Holdings, L.L.C., owned, operated, designed and controlled the website, including its content. Defendant Leeward Holdings, L.L.C., also profited from the website www.backpage.com, including the sex ads posted of DESIREE ROBINSON and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant Leeward Holdings, L.L.C., transacted business in Cook County, Illinois, and purposefully availed itself of Cook County, Illinois, and the citizens of Cook County, Illinois, including through the www.backpage.com website.

11.    Defendant Camarillo Holdings, L.L.C., is a Delaware limited liability company. During the time that DESIREE ROBINSON was exploited and advertised for sex on www.backpage.com, Camarillo Holdings, L.L.C. owned, operated, designed and controlled the website, including its content. Defendant Camarillo Holdings, L.L.C., also profited from the website www.backpage.com, including the sex ads posted of DESIREE ROBINSON and of

other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant Camarillo Holdings, L.L.C. transacted business in Cook County, Illinois, and purposefully availed itself of Cook County, Illinois, and the citizens of Cook County, Illinois, including through the www.backpage.com website.

12.     Defendant Dartmoor Holdings, L.L.C., is a Delaware limited liability company. During the time that DESIREE ROBINSON was exploited and advertised for sex on www.backpage.com, Dartmoor Holdings, L.L.C., owned, operated, designed and controlled the website, including its content. Defendant Dartmoor Holdings, L.L.C., also profited from the website www.backpage.com, including the sex ads posted of DESIREE ROBINSON and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant Dartmoor Holdings, L.L.C. transacted business in Cook County, Illinois, and purposefully availed itself of Cook County, Illinois, and the citizens of Cook County, Illinois, including through the www.backpage.com website.

13.     Defendant IC Holdings, L.L.C., is a Delaware limited liability company. During the time that DESIREE ROBINSON was exploited and advertised for sex on www.backpage.com, IC Holdings, L.L.C., owned, operated, designed and controlled the website, including its content. Defendant IC Holdings, L.L.C., also profited from the website www.backpage.com, including the sex ads posted of DESIREE ROBINSON and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant IC Holdings, L.L.C. transacted business in Cook County, Illinois, and purposefully availed itself of Cook County, Illinois, and the citizens of Cook County, Illinois, including through the www.backpage.com website.

14.     Defendant New Times Media, L.L.C., is a Delaware limited liability company. During the time that DESIREE ROBINSON was exploited and advertised for sex on www.backpage.com, New Times Media, L.L.C., owned, operated, designed and controlled the website, including its content. Defendant New Times Media, L.L.C. also profited from the website www.backpage.com, including the sex ads posted of DESIREE ROBINSON and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant New Times Media, L.L.C., transacted business in Cook County, Illinois, and purposefully availed itself of Cook County, Illinois, and the citizens of Cook County, Illinois, including through the www.backpage.com website.

15.     Defendant UGC Tech Group C.V. is a Dutch company domiciled in Curacao. During the time that DESIREE ROBINSON was exploited and advertised for sex on www.backpage.com, UGC Tech Group C.V. owned, operated, designed and controlled the website, including its content. UGC Tech Group C.V. also profited from the website www.backpage.com, including the sex ads posted of DESIREE ROBINSON and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant UGC Tech Group C.V. transacted business in Cook County, Illinois, and purposefully availed itself of Cook County, Illinois, and the citizens of Cook County, Illinois, including through the www.backpage.com website.

16.     Defendants, Backpage.com L.L.C., Back Page, L.L.C., Medalist Holdings L.L.C., Leeward Holdings, L.L.C., Camarillo Holdings, L.L.C., Dartmoor Holdings, L.L.C., IC Holdings, L.L.C., New Times Media, L.L.C., and UGC Tech Group C.V., are hereinafter collectively referred to throughout this complaint as the "Backpage  Defendants" or "Backpage.com Defendants."

17.     To the extent any of the Backpage.com defendants assert that they are not liable for the claims of YVONNE AMBROSE, individually and as Administrator for the Estate of DESIREE ROBINSON, deceased, because of their status as a corporation, limited liability company, or other business entity, or because they were acting on behalf of a corporation, limited liability company, or other business entity, any such protections must be disregarded because the Backpage.com defendants have intentionally tried to use those protections to avoid liability for their knowingly illegal conduct, including profiting from conduct that they knew was illegal. The Backpage Defendants have taken significant profits from conduct that they know is illegal, yet they would attempt to use those protections in order to avoid any liability or accountability for their knowingly illegal conduct and for knowingly accepting illegal profits. It is black letter law that individuals and entities, including corporate officers and owners, may be held liable if they participate in wrongful conduct or have knowledge of wrongful conduct and approve of the wrongful conduct. Plaintiff alleges that each of the Backpage.com defendants knew all of the facts that are alleged in this complaint, including the fact they were accepting significant profits from the illegal sex ads on www.backpage.com, such as the sex ads exploiting DESIREE ROBINSON.

18.     To the extent any of the Backpage.com defendants assert that they are not liable for the claims of YVONNE AMBROSE, individually and as Administrator for the Estate of DESIREE ROBINSON, deceased, because of their status as a corporation, limited liability company, or other business entity, or because they were acting on behalf of a corporation, limited liability company, or other business entity, any such protections must be disregarded because the Backpage.com defendants are the alter ego of one another.

19.     To the extent any of the Backpage.com defendants assert that they are not liable for the claims of YVONNE AMBROSE, individually and as Administrator for the Estate of DESIREE ROBINSON, deceased, because of their status as a corporation, limited liability company, or other business entity, or because they were acting on behalf of a corporation, limited liability company, or other business entity, any such protections must be disregarded because the Backpage.com defendants have been undertaking a joint venture.

20.     To the extent any of the Backpage.com defendants assert that they are not liable for the claims of YVONNE AMBROSE, individually and as Administrator for the Estate of DESIREE ROBINSON, deceased, because of their status as a corporation, limited liability company, or other business entity, or because they were acting on behalf of a corporation, limited liability company, or other business entity, any such protections must be disregarded because the Backpage.com defendants are partners in the acts alleged herein.

21.     As more detailed in the Senate report that is attached as Exhibit A, the Backpage.com Defendants tried to use a wide range of entities to deflect the fact that a few individuals and entities owned and controlled www.backpage.com and took the profits from its illegal operations. There has been such unity of ownership and interest that the separateness of the corporation has ceased to exist.

22.     Upon information and belief, Defendant Anthony Rosales is a resident of Cook County, Illinois. At all times relevant hereto, and while knowing Plaintiff DESIREE ROBINSON was a minor child, defendant Anthony Rosales engaged in communications with DESIREE ROBINSON for immoral, exploitative and illegal purposes, actively attempted to solicit sex with DESIREE ROBINSON, solicited sex with DESIREE ROBINSON, and raped,

abused, assaulted, and eventually killed DESIREE ROBINSON. All of these activities took place in Cook County, Illinois.

23.     DESIREE ROBINSON was raped, abused and killed in the City of Markham, Cook County, Illinois.

24.     As discussed more fully herein, many of the acts and omissions giving rise to this action occurred in Cook County, Illinois; DESIREE ROBINSON resided in Cook County, Illinois; YVONNE AMBROSE resides in Cook County, Illinois, and all of the defendants conduct, or conducted, business in Cook County, Illinois, including at the time of the acts and omissions giving rise to this lawsuit.

## ALLEGATIONS COMMON TO ALL COUNTS

### A. At all relevant times, Backpage was the Largest Source of Sex Trafficking in the United States, Making Millions of Dollars Yearly from the Commercial Sex Trade.

25.     Under U.S. law, human trafficking includes, among other things, the unlawful practice of selling, soliciting, or advertising the sexual services of minors or of adults who have been coerced into participating in commercial sex.

26.     The crime of human trafficking generates billions of dollars each year in illegal proceeds, making it more profitable than any transnational crime except drug trafficking.

27.     The United State Congress designated the National Center for Missing & Exploited Children (NCMEC) to be the "official national resource center and information clearinghouse for missing and exploited children." 42 U.S.C. § 5773(b)(1)(B). Among its 22 statutorily authorized duties, NCMEC assists law enforcement in identifying and locating victims of sex trafficking and operates a "cyber tipline," which collects reports of Internet-related child sexual exploitation, including suspected child sex trafficking. Id. §§ 5773(b)(1)(P)(3), (b)(1)(V).

28.     In 2015, the NCMEC reported that between 100,000 and 300,000 youth are "at risk" for commercial sexual exploitation annually in the United States. *See* http://www.missingkids.org/en_US/publications/missingchildrenstatecare.pdf.

29.     In 2014, the United State Department of Justice has reported that more than half of sex-trafficking victims are 17 years old or younger.

30.     The NCMEC also reported an 846% increase in reports of suspected child sex trafficking from 2010 to 2015 — a spike the organization found to be "directly correlated to the increased use of the Internet to sell children for sex."

31.     According to the latest report from NCMEC, 73% of the suspected child trafficking reports it receives from the public involve Backpage.

32.     According to the Massachusetts Attorney General, "[t]he vast majority of prosecutions for sex trafficking now involve online advertising, and most of those advertisements appear on Backpage."

33.     Backpage.com is a classified advertising website that was launched in 2004.

34.     At all times relevant, www.backpage.com has been the largest source of online human sex trafficking in the United States, generating millions of dollars in profit yearly.

35.     Upon information and belief, in 2014, the Backpage.com defendants generated $135 million in revenue, the vast majority of which was generated from illegal ads for sex on www.backpage.com.

36.     Backpage.com is the market leader in commercial sex advertising and has been linked to thousands of reported cases of sex trafficking, including the trafficking of children.

**B.  At all relevant times, Backpage knew It Facilitated Prostitution and Child Sex Trafficking.**

37.     The Backpage.com Defendants intentionally created an online marketplace for sex trafficking and through their efforts www.backpage.com became the largest source of online human sex trafficking in the United States.

38.     The Backpage.com Defendants knowingly developed a reputation for www.backpage.com as a website where sex traffickers and prostitutes advertise commercial sex to customers. The Backpage.com defendants, through the development, marketing, and operation of the "escort" section of www.backpage.com, intentionally created a context where each individual post on its escort website can be readily ascertained as an advertisement for prostitution. This is often referred to as "normalizing," wherein sex traffickers who post sex ads on www.backpage.com review other sex ads on the website and then try to emulate with their own ads what is "normal."

39.     The Backpage.com defendants have profited tens of millions of dollars from the sex ads posted on the www.backpage.com website. The Backpage.com defendants made these profits, and kept these profits, despite knowing that the profits were generated as a result of illegal sex trafficking.

40.     The Backpage.com defendants conspired with sex traffickers and prostitutes to advertise women and children for sale on the www.backpage.com website.

41.     For example, the Backpage.com defendants knew that sex traffickers and prostitutes were paying the Backpage.com Defendants a fee to post sex ads on www.backpage.com, including in the "escort" section.

42.     The Backpage.com defendants knew that the vast majority of their annual revenue and profits were generated by ads for illegal sex, including ads of women and children who were being trafficked for sex.

11

43.     Thousands of prostitution advertisements and advertisements for sex with minors appeared on www.backpage.com every day, including dozens, if not hundreds, that were targeted at Illinois citizens, including Cook County citizens.

44.     The entire business model of the Backpage.com defendants is built on generating revenue and profit from sex trafficking, even though the defendants try to conceal their unlawful activity by asserting that the website is "like Craigslist." In reality, the Backpage.com defendants knew that advertisements for anything other than prostitution were simply serve as a cover to conceal their illegal operations that generate the vast majority of the website's revenue and profits.

45.     The vast majority of the Backpage.com Defendants' revenue and profit comes primarily from sex trafficking advertisements.

46.     The Backpage.com Defendants used a category on www.backpage.com called "Escorts" knowing full well that all advertisements therein were for sex.

47.     The Backpage.com Defendants knew that in the world of illicit human sex trafficking, the word "escort" stands for and in place of "prostitute" and means virtually the same thing. Escort customers are known as "johns" or "tricks." The predators that exploit and control the prostitutes for financial gain are "pimps."

48.     The Backpage.com defendants knew all of this and intentionally developed their website to require information that promoted this illegal trade to occur through their website, including the illegal trafficking of women and underage children.

**C.  Backpage Assisted in the Development of Sex Ads by Knowingly, Systematically and Intentionally Editing "Adult" Ads in an Effort to "Sanitize" Them.**

49.     After creating the marketplace, the Backpage.com defendants intentionally helped sex traffickers create and develop the content of their ads on www.backpage.com, including

requiring information that promoted sex trafficking and the sex trade of women and children, so that the Backpage.com defendants could profit from each ad.

50.     When media outlets and law enforcement began to scrutinize the illegal activity occurring on www.backpage.com, the Backpage.com defendants took steps to help sex traffickers create ads that would avoid detection by law enforcement so that the Backpage.com defendants could continue to profit from those ads.

### 1. *Backpage Coaches Users via its Posting Rules and Content Requirements.*

51.     The Backpage.com Defendants also developed "posting rules" and "content requirements" that sex traffickers and prostitutes were required to follow in order to post sex ads in the "escort" section of the website. The Backpage defendants asserted in public, including to law enforcement, that the "posting rules" and "content requirements" were intended to prevent sex trafficking ads from appearing on www.backpage.com, including in the "Escort" section.

52.     However, the Backpage.com Defendants knew that the vast majority of the ads in the "Escort" section were sex trafficking ads and that the ads violated the "posting rules" and "content requirements." Nearly every ad in the "escort" section, for example, included one or more photographs of a so called "escort" in skimpy lingerie and sexually suggestive poses, such as spreading their legs at the camera or bending over and putting their thong clad rear ends on display, followed by a price, such as $150 per hour, a name, and a phone number.

53.     The Backpage.com defendants knew that the "posting rules" and "content requirements" served no purpose but to provide them with a way to publicly claim that they were not promoting and profiting from prostitution and sex trafficking of women and children.

54.     Backpage.com coached its customers on how to post "clean" ads for illegal transactions.

55.     When a user attempted to post an ad with a forbidden word, the user would receive an error message identifying the problematic word choice to "help" the user, as Defendant Ferrer put it.

56.     For example, in 2012, a user advertising sex with a "teen" would get the error message: "Sorry, 'teen' is a banned term."

57.     Through simply redrafting the ad, the user would be permitted to post a sanitized version featuring the same escort.

58.     Backpage.com employed a similarly helpful error message in its "age verification" process for adult ads.

59.     In October 2011, Defendant Ferrer directed a Backpage technology consultant to create an error message when a user supplied an age under 18. Ferrer stated that, "An error could pop up on the page: 'Oops! Sorry, the ad poster must be over 18 years of age.'" With a quick adjustment to the poster's putative age, the ad would post.

60.     Backpage has "more stringent rules to post an ad to sell a pet, a motorcycle, or a boat [as compared to a commercial sex ad]. For these ads, you are required to provide a verified phone number." Testimony of Yiota G. Souras, Senior Vice President & General Counsel, National Center for Missing and Exploited Children (NCMEC), before Permanent Subcommittee on Investigations (Nov. 19, 2015).

61.     In another internal email in October 2010, Mr. Ferrer expressed concerns that sex traffickers would be unhappy if the company actually banned their sex trafficking ads that violated the "posting rules" and "content requirements." Mr. Ferrer concluded that banning the sex trafficking ads would be "too harsh." Instead, Mr. Ferrer directed the employees of the Backpage.com defendants that it was "[b]etter to edit by removing bad text or removing bad

language" so that sex traffickers could "adjust."

2. *Backpage Sanitizes Sex Ads via Manual and Automated Editing.*

62.    The Backpage.com defendants also began "moderating" sex ads, which is the term they used for reviewing and editing sex ads on www.backpage.com.

63.    As early as 2006, Backpage executives began instructing staff responsible for screening ads (known as "moderators") to edit the text of adult ads to conceal the true nature of the underlying transaction.

64.    Just like their "posting rules" and "content requirements," the Backpage.com defendants claimed publicly that their "moderation" practices were intended to prevent sex trafficking on www.backpage.com.

65.    However, the Backpage.com defendants knew that their "moderators" were actually reviewing sex ads on www.backpage.com and then sanitizing the ads by making it less obvious that the ads were for sex.

66.    The "moderators" sanitized the sex ads by manually removing or editing language that directly or indirectly indicated that the ad was for sex.

67.    The "moderators" also removed images that indicated the ad was for sex.

68.    After sexually suggestive text and images were removed, the "moderators" would post the remainder of the ad.

69.    Through this "moderation" practice, the Backpage.com defendants were able to reap tens of millions of dollars in profits from advertisements that they knew were generated from illegal sex ads and sex trafficking.

70.    In an October 2016 deposition, a former "moderator" admitted his job as a moderator for the Backpage.com defendants was "to basically sanitize ads for prostitution." The

moderator admitted he sanitized ads by removing terms or images that suggested the ads were for sex for money. He would then post the sanitized ad, even though he knew the ad was a person who was trying to sell sex for money.

71.     In addition to manual editing by "moderators," the Backpage.com defendants also engaged in automatic "moderation" of sex ads on www.backpage.com.

72.     By October 2010, Backpage executives formalized a process of both manual and automated deletion of incriminating words and phrases, primarily through a feature called the "Strip Term From Ad Filter."

73.     At the direction of Backpage executive, Carl Ferrer, the company programmed this electronic filter to "strip"—that is, delete—hundreds of words indicative of sex trafficking (including child sex trafficking) or prostitution from ads before their publication.

74.     When a user posted an ad with certain words that directly or indirectly indicated the ad was for sex, the website would remove the offending language and then post the remainder of the ad.

75.     While the Strip Term From Ad filter changed nothing about the true nature of the advertised transaction or the real age of the person being sold for sex, thanks to the filter, Backpage's adult ads looked "cleaner than ever," as stated by Backpage.com Operations Manager Andrew Padilla in December 2010.

76.     Alternatively, the website would flag the ad and the ad would then appear on the www.backpage.com website until it was reviewed by a "moderator."

77.     Manual editing entailed the deletion of language similar to the words and phrases that the Strip Term From Ad filter automatically deleted—including terms indicative of criminality.

78.     The manual and automatic "moderation" of sex ads on www.backpage.com included words and phrases that indicated the subject of the sex ad was a child. For example, words such as "lolita," "teenage," "rape," "young," "amber alert," "little girl," "fresh," "innocent," and "school girl" were all manually or automatically removed from ads.

79.     After the ad was sanitized, the Backpage.com defendants would then post the ad with the same girl on www.backpage.com minus the offending and incriminating language such as "little girl" or "Lolita".

80.     By Backpage's own internal estimate, by late-2010, the company was editing "70 to 80% of ads" in the adult section either manually or automatically.

81.     The Backpage.com defendants charged a fee for each sex ad.

82.     By "moderating" ads instead of blocking them, the Backpage.com Defendants were able to continue to profit from illegal sex ads and sex trafficking.

83.     The "moderation" practices were used to sanitize ads for sex trafficking by removing or editing language that directly or indirectly indicated that the ad was for sex, instead of blocking said ads.

84.     The Backpage.com Defendants' "posting rules", "content requirements" and "moderation" practices were designed to help sex traffickers create and develop ads for sex that would evade law enforcement.

85.     In 2012, Carl Ferrer, in his capacity as Backpage executive, wrote to the Chief Operating Officer of www.backpage.com that sex traffickers needed to be informed what specific term(s) would prevent their ads from being posted on www.backpage.com.

**D. Backpage has Deliberately Refused to Implement a Meaningful or Reasonable System to Prevent Sex Trafficking.**

86.     The Backpage.com Defendants have long known that thousands of children were being advertised for sex on www.backpage.com, but they have refused to implement any meaningful or reasonable system to prevent children from being trafficked for sex on their website.

87.     For example, one of the original parent companies of www.backpage.com, Village Voice, required photo identification proving an individual was at least 18 years old before their ad could be published in the "adult" section of its newspapers. The company imposed this requirement to help prevent sex trafficking of minors.

88.     However, the Backpage.com Defendants refused to impose this same requirement before a sex ad was posted on www.backpage.com.

89.     The Backpage.com Defendants also refused to require photo identification because they knew that doing so would substantially reduce their profits.

90.     Rather than take any reasonable steps to prevent children from being advertised for sex on their website, the Backpage.com Defendants intentionally underreported the number of child sex ads on their website.

91.     For example, in an internal email, the Chief Operating Officer of www.backpage.com expressed concern with the number of ads that were being reported to the National Center for Missing and Exploited Children (NCMEC). He suggested the website "shouldn't be [reporting] more than 16 a day" unless the Backpage.com Defendants wanted to risk more than 500 reports a month to NCMEC.

92.     The Backpage.com Defendants have long known that sex trafficking is rampant on www.backpage.com. Rather than do anything to prevent sex trafficking, the Backpage.com Defendants have gone out of their way to assist sex traffickers in posting sex ads on their website

so that they can generate more profits. The Backpage.com defendants have not imposed this same requirement before a sex ad was posted on www.backpage.com.

93.     For example, the Backpage.com defendants accepted payment for advertisements of more than one woman or child from the same source.

94.     The Backpage.com defendants also allowed one credit card to be used finance sex ads for several different woman or children at the same time, and went so far as to instruct sex traffickers how to pay anonymously in order to avoid law enforcement detection and criminal prosecution.

95.     Despite knowing that sex traffickers were posting sex ads for many different women and children, the Backpage.com defendants made no effort to prevent those sex traffickers from continuing to post their sex ads.

**E.  The United States Senate Investigates Backpage.**

96.     The Backpage.com Defendants helped sex traffickers and prostitutes post ads, evade enforcement, exploit women and children, and reap profits in violation of numerous federal and state laws, including:

> a.  (720 ILCS 5/11-6) (Indecent solicitation of a child).
>
> b.  (720 ILCS 5/11-6.6) (Solicitation to meet a child).
>
> c.  (720 ILCS 5/11-9) (Public Indecency).
>
> d.  (720 ILCS 5/11-9.1) (Sexual exploitation of a child).
>
> e.  (720 ILCS 5/11-15.1) (Soliciting for a juvenile prostitute).
>
> f.  (720 ILCS 5/11- 17.1) (Keeping a place of juvenile prostitution).
>
> g.  (720 ILCS 5/11-18.1) (Patronizing a juvenile prostitute).
>
> h.  (720 ILCS 5/11-19.1) (Juvenile pimping).

19

i.   (720 ILCS 5/11-19.2) (Exploitation of a child).

j.   (720 ILCS 5/11-20.1) (Child pornography).

k.   (720 ILCS 5/11-21) (Harmful material).

l.   (720 ILCS 5/12-14.1) (Predatory criminal sexual assault of a child).

m.   (720 ILCS 5/12-33) (Ritualized abuse of a child).

n.   (720 ILCS 5/12-5(b)(10) (Child luring).

o.   (720 ILCS 5/11-6.5) (Indecent solicitation of an adult).

p.   (720 ILCS 5/11-25) (Grooming).

q.   Trafficking Victims Protection Act (TVPA), 22 USC § 7102.

97.   In April 2015, the United States Senate Committee on Homeland Security and Governmental Affairs' Permanent Subcommittee on Investigations began its bipartisan investigation into human trafficking on the internet (hereinafter, "the U.S. Senate's online sex trafficking investigation").

98.   Among other things, the U.S. Senate investigated Backpage's role in the facilitation of sex trafficking, including the sex trafficking of children.

99.   After Backpage refused to honor the United States' Subpoenas to produce discovery and appear at a Senate hearing, the United States Senate voted 96-0 to start proceedings to hold Backpage in contempt of Senate.

100.   In January 2017, the U.S. Senate released a 53-page report titled "Backpage.com's Knowing Facilitation of Online Sex Trafficking" (hereinafter, "the U.S. Senate's Backpage.com Report").

101.    In its Report, the U.S. Senate concluded that Backpage executive Carl Ferrer, senior leadership and key employees deliberately crafted loopholes that enabled the trafficking of men, women, and children online.

102.    The Report additionally concluded that (1) Backpage knows that it facilitates prostitution and child sex trafficking, and (2) Backpage has knowingly concealed evidence of criminality by systematically editing its "adult" ads.

103.    Backpage moderators told the U.S. Senate during their investigation that everyone at the company knew the adult-section ads were for prostitution and that their job was to "put[] lipstick on a pig" by sanitizing them.

**F.  Desiree Robinson is Exploited on Backpage.com, Resulting in her Rape and Murder.**

104.    On or about November 29, 2016, DESIREE ROBINSON disappeared from her family home.

105.    Ads selling DESIREE ROBINSON for sex appeared on www.backpage.com in December 2016 and may have been posted even earlier.

106.    DESIREE ROBINSON was a minor girl who was 16 years old when she was repeatedly advertised for sex in the "escort" section of www.backpage.com with her picture displayed.

107.    At least one of these advertisements for sex with minor DESIREE ROBINSON was under the pseudonym "Chinadoll" with her picture displayed.

108.    DESIREE ROBINSON was advertised for sex on www.backpage.com by two unknown adult individuals, who were sex trafficking DESIREE ROBINSON.

109.    Each of the sex ads for DESIREE depicted DESIREE in a sexually explicit manner and indicated that she could be purchased for sex, sex acts, prostitution, and other illegal purposes.

110.    The two unknown individuals who were sex trafficking DESIREE ROBINSON, paid the Backpage.com defendants a fee in order to advertise on www.backpage.com.

111.    Upon information and belief, the Backpage.com defendants trained potential sex traffickers, including those trafficking DESIREE ROBINSON, to create sanitized ads that were less incriminating of sex trafficking on www.backpage.com.

112.    Upon information and belief, the Backpage.com defendants through their moderating or editing practices, combined with their terms of use, was responsible in part for the creation and development of the content of the advertisements featuring DESIREE ROBINSON for sex trafficking.

113.    At no point did the Backpage.com defendants take any steps to prevent DESIREE ROBINSON from being advertised for sex on www.backpage.com.

114.    Upon information and belief, despite knowing that the unknown individuals posting ads were sex traffickers who were selling women and children for sex on www.backpage.com, the Backpage.com defendants made no effort to prevent the two unknown individuals, from continuing to sell women and children for sex on the website, including Desiree Robinson.

115.    Upon information and belief, despite knowing that DESIREE ROBINSON was a minor or was likely a minor, the Backpage.com defendants made no effort to prevent ads exploiting her.

22

116.     As a result of being advertised for sex on www.backpage.com, upon information and belief, DESIREE ROBINSON was sexually abused and exploited by men, including ANTHONY ROSALES, who purchased her for sex by paying money to the two unknown individuals and or other pimps.

117.     On or about December 23, 2016, ads exploiting DESIREE ROBINSON as an "escort" were seen by ANTHONY ROSALES.

118.     On or about December 23, 2016, Anthony Rosales contacted the listed number on the ad for the male unknown individual to arrange a meeting with DESIREE ROBINSON.

119.     On or about the night of December 23, 2016, the two unknown individuals forced DESIREE ROBINSON into a vehicle and drove her to meet Anthony Rosales.

120.     The two unknown individuals then brought her into the residence owned by the parents of Anthony Rosales, DONATO ROSALES and FILIBERTO ROSALES, where DONATO ROSALES was having a party the garage on the property.

121.     The parents of Defendant ANTHONY ROSALES knew Defendant ANTHONY ROSALES was inviting guests and provided permission for DESIREE ROBINSON to attend said party.

122.     At said party, DESIREE ROBINSON was sold to Anthony Rosales by the two unknown individuals.

123.     The two unknown individuals received money in exchange for DESIREE ROBINSON.

124.     The two unknown individuals watched DESIREE ROBINSON be taken from the house into the truck of ANTHONY ROSALES, parked on the street near the party or in the driveway.

125.    In the early morning of December 24, 2016, using www.backpages.com, the 32 year old Defendant Rosales raped DESIREE ROBINSON, a 16 year old minor.

126.    Defendant Rosales then sent DESIREE ROBINSON back to the two unknown individuals when his purchased time with DESIREE ROBINSON had expired.

127.    The two unknown individuals left the residence with DESIREE ROBINSON.

128.    Later in the morning of December 24, 2016, after the two unknown individuals and DESIREE ROBINSON left, the male unknown individual was contacted again by Defendant Rosales who expressed that he would like to purchase DESIREE ROBINSON for a second time.

129.    The two unknown individuals picked Defendant ANTHONY ROSALES from another location and brought him and DESIREE ROBINSON once again, back to the residence where the party had occurred.

130.    The two unknown individuals drove their vehicle back to the residence and DESIREE ROBINSON and Defendant ANTHONY ROSALES went inside the garage.

131.    The two unknown individuals fell asleep in their vehicle.

132.    On December 24, 2016, using www.backpages.com, Anthony Rosales tried to forcibly rape DESIREE ROBINSON, a 16 year old minor, in the garage on the property owned by his parents.

133.    Upon being refused by DESIREE ROBINSON, Anthony Rosales beat DESIREE ROBINSON in and about the face, strangled her as she tried to call for help, and/or used a knife to slash ROBINSON's throat in the garage.

134.    After physically assaulting and murdering DESIREE ROBINSON, Defendant ANTHONY ROSALES stripped her body naked and left her dead on the garage floor.

135.    Defendant ANTHONY ROSALES then left the garage informed the two unknown individuals that DESIREE ROBINSON would be out shortly and left the residence.

136.    The two unknown individuals knocked on the door of the house owned by the parents of ANTHONY ROSALES, and one of the residents unlocked the locked garage.

137.    DESIREE ROBINSON's body was found inside.

138.    As a direct and proximate result of the foregoing acts, DESIREE ROBINSON was exploited, raped and otherwise sexually abused and brutally murdered.

139.    In late December 2016 or early January 2017, the Cook County State's Attorney's Office charged Defendant Rosales with first-degree murder and aggravated sexual abuse; the criminal case is pending in Cook County, Illinois.

### COUNT 1: NEGLIGENCE-WRONGFUL DEATH
**(Plaintiff Yvonne Ambrose, as Administrator for the Estate of Desiree Robinson, v. Backpage Defendants)**

140.    Plaintiff YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, incorporates paragraphs 1 to 142 of this Complaint as if fully set forth herein.

141.    The Backpage.com defendants had a duty of care to operate www.backpage.com in a manner that did not endanger minor children, including DESIREE ROBINSON.

142.    The Backpage.com defendants had a duty of care to take reasonable steps to protect the foreseeable victims of the danger created by their acts and omissions, including the danger created by their online marketplace for sex trafficking and their actions in perpetuating that marketplace by helping sex traffickers post their sex ads.

143.    The Backpage Defendants knew of should have known that a substantial and foreseeable risk of bodily harm and even death for sex trafficking victims who are advertised as

25

"escorts" on its website. Multiple murders of Backpage "escorts" have been committed by killers who found their victims on Backpage. These murders have been widely reported by various news and media outlets.

144. The Backpage.com defendants breached the foregoing duties because they knew, or should have known, that adults working as sex traffickers were using their website to post advertisements of minor children for sex, including such advertisements of DESIREE ROBINSON, but they took no steps to protect those children, including DESIREE ROBINSON.

145. Moreover, the Backpage.com defendants breached their duty through the following acts and/or omissions:

      a. Actively facilitated prostitution and sex trafficking;

      b. Assisted in the development of sex ads by knowingly, systematically and intentionally editing "Adult" ads in an effort to "sanitize" or "clean up" them;

      c. Coached users how to "sanitize" or "clean up" ads via its posting rules and content requirements;

      d. Coached its users on how to post "clean ads" for illegal transactions;

      e. Sanitized sex ads via manual and automated editing;

      f. Refused to implement a meaningful or reasonable system to prevent sex trafficking in its website in order to maintain generating millions of dollars in profits;

      g. Automatically deleted incriminating words from sex ads prior to publication;

      h. Altered the evidentiary value of the original ads;

      i. Used moderators to manually delete incriminating evidence in ads that automatic filters missed;

      j. Intentionally underreported instances of child exploitation;

      k. Deliberately crafted loopholes that enabled the trafficking of men, women, and children online; and/or

l. Was otherwise negligent.

146. As a direct and proximate result of the aforesaid acts and/or omissions by Backpage Defendants, Decedent, DESIREE ROBINSON, was caused to suffer damages, including pain, suffering, and death.

147. The injuries sustained by Decedent, DESIREE ROBINSON, caused or contributed to her death.

148. Plaintiff YVONNE AMBROSE, as Administrator for the Estate of Desiree Robinson, deceased, brings this cause of action pursuant to the provisions of 740 ILCS 180/1, *et seq.*, commonly known as the Illinois Wrongful Death Act.

149. At the time of her death, Decedent, DESIREE ROBINSON, was survived by her mother, YVONNE AMBROSE, father, and siblings.

150. Decedent's parents were dependent upon the Decedent's services, support, society, companionship, love and affection, during and for the remainder of her life, of which they were deprived as a direct and proximate result of DESIREE ROBINSON's death on December 24, 2016.

151. As a further direct and proximate result of the premature death of Decedent, DESIREE ROBINSON, on December 24, 2016 the above named heirs/next-of-kin suffered a loss of service, support, society, companionship, love, and affection for which they were dependent upon DESIREE ROBINSON during and for the remainder of her expected life.

WHEREFORE, YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, respectfully requests that this Court enter judgment against Defendants, BACKPAGE.COM, L.L.C.; BACK PAGE, L.L.C.; MEDALIST HOLDINGS, L.L.C.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO HOLDINGS, L.L.C.; DARTMOOR

HOLDINGS, L.L.C.; IC HOLDINGS, L.L.C.; NEW TIMES MEDIA, L.L.C., and UGC TECH

GROUP C.V., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus

costs with interest in bringing this action, and for such other relief this Court deems fair and just.

## COUNT 2: NEGLIGENCE-SURVIVAL ACTION
### (Plaintiff Yvonne Ambrose, as Administrator for the Estate of Desiree Robinson, v. Backpage Defendants)

152.    Plaintiff YVONNE AMBROSE, individually and as Administrator for the Estate

of Desiree Robinson, deceased, incorporates paragraphs 1 through 142 of this Complaint as if

fully set forth herein.

153.    The Backpage.com defendants had a duty of care to operate www.backpage.com

in a manner that did not endanger minor children, including DESIREE ROBINSON.

154.    The Backpage.com defendants had a duty of care to take reasonable steps to

protect the foreseeable victims of the danger created by their acts and omissions, including the

danger created by their online marketplace for sex trafficking and their actions in perpetuating

that marketplace by helping sex traffickers post their sex ads.

155.    The Backpage.com defendants breached the foregoing duties because they knew,

or should have known, that adults working as sex traffickers were using their website to post

advertisements of minor children for sex, including such advertisements of DESIREE

ROBINSON, but they took no steps to protect those children, including DESIREE ROBINSON.

156.    Moreover, the Backpage.com defendants breached their duty through the

following acts and/or omissions:

   a. Actively facilitated prostitution and sex trafficking;

   b. Assisted in the development of sex ads by knowingly, systematically and
      intentionally editing "Adult" ads in an effort to "sanitize" or "clean up" them;

   c. Coached users how to "sanitize" or "clean up" ads via its posting rules and

content requirements;

d. Coached its users on how to post "clean ads" for illegal transactions;

e. Sanitized sex ads via manual and automated editing;

f. Refused to implement a meaningful or reasonable system to prevent sex trafficking in its website in order to maintain generating millions of dollars in profits;

g. Automatically deleted incriminating words from sex ads prior to publication;

h. Altered the evidentiary value of the original ads;

i. Used moderators to manually delete incriminating evidence in ads that automatic filters missed;

j. Intentionally underreported instances of child exploitation;

k. Deliberately crafted loopholes that enabled the trafficking of men, women, and children online; and/or

l. Was otherwise negligent.

157. As a direct and proximate result of the aforesaid acts and/or omissions by Backpage Defendants, Decedent, DESIREE ROBINSON, was caused to suffer damages, including pain, suffering, and death.

158. The injuries sustained by Decedent, DESIREE ROBINSON, caused or contributed to her death.

159. Plaintiff, YVONNE AMBROSE, and Decedent, DESIREE ROBINSON, did not have knowledge of acts and/or omissions of Defendants, and that they caused injury to the Decedent until her death.

160. Plaintiff, YVONNE AMBROSE, as Administrator of the Estate of DESIREE ROBINSON, Deceased, brings this action pursuant to the provisions of 755 ILCS 5/27-6, known as the Illinois Survival Statute.

161.    As a direct and proximate result of one or more of the Defendants' negligent acts and/or omissions, DESIREE ROBINSON suffered injuries of a personal and pecuniary nature including, but not limited to, hospital, medical and related expenses, disability and disfigurement, pain and suffering, physical loss of chance of survival, and emotional trauma that DESIREE ROBINSON would have been entitled to receive compensation from the Defendants for these injuries, had she survived.

WHEREFORE, YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, respectfully requests that this Court enter judgment against Defendants, BACKPAGE.COM, L.L.C.; BACK PAGE, L.L.C.; MEDALIST HOLDINGS, L.L.C.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO HOLDINGS, L.L.C.;   DARTMOOR HOLDINGS, L.L.C.;  IC HOLDINGS, L.L.C.; NEW TIMES MEDIA, L.L.C., and UGC TECH GROUP C.V., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs with interest in bringing this action, and for such other relief this Court deems fair and just.

### COUNT 3: WILLFUL AND WANTON-WRONGFUL DEATH
**(Plaintiff Yvonne Ambrose, as Administrator for the Estate of Desiree Robinson, v. Backpage Defendants)**

162.    Plaintiff YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, incorporates paragraphs 1 through 142 of this Complaint as if fully set forth herein.

163.    The Backpage.com defendants had a duty of care to operate www.backpage.com in a manner that did not endanger minor children, including DESIREE ROBINSON, and to protect minors from willful and wanton harm, including sex trafficking, exploitation, sexual assault, rape and murder.

164.    The Backpage.com defendants had a duty to refrain from willful, wanton and/or

egregious conduct when operating www.backpage.com in a manner that did not intentionally and/or recklessly endanger minor children, including DESIREE ROBINSON.

165. The Backpage.com defendants engaged in willful and wanton conduct against DESIREE ROBINSON by because they knew that adults working as sex traffickers were using their website to post advertisements of minor children for sex, including such advertisements of DESIREE ROBINSON, but they took no steps to protect those children, including DESIREE ROBINSON and instead facilitated sex trafficking on their website in an effort to maintain and/or maximize profits.

166. Moreover, engaged in willful and wanton conduct against Plaintiffs by committing one or more of the following acts and/or omissions:

   a. Actively facilitated prostitution and sex trafficking;

   b. Assisted in the development of sex ads by knowingly, systematically and intentionally editing "Adult" ads in an effort to "sanitize" or "clean up" them;

   c. Coached users how to "sanitize" or "clean up" ads via its posting rules and content requirements;

   d. Coached its users on how to post "clean ads" for illegal transactions;

   e. Sanitized sex ads via manual and automated editing;

   f. Refused to implement a meaningful or reasonable system to prevent sex trafficking in its website in order to maintain generating millions of dollars in profits;

   g. Automatically deleted incriminating words from sex ads prior to publication;

   h. Altered the evidentiary value of the original ads;

   i. Used moderators to manually delete incriminating evidence in ads that automatic filters missed;

   j. Intentionally underreported instances of child exploitation;

   k. Deliberately crafted loopholes that enabled the trafficking of men, women, and

children online; and/or

l.   Was otherwise willful and wanton.

167.   As a direct and proximate result of the aforesaid willful and wanton acts and/or omissions by Backpage Defendants, Decedent, DESIREE ROBINSON, was caused to suffer damages, including pain, suffering, and death.

168.   The injuries sustained by Decedent, DESIREE ROBINSON, caused or contributed to her death.

169.   Plaintiff YVONNE AMBROSE, as Administrator for the Estate of Desiree Robinson, deceased, brings this cause of action pursuant to the provisions of 740 ILCS 180/1, *et seq.*, commonly known as the Illinois Wrongful Death Act.

170.   At the time of her death, Decedent, DESIREE ROBINSON, was survived by her parents, YVONNE AMBROSE and Walton Treadwell.

171.   Decedent's parents were dependent upon the Decedent's services, support, society, companionship, love and affection, during and for the remainder of her life, of which they were deprived as a direct and proximate result of DESIREE ROBINSON's death on December 24, 2016.

172.   As a further direct and proximate result of the premature death of Decedent, DESIREE ROBINSON, on December 24, 2016 the above named heirs/next-of-kin suffered a loss of service, support, society, companionship, love, and affection for which they were dependent upon DESIREE ROBINSON during and for the remainder of her expected life.

WHEREFORE, YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, respectfully requests that this Court enter judgment against Defendants, BACKPAGE.COM, L.L.C.; BACK PAGE, L.L.C.; MEDALIST HOLDINGS, L.L.C.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO HOLDINGS, L.L.C.;   DARTMOOR

HOLDINGS, L.L.C.; IC HOLDINGS, L.L.C.; NEW TIMES MEDIA, L.L.C., and UGC TECH

GROUP C.V., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus

costs with interest in bringing this action, and for such other relief this Court deems fair and just.

## COUNT 4: WILLFUL AND WANTON-SURVIVAL ACTION
### (Plaintiff Yvonne Ambrose, as Administrator for the Estate of Desiree Robinson, v. Backpage Defendants)

173.    Plaintiff YVONNE AMBROSE, individually and as Administrator for the Estate

of Desiree Robinson, deceased, incorporates paragraphs 1 through 142 of this Complaint as if

fully set forth herein.

174.    Plaintiff YVONNE AMBROSE, individually and as Administrator for the Estate

of Desiree Robinson, deceased, incorporates all preceding paragraphs of this Complaint as if

fully set forth herein.

175.    The Backpage.com defendants had a duty of care to operate www.backpage.com

in a manner that did not endanger minor children, including DESIREE ROBINSON, and to

protect minors from willful and wanton harm, including sex trafficking, exploitation, sexual

assault, rape and murder.

176.    The Backpage.com defendants had a duty to refrain from willful, wanton and/or

egregious conduct when operating www.backpage.com in a manner that did not intentionally

and/or recklessly endanger minor children, including DESIREE ROBINSON.

177.    The Backpage.com defendants engaged in willful and wanton conduct against

DESIREE ROBINSON by because they knew that adults working as sex traffickers were using

their website to post advertisements of minor children for sex, including such advertisements of

DESIREE ROBINSON, but they took no steps to protect those children, including DESIREE

ROBINSON and instead facilitated sex trafficking on their website in an effort to maintain

33

and/or maximize profits.

178. Moreover, engaged in willful and wanton conduct against Plaintiffs by committing one or more of the following acts and/or omissions:

        m. Actively facilitated prostitution and sex trafficking;

        n. Assisted in the development of sex ads by knowingly, systematically and intentionally editing "Adult" ads in an effort to "sanitize" or "clean up" them;

        o. Coached users how to "sanitize" or "clean up" ads via its posting rules and content requirements;

        p. Coached its users on how to post "clean ads" for illegal transactions;

        q. Sanitized sex ads via manual and automated editing;

        r. Refused to implement a meaningful or reasonable system to prevent sex trafficking in its website in order to maintain generating millions of dollars in profits;

        s. Automatically deleted incriminating words from sex ads prior to publication;

        t. Altered the evidentiary value of the original ads;

        u. Used moderators to manually delete incriminating evidence in ads that automatic filters missed;

        v. Intentionally underreported instances of child exploitation;

        w. Deliberately crafted loopholes that enabled the trafficking of men, women, and children online; and/or

        x. Was otherwise willful and wanton.

179. As a direct and proximate result of the aforesaid willful and wanton acts and/or omissions by Backpage Defendants, Decedent, DESIREE ROBINSON, was caused to suffer damages, including pain, suffering, and death.

180. The injuries sustained by Decedent, DESIREE ROBINSON, caused or contributed to her death.

181.    Plaintiff YVONNE AMBROSE, as Administrator for the Estate of Desiree Robinson, deceased, brings this cause of action pursuant to the provisions of 740 ILCS 180/1, *et seq.*, commonly known as the Illinois Wrongful Death Act.

182.    At the time of her death, Decedent, DESIREE ROBINSON, was survived by her parents, YVONNE AMBROSE and Walton Treadwell.

183.    As a direct and proximate result of the aforesaid acts and/or omissions by Backpage Defendants, Decedent, DESIREE ROBINSON, was caused to suffer damages, including pain, suffering, and death.

184.    The injuries sustained by Decedent, DESIREE ROBINSON, caused or contributed to her death.

185.    Plaintiff, YVONNE AMBROSE, as Administrator of the Estate of DESIREE ROBINSON, Deceased, brings this action pursuant to the provisions of 755 ILCS 5/27-6, known as the Illinois Survival Statute.

186.    As a direct and proximate result of one or more of the Defendants' willful and wanton acts and/or omissions, DESIREE ROBINSON suffered injuries of a personal and pecuniary nature including, but not limited to, hospital, medical and related expenses, disability and disfigurement, pain and suffering, physical loss of chance of survival, and emotional trauma that DESIREE ROBINSON would have been entitled to receive compensation from the Defendants for these injuries, had she survived.

WHEREFORE, YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, respectfully requests that this Court enter judgment against Defendants, BACKPAGE.COM, L.L.C.; BACK PAGE, L.L.C.; MEDALIST HOLDINGS, L.L.C.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO HOLDINGS, L.L.C.;   DARTMOOR

HOLDINGS, L.L.C.; IC HOLDINGS, L.L.C.; NEW TIMES MEDIA, L.L.C., UGC TECH

GROUP C.V.; and UGC TECH GROUP C.V., for an amount in excess of FIFTY THOUSAND

DOLLARS ($50,000.00), plus costs with interest in bringing this action, and for such other relief

this Court deems fair and just.

## COUNT 5: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS- SURVIVAL ACTION
### (Plaintiff Yvonne Ambrose, as Administrator for the Estate of Desiree Robinson, v. Backpage Defendants)

187.    Plaintiff YVONNE AMBROSE, individually and as Administrator for the Estate

of Desiree Robinson, deceased, incorporates paragraphs 1 through 142 of this Complaint as if

fully set forth herein.

188.    As described herein, Backpage Defendants, among other things, knew that adults

working as sex traffickers were using their website to post advertisements of minor children for

sex, including such advertisements of DESIREE ROBINSON, but they took no steps to protect

those children, including DESIREE ROBINSON and instead facilitated sex trafficking on their

website in an effort to maintain and/or maximize profits.

189.    Backpage Defendants actively concealed information; facilitated sex trafficking

of women and children by active concealment; and/or knowingly exposed children to sexual

abuse or the high probability of sexual abuse.

190.    The Backpage Defendants' actions are both extreme and outrageous.

191.    The Backpage Defendants knew that there was a high probability that their

conduct would expose women and minors, such as DESIREE ROBINSON, to a risk of serious

physical and/or emotional harm, including exploitation, rape and/or sexual assaults, and that such

exploitation, rape and/or sexual assaults would inflict severe emotional distress upon DESIREE

ROBINSON.

36

192.     Backpage Defendants intentionally and/or recklessly disregarded the high probability that its conduct would inflict severe emotional distress upon DESIREE ROBINSON.

193.     Defendants' conduct did cause and continues to cause Plaintiff severe emotional distress and mental anguish.

194.     As a direct and proximate result of the aforesaid acts and/or omissions by Backpage Defendants, Decedent, DESIREE ROBINSON, was caused to suffer damages, including pain, suffering, and death.

195.     Plaintiff, YVONNE AMBROSE, as Administrator of the Estate of DESIREE ROBINSON, Deceased, brings this action pursuant to the provisions of 755 ILCS 5/27-6, known as the Illinois Survival Statute.

196.     As a direct and proximate result of one or more of the Defendants' negligent acts and/or omissions, DESIREE ROBINSON suffered injuries of a personal and pecuniary nature including, but not limited to, hospital, medical and related expenses, disability and disfigurement, pain and suffering, physical loss of chance of survival, and emotional trauma that DESIREE ROBINSON would have been entitled to receive compensation from the Defendants for these injuries, had she survived.

WHEREFORE, YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, respectfully requests that this Court enter judgment against Defendants, BACKPAGE.COM, L.L.C.; BACK PAGE, L.L.C.; MEDALIST HOLDINGS, L.L.C.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO HOLDINGS, L.L.C.;   DARTMOOR HOLDINGS, L.L.C.; IC HOLDINGS, L.L.C.; NEW TIMES MEDIA, L.L.C., and UGC TECH GROUP C.V., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs with interest in bringing this action, and for such other relief this Court deems fair and just.

## COUNT 6: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS- SURVIVAL ACTION
### (Plaintiff Yvonne Ambrose, as Administrator for the Estate of Desiree Robinson, v. Backpage Defendants)

197.    Plaintiff YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, incorporates paragraphs1 through 142 of this Complaint as if fully set forth herein.

198.    As described herein, Backpage Defendants, among other things, knew or should have known that adults working as sex traffickers were using their website to post advertisements of minor children for sex, including such advertisements of DESIREE ROBINSON, but they took no steps to protect those children, including DESIREE ROBINSON and instead facilitated sex trafficking on their website in an effort to maintain and/or maximize profits.

199.    Backpage Defendants actively concealed information; facilitated sex trafficking of women and children by active concealment; and/or knowingly exposed children to sexual abuse or the high probability of sexual abuse.

200.    The Backpage Defendants' actions are both extreme and outrageous.

201.    The Backpage Defendants knew that there was a high probability that their conduct would expose women and minors, such as DESIREE ROBINSON, to a risk of serious physical and/or emotional harm, including exploitation, rape and/or sexual assaults, and that such exploitation, rape and/or sexual assaults would inflict severe emotional distress upon DESIREE ROBINSON.

202.    Backpage Defendants intentionally, recklessly and/or negligently disregarded the high probability that its conduct would inflict severe emotional distress upon Plaintiff and DESIREE ROBINSON.

203.    As a direct and proximate result of the aforesaid acts and/or omissions by Backpage Defendants, Decedent, DESIREE ROBINSON, was caused to suffer damages, including severe emotional distress and mental anguish.

204.    Plaintiff, YVONNE AMBROSE, as Administrator of the Estate of DESIREE ROBINSON, Deceased, brings this action pursuant to the provisions of 755 ILCS 5/27-6, known as the Illinois Survival Statute.

WHEREFORE, YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, respectfully requests that this Court enter judgment against Defendants, BACKPAGE.COM, L.L.C.; BACK PAGE, L.L.C.; MEDALIST HOLDINGS, L.L.C.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO HOLDINGS, L.L.C.;  DARTMOOR HOLDINGS, L.L.C.; IC HOLDINGS, L.L.C.; NEW TIMES MEDIA, L.L.C., and UGC TECH GROUP C.V., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs with interest in bringing this action, and for such other relief this Court deems fair and just.

## COUNT 7: CIVIL CONSPIRACY
### (Plaintiff Yvonne Ambrose, as Administrator for the Estate of Desiree Robinson, v. Backpage Defendants)

205.    Plaintiff YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, incorporates paragraphs 1 through 142 of this Complaint as if fully set forth herein.

206.    As described above, Backpage Defendants engaged in a plan or conspiracy to use the Backpage.com website to advertise women and children for sex, including Plaintiff and DESIREE ROBINSON, in an effort to maintain and/or maximize profits.

207.    The conspiracy included, among other things: actively facilitating prostitution and sex trafficking; assisting in the development of sex ads by knowingly, systematically and

intentionally editing "Adult" ads in an effort to "sanitize" or "clean up" them; coaching users how to "sanitize" or "clean up" ads via its posting rules and content requirements; coaching its users on how to post "clean ads" for illegal transactions; sanitizing sex ads via manual and automated editing; refusing to implement a meaningful or reasonable system to prevent sex trafficking in its website in order to maintain generating millions of dollars in profits; automatically deleting incriminating words from sex ads prior to publication; altering the evidentiary value of the original ads; using moderators to manually delete incriminating evidence in ads that automatic filters missed; intentionally underreporting instances of child exploitation; and/or deliberately crafting loopholes that enabled the trafficking of men, women, and children online.

208.    As a direct and proximate result of the aforesaid acts and/or omissions by Backpage Defendants, Decedent, DESIREE ROBINSON, was caused to suffer damages, including pain, suffering, and death.

209.    Based on these actions, the defendants are liable for civil conspiracy.

WHEREFORE, YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, respectfully requests that this Court enter judgment against Defendants, BACKPAGE.COM, L.L.C.; BACK PAGE, L.L.C.; MEDALIST HOLDINGS, L.L.C.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO HOLDINGS, L.L.C.;   DARTMOOR HOLDINGS, L.L.C.;  IC HOLDINGS, L.L.C.; NEW TIMES MEDIA, L.L.C., and UGC TECH GROUP C.V., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs with interest in bringing this action, and for such other relief this Court deems fair and just.

### COUNT 8: WRONGFUL DEATH – BATTERY
**(Plaintiff Yvonne Ambrose, as Administrator for the Estate of Desiree Robinson, v. Anthony Rosales)**

210.     Plaintiff YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, incorporates paragraphs 1 through 142 of this Complaint as if fully set forth herein.

211.     Upon information and belief, as described above, on or about December 24, 2016, Defendant, ANTHONY ROSALES, repeatedly engaged in un-permitted, harmful and offensive sexual and physical contact upon the persons of the DESIREE ROBINSON.

212.     Such harmful and offensive sexual and physical contact included battering and choking ROBINSON, as well as cutting her throat with a knife.

213.     ROSALES also sexually assaulted and raped ROBINSON, a minor, in violation of state and federal law.

214.     At all times relevant hereto, Defendant, ROSALES, individually, had a duty to exercise reasonable care, so as to avoid causing injury and/or harmful or offensive contact to ROBINSON.

215.     Notwithstanding said duty, Defendant, ROSALES, intentionally and unlawfully made harmful and offensive contact to the persons of ROBINSON.

216.     As a direct and proximate result of the unlawful actions of Defendant ROSALES, DESIREE ROBINSON, was caused to suffer damages, including pain, suffering, and death.

217.     The injuries sustained by Decedent, DESIREE ROBINSON, caused or contributed to her death.

218.     Plaintiff YVONNE AMBROSE, as Administrator for the Estate of Desiree Robinson, deceased, brings this cause of action pursuant to the provisions of 740 ILCS 180/1, *et seq.*, commonly known as the Illinois Wrongful Death Act.

219.    At the time of her death, Decedent, DESIREE ROBINSON, was survived by her parents, YVONNE AMBROSE and Walton Treadwell.

220.    Decedent's parents were dependent upon the Decedent's services, support, society, companionship, love and affection, during and for the remainder of her life, of which they were deprived as a direct and proximate result of DESIREE ROBINSON's death on December 24, 2016.

221.    As a further direct and proximate result of the premature death of Decedent, DESIREE ROBINSON, on December 24, 2016 the above named heirs/next-of-kin suffered a loss of service, support, society, companionship, love, and affection for which they were dependent upon DESIREE ROBINSON during and for the remainder of her expected life.

WHEREFORE, YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, respectfully requests that this Court enter judgment against Defendant, ANTHONY ROSALES, for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs with interest in bringing this action, and for such other relief this Court deems fair and just.

## COUNT 9: SURVIVAL ACTION – BATTERY
### (Plaintiff Yvonne Ambrose, as Administrator for the Estate of Desiree Robinson, v. Anthony Rosales)

222.    Plaintiff YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, incorporates paragraphs 1 through 142 of this Complaint as if fully set forth herein.

223.    Upon information and belief, as described above, on or about December 24, 2016, Defendant, ANTHONY ROSALES, repeatedly engaged in un-permitted, harmful and offensive sexual and physical contact upon the persons of the DESIREE ROBINSON.

42

224.     Such harmful and offensive sexual and physical contact included battering and choking ROBINSON, as well as cutting her throat with a knife.

225.     ROSALES also sexually assaulted and raped ROBINSON, a minor, in violation of state and federal law.

226.     At all times relevant hereto, Defendant, ROSALES, individually, had a duty to exercise reasonable care, so as to avoid causing injury and/or harmful or offensive contact to ROBINSON.

227.     Notwithstanding said duty, Defendant, ROSALES, intentionally and unlawfully made harmful and offensive contact to the persons of ROBINSON.

228.     As a direct and proximate result of the unlawful actions of Defendant ROSALES, DESIREE ROBINSON, was caused to suffer damages, including pain, suffering, and death.

229.     The injuries sustained by Decedent, DESIREE ROBINSON, caused or contributed to her death.

230.     Plaintiff, YVONNE AMBROSE, as Administrator of the Estate of DESIREE ROBINSON, Deceased, brings this action pursuant to the provisions of 755 ILCS 5/27-6, known as the Illinois Survival Statute.

231.     As a direct and proximate result Defendant ROSALES's unlawful conduct, DESIREE ROBINSON suffered injuries of a personal and pecuniary nature including, but not limited to, hospital, medical and related expenses, disability and disfigurement, pain and suffering, physical loss of chance of survival, and emotional trauma that DESIREE ROBINSON would have been entitled to receive compensation from the Defendants for these injuries, had she survived.

WHEREFORE, YVONNE AMBROSE, individually and as Administrator for the Estate

of Desiree Robinson, deceased, respectfully requests that this Court enter judgment against Defendant, ANTHONY ROSALES, for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs with interest in bringing this action, and for such other relief this Court deems fair and just.

Respectfully submitted,

By: *B. Raveend*

Bhavani Raveendran, one of Plaintiffs' attorneys

Antonio M. Romanucci
Gina A. DeBoni
Bhavani Raveendran
Martin D. Gould
ROMANUCCI & BLANDIN, LLC
321 N. Clark Street, Suite 900
Chicago IL, 60654
Telephone: 312-458-1000
Fax: 312-458-1004
Attorney No. 35875

# EXHIBIT

# F

# Elms Web Services, Inc.

# Invoice

**David Elms**

**Bill To:**
Backpage.com, LLC
1201 E Jefferson
Phoenix, AZ 85034

**Invoice No:** 1313

**Date:** Jan 1, 2008

**Referrals that convert!**
My team and I specialize in placing banner ads and one way in bound links with high conversions and SEO.

| Description | Estimated new referrals per mo | Cost per visit | Amount |
|---|---|---|---|
| Feb Banner ad placement | 450,000 | .00888 | $4,000 |

| | |
|---|---|
| Subtotal | $4,000 |
| Sales Tax | na |
| Total | $4,000 |

**Remit Payment to:**
Elms Web Services, Inc.

5228 W 124th St
Hawthorne, CA 90250
T 310.491.1451 F 310.491.1452
Email: david@elmsweb.com

# EXHIBIT

# G

**To:**

scott.spear%villagevoicemedia.com@gtempaccount.com[scott.spear%villagevoicemedia.com@gtempaccount.com]

**From:**     Google Alerts
**Sent:**     Mon 1/2/2012 8:40:34 PM
**Subject:**  Google Alert - backpage.com
**MAIL_RECEIVED:**     Mon 1/2/2012 8:40:34 PM

**Web**                                                          **5** new results for **backpage.com**

Google Redirect Virus Removal - Easiest Way To **...** - **Backpage**
Other. USA. Google Redirect Virus Removal - Easiest Way To Remove Google Redirect Virus.
nyother.backpage.com/ElectronicsForSale/.../26556833

Newsy | **Backpage.com** Escort Ads Linked to Four Detroit Deaths **...**
Backstage.**com** is linked with four women\'s deaths in Detroit after they posted their own adult escort
ads.
www.newsy.com/.../backpage-com-escort-ads-linked-to-four-...

Start 2012 with a !! - houston escorts - **backpage.com**
Houston. FM 1960/249/Willowbrook. Start 2012 with a !! - 28.
houston.backpage.com/FemaleEscorts/start-2012.../10498299

Vintage Boat Motor Collection - phoenix boats **...** - **Backpage**
Phoenix. Sun city. $1500, Vintage Boat Motor Collection.
phoenixnewtimes.backpage.com/BoatsForSale/.../15991995

iPad 2 32GB - fort lauderdale electronics for sale - **backpage.com**
$120, iPad 2 32GB · Enlarge Picture. Want to save money and Score a brand new iPad 2 for 90% off
retail value? Check out the link below & read the article to **...**
browardpalmbeach.backpage.com/.../120-ipad-2.../16026049

Tip: Use a minus sign (-) in front of terms in your query that you want to exclude. Learn more.

Delete this alert.
Create another alert.
Manage your alerts.

# EXHIBIT

# H

**To:**      Don Bennett Moon[don.moon@azbar.org]; Liz McDougall
VVM[liz.mcdougall@villagevoicemedia.com]
**From:**    Barbara Roessner
**Sent:**    Sat 6/9/2012 11:19:27 PM
**Subject:** Re: i think we should consider/discuss sending a short legalese letter to detroit news asking
that they not use the term "backpage.com murder victim"...backpage.com didn't murder anyone...btr

yes, the risk you cite is definitely the downside. on the other hand...organizations and people
complain all the time to media outlets about headlines, wording, etc., and it has an effect. maybe
this one is just too hot to touch. (and it doesn't seem to be getting picked up much outside detroit.
maybe we can ask anna to track it. just want to avoid a made-for-TV movie of the same title...)

Barbara T. Roessner
btroessner@yahoo.com
mobile: 860-543-9017

--- On **Sat, 6/9/12, Liz McDougall VVM *<liz.mcdougall@villagevoicemedia.com>*** wrote:

> From: Liz McDougall VVM <liz.mcdougall@villagevoicemedia.com>
> Subject: Re: i think we should consider/discuss sending a short legalese letter to detroit
> news asking that they not use the term "backpage.com murder victim"...backpage.com
> didn't murder anyone...btr
> To: "Don Bennett Moon" <don.moon@azbar.org>
> Cc: "barbara roessner" <btroessner@yahoo.com>
> Date: Saturday, June 9, 2012, 7:11 PM
>
> Willing to discuss but strongly disagree.  We can't risk being anti-free speech now, and
> there is no trademark violation to allege.  The term is annoying but it is marginally
> misleading at best.  The potential blowback if our letter to Detroit News was published
> online (which I would do immediately if I were them) is awful.  We should just let that
> news and phrase die out.
>
> On Jun 9, 2012, at 9:55 AM, Don Bennett Moon <don.moon@azbar.org> wrote:
>
>> agree. dbm
>>
>> From: barbara roessner <btroessner@yahoo.com>
>> To: liz.mcdougall@villagevoicemedia.com; don.moon@azbar.org
>> Cc: barbara roessner <btroessner@yahoo.com>
>> Sent: Saturday, June 9, 2012 7:04 AM
>> Subject: i think we should consider/discuss sending a short legalese letter to detroit news
>> asking that they not use the term "backpage.com murder victim"...backpage.com didn't murder
>> anyone...btr

DOJ-BP-0004901767

# EXHIBIT

# I

**To:**         scott.spear%villagevoicemedia.com@gtempaccount.com[scott.spear%villagevoicemedia.com@gtempaccount.com]
**From:**       Google Alerts
**Sent:**       Mon 1/2/2012 8:40:34 PM
**Subject:**    Google Alert - backpage.com
**MAIL_RECEIVED:**    Mon 1/2/2012 8:40:34 PM

**Web**                                                    **5** new results for **backpage.com**

### Google Redirect Virus Removal - Easiest Way To ... - Backpage
Other. USA. Google Redirect Virus Removal - Easiest Way To Remove Google Redirect Virus.
nyother.backpage.com/ElectronicsForSale/.../26556833

### Newsy | Backpage.com Escort Ads Linked to Four Detroit Deaths ...
Backstage.**com** is linked with four women\'s deaths in Detroit after they posted their own adult escort
ads.
www.newsy.com/.../backpage-com-escort-ads-linked-to-four-...

### Start 2012 with a !! - houston escorts - backpage.com
Houston. FM 1960/249/Willowbrook. Start 2012 with a !! - 28.
houston.backpage.com/FemaleEscorts/start-2012.../10498299

### Vintage Boat Motor Collection - phoenix boats ... - Backpage
Phoenix. Sun city. $1500, Vintage Boat Motor Collection.
phoenixnewtimes.backpage.com/BoatsForSale/.../15991995

### iPad 2 32GB - fort lauderdale electronics for sale - backpage.com
$120, iPad 2 32GB · Enlarge Picture. Want to save money and Score a brand new iPad 2 for 90% off
retail value? Check out the link below & read the article to **...**
browardpalmbeach.backpage.com/.../120-ipad-2.../16026049

Tip: Use a minus sign (-) in front of terms in your query that you want to exclude. Learn more.

Delete this alert.
Create another alert.
Manage your alerts.

# EXHIBIT

# J

**To:**        jim.larkin@villagevoicemedia.com[jim.larkin@villagevoicemedia.com]
**From:**      Google Alerts
**Sent:**      Sat 5/5/2012 10:58:24 PM
**Subject:**   Google Alert - backpage.com
**MAIL_RECEIVED:**    Sat 5/5/2012 10:58:24 PM

=== News - 1 new result for [backpage.com] ===

Man Charged in Backpage.com Murders
ABC News
Three of the victims had offered escort services on backpage.com, a
nationwide site similar to Craigslist, according to police. On Dec.
<http://abcnews.go.com/blogs/headlines/2012/05/man-charged-in-backpage-com-murders/>

This as-it-happens Google Alert is brought to you by Google.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Delete this Google Alert:
http://www.google.com/alerts/remove?hl=en&gl=us&source=alertsmail&s=AB2Xq4it5YzjEAra9x13jCU7IHJ7cW
L9e4Q9u7k

Create another Google Alert:
http://www.google.com/alerts?hl=en&gl=us&source=alertsmail

Sign in to manage your alerts:
http://www.google.com/alerts/manage?hl=en&gl=us&source=alertsmail

# EXHIBIT

# K

**From:**     Jim Larkin <Jim.Larkin@VillageVoiceMedia.com>
**Subject:**  Misc.
**Sent:**     Fri, 6 Jan 2012 16:58:41 -0700
**To:**       Michael Lacey <michael.lacey@villagevoicemedia.com>
craigslist agreement 110608.pdf

Michael;

1) I agree we should contemplate a well-considered scorched earth strategy re: McKenna, and I trust Sitrick's potential on-the-ground call in NYC that we might want to go all in against McKenna. Our primary worry is that we simply inflict a flesh wound and he covers his tracks with Microsoft quickly and the story dies. We need to talk about this with Moon as much as I dread the conversation. And McKenna is part of the HUGE adult story on the web as you point out. He doesn't know what he's talking about (Governor from Microsoft?) and neither do the media, the religious or the advocates. Moon won't like it but we should consider a perfect Craigslist-Bing-Microsoft-Campaign$-McKenna media storm as soon as possible, if we can pull it off with better than a 2-1 chance of success.

2) I've followed this parade very closely and I don't think the AG's have any fucking legal authority over any of our activities on the web. They can't prosecute, they can't investigate, they can't subpoena, they can't do bupkis but follow Blumenthal's playbook and beat us harshly from the bully pulpit. So, any agreement that might come from these Moon discussions is strictly window dressing. We have so far agreed to let them bully us and we want them to end up patting us on the head and telling us to follow USC guidelines. I think that is the agreement we are working for with the AG's.

3) Will such an AG agreement calm a buyer? Fuck if I know. The buyers were scared of nothing last time so if I give them nothing again will that make them more comfortable? It might make our lives a little more comfortable if I can get a lender interested with a stand down letter. Is that what we stand to lose if we let the McKenna shit fly? I think so. I've attached the 2008 Blumenthal Craigslist agreement to the bottom of this email. It reads as useless as teats on a boar but to a banker it might seem wonderful. If we let the McKenna shit fly we might want to move right into Federal Court where it is my understanding that the AG's will be told they are barking up someone else's tree.

3) There are a dozen new ways to sell sex on the net every fucking day. We probably have a higher risk to lose our backpage business from the onslaught of inevitable web innovation than we do these lard assed AG's and their analog political agendas.

4) I heard Allesandra the other night and I agree that we need a woman (non lawyer) carrying our water on the tube.
McNally is a smart soldier but Tracy at Culloton's office would have presented better, too bad I fired them, huh? It wouldn't be the first time
I pleaded with a woman to come back. What do you think? Any other ideas on spokeswoman? Obviously it would be better not to
worry about it and if we blow the whole thing up maybe we won't have to worry for a few months.

5) The LAW package is on its way to your house.

Larkin

On Jan 6, 2012, at 4:00 PM, Michael Lacey wrote:

> good call
>
> couple of concerns to discuss iwht mooner
>
> 1) im unclear where this sharing of info is going with mckennas staff.
> a) there is absolutlley no conversation about web safeguards for
> industry/reform/usc
> b) they have no authority to do that or go after us
>
> 2) mckenna is out of there this fall
>
> 3) we will have to deal with new top dog for AG assoc later this year.
> and as AG in Indianna is showing, facts have no bearing if they can
> beat the underage prostutution drum
>
> 4) i wonder, and i dont know but i wonder, might it not be worth
> nailing mckenna because it is juiciest part of story BUT it also
> involves explaining at same time how big adult web is. CRAIG of
> course, yes. and so much more. And your attny generals are corrupt
> whores. Craig, Go Daddy, and political hypocricy could break big
> enough that this goes away. its not an AG drum to pound after a
> perfect storm of publicity. (even CNN had to change the story. a year
> ago when we started running copy the story was over 300,000 underage
> girls every year. now, cnn's anderson cooper sayinig we do a good job
> on that front, why cant  we admit these are prostitutes.) i think we
> should consider perfect storm scenario , and if we do it means getting
> a full treatment
>
> 5)  what does the agreement look like that we need from AGs for
> business purposes and how does it bind the next AG pres when McK
> leaves office.
>
> wonder how long before cops catch someone in detroit

# JOINT STATEMENT

craigslist, the Attorneys General listed below, and the National Center for Missing and Exploited Children ("NCMEC"), announce new measures that craigslist is taking to help combat unlawful activity and improve public safety on its web site.

This agreement culminates a series of discussions and in person meetings between Jim Buckmaster, CEO of craigslist, Richard Blumenthal, Attorney General of the State of Connecticut, and NCMEC.

craigslist is a popular internet classifieds service that provides the public with many benefits. Like all communication tools, it can unfortunately be misused to facilitate unlawful activity.

craigslist has a long record of implementing measures to prevent misuse of its web site, assisting law enforcement investigations, and of improving safety for craigslist users. Law enforcement personnel have called craigslist's attention to misuse of craigslist's "erotic services" category to facilitate unlawful activity. This problem requires new safeguards for craigslist and new ways of working together with law enforcement. Further innovation and collaboration in addressing these issues will be beneficial for the safety of craigslist users and the general public. Accordingly, craigslist, the Attorneys General, and NCMEC, announce the following measures for combating unlawful activity and improving public safety on craigslist:

## I.   DIGITAL TAGGING, COMMUNITY FLAGGING, ELECTRONIC SCREENING

* craigslist has implemented a community self-policing program which allows users to "flag" a posting the user believes violates the terms of use, including the prohibition against pornography. The objectionable posting is eliminated automatically if it receives above a threshold number of flags.

* craigslist uses electronic screening to block certain advertisements that craigslist believes will violate its Terms of Use before they are posted.

* craigslist digitally tags adult sections of the site using industry standard PICS rating headers to facilitate the effectiveness of PC-based parental screening software.

## II.   TELEPHONE VERIFICATION

* craigslist has implemented a telephone verification system for the "erotic services" section of the site requiring any person seeking to post an advertisement to provide a working telephone number.

* Telephone verification enables craigslist to permanently block the phone number of any person posting unlawful or inappropriate advertisements.

## III.   CREDIT CARD VERIFICATION AND FEE TO POST

* craigslist plans to implement credit card verification and fee to post for its "erotic services" category. Persons wishing to post ads in this category will be required to pay a fee using a valid credit card.

* Credit card verification and fee to post will reduce ad volume significantly, and encourage more responsible usage.

* Credit Card verification provides additional identifying information that will enable craigslist to block the accounts of persons who violate craigslist's terms of use.

* credit card information would be available to law enforcement agencies through a subpoena process.

* craigslist plans to contribute 100% of the net revenues from these advertisements to charity. A public accounting firm will verify the net revenue amounts.

## IV.    LEGAL ACTION AGAINST SPAM OPERATORS

* Misuse of craigslist is facilitated by companies providing spamming, posting, and/or flagging services. These businesses seek financial profit by providing services and/or software that circumvent craigslist's terms of use and defense mechanisms or facilitate circumvention by other persons.

* craigslist has initiated (or will soon initiate) lawsuits against a number of these companies that violate craigslist's terms of use (or facilitate the violation of craigslist's terms of use by others).

* craigslist will provide evidence of unlawful activity by these operators to the Attorneys General for potential prosecution.

## V.    COOPERATION WITH LAW ENFORCEMENT

* craigslist has developed search capabilities that enhance its ability to assist NCMEC and law enforcement agencies to locate missing persons, and identify exploited minors and victims of human trafficking.

* craigslist is continuing its development efforts in this area to further enhance its ability to assist law enforcement NCMEC and even social welfare agencies in their efforts to protect children from this type of victimization.

* craigslist will cooperate with law enforcement utilizing the subpoena process.

## VI.    HUMAN TRAFFICKING AND CHILD EXPLOITATION AWARENESS

* craigslist is visited by more than 40 million Americans each month, generating more than 12 billion monthly page views. Information presented by craigslist can help raise awareness among Americans regarding the enormous suffering caused by human trafficking and the exploitation of minors in this country.

* craigslist, the Attorneys General, and NCMEC will work together to further refine and improve educational materials that are currently available on craigslist.

## VII.    FUTURE EFFORTS

* craigslist and the Attorneys General will meet on a regular basis to discuss design and functionality improvements to combat unlawful activity and improve safety on its web site.

\* craigslist will explore the implementation and use of technology that prevents image uploads likely to violate its terms of use.

\* craigslist will work with the Attorneys General to develop more robust electronic screening of language used in craigslist postings.

Jim Buckmaster
President and Chief Executive Officer
craigslist, Inc.

Ernie Allen
President and Chief Executive Officer
National Center for Missing and Exploited
Children

Richard Blumenthal
Attorney General of Connecticut

Terry Goddard
Attorney General of Arizona

Dustin B. McDaniel
Attorney General of Arkansas

John W. Suthers
Attorney General of Colorado

Richard S. Gebelein
Acting Attorney General of Delaware

Peter J. Nickles
Attorney General of the District of Columbia

Thurbert E. Baker
Attorney General of Georgia

Alicia G. Limtiaco
Attorney General of Guam

Mark J. Bennett
Attorney General of Hawaii

Lawrence G. Wasden
Attorney General of Idaho

Lisa Madigan
Attorney General of Illinois

Stephen Carter
Attorney General of Indiana

Tom Miller
Attorney General of Iowa

Steve Six
Attorney General of Kansas

Jack Conway
Attorney General of Kentucky

James D. "Buddy" Caldwell
Attorney General of Louisiana

Steven Rowe
Attorney General of Maine

Douglas F. Gansler
Attorney General of Maryland

Jim Hood
Attorney General of Mississippi

Mike McGrath
Attorney General of Montana

Jon Bruning
Attorney General of Nebraska

Catherine Cortez Masto
Attorney General of Nevada

Kelly A. Ayotte
Attorney General of New Hampshire

Anne Milgram
Attorney General of New Jersey

Gary King
Attorney General of New Mexico

Roy Cooper
Attorney General of North Carolina

Wayne Stenehjem
Attorney General of North Dakota

Nancy H. Rogers
Attorney General of Ohio

Drew Edmondson
Attorney General of Oklahoma

Hardy Myers
Attorney General of Oregon

Tom Corbett
Attorney General of Pennsylvania

Patrick C. Lynch
Attorney General of Rhode Island

Henry McMaster
Attorney General of South Carolina

Lawrence E. Long
Attorney General of South Dakota

Robert E. Cooper, Jr.
Attorney General of Tennessee

Mark L. Shurtleff
Attorney General of Utah

William H. Sorrell
Attorney General of Vermont

Vincent F. Frazer
Attorney General of the Virgin Islands

Robert F. McDonnell
Attorney General of Virginia

Rob McKenna
Attorney General of Washington

Darrell V. McGraw, Jr.
Attorney General of West Virginia

J. B. Van Hollen
Attorney General of Wisconsin

Bruce A. Salzburg
Attorney General of Wyoming

# EXHIBIT

# L

**Proposal for Research: Backpage.com**

As usual, the above costs include all direct costs associated with the project, which should be considered fixed rates associated with each research component. The only other costs associated with this project are related travel for meetings, communications, printing, and shipping, which are billed separately as they are incurred on a pass-through basis. While we provide an electronic copy of the crosstabs for free, there is a nominal cost for printing and shipping the crosstabs. As we do for all of our projects, we ask that each component of the project be paid in full before dialing begins.

Qualitive componet Only

3.29.2012
date

James Larkin
Chairman and CEO
Village Voice media

Anna Greer
SVP
Greenberg Quinlan Rosner
4/2/12

# EXHIBIT

# M

# GREENBERG QUINLAN ROSNER RESEARCH

July 10, 2012

# Backpage.com
## Media and Digital Brand Analysis

**To:**   Liz McDougal
         **Village Voice Media**

**From:**   Anna Greenberg, Phil Zakahi, and Ruth Igielnik
          **Greenberg Quinlan Rosner Research**

---

Over the past several years Backpage.com has become nearly synonymous with prostitution and illegal activity. This brand image is, in large part, the result of press coverage driven by anti-Craigslist and anti-Backpage.com advocates. However, this advocate-driven negative coverage is not the whole story. For years, there has been a near constant stream of stories about prostitution busts that mention Backpage.com.

Former anti-Craigslist advocates are at the heart of Backpage.com's current level of negative press. It may seem that there was a gap between the end of Craigslist's adult advertising and the start of the campaign against Backpage.com. In reality, these advocates actually waged a seamless four year campaign. They began their assault on Backpage.com immediately following Craigslist's capitulation. Many advocates cited Backpage.com as their next opponent in interviews about Craigslist shutting down its adult services section.

This transition from Craigslist to Backpage.com may also have been facilitated by the mention of both Craigslist and Backpage.com in the police blotter stories over the past four years. However, Craigslist was able to change the trajectory of coverage, in part, by shutting down its adult services section.  In contrast, Backpage.com's defense of its right to continue its adult advertising has perpetuated negative coverage and it is now clear that Village Voice Media's brand is now defined, in part, by its ownership of Backpage.com.

This research does not allow us to develop concrete strategic recommendations, but the analysis suggests a number of important considerations for Backpage.com.  First, the news media drives negativity towards Backpage.com; social media does not really react to stories about Backpage.com. This suggests that the current elite focus is well placed.  Second, it is unlikely that Backpage.com can turn around coverage without shutting down its adult services section; that said, there was a positive spike when the website issued additional guidelines for its adult services section, and there may be a benefit to pushing out the efforts that Backpage.com is making to combat trafficking, at least to elite media. Third, Village Voice Media needs to understand that its brand – not just Backpage.com – is being tarnished by this association and should consider steps to change the tone of coverage towards this venerable institution.

WORLD HEADQUARTERS
10 G Street, NE, Suite 500
Washington, DC 20002

EUROPEAN HEADQUARTERS
405 Carrington House
6 Hertford Street
London  UK  W1J 7SU

LATIN AMERICAN HEADQUARTERS
Cabrera 6060, 7 D
C1414 BHN
Ciudad de Buenos Aires, Argentina

www.gqrr.com   |   www.greenbergresearch.com

The following memo lays out our key findings from an analysis of the available press coverage, social media posting, and other internet content from the past several years. All content analyzed cites or mentions Backpage.com, Craigslist.com, or Village Voice Media. The stories and data for the analysis were collected via Lexis-Nexis as well as an automated internet scrape.

## Key Findings

- **Backpage.com Coverage Breaks Down Into Five Major Categories:**

  - **Police Blotter:** Stories about someone getting busted for using Backpage.com. This includes police stings, prostitution arrests, murders, etc. Overall this is the largest category of news about Backpage.com.

  - **Anti-Backpage Releases and Editorials:** Stories driven by the efforts of anti-Backpage activists, press releases from Change.org, statements from Rob McKenna or other AGs, and Kristof editorials. This is the second largest category of coverage and the largest section in recent months.

  - **Coverage of Backpage.com Actions:** Stories reporting some action taken by VVM and Backpage.com, including recent stories about the Washington lawsuit, coverage related to the temporary suspension of adult ads, and other Backpage.com actions.

  - **Backpage.com Defense Stories:** A small, but not insignificant category, these tend to be deeper stories written by business writers, liberal authors, or former sex workers defending Backpage.com and the adult services section.

  - **Industry Press:** Stories focused on the business of selling newspapers or classifieds. These stories were a major portion of Backpage.com's early news coverage and they are a continuing piece of the coverage of VVM.

- **News Media Driven.** With a few minor exceptions—including the Ashton Kutcher tweets—twitter and blogs appear to be on the trailing edge of the news media when it comes to Backpage.com. The news media prints stories and then social media reacts to the news. Furthermore, the social media chatter about this is not self-sustaining. Unlike many successful online advocacy campaigns, including efforts against Craigslist, anti-Backpage efforts have failed to go viral.

  The news media also appear to be driving all of the negativity around Backpage.com. On their own, sentiment towards Backapge.com on twitter and blogs appears to be fairly neutral. However, every big news story or op-ed seems to drive a lot of negative twitter posts for a week or so before the sentiment recovers.

- **Nicholas Kristof Op-Eds Started Small, Getting Bigger.** Kristof's first editorial actually generated only a very small news bump with a short tail of negative news stories. Similarly, its impact on twitter and social media coverage appears limited. However, with

© 2012 Greenberg Quinlan Rosner, All Rights Reserved.

each new op-ed his impact in the news media grows. Kristof's second op-ed gained much more traction both in news coverage and in social media response. Interestingly, while his next two pieces each generated even larger spikes in coverage with the news media, social media mentions seem to have stopped spiking in reaction to his stories.

- **Fluid Transition from Anti-Craigslist to Anti-Backpage.com** We were surprised in our analysis by how quick and how fluid the transition was from attacks on Craigslist to attacks on Backpage.com. Although it takes some time for these attacks to build into their current levels of pressure, they started almost immediately after Craigslist shut down adult services advertising.

  Backpage.com is only occasionally mentioned in anti-Craigslist articles for most of 2010. However as soon as Craigslist makes the decision to shut down adult advertising, stories begin to focus on Backpage.com. Not only do many of the stories about the Craigslist decision actually mention Backpage.com as "another" site still offering adult services, but within a month of the shutdown the first round of States' Attorneys General issue releases calling on Backpage.com to shut down.

- **Village Voice Media Coverage is Now Similar to Backpage.com.** In recent months, as the volume of anti-Backpage.com press has grown, coverage of Village Voice Media has been nearly identical to coverage of Backpage.com.  This concurrence is a recent development.  From 2006 to 2010 both Backpage.com and VVM saw a significant number of mentions in crime and position stories, but VVM's coverage was also focused significantly on industry press. These stories included discussions of the newspaper industry, stories of fights between San Francisco Weeklies, and company attacks on Sherriff Joe Arapaio.

## Looking Back at Backpage.com Coverage

### Pre-2008: Sparse Volume and Industry Press Focus

The earliest period in Backpage.com's history, starting with the announcement of its creation, was pretty uncontroversial. In fact, from the site's creation in 2004 through the end of 2007, our Nexis searches found only 43 news stories mentioning the website. Almost all of these stories are industry press. The stories discuss VVM taking on Craigslist or highlight the growing trend of online classifieds.

This period also carries a number of consumer focused stories about how to use Craigslist, Backpage.com and other classifieds sites. These articles range from how to make a make money cleaning out your house to how to avoid getting scammed when buying online. There are about a dozen of these stories over the course of two years.

■ **Pre-2008 News Headline Examples for Stories Mentioning Backpage.com**

> **"Free classified ads ride wave created online by craigslist"**
> *The Arizona Republic,* August 20, 2005

**"Online Classifieds Increase in Popularity; Category Visitation Surges 47 Percent in Past Year"**
*PR Newswire,* September 5, 2006

**"Popular Craigslist Web Site Now Charges $25 Fee for Help Wanted Listings"**
*San Diego Business Journal,* October 30, 2006

**"10 Steps to Hit the Ground Running; Welcome to New York"**
*The New York Times,* January 25, 2007

## 2008 – 2009: Prostitution and Police Blotter

In April of 2008, Backpage.com centric prostitution stings burst into the headlines after Michigan Senator Debbie Stabenow's husband admitted to buying sex from a women he met on Backpage.com. From that point forward, Backpage.com is regularly mentioned in articles about the new trend in prostitution through the internet, in articles about police stings using fake Backpage.com ads, and in stories about sex-trafficking.

This coverage trend generates more stories, with 73 articles on Lexis/Nexis mentioning Backpage in this two year period. At this point, the articles are almost never critical of Backpage.com, rather the stories address the issue factually in the same way that they might mention that the bust occurred at a Motel 6. This is also how Craigslist and Backpage.com first get linked together. Many articles mention that both Craigslist and Backpage.com were involved in the crime or sting.

Industry and consumer press also continue to play a role in the coverage of Backpage.com at this point. People still mention Backpage.com as a great place to advertise yard sales and the like. In addition there is a small spat between Craigslist and Backpage.com (not related to sex trafficking) that gets significant play in the industry press during this time.

■ **2008 – 2009 News Headline Examples for Stories Mentioning Backpage.com**

**"Sting operation leads to arrests on prostitution"**
*Sarasota Herald-Tribune,* November 18, 2008

**"Police say Overland Park prostitutes advertised online"**
*The Kansas City Star,* April 24, 2009

**"Craigslist executive accuses newspapers of hurting his site's bottom line"**
*SF Weekly,* June 15, 2009

© 2012 Greenberg Quinlan Rosner, All Rights Reserved.

**Brand Analysis: Backpage.com**

■ **Common Word Pairings from 2008 – 2009 Driven by Police Blotter**



## 2010: Volume Rises on Police Blotter, Attention Turns to Backpage.com

The first half of 2010 is marked mostly by a dramatic increase in the amount of police blotter type stories about prostitution stings, drug busts, and child trafficking. Whereas Lexis/Nexis reported 73 articles from 2008 to 2009, there are 248 articles in 2010 alone. We see this trend continue into 2011 and the first half of 2012.

■ **Coverage Jumps Every Year**



© 2012 Greenberg Quinlan Rosner, All Rights Reserved.

In the second half of the year, we see the attention of activist coverage shift from Craigslist to Backpage.com, as Craigslist announces a shutdown of their adult services section. In stories about the shutdown, Backpage.com is cited as the place where these adult ads still existed. After less than a month, the state Attorney Generals shifted their focus to Backpage.com and the press began to publish pieces attacking the website.  Backpage did appear to have a momentary reprieve when it announced an overhaul to safety measures on the adult services section, but that was short lived and attacks started again almost immediately.

■ **2010 News Headline Examples for Stories Mentioning Backpage.com**

> **"Seven charged in prostitution sting at Aurora hotel"**
> *Chicago Daily Herald,* January 5, 2010

> **"Human trafficking adopts technology for victimization"**
> *Catholic Woman,* May 2010

> **"Titusville man charged in online sex sting"**
> *Florida Today,* August 22, 2010

■ **Common Phrases from 2010 Coverage Show Advocacy Messages on Trafficking, Exploitation**



## 2011: Slow Burn on Backpage.com Attacks, Ashton Kutcher Tweets

With Craigslist adult services shut down, 2011 commenced the coordinated attack against Backpage.com. Total article volume this year on Lexis/Nexis was 579, more than twice as in

2010. The first half of the year was filled with negative stories about Backpage.com as well as a continuation of articles of the police blotter variety.

Around this same time, many of the police blotter stories started to change. Whereas stories previously just mentioned Backpage.com in passing, these stories started to also devote a few sentences to the controversy surrounding Backpage.com

In June, Ashton Kutcher's tweet about Backpage.com made enormous, albeit brief, waves on Twitter. In fact, despite months of increasing coverage, press releases, and editorials, Kutcher's tweet remains our highest point in single day of Twitter activity by a wide margin. However, the whole incident registered on Twitter for less than a week, before volume returned back to normal levels. Twitter chatter also shows no long term impact as a result of the Kutcher incident.

■  **Kutcher Tweet Leaves No Lasting Impact**



In the second half of the year there were a few other events that caused significant media spikes. First, the letter from the Attorneys General at the end of August demanding more information from Backpage.com about its control measures generated significant media attention. Later, news that a coalition of members of the clergy was also asking Backpage.com to stop its advertising generated a lot of attention in blogs and social media.

Finally, the very end of 2011 saw a huge news spike related to the Detroit murders. This spike related to the Detroit murders also appears in Twitter, but is only nominally apparent in the blogs and other social media.

© 2012 Greenberg Quinlan Rosner, All Rights Reserved.

■ **Detroit Murders Dominate December, 2011 Coverage**



■ **2011 News Headline Examples for Stories Mentioning Backpage.com**

**"Rights group targets sex ads; Claims online 'escorts' deal in human trafficking"**
*The Commercial Appeal,* January 15, 2011

**"Old profession, new websites"**
*Chicago Tribune,* April 21, 2011

**"Mayor orders city to suspend ads in Seattle Weekly"**
*The Seattle Times,* July 9, 2011

## 2012: Kristof Appears, Coverage and Buzz on the Rise

To date, 2012 has clearly been the toughest year for coverage of Backpage.com. The trend analysis shows that news coverage, twitter buzz, and social media discussion are all starting to show a constant and elevated state of interest. In addition, Lexis/Nexis volume for the first half of 2012 was 683 stories, more than all of 2011. The majority of stories are now spun essentially as attacks on Backpage.com, but we continue to see a consistent stream of police blotter stories about busts and stings.

The large number of coverage spikes makes this year different. These spikes occurred in all three media categories in our trend data and they occur around a variety of events. However, at the end of the day, they appear to be driven in large part by the four op-eds of Nikolas Kristof, each of which garnered a larger and larger press following.

© 2012 Greenberg Quinlan Rosner, All Rights Reserved.

■ **Kristof's Most Recent Op-Ed Generated Enormous Coverage**



The last and largest spike on the trend chart is actually driven by Backpage.com's lawsuit against the state of Washington. Rather than strictly positive or negative, the coverage around this lawsuit has been highly technical, an improvement from the Kristof pieces.

■ **Lawsuit Coverage Comes Through in June, 2012 Word Sets**



■ **2012 News Headline Examples for Stories Mentioning Backpage.com**

**"Co-founder's son calls on media chain to halt adult-services classified ads"**
*Deseret Morning News,* January 14, 2012

**"Critics slam website at legislative hearing"**
*The Associated Press,* January 28, 2012

**"How is Ann Romney connected to a site accused of promoting sex trafficking?"**
*The Business Insider,* April 3, 2012

**"Backpage.com sues over Wash. sex-trafficking law"**
*The Associated Press,* June 5, 2012

**Recent months have seen the most volume and the deepest lows:** Since about March 5th, the volume has been steadily much higher, with only a handful of days with no news mentions and constant tweeting. Sentiment has also been constantly negative at this time, with very few neutral reprieves.

■ **Trend Data Shows More Coverage, Chatter Since March**



© 2012 Greenberg Quinlan Rosner, All Rights Reserved.                          July, 2012

## Looking Back at Craigslist

### General Findings

- **Craigslist Sentiment Is Both Positive and Negative.** While almost all of the coverage sentiment on Backpage.com is totally negative, sentiment towards Craigslist is mixed. While past coverage has frequently focused on human trafficking and the Craigslist killer, there is also significant coverage on Craigslist about the buying and selling of everyday items.

- **Twitter Plays Key Role in Craigslist Sentiment.** There is a constant neutral hum on Twitter about Craigslist from people talking about selling junk, finding a new apartment, or giving away a couch. As a result, Twitter sentiment is not easily swayed, either to the positive or the negative, with regards to Craigslist. When Craigslist agrees to donate its profits from the adult services section to charity, news media and blog sentiments uptick, but Twitter remains unchanged. On the opposite end of the spectrum, when 40 Attorneys General subpoena Craigslist, sentiment drops with news and blogs, but not among those using Twitter.

- **Unlike with Backpage.com, for Craigslist, the news media seems to follow the lead of social media.** Twitter users are breaking stories and driving attitudes related to Craigslist. Twitter and blogs appear to react out in front of stories and then news volume and sentiment follows suit. We see this, for example, when data is released that Craigslist is losing money and visitors due to new procedural changes in November of 2010. The news media does not jump in volume or sentiment. Twitter and blogs, however, jump up and take notice. Similarly blogs responded highly to new Craigslist screening procedures in early 2009, while news media had far less of a reaction.

### Pre-2008 Craigslist; Before Pressure to Shut Down

Since Craigslist's founding by Craig Newmark in 1996, users all over the internet have gone to the site for everything from apartments to jobs to goods or services. The majority of early news was largely positive. The site grew slowly, but by 2003, publications like the New York Times were picking up its activity as Craigslist opened up in city after city across the country. Stories focused on how users utilized Craigslist for a variety of reasons, mostly how it made the online marketplace more accessible to average users. A Lexis Nexus search of stories before 2008 yields hundreds of articles regaling the positive effects Craigslist had on the marketplace.

In the few years leading up to the onslaught of negative attention, articles begin to emerge citing arrests associated with activity on the website. These range from drug arrests to fraud to prostitution. As with Backpage.com, most of the articles did not implicate Craigslist directly, but merely identified the website as the host for the activity.

Early in 2008 when then Attorney General (now Senator) Richard Blumenthal from Connecticut first wrote a letter to Craigslist, there was a spike in sentiment among news media. As a result, Craigslist began employing an anti-fraud team, implemented a new screening policy, and began

to ask all advertisers in their adult services section to provide a phone number – giving the website a positive jump in sentiment.

But coverage quickly got tough for Craigslist. Sentiment took a deep dive for Craigslist when it reached an agreement in 2008 year with a group of 40 Attorneys General to begin charging vendors in their adult services section a small fee for each ad. **News sentiment drops, and it is clear that while Craigslist has made a positive decision, the news media is not particularly happy with it.** Articles surface across the internet condemning Craigslist for playing host to illegal activities, specifically prostitution.

Despite strong reactions in the media to prostitution busts, and Craigslist's subsequent actions, it comes as no surprise that the event that has the strongest bearing on Craigslist's image in 2009 was the news of "The Craigslist Killer." This far exceeds any other references to Craigslist we see through sentiment and volume analysis.

## 2010 and the Craigslist Adult Ad Shutdown

Media sentiment was largely negative or neutral as further pressure was put on Craigslist to shut down its adult services section. This was, however, muddled by news of the Craigslist Killer, so it is difficult to track sentiment as closely. In May 2009, with news sentiment at an all-time low, law suits being filed on behalf of several states alleging that Craigslist was promoting prostitution, and articles flooding the internet condemning Craigslist, they decided to close their "erotic services" section and replace it with an "adult services" section. This, however, did not repair the wounded image Craigslist had accumulated.

**The first time that we see a significant dip across the board – Twitter, blogs, and traditional news – is when Craigslist finally took action and blocked their adult services section in September of 2010.** Volume was at an all-time high. Two months later in December, when Craigslist shut down their adult services section worldwide, there was a small spike, but nothing compared to the initial shutdown decision.

**■ Big Spike from Craigslist Shutdown**



© 2012 Greenberg Quinlan Rosner, All Rights Reserved.                                                July, 2012

## Since the Shutdown; Coverage Has Become More Neutral

Since Craigslist shutdown adult services in 2010, mentions of the website have become increasingly benign. For the most part, mentions are generated from matter of fact statements about the real-estate market or from a story about someone looking for work in the tough economy. It continues to be mentioned in more negative contexts, but it is almost never called out explicitly the way Backpage.com is now targeted. Instead, it might get an occasional mention in a police blotter story about a prostitution bust, a story attacking Backpage.com, or in a story about how to be safe online and avoid being scammed.

Shutting down has not been a perfect solution for Craigslist brand identity—particularly with concerns about Craigslist killers still floating in the media. However, the intense anti-Craigslist media has all but disappeared.

© 2012 Greenberg Quinlan Rosner, All Rights Reserved.                                July, 2012

# EXHIBIT

# O

| | |
|---|---|
| **From:** | Carl Ferrer [carl.ferrer@backpage.com] |
| **Sent:** | Tuesday, June 26, 2012 6:28 PM |
| **To:** | scarpenter@scottsdaleaz.gov |
| **Subject:** | Fwd: Request to hold posts |
| **Attachments:** | Posts 10777990  & 13535811.pdf |

---------- Forwarded message ----------
From: **Records Backpage** <records@backpage.com>
Date: Mon, Jun 25, 2012 at 2:05 PM
Subject: Fwd: Request to hold posts
To: Carl Ferrer <carl.ferrer@backpage.com>

Detective Carpenter,
Attached is a list of URLS and screen shots of other sites where the same phone numbers appeared. We
included the contact info for these other sites.

We are preserving the information you requested. I believe you are in contact with our records dept already.
If there is anything else we can do, please let us know.

- Carl

---------- Forwarded message ----------
From: **Carpenter, Scott - 541** <SCarpenter@scottsdaleaz.gov>
Date: Fri, Jun 22, 2012 at 1:18 PM
Subject: Request to hold posts
To: "records@backpage.com" <records@backpage.com>, "help@backpage.com" <help@backpage.com>

Can you please freeze the following posts, any related posts, and all related documents pending legal
process from Scottsdale PD? We are currently investigating a homicide and these posts are related.

10777990

13535811

Thank you in advance for your assistance.

Detective Scott Carpenter

Scottsdale Police Department

Gang Investigations Unit

1

BP-PSI-074413

DOJ-BP-0000052203

(480)312-6352 office

(480)312-9124 fax

BP-AZGJ00074401

BP-PSI-074414

DOJ-BP-0000052204

# EXHIBIT

# Q

POLICE DEPARTMENT
CITY OF SCOTTSDALE, ARIZONA
## SEARCH WARRANT
COUNTY OF MARICOPA, STATE OF ARIZONA

No. 2012-00616l

**TO ANY PEACE OFFICER IN THE STATE OF ARIZONA:**

Proof by affidavit having been made this day to me by <u>Detective Scott Carpenter #541</u>:

I am satisfied that there is probable cause to believe that:

( )     on the person(s) of:

(X)     in the premises known as:

Backpage.com; 1201 E Jefferson Street, Phoenix, AZ, 85034

( )  .  in the vehicle(s) described as:

( )     On/In the electric devices described as follows:

there is now being possessed or concealed property or things described as:

Any and all information related to internet postings 15682949, 17946824,
16390455, 17753089; 13535811, 10777990, any posting containing the phone
number (480)779-6145 to include all subscriber information such as name and
address, date of birth, gender, date account created, account status, e-mail address,
alternate e-mail address, registration from IP, date ID registered, and log-in IP
addresses associated with session times and dates. Any and all methods of
payment provided by the subscriber to Backpage.com for any services.

1

**Which property or things:**

( )    were stolen or embezzled

(X)    were used as a means for committing a public offense

( )    is (are) being possessed with the intent to use as a means of committing a public offense

( )    is (are) in the possession of _____ to whom it was delivered for the purpose of concealing it or preventing it from being discovered

( )    constitutes evidence tending to show that a public offense has been committed or that ... may have committed the offense.

( )    may be searched and inspected in the interest the public health, safety, or welfare as a part of an inspection program authorized by law

( )    is a person being sought who is the subject of an outstanding arrest warrant

Such public offense(s) being investigated are:

1st Degree Murder ARS 13-1105A1

Which occurred:

On June 22, 2012 at 11260 N 92nd St; #1057 in the City of Scottsdale, County of Maricopa, State of Arizona.

<u>YOU ARE THEREFORE COMMANDED</u>

(X)    in the daytime *(excluding the time period between 10:00 PM and 6:30 AM)*

( )    or nighttime *(good cause therefore having been shown)*

to make a search of the above named or described person(s), premise(s), and vehicle(s) for the herein above described property or things, and if you find the same or any part

2

thereof, to retain such in your custody or in the custody of the Scottsdale Police Department, as provided by A.R.S. 13-3920.

Return this warrant to me within three (3) days of the date thereof, as directed by A.R.S. 13-1318.

Given under my hand and dated this ___ day of _____, 2012.

_____
Judge of the Maricopa County Superior Court

HONORABLE BARBARA HAMNER
MARICOPA COUNTY SUPERIOR COURT

3

# EXHIBIT

# V

**From:** Kellie Rish
**Sent:** Thursday, April 20, 2017 2:57 PM
**To:** sross@akingump.com
**Subject:** State of Louisiana v. Adam Littleton

Pursuant to our telephone conference, I am requesting the address for service of process for a custodian of records to appear to testify in a murder trial in my jurisdiction. We have already received records from backpage.com pursuant to a search warrant. We have a signed court order for the appearance of a custodian for trial, however we were unable to properly serve Backpage because they apparently are no longer located in Dallas. Please advise so that we can send out the necessary paperwork. Our trial is scheduled for June 19, 2017.

Kellie M. Rish
Assistant District Attorney
State of Louisiana
Parish of Jefferson
(504)361-2847

# EXHIBIT

# W

IN THE CRIMINAL DISTRICT COURT NO. 1
OF DALLAS COUNTY, TEXAS

### No. OSW-17-004-H

| | | |
|---|---|---|
| In The Matter of Interstate Subpoena in: | § | Uniform Act to Secure Attendance |
| | § | of Witnesses from Without the |
| **THE STATE OF LOUISIANA** | § | State in Criminal Proceedings |
| v. | § | |
| **ADAM LITTLETON** | § | **Case No. 16-2908** |

## WAIVER OF HEARING

I, the CUSTODIAN OF RECORDS FOR BACKPAGE.COM, LLC, have been personally served with the Order of this Court to appear and show cause why I should not be required to appear before the 24th Judicial District Court of Jefferson Parish, located at 200 Derbigny Street, Gretna, Louisiana 70053, to testify in a pending criminal prosecution, styled *The State of Louisiana v. Adam Littleton*, Case No. 16-2908, beginning on June 19, 2017, as set forth in the Certificate of the Honorable Lee V. Faulkner, Jr., Judge of the 24th Judicial District Court in and for the Parish of Jefferson, State of Louisian, a copy of which is attached to the aforesaid order.

I, the CUSTODIAN OF RECORDS FOR BACKPAGE.COM, LLC, hereby voluntarily waive my right to a hearing on the Order to Show Cause and AGREE AND CONSENT that my testimony is material and necessary to the above-referenced proceeding and that said testimony will cause me no undue hardship. I accept service of the Interstate Subpoena and consent to appear and testify at the time and place directed.

CUSTODIAN OF RECORDS
BACKPAGE.COM, LLC

Date: 05 | 08 | 2017

## Kellie Rish

| | |
|---|---|
| **From:** | Nathan Backpage <nathan@backpage.com> |
| **Sent:** | Monday, May 22, 2017 10:20 AM |
| **To:** | Kellie Rish |
| **Subject:** | State v. Adam Littleton - Backpage.com Testimony |

Ms. Rish,

My name is Nathan Yockey, I am a Custodian of Records with Backpage.com and I have been assigned to aid in the authentication of certain records in the aforementioned case of State of Louisiana v. Adam Littleton.

At this point, I have fairly little knowledge aside from the relevance of the records and the specified date of June 19th set for a possible testimony. You can reach me at this email address or by phone at 469-317-6022 to discuss further travel options as well as any other information surrounding this case.

Regards,
Nathan J. Yockey
Backpage.com Subpoena Compliance Specialist
Custodian Of Records
469-317-6022
nathan@backpage.com

1