# EXHIBIT

# EE

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

YVONNE AMBROSE, individually and as )
    Administrator for the  Estate of Desiree )
Robinson, Deceased, )

        Plaintiffs, )

    V. )   No.

BACKPAGE.COM, L.L.C.; )
BACK PAGE, L.L.C.; )
MEDALIST HOLDINGS, L.L.C.; )
LEEWARD HOLDINGS, L.L.C.; )
CAMARILLO HOLDINGS, L.L.C.; )
DARTMOOR HOLDINGS, L.L.C.; )   **PLAINTIFFS DEMAND**
IC HOLDINGS, L.L.C.; )   **TRIAL BY JURY**
NEW TIMES MEDIA, L.L.C., )
UGC TECH GROUP C.V.; )
and ANTONIO ROSALES )

        Defendants. )

2017L004979
CALENDAR/ROOM R
TIME 00:00
FI Other

**JURY DEMAND**

The undersigned demands a jury trial.

Respectfully Submitted,
ROMANUCCI & BLANDIN, LLC

By: _B. Raveend_

Bhavani Raveendran
Attorney for the Plaintiff

Bhavani Raveendran
ROMANUCCI & BLANDIN
321 N. Clark St.; Ste 900
Chicago, IL  60654
Tel: (312) 458-1000
Fax: (312) 458-1004
Email: nward@rblaw.net
Attorney No.: 35875

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, Deceased, | ) ) ) | |
| | ) ) | 2017L004979 CALENDAR/ROOM R TIME 00:00 |
| Plaintiffs, | ) ) | PI Other |
| V. | ) ) | No. |
| BACKPAGE.COM, L.L.C.; BACK PAGE, L.L.C.; MEDALIST HOLDINGS, L.L.C.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO HOLDINGS, L.L.C.; DARTMOOR HOLDINGS, L.L.C.; IC HOLDINGS, L.L.C.; NEW TIMES MEDIA, L.L.C., UGC TECH GROUP C.V.; and ANTONIO ROSALES | ) ) ) ) ) ) ) ) ) ) ) | **PLAINTIFFS DEMAND TRIAL BY JURY** |
| Defendants. | ) | |

### AFFIDAVIT REGARDING DAMAGES SOUGHT

BHAVANI RAVEENDRAN, being first duly sworn under oath, states as follows:

1.     That your affiant is one of the attorneys of record for the party in this matter.

2.     That the total money damages sought in this civil action exceeds $50,000.

FURTHER AFFIANT SAYETH NOT.

_B. Raveend_

Bhavani Raveendran

Bhavani Raveendran
ROMANUCCI & BLANDIN
321 N. Clark St.; Ste 900
Chicago, IL 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
Email: nward@rblaw.net
Attorney No.: 35875

36

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

YVONNE AMBROSE, individually and as            )
Administrator for the   Estate of Desiree Robinson, )
Deceased,                                       )
                                                )
        Plaintiffs,                    )
                                                )
        V.                             )   No.
                                                )
BACKPAGE.COM, L.L.C.;                           )
BACK PAGE, L.L.C.;                              )
MEDALIST HOLDINGS, L.L.C.;                      )
LEEWARD HOLDINGS, L.L.C.;                       )
CAMARILLO HOLDINGS, L.L.C.;                     )
DARTMOOR HOLDINGS, L.L.C.;                      )   **PLAINTIFFS DEMAND**
IC HOLDINGS, L.L.C.;                            )   **TRIAL BY JURY**
NEW TIMES MEDIA, L.L.C.,                        )
UGC TECH GROUP C.V.;                            )
and ANTONIO ROSALES                             )
                                                )
                                                )
        Defendants.                    )

No. 2017L004979
CALENDAR/ROOM R
TIME 00:00
PI Other

### COMPLAINT AT LAW

Now comes the Plaintiff YVONNE AMBROSE, individually and as Administrator for

the Estate of Desiree Robinson, deceased, by her attorneys, Romanucci & Blandin, LLC, and for

their Complaint against Defendants, BACKPAGE.COM, L.L.C.; BACK PAGE, L.L.C.;

MEDALIST HOLDINGS, L.L.C.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO

HOLDINGS, L.L.C.;  DARTMOOR HOLDINGS, L.L.C.;  IC HOLDINGS, L.L.C.; NEW

TIMES MEDIA, L.L.C., UGC TECH GROUP C.V.; and ANTONIO ROSALES; state as

follows:

### NATURE OF THE ACTION

1.    DESIREE ROBINSON was a minor girl who was sold for sex on the website

www.backpage.com. On December 24, 2016, using www.backpage.com, 32 year old Defendant Anthony Rosales met and raped DESIREE ROBINSON, a 16 year old minor. Upon information and belief, after the rape, Anthony Rosales punched ROBINSON in the face, strangled her as she tried to call for help, and/or used a knife to slash ROBINSON's throat.  In addition to claims against Anthony Rosales, DESIREE ROBINSON's mother and next of kin, YVONNE AMBROSE, is bringing this case against the Backpage.com defendants because the Backpage.com defendants knowingly created and managed an online marketplace for sex trafficking on www.backpage.com, and then helped sex traffickers create and develop their sex ads so the Backpage.com defendants could profit from the ads. The Backpage.com defendants not only told sex traffickers how to avoid detection by law enforcement, but they actively sanitized sex ads to make it less obvious that the ads were for sex. The Backpage.com defendants have generated tens of millions of dollars in profit from the illegal sex ads posted on www.backpage.com.

## PARTIES, JURISDICTION, AND VENUE

### Plaintiff

2.      At all relevant times, decedent DESIREE ROBINSON was a citizen of the United States and a resident of the City of Chicago, County of Cook, State of Illinois.

3.      At the time of her death on December 24, 2016, DESIREE ROBINSON was a minor girl who was 16 years old.

4.      At all relevant times, YVONNE AMBROSE was the biological mother of ROBINSON and a citizen of the United States, residing in the City of Chicago, County of Cook, State of Illinois.

2

5.      On May 16, 2017, the Circuit Court of Cook County appointed Plaintiff, YVONNE AMBROSE, as the Administrator to Collect for the Estate of DESIREE ROBINSON. (Court No.: 2017 P 2614).

6.      Plaintiff YVONNE AMBROSE is the next of kin to DESIREE ROBINSON.

**Defendants**

7.      Defendant Backpage.com L.L.C. is a Delaware limited liability company. During the time that DESIREE ROBINSON was exploited and advertised for sex on www.backpage.com, Backpage.com, L.L.C., owned, operated, designed and controlled the website, including its content. Defendant Backpage.com L.L.C., also profited from the website www.backpage.com, including the sex ads posted of DESIREE ROBINSON and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant Backpage.com, L.L.C., transacted business in Cook County, Illinois, and purposefully availed itself of Cook County, Illinois, and the citizens of Cook County, Illinois, including through the www.backpage.com website.

8.      Defendant Back Page, L.L.C. is a Delaware limited liability company. During the time that DESIREE ROBINSON was exploited and advertised for sex on www.backpage.com, Back Page, L.L.C. owned, operated, designed and controlled the website, including its content. Defendant Back Page L.L.C., also profited from the website www.backpage.com, including the sex ads posted of DESIREE ROBINSON and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant Back Page, L.L.C., transacted business in Cook County, Illinois, and purposefully availed itself of Cook County, Illinois, and the citizens of Cook County, Illinois, including through the www.backpage.com website.

3

9.     Defendant Medalist Holdings L.L.C., is a Delaware limited liability company. During the time that DESIREE ROBINSON was exploited and advertised for sex on www.backpage.com, Medalist Holdings, L.L.C., owned, operated, designed and controlled the website, including its content. Defendant Medalist Holdings L.L.C. also profited from the website www.backpage.com, including the sex ads posted of DESIREE ROBINSON and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant Medalist Holdings, L.L.C., transacted business in Cook County, Illinois, and purposefully availed itself of Cook County, Illinois, and the citizens of Cook County, Illinois, including through the www.backpage.com website.

10.    Defendant Leeward Holdings, L.L.C., is a Delaware limited liability company. During the time that DESIREE ROBINSON was exploited and advertised for sex on www.backpage.com, Leeward Holdings, L.L.C., owned, operated, designed and controlled the website, including its content. Defendant Leeward Holdings, L.L.C., also profited from the website www.backpage.com, including the sex ads posted of DESIREE ROBINSON and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant Leeward Holdings, L.L.C., transacted business in Cook County, Illinois, and purposefully availed itself of Cook County, Illinois, and the citizens of Cook County, Illinois, including through the www.backpage.com website.

11.    Defendant Camarillo Holdings, L.L.C., is a Delaware limited liability company. During the time that DESIREE ROBINSON was exploited and advertised for sex on www.backpage.com, Camarillo Holdings, L.L.C. owned, operated, designed and controlled the website, including its content. Defendant Camarillo Holdings, L.L.C., also profited from the website www.backpage.com, including the sex ads posted of DESIREE ROBINSON and of

other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant Camarillo Holdings, L.L.C. transacted business in Cook County, Illinois, and purposefully availed itself of Cook County, Illinois, and the citizens of Cook County, Illinois, including through the www.backpage.com website.

12.     Defendant Dartmoor Holdings, L.L.C., is a Delaware limited liability company. During the time that DESIREE ROBINSON was exploited and advertised for sex on www.backpage.com, Dartmoor Holdings, L.L.C., owned, operated, designed and controlled the website, including its content. Defendant Dartmoor Holdings, L.L.C., also profited from the website www.backpage.com, including the sex ads posted of DESIREE ROBINSON and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant Dartmoor Holdings, L.L.C. transacted business in Cook County, Illinois, and purposefully availed itself of Cook County, Illinois, and the citizens of Cook County, Illinois, including through the www.backpage.com website.

13.     Defendant IC Holdings, L.L.C., is a Delaware limited liability company. During the time that DESIREE ROBINSON was exploited and advertised for sex on www.backpage.com, IC Holdings, L.L.C., owned, operated, designed and controlled the website, including its content. Defendant IC Holdings, L.L.C., also profited from the website www.backpage.com, including the sex ads posted of DESIREE ROBINSON and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant IC Holdings, L.L.C. transacted business in Cook County, Illinois, and purposefully availed itself of Cook County, Illinois, and the citizens of Cook County, Illinois, including through the www.backpage.com website.

14.     Defendant New Times Media, L.L.C., is a Delaware limited liability company. During the time that DESIREE ROBINSON was exploited and advertised for sex on www.backpage.com, New Times Media, L.L.C., owned, operated, designed and controlled the website, including its content. Defendant New Times Media, L.L.C. also profited from the website www.backpage.com, including the sex ads posted of DESIREE ROBINSON and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant New Times Media, L.L.C., transacted business in Cook County, Illinois, and purposefully availed itself of Cook County, Illinois, and the citizens of Cook County, Illinois, including through the www.backpage.com website.

15.     Defendant UGC Tech Group C.V. is a Dutch company domiciled in Curacao. During the time that DESIREE ROBINSON was exploited and advertised for sex on www.backpage.com, UGC Tech Group C.V. owned, operated, designed and controlled the website, including its content. UGC Tech Group C.V. also profited from the website www.backpage.com, including the sex ads posted of DESIREE ROBINSON and of other women and children, even though it knew those profits were derived from illegal conduct. At all times material hereto, defendant UGC Tech Group C.V. transacted business in Cook County, Illinois, and purposefully availed itself of Cook County, Illinois, and the citizens of Cook County, Illinois, including through the www.backpage.com website.

16.     Defendants, Backpage.com L.L.C., Back Page, L.L.C., Medalist Holdings L.L.C., Leeward Holdings, L.L.C., Camarillo Holdings, L.L.C., Dartmoor Holdings, L.L.C., IC Holdings, L.L.C., New Times Media, L.L.C., and UGC Tech Group C.V., are hereinafter collectively referred to throughout this complaint as the "Backpage  Defendants" or "Backpage.com Defendants."

17.     To the extent any of the Backpage.com defendants assert that they are not liable for the claims of  YVONNE AMBROSE, individually and as Administrator for the  Estate of DESIREE ROBINSON, deceased, because of their status as a corporation, limited liability company, or other business entity, or because they were acting on behalf of a corporation, limited liability company, or other business entity, any such protections must be disregarded because the Backpage.com defendants have intentionally tried to use those protections to avoid liability for their knowingly illegal conduct, including profiting from conduct that they knew was illegal. The Backpage Defendants have taken significant profits from conduct that they know is illegal, yet they would attempt to use those protections in order to avoid any liability or accountability for their knowingly illegal conduct and for knowingly accepting illegal profits. It is black letter law that individuals and entities, including corporate officers and owners, may be held liable if they participate in wrongful conduct or have knowledge of wrongful conduct and approve of the wrongful conduct. Plaintiff alleges that each of the Backpage.com defendants knew all of the facts that are alleged in this complaint, including the fact they were accepting significant profits from the illegal sex ads on www.backpage.com, such as the sex ads exploiting DESIREE ROBINSON.

18.     To the extent any of the Backpage.com defendants assert that they are not liable for the claims of YVONNE AMBROSE, individually and as Administrator for the  Estate of DESIREE ROBINSON, deceased, because of their status as a corporation, limited liability company, or other business entity, or because they were acting on behalf of a corporation, limited liability company, or other business entity, any such protections must be disregarded because the Backpage.com defendants are the alter ego of one another.

19.     To the extent any of the Backpage.com defendants assert that they are not liable for the claims of YVONNE AMBROSE, individually and as Administrator for the  Estate of DESIREE ROBINSON, deceased, because of their status as a corporation, limited liability company, or other business entity, or because they were acting on behalf of a corporation, limited liability company, or other business entity, any such protections must be disregarded because the Backpage.com defendants have been undertaking a joint venture.

20.     To the extent any of the Backpage.com defendants assert that they are not liable for the claims of YVONNE AMBROSE, individually and as Administrator for the  Estate of DESIREE ROBINSON, deceased, because of their status as a corporation, limited liability company, or other business entity, or because they were acting on behalf of a corporation, limited liability company, or other business entity, any such protections must be disregarded because the Backpage.com defendants are partners in the acts alleged herein.

21.     As more detailed in the Senate report that is attached as Exhibit A, the Backpage.com Defendants tried to use a wide range of entities to deflect the fact that a few individuals and entities owned and controlled www.backpage.com and took the profits from its illegal operations. There has been such unity of ownership and interest that the separateness of the corporation has ceased to exist.

22.     Upon information and belief, Defendant Anthony Rosales is a resident of Cook County, Illinois. At all times relevant hereto, and while knowing Plaintiff DESIREE ROBINSON was a minor child, defendant Anthony Rosales engaged in communications with DESIREE ROBINSON for immoral, exploitative and illegal purposes, actively attempted to solicit sex with DESIREE ROBINSON, solicited sex with DESIREE ROBINSON, and raped,

abused, assaulted, and eventually killed DESIREE ROBINSON. All of these activities took place in Cook County, Illinois.

23.    DESIREE ROBINSON was raped, abused and killed in the City of Markham, Cook County, Illinois.

24.    As discussed more fully herein, many of the acts and omissions giving rise to this action occurred in Cook County, Illinois; DESIREE ROBINSON resided in Cook County, Illinois; YVONNE AMBROSE resides in Cook County, Illinois, and all of the defendants conduct, or conducted, business in Cook County, Illinois, including at the time of the acts and omissions giving rise to this lawsuit.

## ALLEGATIONS COMMON TO ALL COUNTS

### A. At all relevant times, Backpage was the Largest Source of Sex Trafficking in the United States, Making Millions of Dollars Yearly from the Commercial Sex Trade.

25.    Under U.S. law, human trafficking includes, among other things, the unlawful practice of selling, soliciting, or advertising the sexual services of minors or of adults who have been coerced into participating in commercial sex.

26.    The crime of human trafficking generates billions of dollars each year in illegal proceeds, making it more profitable than any transnational crime except drug trafficking.

27.    The United State Congress designated the National Center for Missing & Exploited Children (NCMEC) to be the "official national resource center and information clearinghouse for missing and exploited children." 42 U.S.C. § 5773(b)(1)(B). Among its 22 statutorily authorized duties, NCMEC assists law enforcement in identifying and locating victims of sex trafficking and operates a "cyber tipline," which collects reports of Internet-related child sexual exploitation, including suspected child sex trafficking. Id. §§ 5773(b)(1)(P)(3), (b)(1)(V).

28.     In 2015, the NCMEC reported that between 100,000 and 300,000 youth are "at risk" for commercial sexual exploitation annually in the United States. *See* http://www.missingkids.org/en_US/publications/missingchildrenstatecare.pdf.

29.     In 2014, the United State Department of Justice has reported that more than half of sex-trafficking victims are 17 years old or younger.

30.     The NCMEC also reported an 846% increase in reports of suspected child sex trafficking from 2010 to 2015 — a spike the organization found to be "directly correlated to the increased use of the Internet to sell children for sex."

31.     According to the latest report from NCMEC, 73% of the suspected child trafficking reports it receives from the public involve Backpage.

32.     According to the Massachusetts Attorney General, "[t]he vast majority of prosecutions for sex trafficking now involve online advertising, and most of those advertisements appear on Backpage."

33.     Backpage.com is a classified advertising website that was launched in 2004.

34.     At all times relevant, www.backpage.com has been the largest source of online human sex trafficking in the United States, generating millions of dollars in profit yearly.

35.     Upon information and belief, in 2014, the Backpage.com defendants generated $135 million in revenue, the vast majority of which was generated from illegal ads for sex on www.backpage.com.

36.     Backpage.com is the market leader in commercial sex advertising and has been linked to thousands of reported cases of sex trafficking, including the trafficking of children.

**B.  At all relevant times, Backpage knew It Facilitated Prostitution and Child Sex Trafficking.**

37.     The Backpage.com Defendants intentionally created an online marketplace for sex trafficking and through their efforts www.backpage.com became the largest source of online human sex trafficking in the United States.

38.     The Backpage.com Defendants knowingly developed a reputation for www.backpage.com as a website where sex traffickers and prostitutes advertise commercial sex to customers. The Backpage.com defendants, through the development, marketing, and operation of the "escort" section of www.backpage.com, intentionally created a context where each individual post on its escort website can be readily ascertained as an advertisement for prostitution. This is often referred to as "normalizing," wherein sex traffickers who post sex ads on www.backpage.com review other sex ads on the website and then try to emulate with their own ads what is "normal."

39.     The Backpage.com defendants have profited tens of millions of dollars from the sex ads posted on the www.backpage.com website. The Backpage.com defendants made these profits, and kept these profits, despite knowing that the profits were generated as a result of illegal sex trafficking.

40.     The Backpage.com defendants conspired with sex traffickers and prostitutes to advertise women and children for sale on the www.backpage.com website.

41.     For example, the Backpage.com defendants knew that sex traffickers and prostitutes were paying the Backpage.com Defendants a fee to post sex ads on www.backpage.com, including in the "escort" section.

42.     The Backpage.com defendants knew that the vast majority of their annual revenue and profits were generated by ads for illegal sex, including ads of women and children who were being trafficked for sex.

11

43.     Thousands of prostitution advertisements and advertisements for sex with minors appeared on www.backpage.com every day, including dozens, if not hundreds, that were targeted at Illinois citizens, including Cook County citizens.

44.     The entire business model of the Backpage.com defendants is built on generating revenue and profit from sex trafficking, even though the defendants try to conceal their unlawful activity by asserting that the website is "like Craigslist." In reality, the Backpage.com defendants knew that advertisements for anything other than prostitution were simply serve as a cover to conceal their illegal operations that generate the vast majority of the website's revenue and profits.

45.     The vast majority of the Backpage.com Defendants' revenue and profit comes primarily from sex trafficking advertisements.

46.     The Backpage.com Defendants used a category on www.backpage.com called "Escorts" knowing full well that all advertisements therein were for sex.

47.     The Backpage.com Defendants knew that in the world of illicit human sex trafficking, the word "escort" stands for and in place of "prostitute" and means virtually the same thing. Escort customers are known as "johns" or "tricks." The predators that exploit and control the prostitutes for financial gain are "pimps."

48.     The Backpage.com defendants knew all of this and intentionally developed their website to require information that promoted this illegal trade to occur through their website, including the illegal trafficking of women and underage children.

**C. Backpage Assisted in the Development of Sex Ads by Knowingly, Systematically and Intentionally Editing "Adult" Ads in an Effort to "Sanitize" Them.**

49.     After creating the marketplace, the Backpage.com defendants intentionally helped sex traffickers create and develop the content of their ads on www.backpage.com, including

12

requiring information that promoted sex trafficking and the sex trade of women and children, so that the Backpage.com defendants could profit from each ad.

50.     When media outlets and law enforcement began to scrutinize the illegal activity occurring on www.backpage.com, the Backpage.com defendants took steps to help sex traffickers create ads that would avoid detection by law enforcement so that the Backpage.com defendants could continue to profit from those ads.

### 1. *Backpage Coaches Users via its Posting Rules and Content Requirements.*

51.     The Backpage.com Defendants also developed "posting rules" and "content requirements" that sex traffickers and prostitutes were required to follow in order to post sex ads in the "escort" section of the website. The Backpage defendants asserted in public, including to law enforcement, that the "posting rules" and "content requirements" were intended to prevent sex trafficking ads from appearing on www.backpage.com, including in the "Escort" section.

52.     However, the Backpage.com Defendants knew that the vast majority of the ads in the "Escort" section were sex trafficking ads and that the ads violated the "posting rules" and "content requirements." Nearly every ad in the "escort" section, for example, included one or more photographs of a so called "escort" in skimpy lingerie and sexually suggestive poses, such as spreading their legs at the camera or bending over and putting their thong clad rear ends on display, followed by a price, such as $150 per hour, a name, and a phone number.

53.     The Backpage.com defendants knew that the "posting rules" and "content requirements" served no purpose but to provide them with a way to publicly claim that they were not promoting and profiting from prostitution and sex trafficking of women and children.

54.     Backpage.com coached its customers on how to post "clean" ads for illegal transactions.

55.     When a user attempted to post an ad with a forbidden word, the user would receive an error message identifying the problematic word choice to "help" the user, as Defendant Ferrer put it.

56.     For example, in 2012, a user advertising sex with a "teen" would get the error message: "Sorry, 'teen' is a banned term."

57.     Through simply redrafting the ad, the user would be permitted to post a sanitized version featuring the same escort.

58.     Backpage.com employed a similarly helpful error message in its "age verification" process for adult ads.

59.     In October 2011, Defendant Ferrer directed a Backpage technology consultant to create an error message when a user supplied an age under 18. Ferrer stated that, "An error could pop up on the page: 'Oops! Sorry, the ad poster must be over 18 years of age.'" With a quick adjustment to the poster's putative age, the ad would post.

60.     Backpage has "more stringent rules to post an ad to sell a pet, a motorcycle, or a boat [as compared to a commercial sex ad]. For these ads, you are required to provide a verified phone number." Testimony of Yiota G. Souras, Senior Vice President & General Counsel, National Center for Missing and Exploited Children (NCMEC), before Permanent Subcommittee on Investigations (Nov. 19, 2015).

61.     In another internal email in October 2010, Mr. Ferrer expressed concerns that sex traffickers would be unhappy if the company actually banned their sex trafficking ads that violated the "posting rules" and "content requirements." Mr. Ferrer concluded that banning the sex trafficking ads would be "too harsh." Instead, Mr. Ferrer directed the employees of the Backpage.com defendants that it was "[b]etter to edit by removing bad text or removing bad

language" so that sex traffickers could "adjust."

### 2. *Backpage Sanitizes Sex Ads via Manual and Automated Editing.*

62.     The Backpage.com defendants also began "moderating" sex ads, which is the term they used for reviewing and editing sex ads on www.backpage.com.

63.     As early as 2006, Backpage executives began instructing staff responsible for screening ads (known as "moderators") to edit the text of adult ads to conceal the true nature of the underlying transaction.

64.     Just like their "posting rules" and "content requirements," the Backpage.com defendants claimed publicly that their "moderation" practices were intended to prevent sex trafficking on www.backpage.com.

65.     However, the Backpage.com defendants knew that their "moderators" were actually reviewing sex ads on www.backpage.com and then sanitizing the ads by making it less obvious that the ads were for sex.

66.     The "moderators" sanitized the sex ads by manually removing or editing language that directly or indirectly indicated that the ad was for sex.

67.     The "moderators" also removed images that indicated the ad was for sex.

68.     After sexually suggestive text and images were removed, the "moderators" would post the remainder of the ad.

69.     Through this "moderation" practice, the Backpage.com defendants were able to reap tens of millions of dollars in profits from advertisements that they knew were generated from illegal sex ads and sex trafficking.

70.     In an October 2016 deposition, a former "moderator" admitted his job as a moderator for the Backpage.com defendants was "to basically sanitize ads for prostitution." The

moderator admitted he sanitized ads by removing terms or images that suggested the ads were for sex for money. He would then post the sanitized ad, even though he knew the ad was a person who was trying to sell sex for money.

71.     In addition to manual editing by "moderators," the Backpage.com defendants also engaged in automatic "moderation" of sex ads on www.backpage.com.

72.     By October 2010, Backpage executives formalized a process of both manual and automated deletion of incriminating words and phrases, primarily through a feature called the "Strip Term From Ad Filter."

73.     At the direction of Backpage executive, Carl Ferrer, the company programmed this electronic filter to "strip"—that is, delete—hundreds of words indicative of sex trafficking (including child sex trafficking) or prostitution from ads before their publication.

74.     When a user posted an ad with certain words that directly or indirectly indicated the ad was for sex, the website would remove the offending language and then post the remainder of the ad.

75.     While the Strip Term From Ad filter changed nothing about the true nature of the advertised transaction or the real age of the person being sold for sex, thanks to the filter, Backpage's adult ads looked "cleaner than ever," as stated by Backpage.com Operations Manager Andrew Padilla in December 2010.

76.     Alternatively, the website would flag the ad and the ad would then appear on the www.backpage.com website until it was reviewed by a "moderator."

77.     Manual editing entailed the deletion of language similar to the words and phrases that the Strip Term From Ad filter automatically deleted—including terms indicative of criminality.

78.     The manual and automatic "moderation" of sex ads on www.backpage.com included words and phrases that indicated the subject of the sex ad was a child. For example, words such as "lolita," "teenage," "rape," "young," "amber alert," "little girl," "fresh," "innocent," and "school girl" were all manually or automatically removed from ads.

79.     After the ad was sanitized, the Backpage.com defendants would then post the ad with the same girl on www.backpage.com minus the offending and incriminating language such as "little girl" or "Lolita".

80.     By Backpage's own internal estimate, by late-2010, the company was editing "70 to 80% of ads" in the adult section either manually or automatically.

81.     The Backpage.com defendants charged a fee for each sex ad.

82.     By "moderating" ads instead of blocking them, the Backpage.com Defendants were able to continue to profit from illegal sex ads and sex trafficking.

83.     The "moderation" practices were used to sanitize ads for sex trafficking by removing or editing language that directly or indirectly indicated that the ad was for sex, instead of blocking said ads.

84.     The Backpage.com Defendants' "posting rules", "content requirements" and "moderation" practices were designed to help sex traffickers create and develop ads for sex that would evade law enforcement.

85.     In 2012, Carl Ferrer, in his capacity as Backpage executive, wrote to the Chief Operating Officer of www.backpage.com that sex traffickers needed to be informed what specific term(s) would prevent their ads from being posted on www.backpage.com.

**D. Backpage has Deliberately Refused to Implement a Meaningful or Reasonable System to Prevent Sex Trafficking.**

86.     The Backpage.com Defendants have long known that thousands of children were being advertised for sex on www.backpage.com, but they have refused to implement any meaningful or reasonable system to prevent children from being trafficked for sex on their website.

87.     For example, one of the original parent companies of www.backpage.com, Village Voice, required photo identification proving an individual was at least 18 years old before their ad could be published in the "adult" section of its newspapers. The company imposed this requirement to help prevent sex trafficking of minors.

88.     However, the Backpage.com Defendants refused to impose this same requirement before a sex ad was posted on www.backpage.com.

89.     The Backpage.com Defendants also refused to require photo identification because they knew that doing so would substantially reduce their profits.

90.     Rather than take any reasonable steps to prevent children from being advertised for sex on their website, the Backpage.com Defendants intentionally underreported the number of child sex ads on their website.

91.     For example, in an internal email, the Chief Operating Officer of www.backpage.com expressed concern with the number of ads that were being reported to the National Center for Missing and Exploited Children (NCMEC). He suggested the website "shouldn't be [reporting] more than 16 a day" unless the Backpage.com Defendants wanted to risk more than 500 reports a month to NCMEC.

92.     The Backpage.com Defendants have long known that sex trafficking is rampant on www.backpage.com. Rather than do anything to prevent sex trafficking, the Backpage.com Defendants have gone out of their way to assist sex traffickers in posting sex ads on their website

so that they can generate more profits. The Backpage.com defendants have not imposed this same requirement before a sex ad was posted on www.backpage.com.

93.    For example, the Backpage.com defendants accepted payment for advertisements of more than one woman or child from the same source.

94.    The Backpage.com defendants also allowed one credit card to be used finance sex ads for several different woman or children at the same time, and went so far as to instruct sex traffickers how to pay anonymously in order to avoid law enforcement detection and criminal prosecution.

95.    Despite knowing that sex traffickers were posting sex ads for many different women and children, the Backpage.com defendants made no effort to prevent those sex traffickers from continuing to post their sex ads.

**E.  The United States Senate Investigates Backpage.**

96.    The Backpage.com Defendants helped sex traffickers and prostitutes post ads, evade enforcement, exploit women and children, and reap profits in violation of numerous federal and state laws, including:

       a.   (720 ILCS 5/11-6) (Indecent solicitation of a child).

       b.   (720 ILCS 5/11-6.6) (Solicitation to meet a child).

       c.   (720 ILCS 5/11-9) (Public Indecency).

       d.   (720 ILCS 5/11-9.1) (Sexual exploitation of a child).

       e.   (720 ILCS 5/11-15.1) (Soliciting for a juvenile prostitute).

       f.   (720 ILCS 5/11- 17.1) (Keeping a place of juvenile prostitution).

       g.   (720 ILCS 5/11-18.1) (Patronizing a juvenile prostitute).

       h.   (720 ILCS 5/11-19.1) (Juvenile pimping).

      i.    (720 ILCS 5/11-19.2) (Exploitation of a child).

      j.    (720 ILCS 5/11-20.1) (Child pornography).

      k.   (720 ILCS 5/11-21) (Harmful material).

      l.    (720 ILCS 5/12-14.1) (Predatory criminal sexual assault of a child).

     m.  (720 ILCS 5/12-33) (Ritualized abuse of a child).

     n.   (720 ILCS 5/12-5(b)(10) (Child luring).

     o.   (720 ILCS 5/11-6.5) (Indecent solicitation of an adult).

     p.   (720 ILCS 5/11-25) (Grooming).

     q.   Trafficking Victims Protection Act (TVPA), 22 USC § 7102.

97.     In April 2015, the United States Senate Committee on Homeland Security and Governmental Affairs' Permanent Subcommittee on Investigations began its bipartisan investigation into human trafficking on the internet (hereinafter, "the U.S. Senate's online sex trafficking investigation").

98.     Among other things, the U.S. Senate investigated Backpage's role in the facilitation of sex trafficking, including the sex trafficking of children.

99.     After Backpage refused to honor the United States' Subpoenas to produce discovery and appear at a Senate hearing, the United States Senate voted 96-0 to start proceedings to hold Backpage in contempt of Senate.

100.    In January 2017, the U.S. Senate released a 53-page report titled "Backpage.com's Knowing Facilitation of Online Sex Trafficking" (hereinafter, "the U.S. Senate's Backpage.com Report").

101.    In its Report, the U.S. Senate concluded that Backpage executive Carl Ferrer, senior leadership and key employees deliberately crafted loopholes that enabled the trafficking of men, women, and children online.

102.    The Report additionally concluded that (1) Backpage knows that it facilitates prostitution and child sex trafficking, and (2) Backpage has knowingly concealed evidence of criminality by systematically editing its "adult" ads.

103.    Backpage moderators told the U.S. Senate during their investigation that everyone at the company knew the adult-section ads were for prostitution and that their job was to "put[] lipstick on a pig" by sanitizing them.

**F.  Desiree Robinson is Exploited on Backpage.com, Resulting in her Rape and Murder.**

104.    On or about November 29, 2016, DESIREE ROBINSON disappeared from her family home.

105.    Ads selling DESIREE ROBINSON for sex appeared on www.backpage.com in December 2016 and may have been posted even earlier.

106.    DESIREE ROBINSON was a minor girl who was 16 years old when she was repeatedly advertised for sex in the "escort" section of www.backpage.com with her picture displayed.

107.    At least one of these advertisements for sex with minor DESIREE ROBINSON was under the pseudonym "Chinadoll" with her picture displayed.

108.    DESIREE ROBINSON was advertised for sex on www.backpage.com by two unknown adult individuals, who were sex trafficking DESIREE ROBINSON.

109.     Each of the sex ads for DESIREE depicted DESIREE in a sexually explicit manner and indicated that she could be purchased for sex, sex acts, prostitution, and other illegal purposes.

110.     The two unknown individuals who were sex trafficking DESIREE ROBINSON, paid the Backpage.com defendants a fee in order to advertise on www.backpage.com.

111.     Upon information and belief, the Backpage.com defendants trained potential sex traffickers, including those trafficking DESIREE ROBINSON, to create sanitized ads that were less incriminating of sex trafficking on www.backpage.com.

112.     Upon information and belief, the Backpage.com defendants through their moderating or editing practices, combined with their terms of use, was responsible in part for the creation and development of the content of the advertisements featuring DESIREE ROBINSON for sex trafficking.

113.     At no point did the Backpage.com defendants take any steps to prevent DESIREE ROBINSON from being advertised for sex on www.backpage.com.

114.     Upon information and belief, despite knowing that the unknown individuals posting ads were sex traffickers who were selling women and children for sex on www.backpage.com, the Backpage.com defendants made no effort to prevent the two unknown individuals, from continuing to sell women and children for sex on the website, including Desiree Robinson.

115.     Upon information and belief, despite knowing that DESIREE ROBINSON was a minor or was likely a minor, the Backpage.com defendants made no effort to prevent ads exploiting her.

116.     As a result of being advertised for sex on www.backpage.com, upon information and belief, DESIREE ROBINSON was sexually abused and exploited by men, including ANTHONY ROSALES, who purchased her for sex by paying money to the two unknown individuals and or other pimps.

117.     On or about December 23, 2016, ads exploiting DESIREE ROBINSON as an "escort" were seen by ANTHONY ROSALES.

118.     On or about December 23, 2016, Anthony Rosales contacted the listed number on the ad for the male unknown individual to arrange a meeting with DESIREE ROBINSON.

119.     On or about the night of December 23, 2016, the two unknown individuals forced DESIREE ROBINSON into a vehicle and drove her to meet Anthony Rosales.

120.     The two unknown individuals then brought her into the residence owned by the parents of Anthony Rosales, DONATO ROSALES and FILIBERTO ROSALES, where DONATO ROSALES was having a party the garage on the property.

121.     The parents of Defendant ANTHONY ROSALES knew Defendant ANTHONY ROSALES was inviting guests and provided permission for DESIREE ROBINSON to attend said party.

122.     At said party, DESIREE ROBINSON was sold to Anthony Rosales by the two unknown individuals.

123.     The two unknown individuals received money in exchange for DESIREE ROBINSON.

124.     The two unknown individuals watched DESIREE ROBINSON be taken from the house into the truck of ANTHONY ROSALES, parked on the street near the party or in the driveway.

23

125.    In the early morning of December 24, 2016, using www.backpages.com, the 32 year old Defendant Rosales raped DESIREE ROBINSON, a 16 year old minor.

126.    Defendant Rosales then sent DESIREE ROBINSON back to the two unknown individuals when his purchased time with DESIREE ROBINSON had expired.

127.    The two unknown individuals left the residence with DESIREE ROBINSON.

128.    Later in the morning of December 24, 2016, after the two unknown individuals and DESIREE ROBINSON left, the male unknown individual was contacted again by Defendant Rosales who expressed that he would like to purchase DESIREE ROBINSON for a second time.

129.    The two unknown individuals picked Defendant ANTHONY ROSALES from another location and brought him and DESIREE ROBINSON once again, back to the residence where the party had occurred.

130.    The two unknown individuals drove their vehicle back to the residence and DESIREE ROBINSON and Defendant ANTHONY ROSALES went inside the garage.

131.    The two unknown individuals fell asleep in their vehicle.

132.    On December 24, 2016, using www.backpages.com, Anthony Rosales tried to forcibly rape DESIREE ROBINSON, a 16 year old minor, in the garage on the property owned by his parents.

133.    Upon being refused by DESIREE ROBINSON, Anthony Rosales beat DESIREE ROBINSON in and about the face, strangled her as she tried to call for help, and/or used a knife to slash ROBINSON's throat in the garage.

134.    After physically assaulting and murdering DESIREE ROBINSON, Defendant ANTHONY ROSALES stripped her body naked and left her dead on the garage floor.

135.     Defendant ANTHONY ROSALES then left the garage informed the two unknown individuals that DESIREE ROBINSON would be out shortly and left the residence.

136.     The two unknown individuals knocked on the door of the house owned by the parents of ANTHONY ROSALES, and one of the residents unlocked the locked garage.

137.     DESIREE ROBINSON's body was found inside.

138.     As a direct and proximate result of the foregoing acts, DESIREE ROBINSON was exploited, raped and otherwise sexually abused and brutally murdered.

139.     In late December 2016 or early January 2017, the Cook County State's Attorney's Office charged Defendant Rosales with first-degree murder and aggravated sexual abuse; the criminal case is pending in Cook County, Illinois.

### COUNT 1: NEGLIGENCE-WRONGFUL DEATH
**(Plaintiff Yvonne Ambrose, as Administrator for the Estate of Desiree Robinson, v. Backpage Defendants)**

140.     Plaintiff YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, incorporates paragraphs 1 to 142 of this Complaint as if fully set forth herein.

141.     The Backpage.com defendants had a duty of care to operate www.backpage.com in a manner that did not endanger minor children, including DESIREE ROBINSON.

142.     The Backpage.com defendants had a duty of care to take reasonable steps to protect the foreseeable victims of the danger created by their acts and omissions, including the danger created by their online marketplace for sex trafficking and their actions in perpetuating that marketplace by helping sex traffickers post their sex ads.

143.     The Backpage Defendants knew of should have known that a substantial and foreseeable risk of bodily harm and even death for sex trafficking victims who are advertised as

25

"escorts" on its website. Multiple murders of Backpage "escorts" have been committed by killers who found their victims on Backpage. These murders have been widely reported by various news and media outlets.

144. The Backpage.com defendants breached the foregoing duties because they knew, or should have known, that adults working as sex traffickers were using their website to post advertisements of minor children for sex, including such advertisements of DESIREE ROBINSON, but they took no steps to protect those children, including DESIREE ROBINSON.

145. Moreover, the Backpage.com defendants breached their duty through the following acts and/or omissions:

     a. Actively facilitated prostitution and sex trafficking;

     b. Assisted in the development of sex ads by knowingly, systematically and intentionally editing "Adult" ads in an effort to "sanitize" or "clean up" them;

     c. Coached users how to "sanitize" or "clean up" ads via its posting rules and content requirements;

     d. Coached its users on how to post "clean ads" for illegal transactions;

     e. Sanitized sex ads via manual and automated editing;

     f. Refused to implement a meaningful or reasonable system to prevent sex trafficking in its website in order to maintain generating millions of dollars in profits;

     g. Automatically deleted incriminating words from sex ads prior to publication;

     h. Altered the evidentiary value of the original ads;

     i. Used moderators to manually delete incriminating evidence in ads that automatic filters missed;

     j. Intentionally underreported instances of child exploitation;

     k. Deliberately crafted loopholes that enabled the trafficking of men, women, and children online; and/or

l.   Was otherwise negligent.

146.   As a direct and proximate result of the aforesaid acts and/or omissions by Backpage Defendants, Decedent, DESIREE ROBINSON, was caused to suffer damages, including pain, suffering, and death.

147.   The injuries sustained by Decedent, DESIREE ROBINSON, caused or contributed to her death.

148.   Plaintiff YVONNE AMBROSE, as Administrator for the Estate of Desiree Robinson, deceased, brings this cause of action pursuant to the provisions of 740 ILCS 180/1, *et seq.*, commonly known as the Illinois Wrongful Death Act.

149.   At the time of her death, Decedent, DESIREE ROBINSON, was survived by her mother, YVONNE AMBROSE, father, and siblings.

150.   Decedent's parents were dependent upon the Decedent's services, support, society, companionship, love and affection, during and for the remainder of her life, of which they were deprived as a direct and proximate result of DESIREE ROBINSON's death on December 24, 2016.

151.   As a further direct and proximate result of the premature death of Decedent, DESIREE ROBINSON, on December 24, 2016 the above named heirs/next-of-kin suffered a loss of service, support, society, companionship, love, and affection for which they were dependent upon DESIREE ROBINSON during and for the remainder of her expected life.

WHEREFORE, YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, respectfully requests that this Court enter judgment against Defendants, BACKPAGE.COM, L.L.C.; BACK PAGE, L.L.C.; MEDALIST HOLDINGS, L.L.C.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO HOLDINGS, L.L.C.;   DARTMOOR

HOLDINGS, L.L.C.; IC HOLDINGS, L.L.C.; NEW TIMES MEDIA, L.L.C., and UGC TECH

GROUP C.V., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus

costs with interest in bringing this action, and for such other relief this Court deems fair and just.

**COUNT 2: NEGLIGENCE-SURVIVAL ACTION**
**(Plaintiff Yvonne Ambrose, as Administrator for the Estate of Desiree Robinson, v.**
**Backpage Defendants)**

152.    Plaintiff YVONNE AMBROSE, individually and as Administrator for the Estate

of Desiree Robinson, deceased, incorporates paragraphs 1 through 142 of this Complaint as if

fully set forth herein.

153.    The Backpage.com defendants had a duty of care to operate www.backpage.com

in a manner that did not endanger minor children, including DESIREE ROBINSON.

154.    The Backpage.com defendants had a duty of care to take reasonable steps to

protect the foreseeable victims of the danger created by their acts and omissions, including the

danger created by their online marketplace for sex trafficking and their actions in perpetuating

that marketplace by helping sex traffickers post their sex ads.

155.    The Backpage.com defendants breached the foregoing duties because they knew,

or should have known, that adults working as sex traffickers were using their website to post

advertisements of minor children for sex, including such advertisements of DESIREE

ROBINSON, but they took no steps to protect those children, including DESIREE ROBINSON.

156.    Moreover, the Backpage.com defendants breached their duty through the

following acts and/or omissions:

a. Actively facilitated prostitution and sex trafficking;

b. Assisted in the development of sex ads by knowingly, systematically and
intentionally editing "Adult" ads in an effort to "sanitize" or "clean up" them;

c. Coached users how to "sanitize" or "clean up" ads via its posting rules and

28

content requirements;

d.  Coached its users on how to post "clean ads" for illegal transactions;

e.  Sanitized sex ads via manual and automated editing;

f.  Refused to implement a meaningful or reasonable system to prevent sex trafficking in its website in order to maintain generating millions of dollars in profits;

g.  Automatically deleted incriminating words from sex ads prior to publication;

h.  Altered the evidentiary value of the original ads;

i.  Used moderators to manually delete incriminating evidence in ads that automatic filters missed;

j.  Intentionally underreported instances of child exploitation;

k.  Deliberately crafted loopholes that enabled the trafficking of men, women, and children online; and/or

l.  Was otherwise negligent.

157.   As a direct and proximate result of the aforesaid acts and/or omissions by Backpage Defendants, Decedent, DESIREE ROBINSON, was caused to suffer damages, including pain, suffering, and death.

158.   The injuries sustained by Decedent, DESIREE ROBINSON, caused or contributed to her death.

159.   Plaintiff, YVONNE AMBROSE, and Decedent, DESIREE ROBINSON, did not have knowledge of acts and/or omissions of Defendants, and that they caused injury to the Decedent until her death.

160.   Plaintiff, YVONNE AMBROSE, as Administrator of the Estate of DESIREE ROBINSON, Deceased, brings this action pursuant to the provisions of 755 ILCS 5/27-6, known as the Illinois Survival Statute.

29

161.   As a direct and proximate result of one or more of the Defendants' negligent acts and/or omissions, DESIREE ROBINSON suffered injuries of a personal and pecuniary nature including, but not limited to, hospital, medical and related expenses, disability and disfigurement, pain and suffering, physical loss of chance of survival, and emotional trauma that DESIREE ROBINSON would have been entitled to receive compensation from the Defendants for these injuries, had she survived.

WHEREFORE, YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, respectfully requests that this Court enter judgment against Defendants, BACKPAGE.COM, L.L.C.; BACK PAGE, L.L.C.; MEDALIST HOLDINGS, L.L.C.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO HOLDINGS, L.L.C.;   DARTMOOR HOLDINGS, L.L.C.;  IC HOLDINGS, L.L.C.; NEW TIMES MEDIA, L.L.C., and UGC TECH GROUP C.V., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs with interest in bringing this action, and for such other relief this Court deems fair and just.

## COUNT 3: WILLFUL AND WANTON-WRONGFUL DEATH
### (Plaintiff Yvonne Ambrose, as Administrator for the Estate of Desiree Robinson, v. Backpage Defendants)

162.   Plaintiff YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, incorporates paragraphs 1 through 142 of this Complaint as if fully set forth herein.

163.   The Backpage.com defendants had a duty of care to operate www.backpage.com in a manner that did not endanger minor children, including DESIREE ROBINSON, and to protect minors from willful and wanton harm, including sex trafficking, exploitation, sexual assault, rape and murder.

164.   The Backpage.com defendants had a duty to refrain from willful, wanton and/or

30

egregious conduct when operating www.backpage.com in a manner that did not intentionally and/or recklessly endanger minor children, including DESIREE ROBINSON.

165.    The Backpage.com defendants engaged in willful and wanton conduct against DESIREE ROBINSON by because they knew that adults working as sex traffickers were using their website to post advertisements of minor children for sex, including such advertisements of DESIREE ROBINSON, but they took no steps to protect those children, including DESIREE ROBINSON and instead facilitated sex trafficking on their website in an effort to maintain and/or maximize profits.

166.    Moreover, engaged in willful and wanton conduct against Plaintiffs by committing one or more of the following acts and/or omissions:

      a.  Actively facilitated prostitution and sex trafficking;

      b.  Assisted in the development of sex ads by knowingly, systematically and intentionally editing "Adult" ads in an effort to "sanitize" or "clean up" them;

      c.  Coached users how to "sanitize" or "clean up" ads via its posting rules and content requirements;

      d.  Coached its users on how to post "clean ads" for illegal transactions;

      e.  Sanitized sex ads via manual and automated editing;

      f.  Refused to implement a meaningful or reasonable system to prevent sex trafficking in its website in order to maintain generating millions of dollars in profits;

      g.  Automatically deleted incriminating words from sex ads prior to publication;

      h.  Altered the evidentiary value of the original ads;

      i.  Used moderators to manually delete incriminating evidence in ads that automatic filters missed;

      j.  Intentionally underreported instances of child exploitation;

      k.  Deliberately crafted loopholes that enabled the trafficking of men, women, and

children online; and/or

l.   Was otherwise willful and wanton.

167.   As a direct and proximate result of the aforesaid willful and wanton acts and/or omissions by Backpage Defendants, Decedent, DESIREE ROBINSON, was caused to suffer damages, including pain, suffering, and death.

168.   The injuries sustained by Decedent, DESIREE ROBINSON, caused or contributed to her death.

169.   Plaintiff YVONNE AMBROSE, as Administrator for the Estate of Desiree Robinson, deceased, brings this cause of action pursuant to the provisions of 740 ILCS 180/1, *et seq.*, commonly known as the Illinois Wrongful Death Act.

170.   At the time of her death, Decedent, DESIREE ROBINSON, was survived by her parents, YVONNE AMBROSE and Walton Treadwell.

171.   Decedent's parents were dependent upon the Decedent's services, support, society, companionship, love and affection, during and for the remainder of her life, of which they were deprived as a direct and proximate result of DESIREE ROBINSON's death on December 24, 2016.

172.   As a further direct and proximate result of the premature death of Decedent, DESIREE ROBINSON, on December 24, 2016 the above named heirs/next-of-kin suffered a loss of service, support, society, companionship, love, and affection for which they were dependent upon DESIREE ROBINSON during and for the remainder of her expected life.

WHEREFORE, YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, respectfully requests that this Court enter judgment against Defendants, BACKPAGE.COM, L.L.C.; BACK PAGE, L.L.C.; MEDALIST HOLDINGS, L.L.C.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO HOLDINGS, L.L.C.;   DARTMOOR

HOLDINGS, L.L.C.;  IC HOLDINGS, L.L.C.; NEW TIMES MEDIA, L.L.C., and UGC TECH

GROUP C.V., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus

costs with interest in bringing this action, and for such other relief this Court deems fair and just.

## COUNT 4: WILLFUL AND WANTON-SURVIVAL ACTION
### (Plaintiff Yvonne Ambrose, as Administrator for the Estate of Desiree Robinson, v. Backpage Defendants)

173.    Plaintiff YVONNE AMBROSE, individually and as Administrator for the Estate

of Desiree Robinson, deceased, incorporates paragraphs 1 through 142 of this Complaint as if

fully set forth herein.

174.    Plaintiff YVONNE AMBROSE, individually and as Administrator for the Estate

of Desiree Robinson, deceased, incorporates all preceding paragraphs of this Complaint as if

fully set forth herein.

175.    The Backpage.com defendants had a duty of care to operate www.backpage.com

in a manner that did not endanger minor children, including DESIREE ROBINSON, and to

protect minors from willful and wanton harm, including sex trafficking, exploitation, sexual

assault, rape and murder.

176.    The Backpage.com defendants had a duty to refrain from willful, wanton and/or

egregious conduct when operating www.backpage.com in a manner that did not intentionally

and/or recklessly endanger minor children, including DESIREE ROBINSON.

177.    The Backpage.com defendants engaged in willful and wanton conduct against

DESIREE ROBINSON by because they knew that adults working as sex traffickers were using

their website to post advertisements of minor children for sex, including such advertisements of

DESIREE ROBINSON, but they took no steps to protect those children, including DESIREE

ROBINSON and instead facilitated sex trafficking on their website in an effort to maintain

33

and/or maximize profits.

178.   Moreover, engaged in willful and wanton conduct against Plaintiffs by committing one or more of the following acts and/or omissions:

      m. Actively facilitated prostitution and sex trafficking;

      n. Assisted in the development of sex ads by knowingly, systematically and intentionally editing "Adult" ads in an effort to "sanitize" or "clean up" them;

      o. Coached users how to "sanitize" or "clean up" ads via its posting rules and content requirements;

      p. Coached its users on how to post "clean ads" for illegal transactions;

      q. Sanitized sex ads via manual and automated editing;

      r. Refused to implement a meaningful or reasonable system to prevent sex trafficking in its website in order to maintain generating millions of dollars in profits;

      s. Automatically deleted incriminating words from sex ads prior to publication;

      t. Altered the evidentiary value of the original ads;

      u. Used moderators to manually delete incriminating evidence in ads that automatic filters missed;

      v. Intentionally underreported instances of child exploitation;

      w. Deliberately crafted loopholes that enabled the trafficking of men, women, and children online; and/or

      x. Was otherwise willful and wanton.

179.   As a direct and proximate result of the aforesaid willful and wanton acts and/or omissions by Backpage Defendants, Decedent, DESIREE ROBINSON, was caused to suffer damages, including pain, suffering, and death.

180.   The injuries sustained by Decedent, DESIREE ROBINSON, caused or contributed to her death.

181.    Plaintiff YVONNE AMBROSE, as Administrator for the Estate of Desiree Robinson, deceased, brings this cause of action pursuant to the provisions of 740 ILCS 180/1, *et seq.*, commonly known as the Illinois Wrongful Death Act.

182.    At the time of her death, Decedent, DESIREE ROBINSON, was survived by her parents, YVONNE AMBROSE and Walton Treadwell.

183.    As a direct and proximate result of the aforesaid acts and/or omissions by Backpage Defendants, Decedent, DESIREE ROBINSON, was caused to suffer damages, including pain, suffering, and death.

184.    The injuries sustained by Decedent, DESIREE ROBINSON, caused or contributed to her death.

185.    Plaintiff, YVONNE AMBROSE, as Administrator of the Estate of DESIREE ROBINSON, Deceased, brings this action pursuant to the provisions of 755 ILCS 5/27-6, known as the Illinois Survival Statute.

186.    As a direct and proximate result of one or more of the Defendants' willful and wanton acts and/or omissions, DESIREE ROBINSON suffered injuries of a personal and pecuniary nature including, but not limited to, hospital, medical and related expenses, disability and disfigurement, pain and suffering, physical loss of chance of survival, and emotional trauma that DESIREE ROBINSON would have been entitled to receive compensation from the Defendants for these injuries, had she survived.

WHEREFORE, YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, respectfully requests that this Court enter judgment against Defendants, BACKPAGE.COM, L.L.C.; BACK PAGE, L.L.C.; MEDALIST HOLDINGS, L.L.C.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO HOLDINGS, L.L.C.;   DARTMOOR

HOLDINGS, L.L.C.; IC HOLDINGS, L.L.C.; NEW TIMES MEDIA, L.L.C., UGC TECH GROUP C.V.; and UGC TECH GROUP C.V., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs with interest in bringing this action, and for such other relief this Court deems fair and just.

## COUNT 5: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS- SURVIVAL ACTION
### (Plaintiff Yvonne Ambrose, as Administrator for the Estate of Desiree Robinson, v. Backpage Defendants)

187.    Plaintiff YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, incorporates paragraphs 1 through 142 of this Complaint as if fully set forth herein.

188.    As described herein, Backpage Defendants, among other things, knew that adults working as sex traffickers were using their website to post advertisements of minor children for sex, including such advertisements of DESIREE ROBINSON, but they took no steps to protect those children, including DESIREE ROBINSON and instead facilitated sex trafficking on their website in an effort to maintain and/or maximize profits.

189.    Backpage Defendants actively concealed information; facilitated sex trafficking of women and children by active concealment; and/or knowingly exposed children to sexual abuse or the high probability of sexual abuse.

190.    The Backpage Defendants' actions are both extreme and outrageous.

191.    The Backpage Defendants knew that there was a high probability that their conduct would expose women and minors, such as DESIREE ROBINSON, to a risk of serious physical and/or emotional harm, including exploitation, rape and/or sexual assaults, and that such exploitation, rape and/or sexual assaults would inflict severe emotional distress upon DESIREE ROBINSON.

36

192. Backpage Defendants intentionally and/or recklessly disregarded the high probability that its conduct would inflict severe emotional distress upon DESIREE ROBINSON.

193. Defendants' conduct did cause and continues to cause Plaintiff severe emotional distress and mental anguish.

194. As a direct and proximate result of the aforesaid acts and/or omissions by Backpage Defendants, Decedent, DESIREE ROBINSON, was caused to suffer damages, including pain, suffering, and death.

195. Plaintiff, YVONNE AMBROSE, as Administrator of the Estate of DESIREE ROBINSON, Deceased, brings this action pursuant to the provisions of 755 ILCS 5/27-6, known as the Illinois Survival Statute.

196. As a direct and proximate result of one or more of the Defendants' negligent acts and/or omissions, DESIREE ROBINSON suffered injuries of a personal and pecuniary nature including, but not limited to, hospital, medical and related expenses, disability and disfigurement, pain and suffering, physical loss of chance of survival, and emotional trauma that DESIREE ROBINSON would have been entitled to receive compensation from the Defendants for these injuries, had she survived.

WHEREFORE, YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, respectfully requests that this Court enter judgment against Defendants, BACKPAGE.COM, L.L.C.; BACK PAGE, L.L.C.; MEDALIST HOLDINGS, L.L.C.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO HOLDINGS, L.L.C.;   DARTMOOR HOLDINGS, L.L.C.; IC HOLDINGS, L.L.C.; NEW TIMES MEDIA, L.L.C., and UGC TECH GROUP C.V., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs with interest in bringing this action, and for such other relief this Court deems fair and just.

37

## COUNT 6: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS- SURVIVAL ACTION
### (Plaintiff Yvonne Ambrose, as Administrator for the Estate of Desiree Robinson, v. Backpage Defendants)

197.    Plaintiff YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, incorporates paragraphs1 through 142 of this Complaint as if fully set forth herein.

198.    As described herein, Backpage Defendants, among other things, knew or should have known that adults working as sex traffickers were using their website to post advertisements of minor children for sex, including such advertisements of DESIREE ROBINSON, but they took no steps to protect those children, including DESIREE ROBINSON and instead facilitated sex trafficking on their website in an effort to maintain and/or maximize profits.

199.    Backpage Defendants actively concealed information; facilitated sex trafficking of women and children by active concealment; and/or knowingly exposed children to sexual abuse or the high probability of sexual abuse.

200.    The Backpage Defendants' actions are both extreme and outrageous.

201.    The Backpage Defendants knew that there was a high probability that their conduct would expose women and minors, such as DESIREE ROBINSON, to a risk of serious physical and/or emotional harm, including exploitation, rape and/or sexual assaults, and that such exploitation, rape and/or sexual assaults would inflict severe emotional distress upon DESIREE ROBINSON.

202.    Backpage Defendants intentionally, recklessly and/or negligently disregarded the high probability that its conduct would inflict severe emotional distress upon Plaintiff and DESIREE ROBINSON.

203.    As a direct and proximate result of the aforesaid acts and/or omissions by Backpage Defendants, Decedent, DESIREE ROBINSON, was caused to suffer damages, including severe emotional distress and mental anguish.

204.    Plaintiff, YVONNE AMBROSE, as Administrator of the Estate of DESIREE ROBINSON, Deceased, brings this action pursuant to the provisions of 755 ILCS 5/27-6, known as the Illinois Survival Statute.

WHEREFORE, YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, respectfully requests that this Court enter judgment against Defendants, BACKPAGE.COM, L.L.C.; BACK PAGE, L.L.C.; MEDALIST HOLDINGS, L.L.C.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO HOLDINGS, L.L.C.;   DARTMOOR HOLDINGS, L.L.C.; IC HOLDINGS, L.L.C.; NEW TIMES MEDIA, L.L.C., and UGC TECH GROUP C.V., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs with interest in bringing this action, and for such other relief this Court deems fair and just.

## COUNT 7: CIVIL CONSPIRACY
### (Plaintiff Yvonne Ambrose, as Administrator for the Estate of Desiree Robinson, v. Backpage Defendants)

205.    Plaintiff YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, incorporates paragraphs 1 through 142 of this Complaint as if fully set forth herein.

206.    As described above, Backpage Defendants engaged in a plan or conspiracy to use the Backpage.com website to advertise women and children for sex, including Plaintiff and DESIREE ROBINSON, in an effort to maintain and/or maximize profits.

207.    The conspiracy included, among other things: actively facilitating prostitution and sex trafficking; assisting in the development of sex ads by knowingly, systematically and

intentionally editing "Adult" ads in an effort to "sanitize" or "clean up" them; coaching users how to "sanitize" or "clean up" ads via its posting rules and content requirements; coaching its users on how to post "clean ads" for illegal transactions; sanitizing sex ads via manual and automated editing; refusing to implement a meaningful or reasonable system to prevent sex trafficking in its website in order to maintain generating millions of dollars in profits; automatically deleting incriminating words from sex ads prior to publication; altering the evidentiary value of the original ads; using moderators to manually delete incriminating evidence in ads that automatic filters missed; intentionally underreporting instances of child exploitation; and/or deliberately crafting loopholes that enabled the trafficking of men, women, and children online.

208.   As a direct and proximate result of the aforesaid acts and/or omissions by Backpage Defendants, Decedent, DESIREE ROBINSON, was caused to suffer damages, including pain, suffering, and death.

209.   Based on these actions, the defendants are liable for civil conspiracy.

WHEREFORE, YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, respectfully requests that this Court enter judgment against Defendants, BACKPAGE.COM, L.L.C.; BACK PAGE, L.L.C.; MEDALIST HOLDINGS, L.L.C.; LEEWARD HOLDINGS, L.L.C.; CAMARILLO HOLDINGS, L.L.C.;   DARTMOOR HOLDINGS, L.L.C.; IC HOLDINGS, L.L.C.; NEW TIMES MEDIA, L.L.C., and UGC TECH GROUP C.V., for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs with interest in bringing this action, and for such other relief this Court deems fair and just.

**COUNT 8: WRONGFUL DEATH – BATTERY**
**(Plaintiff Yvonne Ambrose, as Administrator for the Estate of Desiree Robinson, v. Anthony Rosales)**

40

210.    Plaintiff YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, incorporates paragraphs 1 through 142 of this Complaint as if fully set forth herein.

211.    Upon information and belief, as described above, on or about December 24, 2016, Defendant, ANTHONY ROSALES, repeatedly engaged in un-permitted, harmful and offensive sexual and physical contact upon the persons of the DESIREE ROBINSON.

212.    Such harmful and offensive sexual and physical contact included battering and choking ROBINSON, as well as cutting her throat with a knife.

213.    ROSALES also sexually assaulted and raped ROBINSON, a minor, in violation of state and federal law.

214.    At all times relevant hereto, Defendant, ROSALES, individually, had a duty to exercise reasonable care, so as to avoid causing injury and/or harmful or offensive contact to ROBINSON.

215.    Notwithstanding said duty, Defendant, ROSALES, intentionally and unlawfully made harmful and offensive contact to the persons of ROBINSON.

216.    As a direct and proximate result of the unlawful actions of Defendant ROSALES, DESIREE ROBINSON, was caused to suffer damages, including pain, suffering, and death.

217.    The injuries sustained by Decedent, DESIREE ROBINSON, caused or contributed to her death.

218.    Plaintiff YVONNE AMBROSE, as Administrator for the Estate of Desiree Robinson, deceased, brings this cause of action pursuant to the provisions of 740 ILCS 180/1, *et seq.*, commonly known as the Illinois Wrongful Death Act.

219.    At the time of her death, Decedent, DESIREE ROBINSON, was survived by her parents, YVONNE AMBROSE and Walton Treadwell.

220.    Decedent's parents were dependent upon the Decedent's services, support, society, companionship, love and affection, during and for the remainder of her life, of which they were deprived as a direct and proximate result of DESIREE ROBINSON's death on December 24, 2016.

221.    As a further direct and proximate result of the premature death of Decedent, DESIREE ROBINSON, on December 24, 2016 the above named heirs/next-of-kin suffered a loss of service, support, society, companionship, love, and affection for which they were dependent upon DESIREE ROBINSON during and for the remainder of her expected life.

WHEREFORE, YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, respectfully requests that this Court enter judgment against Defendant, ANTHONY ROSALES, for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs with interest in bringing this action, and for such other relief this Court deems fair and just.

## COUNT 9: SURVIVAL ACTION – BATTERY
### (Plaintiff Yvonne Ambrose, as Administrator for the Estate of Desiree Robinson, v. Anthony Rosales)

222.    Plaintiff YVONNE AMBROSE, individually and as Administrator for the Estate of Desiree Robinson, deceased, incorporates paragraphs 1 through 142 of this Complaint as if fully set forth herein.

223.    Upon information and belief, as described above, on or about December 24, 2016, Defendant, ANTHONY ROSALES, repeatedly engaged in un-permitted, harmful and offensive sexual and physical contact upon the persons of the DESIREE ROBINSON.

42

224.    Such harmful and offensive sexual and physical contact included battering and choking ROBINSON, as well as cutting her throat with a knife.

225.    ROSALES also sexually assaulted and raped ROBINSON, a minor, in violation of state and federal law.

226.    At all times relevant hereto, Defendant, ROSALES, individually, had a duty to exercise reasonable care, so as to avoid causing injury and/or harmful or offensive contact to ROBINSON.

227.    Notwithstanding said duty, Defendant, ROSALES, intentionally and unlawfully made harmful and offensive contact to the persons of ROBINSON.

228.    As a direct and proximate result of the unlawful actions of Defendant ROSALES, DESIREE ROBINSON, was caused to suffer damages, including pain, suffering, and death.

229.    The injuries sustained by Decedent, DESIREE ROBINSON, caused or contributed to her death.

230.    Plaintiff, YVONNE AMBROSE, as Administrator of the Estate of DESIREE ROBINSON, Deceased, brings this action pursuant to the provisions of 755 ILCS 5/27-6, known as the Illinois Survival Statute.

231.    As a direct and proximate result Defendant ROSALES's unlawful conduct, DESIREE ROBINSON suffered injuries of a personal and pecuniary nature including, but not limited to, hospital, medical and related expenses, disability and disfigurement, pain and suffering, physical loss of chance of survival, and emotional trauma that DESIREE ROBINSON would have been entitled to receive compensation from the Defendants for these injuries, had she survived.

WHEREFORE, YVONNE AMBROSE, individually and as Administrator for the Estate

of Desiree Robinson, deceased, respectfully requests that this Court enter judgment against Defendant, ANTHONY ROSALES, for an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs with interest in bringing this action, and for such other relief this Court deems fair and just.

Respectfully submitted,

By: *B. Raveend*

Bhavani Raveendran, one of Plaintiffs' attorneys

Antonio M. Romanucci
Gina A. DeBoni
Bhavani Raveendran
Martin D. Gould
ROMANUCCI & BLANDIN, LLC
321 N. Clark Street, Suite 900
Chicago IL, 60654
Telephone: 312-458-1000
Fax: 312-458-1004
Attorney No. 35875