Paul J. Cambria, Jr. (NY Bar No.1430909, admitted *pro hac vice*)
Erin E. McCampbell (NY Bar No. 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile: (716) 855-1580
pcambria@lglaw.com
emccampbell@lglaw.com
*Attorneys for Michael Lacey*

Thomas H. Bienert, Jr. (CA Bar No.135311, admitted *pro hac vice*)
Whitney Z. Bernstein (CA Bar No. 304917, admitted *pro hac vice*)
BIENERT | KATZMAN PC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700
Facsimile: (949)369-3701
tbienert@bienertkatzman.com
wbernstein@bienartkatzman.com
*Attorneys for James Larkin*

Additional counsel listed on next page

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

United States of America,

Plaintiff,

vs.

Michael Lacey, *et al.*,

Defendants.

NO. CR-18-00422-PHX-SMB

**DEFENDANTS' OPPOSITION TO THE GOVERNMENT'S MOTION TO ADMIT EVIDENCE OF MURDERS IMPLICATING BACKPAGE (Doc. 920)**

(Oral argument requested)

Gary S. Lincenberg (CA Bar No. 123058, *admitted pro hac vice)*
Ariel A. Neuman (CA Bar No. 241594, *admitted pro hac vice)*
Gopi K. Panchapakesan (CA Bar No. 279856, *admitted pro hac vice)*
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW PC
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110
glincenberg@birdmarella.com
aneuman@birdmarella.com
gpanchapakesan@birdmarella.com
*Attorneys for John Brunst*

Bruce Feder (AZ Bar No. 004832)
FEDER LAW OFFICE PA
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: (602) 257-0135
bf@federlawpa.com
*Attorney for Scott Spear*

David Eisenberg (AZ Bar No. 017218)
DAVID EISENBERG PLC
3550 N. Central Ave., Suite 1155
Phoenix, Arizona 85012
Telephone: (602) 237-5076
Facsimile: (602) 314-6273
david@deisenbergplc.com
*Attorney for Andrew Padilla*

Joy Malby Bertrand (AZ Bar No. 024181)
JOY BERTRAND ESQ LLC
P.O. Box 2734
Scottsdale, Arizona 85252
Telephone: (602)374-5321
Facsimile: (480)361-4694
joy.bertrand@gmail.com
*Attorney for Joye Vaught*

Defendants Michael Lacey, James Larkin, John Brunst, Scott Spear, Andrew Padilla, and Joye Vaught ("Defendants"), by and through their undersigned attorneys, file the instant opposition to the government's Motion to Admit Evidence of Murders Implicating Backpage ("Motion," Doc. 920). Defendants are charged with having facilitated prostitution through operation of a classified ads website, and related money laundering charges. Yet the government seeks to introduce evidence of *ten murders* committed by uncharged third parties, eight of which do not even arguably relate to the Travel Act counts charged in this case, and none of which tend to prove any element of any charged offense. The evidence is entirely irrelevant to this case and is unduly prejudicial, and should be precluded under Rules 401 and 403 of the Federal Rules of Evidence. The government's tortured arguments to the contrary are unmoored from any authority and are entirely infirm.[1]

## ARGUMENT

"Evidence may not be admitted at trial unless it is relevant, as defined by Rule 401 of the Federal Rules of Evidence." *United States v. Vallejo*, 237 F.3d 1008, 1015 (9th Cir. 2001). Under Rule 401, evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Evidence that does not establish an element of a crime charged is not relevant. *See United States v. Ellis*, 147 F.3d 1131, 1135-36 (9th Cir. 1998) (reversing conviction on basis that irrelevant, unduly prejudicial evidence was wrongly admitted and deprived the defendant of a fair trial).

Courts should exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Evidence that does not go to establishing an element of a crime charged has "virtually no probative value." *Ellis*, 147 F.3d at 1136; *accord United States v. Gonzalez-Flores*, 418 F.3d 1093,

[1] Defendants' arguments as set forth in Defendants' Motion to Preclude Presentation of Certain Evidence are incorporated by reference and should be considered as to the murder evidence that the government seeks to introduce. (*See* Doc. 908 (publicly filed version); Doc. 911 (version lodged under seal).)

1098 (9th Cir. 2005). Further, "when evidence is minimally relevant, it is likely to be minimally probative as well. Moreover, a decision regarding probative value must be influenced by the availability of other sources of evidence on the point in question." *United States v. Wiggan*, 700 F.3d 1204, 1213 (9th Cir. 2011) (footnotes omitted).

"Unfair prejudice" refers to "the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997); *Ellis*, 147 F.3d at 1135 (recognizing that "unfair prejudice" refers to "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one or evidence designed to elicit a response from the jurors that is not justified by the evidence" (quotations omitted)).

The Ninth Circuit has explained that "[w]here the evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury." *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992). Courts must carefully engage in balancing under Rule 403 because it is reversible error to admit evidence that "*could have* prejudiced [the defendant] unfairly." *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1098 (9th Cir. 2005) (emphasis added). Consequently, where evidence "very well *could* . . . trigger[] an emotional response from the jury members," giving rise to "at least a modest likelihood of unfair prejudice," Rule 403 requires exclusion unless the evidence is of substantial probative value. *Id.* at 1099 (emphasis added).[2]

## I. Evidence of the murders should be precluded because it is not relevant to any charged crime or to Defendants' conduct.

Evidence of the murders should be precluded. This evidence is not relevant to a charged crime or to the Defendants' conduct. To be clear, the government does not claim that Defendants knew or knew of the third parties committing these crimes, that Defendants knew or knew of the

[2] The government has cited to *United States v. Starnes*, 583 F.3d 196 (3d Cir. 2009), for what it feels is a better standard for Rule 403 balancing. In addition to the fact that this case is not binding on this Court, the standard articulated is at odds with the binding Ninth Circuit standards discussed herein.


victims of these crimes, that Defendants had anything to do with the commission of these crimes, that Defendants even knew the crimes had been committed (unless they read after-the-fact press coverage), or that Defendants ever saw or knew of any ads the government contends relate to these crimes. The only alleged object of the charged conspiracy was making money by facilitating prostitution (Indict. ¶¶ 195-99), and the Travel Act counts allege facilitation of prostitution only. Thus, the murder evidence does not tend to prove any element of the charged offenses and must be precluded under Rule 401. *See Ellis*, 147 F.3d at 1135-36 (explaining that evidence offered to show intent and potential victim impact is not relevant when "neither intent nor potential victim impact were elements of the charge" (quotations omitted)). Indeed, the government has cited no case that supports the admission of evidence under these circumstances.

The government tries to get around this black-letter requirement by arguing that Defendants' purported knowledge of the murders after the fact shows "that Defendants knew about the website's true nature, and helps demonstrate how the company's business practices facilitated the criminal activities of the prostitutes and pimps who used the website." (Mot. at 2.) The government's argument for admission of this evidence proceeds as follows: (1) the people murdered were prostitutes; (2) the prostitutes advertised on Backpage; (3) Defendants learned about the murders from articles that indicated that the women were prostitutes who had advertised on Backpage; and (4) Defendants' after-the-fact awareness of these ten murders means that Defendants knew that all other hundreds of millions of ads posted on Backpage involving all other people were "exclusively for prostitution." (Mot. 1-2.) This convoluted theory of relevance is lacking for several reasons. Indeed, unpacking the chain of inferences necessary to reach the government's suggested result demonstrates that the government's argument is not grounded in fact or logic, and when a "quantum leap of logic" forms the "the linchpin of the government's argument," the court should reject that argument. *United States v. Jimenez-Medina*, 173 F.3d 752, 754-55 (9th Cir. 1999).

First, even if Defendants learned after the fact that ten people who had ads posted on Backpage were in fact prostitutes, that evidence provides no causal link to the purported purpose for admitting this evidence – to show that Defendants knew that the millions of ads posted to the

site were "exclusively for prostitution." After-the-fact knowledge about these isolated ads does not show what Defendants knew about the site in general. It says nothing about what Defendants knew or intended with respect to any ads pre-publication. It does not show what the Defendants knew or intended about the specific business enterprises referenced in the 50 substantive Travel Act counts, to which the Court has now limited this case. (*See* Doc. 946 at 13.) Nor can it make the "quantum leap of logic" to support the claim that Defendants knew that all of the ads posted to the site were "exclusively for prostitution." Instead, at best, it shows that Defendants learned after the fact that a handful of ads out of millions were related to prostitution.[3]

Notably, only two of the murders even related to individuals whose ads are included among the fifty substantive Travel Act charges – Victims 15 and 16 – and it is not at all clear that those murders have any relation to ads on Backpage. Thus, the government's strained efforts to fit the inflammatory murders into the elements of the charges in this case are unavailing and should be rejected. If, as to those two individuals, the government offered evidence that they were prostitutes, that would arguably be relevant. But evidence that they were murdered is not relevant to any of the elements of the charged crimes.

Second, as to almost all of the murders, the government does not even allege that the murder victim met the murderer through a Backpage ad. For instance, as to the four murder victims in Detroit, the women advertised on at least fifteen other websites that were not owned,

---

[3] Indeed, the claim that a small amount of criminal activity (even if serious criminal activity) establishes anything about the "true nature" of a website is unfounded. As of 2016, 101 murders had been linked to Craigslist ads. *See* Caitlin Dewey, *Think Twice Before Answering that Ad: 101 Murders Have Been Linked to Craigslist*, The Washington Post, January 11, 2016 available at https://www.washingtonpost.com/news/the-intersect/wp/2016/01/11/think-twice-before-answering-that-ad-101-killers-have-found-victims-on-craigslist/(last visited May 8, 2020). Further, in 2018, Facebook was responsible for more than ninety percent of the 45 million reports of online photos and videos of children being sexually abused. *See* Katie Benner & Michael Isaac, *Child-Welfare Activists Attack Facebook Over Encryption Plans*, The New York Times, May 5, 2020, available at https://www.nytimes.com/2020/02/05/technology/facebook-encryption-child-exploitation.html (last visited on May 8, 2020). Under the government's logic, this evidence shows that Craigslist's "true nature" is a murder site and that Facebook's "true nature" is a hub for images depicting sexual abuse of children.

operated, or controlled by Backpage.[4] (*See* Daniel Fisher, *Backpage Takes Heat, But Prostitution Ads Are Everywhere*, Forbes, Jan. 26, 2012, a true and correct copy of which is attached hereto as Exhibit A.) The government does not claim that the murderers used Backpage to locate the victims. (*See* Mot. at 2-7.) Likewise, the government does not allege that Victims 6, 15, 14, or D.R. met their murderers through a Backpage ad, merely that they were advertised on Backpage.[5] (*See id.* at 5-7.) This all shows just how attenuated the evidence is from this case, and how presentation of the murders would open the door to a vast array of evidence that is not relevant to the Defendants' conduct or the charged crimes, and, as discussed below, would do nothing more than prejudice Defendants and cause undue delay and jury confusion. For all these reasons, evidence of these murders is not relevant to the Travel Act charges in this case and should not be presented to the jury.[6]

## II.  Evidence of the murders should be precluded because there is no foundation for the proposed boundless scope of this evidence.

In any event, the scope of the government's request is unclear. Does the government seek a blanket ruling that every article, document, and email referenced in its Motion is admissible? Or

---

[4] The government contends that these websites will somehow be linked to Backpage at trial. This contention lacks merit. Backpage did not own, operate or control those other websites, and is not even alleged to have had a relationship or affiliation with any except one, The Erotic Review, but that relationship ended long before these murders. Indeed, in early 2011, Backpage banned reference to The Erotic Review in ads. Further, the fact that other websites copied content from Backpage, which happened frequently, is no reflection on the actions of Backpage. In any event, this just shows the undue consumption of time and juror confusion that will result from the admission of this evidence.

[5] As to those it does so allege – Victim A.H. and 16 – if the murder evidence is let in, the Court would have to hold a trial within the trial to determine whether the allegation is correct.

[6] Additionally, the government misrepresents this Court's holding in the Order (Doc. 793) on the Defendants' Motion to Dismiss. This Court did not hold that "the First Amendment is not a viable defense for the Defendants," as the government claims. (Mot. at 2.) Instead, this Court ruled that, under the standards for dismissal, in which the Court must presume the allegations are true, the Defendants failed to meet their burden for dismissal under the First Amendment. That limited holding is a far cry from a blanket ruling that the First Amendment has no application to the defense of this case at trial.

more generally that any evidence that references the murders is admissible? The government does not say and the motion should be denied on that ground alone. The government has provided no foundation for admitting any particular evidence as evidence of any Defendants' knowledge. To be relevant to a Defendant's knowledge that the website was used "exclusively for prostitution" (as the government contends it wants to do), the government must establish the following foundation evidence for each piece of evidence it wants to present: (1) the Defendant(s), if any, who saw the evidence;[7] (2) what the evidence revealed; (3) why the evidence is relevant to the Defendant who saw it. Additionally, much of the evidence the government apparently wants to admit is hearsay (or double or triple hearsay), and the government must present a basis for its admissibility (which it has not done in its Motion). Indeed, the Motion repeatedly references the foundational evidence that the government intends to present "at trial" with respect to the evidence that references the murders. Because that foundational evidence is not before this Court as part of this Motion, any ruling on the admissibility of this evidence should be made "at trial," to the extent that the Motion is not denied in its entirety based on the lack of relevance and the unduly prejudicial and confusing nature of this evidence.

## III. Evidence of the murders will be unfairly prejudicial and should be excluded as a matter of fundamental due process.

The evidence of uncharged murders should also be excluded as unduly prejudicial. The government has not provided a single case that supports its desire to inject this Travel Act case with such inflammatory evidence.

The presentation of evidence concerning *ten* murders of young women by people not connected to Defendants, including testimony of grieving family members, is exactly the type of emotional, inflammatory, and confusing evidence that should be precluded under Rule 403. In the context of a prosecution for the smuggling of illegal aliens, the Ninth Circuit held that the

[7] This is different from a Defendant who was merely copied on an email. To be relevant, the government must show that the email was received by a Defendant, and at the very least, opened by the Defendant. But to be admissible, the government should be required to prove that a Defendant actually read the email or the email attachment the government seeks to introduce as evidence of that Defendant's knowledge.

government's presentation of evidence that two of the aliens the defendant smuggled were young girls who suffered heat strokes requiring emergency medical treatment should not have been admitted because that evidence did "not go to any of the elements" of the smuggling charge and "very well could have triggered an emotional response from the jury members." *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1098-99 (9th Cir. 2005). The evidence at issue in this case – the murder of young women – is likely to trigger an even greater "emotional response" from the jury than the heat-strokes at issue in *Gonzalez-Flores*. Indeed, even in murder cases, the presentation of evidence of uncharged murders by the defendant results in reversals because such evidence is unduly prejudicial. *See United States v. Bradley*, 5 F.3d 1317, 1319-22 (9th Cir. 1993) (vacating conviction for conspiracy to kill a witness because the government's presentation of an uncharged murder was "highly and unfairly prejudicial" under Rule 403).

Second, the government intends to offer evidence of murders by third-parties, with which Defendants had absolutely no involvement, all of which would only serve to prejudice the jury and demonize Defendants. When evidence of harm caused by third parties does not prove an element of the charged offense, courts exclude such evidence as unduly prejudicial, as this Court should do here. "[I]t's totally unacceptable" for a defendant "to be prejudiced by something he seems to have done but in fact did not." *See Hitt*, 981 F.2d at 423-25 (reversing defendant's unregistered machine gun conviction based on admission of evidence regarding roommate's guns). Here, there is a very real likelihood that if the Court allows evidence of the murders to be presented, the jury will be confused and believe that Defendants are somehow implicated in the murders themselves. Evidence of uncharged, inflammatory crimes has no place in this trial.

Third, the presentation of evidence of these murders – committed by third parties who were and are strangers to Defendants – would confuse the jurors and cause undue delay and wasting of time. Indeed, in this case, allowing the government to present evidence of non-party conduct will involve dozens of time-consuming mini-trials within a trial – with untold numbers of witnesses and impeachment witnesses – on issues not before the jury about each of the alleged murders, including whether any of those crimes had any connection to an ad on Backpage. *See Tennison v. Circus Circus Enters., Inc.*, 244 F.3d 684, 690 (9th Cir. 2001) (affirming exclusion of

evidence under Rule 403 where presentation of the evidence at issue "might have resulted in a 'mini trial'" concerning parties not before the court and "would create a significant danger that the jury would base its assessment of liability on remote events involving other employees, instead of recent events concerning Plaintiffs").

Finally, there are far less prejudicial ways to try to prove that Defendants learned that some people had posted ads on Backpage related to prostitution; indeed, the government intends to offer any number of witnesses and exhibits that supposedly prove this point. Evidence of lurid murders does not add to the evidence, but instead only shocks the jury and invokes an emotional response. This is exactly what Rule 403 is intended to prevent, especially where the probative value is missing or minimal. Consequently, even if the Court were to find Defendants' after-the-fact knowledge that the ads associated with these women was relevant to the elements of the charged crimes or the Defendants' conduct (and it is not), and even if the government established at trial the foundation to introduce evidence of these ten purported instances of *prostitution*, there should be no reference to the murders or other crimes. This would achieve the government's stated objective without interjecting the highly emotional, inflammatory, and prejudicial evidence of the murders into this trial.

For all these reasons, this evidence should be barred under Rule 403.

Critically, the government has not provided this Court with *a single case* that supports its request to inject this highly prejudicial evidence into this case. The Motion cites to just one case from the Ninth Circuit, *United States v. LeMay*, 260 F.3d 1018 (9th Cir. 2001), but that case does nothing to advance the government's request. *LeMay* involved a child molestation prosecution in which the prosecutors obtained permission to present evidence of the defendant's prior convictions for child molestation under Rule 414 – a specialized rule that pertains solely to defendants charged with child molestation. At trial, the defendant challenged the credibility of his young accusers, as well as their lack of corroboration. In expressing approval for the decision to allow the evidence, the Ninth Circuit explained that this type of defense was the precise scenario for which Rule 414 was created and ruled that the evidence at issue was no more prejudicial than the evidence of the charged crimes. Rule 414 analysis has no application here, and *LeMay* case

provides no support for the admission of the murders. The murders the government wants to present are significantly more inflammatory than the evidence to be presented on the charged crimes.

The remainder of the government's cases (*see* Mot. at 8-9) – all from other Circuits – all equally unavailing. For example, in *United States v. Cardena*, 842 F.3d 959 (7th Cir. 2016), the Seventh Circuit affirmed the decision to admit evidence of a defendant's prior offer to cooperate in a drug conspiracy prosecution because the evidence was relevant to his consciousness of guilt and "not emotionally charged like the typical evidence excluded under Rule 403." *Id.* at 992. Here, it is indisputable that the evidence the government seeks to introduce is emotionally charged and, as discussed above, it is not relevant to any of the elements of the charged crimes.

Likewise, *United States v. Moore*, 641 F.3d 812 (7th Cir. 2011), is distinguishable in that there, the court allowed in evidence of a police officer's conversation *with the defendant* about dog fighting at a home, which was of "relatively minor additional prejudice" given that the jury had already heard that the home at issue was "known for drugs, guns, violence, and was nicknamed, "Murder Ave." *Id.* at 827. Moreover, the evidence was relevant because the centerpiece of the defense was that the government could not tie the defendant to the home. Here, the murder evidence would not add "relatively minor additional prejudice" but would add extreme prejudice, does not involve any conduct by Defendants, and would not address any element of the charged offenses or the defenses.

Finally, the government's request finds no support from *United States v. Green*, 617 F.3d 233 (3d Cir. 2010), which also involved the admission of uncharged conduct *by the defendant*, rather than violent uncharged conduct by others. In *Green*, the defendant was charged with attempted possession with intent to distribute cocaine. *Id.* at 237. The government presented recorded calls with an informant wherein the defendant sought both cocaine and dynamite (in the same calls), and the court allowed to government to complete the narrative by presenting evidence that the defendant intended to use the dynamite to kill an undercover officer whose work had led to the defendant's arrest. *See id.* at 237-38. Further, the court found that, for various reasons, the evidence refuted the defendant's repeated attempts to portray the informant as biased. With little

analysis, the Court found that the probative value of this evidence outweighed the potential for prejudice to such a degree that reversal of the conviction was unmerited. Nothing about the facts or analysis in *Green* is relevant to the arguments presented by the government here.

In short, there are no cases that approve of what the government seeks to do here, and with good reason. The presentation of violent crimes by third parties which do not tend to prove any elements of the charged offenses is improper, and would likely be cause for reversal of any convictions obtained in this case. That is because the evidence is so tangential to the charged crimes, the probative value so attenuated (if it exists at all), and the danger of undue prejudice so high, that it should be excluded in its entirety.

**CONCLUSION**

For all these reasons, this Court should deny the Motion in its entirety.

RESPECTFULLY SUBMITTED this 8th day of May, 2020,

Paul J. Cambria, Jr.
Erin E. McCampbell
LIPSITZ GREEN SCIME CAMBRIA LLP

By: /s/ Paul J. Cambria, Jr.
Paul J. Cambria, Jr.
Attorneys for Michael Lacey

*Pursuant to the District's Electronic Case Filing Administrative Policies and Procedures Manual (May 2018) § II (C) (3), Erin E. McCampbell hereby attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized its filing.*

Thomas H. Bienert, Jr.
Whitney Z. Bernstein
BIENERT KATZMAN, PLC

By: /s/ Whitney Z. Bernstein
Whitney Z. Bernstein
Attorneys for James Larkin

Gary S. Lincenberg
Ariel A. Neuman
Gopi K. Panchapakesan
BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.

By: /s/ Ariel A. Neuman
Ariel A. Neuman
Attorneys for John Brunst

Bruce Feder
FEDER LAW OFFICE, P.A.

By: /s/ Bruce Feder
Bruce Feder
Attorneys for Scott Spear

David Eisenberg
DAVID EISENBERG, P.L.C.

By: /s/ David Eisenberg
David Eisenberg
Attorneys for Andrew Padilla

Joy Bertrand
JOY BERTRAND, ESQ.

By: /s/ Joy Bertrand
Joy Bertrand
Attorneys for Joye Vaught

On May 8, 2020, a PDF version of this document was filed with Clerk of the Court using the CM/ECF System for filing and for Transmittal Of a Notice of Electronic Filing to the Following CM/ECF registrants:

Kevin Rapp, kevin.rapp@usdoj.gov
Reginald Jones, reginald.jones4@usdoj.gov
Peter Kozinets, peter.kozinets@usdoj.gov
John Kucera, john.kucera@usdoj.gov
Margaret Perlmeter, margaret.perlmeter@usdoj.gov
Andrew Stone, andrew.stone@usdoj.gov

# EXHIBIT A

Jan 26, 2012, 10:25am EST

BETA

# Backpage Takes Heat, But Prostitution Ads Are Everywhere

**Daniel Fisher** Forbes Staff
Investing
*I cover finance, the law, and how the two interact.*

**This article is more than 8 years old.**

Home of nasty ads for decades. Image via Wikipedia

Nicholas Kristof of the New York Times has a heartrending story today about underage prostitutes who are pimped out on Backpage.com, a website with roots in the swinging personal ads that have appeared at the back of the Village Voice since the 1960s.

Kristof describes how a 13-year-old he calls Baby Face was advertised on Backpage and repeatedly raped by older johns. He quotes Brooklyn prosecutor Lynn Hersh as saying "Backpage is a great vehicle for pimps trying to sell girls." He notes that Craigslist got out of the business after public protests and pressure from state attorneys general.

It's all true -- except Craigslist hasn't really gotten out of the business and Backpage isn't the best place to run an illegal enterprise, at least if you want to keep your business secret from the cops. The company, a unit of Village Voice Media, says it takes credit card numbers for all ads, including free personals, and responds to subpoenas within hours.

**Today In:** Business

**Lufthansa Follows JetBlue's 'New Flying Etiquette' And Mandates Face Masks For All Passengers**

MLB 2020 Proposal Would Give Baseball A Chance To Play To Its Strengths

Love Classic Porsches But Hate Outdated Radios? New Aftermarket Options Offer The Best Of Both Worlds.

BETA

It is true Craigslist got rid of its "Adult Services" advertising category in September 2010, but that doesn't mean prostitutes and pimps aren't still using the site. Type in this Google search if you're curious: site:craigslist.org inurl:cas roses. "Roses" is code for "dollars" in the world of Internet prostitution, and you get more than 20,000 listings by people who seem to be talking about sex and money in Craigslist personals. Want to find more professionals quick? Search for "Asian massage" on Google, or "site:facebook.com escorts new york." I'm not saying they're all prostitutes, but chances are there are more than few among the legitimate escort agencies and massage parlors that advertise online.

Kristof notes that attorneys general of 48 states sent a letter to Backpage last August accusing the company of being a "hub" for child sex trafficking activity. Investigators identified hundreds of prostitution ads and reported that "nearly naked persons in provocative positions are pictured in nearly every adult services advertisement." As opposed to Craigslist personals like this one and this one (warning: explicit).

It's curious that the AGs are targeting Backpage, which they say earns some $22.7 million a year from adult personals. Yes, Backpage makes money from randy ads -- parent Village Voice been doing that for decades -- but it's also the online equivalent of a European red-light district, contained and easily monitored by the police. A Backpage executive who spoke on condition of anonymity told me the company has 123 moderators reviewing the content of ads to try and identify ads for underage prostitution.

Since posters also supply credit-card numbers, it isn't hard in most cases for police to track down who places those ads. (The advertiser in the Kristof case wrote a plain-vanilla personal ad for "labor day weekend fun" with a 21-year-old, but his credit card number allowed him to be quickly identified,

Backpage says.) The Backpage executive said the company responds to about 100 subpoenas a month, and dispatched an employee to testify before a grand jury called by the Brooklyn prosecutor Hersh as recently as September.

BETA

Backpage has taken a defiant tone with the AGs and prosecutors who accuse it of aiding prostitution. The company was recently blamed for prostitute killings in Detroit but Backpage showed that the victims had advertised on at least 15 other sites and there was no evidence the killer had relied on Backpage to find the victims. Its executives are quick to supply the links and Internet code words that show just how ubiquitous Internet prostitution really is. (Try searching for "BBBJ" or "talent gigs" and lots more action pops up.) While Craigslist and other sites have discouraged the use of phone numbers, advertisers simply spell them out or place them in photographs; Google the numbers and you'll see they are often for dubious-looking escort services. Many of those even have explicit Google reviews.

Kristof acknowledges "there's some risk that pimps will migrate to new Web sites," but it seems obvious they never left. So when the AGs declared victory over Craigslist in 2008, it may have been a little premature.

I'm not saying there's anything wrong with trying to shut down the vigorous market for human flesh. It's equivalent to targeting child pornography: Eliminate the producers of this ghastly product and the exploitation will diminish.

But the choice of targets is curious. Especially when one of the leaders of the effort is Washington Attorney General Rob McKenna. Not only is Washington home to Microsoft, whose Bing search engine and software helps power the Internet prostitution business. McKenna's s official bio also notes he practiced business and regulatory law at Perkins Coie from 1988 to 1996. Among the law firm's many clients is Craigslist, which it successfully defended in a 2009 case by the Cook County Sheriff accusing Craigslist of facilitating prostitution.

### *Attorney General McKenna had this to say about the story above:*

BETA

> Attorney General McKenna and the vast majority of state attorneys general raised concerns about Backpage.com because the site is, according to independent industry analyses, the largest Internet hub for prostitution ads. There is a huge and obvious difference between prostitution ads that appear in Internet searches and a business that actively solicits advertisements for prostitutes in every major city in America, along with many smaller cities. The claim that Backpage.com is the online equivalent to a red-light district, “contained and easily monitored by police” ignores that police directly involved in rescuing women and girls from pimps are overwhelmingly opposed to such sites. Finally, the choice of targets is clearly not “curious.” We have seen arrests of those involved in the trafficking of minors through Backpage.com in cities throughout the United States. That’s why non-governmental organizations, religious and secular leaders, police, mayors, state legislators and others throughout the country focus particularly, but not exclusively, on Backpage.com.

### **Backpage issued this response to McKenna's comments on Feb. 17:**

> Taking down Backpage ads would have zero impact on the trafficking Mr. McKenna says he is eager to stop. As *Forbes* shows, his claim that Craigslist has “eradicate[d]” such advertising is not true. Anyone can see erotic ads on Craigslist today. And arrests linked to Craigslist ads have continued all over the country, showing censorship doesn’t work.
>
> A Columbia professor reported this month that 61% of prostitutes advertise on Craigslist, with Facebook gaining fast. These ads are on thousands of web sites, where users use search engines to find them. Unlike Backpage, the largest

search engines even let users instantly locate the closest teen escorts, watch explicit videos and read escort reviews. Searches for “teen escort” produces tens of millions of postings including every city in America. Against these numbers, Backpage is a rounding error.

BETA

The idea that Backpage is the largest such site is ludicrous. Mr. McKenna’s "industry analyses" actually come from a single source that admits its reports are financed by secret money from activists with hidden agendas. In contrast, both Microsoft and USC have recently published independent studies showing the effective solution is to leverage web technology to capture predators and rescue kids.

That’s exactly what Backpage does. We monitor 24/7, cooperate with police, operate lawfully, and use strategies that work. Mr. McKenna’s strategy, while it might make good news copy and political rhetoric, won't rescue anyone.

**Daniel Fisher**

Follow

I am a senior editor at Forbes, covering legal affairs, corporate finance, macroeconomics and the occasional sailing story. I was the Southwest Bureau manager for Forbes... **Read More**

Site Feedback Tips Corrections Reprints & Permissions Terms Privacy

© 2020 Forbes Media LLC. All Rights Reserved. AdChoices

ADVERTISEMENT