MICHAEL BAILEY
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1200
Los Angeles, CA 90012
Telephone (213) 894-3391

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-18-00422-PHX-SMB |
|---|---|
| Plaintiff, | |
| v. | **RESPONSE TO DEFENDANTS' MOTION TO DISMISS BASED ON OUTRAGEOUS GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE [DOC. 940]** |
| Michael Lacey, et al., | |
| Defendants. | [REDACTED FOR PUBLIC DISCLOSURE] |

1     Undeterred by losing five prior motions to dismiss, and based on materials they've

2  had for the better part of a year, Defendants now seek dismissal for a sixth time—asserting

3  a claim of "outrageous government misconduct."  Long on hyperbole, short on substance,

4  Defendants' latest effort boils down to the notion that the government improperly learned

5  from CEO Carl Ferrer that Backpage had invoked First Amendment, *mens rea* and

6  Communications Decency Act (CDA) theories to rationalize the country's largest online

7  marketplace for prostitution solicitations—the same theories that Backpage previously

8  disclosed in courts around the country.  This motion is unavailing for several reasons.

9     First, while Defendants complain that Backpage's CEO Carl Ferrer provided the

10  government with privileged communications, the examples provided by Defendants do not

11  involve typical privileged material, *i.e.*, emails, memoranda, recordings or other items

12  revealing the substance of confidential communications between an attorney and client.

13  (Doc. 940 at 11-12.)  Rather, they are Ferrer's memories of Backpage's known business

14  practices and public legal strategy.  Defendants fail to establish the privileged nature of the

15  statements identified in their Motion, which is their burden under federal law.

16     Second, these statements cannot be privileged because they have not remained

17  confidential.  Even if Defendants hadn't publicly asserted the same legal theories in scores

18  of cases throughout the country over the last decade, Defendants revealed these theories in

19  this case in their earliest filings.  (*See, e.g.*, Docs. 23 and 26.)  Simply put, it was no secret

20  that Defendants would rely on First Amendment, *mens rea*, and CDA arguments to defend

21  their operation of a website whose revenue-generating business model was

22  overwhelmingly based on advertising the sale of adults and children for sex.

23     Third, even if these statements might once have been privileged, Ferrer, as

24  Backpage's CEO, waived the privilege on behalf of the company.  Defendants—

25  Backpage's *former* owners, managers, and employees—have no authority to prevent that

26  waiver.  Defendants rely on Judge Logan's previous order as the "clearest evidence" of the

27  government's misconduct.  (Doc. 940 at 15.)  Defendants, however, exaggerate the scope

28  of Judge Logan's order, which "decline[d] to address the issue of whether Ferrer had

- 1 -

authority to waive Backpage's corporate attorney-client privilege" and instead made clear the ruling was "for the limited purpose of addressing the Government's access to the privileged emails" at issue in the government's motion. (Doc. 345 at 4.) Ferrer possessed the ability to waive privilege on Backpage's behalf and he has exercised that right.

Fourth, Defendants are unable to articulate any prejudice they have suffered. Ferrer's statements did not concern privileged trial strategy information. Accordingly, the burden does not shift to the government, but remains with Defendants to demonstrate prejudice. Defendants fail to articulate any prejudice here.

The government did not violate Defendants' Fifth and Sixth Amendment rights by "invading" attorney-client privileges. With no rights violated, Defendants' argument that the government engaged in outrageous conduct fails. Without any misconduct, Defendants' request for dismissal, or any other remedy, has no basis in fact. Defendants' motion should be denied.

## I.   RELEVANT FACTUAL BACKGROUND

### A.   Carl Ferrer Waived Backpage's Corporate Attorney-Client Privilege; Judge Logan's Limited Order

On April 5, 2018, Carl Ferrer executed a written waiver of the corporate attorney-client privilege held by Backpage.com LLC and various other Backpage-related entities. (Doc. 195-3.) Based on that waiver, among other reasons, the government sought an order from the Court confirming that Backpage's corporate attorney-client privilege had been waived and therefore the prosecution team could gain access to the emails and other communications that were in the filter team's possession. (Doc. 195 at 13.) On October 18, 2018, after further briefing (Docs. 235, 269, 324), the Court denied the government's motion in a limited order. (Doc. 345.)

The Court relied on the validity of a Joint Defense Agreement ("JDA") that "established joint-defense privileges" and "demonstrate[d] that the emails themselves are protected from disclosure." (*Id.* at 4.) Specifically, Judge Logan held: "for the limited purpose of addressing the Government's access to the privileged emails at issue, the Court

finds that the Government cannot use Ferrer's written waiver of attorney-client privilege to circumvent the terms of the JDA." (*Id.*) Judge Logan added: "At this time, the Court declines to address the issue of whether Ferrer had the authority to waive Backpage's corporate attorney-client privilege based on the Defendants' argument that the attorney-client privilege was owned and later shared with Village Voice Media Holdings, LLC." (*Id.* at 4, n.4.) The corporate waiver of Backpage's attorney-client privilege is an open issue in this matter.

**B.   Defendants Filed This Motion Eight Months After Receiving Ferrer's MOIs And Six Months After The Substantive Motions Deadline**

The government produced Ferrer's Memoranda of Interviews (MOIs) in August 2019. (Doc. 730.) Two months later, Defendants filed nine substantive motions on October 18, 2019, the substantive motion deadline. (Doc. 664; *see* Docs. 775, 777, 778, 781, 782, 783, 784, 785, 786.) One of those motions was a joint motion to dismiss the indictment in which Defendants argued the superseding indictment "should be dismissed for gross abuse of the grand jury process." (Doc. 782 at 6.) That motion attached and relied heavily on Ferrer's MOIs to argue that Ferrer contradicted many of the statements included in the charging documents. (*Id.* at 9-11; Doc. 780.) On January 9, 2020, the Court denied Defendants' motion. (Doc. 844.) In their motion *in limine* to preclude certain expert testimony of Quoc Thai, filed several weeks ago, Defendants again attached Ferrer's MOIs. (Doc. 909 at Exs. B & C.)

In the instant motion, Defendants claim: "[W]hen the government finally provided its [MOIs] from the Ferrer interviews, the government's repeated invasions of Defendants' privileged communications became clear." (Doc. 940 at 10.) All of this begs the question—if the serious allegations of misconduct now leveled by Defendants were so "clear" eight months ago, why wait until now to file this sixth motion to dismiss?

**C.   Defendants' Examples Of "Privileged Communications"**

Defendants cite 19 specific paragraphs among the 185-pages of Ferrer's MOIs that they believe demonstrate "repeated invasions of Defendants' privileged

communications."[1] (Doc. 940 at 10-12.) Defendants did not quote directly from the MOIs, but instead paraphrased Ferrer's statements. (*Id.*) However, to properly evaluate Defendants' claims, the actual statements should be reviewed. To assist in this review, the government groups the statements into the following categories, and quotes the full MOI paragraphs cited by Defendants, as follows:

1. First Amendment, *Mens Rea*, or CDA Theories



---

[1] Defendants suggest that there are "many dozen" invasions into privileged communications beyond the "few examples" discussed in their motion. (Doc. 940 at 10.) Should Defendants raise new examples in their reply brief, the Court need not consider them. *United States v. Puchi*, 441 F.2d 697, 703 (9th Cir. 1971) (new point raised in reply brief need not be considered by the Court); *cf. Potter v. Dist. of Columbia,* 558 F.3d 542, 553 (D.C. Cir. 2009) (courts will not "hunt[ ] for truffles buried in . . . the record") (citations and internal quotation marks omitted). In addition to being contrary to case law, if Defendants believed other invasions rose to the level of "outrageous conduct," they should have included them in their motion to permit the government a fair opportunity to respond.



2.    "Escort" Ads and Moderation



² This bracketed language appears in the MOI.

3. Backpage's Sale to Ferrer

- 

4. Backpage's Decision to Accept Gift Cards

- 

5. National Center for Missing and Exploited Children (NCMEC)

-

6.     Continuing Operations Abroad

In total, seven out of the 19 paragraphs discuss the First Amendment, *mens rea*, and the CDA; eight of these paragraphs relate to escort ad moderation; and the final four touch on Backpage's sale, decision to accept gift cards, interactions with NCMEC, and a theoretical plan to continue operations abroad.

## II.     LAW AND ARGUMENT

### A.     Defendants Fail To Establish that Any Identified MOI Statements Are Privileged, And Have Waived Any Privilege Through Public Disclosures

The attorney-client privilege protects "[u]nder certain circumstances" confidential communications between clients and their attorneys.  *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126 (9th Cir. 2012) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). Because this privilege "contravene[s] the fundamental principle that the public has a right to every man's evidence," the Ninth Circuit construes it narrowly. *Id.* (citations and quotations omitted); *United States v. Ruehle*, 583 F.3d 600, 609 (9th Cir. 2009) ("As the party asserting the privilege, Ruehle was obliged by federal law to establish the privileged nature of the communications and, if necessary, to segregate the privileged information from the non-privileged information.").

Courts have recognized several ways by which parties may waive the privilege. *In re Pac. Pictures Corp.*, 679 F.3d at 1126.  "An express waiver occurs when a party discloses privileged information to a third party who is not bound by the privilege, or

otherwise shows disregard for the privilege by making the information public." *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003). It is well-understood that the mere fact that a person is a lawyer does not lay a cloak of privilege upon everything that lawyer prepares, sees, or hears. *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996). The party asserting privilege has the burden of showing that the privilege has not been waived. *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002).[3]

Here, Defendants have failed to carry their burden. *Ruehle*, 583 F.3d at 609. Defendants make "no effort to identify with particularity" how Ferrer's statements are privileged, let alone how any of his above-identified statements divulged the substance of any confidential attorney-client communications. Defendants fail to answer the most basic questions about why they believe Ferrer's statements are privileged, including: (1) "Which attorney was representing which party when the communications were made?"; (2) "Was it a privileged communication because of the JDA or for some other reason?"; (3) "Was the attorney a party to the JDA, if not, how is the statement privileged?"; and (4) "Did the statement reflect legal or business advice?" None of these questions is discussed, much less answered; rather, Defendants argue the Court can deem these statements privileged by simply reviewing the MOIs. (Doc. 940 at 7.) Defendants have made the same mistake as the trial court in *Ruehle* by "invert[ing] the burden of proof, improperly placing the onus on the government to show what information was not privileged." 583 F.3d at 609.

Even if Defendants established Ferrer's memories are privileged, it's clear that confidentiality has not been maintained. Indeed, from the earliest days of this case, Defendants have trumpeted their previous successes in defending their operation of Backpage based on the First Amendment, the CDA and *mens rea* in briefing before this Court. (*See, e.g.,* Doc. 23 at 2-4, 11-12; Doc. 26 at 1-2, 4-5, 10-11; Doc. 183 at 7-9; Doc.

---

[3] *See also, e.g.*, *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 and n.2 (9th Cir. 1992) (privilege proponent must demonstrate the following "eight essential elements: '(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.'" (citations omitted).

503 at 5-7; Doc. 561 at 15-19; Doc. 783, *passim*.)  To the extent any of Carl Ferrer's memories about what occurred at Backpage years ago could be considered privileged, that privilege has been waived.

### 1. Public Disclosure of First Amendment, *Mens Rea* and CDA Theories

Defendants' legal defenses to civil and criminal liability are no secret.  Defendants have publicly disclosed their defense theories regarding Backpage's operations, including reliance on the First Amendment, the CDA, and not possessing criminal intent, in a multitude of ways.  First, Defendants made all these arguments in previous cases.  *See, e.g., M.A. ex rel. P.K v. Vill. Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011) (ruling Backpage immune under the CDA and finding the company did not have *mens rea* to commit federal crimes); *J.S. v. Vill. Voice Media Holdings, L.L.C.*, 359 P.3d 714, 717 (Wash. 2015) (Washington Supreme Court upholding trial court's denial of Backpage's motion to dismiss noting "[t]his case turns on whether Backpage merely hosted the advertisements that featured J.S., in which case Backpage is protected by CDA immunity, or whether Backpage also helped develop the content of those advertisements, in which case Backpage is not protected by CDA immunity"); *Doe ex rel. Roe v. Backpage.com, LLC*, 104 F. Supp. 3d 149, 161 n.9 (D. Mass. 2015) (Backpage argued they did not possess the requisite *mens rea* "to make out a case under 18 U.S.C. § 1595"); *People v. Ferrer*, 2016 WL 7237305, at *2 (Cal. Super. Ct. Dec. 9, 2016) ("Defendants [including Lacey and Larkin] claim that the complaint and prosecution are: barred by the First Amendment, legally deficient under [the CDA], and devoid of any facts that constitute public offenses under the criminal statutes."); *People v. Ferrer*, No. 16FE024013 (Cal. Super. Ct. Aug. 23, 2017).[4]

Second, Defendants have repeatedly advanced these theories in this case, including in their very first filings in this matter.  (Doc. 23 at 3-4 ("the government's underlying assumptions have been repeatedly litigated, and in each case, rejected on First Amendment

---

[4] This decision is unpublished, but Defendants attached it to a previous motion to dismiss.  (Doc. 541-1.)

grounds"); Doc. 26 (same).)  Third, Defendants' public disclosures have not been limited to court filings.  For years, Don Bennett Moon publicly discussed the theories that Defendants now label as "privileged."[5]  For example, in a memorandum to NCMEC staff in 2013, Moon wrote about Backpage's vigorous defense of "First Amendment rights," "immunity from civil claims under the [CDA]," the importance of and legal protection for anonymous internet speech, and the legality of accepting "gift or prepaid cards."  (Memo. from Moon to John D. Ryan & Staca Shehan at 5-9, 14-15, attached as Ex. A.)  Indeed, nearly every "privileged" communication identified by Defendants is discussed in this memorandum to a third party.  (*See, e.g., id.* at 13-14 (opining on "user age and identification verifications regulations" and procedures).)

### 2.   Public Disclosure of Ad Moderation Policy

The other chief category identified by Defendants as "privileged" relates to ad moderation, including Ferrer's reference to the company's receipt of an attorney memorandum on the subject.  Ferrer's MOIs state that in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (2/5/19 MOI ¶¶ 80(a)-(b) (Ex. 15)); *see also* (4/17/18 MOI ¶ 7(c) (Ex. 10).)  When a document is widely-circulated within a corporation, it loses any attorney-client protection, even if based on advice of counsel.  *Sherwood v. BNSF Ry. Co.*, 325 F.R.D. 652, 661 (D. Idaho 2018) ("A corporation's legal compliance policy that serves as a reference or instructional guide to corporate employees is primarily a 'business' policy rather than a 'legal' policy, even if based on the advice of counsel."); *Stevens v. Corelogic, Inc.*, 2016 WL 397936, at *4 (S.D. Cal. Feb. 2, 2016) (documents that are shared "widely within the corporation" are not protected by the attorney-client privilege).  Ferrer's recollections of these practices, which were circulated as "company policy" to Backpage's moderators, are not protected by the attorney-client privilege.

### 3.   Defendants' Remaining Examples Aren't Privileged

---

[5] The government discussed Moon's role with Backpage in a previous motion. (Doc. 929 at 5.)

1    The few examples provided by Defendants that do not fit into either of the two
2  categories discussed above also are not privileged.  Defendants point to statements made
3  by Ferrer about shutting down Backpage's escort section.  (Ex. 11 at ¶ 143.)  Ferrer
4  mentioned that he discussed this idea with Defendants Larkin and Brunst, along with
5  several attorneys and that everyone agreed with the idea.  This isn't privileged. Ferrer
6  wasn't seeking legal advice; he was making a business decision as Backpage's CEO.
7  Moreover, Ferrer's recollection, as reflected in the MOIs, does not reveal the substance of
8  any specific legal advice or analysis he might have received regarding this "idea."

9    Similarly, the paragraphs cited by Defendants that discuss Hemanshu Nigam are not
10  privileged.  (Ex. 14 at ¶¶ 23-24.)  The first paragraph states, ██████████████████
11  ████████████████████████████████████████████  (*Id.* at ¶ 23.)
12  This isn't a "confidential communication."  It's not even a communication.  The next
13  paragraph  suggests  that  ████████████████████████████████████
14  ████████████████████████████  (*Id.* at ¶ 24.)  Backpage's decision to remove
15  The Erotic Review links is not privileged.  Ferrer's discussion does not reveal the basis for
16  Mr. Nigam's recommendation, just a conclusion that Backpage adopted as a business
17  decision.  Indeed, Defendant Padilla communicated this decision to Backpage employees
18  stating the company's "internet safety experts" made the suggestion.  (Feb. 18, 2011 email
19  from A. Padilla, attached as Ex. B.)  Further, this decision was shared in an email with a
20  third-party public relations consultant (who appears to have had input in the decision).
21  (Doc. 269-6 at 4) (listed under The Erotic Review category, "Inform moderators that all ID
22  numbers that are not clearly marked as massage license authentication numbers should be
23  removed upon discovery."); (*see also* Doc. 230 ¶ 100.)

24    The final two examples do not require much explanation.  First, Defendants claim
25  Moon's presentation of an agreement for Ferrer to sign constituted a privileged
26  communication.  (Doc. 940 at 11 (citing Ex. 10 at ¶ 45).)  But Ferrer makes clear Moon
27  represented the sellers in the company's sales transaction, so no privilege could attach in

1 any communications between the two on this issue.[6]  (Ex. 10 at ¶ 45.)  Finally, Defendants

2 argue Ferrer's discussion about Backpage moving operations to Europe was privileged.

3 (Doc. 940 at 11 (citing Ex. 13 at ¶ 81).)  A communication, however, cannot be privileged

4 when there's no discussion between an attorney and her client.  *Ruehle*, 583 F.3d at 607.

5

   **B.** **Carl Ferrer Waived Backpage's Attorney-Client Privilege**

6    Carl Ferrer has the authority as Backpage's CEO to waive the company's attorney-

7 client privilege.  *See generally Commodity Futures Trading Comm'n v. Weintraub*, 471

8 U.S. 343, 349 (1985) ("[W]hen control of a corporation passes to new management, the

9 authority to assert and waive the corporation's attorney-client privilege passes as well.

10 New managers . . . may waive the attorney-client privilege with respect to communications

11 made by former officers and directors.  Displaced managers may not assert the privilege

12 over the wishes of current managers, even as to statements that the former might have made

13 to counsel concerning matters within the scope of their corporate duties.").

14    The government has raised this issue previously, but the Court has not ruled on it.

15 (Doc. 345 at 4, n.4.)  Defendants counter this axiom by claiming that after Ferrer purchased

16 Backpage, "he, Larkin, Lacey, and their respective companies entered into agreements

17 providing that they would be represented jointly and would share privileges."  (Doc. 235

18 at 7.)  Defendants argue that this "joint representation" prevents the new owner of a

19 company (Ferrer) from sharing *any* information stretching back to the company's

20 inception, without consent from the sellers.  This expansive interpretation flies in the face

21 of controlling law that the attorney-client privilege "ought to be strictly confined within

22 the narrowest possible limits consistent with the logic of its principle."  *Ruehle*, 583 F.3d

23 at 607.  If it were true that a company's sellers could prevent the buyers from disclosing

24 any corporate privileged statements without the seller's consent, this tactic would be used

25 liberally in sales transactions.  When individuals sell a company, they lose the ability to

26 prevent the new ownership from waiving the company's privilege as to previous

27

28     [6] Defendants provide no further explanation about how a conversation with opposing counsel could be considered privileged.

communications.[7]

### C.    Defendants Suffered No Constitutional Violations

Defendants argue that the government's "interference" with their attorney-client privilege violated their rights under the Fifth and Sixth Amendments.  The governmental misconduct required to establish a due process violation under the Fifth Amendment must be so outrageous as to shock the conscience of the court.  *United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027, 1048–49 (D. Nev. 2006) (citations omitted).  Cases in which courts have found a due process violation justifying dismissal of an indictment or barring further prosecution are extremely limited.  *Id.* (citing *Rochin v. California*, 342 U.S. 165 (1952)).  This constitutional defense is reserved for "only the most intolerable government conduct."  *Id.* (citing *United States v. Voigt*, 89 F.3d 1050, 1065 (3rd Cir. 1996)).

Similarly, the Sixth Amendment is violated "only when the government's action substantially prejudices the defendant."  *United States v. Green*, 962 F.2d 938, 941 (9th Cir. 1992) (quotations and citations omitted); *see also United States v. Rogers*, 751 F.2d 1074, 1077 (9th Cir. 1985) (indictment may not be dismissed for government interference with the attorney-client relationship absent prejudice to defendant).  In *Green*, the Ninth Circuit noted that defendant had not expressly argued he was prejudiced and found that "[a]lthough a defense strategy was revealed to the prosecutor, there is no indication that Green's ability to defend himself was impaired or that the government was able to utilize the information in any way."  *Id.*

To justify dismissal, Defendants must meet a high bar.  Defendants must show that law enforcement's conduct is "'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) (quoting *United States v. Russell*, 411 U.S. 423, 431-32 (1973)).  Defendants raising such claims must meet an "extremely high standard."

---

[7] Defendants' "joint representation" argument could only apply to future privileged communications.  Defendants concede that Ferrer did not have any "joint representation" agreements with Defendants before the sale.  (Doc. 235 at 7.)

*United States v. Garza-Juarez*, 992 F.2d 896, 904 (9th Cir. 1993). Dismissal is "limited to extreme cases" in which the defendant can demonstrate that the government's conduct "violates fundamental fairness" and is "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011) (quoting *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991) (internal quotation marks omitted)). Accordingly, the "doctrine of outrageous government misconduct, although often invoked by defendants, is rarely applied by the courts." *SDI Future Health, Inc.*, 464 F. Supp. 2d at 1049.

Defendants fail to demonstrate the government's conduct shocked the conscience or violated fundamental fairness. At each interview, the government admonished Ferrer to avoid divulging joint defense privileged information. (4/5/18 MOI at 1-2 (Ex. 9); 4/17/18 MOI at 1 (Ex. 10); 5/10/18 MOI at 1 (Ex. 11); 7/26/18 MOI at 1 (Ex. 13); 12/14/18 MOI at 1 (Ex. 14); 2/5/19 MOI at 1 (Ex. 15); 5/13/19 MOI at 1 (Ex. 16).) While Defendants assert the MOI of the July 23, 2018 interview did not reflect the admonition (Mot. at 15, citing Ex. 12), the Motion fails to identify any allegedly privileged statements from that interview. (*Cf*. Mot. at 11-12.) Defendants next argue that, despite giving Ferrer these admonitions, "the government thereafter repeatedly questioned Ferrer, and elicited information from him, about communications with and advice of counsel." (Mot. at 9, n.3.) Yet, apart from making this overarching allegation, Defendants fail to detail any instances in the record where the government "repeatedly questioned" Ferrer about or "elicited" any privileged communications. Moreover, Defendants have failed to show that any statements identified in their Motion are privileged, much less that Defendants suffered prejudice so manifest that it has impaired their ability to defend themselves. Without any constitutional violations (and, as shown below, without any prejudice), Defendants' requests for dismissal or other remedies also fail.

### D.     Defendants Do Not And Cannot Articulate Prejudice Suffered

Defendants rely almost exclusively on *United States v. Danielson* to support their argument that they suffered prejudice. 325 F.3d 1054 (9th Cir. 2003), as amended (May

19, 2003); (Mot. at 15-17, 22.)  That case, however, is inapposite.  In *Danielson*, the government improperly "obtained information about Danielson's trial strategy."  *Id*. at 1067.  The government "deliberately and affirmatively took steps, while Danielson was represented by counsel, that resulted in the prosecution team's obtaining privileged information about Danielson's trial strategy."  *Id.* at 1059.  Specifically, the government used an informant to record conversations with defendant about his trial strategy, including his plan to testify in his own defense and what arguments he would raise to counter the criminal charges.  *Id.* at 1067.  *Danielson* articulated the standard of what constitutes prejudice, and who has the burden of proof, "in a trial strategy case."  *Id.* at 1070.  The court ruled that "once the government has improperly interfered with the attorney-client relationship and thereby obtained *privileged trial strategy information*, the prosecutor has the 'heavy burden' of showing non-use."  *Id.* at 1072 (emphasis added).

Critically, *Danielson* recognized that no prejudice exists if the defense has already revealed its trial strategy.  The court wrote: "In [*United States v.*] *Irwin* [612 F.2d 1182, 1189 (9th Cir. 1980)], for example, we found no prejudice arising out of the prosecution's learning the defendant's trial strategy because . . . '[d]efense counsel had [already] revealed the nature of the defense in his initial conference with the prosecutor.'"  325 F.3d at 1070.

No matter how the Court views the Ferrer statements Defendants identified, there is no question that the statements do not involve Defendants' "privileged trial strategy information."  First, Defendants learned about Ferrer's cooperation with the government almost immediately after their arrests.  (Docs. 118-1 & 118-2.)  Ferrer never had the opportunity to learn about Defendants' trial strategy.  Without knowledge of trial strategy, no disclosure could occur.  Second, the issues that troubled the *Danielson* court, including, disclosure of defendant's trial witnesses, non-public defenses to charges, and whether defendant would exercise his right to testify, are entirely absent here.  325 F.3d at 1067.  The legal theories that Ferrer alluded to formed the cornerstone of Backpage's (and Defendants') publicly-filed defenses to civil and criminal litigation long predating this case.  Defendants re-disclosed those defenses to the government in their earliest filings in

this prosecution, on April 9, 2018.  (*See* Docs. 23 and 26.)  Third, as shown above, Ferrer waived any conceivable privilege that could have still attached to that information.

Accordingly, the burden of proving prejudice remains with Defendants.  Defendants offer no specifics on the prejudice they suffered, choosing to argue generally that "the government now has deep insights into the defense's strategy and thinking, which it can use to guide its prosecution of this matter and to evaluate and prepare for any defense Defendants may put on."  (Doc. 940 at 17.)  Yet, the notion that Defendants would assert First Amendment, *mens rea* and CDA-based theories simply wasn't a secret, let alone a source of "deep insight" into Defendants' anticipated "trial strategy."  The Ninth Circuit has made clear that a defendant suffers no prejudice, even if the government improperly obtained his trial strategy, if he previously revealed the nature of his trial strategy.  *Irwin*, 612 F.2d at 1189; *see also Green*, 962 F.2d at 941; *SDI Future Health, Inc.*, 464 F. Supp. 2d at 1048.  Defendants' claim of prejudice doesn't reflect reality.

Moreover, in the years since their arrests in this case, Defendants have filed six motions to dismiss, including motions based on the First Amendment and *mens rea* (Doc. 561); the Communications Decency Act (Doc. 783); grand jury abuse (Doc. 782); the Fifth and Sixth Amendments (Doc. 456); and failure to allege necessary elements of the Travel Act (Doc. 746).  These motions also contain all the "privileged" trial strategies Ferrer purportedly identified.  Defendants' ability to defend themselves at trial has not been impaired.  *Green*, 962 F.2d at 941.

**III.     CONCLUSION**

The government did not violate Defendants' attorney-client privileges.  It follows that without any intrusion of these privileges, no constitutional violations occurred, and the government could not have acted outrageously.  The record is also devoid of any prejudice, substantial or otherwise.  Defendants' sixth motion to dismiss should be denied.

1    Respectfully submitted this 5th day of June, 2020.

2                                    MICHAEL BAILEY
                                     United States Attorney
3                                    District of Arizona

4                                    *s/ Andrew C. Stone*
                                     KEVIN M. RAPP
5                                    MARGARET PERLMETER
                                     PETER S. KOZINETS
6                                    ANDREW C. STONE
                                     Assistant U.S. Attorneys
7
                                     JOHN J. KUCERA
8                                    Special Assistant U.S. Attorney

9                                    BRIAN BENCZKOWSKI
                                     Assistant Attorney General
10                                   U.S. Department of Justice
                                     Criminal Division, U.S. Department of Justice
11
                                     REGINALD E. JONES
12                                   Senior Trial Attorney
                                     U.S. Department of Justice, Criminal Division
13                                   Child Exploitation and Obscenity Section

14

15                           **CERTIFICATE OF SERVICE**
           I hereby certify that on this same date, June 5, 2020, I electronically transmitted the
16    attached document to the Clerk's Office using the CM/ECF System for filing and
      transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered
17    their appearance as counsel of record.

18    *s/ Zachry Stoebe*
      Zachry Stoebe
19    U.S. Attorney's Office

20

21

22

23

24

25

26

27

28

# EXHIBIT

# A



NATIONAL
CENTER FOR
**MISSING &
EXPLOITED**
C H I L D R E N®

Charles B. Wang International
Children's Building
699 Prince Street
Alexandria, VA  22314-3175
U.S.A.

Telephone 703.224.2150

Facsimile 703.224.2122

www.missingkids.com

www.cybertipline.com

From the desk of
John Ryan
Chief Executive Officer

June 6, 2013

BY HAND
Don Moon, Esq.

Dear Mr. Moon,

As you know, the National Center for Missing & Exploited Children (NCMEC) is the nation's congressionally-designated resource center on issues of missing and exploited children.  In the fourteen years since we began operation of the CyberTipline, a centralized mechanism for reporting suspected child sexual exploitation, NCMEC has worked closely with the online industry and law enforcement to reduce the proliferation of child pornography on the Internet.  This collaboration has led to the development of sound practices and techniques with regard to online child pornography. Many of these sound practices may be applicable to combating the problem of child sex trafficking through online classified ad websites.

The operation of online classified ad websites that include an "adult" section, or advertisements related to adult entertainment, escorts, body rubs/massages, BDSM/fetish, or other similar categories, creates risks for children to be exploited and trafficked online.  However, there are steps that can help prevent the victimization of these children.

NCMEC offers the following recommendations to companies that own or operate online classified ad websites and want to take measures to reduce the likelihood of child sex trafficking on their websites.  The recommendations listed below should be considered as part of a dynamic approach that will evolve as technology changes and offenders develop new strategies to exploit and traffic children online.

Companies that want to optimize preventative measures should both enforce their terms of service and implement the following:

1) At the time an ad is created and submitted by a user, but prior to the ad being posted online:
   - Take steps internally to verify the identity and age of the user who has submitted the ad
   - Take steps internally to verify the identity and age of any individual depicted in the ad
     - For example, develop an internal process to compare the visual characteristics of an individual depicted in an ad with their photo in a government issued identification card that they provide

Other Offices
California
Florida
New York
Texas

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT
TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

**NCMEC 000059**

DOJ-BP-0004601955

Don Moon, Esq.
June 6, 2013
Page 2

- Prohibit the use of gift cards, pre-paid credit cards or other anonymous purchasing tools as a form of payment for the ads
- Require and validate a user's email address when they are creating/submitting an ad
- Require and validate a phone number when a user is creating/submitting an ad
- Capture the user's IP address at the time an ad is created/submitted
- Ensure the ad is compliant with established Terms of Service
- Enforce a no nudity policy for images contained within ads
- Implement a moderator review system to examine all submitted ads for possible child sexual exploitation
- If a user changes an existing ad, prior to the ad being re-posted, capture the updated IP address and conduct an additional moderator review for Terms of Service violations

2) Prior to an ad being posted, if a possible minor is believed to be featured within a submitted ad or an ad is believed to involve possible child sexual exploitation:
   - Not post the ad or allow it to go "live" on the site
   - Conduct searches of internal systems to identify and review all other ads which may be associated by phone number, email address, credit card information, images depicted within the ad, or any other identifiers
   - Report the possible child sexual exploitation to law enforcement and/or the CyberTipline (www.cybertipline.com)
   - Retain the relevant material related to the possible child sexual exploitation to provide to law enforcement upon the receipt of legal process
   - Digitally hash the photos that were submitted within the ad to allow for comparison with other ads for review and possible removal. These hashes can be utilized to prevent future Terms of Service violations
   - Flag identifiers associated with the ad such as phone number, email address, credit card information, photos, identity of the user or person depicted within the ad, etc. to prevent future Terms of Service violations

3) Once an ad has been posted publicly, if there is suspected child sexual exploitation within the ad:
   - Remove the ad from public view
   - Conduct searches of internal systems to identify and review all other ads which may be associated by phone number, email address, credit card information, images depicted within the ad, or any other identifiers
   - Report the possible child sexual exploitation to law enforcement and/or the CyberTipline (www.cybertipline.com)

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000060

Don Moon, Esq.
June 6, 2013
Page 3

- Retain the relevant material related to the possible child sexual exploitation to provide to law enforcement upon the receipt of legal process
- Digitally hash the photos that were submitted within the ad to allow for comparison with other ads for review and possible removal.  These hashes can be utilized to prevent future Terms of Service violations.
- Flag identifiers associated with the ad such as phone number, email address, credit card information, photos, identity of the user or person depicted within the ad, etc. to prevent future terms of service violations

NCMEC recognizes that there is not a single solution to eliminate child sex trafficking and addressing this problem requires a multi-faceted approach.  Based on NCMEC's experiences, robust enforcement of terms of service combined with the implementation of these operational recommendations will have a significant impact on combating child sex trafficking within online classified ad sites.

We strongly urge all classified ad website operators with an interest in preventing their sites from being used to victimize children to implement these recommendations.

Sincerely,


John D. Ryan
Chief Executive Officer


*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

# **M E M O R A N D U M**

To: John D. Ryan

CC: Staca Shehan

From: Don Bennett Moon

Re: Technology and Adult Advertising Standards

## 1.      Introduction

I appreciated the opportunity for Liz McDougall and me to meet with Staca and other NCMEC staff to discuss the first-cut online adult advertising standards proposals you provided to me in our meeting with Senator DeConcini in June. Health issues have taken me out of service for much of the time since, but those have now been attended to and I look forward to resuming our dialogue.

It has long been my view that a close collaboration between stakeholders on crafting a set of industry standards has much to offer in terms of minimizing child exploitation and more effectively identifying, arresting and prosecuting those who prey on children. As I indicate in the Conclusion, I believe the involvement of a public interest public policy concern, The O'Connor House, founded by retired Justice Sandra Day O'Connor, might provide a valuable platform to move the search for meaningful, workable, standards forward.

As noted in a discussion of your first-cut proposals with Staca and NCMEC staff, I do not believe online standards can be productively separated from the First Amendment concerns of the Internet speech and privacy communities, nor from the unambiguous pronouncements of the federal courts on these issues. However, when I promised Staca that I would furnish a Memo setting out where I think those pronouncements would most impact potential industry standards, it did not occur to me that I was volunteering for a task that would cause the repeated destruction of draft after draft—as being too preachy, or too dense, or insufficiently optimistic about the road ahead. What follows does not completely arrest those concerns but I am hopeful it might be of modest worth as we move forward.

Please permit me to begin with a little history.

## 2.      Background

Following the Kent State shootings in 1970, Michael Lacey and Jim Larkin (with colleagues who would later depart for other pursuits) founded a free mimeographed anti-war newspaper called *New Times* at Arizona State University. At the time, the local daily newspapers—the *Arizona Republic* and *Phoenix Gazette*—were firmly pro-war and traditional advertisers had no interest in patronizing the *New Times* in a state with the highest percentage of military retirees in the nation and a multi-billion dollar military base and defense contractor-driven economy. Consequently, the advertisers needed to sustain *New Times* weekly exercise in free speech were small nightclubs, stereo stores, music and movie venues, and other concerns catering to a younger clientele. The "backpage" referred to the classified advertising section at the back of the paper.

Over a decade after beginning *New Times*, Lacey and Larkin acquired their second paper—*Westward* in Denver. Other papers followed and a merger of *New Times* holdings with five *Village Voice* newspapers in 2006 brought the national total to 16 papers in all. The combined company—Village Voice Media

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

**NCMEC 000063**

Holdings—has won four Pulitzer Prizes and numerous other awards for excellence in journalism and public service.  I joined the board of the company as its only outside director following the 2006 merger.

From its inception, the company has vigorously defended First Amendment rights in a variety of contexts across the country. It successfully challenged on First Amendment grounds a misdemeanor conviction for publishing an advertisement for abortion services [1]. It successfully challenged a regulation restricting the distribution of its newspapers on university campuses [2]. And no media company in America has been more aggressive in pursuing the public's right to public information and public records exposing the decisions and conduct of public officials [3].  The company successfully argued a seminal case before the Texas Supreme Court reaffirming and expanding the right to publish satire that holds public officials up to ridicule [4]. And Lacey and Larkin recently won a far-reaching victory in the Ninth Circuit United States Court of Appeals, under the Civil Rights Act, constricting police and prosecutor immunity for First Amendment retaliatory conduct—a case that arose after they published grand jury information and were subjected to late-night arrests at their homes for an alleged violation of grand jury secrecy laws [5].

The foregoing is by no means an exhaustive list of the fights Lacey and Larkin have fought in furtherance of First Amendment values over many years. It does, however, speak to the basic proposition that their commitment to First Amendment values is neither situational nor of recent vintage.

[1] See *State v. New Times, Inc.*, 511 P.2d 196 (Ariz. App. 1973).

[2] See *New Times, Inc. v. Arizona Bd. of Regents*, 519 P. 2d 169 (Ariz., 1974).

[3] See, e.g., *Phoenix New Times, L.L.C. v. Arpaio,* 177 P.3d 275 (Ariz. App. 2008).

[4] *New Times, Inc. v. Isaacks*, 146 S.W. 3d 144 (2004)

[5] *Lacey v. Maricopa County*, 693 F. 3d 896 (2012)

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

Earlier this year, Lacey and Larkin sold their newspapers and online news platforms. Their company retains Backpage.com.

It has been said by critics that all the owners of Backpage care about is money. I would note that the reason I agreed to sit on the company's board is that I know better than that. I watched this journalistic enterprise lose large, lucrative, national advertising accounts over the years—Anheuser Busch, J.C. Penney, Coors—because they wouldn't soften or sacrifice their principles or content even when they knew a given story, or series, or review, would cause their profit arrow to point south. I have had differences of opinion with Lacey and Larkin over the years—I am probably less a First Amendment absolutist than they—but I respect their views, and their willingness to fight for them, enormously.

3.      **Legal and Political Context for Industry Standards**

As a host of third-party generated content, Backpage has voluntarily implemented reasonable measures to counter use of its service to exploit men, women and children—and is constantly looking for ways to improve. But it has steadfastly refused to succumb to statutory and regulatory censorship of its hosted content.

The company has established its immunity from civil claims under the Communications Decency Act 6. It has enjoined the enforcement of three state criminal statutes on CDA and First Amendment grounds— laws the courts found would plainly chill free speech rights by subjecting Backpage and other online hosts to state criminal liability for not ascertaining the age of persons depicted in advertisements posted by users 7. And it has established that the First Amendment is not a stranger to the attempted

6 *M.A. v. Village Voice Media Holdings*, LLC, 809 F. Supp. 2d 1041 (2011)

7 *Backpage.com, L.L.C. v. McKenna*, 881 F. Supp. 2d 1262 (2012); *Backpage.com. L.L.C. v. Cooper,* 2013 WL 1558785 (M.D. Tenn. Jan. 3, 2013); *Backpage.com, L.L.C. v. Hoffman,* 2013 WL 4502097 (D. N.J. Aug. 20 2013). The Internet Archive—the online equivalent of the American Library Association—was

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000065

DOJ-BP-0004601961

application of federal criminal law to online user content, that First Amendment anonymity rights are not a stranger to online adult advertising, and that the authority of government to investigate in First Amendment space is fundamentally more constricted than in normal investigative contexts.

I am not new to politics or public policy. I have run for and held public office as an elected prosecutor. I have prosecuted crimes against children. I have written statutes and industry regulations. And I have put forward First Amendment values in trial and appellate courts. So I understand why Backpage's ability to assert the importance of Internet speech and privacy rights in the political and public policy arenas, or gain the slightest acknowledgement of its efforts to rescue trafficked children and aid law enforcement, is nil 8. Put another way, I understand why there was not a single "no" vote for blatantly unconstitutional laws intended to protect children by chilling online speech in the Washington, Tennessee and New Jersey legislatures.

That said, it is clear that law enforcement and academic researchers in the area of child sex trafficking and technology 9, Internet service providers and technology experts, and the online speech and privacy community, all bring important perspectives to any discussion of industry standards.

represented by the Electronic Frontier Foundation as co-plaintiff with Backpage in consolidated complaints in *McKenna* and *Hoffman*.

8 In this connection, I would be remiss if I did not gratefully acknowledge your pointing out the company's role in generating NCMEC "reports [that] have led to arrests of suspects for child sex trafficking and the rescue of child victims" in your letter to Congressman Frank Wolf of January 28, 2013, and what Liz McDougall informs me were fair comments about the company, and about our differences on a couple of issues, in your keynote speech at the recent Attorneys General Summit in Milwaukee.

9 The work of Dr. Jennifer Lynne Musto, Dr. danah boyd, Dr. Mital Thakor, and Dr. Mark Latonero, among others, in the area of technology and human trafficking, for example, provides valuable insights into the underlying challenges.

The Electronic Frontier Foundation, the Center for Democracy & Technology, and many other Internet speech and privacy groups, have recently been active both in the federal courts and in the public policy arena.  A coalition letter to several members of Congress in opposition to a recent NAAG request to amend the Communications Decency Act—a request aimed squarely at Backpage—is instructive on this point 10. I believe that the increasing strength of the online speech and privacy community and other industry actors makes it impossible to craft and implement widely-applicable industry standards for adult advertising content that ignore how speech and privacy rights have been applied to the Internet by the courts.

Yet it is my view that protecting children and protecting First Amendment values need not be incongruent and there is no reason to fear fact and law-based technological solutions. As the President has said, regarding the promise of technological solutions to fight human trafficking: "Just as [traffickers] are now using technology and the Internet to exploit their victims, we're going to harness technology to stop them" 11. This is not to say the task will be easy—I have struggled with the appropriate balance between online speech and privacy rights, and child protection goals—but I believe a balance can be struck.

I also believe that absolutist approaches are inherently destructive of meaningful dialogue and solutions. I appreciate the opportunity to briefly set out some threshold concerns, against the backdrop of the June first-cut list regarding standards you provided, that we believe must inform any collaborative effort aimed at crafting a strong and workable set of industry standards.

4.      **Problem Definition 12**

10 See https://www.cdt.org/letter/coalition-letter-congress-section-230

11 B.H. Obama, *Remarks by the President to the Clinton Global Initiative* (September 25, 2012).

12 Some of the sourcing which underpins this Memo is taken from Liz McDougal's *Submission to the Governor's Task Force on Human Trafficking* in Phoenix on September, 11, 2013.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

Our discussion with Staca and staff about the initial standards proposal quickly produced what I think was a reasonable consensus that the initial scope of the websites that would be included in your first-cut standards needs refinement. A focus on classified websites that have an "adult" section, and "similar categories", for example, is both vague and under-inclusive.

The defined scope of standards would be improved with more precision and an embrace of the notion that "[t]echnological-facilitated trafficking [has] spread across multiple online sites and digital platforms" [including] "social networking sites, search engines, generalized classified services, specialized adult websites, interactive gaming technologies and, increasingly, mobile technologies"13.

The same advertisers and the same or similar ads found on Backpage can usually be found among a multitude of other websites, including classified sites such as MyRedBook, AdultSearch, EroticMugShots, LocalEscortPages, MyProviderGuide, FindHotEscorts, and nsaPals14.

Even the most kid-oriented online services are being used to facilitate minor sex trafficking, including to "make connections with minors, advertise minors for sex, record sexual videos and images of minors for advertising, and transfer payment for commercial sex with a minor15". These services include Facebook,

13 Id., at 3.

14 Id. This finding is consistent with the results regularly discovered from voluntary work Backpage undertakes and provides to law enforcement. In addition to searching its own databases in response to government requests, Backpage employs researchers to scan the World Wide Web for further evidence to help support a rescue, arrest or conviction. Typically, the same ad or advertiser is found on numerous other websites. Id., at FN 8.

15 M. Latonero, et al., *The Rise of Mobile and the Diffusion of Technology-Facilitated Trafficking*, U.S.C. Annenberg School for Communications & Journalism (Nov. 2012), at 8.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000068

DOJ-BP-0004601964

MySpace and Tagged 16. Indeed, research undertaken as early as 2008 identified Facebook as a leading source for sex trade clientele in New York City—providing 25% of clients in the city's sex trade compared to only 3% from Craigslist 17.

So technology standards that apply to Backpage's "adult" section, but not to Craigslist's "casual encounters" section, or to any kind of profile, post, message or image on Facebook or Twitter, for example, would be profoundly under-inclusive and ineffective when, between the Internet and mobile technologies, most content resides on multiple sites and migrates freely between platforms18.

This definitional issue is an instance in which the perfect is the enemy of the good. I am convinced that defining the scope of standards in a way that proves effective is doable. I would suggest beginning with something along the lines of the CDA's definition of "interactive computer service provider", which would ensure inclusion of social networking sites, search engines, generalized classified services, specialized adult websites, interactive gaming technologies and, potentially, mobile technologies, with the added specification that the service or app include advertisements, solicitations, listings, reviews, profiles, forums or categories related to "adult entertainment, dating, escorts, massage, personals or other similar categories".  I am sure my proffered suggestion would benefit from refinement.

5.      Imposing an Online Regulatory Obligation to "Know Your Customer"

16 Id., at 8, 23.

17 See S. Venkatesh, *How Tech Tools Transformed New York's Sex Trade*, Wired Magazine (Jan. 31, 2011).  Dr. Ventatesh expected the Facebook percentage to grow by 2011.

18 d. boyd, *Combating Sexual Exploitation Online: Focus on the Networks of People, Not the Technology*, (Oct. 19, 2010), at 2-3.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000069

As you know, the courts have been not been indifferent to society's obligation to protect children. The United States Supreme Court has said that there is "a compelling interest in protecting the physical and psychological well-being of minors" 19. No court I am aware of has quarrelled with the basic proposition that "the protection of our young from sexual abuse may be among the most important functions of a civilized society" 20. Yet, time and again, courts have struck down content-based laws that chill protected speech despite the laws' child protection goals. In virtually every instance a failure to properly balance competing values, or acknowledge practical effects, underpinned the decision.

Laws imposing age and identity verification requirements for online speech are among those that have repeatedly failed judicial scrutiny.

It has been sixteen years since the United States Supreme Court first considered the constitutional implications of age and identity verification on the Internet 21. In striking down the enforcement provisions, i.e. the "decency" provisions, of the Community Decency Act, a 7-2 Court found that the government had "offered no evidence that there was a reliable way to screen [online] recipients and participants for age 22". The Court further found, inter alia, that the "prohibitively expensive" cost of trying to verify age and identity would have a catastrophically chilling impact on protected Internet speech rights 23. Despite many advancements in Internet-related technologies, this basic finding has not changed and no court has found otherwise.

19 *Sable Communications of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989)

20 *U.S. v. United States District Court for the Central District of California*, 858 F. 2d 534, 541 (9th Cir. 1988)

21 See *Reno v. American Civil Liberties Union,* 521 U.S. 844 (1997)

22 Id., at 855-856. The Court's holding was unanimous on this absence of screening technology.

23 Id., at 876-877.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

In a successful 2012 injunctive action by Backpage and the Internet Archive against enforcement of a Washington law that imposed on Backpage, and other online services, the Hobson's Choice between criminal liability for publishing third-party content leading to sex with a minor, or conducting age-verification as an affirmative defense to liability, the United States District Court for the Western District of Washington stated the online verification problem thusly:

> At first blush, requiring publishers to check identification before publishing an escort ad seems as commonsensical as requiring bar owners to check identification before allowing patrons to enter the door. The latter is an identification requirement related to conduct —drinking alcohol in a bar. The former is an identification requirement... related to speech. Since there is no constitutional right to drink alcohol, courts tasked with upholding the Constitution care little if a bar's identification process results in a line forming outside the door, or causes some restaurants to stop serving liquor. However, because there is a constitutional right to free speech, the Constitution cannot permit similar collateral consequences in the First Amendment context24.

It is those "collateral consequences" that I believe cannot be ignored in an effort to craft industry standards to better protect kids and put predators in jail.

The collateral consequences of user age and identification verification regulations for U.S.-based online service providers—who frequently host tens of millions of posts, or more, annually—would include queues of posts awaiting verification for so long that content would be outdated and irrelevant by the

24 *McKenna, supra., at 1277.*

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT
TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000071

time authentication allowed public display. Other services would simply ban the content altogether because they cannot perform or afford a verification process. This is precisely the kind of speech-chilling collateral consequence condemned in cases like *Reno* and *McKenna*.

There is also an endless variety of reasons why law-abiding citizens may want to post adult content, including advertisements, online without their identities being known—may wish to speak anonymously. Fear of public ridicule, family circumstances, or employment considerations, are obvious examples. Even if distasteful to some, this speech is protected. Indeed, adult postings, including specifically those on Backpage, are not run-of-the-mill "commercial speech" entitled to only truncated scrutiny under the First Amendment25.

Popular speech seldom *needs* First Amendment protection. But a website hosting unpopular content that has been conscripted into a "you must know your customer" policy of not allowing—strictly forbidding—anonymous speech will be out of business in short order, and will deserve that fate.

The concept of anonymous speech as a bedrock First Amendment principle is as old as it is well settled26. *Reno* taught that there is "no basis for qualifying the level of First Amendment protection that should be applied" to the Internet27. Accordingly, "the constitutional rights of Internet users, including the First Amendment right to speak anonymously, must be carefully safeguarded28".

Backpage has worked hard to balance the anonymity and free speech rights of users and the protection of children from exploitation and abuse. In working with law enforcement, Backpage has endeavored to operate on the basis that "non-party disclosure is ...appropriate in the exceptional case where the

25 Id., at 1280-82; Cooper, supra., at 20-21.

26 Upon authoring the *Federalist Papers*, Madison, Hamilton and Jay signed them "Publius"

27 *Reno*, supra, at 870.

28 *Doe v 2themart.com Inc.*, 140 F. Supp. 2d 1088, 1097 (W.D. Wash. 2001).

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

compelling need for the discovery sought outweighs the First Amendment rights of the anonymous speaker 29". As a company with deep roots in defending the First Amendment, we understand that we have failed when we prepare and send a NCMEC report, out of concern for child protection, only to later learn from law enforcement, as we often do, that our concern was misplaced. But the very nature of balancing competing interests is that failures—whether caused by too much intrusion into the user experience, or too little—will occur.

### 6.      Gift or Prepaid Cards and other "Anonymous Purchasing Tools"

The suggestion in the draft standards for an outright ban on the use of "anonymous purchasing tools", such as gift or prepaid credit cards, also carries with it legal and practical collateral consequences that I do not believe can be ignored in assessing workable and effective industry standards.

As you know, in 2008 NCMEC and NAAG released a Joint Statement with Craigslist under which Craigslist implemented, inter alia, a requirement that, in its "erotic services" (later "adult") category, "[p]ersons wishing to post ads ... will be required to pay a fee using a valid credit card" 30. It was the considered and collective opinion of NCMEC and NAAG that this change would (1) "reduce ad volume significantly", (2) "encourage more responsible use", (3) "provide[] additional identifying information" in order to "enable Craigslist to block the accounts of persons who violate Craigslist's terms of use", and (4) assist law enforcement by providing additional evidence available "through a subpoena process". The 2008 Joint Statement made no distinction between traditional, debit, or prepaid cards.

---

29 Id., at 1095

30 *Joint Statement between Attorneys General, National Center for Missing and Exploited Children, and Craigslist* (2008).

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

Prepaid cards comprise a small percentage of those used for Backpage ads. Some prepaid cards require consumers to provide personal identifying information at point of sale and some do not. In many instances gift cards are used for the direct deposit of government benefits and one common feature of these cards is that a phone number is needed to get regular text updates on their balance.

To verify whether prepaid card data is in fact valuable to investigations, I asked our law enforcement support staff for a few examples of where prepaid card evidence has assisted in cases against pimps and traffickers. Three examples are illustrative of the evidentiary value of prepaid cards that NCMEC and NAAG appear to have foreseen when they demanded card usage in the 2008 agreement with Craigslist.

In the first example, the card used for a Backpage ad was in a trafficker's possession when he was arrested. In the second, the same prepaid card used to pay for an ad was used to pay the defendant's phone bill. And in the third, a card found in the defendant's possession was used for ads in several states and helped provide the evidentiary trail to make an interstate case involving trafficking and money laundering.

The same basic investigative principle—where a prepaid phone number is used and law enforcement can be provided with other ads using the same prepaid phone number, or where a combination of email address, phone number and credit, debit or prepaid card numbers will aid an investigation to find related ads by a user—applies across the board. Pushing this content to free services—such as Craigslist personals, social networking sites, chat forums and offshore sites 31—is at variance with the clear objectives of the 2008 Joint Statement, and its underlying enforcement and prosecutorial goals.

31 A San Francisco Bay Area vice detective who worked on a number of child trafficking cases gave his review of the decision of Craigslist to drop its Adult category. "Craigslist Adult Section gets shut down and what happened? Now they go to RedBook. Now I can't even get a response from RedBook because they're based out of the country." *2012 Annenberg Report, at 26-27.* I would recommend that anyone who sees the migration of US adult advertising content offshore as an abstract threat to protecting children from sexual exploitation and prosecuting traffickers in the US confer with Irish and Finnish law

People who commit crimes using the Internet may indeed use a prepaid card in furtherance of those crimes, just as they may use prepaid cell phones or unlicensed guns. But prepaid cards are by no means associated solely with criminal conduct. They are used by people with no access to banks because of poor credit. They are common "thank you" gifts, are used to avoid online identify theft and fraud, and to avoid disclosure of infidelity or sexual preference—and a host of other personal and private reasons unrelated to illegality.

To the extent a user employs a prepaid card to protect his or her anonymity in putting forth lawful online speech, this is an exercise of First Amendment rights in its purest form. How best to balance First Amendment values, the value of the evidentiary trails NAAG and NCMEC hoped to, and did, create as a result of the 2008 Joint Statement with Craigslist mandating credit card usage, and the protection of children from abuse and exploitation, all factor into a search for meaningful industry standards.

7.      **Conclusion**

As you will have gathered by now, I am not of the view that online speech prohibitions of debatable efficacy that are blatantly unconstitutional if dressed as laws ought to be entitled to wholesale online application by virtue of being dressed as "best practices".  I do believe, however, that there is considerable room for discussion and negotiation towards feasible measures if we avoid absolutist approaches, share knowledge, involve the speech and privacy and technology communities, and commit to hard work on a complex subject.

enforcement. Both nations succeeded in driving this content offshore by law, with quite striking investigative consequences.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000075

DOJ-BP-0004601971

Toward this end, I have been in consultations in recent months with a friend of long-standing, Lucia Fakonas Howard, who is a board member of The O'Connor House in Phoenix, about online technology and adult content standards/best practices. On her website, Justice O'Connor describes O'Connor House as "a center for problem solving and for bringing together groups with divergent views". While I have not spoken with Justice O'Connor directly, Lucia informs me that online standards are something she would like OCH to help move forward. I note in this connection that Justice O'Connor's interest in technology as a potential protector of children was clearly expressed in her concurring and dissenting opinion in *Reno v. ACLU*.

I regard you highly as a policy player who seeks light over heat. Our interactions with your staff have been productive and characterized by collegiality, even in a couple of areas where we do not agree. This is very much in keeping with the overriding theme of OCH and I am hopeful we can talk before I leave for Europe later this month about setting in motion efforts to craft online standards with the participation of OCH and relevant stakeholders.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

# EXHIBIT

# B

| From: | Andrew Padilla [andrew.padilla@backpage.com] on behalf of Andrew Padilla |
|---|---|
| Sent: | Friday, February 18, 2011 10:16 PM |
| To: | Adam Padilla; Allen Romero; Amanda Thatcher; Andrew Gilchrist; Angel Lampi; Angela Boyd; Beverlie Berry; Billie Miles; Brian Alstadt; Bryan Patenge; Cathleen Wingfield; Cody Gautier; Dawn Lee; Devyn Braga; Donavon Stewart; Ian Leal; James Hammer; Jana Scifers; Jason Statom; Jeff Lyons; Jennifer Phipps; Jessica Shelton; John Cady; Justin Dew; Kolter Whelan; LaTamara Barlow; Levi Yockey; Maria Rhoad; Martina Gutierrez; Matt Hanna; Michael Enriquez; Michael Sanchez; Misty Schneider; Monica Westover; Nathan Yockey; Nick Vann; Ray Ronan; Roger Williams; Sara Colombo; Sean Meyer; Stefano Ciaravella; Tara Kibbey; Tranica Reilly; Zeke Finlay |
| Cc: | Joye Vaught |
| Subject: | another term bites the dust |
| Attachments: | good.jpg; bad.jpg; bad (1).jpg; bad (2).jpg; bad (3).jpg |

All:

We've been filtering out the terms "TER" and "The Erotic Review" along with links to theeroticreview.com since January of this year but our internet safety experts have suggested we take a more aggressive approach.

Effective immediately, any variation of, or reference to, TER is banned.  If you find it in an ad, remove the phrase and update the ad but do not lock the ad from editing for this violation alone.  If the review ID number is attached to the reference (TER #8675309), remove the ID number along with the TER reference.

If you find a string of numbers without a direct reference to TER, it's allowed.
Examples:

"#123456"

"Well Reviewed #666666"

"Google my reviews #12011201"

An easy way to weed out a good chunk of these references is to do a search for "TER" on the city page.  You'll get some false positives but it should point you in the right direction.  Non-adult spammers will sometimes use hidden keywords like "block bus ter video" and the search will see the tail-end of "bus ter".  To avoid this, you can start your search after you've navigated to the Adult section of the city.

I'm attaching 4 example screenshots of what is not allowed (circled in red) and 1 example screenshot of what is okay (circled in green).

If you have any questions, please ask me or Joye.  Thanks.

Andrew Padilla
Operations Manager
Backpage.com | Village Voice Media
1201 E. Jefferson Street
Phoenix, AZ 85034

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BACKPAGE00026361
DOJ-BP-0002126003