MICHAEL BAILEY
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1200
Los Angeles, CA 90012
Telephone (213) 894-3391

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>  Plaintiff,<br><br>  v.<br><br>Michael Lacey, et al.,<br><br>  Defendants. | No. CR-18-422-PHX-SMB<br><br>**UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION TO INDEFINITELY DELAY TRIAL (CR 990)** |

## **INTRODUCTION**

Defendants' motion to indefinitely delay this trial—already set to commence more than 28 months after their arraignments—should be denied. Defendants suggest that no trial should occur until "unmasked testimony will be perfectly safe"—that is, until "after the pandemic." (Mot. at 12). Defendants' concerns will not be completely eliminated until

there is a vaccine or cure for COVID-19, which could be months or even several years from now. Yet, it simply is not possible or practical to put trials on hold indefinitely. Rather, the government supports the Court's efforts in exploring measures that would allow jury trials to proceed safely during this time, while protecting the constitutional rights of Defendants and the health and safety interests of all trial participants.[1]

The United States is mindful of the health concerns raised in Defendants' motion, and does not mean to minimize them in any way. Rather, as explained below, Defendants' concerns are not insurmountable obstacles, and this trial (already continued on three prior occasions) should proceed as scheduled on August 17, 2020 or within a reasonable time this fall, when protocols are in place to ensure, to the greatest extent possible, the safety of all participants.

## RELEVANT FACTS

### Three Trial Continuances Have Already Been Granted In This Case

The parties agreed at the outset that this is a complex case and negotiated a scheduling order that included deadlines linked to an October 7, 2019 trial date. (CR 121). In exchange for the certainty of a trial date, the government agreed to certain disclosures in advance of the government's statutory obligations and precedent in the District of Arizona. At the scheduling conference in May 2018, Defendants argued that they needed additional time to prepare for trial, and the Court granted their request to set the trial for January 15, 2020. (CR 131). However, the Court did not alter any other deadlines. Thus, the trial was extended three months but all disclosure deadlines (*e.g.*, Rule 16, Jencks Act material, expert notices, etc.) remained the same. As a result, Defendants received disclosures earlier than they would have under the parties' originally-negotiated schedule.

---

[1] Many of the suggestions discussed below are also described in the U.S. Courts' COVID-19 Judicial Task Force's recently-released jury subgroup report, "Conducting Jury Trials and Convening Grand Juries During the Pandemic," available at https://www.uscourts.gov/sites/default/files/combined_jury_trial_post_covid_doc_6.10.20.pdf.

On June 3, 2019, Defendants filed a motion to continue the January 2020 trial date. On July 1, 2019, the Court granted the motion, continuing the January trial date for an additional four months until May 5, 2020. (CR 664.) On January 29, 2020, Defendants filed a second motion to continue trial. On February 21, 2020, the Court granted this motion, continuing the trial date for an additional three and a half months until August 17, 2020. (CR 893.) On May 29, 2020, Defendants filed their third motion to continue trial. (CR 990.) As explained below, the Court should deny Defendants' present request for an indefinite and open-ended trial continuance.

## ARGUMENT

Trial courts are accorded wide latitude in scheduling trials. *Morris v. Slappy*, 461 U.S. 1, 11 (1983). In exercising its "broad discretion," *United States v. Flynt*, 756 F.2d 1352, 1358-59 (9th Cir.), *amended*, 764 F.2d 675 (9th Cir. 1985), to grant or deny a continuance, courts conduct a "case-by-case inquiry . . . bound by no particular mechanical test." *Armant v. Marquez*, 772 F.2d 552, 556 (9th Cir. 1985). That said, four factors help guide this Court's consideration of whether to grant Defendants' motion: (1) the defendants' diligence in their efforts to ready a defense prior to the trial date; (2) the usefulness of the continuance; (3) the extent to which granting the continuance inconveniences the court, the government, and its witnesses; and (4) prejudice to the defendants as a result of the failure to grant a continuance. *Flynt*, 756 F.2d at 1358-62. The weight attributed to any one fact may vary. *Id.* (citation omitted). "[T]he focus of [the] prejudice inquiry is the 'extent to which the aggrieved party's right to present his defense [may be] affected.'" *United States v. Kloehn*, 620 F.3d 1122, 1128 (9th Cir. 2010) (internal quotation marks and citation omitted).

Defendants' motion is largely based on the fourth *Flynt* factor, prejudice that would result as a failure to grant a continuance because of COVID-19. As discussed below, and to address Defendants' concerns, several measures can be implemented that will ensure, to the greatest extent possible, the safety of all jury trial participants. Other *Flynt* factors not argued by Defendants (*e.g.*, diligence; usefulness of a continuance; inconvenience to the

court, the government and its witnesses, including victims of sex trafficking facilitated by Backpage who have already waited nearly two and a half years for their day in court) militate against an open-ended continuance and undoubtedly favor getting this case to trial.

### I. DEFENDANTS' ASSERTIONS OF PREJUDICE ARE UNAVAILAING OR CAN BE ADDRESSED BY SAFEGUARDS BEING ADOPTED BY COURTS ACROSS THE COUNTRY.

#### A. Defendants' Trial Preparation Concerns Are Unavailing.

Defendants' argument that they are unable to properly conduct trial preparation because counsel cannot meet in person with their clients and other witnesses cannot withstand scrutiny. (Mot at 8.) To start, Defendants have been in possession of the vast majority of discovery in this case for more than two years, and they had two years to prepare for trial before counsel for the defense (and the government) largely shifted to telecommuting in approximately mid-March 2020. (*See* CR 893 at 4.) Since that time, and in addition to utilizing traditional means of electronic communications (audio-only and FaceTime or Skype video calls, email, shared document review databases like Relativity, and other forms of widely-used collaboration software like GoogleDocs), legal professionals are now widely using video-conferencing platforms such as Zoom or WebEx that allow multiple participants to meet and share documents over in the internet. Defense counsel in this case uses these platforms; indeed, they recently requested to appear for the June 19, 2020 hearing via Zoom video conferencing. (*See* Ex. B, June 3, 2020 email from B. Feder to E. Garcia.) In short, the argument that defense counsel are unable to prepare for trial because they cannot meet with Defendants or potential witnesses in-person to assess their demeanor and credibility until COVID-19 subsides should be rejected.

The defense also suggests that they have been impeded in trial preparation by not having in-person access to their law offices. (Mot. at 6.) However, they fail to articulate how they have been prevented from engaging in any specific forms of trial preparation (other than in-person meetings that can be conducted via Zoom) by working remotely. Moreover, they do not explain why they cannot access their offices on a limited basis if necessary to, for example, retrieve hardcopy files or review demonstrative exhibits,

provided they adhere to now-commonplace precautions such as mask-wearing and social distancing.

      B.    <u>Defendants' Claim that COVID-19 Will Deprive Them of Trial Before a Cross-Section of the Community Is Unfounded, Speculative, and Premature.</u>

Before the Court has even adopted and disseminated a jury questionnaire and assembled the venire, Defendants assert that "jury summonses issued for an August trial cannot produce a lawful cross-section of the community." (Mot. at 10.) This claim fails because: (1) it is premature; (2) Defendants have not demonstrated any failure to comply with the Jury Selection and Service Act, 28 U.S.C. §§ 1861-71 (JSSA); (3) Defendants cannot meet the second or third prongs of the applicable fair cross-section test; and (4) the JSSA addresses the need for calling additional jurors when there is an unanticipated shortage.

      1.    *Defendants' Claim Is Premature.*

Defendants' fair cross-section claim cannot arise before the venire is even called—at minimum, the second and third prongs of the fair cross-section test require showing a *pattern of venires* that lack fair and reasonable representation based on a *systematic* exclusion of same. *See Duren v. Missouri*, 439 U.S. 357, 360 (1979). Furthermore, Defendants cannot establish a *prima facie* violation of the fair cross-section requirement by relying solely on the composition of the venire at their own trial. *United States v. Olaniyi-Oke*, 199 F.3d 767, 773 (5th Cir. 1999); *McGinnis v. Johnson*, 181 F.3d 686, 690 (5th Cir. 1999) ("[A] one-time example of underrepresentation of a distinctive group wholly fails to meet the systemic exclusion element of *Duren*."). Defendants' assertion is entirely premature and should be rejected.

      2.    *Defendants Haven't Demonstrated a Substantial Failure to Comply with the JSSA.*

To obtain relief under the JSSA, "a defendant must prove a 'substantial failure' to comply with the Act's provisions, a substantial failure being one that destroys the random nature or objectivity of the selection process." *Olaniyi-Oke*, 199 F.3d at 772. The

"happenstance" of a disproportionate jury venire is simply not enough to prevail under the JSSA—for example, not every venire will match the proportions of minorities in the community, given the nature of random selection and the size of the sample. *Id*.

Here, Defendants fail to challenge the selection process—"which is what Section 1867 is designed for"—and instead allege that the venire might fail to represent a fair cross-section of the community. *See id*. The defendant in *Olaniyi-Oke* similarly alleged that his venire had "too few" minorities. After noting that every venire would not match the proportions of minorities in the community based on the nature of randomness, the court held defendant's claim not cognizable under the JSSA because he failed to demonstrate any failure to comply with the statute. This Court should reach the same result. Defendants allege that the mere act of sending a jury summons during COVID-19 "destroys the random nature" of jury selection." (Mot. at 11.) But they fail to identify any JSSA provision that would be violated. As such, Defendants present no cognizable claim under the JSSA.

       3.    *Defendants Cannot Meet The Second or Third Prongs of the Fair Cross-Section Test*.

The Sixth Amendment and the Due Process Clause of the Fifth Amendment both require that juries be drawn from a "fair cross-section" of the community. *See Berghuis v. Smith*, 559 U.S. 314, 319 (2010); *Duren*, 439 U.S. at 360; *Taylor v. Louisiana*, 419 U.S. 522 (1975); *United States v. Williams*, 264 F.3d 561, 567-68 (5th Cir. 2001). "However, this does not mean that the Constitution guarantees a 'jury of any particular composition.'" *Paresdes v. Quarterman*, 574 F.3d 281, 289 (5th Cir. 2009). To establish a prima facie violation of the fair cross-section requirement, a defendant must demonstrate the following three prongs, commonly referred to as the *Duren* test:

(1) that the group alleged to be excluded is a "distinctive" group in the community;

(2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

(3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Berghuis*, 559 U.S. at 319 (quoting *Duren*, 439 U.S. at 364); *United States v. Miller*, 771 F.2d 1219 (9th Cir. 1985); *United States v. Nelson*, 718 F.2d 315, 319-320 (9th Cir. 1983).

District courts in the Eastern District of Louisiana repeatedly rejected claims following Hurricane Katrina that minority displacement from the hurricane caused a systemic underrepresentation in its Jury Selection Plan—relying on the third *Duren* prong. *See, e.g., United States v. Haynes*, 2006 WL 1236059, *1 at n.1 (E.D. La. May 3, 2006) (listing cases). In *Haynes*, the court first noted that "even assuming for purposes of this motion that African-Americans were displaced disproportionately by the storm, the defendant cannot establish the second requirement, that the representation of African-Americans in venires from which juries are selected is not fair in relation to the number of such persons in the community." *Id.* at *2. But even if the defendant had demonstrated underrepresentation, he failed to demonstrate that it was the result of "systematic exclusion"—that is, "when the under representation is due to the system of jury selection itself, rather than external forces." *Id.* (quoting *United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996)) (citing cases in which demographic changes, bad weather, and natural disasters resulted in underrepresentation in the jury venire but did not amount to constitutional violations). Ultimately, the court held that "[i]n this case, any under representation, if it exists, was caused by natural disaster, and not by any systematic flaw or subjectivity in the Jury Selection Plan." *Id.* at *3. As a result, the court denied the defendant's motion to quash the venire and stay the trial proceedings. Similarly, COVID-19, a natural disaster in its own right, would fail to give rise to a fair cross-section claim under the third prong of the *Duren* test, even if Defendants could statistically demonstrate significant underrepresentation of minority groups in the venires (which they have not).

    4.  *The JSSA Addresses Potential Juror Shortage*.

The JSSA addresses a scenario in which there is an unanticipated shortage of available petit jurors. It provides that "[w]hen there is an unanticipated shortage of

available petit jurors drawn from the qualified jury wheel, the court may require the marshal to summon a sufficient number of petit jurors selected at random from the voter registration lists, lists of actual voters, or other lists specified in the plan, in a manner ordered by the court consistent with sections 1861 and 1862 of this title." *See* 28 U.S.C. § 1866(f). Thus, if the Court determines that an insufficient number of jurors has responded for the venire due to COVID-19, additional jurors could be summoned.

Additionally, the government has proposed questions to Defendants to include in the jury questionnaire to reduce the time in court needed to assess jurors for health concerns or risk factors in order to excuse or defer jurors that have current health issues or pose a risk of infection to others. These questions include or cover the following:

1. Have you been tested for COVID-19? If so, what was the result of the test?

2. Have you been diagnosed or assessed presumptively positive for COVID-19?

3. At any time over the past two weeks, have you developed flu-like symptoms such as a cough, fever, shortness of breath, or a loss of the sense of taste or smell?

4. Have you been in close contact with anyone who has been diagnosed with a COVID-19 infection within the last two weeks?

5. Are you a healthcare worker directly involved with the treatment of COVID-19?

6. Are you or someone in your household considered to be at high risk for complications from contracting COVID-19 because of a preexisting condition, age, or other characteristic? If so, please explain in detail.

7. Do you have significant childcare or eldercare issues as a result of COVID-19-related closures that would make it difficult for you to serve as a juror? If so, please explain in detail.

8. Are you dependent on mass transportation to travel to and from the courthouse?

Moreover, the Court could issue a supplemental questionnaire on the day jury service begins to obtain up-to-date information regarding the prospective jurors' health and potential exposure to individuals with COVID-19. The Court could also consider more

permissive policies for excusing, deferring, or otherwise exempting potential jurors from service of a summons based on responses to the questionnaire.

      C.      <u>This Court Has Adopted Procedures to Facilitate Jury Selection, Voir Dire, Instructing the Jury and Jury Deliberations in a Manner that Reasonably Addresses Health and Safety Concerns.</u>

Several other federal district courts have issued orders detailing the protocol for the commencement of trials. (*See, e.g.,* Ex. A). In addition, Chief Judge G. Murray Snow of the District of Arizona has issued an order partially lifting the moratorium on jury and other trials in the Tucson and Phoenix Courthouses and setting forth measures to minimize COVID-19 exposure during jury trials. (General Order 20-26 at 2-5.)

The parties have already agreed to use a jury questionnaire to gather biographical and other basic information about potential jurors that will expedite jury selection and limit the time jurors spend in the courtroom. The current proposed questionnaire is mandatory and signed under penalty of perjury. The completed questionnaires will be filed under seal to protect the sensitive health information of the potential jurors who have concerns about COVID-19 exposure.

In addition, arrival times could be staggered for potential jurors, especially when selecting juries for multiple trials, and using several staging areas to facilitate social distancing. The Court could use video teleconferencing for preliminary and general instructions and as a supplement to juror questionnaires on basic questions. The Court could further consider conducting voir dire with small groups of jurors until a full jury is selected. It could also consider seating potential and selected jurors in the courtroom gallery, with sufficient space to encourage social distancing. The Court may direct the use of transparent plastic or plexiglass screens where possible to minimize interactions between court staff and attorneys. (*See* Ex. A at 2.) The jury could take breaks and deliberate in a spacious, unused courtroom that will allow jurors to remain much more than six feet apart at all times. (*See* Ex. A at 2.)

The government recommends that that the Court make available to potential jurors personal protective equipment, including face masks and/or transparent face shields, or

require jurors to bring and wear their own face coverings.

There are options for the Court to reimburse jurors for parking to avoid issues related to public transportation, and safely provide lunch or ask jurors to bring their own food as well as determine where jurors can eat lunch and maintain social distancing.

The Court may instruct jurors via closed circuit video or in pre-recorded instructions to shorten the length of time in court. The parties can evaluate which rooms will allow for safe social distancing during deliberations, including clearing the courtroom for deliberations and using microphones or other means of amplifying voices to ensure effective communication among jurors.

### D. Use of the Special Proceedings Courtroom or Other Measures Can Ameliorate Many of Defendants' Health and Safety Concerns.

The United States respectfully requests that the Special Proceedings Courtroom (SPC) in the Phoenix Courthouse be considered as a possible venue for the trial given the larger number of trial participants involved in this case. The government understands that the SPC is currently utilized for VTC proceedings, along with another VTC-equipped courtroom, and the government is cognizant of the Court's need to balance a large number of competing considerations in determining how to allocate and utilize the Phoenix Courthouse's resources. Nevertheless, and for several reasons, the United States respectfully suggests that the SPC may be ideally suited for the trial in this case.

As the Court knows, the Special Proceeding Courtroom is being utilized for jury trials in the Tucson Courthouse. (General Order 20-26 at 5.) The Phoenix SPC has a much larger seating capacity than the standard courtrooms in the Phoenix Courthouse, allowing for greater social distancing among numerous trial participants. The SPC can be accessed via a single flight of stairs, reducing the need for trial participants to access limited elevator space. The SPC has an open ceiling that reaches several stories high, facilitating air flow and circulation. The large juror assembly room is in close proximity, immediately downstairs from and underneath the SPC, and it could be utilized by the jurors during breaks and lunch. The SPC's upstairs viewing platform allows for social distancing among

members of the public and press choosing to observe trial proceedings, and it could be used by itself or in conjunction with overflow space in another room where members of the public and press could view courtroom proceedings via closed-circuit video.

Perhaps most importantly, use of the SPC would prevent the expected 12-week trial in this case from monopolizing one of the two courtrooms that have been retrofitted for holding jury trials consistent with General Order 20-26.[2]

If use of the SPC is not feasible, the United States respectfully requests that trial take place in one of the other courtrooms that the Court has designated for jury trial use.

Regardless of the courtroom used, the government recommends that the Court conduct a walkthrough or mock trial with the parties and court personnel to identify issues with social distancing and protecting the safety of participants. To maximize social distance during the course of trial, the parties should plan ahead regarding seat arrangements for counsel, Defendants and support staff to maintain social distancing.

The parties, at the direction of the Court and the General Services Administration, can evaluate plans for sanitizing court facilities throughout the phases of the trial and the Court can communicate safety measures to prospective jurors in advance.

E. <u>Defendants' Concerns Regarding Witnesses, Masks, Evidence Presentation and Other Courtroom Issues Can Be Addressed by Measures Adopted by Other Courts and Contemplated by General Order 20-26.</u>

The parties may coordinate with potential witnesses as early as possible regarding service of subpoenas and transportation issues, and discuss any health concerns, risk factors, travel restrictions, or state or local quarantine requirements. Here, the government intends to call approximately 100 witnesses. At the moment there are no government-imposed travel restrictions that would prevent the witnesses to be present for the currently

---

[2] The United States notes that General Order 20-26 contains differing statements regarding multi-defendant cases. A sentence on page three provides that "Multi-defendant proceedings such as operation streamline and the Court's flip-flop calendar remain canceled until further notice." (General Order 20-26 at 3.) However, the next page contemplates the seating of more than one attorney and client at counsel table in multi-defendant cases. (*Id*. at 4.) Moreover, the Order only specifically addresses trials in June and July. (*See id*. at 2.)

- 11 -

1    scheduled August trial or a trial later this fall.  In any event, this is an issue for the
2    government to resolve.  Defendants' witnesses will not being testifying until a later point
3    in the trial, allowing for additional time to assess any COVID-19 concerns.

4        The government recommends that witnesses not wear face coverings while
5    testifying to avoid constitutional issues.  General Order 20-26 expressly allows for witness
6    testimony without masks at the Court's direction, provided that appropriate social
7    distancing or other protective measures are allowed. (General Order 20-2 at 4.) Moreover,
8    the Court and the parties can consider alternative ways of protecting witnesses and other
9    trial participants, including by providing additional space and using plexiglass screens or
10   transparent face coverings.  (*See* Ex. A at 1-2 (discussing rolling plexiglass screens)); *see
11   also Maryland v. Craig*, 497 U.S. 836, 850 (1990) ("[A] defendant's right to confront
12   accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial
13   only where denial of such confrontation is necessary to further an important public policy
14   and only where the reliability of the testimony is otherwise assured."); *id.* at 857
15   (concluding that "where necessary to protect a child witness from trauma that would be
16   caused by testifying in the physical presence of the defendant, at least where such trauma
17   would impair the child's ability to communicate, the Confrontation Clause does not
18   prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures
19   the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby
20   preserves the essence of effective confrontation"). *But see Coy v. Iowa*, 487 U.S. 1012,
21   1021 (1988) (holding that the placement of screen between defendant and child sexual
22   assault victims during their testimony at trial violated defendant's right to face-to-face
23   confrontation under confrontation clause). Courts have approved of additional
24   circumstances in which witnesses may testify with face coverings or disguises, including
25   protecting the identity of agents or witnesses who fear reprisal from gangs. *See, e.g. United
26   States v. de Jesus-Castaneda,* 705 F.3d 1117, 1120–21 (9th Cir. 2013); *Moralez v. Artuz*,
27   281 F.3d 55, 60 (2d Cir. 2002).

28

In addition, the government is open to witnesses appearing by video, or other than in-person, if there is a clear and unequivocal waiver to avoid running afoul of the Confrontation Clause. *See United States v. Gigante*, 166 F.3d 75, 79–80 (2d Cir. 1999) (admission of witness's testimony via two-way, closed-circuit television from a remote location did not violate defendant's right of confrontation, where witness was fatally ill and was part of witness protection program, and defendant was too ill to participate in distant deposition); *United States v. Yates*, 438 F.3d 1307, 1312–13 (11th Cir. 2006) (*en banc*) ("[a] defendant's right under the Confrontation Clause to confront accusatory witnesses may be satisfied, in the absence of physical, face-to-face confrontation at trial, only where denial of such confrontation is necessary to further an important public policy, and only where reliability of testimony is otherwise assured."; allowing the government to present testimony by video teleconference was not necessary to further any important public policy and violated defendants' rights); *see also United States v. Carter*, 907 F.3d 1199, 1208 (9th Cir. 2018) (holding in prosecution for sex trafficking with minors that the fact that one alleged, now-adult victim was seven months pregnant and unable to travel due to complications associated with her pregnancy did not support finding of necessity, such as would permit court to impinge on defendant's right to physically confront witnesses against him by allowing this witness to testify remotely by two-way video conference).[3]

Here, the parties have exchanged witness and exhibit lists many months before trial and the government will continue to send updated lists to Defendants. The government has filed a motion to admit certain categories of evidence in an effort to narrow evidentiary issues and facilitate the introduction of uncontested exhibits outside the presence of the jury. (CR 916). This will minimize the use of sidebars by handling evidentiary issues during breaks outside the presence of the jury. The government also recommends using microphones at counsel table to conduct conferences or sidebars. Further, the government

---

[3] Although the government does not anticipate any serious issues with in-court identification (identification is not a defense raised in this case), it is open to considering alternative procedures or stipulations for in-court identifications if the participants are wearing face coverings.

intends to utilize technology to minimize the need to approach witnesses or handle physical exhibits.  This will essentially be a *paperless trial* as each exhibit will be presented by a trial presentation software (Trial Director) or the document camera (Elmo).  The parties could evaluate technological options to ensure jurors can effectively review evidence (pre-loaded iPads for deliberation, the use of Jury Evidence Recording System (JERS), computer and thumb drives, etc.), including digital evidence, in courtrooms reorganized for social distancing.  (*See also* Ex. A at 1-2.)

The government is mindful of the need for Defendants and counsel to have adequate opportunity to consult with one another throughout the trial.  Cases have approved seating arrangements that separate defendants from counsel as long as they can consult freely during trial.  *See, e.g.*, *United States v. Levenite*, 277 F.3d 454, 465–66 (4th Cir. 2002) (the placement of defendants six feet behind their counsel did not deny them the assistance of counsel, in violation of the Sixth Amendment, where counsel and client were free to consult throughout the trial, and there was no evidence that either defendant's ability to communicate with his attorney and assist in his defense was impaired); *United States v. Balsam,* 203 F.3d 72, 81–82 (1st Cir. 2000) (defendants seated four to five feet from defense table and permitted to "consult freely" with counsel were not denied assistance of counsel); *United States v. Jones,* 766 F.2d 994, 1004 (6th Cir. 1985) (in a trial of 18 defendants where the defendants were seated in two rows behind counsel's table, there was no Sixth Amendment violation because defendants were able to communicate with their attorneys during trial).  The Court could explore other solutions, such as allowing defense counsel to use the interpreter headsets in the courtroom to communicate with their clients while maintaining adequate distance between one another.  (*See* Ex. A at 2).

F.   Public and Press Access Can and Should Be Safeguarded.

To safeguard the public's and Defendants' rights to an open and public trial, and also allow safe access for victims and trial participants, the government recommends that the Court and parties evaluate options for social distancing within the courtroom.  *See, e.g., Presley v. Georgia*, 558 U.S. 209, 215 (2010) ("Trial courts are obligated to take every

reasonable measure to accommodate public attendance at criminal trials."). In addition to a defendant's right to a public trial under the Sixth Amendment, the Supreme Court has "further held that the public trial right extends beyond the accused and can be invoked under the First Amendment." *Id.* at 212 (citations omitted); *see also Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569 (1980) (plurality) (summarizing the evolution of the criminal trial and concluding that trials have "long been presumptively open"). Again, the SPC is a larger space that can accommodate more spectators and allow for greater social distancing. Another option to facilitate public access would be to set up a closed-circuit broadcast of proceedings available in a separate room if there is insufficient space to allow adequate social distancing for the public in the courtroom.

## II. AN INDEFINITE OR PROLONGED CONTINUANCE WOULD BE HIGHLY PREJUDICIAL TO THE GOVERNMENT.

The other *Flynt* factors—none of which Defendants argue—all militate against a continuance. *Flynt*, 756 F.2d at 1358-62. Defendants have not shown how their diligence justifies further delay; the sole rationale for their motion is a circumstance outside of the control of any party—COVID-19. Nor have Defendants demonstrated the usefulness of a continuance. Their motion is devoid of constructive (or any) suggestions for ameliorating the concerns outlined in their brief.

Finally, Defendants' suggestion that the United States and its witnesses will not face any prejudice from indefinite delay is disingenuous. (*See* Mot. at 17.) To be sure, the United States acknowledges that the Court may need to accommodate other cases involving in-custody defendants that take precedence over this out-of-custody defendant case. The government also understands a short continuance of the August trial date might be needed to implement procedures that will ensure, to the greatest extent possible, the safety of everyone involved in this trial. Nevertheless, a prolonged delay (or the indefinite continuance Defendants request) would be highly prejudicial to the United States and its witnesses.

This case has been pending for over 26 months. The defense has already sought and received three continuances. The government has the burden of proof at trial and has expended significant resources with the expectation that trial will begin in August. Over time, memories can fade, and other circumstances can arise that make it more difficult for victims and other witnesses to testify at trial. As the Court recognized in its Order granting Defendant's third request for continuance, four months ago, both victims and the public have a right to proceedings free from unreasonable delay under the Crime Victims' Right Act. (CR 893 at 5.) The Court further recognized "[a] continuance clearly inconveniences the government's witnesses." (CR 893 at 5.) The Court also stated, and the government agrees, "[a] continuance may represent far more than mere inconvenience" to victims— particularly the victims who have already waited more than two years for their day in court. (CR 893 at 5.) The Court, the victims, witnesses, the government, and the public all have an abiding interest in certainty, finality and closure in this long-pending case.

## **CONCLUSION**

Defendants' motion to indefinitely continue the August 17, 2020 trial date should be denied. The government is confident that the Court and the parties can implement procedures that will ensure, to the greatest extent possible, the safety of everyone involved and will, at the same time, enable the justice system to continue to operate. Accordingly, the government respectfully requests that the Court proceed with trial as scheduled, or provide a brief continuance and reset trial for a date certain in the fall of 2020. If necessary, the Court could hold periodic status conferences until the trial date to discuss further safeguards and facilitate trial.

Respectfully submitted this 12th day of June, 2020.

MICHAEL BAILEY
United States Attorney
District of Arizona

*s/ Kevin M. Rapp*
KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW C. STONE
Assistant U.S. Attorneys

JOHN J. KUCERA
Special Assistant U.S. Attorney

BRIAN BENCZKOWSKI
Assistant Attorney General
U.S. Department of Justice
Criminal Division, U.S. Department of Justice

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

## **CERTIFICATE OF SERVICE**

I hereby certify that on this same date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Marjorie Dieckman*
Marjorie Dieckman
U.S. Attorney's Office