1   Thomas H. Bienert, Jr. *(admitted pro hac vice)*
        tbienert@bienertkatzman.com
2   Whitney Z. Bernstein *(admitted pro hac vice)*
        wbernstein@bienertkatzman.com
3   BIENERT | KATZMAN, PC
    903 Calle Amanecer, Suite 350
4   San Clemente, CA 92673
    Telephone: (949) 369-3700
5   Facsimile: (949) 369-3701
    *Attorneys for James Larkin*

6

7   Paul J. Cambria, Jr. *(admitted pro hac vice)*
        pcambria@lglaw.com
    Erin McCampbell *(admitted pro hac vice)*
8       emccampbell@lglaw.com
    LIPSITZ GREEN SCIME CAMBRIA LLP
9   42 Delaware Avenue, Suite 120
    Buffalo, New York 14202
10  Telephone: (716) 849-1333
    Facsimile: (716) 855-1580
11  *Attorneys for Michael Lacey*

12  Additional counsel listed on next page

13                    **UNITED STATES DISTRICT COURT**

14                    **FOR THE DISTRICT OF ARIZONA**

15

16
    United States of America,                CASE NO. 2:18-cr-00422-PHX-SMB
17
                    Plaintiff,                **DEFENDANTS LACEY, LARKIN,
18                                            BRUNST, AND SPEAR'S REPLY IN
            vs.                               SUPPORT OF MOTION TO DISMISS
19                                            BASED ON OUTRAGEOUS
    Michael Lacey, *et al.*,                  GOVERNMENT MISCONDUCT
20                                            INVADING ATTORNEY-CLIENT
                    Defendants.               PRIVILEGE**
21
                                              **[ORAL ARGUMENT REQUESTED]**
22

23                                            Assigned to Hon. Susan M. Brnovich
                                              Courtroom 506
24
                                              Trial Date:        August 17, 2020
25

26

27

28

1    Gary S. Lincenberg (admitted pro hac vice)
      glincenberg@birdmarella.com
2    Ariel A. Neuman *(admitted pro hac vice)*
      aneuman@birdmarella.com
3    Gopi K. Panchapakesan *(admitted pro hac vice)*
      gpanchapakesan@birdmarella.com
4    BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
     DROOKS, LINCENBERG & RHOW, P.C.
5    1875 Century Park East, 23rd Floor
     Los Angeles, California 90067-2561
6    Telephone: (310) 201-2100
     Facsimile: (310) 201-2110
7    *Attorneys for John Brunst*

8    Bruce Feder (AZ Bar No. 004832)
      bf@federlawpa.com
9    FEDER LAW OFFICE, P.A.
     2930 E. Camelback Road, Suite 160
10   Phoenix, Arizona 85016
     Telephone: (602) 257-0135
11   *Attorney for Scott Spear*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.     INTRODUCTION[1]

The government does not dispute: (1) the lawyers whose communications and advice are at issue represented Defendants and/or their companies (and, in some cases, also Backpage); (2) the government repeatedly interrogated Ferrer about communications with those lawyers despite being informed repeatedly, by letters and court filings, that neither Backpage nor Ferrer could waive the privilege as to those lawyers; (3) at the same time it was interrogating Ferrer, the government sought Court approval to access Defendants' privileged communications with those same lawyers (among others) based on Ferrer's purported written waiver of privilege and on various other waiver theories (Dkt. 195); (4) during the hearing on the government's motions, when Defendants expressed concern that the government might already be invading the very same privileges through its questioning of Ferrer, the government withheld from the Court that it was already doing so; (5) Judge Logan rejected the government's waiver theories, holding that Defendants' joint representation and joint defense agreements with Backpage are "valid and enforceable" (Dkt. 338 ("Logan Order I") at 6) and that "the Government cannot use Ferrer's written waiver of attorney-client privilege to circumvent the terms of the JDA" (Dkt. 345 ("Logan Order II") at 4-7); and (6) despite that ruling, the government nonetheless intentionally continued to question Ferrer about communications with Defendants' lawyers for another six months.

The Response instead is just a thinly-veiled request for reconsideration of Judge Logan's orders, combined with baseless theories of waiver, such as that taking a position in litigation or correspondence waives the attorney-client privilege (without explaining why the government failed to assert those theories two years ago in its failed waiver motion). These theories are combined with the equally baseless claim that the government interrogated Ferrer only about non-privileged communications with counsel. Incredibly, the government even argues that Ferrer's statements do not reveal privileged communications because he merely shared his "memories" of privileged

---

[1] On June 10, 2020, the Court vacated the oral argument that had been set on June 19, 2020, for this motion. Dkt. 1017. The Court did so shortly after Defendants' request to hold the argument via video conference in light of the ongoing COVID-19 pandemic. Defendants object to the cancellation of the oral argument and request that it be rescheduled for a video conference hearing consistent with General Order 20-26 (May 28, 2020).

REPLY IN SUPPORT OF MOTION TO DISMISS BASED ON OUTRAGEOUS GOVERNMENT MISCONDUCT

communications, rather than sharing emails or memoranda.  Resp. at 1, 9.

Defendants made a *prima facie* showing that the government intentionally invaded their privileged communications, as required under *United States v. Danielson*, 325 F.3d 1054, 1071 (9th Cir. 2003), as amended (May 19, 2003).  Having done so, "the burden shifts to the government to show that there has been . . . no prejudice to the defendant[] as a result of these communications."  *Id.* at 1071.  The government bears a "heavy burden."  *Id.* at 1072.  The government's attempt to parse what it calls "typical privileged material, *i.e.* emails, memoranda, recordings or other items revealing the substance of confidential communications between and attorney and client," versus Ferrer's unrecorded oral statements about such communications, has no basis in law.  Resp. at 1.  The same is true of the government's attempt to argue Judge Logan's order was "limited" and prevented the government from accessing only privileged *written* communications, but not privileged *oral* communications.  Resp. at 2.  Indeed, the government's choice to invade Defendants' privileges orally, so the only records of its invasions would be its own self-serving MOIs, just underscores the need for heightened judicial scrutiny and putting the government to the "heavy burden" of proving Defendants were not prejudiced.  The Court should exercise both its role as guardian of a defendant's constitutional rights as well as its inherent supervisory powers to send a strong message that such misconduct will not be tolerated.

## II.   ARGUMENT

### A.   The Government Intentionally Obtained Defendants' Privileged Communications.

The government argues that Ferrer's statements cannot be deemed to reveal privileged communications because Defendants did not sufficiently identify the basis for the privilege, citing *United States v. Ruehle*, 583 F.3d 600 (9th Cir. 2009).  Resp. at 9.  *Ruehle* was an options backdating case in which Broadcom's CFO claimed that his communications with company counsel were privileged.  The court held that the CFO's communications were not privileged because they were for the purpose of disclosure to the company's outside auditors and therefore were not "made in confidence."  *Id.* at 609.  There is no parallel to the present case.  The Ferrer MOIs reveal that the government elicited privileged communications clearly made in confidence, some to assess the propriety of business

conduct and others in anticipation of negotiations with adversaries or in anticipation of (extensive) litigation.  *See* Under Seal and In Camera Declaration of James C. Grant, Dkt. 180-1 at ¶¶ 3-21 ("Grant Decl."); Under Seal and In Camera Declaration of James Larkin ("Larkin Decl.").

Citing to *Ruehle*, the government argues that Defendants fail to answer four key questions to establish privilege: (1) "Which attorney was representing which party when the communications were made?"" (2) "Was it a privileged communication because of the JDA or some other reason?"; (3) "Was the attorney a party to the JDA, if not, how is the statement privileged?"; and (4) "Did the statement reflect legal or business advice?"  Resp. at 9.  In fact, these questions have been answered repeatedly.  First, the MOIs set forth the attorneys involved, the topics raised and advice given, and the questions posed and practices analyzed.  The Motion noted that all of these attorneys "were Defendant's lawyers who were in a joint defense arrangement with Ferrer/Backpage or were both Defendants' counsel and Backpage's counsel" subject to a joint representation agreement.  Mot. at 9; *see also* Dkt. 226; Grant Decl. at ¶¶ 3-21.  It also explained, at length (as did Dkt. 226), that Ferrer could not waive the privilege as to any of these communications because of the joint representation and common interest agreements, as previously determined by Judge Logan.  *Id.*; *see also* Larkin Decl.

Second, the government has previously recognized that communications with these lawyers were at least potentially privileged such that the prosecution team could not access them at their whim, and, when it suited the government's purpose, it has acknowledged that these lawyers represented Defendants or their companies.  S*ee*, *e.g.*, Dkt. 524 at 4 (Filter Team would filter potentially privileged documents to look for each of these lawyers' names); Dkt. 195 at 4 ("Steve Suskin, an attorney who served . . . as counsel to Village Voice Media Holdings"); Dkt. 925 at 2 ("Moon also had a personal attorney-client relationship with Defendants Lacey and Larkin."), at 4 ("Defendants hired McDougall as general counsel in February 2012"), at 6 (arguing statements by Attorneys Suskin, Fifer, and Nigam are Defendants' authorized admissions.

Third, the nineteen examples of privilege invasions set forth in Defendants' motion answer these questions on their face.  The examples identified the attorneys involved, the topics on which legal advice was provided, and the advice given.  For instance, the Motion showed that the government interrogated Ferrer about legal memoranda prepared by Attorneys Fifer and Suskin

providing advice on the law pertaining to ad moderation (4/17/18 MOI (Ex. 10) ¶ 7; 2/5/19 MOI (Ex. 15) ¶ 80). The MOIs showed that the government questioned Ferrer about those legal memoranda and the substance of the advice Defendants' counsel gave. The Motion and MOIs showed numerous instances where the government interrogated Ferrer about the legal advice provided by specific lawyers on topics such as: potential defenses to criminal charges based on the First Amendment, Section 230, and the *mens rea*, moderation practices, and modifying business practices to reduce legal exposure.[2] *See* Motion at 6-7; Resp. at 4-8.

Likewise, the cited discussions with attorney Hemanshu Nigam are privileged. Judge Campbell already ruled that communications with Nigam could not be accessed by the government. Dkt. 916-3 at 12-13. The government now argues that Ferrer's statement – that he could relate only what "Hemu and his team" knew (Ex. 14 ¶ 23) – does not reveal a communication with an attorney. Resp. at 12. This is baseless. Ferrer could only relate knowledge imparted by Attorney Nigam if there was a communication with him. Factual discussions with an attorney related to legal advice are privileged. *Upjohn Co. v. United States*, 449. U.S. 383, 389-90 (1981); *United States v. Chen*, 99 F.3d 1495, 1499-1500 (9th Cir. 1996). Moreover, the MOI goes on to describe what Nigam "recommended and then demanded"; obviously, recommendations are made through communications. The fact that the MOI "does not reveal the basis" for the recommendation (Resp. at 12) is irrelevant. Legal advice given by a lawyer is privileged, and an invasion occurs when that advice is revealed, even if all of the analysis underlying that advice is not.[3]

---

[2] The government's distinction between "legal or business" advice sets up a false dichotomy. The attorney-client privilege covers a lawyer's "advice regarding the client's business affairs." *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996). There is no question that such is the case with the attorneys at issue here. Thus, Ferrer's communications with lawyers about the possibility of eliminating the adult services category of the website – which Ferrer says he "would not have [done] without their agreement" (5/10/18 MOI ¶ 143 (Ex. 11)) – are clearly privileged. The MOIs make clear that Ferrer told the government exactly what the attorneys advised. Likewise, communications with Defendants' counsel about possible business strategies in consideration "of a lawsuit, law change, or other legal change" (7/26/18 MOI ¶ 81 (Ex. 13)) also were privileged communications.

[3] Perhaps recognizing this, the government pulls a bait-and-switch by arguing that "the decision" resulting from that recommendation/demand is not privileged, and that the decision was shared with others. Resp. at 12 (citing Gov. Ex. B). But, of course, Defendants do not complain that Ferrer was questioned about the decision that was shared, but about the privilege invasion.

The government suggests it questioned Ferrer only about Backpage's "known business practices and public legal strategy," *id.* at 1, but that suggestion is belied by the MOIs, which show repeatedly questioning of Ferrer about legal advice.  Legal advice is privileged, even if it relates to "known business practices and public legal strategy."  *See Upjohn*, 449. U.S. at 389-90; *Chen*, 99 F.3d at 1501.  The Motion and MOIs make clear that the government invaded Defendants' privileges, while targeting legal advice underpinning key issues the government claims created criminal liability for Defendants, making the government's conduct particularly pernicious.

### B.   The Government Violated and Cannot Re-litigate Judge Logan's Order.

The government claims it could question Ferrer about communications with Defendants' lawyers because Ferrer waived Backpage's privilege.  The government made the very same argument before (Dkt. 195 at 10), and Judge Logan rejected it and held that the government could not rely on Ferrer's purported waiver.  Logan Order II.  Judge Logan ruled that Ferrer could not waive privilege without the consent of all parties to the joint representations and joint defense agreements (*i.e.* Defendants and their companies)—and he did not have that consent.  Therefore, Judge Logan ruled that the parties' agreements "*prevent Ferrer from waiving Backpage's attorney-client privilege.*"  *Id.*

The government acknowledges its prior attempt to argue the very same theory it advances here, and Judge Logan's rejection of that attempt, but claims the Court issued only a "limited order."  Resp. at 2.  The government's claim is apparently meant to suggest the Logan Order II applied only to written communications (Resp. at 2), though the government makes no substantive argument on this point (*see id.* at 13).  Perhaps obviously, Judge Logan's ruling that the parties' joint representation and defense agreements were valid and precluded Ferrer from waiving privileges applies with equal force to all attorney-client communications in whatever form, whether written or oral.  Indeed, in the government's motion that Judge Logan denied, it specifically sought access to emails with *the very same* attorneys about whom they subsequently questioned Ferrer.  (Dkt 195 at 4.)  Thus, the government clearly knew it was not permitted to invade these privileged communications based on Ferrer's purported waiver.

Judge Logan's rejection of that motion meant that the government could not go into communications with these lawyers, period.  In fact, Judge Logan concluded that, under the joint

representation agreements Ferrer and Backpage entered into, Ferrer could not waive privileges as to any of the attorneys at issue without the consent of the other jointly represented parties (including Messrs. Larkin and Lacey).[4]  For this reason, Judge Logan found it unnecessary to reach Defendants' additional arguments that Ferrer as the acquiring party had no right to waive privileges as to third parties, because such privileges were jointly held with the selling companies.  Logan Order II at 4, n.4.  This is the law of the case.  *See* Dkt. 226 at 16-18.  Ferrer's purported waiver was insufficient to give the government access to the privileged communications, and there is no cause to re-litigate it.[5]

The government began its interviews of Ferrer by inappropriately and unilaterally invading Defendants' privileges without a court order allowing the invasion.  *United States v. Pederson*, 2014 WL 3871197 (D. Or. Aug. 6, 2014) ("It should go without saying that, regardless of the content, private communications between a defendant and his or her defense team should be treated as privileged unless otherwise ordered by the court.").  It then showed that it did so intentionally, when it flouted Judge Logan's order and continued to invade the privilege again and again.  Indeed, the government does not deny that it made no changes to its interview practices *vis-à-vis* Ferrer even after Judge Logan's order issued.[6]  The government's continued invasion of Defendants' privileged communications after the Court ruled it could not access them was contemptuous and inexcusable,

---

[4] Judge Logan already rejected the government's argument that the joint representation agreement was only "forward looking" (Resp. at 14) when he ruled that it applied to *all* communications with these lawyers.  Logan Order II.

[5] For the same reason, the government's argument that attorney Don Moon's conversations with Ferrer during the sale of Backpage were not privileged is incorrect.  Moreover, as Defendants previously explained (Dkt. 226 at 4-5, 16-18) and Judge Logan accepted, communications with attorneys – even during the sale – were subject to the same restrictions under the Common Interest Agreement; Ferrer could not unilaterally waive those privileges.  Thus, while the government argues that "no privilege could" cover such communications (Resp. 12-13), in fact, Judge Logan held exactly the opposite (Logan Order II).

[6] The government asserts it "admonished Ferrer to avoid divulging joint defense privileged information" (Resp. at 15), as if that somehow overrides Defendants' challenges about what actually happened in the interviews, *i.e.*, the government's queries and discussions with Ferrer about obvious attorney-client communications.  A lip-service admonishment to a cooperator bent on pleasing the government cannot excuse subsequent, blatant privilege invasions, especially when the invasions were so clear and continued even after Judge Logan ruled that the government could not undertake such invasions.

1  made even worse by the fact that, during the hearing before Judge Logan on October 5, 2018 (Dkt.

2  348 at 91-92), the government intentionally sat silent when the question arose of whether the

3  government already was accessing through its interviews of Ferrer the very same privileged

4  information it sought permission from the Court to invade.

5       ## C.   Defendants Did Not Waive Privilege By Litigation, Memos, or Policies.

6           The government claims Defendants waived the attorney-client privilege by taking successful

7  legal positions in court to defeat claims parallel to those the government has asserted here and by

8  asserting legal positions in this case.  Resp. at 1, 10, 11.  The government also asserts that letters or

9  memoranda to third parties, and company policies, effectuated a similar waiver.  Resp. at 11 (citing

10 Gov Ex. A; 2/15/19 MOI ¶¶ 80(a)-(b) (Ex. 15); and 4/17/18 MOI ¶ 7(c) (Ex. 10)).[7]  The government

11 offers no authority for its positions, because there is none.[8]  The government improperly conflates

12 private attorney-client communications with an attorney's public arguments or the other publicly-

13 stated positions of a company; neither waives the privilege as to attorney-client communications and

14 work product simply because they relate to those positions.  If the government was correct, and the

15 assertion of a legal position in litigation (or in public statements) effected a waiver of all underlying

16 privileged communications, then Defendants would be entitled to obtain all internal DOJ

17 communications about the government's positions and theories reflected in the indictment, in the

18 scores of pleadings in this case and related cases, and in public statements about those cases.  Indeed,

19 if the government was correct, the attorney-client privilege would be decimated, as acting on most

20 legal advice would result in a waiver of the privilege.  That is not the law.  Clients often consult with

21 attorneys to decide on positions to take in litigation or in other public fora.  The attorney-client

---

23  [7] Government Ex. A is a letter from attorney Don Moon to NCMEC.  Nowhere in attorney Moon's
24  letter does he disclose what he discussed with his clients, what those clients told him, and the legal
    advice that resulted.  Instead, he advocates legal positions in an attempt to persuade NCMEC.
25  Likewise, in regard to the circulated policy, it is not the attorney memorandum that was circulated
    widely, but a policy document that contained one point that was also in the attorney memorandum.

26  [8] In support of the assertion that circulating a policy waives the privilege, the government cites two
27  cases that hold that a company policy is not privileged.  Resp. at 11.  These cases are irrelevant; it is
    the government's admitted discussion with Ferrer of the privileged attorney communications, not the
28  company policy, that was improper.

privilege and the work product doctrine are intended "to encourage full and frank communications." *Upjohn Co. v. United States*, 449. U.S. 383, 389-90.  The government's position that taking a public position waives the privilege and lays bare all attorney communications on the subject is nonsense.[9]

### C.    The Government Cannot Escape Its "Heavy" Burden to Prove Lack of Prejudice or Shift that Burden to Defendants.

The government seeks to flip its burden to the defense, arguing Defendants have not "proven" prejudice.  The great difficulty for any defendant to prove prejudice in a scenario such as this is exactly why the Ninth Circuit puts the "heavy" burden of proving a lack of prejudice on the government. *Danielson*, 345 F.3d at 1071-72.[10]

The claim that Ferrer was not familiar with Defendants' trial strategy because he began cooperating shortly *after* the case was indicted (Resp. at 16) is disingenuous.  Backpage was the target of legal claims and attacks for more than a decade.  Village Voice Media Holdings, LLC ("VVMH") and Backpage engaged and worked with lawyers to defend the website and uphold speech and publisher's rights, successfully defending numerous cases.  Throughout this time, Backpage consulted lawyers about moderation, website practices, disclosures, and positions to prevent and preclude improper third-party content.  VVMH, Backpage, Ferrer, Larkin, and Lacey also dealt with and defended criminal accusations.  In 2012, the government commenced a grand jury investigation in

---

[9] *See, e.g.* Cardiac *Pacemakers, Inc. v. St. Jude Med., Inc.*, 2001 WL 699889, at *1 (S.D. Ind. Apr. 26, 2001) ("Defendants seem to be arguing that when a lawyer talks with an adverse party about an issue, that conversation might have 'divulged the content' of the lawyer's private, privileged documents on the same subject so as to waive applicable privileges.  That theory is a non-starter.  Acceptance of the theory would destroy both privileges. … [I]t is not unusual for a client to hope its lawyers will communicate on its behalf with adverse parties concerning the subject of the representation.  That's usually the point of the representation.") (citing *Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.*, 62 F.R.D. 454, 458 (N.D.Ill.1974) (rejecting a similar waiver argument)); *see also Am. Optical Corp. v. Medtronic, Inc.*, 56 F.R.D. 426, 431-32 (D. Mass. 1972) (taking "positions on legal issues [] during negotiations," "like litigation itself," does not "waive the attorney client privilege") (citing *I.B.M. Corp. v. Sperry Rand Corp.*, 44 F.R.D. 10, 13, and 13,n. 2 (D. Del. 1968).)

[10] The government argues that *Danielson* is limited to privileged trial strategy information.  Resp. at 15-17.  While *Danielson* dealt with trial strategy information, the process it lays out for evaluating prejudice resulting from privilege invasions is by no means limited to it.  Additionally, the government *concedes* the privileged communications identified by Defendants dealt with trial strategy by arguing the privilege was waived by Defendants exposing their strategy through filings in this and other cases.

the W.D. Washington, which ended in early 2013 when the federal court there quashed the grand jury's subpoenas and expressed grave concerns about the government's effort to pursue charges based on a novel and unprecedented theory of vicarious website liability.  In that proceeding, VVMH and Backpage demonstrated that the government's attack on Backpage and its owners had debilitating flaws, given the website's extensive efforts to prevent improper content, the website's unparalleled cooperation with law enforcement, and the burdens the government would face in prosecuting an online publisher of third-party speech.  Having failed in Washington, the government instead proceeded with the same prosecution theory in Arizona, so Ferrer was privy to several years of legal work preparing for the potential of an indictment that issued in Arizona.  Moreover, in 2017, Larkin, Lacey, and Ferrer obtained dismissal of two prosecutions by the California A.G. (brought in conjunction with the government), with each court rejecting all charges that Backpage/Larkin, Lacey, and Ferrer facilitated or promoted prostitution (or engaged in money laundering on that basis) by publishing third-party ads.  *People v. Ferrer*, 2016 WL 7237305 (Sup. Ct. Sacramento Cty. Dec. 9, 2016); *People v. Ferrer*, No. 16FE024013 (Sup. Ct. Sacramento Cty. Aug. 23, 2017).

Thus, by 2018, when the government started interviewing Ferrer about privileged communications, he had been involved in privileged discussions regarding strategies for the defense of Backpage, its executives, and its owners for a decade.  Knowing those strategies had been successful in the past, and that its case had serious flaws, the government intentionally invaded these areas with Ferrer to learn specifically what advice was given by counsel and what practices were discussed with counsel.  The government sought to elicit from Ferrer ways to override the actions taken by the website and Defendants that previously failed to establish to criminal liability.

The prejudice to Defendants is manifest.  Knowing the fundamental flaws of their prosecution in light of Backpage's actual practices and the numerous court decisions involving Backpage, the government set out to probe attorney-client communications, and actions in response to attorney advice, to try to find ways to attack or undermine anticipated defenses.  If allowed, this would be an incredibly powerful–and prejudicial–tactic for the government.  Particularly where, as here, the central issues in the case involved extensive input from counsel, it would be extraordinarily prejudicial to a defendant if the government can invade privileges at will to fish out potential areas of attack.

In any event, *Danielson* instructs exactly how the Court should deal with a situation like this: hold an evidentiary hearing and put the government to its "heavy burden." *Danielson*, 345 F.3d at 1071-72.  Such a hearing would flesh out the specific questions asked of Ferrer and the specific answers given.  It would allow the Court to gather details relating to Ferrer's answers – including when and why these attorney communications took place.  It would allow the Court to explore how and why the government continued to invade the privilege even after Judge Logan's ruling, and determine the appropriate remedy.

## III.   THE GOVERNMENT'S BROADER PATTERN OF INVASIONS

While the government claims that Defendants delayed in filing this Motion, if anything, Defendants were forced to file it before Defendants were able to fully address the broader pattern of the government's disdain for the attorney-client privilege.  What is nonetheless clear is that the government appears to be violating Filter Team protocols and using the Filter Team to signal areas for the prosecution team to explore.  Some of this requires further discovery that the government has been reticent to provide.  While Defendants had hoped to gather a complete record of this pattern of misconduct prior to filing this Motion, the government's delay in providing discovery, coupled with the pending trial date, left Defendants no choice but to present the issue to the Court at this time.

As just one other example, the Court need look no further than the government's misrepresentations to this Court on April 23, 2019.  At that time, the Court considered, *inter alia*, Defendants' concern that the Filter Team would unilaterally decide that potentially privileged documents (*i.e.* those with "hits" on terms indicating privilege) were not privileged.  The prosecutors assured the Court that the Filter Team would not turn over potentially privileged documents to the Prosecution Team without getting either Defendants' agreement or a Court order.  Based on the government's representation, the Court denied Defendants' then-pending motion to modify the Filter Team protocol.  *See* Doc. 577, pp. 5-13.  Yet, as Defendants just recently learned, *three weeks after the April 2019 hearing*, the prosecutors issued a written protocol to the Filter Team allowing the Filter Team to do exactly what it told the Court *would not happen*, *i.e.*, allowing the Filter Team to give the prosecution team documents that "hit" for privilege but which the Filter Team unilaterally determined were not privileged, without notice to Defendants or the Court.  Exhibit A, May 15, 2019 Filter Team

Memo (filed under seal).  As Defendants also just learned, apparently following that protocol, the Filter Team gave the prosecution team 955 emails sent to/from Defendants' counsel – including emails marked "ATTORNEY-CLIENT PRIVILEGED" – without telling Defendants or the Court.

This separate invasion of Defendants' privileges shows the government's invasion of Defendants' privileges with Ferrer was no accident or oversight but part of a broader pattern of misconduct.  The government has a serious problem with candor to the Court, with candor to Defendants, and with knowingly and intentionally invading Defendants' privileges.  The government's conduct has been, by any definition, outrageous.  Defendants will raise the additional points with the Court soon.

## III.   CONCLUSION

The government repeatedly and intentionally invaded Defendants' privileges, even after Judge Logan rejected the waivers on which the government purportedly relied to justify its conduct.  The government never told Judge Logan that, at the very time he was considering the purported waivers, the prosecutors were already using them as a basis to elicit privileged communications from Ferrer. Now, confronted with its repeated and brazen violations of Defendants' privileges and the Court's orders, the government tries to defend itself with positions that have no bases in law or fact.  The Court should reject the government's baseless excuses for its serious misconduct and, if it is not prepared to dismiss the case entirely, order an evidentiary hearing as contemplated by *Danielson*.

DATED:  June 15, 2020

      Thomas H. Bienert, Jr.
      Whitney Z. Bernstein
      BIENERT | KATZMAN PC

      By:        *s/Whitney Z. Bernstein*
               Whitney Z. Bernstein
         Attorneys for Defendant James Larkin

*Pursuant to the District's Electronic Case Filing Administrative Policies and Procedures Manual (May. 2020) § II (C) (3), Whitney Z. Bernstein., hereby attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized its filing.*

1     DATED:  June 15, 2020           Paul J. Cambria, Jr.

2                                      Erin McCampbell

LIPSITZ GREEN SCIME CAMBRIA LLP

3

4                                 By:      *s/ Paul J. Cambria, Jr.*

Paul J. Cambria, Jr.

5                                 Attorneys for Defendant Michael Lacey

6     DATED:  June 15, 2020           Gary S. Lincenberg

7                                 Ariel A. Neuman

Gopi K. Panchapakesan

8                                 BIRD, MARELLA, BOXER, WOLPERT, NESSIM,

DROOKS, LINCENBERG & RHOW, P.C.

9

10                               By:      *s/ Gary S. Lincenberg*

11                                 Gary S. Lincenberg

12                                 Attorneys for Defendant John Brunst

13     DATED:  June 15, 2020           FEDER LAW OFFICE, P.A.

14

15                               By:      *s/ Bruce Feder*

16                                 Bruce Feder

Attorneys for Defendant Scott Spear

17

18

19

20

21

22

23

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

2     I hereby certify that on June 15, 2020, I electronically transmitted the attached document to

3 the Clerk's Office using the CM/ECF System for filing.  An electronic version of the filing was

4 emailed with the Under Seal CM/ECF confirmation to registrants who have entered their appearance

5 as counsel of record.

6

7                        */s/ Toni Thomas*
                         Toni Thomas

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY IN SUPPORT OF MOTION TO DISMISS BASED ON OUTRAGEOUS GOVERNMENT MISCONDUCT

# "Exhibit A"

## Filed Under Seal

# MEMORANDUM

**TO:**      All members of the Backpage Filter Team

**FROM:**    Investigative (or Prosecution) Team

**CC:**      Raymond K. Woo
             Criminal Chief

**DATE:**    May 15, 2019

**RE:**      Filter Team Instructions for *United States v. Lacey et al.*, CR-18-422-PHX-SMB

---

## <u>INTRODUCTION</u>

### <u>Relevant Factual Background</u>

Backpage.com was the nation's largest online prostitution advertiser from approximately 2010 to 2018.  For most of its existence, Backpage charged users for posting "adult" ads—and generated more than 90% of its revenue from those ads.  The great majority of Backpage's "adult" ads consisted of offers to sell adults or children for sex.  The "adult" section was a profit-making machine:  Backpage generated approximately a half-billion dollars in revenue from that section from 2004 to 2018.  When Craigslist—Backpage's main online classified advertising competitor— closed its "adult" section in 2010 after learning that many of the ads in that section were for prostitution, Backpage expanded its "adult" category.  Backpage's annual profits then skyrocketed from $26 million in 2010 to over $52 million in 2011, $78 million in 2012, $112 million in 2013 and $134 million in 2014.

In this case, the following individuals have been charged:

- (1) Michael Lacey and (2) James Larkin – these two were founders of the *Phoenix New Times*, and eventually came to own several other alternative newspapers, which were operated through an entity called Village Voice Media Holdings ("VVMH").  Lacey and Larkin, with the assistance of Carl Ferrer, created Backpage.com in 2004.  In 2012,

Lacey and Larkin sold VVMH's print publications, so they could focus on Backpage's development and expansion.

- (3) Jed Brunst and (4) Scott Spear – Following the 2012 sale, Brunst held an ownership interest of around 6% and Spear held an ownership interest of around 4% in Backpage. Brunst served as the Chief Financial Officer of Backpage, while Spear served as the Executive Vice President of one of Backpage's parent companies.

- (5) Andrew Padilla and (6) Joye Vaught – Padilla was Backpage's Operations Manager who was tasked with leading the company's moderation efforts, which involved deleting words and images indicative of prostitution, but then allowing the ad to be published on the website. Vaught served as Backpage's Assistant Operations Manager.

- (7) Carl Ferrer – Ferrer pleaded guilty in April 2018. (Ferrer Plea Agreement attached as Exhibit 1.) At the time, he was Backpage's CEO and purported owner. In the factual basis, Ferrer admitted, among other things, that, "I have long been aware that the great majority of these advertisements are, in fact, advertisements for prostitution services."

- (8) Dan Hyer – Hyer was Backpage's Sales and Marketing Director. He pleaded guilty in August 2018. In his plea, Hyer admitted: "I helped develop a process called 'preboarding' or 'aggregation' . . . . this process consisted of identifying so-called 'escort' and 'adult' ads on other websites and creating ads on Backpage for the individuals depicted in those ads in the hope of securing their future business." (Hyer Plea Agreement attached as Exhibit 2.)

In April 2015, defendants Lacey, Larkin, Brunst, and Spear purported to sell their ownership shares in Backpage and related entities for around $600 million to Dutch entities controlled by Carl Ferrer. Ferrer borrowed most of the purchase price from these four defendants' corporate entities.

That same month, the Senate Permanent Subcommittee on Investigations (PSI) commenced an investigation into internet sex trafficking and issued a subpoena to Backpage. Backpage objected to producing any documents, citing the First Amendment. The Senate, by a vote of 96-0, directed its Legal Counsel to file suit to enforce the subpoena. In August 2016, the Washington D.C. district court ordered compliance. In January 2017, based on its review of Backpage's documents, the Subcommittee issued a 50-page report, BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING. According to the Subcommittee report, Backpage's documents revealed that nearly all of Backpage's "adult" advertisements were solicitations for illegal prostitution, Backpage was fully aware of the true nature of these ads, and Backpage had taken an array of affirmative steps to help its customers (pimps and traffickers) "sanitize" the ads to conceal their illegality.

> The internal company documents obtained by the Subcommittee conclusively show that Backpage's public defense is a fiction. Backpage has maintained a practice of altering ads before publication by deleting words, phrases, and images indicative of criminality, including child sex trafficking….Those practices served to sanitize the content of innumerable advertisements for illegal transactions—even as Backpage represented to the public and the courts that it merely hosted content others had created.

In the fall of 2016, this District of Arizona investigation commenced in an effort to determine whether Backpage and its officials knowingly published advertisements for prostitution services, knowingly published advertisements involving underage sex-trafficking victims, or otherwise intentionally facilitated their customers' crimes (*e.g.,* by editing pimps' ads to reduce the risk of detection). During the Arizona Grand Jury investigation, the grand jury issued dozens of subpoenas and the investigative team secured several search warrants. There was litigation involving several of the grand jury subpoenas, which includes:

1. 16-04-108 – subpoena to Backpage requesting the same categories of documents that the company produced to the Senate. Invoking the First Amendment, Backpage refused to

comply.   In February 2017, the district court in Arizona held a hearing and ordered compliance.   Backpage disobeyed the compulsion order and appealed.   On June 29, 2017, the Ninth Circuit unanimously affirmed the district court's order.   (*See* Ninth Circuit Memorandum, June 29, 2017, attached.)

2. 16-04-108 – after Backpage produced documents responsive to the subpoena, the government filed a motion to compel the company to produce certain documents that had been withheld on the basis of the attorney-client privilege.   This motion involved three categories of documents that Backpage withheld, including: (a) documents reflecting communications between its attorney and three public relations ("PR") firms, Culloton Strategies, Sitrick & Company, and JMS Public Relations; (b) communications with SSP Blue, a company established and operated by Hemanshu Nigam, a former federal prosecutor; and (c) an email between outside counsel and Duff & Phelps, an investment bank.   The district court granted the government's motion in part, and found that "Backpage shall produce the Culloton Strategies, Sitrick & Company, JMS Public Relations, and Duff & Phelps documents."  (Order, April 2, 2018, attached.)

3. 16-04-359 – subpoena served on counsel for the plaintiffs in a civil lawsuit against Backpage pending in Washington state court, *J.S. et al. v. Village Voice Media Holdings, LLC*, No. 12-2-11362-4.   The subpoena generally requested all discovery, deposition transcripts, and correspondence from the civil case.   Plaintiffs' counsel did not object to producing the information, but Backpage argued that production would violate its First Amendment rights.   The district court denied Backpage's motion to quash, ruling, "the Court concludes that the government has a legitimate interest in investigating what Backpage and its employees knew about the allegedly criminal nature of ads posted in its adult section."  (Order, April 17, 2017 [available by request].)

Filter Team Instructions (5/2019)

Page 5

4. 17-04-214 – subpoena to attorney John Becker.  Attorney Becker helped facilitate a wire transfer for Lacey, where Lacey wired $16.5 million in Backpage-derived cash to Becker's IOLTA account, and then to Hungary.  The government filed a motion to compel production based on the crime fraud exception, after Becker refused to comply due to the attorney-client privilege.  The district court found that the crime fraud exception applied and ruled that Becker needed to comply with the bulk of the subpoena requests.  (Order, April 20, 2018, attached as Ex. 5.)

[WILL SUPPLEMENT TO INCLUDE WHERE THE FILTER DOCUMENTS DERIVED FROM]

### Purpose of Memo

These instructions are designed to: (1) prevent the disclosure of protected material information to the prosecution team, which consists of case agents, investigators, and prosecutors assigned to the investigation; and (2) effectively document efforts to do so.[1]  For purposes of these instructions, protected material is information, in whatever form, that is protected by a privilege, rule, statute, or the Constitution.  Throughout this document, all references to "presumptively protected material" should be construed to include all communications between the defense team and a defendant/target, regardless of whether such material meets the requirements for establishing a privilege.  "Potentially protected material" can include other scenarios where a subject discusses legal rights and responsibilities but it is unclear if the communications are with a lawyer or member of a law firm; and all other material is considered "non-protected material."

To prevent such disclosure and the potential taint of the prosecution team, Federal Bureau of Investigation and the United States Department of Justice have designated separate agents and Assistant United States Attorney(s), collectively referred to herein as the "filter team," to review potentially protected material collected as a result of the various search warrants and grand jury subpoenas utilized by the investigative team.  Filter team members will not be involved with the primary prosecution team's investigation in any way, and may not have any further role in the investigation or prosecution of this case, unless some further privilege issue arises requiring

---

[1] This document is not intended to create, does not create, and may not be relied upon to create any rights, substantive or procedural, that are enforceable at law by any party in any matter civil or criminal.

additional review.  Filter team members are prohibited from discussing with the prosecution team any protected information they learn because of their assignment to the filter team.

All participants must review and understand these instructions and the list of the attorneys and/or law firms that are known or believed to represent or to have represented the individual defendants or Backpage.  A separate spreadsheet that includes all these attorneys is attached as Exhibit 6.  Any questions about these instructions that arise at any time during this process should be directed to the filter AUSA before proceeding further.

This memo and the instructions below relate to the process and procedure to identify and remove presumptively protected and potentially protected material contained in the items obtained.  This memo and the instructions below are in addition to the procedures outlined in the search warrants.  The filter team should be familiar with and, where applicable, follow both the instructions contained in this memo and the procedure in the search warrant.

## INSTRUCTIONS TO THE FILTER TEAM

### Overview

1.      In accordance with the filter protocol approved by several magistrate judges in the District of Arizona, the filter team procedure is as follows[2]:

a.      First, the filter team will review documents for privilege or protection only, and the investigative team will determine which documents constitute evidence of unlawful activity;

b.      Second, the filter team will segregate the documents into three categories: (i) non-protected information; (ii) potentially protected information, or (iii) presumptively protected information.

---

[2] Attached is a search warrant issued on August 31, 2018, signed by Magistrate Judge Boyle, which sets forth the filter review protocol.  (*See* Ex. 7.)

        c.        Third, the filter team will disseminate the non-privileged and non-protected documents to the investigative team;

        d.        Four, before the filter team submits any potentially protected information to the Court *in camera* and moves for their disclosure to the investigative team, if appropriate, the filter team will confer with defense counsel for the affected parties, and defense counsel will have the ability to file objections with the Court.[3]

2.        The filter AUSA will review material identified by the filter agent as containing potentially protected or non-protected information.  The filter AUSA will ensure that all presumptively protected items are removed and not reviewed by the filter team except to the extent necessary to make the determination that the material is presumptively protected.

3.        The filter team may not reveal or discuss the contents of any document, file or item determined to contain presumptively protected or potentially protected material to any other person, except counsel for the appropriate defendant, unless otherwise ordered by the court.

**<u>Review by the Filter Team</u>**

1.        The filter agents are responsible for making the initial determination as to whether any of the seized items contain protected information.

2.        For **DIGITAL DEVICES -** The original digital device should be lodged after the review is complete in a secure evidence room and should not be opened by any one absent approval from a member of the filter team.  The container should be labeled: "Contains potentially protected material."

---

[3] If there are materials or information that the filter team determines is subject to the crime-fraud exception, then this procedure will not be followed.  Instead, the filter AUSA will file a motion with the Court, seeking disclosure of any materials that may fall within this exception.

a.      In order to identify protected communications, the filter agent will review the materials on the media to determine whether the items are presumptively protected, potentially protected, or non-protected.

b.      If an item appears to be presumptively protected, the filter agent should not review the item, except as necessary to make the initial determination, and should identify the item as presumptively protected.

c.      If an item contains potentially protected material, the filter agent should designate it as potentially protected.

d.      If an item does not contain any protected material, the filter agent should identify the item as non-protected.  This item need not be reviewed by the filter AUSA.

4      **FILTER LOG**: The filter agent **must** maintain a log of all presumptively protected and potentially protected items identified, describing the material by type, date, sender and recipient (if applicable), and location found (i.e. search location, cellular phone, computer hard drive, email account, etc.,) The log must clearly indicate whether the material contained presumptively protected or potentially protected information and its disposition.   The completed log will then be provided to the filter AUSA.  A sample log is attached to these instructions.  **Please note that in the circumstances of an email review, you may be able to describe your process and the aggregate number of emails screened off, rather than noting each and every individual privileged email.**

5.      If, despite the procedures outlined in this memo, a member of the investigative team finds a document or item that may contain protected information, that person shall leave the document or item in its place, not examine the document or item any further, and immediately notify the filter agent.  The filter agent will take custody of the document or item, notify the filter

Filter Team Instructions (5/2019)

Page 10

AUSA, and place the material in a sealed container for later review consistent with these instructions.

6.      In all instances, in making the initial determination as to whether a document or item contains protected material, the filter agent and investigative agent should err on the side of caution and treat any questionable item as potentially protected material and comply with these instructions.

7.      **FILTER AUSA** - The filter AUSA will receive the filter log and electronic data flagged by the filter agent.

a.      If documents, items or information have been identified as **presumptively protected** by the filter agent, the filter AUSA will not review those items, except as necessary to confirm that they are presumptively protected.   The filter AUSA should return these items – or simply a duplicate copy of the entire thumb drive – to the privilege holder.

b.      If documents, items or information have been identified as **potentially protected** by the filter agent, the filter AUSA will review these items to determine whether the information is in fact protected.

c.      If the filter AUSA determines that a document or item designated as potentially protected is in fact protected and not subject to disclosure, the filter AUSA should return these items to the privilege holder.

d.      If the filter AUSA determines that a document or item designated as potentially protected is not protected, the filter AUSA may designate the document or item as not-protected.  If the filter AUSA is uncertain whether an item is protected, then the filter AUSA will

confer with counsel for the privilege holder[4] and if no agreement can be reached, will consider submitting the material under seal to the Court for a final determination as to whether the material is protected.

    e. If the filter AUSA believes that potentially protected material is not protected due to waiver or other exception to the privilege, the filter AUSA will confer with counsel for the privilege holder and, if no agreement can be reached, submit the material under seal to the Court for a final determination.[5]  The filter AUSA will not forward any potentially protected material to investigative agents or prosecutors without the Court's prior approval.

    f. If documents, items or information have been identified as non-protected by the filter agent, the filter AUSA need not review those items.

    g. The filter AUSA's determination as to whether an item is presumptively protected or potentially protected, and the disposition (*i.e.* sealed for return to the privilege holder, forwarded to the privilege holder for review, disclosed to the prosecution team, forwarded to the court for review, etc.) will be noted in the filter agent's filter log.  (See attached sample log).

    h. The filter team AUSA may only forward items or documents to the prosecution team that, as consistent with these instructions, have been designated as non-protected through: 1) the filter review process; 2) conferring with the privilege holder or privilege holder's counsel; 3) or pursuant to a Court order.

    i. Consistent with these instructions, the filter team will return all originals and copies to the privilege-holder or counsel for the privilege-holder of items or documents determined to be presumptively protected or those otherwise determined to be protected pursuant

---

[4] In the context of this investigation, the filter team can likely just excise the material in this "gray area" from the information turned over to the prosecution team.  In other words, if in doubt we'll just assume it is privileged at this stage.

[5] *See* footnote #4.

to these instructions unless doing so would compromise an ongoing investigation or the ability of

the prosecution team to authenticate or introduce as evidence non-protected documents or items.

In a case where the information is needed for evidentiary admission purposes, the filter team will

ensure that the prosecution team does not have access to protected information.

8.      After the filter team's review is complete, the filter agents will make copies of non-

protected files, data, documents, images or other material.  One or more copies will be provided

to the prosecution team.  Another copy will be lodged in the FBI's evidence room.  The filter agent

will prepare a report documenting steps taken during the review process and provide it to the filter

AUSA.  This report will also be provided to the investigative agents and prosecutors assigned to

this case.

## Applicable Legal Standards

In reviewing items pursuant to these instructions, the filter team agent and AUSA should

err on the side of caution, and treat any questionable items as protected.  In addition:

♦       Unless otherwise advised by the filter AUSA, the filter agent should treat as
        presumptively protected any letter, email, memorandum, or other document
        containing a communication between any target/defendant (or agent of the
        target/defendant) the target/defendant's attorney ( or staff member or agent of the
        attorney).

♦       The filter team should know and refer to the attached spreadsheet (Ex. 6) that
        contains the list of attorneys and/or law firms known or believed to have
        represented the identified target(s)/defendant(s).

♦       The filter team should treat as presumptively protected all materials prepared by
        attorneys, their staff or an agent of the attorney during the course of or in
        preparation for litigation in either the criminal investigation into the targets, or any
        civil litigation in which a target was involved, unless the material was shared with
        third parties who weren't subject to the privilege.

The filter team should also be familiar with the legal elements of the attorney-client

privilege and the attorney work product privilege.  While the USAO has decided to take an

expansive view of what constitutes protected material, particular care should be given to material that falls within the attorney-client privilege and work product doctrines, set forth below.

> ### 1.    *The Attorney-Client Privilege.*

The attorney-client privilege applies "(1) When legal advice of any kind is sought, (2) from a professional legal adviser in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are, at the client's instance, permanently protected, (7) from disclosure by the client or by the legal adviser, (8) unless the protection be waived."  *United States v. Martin,* 278 F.3d 988, 999 (9th Cir. 2002) (citations omitted).  Thus, for the privilege to apply there must first be an attorney-client relationship.  *Id.* at 1000.  In the case of corporate counsel, the corporation's privilege "does not extend automatically" to a corporate officer "in his individual capacity."  *Id.*  Next, "the communication must be between the client and lawyer for the purpose of obtaining legal advice."  *Id.*  Thus, for example, where corporate counsel participates in making *business* decisions, based upon his business judgment as opposed to his legal knowledge, communications concerning those business decisions may not be protected.  In determining the purpose of a lawyer's action:

> there is a rebuttable presumption that the lawyer is hired 'as such'
> to give 'legal advice,' whether the subject of the advice is criminal
> or civil, business, tort, domestic relations, or anything else.  But the
> presumption is rebutted when the facts show that the lawyer was
> 'employed without reference to his knowledge and discretion in the
> law.'

*United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996) *cert. denied* 520 U.S. 1167 (1997).[6]

> ### 2.    *The Attorney Work Product Privilege.*

---

[6] For a discussion on how the attorney-client or work product privileges are waived, please see Schecter's "Privileges" outline on DOJBOOK.

The work product privilege, codified in Federal Rule of Civil Procedure 26(b)(3), protects from discovery "documents and tangible things prepared by a party or his representative in anticipation of litigation." *In re Grand Jury Subpoena (Mark Torf/Torf Environmental Management)*, 357 F.3d 900, 906 (9th Cir. 2004) (internal quotation marks and citation omitted). The work product privilege is narrower than the attorney-client privilege, and is more akin to a limited or qualified privilege. Documents protected as work product may still be discoverable, but only upon a showing of substantial need for the materials and undue hardship in obtaining their substantial equivalent by other means. *Id.*, quoting Fed. R. Civ. P. 26(b)(3).

To qualify as protected work product, "documents must have two characteristics: (1) they must be prepared in anticipation of litigation or for trial, and (2) they must be prepared by or for another party or by or for that other party's representative." *Id.* at 907 (internal quotation marks and citation omitted). Materials prepared by investigators, experts, paralegals, or other agents of the attorney in anticipation of litigation or in preparation for trial are protected by the work product privilege as well. *Id.*, (citing *United States v. Nobles*, 422 U.S. 225, 238-29 (1975)).

Sometimes, documents may be prepared for some purpose in addition to anticipated litigation. In determining whether such "dual purpose" documents are protected work product, the Ninth Circuit employs a "because of" test:

> a document should be deemed prepared 'in anticipation of litigation' and thus eligible for work production protection . . . if in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation.

*In re Grand Jury Subpoena*, 357 F.3d at 907 (internal quotation marks and citation omitted). The "because of" test "does not consider whether litigation was a primary or secondary motive behind the creation of a document;" rather, it considers "the totality of the circumstances and affords protection when it can fairly be said that the document was created because of anticipated

litigation, and would not have been created in substantially similar form but for the prospect of that litigation." *Id.* at 908 (internal quotation marks and citation omitted).

Of particular importance in reviewing potentially protected work product is the protection of the mental impressions or opinions of any of the defendants' lawyers. In fact, even where work product may otherwise be discoverable, Rule 26(b)(3) requires the court to "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." *Id.* at [insert page]. Thus, any document or file that contains the thoughts or opinions of an attorney about actual or anticipated criminal or civil litigation must be protected from disclosure to investigating agents and prosecutors.

### 3.      *Crime-Fraud Exception*

The attorney-client privilege is not absolute. Perhaps the most important limitation on this privilege is the crime-fraud exception. As the Ninth Circuit has explained, "[w]hile there is a societal interest in enabling clients to obtain complete and accurate legal advice, which we serve by sheltering confidential communications between client and attorney from public consumption, there is no such interest when the client consults the attorney to further the commission of a crime of fraud." *In re Grand Jury Proceedings*, 87 F.3d 377, 381 (9th Cir. 1986). Put simply, "[t]he client must not abuse the confidential relationship by using it to further a fraudulent or criminal scheme." *United States v. Hodge & Zweig*, 548 F.2d 1347, 1355 (9th Cir. 1977). Moreover, "[t]he crime or fraud exception applies even where the attorney is completely unaware that his advice is sought in furtherance of an improper purpose." Id. at 1354.

In the criminal context, the Ninth Circuit has repeatedly recognized that the government may invoke the crime-fraud exception to compel the production of documents and testimony that would otherwise be privileged. For example:

• In *United States v. Chen*, 99 F.3d 1495 (9th Cir. 1996), an import-export company that was suspected of tax fraud hired a law firm to help it prepare certain forms to submit to the IRS and Customs Service. *Id.* at 1503-04. Unbeknownst to the law firm, the forms contained inaccurate information. *Id.* The Ninth Circuit held there was "reasonable cause to believe that the [clients] were using their lawyers as part of an ongoing scheme to avoid taxes, so the district court was within his discretion in allowing the government to compel disclosures under the crime-fraud exception." *Id.*

• In *In re Grand Jury Proceedings*, a company was under investigation for employing unauthorized aliens. 87 F.3d at 379-80. After receiving a request from the INS for information about its employment practices, the company retained a law firm to prepare its response but provided incomplete information to the firm. *Id.* at 382-83. As a result, the resulting letter from the law firm to the INS contained important omissions. *Id.* The Ninth Circuit held the government was entitled, under the crime-fraud exception, to obtain information about the communications between the law firm and the client, even though the law firm was unaware its advice was being used to perpetuate ongoing crimes. *Id.*

• And again, in *In re Grand Jury Investigation*, 810 F.3d 1110 (9th Cir. 2016), a company that was the subject of an FDA investigation retained a law firm to attempt to dissuade the FDA from bringing charges. *Id.* at 1112-13. The law firm eventually sent letters to the FDA that "contained false statements designed to obstruct the FDA investigation." *Id.* Even though the lawyers were unaware of the letters' falsity, the Ninth Circuit agreed with the district court that "the government produced sufficient evidence to invoke the 'crime-fraud' exception to attorney-client privilege." *Id.* at 1112.

Filter Team Instructions (5/2019)
Page 17

**<u>Consultation With Investigative Agents or Prosecutors</u>**

During the review process, any member of the filter team may consult with the prosecution team concerning the facts of the investigation, the legal elements of the attorney-client or work product privileges, the scope of the warrants, the scope of the filter review, the appropriateness of the seizure of any document, file, or item, or any other factual or legal question or logistics issue. However, no member of the filter team should disclose the substance of any presumptively or potentially protected item to the prosecution team unless the item is finally determined not to be protected, consistent with these instructions, and may otherwise be disclosed to the investigative agents or prosecutor.