MICHAEL BAILEY
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

DAN G. BOYLE (N.Y. Bar No. 5216825, daniel.boyle2@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1400
Los Angeles, CA 90012
Telephone (213) 894-2426

BRIAN C. RABBITT
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-422-PHX-SMB |
| Plaintiff, | |
| v. | **UNITED STATES' RESPONSE TO DEFENDANTS' MOTION FOR RECUSAL (Doc. 1059)** |
| Michael Lacey, et al., | |
| Defendants. | |

**Preliminary Statement**

In the year 2020, it is anachronistic to suggest that a federal judge with 17 years of judicial experience is unable to preside impartially because of her husband's views. Rather, judges "should be evaluated on their own merits and not judged in any way by the deeds or position in life of their [spouses]." *Perry v. Schwarzenegger*, 630 F.3d 909, 911 (9th Cir. 2011). The Court has continuously served as a judge (in state court and then federal court) in the years since her husband became the head of the Arizona Attorney General's Office (AG's Office). If required to recuse in every case involving subjects that the AG's Office or Attorney General Mark Brnovich (AG Brnovich) have addressed, the Court could not sit in cases involving white collar crime, public corruption, consumer fraud, environmental law, civil rights, human trafficking, and many others. The law of recusal does not go that far. And while Defendants assert that the AG's Office and AG Brnovich have published public-safety literature and other statements critical of www.Backpage.com (Backpage), the AG's Office and AG Brnovich are not directly or indirectly involved in this federal case—they are not parties, they have not appeared as counsel, and they have not filed or joined anything. For many reasons, Defendants' Motion should be denied.

*First*, the Motion is an untimely and meritless attempt by Defendants to seek a replacement judge after suffering adverse rulings. Incredibly, Defendants—who are especially attuned to statements about Backpage made by state attorneys general and other public figures, and to press coverage about themselves—claim they had *no* knowledge until last month about the widely reported fact that the Court's husband has served as Arizona's AG since January 2015, and that the AG's Office (like the AGs of every jurisdiction in the United States since 2010) has, in the course of its official duties, informed the public of the dangers of human trafficking and that such trafficking has occurred via websites like Backpage. Defendants' filing of the Motion long after nearly all the underlying facts became plain to the internet-viewing public, and after suffering several substantive losses, creates a strong presumption that Defendants sat on the basis for their Motion to test the Court's temperament. *See E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1295-

96 (9th Cir. 1992) (a party that moves for recusal after adverse ruling is presumed to be filing for manipulative purposes). Defendants' unsworn assertion that they did not become aware of the basis for their Motion until "on or about September 10, 2020" fails to overcome the presumption of untimeliness. (Mot. at 1.) Such maneuvering is prejudicial to the other parties and denigrates the judicial process, and courts overwhelmingly reject it. *See, e.g., Wells Fargo Bank NA v. Wyo Tech Investment Group LLC*, 2019 WL 4736775, at *9 (D. Ariz. Sept. 27, 2019) ("This is a textbook case of a litigant being aware of information at the start of a case, saying nothing, and then belatedly seeking recusal after becoming dissatisfied with the judge's rulings—a practice that is corrosive to the rule of law and specifically prohibited by Ninth Circuit precedent."). The Motion should be denied for this threshold reason.

*Second*, the notion that recusal is required under 28 U.S.C. § 455(b)(4) and (b)(5)(iii) because the Court's husband has an "interest" that "could be substantially affected by the outcome of this proceeding" is absurd. The "interests" covered by subparagraphs (b)(4) and (b)(5)(iii) are limited to financial or pecuniary interests, or to interests having an obvious relationship to financial well-being, such as a law firm's "reputation and goodwill" and ability to attract future business. No court, however, has construed "interest" in § 455(b) to include any remote, indirect and speculative non-economic interest in the outcome of a case and "the broader issues which it implicates." (Mot. at 11.) Defendants have failed to identify any financial or other cognizable interest of the Court's husband that could be substantially affected by the outcome.

*Third*, Defendants' allegations do not warrant recusal under 28 U.S.C. § 455(a). Where, as here, the judge's spouse has no direct or indirect involvement in this case, no reasonable person would question whether the Court could be impartial merely because of her husband's views and positions, or those of the AG's Office. At most, AG Brnovich is in a similar position to Judge Reinhardt's spouse in *Perry*. The spouse—the executive director of the American Civil Liberties Union of Southern California (ACLU/SC)—had taken positions adverse to the appellants, but had no direct involvement in the appeal at

issue. 630 F.3d at 911-14. Judge Reinhardt denied a motion to recuse based on his spousal relationship, finding the motion was based on "an outmoded conception of the relationship between spouses":

> My wife's views, public or private, as to any issues that may come before this court, constitutional or otherwise, are of no consequence. She is a strong, independent woman who has long fought for the principle, among others, that women should be evaluated on their own merits and not judged in any way by the deeds or position in life of their husbands (and vice versa). I share that view and, in my opinion, it reflects the status of the law generally, as well as the law of recusal, regardless of whether the spouse or the judge is the male or the female. My position is the same in the specific case of a spouse whose views are expressed in the capacity of an officer, director, or manager of a public interest or advocacy organization that takes positions or supports legislation or litigation or other actions of local, state, or national importance. . . . [H]er views . . . cannot be imputed to me, no matter how prominently she expresses them. . . . I cannot accept Proponents' position that my impartiality might reasonably be questioned under § 455(a) because of her opinions or the views of the organization she heads.

*Perry*, 630 F.3d at 911-12. Defendants' Motion is likewise based on "an outmoded conception" of the law of recusal, and Defendants submit no evidence that a reasonable person fully informed of the facts and law would question the Court's sworn duty to be impartial in this case.

It is important "that judges not recuse themselves unless required to do so, or it would be too easy for those who seek judges favorable to their case to disqualify those that they perceive to be unsympathetic merely by publicly questioning their impartiality." *Perry*, 630 F.3d at 916. Contrary to Defendants' assertions, the recusal statute did not "abolish" the duty to sit. Rather, Ninth Circuit precedent holds that courts have a "strong duty to sit" when there is no legitimate reason to recuse. *Clemens v. U.S. Dist. Ct.*, 428 F.3d 1175, 1179 (9th Cir. 2005). Defendants' unsworn assertions fail to meet their burden of establishing that the "extreme measure" of recusal is justified here, and their Motion should be denied. *Twist v. U.S. Dep't of Justice*, 344 F. Supp. 2d 137, 142 (D.D.C. 2004).

## Factual Background

On March 4, 2019, this case was randomly reassigned to this Court. (Doc. 491.) This case has been actively litigated since, to say the least—with some 570 entries in the Court's docket. The Court heard argument and denied a motion to dismiss that involved

some 253-pages of briefing (*see* Docs. 728, 793); presided over a three-day evidentiary hearing involving numerous witnesses (*see* Doc. 839); processed and decided nine defense motions filed on the October 18, 2019 substantive motions deadline (*see* Docs. 775, 777-78, 781-86); and denied another motion to dismiss after argument (*see* Docs. 850, 946).

Defendants assert—but provide no sworn declaration or affidavit in support—that they did not become aware of the facts underlying their Motion until "on or about September 10, 2020" (Mot. at 1), or about one month after the trial would have otherwise started but for the COVID-19 pandemic (Doc. 1031). Yet the exhibits that form the basis of Defendants' Motion are all on the internet, and more than half of them have been openly available for years. Three of Defendants' exhibits consist of different versions of the Arizona Attorney General's Office's booklet, "Human Trafficking: Arizona's Not Buying It" published in June 2018, December 2019 and (in Spanish) on June 2020, respectively. (Mot., Exs. 1-3.) The booklet provides the public with important public-safety information regarding human trafficking, including trafficking occurring via the internet. The 47-page booklet has a short introduction from AG Brnovich, along with his picture (Mot., Ex. 1 at 2.) The booklet's only references to Backpage appear on page 22. (*See* Mot., Ex. 1 at 22.) It describes Backpage as "an online classified advertising site used frequently to purchase sex," and discusses "adult services" ads on Backpage. (*Id.* at 22.)[1]

---

[1] Long before Exhibit 1, Backpage representatives had testified at numerous criminal trials involving pimps who used its website. (*See, e.g.,* Doc. 230 ¶¶ 71, 76, 92.) Published judicial opinions have referenced similar facts. *See, e.g., United States v. Young*, 955 F.3d 608, 614 (7th Cir. 2020) (trafficker taught victims how to post ads for "escort services" on Backpage and then "drove the victims to and from their calls, at least once picking up a victim from high school to take her to a call"); *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 17, 29 (1st Cir. 2016) (minor girls alleging they had been raped more than 1,900 times as a result of being trafficked via Backpage "made a persuasive case" that "Backpage has tailored its website to make sex trafficking easier"); *J.S. v. Village Voice Media Holdings, Inc.*, 359 P.3d 714, 715-16 (Wash. 2015) (discussing Backpage's involvement in minor victims' ads). After the U.S. Senate enforced a subpoena compelling production of thousands of Backpage documents, the Senate Permanent Subcommittee on Investigations published a 50-page report, BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING, concluding that virtually all Backpage "adult" ads were for prostitution. https://www.hsgac.senate.gov/imo/media/doc/Backpage%20Report%202017.01.10%20FINAL.pdf (Jan. 2017). In April 2018, Backpage.com, LLC and its CEO Carl Ferrer pleaded guilty and admitted the "great majority" of Backpage's revenue-generating ads were "for prostitution services." (18-CR-464, Doc. 7-2 at 12-13; 18-CR-465, Doc. 8-2 at 11.)

Still more of the Motion's exhibits contain information published before this case was assigned to the Court. For example, Exhibits 8-10 consist of references to the National Association of Attorneys' General (NAAG) August 16, 2017 letter to Congress requesting amendments to the Communications Decency Act; the letter was signed by 49 Attorneys General, including AG Brnovich. (Mot., Ex. 9 at 5.) Three exhibits involve statements or references that AG Brnovich made about human- and sex-trafficking shortly after he first took office in January 2015—all of which were posted on the internet. (Mot., Exs. 21-23.) Two exhibits refer to sex trafficking conferences that occurred in 2015 and 2016, respectively. (Mot., Exs. 18-19.) Two others concern an interview that TRUST, a third-party organization, conducted with AG Brnovich in 2017. (Mot., Exs. 11-12.)

Defendants' exhibits also contain a smattering of third-party website publications regarding sex trafficking. While Defendants assert that these websites have published "inflammatory" and "highly prejudicial comments about Backpage.com and some of the Defendants" (*e.g.*, Mot. at 2), only two of the Motion's 23 exhibits contain any mention of the individual Defendants by name. Exhibit 14 truthfully states that Defendants Lacey and Larkin have been charged in connection with the Backpage website, and includes a copy of the first page of March 2018 indictment. (Mot., Ex. 14 at 5.) Exhibit 15 consists of a news blog item appearing on the TRUST website. The item does not appear on TRUST's homepage; rather, one must hunt around that organization's website to find it. The item discusses, and links to, an amicus brief filed by the National Center on Sexual Exploitation. While Defendants complain that various materials on the AG's Office website include links to TRUST's website (Mot. at 2-3), Defendants nowhere argue that AG Brnovich or the AG's Office has called attention, or referred anyone directly, to Exhibit 15.

Defendants have long been attuned to statements made about Backpage by state attorneys' general. Starting in 2010, the NAAG began urging Backpage to stop accepting prostitution advertising. (*See* Doc. 230 at 17 (quoting September 2010 letter to Backpage stating that "ads for prostitution—including ads trafficking children—are rampant on the site" and urging Backpage to "stop accepting them altogether"); *id.* at 18 (quoting email

- 5 -

from Defendant Padilla stating "[I]t's the language in ads that's really killing us with the Attorneys General"); *id.* at 26 (discussing August 2011 letter from NAAG to Backpage that characterized Backpage as a "hub" for human trafficking and prostitution ads)[2]; *id.* at 26 (quoting internal email about "the under aged issue" and referencing state "AG's").) In June 2011, Backpage representatives met with representatives of the Washington State Attorney General to discuss concerns about prostitution advertising. (*See* Doc. 230 at 24-25.) Backpage later sued several state AGs. *E.g.*, *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012). Scrutiny that Backpage received from the nation's AGs is also discussed in the Senate Report at 6, 26. *See* n.1, *supra*.

## Argument

**I.   Defendants' Late-Filed Motion Is Untimely and Prejudicial.**

Recusal motions must be timely to avoid prejudicing the other parties and the judicial process. *United States v. Rogers*, 119 F.3d 1377, 1380 (9th Cir. 1997). They are "not intended to give litigants a veto power over sitting judges, or a vehicle for obtaining a judge of their choice." *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993). Moreover, "where the facts are known before a legal proceeding is held, waiting to file ... a motion until the court has ruled against a party is untimely." *Summers v. Singletary*, 119 F.3d 917, 921 (11th Cir. 1997). In considering whether recusal is appropriate under § 455, "the judge is free to make credibility determinations, assign to the evidence what he believes to be its proper weight, and to contradict the evidence with facts drawn from his own personal knowledge." *United States v. Balistrieri*, 779 F.2d 1191, 1202 (7th Cir. 1985), *overruled on other grounds by Fowler v. Butts*, 829 F.3d 788 (7th Cir. 2016).

This case was assigned to this Court more than 16 months ago, and courts have rejected recusal motions for delays of appreciably shorter periods. *E.g.*, *Gallo*, 967 F.2d at 1295 (motion untimely when filed eight months after party knew grounds for

---

[2] The letter was eventually signed by all 51 state attorneys general. *See* NAAG letter to Samuel Fifer (Sept. 16, 2011), available at https://www.naag.org/assets/files/pdf/signons/Backpage.com%20FINAL%209-16-11.pdf. The letter was signed by Tom Horne, AG Brnovich's predecessor.

- 6 -

disqualification and after adverse ruling); *United States v. Owens*, 902 F.2d 1154, 1156 (4th Cir. 1990) (motion untimely when filed four months after sentencing and underlying facts were known to defendant before sentencing); *Singer v Wadman*, 745 F.2d 606, 608 (10th Cir. 1984) (denying motion filed a year after complaint); *United States v. Simmons*, 1997 U.S. Dist. LEXIS 22658, *17 (E.D. Cal. 1997) (delay of 10 months "would normally foreclose relief based on a violation of 455(a)").

Moreover, where a party moves for recusal after suffering adverse rulings, courts presume that the party withheld the allegations for improper purpose of testing the Court's disposition. *See Melendres v. Arpaio*, 2015 WL 13173306, at *13 (D. Ariz. July 10, 2015) (*Melendres II*) ("There is a presumption that a recusal petition submitted after the moving party suffers adverse rulings has been filed for suspect tactical and strategic reasons.") (citing *Gallo*, 967 F.2d at 1295). Some courts go further and impose an automatic waiver in these circumstances. *E.g., Bivens Gardens Office Building, Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 913 (11th Cir. 1998) (plaintiffs denied relief when aware of possible conflict issue three months before trial but thought they would prevail anyway; disqualification cannot be used as "an insurance policy to be cashed in if a party's assessment of his litigation risks turns out to be off and a loss occurs"). This presumption applies here because Defendants filed their Motion after receiving adverse rulings on several substantive and discovery motions, including numerous motions to dismiss. (*See, e.g.*, Docs. 793, 802, 839, 844, 946, 1028.)

In an attempt to overcome the presumption, Defendants make an assertion of prior ignorance that strains credulity. (Mot. at 1.) Even a cursory check of publicly-available information shows that the Court's spouse is AG Brnovich. On February 4, 2015, *Phoenix New Times* (formerly owned by Defendants Lacey and Larkin) published Stephen Lemons' cover story "Long, Strange Trip: Republican Mark Brnovich Channeled Jerry Garcia to Become AZ's Attorney General"; the article reports that AG Brnovich is married to the

Court.[3] *See also, e.g.*, Yvonne Wingett Sanchez, "Trump nominates local judge, U.S. attorney to federal bench," *The Arizona Republic/azcentral.com*, Jan. 24, 2018 ("Susan Brnovich also is the wife of Arizona Attorney General Mark Brnovich").[4]

AG Brnovich's public stance regarding human trafficking is well known—and has been for several years. Defendants' exhibits reference AG Brnovich's public statements about these issues made as early as January 2015. (*See* Mot., Exs. 21-23.) They also document AG Brnovich's participation in NAAG's August 16, 2017 letter to Congress urging changes to the CDA and criticizing websites like Backpage. (Mot., Exs. 8-10.) The first edition of the AG's Office's booklet regarding human trafficking that Defendants cite was posted in June 2018—nearly a year before this case was reassigned to the Court. (*See* Mot., Ex. 1; Doc. 491.) Most of Defendants' more recent exhibits are cited merely to show that the AG's Office has worked with third-party organizations critical of Backpage.

Defendants cannot remain oblivious to information that is readily and publicly available—only until convenient for their trial strategy. Federal courts reject recusal motions as untimely where defense counsel turn a "blind eye" to well known facts of which they had actual or constructive knowledge, and that would have alerted them to the alleged basis for recusal. *Drake v. Birmingham Bd. of Educ.*, 476 F. Supp. 2d 1341, 1347 (N.D. Ala. 2007) (motion untimely where counsel could have easily discovered through his own client that the judge was a deacon in same church as plaintiff and her husband); *see also Guardian Pipeline, L.L.C. v. 950.80 Acres of Land*, 525 F.3d 554, 558 (7th Cir. 2008) (motion untimely when filed after adverse decision and based on publicly-available information; "a litigant who lets this opportunity [to investigate possible bases for recusal] pass, then looks up the commissioners in Martindale-Hubbell after the proceedings have

---

[3] https://www.phoenixnewtimes.com/news/long-strange-trip-republican-mark-brnovich-channeled-jerry-garcia-to-become-azs-attorney-general-6652765 and http://digitalissue.phoenixnewtimes.com/publication/?i=245280 (last visited Oct. 7, 2020). The author now works for Lacey and Larkin as the FrontPageConfidential editor. https://frontpageconfidential.com/about-us/ (last visited Oct. 7, 2020).

[4] https://www.azcentral.com/story/news/politics/arizona/2018/01/24/trump-nominates-local-judge-u-s-attorney-federal-bench/1061914001/ (last visited Oct. 7, 2020)

concluded, has no one to blame but himself"); *Lyman v. City of Albany*, 597 F. Supp. 2d 301, 307-09 (N.D.N.Y. 2009) (motion untimely where basis for recusal was, in part, judge's prior employment by defendant, and judge's biography was publicly available).

In sum, the relationship between the Court and her husband is easily discovered and a matter of widespread public knowledge. So too are the public statements of AG Brnovich the AG's Office regarding Backpage (both before and after AG Brnovich began serving in January 2015). Defendants' assertion that they became aware of these facts only after the Court had resolved a slew of substantive motions is deficient. *Drake*, 476 F. Supp. 2d at 1347; *Lyman*, 597 F. Supp. 2d at 308-09. *See also Rogers*, 119 F.3d at 1383 n.3 (motion untimely when "the information relied upon" was published several months before defendant sought recusal). The Court should deny Defendants' Motion on this basis alone. *See also Twist*, 344 F. Supp. 2d at 142 ("The purpose of the recusal statute is not to enable an unhappy litigant to judge-shop until he finds a judge that rules in his favor.").

**II.    The Positional Interests of the Court's Spouse Do Not Require Recusal Under § 455(b)(4) and (5)(iii).**

A.    <u>Defendants Identify No "Interest" Within § 455(b)(4) and (b)(5)(iii).</u>

Defendants assert recusal is required under § 455(b)(4), which states that a judge must disqualify herself if she "knows that [s]he, individually or as a fiduciary, or h[er] spouse or minor child residing in h[er] household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding." Section 455(b)(4) has been applied only to the "financial or pecuniary interests of some variety" of the Court or those within its household. *Melendres v. Arpaio*, 2009 WL 2132693, at *9 (D. Ariz. July 15, 2009) (*Melendres I*) ("[T]he term 'any other interest' should be interpreted as being limited to financial or pecuniary interests, whether by ownership or some other means."); *Melendres II*, 2015 WL 13173306, at *14 (same). The statute itself defines "financial interest" as a legal or equitable ownership interest, 28 U.S.C. § 455(d)(4), and courts have defined "other interest" as something less than ownership, yet still pecuniary, such as a

contingent or expectancy interest. *E.g., In re Virginia Elec. & Power Co.*, 539 F.2d 357, 367-68 (4th Cir. 1976). Accordingly, the Seventh Circuit has held that "interest" within the meaning of § 455(b)(4) means "an investment or other asset whose value depends on the outcome, or some other concrete financial effect such as how much property tax a judge pays." *Guardian Pipeline*, 525 F.3d at 557. *See also In re New Mexico Nat. Gas Antitrust Litig.*, 620 F.2d 794, 796 (10th Cir. 1980).

Defendants also invoke § 455(b)(5)(iii), which mandates recusal where the judge "or h[er] spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person . . . [i]s known by the judge to have an interest that could be substantially affected by the outcome of the proceeding." Like § 455(b)(4), courts have interpreted subparagraph (b)(5)(iii) to encompass only financial or commercial interests. The Seventh Circuit, for example, applied its definition of "interest" quoted above to both subparagraphs in *Guardian Pipeline*, 525 F.3d at 557. *See also Melendres I*, 2009 WL 2132693, at *11 (the statutory term "interest" has the same meaning in both § 455(b)(4) and (b)(5)(iii)); *cf. Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) ("A term appearing in several places in a statutory text is generally read the same way each time it appears.").

It is undisputed that AG Brnovich has no direct financial or economic interest in this case. However, Defendants assert he has a covered "interest" based on cases finding that a relative's interests in a business's "reputation and goodwill," including the ability "to attract new clients," fall within the scope of the statute. (*See* Mot. at 10-12, citing *SCA Servs., Inc. v. Morgan*, 557 F.2d 110, 116 (7th Cir. 1977) (stating that a partner's interest in the reputation and goodwill of his law firm are within § 455(b)(5)(iii)), and *Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1113 (5th Cir. 1980) (a partner's interests in "his firm's reputation, its relationship with its clients, and its ability to attract new clients" falls within § 455(b)(5)(iii)). Yet the connection between a business's reputation and goodwill and the financial wellbeing of its owners is obvious. These interests are unmistakably commercial. AG Brnovich has no such economic or commercial interests here.

Still, Defendants assert that AG Brnovich "has staked his own 'reputation and goodwill' on this prosecution, the veracity of the government's claims, and the truthfulness of the government's trial witnesses." (Mot. at 12.) To the extent Defendants claim AG Brnovich has "ideological, political, social and activists" interests regarding the subject matter of this case, including public-safety issues involving websites like Backpage, such "interests are not generally recognized as actionable" under § 455(b). *Melendres I*, 2009 WL 2132693, at *11. A contrary reading of the statute "would require judges to recuse themselves whenever they know of a relative's strongly held opinions, whether publicly expressed or not." *Perry*, 630 F.3d at 912. It would also require recusal whenever an organization headed by the court's relative expresses positions "regarding the subject at issue." *Id*. Given the AG Office's broad public-safety portfolio, this construction would require this Court's recusal in a wide range of cases. *Perry* rejects just such a reading: "To suggest that because my wife heads the ACLU/SC she has an 'interest' cognizable under § 455(b)(5)(iii) in cases regarding which the organization has expressed a position would be to suggest that I must recuse myself from cases implicating the constitutionality of the death penalty, school prayer, and affirmative action, among many others." *Id*. at 912-13. This stretches the recusal statute too far.

In short, no positional or public-safety interest that AG Brnovich has regarding the subject matter of this case falls within § 455(b)(4) or (5)(iii). Defendants fail to overcome the presumption of impartiality to which the Court is entitled, and § 455(b)(4) and (b)(5)(iii) do not warrant recusal.[5]

---

[5] At most, Defendants point to Justice Frankfurter's recusal in *Public Utilities Comm'n v. Pollak*, 343 U.S. 451, 467 (1952), in which the Justice self-identified as an aggrieved "victim of the practice in controversy" (playing radio broadcasts on buses). But a judge's identification as a victim of a distasteful practice is not the kind of concrete commercial "interest" to which § 455(b)(4) and (5)(iii) are directed.

- 11 -

### B. Defendants Have Not Demonstrated How Any Particular Outcome Could "Substantially Affect" AG Brnovich's "Reputation and Goodwill."

Moreover, Defendants have not even suggested, much less argued or explained, how the "reputation and goodwill" of AG Brnovich might be "substantially" affected by the outcome of this case, particularly when the degree of any potential impact would be indirect and speculative at best. *TV Commc'ns Network, Inc. v. ESPN, Inc.,* 767 F. Supp. 1077, 1080 (D. Colo. 1991) ("A judge is not expected to recuse himself where his interest, or the interest of a family member, in the litigation is indirect and attenuated."); *Microsoft Corp. v. United States*, 530 U.S. 1301, 1302 (2000) (Chief Justice Rehnquist's recusal unnecessary in antitrust litigation involving Microsoft, even though his son represented Microsoft in separate antitrust matters, because it was too speculative to determine whether and how the Supreme Court case would affect the son's interests).

AG Brnovich and the AG's Office have expressed public-safety concerns about Backpage (but not about any of the individual Defendants). Backpage pleaded guilty, ceased operations and agreed to forfeit its website on April 5, 2018. (*See* 18-CR-465, Doc. 8-2.) Nothing that happens in the instant case will have any impact on whether Backpage comes back to life and resumes its prior operations.

Defendants also do not point to any litigation involving the AG's Office that concern the federal law issues raised in this case, and "[r]ecusal is not required merely because a relative was or is involved in other litigation concerning the same general subject matter that is before the court." *Perry*, 630 F.3d at 913. Even the ACLU/SC's joinder of two amicus briefs and unsuccessful attempt to intervene in the district court proceedings in *Perry* did not "endow my wife or the ACLU-SU with any 'interest that could be substantially affected by the outcome of [the appeal].'" *Id*. at 914 ("[T]he suggestion that either my wife or the ACLU/SC could benefit in any tangible way from this court's ultimate decision simply because the ACLU/SU signed on to peripheral lower court filings is highly 'unreasonable and speculative.'" *Id*. (quoting *Microsoft*, 530 U.S. at 1302).

Put simply, there is nothing in the record to support Defendants' conjecture that AG Brnovich would be "substantially affected" by the outcome of this proceeding. "[W]here

- 12 -

an interest is not direct, but is remote, contingent or speculative, it is not the kind of interest which reasonably brings into question a judge's partiality." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1042 (9th Cir. 2011). Recusal under § 455(b)(4) and (b)(5)(iii) is not warranted.

### III. Recusal Under § 455(a) Is Unwarranted Because a Person Fully-Informed of the Facts and Law Would Not Reasonably Question the Court's Impartiality.

If a part of § 455(b) provides a potential ground for disqualification, then a judge cannot be disqualified on that ground under § 455(a). *Liteky v. United States*, 510 U.S. 540, 552-53 (1994) (affirming denial of recusal motion). "Congress gave careful consideration to the question of when a judge must recuse himself due to a relative's participation and, in § 455(b)(5), identified the specific circumstances in which a judge must do so. Section 455(a) cannot be read so broadly as to render that determination meaningless by proscribing under that provision what is permissible under § 455(b)." *Perry*, 630 F.3d at 915. Defendants' § 455(a) assertions—which focus on the judge's spousal relationship—are subsumed within their § 455(b) claims, and should be denied for the same reasons.

Even if one were to ignore the effect of § 455(b), Defendants' Motion fails to establish that a reasonable person fully informed of the relevant facts and law would reasonably question the Court's impartiality based on her spousal relationship. Courts apply an "objective" standard to § 455(a) motions. *United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008). This standard "requires recusal if a reasonable third-party observer would perceive that there is a 'significant risk' that the judge will . . . resolve the case on a basis other than the merits." *Id*. The reasonable observer is not a "hypersensitive or unduly suspicious person," *Clemens*, 428 F.3d at 1178-79, nor "a 'partly informed man-in-the-street,' but rather someone who 'understand[s] all the relevant facts' and has examined the record and law." *Holland*, 519 F.3d at 914. The standard "must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice." *Id.* at 913. Moreover, because recusal is an extreme measure, *Twist*, 344 F. Supp. 2d at 142, it may not be based on speculation, innuendo, suspicion or opinion. *Clemens*, 428 F.3d at 1178-79.

Defendants cannot meet the reasonable person standard because the central premise of their Motion is obsolete. Courts now resoundingly reject the notion that a judge must recuse under § 455(a) because her spouse has expressed views or taken positions concerning the subject matter at issue in a particular case. *E.g.*, *Perry*, 630 F.3d at 911 ("the status of the law generally, as well as the law of recusal" reflects that judges "should be evaluated on their own merits and not judged in any way by the deeds or position in life of their [spouses]"). People often disagree with their spouses about all kinds of matters. *Id.* at 912 n.3 (citing Mary Matalin and James Carville, *All's Fair: Love, War, and Running for President* 63 (Paperback ed. 1995)). The assertion that a judge should recuse because of her spouse's positions or views "is based on an outmoded conception of the relationship between spouses" that "does not reflect the realities of modern marriage." *Id.* at 911-12.

Several courts agree. In *National Abortion Fed. v. Ctr. for Med. Progress*, 257 F. Supp. 3d 1084, 1089 (N.D. Cal. 2017), anti-abortion activists sought recusal based on the judge's spouse's Facebook communications expressing support for abortion rights, including statements and "likes" appearing alongside profile pictures of her, some featuring her and her husband, Judge Orrick. Denying recusal, the court wrote: "[T]he premise of defendants' argument is the faulty and anachronistic assumption that a wife's communicative activity necessarily represents the views of, or should be attributed to, her husband." 257 F. Supp. 3d at 1090. "No thoughtful or well-informed person"—that is, no reasonable person—"would simply assume that one spouse's views should always be ascribed or attributed to the other in the absence of an express disclaimer." *Id*. *See also, e.g., Nachshin*, 663 F.3d at 1041 (judge's husband serving as unpaid board member of nonprofit that stood to gain from litigation did not require recusal); *Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228 1241 (10th Cir. 2020) ("[i]n present-day society we do not treat a married couple as single-minded on public issues"; denying recusal motion based on spouse's contribution to alma mater's athletic program); *Akins v. Knight*, 2016 WL 127594, at *3 (W.D. Mo. Jan. 11, 2016) (husband "is an independent person . . . [whose] views are his own"). The Court is entitled to carry on her

official duties without her spouse's positions or statements being imputed to her. The Court's spousal relationship does not require recusal under § 455(a).[6]

Contrary to Defendants' assertions, *Melendres I* supports denying the instant Motion. (Mot. at 14.) After defendants suffered an adverse ruling on their motion to dismiss a racial-profiling case, they moved to recuse Judge Murguia because her identical twin sister was the President and CEO of the National Council of La Raza (NCLR), a Latino civil rights organization. The court rejected the notion that a reasonable observer might see her as unwilling to take a position inconsistent with her sister's interests:

> [N]o reasonable person would automatically ascribe the views of one sibling to another. . . . [B]rothers and sisters often disagree about all sorts of issues, regardless of how personally close they are or how often they speak on the telephone. There is no reason to believe that this reality would change when the siblings are identical twins. A reasonable and impartial observer apprised of all the facts would not conclude that identical twins are more likely to share a common view point or interests than other siblings, much less that a twin who is a judge would be incapable of impartiality.

*Id.* at *14. Moreover, "[t]hat the Court's identical twin is on record as opposing the enforcement of federal immigration laws by Sheriff Arpaio and MCSO does not by itself mandate the Court's recusal under § 455(a). If the only grounds for recusal were Janet Murguia's role as President and CEO of NCLR and the public comments that she has made pursuant to that role, the Court's inquiry would stop there." *Id*. Here, too, the grounds for recusal offered by Defendants focus on the judge's spouse's role as AG and public comments he and the AG's Office have made pursuant to that role. This is as far as Defendants' Motion goes—and that's not enough to warrant recusal under § 455(a).

The *Melendres I* court's analysis continued, however, because NCLR had published a series of articles on its "We Can Stop the Hate" website that presented a "close call"

---

[6] Defendants cite just one case involving a spouse (decided a generation ago): *In re Bernard*, 31 F.3d 842, 844-45 (9th Cir. 1994) (Mot. at 1, 4). In that Chapter 7 bankruptcy appeal, Judge Kozinski denied a recusal motion based on the fact that his wife served as the U.S. Trustee. The Trustee's office had performed only routine administrative functions and was not involved in the case substantively; moreover, the case was low-profile and there was no indication its outcome "could significantly aid or hinder her career." Here, AG Brnovich is not involved in this case in *any* way, as a party or otherwise; and Defendants have failed to articulate how the conviction or acquittal of any remaining individual Defendants could "significantly aid or hinder" his career.

- 15 -

warranting recusal—facts that are entirely absent here. *Id*. at *15. First, Judge Murguia observed that the "We Can Stop the Hate" articles personally insulted Arpaio, impugned his honesty, and described his deputies as "thugs." *Id*. at *15. Defendants point to no similar personal invective about any of them published on the official website of the AG's Office or any twitter or other accounts operated or controlled by that Office or AG Brnovich.

Second, the NCLR articles addressed "the exact issues" that "[t]he instant litigation sets out to determine," alleging "that MCSO deputies [had] engaged in wide-spread acts of racial profiling and [] blatantly violated the Fourth Amendment rights of detained immigration suspects by predicating traffic stops on 'physical appearance alone.'" *Id.* at 15. Here, to the extent the Defendants' exhibits contain statements by AG Brnovich, they reflect criticisms of Backpage itself and provide public-safety information about human trafficking. Defendants point to no statements by AG Brnovich or the AG's Office that discuss any of the individual Defendants, let alone that comment on the merits of the federal conspiracy, Travel Act and money laundering charges pending here.

Third, a "prominent picture" of Judge Murguia's identical twin appeared immediately adjacent to each of the "We Can Stop the Hate" articles, causing Judge Murguia to note "the possibility that a reasonably well-informed and impartial observer might mistake the Court for her identical twin sister" when encountering the articles. *Id*. at 15 n.9. Here, in contrast, the instant Motion attaches only two exhibits that identify any individual Defendants—both from third-party websites. (*See* Mot., Exs. 14 and 15.) Exhibit 14 contains truthful information about the two Defendants it mentions, Lacey and Larkin. (Mot., Ex. 14 at 5-6.) Exhibit 15 is a news blog item about a recent Ninth Circuit appeal that requires some effort to find on the trustaz.org website. (*See* Mot., Ex. 15.) Unlike the articles in *Melendres*, the item is not published by the organization that the Court's spouse heads, the Court's spouse's picture is not prominently placed next to (or anywhere remotely near) it, and no reasonable observer could be confused about whether the Court and/or her husband had authored or published the item. This isolated and attenuated third-party publication does not require this Court's recusal.

Defendants' other authorities largely consist of out-of-circuit cases that are based on interpretations of § 455 inconsistent with Ninth Circuit authority or that are distinguishable. In *Hoke v. Charlotte-Mecklenburg Hosp. Auth., Inc.*, 550 F. Supp. 1276 (W.D.N.C. 1982) (Mot. at 14-15), for example, the defendant sought disqualification under § 455(a) because the judge's son had temporarily represented the plaintiff in a separate action in a different judicial district two years prior. 550 F. Supp. at 1277. Even though he had "some trouble following" that these facts required recusal, the judge granted the motion. 550 F. Supp. at 1277-78. The court neither indicated it was applying the reasonable person standard nor cited any supporting caselaw. *See id*. *United States v. Damron*, 1998 WL 1780621, at *1 (D.N.D. 1998) (Mot. at 15), relied on Eighth Circuit authority applying an "average person on the street" standard, rather than the Ninth Circuit standard. *See Holland*, 519 F.3d at 914. And *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1908 (2016) (Mot. at 9) involved a death penalty case in which one of the Pennsylvania Supreme Court justices who reinstated the sentence previously served as the prosecutor who, as district attorney, had given approval to seek capital punishment against the defendant. The Supreme Court had little trouble concluding due process required the justice's recusal in post-conviction proceedings. These facts are worlds apart from this case.

## **Conclusion**

For the foregoing reasons, Defendants' Motion for Recusal (Doc. 1059) should be denied.

Respectfully submitted this 7th day of October, 2020.

> MICHAEL BAILEY
> United States Attorney
> District of Arizona
>
> *s/ Peter S. Kozinets*
>
> KEVIN M. RAPP
> MARGARET PERLMETER
> PETER S. KOZINETS
> ANDREW C. STONE
> Assistant U.S. Attorneys

DAN G. BOYLE
Special Assistant U.S. Attorney

BRIAN C. RABBITT
Assistant Attorney General
U.S. Department of Justice, Criminal Division

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Joy Faraj*
Joy Faraj
U.S. Attorney's Office