**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-00422-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Michael Lacey, et al. | |
| Defendant. | |

Pending before this Court is Defendant's Motion for Recusal. (Doc. 1059.) The Government filed its response, (Doc. 1067), and Defendants replied. (Doc. 1071.) Defendants request oral argument in their reply. The Court has now considered the pleadings, finds the motion is suitable for decision without oral argument, and issues the following order denying Defendants' motion.

**I. BACKGROUND**

This complex criminal case concerns seven individuals who were indicted on March 28, 2018 for their conduct while operating Backpage.com, a classified ad website that the Government alleges was largely used as a forum for soliciting prostitution.[1] This Court inherited the case on March 4, 2019 after Judge Logan and Judge Rayes recused

---

[1] The underlying facts in the case have been detailed in this Court's previous rulings on substantive motions and will not be repeated here. (Docs. 793, 839, 840, 857.)

themselves. (*Id.*) More than 17 months after the Court inherited this case, on September 23, 2020, Defendants move for recusal based on the Court's marriage to Mark Brnovich, the Attorney General of Arizona ("AG Brnovich"). (*Id.*)

Defendants allege that on September 10, 2020, they discovered a booklet published by the Arizona Attorney General's Office entitled *Human Trafficking: Arizona's Not Buying It*, which it appears was published in June 2018. (*Id.* at 1-2, Ex. 1.) The booklet has AG Brnovich's name printed on the front, and begins with a "Letter from Mark." (*Id.* at 1-2, Ex. 2.) The booklet is a 48 page guide advising parents on identifying possible threats to their children, how to identify warnings signs of human trafficking, and what to do if they suspect their child has been a victim. On pages 22 and 23, the booklet talks about where recruitment happens, listing various social media including Facebook, Backpage, and online chatrooms. In the same section, the booklet reads: "Backpage.com: an online classified advertising site used frequently to purchase sex, is listed as a privately held Arizona corporation, with headquarters in Phoenix, Arizona. 78,000 men in Phoenix are online sex ad customers. Over 300 ads are placed each day in Phoenix on Backpage.com for adult services—with an estimated 20% for girls under 18." (*Id.*) The booklet also contains citations to the United States Department of Justice and other organizations, some of whose current or former leadership are listed as prosecution witnesses in this case. (*Id.* at 2, Ex. 1.) AG Brnovich updated and republished the booklet in December 2019 (*Id.*, Ex. 2.) and published a Spanish version in June 2020. (*Id.*, Ex. 3.) The Court notes that only the original version of the publication has any reference to Backpage.com. (*Id.*, Ex. 2 & 3.) No version of the booklet refers to the defendants in this case.

After discovering the booklet, the Defendants claim they conducted further research into other public statements and activities by AG Brnovich. (*Id.* at 3.) Defendants' search revealed that AG Brnovich issued a "tweet" on Twitter on August 19, 2020 about a webinar on human trafficking the following day. (*Id.*)  The "tweet" was not solely aimed at human trafficking, nor did it address Backpage or the defendants by name.  It highlighted multiple webinars being hosted by the Attorney General's Office as including "Suicide Awareness

& Prevention," "Human Trafficking Prevention," and "E-Cigarette Awareness & Prevention." (*Id.*, Ex. 4.) AG Brnovich did not appear in the "Human Trafficking" webinar. During the webinar, the speaker states there are "so many websites that are dedicated to posting advertisements for sex with underage children" [at 6:25]. (*Id.*) Later, she stated, "Backpage.com…[was] where the vast majority of all advertisements were posted for sex trafficking or child exploitation" [34:42]. (*Id.*) In the webinar, the speaker also identified two organizations associated with witnesses for the prosecution in this case—Sex Trafficking Intervention Research ("STIR") and the Polaris Project—as "trustworthy sources" [5:03] and told viewers that they could obtain more information on human trafficking from four organizations—Trust Arizona, Shared Hope International, the Polaris Project, and the National Center for Missing & Exploited Children ("NCMEC")— which Defendants contend produce "inflammatory and highly prejudicial material about Backpage.com and Defendants." (*Id.*) Eight of the Government's trial witnesses are associated with the four entities. (*Id.*)

Defendants' search also revealed an August 16, 2017 press release issued from the Arizona Attorney General's Office highlighting a letter sent from a bipartisan coalition of 50 state attorneys general, including AG Brnovich, asking Congress to amend the Common Decency Act ("CDA"). (*Id.*, Ex. 8.) The press release states, "Some federal courts have interpreted the CDA to render state and local authorities unable to take action against companies that actively profit from the promotion and facilitation of sex trafficking and crimes against children." (*Id.*) Later, the press release states, "In some cases, courts have interpreted certain provisions of the CDA to provide immunity from state prosecution to online classified ad sites, such as Backpage.com, that promote and profit from human trafficking." (*Id.*)

The August 16, 2017 letter to Congress, which includes the signature of AG Brnovich along with the signatures of 49 other state attorneys general, reads in relevant part, "The recent news highlighting the potential complicity of online classified-ad company Backpage.com in soliciting sex traffickers' ads for its website once again

underscores the need to expand, not limit, the ability of *all* law-enforcement agencies to fight sex trafficking." (*Id.*, Ex. 9.) The later states, "One high profile result is that some state and local law enforcement agencies have been left powerless to act against online classified ad services, such as Backpage.com, which have constructed their business models around advertising income gained from participants in the sex trade." (*Id.*) The letter then includes four instances where Backpage.com had facilitating child sex-trafficking. (*Id.*) The letter goes on to state, "Clearly, in these instances, Backpage.com is facilitating—and profiting from—these illegal activities. However, certain interpretations of the CDA have resulted in companies like Backpage.com remaining outside the reach of state and local law enforcement in these kinds of cases." (*Id.*) AG Brnovich promoted the letter and press release the same day on Twitter. (*Id.*, Ex. 10.)

Defendants also cite instances in which organizations that the Arizona Attorney General's Office has partnered with have discussed sex-trafficking, Backpage.com, or the Defendants. Defendants highlight the partnership between AG Brnovich and the Arizona Anti-Trafficking Network ("AATN") and AATN's program known as "Trust Arizona." (*Id.* at 4.) Defendants claim that Trust Arizona's Facebook page contains several interviews with AG Brnovich. (*Id.* at 5.) Defendants also claim that the Arizona Attorney General website states that the Arizona Attorney General's Office is a "proud partner" of AATN. (*Id.* at 5, Ex. 13.) The Arizona Attorney General website directs readers to Trust Arizona's website. (*Id.*, Ex. 13.) Trust Arizona's website contains comments regarding Backpage.com which Defendants claim are prejudicial. (*Id.* at 5-6, Ex. 14, 15, & 16.) Among them are Trust Arizona's "Shocking Facts" which also appear to be used in the *Human Trafficking, Arizona's Not Buying It* booklet published by the Arizona Attorney General's Office. (*Id.* at 6.) The "Shocking Facts" included in the booklet are:

- "78,000 MEN in Phoenix are online sex ad customers"
- "300+ ads are placed each day in Phoenix on Backpage.com for adult services –with an estimated 20% for girls under 18."
- "Backpage.com is listed as a privately held Arizona corporation, with

headquarters in Phoenix" (*Id.*, Ex. 16.)

Trust Arizona's website also contains statements about the Defendants in this case and litigation in other courts in which Defendants have participated. Trust Arizona's website also directly references this case. (*Id.*, Ex. 15.) While Defendants highlight the fact that AG Brnovich appears in interviews on Trust Arizona's Facebook page, they do not single out any such interview as discussing Backpage, the defendants in this case, or the merits of the case.

In addition, Defendants point out that AG Brnovich and the Arizona Attorney General's Office have also partnered with an organization called Shared Hope International ("Shared Hope"), which is associated with one of the Government's trial witnesses. (*Id.* at 7.) Shared Hope, on a page titled "Internet Safety Amidst the COVID-19 Outbreak," states "technology, including social media and classified websites like Backpage.com, are widely viewed as responsible for the explosion of sex trafficking in the United States. Our own research backs this up." (*Id.*, Ex. 17.) Defendants also highlight that Shared Hope hosts an annual sex trafficking conference, which was also sponsored by AATN. (*Id.* at 7.) The Defendants contend that the conference has regularly featured speakers such as Reginald Jones, a prosecutor in this case, as well as other fact witnesses the Government intends to call at trial. (*Id.* at 7.) Defendants contend that AG Brnovich personally appeared at the conference in June 2016. (*Id.* at 7.) In support of this contention, they provide a link to a tweet from AG Brnovich from June 27, 2016, which states, "Happy to support JuST human trafficking first responder kickoff event in Mesa tonight." (*Id.* at 7, n. 20.) The tweet contains a picture of AG Brnovich at a podium speaking to an audience. (*Id.*) The Defendants do not contend that AG Brnovich attended the same JuST conference at which Reginald Jones and the fact witnesses in this case spoke. (*Id.*) The link Defendants provide which shows Reginald Jones and fact witnesses as speakers at a JuST conference appears to have taken place in Cincinnati, Ohio on October 15–17, 2019. (*Id.* at 7, n. 19.) .) Defendant's allege no connection between AG Brnovich and Reginald Jones and the witnesses aside from having attended the same conference three years apart.

- 5 -

The Arizona Attorney General's Office's website also promoted an organization called the Polaris Project on the Arizona Attorney General website, its sex-trafficking booklet, and in its webinars. (*Id.* at 7.) The former CEO of the Polaris Project is one of the trial witnesses in this case. (*Id.* at 7.)  Polaris Project's website has included statements about Backpage.

Defendants claim that these "are just a sample of AG Brnovich's statements about human trafficking and Backpage.com, and literally a drop in the bucket with respect to statements of AG Brnovich's 'partners' and others with whom he has aligned himself." (*Id.* at 8.) However, Defendants produce no materials to back that claim.

When this case was originally assigned, the Court reviewed the case for any possible issue for recusal and found none. AG Brnovich was not involved in the investigation or prosecution of this case and the Court was aware of his stance against human trafficking but there was no tie to this case or any of the defendants.  Having examined the Defendants' concerns, the Court is still confident that she can preside over this case without any bias and that recusal is not warranted.

**II.   ANALYSIS**

    **A.  Timeliness of Recusal Motion**

As the Defendants' Motion for Recusal was filed over 17 months after the Court inherited this case, the Court could deny Defendants' motion on timeliness grounds alone. Motions to disqualify a judge under § 455 must be timely. *United States v. Rogers*, 119 F.3d 1377, 1380 (9th Cir. 1997). Although there is no hard rule specifying an amount of time after a judge is assigned a case by which a motion to disqualify may be filed, such a motion "should be filed with reasonable promptness after the grounds for such a motion is ascertained." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1295 (9th Cir. 1992). Further, "[t]here is a presumption that a recusal petition submitted after the moving party suffers adverse rulings has been filed for suspect tactical and strategic reasons." *Melendres v. Arpaio*, No. CV-07-2513-PHX-GMS, 2015 WL 13173306, at *13 (D. Ariz. July 10, 2015) (*Melendres II*) (citing *E. & J. Gallo Winery*, 967 F.2d at 1295).

Here, Defendants filed their recusal motion nearly a year and a half after the Court inherited this case and after several adverse rulings. In their original motion, Defendants do not address the timeliness of the motion but merely assert that they just discovered the basis for the motion. This bare assertion is unbelievable. The Government points out that it has been widely publicized that the Court is married to the Arizona Attorney General with press going back to 2015. Indeed, in Exhibit 1 to the Reply, Defendants' counsel say that they knew or were made aware that AG Brnovich was married to the Court when the case was assigned to this Court. (Doc. 1071, Ex. 1 at ¶ 4.) The Government also goes through the history of Backpage's interactions with various state attorneys general. (Doc.1067, pp. 6-7)  Thus, knowing that the Court was married to the Attorney General of Arizona and knowing that state attorneys general have been scrutinizing Backpage for years, it is not credible to claim Defendants knew nothing of AG Brnovich's position on human trafficking. Defendants' counsel assert that some of them knew, in April 2018, a coalition of state attorneys general had written a letter to Congress regarding Backpage.com, but they claim that they did not "focus" on the August 16, 2017 letter to Congress and that they also were not "focused on the fact that Attorney General Mark Brnovich was one of the dozens of signatories to the August 16, 2017, letter." (*Id.*, Ex. 1 at ¶ 5.) Defendants' counsel also assert in a declaration that, "Prior to September 2020, we had not seen any information that led us to even consider a recusal motion." (*Id.*, Ex. 1 at ¶ 2.) In other words, Defendants' counsel asserts that they knew that that AG Brnovich was married to the Court and that various state attorneys general had written letters to Congress regarding Backpage.com, but they did not discover that AG Brnovich was one of the state attorneys general that was a signatory to the letter until September 2020. While timeliness alone merits denial of Defendant's motion on these facts, the Court will nonetheless analyze the merits to address Defendants concerns.

### B. Recusal Under 28 U.S.C. §§ 455(b)(4) & (5)(iii)

The Defendants first argue that the Court must recuse herself under 28 U.S.C. §§ 455(b)(4) and (5)(iii). Those provisions require a judge to recuse in the following

circumstances:

> (4) [She] knows that [she], individually or as a fiduciary, or [her] spouse or minor child residing in [her] household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;
>
> (5) [She] or [her] spouse, or a person within the third degree of relationship to either of them, or the spouse of such person:
>
> (iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding.

28 U.S.C. §§ 455(b)(4), (5)(iii).

Courts have interpreted "any other interest" in § 455(b)(4) as limited to financial or pecuniary interests, whether by ownership or some other means. *See Melendres v. Arpaio*, No. CV-07-2513-PHX-MHM, 2009 WL 2132693, at *9 (D. Ariz. July 15, 2009) (*Melendres I*); *see also Guardian Pipeline, LLC v. 950.80 Acres of Land*, 525 F.3d 554, 557 (7th Cir. 2008) ("'Interest' means an investment or other asset whose value depends on the outcome, or some other concrete financial effect (such as how much property tax a judge pays)."). Courts have further reasoned that the term "interest" used in § 455(b)(5)(iii) should be interpreted the same as in § 455(b)(4). *See Melendres I* at *10-11 ("It is not at all clear how the word interests could be given two different meanings in the same statute, when used in a nearly identical context."); *see also Guardian Pipeline, LLC v. 950.80 Acres of Land*, 525 F.3d 554, 557 (7th Cir. 2008). The term "other interest" as used in § 455(b)(4) is necessarily an "imprecise one," courts have found that the term is still a pecuniary interest lesser than an ownership interest. *See, e.g., In re Virginia Elec. & Power Co.*, 539 F.2d 357, 367-68 (4th Cir. 1976) (concluding that a judge's 'bare expectancy' interest of getting a refund constituted an 'other interest' within the meaning of the statute). Thus, the Court finds that both §§ 455(b)(4) and (5)(iii) require an interest that is financial or proprietary in nature. *Melendres I* at *11. Defendants rely on *SCA Services v. Morgan* and *Potashnik v. Port City Const. Co.* for the proposition that non-economic interests such as

"reputation and goodwill" interests can warrant recusal under § 455(b)(4) and (5)(iii). 557 F.2d 110, 116 (7th Cir. 1977); 609 F.2d 1101 (5th Cir. 1980). However, the Court agrees with the Government that the term "interest" as used in both § 455(b)(4) and (5)(iii) encompass only interests which are financial or proprietary in nature. *Melendres I* at *11.

Here, AG Brnovich clearly has no financial or proprietary interest in this matter and is not a member of any organization representing a party in the case. Further, the cases relied on by the Defendants are distinguishable from the instant matter. In the two cases touted by Defendants, *SCA Services* and *Potashnick*, the judges had family members who were partners in law firms representing the case. *See SCA Services, Inc. v. Morgan*, 557 F.2d 110, 113 (7th Cir. 1977); *see also Potashnik v. Port City Const. Co.*, 609 F.2d 1101, 1106 (5th Cir. 1980). While the courts in those cases ultimately found that recusal was required due to the "reputation and goodwill" of their family members working for law firms representing parties in the cases, the reputation and goodwill in those cases were linked to a commercial interest in attracting clients. *SCA Services*, 557 F.2d at 115-16; *Potashnik*, 609 F.2d at 1114 ("Underlying our decision to disqualify Judge Hand is the assumption that a partner will always have some interest which could be affected by the outcome of a proceeding handled by his law firm."). Unlike in the cases cited by Defendants, AG Brnovich is not a member of the organizations or firms representing either party and has no reputational or goodwill interest that is commercial in nature. Further, contrary to Defendants assertions, the outcome of this case is extremely unlikely to "impact his ability to raise campaign funds and to keep his office and salary." (Doc. 1071 at 8, n. 9.) In fact, because AG Brnovich has been elected as Arizona Attorney General in two consecutive terms, he is not eligible to run for his office again. Ariz. Const. art. V, § 1(A). Therefore, Defendants' argument on this point is without merit. Thus, the Court is not persuaded that recusal is required under § 455(b)(4) and (5)(iii) for financial or pecuniary interests of AG Brnovich.

Even if Defendants' arguments were correct, and the "interest" in § 455(b)(4) and (5)(iii) did not need to be financial or pecuniary in nature, Defendants arguments still fail.

Defendants argue that § 455(b)(4) and (5)(iii) warrant recusal because "AG Brnovich unquestionably has an 'interest' both in the outcome of the case and in the broader issues which it implicates." (Doc. 1059 at 11.) Further, Defendants claim that "[AG Brnovich] has staked his own 'reputation and goodwill' on this prosecution, the veracity of the government's claims, and the truthfulness of the government's trial witnesses," (*Id.* at 12.), and that the outcome of the case may affect his "interests and image." (Doc. 1071 at 10.) However, Defendants fail to show how any outcome in this matter could impact the "reputation and goodwill" of AG Brnovich. Any reputation or goodwill interest that could be recognized by AG Brnovich from the outcome of this case is highly speculative. *See Nachsin v. AOL, LLC*, 663 F.3d 1034, 1042 (9th Cir. 2011) ("[W]here an interest is not direct, but is remote, contingent or speculative, it is not the kind of interest which reasonably brings into question a judge's partiality." (quoting in parenthetical *Sensley v. Albritton*, 385 F.3d 591, 600 (5th Cir. 2004))). As AG Brnovich is not associated with any party in this case, did not aid in the investigation and is not prosecuting the case so the outcome of the case is exceptionally unlikely to affect his reputation. Thus, the Court finds that even if §§ 455(b)(4) and (5)(iii) did encompass non-financial or pecuniary interests, Defendants arguments fail.

### C. Recusal Under 28 U.S.C. § 455(a)

The Defendants also argue that the Court must recuse herself under 28 U.S.C. § 455(a) because AG Brnovich's statements about Backpage, stance on human trafficking, and partnerships with other organizations creates the appearance of impropriety. Under § 455(a) a judge "shall disqualify [herself] in any proceeding in which [her] impartiality might reasonably be questioned." The purpose of § 455(a) "is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." *Liljeberg v. Health Servs. Acq. Corp.*, 486 U.S. 847, 865 (1988). The inquiry under § 455(a) is whether "'a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.'" *Blixseth v. Yellowstone Mountain Club, LLC*, 742 F.3d 1215, 1219 (9th Cir. 2014) (quoting *Pesnell v. Arsenault*, 543 F.3d 1038,

1043 (9th Cir. 2008)). "Actual bias isn't required; the appearance of impropriety can be a sufficient basis for judicial recusal." *Id.* (citing *Liljeberg*, 486 U.S. at 864-65.). Courts evaluate impropriety by "considering how the conduct would be viewed by a reasonable person, not someone 'hypersensitive or unduly suspicious.'" *Id.* (citing *United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008)). "[A] judge faced with a potential ground for disqualification ought to consider how his participation in a given case looks to the average person on the street." *Potashnick*, 609 F.3d at 1111. Courts have "a strong duty to sit" when there is no legitimate reason to recuse. *Clemens v. U.S. Dist. Ct. For the Cent. Dist. of Cal.*, 428 F.3d 1175, 1179 (9th Cir. 2005). At least one Ninth Circuit opinion has found that a judge's impartiality cannot reasonably be questioned simply because of the opinions and views expressed by an organization headed by a judge's spouse. *Perry v. Schwarzenegger*, 630 F.3d 909, 912 (refusing to find that Judge Reinhardt's impartiality might reasonably be questioned where his wife was Executive Director of the ACLU of Southern California).

The Court finds particularly instructive Judge Murguia's decision in *Melendres I.* 2009 WL 2132693. In that case, Judge Murguia was faced with the decision of whether to recuse from a civil case between plaintiffs who claimed that they were unlawfully racially profiled and detained due to their Hispanic appearance and then Maricopa County Sheriff Joe Arpaio and his office. *Id.* at *1. The defendants moved for Judge Murguia to recuse based on her relationship with her sister, Janet Murguia, who was the CEO of the National Council of La Raza ("NCLR"), one of the largest national Latino civil rights organizations in the United States. *Id.* NCLR had a number of resources on its website which made derogatory statements about Joe Arpaio, including calling him "a relentlessly self-promoting caricature of a sheriff (ever closer to 'I'm not a real Sheriff, I just play one on TV' territory), not an actual law enforcement official," and referring to Arpaio and his officers as "Arpaio and his thugs." *Id.* at *3. Further, Judge Murguia found that two articles on the NCLR website directly addressed the underlying facts of the case. *Id*. In addition to discussing issues present in the case, the articles made more derogatory comments about Joe Arpaio. *Id.* at *3-4. For example, one article referred to Arpaio as "a man who has

made a career of humiliating prisoners, harassing Latinos of every variety, wasting taxpayer dollars with dubious results, and having a less than stellar respect for civil rights and due process." *Id.* at *4. Another reference called Arpaio "unrepentant, arrogant, and monumentally disingenuous." *Id.* at *4. In making her decision, Judge Murguia recognized that the case was high profile and one that was "not likely to be free from controversy regardless of who [was] presiding over it." *Id.* at *12. Judge Murguia recognized that, in applying the objective standard of § 455(a), whether "a reasonable person apprised of all relevant facts would question its impartiality based on the circumstances" was a "close call." *Id.* at *15. However, noting that when the case is close, the balance should tip in favor of recusal, Judge Murguia, in an "abundance of caution," recused herself from the matter. *Id.*

Here, unlike in *Melendres I*, the § 455(a) analysis is not a close call because a reasonable person apprised of the facts would not question the Court's impartiality. Unlike in *Melendres I*, here, AG Brnovich has not made any derogatory or insulting comments regarding the Defendants in this matter. Further, AG Brnovich has not addressed the viability of charges in this matter or the guilt or innocence of the Defendants. To the extent that Defendants' arguments are based on the NAAG letter to Congress to which AG Brnovich was a signatory, that letter was sent before the indictment in this case, and the letter made no mention of the Defendants before the Court. Although AG Brnovich publicly stands against human trafficking, that alone would not lead a reasonable person to conclude that the Court's impartiality might reasonably be questioned. Nor would the fact that AG Brnovich has referred to Facebook, Backpage, and Craigslist as places where human trafficking occurs. As the Government correctly points out, "No thoughtful, or well-informed person would simply assume that one spouse's views should always be ascribed or attributed to the other in the absence of an express disclaimer." *Nat'l Abortion Fed'n. v. Ctr. for Med. Progress*, 257 F. Supp. 3d 1084, 1089 (N.D. Cal. 2017). Indeed, the Court is an independent person from AG Brnovich, and the average person on the street would not reasonably believe the Court would approach this case in a partial manner simply

because AG Brnovich stands against human trafficking or has addressed the issue of whether statutory protection for online publishers should continue. *Akins v. Knight*, No. 15-CV-4096-NKL, 2016 WL 127594, *3 (W.D. Mo. January 11, 2016) ("The average person on the street would not reasonably believe the undersigned would approach a case in a partial manner due to Mr. Kelly's independent views regarding a subject …"). Further, although AG Brnovich and his office have "partnered" with organizations that have made statements about the Defendants in this matter and who have past or current employees who are expected to be witnesses for the prosecution at trial, those connections are far too attenuated for a reasonable person to question the Court's impartiality in the instant matter. Defendants do not claim that AG Brnovich has adopted or endorses the organizations' statements about the Defendants in this case. In short, the Court will remain impartial in this matter, and no reasonable person fully informed of the facts would question the Court's impartiality based on the Court's marriage to AG Brnovich. Thus, the Court finds that recusal is not required under § 455(a).

**D. Defendants' Reply**

Defendants have attached a 10-page declaration to their reply brief from a retired judge retained by Defendants. (Doc. 1071., Ex. A.) Essentially, the declaration is a second reply written from the perspective of a retired federal judge opining that the Court should recuse herself from this matter pursuant to § 455. (*Id.*, Ex. A at ¶ 7.) The declaration is inappropriate. An expert may be retained to assist the factfinder, but "the expert is not permitted to give an opinion as to his legal conclusions." *Melendres II* at *9 (citing *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004)); *see also* Fed. R. Evid. 702(a) (requiring that expert opinion evidence "help the trier of fact to understand the evidence or to determine a fact in issue"). The decision of whether the Court should recuse under § 455 is solely a question of law, and thus, the declaration is improper. Further, parties generally may not present evidence for the first time in their reply briefs. *Melendres II* at *9, n. 13 (citing *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996)). Therefore, the Court will strike Exhibit A of Defendants' reply brief (Doc. 1071, Ex. A.),

and the Government's Motion to Strike Reply Declarations is moot.[2] (Doc. 1072.)

### III. CONCLUSION

For the reasons discussed above,

**IT IS ORDERED** denying Defendants' Motion for Recusal. (Doc. 1059.)

**IT IS FURTHER ORDERED** striking Exhibit A of Defendants' Reply (Doc. 1071.) and denying as moot the Government's Motion to Strike Reply Declarations. (Doc. 1072.)

Dated this 23rd day of October, 2020.

_____
Honorable Susan M. Brnovich
United States District Judge

---

[2] Although the Government also asks this Court to strike Exhibit B to the Defendants' reply brief, a declaration signed by six of Defendants' counsel, the Court finds it unnecessary to strike that declaration as a result of the decision in this Order.