# Exhibit C

1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

9   United States of America,

10                          Plaintiff,

11          vs.

12   Michael Lacey, *et al.*,

13

14                       Defendants.

15

CR-18-00422-PHX-SMB

**UNITED STATES' PROPOSED JURY
INSTRUCTIONS**

16          The United States submits the attached Proposed Jury Instructions, which includes both

17   parties' proposed instructions.  Where applicable, the instructions have been modified to fit

18   the facts of this case, as noted with an asterisk.  In accordance with the Court's guidance for

19   jury instructions, the full text of all requested instructions is included below and each proposed

20   instruction begins on a new page.  Bracketed material remaining in the attached instructions

21   indicates areas needing clarification or input from the Court.

22          Section I contains model instructions.  If the instruction is stipulated to by the parties

23   then it is preceded by "ST."  If only one party requests the instruction, then the instruction is

24   preceded by either "PL" (Plaintiff) or "DF" (Defendant).  Section II contains non-model

25   instructions to which the parties have stipulated.  Section III contains the non-model

26   instructions requested by the United States.  Section IV contains non-model instructions

27   requested by Defendants and the United States' objections.

28

# I.   MODEL INSTRUCTIONS

1.   Preliminary Instructions

ST   1.1   Duty of Jury

PL   1.2   The Charge – Presumption of Innocence*

DF   1.2   The Charge – Presumption of Innocence*

ST   1.3   What Is Evidence*

ST   1.4   What Is Not Evidence

ST   1.5   Direct and Circumstantial Evidence

ST   1.6   Ruling on Objections

ST   1.7   Credibility of Witnesses

ST   1.8   Conduct of the Jury

ST   1.9   No Transcript Available to Jury

ST   1.10   Taking Notes

ST   1.11   Outline of Trial

PL   1.13   Separate Consideration for Each Defendant

DF   1.13   Separate Consideration for Each Defendant

ST   1.16   Bench Conferences and Recesses

2.   Instructions In The Course Of Trial

ST   2.1   Cautionary Instruction – First Recess

ST   2.2   Stipulated Testimony [if necessary]

ST   2.3   Stipulations of Fact [if necessary]

ST   2.12   Evidence for Limited Purpose [if necessary]

3.   Instructions At End Of Case

ST   3.1   Duties of Jury to Find Facts and Follow Law

PL   3.2   Charge Against Defendant Not Evidence – Presumption of Innocence – Burden of Proof*

DF   3.2   Charge Against Defendant Not Evidence – Presumption of Innocence – Burden of Proof*

| | | | |
|---|---|---|---|
| 1 | ST | 3.3 | Defendant's Decision Not to Testify [if necessary] |
| 2 | ST | 3.4 | Defendant's Decision to Testify [if necessary] |
| 3 | PL | 3.5 | Reasonable Doubt – Defined |
| 4 | DF | 3.5 | Reasonable Doubt – Defined |
| 5 | ST | 3.6 | What Is Evidence* |
| 6 | ST | 3.7 | What Is Not Evidence* |
| 7 | ST | 3.8 | Direct and Circumstantial Evidence |
| 8 | ST | 3.9 | Credibility of Witnesses |
| 9 | ST | 3.10 | Activities Not Charged* |
| 10 | PL | 3.13 | Separate Consideration of Multiple Counts—Multiple Defendants |
| 11 | DF | 3.13 | Separate Consideration of Multiple Counts—Multiple Defendants |
| 12 | ST | 3.18 | On or About—Defined* |

13    4.    <u>Consideration Of Particular Evidence</u>

| | | | |
|---|---|---|---|
| 14 | ST | 4.9 | Testimony of Witnesses Involving Special Circumstances—Immunity, |
| 15 | | | Benefits, Accomplice, Plea* |
| 16 | ST | 4.14 | Opinion Evidence, Expert Witness* |
| 17 | ST | 4.15 | Dual Role Testimony* |
| 18 | ST | 4.16 | Charts and Summaries Not Admitted into Evidence [if necessary] |
| 19 | ST | 4.17 | Charts and Summaries Admitted into Evidence |

20    5.    <u>Responsibility</u>

| | | | |
|---|---|---|---|
| 21 | PL | 5.7 | Knowingly – Defined* |
| 22 | PL | 5.8 | Deliberate Ignorance* |

23    6.    <u>Specific Defenses</u>

| | | | |
|---|---|---|---|
| 24 | DF | 6.10 | Mere Presence* |

25    7.    <u>Jury Deliberations</u>

| | | | |
|---|---|---|---|
| 26 | ST | 7.1 | Duty to Deliberate |
| 27 | ST | 7.2 | Consideration of Evidence – Conduct of the Jury |
| 28 | ST | 7.3 | Use of Notes |

| | | | |
|---|---|---|---|
| ST | 7.4 | Jury Consideration of Punishment |
| ST | 7.5 | Verdict Form |
| ST | 7.6 | Communication With Court |

8. <u>Offenses Under Title 18</u>

| | | |
|---|---|---|
| PL | 8.20 | Conspiracy—Elements (Count 1)* |
| DF | 8.20 | Conspiracy—Elements (Count 1)* |
| DF | 8.22 | Multiple Conspiracies |
| PL | 8.23 | Conspiracy—Knowledge of and Associated with Other Conspirators* |
| DF | 8.23 | Conspiracy—Knowledge of and Associated with Other Conspirators* |
| PL | 8.144 | Travel Act—Interstate or Foreign Travel in Aid of Racketeering Enterprises* |
| DF | 8.144 | Travel Act—Interstate or Foreign Travel in Aid of Racketeering Enterprises* |
| PL | 8.25 | Conspiracy—Liability for Travel Act Violations Committed by Co-Conspirator (*Pinkerton* Charge)* |
| DF | 8.25 | Conspiracy—Liability for Travel Act Violations Committed by Co-Conspirator (*Pinkerton* Charge)* |
| PL | 8.20 | Conspiracy—Elements (Count 52)* |
| DF | 8.20 | Conspiracy—Elements (Count 52)* |
| PL | 8.147 | Laundering Monetary Instruments* |
| DF | 8.147 | Laundering Monetary Instruments* |
| PL | 8.25 | Conspiracy—Liability for Concealment Money Laundering Violations Committed by Co-Conspirator (*Pinkerton* Charge)* |
| DF | 8.25 | Conspiracy—Liability for International Promotional Money Laundering Violations Committed by Co-Conspirator (*Pinkerton* Charge)* |
| PL | 8.148 | Transporting Funds to Promote Unlawful Activity* |
| DF | 8.148 | Transporting Funds to Promote Unlawful Activity* |

- 4 -

| | | | |
|---|---|---|---|
| | PL | 8.25 | Conspiracy—Liability for International Promotional Money Laundering Violations Committed by Co-Conspirator (*Pinkerton* Charge)* |
| | DF | 8.25 | Conspiracy—Liability for International Promotional Money Laundering Violations Committed by Co-Conspirator (Pinkerton Charge)* |
| | PL | 8.150 | Money Laundering* |
| | DF | 8.150 | Money Laundering* |
| | PL | 8.149 | Transporting Monetary Instruments for the Purpose of Laundering* |
| | DF | 8.149 | Transporting Monetary Instruments for the Purpose of Laundering* |
| | DF | 8.22 | Multiple Conspiracies* |

**II.   NON-MODEL STIPULATED INSTRUCTIONS**

**III.   NON-MODEL INSTRUCTIONS REQUESTED BY THE UNITED STATES**

| | |
|---|---|
| PL | "Business Enterprise" Defined |
| PL | "Uses Any Facility in Interstate Commerce" Defined |
| PL | "Facilitate" Defined |
| PL | Specific Intent Defined |
| PL | Proof of Knowledge or Intent |
| PL | State Law Need Not Be Violated for Defendants to Be Found Guilty Under the Travel Act |

**IV.   NON-MODEL INSTRUCTIONS REQUESTED BY DEFENDANTS WITH THE UNITED STATES' OBJECTIONS**

| | |
|---|---|
| DF | Specific Intent |
| DF | Defendant's Good Faith |
| DF | Defense Theory of the Case |
| DF | Conspiracy—Willfulness Defined |
| DF | First Amendment Protection—Protected Free Speech |
| DF | First Amendment Protection—Websites Hosting Third-Party Ads |

| | | |
|---|---|---|
| 1 | DF | First Amendment Protection— "Adult" Services Are Legal |
| 2 | DF | First Amendment Protection—Examples of Legal "Adult" Services |
| 3 | DF | First Amendment Protection—Website Has the Right to Exercise Editorial |
| 4 | | Control and Judgment |
| 5 | DF | First Amendment Protection—Offensive and Sexual Speech |
| 6 | DF | First Amendment Protection—Speech Presumed Protected |
| 7 | DF | First Amendment Protection—Ads Presumed Protected |
| 8 | DF | First Amendment Protection—Coded Advertisement Language |
| 9 | DF | First Amendment Protection—Government Cannot Punish Legal Speech to |
| 10 | | Suppress Illegal Speech |
| 11 | DF | First Amendment Protection—Protected Publication of Third-Party Speech |
| 12 | DF | First Amendment Protection—No Requirement to Shut Down |
| 13 | DF | First Amendment Protection—No Requirement to Investigate |
| 14 | DF | First Amendment Protection—Publication Does Not Create Criminal |
| 15 | | Culpability |

1

## 1.1 DUTY OF JURY

2      Jurors: You now are the jury in this case, and I want to take a few minutes to tell

3 you something about your duties as jurors and to give you some preliminary instructions.

4 At the end of the trial I will give you more detailed [written] instructions that will control

5 your deliberations.  When you deliberate, it will be your duty to weigh and to evaluate all

6 the evidence received in the case and, in that process, to decide the facts. To the facts as

7 you find them, you will apply the law as I give it to you, whether you agree with the law

8 or not. You must decide the case solely on the evidence and the law before you.  Perform

9 these duties fairly and impartially. You should not be influenced by any person's race,

10 color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or

11 economic circumstances. Also, do not allow yourself to be influenced by personal likes or

12 dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases.

13 Unconscious biases are stereotypes, attitudes, or preferences that people may consciously

14 reject but may be expressed without conscious awareness, control, or intention. Like

15 conscious bias, unconscious bias can affect how we evaluate information and make

16 decisions.

17

18

19

20

21

22

23

24

25

26

27

28

## UNITED STATES' PROPOSED INSTRUCTION 1.2 THE CHARGE—
## PRESUMPTION OF INNOCENCE

This is a criminal case brought by the United States government. The United States charges Defendants with conspiracy, violations of the Travel Act, and money laundering. The charges against Defendants are contained in the indictment. The indictment[1] simply describes the charges the United States brings against Defendants. The indictment is not evidence and does not prove anything.

Defendants have pleaded not guilty to the charges and are presumed innocent unless and until the United States proves Defendants guilty beyond a reasonable doubt. In addition, Defendants have the right to remain silent and never have to prove innocence or present any evidence.

In order to help you follow the evidence, I will now give you a brief summary of the elements of the crimes that the United States must prove to make its case against each charged defendant:

Count 1 is conspiracy—the three elements of conspiracy are as follows:

First, there was an agreement between two or more persons to commit at least one Travel Act offense as charged in the indictment;

Second, the defendant became a member of the conspiracy knowing of at least one of its objects, and intending to help accomplish it and

Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

Counts 2-51 are Travel Act counts—the two elements to support a Travel Act conviction are as follows:

First, the defendant used the used the mail or any facility in interstate commerce with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any business enterprise involving prostitution offenses in

---

[1] All references to "indictment" in these instructions refer to the United States' superseding indictment (Doc. 230).

violation of the laws of the State in which they are committed or of the United States; and

Second, after doing so the defendant performed or attempted to perform an act that did promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any business enterprise involving prostitution offenses.

Further, you may find the defendants guilty of the Travel Act as charged in Counts 2-51 of the indictment if the United States has proved each of the following elements beyond a reasonable doubt:

First, a member of the conspiracy committed the Travel Act offense as alleged in that count;

Second, the person was a member of the conspiracy charged in Count 1 of the indictment;

Third, the person committed the Travel Act offense alleged in furtherance of the conspiracy;

Fourth, the defendant was a member of the same conspiracy at the time the offense charged in Counts 2-51 was committed; and

Fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

Count 52 is conspiracy to commit money laundering—the two elements of money laundering conspiracy are as follows:

First, there was an agreement between two or more persons to commit at least one crimes alleged in the money laundering conspiracy, and

Second, that the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

Counts 53-62 are concealment money laundering—the three elements of concealment money laundering are as follows:

First, the defendant conducted a financial transaction involving property that represented the proceeds of promoting, managing, establishing, carrying on, or facilitating

the promotion, management, establishment, or carrying on, of any business enterprise involving prostitution offenses.

Second, the defendant knew that the property represented the proceeds of some form of unlawful activity; and

Third, the defendant knew that the transaction was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity.

Counts 63-68 are international promotional money laundering—the two elements of international promotional money laundering are as follows:

First, the defendant transported money from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States; and

Second, the defendant acted with the intent to promote the carrying on of the specified criminal activity in the indictment.

Counts 69-99 are transactional money laundering—the five elements of transactional money laundering are as follows:

First, the defendant knowingly engaged or attempted to engage in a monetary transaction;

Second, the defendant knew the transaction involved criminally derived property;

Third, the property had a value greater than $10,000;

Fourth, the property was, in fact, derived from specified unlawful activity, that is promoting or facilitating the promotion of any business enterprise involving prostitution offenses; and

Fifth, the transaction occurred in the United States.

Count 100 is international concealment money laundering—the three elements of international concealment money laundering are as follows:

First, the defendant transported money from a place in the United States to or through a place outside the United States;

- 10 -

Second, the defendant knew that the money represented the proceeds of promoting or facilitating the promotion of any business enterprise involving prostitution offenses; and

Third, the defendant knew the transportation was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of promoting or facilitating the promotion of any business enterprise involving prostitution offenses.

**DEFENDANTS' PROPOSED INSTRUCTION**

**1.2 THE CHARGE—PRESUMPTION OF INNOCENCE**

This is a criminal case brought by the United States government. The government charges the defendants with conspiracy, violations of the Travel Act, and money laundering. The charges against the defendants are contained in the indictment. The indictment simply describes the charges the government brings against the defendants. The indictment is not evidence and does not prove anything.

Each defendant has pleaded not guilty to all the charges and is presumed innocent unless the government proves that defendant guilty beyond a reasonable doubt. In addition, each defendant has the right to remain silent and never has to prove innocence or present any evidence.

In order to help you follow the evidence, I will now give you a brief summary of the elements of the crimes that the government must prove to make its case against each defendant:

<u>**Count 1 is conspiracy—the three elements of conspiracy are as follows:**</u>

First, beginning in or around 2004, and ending on or about April 2018, there was an agreement between two or more persons to commit a violation of the Travel Act by promoting, or facilitating the promotion of, prostitution offenses committed by a particular business enterprise in violation of the laws of the State in which they are committed, as charged in Count 1 of the indictment;

Second, that defendant became a member of the conspiracy knowing of at least one of its illegal objects and with the specific intent of helping promote, or facilitate the promotion of, prostitution offenses committed by a particular business enterprise in violation of the laws of the State in which they are committed; and

Third, one of the members of the conspiracy performed at least one overt act on or after March 28, 2013, for the purpose of carrying out the conspiracy. Without at least one defendant's overt act to specifically promote, or facilitate the promotion of, prostitution

offenses committed by a particular business enterprise in violation of the laws of the State in which they are committed, you cannot find a conspiracy.

Counts 2-51 are Travel Act counts—the two elements to support a Travel Act conviction are as follows:

First, that defendant used the mail or any facility in interstate commerce with the specific intent to promote, or facilitate the promotion of, the prostitution offenses committed by a particular business enterprise in violation of the laws of the State in which they were committed, as alleged in each Count; and

Second, after doing so, that defendant performed an act to promote, or facilitate the promotion of, the prostitution offenses committed by a particular business enterprise associated with that particular ad specified in each Count.

Further, you may find a defendant guilty of violating the Travel Act as charged in Counts 2-51 of the indictment if the government has proved each of the following elements beyond a reasonable doubt:

First, a person named in Count 1 of the indictment committed the crime of violating the Travel Act by promoting, or facilitating the promotion of, prostitution offenses committed by a particular business enterprise in violation of the laws of the State in which they are committed;

Second, the person named in Count 1 was a member of the conspiracy as charged in Count 1 of the indictment;

Third, the person named in Count 1 committed the crime of promoting, or facilitating the promotion of, prostitution offenses committed by a business enterprise in furtherance of the conspiracy;

Fourth, the defendant was a member of the same conspiracy at the time the offenses charged in Counts 2-51 were committed;

Fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

- 13 -

<u>Count 52 is conspiracy to commit money laundering—the three elements of money laundering conspiracy are as follows:</u>

First, beginning in or around 2004, and ending on or about April 2018, there was an agreement between two or more persons to commit concealment money laundering in violation of Section 1956(a)(1)(B)(i), international promotional money laundering in violation of Section 1956(a)(2)(A), transactional money laundering in violation of Section 1957(a), and international concealment money laundering in violation of Section 1956(a)(2)(B)(i); and

Second, a defendant became a member of the conspiracy to commit concealment, international promotional, transactional, and international concealment money laundering knowing of at least one of its illegal objects and with the specific intent to help commit one or more of the substantive money laundering offenses charged (whose elements are listed below); and

Third, one of the members of the conspiracy performed at least one overt act on or after March 28, 2013, for the purpose of carrying out the conspiracy to commit concealment, international promotional, transactional, and international concealment money laundering.

<u>Counts 53-62 are concealment money laundering—the three elements of concealment money laundering are as follows:</u>

First, the defendant conducted a financial transaction involving property that represented the proceeds of the knowing and willful promotion, or facilitation of the promotion of, prostitution offense of a particular business enterprise in violation of 18 U.S.C. § 1952(a)(3)(A), specifically (i) a business enterprise involved in at least one of the fifty advertisements that is the subject of Counts 2 – 51 and (ii) a business enterprise for which you found that Defendant guilty of promoting or facilitating the promotion of;

Second, the defendant knew that the property represented the proceeds of some form of unlawful activity; and

Third, the defendant knew that the transaction was designed in whole or in part to

conceal and disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity.

Counts 63-68 are international promotional money laundering—the two elements of international promotional money laundering are as follows:

First, the defendant transported money from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States; and

Second, the defendant acted with the intent to promote, or facilitate the promotion of, a particular business enterprise involving prostitution offenses in violation of 18 U.S.C. § 1952(a)(3)(A), specifically (i) a business enterprise involved in at least one of the fifty advertisements that is the subject of Counts 2 – 51 and (ii) a business enterprise for which you found that defendant guilty of promoting or facilitating the promotion of.

Counts 69-99 are transactional money laundering—the five elements of transactional money laundering are as follows:

First, the defendant knowingly engaged or attempted to engage in a monetary transaction;

Second, the defendant knew the specific transaction charged involved specific criminally derived property;

Third, the property had a value greater than $10,000;

Fourth, the property was, in fact, derived from the knowing and willful promotion, or facilitation of the promotion of, the prostitution offenses committed by a particular business enterprise in violation of 18 U.S.C. § 1952(a)(3)(A), specifically (i) a business enterprise involved in at least one of the fifty advertisements that is the subject of Counts 2 – 51 and (ii) a business enterprise for which you found that Defendant guilty of promoting or facilitating the promotion of; and

Fifth, the transaction occurred in the United States.

Count 100 is international concealment money laundering—the three elements of international concealment money laundering are as follows:

First, the defendant transported money from a place in the United States to or through a place outside the United States;

Second, the defendant knew that the money represented the proceeds of the knowing and willful promotion, or facilitation of the promotion of, the prostitution offenses committed by a particular business enterprise in violation of 18 U.S.C. § 1952(a)(3)(A), specifically (i) a business enterprise involved in at least one of the fifty advertisements that is the subject of Counts 2 – 51 and (ii) a business enterprise for which you found that defendant guilty of promoting or facilitating the promotion of; and

Third, the defendant knew the transportation was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the knowing and willful promotion, or facilitation of the promotion of, the prostitution offenses committed by a business enterprise in violation of 18 U.S.C. § 1952(a)(3)(A).

### Supporting Authorities

*See United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Doc. No. 946 at 13 (Order denying motion to dismiss) ("[Defendants] were not indicted for facilitating the amorphous notion of 'prostitution.' They were indicted for facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-related businesses, or other groups were involved in the business of prostitution."); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Transcript of December 4, 2020 Hearing ("And I think one of the key things in my reason for denying the recusal is that this case is not about Backpage. Backpage was prosecuted in a separate case, entered a plea in a separate case. This case is about these individual defendants and whether they had specific knowledge of these ads as facilitating illegal activity.").

### UNITED STATES' OBJECTIONS

Defendants' isolated quote from the Court's May 4, 2020 Order denying their Motion to Dismiss Indictment for Failure to Allege the Necessary Elements of the Travel Act (Doc. 946) fails to support their proposed instruction.  In disagreeing with Defendants'

assertion that the SI failed to identify the "unlawful activity" under the Travel Act that forms the basis for Travel Act charges, the Court wrote: "Based on the allegations here, Defendants are not charged with anything related to gambling, narcotics, bribery, extortion or arson.   Rather, they are clearly charged with intending to facilitate and thereafter facilitating or attempting to facilitate businesses involved in prostitution.  *See* 18 U.S.C. § 1952(b)(i)(1)."  (Doc. 946 at 9; *see also id*. at 11 ("Additionally, and as noted, the 'to wit: prostitution offenses' language directs Defendants to which 'unlawful activity' is charged under each Travel Act count.") (citing (Doc. 230 ("SI")¶ 201).)  Addressing the individual substantive Travel Act charges in Counts 2-51, the Court also observed that "the SI alleges fifty instances where Defendants posted ads on Backpage.com to facilitate specific individual prostitutes or pimps involved in the business of prostitution" and used language that "almost identically mirrors the Travel Act's text."  (Doc. 946 at 11, citing SI¶¶ 200-201.)  Later, rejecting Defendants' suggestion that the SI indicted a "'boundless conspiracy' to facilitate prostitution in general," the Court wrote that "[s]uch a claim is simply untrue" because Defendants "were not indicted for facilitating the amorphous notion of 'prostitution.'  They were indicted for facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-related businesses, or other groups were involved in the business of prostitution."  (Doc. 946 at 13.)  The Court went on to explain that these fifty instances were part and parcel of "a continuous course of conduct where Defendants facilitated 'unlawful activity' [including] numerous pimps, prostitutes and traffickers in violation of the Travel Act."  (Doc. 946 at 13-14.)

Defendants' proposed instruction incorporates many of the errors discussed in Part I.8 (Offenses Under Title 18), below.  These errors include, without limitation:

Count 1 – Conspiracy

- In the first element, Defendants insist that a Travel Act violation must involve "promoting, or facilitating the promotion of, prostitution offenses committed by *a particular* business enterprise."  (emphasis added).  The word "particular" is unnecessary and confusing.  The statute states that "unlawful activity" under the

Travel Act is defined as "any business enterprise involving . . . prostitution offenses in violation of the laws of the State in which they are committed or of the United States."  18 U.S.C. § 1952(b)(i)(1).  Unlike Defendants' proposed instruction, the United States' instruction tracks the statutory definition of "unlawful activity."  Moreover, this Court has recognized that "[i]nstead of alleging formal labels, what must be alleged for the 'unlawful activity' element under Section 1952(b)(i) are allegations showing 'a continuous course of criminal conduct.'"  (Doc. 946 at 10.)

- In the second element, Defendants add the word "illegal," which is redundant and not part of the Model Instruction.  The first element in the Model Instruction states, in pertinent part, "there was an agreement between two or more persons to commit at least one crime as charged in the indictment," while the second element makes clear the crime requires that "the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it."  The word "illegal" doesn't clarify any aspect of this crime and shouldn't be part of the instruction.

- In the third element, Defendants again add language to the Model Instruction that is unnecessary.  The final sentence in the third element is redundant and restates the language in the first element.  Moreover, Defendants erroneously state that the overt act must be performed by one of the defendants.  Under established law, any person who is a member of the conspiracy—a category of persons not limited to Defendants—may perform the overt act.  *See* Model Instruction 8.20.

Counts 2-51 – Travel Act

- Defendants' proposed instruction includes, in the first three elements under the *Pinkerton* theory of liability, that "a person named in Count 1" must have committed the Travel Act violation.  This instruction is too restrictive and does not appropriately convey *Pinkerton* liability.  For a defendant to be found guilty

at trial under a *Pinkerton* theory, the co-conspirator need not be named in the indictment. *United States v. Carpenter*, 961 F.2d 824, 828 n.3 (9th Cir. 1992) ("As an unindicted co-conspirator, Shahabian's acts and statements in furtherance of the conspiracy may be attributed to Carpenter.") (citing *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946)). Here, the Court has already recognized that *Pinkerton* liability extends to individuals not named in the Superseding Indictment. (Doc. 793 at 19) (discussing *Pinkerton* and fact that "C.F" was a co-conspirator of Defendants). *See also United States v. Long*, 301 F.3d 1095, 1103 (9th Cir 2002) ("The *Pinkerton* doctrine is a judicially-created rule that makes a conspirator criminally liable for the substantive offenses committed by a co-conspirator when they are reasonably foreseeable and committed in furtherance of the conspiracy."). Both the applicable law and facts support the Court instructing the jury using the United States' proposed instruction.

Count 52 – Conspiracy

- Defendants' proposed instruction includes an overt act requirement, which isn't part of a money laundering conspiracy. An overt act is not part of a money laundering conspiracy. *Whitfield v. United States*, 543 U.S. 209, 210-11 (2005) ("These cases present the question whether conviction for conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), requires proof of an overt act in furtherance of the conspiracy. We hold that it does not."); *id.* at 214 ("Because the text of § 1956(h) does not expressly make the commission of an overt act an element of the conspiracy offense, the Government need not prove an overt act to obtain a conviction.").

Counts 53-100 – Various Money Laundering Offenses

- The parties' proposed instructions are similar except Defendants propose a much more stringent definition of the specified unlawful activity. As this Court has previously recognized, that instruction is contrary to

governing law.  "[T]he first money laundering statute that Defendants are indicted under does not require the Government to allege or prove the underlying offenses."  (Doc. 946 at 17.)  *See* 18 U.S.C. § 1956(c)(1) ("the term 'knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity' means that the person knew the property involved in the transaction represented proceeds from some form, *though not necessarily which form*, of activity that constitutes a felony." (emphasis added)).

## 1.3 WHAT IS EVIDENCE

The evidence you are to consider in deciding what the facts are consists of:

(1) the sworn testimony of any witness; and

(2) the exhibits that are received in evidence; and

(3) any facts to which the parties agree.

## 1.4 WHAT IS NOT EVIDENCE

The following things are *not* evidence, and you must not consider them as evidence in deciding the facts of this case:

(1) statements and arguments of the attorneys;

(2) questions and objections of the attorneys;

(3) testimony that I instruct you to disregard; and

(4) anything you may see or hear when the court is not in session even if what you see or hear is done or said by one of the parties or by one of the witnesses.

1

## 1.5 DIRECT AND CIRCUMSTANTIAL EVIDENCE

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which one can find another fact.

You are to consider both direct and circumstantial evidence. Either can be used to prove any fact. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

1

**1.6 RULING ON OBJECTIONS**

2

There are rules of evidence that control what can be received in evidence. When a

3

lawyer asks a question or offers an exhibit in evidence and a lawyer on the other side thinks

4

that it is not permitted by the rules of evidence, that lawyer may object. If I overrule the

5

objection, the question may be answered or the exhibit received. If I sustain the objection,

6

the question cannot be answered, or the exhibit cannot be received. Whenever I sustain an

7

objection to a question, you must ignore the question and must not guess what the answer

8

would have been.

9

Sometimes I may order that evidence be stricken from the record and that you

10

disregard or ignore the evidence. That means that when you are deciding the case, you must

11

not consider the evidence that I told you to disregard.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## 1.7 CREDIBILITY OF WITNESSES

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1) the witness's opportunity and ability to see or hear or know the things testified to;

(2) the witness's memory;

(3) the witness's manner while testifying;

(4) the witness's interest in the outcome of the case, if any;

(5) the witness's bias or prejudice, if any;

(6) whether other evidence contradicted the witness's testimony;

(7) the reasonableness of the witness's testimony in light of all the evidence; and

(8) any other factors that bear on believability.

You must avoid bias, conscious or unconscious, based on a witness's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances in your determination of credibility.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it. What is important is how believable the witnesses are, and how much weight you think their testimony deserves.

**1.8 CONDUCT OF THE JURY**

I will now say a few words about your conduct as jurors.

First, keep an open mind throughout the trial, and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, because you must decide this case based only on the evidence received in the case and on my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty. Thus, until the end of the case or unless I tell you otherwise:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This restriction includes discussing the case in person, in writing, by phone or electronic means, via email, via text messaging, or any Internet chat room, blog, website or application, including but not limited to Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, or any other forms of social media. This restriction also applies to communicating with your fellow jurors until I give you the case for deliberation, and it applies to communicating with everyone else including your family members, your employer, the media or press, and the people involved in the trial, although you may notify your family and your employer that you have been seated as a juror in the case, and how long you expect the trial to last. But, if you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter. In addition, you must report the contact to the court.

Because you will receive all the evidence and legal instruction you properly may consider to return a verdict: do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own. Do not visit or view any place discussed in this case, and do not use Internet programs or other

devices to search for or view any place discussed during the trial. Also, do not do any research about this case, the law, or the people involved—including the parties, the witnesses or the lawyers—until you have been excused as jurors. If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

These rules protect each party's right to have this case decided only on evidence that has been presented here in court. Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process. If you do any research or investigation outside the courtroom, or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete or misleading information that has not been tested by the trial process. Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial. Remember, you have taken an oath to follow the rules, and it is very important that you follow these rules.

A juror who violates these restrictions jeopardizes the fairness of these proceedings [, and a mistrial could result that would require the entire trial process to start over]. If any juror is exposed to any outside information, please notify the court immediately.

## 1.9 NO TRANSCRIPT AVAILABLE TO JURY

At the end of the trial you will have to make your decision based on what you recall of the evidence. You will not have a written transcript of the trial. I urge you to pay close attention to the testimony as it is given.

**1.10 TAKING NOTES**

If you wish, you may take notes to help you remember the evidence. If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case. Do not let note-taking distract you from being attentive. When you leave court for recesses, your notes should be left in the [courtroom] [jury room] [envelope in the jury room]. No one will read your notes.

Whether or not you take notes, you should rely on your own memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## 1.11 OUTLINE OF TRIAL

The next phase of the trial will now begin. First, each side may make an opening statement. An opening statement is not evidence. It is simply an outline to help you understand what that party expects the evidence will show. A party is not required to make an opening statement.

The United States will then present evidence and counsel for Defendants may cross-examine. Then, if Defendants choose to offer evidence, counsel for the United States may cross-examine.

After the evidence has been presented, [I will instruct you on the law that applies to the case and the attorneys will make closing arguments] [the attorneys will make closing arguments and I will instruct you on the law that applies to the case].

After that, you will go to the jury room to deliberate on your verdict.

1
2

**UNITED STATES' PROPOSED INSTRUCTION 1.13 -- SEPARATE**

**CONSIDERATION FOR EACH DEFENDANT**

3    Although the defendants are being tried together, you must give separate
4  consideration to each defendant. In doing so, you must determine which evidence in the
5  case applies to each defendant, disregarding any evidence admitted solely against some
6  other defendant[s]. The fact that you may find one of the defendants guilty or not guilty
7  should not control your verdict as to any other defendant.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# DEFENDANTS' PROPOSED 1.13 INSTRUCTION

Although the defendants are being tried together, you must give separate consideration to each defendant. In doing so, you must determine which evidence in the case applies to each defendant, disregarding any evidence admitted solely against some other defendant[s]. The fact that you may find one of the defendants guilty or not guilty should not control your verdict as to any other defendant.

Only the defendants are on trial.  Backpage.com is not on trial.  You must evaluate the evidence as to each individual defendant, and not as to Backpage.com or any other person.

## Supporting Authorities

Ninth Circuit Manual of Model Criminal Jury Instructions 1.13 (online versions of May 25, 2021); *see United States v. Lacey, et al.* (D. Ariz), Case No. 18-CR-00422-PHX-SMB, Transcript of December 4, 2020 Hearing ("And I think one of the key things in my reason for denying the recusal is that this case is not about Backpage. Backpage was prosecuted in a separate case, entered a plea in a separate case. This case is about these individual defendants and whether they had specific knowledge of these ads as facilitating illegal activity.").

## UNITED STATES' OBJECTIONS

Defendants propose the same 1.13 instruction as the United States, but add an extra paragraph at the end.  The United States objects.

First, this extra language is unnecessary.  The Model instruction aptly sets forth the law as it should be applied by the jury.  Second, the added language is confusing.  While it's true that Backpage.com is not a defendant at trial (because it already pleaded guilty),[2] it is also true that the six defendants created, and at relevant times owned, controlled, managed, and oversaw the website's operations.  As the Superseding Indictment alleges: "The website www.backpage.com ('Backpage') was, until being shut down by federal law

---

[2] *United States v. Backpage.com, LLC*, CR-18-465-PHX-DJH at Doc. 8-2.

enforcement authorities in April 2018, notorious for being the internet's leading source of prostitution advertisements."  (SI¶ 1.)

"Backpage was created in 2004 by defendant Michael Lacey ("LACEY"), defendant James Larkin ("LARKIN"), and third individual, C.F.  From 2004-15, LACEY and LARKIN oversaw the website's policies and strategic direction.  Additionally, LACEY and LARKIN retained significant control over the website (and continued receiving tens of millions of dollars of Backpage-related distributions) after purportedly selling their interests in Backpage in 2015."  (SI¶ 2.)

"Defendant SCOTT SPEAR served as the Executive Vice President of one of Backpage's parent companies and held, at times, an ownership interest in Backpage of approximately 4%."  (SI¶ 3.)

"Defendant JOHN "JED" BRUNST ("BRUNST") served as the Chief Financial Officer of Backpage and several of Backpage's parent companies and held, at times, an ownership interest in Backpage of approximately 6%."  (SI¶ 4.)

"Defendant ANDREW PADILLA ("PADILLA") served as Backpage's Operations Manager."  (SI¶ 5.)

"Defendant JOYE VAUGHT ("VAUGHT") served as Backpage's assistant Operations Manager."  (SI¶ 6.)

In short, while Backpage.com isn't on trial, the remaining defendants owned, managed, or operated the website, and they were largely responsible for the website's strategic business decisions.  The jury should be permitted to evaluate the evidence and make a determination about whether each individual defendant is guilty of crimes alleged against them in the SI.  Part of that evaluation will be determining each individual defendant's culpability in managing, owning, or operating Backpage.com.

1

## 1.16 BENCH CONFERENCES AND RECESSES

2      During the trial, I may need to take up legal matters with the attorneys privately,

3  either by having a conference at the bench when the jury is present in the courtroom, or by

4  calling a recess. Please understand that while you are waiting, we are working. The purpose

5  of these conferences is not to keep relevant information from you, but to decide how certain

6  evidence is to be treated under the rules of evidence and to avoid confusion and error.

7      Of course, we will do what we can to keep the number and length of these

8  conferences to a minimum. I may not always grant an attorney's request for a conference.

9  Do not consider my granting or denying a request for a conference as any indication of my

10  opinion of the case or what your verdict should be.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## 2.1 CAUTIONARY INSTRUCTION—FIRST RECESS

**At the End of Each Day of the Case:**

As I indicated before this trial started, you as jurors will decide this case based solely on the evidence presented in this courtroom.  This means that, after you leave here for the night, you must not conduct any independent research about this case, the matters in the case, the legal issues in the case, or the individuals or other entities involved in the case.  This is important for the same reasons that jurors have long been instructed to limit their exposure to traditional forms of media information such as television and newspapers.  You also must not communicate with anyone, in any way, about this case.  And you must ignore any information about the case that you might see while browsing the internet or your social media feeds.

**At the Beginning of Each Day of the Case:**

As I reminded you yesterday and continue to emphasize to you today, it is important that you decide this case based solely on the evidence and the law presented here.  So you must not learn any additional information about the case from sources outside the courtroom.  To ensure fairness to all parties in this trial, I will now ask each of you whether you have learned about or shared any information about this case outside of this courtroom, even if it was accidental.

[ALTERNATIVE 1 (in open court): if you think that you might have done so, please let me know now by raising your hand. [Wait for a show of hands].  I see no raised hands; however, if you would prefer to talk to the court privately in response to this question, please notify a member of the court's staff at the next break.  Thank you for your careful adherence to my instructions.]

[ALTERNATIVE 2 (during voir dire with each juror, individually): Have you learned about or shared any information about this case outside of this courtroom? . . . Thank you for your careful adherence to my instructions.]

## 2.2 STIPULATED TESTIMONY

[if necessary]

The parties have agreed what [*name of witness*]'s testimony would be if called as a witness. You should consider that testimony in the same way as if it had been given here in court.

## 2.3 STIPULATIONS OF FACT

[if necessary]

The parties have agreed to certain facts that have been stated to you. Those facts are now conclusively established.

## 2.12 EVIDENCE FOR LIMITED PURPOSE

[if necessary]

You are about to hear evidence that [*describe evidence to be received for limited purpose*]. I instruct you that this evidence is admitted only for the limited purpose of [*describe purpose*] and, therefore, you must consider it only for that limited purpose and not for any other purpose.

1

### 3.1 DUTIES OF JURY TO FIND FACTS AND FOLLOW LAW

2      Members of the jury, now that you have heard all the evidence, it is my duty to

3   instruct you on the law that applies to this case. A copy of these instructions will be

4   available in the jury room for you to consult.

5      It is your duty to weigh and to evaluate all the evidence received in the case and, in

6   that process, to decide the facts. It is also your duty to apply the law as I give it to you to

7   the facts as you find them, whether you agree with the law or not. You must decide the

8   case solely on the evidence and the law. Do not allow personal likes or dislikes, sympathy,

9   prejudice, fear, or public opinion to influence you. You should also not be influenced by

10  any person's race, color, religious beliefs, national ancestry, sexual orientation, gender

11  identity, gender, economic circumstances[3] [, profession, occupation, celebrity, or position

12  in life or in the community]. You will recall that you took an oath promising to do so at the

13  beginning of the case.

14      You must follow all these instructions and not single out some and ignore others;

15  they are all important. Please do not read into these instructions or into anything I may have

16  said or done any suggestion as to what verdict you should return—that is a matter entirely

17  up to you.

18

19

20

21

22

23

24

25

26

27

28

---

[3] Modified to conform with the language in Model Criminal Jury Instruction 1.1.

**UNITED STATES' PROPOSED INSTRUCTION 3.2 CHARGE AGAINST DEFENDANT NOT EVIDENCE—PRESUMPTION OF INNOCENCE—BURDEN OF PROOF**

The indictment is not evidence. The defendants have pleaded not guilty to the charges. The defendants are presumed to be innocent unless and until the United States proves the defendants guilty beyond a reasonable doubt. In addition, the defendants do not have to testify or present any evidence. The defendants do not have to prove innocence; the United States has the burden of proving every element of the charges beyond a reasonable doubt.

**DEFENDANTS' PROPOSED 3.2 INSTRUCTION**

I instruct you that you must presume each defendant to be innocent of the crimes charged.  The indictment is not evidence.  Each defendant has pleaded not guilty to the charges.  Each defendant is presumed to be innocent unless the government proves him or her guilty beyond a reasonable doubt.  The defendants do not have to testify or present any evidence.  The defendants do not have to prove innocence.  Thus, each defendant, although accused of crimes in the indictment, begins the trial with a "clean slate"—with no evidence against him or her.

The indictment, as you already know, is not evidence of any kind.   The defendants are, of course, not on trial for any act or crime not contained in the indictment.  The law permits nothing but legal evidence presented before the jury in court to be considered in support of any charge against a defendant.  The presumption of innocence alone, therefore, is sufficient to acquit each defendant.

The government has the burden of proving every element of each charge beyond a reasonable doubt for each defendant.  The burden is always upon the prosecution to prove guilt beyond a reasonable doubt.  This burden never shifts to a defendant for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.  The defendant is not even obligated to produce any evidence by cross-examining the witnesses for the government.

**Supporting Authorities**

Ninth Circuit Manual of Model Criminal Jury Instructions 3.2 (2021); 1A Fed. Jury Prac. & Instr. § 12:10 (6th ed.), 1A Fed. Jury Prac. & Instr. § 12:10 (6th ed.).

**UNITED STATES' OBJECTIONS**

Defendants propose an alternative 3.2 Instruction.  The United States believes the Model Instruction is sufficient.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## 3.3 DEFENDANT'S DECISION NOT TO TESTIFY

[if necessary]

A defendant in a criminal case has a constitutional right not to testify. In arriving at your verdict, the law prohibits you from considering in any manner that the defendant did not testify.

1

## 3.4 DEFENDANT'S DECISION TO TESTIFY

2

[if necessary]

3      The defendant has testified. You should treat this testimony just as you would the

4   testimony of any other witness.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## UNITED STATES' PROPOSED INSTRUCTION 3.5

## REASONABLE DOUBT—DEFINED

Proof beyond a reasonable doubt is proof that leaves you firmly convinced the defendant is guilty. It is not required that the United States prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence, or from lack of evidence.

If after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty. On the other hand, if after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty.

# DEFENDANTS' PROPOSED 3.5 INSTRUCTION

Proof beyond a reasonable doubt is proof that leaves you firmly convinced a defendant is guilty.  It is not required that the government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense—the kind of doubt that would make a reasonable person hesitate to act—and is not based purely on speculation.  It may arise from a careful and impartial consideration of all the evidence, or from lack of evidence.

Unless the government proves, beyond a reasonable doubt, that a defendant has committed each and every element of the offenses charged in the indictment, and that a defendant acted with criminal intend and lacked good faith, you must find that defendant not guilty of the offenses.  If you view the evidence in the case as reasonably permitting either of two conclusions—one of innocence, the other of guilt—the jury must, of course, adopt the conclusion of innocence.

## Supporting Authorities

Ninth Circuit Manual of Model Criminal Jury Instructions 3.5 (2021); 1A Fed. Jury Prac. & Instr. § 12:10 (6th ed.), 1A Fed. Jury Prac. & Instr. § 12:10 (6th ed.).

## UNITED STATES' OBJECTIONS

Defendants propose an alternative 3.5 Instruction that provides additional language beyond the Model Instruction.  This added language to the instruction is unnecessary based on the additional instructions the Court will provide on the elements of the charged crimes. The Model Instruction is appropriate.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.6 WHAT IS EVIDENCE

The evidence you are to consider in deciding what the facts are consists of:

(1) the sworn testimony of any witness; and

(2) the exhibits that are received in evidence; and

(3) any facts to which the parties agree.

## 3.7 WHAT IS NOT EVIDENCE

The following things are *not* evidence, and you must not consider them as evidence in deciding the facts of this case:

(1) statements and arguments of the attorneys;

(2) questions and objections of the attorneys;

(3) testimony that I instruct you to disregard; and

(4) anything you may see or hear when the court is not in session even if what you see or hear is done or said by one of the parties or by one of the witnesses.

### 3.8 DIRECT AND CIRCUMSTANTIAL EVIDENCE

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which one can find another fact.

You are to consider both direct and circumstantial evidence. Either can be used to prove any fact. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

### 3.9 CREDIBILITY OF WITNESSES

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1) the witness's opportunity and ability to see or hear or know the things testified to;

(2) the witness's memory;

(3) the witness's manner while testifying;

(4) the witness's interest in the outcome of the case, if any;

(5) the witness's bias or prejudice, if any;

(6) whether other evidence contradicted the witness's testimony;

(7) the reasonableness of the witness's testimony in light of all the evidence; and

(8) any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

1

### 3.10 ACTIVITIES NOT CHARGED

You are here only to determine whether the defendants are guilty or not guilty of the charges in the indictment. The defendants are not on trial for any conduct or offense not charged in the indictment.

1

2

### UNITED STATES' PROPOSED INSTRUCTION 3.13 SEPARATE CONSIDERATION OF MULTIPLE COUNTS—MULTIPLE DEFENDANTS

3    A separate crime is charged against one or more of the defendants in each count.

4  The charges have been joined for trial. You must decide the case of each defendant on each

5  crime charged against that defendant separately. Your verdict on any count as to any

6  defendant should not control your verdict on any other count or as to any other defendant.

7    All the instructions apply to each defendant and to each count unless a specific

8  instruction states that it applies only to a specific defendant or count.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANTS' PROPOSED 3.13 INSTRUCTION**

A separate crime is charged against one or more of the defendants in each count. The charges have been joined for trial. You must decide the case of each defendant on each crime charged against that defendant separately. Your verdict on any count as to any defendant should not control your verdict on any other count or as to any other defendant.

All the instructions apply to each defendant and to each count unless a specific instruction states that it applies only to a specific defendant or count.

Only the defendants are on trial.  Backpage.com is not on trial.  You must evaluate the evidence as to each individual defendant, not as to Backpage.com or any other person.

**Supporting Authorities**

Ninth Circuit Manual of Model Criminal Jury Instructions 3.13 (2021); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Doc. No. 946 at 13 (Order denying motion to dismiss) ("[Defendants] were not indicted for facilitating the amorphous notion of 'prostitution.' They were indicted for facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-related businesses, or other groups were involved in the business of prostitution."); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Transcript of December 4, 2020 Hearing ("And I think one of the key things in my reason for denying the recusal is that this case is not about Backpage. Backpage was prosecuted in a separate case, entered a plea in a separate case. This case is about these individual defendants and whether they had specific knowledge of these ads as facilitating illegal activity.").

**UNITED STATES' OBJECTIONS**

Defendants propose the same 3.13 instruction as the United States, but add an extra paragraph at the end.  The United States objects for the same reasons set forth in its objection to Defendants' proposed instruction 1.13.

**3.18 ON OR ABOUT—DEFINED\***

The indictment charges that the offenses alleged in Counts 2-51, 53-100, was committed "on or about" a certain date.

Although it is necessary for the United States to prove beyond a reasonable doubt that the offenses were committed on a date reasonably near the date alleged in Counts 2-51, 53-100 the indictment, it is not necessary for the United States to prove that the offense was committed precisely on the date charged.

1

2

## 4.9 TESTIMONY OF WITNESSES INVOLVING SPECIAL CIRCUMSTANCES—IMMUNITY, BENEFITS, ACCOMPLICE, PLEA*

3

4

5

6

You have heard testimony from Carl Ferrer and Dan Hyer, witnesses who pleaded guilty to a crime arising out of the same events for which the defendants are on trial. This guilty plea is not evidence against the defendants, and you may consider it only in determining the witnesses' believability.

7

8

9

10

For these reasons, in evaluating the testimony of Carl Ferrer and Dan Hyer, you should consider the extent to which or whether their testimony may have been influenced by the fact that they have already pleaded guilty.  In addition, you should examine the testimony of Carl Ferrer and Dan Hyer with greater caution than that of other witnesses.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## 4.14 OPINION EVIDENCE, EXPERT WITNESS

You [have heard] [are about to hear] testimony from [*name*] who [testified] [will testify] to opinions and the reasons for [his] [her] opinions. This opinion testimony is allowed because of the education or experience of this witness.

Such opinion testimony should be judged like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

**4.15 DUAL ROLE TESTIMONY**

You [have heard] [are about to hear] testimony from [*name*] who [testified] [will testify] to both facts and opinions and the reasons for [his] [her] opinions.

Fact testimony is based on what the witness saw, heard or did. Opinion testimony is based on the education or experience of the witness.

As to the testimony about facts, it is your job to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it. [Take into account the factors discussed earlier in these instructions that were provided to assist you in weighing the credibility of witnesses.]

As to the testimony about the witness's opinions, this opinion testimony is allowed because of the education or experience of this witness. Opinion testimony should be judged like any other testimony. You may accept all of it, part of it, or none of it. You should give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

1    **4.16 CHARTS AND SUMMARIES NOT ADMITTED INTO EVIDENCE**

2    During the trial, certain charts and summaries were shown to you in order to help

3    explain the evidence in the case.  These charts and summaries were not admitted into

4    evidence and will not go into the jury room with you.  They are not themselves evidence

5    or proof of any facts.  If they do not correctly reflect the facts or figures shown by the

6    evidence in the case, you should disregard these charts and summaries and determine the

7    facts from the underlying evidence.

## 4.17 CHARTS AND SUMMARIES ADMITTED INTO EVIDENCE

Certain charts and summaries have been admitted into evidence. Charts and summaries are only as good as the underlying supporting material. You should, therefore, give them only such weight as you think the underlying material deserves.

**UNITED STATES' PROPOSED INSTRUCTION 5.7 KNOWINGLY—DEFINED**

An act is done knowingly if the defendant is aware of the act, and does not act or fail to act through ignorance, mistake, or accident.  You may consider evidence of the defendants' words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.

**DEFENSE OBJECTION**

The Travel Act and money laundering charges are specific intent crimes.  Therefore, it would be reversible error to provide a "Knowingly" instruction here.  *See United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974) (Travel Act violation is a specific intent crime); *United States v. Gallo*, 782 F.2d 1191, 1194 (4th Cir. 1986) (same); *United States v. James*, 210 F.3d 1342, 1345 (11th Cir. 2000) (same); *see* Ninth Circuit Model Criminal Jury Instructions at 8.146 cmt. ("Because it is a specific intent crime, it is reversible error to give Instruction 5.7 (Knowingly–Defined) in a money laundering case.") (citing *United States v. Stein*, 37 F.3d 1407, 1410 (9th Cir. 1994); *United States v. Turman*, 122 F.3d 1167, 1169 (9th Cir. 1997)).

*See* Ninth Circuit Model Criminal Jury Instructions at 8.146 cmt. ("Because it is a specific intent crime, it is reversible error to give Instruction 5.7 (Knowingly–Defined) in a money laundering case.") Defendants propose a specific intent instruction to accurately advise the jury of the required mens rea for the charged offenses.  *See United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Doc. No. 946 at 13 (Order denying motion to dismiss) ("[Defendants] were not indicted for facilitating the amorphous notion of 'prostitution.' They were indicted for facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-related businesses, or other groups were involved in the business of prostitution."); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Transcript of December 4, 2020 Hearing ("And I think one of the key things in my reason for denying the recusal is that this case is not about Backpage. Backpage was prosecuted in a separate case, entered a plea in a separate case.

This case is about these individual defendants and whether they had specific knowledge of these ads as facilitating illegal activity.").

**UNITED STATES' RESPONSE**

Knowledge is an important element of several of the crimes charged in the SI. Critically, knowledge is a *sine qua non* of intent, as the Court recognized in its May 4, 2020 Order:

> "To establish Defendants' violation of the Travel Act, the Government must prove, among other things, that Defendants acted with a culpable state of mind." *United States v. Welch*, 327 F.3d 1081, 1095 (10th Cir. 2003). "In other words, the Travel Act requires a defendant act *not only with knowledge of what he is doing*, but also with the objective of promoting some unlawful activity." *Id.* As a result, there must be allegations that each Defendant had a "specific intent to promote, manage, establish, carry on or facilitate one of the prohibited activities." *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974) (citing *United States v. Gebhard*, 441 F.2d 1261 (6th Cir. 1971)); *see also United States v. Polizzi*, 500 F.2d 856, 876–77 (9th Cir. 1974) (describing this element as a "specific intent to facilitate an activity which the accused knew to be unlawful").

(Doc. 946 at 14 (emphasis added).)

The Court went on to emphasize that Defendants' alleged awareness—*i.e.*, *knowledge*—that the vast majority of adult and escort ads on Backpage were for prostitution, combined with other allegations, further supported the SI's allegations of intent:

> First, the SI alleges Defendants "used the mail and any facility in interstate and foreign commerce *with intent* to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit: prostitution offenses . . . ." (SI ¶ 201 (emphasis added)). It also alleges "Defendants were aware that the vast majority of the 'adult' and 'escort' ads appearing on Backpage were actually ads for prostitution and took steps to intentionally facilitate that illegal activity." (*Id.* ¶ 9; *see also id.* ¶¶ 10-11.) Only by ignoring these allegations can it seriously be argued that Defendants' intent to facilitate unlawful activity is not alleged.

(Doc. 946 at 15; *see also id.* at 16 (the SI additionally alleges Defendants "received notice by various third parties that a majority of their 'adult services' ads were being used to support these prostitution ventures").)

Indeed, Defendants' proposed "specific intent" instruction includes a similar definition of "knowingly." ("To establish specific intent, the government must prove

beyond a reasonable doubt that the defendant *knowingly* did an act which the law forbids, purposely and intending to violate the law.  Such intent may be determined from all the facts and circumstances surrounding the case.  An act or a failure to act is *knowingly* done if done voluntarily and intentionally, not because of mistake or accident, or other innocent reason.") (emphasis added).  Both parties propose a "specific intent" instruction, so the jury will not be not be confused as to the requisite *mens rea*.  But, because specific intent can be inferred from knowledge, this instruction is appropriate.

Additional authorities underscore that intent can be inferred from knowledge in a variety of circumstances—including several that fit comfortably within the allegations of the SI.  In *People v. Lauria*, 59 Cal. Rptr. 628, 635 (Cal. Ct. App. 1967), for example, the court reversed a conspiracy conviction of a defendant who operated a telephone messaging service knowing that some of his customers were using his services to further their prostitution businesses.  After detailed legal analysis, the court found that the supplier's specific intent to facilitate unlawful activity may be inferred from knowledge in any one of several circumstances (none of which was present in *Lauria*), including:

- "[P]roof . . . of inflated charges" for goods or services used for illegal activities (the United States anticipates introducing evidence that Backpage charged much higher fees for its "adult" and "escort" ads than for ads in its non-adult sections);

- "[E]vidence of any unusual volume of business with prostitutes," such as where "sales for illegal use amount to a high proportion of the seller's total business" (the United States anticipates introducing evidence that Backpage derived the lion's share of its revenues from prostitution ads); or

- Selling goods or services that "serve no other purpose than to advertise the professional services of the prostitutes" (the United States anticipates introducing evidence that the vast majority of Backpage's "adult" and "escort" ads were prostitution ads).

*Lauria*, 59 Cal. Rptr. at 632-33.  *See also* Wayne R. LaFave, 2 *Substantive Criminal Law* (SUBCRL) § 12.2(c)(3), Providing goods or services, (3d ed., Oct. 2020 update) ("Intent

may also be inferred from the fact that the seller has made inflated charges, that he has supplied goods or services which have no legitimate use, or that the sales to the illegal operation have become the dominant proportion of the seller's business."); *id*. (courts have also focused on "the quantity of the sales; the continuity of the relationship between seller and buyer; the seller's initiative or encouragement; and the nature of the goods," and on deceptive or "secretive" tactics used by the seller).

Moreover, *Lauria* found that no inference would be needed in cases involving "[d]irect evidence of participation, such as advice from the supplier of legal goods or services to the user of those goods or services on their use for illegal purposes. . . . When the intent to further and promote the criminal enterprise comes from the lips of the supplier himself, ambiguities of inference from circumstance need not trouble us." *Id*. at 632. The United States anticipates introducing evidence showing, *inter alia*, that Backpage managers and employees helped customers craft their ads to reduce the risk of law enforcement detection without changing the underlying message (moderation), created ads for prostitutes and pimps and offered to publish them for a trial period for no or reduced fees (aggregation), entered into affiliation agreements with bulk prostitution advertisers like Dollar Bill (who received discounts, commissions or other fees from Backpage), and paid thousands of dollars to The Erotic Review, a Yelp-like website for buyers and sellers of commercial sex, in a cross-referral/cross-linkage business arrangement.

In yet another example of the interplay between Travel Act violations and "knowledge," Senior District Judge David Campbell—during grand jury proceedings in this case—recognized that federal law "criminalize[s] the knowing publication of an advertisement for illegal prostitution or other illegal activity." (Doc. 194-1 at 66.) Even Defendants' attorney agreed with Judge Campbell about when Defendants could be held criminally liable. (Doc. 446-1 at 39 ("[I]f there is actual knowledge, say through participation in a venture, you're conspiring with somebody, you know they posted an ad, you know the person involved is underage, that's a prosecutable crime, Your Honor.").)

Model Instruction 5.7 "Knowingly—Defined" should be given.

**UNITED STATES' PROPOSED INSTRUCTION 5.8 DELIBERATE**

**IGNORANCE**

You may find that the defendant acted knowingly if you find beyond a reasonable doubt that the defendant:

1. was aware of a high probability that the vast majority of the "adult" and "escort" ads appearing on Backpage.com were actually ads for prostitution, and

2. deliberately avoided learning the truth.

You may not find such knowledge, however, if you find that the defendant actually believed that the vast majority of the "adult" and "escort" ads appearing on Backpage.com were not ads for prostitution, or if you find that the defendant was simply negligent, careless, or foolish.

**DEFENSE OBJECTION**

The government's proposed *Jewell* instruction, one that typically is used in drug smuggling cases, is inappropriate here. *See* Ninth Circuit Model Criminal Jury Instructions at 5.8 (providing the example of a defendant being aware of a high probability that "drugs were in the defendant's automobile"); *United States v. Jewell*, 532 F.2d 697, 698 (9th Cir. 1976) (involving drugs sealed in a secret compartment of a car). Here, the Travel Act and money laundering charges are specific intent crimes. Therefore, it would be reversible error to provide a "Deliberate Ignorance" instruction to the jurors here. *See Jewell*, 532 F.2d at 700-701 (such an instruction is only appropriate where the underlying crime requires mere knowledge); *see United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974) (holding that the violation of the Travel Act is a specific intent crime and that "[t]he presumption that one intends the natural and probable consequences of his actions is insufficient in this context to establish intent to facilitate criminal activity."); *United States v. Gallo*, 782 F.2d 1191, 1194 (4th Cir. 1986) (same); *United States v. James*, 210 F.3d 1342, 1345 (11th Cir. 2000) (same); *see* Ninth Circuit Model Criminal Jury Instructions at 8.146 cmt. ("Because it is a specific intent crime, it is reversible error to

1    give Instruction 5.7 (Knowingly–Defined) in a money laundering case.") (citing *United*
2    *States v. Stein*, 37 F.3d 1407, 1410 (9th Cir. 1994); *United States v. Turman*, 122 F.3d
3    1167, 1169 (9th Cir. 1997)).

4            Further, such an instruction is only appropriate "if the jury rejects the government's
5    case as to actual knowledge." *United States v. Heredia*, 483 F.3d 913, 922 (9th Cir. 2007)
6    ("In deciding whether to give a willful blindness instruction, in addition to an actual
7    knowledge instruction, the district court must determine whether the jury could rationally
8    find willful blindness even though it has rejected the government's evidence of actual
9    knowledge. If so, the court may also give a *Jewell* instruction.").    And
10   "[e]ven if the factual predicates of the instruction are present, the district judge has
11   discretion to refuse it." *Id.*

12           Further, even if such an instruction were appropriate, whether a given Defendant
13   "was aware of a high probability that the vast majority of the 'adult' and 'escort' ads
14   appearing on Backpage.com were actually ads for prostitution" is not a substitute for the
15   government having to prove beyond a reasonable doubt that each Defendant specifically
16   intended to facilitate the prostitution offenses committed by a particular business enterprise
17   through the publication of fifty advertisements at issue.  *See United States v. Lacey, et al.*
18   (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Doc. No. 946 at 13 (Order denying motion
19   to dismiss) ("[Defendants] were not indicted for facilitating the amorphous notion of
20   'prostitution.' They were indicted for facilitating (via publishing ads) on fifty distinct
21   occasions where prostitutes, prostitution-related businesses, or other groups were involved
22   in the business of prostitution."); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-
23   CR-00422-PHX-SMB, Transcript of December 4, 2020 Hearing ("And I think one of the
24   key things in my reason for denying the recusal is that this case is not about Backpage.
25   Backpage was prosecuted in a separate case, entered a plea in a separate case. This case is
26   about these individual defendants and whether they had specific knowledge of these ads as
27   facilitating illegal activity.").  Willful blindness therefore cannot meet the elements of the
28   offenses.

The government's proposed *Jewell* instruction also is inconsistent with the First Amendment.  The government's proposed instruction would suggest that the jury can use the publication of presumptively protected and lawful speech as the factual basis for a finding that defendants intended to violate the law.  The government proposes to instruct the jury that defendants were obligated to assume that presumptively protected and lawful speech was unprotected speech and to censor that speech.  The First Amendment prohibits this.

Finally, even if a *Jewell* instruction was appropriate in this case, the government's proposed instruction ignores the language of *Jewell* restricting the instruction to circumstances where a defendant's ignorance "was solely and entirely a result of . . . a conscious purpose to avoid learning the truth."  *United States v. Jewell*, 532 F.2d 697, 704 (9th Cir. 1976).

## UNITED STATES' RESPONSE

Defendants are wrong that a *Jewell* instruction can't be given when the alleged crimes require specific intent.  As the Ninth Circuit recently recognized:

> We have repeatedly held that a *Jewell* instruction is proper in specific-intent cases (including conspiracy cases). *See United States v. Ramos-Atondo*, 732 F.3d 1113, 1120 (9th Cir. 2013) (rejecting appellants' argument that "it is impossible to conspire to be deliberately ignorant" and holding that "the *Jewell* standard eliminates the need to establish such positive knowledge to obtain a conspiracy conviction"); *United States v. Heredia*, 483 F.3d 913, 922 & n.13 (9th Cir. 2007) (en banc) (approving of *Jewell* instruction in possession-with-intent-to-distribute prosecution, and observing that "willful blindness is tantamount to knowledge"); *United States v. Nosal*, 844 F.3d 1024, 1039–40 (9th Cir. 2016) (approving *Jewell* instruction in aiding-and-abetting case).… [T]he district court did not err in instructing the jury.

*United States v. Asefi*, 788 F. App'x 449, 452 (9th Cir. 2019).

The "theory of deliberate ignorance need not be exclusive, it may be an argument alternative to actual knowledge."  *Ramos-Atondo*, 732 F.3d 1113, 1120.  The instruction does not "risk[] lessening the state of mind that a jury must find" and is appropriately given when a jury could rationally find willful blindness.  *Heredia*, 483 F.3d at 922 & 924.

Defendants' comment that the charges are based on "presumptively protected and lawful speech" is misplaced in this case, which concerns prostitution advertising (a form of commercial speech that is categorically excluded from First Amendment protection), as more fully explained in the United States' objections to Defendants' case-specific instructions in Part IV, *infra*.  The SI clearly alleges that Defendants had ample notice that prostitution advertising was rampant on Backpage, and that Defendants took numerous steps to expand and capitalize on Backpage's role as the internet's primary source of prostitution advertising.

**DEFENDANTS' PROPOSED INSTRUCTION 6.10 MERE PRESENCE**

Mere presence at the scene of a crime or mere knowledge that a crime is being committed is not sufficient to establish that a defendant committed the crime of violating the Travel Act by promoting, or facilitating the promotion of, prostitution offenses committed by a particular business enterprise in violation of the laws of the State in which they are committed or the crime of money laundering. The defendant must be a participant and not merely a knowing spectator. The defendant's presence may be considered by the jury along with other evidence in the case.

[This instruction should track the elements and definition of "prostitution" that the government provided to the grand jury at the time this indictment was returned. *See* Doc. No. 1171.]

**Supporting Authorities**

Ninth Circuit Manual of Model Criminal Jury Instructions 6.10, 8.144 (2021) (modified to reflect charges); *Woodhull Freedom Foundation v. United States*, 334 F. Supp. 3d 185, 199-201 (D.D.C. 2018), rev'd 948 F.3d 363 (D.C. Cir. 2020); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Doc. No. 946 at 13 (Order denying motion to dismiss) ("[Defendants] were not indicted for facilitating the amorphous notion of 'prostitution.' They were indicted for facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-related businesses, or other groups were involved in the business of prostitution."); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Transcript of December 4, 2020 Hearing ("And I think one of the key things in my reason for denying the recusal is that this case is not about Backpage. Backpage was prosecuted in a separate case, entered a plea in a separate case. This case is about these individual defendants and whether they had specific knowledge of these ads as facilitating illegal activity.").

# UNITED STATES' OBJECTIONS

The Comment to this Model Criminal Jury Instruction demonstrates why this instruction is unnecessary for this case. "Such a 'mere presence' instruction is unnecessary if the government's case is not solely based on the defendant's presence and the jury has been instructed on the elements of the crime." *See United States v. Tucker*, 641 F.3d 1110, 1123 (9th Cir. 2011); *see also United States v. Gooch*, 506 F.3d 1156, 1160 (9th Cir. 2007). The evidence at trial will demonstrate that each defendant was more than "merely present" for the alleged crimes. *See United States v. Howell*, 231 F.3d 615, 629 (9th Cir. 2000).

**7.1 DUTY TO DELIBERATE**

When you begin your deliberations, elect one member of the jury as your [presiding juror] [foreperson] who will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict, whether guilty or not guilty, must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially. Do not allow personal likes or dislikes, sympathy, prejudice, fear, or public opinion to influence you. You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, economic circumstances[4] [, profession, occupation, celebrity, or position in life or in the community].

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so. During your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong.

---

[4] Modified to conform with the language in Model Criminal Jury Instruction 1.1.

**7.2 CONSIDERATION OF EVIDENCE—CONDUCT OF THE JURY**

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves. Except for discussing the case with your fellow jurors during your deliberations:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This restriction includes discussing the case in person, in writing, by phone or electronic means, via email, text messaging, or any Internet chat room, blog, website or any other forms of social media. This restriction applies to communicating with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address. A juror who violates these restrictions jeopardizes the fairness of these proceedings[, and a mistrial could result that would require the entire trial process to start over]. If any juror is exposed to any outside information, please notify the court immediately.

1

## 7.3 USE OF NOTES

2      Some of you have taken notes during the trial. Whether or not you took notes, you

3  should rely on your own memory of what was said. Notes are only to assist your memory.

4  You should not be overly influenced by your notes or those of your fellow jurors.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## 7.4 JURY CONSIDERATION OF PUNISHMENT

The punishment provided by law for this crime is for the court to decide. You may not consider punishment in deciding whether the United States has proved its case against the defendant beyond a reasonable doubt.

## 7.5 VERDICT FORM

A verdict form has been prepared for you. [*Explain verdict form as needed.*] After you have reached unanimous agreement on a verdict, your [presiding juror] [foreperson] should complete the verdict form according to your deliberations, sign and date it, and advise the [clerk] [bailiff] that you are ready to return to the courtroom.

## 7.6 COMMUNICATION WITH COURT

If it becomes necessary during your deliberations to communicate with me, you may send a note through the [clerk] [bailiff], signed by any one or more of you. No member of the jury should ever attempt to communicate with me except by a signed writing, and I will respond to the jury concerning the case only in writing or here in open court. If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, on any question submitted to you, including the question of the guilt of the defendant, until after you have reached a unanimous verdict or have been discharged.

**UNITED STATES' PROPOSED 8.20 CONSPIRACY—ELEMENTS***

The defendants are charged in Count 1 of the indictment with conspiring to violate the Travel Act in violation of Section 1952(a)(3)(A) of Title 18 of the United States Code. In order for the defendants to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt:

First, beginning in or around 2004, and ending on or about April 2018, there was an agreement between two or more persons to commit at least one Travel Act crime as charged in the indictment, namely promoting or facilitating the promotion of any business enterprise involving prostitution offenses in violation of 18 U.S.C. § 1952(a)(3)(A) and § 1952(b)(i)(1);

Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

Third, one of the members of the conspiracy performed at least one overt act on or after March 28, 2013, for the purpose of carrying out the conspiracy.

A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must find that there was a plan to commit at least one of the crimes alleged in the indictment as an object of the conspiracy with all of you agreeing as to the particular crime, *i.e.*, Travel Act violations, which the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the

originators. On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

An overt act does not itself have to be unlawful. A lawful act may be an element of a conspiracy if it was done for the purpose of carrying out the conspiracy. The United States is not required to prove that the defendant personally did one of the overt acts.

**DEFENDANTS' PROPOSED 8.20 INSTRUCTION**

The defendants are charged in Count 1 of the indictment with conspiring to violate the Travel Act in violation of Section 1952(a)(3)(A) of Title 18 of the United States Code. In order for a defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt for that defendant:

First, beginning in or around 2004, and ending on or about April 2018, there was an agreement between two or more persons to commit a violation of the Travel Act by promoting, or facilitating the promotion of, prostitution offenses committed by a particular business enterprise in violation of the laws of the State in which they are committed, as charged in Count 1 of the indictment;

Second, that defendant became a member of the conspiracy knowing of at least one of its illegal objects and with the specific intent of helping promote, or facilitate the promotion of, prostitution offenses committed by a particular business enterprise in violation of the laws of the State in which they are committed; and

Third, one of the members of the conspiracy performed at least one overt act on or after March 28, 2013, for the purpose of carrying out the conspiracy.  Without at least one defendant's overt act to specifically promote, or facilitate the promotion of, prostitution offenses committed by a particular business enterprise in violation of the laws of the State in which they are committed, you cannot find a conspiracy.

**What Is a Conspiracy, and How Does One Become a Member?**

A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes.  The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy.  It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another.  You must find that there was a plan to commit at

least one of the crimes alleged in the indictment as an illegal object of the conspiracy with all of you agreeing as to the particular crime, *i.e.*, a specific publication of an ad in violation of the Travel Act, which the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some illegal object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators. On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some illegal object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists. To become a co-conspirator a person must have an intention and agreement to accomplish the same, specific criminal objective as his or her co-conspirators.

An overt act does not itself have to be unlawful. A lawful act may be an element of a conspiracy if it was done for the purpose of carrying out the unlawful conspiracy. The government is not required to prove that a Defendant personally did one of the overt acts.

Proof of an underlying substantive crime does not, without more, prove the existence of a conspiracy to commit that crime.

### What Is "Travel Act—Facilitate Prostitution"?

The elements of the Travel Act are not satisfied if a defendant merely did an act that promoted, or facilitated the promotion of, prostitution offenses committed by a particular business enterprise. The elements are not satisfied unless a defendant specifically intended his or her act to facilitate the prostitution offenses committed by a particular business enterprise .

The government cannot meet its burden to prove that a defendant had the specific intent to participate in and further the prostitution offenses committed by a particular business enterprise associated with the ad by proving:

- the defendant had after-the-fact knowledge that some people who advertised on Backpage.com engaged in prostitution offenses or that some or even many past ads on Backpage.com related to unlawful activity;
- the defendant knew Backpage.com might facilitate prostitution in the abstract;
- the defendant was indifferent to the actions of the purchasers of classified ads on Backpage.com; or
- the defendant knew that a particular advertiser might, at times, engage in prostitution offenses.

Rather, to satisfy the specific intent requirements of the Travel Act, the government must prove beyond a reasonable doubt, for each Count, that each defendant in some significant manner associated himself or herself with a particular business enterprise associated with the ad charged in that Count with the intent to promote, or facilitate the promotion of, the prostitution offenses committed by that business enterprise.  As such, to find a defendant guilty of conspiring to violate the Travel Act, you must find that the government proved beyond a reasonable doubt that the defendant joined a conspiracy with the specific intent to associate himself or herself with a particular criminal venture for the purpose of advancing its prostitution offenses.  A defendant cannot intend to promote or facilitate a business enterprise he or she does not know exists.

**Unanimity Requirements**

For a defendant to be found guilty of Count 1 (Conspiracy to Violate the Travel Act), you must find beyond a reasonable doubt that the defendant joined in a plan to commit at least one illegal object of the alleged conspiracy – specifically intending to promote, or facilitate the promotion of, prostitution offenses committed by a particular business enterprise upon which you all agree.

[This instruction should track the elements and definition of "prostitution" that the

- 79 -

1    government provided to the grand jury at the time this indictment was returned.  *See* Doc.

2    No. 1171.]

3

4                               **Supporting Authorities**

5        Ninth Circuit Manual of Model Criminal Jury Instructions 7.9, 8.20, 8.144 (2021);

6    Barry Tarlow, *Defense of a Federal Conspiracy Prosecution,* 4 J.Crim.Defense 183, 201-

7    02 (1978) (explaining that the object of the conspiracy must be unlawful); *United States v.*

8    *Lennick*, 18 F.3d 814, 819 (9th Cir. 1994) ("Proof of the underlying substantive crime,

9    however, does not, without more, prove the existence of a conspiracy."); *United States v.*

10   *Lapier*, 796 F.3d 1090 (9th Cir. 2015) (failure to give specific unanimity instruction was

11   plain error because half of jury could have found defendant guilty of joining one conspiracy

12   while other half of jury could have found defendant guilty of joining second conspiracy);

13   *United States v. Pomponio*, 429 U.S. 10, 12 (1976) (willfulness is the "intentional violation

14   of a known legal duty").

15       In *Woodhull Freedom Foundation v. United States*, the government argued that for

16   prosecutions under the Travel Act, the prosecutor must prove "not simply that the

17   defendant was aware of a potential result of the criminal offense, but instead that the

18   defendant intended to 'explicitly further[]' a specified unlawful act." 334 F. Supp. 3d 185,

19   199-201 (D.D.C. 2018), rev'd 948 F.3d 363 (D.C. Cir. 2020).  The court agreed with the

20   government and held that the law applies only to "specific unlawful acts with respect to a

21   particular individual, not the broad subject-matter of prostitution." *Id*.  Most recently, in

22   defending the district court decision in that case, DOJ repeated its position that in a

23   prosecution under the Travel Act, the government must allege that the Defendant acted to

24   intentionally promote or facilitate a "specific, unlawful instance of prostitution." Brief for

25   the United States in *Woodhull Freedom Found. v. United States*, No. 18-5298 (D.C. Cir.

26   Apr. 15, 2019) (Doc. No. 1782997) at 21-22.

27       To prove a conspiracy charge, the government must prove the "requisite intent for

28   the substantive crime." *United States v. Kaplan*, 836 F.3d 1199, 1212 (9th Cir. 2016).

                                     - 80 -

1    *See also United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-

2    SMB, Doc. No. 946 at 13 (Order denying motion to dismiss) ("[Defendants] were not

3    indicted for facilitating the amorphous notion of 'prostitution.' They were indicted for

4    facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-

5    related businesses, or other groups were involved in the business of prostitution."); *see*

6    *United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Transcript of

7    December 4, 2020 Hearing ("And I think one of the key things in my reason for denying

8    the recusal is that this case is not about Backpage. Backpage was prosecuted in a separate

9    case, entered a plea in a separate case. This case is about these individual defendants and

10   whether they had specific knowledge of these ads as facilitating illegal activity.").

11   *United States v. James*, 210 F.3d 1342, 1345 (11th Cir. 2000) ("The elements of a

12   Travel Act charge are: 1) that the defendant traveled in interstate commerce on or about

13   the time, and between the places, charged in the indictment; 2) that the defendant engaged

14   in that travel with the specific intent to promote, manage, establish or carry on an unlawful

15   activity, as defined; and 3) that the defendant thereafter knowingly and willfully committed

16   an act to promote, manage, establish or carry on such unlawful activity."); *United States v.*

17   *Hagmann*, 950 F.2d 175, 182 (5th Cir. 1991) ("The essential elements of the Travel Act . .

18   . are:  (i) *travel* in interstate or foreign commerce, or use of the mail (or any facility) in

19   interstate or foreign commerce; (ii) with the specific *intent* to promote, manage, establish,

20   or carry on—or distribute the proceeds of—unlawful activity; and (iii) knowing and willful

21   *commission of an act* in furtherance of that intent subsequent to the act of travel.")

22   (emphasis in original); *United States v. Echeverri-Jaramillo*, 777 F.2d 933, 937 (4th Cir.

23   1985) ("in order to prove such a violation, under 18 U.S.C. § 1952(a) it must be shown that

24   1) the defendant traveled in interstate commerce on or about the time and between the

25   places noted in the indictment; 2) that the defendant engaged in such travel with the specific

26   intent to promote, manage, establish or carry on an unlawful activity and that 3) the

27   defendant did thereafter knowingly and willfully commit an act to promote, manage,

28   establish or carry on such an unlawful activity."); *United States v. Stagman*, 446 F.2d 489,

491 (6th Cir. 1971) ("the majority of the Courts of Appeals which have directly addressed this question . . . have stated that knowing and wilful [sic] intent to violate state laws is an element of the crime proscribed by the Travel Act") (citing decisions of the 4th, 7th, 8th, and 9th Circuits).

## UNITED STATES' OBJECTIONS

Defendants propose a much lengthier conspiracy instruction that contains misstatements of the law. The Court should provide the Model Instruction on conspiracy, which provides a much clearer explanation of the applicable law than Defendants' proposed instruction. Here are some of the problems with Defendants' proposed instruction.

- In the first element, Defendants insist that a Travel Act violation must involve "promoting, or facilitating the promotion of, prostitution offenses committed by a *particular* business enterprise." (emphasis added). The word "particular" is unnecessary and confusing. The statute states that "unlawful activity" under the Travel Act is defined as "*any* business enterprise involving . . . prostitution offenses in violation of the laws of the State in which they are committed or of the United States." 18 U.S.C. § 1952(b)(i)(1). This Court has recognized this fact previously: "Instead of alleging formal labels, what must be alleged for the 'unlawful activity' element under Section 1952(b)(i) are allegations showing 'a continuous course of criminal conduct.'" (Doc. 946 at 10) (case citations omitted). The Court also suggested that each ad is evidence of a business enterprise: "each ad identified [in the SI] carries an indicia of a commercial or business enterprise because each one invites multiple commercial transactions by soliciting the public to engage in prostitution." (Doc. 946 at 12, n.7) (citing *Charles v. City of Los Angeles*, 697 F.3d 1146, 1151 (9th Cir. 2012) (noting that advertisements "propose a commercial transaction").) Further, unlike Defendants' proposed instruction, the United States' instruction tracks the statutory definition of "unlawful activity."

- 82 -

- In the second element, Defendants add the word "illegal," which is redundant and not part of the Model Instruction. The first element in the Model Instruction states, in pertinent part, "there was an agreement between two or more persons to commit at least one crime as charged in the indictment," while the second element makes clear the crime requires that "the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it." The word "illegal" doesn't clarify any aspect of this crime and shouldn't be part of the instruction.

- In the third element, Defendants again add language to the Model Instruction that is unnecessary. The final sentence in the third element is redundant and restates the language in the first element. Moreover, Defendants erroneously state that the overt act must be performed by one of the defendants. Under established law, any person who is a member of the conspiracy—a category of persons not limited to Defendants—may perform the overt act. *See* Model Instruction 8.20.

- The remainder of Defendants' proposed instruction is not needed and contains Defendants' arguments for why the jury should find them not guilty. (*E.g.*, "[a] defendant cannot intend to promote or facilitate a business enterprise he or she does not know exists."). Instructions are not the place for arguments.

- Defendants add a section titled "unanimity requirements" to their proposed instruction. A specific unanimity instruction may be required when there are multiple conspiracies at issue. *See United States v. Echeverry*, 719 F.2d 974, 975 (9th Cir. 1983). Here, however, the United States has only alleged one conspiracy—conspiracy to violate 18 U.S.C. § 1952(a)(3)(A). (Doc. 230 at 49.) This instruction isn't needed.

- Defendants' intent and knowledge assertions are further addressed in separate sections of these instructions that discuss these elements.

Defendants also cite *Woodhull Freedom Found. v. United States*, 334 F. Supp. 3d 185 (D.D.C. 2018), which dismissed on standing grounds a facial challenge by sex worker advocacy groups to the Allow States and Victims to Fight Online Sex Trafficking Act of 2017 (FOSTA).  FOSTA created a new federal offense for operating "an interactive computer service…with the intent to promote or facilitate *the prostitution of another person*." 18 U.S.C. § 2421(A)(a) (emphasis added).  The court held the plaintiffs lacked a credible threat of prosecution because "key textual indications…make clear that FOSTA targets specific acts of illegal prostitution," not abstract advocacy.  334 F. Supp. 3d at 200.  These "textual indications" included FOSTA's reference to the "'prostitution of another person,' which denotes specific unlawful acts." *Id.* at 199-200.  While the court found the plaintiffs' standing arguments flawed for the "additional reason []" that § 2421A "mirrors" the Travel Act, which had never been used to prosecute advocacy, *id.* at 199-200, the Travel Act contains no text specifically referencing "the prostitution of another person."

Defendants also assert the "DOJ repeated [in the *Woodhull* appeal] that in a prosecution under the Travel Act, the government must allege that the defendant acted to intentionally promote or facilitate a 'specific, unlawful instance of prostitution.'" However, the quoted text refers not to the United States' discussion of the Travel Act, but to § 2421A of FOSTA.  (Gov't Br., *Woodhull Freedom Found. v. United States*, No. 18-5298 (D.C. Cir. Apr. 15, 2019) (Doc.#1782997) at 20-21.)  The United States went on to characterize § 2421A and the Travel Act as "substantially similar" in that both statutes "prohibit[ ] using the internet 'with intent to' 'promote…or facilitate the promotion' of illegal 'prostitution offenses'"—a reading consistent with the government's instructions here. *Id.*

**DEFENDANTS' PROPOSED 8.22 INSTRUCTION—**

**MULTIPLE CONSPIRACIES (Count 1)**

Count 1 of the indictment alleges a single conspiracy to commit a violation of the Travel Act by promoting, or facilitating the promotion of, prostitution offenses committed by a particular business enterprise in violation of the laws of the State in which they are committed.  You must decide whether the single conspiracy to violate the Travel Act as charged in Count 1 of the indictment existed, and, if it did, who at least some of its members were.  If you find that the single conspiracy to violate the Travel Act charged in Count 1 did not exist, then you must return a not guilty verdict, even though you may find that some other conspiracy existed.  For example, if you find that Count 1 concerns two or more conspiracies, you must find each defendant not guilty of the single conspiracy alleged in Count 1.  Similarly, if you find that any defendant was not a member of the conspiracy to violate the Travel Act charged in Count 1, then you must find that defendant not guilty, even though that Defendant may have been a member of some other conspiracy.

[This instruction should track the elements and definition of "prostitution" that the government provided to the grand jury at the time this indictment was returned.  *See* Doc. No. 1171.]

**Supporting Authorities**

Model Crim. Jury Instr. 9th Cir. 8.22 (2021) (modified to reflect the charges in the indictment); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Doc. No. 946 at 13 (Order denying motion to dismiss) ("[Defendants] were not indicted for facilitating the amorphous notion of 'prostitution.' They were indicted for facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-related businesses, or other groups were involved in the business of prostitution."); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Transcript of December 4, 2020 Hearing ("And I think one of the key things in my reason for denying

- 85 -

the recusal is that this case is not about Backpage. Backpage was prosecuted in a separate case, entered a plea in a separate case. This case is about these individual defendants and whether they had specific knowledge of these ads as facilitating illegal activity.").

## UNITED STATES' OBJECTIONS

This instruction should only be given when Defendants raise a multiple conspiracy defense. *United States v. Job*, 871 F.3d 852, 867 (9th Cir. 2017). To support such an instruction, evidence would need to be presented at trial in which a jury could reasonably conclude that some of the defendants were only involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment. *Id.* That's not the case here. The conspiracy charged in Count One would not give rise to a reasonable juror believing that multiple conspiracies occurred. *Id.* at 868 ("Although a single conspiracy can include 'several subagreements or subgroups of conspirators,' that does not mean there are separate conspiracies.") "A single conspiracy exists, as compared with multiple conspiracies, where there is 'one overall agreement' to perform various functions to achieve the objectives of the conspiracy." *United States v. Bauer,* 84 F.3d 1549, 1560 (9th Cir. 1996).

## UNITED STATES' PROPOSED 8.23 CONSPIRACY—KNOWLEDGE OF AND ASSOCIATION WITH OTHER CONSPIRATORS*

A conspiracy may continue for a long period of time and may include the performance of many transactions. It is not necessary that all members of the conspiracy join it at the same time, and one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members.

Even though a defendant did not directly conspire with every other defendant or every other conspirator in the overall scheme, the defendant has, in effect, agreed to participate in the conspiracy if the United States proves each of the following beyond a reasonable doubt:

First, that the defendant directly conspired with one or more conspirators to carry out at least one of the objects of the conspiracy;

Second, that the defendant knew or had reason to know that other conspirators were involved with those with whom the defendant directly conspired; and

Third, that the defendant had reason to believe that whatever benefits the defendant might get from the conspiracy were probably dependent upon the success of the entire venture.

It is not a defense that a person's participation in a conspiracy was minor or for a short period of time.

**DEFENDANTS' PROPOSED 8.23 CONSPIRACY—KNOWLEDGE OF AND
ASSOCIATION WITH OTHER CONSPIRATORS\***

A conspiracy may continue for a long period of time and may include the performance of many transactions. It is not necessary that all members of the conspiracy join it at the same time, and one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members.

Even though a defendant did not directly conspire with every other defendant or every other conspirator in the overall scheme, that defendant has, in effect, agreed to participate in the conspiracy if the government proves each of the following beyond a reasonable doubt:

First, that a defendant directly conspired with one or more conspirators to carry out at least one of the illegal objects of the conspiracy by specifically intending to promote, or facilitate the promotion of, prostitution offenses committed by a particular business enterprise upon which you all agree;

Second, that a defendant knew or had reason to know that other conspirators were involved with those with whom the defendant directly conspired; and

Third, that a defendant had reason to believe that whatever benefits he or she might get from the conspiracy were probably dependent upon the success of the entire enterprise.

It is not a defense that a person's participation in a conspiracy was minor or for a short period of time.

[This instruction should track the elements and definition of "prostitution" that the government provided to the grand jury at the time this indictment was returned. *See* Doc. No. 1171.]

**Supporting Authorities**

Model Crim. Jury Instr. 9th Cir. 8.23 (2021).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES' OBJECTIONS**

The parties' proposed 8.23 Instructions are identical except for the first element. Defendants add language that is unnecessary.  The elements of the Travel Act are instructed on below and this additional language adds nothing but wordiness to the overall instructions. Also, the request that the instructions track the definition of "prostitution" that was given to the grand jury is wholly unnecessary.  This is so because (a) how the grand jurors were instructed, if at all, is of no moment when determining the appropriate jury instructions for a petit jury, and (b) the particular state statutes defining "prostitution offenses" need not be part of this conspiracy instruction.

### UNITED STATES' PROPOSED 8.144 TRAVEL ACT—INTERSTATE OR FOREIGN TRAVEL IN AID OF RACKETEERING ENTERPRISE (18 U.S.C. § 1952(a)(3))*

The defendants are charged in Counts 2-51 of the indictment with violating Section 1952(a)(3) of Title 18 of the United States Code, a statute also referred to as "the Travel Act." In order for the defendants to be found guilty of Counts 2-51, the United States must prove, for each count, the following elements beyond a reasonable doubt:

First, the defendant used any facility in interstate commerce with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any business enterprise involving prostitution offenses in violation of the laws of the State in which they are committed (as specified below) or of the United States, and

Second, after doing so the defendant performed or attempted to perform an act that did promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any business enterprise involving prostitution offenses, specifically, by publishing on Backpage.com the ads listed in Counts 2-51 of the indictment.

Counts 2, 4, 27, 29-30, 33, 35, 37, 40 and 43 concern prostitution offenses in violation of the laws of the State of Massachusetts. A prostitution offense in violation of Massachusetts General Laws Ch. 272 § 53A(a) occurs when:

(1) A person engaged, agreed to engage, or offered to engage, in sexual conduct with another person; and

(2) The sexual conduct was, or was to be, done in return for a fee.

The term "sexual conduct" includes sexual intercourse; anal intercourse; fellatio, or oral sex involving contact between the mouth of one person and the penis of another person; cunnilingus, or oral sex involving contact between the mouth of one person and the female sex organs—the vagina, vulva or labia—of another person; masturbation of another person; or any intrusion of a part of one person's body or some other object into the genital or anal

opening of another person's body.

Counts 3, 6-11, 18, 25-26, and 28 concern prostitution offenses in violation of the laws of the State of Washington.  A prostitution offense in violation of Revised Code of Washington § 9A.88.030 occurs when:

    (1) A person engaged, agreed to engage, or offered to engage in sexual conduct with another person; and

    (2) The sexual conduct, agreement, or offer was in return for a fee.

"Sexual conduct" means sexual contact or sexual intercourse.  "Sexual contact" means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party.  "Sexual intercourse" means that the sexual organ of the male entered and penetrated the sexual organ of the female and occurs upon any penetration, however slight, or any penetration of the vagina or anus however slight, by an object, when committed on one person by another, whether such persons are of the same or opposite sex, or any act of sexual contact between persons involving the sex organs of one person and the mouth or anus of another whether such persons are of the same or opposite sex.

Counts 14-15, 21-22, and 31 concern prostitution offenses in violation of the laws of the State of Arizona. A prostitution offense in violation of Arizona Revised Statute § 13-3214 occurs when:

A person knowingly engaged, agreed, or offered to engage in sexual conduct with another person under a fee arrangement with any person for money or any other valuable consideration.

"Sexual conduct" means sexual contact, sexual intercourse, oral sexual contact, or sadomasochistic abuse.

"Sexual contact" means any direct or indirect fondling or manipulating of any part of the genitals, anus or female breast.

- 91 -

"Sexual intercourse" means penetration into the penis, vulva or anus by any part of the body or by an object.

"Oral sexual contact" means oral contact with the penis, vulva or anus.

"Sadomasochistic abuse" means flagellation or torture by or on a person who is nude or clad in undergarments or in revealing or bizarre costume or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed.

Counts 12-13, 23, and 34 concern prostitution offenses in violation of the laws of the State of California.  A prostitution offense in violation of California Penal Code § 647(b)(1) occurs when:

An individual solicits, or agrees to engage in, or engages in, any act of prostitution with the intent to receive compensation, money, or anything of value from another person.

An act of prostitution occurs when a person has sexual intercourse or does a lewd act with someone else in exchange for money or other compensation.  A lewd act means touching the genitals, buttocks, or female breast of either the prostitute or customer with some part of the other person's body for the purpose of sexual arousal or gratification.

Counts 45-47 and 51 concern prostitution offenses in violation of the laws of the State of New York.  A prostitution offense in violation of New York Penal Law Article 230.00 occurs when:

A person engaged, agreed, or offered to engage, in sexual conduct with another person for a fee.

Counts 19-20 and 50 concern prostitution offenses in violation of the laws of the State of Texas.  A prostitution offense in violation of Texas Penal Code § 43.02(a)-(b) occurs when:

A person knowingly offered or agreed to pay or receive a fee from another to engage in sexual conduct.

"Sexual conduct" includes deviate sexual intercourse, sexual contact, and sexual intercourse.

"Sexual intercourse" means any penetration of the female sex organ by the male sex organ.

"Sexual contact" means any touching of the anus, breast, or any part of the genitals of another person with intent to arouse or gratify the sexual desire of any person.

"Fee" means the payment or offer of payment in the form of money, goods, services, or other benefits.

"Deviate sexual intercourse" means any contact between the genitals of one person and the mouth or anus of another person.

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.  A person acts knowingly or with knowledge with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Counts 16-17 concern prostitution offenses in violation of the laws of the State of Colorado.  A prostitution offense in violation of Colorado Revised Statutes § 18-7-201 occurs when:

A person performed, offered, or agreed to perform, any act of sexual intercourse, fellatio, cunnilingus, masturbation, or anal intercourse, with any person who was not his or her spouse, in exchange for money or other thing of value.

A prostitution offense in violation of Colorado Revised Statutes § 18-7-202 occurs when:

A person solicited another for the purpose of prostitution.

Colorado law provides the following definitions:

"Anal intercourse" means contact between human beings of the genital organs of one and the anus of another.

"Fellatio" means any act of oral stimulation of the penis.

"Cunnilingus" means any act of oral stimulation of the vulva or clitoris.

"Masturbation" means stimulation of the genital organs by manual or other bodily contact exclusive of sexual intercourse.

"Thing of value" includes real property, tangible and intangible personal property, contract rights, choses in action, services, confidential information, medical records information, and any rights of use or enjoyment connected therewith.

Counts 38 and 42 concern prostitution offenses in violation of the laws of the State of Ohio.  A prostitution offense in violation of Ohio Revised Code § 2907.25 occurs when:

The defendant engaged in sexual activity for hire.

A prostitution offense violation of Ohio Revised Code § 2907.231 occurs when:

The defendant recklessly induces, entices, or procures another to engage in sexual activity for hire in exchange for the person giving anything of value to the other person.

Ohio law provides the following definitions:

"Sexual activity" means sexual conduct or sexual contact, or both.

"Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another.  Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

"Sexual contact" means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.

"For hire" means for pay or compensation.

"Sexual activity for hire" means an implicit or explicit agreement to provide sexual activity in exchange for anything of value paid to the person engaging in such sexual activity, to any person trafficking that person, or to any person associated with either such person.

Counts 36 and 49 concern prostitution offenses in violation of the laws of the State of Nevada.   A prostitution offense in violation of Nevada Revised Statutes § 201.354 occurs when:

A person engaged in prostitution or solicitation therefor, except in a licensed house of prostitution.

"Prostitution" means engaging in sexual conduct with another person in return for a fee, monetary consideration or other thing of value.

"Sexual conduct" means sexual intercourse, oral-genital contact or any touching of the sexual organs or other intimate parts of a person for the purpose of arousing or gratifying the sexual desire of either person.

Counts 24 and 44 concern prostitution offenses in violation of the laws of the State of Michigan.   A prostitution offense in violation of Michigan Penal Code § 750.449a occurs when:

A person engaged or offered to engage the services of another person, not his or her spouse, for the purpose of prostitution, lewdness, or assignation, by the payment in money or other forms of consideration.

Count 32 concern prostitution offenses in violation of the laws of the State of Louisiana.  A prostitution offense in violation of Louisiana Revised Statutes §14:82 occurs when:

A person engaged in indiscriminate sexual intercourse for compensation, or solicited another with the intent to engage in indiscriminate sexual intercourse for compensation.

"Sexual intercourse" means anal, oral, or vaginal sexual intercourse.

Count 48 concern prostitution offenses in violation of the laws of the State of Florida. A prostitution offense in violation of Florida Statutes § 796.07 occurs when:

1    A person offered to commit, committed, or engaged in prostitution, lewdness, or

2    assignation.

3        -OR-

4    A person solicited, induced, enticed, or procured another to commit prostitution,

5    lewdness, or assignation.

6    "Prostitution" is the giving or receiving of the body for sexual activity for hire but

7    excludes sexual activity between spouses.

8    "Lewdness" is any indecent or obscene act. "Indecent" means wicked, lustful,

9    unchaste, licentious, or sensual intention on the part of the person doing the act.

10    "Sexual activity" means oral, anal, or vaginal penetration by, or union with, the sexual

11    organ of another; anal or vaginal penetration of another by any other object; or the handling

12    or fondling of the sexual organ of another for the purpose of masturbation; however, the term

13    does not include acts done for bona fide medical purposes.

14    "Assignation" includes the making of any appointment or engagement for prostitution

15    or lewdness or any act in furtherance of such appointment or engagement.

16    To "solicit" means to command, encourage, hire, or request another person to engage

17    in specific conduct.

18    To "procure" means to persuade, induce, prevail upon or cause a person to do

19    something.

20

21    Count 39 concern prostitution offenses in violation of the laws of the State of

22    Alabama.  A prostitution offense in violation of Alabama Criminal Code § 13A-12-121

23    occurs under any of the following:

24    (1)    A person committed an act of prostitution.  Prostitution is defined as the

25    commission by a person of any natural or unnatural sexual act, sodomy, or sexual contact for

26    monetary consideration or other thing of value.

27    (2)    A person solicited, compelled, or coerced any person to have sexual

28    intercourse or participate in any natural or unnatural sexual act, deviant sexual intercourse,

or sexual contact for monetary consideration or other thing of marketable value.

(3)     A person agreed to engage in sexual intercourse, deviant sexual intercourse, or sexual contact with another or participate in the act for monetary consideration or other thing of marketable value and give or accept monetary consideration or other thing of value in furtherance of the agreement.

(4)     A person knowingly did any of the following:

        a)  Caused or aided a person to commit or engage in prostitution.

        b)  Procured or solicited patrons for prostitution.

        c)  Provided persons or premises for prostitution purposes.

        d)  Received or accepted money or other thing of value pursuant to a prior agreement with any person whereby he or she participated or is to participate in the proceeds of any prostitution activity.

        e)  Operated or assisted in the operation of a house of prostitution or a prostitution enterprise.

Count 41 concern prostitution offenses in violation of the laws of the State of Arkansas.  A prostitution offense in violation of Arkansas Code § 5-70-102 occurs when:

A person engaged in, agreed, or offered to engage in sexual activity with any other person in return for or in expectation of a fee.

"Sexual activity" means sexual intercourse, deviate sexual activity, or sexual contact.

"Sexual intercourse" means penetration, however slight, of the labia majora by a penis.

"Deviate sexual activity" means any act of sexual gratification involving: (A) the penetration, however slight, of the anus or mouth of a person by the penis of another person; or (B) the penetration, however slight, of the labia majora or anus of a person by any body member or foreign instrument manipulated by another person.

"Sexual contact" means any act of sexual gratification involving the touching, directly or through clothing, of the sex organs, buttocks, or anus of a person or the breast of a female.

1

2     <u>Count 5</u> concern prostitution offenses in violation of the laws of the State of Maine.

3 A prostitution offense in violation of Maine Revised Statutes 17-A §§ 853-A & 851 occurs

4 when:

5     A person engages in, or agrees to engage in, or offers to engage in a sexual act or

6 sexual contact in return for a pecuniary benefit to be received by the person engaging in

7 prostitution or a 3rd person.

8     "Sexual act" means: (1) Any act between 2 persons involving direct physical contact

9 between the genitals of one and the mouth or anus of the other, or direct physical contact

10 between the genitals of one and the genitals of the other; (2) Any act between a person and

11 an animal being used by another person which act involves direct physical contact between

12 the genitals of one and the mouth or anus of the other, or direct physical contact between

13 the genitals of one and the genitals of the other; or (3) Any act involving direct physical

14 contact between the genitals or anus of one and an instrument or device manipulated by

15 another person when that act is done for the purpose of arousing or gratifying sexual desire

16 or for the purpose of causing bodily injury or offensive physical contact.

17     "Sexual contact" means any touching of the genitals or anus, directly or through

18 clothing, other than as would constitute a sexual act, for the purpose of arousing or

19 gratifying sexual desire or for the purpose of causing bodily injury or offensive physical

20 contact.

21

22                         **Supporting Authorities**

23     Massachusetts General Laws Ch. 272 § 53A(a); Massachusetts Criminal Model

24 Jury Instruction 7.480—Sexual Conduct for a Fee.

25     Revised Code of Washington § 9A.88.030; Washington Pattern Jury Instructions—

26 Criminal § 48.02 Prostitution-Elements; § 48.12 Sexual Conduct—Definition (April 2021

27 update).

28     Arizona Revised Statute §§ 13-3211; 13-3214; Revised Arizona Jury Instructions

(Criminal) §§ 32.11; 32.14.

California Penal Code § 647(b)(1); Judicial Council of California Criminal Jury Instructions (2020 Edition) CALCRIM §§ 1153-55.

New York Penal Law Article 230.00; New York Criminal Jury Instructions and Model Colloquies for Article 230 Prostitution Offenses (there is no statutory definition of the term "sexual conduct" that is expressly applicable to the statutes contained in Penal Law article 230; *See Prus v. Holder*, 660 F.3d 144 (2d Cir. 2011) ("Although 'sexual conduct' is not defined in Article 230, the plain language of the statute makes clear that prostitution in New York encompasses accepting payment for sexual acts beyond . . . "'sexual intercourse'").

Texas Penal Code § 43.02(a)-(b); Texas Criminal Jury Charges § 10:390.10.

Colorado Revised Statutes, §§ 18-7-201 and 18-7-202; Colorado Jury Instructions Criminal 2018, §§ 7-2:01 Prostitution and 7-2:03 Soliciting Another for Prostitution; Instruction F:16 (defining "anal intercourse"); F:81 (defining "cunnilingus"); F:147 (defining "fellatio"); F:217 (defining "masturbation"); F:371 (defining "thing of value"); (the term "sexual intercourse" is not defined in section 18-7-201).

Ohio Revised Code §§ 2907.01, 2907.25, 2907.231; 2 Ohio Jury Instructions Criminal § 507.25.

Nevada Revised Statutes §§ 201.354, 201.295.

Michigan Penal Code § 750.449a.

Louisiana Revised Statutes §14:82.

Florida Statutes § 796.07; 1 FL Standard Jury Instructions in Criminal Cases 23.5 and 23.6.

Alabama Criminal Code §§ 13A-12-120, 13A-12-121.

Arkansas Code §§ 5-70-102, 5-70-101, 5-14-101.

Maine Revised Statutes 17-A §§ 853-A, 851, 251.

**DEFENDANTS' PROPOSED**

**8.144 TRAVEL ACT—INTERSTATE OR FOREIGN TRAVEL**

**IN AID OF RACKETEERING ENTERPRISE**

**(18 U.S.C. § 1952(a)(3))**

**(Counts 2-51 – Travel Act)**

Each defendant is charged in Counts 2-51 of the indictment with violating Section 1952(a)(3) of Title 18 of the United States Code.  In order for a defendant to be found guilty of those charges, the government must prove each of the following elements beyond a reasonable doubt for that defendant as to each charge:

First, that defendant used the mail or any facility in interstate commerce with the specific intent to promote, or facilitate the promotion of, the prostitution offenses committed by a particular business enterprise in violation of the laws of the State in which they were committed, as alleged in each Count; and

Second, after doing so, that defendant performed an act to promote, or facilitate the promotion of, the prostitution offenses committed by a particular business enterprise associated with that particular ad specified in each Count.

The elements of the Travel Act are not satisfied if a defendant merely did an act that promoted, or facilitated the promotion of, prostitution offenses committed by a particular business enterprise.  The elements of the Travel Act are only established if the government proves beyond a reasonable doubt that a defendant knowingly and willfully intended his or her act to facilitate the prostitution offenses committed by a particular business enterprise associated with that ad.

The government cannot meet its burden to prove that a defendant had the specific intent to participate in and further the prostitution offenses committed by a particular business enterprise associated with the ad by proving:

- the defendant had after-the-fact knowledge that some people who advertised on Backpage.com engaged in prostitution offenses or that some or even many past ads on Backpage.com related to unlawful activity;

- the defendant knew Backpage.com might facilitate prostitution in the abstract;
- the defendant was indifferent to the actions of the purchasers of classified ads on Backpage.com; or
- the defendant knew that a particular advertiser might, at times, engage in prostitution offenses.

Rather, to satisfy the specific intent requirements of the Travel Act, the government must prove beyond a reasonable doubt, for each Count, that each defendant in some significant manner associated himself or herself with a particular business enterprise associated with the ad charged in that Count with the intent to promote, or facilitate the promotion of, the prostitution offenses committed by that business enterprise.

The existence of a "business enterprise" is an element of this crime and, unless the government has proven to you beyond a reasonable doubt the existence of a "business enterprise" as to each count, you must return a verdict of not guilty. A defendant cannot intend to promote or facilitate a business enterprise he or she does not know exists. The government also must prove beyond a reasonable doubt that the act each defendant performed in furtherance of the business enterprise was done with the specific intent to facilitate each element of the underlying state crime.

**First Amendment Application**

In addition to the requirements of the Travel Act, under the First Amendment, the jury cannot find a defendant guilty of a crime based on the publication of a presumptively protected third-party classified ad, unless the government proves beyond a reasonable doubt that:

(i)     the defendant had actual knowledge of the particular ad, *and*

(ii)    the defendant had actual knowledge that the particular ad related to unlawful activity, *and*

1      (iii)     the defendant personally took an action causing the particular ad to be

2                  published on, or to continue to be published on, Backpage.com with the aim of

3                  furthering the illegal activity.

4        It is not enough for the government to show that a defendant knew that some adult

5 ads might lead to others committing crimes.  If this is all the government demonstrates,

6 you must find the defendant not guilty.  In order to find the defendant guilty, the

7 government must prove beyond a reasonable doubt that a defendant specifically intended

8 that the prostitution offenses of a particular business enterprises be committed.  Specific

9 intent is defined in the following instruction.

10

11

12 [This instruction should track the elements and definition of "prostitution" that the

13 government provided to the grand jury at the time this indictment was returned.  *See* Doc.

14 No. 1171.]

15

16                                      **Supporting Authorities**

17         Model Crim. Jury Instr. 9th Cir. 8.144 (2021) (modified to reflect the charges in the

18 indictment); *Woodhull Freedom Foundation v. United States*, 334 F. Supp. 3d 185, 199-

19 201 (D.D.C. 2018), rev'd. 948 F.3d 363 (D.C. Cir. 2020) (where the United States took the

20 position that for prosecutions under the Travel Act, the government must prove "not simply

21 that the defendant was aware of a potential result of the criminal offense, but instead that

22 the defendant intended to 'explicitly further[]' a specified unlawful act.").

23         *See Backpage.com v. Dart*, 807 F.3d 229, 234 (7th Cir. 2015) ("'[A]n intermediary

24 . . . normally is indifferent to the content of what it transmits.  Even entities that know the

25 information's content do not become liable for the sponsor's deeds.  Does a newspaper that

26 carries an advertisement for 'escort services' or 'massage parlors' aid and abet the crime

27 of prostitution, if it turns out that some (or many) of the advertisers make money from that

28 activity?' *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003) . . . Backpage is an

intermediary between the advertisers of adult services and visitors to Backpage's website."); *In re Aimster Copyright Litig.*, 334 F.3d 643, 651 (7th Cir. 2003) ("A retailer of slinky dresses is not guilty of aiding and abetting prostitution even if he knows that some of his customers are prostitutes….").

*United States v Gibson Specialty Co.*, 507 F.2d 446, 450 fn. 8 (9th Cir. 1974) ("The presumption that one intends the natural and probable consequences of his actions is insufficient in this context to establish intent to facilitate criminal activity.  It is as likely as not that a vendor similar to the defendants in this proceeding is totally indifferent to the actions of his purchaser.")

*See United States v. Rundo*, 990 F.3d 709, 719-720 (9th Cir. 2021) ("'the intent to engage in one of the prohibited acts is a personal prerequisite to punishment under [the Anti-Riot Act] . . . Simply put, knowing that some might choose to become violent is not at all the same as intending that they do so.").

*Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1281 (W.D. Wash. 2012) ("The third-party publication of offers to engage in illegal transactions does not fall within 'well-defined and narrowly limited classes of speech' that fall outside of First Amendment protection.") (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)).

*See United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Doc. No. 946 at 13 (Order denying motion to dismiss) ("[Defendants] were not indicted for facilitating the amorphous notion of 'prostitution.' They were indicted for facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-related businesses, or other groups were involved in the business of prostitution."); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Transcript of December 4, 2020 Hearing ("And I think one of the key things in my reason for denying the recusal is that this case is not about Backpage. Backpage was prosecuted in a separate case, entered a plea in a separate case. This case is about these individual defendants and whether they had specific knowledge of these ads as facilitating illegal activity.").

*United States v. Jones*, 909 F.2d 533, 539 (D.C.Cir.1990) (a proper Travel Act jury

instruction "would inform the jury that the defendant must have performed or attempted to perform an act in furtherance of the business, with the intent that each element of the underlying state crime be completed"); *Deptula v. Attorney General of U.S.*, 642 Fed. Appx. 184 (3rd Cir. 2016) ("to obtain a Travel Act conviction, the government must prove . . . that the defendant had the specific intent to facilitate each element of the relevant offense."); *United States v. Bertman*, 686 F.2d 772, 774 (9th Cir. 1982) ("When the unlawful activity charged in the indictment is the violation of state law, the commission of or the intent to commit such a violation is an element of the federal offense.").

## UNITED STATES' OBJECTIONS

The Court should give the Travel Act instructions proposed by the United States instead of this proposed instruction by Defendants.  First, the United States' instruction tracks the Model Jury Instruction.  Defendants' proposed instruction provides a host of extraneous material.  Defendants' "First Amendment Application" is—as discussed by the United States in Part IV *infra*—contrary to law and the facts in this case.  All of the instruction following the second element, which is where the Model Instruction ends, is unnecessary and represents Defendants' legal arguments that are unsupported by law, as this Court has recognized in previous Orders.  (*See* Doc. 793 at 15 ("Defendants argue the First Amendment requires the Government or prove that each Defendant was aware of each ad that make up the fifty Travel Act counts and knew that each ad proposed illegal transactions.  The Court is not persuaded that the First Amendment demands such a standard."); Doc. 946 at 13-14 ("[T]he allegations certainly describe a course of conduct where Defendants facilitated 'unlawful activity,' including numerous pimps, prostitutes and traffickers in violation of the Travel Act.  They also certainly describe how these various groups continuously engaged in prostitution, which plausibly fits within the definition of a 'business enterprise.'").)

Defendants also rely on *United States v. Bertman*, for the proposition that Defendants needed the intent to violate the state prostitution offense before being found

guilty.  That's not accurate.  *Bertman* involved a claim under 18 U.S.C. § 1952(b)(2) that the defendant violated the Travel Act by bribing a public official in Hawaii in direct violation of the Hawaii Penal Code.  686 F.2d at 773-74.  The Ninth Circuit held that "[w]hen the unlawful activity charged in the indictment *is* the violation of state law, the commission of or the intent to commit such a violation is an element of the federal offense," the government "must prove . . . that the defendant has or could have violated the underlying state law, and the defendant may assert any relevant substantive state law defense."  *Id*. at 774 (emphasis added).  Here, the unlawful activity at issue is not Defendants' direct *violation* of a state "extortion, bribery, or arson" statute under 18 U.S.C. § 1952(b)(2) (as in *Bertman*), but rather Defendants' *promotion* or *facilitation* of unlawful activity under 18 U.S.C. § 1952(a)(3) and (b)(1).  (*See, e.g*., SI¶¶9-11, 34.)   In these circumstances, it would make no sense to require that the United States prove Defendants did or could have directly committed the underlying state law offenses.  "Promotion" or "facilitation," not commission, is all that is required.  *See* 18 U.S.C. § 1952(a)(3).

Defendants' contrary reading would render superfluous the terms "promote" and "facilitate" in 18 U.S.C. § 1952(a)(3)—"a result we typically try to avoid."  *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 941 (2017).  *See also Williams v. Taylor,* 529 U.S. 362, 404 (2000) ("[W]e must give effect, if possible, to every clause and word of a statute.").  For that very reason, the Ninth Circuit has recognized that the Travel Act does not require proof that defendants intended to violate state law themselves; proof that defendants intended to *promote* or *facilitate* violation of state law suffices.  *Polizzi*, 500 F.2d at 876-77 ("[T]o the extent that [a Sixth Circuit case] requires proof that an accused under § 1952 intended to violate state law himself, we find that it conflicts with the clear meaning of the language used in § 1952.").  These include cases decided post-*Bertman*.  *United States v. Winslow*, 962 F.2d 845, 852 (9th Cir. 1992) ("Section 1952(a)(3) requires the government to prove only that a defendant committed 'a subsequent overt act in furtherance of the unlawful activity.'"); *United States v. Stafford*, 831 F.2d 1479, 1482 (9th Cir. 1987) ("The Travel Act does not require the commission of the predicate offense; rather, only an 'attempt to

promote' the unlawful activity . . . with a 'subsequent overt act in furtherance of that unlawful activity.'"); *see also United States v. Jones*, 642 F.2d 909, 913 (5th Cir. 1981) (subsequent facilitating act required by Travel Act need only make the unlawful activity easier and need not itself be unlawful).  This Court's prior Orders discussing the adequacy of the SI are to the same effect.  (*See* Doc. 793, Order at 15 (quoting *Polizzi* and describing *mens rea* required by Travel Act); *see also* Doc. 840, Order at 10-12 (discussing elements of Travel Act); Doc. 946, Order at 7-8, 11, 14-16 (same).)

    The Court should instruct the jury based on the United States' proposed jury instructions describing Counts 2-51.

**UNITED STATES' PROPOSED 8.25 CONSPIRACY—LIABILITY FOR TRAVEL ACT VIOLATIONS COMMITTED BY CO-CONSPIRATOR (*PINKERTON* CHARGE)***

Each member of the conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy. If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.

Therefore, you may find the defendant guilty of committing a Travel Act crime as charged in Counts 2-51 of the indictment if the United States has proved each of the following elements beyond a reasonable doubt:

First, a member of the conspiracy committed the Travel Act offense alleged in that count;

Second, the person was a member of the conspiracy charged in Count 1 of the indictment;

Third, the person committed the Travel Act offense in furtherance of the conspiracy;

Fourth, the defendant was a member of the same conspiracy at the time the offenses charged in Counts 2-51 were committed; and

Fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

**DEFENDANTS' PROPOSED INSTRUCTION**

**8.25 CONSPIRACY—LIABILITY FOR TRAVEL ACT VIOLATIONS**

**COMMITTED BY CO-CONSPIRATOR (*PINKERTON* CHARGE)**

**(Co-Conspirator Liability)**

Each member of a conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy.  If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.

Therefore, you may find a defendant guilty of a violation of the Travel Act under Section 1952(a)(3)(A) of Title 18 of the United States Code as charged in Counts 2-51 of the indictment if the government has proved each of the following elements beyond a reasonable doubt:

First, a person named in Count 1 of the indictment committed the crime of violating the Travel Act by promoting, or facilitating the promotion of, prostitution offenses committed by a particular business enterprise in violation of the laws of the State in which they are committed;

Second, the person named in Count 1 was a member of the conspiracy as charged in Count 1 of the indictment;

Third, the person named in Count 1 committed the crime of promoting, or facilitating the promotion of, prostitution offenses committed by a business enterprise in furtherance of the conspiracy;

Fourth, the defendant was a member of the same conspiracy at the time the offenses charged in Counts 2-51 were committed;

Fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

To prove a conspiracy, the government must prove beyond a reasonable doubt the requisite intent to commit the substantive crime, here the promotion, or the facilitation of

the promotion, of prostitution offenses committed by a particular business enterprise in violation of the laws of the State in which they are committed. The elements of the Travel Act are not satisfied if a defendant merely did an act that promoted, or facilitated the promotion of, the prostitution offenses committed by a particular business enterprise. The elements of the Travel Act are only established if the government proves beyond a reasonable doubt that a defendant knowingly and willfully intended his or her act to facilitate the prostitution offenses committed by a particular business enterprise associated with that ad.

The government cannot meet its burden to prove that a defendant had the specific intent to participate in and further the prostitution offenses committed by a particular business enterprise associated with the ad by proving:

- the defendant had after-the-fact knowledge that some people who advertised on Backpage.com engaged in prostitution offenses or that some or even many past ads on Backpage.com related to unlawful activity;
- the defendant knew Backpage.com might facilitate prostitution in the abstract;
- the defendant was indifferent to the actions of the purchasers of classified ads on Backpage.com; or
- the defendant knew that a particular advertiser might, at times, engage in prostitution offenses.

Rather, to satisfy the specific intent requirements of the Travel Act, the government must prove beyond a reasonable doubt, for each Count, that each defendant in some significant manner associated himself or herself with a particular business enterprise associated with the ad charged in that Count with the intent to promote, or facilitate the promotion of, the prostitution offenses committed by that business enterprise. As such, to find a defendant guilty of conspiring to violate the Travel Act, you must find that the government proved beyond a reasonable doubt that the defendant joined a conspiracy with the specific intent to associate himself or herself with a business enterprise for the purpose of advancing the

prostitution offenses committed by that business enterprise.

The existence of a "business enterprise" is an element of this crime and, unless the government has proven to you beyond a reasonable doubt the existence of a "business enterprise" as to each count, you must return a verdict of not guilty.  A defendant cannot intend to promote or facilitate a business enterprise he or she does not know exists.   The government also must prove beyond a reasonable doubt that the act each defendant performed in furtherance of the business enterprise was done with the specific intent to facilitate each element of the underlying state crime.

[This instruction should track the elements and definition of "prostitution" that the government provided to the grand jury at the time this indictment was returned.  *See* Doc. No. 1171.]

**Supporting Authorities**

Model Crim. Jury Instr. 9th Cir. 8.25 (2021) (modified to reflect the charges in the indictment).

To prove a conspiracy charge, the government must prove the "requisite intent for the substantive crime."  *United States v. Kaplan*, 836 F.3d 1199, 1212 (9th Cir. 2016).  A violation of the Travel Act is a specific intent crime.  In *Woodhull Freedom Foundation v. United States*, the government argued that for prosecutions under the Travel Act, the prosecutor must prove beyond a reasonable doubt "not simply that the defendant was aware of a potential result of the criminal offense, but instead that the defendant intended to 'explicitly further[]' a specified unlawful act."   334 F. Supp. 3d 185, 199-201 (D.D.C. 2018), rev'd. 948 F.3d 363 (D.C. Cir. 2020).  The court agreed with the government and held that the law applies only to "specific unlawful acts with respect to a particular individual, not the broad subject-matter of prostitution."  *Id*.  Most recently, in defending the district court decision in that case, DOJ repeated its position that in a prosecution under the Travel Act, the government must allege that the Defendant acted to intentionally

promote or facilitate a "specific, unlawful instance of prostitution."  Brief for the United States in *Woodhull Freedom Found. v. United States*, No. 18-5298 (D.C. Cir. Apr. 15, 2019) (Doc. No. 1782997) at 21-22.

See also *Backpage.com v. Dart*, 807 F.3d 229, 234 (7th Cir. 2015) ("'[A]n intermediary . . . normally is indifferent to the content of what it transmits.  Even entities that know the information's content do not become liable for the sponsor's deeds.  Does a newspaper that carries an advertisement for 'escort services' or 'massage parlors' aid and abet the crime of prostitution, if it turns out that some (or many) of the advertisers make money from that activity?' *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003) . . . Backpage is an intermediary between the advertisers of adult services and visitors to Backpage's website."); *In re Aimster Copyright Litig.*, 334 F.3d 643, 651 (7th Cir. 2003) ("A retailer of slinky dresses is not guilty of aiding and abetting prostitution even if he knows that some of his customers are prostitutes….").

*United States v Gibson Specialty Co.*, 507 F.2d 446, 450 fn. 8 (9th Cir. 1974) ("The presumption that one intends the natural and probable consequences of his actions is insufficient in this context to establish intent to facilitate criminal activity.  It is as likely as not that a vendor similar to the defendants in this proceeding is totally indifferent to the actions of his purchaser.").

See *United States v. Rundo*, 990 F.3d 709, 719-720 (9th Cir. 2021) ("'the intent to engage in one of the prohibited acts is a personal prerequisite to punishment under [the Anti-Riot Act] . . . Simply put, knowing that some might choose to become violent is not at all the same as intending that they do so.").

*Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1281 (W.D. Wash. 2012) ("The third-party publication of offers to engage in illegal transactions does not fall within 'well-defined and narrowly limited classes of speech' that fall outside of First Amendment protection.") (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)).

See *United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Doc. No. 946 at 13 (Order denying motion to dismiss) ("[Defendants] were not indicted

for facilitating the amorphous notion of 'prostitution.' They were indicted for facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-related businesses, or other groups were involved in the business of prostitution."); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Transcript of December 4, 2020 Hearing ("And I think one of the key things in my reason for denying the recusal is that this case is not about Backpage. Backpage was prosecuted in a separate case, entered a plea in a separate case. This case is about these individual defendants and whether they had specific knowledge of these ads as facilitating illegal activity.").

*United States v. Jones*, 909 F.2d 533, 539 (D.C.Cir.1990) (a proper Travel Act jury instruction "would inform the jury that the defendant must have performed or attempted to perform an act in furtherance of the business, with the intent that each element of the underlying state crime be completed"); *Deptula v. Attorney General of U.S.*, 642 Fed. Appx. 184 (3rd Cir. 2016) ("to obtain a Travel Act conviction, the government must prove . . . that the defendant had the specific intent to facilitate each element of the relevant offense."); *United States v. Bertman*, 686 F.2d 772, 774 (9th Cir. 1982) ("When the unlawful activity charged in the indictment is the violation of state law, the commission of or the intent to commit such a violation is an element of the federal offense.").

## UNITED STATES' OBJECTIONS

Everything after the fifth element in Defendants' proposed instruction should not be read to the jury for the same reasons the United States articulated in its objection to the Travel Act instruction *infra*.  With that language eliminated, the parties' instructions are similar with one key difference: Defendants' proposed instruction includes the statement "a person named in Count 1" in each of the first three elements.  This instruction is too restrictive and does not appropriately convey *Pinkerton* liability.

For a defendant to be found guilty at trial under a *Pinkerton* theory, the co-conspirator need not be named in the indictment.  *United States v. Carpenter*, 961 F.2d 824, 828 n.3 (9th Cir. 1992) ("As an unindicted co-conspirator, Shahabian's acts and statements in furtherance of the conspiracy may be attributed to Carpenter.") (citing

- 112 -

*Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946)).  Here, the Court has already recognized that *Pinkerton* liability extends to individuals not named in the Superseding Indictment.   (Doc. 793 at 19) (discussing *Pinkerton* and fact that "C.F" was a co-conspirator of Defendants).  *See also United States v. Long*, 301 F.3d 1095, 1103 (9th Cir 2002) ("The *Pinkerton* doctrine is a judicially-created rule that makes a conspirator criminally liable for the substantive offenses committed by a co-conspirator when they are reasonably foreseeable and committed in furtherance of the conspiracy.").   Both the applicable law and facts support the Court instructing the jury using the United States' proposed instruction.

1
2

**UNITED STATES' PROPOSED INSTRUCTION 8.20 MONEY LAUNDERING**

**CONSPIRACY—ELEMENTS***

3   Defendants Lacey, Larkin, Spear, and Brunst are charged in Count 52 of the

4   indictment with conspiring to commit money laundering in violation of Section 1956(h) of

5   Title 18 of the United States Code.  In order for a defendant to be found guilty of that charge,

6   the United States must prove each of the following elements beyond a reasonable doubt:

7   First, beginning in or around 2004, and continuing through April 2018, there was an

8   agreement between two or more persons to commit at least one crime alleged in the money

9   laundering conspiracy, namely Promotional Money Laundering, Concealment Money

10  Laundering, International Promotional Money Laundering, International Concealment

11  Money Laundering, or Transactional Money Laundering; and

12  Second, that the defendant became a member of the conspiracy knowing of at least

13  one of its objects and intending to help accomplish it.

14  A conspiracy is a kind of criminal partnership—an agreement of two or more persons

15  to commit one or more crimes.  The crime of conspiracy is the agreement to do something

16  unlawful; it does not matter whether the crime agreed upon was committed.

17  For a conspiracy to have existed, it is not necessary that the conspirators made a

18  formal agreement or that they agreed on every detail of the conspiracy.  It is not enough,

19  however, that they simply met, discussed matters of common interest, acted in similar ways,

20  or perhaps helped one another.  You must find that there was a plan to commit at least one

21  of the crimes alleged in the indictment as an object of the conspiracy with all of you agreeing

22  as to the particular crime that the conspirators agreed to commit.

23  One becomes a member of a conspiracy by willfully participating in the unlawful plan

24  with the intent to advance or further some object or purpose of the conspiracy, even though

25  the person does not have full knowledge of all the details of the conspiracy.  Furthermore,

26  one who willfully joins an existing conspiracy is as responsible for it as the originators. On

27  the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which

28  furthers some object or purpose of the conspiracy, does not thereby become a conspirator.

1    Similarly, a person does not become a conspirator merely by associating with one or more

2    persons who are conspirators, nor merely by knowing that a conspiracy exists.

**DEFENDANTS' PROPOSED INSTRUCTION**

**8.20 CONSPIRACY—ELEMENTS**

**(Conspiracy to Commit Money Laundering – Elements)**

Defendants Lacey, Larkin, Spear, and Brunst are charged in Count 52 of the indictment with conspiring to commit money laundering in violation of Section 1956(h) of Title 18 of the United States Code.  In order for a Defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt for that Defendant:

First, beginning in or around 2004, and ending on or about April 2018, there was an agreement between two or more persons to commit concealment money laundering in violation of Section 1956(a)(1)(B)(i), international promotional money laundering in violation of Section 1956(a)(2)(A), transactional money laundering in violation of Section 1957(a), and international concealment money laundering in violation of Section 1956(a)(2)(B)(i); and

Second, a Defendant became a member of the conspiracy to commit concealment, international promotional, transactional, and international concealment money laundering knowing of at least one of its illegal objects and with the specific intent to help commit one or more of the substantive money laundering offenses charged (whose elements are listed below); and

Third, one of the members of the conspiracy performed at least one overt act on or after March 28, 2013, for the purpose of carrying out the conspiracy to commit concealment, international promotional, transactional, and international concealment money laundering.

**What Is a Conspiracy, and How Does One Become a Member?**

A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes.  The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a

formal agreement or that they agreed on every detail of the conspiracy.  It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another.  You must find that there was a plan to commit at least one of the crimes alleged in the indictment as an illegal object of the conspiracy with all of you agreeing as to the particular crime – *i.e.*, concealment, international promotional, transactional, international concealment money laundering – which the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some illegal object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators.  On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some illegal object or purpose of the conspiracy, does not thereby become a conspirator.  Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.  To become a co-conspirator a person must have an intention and agreement to accomplish the same, specific criminal objective as his or her co-conspirators.

An overt act does not itself have to be unlawful.  A lawful act may be an element of a conspiracy if it was done for the purpose of carrying out the unlawful conspiracy.  The government is not required to prove that a Defendant personally did one of the overt acts.

Proof of an underlying substantive crime does not, without more, prove the existence of a conspiracy to commit that crime.

**Unanimity Requirements**

For a Defendant to be found guilty of Count 52 (Conspiracy to Commit Money Laundering), you must find beyond a reasonable doubt that there was a plan to commit at least one illegal object of the alleged conspiracy – specifically intending to commit concealment money laundering, international promotion money laundering, transactional money laundering, and international concealment money laundering – with all of you

- 117 -

agreeing beyond a reasonable doubt as to which illegal object – which specific act(s) of concealment money laundering, international promotion money laundering, transactional money laundering, and international concealment money laundering – and all of you agreeing beyond a reasonable doubt that the Defendant knowingly and willfully joined the conspiracy to accomplish such object(s).

**Supporting Authorities**

Ninth Circuit Manual of Model Criminal Jury Instructions 8.20, 8.147, 8.148, 8.150, 8.149 (2021) (modified to reflect criminal objects charged in Count 52); Barry Tarlow, *Defense of a Federal Conspiracy Prosecution,* 4 J.Crim.Defense 183, 201-02 (1978) (explaining that the object of the conspiracy must be unlawful); *United States v. Lennick*, 18 F.3d 814, 819 (9th Cir. 1994) ("Proof of the underlying substantive crime, however, does not, without more, prove the existence of a conspiracy."); *United States v. Lapier*, 796 F.3d 1090 (9th Cir. 2015) (failure to give specific unanimity instruction was plain error because half of jury could have found defendant guilty of joining one conspiracy while other half of jury could have found defendant guilty of joining second conspiracy); *United States v. Pomponio*, 429 U.S. 10, 12 (1976) (willfulness is the "intentional violation of a known legal duty").

*Salinas v. United States*, 522 U.S. 52, 63 (1997) (the government must prove a defendant agreed to pursue the "same criminal objective" as his or her coconspirators); *United States v. Hubbard*, 96 F.3d 1223, 1226 (9th Cir. 1996) ("mere association with members of a conspiracy or knowledge of the conspiracy, 'without an intention and agreement to accomplish a specific illegal objective, is not sufficient to make one a conspirator'"); *United States v. Merino*, 846 F.Appx. 494, 495 (9th Cir. 2021) (same).

**UNITED STATES' OBJECTIONS**

First, an overt act is not part of a money laundering conspiracy. *Whitfield v. United States*, 543 U.S. 209, 210-11 (2005) ("These cases present the question whether conviction for conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), requires

1    proof of an overt act in furtherance of the conspiracy.  We hold that it does not."); *id.* at

2    214 ("Because the text of § 1956(h) does not expressly make the commission of an overt

3    act an element of the conspiracy offense, the Government need not prove an overt act to

4    obtain a conviction.").

5           The remainder of Defendants' proposed instruction is similar to the Model

6    Instruction.  The United States believes the Model Instruction as articulated in its proposed

7    instruction is appropriate.[5]

---

[5] This includes the fact that the United States need only prove that one of the underlying money laundering crimes listed in the instruction was the object of Defendants' conspiracy, rather than all of them.  The United States has properly used the disjunctive "or" while Defendants have improperly used the conjunctive "and."

**UNITED STATES' PROPOSED 8.147 LAUNDERING OR ATTEMPTING TO
LAUNDER MONETARY INSTRUMENTS
(18 U.S.C. § 1956(a)(1)(B))\***

Defendants Lacey, Larkin, Spear, and Brunst are charged in Counts 53-62 of the indictment with Concealment Money Laundering in violation of Section 1956(a)(1)(B)(i) of Title 18 of the United States Code.  In order for a defendant to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt:

First, the defendant conducted a financial transaction involving property that represented the proceeds of promoting, managing, establishing, carrying on, or facilitating the promotion, management, establishment, or carrying on, of any business enterprise involving prostitution offenses;

Second, the defendant knew that the property represented the proceeds of some form of unlawful activity; and

Third, the defendant knew that the transaction was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity.

A financial transaction is a transaction involving the movement of funds by wire or other means that affects interstate or foreign commerce in any way.

The phrase "knew that the property represented the proceeds of some form of unlawful activity" means that the defendant knew that the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony.  I instruct you that violating the Travel Act is a felony.

**DEFENDANTS' PROPOSED INSTRUCTION**

**8.147 LAUNDERING MONETARY INSTRUMENTS**

**(Counts 53-62—Concealment Money Laundering)**

Defendants Lacey, Larkin, Spear, and Brunst are charged in Counts 53-62 of the indictment with Concealment Money Laundering in violation of Section 1956(a)(1)(B)(i) of Title 18 of the United States Code. In order for a defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant conducted a financial transaction involving property that represented the proceeds of the knowing and willful promotion, or facilitation of the promotion of, the prostitution offenses committed by a particular business enterprise in violation of 18 U.S.C. § 1952(a)(3)(A), specifically (i) a business enterprise involved in at least one of the fifty advertisements that is the subject of Counts 2 – 51 and (ii) a business enterprise for which you found that defendant guilty of promoting or facilitating the promotion of;

Second, the defendant knew that the property represented the proceeds of some form of unlawful activity; and

Third, the defendant knew that the transaction was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity.

A financial transaction is a transaction involving the movement of funds by wire or other means that affects interstate or foreign commerce in any way.

The phrase "knew that the property represented the proceeds of some form of unlawful activity" means that the defendant knew that the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony. I instruct you that knowingly and willfully promoting, or facilitating the promotion of, the prostitution offenses committed by any business enterprise in violation of 18 U.S.C. § 1952(a)(3)(A) is a felony.

**Supporting Authorities**

Model Crim. Jury Instr. 9th Cir. 8.147 (2021) (modified to reflect the charges in the indictment). As this Court previously held, the "specified unlawful activity" ("SUA") here is not the general facilitation or promotion of "any business enterprise involving prostitution offenses" in violation of the Travel Act. *See United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Doc. No. 946 at 13 (Order denying motion to dismiss) ("[Defendants] were not indicted for facilitating the amorphous notion of 'prostitution.' They were indicted for facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-related businesses, or other groups were involved in the business of prostitution."); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Transcript of December 4, 2020 Hearing ("And I think one of the key things in my reason for denying the recusal is that this case is not about Backpage. Backpage was prosecuted in a separate case, entered a plea in a separate case. This case is about these individual defendants and whether they had specific knowledge of these ads as facilitating illegal activity."). Therefore, the SUA referenced in each of the proposed jury instructions regarding the Indictment's money laundering charges must reference the "fifty distinct" advertisements at issue in Counts 2 - 51. *Id.*

**UNITED STATES' OBJECTIONS**

The parties' proposed instructions are similar except for the first element. Defendants propose a much more stringent definition of the specified unlawful activity. As this Court has previously recognized, that instruction is contrary to governing law.

> For instance, the first money laundering statute that Defendants are indicted under does not require the Government to allege or prove the underlying offenses. *See* 18 U.S.C. § 1956(c)(1) ("the term 'knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity' means that the person knew the property involved in the transaction represented proceeds from some form, *though not necessarily which form*, of activity that constitutes a felony." (emphasis added)).

(Doc. 946 at 17.)

Contrary to Defendants' proposed instruction, a defendant can be found guilty of

money laundering even if he was found not guilty under any of the Travel Act counts. (Doc. 946 at 17, n.11) ("[A] defendant may be convicted of a money laundering offense even if he did not commit the underlying offense.")

1
2
3

**UNITED STATES' PROPOSED 8.25 CONSPIRACY—LIABILITY FOR CONCEALMENT MONEY LAUNDERING VIOLATIONS COMMITTED BY CO-CONSPIRATOR (*PINKERTON* CHARGE)\***

4   Each member of the conspiracy is responsible for the actions of the other conspirators

5   performed during the course and in furtherance of the conspiracy. If one member of a

6   conspiracy commits a crime in furtherance of a conspiracy, the other members have also,

7   under the law, committed that crime.

8   Therefore, you may find the defendant guilty of Concealment Money Laundering as

9   charged in Counts 53-62 of the indictment if the United States has proved each of the

10   following elements beyond a reasonable doubt:

11   First, a member of the conspiracy committed the crime of concealment money

12   laundering as alleged in that count;

13   Second, the person was a member of the conspiracy charged in Count 52 of the

14   indictment;

15   Third, the person committed the crime of concealment money laundering in

16   furtherance of the conspiracy;

17   Fourth, the defendant was a member of the same conspiracy at the time the offenses

18   charged in Counts 53-62 were committed; and

19   Fifth, the offense fell within the scope of the unlawful agreement and could

20   reasonably have been foreseen to be a necessary or natural consequence of the unlawful

21   agreement.

22
23
24
25
26
27
28

**DEFENDANTS' PROPOSED INSTRUCTION 8.25 CONSPIRACY—LIABILITY FOR CONCEALMENT MONEY LAUNDERING VIOLATIONS COMMITTED BY CO-CONSPIRATOR (*PINKERTON* CHARGE)**

**(Co-Conspirator Liability)**

Each member of a conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy.  If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.

Therefore, you may find a Defendant guilty of a committing concealment money laundering in violation of Section 1956(a)(1)(B) of Title 18 of the United States Code as charged in Counts 53-62 of the indictment if the government has proved each of the following elements beyond a reasonable doubt:

First, a person named in Count 52 of the indictment committed the crime of concealment money laundering as alleged in Counts 53-62;

Second, the person was a member of the conspiracy as charged in Count 52 of the indictment;

Third, the person committed the crime of concealment money laundering in furtherance of the conspiracy;

Fourth, the Defendant was a member of the same conspiracy at the time the offenses charged in Counts 53-62 were committed;

Fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

To prove a conspiracy, the government must prove beyond a reasonable doubt the requisite intent to commit the substantive crime, here concealment money laundering. Concealment money laundering is a specific intent crime.  See the Specific Intent jury instruction.

**Supporting Authorities**

Model Crim. Jury Instr. 9th Cir. 8.25 (2021) (modified to reflect the charges in the indictment).  As this Court previously held, the "specified unlawful activity" ("SUA") here is not the general facilitation or promotion of "any business enterprise involving prostitution offenses" in violation of the Travel Act.  *See United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Doc. No. 946 at 13 (Order denying motion to dismiss) ("[Defendants] were not indicted for facilitating the amorphous notion of 'prostitution.' They were indicted for facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-related businesses, or other groups were involved in the business of prostitution."); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Transcript of December 4, 2020 Hearing ("And I think one of the key things in my reason for denying the recusal is that this case is not about Backpage. Backpage was prosecuted in a separate case, entered a plea in a separate case. This case is about these individual defendants and whether they had specific knowledge of these ads as facilitating illegal activity.").  Therefore, the SUA referenced in each of the proposed jury instructions regarding the Indictment's money laundering charges must reference the "fifty distinct" advertisements at issue in Counts 2 - 51.  *Id.*

To prove a conspiracy charge, the government must prove the "requisite intent for the substantive crime."  *United States v. Kaplan*, 836 F.3d 1199, 1212 (9th Cir. 2016).  Concealment money laundering is a specific intent crime.

**UNITED STATES' OBJECTIONS**

Defendants' proposed instruction, which is largely similar to the United States' proposed instruction, includes the statement "a person named in Count 52" in the first element.  This instruction is too restrictive and does not appropriately convey *Pinkerton* liability.

For a defendant to be found guilty at trial under a *Pinkerton* theory, the co-conspirator need not be named in the indictment.  *United States v. Carpenter*, 961 F.2d 824, 828 n.3 (9th Cir. 1992) ("As an unindicted co-conspirator, Shahabian's acts and

1    statements in furtherance of the conspiracy may be attributed to Carpenter.") (citing

2    *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946)). Here, the Court has already

3    recognized that *Pinkerton* liability extends to individuals not named in the Superseding

4    Indictment. (Doc. 793 at 19) (discussing *Pinkerton* and fact that "C.F" was a co-

5    conspirator of Defendants). *See also United States v. Long*, 301 F.3d 1095, 1103 (9th Cir

6    2002) ("The *Pinkerton* doctrine is a judicially-created rule that makes a conspirator

7    criminally liable for the substantive offenses committed by a co-conspirator when they are

8    reasonably foreseeable and committed in furtherance of the conspiracy."). Both the

9    applicable law and facts support the Court instructing the jury using the United States'

10   proposed instruction.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES' PROPOSED INSTRUCTION 8.148 TRANSPORTING OR**

**ATTEMPTING TO TRANSPORT**

**FUNDS TO PROMOTE UNLAWFUL ACTIVITY**

**(18 U.S.C. § 1956(a)(2)(A))\***

Defendants Lacey, Larkin, Spear, and Brunst are charged in Counts 63-68 of the indictment with transporting funds to promote unlawful activity in violation of Section 1956(a)(2)(A) of Title 18 of the United States Code. In order for a defendant to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt:

First, the defendant transported money from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States; and

Second, the defendant acted with the intent to promote the carrying on of violations of the Travel Act.

**DEFENDANTS' PROPOSED INSTRUCTION**

**8.148 TRANSPORTING FUNDS TO PROMOTE UNLAWFUL ACTIVITY**

**(Counts 63-68—International Promotional Money Laundering)**

Defendants Lacey, Larkin, Spear, and Brunst are charged in Counts 63-68 of the indictment with transporting funds to promote unlawful activity in violation of Section 1956(a)(2)(A) of Title 18 of the United States Code. In order for a defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant transported money from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States; and

Second, the defendant acted with the intent to promote, or facilitate the promotion of, the prostitution offenses committed by a particular business enterprise in violation of 18 U.S.C. § 1952(a)(3)(A), specifically (i) a business enterprise involved in at least one of the fifty advertisements that is the subject of Counts 2 – 51 and (ii) a business enterprise for which you found that defendant guilty of promoting or facilitating the promotion of.

**Supporting Authorities**

Model Crim. Jury Instr. 9th Cir. 8.147 (2021) (modified to reflect the charges in the indictment). As this Court previously held, the "specified unlawful activity" ("SUA") here is not the general facilitation or promotion of "any business enterprise involving prostitution offenses" in violation of the Travel Act. *See United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Doc. No. 946 at 13 (Order denying motion to dismiss) ("[Defendants] were not indicted for facilitating the amorphous notion of 'prostitution.' They were indicted for facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-related businesses, or other groups were involved in the business of prostitution."); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Transcript of December 4, 2020 Hearing ("And I think one of the

key things in my reason for denying the recusal is that this case is not about Backpage. Backpage was prosecuted in a separate case, entered a plea in a separate case. This case is about these individual defendants and whether they had specific knowledge of these ads as facilitating illegal activity.").  Therefore, the SUA referenced in each of the proposed jury instructions regarding the Indictment's money laundering charges must reference the "fifty distinct" advertisements at issue in Counts 2 - 51.  *Id.*

### UNITED STATES' OBJECTIONS

The parties' proposed instructions are similar except for the second element. Defendants propose a much more stringent definition of the specified unlawful activity. As this Court has previously recognized, that instruction is contrary to governing law.

> For instance, the first money laundering statute that Defendants are indicted under does not require the Government to allege or prove the underlying offenses. *See* 18 U.S.C. § 1956(c)(1) ("the term 'knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity' means that the person knew the property involved in the transaction represented proceeds from some form, *though not necessarily which form*, of activity that constitutes a felony." (emphasis added)).

(Doc. 946 at 17.)

Contrary to Defendants' proposed instruction, a defendant can be found guilty of money laundering even if he was found not guilty under any of the Travel Act counts. (Doc. 946 at 17, n.11) ("[A] defendant may be convicted of a money laundering offense even if he did not commit the underlying offense.")

**UNITED STATES' PROPOSED 8.25 CONSPIRACY—LIABILITY FOR INTERNATIONAL PROMOTIONAL MONEY LAUNDERING VIOLATIONS COMMITTED BY CO-CONSPIRATOR (*PINKERTON* CHARGE)\***

Each member of the conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy. If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.

Therefore, you may find the defendant guilty of International Promotional Money Laundering as charged in Counts 63-68 of the indictment if the United States has proved each of the following elements beyond a reasonable doubt:

First, a member of the conspiracy committed the crime of concealment money laundering as alleged in that count;

Second, the person was a member of the conspiracy charged in Count 52 of the indictment;

Third, the person committed the crime of international promotional money laundering in furtherance of the conspiracy;

Fourth, the defendant was a member of the same conspiracy at the time the offenses charged in Counts 63-68 were committed; and

Fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

**DEFENDANTS' PROPOSED INSTRUCTION**

**8.25 CONSPIRACY—LIABILITY FOR INTERNATIONAL PROMOTIONAL**

**MONEY LAUNDERING VIOLATIONS COMMITTED BY CO-CONSPIRATOR**

**(*PINKERTON* CHARGE)**

**(Co-Conspirator Liability)**

Each member of a conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy.  If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.

Therefore, you may find a Defendant guilty of a committing international promotional money laundering in violation of Section 1956(a)(2)(A) of Title 18 of the United States Code as charged in Counts 63-68 of the indictment if the government has proved each of the following elements beyond a reasonable doubt:

First, a person named in Count 52 of the indictment committed the crime of international promotional money laundering as alleged in Counts 63-68;

Second, the person was a member of the conspiracy as charged in Count 52 of the indictment;

Third, the person committed the crime of international promotional money laundering in furtherance of the conspiracy;

Fourth, the Defendant was a member of the same conspiracy at the time the offenses charged in Counts 63-68 were committed;

Fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

To prove a conspiracy, the government must prove beyond a reasonable doubt the requisite intent to commit the substantive crime, here international promotional money laundering.  International promotional money laundering is a specific intent crime.  See the Specific Intent jury instruction.

1

**Supporting Authorities**

2       Model Crim. Jury Instr. 9th Cir. 8.25 (2021) (modified to reflect the charges in the

3   indictment).  As this Court previously held, the "specified unlawful activity" ("SUA") here

4   is not the general facilitation or promotion of "any business enterprise involving

5   prostitution offenses" in violation of the Travel Act.  *See United States v. Lacey, et al.* (D.

6   Ariz.), Case No. 18-CR-00422-PHX-SMB, Doc. No. 946 at 13 (Order denying motion to

7   dismiss) ("[Defendants] were not indicted for facilitating the amorphous notion of

8   'prostitution.' They were indicted for facilitating (via publishing ads) on fifty distinct

9   occasions where prostitutes, prostitution-related businesses, or other groups were involved

10  in the business of prostitution."); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-

11  CR-00422-PHX-SMB, Transcript of December 4, 2020 Hearing ("And I think one of the

12  key things in my reason for denying the recusal is that this case is not about Backpage.

13  Backpage was prosecuted in a separate case, entered a plea in a separate case. This case is

14  about these individual defendants and whether they had specific knowledge of these ads as

15  facilitating illegal activity.").  Therefore, the SUA referenced in each of the proposed jury

16  instructions regarding the Indictment's money laundering charges must reference the "fifty

17  distinct" advertisements at issue in Counts 2 - 51.  *Id.*

18      To prove a conspiracy charge, the government must prove the "requisite intent for

19  the substantive crime."  *United States v. Kaplan*, 836 F.3d 1199, 1212 (9th Cir. 2016).

20  International promotional money laundering is a specific intent crime.

21

**UNITED STATES' OBJECTIONS**

22      Defendants' proposed instruction, which is largely similar to the United States'

23  proposed instruction, includes the statement "a person named in Count 52" in the first

24  element.  This instruction is too restrictive and does not appropriately convey *Pinkerton*

25  liability.

26      For a defendant to be found guilty at trial under a *Pinkerton* theory, the co-

27  conspirator need not be named in the indictment.  *United States v. Carpenter*, 961 F.2d

28  824, 828 n.3 (9th Cir. 1992) ("As an unindicted co-conspirator, Shahabian's acts and

statements in furtherance of the conspiracy may be attributed to Carpenter.") (citing *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946)). Here, the Court has already recognized that *Pinkerton* liability extends to individuals not named in the Superseding Indictment. (Doc. 793 at 19) (discussing *Pinkerton* and fact that "C.F" was a co-conspirator of Defendants). *See also United States v. Long*, 301 F.3d 1095, 1103 (9th Cir 2002) ("The *Pinkerton* doctrine is a judicially-created rule that makes a conspirator criminally liable for the substantive offenses committed by a co-conspirator when they are reasonably foreseeable and committed in furtherance of the conspiracy."). Both the applicable law and facts support the Court instructing the jury using the United States' proposed instruction.

1
2
3

**UNITED STATES' PROPOSED INSTRUCTION 8.150**

**TRANSACTIONAL MONEY LAUNDERING**

**(18 U.S.C. § 1957)\***

4    Defendant Lacey is charged in Counts 69-70, 81, 83-84, 86, 88-92, and 94-99;

5    Defendant Larkin is charged in Counts 80 and 87; Defendant Spear is charged in Counts 71-

6    78, 85, and 93; and Defendant Brunst is charged in Counts 69-70, 78-84, and 86-93, of the

7    indictment with transactional money laundering in violation of Section 1957 of Title 18 of

8    the United States Code.  In order for a defendant to be found guilty of that charge, the United

9    States must prove each of the following elements beyond a reasonable doubt:

10    First, the defendant knowingly engaged or attempted to engage in a monetary

11    transaction;

12    Second, the defendant knew the transaction involved criminally derived property;

13    Third, the property had a value greater than $10,000;

14    Fourth, the property was, in fact, derived from violations of the Travel Act; and

15    Fifth, the transaction occurred in the United States.

16    The term "monetary transaction" means the deposit, withdrawal, transfer, or

17    exchange, in or affecting interstate commerce, of funds or a monetary instrument by,

18    through, or to a financial institution.

19    The term "financial institution" means an insured bank, commercial bank, or credit

20    union.

21    The term "criminally derived property" means any property constituting, or derived

22    from, the proceeds of a criminal offense. The United States must prove that the defendant

23    knew that the property involved in the monetary transaction constituted, or was derived from,

24    proceeds obtained by some criminal offense. The United States does not have to prove that

25    the defendant knew the precise nature of that criminal offense, or knew the property involved

26    in the transaction represented the proceeds of promoting or facilitating the promotion of any

27    business enterprise involving prostitution offenses.

28    Although the United States must prove that, of the property at issue more than $10,000

1 | was criminally derived, the United States does not have to prove that all of the property at
2 | issue was criminally derived.

**DEFENDANTS' PROPOSED INSTRUCTION**

**8.150 MONEY LAUNDERING**

**(Transactional Money Laundering)**

Defendant Lacey is charged in Counts 69-70, 81, 83-84, 86, 88-92, and 94-99; Defendant Larkin is charged in Counts 80 and 87; Defendant Spear is charged in Counts 71-78, 85, and 93; and Defendant Brunst is charged in Counts 69-70, 78-84, and 86-93, of the indictment with money laundering in violation of Section 1957 of Title 18 of the United States Code.  In order for a defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant knowingly engaged or attempted to engage in a monetary transaction;

Second, the defendant knew the specific transaction charged involved specific criminally derived property;

Third, the property had a value greater than $10,000;

Fourth, the property was, in fact, derived from the knowing and willful promotion, or facilitation of the promotion of, the prostitution offenses committed by a particular business enterprise in violation of 18 U.S.C. § 1952(a)(3)(A), specifically (i) a business enterprise involved in at least one of the fifty advertisements that is the subject of Counts 2 – 51 and (ii) a business enterprise for which you found that Defendant guilty of promoting or facilitating the promotion of; and

Fifth, the transaction occurred in the United States.

The term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate commerce, of funds or a monetary instrument by, through, or to a financial institution.

The term "financial institution" means an insured bank, commercial bank, or credit union.

The term "criminally derived property" means any property constituting, or derived from, the proceeds of a criminal offense. The government must prove beyond a reasonable

1    doubt that the defendant knew that the property involved in the monetary transaction

2    constituted, or was derived from, proceeds obtained by some criminal offense.  The statute

3    only encompasses transactions in which a defendant first knowingly obtains "criminally

4    derived property," and *then engages* in a monetary transaction with that property.

5          The government does not have to prove that the defendant knew the precise nature

6    of that criminal offense, or knew the property involved in the transaction represented the

7    proceeds of promoting, or facilitating the promotion of, the prostitution offenses committed

8    by a particular business enterprise in violation of 18 U.S.C. § 1952(a)(3)(A).  But the

9    government must prove beyond a reasonable doubt that the defendant knew the specific

10   transaction charged involved specific criminally derived property—it is not enough that

11   the defendant knew the proceeds derived from advertisements for prostitution offenses.

12         Although the government must prove that more than $10,000 of the property at issue

13   was criminally derived, the government does not have to prove that all of the property at

14   issue was criminally derived.

15                              **Supporting Authorities**

16         Model Crim. Jury Instr. 9th Cir. 8.150 (2021) (modified to reflect the charges in the

17   indictment).  As this Court previously held, the "specified unlawful activity" ("SUA") here

18   is not the general facilitation or promotion of "any business enterprise involving

19   prostitution offenses" in violation of the Travel Act.  *See United States v. Lacey, et al.* (D.

20   Ariz.), Case No. 18-CR-00422-PHX-SMB, Doc. No. 946 at 13 (Order denying motion to

21   dismiss) ("[Defendants] were not indicted for facilitating the amorphous notion of

22   'prostitution.'  They were indicted for facilitating (via publishing ads) on fifty distinct

23   occasions where prostitutes, prostitution-related businesses, or other groups were involved

24   in the business of prostitution."); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-

25   CR-00422-PHX-SMB, Transcript of December 4, 2020 Hearing ("And I think one of the

26   key things in my reason for denying the recusal is that this case is not about Backpage.

27   Backpage was prosecuted in a separate case, entered a plea in a separate case.  This case is

28   about these individual defendants and whether they had specific knowledge of these ads as

1   facilitating illegal activity.").  Therefore, the SUA referenced in each of the proposed jury

2   instructions regarding the Indictment's money laundering charges must reference the "fifty

3   distinct" advertisements at issue in Counts 2 - 51.  *Id.*

4   *See United States v. Piervinanzi*, 23 F.3d 670, 677 (2d Cir. 1994) (government

5   agreeing to vacate conviction and not disputing that "the language of the statute only

6   encompasses transactions in which a defendant first obtains 'criminally derived property,'

7   and then engages in a monetary transaction with that property."); *United States v. Johnson*,

8   971 F.2d 562, 570 (10th Cir. 1992) (reversing conviction, noting that "Section

9   1957 appears to be drafted to proscribe certain transactions in proceeds that have already

10  been obtained by an individual from an underlying criminal offense.").

11  

**UNITED STATES' OBJECTIONS**

12  Defendants proposed fourth element is an incorrect statement of law.  As the Court

13  has already made clear, "In a prosecution for an offense under [18 U.S.C. § 1957], the

14  Government is not required to prove the defendant knew that the offense from which the

15  criminally derived property was derived was specified unlawful activity."  18 U.S.C.

16  § 1957; (*see also* Doc. 946 at 17).

17  Further, Defendants have modified the Model Instruction's definition of "criminally

18  derived property."  Defendants have removed the following sentence from the Model

19  Instruction:  "The government does not have to prove that the defendant knew the precise

20  nature of that criminal offense, or knew the property involved in the transaction represented

21  the proceeds of [specified unlawful activity as alleged in the indictment]."  Manual of

22  Model Criminal Jury Instructions 8.150.  That statement should remain in the instruction

23  given to the jury.

24

25

26

27

28

**UNITED STATES' PROPOSED INSTRUCTION 8.149 TRANSPORTING OR ATTEMPTING TO TRANSPORT MONETARY INSTRUMENTS FOR THE PURPOSE OF LAUNDERING**

**(18 U.S.C. § 1956(a)(2)(B))\***

Defendant Lacey is charged in Count 100 of the indictment with transporting money for the purpose of laundering in violation of Section 1956(a)(2)(B) of Title 18 of the United States Code. In order for the defendant to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt:

First, the defendant transported money from a place in the United States to or through a place outside the United States;

Second, the defendant knew that the money represented the proceeds of Travel Act offenses; and

Third, the defendant knew the transportation was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of Travel Act offenses.

1
2
3
4

## DEFENDANTS' PROPOSED INSTRUCTION
## 8.149 TRANSPORTING MONETARY INSTRUMENTS FOR THE PURPOSES OF LAUNDERING
### (Count 100 – International Concealment Money Laundering)

5      Defendant Lacey is charged in Count 100 of the indictment with transporting money
6  for the purpose of laundering in violation of Section 1956(a)(2)(B) of Title 18 of the United
7  States Code. In order for the defendant to be found guilty of that charge, the government
8  must prove each of the following elements beyond a reasonable doubt:

9      First, the defendant transported money from a place in the United States to or
10 through a place outside the United States;

11      Second, the defendant knew that the money represented the proceeds of the knowing
12 and willful promotion, or facilitation of the promotion of, the prostitution offenses
13 committed by a particular business enterprise in violation of 18 U.S.C. § 1952(a)(3)(A),
14 specifically (i) a business enterprise involved in at least one of the fifty advertisements that
15 is the subject of Counts 2 – 51 and (ii) a business enterprise for which you found that
16 defendant guilty of promoting or facilitating the promotion of; and

17      Third, the defendant knew the transportation was designed in whole or in part to
18 conceal or disguise the nature, location, source, ownership, or control of the proceeds of
19 the knowing and willful promotion, or facilitation of the promotion of, the prostitution
20 offenses committed by any business enterprise in violation of 18 U.S.C. § 1952(a)(3)(A).

### Supporting Authorities

22      Model Crim. Jury Instr. 9th Cir. 8.149 (2021) (modified to reflect the charges in the
23 indictment).  As this Court previously held, the "specified unlawful activity" ("SUA") here
24 is not the general facilitation or promotion of "any business enterprise involving
25 prostitution offenses" in violation of the Travel Act.  *See United States v. Lacey, et al.* (D.
26 Ariz.), Case No. 18-CR-00422-PHX-SMB, Doc. No. 946 at 13 (Order denying motion to
27 dismiss) ("[Defendants] were not indicted for facilitating the amorphous notion of
28 'prostitution.' They were indicted for facilitating (via publishing ads) on fifty distinct

occasions where prostitutes, prostitution-related businesses, or other groups were involved in the business of prostitution."); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Transcript of December 4, 2020 Hearing ("And I think one of the key things in my reason for denying the recusal is that this case is not about Backpage. Backpage was prosecuted in a separate case, entered a plea in a separate case. This case is about these individual defendants and whether they had specific knowledge of these ads as facilitating illegal activity.").  Therefore, the SUA referenced in each of the proposed jury instructions regarding the Indictment's money laundering charges must reference the "fifty distinct" advertisements at issue in Counts 2 - 51.  *Id*.

## UNITED STATES' OBJECTIONS

The United States objects to Defendants' proposed second element, which improperly expands the elements of the crime.  *See* 18 U.S.C. § 1956(c)(1) ("the term 'knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity' means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony.")

**DEFENDANTS' PROPOSED INSTRUCTION**

**8.22 MULTIPLE CONSPIRACIES**

**(Count 52 – Multiple Conspiracies)**

Count 52 of the indictment alleges a single conspiracy to commit concealment money laundering in violation of Section 1956(a)(1)(B)(i), international promotional money laundering in violation of Section 1956(a)(2)(A), transactional money laundering in violation of Section 1957(a), and international concealment money laundering in violation of Section 1956(a)(2)(B)(i).  You must decide whether the single conspiracy to commit concealment, international promotional, transactional, and international concealment money laundering as charged in Count 52 of the indictment existed, and, if it did, who at least some of its members were.  If you find that the single conspiracy to commit concealment, international promotional, transactional, and international concealment money laundering as charged in Count 52 of the indictment did not exist, then you must return a not guilty verdict, even though you may find that some other conspiracy existed. For example, if you find that Count 52 concerns two or more conspiracies, you must find the Defendants not guilty of the single conspiracy alleged in Count 52.  Similarly, if you find that any Defendant was not a member of the conspiracy commit concealment, international promotional, transactional, and international concealment money laundering as charged in Count 52, then you must find that Defendant not guilty, even though that Defendant may have been a member of some other conspiracy.

**Supporting Authorities**

Model Crim. Jury Instr. 9th Cir. 8.22 (2021) (modified to reflect the charges in the indictment).

**UNITED STATES' OBJECTIONS**

"A defendant is entitled to a multiple conspiracies instruction only if the defendant's theory of multiple conspiracies is supported by law and has some foundation in the evidence." *United States v. Anguiano*, 873 F.2d 1314, 1317 (9th Cir. 1989) (internal citations and quotations omitted).  As discussed above, "[a] single conspiracy exists, as compared

- 143 -

with multiple conspiracies, where there is 'one overall agreement' to perform various functions to achieve the objectives of the conspiracy." *United States v. Bauer,* 84 F.3d 1549, 1560 (9th Cir. 1996).

This instruction should be evaluated after the evidence has been presented in order to better understand "Defendants' theory of multiple conspiracies."

II.   **STIPULATED NON-MODEL INSTRUCTIONS**

N/A

III.   **NON-MODEL INSTRUCTIONS REQUESTED BY THE UNITED STATES**

# STATE LAW NEED NOT BE VIOLATED FOR DEFENDANTS TO BE FOUND GUILTY UNDER THE TRAVEL ACT

The United States does not have to prove that the referenced states' laws were actually violated, only that defendants had intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any business enterprise involving prostitution offenses in violation of state law, and committed a subsequent overt act in furtherance of the unlawful activity.

## Supporting Authorities

18 U.S.C. § 1952(a)(3); *United States v. Winslow*, 962 F.2d 845, 852 (9th Cir. 1992) ("Section 1952(a)(3) requires the government to prove only that a defendant committed a subsequent overt act in furtherance of the unlawful activity. . . . Unlike the crime of attempt, the Travel Act does not require that the government establish that the accused took a substantial step in furtherance of the intended unlawful activity.") (internal quotations and citations omitted); *United States v. Polizzi*, 500 F.2d 856, 876-77 (9th Cir. 1974) (Government does not need to prove that defendants had specific intent to violate the underlying state law, only "specific intent to facilitate an activity which the accused knew to be unlawful under state law.").

**"BUSINESS ENTERPRISE" IN THE TRAVEL ACT DEFINED**

"Business enterprise," as used in the Travel Act, 18 U.S.C. 1952(b), means a continuous course of criminal conduct, that is, engaging or planning to engage in two or more violations of law, rather than a sporadic, casual, individual or isolated violation.  An advertisement that invites multiple commercial transactions (like a car wash ad that informs the public of prices charged for each wash, even if only for a limited time) refers to a continuous course of conduct.

**Supporting Authorities**

18 U.S.C. § 1952(b)(i)(1); (*See* Doc. 946 at 10-14); *United States v. Kaiser*, 660 F.2d 724, 731 (9th Cir. 1981) ("The words 'business enterprise' refer to a continuous course of criminal conduct rather than sporadic or casual involvement in a proscribed activity."); *United States v. Donaway*, 447 F.2d 940, 94 (1971) (same); *United States v. Roselli*, 432 F.2d 879, 886 (9th Cir. 1970) ("Congress limited Section 1952 to any 'business enterprise' because the requirement of a continuous course of conduct for profit would ordinarily include the gambling operations of organized crime.").

In alleging a continuous course of criminal conduct, "[n]either [allegations] of large-scale operations nor long-term duration is required[.] . . . Instead, what must be [alleged] is evidence of a continuous enterprise." *United States v. Tavelman*, 650 F.2d 1133, 1140 (9th Cir. 1981).  (*See also* Doc. 946 at 12-13 n.7 ("[E]ach ad identified [in the SI] carries an indicia of a commercial or business enterprise because each one invites multiple commercial transactions by soliciting the public to engage in prostitution.")).

**"USES ANY FACILITY IN INTERSTATE COMMERCE" DEFINED**

The phrase "uses any facility in interstate commerce" as used in the Travel Act, 18 U.S.C. § 1952(a), means employing or utilizing any method of communication or transportation between one state and another, and includes, for example, the use of telephones, mails, and the Internet.

In order to meet its burden of proof on this issue, it is not necessary for the United States to prove that the defendant(s) used an interstate facility. This section also applies to a person who causes another person to use an interstate facility. Therefore, if the United States has proven beyond a reasonable doubt that the defendant(s) caused another person to use an interstate facility, *e.g.,* the Internet, then you may find that the United States has proven this element.

**<u>Supporting Authorities</u>**

*United States v. Sutcliffe*, 505 F.3d 944, 952-53 (9th Cir. 2007) ("The Internet is an international network of interconnected computers, similar to—and often using—our national network of telephone lines. We have previously agreed that it cannot be questioned that the nation's vast network of telephone lines constitutes interstate commerce.") (internal citations and quotations omitted); *United States v. Roselli*, 432 F.2d 879, 890-91 (9th Cir. 1970) ("If the wire employed is an interstate wire the requirements for federal jurisdiction are satisfied. It is wholly irrelevant to any purpose of the statute that the perpetrator of the fraud knows about the use of interstate communication."); *United States v. Villano*, 529 F.2d 1046, 1054-55 (10th Cir. 1976) (upholding Travel Act convictions based on "repeated use of the interstate communications facilities by defendants' agents").

1

## "FACILITATE" DEFINED

In the context of the Travel Act, the term "facilitate" means "to make easy or less difficult."

## **Supporting Authorities**

(*See* Doc. 793 at 21 ("'Facilitate' is given its 'ordinary meaning: to make easy or less difficult.'") (citing *United States v. Gibson Specialty Co.*, 507 F.2d 446, 450 (9th Cir. 1974)); *see also United States v. Foreman*, 926 F.2d 792, 796 (9th Cir. 1990) ("'Facilitate' is defined as 'to make easier or less difficult.'"); *United States v. Adler*, 879 F.2d 491, 495 (9th Cir. 1988) ("'Facilitation' is established by showing that use of a communications facility . . . made easier or less difficult . . . the narcotics offense.").

1

## **"SPECIFIC INTENT" DEFINED**

2

"Specific intent" under the Travel Act (Counts 2-51) means the defendants knew that

3

they were facilitating an unlawful activity under state law.

4

5

6

## <u>**Supporting Authorities**</u>

7

(Doc. 793 at 15 ("Required intent under the Travel is 'specific intent to facilitate an

8

activity which the accused knew to be unlawful under state law.'") (citing *United States v.*

9

*Polizzi*, 500 F.2d 856, 876-877 (9th Cir. 1974) (instructions on specific intent need to

10

"reasonably inform[] the jury that they had to find that [defendants] knew that what they

11

were facilitating was an unlawful activity under state law")).) (*See also* Doc. 793 at 18 ("The

12

Government's proposed *mens rea* standard, specific intent to promote or facilitate

13

prostitution, is consistent with *Gibson, Tavelman*, and *Polizzi*—the Ninth Circuit cases

14

discussing intent requirements of the Travel Act.").)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## PROOF OF KNOWLEDGE OR INTENT

2       The intent of a person or the knowledge that a person possesses at any given time

3   may not ordinarily be proved directly because there is no way of directly scrutinizing the

4   workings of the human mind. In determining the issue of what a person knew or what a

5   person intended at a particular time, you may consider any statements made or acts done or

6   omitted by that person and all other facts and circumstances received in evidence which may

7   aid in your determination of that person's knowledge or intent.

8       You may infer, but you are certainly not required to infer, that a person intends the

9   natural and probable consequences of acts knowingly done or knowingly omitted. It is

10  entirely up to you, however, to decide what facts to find from the evidence received during

11  this trial.

12

13

14                          ## Supporting Authorities

15       1A O'Malley, Grenig and Lee, Federal Jury Practice and Instructions, § 17:07 (6th

16  ed. 2008).

17

18

19

20

21

22

23

24

25

26

27

28

IV.    **NON-MODEL INSTRUCTIONS REQUESTED BY DEFENDANTS WITH THE UNITED STATES' OBJECTIONS**

**DEFENDANTS' PROPOSED INSTRUCTION**

**SPECIFIC INTENT**

The crimes charged in this case are serious crimes which require proof of specific intent before the defendant can be convicted.  Specific intent, as the terms implies, means more than a general intent to commit the act.  To establish specific intent, the government must prove beyond a reasonable doubt that the defendant knowingly did an act which the law forbids, purposely and intending to violate the law.  Such intent may be determined from all the facts and circumstances surrounding the case.  An act or a failure to act is knowingly done if done voluntarily and intentionally, not because of mistake or accident, or other innocent reason.

**Supporting Authorities**

*United States v. Seymour*, 576 F.2d 1345, 1347 (9th Cir. 1978) (verbatim quote); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Doc. No. 946 at 13 (Order denying motion to dismiss) ("[Defendants] were not indicted for facilitating the amorphous notion of 'prostitution.' They were indicted for facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-related businesses, or other groups were involved in the business of prostitution."); *see United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Transcript of December 4, 2020 Hearing ("And I think one of the key things in my reason for denying the recusal is that this case is not about Backpage. Backpage was prosecuted in a separate case, entered a plea in a separate case. This case is about these individual defendants and whether they had specific knowledge of these ads as facilitating illegal activity.").

**UNITED STATES' OBJECTIONS**

Defendants' reliance on *Seymour* is misplaced because that case did not involve the

Travel Act.  *United States v. Seymour*, 576 F.2d 1345, 1345 (9th Cir. 1978) (prosecution for violations of mail fraud (18 U.S.C. § 1341) and interstate transportation fraud (18 U.S.C. § 2314)).  Under the Travel Act, the government need only prove that a defendant had "specific intent to facilitate an activity which the accused knew to be unlawful under state law."  *United States v. Polizzi*, 500 F.2d 856, 876-877 (9th Cir. 1974) (instructions on specific intent need to "reasonably inform[] the jury that they had to find that [defendants] knew that what they were facilitating was an unlawful activity under state law").

The sentence in the middle of Defendants' proposed instruction is particularly problematic.  This sentence reads, "To establish specific intent, the government must prove beyond a reasonable doubt that the defendant knowingly did an act which the law forbids, purposely and intending to violate the law."  This is a misstatement of the applicable law.  To be convicted under the Travel Act, one does not need to violate the underlying state law. *Polizzi*, 500 F.2d at 876-77 (Government does not need to prove that defendants had specific intent to violate the underlying state law).  Rather, a defendant must have acted with specific intent to "facilitate the promotion" of the underlying unlawful activity.  18 U.S.C. § 1952(a)(3).  And "facilitate" is given its ordinary meaning: to make easy or less difficult. (Doc. 793 at 21) ("'Facilitate' is given its 'ordinary meaning: to make easy or less difficult.'")

Defendants' proposed instruction imparts an intent requirement that is not part of the Travel Act.

1
2

## DEFENDANTS' PROPOSED INSTRUCTION
## DEFENDANT'S GOOD FAITH

3       The government has the burden to prove to you, beyond a reasonable doubt, that a

4   defendant acted with criminal intent and lacked good faith. The burden of

5   proving good faith does not rest with a defendant because a defendant does not have any

6   obligation to prove anything in this case. If the government fails to meet its burden to

7   prove a defendant lacked good faith, its failure to do so is a complete and absolute defense

8   to the charges in this case and you must return a not guilty verdict.

9       If a defendant carried out his or her actions in good faith, there was no criminal

10  intent.

11      A person who acts, or causes another person to act, on a belief or an opinion honestly

12  held is not punishable under the charges in the indictment merely because the belief or

13  opinion turns out to be inaccurate, incorrect, or wrong. An honest mistake in judgment or

14  an honest error in management does not rise to the level of criminal conduct.

15      While the term "good faith" has no precise definition, it encompasses, among other

16  things, a belief or opinion honestly held and an absence of malice or ill will.

17      If the evidence in the case leaves the jury with a reasonable doubt as to whether a

18  defendant acted with criminal intent and lacked good faith, the jury must acquit that

19  defendant.

20

21              **Supporting Authorities**

22      *See* 1A Fed. Jury Prac. & Instr. § 19:06 (6th ed.), 1A Fed. Jury Prac. & Instr. § 19:06

23  (6th ed.).

24

25              **UNITED STATES' OBJECTIONS**

26      "A defendant is not entitled to a separate good faith instruction when the court

27  adequately instructs on specific intent." *United States. v. Bonanno*, 852 F.2d 434, 439–40

28  (9th Cir. 1988) (citing *United States v. Green,* 745 F.2d 1205, 1209 (9th Cir.

1984), and *United States v. Cusino,* 694 F.2d 185, 188 (9th Cir. 1982)); *see also United States v. Dees,* 34 F.3d 838, 842 (9th Cir. 1994) (same); *United States v. Rushton,* 963 F.2d 272, 274 (9th Cir. 1992) (same).  The parties have submitted proposed "specific intent" instructions.  Accordingly, a "good faith" instruction should not be given here.

The instruction also should not be given to the extent Defendants are attempting to use it to circumvent invoking an "advice of counsel" defense.  If Defendants claim that their asserted "good faith" is based in any way on legal advice, then they should be required to comply with the requirements of the "advice of counsel" defense, and the jury should receive an appropriate "advice of counsel" instruction instead of the proposed "good faith" instruction.[6]

Finally, Defendants' "good faith" instruction deviates substantially from the source of the instruction that Defendants cite.  *See* 1A *Fed. Jury Prac. & Instr*. § 19:06 (6th ed., Feb. 2021 Update).  If the Court is inclined to give a "good faith" instruction, the United States respectfully requests that the Court use the language in 1A *Fed. Jury Prac. & Instr*. § 19:06 instead of Defendants' instruction.

---

[6] *See* Ninth Circuit Model Criminal Jury Instruction 5.10:

One element that the government must prove beyond a reasonable doubt is that the defendant had the unlawful intent to [*specify applicable unlawful act*].  Evidence that the defendant in good faith followed the advice of counsel would be inconsistent with such an unlawful intent.  Unlawful intent has not been proved if the defendant, before acting, made full disclosure of all material facts to an attorney, received the attorney's advice as to the specific course of conduct that was followed, and reasonably followed the attorney's recommended course of conduct or advice in good faith.

- 155 -

1
2

# DEFENDANTS' PROPOSED INSTRUCTION
## DEFENSE THEORY OF THE CASE

3
4

Defendants intend to request instructions on the defense's theories of the case. Defendants reserve their right to submit that request at the close of the trial.

5
6
7

## Supporting Authorities

8

*See* Fed. R. Crim. P. 30; *United States v. Cortes*, 757 F.3d 850, 857 (9th Cir. 2014)

9

("A criminal defendant is entitled to jury instructions related to a defense theory so long as

10

there is any foundation in the evidence and the instruction is supported by law." (internal

11

quotation marks omitted)); *United States v. Burt*, 410 F.3d 1100, 1103 (9th Cir. 2005) ("A

12

defendant is entitled to instructions relating to a defense theory for which there is any

13

foundation in the evidence, even though the evidence may be weak, insufficient,

14

inconsistent, or of doubtful credibility.").

15
16

## UNITED STATES' OBJECTIONS

17

As discussed below, Defendants' "First Amendment" instructions are not supported

18

by law or evidence, and therefore should not be given. *See, e.g., United States v. Freeman*,

19

761 F.2d 549, 551-52 (9th Cir. 1985) (where the speech at issue falls outside of the First

20

Amendment's protection, a First Amendment jury instruction should not be given).

21
22
23
24
25
26
27
28

## DEFENDANTS' PROPOSED INSTRUCTION
## (Conspiracy – Willfulness Defined)

To find a defendant guilty of conspiracy as charged in the indictment, you must be satisfied that the government has proven beyond a reasonable doubt that the defendant knowingly and willfully entered into the conspiracy, that is, that the defendant agreed to take part in the conspiracy with knowledge of its unlawful purpose and in furtherance of its unlawful objective.  You must also find that the government has proven beyond a reasonable doubt that the defendant acted with criminal intent and lacked good faith.  If the defendant carried out his or her actions in good faith, there was no criminal intent.  While the term "good faith" has no precise definition, it encompasses, among other things, a belief or opinion honestly held and an absence of malice or ill will.  To act willfully means to act with knowledge that one's conduct is unlawful and with the intent to do something the law forbids, that is to say with the specific purpose to disobey or disregard the law.

### Supporting Authorities

*United States v. Pomponio*, 429 U.S. 10, 12 (1976) (willfulness is the "intentional violation of a known legal duty"); *see* 1A Fed. Jury Prac. & Instr. § 19:06 (6th ed.), 1A Fed. Jury Prac. & Instr. § 19:06 (6th ed.); *United States v. Stagman*, 446 F.2d 489, 491 (6th Cir. 1971) ("the majority of the Courts of Appeals which have directly addressed this question . . . have stated that knowing and wilful [sic] intent to violate state laws is an element of the crime proscribed by the Travel Act") (citing decisions of the 4th, 7th, 8th, and 9th Circuits).

### UNITED STATES' OBJECTIONS

This proposed instruction is not supported by law and is unnecessary.  As discussed above, "A defendant is not entitled to a separate good faith instruction when the court adequately instructs on specific intent."  *United States. v. Bonanno*, 852 F.2d 434, 439–40 (9th Cir. 1988).

Defendants' reliance on *Pomponio* is inapposite.  In that case, the Supreme Court reversed the court of appeals, after that court had remanded for a new trial based on an improper jury instruction.  429 U.S. at 10.  The Supreme Court found no error in the trial court's jury instructions and held that "[a]n additional instruction on good faith was unnecessary." *Id.* at 13.  *Pomponio* clarified that an instruction stating that "good motive alone is never a defense where the act done or omitted is a crime" was proper. *Id.* at 11.  In addition, the "willful" instruction approved in *Pomponio* looks nothing like Defendants' proposed instruction.  "A willful act was defined in the instructions as one done 'voluntarily and intentionally and with the specific intent to do something which the law forbids, that is to say with the bad purpose either to disobey or to disregard the law.'" *Id.*

Further, Defendants' reliance on *United States v. Stagman* is misplaced.  The Ninth Circuit in *Polizzi* made clear that *Stagman* is not applicable in this circuit.

> In claiming error in the court's instructions on specific intent, appellants urge us to follow *United States v. Stagman* . . . and hold that specific intent to violate state law is an element of the offense under § 1952.  This Court however, has previously approved an instruction similar to the one given in this case. . . . Moreover, to the extent that *Stagman* requires proof that an accused under § 1952 intended to violate state law himself, we find that it conflicts with the clear meaning of the language used in § 1952. . . .  [The statute's required intent is] specific intent to facilitate an activity which the accused knew to be unlawful under state law.

*Polizzi*, 500 F.2d at 876-77.

The instruction should not be given.

**DEFENDANTS' PROPOSED INSTRUCTION**

**FIRST AMENDMENT PROTECTION—PROTECTED FREE SPEECH**

Advertisements are legally protected speech under the First Amendment to the United States Constitution.  A website's hosting of a third-party's advertisement on the internet is also protected under the First Amendment, including the publication of suggestive advertisements that might relate to either legal or illegal activity.

**Supporting Authorities**

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561, (1980) ("The First Amendment . . . protects commercial speech from unwarranted governmental regulation. . . . Even when advertising communicates only an incomplete version of the relevant facts, the First Amendment presumes that some accurate information is better than no information at all."); *Reno v. ACLU*, 521 U.S. 844, 868-70 (1997) ("[O]ur cases provide no basis for qualifying the level of First amendment scrutiny that should be applied to [the Internet].").

**UNITED STATES' OBJECTIONS**

The first sentence of the instruction is not supported by the law or the evidence.  As the Court has already recognized, "Prostitution ads are ads for illegal transactions," and "[t]he First Amendment does not protect 'offers to engage in illegal transactions.'"  (Doc. 793 at 14, quoting *United States v. Williams*, 553 U.S. 285, 297 (2008).)  Even the case Defendants cite makes clear that advertisements must concern lawful activity to receive First Amendment protection.  *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Commn. of New York*, 447 U.S. 557, 563-64 (1980) ("commercial speech related to illegal activity" is not protected by the First Amendment).  *See also Erotic Service Provider Legal Ed. and Research Project v. Gascon*, 880 F.3d 450, *amended*, 881 F.3d 792, 792 (9th Cir. 2018)

("[f]or commercial speech to receive First Amendment protection[,] the speech must concern lawful activity").  Simply put, prostitution advertising and soliciting are forms of commercial speech that are not constitutionally protected.  *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973) ("We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad…soliciting prostitutes."); *Erotic Service Provider*, 880 F.3d at 459-60 (rejecting First Amendment challenge to ordinance outlawing prostitution solicitations); *Coyote Pub., Inc. v. Miller*, 598 F.3d 592, 600-04 (9th Cir. 2010) (upholding Nevada ban on prostitution advertising).

As the Ninth Circuit has explained, "the degree of disfavor in which prostitution is held in our society, as reflected in law," "is *sui generis*":  "Forty-nine of the fifty states today prohibit all sales of sexual services.  The federal government acknowledges the link between prostitution and trafficking in women and children, a form of modern day slavery."  *Coyote Pub.*, 598 F.3d at 600-01.  *See also id*. at 603-04 (the Thirteenth Amendment "enshrines the principle that people may not be bought and sold as commodities").  This "genuine objection to buying and selling [adults and children for sex] means that *in the context of prostitution an advertisement is an integral aspect of the harm to be avoided*.  In contract terms, an advertisement is an invitation to deal and may operate as an offer. . . ."  *Id*. at 604 (emphasis added).  Without communicating an offer to sell an adult or child for sex, no sale can occur.  *See, e.g.,* A.R.S. § 13-3211(5) (crime of prostitution defined in part as "*offering* to engage in sexual conduct under a fee arrangement with any person for money") (emphasis added)).  The United States anticipates that trial evidence will show that the vast majority of "adult" and "escort" ads published on the website that Defendants owned, operated and/or managed consisted of ads for unlawful prostitution.

Defendants also provide no applicable legal authority for the second sentence of their instruction—that "a website's hosting of a third-party's advertisement on the internet is also protected under the First Amendment, including the publication of suggestive advertisements that might relate to either legal or illegal activity."  The sole case

- 160 -

Defendants cite, *Reno v. ACLU*, 521 U.S. 844 (1997), invalidated on First Amendment overbreadth grounds part of the Communications Decency Act (CDA) that prohibited the transmission to minors of "obscene" or "indecent" materials over the internet.  That statute was "not limited to commercial speech"; rather, its "breadth . . . [was] wholly unprecedented."  *Id*. at 877.  *Reno* nowhere discussed *Central Hudson*'s rule that commercial speech proposing an illegal transaction is excluded from First Amendment protection.  *Reno* provides no license for disseminating over the internet commercial offers to sell humans for sex any more than it permits website operators to sell illegal drugs, computer hacking or murder-for-hire services.  *See, e.g., United States v. Ulbricht*, 31 F. Supp. 3d 540, 568 (S.D.N.Y. 2014) (rejecting website operator's argument that his site's online marketplace for illegal narcotics involved speech protected by First Amendment).

The Court has already considered and rejected Defendants' efforts to dismiss the SI based on claims that Backpage merely operated as a passive host of third-party content involving both legal and illegal activities.  (*See, e.g*., Doc. 793 at 8 ("Defendants repeatedly argue that the government is pursuing a theory of vicarious liability for merely hosting third party content.  That argument is not supported by the SI, which goes through a long and fact-specific description of the Defendants['] participation in a conspiracy to facilitate and promote prostitution. The SI sufficiently explains why defendants in this case are not just merely hosting third party content."); Doc. 793 at 9 (the SI is "replete with specific facts that support finding that the conspirators knew the ads were for prostitution"); Doc. 793 at 9 ("Here, taking the allegations in the SI as true, as the Court must, the Government has met its burden of showing the fifty ads in the SI are for prostitution."); Doc. 793 at 9-11 (detailing SI's allegations showing the ads were for prostitution); Doc. 793 at 12-15 and Doc. 840 at 9-10 & n.6 (explaining that SI's allegations differentiate Backpage's activities from passive hosting of third party content).)

The SI alleges Defendants pursued a number of business strategies specifically designed to attract more prostitution advertising customers and increase prostitution-related revenues.  (SI ¶34 (Defendants "took a variety of steps to intentionally facilitate

that illegal activity").)  These steps "included, but were not limited to, creating free ads for prostitutes in an attempt to secure future advertising revenues from them (*i.e.*, 'content aggregation'), entering into formal business arrangements with known prostitution services and websites in an attempt to increase the volume of prostitution advertisements being posted on Backpage (*i.e.*, reciprocal link and affiliate programs), and sanitizing ads by editing them—specifically, removing terms and pictures that were particularly indicative of prostitution and them publishing a revised version of that ad (*i.e.*, moderation)."  (SI ¶34.)  As the Court has recognized: "The SI does not allege Defendants are criminally liable because they unknowingly and unintentionally operated a website used by third parties to post prostitution ads.  Rather, it alleges Defendants purposely sought out opportunities to increase prostitution advertising on Backpage."  (Doc. 793 at 14.)

Furthermore, on April 5, 2018, Backpage.com, LLC and several related operating entities pleaded guilty to an information charging one count of money laundering.  Backpage admitted it "derived the great majority of its revenue from fees charged in return for publishing advertisements for 'adult' and 'escort' services," and "[t]he great majority of these advertisements are, in fact, advertisements for prostitution services." (*United States v. Backpage.com, LLC*, CR-18-465-PHX-SMB, Doc. 8-2 at 11.) That same day, Backpage's then-CEO and 100% owner, Carl Ferrer, pleaded guilty to an information charging one count of conspiracy. (*United States v.* Ferrer, CR-18-464-PHX-SMB, Doc. 7-2.)  Ferrer likewise admitted that the great majority of Backpage's "adult" and "escort" ads were for prostitution, and he further admitted that to "create a veneer of deniability for Backpage," he worked with co-conspirators "to create 'moderation' processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad." (*Id.*, Doc. 7-2 at 13.) Subsequently, Backpage's Sales and Marketing Director Dan Hyer pleaded guilty to Count 1 of the SI (conspiracy to violate the Travel Act/facilitate prostitution), and admitted the majority of the "escort" ads he and others at Backpage had created as part of the "aggregation" process were actually offering illegal prostitution services.  (Doc. 271 at 9.)

At trial, the United States anticipates introducing testimony from numerous witnesses regarding the actual contents of Backpage's "adult" and "escort" sections, including former Backpage employees and contractors, adults and children who were advertised for sexual services on Backpage, and law enforcement agents who investigated ads on Backpage.  In addition, the United States anticipates introducing evidence showing what Backpage's "adult" and "escort" webpages actually looked like—evidence demonstrating that, rather than marketing legitimate "escort services," these sections included page after page after page of prostitution solicitations. Moreover, consistent with the SI, the United States anticipates introducing testimony and other evidence showing that Backpage's "non-adult sections" were simply intended to provide "plausible deniability" and to make the website "defensible" and more palatable to law enforcement. (SI¶ 112).

In *United States v. Freeman*, 761 F.2d 549, 551-52 (9th Cir. 1985), the Ninth Circuit held that the defendant was entitled to jury instruction concerning a First Amendment defense for 12 counts where he may have generally advocated for the filing of false tax returns, but not for the two counts where he "also assisted in the filing of false returns." The court recognized that "[w]here there is some evidence . . . that the purpose of the speaker or the tendency of his words are directed to ideas or consequences remote from the commission of the criminal act, a defense based on the First Amendment is a legitimate matter for the jury's consideration." *Id*. at 551.  However, where the speech at issue falls outside of the First Amendment's protection, a First Amendment jury instruction should not be given. *Id*. at 522. *See also, e.g., United States v. Rowlee*, 899 F.2d 1275, 1280 (2d Cir. 1990) (where First Amendment did not protect defendants' statements, district court could have avoided giving any First Amendment jury instructions); *United States v. White*, 610 F.3d 956, 962 (7th Cir. 2010) (district court may await development of full factual record at trial before deciding whether to instruct jury on First Amendment defenses).

The proposed instruction should not be given.

### DEFENDANTS' PROPOSED INSTRUCTION

### FIRST AMENDMENT PROTECTION—WEBSITES HOSTING THIRD-PARTY ADS

A website's hosting of a third-party's ad is presumptively protected and therefore legal, unless the government can prove beyond a reasonable doubt that:

(i)     the defendant had actual knowledge of the specific ad, *and*

(ii)    the defendant had actual knowledge that the specific ad's content was in fact for unlawful activity, *and*

(iii)   the defendant specifically intended to further illegal activity.

### Supporting Authorities

*See Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1281 (W.D. Wash. 2012) ("The third-party publication of offers to engage in illegal transactions does not fall within 'well-defined and narrowly limited classes of speech' that fall outside of First Amendment protection.") (quoting *Chaplinsky v. State of New Hampshire,* 315 U.S. 568, 571–572 (1942)); *United States v Gibson Specialty Co.*, 507 F.2d 446, 450 fn. 8 (9th Cir. 1974) ("The presumption that one intends the natural and probable consequences of his actions is insufficient in this context to establish intent to facilitate criminal activity.  It is as likely as not that a vendor similar to the defendants in this proceeding is totally indifferent to the actions of his purchaser."); *See United States v. Rundo*, 990 F.3d 709, 719-720 (9th Cir. 2021) ("the intent to engage in one of the prohibited acts is a personal prerequisite to punishment under [the Act] . . . Simply put, knowing that some might choose to become violent is not at all the same as intending that they do so.").

*See also United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Doc. No. 946 at 13 (Order denying motion to dismiss) ("[Defendants] were not indicted for facilitating the amorphous notion of 'prostitution.' They were indicted for

1   facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-
2   related businesses, or other groups were involved in the business of prostitution."); *see*
3   *United States v. Lacey, et al.* (D. Ariz.), Case No. 18-CR-00422-PHX-SMB, Transcript of
4   December 4, 2020 Hearing ("And I think one of the key things in my reason for denying
5   the recusal is that this case is not about Backpage. Backpage was prosecuted in a separate
6   case, entered a plea in a separate case. This case is about these individual defendants and
7   whether they had specific knowledge of these ads as facilitating illegal activity.").

8

9                               **UNITED STATES' OBJECTIONS**

10         The United States incorporates, by this reference, its objections to Defendants'
11   proposed First Amendment instruction, *supra*.  As explained above, the Court has already
12   considered and rejected Defendants' efforts to dismiss the SI based on claims that
13   Backpage merely operated as a passive host of third-party content.  (*See, e.g.*, Doc. 793 at
14   8-15 and Doc. 840 at 9-10 & n.6 (explaining that the SI's allegations differentiate
15   Backpage's activities from passive hosting).)

16         In addition, the United States objects to Defendants' suggestion that a *website's*
17   publication of prostitution ads is "presumptively protected and thereby legal" unless the
18   government can prove beyond a reasonable doubt that one or more of the individual
19   Defendants in *this* case, *United States v. Lacey, et al.*, CR-18-422-PHX-SMB, "had actual
20   knowledge of the specific ad," "had actual knowledge that the specific ad's content was in
21   fact for unlawful activity," and "the [D]efendant specifically intended to further illegal
22   activity."  On April 5, 2018, Backpage.com, LLC and several related entities that operated
23   the Backpage website pleaded guilty and admitted that Backpage "derived the great
24   majority of its revenue from fees charged in return for publishing advertisements for 'adult'
25   and 'escort' services" and that "[t]he great majority of these advertisements are, in fact,
26   advertisements for prostitution services." (*United States v. Backpage.com, LLC*, CR-18-
27   465-PHX-SMB, Doc. 8-2 at 11.)  The Court accepted Backpage's guilty plea.  (CR-18-
28   465-PHX-SMB, Docs. 10, 20.)  Backpage's guilty plea took the place of its criminal trial.

1    *Florida v. Nixon,* 543 U.S. 175, 187 (2004) ("[T]he plea is . . . itself a conviction.").  The

2    legality of Backpage's operations is not dependent on what the United States can prove or

3    not prove about any individual Defendant here.  To the extent the instruction suggests

4    otherwise, it is irrelevant and confusing, and not supported by the law or the record.

5         The instruction is unnecessary for the additional reason that the contours of the

6    United States' burden of proof is adequately described by its jury instructions regarding

7    the SI's conspiracy, Travel Act and money laundering counts, including instructions

8    discussing *Pinkerton*.  The First Amendment does not create any additional or heightened

9    burdens of proof where, as here, the Defendants' charged conduct involves the publication

10   of offers to engage in transactions that are illegal in 49 states and nearly all of Nevada.  *See*

11   *Coyote Pub., Inc. v. Miller*, 598 F.3d 592, 603-04 (9th Cir. 2010).

12        Moreover, Defendants' authorities do not support the instruction.  *Backpage.com,*

13   *LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012)—and similar cases like

14   *Backpage.com LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015)—were based largely on the false

15   notion that Backpage was nothing more than passive intermediary between advertisers and

16   visitors to its website.  As explained in prior pleadings, many of these cases involved the

17   broad immunity provision of Section 230 of the Communications Decency Act, which does

18   not apply to this federal criminal prosecution.  47 U.S.C. § 230(e)(1) ("Nothing in this

19   section shall be construed to impair the enforcement of…[any] Federal criminal statute.");

20   (*see generally* Doc. 840).

21        Second, since those cases were decided, there has been a sea-change in the

22   availability of evidence concerning Backpage, including Backpage's compelled production

23   of more than 500,000 pages of internal documents to the United States Senate and the grand

24   jury.  (Doc. 649 at 22-23.)  As alleged in the SI, evidence obtained pursuant to the Senate

25   and grand jury investigations revealed that Backpage misrepresented itself in the above-

26   referenced cases as merely a passive "conduit" for third-party content, and exposed its

27   supposed efforts to police unlawful ads on its site as a fiction.  *Cf. McKenna*, 881 F. Supp.

28   2d at 1266-67.   Rather, the evidence showed Backpage facilitated its customers'

prostitution ventures through "moderation" practices that edited or shaped pimps' ads to reduce the risk of detection while still conveying the illegal message; business relationships with prostitution websites (*e.g.*, The Erotic Review) and "super-affiliates" (*e.g.*, Dollar Bill) calculated to increase the volume of prostitution ads on Backpage; "aggregation" practices that involved creating prostitution ads and soliciting pimps and prostitutes to advertise on Backpage; and money laundering.  (*See generally* SI¶¶ 9-11, 34-159.) Defendants failed to disclose this evidence to the courts that previously ruled in Backpage's favor, including *McKenna*.

Third, Defendants' cases were decided before Backpage and its CEO pleaded guilty in April 2018 and admitted the "great majority" of Backpage's revenue-generating ads were "for prostitution services."  (18-CR-464, Doc. 7-2 at 12-13; 18-CR-465, Doc. 8-2 at 11.)  Following these developments, the Northern District of Illinois dismissed *Dart* and imposed $250,000 in sanctions against Backpage.  (Doc. 516-1 at 2-9; *see also* Doc. 446-1 at 14-35.)  The court held Backpage and Ferrer's admissions provide "incontrovertible" proof that Backpage misled the Seventh Circuit about whether "speech on the site was protected, whether Backpage.com policed, rather than promoted, unlawful solicitations, and otherwise merely published, rather than authored, content on its site." (Doc. 516-1 at 4-5; *see id*. at 8 ("Backpage knowingly and repeatedly made false representations of fact concerning relevant aspects of its operations.").  The court attempted to rewrite Backpage's complaint truthfully, as follows:

> The Sheriff has infringed Backpage's First Amendment rights by accurately advising credit card companies…that the great majority of ads on Backpage's adult services web site are for prostitution and that Backpage routinely doctors those ads to conceal their unlawful nature.  When told about these facts by Sheriff Dart, those credit card providers decided that they did not want to be publicly linked to…Backpage and stopped accepting payments for ads placed on Backpage.com.  Or at least they thought they had stopped accepting such payments.  In reality, however, Backpage.com devised ways to deceive the card companies about its continued use of their cards as payment for access to its adult services advertising.

(Doc. 516-1 at 6.)

1    Defendants' remaining authorities are inapposite.  In *United States v. Rundo*, 990

2    F.3d 709 (9th Cir. 2021), the Ninth Circuit reversed the dismissal of an indictment charging

3    several defendants with violating the Anti-Riot Act, 18 U.S.C. § 2101-02.  In the context

4    of construing that statute, the court focused on separating protected advocacy from speech

5    inciting imminent lawless violence.  *Id*. at 716-20.  This case, in contrast, does not present

6    the same concerns—it involves different statutes, and none of the charged conduct involves

7    anything that could be considered constitutionally-protected abstract advocacy.  *Cf. United*

8    *States v. Williams*, 553 U.S. 285, 298-89 (2008) ("To be sure, there remains an important

9    distinction between a proposal to engage in illegal activity and the abstract advocacy of

10   illegality. . . . The Act before us does not prohibit advocacy of child pornography, but only

11   offers to provide or requests to obtain it.  There is no doubt that this prohibition falls well

12   within constitutional bounds.").

13    Moreover, Defendants' quote from the December 4, 2020 hearing in this case does

14   not support the proposed instruction, let alone purport to define the contours of the 100

15   counts in the SI.  The Court's statement that "[t]his case is about these individual

16   defendants and whether they had specific knowledge of these ads as facilitating illegal

17   activity" was made in the context of explaining that the focus of this case is on establishing

18   the guilt of "these defendants," rather than Backpage (which had already been prosecuted

19   and pleaded guilty in a separate case).  (12/4/20 Hr'g Tr. at 38.)

20    Defendants' isolated quote from the Court's May 4, 2020 Order denying their

21   Motion to Dismiss Indictment for Failure to Allege the Necessary Elements of the Travel

22   Act (Doc. 946) likewise fails to support the proposed instruction.  In disagreeing with

23   Defendants' assertion that the SI failed to identify the "unlawful activity" under the Travel

24   Act that forms the basis for Travel Act charges, the Court wrote: "Based on the allegations

25   here, Defendants are not charged with anything related to gambling, narcotics, bribery,

26   extortion or arson.  Rather, they are clearly charged with intending to facilitate and

27   thereafter facilitating or attempting to facilitate businesses involved in prostitution.  *See* 18

28   U.S.C. § 1952(b)(i)(1)."  (Doc. 946 at 9; *see also id*. at 11 ("Additionally, and as noted, the

- 168 -

'to wit: prostitution offenses' language directs Defendants to which 'unlawful activity' is charged under each Travel Act count.") (citing SI¶ 201).) Addressing the individual substantive Travel Act charges in Counts 2-51, the Court also observed that "the SI alleges fifty instances where Defendants posted ads on Backpage.com to facilitate specific individual prostitutes or pimps involved in the business of prostitution" and used language that "almost identically mirrors the Travel Act's text." (Doc. 946 at 11, citing SI¶¶ 200-201.)  Later, rejecting Defendants' suggestion that the SI indicted a "'boundless conspiracy' to facilitate prostitution in general," the Court wrote that "[s]uch a claim is simply untrue" because Defendants "were not indicted for facilitating the amorphous notion of 'prostitution.'  They were indicted for facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-related businesses, or other groups were involved in the business of prostitution." (Doc. 946 at 13.)  The Court went on to explain that these fifty instances were part and parcel of "a continuous course of conduct where Defendants facilitated 'unlawful activity' [including] numerous pimps, prostitutes and traffickers in violation of the Travel Act." (Doc. 946 at 13-14.)

Moreover, to the extent that Defendants' proposed instruction purports to impose a scienter requirement greater than that required by the First Amendment, the instruction is not supported by any First Amendment caselaw cited by Defendants.  *See* Part IV, *infra*, United States' Objections to Defendants' proposed instruction "FIRST AMENDMENT PROTECTION-PROTECTED PUBLICATION OF THIRD-PARTY SPEECH" (incorporated by this reference).

The instruction should not be given.

**DEFENDANTS' PROPOSED INSTRUCTION**

**FIRST AMENDMENT PROTECTION—"ADULT" SERVICES ARE LEGAL**

The phrase 'adult,' even in conjunction with 'services,' is not unlawful in itself nor does it necessarily call for unlawful content.

**Supporting Authorities**

*Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 968 (N.D. Ill. 2009) (verbatim quote).

**UNITED STATES' OBJECTIONS**

This instruction is unnecessary and irrelevant, and is supported by a case that was decided under the Section 230 of the Communications Decency Act, 47 U.S.C. § 230— which, as this Court has already held, has no application here.  (*See generally* Doc. 840.) Moreover, distinguishing that same case, this Court has recognized that the SI "alleges conduct far beyond the simple maintenance of neutral policies prohibiting certain content. *Cf. Dart v. Craigslist, Inc.*, 665 F.2d 961, 968-69 (N.D. Ill. 2009)."  (Doc. 840 at 10; *see also* Doc. 649 at 25-26.)

## DEFENDANTS' PROPOSED INSTRUCTION
## FIRST AMENDMENT PROTECTION—EXAMPLES OF LEGAL "ADULT" SERVICES

Advertisements for escort services, strippers, massage services, dominatrix, and dating are presumptively legal and constitutionally protected speech, because escorting, stripping, providing massage or dominatrix services, and dating all are legal activities.

### Supporting Authorities

*See Dart v. Craigslist, Inc.*, 665 F.Supp.2d 961, 968 (N.D. Ill.2009) (Sheriff Dart "is simply wrong when he insists that [craigslist's adult services category and related subcategories] are all synonyms for illegal sexual services;" craiglist's "adult services" section "is not unlawful in itself nor does it necessarily call for unlawful content"); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 234 (7th Cir. 2015), *cert. denied*, 137 S. Ct. 46 (2016) (rejecting sheriff's presumption that ads on Backpage.com were illegal: Backpage.com was "an avenue of expression of ideas and opinions" protected by the First Amendment, including its "classified ads for 'adult' service;" "Fetishism?  Phone sex? Performances by striptease artists?  (Vulgar is not violent.)  One ad in the category 'dom & fetish' is for the services of a 'professional dominatrix'—a woman who is paid to whip or otherwise humiliate a customer in order to arouse him sexually.  It's not obvious that such conduct endangers women or children or violates any laws, including laws against prostitution.  The district judge remarked 'that the majority of the advertisements [in Backpage's adult section] are for sex'—but a majority is not all, and not all advertisements for sex are advertisements for illegal sex.") (internal citations omitted); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1281-82 (W.D. Wash. 2012) (rejecting similar presumption of state AG defending law targeting Backpage and noting the "third-party publication of offers to engage in illegal transactions does not fall within [the] 'well-

defined and narrowly limited classes of speech' that fall outside of First Amendment protection." (*quoting Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 833-34 (M.D. Tenn. 2013) (rejecting state's argument that escort ads on Backpage.com were unprotected speech); *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at *9-11 (D.N.J. Aug. 20, 2013) (same); *M.A. ex rel. P.K v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1049-50 (E.D. Mo. 2011) (rejecting similar presumption in dismissing plaintiff's civil claims based on 18 U.S.C. §§ 2, 1595, and 2255); *People v Ferrer*, 2016 WL 7237305, at *9 (Cal. Super. Ct. Dec. 9, 2016) (dismissing state's pimping charges against Larkin and Lacey; noting that the only "whiff of illegality" in the AG's complaint improperly "require[ed] the presumption that illegal content was contained in the ads," yet the website's actions in posting the ads "would not be illegal").

## UNITED STATES' OBJECTIONS

The instruction is not supported by the record or the cited cases.

As explained in the SI, while Backpage for many years maintained an "adult" "escorts" advertising category, Defendants were aware that the overwhelming majority of ads in that section were for prostitution—and Defendants deliberately pursued a number of business strategies specifically designed to attract more prostitution advertising customers and increase its prostitution-related revenues.  (SI ¶34 (Defendants "took a variety of steps to intentionally facilitate that illegal activity").)  These steps "included, but were not limited to, creating free ads for prostitutes in an attempt to secure future advertising revenues from them (*i.e.*, 'content aggregation'), entering into formal business arrangements with known prostitution services and websites in an attempt to increase the volume of prostitution advertisements being posted on Backpage (*i.e.*, reciprocal link and affiliate programs), and sanitizing ads by editing them—specifically, removing terms and pictures that were particularly indicative of prostitution and them publishing a revised version of that ad (*i.e.*, moderation)."  (SI ¶34.)

1    The United States anticipates that the trial evidence will show that Backpage's
2    "adult" and "escorts" ads predominantly consisted of ads for prostitution. (*See, e.g.*, Doc.
3    1176 at 15-17.)  The United States anticipates introducing testimony from numerous
4    witnesses, including former Backpage employees and contractors, adults and children who
5    were advertised for sexual services on Backpage, and law enforcement agents who
6    investigated ads on Backpage.  This evidence is expected to include, among other things,
7    testimony that no one who investigated or responded to an ad on Backpage's "adult" or
8    "escorts" sections ever encountered an advertisement for lawful "escort services."  In
9    addition, the United States anticipates introducing evidence showing what Backpage's
10   "adult" and "escort" webpages actually looked like—evidence demonstrating that, rather
11   than marketing legitimate "escort services," these sections included page after page after
12   page of prostitution ads.  Simply put, the term "escort" as used on Backpage was nothing
13   more than a euphemism for prostitution.

14   As also explained elsewhere, Defendants' cited cases have all been eclipsed by
15   Backpage's compelled disclosures of more than 500,000 pages of internal documents to
16   the U.S. Senate and the grand jury, and by the subsequent guilty pleas of Backpage and
17   several related operating entities, Backpage's CEO and 100% owner, and Backpage's Sales
18   and Marketing Director.  (Doc. 649 at 21-26.)

19   Citing a string of cases—from *Backpage.com LLC v. Dart*, 807 F.3d 229 (7th Cir.
20   2015), to *People v Ferrer*, 2016 WL 7237305 (Cal. Super. Ct. Dec. 9, 2016)—Defendants
21   erroneously suggest that "escort" and other adult ads on Backpage were protected under the
22   First Amendment, and that providing a forum for such ads was likewise protected.
23   Defendants fail to mention that they misled courts across the United States in these cases,
24   and that recent subpoenas have unlocked hundreds of thousands of internal documents
25   undermining their claims.  Many of these cases—including the Seventh Circuit's opinion in
26   *Dart*—were based on the notion that Backpage was merely a passive "intermediary between
27   the advertisers of adult services and visitors to Backpage's website."  *Dart*, 807 F.3d at 233-
28   34; *see also, e.g.*, *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash.

1   2012) (using similar First Amendment and Communications Decency Act rationales to

2   invalidate state law that attempted to regulate the online advertising of minors for sex).  In

3   *Dart v. Craigslist*, 665 F. Supp. 2d 961, 969 and n.9 (N.D. Ill. 2009), the court similarly

4   found Craigslist protected by Section 230 of the Communications Decency Act, 47 U.S.C.

5   § 230 (CDA), because it operated as merely a passive host for ads created and posted by third

6   parties, and did not create, solicit or cause or induce anyone to create or post illegal ads.

7           These cases are thoroughly inapposite.

8           First, most of these cases involved Section 230 of the Communications Decency Act,

9   which courts have construed to provide immunity from *civil* and *state criminal* claims for

10  websites that publish content created by third-parties.  *See, e.g.*, *M.A. v. Village Voice Media*

11  *Holdings, LLC*, 809 F. Supp. 2d 1041, 1058 (E.D. Mo. 2011) (dismissing trafficking victim's

12  civil case against Backpage's then-parent; "Congress has declared such websites to be

13  immune from suits arising from such injuries."); *People v. Ferrer*, 2016 WL 7237305, at *11

14  (Cal. Super. Ct. Dec. 16, 2016) (dismissing state law criminal charges against Lacey, Larkin

15  and Ferrer; recognizing "it is for Congress, not this Court, to revisit" the CDA).  As this

16  Court has recognized, however, the CDA's immunity provision does not apply to the federal

17  criminal prosecutions of Backpage and its operators—including this case.  47 U.S.C.

18  § 230(e)(1) ("Nothing in this section shall be construed to impair the enforcement of…[any]

19  Federal criminal statute."); *see generally* Doc. 840.

20          Second (as explained above), since these cases were decided, there has been a sea-

21  change in the availability of evidence concerning Backpage, including Backpage's

22  compelled production of more than 500,000 pages of internal documents to the United

23  States Senate and the grand jury.  (Doc. 649 at 22-23.)  As alleged in the SI, evidence

24  obtained pursuant to the Senate and grand jury investigations revealed that Backpage

25  misrepresented itself in the above-referenced cases as merely a passive "conduit" for third-

26  party content, and exposed its supposed efforts to police unlawful ads on its site as a fiction.

27  *Cf. McKenna*, 881 F. Supp. 2d at 1266-67.  Rather, the evidence showed Backpage

28  facilitated its customers' prostitution ventures through "moderation" practices that edited

- 174 -

or shaped pimps' ads to reduce the risk of detection while still conveying the illegal message; business relationships with prostitution websites (*e.g.*, The Erotic Review) and "super-affiliates" (*e.g.*, Dollar Bill) calculated to increase the volume of prostitution ads on Backpage; "aggregation" practices that involved creating prostitution ads and soliciting pimps and prostitutes to advertise on Backpage; and money laundering.  (*See generally* SI¶¶ 9-11, 34-159.)  Defendants failed to disclose this evidence to the courts that previously ruled in Backpage's favor.

Third, Defendants' cases were decided before Backpage and its CEO pleaded guilty in April 2018 and admitted the "great majority" of Backpage's revenue-generating ads were "for prostitution services."  (18-CR-464, Doc. 7-2 at 12-13; 18-CR-465, Doc. 8-2 at 11.)  Following these developments, the Northern District of Illinois dismissed *Dart* and sanctioned Backpage.  (Doc. 516-1 at 2-9; *see also* Doc. 446-1 at 14-35.)

Where, as here, the speech at issue falls outside of the First Amendment's protection, a First Amendment jury instruction should not be given. *United States v. Freeman*, 761 F.2d 549, 551-52 (9th Cir. 1985).

The instruction should not be given.

1

2

3

4

**DEFENDANTS' PROPOSED INSTRUCTION**

**FIRST AMENDMENT PROTECTION—WEBSITE HAS THE RIGHT TO**

**EXERCISE EDITORIAL CONTROL AND JUDGMENT**

5

6

7

The First Amendment prohibits the government from punishing a website that exercises "editorial control and judgment," including decisions about whether to allow, block, or edit third-party content.

8

9

10

11

Federal law also protects online providers and encourages them to engage in the editorial practices of monitoring, limiting, and/or editing user-submitted content to "maintain the robust nature of Internet communication, and … keep government interference in the medium to a minimum."

12

13

**Supporting Authorities**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *Washington Post v. McManus*, 355 F. Supp. 3d 272, 300 (D. Md. 2019) (enjoining Maryland statute that required social media and news websites to self-publish information about political ads, holding that the statute infringed editorial judgments; "This respect for a publisher's right to exercise 'editorial control and judgment' … applies with equal force to outlets that publish content on the Internet") (quoting *Tornillo*, 418 U.S. at 258), *aff'd.*, 944 F.3d 506 (4th Cir. 2019); *e-ventures Worldwide, LLC v. Google, Inc*., 2017 WL 2210029, at *4 (M.D. Fla. Feb. 8, 2017) ("A search engine is akin to a publisher, whose judgments about what to publish and what not to publish are absolutely protected by the First Amendment"; holding that "Google's actions in … determining whether certain websites are contrary to Google's guidelines and thereby subject to removal are the same as decisions by a newspaper editor regarding which content to publish, which article belongs on the front page, and which article is unworthy of publication. The First Amendment protects these decisions, whether they are fair or unfair, or motivated by profit or altruism."); *Zhang v. Baidu.com Inc*., 10 F. Supp. 3d 433, 438 (S.D.N.Y. 2014) ("a 'search engine's editorial

judgment is much like many other familiar editorial judgments,' such as the newspaper editor's judgment of which wire-service stories to run and where to place them in the newspaper"); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629-630 (D. Del. 2007) (First Amendment protects decisions about placement, ranking, or rejection of online advertisements); *Search King, Inc. v. Google Tech., Inc.*, 2003 WL 21464568 *4 (W.D. Okla. 2003) ("Google's PageRanks are entitled to 'full constitutional protection.'").

*Batzel v. Smith*, 333 F.3d 1018, 1027-28 (9th Cir. 2003) ("'Section 230 was enacted, in part, to maintain the robust nature of Internet communication, and accordingly, to keep government interference in the medium to a minimum.'  Making interactive computer services and their users liable for the speech of third parties would severely restrict the information available on the Internet.") (internal citations omitted); *Doe v. Kik Interactive, Inc.*, 482 F. Supp. 3d 1242, 1247 (S.D. Fla. 2020) ("'Section 230, though . . . was enacted to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum.' *Force v. Facebook, Inc.,* 934 F.3d 53, 63 (2d Cir. 2019), *cert. denied,* —— U.S. ——, 140 S.Ct. 2761, 206 L. Ed. 2d 936 (2020) (quotations omitted).  'Indeed, Congress stated in Section 230 that '[i]t is the policy of the United States – (1) to promote the continued development of the Internet and other interactive computer services and other interactive media; [and] (2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation.'' *Id.* (quoting 47 U.S.C. § 230(b)(1)-(2)).").  *See Bennett v. Google, Inc.*, 2017 WL 2692607, at *2 (D.D.C. June 21, 2017) ("holding Google liable for establishing standards and guidelines would ultimately create a powerful disincentive for service providers to establish any standards or ever decide to remove objectionable content, which the CDA was enacted to prevent"), *aff'd sub nom.*, *Bennett v. Google, LLC*, 882 F.3d 1163 (D.C. Cir. 2018).

### UNITED STATES' OBJECTIONS

The instruction should not be given because this case does not involve the exercise of traditional "editorial control and judgment" functions.  *See, e.g., Miami Herald Publ'g*

1   *Co. v. Tornillo*, 418 U.S. 241, 254-558 (1974) (newspapers cannot be compelled to publish

2   editorials or commentary; decisions regarding the inclusion of materials in the newspaper

3   and "treatment of public issues and public officials—whether fair or unfair—constitute the

4   exercise of [protected] editorial control and judgment").

5        Rather, as this Court has recognized (in reviewing the sufficiency of the SI),

6   Defendants' management and operation of Backpage "fell outside 'traditional, editorial

7   functions' protected by the First Amendment. (Doc. 793 at 12-15.) For example,

8   Defendants "participated in [ad] moderation not merely to edit, but to 'conceal the true

9   nature of the ads being posted on its website.' (SI¶ 11)." (Doc. 793 at 12.) Defendants'

10  "official policy" for posts advertising child prostitution was to delete particular words in

11  the ads indicative of underage prostitution and publish the revised version, thereby creating

12  a veneer of deniability and helping its customers evade law enforcement. (Doc. 793 at 12.)

13  Defendants followed similar policies for ads containing words or phrases indicative of

14  adult prostitution. (Doc. 793 at 12.) Backpage also permitted users to include TER ID

15  numbers in ads—that is, numbers that Johns could use to locate on-line reviews of the

16  advertisers' sex-for-money services. (*See* Doc. 793 at 12.) Moreover, Backpage "taught

17  customers how to word their ads to avoid moderator restrictions," and maintained non-

18  adult sections to provide "plausible deniability" and make the website more "defensible"

19  to law enforcement. (Doc. 793 at 12-13.) *Tornillo* and its progeny do not apply to these

20  policies and practices. (*See* Doc. 793 at 12-15; *see also* Doc. 649 at 26-29.)

21       Separately, Defendants' invocation of "[f]ederal law"—namely, Section 230 of the

22  Communications Decency Act, 47 U.S.C. § 230—should be precluded in the jury

23  instructions. As this Court has already held, Section 230 has no application whatsoever in

24  this federal criminal case. (Doc. 793 at 13; Doc. 840 at 4-12.)

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DEFENDANTS' PROPOSED INSTRUCTION

## FIRST AMENDMENT PROTECTION—OFFENSIVE AND SEXUAL SPEECH

The First Amendment prohibits the government from restricting speech because some find it offensive.  The First Amendment also prohibits the government from restricting adult sexual expression that is indecent, but not obscene.

### Supporting Authorities

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002) ("It is also well established that speech may not be prohibited because it concerns subjects offending our sensibilities. . . . In evaluating the free speech rights of adults, we have made it perfectly clear that '[s]exual expression which is indecent but not obscene is protected by the First Amendment'") (citing *Reno v. American Civil Liberties Union*, 521 U.S. 844, 874 (1997).

### UNITED STATES' OBJECTION

This instruction is irrelevant and confusing, and not supported by the record or the law in the context of this case.  This is not an "obscenity" prosecution, or one that seeks to restrict or enjoin the distribution of materials (videos, magazines, books, etc.) that might call for consideration of whether they are "obscene."  *See Miller v. California*, 413 U.S. 15, 24 (1973) (government may restrict dissemination of a work that, taken as a whole, appeals to the prurient interest, is patently offensive in light of community standards, and lacks serious literary, artistic, political, or scientific value); *cf. Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002) (invalidating statute banning "virtual child pornography").  Indeed, this case does not involve any effort to restrict or enjoin the distribution of any materials at all.

Moreover, this is not a case that seeks to restrict "offensive" speech, or "adult sexual expression that is indecent, but not obscene."  Rather than involve purely expressive speech subject to the highest levels of constitutional protection, this case involves a different

category of speech altogether—commercial speech, or speech that does no more than propose a commercial transaction (*i.e.*, advertising). *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Commn. of New York*, 447 U.S. 557, 563-64 (1980). The First Amendment confers no protection at all on speech proposing illegal transactions, including prostitution advertising and soliciting. (Doc. 793 at 14); *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973); *Central Hudson*, 447 U.S. at 563-64; *United States v. Williams*, 553 U.S. 285, 297 (2008); *Erotic Service Provider Legal Ed. and Research Project v. Gascon*, 880 F.3d 450, 459-60, *amended*, 881 F.3d 792, 792 (9th Cir. 2018); *Coyote Pub., Inc. v. Miller*, 598 F.3d 592, 600-04 (9th Cir. 2010).

Given this background, the instruction should not be given.

1
2
3

**DEFENDANTS' PROPOSED INSTRUCTION**

**FIRST AMENDMENT PROTECTION—SPEECH PRESUMED**

**PROTECTED**

4
5      The Constitution does not permit the jury to presume that speech is unprotected

6      merely because it resembles unprotected speech.  The jury must presume that speech is

7      protected.

8      The government always has the burden to prove that particular instances of speech

9      are not protected by the First Amendment.

10

11                              **Supporting Authorities**

12      *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002) ("Protected speech does

13      not become unprotected merely because it resembles the latter."); *United States v. Playboy*

14      *Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the

15      Government bears the burden of proving the constitutionality of its actions."); *id.* at 818

16      ("When First Amendment compliance is the point to be proved, the risk of nonpersuasion

17      … must rest with the Government, not with the citizen.").

18

19                              **UNITED STATES' OBJECTIONS**

20      The instruction is confusing and not supported by the record or the law—

21      particularly to the extent it might be understood as requiring the United States to prove that

22      each and every ad that ever appeared on Backpage's "adult" or "escorts" sections was a

23      prostitution ad in order to prove the offenses charged in the SI.  If Defendants' revenue-

24      generating business model was knowingly, intentionally and overwhelmingly based on the

25      sale of prostitution ads, the Constitution does not impose the near-impossible burden of

26      proving that every ad sold on Backpage proposed an illegal transaction.  Under that

27      interpretation, selling even one licit ad—among millions of illicit ones—would immunize

28      Defendants from prosecution.

1     That is not the law.  Rather, just as "[b]ookselling in an establishment used for
2  prostitution does not confer First Amendment coverage to defeat a valid statute aimed at
3  penalizing and terminating illegal uses of premises," *Arcara v. Cloud Books, Inc.*, 478 U.S.
4  697, 707 (1986), so too may the government seek to prosecute a website (and the individuals
5  who directed and managed it) that operated a massive online marketplace for illegal
6  prostitution—even if the website also gave away free (or sold for exponentially lower prices)
7  ads for legal goods and services for the sake of "plausible deniability." (*See* SI¶ 112); *see*
8  *also United States v. Ulbricht*, 31 F. Supp. 3d 540, 556 (S.D.N.Y. 2014) (unlike other online
9  businesses, defendant "knowingly and intentionally constructed and operated an expansive
10 black market for selling and purchasing narcotics and malicious software"); *United States v.*
11 *Jackson*, 865 F.3d 946, 949 (7th Cir. 2017) (Backpage "advertis[ed]…sex work"), *cert.*
12 *granted, judgment vacated on other grounds*, 138 S. Ct. 1983 (2018); *J.S. v. Village Voice*
13 *Media Holdings, Inc.*, 359 P.3d 714, 715-16 (Wash. 2015) (discussing Backpage's
14 involvement in minor victims' ads); SI¶ 109 (Backpage is "a direct vehicle for prostitution").

15    If the record warrants an instruction similar to that proposed by Defendants, *cf.*
16 *Freeman*, 761 F.2d at 551-52, and to avoid confusion and more faithfully track the law's
17 requirements, the proposed instruction should be revised as follows (additions underlined;
18 deletions in strikeout):

19          **The Constitution does not permit the jury to presume that speech**
20      **is unprotected merely because it resembles unprotected speech.  The**
21      **jury must presume that speech is protected<u>, and the government has the</u>**
22      **<u>burden of proving otherwise</u>.**

23          ~~**The government always has the burden to prove that particular**~~
24      ~~**instances of speech are not protected by the First Amendment.**~~

25    This instruction, if given, should be coupled with an instruction explaining that
26 prostitution advertisements or solicitations are not protected by the First Amendment, as
27 follows:

28          <u>**Prostitution is illegal in 49 states and most of Nevada.  In those**</u>

- 182 -

**places, prostitution advertisements or solicitations have no First Amendment protection at all.   Advertisements or solicitations must concern lawful activity to receive First Amendment protection.**

*See* Doc. 793 at 14; *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Commn. of New York*, 447 U.S. 557, 563-64 (1980) ("commercial speech related to illegal activity" is not protected by the First Amendment); *Erotic Service Provider Legal Ed. and Research Project v. Gascon*, 880 F.3d 450, *amended*, 881 F.3d 792, 792 (9th Cir. 2018) ("[f]or commercial speech to receive First Amendment protection[,] the speech must concern lawful activity").  *See also United States v. Williams*, 553 U.S. 285, 297 (2008) ("Offers to engage in illegal transactions are categorically excluded from First Amendment protection."); *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973) ("a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes"); *Coyote Pub., Inc. v. Miller*, 598 F.3d 592, 600-04 (9th Cir. 2010) (explaining that prostitution is illegal nearly everywhere in the United States, and upholding Nevada ban on prostitution advertising); A.R.S. § 13-3211(5) (crime of prostitution defined in part as "*offering* to engage in sexual conduct under a fee arrangement with any person for money") (emphasis added)).

1

2

3

**DEFENDANTS' PROPOSED INSTRUCTION**

**FIRST AMENDMENT PROTECTION—ADS PRESUMED PROTECTED**

4     A website's publication of a classified ad posted by a third party is protected under

5 the First Amendment unless the transaction proposed in the ad *necessarily* would be an

6 illegal act (like an ad proposing a sale of cocaine, which always is illegal).  Where the

7 legality of a transaction proposed in an ad depends on circumstances outside the content of

8 the ad, a website's publication of the ad is protected by the First Amendment.

9     The jury cannot conclude from coded language or implicit offers in a classified ad

10 that an ad necessarily proposes an illegal act.  Coded language or implicit offers mean that

11 the legality of a transaction proposed in an ad will depend on circumstances outside the

12 content of the ad.

13     The classified ads charged in Counts 2 – 22 and 24 – 51 do not necessarily propose

14 unlawful acts and the legality of the transactions proposed in those ads depends on

15 circumstances outside the content of those ads.  Therefore, Backpage.com's publication of

16 those 49 ads was protected by the First Amendment.

17     A website's publication of classified ads protected by the First Amendment does

18 not become unprotected merely because some, or even many, third-parties use the ads

19 hosted on the website to facilitate their own illegal conduct.

20

21

**Supporting Authorities**

22 *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 822 (9th Cir. 2013) (rejecting Arizona's

23 proposed "novel extension of *Central Hudson's* legality requirement, which has

24 traditionally focused on the content of affected speech—*i.e.*, *whether the speech proposes*

25 *an illegal transaction*—instead of whether the speech is associated with unlawful activity")

26 (emphasis added).

27

**UNITED STATES' OBJECTIONS**

28     The instruction is not supported by the law or the record, and it is confusing and

- 184 -

1    misleading.  The jury is entitled to consider all of the relevant facts and circumstances in

2    determining the meaning of an ad.  An advertisement is not an integrated legal instrument,

3    and the jury may properly consider the use and meaning of coded terms (*e.g.*, "GFE,"

4    "incall/outcall," "roses," "car service," "quickie"), incremental prices (*e.g.*, quarter-hour,

5    half-hour, one-hour), photos, video or other images, identification numbers from

6    prostitution review websites, and any other evidence—including the placement and context

7    of the ad—that conveys information about the meaning of the ad.  *See Pittsburgh Press*

8    *Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973) (determining that employment

9    ads were unlawful based on the context of their placement in gender-specific categories;

10   "We have no doubt that a newspaper constitutionally could be forbidden to publish a want

11   ad proposing a sale of narcotics or soliciting prostitutes.  Nor would the result be different

12   if the nature of the transaction were indicated by placement under columns captioned

13   'Narcotics for Sale' and 'Prostitutes Wanted' rather than stated within the four corners of

14   the advertisement.").

15        There is no requirement that an advertisement "necessarily" or explicitly propose

16   an illegal transaction, without the use of code words or other indicia of unlawful activity,

17   in order for the publication to fall outside of the First Amendment's protection.  The sole

18   case Defendants cite in support of their proposed instruction—*Valle Del Sol Inc. v.*

19   *Whiting*, 709 F.3d 808 (9th Cir. 2013)—does not support that concept and has nothing to

20   do with this case.  In *Whiting*, the court held that Arizona could not target day laborers for

21   harsher punishment when, in the course of soliciting lawful work (*i.e.*, engaging in lawful

22   commercial speech), they violated an unrelated traffic law.  *Id*. at 814, 823.  *Whiting*

23   contains no analysis or discussion of any ads that use code words or other thinly-veiled

24   indicia of illegal activity.  *Whiting* likewise contains no language that would prevent the

25   jury from using ordinary interpretative aids in assessing the meaning of Backpage's ads;

26   nor does it say anything that might limit Defendants' liability here.

27        To the contrary, *Whiting* (*id*. at 822) recognized the continuing validity of *Pittsburg*

28   *Press*—which itself recognized that the context and/or content of an ad may be considered,

- 185 -

1    and that prostitution ads have no constitutional protection whatsoever.  413 U.S. at 388-39.

2    The instruction should not be given.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DEFENDANTS' PROPOSED INSTRUCTION
## FIRST AMENDMENT PROTECTION—CODED ADVERTISEMENT
## LANGUAGE

Coded language in an ad does not mean the ad is for an illegal activity. For example, where a website publishes an escort advertisement posted by a third-party that uses coded language that implies the advertisement is for prostitution, the advertisement may, in fact, just be for legal escort services.

[This instruction should track the elements and definition of "prostitution" that the government provided to the grand jury at the time this indictment was returned. *See* Doc. No. 1171.]

### Supporting Authorities

*See Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1279 (W.D. Wash. 2012) ("The pimp that publishes the advertisement certainly 'knows' whether his offer is for sex, whether explicitly or implicitly. However, what does it mean for the website operator to "know" that an advertisement "implicitly" offers sex? In Washington, 'a person acts knowingly or with knowledge when ... he or she has information which would lead a reasonable person in the same situation to believe that facts exist which facts are described by a statute defining an offense.' Wash. Rev. Code Ann. § 9A.08.010(b)(ii). However, where an online service provider publishes advertisements that employ coded language, a reasonable person could believe that facts exist that do not in fact exist: an advertisement for escort services may be just that. Similarly, Defendants contend that 'offer' is used 'to make clear that a transaction does not have to be consummated for SB 6251 to apply.' However, if the offer is implicit, how can a third party ascertain that which is being offered before the transaction is consummated?").

### UNITED STATES' OBJECTIONS

The instruction is not supported by the facts or the law, and it is confusing and

1   misleading.  The jury is entitled to consider all of the relevant facts and circumstances in

2   determining the meaning and import of a Backpage ad or advertising category.   The

3   government also incorporates by reference its objections to the preceding proposed jury

4   instruction.

5          *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012), does

6   not support the instruction.   That non-precedential case (decided in part under the

7   inapplicable Communications Decency Act) involved a facial challenge to a Washington

8   state statute, not a federal criminal prosecution.  The quoted language contains a series of

9   rhetorical questions and does not state a legal rule or requirement.  The instruction should

10  not be given.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4

## DEFENDANTS' PROPOSED INSTRUCTION
## FIRST AMENDMENT PROTECTION—GOVERNMENT CANNOT PUNISH
## LEGAL SPEECH TO SUPPRESS ILLEGAL SPEECH

5   The First Amendment prohibits the government from restricting or punishing legal
6   speech in an effort to eliminate illegal speech.  The possible harm to society from
7   permitting illegal speech to go unpunished is outweighed by the possibility that legal
8   speech will be suppressed.

9   The First Amendment prohibits the government from punishing a defendant based
10  on that defendant's or Backpage.com's refusal to cease publishing adult services or dating
11  ads, even if eliminating all adult-oriented ads would have reduced the number of ads
12  relating to illegal conduct on the website.

13                          **Supporting Authorities**

14  *Packingham v. North Carolina*, 137 S. Ct. 1730, 1738 (2017) ("as a general rule,
15  the Government 'may not suppress lawful speech as the means to suppress unlawful
16  speech'"); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002) ("The government
17  may not suppress lawful speech as the means to suppress unlawful speech.").

18

19                          **UNITED STATES' OBJECTIONS**

20  The instruction is not supported by the facts or the law, and it is confusing, irrelevant
21  and misleading.  This case is about Defendants' commission of federal offenses in the
22  course of operating, for more than a decade, the internet's largest source of ads for the sale
23  of adults and children for sex.  (*See generally* Doc. 793 (detailing the SI's factual and legal
24  allegations); Doc. 230.)  The suggestion that this case was brought to "punish[ ] a defendant
25  based on that defendant's or Backpage.com's refusal to cease publishing [otherwise lawful]
26  adult services or dating ads" mischaracterizes the SI and is untrue.  (*See generally* Doc.
27  230.)  The instruction should not be given.

28

**DEFENDANTS' PROPOSED INSTRUCTION**

**FIRST AMENDMENT PROTECTION—PROTECTED PUBLICATION OF**

**THIRD-PARTY SPEECH**

Under the First Amendment, the jury cannot find a defendant guilty of a crime based on a website's publication of a third-party classified ad, unless the government proves beyond a reasonable doubt that:

(i)     the defendant had actual knowledge of the particular ad, *and*

(ii)    the defendant had actual knowledge that the particular ad related to unlawful activity, *and*

(iii)   the defendant personally took an action causing the particular ad to be published on, or to continue to be published on, Backpage.com with the aim of furthering the illegal activity.

**Supporting Authorities**

*See Smith v. California*, 361 U.S. 147, 153-54 (1959); *Mishkin v. New York*, 383 U.S. 502, 511 (1966) ("The Constitution requires proof of scienter to avoid the hazard of self-censorship of constitutionally protected material ...."); *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 822 (9th Cir. 2013) (rejecting Arizona's proposed "novel extension of *Central Hudson's* legality requirement, which has traditionally focused on the content of affected speech—*i.e.*, *whether the speech proposes an illegal transaction*—instead of whether the speech is associated with unlawful activity") (emphasis added); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 830 (M.D. Tenn. 2013) (the First Amendment burden imposed by self- censorship is magnified on the Internet, because "websites … will bear an impossible burden to review all of their millions of postings or, more likely, shut down their adult services section entirely.").

# UNITED STATES' OBJECTIONS

The instruction is not supported by the law.  (Doc. 793 at 15-20; *see also* Doc. 649 at 32-36.)  As this Court has already found, the cases on which Defendants rely do not support the scienter described above:

> Defendants argue the First Amendment requires the Government to prove that each Defendant was aware of each ad that make up the fifty Travel Act counts and knew that each ad proposed illegal transactions. The Court is not persuaded that the First Amendment demands such a standard.
>
> . . . . Defendants largely rely on four cases [including *Smith v. California*, 361 U.S. 147 (1959), and *Mishkin v. New York*, 383 U.S. 502, 511 (1966)]. The Court concludes none of these cases mandate the *mens rea* requirement described by Defendants, and, instead, agrees with the Government that intent to promote or facilitate prostitution is sufficient.
>
> . . . . [In *Smith*, the Supreme Court] did not consider "what sort of mental element is requisite to a constitutionally permissible prosecution of a bookseller for carrying an obscene book in stock" and explicitly left open the possibility of prosecution for something less than specific knowledge of the contents of a particular book.  [361 U.S.] at 154–55.
>
> Likewise, *Mishkin* upheld a scienter standard less demanding than the one proposed by defendants.  There, the defendant was convicted of violating a New York Penal Law prohibiting possession of obscene books with intent to sell and hiring others to prepare and publish obscene books.  *Mishkin*, 383 U.S. at 503.  The Court upheld the scienter standard used by the New York Court of Appeals, requiring the State show defendants were "in some manner aware of the character of the material they attempt to distribute." *Id.* at 510. The Court reasoned, "proof of scienter" is required "to avoid the hazard of self-censorship of constitutionally protected material and to compensate for the ambiguities inherent in the definition of obscenity." *Id.* at 511.  The scienter standard used in the prosecution "amply serve[d] those ends, and therefore fully [met] the demands of the Constitution." *Id.*

(Doc. 793 at 15-16.)  Discussing *Pinkerton* liability, the Court also found:

> The SI contains sufficient factual allegations to implicate all Defendants. Additionally, when there is a "continuous conspiracy," the "overt act[s] of one partner may be the act of all without any new agreement specifically directed to that act."  *United States v. Pinkerton*, 328 U.S. 640, 646–47 (1946); *see United States v. Long*, 301 F.3d 1095, 1103 (9th Cir 2002) ("The Pinkerton doctrine is a judicially-created rule that makes a conspirator criminally liable for the substantive offenses committed by a co-conspirator when they are reasonably foreseeable and committed in furtherance of the conspiracy."). . . .  The pleadings and this order are replete with the relevant factual allegations against the defendants, so the Court will only briefly repeat them here.  Taken as true, they show Defendants had a specific intent to promote prostitution.

(Doc. 793 at 19.)

In discussing *Smith* and *Mishkin*, the government similarly explained:

Defendants' cases provide a more generous *mens rea* standard than Defendants suggest.  In *Smith v. California*, the Supreme Court invalidated an obscenity ordinance that contained no *mens rea* standard whatsoever; the ordinance imposed criminal sanctions on a bookseller "if in fact there is to be found in his shop an obscene book," "even though [he] had not the slightest notice of the character of the books [that he] sold."  361 U.S. 147, 152 (1959).  In requiring some *mens rea* requirement, *Smith* expressly did not adopt a specific standard: "We need not and most definitely do not pass today on what sort of mental element is requisite to a constitutionally permissible prosecution of a bookseller for carrying an obscene book in stock; [including] whether there might be circumstances under which the State constitutionally might require that a bookseller investigate further, or might put on him the burden of explaining why he did not, and what such circumstances might be."  *Id*. at 154.  *Smith* accordingly contemplates that *mens rea* may be satisfied by something other than knowledge of the contents of a specific book (or ad), especially where, as here, Defendants knew the vast majority of their "adult" ads were for prostitution and engaged in practices specifically intended to increase such advertising.[ ]

*Mishkin v. State of New York*, similarly recognizes a broader scienter standard.  In *Mishkin*, the Court noted the constitution requires proof of scienter to "avoid the hazard of self-censorship of constitutionally protected material and to compensate for the ambiguities inherent in the definition of obscenity."  383 U.S. 502, 511 (1966).  The Court declined to set a firm rule on what *mens rea* was required under *Smith*, and found more than sufficient the scienter required by the New York Court of Appeals in interpreting the state law at issue: namely, that defendants were "in some manner aware of the character of the material they attempt to distribute" such that the punished behavior was a "calculated purveyance of filth" and not innocent behavior.  *Id*. at 510-11.[ ]  *Mishkin* then rejected the defendant's argument that the evidence was insufficient to show such awareness, where the evidence included that the defendant had instructed artists and writers regarding the contents of most of the 50 books at issue, his efforts to conceal his role in the enterprise, and "the massive number of obscene books [he] published, hired others to prepare, and possessed for sale."  *Id*. at 504, 511-12.

Here, the SI's allegations likewise demonstrate that Defendants were "in some manner aware of the character of the material" they distributed such that their conduct involved the "calculated purveyance of filth" and not innocent behavior.  *Id*. at 510-11.  The SI alleges Defendants and their co-conspirators coached users, including P.R. and Victim 13,  regarding the contents of their ads, including many of the 50 ads identified in SI¶ 201 (*see, e.g.*, SI¶¶132, 172); concealed their roles in facilitating prostitution (*see, e.g.*, SI¶16 (Defendants misled the public, regulators and law enforcement), ¶77 (Padilla threatened to fire any employee who acknowledged in writing that a customer was a prostitute), ¶¶107-08 (Larkin warned Ferrer about making "public" Lacey's statements lauding Backpage's contributions to the prostitution industry); knew the vast majority of their "adult" ads were for prostitution (SI¶¶1, 9, 11, 15, 34); and sold massive numbers of such ads by operating the internet's leading website for prostitution advertising and collecting approximately $500 million in fees from such sales (*see* SI¶¶1, 177).  Combined with Defendants' intentional efforts to expand Backpage's prostitution advertising, and the repeated notices Defendants received from law enforcement, anti-trafficking organizations, the news media and other

- 192 -

sources concerning the predominance of prostitution ads in Backpage's "adult" section (*see generally* SI ¶¶ 9-11, 34-159), the SI demonstrates Defendants were well "aware of the character" of Backpage's "adult" ads such that their activity was "not [the] innocent but calculated purveyance of" prostitution solicitations. *Mishkin*, 383 U.S. at 512.

(Doc. 649 at 33-35.)

*Valle Del Sol Inc. v. Whiting*, 709 F.3d 808 (9th Cir. 2013), contains no language supporting the instruction and has nothing to do with this case. *Whiting* held that Arizona could not target day laborers for harsher punishment when, in the course of soliciting lawful work (*i.e.*, engaging in lawful commercial speech), they violated an unrelated traffic law. *Id.* at 814, 823. Moreover, *Whiting* recognized the continuing validity of *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376 (1973), and the Ninth Circuit has repeatedly reaffirmed that the First Amendment "extends no protection" to prostitution ads and solicitations. *Whiting*, 709 F.3d at 822; *Erotic Service Provider Legal Ed. and Research Project v. Gascon*, 880 F.3d 450, 459-60 (9th Cir. 2018); *Coyote Pub., Inc. v. Miller*, 598 F.3d 592, 603-04 (9th Cir. 2010).

*Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013), predated the factual and legal developments described *supra* and in Doc. 649 at 21-26 (incorporated by this reference). That non-precedential decision (decided in part under the inapplicable Communications Decency Act) does not support Defendants' proposed standard. The instruction should not be given.

**DEFENDANTS' PROPOSED INSTRUCTION**

**FIRST AMENDMENT PROTECTION—NO REQUIREMENT TO SHUT DOWN**

The First Amendment prohibits the government from requiring a website hosting third-party ads to shut down the adult section, even if doing so could have reduced the number of ads relating to illegal conduct.

**Supporting Authorities**

*Packingham v. North Carolina*, 137 S. Ct. 1730, 1738 (2017) ("as a general rule, the Government 'may not suppress lawful speech as the means to suppress unlawful speech'"); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002) ("The government may not suppress lawful speech as the means to suppress unlawful speech.").

**UNITED STATES' OBJECTIONS**

The instruction is confusing and irrelevant. In April 2018, Backpage pleaded guilty in a separate case and cooperated in its shut down. (*See United States v. Backpage.com, LLC*, CR-18-465-PHX-SMB, Doc. 8-2 at 6-11.) The instant case involves criminal charges against six individual Defendants, not Backpage.

Moreover, the proposed instruction is not supported by the cases Defendants cite. Neither case involved a website whose revenue-generating business model consisted of operating a massive online marketplace for illegal prostitution. *See, e.g., United States v. Ulbricht*, 31 F. Supp. 3d 540, 558 (S.D.N.Y. 2014) (rejecting website operator's argument that his site's online marketplace for illegal narcotics involved speech protected by First Amendment); *see also* Doc. 793 at 14 ("The SI does not allege Defendants are criminally liable because they unknowingly and unintentionally operated a website used by third parties to post prostitution ads. Rather, it alleges Defendants purposely sought out opportunities to increase prostitution advertising on Backpage. The SI alleges the Defendants intentionally identified prostitutes, created free Backpage ads for them, and

used those ads to try to secure future business.  (SI¶ ¶ 9, 36). . . .  Defendants also sought to expand their traffic through TER, a 'prostitution website' where 'johns' could rate and review escorts including the 'prices charged for particular sex acts.' (SI ¶¶ 10, 54). As alleged, Backpages' efforts to promote its website facilitated prostitution and were not protected business practices.").  *See also* Doc. 793 at 8 ("The SI sufficiently explains why defendants in this case are not just merely hosting third party content."); Doc. 840 at 9-10 & n.6 (explaining that the SI's allegations differentiate Backpage's activities from passive hosting of third party content).

The instruction should not be given.

1
2
3
4

**DEFENDANTS' PROPOSED INSTRUCTION**

**FIRST AMENDMENT PROTECTION—NO REQUIREMENT TO**

**INVESTIGATE**

5   An internet provider is not required to investigate or learn what its users are doing

6   and whether anyone is hurt as a result.

7

8   **Supporting Authorities**

9   *Doe v. GTE Corp*, 347 F.3d 655, 661 (7th Cir. 2003) ("Plaintiffs do not cite any case

10  in any jurisdiction holding that a service provider must take reasonable care to prevent

11  injury to third parties. Consider the Postal Service or Federal Express, which sell

12  transportation services that could be used to carry harmful articles. As far as we can

13  discover, no court has held such a carrier liable for failure to detect and remove harmful

14  items from shipments. . . . Similarly, telephone companies are free to sell phone lines to

15  entities such as [the Wrongdoer], without endeavoring to find out what use the customers

16  make of the service. See, e.g., *Anderson v. New York Telephone Co.,* 35 N.Y.2d 746, 361

17  N.Y.S.2d 913, 320 N.E.2d 647 (1974) (no liability for phone company that furnished

18  service to someone who used the connection to play a defamatory recording to all callers).

19  . . . Landlord, phone company, delivery service, and web host all *could* learn, at some cost,

20  what [Wrongdoer] was doing with the services and who was potentially injured as a result;

21  but state law does not require these providers to learn, or to act as Good Samaritans if they

22  do. The common law rarely requires people to protect strangers, or for that matter

23  acquaintances or employees. See generally *Stockberger v. United States,* 332 F.3d 479 (7th

24  Cir. 2003).").

25

26  **UNITED STATES' OBJECTIONS**

27  This "First Amendment" instruction is irrelevant, confusing and not supported by

28  First Amendment or other law.  In the case Defendants cite, *Doe v. GTE Corp*, 347 F.3d

- 196 -

1   655 (7th Cir. 2003), the Seventh Circuit affirmed the district court's dismissal, under

2   Section 230 of the Communications Decency Act, of a civil suit brought against an internet

3   service provider.  As this Court has already found, the CDA has no applicability in this

4   federal criminal prosecution.  (Doc. 793 at 13; *see generally* Doc. 840.)  Moreover, the

5   quoted language from *GTE* involved an analysis of the plaintiff's "negligent entrustment

6   of chattel" argument—a legal theory that has no relationship to this case.  *See GTE*, 347 F.

7   3d at 660-62.  The instruction should not be given.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DEFENDANTS' PROPOSED INSTRUCTION
## FIRST AMENDMENT PROTECTION—PUBLICATION DOES NOT CREATE CRIMINAL CULPABILITY

A defendant's operation of a website does not in and of itself provide culpable assistance to a wrongdoer; to prove a defendant guilty of assisting a criminal, the government must prove beyond a reasonable doubt that the defendant had a desire to promote the wrongful venture's success.

## Supporting Authorities

*Doe v. GTE Corp*, 347 F.3d 655, 659 (7th Cir. 2003) (evaluating internet service provider's liability under section 230 where wrongdoer posted surreptitiously obtained photos of naked college athletes: "GTE's activity does not satisfy the ordinary understanding of culpable assistance to a wrongdoer, which requires a desire to promote the wrongful venture's success. See generally *United States v. Pino-Perez,* 870 F.2d 1230 (7th Cir. 1989) (en banc). A web host, like a delivery service or phone company, is an intermediary and normally is indifferent to the content of what it transmits. Even entities that know the information's content do not become liable for the sponsor's deeds. Does a newspaper that carries an advertisement for "escort services" or "massage parlors" aid and abet the crime of prostitution, if it turns out that some (or many) of the advertisers make money from that activity? How about Verizon, which furnishes pagers and cell phones to drug dealers and thus facilitates their business? GTE does not want to encourage the surreptitious interception of oral communications, nor did it profit from the sale of the tapes. It *does* profit from the sale of server space and bandwidth, but these are lawful commodities whose uses overwhelmingly are socially productive. That web hosting services likewise may be used to carry out illegal activities does not justify condemning their provision whenever a given customer turns out to be crooked. [The wrongdoer] did not demand a quantity or type of service that is specialized to unlawful activities, nor do

plaintiffs allege that the bandwidth or other services required were themselves tipoffs so that GTE, like the seller of sugar to a bootlegger, must have known that the customer had no legitimate use for the service. Just as the telephone company is not liable as an aider and abettor for tapes or narcotics sold by phone, and the Postal Service is not liable for tapes sold (and delivered) by mail, so a web host cannot be classified as an aider and abettor of criminal activities conducted through access to the Internet.").

## UNITED STATES' OBJECTIONS

The instruction is not supported by law. In Defendants' sole supporting case, *Doe v. GTE Corp*, 347 F.3d 655 (7th Cir. 2003), the Seventh Circuit affirmed the dismissal under Section 230 of the Communications Decency Act of a civil suit against an internet service provider. As this Court has already found, the CDA has no application to this federal criminal prosecution. (Doc. 793 at 13; *see generally* Doc. 840.) Moreover, *GTE* does not address the Travel Act or other charged offenses set forth in the SI. And while Defendants style this as a "First Amendment" instruction, they cite no First Amendment caselaw in support. The instruction should be rejected.

In all events, and contrary to *GTE*, there are many independent ways of proving that a seller of goods or services (including a website operator) intended to facilitate unlawful activity. *See, e.g., People v. Lauria*, 59 Cal. Rptr. 628, 632-33 (Cal. Ct. App. 1967) (a seller's intent to facilitate prostitution may be inferred from, *inter alia*: (1) "proof . . . of inflated charges" for goods or services used for prostitution; (2) "evidence of any unusual volume of business with prostitutes," such as where "sales for illegal use amount to a high proportion of the seller's total business"; or (3) sales that "serve no other purpose than to advertise the professional services of the prostitutes"); Wayne R. LaFave, 2 *Substantive Criminal Law* (SUBCRL) § 12.2(c)(3), Providing goods or services, (3d ed., Oct. 2020 update) (intent may also be inferred from "the fact that the seller has made inflated charges, that he has supplied goods or services which have no legitimate use, [] that the sales to the illegal operation have become the dominant proportion of the seller's business," or the

- 199 -

seller's use of deceptive or "secretive" tactics); Monica J. DeLateur, *From Craigslist to Backpage.com: Conspiracy as a Strategy to Prosecute Third-Party Websites for Sex Trafficking*, 56 Santa Clara L. Rev. 531, 581 (2016) (intent can be proven, *inter alia*, by showing "the illegal activity was a high proportion of the business, the presence of a stake in the venture, or deliberate ignorance").  Moreover, no inference of intent is needed in cases involving "[d]irect evidence of participation, such as advice from the supplier of legal goods or services to the user of those goods or services on their use for illegal purposes." *Lauria*, 59 Cal. Rptr. at 632.

Furthermore, a website operator may be found to have the requisite intent when the defendant's website was designed or tailored to further illegal activity.  *See, e.g.*, *United States v. Ulbricht*, 31 F. Supp. 3d 540, 556 (S.D.N.Y. 2014) ("The Indictment does not allege that Ulbricht is criminally liable simply because he is alleged to have launched a website that was—unknown to and unplanned by him—used for illicit transactions. . . . Rather, Ulbricht is alleged to have knowingly and intentionally constructed and operated an expansive black market for selling and purchasing narcotics and malicious software and for laundering money. This separates Ulbricht's alleged conduct from the mass of others whose websites may—without their planning or expectation—be used for unlawful purposes."); *United States v. Omuro*, N.D. Cal. No. 14-CR-336, Doc. 70 at 1-3 (court accepted guilty plea and convicted www.myRedBook.com founder Eric Omuro under the Travel Act, 18 U.S.C. § 1952(a)(3)(A); Omuro's website hosted thousands of ads posted by prostitutes in the western United States, and generated profits from fees paid by "escorts" to post their ads more prominently); *United States v. Hurant*, E.D.N.Y. No. 16-CR-45, Doc. 117 at 1, 6 13-14 (court accepted guilty plea and convicted www.Rentboy.com founder Jeffrey Hurant for violating the Travel Act; Hurant admitted he "was well aware…that the escort ads he posted…were thinly-veiled proposals of sexual services in exchange for money"; *id*. Doc. 125 at 2 (like Backpage, Hurant's employees often rejected ads with explicit offers of sex for money "but allow[ed] the ad to be resubmitted with different language.  In many cases, Rentboy.com employees would just

edit the advertisement's language and approve it.").

Finally, the instruction is unnecessary to the extent it merely reiterates any requirements from other instructions, including those regarding the substantive offenses charged in the SI.

The instruction should not be given.