UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

United States of America, ) CR-18-00422-PHX-SMB
Plaintiff, ) Phoenix, Arizona
vs. ) September 2, 2021
) 8:36 A.M.
Michael Lacey, et al.,
Defendants. )

BEFORE: THE HONORABLE SUSAN M. BRNOVICH, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL - MORNING SESSION

Official Court Reporter:
Barbara H. Stockford, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 39
Phoenix, Arizona 85003-2151
(602) 322-7247

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

A P P E A R A N C E S

For the Government:

U.S. Attorney's Office
By: PETER S. KOZINETS, ESQ.
KEVIN M. RAPP, ESQ.
MARGARET WU PERLMETER, ESQ.
ANDREW C. STONE, ESQ.
Two Renaissance Square
40 North Central Avenue, Suite 1200
Phoenix, AZ 85004

U.S. Department of Justice
Child Exploitation & Obscenity Section
By: REGINALD E. JONES, ESQ.
1400 New York Avenue, NW, Suite 600
Washington, DC 20530

For the Defendant Michael Lacey:

Lipsitz Green Scime Cambria LLP
By: PAUL J. CAMBRIA, JR., ESQ.
ERIN McCAMPBELL PARIS, ESQ.
42 Delaware Avenue, Suite 120
Buffalo, NY 14202

For the Defendant James Larkin:

Bienert Katzman PC
By: THOMAS H. BIENERT, JR., ESQ.
WHITNEY Z. BERNSTEIN, ESQ.
903 Calle Amanecer, Suite 350
San Clemente, CA 92673

For the Defendant John Brunst:

Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow PC
By: GARY S. LINCENBERG, ESQ.
GOPI K. PANCHAPAKESAN, ESQ.
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067

A P P E A R A N C E S (Continued)

For the Defendant Scott Spear:

Feder Law Office PA
By: BRUCE FEDER, ESQ.
2930 East Camelback Road, Suite 160
Phoenix, AZ 85016

For the Defendant Anthony Padilla:

David Eisenberg PLC
By: DAVID EISENBERG, ESQ.
3550 North Central Avenue, Suite 1155
Phoenix, AZ 85012

For the Defendant Joye Vaught:

Joy Bertrand Esq. LLC
By: JOY MALBY BERTRAND, ESQ.
P. O. Box 2734
Scottsdale, AZ 85252

4

INDEX

| SUMMARY OF COURT PROCEEDINGS | PAGE |
| --- | --- |
| Jury Voir Dire | 5 |

UNITED STATES DISTRICT COURT

(In open court; jury not present.)

THE COURT: We are on the record outside the presence of the jury.

All right. So we're going to talk about strikes for cause before the jury comes back.

From the government, do you have any motions?

MS. PERLMETER: Your Honor, the government moves to strike Juror No. 38 for cause.

THE COURT: I'm sorry. Can you speak up?

MS. PERLMETER: The government moves to strike number 38 for cause.

MR. LINCENBERG: Did you say number 38, please?

MS. PERLMETER: Juror No. 38 was the one whose children were victimized in sex crimes. She made the distinction yesterday that she could sit if the case did not involve children, but that she would not be able to sit if the case involved children. Although the government does not anticipate calling any children as witnesses, some of the people who we anticipate testifying were children when the events happened to them.

MR. LINCENBERG: We have no objection.

THE COURT: Okay, okay. Juror 38 will be struck.

Any others?

MS. PERLMETER: Juror No. 39, Your Honor. Juror No. 39 is the 19-year-old who expressed that she did not

think she could sit as a juror because she is a kid herself and didn't understand some of the words that were being asked of her yesterday.

THE COURT: Any objection?

MS. BERNSTEIN: No objection.

THE COURT: Juror No. 39 will be struck.

MS. PERLMETER: And then Juror No. 45, Your Honor. Juror 45 was the gentleman sitting behind the prosecution area in the courtroom yesterday. He was wearing a green-ish top. He said he couldn't deliberate because the case involved children.

MS. BERNSTEIN: No objection.

THE COURT: Okay. Juror 45 will be struck.

MS. PERLMETER: And that's it from the government.

THE COURT: Okay. From the defense?

MR. CAMBRIA: Good morning, Your Honor. Paul Cambria.

Juror No. 34, you may require -- you may recall he was the retired police officer who made it very clear that he would treat police witnesses differently than he would others. And I think when the government attempted to rehab him, he dug in even farther at that point.

THE COURT: Any objection?

MS. PERLMETER: No objection.

THE COURT: And, just for the record, if one of you moves to strike someone, I'll assume you all do unless you tell

me you disagree.

MR. CAMBRIA: Thank you.

THE COURT: Okay. Mr. Cambria, do you have others?

MR. CAMBRIA: I do. Number 54, this was the lady who had been on a prior case involving sexually-oriented material and she said that, apparently, it had a traumatic effect on her because she indicated that she continues to visualize, if you will, the exhibits that were in that case. She said that it would be very difficult for her to be able to engage with other jurors and discuss any pictures, if you will. And I think that, you know, based on the fact that -- I mean, I've got a lot of cases in certain areas. I've never had anybody say that they were traumatized by looking at certain things like this, and she did. So I think that that's so engrained that she is not someone who can be fair and impartial to the defendants.

MS. PERLMETER: Your Honor, would you like me to stand when I respond or is it okay to remain seated?

THE COURT: You can remain seated.

MS. PERLMETER: Okay. Your Honor, the government objects. Juror No. 54, she did explain she was questioned heavily by the defense. She stated that, while the -- specifically as to the photos, that she remembered the photos, that it was still her memory, and she said it would be uncomfortable deliberating. However, she did say she would be able to deliberate. It's not materials that she will

particularly want to see every day, but that she would be able to do her duty and she understands her duty based on her prior jury service.

MS. BERNSTEIN: Your Honor, this is Ms. Bernstein. I just want to add for the record that that question -- "Can you deliberate about graphic sexual topics?" -- if you'll recall, that was put into our questionnaire by Mr. Rapp himself. He said that was crucial for the case. He fought for that question and this is why -- because, if a juror is uncomfortable discussing the subject matter we're going to go through in laborious detail for the next couple of months, they should not be on the jury. And I recall speaking with that juror and she said it was twofold; that, one, she was unable to -- she felt uncomfortable herself and she also felt extremely uncomfortable speaking to others, strangers, on the jury about it.

THE COURT: Sorry, I just want to get her questionnaire because, although she did say it was uncomfortable, I remember it that she was very clear that she could do it. She -- even if it would be uncomfortable.

MS. BERNSTEIN: She did say that she would be able to do it like she did four years ago where the images continue to haunt her.

MR. LINCENBERG: And, Your Honor, this is Mr. Lincenberg. You may want to check the transcript on it.

Obviously, we went through a lot of jurors. My memory is a little different from the Court's.

THE COURT: Okay. Well, that's not one where I -- I was paying particular attention because I knew what the issue was when both sides were questioning her. And the motion to strike is denied.

MR. FEDER: Number 40.

THE COURT: Do you want to put -- I mean, if there's no objection, I don't have to hear argument.

MS. PERLMETER: We object.

THE COURT: Okay.

MR. FEDER: One, he talked about his financial hardship. This is in his jury questionnaire. Questionnaire indicates hardship would be to loss of income and burden on work as I'm a software project manager overseeing several large software implementations during the timeframe. I think he talked about that at some length.

When questioned about whether or not, if an advice-of-counsel defense was proposed, he would indicate, even if the advice was bad, that they're still breaking the law and it wouldn't matter if a defendant relied on it which, of course, undermines the good-faith defense which we believe will be an issue in this case.

Then he equated prostitution and trafficking which, as the Court knows, have been an ongoing problem in this case with

the government asserting trafficking when they're not charged with trafficking, and -- but that he would not back off of that.

And then he couldn't really commit to saying that he wouldn't give the law enforcement officers more credibility than other witnesses notwithstanding what the instruction is.

THE COURT: And from the government?

MS. PERLMETER: Your Honor, Mr. Feder hit the nail on the head when he said the juror was unable to commit. Jury selection is not an attempt for jurors to commit one way or another how they will vote. At this juncture, there has been no evidence presented. We are just trying to figure out if people can sit fairly and impartially based on life circumstances they may have had.

As to the financial hardship, he stated that he would not -- he would likely not lose his job if he sat on this jury. He indicated that his projects would be delayed, but he thought it would be unlikely that his clients would move to another company.

Further, he stated he would be okay with someone like himself on the jury when asked by the defense. He does have some questions about what the law is, as many jurors do, between what an escort is, what prostitution is, and what trafficking means. And, at this point, that is to be expected as they have received no instruction from the Court.

He further stated that, in his view, it's not about whether or not escorting's a good thing or bad thing. It's about whether or not someone broke the laws. He stated over and over again that he would treat all witnesses fairly, that he could be fair and impartial, and that he would abide by the law.

So, for those reasons, we ask for the defendant's motion to be denied.

MR. FEDER: You do have to commit to following the law. This is not committing to some side or the other. You have to commit to following the law, and he said that he would not do that as it regards law enforcement.

If you look at his questionnaire, he is bothered by the fact that escorts are legal. He believes it should be illegal. And there is just a whole host of questions -- or answers in his questionnaire that indicate he couldn't -- he couldn't and shouldn't be a good juror.

MS. PERLMETER: And, Your Honor, he further stated that he could be fair and went so far as to discuss that he would not -- if the evidence -- if the government failed to prove its case, he would have no qualms about returning a not guilty verdict and going home to tell his wife about it.

MR. CAMBRIA: May I add, Your Honor, that my note indicates that he could not commit to treating non-police or law enforcement witnesses with equal credence as other

witnesses. Indicated that he had two family members who are police in Canada and he is accustomed to trusting law enforcement. So he's -- in fact, there is no equivocation there about his fact that he made it clear he could not treat the two alike. And there will be a number of police officers in this case, and that's sort of bedrock. I think that that disqualifies him alone.

MS. PERLMETER: Your Honor, the jurors --

THE COURT: Okay. Go ahead.

MS. PERLMETER: The juror stated that he could treat all witnesses fairly and then, when questioned about the relationship with the law enforcement officers in Canada, he indicated that they were his brothers-in-law and not his brothers.

MR. CAMBRIA: The bottom line is he --

THE COURT: Mr. Cambria, enough. Juror 40 will be struck over objection.

Any others?

MR. EISENBERG: Good morning, Your Honor. I'm David Eisenberg. And we're moving to strike Juror No. 46. This refers to this juror's answers to the questionnaire. One answer was that she could not -- she was -- she agreed with the proposition that the defendant should prove his innocence and she agreed with the proposition that the defendant should be expected to testify which are both bedrock principles with

respect to the Constitution.

So many people have evidence that, in this -- both in the jury questionnaires and during the voir dire, this one, I think she just maintained that that's what her position should be and that's what her position is. That is inherently a biased juror.

THE COURT: The government's position?

MS. PERLMETER: Your Honor, I don't have her saying that she -- if she -- as many jurors stated early on in their questionnaire that they thought the defendant should testify about their innocence or they thought they should do something proactively in a criminal trial, however, many of them rehabilitated. I don't have any notes that this one maintains a defendant should need to testify.

This juror volunteered that she had no problem voicing her opinion and would do what she needed to do if chosen to sit as a fair and impartial juror. She said that she was open to hearing facts and that, at the end of the day, she would hold her ground as to this position.

THE COURT: Okay. So I'm left with her answer in the questionnaire with no rehabilitation. So Juror 46 will be struck.

MR. LINCENBERG: Your Honor, the next would be Juror 44.

This is Mr. Lincenberg.

Juror No. 44, in the questionnaire, when asked about the ability to discuss sexually explicit topics with fellow jurors -- that was Question 79 -- said no, it would be difficult. Question 88, when asked about any beliefs affecting your ability to sit in judgment, said yes without explanation. I think that's enough to disqualify the juror.

On top of that, juror also indicated that, with regard to escort services, even if they are legal, it is -- they are a sin. The juror was bothered that escorts are legal, and it is a sin. And with regard to prostitution also being a sin, Juror 44 talked about her how her ex-husband was addicted to pornography, was convicted and served time. Felt he deserved it.

I don't believe that this juror, based on both her answers in the questionnaire and in court, has the ability to sit as a fair and impartial juror.

MS. PERLMETER: No objection.

THE COURT: 44 will be struck.

MR. LINCENBERG: With regard to Juror 56, Juror 56, Your Honor, I would submit is a very easy call. Juror 56 said it's hard to believe that the Backpage defendants wouldn't understand that they were facilitating prostitution by posting escort ads and then said "My belief in this is firm." The juror said that the juror would not be able to distinguish between illegal and adult sex ads even if the law does. And it

bothers the juror that escorts are legal.

THE COURT: Any objection?

MS. PERLMETER: No, Your Honor.

THE COURT: 56 will be struck.

MS. BERNSTEIN: Your Honor, this is Whitney Bernstein.

I would like to move to strike Juror No. 37 for cause. This was an individual who was seated over here. He said that he worked in a career in law enforcement in Tempe and he knows that escorts and prostitutes are synonymous despite what the law says. He said "If I were a defendant in this case, I would not want me on the jury" -- excuse me. I'm sorry. I'm reading notes for a different juror.

Let me go back to 37, Your Honor. That was the juror that said he had also formed a very firm belief that prostitution and escorts are anonymous. He said, when asked if he could still be impartial, that he has his doubts because it's a moral question for him, and he said he has held these beliefs for a long time.

THE COURT: Any objection?

MS. PERLMETER: Yes. Your Honor, the same issue applies to Juror No. 37. He does not know what escorting and prostitution is as defined by the Court.

With regard to morality, I don't think it's unexpected that you will find a person that feels that prostitution is immoral. Similarly, like you would not -- it would not be

unexpected to find a juror who thinks that child pornography, sexual exploitation or murdering somebody is immoral. This juror said that he was not sure what this case was about yesterday, and he said that he would do his duty and sit and listen to the evidence if required.

MS. BERNSTEIN: Your Honor, those are not my notes. My notes show a direct quote.

THE COURT: Okay, stop. So Juror 37 will be struck. I have him in with two other jurors that have already been struck where they were unable to or unwilling to distinguish between an expert -- I'm sorry -- an escort and a prostitute. Juror 37 will be struck.

MR. BERTRAND: Your Honor, this is Joy Bertrand for Ms. Vaught.

The defense moves to strike Juror 43. You might recall that Juror 43 is our juror who also submitted a questionnaire that was not completed and he had an excuse for it we heard about for the first time yesterday. So there's also an initial concern about him being able to follow direction and fully participate.

Within the voir dire that occurred with him yesterday, he had a strong feeling about pornography, saying pornography takes advantage of people who need support, especially teenagers. This Court talked with him, but he also had several inconsistencies within his statements. He said his moral views

he keeps inside and that websites should have accountability and be responsible for illegal content hosted by users.

So he is coming with a preformed conclusion about what is the crux of this case, and I would note that the standard here is one of substantially impaired. It does not -- the standard is not that they are so obviously biased. It's that does their world view create a substantial impairment to being able to fairly sit on this case and, at the end of the case, deliberate. So we would move that Juror 43 be struck.

THE COURT: Any objection?

MS. PERLMETER: Yes. First, as to being unable to follow directions, Juror No. 43's questionnaire did not -- it was not complete, the version that the parties received. He stated that he hitted "Submit" and he had an error and then he resubmitted. So the government does not see any instance where he failed to follow directions.

As to his ability to sit fairly and impartially, while he did say that websites should bear some responsibility, that is not -- that question was asked of everybody. So not everybody who answers one way or another, or it would be everybody who answers with -- suddenly had a preconceived notion would be unable to sit, which is simply not the case. He was very, very clear, after being pressed time and time again, that he would be fair, that he would be impartial, and he even went on to say that, if the law was such that it was

against what he thought it should be or it was against his morals, that it would win and he would follow the law.

THE COURT: Okay. The motion to strike Juror 43 is denied.

Are there any others?

MR. BERTRAND: Yes, ma'am. Juror 57.

THE COURT: Did you say 57?

MR. BERTRAND: Yes.

THE COURT: Okay.

MR. BERTRAND: This is the gentleman in the back of the room near the door. And we had a conversation yesterday late in the day about distinguishing trafficking from prostitution and, as noted in the defendant's pleadings recently, this is a critical distinction, and he struggled.

THE COURT: Is it the critical distinction between escorts and prostitutes or escorts and trafficking, not prostitutes and trafficking, which are both illegal?

MR. BERTRAND: I think there is an additional distinction because the defendants here are charged only with facilitating prostitution. The government is doubling down on its efforts to make this a case about contributing to human trafficking. And this gentleman could not -- had difficulty discerning between prostitution, which is illegal understandably, but not nearly as serious as human trafficking. And that's a big difference because, if he is going into the

back -- going back to deliberate with his jurors and conflating prostitution which does -- and sex work, which includes people choosing to do this that are free agents, and trafficking where people are trapped, forced to do things they do not want to do for whatever reason, that is a very serious predisposition that he is not going to be able to put aside. So we would move to strike 57 for cause.

THE COURT: Okay. Government?

MS. PERLMETER: Your Honor, Juror No. 57 has not been given an instruction or any guidance on what prostitution is and how it may or may not be different from human trafficking. So it's very difficult for him. There is no evidence right now that he is going to conflate anything in a jury room if he is selected to be a member of this jury. He indicated he could be fair and impartial and he could follow the law.

THE COURT: Okay. The motion or request to strike Juror 57 is denied. I agree. These are complicated things to understand if you have no exposure. And just because he wasn't out of the blue able to come up with the correct definition doesn't mean he wouldn't be able to understand it or that it would affect his ability to follow the instructions.

Are there any others?

No. Okay. All right. We will bring in the next group.

MS. BERNSTEIN: Your Honor, before we get started,

I just wanted to ask for a break no later than 10:30, if I can have a 30-minute break. I can go until about 10:30.

THE COURT: Okay. Thirty minutes.

MS. BERNSTEIN: I will need a 30-minute break.

THE COURT: Are you going to need that through the entire trial?

MS. BERNSTEIN: Yes, Your Honor.

MR. BIENERT: Your Honor, I'm yelling from the rafters because I'm way up here. I am here and I can step in if there's a reason, if you're not there when we need to get going. I will be here throughout the trial.

THE COURT: We'll have to talk about that.

MS. BERNSTEIN: Your Honor, while I'm handling jury selection today, I would just ask to be able to get a break so I'm not missing that.

THE COURT: Yes.

Before she goes down, I did want to let you know I went and looked at statements by Juror 30 and 14 because I took those under advisement yesterday. And there was an objection by each side to one and, over objection, Juror 30 and Juror 14 are going to be struck.

Okay, now you can unmute it and bring in the next panel.

MS. PERLMETER: Just for scheduling, are we doing Panel 3 --

MR. LINCENBERG: I can't hear you, Ms. Perlmeter.

THE COURT: We can't hear you.

MS. PERLMETER: Just for scheduling purposes, it looks like, from the seating chart that was handed out yesterday, there is Panel No. 3 that's full and then there's a few people left on Panel No. 4, right?

THE COURT: Yes.

MS. PERLMETER: Okay, thank you.

MR. LINCENBERG: I'm sorry. So this panel is going to be 62 through what number?

THE COURTROOM DEPUTY: 63.

THE COURT: 63.

MR. LINCENBERG: 63 through what?

THE COURT: 94.

THE COURTROOM DEPUTY: No, 93, Your Honor.

THE COURT: 93?

THE COURTROOM DEPUTY: Yes. Is that 31?

MR. LINCENBERG: That's 31.

(Recess taken from 9:02 a.m. to 9:11 a.m.)

(Prospective jurors present.)

THE COURT: Okay. Counsel, in this group, Juror 78 is late. So we're just going to put Juror 78 with the next group just so you know. And I believe we left the seat empty so you'll know.

All right. Good morning, everybody, and thank you for

your time and patience. I know you had to listen downstairs all day yesterday; so I'm sure it was a long day. As I have explained and, hopefully, you heard, because of COVID procedures, we have to do this in much smaller groups than we normally would. So it does take a little bit longer.

We are set to continue jury selection in this case. Would all prospective jurors please stand and raise your right hand to be sworn?

(Prospective jurors sworn.)

THE COURT: And I'm going to re-go over some ground rules that you might have heard me tell the jurors yesterday, but I just want to go over them again.

During this process here in person, we will be using your juror number to talk to you. So I will call you by your number. The attorneys will call you by your number. And I'll ask that, when you identify yourself, that you use your number.

I've explained that the reason we do that, because everything said here in court is being taken down word for word by the court reporter. So we do this to keep your names out of the record and it's not meant to be impersonal, and I hope you don't take offense to it, but that's why we're doing it.

This morning you will be asked a number of questions about yourselves and you have been asked a number of questions about yourselves. These questions are not intended to pry unnecessarily into your private lives and affairs. However, it

is necessary that we ask these questions to find out if you have any knowledge about this case or any of the people involved in the case, to find out if you have any preconceived opinions about the case which you might find difficult to lay aside and find out if you've had any personal or family experiences that might cause you to identify yourself with one party or the other. So, in other words, we're asking these questions so we can assure all the parties that the jurors who are selected to decide this case can be fair and impartial.

When answering a question, don't be concerned with whether your answer to a question is right or wrong. Just be honest and candid in your answers.

During this in-person process, if your answer to a question is no, you need do nothing. If your answer to a question is yes, please raise your hand and I or the attorneys may follow up with you.

If, at any time, you are asked a question, I'm going to ask that you stand up because it helps. We're also going to have microphones brought to you. It is very difficult for all of us to hear if you don't use the microphone. So it's a little -- and sometimes they're a little tricky. So you have to keep it pretty close-up, but we'll remind you if we can't hear you. Anyway, so if you're asked a question, if you could please stand and state your number before you answer it. That way, it's on the record who's talking.

All right. That is my introduction. And the only question I have for -- well, actually I have two questions. One is: Is there anybody that has read, heard or seen anything about this case after you left here last night?

Okay. I don't see any hands.

And is there anything that's changed after you submitted the questionnaire that you think would affect your ability to sit as a juror in this case?

Okay. I'm just going to write down everybody's number and you can put your hands down. 68, 70, 72, 74, 76, 77, 79, 80, 81, 82. Thank you. 86, 87, 88, 89.

Okay. Juror 68.

JUROR: Good morning.

THE COURT: Good morning.

JUROR: I'm Juror 68. Yesterday, Your Honor asked potential jurors if anything had changed since we filled out the survey. My circumstances have remained the same. However, upon hearing questions posed both by the prosecution, defense -- and defense lawyers, subsequent answers I provided for potential jurors, I would like to add the four following items in the hope that they may be helpful to the Court.

First, I work as a software engineer at CVS Health Aetna. I had assumed all along that I would be able to serve as a juror for an extended period of time without any financial hardship. Based on what I heard yesterday that some answers

were given, I am not sure that something was correct or not. I asked my manager for input.  So far, I haven't gotten any.

Second, questions arose about witnesses who may be homeless or about prior drug use.  I grew up on welfare in the home of an alcoholic.  For a brief period around the age of 12 and 13, I used drugs, mostly marijuana.  At age 14, along with my father, we were homeless for a short period of time. I wanted to make it clear that I always thought it was temporary, and it was, but I am confident I can process the credibility of witnesses without bias attached to their homelessness and prior drug use.

Third, I do not recall the answers I provided on the survey, but I would like to ensure the Court -- know that I am a member of the Free Software Foundation, a nonprofit that works to produce free software.  Examples of free software include Linux Kernel that is found in most cell phones and the Apache web server that runs many websites.

Questions about platforms, content and responsibility and technology is of general deep interest to me in particular as it centers on questions regarding user control over the programs they use.

Several years ago I deleted my Facebook account and switched to a social media platform called Diaspora.  I did so because Diaspora is based on free software.

Fourth, much of my work involves securing data via

encryption.  My interest -- my work interest generated an early
interest in Bitcoin.  I owned just over two Bitcoins before
giving them to my daughter and son-in-law as a wedding gift.
I eventually sold my remaining Bitcoins and concluded I had
ethical concerns with the technology.  In particular, I was
bothered by the enormous energy consumption by Bitcoin.  The
ability to process financial transactions outside the normal
financial system is clearly attractive to criminal actors such
as ransomware authors and the infamous Silk Road website.

That said, like cash itself, Bitcoin itself can be
used by any two actors whether they be law abiding or
criminals.  Although many assume Bitcoin is anonymous, in fact,
the ledger is entirely public and cryptographically beyond
tampering.  It has to be; otherwise, the system would not work.

Anonymity within Bitcoin is only insured when the
relationship between the Bitcoin address and the private key
used to produce it is a secret.  If the identity of the owner
of the Bitcoin address is known, the entire transactions
associated with that address can also be known.  Thus, I would
view the Bitcoin ledger that is Bitcoin itself non-disputed.
However, the burden of any who would use such evidence to
establish -- pardon me.  However, the burden of any who use
such evidence would be to establish who owns the Bitcoin
address involved in the transaction, what goods and services
were used, were being paid for or sold.  This latter

information is not in the public ledger.

Thank you.

THE COURT: Okay, thank you.

Juror 70.

JUROR: Number 70. Your Honor, since I filled out the questionnaire, I've been diagnosed with Felty syndrome and four weeks ago I started weekly chemotherapy treatments.

THE COURT: Okay. Thank you.

MR. LINCENBERG: Can the Court just repeat that? I just didn't hear it.

THE COURT: She was recently diagnosed with something that I probably can't pronounce, but has started weekly chemotherapy for that. Does that help?

Okay, Juror 72.

JUROR: Good morning, Your Honor. Juror 72.

Since filling out the questionnaire, I have had two things come up. I have been waiting -- I'm a victim in a crime out of my area. It happened back in January and, due to the pandemic, it was postponed. And we just recently got notification that it will be started on November 2nd, and this is through the San Tan Justice Court out in Chandler.

And also there was a trip that was scheduled without my knowledge, October 21st through the 25th. Airline tickets have been purchased. Venues have been purchased. Accommodations have been purchased.

THE COURT: Okay. Thank you.

THE COURTROOM DEPUTY: Juror 74.

JUROR: Good morning. Juror 74.

Since I filled out the questionnaire last Thursday, my son received a positive COVID test and I had emailed you on Friday the test results. And he does reside in my house. I have tested negative, but I felt that was something important to share.

Additionally, my son who is a senior at ASU, criminal justice major, has received an internship job just this last week and he will be doing some surveys with the Glendale Police Department.

THE COURT: Okay. Thank you.

Juror 76.

JUROR: I have lupus in my questionnaire, but I wanted to provide more detail: that I started a new job about six weeks ago with a small nonprofit. I play a leadership position and it would be an extreme hardship for me to be gone. And I would be working at night and on weekends to try and complete work which would create a distraction for me throughout this trial.

THE COURT: Okay. Thank you.

Juror 77.

JUROR: Good morning.

THE COURT: Good morning.

JUROR: Juror 77. Since I filled out the survey, my job at work -- I work for a large aerospace firm. The recovery has turned sort of the other way and, while I still could be an impartial juror for a long trial like this, I would have to work nights and weekends to keep up at work because there are certain leadership things that I have to participate in if things go south and we end up having to reduce our force or something like that.

THE COURT: Okay, thank you.

JUROR: Good morning. Juror 79.

Since filling out the questionnaire, I put that I was moving, that I was supposed to move at the end of August. But I became a holdover tenant and we're having trouble finding a place. So I'm ongoingly searching for a rental place. So I yet don't know where I'm going to live, but I will be moving at the start of this trial. I don't think it should affect my juror status too much because I should be able to move on a weekend, but I don't know where I'm living yet.

THE COURT: Okay. So you're moving locally?

JUROR: Yes. I'm staying in the area.

THE COURT: You're not moving out of state. Okay.

JUROR: And then also I am a graduate student on a research project and I am the only graduate student on my research project. There is no one else that can take over and I'm just kind of concerned that I won't be able to graduate on

time next year and it might affect my funding.

THE COURT: Where are you a graduate student?

JUROR: Arizona State.

THE COURT: Okay. Thank you.

Juror 80.

JUROR: Good morning, Your Honor. Subsequent to filling out the questionnaire, I just wanted to share with the Court that the chief financial officer of the company where I'm employed, which is a public company located in Scottsdale, has announced her retirement. And her replacement and the transition for that individual is slated to occur over the next three months. In my role at the company, I will be directly involved in that transition process and they've expressed concern about my inability to be around for the timeframe required by this case. And would also require night and weekend work just to keep up and maintain with day-to-day responsibilities.

THE COURT: And what company is that?

JUROR: It's STORE Capital Corporation.

And I just further wanted to share that my daycare-aged child is in speech therapy twice a week and I am responsible for taking him to his appointments and back to daycare. For a long-term basis, it would be challenging for me to find accommodations or alternative logistics of getting him to those appointments for the trial period.

THE COURT: Okay, and are there any other adults living with you?

JUROR: Yes, my husband.

THE COURT: And does he work?

JUROR: He does. He is in a senior leadership position as well.

THE COURT: And do you have any other family in the area?

JUROR: My husband's parents live in the area.

THE COURT: Do they drive?

JUROR: They do.

THE COURT: Okay. Thank you.

Juror 81.

JUROR: Juror 81. My wife and I both work full time. And we have three young children; ages nine, seven and four. And when I filled out the questionnaire, my expectation was that three kids would all be in school or preschool full time during the time of trial. And with the explosion of the Delta variant, COVID, we have decided it's not safe to have them in school all the time. So the four-year-old is staying home full time now. And the seven and nine-year-old, they're in school only during the times they have to be which means we drop them off in the morning and pick them up for lunch and take them out of school for lunch, take them back after lunch, and pick them up as soon as they are released.

So if they were in school full time, I thought it would be, you know, kind of a burden, but we could get through. My wife would be -- she would have the whole day mostly to work. We both work from home full time, by the way.

So, since they're not in school full time, I'm just concerned it would be a very heavy burden on her. She was already very stressed at work and considering quitting her job, and literally just yesterday she got a promotion which means the stress level is going to be increased. She'll have more responsibility. And I'm almost certain, if I have to do jury duty for three months, she'll be effectively a single mom for three months. I think she will end up quitting her job and it would put a heavy financial burden on us. That's all.

THE COURT: Okay. Thank you.

Juror 82.

JUROR: Juror 82. Since filling out the questionnaire, I have seen my doctor and they are treating me for IBS that has been flaring up for the last three weeks. And I also talked with my employer. They are unaware of the policy, if it would extend more than 10 days.

I am a single provider in my household as well as going through a bankruptcy and a divorce case that are both filed with the courts here in Arizona.

THE COURT: And who do you work for?

JUROR: Walgreens.

THE COURT: And did you check with the HR department about their jury policy?

JUROR: My manager reached out to our corporate office when we -- I first heard about the trial a couple weeks ago, but we have not heard back from corporate.

THE COURT: Well, that's disappointing. Okay, thank you.

Juror 86.

JUROR: Good morning, Your Honor. I'm asking to be dismissed from this case because of crimes against women. My sister was murdered and my mother was murdered. I feel it would be too emotional for me, and I have already formed an opinion and I would just like to be dismissed from the case.

THE COURT: And how did you form an opinion? Just based on the little description?

JUROR: Based on the information I received yesterday from listening, I've decided that it's -- I've already made a decision.

THE COURT: Okay. Thank you.

And Juror 87.

JUROR: Hi, yes. 87. I have a compromised immune system and, since the increase in the Delta variant, my rheumatologist has suggested that it would be too large of a risk to participate in, you know, potential exposure. So in a leadership position full time in my job, and it would be a risk

to my employment.

THE COURT: And I'm sorry, I lost you at the end there.

JUROR: I'm sorry. It would be a risk to my employment. I have only been there about four weeks in a leadership position and they don't pay for service beyond the time that is.

THE COURT: And who do you work for?

JUROR: Item 9 Labs.

THE COURT: Okay. Thank you.

Okay. Juror 88.

JUROR: Juror 88. I submitted a request to the Court that my service be postponed for six months. I am revoking that request. My circumstances have changed.

Secondarily to that is, when I filled out the questionnaire, the question about do I have any relatives affiliated with law enforcement, I said no. In fact, that's not true. I have an uncle who is retired from the Montana State Patrol and I have a cousin employed by the sheriff of San Jose County, California.

THE COURT: Okay. Thank you. Well, let me just ask you a follow-up on that. Your relatives that are in law enforcement, do you talk them to about their job?

JUROR: I rarely see them and I rarely talk to them. The last time I talked to the uncle was four years ago and the

last time I talked to my cousin was probably six to seven years ago.

THE COURT: Okay. And is there anything about what you do know about their job that would affect your ability to be fair and impartial?

JUROR: No. They've never discussed anything with me about what they do.

THE COURT: Okay, thank you.

JUROR: Just to let you know.

THE COURT: Juror 89.

JUROR: Juror 89. Since filling out the questionnaire, my six-year-old son is back in school and he is in first grade now. And, on the questionnaire, I indicated that we didn't know the status of the after-school program. And his school has not opened that up at this point and there is not a date that that will occur. We're on the wait list for when that does become a possibility.

So, at this time, he is with me after school which is 1:00 p.m. on Wednesdays and 3:30 the other days of the week. We also have a planned one-week break in October as well as a planned one-week break in November, and next week there are three early release days at 1:00 p.m.

My husband is the other adult in the household, but he works in construction and is required to be at job sites and my son cannot go with him after school. And my husband is also on

call for any emergencies that arise at the job sites, kind of all hours.

We have one other family member in town and that is my husband's grandma and she's 101 and lives in a home care facility.

THE COURT: You, obviously, listened to questions I have asked before. So I appreciate that.

And do you work?

JUROR: Yes. I work full time from home.

THE COURT: From home. Okay, thank you.

JUROR: Thank you.

THE COURT: Okay. That's all I wrote down. Is there anyone else?

MR. LINCENBERG: Your Honor, this is Mr. Lincenberg. Could we have a sidebar?

THE COURT: Yes.

(Sidebar conference heard, reported as follows:)

MR. LINCENBERG: Thank you, Your Honor. Two points: I don't know how the Court wants to handle the juror who had a COVID-positive son in the home. She said she tested negative. I know that -- I know the Court has, you know, taken extensive measures to try to keep this matter safe and so forth. It concerns me in terms of the precedent there. My suggestion would be that we let her go.

The other juror -- I have something with a second

juror, but I don't know if other counsel wanted to discuss.

MS. PERLMETER: I thought we were just talking about the COVID issue. I'm happy to discuss other things. I would just need to know what they were.

MR. LINCENBERG: I said there is one other.

THE COURT: Okay. What are your thoughts about excusing her? That was, obviously, running through my head while we were talking about the other people.

MS. PERLMETER: I have no objection about the COVID person.

THE COURT: Okay.

MR. LINCENBERG: Okay. Other one -- and, Ms. Perlmeter, if you need to get your notes, fair enough.

With regard to Juror 86 who made the comments about sister and mother murdered, he's formed an opinion and his questionnaire -- his answers are very consistent with that. I'm concerned, frankly, that any voir dire of him is only going to infect the jury. I can go through the questions if Ms. Perlmeter has a different view.

MS. PERLMETER: No, I agree. I remember his questionnaire. He wrote things like "I don't trust anybody," "I don't want to be here." He talked about the crimes against his family members. He pretty much put "I don't trust anybody" in every single question on the "Credibility of Witnesses" section.

THE COURT: Yeah. Okay. So I don't like letting people go this early because it gives signals to other people. But Juror 86 will be struck; so do not follow up with Juror 86.

Also Juror 70 who is undergoing chemo.

MR. LINCENBERG: That's fine too.

MS. PERLMETER: What's her number?

THE COURT: 70. 70, 86. I'm going to release 74 now.

MS. PERLMETER: What number is the COVID lady?

THE COURT: 74.

MR. LINCENBERG: 70, 74 and 86.

MS. PERLMETER: I'm sorry. I didn't hear you.

MR. LINCENBERG: 70, 74 and 86.

MS. PERLMETER: 70, 74 and 86.

THE COURT: Since I have you, if we can resolve Juror 81, I would excuse for hardship since they are -- he's the one that has the three kids --

MS. PERLMETER: Oh.

THE COURT: -- where he is pulling them out at lunch.

MS. PERLMETER: Yes. No objection. What is his number?

MS. BERNSTEIN: That's 81.

Your Honor, we agree that there's an extreme hardship, but I also think its worth noting for the record --

MS. PERLMETER: I'm sorry, I can't hear you.

MS. BERNSTEIN: I'm sorry. We agree that there's a

hardship for Juror No. 81 who has the three children who, because of the Delta variant, has to pull them out of school and be home and his wife's going to lose her job.

I also think it's worth noting for the record, though, that we had, by my calculations, four jurors in this panel alone whose circumstances have changed because of the Delta variant and the rise in COVID. And, you know, I know we're here, but going to trial at this point, it's kind of nuts and it's really affecting our client's due process rights to get the jury of their peers.

MR. FEDER: There's a question --

THE COURT: Okay. Are you talking about a juror or are you going to talk about the COVID issue?

MR. FEDER: Well, this juror that is exposed to COVID and then comes to court, I mean, under the protocols at least as I understand them, there's been an exposure where everybody is technically at least have to quarantine.

THE COURT: No, no. That's absolutely not right.

MS. PERLMETER: Yeah.

MS. BERNSTEIN: Did she say she was vaccinated?

MS. PERLMETER: I don't know.

THE COURT: We're done. I'm going to send her home. Those three -- there's more, but --

MR. LINCENBERG: Those three we will not do any voir dire.

THE COURT: Yes.

MS. PERLMETER: Four people.

THE COURT: Yes. But 74 is actually physically going to be gone.

MR. LINCENBERG: Four or three?

THE COURT: Three. Three that are still going to be here that you shouldn't question because --

MR. LINCENBERG: And one who is going to go.

THE COURT: Yes.

MS. BERNSTEIN: Are we letting the COVID-positive juror go right now?

THE COURT: Yes.

(The following proceedings were heard in the presence of the jury:)

THE COURT: Okay. Juror 74, I'm going to excuse you to go home.

All right. I have -- really, because we asked the questionnaire, that was the only question I wanted to ask is if anything had changed. So the attorneys may have some follow-up questions for you based on your questionnaires.

Ms. Perlmeter?

MS. PERLMETER: Thank you.

All right. Good morning, everybody. Thank you for being here today. My name is Peggy Perlmeter. I am one of the attorneys representing the government. And, as the Court has

stated, I would like to follow up with a few of you based on some of your answers in the questionnaires that you have prepared.

Juror No. 64, if, at any point in time, you can't hear me, please let me know and I will speak up.

JUROR: 64.

MS. PERLMETER: Good morning, sir. In your questionnaire, you indicated that either you or someone you know is involved in a sex or sex trafficking crime?

JUROR: No, it wasn't me.

MS. PERLMETER: No?

JUROR: No.

MS. PERLMETER: Let me make sure I have...

We asked some questions of individuals yesterday about what a criminal defendant may or may not have to do at a trial. We talked about how, in a criminal case, the burden of proof resides on the government and how a criminal defendant has a right to remain silent and need not testify.

I have that you indicated that you expected a criminal defendant to testify. Is that a belief that you have?

JUROR: Yeah, it is.

MS. PERLMETER: Can you please explain?

JUROR: Again, back to the questions about the presumption of innocence and the not presenting or not defending yourself just creates an atmosphere.

MS. PERLMETER: What does it create an atmosphere of? If you are instructed that a criminal defendant need not prove their innocence, it's the government's job to do it.

JUROR: Right. But, still, it creates a perception that the person is giving up, in essence.

MS. PERLMETER: I'm sorry. Could you please speak up?

JUROR: That the person is giving up, in essence, that they're not defending themselves.

MS. PERLMETER: They -- a criminal defendant may elect to defend themselves in a different way that does not include, you know, testifying in a trial or making a statement. But knowing that now, would you still expect or want to see a criminal defendant make a statement or testify?

JUROR: No. It's not necessary, no.

THE COURT: But if someone -- if a defendant elected not to do it, would you hold that against them?

JUROR: No, I would not.

MS. PERLMETER: Thank you, Juror No. 64.

Juror No. 65.

JUROR: Juror No. 65.

MS. PERLMETER: Good morning, Juror No. 65. I have in your questionnaire that you know someone who pleaded no contest to a sexual predator charge in Tucson.

MR. LINCENBERG: I'm sorry, Ms. Perlmeter, I can't hear you.

 MS. PERLMETER: Was that from Juror 64 or from one of the --

MR. LINCENBERG: That was from me. I apologize. I just couldn't hear you.

MS. PERLMETER: Oh, it was from Mr. Lincenberg. Okay.

Can you please tell us about -- so I had asked Juror 65 if he knew someone who had pleaded no contest to a sexual predator charge in Tucson. And he said yes and I asked him to explain or expound on that.

JUROR: Back in 1980s, I'm not sure exactly the date, my brother was charged with sexual misconduct and he pleaded no contest.

MS. PERLMETER: And you said that was 20 years ago?

JUROR: 1980s.

MS. PERLMETER: 1980.

JUROR: It was more than 20 years.

MS. PERLMETER: You stated in your questionnaire that you felt he was innocent?

JUROR: Yes. Not that he was innocent of the act, but -- well, what he was modeling was a cultural thing that was acceptable in a different generation which is not acceptable in the generation in which he lived.

MS. PERLMETER: What did his conduct entail? What was he accused of doing?

JUROR: Inappropriate touching.

MS. PERLMETER: Of an adult or child?

JUROR: Child.

MS. PERLMETER: Do you know how old the child was alleged to have been?

JUROR: No.

MS. PERLMETER: So you don't know if it was a teenager?

JUROR: It was younger than a teenager.

MS. PERLMETER: Prepubescent child?

JUROR: I'm not sure.

MS. PERLMETER: But not a teenager?

JUROR: Not a teenager.

MS. PERLMETER: Do you have any opinions on whether your brother was treated fairly when he was partaking in the criminal justice system?

JUROR: He was treated according to the law at that time.

MS. PERLMETER: So you felt like he was treated fairly by the government, by the law enforcement agencies and the court systems as he was moving through.

JUROR: At that time, yes. If this had occurred the generation before, that it never would have come to trial.

MS. PERLMETER: And since you make the distinction at that time, would you have a different opinion if he had -- if he was being charged with that kind of offense now?

JUROR: If he was charged with the offense now, he would still have to plead no contest.

MS. PERLMETER: Why do you say that?

JUROR: Because, according to the law, he violated it.

MS. PERLMETER: Sometimes people -- why do you think that? Why would he have to plead no contest?

JUROR: Because he did the act. He did the act and it was against the law at the time.

MS. PERLMETER: Okay. So if you do the act and it's against the law and you know that you do the act, what is the reason why he could not plead guilty and had to plead no contest?

JUROR: I'm not sure why he did that. I just know that what he -- the act that he did was acceptable in my parents' generation and the generation before that, but it was not acceptable during his time. He was modeling behavior that he had actually seen when it was acceptable.

MS. PERLMETER: So what was the act that he did that was criminal?

JUROR: Touching genitalia.

MS. PERLMETER: Which genitalia? And I ask this because you indicate, if it had been the generation before, it would not have been a crime.

JUROR: Below the waist genitalia.

MS. PERLMETER: Is there anything about your brother's

case, knowing that this case has some sexual connotations to it, that would make you unable to sit and listen to the evidence?

JUROR: No.

MS. PERLMETER: Do you have any concerns about whether or not you would be able to give the victims who are going to appear in this case a fair shake and consider what happened to them?

JUROR: No.

MS. PERLMETER: You indicated that you might have some trouble deliberating based on your questionnaire. Hearing -- did you hear the discussion that we had in court yesterday through the television?

JUROR: Yes, I did.

MS. PERLMETER: Hearing the questioning process and some of the answers, do you still have that concern?

JUROR: I didn't hear what the concern was.

MS. PERLMETER: Okay. So the question about being able to deliberate is: Knowing that the case involves evidence of sexually-related offenses, being able to deliberate on and speaking to other members of the jury on topics like sexual intercourse, oral sexual contact, being able to use words, hearing and being able to speak words like "penis," "vagina," different kinds of sex, words like that will be used throughout the trial and then, if you're selected as a member of the jury,

then you're going to be able to need to talk about with -- with each other. So is that something that you think you would be able to do based on your life circumstances and experiences?

JUROR: Yes, I'll be able to do -- speak about those items.

MS. PERLMETER: Can you say that again?

JUROR: Yes, I can. I'm able to speak about those.

MS. PERLMETER: Thank you very much, sir.

Can I just circle back to Juror No. 64 for one minute?

JUROR: 64.

MS. PERLMETER: Sorry. Juror No. 64, I just wanted to clarify something here. In your questionnaire, and just tell me if it was a typo because, in the question where it says "Have you, any members of your family or close friends ever engaged in, been accused of or engaging in, or convicted of sex trafficking or sex-related crime?" you wrote "yes."

JUROR: That's an error.

MS. PERLMETER: That's a typo. Okay, thank you. That's all. I just wanted to clarify.

Okay, Juror No. 66.

JUROR: Juror No. 66.

MS. PERLMETER: Good morning, Juror No. 66. In your questionnaire, you indicated your father had been arrested for a crime and you did not feel he was treated fairly by law enforcement.

JUROR: Yes.

MS. PERLMETER: Can you please tell us about that?

JUROR: He was arrested for -- I believe it was domestic abuse, of which he applied little to just about none, but he was still arrested and was in jail for, I want to say, almost a solid month.

MS. PERLMETER: When did this happen and where did it happen?

JUROR: It happened -- I know I was like 12 or so around the time. I'm 20 now. So like eight years ago. And this happened in Phoenix. And oodles of our family members -- or a lot of our family members were brought over, disputing and debating about whether or not this was justified, whether or not he acted the way he did around the time where they were even considered as abuse, but, by law, they were. And, for that, he was brought to jail and was in jail for about a month.

MS. PERLMETER: And then were charges filed? Was he prosecuted? Anything like that?

JUROR: I don't think charges were filed. Around the time, I was explained very vaguely about the entire endeavor. And even today they still explained it very vaguely to me. But as far as I know, no charges were filed.

MS. PERLMETER: Who is the person your father was accused of harming?

JUROR: My mother.

MS. PERLMETER: And then so it sounds like you feel like the police officers were not fair in how they dealt with your father's case?

JUROR: Yes.

MS. PERLMETER: Okay. Now, with that in your life and knowing that, if you're selected as a member of the jury in this case, there will be police officers that come to court and testify, would you be okay or would you have any problems considering the testimony of the police officers for what they said or will you be impacted and influenced by your prior encounter with law enforcement?

JUROR: No. I would still hear the testimony and still understand their side of the story. Each police officer is different from one another.

MS. PERLMETER: Okay. So you understand that the officers involved in your father's case, that was one day, one event or, like, a set of facts and circumstances, and then the other officers who may come to testify in this case are also talking about a different set of circumstances?

JUROR: Indeed.

MS. PERLMETER: And then would you be able to consider each group of people or officers that come with a fair shake and being able to set aside what happened to you when you were 12?

JUROR: Yes.

THE COURT: Okay. All right. Thank you. Thank you very much, sir.

Juror No. 67.

JUROR: Juror No. 67.

MS. PERLMETER: Good morning, Juror No. 67. In your questionnaire, I just wanted to follow up. Your participation in the criminal jury where you indicated you had a positive experience, it was a murder trial?

JUROR: Yes. It was a cold case murder.

MS. PERLMETER: Cold case murder? What was the verdict? Because that part happened to be left blank.

JUROR: The verdict actually went to deadlock.

MS. PERLMETER: Okay. So hung jury?

JUROR: Yes.

MS. PERLMETER: And what about that do you find -- what about the overall experience did you find to be so positive?

JUROR: I think everything from both standpoints was presented very well. Just I think the testimony experience just -- I guess you would say that how we've been talking about the evidence was presented, and I guess that's all I can say about it. It just went very smoothly. I never had been in one before and it was more than I expected.

MS. PERLMETER: Do you remember when that was?

MS. BERNSTEIN: When that was? I believe I was 18,

19.  So about 12 years ago.

       MS. PERLMETER:  And that was here in the Valley?

       JUROR:  Yes.

       MS. PERLMETER:  And you also indicated that you have had some prior victimization, it sounds like, when you were much younger, a child?

       JUROR:  Yes.  I think I was about six or seven.

       MS. PERLMETER:  And that you've forgiven and moved on?

       JUROR:  Um-hmm.  Yes, that's correct.

       MS. PERLMETER:  Who was the defendant to you?

       JUROR:  Teenager that lived down the street or the next block over.  One of our neighbors.

       MS. PERLMETER:  Is there anything about your experience in that circumstance that would make you hesitant, unable to -- unable to sit as a fair and impartial juror in this trial because you know now that there's going to be some sexual evidence presented and discussed?

       JUROR:  No, I don't believe so.

       MS. PERLMETER:  Okay.  All right.  Thank you.

       Juror No. 73.

       JUROR:  Number 73.

       MS. PERLMETER:  Good morning, No. 73.  My question for you is in line with the obligations or lack of obligation of a criminal defendant, how one need not testify, and that one's decision to remain silent cannot be used against them in court

because the burden of proof in a criminal case resides on the government.

Do you think -- because, in your questionnaire, it looks like you checked the box where you said you would expect a defendant to testify. So now that you have been in court for the past day, do you have any more thoughts on that?

JUROR: I might have checked the wrong box because, again, I think it's up to the government to prove whether somebody is guilty or not. And the defendant has the ability to stay silent.

MS. PERLMETER: Okay. So you do not expect a criminal defendant to testify on their behalf in a criminal case?

JUROR: They don't have to, no.

MS. PERLMETER: Okay, thank you very much.

Juror No. 76.

JUROR: Juror No. 76.

MS. PERLMETER: Juror No. 76, good morning. You indicated that your boss was the former executive director at the ACLU?

JUROR: Arizona, yes.

MS. PERLMETER: What is his or her name?

JUROR: Alessandra Navidad.

MS. PERLMETER: I'm sorry. Can you speak up a little bit?

JUROR: Alessandra Navidad.

MS. PERLMETER: And, in your questionnaire, you talked about how you are against or not for prostitution when it involves underaged children. Do you have any opinion on -- on whether or not -- do you have any opinion on adults who may engage in acts of commercial sex?

JUROR: As long as it's legal, but it's not.

MS. PERLMETER: I'm sorry. Could you please hold the microphone up to your face and speak directly into it?

JUROR: I understand if it's, like, legal as part of the law, but when it's not, I don't agree with it.

MS. PERLMETER: So when the Court instructs on the law, if you're selected as a juror, would you be willing to listen to it and follow it?

JUROR: Yes, I would follow the law and not my opinion.

MS. PERLMETER: And if the law is something that you -- if what you thought was the law was not actually the law, would you follow what you thought it was or what the judge instructs?

JUROR: What the judge instructs.

MS. PERLMETER: You had also indicated that you weren't sure in your questionnaire if you would be able to deliberate. So my question for you, now that you've been in court for a little bit, do you have any additional opinion on whether or not you would be able to deliberate as a juror

knowing that there will be some sexual aspects discussed during this trial?

JUROR: I mean, if it was asked of me, I would do it. I would prefer not to.

MS. PERLMETER: And I understand that. It can be an uncomfortable topic. It's not something people typically talk about with strangers but, if you are chosen and you were asked to do it for the purposes of a court case, would you be willing to serve?

JUROR: Yes.

MS. PERLMETER: All right. Thank you.

Juror No. 78. Oh, not here. Okay.

Juror No. 79.

JUROR: Number 79.

MS. PERLMETER: I'm sorry. What did you say?

JUROR: Number 79.

MS. PERLMETER: I know you've spoken a little bit already. In your questionnaire, you had checked the box that you expected or would expect a defendant to testify. Do you still have that expectation or do you have any additional thoughts on that?

JUROR: No, I changed my mind. I wouldn't expect them to testify. I was educated yesterday hearing all of the discussion, and so I wouldn't have that expectation any longer.

MS. PERLMETER: All right. Juror No. 80.

JUROR: Juror No. 80.

MS. PERLMETER: Good morning, Juror No. 80. Do you still have -- or do you have any plans to visit your father --

JUROR: Sorry. I don't think your mic is working.

MS. PERLMETER: Do you have plans to visit your father in Utah on October 20th for his birthday?

JUROR: We have not made accommodations yet, but it is his 70th birthday; so he is expecting a party.

MS. PERLMETER: Is it something that you anticipate needing to fly to or would you plan to drive?

JUROR: We would fly. I have a two- and a four-year-old and would not want to be in the car with them for 12 hours.

MS. PERLMETER: And is it just the one day that would be impacted, October 20th?

JUROR: I'm not sure when the party would be. I would assume the weekend as most of my family still works.

MS. PERLMETER: Your questionnaire, you also -- I want to clarify something. You mentioned that you have a nephew that is going through some criminal charges.

JUROR: Yes.

MS. PERLMETER: Is it one nephew? Is it one nephew or two nephews?

JUROR: Just one nephew.

MS. PERLMETER: Okay. So is he going through both the

firearms charges as well as child pornography charges?

JUROR: Yes. That case has actually moved further along and he has pled guilty to two felonies; one related to assault with a firearm and one related to possession of child pornography, and he has been sentenced and is currently in a prison in California.

MS. PERLMETER: So his case has already progressed and has concluded?

JUROR: Yes.

MS. PERLMETER: It sounds like you participated in the court process with him. You helped him find counsel and --

JUROR: I did, yes. I paid for his lawyer and has been his primary, you know, support system and family member involved in helping him. I actually went to California a couple of weeks ago, moved all of his belongings out of his apartment and tried to pack up everything as best I could. So I have a power of attorney and overseeing his financial affairs as well.

MS. PERLMETER: Okay. How do you feel -- do you have any -- what are your thoughts on how he was treated as he was going through the criminal justice system?

JUROR: I would say fairly. I wasn't present at any of the court hearings. They were all done virtually via Zoom, and I did not participate in any of them. But, based off everything that I have heard through him and through his

lawyer, I believe he was treated fairly.

MS. PERLMETER: So you feel like he -- that there was overall justice served for what he did and the punishment that he may have received?

JUROR: Yes.

MS. PERLMETER: Is there anything about that case and that experience that would impact your ability to sit fairly and impartially in this case?

JUROR: No, I don't believe so.

MS. PERLMETER: Based on your participation in your nephew's case, you know, finding his attorney, you know, working with the attorneys, do you feel like you have more insight on what the criminal justice system would be like than someone who has never been through the process?

JUROR: I would say yes. I mean, I definitely learned about the process, the approach, kind of the timing of things, and just, you know, the various defenses that I spoke with his attorney about. So I would say yes compared to kind of the average person that hasn't been involved in the criminal system.

MS. PERLMETER: And would you be able to -- since you have some background knowledge based on your experience, you bring that with you. Would you be able to be fair and impartial to the defendants in this case as they go through their process through the criminal justice system?

JUROR: Yes, I believe so.

MS. PERLMETER: Okay, all right. Thank you.

JUROR: Yes.

MS. PERLMETER: Oh, wait, one second. One more question for you. I'm sorry.

JUROR: Juror No. 80.

MS. PERLMETER: Yes, Juror No. 80. I think you had also checked the box that you expect defendants to testify on their behalf. Do you still hold that opinion? I know you filled out the questionnaire a couple months ago.

JUROR: No, I don't believe that.

MS. PERLMETER: Why is that?

JUROR: I understand the law and their right to remain silent and I don't believe that they should or would need to testify on their behalf, and it's kind of up to the prosecution to plead their case and then the defense to litigate it as best they see fit. That includes them testifying or not testifying.

MS. PERLMETER: Thank you.

Juror No. 82.

I'm sorry. Juror No. 81, please sit down. Thank you.

JUROR: Juror 82.

MS. PERLMETER: Hi, Juror 82. Same question I posed to Juror No. 80 just now. When you filled out the questionnaire a couple months ago, I think you also marked that you would expect the defendant to testify. After being part of

the proceedings yesterday and today, do you still hold that belief?

JUROR: I don't believe the defendant themselves should testify. I understand that the burden of proof is on the government. I believe, in some cases, especially like white collar crimes where it's a little bit harder to find evidence because it can be easily hidden, that at least, like, the attorney should at least stand up and have some defense to the defendant, but I also know that the law states that all they have to do is just sit there and the State has to prove what happened.

MS. PERLMETER: So sounds like you are -- you would not hold it against a defendant if he chose to remain silent and say nothing?

JUROR: No, I would not.

MS. PERLMETER: Okay. Now that concept kind of applies to the entire defense. Everyone can just sit there and say nothing. Their defense attorneys can say nothing. They can ask no questions and they can call no witnesses. If they elect to do that in this case -- would you expect them to do something or would you be okay if they just sat there and asked no questions and called no witnesses --

JUROR: So --

MS. PERLMETER: -- and just said, you know, it's the government's burden of proof; so we're just going to let them

prove it?

JUROR: Even that, that's just stating they are -- they are defending them, but still saying that "Well, we'll respond if something shows like it's guilty," but the -- like say they say that there is -- well, here's a transaction. They're just standing up that that was a business transaction or something like that, like just even just responding while the State is prosecuting or asking witnesses.

MS. PERLMETER: Would you hold it against the defendants if they presented no evidence, called no witnesses and simply argued that the government, at the end of the day, has not met its burden of proof?

JUROR: I would not hold it against them. There would be a small thought in the back of my mind. Like if I feel the State has proved its case and upon a reasonable doubt, then I would question a little bit about, okay, so why didn't they stand up and defend if, in my mind, this is beyond a reasonable doubt that the person did it?

MS. PERLMETER: Okay. So let me ask you this way: If the State has proven their case beyond a reasonable doubt with its own evidence and the defense did not present any evidence of their own -- first of all, you understand that the defense does not have to, right?

JUROR: Yes.

MS. PERLMETER: Okay. If you feel that the government

or the State met its burden of proof, would you be willing to find the defendants guilty just based on the government meeting its burden of proof?

JUROR: Yes, I would not penalize the defendant or the defense for not speaking.

MS. PERLMETER: All right. Thank you, Juror No. 82.

Juror No. 83.

JUROR: Juror No. 83.

MS. PERLMETER: Juror No. 83, I think your questionnaire indicated that your wife serves as a court reporter?

JUROR: Yes.

MS. PERLMETER: Does she report for the courts?

JUROR: Depositions.

MS. PERLMETER: Depositions. So in offices and not so much in the courthouses?

JUROR: Correct.

MS. PERLMETER: Does she work in -- does she transcribe and take testimony for cases that appear before this court, the District Court of Arizona?

JUROR: No. California.

MS. PERLMETER: California, okay.

You had indicated that you have some experiences with law enforcement?

JUROR: Thirty years.

MS. PERLMETER: Yes, sir. Do you think that you would be able to be fair and impartial to all parties in this case in light of your experiences with law enforcement?

JUROR: Yes, absolutely.

MS. PERLMETER: Why do you think that?

JUROR: That's what I stood for. Thirty years of making sure everybody's rights were upheld and understanding what their constitutional rights are and doing everything I could to make sure both sides were listened to equally.

MS. PERLMETER: So you're able to balance the upholding the laws of the state or -- the state or the country along with the constitutional rights of individual defendants?

JUROR: Absolutely.

MS. PERLMETER: Would you treat a law enforcement officer's testimony with more credence than the testimony of somebody else?

JUROR: No.

MS. PERLMETER: Why not?

JUROR: Officers are human beings and they're fallible. So you have to weigh everyone and their statements on the stand.

MS. PERLMETER: Thank you very much, Juror No. 83.

Juror No. 85.

JUROR: Juror 85.

MS. PERLMETER: Juror No. 85, what is your experience

with journalism, media and radio broadcasting?

JUROR: Back in 1969, I worked for a small radio station in Iowa as a broadcaster. We did a little bit of everything because it was a very small station.

MS. PERLMETER: All right. Thank you very much, Juror No. 85.

I'm sorry, Juror No. 85. Can you stand up again, please? You've been a juror before?

JUROR: Yes, I have.

MS. PERLMETER: Okay. When you served as a juror previously, do you recall if the Court instructed you to follow the law as stated by the Court?

JUROR: Yes.

MS. PERLMETER: Okay. So do you agree that -- to follow the law as stated by the Court, as this Court shall give it, if you are selected as a member of the juror -- jury?

JUROR: Yes.

MS. PERLMETER: Okay. The reason I ask is because, in your questionnaire, the box is checked where you said that you would not follow the law if you disagreed with it. So I just wanted to make sure that that was a typo of some sort.

JUROR: Just from my perspective, you can argue the law. It's -- everybody has got a different opinion how to interpret it and that's probably why I answered the way I did. It would be an interpretation. But, as instructed, as

I remember being on the jury, we got very specific instructions.

MS. PERLMETER: Okay.

JUROR: And that's what we followed.

MS. PERLMETER: Okay. So would you be willing to follow the Court's instructions in this case?

JUROR: Yes.

MS. PERLMETER: If, in part of those instructions, the Court said this particular law is this and it was not what you expected, would you be willing to follow the law as the Court instructed?

JUROR: Yes.

MS. PERLMETER: If it was -- if the instruction the Court provides is not something that you personally agree with, would you be willing to follow what the Court instructs?

JUROR: That's a tough one. Yes.

MS. PERLMETER: Why do you say that?

JUROR: Well, because whether a person agrees with something or not, if that is, in fact, what it is, they have to go along with it. Does that make sense?

MS. PERLMETER: Yes, thank you. Now, what if -- you had mentioned subject to interpretation.

JUROR: Well, I guess I just go back on my experiences. I was a labor negotiator for a while and we would negotiate contracts with our company. And once the contract

was written and agreed on and everything else for the next
years of that contract, there was constant disputes or
disagreements on the interpretation.

Everybody -- most everybody interprets things
differently to bend them toward their point of view.  And
I think that laws were written years ago and the Constitution
was written years ago and things have changed in this world.
So there is some interpretation of it and that's what the
courts do.

MS. PERLMETER:  So it sounds to me like the law in
your previous case may not have been clear or as clear as it
could have been?

JUROR:  It was pretty clear.  It was against Sherman
antitrust laws.

MS. PERLMETER:  Okay.  Is there anything about that
experience that you had as a prior juror that would prevent you
from being able to sit fairly and impartially here in this
trial?

JUROR:  I really don't look forward to a ten-week
trial.  The last trial I was on was six weeks, and it gets old.
It's almost like having a job again, and I haven't had a job
for years.  I've been retired.  So, you know, I really don't
want a job again.

MS. PERLMETER:  Do you just not want to be chosen as a
member of the jury?

JUROR: I really don't want to be chosen as a member, but, if I am, I will serve.

MS. PERLMETER: All right. Do you have -- okay. Thank you very much, 85. That was very honest and I appreciate that. Yeah. Thank you.

What is the highest number juror we have in court right now? What number are we up to?

THE COURTROOM DEPUTY: 93.

MS. PERLMETER: 93. Okay.

Juror No. 91, good morning. In your questionnaire, you started to talk about your partner's work and then it didn't complete. So what does your partner do for a living?

JUROR: My partner is a real estate agent and her business --

MS. BERNSTEIN: We can't hear you.

JUROR: My partner is a real estate agent and her business partner is a DPS officer as well.

MS. PERLMETER: One second, Your Honor.

Juror No. 91, you also stated that you had read some articles about Backpage in this case. I just wanted to clarify, was that a while back? Last week? Today?

JUROR: When it was first brought around, the charges were first filed.

MS. PERLMETER: Is there anything -- did you know anything about Backpage? Is there anything that you read that

would give you an idea on what the evidence in this case is expected to be?

JUROR: No more than what was presented yesterday in the jury selection process.

MS. PERLMETER: Do you have any concerns about whether or not you would be able to sit as a fair and impartial juror in this case involving the website?

JUROR: No.

MS. PERLMETER: Okay, and why not?

JUROR: It's -- evidence is going to be presented by you and by these gentlemen and ladies and we have to decide which one is accurate based on the instructions the judge will provide us.

MS. PERLMETER: In your questionnaire, sir, you indicated that the criminal justice system -- let me make sure I have the right -- makes it too hard for the criminal justice -- the criminal justice system makes it too hard for prosecutors to convict people who have committed crimes?

JUROR: I may have selected that radio in error.

MS. PERLMETER: Can you please speak up since I'm very far away from you?

JUROR: I may have selected that radio incorrectly. I'm sorry.

MS. PERLMETER: What is your belief about the criminal justice system? Do you think that the burden of proof is too

high on the government and that it's something that is unachievable or do you think that the burden of proof is appropriate, that it's the government's burden, or do you have some other opinion?

JUROR: The government needs to provide sufficient data to make the decision.

MS. PERLMETER: If the government provides enough evidence to satisfy proof beyond a reasonable doubt, would you be willing to vote guilty?

JUROR: Yes.

MS. PERLMETER: Thank you very much, Juror No. 91.

Can I circle back to Juror No. 76, please?

JUROR: Juror No. 76.

MS. PERLMETER: Juror No. 76, I know you started a new job recently. You shared that with us today. There are -- this is a longer trial. It's expected to last several months, but, within the trial calendar, there are several days where we will not have trial and there is a two-week period in November where court will not be held.

Knowing that, do you still think that it would be a hardship to serve as a member of this jury?

JUROR: I mean, we're a really small organization and our marketing team is two people including me. And it's a lot to put on my direct report who, before I came on, was by herself for the last six months. So it would be undue hardship

to put that all on her to figure it out and then have to work outside of jury hours.

MS. PERLMETER: I understand that it would be difficult for your nonprofit to carry on without you. But would you be able to complete your work -- did you get the trial schedule, by chance, when you filled out the questionnaire?

JUROR: Yeah. I don't know if that changed now that the trial was pushed back a little bit. But, yeah, I understand there is a -- and if I'm asked to, I can serve. I understand my civic duty, but it also will be -- I will be working outside of being a juror.

MS. PERLMETER: Would you have enough time to get your work done with the days off?

JUROR: I do a lot of writing projects. So it's all about if I can get in the zone to write. And I have to say, when I went home yesterday, I was completely exhausted from this long day. And I know that's how the trial will be which will make it difficult to create content, write.

MR. LINCENBERG: I missed that. I'm sorry.

JUROR: After yesterday, going home and being completely drained from the day, I know that's how jury duty will be, and I will still need to work and create content after work -- or after jury duty.

MS. PERLMETER: Thank you very much, Juror No. 76.

JUROR: Yep.

MS. PERLMETER: Juror No. 77.

JUROR: Juror No. 77.

MS. PERLMETER: Sir, you had also indicated you may need to work nights or weekends if you are selected to serve as a member of this jury.

JUROR: Yes.

MS. PERLMETER: So same question that I just posed to 76: Knowing that there are going to be some days where we don't have court and knowing that we have a long break in early November for two weeks, would you be able to serve as a member of this jury?

JUROR: Yes, I would make it work.

MS. PERLMETER: Okay, thank you.

THE COURT: Ms. Perlmeter, we're going to take a break.

MS. PERLMETER: Oh, okay.

THE COURT: Okay. We've been going about 90 minutes now. So we're going to take a break for a half an hour so that everybody has an opportunity to go to the bathroom, get something to drink. So when you come back, please stay outside the courtroom until you are all called back in. Try to remember where you sit because you'll go to the same spot. If you forget, of course, you can ask when you come back in. We'll see you in half an hour.

(Recess taken from 10:29 a.m. to 11:00 a.m.)

(In open court; jury not present.)

THE COURT: You can have a seat. I just want to ask you about four more hardship excuses. If you have any objection, let me know.

Juror 68, for financial reasons, is there any objection from the government?

MS. PERLMETER: No objection.

THE COURT: He works for CVS Aetna. Worries about money.

MR. LINCENBERG: 68 was the guy to who read the speech?

THE COURT: Yes.

MR. LINCENBERG: What was financial hardship again, Your Honor?

THE COURT: Because he wasn't going to be paid after 10 days.

MR. LINCENBERG: Your Honor, my note says he was going to ask his manager about that, that he wasn't sure. Is your note -- is the Court's note different?

THE COURT: I do not have that he was checking with his manager.

MS. BERNSTEIN: Your Honor, I have that it was a possible financial hardship. I didn't write much more than that.

MR. LINCENBERG: Does anybody else have notes on that?

MR. EISENBERG: I have some notes not on that matter, Your Honor. He talked about Bitcoin and being encrypted. He had ethical concerns with the technical -- I've got "aspects of it."

MR. FEDER: My notes are also that he was checking with his manager.

THE COURT: Okay.

MR. LINCENBERG: The note was that he asked, but that he did not get an answer is what I'm informed. Can we ask him about that?

THE COURT: Yeah, I'll ask him.

Juror 79 who is the grad student working on a research project, she's concerned that it would delay her graduation. Is there any objection?

MS. PERLMETER: We'd just like the opportunity to ask some follow-up questions.

MR. LINCENBERG: We don't have an objection on 79.

THE COURT: Okay. Over objection of the government, I'm going to strike Juror 79 for hardship.

89 for child care issues. Unlike another juror who answered that they do have other family, this juror was very clear that there wasn't anybody else.

MS. PERLMETER: 89?

THE COURT: Yeah.

MS. PERLMETER: No objection.

THE COURT: Child is in school and the school doesn't have any aftercare.

MS. PERLMETER: Yeah, and she said her husband is the contractor on construction sites and the grandmother is in a care facility.

MR. LINCENBERG: Did the Court already make a decision on 89 at sidebar? I may have written down the wrong number.

THE COURT: I did not. It was 81.

MR. LINCENBERG: 81. That's right, okay.

THE COURT: Yeah.

MR. LINCENBERG: Your Honor, with regard to 89, if I may, this is part of making a record related -- in connection with doing the trial during COVID that we are -- we are seeing jurors who, I think, could be good jurors to be able to sit, and there's more and more excuses coming up because of COVID. This one, I guess, because he didn't have this issue necessarily before, at the time of the questionnaire, but now because of COVID, the kids have to come home early from school, if I have the right juror.

THE COURT: That was 81. Juror 86 has a six-year-old in school, but the school is not offering aftercare.

MR. LINCENBERG: Right. And there's early release. I thought that was related to COVID is what the juror was saying.

THE COURT: I don't remember why they weren't, just that they weren't.

MR. LINCENBERG: My understanding is there was no after-school program and various release dates because of COVID. We understand the Court's position on that. For the record, we do think that's a concern, Your Honor. I think with regard to 89, we'd like to question him further.

THE COURT: Okay. Over objection, I'm going to excuse Juror 89.

Juror 72 has prepaid travel. I checked the calendars and it would conflict with three days of trial. Although I'm hopeful that we won't need actually every day we're in trial because we've already delayed it.

MR. FEDER: 72?

THE COURT: Yeah.

MS. PERLMETER: We have no objection, Your Honor. No objection.

MR. LINCENBERG: No objection.

THE COURT: Okay, Juror 72 is struck.

Okay. So I'm going to release 70, 81 -- these are not in order. Hold on. I'll put them in order. 70, 72, 79, 81, 86 and 89.

MR. LINCENBERG: 70, 72, 79, 81, 86 and 89?

THE COURT: Yeah. Okay. You can bring the jurors back in.

MR. LINCENBERG: The juror number who was earlier let go was 74?

THE COURT: Yes.

(In open court; jury present.)

THE COURT: All right. And we are back on the record with the jury present.

Before we proceed any farther, I'm going to excuse some of the jurors. So if your number is called, you're free to leave and you're excused.

Jurors 70, 72, 79, 81, 86 and 89.

Ms. Perlmeter?

MS. PERLMETER: Juror No. 78, please.

THE COURT: There is no 78.

MS. PERLMETER: Oh, that's right. He is coming later.

THE COURT: Yes.

MS. PERLMETER: Thank you.

Juror No. 75.

JUROR: Juror No. 75.

MS. PERLMETER: Good morning, Juror 75.

JUROR: Good morning.

MS. PERLMETER: You had indicated on your questionnaire that you had a trip planned to Cabo from October 4 to October 8?

JUROR: Canceled.

MS. PERLMETER: You had also mentioned that you had

learned about this case from your wife and read some articles about it?

JUROR: That's correct.

MS. PERLMETER: Tell us about that.

JUROR: Well, my wife works for *New Times* which is connected to Backpage. I don't know how. But so her boss is one of the defendant's brothers. So I get some info from -- even before I knew the case started.

MS. PERLMETER: So you had info before the case even started?

JUROR: Correct.

MS. PERLMETER: Info about what?

JUROR: About what went down, like, the --

THE COURT: Ms. Perlmeter, I don't want to get into any details.

MS. PERLMETER: Okay. What does your wife do for the *New Times*?

JUROR: She does national accounts payable. I believe. I'm not quite sure of her title.

MS. PERLMETER: How long has she worked for there?

JUROR: It's not -- she doesn't work for *New Times*. It's above *New Times*. It's the parent company.

What was the question again?

MS. PERLMETER: Your wife -- she works for the parent company that owns the *New Times*?

JUROR: I believe -- yes, she does the national accounts payable, something like that.

MS. PERLMETER: She does accounts payables and stuff --

JUROR: I believe so. I'm not quite sure.

MS. PERLMETER: And how long has she had that position?

JUROR: Thirteen years.

MS. PERLMETER: Thirteen years. And you mentioned that her boss is the brother or sister -- is a sibling of one of the defendants?

JUROR: Yes.

MS. PERLMETER: Who is her boss?

JUROR: Her boss is Joe -- Joe Lancy.

MS. PERLMETER: Okay. And -- Hensley?

JUROR: Lancy. Joe Lancy.

MS. PERLMETER: Could you spell that for me, please?

THE COURT: The defendants, Michael Lancy. Joe Lancy, I believe.

MS. PERLMETER: Lacey?

JUROR: Lacey, yeah. Sorry about that.

MS. PERLMETER: No problem. And so -- and then the first name?

JUROR: Joe.

MS. PERLMETER: Joe. So the brother of Mr. Lacey?

JUROR: Yes.

MS. PERLMETER: Okay. So has your wife talked to you about her work and -- for the past 13 years that she has had the position?

JUROR: We talk about work, yes.

MS. PERLMETER: You also mentioned that you have a close friend who is a Phoenix police officer?

JUROR: That's correct.

MS. PERLMETER: Does your friend work sex crimes or financial-related crimes?

JUROR: He just started. It's his second year, I believe. He graduated last year from the academy. So he is on patrol right now. So I get to hear some stories about what he does.

MS. PERLMETER: Okay. So he's a patrol officer?

JUROR: Yes.

MS. PERLMETER: And you hear some stories about what he does?

JUROR: Correct.

MS. PERLMETER: So anything that you have learned from your relationship with your friend that would impact your ability to be a fair and impartial juror in this case?

JUROR: No.

MS. PERLMETER: And then you also mentioned in your questionnaire that -- and I just want to make sure I have it

correct, but it sounds like you think someone's race or socio-economic status may have an impact on how you evaluate that person's credibility as a witness?

JUROR: Yeah, but also instructed not to take those accounts. I would put those -- those crimes aside -- those thoughts aside.

MS. PERLMETER: So you would be able to treat people of different races equally and consider their testimony?

JUROR: Yeah.

MS. PERLMETER: On the same level?

JUROR: I would treat everybody equally. I treat people the way they treat me.

MS. PERLMETER: I'm sorry?

JUROR: I said I treat people the same way they treat me. So if one messes with me or has done anything to me, I'm not going to do anything.

MS. PERLMETER: Is that -- did you -- is that something that you have decided since coming to court or did you check the wrong box when you filled this out a couple --

JUROR: I might have read it wrong and entered it wrong, so...

MS. PERLMETER: All right. Thank you very much.

Oh, wait. Sorry. One more second.

Juror No. 75, do you think you could be fair knowing that your wife works for one of the defendants' brothers?

Would you be able to consider all the evidence?

JUROR: Yeah, I would be fair.

MS. PERLMETER: If you are instructed -- if you are selected, you're not going to be able to talk about the case outside of the courtroom.

JUROR: Correct, I know that.

MS. PERLMETER: So would you be able to spend the next three months not talking to your wife about the case?

JUROR: That would be a blessing.

(Laughter)

MS. PERLMETER: Okay. Thank you very much.

JUROR: Thank you.

MS. PERLMETER: Juror No. 80, please.

JUROR: Juror No. 80.

MS. PERLMETER: Sorry, I'm going back to you.

JUROR: That's okay.

MS. PERLMETER: Follow-up question. You had talked about some childcare issues that you may -- that you have now. Would to be possible for you to see if your husband's parents or perhaps your husband would be able to help you out during this time period?

JUROR: Definitely can explore that. Currently my husband's work schedule is he works 7:00 to 4:30. So he would need to figure out how to work his 10-hour day by doing both drop-off and pick-up. Because of COVID, our daycare is open

more limited hours than they used to be. So we have to accommodate those.

MS. PERLMETER: I understand. Is your husband's work a work-from-home position or is he expected to work outside of the home?

JUROR: No. My husband goes to the office every day, as do I.

MS. PERLMETER: And how about your husband's parents? Are they in a position where they could potentially step in and assist over the next few months?

JUROR: I'd have to check to see what their personal commitments are. They are both retired, but they volunteer and they're also in the process of remodeling their house. So they have to be home for the workers. So I would have to confirm their availability.

MS. PERLMETER: And then do you have any friends or family or trusted individuals in the community that you could potentially ask to see if they could step in and provide coverage over the next few months?

JUROR: Not really.

MS. PERLMETER: All right. Thank you.

All right. The government has no more questions.

THE COURT: Okay. For the defense?

MS. BERNSTEIN: I'll start, Your Honor.

THE COURT: Okay.

MS. BERNSTEIN: Do we have a microphone?

THE COURTROOM DEPUTY: No. The batteries.

MS. BERNSTEIN: Good afternoon. My name is Whitney -- excuse me. My name is Whitney Bernstein and it is my honor to represent James Larkin.

I'm going to follow up on some of the answers that you have given earlier today and then your questionnaire.

Juror No. 83.

JUROR: 83.

MS. BERNSTEIN: Hi. You indicated that you teach a course every Wednesday?

JUROR: Yes.

MS. BERNSTEIN: Can you give us the timing of that that and the duration of your semester?

JUROR: It's 18 weeks, ends December 19. It's in progress right now. I missed class yesterday. And it goes from 11:30 to 12:45.

MS. BERNSTEIN: And what happens when you miss class?

JUROR: I create a video and post the video for the Zoom class.

MS. BERNSTEIN: And what are you teaching?

JUROR: Criminal Justice, Principles of Evidence in Case Law.

MS. BERNSTEIN: I'm sorry, say that again.

JUROR: Principles of Evidence in Case Law.

MS. BERNSTEIN: Criminal Justice, Principles of Evidence in Case Law?

JUROR: Correct.

MS. BERNSTEIN: So it sounds like you might have a lot of knowledge about what may go on here?

JUROR: I have some. I have 30 years of experience in law enforcement experience. I am a retired deputy police chief.

MS. BERNSTEIN: Is that in California?

JUROR: Yes.

MS. BERNSTEIN: I noted, in your questionnaire, you indicated that, when you were an officer, you worked prostitution stings?

JUROR: Yes.

MS. BERNSTEIN: And when you did those stings, did you ever receive training from Backpage as to how to conduct those stings?

JUROR: It was back in the -- I've never heard of Backpage. So no. The answer is no.

MS. BERNSTEIN: So how would you conduct your sting?

JUROR: We had -- there was two ways. We had undercover female police officers working and we would arrest the johns. We would approach them. And other times we'd have undercover male officers picking -- or propositioning the people working the streets and arrest them after proposition.

MS. BERNSTEIN: And then, in the latter scenario, those individuals would be prosecuted for prostitution?

JUROR: Most of them, yes. And it was for prostitution or lewd acts or, I'm sorry, solicitation of prostitution.

MS. BERNSTEIN: And this was in the nineties?

JUROR: It would be the -- I started in '82. It would be the nineties and early 2000s.

MS. BERNSTEIN: At that time in your jurisdiction, were there diversionary programs available to people arrested for prostitution crimes?

JUROR: You know, I'm not sure what the -- I know most of them were fined and given probation, but I'm not sure what types of programs were provided.

MS. BERNSTEIN: And would you say that your stings more often targeted people on the streets acting as prostitutes or more often targeted the johns soliciting prostitutes?

JUROR: We targeted people on the streets working as prostitutes and then targeted the johns that approached the people on the streets.

MS. BERNSTEIN: I understand that. I think you said there were two scenarios.

JUROR: Correct.

MS. BERNSTEIN: I'm wondering, were they deployed with equal frequency or was one used more frequently than the other?

JUROR: We deployed the john program more frequently, meaning we had the undercover female officers working as prostitutes and arrested the people that came and solicited them. We did that more often.

MS. BERNSTEIN: And I think you left blank on your questionnaire whether or not you believed prostitution should be legalized. You said no, but there was no explanation. Can you expound on that?

JUROR: I can. If I, just a little bit --

MS. BERNSTEIN: Sure.

JUROR: Working the street for so long, you do develop an empathy for the people who are out there. And I'm not sure the criminal direction was -- actually resolved the issues. Most of them would return and they worked a different circuit. So I'm torn about it. I wish we could regulate it and find a different way or pathway for the people who are involved.

MS. BERNSTEIN: When you say most of them would return of their own free will volitionally, these individuals would decide to engage in this behavior again?

JUROR: I can't tell you if it's their own free will. I know some of the girls -- I'll just say girls specifically this time -- were working on their own free will. Others were manipulated and coerced out there and were working for someone who was lurking around the corner as a pimp.

MS. BERNSTEIN: Would you arrest and prosecute that

person as well?

JUROR: We weren't as successful getting those people because of the fear of -- when people were arrested, their fear of speaking against the person they're working for.

MS. BERNSTEIN: So the people who were around the corner pulling the strings were not frequently held accountable?

JUROR: Not as often as we would have liked. Correct.

MS. BERNSTEIN: And I just want to clarify. When you said "girls," what do you mean by that?

JUROR: I was just speaking, predominantly, most of them were females walking the street that I'm talking about. There were males sometimes, but not as frequent.

MS. BERNSTEIN: "Girls" connotes a certain age. Do you --

JUROR: Oh, I'm sorry. None of them that I was involved in were under the age of 18. I can't tell you for sure we verified everyone's age, but as far as I know, we never arrested a child out there or under the age of 18 during these stings.

MS. BERNSTEIN: How would you do age verification?

JUROR: Most of the time, it was during the fingerprint process.

MS. BERNSTEIN: And these people were in the system already?

JUROR: A lot of them, yes.

MS. BERNSTEIN: If they weren't in the system, how does that indicate their age?

JUROR: Most of the time, we went with what they told us and tried to verify whatever information they provided us -- a residence or, you know, previous history, driver's license.

MS. BERNSTEIN: So you had to take their word for it a lot?

JUROR: Pretty much, yes. At least -- I'm sorry. Yes. Pretty much that's how it started off.

MS. BERNSTEIN: And when did you retire?

JUROR: 2011.

MS. BERNSTEIN: And what rank did you retire at?

JUROR: Deputy police chief.

MS. BERNSTEIN: And what types of -- what types of crimes were you overseeing when you retired?

JUROR: I was overseeing the entire department, the operations and administrative side, but I've worked every avenue. I was a detective. I primarily worked gangs and narcotics. And as I promoted up the chain, I worked internal affairs, patrol operations, community-oriented policing teams.

MS. BERNSTEIN: So if you retired in 2011, are you familiar with whether anyone under you has ever subpoenaed or worked with Backpage.com?

JUROR: No, I'm not.

MS. BERNSTEIN: You're not familiar or they did not?

JUROR: Well, I don't know if they did or not. I'm not familiar with it. I never heard of Backpage.

MS. BERNSTEIN: Have you ever served on a jury?

JUROR: No.

MS. BERNSTEIN: And given your extensive personal experience with this as well as the fact that you appear to be somewhat of an expert teaching at least a course online -- someone thinks so, right?

JUROR: Right.

MS. BERNSTEIN: Would you be able to set that aside and just listen to the evidence as it came in? I imagine that may be difficult.

JUROR: It's what I was supposed to do for 30 years was to be fair. So I don't see it as a difficult task. I understand both sides. I have experience with both sides. And my role, like if I was asked to step up, I would step up and do the best job I could to be fair.

MS. BERNSTEIN: I appreciate that. And, of course, being fair is really important. I think what I'm trying to get at is whether or not you could kind of be more of a blank slate. You have a lot of experience with how certainly vice cops work, with how street cops work, and I wonder if you're able to put that entirely out of your mind and just listen to what officers say or if you would be checking that against your

own experience.

JUROR: To be quite honest, it would -- I would evaluate what they said. But, I mean, I do have a lot of experience. If they work undercover, buy and sell drugs undercover. So, I mean, to say -- honestly say I can just get rid of all my life's experiences would be difficult, but I would do the best I could to be as fair as possible.

MS. BERNSTEIN: I imagine it's like when I watch *Law and Order*, it in no way parallels what's going on, and it frustrates me. And I do often provide my own commentary as to how that's not how the rules of evidence works, that's not how court works. Would you be doing the same thing?

JUROR: I don't think I would be doing the same thing here because I'm not completely familiar with it, but I do understand what you're saying because I watch cop shows. That's crazy; that's not what happens. But my job is to judge the performance. My job would be to evaluate the evidence presented by both parties and the statements by the witnesses and to determine if they're credible or not.

MS. BERNSTEIN: Right. A lot of your job will be determining credibility.

JUROR: Correct.

MS. BERNSTEIN: And given your extensive, almost lifelong experience with this, would you be able to forget every person you've ever worked with and judge them as a blank

slate?

THE COURT: Okay. Ms. Bernstein, can we have a sidebar?

MS. BERNSTEIN: Sure.

(Sidebar conference heard, reported as follows:)

THE COURT: So I just have an issue with you keep repeating that they have to come in with a clean slate. No juror has to come in with a clean slate --

MS. BERNSTEIN: Okay.

THE COURT: -- because they all have stuff.

MS. BERNSTEIN: Experiences.

THE COURT: So -- and you can rephrase it.

(The following proceedings were heard in the presence of the jury:)

MS. BERNSTEIN: Thank you, Juror 83. Sorry you had to stand for that.

So I think a better way to phrase the question might be -- I think a better way to phrase the question might be: How realistic is it for you to just leave your brain outside the door and your life experiences and evaluate the evidence?

MS. PERLMETER: Objection.

THE COURT: Yeah. You don't have to answer that question.

Everybody comes into court with some sort of life experiences. So maybe you can rephrase it.

MS. BERNSTEIN: I would not be a good juror for a criminal defense case because I have spent my entire life practicing as a criminal defense attorney. It would be very difficult for me to not read into things the judge was doing or the attorneys were doing because I'm so familiar with that myself.

Do you have similar concerns or reservations about serving in this case? Because it matters a lot for our clients' fairness and due process.

JUROR: I completely respect that. I'm surprised you're even speaking with me, actually. But I do know that I've always been fair. I've always -- like I said, I've worked both sides within law enforcement capacity. And my job is -- what I stood for was protection of everybody's rights, to understand that and do the best I could to be fair to everybody on the street, in the courtrooms and everything else.

So knowing can I just wipe off my memory and my life experience, no. All I can tell you is that, if asked, I would be as fair as I possibly humanly can.

MS. BERNSTEIN: Do you think this is the right trial for you?

JUROR: I'm not --

MS. PERLMETER: Objection.

THE COURT: Ms. Bernstein --

You can answer that question.

And then you need to move on.

MS. BERNSTEIN: Do you think this is the right trial for you?

JUROR: I know nothing about the case other than what you were asking yesterday, and it's definitely concerning because of my history in law enforcement.

MS. BERNSTEIN: Thank you.

JUROR: Yes.

MS. BERNSTEIN: Juror No. 87. Sorry. Juror No. 87.

JUROR: 87.

MS. BERNSTEIN: Hi. You indicated earlier that the rise of the Delta variant is a concern for you given your compromised immune system. Would it be distracting for you to have to sit here for a couple of months in this large shared air space?

JUROR: Yes.

MS. BERNSTEIN: Do you think that would impede your ability to fairly and personally serve on this trial if you are distracted?

JUROR: I do.

MS. BERNSTEIN: Thank you.

THE COURT: Before we move on, Juror 87, I did want to follow up with you. You did not -- I didn't see anything in your jury questionnaire about your health issue. Is that something that is new?

JUROR: No, it's not. It's just something that has been really well under control until recently. And with the rise of the variant, my rheumatologist has expressed some concern about just exposure.

THE COURT: Okay, thank you.

MS. BERNSTEIN: No further questions from me, Your Honor.

THE COURT: Okay. Who's next?

Mr. Cambria.

MR. CAMBRIA: Yes, Your Honor.

Potential Juror 83.

JUROR: 83.

MR. CAMBRIA: Yes, sir. When you were -- I gather from what you've told us that most of the prostitution work that you did involved people on -- not a good move here. Hang on one second.

Bear with me here, Your Honor.

THE COURT: Um-hmm.

(Mr. Cambria adjusts microphone.)

MR. CAMBRIA: There we go.

When you were doing your work, most of the people that you were dealing with were walking the streets, so to speak?

JUROR: Yes.

MS. PERLMETER: Objection. Asked and answered.

MR. CAMBRIA: It's just an intro question, Your Honor.

THE COURT: Yeah, go ahead.

MR. CAMBRIA: Were you familiar with advertisements, if you will, in the Yellow Pages?

JUROR: No.

MR. CAMBRIA: Was there ever a time when somebody in your division looked at Yellow Pages to determine whether they were advertisements for people who may want to engage in prostitution?

JUROR: No.

MR. CAMBRIA: Okay.

JUROR: It was just a very active area that I worked in.

MR. CAMBRIA: All right. That's all I have, sir. Thank you.

JUROR: Thank you.

MR. CAMBRIA: All right. Let's see if I can make -- 93, please.

JUROR: 93.

MR. CAMBRIA: In one of your questions -- one of your answers to the questions to the questionnaire, the question was feelings regarding website responsibility for content posted by users. You indicated you think they have a responsibility to monitor their site and assure it's being used in a proper legal manner that's not harmful, correct?

JUROR: That's correct.

 MR. CAMBRIA: If, for example, there was an ad, let's say, on Facebook, and somebody responded to that ad and it turned out to be someone engaging in something that could be prostitution, is it your belief or feeling that, let's say, Mr. Zuckerberg who owns Facebook should be responsible for that?

JUROR: To a degree, yeah.

MR. CAMBRIA: All right. And would that -- would the responsibility be, for example, working with the police to ferret out people who may abuse Facebook and help them be prosecuted, let's say?

JUROR: I think that overall he just needs to -- it's his -- he has the ability and the means to be able to weed things of that nature out. So, to a certain degree, yeah, I think he's responsible for it.

MR. CAMBRIA: Well, what I'm saying is would it be, in your opinion, sufficient if Facebook did everything possible to cooperate with the police and to ferret out those who were abusing Facebook by posting these ads?

JUROR: I don't know.

MR. CAMBRIA: Okay. Would you think that the only way to fix it, since some people could use Facebook for this, is to shut Facebook down?

JUROR: No.

MR. CAMBRIA: No. And why not?

JUROR: Because, unfortunately, you can't catch everybody. It's -- some things just get by.

MR. CAMBRIA: So you don't think that the obvious answer is, well, we'll just shut Facebook down and we won't have ever even a chance of this happening?

JUROR: Then you'd have to shut down a whole lot of other ones as well.

MR. CAMBRIA: Oh, because you think that whoever was abusing Facebook would just find some other thing to abuse?

JUROR: Correct.

MR. CAMBRIA: I see. Well, you think that it's appropriate, however, for Facebook or whatever platform to cooperate with the police and to try to identify those abusing the system and punish them?

Let me put it a different way.

So let's assume I post an ad on Facebook and it's for prostitution. Probably I wouldn't get any takers, but let's assume I did that, okay. Would it be appropriate for Facebook then to identify me if they could, turn me over to the police, and prosecute me because I abused their site?

MS. PERLMETER: Objection. Argumentative.

MR. CAMBRIA: I'm just asking him his opinion, Your Honor.

THE COURT: The objection is overruled.

Go ahead.

JUROR: Can you ask the question again? I'm sorry.

MR. CAMBRIA: I'm sorry, sir. I didn't hear you.

JUROR: Can you repeat the question, please?

MR. CAMBRIA: Oh, sure. So let's assume I contact Facebook and I put an ad in and it's for prostitution. I can't even say it with a straight face here. It's for prostitution. And should Facebook, if they can, report me to the police if they are able -- in the millions of ads they get, if they're able to detect me as perhaps doing this stuff? Do you think that's a good thing that they would do that?

JUROR: Yes, yes. I think it is.

MR. CAMBRIA: All right. That's all I have. Thank you.

Let's see. Juror No. 63, good afternoon.

JUROR: Number 63.

MR. CAMBRIA: You have here -- I'm reading your answers to your questions. Retired police officer?

JUROR: Correct.

MR. CAMBRIA: Vacaville?

JUROR: Correct.

MR. CAMBRIA: Can you put that right up there?

You can see I have a little mechanical assistance here.

And your spouse is a retired police sergeant?

JUROR: Correct.

MR. CAMBRIA: Well, one of the questions we've been asking here of a number of people who have a prior law enforcement background is whether or not they could judge police officers who will be witnesses in this case the same as a non-police officer or, because of all your years of that sort of employment, you would give them a little leg up just because they're police officers.

JUROR: No. I would want to hear what they have to say. I'd be eager to hear what they have to say.

MR. CAMBRIA: Okay.

JUROR: I'm not going to give them anything beyond what anybody else would say.

MR. CAMBRIA: So just because they were police officers, they wouldn't get a leg up?

JUROR: Not from me.

MR. CAMBRIA: Okay. At any time in your career, were you involved in any sort of internet situation where people committed crimes using the internet?

JUROR: I had one case where there was an internet component to it, but that's -- that's it. I didn't deal with the internet.

MR. CAMBRIA: And was there any feeling on your part that the internet providers themselves were in some way responsible for the crime?

JUROR: Not at that time. They were very cooperative

in my investigation.

MR. CAMBRIA: So you thought that they were trying to help you by cooperating with you?

JUROR: Yes.

MR. CAMBRIA: And they did help you?

JUROR: Yes.

MR. CAMBRIA: Have you, in the past, dealt with crimes that involved either the mail or telephones?

JUROR: No.

MR. CAMBRIA: No, okay. Now it says you were a sexual investigator -- assault investigator for two years, correct?

JUROR: No.

MR. CAMBRIA: Oh, no?

JUROR: I was a sexual assault investigator for approximately five years and then I did juvenile sexual assault for an additional two.

MR. CAMBRIA: Oh, I see. All right. And now, so that means that you've had some experience with individuals who are alleged to be perpetrators of sexual assault?

JUROR: Correct.

MR. CAMBRIA: And by those who are the subjects of sexual assault?

JUROR: Correct.

MR. CAMBRIA: All right. Now, you have a lot of background information and so on as a police officer in

connection with crimes like that. Is that something that you would share with other jurors?

JUROR: No.

MR. CAMBRIA: You would not?

JUROR: No.

MR. CAMBRIA: Is it something that, for example, if something was -- if a juror said something that you knew was 100 percent wrong based on your prior work, would you then correct them?

JUROR: No.

MR. CAMBRIA: No, okay.

The -- one of the questions you answered was that you were bothered that escorts are legal.

JUROR: Correct.

MR. CAMBRIA: Do you recall that?

JUROR: Correct.

MR. CAMBRIA: Do you know that there are a number of legal escorts?

JUROR: I'm aware of it, yes.

MR. CAMBRIA: I can't hear you.

JUROR: Yes.

MR. CAMBRIA: And that they are, in fact, licensed?

JUROR: I am aware of that, yes.

MR. CAMBRIA: By several municipalities?

JUROR: Correct.

MR. CAMBRIA: The -- you did indicate, I believe here, that the length of the trial might create an undue hardship?

JUROR: Yes, because I intend to be in Texas in the month of October for the birth of my first grandchild.

MR. CAMBRIA: Okay. Also it indicate -- you indicated here that you wear hearing aids?

JUROR: I do.

MR. CAMBRIA: Know all about them.

JUROR: I don't consider them a disability. Sometimes they malfunction, but I don't need any special -- what's the word I'm looking for -- I don't need anything special to hear.

MR. CAMBRIA: As long as there's not a lot of background noise, you're good?

JUROR: Correct.

MR. CAMBRIA: Now back to the situation with the birth, did you say, of a grandchild?

JUROR: Correct, yes.

MR. CAMBRIA: Is that something you were planning -- you know, you've had some long-term plans with regard?

JUROR: Well, my daughter is pregnant and she has a due date and she has asked me to be there, and I said yes.

MR. CAMBRIA: Okay, I didn't mean that. I said is there some kind of reveal party or something like that that's going to go on?

JUROR: No.

MR. CAMBRIA: All right.

JUROR: It's a boy, by the way.

MR. CAMBRIA: Apparently, that's already happened. Okay.

Let's see here. That's all I have, thank you.

Number 65.

JUROR: Juror 65.

MR. CAMBRIA: I can hear you. Thank you.

JUROR: I'm a classroom teacher.

MR. CAMBRIA: You have marked here that you've got a financial hardship not being paid during jury duty, sole provider of income for the household.

JUROR: That's incorrect. I am a retired teacher.

MR. CAMBRIA: Well, I have the wrong sheet here.

Well, I'll have to skip you then until -- here we go. It's the same one. Well, I'm sorry. This sheet has that you have a paid vacation, Harrah's Casino. No.

JUROR: Yes, but that's on the weekend.

MR. CAMBRIA: Okay. So that part is correct?

JUROR: That's correct.

MR. CAMBRIA: And then you indicated you feel high risk for COVID?

JUROR: No, I'm fully vaccinated.

MR. CAMBRIA: I wonder if we have the right sheet here.

How about this: Were you in the military police in Korea?

JUROR: My son was.

MR. CAMBRIA: That's the connection. Okay. Your son, Army military police, Korea. Okay. So part of this is right anyway?

JUROR: Yes, part of it is correct.

MR. CAMBRIA: Well, it says here you have a paid vacation. So maybe that would be something to go with.

JUROR: Maybe I should go take it.

MR. CAMBRIA: Okay. All right. So there is no financial hardship. You are not the sole provider in the sense that you wouldn't have a -- any income?

JUROR: No. I have fixed income.

MR. CAMBRIA: All right. Let's see. If -- if the evidence were such that somebody placed an ad and eventually it turned out that that person had in mind committing an act of prostitution, is it your belief then that the ad service, if you will, should be held accountable for that or the person that actually posted the ad and the individual who actually engaged in the prostitution?

MS. PERLMETER: Your Honor, I would object. This doesn't appear to be a follow-up question to anything in the questionnaire or has been asked of this juror this morning. It appears to be something else.

MR. CAMBRIA: It's a follow-up question, Your Honor --

THE COURT: Okay, one second.

MR. CAMBRIA: -- to 76.

THE COURT: Okay, you can answer. Do you remember the question?

JUROR: I believe you're asking if it's the responsibility of the publication to monitor their location or something to that effect?

MR. CAMBRIA: Yeah. The question was: If an agency is such that somebody buys an ad and they put something in the ad which eventually allows a person to respond to the ad and the ultimate outcome is an act of prostitution, do you feel that the website is responsible or the person who placed the ad or the individual who actually committed the act of prostitution?

JUROR: I think the website or publication has an obligation to monitor what they put on their publication or website and, if they find something that is not according to their standards, they need to red flag it, they need to delete it, or they need to take that person off of their site.

MR. CAMBRIA: How about if they report it to the police?

JUROR: I don't think it's their job to report it to the police. I think it's their job to monitor their site. That's it. So flag it, remove it and -- or delete it or remove

the person that's putting that stuff on there.

MR. CAMBRIA: What if they did report it to the police and then the police followed up and the police prosecuted someone and held them accountable; wouldn't that be good?

JUROR: They are taking some responsibility, I believe.

MR. CAMBRIA: Okay, okay. Thank you, sir.

JUROR: Thank you.

MR. CAMBRIA: Number 66. I'll see if I've got the right sheet now. You indicated that, with regard to that last question that I asked this gentleman, was your answer you think the individual should be responsible for the content, meaning the one who posted the ad?

JUROR: Yes.

MR. CAMBRIA: And if, for example, the ad agency, if you will, reported that person, if they thought there was an issue, to the police, would you find that to be reasonable and responsive?

JUROR: I would.

MR. CAMBRIA: And do you think that if, for example, somebody uses, let's say, telephones to commit crimes, that we should outlaw telephones?

JUROR: No. That wouldn't be necessary.

MR. CAMBRIA: Because some people abuse them, we shouldn't just kill the phone service, so to speak?

JUROR: No, that wouldn't be necessary. I think that would create a new issue.

MR. CAMBRIA: And how about a website, for example? If somebody slips through and posts an advertisement that turns out to result in an act of prostitution, should the website be shut down or the people who posted the ad be punished?

JUROR: The people who posted the ad be punished.

MR. CAMBRIA: You do indicate a connection to law enforcement. You say that there's some -- several, apparently, police officers in your family at least historically?

JUROR: I don't recall saying seven police officers, but my grandfather was a police officer, yes.

MR. CAMBRIA: Okay. And as a result of that, would you give police officers an advantage if they were to testify in this case?

JUROR: Not really. Every police officer has their own story and way of going about a situation.

MR. CAMBRIA: Well, would they get, you know, some kind of points, if you will, just because they're police officers, before they even start testifying?

JUROR: No.

MR. CAMBRIA: All right. That's all I have. Thank you.

Number 67. Afternoon.

JUROR: Juror No. 67.

MR. CAMBRIA: Yes. I noticed one of your answers here, you indicate your father is a pastor in a church and a chaplain at a hospital.

JUROR: That's correct.

MR. CAMBRIA: And if -- let's assume that we go through this trial. You're here. You're a juror. And, at the end of it, you and the other 11 jurors say, you know what, government did not prove these specific charges that they have alleged. Would there be any reluctance on your part to vote that way because of your father's religious connection?

JUROR: We do not share the same level of belief.

MR. CAMBRIA: I'm sorry?

JUROR: We do not share the same level of belief.

MR. CAMBRIA: All right. Okay. So you're an independent thinker?

JUROR: That is correct.

MR. CAMBRIA: You've indicated that you have some usage, if you will, of the internet in the past?

JUROR: That's correct.

MR. CAMBRIA: And in the course of that, in the course of surfing through that, if you will, did you see what appeared to be ads for people having sex?

JUROR: I mean, I don't go on any sites.

MR. CAMBRIA: I'm sorry?

JUROR: I don't go on any sites specifically tailored

to that, but I have seen advertisements yes.

MR. CAMBRIA: I didn't mean to indicate you did. You named a number of them in here.

JUROR: Yeah.

MR. CAMBRIA: I'm just asking, in the course of going through those sites, did you see any of these other type ads?

JUROR: I don't think specifically, like a specific type of ad selling for sex.

MR. CAMBRIA: Okay. Were there ads where people -- were there any ads where people were, like, provocatively dressed or anything like that?

JUROR: I could say so, yeah. There was ads that, you know, "meet now" and different things like that, where people...

MR. CAMBRIA: Yeah. And, of course, you'd never know what the end result of that is unless you contacted that person and met them and all the rest of it; is that fair?

JUROR: That's correct.

MR. CAMBRIA: You couldn't really just tell by looking at the picture or the ad?

JUROR: That's correct.

MR. CAMBRIA: It appears here that, in the past, you have used Craigslist?

JUROR: Yes.

MR. CAMBRIA: Did you see any of those types of ads?

JUROR: It's been a long time. I was just looking for some Pfaltzgraff for my mother's gift. So no.

MS. PERLMETER: Okay. But there were a number of different categories and you just go on your specific one you were interested in?

JUROR: That's correct.

MR. CAMBRIA: Were there adult categories?

JUROR: I haven't been on it in so long, but I'm not really sure.

MR. CAMBRIA: Okay, all right. That's all I have. Thank you.

THE COURT: Mr. Cambria, it's 12:00; so we're going to break.

MR. CAMBRIA: Okay.

THE COURT: We're going to break for an hour for lunch. In an hour, if you could again wait outside until we bring you back in. And have a good lunch. See you in an hour.

Counsel, I need to talk to you, though.

(In open court; jury not present.)

THE COURT: Everybody needs to stay here. There are a couple jurors who wanted to talk to us from a different panel.

You can have a seat. She's bringing one of them in right now.

MS. BERNSTEIN: May we have the numbers, if you know?

THE COURT: I'm not sure who she's bringing in first.

(Juror No. 24 enters courtroom.)

THE COURT: This is Juror 24.

You can just stand there and I'll hear from you.

So, Juror 24, all I have is a note that says you want to address the Court with new information.

JUROR: So, basically, one thing I wanted to ask is, you know -- I was in the first jury pool and there were some topics that were discussed in the second and third jury pools today that I would have liked to have responded to, but, obviously, I wasn't in the room. So that was my one question.

And then my other question was that I sent a second letter from my employer in to the juror office, I think. I was wondering if you or anyone else actually got that because I never got a confirmation.

THE COURT: When did you send it?

JUROR: I sent it on Tuesday, like around 4:30 p.m. So it was right before they were due, but, you know, I was just wondering if it actually got received because I never got confirmation.

THE COURT: I believe I did, but I can check on that.

JUROR: Okay. I have a copy of it here if you don't, so -- if it's lost in email somewhere.

Anyway, that was my main question is will there be another session where someone like myself from your first jury pool can respond to some of the topics that were brought up?

THE COURT: No, there will not be. What is it you're worried about?

JUROR: So, basically, I wanted to say that I don't think that I can be a fair juror on this trial because, after some of what the defense was saying yesterday, I think that the case is -- I can already kind of see where this is going basically. They're going to try to say that they're innocent because, you know, there is some guys that have a website, you know, whose fault -- how is it their fault -- it's like how are they supposed to be at fault for something someone else did on their site. But that's like saying, you know -- you know, they collected money from those people, right? So why -- why are they able to accept the money for illegal prostitution advertisements, but then not be prosecuted for it at the end? I don't understand how that's possible.

You know, other -- second session, someone asked, you know, is there a law, is there like a specific law that's about this? And I don't know because I'm not an expert, you know, but, if there isn't, you know, I feel like that's the loophole they're looking for. So I feel bad for the prosecutor because they're probably going to get off. Then is this probably going to just keep going up the chain to the Supreme Court, right?

THE COURT: So it's a little difficult because this is voir dire; so you haven't heard any evidence.

JUROR: Right.

THE COURT: You haven't been instructed on the law that will apply in this case. So --

JUROR: Right. I guess I just wanted to make it clear to the attorneys that those were my opinions that I developed yesterday. You're right; I don't know. I don't think I'm a dumb guy. So I could probably understand that people are explaining laws to me, but I just wanted to say, you know, yes, maybe at the beginning of the day, I was in the middle and now I don't feel like I'm in the middle anymore.

THE COURT: Okay, does the government have any follow-up questions?

MS. PERLMETER: No, Your Honor.

THE COURT: Does the defense?

MR. CAMBRIA: Yes. Are you simply saying to us, sir, in clear and unequivocal terms, heartfully felt, that you cannot be fair and impartial in this case?

JUROR: What I'm saying is that I feel like I already know how this is going to go. I'm not saying I can't be fair. You know, I'm not -- like I said, I'm not a -- so I have Ph.D. in chemistry, right? I'm not an idiot. I understand that there are nuances to every situation. I also understand that there are loopholes that you guys are going to look for in these laws.

I don't think that -- like, for example, your question about should telephone companies be shut down because someone

commits a crime on the phone, I think that's completely misrepresenting this case. That's not even remotely related to this.

MR. CAMBRIA: So we'd have to change your mind?

JUROR: Yes. You would have to change my mind, yes, at this point.

MR. CAMBRIA: That's all.

THE COURT: Okay, thank you. You can go to lunch now and we'll see you back downstairs in an hour.

MR. CAMBRIA: Before you let him go, could we have a sidebar?

THE COURT: We can talk about it later.

MR. CAMBRIA: Well, I --

THE COURT: He's just going to lunch.

MR. CAMBRIA: But if he shares those views with other jurors, we may have more problems.

THE COURT: Juror 24, don't discuss your views with other jurors. Do you have any problem with that?

JUROR: I can do that. No worries.

THE COURT: All right. Thank you.

And the next one should be Juror 27.

(Juror No. 27 enters courtroom.)

THE COURT: Juror 27, you can just stand there for a minute?

JUROR: Sure.

THE COURT: I just have a note that says you wanted to address the Court with new information.

JUROR: Yes, Your Honor.

THE COURT: Okay.

JUROR: And Counsel and Your Honor, there was two issues. During the questioning yesterday, the second group, there was open-ended question that came up about linking escorts and prostitutes and them being synonymous and who thought that and felt that. My position -- that was kind of where I stood and also felt that they were synonymous.

And second issue, I'm sure it was in my questionnaire, but it was so long ago, I'm not sure how clear it was, that serving on a 10-week jury trial would be very difficult for me in my practice and being able to fully adequately represent my current clients.

I work in the evenings and now in the mornings. As a perfect example, last night I was up until 12:30 working. I was up this morning again a couple hours before this selection started today working on my existing work. I canceled a deposition that was this afternoon. And so a 10-week trial would be very difficult for me to serve on. That's all. Beyond that, just wanted to bring that to the Court's attention and counsel's attention.

THE COURT: Okay. And as to the first part, I just want to make sure I understand. When you were listening to

this discussion yesterday about escorts, prostitutes, trafficking, there was a number of questions about that. What is your feeling about those right now?

JUROR: Sure. I think just the -- the two, in my mind -- an escort and a prostitute being synonymous, I wasn't even aware, frankly, that escorts was a licensed legal practice, that it was allowed. I've always thought you're paying for it, that there was some level of prostitution, you're paying for some type of sexual act in coordination with an escort. If it's legal and it's licensed, I guess I still kind of think, all right, maybe licensed, but there's likely some type of act going on after the fact related to some prostitution type of act. That's just what I thought my understanding of it was.

THE COURT: You're a lawyer. So now you know or you've heard that escort services can be legal depending on the jurisdiction.

JUROR: Sure.

THE COURT: And would you be able to distinguish between the two if you're given more information?

JUROR: I mean, I can distinguish between the two as I stand here before you now, but I -- still, in being able to distinguish between the two, I also understand, while something may be legal, doesn't mean that there isn't additional things going on. It could be a regulated activity, but the person

that's licensed could very well still be committing the illegal acts despite being licensed for one particular purpose.

THE COURT: Okay. Any follow-up questions from the government?

MS. PERLMETER: Yes, Your Honor.

Hi, Juror No. 27.

JUROR: Hello.

MS. PERLMETER: Hi. So you expressed some concerns about your practice. And just to follow up with you, did you receive the trial calendar while you filled out the questionnaire?

JUROR: I did, yes.

MS. PERLMETER: You see how there are days off every once in while? Sometimes it's just one day per week and then sometimes a couple days per week and then, in November, there's a chunk where we don't have trial for two weeks?

JUROR: Yes.

MS. PERLMETER: Would you be able to manage your client work in those times and in the before and following trial?

JUROR: I honestly don't think that's going to be sufficient. I currently have -- I have a hearing next -- this upcoming Wednesday. I practice all over the country. Florida -- my hearing on Wednesday is in Florida. I have hearings in Delaware bankruptcy court. I have them in Texas

bankruptcy. And hearings are regularly set by bankruptcy court not based on my particular representation of one creditor in the case. So they're generally regularly popping up and it would be extremely difficult for me to do that.

MS. PERLMETER: Do you work for yourself, sir, or do you work as a member of a firm?

JUROR: No. I do work as a member of a firm. And there are certain cases that I work on with other attorneys in my firm that could serve that purpose. I am the primary and only, that I know of, licensed bankruptcy attorney in my firm for the state of Florida, and so I handle our Florida bankruptcy.

MS. PERLMETER: Do you have a lot of Florida matters in the next three months?

JUROR: Yeah. Like I said, this upcoming -- on Wednesday, I know I have a hearing in -- at one of my bankruptcy cases. I have two or three pending cases in Florida right now.

MS. PERLMETER: And given the current climate with the pandemic, are these hearings -- are they requiring you to fly in person or are you able to attend the hearings virtually?

JUROR: No. I do attend virtually, yes.

MS. PERLMETER: Thank you.

JUROR: Sure.

THE COURT: Mr. Cambria? Oh, hold on.

MR. CAMBRIA: Thank you, Your Honor.

So is it fair to say that, if there is an ad and it simply said "escort," licensed or not, you'd assume it's prostitution?

JUROR: That's, yes, my assumption.

MR. CAMBRIA: Thank you.

THE COURT: Any other questions?

All right. Thank you.

JUROR: Thank you, Your Honor, Counsel.

(Juror 27 exits courtroom.)

THE COURT: Any objection to striking Juror 24?

MS. BERNSTEIN: No, Your Honor.

THE COURT: Juror 24 will be struck.

And any objection to striking Juror 27?

MS. BERNSTEIN: No, Your Honor.

MR. LINCENBERG: No objection.

MS. PERLMETER: We object to the release of Juror No. 27.

THE COURT: Okay. Over objection, I'm going to release Juror 27 mostly because of his work obligations.

Oh, and just one other thing before you go. When we come back, Juror 75 -- he's the one whose wife works for *New Times*. If you plan on asking any questions about -- because he said something about knowing information about the case. I'd ask that you not do it and we can talk to him separately. If

you do have any questions about that, just let me know.

MS. PERLMETER: Did the Court rule on Juror 24? Because the government -- the United States didn't state its position. It was a bunch of voices from the defense.

THE COURT: Oh, I'm sorry. I thought you said "no objection."

MS. PERLMETER: No, I didn't actually say anything.

THE COURT: Okay. You can take your position.

MS. PERLMETER: Your Honor, we object to the excusal of Juror No. 24.

THE COURT: Okay. Over objection, I'm still excusing him. He was pretty adamant.

MR. LINCENBERG: Your Honor, can I raise a question with regard to Juror 63? This was the police officer, the female police officer.

THE COURT: What about it?

MR. LINCENBERG: Well, we heard for the first time this hardship in October. I had asked Ms. Perlmeter as to whether she wanted to stipulate. She said she would consider it over the lunch hour and get back to me. Just before I go through further examination, if it's the Court's inclination to release her, we would ask that she be released. She was the one who said she is going to Texas in October for the month.

THE COURT: Did she say she was going for the month?

MR. LINCENBERG: That's what I thought I heard. She

said the month of October.

MS. PERLMETER: Yes, to assist her granddaughter.

THE COURT: She said in the month of October.

MS. PERLMETER: I heard for the month.

THE COURT: Obviously, I'm not going to make her not go to Texas, but maybe what I'll do is I'll ask her when we get back "Was your plan just to, like, go and visit or is your daughter expecting that you're going to stay for three weeks to help her learn how" -- I don't know if this is her daughter's first child or second.

MS. BERNSTEIN: Yes, she indicated it was the first grandchild.

MS. PERLMETER: This was on her questionnaire. First grandchild. Due date is October 20th. We all know babies come when they want to. We have that long break in the beginning of November. So I don't know if she thought -- was planning around that.

MR. LINCENBERG: Her answer on the questionnaire was "I am expected to be in Texas to assist with the birth." I have no problem if the Court wants to follow up there. I'm only raising it because I can save some time on voir dire if the Court is going to dismiss her.

THE COURT: So why don't I ask her first and I'll call you up to sidebar, I guess.

MR. LINCENBERG: Okay.

THE COURT: Okay. All right. We're at recess. Thank you.

(Lunch recess taken at 12:15 p.m.)

(Transcript of afternoon session in separate file.)

C E R T I F I C A T E

I, BARBARA H. STOCKFORD, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 24th day September 2021.

/s/ Barbara H. Stockford
Barbara H. Stockford, RMR, CRR, CRC