**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. CR-18-0422-PHX-SMB |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | August 20, 2021 |
| Michael Lacey, | ) | 9:38 a.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE SUSAN M. BRNOVICH, JUDGE

<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>

<u>STATUS CONFERENCE</u>

Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2    For the Government:

3

4        U.S. ATTORNEY'S OFFICE
         By:  **Mr. Peter S. Kozinets**
5             **Mr. Kevin M. Rapp**
              **Ms. Margaret Wu Perlmeter**
              **Mr. Andrew C. Stone**
6        40 North Central Avenue, Suite 1200
         Phoenix, Arizona 85004

7

8        U.S. DEPARTMENT OF JUSTICE
         By:  **Mr. Reginald E. Jones**
9        1400 New York Avenue, NW, Suite 600
         Washington, DC 20530

10

11       U.S. ATTORNEY'S OFFICE
         By:  **Mr. Daniel G. Boyle**
12       312 North Spring Street
         Los Angeles, California 90012

13

14   For the Defendant Lacey:

15

16       LIPSITZ GREEN SCIME CAMBRIA
         By:  **Mr. Paul J. Cambria, Jr.**
17       42 Delaware Avenue, Suite 120
         Buffalo, NY 14202

18

19   For the Defendant Larkin:

20       BIENERT KATZMAN
         By:  **Mr. Thomas H. Bienert, Jr.**
21            **Ms. Whitney Z. Bernstein**
         903 Calle Amanecer, Suite 350
22       San Clemente, CA 92673

23

24

25

                    UNITED STATES DISTRICT COURT

```
1   For the Defendant Spear:

2       FEDER LAW OFFICE
        By:  Mr. Bruce S. Feder
3       2930 East Camelback Road, Suite 160
        Phoenix, AZ 85016
4

5   For the Defendant Brunst:

6       BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
        LINCENBERG & RHOW
7       By:  Mr. Gopi K. Panchapakesan
             Mr. Gary S. Lincenberg
8       1875 Century Park E, Suite 2300
        Los Angeles, CA 90067
9

10  For the Defendant Padilla:

11      DAVID EISENBERG, PLC
        By:  Mr. David S. Eisenberg
12      3550 North Central Avenue, Suite 1155
        Phoenix, AZ 85012
13

14  For the Defendant Vaught:

15      JOY BERTRAND, LLC
        By:  Ms. Joy M. Bertrand
16      P.O. Box 2734
        Scottsdale, AZ 85252
17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

1

2       COURTROOM DEPUTY:  On the record in CR 18-422, United

3   States of America versus Michael Lacey and others, before the

4   Court for a status hearing.

5       MR. RAPP:  Good morning.  Kevin Rapp, Andrew Stone,

6   Daniel Boyle, Peter Kozinets, Margaret Perlmeter,

7   telephonically, and Reginald Jones, on behalf of the United

8   States.

9       MR. CAMBRIA:  Good morning, Your Honor.  Paul Cambria

10   and Mr. Lacey are here this morning.  Good morning.

11       MS. BERNSTEIN:  Good morning, Your Honor.  Whitney

12   Bernstein, and Tom Bienert is on the phone.  Accompanied with

13   me is Toni Thomas, and Mr. Larkin is here as well.

14       MR. PANCHAPAKESAN:  Good morning, Your Honor.  Gopi

15   Panchapakesan on behalf of Mr. Brunst who is present in the

16   courtroom.  Mr. Lincenberg is on the phone.

17       MS. BERTRAND:  Good morning, Your Honor.  Joy Bertrand

18   appears for Joye Vaught.  We waive her appearance for today.

19       MR. EISENBERG:  Good morning, Your Honor.  David

20   Eisenberg on behalf of Andrew Padilla.  We would waive his

21   appearance as well.  Thank you, Your Honor.

22       MR. FEDER:  Bruce Feder on the phone, with Scott Spear

23   also on the phone.

24       THE COURT:  All right.  And we're set for a status

25   conference.  Part of the conference was just to have the

1    attorneys come in and get familiar with the courtroom setup.

2          Now that you've seen the setup, do you have any

3    requested changes that are something you think we could do?

4          MS. BERNSTEIN:  Your Honor, this is Whitney Bernstein.

5          MR. FEDER:  Is there going to be WiFi available in the

6    courtroom?  Do you know?

7          THE COURT:  I don't know.  I don't know if there

8    normally is.

9          COURTROOM DEPUTY:  No.

10         THE COURT:  There isn't normally.  So if there isn't

11   in the other courtrooms, there wouldn't be here.

12         Ms. Bernstein.

13         MS. BERNSTEIN:  Your Honor, I just want to clarify

14   where counsel sits and where clients sit, because it looks like

15   there is only -- if I counted correctly, including the seats on

16   the side and including the gallery seats, it appears that there

17   is 20 seats for defense.  So with staff and clients, I think we

18   have more than that, so I just want to clarify where everyone

19   would sit.

20         THE COURT:  Well, the tables are meant for one counsel

21   and one client.

22         MS. BERNSTEIN:  Okay.

23         THE COURT:  And then everybody else has to sit either

24   in those chairs or in the back.

25         MS. BERNSTEIN:  Okay.  And can we bring tables to make

1    those chairs into sort of working stations?

2              THE COURT:  Probably.

3              MS. BERNSTEIN:  Okay.

4              THE COURT:  I mean, it looks like the seats are spaced

5    out enough that we could probably do that.

6              MS. BERNSTEIN:  I'm just thinking it might be hard to

7    like set up a laptop and take notes and sit in the chair.

8              Thank you.

9              THE COURT:  Counsel, because we have people on the

10   phone, make sure you're closer to the microphone.

11             MS. BERNSTEIN:  Sorry.  Thank you.

12             THE COURT:  Okay.  And last time I think counsel had

13   expressed that I should have additional alternate jurors.  With

14   the setup, I've added one extra seat, so we'll have 17

15   jurors -- no, sorry, 19.

16             MR. STONE:  17.

17             THE COURT:  17.  17 jurors.  So we'll have five

18   alternates.

19             MS. BERNSTEIN:  And, Your Honor, will that give us an

20   additional peremptory?

21             THE COURT:  No.

22             MS. BERNSTEIN:  Okay.

23             THE COURT:  Because, as it stands, I already granted

24   the defendants 15 and the government 9, and I'm inclined to

25   leave it like that.

1          With respect to trial proceedings, I'm considering

2    implementing an order that counsel, paralegals, and defendants

3    test on August 30th, take a COVID test on August 30th.

4          Does anybody have any objection to that?

5          MR. RAPP:  Well, I don't have an objection to the

6    test, it's just that if it's on August 30th, are you -- a rapid

7    test or --

8          THE COURT:  Yes, a rapid test.  So that's 48 hours --

9    well, I guess it could be less.

10         MS. BERTRAND:  Is that something that everyone will

11   have to arrange or will that be arranged?

12         THE COURT:  Yes.  And, actually, I meant to bring the

13   list.  We have -- or the court has gathered a list of places

14   that do it for free.  Walgreens, you can go to any Walgreens

15   location.  You can sign up online.  They do it for free.  And I

16   got mine within like four hours when I tested.  And there is

17   some other places, I just don't have the names, but before you

18   leave, we'll get you that information.

19         Elaine.

20         COURTROOM DEPUTY:  Yes.

21         (An off-the-record discussion was held between the

22   Court and the courtroom deputy.)

23         THE COURT:  All right.  So I'm going to order that all

24   counsel, paralegals, or anyone else that you plan to have

25   assist you in court, take a rapid COVID test on August 30th.

1    And you'll have to bring those results and show me.  I'm not
2    going to file them in, but I want to see them.
3            MS. BERNSTEIN:  And, Your Honor, could we instead get
4    like a regular test and show that we're negative within a
5    certain period of time?  Is the requirement that we get a rapid
6    test or can we --
7            THE COURT:  No, you can get a regular test, you just
8    have to make sure you have the results.
9            MS. BERNSTEIN:  Okay.  Thank you.
10           MR. EISENBERG:  Your Honor.
11           THE COURT:  Okay.
12           MR. EISENBERG:  Would that also apply to clients?
13           THE COURT:  Yes.  Did I not say that?
14           MR. EISENBERG:  Just heard you to say counsel and
15   paralegals and people assisting.
16           THE COURT:  No, it also goes for the defendants.
17           MS. BERNSTEIN:  And does that apply to potential
18   jurors, the jury panel as well?
19           THE COURT:  No.  We don't have a procedure for doing
20   that.
21           MS. BERTRAND:  Will it apply to witnesses?
22           THE COURT:  No.  All right.  And I've never done that
23   before.  You guys have expressed additional concerns, and there
24   is more of you, so this is the first time I'm doing it.
25           I have done eight trials during COVID, and with the

1    masking and other precautions we've taken with social

2    distancing, knock on wood, we haven't had any issues.  But

3    because there is so many of you, I decided that maybe it would

4    help with everybody's comfort level if we had that test.

5         All right.  With respect to the statement of the case,

6    I've read the government's request and defendants' objection to

7    the suggestion that I read a statement of the case during, I

8    guess, either voir dire or in opening instructions.

9         I'm going to agree with the defendants, I'm not going

10   to read the statement of the case.  We did a statement of the

11   case in the jury questionnaire, and, obviously, after

12   preliminary instructions are read, both parties will have an

13   opportunity to make their opening statement.

14        With respect to the defense request -- I don't think I

15   have it -- that I conduct some prescreen of witnesses and

16   exhibits, defense seems to be asking me to do what the

17   government asked me to do in their motion in limine, which is

18   prescreen exhibits for admissibility, which I, for the most

19   part, decline to do.  It is not something I have regularly

20   done.  I know that some people do it, but I, without knowing

21   context and things like that, it's hard for me to do.

22        I will note that I looked over the witness list, I

23   looked over the motion in limine rulings.  One of the concerns

24   raised by the defense was that the same experts are listed.  As

25   I read through the list, their initial -- or in the initial

1    motion in limine regarding experts, there were ten listed.  I

2    only see six on the final list.

3              Is that accurate?

4              MR. RAPP:  That's accurate.

5              THE COURT:  So they have reduced it somewhat.  They

6    will be held to the rule that only one expert per topic.

7              I did want to ask, though, I have a question for each

8    side.

9              For the defense -- and, Ms. Bernstein, I think you

10   wrote the motion so maybe you can answer.  You specifically

11   said that there are six witnesses who are missing Jencks

12   materials.  Can you tell me which six those are?

13             MS. BERNSTEIN:  I will try off the top of my head.

14   There are, I think, more than six, but I believe we sent a

15   letter to the government about this as recently as Wednesday,

16   so perhaps they have it.

17             I believe it's Sal Cervantes, who is an IRS witness;

18   Brittany McMartin, who is the sister of Crystal McMartin; Julie

19   Raine, who the government has said that they have dropped from

20   their witness list when we inquired why we had no Jencks for

21   this individual years ago, and then they put her back on the

22   witness list.  They told us the reason we had no Jencks is

23   because they dropped her, but they have put her back on the

24   witness list.  Christopher Dickinson -- Dixon; Mike Gallagher;

25   Christopher Butler.

1        And I believe there are a few others.  I will pull up

2   their names, Your Honor.

3        THE COURT:  Okay.  And --

4        MR. FEDER:  I'm looking at Ms. Bernstein's letter, and

5   I believe we need Emily Wyatt.  I think that's the only one she

6   left out.

7        MS. BERNSTEIN:  And there is also a witness that is

8   identified as a NAAG member, N-A-A-G, member, so we have no

9   Jencks for this anonymous witness either.

10       THE COURT:  Yes, that was my next question.  But,

11  first, with respect to the witnesses that they've listed, and

12  apparently sent you a letter about, why hasn't that material

13  been disclosed?

14       MR. RAPP:  Well, first, I would say that we fully

15  understand --

16       THE COURT:  Can you talk into the microphone?

17       MR. RAPP:  Yes, ma'am.

18       We fully understand our Jencks obligation.

19       With respect to Sal Cervantes, we're no longer calling

20  Mr. Cervantes.

21       With respect to Mr. Butler, he is a custodian of

22  records.

23       With respect to Mr. Dixon, we're no longer calling

24  that witness.

25       With respect to Julie Raine, who was a CEOS

1    investigator, her inclusion on the most recent witness list was

2    in error, and so -- I'd have to know the other witnesses that

3    they have.

4              MS. BERNSTEIN:  Emily Wyatt.

5              MR. RAPP:  Excuse me?

6              MR. FEDER:  Let me pull them up again.  Hang on.

7              MR. RAPP:  With respect to the NAAG, we intend to --

8    one of the witnesses who has been on the list from -- at the

9    very inception of us disclosing the witness list, was a witness

10   by the name of Paula Selis, she's a professor of law in the

11   state of Washington.  She will be testifying -- she was also a

12   member of NAAG -- she will be testifying to the NAAG letters.

13             THE COURT:  Who is that, Paula?

14             MR. RAPP:  Paula Selis.

15             THE COURT:  Okay.

16             MR. FEDER:  Mr. Rapp, there is six people that were

17   named in the letter:  Christopher Butler, Cervantes, Dixon,

18   Gallagher, McMartin, Wyatt.

19             THE COURT:  Yes.  So Gallagher, what about Gallagher?

20             MR. RAPP:  So his -- his statements and investigative

21   reports related to one of the victims in Oregon, can be found

22   at Bates number 0024248 through 0024575.

23             So just -- I am actually reading from an e-mail that I

24   drafted this morning and intended to send to Ms. Bernstein, and

25   other defense counsel, I suppose.  At the conclusion of the

1   hearing, I will send this to them, and if they have any

2   follow-up questions, we're happy to address those.

3            MS. BERNSTEIN:  And, Your Honor, I should clarify that

4   we've received seven discovery productions from the government

5   since July.  We received a discovery production as early as

6   last night.  And that one included some e-mails from June, as

7   well as some memos of interview from July, so I'm not -- I

8   don't know if our missing Jencks is still accurate, as the

9   government continues to dump discovery on us on a nightly

10  basis.

11           MR. RAPP:  Would you like a response?

12           MR. BIENERT:  And, Your Honor, this is Tom Bienert.

13           Is Your Honor able to hear me?

14           THE COURT:  Okay.  My question is about Jencks, it's

15  not about some random discovery.  So what I want to know, and

16  the government's went through four of the witnesses, five of

17  them, so there is two left that the defense has raised, and one

18  of them is McMartin, I'm guessing it's Lynn McMartin.

19           MS. BERNSTEIN:  It's Brittany that we're missing

20  discovery for.

21           THE COURT:  Brittany.  Okay.  Brittany.  Sorry.

22           MR. RAPP:  So there is no -- let me just take a step

23  back.

24           Jencks is a statement that's been adopted by a

25  witness.  Obviously, we are getting close to trial, meeting

1    with witnesses.  Some of them are provided statements where

2    they adopt those statements and now they magically become

3    Jencks.

4         We have been pretty good about just providing the

5    defense statements that haven't been adopted that don't

6    constitute Jencks.  So if they're getting disclosures -- I

7    might add that the defense has made three disclosures in the

8    last month or so that total about 10,000 pages -- but, aside

9    from that, we are pushing out the discovery as quick as we can.

10        And with respect to the McMartin, there is no Jencks

11   on that witness.  And we're not clear as to whether we're going

12   to call the witness.

13        THE COURT:  Okay.  And is there any Jencks material

14   for Emily Wyatt?

15        MR. JONES:  Good morning, Your Honor.  Reggie Jones on

16   behalf of the United States.

17        There is no Jencks material as it pertains to Emily

18   Wyatt.  The government initially listed Mrs. Wyatt on our

19   exhibit list as a custodian of records for the unchartered

20   records.  The Court has since ruled on our motion in limine

21   admitting those, authenticating those evidence, and so we are

22   no longer -- no longer need to call Ms. Wyatt as a witness, so

23   she is no longer -- she will no longer be on our witness list.

24        THE COURT:  Okay.  Ms. Berstein, with respect to

25   McMartin, do you have any questions about Brittany McMartin?

1          MS. BERNSTEIN:  No, Your Honor, just that, you know,

2    there was an order to produce Jencks material, obviously, in

3    August of, I believe, 2019, and so we -- it's hard for us to

4    comply with reciprocal discovery, it's hard for us to provide

5    lists, it's hard for us to prepare impeachment and

6    cross-examination when this list continues to evolve.  And

7    we've learned this morning that six of these witnesses may or

8    may not be called so...

9          THE COURT:  Okay.

10          MS. BERTRAND:  Judge, may I ask --

11          MR. BIENERT:  Your Honor, this is Mr. Bienert.

12          THE COURT:  I'm sorry.  We can't hear you.  Who is

13    this?

14          MR. BIENERT:  It's Tom Bienert, Your Honor.

15          THE COURT:  Okay.

16          MR. BIENERT:  Are you able to hear me?

17          THE COURT:  Now we can, yeah.

18          MR. BIENERT:  I thought you opened this by just

19    commenting on our request to kind of go through some witness

20    lists and exhibits.  I think this highlights why it would make

21    sense, maybe not today, but some point before trial to do it,

22    because if you think about it, as sort of a subset of that

23    topic, you, you know, followed up on our request for recent

24    Jencks material, but just of these six or so witnesses that we

25    highlighted because of a Jencks letter, if I'm following this

1   right, the government has basically said at least four of them

2   they're not calling.

3          Well, if we take that back to the original point you

4   were addressing, which is our request to have some mechanism to

5   go over witness lists and exhibits to know what's realistic,

6   there are 90 or so listed.  And if right now they've said, of

7   those six we asked about, four of them they're not calling, we

8   shouldn't have to potentially prepare for up to 90 witnesses

9   when many of them are not going to get called.

10          It's going to make it hard for us to get our various

11   exhibits together, to get our discover -- to get our

12   impeachment folders together, et cetera.  So it makes sense to

13   me, I would suggest, that even for a couple of hours at some

14   point before the trial starts, if we just sort of go through

15   and Your Honor would say which of these witnesses that you're

16   not going to call, or which exhibits are you not going to use.

17          And, similarly, as sort of a subset of this, we think

18   it would make sense, given the four months of trial and the

19   dozens and dozens of witnesses, if the government would every

20   -- whatever is the last day of the week, of the trial week,

21   whether it's Thursday or Friday, if they tell us at the end of

22   that day who the witnesses are they expect to call the next

23   week, and then, you know, give us sort of two days confirmation

24   as we go through forward, that will allow us to focus on the

25   actual witnesses and exhibits that are in play instead of

1    having to figure out who we address that may not be in play.

2    It will make the trial more efficient and it will allow us to

3    prepare.

4              THE COURT:  Mr. Rapp, do you want to be heard on that?

5              MR. RAPP:  Well, the Court has already issued an order

6    that the government provide to the defense 48 hours in advance

7    of a particular witness testifying, not only the name of the

8    witness, but the exhibits the government intends to admit

9    through that witness, and we are more than happy to do that.

10             I will tell you in a similar lengthy, complicated case

11   that had more exhibits than we've noticed in this case, the

12   judge simply just said -- in this district, by the way --

13   everything comes in, but, government, you provide the defense

14   48 hours in advance the witness's name and give them

15   chronologically the exhibits that you intend to admit.  In

16   other words, don't give them ten exhibits and mix it up as to

17   how you're going to choose to admit it, I am ordering you to

18   give it in chronological order and the -- now, defense, you

19   will tell me which one of those exhibits you have an objection

20   to, and we will take that up on a break, before we start trial

21   in the morning, and we will argue about whether -- about the

22   admissibility of the exhibit.

23             And we did away with the, I'm showing you this

24   exhibit, you identify it, now can we move to admit it, publish

25   it for the jury, all of that was taken out and we -- the trial

1    moved rather quickly.  And so that's, by the way, the

2    suggestion that we have made to the defense for some time, and

3    they have not really responded to the exhibit portion of that.

4    I get it, they want the witnesses, but it's really the exhibits

5    are what's going to slow down the trial.

6         They've known who our exhibit -- the critical

7    exhibits.  And none of these witnesses they've raised this

8    morning are, by any definition, critical witnesses.  They know

9    who our critical witnesses are, they're trafficking victims,

10   they're former employees of Backpage.  Those are the important

11   witnesses.

12        And I just want to make one other point.  95 percent

13   of the evidence in this case that the government's going to

14   seek to admit came from the defendants.  Let me say it again,

15   95 percent of the evidence came from the defendants.  They gave

16   it to us.  And about 99 percent of that are the -- their own

17   internal e-mails, so there shouldn't be a surprise about what

18   we intend to admit in this trial.

19        I'll also add that this isn't the first case where

20   they have been exposed to their own exhibits and their own

21   evidence.  They've had civil cases.  They've had a Senate

22   investigation.

23        THE COURT:  Okay.  I only wanted a response to the

24   request that I change my previous ruling, which was 48 hours

25   disclosure to the week before.

1          MS. BERNSTEIN:  Your Honor, I just -- I need to

2   clarify that.  And Mr. Rapp well knows that absolutely none of

3   the counsel sitting at this table have been subject to anything

4   that he has talked about, any of these prior litigation.  And

5   when he says they came from the defense, the Court understands

6   that there is a long history of civil litigation, criminal

7   litigation, none of which any of noticed counsel have been a

8   part of.

9          So to suggest that we do know what is critical of

10  these single-spaced, 160-page lists, if he would let us know,

11  that would be helpful.  To know that there are witnesses and to

12  know that there are exhibits that they don't intend to use, and

13  we don't find that out until we press in court before you is

14  difficult for us for preparation.  So if the Court -- if they

15  can let us know a week before, and confirm with 48-hour notice,

16  because things change, it would make things run a lot smoother.

17          MR. PANCHAPAKESAN:  Your Honor, if I could add one

18  point.  Half the counsel are from out of state, two of us are

19  from California and Mr. Cambria is from New York, and so our

20  plan is to fly back and forth, you know, prep at our home

21  offices.  And so I think, you know, further to Mr. Bienert's

22  suggestion, if we were to know the Thursday before, it would

23  give us the opportunity to go home and use our home offices to

24  prep, but we appreciate that the government -- and the defense

25  will be flexible in terms of who they actually call -- but that

1    week lead time I think, logistically, would help us.

2            THE COURT:  Okay.  Well, we discussed this at our last

3    hearing.  I offered to have anybody say anything about my

4    proposed order, nobody objected, nobody challenged my order at

5    that time, and so I'm sticking with the previous rules that

6    I've ordered, which is 48 hours before they provide you their

7    witness list and the exhibits that they intend to use with that

8    particular witness.

9            MS. BERNSTEIN:  And then, Your Honor, would that mean

10   that the day of, or the morning before, that we would provide

11   our impeachment material on that witness to the Court?

12           THE COURT:  Yeah, we didn't talk about that.  So the

13   defense suggestion is that I order the impeachment material due

14   the morning after they disclose their list?

15           MS. BERNSTEIN:  Your Honor, I think probably the

16   morning of, because we're going to need 48 hours to go through

17   the exhibits and to go through what's going on, especially

18   because, if we don't have more notice than that, it's hard for

19   us to react quickly.

20           THE COURT:  Mr. Rapp, do you want to be heard on that?

21           MR. RAPP:  So is the suggestion that they provide the

22   impeachment the morning that the witness testifies or the day

23   before?

24           THE COURT:  Their request was that I order it

25   disclosed the morning they're going to testify.

UNITED STATES DISTRICT COURT

1          MR. RAPP:  And I presume this is all reciprocal, the

2     government will get the same consideration when they call all

3     the --

4          THE COURT:  The 48-hour rule?

5          MR. RAPP:  Not only the 48-hour rule, but the

6     impeachment rule as well.

7          THE COURT:  Yes.

8          MR. RAPP:  Fine.

9          THE COURT:  All right.  So, for both sides, as I

10    previously ordered, 48 hours before the witnesses are called,

11    the party provide the witness list and the exhibits they intend

12    to use with those witnesses, then the morning of, the opposing

13    side provide the impeachment materials to the other side.

14         MS. BERNSTEIN:  I'm sorry, we provide --

15         THE COURT:  By 8:30.

16         MS. BERNSTEIN:  My understanding of the Arizona rules

17    is we have a sealed envelope of the impeachment materials that

18    we lodge with the Court, not that we give them to opposing

19    counsel.

20         MR. RAPP:  Yes, that's the rule, that's fine, if it's

21    reciprocal.

22         THE COURT:  Okay.  So provide it to the Court by 8:30.

23         Okay.  There are two new documents, 1223 and 1221.

24    One was a notice from the defense regarding 902 certifications,

25    and one of them was framed as a motion regarding the 902

1    certifications.

2          There hasn't been an opportunity to respond to the

3    government's motion.  Do you want to talk about that now or do

4    you want me to wait?

5          MS. BERNSTEIN:  We're happy to wait, Your Honor.

6          THE COURT:  To wait?

7          MS. BERNSTEIN:  Yes, Your Honor.  We will be objecting

8    so we just want to gather our thoughts.

9          THE COURT:  Okay.  Well, whatever -- okay.

10         With respect to jury instructions, hopefully you all

11   got my draft preliminary instructions.  Did anybody not receive

12   it by e-mail?

13         MR. STONE:  I didn't, Your Honor, but Mr. Kozinets

14   sent it to me.

15         THE COURT:  Okay.  Obviously, the preliminary

16   instructions are generally more brief than the final

17   instructions.  We can talk a little bit about the final

18   instructions after the preliminary instructions, but I do want

19   to at least get through the preliminary instructions.

20         Okay.  So let's talk about the second instruction,

21   which is the charge, presumption of innocence, because I'm

22   assuming that's the one where there may be some disagreement.

23         From the government, who is going to discuss jury

24   instructions?  Mr. Stone.

25         MR. STONE:  I will discuss all jury instructions that

1    don't have to do with the First Amendment.  If we get to the

2    First Amendment, Mr. Kozinets will discuss those.

3            THE COURT:  Okay.  So with respect to the preliminary

4    draft instruction on presumption of innocence and the charge,

5    does the government have any corrections or additions?

6            MR. STONE:  No, Your Honor.  Actually, I'm sorry, Your

7    Honor, it just looked like there was maybe a typo.  Counts 69

8    through 99 are listed twice, at least on the copy that I

9    received.

10           THE COURT:  Yes, they are.  Okay.  Thank you.

11           And from the defense.  Let's start with you,

12   Mr. Cambria.

13           MR. CAMBRIA:  Your Honor, if I might, we have sort of

14   divided this up among us, if you would indulge us to have --

15           THE COURT:  Okay.

16           MR. CAMBRIA:  -- those people assigned to certain

17   topics, handle those topics.

18           THE COURT:  So who is going to handle this?

19           MS. BERNSTEIN:  I'll be dealing with some of this one,

20   Your Honor.

21           THE COURT:  Okay.

22           MS. BERNSTEIN:  So we do have the Court's preliminary

23   instructions.  And starting on page 3, which is the Court's

24   presumption of innocence and charge instruction, we've no

25   objections as to what appears on that page.

1          Beginning on page 4, there are a couple of places we

2    want to clarify.  At the top of the page, the paragraph that

3    starts, second, after doing so, the defendant performed.

4          THE COURT:  Yes.

5          MS. BERNSTEIN:  We want the end of that to -- where it

6    says, of any business enterprise involving prostitution

7    offenses -- and this occurs throughout these instructions -- we

8    just want that to repeat the way the model says.  So it should

9    say, any business enterprise involving prostitution offenses in

10   violation of the laws of the state in which they are committed.

11   And that is paraphrasing the government's revised Travel Act

12   instruction as well, where they now acknowledge that there are

13   15 separate state laws that they need to contend with.

14         And the second full paragraph, the one that begins,

15   further, we believe that should read, further, you may find a

16   given defendant guilty of the Travel Act, just to make clear

17   that there are six of us on trial here, and that the jury's

18   verdict does not have to apply to us as a group.

19         Scrolling down to the next page, Your Honor, on

20   page 5, under the heading of counts 53 to 62, it's the -- the

21   paragraph that says, first, the defendant conducted a financial

22   transaction, goes on to say, of any business enterprise

23   involving prostitution offenses, and we want that to say, in

24   violation of the laws of the state in which they are committed

25   as charged in counts 2 through 51.

1          THE COURT:  I'm sorry, can you repeat?  That was on

2     page 5, right?

3          MS. BERNSTEIN:  On page 5.

4          THE COURT:  Under 53 to 62?

5          MS. BERNSTEIN:  53 to 62.

6          THE COURT:  The end of that first paragraph?

7          MS. BERNSTEIN:  Yes.  Having it say, in violation of

8     the laws of the state in which they are committed as charged in

9     counts 2 through 51.

10         At the bottom of the page, the final paragraph that

11    begins, second, the defendant acted with the intent to promote

12    the carrying on of the specified criminal activity in the

13    indictment, comma, specifically, the alleged violations of the

14    Travel Act as charged in counts 2 through 51.  We request that

15    language.

16         On the next page, Your Honor, the paragraph that

17    begins, fourth, the property was, in fact, derived from

18    specified unlawful activity that is promoting or facilitating

19    the promotion of any business enterprise involving prostitution

20    offenses, the insert we would like is in violation of the laws

21    of the state in which they are committed as charged in counts 2

22    through 51.

23         And we want to replicate that language again at the

24    bottom of the page 6, the paragraph that begins, fourth, the

25    property was, in fact, derived from specified unlawful

1  activity, we want that sentence to end, in violation of the

2  laws of the state in which they are committed as charged in

3  counts 2 through 51.

4        And that edit appears again, Your Honor, on page 7,

5  the paragraph that begins, second, the defendant knew the money

6  represented the proceeds of promoting or facilitating the

7  promotion of any business enterprise involving prostitution

8  offenses in violation of the laws of the state in which they

9  are committed as charged in counts 2 through 51.  And those are

10  for that count -- for that charge, excuse me.

11        THE COURT:  Okay.  Mr. Stone.

12        MR. STONE:  Yeah.  One overarching comment is we're

13  adding more language here to the initial instruction.  They're

14  going to be -- the jurors are going to be instructed on the

15  specific elements of all the crimes at the conclusion of the

16  case, so adding that language is sort of a mouthful and

17  confusing.

18        The bigger issue, as with respect to all of the money

19  laundering counts, as this Court is well aware, the government

20  could have brought the money laundering counts without any

21  subsequent Travel Act counts, so there doesn't need to be any

22  connection and they don't need to be tied to counts 2 through

23  51.  They're separate counts.  The element that is critical is

24  that there was a specified unlawful activity, here would be

25  violation of the Travel Act.  It does not need to be tied to

1    counts 2 through 51, and that is just adding an element to

2    those money laundering offenses that's not -- that's not part

3    of those crimes.

4             THE COURT:  Okay.

5             MS. BERNSTEIN:  Would you like a response to that,

6    Your Honor?  Because this does come up throughout the disputed

7    instructions between the defense and the government.

8             THE COURT:  Yeah, and we'll talk about it when we get

9    there.

10            But with respect to these preliminary instructions, I

11   will add the language, in violation of the laws of the state in

12   which they are committed, to all those areas, and I'll change

13   the wording from the defendants to a given defendant on page 4.

14            Do you -- let me see.  The language that you requested

15   on page 5 under counts 63 to 68, I don't remember specifically

16   what it was.  I just made a note that it was excessive and not

17   necessary.

18            And I'm not going to include the added language after,

19   in violation of the laws in the states in which they are

20   committed, under money laundering, with respect -- the language

21   of with respect to counts 2 through 51 for the preliminary

22   instructions.  Okay.

23            With respect to the rest of the preliminary

24   instructions, does the government have any other additions or

25   corrections?

1          MR. STONE:  No, Your Honor.

2          THE COURT:  Ms. Bernstein.

3          MS. BERNSTEIN:  The rest of what the -- I'm sorry, the

4     rest of what the Court put forward?

5          THE COURT:  Yeah.  I think they're all standard

6     instructions, but --

7          MS. BERNSTEIN:  They are, Your Honor.

8          THE COURT:  -- I might be missing something that you

9     noticed or a typo or something.

10         MS. BERNSTEIN:  No objection to what is evidence.  No

11    objection to what is not evidence or circumstantial, ruling on

12    objections, credibility, conduct, admonition, no transcript,

13    taking notes.

14         We do have an objection to the separate consideration

15    for each defendant.  And so we would like the end of that to

16    say as we have proposed in our proposed instructions -- I'm

17    trying to pull up the exact language, Your Honor -- but the

18    rest of it would say something to the effect of, Backpage is

19    not on trial, and the defendants are not Backpage.  I'll pull

20    up the specific language, but it is what we've submitted.

21         And we think that that's really important, Your Honor,

22    because the government, even in their objection to our proposed

23    language, acknowledges that what they intend to do in this

24    trial is propose all of the horrible things that they contend

25    Backpage the company did, and then say that our clients are

1    therefore responsible for the company.  As this Court has

2    acknowledged time and again, Backpage is not on trial.  It's a

3    separate defendant, pled guilty in a separate case.

4            The government does intend to connect our clients to

5    Backpage, obviously, through their employment at Backpage, but

6    Backpage itself is not on trial.  There is no scienter element

7    in the preliminary instructions, which we also think should be

8    there.  But that makes it particularly important that the jury

9    is apprised at the very beginning of this case that when the

10   government comes up here and says, Backpage this, Backpage

11   that, that is not the specific intent required to establish

12   that any of the six defendants on trial did anything wrong.  So

13   we do think, not only that the Court should advise that each

14   defendant should be considered separately, but that the Court

15   should advise that each defendant is not Backpage.

16           THE COURT:  Okay.  Obviously, I saw the government's

17   request and the defense request, this is the one I put in here

18   because it's a standard instruction.  There is nowhere in the

19   heading of the case or anywhere in the instructions that

20   indicates Backpage is a defendant, so I'm not inclined to

21   include that language.

22           Does the government want to be heard on that?

23           MR. STONE:  No, Your Honor.

24           THE COURT:  But I understand your argument, but I'm

25   denying your request.

1          MS. BERNSTEIN:  Understood, Your Honor.

2          And as for scienter, we do think that that's

3    critically important to be told to the jury at the beginning of

4    the case.  The government is going to bombard the jury for

5    months with all the parade of horribles that they allege

6    Backpage.com committed.

7          We understand the Court won't distinguish the

8    defendants from Backpage.com in the preliminary instructions,

9    but we do think it's very important that the jury know from the

10   outset the specific intent is what is required to prove these

11   charges.

12         THE COURT:  I am just -- sorry, I'm looking at the

13   charge instruction.

14         So the charge instruction on page 3 says that the

15   defendant used -- oh, that's a typo -- defendant used the mail

16   or any facility in interstate commerce with the intent to

17   promote, manage, establish, carry on, or facilitate the

18   promotion, management, establishment -- so it says they have to

19   have the intent to do that.

20         And that's the intent you're concerned about, right?

21         MS. BERNSTEIN:  It is, Your Honor.  And you saw the

22   defendants' charge instructions where we propose there to be a

23   series of sort of special interrogatories as to this.  And that

24   derives, Your Honor, from our really legitimate concern that

25   what the government is going to do here is obscure the business

1    enterprise element, lower the intent to knowledge, as they have

2    tried to do throughout their jury instructions, and sort of

3    confuse the jury.

4            So we would just like if it were abundantly clear at

5    the outset of this case before they are presented with all of

6    the, what we contend is extraneous, inadmissible evidence that

7    the government's going to put up, we would like if the Court

8    could instruct the jury specifically on intent.  It's specific

9    intent for money laundering counts as well.  I don't know if

10   that language is in the charge for money laundering counts.

11           But after the charge, before we get into what is

12   evidence, we would propose that there be a model instruction

13   explaining what specific intent means.

14           THE COURT:  Okay.  And I didn't print out all 200

15   pages of jury instructions, so can you just tell me which page

16   the scienter instruction was on?

17           MS. BERNSTEIN:  Yes, Your Honor.

18           THE COURT:  I mean, you have several of them, but --

19           MR. PANCHAPAKESAN:  So, Your Honor, our specific

20   intent instruction is on page 152 of the government's filing,

21   so that's Docket 1216-3.

22           MS. BERNSTEIN:  And I have a copy if the Court would

23   like to see it.

24           THE COURT:  Sure.  Elaine, can you grab that.

25           So this is the one you want in the preliminary

1    instructions?

2          MR. PANCHAPAKESAN:  That's right, Your Honor.  And one

3    clarification on this.  I think the first sentence says, the

4    crimes charged in this case are serious crimes.  I think we

5    prefer that language not to be there.  I think it's, in

6    retrospect, probably unnecessary and prejudicial.  But I will

7    add that this is an instruction that was lifted verbatim from,

8    you know, a published Ninth Circuit case dealing with the issue

9    of specific intent.

10         THE COURT:  Okay.  Well, I'll say at the outset, I

11   don't normally put it in preliminary instructions any scienter

12   instructions.  I do see why maybe in a case of this length I

13   should consider that.

14         With this particular instruction, on the fifth line

15   where it says, defendant knowingly did an act which the law

16   forbids, I don't like that language because it makes it sound

17   like the defendant has to know it's illegal, which that's not

18   true.  Same with purposely and intending to violate the law,

19   that's not accurate either, because they have to intend to

20   facilitate the business enterprise engaging in prostitution not

21   intend to break the law.

22         MR. PANCHAPAKESAN:  I think that's right, Your Honor.

23   The government raises that objection to violate the law, and I

24   think if we were to replace that with the language you just

25   read, intentionally facilitating the business enterprise, et

1    cetera, that would be acceptable.

2         MR. STONE:  Your Honor, if I might be heard on this.

3         I agree, Your Honor has hit the nail on the head with

4    the problem with this particular instruction, it was pulled

5    from a non Travel Act case, and that's why the instruction

6    doesn't really work here.

7         The government has reviewed the defendant's filing

8    from Wednesday.  And in light of some of the issues they've

9    raised, we've tweaked our specific intent instruction just a

10   little bit, and I think it corresponds with what the defendants

11   just suggested, and what Your Honor just suggested.

12        And that would be simply to state, the Travel Act is a

13   specific intent crime.  That means for each defendant to be

14   found guilty, the government needs to prove that each defendant

15   specifically intended to facilitate an activity which that

16   defendant knew to be unlawful under state law.  And that tracks

17   the language in Polizzi.  And it does a better job, I think,

18   than what the government's initial proposal was.  So it's just

19   a bit of a tweak, but I think it tracks what all parties are

20   suggesting.

21        I'm happy to e-mail that to the Court, if that's

22   helpful.

23        MS. BERNSTEIN:  I would just like to look at it as

24   well, if the government has that available.

25        THE COURT:  Do you have it written down?

1          MR. STONE:  I do.  I have some other notes here

2     though.

3          MR. PANCHAPAKESAN:  Just give us a moment, Your Honor.

4          MS. BERNSTEIN:  And so I think that we're getting

5     closer, Your Honor, to agreement, but this does still have the

6     language that the Court just raised of, knew to be unlawful

7     under state law, so I think it should just have the business

8     enterprise stock language that we just went through, that the

9     act was --

10          THE COURT:  One second.

11          Go ahead, Ms. Bernstein.

12          MS. BERNSTEIN:  So reading from Mr. Stone's paper, it

13     says, the Travel Act is a specific intent crime.  That means

14     for each defendant to be found guilty, the government needs to

15     prove that each defendant -- I would have it say that that

16     defendant -- specifically intended to facilitate an activity

17     which the defendant knew to be unlawful under state law, comma,

18     specifically, promoting or facilitating the promotion of any

19     business enterprise involving prostitution offenses in

20     violation of the laws of the state in which they are committed.

21          MR. STONE:  There are other instructions that will get

22     to other parts of the crime.  I think it would be easier for

23     the jury to digest if we kept this scienter requirement as

24     clean as possible.  I am not suggesting what Ms. Bernstein said

25     isn't part of the law, but there are other instructions that

```
1    will get to that.
2              THE COURT:  Okay.  So I'll include that instruction.
3    I'm not sure whether -- what I'd probably do is facilitate an
4    activity which the defendant knew to be unlawful under state
5    law, specifically, promoting or facilitating the promotion of
6    any business enterprise involved in prostitution, but not
7    include, in violation of the laws of the state, because we just
8    said unlawful under state law above.
9              MR. PANCHAPAKESAN:  I agree with that.
10             THE COURT:  So I only want to say it one place.
11             MS. BERNSTEIN:  Okay, Your Honor.
12             THE COURT:  And then where should we put that?  Do you
13   want me to put it --
14             MS. BERNSTEIN:  I think just at the end, Your Honor.
15             THE COURT:  Just at the end.
16             MS. BERNSTEIN:  I wrote it for Mr. Stone's benefit as
17   well.
18             MR. STONE:  I'm sorry, Your Honor, we're suggesting
19   where this falls in the preliminary instructions?
20             THE COURT:  Yes.
21             MR. STONE:  I think it should be after 1.2.  It would
22   seem out of place to do it at the very end.  1.2 gives the
23   elements for all the crimes, you can then read this and then
24   move on to the other non substantive instructions.
25             MS. BERNSTEIN:  That's fine with us, Your Honor.
```

1          THE COURT:  Okay.  So I'll put it on page 7.  There is

2     a space at the end of the charge instruction, and I'll put it

3     in there.

4          And as a title, I'll just put, Intent Defined.  Any

5     objection to that?

6          MR. STONE:  No.

7          THE COURT:  I mean, I'll show these to you again once

8     I get it fixed but --

9          MS. BERNSTEIN:  We just think it should say, Specific

10    Intent Defined.

11         MR. STONE:  Also fine, Your Honor.

12         THE COURT:  All right.  Okay.  Any -- were there any

13    other additions?

14         MR. CAMBRIA:  Your Honor, if I might, when we go

15    through the First Amendment aspect of this case, I may have

16    some requests for a First Amendment addition to the preliminary

17    instructions.  This is a First Amendment case.  I know the

18    government doesn't think so, but it is.

19         THE COURT:  Okay.  Well, let's talk about that,

20    because I've, obviously, already ruled that the First Amendment

21    doesn't preclude this case from going forward, and there are

22    specific elements of these offenses that the government has to

23    prove.  The first is -- it seems like you're wanting to input

24    the First Amendment as a defense in this case.

25         MR. CAMBRIA:  May I approach?

1          THE COURT:  Yes.

2          MR. CAMBRIA:  Thank you.  I think what needs to be in

3     this case is the understanding that the publications that are

4     the gravamen of the charges are protected, presumptively, by

5     the First Amendment.  And that needs to be said and the jurors

6     need to be told that that presumption exists.

7          I know that in our suggested instructions, the

8     government started off by saying our first sentence of those

9     instructions was not supported by case law.  And that first

10    sentence here was, advertisements are legally protected speech

11    under the First Amendment of the United States Constitution.

12    And the Bursey case, which is a Ninth Circuit case, states, at

13    page 1082, all speech, press, and association relationships are

14    presumptively protected by the First Amendment.  The burden

15    rests on the government to establish that the particular

16    expressions or relationships are outside its reach.

17         The government's position is, well, this is all

18    statements about crime so it's not covered by the First

19    Amendment.  Well, that's their proof.  That's what they have to

20    prove in this case.  And it's interesting, and, ironically, the

21    Bursey case sort of answers the government's argument, because

22    at the beginning of that quote that I just read that's on 1082,

23    the Court makes this observation:

24         The government's argument takes as its premise the

25    conclusion to be proved the expressions and associational

1    relationships in issue are not protected by the First

2    Amendment.  This argument implies that there is a presumption

3    of non protection applied to the expression and associations

4    involved in this case, and that the witnesses are obliged to

5    overcome it -- because in that case they had witnesses --

6    before they can rely on the First Amendment.

7            So, basically, what's happening here, and what we see

8    throughout the government's objections to our First Amendment

9    instructions, is they keep saying, well, you're alleging this,

10   and it's illegal, so it's not covered.  You're alleging that,

11   it's illegal, it's not covered.  That's what they have to

12   prove.  But we first start off with a presumption.  And the

13   jury needs to be told that that presumption exists and that

14   they have to overcome it.

15           This is a speech case.  I know they don't want it to

16   be a speech case, but it is.  And so we're going to get into

17   when is it illegal.  They cite Central Hudson.  We know what

18   Central Hudson says.  It says that if there is an exception to

19   the First Amendment, then the First Amendment doesn't apply,

20   and the one exception is that you're alleging a crime.  Well,

21   that's what they have to prove that there is.

22           The other cases that we've cited, a number of them say

23   that if it's ambiguous, the testimony is -- or the statement is

24   ambiguous, it's protected.  And the reason for that is obvious,

25   because the one thing that is not tolerated is strict liability

UNITED STATES DISTRICT COURT

1   in a First Amendment case.  So you can't have a situation

2   where, for example, third party -- we publish third-party

3   speech, and the government says, well, that's illegal, without

4   showing that we knew about it.  And the reason for that is

5   because publishers would not publish anything.  They would say,

6   well, if we're going to be held even to something we don't know

7   about, we're not going to publish at all.  So that is kind of a

8   fundamental First Amendment tenant, so you have to show

9   knowledge.

10          So here we have situations where the government has

11  alleged one of the ads as a so-called, on its face, illegal

12  transaction.  One ad only.  The rest of them are, well, it

13  sounds like it's illegal, or it may be ambiguous as to whether

14  or not it's illegal, or perhaps it could be interpreted one way

15  or the other.  Every one of those are protected by the First

16  Amendment.  And the -- the cases that we cite demonstrate why,

17  because if it's not clear on its face that it's a criminal

18  communication, then you have -- then the First Amendment says,

19  well, you have to have proof that it is and knowledge that you

20  know, otherwise you wouldn't publish anything.  That's --

21  that's what happens here.  So we've cited a number of cases.

22          For example, our Eimann case, E-I-M-A-N-N, Soldier of

23  Fortune.  There they said the possibility of an illegal result

24  to a communication still does not remove the First Amendment

25  protection to that publication.

1          And we look at Bartnicki, and it says, you can't

2    punish a publisher to deter something that a third party is

3    going to do that may be wrong, that may be against the law.

4    All of these indicate that when you're in a situation where it

5    isn't, on its face, without question, a crime, then the First

6    Amendment applies.

7          They cite the Coyote case.  Coyote was a situation

8    where they alleged, or they publicized, if you will,

9    prostitution.  It was clear that it was against the law.  So,

10   sure, that case didn't have First Amendment protection, because

11   they were advertising prostitution.  They admitted that they

12   were advertising prostitution.  So in those cases where it's

13   unequivocal on the face of the publication that it's against

14   the law, I agree, Central Hudson says that's not covered.

15         But in our cases, except for one, one count, in our

16   cases, every one of those you have to have some kind of

17   circumstantial proof, or somebody saying it meant this or it

18   meant that, but on its face it's not illegal, so it's protected

19   by the First Amendment.

20         And so these jurors need to be told that there is a

21   presumption of protection by the First Amendment.  It can only

22   be eliminated if they prove their case beyond a reasonable

23   doubt.  And that's not here.  It's not in any of these

24   instructions.

25         And when we go through all of ours, I can -- I can

1    tell you, and I'd be glad to tell you point by point why

2    they're wrong on saying that these instructions that we've

3    requested are not valid.  They are valid.  They are -- they are

4    covered by the cases.  I mean, I read you the Ninth Circuit in

5    Bursey, all speech and press are presumptively protected.  And

6    the only exception is if, unequivocally, on its face, it's a

7    crime.  And so that has to be in this case.

8              This is a First Amendment case.  The jurors need to be

9    told it's a First Amendment case.  And it can't just turn into

10   a general intent, they probably knew, maybe they knew, that

11   sort of thing.  It has to be specifically grounded in the First

12   Amendment.  And I am prepared when we go through this to go

13   through the instructions and say why.

14             The other -- we're not at this point, I suppose, but

15   in the instructions that they gave to you and to us, they now

16   for the first time refer to all these state statutes on

17   prostitution.  You know that we made a motion, we asked that

18   you inspect the grand jury minutes.  We're sitting here now and

19   we have all these state statutes that they referred to.

20             I can tell you some of them, the language in some of

21   them would never pass First Amendment muster in some of these

22   statutes.  But, that aside, they now say these are the state

23   laws that apply to this case.  Did they instruct the grand jury

24   on every one of those state laws, because if they did not, they

25   have amended the indictment.  If they didn't give the grand

1    jurors the exact thing that they're now proposing that you tell

2    the jurors, then the grand jurors could not have rendered this

3    indictment without those instructions.

4            And the very least, Your Honor, and I -- and I, again,

5    I apologize, but it's so important, I believe the Court needs

6    to look at those instructions before the grand jury and see if

7    they made any at all.  I think what they're banking on here is

8    some of the cases in the Ninth Circuit that said, well, if you

9    go through the trial and you did it correctly in the trial, it

10   makes it all okay and there is no more error.

11           Well, I don't believe that happens in this case,

12   because now we have 15 states or so that they gave us the laws

13   on.  And if they didn't give any of those to the grand jury,

14   how could the grand jury render the charges that they now want

15   us to face and they say this is the law that applies?  This is

16   fundamental.  It's a Fifth Amendment right to a grand jury

17   indictment.

18           They've treated the indictment process here as a joke.

19   Number one, they've told us -- this is the first case in all

20   the years -- I've been doing this 40-some years, and I've never

21   seen a case where the entire case was two summary agents, which

22   they told us that's what this grand jury presentation was.

23           THE COURT:  Mr. Cambria.

24           MR. CAMBRIA:  I'm sorry?

25           THE COURT:  We've argued this grand jury issue four

1    times.

2           MR. CAMBRIA:  I know, but now we have their claim as

3    to what the law is.  And I'm saying, okay, now they've declared

4    this is what they say the law is, we need to know if that was

5    given to the grand jury.  If it wasn't, we're here on a

6    different charge.  We're here on something the grand jury never

7    considered.  And I think that violates our Fifth Amendment

8    right to be indicted by a grand jury.  And it is -- I mean,

9    you've already indicated you have looked at these instructions

10   in the past, we're just asking you to look at them now in light

11   of what they've submitted to us.

12          THE COURT:  Okay.  Is there anything else you want to

13   say about the First Amendment instructions?

14          MR. CAMBRIA:  At this point, not until we get into the

15   instructions, Your Honor.

16          THE COURT:  Well, that's what I'm asking you about.

17          MR. CAMBRIA:  Well, they make several -- I mean, I can

18   go through what their arguments are and what my response is.

19          THE COURT:  Okay.

20          MR. CAMBRIA:  All right.

21          MS. BERNSTEIN:  And, Your Honor, if I can just

22   piggyback real quick off Mr. Cambria's request about the grand

23   jury minutes, because we do have a dispute.  Could you just

24   preserve them for appeal, because it's obviously important to

25   us.  Could you order the government to preserve those for

1   appeal, to preserve the grand jury minutes.

2          THE COURT:  I'm sorry, I thought you were just asking

3   to preserve -- to put on the record that you're preserving the

4   issue for appeal, which I think it has been.

5          MS. BERNSTEIN:  Because it is something that we would

6   likely appeal, we would like that the grand jury minutes do not

7   disappear.  So if those minutes can be preserved as part of the

8   record, so that if this case proceeds to an appeal, this issue

9   that we feel very strongly about contravenes our Fifth

10   Amendment rights, can be evaluated by the Ninth Circuit.

11          THE COURT:  Does the government want to be heard on

12   that?  I mean, I guess I --

13          MR. STONE:  Heard on which part of it?

14          THE COURT:  -- assume that grand jury minutes are

15   preserved.

16          MR. RAPP:  They are for eternity.  They're not going

17   anywhere.

18          THE COURT:  Okay.  So there is -- do you need a

19   special order that you preserve them?

20          MR. RAPP:  No.  They exist.

21          MS. BERNSTEIN:  I think we need them to be lodged as a

22   part of the record in this case so that we have the issue for

23   appeal, because we're confined to the record in district court

24   on appeal, so that's what we're asking for.

25          THE COURT:  Okay.  So that is not part of the normal

1   rules with respect to grand jury, that they're lodged?

2           MS. BERNSTEIN:  We're going to lose the ability to

3   argue this on appeal if those minutes are not preserved as part

4   of this case and as part of this record that goes up to the

5   Ninth.

6           THE COURT:  So I'm going to ask you to file a motion.

7           MS. BERNSTEIN:  Okay.

8           THE COURT:  Thank you.

9           Okay.  Mr. Cambria.

10          MR. CAMBRIA:  Thank you, Your Honor.

11          Page 159, which is defendant's proposed instruction

12  First Amendment protection, protected speech.  Their objection

13  to that is that the first sentence, which talks about

14  presumptively protected, is not supported by the cases.  We

15  just indicated the Ninth Circuit case of Bursey fully supports

16  that.

17          The second one, which is our request that the -- that

18  the instruction be given about websites hosting of third-party

19  ad presumptively protected, and therefore legal unless the

20  government can prove the following.  Again, that's Bursey, and

21  it's a number of other cases that we have cited, but primarily

22  Bursey because that's a Ninth Circuit case right on point.

23  Again, what the government is, basically, saying is that there

24  is a presumption that they're not legal, and that's upside

25  down.  It's totally the other way.

1          Our other instruction is the phrase adult, even in

2     conjunction with services, is not unlawful in itself.  We have

3     supplied cases that substantiate that.  A number of them were

4     cases that Backpage was involved in, like Dart versus

5     Craigslist, Backpage versus Dart.  Just to words such as adult

6     and so on, the jurors shouldn't be confused to think that

7     they're, per se, unlawful activities, when they're

8     presumptive -- presumed to be otherwise.

9          We have a request -- this is on 179 -- First Amendment

10    prohibits the government from restricting speech because some

11    find it offensive.  I don't think there is any disagreement

12    about what the authorities say on that.  Offensive speech has

13    been protected by the First Amendment forever.

14         181, constitution doesn't permit the jury to presume

15    that speech is unprotected merely because it resembles

16    unprotected speech.  And, again, the government famously here

17    has stated that they think that escorts are the same as

18    prostitutes.  And, again, that was one of the things that we

19    asked, as to whether the grand jurors were given that erroneous

20    statement, because, obviously, we've cited a number of

21    authorities which indicate that things such as escorts and so

22    on are not presumptively not covered by the First Amendment.

23         Again, I say this because the only way there is no

24    presumptive protection is if, unequivocally, on the face of the

25    speech, it is illegal.  For example, they make -- they tried

1    try to make an analogy and say, oh, well, what about drugs, you

2    know, some ad for drugs or some ad for guns.  There is no First

3    Amendment that protects drugs or guns.  First Amendment

4    protects speech.  And there is no doubt that drugs or guns

5    would be illegal, per se, on their face, and therefore under

6    Central Hudson they would not be entitled to the presumption.

7            We see these analogies in many of these cases over the

8    years.  The government always says, oh, well, if you had an ad

9    for cocaine, I guess that's okay.  No, those aren't protected

10   by the First Amendment.  That isn't speech and it's not

11   expression and that is not an apt analogy, if you will.

12           Again, the other thing, coded language.  We cited

13   cases to you, Backpage versus McKenna, for example, where the

14   Court very well said coded language could be understood by a

15   consumer to be something other than it is, and, as a result of

16   that, somebody might say -- or the government would say, well,

17   coded language, per se, is something illegal.  Well, that's

18   ambiguous as to whether or not it's illegal.  So the

19   presumption is still in place.  And the only way that it is

20   gone is if they prove otherwise.  But what we're saying is the

21   jury needs to be told in a First Amendment case that they start

22   with a presumption of constitutionality and protection.  That

23   is so important here.

24           Page 189, our instruction about prohibits the

25   government from restricting or punishing legal speech in an

1    effort to eliminate illegal speech.  We cited the Bartnicki

2    case, and that indicates the same, that you can't punish, you

3    know, an innocent party that's publishing, for example, in

4    order to reach a third party who may be committing a crime or

5    trying to commit a crime.

6            On 190, under the First Amendment jury cannot find a

7    defendant guilty of a crime based on the website's publication,

8    and we -- we have cited for you cases which say publication

9    alone does not supply an intent.  And that's exactly what the

10   government would like to take the position of, but it's not

11   true.  Publication alone does not supply an intent, or the

12   specific intent that's involved.

13           So the -- the authorities that we've cited, Your

14   Honor, completely substantiate the -- the request that we made

15   here.

16           Another one, this one is on 194.  First Amendment

17   prohibits the government from requiring a website hosting

18   third-party ads to shut down the adult section even if doing so

19   could have reduced the number of ads.  Again, this is a

20   situation calling for suppressing all speech when you're trying

21   to reach just a limited category of speech.

22           We've cited for you, for example, the Metro Lights

23   case, indicating that if something is related to illegal

24   activity, it's still presumptively protected because it is not

25   illegal on its face.

We cite McKenna, a situation where if something might be illegal, it's ambiguous, it's still presumptively protected unless and until there is proof to the contrary.

We've cited the Cooper case, Backpage versus Cooper, which talks about escorts being protected, online, phone, dancing, striptease, all these things are presumptively protected activities and the First Amendment protects them.

We talked about, in addition, Backpage versus Dart, avenue of expression of ideas and opinions.  Even if a third-party ad had no protection because the third party knew that there was criminal conduct, doesn't mean that the publisher loses its presumption of protected status.  This isn't a matter of the third party's intent.  Here they're just publishers. And so it's in very, very few situations, frankly, only where it's unambiguously and a statement of crime, or about crime, that this presumption does not apply.

And the jurors need to be told, I submit, Your Honor, that there is a presumption here, because we're dealing with First Amendment activity, and they need to be told that that's part of it, that it starts off, presumably, legal, because it's speech, and the prosecution then has the burden of demonstrating otherwise.

And Bursey, if you will, is a perfect case, from our standpoint, because, as I say, not only does it establish that presumption, but it also shows the flaw of the government's

1   theory that, well, this is obvious on its face that it's, you

2   know, not protected by the law.  It has to be, like the Coyote

3   case that they cite, where there they said, we have

4   prostitutes, here's our ad, and clearly it would be illegal.

5   We don't have that in this case.

6          Thank you.

7          THE COURT:  Okay.

8          MR. BIENERT:  And, Your Honor, this is Mr. Bienert.

9   If I could just -- to me, kind of what sums it up, at least in

10  practical terms, I've pulled up the government's proposed

11  Exhibit 8.144, which is their exhibit, you know, where they're

12  given the Travel Act definition, or a proposed one.  And this

13  is where they first introduced --

14         THE COURT:  Wait, wait.  Mr. Bienert, I'm sorry, you

15  referred to an exhibit, but now it sounds like you're referring

16  to an instruction.

17         MR. BIENERT:  Yes, ma'am.  I'm looking at the

18  government's 8.144, which is easy to generalize, by the way, if

19  you don't want to pull it up, but to me it makes -- I think it

20  puts in practical terms what Mr. Cambria is talking about as it

21  relates to the case.

22         THE COURT:  Okay.  So you're talking about a jury

23  instruction, 8.144?

24         MR. BIENERT:  Yes, Your Honor.  But just to make the

25  point that he's making --

1          THE COURT:  Okay.

2          MR. BIENERT:  -- with an example.  And so this is

3   where they go through the various state statutes that they're

4   now saying we violated.  And so I'm just taking Massachusetts,

5   because that's the very first one they use.  And they said

6   counts 2, 4, 27, et cetera, concern prostitution in violation

7   of the laws of Massachusetts.  They then give a definition that

8   they say is what Massachusetts makes, quote, prostitution.  And

9   it, basically, says sexual conduct for a fee, and then it

10  defines sexual conduct, basically, to be sexual intercourse, or

11  oral sex, to make it simple.

12          So if the ads that they're citing on their face say,

13  you know, whatever the name of the person is, sexual

14  intercourse or oral sex in exchange for $50, that would be an

15  ad that facially violates the law, and there is -- would then

16  be an argument that the First Amendment has now been abandoned

17  and does not apply.

18          But the ads don't say that, Your Honor.  They do not

19  have an ad under Massachusetts law that says -- that form those

20  acts.  They have ads that are vague.  They have ads that show

21  someone in a provacative position.  They may say things that

22  the government says insinuate prostitution, but they don't say

23  it.  As a result, under what is, can't be disputed, bedrock

24  law, the First Amendment protections are presumptively there.

25          Now, the government, if they can, can still go out,

1    presumably, and with percipient, proper evidence, show why our

2    clients knew that that particular ad was really for

3    prostitution and that the clients facilitate -- intended to

4    facilitate prostitution through that ad and the business

5    enterprise involved.  If they can do that, fine, that's their

6    burden.  And then the presumption would not apply.

7          But because the ad itself does not describe what the

8    Massachusetts law makes illegal, the burden does apply.  And we

9    can say that for every single one of these state laws.  And so

10   it doesn't mean the government can't try to prove their case,

11   but it is extremely important that the jurors understand that

12   there is a presumption of First Amendment applicability.  And

13   there is no doubt that that is a key component of the defense.

14         And then the last thing I would say is Your Honor

15   alluded to that in your ruling a month or so ago on the

16   attorney-client privilege issues where you said words to the

17   effect, in your opinion, there is no big mystery here about

18   some of these things being said, because these have been

19   defenses used for years by Backpage and Backpage people in the

20   prior cases where they're basically -- what was being talked

21   about -- say we were told by lawyers and court opinions that

22   the First Amendment protected this activity.

23         So that's exactly what's going on here and is a key

24   component that the trier of fact in this case will need to

25   determine, but they need to have appropriate understanding of

1    the law because it's key in the case.

2              THE COURT:  Okay.

3              MR. CAMBRIA:  May I add one more thing before the

4    government speaks, Your Honor?

5              THE COURT:  Okay.

6              MR. CAMBRIA:  Please.

7              For the first time when we were given their

8    instructions that included all these state statutes, for the

9    first time we got an opportunity to look at those statutes.

10   Some of them are extremely troublesome, I -- and I -- I

11   believe, clearly, violative of the First Amendment.  Let me

12   give you an example.

13             Page 96, they talk about a Florida statute, and they

14   say a person offered to commit, committed, or engaged in

15   prostitution, lewdness, or assignation.  And then it defines

16   assignation as, includes the making of any appointment or

17   engagement for prostitution or lewdness or any act in

18   furtherance of such appointment.

19             That might be an offense in Florida, but that is not a

20   violation when it is in a First Amendment context of

21   publishing.  And so if they're trying to say in Florida

22   whatever was published violated this statute, and this statute

23   talks about merely making an appointment, we have a problem.

24   And so because that clearly would not -- it might be an offense

25   for the statute, but it is not when you're publishing something

1    and they're using that to criminalize the publication.  And so

2    we need to know if the grand jury was instructed on these

3    things.

4           We had another one in here --

5           THE COURT:  Mr. Cambria, do you have anything else to

6    say about the First Amendment instructions?

7           MR. CAMBRIA:  Only other than I noticed that one of

8    them includes the term obscenity, which would mean the Miller

9    test would have to be given.

10          THE COURT:  One of what?  One of the state

11   instructions --

12          MR. CAMBRIA:  Yeah, one of the state instructions.

13          THE COURT:  -- or one of the First Amendment

14   instructions?

15          MR. CAMBRIA:  One of the state instructions the

16   statute includes the term obscenity, so do we know what

17   happened with that?

18          THE COURT:  Okay.

19          MR. CAMBRIA:  Thank you.

20          MR. KOZINETS:  Your Honor, may I speak from the

21   podium?

22          THE COURT:  Yes.

23          MR. KOZINETS:  Thank you, Your Honor.  Good morning.

24          There are a number of points to be made in response to

25   what we've just heard.  I'd like to start by talking about the

1    Bursey case which is emphasized so heavily in the filing we

2    received on Wednesday evening and again this morning.

3            The Bursey case was decided in 1972.  It was a case

4    about how the First Amendment applies in the context of grand

5    jury proceedings, and that case had nothing to do with the

6    formulation of jury instructions for a criminal trial.

7            The case was overruled shortly thereafter by the U.S.

8    Supreme Court in the Branzburg versus Hayes case.  Moreover,

9    Bursey, decided by the Ninth Circuit in 1972, predates all of

10   the commercial speech and First Amendment cases that we have

11   briefed in this case.  It predates the Pittsburgh Press case

12   which was decided the next year, Central Hudson decided several

13   years later, Williams, Coyote Publishing, Erotic Service

14   Providers, et cetera.  Bursey doesn't provide the applicable

15   context for determining jury instructions here.

16           Secondly, the defense has cited no case that really

17   discusses when First Amendment jury instructions should be

18   given to the jury.  In fact, we have cited cases from the Ninth

19   Circuit, the Seventh Circuit, and the Second Circuit in our

20   objections to the defense proposed jury instructions.  This is

21   the U.S. versus Freeman case from the Ninth Circuit, 1985, the

22   United States versus White case from the Seventh Circuit, 2010,

23   and the Rowley case from the Second Circuit from 1990.

24           And, basically, what all of these cases stand for is

25   the proposition that when a defendant believes they have a

1    First Amendment defense to federal criminal charges, the

2    appropriate time to take up that defense and decide whether a

3    jury instruction should be offered is at the close of evidence,

4    because the applicability of those defenses are very highly

5    fact specific.  And the defense has not cited a single case

6    that is to the contrary.  They've cited general cases talking

7    about general principles of law, but nothing specifically

8    addressing jury instructions and when they should be hashed out

9    and when they should be given to the jury.

10         Now, in each of these cases, Freeman and White in

11   particular, of course the defendant felt that those cases were

12   fundamentally First Amendment cases.  That was their core

13   theory.  So Freeman involved a tax protester, White involved

14   somebody who ran a website.  And both of them said, you know,

15   publishing your speech is a core part of what is at issue.  And

16   in both of those cases, the appellate courts said, well, let's

17   wait and see what the evidence is and then we'll determine

18   whether First Amendment instructions might be appropriate.

19         The White case is particularly instructive, because

20   that case involved what could be considered coded language.

21   The charge there was a solicitation to commit a crime of

22   violence.  And the Seventh Circuit says, this is at 610 F.3d,

23   page 960, furthermore, that a request -- and I'm quoting --

24   furthermore, that a request for criminal action is coded or

25   implicit, does not change its characterization as a

1    solicitation.

2          And then they go on to discuss another Seventh Circuit

3    case that involved a mob boss speaking to his chief enforcer

4    about a judge.  And that -- that mob boss, Mr. Hill, he never

5    explicitly asked his chief enforcer to do anything.  He simply

6    asked his chief enforcer to locate a judge's home address, and

7    made statements such as, that information has been provided.

8    If you wish to do anything yourself, you can, you know.  And

9    then he later made attempts to distance himself from any

10   illegal action with statements like, I'm going to fight within

11   the law, and I can't take any steps to further anything

12   illegal.  But there the Court held that a rational jury could

13   have inferred his true intention from the evidence, regardless

14   of these attempts to distance himself from that language.

15         So the law recognizes that just because a statement,

16   an ad, what have you, may include some coded language, that

17   doesn't mean that the First Amendment somehow protects the

18   speech, or that you can't consider contextual information,

19   coded language, other information about the meaning of the

20   speech at issue when turning to First Amendment issues.

21         And just real briefly, Your Honor, some of the cases

22   that the defendants have brought forward in their Wednesday

23   night filing do not support the notion that you must have -- or

24   that in order to fall outside of First Amendment protection,

25   the speech, on its face, must wholly, expressly propose a

1     criminal transaction.  None of their cases say that.

2           The -- the IMDB case, which is discussed prominently

3     in their brief, but we haven't heard anything about this

4     morning, is a case that doesn't even involve commercial speech.

5     The Ninth Circuit said that there was no -- this is the case

6     that didn't involve an ad, it didn't refer to a particular

7     product, there was no evidence of an economic motivation.  And

8     then the Court went on to make other statements, but,

9     basically, it never held, it never stated anything along the

10    lines of what the defense is suggesting, which is that only

11    something that just purely expressly on its face proposes a

12    commercial transaction falls outside of the scope of the First

13    Amendment.

14          And the Metro Lights case that we heard about this

15    morning, the only relevant discussion is in footnote 7 of that

16    case on page 904.  And in that case, the discussion is just

17    dicta.  The parties agreed that the speech at issue didn't

18    relate to illegal activity.  In a footnote, the Court goes on

19    to say that in the context of advertising, one must ask whether

20    the goods or services the party advertises are illegal.  That's

21    not some sort of narrowing construction.  It doesn't require

22    some sort of hyper facial analysis of the speech at issue.  It

23    invites an inquiry into whether the ad is proposing the sale of

24    goods or services that are illegal.

25          I can talk about some of the other cases that have

1    been cited.  The Bartnicki case really has nothing to do with

2    this case.  That's about a journalist who lawfully came into

3    possession of truthful information about a matter of public

4    concern and then published it.  Circumstances having nothing to

5    do with this case.

6              We've heard, as defense counsel went through some of

7    the individual instructions this morning, references to other

8    cases like Backpage versus Dart from the Seventh Circuit, and,

9    you know, in the McKenna case, kind of sort of a group of cases

10   that the defense has mentioned again and again in various

11   filings.  And we've referred back to, you know, the reasons why

12   those cases just aren't applicable here.  Your Honor recognized

13   that in your order of October 24th, 2019, Doc. 793.

14             And really even with respect to that Dart case in the

15   Seventh Circuit, that was a case that predated the compelled

16   discovery of more than half a million pages of internal

17   documents from Backpage.  It predated the grand jury

18   investigation in this case.  It predated the Senate report,

19   Backpage.com's knowing facilitation of sex trafficking, and it

20   really predated the sea change and availability of information,

21   documents, witnesses, and so forth, about how the defendants'

22   company was really operating.

23             And since that time, again, as we've pointed out in

24   prior filings, the district court in Backpage versus Dart

25   entered an order that sanctioned Backpage in the amount of

1   $250,000, because the Court found that Backpage had committed a

2   fraud on the Court in its earlier proceedings, in earlier

3   proceedings that resulted in that Seventh Circuit decision.

4   And that district court case we have filed before in this

5   proceeding.  One copy of it can be found at Doc. 516-1, pages 2

6   through 9.

7           So I could go through the -- some of the individual

8   instructions if the Court would like to hear further argument

9   on those, but I think the key takeaway points are this isn't a

10  case where it's appropriate at this juncture to even get to

11  these jury instructions.  This is something that's -- the Ninth

12  Circuit, the Seventh Circuit, the Second Circuit, have all said

13  is appropriately taken up after we know the facts, after all

14  the trial evidence has come in.  So that's one key point.

15          The second key point is this notion that coded

16  language is something that is appropriately considered in

17  determining whether there is any sort of First Amendment

18  protection.

19          THE COURT:  Okay.  So my question for you is, without

20  getting to the specific instructions, the first question is,

21  why shouldn't I include some instruction, not necessarily as

22  detailed as the defense has suggested, but some instruction

23  regarding the First Amendment protections?

24          MR. KOZINETS:  So I think it would be unnecessary and

25  potentially confusing.  The Rowley case, the Second Circuit

1   case that we've cited in our objections here, talks about how

2   when you're dealing with a federal criminal felony, the

3   government has the burden of proof beyond a reasonable doubt of

4   establishing guilt.  And, you know, the government's either

5   going to meet its burden at trial or not.  If the government

6   doesn't meet its burden, really the First Amendment doesn't

7   even come into play.

8        And it can be -- and the Court there recognized that

9   it was unnecessary to even have any First Amendment

10  instruction.  And I think the -- again, going back to the

11  Freeman case from the Ninth Circuit, that case was authored by

12  Judge Anthony Kennedy, who went on to become Justice Kennedy,

13  and nobody would doubt his First Amendment bona fides.  Judge

14  Kennedy himself said, however, that a First Amendment defense

15  is not there for the asking -- that comes right out of the

16  Freeman case -- and that whether the First Amendment even

17  applies is very fact specific.  And so, for those reasons,

18  whether to -- to kind of broach those jury instructions is best

19  left for the close of the evidence.

20       I guess just one other point, Your Honor, is that

21  there has been some discussion about the 50 ads in the

22  superseding indictment.  As Your Honor recognized in Doc. 793,

23  the superseding indictment is full of allegations demonstrating

24  why all of those 50 ads were ads for prostitution.  And Your

25  Honor correctly held, taking the allegations as true, as the

1    Court must at the motion to dismiss stage, you know, the

2    government's superseding indictment shows that these ads are

3    for prostitution and they're not presumptively or otherwise

4    protected by the First Amendment.  And I think what we would

5    see then is, at the close of the evidence, whether that has

6    been borne out by the evidence at trial.  And that is the best

7    time to assess whether and to what extent any of these First

8    Amendment instructions should be given.

9         THE COURT:  And just one final question before I hear

10   from Mr. Cambria again.

11        I guess based on some of your statements, whether

12   they're protected or not seems to be a factual question which

13   would be left for the jury, which is, I think, what they're

14   asking for the instructions, so that the jury is aware that

15   it's protected unless it's illegal.

16        MR. KOZINETS:  Well, certainly, Your Honor.  If, you

17   know, the -- the elements of the crime, I think, though, cover

18   that.  The government has to prove that the defendants

19   intentionally facilitated business enterprises involved in

20   prostitution offenses.  So I think that that covers it, Your

21   Honor, intentional facilitation of business enterprises

22   involved in prostitution offenses.  If the government fails to

23   prove that the alleged conduct constitutes that illegal

24   activity, that is really the key question.

25        THE COURT:  Okay.  Thank you.

1          MR. KOZINETS:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          So, Mr. Cambria, before you state your response, why

4     doesn't, in your opinion, the Travel Act instruction as is,

5     because it describes the illegal activity, cover your concerns?

6          MR. CAMBRIA:  Well, because it says nothing about the

7     fact that they're presumptively protected by the First

8     Amendment.  It's one thing for them to carry their burden, but

9     this is a First Amendment case, and that is a principle of law.

10    It's interesting that in attempting to distinguish Bursey, he

11    said -- and the record could be checked -- it states a general

12    principle of law.  Yes, that's exactly why I'm citing it.  It

13    states a general principle of law.  It says, all speech, press

14    and association are presumptively protected.  Burden rests on

15    the government.  That's what we need to have the jury told.

16          He cites Freeman.  Freeman was a tax preparer guy.

17    Part of his defense was First Amendment and it was allowed,

18    because he had said, well, in my opinion, you don't have to do

19    this or do that.  The other part was he committed the crime, if

20    you will, with the defendant, so they said that wasn't anything

21    to do with speech so they didn't allow it.

22          And this isn't the same as when the Court went through

23    is the indictment sufficient or not.  Yes, there is a

24    presumption that everything alleged is true, et cetera, here

25    there is a presumption of innocence.  There is no presumption

1    that everything that they're saying is true.  What I'm saying,

2    there is a further presumption that this is protected activity.

3    This is, in fact, protected speech unless and until they can

4    prove otherwise.  And the jurors should know when they go

5    through this that it is, starting off, as protected, because

6    it's speech.  It's that important.  The First Amendment isn't

7    first for -- by accident.  It's there because it was the most

8    important thing that our government thought existed in the Bill

9    of Rights, and that's the reason why it's in the first spot.

10           And all we're saying here is that -- and they cannot

11   dispute what -- what Bursey says, what I read to you, as far as

12   a general proposition of law.  They have no case that says that

13   what Bursey said in there -- in that decision, that everything

14   is presumptively protected, is untrue.  There is no case that

15   says that.  It says exactly what I said and what Bursey said.

16   And so it is a general principle of law.  It is one that's

17   indispensable to this jury doing a fair job from the standpoint

18   of the defendants.

19           The other cases he cites, Branzburg and so on,

20   Branzburg basically refined Chaplinsky, if you will, the so-

21   called fighting words case.  And what happened there is, yes, I

22   agree, in those cases, White and the others, their statements

23   were interpreted as violating the law on their face.  And

24   that's the reason why they did not have a presumptive

25   protection.

1          We don't have that here.  We have one ad where

2     somebody says, X number of dollars for a sex act.  All the rest

3     of the ads you have to get into, well, what does this mean?

4     What does that mean?  Does GF mean this?  Did that really

5     happen?  And, frankly, we don't know any of that at this point.

6     We just know that there is language that's ambiguous.

7          When we look at the First Amendment, it always says

8     that if there is any aspect that can be legal, the presumption

9     still applies.  So if there are two interpretations, if you

10    will, to something, the presumption still applies.  Otherwise

11    the publisher would say, well, I'm not going to risk that and

12    kill it all.  It doesn't work that way.  Speech is a very

13    delicate thing with its own set of constitutional rules.  And

14    all we're saying here is Bursey says what the principle is.  He

15    agrees it's a general principle, it is.  And the jury should be

16    told about it so that they can start off in this case and say,

17    yes, this is presumed to be legal.

18         And we're going to have, you know, situations here

19    where we get to the end of the government's case, we can't have

20    the jurors and the Court and the rest of us putting in our

21    evidence and asking our questions without all the complete

22    rules that apply.  And one of them is that there is a

23    presumption of constitutionality that the jurors should be

24    told.  How could they be opposed to that?  Why would they be

25    opposed to that, unless they thought it made it easier for them

UNITED STATES DISTRICT COURT

1   to prove their case, but because we shouldn't apply the law.

2   It is the law.  It is clearly the law.  And the jurors should

3   be told that.  And there is nothing, nothing that undermines

4   the Branzburg principle that it applies.

5          THE COURT:  Okay.  All right.  We're going to suspend

6   any further discussion of jury instructions right now, but I'm

7   not making a decision right this second about whether it's

8   included in the preliminary instructions.  In general, I always

9   believe it's more appropriate to leave more specific

10  instructions until the final instructions, but I'll take this

11  under advisement as to whether or not to include it in the

12  preliminary instructions.

13         A couple just --

14         Yes.

15         MS. BERNSTEIN:  Your Honor, I'm sorry, I need to just

16  put something on the record as to the jury instructions.

17         THE COURT:  Yeah.

18         MS. BERNSTEIN:  The defendants filed our response to

19  the government's, and we stated that there were six brand new

20  Travel Act definitions that we had never before seen.  I want

21  to clarify that.  The government had proposed four of those,

22  although three have been altered from their prior proposal, so

23  I just want it to be on record that there were, in fact, only

24  two brand new definitions and four that they had prior proposed

25  with three revisions.

1        THE COURT:  Okay.  I mean, I guess it's not that

2   unusual for people to propose new instructions at the last

3   minute, even if they haven't proposed them now, if they feel

4   there is new instructions that apply at the end of the case,

5   they can do that.

6        MS. BERNSTEIN:  Yes, Your Honor.  I just wanted to

7   clarify that we had sort of accused them of presenting six, and

8   that was not correct, so I just wanted to mea culpa on that.

9        THE COURT:  And somebody said something about

10  something filed this morning.  Was there something filed this

11  morning?

12        (No response.)

13        THE COURT:  Okay.  I thought Mr. Kozinets said there

14  was something new filed this morning, because, if there was, I

15  didn't see it.

16        MR. KOZINETS:  I apologize, Your Honor.  I just meant

17  to refer to what was filed on Wednesday evening.

18        THE COURT:  Okay.  There are a couple questions I want

19  to talk about just trial procedure.

20        For voir dire --

21        MR. FEDER:  Before you leave the preliminary jury

22  instructions -- this is Bruce Feder -- if you look at your

23  questions by jurors, in the last paragraph I think there is

24  a --

25        THE COURT:  Mr. Feder, we can't hear you.

1          MR. FEDER:  I'm sorry.  Can you hear me now?

2          THE COURT:  Yes.

3          MR. FEDER:  In your -- in your questions by the jury

4    in the preliminary instructions --

5          THE COURT:  Yes.

6          MR. FEDER:  -- in the last paragraph it says, when we

7    do not ask a question.  I assume it's meant to say, when we do

8    not answer a question, it is no reflection on the person

9    submitting it.  And then it also says, you should attach no

10   significance to the failure to ask a question, I assume that

11   was meant to mean failure to answer a question.

12         THE COURT:  No, it's meant as ask, so they submit a

13   question to us and I don't ask it to the juror.

14         MR. FEDER:  Okay.

15         THE COURT:  Okay.  Thank you.

16         MR. FEDER:  And then I'd like to -- are we going to

17   address the motion to continue the trial back to its original

18   spot or to September 8th that I filed?

19         THE COURT:  Yes, we can do that, but not right this

20   moment.

21         MR. FEDER:  All right.

22         THE COURT:  Okay.  With respect to voir dire, I think

23   I was talking with some of the attorneys before we went on the

24   record.  So for jury selection, the defendants and one attorney

25   should be at the table.  Everybody else has to be upstairs,

1   because we have to use every seat in this courtroom for the

2   jury.

3           And as I counted it last time, we're going to have to

4   do it in groups of 36.  So if I didn't mention this, I allowed

5   you guys to do this extensive questionnaire so that our oral

6   voir dire is limited to follow-up question.  There is no

7   opening up new areas of questioning.  You had a really long

8   questionnaire.  So the only thing to do in oral voir dire is to

9   follow up, to clarify any questions you may have based on their

10  answers.

11          And, from the government, who is going to be handling

12  voir dire for you guys?

13          MR. RAPP:  Margaret Perlmeter will be handling voir

14  dire.

15          THE COURT:  Okay.  And from the defense, have you

16  discussed who is going to start your voir dire?

17          MS. BERNSTEIN:  We have not yet, Your Honor.

18          THE COURT:  Okay.  So for, for instance, Mr. Larkin

19  has co-counsel, do you know which of you is going to handle it?

20          MS. BERNSTEIN:  We haven't figured that out yet, Your

21  Honor.

22          THE COURT:  So that morning I need to know.

23          MS. BERNSTEIN:  Okay.

24          THE COURT:  Just so that I can keep it organized.

25          MR. RAPP:  I have a question.

1          THE COURT:  Yeah.

2          MR. RAPP:  So if I understand this correctly, the rest

3     of the -- the rest of the lawyers, both defense and

4     prosecution, I suppose, have to be up in -- is there going to

5     be an area -- and I haven't discussed this with the defense --

6     but is there going to be an area that is going to be corded off

7     just for the litigants, the paralegals, the agents, so that

8     we're not up shoulder to shoulder with whomever?  So that we

9     can candidly talk about the case, I mean, obviously, we can't

10    talk too candidly, or, you know, share information, but are we

11    just going to be up here with the general public?

12         THE COURT:  You are.

13         MR. RAPP:  All right.  That's good to know.

14         THE COURT:  So take notes and discuss it when we take

15    a break.

16         We have to discuss if there has to be a bench

17    conference, whether that's going to be possible, because there

18    is so many of you.  Obviously, it would have to be limited to

19    one counsel per defendant and one counsel for the government.

20    I will probably not allow as many as I normally would because

21    of the logistics of it.  And as I'm looking at this -- well,

22    we'll just have to be patient, but there is a mic over there, I

23    may see if I can move it farther so that we can kind of circle

24    around that open area, if we have to.

25         If we do have to have a bench conference, it is really

1    important that you -- I will do my best to try to specifically

2    address the attorneys, but when you speak, you have to come up

3    to the microphone, you have to state your name, and then state

4    your position, because the court reporter can't hear it, it's

5    especially difficult with the masks, and we also don't want the

6    jury to hear it.

7            Otherwise, I think I told you, if I don't allow a

8    bench conference, I'll allow you to make the record at the

9    break.  If I forget to ask you, please feel free to tell me

10   before we get off the record.

11           So for peremptory strikes, it's generally done --

12   well, I've done it both ways -- but generally simultaneous.

13   So, the defense, I guess it's up to you guys to think about if

14   you want me to have you guys rotate on one list, or if you're

15   all going to separately do your strikes and each have a list

16   and you do it simultaneously, but I just need to know how it's

17   going to be done.

18           The government will do theirs separate, the defense

19   will do theirs separate.  What I want to know is if you're

20   going to all do them simultaneously or if you're going to pass

21   it around.

22           MS. BERTRAND:  Your Honor, if I may ask for some

23   clarification.  Is the Court then saying that it intends to

24   require, between the prosecution and the defense, simultaneous

25   strikes?

1          THE COURT:  Yes.

2          MS. BERNSTEIN:  Okay.  And then the Court's next

3     question was will the defense pass around one jury list or each

4     of us do --

5          THE COURT:  Each of you --

6          MS. BERTRAND:  -- concurrent strikes as well?

7          THE COURT:  Right.

8          MS. BERTRAND:  Okay.

9          THE COURT:  Because there is 15.

10          MS. BERTRAND:  Uh-huh.

11          THE COURT:  The goal was for -- well, for if you

12     wanted to split them up, it's three each, if you're going to

13     all sort of huddle together and do them together or not.

14          MS. BERTRAND:  Okay.  Is the Court firm in its

15     position that the defense and the government will have

16     simultaneous strikes?  And I'm happy to explain why, but is the

17     Court hard and fast on that position?

18          THE COURT:  No.  I've done it both ways.

19          MS. BERTRAND:  Okay.  I think that the defense would

20     prefer to have back and forth strikes, simply because there are

21     so many people involved, and we're -- what ends up happening

22     with simultaneous strikes in a complex case is both sides end

23     up wasting strikes.

24          THE COURT:  Yeah.

25          MS. BERTRAND:  So this way, especially with all of the

1    moving parts here, it is more -- it is actually more efficient

2    and more effective for both sides to have the back and forth

3    strikes so that we don't waste.  It's too important for both

4    sides.

5              THE COURT:  Does the government object to doing it

6    that way?

7              MR. RAPP:  We would prefer that it be simultaneous.

8              THE COURT:  Simultaneous?

9              MR. RAPP:  Yes.

10             THE COURT:  And the rule -- so I've done it both ways

11   when the parties agree.  I think the rule says simultaneous

12   so --

13             MS. BERTRAND:  Right.  We would object to simultaneous

14   strikes.  I would be happy to submit briefing on it.  I think

15   with this many defendants, it's going to waste so many strikes

16   when we already have a very precious number for each defendant.

17   So I am happy to brief the issue.

18             THE COURT:  Okay.  You're going to have to brief it,

19   because the rules call for simultaneous, so if you want me to

20   vary from the rule, I guess I need --

21             MS. BERTRAND:  Okay.

22             MS. BERNSTEIN:  Your Honor, I want to clarify, because

23   you suggested if the defendants don't sort of work as one unit

24   to propose strikes, that there is three each, but I believe the

25   Court only gave 15 and there is six defendants.

1          THE COURT:  Did I do my math wrong?

2          Was somebody saying something?

3          (No response.)

4          THE COURT:  Okay.  All right.  Let me consider whether

5     I should add additional strikes based on that.

6          MS. BERNSTEIN:  Thank you.

7          MR. LINCENBERG:  Your Honor, this is Gary Lincenberg.

8          If I may go back to a comment that the Court made

9     about logistics with regard to people upstairs.  As I

10    understand it, there is -- I'm not sure that there is even an

11    area that the defense team could then gather privately.  It

12    sounds like that's a concern the government has as well.  Would

13    the Court have any objection if the defense had a separate Zoom

14    set up so that we could at least exchange chats back and forth

15    between folks who may not be in the courtroom and those who

16    may, and the government might want to do something similar.

17         THE COURT:  Just for voir dire?

18         MR. LINCENBERG:  Yes, just for voir dire.

19         THE COURT:  I do have an objection to that, but I will

20    think about it.  But my initial reaction is, yes, I would have

21    an objection to that.

22         MR. LINCENBERG:  It might help to get the government's

23    position on that.

24         THE COURT:  Do you take a position on that?

25         MR. RAPP:  We don't.

UNITED STATES DISTRICT COURT

1          THE COURT:  No?

2          MR. RAPP:  No.

3          THE COURT:  Okay.  Let's talk about the motion to

4    continue.

5          MR. LINCENBERG:  I think --

6          THE COURT:  I'm sorry?

7          MR. LINCENBERG:  Yeah, excuse me, one other quick

8    point.

9          THE COURT:  Who is it?

10         MR. LINCENBERG:  This is Mr. Lincenberg.

11         The Court mentioned who would be in the courtroom

12   during voir dire.  We also anticipate having a jury consultant

13   present in the courtroom with us during voir dire.

14         THE COURT:  Okay.  They just won't be able to be at

15   the table.

16         MR. LINCENBERG:  Okay.  As long as we -- there is a

17   place where we can consult with that jury consultant in the

18   courtroom.

19         THE COURT:  They can -- I anticipate that they can

20   consult after voir dire or in between panels.

21         MS. BERNSTEIN:  And, Your Honor, how many panels are

22   we doing of 36 jurors?

23         THE COURT:  I'm sorry, I don't remember how many we

24   have left, how many jurors, but there is close to a hundred.

25         MS. BERNSTEIN:  We have 104 left and there were six

1    late excuses submitted.

2            THE COURT:  So then that would be three.

3            MS. BERNSTEIN:  Okay.

4            THE COURT:  Okay.  Before we end, let's talk about the

5    motion to continue.

6            Mr. Feder, I did receive your objection.  And let me

7    tell you why I did what I did.

8            First off, I only anticipated granting a one-week

9    extension in the first place.  I did two because I was

10   generous.  I was trying to offer extra time, which I don't

11   think was necessary, but when I received the extra request, one

12   is these holidays had to have known -- been known by the

13   parties when we finalized the calendar months ago.  And I asked

14   the parties for input on the calendar.  I made adjustments

15   based on the parties' suggestions and we sent it out with the

16   jury questionnaire.

17           When we had a discussion about Mr. Feder's motion to

18   continue in the first place, nobody mentioned the issue with

19   these two days.  That additional week was a buffer and I'm

20   using that buffer.  I have no problem blocking out those two

21   additional days for the holidays, but I -- we prescreened those

22   jurors to a specific date in December, my goal is to get this

23   trial done by that date and with the days we have planned.  So

24   I will not reconsider my decision to start on September 1st.

25           MR. LINCENBERG:  Your Honor, this is --

1              THE COURT:  Hold on.  Only one of you can talk at a

2    time.

3              Mr. Feder, did you want to say something?

4              MR. FEDER:  I'll let Mr. Lincenberg make his

5    statement, then I'll make mine.

6              THE COURT:  Okay.  Mr. Lincenberg.

7              MR. LINCENBERG:  Your Honor, first of all, I apologize

8    if I didn't notice this earlier.  I will tell the Court that I

9    am in trial as we speak, on break for this hearing, with others

10   in my firm handling the witnesses this morning.  It's the close

11   of the fifth week of trial, and it's been incredibly busy, and

12   it's always with the weeks leading up to that.

13             I'm not going to ask the Court to reconsider the start

14   date, and it may be that we can cover certain things.  Part of

15   our problem is Mr. Panchapakesan is also expecting a baby

16   during that week, and we're trying to figure out coverage

17   because Mr. Neuman and I are culprits on wanting to be off for

18   the Jewish holidays.

19             With regard to the second day of court, we appreciate

20   the Court granting our request not to have trial that day.

21   When the Court added the day before the 13th, I'm not sure if

22   the Court is aware or not, but that holiday starts the evening

23   before.  And it is one in which we fast for 24 hours, and it

24   basically starts with the meal before the fast.  And it is a

25   holiday that I plan to spend with my family.

1          If we're in trial on the 13th, I don't know how I can

2    fly back to Los Angeles for that day.  So I would ask the Court

3    to consider not having us in trial the 13th, which was a day

4    that I understand the Court had instructed -- was not part of

5    the trial schedule to begin with anyway.

6          THE COURT:  I thought the holiday was on the 16th, the

7    7th and the 16th.

8          MR. LINCENBERG:  Let me -- let me double check the

9    dates.

10          I'm sorry.  I'm sorry.  It's the 16th, so it would be

11    the 15th.  And it may be, Your Honor, that as we get near that

12    date, that Mr. Panchapakesan will be available.  And,

13    particularly, if we know the government's witnesses the week

14    before for that week, we may be able to plan around it.  But

15    the Court is correct, it's the 15th and 16th.

16          THE COURT:  Okay.  So, Mr. Lincenberg, if that is part

17    of the holiday, why did you not include it in your request?

18          MR. LINCENBERG:  I'm sorry, the request that Mr. --

19    with regard --

20          THE COURT:  Well, I don't know, I don't remember who

21    filed the written request to suspend trial for these two days,

22    but the request was for the 7th and the 16th.  Nobody said

23    anything about the 15th.

24          MR. LINCENBERG:  Then we were wrong to not include it.

25    And I'm not -- and I'm not -- it may be that as we get close,

```
1    we can do the 15th if it's a day that Mr. Panchapakesan is
2    available, and if it's a day that the witnesses are not
3    primarily involving my client, we can work with the Court on
4    that.  It would be helpful to know the week before who the
5    witnesses will be that week, what the government is planning.
6              THE COURT:  Are you lead counsel?
7              MR. LINCENBERG:  Yes, I am, Your Honor.
8              THE COURT:  Okay.  Well, I am not comfortable having a
9    trial day without lead counsel so --
10             MR. LINCENBERG:  And, Your Honor, I'm comfortable
11   having a trial day if Mr. Panchapakesan is available, depending
12   upon his wife's birth on the 15th, or in doing a half a day or
13   something.  I just am alerting the Court of my situation, and,
14   you know, I certainly want -- I understand and respect the
15   Court's desire to keep the trial moving forward as well.
16             THE COURT:  Okay.  Does the government want to be
17   heard with respect to what I should do on the 15th?
18             MR. RAPP:  I guess the consensus is a half day is what
19   we recommend on the 15th.
20             THE COURT:  I'm sorry, you've got to speak up.
21             MR. RAPP:  I thought I was.
22             We recommend a half day on the 15th.
23             THE COURT:  Mr. Lincenberg, would a half day, if we
24   did the morning, be sufficient?
25             MR. LINCENBERG:  Yes, it would, and we appreciate --
```

1    we would appreciate that accommodation.

2          THE COURT:  Okay.  So we will have a half a day, 9:00

3    to 12:00, on the 15th.

4          Okay.  That is everything that I had on my list.

5    We're at ten to 12:00, so if there is any minor questions you

6    want to ask --

7          Okay.  Hold on.  Someone on the phone is -- did

8    someone on the phone --

9          MR. FEDER:  This is Bruce Feder.  I'd like to address

10   the motion that you're, apparently, just dismissing, and put on

11   the record the following.

12          I have concerns about Mr. Spears' Sixth Amendment

13   right to competent counsel.  I didn't overstate my symptoms.

14   I've been in touch with the Court all the way along.  I'm still

15   having symptoms sufficient to be excluded from the court by the

16   general order that's in place.

17          It's been commented to me that I must have been in a

18   fog the last several weeks because of some of the things I did

19   or didn't do in regard to preparation of exhibits.  Some of

20   those symptoms, as I have indicated in my e-mails to the Court,

21   which I at this time ask be made a part of the record, or I

22   will make them part of the record, if the Court pleases,

23   indicate that the symptoms continue.

24          As the Court probably knows, keeping up -- keeping

25   track with what's going on in the media, and with the medical

1    community in Arizona specifically, breakthrough COVID is

2    somewhat epidemic at this point in time.  A lot of people have

3    it.  The symptoms are unknown.  The length of the symptoms is

4    unknown.  Thankfully, they are not as serious as people who

5    have not been vaccinated, but they're serious enough, having

6    now been experienced of them.

7              So I would ask the Court to reconsider.  I asked

8    originally for three weeks.  I understand what the Court is

9    saying.  I didn't ask just for the -- for my own summary of

10   asking for three weeks.  Three weeks was intentional because I

11   knew I was not feeling well, not functioning well, not able to

12   prepare as I would ordinarily prepare for a trial.  And the

13   Court has now cut it back to, essentially, one week, where I

14   know I've lost at least two, if not, three weeks, and, again,

15   have continuing symptoms.

16             So if the Court's going to, essentially, ignore that,

17   that's what the Court's going to do.  The Court's going to have

18   to exempt myself and my staff from the general order, because

19   we still have symptoms that would preclude us from coming to

20   court.  I will let the other lawyers speak, but I know some of

21   them, as I've indicated in my e-mail, are uncomfortable being

22   around me, even though I don't think I'm still contagious.

23             THE COURT:  Mr. Feder --

24             MR. FEDER:  I would ask the Court to reconsider.

25             THE COURT:  -- you did put that all in your motion.  I

1   didn't ignore your motion.  I didn't dismiss your motion.  I

2   denied your motion after consideration of the circumstances.

3   So I wanted to make that clear.  And your request to reconsider

4   is denied.

5          The Court -- you mentioned the Court's general order.

6   The Court's general order with respect to symptoms is based

7   upon an idea that the general public coming into the courthouse

8   who we don't have any information about and has symptoms.  Your

9   situation is different because prior to -- well, one is I

10  authorized you to appear by phone for this hearing because --

11  not because of the general order, but because Ms. Bernstein had

12  expressed some concerns about it at the last conference and I

13  thought we could handle it.  It is not because the general

14  order.

15         The general order would not apply to you, I've talked

16  to Judge Snow, because you have tested negative since you were

17  positive, and we will, again, have another test prior to you

18  coming in.  So, although the general order doesn't say it

19  doesn't apply to those who have been tested negative, but I

20  have -- I have, because of your motion, discussed it with Judge

21  Snow.

22         Okay.

23         MR. PANCHAPAKESAN:  Your Honor, I had one last --

24         A VOICE:  Your Honor --

25         THE COURT:  Hold on.

1          Go ahead.

2          MR. PANCHAPAKESAN:  I had one last unrelated process

3     question.  I know some counsel have been in touch with

4     Ms. Garcia about this.

5          Is there sort of a guideline for the parties as to

6     paper versus electronic exhibits and how the Court prefers all

7     that to be done, the timing on that, just so we can be

8     prepared.

9          THE COURT:  Yes.  Thank you for asking.  It should all

10    be done electronically.  This is all paper, right, there is no

11    physical exhibits that anybody intends, so you should consult

12    with Elaine about getting that in to the JERS system.

13         Okay.  So I may be misunderstanding the question.  We

14    do need a paper copy of all the exhibits for Elaine to admit,

15    but for purposes of during the trial, everything should be done

16    electronically.  So you have to get the exhibits submitted

17    electronically, and then run from the podium, you'll have to

18    attach your computer when you want to show an exhibit, and we

19    will control whether it gets published to the jury.  So you can

20    show it to the witness and counsel without the jury seeing it,

21    and it's not until it's published that the jury will see it on

22    their screens.

23         Which reminds me, I will -- I am going to enter an

24    order right now that up in the -- well, anywhere in the

25    courtroom, there is not to be any photography or video or audio

1    recording.  And part of my concern is there is going to be

2    people upstairs, I don't want them photographing anything on

3    your tables, you know, from either side, or just the press or

4    public, so I'll have that posted.  I'll probably have somebody

5    monitoring upstairs as well, but you should let everybody know

6    that you're involved with.

7            MR. PANCHAPAKESAN:  And just to clarify, Your Honor --

8    we can talk to Ms. Garcia about this -- so the Court needs a

9    set of paper copies, and then, other than that, we'll deal

10   electronically?

11           THE COURT:  Correct.

12           MR. PANCHAPAKESAN:  Okay.

13           THE COURT:  So those are really just for the record,

14   but for use during trial, it's all electronic.  That way we

15   don't have to have anybody approaching the witness with

16   exhibits.

17           Do you have a question, Mr. Rapp?

18           MR. RAPP:  No.  I was just going to say we're going to

19   bring our hard copy exhibits in the day before.  We'll make

20   arrangements to have them in here.  They're there, if the

21   defense wants to use them in lieu of electronic, they can use

22   the document camera.

23           We'll provide the Court whatever -- we'll work this

24   out with Ms. Garcia -- whatever digital device works for you.

25   We'll bring you all the government's exhibits on a disk in the

1    event you want to look at them.

2         We are expected to exchange, simultaneously,

3    electronic exhibits with the defense on the 27th.

4         THE COURT:  So they'll have your exhibits

5    electronically, too, right?

6         MR. RAPP:  Well, right, we're going to exchange on the

7    27th.  It's the agreement we've had with defense that they will

8    provide us a disk of their electronic exhibits, we'll provide

9    them a disk of ours.

10        THE COURT:  So my anticipation is that you shouldn't

11   have to use paper and the Elmo, you should be able to pull it

12   up.  Obviously, if there is a technical issue, we'll break out

13   the paper and you can show it on the Elmo, but we want to try

14   to avoid sharing paper.

15        MR. RAPP:  We're not going to use paper exhibits, from

16   our standpoint.

17        THE COURT:  Okay.  So, for both sides, I do usually

18   keep a court copy, so that as we're going through I can look at

19   it.  But, since there is so many, if you can provide it to me

20   electronically, then you don't have to provide an extra paper

21   copy for me.

22        MR. RAPP:  Thank you.  We weren't intending to do that

23   just because of the volume.

24        THE COURT:  Okay.

25        MR. RAPP:  We have a couple just housekeeping.

1          THE COURT:  Okay.  I think someone on the line had

2     something else to raise.

3          MR. BIENERT:  Yes, Your Honor.  It's Mr. Bienert.  I

4     didn't want to interrupt, but this is back on the voir dire.

5          One issue, especially in light of the government's

6     definitions of state prostitution, they actually are fairly

7     graphic in terms of different sex acts.  And I don't remember

8     how much we asked in the jury questionnaire, but I think it

9     would be appropriate to ask just jurors in general, and I

10    actually think it would be better coming from the Court, but

11    just a couple of questions to the entire panel along the lines

12    of -- and we can submit something for Your Honor's

13    consideration -- but to the effect of, this case will involve

14    discussion of various adult activities, including matters

15    related to sex, and just to the degree if there are jurors who

16    would not be comfortable hearing about such descriptions or

17    discussing them, we would at least think they should have a

18    chance to flag that and express that so we can follow up as

19    appropriate, or the Court could follow up as appropriate.

20         THE COURT:  I believe that was asked at least twice in

21    the jury questionnaire in two different ways.  I don't have it

22    right in front of me, but I'm happy to e-mail the questions

23    that I think covered it.

24         MR. BIENERT:  So be appropriate for follow-up then?

25         THE COURT:  Yeah.

1          MR. BIENERT:  I just want to make sure it's addressed

2     one way or the other.  I don't want to be precluded if we think

3     it's appropriate to ask some followup.

4          THE COURT:  No, no.  I think there were questions

5     about that, and I think there was a suggestion that we strike

6     some people, and we may have struck some people based on that.

7     But if somebody is still on the panel that expressed some

8     concern about that, then, yes, that would be fair followup.

9          MR. BIENERT:  Thank you, Your Honor.

10          THE COURT:  Okay.

11          MR. FEDER:  Judge, one logistic problem.  I'm assuming

12     from what Mr. Rapp just said and the Court just said, that the

13     exhibits are due the day before trial, the electronic exhibits?

14          THE COURT:  Let me check with Elaine.

15          (An off-the-record discussion was held between the

16     Court and the courtroom deputy.)

17          THE COURT:  Okay.  Elaine has asked that you submit

18     them a week before.  She needs to make sure that they're

19     properly formatted and can work in our system.

20          Do you have any problem with that?

21          MR. RAPP:  No.  So the electronic -- a disk or

22     whatever digital device is compatible of the electronic

23     exhibits on, would that be next Wednesday?

24          THE COURT:  Okay.  So you're getting -- or you're

25     exchanging them on the 27th?

1          MR. RAPP:  Yes.

2          MS. BERNSTEIN:  Well, Your Honor, our understanding

3    was that the government was actually going to give them to us

4    and we have a week to respond.  I mean, we don't even have

5    their final exhibit list.  Their witness list appears to be

6    ever evolving.  And, as the Court knows, their exhibit list is

7    about 160 single-paced pages.  So I don't know that we're going

8    to be in a position to provide those by Monday when we don't

9    even have them from the government yet.  We need a week to

10   react to what the government's doing.

11         THE COURT:  The government just told me you guys had

12   agreed to simultaneously exchange exhibits.

13         MS. BERNSTEIN:  Our understanding was that we were

14   getting our list back to them one week after they had provided

15   their list.

16         MR. RAPP:  Wait a minute.  They've had our list

17   forever, for -- for a couple years.  We are going to exchange

18   simultaneous our electronic exhibits.  That was the agreement

19   we thought we had.  We've not even received a witness or an

20   exhibit list, a final, from the defense.

21         MS. BERNSTEIN:  Well, Mr. Rapp has had our preliminary

22   list for years as well.  I mean, Your Honor, we're right before

23   trial.  We really want this to run efficiently.  We desperately

24   want this trial to end before December 3rd, if we can.  So

25   we're not in a position to react until we've seen the

1    government's exhibits and list.  They sent us -- and I think I

2    didn't send it to the Court, I had sent it to government

3    counsel, in requesting that they provide us their exhibits.

4    They send us a list, Your Honor, and they have the Bates

5    pages --

6            THE COURT:  Yes, I know.  You've explained it in your

7    motions.

8            MS. BERNSTEIN:  It's thousands of things.  It takes us

9    hours to put together one of their exhibits.  So we just simply

10   are not in a position to provide ours to the Court until we've

11   had at least a week to react to the government.  We'd like more

12   time but I understand we're going to proceed on the 1st.  We'll

13   do everything as fast as we can, but we do need a lag time

14   between when the government gives it to us and when we respond

15   to that.

16           THE COURT:  Give me a second.  I'm going to pull up

17   the calendar.

18           Okay.  Well, I don't know what you guys have agreed on

19   between each other.  I just need to make sure that the Court

20   has the exhibits.  It doesn't have to be that these are the

21   exhibits -- all the exhibits you're going to use, you may miss

22   a few, but we need to know that the formatting is right and

23   that you know that the formatting is right.  So I'm ordering

24   both sides to, on the 27th, provide Elaine with the electronic

25   copies of your exhibits.

1          I understand that you will probably refine those lists

2    as the trial goes along, but this case has been pending for a

3    long time.  I find it hard to believe that both sides don't

4    have a pretty good idea of what exhibits they want to use, so

5    I'm ordering it on the 27th.

6          Was there anyone else on the phone that has another

7    question?

8          (No response.)

9          THE COURT:  Anyone else on the defense side over here?

10         MS. BERNSTEIN:  Your Honor, this is a different topic.

11         THE COURT:  Okay.  If it's quick.

12         MS. BERNSTEIN:  Well, if we need to continue the

13   discussion to another time, that's fine, but I would find it

14   helpful to know from the Court what the plan is if one of the

15   jurors or one of the witnesses tests positive for COVID mid

16   trial.  Understanding that we do have extra alternates, but,

17   for example, this week the Arizona Republic reported that the

18   Deer Valley Unified School District sent home 2,000 children to

19   quarantine, and Scottsdale Unified sent home 635 children to

20   quarantine.  My fiancé's ex-wife currently is waiting for her

21   COVID results after being exposed over the weekend.

22         All of my -- one of my paralegals currently has COVID

23   and is quarantined with two of her children.  All of these

24   people that I know were previously vaccinated.  So Law 360

25   reported this week that the Eastern District of Michigan had

1    this exact problem happen.  And I think it would be helpful to

2    the parties, to the jurors, to everyone involved in this trial

3    to have worked out what the plan is when someone involved in

4    this trial is exposed to COVID before it's -- I'd rather know

5    that ahead of time, and I think the jurors would rather know it

6    ahead of time, as would all of us, than be in a reactive mode

7    when it happens.

8            And perhaps the Court has discussed this with Judge

9    Snow, but I don't believe we've received anything either from

10   the clerk's office or in a general order or from this Court

11   regarding what the plan is for that.

12           THE COURT:  Okay.  So --

13           MR. FEDER:  One addition to that, Judge, has to be --

14   wakes up with some kind of symptom, what do they do.

15           THE COURT:  On the phone, you have to tell us who is

16   speaking, and speak directly into the phone.

17           MR. FEDER:  It's Bruce Feder.  And an addition to that

18   is what's the procedure if anybody involved in this trial, a

19   juror, lawyer, et cetera, wakes up and has a symptom that's

20   associated with COVID.

21           THE COURT:  Okay.  I will issue a very general order.

22   I am not going to tell you how I will specifically handle any

23   particular situation that may or may not happen.  It's too

24   speculative.  I had it come up one time in a trial, in eight

25   trials, one time, and we dealt with it.  And it turned out not

1    to be an issue.

2           Now, obviously, we're all going into this knowing that

3    there is this overarching concern, and we will deal with it

4    when it comes.  I mean, I'm not going to say exactly what I'm

5    going to do when I don't know what the circumstance is.

6           Does the government -- the government did have some

7    issues.

8           MR. RAPP:  I will run through them quickly.

9           There are approximately 120, 130 witnesses in this

10   database, that's both government --

11          THE COURT:  I need you to speak up a little.

12          MR. RAPP:  There is approximately 120 witnesses, by

13   our estimation, for this case.  And what we have done for the

14   last 15 years in similar lengthy cases is taken a digital

15   photo, unsmiling photo, of the witness and provided it at some

16   point during the week in a notebook for the jurors so they

17   can -- they can make notes, they can do whatever they want, but

18   at least they can identify the witness.

19          We intended to do that in this case.  We're happy to

20   take that on for the defense witnesses, if they -- if they

21   are -- if they would like us to do that.

22          We also have two case agents in this case.  One case

23   agent handles the victims and law enforcement, the other case

24   agent handles the former employees of Backpage and some of the

25   financial witnesses, and so we would like to -- and those are

1   two case agents that were in the jury questionnaire.  We'd like

2   to have them designated as our case agents and in the courtroom

3   during the respective testimony of the witness they've been

4   assigned to.

5          Are we all using this podium, or are we -- can we

6   present from here?  Is that a -- if we brought in our own, you

7   know, elevated podium, or do you want us to present from there?

8          THE COURT:  If you want to question the witness -- and

9   this goes for anyone -- if you want to question the witness

10  from your table, I don't have any objection to that.  If you

11  want to come up to the podium, you can come up to the podium.

12  But it has to be in one of those two spots, because we don't

13  want people walking around.  And opening statements will have

14  to be given from the podium.

15         MR. RAPP:  And is the questioning attorney required to

16  wear the mask and is the witness required to wear the mask?

17         THE COURT:  The witness is not required to wear the

18  mask.  You should instruct your witnesses that when they come

19  in, they have to wear the mask.  They can't take it off until

20  they get to the witness stand, and then they have to put it on,

21  obviously, before they walk off.

22         In my courtroom, I let the attorneys take off their

23  masks at the podium, but this podium is right next to the

24  attorneys, because you're kind of squished, so I was not going

25  to allow that.

1          MR. RAPP:  What if we question from here?

2          THE COURT:  If you question from there -- well, I --

3    see, I want the same rule to apply as over here, and they're a

4    little more crowded than you.

5          MR. CAMBRIA:  Your Honor, we should be able to speak

6    without a mask so that -- I can tell you now that a number of

7    people have been speaking, sometimes I'm not catching all the

8    words that are coming out because of the masks.  And the last

9    thing that I think we should have is for the jurors not to be

10   able to hear the attorneys clearly.  And so, for that reason, I

11   think we should be permitted to take the masks off when we're

12   at the -- when we're at the podium.  Unless somebody here is

13   going to object to that, I just think it's essential that they

14   hear exactly what our questions are.

15         I mean, I'm having trouble hearing, and I'm sitting

16   here wearing two, you know, diesel hearing aids.  And the

17   problem is when you talk through these -- through these, and I

18   have kind of a breathing issue, you noticed, when I was

19   arguing, I was pulling this thing away, you know, I -- I just

20   don't think it's fair.

21         THE COURT:  Well, it's easier for the court reporter

22   as well.  She prefers it if you take off your mask.

23         MR. CAMBRIA:  That usually settles it right there, if

24   the court reporter is good with it, we're done.

25         I'm kidding.

UNITED STATES DISTRICT COURT

1              THE COURT:  Well, except I -- everybody has a

2    different level of comfort with that.

3              MR. CAMBRIA:  Well, if somebody objects, if they

4    don't, I mean --

5              THE COURT:  Okay.

6              MR. CAMBRIA:  -- that really putting a crimp in our --

7    in us and I don't think it's fair.

8              THE COURT:  Mr. Eisenberg.

9              MR. EISENBERG:  Your Honor, I think the solution is to

10   allow the attorneys, at least on the defense side, ask

11   questions from their spot without the mask.  Their client can

12   sit sufficiently away while that is going on.  I mean, what is

13   it, six feet, or I've forgotten what the distance is, perhaps

14   by rolling around a little bit, so that would be the solution.

15   And I am also in favor of not having the mask when doing the

16   questioning.

17             MR. CAMBRIA:  Well, I'd like to use the podium, and

18   that's where I'm asking I be permitted to take my mask off.

19             THE COURT:  Well, you're far enough away from the

20   government, so even if they object, I'd probably let you, but I

21   don't know who is going to -- is this how you're planning on

22   sitting --

23             MR. CAMBRIA:  Yes.

24             THE COURT:  -- in this order?

25             MR. CAMBRIA:  Mr. Bienert, I would assume, is going to

1  be over here.

2  　　　　　MR. EISENBERG:  So, Your Honor, the solution there is

3  just to have, perhaps, an extra table, or smaller table over

4  here so people can move down, and that will allow anybody who

5  wants to question from the podium to do that.  And that's also

6  a pretty good idea, because if the witness is there in that

7  chair, and the podium is there, pardon me for pointing, there

8  is a -- the distance between the two does not really lend

9  itself to a comfortable question and answer.

10  　　　　　THE COURT:  Mr. Bienert, on the line --

11  　　　　　MR. BIENERT:  Yes, Your Honor.

12  　　　　　THE COURT:  -- are you still there?

13  　　　　　So you are seated the closest to the -- or your table

14  is seated closest to the podium.  What's your position on

15  questioning from the podium without a mask?

16  　　　　　MR. BIENERT:  I'm vaccinated, Your Honor.  Although I,

17  as you know through your clerk, I've had a scare, but I tested

18  negative.  I'm sick with something else right now.  I'm

19  assuming when we're sitting there, we can wear our mask when

20  someone else is at the podium, right, obviously?

21  　　　　　THE COURT:  Well, that would be the rule.  The only

22  time you would be allowed to remove your mask is when you're

23  questioning a witness or -- yeah, when you're questioning a

24  witness or doing -- whoever is doing openings.

25  　　　　　MR. BIENERT:  First of all, I appreciate the other

```
1    lawyers deciding where I'm going to sit.  That was nice of

2    them.  But, in any event, I am fine with people taking their

3    mask off from the podium when they're doing questioning.

4              THE COURT:  Okay.  Does anybody else want to be heard

5    on that?

6              (No response.)

7              THE COURT:  So --

8              MR. FEDER:  What about transparent masks?

9              THE COURT:  I'm sorry, I didn't hear you.

10             MR. FEDER:  Do you permit transparent masks?  In other

11   words, they have a transparent piece of plastic or something

12   like that by the nose and mouth.

13             THE COURT:  Oh, but it's solid?

14             MR. FEDER:  Yeah, it's incorporated into the mask.

15             THE COURT:  I guess I'm not sure what you're talking

16   about, so as long as it's solid.  I've seen the mesh ones,

17   which are really people's way of faking it.  So assuming it's a

18   solid, legitimate mask, yes, I wouldn't have any problem with

19   that.

20             So, in general, I'm more restrictive now about

21   courtroom movement, because of COVID, but I will allow the

22   attorney doing the questioning to remove their mask, the

23   attorney doing the opening and the closing to remove their

24   mask.  It has to be put back on right after.

25             And anybody that wants to move away from the person
```

1    doing the questioning can move, either over here or some space

2    where somebody is not sitting.  I don't know how many people

3    you guys are going to have in the back, but you can get up and

4    stand and move away if you want to.

5          Okay.  And then the case agents.  The government's

6    allowed to have a case agent, in this case they have two, but

7    it sounds like you would anticipate only having one in the

8    courtroom at a time?

9          MR. RAPP:  That's right.

10          THE COURT:  Does anybody want to say anything about

11    that?

12          MS. BERNSTEIN:  Your Honor, we don't object to that,

13    but we would ask to have a corresponding seat for, like, a

14    rotating paralegal, because like their case agents are sort of

15    the custodians of a lot of knowledge, so are our paralegals.

16    So we don't object to them having one case agent, we would just

17    ask for the same consideration and be able to have a rotating

18    paralegal sit with us.

19          THE COURT:  Well, their case agent, if he's sitting in

20    here, has to take the place of one of them.

21          MS. BERNSTEIN:  Okay.  And so will the back of the

22    courtroom be reserved for trial participants during the case

23    or --

24          THE COURT:  This side is only for the jury, and this

25    side is actually reserved for your staff.

1          MS. BERNSTEIN:  Okay.

2          THE COURT:  Your paralegals.  And the public has to go

3   up there.

4          MS. BERNSTEIN:  Thank you.

5          THE COURT:  And there has been a request -- I think

6   we're going to have a listening line for press, but no -- no

7   video feed of the trial.  It's just a listening line.

8          MS. BERNSTEIN:  And could attorneys who wouldn't be

9   present in court also listen in on that line, participants in

10  the case?

11         THE COURT:  Yeah, it will be an open line.

12         MS. BERNSTEIN:  Okay.  Thank you.

13         THE COURT:  Okay.  And the juror notebooks.  So the

14  government's requesting the jurors be given a notebook only

15  with pieces of paper and the witness's picture?

16         MR. RAPP:  That's correct.

17         MS. BERNSTEIN:  We object.

18         THE COURT:  And why?

19         MS. BERNSTEIN:  If it's coming in as evidence, then

20  obviously the jurors will have it at the end of the case in a

21  folder, but to give them just sort of a dossier with everyone's

22  photographs, we object to that.  I don't know that there is any

23  case law that provides for that either.

24         MR. CAMBRIA:  The other thing that I object to is then

25  the jurors are going to be given 90 pictures for the

1    prosecution, and maybe some less for the defense, since most of

2    -- since a lot of our case will be coming out through the

3    prosecution.  I just -- I've never seen a situation where -- I

4    mean, it's one thing when they put a picture up when they talk

5    about someone and it's relevant to the testimony, but this --

6    you know, to add pictures there, it can only be to prejudice

7    the jurors.

8            The jurors don't need to know what somebody looks

9    like.  They'll -- they're sitting here.  They know what they

10   look like.  And so I object to it.  I think that it's

11   prejudicial to the defense, especially since there will be a

12   stack like this for the prosecution, and then, you know, maybe

13   nothing for the defense, but it will look like it's the

14   prosecution's people.  I just think that's wrong.

15           MS. BERNSTEIN:  Particularly, Your Honor, where we

16   object to many, if not, most of the government's witnesses, I

17   don't even logistically know how this would work.  Would they

18   get the photograph after the person is admitted and testifies,

19   because it would not be appropriate to send it all back prior

20   to that, since we really object to most of their witnesses not

21   being percipient.

22           MR. RAPP:  I just want to --

23           THE COURT:  Hold on.

24           MS. BERTRAND:  It's also just creepy.  Judge, it's

25   creepy, and it's intimidating to the witnesses, not all of whom

1   are coming because they want to help the government.  It's

2   really intrusive on those witnesses and I wholly object.

3          MR. RAPP:  We have done this in about 30 or 40 trials

4   in this district, particularly of this length.  The goal is to

5   help the jury understand the case.  And if they have a picture

6   after -- not before the witness testifies, but after the

7   witness testifies, they get an unsmiling picture of them that

8   they can put in a notebook and be able to identify who that

9   witness is.  That wouldn't be a big deal if it was a two or

10  three-day trial, but three months.  And we're happy to do it

11  for the 40 witnesses that the defense has noticed.

12         MS. BERNSTEIN:  And the government could also just

13  call the witnesses that are percipient and then they wouldn't

14  have so many.  We fully object.

15         THE COURT:  All right.  We don't need the side

16  comments.

17         So the question is -- juror notebooks are used.

18  They're not even asking that exhibits be included in the juror

19  notebook, but let me think about it.  I agree there is a --

20  some jurors might be uncomfortable with that -- or some

21  witnesses, so I will think about it and I'll let you know in

22  time that you can prepare it.

23         Okay.  We're at recess.  Thank you.

24         (Proceedings concluded at 12:17 p.m.)

25                *         *         *

1          C E R T I F I C A T E

2

3          I, CHRISTINE M. COALY, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 1st day of December,

13   2021.

14

15

16               /s/ Christine M. Coaly

17               Christine M. Coaly, RMR, CRR

18

19

20

21

22

23

24

25