Paul J. Cambria, Jr. (NY Bar No.1430909, admitted *pro hac vice*)
Erin McCampbell Paris (NY Bar No. 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:   (716) 855-1580
pcambria@lglaw.com
emccampbell@lglaw.com
*Attorneys for Michael Lacey*

Gary S. Lincenberg (CA Bar No. 123058, *admitted pro hac vice*)
Ariel A. Neuman (CA Bar No. 241594, *admitted pro hac vice*)
Gopi K. Panchapakesan (CA Bar No. 279856, *admitted pro hac vice*)
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW PC
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110
glincenberg@birdmarella.com
aneuman@birdmarella.com
gpanchapakesan@birdmarella.com
*Attorneys for John Brunst*

Additional counsel listed on next page

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | NO. CR-18-00422-PHX-DJH |
| Plaintiff, | |
| vs. | **OBJCTION TO THE COURT'S PROPOSED JURY INSTRUCTION RELATING TO THE FIRST AMENDMENT** |
| Michael Lacey, *et al.*, | |
| Defendants. | |

Eric Kessler
KESSLER LAW GROUP
6720 N. Scottsdale Rd., Suite 210
Scottsdale, AZ  85253
Telephone: (480) 644-0093
eric@kesslerlawgroup.com
*Attorney for Scott Spear*

Bruce Feder (AZ Bar No. 004832)
FEDER LAW OFFICE PA
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: (602) 257-0135
bf@federlawpa.com
*Attorney for Scott Spear*

David Eisenberg (AZ Bar No. 017218)
DAVID EISENBERG PLC
3550 N. Central Ave., Suite 1155
Phoenix, Arizona 85012
Telephone: (602) 237-5076
Facsimile: (602) 314-6273
david@deisenbergplc.com
*Attorney for Andrew Padilla*

Joy Malby Bertrand (AZ Bar No. 024181)
JOY BERTRAND ESQ LLC
P.O. Box 2734
Scottsdale, Arizona 85252
Telephone: (602)374-5321
Facsimile: (480)361-4694
joy.bertrand@gmail.com
*Attorney for Joye Vaught*

1   The Court's proposed jury instruction relating to the First Amendment reads:

2   All speech is presumptively protected by the First Amendment to the United
    States Constitution.  Accordingly, you must presume that speech is protected.
3   *Speech relating to illegal activity, however, is not protected.*  Prostitution is illegal in 49
    states and most of Nevada.  *Therefore, advertisements or solicitations for prostitution*
4   *have no protection.*  The government has the burden to establish that the
    particular expressions of speech at issue are not protected by the First
5   Amendment.  You may consider any direct or circumstantial evidence in
    assessing *whether any ads in this case related to illegal activity.* (emphasis added).
6

7   As discussed below, Defendants object to the italicized portions of the instruction as being

8   inconsistent with decisions of the United States Supreme Court, the Ninth Circuit, and other

9   courts.

10  **1.    The Ninth Circuit Uses the Phrase "Speech Relating to Illegal Activity" As a
        Shorthand Reference to Supreme Court's Decisions, Not As a Constitutional**
11      **Standard To Be Applied to a Publisher of Third-Party Speech.**

12          **A.    The Supreme Court's Decisions in *Pittsburgh Press*, *Central Hudson*,
                and *Williams* Apply Narrowly to Speech That Itself Proposes Illegal**
13              **Transactions and to Criminal Solicitation—Not to All Speech "Related"
                to Illegal Activity.**
14

15          In *Pittsburgh Press*, the Pittsburgh Press Co. was charged with violating a city ordinance

16  prohibiting the publication of sex-designated "help wanted" ads, by allowing employment

17  ads to be posted in its daily newspaper under headings designating employment preferences

18  by sex (*e.g.*, "'Male Help Wanted,' 'Female Help Wanted,' and 'Male-Female Help Wanted').

19  *Pitt. Press Co. v. Pitt. Comm. on Human Relations*, 413 U.S. 376, 377-80 (1973).  The Pittsburgh

20  Press asserted that the city ordinance violated the First Amendment by restricting its

21  editorial judgment.  The Supreme Court rejected newspaper's position, saying:

22          "We have no doubt that a newspaper constitutionally could be forbidden to
            publish a want ad proposing a sale of narcotics or soliciting prostitutes.  Nor
23          would the result be different if the nature of the transaction were indicated by
            placement under columns captioned 'Narcotics for Sale' and 'Prostitutes
24          Wanted' rather than stated within the four corners of the advertisement…Any
            First Amendment interest which might be served by advertising an ordinary
25          commercial proposal…is altogether absent when *the commercial activity itself is*
            *illegal* and the restriction on advertising is incidental to a valid limitation on
26          economic activity."

27  *Id.* at 388-89 (emphasis added).  The Supreme Court concluded, saying:  "We hold only that

28  the Commission's modified order, narrowly drawn to prohibit placement in sex-designated

3

1  columns of advertisements for nonexempt job opportunities, does not infringe the First

2  Amendment rights of Pittsburgh Press." *Id.* at 391.  The Supreme Court's holding in

3  *Pittsburgh Press* only goes so far as to say that the First Amendment does not protect a

4  publisher's knowing publication of classified ads that are *per se* unlawful (whether because the

5  *content* of the ads proposes facially unlawful transactions or because the ads were posted in

6  *per se* unlawful categories).  *Id.* at 388-89, 391.  The Supreme Court's decision cannot be read

7  to suggest that the government could forbid, or prosecute a newspaper or website for,

8  publishing facially lawful advertisements in lawful categories because those ads might be

9  *related to* unlawful activity—such as an employer soliciting job applications with facially lawful

10  ads but then discriminating based on sex when hiring employees.

11       Later, in *Cent. Hudson Gas & Elec. Corp. v. Pub. Svc. Comm.*, 447 U.S. 557 (1980), the

12  Supreme Court referred to its holding in *Pittsburgh Press* as addressing "speech related to

13  illegal activity," but those five words of *dicta* in *Central Hudson* merely were a shorthand

14  characterization of *Pittsburgh Press*—not a sweeping expansion of its narrow holding.[1]

15       In *United States v. Williams*, 553 U.S. 285, 288 (2008), the Supreme Court considered

16  whether a federal statute criminalizing the "solicitation of child pornography" was

17  unconstitutional for being "overbroad under the First Amendment."  That statute, 18 U.S.C.

18  § 2252A(a)(3)(B), "criminalize[d] only offers to provide or requests to obtain contraband—

19  child obscenity and child pornography involving actual children, both of which are

20  proscribed and the proscription of which is constitutional."  *Id.* at 297.  In holding the

21  statute constitutional, the Supreme Court again relied on *Pittsburgh Press*:

22       "Offers to engage in illegal transactions are categorically excluded from First
         Amendment protection.  *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human
23       Relations*, 413 U.S. 376, 388 [] (1973)…  [T]he rationale for the categorical

24  _____

25  [1]  Indeed, the entirety of the Supreme Court's discussion of *Pittsburgh Press* in *Central Hudson*
    was:  "The government may ban forms of communication more likely to deceive the public
26  than to inform it, *Friedman v. Rogers*, *supra*, at 13, 15–16, 99 S.Ct., at 896, 897; *Ohralik v. Ohio
    State Bar Assn.*, *supra*, at 464–465 [], or commercial speech related to illegal activity, *Pittsburgh*
27  *Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 [] (1973)."  *Cent. Hudson*, 447 U.S. at
    563-64.  As such, the Supreme Court's five-word, shorthand description of the holding in
28  *Pittsburgh Press* must be read as addressing speech proposing a facially illegal transaction.

exclusion…is based…on the principle that *offers to give or receive what it is unlawful to possess* have no social value and thus, like obscenity, enjoy no First Amendment protection, *see Pittsburgh Press*, *supra*, at 387–389, 93 S.Ct. 2553."

(emphasis added).  The Supreme Court's holding in *Williams* was narrow and applied only to offers to give or obtain contraband, which *necessarily* is unlawful—not to facially lawful speech "relating to illegal activity."

In sum, *Pittsburgh Press* teaches only that advertisements for a "commercial activity [that] itself is illegal" are unprotected by the First Amendment, *Central Hudson's dicta* adds nothing to the holding in *Pittsburgh Press*, and *Williams* holds only that criminal solicitations of contraband are unprotected.  Nothing in these decisions suggests that speech proposing a lawful transaction—such as a dating ad, a massage ad, or an escort ad—is unprotected if the party proposing the facially lawful transaction ultimately uses such an ad as a prelude to proposing and consummating an unlawful transaction.

> **B.      The Ninth Circuit Has Narrowly Construed *Pittsburgh Press*, *Central Hudson*, and *Williams*, Focusing on the Content of the Speech and Not Any Conduct Associated with the Speech.**

The Ninth Circuit has narrowly construed *Pittsburgh Press*, *Central Hudson*, and *Williams* as applying to speech expressly proposing illegal transactions.  The Ninth Circuit also has expressly rejected the contention that facially lawful speech that might *facilitate* the illegal activity of third parties falls outside the scope of the First Amendment.

First, in *Metro Lights, L.L.C. v. City of L.A.*, 551 F.3d 898, 904 n.7 (9th Cir. 2009), a case involving commercial advertising, the Ninth Circuit narrowly construed *Central Hudson's* language "related to unlawful activity" to mean "whether the goods or services the party advertises are illegal."  In particular, the Ninth Circuit said the district court:

> "relied in part on the observation that '[a]dvertising is undisputably a lawful activity.'  That is not the point, since not all advertisements receive First Amendment protection.  *Central Hudson* asks if the commercial speech is "related to unlawful activity."  447 U.S. at 564.  Thus, *in the context of advertising, one must ask whether the goods or services the party advertises are illegal.*

*Id.* (emphasis added).

Four years later, in *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808 (9th Cir. 2013), the Ninth Circuit again narrowly construed *Pittsburgh Press* and *Central Hudson* as focusing on the content

of the speech at issue and whether that content proposes an illegal transaction:

> "Commercial speech merits First Amendment protection only if 'the communication is neither misleading nor related to unlawful activity.'  Arizona argues that the day labor provisions are permissible because they regulate speech only when associated with the unlawful activity of blocking or impeding traffic.  Arizona's proposed rule would be a novel extension of *Central Hudson's* legality requirement, which has traditionally focused on *the content of affected speech* - i.e., *whether the speech proposes an illegal transaction - instead of whether the speech is associated with unlawful activity*…. Some decisions have expressly phrased the legality requirement as whether '*the transactions proposed* in the forbidden [communication] *are themselves illegal* in any way.'…However it is formulated, we think it clear that Central Hudson's legality requirement requires us to evaluate *the content of a commercial message* … Nothing in *Pittsburgh Press* or any other case Arizona cites suggests that we should expand our inquiry beyond *whether the affected speech proposes a lawful transaction* to whether the affected speech is conducted in a lawful manner."

*Id.* at 821-22 (emphasis added).

In 2020, the Ninth Circuit reiterated its holdings in *Metro Lights* and *Valle del Sol*, construing *Pittsburgh Press* as applying *only* to speech that *itself* proposes an illegal transaction (*i.e.* speech proposing a facially illegal transaction), while also emphatically rejecting the Screen Actors Guild's contention that *Pittsburgh Press* applies to facially lawful speech "that facilitates illegal conduct:"

> *Pittsburgh Press* implicates *only* those instances when the state restricts *speech that itself proposes an illegal transaction.  See, e.g., United States v. Williams*, 553 U.S. 285, 297 [] (2008) ("Offers to engage in illegal transactions are categorically excluded from First Amendment protection." (citing *Pittsburgh Press Co.*, 413 U.S. at 388 [])); *Valle Del Sol Inc.*, 709 F.3d at 822 ("Nothing in *Pittsburgh Press*…suggests that we should expand our inquiry beyond whether the affected speech proposes a lawful transaction….").…If accepted, SAG's interpretation of *Pittsburgh Press* would require this court to permit the restriction not only of speech that proposes an illegal activity but also facially inoffensive speech that a third-party might use to facilitate its own illegal conduct.   But as the Supreme Court has noted, 'it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party.'  *Bartnicki v. Vopper*, 532 U.S. 514 [] (2001)…"

*IMDb.com Inc. v. Bacerra*, 962 F.3d 1111, 1123 (9th Cir. 2020) (emphasis added).[2]

---

[2] *Accord Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 114 (2d Cir. 2017) ("[T]he First Amendment offers no protection to speech that proposes a commercial transaction if consummation of that transaction would *necessarily* constitute an illegal act.  However, if, as here, there are plausible ways to complete a proposed transaction lawfully, speech proposing that transaction 'concerns lawful activity' and is therefore

1    In sum, despite the seemingly broad language in *Central Hudson* ("speech related to

2  illegal activity") and *Williams* ("offers to engage in illegal transactions"), the Ninth Circuit has

3  held that language must be narrowly construed as applying only to either speech that *itself*

4  proposes an illegal transaction or to speech that constitutes criminal solicitation—not to

5  speech that might be *related to* an illegal transaction.  Moreover, in *IMDB* the Ninth Circuit

6  expressly rejected the argument that *Pittsburgh Press* permits the government to criminalize

7  the publication of facially inoffensive speech on the grounds that a third-party might use that

8  speech to facilitate its own illegal conduct—yet that rejected concept is the cornerstone of

9  the government's case.

10    **C.    Even if a Charged Ad Is Construed As a Criminal Solicitation, the First
           Amendment Nonetheless Protects the Publisher of Such Third-Party**
11           **Speech**

12    As the Court will learn at trial, forty-nine of the fifty charged ads propose facially

13  lawful dating, massage, and escorting transactions and, as such, are not themselves "offers to

14  engage in illegal transactions" or criminal solicitations.  Nonetheless, even if those ads are

15  construed to be unprotected criminal solicitations made by the persons posting the ads (or

16  unprotected speech incident to their criminal conduct), that does not mean Backpage.com's

17  publication of those third-party ads was outside of the protection of the First Amendment.

18  *Backpage.com, L.L.C. v. McKenna*, 881 F. Supp. 2d 1262, 1280-81 (W.D. Wash. 2012).

19    In *McKenna*, the State of Washington passed a statute targeting Backpage.com that

20  criminalized the publication of any content containing "any 'explicit or implicit offer' of sex

21  for 'something of value'" depicting a minor.  *Id.* at 1268.  In defending its statute from a

22  constitutional challenge, the state claimed that "all online advertisements for escort services

23  actually are offers for prostitution" and argued that the statute reached "only offers to

24  engage in illegal conduct."  *Id.* at 1282.  The court rejected the state's claim that the statute

25  reached "only offers to engage in illegal conduct," holding that the statute did "not fall

26  within the exception for offers to engage in illegal activity" because the statute "prohibit[ed]

27  

28  protected commercial speech.") (emphasis in original); *accord Greater Philadelphia Chamber of
    Comm. v. City of Philadelphia*, 949 F.3d 116, 142 & n.170 (3d Cir. 2020) (similar).

7

1    not only 'offers' to engage in commercial sex acts, but also the direct and indirect

2    publication, dissemination, and display of such offers." *Id.* at 1280-81.  In making the clear

3    constitutional distinction between offers to engage in illegal transactions and the publication

4    of those offers by a third-party website, the court held:  "The third-party publication of

5    offers to engage in illegal transactions does not fall within 'well-defined and narrowly limited

6    classes of speech' that fall outside of First Amendment protection." *Id.* at 1281.  In other

7    words, even if the poster of an ad would have been unprotected by the First Amendment

8    because the ad constituted an offer to engage in an illegal transaction, a third party website

9    publishing that ad nonetheless would be protected by the First Amendment (absent another

10   exception under the First Amendment, such as publishing the ad in a manner that would

11   constitute aiding and abetting under traditional accomplice liability principles).  To be clear,

12   this aspect of the holding in *McKenna* is based on the First Amendment, not the

13   Communications Decency Act.  Therefore, this principle articulated in *McKenna* is equally

14   applicable here.

15            Further, the focus in the proposed First Amendment instruction on the *activities*

16   associated with speech, rather than on the *content* of the speech itself, would leave a publisher

17   of third-party speech with no means to distinguish between protected speech and

18   unprotected speech, since that distinction could not be discerned from the *content* of the

19   speech (*i.e.* "whether the speech proposes an illegal transaction")*,* but instead would require

20   the publisher to have advance knowledge of the *activities* of the person posting each ad (*i.e.*

21   "whether the speech is associated with unlawful activity").  *Valle del Sol*, 709 F.3d at 822.  In

22   *McKenna*, the court rejected the idea that the First Amendment allows a publisher to "be put

23   at complete peril in distinguishing between protected and unprotected speech" and struck

24   down a Washington statute that attempted to impose such a quandary on publishers of

25   third-party adult advertising by criminalizing the publication of any content containing "any

26   'explicit or implicit offer' of sex for 'something of value'" depicting a minor.  *Id.* at 1282.

27   The court held that the Washington legislature's attempt to present such a "Hobson's choice

28   to website operators like Backpage.com" with the aim of forcing it to "ceas[e] the posting of

advertisements for commercial sex acts altogether" was unconstitutional.  *Id.*  Explaining its

reasoning, the court said:

> "The pimp that publishes the advertisement certainly 'knows' whether his offer is for sex, whether explicitly or implicitly.  However, what does it mean for the website operator to 'know' that an advertisement 'implicitly' offers sex?  In Washington, 'a person acts knowingly or with knowledge when ... he or she has information which would lead a reasonable person in the same situation to believe that facts exist which facts are described by a statute defining an offense.'  Wash. Rev. Code Ann. § 9A.08.010(b)(ii).  However, where an online service provider publishes advertisements that employ coded language, a reasonable person could believe that facts exist that do not in fact exist:  an advertisement for escort services may be just that….[Also] if [an] offer is implicit, how can a third-party ascertain that which is being offered before the transaction is consummated?"

*Id.* at 1279; *accord Backpage.com, L.L.C. v. Cooper*, 939 F. Supp. 2d 805, 834 (M.D. Tenn. 2013);

*Backpage.com, L.L.C. v. Hoffman*, 2013 WL 4502097, at *10 (D.N.J. Aug. 20, 2013)

("Describing criminal conduct as anything that is 'implicit' is inherently vague, because it

means '[n]ot directly expressed [and] existing [only] inferentially' and 'fails to clearly mark the

boundary between what is permissible and impermissible.'… [L]aws regulating speech are

void for vagueness when they are so ambiguous that a reasonable person cannot tell what

expression is forbidden and what is allowed…").

Unlike the statutes held to be facially unconstitutional in *McKenna*, *Cooper*, and

*Hoffman*, the Travel Act is a law of general applicability that does not directly target speech.

But that does not mean that the Travel Act escapes First Amendment scrutiny if used to

target speech, as the government seeks to do here.  *People for the Ethical Treatment of Animals,*

*Inc. v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 827-28 (4th Cir. 2023) ("[A] State may not

harness generally applicable laws to abridge speech without first ensuring the First

Amendment would allow it….  Laws cast in broad terms can restrict speech as much as laws

that single it out….  General or not, the First Amendment applies when [a statute] is used to

silence protected speech.").

1    RESPECTFULLY SUBMITTED this 2nd day of August, 2023,

2

3                              Paul J. Cambria, Jr.
                              Erin McCampbell Paris
4                              LIPSITZ GREEN SCIME CAMBRIA LLP

5                              By:     /s/ Paul J. Cambria, Jr.
6                                      Paul J. Cambria, Jr.
                                       Attorneys for Michael Lacey
7

8    *Pursuant to the District's Electronic Case Filing Administrative Policies and Procedures Manual (Jan.*
     *2020) § II (C) (3), Paul J. Cambria hereby attests that all other signatories listed, and on whose behalf this*
9    *filing is submitted, concur in the filing's content and have authorized its filing.*

10
                                   Gary S. Lincenberg
11                                 Gopi K. Panchapakesan
                                   BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
12                                 DROOKS, LINCENBERG & RHOW, P.C.

13
                              By:     /s/ Gary Lincenberg
14                                     Gary Lincenberg
                                       Attorneys for John Brunst
15

16                                 Eric W. Kessler
                                   KESSLER LAW OFFICE
17

18                            By:     /s/ Eric W. Kessler
                                       Eric W. Kessler
19                                     Attorneys for Scott Spear

20                                 Bruce Feder
                                   FEDER LAW OFFICE, P.A.
21

22                            By:     /s/ Bruce Feder
                                       Bruce Feder
23                                     Attorneys for Scott Spear

24                                 David Eisenberg
25                                 DAVID EISENBERG, P.L.C.

26                            By:     /s/ David Eisenberg
27                                     David Eisenberg
                                       Attorneys for Andrew Padilla
28

                                       10

Joy Bertrand
JOY BERTRAND, ESQ.

By:    /s/ Joy Bertrand
       Joy Bertrand
       Attorneys for Joye Vaught

On August 2, 2023, a PDF version of this document was
filed with Clerk of the Court using the CM/ECF System
for filing and for Transmittal of a Notice of Electronic
Filing to the to the CM/ECF registrants who have
entered their appearance as counsel of record