UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,          )
                                   ) No. 2:18-cr-00422-DJH
                    Plaintiff,     )
                                   )
            vs.                    )
                                   ) Phoenix, Arizona
Michael Lacey, et al.,             ) September 8th, 2023
                                   ) 9:30 a.m.
                    Defendants.    )
_____    )


**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**


<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**TELEPHONIC HEARING RE: EXHIBITS**</u>

<u>**AS TO LACEY, SPEAR, BRUNST, PADILLA, VAUGHT**</u>


Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Government:
    UNITED STATES ATTORNEY'S OFFICE
    By:  **Mr. Kevin M. Rapp, Esq.**
        **Mr. Andrew C. Stone, Esq.**
        **Mr. Peter Shawn Kozinets, Esq.**
        **Ms. Margaret Wu Perlmeter, Esq.**
    40 North Central Avenue, Suite 1800
    Phoenix, Arizona  85004-4408
    kevin.rapp@usdoj.gov
    peter.kozinets@usdoj.gov
    andrew.stone@usdoj.gov
    margaret.perlmeter@usdoj.gov
    - and -
    UNITED STATES DEPARTMENT OF JUSTICE
    By:  **Mr. Austin Berry, Esq.**
    1301 New York Avenue NW, 11th Floor
    Washington, DC  20005
    austin.berry2@usdoj.gov

For the Defendant Michael Lacey:
    LIPTSITZ GREEN SCIME CAMBRIA, LLP
    By:  **Mr. Paul J. Cambria, Esq.  (Telephonic)**
    42 Delaware Avenue, Suite 120
    Buffalo, New York  14202
    pcambria@lglaw.com

For the Defendant Scott Spear:
    KESSLER LAW OFFICE
    By:  **Mr. Eric Walter Kessler, Esq.  (Telephonic)**
    6720 North Scottsdale Road, Suite 210
    Scottsdale, Arizona  85253
    eric.kesslerlaw@gmail.com
    - and -
    FEDER LAW OFFICE, PA
    By:  **Mr. Bruce S. Feder, Esq.  (Telephonic)**
    2930 East Camelback Road, Suite 160
    Phoenix, Arizona  85016
    bf@federlawpa.com

<pre>
 1                   A P P E A R A N C E S (Cont'd)

 2    For the Defendant John Brunst:
           BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
 3         By:  Mr. Gopi K. Panchapakesan, Esq. (Telephonic)
           1875 Century Park E, Suite 2300
 4         Los Angeles, California  90067
           gpanchapakesan@birdmarella.com
 5         glincenberg@birdmarella.com
           aneuman@birdmarella.com
 6
      For the Defendant Andrew Padilla:
 7         DAVID EISENBERG, PLC
           By:  Mr. David S. Eisenberg, Esq. (Telephonic)
 8         3550 North Central Avenue, Suite 1155
           Phoenix, Arizona  85012
 9         david@deisenbergplc.com

10    For the Defendant Joye Vaught:
           JOY BERTRAND, ESQ, LLC
11         By:  Ms. Joy Malby Bertrand, Esq (Telephonic)
           P.O. Box 2734
12         Scottsdale, Arizona  85252-2734
           Joy@joybertrandlaw.com
13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

**P R O C E E D I N G S**

1

2          (Court was called to order by the courtroom deputy.)

3          (Defendants Lacey and Padilla are present

4    telephonically.)

5          (Defendants Spear, Vaught, and Brunst are not

6    present.)

7          (Proceedings commence at 9:30 a.m.)

8          THE COURTROOM DEPUTY:  This is Case Number CR-18-422,

9    United States of America vs. Michael Lacey and others, on for

10   telephonic hearing.                                         09:31:03

11          Counsel, please announce your presence for the record.

12          MR. RAPP:  Good morning.  Kevin Rapp, Austin Berry,

13   Peter Kozinets, Margaret Perlmeter, Andy Stone on behalf of the

14   United States.  Also at counsel table is IRS Special

15   Agent Richard Robinson.                                     09:31:19

16          THE COURT:  Good morning.

17          MR. CAMBRIA:  Good morning, Your Honor.  Paul Cambria.

18   And my client is on the phone.

19          THE COURT:  Good morning.

20          MR. KESSLER:  Good morning, Your Honor.  Eric Kessler   09:31:31

21   and Bruce Feder for Mr. Spear.  We're both on the phone.

22   Mr. Spear's presence is being waived, if that's acceptable.

23          THE COURT:  Yes.  Good morning.

24          MR. PANCHAPAKESAN:  Good morning, Your Honor.  Gopi

25   Panchapakesan on behalf of Mr. Brunst.  And we're waiving his  09:31:49

1    appearance.

2            THE COURT:  And good morning.

3            MR. EISENBERG:  Good morning, Your Honor.  David

4    Eisenberg on behalf of Mr. Padilla.  He is present next to me

5    on my line.                                                  09:32:01

6            THE COURT:  Good morning.

7            MS. BERTRAND:  Good morning.  Joy Bertrand appears for

8    Joye Vaught.  I would ask that Mrs. Vaught's appearance be

9    waived today.  Thank you.

10           THE COURT:  Yes, it may.  Good morning.              09:32:15

11           Well, good morning, counsel.  I cancelled yesterday's

12   proceeding because I started losing my voice on Wednesday

13   evening.  So I'm slowly getting it back, so I beg your

14   indulgence.  But I think there's a manner in which I'd like to

15   proceed that might expedite how we proceed.                  09:32:42

16           And I will tell you that I did review all but about

17   five of the exhibits in the next batch of 50 yesterday.  And I

18   also had time the night prior to look at the prior order,

19   Document 1212, as well as Document 1159.  Those orders, as you

20   will recall, were previous orders related to certain sets of   09:33:22

21   exhibits that there were objections to.

22           And, for the most part, I will say that I will adhere

23   to those orders, although the larger question looms about

24   whether or not the exhibits that are related to these two

25   orders -- and I think there's an additional order that I didn't 09:33:54

1  get to, and that might be Document 1165, yet, but I have that

2  on my desk.  Well, actually, it's right here.  I don't know

3  specifically whether or not there has been a change in the

4  exhibits.  And that's the only question I have.

5  But before that gets answered, what I would say is at       09:34:24

6  least in the next batch of 50 exhibits that I've reviewed --

7  I'll tell you the ones that I did not get to.  I didn't look

8  at 1895 and 1895c, nor did I look at 933a or 600.

9  MR. FEDER:  I'm sorry.  What was the last two?

10  THE COURT:  Who was that?                                   09:35:16

11  MR. FEDER:  Bruce Feder.

12  THE COURT:  933a and 600.

13  But I can ask the government to put those up.  But

14  what I would say is, for the most part, again, with the caveat

15  that the government will be able to lay sufficient foundation  09:35:38

16  for the existence of a conspiracy, then I would suggest that

17  all of the emails from or to Mr. Ferrer using his Backpage

18  email address are relevant and admissible predominantly under

19  801(d)(2)(A) and (D).  I would reserve an 801(d)(2)(E) ruling

20  simply because I'd like to also see whether or not the          09:36:26

21  particular email is related to in furtherance of the

22  conspiracy.  So in terms of the batches of emails from and to

23  Mr. Ferrer or on which he is cc'ed, I would find that they

24  would be admissible.

25  Again, subject -- and I -- again, I will remind             09:36:54

UNITED STATES DISTRICT COURT

defense counsel, indeed, government counsel, when defense puts

on its case, that you should layer objection at the time under

the rule, and then I can sustain or overrule.  But at least

you'll have a record.

So, in any event, I would say that for those                    09:37:18

categories of emails, from or to Mr. Ferrer or those he was

cc'ed on.  And so I'll say that.

With regard to the letters that were included in that

last batch -- and I might be wrong, but they -- I think they

were 593 -- let me -- let me look at this.  They're -- they're   09:37:52

the Attorney General letters, the State Attorney General

letters, and the notation by the government is that they're

being offered not for the truth.  But I think Judge Brnovich

already ruled that those letters could come in to show

knowledge, to show knowledge of what others had alerted         09:38:25

Backpage -- who just joined?

Who just joined?  Or who left?

Well, I guess they can't speak if they left.

But, in any event, the -- I would adhere to

Judge Brnovich's ruling with regard to those letters.           09:39:01

Here again, when the government, assuming, lays the

proper foundation for those letters coming in, you may object,

and I will consider the objection anew.  Just based on the

prior ruling, however, I think they are relevant.  They're

probative, they go to knowledge of the defendants about what    09:39:31

1  others viewed were on their page, and they were alerted to

2  them.  I also believe that there was a -- and, again, I don't

3  recall what the precise exhibit was, but there were at least a

4  couple of exhibits that had plans that were forwarded by

5  Mr. Ferrer to -- I believe it was Adam or Jess.  I can't          `09:40:06`

6  remember which.

7          MR. RAPP:  Yes, Adams.

8          THE COURT:  Yes, Adams.

9          And to the extent that, again, foundation is laid,

10  those categories of exhibits that included Mr. Ferrer in that    `09:40:22`

11  conversation about business plans -- or I recall there were a

12  couple of emails, for example, in which a whole -- whole list

13  of staff were included about terms or looking at terms,

14  removing terms.  Those I find relevant, probative, and, again,

15  so long as the foundation is laid.  And so that's how we will   `09:40:55`

16  proceed on those.

17          But, in any event, the way I think we should -- there

18  were a couple of questions I did have, and perhaps we can start

19  with those.  And going down the line starting from -- I think

20  we were starting at 1857, Mr. Rapp; is that correct?  Or was it  `09:41:27`

21  567?  I ...

22          MR. RAPP:  I have us starting at 1174.

23          THE COURT:  Oh, okay.  1174.  Okay.  So what I

24  could -- what I would say is we could go down the line, and I

25  can see if any defendant has a particular objection they wish   `09:41:52`

1    to raise on the exhibit that is something aside and apart from

2    what has already been briefed in the motions that

3    Judge Brnovich issued orders on or that I've just stated my

4    position on with regard to those categories of -- of evidence

5    and documents to be introduced.                                    09:42:32

6            Let me know if you have any questions about how to

7    proceed then, Mr. Rapp.

8            MR. RAPP:  No, I don't.

9            Madam clerk, if you could turn on the counsel table.

10           THE COURT:  Can you -- can you use the microphone.        09:42:48

11           MR. RAPP:  Yes.  My apologies.

12           THE COURT:  Liliana just informed me that we did stop

13   at 1857.

14           MR. RAPP:  Yeah.  I believe 1857 might have been a

15   duplicate, so let me just --                                       09:43:16

16           THE COURT:  What?

17           Wait.

18           Okay.  Can -- can whomever is having the side

19   conversation stop.

20           Okay.  1857 actually appears as 1857a and 1857b.          09:43:35

21           MR. RAPP:  Yes.  Just to clear up the confusion, 1857

22   is the transmission email for 1857a and b.  It was out of

23   order.  It is a email from Carl -- the transmission email at

24   1857 is from Carl Ferrer to admin@theeroticreview where he is

25   simply confirming that the check is in the mail.                   09:44:11

1           And then 1857a and b, just going back to those two

2    exhibits --

3           THE COURT:  Okay.  So --

4           MR. RAPP:  -- 1857 -- just to look at it on your

5    screen, this is this email talking about batches.  And then b      09:44:30

6    is another Roger Williams email where he is confirming

7    reciprocal links between The Erotic Review and Backpage.

8           THE COURT:  Okay.  So let me just -- I think we've

9    already addressed 1857.

10           Let's go to 567a.  Is there an objection to 567a?  I      09:45:04

11    mean -- and, again, my preference would be if these are -- I

12    didn't write them down.  Actually, I have a corresponding --

13    your corresponding exhibit list.  I can use that.  But to the

14    extent that they are emails to and from Mr. Ferrer or he's

15    copied thereon, they're going to be presumed relevant and      09:45:36

16    admissible under the prior order.

17           And then, again, unless there's some specific

18    additional objection that you wish to make, and that includes

19    if there -- if you have a prejudicial objection, I'd like to

20    hear that now.      09:46:01

21           567a then.

22           MR. RAPP:  567a is on your screen.  It's a invoice to

23    David Elms at The Erotic Review.  It's to Elms Web Services.

24    It conceals the fact that the $4,000 being paid by Backpage is

25    actually going to The Erotic Review.      09:46:27

1            THE COURT:  All right.  A specific objection?

2            MR. FEDER:  Judge, this is Bruce Feder.

3            Other than what we talked about last time, which is

4    401, 403, 801, and it may be for some of these 106, is it

5    necessary for purposes of this hearing to even tell you that          09:46:47

6    unless we have a special objection to preface this with some

7    other basis, or just can it be assumed?

8            THE COURT:  It can be assumed.  It can be assumed --

9            MR. FEDER:  Okay.

10           THE COURT:  -- that you're -- and, again, it can be          09:47:00

11   assumed that you're going to make those objections.  But if

12   there is going to be a specific objection related to, for

13   example, 403, you know, I think that it's appropriate for us

14   to get that out, and we can address it instead of taking the

15   jury's time.                                                          09:47:25

16           All right.  So 1174.

17           MR. PANCHAPAKESAN:  Your Honor, this is

18   Mr. Panchapakesan.

19           MS. BERTRAND:  Your Honor.

20           THE COURT:  I'm sorry.  Okay.  Let me take first --          09:47:34

21   who did I hear first?  Mr. Kessler.  And then I'll go with

22   Ms. Bertrand.

23           Mr. Kessler, is that you?

24           MR. KESSLER:  That was not me.

25           THE COURT:  Okay.  Who else?                                  09:47:48

 1          MR. PANCHAPAKESAN:  This is Mr. Panchapakesan.  Are

 2    you able to hear me okay?

 3          THE COURT:  Yes.

 4          MR. PANCHAPAKESAN:  Your Honor, I just -- I wanted to

 5    briefly just clarify your earlier remarks about Rule 801 just          09:47:56

 6    to make sure I have it right.

 7          So -- so in terms of emails to or from Mr. Ferrer, as

 8    I understand it, Rule 801(b)(2)(A) concerns admissions by a

 9    party opponent.  You know, to the extent it's an email from one

10    of our clients, I think it would probably qualify under that --       09:48:24

11    under that exception.  But since Ferrer's not a party, I don't

12    know that that exception would apply to emails he sent.

13          And then as to sub D, which concerns statements made

14    by a party's agent, since Backpage is not a party, you know, it

15    would not be Ferrer as an agent of Backpage.  So it does seem          09:48:50

16    that as to these Ferrer emails we're talking about the

17    co-conspirator exception.  And I understand that the Court, you

18    know, has already explained what foundation must be laid, but I

19    just -- I wanted to clarify that.

20          THE COURT:  So what was the question?                           09:49:08

21          MR. PANCHAPAKESAN:  Yeah.  The question, Your Honor,

22    is -- is I think the Court suggested that -- that emails sent

23    by Mr. Ferrer would qualify under -- under the hearsay

24    exception under 801(b)(2)(A).  I don't know that that would

25    apply to -- to Ferrer's statements, because he's not -- he's          09:49:31

```
 1   not a party.  And so it wouldn't be an admission by a party

 2   opponent.

 3           MR. RAPP:  Judge, can I short-circuit this?

 4           THE COURT:  I think I said it would be either under

 5   801(d)(2)(A) or (D) and possibly (E), but I was reserving my        09:49:46

 6   ruling with regard to (E).

 7           And with regard to, I think, your second statement

 8   about Backpage not being a party, I think there was a whole

 9   order that addressed that argument, and that was -- I think

10   that was Document 1212.  And I'm not going to revisit it.          09:50:11

11           Mr. Rapp.

12           MR. RAPP:  Well, Mr. Ferrer is a co-conspirator.  And,

13   in fact, he's pled guilty to that.  And so any email that he is

14   sending, we expect his testimony to be that he is furthering a

15   conspiracy.                                                         09:50:29

16           THE COURT:  That's what I understood.

17           All right.

18           MS. BERTRAND:  This is Joy Bertrand.  I'd like to be

19   heard if the Court would allow.

20           THE COURT:  Well, I was waiting to see if Mr. --          09:50:44

21           MS. BERTRAND:  Okay.

22           THE COURT:  -- Panchapakesan had anything --

23           MR. PANCHAPAKESAN:  No.

24           THE COURT:  -- further.

25           MR. PANCHAPAKESAN:  No, Your Honor.                        09:50:50
```

1          THE COURT:  All right.  Ms. Bertrand.

2          MS. BERTRAND:  Your Honor, my additional objections to

3     this would be cumulative and waste of time.  I also believe

4     that I -- I don't think the government can make a blanket

5     assertion that anything Carl Ferrer said over a 14-year period          09:51:04

6     is a statement in furtherance of a conspiracy.  They're going

7     to have to lay the framework that not only did he make that

8     statement or that a co-conspirator, someone who knowingly and

9     willingly joined the same conspiracy to which our clients are

10    charged, that it was done in furtherance of that conspiracy,          09:51:28

11    not a different one.  And I think that is going to be -- we

12    don't have to decide that today, but I just want to flag that

13    as an issue.

14          But I do think that this is -- we were talking about

15    this in the last hearing, and these are a bunch of bills          09:51:41

16    between TR -- TER and communication back and forth with Ferrer

17    and someone at TER sometimes, maybe it's Mr. Elms sometimes,

18    maybe it's someone else.

19          Okay.  TER existed.  Ferrer was talking to them.

20    There was money exchanged.          09:52:01

21          I don't think that they need to pile on about this,

22    and especially in a trial where we now are several days behind

23    with this jury.  I am very sensitive to this idea of duplic- --

24    duplic- -- duplication and redundancy in the government's

25    proof.          09:52:22

1          So I -- I'm also lodging here objections under 403 as

2    cumulative and a waste of time in addition to my additional

3    concerns about the foundation the government will be able to

4    lay as to these co-conspirator statements.

5          THE COURT:  Well, I don't want to belabor the point        09:52:38

6    again.  The caveat has always been that the government at the

7    outset has to establish the existence of a conspiracy and that

8    they have to show that the defendant had knowledge of and

9    participated in the conspiracy and that any exhibit is for the

10   purposes of showing -- there has to be a prima facie showing    09:53:12

11   first that whatever that exhibit is was made in furtherance of

12   the conspiracy's objective.

13         That goes without saying.  But with regard to

14   cumulative, I agree to the extent that there is multiple same

15   exhibits in the same time frame.  You've got a long time frame  09:53:43

16   alleged in the indictment.  And so I would agree with the

17   cumulative objection if, say, for example, all of the exhibits

18   of invoices are with respect to something that happened in

19   2008.  And so be mindful of that.  It may become cumulative and

20   a waste of time.                                                09:54:12

21         And so let's move forward.

22         That was 567?

23         MR. RAPP:  That was 567a.

24         This is 1174.  This is a email from Carl Ferrer to

25   Jess Adams.                                                     09:54:24

UNITED STATES DISTRICT COURT

```
 1              Can you track that check to TER, he is telling Jess
 2    Adams.
 3              And he is -- below just demonstrates that TER is being
 4    paid for this relationship that they have.
 5              THE COURT:  I'm assuming the same objections.          09:54:42
 6              Let's go to 1935.
 7              MR. RAPP:  1935 is a email from Carl Ferrer to Scott
 8    Spear talking about budgets.  It talks about the affiliate
 9    program.  Just basically the fact that he is referring to Carl
10    Ferrer -- or to Scott Spear, rather, significant information     09:55:19
11    about budget matters.
12              THE COURT:  24.
13              MR. FEDER:  That would be another -- that would be --
14    Bruce Feder.  That would also be a 106 objection.
15              THE COURT:  Are you -- Mr. Feder, was that in relation 09:55:42
16    to 1935?
17              MR. FEDER:  Yes.
18              THE COURT:  All right.
19              MR. RAPP:  This is Exhibit 24.  And 24a is a budget
20    meeting.  So 24 is a transmission email between Carl Ferrer and  09:56:04
21    Jess Adams.
22              Can I get the file?  It wasn't attached to Scott's.
23    Looking forward to the presentation.
24              And then 24a is a budget presentation which, among
25    other things, talks about The Erotic Review, high-page peak      09:56:33
```

UNITED STATES DISTRICT COURT

1   view for referral.

2          That's obviously relevant in furthering this

3   relationship.

4          THE COURT:  All right.  570.

5          MR. RAPP:  570 is a email between Carl Ferrer and Dave    09:56:58

6   Elms.  It is talking about meeting to train TR -- TER staff to

7   increase links and referral traffic.

8          So it just demonstrates the relationship between

9   Backpage and The Erotic Review.

10          THE COURT:  Wait.  Let me -- before we move forward,    09:57:23

11   let me go back to, sorry about that, the 1935.

12          And the 106 objection, Mr. Feder, what -- can you

13   flesh that out for me.

14          MR. FEDER:  Hang on.  Judge, I'm trying to go back to

15   1935.                                                          09:57:53

16          THE COURT:  It sounded like you said 1925.  1935.

17          MR. FEDER:  I thought I said 1935, but that's what I

18   meant.  There are attachments to the one -- to the -- to the

19   1935 that are not here but are taken out of context.

20          MR. RAPP:  May I be heard on that?                     09:58:25

21          THE COURT:  Yes.

22          MR. RAPP:  I'm not sure what they're referring to when

23   they say they -- they talk about a 106 in relationship to

24   attachments.  106 is -- is a statement of an individual, and

25   the Rule of Evidence talks about the completeness of the      09:58:44

UNITED STATES DISTRICT COURT

1    statement.

2        There will be transmission emails that have

3    attachments, but the attachments by themselves are not

4    statements and, in some cases, could be self-serving.

5        In this case, this is an email exchange between --    09:58:58

6    with Scott Spear and Carl Ferrer, and Scott Spear is

7    referencing down here staffing for The Erotic Review.  And so

8    what is the completed statement that counsel believes is

9    deficient in this email such that the 106 is -- is even

10   relevant?                                                    09:59:30

11       MR. FEDER:  Judge, the position of the parties of the

12   defendants is if an email that the government's trying to admit

13   refers to attachments or other items or things that are

14   redacted, or whatever, then that's an incomplete document, and

15   it's out of context.  And, in fairness, the attachments should  09:59:51

16   be attached and presented.

17       THE COURT:  Do you know what the attachments are?

18       MR. FEDER:  I don't.  Not from this.

19       MR. RAPP:  Well, no.  They do know what the

20   attachments are because they have them as exhibits.  So this is  10:00:08

21   the attachment.  It's not something that we intend to admit,

22   but, certainly, counsel could -- could use this in

23   cross-examination.  It's not exactly that helpful to him, but

24   it -- it is a Google Analytics document, but it's not -- it

25   does not fall within the ambit of 106 as a complete statement.  10:00:32

1          This -- if this is something they would like to

2    introduce, they certainly could do that in cross-examination.

3    And that would go for any attachment that we are choosing to

4    introduce or not introduce.

5          THE COURT:  I'd like to just --                          10:00:53

6          MR. FEDER:  I think we agree to disagree, Judge.

7          THE COURT:  Well, Mr. --

8          MR. FEDER:  Just from a -- from a procedural

9    standpoint, think about this:  So the government puts on an

10   exhibit like this that talks about attachments.  Instead of   10:01:03

11   putting on the whole document so that the jury can see it, they

12   are expecting us to come back in cross-examination to

13   essentially go back over all of their exhibits and bring in

14   attachments or other parts of that same exhibit that were not

15   presented by the government.                                   10:01:20

16         It would be confusing, time consuming, and we think a

17   violation of Rule 106 on its face.

18         THE COURT:  Well, I'm going to consider that a little

19   bit more.

20         And let's go ahead and move on.                          10:01:34

21         MR. FEDER:  Okay.

22         MS. BERTRAND:  Your Honor, I have a -- Your Honor,

23   regarding the Google Analytics discussion, I have a further

24   objection than those already raised.  This is Joy Bertrand.

25         THE COURT:  Ms. Bertrand --                              10:01:47

 1          MS. BERTRAND:  Yes.

 2          THE COURT:  -- is it related to -- it's not related to

 3   something -- I think I remember there was a ruling by

 4   Judge Brnovich regarding some other Google exhibits?

 5          But I might be confusing --                          10:02:00

 6          MS. BERTRAND:  I don't --

 7          THE COURT:  I might be confusing that.  I think that

 8   really actually has to do with evidence that Google shut down.

 9          MS. BERTRAND:  Yeah.  But no, no.  That's not my --

10   that's not my objection, Your Honor.                        10:02:15

11          THE COURT:  All right.

12          MS. BERTRAND:  My objection's different.

13          THE COURT:  Well, why don't you tell me --

14          MS. BERTRAND:  My objection is --

15          THE COURT:  Why don't you tell me what your objection  10:02:22

16   is then.

17          MS. BERTRAND:  901.  Lack of foundation.  These Google

18   Analytics captions and the discussions that are being held with

19   the -- the -- the speakers in these emails is based on data.

20   And we went and talked about this briefly with a couple of    10:02:39

21   exhibits in our last hearing where the government said:  No.

22   You have the metadata.  You can just click on these links.

23          You go to that metadata, and all it does is show who

24   wrote it or who opened it.  It doesn't show the data behind

25   those reports.                                              10:02:58

1          And I don't believe -- it's a big discovery set, and I

2     don't believe we have ever received the actual data driving

3     those reports.

4          And so I would --

5          THE COURT:  Well --                                    10:03:10

6          MS. BERTRAND:  -- insert an objection to what my

7     colleagues have said, that they can't enter the discussions of

8     these analytics without the data itself --

9          THE COURT:  Well --

10         MS. BERTRAND:  -- and we've never received that.        10:03:20

11         THE COURT:  Let me -- let me see if I can maybe

12    clarify my understanding of the exhibit regarding Google

13    Analytic data.  And the government can correct me if I'm wrong.

14         An email that attaches a Google Analytic data is not

15    intended to show the truth of the matter of what that data is,  10:03:46

16    but it's how Mr. Ferrer and others relied upon that data.  And

17    so long as they can meet the prima facie threshold of 901, that

18    it is 901.4, characteristic of what a Google Analytic data

19    sheet looks like and they throughout the years relied on that,

20    then it's admissible.                                          10:04:19

21         I don't necessarily think we need to have somebody

22    from Google or something like that come in to say:  This is how

23    we create the -- the data.

24         That's not the intended purpose.  That's my

25    understanding.                                                 10:04:36

1              Am I -- am I wrong on that, Mr. Rapp?

2              MR. RAPP:  No, Your Honor.  And that -- it was --

3      you're correct.  It was addressed in Document 1212.

4              MS. BERTRAND:  Your Honor, I -- I would say this,

5      though:  But if the government keeps saying with any                    10:04:48

6      problematic document they've got, it's not offered for the

7      truth, he didn't.  They're offering it to show the volume of

8      back and forth, the volume of clicks from one site to another,

9      the money going back and forth.

10             So they cannot say it is not being offered for the            10:05:03

11     truth; it's only being offered to show what they can see people

12     did with it.  Because, if so, what's the purpose of this?  It's

13     just -- then he did what with it?  Talked about it.  Did what

14     with it?  Went back to other other people and said what?

15             The idea that this isn't for the truth of the matter,        10:05:28

16     and that being the underlying information in the data, it is

17     not something that can overcome a 901 objection or, frankly, a

18     hearsay objection.

19             So I'm making my record now, and I'm -- I think as

20     this comes in this discussion's going to become more common,         10:05:48

21     because the government cannot be allowed to get away with it's

22     not offered for the truth, because it's getting to the point

23     where much of this trial's not being offered for the truth.

24     And that's not what trials are for.

25             THE COURT:  Well, we're talking about a specific set         10:06:04

1   of data, Ms. Bertrand.  And I -- I will disagree with you.  I

2   view it the way that I just explained it.  And so, of course,

3   you can make the objection, but my rationale is going to be the

4   same.  And, of course, they have the burden of proof.  And so

5   they're entitled to bring in the evidence that they believe          10:06:27

6   support their case.  And I think that in terms of the Google

7   Analytic data, I've already made my views known.

8           So let's move on.

9           MR. RAPP:  I think we left off on 570, but this is

10  just an exchange between Carl Ferrer and David Elms regarding         10:06:52

11  training of TER staff.  And this is to -- in the government's

12  view, this is to co-conspirators just furthering the objectives

13  of the conspiracy.

14          THE COURT:  Any objection other than the routine

15  objections?                                                          10:07:13

16          MR. FEDER:  Not from me.  Bruce Feder.

17          MR. EISENBERG:  Your Honor, this is Dave Eisenberg.  I

18  do have an objection that based upon when one of our clients

19  allegedly joined the conspiracy theoretically.  In other words,

20  if there is no evidence that, for example, Defendant A was even       10:07:36

21  involved in anything that -- excuse me -- that had to do with

22  TER, then we're left with the unenviable position of being

23  damned, if it's damning evidence in the first place, with

24  respect to our client.

25          So while -- that's a slightly different type of               10:08:01

1  objection, but the government's going to have to show when, for

2  example, Client A joined the conspiracy allegedly.  And if

3  Client A wasn't involved in the conspiracy at -- what is

4  this -- February 3rd, 2009, then there should be a limiting

5  instruction at the very least with respect to that client or          10:08:26

6  that defendant.

7         THE COURT:  Well, I think, Mr. Eisenberg, I was just

8  going to say at the end of the case, as you know, there are

9  going to be instructions, and I think I did give a preliminary

10  instruction, that the evidence has to show the individual's          10:08:40

11  action in the conspiracy.  They have to be based on their

12  individual acts.  And there's going to be a final instruction

13  to that effect, and there's also going to be a verdict form

14  that outlines that.

15         And so I don't necessarily know that it is manageable,       10:09:04

16  and I think it's -- I don't necessarily know the necessity of a

17  limiting instruction every time an exhibit comes up that the

18  Court says:  Oh, you know, So-and-So Defendant wasn't

19  associated with Backpage at this time, so disregard the

20  evidence as to them.                                                 10:09:36

21         That's going to be a little bit time consuming and

22  possibly lead to confusion, because some of these exhibits

23  include -- multiple individuals are cc'ed on them.

24         And so I understand what you're saying.  I understand

25  your concern, but at the end of the day it's for the government      10:10:00

1   to parse out who was a part of the conspiracy and at what time

2   based on the charges in the indictment, and for defense counsel

3   to make their arguments with regard to whether or not their

4   client was privy to some of these emails on their

5   cross-examination and otherwise.                    10:10:27

6             And so let's move forward.  1151.

7             MR. RAPP:  This is a -- an exchange between Jess Adams

8   to Carl Ferrer.  This is referencing both Google Analytics and

9   The Erotic Review.  And the context of this is that in

10  referencing the Google Analytics, it demonstrates the -- the    10:11:09

11  referral traffic coming from the The Erotic Review.

12            THE COURT:  I'll assume all usual objections with 1151

13  and 1151a.

14            MR. RAPP:  Yeah.  So here --

15            MR. FEDER:  Yeah.  This is Bruce Feder.  That's 901    10:11:36

16  and cumulative.

17            THE COURT:  1151a.

18            MR. RAPP:  One second.

19            MR. CAMBRIA:  Something analytics.

20            MR. RAPP:  There it is.  This is a Google Analytics    10:12:02

21  report.  Obviously relevant because it shows that a bunch of

22  the referral traffic is coming from review boards, prostitution

23  review boards, primarily The Erotic Review.

24            THE COURT:  Assume the same objections and including

25  Ms. Bertrand's objection.                           10:12:34

```
 1              MS. BERTRAND:  Correct, Judge.  Thank you.

 2              THE COURT:  1944.

 3              MR. RAPP:  This is an email now between Carl Ferrer

 4   and to Andrew Padilla and Roger Williams referencing the TER

 5   links, attacking the Craig [sic] links before the City Vibe      10:13:17

 6   gets to them.  City Vibe is a competing prostitution website.

 7              Traffic is down in escorts, and TER is a way to

 8   reverse this.

 9              Carl is informing both Andrew Padilla and Roger

10   Williams.                                                        10:13:38

11              THE COURT:  All right.  Assume the same objections.

12              MR. FEDER:  Yes.

13              THE COURT:  Okay.  573a.

14              MR. RAPP:  Okay.  So, first, I'm showing you 573.  And

15   this is --                                                       10:14:04

16              THE COURT:  Can you enlarge that?  Okay.

17              MR. RAPP:  Yes.

18              THE COURT:  Okay.

19              MR. RAPP:  This is a -- well, first, we don't intend

20   to admit this in the form it is.  This is the Phoenix New Times  10:14:10

21   article on the arrest of David Elms, who is the -- who we've

22   seen in these previous emails with Mr. Ferrer as the principal

23   of The Erotic Review.  He also talks about prostitution

24   websites, the Desert Divas.  He -- it is characterized that the

25   website, The Erotic Review, according to the New York Times, is  10:14:41
```

1    the Amazon.com of prostitution.

2         What we find relevant and significant, and what you

3    see in 537a, is in an alternative newspaper based here in

4    Phoenix, owned and operated by Michael Lacey, Scott Spear, and

5    Jedd Brunst -- and Michael Lacey, I might add, is the editor of          10:15:08

6    this newspaper.

7         What you see in --

8         THE COURT:  Can you blow that up for me?

9         MR. RAPP:  Sure.

10        I'm sorry, Your Honor.  Which portion do you -- would          10:15:33

11   you like blown up?

12        THE COURT:  That's 537, isn't it?

13        MR. RAPP:  Yes.

14        THE COURT:  And so this is the question I have:  In

15   the -- in your actual exhibit lists that you submitted to the          10:15:45

16   Court, I only have 537.  I don't have a 537a.

17        MR. RAPP:  I think -- are we talking past each other?

18   It's 573.

19        THE COURT:  I'm sorry.  Okay.  Oh, okay.

20        MR. RAPP:  So let me --          10:16:03

21        THE COURT:  My -- yes.

22        MR. RAPP:  So let me make sure we understand that.

23   This is -- this is 573a is a subset of 573.  And we believe the

24   relevance of this is because the arrest of David Elms as the

25   principal of The Erotic Review -- and it gives a fairly good          10:16:22

description of what The Erotic Review's business model is --
we -- we feel that's relevant.

        The only portion of this, though, that we want to
admit is the fact that in the newspaper owned by the
conspirators, it highlights The Erotic Review, but it also          10:16:44
gives an example of a review found on The Erotic Review.

        And we believe this is -- if this was in the New York
Times or the Seattle Times, we would understand maybe not so
relevant.  But if it's in a newspaper that is owned and
operated by the defendants, we believe it is strong evidence of     10:17:10
notice of who The Erotic Review is.

        Now, there's emails where -- and meetings where they
are confronted with the existence of this relationship.  And so
this is yet another example of that notice, and that's why we
view it as relevant.                                                10:17:28

        THE COURT:  Well, let me first ask you, because I'm --
I'm confused about this.  573 is the headline.  And tell me how
it is you intend to use it if you're not going to introduce it
or --

        MR. RAPP:  Oh --                                            10:17:49

        THE COURT:  -- move to admit.

        MR. RAPP:  -- yeah.  So Carl Ferrer is very much aware
of -- of this article in the New Times, obviously.  He's --
he's had this ongoing relationship with The Erotic Review.

        Later, I believe it's Exhibit -- let's see.               10:18:04

1          THE COURT:  Well, how are you going to introduce this

2     to the witness?

3          MR. RAPP:  Carl Ferrer's going to say:  I looked at

4     this article.  I was familiar with this article because it was

5     in the New Times.                                        10:18:18

6          He's officed in the building down there where they

7     print it.  Obviously, this was -- when David Elms is arrested,

8     it interrupts a very critical relationship that Backpage has

9     built with The Erotic Review.  It -- actually, they don't even

10    miss a beat.  They install somebody else, and we'll see that   10:18:37

11    in -- in subsequent emails, so that the relationship goes on

12    unabated.  But this is actually significant because this is

13    a -- a -- an important component of their referral traffic.

14    And so when -- when David Elms gets arrested, they believe that

15    that could impact the revenue.                           10:19:01

16          And so he is aware of this -- this article.  He can

17    talk about seeing the article itself.  He's not going to -- I

18    mean, obviously, I think it is probably prejudicial, because

19    he's -- he's actually not arrested for running The Erotic

20    Review, but he was -- he was arranging a hit of, ironically, a   10:19:21

21    prostitute.  We're not getting into all of that.  That's what

22    the nature of this article is.

23          What's important in this article and what we think is

24    relevant -- and we do not think it is -- it has 403

25    implications -- is the fact that embedded in the article is an   10:19:42

example of the review found on The Erotic Review.

And just, by the way, all the defendants here are officed in the building that is printing this newspaper, and Mr. Lacey, as I've identified, is the -- is the editor of this newspaper.                                                    10:20:04

So that's our -- that's our basis for not getting in the entirety of 573, but, rather, getting in just this small portion of 573 that obviously indicates that it was published in the New Times up here and that it involved The Erotic Review.  And Mr. -- we expect Mr. Ferrer's testimony to be that    10:20:28 this is a -- a -- a review that they would see frequently in The Erotic Review.

THE COURT:  All right.  Other than the usual objections?

MR. FEDER:  Yes.  I think -- this is Bruce Feder.          10:20:50 More than the usual objections?

THE COURT:  Yes.

MR. FEDER:  I'll use Mr. Rapp's words.  This is a -- I don't know -- I don't know what it is.  It's something that is embedded in a newspaper article, way down in the newspaper      10:21:01 article, in a New Times with unknown source.  It's an article -- all you can tell from this is you've got New Times at the top, and it's in bold The Erotic Review by Ray Stern.  And then nothing but this thing there, which there's double, triple, quadruple hearsay.  Out of context.  106.  Prejudicial,    10:21:30

1   of course.  Even Mr. Rapp admitted that.

2          And what's -- what is the -- this is notice of all

3   these people that they actually read this article in a New

4   Times article?

5          What's the point?  Is this notice?  And if it is, it's          10:21:54

6   overwhelming.  It's hearsay, double hearsay, triple hearsay,

7   unless they're calling Ray Stern, if they're not, to testify

8   about where this document -- where this information even came

9   from.  It's not even an article.  It's imported into an

10  article.                                                               10:22:20

11         MR. EISENBERG:  Your Honor, this is Dave Eisenberg.

12  Along with what Mr. Feder just said, how is this going to

13  relate to notice to any of the defendants if the defendants

14  aren't on this, if you will?

15         It's not an email.  It's just something that got          10:22:37

16  published.  So what does that have to do with, let's say, my

17  client or any of the other clients?

18         THE COURT:  Didn't I just hear Mr. Rapp say at the

19  time Mr. Lacey was the owner of the New Times?

20         MR. RAPP:  No.  They -- they all are the owner.          10:22:53

21  Mr. Lacey is -- is a majority owner, along with Mr. Larkin.

22  But Mr. Spear and Brunst are minority owners, and they're all

23  officed down there in the same building where they -- they are

24  editing this newspaper, and it's -- I don't know if it's

25  printed down there, but -- but, hey, it's their newspaper.          10:23:14

```
 1            And so let me just -- let me just go to Exhibit 28.

 2            MR. EISENBERG:  I'm not -- excuse me, sir.  I'm sorry.

 3   I don't mean to cut you off, Mr. Rapp.

 4            Your Honor, if I may?

 5            That is really an argument that's -- it's conjecture.   10:23:29

 6   So what if Mr. X owned the paper?  It doesn't mean he saw this.

 7   That's sort of like tarring him with a brush of inference that

 8   doesn't stand up.

 9            And that's -- I guess I talked about this earlier

10   about how a particular defendant gets associated with this      10:23:51

11   conspiracy.  This ad -- I'm sorry -- publication has nothing to

12   do with notice because you can't relate it to any of the

13   defendants.

14            MS. BERTRAND:  I also have a further objection.  This

15   is Joy Bertrand.  I'm just -- I'd ask that we not go to another  10:24:12

16   exhibit until I have an opportunity to be heard.

17            THE COURT:  Go ahead.

18            MR. RAPP:  Oh, I --

19            MS. BERTRAND:  Your Honor, I -- a couple things.

20            First, the government just asserted that all of these   10:24:24

21   people work in the same building at the time this report was

22   published.  My client did not.  And the idea that people

23   working on a different floor doing a completely different job

24   than the newspaper are somehow not only on notice of what the

25   newspaper says, but somehow endorsing it or assenting to it,    10:24:50
```

1   I've never seen a case that says that.

2        Likewise, this David Elms thing, with him getting

3   arrested for conspiracy to commit murder and all this other

4   stuff, David Elms getting arrested at all has -- it wasn't --

5   it didn't have anything to do with this case.                     10:25:14

6        It's beyond what is allowed under 403.  And this

7   becomes literally what they teach us in law school.  It's a

8   trial within a trial and the confusing issues.  It is a

9   nonstarter with what this jury needs to decide as to the

10  elements of proof for the government.  And the confusion and     10:25:34

11  time wasting and detour that this line of evidence, starting

12  with this article, creates is very improper.

13       THE COURT:  All right.  I'll let you have the last

14  word, Mr. Rapp, and then let's move on.

15       MR. RAPP:  Okay.  Well, just to be clear, I -- we're        10:25:55

16  not introducing any evidence of the arrest or what he was

17  arrested for.  In fact, we're going to avoid that subject.

18  We're just going to say he just was moved along and somebody

19  else came in and took his place.  So that should -- that should

20  address that issue for the defense.                              10:26:11

21       So if we're done with -- with this --

22       THE COURT:  All right.  18 --

23       MR. CAMBRIA:  Your Honor, Paul Cambria.  I'd like to

24  be heard.

25       I -- I'm not understanding the last statement that was      10:26:24

1   made by Mr. Rapp.  573 has all the information in here about an

2   arrest, and the arrest clearly has nothing to do with Backpage

3   or any of the defendants.

4           And what part of 573 is claimed to be notice?

5           THE COURT:  Well, Mr. Cambria, Mr. Rapp just said      10:26:47

6   they're not going to refer to the arrest.

7           MR. CAMBRIA:  Okay.  Well, what -- that's what this

8   whole thing is about.

9           THE COURT:  No.

10          MR. CAMBRIA:  And what part of 573 is notice?          10:26:58

11          THE COURT:  5- -- we just had that discussion,

12  Mr. Cambria.  573a is the embedded review section that

13  discusses The Erotic Review.

14          And so I've yet to rule on it, but let's move on.

15          MR. RAPP:  So 1860 --                                  10:27:23

16          MR. CAMBRIA:  Well, my point was that there is nothing

17  that indicates that any of these defendants saw this so-called

18  review or that this review had anything to do with the charges

19  in this indictment.

20          THE COURT:  Well, I -- I actually think I'm going to   10:27:40

21  reserve it, because I have to, yet, hear what Mr. Ferrer's

22  going to say about that.

23          So let's move on.  1862.

24          MR. RAPP:  1862 is yet another email exchange between

25  Backpage and The Erotic Review detailing the linked           10:27:59

```
 1    relationship that comes even after the arrest or Mr. Elms
 2    disappeared from being Mr. Ferrer's point of contact there.
 3              THE COURT:  And 1862a?
 4              MR. RAPP:  Same thing.
 5              THE COURT:  Any objections other than usual?            10:28:25
 6              MR. CAMBRIA:  For one thing --
 7              MR. FEDER:  Give me a second.
 8              MR. CAMBRIA:  -- there isn't any identification --
 9              THE COURT:  Who's speaking?
10              MR. CAMBRIA:  Oh, I'm sorry.  Mr. Cambria.             10:28:35
11         There's -- it just says staff.  Staff to
12    administration.  And there's no connection to any of the
13    defendants.
14              MR. RAPP:  Can I be heard on that or --
15              THE COURT:  No.  That's okay.                          10:28:58
16         1862a.
17              MR. RAPP:  1862a is the same -- is the same type of --
18    of an email with the series of links.
19         Oh, my agent has advised me that it is a duplicate, so
20    we can strike 1862a.                                            10:29:14
21              MR. FEDER:  It's the same as 573a; is that right?
22              THE COURT REPORTER:  Who is speaking, please?
23              MR. FEDER:  Bruce Feder.
24         Throughout?
25         What I have in my notes.  I just want to make sure.        10:29:28
```

1          THE COURT:  Wait.  I think you're confusing things,

2     and you're confusing me.

3          MR. FEDER:  I'll try not to.

4          THE COURT:  We are on -- we are on 1862 and 1862a.

5     Which is a duplicate of what?                                    10:29:47

6          MR. RAPP:  1862a is a duplicate of 1862, so we can

7     strike that.  We're not going to use it.

8          The next -- the next exhibit is 574.  This is an email

9     between Carl Ferrer's personal email address and from his

10    Backpage address.  And it deals with a banner ad change to The   10:30:15

11    Erotic Review.  This Fred Magid is his new contact at The

12    Erotic Review.  And so David Elms was a co-conspirator for the

13    objectives of both of this conspiracy.  And now Fred Magid has

14    stepped into David Elms' shoes, and he is now a co-conspirator

15    with Mr. Ferrer in furthering their relationship between The     10:30:50

16    Erotic Review.

17         And the subject of it is where he says:  Hey, Fred, my

18    bosses want me to -- want me to be less excort-ish on the

19    banner ad on The Erotic Review.  I think it's crazy, but it's

20    worth -- not worth arguing about.                                10:31:10

21         And so that's -- this is the way the banner ad looked

22    down here at 574, page 5, where it said apartments, jobs, and

23    escorts.  And the nature of this email is they want to change

24    that and just change it to -- oh, it -- it used to say --

25    right.  Mr. Ferrer will testify that it used to say, find        10:31:34

1    escorts here, referring to Backpage, and the management of

2    Backpage now wants to change the banner ad to just apartments,

3    jobs, and escorts.

4            So, obviously, we think that's relevant.

5            THE COURT:  Any other objection other than the usual?    10:31:57

6            MR. FEDER:  Same.

7            THE COURT:  1946.

8            MR. RAPP:  This is an email from Scott Spear to Carl

9    Ferrer, and they're talking about The Erotic Review, changing

10   the -- the -- the banner ad.  And so 1946a is also in          10:32:59

11   relationship to that.

12           THE COURT:  Any other than the usual objections?

13           MR. FEDER:  No.

14           THE COURT:  There's also a 1946b, Mr. Rapp.

15           MR. RAPP:  What?  That's just the part of the banner    10:33:29

16   ad that they're -- they're changing.  They're just trying to

17   manipulate the banner ad on The Erotic Review.  And this is in

18   the wake of David Elms being arrested.

19           THE COURT:  All right.

20           MR. RAPP:  575.                                         10:33:54

21           THE COURT:  575.

22           MR. RAPP:  575 is just an email exchange between Jess

23   Adams and Carl Ferrer.  SS is -- refers to Scott Spear.

24           We expect the testimony to be asked for this.  Here's

25   what I see.  Any comments/corrections before I send it over?    10:34:11

UNITED STATES DISTRICT COURT

1    We'll be fine.

2            And then they're just talking about a -- another

3    employee.

4            And so here is -- here is the spreadsheet that is

5    attached to that email.  Just it talks about payments to The        10:34:24

6    Erotic Review.  Significantly, it talks about some of the

7    referral traffic.

8            THE COURT:  All right.  Anything -- any other

9    objection other than the usual?

10           And that was 575b as well?                                  10:34:53

11           MR. RAPP:  Yes, ma'am.

12           MR. FEDER:  901 is also there, on both 575 and 575b.

13           THE COURT:  Did you say 901?

14           MR. FEDER:  901.  And I don't know what 575a is, but

15   that may be a 106.                                                  10:35:12

16           THE COURT:  And that was Mr. Feder?

17           MR. FEDER:  Yes.  I'm sorry.

18           THE COURT:  28.

19           MR. RAPP:  Okay.  28.

20           THE COURT:  I'm sorry.  Yes, 28.                            10:35:28

21           MR. RAPP:  28.  28 is a -- is an email from Mr. Larkin

22   to Scott Spear and Carl Ferrer.  And the subject is:  The

23   authorities.  43 more indicted in the Desert Divas prostitution

24   bust.

25           And he is alerting -- one could gather he's alerting        10:35:51

1    them to this situation.

2           Down in -- yeah, down in the subject line is -- so

3    this is -- the subject line:  John's accused of favorly rating

4    escorts on The Erotic Review in exchange for discounts.

5           And then later on in the article that -- and this is      10:36:15

6    all being offered for notice to Mr. Spear in particular about

7    the -- the -- The Erotic Review, because although this has to

8    do -- just so the Court understands the context, certainly

9    Mr. -- this doesn't necessarily relate to the arrest of

10   Mr. Elms that we just saw back in Exhibit 24.  This -- oh, I'm   10:36:42

11   sorry.  575.  Thank you.  573a.  This relates to -- this

12   relates to a bust of a prostitution service in the Phoenix

13   area, and it just re- -- it just mentions The Erotic Review.

14          And so it's -- it's notice to Mr. Spear.

15          THE COURT:  What was the -- what's the date on it?  I      10:37:15

16   can't read from this part.

17          MR. RAPP:  The date on that is May 9th of 2009.

18          MR. CAMBRIA:  May 11th.

19          MR. RAPP:  The article is -- the -- the -- the email

20   is 5/11/2009, and the Arizona Republic is two days before that.  10:37:27

21          THE COURT:  All right.  Any other than the usual

22   objections?

23          MR. FEDER:  Highly prejudicial --

24          MS. BERTRAND:  Yes.

25          MR. FEDER:  Talking -- this is Bruce Feder.  Highly       10:37:47

1   prejudicial.  Talking about another criminal -- so-called

2   criminal enterprise in the first paragraph.  It earned

3   $18 million, VIP reduced rates.  And I'm just going through it.

4   Talking about all kinds of irrelevant, unrelated information,

5   all to get to one middle tidbit that TER to show notice.          10:38:10

6   Cumulative -- in addition to being cumulative.

7            MS. BERTRAND:  This is Joy Bertrand.  I also -- I join

8   in that and also note this again, much like the David Elms

9   thing, becomes a trial within a trial.  Backpage was never

10  implicated in Desert Divas, to the best of my knowledge, and I  10:38:40

11  have a good amount of familiarity about that litigation.

12           Notice for what?  Prostitution occurs.  TER had

13  prostitution on its website.

14           This kind of evidence may be relevant if you can

15  squint and maybe see some relevance in it.  403 weighing of    10:39:00

16  this.  So that it's unduly prejudicial, a waste of time,

17  cumulative as to what anyone knows about TER at the time, in

18  2009, and really sets up a trial within a trial, confusion of

19  issues.

20           THE COURT:  Anyone else?                                10:39:28

21           Well, I think part of the elements that the government

22  has to show is knowledge.  And short of having them redact

23  everything above the relevant information, it does show an

24  awareness of what The Erotic Review was about or accused of.

25  And it -- it at least provides some indication of knowledge.    10:40:00

1        So I think it is relevant.  And so I'd be amenable to

2   redacting the other portions, which I think make it tick

3   towards prejudicial, because it really does include additional

4   nonrelevant information.  So I would suggest redacting those

5   portions not relevant.                                    10:40:43

6        MR. RAPP:  Where I've indicated the redaction is

7   because down here they talk about The Erotic Review

8   prostitution website and rated Desert Divas' escorts.

9        Just, by the way, Your Honor, we expect the testimony

10  to be that the Desert Divas, although it was a prostitution   10:41:00

11  service here in Phoenix, they also posted ads on Backpage.  And

12  so -- but they could testify to that.

13       But is that redaction there sufficient or --

14       THE COURT:  I would say it is.

15       MR. RAPP:  All right.                                10:41:21

16       THE COURT:  So that would address some of the

17  prejudicial nature of it, but I do think it's relevant.  It is

18  probative of knowledge.  And so at least at this juncture,

19  assuming foundation can be laid, it will -- it should be

20  admissible.                                               10:41:37

21       All right.  Go on to the next.

22       MR. RAPP:  579.  This is -- this is an email from

23  Andrew Padilla to Carl Ferrer and Dan Hyer.

24       So there were three co-conspirators on this, in the

25  government's view, on this email.  And this is around the time   10:41:56

that Craigslist shut down its erotic services portion of its

adult category.

Okay.  They've made some changes, and they are

pointing to Backpage as being a much more egregious

prostitution marketing website.                                   10:42:27

And so that's sort of the context of this email.  And

so if you look down here at the bottom, it is focusing on South

Carolina.  And so -- and when you go to the top -- in the

middle, rather, Carl Ferrer is instructing Andrew Padilla

that -- telling him that because of the scrutiny of the South   10:42:58

Carolina market, the Backpage market, that's their first

priorities.  They need to remove any sex-for-money language.

Also, obviously:  We do not have the manpower to read texts in

other markets.

And then Andrew Padilla is responding that he will          10:43:16

direct his moderators to implement a cleanup on -- in the South

Carolina Backpage market.

THE COURT:  All right.  Any other than the routine

objections?

MR. FEDER:  Bruce Feder.  106.  901.                        10:43:44

THE COURT:  What is -- what is the 106?

MR. FEDER:  It's 579a, which has been deleted.

MR. RAPP:  Yeah.  So we don't intend to introduce

579a.  This is what it is.  It's -- so apparently Craigslist

and Backpage have their own blogs, and this is just an example  10:44:14

of the blog.  This is what causes them to try to clean up the
South Carolina Backpage market -- or Backpage website that has
a presence in South Carolina.  But we weren't going to admit
this.

THE COURT:  Well, if there's a 106 objection, maybe    10:44:34
you should.

In any event, let's move on.

MR. RAPP:  All right.  So 902.

THE COURT:  So 902 -- I believe it's 902, and I --
correct me if I'm wrong.  Is it -- maybe it's 1610 and 1609a.    10:45:00
Are those the letters?

MR. RAPP:  1609 and -- let me just double-check on
that.  I don't have -- I don't have my computer -- well, so I
think the Court was referencing these letters at the outset of
this hearing, that this is obviously a letter to Backpage by a    10:45:34
subset of State Attorneys Generals that are, you know, alerting
Backpage to some of the issues with their site.  In particular,
their -- they -- they identify that there is this direct link
relationship between The Erotic Review and ...

THE COURT:  All right.  And the objections to these    10:46:10
letters are noted as in the pleadings.  I believe it was
addressed in Document 1212, if I'm not mistaken.

MR. FEDER:  It would also -- I don't think they're in
there.  But if they're going to put in the Attorney General
letters, then the responsive letters from Mr. Fifer should be    10:46:34

1    there --

2            THE COURT:  Then I think --

3            MR. FEDER:  -- as well.

4            THE COURT:  Mr. Feder, can you please just state your

5    name before you speak.  It will help --                    10:46:45

6            MR. FEDER:  I'm sorry.

7            THE COURT:  -- our transcription immensely.

8            And --

9            MR. FEDER:  I --

10           THE COURT:  -- I think it goes without saying that if  10:46:52

11   you have those letters and you want to introduce them on

12   cross-examination, you're free to do that.  But the

13   government -- I can't compel the government to introduce letter

14   upon letter upon letter.  They're entitled to introduce what

15   they wish in their case-in-chief.                          10:47:13

16           So with regard to those letters from the Attorney

17   Generals or States Attorney General -- I think there was one

18   from a sheriff's office or something that I read as well --

19   those letters are at this juncture admissible subject to

20   foundation, essentially for the knowledge component that     10:47:32

21   it's -- the government's required to -- to prove.

22           All right.  So 585.

23           MR. RAPP:  585 is an email from Scott Spear to Carl

24   Ferrer.  And he is just attached to this.  This would be an

25   attachment that we would introduce.  It has a list of terms.  10:48:01

1    All these are terms that are going to be removed from the

2    postings, but the postings are going to continue to be posted.

3    We expect the testimony to be that each one of these terms,

4    coded or not, are reference to a sexual act.

5              THE COURT:  585a.                                    10:48:27

6              MR. RAPP:  This is 1895.

7              MR. FEDER:  Wait a minute.  Did we skip over 585a?

8    This is Bruce Feder.

9              MR. CAMBRIA:  That's what the Court referred to, 585a.

10             MR. FEDER:  Okay.                                     10:49:07

11             MS. BERTRAND:  This is Joy Bertrand.  I would ask that

12   for 585 and 585a the Court note the defense's standard

13   objection to this.

14             MR. FEDER:  Okay.  Thank you.

15             THE COURT:  I'm still waiting for 585a to come up.    10:49:17

16             MR. RAPP:  Yeah.  This is -- on the screen is 585a.

17             THE COURT:  Okay.  Thank you.

18             MR. RAPP:  Oh.  Oh, I'm sorry.  So -- so here's the

19   transmission email.  There's the transmission email from Scott

20   Spear, and here's the attachment with the terms and codes.     10:49:34

21             THE COURT:  And the objection are noted, and the Court

22   finds 585a relevant.

23             MR. RAPP:  1895 is a transmission email from Jess

24   Adams to Carl Ferrer discussing a Backpage budget presentation.

25             And 18 -- 1895c is that presentation.  This is the    10:50:05

government's redacted version of that.  We intend to admit
the -- this page, this page, page 3.

          We expect testimony to be at trial that Backpage, the
upper management directed Mr. Ferrer and others to engage in
what they refer to as a coded term of the slow dance, which          10:50:46
means to slow down any changes to the site and just give the --
the Attorney Generals just enough that they don't shut down the
site.

          And so you're going to hear that, and you might have
heard that in the opening statement already.  But this is          10:51:08
referenced a couple times in the portions of the PowerPoint
that we intend to -- to show.

          THE COURT:  Okay.  And, hereto, the record has the
defendants' objections to those PowerPoints.  Judge Brnovich
addressed them in her order, and I will adhere to the order          10:51:38
assuming the appropriate foundation is laid.

          Are there any other objections rather than the
standard?

          MR. FEDER:  For 106.  This is Bruce Feder.

          THE COURT:  And, again, hereto, if you think there are          10:51:58
portions of that PowerPoint that you want to introduce on
cross-examination or your case-in-chief, you can do that.

          MR. FEDER:  Thank you, Judge.

          THE COURT:  All right.

          MR. PANCHAPAKESAN:  Your Honor, this is          10:52:15

Mr. Panchapakesan.  Sorry.  This is Mr. Panchapakesan.

In terms of -- of this PowerPoint, if I'm looking at the right slide, I guess 1895b, it looks like on page 3 it sets specific initiatives for a 2010 plan, and then it notes that it's been redacted for privilege.                                          10:52:45

And -- and that -- that raises a -- a couple of issues.  One is that the unredacted version, the complete version of this, has been produced in discovery and I believe reviewed by the prosecution team.  And I understand that Mr. Ferrer was even asked about this specific slide during his     10:53:18 interview with the government, any reference to this sort of a slow dance terminology that Mr. Rapp referred to.

And so if it's now the government's position that this slide is somehow privileged, then, in essence, the government's admitting that they've invaded the privilege because they've     10:53:39 had the unredacted copy of this exhibit for years, the unredacted version.  It's been on their exhibit list.  They've talked to Mr. Ferrer about it.  So that -- that's a little perplexing, frankly.

But if -- if all this is talking about, as I                10:53:54 understand it, is that the company was communicating with the Attorney General and -- and monitoring legal developments, and that -- and that was Ferrer's understanding, then if this is going to come in, it ought to come in with -- with that information at the same time because it's the exhibit as         10:54:13

1    opposed to an attachment.

2              MR. RAPP:  Can I just respond briefly to that?

3              THE COURT:  Yes.

4              And, quite frankly, Mr. Panchapakesan, you lost me.

5              MR. RAPP:  He lost me too.                              10:54:26

6              THE COURT:  I'm not exactly sure what the question is

7    regarding -- well, why don't -- why don't I do this:  Let me

8    ask Mr. Rapp to explain the "redacted for privilege" term on

9    there.

10             MR. RAPP:  Yeah.  I have to -- is that Bates stamped?   10:54:43

11             So if you look down at the Bates stamp numbers down

12   here, it says Backpage.  And you're going to see that, Judge.

13   You're going to see Bates stamps numbers that reference the

14   PSI, which is the sentence subcommittee.  You're going to see

15   AZGJ sometimes, which is the Arizona grand jury.               10:55:01

16             When we served a subpoena on them, they produced it in

17   this format.  And one of their attorneys went through and

18   redacted portions of the documents that they produced to us,

19   and they made some -- they made some determination that

20   portions were privileged for whatever reason.  And in some      10:55:27

21   cases you'll see redacted for confidentiality.  And I think in

22   those cases they redact, perhaps, somebody's email address or

23   some other personal identifiable information.

24             So unless Mr. Panchapakesan and I are talking past

25   each other right now, this -- this is the way Backpage produced  10:55:50

the documents to us through their attorneys.  And so I'm not
sure what he's talking about, whether we've invaded some
privilege or anything.

They kept a privilege log on the documents they
produced to us.  Obviously, we litigated some of that, and they    10:56:07
had to turn over a number of documents related to the public
relations firms.  But this is the way we received it.

We don't know what's -- I don't know what's redacted
here.  I don't know if it's by -- I presume they were acting in
good faith and redacted information that they thought fell        10:56:28
within the purview of some type of privilege.

MR. PANCHAPAKESAN:  Well, Your Honor, to kind of put a
finer point on it, Exhibit 588 is the unredacted version of
this PowerPoint.  And so the government had the unredacted
version of what's been redacted here.  And what the redacted     10:56:53
portion said -- I mean, we all have it.  Both sides have it.
It's been produced in discovery.  If it says legal strategy
from 2010, it goes on to say:  Continued to engage Attorney
Generals.  Move slowly but deliberately.  Continue to work
closely with law enforcement.  It says monitor if they had       10:57:16
legal changes and initiatives.

And so I -- I understand Mr. Rapp to be saying that
one version of this was redacted, but there is another
unredacted version on the government's exhibit list.  And so
I'm a little confused as to -- as to why this version is an      10:57:33

exhibit as opposed to the unredacted one if the government has

it.

THE COURT:  That's a fair point, Mr. Rapp, because I

do note, as he suggested, that there is a PowerPoint

presentation listed on the exhibit as -- with the same date.          10:57:51

So why don't you do this:  Go back and revisit these

two sets of exhibits and determine which one you're going to

use.  I -- I would suggest using the unredacted version --

MR. RAPP:  All right.  Very well.

THE COURT:  -- so -- all right.          10:58:14

34.

MR. FEDER:  Judge, this is Bruce Feder.  Can we take a

break in some reasonable period of time?

THE COURT:  Well, let's get through to -- let's go

through 311, and we can take a break.          10:58:33

MR. FEDER:  Thank you.

THE COURT:  34.

MR. RAPP:  34 is an email from Thomas Pearl at

Backpage to Carl Ferrer.  And it's been -- it starts with

Thomas Pearl to Andrew Padilla and then up to Carl Ferrer.  And          10:59:02

so this involves, if you might recall, the super-poster or

super-affiliate relationship that Backpage established.  That

was one of their internal prostitution marketing strategies.

And this is an email from the super-affiliate William Mersey,

often known as Dollar Bill.  And he is complaining that a          10:59:31

number of his ads were removed.  And Andrew Padilla is --

because he is a -- we expect the testimony to be that he is

a -- somebody that brings in-volume ads, you know, upwards of

4,000 ads in any given market, he is somebody that gets

preferential treatment.                                      10:59:56

          And so that's -- that's what this email is all about.

          THE COURT:  And 35?

          MR. RAPP:  35 is -- this is what is often referred to

as a Mantis report.  This is a report -- because it's in a

different format, if you can see.  You know, it has these lines  11:00:16

and stuff.  This is a report going to Mantis.  This actually

involves Dollar Bill and the fact that -- and, oh, and I just

had mentioned -- see, if you see up here in the subject line,

somebody within Backpage inadvertently deleted 4200 ads of

Dollar Bill.                                                 11:00:41

          This is a -- this is a big deal within Backpage

because this is a client who is bringing in-volume prostitution

ads and generates quite a bit of revenue for Backpage.  And so

they -- this is nothing more than a email that is being sent to

the servers down at -- in desert -- down in Tucson to make sure  11:01:01

that those ads get restored.

          THE COURT:  As to 34 -- and I failed to ask.  Other

than the usual objection, 34?

          MS. BERTRAND:  Hi.  This is Joy Bertrand.

          Yes.  I would like -- with regards to statements from  11:01:22

1    Thomas Pearl to Mr. Padilla, I would like the government to

2    clarify whether or not Mr. Pearl is now also being treated as a

3    unindicted co-conspirator.

4         MR. RAPP:  Well, there's no -- there's really no

5    statement from Thomas Pearl on -- it's -- it's all by Padilla.    11:01:43

6    It's forwarded by Padilla.

7         MS. BERTRAND:  34 is an email from Thomas Pearl to

8    Andrew Padilla and Mr. Padilla's response.

9         I'm asking if the government is going to assert that

10   Mr. Pearl is an unindicted co-conspirator for hearsay purposes.    11:02:04

11        MR. RAPP:  Well, so -- I don't really have -- we don't

12   have to reach that because this is not -- it's -- it's

13   offered -- the -- of the effect on the listener, namely Andrew

14   Padilla.  The information is forwarded to Andrew, and Andrew,

15   in response to that, he does -- he takes further action.    11:02:26

16        So you don't really have to reach whether or not

17   Thomas Pearl is a co-conspirator.  It's -- it's just offered to

18   show the effect on the listener, Andrew Padilla, his -- his

19   supervisor.

20        And then if you go to 35, Andrew Padilla is the one    11:02:45

21   that is making sure that this is the effect on him, him getting

22   notice from Thomas Pearl.  He is now causing him to act, namely

23   to inform the servers that Dollar Bill's postings need to be

24   restored to a live status.

25        THE COURT:  And --    11:03:15

1          MS. BERTRAND:  I want to be clear --

2          THE COURT REPORTER:  I'm sorry.

3          THE COURT:  Wait.  Wait.  Ms. Bertrand, someone was

4    coughing while you were talking, and so you're going to have to

5    start over.                                                        11:03:30

6          MS. BERTRAND:  Okay.  Thank you.

7          I just wanted to clear it up.  It sounds like the

8    government is refusing to state whether or not Mr. Pearl is

9    going to be included as one of the unindicted co-conspirators.

10   I believe he's going to come up in the context of other          11:03:44

11   discussions, and Ms. Vaught specifically would -- would object

12   to this under 403; cumulative, waste of time, and particularly

13   not relevant to any knowledge she had.

14         THE COURT:  Well, I'm -- I think, as I recall, correct

15   me if I'm wrong, I addressed the relationship between the         11:04:07

16   co-conspirators and this Dollar Bill person in the same motion

17   in limine order related to Mr. Elms.

18         And so the relationship is -- is relevant, assuming

19   that the government's going to lay this similar foundation for

20   what Dollar Bill did and was known to have done in terms of       11:04:32

21   these prostitution ads.

22         And so, to that extent, it is relevant, and it -- the

23   content of the -- well, I think there is some relevance in

24   terms of the content of what the email discusses.  There's a

25   large swath of prostitution ads that have been -- gone missing    11:04:58

1    or were deleted inadvertently, and one of the co-conspirators

2    is telling them to put it back up.

3          I think that's relevant in terms of conduct and

4    knowledge --

5          MR. EISENBERG:  Your Honor --                        11:05:19

6          THE COURT:  So, in any event --

7          MR. EISENBERG:  I'm sorry.

8          THE COURT:  So at that -- at this point I find that,

9    assuming the foundation can be laid, it is admissible on those

10   findings.                                                  11:05:28

11         Mr. Eisenberg.

12         MR. EISENBERG:  Yeah.  Thank you, Your Honor.

13         The concern I have, besides what you've just heard, is

14   it starts with Thomas, and I assume it's Mr. Pearl.  And he is

15   relating a whole series of things about prost- -- or ads that   11:05:44

16   are really hot, and whatever the language is.  Pinky.  Korea's

17   best.

18         That's highly prejudicial to my client.  And that's

19   Mr. Pearl's view of the world, I suppose, but my client doesn't

20   react on -- on that basis and has no knowledge, at least from   11:06:06

21   what I could tell from this email, as to the nature of what

22   Thomas is explaining.  All -- all Mr. Padilla is doing is --

23   it's hard -- as he says, it's hard to tell what happens after

24   the ad has been restored.

25         So my -- my view of this is it's a 403 issue, at least   11:06:28

with respect to what Pearl says to -- Thomas, rather, says to

Andrew, which is the first part of this email.

        The rest of it, the attachment, which is the next one,

I'm not contesting that, but I am contesting the 403 version or

portion of this that precedes what Mr. Padilla did.  That                11:06:54

doesn't put notice to Mr. Padilla at all.  It's just -- he's

doing this to restore information, the ad.

        THE COURT:  All right.  I've noted the objection, and

let's finish with 311 and take a ten-minute break.

        MR. RAPP:  311 is a -- is a Google Analytics report            11:07:20

that is dated for a single day, March 2nd of 2010.  And the

relevant portion of it is the referral traffic on a single day

from the review site, The Erotic Review.

        The two sites underneath The Erotic Review, these are

also prostitution review sites, but, obviously, they don't have       11:07:57

the same referral traffic that The Erotic Review has.  So it's

relevant to show this ongoing relationship, even in light of

Mr. Elms' departure.

        And this is an important -- an important analytics

that Mr. Ferrer and upper management scrutinized on a daily and       11:08:22

monthly basis to -- to show where the page views and the

referral traffic.  And, obviously, the page views on a single

day is nearly 18,714,000 in the female escort section, which is

this section that is the -- is -- the vast majority is

prostitution postings and -- and these are where -- these are         11:09:01

```
 1   postings that are paid for, and this is what generates the vast
 2   majority of the revenue for Backpage.
 3           That's why this is relevant.
 4           THE COURT:  Any other than the usual argument -- or
 5   objection?                                                          11:09:23
 6           All right.
 7           MR. FEDER:  So 9- -- 901 and cumulative.  This is --
 8   I'm sorry.  Again, Bruce Feder.
 9           901.  Cumulative.
10           THE COURT:  All right.  All right.  Let's stand in a        11:09:34
11   ten-minute recess.  I'll resume.
12           (Recess from 11:09 a.m. to 11:24 a.m.)
13           THE COURT:  Do we have Mr. Cambria on the line?
14           MR. CAMBRIA:  Yes, Your Honor.
15           THE COURT:  Do we have Mr. Feder and --                     11:24:57
16           MR. FEDER:  Yes.
17           THE COURT:  Mr. Panchapakesan?
18           MR. PANCHAPAKESAN:  Yes, Your Honor.
19           THE COURT:  Mr. Eisenberg?
20           MR. EISENBERG:  Yes.  And I'm here with Mr. Padilla.        11:25:12
21           THE COURT:  Ms. Bertrand?
22           MS. BERTRAND:  Yes.
23           THE COURT:  Mr. Kessler?
24           MR. KESSLER:  I'm here.
25           THE COURT:  And am I missing anybody?  I don't think        11:25:23
```

```
 1   so.

 2            All right.  And the government is present.

 3            Let's try to move through.  I have -- I feel like my

 4   voice is starting to give a little bit, so let's move through

 5   as best we can and try to resolve as many of these as we can.          11:25:38

 6            MR. RAPP:  All right.  I have on your screen 593.

 7   It's because it puts the sub-exhibits into context.  We're not

 8   introducing 593, but I think it's relevant.

 9            THE COURT:  I can't see that, Mr. Rapp.

10            MR. RAPP:  Yeah, it's -- it's -- it's this weird -- so    11:26:05

11   basically what it is is a Craigslist blog, and in this blog

12   they are criticizing Backpage because they are highlighting

13   within the blog that -- that Craigs- -- that Backpage has ads

14   for prostitution that are very explicit, and they include the

15   links in the blog.                                                 11:26:32

16            And so the subsequent sub-exhibits, which is 593a, b,

17   and c -- and this is a -- this is the links that Craigslist

18   includes in the -- in their blog.  And so -- and they are

19   calling out Backpage for having very explicit postings, as you

20   could see.                                                         11:27:04

21            So I'll just go through these quickly so we can --

22            THE COURT:  So 5- -- excuse me.  593a, b, and c --

23            MR. RAPP:  Yeah.

24            THE COURT:  -- are -- begin in a New York Times

25   posting?                                                           11:27:21
```

1          MR. RAPP:  No.  They -- okay.  So, yeah.  It's -- so

2     what it -- what it is is a blog.  Here's 593.  We're not

3     introducing 593.  We are introducing 593c, which is the portion

4     of the blog -- maybe I should have just started there -- is the

5     portion of the blog that -- that has the links to -- to 593a            11:27:42

6     and b.  So, if you see, this is -- this is Craigslist basically

7     saying that Backpage has these very explicit postings.

8          And so that's all this is about.  It -- this is a

9     notice document, the blog itself alerting Backpage that they

10    have very explicit sex-for-money-type postings and then the          11:28:17

11    actual postings, which we expect Carl Ferrer to authenticate as

12    a custodian for Backpage, is what makes up 533 -- 5- -- I'm

13    sorry -- 593a and b.

14          THE COURT:  I guess let me just ask a clarifying

15    question.  You're not introducing 593/593a?  You're introducing          11:28:46

16    593c?

17          MR. RAPP:  Yes.  I wanted to -- I wanted just to show

18    the Court where the 593c comes from.  This comes from a lengthy

19    blog that -- that is sponsored by Craigslist, and it has other

20    subject matter in the blog.  But part of the blog is calling          11:29:15

21    out Backpage because of their -- the explicit ads they are

22    running.

23          THE COURT:  All right.  Any other than the usual

24    objections?

25          MR. FEDER:  Well, let me -- this is Bruce Feder.          11:29:29

UNITED STATES DISTRICT COURT

1          Let me add the word rank 801 hearsay.  Relevance,

2    unless they can show that this was read by anybody.  But it's

3    hearsay on hearsay on hearsay.  Prejudicial.

4          But -- and if the Court's going to let in editorial

5    comment and that stuff, then please let us know, and we'll          11:29:57

6    object to that too.  But --

7          THE COURT:  Mr. Feder, are you talking about edit --

8    are you -- are you saying that 593c is editorial comment?

9          MR. FEDER:  Well, it's a blog -- the -- the entree is

10   a blog from Craigslist, a competitor of Backpage.                   11:30:17

11          And then if you also look at these documents, Judge --

12   look at the -- the top.  It says Way Back Machine.  So it would

13   also be a 901 objection since this is not --

14          THE COURT:  And --

15          MR. FEDER:  Way Back Machine is a -- a site where you         11:30:36

16   can go and try to find old stuff that was on the Internet.

17          THE COURT:  I think I just read about the Way Back

18   objections that were advanced by the defense.  And I --

19          MR. FEDER:  Excuse me.

20          THE COURT:  Yes.                                             11:31:15

21          Okay.  Regarding the evidence related to the Way Back

22   Machine, this is at Sealed Doc. 1212.  And so the objections

23   are already noted.  And I think at the -- at this point I'm not

24   going to rule on anything related to the Way Back Machine in

25   terms of their admissibility yet.  Again, the foundation has to     11:31:45

1    be laid.  But I think, at least to the extent that foundation

2    is laid, because this is a Backpage.com ad on 593c, it is

3    relevant.  And depending on what the foundation is laid in

4    terms of the Craigslist blog, who had notice of it, it would be

5    otherwise admissible.                                      11:32:15

6             But your objections are noted, and you can make them

7    again.

8             All right.  Let's go to 594.

9             MR. RAPP:  Yes.  So we're not going to admit 594.

10            THE COURT:  594 will not come in?                  11:32:38

11            MR. RAPP:  No.

12            But, just so you know, it's -- it's the Backpage

13   response to the Craigslist blog.

14            So this moves on to 804.  And this is a email with --

15   from Scott Spear.  So it starts down below is from Michael      11:33:05

16   Lacey down at the bottom here.  And this is -- they've gotten

17   notice of -- regarding a exposé or a senator, or Attorney

18   General at the time Blumenthal speaking on CNN regarding a

19   underage trafficking on Backpage.

20            And Mr. Lacey is asking in April of 2010:  Is there   11:33:33

21   any evidence of trial -- of child trafficking anywhere?

22            And Scott Spear responding to Mr. Lacey and saying:

23   We have subpoenas that deal with this exact issue.  More

24   details and specifics later today.  We get a ton of subpoenas

25   that we with -- that we comply with on a daily basis.          11:33:54

1          And so that's obviously relevant because Mr. Spear, a

2    co-conspirator, is putting Mr. Lacey on notice that they do

3    receive subpoenas regarding child trafficking, but that's

4    really prostitution.

5          THE COURT:  Any other than the usual objections?                    11:34:17

6          MR. FEDER:  This is the -- I'm sorry.  Bruce Feder.

7          This is the injection that caused the mistrial last

8    time of child trafficking.  So it's the same old objections,

9    but an emphasis on the prejudice and the impropriety since, as

10   the Court has noted, they're not charged with child                        11:34:41

11   trafficking.

12         But this is just a -- not even a vailed way for the

13   government to try to get in what is improper prejudicial

14   evidence.

15         THE COURT:  Well, I think, Mr. Feder, the Court's                    11:34:55

16   ruling was that it is necessarily a part of the allegation,

17   although there's no charge here.  And, again, this might be an

18   appropriate time for the limiting instruction to be read.

19         But is there any other objection beyond that?

20         MR. FEDER:  No.                                                      11:35:20

21         THE COURT:  All right.  49.

22         MR. RAPP:  49 is a email from Andrew Padilla to

23   co-conspirator Dan Hyer with Carl Ferrer copied.  And they're

24   just talking about -- in the wake of some pressure from the

25   Attorney Generals and others, they're talking about starting to           11:35:45

1    implement deleting ads when the violations are extreme and

2    repeat offenses.

3           When we delete ads, we're going to send an email from

4    sales.  When we ban a user, we need the ban to stick for at

5    least 30 days.  When we delete from the queue, we'll use          11:36:04

6    delete/notify.  We'll do everything to notify the user so it's

7    not a total snub, and we'll do everything we can to affect only

8    the worst apples.

9           This is clearly just a -- a statement from

10   Mr. Padilla, a co-conspirator.  He's furthering the -- the        11:36:21

11   objectives of the conspiracy.

12          THE COURT:  Any objection other than the usual to 49?

13          MR. FEDER:  The usual.  Thanks.  Bruce Feder.

14          THE COURT:  1187.

15          MR. RAPP:  1187 is -- is a filter -- a filter sheet         11:36:38

16   that is sent to the -- to the servers, to the developers, to

17   ban a -- a particular term here is obviously a term relevant to

18   a sex act.

19          It is being banned in escorts by ADP, which is Andrew

20   Padilla.                                                          11:37:12

21          And then -- yeah, you have it on the second page of

22   this is the forbidden text that -- and in the -- in all of

23   these categories.

24          THE COURT:  All right.  Any other objection other than

25   the usual objections?                                             11:37:45

1          All right.

2              MR. FEDER:  Bruce Feder.  No.

3              THE COURT:  1613.

4              MR. RAPP:  This is just an email between Carl Ferrer

5    and Sean Kim.  Sean Kim, Carl Ferrer will testify, is one of     11:37:56

6    the super-posters, very similar to William Mersey, Dollar Bill.

7              This is just an exchange between them about some --

8    some tech difficulties they're having -- he's having on certain

9    ads.  We expect the testimony from Mr. Ferrer that Sean Kim was

10   supplying postings in the female escort section in New York      11:38:25

11   City and that his postings were all prostitution postings.

12             And there's a second page of this as well.  It's still

13   a exchange between them.

14             THE COURT:  Any other than the standard objections?

15             MR. FEDER:  Bruce Feder.  No.                          11:38:48

16             THE COURT:  6- --

17             MR. RAPP:  918, I think.

18             THE COURT:  918, yes.

19             MR. RAPP:  918 is a -- this is an email exchange

20   between Scott Spear and Carl Ferrer.  And if you go to the       11:39:01

21   bottom, this is a -- a -- an important time in the growth of

22   Backpage, because now Craigslist has shut down its adult

23   section, and all of the prostitution ads are migrating from --

24   from Craigslist to Backpage.  And Mr. -- and Carl Ferrer is

25   asking Scott Spear if they can buy additional equipment to       11:39:34

scale up to handle the increased volume of -- of prostitution

postings.  And Scott Spear is -- as Mr. Ferrer's direct

supervisor, is telling -- is approving those purchases and

telling him to get them.

THE COURT:  Anything other than the usual objections?    11:39:57

MR. FEDER:  Bruce Feder.  No.

THE COURT:  925.

MR. RAPP:  925.  925 is a -- this is a message from

Scott Spear to Jim Larkin with Carl Ferrer copied on it.  It

involves notice testimony that they heard from an individual by    11:40:23

the name of Ernie Allen, who is the president of the National

Center for Exploited and Missing Children at the time.  And

Larkin is asking:  Do we know anything about the underage

example Ernie Allen cited from Backpage?  Did they ever notify

of this?    11:40:49

And Scott Spear says:  Not to my knowledge.  The

Maryland example.

Copying Carl to see if he has knowledge.

It's actually important because they do get notice

from Maryland around this time period regarding a underage    11:41:00

traffic -- not only underage trafficking prostitution in

Maryland, but they are alerting Backpage to that they are

violating the laws of Maryland.

And so this -- that notice from Maryland puts this

particular exchange between these co-conspirators in context.    11:41:24

UNITED STATES DISTRICT COURT

1          THE COURT:  Any other than the usual objection to 925?

2          MR. FEDER:  It's another child trafficking ad.

3          This is Bruce Feder.

4          THE COURT:  1610.

5          MR. RAPP:  1610.  1610 is offered for notice.  It is          11:42:00

6    a -- it -- so this is about -- around the time that Craigslist

7    has shut down their adult site.  And the -- this is from what

8    is known as the AIM group.  This is a -- a publication that

9    deals with classified websites.  It's sort of -- you know, it's

10   like the -- the Arizona Bar Magazine, but this is -- for          11:42:37

11   lawyers.  This is what classified websites rely upon, this

12   publication.

13         And there will be some evidence that at the direction

14   of Mr. Larkin and Mr. Spear, Mr. Ferrer engages with the

15   publisher of the AIMS report, an individual by the name of          11:42:58

16   Peter Zollman.  So they're very aware of this publication.

17   This is a publication that came out in October of 2010, which

18   the headline is Backpage Replaces Craigslist as Prostitution Ad

19   Leader.

20         MS. BERTRAND:  Hi.  This is Joy Bertrand.  I have          11:43:24

21   additional objections beyond the usual.

22         THE COURT:  Okay.  Go ahead.

23         MS. BERTRAND:  The government -- one thing that is

24   patently not relevant here is some type of constructive notice

25   where there is no evidence anyone read this.  This is being          11:43:42

1  offered as a -- everyone's on notice.  And I hate to say this,

2  but, you know, the example Mr. Rapp just gave of just, like,

3  the bar publication, there is no evidence that anyone reads the

4  bar magazine.  You know, sometimes we do; sometimes we don't.

5  And, in fact, there's been a lot of criticism of the necessity       11:44:06

6  for bar magazines.

7        So this is well outside of any notice that is actually

8  attributable to any defendant, including Ferrer, unless he

9  testifies he knew about it.  But that doesn't mean that

10  knowledge that Ferrer had is attributable to anybody else.          11:44:25

11        So these kinds of articles that are being proffered

12  for notice -- and, again, they're hearsay.  They're still

13  hearsay.  And the government can't say on one hand we're --

14  we're saying the defendants are on notice of this, and on the

15  other hand say, but we're not offering it for the truth of it.      11:44:50

16        That's -- that doesn't line up.  So these reports

17  standing alone cannot be admitted against these defendants

18  under 401 because there's no evidence that anyone read it.

19  Indeed, there's no support here to overcome a hearsay objection

20  unless they're going to bring in the people from AIM, and they       11:45:17

21  haven't proffered any, to talk about their method for studying

22  this, the basis for their report, their conclusions.

23        You can't just have publications submitted and told

24  you're on notice.  That's not how specific notice works, that's

25  not how knowing entry into a conspiracy works, and it's             11:45:34

1    certainly not how willful participation in a conspiracy works.

2         THE COURT:  Well, I -- it is hearsay.  I'll say that

3    over.  I agree that it's hearsay, but I think, again, here I'm

4    going to provide the government an opportunity to lay that

5    foundation to determine who it is that they are going to            11:45:57

6    proffer read that and what, if anything, happened as a result

7    of it.  And so in that context, if they can lay the appropriate

8    foundation, then it is relevant to showing knowledge, knowledge

9    of what occurs next.

10        And so the objection is noted, and we will wait to see       11:46:23

11   how it unfolds.

12        1609a.

13        MR. RAPP:  This is a -- similar to the AIMS report,

14   this is -- oh, this is the same.  This is the same group.

15   You're right.  It -- but it's just entitled Classified            11:46:50

16   Intelligence Report.

17        This, actually, is, again, notice to Backpage.  This

18   is a publication that classified websites rely upon for

19   information.  In this, they -- they talk about Backpage's

20   revenue and increase in revenue for sex-related services as a     11:47:11

21   result of Craigslist shutting down their adult service.

22        Yeah.  I -- so 16- -- this is a -- a -- nearly a

23   24-page document.  We only intend on introducing the first page

24   of this document, which is the 1609.

25        MR. FEDER:  So this -- this is Bruce Feder.  1609a?         11:47:40

1          MR. CAMBRIA:  Yes.

2          MR. RAPP:  So, again, 1609 is the 24-page complete

3   document.  We only want to, for notice purpose, introduce the

4   first page, which references Backpage and revenue Backpage is

5   making from online commercial sex acts.                    11:48:03

6          THE COURT:  Again --

7          MS. BERTRAND:  This is Joy.

8          THE COURT:  Well, I would say --

9          MR. FEDER:  Yeah, go ahead.

10         THE COURT:  Again, I'm going to say that assuming the    11:48:14

11   appropriate foundation is laid for whomever received this

12   report and whether or not they took some action regarding it,

13   you can deduce knowledge by.  Beyond that, the objections are

14   noted.

15         Is there any other than the usual objection to 1609a?   11:48:38

16         MS. BERTRAND:  Yes.

17         MR. CAMBRIA:  Your Honor --

18         THE COURT:  Let's -- wait.  Let's start with

19   Ms. Bertrand.

20         MR. CAMBRIA:  Sure.                                 11:48:50

21         MS. BERTRAND:  Your Honor, I would also note a 901

22   objection in that we don't know what the basis of the -- the

23   data behind this is.  And this is being called a, quote,

24   business intelligence product.  And 1609a also is a forecast of

25   revenue, not -- not a collection of up-to-date revenue.       11:49:09

1          So this, again, gets to beyond simple hearsay

2     objections.  But who -- who are they going to put on to say

3     this was a bona fide study?  And what data was used and what

4     opportunity would the defense have to counter that?  None of

5     that has been proffered.                                      11:49:30

6          So these types of reports, and I say the same thing

7     about 1610, also are going to run into a 901 objection.

8          THE COURT:  Mr. Cambria.

9          MR. CAMBRIA:  Yes.  Thank you, Your Honor.

10         I -- I obviously join in all of that.  The -- what      11:49:43

11    troubles me is that it seems like the government feels that

12    anything that was ever published that had the name Backpage in

13    it, if it was published, they can say that our clients

14    automatically had knowledge of it.

15         To prove knowledge, you need to show knowledge.  And,    11:50:01

16    you know, to just put these in is prejudicial in the sense

17    that, you know, if the jurors are -- think that simply because

18    something was published at -- with the term Backpage in it,

19    everybody automatically has knowledge of it, that's just not

20    so.                                                           11:50:23

21         And -- and so -- and that's an outgrowth of 401,

22    actually.  It's not relevant unless you can show that the

23    individual was exposed to it.  And we have -- and this also has

24    opinion in it as well.

25         And so not only is there hearsay, there's opinion.       11:50:37

```
1    You know, there are a number of different reasons why this

2    shouldn't come in.

3            THE COURT:  Someone else was trying to --

4            MR. EISENBERG:  Your honor, this is --

5            THE COURT:  -- speak as well.

6            MR. EISENBERG:  -- Dave Eisenberg.

7            I'm sorry.

8            THE COURT:  Go ahead.

9            MR. EISENBERG:  Thank you, ma'am.

10           Perhaps in view of all the other objections, but in

11   addition, perhaps the government would give us a proffer as to

12   who or how they will show which of the defendants, if any,

13   actually saw this rather than wait until this gets before the

14   jury, maybe not admitted, and the testimony starts with respect

15   to this particular ad and the others.

16           Can we have a proffer now as to how they intend to

17   show who saw it among the defendants and how they're going to

18   prove that?

19           THE COURT:  I don't see why not.

20           Mr. Rapp.

21           MR. RAPP:  Certainly.

22           Again, Peter Zollman is the publisher of the AIMS

23   report, and Mr. Larkin and Mr. Spear in particular had

24   discussions with Mr. Ferrer about some of the articles,

25   including these that were being published by -- by the AIMS
```

11:50:50

11:50:55

11:51:20

11:51:35

11:51:53

UNITED STATES DISTRICT COURT

1    report.  And at their direction, he engaged with Peter Zollman,

2    exchanged emails, met with him to try to give them -- give him

3    their position on their website.

4         This one is focused much on Backpage's revenue,

5    Backpage.com.  If you see that right there:  Backpage.com will          11:52:24

6    earn about 17.5 million in online and sex ads this year.

7         What Mr. Ferrer is expected to testify is that they

8    were -- they were pleased that the AIMS report actually only

9    reported what is a fraction of their revenue and projected

10   revenue.  They -- they didn't understand how Backpage             11:52:53

11   functioned in that a lot of the revenue was based on

12   auto-reposts and move to the top.  And that wasn't taken into

13   account in these figures.

14        MR. EISENBERG:  Judge, I'm not sure --

15        THE COURT:  Well --                                          11:53:14

16        MR. EISENBERG:  -- that that's the same thing.

17        I don't mean to interrupt, but -- I'm sorry -- but

18   that's the same thing as saying that this document was viewed

19   by whomever, whoever of the defendants.  I don't think that's

20   what I heard Mr. Rapp just say.                                   11:53:30

21        MR. RAPP:  Judge, and I just want to add on top of

22   that, if I could direct counsel to Exhibit 615, which is -- I'm

23   sorry -- 650, which is not a document that we intend to

24   introduce because it's a self-serving document authored by an

25   agent, namely a lawyer of Backpage, where they actually          11:53:53

1    reference -- reference a number of the information -- the

2    information that Mr. Zollman prints regarding Backpage and the

3    AIMS report.

4         So that suggests that at a very high level, since

5    Mr. Lacey and Mr. Larkin were paying -- and Mr. Brunst were          11:54:14

6    actually cutting checks to Mr. McNally to write letters on

7    their behalf, you could impute their knowledge to the AIMS

8    publications by virtue of that letter.

9         So I refer them to page -- to Exhibit 650.

10        THE COURT:  Well --                                             11:54:35

11        MR. EISENBERG:  Well, Your Honor -- I'm sorry.

12        THE COURT:  No.

13        MR. EISENBERG:  Again --

14        THE COURT:  Let me --

15        MR. EISENBERG:  -- I don't mean to butt in.                     11:54:40

16        THE COURT:  Let me just --

17        MR. EISENBERG:  Go ahead.  I'm sorry.

18        THE COURT:  Let me put the conversation to rest, and

19    we'll move forward.

20        But it is true you're going to have to lay the                  11:54:45

21    foundation for whom -- who it is that read this, received it,

22    read it.  What did they do with it?

23        And if you can't lay that foundation -- and I didn't

24    hear it in your proffer.

25        MR. RAPP:  Well --                                              11:55:06

UNITED STATES DISTRICT COURT

1           THE COURT:  You -- I didn't -- I didn't hear it.

2           MR. RAPP:  They -- Mr. Larkin and Mr. Spear for sure

3  read these publications.  For sure --

4           THE COURT:  Well --

5           MR. RAPP:  -- read them.                              11:55:15

6           THE COURT:  -- I don't know who you're going to get on

7  the stand.

8           MR. RAPP:  What's that?

9           THE COURT:  I don't know who you're going to get on

10  the witness stand.                                            11:55:22

11          MR. RAPP:  Well, Mr. Ferrer's going to -- they -- they

12  discussed the AIMS report, because obviously the AIMS report

13  was accusing them of having a prostitution website.  So it was

14  a reputational concern for Backpage.  So there were quite a bit

15  of discussions.  And at their direction, Mr. Larkin and        11:55:35

16  Mr. Spear, Mr. Ferrer actually met with the publisher of the

17  AIMS.

18          And then we see some of the statistics, some of the

19  revenue projections that they challenge, and some of the

20  conclusions they challenge in a letter from a lawyer for       11:55:52

21  Backpage, a lawyer for Mr. Larkin and Mr. -- Mr. Lacey.  And

22  that's Exhibit 650.

23          THE COURT:  Well, I -- I would suggest this, that if

24  you can lay the foundation for the knowledge of what was being

25  said about them -- I don't necessarily know that this needs to  11:56:15

1   go in front of the jury, this particular exhibit, because it

2   also is filled with speculative information from -- and we

3   don't know from what source.

4          And so he can certainly say whatever the testimony is

5   going to be, that this report came to their attention so they          11:56:40

6   called me -- this is Mr. Ferrer.  They called me -- perhaps it

7   refreshes his recollection -- and so I did X, Y, and Z.

8          So it -- if it comes in in that way, but I don't

9   necessarily think, at least the -- the ad that's on the screen

10   here, needs to go to the jury.          11:57:02

11          MR. RAPP:  Very well.

12          THE COURT:  All right.  Let's move on.

13          MR. RAPP:  This is an email exchange between --

14          THE COURT:  What?  I'm sorry.  What --

15          MR. RAPP:  923?          11:57:23

16          THE COURT:  9- --

17          MR. RAPP:  Yeah.  Am I right?

18          THE COURT:  923.

19          MR. RAPP:  Yes, 923.

20          This is an email exchange that starts here at the          11:57:30

21   bottom with Mr. Lacey and Mr. Spear and Mr. Ferrer, and it's

22   regarding a -- a change -- this is -- this is only

23   approximately two weeks after -- even less after Craigslist

24   shut down their adult section.  And this is a petition by an

25   organization called Change.org that is -- they're trying to get          11:57:56

1  a petition to have Village Voice Media to stop child sex

2  trafficking on Backpage.  And it is -- goes up to Mr. Spear.

3          THE COURT:  All right.  Any other than the usual

4  objection?

5          MR. CAMBRIA:  Sorry.  Is that 923?                11:58:20

6          THE COURT:  Yes.

7          MR. CAMBRIA:  You've said that -- let's see.

8          Yeah.  Well, obviously the objection we gave, but,

9  again, it looks like they're trying to convince the jury that

10  child sex trafficking is occurring like that's a charge.     11:58:51

11  Because that's what that article appears to be, the hyperlink

12  that's there.  That's what it appears to be dealing with,

13  Village Voice Media to stop child sex trafficking on Backpage.

14          A total conclusion at that point.  And, again, trying

15  to inject children into this case, which derailed it the first  11:59:22

16  time.

17          THE COURT:  And that is -- that is a difficulty here

18  in these sort of situations, where you don't have anyone --

19  presume you don't have anyone who is going to indicate what

20  the -- in their view sex trafficking means versus what the    11:59:40

21  allegations are.   And so I'd be mindful of that.

22          But I do think it's relevant, but I noted that

23  objection.

24          MR. CAMBRIA:  The prejudice outweighs the -- the slim

25  relevance that may be imagined here.                        12:00:02

1          THE COURT:  Well, I think it goes to notice.

2          MR. CAMBRIA:  Well, again, you have to prove that the

3    individual saw whatever the information was that allowed them

4    to draw this conclusion in this communication.

5          THE COURT:  Well, I'll let the government argue its

6    case.  I didn't view the exhibit in that way.  But, in any

7    event, let's move forward.  Your objection is noted.

8          932 is, again, one of these letters?

9          MR. RAPP:  Yes.  So 932's actually relevant to the

10   previous exhibit that we looked at.

11         THE COURT:  Can you speak in the microphone.

12         MR. RAPP:  Yes.  I'm sorry.

13         It's relevant to the -- the previous exhibit where

14   Mr. Spear says, well -- when Mr. Lacey is asking about is there

15   any child sex trafficking on the site, and Mr. Spear in that

16   email references Maryland.  So this is a fax that Backpage

17   received from -- from the Department of Police in Montgomery

18   County, which is in Maryland, and they are alerting Backpage.

19         I've also reviewed Backpage.com's terms of use.  But

20   it goes on to say:  Your website is in violation of a number of

21   Maryland state statutes; human trafficking, receiving the

22   proceeds of prostitution, soliciting for prostitution.

23         And they request that they immediately remove all the

24   categories from the Washington, D.C., area, particularly

25   Montgomery County.

1          And so this is -- this goes to notice.  And so this is

2    a -- and I think you have to take this into consideration with

3    another -- this just shows -- the next page of 932, page 2,

4    just actually just shows this being faxed to Backpage.

5          And then taking in -- this into consideration with             12:02:17

6    933, which is a -- which is a email between Carl Ferrer -- from

7    Scott Spear to Carl Ferrer, copy the attorney.  And Scott Spear

8    is saying:  Should we ask him to identify the specific postings

9    that violate the terms of use, or does that just open a huge

10   can of worms?                                                        12:02:46

11         This portion of the response that they give to the

12   detective down here is a self-serving statement from Carl

13   Ferrer.  He's going to say that it's self-serving and that it

14   was inaccurate.  And so we have redacted that portion out and

15   only intend to show 933a, which redacts out -- which indicates   12:03:07

16   that they did receive the fax find -- found in 932 and that

17   Mr. Spear was made aware of it.

18         THE COURT:  All right.

19         MR. CAMBRIA:  Paul Cambria.

20         MS. BERTRAND:  Joy Bertrand.                                    12:03:29

21         THE COURT:  Well, let me just say the letter --

22   actually, I think I've addressed those types of letters with

23   regard to notice in the prior Court's ruling at Docket 1159

24   regarding those letters and relevant for notice.

25         And so I heard Mr. Cambria.                                     12:03:49

1          MR. CAMBRIA:  Yes, Your Honor.

2          THE COURT:  Anything?

3          MR. CAMBRIA:  Well, first of all, 932.  It's not

4    notice to any defendant in this case.  Backpage isn't a

5    defendant.  And so there's -- you know, as far as saying that          12:04:00

6    that's notice, again -- and I have to go back to one of

7    Judge Brnovich's rulings.  But one of the things, obviously,

8    that she discussed was you'd have to show actual knowledge by a

9    defendant before you could include that that was knowledge.

10   And not only that, this particular statement letter is rife          12:04:25

11   with hearsay.

12         But I -- my first problem is I don't think the

13   knowledge to one of these defendants just because a letter

14   shows up.  And they didn't even show that it shows up at

15   Backpage.  But that's all they have.  This isn't addressed to          12:04:51

16   anybody in this trial.  If it were, you'd still have to prove

17   that they got it and read it.

18         MR. RAPP:  Well, Mr. Feder's counsel's not going to

19   take that position, because he actually gets -- he actually is

20   a -- confirming that he -- he received it in 933 where he          12:05:10

21   says -- the subject line is:  Response to Maryland fax.

22         And what we expect the testimony to be is what he --

23   what Mr. Ferrer took from Mr. Spear saying, or does that just

24   open a huge can of worms, is we don't really want to know what

25   those specific postings are because they may be or, in all          12:05:40

UNITED STATES DISTRICT COURT

```
 1    likelihood, are prostitution postings.
 2           But if you go back to, just to address Mr. Cambria's
 3    point -- what's the word?
 4           MR. CAMBRIA:  I lost you.
 5           MR. RAPP:  Which one is that?                           12:05:59
 6           THE COURT:  No, there's a -- there -- did you get the
 7    point that there's a confirming note?
 8           MR. CAMBRIA:  As to -- well, they say there is --
 9           THE COURT:  There's a confirmation that they've
10    received the letter.                                          12:06:11
11           MR. RAPP:  There's confirmation from Mr. Spear --
12           MR. CAMBRIA:  That's --
13           MR. RAPP:  -- but -- not to interrupt Mr. Cambria, but
14    if you recall that exchange from Mr. Lacey in the previous
15    exhibit where he says, hey, is there any evidence of child sex 12:06:21
16    trafficking, which Mr. Cambria had an objection to, Mr. Spear
17    says, well, only -- and in parentheses, only the Maryland
18    example.
19           So that puts those -- those exhibits together.  And,
20    frankly, Mr. Spear 100 percent knows about this fax.  Mr. Lacey 12:06:40
21    just knows that Mr. Spear is telling him, like, there's another
22    example here from Maryland, and, so ...
23           MR. CAMBRIA:  Yeah, but not indicating that he saw the
24    letter.
25           MR. RAPP:  Well ...                                     12:06:58
```

UNITED STATES DISTRICT COURT

1    MS. BERTRAND:  Your Honor, I have an objection to 932.

2  This is Joy Bertrand.

3    THE COURT:  Go ahead.  Quickly.

4    MS. BERTRAND:  Your Honor, this letter is unsigned

5  from an unknown person on police letterhead demanding closure        12:07:09

6  of Backpage.

7    And my objection is Crawford, that we don't know who

8  wrote it.  We have no opportunity to cross-examine this person.

9  And I -- that -- this -- and this was clearly sent -- well,

10  ostensibly sent by law enforcement so they knew this might end       12:07:30

11  up in some type of litigation.

12    Regardless of a ruling on hearsay, this is a Sixth

13  Amendment confrontation problem with this that I don't think

14  the government can overcome.

15    THE COURT:  All right.                                            12:07:46

16    MR. FEDER:  This is Bruce Feder.

17    I think that's a good stage.  Anything that the

18  government's going to bring in exhibit-wise that they don't

19  have a witness for has a potential Crawford problem, number 1.

20    Number 2, as to this specific email, it's a 106 issue,           12:08:03

21  and we're not -- I mean, if the Court's going to make us bring

22  in the unredacted part of it, then that's fine.  It's going to

23  prolong this trial.  However long Mr. Ferrer testifies, the

24  cross would have to be probably similar because they're showing

25  him an exhibit that they have redacted, and on cross we'll have      12:08:24

1    to bring in the unredacted.  So it will be however long it's

2    going to be.

3              MR. PANCHAPAKESAN:  Your Honor, this is

4    Mr. Panchapakesan.  I can speak briefly to this completeness

5    issue.                                                    12:08:41

6         So on 933a -- I don't know if the Court has

7    Exhibit 933 in front of it, but the redacted portion of that

8    email is -- is a draft response from Mr. Ferrer to

9    Detective Fitzgerald who writes the letter in 932.  He's a

10   detective in Maryland.  And Ferrer essentially says that in the  12:09:03

11   draft that he thinks that -- that Backpage is doing things like

12   complying with -- like cooperating with law enforcement,

13   complying to law.

14        I understand that Mr. Rapp's point is -- his view --

15   his view is that this is a self-serving statement by Ferrer.  I  12:09:25

16   think the problem with that is we've just gone through about,

17   you know, 100-plus emails from Ferrer, and the Court has said

18   that emails Mr. Ferrer has sent using his Backpage email

19   address are -- are essentially presumed to be relevant and

20   admissible.                                               12:09:45

21        So I don't think the government can parse this out and

22   say, well, in their view some emails from Ferrer, you know,

23   come in and some don't because the government's made a

24   determination that Ferrer wasn't telling the truth, you know,

25   in one of those emails.                                   12:10:01

1          I think that what this email stands for, the redacted

2    portion, is that it doesn't come in for the truth.  It comes in

3    to show that this was Backpage's position.  This was Ferrer's

4    understanding at the time.

5          And now Mr. Ferrer can certainly testify that he          12:10:15

6    didn't mean what he said, but I don't think that that allows

7    the government to redact out the -- the entirety of the email.

8          THE COURT:  And I would agree.  I think that you're

9    going to run into an objection for completeness.  I think that,

10   you know, it's relevant.  And so I think if you produce the     12:10:38

11   unredacted version, it's going to save us a lot of time and --

12         MR. RAPP:  I'm happy to bring it in.

13         THE COURT:  Okay.  So that issue's resolved.

14         Let's move forward.  52.

15         MR. RAPP:  Okay.  So this is just --                      12:10:52

16         MS. BERTRAND:  Your Honor, I just want to note, I

17   don't think we've resolved the Crawford objection under 932, so

18   I just want to make a record.

19         THE COURT:  Well, I --

20         MS. BERTRAND:  I don't think it's resolved.              12:11:13

21         THE COURT:  Your objection is noted.  And I previously

22   stated that those letters that were received and reviewed and

23   acknowledged by one of the co-conspirators is relevant.  It's

24   admissible so long as there's foundation laid --

25         MS. BERTRAND:  Your Honor --

1          THE COURT:  -- and it goes toward knowledge --

2          MS. BERTRAND:  -- Crawford --

3          THE COURT:  Okay.  And so we'll let them lay the

4   foundation and put forward their actual evidence and testimony

5   in order to support the admission thereto.                    12:11:42

6          Let's go forward.

7          MR. RAPP:  So --

8          MS. BERTRAND:  Your Honor, this is -- Your Honor,

9   Crawford is not a relevance objection.  It's a Sixth Amendment

10  objection.  We -- we -- this is not hearsay.  Regardless of    12:11:52

11  what happens with hearsay, this is a confrontation issue

12  regarding whoever wrote -- this is unsigned.  They want to

13  attribute it to a detective.  It's unsigned.

14         And so my objection is -- is different.  And I just

15  want to make sure the record's clear that this unsigned letter, 12:12:11

16  hearsay, relevance notwithstanding, presents a Sixth Amendment

17  problem under *Crawford vs. Washington*.

18         THE COURT:  Mr. Rapp.

19         MR. RAPP:  Well --

20         THE COURT:  -- are you introducing an unsigned letter?  12:12:26

21  I thought there was a signature line on there.

22         MR. RAPP:  Well, it -- so, yeah, there's --

23         THE COURT:  And it was -- and it was from a

24  Detective Fitzgerald, or something like that.

25         MR. RAPP:  Right.  It's -- here it is.  It's -- it's   12:12:36

1    faxed to -- if you see the second page of 932, it's faxed to

2    Backpage.  Carl Ferrer's going to testify that he received it.

3    It's from Dan Fitzgerald.

4           And then the -- the first page of the letter is:  I

5    look forward to your cooperation in this matter.  If you have          12:13:00

6    any questions or concerns, please address these matters with

7    Detective Dan Fitzgerald of the Montgomery County Police

8    Department.

9           And it gives his email address.

10          THE COURT:  All right.  Let's go forward.                       12:13:14

11          MR. RAPP:  So, let's see.

12          MR. CAMBRIA:  52.

13          MR. RAPP:  52.  52 is just another State Attorneys

14   General letter to the defendants, to an agent of the

15   defendants, Samuel Fifer, and detailing in the wake of                 12:13:34

16   Craigslist shutting down some of the -- and they highlight the

17   fact that much of the prostitution postings have migrated to

18   Backpage.

19          And so this is -- this just falls into a number of

20   letters that they received from the State Attorney General and         12:13:56

21   the National Attorney Generals Association alerting Backpage to

22   what's going on on their website.

23          THE COURT:  Any other than the usual objections?

24          All right.

25          MR. FEDER:  No.                                                 12:14:16

1        THE COURT:  907.

2        MR. RAPP:  This is 907.  This is a -- this is an email

3   from John Georgio.  And Mr. Ferrer is expected to identify that

4   John Georgio is the person that took over The Erotic Review

5   from -- from David Elms after David Elms was arrested.          12:14:40

6        And so Mr. Ferrer is alerting him, you know, to this

7   prostitution review site, that we are getting a lot of pressure

8   from the AGs, as is evidenced by the AGs' letters that we've

9   been looking at.

10       So this is -- he's going to implement some changes to      12:15:04

11   try to mit- -- minimize their exposure to -- to the -- to law

12   enforcement.

13       THE COURT:  Any other than the usual objection --

14   objections?  Excuse me.

15       All right.  9- -- 907.                                     12:15:28

16       MR. FEDER:  That was 907.

17       THE COURT:  I'm sorry.  11- -- 1185.

18       MR. RAPP:  Okay.  1185 is -- now, this is a -- a

19   first.  It's a -- it's an email string, and it is from CNN.  And

20   they are beginning to ask Carl Ferrer if they would be          12:15:52

21   willing -- if he would be willing to submit to an interview.

22   And what they do is they alert him down here, cc's CNN

23   Investigations.  And he wants to ask them some questions, you

24   know, about a particular posting here.

25       I only highlight this because this becomes relevant        12:16:21

1    down the road in all the -- at least Mr. Spear and Mr. Lacey

2    become involved in this.  And so this is several-page document.

3             And then part of that document is a reporter by the

4    name of Amber Lyon.  This goes into September of 2010.  And

5    she's a correspondent with CNN, and she's just alerting them          12:16:52

6    that there is prostitution -- underage prostitution on your

7    escort section.

8             So this is the first sort of the introduction to this,

9    to CNN's exposé on Backpage.

10            MR. PANCHAPAKESAN:  Your Honor, this is                       12:17:17

11   Mr. Panchapakesan.

12            So 1185a, as the Court can see, has some redactions in

13   it.

14            THE COURT:  It does.

15            MR. PANCHAPAKESAN:  1185 is the unredacted version.           12:17:29

16   And the redactions are Backpage's response to CNN's Amber Lyon,

17   which, in essence, say that, you know, Backpage is -- is taking

18   steps to -- to comply with the law, you know, plain and

19   relevant.

20            I -- I take it, based on prior exhibits, the                  12:17:52

21   government's redactions are because in their mind these are

22   self-serving statements.  And I think in response, the same as

23   it's been on the other exhibits.

24            But here, this is, I think, in -- just so you know,

25   CNN was putting our clients on notice of something, and -- and        12:18:09

UNITED STATES DISTRICT COURT

1   so the redacted statements are relevant because it responds.

2   It's not coming in for the truth.  It's coming in to show

3   Backpage and our clients' state of mind and their understanding

4   of what position they're taking vis-a-vis CNN.

5          And so we ask, if this is admitted, that the                    12:18:30

6   unredacted version come in.

7          THE COURT:  Is there a reason for --

8          MR. CAMBRIA:  Yes.

9          THE COURT:  Wait.  Let me speak, Mr. Cambria.

10         MR. RAPP:  Couple of things.  Well, so --                        12:18:38

11         THE COURT:  Is there a reason for the redaction?

12         MR. RAPP:  Yes.  First of all, they -- the -- the --

13  the response from Backpage to CNN is not accurate, and it also

14  includes -- it's self-serving, but it also includes references

15  to the CDA and the like.  And so, based on the Court's previous    12:18:54

16  orders, that shouldn't come in.

17         The -- you know, the door doesn't go both ways here.

18  These are self-serving statements.  Just because this came up

19  previously with other exhibits, I made the comment that, well,

20  if the defense wants these self-serving statements, they're        12:19:17

21  going to have to try to get those in on cross or in their -- if

22  they put on a case, put in their case.

23         But I want to be clear.  We're not agreeing to that.

24  We -- these are self-serving hearsay.  And -- and in these ones

25  in particular, it is a blend of self-serving hearsay plus CDA      12:19:36

1    references.

2            THE COURT:  What -- so give me --

3            MR. CAMBRIA:  Your Honor, Paul Cambria.

4            THE COURT:  No.  No, Mr. Cambria.  No.  Let me take my

5    turn.                                                                    12:19:51

6            MR. CAMBRIA:  Oh, I'm sorry, Your Honor.

7            THE COURT:  What does the reference to CDA say?

8        And you say that -- you say the response was not

9    accurate.

10           MR. RAPP:  Yeah.  Let me -- let -- what I think might   12:20:01

11   be helpful, just to pull up both of the -- the original exhibit

12   and then the redacted one.  And so -- oh, let's see.

13       Yeah.  So this is -- this is in response to a civil

14   lawsuit that Backpage hired -- or Backpage was defending.  And

15   you see there:  We provided the FBI with the perpetrator's IP    12:20:40

16   address, credit card information.  Section 230 of the

17   Communications Decency Act of 1996 recognize that at the very

18   nature of the Internet meant that the vast traffic depended on

19   the ability of citizens to post directly into websites like

20   Backpage.com.                                                    12:20:59

21       So this is all very self-serving, that they are

22   assisting -- there is -- this is -- there is a conspicuous

23   absence of any reference to a long-standing relationship with

24   The Erotic Review or the cultivation of super-posters or, at

25   the very inception of Backpage, the aggregation of -- of        12:21:16

```
 1   prostitution postings from other sites.  And they don't -- they

 2   don't detail the true nature of the moderation, which we'll get

 3   to a little bit later in exhibits.

 4        So, for those reasons, we think this is -- based on

 5   the Court's previous order, plus the self-serving nature of it,

 6   we are not going to introduce it, and we would object to

 7   this -- this being introduced.

 8        And on -- and, also, any similar self-serving

 9   correspondence that Backpage sents -- sends to whomever,

10   whether it's the National Attorney Generals Association or to

11   CNN or to anybody else.

12        THE COURT:  All right.  Mr. Cambria, you wish to say

13   something?

14        MR. CAMBRIA:  I do, Your Honor.

15        First of all, this is, you know, this self-serving

16   panacea here by the government.  Anytime somebody pushes back

17   and has a different opinion about the facts and the law, they

18   call it self-serving and say it shouldn't be admitted.

19        Without admitting it, this then goes unchallenged like

20   it's an admission.  And so they opened the door on this

21   subject.  They made an accusation, and there was a response.

22   And so both of them have to come in in order for that to be

23   fair.

24        And whether they disagree with the response, that's

25   the response.  We obviously disagree with the opening letter.
```

12:21:34

12:21:55

12:22:06

12:22:31

12:22:49

1          And so what do I say?  It's self-serving for the

2    government, and they -- it shouldn't come in for that reason?

3    No.  They opened the door.  They want to make this accusation.

4    If -- the jury needs to know that we refuted it and how we

5    refuted it.  And they can make whatever argument they want, but          12:23:09

6    they're opening the door to this subject.  And if we don't

7    respond and we don't put this response in, it looks like we

8    didn't respond, so we must not be able to respond or refute it.

9          That's just not fair.

10          THE COURT:  Anyone else?                                          12:23:30

11          MR. FEDER:  This is Bruce Feder.

12          It -- this is just an attempt to distort the

13    truth-finding process by the government, Judge.

14          The orders of the Court regarding CD-230 are you can't

15    assert that it's a complete defense to what they did.  Has          12:23:42

16    nothing to do with whether or not it can be mentioned.  And, if

17    mentioned throughout, all of the correspondence, all of the

18    exhibits on both sides.  And the idea that Mr. Rapp thinks that

19    because they didn't go into chapter and verse all of the ideas

20    that the government has that Backpage was doing something wrong          12:24:01

21    by their aggregation and reciprocal agreement process, it's

22    just -- it's absurd on its face.

23          This is a -- this is an attempt at distortion, and

24    we -- we -- I mean, I think we're entitled to bring in fair

25    response to accusations.  And if the government's going to          12:24:20

```
 1   introduce this, we're going to bring in, you know, the
 2   response.
 3          And if the Court's going to block us from doing that,
 4   so be it, but it's -- that --
 5          THE COURT:  Well, I think --                          12:24:37
 6          MR. FEDER:  You've been --
 7          THE COURT:  Let me just --
 8          MR. CAMBRIA:  It's --
 9          THE COURT:  No.  No.  Mr. Cambria, now it's my turn,
10   and then we're going to move on.                             12:24:46
11          I'm going to look at the content of the redacted
12   exhibit.  You'll provide that to me.  But I adhere to my prior
13   ruling.  I'm not going to permit anybody to bring in any
14   information related to the CDA.  This is not a CDA case.
15   And so if the response is self-serving, and if I find that the  12:25:12
16   CDA permeates that response, then the government's entitled to
17   have the redaction.  But I'll otherwise take that under
18   advisement.
19          938.
20          MR. RAPP:  So 938 is a several-page email exchange.    12:25:36
21   It involves Mr. Spear and Mr. Ferrer, and it starts with a
22   reference here with Ashton Kutcher and Demi Moore.  This is the
23   married-at-the-time actor and actress.  They are also -- have
24   their own NGO against child sex trafficking, and they have
25   published an article.  And this also references the Amber Lyon  12:26:11
```

 1   report.

 2           And so it's just a -- it's a notice in here.  They are

 3   trying to formulate a response to this recent salvo in USA

 4   Today, and now they have hired a public relations person --

 5   firm to assist in -- in public relations on these issues.          12:26:45

 6           And Michael Lacey at the very top received this whole

 7   string of emails.

 8           MR. CAMBRIA:  Is this 938?

 9           MR. RAPP:  Yes.

10           THE COURT:  Yes.                                           12:27:00

11           MR. CAMBRIA:  938.

12           THE COURT:  Any other than the usual objection?

13           MR. CAMBRIA:  Yes, because, again, here we go with the

14   children.  That's -- you know, that's the MO on the part of the

15   government.  Children, children, children.  And that's --        12:27:14

16   that's where this is again.

17           THE COURT:  600.

18           MR. RAPP:  600.  Now we are in 2010, and they

19   really -- because of the pressure of -- of the National

20   Attorney Generals and some of the media, they are now            12:27:42

21   ratcheting up moderation.

22           And so this is just an email exchange between Andrew

23   Padilla, Carl Ferrer, and Dan Hyer.  And they are talking about

24   moderation and listing out terms.  They have now hired -- they

25   have now contracted out moderation to an India-based moderation  12:28:05

1    company, and they are exchanging emails with that company and

2    giving them direction on -- for example, here on -- for the

3    record, on page 2 of this, they are giving them direction on

4    things, on images, things that should be failed, and then on

5    the top of that email things that would not be subject to          12:28:36

6    failure on postings that are coming through and being

7    monitored -- or moderated, rather.

8            And Andrew Padilla is being made aware of these --

9    these -- these contacts.

10           THE COURT:  All right.  Anything other than the usual      12:28:55

11   objection?

12           All right.  To Mr. Cambria's last point, again,

13   adhering to the prior rulings of the Court, the prior Court in

14   this court, we cannot avoid the terms of trafficking, child

15   trafficking, child sex trafficking.  As the Courts have           12:29:23

16   previously noted, it's a part of the terminology that's used

17   within the context of the topical areas here.

18           And so, however -- and it -- and especially, for

19   example, in this last exhibit.  They're talking about a

20   movement to bring awareness to trafficking.  It's become          12:29:52

21   nomenclature.

22           At the appropriate time the Court will remind the jury

23   in the limiting instruction that I put forward what this case

24   is about.  And we'll do so at the final instructions as well.

25   But the Court cannot -- it cannot preclude the government from     12:30:20

introducing any exhibits simply because it refers to the word

trafficking.

So, in any event, what I will say is I remain

concerned about Exhibit 573 and 573a.  It seems to me, if the

government's intent in bringing forward that exhibit about                12:30:51

Mr. Elms' arrest, it need only -- and the purpose for it, as I

understand it, was only to show that he's out of the picture

now at The Erotic Review and somebody else takes over and so

the relationship begins anew, I think there's ways you can do

that without bringing in that exhibit.  And I think then the              12:31:16

real problem becomes, what is the foundation to be laid in

getting to whatever that --

MR. RAPP:  Yeah.  So, Judge --

THE COURT:  -- moniker --

MR. RAPP:  -- just --

THE COURT:  -- is?

MR. RAPP:  Yeah.

THE COURT:  So I just -- I put that forward because --

MR. RAPP:  Not to interrupt you, Your Honor.

THE COURT:  -- I think that's a real problem you have           12:31:35

when you bring forward that exhibit.

MR. RAPP:  So, just to be clear, we are not breathing

a word of Mr. Elms' arrest.  We're not bringing in anything,

any details.  The only thing we are bringing in is the fact

that The Erotic Review was published in Michael Lacey's                   12:31:51

newspaper and it had an example of the review.  That's it.

    We're not going to talk about what -- the facts surrounding Mr. Elms' arrest, only the fact that Mr. Lacey's own newspaper published an article about The Erotic Review, which, as we get down the road, he's going to be confronted with the leadership in person.  He's going to be confronted by NCMEC with the relationship between The Erotic Review and Backpage.

    But this just serves as notice that you can't plausibly say that your own newspaper that's being published a floor below you is having an article about the person who's running The Erotic Review, and you don't know anything about it?

    And all we are presenting -- Mr. -- Mr. Ferrer -- this -- this article's not coming in except for the fact that that one little portion of it that demonstrates a -- right here on the screen that demonstrates actually what the website looked like because his paper published a review.

    That's relevant.  That's relevant.  And that --

    THE COURT:  It is only if you can lay the foundation for whomever saw it or put it in there, or what -- however it is.

    MR. RAPP:  Well, if you're the editor of a newspaper, I think, you know ...

    THE COURT:  Well, you may have to wait until

UNITED STATES DISTRICT COURT

1    cross-examination then.

2           MR. RAPP:  All right.

3           THE COURT:  All right.  So, in any event, I expect all

4    counsel to be here before the jury is seated, and we're going

5    to seat them promptly at 9:00 a.m. on Tuesday.                    12:33:34

6           Now, there are other filings that have been made.  Pay

7    attention to those.  Adhere to the Court's directive in terms

8    of responses.

9           Mr. Panchapakesan, I will say I noticed Mr. Lincenberg

10   is not and has not been a part of these discussions.  You will   12:33:53

11   advise him as to the Court's process.  We went through these

12   exercises, important exercises, so that no speaking objections

13   will be made before the jury, only those related to relevance,

14   hearsay, 403, and so on and so forth.  He does not get to ask

15   for sidebars, because if he does, I'm going to shut him down.     12:34:14

16   We're not going to have sidebars.  We're going to move forward.

17   And if he wishes to make a record, then, again, as I said with

18   every counsel, every counsel is permitted to ask for a record

19   to be made at a break, before trial, or after trial.  I'm not

20   going to waste any more of this jury's times on any delay.        12:34:32

21          And so I expect everybody to be here promptly.  And do

22   take care of your health.  All right?

23          And so is there anything further from the government?

24          MR. RAPP:  No, Your Honor.  Thank you.

25          THE COURT:  Anything further from you, Mr. Cambria?        12:34:48

1          MR. CAMBRIA:  No, Your Honor.

2          THE COURT:  And congratulations in advance, I think.

3          And anything from you, Mr. Feder?

4          MR. FEDER:  No.

5          THE COURT:  Anything further from you, Mr. Kessler?        12:35:02

6          MR. KESSLER:  No, Your Honor.  Thank you.

7          THE COURT:  Anything further from you,

8   Mr. Panchapakesan?

9          MR. PANCHAPAKESAN:  No, Your Honor.  And I take it

10  that we are -- we're not convening on Monday for any purpose?    12:35:14

11         THE COURT:  Not unless any party thinks that there's a

12  necessity to.  I was going to vacate that 2:30.

13         Mr. Eisenberg?

14         MR. PANCHAPAKESAN:  Thank you, Your Honor.

15         MR. EISENBERG:  No.  Nothing, Your Honor.  Thank you.     12:35:30

16         THE COURT:  Ms. Bertrand?

17         MS. BERTRAND:  No.  Thank you.

18         THE COURT:  All right.  I will see you promptly on

19  Tuesday.  Have a good weekend.

20         (Proceedings conclude at 12:35 p.m.)                      12:35:38

21                         ---oOo---

22

23

24

25

UNITED STATES DISTRICT COURT

1

2

3

4

5                     **C E R T I F I C A T E**

6

7          I, CATHY J. TAYLOR, do hereby certify that I am duly

8   appointed and qualified to act as Official Court Reporter for

9   the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11  a full, true, and accurate transcript of all of that portion of

12  the proceedings contained herein, had in the above-entitled

13  cause on the date specified therein, and that said transcript

14  was prepared under my direction and control.

15         DATED at Phoenix, Arizona, this 8th day of September,

16  2023.

17

18

19

20                              /s/ Cathy J. Taylor
                                _____
                                Cathy J. Taylor, RMR, CRR, CRC

21

22

23

24

25

UNITED STATES DISTRICT COURT