2:18-cr-00422-DJH, September 19, 2023 A.M.

1              **UNITED STATES DISTRICT COURT**

2              **FOR THE DISTRICT OF ARIZONA**

3                   _____

4

**United States of America**,            )
5                                         )
                          Plaintiff,      )
6     vs.                                 )
                                          )   2:18-cr-00422-DJH
7     **Michael Lacey, et al.**,          )
                                          )
8                          Defendants.    )
                                          )   September 19, 2023
9     _____   )   9:10 a.m.

10

11

12          **BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE**

13            **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

14                 JURY TRIAL - DAY 8 A.M.

15

16

17

18

19

20

21    Official Court Reporter:
      **Elaine Cropper, RDR, CRR, CCP**
22    Sandra Day O'Connor U.S. Courthouse, Suite 312
      401 West Washington Street, SPC 35
23    Phoenix, Arizona  85003-2151
      elaine_cropper@azd.uscourts.gov
24
      Proceedings Reported by Stenographic Court Reporter
25    Transcript Prepared by Computer-Aided Transcription

                 United States District Court

2:18-cr-00422-DJH, September 19, 2023 A.M.

1

**I N D E X**

2

**TESTIMONY**

3

**WITNESS**                          **Direct    Cross     Redirect   Recross**

4

Government's Witnesses

5

 CARL FERRER                          7

6

7

**E X H I B I T S**

8

Number                                                          Ident  Rec'd

9
103     Email from Padilla to Vaught, Mohan,         30     31
        and Moderators (with attachment),
10      04/05/2011

11
104     Email from Hooper to Larkin, Spear,          33     33
        Ferrer (with attachment), 04/27/2011
12
104a    Attachment. Document outlining action        33     33
13      items.

14
113     Email from Ferrer to Lacey and Larkin        65     66
        re Age Verification Software,
15      07/27/2011

16
113a    Attachment. Document titled "Backpage        67     68
        understood."
17
115     Email from Ferrer to Lacey and Larkin        69     70
18      (with attachment), 07/28/2011

19
115b    Attachment. "Backpage                         69     70
        understood_carl_comments" document
20      (displays comments/changes)

21
119     Letter from NAAG to Backpage,                81     82
        08/31/2011
22
203     Emails between Padilla and Ferrer re         87     88
23      GFE ads, 08/31/2011

24
651     Emails to Larkin, Spear, Ferrer,             8      9
        "holding conference call time for
25      Friday," 02/28/2011,

2:18-cr-00422-DJH, September 19, 2023 A.M.

1        **E X H I B I T S** (Continued)

2    Number                                              Ident   Rec'd

3    655    Emails between Ferrer and Brunst, "2nd       25      26
            moderation team in Florida",
4           03/29/2011,

5    661    Letter from Seattle Mayor to Larkin,         46      47
            07/01/2011,
6
7    662b   Email from Larkin to Lacey, "Sgt Byron       52      53
            Fassett", 07/06/2011,

8    670    Emails between Lacey and Ferrer, "Re:        62      63
            the three examples of under aged girls
9           handed to me at the meeting",
            07/17/2011,
10
11   670a   Capture of linked ad                         63      63
            "sweet-petite-the-one-guys-want-to-mee
12          t-19",

13   805    Email from Padilla to Vaught, "Fwd:         43
            Child Recovered", 06/21/2011

14   846    Email from Ferrer, "Fwd: follow up re:       56      56
            today's call", 07/27/2012
15   846a   Attachment, "Documented Backpage.com         59      56
            Incidents",
16
17   850    Email to Larkin, "August 22 Letter",         78      79
            08/22/2011,
18   850a   Attachment, Letter from Washington           78      79
            State Mayors
19
20   912    Email from Lacey, "Re: Seattle Mayor",       50      50
            07/11/2011
21   1696   Email from Vaught to Moderators,             42      43
            06/14/2011
22
23   1697   Email from Vaught to Moderators,             44      45
            06/23/2011
24   1697a  Email from Vaught to moderators,             45      45
            forwarded by Padilla, 08/31/2011
25

                    United States District Court

2:18-cr-00422-DJH, September 19, 2023 A.M.

1

**E X H I B I T S (Continued)**

2

| Number | | Ident | Rec'd |
|---|---|---|---|
| 1881 | Email to Ferrer, Padilla, "BP 5.17", 05/19/2011, | 40 | 41 |
| 1881a | Attachment.  "Letter to J. McCoy – Seattle – 8-4-2011-1" | 40 | 41 |

3

4

5

6

7

8

**MISCELLANEOUS NOTATIONS**

9

| Item | Page |
|---|---|
| Motion for Mistrial | 92 |
| Court's ruling | 99 |

10

11

12

13

**RECESSES**

14

| | Page | Line |
|---|---|---|
| (Recess at 10:43; resumed at 11:03.) | 57 | 10 |

15

16

17

18

19

20

21

22

23

24

25

United States District Court

2:18-cr-00422-DJH, September 19, 2023 A.M.

1                      **A P P E A R A N C E S**

2

   For the Government:

3                         **KEVIN M. RAPP, ESQ.**
                          **PETER S. KOZINETS, ESQ.**

4                         **ANDREW C. STONE, ESQ.**
                          **MARGARET WU PERLMETER, ESQ.**

5                         U.S. Attorney's Office
                          40 N, Central Ave., Ste. 1800

6                         Phoenix, AZ  85004-4408
                          kevin.rapp@usdoj.gov

7                         peter.kozinets@usdoj.gov
                          andrew.stone@usdoj.gov

8                         margaret.perlmeter@usdoj.gov

9                         **AUSTIN M. BERRY, ESQ.**
                          U.S. Department of Justice

10                        Child Exploitation and Obscenity Section
                          1301 New York Ave., NW, 11th Fl.

11                        Washington, D.C.  20005
                          austin.berry2@usdoj.gov

12

13     For the Defendant Michael Lacey:
                          **PAUL J. CAMBRIA, JR., ESQ.**

14                        Lipsitz Green Scime Cambria, L.L.P.
                          42 Delaware Ave., Ste. 120

15                        Buffdalo, NY  14202
                          pcambria@lglaw.com

16

   For the Defendant Scott Spear:

17                        **BRUCE S. FEDER, ESQ.**
                          Feder Law Office, P.A.

18                        2390 E. Camelback Road, Ste. 160
                          Phoenix, AZ  85016

19                        bf@federlawpa.com

20                        **ERIC W. KESSLER, ESQ.**
                          Kessler Law Office

21                        6720 N. Scottsdale Rd., Ste. 210
                          Scottsdale, AZ  85253

22                        eric.kesslerlaw@gmail.com

23

24

25

                   United States District Court

2:18-cr-00422-DJH, September 19, 2023 A.M.

1                **A P P E A R A N C E S** (Continued)

2    For the Defendant John Brunst:
                 **GOPI K.   PANCHAPAKESAN, ESQ.**
3                **GARY S. LINCENBERG, ESQ.**
                 Bird Marella Boxer Wolpert Nessim Drooks
4    Lincenberg & Rhow, P.C.
                 1875 Century Park E. Ste. 2300
5                Los Angeles, CA  90067
                 gpanchapakesan@birdmarella.com
6                glincenberg@birdmarella.com

7    For the Defendant Andrew Padilla:
                 **DAVID S. EISENBERG, ESQ.**
8                David Eisenberg, P.C.
                 3550 N. Central Ave., Ste. 1155
9                Phoenix, AZ  85012
                 david@deisenbergplc.com
10
     For the Defendant Joye Vaught:
11               **JOY MALBY BERTRAND, ESQ.**
                 Joy Bertrand, Esq., L.L.C.
12               P.O. Box 2734
                 Scottsdale, AZ  85252-2734
13               joy@joybertrandlaw.com

14

15

16

17

18

19

20

21

22

23

24

25

                 United States District Court

7

CARL FERRER - Direct

<u>**P R O C E E D I N G**</u>

| | |
|---|---|
| 1 | |
| 2 | (Proceedings begin at 9:10.) |
| 3 | (The defendants are present and out of custody.) |
| 4 | (Court was called to order by the courtroom deputy.) |
| 5 | THE COURT:  Please be seated. |

THE COURT:  Please be seated.

It appears that we have all of our jurors here and so we will go gather our jurors.  And why don't we have Mr. Ferrer on the witness stand?

All rise for the jury.

(Jury enters at 9:12.)

THE COURT:  Please be seated.

And good morning, members of the jury.  I hope that you had a good and restful weekend and pleasant Monday and that you are all ready to proceed ahead.  We have our witness is on the stand.

And Mr. Rapp, you may proceed.

MR. RAPP:  Thank you, Your Honor.

(CARL FERRER, a witness herein, was previously duly sworn or affirmed.)

**DIRECT EXAMINATION** (Continued)

BY MR. RAPP:

Q.   Good morning, Mr. Ferrer.

A.   Good morning.

Q.   When we last left, I don't know if this has been admitted. When we last left, we were talking about your meeting with

09:10:55
09:12:34
09:13:21
09:13:25
09:13:34

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | NCMEC.  Do you recall that? | 09:13:41 |
| 2 | A.   Yes. | |
| 3 | Q.   And I'm showing you for your eyes only United States 651. | |
| 4 | Do you see that on your screen? | |
| 5 | A.   I do. | 09:13:56 |
| 6 | Q.   And what is it. | |
| 7 | A.   This is the schedule to have the meeting with NCMEC on -- | |
| 8 | the email was sent Monday, February 28, 2011. | |
| 9 | Q.   And when we broke on Friday, we were looking at another | |
| 10 | exhibit that was an email that you were sending to a number of | 09:14:28 |
| 11 | individuals.  Do you remember that? | |
| 12 | A.   Yes. | |
| 13 | Q.   And do you recall the date of that email? | |
| 14 | A.   I do not. | |
| 15 | Q.   Was it sent after the meeting at NCMEC? | 09:14:42 |
| 16 | A.   I believe so. | |
| 17 | Q.   And so was this email that you received, was this shortly | |
| 18 | before the NCMEC meeting? | |
| 19 | A.   Yes.  This email lays out the travel itinerary before the | |
| 20 | NCMEC meeting. | 09:14:59 |
| 21 | Q.   All right. | |
| 22 | MR. RAPP:  Move to admit Exhibit 651. | |
| 23 | MS. BERTRAND:  Objection.  Hearsay.  Lack of | |
| 24 | foundation. | |
| 25 | THE COURT:  Overruled. | 09:15:07 |

CARL FERRER - Direct

1     It may be admitted.                                          09:15:11

2         (Exhibit Number 651 was admitted into evidence.)

3         THE COURT:  And published.

4   BY MR. RAPP:

5   Q.   So just starting at the top, is there a reference to a    09:15:21

6   PowerPoint?

7   A.   Yes, there is.

8   Q.   What can you tell us about the PowerPoint?

9   A.   This is the PowerPoint that Scott Spear, myself, Jim

10  Larkin, and Hemu Nigam and others had been working on to        09:15:41

11  present to NCMEC for Polaris.

12  Q.   And when you arrived at NCMEC and had the meeting, who was

13  responsible for presenting the PowerPoint, if anyone?

14  A.   I was.

15  Q.   Do you know why you were designated to present the         09:16:02

16  PowerPoint?

17  A.   Well, I was the one to operate the PowerPoint.  I had that

18  PowerPoint on my laptop.  I brought my laptop in and I can

19  discuss a lot of the slides although Hemanshu Nigam also talked

20  about some of the slides.                                       09:16:29

21  Q.   And then also does this portion of the email, does this

22  lay out the schedule of your meeting with NCMEC?  And I believe

23  you also testified that on the same day you met with another

24  organization by the name of Polaris?

25  A.   Yes, it does.                                              09:16:57

10

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Q.   All right.  And just so we're clear, does this email | 09:16:58 |
| 2 | refresh your recollection as to the date of the meeting? | |
| 3 | A.   Yes, it does.  It was Tuesday, March 1. | |
| 4 | Q.   Now, above here in sending the email, is Mr. Lacey | |
| 5 | mentioned as receiving a copy of this PowerPoint presentation? | 09:17:27 |
| 6 | A.   I don't see his name copied here. | |
| 7 | Q.   All right.  And then if you go down to the bottom part and | |
| 8 | we'll go to this next page, does Mr. Larkin advise Mr. Nigam of | |
| 9 | something regarding Mr. Lacey? | |
| 10 |    MR. CAMBRIA:  Objection. | 09:18:05 |
| 11 |    MS. BERTRAND:  Objection. | |
| 12 |    MR. CAMBRIA:  Leading. | |
| 13 |    THE COURT:  Sustained. | |
| 14 | BY MR. RAPP: | |
| 15 | Q.   Can you read what Mr. Larkin tells Mr. Nigam? | 09:18:09 |
| 16 | A.   Jim Larkin writes:  "Hemu:  As I mentioned, Michael Lacey, | |
| 17 | Executive Editor of *The Village Voice*" -- | |
| 18 | Q.   And what's he say on the next page? | |
| 19 | A.   -- Media, will be joining us in our DC meetings tomorrow. | |
| 20 | Can you have the current Powerpoint presentation sent to me? | 09:18:40 |
| 21 | Would you also forward the operative Tuesday schedule of times | |
| 22 | and places which I understand may have changed? | |
| 23 |    "Thank you, Larkin." | |
| 24 | Q.   And then let's jump to the time you spent at NCMEC.  I | |
| 25 | believe you testified last Friday that you went to a conference | 09:19:05 |

United States District Court

11

CARL FERRER - Direct

1  room within NCMEC?                                              09:19:09

2  A.   Yes.

3  Q.   And can you describe, to the best of your recollection,

4  who was there from NCMEC?

5  A.   Ernie Allen, the CEO of NCMEC; John Shehan, one of the    09:19:25

6  managers; and then there were at least two other NCMEC

7  individuals there.

8  Q.   Okay.  And how does the meeting start?

9  A.   The meeting starts with we're in a large conference room

10  and there's some introductions made and then I believe I      09:19:55

11  started the PowerPoint for the Backpage PowerPoint.

12  Q.   At the time you started the PowerPoint, was Mr. Lacey in

13  the conference room?

14  A.   He was not.

15  Q.   As you started the PowerPoint at some point, did Mr. Lacey  09:20:23

16  arrive?

17  A.   He did.  He arrived late.

18  Q.   Can you explain that to the jury?

19  A.   We're there to make this presentation to NCMEC and so it's

20  a bit of a sales pitch.  Lacey came in just more casual, not in  09:20:46

21  a suit.

22  Q.   Can you describe his demeanor?

23  A.   He seemed kind of grumpy and unhappy to be there.

24  Q.   What makes you say that?

25  A.   Just my general sense and, of course, I also was          09:21:03

United States District Court

12

CARL FERRER - Direct

1    disappointed he was late.                                              09:21:09

2              MR. CAMBRIA:  I object to this.

3    BY MR. RAPP:

4    Q.   Why were you disappointed he was late?

5              THE COURT:  Wait.  There's an objection.            09:21:15

6              What was the objection?

7              MR. CAMBRIA:  It's not responsive because he was

8    disappointed.  There was no question that called for that

9    answer.

10             THE COURT:  Sustained.                              09:21:24

11   BY MR. RAPP:

12   Q.   Does Mr. Lacey sit down?

13   A.   Yes, he does.

14   Q.   Do you proceed with the PowerPoint?

15   A.   I do proceed with the PowerPoint and then Ernie Allen    09:21:38

16   begins to -- interrupts and --

17   Q.   When he interrupts you, does he say anything to you?

18             MS. BERTRAND:  Objection.  Calls for hearsay.

19             THE COURT:  Overruled.

20             THE WITNESS:  Yes.  Ernie states that in so many    09:21:57

21   words, "Come on, these ads are prostitution."

22   BY MR. RAPP:

23   Q.   And in response to that, does anybody in the room respond

24   to that?

25   A.   Michael Lacey responds.                                  09:22:13

United States District Court

13

CARL FERRER - Direct

1   Q.   What does Mr. Lacey say?                  09:22:14

2   A.   He tells NCMEC that it's mission creep, that they are not

3   supposed to be -- that's not their mandate to be involved in

4   prostitution.   They are supposed to be focused on children.

5   Q.   What did you take that to mean?          09:22:34

6           MR. CAMBRIA:   Object to that.

7           THE COURT:   Overruled.

8           THE WITNESS:   Exactly as he said, that NCMEC is

9   focused on children.   This meeting isn't about prostitution

10  and -- that's it.                    09:22:52

11  BY MR. RAPP:

12  Q.   All right.   And can you describe the tone and tenor?   Was

13  there an exchange between Mr. Allen and Mr. Lacey?

14  A.   Yes.   Ernie Allen responds back angrily and raised voices

15  now that prostitution's illegal in U.S. and, you know, this  09:23:19

16  is -- you need to stop.   And there's just -- there's more

17  argument and it's -- the atmosphere now at NCMEC, this meeting

18  is very negative.

19  Q.   Okay.   What makes you say that?

20  A.   They are arguing, there's long pause where there's just an  09:23:49

21  uncomfortable pause and we're at an impasse so I state,

22  "Gentlemen, can we please just get back to the PowerPoint,"

23  because that's what I'm focused on, presenting the PowerPoint.

24  Q.   All right.   And did you continue on with the PowerPoint?

25  A.   I did.                         09:24:18

14

CARL FERRER - Direct

1    Q.   And can you just ballpark how many slides was this          09:24:19
2    PowerPoint deck?

3    A.   Two -- a couple dozen slides at least.  I'm going through
4    them as quickly as possible.

5    Q.   Was this a PowerPoint that you had presented on some other   09:24:31
6    occasion to anyone else?

7    A.   This is the same PowerPoint, yes, that's our standard
8    template.

9    Q.   Does it show --

10   A.   Go ahead.                                                    09:24:50

11   Q.   Not to interrupt you.  Does the PowerPoint explain
12   anything about the relationship page Backpage had with The
13   Erotic Review?

14            MS. BERTRAND:  Objection.  Leading.

15            THE COURT:  Overruled.                                   09:25:04

16            THE WITNESS:  It does not.

17   BY MR. RAPP:

18   Q.   Did it discuss the strategy of aggregation?

19   A.   It does not.

20   Q.   Did it mention the relationship Backpage had with the       09:25:16
21   super posters like Dollar Bill and Sean Kim and Somad?

22   A.   It does not.

23            MS. BERTRAND:  Objection.  Leading.

24            THE COURT:  Overruled.

25            THE WITNESS:  It does not.                               09:25:29

United States District Court

CARL FERRER - Direct

BY MR. RAPP:                                                        09:25:30

Q.   Does the PowerPoint have any explanation about moderation?

A.   It did but it was deceptive.

Q.   Can you explain to the jury how it was deceptive?

A.   It talked about removing nudity and not allowing certain       09:25:49

words, but of course those words were either banned and then

the user would know to use a different word.  And it created

the impression that we were removing prostitution ads when, in

fact, we were just coaching users to not use certain words or

not use certain pictures.                                           09:26:11

Q.   That detail was not included in the PowerPoint?

A.   It was not.

Q.   Well, we looked at this email with the slides previously

that was -- that I believe you testified that was provided to

you during the meeting and you walked out of the meeting with     09:26:34

it.  Do you recall that?

A.   I do.  There were some slides that NCMEC -- some pages

that NCMEC gave us representing ads that they had posted on the

site.

Q.   In addition to that, did NCMEC provide you or present         09:26:55

anything else to you while you were there?

A.   Well, they gave their presentation and I just recall

getting two sets of slides.  One was an ad that they posted in

all markets and the other one was a collection of many ads that

they had posted.                                                    09:27:21

United States District Court

CARL FERRER - Direct

1  Q.   All right.   During their presentation, did they mention in   09:27:23
2  any regard The Erotic Review?
3  A.   Yes, they did.
4  Q.   Do you recall how they identified -- strike that.
5       Do you recall in what context they mentioned The   09:27:43
6  Erotic Review?
7       MR. CAMBRIA:   Your Honor, could we have the identity
8  of the person that is making these statements?
9       THE COURT:   Yes.   Fair enough.
10      Mr. Rapp, can you probe that?   09:27:57
11 BY MR. RAPP:
12 Q.   Do you recall -- among the NCMEC representatives that
13 you've identified, do you recall who was giving the
14 presentation to the Backpage representatives?
15 A.   I only recall it was one of the NCMEC employees, senior   09:28:16
16 employees.   I'm not sure if it was John Shehan or Michelle
17 Collins or Stacy.   It was one of the senior employees of NCMEC
18 pointing out that we had links to The Erotic Review.
19 Q.   In the PowerPoint?
20 A.   In the ads.   Yes.   And they were then calling us out for   09:28:39
21 having links to prostitution review sites.
22 Q.   When they did that, did any of the Backpage
23 representatives, Mr. Larkin for example, Mr. Lacey, you, did
24 you volunteer the relationship that you had at that point?
25      MS. BERTRAND:   Objection.   Relevance.   09:28:59

United States District Court

17

CARL FERRER - Direct

1          THE COURT:  Overruled.                              09:29:01

2          THE WITNESS:  I recall when they mentioned it that I

3   looked over to Larkin and we both -- I knew it was a problem

4   but we didn't say anything about NCMEC.  I mean, we didn't say

5   anything about The Erotic Review links.  We just kind of --    09:29:16

6   they mentioned it and then we didn't pursue it.

7   BY MR. RAPP:

8   Q.   How long was this meeting?

9   A.   Hour and a half I believe was the meeting.

10  Q.   And at the conclusion of the meeting, did you depart     09:29:38

11  NCMEC?

12  A.   We did.  Caught a taxi to a restaurant for lunch to get

13  ready for Polaris.

14  Q.   All right.  And when you say you caught a taxi, who did

15  you catch a taxi with?                                         09:29:57

16  A.   I caught a taxi with Jim Larkin on one side of the back

17  seat of the taxi and Michael Lacey on the other, with me

18  uncomfortably sandwiched in between the two of them.

19  Q.   And in the taxicab from NCMEC, do you recall where you

20  went?                                                          09:30:19

21  A.   A restaurant.

22  Q.   All right.  And was there any discussion in the taxi about

23  how this meeting with NCMEC went?

24  A.   There were some conversations in the back of the cab and

25  it was the feeling, the sentiment was negative.  The comments  09:30:44

United States District Court

CARL FERRER - Direct

1   were negative.                                                    09:30:47

2   Q.   All right.  Did they believe -- based on those comments,

3   did you -- did Mr. Lacey and Mr. Larkin provide an opinion as

4   to how the meeting went?

5   A.   Yes.                                                         09:31:04

6   Q.   And what was that?

7   A.   That did not go well.  That -- that didn't meet our

8   expectations, it was a disaster.  I don't think he used the

9   word "disaster" but it was more like it just didn't go well.

10  Q.   Did you go to lunch?                                         09:31:37

11  A.   Yes, we did.

12  Q.   After lunch, then where did you go?

13  A.   We went to Polaris.

14  Q.   And I believe just to remind the jury, what is Polaris?

15  A.   Polaris is an anti-human trafficking organization.          09:31:51

16  Q.   And there was also a meeting arranged with them on the

17  same day?

18  A.   Yes.

19  Q.   Was this a meeting that Polaris requested of Backpage

20  representatives or Backpage representatives requested of         09:32:09

21  Polaris?

22  A.   I recall that we initiated these meetings.  We're trying

23  to get some -- we're trying to get NCMEC and Polaris to not be

24  so adverse to Backpage.  That's our goal.

25  Q.   That was your goal for both the meetings?                   09:32:29

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | A.    Yes. | 09:32:32 |
| 2 | Q.    And do you proceed -- is Polaris also based -- is Polaris | |
| 3 | what's often referred to as a nongovernmental organization? | |
| 4 | A.    Yes, NGOs we would call them. | |
| 5 | Q.    And do you proceed down to the offices of Polaris? | 09:32:47 |
| 6 | A.    Yes, we do. | |
| 7 | Q.    And is Polaris also based in the Washington, D.C. area? | |
| 8 | A.    Yes, it is. | |
| 9 | Q.    When you arrive at Polaris, who do you recall is with you | |
| 10 | now from Backpage? | 09:33:07 |
| 11 | A.    So I recall Simrin, Hemu, Hemu Nigam, and Jim Larkin and | |
| 12 | myself. | |
| 13 | Q.    And do you proceed into Polaris? | |
| 14 | A.    We do.  We proceed into Polaris. | |
| 15 | Q.    Is Mr. Lacey there with you? | 09:33:32 |
| 16 | A.    He's not with us.  Jim Larkin had told me that he -- | |
| 17 |             MR. CAMBRIA:   Object to that response.  It's not the | |
| 18 | question. | |
| 19 |             THE COURT:   Sustained. | |
| 20 | BY MR. RAPP: | 09:33:43 |
| 21 | Q.    Did Mr. Larkin tell you anything about why Mr. Lacey would | |
| 22 | not be at the meeting. | |
| 23 | A.    Yes, he did. | |
| 24 | Q.    What did he say? | |
| 25 | A.    He said it wouldn't be a good idea to have Michael Lacey | 09:33:52 |

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | at the meeting with Polaris after what happened at NCMEC. | 09:33:55 |
| 2 | Q.   And do you meet some type of a representative from Polaris | |
| 3 | at Polaris? | |
| 4 | A.   We do.  We meet Bradley Myles or Brad Myles. | |
| 5 | Q.   And what did you understand Mr. Myles' role was at | 09:34:15 |
| 6 | Polaris? | |
| 7 | A.   He was the CEO of Polaris. | |
| 8 | Q.   All right.  And did you proceed to some type of a | |
| 9 | conference room? | |
| 10 | A.   We do. | 09:34:30 |
| 11 | Q.   And does Mr. Myles give you any types of explanation of | |
| 12 | what Polaris does? | |
| 13 | A.   Yes.  He does.  He tells us the history of Polaris. | |
| 14 | MR. CAMBRIA:  Object to the hearsay. | |
| 15 | THE COURT:  Overruled. | 09:34:46 |
| 16 | BY MR. RAPP: | |
| 17 | Q.   And when you say he tells you the history of Polaris, what | |
| 18 | information does he provide you? | |
| 19 | MR. CAMBRIA:  Same objection. | |
| 20 | THE COURT:  Overruled. | 09:34:52 |
| 21 | THE WITNESS:  About how he had launched the site or | |
| 22 | the solution, his organization, sometime shortly after college | |
| 23 | and what their mission statement was, how they were focused on | |
| 24 | human trafficking and prostitution being a part of human | |
| 25 | trafficking, especially in Asian massage parlors. | 09:35:14 |

United States District Court

21

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | BY MR. RAPP: | 09:35:21 |
| 2 | Q.   And what, if anything, did you know about prostitution | |
| 3 | being involved in Asian massage parlors? | |
| 4 | MR. CAMBRIA:  Object to the relevance. | |
| 5 | THE COURT:  Overruled. | 09:35:33 |
| 6 | THE WITNESS:  We knew it was already there because | |
| 7 | the site in New York City was under Body Rubs nothing but Asian | |
| 8 | massage parlors and they were Dollar Bill's clients and Sean | |
| 9 | Kim's clients. | |
| 10 | BY MR. RAPP: | 09:35:53 |
| 11 | Q.   Did you volunteer that to Mr. Myles during the meeting? | |
| 12 | MS. BERTRAND:  Objection.  Relevance. | |
| 13 | THE COURT:  Overruled. | |
| 14 | THE WITNESS:  No, we did not. | |
| 15 | BY MR. RAPP: | 09:36:00 |
| 16 | Q.   Did Mr. Myles -- well, strike that. | |
| 17 | Did you present any type of a PowerPoint similar to | |
| 18 | what you did in the morning at NCMEC? | |
| 19 | A.   Yes, we did. | |
| 20 | Q.   Same PowerPoint? | 09:36:18 |
| 21 | A.   Yes. | |
| 22 | Q.   Aside from the PowerPoint, I think your testimony is you | |
| 23 | didn't volunteer the super poster relationship but orally, did | |
| 24 | any of the representatives from Backpage represent the | |
| 25 | relationship with The Erotic Review? | 09:36:41 |

22

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | MS. BERTRAND:  Objection.  Relevance. | 09:36:44 |
| 2 | THE COURT:  Overruled. | |
| 3 | THE WITNESS:  No Backpage representatives talked | |
| 4 | about the relationship with The Erotic Review. | |
| 5 | BY MR. RAPP: | 09:36:57 |
| 6 | Q.   And what about aggregation? | |
| 7 | MS. BERTRAND:  Same objection.  Not relevant. | |
| 8 | THE COURT:  Overruled. | |
| 9 | THE WITNESS:  Same answer.  No one did. | |
| 10 | BY MR. RAPP: | 09:37:04 |
| 11 | Q.   After you were done with the presentation of the | |
| 12 | PowerPoint, did Mr. Myles show you anything? | |
| 13 | A.   He showed us examples of ads that were potential human | |
| 14 | trafficking. | |
| 15 | Q.   Okay.  Did he indicate to you with those ads, did he | 09:37:28 |
| 16 | indicate with you how he was able to determine that the | |
| 17 | individuals in the ads might be involved in human tracking? | |
| 18 | MR. FEDER:  Same.  Join. | |
| 19 | MS. BERTRAND:  Join.  Not relevant. | |
| 20 | MR. FEDER:  Actually 403 is part of the same. | 09:38:01 |
| 21 | THE COURT:  Sustained. | |
| 22 | BY MR. RAPP: | |
| 23 | Q.   All right.  Without going into what Mr. Myles actually | |
| 24 | said to you, when he was showing you these postings, did you | |
| 25 | observe him indicating to anything? | 09:38:27 |

United States District Court

CARL FERRER - Direct

1    MS. BERTRAND:  Objection.                                    09:38:32

2    THE WITNESS:  I did.

3    MS. BERTRAND:  Leading.  Objection, leading, ma'am.

4    THE COURT:  Overruled.

5    THE WITNESS:  I did.  He stated his company had a lot    09:38:40

6    of expertise.  It was the way that people were dressed, the

7    kind of text that was used in the ads was much more suggestive

8    of sex and, you know, he even volunteered to help with the

9    training and staff for us to be able to flag and remove these

10   postings.  But in the end, he said that they are really all   09:39:15

11   prostitution and you just need to shut down the category.

12        We just seemed to, once again, just seemed to hit a

13   wall with Polaris like we're not going to remove the category.

14   BY MR. RAPP:

15   Q.   Okay.  How long was this meeting with Polaris?          09:39:40

16   A.   I think about an hour, shorter than the NCMEC meeting.

17   Q.   Okay.  All right.  And you left Polaris, and did you

18   return home?

19   A.   Yes.

20   Q.   With respect to Mr. Myles' offer to train Backpage staff  09:40:01

21   on identifying prostitution, was that ever taken up with

22   Polaris in any respect?

23   A.   The company did not take up Polaris on the request for

24   training.  It would have been bad for business.

25   Q.   All right.  And why would that have been bad for business?  09:40:26

CARL FERRER - Direct

1   A.   Based on the Polaris standard, he would have had us remove   09:40:30

2   virtually every ad in the Body Rubs category, certainly in

3   markets like New York City.

4   Q.   And what impact, if any, would that have on Backpage if

5   those ads were removed?   09:40:46

6   A.   Revenue would be reduced dramatically.

7   Q.   All right.  So any further meetings after the March 2011

8   meeting with Polaris, any further meetings with Polaris?

9   A.   No further meetings with Polaris.

10  Q.   What about NCMEC?  Did you have any further meetings with   09:41:13

11  NCMEC after the March 1 meeting?

12  A.   There was -- there was a delay in our meetings with NCMEC.

13  We just -- at least a month it was no contact with NCMEC.  It

14  just seemed like things had gone very poorly --

15       MS. BERTRAND:  Objection, Your Honor.  Nonresponsive.   09:41:42

16  Move to strike.

17       THE COURT:  Sustained.

18  BY MR. RAPP:

19  Q.   Well, how did you believe --

20       THE COURT:  Again, let me just instruct the witness.   09:41:49

21  Listen to the question.  Answer only the question asked.  Don't

22  offer anything beyond what has been asked.  Mr. Rapp can ask

23  you a follow-up question if necessary.  All right?

24       Let's proceed.

25       THE WITNESS:  Yes, Your Honor.   09:42:06

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | MR. RAPP:  Thank you. | 09:42:07 |
| 2 | BY MR. RAPP: | |
| 3 | Q.   After you returned to Phoenix, was there any discussion | |
| 4 | while in Phoenix about how the meetings with NCMEC and Polaris | |
| 5 | had gone? | 09:42:22 |
| 6 | A.   Yes, there was a discussion. | |
| 7 | Q.   Who did you have those discussions with? | |
| 8 | A.   Scott Spear, Jim Larkin. | |
| 9 | Q.   And what, if anything, was said about whether or not the | |
| 10 | meetings were successful or not successful? | 09:42:40 |
| 11 | A.   The discussion was the meetings were not successful and | |
| 12 | that Hemo Nigam had failed to deliver NCMEC to be less adverse | |
| 13 | to Backpage. | |
| 14 | Q.   And after that meeting, was there any discussion about | |
| 15 | removing references to The Erotic Review in postings? | 09:43:13 |
| 16 | A.   Not right away.  Let's see.  That's March.  No.  There | |
| 17 | wasn't. | |
| 18 | Q.   All right.  Let me show you United States 655 for the | |
| 19 | witness's eyes only. | |
| 20 | Do you recognize this email? | 09:43:57 |
| 21 | A.   Yes, I do. | |
| 22 | Q.   And how is it that you recognize this? | |
| 23 | A.   This email is a discussion of the second moderation team. | |
| 24 | Q.   And who is this email with? | |
| 25 | A.   This email is from Jed Brunst to myself and Scott Spear. | 09:44:17 |

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | MR. RAPP:  All right.  Let me move to admit 655. | 09:44:23 |
| 2 | MR. FEDER:  Same. | |
| 3 | THE COURT:  Overruled.  It may be admitted. | |
| 4 | MR. LINCENBERG:  And no objection. | |
| 5 | (Exhibit Number 655 was admitted into evidence.) | 09:44:38 |
| 6 | THE COURT:  And who was that that just said that? | |
| 7 | MR. LINCENBERG:  No objection. | |
| 8 | THE COURT:  Who was that that just said that? | |
| 9 | MR. LINCENBERG:  That was Mr. Lincenburg. | |
| 10 | BY MR. RAPP: | 09:44:53 |
| 11 | Q.   You said this was an email from Jed Brunst to you with a | |
| 12 | copy to Scott Spear? | |
| 13 | A.   Yes. | |
| 14 | Q.   Now, you've exchanged emails with Mr. Brunst.  I believe | |
| 15 | you've testified to that fact? | 09:45:06 |
| 16 | A.   Yes, I have. | |
| 17 | Q.   And you have a -- your email is what?  I know it just has | |
| 18 | your name but what is it @, for example? | |
| 19 | A.   It's -- at that time it's carl.ferrer@backpage.com. | |
| 20 | Q.   But Mr. Brunst, he doesn't have that.  He has something | 09:45:30 |
| 21 | else.  What does he have? | |
| 22 | A.   Mr. Brunst has jed.brunst@villagevoicemedia.com. | |
| 23 | Q.   Why did Mr. Brunst have, if you know, | |
| 24 | @villagevoicemedia.com? | |
| 25 | A.   His mail address represents that he's the CFO of the | 09:45:47 |

United States District Court

CARL FERRER - Direct

1   entire company Village Voice Media.                          09:45:52

2            MS. BERTRAND:  Objection.  Misstates what the address

3   says.  Move to strike.  Nonresponsive.

4            THE COURT:  Overruled.  He read the email address.

5            MS. BERTRAND:  Right, and said it represents he's the   09:46:16

6   CFO but the email address doesn't.

7            THE COURT:  But to his knowledge and so overruled.

8   BY MR. RAPP:

9   Q.   So he has a -- maybe just explain again to the jury, in

10  case it wasn't clear, why he has an @villagevoicemedia.com     09:46:34

11  which compared to you which has @backpage.com?

12  A.   So the corporate office used villagevoicemedia.com so that

13  would be Jed Brunst, Scott Spear, Jim Larkin, whereas the email

14  address that I used, carl.ferrer@backpage.com, because I worked

15  on lead of Backpage.com.  Village Voice Media owns Backpage and  09:47:02

16  other -- owns 11 or more publications.

17  Q.   These are the alternative newspapers we have been

18  discussing?

19  A.   Yes.

20  Q.   And at this point now we're in 2011.  Do you observe how    09:47:22

21  these alternative newspapers that are under Village Voice

22  Media, how they are doing from a profit standpoint?

23  A.   They are continuing to decline certainly from revenue and

24  they are reducing staff.

25  Q.   And can you read what Mr. Brunst tells you?               09:47:53

28

CARL FERRER - Direct

1   A.   "Carl, we should talk today if possible to begin putting 5        09:47:58

2   yr. projections together which will include all your expansion

3   ideas.  If you could spend some time and start putting your

4   thoughts together we can schedule a call this afternoon?  with

5   you me and Spear.  Thanks."                                             09:48:15

6   Q.   All right.  And below can you just sort of summarize below

7   what you're telling Mr. Brunst with respect to moderation?

8   A.   Yes.  Below I'm answering an email to them to Kate and

9   Jed.  "Kate and Jed, I was reviewing all the possible

10  agreements and vendors we have tonight.  I forgot one.             09:48:47

11          "We have our Indian Moderators.  But we are also

12  testing a Florida US Moderation vendor.  No written agreement.

13  Just an email agreement at 17 cents a post for 100k postings.

14          "They are Hemu's friends.  I'm giving them a test in

15  the interest of good politics.                                     09:49:10

16          "It is likely that I will terminate this Florida crew

17  and put resources towards something more productive like

18  Europe.  But I do not know when yet.

19          "The cost is $17K a month."

20  Q.   And then going back up to Mr. Brunst's email, what did he    09:49:27

21  mean or what did you take it to mean about expansion ideas?

22  A.   Expansion ideas, it's Europe. it's the main expansion but

23  there's other ones.

24  Q.   All right.  Did you have this meeting with Mr. Brunst and

25  Mr. Spear?                                                          09:49:52

United States District Court

CARL FERRER - Direct

1    A.    Yes, and I worked on these projections and they kept          09:49:55

2    wanting more and more aggressive revenue growth.

3    Q.    When you say "they," who?

4    A.    Scott Spear, Jed Brunst.

5    Q.    Okay.  And do you know what Mr. Brunst is referring to        09:50:08

6    when he talks in terms of five-year projections?

7    A.    Yes, I do.  Very common.

8    Q.    What does that mean?

9    A.    It means that you project growth for next year at, say, 18

10   percent and then subsequent years with growth of another           09:50:47

11   double-digit percentage increase so that in the end, at around

12   the five-year projection level, that you've nearly doubled

13   revenue.

14   Q.    Was that based on what you knew of the revenue that was

15   being generated by Backpage.com, did you believe that was a        09:51:12

16   possibility?

17   A.    I would have this argument with Spear and Brunst.  They

18   would accuses me of sandbagging on the revenue and we would go

19   back and forth until we could come to a negotiated agreement on

20   what the total revenue increases would be.  And they were          09:51:33

21   always extremely aggressive and challenging, especially since

22   we're supposed to be moderating and removing content.  I mean,

23   how do you expect to get these double-digit increases year over

24   year?

25   Q.    So when you talk in terms of double-digit growth, did the     09:51:52

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | moderation that was implemented, did it have an impact on | 09:51:58 |
| 2 | revenue? | |
| 3 | A.   The moderation was designed to not have an impact on | |
| 4 | revenue. | |
| 5 | Q.   Okay.  Let's look at United States 103 for your eyes only. | 09:52:18 |
| 6 | What is this? | |
| 7 | A.   This is an email regarding relaxed image standards that I | |
| 8 | was copied on. | |
| 9 | Q.   And at the top, who is it from? | |
| 10 | A.   It's from Andrew Padilla. | 09:52:50 |
| 11 | Q.   All right.  And who else is copied on this email? | |
| 12 | A.   Joye Vaught, Monita Mohan of El Camino. | |
| 13 | Q.   And can you just remind the jury again, there's a lot of | |
| 14 | names here, who is Monita Mohan? | |
| 15 | A.   Monita Mohan is the CEO of El Camino that is doing our -- | 09:53:10 |
| 16 | a lot of our moderation. | |
| 17 | Q.   And who else is on this email as well? | |
| 18 | A.   Myself and Joye Vaught. | |
| 19 | Q.   And with respect to 130a, let's just cycle through that. | |
| 20 | What is 130a. | 09:53:38 |
| 21 | THE REPORTER:  130a? | |
| 22 | MR. RAPP:  I'm sorry.  Thank you. | |
| 23 | Q.   103a. | |
| 24 | A.   It's pictures and illustrations on what's okay and not | |
| 25 | okay. | 09:53:49 |

United States District Court

CARL FERRER - Direct

1   Q.   All right.  So let's go back and so have you seen this          09:53:50

2   before and you recognize this email?

3   A.   Yes.

4         MR. RAPP:  Move to admit United States 103 and the

5   attachment 103a.                                                    09:54:00

6         THE COURT:  It may be admitted and published.

7         (Exhibit Number 103 was admitted into evidence.)

8   BY MR. RAPP:

9   Q.   All right.  So let's go to 103 and let's start at the

10  bottom here.  What is Mr. Padilla telling Monita Mohan?            09:54:19

11  A.   Andrew Padilla writes, "All:  We're going to take boobs

12  back to 11-18-2010.  Here's the relevant part of an old email:

13  'users can cover their nipples with their own hands, clothing

14  or just about anything.  Wet t-shirts are okay.  Bubbles are

15  okay.  Side boob is okay.  Under boob is okay.  Cleavage is       09:54:47

16  okay.  We're only removing images of exposed nipples and

17  areolas.  This doesn't pertain to images of men.  Pixelization

18  and blurring are not okay.  Maxim is a good example of what is

19  still allowed on our site.'

20         "Dan:  Can you have Andrea modify the posting rules         09:55:12

21  accordingly?

22         "Monita:  I'll make the changes to the queue

23  guidelines for your crew.

24         "If you have any questions, let me know.  Thanks,

25  Andrew."                                                          09:55:27

United States District Court

CARL FERRER - Direct

1  Q.   And what does Monita Mohan write to Andrew and Joye                    09:55:33

2  Vaught?

3  A.   Monita Mohan writes, "Hello, Andrew and Joye.  Please go

4  over this compilation of photos and please let us know which

5  are acceptable and which are not.  Please do so for every image   09:55:50

6  and then I will call an all team meeting and go over these

7  guidelines.  Or alternatively I am happy to have a gotomeeting

8  with both of you to discuss these images.  AS you know we will

9  receive a slew of clarifications with this change so I just

10  want to make sure we have many solid examples to provide them     09:56:11

11  to minimize this."

12  Q.   All right.  Is this standard change, is this becoming more

13  restrictive or you lessening the standard?

14  A.   We're more permissive.

15  Q.   And so 138 (sic), is it fair to say that these are a         09:56:43

16  compilation of images in various stages of nudity?

17  A.   Yes.

18  Q.   So let's go through these quickly.

19         THE REPORTER:  What number did you say?  I thought

20  you said 138.                                                      09:57:07

21         MR. RAPP:  103a.  I did it again.

22  BY MR. RAPP:

23  Q.   All right.  Now, we've talked about Mr. Nigam's role at

24  Backpage as the security professional.  Does -- do they

25  continue to send you emails regarding postings?                    09:57:33

United States District Court

CARL FERRER - Direct

1   A.   Yes, they do.                                              09:57:39

2   Q.   Let's look at for the witness's eyes only 104.  Do they

3   continue to send you recommendations?

4   A.   Yes, they continue to do so.

5   Q.   And do you recognize this email?                           09:58:06

6   A.   I do.

7   Q.   How do you recognize this email?

8   A.   Because I read the email when we received it.  It's an

9   action plan after the NCMEC and Polaris meeting.

10  Q.   All right.  And does 104 have an attachment?  Without      09:58:19

11  reading anything on the attachment at this point, can you sort

12  of characterize what this attachment is?

13  A.   It's describing various tasks that could be implemented to

14  improve the content on the site.  More recommendations from SSP

15  Blue.                                                           09:58:45

16           MR. RAPP:  Move to admit 104 and 104a.

17           THE COURT:  These may be admitted and published?

18           MR. RAPP:  Thank you.

19           (Exhibit Numbers 104 and 104a were admitted into

20  evidence.)                                                      09:58:54

21  BY MR. RAPP:

22  Q.   First, who does this email go to?

23  A.   It goes to Carl Ferrer, Jim Larkin, Scott Spear.

24  Q.   All right.  And can you remind the jury who Simrin Hooper

25  is?                                                             09:59:21

United States District Court

34

CARL FERRER - Direct

1   A.   Simrin Hooper is an assistant to Hemanshu Nigam of SSP                    09:59:21

2   Blue.

3   Q.   And Mr. Nigam is also copied?

4   A.   Yes.

5   Q.   And can you remind the jury who Jamie Schumacher is?                      09:59:34

6   A.   Jamie Schumacher is the PR firm.

7   Q.   All right.  What does Simrin Hooper tell you and

8   Mr. Spear?

9   A.   "Hi there.  Attached is tracking document for the agreed

10  upon changes and initiatives based on the meeting with NCMEC            09:59:56

11  and Polaris, as well as our subsequent call.  I'll coordinate

12  with Carl on the details.

13          "Please let me know if you have any questions!

14          Thanks Simrin."

15  Q.   And then looking at 140a --                                              10:00:16

16          MR. CAMBRIA:  104.

17  BY MR. RAPP:

18  Q.   104a, let me just blow this up.  Can you sort of describe

19  what these various columns reflect?

20  A.   So Column A is the type of task or the area on Backpage             10:00:42

21  that they suggest attached should be done.  The actual task or

22  issue is in Column B and then Column C is the change that

23  should be implemented.

24  Q.   All right.  So, for example, if you could just read what

25  Simrin is telling you in row two going across?                                10:01:09

CARL FERRER - Direct

1  A.   In row two:  "NCMEC reports.  Appearance that reports are                    10:01:14

2  coming from users instead of moderators."  And then the change

3  is:  "Train moderators that will" -- excuse me.  Let me try

4  that again.  Change:  "Train moderators that while they are

5  reviewing images for compliance with Terms, they should be       10:01:34

6  reviewing images to ensure that there aren't any users under 18

7  in these photos."

8  Q.   Okay.  And did you emplement that recommendation in any

9  respect?

10  A.   The one I just read?                                        10:01:59

11  Q.   Yes.

12  A.   You know, moderators were trained to look for images of

13  people that looked young, so that was done; but we didn't show

14  the name of the moderator that was making those reports.

15  Q.   Right.  So was there some type of a meeting with NCMEC      10:02:21

16  staff to sort of train the moderators on what they might be

17  looking for in terms of prostitution?

18  A.   You mean like there should be a suggested memeting or --

19  Q.   Somebody from NCMEC comes in and trains them on

20  identifying evidence of prostitution.                            10:02:43

21  A.   No, not prostitution.  Just we're focused on reporting

22  underage prostitution.

23             MS. BERTRAND:  Objection.  Relevance.  401 and 403.

24             THE COURT:  Overruled.

25  \\\

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | BY MR. RAPP: | 10:03:02 |
| 2 | Q.   Just drawing your attention to row 15, can you read what | |
| 3 | this recommendation was? | |
| 4 | A.   "Finding illegal ads.   Credit Cards and Phone Numbers. | |
| 5 | Determine if there is a way to figure out if a card being used | 10:03:20 |
| 6 | is prepaid; this could be one indicator (of many) to moderat | |
| 7 | to pay closer attention to the ad as a potential trafficking | |
| 8 | ad." | |
| 9 | Q.   What did Backpage, Mr. Spear, Mr. Larkin, you, in response | |
| 10 | to this email, what if anything, did you do to implement that? | 10:03:44 |
| 11 | A.   We did not -- we would not do that. | |
| 12 | Q.   You would not do that?  Why would you not do that? | |
| 13 | A.   We learned that up to 70 percent of our transactions came | |
| 14 | from prepaid cards; so if we're going to flag ads that are | |
| 15 | posted using prepaid cards, well, that's going to be up to 70 | 10:04:06 |
| 16 | percent of the ads posted. | |
| 17 | Q.   All right.  And what impact, if any, would that have on | |
| 18 | Backpage? | |
| 19 | A.   It could reduce revenue by 70 percent. | |
| 20 | Q.   All right.  And then looking at rows -- looking at rows 16 | 10:04:22 |
| 21 | through 18, is it fair to say that these rows make | |
| 22 | recommendations regarding The Erotic Review? | |
| 23 | A.   Yes, they do. | |
| 24 | Q.   Can you read starting in row -- yes, row 16, can you read | |
| 25 | what the recommendation is? | 10:05:11 |

United States District Court

CARL FERRER - Direct

1   A.   "Finding illegal ads.  The Erotic Review:  TER.com.                    10:05:13
2   Automate a periodic flush out of TER IDs."
3   Q.   And just so the jury is clear, can you distinguish between
4   IDs and links?
5   A.   So postings would often have "highly reviewed" and then           10:05:33
6   they would put in a six-digit number and the Johns that used
7   the site would take that ID number, go to The Erotic Review and
8   search the prostitution review with that ID number.
9   Q.   Thank you.
10        Did you implement this automated periodic flush out            10:05:56
11  of TER IDs?
12  A.   We never did.
13  Q.   And with regard to 17, what's the recommendation regarding
14  The Erotic Review.
15  A.   "Finding illegal ads.  The Erotic Review:  TER.com.              10:06:13
16  Inform moderators that all ID numbers that are not clearly
17  marked as massage license authentication numbers should be
18  removed upon discovery."
19  Q.   Did you implement that recommendation?
20  A.   We did not.                                                      10:06:34
21  Q.   With respect to row 18, what is the recommendation that
22  they make?
23  A.   "Finding illegal ads.  The Erotic Review:  TER.com.  Ads
24  visited directly from TER should be identified and removed."
25  Q.   Did you implement that?                                          10:06:57

United States District Court

CARL FERRER - Direct

1   A.   We did not.   Those would be our referrals.                          10:07:01

2   Q.   As a matter of fact, what is the reason you did not

3   implement these recommendations from The Erotic Review from the

4   very security person that you had working for Backpage?

5            MS. BERTRAND:   Objection.   Leading.   Argumentative.          10:07:20

6            THE COURT:   Overruled.

7   BY MR. RAPP:

8   Q.   What's the reason?

9   A.   We ignored these requests because The Erotic Review was

10  the secret sauce that made Backpage very successful for          10:07:38

11  prostitution ads.

12  Q.   All right.   And then they also made some recommendations

13  regarding Polaris in rows 19 through 21.   Can you -- can you

14  just read the row and tell us whether or not you implemented

15  this recommendation?                                                     10:08:14

16           MS. BERTRAND:   Objection.   401 and 403.

17           THE COURT:   Overruled.

18           THE WITNESS:   19.   "Human trafficking.   User

19  reporting to Polaris.   Ad the Polaris 1-800 # in the 'Report

20  Ad' Area."                                                               10:08:29

21           We did -- our action was we did add Polaris's number

22  I believe to the user safety page.   I don't think we put it in

23  the report ad but I can't recall that.   But certainly we felt

24  like we did enough of a cosmetic change to our user safety page

25  by just putting Polaris there.                                           10:08:51

CARL FERRER - Direct

| | |
|---|---|
| 1 | BY MR. RAPP: | 10:08:53 |
| 2 | Q.   All right.  And how about 20? |
| 3 | A.   20:  "Human tracking.  User Reporting to Polaris.  Add a |
| 4 | link to Polaris that also explains trafficking and encourages |
| 5 | reporting."  That's what I just spoke about.  That's what we | 10:09:02 |
| 6 | did, the user safety page. |
| 7 | Q.   And then 21.  How about that recommendation? |
| 8 | A.   "Human trafficking.  Moderator Reporting.  Set up |
| 9 | trainings between Backpage moderators and Polaris on how to |
| 10 | identify potential victims in ads." | 10:09:22 |
| 11 | Q.   What did you do in that regard? |
| 12 | A.   I don't recall us doing anything in that regard. |
| 13 | Q.   Was there a recommendation here from Simrin Hooper and, |
| 14 | SSP Blue to meet with an individual by the name of Byron |
| 15 | Fassett? | 10:10:19 |
| 16 | A.   Yes.  There was a recommendation that Backpage needs to |
| 17 | meet with Byron Fassett in Dallas. |
| 18 | Q.   All right.  And did you actually follow that |
| 19 | recommendation? |
| 20 | A.   I was living in Dallas going back and forth between Dallas | 10:10:32 |
| 21 | and Phoenix, yes. |
| 22 | Q.   That one you implemented? |
| 23 | A.   We did.  I lived in Dallas.  It was easy enough for me to |
| 24 | go meet with Byron Fassett. |
| 25 | Q.   Did you -- did you communicate the fact that you are | 10:10:48 |

CARL FERRER - Direct

1  meeting with Byron Fassett to anybody in upper management or                    10:10:54

2  ownership?

3  A.   I did.   I communicated before and then I gave a report

4  afterwards.

5  Q.   At this point, was the status of SSP Blue, the security                    10:11:10

6  person that was hired for the purposes of making the site more

7  secure, what was the status of this person, Mr. Nigam?

8  A.   They were shelved.   We would continue to keep them and

9  make payments to them and use their user safety security

10 backgrounder, but there was no longer any priority to follow                    10:11:42

11 SSP Blue's recommendations.   Hence we started to go backwards

12 and became more permissive in the content on the site.

13 Q.   When you say "more permissive in the content on the site,"

14 do you mean images and terms?

15 A.   Yes.                                                                       10:12:07

16 Q.   All right.   I'm showing you, for the witness's eyes only,

17 1881.   What is this?

18 A.   This is an email from one of SSP Blue's other assistants

19 emailing myself and Andrew Padilla ads that are violating our

20 posting rules.                                                                  10:12:40

21          MR. RAPP:  Move to admit --

22 BY MR. RAPP:

23 Q.   And let me show you these ads let me just show you 1881a,

24 are these the ads that are attached to it?

25 A.   Yes, they are.                                                             10:12:55

United States District Court

41

CARL FERRER - Direct

1   Q.   All right.                                                        10:12:56

2               MR. RAPP:  Move to admit 1881 and 1881a.

3               MS. BERTRAND:  Objection.  Hearsay.

4               THE COURT:  Overruled.  They may be admitted.

5               (Exhibit Numbers 1881 and 1881a were admitted into        10:13:09

6   evidence.)

7               MR. RAPP:  Request permission to publish.

8               THE COURT:  Yes.  They may be.

9   BY MR. RAPP:

10  Q.   And so this is -- is this the person from SSP Blue?              10:13:15

11  A.   Yes.  Marie Slayton.

12  Q.   And she is sending this to both you and Mr. Padilla?

13  A.   Yes.

14  Q.   And what does she say to you and Mr. Padilla?

15  A.   "Gentlemen.  This is from Tuesday.  All items on the             10:13:38

16  attached list were present after 24 hours.  Thank you.  Marie."

17  Q.   And then going to 1881a, do you know why -- based on the

18  content of this ad, why she's sending this along to you?

19  A.   She states it on top that it's prostitution.

20  Q.   All right.  And that is this upper ad here; right?              10:14:14

21  A.   Yes.

22  Q.   And then what is she sending this one to you for?

23  A.   That particular post, the image violates the nudity

24  standard.

25  Q.   And then going on to page two, what's the problem with          10:14:45

United States District Court

CARL FERRER - Direct

1  these postings?                                                    10:14:56

2  A.   Well, the top posting is two people touching one another

3  and the bottom posting has a review number.

4  Q.   Down here (Indicating)?

5  A.   Yes.                                                          10:15:12

6  Q.   And when you say "review number," what are you referring

7  to?

8  A.   Review #126439.

9  Q.   When you were alerted to these, you and Mr. Padilla were

10 alerted to these postings, what, if anything, did you do?        10:15:30

11 A.   Well, I was instructed to be polite and ignore Hemu so

12 Andrew and I ignored this email.

13 Q.   Okay.  And going on to the next one, is this also one that

14 they alerted you to for some reason?

15 A.   Yes.  I think they are raising this on the page before.      10:15:57

16 The bottom ad is alerted because of nudity.

17 Q.   And -- okay.

18 A.   Top ad has a review number.

19 Q.   All right.  And so after the meeting, the March meeting

20 with Polaris and NCMEC, and we've looked at some other emails,    10:16:22

21 do the standards become more permissive?

22 A.   The standards become more permissive and we're not

23 implementing SSP Blue standards to remove prostitution ads.

24 Q.   All right.  And then looking at United States 1696.  What

25 is this?                                                          10:16:59

United States District Court

43

CARL FERRER - Direct

1   A.   This is an email from Joye to the moderation team.   The      10:16:59
2   subject line is stripped term.
3   Q.   All right.
4           MR. RAPP:  Move to admit 1696.
5           THE COURT:  Yes.  It may be admitted and published.      10:17:13
6           (Exhibit Number 1696 was admitted into evidence.)
7   BY MR. RAPP:
8   Q.   And so what is Joye telling this moderation staff?
9   A.   "Hello, we are going to start allowing the users to post
10  the word prostate again.  If you have any questions let me      10:17:33
11  know.  Thank you.  Joye."
12  Q.   And what, if anything, did you take that to mean?
13  A.   We had many ads that wanted to use the word "prostate."  I
14  believe the term was stripped out and now the term is going to
15  be reallowed.      10:17:48
16          MR. RAPP:  All right.  Showing for the witness's eyes
17  only United States 805.
18  BY MR. RAPP:
19  Q.   What is this is email?
20  A.   So this is an email that is about a child that's recovered  10:18:06
21  as a result of a NCMEC report sent out by page.
22          MS. BERTRAND:  Objection.  Relevance.  401, 403.  And
23  hearsay.
24          THE COURT:  Sustained.
25  \\\

United States District Court

44

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | BY MR. RAPP: | 10:18:35 |
| 2 | Q.   So who does this -- who is being noticed of this event? | |
| 3 | A.   From the beginning of this email? | |
| 4 | Q.   Yes.  Let me go down.  Yeah, so first can you identify the | |
| 5 | people on this -- the first part of this email that's alerting | 10:19:01 |
| 6 | you to this? | |
| 7 | A.   Yes.  John Shehan of NCMEC is sending an email to Don Moon | |
| 8 | who is now our point of contact with NCMEC. | |
| 9 |         MS. BERTRAND:  Your Honor.  Objection.  The Court has | |
| 10 | sustained the objection as to this document. | 10:19:20 |
| 11 |         THE COURT:  I did. | |
| 12 |         MR. RAPP:  Based on hearsay or? | |
| 13 |         MS. BERTRAND:  We made one on hearsay and relevance. | |
| 14 | 401 and 403. | |
| 15 |         THE COURT:  Sustained.  I did sustain it. | 10:19:37 |
| 16 | BY MR. RAPP: | |
| 17 | Q.   Okay.  Let's look at 1697. | |
| 18 |         MS. BERTRAND:  What is the actual exhibit number as | |
| 19 | opposed to the Bates number or is that the Bates number? | |
| 20 | Excuse me.  The Exhibit Number. | 10:20:00 |
| 21 | BY MR. RAPP: | |
| 22 | Q.   Is this -- do you see 1697 on the screen? | |
| 23 | A.   Yes, I do. | |
| 24 | Q.   All right.  And what is this? | |
| 25 | A.   This is an email from Joye to the Moderation Department | 10:20:21 |

United States District Court

CARL FERRER - Direct

1   regarding pictures.                                          10:20:24

2   Q.   And then looking -- is there attachment 1697a?

3   A.   Yes, there is.

4   Q.   And basically what is that?

5   A.   It's an image of Backpage poster.                       10:20:38

6           MR. RAPP:  Move to admit 1697 and 1697a.

7           THE COURT:  Yes, it may be admitted and published.

8           (Exhibit Numbers 1697 and 1697a were admitted into

9   evidence.)

10  BY MR. RAPP:                                                 10:21:02

11  Q.   And what is Joye Vaught telling the moderation team?

12  A.   "Hi guys.  Wanted to check in with you all about pictures.

13  This is an example of a picture we would not remove from an ad.

14  There is no nipple showing, or any genitalia.  We do not allow

15  pixelization as a cover up for nudity but it is fine when it's  10:21:21

16  used to blur their face."

17  Q.   What did you take that to mean?

18  A.   Well, the standard was no pixelization for frontal nudity

19  and covering genitalia or boobs.  But it was okay to blur the

20  face because we had a large number of users wanting to do that. 10:21:43

21  Q.   And then the link here, can you explain where this is

22  coming from?

23  A.   Yes, I can.  If you click that link, it's going to be

24  enlarged image of the -- that we're -- that she's discussing.

25  Q.   And do you know what market -- can you tell what market   10:22:12

United States District Court

46

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | it's in? | 10:22:15 |
| 2 | A.   Yes.   It's in NOVA which is northern Virginia. | |
| 3 | Q.   And then looking at 1697a, is that the image that Joye | |
| 4 | Vaught is sending to the -- sending to her moderation team? | |
| 5 | A.   Yes. | 10:22:39 |
| 6 | Q.   All right.  Now, did there come a time in 2011, mid-2011, | |
| 7 | that you received a letter from the Mayor of Seattle? | |
| 8 | A.   Yes. | |
| 9 | Q.   And I'm showing you 661, do you see that on your screen? | |
| 10 | A.   I do. | 10:23:19 |
| 11 | Q.   What is it? | |
| 12 | MS. BERTRAND:  Objection.  Relevance.  Calling for | |
| 13 | relevance -- objection.  Relevance and calls for hearsay. | |
| 14 | THE COURT:  Overruled. | |
| 15 | Lay some foundation again, Mr. Rapp. | 10:23:34 |
| 16 | BY MR. RAPP: | |
| 17 | Q.   How is it that you were made aware of this letter? | |
| 18 | A.   This letter was given to me by Jim Larkin or Scott Spear. | |
| 19 | Q.   All right.  You don't recall which person gave it to you? | |
| 20 | A.   I don't. | 10:23:49 |
| 21 | Q.   All right.  And is the subject of the letter some type of | |
| 22 | a criticism of Backpage's content of the website? | |
| 23 | MS. BERTRAND:  Objection.  Leading. | |
| 24 | THE COURT:  Sustained. | |
| 25 | \\\ | |

United States District Court

47

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | BY MR. RAPP: | 10:24:03 |
| 2 | Q.   What's the subject of the letter? | |
| 3 | A.   The subject of the letter is Backpage has a problem that | |
| 4 | there's child prostitution on the site. | |
| 5 | MS. BERTRAND:  Objection.  401, 403.  Move to strike. | 10:24:18 |
| 6 | THE COURT:  Overruled. | |
| 7 | MR. RAPP:  Move to admit United States 661. | |
| 8 | THE COURT:  It may be admitted and published. | |
| 9 | (Exhibit Number 661 was admitted into evidence.) | |
| 10 | BY MR. RAPP: | 10:24:38 |
| 11 | Q.   All right.  And I believe your testimony was this was | |
| 12 | addressed to Mr. Larkin? | |
| 13 | A.   Yes. | |
| 14 | Q.   And what -- starting here, what does the -- well, first of | |
| 15 | all, are you familiar with the signatory on this letter? | 10:24:48 |
| 16 | A.   Yes, I am. | |
| 17 | Q.   How are you familiar with him? | |
| 18 | A.   I would later have meetings will Mayor McGinn in Seattle. | |
| 19 | Q.   Did you have meetings with Mayor McGinn after Mr. Larkin | |
| 20 | received this letter? | 10:25:11 |
| 21 | A.   Yes, I did. | |
| 22 | Q.   And what does Mayor McGinn tell you in this letter? | |
| 23 | A.   "The Seattle Police Department has identified the use of | |
| 24 | the adult services section of Backpage as a contributor to the | |
| 25 | problem:  Specifically, they are an 'accelerant' of underage | 10:25:26 |

United States District Court

CARL FERRER - Direct

| 1 | prostitution.  The problem exists in both the print and online | 10:25:32 |
| 2 | version of the Backpage service.  In 2011 alone, SPD detectives |
| 3 | uncovered four documented cases of child prostitution openly |
| 4 | advertised on the Backpage.com website." |
| 5 | Q.   Can you just explain to the jury what SPD means? | 10:25:52 |
| 6 | A.   Seattle Police Department. |
| 7 | Q.   All right.  And if you could go on. |
| 8 | A.   "I understand that you have existing policies aimed at |
| 9 | preventing the trafficking of minors.  But the problem remains. |
| 10 | It's time to reexamine your policies.  We must do better. | 10:26:07 |

Line 1: prostitution.  The problem exists in both the print and online — 10:25:32

Line 2: version of the Backpage service.  In 2011 alone, SPD detectives

Line 3: uncovered four documented cases of child prostitution openly

Line 4: advertised on the Backpage.com website."

Line 5: Q.   Can you just explain to the jury what SPD means? — 10:25:52

Line 6: A.   Seattle Police Department.

Line 7: Q.   All right.  And if you could go on.

Line 8: A.   "I understand that you have existing policies aimed at

Line 9: preventing the trafficking of minors.  But the problem remains.

Line 10: It's time to reexamine your policies.  We must do better. — 10:26:07

Line 11:        "I am inviting you and your staff to sit down with

Line 12: Seattle Police Chief John Diaz and myself to work toward a

Line 13: solution.  If we tackle this together, I believe we can find a

Line 14: way forward that better protects youth in Seattle and our

Line 15: country as a whole. — 10:26:30

Line 16:        "You can reach me at (206) 684-4000 or

Line 17: mike.mcginn@seattle.gov.  I look forward to working with you

Line 18: soon.  Sincerely Mike McGinn, Mayor."

Line 19: Q.   All right.  And I think your testimony was that you did

Line 20: meet with Mr. McGinn, Mayor McGinn? — 10:26:59

Line 21: A.   Yes, I did.

Line 22: Q.   And do you know how long after this meeting that you met

Line 23: with him?

Line 24: A.   It was soon after.  I want to think maybe just a week or

Line 25: two, not long. — 10:27:14

CARL FERRER - Direct

1   Q.   And where did you meet with him?                           10:27:18

2   A.   We met with -- we myself -- could you ask that question

3   again?

4   Q.   Where did you meet with him?

5   A.   We met at Mayor McGinn's office in the conference room.    10:27:27

6   Q.   Who else was -- was just Mayor McGinn there?

7   A.   No.  Mayor McGinn was there, the Police Chief Diaz was

8   there.  I also believe a council member was there, Tim Burgess,

9   myself, Kenny Stocker, who was publisher of *The Seattle Weekly*

10  paper.                                                          10:27:56

11  Q.   Why would a person by the name of Kenny Stocker be present

12  at this meeting?

13  A.   He was there because Mayor McGinn was boycotting any ads

14  in *The Seattle Weekly*.  So it was a big deal.

15  Q.   All right.  So let's just unpack that just a bit.  What is  10:28:11

16  *The Seattle Weekly*?  What is that and what relation, if any,

17  does that have to . . .

18  A.   *The Seattle Weekly* is like the *Phoenix New Times*,

19  alternative weekly newspaper, but it's published in Seattle.

20  Q.   So just to be clear, is this an alternative newspaper that  10:28:31

21  Mr --

22          THE COURT:  Can you move to the microphone?

23          MR. RAPP:  Yes.

24  BY MR. RAPP:

25  Q.   Is this an alternative newspaper that Mr. Lacey and        10:28:43

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Mr. Spear and Mr. -- the Chief Financial Officer, Mr. Brunst, | 10:28:47 |
| 2 | have an ownership interest in? | |
| 3 | A.   Yes. | |
| 4 | Q.   And I believe your testimony was that the City was going | |
| 5 | to boycott ads in *The Seattle Weekly* and then you ended by | 10:29:06 |
| 6 | saying that's a big deal.  Why would that be a big deal? | |
| 7 | A.   Because they were calling for others to boycott the paper. | |
| 8 | The paper relies on advertising revenue.  It's distributed free | |
| 9 | and losing the City's revenue and then the bad publicity around | |
| 10 | it could lead to other advertisers not running ads in *The* | 10:29:32 |
| 11 | *Seattle Weekly*. | |
| 12 | Q.   All right.  Let's look at Exhibit 912.  What is this? | |
| 13 | A.   This is an exhibit from Michael Lacey to myself and others | |
| 14 | regarding the Seattle Mayor. | |
| 15 |             MR. RAPP:  Move to admit and publish. | 10:30:12 |
| 16 |             THE COURT:  It may be admitted and published. | |
| 17 |             (Exhibit Number 912 was admitted into evidence.) | |
| 18 | BY MR. RAPP: | |
| 19 | Q.   And so what is Mr. Lacey telling the people endorsed on | |
| 20 | this?  What is he telling them? | 10:30:34 |
| 21 | A.   Do you want me to read this? | |
| 22 | Q.   Yes. if you can read it. | |
| 23 | A.   "guys, my understanding in Seattle is that this is | |
| 24 | npr interview done a couple days ago. | |
| 25 |             "We got our numbers from seattle police.  When | 10:30:54 |

United States District Court

CARL FERRER - Direct

1  seattle police read story, they contacted us, apologized, and          10:30:57

2  said they should also have included kids recovered, not

3  arrested.

4          "3) we changed numbers as soon as seattle police gave

5  us new numbers.                                                         10:31:07

6          "4) but even taking their new number of 80 in 2010,

7  if you ran that out to america's 40 biggest cities, 40 x 80,

8  you have 3200 victims, not 100k or 300k.  It is a problem, not

9  an epidemic."

10 Q.   What did you take that last line to mean?                          10:31:35

11          MR. CAMBRIA:  Object to the relevance, his opinion.

12          THE COURT:  Overruled.

13          THE WITNESS:  So there were numerous anti-trafficking

14 organizations citing 100,000 to 300,000 child victims per year

15 and Lacey and his team had contacted the police department to            10:31:59

16 do a count of how many children were recovered.

17 BY MR. RAPP:

18 Q.   Let me just stop you there.  How do you even know all of

19 this?  How do you know this?

20 A.   Well, he just -- we got our numbers from Seattle police,           10:32:17

21 meaning they called the police department to get the numbers on

22 the number of underage prostitution cases, and then he's

23 extrapolating that across 40 of the largest cities.  So if the

24 new number is 80, then 40 times 80 equals 3200 victims, not

25 100,000, not 300,000.                                                    10:32:50

United States District Court

CARL FERRER - Direct

```
1   Q.   All right.  Let's move on to 662b.  We had talked about      10:32:54
2   this recommendation to meet with the guy -- a person by the
3   named of Byron Fassett.  Did you, in fact, have that meeting?
4   A.   Yes, I did.
5   Q.   And are you communicating this meeting up to Mr. Lacey and  10:33:28
6   Mr. Larkin?
7   A.   I am.
8   Q.   All right.
9           MR. RAPP:  Move to admit 662b.
10          MS. BERTRAND:  Objection.  Relevance.  401 and 403        10:33:43
11  and hearsay within hearsay.
12          THE COURT:  Overruled.  I would say the --
13          Mr. Rapp, lay some foundation.
14  BY MR. RAPP:
15  Q.   All right.  Did you have a meeting with Mr. Fassett?        10:33:57
16  A.   Yes, I was asked to go meet with Sergeant Byron Fassett.
17  Q.   Who were you asked to go meet with him by?
18  A.   Scott Spear and Jim Larkin.
19  Q.   And what was the purpose of you meeting with him?
20  A.   It was on the Hemu to-do list.  It's another chance for us  10:34:22
21  to see if we can find some level of cooperation with law
22  enforcement.
23  Q.   And after you met with him, did you summarize the meeting?
24  A.   I did.  I was asked to do it by Jim Larkin after I had,
25  you know, told him just what an ambush that event was.         10:34:52
```

United States District Court

CARL FERRER - Direct

1    Q.   All right.  You say it's an ambush.  Why do you          10:34:56

2    characterize it as an ambush?

3    A.   Well, the first time I went to meet with the Dallas PD it

4    was just one person.  We met over BBQ.  Casual meetings but

5    this meeting I walk in and I open the door and there's, like,   10:35:14

6    12 people there and I don't have a lawyer with me.  They have

7    got the FBI, the Sheriff's Department.  I have Sergeant Fassett

8    there and numerous others, stressful meeting.  So that's why I

9    wrote this long report of the meeting.

10   Q.   All right.  And did you -- following this meeting, did you  10:35:37

11   continue to have contact with Mr. Fassett, Sergeant Fassett

12   rather?

13   A.   Yes.  We continued to receive emails from him regarding

14   ads that should be removed.

15   Q.   All right.  And but in this email, are you communicating   10:35:54

16   the substance of the meeting to Mr. Lacey?

17   A.   Yes, I am.

18           MR. RAPP:  Move to admit 662b.

19           MS. BERTRAND:  Objection.  Hearsay within hearsay.

20           THE COURT:  Overruled.                                  10:36:15

21           MR. RAPP:  And request permission to publish.

22           THE COURT:  Yes, it may be published.  Yes.  This is

23   Exhibit 662b, admitted and published.

24           (Exhibit Number 662b was admitted into evidence.)

25   \\\

United States District Court

CARL FERRER - Direct

1    BY MR. RAPP:                                                    10:36:40

2    Q.   And then just looking at the top here, what does

3    Mr. Larkin inform Mr. Lacey?

4    A.   "Michael:  I talked with Carl about this this morning at

5    length.  I wanted him to write about what he heard this morning   10:36:50

6    in Dallas from the cops memorialized so that you would have it

7    to review.  Larkin."

8    Q.   And then what are you telling Mr. Lacey here?

9    A.   "I had a meeting with SGT Byron Fassett.  He heads up the

10   High Risk Victims and Trafficking Unit.  My thought is to get    10:37:18

11   to know the guy who is very well known and liked at the Crimes

12   Against Children Conference in Dallas."

13   Q.   Does he say anything about NCMEC reports?  I'm going to

14   draw your attention down here.  What do you communicate to

15   Mr. Lacey?                                                       10:37:47

16   A.   "They only" -- that's Sergeant Fassett's unit -- "only use

17   1% of the NCMEC reports we send them.  There are several

18   reasons for this:"

19   Q.   Going to the next page.  What does he say about that?

20   A.   "backpage needs to do a better job.  We are reporting pics  10:38:13

21   where the user is clearly not underaged.  Even if the pic looks

22   under aged, they still have to set up meetings with the user

23   and often they do not get a call back when they leave a

24   voicemail.

25        "Most of their successful cases are achieved thru          10:38:30

United States District Court

CARL FERRER - Direct

1   other means than one of our NCMEC reports.                          10:38:32

2          "Even reports from other users often turn out to be

3   competitors just trying to get someone's ad taken down.

4          "He had printed out a stack of NCMEC reports that he

5   said are not useful with the exception of 1 case.  In that         10:38:48

6   exception, they already had heard from a relative and they

7   received a ncmec report from us directly after.

8          "He is not saying stop the NCMEC reports, just try to

9   do a better job looking at the pic."

10  Q.   All right.  So do you continue to have contact with           10:39:18

11  Sergeant Fassett?

12  A.   I did.  Yes.  We continue.

13  Q.   All right.  And now it seems like you're working between

14  Dallas and Seattle.  Looking at -- when you were at the meeting

15  in Seattle, do they provide you anything?                          10:39:38

16  A.   Yes, they do.

17  Q.   What do they give you?

18  A.   They give us an analysis of prostitution arrests and I

19  believe -- yeah.  That's what I recall.

20  Q.   Okay.  And do they give you anything that has a connection    10:40:01

21  between prostitution and Backpage?

22  A.   Yes.  I believe they give the analysis and they break it

23  down by the source like Backpage, Craigslist, *Stranger*, which

24  is another alt weekly, and then they also include pictures of

25  some ads.                                                          10:40:34

United States District Court

CARL FERRER - Direct

1   Q.   Okay.  And are these hard-copy documents?                    10:40:34

2   A.   Yes.

3   Q.   Do you walk out of the meeting with these?

4   A.   I did.

5   Q.   Showing you Exhibit 846.  What is 846?                       10:40:46

6   A.   So 846 is a follow-up from a phone call that we had with

7   Tim Burgess and that reply that I'm sending to Tim Burgess

8   is -- was written for me so it was a copy-and-paste job for me.

9   Q.   Okay.  Is this after the meeting that you had with the

10  Seattle PD?                                                        10:41:49

11  A.   Yes, it is.  July 26, July 27.

12  Q.   And do you also send the people endorsed on this email, do

13  you send them the documents that were provided to you by the

14  Seattle PD when you had the meeting with Mayor McGinn,

15  Councilman Burgess and representatives from the Seattle PD?        10:42:22

16  A.   I believe so, yes.

17          MR. RAPP:  Move to admit 846 and 846a.

18          MR. CAMBRIA:  Hearsay.

19          THE COURT:  Overruled.  846 and 846a are going to be

20  admitted.                                                          10:42:48

21          Mr. Rapp, are you going to be a while with that

22  exhibit?

23          (Exhibit Numbers 846 and 846a were admitted into

24  evidence.)

25          THE COURT:  All right.  So, members of the jury,           10:42:53

United States District Court

CARL FERRER - Direct

| | |
|---|---|
| 1 | before we go any further I think it's about time that we have | 10:42:54 |
| 2 | our morning break.  And so I, again, will remind you of the |
| 3 | admonishment not to come to any conclusions or discuss any of |
| 4 | the matters that have been presented here so far in the trial; |
| 5 | just simply to enjoy your break.  We'll try to be back on the | 10:43:07 |
| 6 | hour to resume. |

1 before we go any further I think it's about time that we have          10:42:54
2 our morning break.  And so I, again, will remind you of the
3 admonishment not to come to any conclusions or discuss any of
4 the matters that have been presented here so far in the trial;
5 just simply to enjoy your break.  We'll try to be back on the          10:43:07
6 hour to resume.
7                 Please all rise for the jury.
8                 (Jury departs at 10:43.)
9                 THE COURT:  All right.  We will stand in recess.
10                (Recess at 10:43; resumed at 11:03.)          10:43:44
11                (Court was called to order by the courtroom deputy.)
12                THE COURT:  All right.  Please be seated.
13                And let's go ahead and have the jury in.
14                All rise for the jury.
15                (Jury enters at 11:03.)          11:03:52
16                THE COURT:  All right.  Please be seated.  The record
17 will reflect the presence of the jury.  The witness is on the
18 witness stand.
19                Mr. Rapp, you may continue.
20                MR. RAPP:  Thank you, Your Honor.          11:04:26
21                Madam Clerk, I believe that 846 and 846a were
22 admitted.  If we could publish.  Thank you.
23 BY MR. RAPP:
24 Q.   So when we broke, I believe you were testifying that the
25 portion that starts with Dear Councilman Burgess you didn't          11:04:51

United States District Court

CARL FERRER - Direct

1  write?                                                                    11:04:56

2  A.   Correct.  I did not write it.

3  Q.   Who do you believe wrote this?

4  A.   Edward McNally who was hired by Jim Larkin.

5  Q.   And then I want to just draw your attention to this        11:05:15

6  paragraph.  Can you read that paragraph?

7  A.   "I also appreciated your suggestion that we should talk

8  w/Seattle PD about the subpoenas I mentioned.  In this same

9  lane, attached as we discussed is a scan copy of the materials

10 that were provided at the meeting you and I participated in on  11:05:30

11 July 15th.  We've been reviewing these materials and hope to be

12 able to provide add'l information as to them, as well."

13 Q.   All right.  And so you sent these scanned materials to

14 Mr. Lacey?

15 A.   Yes, I did.                                                 11:05:58

16 Q.   So anything about the responses that you gave to

17 Councilman Burgess that reflect the relationship you've had

18 with The Erotic Review?

19          MS. BERTRAND:  Objection.  Relevance.

20          THE COURT:  Overruled.                                  11:06:18

21          THE WITNESS:  No.

22 BY MR. RAPP:

23 Q.   Aggregation?

24          MS. BERTRAND:  Same objection.  Relevance.

25          THE COURT:  Overruled.                                  11:06:24

United States District Court

CARL FERRER - Direct

```
 1              THE WITNESS:  No.                            11:06:25
 2    BY MR. RAPP:
 3    Q.   Relationship with the super posters?
 4              MS. BERTRAND:  Objection.  Relevance.
 5              THE COURT:  Overruled.                       11:06:32
 6              THE WITNESS:  No.
 7    BY MR. RAPP:
 8    Q.   So let's look at, for the record, 846a, and just so we
 9    understand, is this one of the documents that was provided to
10    you at the meeting?                                    11:06:46
11    A.   Yes.
12    Q.   And there's some handwriting on document.  Do you
13    recognize that?
14    A.   Yes.  That's my handwriting.
15    Q.   And what did you understand the information on this   11:07:08
16    document to represent?
17              MS. BERTRAND:  Objection.  401.  403 and hearsay to
18    the extent he's being asked to summarize what someone else told
19    him.
20              THE COURT:  Overruled.                       11:07:20
21              MR. FEDER:  Foundation, too.
22              THE COURT:  Overruled.
23              THE WITNESS:  This document breaks down prostitution
24    cases and then breaks them down even further into juvenile
25    recoveries on Backpage.com and other sites.            11:07:37
```

United States District Court

CARL FERRER - Direct

1   BY MR. RAPP:                                                              11:07:41

2   Q.   Okay.  And do they do it by year?

3   A.   Yes, they do.

4   Q.   And then going to 846a, page two, does this page continue

5   on with that breakdown?                                                  11:07:54

6   A.   Yes.  It includes other sites.

7   Q.   All right.  And then going to 846a-3, what did this report

8   tell you and then when forwarded to Mr. Lacey, what did they

9   tell you in this report?

10          MS. BERTRAND:  Objection.  Hearsay.  Objection, 401,             11:08:27

11   403 and foundation as to this document.

12          THE COURT:  Overruled.

13          THE WITNESS:  "The Seattle Police Department

14   Vice/High Risk Victims Unit believes that Backpage.com and its

15   parent company Village Voice media is not doing enough to              11:08:47

16   combat child prostitution.

17          "Many are presented on Backpage.com with everything

18   but a price tag.  The profit to Backpage.com for this carte

19   blanche access?  Millions of dollars in revenue.  The profits

20   to the child victims?  Nothing.                                        11:09:06

21          "In 2011 alone, SPD detectives have uncovered four

22   documented cases of child prostitution openly advertised on the

23   Backpage.com website.

24          "Detectives have worked on these cases to identify

25   and rescue the children in question and to any of the those who        11:09:25

United States District Court

CARL FERRER - Direct

1   have trademarked them.                                          11:09:28

2         "Backpage.com needs to realize that society will no

3   longer tolerate inaction and ignorance.

4         "Seattle Police detectives ask that Backpage.com

5   monitor its own Web site for suspected child prostitution      11:09:42

6   through age verification.  A simple solution would be for

7   Backpage.com to require photo identification when clients

8   submit photo profiles.  The Seattle Police Department is

9   willing to work with Backpage.com employees to train them to

10  identify such cases.  When cases are discovered that involve   11:10:04

11  child prostitution, detectives request cooperation and

12  assistance from Backpage.com in order to successfully rescue

13  the child victims.  Detectives are not asking Backpage.com

14  employees to become agents of the police.  Detectives are only

15  asking that they provide a modest amount of cooperation in     11:10:26

16  fighting the social blight of child prostitution."

17  BY MR. RAPP:

18  Q.  And then going on to 846a, page four.  Do you see these

19  postings that are 846a, page four and 846a, page six -- or five

20  rather and this is six, 846a-7, and 846a-8?                    11:10:57

21        Why did they provide you these postings that you

22  then, in turn, forwarded to Mr. Lacey?

23              MS. BERTRAND:  Objection.  Leading.

24              MR. CAMBRIA:  Objection.

25              MR. EISENBERG:  Objection.  Calls for a conclusion.  11:11:23

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Speculation. | 11:11:25 |
| 2 |       THE COURT:  Sustained as to Mr. Eisenberg's | |
| 3 | objection.  Overruled as to Ms. Bertrand's. | |
| 4 | BY MR. RAPP: | |
| 5 | Q.  Well, do you know why -- in addition to these other | 11:11:33 |
| 6 | documents, why did they provide you these postings? | |
| 7 |       MR. EISENBERG:  Objection, Your Honor.  Foundation. | |
| 8 |       THE COURT:  Sustained. | |
| 9 | BY MR. RAPP: | |
| 10 | Q.  The postings that we just looked at contained in 846, did | 11:11:56 |
| 11 | you do something with those postings? | |
| 12 | A.  Yes, I did. | |
| 13 | Q.  What did you do? | |
| 14 | A.  Well, we attempted to research the postings as being | |
| 15 | online and then I -- we reviewed the content for conforming to | 11:12:11 |
| 16 | the posting rules. | |
| 17 | Q.  Okay.  And then once you located those postings, did you | |
| 18 | provide them to anybody? | |
| 19 | A.  Yes, I did. | |
| 20 | Q.  Who did you provide those postings to? | 11:12:36 |
| 21 | A.  Sent an email I believe to my bosses, which would be Scott | |
| 22 | Spear, Jim Larkin, Michael Lacey.  One of those three I sent it | |
| 23 | to. | |
| 24 | Q.  Okay.  Now, did you learn at some point that -- let me | |
| 25 | just show you 670 for the witness's eyes only. | 11:13:05 |

United States District Court

63

CARL FERRER - Direct

1         Do you see that on your screen?                    11:13:20

2   A.   I do.

3   Q.   And then looking at 670a, there's a number of pages.

4   A.   Yes.

5   Q.   And do you know, sir, what those are?                   11:13:33

6   A.   These are the ads that were referenced by the Seattle

7   Police Department and it's an admin view of those ads that I

8   had looked up.

9   Q.   And do you send those postings to Mr. Lacey?

10        MR. CAMBRIA:  Object to the leading.            11:13:59

11        THE COURT:  Sustained.

12  BY MR. RAPP:

13  Q.   What do you do with the postings?

14  A.   I send them to Mr. Lacey.

15  Q.   All right.                                              11:14:05

16        MR. RAPP:  Move to admit 670 and 670a.

17        THE COURT:  Yes, they may be admitted and published.

18        MR. RAPP:  Thank you.

19       (Exhibit Numbers 670 and 670a were admitted into

20  evidence.)                                                  11:14:14

21  BY MR. RAPP:

22  Q.   And so in this portion of the email, what do you tell

23  Mr. -- well, let's start at the bottom.  What does Mr. Lacey

24  say to you down here?

25  A.   Mr. Lacey writes, "Do y hv identity of 3 people who placed   11:14:36

United States District Court

CARL FERRER - Direct

1  underage ads n seattle?"                                         11:14:40

2  Q.   And how do you respond to Mr. Lacey's question?

3  A.   I respond, "RE:  The three examples of under age girls

4  handed to me at the meeting.  At the meeting they gave me three

5  print outs of ads that they knew to be under-aged girls.  I     11:15:05

6  believe they said they were arrested before.

7         "Ad 1 was posted June 3rd in Seattle."  And then I

8  provide a link of that ad with the title Sweet Petite, The One

9  Guys Want to Meet.

10         "Ad 2 was in Tacoma (must likely out of the Seattle's   11:15:29

11  jurisdiction, did they let Tacoma know?)"  And title of that

12  ad, Naughty Play Mate 1 Choice.

13         "Ad 3 was in Wenatchee (Out of Seattle's

14  jurisdiction?)" with the title 100 Real Pictures New in Town.

15         "I removed the ads so the URLs above will not work.     11:15:57

16  If you want to see the pdf's and all the user info, please let

17  me know.

18         "RE:  A history of Seattle's subpoena's to us.  I

19  have 10 from King County in the past year.  I have all records

20  and subpoena's in pdf's.  If you want those, also let me know."  11:16:15

21  Q.   And King County is?

22  A.   King County is in Seattle.

23  Q.   And then what does Mr. Lacey say to you?

24  A.   "noted your earlier comment that the underage always have

25  someone else place ad, pimp, boyfriend.                        11:16:39

United States District Court

CARL FERRER - Direct

1     "want to see what happened to these guys so that          11:16:43
2  raises question of their identity.

3     "often you simply can't locate the underaged.  They
4  have safe harbor in seattle so kids are placed in something
5  other than jail.  the guy or pimp is only lead."           11:16:57
6  Q.  All right.  Now, we just looked at an exhibit that had
7  this response to the councilman.  Do you recall that?
8  A.  Yes.
9  Q.  Did you come to learn that Mr. Lacey was --
10           MR. CAMBRIA:  Object to the leading.           11:17:22
11           MS. BERTRAND:  Join.
12           MR. RAPP:  I haven't even finished the question.
13           THE COURT:  Sustained.
14  BY MR. RAPP:
15  Q.  Did Mr. Lacey prepare some type of article in rebuttal to  11:17:28
16  Mayor McGinn?
17  A.  Yes.  Backpage understood.
18  Q.  Is that the title of the article?
19  A.  Yes.
20  Q.  Let me show you Exhibit 113 for your eyes only.  Do you    11:17:47
21  see that on the screen?
22  A.  Yes, I do.
23  Q.  All right.  What is this?
24  A.  This is an email from Jim -- or from Michael Lacey to Jim
25  Larkin.                                                      11:18:22

United States District Court

CARL FERRER - Direct

1   Q.   Do you recognize Mr. Lacey's email?                                    11:18:24

2   A.   Yes, I do.

3   Q.   How is it that you recognize this email?

4   A.   It's in the standard format of first name, dot, last name

5   @villagevoicemedia.com which is corporate email address.         11:18:38

6   Q.   Is this the same @ that we saw with Mr. Brunst, the CFO?

7   A.   Yes.

8   Q.   In terms of what you just said, Backpage understood, were

9   you provided a draft at some point of this article?

10  A.   Yes, I was.                                                            11:19:07

11          MR. RAPP:  Move to admit 113.

12          MR. FEDER:  Same.

13          MS. BERTRAND:  Objection.  106.  Rule of

14  completeness.

15          THE COURT:  Is it the completed email?                             11:19:22

16          MR. RAPP:  So this is the -- an email that is a

17  transmission email and there's an attachment attached to it.

18          THE COURT:  And is that 113a?

19          MR. RAPP:  Yes, ma'am.

20          THE COURT:  Overruled.  And it may be admitted.                    11:19:38

21          (Exhibit Number 113 was admitted into evidence.)

22          MR. RAPP:  And published?

23          THE COURT:  And published.

24          MR. RAPP:  Thank you.

25  \\\

United States District Court

67

CARL FERRER - Direct

| | |
|---|---|
| 1   BY MR. RAPP: | 11:19:49 |
| 2   Q.   What does Mr. Lacey tell Mr. Larkin? | |
| 3   A.   "jim, take a look at this.  We could run this as a | |
| 4   statement in seattle in the weekly after adding something from | |
| 5   carl following call with mayor.  Distribute to staff before it | 11:20:05 |
| 6   goes up.  then take to advertisers. | |
| 7          "what do you think?  points missing? | |
| 8          "points we should skip?  lacey." | |
| 9   Q.   And then looking at 113a, at some point -- and let's just | |
| 10   go through these pages.  At some point, did you also receive | 11:20:27 |
| 11   this draft? | |
| 12   A.   Yes, I did. | |
| 13   Q.   And why did you receive this draft? | |
| 14   A.   I was asked to review it by Jim Larkin. | |
| 15          MR. RAPP:  I'm sorry.  My fault.  I wanted this to | 11:20:47 |
| 16   remain published.  Thank you. | |
| 17          COURTROOM DEPUTY:  You moved 113. | |
| 18          THE COURT:  You said 113. | |
| 19          MR. RAPP:  I'm sorry. | |
| 20   BY MR. RAPP: | 11:20:58 |
| 21   Q.   Was there an article attached to -- was a draft of the | |
| 22   article attached to 113? | |
| 23   A.   Yes. | |
| 24   Q.   And is this an article -- did you come to learn that this | |
| 25   was an article written by Michael Lacey? | 11:21:08 |

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | A.   Yes. | 11:21:13 |
| 2 | MR. RAPP:  Move to admit 113a. | |
| 3 | THE COURT:  Yes.  It may be admitted and published. | |
| 4 | (Exhibit Number 113a was admitted into evidence.) | |
| 5 | BY MR. RAPP: | 11:21:35 |
| 6 | Q.   And what was the title of this article? | |
| 7 | A.   "Backpage.com understood." | |
| 8 | Q.   And in reading this article, what does he say with respect | |
| 9 | to the Mayor of Seattle, Mike McGinn? | |
| 10 | MR. CAMBRIA:  Objection.  Speaks for itself. | 11:21:57 |
| 11 | THE COURT:  Sustained. | |
| 12 | BY MR. RAPP: | |
| 13 | Q.   Can you read it? | |
| 14 | A.   "A significant portion of this rhetoric has come from the | |
| 15 | Mayor of Seattle, Mike McGinn." | 11:22:05 |
| 16 | Q.   And then just looking at page three, what does he say in | |
| 17 | the last paragraph here on page three? | |
| 18 | A.   "Today we are still only about one-twentieth the size of | |
| 19 | Craigslist.  But our decision to compete rather than surrender | |
| 20 | has led to a flow of revenue at a time when the newspaper | 11:22:32 |
| 21 | business remains seriously stressed." | |
| 22 | Q.   What did you take that to mean? | |
| 23 | MR. CAMBRIA:  Your Honor, 106. | |
| 24 | THE COURT:  I'm sorry, what was the objection? | |
| 25 | MR. CAMBRIA:  The objection is that they are reading | 11:22:51 |

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | this out of context.  It speaks for itself and should not be | 11:22:53 |
| 2 | read in excerpts. | |
| 3 | THE COURT:  Overruled. | |
| 4 | BY MR. RAPP: | |
| 5 | Q.   What did you take his reference to "seriously stressed" to | 11:23:07 |
| 6 | mean? | |
| 7 | A.   The newspaper is -- it's becoming more and more difficult | |
| 8 | to sell print ads and Backpage.com is doing extremely well. | |
| 9 | Q.   All right.  Now, let's look at 115.  This is for the | |
| 10 | witness's eyes only.  What is this? | 11:23:37 |
| 11 | A.   This is an email about the revisions to the Backpage | |
| 12 | understood document that I make and send to Larkin that | |
| 13 | ultimately goes to Lacey. | |
| 14 | MR. RAPP:  Move to admit -- | |
| 15 | BY MR. RAPP: | 11:24:06 |
| 16 | Q.   And as attached -- let's look at 115b, do you recognize | |
| 17 | 115b? | |
| 18 | A.   I do. | |
| 19 | Q.   What is 115b? | |
| 20 | A.   It is the "Backpage.com understood" document with my | 11:24:20 |
| 21 | suggested edits. | |
| 22 | Q.   All right. | |
| 23 | MR. RAPP:  Move to admit 115 and 115b, and request | |
| 24 | permission to publish. | |
| 25 | MR. CAMBRIA:  106. | 11:24:32 |

United States District Court

CARL FERRER - Direct

1   THE COURT:  Is there another portion to this, Mr.                  11:24:42
2   Rapp?
3   MR. RAPP:  No.  This is the entirety of it.
4   THE COURT:  All right.  Overruled and it may be
5   admitted and published.                                            11:24:48
6   (Exhibit Numbers 115 and 115b were admitted into
7   evidence.)
8   BY MR. RAPP:
9   Q.   So just starting down here, what are you telling
10  Mr. Larkin down in the lower part here?                            11:24:58
11  A.   "See comments in doc.  I also have suggested changes
12  tracked."
13  Q.   Okay.  And what does Mr. Larkin -- just by the way, what
14  is Mr. Larkin's email address?
15  A.   First name, dot, last name @villagevoicemedia.com, which     11:25:21
16  is the corporate email address.
17  Q.   What does Mr. Larkin tell Mr. Lacey about your edits?
18  A.   "Mike:  Or I can provide you with a completely edited
19  version.  We're trying to thread a dozen needles at the same
20  time here.  Customers, cops, wrongdoers, employees,               11:25:52
21  politicians, the public, etc. etc.  Larkin."
22  Q.   And what is the subject line in the email from you to
23  Mr. Larkin?
24  A.   So the subject line to me is, "Please review this asap.
25  we are considering running in Seattle Weekly."                    11:26:23

United States District Court

CARL FERRER - Direct

1   Q.   Okay.  So let's go to 115b.  Do you see over here to the         11:26:28

2   side, can you sort of explain what's going on here with the

3   comments?

4   A.   Yes.  Do you want me to read my comment?

5   Q.   Well, more importantly at this point, can you just explain       11:26:55

6   to the jury what you do and what the comments are and is it --

7   can you just explain that part of it?

8   A.   So I've received a Word document here from one of the

9   owners and so I want to be very careful about my suggestions

10  and edits so I'm not just making them.  I am putting them on       11:27:16

11  the side as a comment or that I'm suggesting redactions and

12  then they can choose to accept them or, you know, not accept

13  them.

14  Q.   All right.  So let's just look at this.  Do you make -- is

15  this your first comment?  Did you read what Mr. Lacey writes       11:27:38

16  and then what your suggested edit is?

17  A.   "The mayor has since made the odd claim that Backpage is

18  an 'accelerant' for underage prostitution.  He has pulled the

19  city's advertising from *Seattle Weekly*, and has said he will

20  hold those funds hostage until Backpage 'steps up to the plate'    11:27:58

21  and works harder to prevent people from posting ads might

22  involve underage prostitution."

23  Q.   What comment to you make or edit do you make in response

24  to this paragraph that Mr. Lacey writes?

25  A.    I have the term "odd" highlighted and I write, "Maybe          11:28:20

United States District Court

CARL FERRER - Direct

1    remove this term since it damages the objective tone in the          11:28:27

2    article."

3    Q.   All right.  Now I'm drawing your attention to 115b, page

4    four.  What comment do you make?  Can you read the relevant

5    sentence and then the comment that you -- or edit you make          11:28:57

6    here?

7    A.   So in the Backpage understood doc, there's a sentence,

8    "Craigslists's 'therapeutic massage' category also features ads

9    that clearly refer to prostitution, including posts from

10   masseuses offering 'outcall' services to local hotels."          11:29:20

11   Q.   All right.  And then you make a comment.  What comment do

12   you give Mr. Lacey, a suggested edit to Mr. Lacey on that

13   statement?

14   A.   Do you want both comments?

15   Q.   Just the comment four actually.          11:29:38

16   A.   Comment four.  "I would remove 'that clearly refer to

17   prostitution.'  I am not looking to drag craigslist into

18   counter attacking us.  'Outcall' services says it all."

19   Q.   What do you mean by that?

20   A.   So the sentence currently says, "Craigslist 'therapeutic          11:29:58

21   massage' category also features ads that clearly refer to

22   prostitution, including posts from masseuses offering 'outcall'

23   services to local hotels."  If we take out "that clearly refer

24   to prostitution," then Craigslist therapeutic massage category

25   also features ads including posts from masseuses offering          11:30:18

United States District Court

CARL FERRER - Direct

1    outcall services to local hotels.                              11:30:23

2              "Outcall," I say, "refers to prostitution anyway so

3    we don't need to say that clearly refer to prostitution."

4    Q.   All right.  And then with respect to postings on Backpage,

5    were there occasions where you identified the term "incall" or   11:30:43

6    "outcall" on any of the Backpage postings?

7    A.   Those terms were permitted and they were in most of the

8    postings, many of them.

9    Q.   And then going to page seven Mr. Lacey's paragraph and

10   what your suggested edit or comment is?                         11:31:27

11   A.   "Any time a user edits an ad, it goes back into the

12   moderation queue for inspection.  And it's not uncommon for

13   users to make as many as ten edits before their satisfied.  Any

14   user attempting to inappropriately edit an ad can also be

15   blocked from the ad editing process."                          11:31:48

16   Q.   What's your suggestion there?

17   A.   I've taken out the word "is" and put in "be" because users

18   are not blocked for inappropriate edits.  They could be and

19   that would mean that we put on the -- don't allow them to edit

20   their ad feature, click that.  But I'm saying that they -- can   11:32:12

21   also be is a more accurate.

22   Q.   All right.  Let's look at page seven.  Your fifth comment?

23   A.   "Thus it's not an exaggeration to say that Backpage may be

24   the largest single provider of leads to police whose job it is

25   to track down adults who are exploiting or attempting to         11:32:47

United States District Court

74

CARL FERRER - Direct

1   exploit a child."                                                    11:32:51

2   Q.   And so what edit are you making to Mr. Lacey's statement

3   there?

4   A.   I don't believe I made any edits.  I just comment, "This

5   is true.  I'm not sure I want competitor's to quote this to our   11:33:10

6   customers.  Nor, does it help victims of exploitation."

7   Q.   Okay.  And then down here, what's the statement Mr. Lacey

8   makes and what is your comment?

9   A.   "As soon as we receive user reports, they are forwarded,

10  verbatim, to law enforcement."                                      11:33:55

11        And I comment, "We will withhold the user's email

12  address that send us the report unless some familial

13  relationship is indicated in the text of the email.  So, it is

14  better that we say:  'As soon as we receive user reports on

15  postings involving possible child exploitation, we alert law       11:34:19

16  enforcement immediately.'"

17  Q.   And then finally, let's look at page nine.  You've

18  stricken out some portions of Mr. Lacey's statement.  What is

19  it that you take out here?

20  A.   I took out, "However, Backpage is part of the solution.        11:35:06

21  Eliminating our adult advertising will in no way eliminate or

22  even reduce the incidence of prostitution in this country.  It

23  certainly will not prevent the exploitation of teenagers.  If

24  anything, it will simply make it far more difficult for law

25  enforcement to arrest and prosecute those who seek to harm          11:35:26

United States District Court

CARL FERRER - Direct

1    children.                                                          11:35:29

2              "For the very first time, the oldest profession in

3    the world has transparency, record-keeping and safeguards.

4    Driving adult activity back into the shadows doesn't end the

5    activity, it ends the safeguards."                                 11:35:44

6    Q.   This last portion, why did you strike that out?

7    A.   Well --

8    Q.   What is your comment?

9    A.   My comment is, "I took this all out.  I do not have

10   prostitution ads.  Also, I do not even want to suggest that we     11:36:00

11   would eliminate our Adult section."

12   Q.   All right.  Well, is that a true statement?

13             THE COURT:  Mr. Rapp, what was the question?  You

14   need to be by the microphone.  I didn't hear you.

15             MR. RAPP:  I'm sorry.                                    11:36:22

16   BY MR. RAPP:

17   Q.   Is that -- is your edit a true statement?

18   A.   No.  Of course we have prostitution ads on the site.  I

19   just don't want to acknowledge it in a document that is publish

20   in our own paper.                                                  11:36:37

21   Q.   And what about the edit where you don't even want to

22   suggest that we would eliminate our Adult section?

23   A.   Well, we eliminate the Adult section, there's just not

24   enough revenue for Backpage to operate profitably or certainly

25   to support the rest of the company.                                11:37:04

CARL FERRER - Direct

Q.   In terms of these three assertions by Mr. Lacey, what did          11:37:08
you take him to mean by transparency?

          MR. CAMBRIA:   Object to the relevance.   It speaks for
itself.

          THE COURT:   Overruled.                                      11:37:34

          THE WITNESS:   Well, that sounds good that
transparency means that we're capturing some data but it's, in
fact, we're not transparent.

BY MR. RAPP:

Q.   Why aren't you transparent?                                       11:37:50

A.   Well, at this time we still have The Erotic Review.   You
know, our moderation is more like coaching.   We're not really
focused on -- we're not he focused on eliminating prostitution
ads.   There's a lot of concealment.

Q.   All right.   And with respect to record-keeping, what             11:38:12
record-keeping is Backpage engaging in at this time?

A.   Well, we're capturing the IP address.   We have an email
address even though at this time you could actually use an
email address that wasn't even valid.   As long as you paid for
the ad, it would still work.                                           11:38:33

Q.   Can you explain that to the jury?

A.   So if you paid for an ad, the email address didn't even
need to be real.   You could put -- like one of the common email
addresses like noone@yahoo.com.   Well, a lot of ads use
noone@yahoo.com because the email address didn't even need to          11:38:57

CARL FERRER - Direct

1  be valid.                                                                11:39:03

2  Q.   Well, what about credit cards?  Credit cards would be a

3  record, would it not?

4  A.   We did secure credit card data.  We did store that but 70

5  percent of our transactions are coming from prepaid cards like           11:39:12

6  vanilla VISA where there's -- where it's essentially an

7  anonymous credit card.

8  Q.   Why didn't you just -- was there ever a discussion of just

9  preventing the use of the vanilla VISA cards?

10 A.   Sure.  We were, I believe, asked to do it or look at it as          11:39:34

11 a flag by Simrin Hooper of SSP Blue.  But no, there's no

12 serious -- there was no consideration of banning prepaid cards.

13 It's possible.  We could have done it.

14 Q.   But why not?

15 A.   Because it's 70 percent of the revenue.                             11:39:53

16 Q.   And then in terms of gift cards, could you have any idea

17 of what Mr. Lacey is referring to hereby safeguards?

18 A.   We are sending NCMEC reports.  We're using NCMEC because

19 so much postings we just don't know.  We don't have age

20 verification.  It's really difficult to tell the age of                  11:40:17

21 somebody just from a photograph so we send it to NCMEC and --

22 Q.   Why didn't you implement age verification?

23 A.   Well, we did the slow dance with Mayor McGinn to add age

24 verification and it was kind of clunky and it was decided later

25 by -- by the owners to no longer pursue the age verification.            11:40:41

United States District Court

78

CARL FERRER - Direct

1   Q.   All right.  And when you say "owners," who are you

2   referring to?

3   A.   I'm saying Jim Larkin, Scott Spear at that time.

4   Q.   Did you continue to receive letters from the Seattle

5   Mayor?

6   A.   Yes.

7   Q.   And as a matter of fact, did you receive a letter -- let

8   me just show it to you, 850 on your screen there, do you see

9   that?

10  A.   Yes, I do.

11  Q.   And what is this?

12  A.   So this is a letter that Mayor Mike McGinn of Seattle sent

13  to Jim Larkin and then Jim Larkin sends it to Michael Lacey.

14  Q.   All right.  And then let me just show you 850a, do you see

15  that on your screen?

16  A.   I do.

17  Q.   And are you familiar with this letter?

18  A.   I am familiar with this letter and the reply we would make

19  to this letter because it would be in my name.

20  Q.   And is that how you're familiar with the letter attached

21  to the email as 850a?

22  A.   Yes.

23          MR. RAPP:  Move to admit 850 and 850a.

24          MS. BERTRAND:  Objection.  Hearsay and relevance

25  under 401 and 403 and lack of foundation under 901.

United States District Court

11:40:49

11:41:14

11:41:44

11:42:12

11:42:28

11:42:44

CARL FERRER - Direct

1        THE COURT:  Overruled as to each.                         11:42:48

2   BY MR. RAPP:

3   Q.    So let's look at 850.  Is this is what you are referring

4   to --

5        THE COURT:  Wait.  Mr. Rapp, did you ask for its         11:43:06

6   admission then?

7        MR. RAPP:  Yes, I'm asking for the admission and

8   request permission to publish.

9        THE COURT:  Yes.  It may be admitted and published.

10       (Exhibit Numbers 850 and 850a were admitted into         11:43:14

11  evidence.)

12  BY MR. RAPP:

13  Q.    And what is this below?

14  A.    This is Mayor Mike McGinn of Seattle sending an email to

15  Jim Larkin with an attachment.                                 11:43:33

16  Q.    Okay.  And is that the letter attached at 850a?

17  A.    Yes.  The August 22 letter.

18  Q.    And so this, do you actually -- do you know who this

19  letter is from?  Let's look at page two of 850a.  Can you tell

20  the jury who the signatories on this letter are, basically who 11:44:05

21  they are?

22  A.    Yes.  These are --

23       MR. FEDER:  Foundation.

24       THE COURT:  Overruled.

25       THE WITNESS:  These are the mayors -- it's the Mayor     11:44:15

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | of Seattle and the cities that surround Seattle. | 11:44:16 |
| 2 | BY MR. RAPP: | |
| 3 | Q.   And the Mayors surrounding Seattle, what do they tell | |
| 4 | Mr. Larkin in this letter that was ultimately forwarded to Mr. | |
| 5 | Lacey?  Can you read it? | 11:44:44 |
| 6 | A.   "We the undersigned mayors of the cities in Washington | |
| 7 | State, write to urge you to take steps to prevent the use of | |
| 8 | Backpage.com for underage sex trafficking by requiring | |
| 9 | in-person verification of any prospective escort advertiser's | |
| 10 | ID, as well as proof of identity and age for anyone pictured in | 11:45:04 |
| 11 | an escort ad.  There is an urgent need to act quickly, as our | |
| 12 | cities have continued to find advertisements on your site that | |
| 13 | reflect underage sex trafficking in recent weeks. | |
| 14 | Backpage.com. | |
| 15 | "Backpage.com does not employ adequate safeguards to | 11:45:24 |
| 16 | prevent underage sex trafficking.  To place an ad on | |
| 17 | Backpage.com, all one has to do is check a box saying that the | |
| 18 | person featured in the ad is over 18.  Other advertising | |
| 19 | services require a photo ID to be brought to an office, in | |
| 20 | person, to verify age.  We believe" -- | 11:45:41 |
| 21 | Q.   Let me just stop you there.  Was there at any point in the | |
| 22 | history of Backpage from 2004 to 2018 that you required | |
| 23 | in-person proof of who you were and what age you were? | |
| 24 | MS. BERTRAND:  Objection.  Argumentative.  Leading. | |
| 25 | THE COURT:  Overruled. | 11:46:04 |

United States District Court

CARL FERRER - Direct

```
 1          THE WITNESS:  No.                                    11:46:05
 2  BY MR. RAPP:
 3  Q.   All right.  And if you would go on starting with "We
 4  believe."
 5  A.   "We believe this practice is substantially more effective  11:46:15
 6  at rooting out under April sex tracking.  In the last 18 months
 7  the City of Seattle has not found any evidence of underage sex
 8  trafficking on sites requiring photo ID.  Since the beginning
 9  of 2010, 22 children advertised on Backpage.com were recovered
10  by the Seattle Police Department.  The Tacoma Police Department  11:46:37
11  reports that they are currently working on 16 cases of juvenile
12  prostitution involving 14 persons who had Backpage.com ads.
13          "We urge to you take quick action and help us address
14  underage sex trafficking by requiring photo ID.  Sincerely."
15  Q.   Now, did you continue to receive letters from the National  11:47:06
16  Association of Attorney Generals?
17  A.   Yes.
18  Q.   Let me show you United States 119.  Do you see that on
19  your screen?
20  A.   I do.                                                   11:47:28
21  Q.   And is this a multiple-page letter?
22  A.   It is.
23  Q.   And who are the signatories of this letter?
24  A.   These are Attorneys Generals from most of the U.S. states.
25  Q.   All right.  And who is this letter addressed to?         11:47:47
```

United States District Court

CARL FERRER - Direct

1   A.   It's addressed to Mr. Sam Fifer, counsel for Backpage.com,          11:47:53
2   LLC.
3   Q.   All right.  And how is it that you received this?  Are you
4   familiar with this letter?
5   A.   I am.                                                               11:48:10
6   Q.   And how are you familiar with this letter?
7   A.   It was sent to me.  It's also has like a to-do list that
8   was given to me to find records that they are requesting.
9   Q.   All right.
10          MR. RAPP:  Move to admit 119.                                    11:48:31
11          MS. BERTRAND:  Objection.  401, 403 in particular and
12   hearsay, lack of foundation.
13          MR. FEDER:  106.
14          THE COURT:  Is there an addition to the letter?
15          MR. RAPP:  No.  This is it?                                      11:48:55
16          MR. FEDER:  There would be a response which would
17   make it complete.  Otherwise, it's out of context.
18          THE COURT:  Overruled as to that, Mr. Feder, and I'll
19   overrule Ms. Bertrand's objections.  It may be admitted.  It
20   may be published.                                                       11:49:12
21          (Exhibit Number 119 was admitted into evidence.)
22   BY MR. RAPP:
23   Q.   All right.  So this is a multiple-page letter?
24   A.   Yes.
25   Q.   And just so we understand who the signatories are, let's           11:49:21

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | go to the last couple of pages. We're not going to go through | 11:49:26 |
| 2 | every one of these but are these the Attorneys General that you | |
| 3 | were referring to from various states? | |
| 4 | A.   Yes. | |
| 5 | Q.   And just to be clear, had you received letters from | 11:49:39 |
| 6 | Attorney Generals in the past? | |
| 7 | A.   We had received letters from Attorney Generals in the | |
| 8 | past. | |
| 9 | Q.   But is this more Attorney Generals? | |
| 10 | A.   This is significantly more. | 11:50:02 |
| 11 | Q.   All right.  So let's just look at a couple of paragraphs | |
| 12 | here.  Can you read the first paragraph? | |
| 13 |        MS. BERTRAND:  Objection to this line of questioning | |
| 14 | under Rules 401 and 403. | |
| 15 |        THE COURT:  Overruled. | 11:50:25 |
| 16 |        THE WITNESS:  "This letter is in response to | |
| 17 | Backpage.com's assurances, both public and private, concerning | |
| 18 | the company's facilitation of the sexual exploitation of | |
| 19 | children, and prostitution.  As our state's chief law | |
| 20 | enforcement officers, we are increasingly concerned about human | 11:50:41 |
| 21 | trafficking, especially the trafficking of minors. | |
| 22 | Backpage.com is a hub for such activity." | |
| 23 | BY MR. RAPP: | |
| 24 | Q.   And then going down here to this last page, can you read | |
| 25 | this last full paragraph on page one, can you read that? | 11:51:04 |

United States District Court

CARL FERRER - Direct

1   A.   "Nearly naked persons in provocative positions are       11:51:07

2   pictured in nearly every adult services advertisement on

3   Backpage.com and the site requires advertisements for escorts,

4   and other similar 'services,' to include hourly rates.  It does

5   not require forensic training to understand that these          11:51:24

6   advertisements are for prostitution.  This hub for illegal

7   services has proven particularly enticing for those seeking to

8   sexually exploit minors."

9   Q.   All right.  Let's just look at page two.  Can you read

10  this?                                                           11:52:04

11  A.   "In a meeting with the Washington State Attorney General's

12  office, Backpage.com vice president Carl Ferrer acknowledged

13  that the company identifies more than 400 'adult services'

14  posts every month that may involve minors.  This figure

15  indicates the extent to which the trafficking of minors occur   11:52:20

16  on the site -- the actual number of minors exploited through

17  Backpage.com may be far greater.  The company's figures, along

18  with real world experience, demonstrate the extreme difficulty

19  of exercising a particularly egregious crime -- the sexual

20  exploitation of minors -- on a site seemingly dedicated to the  11:52:43

21  promotion of prostitution."

22  Q.   And then this last paragraph on page two, can you read

23  this?

24  A.   "In fact, in a meeting with the Washington State Attorney

25  General's Office, Village Voice Media Board Member Don Moon     11:53:12

United States District Court

CARL FERRER - Direct

1   readily admitted that prostitution advertisements regularly          11:53:17

2   appear on Backpage.com.  This shows that the stated

3   representations about the site are in direct conflict with the

4   reality of Backpage's business model:  Making money from a

5   service illegal in every state, but for a few counties in            11:53:39

6   Nevada."

7   Q.   Now, at some point when you were meeting with the Mayor of

8   Seattle and this councilman and the Seattle PD, did you also

9   have occasion to meet with representative from Washington State

10  Attorneys General Office?                                            11:54:05

11  A.   Yes, we did.

12  Q.   How is it that that meeting was -- came about?

13  A.   So that meeting came about -- it was scheduled after Mayor

14  McGinn, Don Moon, Kenny Stocker and myself attended the

15  meeting.                                                             11:54:27

16  Q.   All right.  Kenny Stocker and Don Moon attended the

17  meeting with the Seattle Mayor?

18  A.   Yes.  They also attended that meeting so we sort of had

19  lunch and then we went to the next meeting, which was

20  AUSA Paula Selis at the Washington State Attorney General's          11:54:42

21  Office.

22  Q.   It's a small point but is she an Assistant U.S. Attorney

23  or was she Assistant Attorney General?

24  A.   Oh.  Yeah.  She's the assistant for the State Attorney

25  Generals.                                                            11:54:59

United States District Court

86

CARL FERRER - Direct

1  Q.   And during that meeting, what was the purpose of that    11:55:03
2  meeting?
3  A.   We went through the same PowerPoint that we had done in
4  past with other groups and the same PowerPoint that we did with
5  Mayor McGinn.    11:55:19
6  Q.   All right.   At some point did Assistant Attorney General
7  Paula Selis confront you and Mr. Moon in any respect regarding
8  the content on the site?
9           MS. BERTRAND:   Objection.   Leading.
10           THE COURT:   Sustained.    11:55:38
11 BY MR. RAPP:
12 Q.   What did she say in response to your PowerPoint, if
13 anything?
14 A.   Paula Selis said to me that these ads appear to be
15 prostitution.   Why don't you call them up -- and she's talking    11:55:48
16 to me.   Why don't I call them up and ask them.
17 Q.   And what was your response?
18 A.   That was a really difficult question so I didn't respond
19 for a while.   And then Don Moon said, "Don't deny the
20 undeniable."    11:56:10
21 Q.   All right.
22 A.   But I still was going to deny it so I said, "I don't think
23 my wife would appreciate me doing that."
24 Q.   All right.
25 A.   And tried to move on.    11:56:21

United States District Court

87

CARL FERRER - Direct

1  Q.   So just to be clear, Mr. -- I think -- I believe his name        11:56:24

2  is referenced in this letter.  What was his position with

3  Backpage, Mr. Moon?

4  A.   So Mr. Moon was a Village Voice Media board member.

5  Q.   And in that capacity, why was he at this meeting with you        11:56:46

6  with Assistant Attorney General Paula Selis?

7  A.   He had stepped in to deal with these kinds of meetings,

8  meeting with Paula Selis.  He was talking to NCMEC.  We would

9  later go on together and Don Moon and I at the Internet Crimes

10 Against Children conference.                                          11:57:11

11 Q.   Who was he representing at this meeting?  Who was he

12 representing?

13 A.   He's representing the company Village Voice Media.

14 Q.   All right.  As a result of this letter from the national

15 Attorney Generals and these meetings, was there any effort to        11:57:32

16 clean up the site?

17 A.   Yes.

18 Q.   Let me show you Exhibit 203.  Now, what is this?

19 A.   So this is an email where I'm attempting to gather

20 information in response to the Attorney General's request for        11:58:03

21 more detail about our moderation processes.

22 Q.   Right.  And who else is on this email exchange?

23 A.   Andrew Padilla.

24 Q.   All right.

25          MR. RAPP:  Move to admit 203.                               11:58:26

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | THE COURT:  Yes.  It may be admitted and published. | 11:58:29 |
| 2 | (Exhibit Number 203 was admitted into evidence.) | |
| 3 | BY MR. RAPP: | |
| 4 | Q.   All right.  With respect to this portion of the email, | |
| 5 | what are you telling Mr. Padilla? | 11:58:40 |
| 6 | A.   I write, "HA . . . I need to give them a list f terms we | |
| 7 | banned.  I do not want to give them all 22,000 terms.  It is | |
| 8 | proprietary." | |
| 9 | Q.   What do you mean by that, it's proprietary? | |
| 10 | A.   Well, we would be giving up -- we would be showing too | 11:59:00 |
| 11 | much of our hidden processes and we don't want to share that | |
| 12 | with anyone and I'm using proprietary to say we don't want to | |
| 13 | share it with especially a competitor. | |
| 14 | Q.   Okay.  Go on. | |
| 15 | A.   "I can not have released to the public email address and | 11:59:19 |
| 16 | web sites that we have banned since the banned person will find | |
| 17 | a work around. | |
| 18 | "I need the money for sex terms or though.  Can you | |
| 19 | give me 100 some terms and make sure that they are in the | |
| 20 | filter?" | 11:59:37 |
| 21 | Q.   All right.  And then in response to this, what does Andrew | |
| 22 | Padilla tell you? | |
| 23 | A.   "I'm gonna take anything good that I can find from the | |
| 24 | hemu list you copied and then I'll go through our filters.  I'm | |
| 25 | going to include misspellings for all of the solid sex for | 11:59:57 |

United States District Court

CARL FERRER - Direct

1    money terms."                                                    12:00:01

2    Q.   All right.  And then, is it fair to say what are all of

3    these terms indicative of, if anything?

4    A.   So we found this on the Internet and it's terms kind of

5    like urban sex -- urban dictionary list of terms related to    12:00:24

6    prostitution.

7    Q.   And we're not going to go through these terms except I

8    just want to draw your attention to this term, reference to

9    this.  Is this part of -- what is this GFE?

10   A.   GFE equals Girlfriend Experience.  Different variants of  12:01:03

11   the definition but the basic definition includes FS, which

12   means full service; BJ, which means blowjob; DATY, which means

13   dining at the Y, which is oral sex for a female; not a clock

14   watcher; could kiss; treats you like her boyfriend.

15   Q.   All right.  Now, and so just so we're clear, why you are  12:01:32

16   cataloging these terms?  Are you doing this in response to

17   anything?

18   A.   This is in response to the Attorney Generals?

19   Q.   And does this go on -- well -- well, let's just go on to

20   1698, shall we?  I'm putting this on your screen for you.      12:02:07

21           THE COURT:  Well, I briefly lost track of the time.

22   Is that the lunch or just beyond the lunch hour.

23           And so, members of the jury, what we will do is,

24   we'll stand in recess for an hour for lunch.  And, again, I

25   remind you of the admonition not to discuss the matter amongst  12:02:26

United States District Court

CARL FERRER - Direct

1  yourselves or with anyone else or to come to any conclusions          12:02:32

2  but just to enjoy your lunch and we will resume promptly at 1.

3              Please all rise for the jury.

4              (Jury departs at 12:02.)

5              THE COURT:  All right.  Please be seated.                  12:03:08

6              And, again, I remind those of you who are in the

7  courtroom just to remain for a few minutes so that our jurors

8  can make their way out of the building if they wish to do so

9  for the lunch hour uninterrupted or disturbed.

10             I guess I'm just going to inquire, Mr. Rapp, is there     12:03:29

11 any way that we can move along more quickly?  I just am very

12 mindful of the calendar and of the missed week that we had and

13 I'm just curious as to is there any way we can make up time

14 here in your examination?

15             MR. RAPP:  We're trying to do that, Judge.  We're          12:03:51

16 cutting exhibits.  We are contemplating cutting some witnesses

17 with a lot of the testimony that we get in through Mr. Ferrer.

18 We are not -- we are also concerned about that because we do

19 have a lot of out-of-state witnesses that we have to get on and

20 off the stand and so we meet, as we did this weekend, and are    12:04:14

21 trying our best to.  So it seems like it's just going sort of

22 slowly but everything we get in may result in not calling

23 another witness.

24             THE COURT:  And to that end, I want to remind you of

25 our discussion on Friday.  Please lay the foundation before you  12:04:36

CARL FERRER - Direct

1    introduce the exhibit to your witness.                          12:04:39

2          MR. RAPP:  I will and yes, I have just a second on

3    the exhibit I have on my screen.  I believe that one of my

4    colleagues sent this to your clerk regarding the redactions to

5    this letter from CNN to Backpage.                               12:04:54

6          THE COURT:  I did not see it.  Do you have -- did we

7    receive a copy of that in our mailbox or how was it sent and

8    when was it sent?

9          MR. RAPP:  I don't know.

10         My apologies, Judge.  I misunderstood.  I thought        12:05:17

11   this was sent to chambers.  I guess this was just sent to the

12   defense.

13         So this is the redactions we had made to this

14   exhibit?

15         THE COURT:  Well, I'm not sure.  What is the exhibit     12:05:35

16   and what is the foundation that you're going to lay for the

17   exhibit?  What is the relevance to the furtherance?

18         MR. RAPP:  So this is a response -- so after the

19   presentation of Selling the Girls Next Door, the CNN exposé on

20   Backpage, Backpage sends CNN a letter, basically what's called 12:05:57

21   a SLAP letter.  It's a cease and desist to prevent them from

22   rebroadcasting it.

23         They reference a number of things that -- Backpage

24   that is, references a number of things that they believe the

25   exposé was deceptive about and then this is a response point by 12:06:18

United States District Court

CARL FERRER - Direct

1   point to their letter, and we have removed portions that we        12:06:27

2   believe are -- may be prejudicial.  But there are a number of

3   areas that -- this is notice back to Backpage about -- in

4   response to their letter saying, "You know, you've got this

5   wrong."                                                            12:06:53

6            And CNN is saying, "Oh, no.  We don't have this

7   wrong.  This is what our -- what we have found."

8            And so we would like to get in, just by way of

9   example.  One of the things that CNN identifies in Backpage

10  postings is the identification numbers for The Erotic Review.      12:07:11

11  Obviously we've heard plenty about that in the letter sent from

12  Backpage to CNN.  They make no reference to The Erotic Review

13  and the relationship that they have had.  That's just an

14  example.  There's a couple of other paragraphs that we feel are

15  relevant.                                                          12:07:34

16           THE COURT:  And this is exhibit what, 1698?

17           MR. RAPP:  No.  It is -- 85 is the original exhibit

18  and 85a is the redacted exhibit.

19           THE COURT:  All right.  I'll see how the foundation

20  is laid and I will make my ruling.                                 12:08:05

21           MS. BERTRAND:  Your Honor, if the Court is going to

22  take a recess now, the defense would like a couple of minutes

23  before the jury comes back to renew its motion for a mistrial.

24           THE COURT:  Why don't you make your motion now?

25           MS. BERTRAND:  Your Honor, the defense renews its        12:08:20

United States District Court

93

CARL FERRER - Direct

1   motion for mistrial based on the, by my count, 20 exhibits that   12:08:21

2   came in today specifically referencing child sex, child sex

3   trafficking, or human trafficking.  This all after we just

4   talked about this on Friday and the Court said the Government

5   hadn't overstepped it's bounds yet.   12:08:39

6        The defense maintains that the grounds have now been

7   overstepped.  This is intentional.  There's no mistake about

8   this.  We have been making 403 objections because even if it

9   had any relevance, it is well out-weighed by the prejudicial

10  effect.   12:08:59

11       And I expect we're going to hear more in this same

12  line, but we're now at one exhibit that I think on the first

13  paragraph mentioned child sex or child human trafficking and

14  three times in the first paragraph we have several documents

15  coming in regarding this from law enforcement or Attorneys   12:09:25

16  General that kind of reinforces the weight of these documents.

17       And for the Government to stand here and say no, no,

18  no.  This is just a prostitution case.  This isn't about child

19  sex.  This isn't about human tracking.  This is specious at

20  this point.  This case is going to be about child sex   12:09:42

21  trafficking and human trafficking as much as the Government is

22  allowed to make it.  And I believe at this point they have done

23  it for too much and tainted this jury.

24       MR. CAMBRIA:  May I add to that, please?  Thank you.

25       Frankly, it's outrageous to in any way say that this   12:10:03

United States District Court

CARL FERRER - Direct

1    is not a purposeful strategy on the part of the Government and          12:10:13
2    especially with regard to this letter from the Attorney
3    Generals where they basically have accused this side, if you
4    will, the defense and Backpage, of committing several crimes
5    which would be 404(b), because that's what they have said in          12:10:29
6    that letter that you allowed to come in, that Backpage has been
7    involved in trafficking and so on, which implicates 404(b), not
8    just 403.

9          And this clearly is what the motive was last time.
10   The Government is not kidding anyone as to what their tactic is          12:10:54
11   here.  And a lot of these cases that I have been involved in
12   over the years, this is a very common tactic and they did it in
13   the first case.  We're far beyond the amount of prejudice that
14   happened in the first case for this case, especially with the
15   letter that came in with regard to the Attorneys General and          12:11:17
16   all of the accusations that are made in that letter of criminal
17   conduct, of prior criminal conduct.  That's basically what they
18   have done in that letter.

19         And we can continue to have this fiction that this is
20   not happening but it clearly is happening.  Ray Charles could          12:11:35
21   find out that this is happening.  I mean, this is just a matter
22   of all you have to be is alive to see exactly what's going on
23   here.

24         MR. EISENBERG:  Your Honor, may I add, too?
25         THE COURT:  You may.          12:11:54

United States District Court

CARL FERRER - Direct

1          MR. EISENBERG:  Thank you, Your Honor.                    12:11:55

2          The letter is in document 119 and in the very first

3    paragraph, this is now offered for the truth of the matters, no

4    matter how many times the Court would tell a jury it's not.

5    This letter is in response to Backpage and so forth concerning  12:12:11

6    the company's facilitation of sexual exploitation of children

7    and prostitution, one.

8          As our state's chief law enforcement officers, we are

9    increasingly concerned about human trafficking, especially the

10   trafficking of minors.  That's two.                             12:12:30

11         Backpage.com is a hub for such activity and reference

12   or inference, that's the third time.

13         These are not just notice.  No one would take them

14   that way.  It's as if it's a foregone conclusion that these

15   persons who have posted are underage and they are doing it for  12:12:47

16   prostitution.  There's at least two references to that and I

17   think a jury listening to that and then reading it when they

18   consider the case is going to take it just that way.

19         And this is -- I have not counted them entirely but

20   it's at least the fifth or sixth such type of letter.           12:13:08

21         THE COURT:  Are you finished?

22         MR. EISENBERG:  Yes, Your Honor.

23         THE COURT:  Anyone else?

24         MR. LINCENBERG:  We'll submit on co-counsel.

25         MR. FEDER:  One also has to take this in the context      12:13:27

                    United States District Court

CARL FERRER - Direct

1    of previous order for mistrial and the comments made in the          12:13:29

2    appeals.  This was not an intentional act but it's --

3    obviously, since they continue it, it perpetuates and

4    demonstrates that that is their strategy and always has been

5    their strategy and they got away with it in trial number one.        12:13:42

6    And here we are in trial number two and it's probably ten-fold

7    what it was in trial number one that caused the mistrial.

8          And the argument that the Government made was it was

9    just kind of a mistake and, you know, it's really not what we

10   intended, et cetera, et cetera.  But it's obviously                  12:13:59

11   intentional.  It can't be anything else but that.  They have

12   chosen these exhibits from the thousands, hundreds of

13   thousands, millions of pages of documents that don't have child

14   sex trafficking in it.  They have specifically chosen those to

15   cause this.  This is -- this should be a dismissal for               12:14:16

16   misconduct, not just a motion for mistrial.

17         THE COURT:  Let me just say before, I let the

18   Government respond, that it does not, in my mind, persuade me

19   when you bolster this to the first trial.  Those were specific

20   facts related to the prior Court dismissing the case.  It was        12:14:43

21   based on completely different testimony, completely different

22   evidence; and so it doesn't do you any good to bolster your

23   motion to what occurred then.  That's water under the bridge.

24   We're starting over.

25         Mr. Rapp?                                                      12:15:14

United States District Court

CARL FERRER - Direct

1        MR. RAPP:  Well, Judge, at doc 1643 the Court has          12:15:15
2   already ruled that sex trafficking and child sex trafficking
3   are, by definition, both forms of prostitution.  Each one of
4   these exhibits that is -- that references that either goes to
5   these defendants and their capacity as the owners of this      12:15:35
6   website or they are the author -- we just saw an exhibit where
7   Mr. Lacey talked about the oldest profession.  That's
8   prostitution.  The fact of the matter is, child sex trafficking
9   and is a form of prostitution.  They are being made aware of
10  that form of prostitution being on the site.  That is highly   12:16:05
11  relevant to the charges in the indictment.  They asked for an
12  instruction by this Court to be given every single time to
13  mitigate and minimize what they believe is the prejudice.  Now
14  they don't even want that.

15        So it's hard to -- you know, among all the hyperbole,    12:16:26
16  it's hard to understand what the defense's issue is.  These are
17  relevant emails and relevant letters telling them there's
18  prostitution on the website.  In some cases it just happens to
19  be child prostitution.

20        So that's our response and that would be our response    12:16:43
21  every time they raise this issue.

22        THE COURT:  And I would just say that the Court did
23  caution the Government that it would not allow the Government
24  to linger on the details of what occurs or what potentially
25  occurs in these cases of alleged child or adult sex trafficking 12:17:07

United States District Court

CARL FERRER - Direct

1   victims, what they have suffered as a result.  That has to do          12:17:18

2   with the prior order of the Court.  But it is, in my view,

3   relevant that if you have someone who is underaged, having sat

4   through a number of child abuse cases, I think of children as

5   12 and under, those individuals who have not yet turned 18.  If          12:17:43

6   there is evidence of offering them as a sex ad, then certainly

7   it is relevant to show knowledge about whether or not indeed

8   the ads that were placed on Backpage were prostitution ads and

9   whether or not any of the charged defendants had knowledge of

10  it.                                                                       12:18:19

11          And with respect to so far the Government's evidence

12  today, it has been in response to statements made by one of the

13  defendants or some of them about what they are refuting as

14  prostitution ads being on Backpage and so it's relevant.  And

15  at this juncture it is relevant; but again, the Government must          12:18:50

16  tie each of these exhibits to some of the counts in the

17  indictment and that is why I've cautioned the Government to lay

18  the appropriate foundation for the exhibit.

19          And if you fail to do that, then possibly we'll have

20  another motion; but at this juncture, I don't find that there           12:19:21

21  is prejudice to the degree -- and I will say that I am not

22  going to give the limiting instruction any longer because

23  Mr. Lincenburg said no.  That highlights the words "child" or

24  "trafficking" or for whatever reason.  So to the extent that

25  any minimization of whatever you believe the prejudicial effect         12:19:48

CARL FERRER - Direct

1    is, then you've asked the Court not to give that instruction,        12:19:54

2    that limiting instruction.  I will give it at the end of the

3    trial, however.  But in any event, that's my ruling and I will

4    deny the mistrial motion.

5            MR. CAMBRIA:  Can I add one thing, Your Honor?          12:20:11

6            One of the big differences is, the letter that came

7    in from the various prosecutors around the country basically

8    accusing Backpage and the defendants of having committed crimes

9    involving children.  That is 404(b) and that is 403.

10           We had no notice under 404(b) with regard to this        12:20:33

11   specific allegation.  That is particularly egregious and they

12   can jump around here all they want.  They have never said one

13   thing about 404(b) with regard to the Attorney General's letter

14   and that letter has a cadre of prosecutors accusing this side

15   of committing prior crimes.                                     12:20:56

16           THE COURT:  All right.  Mr. Rapp, I'll give you one

17   moment to make a response.

18           MR. RAPP:  Yes.  Judge, document 230, which is the

19   superseding indictment, paragraph 111.  On August 31, 2011,

20   Backpage received a letter from the NAAG.  This letter          12:21:12

21   characterizes Backpage as a hub for human trafficking,

22   identified more than 50 instances in 22 states over three years

23   of charges filed against those trafficking or attempting to

24   traffic minors on Backpage.com.

25           This is relevant notice evidence that they received      12:21:28

CARL FERRER - Direct

1   in the indictment that is part and parcel of this 14-year                    12:21:32
2   conspiracy.  It is not 404(b).

3           MR. CAMBRIA:  That letter is 404(b) and there's
4   been -- and if you read that letter, you can read it no other
5   way than a cadre of prosecutors across of country have accused    12:21:51
6   these individuals on this side of several child-related crimes.

7           THE COURT:  Was that in the form of an objection or
8   was that to -- did you want to supplement your request for a
9   mistrial with that argument?

10          MR. CAMBRIA:  Yes.  Yes.  That's exactly what I was      12:22:17
11  doing.

12          THE COURT:  Well, I think given the allegations in
13  the indictment at paragraph 111, it is relevant again to prove
14  notice and as a result of the prior notice that was given and
15  the letter was in response to some of those responses that --    12:22:33
16  one or some of the co-defendants --

17          MR. CAMBRIA:  The indictment is not a substitute for
18  404(b) notice under the rules.

19          THE COURT:  All right.  Well, in any event, you were
20  provided the exhibit.  You were provided an opportunity to       12:22:54
21  object.

22          MR. CAMBRIA:  And we did.

23          THE COURT:  Yes.  And the Court overruled so my
24  ruling stands.

25  ///                                                              12:23:04

United States District Court

CARL FERRER - Direct

1    You have until 1 o'clock to have your lunch.                    12:23:04

2    We'll stand in recess.

3    COURTROOM DEPUTY:  All rise.

4    (Whereupon, these proceedings recessed at 12:23 p.m.)

5                        * * * * *                                   12:23:12

1                    C E R T I F I C A T E                        12:23:12

2

3          I, ELAINE M. CROPPER, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of       12:23:12

6    Arizona.

7

8          I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion of

10   the proceedings contained herein, had in the above-entitled     12:23:12

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control, and to the best of

13   my ability.

14

15         DATED at Phoenix, Arizona, this 19th day of               12:23:12

16   September, 2023.

17

18

19

20                          s/Elaine M. Cropper                      12:23:12

21                        _____

22                         Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                   12:23:12

                    United States District Court