UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, ) | |
| ) | No. 2:18-cr-00422-DJH |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | Phoenix, Arizona |
| Michael Lacey, et al., ) | September 22, 2023 |
| ) | 9:11 a.m. |
| Defendants. ) | |
| _____) | |

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL – DAY 11**

**(A.M. SESSION)**

Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Government:
     UNITED STATES ATTORNEY'S OFFICE
     By:  **Mr. Kevin M. Rapp, Esq.**
          **Mr. Andrew C. Stone, Esq.**
          **Mr. Peter Shawn Kozinets, Esq.**
          **Ms. Margaret Wu Perlmeter, Esq.**
          **Mr. Daniel G. Boyle, Esq.**
     40 North Central Avenue, Suite 1800
     Phoenix, Arizona  85004-4408
     kevin.rapp@usdoj.gov
     peter.kozinets@usdoj.gov
     andrew.stone@usdoj.gov
     margaret.perlmeter@usdoj.gov
     - and -
     UNITED STATES DEPARTMENT OF JUSTICE
     By:  **Mr. Austin Berry, Esq.**
     1301 New York Avenue NW, 11th Floor
     Washington, DC  20005
     austin.berry2@usdoj.gov

For the Defendant Michael Lacey:
     LIPTSITZ GREEN SCIME CAMBRIA, LLP
     By:  **Mr. Paul J. Cambria, Esq.**
     42 Delaware Avenue, Suite 120
     Buffalo, New York  14202
     pcambria@lglaw.com

For the Defendant Scott Spear:
     KESSLER LAW OFFICE
     By: **Mr. Eric Walter Kessler, Esq.**
     6720 North Scottsdale Road, Suite 210
     Scottsdale, Arizona  85253
     eric.kesslerlaw@gmail.com
     - and -
     FEDER LAW OFFICE, PA
     By:  **Mr. Bruce S. Feder, Esq.**
     2930 East Camelback Road, Suite 160
     Phoenix, Arizona  85016
     bf@federlawpa.com

1                    **A P P E A R A N C E S (Cont'd)**

2    For the Defendant John Brunst:
         BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
3        By:  **Mr. Gopi K. Panchapakesan, Esq.**
              **Mr. Gary S. Lincenberg, Esq.**
4             **Mr. Ariel A. Neuman, Esq.**
         1875 Century Park E, Suite 2300
5        Los Angeles, California  90067
         gpanchapakesan@birdmarella.com
6        glincenberg@birdmarella.com
         aneuman@birdmarella.com

7

     For the Defendant Andrew Padilla:
8        DAVID EISENBERG, PLC
         By:  **Mr. David S. Eisenberg, Esq.**
9        3550 North Central Avenue, Suite 1155
         Phoenix, Arizona  85012
10       david@deisenbergplc.com

11   For the Defendant Joye Vaught:
         JOY BERTRAND, ESQ, LLC
12       By:  **Ms. Joy Malby Bertrand, Esq**
         P.O. Box 2734
13       Scottsdale, Arizona  85252-2734
         Joy@joybertrandlaw.com

14

15

16

17

18

19

20

21

22

23

24

25

                     UNITED  STATES  DISTRICT  COURT

1                          **I N D E X**

2    <u>**WITNESSES FOR THE GOVERNMENT:**</u>                     <u>**PAGE**</u>

3    Carl Ferrer
             Direct Examination (Cont'd) by Mr. Rapp        10
4            Cross-Examination by Mr. Feder                 119

5

6                           <u>**EXHIBITS**</u>

7    <u>**NO.**</u>      <u>**DESCRIPTION**</u>                              <u>**REC'D**</u>

8    1, page    Email from Lacey to Becker, 07/29/2016       70
     3          DOJ-BP-0004688931- DOJ-BP-0004741536
9               (email begins at DOJ-BP-0004688935)

10   1, page    Email from Lacey to Becker, 07/29/2016       49
     4          DOJ-BP-0004688931- DOJ-BP-0004741536
11              (email begins at DOJ-BP-0004688935)

12   85a,       Redacted version of Exh 85                   40
     page 1;    DOJ-BP-0000006126- DOJ-BP-0000006132
13   85a,
     page 5
14
     220a       Victim #15 - Backpage Ads, 05/19/2015        63
15              DOJ-BP-0004719427- DOJ-BP-0004719438

16   222        Victim #17 - Backpage Ads, 07/01/2015        65
                DOJ-BP-0004719439- DOJ-BP-0004719456
17
     222a       Victim #15 - Backpage Ads, 05/19/2015        66
18              DOJ-BP-0004719427- DOJ-BP-0004719438

19   223        Ad entitled "GFE Service Available!         109
                Private Encounters w/ Pampering Beauty,"
20              01/26/2018,
                DOJ-BP-0004719534-DOJ-BP-0004719537
21

22

23

24

25

                 UNITED STATES DISTRICT COURT

**EXHIBITS (Cont'd)**

| NO. | DESCRIPTION | REC'D |
|-----|-------------|-------|
| 224 | Ad entitled "241 & white plans area Carfun  Perfect Treat  Available No Rush," with "Sweet Sexy GFE" in accompanying text, 01/30/2018, DOJ-BP-0004719538-DOJ-BP-0004719540 | 110 |
| 225 | Ad entitled "GFE REAL HOT Sweet DREAM AMAZING BEST RELAX," 01/30/2018, DOJ-BP-0004719541-DOJ-BP-0004719543 | 118 |
| 226 | Ad entitled "Tall, Slim & Sexy Luxe Goddess * NARCISA * Sensual Body Rub + Fetish Sessions," with accompanying text "gfe  Hh: $160  H:  $220," 01/30/2018, DOJ-BP-0004719544-DOJ-BP-0004719545 | 112 |
| 227 | Ad entitled "Exotic Asian Beauty," with accompanying text "I am an independent GFE with excellent massage skills," 01/31/2018, DOJ-BP-0004719546-DOJ-BP-0004719547 | 113 |
| 228 | Ad entitled "Nuru (Best GFE ever) incall only," 02/01/2018, DOJ-BP-0004719548 | 115 |
| 229 | Ad entitled "Tuesday with Ashleigh. Available now," with "GFE" in accompanying text, 02/06/2018, DOJ-BP-0004719549-DOJ-BP-0004719551 | 116 |
| 230 | Ad entitled "GFE  Kisskisspop 100% Real Photo Choice 9Asian girl Nurunude," 02/06/2018, DOJ-BP-0004719552-DOJ-BP-0004719553 | 117 |
| 836a, page 2 | Redacted version of Exh 836 DOJ-BP-0004487399 - DOJ-BP-0004487401 | 43 |

1                              **EXHIBITS (Cont'd)**

2    **NO.**        **DESCRIPTION**                                    **REC'D**

3    1246      Emails from Brunst and Ferrer, "csob",              50
              02/12/2018, USAO-BP-025615
4

5    1718      Ad entitled "Finally!!  PSE & GFE - Kimber         74
              Rae and MIA Marie Together BOOK NOW" Apr.
6             21, 2016, USAO-BP-0032907-USAO-BP-0032909

7    1719      Ad entitled "GFEE New - 18"                        75
              Nov. 3, 2016,
8             USAO-BP-0032910-USAO-BP-0032911

9    1720      Ad entitled "Mind blowing Tiffany. Incall          77
              in Taunton - 37," with accompanying text
              "Soft GFE . . . Im real and reviewed" Nov.
10            11, 2016, USAO-BP-0032912-USAO-BP-0032913

11   1721      Ad entitled "Top Model  2016 Special               78
              'Best Looking Young Asian' . . . - 22,"
12            with accompanying text "Sexy Asian Girl
              Incall Service" and "GFE", Nov. 14, 2016,
13            USAO-BP-0032914-0032916

14   1722      Ad entitled "The True (G)irl (F)riend              104
              (E)xperience… Visiting November 27th
15            Sunday ~ PRE-BOOKING SPECIAL ~ - 100,"
              with accompanying text "Let's blur
16            restrictions between financial transaction
              & Romantic Connection", Nov. 19, 2016,
17            USAO-BP-0032918-USAO-BP-0032919

18
     1723      Ad entitled "Top Asian  Grand Opening              81
19            100% Young 100% Sexy . . . - 23," with
              accompanying text "BEST INCALL IN TOWN!"
20            And "GFE", Nov. 24, 2016,
              USAO-BP-0032923-0032924
21
     1724      Ad entitled "I LOVE MEN!!  I'm a GFE.              82
22            OutCall and Incall with exception on the
              Incall!! - 42",
23            DOJ-BP-0005070394-DOJ-BP-0005070440 (ad
              begins at DOJ-BP-0005070416)
24            Nov. 26, 2016, USAO-0032925-0032927

25

**EXHIBITS (Cont'd)**

| NO. | DESCRIPTION | REC'D |
|-----|-------------|-------|
| 1725 | Ad entitled "OMG  Sexy Sensual 36DD-24-36 Stacked College Coed With The Best Mouth Ever! BOOK NOW! -24," with accompanying text "I do ALL the things YOU Wish Your Wife Did!!" And "(G).(F).(E) 30 min/$180", Dec. 20, 2016, USAO-BP-0032928-0032930 | 86 |
| 1726 | Ad entitled "Real & Reviewed Girlfriend Theonesweet.weebly.com - 30," with accompanying text "250 G F E", Jan. 15, 2017, USAO-BP-032931-USAO-BP-0032933 | 107 |
| 1727 | Ad entitled "KISSING & GFE KOREAN GIRLS - 20", April 4, 2017, USAO-BP-0032934-0032935 | 89 |
| 1728 | Ad entitled "Pettit Sexy #Corey# 4407239339 - 30," with accompanying text "complete GFE experience", Apr. 11, 2017, USAO-BP-0032936-USAO-BP-0032937 | 97 |
| 1729 | Ad entitled "WANNA HANG OUT NOW UpScale New In Town! Call ME now for an unforgettable visit - 20," with accompanying text "100% GFE with 100% no Pimps", July 3, 2017, USAO-BP-0032938-USAO-BP-0032940 | 100 |
| 1730 | Ad entitled "Ready for some fun daddy? This is your chance too have a amazing time - 21," with accompanying text "Slim body, nice tits, freaky, GFE", July 15, 2017, USAO-BP-0032941-USAO-BP-0032943 | 101 |
| 1731 | Ad entitled "New in town BiGBubble Booty SWEETLiPS HOT BODY - 24," with "GFE" in accompanying text, July 15, 2017, USAO-BP-0032944-USAO-BP-0032946 | 102 |

| | | | |
|---|---|---|---|
| 1 | | **EXHIBITS (Cont'd)** | |
| 2 | **NO.** | **DESCRIPTION** | **REC'D** |
| 3 | 1732 | Ad entitled "Pettit Sexy #Corey# | 103 |
| 4 | | 4407239339 - 30," with accompanying text "complete GFE experience" | |
| 5 | | July 21, 2017, USAO-BP-0032947-USAO-BP-0032948 | |
| 6 | 1733 | Ad entitled "ASIAN GODDESS - 100% young - | 108 |
| 7 | | 20," with accompanying text "100% Discreet service" and "#GFE", | |
| 8 | | July 23, 2017, USAO-BP-0032949-USAO-BP-0032950 | |
| 9 | 1735 | Ad entitled "Sometimes It's All About The | 79 |
| 10 | | Journey, And The Destination…..Erectile Dysfunctional G F E Provider - 44," | |
| 11 | | with accompanying text "You can find a few current reviews at T3R xxxxxx#" and "I | |
| 12 | | have been EROS authenticated", Nov. 14, 2016, USAO-BP-0032319-USAO-BP-0032321 | |
| 13 | 1796 | Email from Spear to Larkin, Brunst, | 58 |
| 14 | | Ferrer, "Principal's Meeting", 01/31/2018, USAO-BP-0033835 - USAO-BP-0033836 | |
| 15 | 2041 | Email sent by Larkin, copying Brunst, | 14 |
| 16 | | "Fwd: VVM governance", 03/27/2012, USAO-BP-0037950 | |
| 17 | 2042 | Email sent by Brunst, "CP stock purchase | 17 |
| 18 | | and revised operating agreement", 05/09/2012, USAO-BP-0037593 | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

|   | **P R O C E E D I N G S** |   |
|---|---|---|
| 1 | | |
| 2 | (Court was called to order by the courtroom deputy.) | |
| 3 | (Jury not present at 9:11 a.m.) | |
| 4 | (Proceedings commence at 9:11 a.m.) | |
| 5 | THE COURT:  We apparently had an accident on the I-17 | 09:11:35 |
| 6 | that delayed a number of the jurors, so they're all present. | |

1       **P R O C E E D I N G S**

2       (Court was called to order by the courtroom deputy.)

3       (Jury not present at 9:11 a.m.)

4       (Proceedings commence at 9:11 a.m.)

5       THE COURT:  We apparently had an accident on the I-17    09:11:35

6 that delayed a number of the jurors, so they're all present.

7       I logged off at 8:30.  I did not see the response.  I

8 did see it early this morning.  I've not gotten through but a

9 few pages of it.  I will say that there's a portion in there

10 that I didn't start to read but I think merits a reply by the    09:11:58

11 government, and I'll let you know what that is at our break.

12       And so let's go ahead and have our jury in.

13       Oh, Liliana?

14       THE COURTROOM DEPUTY:  Yes?

15       THE COURT:  Did you happen to -- did you -- did you --    09:12:21

16 did you happen to ask the jurors to -- if they can make it to

17 12:30?

18       THE COURTROOM DEPUTY:  I did not.

19       THE COURT:  Okay.  We can --

20       THE COURTROOM DEPUTY:  I'll ask them right now since    09:12:33

21 they're all here now.

22       THE COURT:  Okay.  Thank you.

23       All rise for the jury.

24       (Jury present at 9:13 a.m.)

25       THE COURT:  All right.  Please be seated.    09:14:07

1          And, members of the jury, I appreciate that some of

2    you went through a -- sort of a difficult commute this morning,

3    and it happens, but you're all here safely.

4          And so the record will reflect the presence of our

5    jurors and the witnesses on the stand.                    09:14:24

6          Mr. Rapp, you may continue.

7          MR. RAPP:  Thank you, Your Honor.

8                DIRECT EXAMINATION (Cont'd)

9    BY MR. RAPP:

10   Q.  Good morning, Mr. Ferrer.                             09:14:36

11   A.  Good morning.

12   Q.  I want to loop back to an issue we spoke about several days

13   ago.

14          Do you recall the -- an article -- do you recall a

15   number of articles by Nicholas Kristof?                   09:14:47

16   A.  Yes, I do.

17   Q.  Do you recall a particular article that he did regarding

18   investors?

19   A.  Yes.

20   Q.  Do you know sitting there the exact date of that article?  09:15:07

21   A.  I know maybe a range of years, but I'm not sure of the

22   exact date.

23   Q.  All right.  But did you read the article?

24   A.  Yes.

25   Q.  Let me just show you for your eyes only -- let me see here.  09:15:18

1    Let's look at 1043.

2          Do you see that there?

3    A.  Yes, I do.

4    Q.  Is that the article by Nicholas Kristof regarding

5    investors?                                              09:15:48

6    A.  Yes, it is.

7    Q.  Does -- does the date of that article, does that refresh

8    your recollection as to when that article came out?

9    A.  Yes, it does.

10   Q.  All right.  Let me take it off the screen.           09:16:01

11         When did that article come out?

12   A.  March 2012.

13   Q.  Now I'm showing you Exhibit 241.

14         Do you see that?

15         MR. RAPP:  I'm sorry.  2041.                       09:16:25

16         Thank you so much.

17   BY MR. RAPP:

18   Q.  2041.  Do you see that on your screen?

19   A.  Yes, I do.

20   Q.  And do you recognize some of the -- so, first of all, are   09:16:31

21   you on this email?

22   A.  I am not.

23   Q.  All right.  Do you recognize some of the emails, the email

24   addresses on this exhibit?

25   A.  Yes, I do.                                           09:16:56

```
 1   Q.  Whose email do you recognize?
 2   A.  Jimlarkin@villagevoicemedia.com.
 3   Jedbrunst@villagevoicemedia.com.
 4   Q.  All right.  How long -- well, can you -- based on the date
 5   of this email, when was it -- when was it sent in relationship      09:17:20
 6   to the Nicholas Kristof article?
 7             MS. BERTRAND:  Objection.  Leading.
 8             THE COURT:  Overruled.
 9             THE WITNESS:  So the Kristof article, if I recall, was
10   sent on March 31st, 2012.  This appears to be sent Tuesday,         09:17:36
11   March 27th, 2012.  So four days before.
12   BY MR. RAPP:
13   Q.  And without reading the substance of this email, is the
14   context of this email, does it have to do with the Nicholas
15   Kristof article?                                                    09:18:00
16   A.  Yes, it does.
17   Q.  As a matter of fact, is -- is there another email address
18   on this that you at least recognize the name?
19   A.  I do.  And I recall seeing the email address in other
20   emails.                                                             09:18:17
21   Q.  All right.
22   A.  Nicholas Kristof's address.
23   Q.  Whose email address is that?
24   A.  Nicholas Kristof of the New York Times.
25   Q.  When you say that you saw his other email addresses before,     09:18:25
```

```
 1   what do you mean by that?
 2   A.  When he wrote the first column, he had inquired, and I was
 3   copied on those emails where Nicholas Kristof was requesting
 4   information --
 5   Q.  All right.                                              09:18:42
 6   A.  -- from Backpage.
 7   Q.  All right.  And so you -- do you actually recognize his
 8   email address?
 9   A.  Yes, I do.
10        MR. RAPP:  Move to admit 2041.                        09:18:49
11        MR. LINCENBERG:  Objection.  First, foundation;
12   second, 403; and, third, in light of the Court's prior orders,
13   this would be impermissible since related notice evidence is
14   not being allowed in.
15        MR. FEDER:  401, too.                                 09:19:11
16        THE COURT:  Confused as to your related notice
17   evidence objection.
18        MR. LINCENBERG:  Right.
19        THE COURT:  What is that?
20        MR. LINCENBERG:  If this is being offered for notice, 09:19:27
21   there are a lot of other events around this time period that
22   give contrary notice that the Court's orders have precluded the
23   defense from introducing.
24        THE COURT:  All right.  Overruled.
25        It may be admitted and published.                     09:19:41
```

UNITED STATES DISTRICT COURT

```
 1                (Exhibit 2041 admitted into evidence.)
 2    BY MR. RAPP:
 3    Q.  All right.  Can you just --
 4                THE COURT:  Before -- before you move on, Mr. Rapp --
 5                MR. RAPP:  Yes, ma'am.                                    09:19:53
 6                THE COURT:  -- and this is more or less a footnote to
 7    myself and counsel -- can you double-check that your prior
 8    questioning related to Exhibit 1043.  I have it marked as
 9    admitted, and so I want to make sure that -- that I'm not in
10    error on that --                                                     09:20:16
11                MR. RAPP:  Okay.
12                THE COURT:  -- because you were treating it as though
13    it was not.
14                MR. RAPP:  Okay.
15                THE COURT:  And so --                                    09:20:21
16                THE COURTROOM DEPUTY:  I don't have it.
17                THE COURT:  Well, my trusted --
18                MR. FEDER:  Did you say 1043?
19                THE COURT:  My trusted courtroom deputy says it is
20    not, so I trust her.                                                 09:20:31
21                MR. RAPP:  All right.  I trust her, too.
22                THE COURT:  I wanted to make sure.
23                MR. RAPP:  But we'll verify.
24                THE COURT:  Okay.
25                ///
```

```
 1  BY MR. RAPP:
 2  Q.  All right.  And then can you -- can you read the message
 3  below down here?
 4  A.  "Liz, thanks for coming into the lion's den the other day.
 5  I raised the question of VVM ownership over lunch, and I remain    09:20:55
 6  curious so let me formally ask:  Who are the major owners of
 7  VVM, say owning more than 10 percent of the company, and what
 8  is the share of each?  And who are the board members?  I
 9  realize that private companies may not have to disclose this
10  information, but I thought I would try.  Thanks, Nick."           09:21:16
11  Q.  All right.  And then this -- this email up here, this is
12  from who to who?
13  A.  So it's from Jim Lar- -- Larkin.  It's sent to Scott
14  Lebovitz.  It's copied to Jed Brunst.
15  Q.  And what does Mr. Larkin tell this individual, Scott           09:21:43
16  Lebovitz?
17  A.  "Scott.  Nicholas Kristof of the New York Times has decided
18  to make Backpage his senior class project.  Jed said that he
19  mentioned to you that Egan had been pinged yesterday and I
20  received a copy of the email below today.  VVM's and backpage's   09:22:04
21  attorney, Liz McDougal, met with Kristof yesterday for lunch.
22  Kristof followed up email followed below," [as read].
23        I misread that.  "Kristof followed up email followed
24  below.  McDougal of course said nothing yesterday and will not
25  comment today.  Thanks, Larkin," [as read].                       09:22:30
```

1   Q.  All right.  There is a name mentioned in this email here.

2          Do you see that?

3   A.  Yes.

4   Q.  Are you familiar with that name?

5   A.  I've heard that name, yes.                          09:22:48

6   Q.  And in what is the context that you've heard that name?

7   A.  That he was one of the investors in VVM.

8          MR. RAPP:  All right.  Now let's move to 2042 for the

9   witness's eyes only.

10  BY MR. RAPP:                                            09:23:17

11  Q.  Now, do you see this document on your screen?

12  A.  Yes, I do.

13  Q.  And do you recognize one of the emails on this screen?

14  A.  I recognize Jed Brunst and villagevoicemedia.com.

15  Q.  Okay.  And how long after the -- how long after the    09:23:44

16  Nicholas Kristof article was this email sent?

17  A.  Oh, well, this email was sent Wednesday, May 9th, 2012.

18  Q.  All right.  Does this email, at least the subject matter of

19  the email, does it involve investors or investments into VVM?

20  A.  Yes.                                                 09:24:19

21         MR. RAPP:  Move to admit Exhibit 2042 and publish.

22         MR. LINCENBERG:  Your Honor, I have the same

23  objections, which are foundation, 403, and improper if this is

24  some type of notice evidence given that the corresponding

25  notice to rebut it is not being allowed in.             09:24:43

```
 1              MR. FEDER:  Also 401.
 2              THE COURT:  Overruled.  Overruled.
 3              MR. FEDER:  I'm sorry.  And hearsay.  Thanks.
 4              THE COURT:  And overruled.
 5              It may be admitted and published.            09:24:56
 6              (Exhibit 2042 admitted into evidence.)
 7  BY MR. RAPP:
 8  Q.  All right.  Can you read -- can you read this email from
 9  Mr. Brunst.
10  A.  "As you all know, Backpage pressure has reached red hot.  I  09:25:11
11  would like to get the CP stock purchase agreement and revised
12  operating agreement executed by next week if possible.
13  Tomorrow I will send a revised operating agreement for your
14  approval.  This is needed to, 1, allow for the purchase of the
15  CP stock by New Times (the operating agreement prohibits the  09:25:36
16  sale of the upstream entities, and, 2) to give us the running
17  room we need to deal with our banks, who are being very
18  difficult, and the Backpage turmoil.  The revised operating
19  agreement will change your role to that of a passive investor
20  without any management/shareholder controls.  I believe this is  09:26:01
21  where you should want to be so you cannot be implicated in any
22  way with the 'management' of the company.  The stock purchase
23  agreement and the revised operating agreement will need to be
24  executed simultaneously.  I am available to discuss any issues
25  you may have at your convenience.  Jed Brunst, CFO, Village  09:26:23
```

1   Voice Media Holdings."

2   Q.   Thank you.

3        Now I want to talk to you about another issue.  Do you

4   recall yesterday a number of questions regarding the -- what

5   we -- what you referred to as the PSI?                          09:26:45

6        Do you remember that?

7   A.   Yes.

8   Q.   Did there come a time when you received, you received, as

9   the owner of Backpage, a subpoena from the PSI?

10  A.   Yes, we received a subpoena.  I received a subpoena from  09:27:02

11  the PSI.

12       MR. LINCENBERG:  Your Honor, I'm going to make an

13  objection to all questions relating to the PSI in that not only

14  is it a 403 issue, but given the Court's rulings on notice

15  evidence, it would be under 403 unfair to be in -- admitting    09:27:21

16  this without other notice evidence.

17       THE COURT:  I have to say I must have had a bad night

18  because I'm drawing a blank as to the acronym, what it stands

19  for.

20       MR. RAPP:  Okay.  Could -- I don't want to testify,       09:27:44

21  but can I ask the question --

22       THE COURT:  Yeah.

23       MR. RAPP:  -- the witness some questions about that?

24       THE COURT:  Yes, I -- it'll help refresh my

25  recollection of what that relates to.                           09:27:53

```
 1              MR. RAPP:  Very well.
 2    BY MR. RAPP:
 3    Q.  Mr. Ferrer, what is the PSI?
 4              MR. FEDER:  Relevance.  403 hearsay.
 5              THE COURT:  I guess the question that I have for you,   09:28:10
 6    Mr. Rapp, and you can correct me if I'm wrong, I know
 7    Mr. Ferrer testified to something regarding that.  I'm just
 8    drawing a blank, frankly.
 9              MR. RAPP:  All right.  Maybe I can fill it in a little
10    bit.                                                              09:28:33
11    BY MR. RAPP:
12    Q.  Mr. -- Mr. Ferrer, did you come to learn that Backpage was
13    under investigation by the United States Senate?
14              MR. FEDER:  I'm sorry.  Objection.
15              THE COURT:  Yeah.  I recall.  Now I recall.            09:28:48
16              MR. FEDER:  Needing relevance.  403 hearsay.
17              THE COURT:  Well, I think he was trying to help the
18    Court out, but I am going to -- let me see counsel at sidebar.
19              (Sidebar discussion begins on the record.)
20              THE COURT:  I'm just -- I'm just predicting, Mr. Rapp, 09:29:23
21    that you're going to try to introduce that Senate report.
22              MR. RAPP:  You know, Judge, I'm not going to introduce
23    the Senate report.  But, obviously, the Senate report reveal is
24    highly relevant not just for notice knowledge, but knowledge.
25              The Senate -- he's going to discuss what he knows      09:29:44
```

1    about the Senate report and namely that the Senate report was

2    based upon nearly 800 subpoenas -- 800 internal emails that he

3    had to produce, Backpage had to produce.

4          We expect his testimony is that really the owners

5    manage the production of these emails to the Senate and that is    09:30:06

6    what supports the Senate subcommittee report.  He's going to

7    talk about how he traveled out to Washington, D.C.  He was in

8    the same room with Mr. Lacey, Larkin, and ultimately

9    Mr. Padilla.  It -- it goes to certain substantial proof that

10   they read the Senate report that -- that is supported by the    09:30:31

11   internal emails of -- of Backpage.  And it goes to both

12   knowledge and --

13          THE COURT:  Okay.

14          MR. RAPP:  I am not going to admit it.

15          THE COURT:  That's the only caution I would say,    09:30:46

16   because I wouldn't -- I would find for a 403 ruling if you move

17   to admit it.  I'm not going to permit you to admit it.

18          To the extent this witness can testify about what he

19   recalls reading and discussing in the Senate, who was present

20   and so on and so forth, based on his knowledge, that's fine.    09:31:06

21          MR. RAPP:  All right.

22          MR. LINCENBERG:  Does the Court want to hear from the

23   defense in this, or not?

24          THE COURT:  Well, he hasn't yet laid his direct

25   questioning.  So you can object.  I've already made a ruling --    09:31:17

```
 1              MR. LINCENBERG:  As long --

 2              THE COURT:  -- it's not coming in.

 3              MR. LINCENBERG:  -- as --

 4              THE COURT:  Okay.  I don't know that there's anything

 5     to rule on otherwise.                                    09:31:24

 6              MR. FEDER:  There actually is.  He's going to --

 7              MR. LINCENBERG:  Our objections --

 8              THE COURT:  There is no testimony.

 9              MR. LINCENBERG:  Your Honor, our objections are not

10     just about whether the Senate report comes in.  And the cat is   09:31:31

11     out of the bag on this, and the Court will make its call on

12     whether this comes in.  And I think the Court understands --

13              THE COURT:  I've already made the call.  The report is

14     not coming in.

15              MR. LINCENBERG:  But the testimony -- the cat is   09:31:44

16     already out of the bag about Senate

17     investigation/investigations.  And so, you know, we're in this

18     situation where it's reasonable for a jury to ask the question,

19     how does one respond when you're under investigation by a grand

20     jury, when you're under investigation by the Senate, and so   09:31:59

21     forth?

22              Of course the defense position is that the defendants

23     all responded honorably.  They said, let's take it to court or

24     deal with things in court and have those addressed.  And that

25     goes to their state of mind.                             09:32:15
```

1        Where the record is now, the Court is saying the

2   defense cannot get into that.  The government can keep getting

3   into Attorney General communication, Senate communications,

4   everybody in the world telling them that you're doing something

5   criminal that we don't like.                                    09:32:29

6        THE COURT:  You're -- you're -- you're

7   misunderstanding my prior ruling.  You haven't yet entered into

8   cross-examination of this witness at all.

9        MR. LINCENBERG:  Okay.

10       THE COURT:  You haven't proffered anything at all          09:32:40

11  other than what I understand to be some objections to some of

12  the exhibits, which I have yet to, again, be fully briefed on.

13       So let's move on with this witness and this topic.

14  You can object if there's something objectionable in the

15  testimony, but so far that's the only ruling I made, that       09:32:58

16  that --

17       MR. LINCENBERG:  That's fine.

18       THE COURT:  -- report is not coming in.

19       MR. LINCENBERG:  I don't need to --

20       THE COURT:  Okay.  We're done.  We're done.  We've got     09:33:05

21  a jury here.

22       (End of sidebar discussion.)

23       THE COURT:  All right.  Thank you, members of the

24  jury, for your patience.

25       And we can move ahead.                                     09:33:21

```
1   BY MR. RAPP:
2   Q.  All right.  Where was I?  Ah.
3        Did you -- did you receive in your capacity as the
4   owner of Backpage a subpoena from the PSI?
5   A.  Yes, I did.                                    09:33:43
6   Q.  All right.  And just so we're clear on the record here,
7   when I say "PSI," who am I talking about?
8   A.  The Permanent Select Committee of Investigations.  It's a
9   Senate committee that investigates the --
10       MR. FEDER:  Judge, 401/403 hearsay.            09:34:02
11       But instead of wasting time, may there be a continuing
12  objection to this entire subject matter going along with what
13  Mr. Lincenberg has already objected, as to the Court's rulings?
14       MR. LINCENBERG:  And that's all I was going to say at
15  the end of sidebar.                                09:34:19
16       THE COURT:  All right.  Sustained.
17       MR. LINCENBERG:  Can we just have a continuing
18  objection?
19       THE COURT:  All right.  Go forward.  I'm sorry.
20  Noted.                                             09:34:26
21       And with regard to the objection -- the specific
22  objection, overruled, but it -- the objection -- the continuing
23  objection is noted.
24       MR. RAPP:  All right.
25       ///
```

```
 1    BY MR. RAPP:
 2    Q.  Do you recall, sir, the circumstances under which you were
 3    informed of the subpoena?  How did it come to your attention?
 4    A.  It came to my office in downtown Dallas and --
 5    Q.  Let me just stop you there.                                09:34:56
 6          Did you -- did you look at it?
 7    A.  Yes.
 8    Q.  Did --
 9    A.  Very much so.
10    Q.  After looking at it, did you inform anybody of its         09:35:03
11    existence?
12    A.  Yes.  I sent it to the, quote/unquote, sellers.
13    Q.  All right.  And when you say, "quote/unquote, sellers," who
14    specifically are you talking about?
15    A.  Let's see.  Timeline 2012.                                 09:35:27
16          Yes, I sent it.  So this was -- so I sent it to one of
17    their agents.  I might have sent it to them direct, but I sent
18    it one of their -- to one of their agents.
19    Q.  When you say "agents," somebody who represented them in
20    some capacity?                                                 09:35:48
21    A.  Yes.
22          MR. LINCENBERG:  Your Honor, I'm going to object.
23    Vague.  To the extent that this witness keeps saying "one of
24    their agents," I think he should identify who that is.  I think
25    he knows who it is.                                            09:35:59
```

```
 1            THE COURT:  Sustained.
 2   BY MR. RAPP:
 3   Q.  All right.  Fair to say you -- you -- you sent this to
 4   somebody?
 5   A.  I sent it to somebody ensuring that it would get to Larkin,    09:36:07
 6   Lacey --
 7   Q.  All right.
 8   A.  -- Brunst.
 9   Q.  And do you recall what it is the subpoena was seeking?
10   A.  It was seeking all of our emails pertaining to moderation.    09:36:26
11   Q.  All right.  What, if anything -- what concern, if any, did
12   you have about that?
13   A.  We did not -- I didn't want them to have those emails
14   because the moderation emails are damning.
15   Q.  All right.  And when you say "the moderation emails are       09:36:58
16   damning," what do you mean by that?
17   A.  It shows that those -- some of those emails will show
18   the -- the moderation department's main priority was to not ban
19   prostitution advertisers but to provide tools and mechanisms to
20   coach them.  It was about growing revenue and not removing        09:37:31
21   illegal content.
22   Q.  All right.  And at some point -- well, wait a minute.
23        Do you recall with -- do you recall when you received
24   that subpoena?
25   A.  Mid-2016.                                                     09:37:58
```

```
 1    Q.  All right.  And jumping ahead a bit, did the Senate -- and
 2    we referenced this yesterday, but did the Senate issue some
 3    type of report?
 4    A.  Yes, they did.
 5    Q.  Did you read the report?                                    09:38:31
 6    A.  Yes, I did.
 7    Q.  Was -- did the subpoena -- did the -- did -- at some point
 8    were the emails -- if you know, were the emails turned over to
 9    the Senate?
10    A.  Yes, they were.                                             09:38:50
11    Q.  Did the report rely in any way upon those subpoenas?
12    A.  Yes.  It relied on the subpoenas of the emails, and the
13    emails were cited in their appendix.
14    Q.  All right.  And, if you know, have we looked in the last
15    two weeks at any of those emails that were also used or part of 09:39:24
16    this Senate report?
17    A.  Yes, we have.
18    Q.  Now, did you have to travel to Washington, D.C., to --
19    related to this report?
20    A.  Yes.                                                        09:39:55
21    Q.  When you traveled to Washington, D.C., did you go to the
22    United States Senate building?
23    A.  We did the next day.  The first day we met in a conference
24    room.  The next day we did go to the U.S. Senate.
25    Q.  All right.  When you say that you met in a conference room, 09:40:18
```

1    was any of the owners in that conference room?

2    A.  Yes.

3    Q.  Who among the owners were in the conference room?

4    A.  Jim Larkin and Michael Lacey.

5    Q.  Was there anybody else that you've identified in court as          09:40:39

6    part of Backpage that was also at the United States Senate?

7    A.  At the Senate, Andrew Padilla.

8    Q.  Now, I believe your testimony was that the report came out?

9    A.  Yes.  The report came out the evening before we were to

10   testify in front of the Senate hearing.          09:41:21

11   Q.  All right.  And we did talk about this yesterday, and I

12   don't -- I'm not retreading that, but was -- after the report

13   came out, did -- was something done with the adult category?

14   A.  Yes.  We made a major change to the adult category.

15   Q.  And what was that change?          09:41:55

16   A.  We had decided to take down the adult section to undermine

17   the impact of the Senate hearing.

18   Q.  All right.  And what happened to the revenue after you did

19   that at Backpage.com?

20   A.  The majority of the paid customers who were running in the          09:42:25

21   adult categories, like female escorts, moved to the dating

22   category -- dating categories and to therapeutic massage.

23   Q.  All right.  And did you still -- we've talked and you've

24   testified in -- at least in this week about payments that you

25   were making to the owners.          09:42:59

1           After that change in 2017, did you continue to make

2    payments to the owners?

3    A.   Yes.

4    Q.   All right.  Can you estimate how much you were making on a

5    monthly basis to the owners?                              09:43:22

6    A.   We were making interest only payments for the half a

7    billion dollar debt for the U.S. loan, and then we were paying

8    interest and principal on the European loan.  So I think it

9    was, all in, 3 million a month.

10   Q.   All right.  So now I just want to go back to mid-2016.  And  09:43:51

11   you've -- you've -- you've testified that this is when you

12   received the subpoena for the PSI.

13          During 2016, did you come to learn that the Wall

14   Street Journal was doing an article on Backpage.com?

15          MS. BERTRAND:  Objection.  Leading.  Seeking hearsay.   09:44:28

16          MR. FEDER:  401/403 hearsay also.

17          THE COURT:  Overruled.  He can say if he learned.

18   BY MR. RAPP:

19   Q.   Do you know how you learned that?

20   A.   Yes.  There was -- we -- we had a -- we had someone talk to  09:44:40

21   the Wall Street Journal.  They had reached out to us for

22   information.

23   Q.   Do you remember the specific date that they reached out to

24   you for information?

25   A.   I thought it was mid-July.                            09:45:02

Q.  Well, let me -- let me show you 835.

        MR. RAPP:  Just for the witness's eyes only, madam clerk.  Thank you.

BY MR. RAPP:

Q.  Do you see that -- do you see the email on the -- on the -- your screen?

A.  Yes, I do.

Q.  Does this -- is this -- are you on this email?

A.  I am on this email.

Q.  And is the subject matter of this email the -- have to do with the Wall Street Journal?

A.  Yes, it does.

Q.  And does it tell you what the specific date is that the Wall Street Journal -- Wall Street Journal writer was contacting Backpage.com?

A.  Yes, it does.  July 11th, 2016.

Q.  All right.  Again, did -- did the fact that the Wall Street Journal was contacting you, did that cause any issue with you whatsoever?

A.  Yes.  It's calling out some of our questionable marketing --

        MS. BERTRAND:  Your Honor, objection.  Move to strike. Nonresponsive.  Everything after "yes."

        MR. FEDER:  Also 401/403 hearsay.

        THE COURT:  Overruled as to those, Mr. Feder, but

UNITED STATES DISTRICT COURT

1    sustained as to Ms. Bertrand's objection.

2            MR. RAPP:  Which was?

3            THE COURT:  Again, just be responsive to the question.

4            MR. RAPP:  Okay.

5            THE COURT:  Don't narrate unless Mr. Rapp will ask you                    09:47:06

6    a follow-up question.

7            All right.  Mr. Rapp, continue.

8    BY MR. RAPP:

9    Q.  What, if any, concern did the -- the fact that the Wall

10   Street Journal was doing an article on Backpage, what -- did               09:47:24

11   that have any impact on you whatsoever?

12   A.  Yes, it had an impact on me.

13   Q.  Okay.  And what impact did that have on you?

14   A.  It's -- it's -- it's a lot of bad news.  It's a lot more

15   disclosure than we want to share.  It's talking about the                  09:47:50

16   site's shortcomings.  And I believe it even mentions the

17   Senate.

18   Q.  All right.  And did -- were you made aware that this Wall

19   Street Journal writer was asking about some of Backpage's

20   strategies?                                                                09:48:17

21   A.  Yes.

22   Q.  What strategy did it ask about?

23            MR. FEDER:  Objection.  401/403 hearsay.

24            And, again, may there be a continuing objection to

25   this newspaper article?                                                    09:48:32

UNITED STATES DISTRICT COURT

1           THE COURT:  Overruled.

2           MR. FEDER:  May there be a continuing objection to

3      questions regarding this article?

4           THE COURT:  Overruled.

5           MR. FEDER:  Okay.  Thanks.                    09:48:41

6           THE WITNESS:  It talked about the relationship with

7      The Erotic Review.

8      BY MR. RAPP:

9      Q.  All right.  Now let's just jump back to -- remember -- it

10     seems years ago.  Do you remember the CNN investigation, the   09:48:59

11     CNN broadcast?

12     A.  Yes.

13     Q.  Do you recall a letter that you received from CNN?

14          MS. BERTRAND:  Objection.  Leading.  Seeks hearsay.

15          THE COURT:  He can answer if he remembers receiving a   09:49:20

16     letter.

17          Overruled.

18          THE WITNESS:  I recall receiving letters from CNN,

19     yes.

20     BY MR. RAPP:                                       09:49:32

21     Q.  And -- well, was the -- do you know if the CNN letter --

22     and do you know -- do you remember who the -- the letter was

23     from from CNN?

24     A.  Mr. Vigilante.

25     Q.  All right.  And do you -- do you know what -- was he   09:49:47

```
 1   responding to anything?
 2          MS. BERTRAND:  Objection.  Calls for speculation and
 3   foundation.
 4          THE COURT:  Well, I guess lay a little bit more
 5   foundation, Mr. Rapp.                              09:50:02
 6          And --
 7   BY MR. RAPP:
 8   Q.  Do you -- I think you --
 9          THE COURT:  -- regarding the speculation.
10          MR. RAPP:  All right.                       09:50:07
11          THE COURT:  -- I'll overrule that.
12          MR. RAPP:  All right.
13   BY MR. RAPP:
14   Q.  Do you -- do you remember whether Mr. --
15          THE COURT:  And I guess, Mr. Rapp, I heard him say  09:50:12
16   letters in the plural.  That's part of the problem.
17          MR. RAPP:  All right.
18   BY MR. RAPP:
19   Q.  Well, let's just take a step back.  Do you remember -- do
20   you remember -- let me just see if I can jog your memory here.  09:50:25
21          You've talked --
22          MS. BERTRAND:  Objection.  Your Honor, he hasn't
23   testified that he doesn't remember.
24   BY MR. RAPP:
25   Q.  Well, let me just show this to you.              09:50:34
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Well --
 2   BY MR. RAPP:
 3   Q.  Do you remember if --
 4              THE COURT:  -- he hasn't finished.
 5              Ms. Bertrand, he had -- he did not finish his        09:50:39
 6   question.  So let Mr. Rapp finish his question, and then you
 7   can make your objection.
 8   BY MR. RAPP:
 9   Q.  Do you --
10              THE COURT:  Mr. Rapp.                                 09:50:47
11   BY MR. RAPP:
12   Q.  Do you remember if Mr. McNally -- were you aware whether
13   Mr. McNally sent a letter to CNN?
14   A.  Yes, I am.
15   Q.  All right.  Were you involved in providing any information  09:50:57
16   for that letter whatsoever?
17   A.  Yes, I was.
18   Q.  And was that -- was -- and I think we've talked about this,
19   but was that letter that was -- that you became aware of sent
20   to CNN, was it accurate?                                        09:51:13
21   A.  Some parts were; some parts weren't.
22   Q.  Did you come to learn that there was a -- a response letter
23   from CNN?
24   A.  Yes.
25   Q.  All right.                                                  09:51:27
```

```
 1   A.  They responded.
 2   Q.  And did the response letter from CNN, did it in any way
 3   I -- identify some internal strategy that Backpage had?
 4           MS. BERTRAND:  Objection.
 5           THE WITNESS:  Yes.                              09:51:44
 6           MS. BERTRAND:  Leading.
 7           THE COURT:  Sustained.
 8   BY MR. RAPP:
 9   Q.  What, if anything, did that letter identify about the
10   Backpage?                                              09:51:52
11           MR. FEDER:  Hearsay.  401/403.
12           THE COURT:  Overruled.
13           THE WITNESS:  It identified the fact that TER links
14   were in Backpage ads.
15   BY MR. RAPP:                                           09:52:08
16   Q.  Okay.  But with respect to the CNN and the Wall Street
17   Journal and the PSI, the Senate subcommittee, did they know
18   about the relationship Backpage had with David Elms and The
19   Erotic Review?
20           MR. LINCENBERG:  Objection, Your Honor.  Calls for   09:52:37
21   speculation.
22           MR. CAMBRIA:  And foundation.
23           MR. FEDER:  401/403 hearsay.
24           THE COURT:  Sustained as to speculation.  Overruled as
25   to relevance.                                          09:52:46
```

```
 1              I'll overrule Mr. Cambria's objection.

 2              MR. RAPP:  It was sustained as to what, Judge?

 3              THE COURT:  Speculation.

 4              MR. RAPP:  Speculation.

 5   BY MR. RAPP:                                                09:53:05

 6   Q.  Well, have you read the CNN letter that's Exhibit 85?

 7   A.  Yes, I have.

 8   Q.  Does the -- does the CNN letter talk about The Erotic

 9   Review?

10   A.  It mentions The Erotic Review IDs and links on Backpage  09:53:21

11   ads.

12   Q.  But does it -- does it talk about anything about Backpage

13   paying The Erotic Review?

14              MR. FEDER:  Objection.  401/403 and hearsay.

15              May there be a continuing objection as to this subject  09:53:43

16   area?

17              MR. EISENBERG:  And, Your Honor, it's leading.

18              MR. FEDER:  I'm sorry, Your Honor?

19              THE COURT:  Mr. Eisenberg, what did you say?

20              MR. EISENBERG:  Your Honor, I said it's leading.  09:53:55

21   Objection.

22              THE COURT:  Sustained as to leading.

23              And your continuing objection is noted but overruled.

24              MR. FEDER:  Would the Court like me to continue

25   objecting to this area?                                      09:54:07
```

```
 1              THE COURT:  I'm sorry.  I spoke backward.  I overruled
 2    your objection, and I note your continuing objection.
 3              MR. FEDER:  Okay.  Thank you.
 4              THE COURT:  There we go.
 5              MR. FEDER:  There we go.                    09:54:16
 6              THE COURT:  Okay.  All right.
 7              Go ahead, Mr. Rapp.
 8    BY MR. RAPP:
 9    Q.  Okay.  Did this -- did the -- let's -- I'll tell you what.
10    Why don't we just look at the CNN letter.  That might help     09:54:29
11    here.
12              So I'm showing you on your screen, Mr. Ferrer -- do
13    you see that on your screen?
14    A.  Yes, I do.
15              MR. EISENBERG:  Can we have a number?             09:55:11
16              MR. RAPP:  It's Exhibit 85a.
17              MR. EISENBERG:  Thank you.
18    BY MR. RAPP:
19    Q.  And do you recognize this as the letter from CNN?
20    A.  Could you go back one page?                         09:55:22
21    Q.  You bet.
22    A.  Yes, I do.
23    Q.  And who is this letter sent to?
24    A.  It's sent to Ed McNally.
25    Q.  All right.  And is this -- you've read this letter before?   09:55:37
```

```
 1   A.  Yes.

 2   Q.  And does the letter --

 3            MR. RAPP:  I'll tell you what.  I will move to admit

 4   85a, page 5, and publish it to the jury.

 5            MS. BERTRAND:  Objection.  Rule of completeness.      09:56:01

 6   Rule 106.  The government is moving to admit one page of a

 7   multiple-page document.  And even of that one page, 90 percent

 8   of it is redacted.

 9            THE COURT:  I have a recollection of sustaining an

10   objection to a prior motion to admit and --                   09:56:22

11            MR. RAPP:  I'd be happy to admit the entirety of the

12   letter.

13            MS. BERTRAND:  That's fine.

14            THE COURT:  Unredacted?

15            MR. RAPP:  Unredacted.                               09:56:30

16            MR. LINCENBERG:  Well, we object to admitting the

17   entirety of the letter.  I think these redactions --

18            MR. RAPP:  I see.

19            MR. LINCENBERG:  Counsel's just looking at this, but

20   these redactions are per prior Court orders.                  09:56:40

21            THE COURT:  Well, yes.  I understand what the exhibit

22   is.  I understand what the prior objection was.  We do now have

23   conflicting objections, Ms. Bertrand --

24            MR. LINCENBERG:  Right.

25            THE COURT:  -- and your objection.                   09:56:50
```

UNITED STATES DISTRICT COURT

```
 1              MR. LINCENBERG:  Right.

 2              MS. BERTRAND:  I'll withdraw my objections to the

 3      exhibit.

 4              THE COURT:  I'm going to permit the government to

 5      admit the entirety of the letter without the redactions.        09:57:03

 6              MR. LINCENBERG:  Wait.  Your Honor, is the Court aware

 7      that these redactions were in connection with prior Court

 8      orders?

 9              I think that Ms. Bertrand saw this letter and wasn't

10      sure what the redactions were relating to.                      09:57:14

11              MS. BERTRAND:  Right.  I'm withdrawing the objection

12      to the redactions.

13              THE COURT:  Well --

14              MS. BERTRAND:  I think --

15              THE COURT:  All right.  Then the government then may    09:57:22

16      introduce the letter redacted.

17              MR. RAPP:  I can introduce --

18              THE COURT:  You can move to -- you've moved to

19      introduce this.

20              MR. RAPP:  Move to --                                   09:57:31

21              THE COURT:  What is on -- what is on my screen and

22      your screen and Mr. Ferrer's screen, you've moved for the

23      admission.

24              Overrule the objection.  Other --

25              MR. FEDER:  Also --                                     09:57:40
```

```
 1              THE COURT:  The other objection for rule of
 2    completeness has been withdrawn, and so you may admit.
 3              MR. FEDER:  There's also a 401/403 hearsay objection.
 4              THE COURT:  Overruled.
 5              MR. RAPP:  All right.                              09:57:54
 6              (The Court and the courtroom deputy confer.)
 7              THE COURT:  Well, let's clarify.
 8              Mr. Rapp, you moved to admit just page 5?
 9              MR. RAPP:  I'd be fine at this point just to admit
10    page 5, but the --                                          09:58:04
11              THE COURT:  We can go forward in that way.  So you
12    can -- you can admit page 5.
13              MR. RAPP:  All right.  Well, how about just --
14              MR. LINCENBERG:  Your Honor, can we just have a moment
15    to look at just what page 5 is?                             09:58:16
16              THE COURT:  Yes.
17              Okay.  Go forward.
18              MR. RAPP:  All right.  I will -- I -- I think I need
19    to just -- need to pick up page 1 so it's clear where this
20    letter comes from.                                          09:58:53
21              So I move to admit 85a, page 1, and 85a, page 5.
22              THE COURT:  Are you renumbering them?  I only have 85,
23    so --
24              MR. RAPP:  Right.
25              THE COURT:  So you're renumbering as page 1, and b as  09:59:07
```

```
 1   page 5?
 2            MR. RAPP:  Yes.  We'll -- we'll make sure it's clear.
 3            So move to publish 85a, page 1, first page of this
 4   letter.
 5            THE COURT:  Yes.  It may be admitted and published.       09:59:27
 6            (Exhibit 85a, page 1; 85a, page 5 admitted into
 7   evidence.)
 8   BY MR. RAPP:
 9   Q.  All right.  Now, is this the letter that was received from
10   CNN?                                                                09:59:42
11   A.  Yes, it is.
12   Q.  And then going to page 5, can you read what Mr. Vigilante
13   identified about Backpage.
14   A.  "Many of the ads also contained an identification number
15   for a separate web site called The Erotic Review.  The Erotic     10:00:08
16   Review is a site where men rate the sexual performance of the
17   women they buy.  The inclusion of The Erotic Review numbers on
18   Backpage ads offers strong evidence that these current ads are,
19   in fact, for illegal prostitution," [as read].
20   Q.  Now, jumping ahead to mid-July of 2016, did the Wall -- did    10:00:34
21   you come to learn that the Wall Street Journal had also
22   identified The Erotic Review ID numbers?
23            MS. BERTRAND:  Objection.  Leading.
24            THE COURT:  Sustained.
25            ///
```

UNITED STATES DISTRICT COURT

BY MR. RAPP:

Q.  All right.  Let me see if I can show you an email in that regard.

All right.  But just jumping to the United States Senate, they also identify The Erotic Review?                           10:01:26

A.  Yes.

MR. FEDER:  Relevance.  403 hearsay.

THE COURT:  Overruled.

MR. CAMBRIA:  And leading.

BY MR. RAPP:

Q.  And so how did you become aware of the Wall Street Journal asking -- asking about The Erotic Review ID numbers?

MS. BERTRAND:  Objection.  Leading.  Assumes facts not in evidence.

THE COURT:  That's sustained.                                 10:02:07

BY MR. RAPP:

Q.  All right.  Let me see if I can find something here for you.

I'm now showing you what has been marked as 836.  It's multiple pages.  Is it -- and did you become aware of an email   10:02:54 exchange between the Wall Street Journal and representatives from Backpage?

A.  Yes, I did.

Q.  All right.  Now I'm -- after further ado, I'm now showing you on your screen 836a.                                         10:03:35

```
 1              Do you see that on your screen?
 2    A.  Yes, I do.
 3    Q.  All right.  And do you recognize who this -- who this
 4    reporter is emailing?
 5    A.  The reporter is emailing -- emailing Liz McDougal.      10:03:56
 6    Q.  And is the reporter asking about The Erotic Review?
 7    A.  Yes.
 8              MR. RAPP:  Move to admit 836a, page 2.
 9              MS. BERTRAND:  Objection.  Hearsay.
10              MR. FEDER:  401/403 hearsay.                       10:04:27
11              MR. LINCENBERG:  Your Honor, I think we just need a
12    minute.  Mr. -- as I understood, Mr. Rapp put 836 on.
13              THE COURT:  Yes, I --
14              MR. LINCENBERG:  He's now -- I just --
15              THE COURT:  Yeah, I see that, too.  I have -- you   10:04:37
16    asked him about 836, and now you're talking about 836a.
17              MR. RAPP:  No.  I think I always was saying 836a.
18              MR. CAMBRIA:  No.
19              THE COURT:  My read of it is, "I'm showing you what
20    has been marked as 836."                                     10:04:57
21              MR. RAPP:  I'm sorry.  I missed that.
22              THE COURT:  You confined it to 836.
23              MR. RAPP:  Oh, I'm sorry.  My mistake.  836 -- for the
24    record, 836a, page 2.
25              THE COURT:  And you had moved to admit; is that right? 10:05:21
```

```
 1              MR. RAPP:  Yes.  And publish.

 2              THE COURT:  Yes, it may be admitted and published.

 3              MR. RAPP:  Thank you.

 4              (Exhibit 836a, page 2 admitted into evidence.)

 5              MR. LINCENBERG:  Your Honor, now that I've had a        10:05:34

 6    chance to read it, I do object on completeness with regard to

 7    the redactions that page 3 should also be included, at least

 8    part of page 3.  And I don't want to have a speaking objection

 9    to go through which parts.

10              THE COURT:  Noted.  The objection is noted but         10:05:52

11    overruled.

12    BY MR. RAPP:

13    Q.  What does the -- is this the Wall Street Journal?

14    A.  Yes, it is.

15    Q.  What are they asking a representative from Backpage?         10:06:18

16    A.  "Hey, Liz.  We do need to get an answer on the TE" -- "TER

17    numbers pretty soon.  I would be happy to talk now, or we could

18    plan to talk on Monday at 6 a.m. Pacific?  Or we can use

19    something from your note tonight if that's what you prefer.

20    Thank you again.  I really appreciate your willingness to talk. 10:06:44

21    Best, John.  Wall Street Journal," [as read].

22    Q.  Now, I want to stay in mid-2016.

23              I -- we showed you this exhibit yesterday.  This is

24    2045.

25              MR. RAPP:  And I believe it's been admitted.  Has it?  10:07:12
```

UNITED STATES DISTRICT COURT

```
 1                THE COURTROOM DEPUTY:  Yes.
 2                MR. RAPP:  Yes.  All right.  So I would request
 3   permission to publish.
 4                THE COURT:  Yes, it may be published.
 5   BY MR. RAPP:                                              10:07:28
 6   Q.  And just -- just as a reminder, this was -- this is a -- is
 7   this an email address that you've exchanged with Mr. La- --
 8   Mr. Lacey?
 9   A.  Yes, it is.
10   Q.  All right.  And going to Exhibit 1.                   10:07:41
11                Do you this on your screen?
12   A.  Yes, I do.
13   Q.  Is this the same email address?
14   A.  Yes, it is.
15   Q.  Is this in the middle of 2016?                        10:08:13
16   A.  It is in the middle of 2016.
17   Q.  Is that when you received the subpoena from the PSI?
18                MR. CAMBRIA:  Hang on one second.  245 -- 2045.
19                MR. RAPP:  I've moved on.  I'm on Exhibit 1.
20                MR. CAMBRIA:  Oh, all right.                 10:08:36
21                THE WITNESS:  Yes.
22   BY MR. RAPP:
23   Q.  Did you -- did you receive the subpoena from the Senate
24   subcommittee in the middle of 2016?
25   A.  Yes.                                                  10:08:50
```

```
 1   Q.  Did you give it to the -- to the owners, to Mr. Lacey and

 2   Mr. Larkin?

 3   A.  Yes.

 4           MR. RAPP:  Move to admit Exhibit 1, page 4.

 5           MS. BERTRAND:  Objection.  Lack of foundation.          10:09:09

 6           MR. CAMBRIA:  I'm sorry.  I haven't seen that.  I know

 7   there's several pages there.  I didn't see.  Just 4?

 8           MR. RAPP:  I'm just moving to admit page 4 of

 9   Exhibit 1.

10           MR. CAMBRIA:  I need to look at it.                     10:09:26

11           MR. RAPP:  It's on the screen.

12           MR. CAMBRIA:  Yeah.  My screen is pretty dark.

13           THE COURT:  Give Mr. Cambria a moment.

14           MR. CAMBRIA:  Your Honor, my screen is dark.

15           THE COURT:  Is it plugged in?  What was that?          10:09:48

16           MS. BERTRAND:  His screen is on now.  It was off.

17           THE COURT:  Oh.

18           MR. CAMBRIA:  Here we go.

19           THE COURT:  Mr. Cambria, have you looked at it?

20           MR. CAMBRIA:  I'm looking at it now, Your Honor.       10:10:39

21   There's several pages here.

22           Yeah.  No, I understand that.

23           I have a 106 objection to this, Your Honor.  I think

24   that the -- I'm not sure which page this is.  I don't see

25   numbers on them.                                               10:11:24
```

1          It says --

2          MR. RAPP:  In the interest of time, I move to admit

3   all five pages.

4          THE COURT:  And that will address the 106 objection.

5          MR. CAMBRIA:  Yeah.  There's a -- there's another page          10:11:41

6   in here that I object to.  Maybe it's gone from yesterday.

7          THE COURT:  Did you make sure that Mr. Cambria has the

8   relevant exhibit, Mr. Rapp?

9          And I remind counsel to do that prior to trial.

10          MR. CAMBRIA:  Yeah, here.  The very first page I          10:12:01

11   object to.

12          MR. RAPP:  That's okay because I'm just admitting

13   page 4.  So that's not an issue.

14          THE COURT:  All right.  So --

15          MR. CAMBRIA:  Well, but I -- but --          10:12:11

16          THE COURT:  Lay your objection, Mr. Cambria --

17          MR. CAMBRIA:  Yes.

18          THE COURT:  -- or let's move on.

19          MR. CAMBRIA:  On 106, as I said, there is a

20   communication there from my client, and it is -- let's see,          10:12:20

21   there's -- there's no date.  2/21/17 -- 2017, 11:28 a.m.  That

22   should be part of the exhibit.

23          MR. RAPP:  Done.  What page is that?

24          No objection to page 2.

25          MR. FEDER:  Objection.  Hear- -- 401/403 hearsay.          10:12:46

```
 1              MR. CAMBRIA:  These pages aren't numbered or this
 2    would be easy.
 3              MR. RAPP:  Actually, the pages are numbered.
 4              MR. CAMBRIA:  Well, okay.  Here's this page.
 5         Which page is that?                                     10:12:58
 6              MR. RAPP:  Well, that's page 1.
 7              MR. CAMBRIA:  Okay.  I object to page 1, Your Honor.
 8         And as far as --
 9              THE COURT:  What's the objection with regard to
10    page 1?                                                      10:13:06
11         MR. CAMBRIA:  It appears to be something created by
12    the government.
13              MR. RAPP:  Judge, I'm not even admitting page 1.  So
14    that's not an issue, so --
15              MR. CAMBRIA:  All right.  This is 2.               10:13:16
16         And page 3 is the one that should be admitted as well
17    under 106.
18         Oh, I'm sorry.  That's -- hang on here.  Hang on.
19         THE COURT:  Well, move to admit the non-objectionable
20    pages at this time.                                          10:13:49
21              MR. CAMBRIA:  Yeah.
22         THE COURT:  And Mr. Cambria can review the entirety of
23    the exhibit on the break, and then he can lay his objections to
24    other pages --
25              MR. CAMBRIA:  Page --                              10:13:57
```

1          THE COURT:  -- if that's necessary.

2          MR. CAMBRIA:  Page 3 is the other one that I would ask

3    be admitted.

4          THE COURT:  Overruled.

5          Mr. Rapp --                                          10:14:03

6          MR. CAMBRIA:  Overruled?

7          THE COURT:  -- Exhibit 1 --

8          MR. CAMBRIA:  Page 3?  I'm saying to be complete here,

9    Your Honor, page 3.

10          THE COURT:  I understand the objection.              10:14:13

11          MR. CAMBRIA:  You're not allowing page 3 in?

12          THE COURT:  No.

13          MR. CAMBRIA:  Okay.

14          THE COURT:  We'll have a moment -- you'll have a

15    chance to examine the witness, Mr. Cambria.               10:14:27

16          All right.  Mr. Rapp, let's for the record state

17    precisely the page numbers as to Exhibit 1 you are moving to

18    admit, please.

19          MR. RAPP:  Page 4.

20          And just to make the record complete, the Bates     10:14:49

21    stamp number for that page is 0004688934.  There's also another

22    number at the bottom of it with the number 292 for the record.

23          THE COURT:  All right.

24          MR. CAMBRIA:  And my request, Your Honor, is that

25    Bates stamp page 02058 be admitted as well, because that makes  10:15:16

```
 1    the -- that makes the communication complete.
 2            THE COURT:  And, again, I'm going to overrule the
 3    objection.  You'll have an opportunity to examine the witness
 4    on your turn, Mr. Cambria.
 5            MR. CAMBRIA:  But this --                               10:15:34
 6            THE COURT:  Go forward.
 7            MR. CAMBRIA:  This witness doesn't have anything to do
 8    with this particular page.
 9            THE COURT:  Well, overruled then.
10            Let's continue, Mr. Rapp.                               10:15:41
11            MR. RAPP:  Publish -- please publish page 4, please.
12            (The Court and the courtroom deputy confer.)
13            THE COURT:  Yes, it is admitted.
14            (Exhibit 1, page 4 admitted into evidence.)
15    BY MR. RAPP:                                                   10:16:01
16    Q.  All right.  Is this -- this is the email address that --
17    that you had previously exchanged emails with Mr. Lacey?
18    A.  Yes, it is.
19    Q.  And at the bottom of this email, is Mr. Lacey's name on it?
20    A.  Yes.                                                       10:16:23
21    Q.  And in exchanging with -- emails with Mr. Lacey, was there
22    anything unique about the way, besides the type, of he would
23    sign his name?
24    A.  Yes.  Usually all lower case.
25    Q.  All right.  And then drawing your attention to this        10:16:46
```

1  paragraph, what does Mr. Lacey say?

2  A.  "To revisit for just a moment, I am not interested in any

3  tax avoidance.  I just want to put some assets in places where

4  litigious parties, including the government parties, cannot

5  access my accounts," [as read].                    10:17:21

6  Q.  All right.  Let's go to 2018.  I'm now showing you for the

7  government's [sic] eyes only Exhibit 1246.

8       Do you see that on your screen?

9  A.  Yes, I do.

10  Q.  Who's it from?                                  10:17:55

11  A.  The email's from Jed Brunst.

12  Q.  And who's it to?

13  A.  Myself.

14  Q.  And what email addresses are you and Mr. Brunst using, or

15  what type of email platform are you and Mr. Brunst using?  10:18:13

16  A.  ProtonMail.  Its type is more anonymous-type email.

17  Q.  All right.

18       MR. RAPP:  Move to admit and publish 1246.

19       THE COURT:  Yes, it may be admitted and published.

20       (Exhibit 1246 admitted into evidence.)          10:18:42

21  BY MR. RAPP:

22  Q.  What do you say below to Mr. Brunst down here?

23  A.  "5 million- (1 just arrived from Frick which was a stuck

24  payment).  2 million is for debt payment, Carl."

25  Q.  And what does Mr. Brunst respond to you?          10:19:00

```
 1   A.  "I think you should send all you can as debt payment rather
 2   than risk some unplanned event."
 3   Q.  What did you take "unplanned event" to mean?
 4   A.  That those funds could be seized.
 5   Q.  All right.  Now --                                    10:19:26
 6            MR. RAPP:  It doesn't work like that.
 7            THE COURT:  It's fine.
 8            MR. RAPP:  Well -- oh, could we just take a break?
 9            THE COURT:  Is he waiving his presence for --
10            MR. EISENBERG:  I am, Your Honor.              10:19:50
11            THE COURT:  Yes, for this small purpose.
12            MR. RAPP:  Okay.
13            (Mr. Padilla leaves the courtroom.)
14            MR. RAPP:  I'm sorry.  I lost track.
15   BY MR. RAPP:                                             10:20:04
16   Q.  What did you take "unplanned event" to mean?
17   A.  That the funds could be frozen or seized.
18   Q.  Okay.  I think you did answer that.  I'm sorry.
19            In 2018, early 2018, January -- the January/February
20   time period, what was your -- did you want to continue with  10:20:22
21   Backpage.com?
22   A.  No, I -- I didn't want to continue with Backpage.  I just
23   finished a surgery.
24   Q.  Okay.  And did you communicate that in any respect to the
25   owners?                                                 10:20:56
```

```
 1    A.  Yes.  I let them know that this was too much for me.  I
 2    couldn't take it anymore.  I had a major health scare.  I
 3    need -- I want out.
 4    Q.  All right.  And so what, if any, was their reaction to
 5    that?                                                         10:21:16
 6    A.  Hang in there.  We're going to find somebody --
 7            MR. LINCENBERG:  Your Honor, I'm going to object.
 8    Vague as to --
 9            MR. RAPP:  Let me --
10            MR. LINCENBERG:  -- their reaction and when this -- is  10:21:25
11    this at a meeting or --
12            THE COURT:  Sustained.
13    BY MR. RAPP:
14    Q.  At this point, in 2018, were you talking directly to the
15    owners?                                                       10:21:38
16    A.  No.
17            MR. LINCENBERG:  Vague.
18            THE COURT:  Oh, I guess the -- the vagueness issue --
19            MR. RAPP:  Is the owners.
20            THE COURT:  Yes.  Thank you.                          10:21:50
21            MR. RAPP:  All right.
22    BY MR. RAPP:
23    Q.  Were you talking directly to Mr. Lacey, Mr. Brunst, and
24    Mr. Spear?
25    A.  Sometimes we had a meeting over the phone, but most of the 10:21:58
```

```
 1   time it went through either Dan Quigley, who then referred to
 2   Don Moon, who then got it to the sellers.
 3   Q.  All right.  Was there some --
 4            MR. LINCENBERG:  I'm going to just move to strike as
 5   speculation/foundation for what he's suggesting "then got to          10:22:23
 6   the sellers."
 7            He can talk about his communications with whoever he
 8   spoke to.
 9   BY MR. RAPP:
10   Q.  Did you deal with --                                              10:22:33
11            THE COURT:  Well, I'll sustain the objection.
12   BY MR. RAPP:
13   Q.  Did you deal --
14            THE COURT:  And -- and the jurors will disregard
15   everything after Dan Quigley and --                                   10:22:42
16   BY MR. RAPP:
17   Q.  Did you deal with some- -- somebody who represented
18   themselves to be a representative of Mr. Lacey and Mr. Larkin?
19   A.  Yes.
20   Q.  Who was that person?                                             10:22:58
21   A.  Don Moon.
22   Q.  All right.  And when you just testified here that you
23   communicated that you no longer wanted to stay with Backpage,
24   who did you communicate that to?
25   A.  I communicated that to Don Moon --                               10:23:12
```

UNITED STATES DISTRICT COURT

```
 1    Q.  All right.

 2    A.  -- through Dan Quigley.

 3    Q.  All right.  And when you made that known to them, did

 4    either of those two gentlemen come back and tell you what --

 5    what their plan was going forward?                              10:23:34

 6    A.  Yes, they did.

 7    Q.  Where did that -- if you recall, where did that

 8    conversation take place?

 9    A.  We had the conversations over the phone.

10    Q.  All right.  And what did they communicate?  Did they       10:23:48

11    communicate anything whatsoever about the future of

12    Backpage.com?

13              MR. CAMBRIA:  Object to the hearsay.

14              THE COURT:  Well, over- -- overruled.

15              But, again, Mr. Rapp, the -- speaking in the plural -- 10:24:03

16              MR. RAPP:  All right.

17    BY MR. RAPP:

18    Q.  Specifically --

19              THE COURT:  -- is not helpful.

20              MR. RAPP:  Not to interrupt.                          10:24:11

21    BY MR. RAPP:

22    Q.  Specifically between these two gentlemen that you've

23    identified, Mr. Moon and Mr. Quigley, who are you having the

24    conversation with?

25    A.  Mr. Moon gave me the plan going forward.                   10:24:20
```

```
 1   Q.  And what did Mr. Moon tell you on behalf of Mr. Lacey and
 2   Larkin what the -- what the plan was going forward?
 3   A.  That they were going to sell the site, that they had found
 4   some leads, that it was a -- an owner of major porn cites, and
 5   that, you know, just hang in there.  Keep running it while we      10:24:43
 6   find a new person to take it over.
 7   Q.  All right.  Were you continuing to pay them this monthly
 8   payment?
 9   A.  Yes.
10   Q.  In fact, we just saw this -- this email here in February.     10:24:56
11        Does -- is that part of the -- the payments you're
12   continuing to make?
13   A.  Yes, it is.
14   Q.  Did you ever discuss with them that you just want to give
15   the website back to them?                                          10:25:12
16        MS. BERTRAND:  Objection.  Leading.
17        THE COURT:  Overruled.
18        THE WITNESS:  Yes.  That's why I said I -- I'm out --
19   I was out.  They need -- said they need to find someone else
20   who will take it or they need to take it back.                     10:25:25
21   BY MR. RAPP:
22   Q.  All right.  Let me show you for your eyes only 1796.
23        Do you see this email?
24   A.  Yes, I do.
25   Q.  Are you on the email?                                          10:25:43
```

```
 1   A.  Yes, I am.

 2   Q.  And can you identify the other people on this email?

 3   A.  Yes, I can.

 4   Q.  Who are they?

 5   A.  The email's from Scott Spear using a ProtonMail email        10:25:55

 6   address.

 7   Q.  How do you know it's from Scott Spear?

 8   A.  Because it says Scott at the bottom of the email.

 9   Q.  All right.  And did -- and around the time of this email,

10   did you have occasion to either meet with Mr. Spear in person    10:26:15

11   or over the phone?

12   A.  Yes.  Well, we had the meeting.  We had the phone call

13   meeting --

14   Q.  All right.

15   A.  -- with Mr. Spear, yes.                                      10:26:31

16   Q.  And that -- was Mr. Spear on the phone call?

17   A.  Well, they were all in a conference room, and I was on the

18   phone --

19   Q.  All right.

20   A.  -- because I wasn't going to any more meetings.              10:26:40

21           MR. LINCENBERG:  Your Honor, I'm going to object to

22   "they were all."

23   BY MR. RAPP:

24   Q.  Well, tell us --

25           THE COURT:  Sustained.                                   10:26:47
```

```
 1  BY MR. RAPP:
 2  Q.  -- who did -- who did you understand -- who could you tell
 3  over the phone was in the room during this meeting?
 4  A.  Scott Spear.
 5  Q.  Let me stop you there.                                    10:26:59
 6          How do you know that, though?  How do you know --
 7  because you weren't in the room, how do you know it was him?
 8  A.  Because he -- they said hello.  We exchanged pleasantries.
 9  Q.  All right.  Who else?
10  A.  It -- Jim Larkin.                                         10:27:13
11  Q.  All right.  Anybody else?
12  A.  I believe Dan Quigley was also there.  And Jed Brunst.
13  Q.  All right.  How do you know Jed Brunst was there?
14  A.  Because these were all the attendees that were going to be
15  at the meeting.                                               10:27:30
16  Q.  All right.  And it -- does this email have something to do
17  with that meeting?
18  A.  Yes, it does.
19  Q.  Okay.  And I -- if I didn't ask you, is Mr. Brunst on this
20  email?                                                        10:27:50
21  A.  Yes, he is.
22  Q.  And is Mr. Larkin on this email?
23  A.  Yes.  Yes, he is.
24  Q.  But does it say his name, though?
25  A.  His email is 22ndstreet@protonmail.com, and I knew that to 10:28:03
```

```
 1    be Jim Larkin.
 2    Q.  Okay.  How did you know that to be Jim Larkin?
 3    A.  From previous emails.
 4    Q.  Okay.  And then I -- I did ask you about Mr. Spear, but if
 5    you look down, do you identify the name of Mr. Spear associated      10:28:25
 6    with a email address?
 7    A.  Yes.  Scott Spear's name is associated with an email
 8    address, valhalla4426@protonmail.com.
 9           MR. RAPP:  Move to admit 1796 and publish.
10           THE COURT:  Yes, 1796 may be admitted and published.         10:28:45
11           (Exhibit 1796 admitted into evidence.)
12    BY MR. RAPP:
13    Q.  All right.  And what is the subject of this email?
14           MR. FEDER:  Before you go on, could we see page 2?
15           (Mr. Padilla returns to proceedings.)                        10:29:07
16           THE COURT:  And the record will reflect the return of
17    Mr. Padilla.
18    BY MR. RAPP:
19    Q.  What was the -- the name given to this meeting?
20    A.  The name of the meeting is Principal's Meeting.                  10:29:30
21    Q.  What did you take that to mean?
22    A.  It means the owners.
23    Q.  All right.
24    A.  The real owners.
25    Q.  And so what role, if -- did you -- were you able to              10:29:48
```

1    determine what role, if any, Mr. Spear had during this meeting?

2    A.   Yes.  I was told what his role would be at the meeting.

3    Q.   Who -- who were you told by?

4    A.   Jim Larkin told me, and Scott Spear acknowledged.

5    Q.   What did Mr. Spear acknowledge?                            10:30:12

6    A.   That he was coming back to help me, to take off some of the

7    load, and to assist with banking.

8    Q.   All right.  Were you interested in doing that?

9    A.   Well, I took it as he's coming to take over, which

10   seemed -- you know, that's what I want.  I want someone to take   10:30:42

11   this site back.

12   Q.   All right.

13   A.   But I -- I didn't want him to just help get bank, because

14   banking was impossible.

15   Q.   All right.  Let's jump to April of 2018.  What happened to   10:30:55

16   Backpage.com in April of 2018, the website?

17   A.   The website and the company was shut down.

18   Q.   And what role, if any, did you have in that?

19   A.   My role was when I create -- when I pled guilty was to help

20   shut down the site, secure the assets, both computers and        10:31:42

21   financial assets.

22   Q.   Does that include funds in bank accounts?

23   A.   It included funds in bank accounts both in Europe and in

24   the U.S., and it included $15 million worth of Bitcoin.

25   Q.   All right.  When you say you shut down the website, where    10:32:07

```
 1   was the website?

 2   A.  The -- it was --

 3   Q.  Well, let me just withdraw the question.

 4        Did you shut down the website in the United States?

 5   A.  Yes, I shut down the website in the United States.      10:32:26

 6   Q.  Was it shut down in -- in any other location it might have

 7   had a presence?

 8   A.  Yes.  It was also shut down in Amsterdam, where we had

 9   another data center.

10   Q.  I -- I believe you just said a few seconds ago that you    10:32:45

11   pled guilty.

12   A.  Yes.

13   Q.  Where did you plead guilty?

14   A.  Here in Phoenix, Arizona.

15   Q.  In -- in federal or state court?                          10:33:01

16   A.  Yes.  Not this courtroom.

17   Q.  Okay.

18   A.  A different courtroom.

19   Q.  Another courtroom.

20        Where else did you plead guilty?                         10:33:11

21   A.  I also pled guilty in the state of Texas and the state of

22   California.

23   Q.  All right.  And, as part of that guilty pleas, did that

24   include assistance to investigators and prosecutors?

25   A.  Yes, it did.                                              10:33:37
```

1  Q.  And did that include what you've testified to as shutting

2  down the website?

3  A.  Yes.

4  Q.  Did it include seizing the assets?

5  A.  Yes, it included seizing the assets.                    10:33:53

6  Q.  Did it also include testifying in certain proceedings?

7  A.  Yes.

8  Q.  Do you expect to be sentenced at some point?

9  A.  Yes, I do.

10 Q.  The assistance that you have provided to investigators and   10:34:15

11 prosecutors, do you know if it will be made known to any of the

12 judges that will sentence you?

13 A.  Yes.

14 Q.  And do you know if it can be considered in their sentence?

15 A.  Yes.                                                     10:34:36

16 Q.  Is there any promises to you regarding what your sentence

17 will be?

18 A.  There are no promises.

19         MR. RAPP:  Judge, I'm about to go into another area if

20 you want to take a break.  That will be a little bit lengthy.   10:34:54

21         THE COURT:  Well, I was going to forge on for about

22 ten more minutes --

23         MR. RAPP:  I can do that.

24         THE COURT:  -- since we're only going to go through

25 12:30.  So if -- unless there's objection to ten more minutes?   10:35:04

```
 1              All right, I see shaking heads.  So let's move forward
 2    for about ten --
 3              MR. RAPP:  Very well.
 4              THE COURT:  -- more minutes, Mr. Rapp.
 5              MR. RAPP:  No problem.                              10:35:17
 6    BY MR. RAPP:
 7    Q.  I want to show you what has been marked as
 8    Government's 220a.
 9              Do you see that on your screen, sir?
10    A.  Yes, I do.                                               10:35:59
11    Q.  And what is it?
12              Let me show you the entirety.
13              Can you tell what it is?
14    A.  Yes.  It's a Backpage posting printed out as a PDF by an
15    administrator because it has the personally identifiable     10:36:24
16    information, like an email address.
17              MR. RAPP:  Move to admit 220a.  Request permission to
18    publish.
19              MR. FEDER:  401/403 hearsay.  Thanks.
20              THE COURT:  Well, overruled.                       10:36:40
21              But I want to note here, again, I only have a 220, and
22    the description is Google Analytics report.
23              MR. RAPP:  May I approach?
24              THE COURT:  Yes.
25              (The Court and the courtroom deputy confer.)       10:37:16
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Oh, okay.  Okay.  It's -- that's my error.
 2    Maybe I need a break.
 3              MR. RAPP:  All right.  Move to admit 220a.
 4              THE COURT:  Let me just look real quickly.
 5              Ah, yes.  Yes, it may be admitted.                      10:37:30
 6              And this is attached to 220, right, which was
 7    admitted?
 8              MR. RAPP:  It's a -- it's a separate exhibit,
 9    sub-exhibit of 220.
10              THE COURT:  Yes, it may be admitted and published.    10:37:49
11              (Exhibit 220a admitted into evidence.)
12    BY MR. RAPP:
13    Q.  All right.  Is -- is this a Backpage posting?
14    A.  Yes, it is.
15    Q.  What city is this posting in?                               10:37:58
16    A.  This is posted in Dallas, Texas.
17    Q.  And what was the date?
18    A.  The date is Tuesday, May 19th, 2015.
19    Q.  And just looking at the text, let me just ask you about
20    some of the terms here.                                         10:38:51
21              Do you see that term there?
22    A.  "Independent."
23    Q.  What did you come to learn that meant?
24    A.  That's a selling feature used by posters in this category
25    that is, you know, considered a good thing.  There's no pimp.  10:39:05
```

1    There's no agency.

2    Q.  And then in terms of deleted images, can you explain that?

3    A.  So this image was deleted by a Moderator BP26, and it's

4    deleted now.  But if an administrator wanted to restore it,

5    they could.                                                    10:39:33

6            And then --

7            MS. BERTRAND:  Objection.  Goes beyond the scope of

8    the question.  Move to strike.

9            THE COURT:  Overruled.

10   BY MR. RAPP:                                                   10:39:44

11   Q.  And this information, what does this show?

12   A.  So this is an invoice, and it shows the price of the ad is

13   $12.

14   Q.  All right.  Moving on to Exhibit 222.

15           Yes.  Showing you 2- -- 222.                           10:40:57

16           Do you see that on your screen?

17   A.  Yes, I do.

18   Q.  And what is it?

19   A.  It's a Backpage posting posted July 1st, 2015.

20   Q.  All right.                                                 10:41:13

21   A.  It's been printed out as a PDF in administrator view.  It

22   has personally identifiable information, like an email address.

23   Q.  All right.

24           MR. RAPP:  Move to admit 222 and publish.

25           MS. BERTRAND:  Objection.  Hearsay.  Relevance.        10:41:32

```
 1   Foundation.
 2               THE COURT:  Overruled.
 3               It may be admitted and published.
 4               (Exhibit 222 admitted into evidence.)
 5   BY MR. RAPP:                                          10:41:40
 6   Q.  And just so the jury knows the date.
 7               And what was the market?
 8   A.  The market is Phoenix, Arizona.
 9               In terms of the text, do you identify the same term,
10   "independent," that we saw on the last one.           10:42:30
11               MS. BERTRAND:  Objection.  The document speaks for
12   itself.
13               THE COURT:  Sustained.
14               But let's move forward, Mr. Rapp.
15               MR. RAPP:  I will.                         10:42:43
16   BY MR. RAPP:
17   Q.  And does it also have -- this term "incalls," what did you
18   take that to mean?
19   A.  Incalls --
20               MS. BERTRAND:  Objection, Your Honor.  The document   10:42:51
21   speaks for itself.  Mr. Ferrer cannot speculate as to what
22   someone intended in their speech.
23               THE COURT:  Well, he's -- he's previously testified to
24   it, and so he can answer the question.
25               ///
```

UNITED STATES DISTRICT COURT

```
 1   BY MR. RAPP:
 2   Q.  Incalls?
 3   A.  Incalls means you go to the prostitute.
 4           MS. BERTRAND:  Objection to the termination --
 5   terminology "prostitute."  Mr. Ferrer does not appear to have    10:43:16
 6   any personal knowledge as to what this woman does with
 7   customers.
 8           THE COURT:  Overruled.  The answer will stand.
 9   BY MR. RAPP:
10   Q.  And just looking at the rest of 222.                         10:43:34
11           And now going on to 222a.
12           Do you see that on your screen?
13   A.  Yes, I do.
14   Q.  Is this a different date for this person?
15   A.  Yes, it is.                                                  10:43:57
16   Q.  Does it appear to be the same person?
17   A.  Yes, it does.
18   Q.  What is the market?
19   A.  The market is Phoenix.
20           MR. RAPP:  Move to admit 220 -- 222a.                    10:44:06
21           THE COURT:  Yes, it may be admitted and published.
22           (Exhibit 222a admitted into evidence.)
23           MS. BERTRAND:  Defense notes its objections for the
24   record.
25           THE COURT:  Sustained -- I'm sorry -- overruled.        10:44:18
```

```
 1              Yes, the --
 2              MS. BERTRAND:  Understood.
 3              THE COURT:  Well, maybe we should have our break.
 4              I think I'll overrule the objection.
 5              And we'll let Mr. Rapp finish the examination with    10:44:27
 6   regard to 222a, and then we'll take our break.
 7              Mr. Rapp.
 8              MR. RAPP:  Oh, I'm sorry.  Yes.
 9   BY MR. RAPP:
10   Q.  222a.  It's admitted.  I'm just looking quickly at the    10:44:43
11   text.
12              Does it also contain the term "incalls"?
13   A.  Yes, it does.
14   Q.  And does this also show that the posting was paid for?
15   A.  Yes, for $12.                                             10:45:22
16              MR. RAPP:  That's it.  Thank you.
17              THE COURT:  All right.  Members of the jury, we will
18   stand in recess for 20 minutes, and then we'll forge ahead for
19   the remainder of the day.  And so just remember the
20   admonishment and just have a pleasant break, and be ready to   10:45:52
21   come in in precisely 20 minutes.
22              Please all rise for the jury.
23              (Recess from 10:46 a.m. to 11:05 a.m.)
24              (Jury not present at 11:05 a.m.)
25              THE COURT:  All right.  Be seated.                  11:06:04
```

```
 1              Mr. Cambria.

 2              MR. CAMBRIA:  Yes.  Thank you, Your Honor.

 3              What I wanted to do is, with all due respect, revisit

 4     this issue about Exhibit Number 1 and the rule of completeness.

 5              The reason that I'm asking is under Rule 106,          11:06:25

 6     basically the rule says that if an adverse party believes that

 7     the introduction at -- at the same time of another part of a

 8     writing ought in fairness to be considered contemporaneously,

 9     then that should occur.

10              And here's what I'm stating:  They put in one page,   11:06:47

11     and basically this page says that my client wanted to deposit

12     some money in places where litigious parties could not reach

13     it, including the government, which clearly gives the jury the

14     impression that he's trying to hide this information from the

15     government.                                                    11:07:17

16              What I think should be put in, in fairness, is page 3.

17     His email says, and it's to his attorney, "Do you or Jacob

18     Stein," who's another attorney, "do the reporting to government

19     on money that was moved?"

20              And so I think that for the jurors, especially since  11:07:37

21     they're not going to hear from me until next week -- I'm not

22     next in the line, if you will.  And so for them to think, for

23     example, here that he's trying to hide this money in a -- in a

24     series of documents, which they only put one page in and it

25     gives that impression, when in that same series of documents   11:07:58
```

1    it's quite clear that he says, who's doing the reporting to the

2    government on this money, in fairness, Your Honor, I think that

3    the jury needs to know that.

4         And, like I say, it would be several days before

5    they'd find that out if we had to wait until the time of my          11:08:15

6    cross-examination.  And the rule speaks in terms of at the time

7    that the original document is introduced.

8         And I don't think there's any question.  It's --

9    it's -- there's no reason it can't be introduced as far as

10   evidentiary reasons.  It's the same foundation that he laid for     11:08:37

11   the ones that he did put in.  So it's just a matter of timing.

12   And I think Rule 106 speaks to timing in the interest of

13   fairness.  They shouldn't be given an impression that's not so.

14         THE COURT:  Okay.  Mr. Rapp.  Quickly.

15         MR. RAPP:  We don't have any objection to that.           11:08:54

16         THE COURT:  All right.  And so then it may come in.

17         And I was going to say that my understanding in terms

18   of the prior Court's order regarding Exhibit 1 was the -- you

19   gave the entirety of that exhibit over to the Court when there

20   was an admission -- admissibility determination made.  And so     11:09:12

21   it'll come in.

22         All right.  Let's --

23         MR. CAMBRIA:  So --

24         THE COURT:  -- have the jury in.

25         MR. CAMBRIA:  So the other page that I asked for will      11:09:21

1    come in?

2         THE COURT:  Yes.  He had no objection.

3         MR. CAMBRIA:  Will he do it?  I mean, it should be

4    done --

5         THE COURT:  It is page 3?

6         MR. CAMBRIA:  -- contemporaneously.

7         THE COURT:  I'm sorry.  It is page 3; right?

8         MR. CAMBRIA:  Yes.

9         THE COURT:  Yes.

10        MR. CAMBRIA:  Thank you.                          11:09:40

11        THE COURT:  All rise for the jury.

12             (Jury present at 11:10 a.m.)

13        THE COURT:  All right.  Please be seated.

14             The record will reflect the return of our jury.  The

15   witness is on the stand.                               11:10:32

16             Mr. Rapp, you may continue.

17   BY MR. RAPP:

18   Q.  So, Mr. Ferrer, I'm also moving to admit page 3 of

19   Exhibit 1.

20        THE COURT:  Yes, it may be admitted and published.   11:10:52

21        MR. RAPP:  And published.

22        MR. CAMBRIA:  Thank you.

23             (Exhibit 1, page 3 admitted into evidence.)

24   BY MR. RAPP:

25   Q.  All right.  Now, sir, in advance of your testimony today,  11:11:02

```
 1    have you -- have you reviewed a number of ads that -- from

 2    Backpage that include a reference to GFE?

 3              MR. CAMBRIA:  Excuse me, Your Honor.  Could that

 4    please be read.  I know it was flashed on the screen, but it

 5    could be read to the jury --                               11:11:33

 6              MR. RAPP:  I think the jury got to read it.

 7              MR. CAMBRIA:  -- consistent with the way it was -- the

 8    others were introduced.

 9              THE COURT:  Yes.  You may put Exhibit 1, page 3, on

10    the screen.  We can let the jury read it for a moment.      11:11:43

11              Or if you want to inquire, Mr. Ferrer.

12              MR. RAPP:  I'll just have the -- the jury read it.

13              MR. CAMBRIA:  Thank you.

14              THE COURT:  And, hereto, once it's on the screen, just

15    take your time reading that portion of Exhibit 1.  And then 11:12:03

16    just look up, and I'll know that you've completed your review.

17              Okay.  You can continue.

18              MR. RAPP:  Thank you, Your Honor.

19    BY MR. RAPP:

20    Q.  Now, Mr. Ferrer, in advance of your testimony today, have 11:13:26

21    you reviewed a number of exhibits from Back- -- a number of

22    exhibits that are postings from Backpage that include the

23    reference to GFE?

24    A.  Yes.

25    Q.  And -- and did all those exhibits, are they postings that 11:13:46
```

1   are from the website Backpage.com?

2   A.  Yes, they are.

3   Q.  And -- and how do you know they are?

4   A.  Because they're -- you can tell by the pages, how they're

5   designed, the look and feel, the headers, the breadcrumb          `11:14:07`

6   trails, the different fields like the reply ad field, and the

7   footers of the ad that they're Backpage ads.

8   Q.  And do -- do some of them have the administrative data that

9   we've seen on previous ads?

10  A.  Yes.  The ones with administrative data can only be printed   `11:14:28`

11  out by an administrator at Backpage.

12  Q.  All right.

13          MR. RAPP:  Move to admit United States 1718 through

14  1733, 1735, and Exhibits 20- -- 223 through 230.

15          MS. BERTRAND:  Objection.  Lack of foundation.           `11:14:56`

16  Hearsay.  403.

17          MR. FEDER:  And 401.

18          MR. CAMBRIA:  Could you repeat those, please.

19          THE COURT:  Yes.  I'd like you to repeat those again.

20          MR. RAPP:  Certainly.  Exhibit 1718 through 1733,         `11:15:09`

21  1735, 223 through 230.

22          MS. BERTRAND:  Same objections.

23          THE COURT:  I guess, Mr. Rapp, can you ask him if

24  those are the exhibits that he reviewed reference to your prior

25  question?                                                         `11:15:56`

```
 1   BY MR. RAPP:
 2   Q.  Do you know if those are the exhibits that you reviewed?
 3   A.  Yes, they are.
 4           MS. BERTRAND:  Your Honor, I don't know how we can
 5   know if they're the exhibits that he reviewed because there's    11:16:04
 6   nothing in front of the defense to determine what they're
 7   talking about.
 8           THE COURT:  That's a fair point.
 9           Mr. Rapp, it's not before Mr. Ferrer either.
10           MR. RAPP:  Judge, I can -- I can go through them --    11:16:14
11           THE COURT:  Okay.
12           MR. RAPP:  -- individually.
13           THE COURT:  That's fine.
14           MR. RAPP:  All right.
15   BY MR. RAPP:                                                    11:16:20
16   Q.  I'm showing you 1718.
17           Do you see that on your screen, sir?
18   A.  Yes, I do.
19   Q.  Is that a posting from Backpage.com?
20   A.  Yes, it is.                                                 11:16:30
21           MR. RAPP:  Move to admit 1718.
22           MS. BERTRAND:  Objection.  Hearsay.  Foundation.
23           THE COURT:  Overruled.
24           MR. FEDER:  I'm sorry.  Also relevance.
25           THE COURT:  Overruled.
```

```
 1              MR. FEDER:  403.

 2              THE COURT:  Overruled.

 3              1718 may be admitted and published.

 4              (Exhibit 1718 admitted into evidence.)

 5  BY MR. RAPP:                                          11:16:56

 6  Q.  Do you see a reference here that I've highlighted?

 7  A.  Yes, I do.

 8  Q.  What does it mean?

 9  A.  PSE.  Finally, PSE, which is porn star experience; and GFE,

10  girlfriend experience.                                11:17:09

11  Q.  And what is the date?

12  A.  Thursday, April 21st, 2016.

13  Q.  Do you see the -- do you see the category?

14  A.  Yes.  It was posted in dating, women seeking men.

15  Q.  So this was not posted in the female escort section?  11:17:30

16  A.  That's correct.

17  Q.  I'm now showing you 1719.

18              Do you see that?

19  A.  Yes, I do.

20  Q.  Do you recognize it?                              11:18:00

21  A.  Yes, I do.

22  Q.  What is it?

23  A.  It's a Backpage ad posted November 3rd, 2016, in Seattle.

24              MR. RAPP:  Move to admit 1719.

25              MS. BERTRAND:  Objection.  Foundation.  Hearsay.  11:18:17
```

UNITED STATES DISTRICT COURT

```
 1    Relevance.
 2              THE COURT:  Overruled.
 3              MR. RAPP:  And request permission to publish.
 4              THE COURT:  Yes, it may be published.
 5              MR. RAPP:  Thank you so much.                    11:18:33
 6              (Exhibit 1719 admitted into evidence.)
 7    BY MR. RAPP:
 8    Q.  Do you see the reference there where I've highlighted it?
 9    A.  Yes.
10    Q.  What is it?                                            11:18:43
11    A.  It's "Best GFEE" --
12    Q.  All right.
13    A.  -- "experience."
14    Q.  Did you often see this acronym, GFE, misspelled?
15    A.  Yes.                                                   11:19:00
16    Q.  All right.  Going to this, have you seen this reference?
17    A.  Yes, I have.
18              MS. BERTRAND:  Judge, objection.  Asked and answered
19    as to these terms multiple times.
20              THE COURT:  Well, overruled.                     11:19:16
21    BY MR. RAPP:
22    Q.  What does -- what does that term mean?
23              MS. BERTRAND:  Objection.  Calls for speculation.  He
24    doesn't know what the intent of the speaker was.
25              THE COURT:  And the record -- the oral record doesn't  11:19:26
```

```
 1    reflect what the "this" that you're referring to --
 2              MR. RAPP:  Oh.
 3              THE COURT:  -- is.
 4    BY MR. RAPP:
 5    Q.  This incalls/outcalls, what does it mean?            11:19:35
 6              MS. BERTRAND:  Same objection.
 7              THE COURT:  Overruled.
 8              MS. BERTRAND:  Calls for speculation.
 9              THE COURT:  Overruled.
10              THE WITNESS:  Incalls, you go to them.  Outcalls, they 11:19:42
11    come to you.
12    BY MR. RAPP:
13    Q.  And do you see here, "Available 24/7"?
14              What did you take that to mean?
15    A.  That means they will come seven days a week, 24 hours a  11:19:54
16    day.
17    Q.  I'm now showing you Exhibit 1720.
18              Do you see that on your screen?
19    A.  Yes, I do.
20    Q.  What is it?                                           11:20:14
21    A.  This is an ad posted in women seeking men on November 11th,
22    2016, in the Backpage Boston site.
23    Q.  All right.  Do you see this term?
24    A.  Yes.
25    Q.  Is -- is that term representative of the girlfriend   11:20:37
```

1   experience?

2           MS. BERTRAND:  Objection.  Calls for speculation.

3           THE COURT:  Overruled.

4           THE WITNESS:  Yes.  GFE is girlfriend experience.

5   BY MR. RAPP:                                            11:20:53

6   Q.  And do you see this term?

7   A.  Yes.

8           MR. RAPP:  I move to admit and request permission to

9   publish.

10          MS. BERTRAND:  Same objections.                 11:21:03

11          THE COURT:  Overruled.

12          It may be admitted and published.

13          (Exhibit 1720 admitted into evidence.)

14  BY MR. RAPP:

15  Q.  So let's just -- you were saying what market this was  11:21:11

16  posted in?

17  A.  It's posted in Boston.

18  Q.  And the date again?

19  A.  November 11th, 2016.

20  Q.  And when you were talking about GFE, is -- where it's   11:21:22

21  highlighted, is that what you were referring to?

22  A.  Yes, I was.

23  Q.  And then the section "I'm real and reviewed," that I have

24  circled, what did you make that to mean?

25  A.  You can find her reviews on prostitution websites.      11:21:39

```
 1              MS. BERTRAND:  Judge, objection.  Calls for
 2   speculation.  He has -- there's no foundation here that he's
 3   ever met this person to know where she was reviewed, by whom,
 4   or what.
 5              THE COURT:  Overruled.  Given the prior testimony      11:21:54
 6   about Mr. Ferrer's 15-plus years of experience, he is qualified
 7   to answer.
 8   BY MR. RAPP:
 9   Q.  I'm now showing you 1721.
10              Do you see that on your screen, sir?                   11:22:12
11   A.  Yes, I do.
12   Q.  Is this a -- is this a Backpage posting?
13   A.  Yes.  It's a Backpage posting in Boston in the escorts
14   category on Monday, November 14th, 2016.
15              MR. RAPP:  Move to admit and publish 1721.             11:22:39
16              MS. BERTRAND:  Objection.  Foundation.  Hearsay.
17   Relevance.
18              THE COURT:  Overruled.
19              It may be admitted and pub- -- published.
20              (Exhibit 1721 admitted into evidence.)                11:22:55
21   BY MR. RAPP:
22   Q.  What was the date of the posting?
23   A.  Posted Monday, November 14th, 2016.
24   Q.  Does it have a reference to incall?
25   A.  Yes, it does.                                                11:23:23
```

UNITED STATES DISTRICT COURT

```
 1    Q.  All right.  I'm now showing you Exhibit 1735.

 2              MR. RAPP:  Oh, wait.  This is -- was that published?

 3    1721 was published?

 4              THE COURTROOM DEPUTY:  Correct.

 5              MR. RAPP:  Yes.  Thank you.                        11:23:46

 6    BY MR. RAPP:

 7    Q.  1735.  Do you see that on the screen, sir?

 8    A.  Yes, I do.

 9    Q.  Do you recognize it?

10    A.  Yes.  It's a Backpage ad posted in Phoenix escorts on    11:23:55

11    Monday, November 14th, 2016.

12              MR. RAPP:  Move to admit 1735.

13              MS. BERTRAND:  Objection.  Hearsay.  Foundation.

14    Relevance.

15              THE COURT:  Overruled.                             11:24:09

16              It may be admitted and published.

17              (Exhibit 1735 admitted into evidence.)

18    BY MR. RAPP:

19    Q.  Do you see a reference, sir, in this where I've highlighted

20    where it says, "You can find a few current reviews at T3,"     11:24:34

21    backwards R, and a six-digit number?

22              MS. BERTRAND:  Objection.  Leading.

23              THE COURT:  Overruled.

24              THE WITNESS:  Yes, I see it.

25              ///
```

UNITED STATES DISTRICT COURT

```
1    BY MR. RAPP:

2    Q.   And what did -- what do you take that to mean based on your

3    experience?

4    A.   That means you can read that review if you go to TER and

5    search for the reviews 200088.                                    11:24:56

6    Q.   Does it have the reference to outcalls?

7    A.   Yes, it does.

8    Q.   And to cities, are you familiar with the cities?

9          MS. BERTRAND:  Judge, objection.  They're Phoenix area

10   cities.  We can all see that.                                    11:25:22

11         THE COURT:  Overruled.

12         THE WITNESS:  Yes.  Those are cities surrounding the

13   Phoenix area.

14   BY MR. RAPP:

15   Q.   And does it also have the reference to GFE?                 11:25:36

16   A.   Yes, it does.

17   Q.   I'm now showing you Exhibit 1723.

18         Let me back up.  Do you see that on your screen, sir?

19   A.   Yes, I do.

20   Q.   Do you recognize it?                                        11:26:02

21   A.   Yes.  It's a Backpage posting in the Boston escorts

22   category on November 24th, 2016.

23         MR. RAPP:  Move to admit 1723.

24         MS. BERTRAND:  Objection.  Foundation.  Hearsay.

25   Relevance.                                                       11:26:21
```

```
 1              THE COURT:  Overruled.

 2              1723 is admitted and may be published.

 3              (Exhibit 1723 admitted into evidence.)

 4   BY MR. RAPP:

 5   Q.  All right.  And you've -- what was the date of this        11:26:31

 6   posting?

 7   A.  Thursday, November 24th, 2016.

 8   Q.  And in what category?

 9   A.  In the Boston escorts category.

10   Q.  And this reference, "best incall in town," is that -- do    11:26:50

11   you take the same view of that that you've testified in

12   previous -- in previous postings regarding that reference

13   incall?

14              MS. BERTRAND:  Same objection as to speculation as to

15   what this person intended it to mean.                          11:27:10

16              THE COURT:  Overruled.

17              THE WITNESS:  Yes.  You are going to see -- you go to

18   their location.

19   BY MR. RAPP:

20   Q.  Okay.  I'm now -- I'm now showing you 1724.                11:27:19

21              Do you see that on your screen, sir?

22   A.  Yes, I do.

23   Q.  Do you recognize it as a Backpage posting?

24   A.  Yes.  It's a Backpage posting in Los Angeles in the

25   category women seeking men posted Saturday, November 26th,     11:27:46
```

```
 1    2016.
 2            MR. RAPP:  Move to admit 1724.
 3            MS. BERTRAND:  Objection.  Lack of foundation.  Not
 4    relevant.  Seeks hearsay.
 5            THE COURT:  Overruled.                              11:27:58
 6            MR. RAPP:  May I request permission to publish?
 7            THE COURT:  Yes, it may be published.
 8            MR. RAPP:  Thank you, Your Honor.
 9            (Exhibit 1724 admitted into evidence.)
10    BY MR. RAPP:                                                11:28:13
11    Q.  So here you identified the market as Los Angeles?
12    A.  Yes.
13    Q.  Does it also have the reference to GFE?
14    A.  Yes, it does.
15    Q.  And just in the interest of time, the -- every time one of 11:28:23
16    these postings references GFE, what does it mean?
17            MS. BERTRAND:  Objection.  Calls for speculation as to
18    what every GFE means in every single one of these postings.
19    There is no way Mr. Ferrer can know that.
20            THE COURT:  You'll have to take the time to lay that  11:28:40
21    foundation, Mr. Rapp.
22            MR. RAPP:  All right.
23            THE COURT:  I'll sustain the objection.
24    BY MR. RAPP:
25    Q.  What do you take GFE to mean?                           11:28:48
```

```
 1            MS. BERTRAND:  Same objection as to speculation.
 2            THE COURT:  Overruled.
 3            THE WITNESS:  Girlfriend experience, which means she
 4     will like you when having sex.
 5     BY MR. RAPP:                                                    11:29:04
 6     Q.  And I just draw your attention to this portion of her
 7     posting that I have circled there.
 8            Do you see that term?
 9     A.  Yes.
10     Q.  What does that -- what is the term?                        11:29:15
11     A.  Erosguide.
12     Q.  And do you know anything about Erosguide?
13     A.  Yes.  Erosguide is a -- another prostitution site.
14            MR. FEDER:  Objection.  Hearsay and beyond the scope.
15            MS. BERTRAND:  And speculation.  Lack of foundation.    11:29:33
16            THE COURT:  Well --
17            MR. CAMBRIA:  Foundation.
18            THE COURT:  -- I think he can -- and he has answered
19     that he knows something about it, so the answer "yes" will
20     stand.  Everything following that will be removed from the    11:29:44
21     record and the jury will disregard.
22            Mr. Rapp, you can move forward.
23     BY MR. RAPP:
24     Q.  Has -- is Erosguide a referral site?
25            MS. BERTRAND:  Objection.  Leading.                     11:29:59
```

```
 1              THE COURT:  Sustained.
 2    BY MR. RAPP:
 3    Q.  What do you know about Erosguide?
 4    A.  Erosguide --
 5    Q.  Tell us everything you know.                    11:30:05
 6    A.  Erosguide has prostitution reviews and ads.
 7    Q.  How do you know that?
 8    A.  Because I'm familiar with the competitors of Backpage,
 9    along with the P-411.
10    Q.  Tell us about that.                             11:30:21
11    A.  P-411 is another prostitution website that also has
12    reviewed -- reviews that operates out of Canada but has a large
13    U.S. presence.
14    Q.  And is there a reference here to the images that are
15    posted?                                            11:30:44
16    A.  "Yes its me in these photos."
17    Q.  All right.  Have you seen that in other postings?
18    A.  Yes.
19    Q.  And based on your experience with Backpage, did you come to
20    learn that that had some significance?              11:30:58
21    A.  It's a selling feature that posters in these categories
22    would often use.
23    Q.  And then down here, do you see the term "outcall only"?
24    A.  Yes.
25    Q.  And in the context of this ad, what do you understand that  11:31:20
```

```
 1    to mean?

 2              MS. BERTRAND:  Objection, Your Honor.  Speculation as

 3    to what the speaker intended it to mean.  And it's getting

 4    duplicative.  We've talked about incall and outcall quite a

 5    bit.                                                              11:31:34

 6              MR. RAPP:  Well --

 7              THE COURT:  Well, I think you've raised previous

 8    objections.  So I'm going to overrule the objection because

 9    also raised counter-objections when he has done so.

10              So as to the ad, then Mr. Rapp can continue.           11:31:49

11              MR. RAPP:  All right.

12    BY MR. RAPP:

13    Q.  And just one -- oops.  One last reference here.

14              Do you see that, the notice right here?

15    A.  Yes.  "At least 24 to 48 hours notice," [as read].          11:32:05

16    Q.  All right.  I am now showing you Exhibit 1725.

17              Let me just go back quickly to 1724.  I just want to

18    make sure -- I don't know if the images were -- all right.  Oh,

19    I'm sorry.

20              MR. RAPP:  Could you publish -- could we go back and   11:32:41

21    publish 1724, which has been admitted.

22    BY MR. RAPP:

23    Q.  I just want to make -- were these the images on the -- on

24    the posting?

25              MS. BERTRAND:  Objection.  The document speaks for     11:32:55
```

```
 1   itself.
 2           THE COURT:  He can answer yes or no.
 3           THE WITNESS:  Yes.
 4   BY MR. RAPP:
 5   Q.  All right.  Thank you.                              11:33:00
 6           Now going to 1725.  Do you recognize 1725?
 7   A.  Yes, I do.  It's a Backpage posting in the escorts category
 8   in Boston posted on Tuesday, November -- December 20th, 2015.
 9           MR. RAPP:  Move to admit 1725.
10           MS. BERTRAND:  Same objections as to hearsay,      11:33:30
11   foundation, and relevance.
12           THE COURT:  Just a point of clarification.  Did you
13   say 2015 or 2016?
14           THE WITNESS:  I misread it, Your Honor.  I think it's
15   a '16.                                                    11:33:51
16           THE COURT:  All right.  Overruled.  It is admitted.
17           (Exhibit 1725 admitted into evidence.)
18           THE COURT:  And may be published.
19   BY MR. RAPP:
20   Q.  There's the date.  And what category is this in?      11:34:07
21   A.  It's in the category of escorts.
22   Q.  And then let's look at the title quickly.
23           Can you read the title?
24           MS. BERTRAND:  Judge, the jury can read.  It's not
25   that long.                                                11:34:27
```

```
 1              THE COURT:  Well, let the jury --
 2              MS. BERTRAND:  Objection.
 3              THE COURT:  Let the -- let the jury read the title,
 4    Mr. Rapp.
 5              MR. RAPP:  Certainly.                              11:34:32
 6    BY MR. RAPP:
 7    Q.  All right.  And then let's go to the text.  Just drawing
 8    your attention down here where I've highlighted, can you -- can
 9    you interpret that for us.
10              MS. BERTRAND:  Objection, Your Honor.  Foundation and 11:34:54
11    speaks for itself.
12              THE COURT:  Well, overruled.  And overrule the -- both
13    objections.
14              THE WITNESS:  It's, "(G)(F)(E).  30 minutes for $180.
15    One hour for $200.  90 minutes for $300.  Two hours for $400,"  11:35:20
16    [as read].
17    BY MR. RAPP:
18    Q.  And then the images.
19              All right.  Going on to 1727.
20              Do you see that on your screen?                    11:35:53
21    A.  Yes, I do.
22    Q.  Is this a posting from Backpage?
23    A.  Yes, it is.
24    Q.  And in what category?
25    A.  It's posted women seeking men in Boston.                 11:36:03
```

```
 1    Q.  All right.  And is that -- just to be clear, is that a

 2    dating category?

 3    A.  Yes.  Women seeking men is a subcategory of the dating

 4    section.

 5            MR. RAPP:  Okay.  Move to admit 1727 and publish.          11:36:22

 6            MS. BERTRAND:  Your Honor, before we -- well, same

 7    objections; foundation, hearsay, relevance.

 8            But can we just confirm that the government intends on

 9    only publishing what's in this ad?

10            I want to make sure that nothing is mistakenly            11:36:38

11    admitted.  Can we just see the entirety of what the government

12    plans to enter in here?

13            THE COURT:  Did they disclose the exhibit to you

14    previously?

15            MS. BERTRAND:  They did, and that's why I have a          11:36:52

16    concern about what they're proffering.

17            MR. CAMBRIA:  Yes, particularly page 2.

18            THE COURT:  Are they -- did you disclose page 2?

19            MR. RAPP:  Yes, we disclosed these postings.

20            THE COURT:  Is it part of the exhibit?                    11:37:05

21            MR. RAPP:  Yes.

22            MR. CAMBRIA:  No.

23            MR. RAPP:  Page 2 isn't.

24            MS. BERTRAND:  No.

25            THE COURT:  I'm asking Mr. Rapp.                          11:37:10
```

1          MR. RAPP:  Page 2 is not what I'm admitting.  I'm just

2     admitting the posting.

3          THE COURT:  Okay.  That's what I --

4          MR. RAPP:  I can admit page 2 if they want page 2.

5          MS. BERTRAND:  I'm not asking to publish page 2.  I'm          11:37:20

6     asking to confirm that it's not being published.  That's all I

7     needed to know.

8          THE COURT:  All right.

9          MR. RAPP:  I'm admitting this.

10          THE COURT:  All right.  Without page 2?          11:37:28

11          MR. RAPP:  Without page 2.

12          THE COURT:  All right.  Let's move forward.  It may be

13     admitted.

14          (Exhibit 1727 admitted into evidence.)

15     BY MR. RAPP:          11:37:38

16     Q.  All right.

17          THE COURT:  Let me just say to the jurors, I know that

18     from time to time there might be omitted pages, and there's

19     usually a reason.  You should never guess what is omitted from

20     an exhibit.  Never come to any sort of conclusion on your own          11:37:53

21     as to what or why something has been removed.  There's usually

22     a issue related to a legal determination that the Court has

23     made, and so just never guess about what has been removed or

24     admitted.

25          Let's move forward, Mr. Rapp.          11:38:12

```
 1            MR. RAPP:  Very well.
 2    BY MR. RAPP:
 3    Q.  And this was in what category?
 4    A.  Women seeking men.
 5    Q.  And what does it say in the title here?          11:38:21
 6    A.  "Kissing & GFE."
 7    Q.  And on what date was it -- was this posted?
 8    A.  Tuesday, April 4th, 2017.
 9    Q.  And here does it have a reference to -- what is this --
10    what is this a reference to?                         11:38:52
11            MS. BERTRAND:  Objection.  Lack of foundation.
12    Speculation as to what it was intended by the speaker.
13            THE COURT:  He can testify as to what it meant to him
14    based on his experience.
15            THE WITNESS:  So "2 girls new in town" means that they  11:39:06
16    are new in town, which is a selling feature that's often used
17    by posters in these categories.
18    BY MR. RAPP:
19    Q.  All right.  And -- and we actually saw an exhibit from
20    Simrin Hooper.                                       11:39:24
21            Do you remember that 104/104a?  It had a reference to
22    new in town as being involved in prostitution?
23            MS. BERTRAND:  Judge --
24            THE WITNESS:  Yes.
25            MS. BERTRAND:  -- objection.  Leading.           11:39:34
```

```
 1              THE COURT:  Sustained.
 2  BY MR. RAPP:
 3  Q.  All right.  And so with regard to -- does it give some
 4  references down here to services?
 5              MS. BERTRAND:  Your Honor, the document speaks for     11:40:04
 6  itself.  Objection.
 7              THE COURT:  Sustained.
 8  BY MR. RAPP:
 9  Q.  All right.  And then looking at the images -- oop.
10              All right.  Moving on to 1728.                         11:40:26
11              Do you see that posting?
12  A.  Yes, I do.
13  Q.  Okay.  And in what category is it?
14  A.  It's posted in women seeking men in the Cleveland site.
15  Q.  All right.  And on what date?                                  11:40:49
16  A.  Posted Tuesday, April 11th, 2017.
17  Q.  And does it reference --
18              MR. RAPP:  Oh, move to admit.
19              MS. BERTRAND:  Your Honor, objection.  If the -- if
20  the blowup of this image is taken out, I have concerns about      11:41:05
21  this document.
22              MR. RAPP:  Well, let me -- let me see if I can take
23  care of this.
24  BY MR. RAPP:
25  Q.  When -- when was this post -- when was this posting done?     11:41:14
```

1  A.  So this posting was on April 11th, 2017.

2  Q.  Okay.  And what's -- and do you see the -- there is a

3  banner on this posting?

4  A.  Yes.

5           MS. BERTRAND:  Judge, objection as to prior orders and    11:41:31

6  discussion of this.

7           MR. RAPP:  I have no idea what you're talking about.

8           Could I have the prior order on this?

9           MS. BERTRAND:  I thought we had discussed this

10  previously.                                                      11:41:50

11           THE COURT:  Well, I think --

12           MR. RAPP:  Let me see if I can lay some foundation.

13  BY MR. RAPP:

14  Q.  Can you identify this -- this portion at the bottom here?

15  A.  Yes, I can.                                                  11:42:06

16  Q.  How can you identify this?

17  A.  Because this notice appeared on this site when I helped

18  shut the site down.

19  Q.  Okay.  So are you familiar with that being on the site

20  after a certain day?                                             11:42:26

21           Do you know a day?

22  A.  After --

23           MR. FEDER:  401/403 hearsay.

24           MR. CAMBRIA:  Yes.  This is not part of the original

25  document, Your Honor.  This is something the government --       11:42:42

```
 1              THE COURT:  I can't hear you, Mr. Cambria.

 2              MR. CAMBRIA:  I said this is not part of the original

 3    document.  This is something the government placed on this

 4    document.  It's like the page 2 that was omitted a few exhibits

 5    ago.                                                            11:42:53

 6              MR. RAPP:  Yeah, I'm going to object to that.  Just,

 7    you know --

 8              THE COURT:  Right.  I think the characterization is

 9    unnecessary, and so the jury will disregard.

10              And I'll overrule Mr. Feder's objections as well as    11:43:08

11    Ms. Bertrand.

12              You may move forward, Mr. Rapp.

13              MR. RAPP:  Thank you, Your Honor.

14    BY MR. RAPP:

15    Q.  All right.  Is -- is this a posting from Backpage.com?       11:43:22

16    A.  Yes, it is.

17              MR. RAPP:  And move to publish 1728.

18              MR. EISENBERG:  Your Honor?

19              MS. BERTRAND:  Same objections.

20              MR. EISENBERG:  And I would add, Your Honor, that the   11:43:37

21    date in that block that was just identified by the witness

22    postdates the posting of this advertisement.  So it isn't

23    relevant with respect to the four corners of the advertisement;

24    and, therefore, it's misleading.

25              THE COURT:  Well, maybe -- well, I think, Mr. Rapp, if 11:44:00
```

```
 1    you can clarify what the discrepancies in the dates are.
 2           MR. RAPP:  Sure.
 3           THE COURT:  I think there has been sufficient prior
 4    testimony this morning related to what Mr. Ferrer did in terms
 5    of shutting down the site, and this is relevant to that.            11:44:12
 6           So lay some more foundation --
 7           MR. RAPP:  Okay.
 8           THE COURT:  -- with regard to the different dates.
 9           MR. RAPP:  All right.
10    BY MR. RAPP:                                                        11:44:23
11    Q.  Do you see the date here that it was posted?
12    A.  Yes.  I see the posting date of April 11th, 2017.
13    Q.  All right.  And then you also see this banner down here?
14    A.  Yes, I see this banner.
15    Q.  And then you see --                                            11:44:40
16    A.  Uh-huh.
17    Q.  Do you see the date that the banner was put on?
18    A.  Yes.  On April 6th, 2018.
19    Q.  Can -- okay.  Do you have any explanation as to the fact
20    that the posting was in 2017 and this banner that is on it in      11:44:55
21    2018?
22    A.  Yes.
23    Q.  Can you explain that to the jury, please, sir.
24           MR. FEDER:  401/403 hearsay.  Authentication.
25    Foundation.                                                        11:45:10
```

```
 1            THE COURT:  Overruled.

 2            THE WITNESS:  So when the ad's pulled from the

 3    database, it's also pulling -- so this ad was pulled -- the ad

 4    was posted in 2017.  The ad was pulled from the database, and

 5    it's automatically bringing in this disclaimer page for the        11:45:31

 6    home page of Backpage.

 7            If -- I hope that helps.  So it's kind of an automatic

 8    process that this bottom part that lists the date April 6th,

 9    2018, comes up.  Any data pulled from the database will pull

10    this banner up at this time frame.                                 11:45:53

11            MR. RAPP:  Okay.  Move to -- move to admit and publish

12    1728.

13            MR. EISENBERG:  I renew my objection, Your Honor.

14    It -- it really speaks for itself.  It's not the -- this did

15    not appear at the time this ad was posted, and I think that's      11:46:09

16    what the government had intended to offer all these other

17    advertisements for.  What did it look like when it was posted?

18            This is different.  It contains something that clearly

19    wasn't on that ad at the time it was posted.

20            MR. FEDER:  Same objections.  Best evidence also.          11:46:32

21            THE COURT:  Mr. Rapp.

22    BY MR. RAPP:

23    Q.  Was this banner on the ad when this person posted back in

24    2017?

25    A.  No.  That was a year before this site was seized.             11:46:39
```

1   Q.  All right.  And so if we un- -- if I understood your

2   explanation to the jury, when it was taken off the site, it was

3   taken off after it was seized?

4   A.  When it was taken off the site, it was taken -- yes.  So

5   when the data was extracted out of the database, it was after          11:46:59

6   the site was seized.  So when this data's pulled, if it's --

7   when the site was seized, all ads will show this disclaimer.

8   BY MR. RAPP:

9   Q.  All right.  Well, let's -- let's explain.

10          If after April 6th, what would happen if you tried          11:47:19

11  to -- if you were a John, for example, and you were trying to

12  go to Backpage.com, what would you get?

13  A.  You would --

14          MS. BERTRAND:  Relevance.

15          MR. FEDER:  403 hearsay.                                      11:47:35

16          THE COURT:  Sustained.

17          MR. RAPP:  Move to admit 1728.

18          MS. BERTRAND:  Same objections.

19          MR. FEDER:  Same exhibit -- I'm sorry -- objections.

20          MR. EISENBERG:  Your Honor, perhaps if the government         11:47:49

21  could supply this in its original state, then there would be

22  less of an objection.  We have our standing objections, in any

23  event.  But if it could be submitted without the additional

24  banner, that's what I'll call it.

25          MR. RAPP:  I would object to that.  It should be             11:48:08

UNITED STATES DISTRICT COURT

```
 1    admitted in the manner that it was taken off of the site.
 2              MR. EISENBERG:  That's absolutely -- I'm sorry,
 3    Mr. Rapp.
 4              Your Honor, that's absolutely misleading.  It's not
 5    how it was posted originally.                                    11:48:18
 6              THE COURT:  Well, I'm going to overrule the objection
 7    because this witness has previously testified to his knowledge
 8    regarding the banner and his knowledge regarding the way that
 9    the posting looked at the time and then at the time it was --
10    the site was shut down.                                          11:48:37
11              So overruled.
12              Exhibit 1728 may be admitted and may be published.
13              (Exhibit 1728 admitted into evidence.)
14              MR. RAPP:  Thank you.
15    BY MR. RAPP:                                                     11:48:46
16    Q.  All right.  Now, starting up here, does this ad reference
17    GFE?
18              MS. BERTRAND:  Objection.  The ad speaks for itself.
19              THE COURT:  Sustained.
20    BY MR. RAPP:                                                     11:49:06
21    Q.  Does every one of these ads reference GFE?
22              MS. BERTRAND:  Objection.  Lack of foundation.
23    Hearsay.  Speculation.
24              THE COURT:  Are you talking about --
25              MR. RAPP:  I'm talking about all --                    11:49:14
```

```
 1              THE COURT:  Well, let me ask the question first --
 2              MR. RAPP:  All right.
 3              THE COURT:  -- before you start answering.
 4          Are you talking about all of the prior exhibits that
 5   have been admitted and he's testified to, or are you talking      11:49:22
 6   about all future exhibits?
 7              MR. RAPP:  I'm talking about all the exhibits that he
 8   reviewed in advance of his testimony that I'm now admitting.
 9              THE COURT:  Okay.  That's -- okay.  That's very
10   different, because, as I understand the objection, it's going      11:49:33
11   forward.  So he can answer as to all the exhibits that have
12   been admitted and he's reviewed so far.
13              MR. RAPP:  Okay.  I'm just trying to move this along.
14              THE COURT:  I understand that, but you're going to --
15              MR. RAPP:  All right.                                   11:49:49
16              THE COURT:  -- receive multiple --
17              MR. RAPP:  Okay.
18              THE COURT:  -- objections if you do that.
19              MR. RAPP:  All right.
20   BY MR. RAPP:                                                      11:49:53
21   Q.  What does GFE experience mean?
22              MS. BERTRAND:  Judge, objection.  Repetitive.
23   Discussed.
24              THE COURT:  All right.  And overruled.
25              Let's move on.                                          11:50:02
```

UNITED STATES DISTRICT COURT

```
 1              MR. RAPP:  I would love to.
 2    BY MR. RAPP:
 3    Q.  All right.  So -- and this was -- what date was this posted
 4    on?
 5    A.  Tuesday, April 11th, 2017.                          11:50:14
 6    Q.  And what category?
 7    A.  Women seeking men.
 8    Q.  And just so the -- the jury understands what we're
 9    referring to, did you have anything to do with this banner that
10    was put on the website on April 6th, 2018?               11:50:30
11    A.  Yes, I did.
12    Q.  What was your role in that, sir?
13    A.  I helped work with the government and the developers in
14    order to change the DNS to force all traffic to pull up this
15    banner --                                                11:50:47
16    Q.  All right.
17    A.  -- all Backpage traffic.
18    Q.  Thank you.
19              Now, let's move on to 1729.
20              MR. CAMBRIA:  21?  I'm sorry.                  11:51:04
21              MS. BERTRAND:  29, Paul.
22              MR. CAMBRIA:  Thank you.
23    BY MR. RAPP:
24    Q.  All right.  Do you recognize this as a Backpage posting?
25    A.  Yes, I do.                                           11:51:13
```

```
 1    Q.  How do you recognize it?

 2    A.  It's post -- it's a -- it's posted in the women seeking men

 3    category in Mobile, Alabama.  It's posted on Monday, July 3rd,

 4    2017.  And it looks like a Backpage posting.

 5    Q.  All right.  And does it have -- you've often referred to        11:51:31

 6    breadcrumbs.  Does it have reference to Backpage here?

 7    A.  Yes.  It has the breadcrumb with the Backpage.com name.

 8          MR. RAPP:  Move to admit 1729.

 9          MS. BERTRAND:  Objection.  Foundation.  Hearsay.

10    Relevance.                                                          11:51:49

11          THE COURT:  Overruled.

12          1729 is admitted and may be published.

13          (Exhibit 1729 admitted into evidence.)

14    BY MR. RAPP:

15    Q.  Does it have a reference to new in town?                       11:51:55

16          MS. BERTRAND:  Judge, objection.  The jurors can read.

17          THE COURT:  Sustained.

18    BY MR. RAPP:

19    Q.  We haven't seen this one.

20          Have you seen -- do you see that down here?                  11:52:08

21    A.  Yes, I do.

22    Q.  "100% no pimps."

23          What do you understand that to mean?

24    A.  That means she is independent.  It's another way of saying

25    independent.                                                       11:52:23
```

```
1    Q.  Okay.  And was this posted on July 3rd of 2017?

2    A.  Yes..

3    Q.  And looking at -- sorry.  Just looking quickly at the

4    postings -- or the images, rather.  I'm sorry.

5            All right.  Moving on to 1730.                          11:52:54

6            Do you see this posting?

7    A.  Yes, I do.

8    Q.  Is it from Backpage?

9    A.  Yes, it is.

10   Q.  How do you know that?                                      11:53:12

11   A.  It's posted in Boston.  The date is Saturday, July 15th.

12   It's got features like the report ad button, which is standard

13   on Backpage, and it has the breadcrumb trail with the Backpage

14   name on the left.

15           MR. RAPP:  All right.  Move to admit 1730.             11:53:33

16           MS. BERTRAND:  Objection.  Lack of foundation.

17   Hearsay.  Relevance.

18           THE COURT:  Overruled.

19           It may be admitted and published.

20           (Exhibit 1730 admitted into evidence.)                11:53:46

21   BY MR. RAPP:

22   Q.  All right.  Let's -- just for the record, does it have a

23   term GFE?

24   A.  Yes.

25   Q.  Okay.  And does -- now, this is -- do you catch some of the 11:53:54
```

```
 1   banner ad that was placed on after April 6th?

 2           MS. BERTRAND:  Objection.  Document speaks for itself.

 3           THE COURT:  Sustained.

 4   BY MR. RAPP:

 5   Q.  All right.  Moving to -- to admit 1731.                    11:54:14

 6           Do you recognize this, sir?

 7   A.  Yes, I do.  It's a Backpage posting.  It's in Little Rock,

 8   Arkansas, in the women seeking men category, posted on

 9   Saturday, July 15th, 2017.

10           MR. RAPP:  All right.  Move to admit 1731.             11:54:46

11           MS. BERTRAND:  Objection.  Foundation.  Hearsay.

12   Relevance.

13           THE COURT:  Overruled.

14           It may be admitted and published.

15           (Exhibit 1731 admitted into evidence.)                11:54:57

16   BY MR. RAPP:

17   Q.  Does it contain this reference to new in town?

18   A.  Yes, it does.

19   Q.  All right.  And in terms of the images, those are the

20   images?                                                       11:55:22

21           MS. BERTRAND:  Objection.  The document speaks for

22   itself.

23           THE COURT:  He can answer whether those are the

24   images.

25           THE WITNESS:  Those are the images associated with the 11:55:34
```

 1   ad.

 2   BY MR. RAPP:

 3   Q.  Does it also contain a reference to GFE?

 4   A.  Yes.

 5   Q.  Okay.  Moving on to 1732.                          11:55:41

 6        Do you see this posting?

 7   A.  Yes, I do.

 8   Q.  And does 1732, do you recognize -- does it look familiar?

 9   A.  Yes.  It's a Backpage posting in the women seeking men

10   category in Cleveland posted on Friday, July 21st, 2017.   11:56:11

11   Q.  And -- and do you recognize the -- the image and the

12   headline as a -- as yet another posting on a different date

13   that we already looked at?

14   A.  Yes.

15        MR. RAPP:  All right.  Move to admit 1732.         11:56:28

16        MS. BERTRAND:  Objection.  Foundation.  Hearsay.

17   Relevance.

18        THE COURT:  Overruled.

19        It may be admitted and published.

20        (Exhibit 1732 admitted into evidence.)            11:56:37

21   BY MR. RAPP:

22   Q.  Does it contain the term GFE?

23   A.  Yes.

24        MS. BERTRAND:  Objection.  The document speaks for

25   itself.                                                11:56:53

```
 1                THE COURT:  He can answer whether it does or not.

 2                THE WITNESS:  Yes, it contains the term.

 3    BY MR. RAPP:

 4    Q.  All right.  And then the image has a single image?

 5    A.  Yes.                                                    11:57:07

 6    Q.  Moving on to 1722.

 7                MS. BERTRAND:  I'm sorry.  What was the number?

 8                MR. RAPP:  1722.

 9                MS. BERTRAND:  22.  Okay.

10                MR. RAPP:  1722.                                11:57:23

11                MS. BERTRAND:  Got it.  Thank you.

12    BY MR. RAPP:

13    Q.  Do you recognize Exhibit 1722?

14    A.  Yes.  It's a Backpage posting in the Baton Rouge city in

15    the escorts category posted on Saturday, November 19th, 2016.  11:57:36

16    Q.  All right.

17                MR. RAPP:  Move to admit 1722.

18                MS. BERTRAND:  Objection.  Relevance.  Foundation.

19    Hearsay.

20                THE COURT:  Overruled.                          11:57:51

21                MR. RAPP:  Move to admit and publish, please.

22                THE COURT:  Yes, it may be admitted and published.

23                (Exhibit 1722 admitted into evidence.)

24    BY MR. RAPP:

25    Q.  What date was this posted on?                          11:58:15
```

1  A.  Posted on November 19th, 2016.

2  Q.  In what category?

3  A.  In the Baton Rouge -- or in the escorts category.

4  Q.  And does it include a reference to GFE?

5  A.  Yes, it does.                                              11:58:29

6  Q.  And does it provide rates in the posting?

7         MS. BERTRAND:  Objection.  Document speaks for itself.

8         THE COURT:  Overruled.

9         THE WITNESS:  Yes, it does provide rates in the

10 posting.  "750/dinner (no-clock).  Overnight, 1K," [as read].  11:58:47

11 BY MR. RAPP:

12 Q.  And does it also include rates on the right side of the

13 screen over here?

14 A.  Yes, it does.  "$100 Pre-Booking Special."

15        MS. BERTRAND:  Objection.  Goes beyond the scope of      11:59:09

16 the question.  Move to strike.

17 BY MR. RAPP:

18 Q.  Does --

19        THE COURT:  Sustained.

20        The jury will disregard after, "Yes, it does."          11:59:16

21 BY MR. RAPP:

22 Q.  Well, can you read the rates that it has.

23        MS. BERTRAND:  Document speaks for itself.  The jury

24 can read.

25        THE COURT:  Yes.  You can leave it up for the jury to    11:59:25

UNITED STATES DISTRICT COURT

1    read.

2            MR. RAPP:  Unfortunately, the transcript doesn't speak

3    for itself.

4            THE COURT:  No.  That's true.

5            MS. BERTRAND:  Well, Your Honor, the document is now          11:59:32

6    in evidence, so the jury will be able to -- the -- any reviewer

7    in court can see.

8            THE COURT:  Overruled.

9            Go ahead and ask your question, Mr. Rapp --

10            MR. RAPP:  Yes.                                              11:59:41

11            THE COURT:  -- and then move on.

12    BY MR. RAPP:

13    Q.  What do the rates say?

14    A.  "$100 Pre-Booking Special.  Baton Rouge In-Call.  Rates

15    $300 & Up.  Providing Out-call.  Rates $475 & Up.  Plus           11:59:50

16    Travel/$2.00 (per mile)."

17    Q.  All right.  And let's look at 1726.

18            Do you recognize this, sir?

19    A.  Yes, I do.  It's a Backpage posting in Reno, Nevada, posted

20    in the women seeking men category posted on Sunday,               12:00:30

21    January 15th, 2017.

22    Q.  All right.  Does it include a reference to GFE?

23            MS. BERTRAND:  Objection.  Document can speak for

24    itself.

25            THE COURT:  Overruled.                                     12:00:50

```
 1              THE WITNESS:  Yes, it does.
 2   BY MR. RAPP:
 3   Q.  And does it have a -- a number in front of the GFE?
 4   A.  "250."
 5              MR. RAPP:  Oh, move -- move to admit and request      12:01:01
 6   permission to publish.  Thank you.
 7              THE COURT:  Yes, it may be admitted and published.
 8              (Exhibit 1726 admitted into evidence.)
 9              MS. BERTRAND:  Same objections for the record.
10              THE COURT:  Noted.                                    12:01:13
11   BY MR. RAPP:
12   Q.  And just so that -- right there is the GFE, correct --
13   A.  Yes.
14   Q.  -- where I've highlighted?
15              And then this all -- this also has a reference to real  12:01:24
16   and reviewed?
17   A.  Yes, it does.
18   Q.  And moving on to 1733.
19              Do you recognize this as a posting?
20   A.  Yes.  It's a Backpage posting in the women seeking men        12:01:53
21   category posted in Boston on Sunday, July 23rd, 2017.
22   Q.  And does it contain a reference to GFE?
23   A.  Yes, it does.
24   Q.  All right.  And the images.
25              MR. RAPP:  Move to admit and publish.                  12:02:20
```

```
 1              THE COURT:  Yes, it may be admitted and published.

 2              (Exhibit 1733 admitted into evidence.)

 3   BY MR. RAPP:

 4   Q.  And where I've highlighted, is that where the reference to

 5   GFE is?                                                          12:02:31

 6   A.  Yes.

 7   Q.  And the images quickly.

 8              Now moving on to Exhibit 223.

 9              Do you recognize this, sir?

10   A.  Yes, I do.                                                   12:02:55

11   Q.  How do you recognize it?

12   A.  It's posted in Detroit, Michigan, in the massage category

13   on Friday, January 26th, 2018.

14   Q.  Does it include a reference to GFE?

15   A.  Yes, it does.                                                12:03:12

16   Q.  And what's -- and you gave us the date.  And this also has

17   this reply.  And that -- can you remind the jury what that

18   means.

19   A.  When you click the reply, an email form will pop up.

20              MR. RAPP:  Hold on.                                   12:03:30

21              Move to admit and publish, please.

22              MS. BERTRAND:  Same objections.  Foundation.  Hearsay.

23   Relevance.

24              THE COURT:  Overruled.

25              223 is admitted and may be published.                12:03:34
```

UNITED STATES DISTRICT COURT

```
 1              (Exhibit 223 admitted into evidence.)

 2   BY MR. RAPP:

 3   Q.  All right.  And then this just quickly.  This, it has a

 4   reference to GFE?

 5   A.  Yes.                                                    12:03:46

 6   Q.  The images.

 7              And when was it posted?

 8   A.  Posted January 26th, 2018.

 9   Q.  And -- and where?

10   A.  In Detroit, Michigan.                                  12:04:06

11   Q.  And in what category?

12   A.  In the massage category.

13   Q.  All right.  All right.  Go back to 223.  There's some

14   additional image -- images.

15   A.  Yes.  Those are the images with the ad.                12:04:29

16   Q.  And this is the -- the text.  Reference to GFE?

17   A.  Yes.

18   Q.  Incall/outcall?

19   A.  Yes.

20   Q.  But, just to be clear, this was posted in the massage  12:04:58

21   category as opposed to escort -- escort or personals; right?

22   A.  Yes, it was posted in the therapeutic massage category.

23   Q.  All right.  Now going on to Exhibit 224.

24              Do you recognize it as a Backpage posting?

25   A.  Yes.  This is a Backpage posting in therapy massage posted 12:05:40
```

```
 1    in the Bronx on Tuesday, January 30th, 2018.

 2              MR. RAPP:  Move to admit 224.

 3              THE COURT:  I'm sorry.  What did you say it was

 4    posted?

 5              THE WITNESS:  It -- it -- I'll say it again.  Posted    12:05:57

 6    in therapeutic massage in the city of Bronx, New York.

 7              THE COURT:  Yes.

 8              THE WITNESS:  Bronx.

 9              THE COURT:  Bronx, New York.  Okay.

10              THE WITNESS:  Yeah.                                     12:06:13

11              THE COURT:  Thank you.

12              Yes, it may be admitted and published.

13              (Exhibit 224 admitted into evidence.)

14              MR. RAPP:  Thank you, Your Honor.

15    BY MR. RAPP:                                                     12:06:18

16    Q.  And, just so the jury knows, here's the Bronx massage and

17    the headline.

18              Have you seen this term in postings during your -- the

19    time period you've been with Backpage?

20    A.  Yes, I have.                                                 12:06:45

21    Q.  And what did you come to learn that meant?

22              MR. FEDER:  Relevance.  403.  Speculation.

23              THE COURT:  Overruled.

24              MR. FEDER:  I'm sorry.  Hearsay.

25              THE COURT:  Overruled.                                 12:06:58
```

UNITED STATES DISTRICT COURT

 1          What he took it to mean.

 2          THE WITNESS:  That's sex in the car.

 3   BY MR. RAPP:

 4   Q.  All right.  And the images.

 5          And 224, two additional images.  And the posting.          12:07:09

 6          Now going on to Exhibit 226.

 7          Do you recognize this as a Backpage posting?

 8   A.  Yes, I do.  It's posted in Brooklyn, New York, in the

 9   therapeutic massage that- -- category on Tuesday, January 30th,

10   2018.                                                             12:07:52

11          MR. RAPP:  Move to admit 226.

12          MS. BERTRAND:  Objection.  Relevance.  Foundation.

13   Hearsay.

14          THE COURT:  Overruled.

15          And just a point of confusion.  My exhibit list has no     12:08:02

16   226.  It jumps from 225 to 228.  Unless that was a more

17   recently added ...

18          (The Court and the courtroom deputy confer.)

19          THE COURTROOM DEPUTY:  Okay.  I'll see if I have it

20   from Daniel, and I can print it since that's yours.  One          12:09:09

21   second.

22          THE COURT:  Ms. Bertrand, do you have a 226?

23          MR. CAMBRIA:  I do.

24          MS. BERTRAND:  Your Honor, I don't -- I'll have to

25   check with my paralegal as to what we've got on our list.  I     12:09:25

UNITED STATES DISTRICT COURT

```
 1   wrote down 226.
 2            MR. CAMBRIA:  I have 226.
 3            THE COURT:  I just simply don't have it.
 4            But you can move forward, Mr. Rapp.
 5            MR. RAPP:  Sure.                                    12:09:41
 6            THE COURT:  We can figure out where -- where the gap
 7   is.
 8            MR. RAPP:  I'll just -- I'll go on to 227 just in the
 9   interest of time.
10            THE COURT:  Well, bad news.  I was going to say, I    12:09:50
11   don't have 227 either.
12            Okay.  Well, now we have a new page that shows it.
13   Okay.
14            Go ahead.  Move on.
15            MR. RAPP:  Does your -- does this new page have 226?  12:10:04
16   All right.
17   BY MR. RAPP:
18   Q.  Just going back to 226 quickly, do you recognize this?
19   A.  Yes, I do.  It's an ad posted in Brooklyn, New York, in
20   therapeutic massage on January 30th, 2018.                    12:10:21
21            MR. RAPP:  All right.  Move to admit 226.
22            MS. BERTRAND:  Hearsay.  Foundation.  Relevance.
23            THE COURT:  Overruled.
24            226 may be admitted and published.
25            (Exhibit 226 admitted into evidence.)               12:10:39
```

```
 1   BY MR. RAPP:
 2   Q.  All right.  And --
 3            MR. RAPP:  Thank you.
 4   BY MR. RAPP:
 5   Q.  So here's the posting.  Does it have the reference to GFE?    12:10:45
 6            Let me see if I can help you out here.
 7   A.  Yes, it does.
 8   Q.  And does it have what -- what do these features with the Hh
 9   here refer to?
10   A.  So Hh is a half hour.  H is an hour.                          12:11:07
11   Q.  All right.  All right.  Let's move on to Exhibit 227.
12            Do you see that on your screen?
13   A.  Yes, I do.
14   Q.  How -- do you recognize it?
15   A.  I do.  It's a Backpage ad posted in the West Palm Beach      12:11:36
16   city in the therapy massage category on Wednesday,
17   January 31st, 2018.
18            MR. RAPP:  Move to admit 227.
19            MS. BERTRAND:  Objection.  Foundation.  Hearsay.
20   Relevance.                                                       12:11:56
21            THE COURT:  Overruled.
22            227 may be admitted and published.
23            (Exhibit 227 admitted into evidence.)
24   BY MR. RAPP:
25   Q.  So you -- this -- you were referencing the market.  Where    12:12:09
```

UNITED STATES DISTRICT COURT

1    was it posted?

2    A.   It was posted in West Palm Beach.

3    Q.   And on what date?

4    A.   It was posted on January -- Wednesday, January 31st, 2018.

5    Q.   All right.  And then also it has five images?          12:12:27

6    A.   It's six images.

7    Q.   Six images?

8    A.   The ad text she -- this user put as an image.

9    Q.   Let's go to the second page.

10   A.   Oops.  I misspoke.  There's an additional three images.   12:12:59

11   Nine images.

12   Q.   All right.  And then the text of the posting.

13   A.   "I'm an independent GFE with excellent massage skills.

14   Please call me at (561)713-9531 for an appointment.  Hours:

15   11 am to 6 pm."                                          12:13:26

16   Q.   All right.  I'm now going to -- thank you.

17          I am now going to 229.

18          Do you see that on your screen?

19   A.   229?  Not -- it's -- I see.

20   Q.   Oh, I'm sorry.  228.  I'm looking at the wrong number.  My   12:13:43

21   mistake.

22          Do you see that?

23   A.   Yes, I do.

24   Q.   And do you recognize it?

25   A.   Yes.  It's a Backpage posting in Las Vegas, Nevada, in the   12:13:53

 1   therapy massage category posted on February 1st, 2018.

 2           MR. RAPP:  Move to admit 228.

 3           MS. BERTRAND:  Objection.  Relevance.  Foundation.

 4   Hearsay.

 5           THE COURT:  Overruled.                    12:14:14

 6           It may be admitted and published.

 7           (Exhibit 228 admitted into evidence.)

 8   BY MR. RAPP:

 9   Q.  And does this have a reference -- I'm going to highlight a

10   reference here.                                   12:14:30

11           Did you come to learn what that meant?

12   A.  Yes.  It's a reference to The Erotic Review ID.

13   Q.  And does it also have a reference to GFE?

14   A.  Yes.  "Best GFE ever."

15   Q.  And then looking at 229.                      12:14:47

16           Do you see that on your screen?

17   A.  Yes, I do.

18   Q.  Let me go back to the first page.

19           Do you recognize this?

20   A.  I'm sorry?                                    12:15:17

21   Q.  Do you -- I'm sorry.  Maybe I -- do you recognize this

22   posting?

23   A.  Yes, I do.  It's a Backpage posting in Fort Worth, Texas,

24   posted in the therapeutic massage category on February 6th,

25   2018.                                             12:15:34

1          MR. RAPP:  Move to admit 229.

2          MS. BERTRAND:  Objection.  Relevance.  Foundation.

3   Hearsay.

4          THE COURT:  Overruled.

5          It may be admitted and published.                    12:15:40

6          (Exhibit 229 admitted into evidence.)

7   BY MR. RAPP:

8   Q.  And does it have a reference to GFE?

9   A.  Yes, it does.

10  Q.  All right.  Okay.  And let's go to the second page of 229.  12:15:59

11          Does it have additional images?

12  A.  Yes, it is.

13  Q.  Page 3.  And is this the text?

14  A.  This text is -- links to her other ads that are posted on

15  the Backpage site.                                          12:16:35

16  Q.  Okay.  And references a 100 New Year special.

17          What did you take that to mean?

18  A.  It's the $100 New Year's special.

19  Q.  All right.  And let's go on to Exhibit 230.

20          Do you see that on your screen?                     12:17:06

21  A.  Yes, I do.

22  Q.  And do you recognize it?

23  A.  Yes.  It's a Backpage posting posted in New York City in

24  New York in the therapeutic massage category on February 6th,

25  2018.                                                       12:17:29

```
 1              MR. RAPP:  Move to admit 230.
 2              MS. BERTRAND:  Objection.  Relevance.  Foundation.
 3    Hearsay.
 4              THE COURT:  Overruled.
 5              It may be admitted and published.          12:17:34
 6              (Exhibit 230 admitted into evidence.)
 7    BY MR. RAPP:
 8    Q.  And does it have a reference to GFE?
 9    A.  Yes, it does.
10    Q.  And going on to the next page.                    12:17:50
11              So we have talked about Dollar Bill during your
12    testimony.  Is this the market that Dollar Bill was involved
13    in?
14              MS. BERTRAND:  Objection.  Relevance as to this ad.
15              THE COURT:  Overruled.                       12:18:21
16              THE WITNESS:  Yes.
17              MR. RAPP:  All right.  You can take it off.
18    BY MR. RAPP:
19    Q.  Let's look at one more.
20              Do you see that on your screen, sir?  Do you have that 12:18:57
21    on your screen?
22    A.  Yes, I do.
23    Q.  All right.  Do you recognize that?
24              MR. FEDER:  Could you put that back on the screen.
25              MS. BERTRAND:  It's not on our screen.       12:19:16
```

UNITED STATES DISTRICT COURT

```
 1            MR. CAMBRIA:  Exhibit number?

 2            MS. BERTRAND:  What's the exhibit number while we're

 3    pulling it up?

 4            MR. RAPP:  225.

 5    BY MR. RAPP:                                              12:19:25

 6    Q.  Do you recognize that, sir?

 7    A.  Yes.  It's a posting in New York City, New York, in the

 8    therapeutic massage category posted on Wednesday, January 31st,

 9    2018.

10            MR. RAPP:  Move to admit 225.                     12:19:41

11            MS. BERTRAND:  Objection.  Foundation.  Relevance.

12    Hearsay.

13            THE COURT:  Overruled.

14            MR. RAPP:  Request permission to publish.

15            THE COURT:  Yes, it may be published.            12:19:48

16            (Exhibit 225 admitted into evidence.)

17    BY MR. RAPP:

18    Q.  And can you identify the market.

19    A.  The market's New York City.

20    Q.  And is there a reference to GFE?                     12:20:03

21    A.  Yes, there is.

22    Q.  Going on to the second page of 225, is there additional

23    images?

24    A.  Yes, there are.

25    Q.  Page 3.  This is the posting with the -- is there another  12:20:16
```

```
 1   reference to GFE?
 2   A.  Yes, there is.
 3              MR. RAPP:  Mr. Ferrer, thank you for your testimony.
 4              I'll pass the witness.
 5              THE COURT:  All right.  Who's up?  Mr. Feder.          12:20:46
 6              Are you drawing an exhibit?
 7              MR. FEDER:  Judge, when are we going to till today?
 8              THE COURT:  12:30.  Seven minutes.
 9              MR. FEDER:  Okay.  All right.
10                        CROSS-EXAMINATION
11   BY MR. FEDER:
12   Q.  Good morning, Mr. Ferrer.
13              THE COURT:  I can't hear you, Mr. Feder.  You're going
14   to have to adjust that microphone.
15              MR. FEDER:  Testing one, two, three.              12:22:43
16              THE COURT:  Can you hear him, Mr. Panchapakesan?
17              THE COURTROOM DEPUTY:  I put the volume up.
18              MR. LINCENBERG:  Try it again.
19              MR. FEDER:  One, two, three.  One, two, three.
20              MR. LINCENBERG:  Yes.                           12:23:02
21   BY MR. RAPP:
22   Q.  Mr. Ferrer, you've testified quite a bit of time, and
23   you've indicated that pretty much from the beginning of your
24   work, starting with New Times all the way to Backpage, that you
25   knew you were doing something wrong; is that correct?          12:23:15
```

```
 1              MR. RAPP:  Judge, I'll -- I'll object.  This --
 2    whatever this is, it hasn't been admitted into evidence.
 3              MR. FEDER:  It's just a -- it's a summary exhibit
 4    potentially.
 5              THE COURT:  Well --                                 12:23:24
 6              MR. RAPP:  Same objection.
 7              THE COURT:  I thought it was a blank page myself,
 8    so --
 9              MR. FEDER:  It's got some years on it.
10              MR. RAPP:  You have to admit it into evidence to show  12:23:32
11    to a jury first.
12              THE COURT:  Yeah.
13              MR. FEDER:  Well, it hasn't been completed.
14              THE COURT:  Well, we're not going to proceed in that
15    way.  You can ask him some questions.  And if you have a      12:23:40
16    demonstrative that you want to introduce later --
17              MR. FEDER:  Sure.
18              THE COURT:  -- that's fine.
19    BY MR. FEDER:
20    Q.  When did you start at New Times?                          12:23:48
21              MR. RAPP:  I still have an objection.
22              THE COURT:  Yes.  Can you remove the -- I don't know
23    what you call them these days -- flip chart.
24    BY MR. FEDER:
25    Q.  When did you start at New Times?                          12:23:58
```

1    A.  I started with the company 1996 with the Dallas Observer.

2    Q.  All right.  And what was your position at -- at the

3    Observer?

4    A.  My position was I was the classified director.  So I was in

5    charge of the inside sales department.                     12:24:16

6    Q.  Was that a New Times company?

7    A.  It was a company owned by New Times but in Dallas.

8    Q.  All right.  And was there another weekly or daily newspaper

9    in Dallas at that time?

10   A.  There was a daily newspaper in Dallas.                 12:24:33

11   Q.  Did you scrape ads from those other dailies and weeklies to

12   try to get advertisers from those periodicals onto the

13   Observer?

14          MR. RAPP:  I'm going to object as to the relevance of

15   this.                                                      12:24:51

16          THE COURT:  Overruled.

17          THE WITNESS:  What -- what period of time are you

18   referring to?

19   BY MR. FEDER:

20   Q.  When you worked at the Observer.                       12:24:56

21   A.  So when I worked for the newspaper -- and this isn't

22   anything to do with online -- we -- we did scrape ads and put

23   them in a database called GoldMine so that salespeople could

24   make phone calls and then sell them ads in print.

25   Q.  And scrape is the right word, not steal, isn't that true,  12:25:19

```
 1   Mr. Ferrer?

 2   A.  At that time -- well, yes, scraping is -- is -- we used a

 3   robot to do it, so you -- so it's more of an automated process,

 4   like Google takes ads for the search engine.

 5   Q.  It's called scraping, data mining, things like that; is          12:25:41

 6   that right?

 7   A.  Yes, it is.

 8   Q.  Okay.  The idea is that an -- that an employee of a

 9   newspaper or an Internet provider can go to advertisers of

10   other cites where they're in competition with?                       12:25:57

11         MR. RAPP:  I'm going to object to the foundation

12   already on this question.

13         When are we talking about?

14         THE COURT:  Yeah.  Lay some foundation.

15   BY MR. FEDER:                                                        12:26:07

16   Q.  Let's stay -- let's stay at the time you were at the

17   Observer; right?

18   A.  Yes.

19         THE COURT:  Can --

20   BY MR. FEDER:                                                        12:26:13

21   Q.  You go to an advertiser --

22         THE COURT:  Wait.  Can you clarify what time frame

23   we're talking about?

24         MR. FEDER:  I believe he's already testified to that.

25   BY MR. FEDER:
```

1   Q.  But go ahead and say that, when you were at the Observer.

2   From when to when?

3   A.  So I worked at the Observer from 1996 to approximately

4   2000.

5   Q.  And then -- so during that period, that four-year period,          12:26:33

6   people would go from your periodical, and you included, and try

7   to scrape ads from other periodicals and then try to have them

8   advertise on your periodical; correct?

9   A.  Well, I don't think scraping is the right term.  I mean,

10  we'd take --                                                           12:26:57

11  Q.  Wait.  Before we go on, let's try to have some rules

12  between you and me.  Okay?

13          When I ask you a question and it's a yes-or-no answer,

14  would you please say yes or no and not kind of go on and on

15  about what you want to say?                                            12:27:10

16          Is that okay?

17  A.  Yes.

18  Q.  Can you do that?

19  A.  I -- I understand.

20  Q.  Okay.                                                              12:27:14

21  A.  Yes.

22  Q.  All I want from you is question/answer to my question and

23  nothing more.

24          Do we understand each other?

25  A.  Yes, we do.                                                        12:27:21

UNITED STATES DISTRICT COURT

```
 1   Q.  Good.  Thank you.

 2          So let's go back to scraping is a term of art in the

 3   advertising world; right?

 4   A.  If --

 5   Q.  Yes or no?                                              12:27:35

 6   A.  Well --

 7          MR. RAPP:  I'm going to object --

 8          THE WITNESS:  -- kind of.

 9          MR. RAPP:  -- to this.  If he cannot answer it yes or

10   no --                                                       12:27:41

11          MR. FEDER:  Then he can say:  I don't know.

12          I'm sorry.  Thank you, Mr. Rapp.

13   BY MR. FEDER:

14   Q.  We'll have the answers yes, no, I don't know.

15          Is that okay with you?                              12:27:49

16   A.  Yes.

17   Q.  All right.  So back to my question.

18          Is scraping a term of art in the advertising world?

19   A.  Yes.

20   Q.  When you worked at the Observer for that four years, was 12:28:01

21   scraping common at the Observer and other periodicals that you

22   were familiar with?

23          MR. RAPP:  Well, that's a -- objection.  That's a

24   vague question.  "Other."

25          THE COURT:  Sustained.  Sustained as to "other        12:28:16
```

UNITED STATES DISTRICT COURT

```
 1    periodicals."
 2            MR. FEDER:  That he was familiar with.
 3            THE COURT:  Well, you can reask the question, but I
 4    sustained it.
 5    BY MR. FEDER:                                              12:28:31
 6    Q.  Were you familiar with other periodicals other than the
 7    Observer, Mr. Ferrer, during that four-year period at the
 8    Observer?
 9    A.  Yes.
10    Q.  Was scraping common among other -- the other periodicals  12:28:39
11    that you were familiar with and the Observer during that
12    four-year period?
13    A.  No.
14    Q.  No?  But it was common at the Observer?
15    A.  No.                                                    12:28:55
16    Q.  Did you do it?
17    A.  No.  We wouldn't call it scraping.
18    Q.  What did you call it?
19    A.  We called it calling clients who were running ads in other
20    papers and getting their permission to publish their ads in the  12:29:11
21    Dallas Observer.  So we called it sales.
22    Q.  Not stealing; right?
23    A.  No.  We had the consent.  We had to -- we had to sell these
24    ads.
25    Q.  You had the consent of the other places that you are taking  12:29:26
```

```
 1    these ads from to take their ads?  Is that what you're saying?
 2    A.  No.  I -- I didn't say that.  I --
 3    Q.  What did you mean by "consent"?
 4    A.  I meant by consent that we would call the business that was
 5    running those ads in the other publication and get their            12:29:47
 6    approval to make an ad to place it into the Dallas Observer.
 7    Q.  You would call the advertiser, not the place where the
 8    advertisement was placed --
 9    A.  Yes --
10    Q.  -- true?                                                        12:30:03
11    A.  -- that's true.
12    Q.  Right.
13    A.  Yes.
14    Q.  You didn't get the permission of the place that had the
15    advertisement on its periodical; true?                             12:30:08
16    A.  True.
17    Q.  And you never called it scraping -- stealing until you
18    started to work for the government and agreed to testify for
19    them; true?
20    A.  True.                                                          12:30:23
21    Q.  Stealing is -- is a crime; right?
22    A.  Yes.  Right.
23    Q.  And scraping is not a crime; true?
24    A.  Selling an ad and scraping an ad are two different things,
25    so I can't answer the question.                                    12:30:43
```

```
 1    Q.  If you go to an advertiser on another -- at another site

 2    and contact their advertiser and remove the ad that they have

 3    on that advertisement and say, hey, can we run your ad on the

 4    Observer, that's not stealing, is it?

 5    A.  No, it's not stealing.                                      12:31:03

 6    Q.  Okay.  So you decided with yourself, or maybe others, that

 7    you were going to use the word stealing when you became a

 8    witness for the government; true?

 9    A.  It's a completely different activity.

10    Q.  Who told you --                                             12:31:18

11    A.  I can't answer that.

12    Q.  Who told you to call it stealing?  Was that your idea or

13    somebody else's idea?

14    A.  It was a term we coined in the marketing department many

15    years before I pleaded guilty.                                 12:31:32

16            THE COURT:  All right.  So on that note, we are just

17    beyond the 12:30 hour that I promised the jury that they would

18    stay until.

19            And so, again, because we are on the weekend, members

20    of the jury, I admonish you not to come to any conclusions, not 12:31:50

21    to research, Google, X, whatever that term is, look up any of

22    the terms that have been discussed so far.  Just have a very

23    pleasant weekend.  And I think Liliana has made an inquiry if

24    she won't remind -- or to make an inquiry if you can come here

25    and be present to come in to court at 8:45.  Again, remembering 12:32:18
```

UNITED STATES DISTRICT COURT

1    we only have three days next week.

2          And so with that, please all rise for the jury.

3          (Jury not present at 12:32 p.m.)

4          THE COURT:  Mr. Ferrer, you may step down.

5          MS. BERTRAND:  Your Honor, after a brief pause, my I          `12:32:56`

6    ask that my client be excused to use the ladies' room and she

7    can come back?

8          THE COURT:  Yes.

9          MS. BERTRAND:  All right.  Thank you.

10         THE COURT:  I don't -- I was just going to take up          `12:33:12`

11   the -- the responsive pleading.

12         Do you wish her to --

13         MS. BERTRAND:  I'll waive her presence while she's in

14   the ladies' room.

15         THE COURT:  All right.  So let me just make          `12:33:26`

16   a suggestion here.  I've already tried to make my way through

17   that responsive pleading.  I'm going to ask the government and

18   give them an opportunity to reply in particular to defendants'

19   assertions and -- on -- beginning at, I think, the bottom of

20   pages 8 and 9.  And, in particular, I'd like you to look at the          `12:33:53`

21   cases that are cited, in particular the Ninth Circuit for their

22   proposition.

23         I did have some opportunity to look at, in particular

24   in the government's motion -- of course, I don't have -- I

25   don't have the -- the list of their exhibits.  But in it --          `12:34:30`

1    but, in any event, there are 220 exhibits that I think, if I

2    remember correctly, these relate to responses to subpoenas.

3        And, number 1, I will say that their cumulative

4    objection is well taken.  Number 2, this morning we heard

5    testimony about responses to subpoenas to the con- -- to the          12:35:03

6    Senate.  And so what I would suggest -- and we can all

7    highlight that we can revisit this and try to come to some

8    understanding on Monday at 3:30.  But there has been testimony

9    by this witness about receiving subpoenas, responses to

10   subpoenas, and I'll have to go back and refresh my recollection     12:35:36

11   about in particular who those subpoenas were responded to or

12   who made the request.

13       So to the extent that you've examined the record and

14   it relates to that testimony, you may introduce some, but not

15   all of those email responses because it correlates, and, in          12:36:03

16   fact, it -- in some ways it bolsters his testimony about what

17   the practice was.  But, like, for example, last night I

18   recalled reading some, you know, 10-plus responses to -- in the

19   month of May, just these routine responses, I think of 2013 or

20   so, that are cumulative and become irrelevant, and that the          12:36:40

21   reason they become irrelevant is because we don't know what the

22   subpoena request was.  We only know what this response was

23   about:  Well, these phone numbers showed up in these other

24   places, but I don't know what the question was.

25       So it's irrelevant in that way.  But, again, here --             12:37:03

UNITED STATES DISTRICT COURT

1    so, for example, to the extent that there's something in those

2    laundry list of exhibits beyond these -- I'll tell you what I'm

3    referring to.  It's the government's objections in

4    Document 1801 at paragraph 3 that relate to these really

5    standardized responses to subpoenas.                              12:37:33

6           To the extent that this witness has responded to the

7    time period or the agency -- I don't remember any questions

8    about responses to an FBI subpoena, a Federal Defender's Office

9    subpoena, an ICE subpoena, so none of that's coming in.

10          So look at those very carefully.  And if they coincide   12:37:57

11   with the witness's testimony, the time period, what he

12   responded -- what he testified he was responding to in terms of

13   those subpoenas, then I may let them in, but I'm not going to

14   let in all of those.  It's just an avalanche of really

15   confusing and irrelevant responses.  So that's that category.   12:38:26

16          I'll ask the government to respond to the issues

17   outlined in the defense response.  And you can do that by -- I

18   think you can do that by the end of the day, if not by -- yeah,

19   well, by the end of today.  It's a narrow issue that I ask you

20   to look at and put your position forward.  And --                12:38:48

21          MR. STONE:  Your Honor, any objection to extending it

22   to Saturday or Sunday to give us a little bit more time?

23          THE COURT:  You can work on it on Saturday.  How's

24   that?

25          MR. STONE:  Okay.                                         12:39:05

```
 1          THE COURT:  I'll give you till Saturday.  I've got to
 2   have some opportunity, then, to review that in light of what
 3   the defense has filed.
 4          MR. STONE:  Saturday by 5:00?
 5          THE COURT:  And by looking -- Saturday at          12:39:13
 6   5:00 o'clock.  How's that?
 7          MR. STONE:  Thank you, Your Honor.
 8          THE COURT:  You can have your Saturday evening free.
 9   All right?
10          So what I would suggest is we then take this matter   12:39:19
11   up.  If you can't come to some agreement or understanding with
12   regard to those batch of exhibits that are cumulative and
13   irrelevant to responding to the relevant subpoenas, then -- I
14   hope you can, but otherwise I'll just -- I'll let you know I'll
15   have some determination on that.                          12:39:51
16          So anything further from Mr. Rapp?
17          MR. RAPP:  Yes.  Just a small point.
18          This is in terms of scheduling.  We have two witnesses
19   that are from the east coast that we're going to have available
20   next week.  I don't know how long cross-examination's going to  12:40:05
21   go on.  They do have some fairly serious scheduling issues, and
22   I would like to get them on the stand next week, if I can.  And
23   that might require a request to take Mr. Ferrer off the stand
24   and put them on.  I don't think they're going to be very
25   lengthy.                                                 12:40:25
```

```
 1              So I just -- that -- I don't -- in fairness, I have
 2    not discussed this with the --
 3              THE COURT:  Okay.
 4              MR. RAPP:  -- defense, but --
 5              THE COURT:  Well --                                12:40:33
 6              MR. RAPP:  -- I just want to throw that out that that
 7    may be a request we'll be making next week.
 8              THE COURT:  And discuss it with government -- with the
 9    defense counsel, and if it -- anybody has an objection, they
10    can let me know that.  And, of course, I'm going to ask you     12:40:44
11    and -- who those witnesses are and what the conflict is, and so
12    I'd like to have defense counsel meet with you on that.
13              MR. RAPP:  All right.
14              THE COURT:  Anything other?
15              MR. RAPP:  No, Your Honor.                        12:41:00
16              THE COURT:  All right.
17              MR. RAPP:  Thank you.
18              THE COURT:  Mr. Cambria?
19              MR. CAMBRIA:  No.
20              THE COURT:  Ms. Bertrand?                         12:41:03
21              MS. BERTRAND:  No.  Thank you.
22              THE COURT:  Mr. Lincenberg?
23              MR. LINCENBERG:  Yes, Your Honor.
24              First, if there are -- government counsel indicated
25    that there were witnesses that they were cutting from the list. 12:41:13
```

```
 1   We're obviously doing a lot of preparation work.  If government
 2   counsel can advise us sooner rather than later, that would be
 3   really helpful.
 4         MR. RAPP:  Yeah.
 5         THE COURT:  It would be helpful.                          12:41:25
 6         MR. RAPP:  Sure.  And we'll give them the exhibits.
 7   It's John and Staca --
 8         MS. PERLMETER:  No.
 9         MR. BERRY:  They're asking who we're cutting.  We
10   can't say that just yet.                                       12:41:36
11         MR. RAPP:  Oh.  Oh, who we're cutting.  I'm sorry.  I
12   misunderstood.
13         We have not made any final decision on that.  We're
14   trying to keep in mind what trial days are left here.  And so,
15   no, we have -- we're not in a position to do that now.         12:41:48
16         THE COURT:  Okay.
17         MR. LINCENBERG:  Even if --
18         THE COURT:  Well, to the extent that you are doing
19   that, can you please just let defense counsel know.
20         MR. LINCENBERG:  And even if they're just               12:41:58
21   contemplating them, understanding it's not a final decision,
22   would -- it would be helpful.
23         Second, Your Honor, it -- I think you indicated
24   that -- Your Honor indicated that you were setting a hearing
25   for Monday at 3:30; is that correct?                           12:42:10
```

```
 1                THE COURT:  Yes.

 2                MR. LINCENBERG:  Can I just have a moment to consult

 3     with counsel about that timing?

 4                THE COURT:  Well --

 5                MR. LINCENBERG:  It's a holiday.  I just want to --    12:42:17

 6     can I just have a moment to consult?

 7                THE COURT:  Monday is a holiday?

 8                MR. LINCENBERG:  Yes.

 9                MS. BERTRAND:  Your Honor, it's a Jewish holiday.

10                MR. LINCENBERG:  Maybe it -- can I just have a moment   12:42:25

11     to consult with counsel?

12                THE COURT:  Yes.  Yes.

13                (Brief pause.)

14                MR. LINCENBERG:  Thank you, Your Honor.

15                We'll -- we'll -- we'll do -- we'll live with the      12:43:54

16     Monday at 3:30.  Thank you.

17                THE COURT:  And I'm going to adjust it to 3:45.  I do

18     have another matter immediately, and I just want to buffer some

19     time.

20                MR. FEDER:  Judge, just so you know, Mr. Eisenberg and  12:44:08

21     I are going to be starving by 3:45 because Yom Kippur, you fast

22     for the 24 hours before.  So --

23                THE COURT:  When does it end?

24                MR. FEDER:  Sundown.

25                THE COURT:  Sundown?                                    12:44:22
```

```
 1              MR. FEDER:  Sundown to sundown.
 2              THE COURT:  So you will be in your usual grumpy --
 3              MR. FEDER:  Yeah.  I'm going to be even grumpier than
 4      I normally am --
 5              THE COURT:  In all kidding.                              12:44:33
 6              MR. FEDER:  -- because when I don't eat, I'm grumpy.
 7              MS. BERTRAND:  Your Honor?
 8              THE COURT:  I recognize that.  So, you know, I could
 9      set aside some time at 4:30 on Monday.  But I want to get these
10      issues done.  And if you -- if you agree that you will refrain  12:44:47
11      from introducing any of those objectionable exhibits that the
12      government has put forward until the time that we have
13      addressed them, then I'm happy to release you of Monday.
14              MR. FEDER:  You know, my concern is this, Judge:  I
15      mean, I've got a certain chronology that I've planned out.      12:45:10
16      But, I mean, not knowing what's going to come in and what's
17      going to go out is going to put me --
18              THE COURT:  Well, then we'll go with plan A then.  And
19      I'll be with you in that, because I'll have a full day, so --
20              MR. FEDER:  3:45?                                       12:45:25
21              THE COURT:  3:45.
22              MR. EISENBERG:  Your Honor, I would just say simply
23      the later in the afternoon the better.  So long as we're able
24      to finish whatever it is that the Court wants to cover, I'll be
25      here.                                                           12:45:37
```

```
 1              THE COURT:  Yes.  I don't --
 2              MR. EISENBERG:  Whatever the Court directs.
 3              THE COURT:  I don't anticipate we are going to go any
 4    further than 5:00 o'clock, I would hope, so --
 5              MR. EISENBERG:  Could we start at 4:00?          12:45:46
 6              THE COURT:  Well, yes.  That's an option, but we're
 7    only going to go to 5:00.  How's that?
 8              MR. EISENBERG:  How about a quarter of 4:00 so that we
 9    have enough time?
10              THE COURT:  Yes.                                 12:45:56
11              MR. FEDER:  And this is in person?
12              THE COURT:  Well, to the extent that you're here, yes.
13    If you want to appear telephonically, you can.  But, again,
14    you're going to have to let me know if you're going to waive
15    your client's presence.                                   12:46:07
16              MR. LINCENBERG:  And, Your Honor, Mr. Panchapakesan
17    will be handling the hearing, but I would appreciate if the
18    Court would permit me to listen in telephonically.
19              THE COURT:  That's fine.
20              MR. LINCENBERG:  Thank you.                      12:46:17
21              MS. BERTRAND:  I would ask that my client's appearance
22    be waived at the Monday hearing.  Thank you.
23              THE COURT:  All right.
24              MR. FEDER:  Same.
25              MR. EISENBERG:  And I'll have to determine that by     12:46:25
```

UNITED STATES DISTRICT COURT

1   talking to Mr. Padilla, Your Honor, but perhaps I -- I'm not

2   sure if I'll be here in present or telephonically, so let me

3   just hold off on that.

4          THE COURT:  All right.

5          MR. CAMBRIA:  Would it be okay to waive Mr. Lacey's          12:46:36

6   appearance --

7          THE COURT:  If you wish.

8          MR. CAMBRIA:  -- on Monday?

9          THE COURT:  If you wish.

10         MR. CAMBRIA:  Thank you so much.  Appreciate it.          12:46:43

11         THE COURT:  All right.  Mr. Feder has waived his

12   client's presence, as has Ms. Bertrand, Mr. Cambria.

13         All right.  We are adjourned.

14         MR. EISENBERG:  Your Honor, excuse me.  I just got a

15   signal from Mr. Padilla.  I'll waive his presence.          12:46:58

16         THE COURT:  All right.  So noted.

17         (Proceedings conclude at 12:47 p.m.)

18                         ---oOo---

19

20

21

22

23

24

25

1

2

3

4

5                    **C E R T I F I C A T E**

6

7            I, CATHY J. TAYLOR, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10            I FURTHER CERTIFY that the foregoing pages constitute

11    a full, true, and accurate transcript of all of that portion of

12    the proceedings contained herein, had in the above-entitled

13    cause on the date specified therein, and that said transcript

14    was prepared under my direction and control.

15            DATED at Phoenix, Arizona, this 22nd day of

16    September, 2023.

17

18

19                                /s/Cathy J. Taylor
20                                Cathy J. Taylor, RMR, CRR, CRC

21

22

23

24

25

UNITED STATES DISTRICT COURT