UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Phoenix, Arizona |
| Michael Lacey, et al., | ) | September 27, 2023 |
| | ) | 8:53 a.m. |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL – DAY 13**

**(A.M. SESSION)**

Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
1                     A P P E A R A N C E S

2    For the Government:
         UNITED STATES ATTORNEY'S OFFICE
3        By:  Mr. Kevin M. Rapp, Esq.
              Mr. Andrew C. Stone, Esq.
4             Mr. Peter Shawn Kozinets, Esq.
              Ms. Margaret Wu Perlmeter, Esq.
5             Mr. Daniel G. Boyle, Esq.
         40 North Central Avenue, Suite 1800
6        Phoenix, Arizona  85004-4408
         kevin.rapp@usdoj.gov
7        peter.kozinets@usdoj.gov
         andrew.stone@usdoj.gov
8        margaret.perlmeter@usdoj.gov
         - and -
9        UNITED STATES DEPARTMENT OF JUSTICE
         By:  Mr. Austin Berry, Esq.
10       1301 New York Avenue NW, 11th Floor
         Washington, DC  20005
11       austin.berry2@usdoj.gov

12   For the Defendant Michael Lacey:
         LIPTSITZ GREEN SCIME CAMBRIA, LLP
13       By:  Mr. Paul J. Cambria, Esq.
         42 Delaware Avenue, Suite 120
14       Buffalo, New York  14202
         pcambria@lglaw.com

15
     For the Defendant Scott Spear:
16       KESSLER LAW OFFICE
         By: Mr. Eric Walter Kessler, Esq.
17       6720 North Scottsdale Road, Suite 210
         Scottsdale, Arizona  85253
18       eric.kesslerlaw@gmail.com
         - and -
19       FEDER LAW OFFICE, PA
         By:  Mr. Bruce S. Feder, Esq.
20       2930 East Camelback Road, Suite 160
         Phoenix, Arizona  85016
21       bf@federlawpa.com

22

23

24

25
```

1                    **A P P E A R A N C E S (Cont'd)**

2    For the Defendant John Brunst:
         BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
3        By:  **Mr. Gopi K. Panchapakesan, Esq.**
              **Mr. Gary S. Lincenberg, Esq.**
4             **Mr. Ariel A. Neuman, Esq.**
         1875 Century Park E, Suite 2300
5        Los Angeles, California  90067
         gpanchapakesan@birdmarella.com
6        glincenberg@birdmarella.com
         aneuman@birdmarella.com
7
    For the Defendant Andrew Padilla:
8        DAVID EISENBERG, PLC
         By:  **Mr. David S. Eisenberg, Esq.**
9        3550 North Central Avenue, Suite 1155
         Phoenix, Arizona  85012
10       david@deisenbergplc.com

11   For the Defendant Joye Vaught:
         JOY BERTRAND, ESQ, LLC
12       By:  **Ms. Joy Malby Bertrand, Esq**
         P.O. Box 2734
13       Scottsdale, Arizona  85252-2734
         Joy@joybertrandlaw.com
14

15

16

17

18

19

20

21

22

23

24

25

                      UNITED STATES DISTRICT COURT

1                          **I N D E X**

2    **WITNESSES FOR THE GOVERNMENT:**                        **PAGE**

3    Carl Ferrer
              Cross-Examination (Cont'd) by Mr. Cambria         9
4             Cross-Examination by Mr. Lincenberg              86

5


6                            **EXHIBITS**

7    **NO.**        **DESCRIPTION**                            **REC'D**

8    662        Email from Ferrer to Larkin and Lacey,         20
                "Sgt Byron Fassett", 07/06/2011,
9               DOJ-BP-0002114645 - DOJ-BP-0002114646

10

11   668        Email from Ferrer to Lacey, "RE: Age           35
                verification ID", 07/15/2011,
12              DOJ-BP-0001127479 - DOJ-BP-0001127481

13   669        Emails between Spear, Larkin, Ferrer, and      44
                Lacey, "stats…more info", 07/15/2011,
14              DOJ-BP-0001127482 - DOJ-BP-0001127483

15   6243       Jan. 2006 VVM Corporate Structure              73
                DOJ-BP-0004602110-017

16

17

18

19

20

21

22

23

24

25

                  UNITED  STATES  DISTRICT  COURT

1              **P R O C E E D I N G S**

2              (Defendants are present and out of custody.)

3              (Court was called to order by the courtroom deputy.)

4              (Proceedings reconvene at 8:53 a.m.)

5              (Jury not present at 8:53 a.m.)                    08:53:35

6         THE COURT:  All right.  Please be seated.

7         Good morning, everyone.  We have a juror who is under

8    the weather somewhat.  She's explained a particular health

9    issue that she does not feel safe in driving in.  She's got

10   a -- quite a long commute.  We've conveyed to her a couple   08:54:08

11   options, including the -- being reimbursed for ride share.  And

12   she lives quite a distance away that she didn't think that that

13   would be feasible she would be able to get a Uber or a Lyft

14   from the distance that she drives.

15        The Alternative B is we're checking with our            08:54:37

16   technological department to see, and she's willing and capable,

17   of viewing the proceedings through a video.  And we're looking

18   into that in terms of how long it will take us to set that up

19   and to test it.

20        And so while that is being done, I ask you to meet and  08:55:02

21   confer with your respective clients and determine whether or

22   not that is something you wish to do.  And if that is not

23   something that you think that you are going to be agreeable to,

24   we can make a record on that.  And then you have, I think, a

25   decision to make, which would be to postpone for today or to   08:55:30

1  release the juror.

2          And so while Liliana checks with our IT folks on how

3  to establish that link and bring in the equipment to do that,

4  I'll leave you to meet and confer, and then I'll check back in.

5          MR. RAPP:  Your Honor?                                    08:55:54

6          MR. CAMBRIA:  Can we know who it is?

7          THE COURT:  It's Juror Number 9.

8          MR. FEDER:  Thank you, Your Honor.

9          THE COURTROOM DEPUTY:  All rise.

10         (Recess from 8:56 a.m. to 9:17 a.m.)                      08:56:11

11         THE COURTROOM DEPUTY:  All rise.

12         THE COURT:  All right.  Please be seated.

13         And so has there been any agreement with regard to

14  Juror Number 9 from the government's perspective?

15         What is your position?                                    09:17:36

16         MS. PERLMETER:  Good morning.  The government has no

17  objection to Juror Number 9 appearing telephonically or through

18  videoconferencing, as the Court suggested.  We think that this

19  would be a good alternative to her being live in court given

20  that she is healthy enough and able to participate in the       09:17:55

21  continued proceedings.

22         We very much do not want to delay this trial any

23  further, so we ask that the Court allow her to do that.

24         THE COURT:  All right.  Mr. Cambria?

25         MR. CAMBRIA:  Your Honor, our position is that she        09:18:09

1   should be excused.  There's just too much, let's say, lack of

2   any kind of control, and so on, with somebody being remote.

3   That's just not acceptable to us.  We think that she should be

4   excused.

5          THE COURT:  Ms. Bertrand?                           09:18:29

6          MS. BERTRAND:  I join in my colleague's

7   recommendation.  I would ask that this juror be excused.

8          THE COURT:  Mr. Lincenberg?

9          MR. LINCENBERG:  Yes, Your Honor.  We join.

10          THE COURT:  Mr. Feder?                             09:18:38

11          MR. FEDER:  We do not agree to having her remotely.

12   We do agree to her being removed or excused.

13          THE COURT:  Mr. Eisenberg?

14          MR. EISENBERG:  The same, Your Honor.

15          THE COURT:  All right.                             09:18:49

16          Well, that poses a different question, then, to the

17   government with regard to excusing the jury -- juror from

18   service.

19          THE COURT REPORTER:  I'm sorry.  I can't hear you.

20          MS. PERLMETER:  While we do prefer that she continue   09:19:06

21   participation in this trial, if the Court decides that it is in

22   the interest of keeping the trial moving, we have no objection

23   to letting her go.

24          THE COURT:  All right.  Well, I think because there is

25   no agreement with regard to her appearing remotely for the   09:19:23

1    purposes of keeping us on track, then I believe it is in the

2    interest of the parties to release Juror Number 9.

3            And so all of our jurors are present.  And so we will

4    proceed without Juror Number 9.  Liliana and our juror

5    administrate -- okay -- our jury administrative office will            09:19:49

6    inform her that she's excused from further duty.

7            And so with that, let's go ahead and check on the jury

8    and have them in.

9            Mr. Cambria, are you prepared to proceed?

10           MR. CAMBRIA:  Yes, Your Honor.                                 09:20:08

11           THE COURT:  All right.  Let's have our witness in.

12           All rise for the jury.

13           (Jury present at 9:21 a.m.)

14           THE COURT:  All right.  Please be seated.

15           Members of the jury, not quite the early start that I          09:21:53

16   had anticipated.  The best laid plans apparently do not work

17   well for me.  So, in any event, due to circumstances, and you

18   need not concern yourself with the details, we have determined

19   that it best to proceed without Juror Number 9.  And so Juror

20   Number 9 has been excused from service -- further service.  So        09:22:22

21   I just wanted to update you on all on that.

22           And so we are ready to proceed.  The witness is

23   present.

24           And, Mr. Cambria, you may continue.

25           MR. CAMBRIA:  Thank you, Your Honor.                           09:22:34

```
 1                    CROSS-EXAMINATION (Cont'd)
 2   BY MR. CAMBRIA:
 3   Q.  Good morning, Mr. Ferrer.
 4   A.  Good morning.
 5   Q.  In your various interviews with people from the government,   09:22:42
 6   you were asked some questions, and you made some statements
 7   with regard to Mr. Lacey.
 8           Do you recall that?
 9   A.  Yes.
10   Q.  All right.  And, for example, you characterized Mr. Lacey   09:22:59
11   as a journalist.  Is that fair?
12   A.  Yes.
13   Q.  All right.  And, as a matter of fact, there were -- at one
14   time was it 19 or so various newspapers?
15   A.  With this number, it was 11.  Then it went up to 16, so --   09:23:22
16   Q.  16's the highest number you recall?
17   A.  That's the highest number that I recall.
18   Q.  Okay.  And Lacey was the overall editor of those papers.
19   Is that fair to say?
20   A.  Yes.   09:23:38
21   Q.  And -- but the individual papers had editors as well, did
22   they not?
23   A.  Yes, they did.
24   Q.  Yeah.  And then he would supervise those individuals?
25   A.  That was my understanding.   09:23:51
```

1    Q.  Okay.  And that's all we can ask you for.

2          That some of the things that he did was -- or he wrote

3    editorials; true?

4    A.  Yes.  I think so.

5    Q.  Okay.  And wrote articles.  Not necessarily editorials, but          09:24:10

6    articles?

7          MR. RAPP:  Objection.  Foundation.

8    BY MR. CAMBRIA:

9    Q.  Well --

10          THE COURT:  Well --

11    BY MR. CAMBRIA:

12    Q.  -- if you know.

13          THE COURT:  -- just -- just lay a little foundation

14    for the question, Mr. Cambria.

15          MR. CAMBRIA:  Ooh.  Let me put this on.          09:24:26

16    BY MR. CAMBRIA:

17    Q.  Well, you -- you were familiar with the newspapers, were

18    you not?

19    A.  Yes, I was.

20    Q.  All right.  And so I said, he also wrote articles, did he          09:24:33

21    not?

22          MR. RAPP:  Again, objection.  Foundation.  When?

23    Where?

24          THE COURT:  Yes.  I guess --

25          MR. CAMBRIA:  Okay.          09:24:45

```
 1              THE COURT:  -- if you could be a little bit more
 2   precise and --
 3   BY MR. CAMBRIA:
 4   Q.  All the time that you were associated with Village Voice
 5   Media, Backpage, et cetera, were you able to observe whether or    09:24:51
 6   not Mr. Lacey worked with the newspapers in writing articles?
 7   A.  Yes, he did.
 8   Q.  Okay.
 9              MR. CAMBRIA:  Is that good?
10   BY MR. CAMBRIA:                                                    09:25:06
11   Q.  Next.  You described Mr. Lacey as being a layer away from
12   Backpage?
13              Do you recall that?
14   A.  I did say that, yes.
15   Q.  Okay.  And you also said, did you not, that you did not       09:25:21
16   act -- interact very much with Mr. Lacey; true?
17   A.  Yes, but it was different at different times.
18   Q.  Okay.  And in addition to that, you also stated that Lacey
19   was more or less in the background; true?
20   A.  It depends on the time.  There's some times that he was      09:25:45
21   very much in the forefront.
22   Q.  Okay.  With regard --
23   A.  Not so much.
24   Q.  We were -- you at some time had mentioned so-called
25   quarterly meetings or banking meetings.                          09:26:00
```

1         You indicated Lacey did not attend those; correct?

2    A.  That's correct.

3    Q.  Now, I wanted to talk about the operation of Backpage.  I

4    mean, you were the -- basically the CEO there of Backpage, were

5    you not?                                                          09:26:21

6    A.  I -- I don't understand by that term, because I always

7    think of a CEO as somebody who has some ownership stake or owns

8    a percentage of the company.

9    Q.  All right.  How about operating Backpage?  You were the

10   chief operator, were you not?                                     09:26:39

11   A.  I would use the term a director, yes.

12   Q.  Director/operator.  What I'm talking about is the

13   day-to-day business of Backpage.

14         You were the person in charge of that, were you not?

15   A.  I was the overall supervisor that reported to Scott Spear.    09:26:58

16   Q.  Okay.  And, now, with regard to -- there were a number of

17   terms that the moderators would look for and take out of ads;

18   is that correct?

19   A.  Correct.

20   Q.  And that was at -- that was their job, one of their jobs,     09:27:20

21   was it not?

22   A.  It was.

23   Q.  All right.  And we see, for example, other platforms.

24   Let's talk about, like, Facebook.

25         MR. RAPP:  Objection.                                       09:27:36

UNITED STATES DISTRICT COURT

CARL FERRER - CROSS-EXAMINATION (Cont'd)

13

```
 1   BY MR. CAMBRIA:
 2   Q.  There are times --
 3            MR. RAPP:  Objection.  Relevance.
 4            THE COURT:  Overruled.
 5   BY MR. CAMBRIA:                                              09:27:40
 6   Q.  There are times when the people who run Facebook take
 7   certain things out or prohibit certain things; correct?
 8            MR. RAPP:  Same objection.  And foundation.
 9            THE COURT:  Well, it -- if he knows based on his own
10   knowledge, he can answer.                                    09:27:58
11   BY MR. CAMBRIA:
12   Q.  You're familiar with that, aren't you?
13   A.  Yeah, but I have a different impression.
14   Q.  Well, my question is, are you familiar with that and do
15   they do that?                                                09:28:07
16   A.  I believe they do something different.
17   Q.  All right.  Well -- all right.  How about this:  You talked
18   about -- you used a few terms, BBJ.  You talked about Greek and
19   all these other things.
20            Do you recall that?                                 09:28:28
21   A.  Yes.
22   Q.  All right.  Now, in a situation where somebody launches an
23   ad, the idea is that some other person will respond to that ad;
24   correct?
25   A.  Yes.                                                     09:28:44
```

UNITED STATES DISTRICT COURT

CARL FERRER - CROSS-EXAMINATION (Cont'd)

14

```
 1    Q.  All right.  The ad is sort of an offer, and they're looking
 2    for a customer?
 3    A.  Yes.
 4    Q.  All right.  So, now, if I am somebody -- you talked about
 5    the term "Greek."  All right.  And you said -- I think you said      09:28:59
 6    Greek was -- that some people interpreted that word to mean
 7    anal sex; true?
 8    A.  It's -- Greek is a common term for anal sex --
 9    Q.  Okay.
10    A.  -- in the adult industry.                                        09:29:17
11    Q.  All right.  So if I were someone who was perusing ads and I
12    was interested in engaging in that kind of conduct, I would
13    look for that word, would I not?
14    A.  That could happen, yes.
15    Q.  Well, it makes sense, doesn't it?                                09:29:42
16    A.  Well, I suppose if you're looking for anal sex in the
17    female escorts category that you could search for that term,
18    Greek --
19    Q.  Well --
20    A.  -- and then those ads would come up.                             09:29:59
21    Q.  Okay.  But wasn't -- wasn't that the point you were trying
22    to make, that maybe there are people that associate that term
23    with that kind of conduct; right?
24    A.  Some, it's not a really accurate term if you're browsing
25    the female escorts category.  It would be many or most.             09:30:20
```

UNITED STATES DISTRICT COURT

CARL FERRER - CROSS-EXAMINATION (Cont'd)

15

```
 1    Q.  Well, you can't speak for people you never met before, can

 2    you?

 3    A.  Well, I -- I can tell you that we --

 4    Q.  No.  That wasn't my question.

 5              Can you speak for people you never met before?        09:30:33

 6              MR. RAPP:  Objection as to vague.

 7              MR. CAMBRIA:  Well, Your Honor --

 8              MR. RAPP:  And speculation.

 9              MR. CAMBRIA:  -- that wasn't my question.

10              THE COURT:  Sustained.                                09:30:42

11    BY MR. CAMBRIA:

12    Q.  Okay.  Can you speak for people who you have never met

13    before?

14              MR. RAPP:  Same.

15    BY MR. CAMBRIA:                                                 09:30:49

16    Q.  Do you understand?

17              MR. RAPP:  Objection.

18              THE COURT:  Sustained.

19              MR. CAMBRIA:  Okay.

20    BY MR. CAMBRIA:                                                 09:30:53

21    Q.  In any event, if that word would indicate to someone who

22    was looking for that kind of conduct that perhaps it was

23    available in that ad, you would need to have that word in the

24    ad, would you not?

25              MR. RAPP:  Objection.  Speculation.  Foundation.      09:31:12
```

UNITED STATES DISTRICT COURT

```
 1            THE COURT:  Well, overruled.
 2   BY MR. CAMBRIA:
 3   Q.  Do you understand my question?
 4   A.  No.
 5   Q.  Okay.  Let's assume that --                          09:31:24
 6            MR. CAMBRIA:  Sorry.
 7   BY MR. CAMBRIA:
 8   Q.  Let's assume that I'm someone looking for that kind of
 9   activity and that I would associate that word with that
10   activity.                                                09:31:42
11            If I reviewed an ad that had that word in it, then
12   perhaps I would respond to it for that activity; correct?
13   A.  Correct.
14   Q.  All right.  Now the word's gone.  It's not in the ad
15   anymore.                                                 09:31:58
16            Why would I respond to the ad --
17   A.  Because.
18   Q.  -- if I was looking for that conduct and that word was
19   gone?
20   A.  Because you would look for the misspelling.  You would look  09:32:10
21   for Greek spelled with -- instead of two Es, two 3s.
22   Q.  Okay.  Now, let's assume that wasn't there either.  There
23   was no Greek, no 3s, no 6s, no 12s.  No Greek.
24            That's not an ad that would catch my attention, don't
25   you agree, if I was looking for that conduct and looking for  09:32:33
```

UNITED STATES DISTRICT COURT

1  those words if they were gone?

2  A.  You're -- you're really speaking about a hypothetical here,

3  because you could just call her and ask.

4  Q.  You could.  And then you would have a conversation.

5  Somebody would make an offer.  You would have an acceptance;                09:32:52

6  correct?

7  A.  Correct.

8  Q.  All right.  I'm talking about just reading an ad.  Reading

9  an ad doesn't have that connection with the individual, does

10  it?                                                                          09:33:05

11  A.  It's not as transparent, if that's what you mean.

12  Q.  What I mean is --

13  A.  Not as convenient.

14  Q.  -- if you read an ad and the word's not there and you

15  haven't talked to the individual, then you're going to have no              09:33:19

16  connection with that person for that activity, are you?

17          MR. RAPP:  Objection.  Asked and answered.

18          THE COURT:  Sustained.

19          MR. CAMBRIA:  All right.  I guess they agree with me

20  then.                                                                       09:33:33

21          MR. RAPP:  Objection.  Move to strike that and

22  admonish counsel not to editorialize.

23          THE COURT:  Sustained, Mr. Cambria.

24          MR. CAMBRIA:  All right.  Could we show the witness

25  Exhibit 662, which I believe is in evidence.                               09:34:18

CARL FERRER - CROSS-EXAMINATION (Cont'd)                    18

```
 1   BY MR. CAMBRIA:
 2   Q.  Do you see that, Mr. Ferrer?
 3   A.  I do.
 4   Q.  All right.  And I think that you had identified that
 5   earlier as a -- an email from you to Mr. Larkin, Mr. Lacey, and    09:34:42
 6   it's with regard to a meeting you had with a Byron Fassett.
 7           Who's Byron Fassett?
 8   A.  So he's a police officer for prostitution investigations
 9   involving juveniles in Dallas, Texas.
10           MR. CAMBRIA:  Okay.  And before we go on, could we        09:35:14
11   just publish this, please.
12           MR. BERRY:  It's not in evidence.
13           MR. CAMBRIA:  It's in evidence.
14           MR. RAPP:  It's not in evidence.  It's not in
15   evidence.  662b is in evidence.                                   09:35:27
16           MR. CAMBRIA:  All right.
17   BY MR. CAMBRIA:
18   Q.  Mr. Ferrer, I call your attention to 662.
19           Is that something that you wrote?
20   A.  Yes, it is.                                                   09:35:44
21   Q.  And you send it to Jim Larkin, Mike Lacey, and it was with
22   regard to Byron Fassett; is that correct?
23   A.  I sent it to them because they requested that.
24   Q.  I didn't ask you that.  I asked you if you sent it to them.
25   A.  I did.                                                        09:35:59
```

UNITED STATES DISTRICT COURT

1    Q.  All right.

2            MR. CAMBRIA:  And I offer it in evidence.

3            THE WITNESS:  I'm sorry?  I did not -- I didn't hear

4    that.  Oh.

5            THE COURT:  I'm sorry?                              09:36:11

6            MR. CAMBRIA:  I offer it into evidence.

7            THE COURT:  You're moving to admit?

8            MR. CAMBRIA:  I'm sorry.

9            THE COURT:  Are you moving to admit?

10           MR. CAMBRIA:  Yes.                                  09:36:18

11           THE COURT:  Oh, okay.

12           Is there an objection?

13           MR. RAPP:  Judge, I need a second because this is not

14   the version of the exhibit that -- so I need to see the second

15   page.                                                       09:36:29

16           THE COURT:  Oh, are there multiple pages, Mr. Cambria?

17           MR. CAMBRIA:  Your Honor, I thought this one was in

18   evidence.  He says there's a 662a apparently.

19           MR. RAPP:  B.

20           THE COURT:  B.                                      09:36:41

21           MR. CAMBRIA:  B.

22           MR. RAPP:  If -- if counsel wants this in, it can be

23   published and admitted.

24           THE COURT:  This is Government's 662, is that correct,

25   Mr. Cambria?                                                09:37:10

```
 1                MR. CAMBRIA:  Yes, Your Honor.

 2                THE COURT:  It may be admitted, and it may be

 3   published.

 4                MR. CAMBRIA:  Thank you.

 5                (Exhibit 662 admitted into evidence.)          09:37:17

 6   BY MR. CAMBRIA:

 7   Q.  Mr. Ferrer, would you read this, please.

 8                MR. RAPP:  Well, the --

 9                THE WITNESS:  The entire --

10                MR. RAPP:  Hold it.                             09:37:23

11                It's a lengthy -- it's a lengthy email here.  The

12   entirety of it?

13                MR. CAMBRIA:  Well, sections at a time here.

14                Could we have him read it, please.

15                THE COURT:  Well, how are you going to have him read 09:37:36

16   it?  From the top up or from the top down?

17                MR. CAMBRIA:  From the top down.

18                THE COURT:  Okay.  And I'm assuming that you don't

19   need him to read the email addresses.

20                MR. CAMBRIA:  No.                               09:37:49

21                THE COURT:  Okay.

22                You may -- you may read the email, Mr. Ferrer.

23                THE WITNESS:  "I had a meeting with Sergeant Byron

24   Fassett.  He heads up the High Risk Victims and Trafficking

25   Unit.  My thought is to get to know the guy who is very well   09:38:03
```

UNITED STATES DISTRICT COURT

1   known and liked at the Crimes Against Children Conference in

2   Dallas.

3          "He had been quoted in several articles by our papers

4   in the past.  Including the Super Bowl article" -- and then I

5   have a link to the Super Bowl article with the title Super Bowl          09:38:17

6   Prostitution, 100,000 Hookers Didn't Show but America's Latest

7   Political Scam did.

8          "I expect a low key meeting with Byron.  I ended up in

9   a meeting with 8 well-prepared people.  Sergeant Fassett and

10  Sergeant Nunez (head of vice), a Lieutenant on the vice squad,          09:38:37

11  an ICAC member, Joe Ullman of the FBI, Sally Lannon Lieutenant

12  PD, Lisa Miller AUSA, Brooke Grona-Robb, ADA, and another

13  sergeant who pulled records but did not have a card.

14         "I told them I was not a reporter.  I run the web site

15  and want to work with them.  Our priorities are deter, remove,          09:39:03

16  and report bad postings and help prosecute any child

17  exploitation or human trafficking cases.

18         "Sergeant Fassett recalled speaking with the Village

19  Voice reporter last week.  He indicated the arrest records are

20  problematic way to qualify the prostitution" -- "child                  09:39:22

21  prostitution issue.  However, he felt to exaggerate statistics

22  were not helpful.  If we say there are around a thousand child

23  prostitute victims, he says it means there are 10,000.  This is

24  because so many cases involving child exploitation may get

25  charged for a different crime.                                          09:39:47

1          "They only use 1 percent of the NCMEC reports we send

2     them.  There are several reasons for this:  Backpage needs to

3     do a better job.  We are reporting pics where the user is

4     clearly not underaged.  Even if the pic looks under aged, they

5     still have to set up a meeting with the user and often they do          09:40:05

6     not get a call back when they leave a voicemail," [as read].

7     BY MR. CAMBRIA:

8     Q.  Let me stop you there for a second.

9          So he at this meeting said that even if the pic looks

10    under aged, they still have to set up a meeting with the user;          09:40:22

11    is that correct?

12    A.  That's what it says.

13    Q.  Under- -- do you understand that to mean at the time by him

14    that simply looking at the picture itself, or the ad, was not

15    sufficient?  You had to actually meet?          09:40:38

16    A.  That's how I understood it.

17    Q.  Okay.  Continue, please.

18    A.  "Most of their successful cases are achieved through other

19    means than our" -- "than one of our NCMEC reports.  Even

20    reports from other users often turn out to be competitors just          09:40:54

21    trying to get someone's ad taken down."

22    Q.  Let me stop you there.

23          That last statement that sometimes reports turn out to

24    be competitors, are you familiar with that generally aside from

25    what he said?          09:41:19

```
 1    A.  Yes, I am.

 2    Q.  All right.  And that from time to time people will call in

 3    and report a particular ad and say that it -- you know, it's

 4    inappropriate, or what have you, and they're really trying to

 5    get that ad taken down because that's one of their competitors;   09:41:41

 6    true?

 7    A.  We did see that happen on occasion.

 8    Q.  Okay.  And so sometimes a statement, whether it be a report

 9    or a claim or so on, isn't reliable?

10            MR. RAPP:  Objection.  Foundation.                        09:42:02

11    BY MR. CAMBRIA:

12    Q.  From your experience?

13            THE COURT:  Sustained.

14    BY MR. CAMBRIA:

15    Q.  Based on your observations and your experience?              09:42:10

16            MR. RAPP:  Same.  Same objection.  When?  Where?

17    What?

18            THE COURT:  Sustained.

19    BY MR. CAMBRIA:

20    Q.  All right.  Does it matter when, where, or what as a -- as   09:42:18

21    to whether that occurs?

22            Would it matter if it happened in March versus

23    December?

24    A.  It -- it -- no.  It matters more on the IP tracking and the

25    tools that we put in place to ignore those type of reports.     09:42:40
```

UNITED STATES DISTRICT COURT

CARL FERRER - CROSS-EXAMINATION (Cont'd)

24

1   Q.  Let me give you another example.  If you, for example, had

2   a complaint about a particular ad, let's say, and then it turns

3   out that you had complaints about a number of ads but they all

4   came from the same place, that would be something you'd look

5   at; correct?                                                    09:43:04

6   A.  Correct.  That's how you could identify somebody who -- who

7   may be -- the report is not genuine.

8   Q.  Yeah.  So, in other words, one IP address is reporting 50

9   other ads as being inappropriate.  That usually is somebody

10  who's a competitor trying to get somebody else taken down;      09:43:24

11  right?

12  A.  Sometimes.  Sometimes it's a NGO or an anti-human

13  trafficking group that's just flagging every ad in the

14  category.

15  Q.  And there would be no way for you to tell just by looking    09:43:37

16  at it?

17  A.  Well, there is a way.  I mean, we -- you'd look at the

18  number of reports by IP and if it's all in one particular city,

19  then we question the -- whether that report is genuine and

20  whether we should send a report to NCMEC or not.                09:43:53

21  Q.  Right.  And so you'd find, however, in situations like that

22  that frequently the reports are not genuine?

23  A.  No.  It's more like the minority of the reports.  I mean,

24  frequently they're -- the reports are -- appear to be genuine.

25  Q.  Okay.  And so the problem is, however, that you don't know   09:44:12

1  the genuine from the not accurate?

2  A.  I think that's why we enjoyed sending those reports to

3  NCMEC and let them send it to the police department to let them

4  investigate.

5  Q.  So is your answer to my question yes?                    09:44:33

6  A.  Well, could you -- can I -- could you say that question

7  again?

8  Q.  Oh.

9  A.  I'm sorry.

10  Q.  Yeah.  No.  What I said was, you can't tell the difference   09:44:42

11  between a genuine and a non-genuine?

12        And did you not say, we just send them on to NCMEC and

13  let them figure it out?

14  A.  Well --

15        MR. RAPP:  Objection.  Objection.  Confusing and vague   09:44:53

16  and --

17  BY MR. CAMBRIA:

18  Q.  Are you confused by that?

19        THE COURT:  Well, no.  Let -- let me -- Mr. Cambria,

20  when there's an objection, let me make a ruling.              09:45:00

21        MR. CAMBRIA:  I'm sorry.  Sure, Your Honor.

22        THE COURT:  Okay.  So I will sustain the objection.

23        And you can rephrase or --

24        MR. CAMBRIA:  Okay.

25        THE COURT:  -- ask a new question.                     09:45:09

BY MR. CAMBRIA:

Q.  All right.  In any event, you told us, didn't you, that in situations like that you'd send those to NCMEC and let them figure it out?

A.  In situations where we felt that the report was genuine, we would send them to NCMEC.                                              09:45:18

Q.  All right.  Well, if -- if you felt that it wasn't genuine, would you still send them to NCMEC so that they could figure out for sure if it was genuine?

A.  We would err on the side of sending the report to NCMEC.     09:45:37

Q.  So -- so you would send it?  Either way, you would send it to be safe?

A.  If you had asked me earlier about the reports being genuine, some reports appeared to be very genuine if they involved a family member.                                            09:45:59

        So there's just degrees of authenticity of these reports.  You know, I can't paint the -- a broad brush on every report that we have from the user.

Q.  Okay.  Back to where we were reading.  Do you recall where we were here?                                                       09:46:16

A.  I don't.

Q.  All right.  Let's start with the part where it says, "Dallas focuses on run aways."

A.  I got it.

        "Dallas focuses on run aways and this they feel is    09:46:30

1    much more successful.  They have 9,000 run aways per year.  Any

2    child who runs aways 4 times or more they believe is at risk of

3    child exploitation.  They end up creating a list of 207 high

4    risk children.  These high risk children profiles are shared

5    with law enforcement.  About 94 high risk children end up          `09:46:55`

6    involved in prostitution.

7         "They would like backpage to do the following:  Build

8    a tool where law enforcement can access and do a search by

9    phone number all cities; build an image hash so we can find and

10   remove images where a child is exploited and/or assist law          `09:47:18`

11   enforcement; include the backpage user name that made the NCMEC

12   report; ask the backpage person to provide more detail on why

13   they think someone is under age; include a PSA on the site

14   explaining the consequences of statutory rape (run this in the

15   listing or at the bottom of every ad); include a time date and     `09:47:47`

16   time zone info with the IP address; as was the case in Chicago,

17   they also think they should be able to get info without a

18   subpoena if we added this to our disclaimer or Terms of use.

19   (I said my attorneys continue to review this request but it's

20   problematic).                                                       `09:48:07`

21        "Sergeant Nunez asked if I would remove ads from known

22   prostitutes.  I said, email me the posting and I would be happy

23   to do so.

24        "We also talked about user reporting.  Do we continue

25   to assume anonymous reports or do get their email address and      `09:48:24`

1  share it with law enforcement?

2      "I said user reporting was under review, that I will

3  share any info they need with a subpoena (or the promise of a

4  subpoena) for exigent circumstance.  Carl," [as read].

5  Q.  So the last part of that, there were a number of things          09:48:43

6  that they asked Backpage to do to assist them; correct?

7  A.  Yes.

8  Q.  All right.  So they were asking to continue to work with

9  Backpage, were they not?

10 A.  I don't know if they'd describe it work with us.  That's         09:49:01

11 implying some kind of partnership.  But they do have a to-do

12 list they'd like us to consider.

13 Q.  Well, if they ask you to do something and then you do that

14 for them, you're working with them, aren't you?

15      MR. RAPP:  Objection.  Asked and answered.                      09:49:18

16      THE COURT:  Overruled.

17      You can answer, if you can.

18      THE WITNESS:  We're following through on some of their

19 suggestions but some we did not do.

20 BY MR. CAMBRIA:                                                      09:49:32

21 Q.  All right.  So the ones you're following through on, then,

22 you're working with them because you are accepting their

23 request; true?

24 A.  Part of my reason to visit them was to create the

25 impression that we're working with them.                            09:49:49

UNITED STATES DISTRICT COURT

1    Q.  Do you remember my question?

2    A.  I just did.

3    Q.  I said, if they asked you to do something, you agreed to do

4    it, you were working with them, were you not?

5           That's a yes or a no.                                      09:50:03

6    A.  Well, what if they asked me not to --

7    Q.  That's a yes or no.

8    A.  There's things that I'm not doing, so I'm not working with

9    them on those things.

10   Q.  So it's no?                                                    09:50:17

11   A.  No.  I just wouldn't characterize it as working with them.

12   I just think that that implies a partnership.  As I said

13   earlier, I was there for a PR --

14   Q.  If the police asked you to do something and you agreed to

15   do it, you consider that working with them?                       09:50:34

16          MR. RAPP:  Objection.  Asked and answered.

17          MR. CAMBRIA:  Well, he hasn't answered it.  I've asked

18   for a yes or no.

19          MR. RAPP:  He's answered it.

20          MR. CAMBRIA:  No, he's not.                                 09:50:47

21          THE COURT:  All right.  There's an objection, and I'm

22   going to sustain it.

23          MR. CAMBRIA:  Okay.

24          THE COURT:  Let's move on, Mr. Cambria.

25          ///

 1    BY MR. CAMBRIA:

 2    Q.   Are you familiar with the USC Annenberg study?

 3    A.   I am.

 4          MR. CAMBRIA:  And could we pull up PCCF 20, please.

 5          THE COURT:  What did you say?                        09:51:44

 6          MR. CAMBRIA:  PCCF 20.

 7    BY MR. CAMBRIA:

 8    Q.   Mr. Ferrer, do you recall writing this email?

 9    A.   I do.

10    Q.   Okay.  And did you send this particular email to Mr. Larkin   09:52:21

11    with a copy to a Don Bennett Moon, Michael Lacey --

12    A.   I did.

13    Q.   -- and --

14          MR. CAMBRIA:  I'd offer this in evidence.

15          MR. RAPP:  Objection.  Hearsay.  And, in particular,   09:52:41

16    the lower email.

17          THE COURT:  Sustained.

18    BY MR. CAMBRIA:

19    Q.   Well, my question is, did you report this information to

20    the individuals you sent it to?                            09:52:54

21    A.   Are you referring to the Annenberg study?

22    Q.   I'm referring to this email that you sent to these

23    individuals.

24          MR. CAMBRIA:  I'm offering it, Your Honor, not for the

25    truth but for the fact that it was reported.               09:53:12

                    UNITED STATES DISTRICT COURT

```
 1              THE COURT:  You can ask him about that.
 2    BY MR. CAMBRIA:
 3    Q.  This email you wrote; correct?
 4    A.  I wrote it.
 5    Q.  And you sent it to these individuals; true?        09:53:23
 6    A.  I did, but I would like a moment to read it --
 7    Q.  Certainly.
 8    A.  -- just to confirm that, because this is the first time I'm
 9    seeing this email, and it's 2011, 12 years ago.
10              THE COURT:  Is the -- is that the full exhibit?   09:53:41
11              MR. CAMBRIA:  It's all I have, Your Honor.
12              MR. RAPP:  Do you have a hard copy available of this?
13              THE COURTROOM DEPUTY:  Counsel should have it.
14              MR. RAPP:  Do you have a hard copy available?
15              MR. CAMBRIA:  Mine.                          09:54:02
16              THE COURT:  Did you provide copies to the Court,
17    Mr. Cambria?
18              MR. CAMBRIA:  Pardon me, Your Honor?
19              THE COURT:  Did you provide copies of that exhibit to
20    the Court?                                             09:54:11
21              MR. CAMBRIA:  All of the exhibits that we've referred
22    to we've provided.  I'm told.  I didn't physically do it
23    myself.
24              (The Court and the courtroom deputy confer.)
25              THE COURT:  They're not here.  Your exhibits are   09:54:23
```

UNITED STATES DISTRICT COURT

```
 1  not -- that exhibit in particular's not here, and we don't
 2  have -- I don't have a copy of it.
 3          MR. CAMBRIA:  It was filed by the paralegals, Your
 4  Honor.  I didn't file the exhibits.
 5          MS. BERTRAND:  Your Honor, may I step out and get the      09:54:43
 6  paralegals?
 7          THE COURT:  Yes.
 8          MS. BERTRAND:  They're in the workroom.  I'll be right
 9  back.
10          MR. CAMBRIA:  Pardon me?                                  09:54:49
11          THE COURT:  Well, we don't have your exhibit, but,
12  nevertheless, it's on the screen in front of the witness, so
13  you can move forward.
14          MR. CAMBRIA:  Oh, thank you.
15  BY MR. CAMBRIA:                                                   09:54:58
16  Q.  All right.  I was asking you, did you send this on
17  December 8th, 2011, to the individuals I've indicated; Larkin,
18  Lacey, Moon?
19  A.  Yes, I did.
20  Q.  All right.                                                    09:55:10
21          MR. CAMBRIA:  And I'd offer this in evidence, Your
22  Honor.
23          MR. RAPP:  Right.  Same objection.  It's hearsay.
24          MR. CAMBRIA:  Well, it's being offered for conveying
25  this information to those individuals, as the government has     09:55:21
```

 1  done with a number of exhibits.

 2          MR. RAPP:  No.  The door doesn't swing both ways.

 3          MR. CAMBRIA:  It should.

 4          MR. RAPP:  This is -- it doesn't.  This is hearsay.

 5          THE COURT:  Okay.  Sustained as to hearsay.                    09:55:35

 6          MR. CAMBRIA:  Okay.  Could I have Exhibit 668, please?

 7          THE COURT:  Just confirming.  You said 668?

 8          MR. CAMBRIA:  I did.

 9  BY MR. CAMBRIA:

10  Q.  All right.  668.                                                   09:56:37

11          Do you see that, sir?

12  A.  I do.

13  Q.  And do you recall that is an email that you wrote to

14  Mr. Lacey July 15th, 2011?

15  A.  Yes.                                                              09:56:49

16          MR. CAMBRIA:  Offer that in evidence, Your Honor:

17          MR. RAPP:  Objection.  Hearsay.

18          MR. CAMBRIA:  This is what he's telling Mr. Lacey.

19  He's available here to cross-examine.

20          MR. RAPP:  You can ask him about that, but it contains        09:57:21

21  other emails.  It's an email thread.

22          THE COURT:  Does it?  I -- is this the only page?  Oh,

23  okay.  All right.

24          MR. CAMBRIA:  I'm offering it up to where it says

25  "Carl."  That's the first email.                                      09:57:38

 1              THE COURT:  Well, the problem, though, is that it's

 2    not been redacted to that point, Mr. Cambria.

 3              MR. CAMBRIA:  Well, we can supply that, Your Honor.

 4    At this point I would only ask him about the part that goes up

 5    to the end that he wrote.                                    09:58:02

 6              THE COURT:  Yet -- well --

 7              MR. CAMBRIA:  Pardon?

 8              THE COURT:  Okay.  All right.  It has been redacted,

 9    and so --

10              MR. CAMBRIA:  Oh, good.  Thank you.  I appreciate    09:58:19

11    that.

12    BY MR. CAMBRIA:

13    Q.  All right.

14    A.  Is it --

15              THE COURT:  Well, hold on.                          09:58:25

16              Did the government have an objection with regard to

17    the redacted version?

18              MR. RAPP:  So the -- I -- now that it's redacted,

19    it's -- it's -- the other part is still hearsay.  He's still

20    offering it for the truth.                                   09:58:39

21              MR. CAMBRIA:  Your Honor, I'm --

22              THE COURT:  Well --

23              MR. CAMBRIA:  Speaker is --

24              THE COURT:  Well, let me make a ruling.

25              MR. CAMBRIA:  Yeah.                                 09:58:50

UNITED STATES DISTRICT COURT

1          THE COURT:  I'm going to overrule the objection with

2     regard to the redacted version.  And so this redacted version

3     that is on your screen is admitted.

4          MR. CAMBRIA:  Thank you.

5          (Exhibit 668 admitted into evidence.)                    09:59:02

6          MR. CAMBRIA:  May I publish it, please.

7          THE COURT:  Yes.

8          MR. CAMBRIA:  May I have the witness read it?

9     BY MR. CAMBRIA:

10    Q.  Would you read it, please, up to where it says "Carl."     09:59:07

11         THE COURT:  Oh, I'm sorry.  Are you asking the

12    witness?

13         MR. CAMBRIA:  I'm asking the witness to read it, yes.

14         THE WITNESS:  Oh --

15         THE COURT:  Yeah.                                          09:59:22

16         THE WITNESS:  -- I'm sorry.

17    BY MR. CAMBRIA:

18    Q.  I'm sorry, sir.  Go ahead.

19    A.  From the top?

20    Q.  Yes, please.                                                09:59:28

21    A.  "I just want to make sure you have thoughts on this photo

22    ID.  Regarding age" --

23         MR. RAPP:  I'm sorry.  That was -- you -- you

24    misstated that.  Objection.

25         THE COURT:  I can't hear you, Mr. Rapp.                    09:59:43

UNITED STATES DISTRICT COURT

1            MR. RAPP:  My apologies.  He misstated that sentence.

2  He just missed a word.  If he could read it again.

3            MR. CAMBRIA:  I think he left out "my thoughts."

4            THE WITNESS:  Oh, I apologize.

5            Starting again.  "I just want to make sure you have my          09:59:55

6  thoughts on this photo ID.  Regarding Age verification ID.

7  Response:  There's always an adult involved in child

8  exploitation.  According to Sergeant Byron Fassett, Dallas

9  Police Department's Crimes Against Children unit, the adult

10 places the ad, the adult rents the motel room, and the adult          10:00:22

11 provides the transportation.  The majority of the cases

12 involved" -- "involve a homeless run away with limited

13 resources.  Our own experience at backpage.com has been that in

14 virtually every case of posting involving a child exploitation,

15 the post was from someone over the age of 18 and using a valid          10:00:43

16 credit card.

17            "Credit cards:  We capture full credit card numbers,

18 the users name and address with every transaction.  We also use

19 AVS (address verification system) to further authenticate the

20 user.  We do not take cash or money orders.  We provide the          10:01:05

21 full credit card number with a subpoena and it has aided law

22 enforcement in their prosecution.  Retaining this personally

23 identifiable data and credit card number requires a great deal

24 of expense in terms of security.  Many sites simply choose to

25 not retain this information and avoid the expense.          10:01:27

1          "Some clients do not use" -- or, excuse me.  "Some

2     clients do use prepaid debit cards, someone else's credit card

3     with or without the card holder permission.  Our experience has

4     been the vast majority of users eventually post with their

5     credit card and provide valuable personally identifiable          10:01:50

6     information.

7          "Photo IDs are impractical for e-Commerce sites.

8     Other sites like Match.Com, AdultFriendFinder, Plenty of Fish

9     and Craigslist do not require a photo ID to post.  Requiring a

10    credit card is the most widely acceptable method of user         10:02:09

11    verification.  Very few people have the capability to scan

12    their ID or fax.

13         "Images on dating and classified sites are often not

14    valid.  It is widely known among law enforcement that the image

15    used on Internet postings will not off" -- "will often not be    10:02:27

16    real.  Images are often borrowed from other ads or other

17    websites.

18         "Regarding Eros.com.  They have a policy that if you

19    look under the age" -- "that if you look under the age of 25

20    they may request a fax of their ID.  Their ID requirement is     10:02:47

21    enforced selectively.  Many vice detectives consider Eros's ID

22    requirement as a way to make it impossible for their vice

23    department to post a sting ad.

24         "User education and age verification.  We have notices

25    throughout the site to not post in adult or personals if you     10:03:12

CARL FERRER - CROSS-EXAMINATION (Cont'd)

38

1   are under 18.  The posting form requires you to enter an age.

2   You are told you cannot post in this site if you enter any age

3   under 18.  Our moderators aggressively report to law

4   enforcement postings that may have a pic or language in the ad

5   suggestive of someone who appears to be under the age of 18.        10:03:34

6   In addition, users browsing the site also send us reports of

7   any ads in violation of our terms.

8          "Law enforcement has not complained about the quality

9   or quantity of the information we provide.  They are more

10  focused on getting the information quickly.  For example, they   10:03:54

11  sometimes need information at 3 am where a subpoena will be

12  forthcoming.  Backpage staff has been focused on turning around

13  requests for information expeditiously as possible often within

14  the hour or same day.  I have been told we respond

15  significantly faster than the cell phone carriers, internet     10:04:16

16  service providers and email service providers which can take a

17  week or longer.  Carl," [as read].

18  BY MR. CAMBRIA:

19  Q.  And, as I say, you sent this email to Mr. Lacey in July of

20  2011; correct?                                                  10:04:36

21  A.  I did.

22  Q.  All right.  And one of the things that you said in there

23  and that you had learned is that photographs that appear in ads

24  are all -- not always genuinely the person posting the ad;

25  correct?                                                        10:04:56

1    A.  Correct.

2    Q.  Sometimes people will use photographs of younger-looking

3    people; true?

4    A.  Yes, that could be true.

5    Q.  And, in addition, they may use just stock photographs that    10:05:10

6    they find on the Internet?

7    A.  That also could be true.

8    Q.  So a picture isn't necessarily a depiction of the person

9    who is posting the ad.

10            Is that fair to say?  You knew that?    10:05:37

11   A.  That could be true.

12   Q.  All right.  And, also, the information that's in the ad,

13   the platform, if you will, like Backpage or Facebook or

14   whatever, the -- it isn't the practice to verify all of those

15   statements that people put into ads?    10:05:58

16            MR. RAPP:  Objection.  Relevance and foundation.

17            THE COURT:  Sustained.

18   BY MR. CAMBRIA:

19   Q.  Well, with regard to a -- with regard to a particular ad,

20   there isn't -- there isn't anything -- in other words, when    10:06:22

21   somebody places an ad, they don't come down personally -- or

22   they don't have to come down personally and verify their age

23   and their identity and their picture and so on; is that

24   correct?

25   A.  That's correct.    10:06:42

1   Q.  And that's how it goes for most things, that, for example,

2   your background of newspapers, when people posted ads in

3   newspapers?

4           MR. RAPP:  Objection.  Relevance.  Foundation.

5           MR. CAMBRIA:  Your Honor, it is relevant.                    10:06:57

6           THE COURT:  Well --

7           MR. CAMBRIA:  It is the practice.

8           THE COURT:  Well, he can answer the question.  I'll

9   overrule the objection.

10          MR. CAMBRIA:  Okay.  Thank you.                              10:07:08

11  BY MR. CAMBRIA:

12  Q.  So, in other words, when you were in the newspaper

13  business, you didn't verify the information that somebody

14  called in on an ad, did you?

15  A.  It was pretty rare, but sometimes.                              10:07:19

16  Q.  That's a yes or no.

17  A.  Well, I can't answer a yes or no because --

18  Q.  All right.  I'll withdraw the question.

19          At its peak, how many ads a week would be posted on

20  Backpage?                                                           10:07:42

21          MR. RAPP:  Objection as to foundation.  When?  Where?

22          MR. CAMBRIA:  At its peak.

23          THE COURT:  Well, I think it's confusing.  Maybe you

24  can ask him what he considers to be the peak.

25          MR. CAMBRIA:  All right.  I adopt that question.            10:07:58

1          MR. RAPP:  Well, I still have an objection as to the

2    market.  And Backpage was many places.

3    BY MR. CAMBRIA:

4    Q.  Let's say all the markets.  How many ads -- because, for

5    example, the moderators would review the words for all the          10:08:16

6    markets, didn't they, except -- all the United States markets;

7    correct?

8    A.  You're speaking of just the U.S. markets?

9    Q.  That's the United States.

10   A.  What was the question?                                          10:08:35

11   Q.  The question was, the moderators would review all of the

12   ads for the United States, would they not?

13   A.  No.

14   Q.  No?  Okay.

15          Was there a particular state left out?                       10:08:46

16   A.  No.  There's categories --

17   Q.  Oh, okay.

18   A.  -- with --

19   Q.  Let's take the adult category.  Okay?

20          How many at its peak, meaning the most, adult ads were       10:09:00

21   published in a week?

22          Best estimate.  Thousands?  Hundreds?  Millions?

23          MR. RAPP:  I still have a foundational question.

24          THE COURT:  Yeah.

25          MR. RAPP:  Can we establish what the peak is and in --       10:09:19

```
 1   in all cities?
 2           MR. CAMBRIA:  All cities.
 3           THE COURT:  Sustained.
 4   BY MR. CAMBRIA:
 5   Q.  Yeah, the peak -- do you understand peak to mean the        10:09:30
 6   highest number?
 7   A.  I do.
 8   Q.  Okay.  And so I'm asking you, in any given week, what was
 9   the highest number of ads that were submitted to Backpage in
10   the United States?                                              10:09:44
11   A.  So this is a more complicated answer than you think.
12   Q.  Okay.
13   A.  Okay?  And I -- I want a chance to explain.
14   Q.  All I'm asking you is for numbers.  Is it --
15   A.  Well --                                                     10:10:00
16   Q.  -- hundreds -- hang on one second.
17           Is it thousands?  Is it millions?  How many?
18   A.  I've got to qualify my answer.
19   Q.  Go ahead.
20   A.  So are we talking about new ads that are posted?  Are we    10:10:09
21   talking about ads that had been moved to the top?
22   Q.  All right.  Let's --
23   A.  Do you want to count an ad that's moved to the top as a new
24   ad that -- are we talking ads that day that are new?
25   Q.  Let's start with new ads in a week.                         10:10:25
```

UNITED STATES DISTRICT COURT

```
 1   A.  I'm going to say maybe 5- to 10,000.

 2   Q.  5- to 10,000 ads in a week?

 3   A.  The majority of the ads, once posted, users would move to

 4   the top.  And so a significantly greater number.

 5   Q.  Okay.  Well, whether or not hundreds of thousands of ads        10:10:49

 6   posted on Backpage, let's say, in a month --

 7   A.  Are -- are we talking adult again?

 8   Q.  Well, let's start with all ads first, and then we'll break

 9   it down.

10   A.  Once again, I've got to qualify my answer.                      10:11:08

11   Q.  I'm not surprised.

12          Go ahead.

13   A.  Okay.  Are we talking about just user-generated content?

14   Q.  Yes.

15   A.  Are we talking about feeds coming in from, you know,           10:11:21

16   websites?

17   Q.  We're --

18   A.  Take XML feeds.

19   Q.  We're talking about all ads that the moderators would

20   review.                                                            10:11:33

21   A.  Okay.  So that would be user-generated content across all

22   categories.

23   Q.  Yes.

24   A.  Hundreds of thousands.

25   Q.  A week?                                                        10:11:43
```

CARL FERRER - CROSS-EXAMINATION (Cont'd)

44

```
 1   A.  No.  I -- I was thinking of a month.

 2   Q.  A month.  Hundreds of thousands?

 3   A.  Yes.

 4   Q.  Okay.

 5   A.  And I want to qualify that by just saying it's an estimate.   10:12:05

 6   There's reports that can give you an exact number.

 7   Q.  All right.

 8        MR. CAMBRIA:  Could we pull up 669, please.

 9   BY MR. CAMBRIA:

10   Q.  On the screen you see Exhibit 669.                            10:12:25

11        Is -- do you recognize this as an email from you to

12   Michael Lacey, Jim Larkin in 2011?

13   A.  Yes, I do.

14   Q.  All right.  And do you recall this?

15   A.  I do.                                                         10:12:45

16   Q.  All right.

17        MR. CAMBRIA:  Offer this in evidence.

18        MR. RAPP:  No objection.

19        THE COURT:  It may be admitted.

20        MR. CAMBRIA:  Thank you.

21        (Exhibit 669 admitted into evidence.)

22        THE COURT:  And published.

23        MR. CAMBRIA:  Thank you.

24   BY MR. CAMBRIA:

25   Q.  Could you read this, please.                                 10:13:08
```

1    A.   "We sent 19 NCMEC reports to date in 2011 for Seattle

2    specific postings.  This does not include Tacoma, etc.

3           "You probably remember these stats:  Approximately

4    21,143 banned terms (terms added on a daily basis); 96,350

5    banned users; 4,323 banned IPs; 493,516 ghosted postings all        10:13:32

6    sections (although most people would not know what ghosting

7    means)."

8    Q.   All right.  Let's hold one moment there.

9           What is a ghosting posting?

10   A.   So this is an automated process that when people are          10:13:53

11   posting spam ads and jobs it appears that their ad is live, but

12   it's actually not going to appear in the listings.  So it won't

13   interfere with the user experience.

14   Q.   And were -- did you do any ghosting -- ghosted postings in

15   connection with law enforcement?                                   10:14:22

16   A.   Did we ghost any postings in connection with law

17   enforcement?  Why?

18   Q.   I'm just asking you if you did.

19   A.   Yeah.  I can't think of any reason why --

20   Q.   Now --                                                        10:14:40

21   A.   -- we'd do that.

22   Q.   -- there came a time, did there not, when law enforcement

23   would put up a sting ad; is that true?

24   A.   Yes.

25   Q.   And what is a sting ad?                                       10:14:55

1   A.  So a sting ad is when law enforcement posts an ad in order

2   to get Johns to respond and then they are arrested.

3   Q.  So, in other words, the law enforcement officers would make

4   an arrangement with Backpage that they would post an ad where

5   they were trying to catch people who were trying to break the                    10:15:24

6   law?

7   A.  There was no arrangement.

8   Q.  Well --

9   A.  We did it -- we didn't even want to tell them.

10  Q.  Well, you said there was no arrangement.  You answered my                    10:15:38

11  question.

12          Next question.

13  A.  That's -- there's no arrangement.

14  Q.  Okay.

15  A.  They do it anonymously.                                                      10:15:44

16  Q.  Next --

17  A.  We don't know.

18  Q.  Next question.  Did you not have cases where they posted a

19  sting ad and your moderators took it down?

20          MR. RAPP:  Objection as to foundation.  When?  Where?                    10:15:57

21  BY MR. CAMBRIA:

22  Q.  Anytime during the operation of Backpage when you worked

23  there, whether situations where they posted a sting ad and your

24  moderators took it down because it had a word in it that on

25  your list of words wasn't prohibited.                                            10:16:14

 1              THE COURT:  All right.

 2              MR. CAMBRIA:  Was prohibited.

 3              THE COURT:  Mr. Cambria, I will overrule the objection

 4    given that you've clarified the question.

 5              MR. CAMBRIA:  Thank you.  I'm sorry, Your Honor.        10:16:26

 6    Thank you.

 7    BY MR. CAMBRIA:

 8    Q.  Do you -- do you follow me?

 9    A.  Yes.  Moderators did remove ads, but they wouldn't know

10    that they were sting ads.                                        10:16:35

11    Q.  Okay.  But here's my question:  The police put up a sting

12    ad, which basically is a fake ad, and they're trying to get

13    somebody to respond to it so that they can arrest them.

14              Isn't that a fact?  Isn't that true?

15    A.  That's -- that's what I understand.                          10:16:51

16    Q.  Okay.  And at some time what happened is they put up one of

17    these sting ads, and your moderators took it down because it

18    had a term in it that was not permitted --

19              MR. RAPP:  Objection.

20    BY MR. CAMBRIA:                                                  10:17:07

21    Q.  -- correct?

22              MR. RAPP:  Asked and answered.

23    BY MR. CAMBRIA:

24    Q.  Well, is that true?

25              THE COURT:  Overruled.                                 10:17:12

UNITED STATES DISTRICT COURT

 1          THE WITNESS:  It did happen.
 2   BY MR. CAMBRIA:
 3   Q.  All right.  And then the police would call you and say,
 4   hey, don't take my ad down, it's a sting ad; correct?
 5   A.  Yes.  They wouldn't use the word "sting," though.  They'd          10:17:21
 6   say prostitution investigation.
 7   Q.  Okay.  You understood it to be a sting ad; correct?
 8   A.  I did.
 9   Q.  All right.  And prostitution investigation was simply a way
10   of trapping people to -- who were looking to break the law;          10:17:41
11   correct?
12   A.  That's my understanding.
13   Q.  All right.  But what my point is, that the -- they would
14   post this.  Your moderators wouldn't know it was a police ad,
15   but because it had prohibited terms in it, they'd take it down.      10:17:59
16   And then the police would call you and say, hey, put that back
17   up, it's a sting ad; correct?
18          MR. RAPP:  Objection.  Asked and answered.
19          THE COURT:  Sustained.
20          MR. CAMBRIA:  All right.                                       10:18:10
21   BY MR. CAMBRIA:
22   Q.  And so in that circumstance, where you put the ad back up,
23   you were facilitating the police, were you not?
24   A.  Our policy was not --
25   Q.  That's not the question.                                         10:18:29

1    Were you facilitating the police?  Were you helping

2    them?

3    A.  You asked --

4    Q.  The last question is, were you facilitating the police?

5        MR. RAPP:  Objection.  It's confusing.                    10:18:41

6        MR. CAMBRIA:  Okay.  I withdraw the question.

7    BY MR. CAMBRIA:

8    Q.  Were you helping the police by putting their sting ad back

9    up?

10   A.  That statement is completely false --                     10:18:51

11   Q.  False?

12   A.  -- because we did not put the sting ads up -- back up, to

13   my recollection.  We told them:  Post again.  Follow the

14   posting rules.

15   Q.  Okay.  You didn't put the same ad back up?                10:19:06

16   A.  It's a big difference.

17   Q.  You let them post the same ad again.  Is that fair?

18   A.  We don't want to know it's a sting ad.

19   Q.  Okay.  Here's the question:  You let them post the sting ad

20   again.                                                        10:19:22

21       Is that how you did it?

22   A.  Yes.

23   Q.  Okay.  So what happens is they post a sting ad, your

24   moderators took it down, they contacted you, and you had them

25   repost a sting ad; correct?                                   10:19:37

UNITED STATES DISTRICT COURT

CARL FERRER - CROSS-EXAMINATION (Cont'd)

50

1   A.  We didn't have -- we -- we didn't let them.  They would

2   post again.

3   Q.  You didn't let them?

4   A.  Do you understand?  Your statement was just not accurate.

5   Q.  Okay.  Let's see if we can make it accurate.          10:19:53

6           They'd post a sting ad.  Your moderators take it down.

7           Are we okay so far?

8   A.  We are.

9   Q.  All right.  They then repost another ad that is a sting ad;

10  correct?                                                  10:20:12

11  A.  We don't know.

12  Q.  Well, if they contact you and say, hey, you took my sting

13  ad down, you know, don't you?

14  A.  Yes.  Then for that ad we do know.

15  Q.  All right.  And that happened, didn't it?             10:20:28

16  A.  It did.

17  Q.  That was easy, wasn't it?

18          THE COURT:  Mr. Cambria.

19          MR. RAPP:  Judge, I'm going to object.

20          THE COURT:  Yes.  Sustained.                      10:20:37

21          MR. CAMBRIA:  Could we have 669 up?  669.  Oh, here we

22  go.

23  BY MR. CAMBRIA:

24  Q.  All right.  Do you see 669 on your screen?  It's a -- a --

25  it appears to be an email from you to Mr. Lacey, Mr. Larkin?  10:21:25

1   A.  Yes, I do.

2   Q.  And do you recall this?

3   A.  It looks like I sent it, and I would just need some time to

4   read it to fully understand this email.

5   Q.  Would you -- would you do that, please.                    10:21:44

6   A.  Isn't this the same email?

7   Q.  Yeah, I -- I've lost track now whether I had you read this

8   or not to publish it to the jurors.

9           THE COURT:  It was admitted, and it was previously

10  published, Mr. Cambria.                                        10:22:12

11          MR. CAMBRIA:  Oh, all right.  Thank you.

12          Would you put up 637, please.

13  BY MR. CAMBRIA:

14  Q.  All right.  I'm showing you what's been marked as 637.

15          Do you recognize this as an email from you to Mike      10:22:49

16  Lacey, Bill Jensen, Scott Spear?

17  A.  Yes, I do.

18          MR. CAMBRIA:  And I'd offer this in evidence.

19          MR. RAPP:  I believe it's in, and no objection to it

20  being published.                                              10:23:08

21          THE COURT:  It is.  It's already been admitted a

22  couple of weeks back, Mr. Cambria, and it can be published.

23          MR. CAMBRIA:  All right.

24  BY MR. CAMBRIA:

25  Q.  Would you read this, sir.                                  10:23:16

1          MR. RAPP:  Could I ask that he -- if he's going to

2     read it, he reads the entire one.  And it starts on the second

3     page.

4          THE WITNESS:  Start from where?

5     BY MR. CAMBRIA:                                            10:23:28

6     Q.  It starts where it says, "We would not have reported

7     Amber's ads to NCMEC."

8     A.  "We would not have reported Amber's ads to NCMEC.  We had

9     made reports when the following happens:  A user reports it,

10    i.e., 'I saw this girl and she is not 18' or 'I see this pic   10:23:46

11    and I think she is too young'.  We aggressively ask users to

12    report child exploitation.  We get several reports a day.

13         "Our moderators will see pics where the pic might be

14    too young or the text is suggestive of child exploitation.

15         "Once a report goes to NCMEC, they vet it and send it   10:24:10

16    to local law enforcement.  I think they look to make sure it is

17    a possible exploitation:  Pic too young, text saying things

18    like 'first time to the rodeo', 'fresh', '1st timer',

19    et cetera.

20         "The NCMEC people have been quite helpful," [as read].   10:24:30

21         Then below, "Carl, why would we isolate this ad?  What

22    would NCMEC do with this ad?  What do they look for?  What is

23    being guarded against?  Lacey."

24         Then I write, "A senior VP staff member can click a

25    link while in admin view called 'Report this ad to the NCMEC'.   10:24:58

1   A 4-color pdf is automatically emailed of the posting to NCMEC

2   and includes an IP email address, comments from our staff, and

3   FAQ explaining data and how to contact us.

4          "NCMEC then emails us acknowledging receipt of the

5   report," [as read].                                              10:25:19

6           Then Scott Spear writes, "Carl, you are better

7   equipped than I to explain the nuances of the NCMEC reporting

8   than I.  Please shoot them the basics without a lot of tech

9   talk.  Thanks, Scott Spear, Executive Vice President, Village

10  Voice Media Holdings, LLC," then his phone number.              10:25:43

11          And you really want me to read the disclaimer that he

12  has at the bottom?

13  Q.  No.  You don't have to read that.

14  A.  Then I'll just finish with from Michael Lacey to Scott

15  Spear, "Will you send to Jensen Andy and me a few sentences to  10:25:59

16  describe how we forward to Ernie Allen questionable ads for his

17  review, Lacey."

18  q.  Did there come a time when you developed a response manual,

19  if you will, for the law enforcement individuals?

20  A.  Yes.                                                        10:26:30

21  Q.  And it was a law enforcement guide.

22          Is that what it was?

23  A.  It was.

24  Q.  And what -- who developed it?

25  A.  I believe I contributed the most to that guide.             10:26:43

 1   Q.  Okay.  And what did the guide do?

 2   A.  Well, it answered questions so that law enforcement

 3   wouldn't have to ask us in support.  We wanted to reduce the

 4   amount of communication between support and law enforcement

 5   because we had so many subpoenas.                              10:27:13

 6   Q.  So this was designed to assist law enforcement individuals

 7   in pursuing cases against people who violated the law?

 8   A.  But it -- once again, it was designed for two reasons.

 9   Q.  First question.  Can you answer my question?

10   A.  That's one of the reasons.                                 10:27:38

11   Q.  Okay.  And these -- this law enforcement guide was

12   distributed to members of law enforcement, was it?

13   A.  With a valid subpoena.

14   Q.  And basically what it would do is it would help them obtain

15   the information they were looking for; correct?                10:28:04

16   A.  No.  They already have the information.

17   Q.  Well, they were asking you for information, were they not?

18   A.  Yeah, but you said obtain.  What they needed that guide for

19   was really to kind of understand the information so that they

20   wouldn't have to email us in support.                          10:28:26

21   Q.  Right.  And wasn't my question so that that guide would

22   help them obtain the information they were looking for?

23   A.  Well, I wouldn't say it that way, but we sent the guide

24   with the information to help them understand it.

25   Q.  Okay.  And facilitate their getting the information that    10:28:44

```
 1   they were trying to get?
 2   A.  Yeah, I don't really understand that word "facilitate."  It
 3   sounds like a legal term, but, yes.
 4   Q.  You think facilitate's a legal term?
 5   A.  Well, I don't use it very much.  I help --                    10:28:59
 6   Q.  Do you understand --
 7   A.  We wanted to help them.
 8   Q.  Do you understand what it means?  What's it mean to you?
 9   A.  I think it means to assist.
10   Q.  Okay.  You got it.  So let's use it the way you understand    10:29:10
11   it.
12          That law enforcement guide assisted the police in
13   gathering the information they were looking for; correct?
14   A.  Once again, it did help law enforcement understand the
15   information.                                                      10:29:30
16   Q.  And that would be assistance, wouldn't it?
17   A.  It is.
18   Q.  Okay.  Now, you had --
19          MR. CAMBRIA:  I'll stay over here.
20   BY MR. CAMBRIA:                                                   10:29:42
21   Q.  You had -- a number of subpoenas would come in, and law
22   enforcement individuals would ask you for certain types of
23   information to help them build cases.
24          Is that fair to say?
25   A.  That's correct.                                              10:29:59
```

CARL FERRER - CROSS-EXAMINATION (Cont'd)

56

1    Q.  All right.  And by supplying that information, you were

2    assisting the law enforcement people, were you not?

3    A.  Yes.

4    Q.  And you were not in any way assisting or facilitating the

5    potential law violators, were you?                          10:30:17

6    A.  We weren't, but we had no choice with the subpoena.

7    Q.  Answer --

8    A.  You have to send the information.

9    Q.  That wasn't my question.

10           My question was, by giving that information to the    10:30:28

11   police, you were assisting the police; correct?

12   A.  We are assisting, but, once again, we have no choice.  We

13   have to give them this information.

14   Q.  Whether you have a choice or not, that's what you were

15   doing, assisting them, weren't you?                         10:30:43

16   A.  I do think it's assistance providing the records.

17   Q.  Okay.  And by assisting the police, you weren't helping the

18   people they were trying to arrest, were you?

19           MR. RAPP:  Objection.  Asked and answered.

20           THE COURT:  Overruled.                               10:30:58

21           THE WITNESS:  No.

22   BY MR. CAMBRIA:

23   Q.  All right.

24   A.  We would not do that.

25   Q.  All right.  So -- and we've mentioned a -- a number of    10:31:04

UNITED STATES DISTRICT COURT

 1    times that there were -- well, strike that.

 2              How many different law enforcement agencies do you

 3    believe you supplied records to?  Can you give us a -- an

 4    estimate?  Is it hundreds?

 5    A.  I can tell you that we had 20,000 subpoenas from 2004 to          10:31:24

 6    2018, and there were many different law enforcement

 7    departments.

 8    Q.  Over 50?

 9    A.  Yes.

10    Q.  Over a hundred?                                                   10:31:40

11    A.  Yes.

12    Q.  Both state and federal?

13    A.  Yes.

14    Q.  Okay.  And you -- there was an expense involved, wasn't

15    there, in maintaining the records that you knew the law              10:31:56

16    enforcement wanted to have access to?

17    A.  The main expense is providing --

18    Q.  That's a yes or no.

19              There's an expense involved, was there not?

20    A.  Yes.                                                             10:32:14

21    Q.  Okay.  And Backpage paid that expense to maintain those

22    records, did it not?

23    A.  We did.

24    Q.  Okay.  And -- and that expense was because you were trying

25    to be in a position to respond to these subpoenas; true?           10:32:29

```
 1    A.   Yes.

 2    Q.   Okay.  That included computer storage, did it not?

 3    A.   Data storage, yes.

 4    Q.   And it -- and it included people, employees; correct?

 5    A.   Yes, it did.                                              10:32:57

 6    Q.   All right.  And so at Backpage's expense you had the people

 7    and the equipment necessary to store information that you knew

 8    law enforcement individuals were going to access?

 9    A.   The information's already on our servers.  There's really

10    no additional expense in storing it.  The expense is in pulling  10:33:24

11    the records, responding to law enforcement.

12    Q.   Okay.  Did you have additional storage so that you could

13    maintain records that eventually went to the police?

14    A.   The records are on the servers.  The -- the data is already

15    there.  So we didn't really have any significant storage         10:33:47

16    expense other than people needed computers.

17    Q.   Okay.  So when the police would send you a subpoena and

18    let's say it asked -- it mentioned a specific web address,

19    would you have your individuals search your database to see if

20    that web address turned up anyplace else?                        10:34:14

21    A.   You're talking about web address?

22    Q.   Well, and I --

23    A.   I'm confused.

24    Q.   Computer ID.  Your address.  A computer address.  IP

25    address.                                                         10:34:35
```

UNITED STATES DISTRICT COURT

1    A.  I'm sorry.  I still don't follow the question.

2    Q.  All right.  Every computer has a -- an address, if you

3    will; correct?

4    A.  There's an IP address when they access the Internet.

5    Q.  And so that means that it can be traced back to the unit          10:34:50

6    that sent the message; correct?

7    A.  Only if you subpoena the ISP.

8    Q.  I'm talking about, technically speaking, you can -- you can

9    go back and find out which computer sent an address -- sent a

10   message on a certain day; correct?                                    10:35:15

11   A.  I'm just telling you that we don't have that information.

12   We have the IP address.  They would need to go through an

13   Internet service provider to find the location of that IP

14   address.

15   Q.  Well, did you have situations where law enforcement would         10:35:27

16   ask you about a particular individual and you would determine

17   that that individual was not only where they were looking, but

18   identified in other sites as well?

19   A.  Correct.  We did do that.

20   Q.  And you volunteered that information to law enforcement,          10:35:48

21   didn't you?

22   A.  They re- -- they demand all ads posted by a particular

23   user, which means email address.  And if they're posting in

24   five different cities, they get all of the ads.

25   Q.  I'm talking about posting on other -- other platforms            10:36:06

1    besides Backpage.

2         If you knew -- did you not give them, the law

3    enforcement people --

4    A.  So --

5    Q.  -- information that not only did they post on us, but they          10:36:19

6    posted on others, and you told them which ones they were?

7    A.  So this is a significantly different area that you're going

8    into.  This is a public relations area that the subpoena

9    compliance department handled.

10   Q.  All I'm asking you is, did you do that?                             10:36:38

11        I didn't ask your motivation or what you today are

12   going to say the motivation was.  I asked you whether you did

13   it.

14        MR. RAPP:  I'm going to object to that question.  It's

15   argumentative.                                                         10:36:51

16        MR. CAMBRIA:  Wait.  There's nothing argumentative

17   about my question.

18        THE COURT:  Well, let -- I've, frankly, lost track of

19   the question.

20        MR. CAMBRIA:  Okay.                                               10:37:00

21   BY MR. CAMBRIA:

22   Q.  Here's the question --

23        THE COURT:  I'm going to --

24        MR. CAMBRIA:  Oh.

25        THE COURT:  -- sustain the objection.                             10:37:03

1          So you can rephrase or ask a new question.

2          MR. CAMBRIA:  I will.  Thank you.

3     BY MR. CAMBRIA:

4     Q.  So if they -- if law enforcement asks you for particular

5     information about a particular individual or computer and you          10:37:14

6     found out that that computer or individual was used on other

7     sites and you had that information, would you not supply that

8     to law enforcement even though they didn't ask for it?

9     A.  I don't know why you're referencing computers.  That just

10    doesn't make any sense.                                                 10:37:38

11    Q.  Okay.

12    A.  You want to say that if we saw an ad with a phone number

13    running on other sites?

14    Q.  Yes.  There you go.

15    A.  Okay.  Good.                                                        10:37:46

16    Q.  I adopt your question.

17    A.  Okay.  So that we would compile a list of sites that had

18    scraped Backpage ads and put them on different web addresses,

19    and we would provide that list.

20    Q.  So that was actually bonus.  They'd ask for one thing.             10:38:02

21    You'd give them what they asked for, and then you'd give them

22    other information that was helpful?

23    A.  It's not a bonus.  It's more of a misdirection.

24    Q.  Well, whatever your motive is, you gave them additional

25    information where that other person had posted an ad --                10:38:20

1    A.   No.

2    Q.   -- correct?

3             No?

4    A.   No.   This is information where that ad had reappeared.   And

5    like we had discussed earlier in my testimony about scraping,          10:38:30

6    many sites would scrape ads from Backpage and then repurpose

7    them on different domains.   So a good portion of that list of

8    links and other ads was ads Backpage ads repurposes on domains

9    not owned by Backpage --

10   Q.   Okay.                                                             10:38:48

11   A.   -- with the exception there were a couple of legitimate

12   sites that would be included in that list.

13   Q.   And you gave that information to law enforcement?

14   A.   We did.

15   Q.   Okay.  Did Backpage from time to time post public service         10:38:59

16   announcements?

17   A.   We did.

18   Q.   And what were they?

19   A.   There was a PSA, I believe, in Denver that we posted in the

20   Denver Backpage site at the request of law enforcement.               10:39:41

21   Q.   No.  I'm asking, what was the public service announcement?

22   A.   Time?  When?  What PSA are you talking about?

23   Q.   I'm asking you which ones were posted whenever on the site.

24   Public service announcement.

25             Call this number if you're in trouble, whatever.            10:40:03

 1    Things like that.
 2    A.   Oh.  So we did have user safety guide information where you
 3    post on some other sites or some NGO's contact information.
 4    Q.   Well, let's -- let's -- let's get down to what they were.
 5    In other words, what public service announcement did you have          10:40:22
 6    on the website that somebody could report something that was
 7    wrong?
 8            How about that?
 9    A.   Yeah.  It's just an unusual way to describe it, as a public
10    service announcement.                                                   10:40:37
11            You mean did -- we had ways that users could report
12    problematic ads.
13    Q.   Yes.  Well, not only that, but, for example, didn't you
14    have a public service announcement that said that it would say
15    to youths, if you're in an issue or you have a problem, you            10:40:55
16    could call this number?  That sort of thing.
17    A.   We donated an ad to an organization who ran.
18    Q.   What was it?
19    A.   The add text or the name --
20    Q.   Both.                                                             10:41:16
21    A.   -- of the organization?
22    Q.   Both.
23    A.   The name of the organization is Children of the Night, and
24    the ad text is:  Tired of turning tricks.  Your pimp doesn't
25    care.  Call this number.                                              10:41:28

```
 1   Q.  And you posted that on the Backpage website?

 2   A.  We donated that ad.  Yes.

 3   Q.  At your -- at the expense of Backpage?

 4   A.  Yes.

 5   Q.  And so basically that ad was telling people who may have          10:41:40

 6   been victimized by others where they could get help; right?

 7   A.  Correct.

 8   Q.  And any other ads like that?

 9   A.  During the history of Backpage?

10   Q.  Yes.                                                              10:42:03

11   A.  As I said earlier, there was some crime in Denver, and so

12   we posted an ad in Denver to see --

13   Q.  How about this?  Did you post something where you basically

14   said XYZ is against the law and will be reported?

15   A.  Yes.                                                              10:42:31

16   Q.  And what was that?

17   A.  We could -- wouldn't call it a PSA.  It's a --

18   Q.  Whatever.  What was the --

19   A.  The posting rules of the site.  When you -- when you go to

20   look at a category, you'll see the rules.  When you go to post     10:42:45

21   in a category, you'll get some rules.

22   Q.  Okay.  Do you recall that you made a presentation at Crimes

23   Against Children Conference?

24   A.  Yes, I do.

25   Q.  And that presentation was basically what law enforcement        10:43:16
```

1    needed to do to get information from Backpage about ads?

2    A.  That's correct.

3    Q.  And were there not occasions when you were called by

4    prosecutors to come and actually testify at trials to help law

5    enforcement convict individuals who violated the law?                10:43:43

6    A.  Yes, that happened.

7    Q.  And --

8           THE COURT:  Mr. Cambria, can I ask you to move closer

9    to a microphone.

10          MR. CAMBRIA:  Oh, I'm very sorry --                           10:43:52

11          THE COURT:  Thank you.

12          MR. CAMBRIA:  -- Your Honor.  I apologize.  I'm a

13   wanderer.

14   BY MR. CAMBRIA:

15   Q.  There were situations where you would be called by the          10:44:00

16   prosecution, both state and federal; correct?

17   A.  Are you talking about me personally or the company?

18   Q.  Yeah, you personally to be a witness.

19   A.  None -- no state.  All federal.

20   Q.  All federal.  Okay.                                             10:44:18

21          But, in any event, you were called as a prosecution

22   witness; correct?

23   A.  I was called as a custodian of record to authenticate the

24   records.

25   Q.  By the prosecution; correct?                                    10:44:30

 1   A.   Yes.

 2   Q.   To help their case; true?

 3   A.   I presume so.

 4   Q.   To convict somebody else; right?

 5   A.   I presume so.                                          10:44:40

 6   Q.   And some people were convicted; true?

 7   A.   True.

 8   Q.   And you were a witness for the prosecution in those cases?

 9   A.   I was a witness providing custodian of record

10   authentication.                                            10:44:58

11   Q.   For the prosecution?

12   A.   Yes.

13   Q.   Okay.  And you provided records and identified records in

14   those proceedings, too, did you not?

15   A.   I did.                                                 10:45:09

16   Q.   Okay.

17        THE COURT:  Mr. Cambria, I think at this point we

18   should take our morning break.

19        And so, members of the jury, just remember the

20   admonition.  We'll be on our usual 20-minute break.  So that   10:45:26

21   puts us at about five minutes after the hour.  We'll go short

22   this morning because I know you've been here early.  And so

23   we'll aim to break right at the noon hour for our 45-minute

24   lunch because I think you've been here for a while.  And so

25   just remember the admonition.                              10:45:45

1          And please all rise for the jury.

2          (Jury not present at 10:45 a.m.)

3          THE COURT:  All right.  We will stand at recess.

4          And can you make sure that we have defense exhibits

5   here and ready for Liliana.                              10:46:17

6          (Recess from 10:46 a.m. to 11:06 a.m.)

7          THE COURT:  All right.  Let's bring the jury in.

8          All rise for the jury.

9          (Jury present at 11:07 a.m.)

10          THE COURT:  All right.  The record will reflect the   11:08:04

11   presence of our jury.

12          Mr. Cambria, you may proceed.

13          MR. CAMBRIA:  Thank you, Your Honor.

14   BY MR. CAMBRIA:

15   Q.  Mr. Ferrer, do you recall in one of your interviews with   11:08:13

16   various agents or attorneys for the government that you

17   indicated that Dollar Bill's ads did not contain offers of sex

18   for money?

19          Do you remember making that statement?

20   A.  I believe I -- I do recall making that statement.   11:08:33

21   Q.  Okay.  You bought Backpage what, in 2015?

22   A.  Yes.

23   Q.  Okay.

24          MR. CAMBRIA:  Could we pull up 19 --

25          THE COURT REPORTER:  19 what?  I'm sorry.   11:09:00

```
 1              MR. CAMBRIA:  1928.

 2              MR. FEDER:  1928?

 3              MR. CAMBRIA:  1928.

 4              THE COURTROOM DEPUTY:  That's been admitted.

 5              MR. CAMBRIA:  There we go.                     11:09:17

 6   BY MR. CAMBRIA:

 7   Q.  Do you see that on the screen?

 8   A.  Yes, I do.

 9   Q.  Okay.  And is this a -- an email from Mr. Padilla to you?

10   A.  Yes, it is.                                          11:09:34

11   Q.  And does it -- does it deal with the term GFE/PSE?

12   A.  Yes, it does.

13   Q.  Now, before you told us GFE meant girlfriend experience?

14   A.  Yes.

15   Q.  Must have some different girlfriends.                11:09:53

16          So -- and the other was porn star experience?

17   A.  Yes.

18   Q.  All right.  And basically what's happening here is that --

19   well, you tell me.  What's happening here?  What -- what's

20   happening in this email to you?                          11:10:17

21   A.  Well, can I start from the bottom working up?

22   Q.  Well, all right.  Let's make it easier.

23          Is this a situation where Padilla's talking about

24   pulling the terms GFE and PSE?

25   A.  Yes, it is.                                          11:10:36
```

```
 1   Q.  And you say that those terms will be stripped out but, to

 2   you, begrudgingly?

 3   A.  Yes.

 4   Q.  Okay.  So those terms were stripped out then.

 5        Is that fair to say?                                    11:10:54

 6   A.  Yes.

 7   Q.  And this is in 2010?

 8   A.  Yes, it is.

 9   Q.  Now, you took over in 2015?  You bought Backpage; correct?

10   A.  I became the nominal owner in April of 2015.             11:11:07

11   Q.  All right.  You say "nominal owner."  Aren't you the one

12   who told us as part of your plea bargain that you gave Backpage

13   to the prosecution to shut down?

14        Is that what you did?

15   A.  I wanted to shut down the site.                          11:11:26

16   Q.  No.  That's not the question.

17        Did you give Backpage to the prosecution to shut down

18   as part of your plea agreement -- plea agreement?

19   A.  I wouldn't use the word "give," but --

20   Q.  Well --                                                  11:11:41

21   A.  Okay.

22   Q.  -- turned it over to them?

23   A.  Yes.

24   Q.  Okay.  So you must have had control over it to be able to

25   turn it over to them, didn't you?                            11:11:48
```

1   A.  I knew all the developers.

2   Q.  That's a yes or no.

3   A.  I had the access to do it.

4   Q.  Okay.  So now when 2015 came around and you had this

5   access, didn't you reinstate the term GFE?                    11:12:05

6   A.  There was a time --

7   Q.  Yes or no?

8   A.  Yeah, there was a time GFE was added to the site.

9   Q.  While you owned it?

10  A.  During the period of time, yes.                           11:12:16

11  Q.  Okay.  So you put it back in?

12  A.  I don't recall the why it came back in.

13  Q.  I didn't ask you that.  I asked you whether you're the one

14  that put it back in.

15  A.  I don't know that.                                        11:12:30

16  Q.  I'm sorry?

17  A.  I don't know that.

18  Q.  You don't know whether you put the term back in?

19  A.  I don't know whether I did it or whether it was just Andrew

20  and I deciding together that let's take it out -- let's stop  11:12:44

21  banning it, because we really need to focus on other things --

22  Q.  Well, you can't --

23  A.  -- with --

24  Q.  You can't say that he did it.

25          You're the one that had control over it then; correct? 11:12:56

CARL FERRER - CROSS-EXAMINATION (Cont'd)

71

1   A.  Yes, I had --

2   Q.  Right.

3   A.  -- control --

4   Q.  That would be --

5   A.  -- but what I'm saying --                          11:13:03

6   Q.  That would be -- I'm sorry.

7   A.  What I --

8   Q.  That would be your decision; correct?

9   A.  What I'm saying is it would be helpful if you had an email,

10  because we're talking about 2000 -- sometime after 2015 to   11:13:09

11  today.

12  Q.  Have you recalled a number of things about 2015 for the

13  government?

14  A.  If there's an email or an --

15          MR. RAPP:  Objection.                          11:13:25

16          THE WITNESS:  -- exhibit, I find --

17          MR. RAPP:  Objection.  Vague.  Confusing.

18          THE COURT:  Sustained.

19  BY MR. CAMBRIA:

20  Q.  Well, here.                                        11:13:31

21          THE COURT:  Sustained as to that last question.

22  BY MR. CAMBRIA:

23  Q.  Let's -- let's do it this way:  In 2015, as you indicated,

24  you had the access to control the website; correct?

25  A.  Yes.                                               11:13:40

1  Q.  All right.  And it turns out that that term got back in in

2  2015, didn't it?

3  A.  It did.

4  Q.  All right.  Now, how about porn star experience?  Did that

5  get back in, too?                                                    11:13:53

6  A.  I don't know.

7  Q.  Okay.  By the way, have you ever typed in the letters GFE

8  into Backpage to see what you get?

9          I'm sorry.  Not Backpage.  Facebook --

10         MR. RAPP:  Objection.  Relevance.                            11:14:21

11 BY MR. CAMBRIA:

12 Q.  -- to see what you get?

13         MR. RAPP:  Objection.  Relevance.  Foundation.

14         THE COURT:  Sustained.

15         MR. CAMBRIA:  Just asked if he's done it.                    11:14:27

16         MR. RAPP:  Same objection.

17         MR. CAMBRIA:  I didn't hear you, Your Honor.

18         THE COURT:  Sustained, Mr. Cambria.

19         MR. CAMBRIA:  Hang on.

20         MR. FEDER:  Is this --                                       11:14:37

21         THE COURT:  Sustained.

22         MR. FEDER:  -- exhibit in?

23         THE COURT:  Sustained.

24         MR. CAMBRIA:  Oh, thank you.  Okay.

25         ///

 1  BY MR. CAMBRIA:

 2  Q.  Did you ever type in GFE into TikTok?

 3          MR. RAPP:  Same objection.  Foundation and relevance.

 4          THE COURT:  Sustained.

 5          MR. CAMBRIA:  Okay.  Could we pull up Defense 6243,        11:15:01

 6  please.

 7          THE COURT:  This is --

 8  BY MR. CAMBRIA:

 9  Q.  All right.  Do you see this on your screen?

10  A.  I do.                                                        11:15:15

11  Q.  Do you recall what this is?

12  A.  This is the corporate structure for Village Voice Media.

13  Q.  Okay.

14          MR. CAMBRIA:  I offer this in evidence.

15          MR. RAPP:  No objection.                                 11:15:32

16          MR. CAMBRIA:  Okay.

17          THE COURT:  Wait.  Is the -- I'm sorry.  What exhibit

18  number is it again, Mr. Cambria?

19          MR. CAMBRIA:  Your Honor, it is 6243.

20          THE COURT:  Yes, it may be admitted --                   11:15:44

21          MR. CAMBRIA:  Thank you.

22          THE COURT:  -- and published.

23          (Exhibit 6243 admitted into evidence.)

24          MR. CAMBRIA:  Could we have Exhibit 23 on the screen,

25  please.  Page 8.                                                 11:15:53

```
 1              THE COURT:  Oh, we're talking about a different
 2   exhibit now?
 3              MR. CAMBRIA:  Now we are, yeah.
 4              THE COURT:  20 -- 23?
 5              MR. CAMBRIA:  23.
 6              THE COURT:  Government's 23?
 7              MR. CAMBRIA:  Yes.  Page 8.
 8   BY MR. CAMBRIA:
 9   Q.  Do you see this on your screen?
10   A.  I do see it.                                      11:16:13
11   Q.  Okay.  The last paragraph, there's a reference there --
12              MR. CAMBRIA:  This is in evidence, I believe.
13              MR. RAPP:  Yes.
14              MR. CAMBRIA:  All right.
15   BY MR. CAMBRIA:                                       11:16:29
16   Q.  -- which says, "Larkin and Lacey arrested by Arpaio."
17              Do you recall that?
18   A.  I'm sorry.  I don't recall this exhibit.  Could I see the
19   other pages?
20   Q.  Well, no.  What I'm asking you is, do you recall when Lacey  11:16:39
21   and Larkin got arrested by Arpaio?
22              MR. RAPP:  Objection.  Relevance.  Move to strike.
23              THE COURT:  Sustained.
24              MR. CAMBRIA:  Your Honor, I believe that it is
25   relevant as to motivation.                            11:16:51
```

CARL FERRER - CROSS-EXAMINATION (Cont'd)

75

```
 1              THE COURT:  Well, with regard to the question, it's

 2   sustained.

 3              MR. CAMBRIA:  All right.

 4              (Microphone noise.)

 5              MR. CAMBRIA:  I'm sorry about that.                    11:17:20

 6   BY MR. CAMBRIA:

 7   Q.  Now, do you recall in the past indicating that the reason

 8   that there's a charge for adult ads is to help ensure that the

 9   content is legal?

10              MR. RAPP:  Objection.  Foundation.                    11:17:43

11              MR. CAMBRIA:  Did he say it?

12              THE COURT:  Well, let me -- let me review the question

13   once more, Mr. Cambria.

14              Overruled.

15              You can answer.                                       11:18:03

16   BY MR. CAMBRIA:

17   Q.  Do you recall the question?

18   A.  Yes, I do.

19   Q.  Okay.  And the answer?

20   A.  Yes, that was the company narrative.                        11:18:08

21   Q.  All right.  Well, that's what you said the reason for

22   charging for ads was; correct?

23   A.  That's what I said --

24   Q.  Yeah.

25   A.  -- but you need to --                                       11:18:25
```

1    Q.  You said that, didn't you?

2            MR. RAPP:  Well, I'm going to -- I'm going to object

3    as the foundation for the -- the answer.  Where?

4    BY MR. CAMBRIA:

5    Q.  Do you remember --                                    11:18:39

6            MR. RAPP:  And --

7            MR. CAMBRIA:  I'll handle it.

8    BY MR. CAMBRIA:

9    Q.  Do you remember testifying in a case called *United*

10   *States vs. Fuentes*?                                     11:18:47

11   A.  Yes.

12   Q.  And do you recall in that case you said, "We do charge for

13   adult ads to help ensure that the content is legal"?

14           Did you make that statement under oath in that case?

15   A.  I did.                                                11:18:58

16   Q.  Okay.  Was it a lie?

17   A.  It turned out that --

18   Q.  No, no.  Was it a lie?

19   A.  I later learned --

20   Q.  Was it a lie?                                         11:19:08

21   A.  Well, I later learned different information --

22   Q.  No.

23   A.  -- that it --

24   Q.  At the time you stated it, was it -- was it -- did you

25   believe it was true?                                      11:19:14

CARL FERRER - CROSS-EXAMINATION (Cont'd)                    77

1    A.  At the time I stated it, I did believe it to be true.

2    Q.  All right.  Now, did you also state that you forbid any

3    posting that is a sex act for money exchange or any explicit

4    pictures of genitalia?

5    A.  Yes.                                                    11:19:34

6    Q.  And did you also testify on a case called *United States vs.*

7    *Chappell*?

8    A.  I did.

9    Q.  By the way, in the first case, Fuentes, you were testifying

10   for the prosecution, were you not?                          11:20:19

11   A.  Once again, custodian of record.

12   Q.  You were testifying for the prosecution, were you not?

13   A.  And, yes, I was called by the prosecution.

14   Q.  I didn't ask you that.  I just asked you if you were

15   testifying for the prosecution?  Yes?                       11:20:35

16   A.  I just said yes.

17   Q.  No?

18        Okay.  And the same thing in *U.S. v. Chappell*.  You

19   were testifying for the prosecution; correct?

20   A.  Yes, but I think it's important to clarify that I'm      11:20:49

21   testifying specifically about the records.  I don't know the

22   defendant.

23   Q.  Mr. Ferrer, it's a simple question.

24        You were called by the prosecution to testify, were

25   you not?                                                    11:21:04

 1    A.  I was.

 2    Q.  All right.  And do you recall testifying in that case that

 3    Backpage does not intentionally post illegal activity?

 4    A.  What does it say exactly?

 5    Q.  The question was, "Backpage does not intentionally post          11:21:25

 6    illegal activity; true?"

 7             And your answer was, "Correct."

 8             Do you recall that question and that answer?

 9    A.  I do recall the question and the answer.

10    Q.  Was it true?                                                     11:21:40

11    A.  Other users --

12    Q.  Was it a true statement?

13    A.  Because they're saying --

14    Q.  Was it a true statement?

15    A.  I've got to give you some context because you --               11:21:48

16    Q.  How about first answering my question?

17    A.  Well --

18    Q.  Was it a true statement?

19    A.  Backpage doesn't post --

20             MR. CAMBRIA:  Your Honor --                               11:21:56

21             THE WITNESS:  -- ads.

22             MR. CAMBRIA:  -- would you indicate to the witness to

23    answer my question, please, "Was it a true statement?"

24             Simple.

25             THE COURT:  If you can answer yes or no, please do so.    11:22:03

 1    I'm certain Mr. Rapp will permit you to clarify any issues, but

 2    don't get into a debate or argument.  Just if you can answer,

 3    answer yes or no.

 4    BY MR. CAMBRIA:

 5    Q.  Was it a true statement?                                    11:22:18

 6    A.  It's a true statement.

 7    Q.  Okay.  Did you also testify that Backpage doesn't encourage

 8    illegal activity?

 9    A.  I did.

10    Q.  Okay.  Do you recall testifying in a case called *United*    11:22:39

11    *States vs. Townsend*?

12    A.  Yes.

13    Q.  And, again, in that case you were called by the prosecution

14    as their witness; correct?

15    A.  Yes.                                                         11:23:00

16    Q.  Okay.  And you said -- do you recall saying that Backpage

17    had about a hundred employees?

18    A.  Could you say that again?

19    Q.  That Backpage had about a hundred employees?

20    A.  Don't have it in front of me but --                         11:23:21

21    Q.  Well, I'm -- does that -- do you recall making that

22    statement?

23    A.  Well, I -- that sounds about right.

24    Q.  Okay.  And that there was an -- an adult jobs section,

25    strip clubs, porn jobs, drivers, things like that?             11:23:41

1   A.   That sounds right.

2   Q.   Okay.   That in April of 2012, Backpage website users posted

3   3.3 million ads?

4        Did you make that statement?

5   A.   I did make that statement.                          11:24:02

6   Q.   Okay.   And that charging for ads and requiring payment by

7   credit cards discourages abusive posting and helps identify and

8   track users who misuse the site.

9        Do you recall saying that?

10  A.   Yes.                                                11:24:30

11  Q.   And that Backpage.com prohibits illegal content and

12  activity on its service, and especially condemns all forms of

13  human trafficking and child exploitation.

14       "We take many steps to prevent such abuse and misuse

15  on the site."                                            11:24:54

16       Did you say that?

17  A.   Yes.   Once -- once again, though, is this --

18  Q.   The question is, did you say that?

19  A.   Yes.

20  Q.   All right.   Next.   Let's see here.                11:25:00

21       Do you recall making a statement that it's impossible

22  to determine what is an implicit offer for commercial sex?

23  A.   Can you -- can I see the document?

24  Q.   Yeah.   I have -- let's see.   Exhibit 6180.   Exhibit 6180,

25  page 9.   It should be paragraph 19.                     11:25:55

UNITED STATES DISTRICT COURT

1      MR. RAPP:  Right.  I'd move to object, Judge.  This is

2  based on the Court's previous order.

3      MR. CAMBRIA:  I'm just asking if he made this

4  statement.

5      THE COURT:  6180, dash, what?                          11:26:16

6      MR. CAMBRIA:  6180, page 9.  Oh, yeah, page 9,

7  paragraph 19.

8      I'm simply asking about a statement not a case.

9      MR. RAPP:  It's within the context of a case.

10     MR. CAMBRIA:  It's not relevant.  It's a free-standing  11:26:34

11  statement.

12     THE COURT:  Wait.  There's a pending objection.  Let

13  me look at the exhibit.

14     I'm -- I must state that I'm confused, because I

15  thought the prior line of questions was related to his     11:27:13

16  testimony in Townsend, Fuentes, and so forth --

17     MR. CAMBRIA:  And it was.

18     THE COURT:  -- and you were posing his testimony with

19  regard to that.  This doesn't look like testimony in a case.

20     So I think you --                                       11:27:32

21     MR. CAMBRIA:  This -- this -- this --

22     THE COURT:  I somehow have overlooked where your

23  transition occurred.

24     So with regard to this exhibit --

25     MR. CAMBRIA:  This is a declaration.                    11:27:40

```
 1              THE COURT:  -- what was the -- well, you phrased it as
 2    testimony.  So I think you need to --
 3              MR. CAMBRIA:  Okay.
 4              THE COURT:  -- rephrase the question and the -- the --
 5              MR. CAMBRIA:  Okay.                                    11:27:54
 6              THE COURT:  -- that the witness may look at the
 7    exhibit.  But you need to rephrase the question first.
 8              MR. CAMBRIA:  Okay.
 9    BY MR. CAMBRIA:
10    Q.  Do you recall making a declaration under oath where you    11:28:08
11    said "because it is impossible to determine" -- "to determine
12    what is an 'implicit' offer for commercial sex"?
13              MR. RAPP:  Objection.
14    BY MR. CAMBRIA:
15    Q.  Do you recall making that statement in a declaration under 11:28:24
16    oath?
17              MR. RAPP:  Objection.  Court's previous order.  It's
18    within the context of a different case.
19              MR. CAMBRIA:  I'm not referring to the case at all,
20    just the statement.                                            11:28:36
21              THE COURT:  Well, I -- I'm going to sustain the
22    objection because it's not the -- it's not the full statement.
23    You only read a part of it.
24              And he can say whether or not he remembers making that
25    statement.                                                     11:28:50
```

```
 1              MR. CAMBRIA:  Okay.  Can we have the -- can we put the
 2    full affidavit on the screen, please, starting at the first
 3    paragraph.  And it's -- the statement I'm talking about's in
 4    the 19th paragraph.
 5              He can read it all, Your Honor, and see.          11:29:07
 6    BY MR. CAMBRIA:
 7    Q.  Does it start off, "I, Carl Ferrer, declare and state" --
 8              THE COURT:  No.
 9              MR. CAMBRIA:  -- "as" --
10              THE COURT:  No.                                   11:29:18
11              MR. CAMBRIA:  -- "follows"?
12              THE COURT:  No, no, no.  The paragraph 19 is what you
13    were focused on.
14              MR. CAMBRIA:  Yes.
15              THE COURT:  There was a sentence, but you only read  11:29:23
16    half of it.  That's -- that is the difficulty with the way that
17    you presented it.
18              MR. CAMBRIA:  Okay.
19              THE COURT:  So --
20              MR. CAMBRIA:  Would you show him paragraph 19, please.  11:29:35
21              THE COURT:  You can read the full sentence and ask him
22    if he recalls making that statement.
23              MR. CAMBRIA:  Okay.
24    BY MR. CAMBRIA:
25    Q.  "Alternatively" -- "Alternatively, because it is impossible  11:29:44
```

1    to determine what is an 'implicit'" -- in quotes -- "offer for

2    commercial sex, online service providers could require

3    identification from all users who submit postings containing a

4    person's photograph (and retain copies of the identification

5    apparently indefinitely).  I expect that most online users          11:30:04

6    would be unwilling to comply with such requirement because of

7    the burden and/or because of privacy concerns."

8         So my question is, did you --

9         MR. CAMBRIA:  The first part of that, which is a

10   declaration, "because it is impossible to determine what is an       11:30:19

11   'implicit' offer for commercial sex," I'm asking him if he made

12   that statement in this declaration under oath.

13        MR. RAPP:  Objection.  It goes to a Court's private --

14   previous order.  Move to strike the question.

15        THE COURT:  Well, again, that's a different question          11:30:40

16   that you asked than previously.  The prior question, as I

17   recall it, was, "Do you recall making that statement?"

18        And he can testify as to whether or not he recalls

19   making the statement.

20        THE WITNESS:  I don't recall this specific paragraph,          11:30:59

21   because I didn't --

22   BY MR. CAMBRIA.

23   Q.  No.

24   A.  -- write these.

25        MR. CAMBRIA:  Please, Your Honor.  Can you --               11:31:06

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  He said he did not recall.

 2              MR. CAMBRIA:  All right.  Thank you.

 3              THE COURT:  So ask your next question.

 4   BY MR. CAMBRIA:

 5   Q.  So now when you look at this, do you recall that you        11:31:13

 6   submitted a sworn declaration which you have in front of you?

 7   A.  I was asked to sign a declaration by my supervisors.

 8   Q.  And you signed it under oath; correct?

 9   A.  Yes.

10   Q.  All right.  And it included this paragraph 19; correct?     11:31:33

11   A.  It appears to be it's included.

12   Q.  Okay.  And paragraph 19 starts off with the words

13   "alternatively, because it is impossible to" --

14              MR. RAPP:  Objection.  Asked and answered.

15              THE COURT:  Sustained.                               11:31:52

16              MR. CAMBRIA:  Okay.

17   BY MR. CAMBRIA:

18   Q.  And it -- all right.  So you did submit this declaration

19   under oath containing those words; correct?

20   A.  It appears so.                                              11:32:03

21   Q.  All right.  Is it true that on the website there are --

22   website, the Backpage website, there are messages about

23   exploitation and how to report it throughout the website?

24   A.  It's in a couple different locations.

25   Q.  All right.  So it's there; correct?                         11:32:36
```

```
 1   A.  It is there.
 2   Q.  All right.  When -- all right.  Bear with me a second here.
 3           6243.
 4           And did you also in your interviews with the various
 5   government officials say that cooperating with law enforcement    11:33:51
 6   was one of your favorite parts of employment at Backpage?
 7   A.  I did say that.
 8           MR. CAMBRIA:  That's all I have, Your Honor.
 9           THE COURT:  All right.  Who is coming forward?
10           MR. EISENBERG:  May we split -- switch places with        11:34:16
11   counsel so that they --
12           THE COURT:  Your seating?  Yes.  Yes.
13           MR. EISENBERG:  Thank you.
14           MR. LINCENBERG:  Liliana, can I get that microphone?
15           How's that?                                               11:34:53
16                       CROSS-EXAMINATION
17   BY MR. LINCENBERG:
18   Q.  Mr. Ferrer, my name's Gary Lincenberg.  I represent
19   Mr. Brunst.
20           THE COURT:  You're going to have to speak up.             11:36:03
21           MR. LINCENBERG:  Can everybody hear me?  Is it loud
22   enough?
23           Let me try putting it on my tie.  Is that better?
24           THE COURT:  Better.
25           MR. RAPP:  Yes.                                           11:36:14
```

```
 1    BY MR. LINCENBERG:
 2    Q.  Mr. Brunst, before we talk about -- is that too loud?
 3            THE COURT:  Well, Mr. Ferrer.
 4            THE COURTROOM DEPUTY:  I'll bring it down.
 5            THE COURT:  You called him Mr. Brunst.                    11:36:24
 6            MR. LINCENBERG:  Is that too loud?
 7            THE COURT:  No.  That's fine.
 8    BY MR. LINCENBERG:
 9    Q.  Mr. Ferrer --
10            THE COURT:  Thank you.
11    BY MR. LINCENBERG:
12    Q.  -- before we discuss a lot of the testimony you had about
13    credit card processing and banking relationships with regard to
14    Mr. Brunst, I'd like to go over some of the other areas just to
15    see if there's anything that we need to pursue in those areas?   11:36:42
16            So, first, you had testified about conversations with
17    Mr. Larkin back in 2003-2004 about the founding of Backpage.
18            Do you recall that topic?
19    A.  Yeah, 2003.
20    Q.  Okay.  Was Mr. Brunst involved in those conversations that   11:37:04
21    you were referring to back in 2003?  Do you recall?
22    A.  He was not.
23    Q.  Okay.  And you had a lot of testimony about the marketing
24    of the adult section.
25            Was Mr. Brunst ever a part of the marketing department   11:37:21
```

 1   at Backpage?

 2   A.  Was he ever a part of the marketing department?

 3   Q.  Yes.  Was he in the marketing department of Backpage?

 4   A.  No.  He's part of the budget process.

 5   Q.  Okay.  So my -- we're going to discuss the budget process.       11:37:37

 6   If you can try --

 7   A.  Yeah.

 8   Q.  -- to answer my question.  I promise that whatever else --

 9   A.  Okay.

10   Q.  -- you want to say Mr. Rapp will ask you or I'll follow up       11:37:47

11   later.  We'll do it one point at a time.

12         Was he a part of the marketing department?

13   A.  He was not --

14   Q.  Okay.

15   A.  -- a part of the marketing department.                          11:37:57

16   Q.  And in the marketing department, I believe your testimony

17   was that there was money spent on marketing, non-adult

18   advertisements, but money wasn't spent in marketing adult

19   advertisements; is that correct?

20   A.  Could you say that one more time --                             11:38:18

21   Q.  Sure.

22   A.  -- please?

23   Q.  Let me break it down.

24         Is it your testimony that with regard to marketing

25   expenses that money was spent to help market some of the            11:38:29

 1    non-adult sections?

 2    A.  A nominal amount, yes.

 3    Q.  Okay.  And money was not spent -- perhaps it wasn't needed,

 4    but money was not spent marketing the adult section.  Is that

 5    accurate?                                                              11:38:51

 6    A.  No, that's not accurate.

 7    Q.  Okay.  And you testified about The Erotic Review at length

 8    and your dealings with people at The Erotic Review, including

 9    Mr. Elms.

10         To your recollection, was Mr. Brunst ever a part of         11:39:10

11    your conversations with Mr. Elms?

12    A.  Was he ever a part of my conversation with Mr. Elms?

13    Q.  Yes.

14    A.  He was not.

15    Q.  Okay.  Do you know whether Mr. Brunst ever had any          11:39:26

16    conversations with Mr. Elms?

17    A.  I thought that was the question.  He did not.

18    Q.  Okay.  And with regard to ad moderation, was Mr. Brunst a

19    part of the compliance department that dealt with ad

20    moderation?                                                       11:39:50

21    A.  He wasn't -- he wasn't affiliated or a part of the

22    moderation department.

23    Q.  Okay.  With regard to aggregation, do you have any

24    knowledge of Mr. Brunst ever communicating with any

25    aggregators?                                                      11:40:13

1    A.  I'm sorry?

2    Q.  Yes.  Do you have any knowledge of Mr. Brunst having ever

3    communicated with any aggregators?

4    A.  With any advertisers?

5    Q.  Aggregators.                                                    11:40:27

6    A.  Ag- --

7    Q.  Aggregators.

8    A.  Aggregators.  Oh, okay.  I don't, other than hiring them.

9    But, no, I don't believe he ever communicated directly with

10   them.                                                              11:40:49

11   Q.  Okay.  With regard to advertisers, people who advertised on

12   Backpage, do you have any knowledge of Mr. Brunst ever having

13   any communication with anybody who advertised on Backpage?

14   A.  I don't believe he did.

15   Q.  Okay.  With regard to reviewing ads -- you testified about   11:41:12

16   numerous ads.  A number of ads were introduced as exhibits

17   during your direct examination.

18          Do you have any knowledge of whether Mr. Brunst ever

19   reviewed any of the ads that you testified about during your

20   direct examination?                                              11:41:36

21   A.  I don't know.

22   Q.  Okay.  With regard to super posters -- I believe Mr. Mersey

23   was somebody you identified as a super poster; is that right?

24   A.  Yes.

25   Q.  Okay.  Do you have any knowledge of Mr. Brunst ever having   11:41:56

```
 1   any conversation with Mr. Mersey?

 2   A.  I don't believe he did.

 3   Q.  Okay.  Did you ever include Mr. Brunst on any email that

 4   you had with Mr. Mersey, to your recollection?

 5   A.  No.                                                          11:42:21

 6   Q.  One of the topics that you testified to was dealings you

 7   had with NCMEC.

 8        Do you recall that?

 9   A.  Yes.

10   Q.  And was Mr. Brunst, to your memory, ever a part of any      11:42:30

11   meetings you had with anybody from NCMEC?

12   A.  No, he was not.

13   Q.  Okay.  To your memory, was Mr. Brunst ever a part of any

14   phone calls or emails that you had with people from NCMEC?

15   A.  I don't recall any.                                         11:42:49

16   Q.  Okay.  With regard to your testimony about going to

17   Washington involving the Senate proceedings, was Mr. Brunst

18   with -- present in Washington, D.C.?

19   A.  He was not.

20   Q.  Okay.  You had testified, I believe, that -- I think you   11:43:08

21   said Mr. Lacey and Mr. Larkin and others were there; is that

22   right?

23   A.  Correct.

24   Q.  Who were the others who were there?

25   A.  PR firms.                                                   11:43:20
```

```
 1   Q.  Okay.  Was Mr. Moon there?

 2           Mr. Moon, was he there?

 3   A.  I don't know.

 4   Q.  All right.  But when you say "others," just so the record's

 5   clear, you're not referring to Mr. Brunst; correct?          11:43:36

 6   A.  Correct.

 7   Q.  All right.  With regard to responding to subpoenas, from

 8   your recollection, was Mr. Brunst ever a part of the effort to

 9   respond to law enforcement subpoenas or subpoenas in any piece

10   of litigation or investigation?                              11:43:59

11   A.  Generally funding the people in subpoena compliance, but I

12   don't believe he ever had any individual interactions --

13   Q.  Okay.

14   A.  -- fulfilling the subpoena.

15   Q.  Just so we're clear, when you say "generally funding,"     11:44:14

16   you're saying -- and you testified that at times there'd be a

17   budget that would be presented to him and ownership for

18   approval.

19           Is that what you're referring to?

20   A.  Correct.                                                  11:44:25

21   Q.  Okay.  There was testimony about correspondence from

22   Attorneys Generals, different State Attorneys Generals.

23           Do you recall testifying -- several different

24   interactions that you had with Attorneys Generals?

25           Do you recall that?                                   11:44:46
```

1    A.   Yes.

2    Q.   With regard to any of the back and forth with any of those

3    Attorneys Generals, did you ever, to your memory, consult with

4    Mr. Brunst about how you should respond?

5    A.   No.                                                          11:45:02

6    Q.   All right.  There was a little bit of testimony about press

7    and press inquiries.

8         Did you ever consult with Mr. Brunst about how to

9    respond to press inquiries?

10   A.   I don't recall any.                                          11:45:24

11   Q.   Okay.  There was some testimony about dealing with

12   legislative bodies or mayors in the case of the State of

13   Washington.

14        Do you ever recall speaking with Mr. Brunst about how

15   to respond to any political officials?                           11:45:43

16   A.   No.

17   Q.   Okay.  With regard to dealing with outside lawyers

18   regarding non-transactional matters -- do you know what I mean

19   by non-transactional matters?

20   A.   I think.  Can you give me an example?                        11:46:05

21   Q.   Sure.  So let's put aside, for example, if there were

22   lawyers involved in buying or selling a business, helping

23   execute a transaction.

24        And just talking about lawyers who may have been

25   advising in connection with compliance or litigation --          11:46:21

```
 1              MR. RAPP:  Objection.
 2   BY MR. LINCENBERG:
 3   Q.  -- was --
 4              MR. RAPP:  It was --
 5              MR. LINCENBERG:  I haven't finish the question.     11:46:28
 6              MR. RAPP:  Objection.  Move to strike the question.
 7              THE COURT:  Sustained.
 8   BY MR. LINCENBERG:
 9   Q.  Were -- did you ever discuss with Mr. Brunst or was he a
10   part of any of your conversations with non-transactional        11:46:41
11   attorneys?
12              MR. RAPP:  Same objection.
13   BY MR. LINCENBERG:
14   Q.  Do you recall?
15              MR. RAPP:  Move to strike and admonish counsel.      11:46:46
16              THE COURT:  Sustained.
17   BY MR. LINCENBERG:
18   Q.  Now, one part of your testimony was that the moderation
19   department, I think at one point you said some of their work
20   was just a veneer.                                              11:47:08
21              Do you recall that testimony?
22   A.  Yes.
23   Q.  Did you ever have any emails where you said, Jed, I'd like
24   you to know that the work we're doing in the moderation
25   department is a veneer?                                         11:47:22
```

 1    A.   It's in the budgets, which were emailed.

 2    Q.   So in the budgets -- which we're going to look at some of

 3    those exhibits -- were -- are you saying we're going to find in

 4    those budget proposals your statement that the ad moderation

 5    efforts are a veneer?                                          11:47:44

 6    A.   It's not going to use the word veneer.

 7    Q.   Okay.  And I believe you said that in your testimony.  I

 8    believe you -- you testified that you were facilitating

 9    prostitution.

10         Is that the gist of your testimony?  Some of your         11:48:04

11    testimony?

12    A.   Promoting.

13    Q.   Okay.  Did you ever send any emails or presentations for

14    budget review or anything to Mr. Brunst where you indicated

15    that you were promoting prostitution?                          11:48:25

16    A.   I -- I wouldn't do that.

17    Q.   Okay.  So the answer is you never did that; correct?

18    A.   No, I didn't.  I wouldn't want to be fired.

19    Q.   Okay.

20         MR. LINCENBERG:  I move to strike the last part after      11:48:45

21    the word "No."

22         THE COURT:  Okay.  The jury will disregard after, "No,

23    I didn't."

24    BY MR. LINCENBERG:

25    Q.   I know you want to make certain points, and you'll have an 11:48:57

1    opportunity on redirect.  Just try to answer my questions.

2          Now, prior to your purchase of Backpage in 2015 --

3    well, let's go even further back.

4          Did you understand that at one point in time

5    Mr. Brunst was the chief financial officer of a company called          11:49:25

6    New Times?

7    A.  Yes.

8    Q.  And is it your understanding that he was the CFO of a

9    company called New Times until there were certain corporate

10   purchases and sales and then the holding company became Village        11:49:43

11   Voice Media Holdings?

12   A.  That's correct.

13   Q.  All right.  And when -- was that around 2012?

14   A.  When it became Village Voice --

15   Q.  Yeah.                                                              11:50:05

16   A.  -- Media?

17          No.  I think 2006.

18   Q.  2006?  Okay.

19   A.  It was with the acquisition of the Village Voice.

20   Q.  Okay.  And was it your understanding that at one point            11:50:14

21   the -- the holding company -- I'm going to refer to it as the

22   holding company since at times it's New Times and at times

23   Village Voice Media Holding Company.

24          Do you understand that at some point the holding

25   company held approximately 18 different business units,                11:50:36

 1    different companies?

 2    A.  Approximately.

 3    Q.  Okay.  And so, for example, let's focus, and just to pick a

 4    time period for the moment, 2006 to 2012.

 5          Did you understand that the -- that Mr. Brunst was                 11:50:56

 6    listed as the CFO for all of those holding companies for

 7    purposes of corporate documentation?

 8    A.  I understood he was the corporate CFO.

 9    Q.  And during that time period -- in fact, at any time period,

10    was Mr. Brunst on Backpage's payroll?                                   11:51:31

11    A.  During what time period?

12    Q.  Any time period.  Was Mr. Brunst ever on Backpage's

13    payroll?

14    A.  After the transaction I had to pay a loan origination fee

15    that I thought was covering Jed Brunst's expenses to maintain          11:51:52

16    the loan, to collect on the loan.

17          MR. LINCENBERG:  Your Honor, I move to strike the

18    answer as nonresponsive.  My question is not about loan

19    payments to a -- to a company.  It's about whether or not

20    Mr. Ferrer ever understood that Mr. Brunst was on Backpage's          11:52:07

21    payroll.

22          MR. RAPP:  Objection as to foundation.  When?  Where?

23          THE COURT:  Well --

24          MR. LINCENBERG:  Ever.

25          THE COURT:  -- I think the question was ever, so                 11:52:19

1    overruled as to that.

2          He can answer it if he -- if he can, if he knows.

3          THE WITNESS:  So Backpage made payments that I

4    understood was going to Brunst, some part of it.  Not the loan

5    payment.  It was like a loan maintenance fee.                    11:52:37

6    BY MR. LINCENBERG:

7    Q.  Sir, do you understand what the word payroll means?

8    A.  I do.

9    Q.  And what does the word payroll mean to you?

10   A.  Payroll means that you are getting a paycheck.               11:52:49

11   Q.  Okay.  And when somebody got a paycheck from Backpage, for

12   example, was it a normal -- in the normal course of business

13   activity?

14         Did Backpage issue a W-2 for its employee?

15   A.  Yes.                                                         11:53:11

16   Q.  And as the senior officer of Backpage, however you want to

17   describe yourself, do you know whether or not a W-2 was ever

18   issued to Mr. Brunst --

19   A.  We didn't --

20   Q.  -- at Backpage ever?                                         11:53:28

21   A.  No.

22   Q.  Yes or no?

23         No.

24         And so then in response to the question of whether he

25   was ever on Backpage's payroll, using your understanding of     11:53:36

1   payroll, is the answer, likewise, no, he was never on

2   Backpage's payroll?

3   A.  He wasn't on his payroll --

4   Q.  Thank you.

5   A.  -- to receive a W-4.  Or was it W-2?                    11:53:47

6   Q.  If you want to discuss W-4s and what that means, feel free

7   to do it on redirect.  For right now, please answer my question

8   about payroll.  Okay?

9           Now, was -- to your knowledge, did Mr. Brunst ever

10  hold an operational position at Backpage?                  11:54:11

11          You know that he was listed on documents as a CFO.

12  Did he ever act as an operating CFO at Backpage?

13  A.  Can I have a time frame, because his role changed?

14  Q.  Well, my question is ever, and my question is about

15  operational.  We're going to look at documents where he was    11:54:39

16  listed as an ultimate business owner.  And when he signed, it

17  was CFO of Backpage or other newspapers.

18          My question, if you can focus on it, is, did he ever

19  hold an operational position at Backpage?

20          MR. RAPP:  Objection.  Foundation.               11:54:58

21          THE COURT:  Overruled.

22          THE WITNESS:  Yes, he did.

23  BY MR. LINCENBERG:

24  Q.  Okay.  We'll explore that later.  We'll explore that answer

25  later.                                                     11:55:12

1          Did Backpage -- let's just for foundation pick a time

2    frame.  Let's talk about prior to 2013.

3          Did Backpage have an in-house controller?

4    A.  What date again was that?

5    Q.  Prior to 2013.                                                11:55:36

6    A.  We had an accountant.

7    Q.  Okay.  Who was that accountant?

8    A.  Their time -- which time frame?  They were --

9    Q.  Prior to 2013.  If it'll help you, prior to Nathan Kopecky

10   being hired in 2013, my question is, who was in -- who was in   11:55:58

11   charge of accounting, controller actions at Backpage?

12          MR. RAPP:  I'm going to object as to foundation.

13   Prior to 2013 when?

14          THE COURT:  Yeah.  Perhaps just confine that --

15          MR. LINCENBERG:  Let's just use the --                     11:56:19

16          THE COURT:  Okay.  Can I finish --

17          MR. LINCENBERG:  Yeah.

18          THE COURT:  -- what I'm saying?

19          MR. LINCENBERG:  Yeah.

20          THE COURT:  Can you just confine whatever the time         11:56:23

21   period is --

22          MR. LINCENBERG:  Sure.

23          THE COURT:  -- in your question, please.

24          MR. LINCENBERG:  Yes, Your Honor.

25          THE COURT:  Thank you.                                     11:56:29

1   BY MR. LINCENBERG:

2   Q.  Let's take 2011.  In 2011, who was the person who was doing

3   the accounting at Backpage?

4   A.  I can't be sure.  There were at least three separate

5   accountants that I could recall.                                    11:56:43

6   Q.  Okay.  What names do you recall?

7   A.  Jess Adams.  There was an Adrianna.  And then there was

8   another individual.  I just can't -- his name doesn't come to

9   mind right now.

10  Q.  Okay.  Jess Adams was a name we heard before.  I think you   11:57:00

11  identified him as a person who reported to Mr. Spear; is that

12  right?

13  A.  It was my understanding that he reported to Mr. Spear and

14  Mr. Brunst.

15  Q.  Okay.  And when you were interviewed by the government        11:57:13

16  multiple times, did you ever review an interview report in

17  which you stated that Mr. Adams reported to Mr. Brunst?

18  A.  Did I --

19  Q.  Let me rephrase it.

20  A.  Yes.                                                          11:57:35

21  Q.  Let me rephrase it.

22         Prior to your testimony in this trial, did you ever

23  tell these prosecutors in your 30-plus interviews that

24  Mr. Adams reported to Mr. Brunst?

25  A.  I'm not sure.  I would have said that he -- the primary       11:57:49

UNITED STATES DISTRICT COURT

 1    report would be Scott Spear.
 2    Q.  Okay.  As to anything else, you're just not sure.
 3          Is that your testimony?
 4    A.  No the -- my experience was in talking to Jess Adams.
 5    Q.  Wait, wait, wait.  My question is, and you're not sure          11:58:04
 6    whether you said anything else in your prior reports, in your
 7    prior interviews?
 8    A.  Are we talking about the prior reports?
 9    Q.  Yeah.
10    A.  Yes.  I --                                                      11:58:12
11    Q.  Okay.
12    A.  I don't have that in front of me.
13    Q.  Fair enough.
14          Do you know of -- let's just focus on --
15          MR. LINCENBERG:  Well, let's -- let's put up            11:58:21
16    Exhibit 6243, which is in evidence.
17          I ask for permission to publish.  This was a -- I
18    think an organizational chart that Mr. Cambria used.
19          THE COURT:  Yes.  And once you're done with this, we
20    can take our lunch recess.                                         11:58:38
21          MR. LINCENBERG:  Okay.  It's kind of difficult to
22    read.  Let's, if we can, first, maybe blow up the middle of
23    this organizational chart.  A little more so it includes
24    everything under Mr. Larkin.  Oh, it does include everything.
25    Okay.  I'm sorry.  Go ahead and -- there we go.                    11:59:04

UNITED STATES DISTRICT COURT

1    BY MR. LINCENBERG:

2    Q.  All right.  I believe that Mr. Cambria showed you this

3    organizational chart.  And this organizational chart notes

4    Mr. Larkin is the CFO -- CEO; Mr. Spear is the -- a vice

5    president; Scott Tobias, Ruxton Group and Backpage.          11:59:25

6           And was it your understanding that in this time period

7    Backpage reported up through Mr. Spear ultimately to the CE- --

8    CEO, Jim Larkin?

9           MR. RAPP:  Objection.  Foundation as to which time

10   period this is.                                              11:59:43

11          MR. LINCENBERG:  I believe I --

12   BY MR. LINCENBERG:

13   Q.  Do you recognize this as an organization --

14          THE COURT:  Well, let me -- let me rule on the

15   objection.                                                   11:59:47

16          MR. LINCENBERG:  I'm sorry, Your Honor.

17          THE COURT:  Sustained.

18          MR. LINCENBERG:  Okay.  I'm sorry.

19          THE COURT:  One more question, and then we'll take our

20   lunch break.                                                 11:59:53

21          MR. LINCENBERG:  Okay.

22   BY MR. LINCENBERG:

23   Q.  Do you -- do you recognize this as the organizational chart

24   in the 2011 time period?

25   A.  It looks like an organization chart.  I just don't think  12:00:03

 1    I've seen it before.

 2              THE COURT:  All right.

 3              MR. LINCENBERG:  Thank you, Your Honor.

 4              THE COURT:  Members of the jury, we will take our

 5    45-minute lunch break at this time.  Again, just remember the        12:00:12

 6    admonition.  And be prepared to come back into court at quarter

 7    till the hour.

 8              So with that, please all rise for the jury.

 9              (Jury not present at 12:00 p.m.) can.

10              THE COURT:  All right.  Please be seated.                    12:00:51

11              And let me just make one inquiry with counsel.  Last

12    evening I received a -- by email an exhibit -- Defense

13    Exhibit 6250 and a redacted version, 6013.

14              Did the government receive those exhibits?

15              MR. RAPP:  We did, Your Honor?  Yes.                         12:01:17

16              THE COURT:  Okay.  I just wanted to make sure.

17              All right.  We'll stand in recess.

18              THE COURTROOM DEPUTY:  All rise.

19              (Proceedings recessed at 12:01 p.m.)

20                          ---oOo---

21

22

23

24

25

**C E R T I F I C A T E**

I, CATHY J. TAYLOR, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 27th day of September, 2023.

/s/ Cathy J. Taylor
Cathy J. Taylor, RMR, CRR, CRC