UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | NO. 2:18-cr-00422-DJH |
| v. | ) | |
| | ) | Phoenix, Arizona |
| Michael Lacey, et al., | ) | September 27, 2023 |
| | ) | 12:45 p.m. |
| Defendants. | ) | |

_____ )

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL DAY 13**
**P.M. SESSION**

Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

```
 1                    A P P E A R A N C E S

 2   For the Plaintiff:
          UNITED STATES ATTORNEY'S OFFICE
 3        By:  Kevin M. Rapp, Esq.
               Andrew C. Stone, Esq.
 4             Peter Shawn Kozinets, Esq.
               Margaret Wu Perlmeter, Esq.
 5        40 North Central Avenue, Suite 1800
          Phoenix, Arizona 85004-4408
 6

 7   For the Defendant Michael Lacey:
          LIPTSUTZ GREEN SCIME CAMBRIA, LLP
 8        By:  Paul J. Cambria, Jr. Esq.
          42 Delaware Avenue, Suite 120
 9        Buffalo, New York  14202

10   For the Defendant Andrew Padilla:
          DAVID EISENBERG, PLC
11        By:  David S. Eisenberg, Esq.
          3550 North Central Avenue, Suite 1155
12        Phoenix, Arizona 85012

13   For the Defendant Scott Spear:
          KESSLER LAW OFFICE
14        By:  Eric Walter Kessler, Esq.
          6720 North Scottsdale Road, Suite 210
15        Scottsdale, Arizona 85253
          - and -
16        FEDER LAW OFFICE, PA
          By:  Bruce S. Feder, Esq.
17        2930 East Camelback Road, Suite 160
          Phoenix, Arizona 85016

18

19   For the Defendant John Brunst:
          BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
20        By: Gary S. Lincenberg, Esq.
               Gopi K. Panchapakesan, Esq.
21        1875 Century Park E, Suite 2300
          Los Angeles, California 90067

22

23   For the Defendant Joye Vaught:
          JOY BERTRAND, ESQ, LLC
24        By:  Joy Malby Bertrand, Esq.
          P.O. Box 2734
25        Scottsdale, Arizona 85252-2734
```

UNITED STATES DISTRICT COURT

```
1                              I N D E X

2

3   GOVERNMENT WITNESS:                                      PAGE

4   CARL FERRER
    Continued Cross-Examination by Mr. Lincenberg..............
5

6   Sidebar discussion........................................96

7

8                             EXHIBITS

9   EXHIBIT                                              RECEIVED

10  NO.      DESCRIPTION

11  6189     Classified Solutions Ltd. eMerchantPay              75
             Merchant Application Form
12           DEFENSE 024742-024749

13  6194     01.26.16 Email from M. Gage to                     81
             C. Ferrer re: "PostFastr.com"
14           DOJ-BP-0002885636-0002885637

15  474      Email from Ferrer to Hansen re American           111
             Express, 07/22/2015, DOJ-BP-0005064739-
16           DOJ-BP-0005064740

17

18

19

20

21

22

23

24

25
```

1                    *P R O C E E D I N G S*

2   *(Whereupon the proceedings began at 12:34 p.m.)*

3              COURTROOM DEPUTY:  All rise, court is now in

4   session.

5              THE COURT:  All right, please be seated.  We can

6   have Mr. Ferrer back on the witness stand, and we'll retrieve

7   our jury.

8              All rise for the jury.

9              (Jury in at 12:48 p.m.)

10             THE COURT:  Please be seated.  The record will

11  reflect the presence of the jury.  Mr. Ferrer is on the

12  witness stand.  Mr. Lincenberg, you may continue.

13             MR. LINCENBERG:  Thank you, Your Honor.

14             We were in the middle of talking about Exhibit 6243.

15  If we could publish the organizational chart again.

16                    CONTINUED CROSS-EXAMINATION

17  BY MR. LINCENBERG:

18  Q.   Mr. Ferrer, we discussed the 2011 Village Voice Media

19  holding corporate structure.  We blew up the middle part,

20  which is where Backpage is located.

21       Let's move to the left-hand side.  If we can blow that

22  up, and does this appear to be where Mr. Lacey -- the

23  organizational chart involving Mr. Lacey on the left-hand

24  side?

25             MR. RAPP:  Objection as to foundation.

1          THE COURT:  Sustained.

2   BY MR. LINCENBERG:

3   Q.   Well, sir, you -- do you recognize this as an

4   organizational chart involving Village Voice Media holdings

12:49p  5   2011?

6   A.   I do recognize it as an organizational chart for Village

7   Voice.

8   Q.   And let me ask you this:  Did you understand that

9   Mr. Lacey supervised somebody named Christine Brennan, an

12:50p 10   Executive Managing Editor, involving the newspapers?

11   A.   Yes, I do.

12   Q.   And that he would also have editors in *News Weekly*,

13   publishers reporting to him?  Was that your general

14   understanding?

12:50p 15   A.   Yes, it is.

16   Q.   Okay.  So now let's look at the right-hand side, if we

17   can, of this.  And do you know who Mr. Mars was?

18   A.   Yes.

19   Q.   Okay.  And Mr. Goroski, Chief Information Officer?

12:50p 20   A.   Yes.

21   Q.   And Diana Fraser?

22   A.   Yes.

23   Q.   And then business managers, did you understand that the

24   seventeen newspapers that Village Voice holding company owned

12:50p 25   at the time had business managers?  Did you have that

1  understanding?

2  A.   Yes.

3  Q.   And did you understand that these were the folks who

4  reported up to Mr. Brunst at that time?

**12:50p** 5      MR. RAPP:  It's still unclear as to what the

6  foundation is.

7      THE COURT:  I think he asked in reference to 2011?

8      MR. LINCENBERG:  Yes.

9      MR. RAPP:  That's what he's saying.  He's just

**12:51p** 10  saying that.  There's no foundation.  He doesn't even

11  recognize this.  So what's the foundation?

12      THE COURT:  Yes, so lay some more foundation,

13  please.

14  BY MR. LINCENBERG:

**12:51p** 15  Q.   Well, Mr. Ferrer, I believe I'm focusing on the Village

16  Voice Media holdings organizational chart in 2011 and asking

17  you did you understand this to be the organizational chart in

18  Village Voice Media holdings in 2011?

19  A.   I don't believe I've seen this organizational chart.

**12:51p** 20  However, I understand the personnel.  I know the personnel and

21  I know some of their job descriptions.

22  Q.   Okay, thank you.

23      MR. LINCENBERG:  We can take 6243 down now.

24  BY MR. LINCENBERG:

**12:51p** 25  Q.   And just to give you a time period let's just stick with

           1    2011.  Did Backpage have ledgers -- let me back up.

           2         Do you know what an accounting ledger is?

           3    A.   You would use P & L statements, is that what you mean?

           4    Q.   Well, do you understand -- within Backpage -- did

12:52p     5    somebody in Backpage record transactions -- record financial

           6    transactions in the books?

           7    A.   Did somebody at Backpage record transactions in 2011?

           8    Q.   Yes.

           9    A.   Yes, the accountant.

12:52p    10    Q.   Okay.  And when you say "the accountant," you're not

          11    referring to Mr. Brunst, are you?

          12    A.   No.

          13    Q.   Now, in 2013 Backpage hired somebody named Nathan

          14    Kopecky, correct?

12:53p    15    A.   Correct.

          16    Q.   And was Nathan Kopecky's title when he was hired Chief

          17    Financial Officer of Backpage?

          18    A.   Yes, it was.

          19    Q.   All right.  And where did Mr. Kopecky come from, do you

12:53p    20    recall?

          21    A.   He came from a recruiter that Jed Brunst knew.

          22    Q.   Okay.  And then you interviewed him?

          23    A.   Not exclusively.

          24    Q.   Right.  Mr. Brunst also interviewed him, correct?

12:53p    25    A.   Yes.

```
     1   Q.   My question is simply did you interview him?
     2   A.   Yes.
     3   Q.   All right.  And did he then serve as the Chief Financial
     4   Officer of Backpage until Mr. Gage was -- later became CFO?
12:53p 5   A.   Yes, he did.
     6   Q.   All right.  And did Mr. Gage become the CFO of Backpage
     7   after you bought Backpage in 2015?
     8   A.   Yes, he did.
     9   Q.   All right.  And was Mr. Gage somebody who you had had --
12:54p 10   was referred to you by Trent Voigt?
    11   A.   Yes.
    12   Q.   And just to remind the jurors, I think we saw his name in
    13   some e-mails, but was Trent Voigt somebody who worked for a
    14   payment processor call Jetpay?
12:54p 15   A.   Yes.
    16   Q.   All right.  And did you then hire Mr. Gage as the CFO of
    17   Backpage post 2015 sale?
    18   A.   It was a decision to hire between Jed Brunst and myself.
    19   Q.   Okay.  By adding that Mr. Brunst was involved in the
12:54p 20   decision, are you saying that you did or did not hire him for
    21   Backpage?
    22   A.   I'm saying there's no way I could higher a CFO
    23   independently without Jed Brunst's approval.
    24   Q.   Okay.  So Mr. Brunst approved your hiring of Mr. Gage; is
12:55p 25   that correct?
```

1  A.   Yes.

2  Q.   All right.  So you hired Mr. Gage, correct?

3  A.   The company hired Mr. Gage.

4  Q.   Okay.  And Mr. Gage came out of the payment processing

12:55p  5  world; is that right?

6  A.   Yes.

7  Q.   He had some background, expertise in that area, correct,

8  your understanding?

9  A.   Yes.

12:55p 10  Q.   All right.  And that was something that was important to

11  you at the time, to have somebody who could help secure

12  payment processing for Backpage; is that right?

13  A.   It was important for the company, yes.

14  Q.   Okay.  Now, earlier I believe you confirmed that

12:55p 15  Mr. Brunst never had a Backpage e-mail address to your

16  knowledge; is that correct?

17  A.   No, he did not.

18  Q.   And was it your understanding that he also never had an

19  e-mail address for any of the other seventeen newspapers that

12:56p 20  were owned by the holding company?

21  A.   I think he did at one time.

22  Q.   At what time?

23  A.   Oh, let's say e-mail address -- what time?

24  Q.   Was it --

12:56p 25  A.   Probably 2000 -- before the Village Voice Media merge he

```
 1  used a New Times e-mail address.
 2  Q.   Well, that was a New Times holding company that he worked
 3  for, not the Phoenix New Times newspaper, correct?
 4  A.   Okay.
```
12:56p  5  Q.   Okay.  To your knowledge, did he ever have a e-mail
```
 6  address from the San Francisco Weekly, for example?
 7  A.   Not to my knowledge.
 8  Q.   All right.  Or the -- there was a Cleveland newspaper, I
 9  believe, that was owned by the holding company.  To your
```
12:56p 10  knowledge, did he have an e-mail address from the Cleveland
```
11  newspaper?
12  A.   No, he did not --
13  Q.   All right.
14  A.   -- to my knowledge.
```
12:57p 15  Q.   Let's talk about budgets, et cetera, budget meetings that
```
16  you testified to.  So, first of all, I believe your testimony
17  was that they would happen once a year; is that right?
18  A.   The main budget.
19  Q.   The annual budget?
```
12:57p 20  A.   The annual budget once a year.
```
21  Q.   Let's talk about the annual budget meeting.  That would
22  happen once a year; is that right?
23  A.   Yes.
24  Q.   And was that generally near the end of the year?
```
12:57p 25  A.   Correct.

```
 1   Q.   Okay.  And would those meetings -- they would take place

 2   -- was it a -- on one day, is that -- is that right?

 3   A.   Yes.

 4   Q.   Okay.  And I believe your testimony was that -- talking

 5   generally -- we'll focus on some particular years, but talking

 6   generally your general testimony is that Mr. Brunst

 7   participated in those annual budget meetings, correct?

 8   A.   Yes.

 9   Q.   Okay.  And was it your understanding that he also

10   participated in annual budget meetings near the end of the

11   year for all eighteen companies that were owned by the holding

12   company?

13   A.   What year is this?

14   Q.   Well, let's pick the year 2008.  Is that your

15   understanding?

16   A.   In 2008 that is my understanding.

17   Q.   Okay.  So in the month of December your understanding --

18   I understand you were not in those meetings, but your

19   understanding was that Mr. Brunst was participating in some

20   eighteen different budget meetings for different businesses

21   owned by the holding company, fair?

22   A.   Well, I -- I don't know.

23   Q.   Okay.

24   A.   He might have offloaded some of that work to the

25   controller.
```

12:57p   5
12:58p  10
12:58p  15
12:58p  20
12:58p  25

1  Q.   Okay.  That would be speculation if that happened?

2  A.   That's right, so I don't know.

3  Q.   Just asking about your understanding.

4       Is that your understanding?

12:59p  5  A.   It's likely.

6  Q.   All right.  And let's focus on 2007 since that was the

7  subject of one of the exhibits.

8       So let's focus on 2007, and when I say 2007 I'm talking

9  about a meeting which ostensibly took place in December of

12:59p  10  2007 for a 2008 budget.  Fair enough?

11  A.   Yes.

12  Q.   And I believe your testimony was that you would prepare,

13  with the help of others, budgets and revenue projections in

14  anticipation of that meeting; is that right?

12:59p  15  A.   No, Scott Spear would prepare the budget.

16  Q.   Okay.  Wasn't your testimony that Mr. Spear would help

17  with that?

18  A.   He would lead it.

19  Q.   Okay.

01:00p  20  A.   I -- I would -- I would help.

21  Q.   All right.  So you helped Mr. Spear prepare budget and

22  revenue projections for the 2007 meeting as best you recall?

23  A.   Yes.

24  Q.   All right. And Mr. Larkin, I believe you said, would be

01:00p  25  present at budget meetings; is that right?

1   A.   Yes, he would.

2   Q.   All right.  And Mr. Larkin was the CEO of the holding

3   company for which we just looked at the organizational chart.

4        Backpage reported up to him, right?

01:00p 5   A.   Yes, he was the CEO of the holding company.

6   Q.   All right.  And as a general description of Mr. Larkin's

7   job duties, would it be fair to say that he oversaw overall

8   business operations as the CEO?

9   A.   It's my understanding.

01:01p 10  Q.   All right.  And, again, let's focus on 2007 with regard

11  to marketing.  Mr. Spear, as best you could recall, was

12  present at annual budget meetings?

13  A.   Yes, he was.

14  Q.   All right.  And he -- his job, I think you said, was

01:01p 15  overseeing marketing; is that right?

16  A.   I'm sorry, Mr. Spear?

17  Q.   Yes.  What was -- how would you describe his role there?

18  A.   He's the supervisor of -- of the entire Backpage

19  operation and I report to him.

01:01p 20  Q.   Okay.  And as far as you recall, Mr. Brunst was present

21  at this meeting that may have taken place sixteen years ago,

22  correct?

23  A.   Mr. Brunst was always in attendance for the budget

24  meetings.

01:02p 25  Q.   All right.  And so the answer's "yes" as far as you

1    recall?

2    A.    Yes.

3    Q.    All right.  And Mr. Brunst's role would be to look at the

4    overall projected expenses versus revenue that was projected;

01:02p  5    is that fair?

6    A.    What year are we?

7    Q.    2007.

8    A.    At that time looking at expenses and revenue, yes.

9    Q.    Okay.  And when I say looking at expenses and revenue --

01:02p  10   or when you say "looking at expenses and revenue," it really

11   was looking at the overall numbers, correct?

12   A.    It's looking at the overall numbers and how a sale

13   strategy will achieve those numbers.

14   Q.    And in terms of any line items, there were occasions when

01:02p  15   Mr. Brunst might raise a question about, let's say, executive

16   salaries, correct?

17   A.    That would be one item.

18   Q.    Okay.  Do you recall any instance in which Mr. Brunst

19   ever questioned any other budget line item?

01:03p  20        And I'm asking for a specific recall.  Do you

21   specifically recall any instance in which Mr. Brunst ever

22   questioned any budget line item other than persons' salaries?

23   A.    Other than persons' salaries?  So what line item would

24   there be without salaries?  Usually that's the main

01:03p  25   discussion.

1    Q.   Okay.  And did -- in preparing for your testimony, did

2    you review any e-mails in which you're asking Mr. Brunst to

3    review any particular line item?

4    A.   No, that's above my pay grade.  That would be Scott

01:04p 5    Spear.

6    Q.   All right.  So since it's above your pay grade, I'm going

7    to interpret your answer as being "no."

8    A.   And the question was:  Did I e-mail Jed Brunst directly

9    with concerns about the budget?

01:04p 10   Q.   No, no, no.  The question was:  Did you ever have an

11   e-mail with Mr. Brunst about any particular line item?  And

12   your answer was to talk about what Scott Spear may or may not

13   have done, and I'm asking if that answer means that your

14   answer is "no"?

01:04p 15   A.   Well, I -- I don't know.  I'm -- I just don't know.

16   Q.   Okay.  You don't know, but as we sit here today having

17   reviewed a lot of exhibits that the Government wanted to show

18   you in preparing, do you recall ever seeing anything like that

19   in any e-mail that the Government showed you, "yes" or "no"?

01:05p 20   A.   There are e-mails, but they're not focused on the budget.

21   They're different -- different items about the business --

22   Q.   Of course.

23   A.   -- like when we were selling the business --

24   Q.   And we'll -- we're gonna cover the sale.  Let's focus on

01:05p 25   the question, not veer off into some other topic.  Okay?

1        All right.  Now, with regard to compliance department

2    budgets or add moderation if that's easier for you -- if

3    that's a term that's easier for you to focus on, did you ever

4    seek advice from Mr. Brunst regarding the budget for the

01:05p 5    moderation department?  Did you ever seek his advice on that?

6    A.   For the budget, specific to the budget, I can't recall.

7    Q.   Fair enough.  Let me ask you a couple questions about

8    Mr. Moon.  He came up in your testimony.

9        Mr. Moon you described as a board member of the holding

01:06p 10   company, correct?

11   A.   That was my understanding.

12   Q.   All right.  And just to put some time frame on this, was

13   this beginning around 2012 or so?

14   A.   When I first met Don Moon or --

01:06p 15   Q.   When he got on the board.

16   A.   I don't -- I thought he'd been on the board much longer.

17   I don't know.

18   Q.   All right.  Over the years did you ever -- let me start

19   general and then we'll get specific.

01:06p 20       Did you ever have discussions with Mr. Moon about the

21   business of Backpage?

22   A.   Generally?

23   Q.   I'm asking you generally.  We're gonna get more specific

24   in a minute.

01:07p 25   A.   Yes.

```
 1   Q.   All right.  And was that primarily in the 2012 onward
 2   time frame?
 3   A.   I believe so.
 4   Q.   All right.  And in those conversations with Mr. Moon do
 5   you recall talking to Mr. Moon about the fact that Mr. Brunst
 6   didn't really know or understand the business well?
 7            MR. RAPP:  Objection to the extent it calls for --
 8   the question itself calls for hearsay.
 9            MR. LINCENBERG:  This is not offered for the truth.
10            MR. RAPP:  Well, it can't be offered for any other
11   reason.
12            THE COURT:  Sustained.
13   BY MR. LINCENBERG:
14   Q.   Sir, did you -- did you have discussions with anybody
15   about the fact that when it came to business operations of
16   Backpage, that Mr. Brunst did not know or understand that
17   business very well?
18            MR. RAPP:  Objection, foundation and hearsay.
19            THE COURT:  Sustained.
20   BY MR. LINCENBERG:
21   Q.   Did Mr. Moon ever say to you that in his view, in
22   connection with these business discussions, that Mr. Brunst
23   didn't understand the business operations well?
24            MR. RAPP:  Objection, the question itself is
25   hearsay.  Move to strike it.
```

01:07p  (line 5)
01:07p  (line 10)
01:07p  (line 15)
01:08p  (line 20)
01:08p  (line 25)

1        MR. LINCENBERG:  This is not calling for the truth

2    of the matter, Your Honor.

3        THE COURT:  It's sustained.

4        MR. RAPP:  To strike it, Judge?

01:08p 5        THE COURT:  Yes, the question will be stricken and

6    the jury will disregard.

7        MR. LINCENBERG:  All right.  Let's turn to Exhibit

8    23 in evidence, and if we can start by -- we can just publish

9    the first page for the moment.

01:09p 10   BY MR. LINCENBERG:

11   Q.   Okay.  So we're looking at a document entitled 2008

12   Budget and Business Plan For Backpage Overview.

13        Is that correct?

14   A.   Yes, it is.

01:09p 15   Q.   And when you were asked who authored it, I believe part

16   of your answer was that Mr. Spear was the main author; is that

17   right?

18   A.   I'm looking at Page 1 and I can tell you that Mr. Spear

19   wrote this.  I -- I -- I didn't write it.

01:09p 20   Q.   Well, did you contribute to it?

21   A.   It's possible.

22   Q.   Did you testify two weeks ago -- did my mic go off?

23        Did you testify two weeks ago that you contributed to

24   this document?

01:10p 25   A.   Yes, I would contribute reports and information --

1   Q.    Okay.

2   A.    -- to go into the document.

3   Q.    And did you testify that Jess Adams contributed to this?

4   A.    Yeah, I'm not exactly sure what date Jess Adams is

01:10p   5   working, but the Backpage accountants are contributing.

6   Q.    All right.  Did you testify that you got some data for

7   this document from Mr. Hyer and Mr. Padilla?

8   A.    This is 2008?

9   Q.    Yes.

01:10p   10   A.    Yes, I assume so.

11   Q.    All right.  And as you testified, those are the people

12   you recall contributing to preparing this document; is that

13   fair?

14   A.    Yes.

01:10p   15   Q.    All right.  And was the -- this would have been used in

16   preparation for a meeting with some of the owners; is that

17   right?

18   A.    This is the annual budget meeting in which Jim Larkin and

19   Jed Brunst need to approve the budget for 2008.

01:11p   20   Q.    All right.  So the answer's "yes"?

21   A.    Yes.

22   Q.    Okay.  And Mr. Larkin was the CEO, correct?

23   A.    Yes, he was.

24   Q.    All right.  He was the person who you would have been --

01:11p   25   who would have been overseeing any discussion of the business

1    operations as the CEO; is that right?

2    A.    Yeah -- well, what was the question again?

3          I'm sorry, I was reading this document.

4    Q.    Yeah.  As the CEO -- fair to say that discussion about

01:11p  5   the business operations would have been directed to the CEO of

6    the holding company in connection with this meeting?

7    A.    I always thought we were directing it to both.

8    Q.    Okay.  With regard to issues like we talked about earlier

9    about expenses, projected revenues, that's something that you

01:12p 10   recall Mr. Brunst would be looking at, correct?

11   A.    Mr. Brunst would look at expenses, but I have to tell you

12   he also commented --

13   Q.    Well, you don't have to tell me.  You can just answer my

14   question and then volunteer whatever you want on redirect,

01:12p 15   okay?

16   A.    May I ask --

17   Q.    The question is:  Would he be reviewing expenses and

18   forecasts?

19   A.    May I answer the question?

01:12p 20   Q.    That question.

21          THE COURT:  Okay, stop.  Don't speak over one

22   another, please, for purposes of our court reporter.  It's

23   very difficult for her to do that when you're talking over one

24   another.  Simply pause, let him answer if he can.  Mr. Ferrer

01:12p 25   will do the same, let you ask the next question.  Just don't

```
 1   talk over one another.

 2              MR. LINCENBERG:  Okay.

 3              THE COURT:  You may proceed.

 4              MR. LINCENBERG:  All right.

 5   BY MR. LINCENBERG:

 6   Q.   Now, where did this 2000 -- with regard to this meeting

 7   in December 2007, do you recall anything particular -- look at

 8   me please, sir.  I'm not asking about the document for the

 9   moment.

10   A.   Okay.

11   Q.   Do you recall -- do you recall any piece of conversation

12   that took place in this meeting that apparently took place

13   sixteen years ago?

14   A.   I cannot -- I remember conversations, but I can't tie

15   them to specific years for this specific meeting.

16   Q.   Fair enough, and I'm not trying to test you here.

17        This is sixteen years ago, but just so the jury

18   understands, your testimony that you're giving in connection

19   with this is basically reviewing the document and then trying

20   to reconstruct what might have taken place in a meeting; is

21   that fair?

22   A.   Well, no, it's not fair.

23   Q.   All right.  Well, let me ask you this:  Do you remember,

24   for example, where you were seated during this meeting in

25   December of 2007?
```

01:13p 5
01:13p 10
01:13p 15
01:14p 20
01:14p 25

1  A.   Well, this is -- this would have been December of 2007?

2  Q.   Yeah, do you remember where you were seated?

3  A.   No.

4  Q.   Do you remember if anybody was present by telephone?

01:14p  5       Do you remember if anybody was present by telephone in

6  this meeting in December of 2007?

7  A.   I don't believe there's -- I've ever had a budget meeting

8  where someone only attended by telephone.

9  Q.   Do you remember whether or not you handed Exhibit 23 to

01:14p  10  somebody at the meeting or perhaps e-mailed it to them ahead

11  of time?  Do you remember that?

12  A.   I believe that we did e-mail, but also handed it out at

13  the meeting.

14  Q.   And when you say you believe, fair to say you're just

01:15p  15  thinking about maybe what you generally did but really have no

16  specific memory about this meeting?

17  A.   No, it's protocol to, you know, e-mail it in advance and

18  then hand it out at the meeting.  I just wasn't sure if I

19  handed it out or Jess Adams did.

01:15p  20  Q.   Okay.  You're testifying now about what you remember the

21  protocol being, but not really what was done on December 20th

22  of 2007, correct?

23  A.   I -- I -- I don't understand that question because this

24  is -- we have a budget.  We print out the budget.  We hand it.

01:16p  25  We have Scott's -- or we have Scott Spear, myself, Jess Adams,

        1    Jim Larkin, Jed Brunst and we go through the budget and we try

        2    to get their approval.  That's -- that's the process.

        3    Q.   And I'm not debating with you what your protocol or

        4    process was.  I'm asking if you have any memory of this

01:16p  5    particular meeting.  That's all I'm asking you.

        6    A.   There's nothing eventful that I remember --

        7    Q.   Okay.

        8    A.   -- in this meeting.

        9    Q.   Now, when the prosecutor asked you about this meeting on

01:16p 10    September 13th you testified, quote, "We were all excited."

       11         Remember that testimony from two weeks ago?

       12    A.   And what year?

       13    Q.   This -- with regard to this 2007 meeting about the 2008

       14    budget.  Do you recall that testimony, sir?

01:17p 15    A.   And you're saying that I said I was excited about the

       16    budget?

       17    Q.   Your testimony was, quote, "We were all excited."

       18         Do you recall -- first of all, if you can just look at me

       19    for a moment.

01:17p 20    A.   Yeah.

       21    Q.   Do you recall testifying to that?

       22    A.   I've testified a lot.  I -- I don't recall.

       23    Q.   So then just say you don't recall.

       24    A.   Okay.

01:17p 25              THE COURT:  I'm sorry, was there an answer?

1          MR. LINCENBERG:  I believe there was.

2          THE WITNESS:  I said, "I don't recall."

3          THE COURT:  Okay, thank you.

4  BY MR. LINCENBERG:

01:17p 5  Q.   So as you sit here today on September 27th, your best

6  testimony is you have no recollection about whether people at

7  this meeting were all excited, fair?

8      Just asking about.

9  A.   You know, it's not fair because, actually, the best thing

01:18p 10  the company had going for it was backpage.com.  So every year

11  was exciting because the company was growing --

12          MR. LINCENBERG:  Your Honor --

13          THE WITNESS:  -- substantially.

14          MR. LINCENBERG:  -- I move to strike the answer as

01:18p 15  non-responsive.

16          THE COURT:  And the answer will be stricken as

17  non-responsive.  I think you can reask your question and if

18  you can answer it "yes" or "no" or "I don't know" or however,

19  but listen to the question.  Answer the question if you can

01:18p 20  answer it.

21          THE WITNESS:  Okay.

22  BY MR. LINCENBERG:

23  Q.   Let me ask you this, sir:  Do you recall anything that

24  Mr. Brunst said in this December 2007 meeting as you sit here

01:19p 25  today?

1  A.   No, I cannot.

2  Q.   Okay.  Do you recall any reaction -- do you recall him,

3  for example, saying, "Yippy, I'm all excited," or jumping up

4  and down?  Any reaction -- do you recall any reaction of

01:19p  5  excitement from this meeting?

6  A.   I -- I cannot.

7  Q.   Okay.  And in -- you were -- in your 30 interviews with

8  the Government, did you ever make the statement to Mr. Rapp

9  that the people at this meeting were all excited?

01:19p  10  A.   I -- I may have.  I'm describing the mood because the

11  company was growing.

12  Q.   So your testimony is that you may have stated that to

13  Mr. Rapp?

14  A.   It's -- yes, it's very likely.

01:20p  15  Q.   Okay.  And if it's very likely, let me break it down.

16       After April of -- I believe it was established that the

17  last time that agents wrote down what you said in terms of

18  what was provided to the defense counsel, that that was April

19  of 2020.

01:20p  20       Is it your memory that you said this to Government

21  counsel after April of 2020?

22  A.   No, I don't recall saying that --

23  Q.   Okay.

24  A.   -- but. . .

01:20p  25  Q.   Let me ask you this:  In the past three-plus years since

 1   April of 2020 I believe you indicated your best estimate was

 2   that you maybe had 30 interviews?

 3   A.   I -- that's what I had said.  It was many is what I'm

 4   comfortable testifying to.

01:21p  5   Q.   And you reviewed a lot of documents with the Government

 6   in those post April 2020 interviews; is that fair?

 7   A.   Yes.

 8   Q.   You provided them new information regarding your memory

 9   of documents that you were reviewing, for example, fair?

01:21p 10   A.   New information?

11   Q.   Yeah, you'd give them answers.  They'd show you documents

12   they hadn't showed you in earlier meetings and you'd provide

13   answers, right?

14   A.   I would -- yes.

01:21p 15   Q.   Okay.

16   A.   That I would do.

17   Q.   And did Government counsel ever show you notes or

18   typewritten interviews from those 30 or so interviews that

19   took place after April 2020?

01:21p 20          MR. RAPP:  Objection, this is a compound question.

21          THE COURT:  Sustained.

22   BY MR. LINCENBERG:

23   Q.   Did you ever see any memorandum of interview for a

24   meeting that took place between you, Mr. Rapp and his

01:22p 25   colleagues after April of 2020 where it was recorded what you

 1  told them?

 2  A.   I -- I'm not sure about all the dates.

 3  Q.   When you say "all the dates," any meeting after April

 4  2020?

01:22p  5  A.   I might be mistaken, but I don't believe I saw any

 6  written notes after April 2020.

 7  Q.   Okay.  So if you would have said this to the Government

 8  during an interview after April 2020, they would have never --

 9  they never ran it by you to confirm whether you said that or

01:22p  10  not; is that right?

 11  A.   What are we saying that I said?

 12  Q.   Well, we were focusing for the moment on this testimony

 13  that "we were all excited," whether that was ever said in any

 14  interview; and right now I'm focusing to see if it was said in

01:23p  15  any interview that we never got a report of.

 16  A.   Okay, what was the question?

 17  Q.   Did you ever -- that you never -- you were never shown

 18  any notes of statements by you for statements you made to the

 19  prosecutors or statements you made after April of 2020,

01:23p  20  correct?

 21  A.    I've answered that, yes.

 22  Q.   All right.  Getting back to Exhibit 23, let's go to the

 23  bottom of Page 1 and the top of Page 2.

 24       Okay, so let's just focus for a moment in this document.

01:24p  25  It says, "In May in New York we launched a paid rentals

```
 1   section following Craigslists' entry into this paid arena a

 2   few months prior."  Do you see that?

 3   A.   I do.

 4   Q.   And then you see where it says, "While our actual revenue

 5   did not meet our original projections, the initiative has

 6   built significant revenue..."  Let's pause there.

 7        Now, was that statement accurate?

 8   A.   That's what it says, but in comparison to revenue in

 9   adult it was not that significant.

10   Q.   Well, I believe your testimony on direct examination was

11   that none of the areas other than adult were ever significant

12   at all, correct?

13   A.   They were -- correct.

14   Q.   All right.  So fair to say that in your view, then, this

15   is a false statement?

16   A.   It's -- I wouldn't call it false.  I would say that it's

17   hopeful, hopeful that maybe we could compete with Craigslist

18   in a non-adult category.

19   Q.   So when the statement says the initiative, quote, "...has

20   built significant revenue..." your interpretation of that is

21   that this is hopeful as opposed to what has been done?

22   A.   It is and I can explain.

23   Q.   I'm just asking if that's your interpretation of what's

24   in this report that you presented to the audience of

25   Mr. Larkin and Mr. Brunst?
```

01:24p  5
01:24p  10
01:25p  15
01:25p  20
01:25p  25

           1  A.   Well, I -- I need to explain the context.

           2  Q.   No, you don't need to explain the context.  You can do

           3  that later.  I'm asking you the question of whether or not

           4  your interpretation of "has built" is hopeful?

01:26p     5  A.   Yes, I would describe it as hopeful.

           6  Q.   Okay, all right.  And so in presenting this to Mr. Larkin

           7  and Mr. Brunst you're saying you were not attempting to lie in

           8  this statement?

           9  A.   I didn't write this.

01:26p    10  Q.   Well, you presented it, right?  You helped prepare it?

          11  You reviewed it beforehand, right?

          12  A.   I've got Scott Spear as a co-presenter.

          13  Q.   Okay.  So in response to my question your answer is just

          14  "I didn't write this," fair?

01:26p    15  A.   I'm a -- state it --

          16  Q.   Is that your response?

          17  A.   What --

          18           MR. LINCENBERG:  I'll withdraw and move on, Your

          19  Honor.

01:27p    20  BY MR. LINCENBERG:

          21  Q.   Let's look at Page 11, analysis of expenses.  So maybe

          22  let's zoom in on this part here where it's "Total Proposed

          23  Expense Increase" year over year.  Do you see that?

          24  A.   I do.

01:27p    25  Q.   All right.  And to your understanding, is that sort of --

```
  1   is that the type of number that would be the focus of the

  2   ownership that is reviewing the budget?

  3   A.    That would be one number.

  4   Q.    Okay.

  5   A.    There are others.

  6   Q.    All right.  Let's go to Page 15 and I'm gonna run through

  7   seriatim Pages 15 through 21.  Maybe Page 16?  Okay, yeah,

  8   let's go back to Page 15 for a moment.

  9         So this is a section dealing with "Premium Position

 10   Sponsorship," and on the bottom it says examples of the

 11   Premium Position Sponsorship.  Do you see that?

 12   A.    I do.

 13   Q.    And what did you understand Premium Position Sponsorship

 14   to mean?

 15   A.    It was a product we were trying to build for the papers

 16   so that they could sell a position.

 17   Q.    Okay.  So then if we then move to Page 16, we're now

 18   seeing some examples of Premium Position Sponsorship and these

 19   are samples of -- relating to marketing work, for example,

 20   right?

 21   A.    This is a real screenshot.  We did sell that ad as a

 22   premium sponsor.

 23   Q.    Okay.  And I know it's hard to read this but, for

 24   example, this is dealing with cabinets and wood bedrooms and

 25   furniture and the like; is that right?
```

01:27p  5
01:28p 10
01:28p 15
01:28p 20
01:29p 25

1    A.    Well, those are the two sponsor ads on top.

2    Q.    Okay.  And let's look to the next page and blow that up a

3    little bit.  This seems to also deal with furniture as

4    examples of the Premium Position Sponsorship program; is that

01:29p  5    right?

6    A.    No, it's not right.

7    Q.    Okay.  Let's go to the next page, and this is also a

8    sample page involving furniture, correct?

9    A.    This is the -- it's not a sample page.  It's a real ad

01:30p 10    that we -- that we created for this customer, and this is the

11    ad page that you would see when you click the sponsor ad.

12    Q.    Okay.  And this real ad is an example that is included in

13    the annual budget presentation that you're making to the CEO

14    and CFO of the holding company in talking about a Premium

01:30p 15    Position Sponsorship program that you're doing at Backpage,

16    right?

17    A.    Correct.

18    Q.    All right.  So let's look at the next one, maybe try to

19    blow this up.  You know, it's hard for me to read this at all,

01:30p 20    but I think that I can read "lingerie," for example.

21          Do you see that where I underlined?

22    A.    I do see that word.

23    Q.    Okay.  And is this another example of a program -- of a

24    ad that was run in your Premium Position Sponsorship program

01:31p 25    that does not involve escort services?

```
 1   A.   Was this included in the budget?

 2   Q.   Yeah, this was page -- I think we're up to Page 19.

 3   A.   Yeah, it's -- it's kind a hard for me to read, but I

 4   think it is another example.

 5   Q.   All right.  And let's just quickly run through the last

 6   two.  The next one, "lingerie," do you see that?

 7   A.   I do.

 8   Q.   All right.  And let's just run to the last one, if we can

 9   blow that up.  Boy, I have a hard time reading this, but you

10   recall that these examples of ads that have been used as part

11   of the Premium Position Sponsorship that you were putting in

12   the proposal -- the 2008 budget proposal for Mr. Larkin did

13   not involve ads for prostitution?

14   A.   Agreed.

15   Q.   All right.  And just to show you that's the last one,

16   let's go to the next page.  I think it moves on to the next

17   topic.

18        All right.  Now, in this 2007 time period -- so just

19   before, let's focus on 2006.  Do you recall that that was when

20   the New Times holding company bought the Village Voice?

21   A.   Yes.

22   Q.   Okay.  And I don't expect you to remember the exact

23   numbers, but do you recall that being approximately a 125

24   million dollar transaction?

25   A.   I was not privy to those numbers.
```

01:31p — line 5
01:32p — line 10
01:32p — line 15
01:33p — line 20
01:33p — line 25

```
 1  Q.   Okay.  And were you aware that in connection with that
 2  large transaction that Mr. Brunst was very busy working with
 3  the bankers and the lawyers in connection with the accountants
 4  in connection with that transaction?
```
01:33p   5  A.   I don't know.
```
 6  Q.   All right.  And do you recall, also, that not long after
 7  that there were transactions where New Times sold some of the
 8  newspapers -- four newspapers?
 9           MR. RAPP:  Objection, foundation.
```
01:34p  10           THE COURT:  Sustained.  Lay some foundation.
```
11           MR. LINCENBERG:  Will do, Your Honor.
12  BY MR. LINCENBERG:
13  Q.   Do you know whether or not New Times ever sold any of its
14  newspapers?
```
01:34p  15  A.   I think they did.
```
16  Q.   All right.  And do you know or recall -- we're going back
17  many years, but do you recall that one such transaction before
18  the rest of them were sold was a sale of about four
19  newspapers?
```
01:34p  20  A.   I -- I don't remember four.  I remember two.
```
21  Q.   Okay.  Was it your understanding that part of
22  Mr. Brunst's role was to be heavily engaged in transactions
23  involving the sales of newspapers?
24  A.   I don't know.  I really wasn't involved or I didn't sit
```
01:35p  25  in on any meetings.  I don't know.

1    Q.    Okay.  But was it your understanding that that was

2    consuming a lot of his time in that time period, if you know?

3             MR. RAPP:  Objection, asked and answered.

4             THE COURT:  Sustained.

01:35p  5    BY MR. LINCENBERG:

6    Q.    And do you recall when the *San Francisco Weekly* paper had

7    -- went bankrupt?

8             MR. RAPP:  Objection, relevance.

9             THE COURT:  Well, I'll overrule the objection and

01:35p  10   we'll see.

11            THE WITNESS:  Do you have a time frame?

12            MR. LINCENBERG:  In the -- one moment.  2010.

13            THE WITNESS:  I guess I wasn't involved and I can't

14   recall it.

01:36p  15   BY MR. LINCENBERG:

16   Q.    Forget about the date.  Do you recall at all Mr. Brunst

17   being consumed by involvement in the *San Francisco Weekly*

18   bankruptcy?

19            MR. RAPP:  Objection, foundation.

01:36p  20            THE COURT:  Sustained.

21   BY MR. LINCENBERG:

22   Q.    Now, you testified to a couple of Google Analytics

23   reports.  Do you recall that?

24   A.    Yes.

01:36p  25   Q.    Okay.  And I believe that some e-mails showed that one of

| | | |
|---|---|---|
| | 1 | the persons who received e-mails that contained Google |
| | 2 | Analytics reports at least at some point was Mr. Brunst. |
| | 3 | Do you recall that? |
| | 4 | A.   You're asking if Mr. Brunst received any Google |
| 01:37p | 5 | Analytics -- |
| | 6 | Q.   Right. |
| | 7 | A.   -- reports by -- |
| | 8 | Q.   I can show you the e-mails, but I believe that was your |
| | 9 | testimony. |
| 01:37p | 10 | A.   Okay, yes. |
| | 11 | Q.   And in connection with any Google Analytics reports that |
| | 12 | you sent to Mr. Brunst, let me ask you the following:  Did you |
| | 13 | ever receive an e-mail response from Mr. Brunst talking about |
| | 14 | any of the content of those reports? |
| 01:37p | 15 | A.   By e-mail only? |
| | 16 | Q.   Starting with e-mail. |
| | 17 | A.   I don't recall. |
| | 18 | Q.   Okay.  Did you ever e-mail Mr. Brunst asking him to |
| | 19 | analyze any of those reports? |
| 01:37p | 20 | A.   No. |
| | 21 | Q.   All right.  Did you ever receive any e-mail from |
| | 22 | Mr. Brunst providing analysis to you regarding any Google |
| | 23 | Analytics report? |
| | 24 | A.   What time frame? |
| 01:38p | 25 | Q.   At any time frame.  Did you ever receive any e-mail from |

```
          1  ║ my client, Jed Brunst, providing you any analysis of any
          2  ║ portion of these Google Analytics reports?
          3  ║ A.   Well, there were some e-mails but I -- right around the
          4  ║ attempted first sale of Backpage that involved Google
01:38p    5  ║ Analytics reports and traffic.
          6  ║ Q.   We know that you sent the reports at different times to
          7  ║ various people, including Mr. Brunst.  You can focus on my
          8  ║ question.  My question is:  Did you ever receive any e-mail
          9  ║ from Mr. Brunst providing an analysis of any of the Google
01:39p   10  ║ Analytics reports?
         11  ║ A.   No, but he did request analysis.
         12  ║        MR. LINCENBERG:  Your Honor, I move to strike the
         13  ║ portion after "no."
         14  ║        THE COURT:  All right.  The portion after "no" will
01:39p   15  ║ be stricken and the jury will disregard.
         16  ║ BY MR. LINCENBERG:
         17  ║ Q.   Now, these Google Analytics reports, I believe you
         18  ║ testified that for a large time frame they were provided for
         19  ║ free, correct?
01:39p   20  ║ A.   Yes.
         21  ║ Q.   All right.  And by the way, do the reports say anything
         22  ║ about the content of a given ad?
         23  ║ A.   The Google Analytics reports?
         24  ║ Q.   Right.  Do they, for example -- do the reports say,
01:39p   25  ║ "Here's an analysis of ads that you have where prostitutes are
```

 1  advertising their services," anything like that?

 2  A.   With the Google -- what are you saying that the Google

 3  Analytics reports would say?

 4  Q.   Repeat the question.  The question is:  Did the Google

01:40p  5  Analytics reports ever provide any breakdown, for example,

 6  which said, "Here's an analysis of prostitution -- prostitutes

 7  who are seeking to advertise on Backpage"?

 8  A.   That's not something that Google Analytics reports would

 9  do.

01:40p 10  Q.   Okay.  Did anyone at Google ever say to you in providing

11  these reports that Google was facilitating prostitution?

12           MR. RAPP:  Objection.  Relevance, foundation, and

13  then the question itself is hearsay.

14           MR. LINCENBERG:  I'm asking --

01:40p 15           THE COURT:  Sustained.

16           MR. LINCENBERG:  Okay.  Let me ask if we could

17  publish Exhibit 1925, which is in evidence.  It's a December

18  4th, 2013, e-mail and there's an e-mail chain.

19  BY MR. LINCENBERG:

01:41p 20  Q.   On the bottom we see there's an e-mail from you, which I

21  think leaks onto the next page, and then there is an e-mail in

22  the middle and then an e-mail from you and then an e-mail from

23  Mr. Brunst and it relates to the subject line of "Google

24  Analytics premium."  Do you see that?

01:41p 25  A.   Yes.

CARL FERRER - CONT'D CROSS EXAM BY MR. LINCENBERG          38

1  Q.   All right.  And I believe that within this chain -- and

2  maybe we can just focus in here -- there's a discussion about

3  a charge that Google wants to charge.  It talks about

4  different tiers which could run up to $330,000 a year.

01:42p  5       Do you see that?

6  A.   That's correct.

7  Q.   All right.  And because -- and you were considering

8  whether or not to spend that money, correct?

9  A.   I think I'm seeking approval --

01:42p  10  Q.   Okay.

11  A.   -- from Brunst to spend that money.

12  Q.   Right.  So you were -- did you want to spend that money?

13       MR. LINCENBERG:  We can go back to the full document

14  so Mr. Ferrer can see it.

01:42p  15       THE WITNESS:  I didn't think we would have any

16  choice.

17  BY MR. LINCENBERG:

18  Q.   Okay.  The -- and Mr. Brunst at some point on the top of

19  the e-mail chain responds by asking you what's the benefit.

01:43p  20       Do you see that?

21  A.   I -- I see what he wrote to me.

22  Q.   Okay.  And was there ever any discussion with Mr. Brunst

23  in your e-mails back and forth about ads for prostitution?

24  A.   In this e-mail?

01:43p  25  Q.   Right.

1   A.   No.

2   Q.   All right.  And I take it you didn't find it unusual that

3   somebody reviewing budgets would ask for a cost benefit

4   analysis on a potential $330,000 expenditure, did you?

01:43p  5   A.   I thought it was usual to ask how an expenditure would

6   increase revenue.

7   Q.   Okay.

8           MR. LINCENBERG:  And let's look at Exhibit 1151a,

9   which is in evidence, and I ask that that be published.  I

01:44p 10   think there's an e-mail -- let's go to 1151, which I think is

11   the e-mail that attaches 1151a.

12   BY MR. LINCENBERG:

13   Q.   Okay.  So this is an e-mail -- e-mail exchange between

14   you and Jess Adams; is that right?

01:44p 15   A.   Yes, it is.

16   Q.   All right.  And this is fourteen years ago, correct?

17   A.   Yes.

18   Q.   And it notes that there's a list of referring sites in

19   the Google Analytics report that was attached to it, right?

01:44p 20   A.   Yes.

21   Q.   And did you ever discuss with Mr. Brunst that list of

22   referring sites?

23   A.   Yes, I did.

24   Q.   When did you discuss with Mr. Brunst that list of

01:45p 25   referring sites?

1    A.    I discussed this with Mr. Brunst in a meeting with Jim

2    Larkin in a conference room where I pulled up these reports

3    and I described the sites that were referring to Backpage.

4    Q.    So that was what meeting?  What year did you do that?

01:45p  5    A.    Somewhere 2007, 2008, 2009.  It was right around that

6    time.

7    Q.    Okay.  So you don't recall what meeting that was?

8    A.    No, I can -- I recall the meeting.  I just can't recall

9    the exact time 'cuz we were in Building B --

01:45p 10    Q.    Okay.

11    A.    -- conference room and I pulled it up on the screen and

12    we're just amazed by how much traffic was being referred to us

13    by The Erotic Review.

14    Q.    So this testimony that you've just given today, in the

01:46p 15    ten or twelve interviews that you had with Mr. Rapp and his

16    colleagues between April of 2018 and April of 2020, did you

17    ever say that during those interviews?

18         Seems like pretty significant testimony.  Did you ever

19    say that during those interviews?

01:46p 20    A.    I -- I'm certain that I talked about The Erotic Review

21    and my disclosure to my supervisors about The Erotic Review's

22    success.

23    Q.    Well, your supervisor was Mr. Spear, right?

24    A.    I always felt I had three bosses.

01:46p 25    Q.    Oh, okay.  You told the Government that your supervisor

1    was Mr. Spear?

2    A.    Actually, I misspoke.   Four bosses.   The owners are the

3    boss.

4    Q.    So you told the Government that your supervisor was

01:46p  5    Mr. Spear, correct?   Correct?

6    A.    Yeah, he's my direct supervisor.

7    Q.    And we saw an organizational chart where Mr. Larkin is --

8    was the supervisor over Mr. Spear, correct?

9    A.    Correct.

01:47p 10    Q.    Okay.   But you're now telling the Members of the Jury

11    that Mr. Brunst was always one of your supervisors or at least

12    that's what you always felt; is that your testimony?

13    A.    I never -- I didn't say that.

14    Q.    Okay.   And this -- getting back to my question, whether

01:47p 15    in any interview with the Government, 30-plus interviews, did

16    you ever tell the Government that you discussed the source of

17    referrals with Mr. Brunst?

18    A.    Yes.

19    Q.    Okay.   And was that in one of the interviews that was

01:47p 20    typed up that you reviewed?

21    A.    I don't know if it's there.

22    Q.    Okay.

23         MR. LINCENBERG:   Thanks, Christina.   We can take

24    that down.

01:48p 25    BY MR. LINCENBERG:

1  Q.   Let's talk a little bit more about The Erotic Review.  So
2  I believe your testimony was that you met with Mr. Elms around
3  2007 to negotiate a business deal.
4       Was that the right time frame?
01:48p  5  A.   I think so.
6  Q.   All right.  Mr. Brunst was not at that meeting, correct?
7  A.   He was not.
8  Q.   And I believe we already confirmed, I won't harp on it,
9  that Mr. Brunst was not a part of any conversations or
01:48p  10  meetings or e-mails Mr. Elms; is that correct?
11          MR. RAPP:  Objection, asked and answered.
12          THE COURT:  Sustained.
13  BY MR. LINCENBERG:
14  Q.   And the Government showed you several e-mails in their
01:48p  15  direct examination and at least with regard to the e-mails
16  that the Government picked to show you, which were, I'll note
17  for the record, Exhibit 570, 837 and 1172, those were e-mails
18  between you and Mr. Elms.  Mr. Brunst was not copied on any of
19  those, correct?
01:49p  20          MR. RAPP:  Same objection.
21          MR. LINCENBERG:  Specifically talking about e-mails.
22          THE COURT:  Well, I think the problem here,
23  Mr. Lincenberg, is you're asking about exhibits that are not
24  before this witness when you're asking the question and you're
01:49p  25  noting for the record what those exhibits are.

1    So I'm going to strike the entirety of the question

2  and you can start over.

3         MR. LINCENBERG:  Okay, I was just trying to expedite

4  it.  If we can put Government Exhibit 570 in evidence on the

01:49p  5  screen.

6  BY MR. LINCENBERG:

7  Q.   570 was a 2009 e-mail between you and Mr. Elms, correct?

8  A.   Correct.

9  Q.   Mr. Brunst is not a part of that e-mail exchange,

01:49p 10  correct?

11  A.   He is not.

12  Q.   We can go to Exhibit 837, and just go to the top.  It's

13  cut off a little bit but Mr. Elms -- Mr. Brunst is not part of

14  that e-mail exchange, correct?

01:50p 15  A.   Correct.

16  Q.   And Exhibit 1172.  Mr. Brunst is not part of this e-mail

17  exchange, correct?

18  A.   He's -- he's not copied on this e-mail.

19  Q.   All right.  Let's take a look at Exhibits 567 and 567a.

01:50p 20  So let's start with 567.

21     So this is an invoice -- it says from you to Jess Adams

22  and here is David's January invoice for TER banner.

23     Okay, and if we can now move to 567a, the attachment, and

24  it contains an invoice that was for $4,000.  Do you see that?

01:51p 25  A.   I do.

 1   Q.   All right.  And the invoices, by the way, don't say

 2   anything about adult or anything.  It's just "ad placement,"

 3   correct?

 4   A.   Correct.

01:51p   5   Q.   All right.  And in connection with this invoice you

 6   testified in response to questions from Mr. Rapp that what you

 7   then do, "I have to have this invoice and then do a request

 8   for payment for Scott Spear and Jed Brunst to approve."

 9        Did you review this document with the Government prior to

01:51p  10   your testimony?

11   A.   I believe so.

12   Q.   And was your testimony on September 13th the first time

13   that you ever told the Government that you went to Jed Brunst

14   for approval of this invoice?

01:52p  15   A.   I don't know.

16   Q.   Do you recall as you sit here today ever making that

17   statement to anybody prior to your testimony in this courtroom

18   that you went to Jed Brunst for approval of this invoice?

19   A.   It's -- it's likely that I did state that this invoice

01:52p  20   would have to be paid.  It has to get approved by Scott Spear

21   and Jed Brunst.

22   Q.   It's likely that you stated that to the Government?

23   A.   Yes.

24   Q.   So if you did state that to the Government, it's either

01:52p  25   in one of the written memorandum of interview received or it

```
 1  wasn't documented by the Government?  One of those two

 2  alternatives, correct?

 3  A.   Yes.

 4       MR. LINCENBERG:  Okay, we can take this down.

 5  BY MR. LINCENBERG:

 6  Q.   Now, you testified -- in connection with financial

 7  institutions you testified about -- I think you used the term

 8  "KYC" at one point, right?

 9  A.   Correct.

10  Q.   And KYC, just to remind the jurors, stands for "know your

11  customer," correct?

12  A.   Yes.

13  Q.   And your understanding is that you can't get a bank

14  account without having to go through a KYC process, correct?

15  A.   Correct.

16  Q.   And your understanding is that in going through that

17  process the banks might have reputational concerns.  I believe

18  you used the term "reputational" several times, correct?

19  A.   Correct.

20  Q.   And, frankly, banks might also have anti-money laundering

21  obligations, right?

22  A.   Yes.

23  Q.   Right.  You understood that banks have AML departments,

24  correct?

25  A.   I believe they do.
```

01:53p 5
01:53p 10
01:54p 15
01:54p 20
01:54p 25

1  Q.   And that they're required to under the Bank Secrecy Act;

2  is that your understanding?

3  A.   I've heard of the act.  I guess I don't have a full

4  understanding of that act, though.

01:54p  5  Q.   Okay.  And when you fill out a contract -- let's focus

6  for a moment on a contract for payment processing -- and spend

7  months getting contracts vetted by the acquiring bank, by

8  their attorneys, you're not disguising your transaction, are

9  you?

01:55p 10  A.   What -- what time frame?

11  Q.   Well, did you ever, ever, disguise your transactions,

12  your applications for -- to acquiring banks or processors?

13  A.   Process --

14         MR. RAPP:  Objection, foundation.

01:55p 15         THE COURT:  Sustained.

16  BY MR. LINCENBERG:

17  Q.   Well, sir, you -- you yourself prepared some 30

18  applications over -- over the course of the years to different

19  payment processors, correct?

01:55p 20  A.   I believe that's correct.

21  Q.   And in preparing those applications you knew that they

22  were gonna -- you understood that they were going to be

23  vetted, correct?

24         MR. RAPP:  Same objection as to foundation.  When?

01:56p 25         MR. LINCENBERG:  At all times.

```
 1              THE COURT:  With respect to the --
 2              MR. LINCENBERG:  The 30.
 3              THE COURT:  -- the 30?
 4              MR. LINCENBERG:  Yes.
```
01:56p  5              THE COURT:  Well, maybe for clarity of the record
```
 6  you can lay some foundation as to the time frame that you're
 7  talking about.
 8              MR. LINCENBERG:  Okay.
 9  BY MR. LINCENBERG:
```
01:56p 10  Q.   Over what time period did you submit applications to --
```
11  for payment processing?
12  A.   So I submitted and signed applications for payment
13  processing after the transaction in April of 2015.
14  Q.   You're saying you never submitted them prior to April of
```
01:56p 15  2015?
```
16  A.   I didn't -- I couldn't sign them prior to 2015.
17  Q.   Didn't ask if you signed them, asked if you prepared --
18  asked if you were -- let's use the word "involved" in
19  preparing to submit them prior to April of 2015?
```
01:57p 20  A.   Yes, I was involved in preparing.
```
21  Q.   You couldn't sign them.  What you're getting at is that
22  the signature -- it needed a signature of -- I think you used
23  the term "UBO," ultimate business owner, correct?
24  A.   Correct.
```
01:57p 25  Q.   So even if you were preparing an application for payment

```
      1  processing, it would need a signature from Larkin, Lacey,

      2  Spear or Brunst, correct?

      3  A.    Correct.

      4  Q.    All right.  And there were times when Mr. Brunst signed

01:57p 5  those applications that you were submitting on the -- in the

      6  area that required a signature from a UBO, an ultimate

      7  business owner, correct?

      8  A.    At what time frame?

      9  Q.    Well, at any time frame whether prior to 2015 or after 20

01:57p 10 -- let's -- let's break it down.

      11 A.    He wouldn't sign them after 2015.

      12 Q.    So prior to 2015?

      13 A.    Yes.

      14 Q.    Okay.  And in preparing those applications you wanted to

01:58p 15 make sure you were telling the truth in those applications,

      16 correct?

      17 A.    We wanted to position us in the most favorable light, but

      18 I wouldn't describe those applications as being transparent.

      19        MR. LINCENBERG:  Your Honor, for the witness' eyes

01:58p 20 only I'd like to pull up on the screen -- not publish, but

      21 pull up on the screen Exhibit GL-CF-04, which is the May 10th,

      22 2018, "Memorandum of Interview" at Paragraph 132.

      23        THE COURT:  Okay.  You're going to have to wait for

      24 Liliana to distribute the exhibit.

01:59p 25        MR. LINCENBERG:  Yes.
```

                1           THE COURT:  Did you put that slash on the screen?

                2    There's a hash mark on the screen.

                3           MR. LINCENBERG:  I'm sorry, I didn't hear you, Your

                4    Honor.

**01:59p**     5           THE COURT:  There's a hash mark on the screen.

                6           MR. LINCENBERG:  Oh, got it, okay.

                7           MR. LINCENBERG:  Has Your Honor had a chance to

                8    review Exhibit 132?

                9           THE COURT:  As best I can.  It's a multiple-page

**02:00p**     10    document.

               11           MR. LINCENBERG:  Is the Court focused on the part on

               12    the screen, which is the part we're using, which is Paragraph

               13    132?

               14           THE COURT:  Yes, I've seen it.

**02:00p**     15           MR. LINCENBERG:  Your Honor, I'd like to read that

               16    top portion, those three sentences in 132 for purposes of

               17    impeachment.

               18           THE COURT:  Was there a question before the witness?

               19           MR. LINCENBERG:  Yes, the question was --

**02:00p**     20    Mr. Ferrer's testimony was that he was deceptive in these

               21    applications.

               22           MR. RAPP:  I don't think that's accurate.

               23           Objection, improper impeachment.

               24           MR. LINCENBERG:  It is accurate.

**02:01p**     25           THE COURT:  Well, I'm going to sustain because I

 1  don't have that recollection.

 2          MR. LINCENBERG:  Let me -- let me then go back to

 3  it, your Honor.

 4          THE COURT:  Should we go back into the record and

02:01p  5  ask the court reporter to state what his answer is?

 6          MR. LINCENBERG:  We can do that, that'd be great.

 7          THE COURT:  Is it the question immediately preceding

 8  this introduction of the exhibit?

 9          MR. LINCENBERG:  I think so.

02:02p 10          If the court reporter can read the question and

11  answer.

12          (Whereupon the question and answer were read back.)

13          THE COURT:  I think it's consistent for the

14  proffer --

02:02p 15          MR. LINCENBERG:  Okay.

16          THE COURT:  -- and I'm going to sustain the

17  objection.

18          MR. LINCENBERG:  Let me get back in to it.

19  BY MR. LINCENBERG:

02:02p 20  Q.  Sir, in preparing these applications is it true that you

21  knew that you could not lie on the applications?

22  A.  We could not have an obvious lie on the applications.

23  Q.  So your testimony is you could have a lie as long as it

24  wasn't obvious?

02:02p 25  A.  We did -- was that a question?

```
 1   Q.   So is your answer that you could lie on these
 2   applications as long as it wasn't obvious?
 3         Is that your testimony?
 4   A.   No.
```
**02:02p**
```
 5              MR. RAPP:  Well, object.  That wasn't his testimony.
 6              MR. LINCENBERG:  Your Honor, that was his testimony;
 7   but I'd ask the Court to admonish Mr. Rapp he can make his
 8   objection without coaching.
 9              THE COURT:  Overruled as to that.  It wasn't
```
**02:03p 10**
```
     coaching, but let me look at the prior objection.
11              I think we can move on.  I'll overrule the
12   objection, but move on.
13              MR. LINCENBERG:  Do we have an answer?
14              THE REPORTER:  "No."
```
**02:03p 15**
```
                THE COURT:  He stated "no."
16   BY MR. LINCENBERG:
17   Q.   And, sir, is it true that you took care to not provide
18   information that was false?
19   A.   There's just a lot of applications, and I'm having to
```
**02:04p 20**
```
     think about them.  This is at what time frame?
21   Q.   It's in connection with what you told the Government
22   about merchant applications and agreements between 2010 and
23   2018 that you signed and submitted some 30 applications.
24   A.   And your question was?
```
**02:04p 25**
```
     Q.   Is it true that you took care not to provide information
```

1    that was false?

2    A.   I'd have to look at each individual application.

3    Q.   Did you tell the Government that you'd have to look at

4    each individual application before telling them that you took

02:04p 5   care to not provide information that was false?

6         THE WITNESS:  I don't really understand that

7    question.

8         MR. LINCENBERG:  Your Honor, this is straightforward

9    impeachment.

02:05p 10        THE COURT:  Well, no.  You stated in your question

11   testimony that he did not give.

12        MR. LINCENBERG:  I stated exactly what he stated.

13        Sir, let me -- let me see if I can address the

14   Court's concern.

02:05p 15   BY MR. LINCENBERG:

16   Q.   In discussing merchant applications and agreements, you

17   were telling the Government in your interviews that Backpage

18   submitted some 30 applications for merchant accounts, correct?

19   A.   Correct.

02:05p 20   Q.   And you noted that many were turned down because of what

21   you called "death by Google search," correct?

22   A.   Correct.

23   Q.   And by that you meant that in performing their "know your

24   customer" functions, banks could easily go on Google and see

02:06p 25   all sorts of publicity involving Backpage that was negative,

           1   correct?

           2   A.    Correct.

           3   Q.    And in discussing the applications, did you advise the

           4   Government that they knew that they couldn't lie on the

02:06p     5   applications?

           6   A.    I -- I may have said that.

           7   Q.    Did you -- and was that a true statement?

           8   A.    We couldn't lie, but that doesn't mean we didn't

           9   misdirect.

02:06p    10   Q.    We're gonna get to the misdirection in a moment.  So I'm

          11   not going to move to strike the part that's non-responsive.

          12   We're going to get to that; but you knew you couldn't lie,

          13   correct?

          14   A.    We knew we couldn't lie.

02:07p    15   Q.    Right.

          16   A.    We knew that you shouldn't lie on these bank

          17   applications, correct.

          18   Q.    And you knew that you -- you took care to provide -- to

          19   not provide information that was false, correct?

02:07p    20   A.    "Took care," I wouldn't describe it as that.

          21   Q.    Okay.

          22         MR. LINCENBERG:  Well, Your Honor, I'd like to

          23   impeach the witnesses with the statement -- the first phrase

          24   of the second sentence of Paragraph 132.  We're gonna get to

02:07p    25   the third part of it.  Right now I'd like to impeach the

```
 1    witness while it's timely with this.
 2              THE COURT:  Show me the exhibit again.
 3              MR. LINCENBERG:  Can we put for Court's eyes, for
 4    counsels' eyes.
 5              THE COURT:  You may ask the question.
 6              MR. LINCENBERG:  What I'd like to do is read in the
 7    statement.  He's already --
 8              THE COURT:  You can ask it -- ask him a question.
 9    BY MR. LINCENBERG:
10    Q.  Sir, you stated to the Government in this interview of
11    May 10th, 2018, first, that you knew you couldn't lie on the
12    applications, we covered that; and, second, you took care that
13    you were not providing information that was false.
14         I'm going to get to the next sentences.  Focus on what
15    I'm asking you first, and then I'll get to the next sentence.
16         Is that true?
17    A.  What was the first question?
18    Q.  Did you tell the Government that you took care that you
19    were not providing information that was false?
20    A.  Yes.
21    Q.  All right.  Now, let's get to -- you also told the
22    Government that you -- that you presented information in the
23    most favorable light to your application, correct?
24              MR. LINCENBERG:  We can take this down now.
25              THE WITNESS:  Correct.
```

02:08p (lines 5, 10, 15, 20)
02:09p (line 25)

 1  BY MR. LINCENBERG:

 2  Q.   All right.  And so, for example, if I'm applying for a

 3  job and my résumé says that I have great grades, but I don't

 4  tell them that I got a "D" in accounting, but it's accurate

02:09p 5  that I had great grades, that's making sure I'm accurate but

 6  also not highlighting other aspects of my résumé.

 7       Fair analogy?

 8            MR. RAPP:  Objection, there's more to this

 9  paragraph.

02:09p 10            MR. LINCENBERG:  Oh, I'm gonna get to it all -- or

11  you can get to it.

12            THE COURT:  Well, is there an objection to the prior

13  question?

14            MR. RAPP:  Yes, improper impeachment is the

02:09p 15  objection.

16            MR. LINCENBERG:  Right now we're not impeaching,

17  we're asking a question.

18            MR. RAPP:  Well, I don't know what we're doing by

19  reading this.

02:09p 20            MR. LINCENBERG:  We're asking a question.

21            THE COURT:  Well, his question starts out if I'm

22  applying for a job and my résumé says X, Y and Z, that's the

23  question before the witness.

24            So perhaps the court reporter can re-read the

02:10p 25  question that was asked, and if Mr. Ferrer can answer he can

```
  1    try to do that.
  2    BY MR. LINCENBERG:
  3    Q.   Fair analogy?
  4              THE COURT:  Well, I asked the court reporter to
02:10p  5    re-read --
  6              MR. LINCENBERG:  Oh, I'm sorry.
  7              THE COURT:   -- your question.
  8              MR. LINCENBERG:  Thank you.
  9              (Whereupon the question was read back.)
02:10p 10              THE WITNESS:  It seems like you're presenting grades
 11    in a favorable light, yes.
 12              MR. LINCENBERG:  Okay.
 13    BY MR. LINCENBERG:
 14    Q.   Now, we've also previously stated that there was no
02:11p 15    evidence of fraudulent merchant bank applications, correct?
 16    A.   Is it possible to see this?
 17    Q.   Yes.
 18    A.   Because you seem --
 19    Q.   I will show you that, but let me ask you if you remember
02:11p 20    stating it?
 21    A.   I don't know if I used those exact words.
 22    Q.   Okay.  I'm going to show you the question -- the prior
 23    statement in a moment, but let me ask:  Is it true as you sit
 24    here today and the testimony to this jury under oath that you
02:11p 25    stated in the past that there was no evidence of fraudulent
```

1    merchant bank applications?

2    A.    What time frame?  Does it have a time frame?  Ever?

3    Q.    You made the statement in May of 2017.

4    A.    Well, I guess I need to see the context of it.  I'm --

02:12p  5    I'm -- I don't remember.

6    Q.    Okay.

7            MR. LINCENBERG:  Your Honor, I'd like to place for

8    the witness' eyes GL-CF-37.  There's an e-mail at 36 which

9    relates to 37, but I think we can focus on 37.

02:13p 10            MR. RAPP:  Could we have an identification of this

11    document?

12            MR. LINCENBERG:  These are Mr. Ferrer's comments in

13    response to allegations made against him by the California

14    Attorney General, and I'm looking for the comment -- let me --

02:13p 15    let's keep this document handy because I don't see it on this

16    page.  I may have the page wrong so let's come back to this in

17    a moment.

18            THE COURT:  You can ask one more question and we'll

19    take our afternoon break.

02:14p 20    BY MR. LINCENBERG:

21    Q.    Sir, did you also make the statement that a money

22    laundering charge is really an attempt to legislate by

23    prosecution via payment service providers which is the weak

24    link the Government pressures to cut off unpopular speech?

02:14p 25            MR. RAPP:  I'm going to object to this.  I have no

```
 1   idea what this document is, and he has to identify it.

 2              THE COURT:  That's sustained.

 3              MR. LINCENBERG:  We can go through that.  I don't

 4   think the Court wants me to go through it on the record, but

 5   we can or we can do it at the break.

 6              THE COURT:  Well, let's go ahead and take our

 7   afternoon break.  We've been at it for, by my count, an hour

 8   and a half.  We'll take our usual 20-minute break and aim to

 9   end at 4:30.

10              Members of the jury, again, just remember the

11   admonishment and we will stand in recess.

12              Please all rise for the jury.

13              (Jury out 2:15 p.m.)

14              THE COURT:  Mr. Ferrer, you may step down.

15              Please be seated.  I guess, Mr. Lincenberg, just a

16   note when you ask him whether he made a prior statement, it's

17   helpful if you give some context so this witness can try to

18   recall.  I think he's trying to do his best to do that, and

19   when you put forward a statement that he made that may not

20   have to do with any testimony that he's given, I think it's

21   entirely helpful that you do that.  So just be cognizant.

22              All right, we'll stand in recess.

23              MR. LINCENBERG:  Your Honor, it might be helpful if

24   I can address the question Mr. Rapp asked.

25              THE COURT:  You can discuss whatever it is you wish
```

02:14p  5
02:15p  10
02:15p  15
02:16p  20
02:16p  25

 1    to discuss out of my presence.

 2              MR. LINCENBERG:  Okay.

 3              COURTROOM DEPUTY:  All rise.

 4              (Recess taken at 2:16 p.m.)

02:38p 5         COURTROOM DEPUTY:  All rise, court is now in

 6    session.

 7              (Back on the record at 2:38 p.m.)

 8              THE COURT:  Please be seated.

 9              We have the witness back on the stand.

02:38p 10        MR. RAPP:  Judge, can we just be heard on this last

11    effort to --

12              THE COURT:  Can you turn your microphone on?

13              MR. RAPP:  I'm sorry.  I think it's on, I just was

14    not standing close enough.

02:38p 15        So this -- the exhibit -- and I apologize, I don't

16    -- for the record, I don't know what the exhibit number is --

17              MR. LINCENBERG:  For the record, it's GL-CF-37 and

18    the attached e-mail is 36.

19              THE COURT:  There's an attached e-mail?

02:39p 20        MR. LINCENBERG:  36 is just an e-mail of 37.

21              MR. RAPP:  Yeah.  So here's -- here's our objections

22    to the use of this, Judge:  If you look at this document --

23    first of all, this is an unsigned document.  There's nowhere

24    anywhere on this document that Carl Ferrer has signed this

02:39p 25    document.  That's the least of the problems, though.

1        It is specific answers -- if you look the way this

2   is laid out, this is specific answers, I guess, imputed to

3   Carl Ferrer in response to the specific allegations in the

4   California indictment, and so for that reason alone it is

02:39p  5   irrelevant.

6        He is commenting on the specifics of the allegations

7   in a state criminal proceeding involving different statutes

8   and, more importantly, different elements and different

9   specified unlawful acts as a predicate for money laundering.

02:40p 10   That's -- that should be enough to prevent the defense from

11   using these comments to attempt to impeach Mr. Ferrer.

12        The second problem with this is this is a document

13   that was prepared in conjunction with the attorneys for

14   Backpage and Mr. Ferrer will say that, and this is privileged

02:40p 15   information that we have not had access to.

16        As the Court might be aware from the history of

17   litigation in this case is they have a joint defense agreement

18   that they have used as a shield for a number of documents.

19   It's just now that Mr. Ferrer isn't part of that, they're now

02:40p 20   using it as a sword against him.  So that reason alone, this

21   has now invaded Mr. Ferrer's privilege with the attorney that

22   assisted him in creating these answers to these various

23   allegations.

24        MR. LINCENBERG:  A couple things.  First, the

02:41p 25   Government had as part of their cooperation effort that

1    Mr. Ferrer would plead guilty to money laundering charges in

2    California.  So, number one, they've put in issue his play --

3    they want to tag us with Pinkerton liability, and he's

4    claiming -- he went into court and said, "I've committed money

02:41p  5    laundering," when, in fact, he has made statements to the

6    opposite.  That's number one.

7            Number two, most important, is that these are prior

8    statements, not just in relation to a specific allegation.

9    These are statements by him that says when you fill out a

02:42p 10    contract.  It has nothing to do with the particular contract.

11           Spend months vetting contracts vetted by the

12    acquiring bank and processor.  You are not disguising your

13    transaction.  That's impeachment to his testimony.  He says

14    there was no evidence of fraudulent merchant bank

02:42p 15    applications.  That's impeachment to his testimony.

16           When he says a money laundering charge is really an

17    attempt to legislate by prosecution, that is impeachment

18    testimony and that it's done in order to cut off unpopular

19    speech.

02:42p 20           It doesn't matter the proceeding.  I'd be happy to

21    go into the proceeding.  I was purposely avoiding it because I

22    was trying to be mindful of the Court not wanting me to get

23    into that.

24           Now, let now address the last point about the

02:42p 25    privilege, and this is really set out at Docket 180-1.  There

1    is a declaration there from Jim Grant.  So in connection with

2    a motion to disqualify the Davis --

3                THE COURT:  I don't know -- I don't know what docket

4    you're referring to.  In -- in this proceeding?

02:43p  5                MR. LINCENBERG:  Yes, in this proceeding.

6                THE COURT:  So what is it?

7                MR. LINCENBERG:  180 -- I have down 180-1.

8                So to give the Court some background, the Government

9    moved to disqualify the Davis, Wright and Tremaine firm from

02:43p 10    further representation in this case.  Davis, Wright and

11    Tremaine represented Backpage.  I believe it represented, I

12    think, Mr. Ferrer as well; and that was opposed and the Court

13    ruled that they're not disqualified.

14                But in connection with that, Mr. Grant, who's a

02:43p 15    lawyer at Davis, Wright and Tremaine, submitted a declaration

16    and at Page 78 -- and, really, it's really what he attaches.

17                He attaches Mr. Ferrer's proffer agreement in which

18    he waives privileges with regard to, for example, this

19    document; and the proffer agreement at Paragraph 2 says

02:43p 20    Mr. Ferrer voluntarily waives all claims of attorney-client

21    privilege, whether in his personal or official capacity, as

22    the Chief Executive Officer of Backpage.com LLC, as whether in

23    his personal or official capacity, as the CEO of Backpage as

24    to communications with any attorney or law firm that

02:44p 25    represented Backpage or any related entity when such

 1  communications concern or related to backpage.com or any

 2  related entity.

 3         Now, I don't need to go into all that background.  I

 4  have a statement that he has lied under oath here directly

**02:44p**  5  contradicting prior statements that he's made.  I should be

 6  entitled to use that statement to impeach him, and it doesn't

 7  negate the impeachment value simply because, well, it was a

 8  California case.  There were, you know, other counts of money

 9  laundering that we didn't specifically name here.

**02:44p** 10         His testimony has been about deceiving banks and

11  he's -- he's running away from his prior statements.

12         THE COURT:  Let me -- let me just comment on that.

13  We can move on and have our jury in.

14         Number one, I think -- pay close attention to what

**02:45p** 15  this witness says in response to your answers.  There's

16  already been two or three times when you've proffered

17  impeachment exhibits when the testifying witness has not made

18  an inconsistent statement.  So that's number one, and I didn't

19  see that here.  That's -- that's why I sustained the

**02:45p** 20  objection, okay.

21         Number two, I look at this exhibit and it is

22  non-descript to me.  There are strikeout lines in here.  I

23  don't know what the authenticity of this document is or what's

24  -- you know, there's -- you know, Count 6, there's strikeout

**02:45p** 25  in red and -- so I don't know where this comes from.

1           I don't know what it's in relation to, and if you're

2    relying on Docket No. 180-1 I'd like to a moment to review

3    that.

4           MR. LINCENBERG:  That's fine.

02:46p  5           THE COURT:  And so you won't bring this in in the

6    next round of questions --

7           MR. LINCENBERG:  Fair enough.

8           THE COURT:  -- and so you can move on --

9           MR. LINCENBERG:  Fair enough.

02:46p 10           THE COURT:  -- to something else.

11           MR. LINCENBERG:  Can I just flash on the screen for

12    the Court to answer part of the questions which is CF --

13    GL-CF-36, which is the e-mail that that's attached to,

14    comment_transcript.

02:46p 15           MR. RAPP:  It says "attorney-client privileged" on

16    it.

17           MR. LINCENBERG:  Yeah, it was and he waived it.

18           THE COURT:  Well, that -- that's fine.  But, again,

19    the document itself, whatever it is, I don't know what this

02:46p 20    is.  It on the top of it says, "NOTE:  Many Blank Pages below.

21    You need to page thru them.  My comments in yellow highlight."

22           I don't know what this is --

23           MR. LINCENBERG:  Well, that's for --

24           THE COURT:  -- or where it comes from.

02:47p 25           MR. LINCENBERG:  That's for me to explore -- let him

```
 1    answer where it is.
 2               THE COURT:  Well, so at the moment we're not going
 3    to go into it.  I'm going to look at Docket 180-1.  I'll see
 4    whether or not the privilege was waived.  But, again, here I
 5    don't -- these are statements that are -- or comments that are
 6    put in underneath a particular declaratory statement, and so
 7    it's out of context.  So that's another problem.  So let's
 8    move forward.  Let's have the jury in.
 9               (Jury back in at 2:48 p.m.)
10               THE COURT:  All rise for the jury.
11               All right, please be seated.  Thank you for your
12    patience.  We've had some matters to discuss out of your
13    presence, but I will note the presence of the witness; and,
14    Mr. Lincenberg, you may continue.
15               MR. LINCENBERG:  Thank you, your Honor.
16    BY MR. LINCENBERG:
17    Q.   Sir, we were talking about payment processing
18    applications, and I'd like to return to that topic.
19         Now, there was some discussion in your testimony in
20    response to Mr. Rapp's questions about establishing European
21    companies and did you under -- and, in fact, there was a
22    European company established, I believe, in the Netherlands,
23    for example, correct?
24    A.   Say again, I'm sorry.
25    Q.   There was a company established in the Netherlands?
```

02:47p  5
02:48p 10
02:49p 15
02:49p 20
02:49p 25

         1   A.    Yes.

         2   Q.    Okay.  Do you recall the name of that company?

         3   A.    I do.

         4   Q.    What was that?

02:49p   5   A.    Payment Solutions BV.

         6   Q.    And when Payment Solutions was established, were some of

         7   the requirements for establishing that that there be a Dutch

         8   director?

         9   A.    Yes.

02:50p  10   Q.    And did that director have to sign off on everything

        11   involving that company?

        12   A.    I think, yes, possibly a co-signature with Jed Brunst.

        13   Q.    Okay.  And did you understand that in order to establish

        14   certain banking relations in Europe, there were laws in Europe

02:50p  15   that required there to be a European entity?

        16         Do you recall that?

        17   A.    That's what I said, required?

        18   Q.    (Nodding of the head.)

        19   A.    Did I say "laws"?  I think it's a different word.

02:51p  20   Q.    What word did you use?

        21   A.    The banks -- European banks require a European company.

        22   Q.    Okay.  And in -- let's just say, for example, the --

        23   let's pick a time period, late 2015, Backpage was trying to

        24   build business in Europe, correct?

02:51p  25   A.    Correct.

```
       1   Q.   Now, in connection with efforts to get payments
       2   processed, did you state that you had endless discussions with
       3   Don Moon?
       4   A.   Probably.
02:51p 5   Q.   Did you describe Mr. Moon as your financial payment
       6   method therapist?
       7   A.   I don't recall that.  I guess I'd want to see it.
       8   Q.   Okay.  And did -- well, let's show that to you.
       9        Let's look at GL-CF-22, which is a July 10th, 2019,
02:52p 10  interview at Paragraph 21.
       11       Take a look at Paragraph 21 from that interview, and does
       12  that help refresh your memory that you described Mr. Moon as
       13  your financial payment method therapist?
       14  A.   That's what it states.
02:53p 15  Q.   And it states that -- that's an interview that you
       16  reviewed and didn't change that statement, correct?
       17  A.   Yes.
       18  Q.   So when you say "that's what it states," just so the jury
       19  understands, that's what the Government agent's memorandum of
02:53p 20  your interview states and then you reviewed it and made no
       21  changes to that, correct?
       22  A.   Well, I'm not sure the time frame.  Mr. Moon had a
       23  variety of roles with the company.
       24  Q.   And one of them was, as you described it, your financial
02:53p 25  payment method therapist?
```

```
 1   A.    Correct.

 2   Q.    And I believe you also indicated -- we can take this

 3   down, thank you.

 4         You also indicated that Mr. Moon at one point threatened

 5   Litle, L-i-t-l-e, Litle with litigation.  Do you recall that?

 6   A.    Litle with litigation?

 7   Q.    Let's put up the same document, GL-CF-24, Paragraph 21.

 8             THE COURT:  I think that was 22.

 9             MR. LINCENBERG:  21.

10             THE COURT:  You said CF-24 --

11             MR. LINCENBERG:  Oh.

12             THE COURT:  -- and it's 22.

13             MR. LINCENBERG:  Got it, sorry.

14   BY MR. LINCENBERG:

15   Q.    So did you have endless discussions with Mr. Moon over

16   the phone?

17   A.    We did --

18             MR. RAPP:  Objection, foundation.

19             THE COURT:  Sustained.

20   BY MR. LINCENBERG:

21   Q.    Well, did you tell the Government that you had -- on July

22   10th of 2019 that you had endless discussions with Mr. Moon

23   over the phone throughout this process and described him as

24   your financial payment method therapist?

25             MR. RAPP:  Objection, asked and answered.
```

Timestamps:
02:53p  5
02:54p  10
02:54p  15
02:54p  20
02:55p  25

```
 1              THE COURT:  Sustained.
 2  BY MR. LINCENBERG:
 3  Q.   Well, did you make statements to the Government on July
 4  10th, 2019, about your endless discussions with Mr. Moon?
02:55p 5  A.   Yes.
 6  Q.   Okay.  And were those discussions involving payment
 7  processing?
 8  A.   Yes, they were.
 9  Q.   Okay.
02:55p 10         MR. LINCENBERG:  We can take that down.
11  BY MR. LINCENBERG:
12  Q.   Now, you recall -- just to refresh the jury's memory, I
13  think you mentioned a company named Litle.
14         Can you just remind the jury who Litle was?
02:55p 15  A.   So Litle was a payment processor for Backpage for at
16  least a couple of years.
17  Q.   Did that end around 2013?
18  A.   I believe so.
19  Q.   And did Litle terminate that relationship?
02:56p 20  A.   Yes, they did.
21  Q.   And did they -- did Litle advise you that they were
22  terminating that relationship because of quote "reputational
23  risk"?
24  A.   Yes.
02:56p 25  Q.   And when you use the term "reputational risk," are you
```

```
 1   referring to sort of a phrase that captures the idea that
 2   we're gonna look bad if we continue dealing with you?
 3   A.   Yes.
 4   Q.   All right.  And after -- and Litle told you they didn't
 5   have any other complaints about doing business with Backpage,
 6   it was just that things were getting -- things were too hot
 7   and they didn't want to be associated with Backpage, right?
 8   A.   I don't think he used the expression "too hot."  Just
 9   simply saying, "What are you doing about reputational risk?"
10   and I took that to mean how are we staying out of Google news
11   with all of the arrests and how are we ensuring that we don't
12   have illegal transactions.
13   Q.   Okay.  And just to clarify for the jury, when you say
14   "all of the arrests," you're not aware of Mr. Brunst ever
15   being criminally charged in any case, are you?
16             MR. RAPP:  Objection, relevance.
17             MR. LINCENBERG:  I want to clarify what he means.
18             THE COURT:  Well, I'll overrule the objection.
19             THE WITNESS:  I'm talking about the arrest --
20   BY MR. LINCENBERG:
21   Q.   Answer my question, simple question.
22        You're not referring to Mr. Brunst?
23             MR. RAPP:  Objection --
24   BY MR. LINCENBERG:
25   Q.   You don't know of any arrest of Mr. Brunst?
```

02:56p  5
02:57p 10
02:57p 15
02:57p 20
02:57p 25

1          MR. RAPP:  Objection, foundation.

2          THE COURT:  Sustained.

3    BY MR. LINCENBERG:

4    Q.   Do you -- when you said your conversation with Litle and

02:58p  5    all of the arrests out there, you don't know of Mr. Brunst

6    ever being arrested, correct?

7    A.   Correct.

8    Q.   All right.  Now -- and reputational risk was the only

9    problem that Litle had with Backpage, correct?

02:58p 10    A.   That's what they told me.

11    Q.   Okay.  All right.  So after Litle ceased doing business

12    with Backpage, the company needed another payment processor,

13    correct?

14    A.   Correct.

02:58p 15    Q.   All right.  And you worked somebody named Trent Voigt to

16    help in connection with payment processing by his company

17    Jetpay, correct?

18    A.   Correct.

19    Q.   And is it true that you were the primary contact from

02:58p 20    Backpage with Mr. Voigt?

21    A.   With Mr. Voigt?

22    Q.   Yeah.

23    A.   Not initially.

24    Q.   Did you socialize with Mr. Voigt?

02:59p 25    A.   I did have lunch with him.

```
      1    Q.   Did you go to baseball games with him?

      2    A.   I think I did go to one baseball game.

      3    Q.   All right.  And during this time frame when you're

      4    dealing with Mr. Voigt, Michael Gage, who you hired as CFO for

02:59p 5    Backpage, had been Jetpay's CFO, correct?

      6    A.   Yes, he had been.

      7    Q.   All right.  And you openly disclosed to Jetpay that

      8    Backpage was the primary business that you were involved with,

      9    correct?

02:59p 10   A.   I --

      11   Q.   Let me re -- let me shorten it.  Did you tell Mr. Voigt

      12   that you were with Backpage?

      13   A.   Yes.

      14   Q.   Okay.  Now, during the 2010 to 2018 time frame, I believe

03:00p 15   your estimate was that you signed and submitted some 30

      16   applications from merchant accounts with payment processors,

      17   correct?

      18        MR. RAPP:  Objection, asked and answered.

      19        THE COURT:  Sustained.

03:00p 20        MR. LINCENBERG:  Okay.

      21   BY MR. LINCENBERG:

      22   Q.   Over these years there was lots of negative press

      23   involving Backpage, correct?

      24   A.   Correct.

03:00p 25   Q.   And Backpage also had faced different lawsuits during
```

           1   that time that were in the press, right?

           2           MR. RAPP:  Objection, relevance.

           3           THE COURT:  Sustained.

           4   BY MR. LINCENBERG:

03:00p     5   Q.   So when you say that many of the applications were turned

           6   down due to death by Google search, there's different things

           7   that people would have seen on Google search that might have

           8   said, "You know what, I just don't want to deal with these

           9   guys."  Reputational reasons, right?

03:01p    10   A.   Sorry, you kinda just cut in and out and I could barely

          11   hear you.

          12   Q.   I'm sorry.  The -- let's take a look at one exhibit in

          13   particular, one of the merchant pay applications.

          14           MR. LINCENBERG:  If we could place before the

03:01p    15   witness Exhibit 6189 for identification.

          16   BY MR. LINCENBERG:

          17   Q.   Sir, do you recognize 6189 for identification as a

          18   merchant application form for eMerchantPay?  And if you need

          19   to look at any pages of it, we can -- we can flip through

03:01p    20   them.

          21   A.   I'd like to see the page with the date --

          22   Q.   Sure.

          23   A.   -- on it.

          24           MR. LINCENBERG:  Maybe we can go to Page 2.  Let's

03:02p    25   see, I have a hard time here.

1           I don't see a date in this exhibit.  I don't see it

2    in the application.  Maybe we can show the witness --

3           MR. RAPP:  Judge, I don't have an objection to this

4    being admitted and published.

03:02p  5           MR. LINCENBERG:  -- some of the pages to see if you

6    recognize it.

7           THE COURT:  Wait.  Mr. Rapp said something and I

8    didn't hear him.  Can you -- what is it that you said,

9    Mr. Rapp?

03:02p 10           MR. RAPP:  I don't have an objection -- sorry for

11    the delay.  I don't have an objection to this coming in and

12    being published.

13           MR. LINCENBERG:  We move to admit it.

14           THE COURT:  Well, I think the witness asked to be

03:03p 15    shown a particular page.

16           MR. LINCENBERG:  Well, I -- I think I offered to

17    show him different pages.  He asked if there was a date on it,

18    and on the pages I have in front of me I don't see a date.

19           THE COURT:  So I do believe -- you can ask another

03:03p 20    question if he recognizes it and so on and so forth, but I

21    think that was going to help him in that.

22           MR. LINCENBERG:  Okay.

23    BY MR. LINCENBERG:

24    Q.  First of all, do you recall submitting an application for

03:03p 25    payment processing to eMerchantPay?

1    A.   Yes, I do.

2    Q.   Okay.  And in the application did you note -- I'm

3    directing you just to look at Page 1, for example -- that the

4    legal name of the company submitting it was Classified

03:04p  5    Solutions?

6    A.   That is the European company --

7    Q.   Okay.

8    A.   -- that is being used.

9    Q.   All right.  And you recall -- if we can go lower on that

03:04p 10    -- that Page 1.  Do you recall application that involved owner

11    of account Website Technologies, bank name BMO Harris Bank?

12    A.   Yes, this is the information Jed would have put in.

13           MR. LINCENBERG:  Your Honor, we'd move it in to

14    evidence.

03:04p 15           THE COURT:  Yes, it may be admitted.

16           (Exhibit No. 6189 admitted in to Evidence.)

17    BY MR. LINCENBERG:

18    Q.   Now, if we go to Page 2 under "Contact Information," is

19    the contact information Page 2 -- if we can highlight where it

03:05p 20    -- okay.

21        All right.  If we look at my lower circle, is the primary

22    contact person noted Carl Ferrer at backpage.com?

23    A.   Correct, I was to be the contact.

24    Q.   Okay.  And so in this application, which was for this

03:05p 25    Classified Solutions entity located in the UK, you weren't

```
     1   concealing that Backpage was connected with this application,

     2   were you?

     3   A.   No, there's a different kind of concealment.

     4   Q.   Were you concealing that Backpage was connected with this

03:06p  5   application?

     6   A.   No, 'cuz my e-mail address has backpage.com in it.

     7   Q.   All right.  And the idea that there was an overseas

     8   entity established in connection with this application had to

     9   do with a requirement, as you understood it, that there be an

03:06p 10   overseas entity, correct?

    11   A.   Well, there's more to that than just that requirement --

    12   Q.   I know --

    13   A.   -- and I'd like to --

    14   Q.   -- I'm asking about this particular requirement.

03:06p 15        Is that correct?

    16   A.   This processor requires you to have a European company

    17   doing European transactions, and we don't have many.

    18   Q.   All right.  Did you ever make a prior statement where you

    19   stated that you established non-US companies because you had

03:07p 20   non-US sites, non-US employees pay taxes to non-US governments

    21   and take transactions in other currencies?

    22            MR. RAPP:  Objection, relevance.

    23            THE COURT:  Overruled, but it is compound.

    24            THE WITNESS:  And the time frame of that statement?

03:07p 25            MR. LINCENBERG:  Well, I'm asking if you ever made
```

```
 1   such a statement, but the Court would like me to break it
 2   down.
 3   BY MR. LINCENBERG:
 4   Q.   Did you ever -- isn't it true that one of the reasons you
 5   established non-US companies is because, one, you had non-US
 6   employees, right?
 7   A.   That was by design to hire non-US employees.
 8   Q.   So the answer's "yes" you had non-US employees?
 9   A.   But not at this time.
10   Q.   You had about twenty employees in 2017 working outside of
11   the United States?
12   A.   Yeah, but I think this application's 2013 or '14.
13   Q.   Well, I'm just giving you a time frame to -- in 2017 did
14   you have twenty employees working outside of the United
15   States?
16   A.   We did.
17   Q.   All right.  Did you pay rent overseas?
18   A.   We did.
19   Q.   Okay.  And did you pay taxes to non-US governments?
20   A.   Eventually, yes, but not at this time frame.
21   Q.   All right.  And we can take this document down.
22        I want to get back to -- we had talked earlier about this
23   term "ultimate business owner verification."  Do you recall
24   that, UBO verification, where one of the owners -- prior to
25   2015 one of the owners of the holding company of Backpage had
```

03:07p  5
03:08p 10
03:08p 15
03:08p 20
03:09p 25

1  to sign on applications.  Do you recall that?

2  A.   Yes, a UBO an owner needs to sign the application.

3  Q.   And in connection with any document that Mr. Brunst

4  signed as a UBO, was there -- do you recall there being

03:09p 5  anything in there that was factually false on those

6  applications?

7  A.   Once -- once again, I'd like to see the application.

8  Q.   Well, I'm asking you generally.

9  A.   Okay.  Well, I can tell you generally that when we're

03:10p 10  opening up accounts with European banks and using a European

11  company, we don't have European transactions, that that is a

12  deception to the banks.

13  Q.   So -- so in the applications you were submitting to banks

14  in Europe, you were deceiving them?

03:10p 15  A.   No, we described ourselves more as a work in progress.

16  We're gonna try to build up international, but the banks came

17  first, you know.  We had some, but not very many.

18  Q.   So "no" you were not deceiving them?

19  A.   Let's just say I don't think we were transparent.

03:10p 20  Q.   Well, just pick an answer.  Were you deceiving them or

21  not deceiving them?

22  A.   I think I just did pick an answer.

23  Q.   All right.  And so in your testimony over the prior two

24  weeks did you point to any false statement made by Mr. Brunst

03:11p 25  in connection with any payment processing application, do you

 1  recall?

 2  A.   I don't recall pointing to anything specific.

 3  Q.   Okay.  Now, let's talk about PostFastr.  PostFastr, as I

 4  understand it, was a company that Backpage dealt with,

03:11p  5  correct?

 6  A.   You mean created?  We created that company, PostFastr.

 7  Q.   Okay.  And PostFastr allowed users to post across the web

 8  at once; is that right?

 9  A.   It never did do that.

03:11p 10  Q.   All right.

11          MR. LINCENBERG:  I'd like to place before the

12  witness for his eyes only, not the jury's eyes, document

13  GL-CF-05.

14  BY MR. LINCENBERG:

03:12p 15  Q.   Sir, did you write an e-mail in June of 2014 to Scott

16  Spear, Jim Larkin and Jed Brunst about PostFastr?

17  A.   Yes, I do.

18  Q.   Did you state in it that e-mail that PostFastr allows

19  users to post across the web at once?  Did you state that?

03:12p 20  A.   That's what it says.

21  Q.   Well, let's explore your answer "that's what it says."

22          So when you say that's what it says, are you saying that

23  was a lie or was that the truth.

24  A.   I'm saying that I'm gonna need to explain what that

03:12p 25  means, because obviously you can't post across every web site.

1   Q.   So you're saying it was false?

2   A.   What I'm saying is this is an intent, you know.  I'm

3   writing the intent of PostFastr.  That's the description.  It

4   says here, "Scott, can you help me file an intent to use for

03:13p  5   PostFastr?" and then I'm providing a description.  So I'm

6   asking for help from my boss, Scott Spear.

7   Q.   Okay.  And --

8   A.   So it's not a lie.

9   Q.   It's not a lie, okay.

03:13p 10        And was the description also that it's ideal for

11   employees, property managers, buyers and sellers seeking

12   increased response and traffic to their posting?

13   A.   Yes, that's the family friendly description.

14   Q.   Okay.

03:13p 15              MR. LINCENBERG:  And if we can look at Exhibit 6194

16   for identification.  Let me just blow it up so Mr. Ferrer can

17   read it.

18   BY MR. LINCENBERG:

19   Q.   Mr. Ferrer, do you recognize Exhibit 6194 for

03:14p 20   identification as an e-mail from Michael Gage to you in

21   January of 2016?

22   A.   Yes, I do.

23   Q.   And was that an e-mail regarding PostFastr?

24   A.   Yes, that's the subject line.

03:14p 25   Q.   All right.

1           MR. LINCENBERG:  Your Honor, I would move in to

2    evidence 6194 for ID.

3           MR. RAPP:  No objection.

4           THE COURT:  6194 may be admitted and it may be

03:14p  5    published.

6           MR. LINCENBERG:  Thank you, Your Honor.

7           (Exhibit No. 6194 admitted in to Evidence.)

8    BY MR. LINCENBERG:

9    Q.   Now, let's just focus in on the timing here.  This is

03:14p 10    January 2016.  That was post sale, right?

11   A.   Yes.

12   Q.   And as part of this effort during that time is Mr. Gage

13   helping to arrange payment processing?

14   A.   He is.

03:15p 15   Q.   All right.  And this e-mail, Mr. Brunst is not copied on

16   this, correct?

17   A.   I don't believe he is.

18   Q.   Okay.

19           MR. LINCENBERG:  We can take this down, thank you.

03:15p 20   BY MR. LINCENBERG:

21   Q.   Sir, are you familiar with the term "Operation

22   Chokepoint"?

23           MR. RAPP:  Objection, relevance.

24           MR. LINCENBERG:  Well, the relevance, Your Honor, is

03:15p 25   this deals with the whole credit card issue.

1    THE COURT:  He can answer if he's familiar with the

2  term "yes" or "no."

3    THE WITNESS:  I am.

4  BY MR. LINCENBERG:

03:15p  5  Q.  And do you recall there being an initiative in 2012 --

6  federal initiative in 2012 that was attempting to ban

7  high-risk industries such as porn, firearms, dating and payday

8  loans from acquiring transactions?

9    MR. RAPP:  Objection as to the relevance of this.

03:16p  10    THE COURT:  Sustained.

11    MR. LINCENBERG:  Your Honor, the proffer of

12  relevance is that this is the -- this is what lays the

13  predicate for everything to come in the credit card part of

14  the testimony.

03:16p  15    THE COURT:  Well, rephrase the question.

16    MR. LINCENBERG:  Okay.

17  BY MR. LINCENBERG:

18  Q.  Do you recall that there was a federal initiative in 2012

19  in an attempt to ban high-risk industries?

03:16p  20    MR. RAPP:  Objection as to foundation as to his

21  basis of knowledge.

22    THE COURT:  Sustained.

23  BY MR. LINCENBERG:

24  Q.  Well, were you familiar with Operation Checkpoint?

03:16p  25  A.  No.

1    Q.   It did not inform any of the work you were doing at

2    Backpage?

3    A.   Not Operation Checkpoint.

4    Q.   Okay.  Oh, I'm sorry, I guess I misstated checkpoint.

03:17p   5        Operation Chokepoint?

6    A.   Yes, I am.

7    Q.   Okay.  And how did it inform your efforts at payment

8    processing?

9             MR. RAPP:  Objection to the extent it calls for

03:17p  10   hearsay for his basis of knowledge.

11            MR. LINCENBERG:  Not asking for the truth.

12            MR. RAPP:  Well --

13            THE COURT:  Overruled.  He can answer the question

14   if he can, how it informed his payment processing.

03:17p  15            THE WITNESS:  And I'm -- I'm gonna have to explain.

16            MR. LINCENBERG:  Please do.  I want you to explain

17   how you were informed.

18            THE WITNESS:  It's not a "yes" or "no" answer.

19            MR. LINCENBERG:  Yes.

03:17p  20            THE WITNESS:  So this comes back, once again, to

21   there's a lot of bad news in Google about different arrests

22   from the female escorts category of Backpage, which creates a

23   lot of risk for the banks and that the banks are held

24   accountable for the nature of the transactions, and so then

03:18p  25   they choose not to do business with those businesses.

1    BY MR. LINCENBERG:

2    Q.   And your statement about Operation Chokepoint at the time

3    was your understanding was that they were targeting businesses

4    simply for reputational reasons, correct?

03:18p   5    A.   Well, it's -- I know that they targeted Payday Loans --

6    Q.   Right.

7    A.   -- and I suppose that the reputation was the interest

8    rate.

9    Q.   And you know that they targeted firearms dealers, right?

03:19p   10   A.   Yes.

11   Q.   And porn, right?

12   A.   I'm speculating but. . .

13   Q.   You speculated in the past?

14   A.   It is a high-risk industry.

03:19p   15   Q.   And dating sites, correct?

16   A.   Some dating sites.

17   Q.   And your response to Operation Chokepoint was that

18   Backpage doesn't create porn, it actively deletes porn

19   pictures, doesn't sell guns, we sell advertising, correct?

03:19p   20   A.   Well, that's a very self-serving response on my part --

21   Q.   Okay.

22   A.   -- and not accurate.

23   Q.   All right.  So your response to it was inaccurate?

24   A.   Well, what am I responding -- what am I responding to?

03:20p   25        MR. LINCENBERG:  Now, let me show you Exhibit 792 in

1  evidence and ask that it be published, Your Honor.

2  BY MR. LINCENBERG:

3  Q.   Now, sir, this is an e-mail which the Government showed

4  you from April of 2015; and I believe the focus of their

03:20p 5  questioning was about the top part where Mr. Brunst writes,

6  "Didn't we go down the Mauritius path once and the banks had

7  the same issue with our content."  Do you recall that?

8  A.   Yes.

9  Q.   Okay.  Now, let's look further down the page at the

03:20p 10  preceding e-mail from you.  Okay.  So in the preceding e-mail

11  if we look towards the bottom of the page -- and maybe we can

12  just blow up -- let's try to -- well, let's blow up a bigger

13  portion for the witness to read.  Let's just blow up this

14  part.

03:21p 15      So in the preceding e-mail from you, you're raising that

16  certain banks may not process Mastercard transactions; is that

17  right?

18  A.   I'm -- it wouldn't be some banks.  Mastercard is

19  investigating Backpage and it could be we could lose

03:21p 20  Mastercard completely.

21  Q.   Okay.  So the -- and back -- and Mastercard was

22  investigating Backpage, in part, in response to threats from

23  Cook County Sheriff Dart, correct?

24  A.   I don't know that.

03:22p 25  Q.   You don't know that?

        1   A.   It says April 1, 2015.

        2   Q.   Right.

        3   A.   I didn't really link it with Dart at the time.

        4   Q.   Okay.  We'll get to -- we'll get to Dart.  Let's focus

03:22p  5   on -- on this.

        6        So in the lower e-mail you suggest using a bank in

        7   Mauritius to help advance credit card processing; is that

        8   right?

        9   A.   I'm sharing a recommendation from the consultant.

03:22p 10   Q.   Okay.  And there had been a previous attempt to get this

       11   bank in Mauritius to do business with Backpage, correct?

       12   A.   Correct.

       13   Q.   And so what Mr. Brunst's response is, essentially, why

       14   would you go to the same bank that already turned you down,

03:23p 15   correct?

       16   A.   Essentially that's what he says.

       17   Q.   And Backpage did not move forward with that bank,

       18   correct?

       19   A.   I don't remember.

03:23p 20   Q.   Okay.  And did Mr. Brunst -- we can take this exhibit

       21   down.

       22        Did Mr. Brunst suggest contacting counsel to help with

       23   the banking and credit card processing issue?

       24             MR. RAPP:  Objection, Judge.

03:23p 25             MR. LINCENBERG:  This is from a direct exam.  This

 1    was testimony that the Government brought out on September

 2    21st at Pages 80 and 81.

 3              MR. RAPP:  I'll have to look at it.  I've got to

 4    know the context.

03:24p 5          THE COURT:  He can answer "yes" or "no" if he knows.

 6              THE WITNESS:  Could I have a date, please?

 7              MR. LINCENBERG:  Well, you'll have to give me a

 8    date.  It involves Frick Bank.  You'll have to give me a date.

 9    It was your testimony.

03:24p 10         THE WITNESS:  Yeah, I remember.

11              MR. LINCENBERG:  Okay.

12              THE WITNESS:  What was the question?

13    BY MR. LINCENBERG:

14    Q.   The question was:  Mr. Brunst had suggested contacting

03:24p 15   counsel to help address issues you were having specifically

16    with bank threat?

17    A.   He wanted counsel to get them to pay us.

18    Q.   Right.  And did you see something -- did you see

19    something improper that Mr. Brunst was suggesting that if a

03:25p 20   bank is not paying you, that maybe you should have counsel get

21    involved to assist in getting him paid?

22         I understand you disagreed with the suggestion, but did

23    you see that suggestion as something sinister, getting a bank

24    involved to help dealing with potential legal dispute there --

03:25p 25   get counsel involved to help you deal with potential legal

```
 1   dispute?
 2   A.   Counterproductive but not sinister.
 3   Q.   Okay.  Counterproductive, you just didn't -- you didn't
 4   think it would work, correct?
```
03:25p 5   A.   We were having a hard time getting banks.  So threatening
```
 6   them is not a good idea.
 7   Q.   Okay.  And you're using the word "threatening them," but
 8   you referenced DLA Piper.  DLA Piper was the law firm you're
 9   referring to here, right?
```
03:25p 10  A.   Yes.
```
11   Q.   DLA Piper's got, like, 4,000 lawyers around the world,
12   right?
13              MR. RAPP:  Objection, foundation.
14              THE COURT:  Sustained.
```
03:26p 15  BY MR. LINCENBERG:
```
16   Q.   You understood them to be a reputable law firm, correct?
17   A.   I did.
18   Q.   Okay.  And so you're not suggesting there's something
19   sinister about saying, "Well, if we're having a dispute with a
```
03:26p 20  bank, let's see if counsel can help out," are you?
```
21              MR. RAPP:  Objection, asked and answered.
22              THE COURT:  Sustained, and I think it's a
23   misstatement of the testimony; but the jury will make that
24   ultimate decision.
```
03:26p 25             MR. LINCENBERG:  Well, if it's a misstatement, then

 1   it wasn't asked and answered.

 2          THE COURT:  Well, no, your including what he said is

 3   a misstatement of what he -- what Mr. Ferrer --

 4          MR. LINCENBERG:  I want this to be clarified.

03:26p  5          THE COURT:  Well, he testified it was not sinister.

 6          MR. LINCENBERG:  Right.

 7          THE COURT:  And you incorporated that in your

 8   question.

 9          MR. LINCENBERG:  Right.

03:26p 10          THE COURT:  So that's the part.

11          MR. LINCENBERG:  Okay, okay.

12   BY MR. LINCENBERG:

13   Q.   You also discussed banking issues with Mr. Moon, correct?

14   A.   Yes --

03:26p 15          MR. RAPP:  Objection, asked and answered.

16          MR. LINCENBERG:  No, I asked about payment --

17          THE COURT:  Overruled.

18          MR. LINCENBERG:  Sorry.

19   BY MR. LINCENBERG:

03:27p 20   Q.   Is that correct?

21   A.   Yes.

22   Q.   Okay.  And Mr. Moon also suggested seeking legal help to

23   address any issues that might be outstanding with financial

24   institutions, correct?

03:27p 25          MR. RAPP:  Objection, the question itself is

                   UNITED STATES DISTRICT COURT

 1  hearsay.

 2          THE COURT:  Sustained.

 3  BY MR. LINCENBERG:

 4  Q.   Well, sir, you've testified on direct examination about

03:27p  5  this idea of having people involved in assisting with disputes

 6  with banks.

 7      I'm asking if, in part, that was also something that you

 8  had discussed with Mr. Moon?

 9          MR. RAPP:  Objection, asked and answered.

03:27p 10          THE COURT:  Sustained.

11  BY MR. LINCENBERG:

12  Q.   So let's focus on the major credit card companies, and

13  we'll break it down a little bit, but for starters AmEx, Visa

14  and Mastercard.

03:28p 15      From 2004 until around June of 2015 did all three of

16  those credit card companies allow their cards to be used to

17  buy ads on Backpage?

18  A.   Yes.

19  Q.   And after June of 2015 did that all change as a result of

03:28p 20  Sheriff Dart sending threatening letters to them?

21          MR. RAPP:  Objection, foundation.

22          THE COURT:  Sustained.

23  BY MR. LINCENBERG:

24  Q.   Was that your understanding?

03:28p 25          MR. RAPP:  Same objection.

1          THE COURT:  Sustained.

2          MR. LINCENBERG:  Well, sir, you -- Your Honor, I'm

3    trying to avoid getting into areas that the Court has had

4    orders on, which is part of the way of laying the foundation.

03:29p  5    So I'd ask the Court for some liberty here so that I don't get

6    into certain things.

7          THE COURT:  Well, you're not going to get into those

8    things that I ordered you not to get into.

9          MR. LINCENBERG:  Right, but --

03:29p 10          THE COURT:  Ask him a proper question.

11          MR. LINCENBERG:  That's why I'm asking the Court so

12   that I don't have to because that's part of foundation to give

13   me some leeway here.

14   BY MR. LINCENBERG:

03:29p 15   Q.  So, sir, in the summer of 2015 your understanding was

16   that Visa buckled to the reputational risk pressure from

17   Sheriff Dart, correct?

18          MR. RAPP:  Objection.  Foundation, relevance and

19   previous Court order.

03:30p 20          THE COURT:  Sustained.

21          MR. LINCENBERG:  I'd like to place before the

22   witness Exhibit GL-CF-08, and I'll just generally indicate

23   that this is an August 2015 deposition testimony in a

24   different proceeding.  I'd like to focus the witness on Page

03:30p 25   93, Line 6 through 11.

1           MR. RAPP:  This is the wrong -- sorry.

2           THE COURT:  As Liliana works on that, I'll just say

3    there's no -- there's no question before the witness.

4           MR. LINCENBERG:  I know.  I just wanted to place

03:31p  5    this before the witness and then ask the question.  Sir --

6           THE COURT:  Well, he doesn't have it yet.

7           MR. LINCENBERG:  Do you have it on your screen?

8           MR. RAPP:  He has it on the screen, we don't.

9    BY MR. LINCENBERG:

03:31p  10    Q.   So in sworn testimony in response to a question of your

11    understanding of the reputational risk that Visa was hung up

12    on was being associated with Backpage --

13           MR. RAPP:  Judge --

14           MR. LINCENBERG:  -- your answer was that --

03:31p  15           MR. RAPP:  -- I'm going to object.

16           MR. LINCENBERG:  I haven't asked the question yet.

17           THE COURT:  Wait.

18           MR. LINCENBERG:  -- the letters and the news that

19    broke from the result of those letters created a lot of bad

03:31p  20    news, which was reputational risk?

21           THE COURT:  Well, in the first instance, you're

22    reading from an exhibit that's not been admitted.

23           Number two, there was no question before this

24    witness prior to this exhibit being laid before him.

03:32p  25           MR. LINCENBERG:  Okay.

```
 1   BY MR. LINCENBERG:

 2   Q.   Sir, let's go back to the cover page of this exhibit.

 3        Did you testify in Los Angeles, California, on August

 4   18th, 2015, in a deposition?

 5   A.   Yes, I did.

 6   Q.   And was your testimony under oath?

 7   A.   Yes.

 8   Q.   Did you seek to tell the truth in that testimony?

 9   A.   I did.

10   Q.   Okay.  And in that testimony did you testify that the

11   letters and news from Sheriff Dart letter to credit card

12   companies --

13             MR. RAPP:  I'm going to --

14             MR. LINCENBERG:  -- created a lot of bad news, which

15   was reputational risk?

16             MR. RAPP:  Objection, improper impeachment.

17             MR. LINCENBERG:  I'm not impeaching right now.  I'm

18   asking if he testified to that.

19             THE COURT:  Well, he can answer the question if he

20   recalls.

21             MR. LINCENBERG:  We can go back and show the witness

22   93, Lines 6 through 11.

23             THE WITNESS:  And the question was?

24   BY MR. LINCENBERG:

25   Q.   The question was:  Did you testify as I indicated in my
```

03:32p (line 5)
03:32p (line 10)
03:32p (line 15)
03:33p (line 20)
03:33p (line 25)

          1    question to you from a moment ago?

          2    A.   I suddenly can't hear you.

          3    Q.   I'll repeat it.  In response to a question of your

          4    understanding of the reputational risk that Visa was hung up

03:33p    5    on being associated with Backpage, did you respond that the

          6    letters, the news that broke from the results of those letters

          7    created a lot of bad news, which was reputational risk?

          8    A.   That's what I stated.

          9         MR. LINCENBERG:  We can take this down now, thank

03:34p   10    you.

         11    BY MR. LINCENBERG:

         12    Q.   And this is what you referred to when you used the term

         13    "credit card apocalypse," correct?

         14    A.   Yes.

03:34p   15    Q.   That these credit card companies had been hit with a

         16    letter from a Sheriff of Cook County, and just from that

         17    letter they stopped doing business with Backpage for

         18    reputational reasons, right?

         19         MR. RAPP:  Objection.  Foundation, relevance,

03:34p   20    previous Court order.

         21         THE COURT:  Sustained.

         22    BY MR. LINCENBERG:

         23    Q.   And by the way, this was after you purchased Backpage,

         24    correct?

03:34p   25    A.   It was two and a half months after I became the nominal

1   owner.

2   Q.   The nominal owner who made the decision to shut down the

3   Backpage site, right?

4   A.   Correct.

03:35p   5   Q.   You didn't ask the non-nominal owners to do that, did

6   you?

7   A.   Well, I --

8   Q.   "Yes" or "no."

9   A.   To shut down the site or take down the category?

03:35p   10   Q.   To shut down the site.

11   A.   Not at that time.  I made the decision on my own.

12   Q.   All right.  And in this time period your view of what

13   Sheriff Dart was doing was starting a campaign against

14   Backpage, correct?

03:35p   15         MR. RAPP:  Okay, Judge, I'm going to object to this.

16   There's no foundation for it.  It's irrelevant.  There's

17   previous Court orders.  I'd ask that counsel be admonished.

18         MR. LINCENBERG:  This is -- I ask that counsel be

19   admonished --

03:35p   20         THE COURT:  Wait, wait, no.

21         MR. LINCENBERG:  -- for making that statement.

22         THE COURT:  I'm going to sustain the objection.

23   I'm going to sustain the objection.

24         MR. LINCENBERG:  Okay.

03:36p   25         THE COURT:  Move on to a different area,

       1   Mr. Lincenberg.

       2           MR. LINCENBERG:  All right.

       3   BY MR. LINCENBERG:

       4   Q.  Now, sir, did -- did you work with somebody named Tom

03:36p 5   Brown to respond to respond to the Sheriff Dart issues?

       6           MR. RAPP:  Okay, Judge --

       7           MR. LINCENBERG:  Can we have a sidebar, please.

       8           MR. RAPP:  Objection --

       9           THE COURT:  Yes, you may.

03:36p 10          (Following discussion held at sidebar.)

      11           THE COURT:  Mr. Rapp was in the middle of making an

      12   objection.  What was the objection?

      13           MR. RAPP:  My objection is he is trying to smuggle

      14   in an advice of counsel defense.  This is a lawyer and this

03:37p 15  lawyer -- of course, he hasn't complied with the requirement.

      16   This lawyer has no idea what the internal prostitution

      17   marketing strategies of Backpage are, and he's just simply

      18   trying to smuggle in what we were concerned about in previous

      19   hearings.

03:37p 20          THE COURT:  Is this -- this is -- I assume you're

      21   talking about the Dart litigation?

      22           MR. RAPP:  Yes.

      23           THE COURT:  And that's the way I see it at this

      24   juncture.  Mr. Lincenberg, I told you yesterday you could

03:37p 25  mention Dart --

1          MR. LINCENBERG:  Right.

2          THE COURT:  -- that Mr. Dart -- Sheriff Dart was

3     sending subpoenas or making inquiries, but you're getting very

4     close to the line of having this witness testify related to

03:37p 5     that litigation and so that is the reason I'm cutting you off.

6          MR. LINCENBERG:  Can I respond?

7          THE COURT:  Yes.

8          MR. LINCENBERG:  Thank you.

9          Your Honor, it's loud and clear to me --

03:38p 10          THE REPORTER:  Mr. Lincenberg, I can't hear you.

11          MR. LINCENBERG:  It is loud and clear to me that the

12     Court is not allowing us to get in any complaints that were

13     filed against the Sheriff, the Court opinion that was in

14     response to that.

03:38p 15          We are not -- for the umpteenth time, we are not

16     asserting an advice of counsel defense.  My client never spoke

17     to any lawyer --

18          THE COURT:  Which has nothing to do with advice of

19     counsel.  This is related to unrelated litigation.

03:38p 20          MR. LINCENBERG:  Well, I disagree that it's

21     unrelated, but I accept that that's the Court's order.

22          My client's state of mind is at issue before this

23     jury.  His good faith is at issue, and I want to get as close

24     to the line without crossing it as this Court will permit

03:38p 25     because the -- and in response, for example, in my opening

1  statement I was very clear not to get into litigation.

2          I stated in my opening statement that as a result of

3  the way the dispute with Mr. -- or Sheriff Dart ended,

4  whatever my words were, that my client took comfort in the

03:39p  5  further credit card processing and that work that was done.

6          Now, in our view, the opinion is the most relevant

7  thing to my client's state of mind.  The Court's not letting

8  me get there, but I'm trying to get in as much as I can.  I

9  have no intention of raising a legal complaint, a legal

03:39p 10  opinion; but this person, Mr. Ferrer, along with Larkin and

11  others, sent a letter to Sheriff Dart where they laid out

12  their response to his threats and include some things in it

13  like about the CDA that I'm not going to get into.  It also

14  includes some things about the First Amendment.

03:40p 15          THE COURT:  This is the lawyer letter?

16          MR. LINCENBERG:  This is the lawyer letter from Tom

17  Brown.

18          THE COURT:  With multiple redactions?

19          MR. LINCENBERG:  Right.

03:40p 20          THE COURT:  And I was going to say that the majority

21  of that letter speaks to other legal issues that were

22  confusing.  It's a voluminous letter laying out legal

23  analysis, and so that's not admissible for multiple reasons

24  and -- and I will say this:  That you've come to that line.

03:40p 25          MR. LINCENBERG:  Okay.  So is the Court's order that

         1   I cannot ask any further questions about Sheriff Dart?

         2           THE COURT:  About the Dart -- no, I did not say

         3   that --

         4           MR. LINCENBERG:  I'm asking.

03:40p   5           THE COURT:  -- about Sheriff Dart.

         6           MR. LINCENBERG:  Okay.

         7           THE COURT:  I'm talking about the line related to

         8   litigation and how the claims were brought; but you can say,

         9   "Did you meet with Sheriff Dart?"  You know, "What was your

03:40p  10   understanding of Sheriff Dart's concerns?"  That's all

        11   legitimate, but you're getting at the line where you're going

        12   to start getting into this litigation and that's where we're

        13   drawing it.

        14           MR. LINCENBERG:  So the key point for me to

03:41p  15   understand is:  Can I bring out that the response that was

        16   sent to Sheriff Dart was that the First Amendment -- that the

        17   business is operating lawfully because of the First Amendment?

        18           THE COURT:  No.

        19           MR. LINCENBERG:  Okay.

03:41p  20           MR. CAMBRIA:  Can -- can we also be heard on that,

        21   Judge?  I think what's happened here --

        22           THE COURT:  On what?

        23           MR. CAMBRIA:  On this issue -- the same issue.

        24           I think what's happened is there's -- it's been sort

03:41p  25   of suggested to the jury that the reason the credit card

```
 1  companies discontinued their service was because some --
 2  because Backpage people did something illegal when, as a
 3  matter of fact, the Court found that it was Sheriff Dart who
 4  did something illegal and so it seems to me that the problem
```
03:41p  5  here is --

```
 6          THE COURT:  Well, there's no -- I don't think there
 7  was a finding --
 8          MR. CAMBRIA:  A hundred percent.
 9          THE COURT:  -- as to illegality in terms of the
```
03:42p 10  Court's opinion.  It was an order on the preliminary

```
11  injunction.  That's what I understood it to be, but in any
12  event --
13          MR. CAMBRIA:  Well, what's happening, though, is
14  there's this kind of suggestion out there, if you will, that
```
03:42p 15  the reason that they shut down is because they were breaking

```
16  the law as opposed to they shut down because a -- an official
17  threatened them, which eventually the Court found was
18  inappropriate, but that somebody threatened them.
19          That was key here that the jury should know that it
```
03:42p 20  wasn't because the credit card companies thought they were

```
21  doing something illegal.  It was because they got threatened
22  by a sheriff.  That's what happened.
23          THE COURT:  Well, but I've already made my ruling
24  with regard to that.  You've made your record, and so let's
```
03:42p 25  not keep the jury waiting.

1            MR. LINCENBERG:  Your Honor, I'm going to need a

2    moment to look through my outline to see if there's any

3    questions I have in there that I don't think violate the

4    Court's order.  It's going to take me a minute to look at

03:43p  5    that.

6            THE COURT:  Yes, that's fine.

7            While I have you here, let me show you what I pulled

8    up.  I don't know, you need to go look back at the docket.

9    This is what you cited to me, and this is not related to your

03:43p 10    earlier argument.

11            MR. LINCENBERG:  180-1.

12            THE COURT:  180-1.  There is no dash one to this.

13    In other words, there's no exhibit --

14            MR. LINCENBERG:  We'll pull that.

03:43p 15            THE COURT:  Okay.

16            MR. LINCENBERG:  I won't get in to it today.

17            (End of sidebar discussion.)

18            THE COURT:  All right.  Thank you, Members of the

19    Jury.  I thought that was a pretty good stretch break as well.

03:43p 20    So let's give Mr. Lincenberg a moment, and then we can

21    continue forward.

22    BY MR. LINCENBERG:

23    Q.   Mr. Ferrer, in July of 2015 did you ever state that

24    Sheriff Dart's actions and termination of credit card services

03:44p 25    harmed Backpage's efforts to police and preclude improper ads?

```
 1   A.   That sounds like the company narrative.

 2   Q.   Did you make that statement under oath?

 3   A.   I'd like to see it.

 4   Q.   Sure.  That is --

 5          MR. LINCENBERG:  Can we show the witness GL-CF-07

 6   and first show him the front page, and then if we can go to

 7   Paragraph 29.

 8   BY MR. LINCENBERG:

 9   Q.   Have you had a chance to review that?

10   A.   I have.

11   Q.   Okay.  Is that a statement you made under oath?

12   A.   I did.

13   Q.   And when you volunteered that that was the company

14   narrative, did you do that to suggest that you could lie under

15   oath but it was somebody else's fault?

16   A.   No, it's not transparent.

17   Q.   Okay.

18          MR. LINCENBERG:  We can pull that down.

19   BY MR. LINCENBERG:

20   Q.   A couple years earlier had Sheriff Dart recommended that

21   Backpage use credit cards because it could assist in

22   identifying people posting on the site?

23          MR. RAPP:  Objection as to foundation.

24          THE COURT:  Sustained.

25   BY MR. LINCENBERG:
```

03:45p 5
03:45p 10
03:45p 15
03:46p 20
03:46p 25

CARL FERRER - CONT'D CROSS EXAM BY MR. LINCENBERG

1  Q.   In 2013 do you recall learning that Sheriff Dart had

2  advised Backpage -- requested from Backpage to impose charges

3  and require users to pay by credit cards in order to

4  discourage improper postings and provide information for law

03:47p  5  enforcement?

6  A.   I recall we received letters from Sheriff Dart.  I don't

7  recall specifically what was in those letters, and they seemed

8  to change from time to time.

9       MR. LINCENBERG:  I'd like to show you that same

03:47p 10  declaration, GL-CF-07, the July 2015 declaration that you

11  signed.  If we can put Paragraph 29 on the screen.

12       Let me ask you a question.

13  BY MR. LINCENBERG:

14  Q.   Did you state under oath that Sheriff Dart's actions and

03:48p 15  the termination of credit card services have harmed Backpage's

16  efforts to police and preclude improper ads?

17  A.   Yes.

18       MR. LINCENBERG:  You can take this down.

19  BY MR. LINCENBERG:

03:49p 20  Q.   And did you previously state that two years prior,

21  meaning 2013, that Sheriff Dart had sent Backpage a letter

22  demanding that it require reliance on credit cards for all

23  adult advertisements?

24  A.   I -- I don't recall that, but I do know we received

03:49p 25  letters from Sheriff Dart in 2013 asking us to do a number of

1    things, some of which we were already doing.

2    Q.   Let me direct your attention to Exhibit 6025 -- I'm

3    sorry.  Yeah, let me direct your attention to Exhibit 6025 for

4    identification, July 21st, 2015, e-mails between you and Trent

03:50p  5    Voigt regarding the Visa, AmEx, Dart issues.

6        Do you recognize this redacted exhibit?

7    A.   I do.

8    Q.   As an e-mail exchange between you and Mr. Voigt?

9    A.   Yes.

03:50p 10    Q.   And did it involve Mastercard and Visa and Dart?

11    A.   Yes, it did.

12        MR. LINCENBERG:  Your Honor, before we move it into

13    evidence, I would direct the Court's attention to the top

14    e-mail if the Court wishes to review that first sentence under

03:51p 15    -- regarding Mastercard and advise whether the Court will

16    admit this into evidence.

17        MR. RAPP:  Obviously we want to be heard.

18        THE COURT:  Well, is there an objection to the

19    exhibit coming in as is?

03:52p 20        MR. RAPP:  It's the Court's previous order.  It's

21    riddled throughout this.

22        THE COURT:  Yes, I think it should be redacted.  The

23    second --

24        MR. LINCENBERG:  Well, before -- before we -- I'm

03:52p 25    sorry.

1          THE COURT:  The second sentence under "regarding

2    Mastercard."

3          MR. RAPP:  And also, Judge, even further down, the

4    entirety of that.

**03:52p**  5          MR. LINCENBERG:  Before we get further down, Your

6    Honor, by "the second sentence," are you referring to the "we

7    think" or "we will know" sentence?

8          THE COURT:  "If we..."

9          MR. LINCENBERG:  Okay.  With those redactions, we're

**03:52p** 10   not going to move it into evidence.

11         MR. RAPP:  I'm sorry, I didn't hear that.

12         MR. LINCENBERG:  We're not -- we're not moving it in

13   if that's redacted.

14         MR. RAPP:  Oh.

**03:52p** 15         THE COURT:  I misspoke, Mr. Lincenberg.  It's the

16   first portion of that sentence but it's --

17         MR. LINCENBERG:  "We think..."?

18         THE COURT:  It does then take it out of context

19   somewhat but. . .

**03:53p** 20         MR. LINCENBERG:  When you say "the first portion" --

21         THE COURT:  Up to the comma.

22         MR. LINCENBERG:  Is it what's been blacked out now?

23         THE COURT:  Yes.

24         MR. LINCENBERG:  Okay, then we'll move that in.

**03:53p** 25         MR. RAPP:  Judge, there's -- there's a lot of --

```
 1  first of all, this is a three-page e-mail and there's quite a

 2  bit of information that is subject to the Court's order.

 3          MR. LINCENBERG:  Well, I don't -- I don't believe

 4  there's anything else subject to the Court's order on the

03:53p 5  other pages.  Can I have a moment to consult with Mr. Rapp?

 6          THE COURT:  Yes.

 7          (Counsel confer.)

 8          THE COURT:  Why don't -- why don't you take the

 9  evening to visit on the exhibit, and if you can come to some

03:54p 10  agreement you can take it up in the morning.

11          MR. LINCENBERG:  Well, that's fine; but in light of

12  the Court's order I'm not disagreeing with the other two

13  parts.

14          THE COURT:  Yes.

03:54p 15          MR. LINCENBERG:  So can I do my exam without

16  introducing it?

17          THE COURT:  Yes, yes.

18          MR. LINCENBERG:  Okay, thank you.

19  BY MR. LINCENBERG:

03:54p 20  Q.   So, sir, on July 21st of 2015 did you advise Mr. Voigt

21  regarding Mastercard and Dart, "We think they will come back

22  once Visa is back..." and then after the redacted portion,

23  "then Visa has cover for protected speech"?

24       Did you advise that?

03:55p 25  A.   I was told this information --
```

       1   Q.   Did you advise him of that?

       2   A.   -- and I advised him.

       3   Q.   Okay.  You were told -- I don't think the Court's order

       4   permits you to get into who told you this.  I'm just asking if

03:55p 5   you advised him, "yes" or "no"?

       6   A.   I -- I gave him this advice.

       7   Q.   Okay.

       8          MR. LINCENBERG:  Can we go back to the document, the

       9   full document, Christina.  Thank you.

03:55p 10          Can we go to the second page.

      11          Can we go to the third page.

      12   BY MR. LINCENBERG:

      13   Q.   And on the third page, prior to your response to

      14   Mr. Voigt, did Mr. Voigt write to you and ask --

03:56p 15          MR. RAPP:  This would be hearsay.  So I'd object to

      16   this on a hearsay ground.

      17          MR. LINCENBERG:  Well, it goes to explain his

      18   response.

      19          MR. RAPP:  Well, no, it's still hearsay.  He's

03:56p 20   offering it for the truth.

      21          MR. LINCENBERG:  It's not offered for the truth.  It

      22   gives context to his response.

      23          THE COURT:  Well, in the context of the e-mail the

      24   question was did he write to you and ask; and so he can answer

03:56p 25   as to what's on the e-mail, yes.

 1          MR. LINCENBERG:  So do you understand the question,

 2   sir?

 3          THE WITNESS:  No.

 4          MR. LINCENBERG:  Do you want me to repeat it?

03:56p  5          THE WITNESS:  (Nodding of the head.)

 6   BY MR. LINCENBERG:

 7   Q.   So prior to your response to Mr. Voigt, had he asked you

 8   on July 21st, "When are you guys meeting with Visa?  Can you

 9   give me a status on what you are doing with MC?  Also what

03:57p 10   happened with AmEx?"  Do you see that?

11   A.   Correct, that's what I see.

12   Q.   So you're having conversations with Mr. Voigt openly

13   discussing the issues that Sheriff Dart is raising, correct?

14   A.   Yes.

03:57p 15   Q.   And you had discussions with Mickey Hansen of American

16   Express about these same issues, correct?

17   A.   I did.

18   Q.   And fast forwarding -- in your -- in your interviews with

19   the Government there were, as I counted, over 30 times when

03:58p 20   you broke things down into sort of pre-Dart and post-Dart

21   communications.  Do you recall that?

22   A.   Yes.

23   Q.   And so just "yes" or "no," post Dart did you gain any

24   comfort in the legality of the credit card processing in the

03:58p 25   post-Dart setting?  I can't state more in my question.

```
 1              MR. RAPP:  Objection.  Relevance, foundation, and it
 2   implicates the Court order.
 3              MR. LINCENBERG:  Well, I'm trying to avoid the
 4   Court's order.
```
**03:59p**  5              THE COURT:  I'll sustain the objection.
```
 6   BY MR. LINCENBERG:
 7   Q.   And, sir, in this post-Dart time period were -- was
 8   Mr. Moon -- well, were you guided by Mr. Moon in your efforts
 9   to get credit card processing?
```
**04:00p** 10              MR. RAPP:  Objection, it calls for hearsay.
```
11              MR. LINCENBERG:  Not offered for the truth.
12              THE COURT:  Well, he can say "yes" or "no" but --
13   and then we'll see what Mr. Lincenberg's next question is.
14              MR. LINCENBERG:  "Yes" or "no," sir.
```
**04:00p** 15              THE WITNESS:  He was one of multiple individuals.
```
16              MR. LINCENBERG:  And then let me show you Exhibit
17   474 for identification.  If we can just make it a little
18   bigger for Mr. Ferrer to see on the top.
19   BY MR. LINCENBERG:
```
**04:01p** 20   Q.   Did you have an e-mail exchange in July of 2015 with
```
21   Mickey Hansen of American Express?
22   A.   I do.
23   Q.   And had Mr. Hansen raised concerns that AmEx cards being
24   used to buy credits on Backpage?
```
**04:01p** 25   A.   He did.

CARL FERRER - CONT'D CROSS EXAM BY MR. LINCENBERG       110

1    Q.   At this point, July 22, middle of Dart, did -- is it fair

2    to say that AmEx did not want their credit cards used for

3    adult ads?

4    A.   Yes.

04:01p   5    Q.   And did you attempt to comply with that?

6    A.   Well, we actually attempted to not comply.

7    Q.   Okay.

8            MR. LINCENBERG:  I'd like to place before this

9    witness GL-CF-08, which is that August 2015 deposition

04:02p  10    testimony, Page 109, Line 20 through 110/Line 7.

11    BY MR. LINCENBERG:

12    Q.   Sir, if you look -- you can read the question beforehand.

13    I'm going to focus you on Lines 5 through 7, which after a

14    lengthy statement did you testify under oath that you did your

04:02p  15    best to comply with Mickey Hansen's request?

16    A.   Is that a question?

17    Q.   Yes.  Did you testify under oath that you did your best

18    to comply with Mickey Hansen's request?

19    A.   We did it incrementally and dragged it out to get as much

04:03p  20    processing time as we could and then we complied.

21            MR. LINCENBERG:  Move to strike as non-responsive.

22            THE COURT:  All after "we did it incrementally" will

23    be stricken and the jury will disregard.

24            MR. LINCENBERG:  And just to go back to Exhibit 474

04:03p  25    for identification, I'd move this in to evidence, Your Honor.

 1            It is a Government exhibit.

 2            THE COURT:  It is, but let me make an observation.

 3            It is also part of 6025 that we just looked at.

 4            MR. RAPP:  How many pages is this?

04:04p  5            MR. LINCENBERG:  Which one was 6025?

 6            Right, this is further -- I'm not sure if part of

 7    the string is a part of this, but this is further parts of the

 8    string.

 9            THE COURT:  Well, in any event, does the Government

04:04p 10    have an objection to Government's 474?

11            MR. RAPP:  No objection.

12            THE COURT:  Yes, it may be admitted and it may be

13    published.

14            MR. LINCENBERG:  Thank you, your Honor.

04:05p 15            (Exhibit No. 474 admitted in to Evidence.)

16    BY MR. LINCENBERG:

17    Q.   One single question for Mr. Ferrer.  Was Mr. Brunst a

18    part of this e-mail exchange that you were having with Mickey

19    Hansen?

04:05p 20    A.   No, he's not.

21    Q.   Okay.

22            MR. LINCENBERG:  All right.  I'd like to place

23    before the witness Exhibit 177, which is in evidence and

24    publish it.  This is a March 10th, 2014, e-mail from

04:05p 25    Mr. Brunst to several folks.

1   BY MR. LINCENBERG:

2   Q.   So this came up on your direct examination, and this

3   deals with Website Technologies.  Do you recall that?

4   A.   Yes, I do.

04:06p  5   Q.   All right.  And Joe -- Joe Backpage is Joe Kaiping,

6   K-a-i-p-i-n-g?

7   A.   Yes, he is.

8   Q.   He was a Chief Technology Officer?

9   A.   Yes.

04:06p  10  Q.   And on the bottom he writes that Carl and I, I being Joe,

11  were discussing company names and the possibility of updating

12  our e-mail addresses to Website Technologies.com.

13       Do you see that?

14  A.   I do.

04:06p  15  Q.   And Mr. Brunst responded, "We need to think this thru or

16  all the work to separate it from Backpage will be lost."

17       Do you see that?

18  A.   I do see it.

19  Q.   Now, Website Technologies was a company that you

04:06p  20  recommended forming, correct?

21  A.   I think I recommended the name, yes.

22  Q.   Okay.  You also spent money developing a Website

23  Technologies business, correct?

24  A.   You know, Website Technologies was started before I took

04:07p  25  over the site so --

1    Q.   Right, Jed --

2    A.   -- so Jed spent money having content.

3    Q.   Website Technologies was a company which provided

4    services to -- or let's say potentially provided services to

04:07p  5    different web companies, correct?

6    A.   No, it only provided services to Backpage.com and it was

7    a -- sort of separate the reputational risk from Backpage.

8    Q.   Now, do you recall going to a conference in the

9    Netherlands for an AIM group?

04:08p 10    A.   For a what group?

11    Q.   AIM?

12    A.   No.

13    Q.   Do you recall being in the Netherlands and part of the

14    purpose for being there was to sell website services to

04:08p 15    companies?

16    A.   I don't recall that at all.

17    Q.   Did you recall that you marketed that Website

18    Technologies was a company that could provide back room

19    technical support for Internet companies?

04:08p 20              MR. RAPP:  I'm object to the foundation.

21              THE COURT:  Sustained.

22    BY MR. LINCENBERG:

23    Q.   Did you recall marketing it as a company that had website

24    development capabilities?

04:08p 25              MR. RAPP:  Same objection.

 1              THE COURT:  Well, is it -- you know, I'm going to

 2    say that I'm going to reverse my prior ruling.  The question

 3    was, "Did you recall that you marketed that Website

 4    Technologies was a company that could provide back room

04:09p  5    technical support for Internet companies?"

 6              He may answer if he recalls.

 7              THE WITNESS:  I think we may have used that

 8    description for something on Website Technologies; but,

 9    really, it was just for our own companies, never a third-party

04:09p 10    company.

11    BY MR. LINCENBERG:

12    Q.   So is it your testimony that Website Technologies had no

13    other businesses it did business with other than Backpage?

14    A.   No other -- well, I just want to be accurate.  What was

04:10p 15    that question again?

16    Q.   Yes.  Did Website Technologies sell services to any

17    company?

18    A.   Any company not owned by Backpage or affiliated to

19    Backpage?

04:10p 20    Q.   Right.

21    A.   Like an outside third company?

22    Q.   Right.

23    A.   Independent of Backpage, I can't recall any.

24    Q.   Did Website Technologies develop privacy controls?

04:10p 25         Privacy controls?

```
         1    A.    Privacy controls?

         2    Q.    Right.

         3    A.    I don't know what that is referring to.

         4    Q.    Did you advise any of the owners of the holding company

04:10p   5    that Website Technologies could create value apart from

         6    backpage.com?

         7              MR. RAPP:  Objection, foundation.

         8              THE COURT:  Overruled.

         9              THE WITNESS:  It's possible.  Perhaps we thought

04:11p  10    about licensing the software, for example.

        11    BY MR. LINCENBERG:

        12    Q.    Now let's get back to this e-mail.  So under sub point 1,

        13    the CTO, Joe, is talking about, "If we keep the PCI audit

        14    company as Backpage.com LLC, then the assessments and PCI

04:11p  15    audit would just apply to Backpage.com and its immediate

        16    holdings."  Do you see that?

        17    A.    Yes, I see it.

        18    Q.    And then he writes, "Any PCI audits required for other

        19    parent company holdings would then be performed separately."

04:11p  20          Do you see that?

        21    A.    Yes, I do.

        22    Q.    Do you know what a "PCI audit" is?

        23    A.    I do.

        24    Q.    What is it?

04:12p  25    A.    It's a -- it's something that you have to do annually to
```

1    verify that you're securing the credit card data.

2    Q.   And was being PCI certified a good thing, in your view?

3    A.   We had to do it annually, and that's what Joe is

4    referring to here.

**04:12p** 5    Q.   Did you hear my question?

6    A.   I -- I'm sorry, I was reading this.

7    Q.   Okay.  I know it's late in the day, but try to focus on

8    my question.

9    A.   Go ahead, tell me the question again.

**04:12p** 10   Q.   Did you review it as a good thing to be PCI certified?

11   A.   It's not just a good thing, it's a requirement.

12   Q.   And at this time Website Technologies was not PCI

13   certified, correct?

14   A.   I'm not sure what all of this really means.  I mean --

**04:12p** 15   Q.   Well --

16   A.   Why would Website Technologies be PCI certified?  This is

17   the kind of thing that the CTO handled.  I'm not an expert in

18   PCI compliance.

19   Q.   "PCI" stands for payment card industry and it deals with

**04:13p** 20   data security standards as far as you understand, correct?

21   A.   Yes.

22   Q.   And your CTO is saying in this e-mail that Backpage is

23   PCI compliant but Website Technologies is not, right?

24   A.   I think that means that the audit's in Backpage's name and

**04:13p** 25   not Website Technologies' name.

1   Q.   And there's a concern being discussed here that if you

2   cross pollinate the companies, that Backpage could lose its

3   certification -- its PCI certification, correct?

4   A.   Once again, you lost me.  I don't really understand PCI

04:13p  5   audits.

6   Q.   All right.  Well, --

7   A.   I don't understand what the impact is on cross

8   pollinization.  It's way beyond my scope.

9   Q.   All right.  So this exhibit that you testified to on

04:14p  10   direct examination you're saying is an exhibit for which you

11   really don't understand what you were talking about?

12   A.   No, I'm saying that the specifics of PCI compliance in

13   regard to holding companies -- or cross pollinization, as you

14   say, that part I don't really understand.

04:14p  15   Q.   Okay.  And so you don't understand if when Mr. Brunst

16   writes back, "We need to think this thru or all the work to

17   separate it from BP will be lost," you have no idea whether

18   what he's referring to is be careful because if a company is

19   PCI certified and it combines with a company that's not, the

04:14p  20   company that's certified might lose its PCI certification,

21   right?

22   A.   That is not what Jed Brunst is referring to.  He's

23   talking about reputation.  He's talking about Backpage's bad

24   reputation bleeding over into Website Technologies; and then

04:15p  25   we lose the company that handles payroll, retirement accounts,

```
 1    the leases.
 2    Q.   Okay.  So when you say that Mr. Brunst in this e-mail is
 3    talking about reputation, is there anything in the e-mail
 4    below by Joe, the technology guy, that talks about
 5    reputational concerns?
 6    A.   I don't see Joe referring to it, and that's why Jed is
 7    referring to it.
 8    Q.   And when you say "Jed is referring to it," does he refer
 9    in this to reputation?  Does he talk about reputation here?
10    A.   All the work to separate it from BP will be lost.
11    Q.   Right.
12    A.   Yes.
13    Q.   And this is in response to an e-mail about PCI audits,
14    right?
15    A.   Yes, but I believe Jed's referring to something else.
16    Q.   Okay.
17              MR. LINCENBERG:  We can take this down.  Let's look
18    at Exhibit 178 in evidence.
19    BY MR. LINCENBERG:
20    Q.   Now, one of the companies that you guys had been dealing
21    with -- one of the banks you had been dealing with is US Bank;
22    is that right?
23    A.   Yes.
24    Q.   And there came a point in time when US Bank cut off doing
25    business with Backpage, right?
```

04:15p   5
04:15p  10
04:16p  15
04:16p  20
04:16p  25

```
       1   A.    I believe so.

       2   Q.    And did you understand that New Times -- strike that.

       3         Did you understand that New Times and then Village Voice

       4   Media holding company between them had had a long relationship

04:17p 5   with US Bank?

       6             MR. RAPP:  Objection, foundation.

       7             MR. LINCENBERG:  I'm asking if he understood.

       8             THE COURT:  Sustained.

       9   BY MR. LINCENBERG:

04:17p 10  Q.    And did you understand that with regard to Bank of

      11   Montreal, that Bank of Montreal was also a bank that had done

      12   business over the years with the holding company?

      13   A.    What was that question again?

      14   Q.    Yes.  Did you understand that there was a long-term

04:17p 15  banking relationship with Bank of Montreal?

      16   A.    I thought they might have invested money in the company.

      17   Q.    They were a lender, right?

      18   A.    They're a big bank.

      19   Q.    And, for example, you understood that Bank of Montreal

04:18p 20  was one of the major banks that had loaned money to New Times

      21   on purchase the Village Voice newspaper in 2008, correct?

      22   A.    Well, that I did not know until you just said it.

      23   Q.    Okay.  And did you understand that revenue from Backpage

      24   and various newspapers was being used to repay loans from the

04:18p 25  banks that had helped finance the purchase of the Village
```

1   Voice newspaper?

2   A.   Once again, way over my pay grade.  I don't know.

3   Q.   Okay.  In 2014 you discussed with Mr. Brunst contacting

4   Bank of Montreal to see if Bank of Montreal would bank

04:18p  5   Backpage, correct?

6   A.   In what date?

7   Q.   April of 2014.

8   A.   No, this is -- I -- I'm not -- at this time I'm not

9   leading any initiative to sign up bank accounts with BMO.

04:19p  10   Q.   Well, were you involved in providing know your customer,

11   KYC, information to Bank of Montreal?

12   A.   Well, the kind of information like the ultimate business

13   owner of the company and the organization, that would have

14   been handled by Jed Brunst entirely.

04:19p  15   Q.   Did you ever have any direct dealings yourself with

16   anybody at Bank of Montreal?

17   A.   I did years later after the transaction in April that

18   would put my name on the banking accounts.

19   Q.   And did you -- do you have any doubt in your mind as you

04:20p  20   sit here today that for many years Bank of Montreal was fully

21   aware that Website Technologies' account was related to

22   Backpage's work?

23          MR. RAPP:  Objection, foundation.

24          MR. LINCENBERG:  Let me restate it.

04:20p  25   BY MR. LINCENBERG:

 1   Q.   Do you have any doubt that in April of 2014 that Bank of

 2   Montreal was fully aware that Website Technologies was related

 3   to Backpage?

 4           MR. RAPP:   Same objection, plus speculation.

04:20p  5           THE COURT:   Well, yes, as to those; but it's also a

 6   very confusing question and so I'll sustain the objection.

 7           MR. LINCENBERG:   Let's move on to Exhibit 616a,

 8   which is in evidence.   This is a redacted version of a

 9   November 2010 e-mails from Spear and Larkin to Mary Latta of

04:21p 10   Bank of Montreal, right, if you look near the bottom.   Let's

11   show the whole two pages of the document.

12   BY MR. LINCENBERG:

13   Q.   So if we start on the bottom, we see that what's being

14   forwarded to Bank of Montreal is initially an e-mail from the

04:21p 15   Backpage CEO, Jim Larkin.   Do you see that?

16   A.   Yes, I do.

17   Q.   And he's copying -- he's sending that first to Tom

18   McGraw.   Who is Tom McGraw?

19   A.   I don't know.

04:21p 20   Q.   And Mary Latta, do you recall her being at Bank of

21   Montreal?

22   A.   I do.   She would -- yes, I recall her name in future

23   e-mails.

24   Q.   And Steve Suskin was a lawyer at Village Voice Media

04:22p 25   holdings?

 1  A.    Yes.

 2  Q.    And so the -- what preceded this e-mail exchange was the

 3  part which is all blacked out, right?

 4  A.    Correct.

04:22p  5  Q.    But as your testimony in introducing this was that this

 6  was a record of Backpage and that the whole thing was

 7  forwarded to the bank?

 8  A.    Did I say the whole thing was forwarded to me?

 9  Q.    Well, this was the exhibit that the Government placed

04:22p  10  before you and testified that this was your record of this

 11  e-mail exchange.

 12  A.    No, I believe I testified to the e-mail addresses, that

 13  I'm familiar with the e-mail addresses of Jed Brunst and Scott

 14  Spear, Jim Larkin.

04:22p  15  Q.    And with regard to Mary Latta's response to Jim Larkin

 16  she writes, "Please just let me know what was suspended and

 17  when it will be re-instated."  Is that correct?

 18  A.    That is correct.

 19  Q.    All right.  Her response doesn't question anything from

04:23p  20  the lengthy e-mail from the CEO, does it?

 21  A.    I don't know what the CEO had sent so I -- I guess I

 22  don't see a question here -- well, yes, I do see a question.

 23  "Please let me know what was suspended."

 24  Q.    All right.  And then Mr. Spear responds to Mary Latta on

04:23p  25  the top, right?

1   A.   Correct.

2   Q.   And I believe you noted in response to Mr. Rapp's

3   question that the e-mail did not go into a dissertation about

4   Backpage's marketing activities?

04:24p  5   A.   Not sure I used the word "dissertation," but it didn't

6   disclose the prostitution marketing activities.

7   Q.   And was there anything in the response from Mr. Spear to

8   Ms. Latta that, in your opinion, was false?

9   A.   It is very deceptive.

04:24p 10   Q.   So just to be clear, you've used this term "deceptive"

11   because he's not talking about everything that Backpage did in

12   its business that you believe was deceptive, right?

13   A.   Well, I can -- can I explain what's deceptive with this?

14   Q.   How about answering my question whether there's anything

04:25p 15   in this e-mail that you believe was false?

16   A.   Yes, I -- I think the e-mail in its entirety is a

17   falsehood.

18   Q.   Well, the e-mail in its entirety, we don't know what's

19   here because the Jim Larkin e-mail was blacked out, right?

04:25p 20               MR. RAPP:   All right, I'm going to object to that.

21               THE COURT:   Sustained.

22   BY MR. LINCENBERG:

23   Q.   And Mr. Brunst is copied on this e-mail, correct?

24   A.   Yes, he is.

04:25p 25   Q.   And you understood that he was a person who was a

1    relationship contact with the bank, correct?

2    A.    I would later come to understand that, yes.

3    Q.    But in terms of the substance of whatever is being

4    discussed about the operations of the business unit, questions

04:26p  5    and answers, they're being written by Larkin, Spear, back and

6    forth with Latta, correct?

7    A.    In this e-mail the reply to the bank is being written by

8    Scott Spear.

9    Q.    All right.  And it's also forwarding whatever Mr. Larkin

04:26p  10   said, correct?

11             MR. RAPP:  Objection, asked and answered.

12             THE COURT:  Sustained.

13             MR. LINCENBERG:  Well, let's take a look at Exhibit

14   616 for identification only, which is the unredacted November

04:26p  15   2010 e-mail, and I'm going to direct your attention to sub

16   point four from Mr. Larkin's e-mail; and don't state anything

17   out loud because we have some court orders here, but I'm going

18   to ask you a specific question.

19   BY MR. LINCENBERG:

04:27p  20   Q.    Did you ever hear Mr. Larkin say that the Attorney

21   General --

22             MR. RAPP:  Objection, hearsay.

23             MR. LINCENBERG:  Wait a second, I haven't asked my

24   question.

04:27p  25             MR. RAPP:  No, the question calls for hearsay.

1    THE COURT:  Let him finish -- there's an objection.

2  Let him finish.

3    MR. LINCENBERG:  I don't know what it's to because I

4  haven't finished my question.

04:27p  5    MR. RAPP:  Well, I got a good idea.

6    THE COURT:  Well, and that's what I was going to

7  say.

8    MR. LINCENBERG:  Okay.

9    THE COURT:  Let him finish the question, and if

04:27p 10  there's an objection you can object, Mr. Rapp.

11  BY MR. LINCENBERG:

12  Q.   Did you ever hear Mr. Larkin, your alleged -- one of your

13  alleged co-con conspirators in this matter, say that Attorney

14  General attacks on Backpage were a quote "political dance"?

04:27p 15    Did you ever hear him use that terminology?

16    MR. RAPP:  Objection.  Relevance, hearsay.

17    THE COURT:  Well, he can answer "yes" or "no" if

18  he's heard it.

19    THE WITNESS:  I hadn't heard "political dance."

04:28p 20  BY MR. LINCENBERG:

21  Q.   What did you hear?

22  A.   Well, I heard that we would engage with them in a slow

23  dance.

24  Q.   Okay.  And do you recall Mr. Larkin regularly being

04:28p 25  concerned that these letters from the Attorney Generals were

```
 1   being done by -- were being sent by political people who were
 2   seeking higher office?
 3              MR. RAPP:  All right, objection, hearsay, relevance.
 4              MR. LINCENBERG:  They introduced a lot of Attorney
 5   General letters.
 6              MR. RAPP:  It's still hearsay.
 7              THE COURT:  He can answer "yes" or "no" if he
 8   recalls.
 9              THE WITNESS:  What was that question again?
10              MR. LINCENBERG:  Yes, can we have it read back.
11              (Whereupon the question was read back.)
12              THE WITNESS:  I had heard those words, but in a
13   different way, essentially the same meaning.
14              MR. LINCENBERG:  We can pull this off the screen,
15   thank you.  Your Honor, how we doing time wise?
16              THE COURT:  We're at 4:29 and so good observation
17   there.
18              All right.  So Members of the Jury, we will end our
19   trial for today and, again, just remember the admonishment.
20   We have one more 845 a.m. start tomorrow, which will be our
21   last day, and so do try to be here so that we can start on
22   time and then we'll continue.  Please all rise for the jury.
23              (Jury out at 4:30 p.m.)
24              THE COURT:  All right, please be seated.
25              Let me -- let me clarify for the record prior to the
```

04:28p (line 5)
04:29p (line 10)
04:29p (line 15)
04:30p (line 20)
04:31p (line 25)

         1    jury coming in for the afternoon session Mr. Lincenberg

         2    referenced documents from the Court and I provided you with

         3    what you referred to as Document 180-1 and --

         4             MR. LINCENBERG:  Not document, docket.

04:31p   5             THE COURT:  Docket, yes.  180-1, it does not have

         6    exhibits attached to it.  So please review whatever it was

         7    that your exhibit was attached to, and let my chambers know

         8    precisely where that is so that I can review that to see if it

         9    is as Mr. Rapp indicates regarding his -- his concern and

04:32p  10    objection.

        11             Let me also say that with regard to this Exhibit

        12    6025, I know we had a lengthy discussion about that exhibit

        13    yesterday; and I'm going to go back and look at what I said

        14    was permitted in this exhibit and, frankly, in looking at it

04:32p  15    and looking at the redacted version I -- frankly, I can't

        16    recall my precise ruling as to whether or not you could elicit

        17    testimony about the exhibit and just not admit it or if I said

        18    it was to be a question that I would resolve at the time.

        19             You've added particular redactions to this now.  So

04:33p  20    I'm going to review that record in the light of the

        21    redactions.

        22             MR. LINCENBERG:  Would it help the Court for

        23    Mr. Rapp to note there were, I believe, two additional

        24    redactions that I sidebarred with him that I was agreeing to.

04:33p  25             THE COURT:  And what would help me more is if you

1   provide to me the redacted version.

2           MR. LINCENBERG:  Okay.

3           THE COURT:  Now, I will say that when I was looking

4   at Government's Exhibit 474 -- and maybe I'm wrong -- but I

5   believe that this second page of 6025 from -- and it ends

6   "Thanks, Mickey," is 474.  So double-check that.

7           I want to make sure that I'm not misstating or

8   confusing the record.  To me, it looked like the same precise

9   verbiage and all of that.  So I want to make sure that the

10  record is clear.

11          Okay, so -- and tomorrow, apparently the jurors have

12  lost a little track and familiarity with all counsel.  So what

13  we're going to do -- we'll do it tomorrow, but we'll start

14  this as a regular practice at the beginning of the week of

15  trial is I'll have Government counsel introduce your

16  co-counsel and defense counsel may introduce themselves and

17  their clients in the morning session.  They just want to get

18  familiar with faces again, all right?

19          Okay.  All right, so we will stand in recess until

20  8:45 in the morning.

21  (Whereupon the proceedings concluded at 4:35 p.m.)

22

23

24

25

*REPORTER'S CERTIFICATION*

1

2

3          I, TERI VERES, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages

7    constitute a full, true, and accurate transcript of all of

8    that portion of the proceedings contained herein, had in the

9    above-entitled cause on the date specified therein, and that

10   said transcript was prepared under my direction and control.

11          DATED at Phoenix, Arizona, this 28th of

12   September, 2023.

13
                                    _____s/Teri Veres_____
14                                   TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT