UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,       )
                                )
                  Plaintiff,    )   NO. 2:18-cr-00422-DJH
v.                              )
                                )   Phoenix, Arizona
Michael Lacey, et al.,          )   September 28, 2023
                                )   1:01 p.m.
                  Defendants.   )
_____ )

BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL DAY 14
P.M. SESSION

Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                   A P P E A R A N C E S

 2    For the Plaintiff:
          UNITED STATES ATTORNEY'S OFFICE
 3        By:  Kevin M. Rapp, Esq.
               Andrew C. Stone, Esq.
 4             Peter Shawn Kozinets, Esq.
               Margaret Wu Perlmeter, Esq.
 5        40 North Central Avenue, Suite 1800
          Phoenix, Arizona 85004-4408
 6

 7    For the Defendant Michael Lacey:
          LIPTSUTZ GREEN SCIME CAMBRIA, LLP
 8        By:  Paul J. Cambria, Jr. Esq.
          42 Delaware Avenue, Suite 120
 9        Buffalo, New York  14202

10    For the Defendant Andrew Padilla:
          DAVID EISENBERG, PLC
11        By:  David S. Eisenberg, Esq.
          3550 North Central Avenue, Suite 1155
12        Phoenix, Arizona 85012

13    For the Defendant Scott Spear:
          KESSLER LAW OFFICE
14        By:  Eric Walter Kessler, Esq.
          6720 North Scottsdale Road, Suite 210
15        Scottsdale, Arizona 85253
          - and -
16        FEDER LAW OFFICE, PA
          By:  Bruce S. Feder, Esq.
17        2930 East Camelback Road, Suite 160
          Phoenix, Arizona 85016
18

19    For the Defendant John Brunst:
          BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
20        By: Gary S. Lincenberg, Esq.
               Gopi K. Panchapakesan, Esq.
21        1875 Century Park E, Suite 2300
          Los Angeles, California 90067
22

23    For the Defendant Joye Vaught:
          JOY BERTRAND, ESQ, LLC
24        By:  Joy Malby Bertrand, Esq.
          P.O. Box 2734
25        Scottsdale, Arizona 85252-2734
```

UNITED STATES DISTRICT COURT

1                          *I N D E X*

2

3    **GOVERNMENT WITNESS:**                              **PAGE**

4    CARL FERRER
     Continued Cross-Examination by Mr. Lincenberg...............4
5    Cross Examination by Mr. Eisenberg..........................20

6

7                          *EXHIBITS*

8    **EXHIBIT**                                     **RECEIVED**

9    NO.     DESCRIPTION

10   581     Email from Spear to Ferrer, "Draft of          69
             adult abuse abatement", 05/26/2009,
11           DOJ-BP-0002125279 - DOJ-BP-0002125280

12   51      Email from Ferrer to Hyer, Spear, and          91
             Padilla (with attachments), 09/05/2010,
13           DOJ-BP-0000005681

14   51a     Attachment. Document listing banned terms      97
             DOJ-BP-0000005682-DOJ-BP-0000005683
15

16   59      Email from Padilla to Hyer, Vaught,            108
             and Moderators, 10/16/2010
17           DOJ-BP-0000005332

18   61      Emails between Ferrer, Hyer, Spear,            119
             and Padilla, 10/25/2010
19           DOJ-BP-0000005068- DOJ-BP-0000005069

20

21

22

23

24

25

|   |   |
|---|---|
|   | 1 |

**P R O C E E D I N G S**

*(Whereupon the proceedings began at 1:01 p.m.)*

            COURTROOM DEPUTY:  All rise, court is now in session.

01:01p 5     THE COURT:  Please be seated.  We'll make sure our jury's all gathered and bring them in.

            All rise for the jury.

            (Jury in 1:05 p.m.)

            THE COURT:  All right, please be seated.

01:05p 10     The record will reflect the return of our jury. Mr. Ferrer is on the witness stand.

            Mr. Lincenberg, you may continue.

            MR. LINCENBERG:  Is the mic okay?

            THE REPORTER:  No.

01:05p 15     MR. LINCENBERG:  Let me turn it on.

            THE COURT:  Yes, that will be helpful.

                    CONTINUED CROSS-EXAMINATION

BY MR. LINCENBERG:

Q.    Sir, do you recall a hearing in which you entered your

01:06p 20 guilty plea on April 5th of 2018?

A.    Yes, I do.

Q.    Okay.  And you recall that that hearing was before Her Honor Judge Humetewa, correct?

      I'm hearing a "no."  I have it in the transcript.

01:06p 25     THE COURT:  Well, it's -- the question wasn't to me,

```
 1   but I'm not recalling it.
 2              MR. LINCENBERG:  Okay.  I'll point out where it's in
 3   the transcript, but let's leave it alone.
 4   BY MR. LINCENBERG:
 5   Q.   Do you recall standing before a Federal Judge?
 6   A.   I do.
 7   Q.   And do you recall in that hearing the Judge saying that
 8   before sentencing your judge is going to use a guideline chart
 9   to help you determine your sentence -- to help determine your
10   sentence?
11   A.   Do I recall that --
12   Q.   Yes.
13   A.   -- him specifically saying that?
14   Q.   Yes, or generally?
15   A.   Generally?  It's one of the worst days of my life, and
16   I'm having difficulty recalling everything that was said.
17   Q.   So my question is:  Do you recall, specifically or
18   generally, the Judge saying that before sentencing your judge
19   is going to use a guideline chart to help determine your
20   sentence?
21   A.   I -- I recall other things.  I just don't recall that
22   specifically.
23   Q.   Do you recall the Judge telling you that a copy of the
24   chart is in front of you?
25   A.   I'm sorry, I don't.
```

01:06p (line 5)
01:06p (line 10)
01:06p (line 15)
01:07p (line 20)
01:07p (line 25)

1  Q.   Do you recall the Judge telling you that the Judge is

2  going to go through it with you?

3  A.   Well, he went through -- the Judge went through things

4  with me.  It was fairly detailed.

01:07p 5  Q.   Do you recall the Judge asking if you understand how that

6  guideline chart works and your answer was, "I do, Your Honor"?

7       Do you recall that?

8  A.   I recall saying "I do."

9  Q.   And the Judge went through that chart because this was a

01:08p 10  very important decision you were making and the Judge wanted

11  to make sure that you fully understood your plea agreement,

12  correct?

13  A.   Well, I think --

14  Q.   Is that correct?

01:08p 15  A.   Yes, I think the Judge was -- went through --

16  Q.   Okay.

17  A.   -- with a lot of detail and thoroughness.

18  Q.   And, in fact, the Judge broke it down in further detail

19  and said on the left side of the chart are certain numbers and

01:08p 20  explained what they mean, correct?

21  A.   Once again, I can't recall the chart.

22  Q.   Do you recall --

23  A.   You're asking me to recall a chart from five years ago.

24  Q.   Do you recall the Judge then pointing out to you that on

01:09p 25  the right side of the chart are other documents?

1    Do you recall that?

2  A.   I can't recall that specifically at this time.

3  Q.   And the Judge asking if that makes sense to you and you

4  said, "It does, Your Honor."  Do you recall that?

01:09p  5  A.   I'm sure I said "I do."

6  Q.   Okay.  And do you recall the Judge explaining that what

7  happens at sentencing is your judge decides a category and

8  your offense level and then draws a line from both of those.

9  Wherever those lines meet in the middle of the chart, that's

01:09p 10  your guideline range.  Do you recall that?

11  A.   I remember some similar language to that effect.

12  Q.   Do you recall the Judge that's again asking you, do you

13  understand how the middle of the chart works and you said, "I

14  do, Your Honor."  Do you recall that?

01:10p 15  A.   I said "I do."

16  Q.   Okay.  And then do you recall having a separate hearing

17  in connection with this leniency agreement that you entered

18  into?

19          MR. RAPP:  Objection, misstates the agreement, title

01:10p 20  of the agreement.

21          THE COURT:  Sustained.

22  BY MR. LINCENBERG:

23  Q.   Well, the title of the agreement was "Cooperation

24  Addendum," right?

01:10p 25  A.   I don't have it in front of me.

1  Q.   But you recall the title of the agreement was a title

2  chosen by the prosecutors, correct?

3  A.   I -- I can answer your questions better if you have -- if

4  I have the Cooperation Agreement in front of me.

01:10p 5  Q.   And do you recall the Judge in that hearing explaining to

6  you what a 5K1.1 motion for a downward departure meant?

7  A.   Once again, my best answer is maybe.

8  Q.   And do you recall the Judge explaining that if the

9  Government chooses to make a motion, that the Court could

01:11p 10  consider that and give you a downward departure from your

11  guideline sentence; and your response was, "Yes, your Honor, I

12  understand that."  Do you recall that?

13  A.   I could recall it better if I had a transcript in front

14  of me.

01:11p 15  Q.   Sir, fair to say that this agreement that you entered

16  into to, quote, "cooperate" with the prosecution and plead

17  guilty was one of the most important agreements you've ever

18  entered into in your life?

19  A.   It is and it's the reason why I had an attorney really

01:12p 20  handle this matter for me --

21  Q.   Well --

22  A.   -- and explain it to me.

23  Q.   Sir, you were asked by the Judge to make sure you

24  understood it so that you couldn't come back later and just

01:12p 25  say, "My attorney was dealing with that," right?

1  A.   Yes, I agreed to it, but only after this was explained by

2  the attorney and then, I believe, the Judge went through it,

3  too.

4  Q.   And it was explained to you by the attorney, right?

01:12p  5  A.   Yes.

6  Q.   In fact, the Judge specifically made sure that you had

7  discussed it, that agreement, fully with your attorney, right?

8  A.   I'm not certain if -- if that was said.

9  Q.   How is it that you remember conversations vividly from

01:12p 10  2007 that the prosecutor asked you about, but you don't recall

11  these parts of your entering a guilty plea, an agreement,

12  which was one of the most important agreements that you ever

13  entered into?  How is it?

14  A.   Well, can I explain?

01:13p 15  Q.   You can -- yeah, you can explain.  Go ahead.

16  A.   It just helps if I have an exhibit or a transcript

17  because it's been so many years.

18  Q.   Because when you have an exhibit, then you can just read

19  off of the exhibit, right?

01:13p 20  A.   I'm not reading just off the exhibit.  It's helping me

21  recall.

22  Q.   So -- and, sir, was this agreement and the opportunity to

23  please the prosecutors and get this motion for a downward

24  departure one of your motivations for testifying here today?

01:13p 25         MR. RAPP:  Objection, argumentative and compound.

```
 1           THE COURT:  I'll overrule.
 2   BY MR. LINCENBERG:
 3   Q.   Was that one of your motivations?
 4   A.   I've agreed -- my motivation is I've agreed --
 5   Q.   Sir, I -- move to strike.  We're going to go through a
 6   lot of your motivations.  I want you to answer my question.
 7        Was that one of your motivations?
 8   A.   I will do so truthfully.
 9   Q.   Okay.  Now, sir, another one of your motivations was that
10   you understood in April of 2018 that it was going to be
11   difficult to continue operating Backpage because Congress had
12   just passed a new law that was about to go into effect that
13   would have targeted Backpage?
14           MR. RAPP:  Objection.  Foundation, irrelevant.
15           MR. LINCENBERG:  Your Honor, this goes to his
16   motivation.
17           THE COURT:  Sustained.
18   BY MR. LINCENBERG:
19   Q.   Sir, are you familiar with a law that was called FOSTA,
20   F-O-S-T-A?
21           MR. RAPP:  Objection.  Irrelevant, foundation.
22           THE COURT:  Sustained.
23   BY MR. LINCENBERG:
24   Q.   Sir, isn't it true that one of your motives for pleading
25   guilty was because there was going to be a new law coming into
```

01:14p 5
01:14p 10
01:14p 15
01:14p 20
01:15p 25

```
  1   effect that would make it harder for you to operate your
  2   business?
  3              MR. RAPP:  Same objection.
  4              MR. LINCENBERG:  I'm asking you if that's one of
  5   your motives?
  6              MR. RAPP:  Same objection.
  7              THE COURT:  Well, I'll permit the witness to answer
  8   "yes" or "no," but let's move on from the area,
  9   Mr. Lincenberg.
 10              MR. LINCENBERG:  "Yes" or "no"?
 11              THE WITNESS:  Absolutely no.
 12   BY MR. LINCENBERG:
 13   Q.   Was one of your motivations for entering into a leniency
 14   agreement that the US agreed not to seek to forfeit a property
 15   located at 2531 Tumbleweed Way?
 16              MR. RAPP:  I'm going to object on two things.
 17              One, this is -- I don't know what this address is,
 18   but it's personal information; and, secondly, this has been
 19   asked and answered.
 20              THE COURT:  Yes, it has been asked and answered.
 21              MR. LINCENBERG:  Your Honor, I have a client.  I
 22   should be able to cross-examine these witnesses about these
 23   points.  I'm going to run through these different points.
 24   Some of them were testified to in certain manners and some
 25   weren't.
```

01:15p (line 5)
01:15p (line 10)
01:15p (line 15)
01:16p (line 20)
01:16p (line 25)

         1            THE COURT:  Let's refrain from publishing any

         2    personal addresses --

         3            MR. LINCENBERG:  Okay.

         4            THE COURT:  -- or identifying information.

01:16p   5            You can rephrase the question.  I'll let you do so

         6    in a limited way.

         7            MR. LINCENBERG:  Thank you, Your Honor.

         8    BY MR. LINCENBERG:

         9    Q.   Sir, did the United States agree not to forfeit a

01:16p  10    property in Frisco?

        11    A.   Yes, my primary residence.

        12    Q.   Okay.  And was that primary residence a house or an

        13    apartment?

        14    A.   Excuse me?

01:16p  15    Q.   Was your primary residence a house or an apartment?

        16    A.   It was a house that we had purchased only a year or two

        17    after Backpage had launched.

        18    Q.   Okay.  And so all of the mortgage payments and other

        19    payments for the house were payments that were made from

01:17p  20    proceeds of Backpage?

        21    A.   Nope, none of the payments were.

        22    Q.   Okay.  And did the United States agree to not forfeit

        23    your retirement account, which had been added to over the

        24    years with proceeds from Backpage?

01:17p  25    A.   That is incorrect.

                       UNITED STATES DISTRICT COURT

```
        1   Q.   Did the United States agree to let you keep two different

        2   Mercedes?

        3   A.   It let -- well, no, I think the car is also not excluded

        4   from forfeiture.

01:17p  5   Q.   Well, sir, you, I believe, first of all, testified that

        6   you had purchased a car in 2018, March of 2018, correct?

        7   A.   Correct.

        8   Q.   That was purchased for $65,000, correct?

        9   A.   I believe so.

01:18p 10   Q.   And that was purchased with money you earned from

       11   Backpage, right?

       12   A.   Correct.

       13   Q.   And that car was never forfeited, was it?

       14   A.   But that doesn't mean it's not up for forfeiture.  It

01:18p 15   could be forfeited.  I had a chance to review the agreement,

       16   and I just want to be truthful.  It could be forfeited.

       17   Q.   So five years later you're still driving that car, right?

       18   A.   Yes.

       19   Q.   And you also had a 2012 Mercedes that you purchased for

01:18p 20   $55,000 that also wasn't forfeited, correct?

       21   A.   2012?

       22   Q.   Black utility Mercedes?

       23   A.   Oh, that -- that car is -- I traded in for the new car.

       24   Q.   Sir --

01:19p 25   A.   So that wasn't possible to forfeit that car because the
```

1    car was -- the dealership had it.  I did a trade-in.

2    Q.   And you filed for divorce in January of 2018; is that

3    correct?

4            MR. RAPP:  Objection, relevance.

01:19p  5            THE COURT:  Sustained.

6    BY MR. LINCENBERG:

7    Q.   Sir, in 2018 the United States did not seek forfeiture of

8    all of the money that was sent over to your then wife as

9    marital assets that you were placing in her name, correct?

01:19p  10   A.   That's not correct at all.

11   Q.   That's not correct?

12   A.   No.

13   Q.   You ended up reaching a divorce agreement, correct?

14   A.   Let me make sure I have the time frame correct.

01:19p  15       We reached an agreement on the divorce, but forfeited

16   funds were not part of any divorce settlement to her.

17   Q.   Right.  Nothing that was sent to your wife was forfeited,

18   correct?

19   A.   Nothing was sent to my wife on the list to be forfeited.

01:20p  20   Q.   Well, let's go through a couple of examples.  So, for

21   example, you bought a speedboat, put it in your wife's name in

22   2017, correct?

23   A.   I didn't buy the speedboat and put it in my wife's name.

24   My wife bought the boat.  She likes boating, I don't.

01:20p  25   Q.   And your wife bought it with Backpage proceeds, correct?

1  A.   Yes.

2  Q.   Okay.  And there was a 2017 Mercedes, a third Mercedes,

3  black SUV, purchased for $77,000 that became part of the

4  marital assets of your wife, correct?

01:21p  5  A.   She had bought that car, correct.

6  Q.   All right.  And that car was purchased with proceeds from

7  Backpage, correct?

8  A.   Probably.

9  Q.   And to your knowledge, that $77,000 car was also not

01:21p  10  forfeited, correct?

11  A.   No.

12  Q.   And -- when you say "no," meaning, "yes," it was --

13  correct it was not forfeited, right?

14  A.   What was the question?

01:21p  15  Q.   Was it forfeited?

16  A.   No.

17  Q.   All right.  And without giving the address, the

18  Government did claim a residence in The Colony?  Let's not

19  give the address.  You know which residence I'm referring to?

01:21p  20  A.   I do.

21  Q.   You purchased it in September 2017 for cash?

22  A.   I did not purchase it.

23  Q.   Was that -- was it your -- was it your residence?

24  A.   It was not my residence.

01:22p  25  Q.   So what was that property?  Who owned it?

1   A.   My wife.

2   Q.   Okay.  And your wife purchased it with money from your

3   work at Backpage?

4   A.   Actually, that money came from some bitcoin that I had

01:22p  5   bought and then it, like, enormously went up in value so it --

6   that's -- and then I liquidated it.

7   Q.   And that bitcoin was bitcoin that you bought from money

8   that you had earned in your work at Backpage, correct?

9   A.   Well, it was actually expense reimbursement from Backpage

01:22p  10   for expenses that I incurred.

11   Q.   Okay.  And that -- and the Government, in fact, released

12   any claim on that large home in March of 2022, correct?

13   A.   I gave up and forfeited all claims to that house, and

14   whatever arrangement that she had with her lawyer and the

01:23p  15   Government was up to her.

16   Q.   Sir, are you aware that the Government released any claim

17   to that multi-million dollar house in March of 2022, "yes" or

18   "no"?

19   A.   Yes.

01:23p  20   Q.   Okay.  And being able to retain these assets, some of the

21   examples I've gone through, was a part of your motivation for

22   entering into this agreement with the Government, right?

23   A.   A part of my motivation?  Very small part.  I have much

24   more important motivation.

01:23p  25   Q.   All right.

 1    A.    Which is tell the truth.

 2    Q.    And another very small part of your motivation was that

 3    by cooperating you had very lenient bail conditions so that

 4    you can travel, for example, wherever you want?

01:24p  5    A.    That's absolutely not the case.  I wore an ankle bracelet

 6    and then my travel is restricted.

 7    Q.    Okay.  So you believe that your bail conditions would

 8    have been the same regardless?

 9    A.    Well, I can't speculate to that.

01:24p 10    Q.    Okay, fair enough.  And fair to say that avoiding the

11    life-changing stress of sitting through a trial as a criminal

12    defendant was part of your motivation for cutting this deal?

13    A.    What was that question again?

14    Q.    Yeah.  Was part of your motivation for cutting this deal,

01:25p 15    this leniency agreement, being able to avoid sitting through a

16    life-changing stressful federal criminal trial?

17    A.    Well, this is -- my main -- my main motive -- was it part

18    of my motivation?  I didn't really understand it.  I agreed --

19    Q.    The only question is:  Was it part of your motivation,

01:25p 20    "yes" or "no"?

21    A.    No, my main motivation was to cooperate.

22    Q.    Sir, you're going to have plenty of time to talk about

23    whatever other motivations you want to talk about.  Try to

24    confine yourself to the questions I'm asking you.

01:25p 25          Was part of your motivation being able to retain

1    money that was from Backpage to pay the large attorneys'

2    fees that you spoke about the other day during your

3    examination?

4              MR. RAPP:  Objection, asked and answered.

01:26p 5       THE COURT:  Overruled.

6              THE WITNESS:  Did you say attorney fees?

7              MR. LINCENBERG:  Yes.

8    BY MR. LINCENBERG:

9    Q.   Was that part of your motivation, being able to have that

01:26p 10   money to be able to pay -- I believe you said -- my memory is

11   upwards of a million dollars that was used -- that Backpage

12   money was used to pay for?

13   A.   It -- it is a benefit.

14   Q.   And was at the same time limiting how much money you

01:26p 15   would have to spend to defend yourself part of your motivation

16   for this agreement you entered into with the Government?

17   A.   Limiting the amount of money I would have to spend by

18   cooperating?  I think I really -- I don't think I considered

19   that.

01:26p 20   Q.   Was part of your motivation getting out from under the

21   loan obligations?

22   A.   Oh, absolutely not.  That loan's uncollectible.

23   Q.   Now, sir, you've testified for about ten days in this

24   matter.  We've heard at various times about prior testimony

01:27p 25   and declarations under oath that you've given over the years,

 1  and is it your testimony that you've never lied under oath

 2  during this testimony?

 3  A.   Yes.

 4          MR. LINCENBERG:  I have nothing further, your Honor,

01:27p  5  thank you.

 6          THE COURT:  Thank you, Mr. Lincenberg.

 7          Who is next?

 8          MR. EISENBERG:  (Indicating.)

 9          THE COURT:  Oh, Mr. Eisenberg.

01:27p 10          Come forward, Mr. Eisenberg.

11          MR. EISENBERG:  I need to adjust the podium.

12          THE COURT:  Yes, and the microphone if you're not

13  using the lapel mic.

14          MR. LINCENBERG:  I'm taking this home with me, Your

01:28p 15  Honor.

16          MR. EISENBERG:  I will go with this first, Your

17  Honor, but I have to change. . .

18          MS. BERTRAND:  And, Judge, if it's okay with the

19  Court, may I sit over here?  It's hard for me to see over the

01:28p 20  podium.

21          THE COURT:  Yes.  Of course, yes.

22          MS. BERTRAND:  Thank you.

23          MR. EISENBERG:  Okay.  Can you hear me?  No?

24          THE COURT:  That microphone will need to be pretty

01:28p 25  high up on your tie.

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1                    CROSS-EXAMINATION

2   BY MR. EISENBERG:

3   Q.   Well, good afternoon, Mr. Ferrer.

4   A.   Good afternoon.

01:28p  5   Q.   Mr. Ferrer, I'm Dave Eisenberg.  I represent Mr. Padilla;

6   and this is the first time we've talked, correct?

7   A.   Correct.

8   Q.   Okay.  And so I want to just go through some preliminary

9   matters, and then I'm going to tell you that we're going to go

01:29p  10  through many of the exhibits that you have seen and admitted

11  into evidence through your testimony before.  Okay?

12  A.   Okay.

13  Q.   And there'll be some new ones.  So if you need time to

14  look at the new ones, just let us know.  Okay?

01:29p  15  A.   Okay.

16  Q.   All right, good.  And the other request I have is please

17  try to answer my question.

18  A.   I'll do my best.

19  Q.   I know you will.  I hope you will.

01:29p  20       Now, sir, I think from your prior testimony we heard that

21  you were with Backpage as a project manager; is that correct?

22  A.   I had many titles, but essentially the project manager.

23  Q.   Okay.  I'm going with that one, project manager.

24       And you were with Backpage from 2000 -- started in 2004;

01:30p  25  is that correct?

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1    A.   Correct.

2    Q.   And then you stayed with Backpage until it was closed,

3    correct?

4    A.   That is correct.

01:30p  5    Q.   And that was 2018, right?

6    A.   Correct.

7    Q.   And then you -- during that period of time you had other

8    titles, like vice president, right?

9    A.   Sales and marketing, director, and then vice president.

01:30p 10    Q.   Okay.  And then president?

11    A.   Then president.

12    Q.   And then CEO?

13    A.   Yeah, I think CEO kicked in in 2015.

14    Q.   Okay.  But that's before 2018?

01:30p 15    A.   Yes.

16    Q.   And during this period of time you came to know my

17    client, Andrew Padilla?

18    A.   Yes.

19    Q.   You didn't hire Mr. Padilla, though, did you?

01:31p 20    A.   That's a good question.

21    Q.   I know.  You wouldn't know we asked a good question.

22         Well, let me -- let me approach it this way:  Do you know

23    Micah Killough?

24    A.   Yes, I do.

01:31p 25    Q.   I may have mispronounced it, but that's the gentleman who

1    hired Mr. Padilla; is that correct?

2    A.    That is correct.

3    Q.    And then when he started, if you know, if you know, he

4    started in an area -- I'll call it spam relief for lack of a

01:31p  5    better term?

6    A.    Yes.

7    Q.    Okay.  And the spam relief was -- that was -- it wasn't

8    moderation at that point, correct?

9    A.    Well, it's a -- it's a type of moderation, but a

01:31p 10    different type of moderation.  It didn't have moderation

11    queues.

12    Q.    Well, it's different than the moderation that you've been

13    testifying about for the last several days?

14    A.    That's correct, sir.

01:32p 15    Q.    That's mod -- excuse me.  That's moderation with respect

16    to advertisements being posted in, I think, adult content or

17    adult and escorts and some of the other ones that you've

18    mentioned, right?

19    A.    I would agree with you.

01:32p 20    Q.    Good.  And so this moderation -- well, spam has to do

21    with taking advertisements that appeared to be misleading with

22    respect to jobs or business opportunities?

23    A.    Exactly.

24    Q.    Okay.  So that's what he was doing when he first started,

01:32p 25    if you know?

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1   A.   I believe he was, but he was under the supervision of

2   Micah Killough.

3   Q.   Okay.  Eventually he started doing moderation with

4   respect to what I've been calling just now the ads in escort

01:33p 5   and massage, et cetera?

6   A.   Correct.

7   Q.   And that started in approximately, I think, 2006, maybe

8   2007?

9   A.   I believe you're correct.

01:33p 10   Q.   And then there came a time when -- excuse me -- the

11   moderation section -- well, let me back up.

12       He became in charge of the moderators at some point,

13   correct?

14   A.   He did eventually.  For a while we had three managers in

01:33p 15   the department, and he was one of the managers and eventually

16   he would supervise the moderators.

17   Q.   So that would be in approximately 2009, is that about

18   right, 2008?

19   A.   Around that time, yes.

01:34p 20   Q.   Okay.  And remember, I'm only going to ask you to respond

21   if you have the knowledge, please respond.  If you don't know,

22   then you don't know.  Fair enough?

23   A.   Fair enough.

24   Q.   Good.  So starting at about that period of time, if you

01:34p 25   remember, how many moderators was he supervising when he

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                    24

```
       1  became the head of the moderation process?
       2  A.   Well, I'm going to have to give you an estimate.
       3  Q.   That's okay, go ahead.
       4  A.   Well, I don't know the exact number.
01:34p 5  Q.   Well, all right.  Give us an estimate.
       6  A.   I'm going to say, maybe, eight or nine.
       7  Q.   And then it grew eventually?
       8  A.   It did.
       9  Q.   In fact, I think you've testified before that there came
01:34p 10 a period of time when he was in charge of in Phoenix at least
       11 20 moderators?
       12 A.   There was a time when he had 20 moderators.
       13 Q.   And then there came a time when the moderation effort
       14 involved people not working at Backpage, but working at home?
01:35p 15 A.   Yes.
       16 Q.   And that practically doubled -- if not, it did double the
       17 amount of moderators that he was supervising?
       18 A.   It did.
       19 Q.   And then there came a time when -- I think the company's
01:35p 20 name is El Camino.  Do you remember that?
       21 A.   I do.
       22 Q.   That's Ms. Mohan, right?
       23 A.   Correct.
       24 Q.   And her husband?
01:35p 25 A.   Sukesh.
```

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1    Q.   Sukesh.   And her name is Monita?

2    A.   Correct.

3    Q.   And that is an off-shore moderating operation, correct?

4    A.   Correct.

01:35p    5    Q.   And that was -- what date approximately did El Camino

6    come into the picture?

7    A.   Approximately, I'm gonna say, 2009 or 2010.

8    Q.   Well, I think in your direct you associated the -- that

9    company with what you called credit card Armageddon and that

01:36p   10    led to the hiring of moderators in India?

11    A.    No, I think your time frame is wrong there.   Credit card

12    Armageddon is July of 2015, like two and a half months after

13    my name as the owner of the site.

14    Q.   Okay.

01:36p   15    A.   So you're referring -- we had had Sukesh -- we had

16    El Camino with us years before.

17    Q.   Okay.   But that was due to the fact that the number of

18    ads in these categories were growing?

19    A.   Correct.

01:36p   20    Q.   And you had to have more moderators to moderate the ads,

21    right?

22    A.   The number of ads were growing, but also there were some

23    content rules.   So there was more work.

24    Q.   More work because people were going to be following the

01:37p   25    content rules, right?

1   A.   Well, people were gonna be following the rules?

2   Q.   Yeah, the moderators, I'm sorry.

3   A.   Oh.  The moderators were going to be enforcing the rules.

4   Q.   Right.  So because of the volume of ads that were

01:37p   5   increasing, you needed more moderators, right?

6   A.   I'm saying we needed more moderators because the volume

7   of ads and there were continually new rules added.

8   Q.   Those new rules that you're talking about meant rules

9   with respect to what could go into an ad and what couldn't?

01:37p   10   A.   That's correct.

11   Q.   Okay.  And so by the time the Indian -- moderators from

12   India came in were you up to something like -- well, how many

13   moderators were you up to at that point?

14   A.   Once again, it's helpful to have an exhibit or an e-mail

01:38p   15   at that time frame; but if you're gonna ask for an estimate,

16   I'm gonna say that, well, we had filled every desk in the

17   office.  So -- at what time -- what time frame are you talking

18   about?

19   Q.   Whenever you hired them.

01:38p   20   A.   Oh, whenever we hired El Camino?

21   Q.   Uh-huh.

22   A.   Well, 24 or more, I believe.

23   Q.   Well, there came a point in time -- and maybe it was

24   after you hired El Camino -- but weren't there up to 400

01:38p   25   moderators working at one time for Backpage?

```
 1   A.   At the peak?

 2   Q.   At the peak, okay, sure.

 3   A.   Well, those -- that's about -- about maybe 50 to 70 US

 4   moderators and the rest are moderators in the Philippines at

 5   the peak.

 6   Q.   Okay.  So the Philippine moderators, they came in after

 7   the moderators from India?

 8   A.   Correct.

 9   Q.   Okay.  So I guess we've established then -- excuse me,

10   Your Honor.

11           MR. EISENBERG:  Would you hand me the water.

12           We'll drink together.  Cheers.

13   BY MR. EISENBERG:

14   Q.   So at some point in time, okay, we're up to 400

15   moderators; and Mr. Padilla, he's in charge of 400 moderators?

16   A.   He is.

17   Q.   And he was assisted by Ms. Vaught?

18   A.   He was assisted by Ms. Vaught.

19   Q.   Okay.  So now I'm going to ask you if you know.  If you

20   know, how much did Mr. Padilla make, salary -- first of all,

21   was he salaried?

22   A.   Well, it varied by time frame.  So can you give me a time

23   that you would like to know?

24   Q.   Well, how was he paid throughout this whole period of

25   time?  Salary or was it by the hour or was it in assets?
```

01:39p  5
01:39p 10
01:39p 15
01:39p 20
01:40p 25

1  A.   No, it -- I believe it was started by the hour, but then

2  it went to a salary.

3  Q.   Okay.

4  A.   A very reasonable salary.

01:40p  5  Q.   I'm sorry, I didn't hear.

6  A.   Reasonable.

7  Q.   A reasonable salary.  And I suggest to you that a

8  reasonable salary would have been about -- at least in 2012

9  $70,000 -- $74,000.  Does that sound right?

01:40p  10  A.   In 2012?

11  Q.   Yes, sir.

12  A.   Yes.

13  Q.   Okay.  And there was also a bonus that he would get.

14        Do you remember that?

01:41p  15  A.   There was a bonus plan again -- yes, there was.

16  Q.   Okay.  And in his case that bonus came to approximately,

17  in 2012, $10,000?

18  A.   Correct.

19  Q.   Okay.  Now, his salary wasn't predicated on the number of

01:41p  20  ads that went in to Backpage, was it?

21  A.   It was not.

22  Q.   And his bonus it was not predicated on that either, was

23  it?

24  A.   It was not.

01:41p  25  Q.   So if there were, I think, at one time a million ads over

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

```
 1    a certain period of time, that didn't increase his salary

 2    from, let's say, $800,000 -- ads?

 3    A.    I'm sorry, could you ask that again?

 4    Q.    Okay.  At some point in time I believe you've testified

 5    that there were a million postings like a day on Backpage?

 6    A.    I don't recall that number, but exactly.  There's a lot

 7    of postings.

 8    Q.    A lot, okay.

 9    A.    Okay.

10    Q.    And those postings rose over time, correct?

11    A.    Correct.

12    Q.    But over time his bonus was not linked to that volume,

13    was it?

14    A.    Now I understand.  It wasn't linked to the volume, but he

15    did get annual increases.

16    Q.    He did, okay.

17    A.    He did.

18    Q.    But as far as I can tell, there was $74,000 in 2012.  I

19    think we've established that.  We've agreed to that, "yes"?

20    A.    Yes.

21    Q.    Okay.  And there was a bonus of approximately 10,000,

22    right?

23    A.    Yes.

24    Q.    Okay.  And in terms of hiring moderators, whose job was

25    that?
```

01:42p  5
01:42p 10
01:42p 15
01:42p 20
01:43p 25

```
 1  A.    What time frame?

 2  Q.    2012.

 3  A.    2012.  Well, that would be Andrew Padilla.

 4  Q.    Would be Mr. Padilla, right?

 5  A.    Yes.

 6  Q.    He had the authority to hire people, moderators?

 7  A.    That's right.

 8  Q.    And then Mr. Padilla was also in charge of training the

 9  moderators, right?

10  A.    Yes, he was.

11  Q.    And he was also in charge of -- well, let me ask this.

12  Let me ask you this:  He was not in charge of setting the

13  budget for Backpage, was he?

14  A.    Not at all.

15  Q.    Not at all, and I think what you're saying is he had

16  nothing to do with the budget?

17  A.    About the only thing he did with the budget is provide a

18  list of moderators and negotiate on what their annual increase

19  might be and compensation.

20  Q.    Okay.  And was probably -- in fact, I believe he was also

21  in charge of analyzing their performance over a period of

22  time?

23  A.    That is in his job description, yes.

24  Q.    Well, okay.  The question is -- well, I think you've

25  answered it, okay.
```

Timestamps in left margin: 01:43p (line 5), 01:43p (line 10), 01:43p (line 15), 01:44p (line 20), 01:44p (line 25)

1    So he was not in charge of -- well, let me ask it this

2    way:  His job was moderation, correct?

3    A.   Correct.

4    Q.   Supervising moderators, right?

01:44p  5    A.   Correct.

6    Q.   He was not in charge of -- and I think the phrase that

7    you had used at some point in time early on in your direct was

8    he wasn't -- I'll revise that.

9        He did not get involved in stealing ads, did he?

01:44p 10   A.   I don't -- I had to speculate.  I don't know.

11   Q.   Well, we don't want you to speculate.  So if you don't

12   know, you don't know; but those ads that you say were stolen,

13   wasn't that through the marketing staff?

14       They were involved in -- I'll use a different word if you

01:45p 15   prefer -- taking ads that were on Craigslist and posting them

16   on Backpage?

17   A.   That's right, and there was a marketing staff in Phoenix

18   for a period of time.

19   Q.   Please, sir.  Okay.

01:45p 20   A.   I'm sorry.

21   Q.   Those are the people who were charged -- I'm sorry,

22   involved in taking ads from, say, Craigslist and posting them

23   in Backpage, not Mr. Padilla?

24   A.   I want to be truthful so I'm gonna need to explain.

01:45p 25   Q.   Here's the question:  As far as you know, Mr. Padilla was

```
 1  not involved in stealing ads?
 2  A.   It would have been tangential, meaning that there may
 3  have been some marketing people there that he was still
 4  supervising --
```
01:46p   5  Q.   Okay.
```
 6  A.   -- but eventually all of that would move to Dallas.
 7  Q.   And all of it would move to Mr. Hyer.  He would -- he was
 8  in charge of marketing, wasn't he?
 9  A.   Correct.
```
01:46p  10  Q.   Okay.  And when you say that my client was supervising
```
11  somebody, I think you're referring to a man whose first name
12  is Roger?
13  A.   That's exactly who I'm referring to.
14  Q.   And Roger -- that's just one person that you're referring
```
01:46p  15  to, correct?
```
16  A.   Yeah, there might have been one more.
17  Q.   Well, I heard you to say in testimony that Roger was
18  assisting in this process.  That's the name I remember.
19  A.   Is that a question --
```
01:46p  20  Q.   Yes.
```
21  A.   -- I'm not sure.
22       Could you ask it again?  I didn't quite follow.
23  Q.   Sure.  The person that I heard you mention involved in
24  stealing ads was Roger and last name is Williams, right?
```
01:47p  25  A.   Yes.

1   Q.   Okay.  There may have been other people, but they weren't

2   Mr. Padilla.  That's my point.

3   A.   That's correct.

4   Q.   Okay.  And when you say Mr. Padilla was supervising --

01:47p   5   I'll just use his first name, Roger.  It wasn't that he was

6   instructing Roger how to go out and steal ads.  That's not

7   what he was supervising, was he?

8   A.   No, I think his supervision was show up to the office.

9   Q.   Right.  Make sure that he timed in, checked in, that kind

01:47p   10   of thing?

11   A.   Correct.

12   Q.   Now, Roger also did do some moderation work, didn't he?

13   A.   He did.

14   Q.   Okay.  So in that sense Mr. Padilla supervised Roger?

01:47p   15   A.   That is correct.

16   Q.   Okay.  Now, I know you had a lot of testimony, sir, that

17   pertained to The Erotic Review and that there were situations

18   in which the references to The Erotic Review occurred in

19   Backpage postings, let me put it that way.  Okay?

01:48p   20        Remember that?

21   A.   Yes.

22   Q.   Okay.  The effort in order to get those links, I think,

23   isn't that the term?  You'd see a link?

24   A.   Yes.

01:48p   25   Q.   Okay.  He, Mr. Padilla, he wasn't in charge of putting

       1    those links into the ads, was he?

       2    A.   No, Roger Williams was engaged in it the most.

       3    Q.   And he was engaged in it under the supervision of

       4    Mr. Hyer?

01:48p 5    A.   You know, it's just -- I'm just saying that there was a

       6    little window where maybe Mr. Hyer wasn't as involved.

       7    Q.   Okay.

       8    A.   But for the most -- for the most part, Roger Williams

       9    operated, when it came to The Erotic Review, independently.

01:49p 10   Q.   Okay.  I'm going to ask you the same type of question

       11   with respect to super posters.  I remember your testimony was

       12   that you went to the Somad offices in New York City?

       13   A.   Yes, I did.

       14   Q.   And that was in connection with the super posters idea?

01:49p 15   A.   Super posters ID?

       16   Q.   No, idea.

       17   A.   Oh, idea, I'm sorry.  Yes.

       18   Q.   Okay.  Now, Mr. Padilla didn't go with you to New York

       19   City to visit Somad, did he?

01:49p 20   A.   He did not.

       21   Q.   Those super posters, I think you named them as Dollar --

       22   Dollar Bill?  One of them was Dollar Bill?

       23   A.   One of them was Dollar Bill.

       24   Q.   Okay.  But then I think your testimony was -- had

01:50p 25   pertained to -- I'm going to call them letters.  See if you

 1  recall this.

 2      First of all, letters from the Attorneys General.  Do you

 3  recall going through that in your testimony?

 4  A.   Yes, I recall those letters.

01:50p  5  Q.   Okay.

 6  A.   Lots of them.

 7  Q.   And do you recall when you met -- I think you met with

 8  Attorneys General?

 9  A.   I met with a Assistant Attorneys -- Attorneys General.

01:50p 10  Q.   Assistant Attorney General.

11  A.   I didn't meet with her -- her boss.

12  Q.   Okay.  Mr. Padilla didn't go with you on that meeting,

13  did he?

14  A.   He did not.

01:50p 15  Q.   And I think your testimony was that in order to deal with

16  the Attorneys General, we -- and I think I have this right --

17  hired an individual to represent the company in its

18  discussions -- I'm sorry, that's not accurate.

19      Also with respect to NCMEC, let me revise.

01:51p 20      N-C-M-E-C, correct?

21  A.   Correct.

22  Q.   Okay.  And there were meetings with respect to NCMEC,

23  right?

24  A.   Correct, there were meetings.

01:51p 25  Q.   There were more than one, correct?

```
      1  A.    Yes.

      2  Q.    And you went to those meetings?

      3  A.    I went to one meeting.  The rest were telephonic for me.

      4  Q.    And the ones that were telephonic for you, were there
01:51p  5  other people there on the phone besides yourself?

      6  A.    The other people from the company were there at the NCMEC

      7  meeting.

      8  Q.    Mr. Padilla wasn't there at the NCMEC meeting, was he?

      9  A.    He was not.
01:52p 10  Q.    Nor was Mr. Padilla on the telephone when there were

     11  these telephonic conversations with NCMEC, right?

     12  A.    He was not.

     13  Q.    I think I might have this a little bit wrong.

     14        The mayor of Seattle, is that McGinn?
01:52p 15  A.    That is correct.

     16  Q.    Mayor McGinn.  And there were meetings with Mayor McGinn

     17  and his staff; is that correct?

     18  A.    Correct.

     19  Q.    And you were present at those meetings?
01:52p 20  A.    I was.

     21  Q.    Was there more than one, sir?

     22  A.    There were two other people from the company present.

     23  Q.    How many meetings were there?

     24  A.    In person or telephonic?
01:52p 25  Q.    Well, let's do in person first.  How many in person?
```

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1    A.    One.

2    Q.    And how many telephonic?

3    A.    Well, if -- I guess we're including the mayor's staff at

4    least -- and the president of the city council.  Maybe three

01:53p    5    -- two or three.

6    Q.    These are telephone conversations, right?

7    A.    Correct.

8    Q.    Mr. Padilla wasn't at the meeting with Mayor McGinn or

9    his staff, correct?

01:53p   10    A.    He was not.

11    Q.    And he was not on the telephone any of those times, two

12    or three times?

13    A.    He was not.

14    Q.    So there was also a Polaris.  I think Polaris involved a

01:53p   15    letter from Polaris?

16    A.    Did we get a letter from Polaris?

17    Q.    Only if you recall.

18    A.    Yeah, I don't know if we got a letter or just went to

19    meet him in person.

01:53p   20    Q.    Okay.  The Polaris meeting, where was that?

21    A.    In Washington, D.C.

22    Q.    Was there just the one meeting?

23    A.    Yes.

24    Q.    Okay.  At the Polaris meeting Mr. Padilla was not

01:54p   25    present, was he?

```
 1   A.   He was not.

 2   Q.   With respect to aggregation, you know what I mean by that

 3   -- well, do you remember the term, "aggregation"?

 4   A.   Yeah, or the stealing ads, aggregation.

 5   Q.   Okay, that's the same thing.  All right, fine, thank you.

 6        So I want to show -- well, first of all, have you ever

 7   seen -- I think you have -- the job description for

 8   Mr. Padilla?

 9   A.   It's possible that I even wrote it.

10   Q.   All right.

11             MR. EISENBERG:  Can we have the witness shown

12   Exhibit 899e and this is -- by the way, I'm sorry, Your Honor,

13   in evidence.  899e is in evidence.

14   BY MR. EISENBERG:

15   Q.   Do you see it on your screen, sir?

16   A.   I do.

17   Q.   Now, at the top you've got Mr. Hyer, right?

18   A.   We do.

19   Q.   And then Ms. Nickel and then down at the bottom do you

20   see Andrew Padilla?

21   A.   Correct.

22   Q.   Okay.  And you wrote this job description; is that

23   correct?

24   A.   I believe I did.

25   Q.   And what you say in there is he was to manage the staff
```

01:54p  5
01:54p 10
01:55p 15
01:55p 20
01:55p 25

 1  assignments and training for spam abatement.

 2       Let me just stop right there.

 3  A.   Do you know what year this document is?

 4  Q.   Well, sir, this document was produced by the Government

01:55p  5  so I do not know.  All I know is there is a job description

 6  for Mr. Padilla.

 7  A.   Okay.

 8  Q.   And -- well, it is accurate, isn't it?

 9  A.   I -- I recall writing it.  I was just trying to remember

01:56p 10  the time.

11  Q.   Okay, all right.  And I think your testimony was that he,

12  my client, managed the moderation department.  Then I told him

13  -- well, he managed the moderation department, and what you're

14  referring to here is staff assignments and training for spam

01:56p 15  abatement.  That has to do with what I've been calling

16  moderation, correct?

17  A.   Correct.

18  Q.   Okay.  Then you went on to say, "...this task is becoming

19  a 24/7 operation," and by that you meant that it's a

01:56p 20  full-time, around-the-clock, everyday effort, correct?

21  A.   Correct.

22  Q.   And Mr. Padilla was in charge of that, right?

23  A.   Right.

24  Q.   Is I'll go down to the next sentence where it says, "You

01:56p 25  also will suggest..."  Do you see that?

```
     1   A.    Yes.

     2   Q.    "You also will suggest improvement to and manage the use

     3   of spam abatement tools..." correct?

     4   A.    Correct.

01:57p 5  Q.    Okay.  "...including the global filter..."

     6         Let me stop there.  Did I read that correct?

     7   A.    Correct.

     8   Q.    The global filter, what is that, sir?

     9   A.    That's the list of words that can either be stripped out

01:57p 10 or alerted or banned, which would not allow a user to post an

     11  ad with a particular word.

     12  Q.    Okay.  And then it goes on to say, "...violation monitor,

     13  global delete tools..." -- as a matter of fact, two phrases,

     14  sorry.  "Violation monitor," that's kind of like what you were

01:57p 15 discussing before.  He would monitor to make sure that banned

     16  words were taken out or stripped, correct?

     17  A.    No, it's different.

     18  Q.    What is it?

     19  A.    It's -- it's when other users report an ad, they get

01:58p 20 thrown into a queue and then you have to monitor those

     21  violations.  So it's user-reported potential violations in a

     22  queue.

     23  Q.    Okay.

     24  A.    That's the violations monitor.

01:58p 25 Q.    All right.  And then "global delete tools," what's that?
```

 1   A.   There were some tools that you could delete all the ads

 2   or many ads at one time.

 3   Q.   Right, okay.

 4        Now, I'm going to start with some moderation practices,

01:58p  5   if you will.  I just want you to get into the right frame of

 6   mind, and I've tried to organize these chronologically.  Okay?

 7   A.   Okay.

 8   Q.   Okay, very good.  So -- and I may have made a mistake on

 9   a day or two, and if I did I apologize; but let's have 551 in

01:59p 10   evidence shown to the witness.

11        All right, sir.  Now, this is from you.  Would you agree?

12   We'll concentrate at the top.

13   A.   It is from me.

14   Q.   Okay.  The date is February 22, 2008, all right.  So

01:59p 15   that's -- at least we're into the time when monitoring escort

16   and adult ads has at least begun?

17   A.   Correct.

18   Q.   Okay.  And then there's a cc to Steve Suskin; is that

19   right?

01:59p 20   A.   Correct.

21   Q.   Okay.  And then the subject matter is "Terms of Use,"

22   correct?

23   A.   Correct.

24   Q.   Okay.  And this is a summary, as you can see from the

02:00p 25   first line, of various changes to be done.

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1      Did I read that correctly?

2   A.   You did.

3   Q.   And that's something that you were putting in to

4   practice, that is, changes, right?

02:00p  5   A.   These are changes that Scott Spear wants that I'm

6   documenting so that I can pin him down to this is a final

7   version of changes that he wants to do.

8   Q.   Okay.  I don't see pinning down in this e-mail, and I've

9   read it pretty closely.  It's not there.

02:00p 10   A.   Well, it's --

11   Q.   It's not there, is it, sir?

12   A.   Oh, I'm sorry.

13   Q.   Okay.  It isn't there, is it?

14   A.   No.  The words to it, in effect, are there; but "pinning

02:00p 15   down" is not there.

16   Q.   Oh.  Well, I missed that, okay.

17      Now, if you go to "Step 1," "Add 'Posting Rules' on top

18   of the posting form for escorts and body rubs."

19      Let me just stop there.  What is the posting form that

02:01p 20   you're referring to there?

21   A.   So that's the form you would click when you are going to

22   write an ad, put in the title, the body copy, and then attach

23   some images.  That's -- that's the posting form.

24   Q.   Okay.  And that's what a user or an advertiser would do;

02:01p 25   is that correct?

             1  A.    That would be a -- excuse me, I'm sorry?

             2  Q.    That would be the user, the poster, the person that

             3  posts?

             4  A.    Yeah, that would be a user posting versus --

02:01p       5  Q.    Okay.  And so what's supposed to appear up there is where

             6  under this headline all in caps, "YOU MUST OBSERVE THE

             7  FOLLOWING POSTING RULES," right?

             8  A.    Correct.

             9  Q.    And then you list some four different rules, correct?

02:02p      10  A.    Yes.

            11  Q.    Okay.  I'm referring to where it says "do not," and I see

            12  it there four times.

            13  A.    I was just counting.

            14  Q.    Okay.  Did I get it right?

02:02p      15  A.    You did.

            16  Q.    Okay.  Let's go to the first one.  No. 1, "Do not suggest

            17  or imply an exchange of sexual favors for money," right?

            18  A.    Correct.

            19  Q.    And that's a -- that's a clear sign of prostitution,

02:02p      20  right?

            21  A.    That would be very obvious prostitution.

            22  Q.    And so what Mr. Spear is requesting that you do,

            23  according to what you testified, is to make sure that there's

            24  a posting at the top that says, "Do not suggest or imply an

02:02p      25  exchange of sexual favors for money"?

                        UNITED STATES DISTRICT COURT

 1   A.   He wants this on top of the posting form, that's correct.

 2   Q.   Okay.  That's where -- well, withdrawn.

 3        Then the next request is, "Do not use code words..." and

 4   I'll just omit the code words.  We don't need to talk about

02:03p 5   them, but there are certain code words that he is saying do

 6   not use these code words; is that correct?

 7   A.   He also wants this on top of the posting form.

 8   Q.   Okay.  And he also wants on top of the posting form, "Do

 9   not include obscene images," right?

02:03p 10   A.   Correct.

11   Q.   Okay.  And, "Do not post" -- I'm down to the last one --

12   "content which advertises an illegal service."

13        Do I have that right?

14   A.   Correct.

02:03p 15   Q.   Goes to the top of the form?

16   A.   That's what's gonna be on top of the posting form.

17   Q.   Okay.  And then if you don't comply -- now I'm down to

18   the next sentence.  "Postings not complying with terms of use

19   are subject to removal."  Do I read that right?

02:03p 20   A.   You do.

21   Q.   And "removal" means that ad gets taken out or --

22   A.   Correct.

23   Q.   I'm sorry, I didn't mean to interrupt you.  Did I say

24   that?  Is that correct?

02:04p 25   A.   Well, that's what it says.

1    Q.    Okay.  Well, that's what you wrote.

2    A.    That's what Scott Spear wanted at the top of the posting

3    form, and that's what I wrote in this e-mail.

4    Q.    Okay.  The part there, that's what you wrote, correct?

02:04p  5    A.    Correct.

6    Q.    Okay.  And by being subject to removal, that could mean

7    -- and maybe I don't have this right, but that ad would never

8    get posted in the first place if the moderator saw it?

9    A.    Say that again.

02:04p 10    Q.    Yeah.  If a -- well, I'll do it this way:  If a moderator

11    who was moderating this -- any particular ad saw sex for

12    money, the idea was -- not the idea, the instruction was,

13    "Don't approve that ad"?

14    A.    We're talking about this time line or are you talking

02:04p 15    2015?  We're talking 2008, right?

16    Q.    We're talking 2008, that's the date.

17    A.    These are the rules that are going on top of the posting

18    forms, and I'm not sure if the queues are even built yet.  So

19    I don't think the moderators are -- you know, I -- I just need

02:05p 20    to know when the moderation queues were built.

21    Q.    Okay.

22    A.    For now I can say with this e-mail this is what's on top

23    of the posting form.

24    Q.    All right.  Let's skip No. 2 and let's go all the way

02:05p 25    down to No. 4.  Do you see where -- 4(a)?

                   MR. EISENBERG:  Ms. Ellig, could you highlight 4(a)

for us, please.  Thank you.

BY MR. EISENBERG:

Q.   See in 4(a) -- I'll read this to you and I'm going to ask

02:05p   you what it means.  "Posting adult content or explicit adult

material unless..." and I'm going to stop right there.

     What I think this meant to say is, "Do not post adult

content or explicit adult material unless:"

A.   Yeah, but that's not what it says.

02:06p   Q.   I know.  And when you read it, it doesn't make any sense,

does it?

A.   It doesn't.

Q.   But I think what you intended to say is just the

opposite, "Do not post adult content or explicit adult

02:06p   material unless:"  So far so good?

A.   Well, I can explain --

Q.   Well --

A.   -- if you'll permit me.

Q.   Okay.  This isn't -- no, go ahead.  What's that mean?

02:06p   A.   It will be helpful.

Q.   All right.

A.   I think this is a -- this is just can an excerpt of --

4(a), part of the Terms of Use, and above it it's saying like

don't -- these are things that -- don't do these things.

02:07p   Q.   Good, okay.  I understand.  And one of the don't do's is

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                    47

```
 1   don't post unless the material is specifically permitted in

 2   the designated adult category.  If it is, then you can post.

 3        Did I -- do I have that right?

 4   A.   You have that right.

 5   Q.   Okay.  And don't post unless you are at least 18 years of

 6   age or older.  Did I read that right?

 7   A.   Correct.

 8   Q.   And that's called what -- I guess I can call that an age

 9   restriction, right?

10   A.   It's an age restriction in the Terms of Use --

11   Q.   Okay.

12   A.   -- for the adult category.

13   Q.   All right.  And then (b) --

14   A.   I might have misspoke, I'm sorry.

15   Q.   Oh, go ahead.

16   A.   No, that could be for all categories, too.

17   Q.   All right.  And then 4(b) is basically don't post

18   anywhere on the site obscene or lewd and lascivious graphics

19   or photographs; is that correct?

20   A.   That's correct.

21   Q.   Okay.  So this is a warning don't do these things, right?

22   A.   It's in the Terms of Use.

23   Q.   Okay.  And don't post graphics or photographs depicting

24   or simulating sexual acts; is that right?

25   A.   That's what it states, correct.
```

02:07p (line 5)
02:07p (line 10)
02:07p (line 15)
02:08p (line 20)
02:08p (line 25)

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1    Q.   And that's what you wrote?

2    A.   No, this is actually written by Scott Spear --

3    Q.   Okay.

4    A.   -- and then it's given to me because I don't write the

02:08p  5    language in the Terms of Use.  It's kind of lawyer-ish.

6    Q.   And you don't do lawyer-ish?

7    A.   You may have noticed I don't do it well.

8    Q.   Well, I've noticed a lot, sir, but that's -- nevermind,

9    gratuitous comment.

02:08p 10        Don't post any solicitation directly or in coded fashion

11    for any illegal service.

12        That's another thing that Mr. Spear wanted in there; is

13    that right?

14    A.   That's correct.

02:09p 15    Q.   Okay.  And then I should have completed it.

16    "...exchanging sexual favors for money or other valuable

17    consideration."  Is that right?

18    A.   That's correct.

19    Q.   Okay.  There came a point in time when these rules were

02:09p 20    changed to some extent.  I know that's broad and open.  That's

21    probably not fair.

22        Some of these rules did change, correct?

23    A.   I would tell you that the rules were continually

24    changing.

02:09p 25    Q.   Okay, all right.  And they were continually changing at

UNITED STATES DISTRICT COURT

 1  -- not at Mr. Padilla's direction?

 2  A.   That is correct.

 3  Q.   In fact, Mr. Padilla didn't make up the rules, did he?

 4  A.   He did not.

**02:09p** 5  Q.   And neither did Ms. Vaught?

 6  A.   Correct.

 7  Q.   Their job and my client's job was to enforce the rules,

 8  right?  Why do you pause, sir?

 9  A.   Well, there's a difference in the rules that are stated

**02:10p** 10  here versus the rule -- the way content would be.  We -- we

 11  did our moderation increment --

 12  Q.   Here's my question --

 13  A.   You asked me to explain.

 14  Q.   No, then I'll rephrase.

**02:10p** 15  A.   Okay.

 16  Q.   But my question to you was:  His job was to enforce the

 17  rules?  If I can explain it a different way, he was in charge

 18  of moderating the ads so they would conform to the rules?

 19       That's his job?

**02:10p** 20  A.   Are we talking about these rules?

 21  Q.   We're talking about any rule at the time that he was in

 22  charge of the moderation effort.  His job was to enforce the

 23  rules no matter whether they changed at midnight, next year,

 24  four years later.  As long as he was there, that's his job?

**02:11p** 25  A.   His job is to --

```
 1   Q.   "Yes" or "no," sir -- I'm sorry.  Go ahead.
 2   A.   His job is to enforce the rules as we deemed them to be
 3   implemented, which was in a continual state of flux.
 4   Q.   I understand that; but the answer is "yes" that's his
 5   job, enforce the rules?
 6   A.   Yes.
 7   Q.   Not hard to say, right?  It's accurate?
 8   A.   Okay.
 9   Q.   All right.  May the witness be shown exhibit -- well, let
10   me do it this way:  In 2008 there was a budget and business
11   plan for Backpage's operation.  In fact, there probably was
12   for every year.  I know that's compound.
13        Do you remember seeing a budget plan in 2008 for
14   Backpage?
15   A.   So there would be an annual budget, no doubt.  I think
16   that was one of the exhibits.
17   Q.   Yes, it was.  And I think it's Exhibit 23.  It's in
18   evidence.
19            MR. EISENBERG:  May we have 23, ma'am?
20            Oh, it's there.  Okay, good.
21   BY MR. EISENBERG:
22   Q.   And this is -- my recollection, sir, this is what you
23   identified.  This is Exhibit 23.
24   A.   Correct.
25   Q.   Okay.  So in Exhibit 23 if you go to Page 2 of that
```

02:11p  5
02:11p 10
02:12p 15
02:12p 20
02:12p 25

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1    exhibit -- let me back up.  Who wrote the budget plan?

2    A.   Scott Spear.

3    Q.   And did you participate in helping Mr. Spear write this

4    plan?

02:13p  5    A.   I did.

6    Q.   And you gave Mr. Spear information that would go into the

7    budget, right?

8    A.   I did.

9    Q.   So let's go now to Page 2, and you see down at the bottom

02:13p 10    the last paragraph?  I'm gonna ask you -- yeah, that's the

11   one.  Read it to yourself just so we put this into context,

12   and my question as you read is:  Did you write this section?

13   A.   It is likely, but I'm not absolutely certain, but I'm

14   familiar with all these tools.

02:14p 15   Q.   Okay, fine.  So what is -- what you're saying is -- I'm

16   sorry.  What the budget plan is saying, "We also have spent a

17   considerable amount of time..."  I'll just stop there.

18        "We" is who?

19   A.   So "we" is speaking -- so that would be Scott Spear and

02:14p 20   Backpage.  Backpage has spent a lot of time and resources --

21   Q.   Well --

22   A.   -- collectively.

23   Q.   Okay, sorry.  Would you agree with this statement that

24   Backpage has spent a considerable amount of time and resources

02:14p 25   in 2017 in improving content quality?

1    You agree with that, right?

2    A.   I do.

3    Q.   Okay.  And then the next sentence talks about the

4    "Automated spam routines removal bad postings..." I'll spot

02:15p 5    there -- actually, I should go a little bit further --

6    "...within 15 minutes at a pace of 180,000 removals per

7    month."  Did I read that correctly?

8    A.   That is correct.

9    Q.   And you would agree with that, too, in that routines have

02:15p 10   been instituted to remove bad postings within fifteen minutes?

11   A.   That's what it states, but there's some important

12   distinctions that I should point out to you.

13   Q.   Well, I'm not sure, sir, whether that actually answers

14   the question.  My question is:  Is that what it states?

02:15p 15   A.   That is what it states.

16   Q.   So any -- I'm sorry, I didn't mean to interrupt you; but

17   anybody reading this would look at it and say that the spam

18   routines would result in removal within fifteen minutes of a

19   bad posting, right?

02:16p 20   A.   Well, not if they work for Backpage.

21   Q.   Well, I'm sorry, sir, but -- all right.  This is an

22   internal document, isn't it?

23   A.   Yeah, but spam routines --

24   Q.   Uh-huh.

02:16p 25   A.   -- doesn't affect any adult postings.  It only is for

CARL FERRER - CROSS-EXAM BY MR. EISENBERG          53

```
    1  free postings, and that's what I wanted to clarify.
    2  Q.   Oh, okay.  I'm sorry, all right.  Then it says, "The
    3  staff's global delete tools increased by ten fold the amount
    4  of spam manually removed."  Is that correct?
02:16p  5  A.   That's correct.
    6  Q.   Okay.  That relates just to spam; is that right?
    7  A.   That's correct.
    8  Q.   If you go to Page 7 of this plan you see under "Our Basic
    9  Strategic Plan is as Follows"?
02:17p 10  A.   I see it.
   11  Q.   Okay.  If you go down to point five -- see point five,
   12  "Put a staff in place..."
   13  A.   I do see it.
   14  Q.   And what that provides is, "Put a staff in place to
02:17p 15  handle the tasks above..." and then, "...including continued
   16  user improvements..." -- let me stop there.
   17       What's a "user improvement"?
   18  A.   Just making the site faster, easier, perhaps making the
   19  content better.
02:17p 20  Q.   Okay.  Then it says, "...abuse, spam, fraud prevention,"
   21  and then "user and user content creation," right?
   22       That would refer to postings in the adult section,
   23  wouldn't it?
   24  A.   What's -- 2008?
02:18p 25  Q.   Yes, sir.
```

```
 1   A.   And you're stating -- you're asking if the user and user
 2   content creation refers to the adult section?
 3   Q.   Yes.
 4   A.   Correct.
02:18p  5   Q.   Okay.  So that's 2008.  This is -- this is -- you don't
 6   -- I couldn't tell from this -- I'm sorry, I'm not the
 7   witness.
 8        You can't tell from this what date it came out in 2008?
 9   A.   What date this plan came out?
02:18p 10   Q.   Yes, sir.
11   A.   I can give you a month.
12   Q.   Good.  What month?
13   A.   Almost always in December of 2007 would be the plan.
14   Q.   To cover the next year?
02:18p 15   A.   The budget meetings were normally one month -- the
16   December prior to the new year.
17   Q.   Now, let's go to Exhibit 1164.  This is in evidence, and
18   I think you've testified to this one as well?
19   A.   Correct.
02:19p 20   Q.   Now, if you look up -- jury's got it, okay.
21        You look up at the top and you see what it's referring to
22   is "backpage links," right?
23   A.   Correct.
24   Q.   And then there is a message about this.  It's from Roger
02:19p 25   Williams in adult marketing, correct?
```

```
 1   A.    Correct.

 2   Q.    And he is talking about Backpage -- I'm sorry.  Yeah,

 3   Backpage links; is that right?

 4   A.    He is.

 5   Q.    And that's the same Roger Williams that you were talking

 6   about a little bit before?

 7   A.    It is.

 8   Q.    Okay.  Now let's go to 580 -- I mean withdrawn.

 9         Let's go to 588.  This is also in evidence.

10         Okay.  This refers to a 2010 Budget Presentation

11   pertaining to Backpage, right?

12   A.    It does.

13   Q.    Okay.  And I think you testified about Slide 18.

14              MR. EISENBERG:  So if we could have slide -- I don't

15   know how they're actually marked in the exhibit.  I think it

16   might be under "Special (sic) Initiatives for 2010 Plan."

17   That's really what I'm referring to.  So if we could find

18   that, Ms. Ellig.  It might be the second page.  There it is.

19   It's up on the monitor now.  This is in evidence, okay.

20   BY MR. EISENBERG:

21   Q.    So one of the -- oh, I'm getting ahead of myself.

22         Who drew up this plan -- presentation, sorry?

23   A.    So this presentation is created by Scott Spear, whatever

24   accountant is on staff, and myself.

25   Q.    Okay.  So you helped contribute to it, fair to say?
```

02:19p  5
02:20p 10
02:20p 15
02:20p 20
02:21p 25

1    A.    I have.

2    Q.    Okay.  And with respect to what is now on your monitor

3    under "Specific Initiatives for 2010," did you contribute to

4    this -- I'll call it a slide for lack of a better way to put

02:21p   5    it?

6    A.    I am going to contribute to it and this portion, Scott

7    Spear has stated, I will be speaking about.

8    Q.    Okay.  And under this is to increase the monitoring staff

9    to full 24/7 operation, correct?

02:21p  10    A.    I believe so, yes.

11    Q.    And that pertains to Mr. Padilla's operation, right?

12    A.    It does.

13    Q.    So we're about the time in 2010 when moderation has to go

14    to a seven-day-a-week, 24-hour-a-day operation, correct?

02:22p  15    A.    That's correct.

16    Q.    Okay.  And that's due to the amount of ads that are going

17    through the moderation process in adult, escort, massage,

18    those types of categories, right?

19    A.    It is.

02:22p  20    Q.    Okay.  So if we turn to another slide -- and I think it's

21    18 but it says at the heading -- or the top "Specific

22    Initiatives for 2010 Plan.  Add Personnel."  There we go.

23    Thank you, ma'am.

24         Here under "Add Personnel" do you see Phoenix operations?

02:23p  25    Right down underneath -- it's right underneath "Add

```
 1  Personnel," sir.  There it is.  "Increase monitoring staff..."
 2  A.   Oh, I see, "Increase monitoring staff to a full 24/7
 3  operation."
 4  Q.   Let's see, no.
 5          MR. EISENBERG:  It would be the one that has to do
 6  with Phoenix operation, Ms. Ellig.
 7          I don't mean to mislead you but --
 8          THE WITNESS:  There we go.
 9          MR. EISENBERG:  Oh, thank you.
10  BY MR. EISENBERG:
11  Q.   So now you see what I'm talking about, right?
12  A.   I do.
13  Q.   And it says Mr. Padilla -- he's the operations and abuse
14  manager, right?
15  A.   Correct.
16  Q.   And major projects are going to include -- we can skip
17  the first four, but would you agree one of the major projects
18  is to include "Adult Moderators: days, nights and weekend
19  leads."  Is that correct?
20  A.   Correct.
21  Q.   And that is because we're going now -- or BP is going now
22  to 24/7, right?
23  A.   Correct.
24  Q.   And we need more moderators to handle the workload,
25  right?
```

02:23p 5
02:23p 10
02:23p 15
02:24p 20
02:24p 25

         1    A.    Craigslist shut down their adult section.  We need more

         2    moderators.

         3    Q.    Okay.  And then it says underneath that, "Moderation is

         4    60% of Phoenix total personnel."

02:24p   5          So do I have this right, 60 percent of the people who are

         6    working in the Phoenix area -- I'm sorry, at the Phoenix

         7    location, they are doing monitoring work, right?

         8    A.    Correct.

         9    Q.    Okay.  And underneath you see how that breaks down.  What

02:24p  10    does "Q1" mean?

        11    A.    First quarter.

        12    Q.    Okay.  And then increase from 21 to 23.  And "FT," is

        13    that full time?

        14    A.    It is.

02:25p  15    Q.    All right.  So now we've got 23 moderators full time, and

        16    then you've got some part timers, two to three?

        17    A.    Correct.

        18    Q.    So now we have -- or the request is to increase that many

        19    people full time and part time, right?

02:25p  20    A.    The request is in Q1 to add --

        21    Q.    Uh-huh, just Q1.

        22    A.    -- two moderators full time and one moderator part time.

        23    Q.    Well, Q1 increase -- am I reading this correct?  Yeah,

        24    from 21 to 23, full-time moderators, right?

02:25p  25    A.    So that would be two additional full-time employees.

1  Q.   Sure, okay, I see what you're getting at.  And then part

2  time is two to three part time?

3  A.   Correct.  I believe those are all additional employees.

4  Q.   Oh, what you're saying is you go from two to three?

02:25p 5  A.   Oh, yes, you're correct this time, from two to three.  So

6  it's one part-time employee.

7  Q.   Okay.  Quarter 2 we've got a further increase, don't we?

8  A.   We do.

9  Q.   We go from 23 full time in Quarter 1 to 28 full time in

02:26p 10 Quarter 2, right?

11 A.   Correct.

12 Q.   Okay.  And we go from three part-timers to five

13 part-timers?

14 A.   Correct.

02:26p 15 Q.   Now, what we have underneath that is another -- well,

16 projected project, okay?  And that is "...to hold these

17 numbers as technology increases our efficiency."

18      Let me just stop there.  What does that mean?

19 A.   Well, you can tell in this budget that despite having the

02:26p 20 increase in revenue from Craigslist that we're not really

21 adding that many moderators given that revenue is soaring.

22 Q.   I beg your pardon, sir, but I sure couldn't tell that

23 from this.

24 A.   Well, that's -- you asked my opinion and --

02:27p 25 Q.   No, I asked you -- well, you're right.  I asked you what

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

 1  does that mean.

 2  A.   Yes.  I'm not done.  Can I finish?

 3  Q.   No, I'm sorry.  What it means to the reader is to hold

 4  these numbers -- you want to continue at 28 full time and five

02:27p  5  part time as technology increases our efficiency.

 6  Maybe I shouldn't have left that out.

 7      So what is happening here, if I've got this right, is

 8  you're gonna have technology help these people do their job

 9  and become more efficient at their job?

02:27p 10  A.   I would not interpret it that way.

11  Q.   Okay.  Well, let's go to the next part underneath.

12      It says, "Outsourcing experiment - the Philippines,"

13  okay?  Did I read that right?

14  A.   Correct.

02:28p 15  Q.   I'm curious as to whether does this mean you're going --

16  you intend to go -- or plan on going to hiring moderators in

17  the Philippines?

18  A.   That is correct.

19  Q.   Okay.  So that would have been in 2010 -- projected in

02:28p 20  2010; is that correct?

21  A.   That's correct.

22  Q.   Does that mean you would be replacing the India

23  moderators or this is in addition to the India moderators?

24  A.   The India moderators terminated their contract with us,

02:28p 25  and so we're gonna try the Philippine moderators with two

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1      people to start.

2      Q.   Okay.  And that is because you need to have extra

3      moderators doing the moderating?

4      A.   We need more.

02:29p  5   Q.   We need more and that's because the volume is ever

6      continuing to rise, to rise, to rise, right?

7      A.   Correct.

8      Q.   And you're going to be dividing all those ads among

9      moderators -- no, I'm sorry, let me revise.

02:29p  10          The expectation is that a moderator will moderate every

11     ad?

12     A.   That is not the expectation.

13     Q.   Well, couldn't possibly be, is that what you're saying?

14     A.   It's a fire hose of content coming in and we can barely

02:29p  15  keep -- keep up and what I'm saying here is that this is not

16     enough moderators for what we really needed.

17     Q.   Okay.  And that has to do with planning, right -- I'm

18     sorry, revise.

19          That has to do with the fact that you want to have -- in

02:29p  20  your opinion, you need more money to hire more monitors --

21     moderators, I'm sorry, correct?

22     A.   We needed to put more moderators in the budget than we

23     did.

24     Q.   And the moderators that are there, they are moderating

02:30p  25  ads, the ones that they can get to, and I think we'll get to

      1   this in a while, maybe a thousand ads a day per moderator or

      2   more?

      3   A.   I don't recall the exact number but it's -- it's a lot.

      4   Q.   It's a lot and it's a lot to expect the manager of the

02:30p 5   moderating outfit to make sure that the ads are moderated in

      6   accordance with the standards of the day?

      7            MR. RAPP:  Is that a question?

      8            MR. EISENBERG:  Is that true?

      9            THE WITNESS:  Could you state it one more time?

02:30p 10  BY MR. EISENBERG:

      11  Q.   It's a hard job for the head of the moderators to have

      12  all of these ads moderated to the best of his ability?

      13  A.   It's a hard job and it's also hard because we're asking

      14  them to do a lot of things.

02:31p 15  Q.   Okay, all right.

      16            MR. EISENBERG:  And if you go to the -- I think it's

      17  the next page, Ms. Ellig.  Keep going.  All right, here we go.

      18  I don't know what slide this is, but we've got the right page

      19  up.

02:31p 20  BY MR. EISENBERG:

      21  Q.   This is again under "Specific Initiatives for 2010,"

      22  right?

      23  A.   Correct.

      24  Q.   And it has a headline "Continue as a good corporate

02:31p 25  citizen."  Mr. Spear wrote that?

1   A.    Yes, he did.

2   Q.    Okay.  And underneath we have "Adult Moderation," and

3   that has the following:  "Set and maintain our own standards."

4         Did I read that right?

02:31p  5   A.    Correct.

6   Q.    And then in parentheses in red -- it looks like to me red

7   ink, or whatever it is, there's a reference to a standard

8   called "the Playboy standard."  Is that right?

9   A.    Yes.

02:32p 10   Q.    And the Playboy standard refers to the magazine *Playboy*,

11   I guess, right?

12   A.    It does.

13   Q.    And in 2010 *Playboy* was being published?

14   A.    I believe it was.  I just didn't buy a *Playboy* at that

02:32p 15   time.

16   Q.    Well, did you buy one later on?  You can buy one.

17   A.    I did not.

18   Q.    You never did buy a *Playboy*?

19   A.    (Shaking of the head.)

02:32p 20   Q.    Okay.  Did you ever look at one?  Nevermind.

21         The Playboy standard, and that is what's written here.

22   After the colon on the second line it says, "Sexy and erotic,

23   not sex, lewd and lascivious," right?

24   A.    Correct.

02:33p 25   Q.    Okay.  So the standard is according to the Playboy image,

|        | 1 | or whatever it is, sexy and erotic is okay if you want to |

1   or whatever it is, sexy and erotic is okay if you want to

2   publish an ad that looks like that.  So far so good?

3   A.   Yes.

4   Q.   And this is -- excuse me, sir.

02:33p   5        This is the standard as set by Mr. Spear, right?

6   A.   It is.

7   Q.   But we don't want sex, lewd and lascivious, right?

8   A.   Correct, sex act pics gotta go.

9   Q.   Okay.  What did you say, sex ad pics?

02:33p   10  A.   Sex acts.

11  Q.   Acts, not pictures, okay.  So that's out, right?

12  A.   Correct.

13  Q.   That's inconsistent with this standard, right?

14  A.   Correct.

02:33p   15  Q.   And then "lewd and lascivious," how would you define

16  that?

17  A.   Sex act pic.

18  Q.   Okay, same thing.

19  A.   Or extreme closeups of genitalia.

02:34p   20       MR. EISENBERG:  The next one, Ms. Ellig, if you

21  could go down to the next slide.  Yeah, that's it.

22  BY MR. EISENBERG:

23  Q.   Underneath "Continue as a good corporate citizen" there's

24  "Legal strategy."  You see that?

02:34p   25  A.   I do.

```
 1  Q.   Okay.  And then underneath it's "Continue to engage
 2  Attorney Generals"?
 3  A.   Correct.
 4  Q.   "Move slowly but deliberately," right?
```
02:34p 5  A.   Correct.
```
 6  Q.   And then underneath is, "Continue to work closely with
 7  law enforcement."  Am I correct?
 8  A.   You are correct.
 9  Q.   And I think you would agree with me, sir, that you did,
```
02:34p 10  you, personally, and Backpage did work closely with law
```
11  enforcement, didn't you?
12  A.   We did.  We had 20,000 some subpoenas.
13  Q.   I remember.
14  A.   A lot of work.
```
02:34p 15  Q.   20,000 subpoenas over -- what was that, about eight
```
16  years?
17  A.   Well, from 2004 to 2018, fourteen years.
18  Q.   Fourteen years.  And you had a separate -- well, part of
19  Mr. Padilla's supervision was over the gathering of
```
02:35p 20  information in response to a subpoena?
```
21  A.   Yes, it was.
22  Q.   So when a subpoena came in, if you know, the process
23  would be it would be given to somebody to do the research to
24  get what it is that law enforcement wanted, right?
```
02:35p 25  A.   Correct.

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                66

```
      1  Q.   And that research would be -- oh, I'm sorry.  A subpoena
      2  is something that is issued in accordance with law enforcement
      3  investigation, right?
      4  A.   Correct.  Almost all were prostitution investigations.
02:36p 5  Q.   Well, they were investigations -- you ever keep any
      6  statistics on that?
      7  A.   On how many were not prostitution investigations?
      8  Q.   You said they're all prostitution investigations.
      9  A.   It was --
02:36p 10 Q.   Remember that, Mr. Ferrer?
     11  A.   I can tell you that I remember the few subpoenas that
     12  came along 'cuz they were just so exceptional.  It would,
     13  like, be a wife wanting to know the content of an ad to go
     14  after a husband during a divorce.
02:36p 15 Q.   Okay.  So --
     16  A.   Those jump out at you.
     17  Q.   Why?
     18  A.   Well, it's just so unusual.  I think there were others.
     19  Q.   I don't want to get into this personally so I'll just go
02:37p 20 on to something else, but that subpoena that you just talked
     21  about, that would not be law enforcement.  That would be a
     22  civil subpoena?
     23  A.   That's what I mean.  There was --
     24  Q.   Okay.
02:37p 25 A.   There was very, very few, but there were civil subpoenas.
```

1  Q.   All right.  We'll talk more later on about subpoenas.

2            MR. EISENBERG:  Can the witness be shown Exhibit

3  581?

4            THE COURT:  Mr. Eisenberg, are you going to be a

02:37p  5  while with the exhibit?

6            MR. EISENBERG:  I think I am, Your Honor.

7            THE COURT:  Okay.  So given that, Mr. Eisenberg, I

8  think we should go ahead and take our 20-minute afternoon

9  final break for the day; and so, again, just remember the

02:37p 10  admonishment, Members of the Jury, and just enjoy your break

11  and be prepared to come in -- well, we'll just give it 3:00

12  o'clock.

13            All right, please all rise for the jury.

14            (Jury out at 2:38 p.m.)

02:38p 15            All right, we will stand in recess.

16            (Recess taken at 2:38 p.m.)

17            (Back on the record at 3:00 p.m.)

18            COURTROOM DEPUTY:  All rise, court is now in

19  session.

03:00p 20            THE COURT:  All right, let's be seated and check on

21  the jury.

22            (Jury in at 3:02 p.m.)

23            THE COURT:  All rise for the jury.

24            All right, please be seated.  The record will

03:02p 25  reflect the presence of the jury.  Mr. Ferrer is back on the

```
         1 ║ witness stand and, Mr. Eisenberg, you may continue.

         2 ║          MR. EISENBERG:  Thank you, your Honor.

         3 ║          May the witness be shown 581, which is in evidence.

         4 ║          And may it be published, Your Honor?

03:03p   5 ║          THE COURT:  Yes, it may.

         6 ║          COURTROOM DEPUTY:  I don't have 581.

         7 ║          THE COURT:  5-8-1.

         8 ║          COURTROOM DEPUTY:  When was that admitted?

         9 ║          MR. EISENBERG:  You can't see this, can you,

03:03p  10 ║ Mr. Ferrer?  It's not on your screen?

        11 ║          THE WITNESS:  I can see it.  581?  I can see it.

        12 ║          MR. EISENBERG:  Oh, I can't see it up here.  I don't

        13 ║ know if the jurors can see it, Your Honor.

        14 ║          THE COURT:  Mr. Eisenberg, Mr. Rapp, I don't have

03:03p  15 ║ this admitted as an exhibit.  It's marked 581.

        16 ║          MR. RAPP:  No objection to its admission.

        17 ║          MR. EISENBERG:  Okay.  I'm sorry, your Honor.

        18 ║          THE COURT:  Do you want to lay some foundation first

        19 ║ as to it?

03:04p  20 ║          MR. EISENBERG:  Okay.  Counsel didn't object to it.

        21 ║          THE COURT:  I think just put it in some context.

        22 ║          MR. EISENBERG:  All right.

        23 ║ BY MR. EISENBERG:

        24 ║ Q.   Sir, is this an e-mail from Mr. Spear to you dated May

03:04p  25 ║ 25th, 2019, correct?
```

1  A.   Yes, it is.

2  Q.   And it talks about a draft of adult abuse abatement,

3  correct?

4  A.   Correct.

03:04p  5  Q.   And it has to do with moderation, what we've been talking

6  about?

7  A.   It does.

8  Q.   Okay.  And I think you are on this as well -- I'm sorry.

9       You responded to it; did you not?

03:04p 10  A.   I'm sorry, say again.

11  Q.   You responded to Mr. Spear's e-mail, if you look down at

12  the bottom or maybe even the second page?

13  A.   I think I sent this to Mr. Spear and then he responded.

14  Q.   Okay.

03:04p 15       MR. EISENBERG:  Your Honor, I move the admission of

16  581.

17       THE COURT:  Yes, it may be admitted and published.

18       (Exhibit No. 581 admitted in to Evidence.)

19       MR. EISENBERG:  Okay.  I'm sorry, Mr. Ferrer.

03:05p 20       Let's put this into better context.

21  BY MR. EISENBERG:

22   Q.   So you sent Mr. Spear adult content abuse abatement, a

23  draft of that, correct?

24  A.   Correct.

03:05p 25  Q.   And that's what we see under "Adult content abuse

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                    70

 1    abatement" about midway down, correct?

 2    A.   Correct.

 3    Q.   What you're saying here is, "We want to remove sex act

 4    pics and coded terms."  I read that correctly?

03:05p  5    A.   You did.

 6    Q.   So sex act pics, are those -- well, what you've been

 7    talking about for the last several days.  These are pictures

 8    of sex acts, right?

 9    A.   Correct.

03:05p 10    Q.   And coded terms, I know you've talked about that as well,

11    right?

12    A.   Correct.

13    Q.   Okay.  And so what you're saying to Mr. Spear is, "There

14    is no technical solution that cannot be easily bypassed by a

03:06p 15    creative user."  Let me stop there.

16         What you're saying is if you want to get by whatever we

17    can do in terms of moderating, let's say coded words, and you

18    are a user, you would probably be able to figure out a way to

19    do it, right?

03:06p 20    A.   Correct, we saw that quite a lot.

21    Q.   Okay.  So that's followed by, "We can however build

22    technical solutions to improve efficiency."

23         Okay, let me stop there.  What does that mean?

24    A.   I believe -- this is 2009.  I believe we're looking at

03:06p 25    creating queues, moderation queues to make it easier to look

```
        1  at the new ads or the ads that were recently edited by the
        2  user.
        3  Q.   All right.  Let me break that down.  Would this be a
        4  queue that is -- that a moderator would look at visually or is
03:07p  5  this the type of queue that would automatically strip a term?
        6  We've heard that -- that type of expression or both?
        7  A.   You know, I forgot about the strip-out filter and, yes,
        8  you're correct, it would be both.
        9  Q.   Is would be both kinds, okay.  Now, the next sentence
03:07p 10  reads, "Phoenix needs time to hire additional staff and the
       11  equipment in order to take on this task so our approach will
       12  need to be a series of phases."  Have I read that right?
       13  A.   Correct.
       14  Q.   Okay.  And what you're saying, in effect, is you need
03:07p 15  more people and more equipment in order to achieve adult
       16  content abuse abatement?
       17  A.   Correct.
       18  Q.   Now, underneath there are some -- I don't know if they're
       19  bullet points, but suggestions that you have and then the
03:08p 20  first one says, "First, a staff needs analysis:" okay?
       21       Do you see that, sir?
       22  A.   Correct.
       23  Q.   And then now this is getting to the number of ads that
       24  you estimate will come in in May of 2009, 5,000 per day,
03:08p 25  correct?
```

1   A.   Correct.

2   Q.   And so you got -- that's a pretty -- well, I don't want

3   -- that's a heavy volume, isn't it?

4   A.   It would end up being maybe one-tenth the volume that

03:08p  5   Backpage would eventually do.

6   Q.   Well, okay.  So if we stick with just 5,000 per day,

7   Backpage is open for posting seven days a week, isn't it?

8   A.   It is.

9   Q.   So -- and users -- well, is it fair to multiply this

03:09p 10   times seven to get what would go on in a week?  So seven times

11   five is 35,000?

12   A.   I believe that's correct.

13   Q.   And if we multiplied it times 50 weeks, is that a --

14   that's like a million ads or something like that?

03:09p 15   A.   It's too late in the day for me to --

16   Q.   I'm right there with you; but, anyway, if you do the

17   math, that's a lot of ads, right?

18   A.   It's a lot of ads.

19   Q.   All right.  Now, the tasks -- this starts on the next

03:09p 20   line.  One thing that the staff has to do is review the ad,

21   okay.  So that means somebody is going to be looking at that

22   ad, right?

23   A.   That's correct.

24   Q.   And then "remove abuse."  So if the ad has abuse in the

03:10p 25   form of either a picture or words, that moderator's got to

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1    remove it?

2    A.   Correct.   They would remove the pic, let the other pics

3    stay on-line or remove the offending word.

4    Q.   Okay.   I'll skip the other part, "invoice as fraud" and

03:10p   5    all that.   Let's go down to the next one.

6        The bullet says, "Tag non-offending ads:"

7        See where I've read that?

8    A.   Yes.

9    Q.   What does it mean to tag a non-offending ad?

03:10p  10    A.   Well, we didn't do this, but the thought was if an ad is

11    past the review, that we don't want to look at it again; but

12    we didn't end up building this.

13    Q.   All right.   So that one didn't go through?

14        Then the next is -- this has to do with minutes.

03:11p  15    10,000 --

16    A.   I'm sorry, can I correct my testimony?

17    Q.   Sure, absolutely.

18    A.   We did end up building something like tag non-offending

19    ads.   We ended up -- that morphed into whitelisting.   So we

03:11p  20    did ad whitelisting.

21    Q.   And white -- I'm sorry, sir.   Whitelisting means that ad

22    -- if you know who the poster is, that ad's gonna be okay and

23    you can let it go?

24    A.   We don't have to moderate it.

03:11p  25    Q.   Okay.   The next bullet point there says 10,125 minutes/60

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1   minutes is 169 hours per day.  What does that refer to?

2   A.   So that's the number of manhours needed based on the, you

3   know, minutes per ad.  So I'm just trying to do a manpower

4   calculation for Scott Spear.

03:12p 5   Q.   So you're trying to break something down as a

6   mathematical model to figure out, I suppose, how many -- well,

7   it says underneath "Staff required: 21 people"?

8   A.   Correct.

9   Q.   Okay.  So then underneath that there are phases, and I

03:12p 10   think if we just go to the next page.  You see at the top

11   where it says "Browse paid ads..."?  It's right at the top.

12   A.   Yep, I see it.

13   Q.   Okay.  "Browse paid ads in escorts and remove TOU

14   violation postings each day."

03:12p 15      So what you're saying is that you have to look at the ad

16   in escorts.  So you made a -- looks to me like a specific

17   approach to take with ads that are in escorts, right?

18   A.   Yeah, I think we're doing this incrementally, though, by

19   city, right?

03:13p 20   Q.   Oh, I see.  That was the reference to Phoenix and Dallas?

21   A.   Yes.

22   Q.   Okay.

23   A.   So we're doing it incrementally by market.  That's the

24   plan.

03:13p 25   Q.   Right.

```
  1          MR. EISENBERG:  And then the part of the plan is in
  2   Phase 2.  So if you go down a little bit further, Ms. Ellig.
  3   I think it's around mid page, Page -- Phase 2 and Phase 2 says
  4   -- I'll read it.  Okay, there we go.
03:13p 5   BY MR. EISENBERG:
  6   Q.   "Phoenix hires 5 people and eventually 10 people."
  7          So you're projecting that to do these tasks you would
  8   have to hire -- is it five more people and then ten more
  9   people?
03:14p 10  A.   I know that it's difficult to hire moderators to get that
 11   into the budget.  So I believe I'm talking about only ten
 12   people, but I could see how you could read it both ways.
 13   Q.   Yeah.  I mean, it looks like you're hiring additional
 14   people to the moderators you already have; is that correct?
03:14p 15  A.   Oh, we definitely are.
 16   Q.   Oh.
 17   A.   I'm just unclear -- like you read it, you're hiring five
 18   people and then you're gonna hire another ten people, but I --
 19   it's like hire five people and then add another five people so
03:14p 20  that we'd have ten people.
 21   Q.   Yeah, that's the way I read it; but, anyway, you're the
 22   -- you're the witness, sir; but, yes, I agree, okay.
 23          And then Phase 3 it says, "Develop an escort ad queue for
 24   5,000 ads per day."  What does that mean?
03:15p 25  A.   So that's the development to put any new ad or edited ad
```

```
     1   into a specific queue and then you -- they would flash up on a
     2   screen for a moderator to make a decision on --
     3   Q.   Okay.
     4   A.   -- and either edit or delete.
03:15p 5  Q.   And then if you go to the top of the first page, top of
     6   the first page right at the very top where it says, "Is the 21
     7   additional..." that's from Mr. Spear; is it not?
     8   A.   Yes, Mr. Spear is -- wants some clarification if you want
     9   21 additional or 10 additional.
03:15p 10 Q.   Something like what we just saw wasn't clear?
     11  A.   Yes.
     12  Q.   Okay.  Now, there was an attachment to this -- let's see.
     13         MR. EISENBERG:  I'm sorry, okay.  May the witness be
     14  shown 585, and I believe this one is in evidence.
03:16p 15 BY MR. EISENBERG:
     16  Q.   Do you remember this, sir?
     17  A.   I remember this e-mail.
     18  Q.   Okay.  What you're looking at here appears to me to be a
     19  cover page because it says "attached."  Something is attached
03:16p 20 to it?
     21  A.   Correct.
     22  Q.   Okay.  Now, we need to get the date.  This is November
     23  19, 2009.  So we're still in 2009, correct?
     24  A.   Correct.
03:16p 25 Q.   And what the attachment is is "Common terms and code
```

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

 1   words resulting in a post being removed," right?

 2   A.   Correct.

 3   Q.   Okay.  So if you look at 585a, which I believe is in

 4   evidence, then this is the attachment; am I correct?

03:17p  5   A.   That is the attachment.

 6   Q.   Okay.  And so -- excuse me.

 7        These are words -- and we don't need to go through them,

 8   but these are terms and code words that are referred to in 585

 9   as being -- as the words resulting in a post being removed,

03:17p 10   right?

11   A.   Correct.

12   Q.   So, in other words, if this word, whatever they are,

13   appears in a post, that post, according to what's on 585, is

14   -- is supposed to be removed?

03:18p 15   A.   That was the suggested policy at this time.

16   Q.   Okay, I -- I understand.  So -- and what "removed" means

17   is -- does that mean the word gets taken out or the ad is

18   removed?

19   A.   Well, we went back and forth; but this e-mail says the

03:18p 20   ad's removed, but I can tell you later the ad was edited.

21   Q.   Okay, I know.  It comes -- goes back and forth and back

22   and forth, right?

23   A.   This is the very beginning of moderation.

24   Q.   And so what I think you're saying, sir, is the standards

03:18p 25   changed frequently, didn't they?

 1   A.   It is a very much work in progress.

 2   Q.   Okay.  And the changes go from up above you, like

 3   whomever, Mr. Spear or somebody else, to you, to Mr. Padilla?

 4   A.   That is correct.

03:19p  5   Q.   And then the expectation is he institutes that change?

 6   A.   Correct.

 7   Q.   And -- okay.  He doesn't do -- he doesn't create the

 8   changes.  Those come from somebody else?

 9   A.   What time frame?

03:19p 10   Q.   All right, let's just stick with 2009, okay, this time.

11   A.   At 2009 it's definitely coming from Scott Spear.

12   Q.   Okay.  Before we leave off with this attachment 585a, if

13   you look down at the bottom where it says "note" --

14   A.   Yes.

03:19p 15   Q.   -- and I think -- excuse me.  This pertains to a lot of

16   what you have testified to before, but here we see it, if you

17   agree with me, in writing.  "There are many creative spellings

18   for the terms above which are too numerous to include in any

19   list."  Did I read that correctly?

03:20p 20   A.   You did read it correctly.

21   Q.   And -- I'm sorry.  Do you know who did -- is this list

22   done up by you or is it done up by Mr. Spear or somebody else?

23   A.   I think this is the negotiated list that Scott Spear and

24   I agreed to, but I'm not sure who wrote it.

03:20p 25   Q.   Nonetheless, would you agree with me, sir, that somebody

             1   has made the observation that you could have a mis -- well,

             2   different spelling, like what we saw -- it's compound, sorry.

             3        You could have a different spelling for the word T-E-R,

             4   correct?

    03:20p   5   A.   Correct.

             6   Q.   And instead of the "e" you'd have like a "3" in between T

             7   and R, right?

             8   A.   Correct.

             9   Q.   And at least in an automated way, unless you planned for

    03:21p  10   that change, that ad with T3R might get through?

            11   A.   It often did.

            12   Q.   Okay.  And I think what you're saying and what this is

            13   saying, or maybe this is your experience, no matter how

            14   creative you can be in terms of moderating these ads and

    03:21p  15   planning for them, it's just there are ways to get around it?

            16   A.   There are ways to get around it and they can edit their

            17   ads realtime.

            18   Q.   Okay.  Let's go to Exhibit 49, and I know this one is in

            19   evidence.  So on this one, sir -- okay, it's on the screen

    03:22p  20   there, all right.

            21        This is from Mr. Padilla; is that correct?

            22   A.   That's correct.

            23   Q.   On September the 1st, 2010, correct?

            24   A.   Correct.

    03:22p  25   Q.   So now we're in 2010 obviously, right?

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

```
 1   A.   We are.

 2   Q.   Okay.  The subject here is "new moderation rules"?

 3   A.   That is correct.

 4   Q.   Okay.  And if you just go to the second paragraph, "I'm

03:22p 5   empowering" -- oh, I'm sorry.  He's written this to Dan.

 6        That's Dan Hyer, right?

 7   A.   He has.

 8   Q.   Okay.  And then he says, "I'm empowering the Phoenix

 9   staff to start deleting ads when the violations are extreme

03:22p 10  and repeat offenses.  When we delete ads" -- I should preface

11  this if I'm reading it right -- "we're going to send an e-mail

12  from Sales," right?

13  A.   Correct.

14  Q.   What -- what does that mean, an e-mail from sales when an

03:23p 15  ad is deleted?

16  A.   So when a paid ad is deleted, it's gonna make that user

17  angry.  They could file a chargeback.  So what Andrew's doing

18  is sending to Sales, which is a separate e-mail address, an

19  alert that these ads have been deleted.

03:23p 20       What Sales will do then is send them a promo code and

21  remind them to follow the terms of use.

22  Q.   Okay.  The next sentence is, "When we ban a" -- "When we

23  ban a user, we need the ban to stick for at least 30 days."

24       And banning -- did I read that right?

03:23p 25  A.   You did.
```

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1  Q.   And banning a user means whoever that is, that user is

2  not gonna be able to post an ad for 30 days?

3  A.   That user is almost always posting in female escorts

4  and -- if they get banned, and then the ban's only for 30

03:24p  5  days, which means they can come back and post.  It's like a

6  penalty.

7  Q.   Okay.  "Don't do this" is basically what you're saying to

8  the user, "Your ad's banned"?

9  A.   Yes, and bans didn't work very well.

03:24p  10  Q.   I understand that, sir, but the fact of the matter is at

11  this point in time the ad would be banned, right?

12  A.   The user would be banned.

13  Q.   I'm sorry.  You're right, okay.

14  A.   So they couldn't post any ads.

03:24p  15  Q.   And the user knows this because there's going to be a

16  message sent to the user in some fashion; is that correct?

17  A.   Well -- and that's what Andrew is attempting to negotiate

18  with Sales saying, "Look, don't send them a promo code right

19  away.  We need the ban to stick for 30 days so that they learn

03:25p  20  a lesson and then modify their content in the future."

21  Q.   Okay.  And maybe that's what's in the next sentence when

22  he says, "When we Delete from the queue, we'll use Delete and

23  Notify."  So what does that mean?

24  A.   I think there may have been an automated tool in the

03:25p  25  moderation queues where you could hit "delete" or you could

```
 1    hit "delete and notify," and the notify would send a link to
 2    the ad of the user that posted with, "Follow our Terms of
 3    Use."
 4    Q.    Okay.  In fact, I think on direct I think you testified
 5    pretty much this way, the way you just did.  I think your
 6    testimony was delete and notify is a function where we alert
 7    the user that posted the ad that was deleted that their ad is
 8    deleted.  Please follow the Terms of Use.
 9          Is that right?  Do you recall that testimony?
10    A.    I do.
11    Q.    Okay.  Let's go to Exhibit 1187.  All right.  So -- yeah.
12          So this -- the heading here is "Class:  FilterTerm."
13          The important part here is the date.  January 11th, 2012.
14    Do I have that right?
15    A.    You have it right but, really, that date is generated by
16    a computer whenever the filters were sort of updated.
17    Q.    Okay.
18    A.    That's not the important date.  The date below is more
19    important.
20    Q.    September 1st --
21    A.    Yes.
22    Q.    -- 2010, right?
23    A.    Correct.
24    Q.    Okay.  And what this is saying -- well, there's a box
25    there that says "Term," and that's the term that is going to
```

03:25p  (line 5)
03:26p  (line 10)
03:26p  (line 15)
03:27p  (line 20)
03:27p  (line 25)

1   be filtered; is that right?

2   A.   Correct.

3   Q.   And then we can skip down to "Action."  You see where it

4   says "Ban."  I think the testimony is that you put that word

03:27p   5   in, your ad's gonna be banned?

6   A.   I'm sorry, could you say that again.

7   Q.   Sure.  If you put the word that's listed in "Term" into

8   your ad and the moderator sees it, of course, or if it's

9   picked up, then that ad's gonna be banned, right?

03:27p  10   A.   It will give you an error message that says "whoops" or

11   it would later tell you, "Cum is a forbidden word."

12   Q.   Well, I see something here under "Action" with a black

13   dot in it before the word "Ban."  So the way this is to be

14   read is the action would result in a ban.

03:28p  15       Did I read that right?

16   A.   Yes, that is what it says; but the ban prevents the user

17   from going forward on the posting if that word appears

18   anywhere in the body copy or the title of the ad.

19   Q.   Okay, I get it.

03:28p  20       Under "Expiration" -- excuse me, it says "Expiration

21   Never Expire."  What does that refer to?

22   A.   There were sometimes we would expire a term that was

23   banned quickly because it might be like a spammer using some

24   website.  We also --

03:29p  25   Q.   Well, okay.  Let me focus, then, on the question.

1    The term -- under "Expiration" I see "Never Expire," and

2  I think your testimony was it's telling the poster that this

3  word is a forbidden word, right?

4  A.   Well, I can tell you what it actually says if you look

03:29p   5  further down.

6  Q.   I'll let you go but -- I mean, go ahead.  But my

7  recollection of your testimony is it's telling them that the

8  term that's in there is a forbidden word in this category.

9  That's enough.  They know.  All right.  I got to take out that

03:29p  10  word, okay.  That's what I heard your testimony to be?

11  A.   That's correct.

12  Q.   So the word -- okay.  That tells the person, "You can't

13  use that word."  I mean, that's what it's saying?

14  A.   It does.

03:30p  15  Q.   Okay.

16  A.   It's very customer friendly.

17  Q.   Whatever.  "Description," in here it says, "banned term

18  in escorts," and it gives a date and then initials, and I

19  think you testified that was put in there by Mr. Padilla; is

03:30p  20  that right?

21  A.   That is correct.

22  Q.   And the banned term is in -- I'm sorry, is in the

23  location of United States and Canada, right?

24  A.   It's in the United States and Canada, and I believe it's

03:30p  25  only in the category escorts.

1  Q.    Whatever, okay.  But two countries, total ban throughout

2  Canada, throughout the USA, right?

3  A.    Correct.

4  Q.    Okay.  If you go over to "CategoryKey," I think that's on

**03:30p** 5  the next page.  I'd like to just concentrate on this.

6        Okay.  Are we there, yeah.

7        The way this is -- sorry.

8        Under "CategoryKey" there are several categories.  Are

9  these the categories in which that term is a forbidden word in

**03:31p** 10  those categories?

11  A.    That's correct.

12  Q.    Okay.  So female escorts, right?  Can't do it there.

13  Can't put it in there?

14  A.    Was that a question?

**03:31p** 15  Q.    Yes, sir.

16  A.    I'm sorry, I didn't --

17  Q.    Okay.

18  A.    You just kinda faded off there at the end.

19  Q.    So female escorts, that's a category in which this term

**03:31p** 20  is banned, right?

21  A.    That is correct.

22  Q.    Okay.  I won't go through the rest of them, but it speaks

23  for itself.  All these other categories you can't use that

24  word.  It's forbidden, right?

**03:32p** 25  A.    You are correct.

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                86

1   Q.   Thank you, sir.

2        Let's go to 918.  This, too -- yes, this is in evidence.

3   So wait for it.

4            MR. EISENBERG:  Okay.  So I think -- all right,

03:32p 5   let's go down to where it starts.  It would be "Begin

6   forwarded message," Ms. Ellig.  It's about halfway down there.

7            Yeah, okay.  I just want to make sure that we have

8   this in the right context.

9   BY MR. EISENBERG:

03:32p 10  Q.   This appears to be from Mr. Padilla, right?

11  A.   Yes.

12  Q.   On September the 5th, 2010?

13  A.   Yes.

14  Q.   And at 1:46 a.m., right?

03:33p 15  A.   Yes.

16  Q.   That's like a quarter to 2:00 in the morning?

17  A.   Well, this is central daylight time.  So he's working out

18  of Phoenix at this time.

19  Q.   Okay, whatever.

03:33p 20  A.   Midnight.

21  Q.   All right -- well, okay.  To you, correct?

22  A.   Correct.

23  Q.   Okay.  And what this is is, as he says here, this is

24  what, in effect, he's gonna need on expanding his operation?

03:33p 25  A.   That is correct.

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1    Q.   Okay.  So what he's saying here is, "I'm working on

2    getting the personnel now."  Why don't we just stop there.

3         Do you see that?

4    A.   I do.

03:34p  5    Q.   If you look down underneath almost to the bottom you'll

6    see "Personnel," and there -- okay.

7         And there he talks about one overnight 10:00 p.m. to

8    8:00 a.m., right?

9    A.   He does.

03:34p 10    Q.   So would you interpret that to mean he's looking for

11   somebody to work nights for ten hours?

12   A.   He is.

13   Q.   And then he wants two more personnel moderators, right?

14   These are moderators he's looking for?

03:34p 15    A.   That's correct.

16   Q.   To start on at 4:00 in the morning and work to noon?

17   A.   Correct.

18   Q.   Now, if you turn that page over, he's asking for more

19   help, right?

03:35p 20    A.   Where?

21   Q.   Turn the page.  I'm sorry, can we go to the next page.

22        There we go, okay.

23   A.   Is he asking for more help or --

24   Q.   It looks like he's asking for two late swing moderators?

03:35p 25    A.   No, I -- can you scroll back up?  I mean, can you see the

1   other page?  I think that's, like, his total request of

2   personnel or what -- what he's gonna do with personnel.

3   That's better.

4   Q.   Well, the way I'm reading that, sir, under "late swing"

03:35p 5   -- thank you, ma'am -- is that this is from 4:00 p.m. to

6   midnight.

7   Would you agree with me that that's a different time

8   frame than what he's asking for?

9   A.   It is.  He's -- he's sort of allocating the new people on

03:36p 10   different shifts on a 24-hour-day or -- and the weekends.

11   Q.   Okay.  And then two weekend part-timers; is that correct?

12   A.   Correct.

13   Q.   Okay.  So are you saying -- it's a total of seven more

14   people?

03:36p 15   A.   It is.

16   Q.   Okay.  Then he's also -- if you go back to Page 1 where

17   it says, "I'm working on getting the personnel now," you will

18   see the next sentence is, "I might have them all ready to go

19   in 3 weeks," okay?

03:36p 20   A.   Correct.

21   Q.   Okay.  So the planning here is he's gonna go out -- he is

22   gonna go out and find -- what did we say -- seven people and

23   have them ready to work in three weeks, right?

24   A.   That is correct.

03:36p 25   Q.   Okay.  He also needs more equipment, and you can see the

          1   list there.  Keyboards, for example, monitors and so forth.

          2       Did I get that correct?

          3   A.   Correct.

          4   Q.   Okay.  So then to go above this see where it says

03:37p    5   September the 5th where Carl Ferrer wrote.  It starts, "Hey

          6   Scott"?

          7   A.   I'm sorry.  I do.

          8   Q.   Okay.  And what it appears to me is, if you will agree,

          9   that what you're saying is to Scott, please email me approval

03:37p   10   for what Andrew wants to do in terms of what's listed below?

         11   A.   Yes.

         12   Q.   And then Mr. Padilla -- I'm sorry, Mr. Spear says up at

         13   the top "go get em" -- "Approved.  go get em"?

         14   A.   Correct.

03:37p   15   Q.   So -- okay.  Mr. Spear is approving everything that it is

         16   that Mr. Padilla wants?

         17   A.   That's the process.

         18   Q.   And then I think that what your testimony was, that you

         19   were asking Mr. Spear to e-mail me approval so I can begin to

03:38p   20   make the purchase.  Remember that's your testimony?

         21   A.   Yes.

         22   Q.   I took "go get em" to mean order the equipment and tell

         23   Andrew he can hire the additional personnel, right?

         24   A.   You mean on the Scott Spear's approval?

03:38p   25   Q.   Yes, sir, uh-huh.

1    A.    That is correct.

2    Q.    Okay.  By the way, I meant to ask, sir, what building did

3    Mr. Padilla work in over there on Jefferson?

4    A.    So he's in the building separated from the corporate

03:38p  5    staff.  So Building B where -- which also houses the newspaper

6    *Phoenix New Times*.

7    Q.    Okay.  And where were you located, your office?

8    A.    I'm in Building B.  Sometimes I'm upstairs.  Sometimes

9    I'm downstairs.  I think at this time I'm upstairs.

03:39p 10    Q.    And the -- the moderators are working in what I call an

11    open area, like just basically a big ol' room?

12    A.    They are.

13    Q.    And they got a desk?

14    A.    Later it would just be tables.

03:39p 15    Q.    Because there were so many moderators?

16    A.    Correct.

17    Q.    And it's like a -- you don't have an office.  It's just,

18    like, totally open, right?

19    A.    Did you say me or, like, the staff?

03:39p 20    Q.    No, the moderators.

21    A.    Yeah, no, it's totally open.

22    Q.    Okay.

23          MR. EISENBERG:  So now I'd like to turn to Exhibit

24    51.  This is not in evidence, so just for the witness.

03:40p 25    BY MR. EISENBERG:

 1  Q.   Sir, if you look at this, this is another e-mail, is it

 2  not, from you -- I'm sorry, at least the top.   From

 3  Mr. Padilla to you?

 4  A.   It is.

03:40p   5  Q.   And it's during 2010; is that correct?

 6  A.   That is correct.

 7  Q.   And it relates to a Backpage list of escort service

 8  terms, right, down in the -- I'm sorry.

 9  A.   Yes, it does.

03:40p  10  Q.   And the subject matter is "terms and services," right?

11  A.   The subject matter is "terms and services," correct.

12  Q.   All right.

13       MR. EISENBERG:  Move the admission of Exhibit 51,

14  Your Honor.

03:41p  15       MR. RAPP:  No objection.

16       THE COURT:  It may be admitted and published.

17       (Exhibit No. 51 admitted in to Evidence.)

18  BY MR. EISENBERG:

19  Q.   So if you go down to the middle where it starts

03:41p  20  09/4/2010, would you agree with me, sir, that this is

21  something from you and is to, in part, Mr. Padilla?

22       See under "Tasks:  1. Andrew"?

23  A.   I believe it is.  I can't be absolutely certain, but I'm

24  listing -- oh, yeah, nevermind, I've read it.  Yes, it's going

03:42p  25  to Andrew.

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

```
 1  Q.   Okay.  If you want to take a minute to read this, because
 2  you may not have seen it in a while.  So go ahead and read it
 3  and I'll get back to you.  Just tell me --
 4  A.   I understand it.
```
03:42p 5  Q.   Okay, great.  So what you're saying to him is, "Could you
```
 6  add to the banned list terms on the attached word doc and
 7  sent" -- I think you meant "send to me Monday..." correct?
 8  A.   Correct.
 9  Q.   Okay.  Underneath there's another -- it looks like you
```
03:42p 10 contacted Dan and that would be Dan Hyer?
```
11  A.   Correct.
12  Q.   And you're telling Dan Hyer on Tuesday we'll pull all
13  staff off marketing and have them do moderation, right?
14  A.   Correct.
```
03:42p 15 Q.   Okay, let me just stop there.  What was the reason for
```
16  pulling people out of marketing in September of 2010 to do
17  moderation?
18  A.   I believe Craigslist was exiting adult services and that
19  we're just getting a fire hose of content.
```
03:43p 20 Q.   Okay.  So that happened -- Craigslist happened in
```
21  September of 2010 -- I shouldn't put it that way.
22       Craigslist closed sometime around that time and so now
23  you're getting more ads?
24  A.   I believe so.
```
03:43p 25 Q.   Okay.  And you need more people to help moderate the new

1  volume of ads?

2  A.   We are being overwhelmed.

3  Q.   Okay.  Now, let's stick with Dan because there -- I want

4  to ask you about this.  "I will be there to train."

03:43p  5       What did you mean by that?

6  A.   Well, I live in Dallas.  So I'm going back and forth

7  between Phoenix and Dallas and so I'm -- I'm probably working

8  out of Phoenix then when I write this so that I will be

9  heading to Dallas soon and that I will help guide the staff,

03:44p  10  train the staff Tuesday AM.

11  Q.   Now, that means you will -- it says you will be there to

12  train.  Were you in charge of the training, if you can recall?

13  A.   Well, this is really the early start of moderation and

14  we've got a crisis, an emergency situation --

03:44p  15  Q.   Right.

16  A.   -- and so this is just a stop gap measure to have

17  marketing staff --

18  Q.   Okay.

19  A.   -- help.

03:44p  20  Q.   They're new to this, marketing staff?  They're new to

21  moderation, right?

22  A.   Yeah, they don't do moderation.

23  Q.   Okay.  And you're taking those people who have never done

24  it -- I'm sorry, who haven't done it before and you -- the way

03:44p  25  I'm reading this, would you agree, you'll be there to do the

           1  training?

           2  A.   I am gonna be there to guide them on taking the sex act

           3  pics out.

           4  Q.   Okay.

03:45p     5  A.   That's the primary mission.

           6  Q.   So we're going to be deleting pictures of sex acts; is

           7  that right?

           8  A.   I don't -- probably.

           9  Q.   Okay.  Well, if you don't remember, that's --

03:45p    10  A.   Yeah, I don't remember.

          11  Q.   Okay, that's fine.  So if you go to the top -- well,

          12  above all that is something from Mr. Padilla to you.  Looks

          13  like a response.  Am I right?

          14  A.   Yes.

03:45p    15  Q.   Okay.  Now, if you go up above that we can confirm --

          16  would you agree that it's from Mr. Padilla to you September

          17  the 6th, 2010?

          18  A.   That is correct.

          19  Q.   And it's at 12:31 in the morning?

03:46p    20  A.   Another midnight shift.

          21  Q.   Well, if he sends it at 12:31 in the morning, this is not

          22  a robot sending it out.  This is Mr. Padilla?

          23  A.   Yes.

          24  Q.   Okay.

03:46p    25  A.   And it doesn't have a --

```
 1   Q.   Go ahead.

 2   A.   Well, it doesn't have a time date stamp so -- and it's

 3   e-mailed to me.  I think it is 12:31 a.m. Phoenix time.

 4   Q.   Okay, I see what you're getting at.  So would you agree

 5   with me, sir, he's a pretty hard worker, 12:31 in the morning?

 6   A.   I would agree.

 7   Q.   And -- okay.  And then he says, "My additions are at the

 8   end of your list."  Now, I'll get to that in a moment, but

 9   would you agree that I've read this right?

10       "These additional terms are currently filtered in their

11   common forms..." and I'll stop there.  What did that mean to

12   you?

13   A.   So common form -- I'll use Greek, for example, G-r-e-e-k.

14   And then a obfuscation or creative spelling might be

15   G-r-3-3-k.

16   Q.   Just like TER only the "E" is a "3"?

17   A.   e's are 3's.

18   Q.   Okay.  And then he says, "...and removed manually in

19   their variations."  So let me stop there.

20       "Removed manually," what does that mean?

21   A.   Well, that might mean editing the ad.  It might also mean

22   taking it down.

23   Q.   And manually --

24   A.   Could mean both ways.

25   Q.   I'm sorry.  "Manually" means it's gonna be done by hand,
```

03:46p 5
03:47p 10
03:47p 15
03:47p 20
03:48p 25

1    right?

2    A.   That's right, not using any kind of filter technology.

3    Q.   So that means the moderator has to visually look at this

4    ad, and if it's gonna be removed a human is doing it?

03:48p   5    A.   That's correct.

6    Q.   And then to finish that off, "...manually in their

7    variations."  So I think this really goes to what you were

8    just saying.  That is, a word can have different spellings,

9    right?

03:48p  10    A.   Correct.

11    Q.   Okay.  So -- okay.  And just to make sure we're -- we're

12    on the -- in transition here, I read earlier "My additions are

13    at the end of your list."

14         So I want to go to 51a, which is not in evidence.  That

03:49p  15    will be on your monitor.  Can you see that, sir?

16    A.   Oh, I do see it, I'm sorry.

17    Q.   Oh, okay.  No, that's fine.  And it refers to terms, code

18    words and so forth.  This pertains to what Mr. Padilla has

19    written in 951, correct?

03:49p  20    A.   Yes.

21              MR. EISENBERG:  Move the admission of 51a, Your

22    Honor.

23              MR. RAPP:  No objection.

24              THE COURT:  It will be admitted and may be

03:49p  25    published.

1          (Exhibit No. 51a admitted in to Evidence.)

2          MR. EISENBERG:  So -- thank you, your Honor.

3     BY MR. EISENBERG:

4     Q.   And what this says is, "The following terms, service and

03:49p  5   code words are not allowed in the adult escort category on

6     backpage as they imply a sex for money transaction..." stop

7     there.  Did I read that right?

8     A.   That's correct.

9     Q.   And then -- I'm sorry?  Okay.  And then it says, "...or

03:50p 10   relationship which is a violation of Backpage.com's Terms of

11    Use."  Did I read that correct?

12    A.   That's correct.

13    Q.   And Terms of Use also is referred to as TOU; is that

14    correct?

03:50p 15   A.   It is.

16    Q.   Okay.  Then it says here, "Posts containing these terms

17    will be removed."  Did I read that correctly?

18    A.   You did.

19    Q.   And "removed," what does that mean to you?

03:50p 20   A.   Well, that means that the ad will be deleted but the user

21    will not be banned and they will be permitted to post again.

22    Q.   Well, you kind of anticipated the next sentence, but

23    okay.  In fact, what the next sentence is, "Continued use of

24    these terms by a poster will result in that person being

03:51p 25   banned from using the site."  What does that mean?

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                98

```
 1   A.   Well, you're right, I didn't mean to steal your thunder.
 2        If they keep not following the rules, they're gonna get
 3   banned.
 4   Q.   You don't steal my thunder at all, sir.  That's fine.
 5        If you go down this list without having to go through it,
 6   there are several words; would you agree?
 7   A.   If I go down the list, there are what?
 8   Q.   Several words.
 9   A.   Several words?
10   Q.   Yes.  Several terms?
11   A.   Well, there's many terms here.
12   Q.   I counted them at 39.  I won't ask you to do it, but does
13   that seem about right to you if you just glance down or if you
14   want to count them, you can count them.
15   A.   At this time line?  I forget, what's the time here?  This
16   is right -- 2010?
17   Q.   Yeah, if you go back to 950 -- I'm sorry 51, the
18   transition -- or the e-mail that transitions this September
19   6th, 2010.
20   A.   That seems about right.
21   Q.   Okay.  If you turn the page, there's another note here.
22        Okay.  And that says -- would you agree this is kind of a
23   warning?  "There are many creative spellings for the terms
24   above which are too numerous to include in any list."
25        Did I read that correct?
```

03:51p   5
03:51p  10
03:52p  15
03:52p  20
03:52p  25

1    A.    You did.

2    Q.    And then I think consistent with what you've been

3    testifying about, "...but these terms, however they may be

4    spelled, will be" -- well, let me revise that.

03:52p  5         "...but these terms, however they may be spelled, will be

6    considered 'off limits.'"

7         Okay.  What do you interpret "off limits" to be?

8    A.    "Off limits" would be not following the rules.

9    Q.    Can't use them, okay, all right.  So if you have a -- not

03:53p 10   an embroidered term, but a misspelling or a creative spelling,

11   then that can't be used?

12   A.    For some particular terms.  Kind of short list of terms,

13   any misspellings of those terms.

14   Q.    Okay.

03:53p 15   A.    At this time the list is pretty short.  It will grow

16   longer.

17   Q.    We're just getting started, aren't we, in terms of words,

18   terms?

19   A.    I believe we are.

03:53p 20   Q.    Okay.  And to anticipate what you were just saying, the

21   next sentence on the next -- on that page there says, "Also,

22   this list may be amended from time to time and is in no way

23   meant to be a limitation on what terms may be banned or

24   excluded by backpage.com."

03:54p 25        Did I read that correctly?

1    A.    You did read it correct.

2    Q.    So what I think that means is this list is gonna change

3    and there may be variations on terms that we are also going to

4    ban?

03:54p  5    A.    Correct.

6    Q.    Sir, do you know who wrote that note?

7    A.    I was asking myself while you were reading it.

8    Q.    Did you write it?

9    A.    I don't think I wrote it.

03:54p  10    Q.    Mr. Padilla write it, if you know?

11    A.    I don't know for sure but --

12    Q.    Okay.

13    A.    -- likely.

14    Q.    Okay.  Then we have another portion here.  "The following

03:55p  15    services and terms are examples of terms that have been deemed

16    to be acceptable in the past in the adult escort section of

17    backpage."

18         So what is written underneath these terms are, in the

19    past, been deemed okay.  Acceptable I should say, right?

03:55p  20    A.    Correct.

21    Q.    And then it says, this list may be amended from time to

22    time as other services and terms are acceptable under our TOU,

23    correct?

24    A.    Correct.

03:55p  25    Q.    Okay.  Then the last part is backpage.com -- sorry.

1      "At the same time, backpage.com reserves the right to

2  delete any term or terms seen on this list, as the same may be

3  amended from time to time."  Right?

4  A.   Right.

03:56p  5  Q.   And that means -- well, what does that mean to you?

6  A.   That moderation standards are in a continuous flux.

7  Q.   Okay.  Let's go to Exhibit 600.  This is in evidence.

8      Now, let me see.  This is a long exhibit.  I don't want

9  to belabor it, but if you go to -- looks like -- and correct

03:56p  10  me if I'm wrong about this -- the last page, Page 6, just to

11  try to cap this off, this is from Sukesh Mohan, correct?

12  A.   Correct.

13  Q.   Okay.  He is a part of the El Camino operation, right?

14  A.   He is -- he is.

03:57p  15  Q.   Okay.  And his wife is Monita, right?

16  A.   You know, I'm sorry, but I'm a little hard of hearing

17  myself and sometimes I just --

18  Q.   You know, what I think is happening I keep -- here, I'll

19  try to use this.  Okay, is that better?

03:57p  20  A.   Oh, much better, thank you.

21  Q.   Okay, thank you.  So I was asking that Monita Mohan is --

22  okay, she's part of El Camino, too; is that correct?

23  A.   She is.

24  Q.   Okay.  And what it's saying is on September 21, 2010,

03:57p  25  if I'm interpreting this correct, Mr. Mohan is responding

1    to what appears to have been an inquiry by you interested in

2    El Camino's services?

3    A.    That is correct.

4    Q.    Okay.  And you were the one making the inquiry of El

03:58p  5    Camino; is that correct?

6    A.    I was.  We were looking for help.

7    Q.    You were looking for help because the people working for

8    Mr. Padilla, they're getting pretty overwhelmed, right?

9    A.    Agreed.

03:58p 10    Q.    And so this is a company that came to your attention?

11    A.    I think I found it on Google.

12    Q.    Okay.  There are a list of other events, but let's try to

13    just go to the next page, Page 5, where it says on Thursday,

14    September 23rd you sent out information to Sukesh.

03:59p 15         "Ok, I'd like to test you out."  See that?

16    A.    That is -- I did send that e-mail.

17    Q.    Okay.  And then you're suggesting that, "To do this

18    right, we probably need to start with 6 staff."

19         Did I say that right?

03:59p 20    A.    That is correct.

21    Q.    And what you're suggesting, I assume, is six employees of

22    his group are gonna be tried out?

23    A.    We're gonna try them out.

24    Q.    Okay.  And if you go -- let's try to just go to the first

03:59p 25    page, and tell me if this is correct.  It looks to me like

1   what you're doing is informing Mr. Padilla of how you're going

2   to have El Camino staff tried out on two queues below, and I'm

3   referring to Page 1.  It says "TASK."

4   A.   That is correct.

04:00p  5   Q.   Okay.  And I don't think it's -- well, so this is a test

6   run to see if these people are going to be able to moderate,

7   correct?

8   A.   That is correct.

9   Q.   And underneath what you've got here are what is going to

04:00p 10   be in these two queues, and one is content standard --

11   "CONTENT STANDARDS IMAGES and TEXT."  What does that mean?

12   A.   Well, I can -- I can only see the text -- thank you.

13   Q.   Well, maybe we can do it side to side.

14   A.   Yeah, that's better.  And your question was?

04:01p 15   Q.   What does it mean?

16   A.   What does it mean?

17   Q.   What is that referring to?  What is content standards --

18   well, let me ask it this way.

19   A.   You asked "TWO QUEUES," too.

04:01p 20   Q.   Okay.  And this is going to be -- well, you see under

21   "IMAGES" it says, "We allow full nudes for men and women"?

22   A.   Correct.

23   Q.   Okay.  That was the present standard at that time?

24   A.   It is.

04:01p 25   Q.   Okay.  Then it says in here, "However, we do not want to

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

 1   display any explicit images of genitalia..." et cetera, et

 2   cetera, et cetera, right?

 3   A.   Correct.

 4   Q.   Okay.  The next sentence is, "Our standard is playboy and

04:02p  5   not porn"?

 6   A.   Yes, it does say that that's the standard at that time.

 7   Q.   At that time and the Playboy -- even though it's in lower

 8   case, that refers to the *Playboy* magazine?

 9   A.   It does.  It's the presentation that Scott Spear gave to

04:02p 10   the moderation team using Playboy cutouts in a PowerPoint.

11   Q.   Okay.  And then to just kinda cut to the chase here, you

12   send this to Andrew Padilla because you want him to determine

13   whether this is a good -- how to put it -- test for nude

14   people?

04:02p 15   A.   That's correct.  I want some feedback --

16   Q.   Okay.

17   A.   -- from the moderation supervisor.

18   Q.   And then he responds on October the 5th, 2010, at 6:08 in

19   the morning, correct?

04:03p 20   A.   Correct.

21   Q.   And he says "looks good to me," correct?

22   A.   That's right.

23   Q.   Okay.  Do you recall, sir, how this testing went of

24   El Camino?

04:03p 25   A.   It was a -- it was a pass, but they needed a lot of

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

 1  guidance from Andrew Padilla.

 2  Q.   I think, sir, you have said before, not here in the trial

 3  but -- that what proved to be the case with the Indian team is

 4  that they have been kind of a nightmare to work with.

04:04p  5  Remember that, saying that?  They were very bureaucratic?

 6  A.   This is after they've -- I think I said that after --

 7  Q.   Right.

 8  A.   -- they left us because I experienced a different

 9  moderation team in the Philippines that was easier for both

04:04p 10  Andrew and I.

11  Q.   So fair to say that El Camino -- well, let me ask it this

12  way:  How long did they last?

13  A.   I don't know exactly without referring to exhibits or

14  e-mails, but I want to say maybe two years.

04:04p 15  Q.   Okay.  And then I think you've also said as an

16  observation about the culture in India also seemed to be that

17  all dating is matrimonial so they didn't get the adult

18  section.

19       I think what you're saying there -- or you tell us.  Do

04:05p 20  you remember saying that first?

21  A.   Yes, I remember saying it and I can explain.

22  Q.   Okay.  What did you mean by that?

23  A.   They just couldn't understand why a website would have

24  ads that appeared to be prostitution and that they wanted to

04:05p 25  get rid of all nudity, and it was kind of a difficult

```
        1  adjustment with them.

        2  Q.   So they weren't really moderating terms or images

        3  correctly?

        4  A.   They -- they would but you had to be very careful and

04:05p  5  specific.

        6  Q.   And that led to a lot of back and forth between

        7  Mr. Padilla and Ms. Mohan?

        8  A.   That is correct.

        9  Q.   And from her back to Mr. Padilla, correct?

04:06p 10  A.   Correct.

       11  Q.   Okay.  Now, let's go to exhibit -- excuse me, Your Honor,

       12  Exhibit 57.  This is in evidence.

       13  A.   I see the exhibit.

       14  Q.   Okay.  And you remember it?

04:06p 15  A.   Yeah, I'm only copied on it.

       16  Q.   Okay.  But it was sent from Ms. Mohan to Mr. Padilla,

       17  right?

       18  A.   Correct.

       19  Q.   On October the 12th?

04:07p 20  A.   Correct.

       21  Q.   Okay.  And she's saying to Mr. Padilla, "Thank you so

       22  much for your feedback.  I will discuss with the team."

       23       Did I read that right?

       24  A.   That is correct.

04:07p 25  Q.   And so, actually, what happens is I kinda got that out of
```

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

107

1   context.  That follows on an e-mail from Mr. Padilla to Monita

2   Mohan, correct?

3   A.   Correct.

4   Q.   Okay.  So he's saying, "I've been reviewing the ads

04:07p 5   Failed by at1..."  And "1" refers to a particular moderator?

6   A.   It does.

7   Q.   And they -- they're given numbers, right?

8   A.   They are.

9   Q.   Okay.  "...and I wanted to offer a few pointers to

04:07p 10   hopefully streamline the work for you."

11      Did I read that right?

12   A.   You did.

13   Q.   Okay.  "We have a filter set up to automatically remove

14   the word" -- and it's there -- "so when you see it in an ad

04:08p 15   it's" safer to ignore -- "it's safe to ignore."

16      All right, do I have that?

17   A.   You do have that correct.

18   Q.   And then he's talking about how it would get removed.  It

19   says, "The filter will remove the term after the ad is

04:08p 20   released."  So what is he saying there?

21   A.   What he's saying is that when the ad is posted, shortly

22   after it's posted that term will be removed.  So the user that

23   posted it thinks that term's gonna be in their ad, but by the

24   time the ad goes live it's been stripped out.

04:08p 25   Q.   Okay.

1          MR. EISENBERG:  Let's go to 59, which is not in

2    evidence -- yeah, 59.  So you can be -- the witness can be

3    shown this on his monitor.

4    BY MR. EISENBERG:

04:09p 5    Q.    Okay.  Sir, you see your name as cc'd on this e-mail?

6    A.    I do.

7    Q.    And you see that it's from Mr. Padilla?

8    A.    It's from Mr. Padilla.

9    Q.    Okay.  And it refers to "New Moderation Standards,"

04:09p 10   correct?

11   A.    Correct.

12   Q.    And it's during the October 2010 time period, right?

13   A.    Correct.

14   Q.    Okay.

04:09p 15         MR. EISENBERG:  I move the admission of Exhibit 59,

16   Your Honor.

17         MR. RAPP:  No objections.

18         THE COURT:  It may be admitted and it may be

19   published.

04:09p 20         MR. EISENBERG:  Thank you, your Honor.

21         (Exhibit No. 59 admitted in to Evidence.)

22   BY MR. EISENBERG:

23   Q.    So this is from Mr. Padilla on Saturday, October 16th at

24   9:05 p.m., right?

04:09p 25   A.    That is correct.

1   Q.   Okay.  And it looks like it's to a lot -- I don't want to

2   characterize it.  There are people that it's to, correct?

3   A.   Correct.

4   Q.   And that those people are moderators, aren't they?

04:10p   5   A.   They are.

6   Q.   In fact, you probably recognize a few of the names there,

7   right?

8   A.   I do.

9   Q.   Okay.  And the subject matter is -- I mentioned before

04:10p   10   his "New Moderation Standards," right?

11   A.   Correct.

12   Q.   So now we have yet another change -- projected change?

13   A.   Yes, we do.

14   Q.   And that is a change because somebody has told

04:10p   15   Mr. Padilla we now have new moderation standards?

16   A.   Is that a question?

17   Q.   Yes, it is.

18   A.   Yes.

19   Q.   Okay.  And down in the body of this it says, "Perhaps

04:10p   20   indefinitely, and certainly over the next four days, we need

21   to intensify our efforts in cleaning Escorts, Body Rubs..."

22   et cetera.  Did I read that?

23   A.   You did.

24   Q.   Now, this part, "This intensification will come in the

04:11p   25   form of extra staff and overtime..."  Let me just stop there.

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1  Do you recall, sir, whether by October of 2018 the

2  moderators had increased in numbers?

3  A.  I -- I don't recall, but it's likely.

4  Q.  Okay.  And overtime, do you know whether -- well, what

**04:11p** 5  does "overtime" mean?

6  A.  It means overtime is authorized and that people want to

7  work more than 40 hours a week, they'll get paid time and a

8  half.

9  Q.  And that authorization, that wouldn't be from

**04:11p** 10  Mr. Padilla.  That would be from Mr. Spear?

11  A.  Correct.

12  Q.  Okay.  But most -- I'm gonna read -- gonna continue on.

13  "...but most importantly in stricter standards for

14  language and images in ads."  Did I read that correctly?

**04:12p** 15  A.  You did.

16  Q.  Okay.  So the next part is, "I'd like to still avoid

17  Deleting ads when possible, but if an ad makes a clear

18  reference to sex for money or an image displays a sex act,

19  don't hesitate deleting it," right?

**04:12p** 20  A.  Correct, that's what it says.

21  Q.  Okay.  Well -- all right, next part.  "These are not the

22  types of ads we want on our site at all," right?

23  A.  Right.

24  Q.  And that is what he is saying to the people in the two

**04:12p** 25  block moderators.  "We don't want these ads"?

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                    111

1    A.    He is stating that.

2    Q.    Okay.  And then -- well, to go on, what he's also saying

3    is, "In the case of lesser violations, editing should be

4    sufficient.  We're still allowing phrases with nuance but if

**04:13p**  5    something strikes you as crude or obvious, remove the phrase."

6    A.    That is correct.

7    Q.    Okay.  And you, sir, are in agreement with this; are you

8    not?

9    A.    I am in agreement that we don't want to remove too many

**04:13p** 10    ads at one time --

11    Q.    That's not what I -- okay, I'm sorry, go ahead.

12    A.    We don't want to remove too many ads at one time and then

13    get so many chargebacks that we lose our merchant accounts.

14    So these standards are getting progressively stricter --

**04:13p** 15    Q.    I have a question for you, sir.  What you just said about

16    chargebacks or losing accounts --

17    A.    Yes.

18    Q.    -- that's not in this e-mail, is it?

19    A.    It's here about "avoid deleting ads when possible," and

**04:14p** 20    it's also in there "in the case of lesser violations."

21    Q.    I don't see anything in there about chargebacks.

22    A.    Well, if you delete too many adds --

23    Q.    It's not there.  I'm sorry, sir.

24    A.    Can I explain?

**04:14p** 25    Q.    No, I'm gonna ask you this question:  Chargebacks is not

```
 1   mentioned in this e-mail, right?

 2   A.   The word "chargebacks" is not mentioned in this e-mail.

 3   Q.   Okay.  He starts to go -- I mean, continues on -- okay.

 4   "We're still allowing HBO type nudity..." Let me stop you

04:14p 5   there.  What does "HBO" refer to?

 6   A.   I think it's another word for Playboy, maybe --

 7   Q.   How about Home Box Office, maybe?

 8   A.   Yeah, that -- oh, that's what it means, yeah.  It's been

 9   used as kind of a stricter standard than even Playboy.

04:15p 10  Q.   So what that is is a -- I think that was, like, cable?

11   Something like -- you could get Home Box Office on your

12   television and look at it, that kind of thing?

13   A.   So HBO is a premium movie channel, and it tended to have

14   some nudity --

04:15p 15  Q.   Okay.

16   A.   -- on some programs.

17   Q.   Okay.

18   A.   Very few programs and at night.

19   Q.   Okay.  But if an image makes you think twice -- to

04:15p 20  continue on, "...but if an image makes you think twice, remove

21   the image."  Did I read that right?

22   A.   You did.

23   Q.   "There is zero tolerance for closeups of exposed

24   genitalia."  What do you think -- or how would you interpret

04:15p 25  "zero tolerance"?
```

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

```
 1   A.   That image cannot appear on the site.
 2   Q.   Okay.  It's out, right?
 3   A.   What's that?
 4   Q.   It's out, can't appear?
04:16p  5   A.   Either the image is out or the ad is out.
 6   Q.   Maybe both -- well, the ad is out, the image is out?
 7   A.   I'm sorry?
 8   Q.   If the ad is out, the image is out?
 9   A.   There were times we just removed the image and the ad was
04:16p 10   in.
11   Q.   If the ad is out, so is the image?
12   A.   But I'm telling you --
13   Q.   No, sir.  I'm sorry, I don't mean to be curt.
14   A.   Oh, I see what you're asking.
04:16p 15   Q.   Okay.
16   A.   If the ad was removed, then the images, of course, would
17   not be there because the ad is gone.
18   Q.   Okay.  So then he says here, "To make your efforts count,
19   you'll want to lock any ad you have to edit."
04:16p 20        What does it mean to "lock an ad"?
21   A.   So, like I said earlier, if you're gonna remove a sex act
22   pic, you can just remove the pic and then lock the user from
23   editing their ad again so they can't ad that pic back.
24   Q.   Okay.
04:17p 25   A.   So the ad thing goes live, stays live.
```

 1  Q.   And then without going into it, would you agree with me

 2  that the next sentence or so talks about how you actually

 3  would do that?  You can do this by editing, et cetera?

 4  A.   That next sentence says that, yes.

04:17p 5  Q.   Okay.  And then the last sentence in that paragraph, it

 6  mentions what you just mentioned.  Would you agree, "This

 7  prevents a user from making any future edits to that specific

 8  ad"?

 9  A.   That's correct.

04:17p 10  Q.   Okay.  The last part of this says, "If you find yourself

 11  locking ads for any user more than twice, lock their entire

 12  account."  What does that mean?

 13  A.   Well, if they have two ads that they've had to be locked

 14  out, well, then we're gonna lock them out.  Andrew is going to

04:18p 15  have the staff go through every single ad they might have.

 16  They might have 12, 15, 20 ads and they're going to lock their

 17  ability to edit any of those ads.

 18  Q.   Okay.  Sounds like a lot of work.  Is it?

 19  A.   It would be easier to delete the user, but we're trying

04:18p 20  to retain revenue.

 21  Q.   Okay.  A lot of work?

 22  A.   It is more work to lock users out of everything.

 23  Q.   Could we go to Exhibit 58.  This is in evidence.

 24       Okay.  Now, I think -- okay.  This is from Mr. Padilla;

04:19p 25  is it not?

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1  A.   It is.

2  Q.   And it's sent to, would you agree again, moderators?

3  A.   It is.

4  Q.   If you count the number of moderators there, would you --

**04:19p**  5  well, would you estimate it's at least 30, maybe 40?

6  A.   Yeah, somewhere between 30 and 40.

7  Q.   Okay.  You're cc'd on this, aren't you?

8  A.   I am.

9  Q.   And it's sent out on the 17th of October at 12:11 in the

**04:19p** 10  morning?

11  A.   It is.

12  Q.   Is another early bird, right?

13  A.   Or late.

14  Q.   Or late bird.  Somebody who's working pretty hard; would

**04:19p** 15  you say?

16  A.   I would say at this time the job is very challenging.

17  Q.   Okay.  And that says, "Some of you already received this

18  presentation by Gtalk, but I'm attaching it for those of you

19  that haven't," and I think you testified as to what Gtalk

**04:20p** 20  meant.  That's a form of display?

21  A.   It's a form of messaging that Google had that -- you get

22  a quicker notification that you received a message.

23  Q.   Okay.  And then he talks about slides, and this appears

24  to have been things that were attached to this e-mail.

**04:20p** 25       In other words, there are exhibits attached to this

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

 1   e-mail that you may have gone through some of them in your

 2   testimony; but he's attaching slides of things that are not

 3   acceptable and, in some cases, things that are acceptable?

 4   A.   He's attaching slides in a PowerPoint for banned or

04:21p  5   stripped-out terms.

 6   Q.   Okay.

 7   A.   Well, actually, that's two separate attachments.

 8   Q.   All right.  And then down -- if you go down further it

 9   says, "For images described as Graphic Sex Acts, the entire ad

04:21p 10   should be removed"?

11   A.   That's correct.

12   Q.   Okay.  Then he says, "This is only a guideline.  Most of

13   you already have a good idea of how to handle most images.  If

14   that's working for you, stick to it.  You're not going to get

04:21p 15   in trouble for being too clean right now," meaning that if you

16   did delete more than you should be deleting, that's okay.

17   This is -- we're in a learning mode; is that right?

18   A.   That is correct.

19   Q.   So if you look at 51a, if we could have that one on, this

04:22p 20   is one that got approved?

21   A.   I see 51a.

22   Q.   Okay.  And at some point in your testimony, I think that

23   counsel asked you what would be the purpose of your reviewing

24   this training document?  And your response is to become aware

04:22p 25   of Mr. Padilla doing his job as a supervisor and communicating

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

```
 1    the standards of moderation.

 2         Do you remember saying that in testimony?

 3    A.   Yes.

 4    Q.   And they're changing -- I'm sorry, "yes"?

 5    A.   I'm sorry, what was that last part?

 6    Q.   Do you remember saying that in your testimony?

 7    A.   I do.

 8    Q.   And that they're changing -- they are changing all the

 9    time, referring to standards of moderation, right?

10    A.   Correct.

11    Q.   So there were terms that were attached to this e-mail if

12    you go to -- I'm sorry.  Let's go to 58c.

13         And these are the terms, okay, and it says -- all right.

14    These terms are, I think you testified, descriptive of sex

15    acts, right?

16    A.   Most of them, not all of them.

17    Q.   Okay.  But these terms are terms that are -- if they're

18    in an ad, that ad doesn't go through?

19    A.   Can I see the name of this document again?

20    Q.   Well, you know what I have is 58c, and all that I had on

21    mine is "Sheet1," which you can see at the top.

22    A.   I guess my -- if I -- I'm not sure I understand your

23    question.  It's a little more complicated.  Some of these

24    terms are banned.  Some of them are stripped out, and that's

25    two different functions.
```

04:22p (line 5)
04:23p (line 10)
04:23p (line 15)
04:23p (line 20)
04:24p (line 25)

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1    Q.    Okay, I get it.  But I think your testimony was all of

2    these terms are descriptive of a sex act?

3    A.    Correct.

4    Q.    So --

04:24p    5    A.    I just noticed one that isn't, "young."

6    Q.    Well, somehow it snuck in there; but the idea is if this

7    term is in an ad, the ad is either -- the term is either

8    deleted or the ad itself is blocked?

9    A.    Yeah, the ad is blocked if they attempt to use that term.

04:24p   10   Then they get a message that says, "Don't use that term."

11   Q.    Okay.  Now, let's go to 61.  This is not in evidence so

12   if it can be put on the screen for Mr. Ferrer.

13   A.    I see it.

14   Q.    Okay, sir.  This is from Dan Hyer to you; is that

04:25p   15   correct?

16   A.    That is correct.

17   Q.    And it's in -- we're still in October of 2010; is that

18   correct?

19   A.    We are.

04:25p   20   Q.    And this pertains to updates in terms of things that are

21   happening with respect to staffing that pertains to

22   moderation?

23   A.    Correct.

24         MR. EISENBERG:  Move the admission of Exhibit 61.

04:25p   25         MR. RAPP:  No objection.

```
 1              THE COURT:  Exhibit 61 may be admitted and
 2   published.
 3              MR. EISENBERG:  Thank you, your Honor.
 4              (Exhibit No. 61 admitted in to Evidence.)
04:26p  5   BY MR. EISENBERG:
 6   Q.   Okay.  Let's start with -- okay.  Is it -- is it the
 7   case, sir, that you are writing to Mr. Padilla on an update
 8   that you're going to be giving to Scott Spear?
 9   A.   That's correct.
04:26p 10   Q.   Okay.  And then in parentheses it says "(i'll call you),"
11   right?
12   A.   Correct.
13   Q.   Did you call Mr. Padilla, if you recall?
14   A.   I -- I don't recall the call, but it's very likely.
04:26p 15   Q.   Well, then maybe you can't answer this; and if you can't,
16   that's fine.  Did you call him in an attempt to confirm these
17   things that you're recommending that are gonna go up to
18   Mr. Spear?
19   A.   I'm contacting Andrew Padilla to make sure that I've got
04:27p 20   everything.
21   Q.   Okay.  Now, as I see this, there are several blocks here
22   and I'm just -- I want to go down one by one.
23        The first block is "UPDATE" and it says "Hired 13
24   Indians."  Does that refer to that you did go through with
04:27p 25   El Camino and you hired 13 people there?
```

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

 1  A.   We hired 13 more people from El Camino.

 2  Q.   Okay.  And then No. 2 is "Adult jobs and personals under

 3  beta moderation."

 4       What is "beta moderation"?

04:27p  5  A.   We banned more things to the queues, adult jobs and

 6  personals.  It's only under beta meaning can't really get to

 7  it right now.  We're testing it.

 8  Q.   Testing it, okay.  But it was a -- it was a way -- I

 9  assume what you're saying, it was a way to be more efficient

04:28p 10  and encompassing with respect to moderation by using this

11  system?

12  A.   Well, not quite.  We're trying to keep the escorts from

13  posting in personals and adult jobs.

14  Q.   Okay.  Underneath -- it looks like No. 4.  Let's go to

04:28p 15  No. 4.  "Created 'Edited ad' queue is built with 15 minute

16  window."  What does that mean?

17  A.   That means that queue -- well, give me a moment.

18  Q.   Sure.

19  A.   The edited ad queue is ads that have been edited.  They

04:29p 20  go into a queue.  I can't remember exactly what the 15-minute

21  window meant.  It may mean that they're only going to be in

22  the queue for fifteen minutes but I -- I'm not clear about

23  that anymore; but I can say edited ads, they're going into a

24  queue for potential review.

04:29p 25  Q.   Okay.  So is it safe to say even though you can't recall

          1   exactly what 15-minute window means, it's a way in order to

          2   make moderation easier?

          3   A.   No.

          4   Q.   Or is it a way to just -- after fifteen minutes something

04:29p    5   happens?

          6   A.   I think the edited queue is just like a lot more work for

          7   the moderators.  You know, we can't even really get to it.

          8   Q.   Okay.  Lot more work so it's a tough job, right?

          9   A.   I do agree with you that moderation is a tough job.

04:30p   10   Q.   Okay.  Then, sir, No. 6 says "Staff requests," and this

         11   includes "a check box to delete pics easier."

         12        Do you remember what that meant?

         13   A.   I do.

         14   Q.   What does that mean?

04:30p   15   A.   This way you could just check those pics that you wanted

         16   to delete and then hit "submit" because some pics, they may

         17   show just a little too much nudity --

         18   Q.   Okay.

         19   A.   -- beyond the HBO standard.

04:30p   20   Q.   Well, let's -- let's go down to "Recommendations" and

         21   underneath --

         22             THE COURT:  Mr. Eisenberg --

         23             MR. EISENBERG:  Ma'am?

         24             THE COURT:  -- I want to point out that we are at

04:30p   25   the 4:30 minute mark, and I suspect you have more to go --

```
 1              MR. EISENBERG:  I do.

 2              THE COURT:  -- forward with this exhibit; is that

 3   correct?

 4              MR. EISENBERG:  I can end this exhibit in a minute.

04:30p  5       THE COURT:  Okay, let's forge ahead.

 6   BY MR. EISENBERG:

 7   Q.   Under category -- oh, no, I'm sorry.  Under "Comments,"

 8   "illegal content removed is usually money for sex act," we've

 9   seen that before, right?

04:31p 10   A.   Yes.

11   Q.   Then, "The content is pretty clean after removing pics,"

12   what does that mean?

13   A.   We're just getting rid of the hard core nudity.

14   Q.   Okay.

04:31p 15   A.   By not having any pics, the adult jobs content is just

16   taxed and it's a lot tamer.

17   Q.   Okay.  Let's just go over -- and this is the last area.

18        Let's go to "Standards" on the next page, and I'll just

19   go right down to "no hourly rate for service."

04:31p 20        Does that mean -- well, what does that mean?

21   A.   That means -- that's a -- that's a standard for the

22   personals section so that escorts will not post, you know,

23   15-minute, 30-minute, 60-minute --

24   Q.   Right.

04:32p 25   A.   -- pricing.
```

1    Q.    Increments?

2    A.    Kind of defeats the purpose of personals.

3    Q.    Thank you, Mr. Ferrer.

4              MR. EISENBERG:  I'm done with this, Your Honor.

04:32p 5              THE COURT:  All right.  Thank you, Mr. Eisenberg.

6              Now, Members of the Jury, we are at our ending point

7    and we have one week off; and, again, I remind you so far we

8    are still on the schedule to -- even if there is a Government

9    shutdown, to have you come back on Tuesday, October 10th at

04:32p 10   9:00 o'clock unless you hear otherwise in the interim period

11   from our jury administrator.

12             Because we have this lengthy period off, I'm going

13   to give you a more full admonishment.  So, first, continue to

14   keep an open mind throughout the trial and do not decide what

04:33p 15   the verdict should be until you and your fellow jurors have

16   completed your deliberations at the end of the case.

17             Second, because you must decide this case based only

18   on the evidence received in the case and on my instructions as

19   to the law that applies, you must not be exposed to any other

04:33p 20   information about the case or to the issues it involves during

21   the course of your jury duty.

22             Thus, until the end of the case, or unless I tell

23   you otherwise, do not communicate with anyone in any way and

24   do not let anyone else communicate with you in any way about

04:33p 25   the merits of the case or anything to do with it.  This

1    restriction includes discussing the case in person, in

2    writing, by phone, tablet or computer or any other means via

3    e-mail, via text messaging or any Internet chat room, blog,

4    website or application including, but not limited, to

**04:33p** 5    Facebook, YouTube, X, Instagram, LinkedIn, Snapchat, TikTok or

6    any other forms of social media.

7         This restriction also applies to communicating with

8    your fellow jurors until I give you the case for deliberation

9    and it applies to communicating with everyone else, including

**04:34p** 10    your family members, your employer, the media or press, and

11    the people involved in the trial, although you -- again, of

12    course, obviously, your family and your employers know that

13    you are performing jury service; but if you are asked or

14    approached in any way about your jury service or anything

**04:34p** 15    about this case, you must respond that you have been ordered

16    not to discuss the matter.  In addition, you must report the

17    contact to the Court.

18         Because you will receive all the evidence and legal

19    instruction you properly may consider to return a verdict, do

**04:34p** 20    not read, watch or listen to any news or media accounts or

21    commentary about the case or anything to do with it.

22         Do not do any research such as consulting

23    dictionaries, searching the Internet or using other reference

24    materials, and do not make any investigation or in any other

**04:35p** 25    way try to learn about the case on your own.  Do not visit or

1  view anyplace discussed in this case.  Do not use the Internet

2  or any other research -- resource to search for or view

3  anyplace discussed during the trial.

4  Also, do not do any research about the case, the law

04:35p 5  or the people involved, including the parties, the witnesses

6  or the lawyers, until you have been excused as jurors; and if

7  you happen to hear anything touching on the case in the media,

8  turn away and report it to me as soon as possible.

9  Now, a juror who violates these restrictions does

04:35p 10  jeopardize the fairness of these processes and a mistrial

11  could result that would require the entire process to start

12  all over again; and if any juror is exposed to any outside

13  information, please notify the Court immediately.

14  Probably best if you just concentrate on what's

04:36p 15  going on with Taylor Swift and Travis Kelce and you'll be

16  safe; but do recall that you will come back into the court in

17  the morning Tuesday, October 10th; and, also, I'll remind you

18  because we believe at that point we will be in a shutdown

19  situation, you may wish to bring your own lunch, and so just

04:36p 20  be prepared for that as well.  Again, and this caveat applies

21  unless you are otherwise contacted by the jury administrator.

22  So with that, I hope you have an enjoyable week off

23  and are ready and raring to go when you come back for the

24  trial.  With that, please all rise for the jury.

04:37p 25  (Jury out 4:37 p.m.)

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  All right.  And, again, please give the
 2    jurors a little bit of time to exit the area uninterrupted;
 3    and, again, I do remind counsel that you should take all of
 4    your work product, except for the exhibits that are in front
04:37p 5  of Liliana, we'll have that stored away, but the entire
 6    courtroom will have to be cleared for tomorrow's ceremony.
 7              So -- and I've instructed Liliana if you need to
 8    meet with the Court, I have time tomorrow morning and we can
 9    also reconvene -- I believe it is on Friday the 6th of October
04:38p 10 if you need some time with the Court.
11              All right, we'll stand in adjournment.
12              MR. LINCENBERG:  Your Honor, may I raise one quick
13    point?
14              THE COURT:  Yes, you may.
04:38p 15             MR. LINCENBERG:  Thank you, Your Honor.
16              Your Honor, on behalf of all of the defendants, we
17    renew -- we've renewed it many times, but we renew our demand
18    for discovery with a specific -- with specific focus on the
19    notes of interviews of Mr. Ferrer.
04:38p 20             THE COURT:  I was unaware of a first demand so I
21    don't know what -- I don't know if I heard the first demand
22    for notes regarding Mr. Ferrer.  So let me hear from the
23    Government.
24              MR. RAPP:  Well, I -- this is the first I've heard
04:39p 25 of a demand for rough notes.  So I just recall during the
```

1    testimony there would be changes in the nomenclature.  They'd

2    be talking notes when I believe they're talking about

3    finalized reports.  So that's one thing.  They have all those.

4         If they're talking about the rough notes, they're

04:39p 5    here somewhere, but they're not Jencks.  They haven't been

6    adopted.  They're simply the rough notes of the investigating

7    agent.  I don't know of a case that entitles the defense under

8    Rule 16 to those notes.

9         THE COURT:  Well, I think because we're talking

04:39p 10   about a year's long period of time, you'll have to be a little

11   bit more precise in the request --

12        MR. LINCENBERG:  Well --

13        THE COURT:  -- and with respect to the Jencks issue.

14        So why don't you see if you can work it out with the

04:40p 15   Government, and then we can move forward from there; but I

16   think a more precise request is in order.

17        MR. LINCENBERG:  We've made requests.  If counsel is

18   saying that the notes are available for our inspection, then

19   we would take that as the next step.

04:40p 20        THE COURT:  Well, you can ask Mr. Rapp.

21        All right.  If there's nothing further, we're

22   adjourned.

23        COURTROOM DEPUTY:  All rise.

24   *(Whereupon the proceedings adjourned at 4:40 p.m.)*

0:0:0 25

UNITED STATES DISTRICT COURT

1                          *REPORTER'S CERTIFICATION*

2

3                I, TERI VERES, do hereby certify that I am duly

4     appointed and qualified to act as Official Court Reporter for

5     the United States District Court for the District of Arizona.

6                I FURTHER CERTIFY that the foregoing pages

7     constitute a full, true, and accurate transcript of all of

8     that portion of the proceedings contained herein, had in the

9     above-entitled cause on the date specified therein, and that

10    said transcript was prepared under my direction and control.

11               DATED at Phoenix, Arizona, this 29th of

12    September, 2023.

13
                                        _____s/Teri Veres_____
14                                       TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT