**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No.  2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | October 10, 2023 |
| **Michael Lacey, et al.,** | ) | 8:59 a.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE

<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>

<u>JURY TRIAL - DAY 15, A.M. SESSION</u>

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

<u>**A P P E A R A N C E S**</u>

For the Government:
    UNITED STATES ATTORNEY'S OFFICE
    By:  **Kevin M. Rapp, Esq.**
       **Andrew C. Stone, Esq.**
       **Peter S. Kozinets, Esq.**
       **Margaret W. Perlmeter, Esq.**
    40 N. Central Avenue, Suite 1800
    Phoenix, AZ 85004

    UNITED STATES DEPARTMENT OF JUSTICE
    By:  **Austin Berry, Esq.**
    1301 New York Avenue NW, 11th Floor
    Washington, DC 20005

For Defendant Lacey:
    LIPTSITZ GREEN SCIME CAMBRIA, LLP
    By:  **Paul J. Cambria, Jr., Esq.**
    42 Delaware Avenue, Suite 120
    Buffalo, NY 14202

For Defendant Spear:
    KESSLER LAW OFFICE
    By:  **Eric W. Kessler, Esq.**
    6720 N. Scottsdale Road, Suite 210
    Scottsdale, AZ 85253

    FEDER LAW OFFICE, PA
    By:  **Bruce S. Feder, Esq.**
    2930 E. Camelback Road, Suite 160
    Phoenix, AZ 85016

For Defendant Brunst:
    BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
    LINCENBERG & RHOW PC
    By:  **Gary S. Lincenberg, Esq.**
       **Gopi K. Panchapakesan, Esq.**
    1875 Century Park E, Suite 2300
    Los Angeles, CA 90067

For Defendant Padilla:
    DAVID EISENBERG, PLC
    By:  **David S. Eisenberg, Esq.**
    3550 N. Central Avenue, Suite 1155
    Phoenix, AZ 85012

**A P P E A R A N C E S (Continued)**

For Defendant Vaught:
    JOY BERTRAND, ESQ., LLC
    By:  **Joy M. Bertrand, Esq.**
    P.O. Box 2734
    Scottsdale, AZ 85252

For Witness Carl Ferrer:
    STEPTOE & JOHNSON LLP
    By:  **Tahir Boykins, Esq.**
    1330 Connecticut Avenue, NW
    Washington, DC 20036

```
 1                          I N D E X

 2
     WITNESSES FOR THE            DIRECT   CROSS   REDIRECT   RECROSS
 3   GOVERNMENT:

 4   Carl Ferrer
     By Mr. Eisenberg                        9
 5   By Ms. Bertrand                       102

 6

 7

 8                       E X H I B I T S

 9   NO.                DESCRIPTION                          REC'D

10   62         Email from Ferrer to Hyer and Padilla,       14
                10/26/2010
11              DOJ-BP-0000005012 - DOJ-BP-0000005013

12   609        Email from Ferrer to Spear, "Update on adult 25
                content technology," 10/27/2010,
13              DOJ-BP-0002123889 - DOJ-BP-0002123890

14   74         Emails from Padilla to Mohan, Vaught, and    35
                Moderators, 11/18/2010
15              DOJ-BP-0001096641

16   1193       Email to Ferrer and Padilla, "Backpage Terms 48
                of Use Violations," 04/29/2011.
17              DOJ-BP-0000338012

18   657        Email from Ferrer, "NCMEC Agenda,"           53
                06/01/2011,
19              DOJ-BP-0002114656 - DOJ-BP-0002114657

20   686        Email from Ferrer, "ncmec Sept," 10/08/2011, 69
                DOJ-BP-0002126060 - DOJ-BP-0002126061
21
     686-a      Attachment, "OtherESPs_escorts.pdf,"         73
22              DOJ-BP-0002126062 - DOJ-BP-0002126075

23   129        Email from Padilla to Mohan (with            77
                attachment), 10/21/2011
24              DOJ-BP-0000010264

25
```

| | | |
|---|---|---|
| 1138 | Email from Padilla, "updated terms list 092512," 09/25/2012, DOJ-BP-0004434184 | 82 |
| 1138-a | Attachment, "banned092512," DOJ-BP-0004434185 | 82 |
| 5214 | 02.23.13 Email from Isaac Wall, Denver PD, CO to C. Ferrer re: NCMEC Cyber Tipline Report DEFENSE 002089-002090 | 89 |
| 5215 | 02.27.13 Email from Adam Kavanaugh, St. Louis County PD, MO to C. Ferrer re: Investigation and quick response DEFENSE 002092-002093 | 92 |
| 5343 | 02.16.11 Email from FBI Agent Michael Barker to C. Ferrer Re: "Police Posting" DEFENSE 004431-004432 | 96 |
| 6142 | May 2011 FBI Award to C. Ferrer DEFENSE 023901 | 99 |
| 6259 | 01.04.12 Email from C. Ferrer to Adriana, B. Cook, S. Spear and M. Mohan re Invoice for Dec 2011 | 106 |

**P R O C E E D I N G S**

1          (Proceedings resumed at 8:59 a.m.)

2          (Jury not present.)

3          THE COURT:  All right.  Please be seated.

4          All right.  Good morning, everyone.  Do we have          09:00:05

5  Mr. Baum present?

6          MR. RAPP:  I don't believe he's here, but let me see

7  if there's another attorney.

8          THE COURT:  Good morning, Mr. Baum.  Please come

9  forward.                                                          09:00:47

10          MR. BOYKINS:  Your Honor, my name is Tahir Boykins.

11  I'm working with Mr. Baum's office.

12          THE COURT:  Mr. Boykins, can you spell your last name?

13          MR. BOYKINS:  Yes, B-O-Y-K-I-N-S.

14          THE COURT:  And you are also with the law firm of       09:01:01

15  Steptoe & Johnson?

16          MR. BOYKINS:  Yes.

17          THE COURT:  And is Mr. Baum expected to be present?

18          MR. BOYKINS:  Not today, no.

19          THE COURT:  All right.  And you are familiar with       09:01:12

20  Mr. Ferrer's case and his representation?

21          MR. BOYKINS:  Yes, Your Honor.

22          THE COURT:  All right.  At this juncture, I'm going to

23  ask government counsel to make some space for Mr. -- say your

24  last name again.                                                09:01:26

```
 1              MR. BOYKINS:  Boykins.

 2              THE COURT:  -- Boykins, for Mr. Boykins.

 3              And in the event that Mr. Ferrer needs assistance in

 4      terms of determining whether or not to assert his

 5      attorney-client privilege related to responses, then I'll      09:01:40

 6      permit you to speak with him.  All right.  And we will proceed

 7      in that way.

 8              All right.  We do have our jury present.  And let's

 9      have Mr. Ferrer on the stand.  And, Mr. Eisenberg, if you can

10      get yourself situated.                                         09:02:16

11              And as I mentioned last week and we didn't do, I'm

12      going to have you announce presence for all counsel and all

13      defendants and -- defense attorneys and clients.

14              Please all rise for the jury.

15              (Jury present.)                                        09:03:35

16              THE COURT:  All right.  Please be seated.

17              And welcome back, members of the jury.  I do hope that

18      you had a good respite and that you are all prepared to pay

19      attention and be fully present.

20              We have the parties ready.  I'm going to ask           09:04:30

21      government's counsel just to announce presence for all counsel.

22      I'll do likewise for defense counsel.

23              MR. RAPP:  Good morning.  Kevin Rapp, Peggy Perlmeter,

24      Peter Kozinets, Austin Berry, and Andrew Stone on behalf of the

25      United States.                                                 09:04:49
```

```
 1              THE COURT:  Good morning.

 2              Let's start with Mr. Cambria.

 3              MR. CAMBRIA:  Good morning, Your Honor.  Paul Cambria

 4     and my client, Michael Lacey.

 5              MS. BERTRAND:  Good morning, Your Honor.  Joy Bertrand   09:05:01

 6     appearing with Joye Vaught.

 7              MR. LINCENBERG:  Good morning, ladies and gentlemen.

 8     Gary Lincenberg and my partner, Gopi Panchapakesan, with our

 9     client, John Brunst.

10              THE COURT:  Mr. Feder?                                   09:05:23

11              MR. FEDER:  Good morning.  Good morning.  Bruce Feder

12     with Eric Kessler and our client, Scott Spear.

13              MR. EISENBERG:  Good morning, Your Honor.  David

14     Eisenberg.  Good morning, everyone.  And my client,

15     Mr. Padilla, is present.                                         09:05:34

16              THE COURT:  And, members of the jury, Mr. Ferrer is

17     continuing his testimony on the witness stand.  And just so

18     you're not confused, he has a personal attorney, Mr. Boykins,

19     who is sitting at government table.  In the chance that

20     Mr. Ferrer feels he needs to have consultation with his          09:05:52

21     personal attorney, I've permitted that to be.

22              And so with that, Mr. Eisenberg, you may continue your

23     examination.

24              MR. EISENBERG:  Thank you, Your Honor.

25
```

```
 1                       CARL FERRER,

 2   called as a witness herein by the Government, having been

 3   previously duly sworn or affirmed, continued to testify as

 4   follows:

 5                  CROSS-EXAMINATION (Continued)          09:06:07

 6   BY MR. EISENBERG:

 7   Q.  Good morning, Mr. Ferrer.

 8   A.  Good morning.

 9   Q.  How are you today?

10   A.  Very good.                                        09:06:10

11   Q.  Good.  And welcome back.

12   A.  Thank you.

13           MR. EISENBERG:  May the witness be shown Exhibit 201,

14   which is in evidence?  And as -- all right.

15   BY MR. EISENBERG:                                     09:06:18

16   Q.  Now, to lead into this, Mr. Ferrer, you may recall I was

17   asking you a series of questions that pertained to standards,

18   rules with respect to posting moderation, that sort of thing.

19           Remember that?

20   A.  Yes.                                              09:06:40

21   Q.  That was a long -- admittedly, took a long time.  But now

22   I'm in Exhibit -- I want you to look at Exhibit 201, which you

23   have previously identified.

24           And as you can see your -- that I think your testimony

25   was with respect to this that this reflected, and tell me if   09:06:57
```

1    I'm correct -- I have your testimony -- prior testimony

2    correct.

3          There are many changes, and they're reflected in this

4    particular email from you to Mr. Padilla.  And I believe you

5    said you wanted some agreement that this is what we're going to    09:07:17

6    have Andrew, meaning Mr. Padilla, communicate to the

7    moderators.

8          So far, is that accurate?

9    A.  It's -- I would describe it a little bit differently.

10   Q.  Well, I'm just taking what your testimony was.                 09:07:35

11   A.  Yeah.  Well, these are the -- if you looked at the subject

12   line, these are the guidelines that we put on to the queues to

13   help the moderators --

14   Q.  Right.

15   A.  -- keep track of the numerous moderation rules.  And these     09:07:48

16   are the -- this is the moderation guidelines for this

17   particular time.

18   Q.  And this particular time is October 26th, 2010; isn't that

19   correct?

20   A.  Correct.                                                       09:08:04

21   Q.  And you mailed it out or emailed it out at 4:31 in the

22   morning, correct?

23   A.  I did.

24   Q.  And I believe you also said the reason to do this is

25   because these rules are confusing and you wanted to -- my          09:08:16

1  understanding is -- put this into writing so the moderators

2  would have some understanding of what the rules are.  Correct?

3  A.  Yes.  I agree.

4  Q.  All right.  So if we go down these, and we needn't labor on

5  them, but I'll start with the first line there.                09:08:36

6        MR. EISENBERG:  Ms. Ellig, could you highlight where

7  it says, "We need to have"?  That's the first line up there.

8  BY MR. EISENBERG:

9  Q.  And it says:  We need to have the guidelines on the queue

10 to help in training.                                           09:08:53

11        And I think that's just exactly what you testified to.

12 Am I correct?

13 A.  Correct.

14 Q.  And then the next one is:  No doubt these standards will

15 change.  Right?                                                09:09:01

16 A.  Correct.

17 Q.  And I think that you would be prepared to say that is

18 exactly what happened over time; they changed?

19 A.  That is correct.

20 Q.  But for right now, that is, in October of 2010, on the 26th  09:09:09

21 of that month, there are three categories.

22        1 is:  Under adult ads.  That's number 1.  Okay?  And

23 then there's a list of what is not allowed.  Right?

24 A.  Yeah.  Number 1 is:  Adult jobs.

25 Q.  Under adult jobs.                                          09:09:35

1          And if you go to the end of that first line, it says:

2    No sex act for money.

3          Okay?  Get that right?

4    A.  Correct.

5    Q.  And you wrote these standards, did you not, sir?          09:09:43

6    A.  I did create these guidelines.

7    Q.  Okay.  And you wrote the email, of course?

8    A.  Correct.

9    Q.  Now, what is allowed, as you can see down below, is porn

10   jobs, and that has to do with porn video for sex, because it's  09:10:00

11   considered art.

12         I kind of paraphrased it, but I think I got it right,

13   didn't I?

14   A.  That's correct.

15   Q.  Thank you.                                                  09:10:11

16         And the next one is:  Under personals.  Not allowed,

17   and then you see lots of phrases connected with things that are

18   sexual in nature.

19         Those things are not allowed.  Do I have that right?

20   A.  Correct.                                                    09:10:28

21   Q.  Well, I'm sorry.  It says:  No pics.  I should have said no

22   pictures of them are allowed.

23   A.  Yeah, that --

24   Q.  Okay.  And this -- again, this is what you want the

25   moderators, through Mr. Padilla, to put out to train the        09:10:45

CARL FERRER - CROSS-EXAMINATION

1    moderators in terms of what these rules are.  Right?

2    A.  Yes.

3    Q.  Okay.  And then finally, down at the bottom -- not finally,

4    but down at the bottom, there's:  Adults.  This is escorts and

5    body rubs, and not allowed.                                  09:11:05

6            And it's the same pics that are not allowed that were

7    under personals.

8    A.  Correct.

9    Q.  Okay.  So now if we go forward -- and I think you probably

10   realize what I'm trying to do is go through this in some      09:11:19

11   chronology.

12           So now we're in October of 2010, October 26th.

13           MR. EISENBERG:  If we go to Exhibit 62 -- this is not

14   in evidence.  So if the witness could be shown this on his

15   monitor.                                                     09:11:43

16   BY MR. EISENBERG:

17   Q.  So, Mr. Ferrer, this is another email.  It's from Mr. Hyer

18   to you and Mr. Padilla.  And you see where it says the Re

19   concerns new posting rules?

20   A.  I do.                                                    09:12:03

21   Q.  And would you be prepared to say that what this is reflects

22   new posting rules more or less along the lines that you

23   conveyed the previous day?  Take a look through it, sir.

24   A.  Could you say that again?

25   Q.  Yes.  This has to do with the posting of new rules.       09:12:17

1    A.  This is the posting rules that go on top of the posting

2    form page.

3    Q.  What is a posting form page?

4    A.  So that is where you would put the ad title, the body copy

5    of the ad, the images, your email address, and some other data,         09:12:41

6    and then hit submit.

7    Q.  Okay.

8    A.  So it's the actual form.

9              MR. EISENBERG:  All right.  Move this into evidence,

10   Your Honor, and may I have it published?                                 09:12:52

11             MR. RAPP:  No objection.

12             THE COURT:  Yes, Exhibit 62 may be admitted and

13   published.

14             (Exhibit No. 62 admitted into evidence.)

15   BY MR. EISENBERG:                                                        09:13:02

16   Q.  Now, you got to help me out here, Mr. Ferrer, because the

17   way these emails are written sometimes, it's a little

18   confusing.  If you go to the second page, is that where this

19   email starts?  The second page would be -- looks like it's from

20   you --                                                                   09:13:19

21   A.  Yes.  You're talking about --

22   Q.  -- to Mr. Hyer and Mr. Padilla?

23   A.  -- here?  Yep.

24   Q.  Okay.  And so the date here is also October the 26th, same

25   year, and now we have new posting rules to go on top of the             09:13:31

1    page.  That's what you were just talking about a moment ago,

2    correct?

3    A.  Correct.

4    Q.  So I see the first one underneath there, it says:  We will

5    not remove ads with, and then it has these terms.                    09:13:49

6         How does that square with what you were doing in your

7    previous email?  We will not remove the ad or we will -- I'm

8    sorry, won't remove the ad but we will remove the pic?  Is that

9    the idea?

10   A.  I believe so, yes.                                               09:14:08

11   Q.  Because it says later on:  Just the images unless they are

12   frequent offender.

13         Correct?

14   A.  Correct.

15   Q.  And a frequent offender is somebody, I think you've           09:14:17

16   described this before, who does this type of posting a lot, and

17   finally, the only way out is eliminate the poster?

18   A.  Let me read this again.

19   Q.  Sure.

20   A.  So the frequent offenders will have their ads removed.        09:14:32

21   Q.  Right.

22   A.  But the non-frequent offender, the person that posts an ad

23   one time that has genitalia in the ad, those pictures will be

24   removed.  So the ad is essentially edited.

25   Q.  Right.  Picture gone, now that particular poster is going     09:14:59

1  to be aware of the fact that the picture is gone and so they're

2  left to do whatever they're going to do.  Right?

3  A.  Right.

4  Q.  Maybe try to repost it again with the picture?

5  A.  They would often do that.                              09:15:17

6  Q.  And they would get away with it because of the volume, the

7  huge volume that goes through the moderators every day?

8  A.  Yes.

9  Q.  So if you keep going down with me, post legal ads here, and

10  it has pricing for legal adult services.  Has to be a minimum   09:15:37

11  of an hour.  And do not suggest an exchange of a sexual act for

12  money.  Right?

13  A.  Correct.

14  Q.  And not to use certain words.  Is that correct?

15  A.  Correct.                                               09:15:52

16  Q.  So what you're trying to do is convey to the poster, these

17  are the rules of the road, as well as the monitors --

18  moderators, rather?

19  A.  Yes.

20  Q.  Okay.  And down at the bottom, is it -- so you wrote this,   09:16:08

21  correct?  I should have identified this before, but you wrote

22  this -- I guess I did.

23        You wrote this to Mr. Hyer and Mr. Padilla, right?

24  A.  Down at the bottom?

25  Q.  Yeah.  See, I see "Carl"?                              09:16:25

1    A.  Yeah, I see my signature there.

2    Q.  Right.  Right above the signature is:  The hard part of

3    this job is.

4            Could you read the rest of it?

5    A.  The hard part of this job is the rules keep changing.            09:16:36

6    Q.  And the -- for whatever reason the rules keep changing,

7    those changes are directed essentially by you down to

8    Mr. Padilla and out to the moderators, right?

9    A.  No.

10   Q.  Well, they're not Mr. Padilla's -- oh.                            09:16:54

11   A.  I didn't say they were Mr. Padilla's.

12   Q.  All right.  So go ahead.  Finish what you're saying.

13   A.  So as the result of meetings with Spear and Larkin, don't

14   throw the baby out with the bathwater, moderation is done

15   incrementally, so the rules keep changing, getting more strict.     09:17:12

16   But this gives time for users to adapt.

17   Q.  Okay.  If you go up to what appears to me to be an email in

18   response from Mr. Padilla at 10:21 p.m. on October the 26th, to

19   me, that's the next email in this sequence.  Am I correct?

20   A.  I'm sorry.  I -- I'm a little hard of hearing this morning.      09:17:41

21   Q.  How's this?  Is that better?

22          How's that?

23   A.  A little better.

24   Q.  A little better?

25   A.  Yes.                                                             09:17:55

1    Q.  Just tell me and I'll try to adjust it.  Okay.

2           So you have a responsive email from Mr. Padilla.

3    Would you agree?

4    A.  Yes.

5    Q.  And he's saying:  Do not post obscene images, e.g.,          09:18:05

6    uncovered genitalia, sex acts, and so forth.

7           Did I get that right?

8    A.  Yes.

9    Q.  And then he says:  This means no nudity below the waist,

10   right?  So he's asking a question.                              09:18:26

11          And what was your response?  I think if you look above

12   it, you'll see your response.

13   A.  What is my response at 1:10 a.m.?

14   Q.  Yes.

15   A.  I put in the final version of the posting rules with        09:18:47

16   "erect" removed.

17   Q.  Okay.  So what you're saying is do not use certain words.

18   Do not post obscene images, and you define what those are.  Do

19   not post content which advertises an illegal service.

20          Am I correct?                                            09:19:09

21   A.  Correct.

22   Q.  Okay.  And then the last part of this email appears to be

23   above it.  Let's see if I have this right.  Looks like

24   Mr. Padilla wrote to -- well, responded at October the 27th, if

25   I have this time sequence right.  And you see where I'm         09:19:34

1    pointing or directing your attention to, "I told Monita"?  Do

2    you see that part?

3    A.  I do.

4    Q.  Okay.  Is that Monita Mohan?

5    A.  Is that what?                                                    09:19:45

6    Q.  Monita Mohan?

7    A.  Yes, it was.

8    Q.  She's the lady in charge of El Camino; is that correct?

9    A.  She is.

10   Q.  And El Camino is the offshore India group of moderators        09:19:53

11   that were hired, correct?

12   A.  Correct.

13   Q.  They were hired in order to take up the slack or, if you

14   will, the amount of extra or additional ads that were being run

15   through Backpage.  Correct?                                         09:20:07

16   A.  Correct.

17   Q.  And he says:  I told Monita she could start enforcing the

18   rules listed in the queues, and my crew is going to do the

19   same.

20         Do I have that correct?                                       09:20:21

21   A.  You do.

22   Q.  Is it fair to say that what he's trying to do is to educate

23   or help to train those people in India with these rules?

24   A.  Yes.

25   Q.  Now, again, in sequence, I'd like to show you what's been       09:20:34

1    admitted as Exhibit 604.  It's on the screen.  Okay.

2           My recollection, sir, is that with respect to this

3    exhibit -- well, let me back up.

4           If you look at the bottom, there's a date there.  It

5    says October the 18th of 2010.  Do I have that correct?          09:21:08

6    A.  You do.

7    Q.  Yeah.  I somehow got this out of order in terms of time,

8    but anyway, there it is.

9           And it's an email from Nigam, Hemanshu Nigam, to you.

10   This is one you testified about before; is that correct?         09:21:31

11   A.  It's emailed to me and Scott Spear.

12   Q.  And Scott Spear, okay.

13          And Mr. Nigam, he's a consultant; is that correct?

14   A.  He is.

15   Q.  And the company or business that he's with is?  Can you       09:21:48

16   recall what it is?

17   A.  SSP Blue.

18   Q.  Okay.  And so what he's saying is:  I'm finding -- I am

19   finding way too quickly.

20          Could you read the rest of that?                           09:22:00

21   A.  I'm finding way too quickly prostitution ads at the top of

22   the list.

23   Q.  Okay.  Go ahead.

24   A.  All right.  CT will look in NYC and will see this too.

25          And then there's a URL in New York.Backpage, female        09:22:14

1    escorts, filatio, only hosting in mid town.

2    Q.  And "fellatio" is misspelled?

3    A.  Yes, I believe it is.

4    Q.  And what Mr. Nigam is pointing out is that there are these

5    postings that he is finding and he's basically, would you say,          09:22:36

6    complaining about the number of prostitution ads?

7    A.  Yes, he is.

8    Q.  Okay.  And I think that you testified that he was browsing

9    the Backpage site in New York City, and he was seeing all these

10   ads.  Do I have that right about your previous testimony?            09:22:57

11   A.  That he was browsing New York Backpage to see those ads --

12   Q.  Uh-huh.

13   A.  -- because the Connecticut Attorney General was going to be

14   checking the site out.

15   Q.  Right.  That's what he's written here.                           09:23:12

16          And then Mr. Padilla responds; is that correct?  It's

17   up at the top.

18   A.  He does respond.

19   Q.  He does respond.

20          And he's pretty angry, isn't he?  If you read that           09:23:22

21   response, we can drop the word -- the initial word and then

22   read the rest of it.

23   A.  Do you want me to say the word?

24   Q.  Hmm?

25   A.  Do I need to say the word?                                       09:23:31

1   Q.  No, you don't.  I'm asking you to just drop that word and

2   we'll go on.

3           And -- but he is angry, isn't he?

4   A.  Yeah, he's angry or deeply disappointed.

5   Q.  In fact, he's got the same type of wording at the very end            09:23:46

6   of it.  There's another word that he uses.  You don't --

7   needn't repeat it.

8   A.  Okay.  I agree.  He's angry.

9   Q.  Right.

10          So, and you -- you would agree that -- he says:  I            09:24:00

11  deleted the ad, purged the cache, and let the staff know not to

12  allow this to happen again.

13          Did I read that right?

14  A.  Correct.

15  Q.  How would you interpret that in terms of what he's saying?            09:24:13

16  A.  Well, the standards are continually changing.  There's a

17  lot of ads being posted, and we have a policy that is very

18  customer friendly.  So we are not banning --

19  Q.  That's not what I asked you, sir --

20  A.  I thought --            09:24:33

21  Q.  -- with all due respect.

22  A.  I thought that's what you asked.

23  Q.  No, it isn't.  Well, then I will clarify.

24          Is he saying that what he's done is directed his

25  staff, the other moderators, to not allow this type of            09:24:44

1    advertisement get through?  Basically that's it, isn't it?

2    A.  Yes.

3    Q.  Thank you.

4         Now, with respect to -- excuse me.  1928.  This is

5    also in evidence.                                      09:25:07

6         And -- all right.  There it is.  So if you look down

7    at the bottom of this particular email, which is dated

8    October 18, 8:54 p.m., that would be at night, correct?

9    A.  Correct.

10   Q.  Okay.  So he is responding to an email that you wrote on   09:25:37

11   the same day that has to do with term "strip out" or "ban" per

12   Scott and Hemu, and me begrudgingly.

13        Let me just leave it there.  Did I read that

14   correctly?

15   A.  You did.                                           09:26:00

16   Q.  Now, Scott is Scott Spear, right?

17   A.  Correct.

18   Q.  Hemu is Mr. Nigam, correct?

19   A.  Correct.

20   Q.  He's the gentleman with SRP [sic] Blue, right?     09:26:08

21   A.  Correct.

22   Q.  And then the "me" is you, obviously?

23   A.  It is.

24   Q.  And what is being stripped out here are these words down at

25   the -- in the column there.  GFE, PSE, and so forth.  Correct?   09:26:21

1   A.   Correct.

2   Q.   "Begrudgingly," and that's the term you use, and you use

3   "begrudgingly" because you thought that by taking these words

4   out, you're not going to have as much traffic go through

5   Backpage?                                                            09:26:41

6   A.   No.

7   Q.   Okay.

8   A.   I had a different thought in mind.

9   Q.   What was your thought?

10  A.   My thought was this is going to be a lot of work for the      09:26:48

11  moderators.

12  Q.   Okay.  So, in fact, if you look above, I think your point

13  may be contained in Mr. Padilla's response:  Should I put the

14  crew to look for misspellings of these or start to remove the

15  stuff that happened before and strip the terms?  Because that     09:27:12

16  will mean that -- probably "they" -- have to edit every ad on

17  the site.

18          Correct?  Did I read that right?

19  A.   Yes.  He's saying GFE is virtually on every ad on the site.

20  Q.   And that would be a Herculean task?                           09:27:35

21  A.   It is.

22  Q.   But the idea would be, if possible, to keep it out,

23  correct?  Those terms.

24  A.   Say that again?

25  Q.   Yeah.  The idea is to keep those terms out, if possible.      09:27:49

```
 1    A.  The idea is to keep them out and use technology and manual

 2    moderation.

 3    Q.  Okay.  I think we'll get to that in a moment, the

 4    technology part.  Okay?

 5            MR. EISENBERG:  May the witness be shown for              09:28:10

 6    identification Document 609?  I'm sorry, Exhibit 609.  It's not

 7    in evidence.

 8    BY MR. EISENBERG:

 9    Q.  And let me know, is it on your screen, Mr. Ferrer?

10    A.  It is.                                                        09:28:28

11    Q.  Okay.  A moment ago you mentioned technology.  And -- well,

12    do you know who -- do you recognize your email address?

13    A.  Yes.

14    Q.  And is this an email that you sent to, among other

15    people -- well, to Mr. Spear?                                     09:28:45

16    A.  Yes.

17    Q.  And the subject matter --

18    A.  Update --

19    Q.  The subject matter pertains to content technology, correct?

20    A.  Correct.                                                      09:28:57

21            MR. EISENBERG:  Okay.  Move the admission of

22    Exhibit -- Government's Exhibit 609, Your Honor.

23            MR. RAPP:  No objection.

24            THE COURT:  609 may be admitted and published.

25            (Exhibit No. 609 admitted into evidence.)                 09:29:09
```

```
 1   BY MR. EISENBERG:

 2   Q.  Now, it may be that you haven't seen this in a while, and

 3   it is a long email, Mr. Ferrer.  But, again, I'm going to try

 4   to put this into context for you.

 5             If you look at the last page, down at the bottom,        09:29:19

 6   you'll see a name, Wil.  On the second page.

 7   A.  I do see it.

 8   Q.  Okay.  Is that Wil Gerken?

 9   A.  It is.

10   Q.  Who is Mr. Gerken?                                            09:29:32

11   A.  So Mr. Gerken is the CTO at DesertNet, which is our

12   Backpage developers.

13   Q.  And he deals in technology, among other things, doesn't he?

14   A.  Yes.

15   Q.  If you look at this, I think it starts about midway, Mr. --   09:29:47

16   I'm sorry.  He is sending an email to you, is he not?

17   A.  He is sending an email to me responding to an email that I

18   had sent to him.

19   Q.  Right.  And was that looking for an update or something

20   about how we're going to develop the technology for moderators?  09:30:11

21   A.  Yes.

22   Q.  So what you have here is -- see where it says "A few quick

23   comments"?  It's underneath "Thanks for the update, Carl."

24   A.  Yes.

25   Q.  Is that your comments in response to him or is that          09:30:28
```

1   Mr. Gerken's comments to you?

2   A.  That's Mr. Gerken's comments.

3   Q.  To you?

4   A.  Yes.

5   Q.  Okay.  So one comment he has is:  I told India to hire 22        09:30:41

6   people.

7           Did I read that correctly?

8   A.  That's not from Mr. Gerken.

9   Q.  Is that from you?

10  A.  It is.  Anytime you see the two greater signs, that would        09:30:54

11  be from me.

12  Q.  I see.  So you're -- you're responding to him that you told

13  India to hire 22 people, right?

14  A.  Yes.  We're going to hire more moderators.

15  Q.  That's the El Camino group?                                      09:31:14

16  A.  Yes, it is.

17  Q.  And then underneath, you're talking about "changing our

18  content standards."  I think that's from you.

19  A.  That is from me.

20  Q.  Okay.  And you repeat the standards that I think we've seen      09:31:26

21  just a few moments ago.

22  A.  Where?  I don't see that.

23  Q.  Well, all right.

24  A.  It's maybe an abbreviated version.

25  Q.  An abbreviated version, all right.  Thank you.                   09:31:44

1           And then it says:  I'm getting an agreement on the

2      length of text allowed in an escort ad.

3           What did you mean with respect to that?

4      A.  So I'm trying to get agreement from Spear and Hemu that we

5      could reduce the amount of words in an ad to make it easier for     09:32:04

6      the moderators.

7      Q.  Okay.  Now, if you turn the page again back to where I

8      started, you see about the third paragraph down, which starts,

9      it's -- "Anyway, it's absolute hell"?

10     A.  Yes.                                                            09:32:25

11     Q.  I need to continue to invest heavily in moderation

12     technology and need your help.

13          Did I read that right?

14     A.  You did.

15     Q.  And what's absolute hell is what?                              09:32:33

16     A.  We are disrupting the marketplace with lots of changing

17     rules.

18     Q.  Okay.  And what did you think about -- I'm sorry.  What was

19     your intention in terms of investing heavily in moderation

20     technology?                                                        09:32:55

21     A.  We are going to use tools like strip out and ban to do the

22     majority of the work so the moderators don't have to.

23     Q.  Okay.  Did that come about?

24     A.  Yes.

25     Q.  When?                                                          09:33:15

1   A.  Well, it was constantly in development but being improved

2   upon.  The tools became more powerful.

3   Q.  All right.  Now, if we can go to Exhibit 1586.  This is in

4   evidence.

5          This one, sir, if you look at the top, it's from          09:33:30

6   Mr. Padilla.

7   A.  Yes.

8   Q.  And it's dated October the 27th at 5:25 p.m., correct?

9   A.  Correct.

10  Q.  Looks like he's sending something to all the moderators.      09:33:51

11  You recognize their names?

12  A.  I do.

13  Q.  And the subject matter here is:  New guidelines in adult.

14  A.  Yes.

15  Q.  Now, these guidelines are ones that you conveyed to him?      09:34:01

16  A.  Yes.  It was right about the same time.

17  Q.  Okay.  In fact, it says -- and you can read the list of

18  things that's down there, no bare whatever and so forth.

19          That's an accurate statement as to what is the

20  changes.  Those things are not going to be allowed in the ads.    09:34:26

21  These are new rules, correct?

22  A.  One moment.

23  Q.  Sure.

24  A.  It's not quite accurate, what you said.

25  Q.  Well, just read -- let's just read what he said.             09:34:47

1    A.  Well, you haven't --

2    Q.  I'll cure the inaccuracy.

3    A.  It says that there are some new rules.

4    Q.  We've been messing around -- excuse me.

5         We've been messing around with listing guidelines in       09:34:57

6    the queue since last night, but the language isn't finalized

7    yet.  Regardless of what we specifically wind up saying there,

8    here are some new rules.

9         Did I read that correctly?

10   A.  Correct.                                                     09:35:10

11   Q.  And the rules are -- the rules are listed below?

12   A.  Those are just some.  I mean, he is trying to put -- to

13   break it down very simple for the moderators.  Those aren't the

14   same posting rules that I submitted to be on top of the posting

15   form.                                                            09:35:27

16   Q.  Okay.  And then it says:  You can move forward enforcing

17   these changes immediately.

18        Right?

19   A.  Yes.

20   Q.  And then he says:  I'll have more instructions later about   09:35:35

21   how much female frontal nudity will be allowed.

22        Now, did I read that correctly?

23   A.  You did.

24   Q.  And you are going to give him the information that he will

25   need with respect to what can be allowed with respect to         09:35:49

1  frontal -- female frontal nudity, correct?

2  A.  Once I have the information from my bosses, I will pass it

3  on to him.

4  Q.  Okay.  But he doesn't generate these rules.

5  A.  He does not.                                                09:36:07

6  Q.  Now, if you then go to Exhibit 73, this is in evidence.

7         Now, Exhibit 73 is dated November the 17th, and it's

8  from you to Mr. Padilla.  So I'm just going to start at the

9  top.

10        The consensus is that we took a big step in the right   09:36:47

11  direction.  The content looks great.

12        Why don't you make sure you familiarize yourself with

13  this.

14 A.  I'm sorry?  What was that?

15 Q.  Yeah.  Familiar -- I'm just suggesting that you familiarize 09:37:00

16 yourself with the email before I continue asking you questions.

17 A.  Yes.  I'm familiar with this email.

18 Q.  Okay.  What is -- what did you mean by saying:  The

19 consensus is we took a big step in the right direction?

20 A.  The consensus would be communication that I had with Hemu   09:37:17

21 and Scott Spear that the site is getting cleaned up.

22 Q.  Cleaned up, okay.

23        And then the next sentence is:  The content looks

24 great.  I assume that relates back to what you just said, the

25 content of the ads looks great, right?                          09:37:38

1    A.   Yes.

2    Q.   It's getting cleaned up; is that correct?

3    A.   Correct.

4    Q.   The next line is:  Our goal is to tame the content down

5    even further while keeping good content and users.                      09:37:50

6             Correct?

7    A.   That is correct.

8    Q.   And then down below, you list some, oh, I don't know,

9    eight, nine different items, if I said that right, or elements

10   that have been implemented.                                             09:38:07

11   A.   These are the nine items that I agreed to implement coming

12   out of the meeting with my bosses.

13   Q.   Well, Mr. Nigam, was he your boss?

14   A.   What's that?

15   Q.   Was Mr. Nigam your boss?                                           09:38:26

16   A.   Well, I guess he -- Hemu was not my boss, but he was

17   definitely an authority figure on this topic.

18   Q.   Okay.  He was a consultant, right?

19   A.   Yes.

20   Q.   Now, we have -- underneath here, it says:  Items I agree to        09:38:43

21   implement.  The first one is:  More banned terms.

22            We needn't go through them all, but so one of the

23   things that you've agreed to implement at Mr. Spear's and

24   Mr. Nigam's direction is more banned terms.  Right?

25   A.   Correct.                                                           09:39:08

1    Q.  And remove ads, and then you suggest pregnant ads.  That's

2    another thing that, with their consultation, their direction,

3    you're going to have removed?

4    A.  Yes.

5    Q.  The next item is number 3.  That has to do with pricing.          09:39:21

6    And it says here:  They agree 30 minutes can be in massage ads,

7    and so on and so forth.

8            The "they" is who?

9    A.  Hemu Nigam, Scott Spear, and sometimes Jim Larkin.

10   Q.  We can skip 4 and go down to -- excuse me, go down to 5:          09:39:41

11   We can come up with an FAQ for users posting in adult.

12           And I remember from your testimony before that what

13   that referred to is there would be frequently asked questions

14   that would allow a poster to self-sensor.  Did I say that

15   correctly?                                                            09:40:09

16   A.  Yes.

17   Q.  Okay.  And then if we skip down to 7:  Move to 500

18   characters max ASAP.

19           Did I read that correctly?

20   A.  You did.                                                          09:40:22

21   Q.  And I think the 500 max characters meant the less you could

22   put in an ad, the more cleaner the ad would be.  Something like

23   that?

24   A.  The less likely they are to use terms, quoted terms.

25   Q.  And then 8 is banning nipples.  9 is kill TER links in ads        09:40:37

```
 1    on January 1st.
 2            Did I read that correctly?
 3    A.  Correct.
 4    Q.  Okay.  That part, that "kill TER links," that's also
 5    something that you got from Mr. Nigam?                      09:40:52
 6    A.  From?
 7    Q.  Mr. Nigam, Hemanshu, Hemu?
 8    A.  No, we'd been hearing it from other groups, like the
 9    attorneys generals.
10    Q.  Okay.  But isn't that part of what Mr. Nigam is telling you  09:41:05
11    to do?
12    A.  It was.
13    Q.  Thank you, sir.
14            MR. EISENBERG:  If we could go to Exhibit 74.  This is
15    not in evidence.                                           09:41:18
16    BY MR. EISENBERG:
17    Q.  So it will come up on your screen, sir.
18            And do you recognize the email address of Mr. Padilla
19    as being a Backpage address?
20    A.  Yes.                                                   09:41:37
21    Q.  And you can see the cc is to people I think you know and
22    you've testified to about before, Ms. Vaught and Ms. Nickel?
23    A.  Yes.
24    Q.  And the Re here or the subject here is big policy changes,
25    right?                                                     09:41:53
```

```
 1   A.  That is correct.

 2   Q.  And it has to do -- it was sent to the moderators, correct?

 3   A.  Yes.

 4   Q.  And just to get the relevance correct as to time, what's

 5   the date on this?                                                09:42:06

 6   A.  The date is Thursday, November 18th, 2010.

 7   Q.  Okay.

 8        MR. EISENBERG:  Your Honor, I move this into evidence

 9   and request that it be published.

10        MR. RAPP:  No objection.                                    09:42:18

11        THE COURT:  Yes, it may be admitted and published.

12        (Exhibit No. 74 admitted into evidence.)

13   BY MR. EISENBERG:

14   Q.  So just to complete the top part of it, sir, it says --

15   comes from Mr. Padilla at 10:21 p.m. on November 18th; is that   09:42:27

16   correct?

17   A.  That is correct.

18   Q.  So what this is -- if you look at it, it says:  Effective

19   immediately, and down below he's talking about no more nipples,

20   et cetera.                                                       09:42:42

21        Is that correct?

22   A.  That is correct.

23   Q.  And also -- we can skip the next paragraph.  It says:

24   Pixelation and blurring are not okay.

25   A.  Yes.                                                         09:42:53
```

1   Q.  And I think you may have testified about this before, but

2   what does that mean, pixelation?

3   A.  That policy would later be clarified where you could use

4   pixelation and blurring on your face but not on bare boobs.

5   Q.  Okay.  Blurring is the same idea, I guess?  So blurring is        09:43:10

6   the same idea?

7   A.  Yes.

8   Q.  Okay.  And he's saying they're not okay, but he's not

9   limiting it to -- well, withdraw.

10          You see underneath there, there's another sentence?          09:43:23

11  A.  You mean in big change number 2?  Oh.

12  Q.  No, just above it.  Could you read that?

13  A.  Maxim is a good example of what is still allowed on our

14  site.

15  Q.  Do you know what Maxim is?                                        09:43:41

16  A.  I do.

17  Q.  What is it?

18  A.  It is a men's magazine.

19  Q.  And at that time, back in 2010, it was being published.  A

20  popular magazine, wasn't it?                                         09:43:53

21  A.  Yes.

22          MR. EISENBERG:  May the witness be shown 1612-b.  This

23  is in evidence.

24  BY MR. EISENBERG:

25  Q.  So you testified when -- on direct that with respect to          09:44:16

1    this particular exhibit, that the standards are continuously

2    changing.  This is a huge change.  I mean, there's no way we're

3    going to delete tens of thousands of ads.

4            Did I -- is that -- did I capture your testimony

5    correctly?                                                          09:44:38

6    A.  Is that what I said about this email?  Is that what you're

7    asking me?

8    Q.  Yes.

9    A.  Yeah.  I believe this email is the end of topless nudity --

10   Q.  Well, that's not exactly what is responsive, sir.  I don't      09:44:53

11   mean to cut you off.

12           But my question was, do you recall testifying that

13   this is a huge change with respect to what's in this particular

14   document?  I mean, there's no way we're going to delete tens of

15   thousands of ads.  We're simply going to take out the images        09:45:12

16   that don't meet the new standard.

17           That's my recollection of your testimony.  Did I have

18   it right?

19   A.  That is the -- that is the policy that was implemented.

20   Q.  Okay.  And then with respect to this, and we'll go through      09:45:27

21   this in a moment, what you testified as well is that Andrew is

22   implementing the company mandate the directive.  You know,

23   don't throw the baby out with the bathwater.  Make these

24   changes in a graduated fashion.

25           Correct?                                                    09:45:46

1    A.  Correct.

2    Q.  So the date of this is January the 17th, 2011.  And then

3    underneath, you see Andrew's summary below.  I think it's good.

4         Is that what you said?

5    A.  That's what I said.                                    09:46:03

6    Q.  Okay.  So if you turn the page, you get a summary, correct?

7    A.  I'm sorry?  Say that again.

8    Q.  Yes.  If you turn the page of this exhibit, go to page 2,

9    and you'll see there's a summary.

10   A.  Are you talking about here?                            09:46:22

11   Q.  Well --

12   A.  Oh, you mean -- you're talking about Andrew's summary.

13   Q.  Yes.

14   A.  Yes, okay.

15   Q.  Okay.  Because, I mean, that's what you've referenced     09:46:36

16   there, so I'm assuming you're -- when you say "summary below,"

17   this is the summary, right?

18   A.  Yes, I'm sorry.  I was confused.

19   Q.  That's all right.

20        And then you see that it's got a whole list of people   09:46:47

21   that he's apparently sent this to.  Those are moderators,

22   aren't they?

23   A.  I believe they are all moderators.

24   Q.  Okay.  And then the subject matter, which is on page 2, is:

25   Stricter guidelines for nudity.  January 2011.              09:47:03

1          Is that correct?

2     A.  Correct.

3     Q.  Now, this appears to be yet another change that has been

4     instituted by somebody above Mr. Padilla.

5     A.  Correct.                                                    09:47:19

6     Q.  Okay.  And when you get down to the next part of it, it

7     looks to me like on January the 14th, he wrote, "All."  And

8     then he is describing what the new changes are.

9     A.  Yes, he is.

10    Q.  And he leads off by saying:  Backpage will be increasing   09:47:35

11    the restrictions on images in adult categories effective

12    immediately.

13          Correct?

14    A.  Correct.

15    Q.  And your comment was, the summary below:  I think it's     09:47:45

16    good.

17          So Andrew Padilla has captured the new standards that

18    you and others above him have implemented.  Do I have that

19    right?

20    A.  That's correct.                                            09:48:05

21    Q.  Okay.  We could go to 638.  This is in evidence.

22          All right, sir.  This is from you, correct?

23    A.  It is.

24    Q.  And dated January 22, 2011, correct?

25    A.  Correct.                                                    09:48:44

1    Q.  4:27 in the morning.

2    A.  Yes.

3    Q.  A hard worker, sir.  Would you agree?

4    A.  Yeah.  Yes, we worked long hours.

5    Q.  Okay.  There's a cc here to -- well, there's to Mr. Lacey    09:48:58

6    and a cc to Bill Jensen.  Who is he?

7    A.  Bill Jensen is a manager of Village Voice Digital, which

8    is, you know, everything on the -- for internet products except

9    Backpage.

10   Q.  Now, okay.  And what is written here, in essence, if you    09:49:21

11   just go down to the second paragraph, it starts:  If.  If she

12   looks under 18, report it.  If in doubt, report it.

13          Did I read that correctly?

14   A.  You did.

15   Q.  And you're referring to somebody that's posted in an image    09:49:39

16   in an ad, and if they look a certain age, what you're saying is

17   report it, correct?

18   A.  Yes.

19   Q.  Report it to who?

20   A.  Report it to NCMEC.                                          09:49:51

21   Q.  And those reportings, in some cases moderators were able to

22   do that directly to NCMEC.  Certain times?

23   A.  In some cases, moderators were able to do it directly to

24   NCMEC?

25   Q.  Yeah, in certain times --                                   09:50:10

1    A.  Yeah.

2    Q.  -- of the moderation effort.  They didn't have to go

3    through Mr. Padilla.

4    A.  Correct.

5    Q.  But many of the times they did go through Mr. Padilla, did          09:50:17

6    they not?

7    A.  They did.  It was an admin tool that was limited to select

8    users that they could just click, and then it would

9    automatically send a report to NCMEC.

10   Q.  And then further down, it starts with:  Hemu.  Hemu gave us         09:50:34

11   a dozen code words of underage users.

12          And just let me stop there.  Again, that's Mr. Nigam,

13   right?

14   A.  It is.

15   Q.  And that -- you're following through on what Mr. Nigam has          09:50:47

16   given you with respect to code words, correct?

17   A.  Correct.

18   Q.  And then you say:  Perhaps I'll learn more when at NCMEC.

19          I think that refers to your visit with or to or at

20   NCMEC that you testified about earlier.  Right?                         09:51:05

21   A.  Yes.

22   Q.  Okay.  Underneath that, "Roughly," you say, "we reported 30

23   ads to NCMEC out of 300,000 ads in the past 30 days."

24          Did I read that correctly?

25   A.  Yes.                                                                09:51:21

```
 1    Q.  I think -- I think that's like one-tenth of 1 percent?

 2    I -- anyway.  That's not a lot of ads that were reported.  Is

 3    that correct?

 4    A.  Well --

 5    Q.  Or is it?                                                    09:51:40

 6    A.  It all depends on your perspective.

 7    Q.  On your perspective?

 8    A.  I mean, 30 ads for child prostitution could be a lot to

 9    some people.

10    Q.  On the other hand, in terms of the amount of ads that you    09:51:48

11    were doing within 30 days, would you agree with me it's a small

12    percentage?

13    A.  Technically, it's --

14    Q.  Well, it's a matter of math --

15    A.  -- under 1 percent.                                          09:52:03

16    Q.  -- isn't it?

17            I'm sorry.  Don't mean to speak over you.

18    A.  Yeah.  It's under 1 percent.

19    Q.  Okay.  If you go to Document 645, this is in evidence.

20            And this is from Mr. Padilla, correct?                   09:52:28

21    A.  Correct.

22    Q.  So actually, down at the bottom, if you look where it

23    starts with "Carl," and on February the 15th, 2011, looks like

24    you sent him an email.  Is that right?

25    A.  I did.                                                       09:52:47
```

1    Q.  Now, these -- what's below in the email are various terms

2    that need to be removed.

3    A.  Yes.

4    Q.  Okay.  You asked him a question about two of those terms

5    that have to do with "lactating" and "Daddy," and if you read          09:53:10

6    the context of what Mr. Padilla is writing, isn't it, sir, that

7    it's about the context in which those words appear?

8            In fact, you get it in this first line:  I think Daddy

9    is about context.

10   A.  You're referring to the word "Daddy"?                              09:53:31

11   Q.  Yeah, I am.

12   A.  Right?  And it's about the context.

13   Q.  Right.  And so is "lactating."  It's all about how it

14   appears in an ad.

15   A.  Well, if "lactate" appears in an ad under female escorts,          09:53:42

16   it was just considered really bad taste.  And it came from Jim

17   Larkin that pregnant ads and lactating ads just could not be on

18   the site.

19   Q.  Okay.  Now let's go to 646.  This is in evidence.

20           And it's from Mr. Padilla to a lot of moderators,              09:54:22

21   correct?

22   A.  Correct.

23   Q.  And it's at -- dated February the 18th of 2011, so now

24   we're in 2011, at 10:16 p.m.

25   A.  10:16 p.m.?  I see 1:40 p.m.                                        09:54:44

 1           THE COURT:  Yes.  I was looking at an email from

 2    Ms. Vaught.

 3           MR. EISENBERG:  Oh.  Did I -- let's see.  647.

 4           Could you show 647?

 5           THE WITNESS:  I see it now.  647.1.                    09:55:07

 6    BY MR. EISENBERG:

 7    Q.  Yeah.  Well, I hope we've got the right one here.  It's

 8    from Mr. Padilla, and it's dated February the 18th of 2011 at

 9    10:16?

10    A.  Yes.                                                     09:55:19

11    Q.  Okay.  This is the one I want to ask you about.

12           And when you see down, "All," he's talking about

13    filtering out terms "TER" and "The Erotic Review."  Correct?

14    A.  Correct.

15    Q.  Along with links to The Erotic Review since January of this  09:55:34

16    year.  Correct?

17    A.  That's correct.

18    Q.  But our internet safety experts have suggested we take a

19    more aggressive approach.

20           So let me stop there.  Did I read that right?          09:55:48

21    A.  You did.

22    Q.  The internet safety experts, that's Mr. Nigam's group?

23    A.  It is.

24    Q.  Anybody else who would be -- would fall within that

25    designation?                                                 09:56:03

1  A.  I tended to use that term to be inclusive of Hemu Nigam,

2  Scott Spear, the things that were coming out of Building B.

3  Q.  So -- okay.  But he is taking direction from the internet

4  safety experts, isn't he?

5  A.  From -- all.  Yes, he is.                          09:56:23

6  Q.  Okay.  In fact, would you agree the next paragraph says

7  that's what he's going to be doing:  Effective immediately, any

8  variation of or reference to TER is banned.

9          Did I read that correctly?

10  A.  Yeah, but it's a little more complicated than that.    09:56:45

11  Q.  Well, that's what he's writing there, sir.

12  A.  Yeah, but --

13  Q.  Okay.

14  A.  -- there is -- okay.  But the ID number still remains, if

15  there's no TER reference.  So it will be -- TER will be banned   09:56:59

16  if it's TER and an ID number.

17  Q.  Okay.  So he's just relating what he's getting from the

18  internet safety experts, isn't he?

19  A.  Yes.

20  Q.  Let's go to Exhibit 104.  This is in evidence.         09:57:15

21  A.  Yes, I see it.

22  Q.  See it, sir?  All right.

23          Is it on the monitors for the jury?  It is.

24          Okay.  This is from Simrin Hooper.  I think you've

25  testified about this.  Do you agree?                      09:57:51

1   A.  Yes.

2   Q.  And it's dated April 27th, 2011.

3   A.  Correct.

4   Q.  And it's to you; is that correct?

5   A.  It is to me and Jim Larkin and Scott Spear.          09:58:02

6   Q.  Okay.  And what -- in the body of it, Mr. Hooper, who is he

7   with, sir?

8   A.  Ms. Hooper is Hemu's assistant.

9   Q.  So in other words, another internet safety expert or on the

10  internet safety experts' staff, right?                   09:58:22

11  A.  Correct.  There were two of them that we worked with, Hemu

12  and Simrin.

13  Q.  And he's saying:  Attached is a tracking document for the

14  agreed-upon changes and initiatives based upon the meetings

15  with NCMEC and Polaris.                                  09:58:39

16          Is that correct?

17  A.  Correct.

18  Q.  And then if you go to 104-a, and I think you've testified

19  about this as well, these are some changes that were suggested

20  to be made.                                              09:58:56

21  A.  Yes.  These are suggestions, but we don't have a consensus

22  on many of these changes.

23  Q.  Well, the person who is going to bring about those changes

24  and actually implement them such as there is a consensus is

25  Mr. Padilla and his staff.  Right?                       09:59:15

1    A.  I believe for most of these.  Not for all.  Some of the --

2    some of the Demi and Ashton Foundation tasks, I don't think

3    will be under Padilla.

4    Q.  But the bottom line is, whatever ones you direct him to

5    make in terms of changes, those are the ones that he's going to     09:59:39

6    make, right?

7    A.  Whatever Scott Spear, myself, direct Andrew to do as

8    changes with moderation, he will then implement.

9    Q.  And one of those is number 2 on Exhibit 104-a.  It has to

10   do with NCMEC reports:  Train moderators that while they are      10:00:00

11   reviewing images for compliance with terms, they should be

12   reviewing images to ensure that there aren't any users under 18

13   in these photos.

14          Is that correct?

15   A.  That's what it states, yes.                                   10:00:19

16   Q.  And I believe in direct your testimony was, with respect to

17   this, that moderators were trained to look for images of people

18   that look young, so that was done.  Isn't that what you

19   testified to?

20   A.  Yes.                                                          10:00:40

21   Q.  Okay.  Go to Exhibit 1193.  This is not in evidence.

22          So take a look at it, sir.  It's from Mr. Hooper to

23   you, Mr. Padilla, and it relates to Backpage terms of use

24   violations.

25          Do I have that right?                                     10:01:15

1    A.  You do.

2    Q.  Okay.  And it's within the relevant time period we're

3    talking about in April of 2011, is it not?

4    A.  It is.

5              MR. EISENBERG:  Move the admission and request to        10:01:24

6    publish this, Your Honor.

7              MR. RAPP:  No objection.

8              THE COURT:  Yes.  1193 may be admitted and published.

9              (Exhibit No. 1193 admitted into evidence.)

10   BY MR. EISENBERG:                                                  10:01:36

11   Q.  So, Mr. Ferrer, this talks about terms of use violations,

12   correct?

13   A.  It does.

14   Q.  And there's a lady who is referenced in this by Mr. Hooper,

15   correct?                                                          10:01:47

16   A.  Yes.

17   Q.  That's Marie.

18   A.  Yes.

19   Q.  Marie was on Mr. Hooper's staff, wasn't she?

20   A.  It states here:  She's a new member of the SSP Blue team.      10:01:56

21   Q.  Okay.  And then it states that she has been conducting

22   reviews of BP to ensure continued adherence to the terms and

23   policies.  She'll send you, Carl and Andrew only, a once-daily

24   email with links to ads or images that have been up for 24

25   hours that are in violation of the policies.                      10:02:21

```
 1              Is that correct?
 2    A.  Correct.
 3    Q.  You can expect your first email from her on Monday of next
 4    week.  Correct?
 5    A.  Correct.                                                    10:02:31
 6    Q.  I would like us to use this information to better train the
 7    moderators and coordinate with the moderation company to figure
 8    out how to stop these types of ads from appearing.
 9              Is that correct?
10    A.  That's what it states.                                      10:02:45
11    Q.  All right.  And then she says:  Carl, I'll connect with
12    you, and so forth.
13              Correct?
14    A.  Yes.
15    Q.  SSP Blue was eventually terminated, wasn't it?             10:02:53
16    A.  Yes.
17    Q.  These terms of use, did you ever see any references about
18    them from Marie, violations of terms of use?
19    A.  Not often.  I think we had maybe a -- several emails from
20    her.                                                            10:03:28
21    Q.  Okay.
22    A.  Then it stopped.
23    Q.  And it stopped because SSP Blue was out of the picture; is
24    that correct?
25    A.  They were put on the back burner.                           10:03:36
```

1   Q.  There came a time, sir, when someone else became hired at

2   Backpage to help with moderation, and that is Liz McDougall,

3   correct?

4   A.  Correct.

5   Q.  When was she hired?                                    10:03:56

6   A.  Sometime in 2011.

7   Q.  So Ms. McDougall came in and she was, if you will, helpful

8   with respect to moderation and changes or let's say just

9   moderation with respect to the BP website, correct?

10  A.  Correct.                                               10:04:15

11  Q.  And she had a different view of what could or could not go

12  into an ad; is that correct?

13  A.  She did.

14  Q.  And it was different than SSP Blue's; is that correct?

15  A.  Yes.                                                   10:04:30

16  Q.  She was, would you agree with me, far more liberal?

17  A.  Yes, she was more permissive about some things; but then on

18  other things, she was less permissive.

19  Q.  Mr. Ferrer, you looked to her for guidance, didn't you?

20  A.  We did.                                                10:04:50

21  Q.  And that guidance that you got from her, you passed on to

22  Mr. Ferrer -- I'm sorry, Mr. Padilla?

23  A.  Well, the guidance that I got from her was --

24  Q.  That's just a simple question.

25  A.  -- meetings with Scott Spear.                          10:05:06

1    Q.  I'm sorry, sir.

2             THE COURT:  Don't speak --

3    BY MR. EISENBERG:

4    Q.  I didn't ask you that.

5             THE COURT:  Don't speak over one another.  Okay?        10:05:08

6             MR. EISENBERG:  Okay.  Sorry, Your Honor.

7             THE WITNESS:  I mean, you're --

8    BY MR. EISENBERG:

9    Q.  No, no, I'm sorry.  I ask the questions.

10   A.  Okay.                                                        10:05:18

11   Q.  The advice that you got from her, you passed on to

12   Mr. Padilla?

13   A.  There were meetings where she sat in meetings with

14   Mr. Padilla, so I wasn't necessarily the middleman.

15   Q.  Okay.  I see what you're getting at.                         10:05:40

16            Anyway, she's there, Mr. Padilla is there, and she is

17   viewed as a person who has ideas about what can go into an ad

18   and what cannot go into an ad.  It's that simple, right?

19   A.  Yes.

20   Q.  And she is a person to whom Mr. Padilla would look to for    10:06:01

21   guidance, right?

22            MR. RAPP:  Objection.  Foundation.

23            THE COURT:  Sustained.

24   BY MR. EISENBERG:

25   Q.  There were meetings, correct?                                10:06:16

 1    A.  There were meetings.

 2    Q.  You just mentioned there were meetings.

 3         Mr. Padilla is there at the meetings, correct?

 4    A.  Correct.

 5    Q.  And she is hired as a person who is to give advice with          10:06:24

 6    respect to what happens in terms of moderation, right?

 7         MR. RAPP:  Object to that as foundation as well.

 8    BY MR. EISENBERG:

 9    Q.  Well, if you know.

10         THE COURT:  Well, he can answer if he knows.                    10:06:36

11         THE WITNESS:  Initially she did some work in

12    moderation, but eventually she moved more to PR.

13    BY MR. EISENBERG:

14    Q.  Okay.  But your testimony is she was in moderation at one

15    point, right?                                                        10:06:48

16    A.  Early on, yes.

17    Q.  Okay.  She was there to give guidance?

18         MR. RAPP:  Objection.  Asked and answered.

19         THE COURT:  Sustained.

20    BY MR. EISENBERG:                                                    10:06:59

21    Q.  Let's go to Exhibit 657.  This is not in evidence.

22         And you see it there, sir, on your screen?

23    A.  I do.

24    Q.  And this is from you to Tamara at Backpage; is that

25    correct?                                                             10:07:25

1   A.  Yes.  From me to Tamara.

2   Q.  Okay.  And who is she?

3   A.  She's one of the managers that handles subpoenas at the

4   time.

5   Q.  Okay.  And it pertains to the NCMEC agenda, does it not?        10:07:38

6   A.  Yes.

7   Q.  What is the NCMEC agenda, at least with respect to what's

8   in this document?

9   A.  So we were having phone calls with NCMEC, and so I was

10   tasked to create an agenda on things we could talk to NCMEC        10:07:57

11   about by Scott Spear and Don Moon.

12           MR. EISENBERG:  Okay.  Move the admission of

13   Government's Exhibit 657 and request that it be published.

14           MR. RAPP:  No objection.

15           THE COURT:  I'm sorry?                                      10:08:12

16           MR. RAPP:  No objection.

17           THE COURT:  Yes, Exhibit 657 may be admitted and

18   published.

19           (Exhibit No. 657 admitted into evidence.)

20           MR. EISENBERG:  Thank you, Your Honor.                      10:08:21

21   BY MR. EISENBERG:

22   Q.  And the body of this has to do with things that -- well, an

23   update with respect to information that is going to NCMEC,

24   right?

25   A.  Correct.                                                        10:08:34

1   Q.  For example, and this is information, excuse me, that is --

2   Tamara got this together and then sent it on to you?

3   A.  No.  I'm not -- could you ask that question again?

4   Q.  Sure.  If you look down at the bottom of the page, or even

5   to the second page, isn't this information that you're getting        10:09:00

6   from your staff?

7   A.  Most of this agenda I have put together, and some of the

8   information in terms of subpoena count I'm getting from Tamara.

9   Q.  Okay.  So the first thing, the first item here, is May

10  report count.  That's Item No. 1.  Correct?                           10:09:23

11  A.  Correct.

12  Q.  And you have 214 and 11 expedited.

13          What does that mean?

14  A.  So in the month of May 2011, 214 NCMEC CyberTip reports

15  were sent by Backpage.                                                10:09:42

16  Q.  And a CyberTip report is what, sir?

17  A.  It's an alert that there may be child exploitation being

18  posted on the site.

19  Q.  So that's something that you all at Backpage took the

20  initiative to do, that is, to let NCMEC know that this type of        10:09:55

21  issue may be on the site?

22  A.  Yes.  This is -- we built this and thought NCMEC was very

23  useful to handle these type of reports in ads.

24          MR. EISENBERG:  So let's go to 662-b.  This is not in

25  evidence.                                                             10:10:30

BY MR. EISENBERG:

Q.  And if you see this, sir, do you recognize Mr. Larkin's email?

A.  I do.

Q.  And then down -- a little bit down, maybe a third of the way down, there's an email from you.  Is that correct?

A.  Yes.

Q.  And it's dated July 6th, 2011, correct?

A.  Correct.

Q.  And it pertains to a meeting that you had with Sergeant Fassett?

A.  That is correct.

Q.  And he is the man that you testified about before was with Dallas Police Department, correct?

A.  Yes.

        MR. EISENBERG:  Move the admission of Exhibit 662-b, Your Honor, request that it be published.

        MR. RAPP:  I believe it's in, so we don't have an objection.

        MR. EISENBERG:  I'm not sure it is, but if it is then I stand corrected.

        THE COURT:  This is 662-b?

        MR. EISENBERG:  b, Your Honor.

        THE COURT:  I believe it is in.

        MR. EISENBERG:  Okay.  I stand corrected.

```
 1    BY MR. EISENBERG:

 2    Q.  Down at the bottom, let's go down at the first page.

 3          You see where it says:  They only use 1 percent of the

 4    NCMEC reports that we send them?

 5          You see where I'm talking about, sir?              10:11:53

 6    A.  Yes.

 7    Q.  And then he says, or you -- this is something you are

 8    writing, correct?

 9    A.  I am writing this.

10    Q.  Yeah.  And then you say:  There are several reasons for   10:11:59

11    this.

12          And if you turn the page, you go on to say:  Backpage

13    needs to do a better job.

14          Do I have that right?

15    A.  Correct.                                              10:12:11

16    Q.  And then you go on to say:  We are reporting pics where the

17    user is clearly not underaged.

18          Let me stop there.  Did I read that right?

19    A.  You did read that correctly.  That is what Sergeant Fassett

20    is telling me.                                           10:12:27

21    Q.  Okay.  Well, I understand.  You're getting it from him,

22    correct?

23    A.  Yes.

24    Q.  So he's complaining about the fact that you all are sending

25    them ads with pictures that, in his opinion, are not of people 10:12:36
```

CARL FERRER - CROSS-EXAMINATION

1    who are underaged.  Right?

2    A.  Correct.

3    Q.  But if -- isn't it a case of him having -- well, I don't

4    want to call for a conclusion.

5         Would you say, sir, that you are giving him more work    10:12:53

6    than he wants?

7    A.  Yeah.  He described it as a haystack and he had to still

8    find the needle.

9    Q.  Well, you're trying to err on the side of caution, correct?

10   A.  We are trying to err on the side of the caution because we    10:13:11

11   don't know the age of the users posting.

12   Q.  Correct.

13        But he apparently is upset, would you agree, with the

14   fact that you are giving him too many referrals?

15   A.  He is.    10:13:27

16   Q.  Then the next part says:  Even if the pic looks underaged,

17   they still have to set up meetings with the user.

18        Did I read that correctly?

19   A.  You did.

20   Q.  So what he's saying to you is, they don't know if a person    10:13:40

21   is underage until they actually get to meet them and talk to

22   them.  Right?

23   A.  This is what they told me, yes.

24   Q.  And, in fact, you all at Backpage would never know that a

25   person is underage because you never meet them like he does.    10:13:54

1  A.  That is correct.  We don't meet the users.

2  Q.  And isn't that part of law enforcement's task?  They are to

3  do the investigation, right?

4          THE COURT:  Excuse me, Mr. Eisenberg.  One moment.

5          Let's pause for a minute.  I hear an alarm, and I'll          10:14:13

6  have Liliana contact our security to see if we need to vacate.

7  Just please stand silent.

8          Okay.  We're all clear.

9          MR. EISENBERG:  Thank you, Your Honor.

10 BY MR. EISENBERG:                                                    10:14:42

11 Q.  What I was asking you, sir -- well, they're the

12 investigators; you're not.

13 A.  Correct.

14 Q.  Now, the next thing is:  Most of their successful cases are

15 achieved through other means than one of our NCMEC reports.        10:14:59

16          Correct?

17 A.  Correct.

18 Q.  And he was telling you that in order to do a successful

19 case, they have to go out and do an investigation, right?

20 A.  No.  He's -- he told me something different that I can        10:15:12

21 explain.

22 Q.  It says:  Most of this are achieved through other means

23 than one of our reports.

24 A.  Yes.  He had a different -- he had a different strategy to

25 locate child prostitutes by focusing on runaways, and so that's   10:15:31

1   his whole point here, is that the NCMEC reports aren't as

2   valuable as focusing on runaways.

3   Q.  So runaways are somebody, in order to determine if they're

4   underage or for whatever reason, he has to actually go and find

5   that person?                                            10:15:54

6   A.  Yeah.

7   Q.  How else would he know?

8   A.  I'm not sure I understand your question.

9   Q.  In order to do an investigation, isn't he telling you that

10  he has to go and find the person who is either a victim,      10:16:04

11  alleged victim, or somebody who is a runaway?  He has to

12  actually meet them and talk to them?

13  A.  Yes.  He's describing that's what he has to do as part of

14  his investigation.

15  Q.  Part of his investigation.                      10:16:20

16        So he can't determine that on the basis of a picture

17  in a posting alone?

18  A.  Well, 1 percent, he could.

19  Q.  1 percent?

20  A.  Yes.  They only use 1 percent of the NCMEC reports we send  10:16:37

21  them.

22  Q.  Oh, but that's different.  I don't mean to argue with you,

23  sir, but he's using 1 percent of the reports and finding out,

24  in his view, that something is wrong only after he talks to the

25  person who is in that report.  He doesn't do it on the basis of  10:16:53

1    the report itself.

2    A.  Well, he has problems with the reports, but he's --

3    Q.  That's not what I'm asking.

4    A.  -- not telling me to stop sending NCMEC reports.

5    Q.  Mr. Ferrer -- sorry.  Sorry.                              10:17:09

6            What I'm saying to you, sir, is he is not going to

7    complete a case and do a case solely on the basis of a

8    report -- excuse me, an advertisement in the publication of

9    Backpage.

10            MR. RAPP:  Objection.  Foundation as to how this     10:17:23

11   witness would know that.

12            THE COURT:  Sustained.

13   BY MR. EISENBERG:

14   Q.  It says here:  He had printed out a stack of NCMEC reports

15   that he said are not useful with the exception of one case.    10:17:43

16   One case.

17            Let me stop there.  Is that what you meant by --

18   A.  I was -- that -- I was more focused on this over there

19   (indicating).  But that's what he told me.

20   Q.  All right.  Then he says, or you have him saying to you:    10:18:02

21   He is not saying stop the NCMEC reports, just try to do a

22   better job looking at the pic.

23            What do you mean by that, if you know?

24   A.  He believes that Backpage is being -- should probably --

25   well, should send pics that they believe are under -- I think   10:18:25

1    our standard at the time was around -- anything under 25, but

2    it's very hard to tell the age in a pic.  So we tend to be

3    overzealous in our reporting, and he's saying that's not useful

4    for him.  We'd like to see fewer NCMEC reports but higher

5    quality reports.                                          10:18:48

6    Q.  So he wants you to do a better job of finding people who

7    are underage so he's not inundated with a lot of work, correct?

8    A.  Yeah.  He would prefer fewer NCMEC reports.

9    Q.  Well, okay.

10   A.  But, you know, he's -- he's just one law enforcement    10:19:02

11   officer --

12   Q.  Thank you, sir.  Sorry.

13         Go down to number 7.  Do you see where it says:  As

14   was the case in Chicago, they also think they should be able to

15   get info without a subpoena?                              10:19:19

16         Did I read that right?

17   A.  You did.

18   Q.  If we added this to our disclaimer or terms of use -- let

19   me stop there.

20         Is he suggesting that he wants information about       10:19:32

21   somebody who's posted an ad without getting a subpoena out to

22   you to do that?

23   A.  Yes.

24   Q.  You give him the response that I think is appropriate.

25   Well, my view:  I said my attorneys continue to review this   10:19:48

1    request, but it's problematic.

2           And what you meant there is, I can't give you --

3    really, I can't give you information of a substantive nature

4    without a subpoena.

5           Right?                                                   10:20:02

6    A.  Yeah, unless it's an exigent circumstance.

7    Q.  Okay.  Exigent circumstances, that means when police call

8    up and they say, we've got a real problem because somebody is

9    in danger or there's an issue going on where we have an

10   immediate need for information with respect to that people.    10:20:17

11          That's what exigent is, correct?

12   A.  Correct.

13   Q.  And BP complied with that request often, didn't it?

14   A.  We had a number of exigent requests.

15   Q.  And many times those requests, if you know, came to        10:20:34

16   Mr. Padilla in the middle of the night?

17   A.  Well, I thought he had staff to handle those, but I -- I

18   had also got those requests in the middle of the night.

19   Q.  You got them too, yeah.  But so did he, didn't he?

20   A.  I don't know exactly, but it's likely.                     10:20:57

21   Q.  It's likely because that's when law enforcement calls and

22   they need to have somebody to contact, right?

23   A.  Well, I don't think we listed Andrew Padilla's name and

24   number in the -- this database that the DOJ has.

25   Q.  You ever heard Mr. Padilla -- never mind.  Withdrawn.      10:21:21

 1            But you're not saying, as far as you know, he never

 2    responded?

 3    A.  Excuse me?

 4    Q.  In the middle of the night.

 5    A.  Well, I just can't think of any examples.  As I said, it's    10:21:34

 6    likely.

 7    Q.  It's likely that he did, correct?

 8    A.  Yes.

 9    Q.  All right.  Let's go to Exhibit 203.

10            THE COURT:  Mr. Eisenberg, are you going to be long    10:21:50

11    with this exhibit?

12            MR. EISENBERG:  I can stop here, Your Honor.

13            THE COURT:  All right.  I think we're probably at an

14    opportunity where we can take our morning recess.

15            And, members of the jury, again, I'll remind you of    10:22:05

16    the admonition not to come to any conclusions, nor to conduct

17    any research or to discuss the matters amongst yourself.

18            You may be prepared to come back into court at 10:45,

19    and we'll stand in recess.

20            Please all rise for the jury.    10:22:22

21            (Jury not present.)

22            THE COURT:  All right.  We will stand in recess.

23            (Recess taken, 10:22 a.m. to 10:43 a.m.)

24            THE COURT:  All right.  Let's go ahead and check on

25    the jury.    10:43:58

1          All rise for the jury.

2          (Jury present.)

3          THE COURT:  All right.  Please be seated.  And the

4    record may reflect the presence of the witness.

5          And, Mr. Eisenberg, you may continue.                    10:46:09

6          MR. EISENBERG:  Thank you, Your Honor.

7    BY MR. EISENBERG:

8    Q.  Mr. Ferrer, I'm going to go back just for a second to the

9    previous exhibit.  That's 662-b.

10          And one thing I omitted to ask you about was on the      10:46:22

11   second page, about two or three lines down, where it says --

12   get this highlighted:  Even reports from other users often turn

13   out to be competitors just trying to get someone's ad taken

14   down.

15          Did I read that correctly?                               10:46:45

16   A.  You did.

17   Q.  Now, and that is something that Detective -- or rather,

18   Sergeant Fassett told you during your meeting with him; is that

19   correct?

20   A.  Yes.                                                        10:46:57

21   Q.  And what that refers to is someone trying to post an ad

22   who's a competitor in another, what, another -- well, what did

23   he mean by that?

24   A.  People posting in the female escorts category would often

25   want to eliminate their competition by having those ads          10:47:19

```
 1   flagged.  And so we -- we saw that.  Or we saw NGO groups flag

 2   every ad in the category as for abuse.

 3            MR. EISENBERG:  Okay.  Let's go now to 203.  I don't

 4   think this one is in evidence, Your Honor.

 5   BY MR. EISENBERG:                                               10:47:44

 6   Q.  So if you look --

 7            THE COURT:  Mr. Eisenberg, I do have 203 as being in

 8   evidence.

 9            MR. EISENBERG:  Well, then that will obviate my next

10   series of questions.  Thank you, Your Honor.                    10:48:13

11   BY MR. EISENBERG:

12   Q.  Sir, this is from Mr. Andrew Padilla to you, and it's -- it

13   addresses NCMEC info.

14            Do you see that?

15   A.  Yes.                                                        10:48:28

16   Q.  Okay.  Now, there's a variety of words and phrases down at

17   the bottom of this.  Is that correct?

18   A.  Yes.

19   Q.  And they go on to the next page, correct?

20   A.  Yes, they do.                                               10:48:43

21   Q.  And what Mr. Padilla is saying is:  I'm going to take

22   anything good that I can find from the Hemu list.

23            Let me just stop there.  The Hemu list is a list that

24   Hemu Nigam made up with respect to words and phrases; is that

25   correct?                                                        10:49:08
```

1   A.  I believe this entire list, you know, going to the end of

2   page 1 and --

3   Q.  Into page 2?

4   A.  -- page 2 is from Hemu.

5   Q.  Okay.  And then he goes on to say:  From the Hemu list you          10:49:21

6   copied, and then I'll go through our filters.

7            Let me just stop right there.  The filters that he is

8   referring to are what?

9   A.  He's talking about the filter that would either ban or

10  strip out a term.                                                        10:49:43

11  Q.  Okay.  And then he goes on to say:  I'm going to include

12  misspellings for all of the solid sex-for-money terms.

13           Right?

14  A.  Correct.

15  Q.  And I know you've testified before about how people will            10:49:53

16  try to misspell something in order to get that misspelled word

17  into the advertisement.  Is that correct?

18  A.  Correct.

19  Q.  And what he's doing, Andrew is trying to do, is he's going

20  to include misspellings or, let's say, derivations -- not              10:50:08

21  derivations -- misspellings of words in the filter in order to

22  keep the misspelled word out as well, correct?

23  A.  He's going to either ban or strip out those misspelling

24  terms.

25  Q.  We've seen an example of that, have we not, in that term           10:50:26

```
 1    "fellatio," correct?

 2    A.  Seen an example of what?

 3    Q.  Misspelled word.  Do you remember?

 4    A.  Yes.

 5    Q.  Thank you, sir.                                      10:50:36

 6          So if you look down, later on, is this you saying:

 7    Ha?

 8    A.  Yeah, and I don't know what I mean by that.

 9    Q.  Okay.  And by the way, he sent this out on August the 31st

10    of 2011, didn't he?                                     10:50:51

11    A.  Yes, he did.

12    Q.  At 10:30 p.m., correct?

13    A.  Can you -- can you give me a second here?

14    Q.  Sure.

15    A.  I just want to read my version.                     10:51:03

16          Okay.

17    Q.  And what I was getting at was he sent it out on August the

18    31st, 2011, at 10:03 p.m.

19    A.  He did.

20    Q.  Okay.  And then we were talking about the "Ha," and then  10:51:22

21    underneath that is:  I need to give them a lit so something

22    terms we banned.

23          That's probably been -- first of all, let's establish,

24    who is it that is saying this?  Is that you, Carl, down at the

25    bottom?  Or, you know -- I'm sorry, underneath, or is that   10:51:40
```

1    Mr. Padilla saying that?

2    A.  I believe it's -- I am saying, I need to give them a list

3    of terms we banned.  Those are the attorney generals.

4    Q.  Okay.  So, and then you say:  I do not want to give them

5    all 22,000 terms.                                                    10:52:03

6           Let me stop there.  Well, let me go on:  It is

7    proprietary.

8           And that means that you didn't want to give the

9    attorneys general all 22,000 terms that you had developed as

10   being terms that should be banned?                                   10:52:19

11   A.  That's correct.

12   Q.  Okay.  And then underneath it says:  I need the

13   money-for-sex terms, though.

14          Stopping there.  So what you want is terms that

15   pertain to sex for money.  I guess that's pretty obvious.  Is        10:52:36

16   that correct?

17   A.  That's correct.  I've been advised to come up with a

18   hundred terms that we're going to give the attorney generals,

19   and they should be sex-for-money terms.

20   Q.  And then down below is all these terms that you are             10:52:53

21   addressing with respect to the ones that Hemu has given.

22   Correct?

23   A.  That's correct.

24          MR. EISENBERG:  Let's go to 686.  Now, again, Your

25   Honor, my notes say this is not in evidence, but obviously I'm       10:53:14

```
 1   behind the 8-ball on that.
 2            THE COURT:  I would agree with you.
 3            MR. EISENBERG:  It is not?
 4            THE COURT:  It is not.
 5            MR. EISENBERG:  Or that I'm behind the 8-ball?      10:53:27
 6            Okay.
 7   BY MR. EISENBERG:
 8   Q.  Look at 686.  It will be on your screen.
 9   A.  I see it.
10   Q.  Okay.  And this is from you, correct?              10:53:37
11   A.  It's from Carl.
12   Q.  To Carl, right?
13   A.  To Carl.
14   Q.  And this has to do with the NCMEC update, doesn't it?
15   A.  This is the agenda for NCMEC's meeting in September.    10:53:51
16   Q.  Right.  And you identified one previously that was a few
17   months before this, correct?
18   A.  Correct.
19            MR. EISENBERG:  Move the admission of Exhibit 686 and
20   request to publish it, Your Honor.                    10:54:06
21            MR. RAPP:  No objection.
22            THE COURT:  Yes, it may be admitted and published.
23            (Exhibit No. 686 admitted into evidence.)
24   BY MR. EISENBERG:
25   Q.  So here we have, if you look down the page, into the next  10:54:15
```

1    page, am I correct in saying you have eight different points?

2    A.  I have eight items to discuss with NCMEC.

3    Q.  Okay.  The first item -- let's go back to the first page.

4         It says:  September NCMEC report count.  And then it

5    says:  187 reports sent.                                    10:54:41

6         Let's stop right there.  Does that mean you or your

7    staff sent NCMEC 187 reports?

8    A.  Yes.

9    Q.  And then underneath, it says:  Number of urgent emails

10   sent, 17.                                                   10:54:58

11        Let me stop there.  What is an urgent email?

12   A.  An urgent email would be when somebody really, really looks

13   young.  There's certainty about it.  Or a family member has

14   flagged that, you know, their relative is underage and posting

15   on Backpage.                                                10:55:18

16   Q.  Down at the bottom of 1, it says:  In October we are

17   reporting more heavily for Washington state with the hope that

18   law enforcement will find these additional reports helpful.

19        Did I read that correctly?

20   A.  You did.                                                10:55:34

21   Q.  And so does that mean that apparently there are postings

22   from Washington state that you found were potentially

23   problematic?

24   A.  I think there's something going on in Washington state

25   that's causing us to want to create the impression that we're  10:55:47

1    working very -- more with law enforcement in Washington state.

2    Q.  Number 2 is:  Subpoenas from NCMEC reports.

3            So am I reading this right?  September count, 136?

4    A.  Correct.

5    Q.  And underneath 2, just going down a little bit, times to          10:56:06

6    testify in the past month:  2.

7            Does that refer to what I'll call custodians of

8    records, perhaps, who testified in these two cases?

9    A.  Yes, it does.

10   Q.  And those cases have occurred.  I think it's                      10:56:23

11   self-explanatory.  One was a grand jury, correct?

12   A.  Correct.

13   Q.  And the other was a district -- federal district court case

14   in Georgia, correct?

15   A.  Correct.                                                          10:56:39

16   Q.  Okay.  If you go over to the last -- or the second page,

17   you see where it says:  Attached, a PDF of adult ads in other

18   sites and places?

19   A.  Correct.

20           MR. EISENBERG:  Now, that, I believe, is in                   10:56:57

21   Exhibit 686-a, which is not in evidence, Your Honor.

22           May 686-a be shown to the witness?

23           THE COURT:  It may.

24   BY MR. EISENBERG:

25   Q.  Now, 686-a, sir, is this the attachment that went to 686?        10:57:23

1    A.  Say that again?  I'm sorry.

2    Q.  Yes.  You should have 686 on your screen now.

3    A.  I do see it.

4    Q.  Okay.  Is this the attachment -- it is the attachment that

5    went with 686, correct?                                    10:57:36

6    A.  I --

7            THE COURT:  Is there more to that?  I just see --

8    there's just one page.

9            MR. EISENBERG:  Oh, no.  There should be -- hmm.

10   There should be many more pages.                           10:57:49

11           Your version has just two pages or one page, Your

12   Honor?

13           THE COURT:  Well, now it's showing two pages.  But is

14   this a multipage --

15           MR. EISENBERG:  It is a multipage --              10:58:04

16           THE COURT:  -- exhibit?

17           MR. EISENBERG:  -- Your Honor, and it should have --

18   there's something like 14 or 15 pages.  And that's not coming

19   up?

20           THE COURT:  It's showing just two.                 10:58:20

21           MR. EISENBERG:  Oh, I see.  Okay.

22           THE COURT:  There we go.

23   BY MR. EISENBERG:

24   Q.  So would you agree with me, sir, that this is the

25   attachment?                                                10:58:43

1    A.  Yes, it is.

2              MR. EISENBERG:  Move the admission of 686-a, Your

3    Honor.  Ask that it be published.

4              MR. RAPP:  Judge, I object on relevance grounds.

5              MR. EISENBERG:  Well, Your Honor, it's an attachment        10:59:00

6    to an exhibit that is now in evidence.  And it's part of the

7    report that the gentleman had with respect to NCMEC for the

8    month of September.  It's all relevant.

9              THE COURT:  I'll overrule.  It may be admitted.  It

10   may be published.                                                    10:59:16

11             MR. EISENBERG:  Thank you, Your Honor.

12             (Exhibit No. 686-a admitted into evidence.)

13   BY MR. EISENBERG:

14   Q.  I only need you to look at -- you see where it says

15   screenshots?  Disregard that page.  Go to the next page.            10:59:21

16             See where it says Google?

17   A.  I do.

18   Q.  Okay.  And underneath, sir -- well, Google, and then site,

19   YellowPages.com/escorts, correct?

20   A.  Yes.                                                             10:59:41

21   Q.  This is referring to escorts, something that has to do with

22   escorts, in Yellow Pages, right?

23   A.  Correct.

24   Q.  And in fact, if you go down to Myrtle Beach, that's the

25   next one underneath, Myrtle Beach Escorts, escorts in Myrtle        10:59:52

1    Beach SC, South Carolina, right?

2    A.  Yes.

3    Q.  And YP.com, that stands for Yellow Pages, right?

4    A.  I believe it does.

5    Q.  It looks to me, and would you agree, sir, that there are          11:00:09

6    escorts ads being put into the Yellow Pages in an area known as

7    Myrtle Beach?

8              MR. RAPP:  Objection.

9              THE COURT:  I can't hear you, Mr. Rapp.

10             MR. RAPP:  I'm sorry.  There's something wrong with my      11:00:26

11   mic.

12             Objection.  Foundation.

13             THE COURT:  Sustained.

14   BY MR. EISENBERG:

15   Q.  This is an attachment that you had to 686?                        11:00:31

16   A.  It is.

17   Q.  And it is something that is in response to your NCMEC

18   report, and it has to do with a PDF of adult ads in other sites

19   and places, correct?

20   A.  Correct.                                                          11:00:50

21   Q.  This is an ad with respect to adult postings or adult ads

22   in other sites and places, correct?

23   A.  This is an ad to --

24   Q.  I'll go back through it, sir, just so we're clear.

25             Number 8 post -- number 8, paragraph 8 on 686, this is     11:01:06

1    what you wrote:  Attached, a PDF of adult ads in other sites

2    and places.

3           Did I read that right?

4    A.  Yes.

5    Q.  You attached 686-a?                                          11:01:21

6    A.  I did.

7    Q.  And you attached it because it showed a PDF of adult ads in

8    other sites and places, right?

9    A.  I attached it because it was a PR campaign to show that

10   there were adult ads in other places.                           11:01:40

11   Q.  Okay.  The adult ads appeared in the screenshots that are

12   attached to this exhibit, right?

13   A.  Well, these don't look like adult ads on this screenshot.

14   Q.  Well, to tell you the truth, sir, I don't mean to argue

15   with you, but if you go back to 686, what you wrote is:          11:02:00

16   Attached is a PDF of adult ads in other sites and places.

17          Did you mean to misconvey the information that you

18   were going to give to NCMEC about what's on this screenshot

19   pertaining to Myrtle Beach?

20          MR. RAPP:  Objection.  Objection.  Foundation.           11:02:19

21          THE COURT:  Overruled.

22          THE WITNESS:  No.  The screenshot that you're

23   referencing to is actually an index of YellowPages.com, and

24   it's not individual escort ads.  And that's what you were

25   referring to.                                                    11:02:36

1   BY MR. EISENBERG:

2   Q.  All right.  In any event, what you've got here is something

3   that pertains to Yellow Pages Myrtle Beach, right?

4   A.  Yes.

5   Q.  And the same with Miami Escorts Yellow Pages, correct?        11:02:44

6   A.  Yes.

7   Q.  And the same with Louisville Escorts, right?

8   A.  This is what appears in Google when you do the search.

9   Q.  Okay.  And if you turn the page, and we'll stop with just

10  this next page, same thing for Houston Escorts only it's          11:03:02

11  Twitter, right?

12          THE COURT:  We're not showing the page.

13          MR. EISENBERG:  Oh, sorry.

14          Ma'am -- Ms. Ellig, could you go to the next page?

15  It's in 686-a.                                                    11:03:18

16  BY MR. EISENBERG:

17  Q.  So you also have a screenshot for Houston Escorts on

18  Twitter.com, right?

19  A.  Yes.  There's one.

20  Q.  And down below, we have Montreal Escorts, Twitter.com,        11:03:42

21  right?

22  A.  Yes.

23          MR. EISENBERG:  May we go to 129, Exhibit 129, Your

24  Honor.  And this is not in evidence.

25                                                                    11:03:55

1    BY MR. EISENBERG:

2    Q.  Do you see it in front of you, sir?

3    A.  I do.

4    Q.  Okay.  Now, it's from -- would you recognize Mr. Padilla's

5    address?                                              11:04:20

6    A.  I do.

7    Q.  Okay.  And you see the name Monita Mohan.  Do you recognize

8    who that is?

9    A.  I do.

10   Q.  And also, there's a cc to Ms. Vaught; is that correct?    11:04:28

11   A.  Correct.

12   Q.  And there's a reference to "at20."  Is that a moderator or

13   a moderator number that works for Ms. Mohan?

14   A.  That is correct.

15   Q.  And it pertains to something that had to do with what that  11:04:42

16   moderator was doing or not doing; is that correct?

17   A.  I believe so.

18           MR. EISENBERG:  Move the admission of Exhibit 129 and

19   request to publish it.

20           MR. RAPP:  No objection.                       11:04:56

21           THE COURT:  Yes, it may be admitted and published.

22           (Exhibit No. 129 admitted into evidence.)

23           MR. EISENBERG:  Thank you, Your Honor.

24   BY MR. EISENBERG:

25   Q.  Now, sir, this is Mr. Padilla writing Ms. Mohan, and I'm    11:05:02

1    going to go through it and I'm going to stop and ask you

2    questions about it.

3          So what we have is:  This morning, one of our

4    third-party watchdog groups points this ad out to Carl.

5          Stop there.  Do you remember the ad?                    11:05:25

6    A.  I don't.

7    Q.  Okay.  Do you know who a watchdog group is?  Is that

8    Mr. Hemu's group?

9    A.  Would you say that again?

10   Q.  Yes.  Mr. Padilla's referring to a third-party watchdog   11:05:38

11   group.  Who is that?

12   A.  Yeah, I'm also not sure who that is.

13   Q.  Okay.  Next sentence -- well, I'm suggesting that it's

14   Mr. Nigam's group.  Does that -- I don't want you to speculate.

15   Withdrawn.                                                     11:06:02

16         It's one of the most egregious oversights I've ever

17   seen a moderator make.  Clearly, even the most poorly trained

18   moderator would recognize that this ad contains nudity, so this

19   must be a case of an employee who doesn't care or an employee

20   who is rushing through their work.                             11:06:21

21         Okay.  Is this beginning to bring to your mind the

22   particular ad?

23   A.  I don't recall the ad.

24   Q.  Okay.

25         MR. RAPP:  I would object.                               11:06:37

 1              MR. EISENBERG:  Fair enough.

 2              MR. RAPP:  The ad is 129-a.

 3              MR. EISENBERG:  Well, whatever.  If you want to put it

 4      in, you can.

 5              Sorry, Your Honor.                              11:06:45

 6              THE COURT:  Yes.  The jury will --

 7              MR. EISENBERG:  I apologize.

 8              THE COURT:  Wait.  Take a moment.

 9              Ask a new question, Mr. Eisenberg.

10              MR. EISENBERG:  Yes.                            11:06:58

11      BY MR. EISENBERG:

12      Q.  The next part of it is -- just go down to the next

13      paragraph.

14              In a perfect world, our own second tier moderation

15      would have caught this, but we're spread pretty thin on the   11:07:12

16      weekends.

17              Did I read that correctly?

18      A.  You did.

19      Q.  Is it a case, sir, of you bringing this ad, if you can tell

20      from the context, to Mr. Padilla's attention with the direction  11:07:26

21      that he inform Ms. Mohan's crew what's going on?

22      A.  It appears that this is an ad that was pointed out to me by

23      third-party watchdog groups and that I have sent it to Padilla.

24      Q.  Okay.  Let's move to 725, also not in evidence.

25              And same series of questions about this one, sir.  Do   11:08:03

```
 1   you recognize Mr. Padilla's email address?

 2   A.  I do.

 3           THE COURT:  One moment, Mr. Eisenberg.  I do have this

 4   in evidence.

 5           MR. EISENBERG:  Okay.                              11:08:17

 6           THE COURT:  I have 725, 725-a and b.

 7           MR. EISENBERG:  And b, all right.  Again, I stand

 8   corrected.  Okay.

 9   BY MR. EISENBERG:

10   Q.  This is an email, sir, that is dated April the 5th, 2012,  11:08:30

11   at 10:30 p.m.  Is that correct?

12   A.  That is correct.

13   Q.  And you recognize the names of moderators down there,

14   correct?

15   A.  I do.                                                  11:08:42

16   Q.  And what he is conveying is a list of adult terms that are

17   banned on the site.  Is that correct?

18   A.  Yes.

19   Q.  And he's also saying that these are terms we consider

20   egregious violations of our terms of use.  Correct?         11:08:58

21   A.  That is -- that is correct.

22   Q.  Okay.  Let's just skip down and to the next paragraph,

23   where it says:  The attached list is automatically filtered,

24   and a user attempting to post an ad with any of these terms

25   receives an error message during the posting process.  We don't  11:09:17
```

1    want these terms on our site.

2            Correct?

3    A.   That's what it states, yes.

4    Q.   Okay.  If we turn to 725-b, which is in evidence, this is

5    the list of those terms that he's referring to.  Is that          11:09:35

6    correct?

7    A.   Yes.

8    Q.   And these -- these list, without going through them

9    specifically, there are variations on the spelling of several

10   different terms.  Correct?                                         11:09:55

11   A.   Yes.

12   Q.   So what he's trying to do is take care of the misspellings

13   along with the terms themselves, right?

14   A.   He is.

15   Q.   Thank you.                                                    11:10:09

16           MR. EISENBERG:  The next one is 1138.  I have this

17   listed as not in evidence, Your Honor.

18   BY MR. EISENBERG:

19   Q.   So if you look at it, again, you recognize Mr. Padilla's

20   email address?                                                     11:10:42

21   A.   I do.

22   Q.   And also, you probably recognize some, if not all, of the

23   names of the people that it's to; they're moderators?

24   A.   I recognize some names.

25   Q.   Okay.  As well as -- well, the subject matter is "Updated     11:10:54

1    terms."  Correct?

2    A.  Correct.

3    Q.  And this appears to be yet another update on terms that are

4    banned; is that correct?

5    A.  It does.                                                    11:11:08

6            MR. EISENBERG:  Your Honor, I move the admission of

7    1138 and 1138-a.

8            MR. RAPP:  No objection.

9            THE COURT:  Yes, they may be admitted and published.

10           (Exhibit Nos. 1138 and 1138-a admitted into evidence.)  11:11:22

11           MR. EISENBERG:  Thank you, Your Honor.

12   BY MR. EISENBERG:

13   Q.  So just to stick with 1138, this is done on September the

14   25th of 2012, correct?

15   A.  Correct.                                                    11:11:30

16   Q.  At 6:18 p.m., right?

17   A.  Yes.

18   Q.  So the cc's include you -- actually, they do include you.

19   Ms. Nickel, right?

20   A.  Yes.                                                        11:11:46

21   Q.  Ms. Vaught?

22   A.  Yes.

23   Q.  Mr. Hyer?

24   A.  Yes.

25   Q.  And Liz McDougall, right?                                   11:11:52

1    A.  Yes.

2    Q.  Okay.  And what he writes here is:  Here's an updated list

3    of banned terms in the adult section.

4           Correct?

5    A.  He does.                                          11:12:03

6    Q.  And if you go over to 1138-a, now we have the actual list

7    of banned terms, correct?

8    A.  We do.

9    Q.  I'm just going to ask you about some of -- not the terms

10   themselves, but if you look into the second paragraph there,   11:12:22

11   you'll see words like "context."

12   A.  Yes.

13   Q.  What does "context" mean in this context?

14   A.  I believe what he's saying, let's use the example "bang."

15   Bang in certain contexts might be sex.                 11:12:38

16   Q.  Okay.

17   A.  And in other contexts it might just be a noise.

18   Q.  So context means how it fits into the actual language

19   that's put into the ad?

20   A.  Could you say that again?                          11:12:55

21   Q.  Yes.

22          Context means how a particular word or phrase fits

23   into the ad as it is posted.  It could be innocuous or it could

24   not be innocuous?

25   A.  Yes.                                               11:13:10

1  Q.  And then down below, or just -- one of them says "alert."

2  The meaning to that is what?

3  A.  Well, there were certain terms that we decided that we

4  don't want to ban or strip out, but we want to have an alert

5  sent.                                                          11:13:28

6  Q.  Would that also deal with the context?

7  A.  No.  The alert means that somebody should look at that ad

8  because it may be descriptive of child exploitation.  Like --

9  Q.  Okay.

10  A.  -- like 12, "barely legal."                               11:13:45

11  Q.  All right.  So that takes a moderator actually eyeballing

12  the ad?

13  A.  Yes.

14  Q.  Let's go to 1829.  This is in evidence.

15          Now, this one is dated April 23rd, 2012, at what time? 11:13:59

16  11:13 p.m., correct?

17  A.  Yes.

18  Q.  It's from Ms. Vaught, right?

19  A.  Yes, it is.

20  Q.  To Mr. Padilla?                                           11:14:14

21  A.  Yes.

22  Q.  And the term or the subject matter is:  Caught up on

23  filters.

24          Right?

25  A.  Correct.                                                  11:14:23

1    Q.   What's a filter, sir?

2    A.   The filter is the strip-out or banned technology that we

3    have in place.

4    Q.   So if we go to -- let's see.  1829-a, that's the list of

5    filtered terms, right?                                          11:14:47

6    A.   Correct.

7    Q.   Okay.  So if you go over to that Column D, I think you

8    testified that Column D is the action?

9    A.   It is the action.

10   Q.   Okay.  And that's where I see "ban" or "flag as spam"; is  11:15:05

11   that correct?

12   A.   Correct.

13   Q.   Then you said Column H is the most important column.  It

14   is -- H is the forbidden.  It's the message.  That's the custom

15   message.                                                        11:15:19

16   A.   Is that a question?

17   Q.   Yeah.  No, well, it is.  That's your testimony, isn't it?

18   A.   That this -- this is the message that will come up, a

19   custom message that will come up when someone's trying to post.

20   If there's no -- nothing in there, then it will be, "Whoops,    11:15:35

21   there's an error."

22   Q.   Okay.  But, for example, when I see, "Sorry, there's a

23   problem with," what does that mean?

24   A.   I'm sorry, where are you at?

25   Q.   Well, if you go -- it's listed in that column.  Several    11:15:48

```
 1  different have that.  "Sorry, there's a problem with."
 2  A.  Right.  So these columns here, the blank ones, if there's
 3  no custom message put in there, it will say, "Whoops, there's
 4  an error," and then the user has to guess what the problem is
 5  with their ad text.                                              11:16:10
 6          But if you see the message, well, then they know that
 7  they can't have "oral" in their ad.
 8  Q.  Okay.  Let's go to Exhibit 225.  This is in evidence.
 9          Now, sir, Exhibit 225, if you -- would you agree with
10  me that it's in New York, something called New York Massages -- 11:16:36
11  or Massage, if you look up above?
12  A.  Yes.
13  Q.  And the images that are here, they're not specifically
14  violative of anything, correct?
15  A.  You're asking if the images are violating any --           11:16:52
16  Q.  Standards?
17  A.  -- terms?
18          Well, maybe here (indicating).  I don't know.
19  Q.  Okay.  If you don't know, then you don't know.
20          Go to the third page.  It's 3 of 3 on this ad.  And do  11:17:06
21  you see down, about midway down, where it says "http"?  That's
22  it.
23          And you see where it says Instagram.com?
24  A.  Uh-huh.
25  Q.  Now, that refers to what?  A publication of an ad or a      11:17:25
```

1    reference to the fact that there may be a publication in -- on

2    Instagram?

3    A.  Yes, that's what it reference.

4    Q.  Let's go to 227.  Now, 227 is also in evidence.

5            And it's under West Palm Beach Massage, correct?        11:17:53

6    A.  Yes, it is.

7    Q.  These images here, sir, there's no particular violation on

8    any of them, are there?

9    A.  Well, there's an image with ad text.  And I don't really

10   have time to go through looking at every single word, but --     11:18:15

11   Q.  No, I'm talking about the images.

12   A.  The images are fine.

13   Q.  Okay.  And then if you go to page 2 of 2, about halfway

14   down, you see "https"?

15   A.  I do.                                                        11:18:32

16   Q.  All right.  And www.Facebook.com/Exotic Asian Beaty?

17   Probably meant beauty, but anyway, be that as it may, that's

18   what it says.

19           So that refers to a potential posting by this person

20   on Facebook?                                                     11:18:51

21   A.  Yes, but I'm familiar with this, and often those URLs

22   didn't resolve.  Because we were requiring them, at this period

23   of time in January 2018, to put in a Facebook or a Twitter or

24   an Instagram, because it was a strategy.  But often those URLs

25   didn't work.                                                     11:19:14

1    Q.  Well, let me just go back and make sure you understand me.

2          Did I read it right?  Www.Facebook.com/Exotic Asian

3    Beaty?

4    A.  That's what it says.

5    Q.  Thank you.                                          11:19:32

6          Let's go to Exhibit 5214.  This is a defense exhibit.

7          Do you see that, sir?

8    A.  I do.

9    Q.  Okay.  Now, this is not in evidence.  So this is an email

10   to you, would you agree, from Isaac Wall, who is a policeman in   11:19:50

11   Denver, correct?

12   A.  You're starting down here?

13   Q.  Well, down at the bottom.  You can go to the next page.

14   A.  Yeah.  So it's -- it's from some -- a police officer in

15   Denver to "Abuse."                                      11:20:17

16   Q.  Okay.  And -- well, actually, it's from Denver, and it's

17   addressed to you, isn't it, Mr. Ferrer?

18   A.  Well, it does say "Attention."  I think they want to get it

19   to me.  It's not in my email address until Andrew sends it.

20   Q.  Okay.  Do you recognize Andrew's email?            11:20:38

21   Andrew@backpage.com?

22   A.  I do.

23   Q.  And you recognize your email, Carl Ferrer?

24   A.  I do.

25   Q.  Okay.  So this is a document, sir, that came to your -- to   11:20:51

```
1    Backpage to your attention, correct?

2    A.  It did.

3            MR. EISENBERG:  Move the admission of Exhibit 5214.

4            MR. RAPP:  No objection.

5            THE COURT:  Yes, it may be admitted and published.    11:21:10

6            (Exhibit No. 5214 admitted into evidence.)

7    BY MR. EISENBERG:

8    Q.  So this is from Detective Isaac Wall at the Denver Police

9    Department, correct?

10   A.  Correct.                                                  11:21:21

11   Q.  And he says -- I'm just going to concentrate on -- let's go

12   over, and I'll try to read this in the order in which it was

13   written.

14           It's addressed to Mr. Carl Ferrer, right?

15   A.  Yes.                                                      11:21:41

16   Q.  And now I'm on the first page.  And it says:  I received a

17   NCMEC CyberTipline report stating Backpage.com moderator bp26

18   feels the text in this post is suggestive of child exploitation

19   with the phrase, so forth.

20           Correct?                                              11:22:04

21   A.  Correct.

22   Q.  The post ID is -- there's a number there.

23           Post ID refers to a number I guess you can trace the

24   ad to?

25   A.  That is correct.                                         11:22:14
```

1   Q.  Then he says:  I investigated this report and contacted the

2   female in the advertisement on a sting operation.

3           Right?

4   A.  Yes.

5   Q.  A sting operation is like a -- well, undercover type of          11:22:24

6   thing, I guess you could call it?

7   A.  Yes.

8   Q.  The female was found to be 20 years of age.  No evidence of

9   child exploitation or sex trafficking was found in this case.

10          Did I read that right?                                       11:22:43

11  A.  You did.

12  Q.  Okay.  Sex trafficking would refer to, well, sex

13  trafficking, I guess.  Means no incidents of someone being

14  sexually trafficked?

15  A.  Correct.  It's run-of-your-mill prostitution.                    11:23:01

16  Q.  Well, does he say that?  Let's see.  Does he say

17  run-of-the-mill prostitution?  I'm sorry, sir.  I don't see

18  that.

19  A.  No, I don't see it.  I guess that's what I interpret this.

20  Q.  Yeah.  Well, you know, you want to make sure that --            11:23:16

21  anyway, the words are -- words govern here.

22          Next one:  I wanted to contact you and thank you for

23  your concern in the matter of possible child exploitation being

24  conducted on the site.

25          Did I read that right?                                       11:23:32

1    A.   You did.

2    Q.   Then Mr. Padilla, looks like it must have come to him, if

3    you can say whether that's true.  And then there's this

4    terminology:  Nice.  I copied Liz.

5         Do you see that?                                        11:23:50

6    A.   Yes.

7    Q.   That would be Liz McDougall, wouldn't it?

8    A.   It is.

9    Q.   Okay.  Let's go to Exhibit 5215 -- let's go to

10   Exhibit 5215.                                                11:24:04

11        Before I leave the previous exhibit, it's fair to say

12   that what the detective is doing is thank you -- saying thank

13   you for your help?

14   A.   I think he's --

15             MR. RAPP:  Objection.  The email speaks for itself.  11:24:21

16             THE COURT:  Sustained.

17   BY MR. EISENBERG:

18   Q.   Let's go to 5215, not in evidence.

19        If you look at this one, sir, it's the same series of

20   questions.  Do you recognize your email address?            11:24:40

21   A.   I do.

22   Q.   And that this pertains to an email from a sergeant in the

23   St. Louis County Police Department, correct?

24   A.   I'm sorry.  You trailed off there.

25   Q.   Yeah, I'm sorry.  It pertains to an email from the      11:25:00

```
 1   St. Louis County policeman Sergeant Adam Kavanaugh, right?
 2   A.  Correct.
 3   Q.  And this is, in effect, saying thank you for your help?  If
 4   you look at the first page.
 5           MR. RAPP:  Objection.  It's not in evidence.          11:25:26
 6           MR. EISENBERG:  All right.  Move it in evidence, Your
 7   Honor.
 8           THE COURT:  Well, I think there was a question before
 9   the witness.
10           MR. EISENBERG:  Well --                               11:25:36
11           THE COURT:  Why don't you let him answer the question
12   before you move into evidence.
13           MR. EISENBERG:  Sure.
14   BY MR. EISENBERG:
15   Q.  The question is, it's a thank you?                        11:25:42
16   A.  He is thanking us for providing information.
17           MR. EISENBERG:  Move Exhibit 5215 into evidence, Your
18   Honor.
19           THE COURT:  Yes.  It may be -- is there an objection?
20           MR. RAPP:  No.  No objection.                         11:25:59
21           THE COURT:  It may be admitted and it may be
22   published.
23           (Exhibit No. 5215 admitted into evidence.)
24   BY MR. EISENBERG:
25   Q.  So, again, going to the -- I guess it's page 3 of how this 11:26:05
```

1   one came out, this is from Sergeant Adam Kavanaugh, St. Louis

2   County Police, right?

3   A.  Yes, it is.

4   Q.  And it's addressed to Carl, which I assume is you.  Right?

5   A.  Yes, it is.                                              11:26:22

6   Q.  And now he says:  Per our conversation, we are working a

7   homicide case and need IP information.

8        Let me just stop there.  Do you recall having a

9   conversation with Sergeant Kavanaugh?

10  A.  I received a number of emails like this.  I don't recall   11:26:34

11  this specific email.

12  Q.  You have no reason to believe that that sergeant is

13  inaccurate about having a conversation with you?

14  A.  "Per our conversation."  Well, you know, I believe he's

15  accurate, so I just don't recall.                           11:26:53

16  Q.  Okay.  And he's asking -- he says:  Need an IP information

17  on this particular posting.

18       And there's the date and there's the time it was

19  posted.  Right?

20  A.  Correct.                                                 11:27:05

21  Q.  And it says:  Could you also provide how payment was made,

22  and it's the same as posted after that time.

23       Stop right there.  So he's asking for certain

24  information about an ad; safe to say?

25  A.  Yes.  He's asking for the payment information and any IP  11:27:21

1  data that we might collect to help them investigate this crime.

2  Q.  Then he says:  I will send a subpoena tomorrow.

3        So you do require a subpoena except in exigent

4  circumstances?

5  A.  Yeah.  But this is an exigent circumstance, so we're going          11:27:38

6  to start working on it right away.

7  Q.  Okay.  And it appears as though you did send him

8  information.  Is that how I'm to read February 27th, 2013, at

9  9:19 p.m. at the top of this page?

10 A.  Yes.  I must have sent him the IP information and then told          11:28:02

11 him the payment information I would get to him tomorrow.

12 Q.  Then he follows through on February 27th, looks like at

13 11:00 o'clock in the evening Central Standard Time.  That's on

14 page 2.

15 A.  Yes, he does.                                                       11:28:24

16 Q.  Okay.  He says:  Carl, thank you very much.  The

17 information you provided was helpful.  Unfortunately, Clearwire

18 does not feel the same as your company when it comes to the

19 safety of people.

20       Stop.  What is Clearwire?                                        11:28:38

21 A.  I believe Clearwire might be the ISP.  You know, we provide

22 some IP information for them, so then they need to go to the

23 ISP so that they can find the actual physical address.

24 Q.  Okay.  Then he says:  I'm very happy and always have been

25 with the level of cooperation I get when dealing with Backpage.          11:29:01

1          Did I read that right?

2   A.  You did.

3   Q.  Please leave the ad up and any future ad they may post, as

4   our investigation is ongoing.

5          Read that correctly?                              11:29:13

6   A.  You do.

7   Q.  Okay.  I will notify you as soon as our investigation is

8   done, and at that time you can do what you will with the

9   account.

10         Okay.  Let me stop there.  What do you interpret to    11:29:25

11  mean to do -- you can do what you will with the account?

12  A.  So when he notifies us that his investigation is done, we

13  will 404 the ads and the account and remove it from being

14  publicly displayed.  We'll store the information for any future

15  subpoena.                                                11:29:51

16  Q.  He says:  Again, I thank you for your quick response and

17  your company's help with attempting to locate a dangerous --

18  very dangerous subject.

19         Read that right?

20  A.  You do.                                              11:30:01

21  Q.  Okay.  Let's go to Exhibit 5343, which is not in evidence.

22         Really, the same type of question:  Do you recognize

23  your email address here?

24  A.  I do.

25  Q.  And the relevance of it is that someone in law enforcement  11:30:27

1    is contacting you; is that correct?

2    A.  That is correct.

3            MR. EISENBERG:  Move the admission of 5343.

4            MR. RAPP:  No objection.

5            THE COURT:  Yes, it may be admitted and it may be          11:30:45

6    published.

7            (Exhibit No. 5343 admitted into evidence.)

8            MR. EISENBERG:  Thank you, Your Honor.

9    BY MR. EISENBERG:

10   Q.  So this pertains to an email -- I see how it's organized.       11:30:51

11   There are a couple of emails, correct?

12   A.  They are.

13   Q.  All right.  We could -- if you start under email 2, you see

14   where email 2 starts on page 1?

15   A.  I do.                                                           11:31:08

16   Q.  And it says it's from Carrie Landau; is that correct?

17   A.  Yes.

18   Q.  Do you know who she is?

19   A.  Yes.

20   Q.  Who is she?                                                     11:31:15

21   A.  She is an FBI agent that I have had some emails back and

22   forth.

23   Q.  Okay.  If you go over to the next page, and correct me if

24   I'm wrong, this is the beginning of her contact with you on

25   February 16th, 2011, at 3:56 p.m., where it says, "She wrote."     11:31:39

1    Right?

2    A.  I believe for this email, yes.

3    Q.  And she's talking about her partner, Mike Barker, just

4    emailed you re the "police" posting and heard you will ghost

5    it.                                                              11:32:02

6            Okay.  What does it mean, your understanding, as to

7    ghost an ad?

8    A.  Usually that means to have the ad no longer appear in the

9    listings.

10   Q.  And then she says:  Can you search "police" in our area and  11:32:13

11   do the same to all of them.

12           What did you take that to mean, if you have any --

13   A.  I believe she's going to be running a series of stings, and

14   then I've had conversations with Mr. Barker that his sting ads

15   need to conform to the terms of use or they may be taken down.   11:32:43

16   Q.  Okay.  And if you go back to the beginning of where it says

17   email to, when Ms. Landau says "Thank you very much," do you

18   read that to mean that you did as she requested?

19   A.  Well, no.  I think I need to correct myself, because they

20   have somebody -- oh, here's what's going on.  Somebody is        11:33:09

21   alerting other Backpage users that there are sting ads, and so

22   Mike Barker, Agent Barker and Agent Landau want me to remove

23   those ads that are alerting users to the sting ads, and that's

24   what I've done.  And that's what she's responding to, "Thank

25   you very much."                                                  11:33:39

```
1    Q.  Okay.  Now, the date of this is when?  In February 2011,

2    right?

3    A.  Correct.

4    Q.  Let's go to exhibit -- Defense Exhibit 6142.  This is not

5    in evidence.                                              11:33:57

6          Do you see that, sir?

7    A.  I do.

8    Q.  And you can identify it as something that's -- I'll call it

9    a notice, for lack of a better term, a citation?

10   A.  Yes.                                                  11:34:12

11   Q.  And it's from the FBI, correct?

12   A.  It is.

13   Q.  And it pertains to your position at Backpage, correct?

14   A.  It does.

15         MR. EISENBERG:  Move the admission of Exhibit 6142,  11:34:23

16   Your Honor, and request that it be published.

17         MR. RAPP:  Objection.  Relevance.

18         THE COURT:  Sustained.

19   BY MR. EISENBERG:

20   Q.  Is this an accolade about your work?                 11:34:37

21         MR. RAPP:  Well, I'd object since it's not in

22   evidence.

23         THE COURT:  Well, I think Mr. Eisenberg can attempt to

24   lay some foundation for the relevance, so he's entitled to ask

25   a few probing questions.                                 11:34:54
```

1    BY MR. EISENBERG:

2    Q.  It is, isn't it?

3    A.  I'm sorry?  What was the question again?

4    Q.  It's an accolade about your work?

5    A.  Yes.                                                    11:35:03

6    Q.  And it's thanking you for your outstanding cooperation?

7    A.  Yes, it is.

8    Q.  With respect to assistance in connection --

9            MR. RAPP:  Well, I'm going to object.

10           MR. EISENBERG:  Well, I'll move the admission.       11:35:17

11           MR. RAPP:  Same objection.  Relevance.

12           THE COURT:  Overruled.  It may be admitted.

13           (Exhibit No. 6142 admitted into evidence.)

14   BY MR. EISENBERG:

15   Q.  Now, it is addressed to Carl Ferrer, correct?          11:35:24

16   A.  It is.

17   Q.  And it's dated May of 2011; is that correct?

18   A.  That's correct.

19   Q.  And could you read the accolation or the portion that

20   starts with "For"?                                         11:35:39

21   A.  For your outstanding cooperation and assistance in

22   connection with an investigation of great importance.  The

23   FBI's ability to carry out its investigative responsibilities

24   to the American people have been greatly enhanced through your

25   help, and you can be very proud of your valuable contributions  11:35:56

1    to the success achieved.

2    Q.  And it's directed to you as vice president, Backpage,

3    correct?

4    A.  It is.

5    Q.  Can you read who signed it?                        11:36:05

6    A.  Robert S. Mueller.

7    Q.  And what is his title?

8    A.  I believe he is the director.

9    Q.  He's the head of the FBI, right?

10   A.  Correct.                                           11:36:17

11   Q.  Sir, how long have you known Mr. Padilla?

12   A.  Many years.

13   Q.  I remember, I think, earlier in my cross-examination of

14   you, we established you didn't hire him.  Somebody else did,

15   right?                                                 11:36:48

16   A.  Correct.

17   Q.  But you got to know him pretty well, right?

18   A.  I did.

19   Q.  Do you know his background?

20   A.  A little bit, yes.                                 11:36:53

21   Q.  Do you know whether he was a high school graduate?

22          MR. RAPP:  Objection.  Relevance.

23          THE COURT:  Sustained.

24   BY MR. EISENBERG:

25   Q.  Do you know whether he -- when did he come to Backpage?  11:37:03

101

A.  I'm thinking within a few years of the site being launched,
so 2006, 2007.

Q.  You know, sir, I remember you were testifying about your
background when you were first put on the stand --

A.  Yes.                                                    11:37:30

Q.  -- during direct.  And you told us where you went to
college?

A.  Yes.

Q.  And you told us what you did for your job before you joined
Backpage?                                                  11:37:37

A.  Yes.

Q.  And that was all relevant to you as a witness, right?

A.  Yes.

Q.  You were asked those questions by the government, right?

A.  Yes.                                                    11:37:46

Q.  I'm asking you the relevance -- with respect to the
relevance of Mr. Padilla, what his background is.

          MR. RAPP:  Yes, I'll --

          MR. EISENBERG:  He's a defendant.

          MR. RAPP:  I'll object to that as relevance.      11:37:56

          THE COURT:  Sustained.

          MR. EISENBERG:  Thank you for your help.

          Pass the witness, Your Honor.

          THE COURT:  Ms. Bertrand.

          MS. BERTRAND:  Thank you, Your Honor.             11:38:12

```
 1            May I get a cup of water?  Thank you.

 2            May I proceed?

 3            THE COURT:  Yes.

 4            MS. BERTRAND:  Thank you.

 5                      CROSS-EXAMINATION                          11:39:00

 6   BY MS. BERTRAND:

 7   Q.  Good morning.  Good morning, Mr. Ferrer.

 8   A.  Good morning.

 9   Q.  I have a little bit of a froggy throat this morning, so I'm

10   going to do my best to project.  Please let me know if you     11:39:07

11   can't hear me, okay?

12   A.  Okay.

13            MS. BERTRAND:  Your Honor, as an initial matter, I'd

14   like to at this time move into evidence documents that the

15   government has previously stipulated or agreed should be        11:39:21

16   admitted that was in ECF Document 1801.  I can read off the

17   defense exhibit numbers if that assists the Court and its

18   clerk.

19            THE COURT:  Is there an objection to having them

20   admitted in that way?                                           11:39:41

21            MR. RAPP:  Yes.  I'd like to see what the foundation

22   is.

23            THE COURT:  Yes.  So --

24            MS. BERTRAND:  Okay.  Then we'll do it piece by piece.

25            THE COURT:  Yes.                                       11:39:55
```

1          MS. BERTRAND:  Okay.  Thank you.

2     BY MS. BERTRAND:

3     Q.  Mr. Ferrer, you testified a month ago or so now about your

4     college education.  I believe you testified you went to the

5     University of Wisconsin.  Is that correct?                      11:40:13

6     A.  Correct.

7     Q.  University of Wisconsin has several campuses, correct?

8     A.  Correct.

9     Q.  Madison being the biggest, correct?

10    A.  Correct.                                                     11:40:23

11    Q.  You did not graduate from the University of Wisconsin at

12    Madison, correct?

13    A.  No.  I transferred to Stevens Point to be able to graduate.

14    Q.  So your degree is from Stevens Point, not Madison?

15    A.  What's that?                                                 11:40:39

16    Q.  Sorry.  Your degree is from Stevens Point, not Madison,

17    correct?

18    A.  Well, I attended both campuses for the University of

19    Wisconsin.  And I was asked what university I went to, and I

20    said the University of Wisconsin.                               11:40:50

21    Q.  Okay.  Your degree is from Stevens Point, correct?

22    A.  Yes.

23    Q.  Do you recall, this was probably in the second week of your

24    testimony, discussing an email that was a Backpage.com email

25    but Carl@backpage.com?  Do you remember talking to the          11:41:11

1    government about that?

2    A.  I'm not -- I don't know what you're referring to.

3    Q.  Okay.  Your official email at Backpage.com was

4    Carl.Ferrer@backpage.com, correct?

5    A.  Correct.                                                    11:41:32

6    Q.  And there was another email that Backpage used that was

7    Carl@backpage.com.  Right?

8    A.  That email was for marketing.

9    Q.  Okay.  So that was a different email?

10   A.  It really wasn't my email address.                         11:41:49

11   Q.  So if it wasn't your email address, does that mean other

12   people could access that email address?

13   A.  They did.  They would often bring emails to my attention if

14   they needed some help with, but it was for marketing.

15   Q.  And that same email address, other people could respond     11:42:10

16   from, correct?

17   A.  Correct.

18   Q.  So if an email is coming from the Carl@backpage.com email,

19   the one that you're referring to as the marketing email, that

20   could have been written by several people, right?             11:42:28

21   A.  You mean it could have been responded to by several people?

22   Q.  Correct.

23   A.  Yes.

24   Q.  Okay.  Thank you.

25          MS. BERTRAND:  I would like to show -- this has not      11:42:43

```
1   been admitted into evidence, please -- if we could please show
2   the witness Exhibit 6259.
3   BY MS. BERTRAND:
4   Q.  Mr. Ferrer, do you see your screen there?
5   A.  I do.                                                      11:43:07
6   Q.  Do you recognize what is on that screen?
7           MS. BERTRAND:  And I'm in an awkward place.  I can't
8   look at the monitor without looking at the government's
9   materials.  May I step over and just pull the monitor toward me
10  a little bit, Judge?                                           11:43:23
11          THE COURT:  Yeah, if it will move.  Just take care
12  that you don't disconnect it.
13          MS. BERTRAND:  Now I'm afraid to touch it.
14          Okay.  I just don't want to be overbearing on them and
15  intrude on their privacy.  Okay.  All right.                  11:43:36
16  BY MS. BERTRAND:
17  Q.  Mr. Ferrer, this is an email, right?  Do you recognize that
18  email address at the top, the "From"?
19  A.  I do.
20  Q.  And it's to an Adriana, correct?  I'm going from the top   11:43:47
21  down.
22  A.  Correct.
23  Q.  And about a third of the way down that first page, do you
24  recognize that message that you sent?
25          Do you see that there, Mr. Ferrer, about a third of    11:44:24
```

1   the way down the first page?

2   A.  I do.

3   Q.  All right.  Do you recognize who that's being written to?

4   A.  You're at, "Adriana, please pay ASAP, Carl"?

5   Q.  "ASAP, Carl."  Right?                                    11:44:40

6   A.  Yep.

7           MS. BERTRAND:  Before we go any further, I'd like to

8   move this into evidence, please.

9           MR. RAPP:  No objection.

10          MS. BERTRAND:  Move to publish, please.              11:44:48

11          THE COURT:  Well -- well, let me --

12          MS. BERTRAND:  Sorry.

13          THE COURT:  -- rule.

14          It may be admitted and it may be published.

15          (Exhibit No. 6259 admitted into evidence.)           11:44:54

16  BY MS. BERTRAND:

17  Q.  So now the jury sees it too.

18          This is an email, further down, where apparently you

19  emailed Monita.  Do you see that?

20  A.  Correct.                                                 11:45:06

21  Q.  And Monita's the woman who worked with the Indian

22  moderation company, correct?

23  A.  That is correct.

24  Q.  And you're telling her that she had sent you an email to

25  the Carl@backpage.com address, right?                        11:45:19

1    A.  Correct.

2    Q.  And that your real email address is

3    Carl.Ferrer@backpage.com?

4    A.  That's correct.

5    Q.  And you note that your staff checks that Carl address.          11:45:30

6    That's the marketing address, right?

7    A.  Yes.

8    Q.  Okay.  I'm going to change subjects now.

9         Mr. Ferrer, I'd like to talk with you about your plea

10   agreement in this case.  I believe you talked with my            11:45:52

11   codefendant counsel about it at some length and also talked

12   with the government about it.

13        Do you remember that, talking about your plea

14   agreement?

15   A.  Yes.                                                          11:46:04

16   Q.  And what I recall from your testimony at one point was that

17   there were some funds that were placed in an attorney trust

18   account.  Do you remember talking about that?

19        MR. RAPP:  Judge, I'm going to object.  This has been

20   asked and answered.                                              11:46:29

21        MS. BERTRAND:  I can lay the foundation for the cross.

22        THE COURT:  Yes.  I'll give her some latitude here.

23   BY MS. BERTRAND:

24   Q.  Do you remember that?

25   A.  Yes.                                                          11:46:39

108

1    Q.  And your plea agreement, do you recall that you're required

2    to give a full accounting of your assets to the government as

3    part of that plea agreement?

4    A.  Yes.

5    Q.  Has that full accounting been done?                          11:46:51

6    A.  I know that we've -- I've given some information to my

7    attorney.

8    Q.  Okay.  Do you know, sitting here today, whether or not the

9    full accounting required by your plea agreement has been given

10   to the government?                                               11:47:14

11   A.  I think that there's actually a pretrial report that needs

12   to be done that will be done after this trial.

13   Q.  Okay.  So I want to make sure we all understand what your

14   answer means.

15        Does that mean that full accounting that is listed in     11:47:38

16   your plea agreement has not been done so far?

17   A.  Well, I -- there was some accounting done, and that was

18   given to my attorney.

19   Q.  All right.  But you don't know where it went after that?

20   A.  What's that?                                                 11:47:57

21   Q.  You don't know where it went after you gave it to your

22   attorney, correct?

23        MR. BOYKINS:  Objection, Your Honor, to the extent it

24   asks my witness -- the witness to testify to any

25   attorney-client privileged information.                         11:48:10

CARL FERRER - CROSS-EXAMINATION

```
 1            THE COURT:  Sustained.
 2    BY MS. BERTRAND:
 3    Q.  I don't want you to talk about anything you talked about
 4    with your lawyer, like what he's told you, what you've told
 5    him.  I'm asking for your understanding.  Has that term of your      11:48:20
 6    plea agreement, as you sit here today, been complied with?
 7    A.  I'm sorry?  You kind of trailed off.
 8    Q.  Has the -- as you sit here today -- I don't want you to say
 9    a thing about anything involving anything you've said or heard
10    from your attorney.                                                  11:48:36
11            As you sit here today, can you state that that full
12    accounting required on page 5 of your plea agreement has been
13    done?
14    A.  Well, I'm not sure if there -- I can say this:  that there
15    was accounting of my assets and it was communicated to my           11:48:58
16    attorney.
17    Q.  All right.  That's fine.
18            Did that accounting of your assets include the amount
19    that was deposited into the attorney trust account?
20    A.  I believe that was communicated to my attorney.  I mean,        11:49:14
21    obviously they know the trust amount.
22    Q.  Okay.  So is it fair to say, sitting here today, you don't
23    know if the government has received that accounting?
24            MR. RAPP:  I'm going to object.  Asked and answered.
25            THE COURT:  Sustained.  Let's move on.                       11:49:43
```

CARL FERRER - CROSS-EXAMINATION                              110

BY MS. BERTRAND:

Q.  When you provided that accounting, what's your
understanding of what the amount was that had been placed in
the attorney trust account?

A.  I don't recall.                                          11:49:55

        MR. RAPP:  I'm going to object.  This has been asked
and answered.

        THE COURT:  Well, no, it has not.  But he answered he
doesn't remember.

        THE WITNESS:  I don't recall.                        11:50:07

BY MS. BERTRAND:

Q.  Do you have an estimate?

A.  I do not.

Q.  Is it more than a hundred thousand dollars?

A.  Yes.                                                     11:50:17

Q.  More than $500,000?

A.  Now I just don't recall.  I don't have that number in front
of me.

Q.  That accounting that you were required to give as part of
your plea agreement, that also would include assets like bank   11:50:37

accounts, correct?

A.  Correct.

Q.  Bitcoin holdings, correct?

A.  Correct.

Q.  Homes and cars?  I think you talked about the houses and     11:50:49

CARL FERRER - CROSS-EXAMINATION

1    the cars and the boats before.

2    A.  Correct.

3    Q.  Is that something that you understand to be an ongoing

4    requirement of you?  Like, if you get more assets, you have to

5    give the government notice?                                          11:51:06

6    A.  Well, it's something I'm going to work with my attorney on.

7    I'm -- when we fill out the pretrial paperwork.

8    Q.  Uh-huh.

9           THE COURT:  Is that a yes?

10          MS. BERTRAND:  I just nodded my head.  I'm sorry.            11:51:28

11          THE COURT:  I heard an "uh-huh" or something.

12          MS. BERTRAND:  I apologize.

13   BY MS. BERTRAND:

14   Q.  Sir, what's your understanding of how the government is

15   going to find out how much is left at the end of this to be        11:51:40

16   given to them?

17          MR. BOYKINS:  Objection, Your Honor.  Same objection

18   as before, to the extent it seeks attorney-client privileged

19   information.

20          THE COURT:  I'll sustain that.                               11:51:56

21          Maybe you can rephrase.

22          MS. BERTRAND:  Sure.

23   BY MS. BERTRAND:

24   Q.  Outside of any information your lawyer has communicated to

25   you, you testified, I believe, when talking with the               11:52:04

```
 1    government, that at the end of all of this, whatever is
 2    remaining in the trust account will be given to the United
 3    States.
 4              Do you remember that?
 5    A.  I do.                                               11:52:20
 6    Q.  What's your understanding of how the government is going to
 7    know how much it's receiving?
 8              MR. RAPP:  Well, objection.  Foundation.
 9              THE COURT:  Well, sustained.
10    BY MS. BERTRAND:                                        11:52:41
11    Q.  Do you know how it's going to be told to the government?
12              MR. RAPP:  Same objection.
13              THE COURT:  I'm going to sustain the form of the
14    question.
15    BY MS. BERTRAND:                                        11:52:52
16    Q.  As you sit here today, Mr. Ferrer, you don't know what the
17    government's been told about your assets, and you don't know
18    how it's going to be -- how you're going to be disclosing your
19    assets at the end of this case.  Correct?
20    A.  No --                                               11:53:12
21              MR. RAPP:  Well, object.  It's a compound question,
22    but it's also a foundation objection.
23              THE COURT:  Well, it is a compound question, and I
24    believe he has been asked this in a variety of ways, and he's
25    attempted to answer.  So let's move on, Ms. Bertrand.     11:53:26
```

```
1    BY MS. BERTRAND:

2    Q.  Before today, you have been testifying for about three

3    weeks.  Is that fair?

4    A.  Yes.

5    Q.  And we've been on a break.  Welcome back.              11:53:46

6         Over the break, did you review any documents to

7    prepare for coming back today?

8    A.  I did.

9    Q.  What did you review?

10   A.  I reviewed a document where there was a description of Jed  11:54:01

11   Brunst had made some edits on a reply to BMO Bank.

12   Q.  Is that the only document you reviewed in the past 10 days

13   regarding this case?

14   A.  Trying to think if there are any other documents.

15        I don't recall any.                                  11:54:39

16   Q.  Did you meet with anybody other than your attorneys over

17   the break regarding this matter?

18   A.  I did not.

19   Q.  I believe in talking with one of my colleagues in your

20   cross-examination, you mentioned testifying in at least two  11:55:08

21   criminal matters.

22        Do you recall that discussion?

23   A.  Are you talking about custodian of record testimony?

24   Q.  I'm talking about federal criminal matters in which you

25   testified.  Do you remember that?                         11:55:28
```

```
 1   A.   I recall three custodian of record testimonies.

 2   Q.   One was I believe Fuentes, F-U-E-N-T-E-S, correct?

 3   A.   Could you say that again?

 4   Q.   Fuentes was one of them?  Does that sound right?

 5   A.   Is that the case in Miami?                                11:55:43

 6   Q.   Yeah.  I think so.

 7   A.   Yes.

 8   Q.   And then there was a Chappell?

 9   A.   Yes.  The case in Minnesota.

10   Q.   Do you remember the other matter?                        11:55:52

11   A.   Jacksonville.  And so actually, there were four times.

12   Because I had to go back up to Minnesota.

13   Q.   Okay.  So Chappell, you had to testify twice?

14   A.   Correct.

15   Q.   And then there was another matter in Jacksonville.  Do you  11:56:09

16   remember the name of that matter?

17   A.   I do not.

18   Q.   In any of those cases, while you were testifying or before

19   you were testifying regarding those cases, did you assert a

20   Fifth Amendment privilege?                                    11:56:30

21          MR. RAPP:  Geez.  Objection.  Relevance.

22          THE COURT:  Sustained.

23          MS. BERTRAND:  I'd like to show the witness

24   Exhibit 228.  This is a government exhibit that I think has

25   already been admitted.                                        11:56:52
```

 1          Thank you.

 2   BY MS. BERTRAND:

 3   Q.  Mr. Ferrer, I believe you talked with the government about

 4   this --

 5          THE COURT:  Can you move to the microphone?                    11:57:13

 6          MS. BERTRAND:  Sure.

 7   BY MS. BERTRAND:

 8   Q.  You talked to the government about this particular exhibit,

 9   and it's posted in the Las Vegas Backpage site, correct?

10   A.  Yes, it is.                                                       11:57:25

11   Q.  And is it under -- can you tell from the top series there

12   if it's under an adult section or a regular, general section?

13   A.  Well, we had shut down adult at this time, and it's in

14   therapeutic massage.

15   Q.  And it's in the Las Vegas version or publication of          11:57:47

16   Backpage, correct?

17   A.  That's correct.

18   Q.  I believe you testified on direct about having some

19   familiarity with prostitution being legal in some limited areas

20   of Nevada?                                                           11:58:12

21          MR. RAPP:  Objection.  Foundation.  And also, he's not

22   qualified to testify about the legality.

23          THE COURT:  Sustained.

24   BY MS. BERTRAND:

25   Q.  Mr. Ferrer, are you familiar with any of the laws in Nevada   11:58:27

1    regarding prostitution?

2            MR. RAPP:  Same objection.  Foundation.

3            THE COURT:  Well, overruled.  He can answer if he is

4    familiar or not.

5            THE WITNESS:  I have heard there are some counties in          11:58:38

6    Nevada where prostitution is legal, like where the BunnyRanch

7    might be.

8    BY MS. BERTRAND:

9    Q.  The BunnyRanch is in Nye County, outside of Las Vegas,

10   correct?                                                              11:58:56

11   A.  Well, that, I don't know.

12   Q.  What about areas outside of Reno?

13   A.  I don't know.

14   Q.  Is there anything in this ad that we're looking at here,

15   Exhibit 228, that indicates anything will happen in the city of       11:59:11

16   Las Vegas?

17   A.  Yes.

18   Q.  Okay.  What's that?

19   A.  It's here.  "East of strip on Tropicana."

20   Q.  And is there any promise or assurance that that's where           11:59:34

21   things are going to happen?

22   A.  Could you say that again?

23   Q.  Sure.

24           Is there anything in this ad that makes a promise or

25   assurance that whatever happens in response to this ad will           11:59:46

1   happen east of the strip on Tropicana?

2   A.  Yes.

3   Q.  What's that?

4   A.  Well, you've got "best GFE" and you've got a "TER."

5   Q.  Okay.  What's that got to do with where this happens?          12:00:05

6   A.  Oh, you were asking the question of where it's going to

7   happen?

8   Q.  Correct.

9   A.  Well, I mean, the location.

10  Q.  Uh-huh.  That's where she's saying she is when she is --       12:00:17

11  whoever it is is posting, right?

12  A.  Yeah.  It's -- Tropicana.  I believe that's the hotel.

13  Q.  And for all we know, it could also happen in one of the

14  counties where this is legal, right?

15  A.  That's not how I would characterize this ad.                   12:00:30

16  Q.  All right.  Let's look at Exhibit 523 that I believe has

17  also been entered into evidence.

18         THE COURT:  Well, Ms. Bertrand, we are at the noon

19  hour.

20         MS. BERTRAND:  Okay.                                        12:00:45

21         THE COURT:  So we can take that up after we return

22  from lunch.

23         Members of the jury, we will stand in recess for one

24  hour for lunch.  Again, just remember the admonition not to

25  come to any conclusions or to discuss or research the matter       12:00:58

1    with anyone else, and please just have a good lunch break.

2              Please all rise for the jury.

3              MS. BERTRAND:  Your Honor, you said one hour?

4              THE COURT:  Yes.

5              (Jury not present.)                              12:01:10

6              THE COURT:  All right.  We will stand in recess.

7              (Lunch recess taken, 12:01 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, JENNIFER A. PANCRATZ, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of

6   Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion of

9   the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 11th day of October,

13  2023.

14

15

16

17                    s/Jennifer A. Pancratz
                      Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25