UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,       )
                                )
              Plaintiff,        )   NO. 2:18-cr-00422-DJH
v.                              )
                                )   Phoenix, Arizona
Michael Lacey, et al.,          )   October 11, 2023
                                )   8:45 a.m.
              Defendants.       )
_____)


**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**EXCERPTED TESTIMONY OF JESS ADAMS**

**JURY TRIAL DAY 16**
**A.M. SESSION**


Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251


Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                          A P P E A R A N C E S

 2    For the Plaintiff:
           UNITED STATES ATTORNEY'S OFFICE
 3         By:  Kevin M. Rapp, Esq.
                Andrew C. Stone, Esq.
 4              Peter Shawn Kozinets, Esq.
                Margaret Wu Perlmeter, Esq.
 5         40 North Central Avenue, Suite 1800
           Phoenix, Arizona 85004-4408
 6

 7    For the Defendant Michael Lacey:
           LIPTSUTZ GREEN SCIME CAMBRIA, LLP
 8         By:  Paul J. Cambria, Jr. Esq.
           42 Delaware Avenue, Suite 120
 9         Buffalo, New York  14202

10    For the Defendant Andrew Padilla:
           DAVID EISENBERG, PLC
11         By:  David S. Eisenberg, Esq.
           3550 North Central Avenue, Suite 1155
12         Phoenix, Arizona 85012

13    For the Defendant Scott Spear:
           KESSLER LAW OFFICE
14         By:  Eric Walter Kessler, Esq.
           6720 North Scottsdale Road, Suite 210
15         Scottsdale, Arizona 85253
           - and -
16         FEDER LAW OFFICE, PA
           By:  Bruce S. Feder, Esq.
17         2930 East Camelback Road, Suite 160
           Phoenix, Arizona 85016
18

19    For the Defendant John Brunst:
           BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
20         By: Gary S. Lincenberg, Esq.
                Gopi K. Panchapakesan, Esq.
21         1875 Century Park E, Suite 2300
           Los Angeles, California 90067
22

23    For the Defendant Joye Vaught:
           JOY BERTRAND, ESQ, LLC
24         By:  Joy Malby Bertrand, Esq.
           P.O. Box 2734
25         Scottsdale, Arizona 85252-2734
```

UNITED STATES DISTRICT COURT

*I N D E X*

**GOVERNMENT WITNESS:**                                          **PAGE**

JESS ADAMS
Continued Direct Examination by Mr. Stone..................5
Cross-Examination by Mr. Feder............................59
Cross-Examination by Mr. Eisenberg.......................109
Cross-Examination by Ms. Bertrand........................115

*EXHIBITS*

**EXHIBIT**                                                 **RECEIVED**

NO.     DESCRIPTION

1167    Emails from Adams and Ferrer Re health ads        13
        in escorts, 08/25/2008, DOJ-BP-0002133296

1168    Email from Ferrer, "Please don't remove           15
        this ad", 09/09/2008, DOJ-BP-0002133259

1176a   Attachment, Email to Adams, "Fwd…Removed I        21
        LOVE GR@@@K", 08/31/2009, DOJ-BP-0002125219

1176    Email from Adams to Ferrer, "Fwd…Removed I        25
        LOVE GR@@@K", 08/31/2009, DOJ-BP-0002125218

1182    Emails from Adams and Ferrer, "Re: Ghosting       28
        Ads", 03/04/2010,
        DOJ-BP-0000210042 - DOJ-BP-000210043

1171    Email from Ferrer to Adams, Spear, "Invoice       32
        to be paid", 12/03/2008,
        DOJ-BP-0002134636 - DOJ-BP-0002134637

1171a   Attachment, Invoice, web_services_dec,            32
        DOJ-BP-0002134638

2046    Archive.org capture of backpage.com               40
        Dallas Escorts page 1 for 02/09/2008

UNITED STATES DISTRICT COURT

***P R O C E E D I N G S***

*(Whereupon the proceedings began at 8:45 a.m.)*

       THE COURT:  Please be seated.  I do understand all of our jurors are present so we can have them in momentarily.

       Was there anything that we need to cover?

       MR. STONE:  Not from the United States, Your Honor.

       THE COURT:  Okay.  Let's have our witness --

       MR. LINCENBERG:  Your Honor, whether we cover it now or later, Mr. Cambria had raised the point about not allowing recross; and if the Court entertains argument, I would add a few points to support that.  It's whenever the Court wants to do that.

       THE COURT:  Let's do that over break because I know it was Mr. Cambria's issue that he raised last evening, and I had asked him to give me more clarity as to what the precise issue that was he was raising, and so we'll do that at the break.

       Let's have our jury in.  Let's have our witness on the stand, please.

       All rise.

       (Jury in at 8:46 a.m.)

       THE COURT:  All right.  Please be seated and good morning, Members of the Jury.  We do have our witness present and, Mr. Stone, you may continue.

```
     1              MR. STONE:  Thank you, your Honor.

     2                  CONTINUED DIRECT EXAMINATION

     3    BY MR. STONE:

     4    Q.   Good morning, Mr. Adams.

08:47a 5    A.   Good morning, sir.

     6    Q.   When we left off yesterday, you were talking about your

     7    preparation and presentation of budget meetings while you

     8    worked at Backpage.  Do you remember that?

     9    A.   Yes.

08:47a 10   Q.   And that was something you did every year when you worked

    11    at Backpage?

    12    A.   Yes.

    13    Q.   And, again, what were the years that you worked at

    14    Backpage?

08:48a 15   A.   I worked there for 2007 through 2010 with a little bit of

    16    consulting work into 2011.

    17    Q.   And we looked at exhibits yesterday dealing with budget

    18    plans for 2008 and then 2009, correct?

    19    A.   Yes.

08:48a 20   Q.   Okay.

    21              MR. STONE:  I want to show the witness what has been

    22    admitted as Exhibit 588 and permission to publish?

    23              THE COURT:  Yes, it may be published.

    24    BY MR. STONE:

08:48a 25   Q.   Okay.  Sir, you see that on your screen?
```

JESS ADAMS - CONT'D DIRECT EXAMINATION BY MR. STONE     6

```
 1 | A.    Yes.
 2 | Q.    Do you recognize this exhibit?
 3 | A.    Yes.
 4 | Q.    What is it?
08:48a  5 | A.    It's the Backpage.com 2010 Budget Presentation.
 6 | Q.    Was this a presentation that you helped prepare?
 7 | A.    Yes.
 8 | Q.    Who did you help -- who else prepared it with you?
 9 | A.    Sure.  My boss, Scott Spear, led the budget process.  I
08:49a 10 | generated reports, spreadsheets, graphs and his assistant,
11 | Heather Dobbins, would have collated it into a PowerPoint
12 | presentation.  Additional inputs would have come from Carl
13 | Ferrer and the operations team if there were staffing needs,
14 | things like this.  So the people who impacted the budget
08:49a 15 | presentation would have been myself, Carl Ferrer.  Scott Spear
16 | would have led it with some assistance from his assistant,
17 | Heather Dobbins.
18 | Q.    Is this a presentation that you reviewed?
19 | A.    I'm sorry?
08:49a 20 | Q.    Is this a presentation that we're looking at right now,
21 | Exhibit 588, that you've reviewed?
22 | A.    Yes.  For sure, yes.
23 | Q.    And did you review it back in 2019 and 2010 when you
24 | helped prepare it?
08:49a 25 | A.    Yes, this would have been prepared at the end of 2009 for
```

1    the year 2010.

2    Q.   And was this presentation presented to the executive

3    team?

4    A.   Yes.  When I was at Backpage, all the budgets were

08:50a 5   presented to the executive team.

6    Q.   Again, who was in those meetings specifically for this

7    year?  If you recall, who was in the meetings from the

8    executive team?

9    A.   The attendees at the budget meetings would have been,

08:50a 10  obviously, Scott Spear presenting the budget.  Carl Ferrer

11   would have been there, myself.  Mr. Spears' administrative

12   assistant, Heather Dobbins would have been there; and then the

13   executive team and ownership would have consisted of Jim

14   Larkin, Jed Brunst.  Beth Cook, the controller, would have

08:50a 15  been present.  Jeff Mars, the VP of Finance would have been

16   present.  I apologize, there may have been other attendees.

17   At this date it's hard for me to remember.  It's been thirteen

18   years.

19   Q.   That's fair.  Let's look at Slide 23 on Exhibit 588.

08:50a 20        Do you recognize this slide, sir?

21   A.   Yes, I do.

22   Q.   Okay.  In the highlighted portion of this under "Legal

23   strategy for 2010" reads "Continue to engage Attorney

24   Generals," and then underneath that it reads "Move slowly but

08:51a 25  deliberately."  Do you see that?

1   A.   Yes, I do.

2   Q.   Do you have an understanding what that means?

3   A.   At this time the Attorney Generals were pressuring

4   Backpage.com about the site and as part of the budget process

08:51a   5   for this year Backpage.com proposed additional legal expenses

6   to engage with the Attorney Generals to hire attorneys and

7   specifically begin working with them.

8   Q.   What does "move slowly but deliberately" mean to you?

9   A.   To me it means what it says, that they intended to work

08:51a   10   with the Attorney Generals but they weren't in a rush.

11   Q.   At the top of the page or right next to the "Legal

12   strategy for 2010" it says "(Scott)."  Do you see that?

13   A.   Yes, I do.

14   Q.   What does that mean?

08:51a   15   A.   In red like that in parentheses this looks like it would

16   be a draft, and it looks like this is indicating that Scott

17   Spear would be the person who would handle this legal strategy

18   for 2010.

19        In these budget documents if someone needed to work on a

08:52a   20   schedule or provide additional information, there would be

21   this red indication of whose name would need to fulfill that

22   task.  So to me, this says that the legal strategy for 2010 is

23   a Scott Spear issue.

24   Q.   Down at the bottom it says "Budget appropriately," and

08:52a   25   then in parentheses it reads "the slow dance" and it has a

1    money figure associated with that.

2        Do you have an understanding of what that meant?

3    A.   Yes, Backpage.com would have legal expenses as a normal

4    part of their operations.  This is saying that in addition to

08:52a  5    the regular legal expenses there was money being set aside for

6    what they termed "the slow dance."

7    Q.   And what's your understanding of what "the slow dance"

8    meant?

9    A.   Again, to engage with the Attorney Generals via paying

08:53a  10   attorneys and that they would move slowly but deliberately.

11   Q.   Did you have any sense for why that was Backpage's

12   strategy, to move slowly but deliberately?

13   A.   I did not.  It wasn't really my decision.

14   Q.   I want to switch topics here.  You mentioned yesterday

08:53a  15   that one of your duties while you worked at Backpage was

16   subpoena response and subpoena compliance; is that correct?

17   A.   Yes.

18   Q.   And if you could give a sense for generally what that

19   meant?

08:53a  20   A.   Backpage would receive faxes at that time from law

21   enforcement agencies.  Could be any type of law enforcement

22   agency and, in general, they would ask for information about a

23   user who had posted an ad in the escort section of Backpage.

24   Q.   Okay.  I want to show you what has already been admitted

08:54a  25   in to evidence as Exhibit 1162.

1    MR. STONE:  Permission to publish, because this is

2  admitted.

3    THE COURT:  Yes, it may be published.

4  BY MR. STONE:

08:54a  5  Q.   Sir, do you recognize this exhibit?

6  A.   Yes.

7  Q.   What is it?

8  A.   This is an e-mail -- it's an e-mail chain.  At the top is

9  an e-mail from Carl to myself and Tamara Nickel, who was the

08:54a 10  operations manager, and he says "done."  And down below

11  there's information from me to Tamara and Carl.

12  Q.   Okay.  November 2007, was that fairly early into your

13  time at Backpage?

14  A.   Yes.  Since I started in the spring of 2007, I would have

08:54a 15  been there six months learning the ropes.

16  Q.   All right.  And was this -- and below the e-mail from

17  Carl was an e-mail that you sent; is that right?

18  A.   Yes.

19  Q.   And was this an e-mail that dealt with a subpoena that

08:55a 20  you received?

21  A.   Yes.

22  Q.   When I say "you," I mean Backpage?

23  A.   Yes.

24  Q.   And what are you informing -- well, who's Tamara?

08:55a 25  A.   Tamara Nickel was an operations manager for Backpage.com

1    when I was there.

2    Q.    And what are you asking Tamara and Carl here?  What

3    information are you providing?

4    A.    Sure.  This is as a result of investigation.  I was

08:55a  5    asking Carl and Tamara questions about how we should handle

6    subpoena -- the subpoena process.

7         So I'm indicating to them that the investigator on this

8    case has indicated that it's okay for us to remove the ad.  So

9    I'm questioning -- you always had to worry with a subpoena

08:55a 10    about leaving content up so that you didn't inform the person

11    that there was investigation.  So there was always a question

12    about whether or not content should stay live so that an

13    investigator could continue their investigation.

14         But for me, when I knew that this ad involved a 14 year

08:56a 15    old and the investigator had said that their investigation was

16    complete and the content could be removed, I didn't know at

17    this stage, because I was new, how to remove the content.  So

18    I'm asking Carl what do we do with these situations, and I'm

19    asking Tamara and Carl how do we remove the ad because I don't

08:56a 20    know how to do it at this point in time.

21    Q.    The subpoena was requesting information from Backpage,

22    correct?

23    A.    Yes.

24    Q.    In connection with a crime; is that right?

08:56a 25    A.    The information from the investigator is that this was a

1   investigation regarding child prostitution.

2   Q.   During your years at Backpage in responding to subpoenas,

3   did the subpoenas -- well, let me strike that.

4        Were these subpoenas from law enforcement agencies

08:56a  5   typically?

6   A.   Almost exclusively, yes.

7   Q.   Okay.  And what type of crimes generally were these

8   subpoenas asking for information about?

9   A.   They were asking for information about prostitution.

08:57a 10   Q.   All right.  I want to show for the witness' eyes only

11   Exhibit 1167.  Sir, is that on your screen?

12   A.   Yes, it is.

13   Q.   Do you recognize this exhibit?

14   A.   Yes, I do.

08:57a 15   Q.   What is it?

16   A.   Again, this an a e-mail chain.  The top content is from

17   Carl Ferrer to Tamara Nickel and myself and Carl is indicating

18   yes --

19   Q.   I want to stop you there.

08:57a 20   A.   Sorry.

21   Q.   Without going into the content, just generally describe

22   the e-mail, please.

23   A.   Yes, it's an e-mail from Carl to myself and Tamara.

24   Q.   And is there an e-mail from you at the bottom of the

08:57a 25   screen?

JESS ADAMS - CONT'D DIRECT EXAMINATION BY MR. STONE          13

```
         1   A.   Yes.

         2   Q.   And this was an e-mail that you sent and received while

         3   you worked at Backpage?

         4   A.   Yes.

08:58a   5            MR. STONE:  Move to admit Exhibit 1167.

         6            THE COURT:  Yes, it may be admitted and published.

         7            (Exhibit No. 1167 admitted in to Evidence.)

         8   BY MR. STONE:

         9   Q.   All right.  Sir, now the jury has this on their screens

08:58a  10   as well.  Could you describe what the jury's looking at?

        11   A.   Yes.  This is an e-mail chain between myself, Carl Ferrer

        12   and Tamara Nickel.

        13   Q.   And the e-mail that you write on the bottom you begin

        14   with, "What are your thoughts on running these 'health' ads in

08:58a  15   escorts?" and "health" is in quotations.

        16        What are you talking about?

        17   A.   Backpage would receive posts frequently from people

        18   advertising medical supplements, Viagra, Cialis, these kinds

        19   of things.  Because I put this in quotes, this indicates to me

08:58a  20   that it was one of those kinds of ads.

        21   Q.   So it wasn't an escort ad?

        22   A.   No.

        23   Q.   You write below, "But they're paying escort ad rates on a

        24   National ad..."  What does that mean?

08:59a  25   A.   A national ad was a program where someone could select to
```

```
        1  post an ad in multiple cities at the same time.  So, for
        2  instance, you could post an ad in Phoenix, Dallas, New York,
        3  Miami.  Escort ads were among the most high -- most costly.
        4  It cost money to post any escort ad on Backpage's site.  So
08:59a  5  this -- but they're paying escort ad rates on a national ad
        6  means that they're paying a high rate on a big purchase, a
        7  national ad.
        8  Q.   Cost more money to buy an escort ad than it did in other
        9  sections?
08:59a 10  A.   Yes.
       11  Q.   And so here, even though it wasn't an escort ad, they
       12  were paying a higher rate on a national ad; is that what
       13  you're saying?
       14  A.   Yes, it wasn't an escort ad, but they were paying the
08:59a 15  rate of an escort ad.
       16  Q.   And that was the most expensive of all the sections on
       17  Backpage?
       18  A.   Yeah, yes.
       19  Q.   All right.  Let's look at for the witness' eyes only
09:00a 20  Exhibit 1168, which is not in evidence.
       21       Sir, do you recognize this exhibit?
       22  A.   Yes.
       23  Q.   What is it?
       24  A.   This is an e-mail chain from Carl Ferrer and Backpage.com
09:00a 25  staff.
```

JESS ADAMS - CONT'D DIRECT EXAMINATION BY MR. STONE          15

```
 1   Q.   Are you a recipient of this e-mail?

 2   A.   Yes, I am.

 3   Q.   Did you receive this e-mail during your time that you

 4   worked at Backpage?

 5   A.   I would have received this, yes.

 6            MR. STONE:  Move to admit Exhibit 1168.

 7            THE COURT:  Yes, it may be admitted and published.

 8            MR. STONE:  Thank you, your Honor.

 9            (Exhibit No. 1168 admitted in to Evidence.)

10   BY MR. STONE:

11   Q.   All right.  The jury now is seeing this exhibit, sir.

12        Could you describe what's going on in this e-mail?

13   A.   Okay.  This is an ad (sic) from Carl to Backpage staff

14   instructing them to not remove an ad.  He's saying it's not a

15   scam and Carl's saying he restored the ad and he's instructing

16   me to make sure that we settle the credit card charge to

17   charge the customer, and he's also indicating to the remainder

18   of the Backpage staff if someone was responsible for removing

19   the content and thinks it's a scam to give Carl a call.

20   Q.   All right.  And there's others who received this e-mail

21   from Carl Ferrer, correct?

22   A.   Yes.

23   Q.   Including Andrew Padilla?

24   A.   Yes, he's on there.

25   Q.   Did you know Andrew Padilla when you worked at Backpage?
```

09:00a (lines 5, 10)
09:01a (lines 15, 20, 25)

1    A.   Yes, he was the operations manager.

2    Q.   You interact with him at all?

3    A.   Yes, he worked in Phoenix.  We were in separate offices.

4    As I said earlier, I worked in the executive suite and Andrew

09:01a   5    was over in the Operations Department, but we did interact

6    from time to time.

7    Q.   How'd you interact?

8    A.   Obviously during budget season if he had staffing needs

9    or if Scott asked him to generate staffing info, I would have

09:01a   10   to take that information and factor in raises and, you know,

11   when we would hire someone so that we could track the

12   projected employee labor expense.

13        I recall if I was walking over to, you know, Andrew's

14   department for a fraud reason, I might stop by and say hi

09:02a   15   socially in his office.

16   Q.   Okay.  Now, back to this e-mail, Carl writes in the

17   middle of the e-mail to you, right?  He says, "Jess make sure

18   we settle this charge," and then there's a string of

19   numbers --

09:02a   20   A.   Yes.

21   Q.   -- associated with that.  You see that?

22   A.   Yes, I do.

23   Q.   What is that about?

24   A.   Again, Carl is instructing me to make sure that we charge

09:02a   25   the customer for the ad and those numbers there represent the

1  first four digits, the last four digits of a credit card, as

2  well as the five digit zip code.

3  Q.   This was an ad that was -- that needed to stay up on

4  Backpage, right?

**09:02a** 5  A.   Per Carl it needed to stay up on Backpage, yes.

6  Q.   And beneath the e-mail from Carl there's some text.  What

7  are we looking at there?  What is that?

8  A.   Carl included the information about the user and the ad

9  content in his e-mail.

**09:03a** 10  Q.   All right.  And the e-mail is eroticmp@gmail.com?

11  A.   Yes.

12  Q.   Were you familiar when you worked at Backpage with that

13  e-mail address and that user?

14  A.   I was familiar with eroticmp.com, yes.

**09:03a** 15  Q.   Okay.  What was eroticmp.com?

16  A.   From the ads that they posted on the site, they were an

17  erotic massage parlor review site.

18  Q.   All right.  What did that mean, "an erotic massage parlor

19  review site"?

**09:03a** 20  A.   Per the ad content, it's saying that if you visit

21  eroticmp.com, you'll get information about erotic massage

22  parlors.

23  Q.   Okay.  Looking at the text of the ad which you just

24  mentioned -- well, starting at the bottom it says, "EroticMP

**09:03a** 25  is a great Beginning For Your Happy Ending."  Do you see that?

1    A.    Yes.

2    Q.    Do you have an understanding of what a "happy ending" is?

3    A.    Yes, I do.

4    Q.    What is it?

09:04a  5    A.    Apologize for my language in the court.  Happy ending is

6    male ejaculating at the end of a massage.

7    Q.    Do you have an understanding of when that occurs during a

8    massage, that it would be prostitution?

9    A.    To me, yes, exchanging sex for money is prostitution.

09:04a 10    Q.    All right.  And then as we go up on the ad it reads, "Are

11    you tired of going to an Erotic massage parlor & getting

12    ripped off?  Don't ever get ripped off again."  Is that right?

13    A.    I see that, yes.

14    Q.    And then it talks about complete with pictures, hours of

09:04a 15    operation, ethnicity of staff, phone number, address, do they

16    take credit cards and the most important thing of all, the

17    dirty details on the erotic massage parlor.  Find out what

18    they do, such as happy endings, do they go down, do they let

19    you go down, FSBM, FS and much more.  Do you see that?

09:05a 20    A.    I do.

21    Q.    Do you have an understanding for some of the things that

22    are listed here in the dirty details?

23    A.    I do, yes.

24    Q.    What -- you already testified happy endings.  What about,

09:05a 25    "Do they go down"?

```
 1   A.   "Do they go down" would mean do they perform oral sex on

 2   you as the customer.

 3   Q.   "Do they let you go down," do you have an understanding

 4   for what that means?

 5   A.   Yes, I do.

 6   Q.   What?

 7   A.   That would mean do they allow you to perform oral sex on

 8   them as the massage provider.

 9   Q.   What about FSBM, any idea?

10   A.   Full service body massage would be what that says to me.

11   Q.   FS, any idea?

12   A.   Again, full service.

13   Q.   Do you have a sense of what "full service" or "full

14   service body massage" means?

15   A.   To me, "full service" is a code word for sexual activity.

16   Q.   At the top Carl's talking about this was an ad that was

17   removed that shouldn't have been; is that right?

18   A.   Yes.

19   Q.   All right.  So this was an ad that was to stay on

20   Backpage's website?

21   A.   Yes.

22   Q.   All right.  For the witness' eyes only I want to show you

23   Exhibit 1176a.  Sir, do you see that on your screen?

24   A.   Yes, I do.

25   Q.   Do you recognize it?
```

09:05a (line 5)
09:05a (line 10)
09:05a (line 15)
09:06a (line 20)
09:06a (line 25)

         1   A.   Yes, I do.

         2   Q.   What is it?

         3   A.   This is a fraud alert with an e-mail chain talking about

         4   what actions were taken.

09:06a   5   Q.   And generally what are fraud alerts in the -- in this

         6   context?

         7   A.   In this context a fraud alert would be generated if

         8   Backpage.com staff had set up an alert based on credit card

         9   fraud.  So it if Backpage.com received chargebacks for

09:06a  10   unauthorized transactions, staff would set up fraud alerts

        11   that might include e-mail addresses, credit card strings so

        12   that if the customer came back in and tried to post more

        13   content staff would be alerted to review it and possibly not

        14   settle credit card charges to avoid fraud, to avoid a

09:07a  15   chargeback.

        16   Q.   Is this something you would receive as part of your job

        17   duties at Backpage?

        18   A.   There was a specific department for fraud.  They would

        19   have reviewed these e-mails, these fraud alerts, and then this

09:07a  20   particular e-mail is indicating from the fraud staff what

        21   action was taken.

        22   Q.   Would there be anything that you'd have to do after you

        23   receive it?

        24   A.   Not necessarily.  This is informing me that they have

09:07a  25   formed the steps and I would review this and say -- I could

JESS ADAMS - CONT'D DIRECT EXAMINATION BY MR. STONE

  1   validate they had done those steps.  As long as they followed

  2   the correct procedure and did the steps in this e-mail, it

  3   wouldn't really have an impact on me personally.

  4   Q.   Okay.

**09:07a** 5            MR. STONE:  Move to admit Exhibit 1176a.

  6            THE COURT:  Yes, it may be admitted and published.

  7            *(Exhibit No. 1176a admitted in to Evidence.)*

  8   BY MR. STONE:

  9   Q.   All right.  The jury's now seeing it, sir.  This is an

**09:08a** 10  e-mail you received, right?

 11   A.   Yes.

 12   Q.   And in the subject line what information is there?

 13   A.   Okay.  It is including the information, the ad title and

 14   the credit card strings that were included on that original

**09:08a** 15  e-mail alert that was sent to the fraud department.  So that

 16   forward, that includes credit card details, the removed status

 17   of the ad plus the actual title of the ad itself.

 18   Q.   Okay.  So this, "I LOVE GR@@@K" and then "S" with a

 19   couple squigglies and (Q)UIRT@R, that was the title of the ad?

**09:08a** 20  A.   Yes.

 21   Q.   All right.  Then into the e-mail there's a credit card

 22   string and are those the numbers related to the credit card?

 23   A.   Yes, correct.

 24   Q.   And does it talk about where this ad was posted, what

**09:09a** 25  city?

 1    A.   Yes, it shows that it was posted in Dallas in the escort

 2    ads category.

 3    Q.   Does it show the cost of the ad?

 4    A.   Yes.

**09:09a** 5    Q.   And what is it?

 6    A.   It's twelve dollars.

 7    Q.   All right.  And then the next sentence reads, "The card

 8    has been blocked from further use on the site.  All invoices

 9    have been marked as fraud."

**09:09a** 10       Do you have an understanding for why that occurred?

 11   A.   Yes.

 12   Q.   Why?

 13   A.   When Backpage received fraud chargebacks on customers,

 14   they would aggressively go and make sure that the people could

**09:09a** 15   not come back in with new credit cards, new accounts.

 16       So in this case they made sure that when a new card came

 17   in under this potential fraud customer, that they blocked this

 18   new card so that the customer couldn't try to use it on our

 19   site for more transactions.  The "all invoices have been

**09:09a** 20   marked as fraud," if each credit card transaction resulted in

 21   an invoice on the Backpage.com system and in order for your

 22   credit card totals to match the reports on Backpage, you had

 23   to make sure to remove that invoice from the totals.

 24       So marking an invoice as fraud meant that it wouldn't be

**09:10a** 25   included in our revenue reports and it wouldn't be included in

1    our credit card settlement.

2    Q.   And was it a big deal for Backpage to deal with credit

3    card fraud?

4    A.   Yes.

09:10a 5    Q.   Why?

6    A.   If a credit card merchant has chargebacks in excess of

7    some percent, I don't know what that percent is anymore, it

8    may be three percent, if more than X percent of your

9    transactions come back as chargebacks, fraudulent,

09:10a 10   unauthorized, it can threaten your merchant account.

11        In addition, chargebacks cost -- I believe it was a

12   nineteen dollar fee.  So if you had a three dollar ad, you

13   might lose twenty-two dollars if that came back as a

14   chargeback.  So credit card fraud was something that was

09:10a 15   investigated diligently.

16   Q.   You mentioned a merchant account.  What is that?

17   A.   Everyone who accepts credit card transactions has to have

18   a merchant processing account to interface with the banking

19   system.

09:11a 20   Q.   If you don't have a merchant account what's that mean as

21   a company?

22   A.   To the best of my knowledge, it means you can't interact

23   with the banking system.  You can't accept credit card

24   transactions into the banking system.

09:11a 25   Q.   Without a merchant account you can't accept credit card

1  transactions?

2  A.   Right.

3  Q.   And if you had too many fraudulent credit card activity

4  or too much activity involving credit card fraud, you could

09:11a  5  lose that relationship with the merchant account?

6  A.   That was my understanding, yes.

7  Q.   At the bottom of this e-mail it reads, "Alert:  Fraud

8  Remove Term Match," and it has an e-mail address there.

9       Do you see that?

09:11a 10  A.   Yes, I do.

11  Q.   Do you recognize that e-mail address?

12  A.   I recognize the e-mail address, yes.

13  Q.   How?  How do you recognize it?

14  A.   When credit card chargebacks came in, the first thing we

09:11a 15  would do would be to identify users, i.e., e-mail accounts,

16  credit card strings, and go through and set up fraud alerts

17  and block strings if we could.

18       So SnowBunny was one that I remember many variations of

19  the name, many chargebacks that came in.  So they -- rather

09:12a 20  than block the e-mail account, they would set up a fraud alert

21  so that when that same customer came in with different credit

22  card account strings, we could block those transactions as

23  well.

24  Q.   What would cause a fraudulent -- what would cause a fraud

09:12a 25  alert?

```
         1   A.   The staff could set up fraud alerts for different reasons
         2   this particular e-mail looks like they set up a term, a fraud
         3   alert term, and that it was the SNWBUNNY09 e-mail account.
         4   Q.   But why?  Were there credit card transactions that had
09:12a   5   been identified as fraudulent and what does that mean?
         6   A.   Yes, if Backpage.com would have received credit card
         7   chargebacks from that customer reporting that the credit card
         8   charges were unauthorized.  So the staff would have set up
         9   fraud alerts to make sure that when this customer came back
09:12a  10   in, Backpage wouldn't lose any more money on that customer.
        11   Q.   Okay.  So the reason why this ad was removed was solely
        12   because of fraudulent credit card transactions?
        13   A.   Yes, or suspected fraud, yes.
        14   Q.   All right.  I want to show for the witness' eyes only
09:13a  15   Exhibit 1176.  Do you recognize this e-mail, sir?
        16   A.   Yes, I do.
        17   Q.   What is it?
        18   A.   This is an e-mail from me to Carl Ferrer.
        19   Q.   Did this e-mail relate to the e-mail that we just were
09:13a  20   reviewing?
        21   A.   Yes.
        22           MR. STONE:  Move to admit Exhibit 1176.
        23           THE COURT:  Yes, it may be admitted and it may be
        24   published.
09:13a  25           (Exhibit No. 1176 admitted in to Evidence.)
```

         1    BY MR. STONE:

         2    Q.   Okay.  You mentioned that this e-mail related to the one

         3    we previously were reviewing, correct?

         4    A.   Yes.

09:13a   5    Q.   And does it have the same title of the ads in the subject

         6    line?

         7    A.   Yes.  I believe the credit card strings are the same as

         8    well.

         9    Q.   All right.  And you are sending this e-mail to

09:14a  10    Mr. Ferrer?

        11    A.   Yes.

        12    Q.   You write, "only point on this is example of lengths

        13    users will go to include banned terms..."

        14         What banned terms were you talking about?

09:14a  15    A.   There were lists of terms that were not acceptable on the

        16    Backpage.com site that Backpage.com management generated.

        17    Q.   Why were there banned terms?

        18    A.   They would ban terms if they believed that they were code

        19    words for prostitution, sex acts.

09:14a  20    Q.   Are there code words for prostitution and sex acts listed

        21    in this exhibit?

        22    A.   Yes.

        23    Q.   Where?

        24    A.   "I LOVE GR@@@K."

09:14a  25    Q.   What does "Greek" mean?

 1    A.    Greek means anal intercourse.

 2    Q.    Any others?

 3    A.    "Squirter" has a meaning.

 4    Q.    Do you remember "squirter" was on the banned term list?

09:14a 5    A.    Yes.

 6    Q.    It was?

 7    A.    I believe so.

 8    Q.    Best of your knowledge today?

 9    A.    Best of my knowledge.

09:15a 10   Q.    All right.  And you said that the lengths users will go

11   to include banned terms, are you saying that because "Greek"

12   isn't spelled correctly?

13   A.    Yes.

14   Q.    And instead of G-r-e-e-k there's some @ symbols here; is

09:15a 15   that right?

16   A.    Yes.

17   Q.    All right.  I want to show you what's been marked as

18   Exhibit 1182 that's not in evidence.

19         Sir, you recognize this e-mail?

09:15a 20   A.    Yes, I do.

21   Q.    Generally, what is this?

22   A.    This is an e-mail chain between myself and Carl Ferrer.

23   Q.    And the subject of this e-mail is what?

24   A.    A development called "Ghosting ads."

09:16a 25   Q.    All right.

```
 1              MR. STONE:  Move to admit Exhibit 1182.

 2              THE COURT:  It may be admitted and it may be

 3   published.

 4              MR. STONE:  Thank you, your Honor.

 5              (Exhibit No. 1182 admitted in to Evidence.)

 6   BY MR. STONE:

 7   Q.   Okay.  The jury's now seeing this exhibit, sir.  At the

 8   top of this e-mail -- or at the top of this exhibit, is that

 9   e-mail from you?

10   A.   Yes.

11   Q.   And below is an e-mail from Mr. Ferrer?

12   A.   Yes.

13   Q.   And he's writing about this new feature that you just

14   testified about?

15   A.   Yes.

16   Q.   What is the new feature?

17   A.   The ghosting process allowed Backpage staff to ghost an

18   ad, which meant that it would continue to appear live for the

19   person who posted it but it would no longer show up live on

20   the website in the public listings.

21   Q.   Mr. Ferrer writes, "Please test out this new feature on

22   the very bad users."  Do you see that?

23   A.   Yes, I do.

24   Q.   And he includes a number of examples of bad users.  Am I

25   reading that correctly?
```

09:16a (lines 5, 10, 15, 20, 25)

1  A.   Yes.

2  Q.   Okay.  The first one is "virus people."  What's that mean

3  to you, "virus people"?

4  A.   To me, in the time that I worked there, there were

09:17a  5  various bad actors who tried to exploit the site to -- for

6  nefarious purposes.  One of them might have been this virus

7  people, you know, ad content that provided a link to an

8  external site that installed a virus on your machine.

9  Q.   All right.  The second category is very frequent stolen

09:17a 10  credit cards like cinderalla's best.

11       Do you have an understanding what that's referring to?

12  A.   Yes.

13  Q.   Do you know who "cinderalla's best" was?

14  A.   Yes.

09:17a 15  Q.   Who is "cinderalla's best"?

16  A.   Cinderalla's best was an associated group of posters on

17  Backpage who had a lot of posts that resulted in credit card

18  chargebacks.

19  Q.   Next category was "spammers in paid categories."  What

09:17a 20  does that mean?

21  A.   As it says, if it's a paid category and someone was

22  posting content that didn't fit, they would be considered a

23  spammer.  So in that previous example, the "health" in quotes,

24  people, they were posting content that was inappropriate for

09:18a 25  that category.  They could be considered a spammer.

1  Q.   A little bit farther down the e-mail Mr. Ferrer writes,

2  "We would only use this tool for users who we would describe

3  as evil."  Do you see that?

4  A.   Yes, I do.

09:18a  5  Q.   And is he referring to those categories that he just laid

6  out above, best of your knowledge?

7  A.   Yes.

8  Q.   Was individuals who posted prostitution ads included in

9  this -- in these categories?

09:18a  10  A.   I do not see that, no.

11  Q.   They -- in this e-mail they're not included as some of

12  the very bad users, correct?

13  A.   No.

14  Q.   Did you have any understanding that this new feature of

09:18a  15  ghosting ads would ever be applied to those who posted

16  prostitution ads?

17  A.   No, unless there was a fraud suspect.

18  Q.   What do you mean by that?

19  A.   Unless the person had been suspected of posting

09:19a  20  fraudulent transactions or had chargebacks come in, I could

21  see that they would possibly ghost one of their ads so the

22  person would think their content was still live.  That would

23  be one exception.

24  Q.   Similar to that exhibit we just looked at, 1176a?

09:19a  25  A.   Yes.

1  Q.   The SnowBunny e-mail?

2  A.   Yes.

3  Q.   That was an ad that dealt with -- or at least had terms

4  that were indicative of prostitution according to you,

09:19a  5  correct?

6  A.   Yes.

7  Q.   And all those ads were removed, but they were removed for

8  what reason?

9  A.   Because of credit card fraud.

09:19a  10  Q.   Fair to say that during your time at Backpage you were

11  looking to remove ads that dealt with credit card fraud in far

12  greater numbers than any ads that dealt with prostitution?

13  A.   Yes.

14  Q.   All right.  I'm going to show for the witness' eyes only

09:19a  15  Exhibit 1171 not in evidence.

16       Sir, is that on your screen and do you recognize that

17  exhibit?

18  A.   Yes.

19  Q.   Could you describe it, please?

09:20a  20  A.   This is an e-mail from Carl Ferrer to me including cc

21  Scott Spear.

22  Q.   All right.  And what's the subject?

23  A.   An invoice to be paid.

24  Q.   And was there an attachment to this e-mail?

09:20a  25  A.   Yes, there's a PDF attachment.

 1    Q.   That dealt with the invoice?

 2    A.   Yes.

 3    Q.   All right.

 4           MR. STONE:  Move to admit Exhibits 1171 and 1171a.

09:20a  5           THE COURT:  Yes, they may be admitted and published.

 6           *(Exhibit Nos. 1171 and 1171a admitted in to*

 7    *Evidence.)*

 8    BY MR. STONE:

 9    Q.   All right.  Let's go to the bottom of this e-mail if we

09:20a 10   can.  Well, start in the middle of the first page.  Perfect.

11           What are we looking at here, sir?

12    A.   These are URLs, website addresses for The Erotic Review

13    and a website address for Backpage.com.

14    Q.   Okay.  And why, if you know, are The Erotic Review web

09:21a 15   addresses and Backpage web addresses?

16    A.   This looks likes it's the reciprocal link where The

17    Erotic Review would make sure that there was a Backpage.com

18    link in a -- on a page on their website and then on

19    Backpage.com staff would ensure that there was a link on that

09:21a 20   person's content that would go back to The Erotic Review.

21    Q.   So there were links on both websites that went to the

22    other website?

23    A.   Yes.

24    Q.   So if you're on Backpage.com, you're looking at an ad,

09:21a 25   you could click a link and then be taken to a review of that

1   individual in The Erotic Review, correct?

2   A.   Yes.

3   Q.   And you testified yesterday that reviews on The Erotic

4   Review were for what?

09:21a   5   A.   For sexual activity.

6   Q.   Sexual activity for money?

7   A.   Yes.

8   Q.   All right.  And above these links there's an e-mail from

9   are Carl Ferrer that's to an individual named David; is that

09:22a  10   right?

11   A.   Yes.

12   Q.   Do you know who David is?

13   A.   David would be David Elms.

14   Q.   Who is David Elms?

09:22a  15   A.   I knew him as the owner of The Erotic Review.

16   Q.   All right.  And there's a discussion here about making a

17   payment, right?

18   A.   Yes.

19   Q.   All right.  And at the top of this e-mail chain is an

09:22a  20   e-mail to you?

21   A.   Yes.

22   Q.   And why was there an e-mail to you?

23   A.   In my responsibilities for Backpage I would have done

24   accounts payable.  So if an invoice was submitted for payment,

09:22a  25   it would have come to me.  I would have obtained a check,

```
     1  obtained signatures and approvals and mailed the payment to

     2  the vendor.

     3  Q.   Who did you obtain the check and signature and approvals

     4  from?

09:23a  5  A.   The signatures would have been from Scott Spear.

     6  Q.   All right.  Let's look at Exhibit 1171a that's now been

     7  admitted.  Was this the attachment to that e-mail, sir?

     8  A.   Yes.

     9  Q.   And what is this?

09:23a 10  A.   This is an invoice from David Elms to Backpage.com that

    11  says "for banner ad placement."

    12  Q.   And it's for an amount of money that Backpage owed The

    13  Erotic Review, correct?

    14  A.   Yes.

09:23a 15  Q.   How much is that?

    16  A.   $4,000.

    17  Q.   And it was your job to secure a check for that payment?

    18  A.   Yes.

    19  Q.   All right.  Let's look at what's been admitted as Exhibit

09:23a 20  567, please.  Sir -- request permission to publish?

    21          THE COURT:  Yes, it may be admitted.  It may be

    22  published.

    23  BY MR. STONE:

    24  Q.   Sir, what is this e-mail?

09:24a 25  A.   This is an e-mail from Carl Ferrer to me -- I'm sorry,
```

1   this is from me to Carl Ferrer and it is an invoice for David

2   Elms.

3   Q.    From Carl to you, is that what you testified?

4   A.    I apologize, it's -- the e-mail system is a little weird.

09:24a  5        This is to me from Carl Ferrer.

6   Q.    And what's he asking you to do?

7   A.    He's asking me to submit another invoice from David Elms

8   for another month for The Erotic Review banner ad.

9   Q.    All right.  And then we can look at Exhibit 567a, which

09:24a 10   is also in evidence, and was this that particular invoice?

11   A.    Yes.

12   Q.    And also for $4,000?

13   A.    Yes.

14   Q.    All right.  Let's look at Exhibit 1174, which is in

09:25a 15   evidence.  Sir, what is this e-mail?

16   A.    This at the top is an e-mail from Carl to me asking me to

17   check on a payment to The Erotic Review.

18   Q.    Okay.  And why was he asking you to check on the payment?

19   A.    In my duties as the accountant I would have generated the

09:25a 20   check, obtained signatures and mailed it to the vendor and

21   then I would have access to the bank accounts to determine if

22   the check had cleared.  I could indicate to Carl what date I

23   had mailed the check.  So Carl would have asked me to check on

24   the status of a payment.

09:25a 25   Q.    There was some delay after you received the invoice for

```
        1  getting the check to the vendor?
        2  A.   Yes, there would have been a processing delay entering it
        3  into the system, obtaining the signatures and then the mail
        4  delay.
09:25a  5  Q.   All right.  Mr. Elms, who you testified to is the owner
        6  of The Erotic Review is asking, "Hey, where's the payment?"
        7  more or less?
        8  A.   Yes.
        9  Q.   All right.  Let's look at what has been admitted into
09:26a 10  evidence as Exhibit 575.
       11       How about this e-mail, do you recognize it?
       12  A.   Yes.
       13  Q.   And what is this e-mail referring to?
       14  A.   Okay.  This is an e-mail from me to Carl and the subject
09:26a 15  is "Elms analysis."  It has a spreadsheet attachment.
       16  Q.   Okay.  Let's look at that attachment at 575b, which is in
       17  evidence.
       18       Well, on the attachment do you recall what the exhibit --
       19  do you recall what was attached to that e-mail?
09:26a 20  A.   Can you show me the e-mail again, please?  It's not on my
       21  screen.
       22  Q.   Actually, there's -- there's some folders before you.
       23  A.   Okay.
       24  Q.   Why don't you just pull 575b.  It should be in front of
09:27a 25  you there.
```

JESS ADAMS - CONT'D DIRECT EXAMINATION BY MR. STONE          37

```
  1  A.   I see a 575.  Is it just 575?

  2  Q.   Well, that's the e-mail.

  3  A.   I don't have another -- I have a 575a.

  4  Q.   Okay, look at that one.

09:27a 5 A.   Apologize.  It says, "Please refer to disc of exhibits."

  6  Q.   Okay, it's not before you.

  7       Fair to say that you were in charge of processing the

  8  payments for The Erotic Review?

  9  A.   Yes, any payments from Backpage.com probably would have

09:27a 10 been submitted threw me.

 11  Q.   And there were a series of payments that you helped

 12  process for The Erotic Review?

 13  A.   Yes.  If memory serves, there were three separate

 14  invoices.

09:27a 15 Q.   Oh, now it's on your screen, actually, 575b.

 16  A.   Yes, thank you.  Thank you.

 17  Q.   And you said memory serves that there were three months?

 18  A.   Yes.

 19  Q.   And that's in December, January, February that's listed

09:28a 20 here?

 21  A.   Yes.

 22  Q.   All right.  So it was $12,000 total.  That was the total

 23  amount of what?

 24  A.   As of February 26th, 2009, that was the total that

09:28a 25 Backpage.com had paid The Erotic Review for banner ads
```

           1   referrals.

           2   Q.    All right.  And then at the bottom of this exhibit it

           3   talks about "Analytics, referrals from TER (visits)."

           4         What's that mean?

09:28a     5   A.    This is data from Google Analytics that would indicate

           6   how many referrals The Erotic Review sent to Backpage.com.

           7   Q.    Okay.  Then there's some listings beneath that.  What are

           8   we -- what information does that show?

           9   A.    Sure.  This shows that in November 2008 that The Erotic

09:28a    10   Review referred 440,797 people to Backpage.com.  December of

          11   '08 they referred 458, January of '09 they referred 521, and

          12   at that point Backpage was paying those invoices for those

          13   ads, and then in February of 2019 for the month to date it

          14   shows that they had sent 427 referrals -- 427,911 referrals.

09:29a    15   Q.    Month to date meaning February 1st through February 25th

          16   of that year?

          17   A.    Yes.

          18   Q.    And these were all referrals that had gone from The

          19   Erotic Review to Backpage?

09:29a    20   A.    Yes.

          21   Q.    And it shows here that the number of referrals increased

          22   during the month that you were paying, at least in January of

          23   that year?

          24   A.    Yes.

09:29a    25   Q.    What did that information mean to you?

```
 1   A.   To me it meant that there was a large number of referrals

 2   that were coming in from The Erotic Review and that the

 3   referrals increased when Backpage.com submitted those payments

 4   to The Erotic Review.

 5   Q.   Was Backpage getting their money's worth?

 6   A.   It looks like it based on the increase in the traffic.

 7   Q.   All right.  I want to show you what is not in evidence,

 8   so for the witness' eyes only, Exhibit 2046.

 9        Sir, do you recognize this exhibit?

10   A.   Yes.

11   Q.   Generally what is this?

12   A.   This is a Backpage.com listing of ads.

13   Q.   Okay.  When you say "listing of ads," what do you mean?

14   A.   It's a list of ads that you can click on to see content

15   in the female escorts category on Dallas Backpage.com.

16   Q.   All right.  Do you know what date this exhibit is

17   showing, what date these ads are from?

18   A.   Yes, there's embedded URLs that show that this is

19   February 9th of 2008.

20   Q.   Okay.  And so this was pulled from -- this shows the

21   Backpage website on February 9th, 2008?

22   A.   That's what it looks like to me, yes.

23   Q.   And where are these ads being posted?

24   A.   Dallas.

25   Q.   In what section?
```

09:29a  5
09:30a 10
09:30a 15
09:31a 20
09:31a 25

JESS ADAMS - CONT'D DIRECT EXAMINATION BY MR. STONE       40

1  A.    Female escorts.

2  Q.    When you worked at Backpage -- well, you were working at

3  Backpage in 2008, correct?

4  A.    Yes.

09:31a  5  Q.    Did you ever go on to the website and review it?

6  A.    Yes.

7  Q.    Does this exhibit -- I think there's eleven pages here.

8  Is this what the website looked like?

9  A.    Yes.

09:31a  10           MR. STONE:  Move to admit Exhibit 2046.

11           MS. BERTRAND:  Objection, hearsay, lack of

12  foundation, relevance under 401 and duplicative and time

13  wasting under 403.

14           THE COURT:  Overruled as to each.  It may be

09:31a  15  admitted.  It may be published.

16           MR. STONE:  Thank you, your Honor.

17           *(Exhibit No. 2046 admitted in to Evidence.)*

18  BY MR. STONE:

19  Q.    I want to come back to this exhibit and I will show it to

09:32a  20  the jury and we will go through it, but right now I want to

21  look at Exhibit 1151 that has been admitted.

22        Sir, do you recognize this e-mail?

23  A.    Yes.

24  Q.    What is it?

09:32a  25  A.    This is an e-mail from me to Carl Ferrer.

1   Q.   Okay.  And it was in February 2009 and what is the

2   subject of this e-mail?

3   A.   It has an attachment, a PDF document that shows referring

4   sites to Backpage.com for January 2009.

09:32a   5   Q.   And referral sites, was that part of your job when you

6   worked at Backpage, gathering that type of information?

7   A.   Yes.  Since I was tasked with pulling traffic data from

8   Google Analytics, I would have done ad hoc reporting at

9   management's request to any traffic data that they requested.

09:33a  10   I would have pulled from Google Analytics.

11   Q.   So it was your job to actually pull the data from Google

12   Analytics?

13   A.   Yes.

14   Q.   And then you would share it with other individuals in the

09:33a  15   company?

16   A.   Yes.

17   Q.   Do you know who you would share it with?

18   A.   Typically Carl Ferrer, Scott Spear.

19   Q.   All right.  And why don't we look at the attachment here,

09:33a  20   which is in evidence, Exhibit 1151a.

21        Sir, what are we looking at here?

22   A.   This is a Google Analytics report.  It shows referring

23   sites for the period of January 1st to January 31st of 2009.

24   Q.   All right.  And let's go through the information that's

09:33a  25   included here.  On the left it has a title that says "Source"

JESS ADAMS - CONT'D DIRECT EXAMINATION BY MR. STONE

```
 1  and then a number of websites listed below; is that right?
 2  A.   Yes.
 3  Q.   Okay.  What information does that refer to?
 4  A.   This is showing referring sites to Backpage.com.  So if
 5  someone was on a different website and clicked a link to take
 6  them to Backpage.com, Google Analytics would track that and
 7  would show that data to Backpage.
 8  Q.   And the first one listed here is Backpage.com.  Any idea
 9  why?
10  A.   If a user just typed in Backpage.com and enter, then
11  Backpage was kind of the referring site.  So if they came in
12  through -- just directly through the Backpage site, it would
13  be -- that would be the referring site so. . .
14  Q.   Is that information particularly helpful for you?
15  A.   No.
16  Q.   Why not?
17  A.   It wasn't an external source.
18  Q.   All right.  So the number one external source was
19  theeroticreview.com?
20  A.   Yes.
21  Q.   And it has visits listed and it has 521,567; is that
22  right?
23  A.   Yes.
24  Q.   Okay.  What does that number mean?
25  A.   It means that's the number of visits that people who were
```

09:34a (lines 5, 10, 15, 20, 25)

1   on The Erotic Review came over to Backpage.com.

2   Q.   So well ahead of the next site, which is indeed.com?

3   A.   Yes.

4   Q.   All right.  Then moving to the right, the next category

09:35a  5   is "Pages/Visit."  What does that mean?

6   A.   Each visitor who came to the site might look at one page,

7   might look at a dozen pages.  So Google would let you know how

8   many pages that visitor looked at.

9   Q.   So for The Erotic Review it's 11.05.  For indeed.com,

09:35a 10   which is the third listing, it's 2.48.  Which one's more

11   valuable to Backpage?

12   A.   The Erotic Review.

13   Q.   Is that just because the user is visiting more pages,

14   spending more time on the web site?

09:35a 15   A.   Yes.  The more traffic you got the better, the more

16   visits you got per visitor page use you got per visitor the

17   better.  Traffic is important.

18   Q.   The next category actually talks about the average time

19   on site.  What does that mean?

09:35a 20   A.   So the referrals from The Erotic Review spent on average

21   almost five minutes on the Backpage site once they arrived.

22   Q.   So again, just comparing it to the next one on the list,

23   indeed.com, it was a minute 47, right?

24   A.   Right.  So when a user came in from indeed.com, they only

09:36a 25   looked at 2.48 pages versus 11, like a visitor from The Erotic

JESS ADAMS - CONT'D DIRECT EXAMINATION BY MR. STONE          44

```
        1  Review, and they would leave the site after a minute 47
        2  seconds versus staying on the Backpage site for four minutes
        3  and 54 seconds on average.
        4  Q.   Do you have any idea what indeed.com was in terms of a
09:36a  5  website?
        6  A.   I believe it's a job site.
        7  Q.   Okay.  The next category is percentage of new visits.
        8       Do you have a sense for what that means?
        9  A.   Google could track new visits versus returning visits.
09:36a 10  To the best of my knowledge, that's showing the percentage of
       11  people that Google felt were new visitors to the Backpage
       12  site.
       13  Q.   All right.  And then finally "Bounce Rate."
       14       What does "bounce rate" mean?
09:36a 15  A.   To me, bounce rate indicates how many people --
       16  percentage of people who were referred who immediately left
       17  the site and went to a different site.
       18  Q.   All right.  So better to have a lower bounce rate from
       19  Backpage's perspective?
09:37a 20  A.   Yes.
       21  Q.   And again, comparing The Erotic Review with indeed.com,
       22  over 20 percent lower in terms of the bounce rate?
       23  A.   Yes.  The indeed.com users came on.  Didn't look at many
       24  pages, didn't spend many minutes, and then bounced at a rate
09:37a 25  of almost 70 percent.
```

JESS ADAMS - CONT'D DIRECT EXAMINATION BY MR. STONE          45

 1  Q.   During your three-plus years at Backpage when you worked

 2  there, did you pull a number of Google Analytics reports like

 3  the one we're looking at?

 4  A.   Yes.

09:37a  5  Q.   Do you have a recollection of on those reports which

 6  website was the top referral?

 7  A.   To the best of my knowledge, The Erotic Review was always

 8  the strongest referring site.

 9  Q.   That didn't change throughout your time at Backpage?

09:37a 10  A.   To the best of my knowledge, no.

11  Q.   All right.  Let's go back to now Exhibit 2046, which was

12  just admitted.  You mention -- now the jury's actually looking

13  at this.  This is how the web page for Backpage.com looked in

14  February 2008; is that right?

09:38a 15  A.   Yes.

16  Q.   And -- well, you already testified Dallas female escorts.

17  That's the section we're looking at?

18  A.   Yes.

19  Q.   All right.  The top of the page a third of the way down

09:38a 20  says Saturday, February 9th.  What does that mean?

21  A.   That's the date when these ads were either posted or

22  reposted onto the website.

23  Q.   Okay.  So those would have been the ads that are either

24  posted or reposted on that particular date?

09:38a 25  A.   Yes.

1   Q.   And, again, this is in Dallas, Texas.  Did Backpage have

2   other cities and other female escort listings?

3   A.   Yes.

4   Q.   Do you have a sense for what -- how many other cities in

**09:39a**  5   the United States Backpage had web pages for?

6   A.   At this particular instant in time it's difficult to know

7   exactly.  When I first started at Backpage there were maybe

8   less than a hundred markets, and it increased the whole time

9   that I was there.  They increased and expanded the number of

**09:39a** 10  markets.

11      So by the end of the time that I was there I would

12   estimate that they had hundreds of markets, and almost all of

13   those markets would have had a female escorts category.

14   Q.   You testified that to purchase an ad in this section, the

**09:39a** 15  female escort section, that was among the most expensive on

16   Backpage, correct?

17   A.   Yes, you had to pay to purchase an escort ad.  There were

18   other categories on Backpage where you could post an ad

19   without paying for free.

**09:39a** 20  Q.   You also mentioned earlier about banned terms on

21   Backpage, correct?

22   A.   Yes.

23   Q.   And some of those banned terms were because they were

24   indicative of prostitution terms?

**09:40a** 25  A.   Yes.

JESS ADAMS - CONT'D DIRECT EXAMINATION BY MR. STONE      47

1   Q.   One of those banned terms you testified to was "Greek"?

2   A.   Yes.

3   Q.   So on the second ad here it reads, "All Day All NIGHT

4   until Sweet GREEK, 125 ONE HUNDRED untill 3a.m."

**09:40a**  5        Do you see that?

6   A.   I do.

7   Q.   And that was in -- that Greek term was indicative of

8   prostitution?

9   A.   Yes.

**09:40a** 10   Q.   Do you see below there's another reference to Greek,

11   although, again, this one is not spelled correctly.

12        Do you see that?

13   A.   Right.

14   Q.   "Let ME Entice YOU to MY GR&&K; or AMERICAN style,"

**09:40a** 15   correct?

16   A.   Yes, yes.

17   Q.   So that would be an ad that would be indicative of

18   prostitution in your understanding?

19   A.   Yes.

**09:40a** 20   Q.   Okay.  The last ad on that page reads, "Wanna play today?

21   Available all day!!!!! GFE!!!!!!!."  Do you see that?

22   A.   Yes.

23   Q.   Do you have an understanding of what "GFE" means?

24   A.   Yes.

**09:41a** 25   Q.   What does it mean?

1    A.    Girlfriend experience.

2    Q.    And what does that mean?

3    A.    To me it describes sexual activity that you're willing to

4    perform.  GFE was used in conjunction or contrast with PSE,

09:41a   5    which meant porn star experience.  So logically you were being

6    indicated different levels of service that you could expect

7    from the provider.

8              MS. BERTRAND:  Your Honor, objection.  Move to

9    strike, non-responsive.

09:41a   10              THE COURT:  Overruled.

11   BY MR. STONE:

12   Q.    Both those terms, "GFE" and "PSE" were indicative of

13   prostitution?

14   A.    Yes.

09:41a   15   Q.    Okay.  On the right-hand side of the screen still on

16   Page 1 there's an ad for The Erotic Review.  Do you see that?

17   A.    Yes.

18   Q.    What -- what is that, this ad on the right-hand side of

19   the screen?

09:41a   20   A.    That's a sponsor ad and in this case this is a sponsor ad

21   that was purchased by that national program, like I mentioned,

22   where you could post an ad in multiple cities at the same

23   time.

24   Q.    I think you mentioned that national ads were fairly

09:42a   25   lucrative for Backpage?

1    A.    Yes.

2    Q.    And, again, this is The Erotic Review, which you

3    testified about was a review site for prostitution?

4    A.    Yes.

09:42a  5    Q.    Was this an ad for The Erotic Review that you noticed was

6    on a lot of the female escort pages in Backpage during your

7    time there?

8    A.    Yes.

9            MR. FEDER:  Objection, leading.

09:42a 10            THE COURT:  Overruled.

11   BY MR. STONE:

12   Q.    Okay, let's go to the second page.  And let's enhance the

13   first half of the screen, please.

14        Again, these are all ads that were posted on that

09:42a 15   Saturday, February 9th date?

16   A.    Yes.

17   Q.    All right.  Fourth down it talks -- the ad -- and, again,

18   these are ad -- what are these?  Are these ad titles?

19   A.    These are ad titles and if you clicked on that blue

09:43a 20   hyperlink, it would have taken you into the ad content itself.

21   Q.    So there would be more content if you clicked on the ad

22   -- on the hyperlink?

23   A.    Yes, this would be kind of referred to as listings; and

24   then if you clicked on the ad, you would be looking at the

09:43a 25   actual ad content itself as posted by the user.

     1   Q.   All right.  This one reads, "Katie is Real Petite

     2   5'1***110lbs****and I Just Turned 18!!****It's like FVCKING a

     3   Virgin."

     4        Do you see that?

09:43a  5   A.   Yes.

     6   Q.   Do you have an opinion as to whether that was an ad for

     7   prostitution?

     8   A.   To me that's an ad for prostitution.  It uses the word

     9   "fucking."

09:43a 10   Q.   All right.  And the next one down doesn't misspell the

    11   words.  It's, "Fuck This Hot & Horny Mature Woman Tonight."

    12        Do you see that?

    13   A.   Yes.

    14   Q.   And then in parentheses it has more information?

09:44a 15   A.   Yes.

    16   Q.   Ad for protrusion?

    17   A.   To me, yes.

    18   Q.   Next one down has, "*Tight**Sweet* and *Discreet***" and

    19   then $40 for 30 minute F/S specials.  Do you see that?

09:44a 20   A.   Yes.

    21   Q.   Any idea what thirty minutes for FS specials meant?

    22   A.   It sounds like, to me, it costs $40 for thirty minutes of

    23   this person's time and "FS" means full service, which means

    24   prostitution.

09:44a 25   Q.   Now, let's go to the bottom half of this page, please.

          1        All right.  There's another add for GFE.  You see that
          2   about halfway down?
          3   A.    Yes.
          4   Q.    "WET dream CUMM true~~~~~~~GFE at its BEST!!!!"
09:44a    5        Prostitution?
          6   A.    To me, yes.  It uses a code word for prostitution.
          7   Q.    All right.  How about the next page, Page 3, and on this
          8   one middle of the page there's another reference to "GFE."
          9        Do you see that?
09:45a   10   A.    Yes.
         11   Q.    "Im BACK and READY to 2 PLAY!!! Hottest Kinkiest GFE from
         12   India"?
         13   A.    Yes.
         14   Q.    GFE, coded prostitution term?
09:45a   15   A.    To me, yes.
         16   Q.    Next one, "$20** 15 ***Minute Specials**24 years old,"
         17   and then gives some descriptions -- some size descriptions,
         18   "36-24-32, B-cup."
         19        Similar to the one you just testified about.  "$20** 15
09:45a   20   ***Minute Specials," what's that mean?
         21   A.    To me, that's discussing a rate for an amount of time.
         22   Q.    And the next one down, "Pamela 5'4 109 lbs / Independent
         23   f/s****$60half$120hour****/$50 more for backdoor."
         24   A.    Yes.
09:46a   25   Q.    Prostitution?

JESS ADAMS - CONT'D DIRECT EXAMINATION BY MR. STONE          52

1  A.   Yes, "backdoor" is a code word for anal sex.

2  Q.   Sort of a theme to most of these ads.  Would you say

3  that's correct?

4  A.   Yes.

09:46a  5          MS. BERTRAND:  Objection, speculation.

6              THE COURT:  Overruled.

7  BY MR. STONE:

8  Q.   All right.  Let's go to Page 4.  About the middle of

9  Page 4 there's another reference to GFE -- or perhaps there's

09:46a 10  a few references.  One near the top, the ultimate GFE $60 for

11  fifteen minutes.  Do you see that?

12  A.   Yes.

13  Q.   "Incalls and Outcalls."  Do you have a sense for what

14  incalls and outcalls meant?

09:46a 15  A.   To me -- no, I don't -- I don't know that.

16  Q.   Totally fair.  "Call Princess Tonight!! GFE!!" a little

17  farther down.  Do you see that?

18  A.   Yes.

19  Q.   Similar to the other ads with the coded term "GFE"?

09:47a 20  A.   Yes.

21  Q.   All right.  How about the next page, this is Page 5.

22  Bottom of Page 5, you see the second ad there has another

23  reference to "GFE"?

24  A.   Yes.

09:47a 25  Q.   The fourth ad says "100$$ to make your dreams CUM true,"

```
 1  with "come" spelled C-U-M.  Do you see that?

 2  A.   Yes, I do.

 3  Q.   Do you have an idea for what that's an ad for?

 4  A.   Prostitution.  "Cum" refers to orgasm.
```

**09:47a**  5  Q.   Three more down, "I am waiting!!!Are you longing for a

```
 6  real GFE?"

 7  A.   Yes.

 8  Q.   "Let me show you how to do it right!"

 9  A.   I see that, yes.
```

**09:47a** 10  Q.   Similar?

```
11  A.   Yeah.

12  Q.   The last ad here reads, "Well reviewed, beautiful Carmen

13  wants to make you very happy..."

14       Do you have any sense for what "well reviewed" means?
```

**09:48a** 15  A.   The --

```
16            MR. FEDER:  Objection, speculation.

17            THE COURT:  He can answer if he has knowledge.

18            MR. STONE:  Only if you have knowledge.

19            THE WITNESS:  To me "well reviewed" means that the
```

**09:48a** 20  person who posted this ad has reviews about themselves on

```
21  other websites.  So to me what this means is that if you

22  locate beautiful Carmen on another website, you would see

23  positive reviews of her.

24            Another website that I would think would be
```

**09:48a** 25  reasonable to expect to research beautiful Carmen would be to

JESS ADAMS - CONT'D DIRECT EXAMINATION BY MR. STONE          54

         1   look at The Erotic Review to determine what her reviews were.

         2   BY MR. STONE:

         3   Q.   All right.  Let's go to the bottom of Page 7, the very

         4   last one.  You see a few here.   The third one down talks about

09:49a   5   "$150/incalls....$200/outcalls***DeStInEe iS CuRiOuS about the

         6   B@cKdOoR***."  Do you see that?

         7   A.   Yes, I do.

         8   Q.   Similar to the other ads?

         9   A.   Yes.

09:49a  10   Q.   Next one, "Panama Models GFE/FVE, Tropical Nights and Hot

        11   Latina Bodies in Panana."  Again, you see the term "GFE"?

        12   A.   I see the GFE term, yes.

        13   Q.   The next one "$60.00 Erotic Exotic Quickie."

        14        What's that mean to you?

09:49a  15   A.   To me, a "quickie" is a fast sexual experience.

        16   Q.   All right.  Top of Page 8.  And so at the top of Page 8

        17   now you see Thursday, February 7th.  Does that mean that those

        18   were ads that were either posted on that day or reposted on

        19   that day?

09:49a  20   A.   Yes.

        21   Q.   Okay.  So we started looking at this on February 9th, and

        22   so we've just moved a couple days in time?

        23   A.   Yes.

        24   Q.   All right.  Top of Page 8, the fourth one down,

09:50a  25   "(((LoOkInG FoR SoMeOnE *2* dO?))) CoMe dO mE!! $100 Full

1    Hour."  Do you see that?

2    A.   Yes, I do.

3    Q.   What's your thought on what that ad is advertising?

4    A.   To me --

**09:50a** 5         MS. BERTRAND:  Objection, calls for speculation.

6         THE COURT:  Overruled.

7         THE WITNESS:  To me, there's a dollar amount in

8    there for an amount of time; and if someone says "come do me,"

9    to me that refers to sexual activity.

**09:50a** 10        MS. BERTRAND:  Objection, same.

11        THE COURT:  Overruled.

12   BY MR. STONE:

13   Q.   All right.  Let's go to the top of Page 10.  The third

14   one down says, "Cedar Hill SPECIAL 100 Roses SUSAN and MYA,"

**09:51a** 15   and a number.  Any idea what "roses" means?

16   A.    "Roses" was a code word.

17        MS. BERTRAND:  Your Honor, objection, speculation,

18   and also lack of foundation regarding any opinion this person

19   is allowed to give and lack of notice regarding opinion

**09:51a** 20   evidence.

21        THE COURT:  Well, he did have -- excuse me.

22        The Government did lay some foundation yesterday,

23   but perhaps Mr. Stone can lay a bit more for this line of

24   questioning.

**09:51a** 25        MR. STONE:  Sure, Your Honor, and I'm about done.

```
 1    BY MR. STONE:
 2    Q.   You worked at Backpage, you testified, from 2007 to
 3    sometime in 2011?
 4    A.   Yes.
 5    Q.   During that time period did you look at the website?
 6    A.   Yes, I did.
 7    Q.   And you reviewed these ads?
 8    A.   I saw these ads yes.
 9    Q.   Or reviewed ads that were like this, correct?
10    A.   Right, similar ads, yes.
11    Q.   Are these ads similar to what ads were posted on other
12    female escort sections?
13    A.   Yes.
14         MS. BERTRAND:  Objection, vague as to time.
15         MR. STONE:  During the time that you worked at
16    Backpage.
17         THE WITNESS:  During the time that I worked at
18    Backpage, the content that I'm looking at is typical of what
19    would have been on the female escort sites on the markets on
20    Backpage.com.
21    BY MR. STONE:
22    Q.   And you've testified that there was a banned term list at
23    Backpage, correct?
24    A.   I saw banned term lists in the office, yes.
25    Q.   And why was there a banned term list?
```

09:51a (line 5)
09:51a (line 10)
09:52a (line 15)
09:52a (line 20)
09:52a (line 25)

JESS ADAMS - CONT'D DIRECT EXAMINATION BY MR. STONE        57

1   A.   Because in the executive and management of Backpage

2   opinion those words were code words for sexual activity.

3   Q.   And some of the terms that are in these ads, were they

4   also on the banned term list?

09:52a 5   A.   Yes.

6   Q.   You also testified that you were in charge of handling

7   the invoices for the payments to The Erotic Review, correct?

8   A.   Yes.

9   Q.   And you also testified that you looked at The Erotic

09:52a 10  Review?

11  A.   Yes.

12  Q.   You testified about the reciprocal link where links went

13  from Backpage to The Erotic Review and vice versa, correct?

14       MS. BERTRAND:  Objection, leading.

09:53a 15       THE COURT:  Sustained.

16       MR. STONE:  Well, I'm trying to avoid being

17  cumulative because I think he's already testified to all this,

18  Your Honor.

19       THE COURT:  Yes, let's move on.

09:53a 20       MR. STONE:  All right.

21  BY MR. STONE:

22  Q.   All right.  So back to this page, the next ad reads,

23  "LeT__Me Brighten__Your Day __With A __BanG," correct?

24  A.   Yes.

09:53a 25  Q.   Let's just go to the bottom half of this page.  You see

JESS ADAMS - CONT'D DIRECT EXAMINATION BY MR. STONE

1    another ad that lists "GFE" on the third down?

2    A.    Yes.

3    Q.    "***P**L**E**A**S**U**R**E*** (!(!CUM & GET IT!)!))!)!"

4    with "come" spelled C-U-M?

09:53a  5    A.    Yes.

6    Q.    And then the last two -- let's go with the last three.

7    $100SPECIALS, $100SPECIALS, $100SPECIALS?

8    A.    Yes.

9    Q.    And the next one, "Close Your Eyes * * *PiCk HeRe* *

09:54a  10   *It'S yOuR lUcKy DaY xxx*GREEK GODDESS*xxx."

11        "Greek" is one of those banned terms?

12   A.    Yes.

13   Q.    And then the last one, "80$pecial~~~~~~~~~Let's Play,"

14   correct?

09:54a  15   A.    Yes.

16           MR. STONE:  Just a second, Your Honor.

17           (Counsel confer.)

18           All right.  Your Honor, that's all the questions I

19   have for my direct examination.

09:54a  20           THE COURT:  All right.

21           Mr. Cambria?

22           MR. CAMBRIA:  No questions.

23           THE COURT:  Mr. Feder?

24           MR. FEDER:  I picked the short straw.

09:54a  25           THE COURT:  Okay.

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | CROSS-EXAMINATION                                                   |
|       | 2  | BY MR. FEDER:                                                       |
|       | 3  | Q.   Good morning.                                                 |
|       | 4  | A.   Good morning.                                                 |
| 09:55a| 5  | Q.   Mr. Adams, my name is Bruce Feder.  I represent Scott         |
|       | 6  | Spear.                                                             |
|       | 7  | A.   Good morning.                                                 |
|       | 8  | Q.   You described him as the best -- to the Government as the     |
|       | 9  | best boss you've ever had; is that true?                          |
| 09:55a| 10 | A.   When I interviewed with them, yes.                           |
|       | 11 | Q.   Considered him honest?                                        |
|       | 12 | A.   I considered him the best boss I ever had.                   |
|       | 13 | Q.   And that usually includes honest, right?                     |
|       | 14 | A.   I'm not sure I would say that I consider him honest at       |
| 09:56a| 15 | this point.                                                        |
|       | 16 | Q.   Compassionate, generous?                                      |
|       | 17 | A.   To me, yes.                                                   |
|       | 18 | Q.   And you've been asked a number of questions for about the    |
|       | 19 | last hour plus and then some yesterday, right?                    |
| 09:56a| 20 | A.   Yes.                                                          |
|       | 21 | Q.   It appears as though you have been prepared with some of     |
|       | 22 | the prosecutors for your testimony; is that true?                |
|       | 23 | A.   I have met with the prosecution, yes.                        |
|       | 24 | Q.   How much -- on how many days for how many hours, if you      |
| 09:56a| 25 | can estimate?                                                      |

```
 1   A.   I would estimate four or five.  I could look back through

 2   my records if you need exact amounts.  I would estimate four

 3   or five times, possibly three hours a meeting.  So a total of

 4   twelve to fifteen hours.
```
09:56a 5   Q.   Have you been paid in any way for that time?

```
 6   A.   I've been compensated as a witness by the Court for

 7   testifying here.

 8   Q.   Fifteen dollars an hour or whatever it is, right?

 9   A.   Yes.  I think they said forty dollars for testifying as a
```
09:57a 10  witness.

```
11   Q.   Have you received --

12        THE COURT:  Mr. Feder, can you just bring the

13   microphone down just a little bit.

14        MR. FEDER:  How about like a double?
```
09:57a 15       THE COURT:  Perfect, thank you.

```
16   BY MR. FEDER:

17   Q.   When were you first contacted by the US Attorney's Office

18   to testify?

19   A.   I recall being contacted in February of 2020 and having a
```
09:57a 20  meeting in 2020 right before COVID and then COVID happened.

```
21   Q.   And so these five days and multiple hours each day of

22   meeting with them have occurred since 2020 to the present?

23   A.   Yes, yes.

24   Q.   And when was the last time you talked to them?
```
09:57a 25  A.   Last time I talked with US Attorney was Monday -- last

```
 1   Monday.  I'd have to -- again, I'd have to look at my notes.
 2   Within the last week.
 3   Q.   Have you gone through several, meaning two, what are
 4   called FBI 302s where there is a summary of what you've told
 5   them in the past?
 6   A.   I'm not familiar with a 302.  Is it a memo where --
 7   Q.   Yeah, it's a memo.
 8   A.   Okay.  Yes, I have, yes.
 9   Q.   And there's only two?
10   A.   I'm aware that there is a memo that outlined what I
11   talked about when I spoke with them, yes.
12   Q.   But there's only two?
13   A.   To the best of my knowledge, yes.
14   Q.   Okay.  On these other days -- according to my math, five
15   minus two leaves three other times of talking to the
16   Government for three hours each time.  Did anybody take notes
17   while you were talking to them?
18   A.   Yes, I'm sure that they were taking notes.
19   Q.   Did anybody tape-record any of these conversations that
20   you had with the prosecutors?
21   A.   I do not believe so, no.
22   Q.   Did you tape-record them?
23   A.   No.
24   Q.   Did you have a lawyer present on any of these?
25   A.   No, I did not.
```

09:57a — line 5
09:58a — line 10
09:58a — line 15
09:58a — line 20
09:58a — line 25

1    Q.   You did not?

2    A.   No.

3    Q.   Didn't you hire a lawyer?

4    A.   I hired a lawyer, yes.

09:58a   5    Q.   What was her name?

6    A.   Julia --

7    Q.   Cassels?

8    A.   There you go, yes.  It's been three years.

9    Q.   Okay.  Why did you hire a lawyer?

09:59a  10    A.   Because after I went in and met with the federal

11   prosecutor and the FBI agent and the IRS agent and talked

12   about my employment at Backpage.com, it occurred to me that it

13   might make sense to protect myself.  So I went and talked to

14   an attorney and paid a retainer to ensure that my legal rights

09:59a  15   were being protected.

16   Q.   Did anybody from the Government tell you that you were in

17   any trouble?

18   A.   No.

19   Q.   Did they threaten you in any way with prosecution?

09:59a  20   A.   Not to the best of my knowledge, no.

21   Q.   Well, I mean, you were there.

22   A.   I don't recall them threatening me with prosecution, no.

23   Q.   Okay.  But Ms. Cassels did not accompany you to any of

24   these approximately five meetings for three hours each that

09:59a  25   you had; is that right?

A.   Correct.  I met with her in her office on two occasions,
and she refunded me most of the retainer.

Q.   Were you given any assurances by anybody in the US
Attorney's Office that you were not going to be prosecuted for
anything?

A.   No, not to the best of my knowledge and certainly nothing
in writing.

Q.   Well, those are two distinct things.  One is verbally,
"Hey, Mr. Adams, you have nothing to worry about."  The second
one is "Dear, Mr. Adams" in writing.  Did that -- did you get
a written or verbal assurance that you were not going to be
prosecuted for anything?

A.   I never received a written assurance.  I do not recall
receiving a verbal assurance.

Q.   Even though you were concerned, you don't recall whether
or not you received a verbal assurance?

A.   What my attorney -- what Julia Cassels told me --

     MR. STONE:  I just want to object to any privilege.

     MR. FEDER:  Don't -- we're not allowed to talk about
what you and your lawyer talked about, okay?  That's called
privilege.

     THE WITNESS:  Thank you.

BY MR. FEDER:

Q.   Mr. Adams, you've testified that you went to work in
approximately -- at Backpage in approximately '08, is that

1    right, or '07?

2    A.    '07.

3    Q.    Okay.  And you also testified that you were promoted

4    about two years in for a higher pay rate where they changed

10:01a  5    your job description so that you could get more money?

6    A.    They changed my job description and paid me more money.

7    I would not refer to that as a promotion.

8    Q.    Do you recall writing an e-mail dated January 6th, 2009,

9    to Mr. Adams and to Mr. Spear -- I'm sorry, to Mr. Ferrer and

10:02a 10    Mr. Spear indicating that, "This promotion means a lot to me.

11    I've really enjoyed working with both of you over the past 20

12    months"?  Does that sound about right?

13    A.    It sounds right, sure, if you have that.

14    Q.    And then you said, "I feel very positive about

10:02a 15    Village Voice Media and Backpage and think we're a great fit

16    for each other," right?

17              MR. STONE:  Object to reading of an exhibit that

18    doesn't seem to be admitted.

19              THE COURT:  Yes.  Mr. Feder, if there's something

10:02a 20    you wish to show the witness or if it's already been admitted

21    you can do that but --

22    BY MR. FEDER:

23    Q.    Did you write an e-mail to Mr. Ferrer or Mr. Spear when

24    you got this promotion thanking them and telling them what a

10:02a 25    great fit you and they were?

1    A.   I don't have a recollection of that, but if you have that

2    e-mail and you can show me that, then I can testify as to the

3    accuracy of it.

4    Q.   And then when you resigned in April of 2010, did you

**10:03a**  5    again write a nice e-mail to both Mr. Ferrer and Mr. Spear

6    thanking them for letting you be employed there and that once

7    you -- if you ever were in the job market again, that you

8    would love to come back, something as to that effect?

9              MR. STONE:  Objection, Your Honor, reading an

**10:03a**  10   exhibit that's not admitted.

11             THE COURT:  Sustained.

12             MR. FEDER:  It's not reading anything.  I'm asking

13   him a question.

14             THE COURT:  Well, sustained.  Rephrase.

**10:03a**  15   BY MR. FEDER:

16   Q.   Did you write them a thank you e-mail when you resigned?

17   A.   It would be customary to write a thank you e-mail and I

18   would --

19   Q.   Mr. Adams --

**10:03a**  20   A.   I do not recall writing an e-mail.  If you have an

21   e-mail, I can testify to it.

22   Q.   Can we have an agreement that when I ask you a question

23   that asks for a "yes" or a "no" answer, that that's what you

24   will do and not go off on a tangent?

**10:03a**  25   A.   Yes, sir.

1    Q.   You think you can do that?

2    A.   Yes, sir.

3    Q.   Thank you.  You didn't tell them when you got your

4    promotion, "them" meaning Mr. Ferrer and Mr. Spear, that,

10:04a  5    "Hey, we're doing something illegal," right?

6    A.   Can you repeat the question?

7    Q.   Have you -- did you in any kind of written form ever say

8    to Mr. Spear or Mr. Ferrer, "We're doing something illegal.

9    I'm going to stop working here," ever?

10:04a 10    A.   I don't recall that in writing, in e-mail, no.

11    Q.   And when you resigned, when you said, "I'd like to come

12    back if I ever have the opportunity," you didn't tell them,

13    "I'm not ever coming back.  This is an illegal enterprise,"

14    right?

10:04a 15    A.   I had a consulting arrangement with them to continue

16    doing consulting for them.  I would not want to jeopardize

17    that.

18    Q.   The consulting thing was you came back at an hourly rate

19    for how long?

10:05a 20    A.   From when I left in 2010 'til, I believe, 2011 was the

21    last of my consulting time.

22    Q.   How many hours per -- well, how many hours that year

23    would you say you consulted?

24    A.   Again, I have tax records, logs, invoices; but off the

10:05a 25    top of my head, I would estimate it was dozens of hours.  Not

```
       1    hundreds of hours.

       2    Q.   Okay.  So you didn't want to jeopardize those tens of

       3    hours even though you, according to your testimony today,

       4    thought you were doing something illegal?

10:05a 5    A.   My wife was -- can you repeat the --

       6    Q.   That's a "yes" or "no," Mr. Adams.  Very simple.

       7    A.   Can you repeat the question for me?

       8            MR. FEDER:  Please read it back to him.

       9            (Reporter read back question.)

10:06a 10           MR. STONE:  Object that it's a compound, Your Honor.

      11            THE COURT:  Sustained.

      12    BY MR. FEDER:

      13    Q.   Did you think you were doing something illegal when you

      14    were working at Backpage "yes" or "no"?

10:06a 15   A.   Myself personally, no.

      16    Q.   Even though you were paying bills for TER, right?

      17    A.   Yes.

      18    Q.   Reviewing ads, right?

      19    A.   For fraud and chargebacks, yes.

10:06a 20   Q.   Working at the company, right?

      21    A.   Yes.

      22    Q.   Getting a paycheck?

      23    A.   (Nodding of the head.)

      24    Q.   So you weren't doing anything wrong, right?

10:06a 25   A.   Right.
```

JESS ADAMS - CROSS-EXAMINATION BY MR. FEDER

1  Q.   And, therefore, you were willing and happy to continue

2  working there, right?

3  A.   I was willing to continue working there.

4  Q.   But you weren't happy while were you working there?

10:06a  5  A.   I was not happy by the end, no.

6  Q.   Okay.  When you quit, you were leaving to be -- to be a

7  -- I'm forgetting the phrase.  To be -- to be a good father

8  with your child, right?

9  A.   Yes.

10:07a  10  Q.   There is a phrase for that, but it's not coming to me but

11  you -- I think you had one, didn't you?

12  A.   Yes.

13  Q.   What is that?

14  A.   May I answer it non "yes/no"?

10:07a  15  Q.   Sure, sure.

16  A.   Yes, it's called a stay-at-home father.

17  Q.   There we go, thank you.

18      Did you tell the Government when you met with them that

19  Heather, Mr. Spears' executive assistant, loved him like a

10:07a  20  father?

21  A.   I used that phrase, yes.

22  Q.   Is that true?

23  A.   Yes.

24  Q.   At least from your vantage point?

10:08a  25  A.   Yes.

1    Q.   And did you also tell them that you came back to be a

2    consultant, even though you were a stay-at-home dad, because

3    he had asked you to do it?

4    A.   Yes, I was asked by Scott Spear, Beth Cook to come back

10:08a  5    in and help train people that replaced me.

6    Q.   Okay.  You started work there in 2007.  The Internet was

7    kind of everything goes in 2007, right?

8                MR. STONE:  Object on foundation.

9                THE COURT:  Sustained.

10:08a  10    BY MR. FEDER:

11    Q.   Did you go on the Internet in 2007?

12    A.   Yes.

13    Q.   2006?

14    A.   Yes.

10:08a  15    Q.   2005?

16    A.   Yes.

17    Q.   2004?

18    A.   (Nodding of the head.)

19    Q.   And then forward?

10:08a  20    A.   Yes.

21    Q.   Saw a lot of ads, right?

22    A.   In the time that I worked for Backpage I saw a number of

23    Backpage ads, yes.

24    Q.   Well, you didn't see any ads on any other site?

10:09a  25    A.   I didn't actively go out and look at other sites.  I

1  clicked on other sites when I worked there, research

2  employment, see what the competitors were doing, that kind of

3  stuff.

4  Q.   Craigslist?

10:09a  5  A.   Craigslist for sure, yeah.

6  Q.   Google?

7  A.   Google really doesn't have ads; but I used Google, yes.

8  Q.   Facebook?

9  A.   I'm not a Facebook user.

10:09a  10  Q.   Twitter?

11  A.   Not Twitter.

12  Q.   Now X?

13  A.   No.

14  Q.   Never looked at that site ever?

10:09a  15  A.   I clicked posts on Twitter, but I never registered to use

16  it and I don't actively go on it, no.

17  Q.   Would an app description of the Internet in '07, '08, '09

18  be the wild days of the Internet where everything went?

19          MR. STONE:  Objection, vague, Your Honor.

10:09a  20          THE COURT:  Overruled.

21          THE WITNESS:  In my opinion, no.  In my opinion, the

22  wild days of the Internet would go back to 1991, 1992 when it

23  first started.

24          MR. FEDER:  Okay.

10:10a  25  BY MR. FEDER:

1  Q.   You were just taken through a number of ads on a number

2  of pages, right?

3  A.   Yes.

4  Q.   And during the whole time that you were at Backpage you

10:10a  5  saw a number of ads, right?

6  A.   Yes.

7  Q.   And you've testified that you looked in to fraudulent

8  credit cards and things like that, right?

9  A.   Yes.

10:10a 10  Q.   Are you familiar with the law -- the prostitution laws in

11  Texas?

12  A.   I'm -- no.

13  Q.   Arizona?

14  A.   Nope.

10:10a 15  Q.   Anywhere else?

16  A.   I'm not a legal expert, no.

17  Q.   Did you ever call a poster of an ad on Backpage?

18  A.   No, not to the best of my knowledge.

19  Q.   Did you ever go out and meet a poster who advertised on

10:10a 20  Backpage?

21  A.   A poster, no.

22  Q.   A user, a poster, an advertiser?

23  A.   Not to the best of my knowledge.  I recall meeting FBI

24  agents in the parking lot.  I don't recall ever meeting a

10:11a 25  poster.

 1    Q.    Sorry to have to ask you this, but you never used the

 2    services, whatever they were, of any poster, user, advertiser

 3    on Backpage, right?

 4    A.    No, I've never used the services of anyone on

**10:11a** 5    Backpage.com.

 6    Q.    You testified quite a bit about what, in your opinion, is

 7    a prostitution term, right?

 8    A.    Yes.

 9    Q.    Is that something that you learned from looking at a

**10:11a** 10   dictionary, talking to somebody else or what's your source for

11    that?

12    A.    The Backpage.com list of banned words was the first

13    indicator that I would have seen, and then from there you can

14    use sites like urbandictionary.com if you have questions about

**10:11a** 15   what something means.

16    Q.    Well, Urban Dictionary is from a college student about

17    ten years ago.  Then there's all kinds of other dictionaries.

18    Would you -- right?

19    A.    Sure, yes.

**10:12a** 20   Q.    Would you agree that you could go to two dictionaries,

21    four dictionaries, five dictionaries and for the same exact

22    term you could get a different interpretation?

23    A.    That's possible, yes.

24    Q.    Have you ever done that kind of comparison?

**10:12a** 25   A.    To com -- I'm sorry, I don't understand your question.

1  Q.   Did you -- is your only source for looking up these words

2  that you have testified about that you saw them on the banned

3  term ad at Backpage, number one, right?

4  A.   That would have been one source, yes.

10:12a  5  Q.   And you went to the Urban Dictionary; is that right?

6  A.   That would be another source, yes.

7  Q.   Anything else?

8  A.   Discussions with other employees and management.

9  Q.   Okay.  None of whom ever told you that they ever

10:12a 10  contacted any user, advertiser, right?

11  A.   I don't know that the Backpage management and staff told

12  me personally that they never used Backpage.com, no.

13  Q.   Do you know what a double negative is?

14  A.   Yes.

10:13a 15  Q.   You know of no one at Backpage that ever used the

16  service, whatever that might be, of anybody advertising on

17  Backpage, true?

18  A.   I have no personal knowledge that anyone --

19  Q.   That's the only thing I'm asking for Mr. Adams is your

10:13a 20  personal knowledge, right?

21  A.   No, I do not.

22  Q.   When you -- you just indicated that you sometimes met

23  with FBI agents or, I assume, other law enforcement people; is

24  that true?

10:13a 25  A.   In my employment at Backpage.com, yes.

1    Q.   Did they ever complain to you that you needed to give

2    them better information because in order for them to do their

3    investigation they had to go out and meet the ad -- the

4    advertisers?

10:14a   5              MR. STONE:  Objection, compound.

6              THE COURT:  Sustained.

7              And with that, Mr. Feder, we'll let you continue

8    your cross-examination of this witness after our morning

9    break.

10:14a  10              Members of the Jury, it's time for our morning

11   break.  We'll take our usual twenty minutes.  I ask you to,

12   again, just remember the admonition and be prepared to come

13   in.  We'll resume at 10:35.

14              All right, please all rise for the jury.

10:14a  15              (Jury out at 10:14 a.m.)

16              THE COURT:  And the witness may step down.

17              All right, please be seated.

18              Mr. Feder and Mr. Cambria.

19              MR. FEDER:  We would ask that no one -- nobody from

10:15a  20   the prosecution talk to Mr. Adams at the break.

21              THE COURT:  I mean, I don't know what you mean.

22   They can't converse with him?

23              MR. FEDER:  We believe it's improper to do that in

24   the break or at the lunch break for that matter.

10:15a  25              THE COURT:  Well, I think they know what their

1   obligations are and their responsibilities are.  I'm not going

2   to not admonish them not to speak to their own witness.

3           MR. FEDER:  Okay, thank you.

4           THE COURT:  And, Mr. Cambria, you wished to clarify

10:15a   5   your record yesterday -- from yesterday evening.  There was

6   some reference to new testimony or something of that sort that

7   you raised.

8           MR. CAMBRIA:  Yeah, I think that the Government was

9   able to get into certain areas that we should be able to get

10:16a  10  into on recross that involve credibility.

11          One example for example, was -- one example, for

12  example, how do you like that -- the declaration, when they

13  asked him about his declaration and some questions about

14  whether anybody else was asked to give a declaration.

10:16a  15          They talked about The Erotic Review and some other

16  things and these were, you know, nuanced -- new issues, if you

17  will, of things that have been mentioned.  So they have two

18  bites at the apple and we're given one.  I think we're

19  entitled to have recross.

10:16a  20          Actually, not that it's any kind of precedent, but

21  I've never been to a court where there wasn't recross in many

22  years, many federal courts; and I was told that, apparently,

23  that is the practice here, but I think that it's erroneous

24  under *Crawford*.

10:17a  25          THE COURT:  And let me just say that in terms of the

 1  area about declarations, I think that it was fairly quick and

 2  my understanding or my recollection of the testimony -- and I

 3  can't remember if it was Mr. Lincenberg or who it was did get

 4  into a question about the declarations.

10:17a  5          MR. CAMBRIA:  I did.

 6          THE COURT:  And I think -- or perhaps it was you.

 7          MR. CAMBRIA:  I did.

 8          THE COURT:  Okay.  And I thought Mr. Rapp,

 9  essentially, just clarified that he was the only person that

10:17a 10  signed the declarations, that no one else had.  So I think

11  that was --

12          MR. CAMBRIA:  It wasn't limited to that.  He made a

13  comment about that he wasn't accurate, which goes to

14  credibility.

10:18a 15          THE COURT:  I'll look at the transcript on that.

16  That doesn't ring a bell to me.  I think I remember the

17  testimony, but just in terms of opening it up for a

18  re-examination in that area, all right.

19          Yes, Mr. Lincenberg.

10:18a 20          MR. LINCENBERG:  And we also would have liked to

21  have done recross.  I'll bring up three points.  It may be

22  that the Court's ruling would not permit it so the Court may

23  be able to rule on these fairly quickly.

24          The first was that the Government introduced an

10:18a 25  entirely new exhibit, Exhibit 5.  They introduced a cover page

1    as well as a different page with the org chart.  The point was

2    to show that was a 2006 document, and this is one of many

3    examples where the Court allowed the Government to have

4    documents introduced through Mr. Ferrer that he apparently had

10:19a  5   never seen, but then denied the defense the ability to do the

6    same; and the main thing I would want to do on recross would

7    be to have the entire exhibit admitted if there's going to be

8    one page of it.

9         It's a lengthy document.  It's actually a PowerPoint

10:19a  10  that I believe was prepared by Harris Bank in 2006.  So that

11   would be the one area that I would want to explore on that

12   point.

13        THE COURT:  Well, on that point, my recollection was

14   that was an exhibit that you used, the chart was, and they

10:19a  15  essentially introduced the cover page, you know, which that

16   chart was a part of and Page 17, which was the chart, and that

17   was your Exhibit 6243.

18        MR. LINCENBERG:  Right.

19        THE COURT:  And that is why I admitted it.

10:20a  20  MR. LINCENBERG:  Right, that's correct.

21        THE COURT:  So I'm not entirely sure what -- because

22   from what you just said, if it is the case that Mr. Ferrer but

23   for your cross-examination and using and recognizing that

24   chart and the organization of it has no knowledge of the other

10:20a  25  content of it, then why would we want to revisit that with

 1   him?

 2          MR. LINCENBERG:  Well, the -- it's not the case that

 3   he has no knowledge of the content.  He'd never seen the

 4   document, apparently, and the Government to sort of show him

**10:20a**  5   what the document was, Mr. Rapp ran through a bunch of pages,

 6   I think he would generally say this stuff all looks familiar.

 7   The truth is that he's supplying the information for it, and

 8   the truth is that if these documents are things that put one

 9   on notice the entire document should be in.

**10:21a** 10          It's a similar thing that they went in to on

11   redirect where they added some testimony about Mr. Ferrer --

12          THE COURT:  Well, let's get -- let's be very focused

13   here because we're on a break.

14          MR. LINCENBERG:  This is related.

**10:21a** 15          THE COURT:  So as to Exhibit 5, I'm going to deny

16   your request to reopen on that.

17          MR. LINCENBERG:  Okay.

18          THE COURT:  What's the next point?

19          MR. LINCENBERG:  Second point is on the redirect on

**10:21a** 20   this point about -- it's called death by Google, that topic,

21   where they had Mr. Ferrer testify about he would see hundreds

22   of stories; and, of course, this is yet another example of

23   where the Government wants to leave the idea that you'd see

24   hundreds of stories, a lot of them negative publicity about

**10:21a** 25   Backpage, which is true, but also what you would see in Google

1   searches are many stories about the Court cases, which are

2   very central to state of mind of defendants.

3           THE COURT:  We're not going to get into court cases,

4   as I've already mentioned and so your -- your request is

10:21a 5   denied with regard to that.

6           MR. LINCENBERG:  Third point is -- is with regard to

7   Exhibit 886, which is one of these e-mails to Bank of Montreal

8   describing Website Technologies.

9           I had raised yesterday about Jencks material that we

10:22a 10   had received.  Mr. Rapp said, "I can cut this off.  We're not

11   planning to get into that exhibit," and he did not get into

12   that exhibit; but I want to note for the record, and if the

13   Court wants we can file something brief on it, the -- the

14   Jencks material that we received Sunday or Monday night was --

10:22a 15   came from Ferrer.  I guess it was sent by his lawyer, and it's

16   very exculpatory in terms of the meaning of these edited

17   changes.

18           Now, I don't need to get into this on redirect

19   unless the prosecution is still going to pursue the position

10:23a 20   that Mr. Ferrer falsely testified about in terms of that

21   Mr. Brunst's changes were changes that made it more deceptive

22   because the Jencks material that we received is to the

23   contrary.

24           THE COURT:  Okay, so you'll need to file

10:23a 25   something --

UNITED STATES DISTRICT COURT

1           MR. LINCENBERG:  Okay.

2           THE COURT:  -- because I don't know what you're

3     referring to --

4           MR. LINCENBERG:  I get it.

10:23a  5           THE COURT:  -- in terms of the material.

6           MR. LINCENBERG:  Okay.  Thank you, Your Honor.

7           THE COURT:  All right, thank you.

8           We'll stand in recess.

9           COURTROOM DEPUTY:  All rise.

10:23a 10           (Recess taken at 10:23 a.m.)

11           COURTROOM DEPUTY:  All rise.

12           (Back on the record at 10:35 a.m.)

13           THE COURT:  Please be seated, and we will have the

14     jury in; and we will run through noon, Mr. Feder.

10:37a 15           MR. FEDER:  Okay.

16           THE COURT:  All rise for the jury.

17           (Jury back in at 10:37 a.m.)

18           THE COURT:  All right, please be seated.

19           The record will reflect the presence of the jury.

10:38a 20     The witness is on the witness stand and, Mr. Feder, you may

21     continue.

22     BY MR. FEDER:

23     Q.   Mr. Adams, you testified that you paid the invoices for

24     either The Erotic Review or a -- seemingly a invoice for

10:38a 25     Mr. Adams individually, right?

1    A.    Mr. Elms.

2    Q.    Mr. Elms, I'm sorry.  You're Adams.

3    A.    Yes.

4    Q.    Right?

10:38a    5    A.    Yes, I handled the processing of the invoice from David

6    Elms, submitted a payment from Backpage.com.

7    Q.    Did you ever go to The Erotic Review site?

8    A.    I'm sure that I clicked on The Erotic Review site when I

9    was employed at Backpage.com.

10:39a   10    Q.    Did you ever meet with any of the people that were

11    reviewed at The Erotic Review?

12    A.    No.

13    Q.    Did you ever talk to any of the people that were there

14    that were the subject of reviews?

10:40a   15    A.    No.

16           MR. FEDER:  Could you bring up Exhibit 23 and scroll

17    to. . .

18    BY MR. FEDER:

19    Q.    The objective while you were at Backpage was to grow the

10:40a   20    site, right?

21    A.    Yes.

22    Q.    And there's nothing wrong with growing a site.  That's

23    what a website wants to do, true?

24    A.    Yes.

10:41a   25           MR. FEDER:  Would you scroll to Page 3.

1  BY MR. FEDER:

2  Q.   See the second paragraph there, Mr. Adams?

3  A.   Yes.

4  Q.   What does that mean to you, if it means anything to you?

10:41a 5  A.   The over 100 tasks were completed with incremental

6  improvements to the site, that says that Backpage.com worked

7  with their desert.net hosting company, who wrote the code and

8  hosted the site, to complete more than 100 development tasks

9  with the -- again, with desert.net.

10:42a 10      And then part two, I apologize, says most of those tasks

11  were the result of customer e-mails sent to support at

12  Backpage.com, and then it gives a metric that the support

13  group at Backpage.com currently averages 300 e-mails per day.

14  Q.   What were the 300 e-mails, if you know?

10:42a 15  A.   I didn't work in support.

16  Q.   Okay.  And see where the fourth paragraph down where it

17  says first of the total revenue. . .

18  A.   Yes.

19  Q.   And it talks about various levels of sources for revenue

10:42a 20  including on-line, print upsells, license fees, maintenance

21  fees, hosting charges and all other revenue streams?

22  A.   Yes.

23  Q.   Are you familiar with all of those sources of revenue?

24  A.   Yes.  Many of them, yes.  It has been a number of years.

10:43a 25           MR. FEDER:  And if you could scroll down the page a

1    little bit more, thank you.

2    BY MR. FEDER:

3    Q.    Do you know what the charge for Google is there?

4    A.    That's revenue, not a charge --

10:43a   5    Q.    Okay.

6    A.    -- I think on this.  So that would be -- it does not say

7    Google AdSense revenue, but if it's revenue from Google my

8    understanding would be that that would be AdSense revenue to

9    the best of my knowledge.

10:43a   10    Q.    Revenue from what or for what, if you know?

11    A.    If it is Google AdSense revenue, then Google AdSense was

12    a program where Backpage.com or a website could have ads from

13    Google's network displayed on their site, and then Google

14    would compensate, in this case, Backpage.com for displaying

10:44a   15    theirs ads.

16    Q.    Do you have any understanding what kinds of ads Google

17    was placing on Backpage?

18    A.    From what I remember seeing Google's ads -- those AdSense

19    ads on Google's sites, they were just generic, regular old

10:44a   20    Google AdSense advertisers so. . .

21    Q.    On various different subjects?

22    A.    Yes, various subjects.

23    Q.    Same thing for -- same question for Oodle?

24    A.    Oodle, if memory serves, was another classifieds website

10:44a   25    at the time.  I believe Oodle had no adult content, and there

         1  was a license agreement between Backpage.com and Oodle.

         2          MR. FEDER:  If you could scroll down, please -- I'm

         3  sorry, go to the next page.  Could you bring up Exhibit 4 --

         4  I'm sorry, 24.

10:45a   5          THE COURT:  Did you say 24?

         6          MR. FEDER:  2-4 -- or how about 24a.

         7  BY MR. FEDER:

         8  Q.   In order to grow the site, Mr. Adams, do you have an

         9  understanding of what "natural growth" means?

10:46a  10  A.   Natural growth to me means that as a website is on-line,

        11  that over time it gets more and more users that come in and

        12  use it.

        13  Q.   So users come to the site because they've heard of

        14  Backpage on their own?

10:46a  15  A.   Or through a search engine or through a referral partner

        16  in this case.

        17  Q.   And the search engines we're talking about that are

        18  sending advertising -- potential advertisers or readers to

        19  Backpage are the Googles, the Bings, all of those search

10:46a  20  engines that we know of?

        21  A.   Yes.  I'm not sure when Bing came into existence, but

        22  yes.

        23  Q.   Well, back then there were some that are no longer with

        24  us and more today than there used to be, right?

10:46a  25  A.   Yes.

1   Q.   And would you say that there were more referrals from

2   search engines?

3   A.   I need to see a report.

4   Q.   Okay.

10:47a   5            MR. FEDER:  Scroll down to No. 5, please.

6   BY MR. FEDER:

7   Q.   Public Affiliate Program was a means by which Backpage

8   was essentially rewarding people that would place ads or get

9   other people to place ads on Backpage and pay like a

10:47a  10  commission, right?

11  A.   Yes.

12  Q.   Again, there's nothing wrong with that, right?

13  A.   I see nothing wrong with an affiliate program --

14  Q.   Okay.

10:47a  15  A.   -- no.

16  Q.   And then what -- do you know what "SEO" is?

17  A.   "SEO" means search engine optimization.

18  Q.   What is that?

19  A.   Trying to optimize your site so that you get as many

10:47a  20  results from the search engines as possible.  To me it would

21  mean the technical team who writes and develops the website

22  would try to write the code and the language on the site in

23  such a way that it would get indexed more highly with Google

24  so that your results would show up higher in search rankings.

10:48a  25  Q.   And Backpage was actively engaged in SEO, right?

JESS ADAMS - CROSS-EXAMINATION BY MR. FEDER                    86

1    A.    To the best of my knowledge.

2    Q.    To the best of your knowledge?

3    A.    Yeah.

4    Q.    Then under "marketing" you were asked a question about

10:48a  5    TER, but there were two other categories that were not

6    discussed; and, that is, TER is a referral site, but there

7    were numerous other referral sites that were sending people

8    hopefully to look at Backpage and either buy an ad or do

9    something there, right?

10:48a 10    A.    Yes, we saw the Google referral report that showed many

11    different websites referring to Backpage, yes.

12    Q.    And then the third category there was that they wanted to

13    advertise themselves and talk about what kind of site they

14    were and they created a Wikipedia site for themselves; is that

10:48a 15    right?

16    A.    Apparently, yes.

17    Q.    You don't know about that, right?

18    A.    I don't know if I ever looked at the Wikipedia page for

19    Backpage.com, and I have never written a Wikipedia entry.

10:49a 20    Q.    All right.  What about No. 8, do you know what that

21    means, "Google PPC"?

22    A.    I'm not -- I can't remember what PPC means.  Paper click,

23    possibly; but, again, I'm not certain.

24    Q.    Well, if it says $2,000 per MO, I assume that means

10:49a 25    month?

```
 1   A.   That's what my assumption would be, yeah.

 2   Q.   Is that Backpage is paying Google or vice versa?

 3   A.   It looks to me that this would be an expense to Backpage

 4   of 2k per month to Google and if "PPC" means paper click, it

 5   sounds like to pay Google for referring traffic; but, again,

 6   I'm not an expert on Google.

 7   Q.   Okay.  To your memory, did they continue to pay Google

 8   two grand a month while you were there?

 9           MR. STONE:  Object on foundation.

10           THE COURT:  Yes, lay some foundation, Mr. Feder.

11           MR. FEDER:  All right.

12   BY MR. FEDER:

13   Q.   Do you know -- I mean, you were writing the checks,

14   Mr. Adams.  Do you recall writing a check to Google for $2,000

15   every month?

16   A.   I do not.  If you have a copy of a check or an invoice, I

17   could certainly talk about that.

18   Q.   Well, I -- okay.  I notice you weren't shown any TER

19   checks, right, but you remember the invoice?

20   A.   Sure.

21   Q.   Do you remember writing the check?

22   A.   Sure, yes, I do.

23   Q.   Were you shown any copies of any checks that were written

24   to TER?

25   A.   Not to my knowledge.
```

10:49a — line 5
10:49a — line 10
10:50a — line 15
10:50a — line 20
10:50a — line 25

 1   Q.   But you remember that one?

 2   A.   TER sticks out in my mind, yes.

 3   Q.   I see.  But you don't remember $2,000 a month to Google,

 4   true?

10:50a  5   A.   This document is also from 2007 when I first started.  So

 6   I think -- or 2008 so I -- I can't recall if Backpage

 7   continued to pay $2,000 per month to Google in -- for the

 8   entire duration of the time that I was there.  If you had a

 9   financial statement, I could testify to that.

10:50a 10   Q.   In 2008 how many checks would you say you issued per

11   month for Mr. Spear's signature?

12   A.   Again, it evolved over time when I was there.  So I don't

13   know exactly how many.  Handful.  It was not many, and when

14   the affiliate program launched, then that resulted in far more

10:51a 15   checks.  So the number of checks that I would have taken to

16   Mr. Spear for signature would have increased; but at the time

17   when I first took over the payables functions for Backpage,

18   there would have been very minimal checks that I would have

19   asked Mr. Spear for signatures.

10:51a 20   Q.   But as business increased, as expenses increased, you

21   issued more and more checks, right?

22   A.   Yes.

23   Q.   And like a lot of people, you stick the checks under

24   Mr. Spear's nose and he'd write them -- he'd sign them one,

10:51a 25   two, three, four, five, right?

```
 1   A.   He would ask for backup typically.  So if I brought in a

 2   batch of affiliate checks, then I would include an affiliate

 3   report with peoples' names and dollar amounts.

 4   Q.   Okay.

 5   A.   So it wasn't just sticking checks in front of his nose

 6   for signature.

 7   Q.   All right.

 8        MR. FEDER:  Could we see Exhibit 588, 5-8-8, and go

 9   to page -- I'm sorry, 23.

10   BY MR. FEDER:

11   Q.   So this is the initiative for 2010, right?

12   A.   Yes.

13   Q.   As you are there from '07 up to 2009, moderation as we

14   know it was implemented in 2008.  Is that your understanding

15   or memory?

16   A.   Again, I didn't work in operations so I -- in 2007, 2008

17   I was learning the ropes on finance, revenue reporting so. . .

18   Q.   You don't know when moderation began, right?

19   A.   I don't know exactly, no.

20   Q.   But you knew that it started sometime within the time

21   frame that you were there, correct?

22   A.   I know that when I was there, there was budget for

23   operation staff to perform moderation.

24   Q.   And --

25   A.   I don't know the date it started.
```

10:52a  (line 5)
10:52a  (line 10)
10:53a  (line 15)
10:53a  (line 20)
10:53a  (line 25)

JESS ADAMS - CROSS-EXAMINATION BY MR. FEDER                90

1    Q.   Okay.  But you knew that you were writing checks for an

2    increasing amount of moderators being hired by Backpage in

3    order to moderate and edit the ads, right?

4    A.   Yes, Backpage staffing went up each year.

10:53a   5    Q.   By multiples, true?

6    A.   Sure, yes.

7    Q.   And you continue -- and you've already testified that you

8    looked at the site, right?

9    A.   Yes.

10:54a   10    Q.   And so the moderation was being implemented over the

11    years that you were there, true?

12    A.   Yes.

13    Q.   And the banned terms that you've already referenced grew

14    from maybe a page to pages and pages and pages and pages,

10:54a   15    right?

16    A.   I didn't maintain that list.  So there may have been

17    multiple copies of it.  I would assume it grew over time.

18    Q.   Okay.  Do you recall when Desert Net was hired?

19    A.   Desert Net was the hosting service when I was hired so it

10:54a   20    pre-dated me.

21    Q.   How much were you paying, if you remember, Desert Net on

22    a monthly basis?

23    A.   Again, the invoices changed over time.  The relationship

24    changed over time.  I believe it was in the tens of thousands

10:54a   25    of dollars to Desert Net on a monthly basis.

1   Q.   And are you aware that Desert Net created the ability to

2   automatically reject certain types of words on the banned list

3   or is that not --

4   A.   It's out -- outside of my scope.

**10:55a** 5   Q.   Okay.  You kept your blinders on --

6   A.   Yeah.

7   Q.   -- and focused on your work, right?

8   A.   Yes.

9        MR. STONE:  Objection to that last question.

**10:55a** 10        THE COURT:  Overruled.

11   BY MR. FEDER:

12   Q.   Move slowly but deliberately.  What does "deliberately"

13   mean to you?

14   A.   With action.

**10:55a** 15   Q.   Kind of an upward projectile, right?

16   A.   I would agree with that, yes.

17   Q.   So this is a business, at least according to their legal

18   strategy for 2010, that it's a relatively big company.  They

19   got to move slow to make sure that they're doing the right

**10:56a** 20   thing, but they are going in a -- one direction and that is

21   deliberately, true?

22        MR. STONE:  Objection, compound.

23        THE COURT:  Sustained.

24   BY MR. FEDER:

**10:56a** 25   Q.   Moving slowly means carefully?

1  A.   Moving slowly means moving slowly.

2  Q.   Okay.  Could it also include carefully?

3  A.   Given that they modified that with "deliberately," they

4  could have modified it with "carefully" as well.

**10:56a**  5  Q.   Did you notice -- it says "continue to work closely with

6  law enforcement."  Did you notice, in your job capacity, that

7  their work with law enforcement continued to be close?

8  A.   I wasn't at the level where I knew what they were doing

9  with law enforcement, but I was doing with law enforcement at

**10:56a** 10  this time in answering subpoenas.  So if I interpreted this

11  through my lens, continuing to work closely with law

12  enforcement would mean continuing to try to provide as much

13  information as possible for a subpoena in a timely manner.

14  That's what I would happen interpret "continue to work closely

**10:57a** 15  with law enforcement" to mean.

16  Q.   Well, your orders were to work quickly and

17  comprehensively with law enforcement subpoena requests, right?

18  A.   Yes.

19  Q.   They wanted you -- if the police said, "We want

**10:57a** 20  something, we need something," your orders were "do it,"

21  right?

22  A.   My orders were do it, yes.

23  Q.   And if the police said, "We need something quickly, even

24  quicker than quick," that's what you were supposed to do,

**10:57a** 25  right?

 1   A.   Yes.

 2   Q.   And that is what you did, right?

 3   A.   I tried to fulfill the subpoenas in as timely a manner as

 4   I could.

10:57a   5   Q.   And during the time that you were there and you've

 6   already testified that the amount of subpoenas started to

 7   ratchet up and up, right?

 8   A.   Yes.

 9   Q.   To a point where at some point were you the only one

10:57a  10   responding to subpoenas?

11   A.   When I resigned, the duties for subpoena compliance were

12   transferred over to the Operations Department.  I'm not sure

13   exactly when it transferred.  I remember training the

14   Operations Department on how to fulfill subpoenas during my

10:58a  15   transition period out of the company.

16   Q.   And when you first started complying with subpoenas, you

17   were being supervised by a person named Steve Suskin, true?

18   A.   Yes.

19   Q.   And Steve Suskin was general counsel for Backpage, right,

10:58a  20   and Village Voice Media?

21   A.   Right.

22   Q.   And he was a lawyer, right?

23   A.   Yes.

24   Q.   And he wanted to make -- did he tell you he wanted it

10:58a  25   done in a certain way at a certain speed?

1          MR. STONE:  Objection, calls for hearsay.

2          THE COURT:  Sustained.

3          MR. FEDER:  I'm sorry, what was the objection?

4          MR. STONE:  Calls for hearsay.

10:58a  5          THE COURT:  Sustained.

6          MR. FEDER:  Not for the truth of the matter, Judge,

7  but just what action it precipitated.

8          THE COURT:  Well, you can rephrase the question.

9          MR. FEDER:  Okay.

10:59a 10  BY MR. FEDER:

11  Q.   Were you told, Mr. Adams, that he wanted it done in a

12  certain way at a certain speed?

13          MR. STONE:  Same objection.

14          THE COURT:  Sustained.

10:59a 15  BY MR. FEDER:

16  Q.   Do you have any understanding of what it meant -- what

17  "monitor and stay ahead of legal changes and initiatives"

18  meant?

19  A.   Again, that's above my pay grade but that to me means --

10:59a 20  Q.   I don't want -- I don't want you to speculate.  I want

21  you -- I asked you a question --

22  A.   No.

23  Q.   -- do you know?

24  A.   No, I do not know.

10:59a 25  Q.   Okay.  How about "look for ways to upgrade our standards

1  without losing customers and traffic"?

2  A.   No, that's their -- not me.   I don't -- I don't know what

3  they meant by that.

4  Q.   So you don't know that that refers to moderation?

**10:59a** 5  A.   If it was referring to moderation, I would think they

6  would say moderation.

7  Q.   Okay.  There was -- and you already testified under

8  "budget appropriately" there was already amounts of money

9  being paid to lawyers and that this was an additional amount

**11:00a** 10  of money being assigned for legal help?

11             MR. STONE:  Objection, I think it misstates the

12  evidence.

13             THE COURT:  Sustained.

14  BY MR. FEDER:

**11:00a** 15  Q.   Didn't you talk about this during your direct

16  examination?

17  A.   I talked about the budget for the slow dance, yes.

18  Q.   Okay.  And what was that for?

19  A.   This is a discussion of how much money to put into the

**11:00a** 20  budget for Backpage for 2010 for legal expenses, including the

21  slow dance, as they referred to it with the Attorney General.

22  Q.   Moving slowly but deliberately?

23  A.   Yes.

24  Q.   Was that $360,000 on top of legal expenses that are

**11:01a** 25  already in the budget?

JESS ADAMS - CROSS-EXAMINATION BY MR. FEDER

1 A.   I need to see that in order to know for sure.   There

2 would have been -- in the 2010 budget there would have been

3 two components to legal expenses.   There would have been the

4 usual amount that would have been expected to be spent based

**11:01a** 5 on the past and then an allocation for whatever they

6 determined they wanted to spend on this slow dance.

7      So I'd have to see the detail in the budget to know what

8 the slow dance -- it's 360,000 or if that's the total legal

9 expenses for the year so. . .

**11:01a** 10 Q.   So, in other words, you don't remember if there were

11 already legal expenses in the previous budgets that this is --

12 the $360,000 is now on top of?

13 A.   I do remember that there was legal expenses in budgets

14 and actual financial statements for years past.   What I'm

**11:01a** 15 saying is I don't know if the slow dance totals 360,000 or if

16 total legal expenses in the budget totaled 360,000 and the

17 slow dance was a component of it.

18      This document makes it look to me like the slow dance was

19 $360,000; but if memory serves, I believe that that's the

**11:02a** 20 total and that there are two components to this year's budget;

21 but, again, based on this slide, it says the slow dance

22 $360,000.

23 Q.   You're confusing me.

24 A.   I apologize.

**11:02a** 25 Q.   Do you recall in the budget of 2008 -- I'm sorry, you

         1   worked there 2007, '08, '09, right?

         2   A.   Yes.

         3   Q.   Do you recall paying legal expenses in '07, '08 and '09?

         4   A.   Yes.

11:02a   5   Q.   Any idea how much?

         6   A.   I'd have to see the financial statements.

         7   Q.   Got it, thank you.

         8        How long did Mr. Suskin supervise your subpoena

         9   compliance, if you recall?

11:02a  10   A.   I recall bringing the first several that I fulfilled to

        11   Mr. Suskin's office at the Phoenix New Times building,

        12   reviewing the subpoena, and going through the documents that I

        13   provided.  I remember doing that multiple times.  So I'd say

        14   maybe ten to twelve, and then Mr. Suskin indicated that he

11:03a  15   trusted that I was fulfilling them properly and no longer

        16   required me to bring them to him; and after that point I

        17   didn't bring subpoenas to Mr. Suskin as a general rule.

        18   I do not remember exactly when he said that I no longer needed

        19   to bring them to him.

11:03a  20   Q.   Okay.  Did you get any complaint from law enforcement

        21   that you weren't complying fast enough or thoroughly enough?

        22   A.   Not that I recall.  I recall specifically being told by

        23   law enforcement I was providing too much information in at

        24   least one situation, printing off a lot of paper and occupying

11:03a  25   their fax machine.

1    Q.    Were you one of the people that was -- when a request

2    would come in, that you would not only get them the

3    information from Backpage, but you would go to looking at

4    other sites to get them comparable information about ads on

11:04a   5    those other sites?

6    A.    When I -- no.  When I fulfilled subpoenas, I pulled

7    information from the Backpage.com site.

8    Q.    Only?

9    A.    To the best of my knowledge, yes.  I didn't represent any

11:04a  10    of those other sites.

11    Q.    I'm sorry?

12    A.    I didn't represent or work for any of those other sites.

13    So it would have been irrelevant for me too pull information

14    from those.

11:04a  15             MR. FEDER:  Could the witness be shown Exhibit 1162.

16    BY MR. FEDER:

17    Q.    To your knowledge, was this some kind of sting, if you

18    know what "sting" means?

19    A.    I do know what "sting" means.  I wouldn't have no -- no

11:04a  20    idea to know if this was a sting or not.

21    Q.    Do you have a recollection of whether -- I mean, the

22    subject line says "subpoena filled - take down ad," right?

23    A.    Yes.

24    Q.    Do you have a recollection of complying with a subpoena

11:05a  25    in regard to this case?

1    A.   Yes.  Based on the e-mail, it indicates that I have

2    provided information for investigation and I'm now asking a

3    question whether or not we can take down the ad.

4    Q.   And did you have -- I mean, when you comply with a

11:05a  5    subpoena, would you have, like, telephonic communications with

6    the law enforcement people --

7    A.   Yes.

8    Q.   -- or e-mail only or both or neither?

9    A.   A variety.  Most of the subpoenas that came in were just

11:05a 10    faxes on the Backpage fax machine.  So I would have a fax and

11    I would fax documents back to the requester.  From time to

12    time I do recall receiving requests via e-mail.

13        I received requests forwarded on from, you know, Scott

14    Spear, from Mr. Ferrer.  So they came in from a variety of

11:06a 15    ways.  I do recall from time to time talking on the phone with

16    a requester specifically to ensure that I understood the scope

17    of what they were looking for, what documents they were

18    looking for; and, again, like I said before, I remembered

19    distinctly meeting with FBI agents in the parking lot of the

11:06a 20    New Times to hand them the documents to fulfill a subpoena.

21    Q.   And they would say "thank you," right?

22    A.   Yes, I believe law enforcement appreciated the efforts.

23    Q.   Is your question in this e-mail whether or not you can

24    trust a law enforcement officer telling you to not take down

11:06a 25    the ad?

1   A.    There's multiple questions that I'm asking in this

2   e-mail.

3   Q.    Okay.

4   A.    I can speak to that directly.

11:07a  5   Q.    Did you think about maybe calling up the police officer

6   or FBI agent and saying, "Hey, what do I do?" or "What can I

7   do?" or "What do you want me to do?"

8   A.    If what you're asking is -- I'm indicating in here to

9   Carl and to Tamara that I had no proof or evidence of anything

11:07a 10   when I received the subpoena.  When I would receive a

11   subpoena, it would be a piece of paper with a law enforcement

12   badge.

13        So the point I'm trying to make here is that from a

14   Backpage standpoint, the only information that we had that we

11:07a 15   knew of is what we were being told on these forms; and I

16   believe my question in this when I first took over subpoenas

17   was, "Does Backpage validate that these subpoenas are actually

18   coming from legitimate law enforcement?"

19        Do you contact them every time?  How would you even

11:07a 20   verify that this is not someone trying to commit fraud against

21   Backpage in some manner?  So what I'm trying to bring up in

22   this is a couple of issues.  The subpoena has been fulfilled

23   and can Backpage take the ad off of its site?  And, also, what

24   am I supposed to just trust, that every subpoena that comes

11:08a 25   through the fax machine is from a valid law enforcement

1   agency?

2   Q.   So the bottom line is you and by inference Mr. Ferrer and

3   Tamara Nickel, you're trying to make sure you're doing the

4   right thing with this ad, right?

11:08a   5   A.   Yes.

6   Q.   You're trying to make sure that you get the law

7   enforcement all of the information they need and want, number

8   one?

9   A.   Yes.

11:08a   10   Q.   You're trying to make sure that if there's an ad that

11   needs to be taken down, it's taken down?

12   A.   Yes.

13   Q.   A careful and deliberate way of trying to make sure that

14   Backpage is doing what it needs to do in cooperating with the

11:08a   15   law enforcement community, right?

16   A.   I was certainly doing my best, yes.

17   Q.   But also protecting your posters' potential privacy; but,

18   also, if they're at risk, trying to make sure that they are no

19   longer at risk?

11:09a   20   A.   Yes.

21   Q.   You testified about -- I'm not gonna bring up the

22   exhibit, but you've testified about trying to make sure that

23   people don't defraud Backpage by using stolen credit cards,

24   right?

11:09a   25   A.   Yes.

1    Q.    Or spammers, right?

2    A.    Yes.

3    Q.    The usual spammer was somebody that's trying to put an ad

4    on a free part of Backpage when it really should be a paid

**11:09a** 5    advertisement, right?

6    A.    I did not work in moderation, support so --

7    Q.    Okay.  So you don't know anything about that, right?

8    A.    I wasn't the spam cleanup person, no.

9    Q.    But there's nothing wrong with trying to stop people from

**11:10a** 10   using stolen credit cards on Backpage, right?

11   A.    No.

12   Q.    That's a common problem for almost all of American

13   business is stolen credit cards?

14   A.    Yes.

**11:10a** 15   Q.    And there's a -- and then the American business, Backpage

16   included, has to pay money for the chargeback, right?

17   A.    Yes.

18   Q.    So there's nothing wrong with doing that, right?

19   A.    There's nothing wrong with a credit card processing

**11:10a** 20   system in the United States.

21   Q.    If you want your business to succeed, you got to try to

22   make more money than you're having to pay out?

23   A.    Yes.

24        MR. FEDER:  Could you bring up 2046.

**11:11a** 25   BY MR. FEDER:

JESS ADAMS - CROSS-EXAMINATION BY MR. FEDER

1   Q.   This is an exhibit you've already looked at, right?

2   A.   I'm sorry, yes.

3   Q.   See at the bottom left-hand corner where it says "The

4   Wayback Machine"?

11:11a  5   A.   The archive.org on the bottom left?

6   Q.   And the date is September 5th of 2023.

7   A.   That looks like February 9th of 2008?  I'm sorry, you

8   said the bottom left?

9   Q.   See the --

11:11a  10   A.   The top left, I apologize.

11   Q.   See the highlight?

12   A.   Where you highlighted, yes, that says "The Wayback

13   Machine" and the date.

14   Q.   Do you have any idea how The Wayback Machine works?

11:11a  15   A.   No, I'm not really familiar with that.  I think it's

16   archive.org, but I don't know about it.

17   Q.   It's like a spot photograph of an item at a certain time?

18        MR. STONE:  Objection to foundation.

19        THE COURT:  Sustained.

11:12a  20   BY MR. FEDER:

21   Q.   We've already had you answer that you've never contacted

22   any of the people on this ad -- on this exhibit, right?

23   A.   Yes.

24   Q.   You don't know who they are?

11:12a  25   A.   No.

JESS ADAMS - CROSS-EXAMINATION BY MR. FEDER

 1  Q.   You don't know if they're real people?

 2  A.   Nope.

 3  Q.   You don't know if they're -- somebody else's posting an

 4  ad for somebody else, right?

**11:12a** 5  A.   Right.

 6  Q.   There's no way of knowing any information about any of

 7  these posters unless you actually contact them in person,

 8  true?

 9  A.   Other than what they put in writing on their ad?

**11:12a** 10  Q.   Correct.

 11  A.   Yes.

 12  Q.   All Backpage is doing is renting a space for somebody --

 13  a third party to put their own ad on, right?

 14  A.   They're providing a platform for people to post content,

**11:12a** 15  yes.

 16  Q.   And in some respect -- sometimes they are charging them

 17  $2, $5, $12 for the add, right?

 18  A.   Yes.

 19  Q.   Sometimes not?

**11:13a** 20  A.   Right.

 21  Q.   And the not -- for the paid ads and the unpaid ads, the

 22  objective -- or at least one of the objectives of Backpage is

 23  to get people to the site, right?

 24  A.   Yes.

**11:13a** 25  Q.   So that you hope your customer base will increase, right?

UNITED STATES DISTRICT COURT

JESS ADAMS - CROSS-EXAMINATION BY MR. FEDER

1    A.    Yes.

2    Q.    And then more and more people will see what they can

3    advertise on Backpage and decide, "Hey, I'm gonna do that"?

4    A.    Yes.

11:13a  5    Q.    Paid and unpaid?

6    A.    Yes.

7    Q.    And the paid ads on Backpage when you started in '07,

8    were they strictly escort ads or were there other paid ads?

9    A.    There were upgrades that you could do to any type of ad

11:13a 10   that would cost money.  So, for instance, a sponsor ad.  Like

11   we talked about these yellow ads off to the right, you could

12   get a sponsor ad in any category.  If it was a free category,

13   you would have to pay for the sponsor ad.  So, yes, when I

14   first started working there, yes.

11:14a 15   Q.    Is "sponsor" and "banner" the same thing or different?

16   A.    To me, they're different.  A banner ad is front and

17   center on a website.

18   Q.    So it's the location gets -- is more costly but it's

19   supposedly more effective, right?

11:14a 20   A.    That would be my assumption, yes.

21   Q.    Okay.  And if your dog had a litter and you wanted to

22   make sure that all the puppies got adopted out or sold out,

23   you could get a banner ad but you'd have to pay for it, right?

24   A.    I'm not sure you could get a banner ad.  You could get a

11:14a 25   sponsor ad, yes.

1  Q.   And then they would -- the owner of the dog and the

2  puppies would have to pay money, right?

3  A.   Yes.

4       MR. FEDER:  Could you bring up 1161 -- I'm sorry,

**11:15a**  5  1161a.  1161a, please.

6       THE COURT:  Is there a 1161a?

7       MR. FEDER:  I must have taken it down wrong.  Maybe

8  it's 1151.  Perfect.

9  BY MR. FEDER:

**11:15a** 10  Q.   Remember when you were being asked questions about The

11  Erotic Review?

12  A.   Yes.

13  Q.   You see where it says "Referring Sites"?

14  A.   Yes.

**11:16a** 15  Q.   Sending 8,335,110 from 15,982 sources?

16  A.   That's what that says, yes.

17  Q.   And the Erotic Review visits are 521, which is whatever

18  percentage of the 8,335,000 is up there, right?

19  A.   Yes.

**11:16a** 20  Q.   And this is just a -- you're familiar with Google

21  Analytics.  You've already testified to that, right?

22  A.   Yeah, yes.

23  Q.   So you know that this is just one page of a typical

24  Google Analytic that has all kinds of other information on it,

**11:16a** 25  true?

JESS ADAMS - CROSS-EXAMINATION BY MR. FEDER

1    A.    There would be -- this says there were 15,982 sources.

2    So there would have been page after page after page of

3    referring sites.

4    Q.    But there's also other aspects of Google Analytic reports

11:16a  5   that are from, like, website visits, right?

6    A.    Yes.

7    Q.    And isn't it your memory that typically the website

8    visits far outnumber any referring site visits, true?

9    A.    Even on this report it looks like someone going directly

11:17a  10   to Backpage.com, that represents 3.4 million of the 8.3

11   million visits in this period.

12   Q.    And that's not including the Googles, the Bings and all

13   those other places where people go looking for whatever it is

14   they look for on Google and they get referred to Backpage?

11:17a  15   A.    Right, I assume that there would be a referring site from

16   those other sources somewhere on this report as well.

17          MR. FEDER:  Could you bring up Exhibit 311.

18          That's 301.  3-1-1.

19   BY MR. FEDER:

11:19a  20   Q.    We were just talking about a Google Analytics site like

21   this.  This is Exhibit 311, which is already in evidence, and

22   this is for -- looks like March 22 of -- I'm not sure what

23   year.  See where it says you've got referring sites in the --

24   right there.  Then you've got search engine visits in the

11:20a  25   lower left.  Could you scroll down a little bit.

JESS ADAMS - CROSS-EXAMINATION BY MR. FEDER

1    And this particular dashboard of a Google Analytics from

2    March 22 of '10, one day when -- you were still there, right?

3    A.   Yes, yep.

4    Q.   And you're a math guy since you're an accounting major,

**11:20a**  5    right?

6    A.   Yes.

7    Q.   So let's take The Erotic Review visits of 43,000 and

8    change and tell me what percentage that is of the total visits

9    on that day 1,730,888.  Just give me a rough estimate.

**11:21a** 10    A.   Can I use a calculator?

11    Q.   Come on.

12         MR. STONE:  Your Honor, object.  That's sort of an

13    unfair question.  He's not a human calculator.

14         THE COURT:  Maybe you can rephrase.

**11:21a** 15         MR. FEDER:  Okay.

16    BY MR. FEDER:

17    Q.   Can you estimate what the percentage of The Erotic Review

18    visits are for that particular day?

19    A.   For this particular day --

**11:21a** 20    Q.   Yep.

21    A.   -- it looks likes it's 43,000 visits out of a total of

22    1,730,000 visits.  That's what this page of this report looks

23    like.

24    Q.   Right.  Under five percent, fair?

**11:21a** 25    A.   Yeah, this is not the type of analytics report that I

                1   would have used to pull tracker reports.  So I'm not super

                2   comfortable stating what -- because, for instance, I'm looking

                3   at theeroticreview.com and it says "referring sites," right,

                4   and these totals here do not come anywhere near close to the

**11:22a**      5   893,000 that's shown over here.

                6       I add these numbers up and I don't even get to a hundred

                7   thousand, but Google's reporting referring sites at 893,000.

                8   So I don't see a relationship between this Google referring

                9   sites total of 893,000 and the referring site here.

**11:22a** 10       This seems like a very small number if these are the top

               11   referring sources.  I mean, they're at villagevoice.com at

               12   3,472.  So I'm not really understanding how this comes

               13   together.

               14   Q.   I think my question was what percentage is -- we'll just

**11:22a** 15   round it off -- 43,000 to 1,730,000 visits?

               16   A.   Okay, that would be a small number.

               17   Q.   Under five percent?

               18   A.   If I could use a calculator, I could give you the exact

               19   number.

**11:23a** 20   Q.   All right, fair enough.  I can't do it either, but I'm a

               21   lawyer.

               22           MR. FEDER:  I think that's all I have, thanks.

               23           THE COURT:  All right.  Who's next, Mr. Eisenberg?

               24                   CROSS-EXAMINATION

**11:23a** 25   BY MR. EISENBERG:

JESS ADAMS - CROSS-EXAMINATION BY MR. EISENBERG        110

1    Q.   Morning, Mr. Adams.

2    A.   Good morning.

3    Q.   Mr. Adams, I'm Dave Eisenberg.  I represent Mr. Padilla.

4         MR. EISENBERG:  May the witness be shown Exhibit

11:23a 5   1168, please.  Previously shown to you, Mr. Adams.

6    BY MR. EISENBERG:

7    Q.   Okay.  Now, on this exhibit that you testified about

8    before -- you recall earlier on your examination?

9    A.   Yes.

11:24a 10  Q.   All right, sir.  Now, the exhibit shows that it's from

11   Mr. Ferrer; is that correct?

12   A.   The top e-mail, yes.

13   Q.   Okay.  And then it was sent on a certain date.  It looks

14   like it's February of 2008; is that correct?

11:24a 15  A.   I think that's September 9th, 2008.

16   Q.   September the 9th, all right.  And then down below, I

17   think you testified about what's in the body of this ad -- I'm

18   sorry, the e-mail and that has to do with are you tired of

19   going to an erotic massage parlor, et cetera.

11:24a 20       Do I have that right?

21   A.   Yes.

22   Q.   And then I think further on down you defined certain

23   terms for the prosecutor down near the bottom; is that

24   correct?

11:24a 25  A.   Yes.

JESS ADAMS - CROSS-EXAMINATION BY MR. EISENBERG

1    Q.    Okay.  Now, the "to" part of this -- back up at the top

2    we go -- there's several names up there; is that correct?

3    A.    Yes.

4    Q.    And one of the ones that you identified was Mr. Padilla;

11:25a  5    is that right?

6    A.    Yes.

7    Q.    And so you know Mr. Padilla from work; am I correct?

8    A.    Yes.

9    Q.    There's another name in there that you know, don't you?

11:25a  10    A.    There's many names I know in there, yes.

11    Q.    One of them is Zeke Finley, correct?

12    A.    Yes.

13    Q.    That's your brother-in-law?

14    A.    Zeke Finley is my brother-in-law, yes.

11:25a  15    Q.    And you introduced Mr. Finley as an potential employee to

16    Backpage, correct?

17    A.    Yes, I did.

18    Q.    And obviously he was hired, right?

19    A.    Yes.

11:25a  20    Q.    It looks like he must have been hired at least by

21    September of 2008?

22    A.    Yes.

23    Q.    Sir, do you know how long your brother-in-law worked for

24    Backpage?

11:25a  25    A.    No, I do not.  He stayed there after I left.

UNITED STATES DISTRICT COURT

JESS ADAMS - CROSS-EXAMINATION BY MR. EISENBERG                112

1    Q.    Okay.  And you left again when, sir?

2    A.    I resigned as an employee in 2010.  I was a 1099

3    consultant subcontractor through 2011.

4    Q.    And was he there even through 2011, meaning your --

11:26a  5    A.    I don't remember when he left.

6    Q.    Okay.  And when you left, sir -- I think you may have

7    testified about this, but I'm not sure.  Your salary when you

8    left, was it $80,000?

9    A.    I think it was in that range, yes.

11:26a  10    Q.    Okay.

11    A.    With bonuses, yes.

12    Q.    All right.  So you got a bonus as well, all right.

13          Now, with respect to Mr. Finley, did you know that he

14    worked for Mr. Padilla?

11:26a  15    A.    Yes.

16    Q.    And did you know that there came a time when Mr. Padilla

17    was in charge of operations, correct?

18    A.    Yes, he was an operations manager when I left there, yes.

19    Q.    And that a good portion, if not almost the entire part,

11:26a  20    of his operations was moderation, correct?

21    A.    That was my understanding, yes.

22    Q.    And you -- you know what "moderation" is.  You've

23    testified about it today?

24    A.    Yes.

11:26a  25    Q.    So Mr. Finley worked in the moderations section; is that

JESS ADAMS - CROSS-EXAMINATION BY MR. EISENBERG                113

1    correct?

2    A.    I'm not sure what his duties were as an employee.

3    Q.    Well, he worked for Mr. Padilla, right?

4    A.    Right, and he covered customer support, spam cleanup,

11:27a  5    moderation, aggregation.

6    Q.    Moderation?  He covered moderation?

7    A.    I believe Zeke Finley was in customer support.

8    Q.    He worked for Mr. Padilla?

9    A.    Yes.

11:27a  10   Q.    Okay.  You testified, sir -- there's a document that had

11   to do with -- I think it's 2046.  Why don't we just get that

12   up on the screen so I won't ask you to guess about anything.

13       This is that Backpage.com document, let me put it that

14   way?

11:27a  15   A.    Yes.

16   Q.    And I think the date of this is 2008.  Is it February of

17   2008?

18   A.    Yes.

19   Q.    Do you remember when you first looked at this document?

11:28a  20   Was it back then, 2008?

21   A.    I wouldn't have looked at it probably in 2008.

22   Q.    Maybe when, 2009?

23   A.    When I first saw this particular exhibit?

24   Q.    Yes.

11:28a  25   A.    I would have -- I probably would have seen this if I've

JESS ADAMS - CROSS-EXAMINATION BY MR. EISENBERG

1    seen it before, this specific page printout, in a meeting with

2    the federal prosecutors.

3    Q.   You've seen ones like it, though, while you were at work,

4    correct?

11:28a  5    A.   While I was at work for sure, yes.

6    Q.   Okay, that's -- all right.  So fair to say, then, it

7    contained -- and I don't know if it's fair to say this, but it

8    contained the similar type of information that you see on this

9    particular page?

11:28a  10   A.   Yes.

11   Q.   All right.  And that's while you were employed with

12   Backpage, correct?

13   A.   Yes.

14   Q.   And you saw several of these, right?

11:28a  15   A.   Yes.

16   Q.   Over time?

17   A.   Yes.

18   Q.   And so you were familiar with, for example, The Erotic

19   Review, correct?

11:28a  20   A.   I was aware of The Erotic Review, yes.

21   Q.   And I think your testimony is that you helped prepare --

22   I'm not sure the accounting nomenclature, but checks in order

23   to pay for invoices to The Erotic Review, correct?

24   A.   Yes.  When Carl would ask for a check to be paid, I would

11:29a  25   get a signature from Scott Spear to pay The Erotic Review.

UNITED STATES DISTRICT COURT

JESS ADAMS - CROSS-EXAMINATION BY MS. BERTRAND          115

1   Q.   So you were participating in cutting checks for money to

2   pay to The Erotic Review, correct?

3   A.   To David Elms as The Erotic Review, yes.

4   Q.   That was part of your job, right?

11:29a  5   A.   Yes.

6   Q.   So you were -- you were engaged in the process of trying

7   to make Backpage work, right?

8   A.   Yes.

9   Q.   That was your job?

11:29a 10   A.   It was my job.

11          MR. STONE:  I'm going to object because it was vague

12   but. . .

13          THE WITNESS:  Sorry.

14          THE COURT:  Overruled.

11:29a 15          Was that it?

16          MR. EISENBERG:  Yes, Your Honor.

17          THE COURT:  All right.

18          Ms. Bertrand.

19          MS. BERTRAND:  May I proceed?

11:30a 20          THE COURT:  Yes.

21                          CROSS-EXAMINATION

22   BY MS. BERTRAND:

23   Q.   Good morning, Mr. Adams.

24   A.   Good morning.

11:30a 25   Q.   My name's Joy Bertrand.  I represent Joye Vaught in this

JESS ADAMS - CROSS-EXAMINATION BY MS. BERTRAND

1   matter.

2   A.   Okay.

3   Q.   Sir, you just were talking with some of my colleagues

4   about your role in assisting with accounts payable at

11:30a   5   Backpage, fair?

6   A.   Yes.

7   Q.   And that involved reviewing invoices, right?

8   A.   Yes.

9   Q.   Asking for approval that they be paid, right?

11:30a 10   A.   Yes.

11   Q.   Making sure the check got cut and signed and mailed?

12   A.   Yes.

13   Q.   Were you also in any way involved in the paperwork for

14   tax reporting for --

11:31a 15   A.   No.

16   Q.   Who did that?

17   A.   Beth Cook.  May I -- Beth Cook was the controller of

18   Village Voice Media.  I was never assigned any tax

19   responsibilities.  So Beth Cook and the management team,

11:31a 20   executive team worked with whoever prepared the income taxes.

21   Q.   Okay.  So you wouldn't know anything about whether or not

22   Mr. Elms, for example, received a 1099 every year?

23   A.   No.

24   Q.   You don't know?

11:31a 25   A.   No.  Again, the accounting process is if someone was

JESS ADAMS - CROSS-EXAMINATION BY MS. BERTRAND

1  classified as a 1099 contractor, it ought to automatically

2  trigger a 1099 so. . .

3  Q.  Sure.  Well, 1099 isn't just issued for a contractor,

4  right?

**11:31a** 5  A.  Right.  There's lots of different types of 1099s, right.

6  Q.  So we won't get into that because you don't know anything

7  about whether or not Mr. Elms received one, correct?

8  A.  Right, and I also don't know if he needed to receive one

9  because I'm not certain that you need to send a 1099, for

**11:32a** 10  instance, to a corporation.

11  Q.  Okay.  Do you recall telling the FBI on March 6th of 2020

12  something to the effect of one of the most fulfilling parts of

13  the job, meaning at Backpage, was dealing with law

14  enforcement, helping them?  Do you recall saying that?

**11:32a** 15  A.  Yes.

16  Q.  Is that correct?

17  A.  Yes, it was very fulfilling.

18  Q.  And that was with regard to the subpoenas assistance?

19  A.  Yes.

**11:32a** 20  Q.  Did you ever have to testify?

21  A.  No.

22  Q.  Did you ever meet Joye Vaught?

23  A.  I believe I met her, but I couldn't identify her in the

24  courtroom today.

**11:33a** 25  Q.  Well, thank you.

1          MS. BERTRAND:  I have nothing further.

2     Thank you, Your Honor.

3          THE COURT:  Mr. Lincenberg.

4          MR. LINCENBERG:  Thank you, Your Honor.  We don't

5     have any questions.

6          THE COURT:  Mr. Cambria?

7          MR. CAMBRIA:  I have no questions, your Honor.

8          THE COURT:  Mr. Stone?

9          MR. STONE:  No redirect, Your Honor.

10          THE COURT:  All right.  May the witness be released

11     from subpoena?

12          MR. STONE:  Yes, your Honor.

13          THE COURT:  Any objection?

14          MR. CAMBRIA:  No.

15          MR. EISENBERG:  No, Your Honor.

16          THE COURT:  All right.  Thank you very much for your

17     testimony, sir.  You are excused and you are released from

18     your subpoena.

19          THE WITNESS:  Thank you, Your Honor.

20          THE COURT:  You may be excused at this time.

21     *(Whereupon the testimony concluded at 11:33 a.m.)*

22

23

24

25

*REPORTER'S CERTIFICATION*

1

2

3              I, TERI VERES, do hereby certify that I am duly

4   appointed and qualified to act as Official Court Reporter for

5   the United States District Court for the District of Arizona.

6              I FURTHER CERTIFY that the foregoing pages

7   constitute a full, true, and accurate transcript of all of

8   that portion of the proceedings contained herein, had in the

9   above-entitled cause on the date specified therein, and that

10  said transcript was prepared under my direction and control.

11             DATED at Phoenix, Arizona, this 11th of

12  October, 2023.

13
                                    _____s/Teri Veres_____
14                                  TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT