GARY M. RESTAINO
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

DAN G. BOYLE (N.Y. Bar No. 5216825, daniel.boyle2@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1400
Los Angeles, CA 90012
Telephone (213) 894-2426

NICOLE M. ARGENTIERI
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

AUSTIN M. BERRY (Texas Bar No. 24062615, austin.berry2@usdoj.gov)
U.S. Department of Justice
Child Exploitation and Obscenity Section
1301 New York Avenue, NW, 11th Floor
Washington, D.C. 20005
Telephone (202) 412-4136
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America,<br><br>                Plaintiff,<br><br>       v.<br><br>Michael Lacey, et al.,<br><br>                Defendants. | CR-18-422-PHX-DJH<br><br>**UNITED STATES' RESPONSE TO DEFENDANT BRUNST'S MOTION TO TESTIFY RE STATE OF MIND AND DEFENDANTS LACEY'S, PADILLA'S, SPEAR'S, AND VAUGHT'S JOINDERS**<br>**(Docs. 1879, 1886, 1887, 1888, 1889)** |

Defendants seek reconsideration of the Court's previous Orders that found certain categories of evidence inadmissible at trial. (Docs. 1879, 1886, 1887, 1888, 1889.) These motions are without merit and should be denied.

## I.  Defendants May Not Introduce Evidence Precluded By Rule 403

Defendants seek to introduce evidence through their case-in-chief about prior unrelated civil cases. Nearly three months ago, the Court ruled that Defendants are precluded from referencing at trial any prior case involving Backpage.com, because that evidence "would confuse the jury, and would prejudice the Government." (Doc. 1643 at 11.) This order should remain the law of the case.

The United States Supreme Court has made clear that defendants do not have the right to introduce all relevant evidence at trial. *Montana v. Egelhoff*, 518 U.S. 37, 41-42 (1996). In overturning a state supreme court decision, the *Egelhoff* Court found that "the proposition that the Due Process Clause guarantees the right to introduce all relevant evidence is simply indefensible." *Id.* at 42. The Court then provided a number of examples of when relevant evidence may be excluded at trial, including because of Rule 403. *Id.* Here, Defendants clearly have the right to testify in their own defense, but that right doesn't extend to topics that violate Rule 403. *Id.* ("And any number of familiar and unquestionably constitutional evidentiary rules also authorize the exclusion of relevant evidence. For example, Federal (and Montana) Rule of Evidence 403 provides. . .").

As the United States argued in a previous motion, evidence related to Backpage's prior litigation would create serious risks of confusing the issues, misleading the jury, and wasting time. (Doc. 1597 at 4.) "The United States would have to explain that these cases involved different statutes, standards, parties, and facts. It would have to spend time articulating how numerous exhibits in this case were unknown to opposing litigants in earlier cases, and thus how the outcomes in those cases involved Backpage's lack of transparency. This trial would devolve into a series of mini trials about those earlier cases." (*Id.*) The Court agreed and granted the motion. (Doc. 1643 at 11.) There's no reason to revisit this issue now.

Defendant Brunst's filing illustrates precisely the Rule 403 problems that the Court's Order (Doc. 1643 at 11) is designed to avoid. Brunst asserts that the Seventh Circuit in *Backpage.com LLC v. Dart*, 807 F.3d 229, 233-34 (7th Cir. 2015), relied on a factual record "that tracks the Government's indictment and evidence at trial in the instant case." (Doc. 1879 at 11.) That's incorrect. As the United States has pointed out repeatedly, the Seventh Circuit (which decided *Dart* in 2015) had none of the *internal evidence* of Backpage's prostitution marketing strategies that Backpage was later compelled to produce to the U.S. Senate and the Arizona federal grand jury in 2016-2017. (Doc. 1597 at 3; Doc. 649, Resp. at 2-3, 22-24.)

This evidence includes incriminating emails demonstrating, *inter alia*, that Backpage entered into a yearslong business relationship with The Erotic Review—discussed in budgets that Brunst reviewed and approved, and funded with checks that Defendant Scott Spear signed—that "created huge brand awareness in this niche industry and increased page views from TER by 120,000 per day" (Ex. 23 at 3, 2008 Budget Plan); Brunst, Scott Spear, Jim Larkin, and others regularly received Google Analytics reports showing that—even as late as 2015—The Erotic Review continued to be Backpage's number one source of non-search engine referrals (*see, e.g.*, Exs. 1924, 1926, 1995); and Defendants continued to allow users to include their TER review identification numbers until the site's shutdown in 2018 (*see, e.g.*, Exs. 73 and 647). The Erotic Review's postings contained details about the prostitution services and prices offered by prostitutes advertising on Backpage. Multiple trial witnesses (including Backpage employees, victims, law enforcement officers, and NCMEC and Polaris representatives) testified that references to such reviews in Backpage's ads left no doubt about what the ads were for—prostitution.

And, of course, the *Dart* court didn't have witness testimony from Backpage insiders like Carl Ferrer, Dan Hyer, and Jess Adams, detailing the company's partnership with The Erotic Review and how that partnership was instrumental in establishing Backpage's market position as a leading source of prostitution ads. Nor did the *Dart* court

have access to internal Backpage documents detailing Backpage's aggregation strategy—copying prostitution ads from other websites, putting them on Backpage, and attempting to enlist the featured prostitutes as Backpage customers—or testimony about how Backpage implemented that strategy. (*See, e.g.,* Ex. 10.) The *Dart* court likewise lacked internal evidence about Backpage's commission-driven relationship with super-posters. It certainly did not have the hundreds of internal emails, and related witness testimony, detailing how Backpage implemented a "moderation" program that was calculated to make prostitution ads less obvious while still promoting, or facilitating the promotion of, its customers' prostitution business enterprises.

*Dart* and similar cases cited by Defendants were all premised on the false notion that Backpage was merely a passive "intermediary between the advertisers of adult services and visitors to Backpage's website." *Dart*, 807 F.3d at 233-34. (Doc. 1597 at 3.) Yet, the subsequently produced internal documents (only a small portion of which are described above) revealed that Backpage had misrepresented itself in the above-referenced cases as merely a passive "conduit" for third-party content, *cf. Dart*, 807 F.3d 229, 233-34, and exposed its supposed efforts to police unlawful ads on its site as a fiction, *cf. Backpage.com, LLC v. McKenna*, 881 F.Supp. 2d 1262, 1266-67 (W.D. Wash. 2012). Defendants failed to disclose this evidence to the courts that previously ruled in Backpage's favor.

After this evidence emerged, Backpage and Ferrer pleaded guilty in 2018 and admitted that the "great majority" of Backpage's revenue-generating ads were "for prostitution services." (18-CR-464, Doc. 7-2 at 12-13; 18-CR-465, Doc. 8-2 at 11; *see* Doc. 271 at 9-10.)

Following these developments, the Northern District of Illinois made a remarkable U-turn—it dismissed *Dart* and imposed $250,000 in sanctions on Backpage.com, LLC for perpetuating a fraud on the court. (*See* Doc. 516-1 at 2-9; *see also* Doc. 446-1 at 14-35.) The court found that Backpage misled the court about whether "speech on the site was protected, whether Backpage.com policed, rather than promoted, unlawful solicitations,

and otherwise merely published, rather than authored, content on its site." (Doc. 516-1 at 4-5; *see id*. at 8 ("Backpage knowingly and repeatedly made false representations of fact concerning relevant aspects of its operations.").

While Brunst attempts to characterize this as irrelevant to his state of mind in 2015-2018 (*cf*. Doc. 1879 at 11 n.2), much of the trial evidence shows that Brunst was aware and approved of Backpage's relationship with TER—including his review and approval of budgets that including funding for TER, his routine receipt of Google Analytics reports, and his oversight and familiarity with the Backpage business—as evidenced by, among other things, his efforts to market the website to third party investors in 2011 and 2014. Based on investor presentations that he co-authored and reviewed, Brunst knew that the vast majority of Backpage's revenue came from its Adult section, and that most of that revenue came from Female Escorts. (*See, e.g*., Ex. 120 at 12, 15; Ex. 1049 b at 6.) Brunst knew that most of the revenue from these ads came from the sale of "move-to-top" upgrades. (*See* Ex. 500.) And he knew that most of those upgrades, in turn, were sold to users of the Female Escorts section. (*See* Exs. 1670, 1670a.) The trial evidence also overwhelmingly shows Brunst's awareness of how Backpage's reputation as a hub for prostitution ads had made the company toxic in banking and financial circles—causing Brunst to personally lead the way for Backpage to open new credit card processing and banking relationships in foreign countries including Bulgaria (eMerchant Pay), Liechtenstein (Bank Frick), and Iceland (Borgun). Brunst also helped direct the use of corporate entities with names unrelated to Backpage to process and launder Backpage derived funds.

The foregoing is not meant to be an exhaustive account of the evidence showing Defendant Brunst's (or any other Defendant's) guilt. Rather, the point is that Brunst had knowledge of Backpage's internal strategies and the public fallout that they caused long before the *Dart* litigation ended in dismissal and sanctions for Backpage.

Defendant Lacey makes similar arguments, and also references other court decisions—including orders dismissing two California criminal complaints against him.

(Doc. 1886 at 5.)  But Lacey concedes, as he must, that these orders were based on the CDA.  (Doc. 1886 at 5.)  *See People v. Ferrer*, 2016 WL 7237305, at *11 (Cal. Super. Ct. Dec. 16, 2016) (dismissing state law criminal charges against Lacey, Larkin and Ferrer; recognizing "it is for Congress, not this Court, to revisit" the CDA); *People v. Ferrer*, No. 16FE024013 (Cal. Super. Ct. Aug. 23, 2017) (after Lacey, Larkin and Ferrer were indicted on new counts, the court again found itself compelled to dismiss pimping-related charges "until Congress sees fit to amend…the broad reach of section 230") (Doc. 561-1 at 19). And the Court has consistently excluded references to the CDA on relevance and Rule 403 grounds here.  (*See, e.g.*, Doc. 1643 at 10; Doc. 793 at 13; Doc. 840.)

Defendant Spear suggests that "[h]ad [he] received information that the Backpage/Village Voice Media practices were illegal and/or not legally protected, he would have resigned."  (Doc. 1888 at 3.)  Brunst make a similar claim.  (Doc. 1879 at 3.) But Backpage's litigation track record was not as straightforward as Defendants argue.

In 2015, for example, the Washington Supreme Court denied Backpage's motion to dismiss a civil lawsuit brought by three minor girls who had been "bought and sold for sexual services" on Backpage.  *See J.S.*, 359 P.3d at 715-16.  The court held that, because the plaintiffs had plausibly alleged that Backpage does "more than just provide a forum for illegal content" and affirmatively shapes the content of users' ads through "posting rules [that are] 'designed to help pimps develop advertisements that can evade the unwanted attention of law enforcement, while still conveying the illegal message,'" the plaintiffs should be permitted to conduct discovery "to ascertain whether in fact Backpage designed its posting rules to induce sex trafficking."  *Id.* at 718.[1]  *See also Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 17, 29 (1st Cir. 2016) (three minor girls who had been raped more than 1,900 times as a result of being trafficked via Backpage "made a persuasive case" that "Backpage has tailored its website to make sex trafficking easier"; nevertheless dismissing case under CDA, which does not a apply here).

---

[1] In 2017, the trial judge in the *J.S.* case denied Backpage's motion for summary judgment. Afterward, Backpage entered a confidential settlement with the plaintiffs.

Backpage also lost several important legal battles regarding the compelled disclosure of its internal documents. *See, e.g.*, *Senate Permanent Subcommittee v. Ferrer*, 199 F. Supp. 3d 125, 129 (D.D.C. 2016); (Doc. 194 at 7-8; Doc. 194-1, Exs. A-D). In January 2017, based on documents Backpage was forced to produce, the U.S. Senate Permanent Subcommittee on Investigations issued its 50-page report, BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING. (Ex. 1587.) Allowing Defendants to testify about Backpage's litigation track record could open the door to questioning about these contrary legal developments—further raising the serious risks of confusing the issues, misleading the jury, and wasting time highlighted in the United States' motion in limine about prior litigation. (*See* Doc. 1597 at 4.)

Defendants also reference the previous investigation into Backpage that occurred in the Western District of Washington as somehow demonstrating that the company and its principals and managers could not be criminally charged. As has been discussed above, the United States did not possess the same evidence it does now that detailed Backpage's internal prostitution marketing strategies. The previous investigation cannot be used to demonstrate Defendants' alleged good faith.

## II. Defendants May Not Assert An Advice of Counsel Defense Without Meeting the Four Factors Articulated By the Court

Defendants also ask the Court to reconsider its previous ruling on Defendants' advice-of-counsel defense.[2] Again, Defendants provide no justification for doing so. The Court clearly set forth the formula for Defendants to raise such a defense. (Doc. 1643 at 12.) To assert the defense, Defendants needed to demonstrate the following four factors: (1) they made a complete disclosure to counsel; (2) they requested counsel's advice as to

---

[2] Defendant Lacey is incorrect when he characterizes the Court's previous Order as limiting any potential advice Defendants received to the 50 charged ads. (Doc. 1886 at 3.) The Court's Order made clear that Defendants *could* raise an advice of counsel defense "if they show they provided 'complete disclosure[s]' about the advice they sought on an ad listed in Counts 2-51 **(or similar ad described in the SI)**." (Doc. 1643 at 12) (emphasis added.) The evidence at trial has demonstrated that nearly every single ad posted in Backpage's female escorts section was for prostitution, so the advice of counsel defense would cover any advice Defendants received related to escort ads.

the legality of the contemplated action; (3) they received advice that it was legal; and (4) they relied in good faith on the advice. (*Id.*)

Defendants have failed to establish any of these four factors. Without demonstrating that "they made a complete disclosure to counsel," any advice they may have received from an attorney isn't valid. For example, Defendant Brunst identifies a 31-page legal memorandum authored by attorney Mark Sableman (Doc. 1879 at 14; Exhibit 5507), as evidence supporting Brunst's good faith. But a cursory review of the memo would lead the reader to conclude that Sableman didn't know, for example, about Backpage's reciprocal link program with The Erotic Review. Exhibit 5507 at 13 ("Village Voice does not encourage, promote, or even acquiesce in ads for illegal services."); *Id.* at 16 ("[Village Voice] takes great efforts to make sure its service is not used for prostitution."). If Defendants didn't inform Sableman of *all* material facts, then his advice is meaningless. This, of course, is why the Court ruled that Defendants must establish the four factors before offering this evidence. This evidence, without first establishing that the attorney had a complete understanding of Backpage's business practices before providing the advice, would confuse and mislead the jury. This advice of counsel evidence should remain inadmissible.[3]

Nor should Defendants be permitted to introduce advice of counsel through the backdoor of asserting that another person (e.g., Mr. Larkin) obtained such advice and then relayed it to them. (*See* Doc. 1886 at 3.) Lacey concedes that he and Larkin were business partners, and that Larkin obtained legal advice on behalf of both of them and/or their jointly-owned business entities. (*See* Doc. 1886 at 3.) Lacey cannot avoid meeting the

---

[3] Defendant Lacey's footnote on page three is misguided. (Doc. 1886 at 3, n.1.) Defendant Lacey confuses whether the attorney-client privilege has been waived as to certain topics based on certain disclosures (Doc. 1168) with the requirements necessary to assert an advice-of-counsel defense. It matters not whether the attorney-client privilege exists as to certain communications. Rather the important consideration is whether Lacey has demonstrated that he "made a complete disclosure to counsel" before the attorneys rendered their advice. The Court's Order in Doc. 1168 is a red herring and has no relevance to the asserted advice of counsel defense.

requirements for asserting an advice of counsel defense merely by virtue of the fact that his partner relayed their lawyers' advice to him.

Nor should Lacey be allowed to cite amicus briefs in other litigation involving Backpage, or letters written in support of Backpage's legal positions by other third parties. Without any proof that full disclosures of Backpage's prostitution-marketing strategies had been made to these third parties, the same undue risks of jury confusion, waste of time, and misleading pronouncements of law underlying the Court's rulings in Doc. 1643 also militate strongly against admission of these third party materials under Rule 403.

### III.  Lacey's "Good Faith Reliance on Public Officials" Argument Lacks Merit

Defendant Lacey asserts that he wants to introduce evidence that certain public officials made statements "indicating that website operators, like Backpage, could not be prosecuted with any federal crimes." (Doc. 1886 at 5.)  As support for this argument, he points to Francine Hakes and Ernie Allen.  Defendants have made similar arguments about public officials' testimony in the past, and the Court has rejected them.  (*See, e.g.*, Doc. 561, Mot. at 28-29; Doc. 793 at 15, 17-18.)

As for Hakes, Lacey cannot testify to what he heard Hakes say, any more than he can testify about what he heard one of his own lawyers say, or what he read some civil court case held.  In addition to being hearsay without an exception, such testimony would violate Rule 403 as being misleading, confusing, and a waste of time for the jury.  Indeed, if Lacey were to testify to one statement he heard Hakes say in a hearing in September 2010, the United States would have to put into evidence the testimony of all other people who testified at that same hearing who said contradictory things—including specifically about Backpage.  Interestingly, that would include the testimony of Ernie Allen from that same hearing, contained Exhibit 925a (not yet admitted), even though Lacey does not mention that testimony among the other Ernie Allen statements he wants to claim to rely upon.

Lacey next asserts that Ernie Allen, who was President and CEO of NCMEC for many years, is a "public official" upon whom Lacey wants to testify he relied upon. But

Allen is not a public official because NCMEC is not a government entity. (Doc. 810 at 4-9.) As John Shehan testified on October 19, 2023, NCMEC is "is a private nonprofit organization." Thus, Allen is not a public official, and his statements cannot be attributed to the United States government in any agency capacity.

Regardless of Allen's title or position, the statements Lacey intends to introduce are hearsay within hearsay, with no exception. *See* Sept. 12, 2023 Tr. (Court sustained Mr. Cambria's objection to "rank hearsay" when Ferrer testified to what Mayor McGinn said in a letter). But here, there are even more layers of hearsay because Lacey would not be testifying about what Ernie Allen said to Lacey, but instead what Don Moon told Lacey that Allen said to Moon. (Exh. 5519). Even worse, is Exhibit 5520, in which Lacey would testify about what Larkin told Lacey that Moon told Larkin, about what Allen told Moon.

Additionally, Defendants are yet again trying to smuggle in advice of counsel by introducing evidence of what Moon, a lawyer, told them. The United States does not object to the advice of counsel defense if Defendants comply with requirements for asserting it. (Doc. 1643 at 12-13.) But until they do so, the introduction of statements by such lawyers, especially in the form of hearsay statements contained in emails offered by someone on the witness stand who is not that lawyer (in this case, Lacey), violates this Court's prior orders on the advice of counsel issue, and would violate Rule 801.

Lacey further supports his argument in part by reliance on impeachment exhibits that have not been disclosed with his filing. (*See* Doc. 1886 at 6 (citing Exh. PC-EA-82, which has not been provided to the United States).) Lacey wants to testify about reading an email or letter of unknown vintage and context, ostensibly from Ernie Allen, in which Allen asserts that he met with Attorney General Eric Holder on some unspecified date, and then sometime later "some Criminal Division prosecutors" met with Allen and made some statements about the *mens rea* for prosecuting Backpage. (*See id.*)

In other words, Lacey seeks to testify that unnamed federal prosecutors told Allen that Backpage could not be prosecuted. This, too, is multi-layered hearsay without exception that should be excluded, especially because at least one layer of hearsay comes

from unnamed sources. It would be the equivalent of the United States offering testimony from Ferrer that he read an email in which Allen said that Allen met with some executives at Backpage who confessed that they were committing a Travel Act crime. Ferrer doesn't know who the executives were that confessed, and he did not hear it himself, but he read it in an email. In that hypothetical, however, there would be a plausible hearsay exception (statement of a party opponent), but it would be so buried within additional layers of hearsay that it would not be admissible. Lacey's attempt to offer similar hearsay—without any exception—should be disallowed.

Similarly, Lacey seeks to testify about and introduce Exhibit 5518, yet another email from Don Moon, about what John Shehan said to Moon in a meeting. Again, like the Allen emails discussed above, this statement by Moon about something he claimed Shehan said, is a double-layered hearsay statement that Lacey cannot introduce. Fed. R. Evid. 801. Notably, Lacey's counsel could have cross-examined Shehan about making such a statement when Shehan testified on October 18, 2023, but chose not to. Perhaps that is because counsel knew that Shehan could not be impeached with an email from Moon about what Moon claimed Shehan said. But that is precisely the same reason why Lacey should not be able to testify about what Lacey claims Moon told Lacey about what Shehan said to Moon. Rule 801 does not have an exception for the hearsay Lacey seeks to introduce in this form.

Next, Lacey argues that a House Judiciary Report published on February 20, 2018, in advance of the enactment of SESTA/FOSTA, "strengthened his belief that the operation of Backpage was lawful." (Doc 1886 at 6.) Lacey quotes the report as saying: "current federal criminal law, which is unaffected by the CDA, presently lacks proper prosecutorial tools to combat these websites." (*Id*. (quoting Exh. 6119 at 5).)

It is unclear from his filing what Lacey wants to introduce to the jury regarding this particular issue. Perhaps he wants to introduce Exhibit 6119 during his own testimony as some kind of evidence that he had relied in good faith on such language that was issued approximately two months before the end of the 14-year conspiracy when Backpage was

shut down and he was indicted. The United States objects to the introduction of such an exhibit because it contains numerous references to Section 230 and the CDA, as well as other litigation, which this Court has already ruled would be very confusing and misleading to the jury. (Doc. 1643 at 9-11.) The law of the case here should control.

Even if the law of the case did not control, this Court should preclude this testimony and exhibit because, if 6119 were admitted, the United States would have to focus the jury's attention on the savings clause:

> **SEC. 5. SAVINGS CLAUSE.**
> Nothing in this Act or the amendments made by this Act shall be construed to limit or preempt any civil action or criminal prosecution under Federal law or State law (including State statutory law and State common law) filed before or after the day before the date of enactment of this Act that was not limited or preempted by section 230 of the Communications Act of 1934 (47 U.S.C. 230), as such section was in effect on the day before the date of enactment of this Act.

Ex. 6119 at 3. The admission of testimony about Exhibit 6119 or admission of the exhibit itself would require rebuttal testimony to explain why the Savings Clause notified Defendants that FOSTA/SESTA does not impede the instant prosecution, and how the Savings Clause further puts Defendants on notice that such a prosecution is viable. Such a devolution into the esoteric nature of federal legislation that post-dated all but two months of a 14-year conspiracy would be so confusing to the jury and such a waste of time, that it necessarily becomes far more prejudicial than probative on the point for which it is proffered. *See* Fed. R. Evid. 403.

Defendants' suggestion that they could not have been prosecuted under federal law pre-FOSTA lacks merit for another reason: Before the indictment issued in this case, at least three federal courts recognized that prostitution website operators may be prosecuted under the Travel Act. (*See* Doc. 649 at 20-23.) First, in *United States v. Omuro*, the Northern District of California accepted the guilty plea and convicted the founder, Eric Omuro, of www.myRedBook.com under the Travel Act, 18 U.S.C. § 1952(a)(3)(A). (*See* N.D. Cal. No. 14-CR-336, Doc. 70 at 1-2.) Omuro's website hosted thousands of ads

posted by prostitutes, and Omuro generated some millions in profits from fees paid by "escorts" to post their ads more prominently and from "membership" fees. (N.D. Cal. No. 14-CR-336, Doc. 70 at 2-3.)

Second, in *United States v. Hurant*, the Eastern District of New York accepted the guilty plea and convicted the founder of www.Rentboy.com, Jeffrey Hurant, for violating the Travel Act. (E.D.N.Y. No. 16-CR-45, Doc. 117 at 1, 13-14.) Hurant admitted he "was well aware . . . that the escort ads he posted . . . were thinly-veiled proposals of sexual services in exchange for money." (E.D.N.Y. No. 16-CR-45, Doc. 117 at 6.) Like Backpage, his employees often rejected ads with explicit offers of sex for money "but allow[ed] the ad to be resubmitted with different language. In many cases, Rentboy.com employees would just edit the advertisement's language and approve it." (E.D.N.Y. No. 16-CR-45, Doc. 125 at 2.)

Third, during grand jury proceedings that led to this prosecution, Senior District Judge David Campbell recognized that federal law "criminalize[s] the knowing publication of an advertisement for illegal prostitution or other illegal activity." (Doc. 194-1 at 66.) Judge Campbell and a unanimous three-judge panel of the Ninth Circuit rejected Backpage's First Amendment challenges to the government's investigation and theory of the case. (*See* Doc. 194 at 7-8; Doc. 194-1, Exhs. A-D.)

Defendants' assertions are also squarely at odds with the law of *this* case. In Doc. 793, the Court rejected Defendants' motion to dismiss the SI (Doc. 230) and held that the SI properly stated an offense under the Travel Act. In Doc. 946, the Court again upheld the sufficiency of the Travel Act charges in the SI. (*See also* Doc. 840 (denying motion to dismiss based on the CDA).); *see United States v. Lacey*, No. 22-10000, 2022 WL 4363818, at *1–2 (9th Cir. Sept. 21, 2022) (discussing Doc. 793's holding that the SI's facts, "taken as true, establish [D]efendants had the specific intent to promote prostitution in violation of the Travel Act"; finding that, at the time of prior mistrial, "the government still had a clear path to prevailing at trial").

Finally, Lacey seeks to testify that the "Director of the FBI, Robert Mueller,

presented a commendation to Ferrer." (Doc. 1886 at 7.) First, there is no evidence that Director Mueller ever met Ferrer, much less presented a commendation to him. Instead, there is evidence that a field agent mailed a certificate to Ferrer that was signed by Mueller. But this evidence was already admitted during Mr. Eisenberg's cross-examination of Ferrer on October 10, 2023. (*See also* Ex. 6142.) If Mr. Lacey wants to take the stand and testify under oath that he relied on Exhibit 6142 in good faith, in the face of all the contrary evidence, the United States does not object; indeed, the United States welcomes the opportunity to test that good faith reliance through cross-examination.

Respectfully submitted this 23rd day of October, 2023.

GARY M. RESTAINO
United States Attorney
District of Arizona

NICOLE M. ARGENTIERI
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

*s/Andrew C. Stone*
KEVIN M. RAPP
MARGARET PERLMETER
PETER KOZINETS
ANDREW STONE
DANIEL BOYLE
Assistant U.S. Attorneys

AUSTIN M. BERRY
Trial Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on October 23, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Andrew C. Stone*