**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | October 17, 2023 |
| Michael Lacey, et al. | ) | 8:59 a.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |


**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**


**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**TRIAL - DAY 19 - A.M. SESSION**


Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

<u>**A P P E A R A N C E S**</u>

For the Government:
    UNITED STATES ATTORNEY'S OFFICE
    By:  **Mr. Kevin M. Rapp, Esq.**
         **Mr. Peter S. Kozinets, Esq.**
         **Mr. Andrew C. Stone, Esq.**
         **Ms. Margaret Wu Perlmeter, Esq.**
    40 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
    kevin.rapp@usdoj.gov
    peter.kozinets@usdoj.gov
    andrew.stone@usdoj.gov
    margaret.perlmeter@usdoj.gov

For the Government:
    UNITED STATES DEPARTMENT OF JUSTICE
    By:  **Mr. Austin Berry, Esq.**
    1301 New York Avenue, NW, 11th Floor
    Washington, DC 20005
    austin.berry2@usdoj.gov

For the Defendant Michael Lacey:
    LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
    By:  **Mr. Paul J. Cambria, Jr., Esq.**
    42 Delaware Avenue, Suite 120
    Buffalo, NY 14202
    pcambria@lglaw.com

For the Defendant Scott Spear:
    FEDER LAW OFFICE, P.A.
    By:  **Mr. Bruce S. Feder, Esq.**
    2930 East Camelback Road, Suite 160
    Phoenix, AZ 85016
    bf@federlawpa.com
    - and -
    KESSLER LAW OFFICE
    By:  **Mr. Eric Walter Kessler, Esq.**
    6720 N. Scottsdale Road, Suite 210
    Scottsdale, AZ 85253
    eric.kesslerlaw@gmail.com

For the Defendant John Brunst:
    BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
    LINCENBERG & RHOW, P.C.
    By:  **Mr. Gopi K. Panchapakesan, Esq.**
         **Mr. Gary S. Lincenberg, Esq.**
    1875 Century Park E, Suite 2300
    Los Angeles, CA 90067
    gpanchapakesan@birdmarella.com
    glincenberg@birdmarella.com


For the Defendant Andrew Padilla:
    DAVID EISENBERG, P.L.C.
    By:  **Mr. David S. Eisenberg, Esq.**
    3550 North Central Avenue, Suite 1155
    Phoenix, AZ 85012
    david@deisenbergplc.com


For the Defendant Joye Vaught:
    JOY BERTRAND, ESQ., L.L.C.
    By:  **Ms. Joy M. Bertrand, Esq.**
    P.O. Box 2734
    Scottsdale, AZ 85252
    joy@joybertrandlaw.com

## I N D E X

| PLAINTIFF WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| QUOC THAI  (cont.) | 11 | 31, 62 | 70 | 77 |
| NAIOMY FIGUEROA | 80 | 102, 105<br>106, 108 | 109 | |

## E X H I B I T S

| EXHIBIT NO. | | PAGE: |
|---|---|---|
| 1689 | Summary Exhibit-Payments from Camarillo Holdings<br>to Spear USAO-BP-0032697 | 16 |
| 1690 | Summary Exhibit-Payments from Cereus Properties<br>to Spear USAO-BP-0032698 | 19 |
| 1693 | Summary Exhibit - Payments from Cereus Properties<br>to Michael Lacey -- 01-11-2016 - 01-04-2017<br>USAO-BP-0025845-USAO-BP-0025847 | 23 |

# **P R O C E E D I N G S**

(Proceedings commence at 8:59 a.m.)

COURTROOM DEPUTY:  All rise.  Court is now in session.

THE COURT:  All right.  Good morning.  We are missing two jurors and, but I understand there was something that you wished, counsel wished to raise.                                          08:59:24

MS. PERLMETER:  Yes, Your Honor.  Good morning.  Few housekeeping and scheduling issues, Your Honor.  First, we have a number of witnesses scheduled to testify today, one of whom         08:59:47 is -- her name is Astrid Cervantes.  She is one of our victims. She has a misdemeanor DUI conviction.  I have conferred with the defense and they have informed me that they are not going to cross-examine her on that DUI.  It's not a 609 impeachment eligible offense, so I just wanted to place that on the record         09:00:08 and it's also not relevant to this case.

THE COURT:  All right.  And anything else?

MS. PERLMETER:  Next, Your Honor, we have another witness.  Her name is Andrea Benson.  She is another victim witness.  She is scheduled to testify today.  She has a cold,         09:00:24 Your Honor.  She said she tested negative for COVID, and she is willing to wear a mask when she testifies if the Court would like her to, so I'm inquiring how the Court would like us to proceed.

THE COURT:  Well, let's go ahead and have her wear a         09:00:39

mask.  Does she have one with her?

     MS. PERLMETER:  We do.  We have masks.

     THE COURT:  Yes, I think that's best for everyone.

     MS. PERLMETER:  Finally, Your Honor, regarding our
schedule of witnesses per day and for planning, we have --    09:00:55

     THE COURT:  Again, Ms. Perlmeter.  Go slowly.  Thank
you.

     MS. PERLMETER:  Mr. Thai is currently on direct
examination.  We don't know how long the cross-examination will
be.  We have on deck, Your Honor, four victim witness -- four    09:01:12
victim witness witnesses today who are prepared to testify.
They have all traveled from out of state.  And as the Court may
have seen, the direct and the cross-examination of the victim
witnesses have been relatively short.

     So in an effort or desire to kind of move them along    09:01:33
and get them in the courtroom and then off the stand so that
they can return to their homes and carry on with their lives,
we are proposing that we interrupt Mr. Thai's direct
examination this morning and proceed first with the four victim
witnesses, and then once we have completed have Mr. Thai resume    09:01:53
his direct examination.

     I have conferred with the defense on that and there
seems to be objections from them.

     THE COURT:  All right.  What are the objections?  What
are the objections?    09:02:12

MR. LINCENBERG:  I can.

THE COURT:  It's a scheduling issue, I think.

MR. LINCENBERG:  I've conferred with all counsel and all counsel objected.  The fact that the government would like to interrupt the exam to have greater convenience for these folks doesn't seem to be a sufficient reason to interrupt the flow of the exam and the cross-examination.  If one of them testifies tomorrow instead of today, they may still get to them today, and they get to them tomorrow.

THE COURT:  What is the prejudice?

MR. LINCENBERG:  The prejudice, you know, from conferring with defense counsel, is simply that there's a flow of witnesses and that this gentleman is on direct and the cross should continue in due course rather than chopping things up.  And with regard to one of the witnesses, I think Mr. Feder said that he's in charge of cross-examining that witness, didn't even bring the file in this morning.  It was just a discussion along those lines, Your Honor.

THE COURT:  When was the -- Ms. Perlmeter, when was the government given notice of the desire to have the four witnesses come in?

MS. PERLMETER:  The --

MR. LINCENBERG:  When was the defense given notice?

THE COURT:  Sorry, when was the defense given notice?

MR. LINCENBERG:  This morning.

THE COURT:  All right.

MS. PERLMETER:  Wait, Your Honor, that's not entirely accurate.  The government provided on Friday afternoon the list of 14 witnesses that we planned on calling this week.  Then on Saturday we provided the names of the next who we believed would be called on Tuesday at the defense request, and then --

THE COURT:  Did those who you believed would be called on Tuesday include these four?

MS. PERLMETER:  It included Astrid Cervantes, it included Naiomy Figueroa.  And then, although part of the list, Arshana Sanders and Andrea Benson, they were added later due to scheduling issues, and wanting to make sure that we made use of every moment of the jury's time we added Ms. Benson and Ms. Sanders to the list of witnesses that we'd like to call for today.

THE COURT:  And so is the individual who Mr. Feder was preparing for either Astrid Cervantes or Ms. Figueroa?

MR. FEDER:  It's Sanders, Judge, who I am just hearing about as we speak.

THE COURT:  As I understand it, all four of these women are from out of town.

MS. PERLMETER:  Yes, Your Honor.

MR. FEDER:  Just so I can -- I don't have a file.

THE COURT:  I'm speaking again, Mr. Feder.  We're going to start off clean slate, okay.

MR. FEDER:  Thank you.

THE COURT:  My understanding is it's a resource issue or is it a convenience issue?  Are there urgent matters that these four women need to attend to if they are not on today or tomorrow?

09:05:27

MS. PERLMETER:  It's both.

MR. LINCENBERG:  Your Honor, I would offer that those who it's an urgent issue can easily get on and off today.  We are going to get to a number of witnesses today.

THE COURT:  We don't know that.  I don't know that.

09:05:43

MS. PERLMETER:  Just based on what Ms. Perlmeter is indicating is the amount of time involved in the witnesses, that's what it clearly appears will be the case.

THE COURT:  Well, let's see how we go with the witness who is currently on the stand this morning, and then if we need to take a break, I'll permit that for the first two witnesses that were noticed over the weekend.  I think there is some necessity to give Mr. Feder some leeway to at least get or refamiliarize himself with the witness that he's responsible for, and so I'll permit you to call Ms. Cervantes, Ms. Figueroa after the lunch hour if your current witness is not off the stand.

09:05:59

09:06:21

MS. PERLMETER:  If the current witness gets off the stand earlier, and if we move through the day more quickly, we'll be permitted to continue on with the list of witnesses as

09:06:38

we prepared.

THE COURT:  Well, I think we'll see how that goes.
And with regard to the witness that Mr. Feder needs to prepare
for, I'm going to give him the lead time to do that.  He can at
least have 24 hours.

09:06:57

MS. PERLMETER:  We understand, but there is another
witness.

THE COURT:  Quickly.

MS. PERLMETER:  Another witness, her name is Andrea
Benson.  I have not heard the defense object to her testimony
today, so we would like to have -- give her the opportunity to
testify today as well because she is here from out of town.

09:07:06

THE COURT:  We'll see how the testimony goes and if
there's enough of the time in the afternoon to have three of
these witnesses on, then we'll see about getting those three
on, but otherwise, aside from I guess Ms. Sanders, then you'll
have to have somebody else on the standby whose been noticed by
the government.

09:07:27

MS. PERLMETER:  Yes, and I can say that as of
yesterday afternoon we informed the defense and the Court that
our witnesses for today are going to be Astrid Cervantes,
Andrea Benson or Arshana Sanders and Derek Fritze.  Derek
Fritze is a law enforcement officer, so he can -- we can wait
on his testimony.  We would like to prioritize the victim
witness testimony.

09:07:43

09:08:04

THE COURT:  All right.  Well, let's move forward with the witness.

Mr. Eisenberg, is this something relevant to this because we have our jury that's waiting?

MR. EISENBERG:  It is, Your Honor.  Given what's happened in the past concerning advertiser witnesses, then it appears to me that they don't testify on direct longer than 25, 30 minutes.  The cross-examinations up to now have been relatively brief, so this may not be an issue anyway.  Those who are from out of town seemingly will be on the stand and likely off the stand by the end of today anyway.

THE COURT:  Thank you for that commentary.  All right. So let's have the witness on the stand and let's check on our jury.

QUOC THAI,
being previously sworn, was examined and testified as follows:


THE COURT:  All rise for the jury.

(Jury is present)

(Proceedings commence at 9:10 a.m.)

THE COURT:  All right.  Please be seated, and welcome back, members of the jury, and I hope everyone had a very pleasant weekend.  We welcome you back, and the witness remains on the stand.

And I will remind you, sir, you are still under oath.

And Mr. Stone, you may proceed.

MR. STONE:  Thank you, Your Honor.

CONTINUED DIRECT EXAMINATION

BY MR. STONE:

Q.  Good morning, Mr. Thai.                                    09:11:19

A.  Good morning, Mr. Stone.

MR. STONE:  May we publish what has been admitted as
1479?

THE COURT:  Yes.

BY MR. STONE:                                                 09:11:35

Q.  Okay.  Mr. Thai, I believe this was where we left off on

Friday afternoon.

A.  Yes, that's correct.

Q.  And these are Count 69 and 70?

A.  Yes, that's right.                                        09:11:47

Q.  And just to make sure we're in the same place, let's focus

on this first part of this page, which is page 17 of

Exhibit 1479.  What's the jury looking at on this highlighted

section, sir?

A.  This shows a transfer of funds of, in the amount of       09:12:08

6.5 million from the Backpage.com US Bank account to the

Camarillo Holdings BMO Harris Bank account.

Q.  This shows for about three weeks in February of 2013;

correct?

A.  That's correct, yes.                                      09:12:26

Q.  Did you also review records for a longer period of time for the transfers from this Backpage US Bank account to this Camarillo Holdings bank account?

A.  I did, yes.

Q.  What time period?

A.  From February 4th, 2013, to June 9th, 2014, and the amount was approximately 99 million.

Q.  And that was Backpage proceeds?

A.  Yes.

Q.  All right.  You mentioned on Friday that in reviewing these records you took notes; is that right?

A.  Yes.

Q.  How did you take notes?

A.  I collected all my notes in an Excel spreadsheet called Master Table.

Q.  And what did those -- what did those notes show in this Master Table, or what did they reflect?

A.  It reflected all the transactions step by step between the various accounts, and it had information specific to where the record was located, the amount that was reflected, the type of record that was identified, which subpoena those records came from, among other things.  I tried to keep it as detailed as possible.

Q.  Okay.  And do you have an understanding if this Master Table was disclosed to defense?

09:12:39

09:12:55

09:13:11

09:13:30

09:13:46

UNITED STATES DISTRICT COURT

A.  Oh, absolutely, yes.

Q.  All right.  Let's focus on the next part of this flowchart, and I've highlighted another section, what are we seeing here, sir?

A.  We see two transactions.  One from Camarillo Holdings, a $10,194.87 check to the Michael Lacey, Bank of America account.  The account number is actually 9463.  It's -- it's mistyped here on the flowchart.

Q.  Okay.  I want to stop there.  This account number which is reflected right here, your testimony is that's an incorrect number?

A.  Yes, it is correct that it is an incorrect number.

Q.  That's a little confusing.  This number is wrong?

A.  Yes, the number is wrong.

Q.  Is the number from the indictment?

A.  It is the number from the indictment, yes.

Q.  Okay.  In your Master Table where you took notes, did your notes, or did you have a chance to review that Master Table recently?

A.  Yes, I did.

Q.  What number was reflected on that Master Table?

A.  9463.

Q.  A different number than what's listed here?

A.  Yes.

Q.  In terms of the accounts, was it also a Michael Lacey bank

account?

A.  It was.

Q.  Was it also a bank account at Bank of America?

A.  Yes.

Q.  The only issue was that the last four numbers of the
account number are wrong on the indictment and incorrect here?

A.  Yes.

Q.  All right.  What about this other wire on August 30th?

A.  Yes, that's from -- a wire from Camarillo Holdings in the
amount of $3,071,687.50 to Mr. Michael Lacey's BMO Harris Bank
account at 5263.

Q.  Let's highlight or zoom in on the next portion.  So under
Count 69, what is reflected on this flowchart?

A.  We see a check written from Mr. Lacey's Bank of America
account to Stewart Title in the amount of $30,000.

Q.  All right.  And what about Count 70?

A.  For Count 70 we see a cashier's check written from Mr.
Lacey's BMO Harris account to Stewart Title in the amount
$62,491.47.

Q.  Did you have an opportunity to review the records to
determine if this Bank of America account controlled by
Michael Lacey received any other funds from Camarillo about the
same time?

A.  Oh, I did, yes.

Q.  Did it?

A.  Yes, it did.

Q.  And Camarillo funds were derived from what?

A.  From Backpage.com.

Q.  All right.  Let's go to the next page, which is page 18 of
Exhibit 1479, and this reflects Counts 71 through 77; is that       09:17:11
correct?

A.  That's correct.

Q.  And those are counts that have been charged against
defendant Scott Spear?

A.  Yes, that's correct.                                            09:17:22

Q.  Highlighting this first part of the flowchart, what are we
seeing here?

A.  We see a series of transactions between bank --
Backpage.com and US Bank to Camarillo Holdings at BMO Harris in
the amount of $6.5 million.                                         09:17:46

Q.  Your testimony was you reviewed records that went from
February 2013 to June 2014, and it was about 99 million that
Backpage sent to Camarillo?

A.  That's correct, yes.

Q.  All right.  I highlighted the next part of this flowchart,      09:18:04
what does this show?

A.  We see 13 transactions from April 12th, 2013, to June 11th,
2014, in the amount of $2,672,770 to Scott and Ellona Spear at
National Bank of Arizona.

Q.  All right.  I want to show you another exhibit side by side     09:18:29

with this that has not yet been admitted.

This is Exhibit 1689, do you recognize that exhibit, sir?

A.  I do.

Q.  What is it?

09:19:14

A.  It's a summary of transactions from Camarillo Holdings and BMO Harris to Mr. Spear at National Bank of Arizona from April of 2013 through to January 2nd, 2015.

Q.  Did you prepare this exhibit?

A.  I did, yes.

09:19:38

MR. STONE:  Move to admit Exhibit 1689.

THE COURT:  Hearing no objection, it may be admitted. It may be published.

(Exhibit 1689 is admitted.)

MR. STONE:  Thank you, Your Honor.  The jury can now see Exhibit 1689, and let me just highlight it.

09:19:50

BY MR. STONE:

Q.  And why don't you talk through briefly what the jury is seeing on their screen?

A.  This is a summary of transfers of payments from Camarillo Holdings to Mr. Spear's National Bank of Arizona account.  It goes from April 12th, 2013 through to January 2015.  The total --

09:20:06

Q.  Is that January or is that November?

A.  Wait, yes, November 2nd, 2015.  I'm sorry.

09:20:29

UNITED STATES DISTRICT COURT

Q.  What is the total?

A.  $6,270,188.53.

Q.  And on Exhibit 1479, it has 13 transaction between

April 2013 and June 2014 that went from Camarillo to a National

Bank of Arizona account for Scott Spear; correct?

A.  Yes, that's correct.

Q.  Is that also reflected in Exhibit 1689 that's now been

zoomed in on your screen?

A.  Yes, it is.

Q.  Okay.  After the money moves to Scott Spear's National Bank

of Arizona account, what happens next?

A.  It gets transferred to various accounts.  So for Count 71,

$300,000 was transferred to The Scott Spear and Ellona Spear

Family Trust; for Count 72, $200,000 was transferred to

Scott Spear's TD Ameritrade account; for Count 73, a million

dollars was transferred to the -- his UBS Financial Services;

for Count 74, $250,000 was transferred to Lincoln National Life

for an annuity; for Count 75, $50,000 was transferred to

Industrial Property Trust for a REIT, which is a Real Estate

Investment Trust; for Count 76, $300,000 was transferred to

Allied Bank for a five-year certificate of deposit; for Count

77, $200,000 was transferred to a Wells Fargo Advisor account.

Q.  Moving to the next page on Exhibit 1479, so that's page 19,

shows Count 78; is that correct, sir?

A.  Yes, that's right.

Q.  Okay.  What is the jury seeing on this particular page?

A.  So here we see a transfer of $811,424 from Website Tech to Cereus Properties, and then, you know, we see a transfer from Cereus Properties to Mr. Spear's National Bank of Arizona account in the amount of $133,045.

Q.  All right.  I want to show --

    THE COURT:  Can I just stop you right there?  You referred to this as 1479, isn't it 1689?

    MR. STONE:  Your Honor, 1689 is on the right.  What I've highlighted is 1479.

    THE COURT:  Thank you.

    MR. STONE:  I want to show for the witness' eyes only Exhibit 1690.

BY MR. STONE:

Q.  Sir, do you recognize this exhibit?

A.  I do, yes.

Q.  What is it?

A.  This summarizes payments from Cereus Properties, which was held both at Dubuque Bank and Trust and Compass Bank to Mr. Spear's National Bank of Arizona account.

Q.  Is this an exhibit that you prepared?

A.  It is.

Q.  Did you prepare it by reviewing the bank records?

A.  I did, yes.

    MR. STONE:  Move to admit Exhibit 1690.

          THE COURT:  Hearing no objection, it may be admitted.

It may be published.

     (Exhibit No. 1690 was admitted.)

BY MR. STONE:

Q.  I'm going to zoom in on the top portion of this exhibit.      09:24:47

Give a brief explanation to the jury now that they can see it,

please.

A.  This is a summary of payments from Cereus Properties, which

was held at Dubuque Bank and Trust and Compass Bank to

Mr. Spear's National Bank of Arizona account.  The dates are      09:25:02

actually January 11th, 2016, to January 4, 2017.

Q.  And the total amount that was transferred?

A.  The total amount is $2,941,500 --

Q.  And 83 cents?

A.  -- and 83 cents, yes.                                        09:25:25

Q.  Your testimony is that the title just reflects the

incorrect, reflects an incorrect date range?

A.  Yes, that's right.

Q.  All the payments that are on this page are from Cereus

Properties?                                                      09:25:43

A.  Yes, from Cereus Properties.

Q.  And where did Cereus Properties obtain money?

A.  From -- primarily from Website Tech, but from Backpage.com.

Q.  Ultimately, it's all revenue from Backpage.com?

A.  Yes, that's right, yeah.                                     09:26:01

Q.  So looking back at Exhibit 1479, page 19, Count 78 reflects

a January 11th, 2016 transfer of money from Cereus Properties

to Scott Spear's bank account; correct?

A.  Yes, that's right.

Q.  And that same transaction is reflected on Exhibit 1690 in          09:26:33

the first entry?

A.  Yes, that's right.

Q.  Sir, this was a transfer of money from Cereus Properties,

did Cereus Properties have a Chief Financial Officer?

A.  Yes, it does.                                                      09:26:57

Q.  Who?

A.  Mr. Brunst.

Q.  What about -- was Mr. Brunst also a signatory on the bank

account?

A.  He was, yes.                                                      09:27:04

Q.  Just to remind the jury, what can a signatory on the bank

accounts do?

A.  He can initiate --

            MR. PANCHAPAKESAN:  Objection; lacks foundation.

            THE COURT:  Sustained.                                    09:27:17

BY MR. STONE:

Q.  Are you aware of what a signatory on a bank account can do?

A.  Yes.  Yeah, I am.

Q.  What can they do?

A.  They can make payments on the account.                           09:27:26

Q.  Initiate wires?

A.  Initiate wires, yes.

Q.  Transfer money?

A.  Yes.

Q.  Going to the next page, Exhibit 1479, page 20, what is   09:27:33
reflected on this particular page, sir?

A.  We see transfers from Website Tech to Cereus, four
transfers in the amount of $3,126,033.07.  From there Cereus
Properties transfers $101,000 -- $101,974 to Mr. Brunst's Wells
Fargo account.   09:28:21

Q.  Is this Backpage money flowing through Website Technologies
to Cereus Properties and ultimately to Mr. Brunst's Wells Fargo
account?

A.  That's correct, yes.

Q.  Pulling up what's already been admitted as Exhibit 1691.   09:28:39
Just to remind the jury, 1691 reflects what?

A.  1691 reflects a summary of payments from Website Tech to
Cereus Properties from December 31, 2015 to August 31, 2016.

Q.  Same transaction reflected on both exhibits?

A.  Yes, that's right.   09:29:27

Q.  First four of the document on the right, Exhibit 1691, also
reflected in the flowchart, is that fair?

A.  Yes, that's right, yes.

Q.  Going to the next page, page 21 of Exhibit 1479, first
transaction or the first part of that shows what?   09:30:04

A.  Six transactions between Website Tech and Cereus for a total of $5,571,187.

Q.  Ultimately that money goes from Cereus Properties to an account held by James Larkin?

A.  Yes, that's right.                                           09:30:22

Q.  And Mr. Brunst you testified to is the CFO of Cereus Properties and signatory on that bank account?

A.  That's right, yes.

Q.  All right.  Next page of Exhibit 1479 reflects Count 81, what is the jury looking at with Count 81, sir?      09:30:47

A.  We see nine transactions from Website Tech to Cereus in the amount of $9,748,987.15 from Website Tech to Cereus.  And then we see a transfer from Cereus to Mr. Lacey's Bank of America account in the amount of $1,692,020.

Q.  All right.  I want to show for the witness' eyes only     09:31:18
Exhibit 1693.  Sir, do you recognize this exhibit?

A.  I do, yes.

Q.  What is it?

A.  It's a summary of payments from Cereus Properties to Mr. Lacey.                                                 09:31:41

Q.  Three-page document?

A.  Three-page document, yes.

Q.  Did you prepare it?

A.  I did.

Q.  Did you prepare it reviewing bank records from this case?   09:31:50

A.  Yes.

        MR. STONE:  Move to admit Exhibit 1693.

        MR. CAMBRIA:  No objection.

        THE COURT:  Did I hear someone say something?

        MR. CAMBRIA:  No objection, Your Honor.        09:32:07

        THE COURT:  Mr. Cambria says "No objection."  The

exhibit may be admitted and it may be published.

    (Exhibit No. 1693 was admitted.)

BY MR. STONE:

Q.  Can you describe this for the jury, sir?        09:32:22

A.  Yes.  This summarizes payments from Cereus Properties

Arizona Bank and Trust to Mr. Lacey from the time period of

January 11th, 2016 through January 4th, 2017.

Q.  That's about a one-year period?

A.  Yes, that's right.        09:32:42

Q.  What is the total amount transferred?

A.  $30,353,596.20.

Q.  Some of the transactions that are on the flowchart, are

they also captured on this Exhibit 1693?

A.  They are, yes.        09:33:06

Q.  I will put back on your screen what's already been admitted

as Exhibit 1479, take you to page 22, so does this flowchart

reflect Backpage money going from Website Technologies to

Cereus Properties and ultimately to a Michael Lacey Bank of

America account?        09:33:37

A.  That's right, yes.

Q.  Move to the next count, Count 82.  The question is, the first part of this is similar to some of the other counts that we just reviewed?

A.  Yes, that's right.                                                09:33:49

Q.  Transactions from Website Technologies to Cereus Properties?

A.  Yes, that's right.

Q.  And ultimately where does money go on April 1st, 2016?

A.  From Cereus Properties it goes to Mr. Brunst's Wells Fargo        09:33:59
account in the amount of $220,944.

Q.  All right.  We move to the next page, page 24, and this shows Counts 83 and 84, and this there is more arrows on this than the previous pages, fair?

A.  Yes.                                                             09:34:25

Q.  All right.  Let's take it step by step.  First part is similar to what we've just reviewed on the previous counts?

A.  Yes, that's right.  We see 12 transactions for a total of $13,443,800.75 from Website Tech to Cereus Properties.

Q.  Let's look at the next step.  Just a little hard to see,         09:34:52
but walk us through where the money is going?

A.  Okay.  From here we see transactions split into five separate accounts from Cereus Properties to five different retained annuity and trust accounts belonging to Mr. Lacey.
The first is a two-year, there's a four-year, a six-year, an         09:35:21

eight-year and a ten-year retained annuity trust.  Each one of those transactions, each one of those accounts receives three payments totaling $821,916 from April 1st, 2016 to May 2, 2016.

Q.  I am going to put admitted Exhibit 1693 back on the screen. I'm going to zoom in on a portion of this exhibit.  Are the transactions that you just testified about also listed here in Exhibit 1693?

09:35:59

A.  Yes, they reference the transactions that go to the Michael Lacey two, four, six, eight and ten-year annuity trusts.

Q.  All right.  Let me put 1479 back on the screen.  Let's look at the next part of this flowchart, what is reflected here?

09:36:28

A.  From those retained annuity trust accounts we find two transactions, one on May 5th, 2016 and one on June 21st, 2016. The transfer from -- on May is in the amount of $4,701,840, and the amount transferred from on June 21st is $750,761.45.  Each of those amounts is transferred from each of the retained annuity trust accounts into Mr. Lacey's Arizona Bank & Trust account ending in 1793.

09:37:08

Q.  All right.  Last part of this exhibit, what is reflected here?

09:37:41

A.  From there Mr. Lacey transfers $397.500 to -- to Fidelity Title, Fidelity National Title on, you know, June 27th, 2016, for Count 86, and for Count, sorry, for Count 83 and for Count 84 he transfers the remaining balance of $12,859,152.57.

Q.  All right.  This page reflects a number of transactions

09:38:16

flowing through, fair?

A.  Yes.

Q.  In your review of the records, is this money that makes up
Count 83 and Count 84 money that was generated from
Backpage.com?                                                    09:38:28

A.  It is, yes.

Q.  Let's go on to the next page, which shows Count 85, could
you describe the flow of money for this particular Count, sir?

A.  Yes.  Here we find Backpage.com transfers money from --
transfers money to Camarillo Holdings in the amounts of         09:38:57
6.5 million from February 4th, 2013 through February 25th,
2013.

Q.  I just want to stop you there.  Just to remind the jury,
you also reviewed records from February 2013 through June 2014
for the same flow of money; correct?                            09:39:14

A.  Yes, that's right.

Q.  And the amount of money that you reviewed that flowed from
Backpage to Camarillo during that time period was what?

A.  Was 99 million.

Q.  Okay.  Move forward from Camarillo to the Scott Spear       09:39:26
National Bank of Arizona account?

A.  From Camarillo there is a total of 26 transactions in the
amount of $6,270,188.53 to Mr. Spear's National Bank of Arizona
account.

Q.  Did you say 26?  It reflects 24 on this page; correct?      09:39:46

A.  Oh, yes, I am sorry.  I am seeing too many numbers.  It is 24 transactions.  I apologize.

Q.  And then from that account $50,000 went to the Strategic Storage Trust?

A.  Yes, that's right.                                    09:40:06

Q.  I am going to show you what has been admitted into evidence as Exhibit 1689, does this reflect the 24 transactions from Camarillo Holdings to Scott Spear's National Bank of Arizona account?

A.  It does, yes.                                         09:40:31

Q.  That's the total number; correct?

A.  Yes, that's right.

Q.  Putting back on the screen 1479, page 25, that's the same number?

A.  Yes, that's right.                                    09:40:54

Q.  All right.  Moving to the next page.  This is Count 86.  For the first part we see similar flow from Website Technologies to Cereus Properties?

A.  Yes, that's right.

Q.  And then on August 2nd, 2016, what is reflected here?    09:41:18

A.  We see a transfer from Cereus Properties to Mr. Lacey's Wells Fargo account in the amount $16,243.

Q.  And Cereus Properties CFO is who?

A.  Mr. Brunst.

Q.  And he's also a signatory on this bank account?        09:41:34

A.  That's correct, yes.

Q.  Count 87, is this similar except the ultimate destination goes to a James Larkin account?

A.  That's correct, yes.

Q.  Count 88, first part similar in flow from Website Technologies to Cereus Properties?

09:41:48

A.  Yes, that's right.

Q.  And what about the money that was transferred on October 6th, 2016?

A.  Yes, it's in the amount $268,016 to Mr. Lacey's two-year annuity trust.

09:42:07

Q.  All right, sir, I put on your screen, or everyone's screen, Exhibit 1479, page 28, next to Exhibit 1693 and I zoomed in on a portion of Exhibit 1693, what are -- what is the jury seeing on this zoomed in portion?

09:43:04

A.  They are seeing the same transaction reflected on both exhibits.

Q.  Same transaction Count 88, what I highlight below?

A.  Yes, that's right.

Q.  Same with Count 89?

09:43:57

A.  Same with Count 89.

Q.  I am not going to highlight this.  Is this the same with Count 90?

A.  Same with Count 90, yes.

Q.  Same question for Count 91.

09:44:28

A.  Same with Count 91, yes.

Q.  And finally, Count 92?

A.  Yes, same with Count 92.

Q.  All right.  Moving on to Count 93, what is reflected on
this flowchart, sir?                                          09:45:06

A.  We see 28 transactions between Website Tech to Cereus in
the amount of $39,249,211.37, and from there we see a transfer
from Cereus to Mr. Spear's National Bank of Arizona account in
the amount of $141,444.

Q.  All right.  Finally, Counts 94 through 100, first part of   09:45:32
this flowchart reflects transfers from Website Technologies to
Cereus Properties?

A.  That's correct, yes.

Q.  Does the second part show transactions that you already
testified about?                                              09:46:01

A.  Yes, that's right.

Q.  And money flowing to these five annuity trusts for
Michael Lacey?

A.  Yes, that's right.

Q.  All right.  What happens after the money flows into the    09:46:09
five annuity trusts?

A.  From there we see five wires from each account totaling
16.5 million flow through to an IOLTA account, which stands for
Interest on Lawyers' Trust Account at Becker House at Johnson
Bank.                                                          09:46:44

Q.  And so each one of those five wires makes up Counts 94
through 98?

A.  Yes, that's right.

Q.  And it flows to this Interest on Lawyers' Trust Account at
Becker & House PLLC, did you have an understanding that that
was an account that, or if that was Michael Lacey's attorney?

A.  Yes.

Q.  And what happens for the last transactions here on this
flowchart?

A.  From there we see a transfer from the IOLTA account to a
Primus Trust Company for the benefit of Mr. Lacey at bank in
Hungary, K & H Bank.

Q.  That's money that went from this bank, this Johnson Bank to
a bank in Hungary?

A.  Yes, that's right.

Q.  Do you know where this Johnson Bank is located?

A.  I think it's located in the United States.  I don't know.

Q.  Put 1479 back on your screen.  That's an admitted exhibit.
We just went through a number of pages on this flowchart that
you prepared; correct?

A.  Yes, that's right.

Q.  That showed a number of transactions and money flowing to a
number of accounts there?

A.  Yes, that's right.

Q.  In your review of the financial records, was all of this

money derived from revenue from Backpage.com?

A.  Yes.

        MR. STONE:  Just a moment, Your Honor.  That's it,
Your Honor.

        THE COURT:  All right.  I see Mr. Panchapakesan coming
to the podium.  You may proceed when you're ready.

                    CROSS-EXAMINATION

BY MR. PANCHAPAKESAN:

Q.  Good morning, Mr. Thai.

A.  Good morning, sir.

Q.  Am I pronouncing that right?

A.  Yes.

Q.  My name is Gopi Panchapakesan.  I represent Mr. Brunst.

        MR. PANCHAPAKESAN:  Ms. Ellig, if you could put up
Exhibit 1479 on the screen.

BY MR. PANCHAPAKESAN:

Q.  Thank you.  Now, sir, you provided a lot of -- can you take
the -- thank you.

        You provided a lot of testimony about these flow
charts.  So if I understand correctly, with this exhibit you're
essentially just showing money being transferred from one
account to another, is that fair?

A.  Yes, that's fair.

Q.  And there's a count number on this here.  It's Count 53 in
the middle.  That's not actually part of the wire transfer.

You just put that in there for illustrative purposes; is that

right?

A.  Yes.

Q.  And to be clear, the box in the middle, that doesn't

reflect some kind of intermediary.  That just reflects the day    09:50:27

of the transfer and the amount that's being transferred;

correct?

A.  Yes.

Q.  Now, if you could go to Count 63, which is page 11, now you

testified on direct exam as to this transfer, I believe that    09:50:46

you didn't look at the purpose of this transfer; correct?

A.  No, I didn't.

Q.  Sitting here today you have no idea why this transfer was

made, is that fair?

A.  No, I don't.    09:51:01

Q.  Okay.  And is it fair to say that as to the other counts

reflected in these flowcharts you also did not look at the

underlying purpose of those transfers; correct?

A.  That's correct, yes.

Q.  Now, are you aware that in the indictment as to this Count,    09:51:16

Count 63, are you aware the government alleges that this was a

payment made to a website developer, aware of that?

A.  Yes.

Q.  So what this shows is that Backpage in 2014 made about a

$6,000 payment to a web developer; correct?    09:51:35

A.  Yes.

Q.  So in other words, if you were showing, for example, let's

say a payment from Google to a website developer in India, in

fairness, it would look a lot like this; right?

A.  Oh, yes.                                                    09:51:54

Q.  You can take that down for now.  Thank you.  You also

testified during your direct exam that Carl Ferrer purchased

the Backpage business in April of 2015, do you recall that?

A.  Yes, I do.

Q.  Now, you testified that you searched and reviewed thousands    09:52:16

of bank records; right?

A.  Yes.

Q.  As well as internal company documents; correct?

A.  Yes.

Q.  And you also sat through a number of interviews the            09:52:26

government conducted of Mr. Ferrer; correct?

A.  Yes, that's right.

Q.  So through that process you learned that there were

actually two loans made by the sellers of Backpage to

Mr. Ferrer, you became aware of that; right?                      09:52:41

A.  Yes.

Q.  And you learned that those loans amounted to about

$600 million; is that correct?

A.  I'm not familiar with the amount.  I just know that, you

know, the purchase happened, the transaction happened.            09:52:58

UNITED STATES DISTRICT COURT

Q.  So you're familiar there were loans, and is it fair to say you're familiar with the fact that the loans were in the hundreds of millions of dollars, is that fair?

A.  I just don't recall a number.

Q.  Okay.  So then in preparation for your testimony today you did not analyze the amounts of the sale; is that correct?

A.  No, I didn't.

Q.  You did not analyze the loan agreements in connection with the sale; correct?

A.  No, I did not.

Q.  And you did not analyze the amount of either of those loans; correct?

A.  No, I didn't.

Q.  So that's not information that you factored into your testimony regarding these flowcharts; correct?

A.  Yeah, that's correct.  I didn't factor them in.

Q.  Now, as a general matter, you learned that Ferrer's business like Website Technologies, you're aware that he made loan payments to the sellers after the sale; correct?

A.  I saw that he made payments.

Q.  And you understand those were loan payments; right?

A.  You know, I don't -- I don't know the nature of the loans or the payments, like I just know that the payments were made. I don't know if they were loan payments or what kind of payments they were.

Q.  So then your testimony, sir, is that in the course of your
review of Backpage records, banking records, interviews with
Ferrer, you never learned that Carl Ferrer made loan payments
to the sellers, you never learned that?

A.  I may have -- I may have heard statements or information to
that effect, but it wasn't part of my analysis.

Q.  Okay.  So then to be clear, as part of your analysis and
everything you testified to on direct, you did not factor into
your analysis the nature of the loan payments that Ferrer was
making to the sellers; correct?

A.  Yes, that's right.

Q.  Now, are you aware, sir, that Cereus Properties collected
the interest and principal payments on the loan for Mr. Ferrer,
are you aware of that?

A.  Again, I didn't -- I couldn't differentiate based on the
bank records what was interest and what was principal.  I just
identified amounts and the movement of the funds.

Q.  So you looked at the bank records, you looked at the
amounts, and that's where your analysis stopped, is that fair?

A.  Yes, that's right.

        MR. PANCHAPAKESAN:  Now, if you could show the witness
Mr. Ferrer's testimony at this trial from September 21st in the
afternoon at page 91, line 1 through 3, and I request to
publish.  It's his testimony in the case.

        MR. STONE:  Your Honor, objection to putting up some

other witness' testimony on the screen.

        MR. PANCHAPAKESAN:  It's not hearsay.

        THE COURT:  I am going to sustain that.

BY MR. PANCHAPAKESAN:

Q.  Let me ask you about this, are you aware that Mr. Ferrer          09:56:40

testified in this case that Cereus Properties collected the

interest and debt payments from the loan in connection with

Backpage, are you aware of that?

A.  I have just been now made aware of it.

Q.  So your testimony then, sir, is that after spending a          09:56:55

couple of years investigating this case, reviewing thousands of

bank records, attending Ferrer's interviews, today is the first

day you've learned that Cereus Properties collected interest

and debt payments from the loan tied to the Backpage sale; is

that correct?          09:57:18

A.  Like I mentioned earlier, I may have heard that at some

point in the past, but that was not part of my analysis, not

part of my focus on the investigation.

        THE COURT:  Put the exhibit down, please.  Thank you.

        MR. PANCHAPAKESAN:  You can --          09:57:31

        THE COURT:  It's down.

        MR. PANCHAPAKESAN:  It's down.

        THE COURT:  Proceed.

BY MR. PANCHAPAKESAN:

Q.  Okay.  Now, are you aware, sir, that Mr. Ferrer's          09:57:37

businesses would make separate payments in connection with two different loans in the sale, are you aware of that?

        MR. STONE:  Object to the foundation.

        THE COURT:  Sustained.

BY MR. PANCHAPAKESAN:

Q.  Are you aware of the facts, sir, through your review of records your interviews with Ferrer, are you aware that there were two loans in connection with the sale, are you aware of that?

A.  The records I primarily reviewed were accounting records, and I saw a number of agreements between Mr. Ferrer and Mr. Brunst, but I didn't review them in depth.  I knew that they existed, but I -- I don't recall them and, you know, I just don't -- it wasn't part of my focus.

        MR. PANCHAPAKESAN:  So if I could show the witness what is in evidence.  It's Exhibit 5427.  And this is in evidence, Your Honor.  I request to publish.

        THE COURT:  You can ask your question.

        MR. PANCHAPAKESAN:  I just asked.  It's in evidence.

        COURTROOM DEPUTY:  Double-checking.

BY MR. PANCHAPAKESAN:

Q.  Now, sir, this is a loan agreement, do you see that?

A.  Yes, I do.

Q.  Do you see where it says, "Backpage U.S. Operations"?

A.  Yes.

Q.  Did you look at this in preparation of your testimony here today?

A.  At some point in the past when I was reviewing financial records I found this, but I didn't review it with any level of depth.  I just know that it's part of some of the financial records that I previously seen.

Q.  So then at some point over the past several years you became aware of this loan agreement concerning the sale of Backpage U.S. Operations, is that fair?

A.  Yes, and even in review like looking at this document here, I don't remember it being a final draft.  There were numerous copies of similar types of documents, but I don't remember if what I saw was a final draft, and I never focused on it.

Q.  So your testimony is that in preparing your flowcharts and preparing for your testimony, you did not focus on a loan agreement like this, is that accurate?

A.  Yes, it's right.

Q.  You can take it down.  Thank you.

        Now are you aware, sir, that you've heard of a company called Ad Tech BV, I believe you testified about it?

A.  Yes, that's right.

Q.  Now, are -- did you become aware at some point that after the Backpage sale in 2015 that payments from Ad Tech BV to Cereus were loan payments, did you become aware of that?

A.  I don't have any knowledge of the intricacies of the loans.

09:59:26

09:59:40

10:00:04

10:00:26

10:00:44

UNITED STATES DISTRICT COURT

Q.  If Mr. Ferrer testified to that effect, you'd have no
reason to dispute his testimony; right?

A.  I don't have any opinion on Mr. Ferrer's testimony.

Q.  Do you have any reason to dispute that payments from Ad
Tech BV after April 2015 to Cereus Property were made in the
form of loan payments, do you have any reason to dispute that?

10:01:03

A.  I don't know.  I don't know how to answer that.

Q.  My question is, do you have a reason to dispute that one
way or the other?

A.  I have no reason to dispute one way or the other.

10:01:19

Q.  And then with respect to Website Technologies, do you have
any reason to dispute one way or the other that payments made
from Website Technologies to Cereus Properties after April 2015
were in the form of loan payments?

A.  Again, I have no opinion about loan payments or knowledge
of it.

10:01:39

Q.  You have no reason to dispute this notion of loan payments
from Website Technologies to Cereus?

            MR. STONE:  Objection; asked and answered.

            THE COURT:  Sustained.

10:01:51

BY MR. PANCHAPAKESAN:

Q.  Your testimony is you have -- you have no -- it's not
something you've considered; right?

A.  Yes, that's right.

Q.  Let's take a look at Exhibit 1691, which was admitted

10:02:03

during Mr. Thai's direct.  Now, sir, all of these wire
transfers are after the April 2015 sale of Backpage; correct?

A.  It appears that way, yes.

Q.  Given everything we just talked about, do you have any
reason to dispute that these are all loan payments in
connection with the sale of Backpage?

       MR. STONE:  Objection; asked and answered.

       THE COURT:  Overruled.

       THE WITNESS:  I have no knowledge of the intricacies
of the loan, loans between Mr. Ferrer and the other parties.

BY MR. PANCHAPAKESAN:

Q.  When you say you're not aware of the intricacies, those are
the types of intricacies you did not look at in preparation for
your testimony; correct?

A.  That's correct.

Q.  Let's put back up Exhibit 1479, which is in evidence.  Now,
by my count, sir, I think about 37 of the 48 counts in here
reflect wire transfers from either Website Technologies or Ad
Tech BV to Cereus Properties after April 2015, does that sound
about right?

A.  Yes, that sounds about right.

Q.  And just to kind of orient folks, April 2015, you
understand that to be when the Backpage sale took place;
correct?

A.  I understand it to be around that time.  I am not familiar

with the date.

Q.   Okay.  And focusing on this exhibit, do you have any reason
to dispute, sir, that payments made from like in this flowchart
Website Technologies to Cereus Properties in May of 2016, do
you have any reason to dispute that the form of this payment          10:04:05
was a loan payment?

A.   I don't know anything about the loan payment or the
agreement as to the loan payment.

Q.   So all you looked at, for example, with respect to this
flowchart, is just that there was a transfer of money.  That's     10:04:22
all you looked at; right?

A.   Yes.

Q.   You didn't look at the purpose of the payment; correct?

A.   No, I didn't.

Q.   And if there might have been a loan agreement or a contract   10:04:32
or something concerning this payment, you didn't look at that?

A.   No, I didn't look at that.

Q.   If there were contemporaneous e-mails, for example, between
the parties documenting what the purpose of the transaction
was, you didn't look at that either; correct?                       10:04:50

A.   No, I didn't look at e-mails.

Q.   Now, isn't it fair to say, sir, that if a business, let's
say Microsoft, takes out a loan from a bank, let's say Bank of
America, and they are making monthly loan payments, and you
were trying to depict that wire in a flowchart, wouldn't it        10:05:18

look a lot like this, is that fair?

A.  So can you repeat what you just said?

Q.  Sure.  Sure.  So let's say you have a company like Microsoft, and let's say think take out a loan from Bank of America to buy a building or something, and there is monthly loan payments made by Microsoft to the bank, in one box you have Microsoft; right?  Correct?

A.  Uh-huh.

Q.  Can you answer audibly?

A.  Yes.

Q.  Thank you.  And then on the right you would have the bank Bank of America; right?

A.  Yes.

Q.  And you would have a line in between?

A.  Uh-huh.

Q.  You have the date and you would have the amount of the transfer; correct?

A.  Yeah, that's right.

Q.  Now, you look at Website Technologies on the left side of this chart, you understand that their bank at the time was Arizona Bank & Trust, do you understand that, sorry, scratch that.

        If you look at the right side, Cereus Properties, you understand that their bank was Arizona Bank & Trust?

A.  Yes, that's right.

Q.  And given your work on this case, Arizona Bank & Trust, you understand that's a bank based in Phoenix?

A.  Yeah, it appears that way, yes.

Q.  Do you have an understanding that they are a large bank with billions of assets, do you have that understanding?

10:06:47

A.  I don't know how large they are.

Q.  Okay.  Sir, do you generally have an understanding in your experience that banks have something called an anti-money laundering policy?  Do you have that understanding?

A.  Oh, yeah, of course.

10:07:09

Q.  And you subpoenaed Arizona Bank & Trust for their bank records; right?

A.  Yes.

Q.  Now, as to this wire transfer in Count 53, in your review of the records Arizona Bank & Trust produced, did you see any correspondence from Arizona Bank & Trust to Cereus Properties about a money laundering policy violation as to this transfer?

10:07:25

A.  I don't recall any correspondence.

Q.  You didn't see anything like that?

A.  I don't recall.

10:07:42

Q.  As to this count, Count 53, this transfer, in your review of the records that Arizona Bank & Trust produced, did you see any notification from the bank to Cereus Properties objecting or trying to prevent this transfer?

MR. STONE:  Objection, Your Honor, foundation.  I

10:08:04

think the witness testified that he didn't look at e-mails.

THE COURT:  Sustained.

BY MR. PANCHAPAKESAN:

Q.  So then is it your testimony, sir, that you in the records
you subpoenaed from Arizona Bank & Trust, you didn't look at          10:08:18
any e-mails or letters or correspondence, is that your
testimony?

A.  I didn't see any, no, I don't recall any.

Q.  Okay.  All right.  Now, through your work on this case,
have you heard of something called The Erotic Review?                 10:08:34

A.  I am familiar with it, yes.

Q.  Now, sir, do you know if any of the Backpage revenues
reflected in Count 53, do you know if any of those revenues
came from an advertisement that had a link to TER, do you know
that?                                                                 10:09:00

A.  I don't have knowledge of that, no.

MR. PANCHAPAKESAN:  Ms. Ellig, can you represent TER
in demonstrative form on the exhibit?  You can take the top one
off.

BY MR. PANCHAPAKESAN:                                                 10:09:14

Q.  Now --

MR. STONE:  Your Honor, object to a modification of an
exhibit that's admitted.

MR. PANCHAPAKESAN:  I intend to move for admission of
the demonstrative form.                                              10:09:24

        MR. STONE:  Don't publish it while you ask questions.

        THE COURT:  If it's not admitted as an exhibit, it
should not be published.  Lay some foundation.

        MR. PANCHAPAKESAN:  Keep it for his eyes only then.

BY MR. PANCHAPAKESAN:                                      10:09:39

Q.  It's true, sir, you testified that as to this transfer in
this count you are not aware of any advertisement that had a
link to TER that formed the basis for the revenue being
transferred here; is that correct?

        MR. STONE:  Object to foundation.                 10:09:58

        THE COURT:  Sustained.

BY MR. PANCHAPAKESAN:

Q.  Sir, did you, in preparing this chart, did you analyze the
source of the revenue?

A.  I did, yes.                                           10:10:10

Q.  Did you analyze the source of the revenue on an ad-by-ad
basis?

A.  I did not, no.

Q.  And so in preparing this chart you did not look as to
whether a given advertisement -- you didn't look to the content 10:10:25
of a given advertisement; is that right?

A.  I did not, no.

Q.  And so, for example, you testified you've heard of The
Erotic Review.  You did not look as to this transfer to see if
any of the advertisements that formed the basis for the revenue 10:10:43

here had a link to The Erotic Review; is that correct?

A.  Yes, that's correct.

Q.  Now, you've heard of the term "moderation"; correct?

A.  I have heard of it, yes.

Q.  And you understand the general sense that Backpage had a          10:11:03

moderation department that moderated ads; right?

A.  That's correct, yes.

Q.  Now, sitting here today, given your testimony, did you

analyze whether any of the advertisements that might have

formed the basis for the revenue here, did you look at how they    10:11:23

were moderated, those ads?

A.  I did not.

Q.  So did you look at whether any of the ads that formed the

basis for this, the revenue here, did you look at whether they

were moderated in a way to hide what the ad was for?               10:11:40

          MR. STONE:  Objection; foundation.

          THE COURT:  Sustained.

BY MR. PANCHAPAKESAN:

Q.  But stepping back, I believe you testified you didn't look

at this on an ad-by-ad level and so you wouldn't have looked at    10:11:52

whether a given advertisement was moderated; is that fair?

A.  Yeah, that's right.

          MR. PANCHAPAKESAN:  And for the witness' eyes only,

please reflect that in demonstrative form.

BY MR. PANCHAPAKESAN:                                              10:12:08

Q.  Have you heard of a term called "aggregation"?

A.  I -- I am familiar with that term as a word in English, but
I'm not aware of how that applies to this case.

Q.  So that's not a term you're familiar with at all in the
context of this case, "aggregation," is that fair?                    10:12:32

A.  I think I have heard it sometime in the past, but I
don't -- I don't really know how it applies.

Q.  Okay.  Fair enough.

        MR. PANCHAPAKESAN:  Your Honor, for the witness only
now, I would move for the admission of this for demonstrative         10:12:47
purposes only as the next exhibit in line, which is 6260.

        MR. STONE:  Objection, Your Honor, the witness
testified that he didn't look on the revenue on an ad-by-ad
basis, so it's not accurate to have these words up with lines
through them.                                                         10:13:07

        THE COURT:  And I would agree with that,
Mr. Panchapakesan, so I am going to not permit you to admit it.

BY MR. PANCHAPAKESAN:

Q.  Okay.  Now, without sparing the jury of going through all
of the flowcharts, is it fair to say that the answers you just       10:13:24
gave me about The Erotic Review, for example, would that
hold -- would that be true as to the other flowcharts?

A.  Yeah, it should.

Q.  And your testimony about moderation, fair to say that would
hold true as to the other flowcharts?                                10:13:43

A.  Yes, that's right.

Q.  And the fact that you didn't look at whether something was

a loan payment, that would hold true as to the rest of the

flowcharts; correct?

A.  Yeah, that's right.                                    10:13:57

        MR. PANCHAPAKESAN:  Now, as to these flowcharts, and

if you could just put this back on the screen without -- no,

sorry, you can take off the, yeah, and put the original

exhibit, if you could publish that.  Thank you.

        MR. STONE:  No objection to this being published.   10:14:25

        THE COURT:  It's admitted.  It may be published.

Sorry if you were waiting for me.

BY MR. PANCHAPAKESAN:

Q.  Do you have any knowledge, sir, as to whether any defendant

was specifically aware of any advertisement that might have    10:14:42

generated the revenue reflected here, is that something you

looked at?

        MR. STONE:  Objection; foundation.

        THE COURT:  Sustained.

BY MR. PANCHAPAKESAN:                                        10:14:52

Q.  Let me ask it this way then:  In preparation for your

testimony, you didn't look at what a given defendant may or may

not have known about an advertisement, is that fair?

A.  Yeah, that's fair.

Q.  And that's the case as to this chart and the other charts;  10:15:05

correct?

A.  Yes, that's right.

Q.  You can take that down.  Thank you.  Now, we talked a bit about the Backpage sale and the loan.  Sir, in terms of your experience, have you ever published any papers about the seller-financed transactions, is that something you've ever done?

10:15:26

A.  I have never published papers about seller-financed transactions.

Q.  And I take it's -- you never taught a course in seller-financed transactions; correct?

10:15:41

A.  No, I haven't.

Q.  Have you ever worked as a loan officer at a bank, for example?

A.  No, I haven't.

10:15:54

Q.  Have you ever worked at a credit card company?

A.  No, I haven't.

Q.  And have you ever worked at a commercial bank like a Bank of America or something like that?

A.  I previously worked at Countrywide.

10:16:08

Q.  Countrywide.  Okay.  And at Countrywide, were you handling things like bank loan administration, was that part of your role?

A.  Bank loan administration?

Q.  Right.  So if a bank makes a loan to someone, was that

10:16:23

something you were doing at Countrywide?

A.  No.

Q.  Okay.  And sir, how many times have you testified as an expert in a federal criminal trial concerning the money flow of a website platform, how many times have you done that?

A.  This would be the first time.

Q.  And sir, you also testified that you were an inspector for the U.S. Postal Inspection Service for a period of time?

A.  Yes, that's right.

Q.  And fair to say the jurisdiction of U.S.P.I.S., it's the mail; right?

A.  Yes, but it's very broad.

Q.  It's broad, but it probably concerns -- the postal service is the mail service; right?

A.  Yes.  Well, the postal service in all its forms, so that includes, for example, you know, money orders that it sells as well.

Q.  Okay.  So it includes money orders, but that's correct to people going to the post office and getting a money order; right?

A.  Yes, that's right.

Q.  You also testified that you, I think you said you received an award for your work on a dark net case involving bitcoin, do you recall that?

A.  Yes, that's right.

Q.  So the jury understands, simplifying this, the dark net,

it's the place on the Internet that's encrypted, is that fair?

A.  Yes, that's right.

Q.  You have a dark net site, for example, it can only be

accessed using specific software credentials, is that a fair          10:18:03

summary?

A.  Yeah, you'd have to access it with special software such as

Tails to access the Tor network.

Q.  Tor network, what is that?

A.  I don't have the definition of it, but it's a type of           10:18:19

encrypted network.

Q.  Put simply, the dark net has nothing to do with this case,

right, is that fair?

A.  Well, not the dark net, no.

        MR. PANCHAPAKESAN:  If you do put Exhibit 1479 back          10:18:50

up, just the clean version of it, and if you could go to

page 17, Count 69 through 70.  Thank you.

BY MR. PANCHAPAKESAN:

Q.  Now, you testified that if we're looking at sort of the

first part of this chart, that this reflects funds transferred       10:19:07

from Backpage at US Bank to Camarillo at BMO Harris Bank; is

that right?

A.  Yeah, that's right.

Q.  Now, first in your review of internal company records,

you're aware that Camarillo Holdings was a parent company to         10:19:24

Backpage; right?

A.  You know, in my review of the flowchart of entities I saw a number of companies that were supposed to be sort of related to other companies, but there were numerous flowcharts with numerous setups that in some cases it appears as though they changed over time.

10:19:52

Q.  Now, did you ever look at an organizational chart in preparing these flowcharts?

A.  Yes, I looked at a number of them as I just said.

Q.  And so in looking at those organizational charts, did you come to an understanding that in 2013 within the organization Camarillo was above Backpage?

10:20:07

A.  Well, the thing is some of those organizational charts, they weren't dated, and so and maybe, some of them were, some of them were not, there was just a number of them, and I don't recall how the different entities related to other entities specifically.

10:20:26

Q.  So then is it fair to say that in preparing, for example, this chart you didn't analyze the organizational structure of the company in preparing this chart; is that right?

10:20:48

A.  No.  I specifically said I reviewed a number of organizational charts to determine the structure and it appears as though structures changed.

Q.  And in doing that, at some point did you come to the determination, did you take a look at an organizational chart

10:21:04

and realized that Camarillo was a parent company of Backpage,
or is that something you never realized?

       MR. STONE:  Objection; asked and answered.

       THE COURT:  Sustained.

BY MR. PANCHAPAKESAN:                                            10:21:15

Q.  In preparing this chart, did you make any determinations
about Backpage and Camarillo and their place within the
organizational structure?

       MR. STONE:  Same objection.

       MR. PANCHAPAKESAN:  It's a yes or no.          10:21:30

       THE COURT:  He can answer yes or no.

       THE WITNESS:  No.

BY MR. PANCHAPAKESAN:

Q.  Now, if you look at this chart, the bank account at US Bank
was held by Backpage, right, do you see that?                    10:21:45

A.  Yes, that's right.

Q.  And did you subpoena US Bank for records?

A.  I did, yeah.

Q.  And in your review of those records, did you review any
correspondence or e-mails or letters?                           10:22:02

A.  No, I didn't see any correspondence in the Backpage
records.  I don't recall them.

Q.  Okay.  So in preparing this, you didn't seek to determine
whether US Bank had, for example, objected to this transfer, is
that fair?                                                      10:22:24

A.  I don't recall.

Q.  And in review, in putting together this chart you didn't

seek to determine whether US Bank had sent out a notification

of a money laundering violation; correct?

        MR. STONE:  Objection; foundation.                    10:22:35

        THE COURT:  Sustained.

BY MR. PANCHAPAKESAN:

Q.  Why don't we take a look at Exhibit 1480, which I believe

is in evidence.  Now, sir, you testified you put together this

chart, did you personally analyze any of the advertisements    10:23:06

that are -- that form the basis of this chart?

A.  I didn't analyze any advertisements.

Q.  You just sort of added up the numbers and put in a

spreadsheet and that's what is reflected here; correct?

A.  Yes.                                                      10:23:21

Q.  So as to the reference to adult entertainment, which is the

second column in the spreadsheet, you analyzed the ads that

formed the basis for that revenue; right?

        MR. STONE:  Objection, asked and answered.

        THE COURT:  Overruled.                               10:23:52

        THE WITNESS:  I did not analyze the ads.

BY MR. PANCHAPAKESAN:

Q.  In your testimony today you're not offering an opinion or a

view about what these ads are for, is that fair?

A.  That's fair.                                             10:24:07

Q.  Okay.  Now, the time period covered by this chart it looks
like it's approximately, looks like October 2010 to
November 2012, do you see that?

A.  Yeah, I see that.

Q.  Now, this analysis, it actually predates your flowcharts in          10:24:21
1479; correct?

A.  It does, yes.

Q.  The flowcharts, I think there were a few transfers in 2013
and most of them were 2015; is that right?

A.  That's right.                                                        10:24:37

Q.  So you haven't presented an analysis about the source of ad
revenue like this as to the 2013 to 2015 time period; is that
correct?

A.  That's correct.

        MR. PANCHAPAKESAN:  Can you please show the witness              10:24:54
Exhibit 1481, which is in evidence?

BY MR. PANCHAPAKESAN:

Q.  Now, if we take a look at towards the first chart on the
top, this shows Backpage-related revenue from looks like
2013-2018; correct?                                                      10:25:16

A.  Yes.

Q.  And in preparing this analysis, did you factor in the
April 2015 sale of Backpage, did you include that in your
analysis here?

A.  Well, it's factored in in the breakdown of the revenues            10:25:31

coming from Backpage, and I include the revenues coming in from Website Tech and Ad Tech BV.

Q.  And for example, if there were loan payments made on the sale, that's not reflected here; correct?

A.  This is an analysis of revenue, so it's not an analysis of loan payments.

Q.  Okay.  Now, if you look at the second chart, income from Medalist, now, you've looked at, I think you said you've looked at Cereus Property records, you recall testifying to that?

A.  Yes.

Q.  So did you become aware in that review of Cereus Property records, did you become aware that in 2013 Medalist sold a number of newspapers, did you become aware of that?

A.  I am familiar with some of the newspaper transactions.

Q.  Are you aware then 2013 there was a $30 million sale with newspapers, are you aware of that?

A.  I don't recall the amount or the specifics relating to the newspaper sales.

Q.  In your review of Cereus Properties records, did you come to learn that there were loans involved in that sale like the Backpage sale, did you come to learn that?

A.  I don't recall.

Q.  So then in analyzing Cereus Properties' records, that's not the kind of thing you were looking at; correct?

A.  That's right, yes.

Q.  Now, are you aware then in 2013, for example, Mr. Brunst
received about $3 million from the sale of those newspapers,
are you aware of that?

A.  I'm not aware of that.

Q.  That's not something that you analyzed in looking at this
chart; right?

A.  No.

Q.  And so I take it that in preparation for your testimony the
government didn't ask you to analyze that 2013 newspaper sale,
fair?

A.  That's right.  I didn't look at the newspaper sales.

        MR. PANCHAPAKESAN:  You can take that down.  Thank
you.

BY MR. PANCHAPAKESAN:

Q.  Now, you testified a little bit about virtual currency and
bitcoin, do you recall that?

A.  Yeah, that's right.

Q.  And you testified you have a lot of experience dealing and
analyzing virtual currency, is that fair?

A.  Yeah, that's fair.

Q.  So just so we're clear, in your experience dealing with
virtual currency, as a general matter, virtual currency, it's a
lawful form of payment; right?

A.  Yeah.

Q.  In fact, in given your experience, you're aware that

virtual currency, it's currently a multibillion dollar

industry, is that fair?

A.  That's fair.

Q.  I could go to Starbucks and buy a latte, and I could

probably use virtual currency to do that, depending on the          10:28:30

location?

A.  Well, I don't know what Starbucks has been accepting as far

as currency is concerned, but if they accept bitcoin, you can

buy coffee with it, but I don't know what is going on with

Starbucks.                                                          10:28:44

Q.  And you're aware that, for example, from the 2015 to 2018

time period there were a number of major American companies

that accepted virtual currency as a form of payment, is that

fair?

          MR. STONE:  Objection; foundation.                        10:28:58

          THE COURT:  Sustained.

BY MR. PANCHAPAKESAN:

Q.  You testified you're an expert on bitcoin, have you in the

past looked at the types of companies that are accepting

bitcoin, is that something you looked at?                           10:29:11

          MR. STONE:  Objection; misstates testimony in the

question.

          THE COURT:  Sustained.  Rephrase.

BY MR. PANCHAPAKESAN:

Q.  In the course of your work dealing with virtual currency in    10:29:20

the past, have you looked at, as a general matter, the types of

companies that are accepting bitcoin as a form of payment?

A.  Yes.

Q.  Okay.  And are you generally aware of the fact that there

is a number of major American companies that have started to          10:29:35

accept virtual currency as a form of payment?

A.  Yes, I have.

Q.  And that would have been true during the 2015 to 2018 time

period; correct?

A.  Yes, that's right.                                                10:29:50

        MR. PANCHAPAKESAN:  Let's take a look at Exhibit 1545,

which is in evidence, and request that it be published.

        THE COURT:  Yes, it may be shown to the jury.

BY MR. PANCHAPAKESAN:

Q.  Now, sir, this is a chart that you testified to during your       10:30:14

direct exam.  Now, this is a chart that simply illustrates that

Backpage it looks like starting in January 2015 was accepting

virtual currency as a form of payment; correct?

A.  Yes, that's right.

Q.  Now, isn't it true that there's an uptick in the amount of        10:30:31

bitcoin being accepted, it looks like it's around October 2015,

is that fair?

A.  October.  I mean, there is multiple upticks, you know,

throughout 2015.

Q.  So if you look, so looks like the monthly transactions            10:30:49

through about June 2015 are, it's below 30,000?

A.  Yes.

Q.  And then it increases into the hundreds of thousands and then you're into the 1 to 2 million range?

A.  That's right.                                            10:31:06

Q.  Now, with the April 2015 sale as sort of a guiding line, isn't it true that the uptick you see starting in July 2015, that's after April 2015, right after the sale; correct?

A.  Sure, yeah.

Q.  Now, is this reference to, it looks like -- does this     10:31:24
reflect some sort of bitcoin wallet or something, or is this just acceptance of payment?

A.  It's not a bitcoin wallet.  It's the amount of transfers from GoCoin to Website Technologies.

Q.  And GoCoin, is that something called a bitcoin wallet, is   10:31:48
that fair?

A.  No.  It's a company that serves as a bitcoin exchanger.

Q.  And --

A.  Digital currency exchanger broadly.

Q.  And you're not testifying that any of the defendants had   10:32:03
any role with respect to that GoCoin exchange, correct, it's not part of your testimony?

        MR. STONE:  Objection; vague.

        THE COURT:  Sustained.

BY MR. PANCHAPAKESAN:                                        10:32:16

Q.  Well, you just testified that GoCoin is a virtual currency
exchange, do I have that right?

A.  I refer to it as digital currency exchange, but yes.

Q.  I will use your terminology.  Then you testified GoCoin is
a digital currency exchange, and I take it that they convert
digital currency into U.S. dollars; is that right?

A.  Yeah, it's a Fiat currency that could include U.S. dollars
or euros.

Q.  You're not testifying that any of the defendants played any
role in that exchange of bitcoin into dollars.  I didn't hear
you testify to that, is that fair?

A.  No, I am not.

Q.  Okay.

        MR. PANCHAPAKESAN:  I have no more questions, Your
Honor.

        Thank you for your time.

        THE COURT:  All right.  I was going to go until about
five more minutes, but I think we're at a natural breaking
point for our morning recess.  And so why don't we take that
now.  I will admonish the members of the jury again just to
continue to keep an open mind not to discuss the case amongst
yourselves or anyone else.  Just simply enjoy your break.  Be
ready to come in, I would say in the 20-minute time frame, so
that would put us about five to the hour, I guess.

        So please all rise for the jury.

        (Jury left courtroom at 10:34 a.m.)

        THE COURT:  All right.  We will stand in recess.

     (Proceedings reconvened at 10:55 a.m.)

        THE COURT:  Is someone else going to cross-examine?

Mr. Cambria.                                                                    10:55:21

        (Jury is present at 10:57 a.m.)

        THE COURT:  Please be seated.  Record will reflect the

presence of the jury.  The witness is on the stand.

        Mr. Cambria, you may proceed.

        MR. CAMBRIA:  Thank you.                                          10:58:04

                  CROSS-EXAMINATION

BY MR. CAMBRIA:

Q.  Good morning.

A.  Good morning.

Q.  In preparation for your testimony you reviewed a number of     10:58:07

bank records?

A.  A lot, yes.

Q.  And you traced money from one account to another account?

A.  Yes, that's right.

Q.  And you found that the bank records contain the appropriate    10:58:22

and accurate names of the individuals?

A.  Yes.

Q.  And addresses?

A.  Well, I didn't scrutinize the addresses.

Q.  But in any event, it appeared that the bank records were       10:58:39

the normal ordinary bank records in the names of the

individuals that held the funds in the various accounts;

correct?

A.  Yes.

Q.  All right.  Do you know what an FBAR is?          10:58:52

A.  I do.  I am familiar with it.

Q.  What is an FBAR?  Hang on one second, please.  My ears

here.  There you go.  What is an FBAR?

A.  It's a Foreign Bank Account Report.

Q.  What's its purpose?                               10:59:11

A.  To report the existence of a foreign bank account by the

owner of it.

Q.  And where is it filed?

A.  Based on my best recollection, I believe it's filed with

the IRS.                                              10:59:25

Q.  How about the Department of Treasury?

A.  The Department of Treasury under FinCEN, I believe.

Q.  What is FinCEN?

A.  FinCEN, I forget what the acronym stands for, but it's a

part of the Department of Treasury that, you know, oversees   10:59:44

banking-related matters, I believe.  I am not sure.

Q.  A part of the treasury department that deals with financial

crimes?

A.  Yes, I think that's part of their mandate, but I am not an

expert in what FinCEN does.                          11:00:08

Q.  Okay.  So if someone has a bank account or an investment
account, any kind of account, if you will, outside the borders
of the United States, they are obligated to file one of these
FBAR reports, are they not?

A.  Yes, that's right.                                          11:00:26

Q.  All right.  And in this case you indicated in one of the
exhibits here a flow, if you will, of money from Mr. Lacey to
his attorney, do you recall that?

A.  Yes, that's right.

Q.  And you talked about the IOLTA account of the attorney?    11:00:45

A.  Yes, that's right.

Q.  That's just a trust account, isn't it?  In other words, the
lawyer has to hold that money for purposes of their client in
trust?

        MR. STONE:  Object.  Objection; foundation.            11:01:02

        THE COURT:  Sustained.

BY MR. CAMBRIA:

Q.  Do you know?

A.  I am not an expert in IOLTA accounts.

Q.  Okay.  Do you know generally what they are?                11:01:13

A.  I mean, I know generally how they function.

Q.  What's that?

A.  That, you know, that it's an account held in the name of a
client, and you know --

Q.  By an attorney?                                            11:01:41

A.  By an attorney, yeah.

Q.  Okay.  And so you saw a flow of money here from Mr. Lacey to his attorney's IOLTA account, correct, the Becker, the attorney Mr. Becker?

A.  Yes, that's right.                                                    11:01:59

Q.  And then in your tracing you show that the attorney consolidates a number of deposits that are in his account and then he sends the money where?

A.  He sends it to a bank in Hungary.  Yeah, that's right.

Q.  Okay.  And so then did you logically search to determine     11:02:24 whether or not an FBAR report had been filed about that account?

A.  I did not search for an FBAR at the time.

Q.  You say at the time, at any time?

A.  No, I did not search for an FBAR at any time.               11:02:45

Q.  Do you know one exists for that account?

A.  Well, I understand now that one exists for that account.

Q.  Why wasn't that in your flowchart to tell the jurors that the money went from Mr. Lacey to his attorney in his attorney's account and then it went from his attorney's account to this     11:03:13 investment, and then there was a specific report to the Department of the Treasury regarding that investment?  Why would you leave that out?

        MR. STONE:  Objection; compound.

        THE COURT:  Sustained.                                 11:03:27

BY MR. CAMBRIA:

Q.  Why would you leave out the FBAR being filed with regard to that account?

A.  I just recently learned about the existence of the FBAR.

Q.  Did you learn about it before you got up here to testify?          11:03:37

A.  Yes, I did.

Q.  Okay.  So you had the opportunity then with the knowledge to tell this jury the end result of that investment, did you not?

A.  I don't have the details relating to the FBAR.          11:03:51

Q.  All you need, well, you could have found that out, could you not?

A.  Well, I am no longer working for the Federal government so I don't have access to those resources.

Q.  So it was an unimportant fact, is that the way you treated          11:04:04
it?

A.  I don't know if I qualify it as unimportant.

Q.  Well, wouldn't you agree that if you were going to give these ladies and gentlemen in the jury a full picture of the flow of this money, that you would show it went from Lacey to          11:04:28
Lacey's lawyer, from Lacey's lawyer to Hungary, and then there was a specific report to the Department of Treasury that it existed?

          MR. STONE:  Objection; compound.

          THE COURT:  Overruled.          11:04:47

UNITED STATES DISTRICT COURT

          THE WITNESS:  I did not know about the details of the

FBAR, so --

BY MR. CAMBRIA:

Q.  Because you never accessed it; correct?

A.  Yes, that's right.                                          11:04:56

Q.  You knew it existed and you could have accessed it;

correct?

A.  No, I couldn't have accessed it with the current resources

I have as a private citizen.

Q.  How about asking them, the government?                      11:05:08

A.  I didn't know that that was a possibility.

          THE COURT:  Ask your next question.

BY MR. CAMBRIA:

Q.  You didn't know that you could ask them for any kind of

document that you discovered existed that dealt with the flow   11:05:25

of that money?

A.  No, I didn't know.  I am a private citizen now.  I felt

like my resources were restricted.

Q.  Well, they weren't restricted for everything you testified

to with regard to the government, were they?                    11:05:44

A.  Well, I prepared those documents before I left law

enforcement.

Q.  Would you consider it fair to present the complete picture

to the jury of the flow of that money and the report of it to

the Department of the Treasury?                                 11:06:04

            MR. STONE:  Objection; asked and answered.

            THE COURT:  Sustained.

            MR. CAMBRIA:  I never asked that question before, Your

Honor, how could it be asked and answered?

            THE COURT:  I sustained the objection.                    11:06:17

BY MR. CAMBRIA:

Q.  Okay.  In any event, you knew that there was an FBAR, you

took no steps to find it and if you would have found it you

could have described to the jurors what it contained; correct?

A.  I could have if it was relevant and had I assessed that it    11:06:35

was relevant.

Q.  Okay.  Well, you're not the one making the strategic

decisions in this case, are you?

A.  I just report what I know.

Q.  Okay.  An FBAR would contain, would it not, where the money  11:06:53

went, true?

A.  I don't recall the details of what are on FBARs.

Q.  Well, the idea of an FBAR is to fully disclose to the

United States Government, to the Department of the Treasury,

any kind of foreign so-called investment, is it not?          11:07:15

            MR. STONE:  Objection; foundation.

BY MR. CAMBRIA:

Q.  Do you know?

            THE COURT:  Well, I will sustain the objection and you

can lay some foundation.                                      11:07:25

BY MR. CAMBRIA:

Q.  Do you know what the purpose of an FBAR is?

A.  I -- yes, I do.  I know about it generally from my class that I took 12 years ago in FLETC, the Federal Law Enforcement Training Center.

11:07:48

Q.  What do you know about it generally?

A.  I just know that it's something as an investigator we check to make sure that the subjects of our investigation have or don't have income from overseas or assets overseas.

Q.  Would you consider yourself an investigator in this case?

11:08:02

A.  I was at one point an investigator.  I am no longer an investigator.

Q.  So as soon as the paycheck stops, you stop, is that basically what you're saying?

        MR. STONE:  Objection; argumentative.

11:08:17

        THE COURT:  Well, sustained.

BY MR. CAMBRIA:

Q.  Well, long story short here, that's a document you know existed with regard to this account and you never mentioned it until I asked you about it; correct?

11:08:33

A.  Well, I only knew that an FBAR existed, but I did not know how it related to the investigation as a whole.

Q.  Well, if an FBAR existed as to an account that you've been investigating, it would be relevant, wouldn't it, to see what it said and what it had in it?

11:08:52

A.  Can you ask that again, sir?

      MR. CAMBRIA:  Would you mind reading that back, please.

      (Record read.)

      THE WITNESS:  I would be curious as to the relevance, yes.

BY MR. CAMBRIA:

Q.  But it turned out that you weren't curious because you didn't follow it through, did you?

A.  I did not, no.

      MR. CAMBRIA:  That's all.

      THE COURT:  Ms. Bertrand.

      MS. BERTRAND:  Nothing, Your Honor.  Thank you.

      THE COURT:  Mr. Eisenberg.

      MR. EISENBERG:  Nothing, Your Honor.

      THE COURT:  Mr. Kessler.

      MR. KESSLER:  No, Your Honor.

      THE COURT:  All right.  Mr. Stone.

           REDIRECT EXAMINATION

BY MR. STONE:

Q.  All right, sir, you were just asked a number of questions about an FBAR, fair?

A.  Yes, that's right.

Q.  Have you dealt with FBARs in previous investigations?

A.  Oh, I have, yes.

Q.  Generally, well, how many investigations?

A.  Oh, at least one, but I think I recall FBARs in two
additional ones that I can think of, yeah.

Q.  The one that you're thinking about, how did it come up?

A.  I was looking into the subject for the possibility of a tax                    11:10:54
evasion charge, and the subject had an FBAR --

Q.  Let me stop you there.  Had an FBAR, what does that mean?

A.  It looks like she may have filed an FBAR.

Q.  So the subject filed an FBAR, go on?

A.  For an account overseas, yes.                                                   11:11:19

Q.  Did that impact your investigation?

A.  It did, yeah.  I used it as a starting point because she
was hiding a significant amount of income that she was
generating and the FBAR did not cover the amount of money that
she was hiding because she also evaded taxes through the use of                    11:11:43
funneling her revenue through her credit cards, which she then
used overseas, effectively creating her credit cards would be,
you know, international bank accounts.

Q.  Was the individual ultimately prosecuted?

A.  Yes.                                                                            11:12:03

Q.  Even though she filed an FBAR?

A.  Yes.

Q.  All right.  I am going to show you what has been admitted
as Exhibit 1545.

        MR. STONE:  Ask to publish.                                                11:12:28

THE COURT:  Yes, it may be published.

BY MR. STONE:

Q.  Mr. Panchapakesan asked you a few questions about this exhibit, do you remember that?

A.  Yes.

Q.  I think he asked you about this sale of Backpage in April of 2015?

A.  Yes.

Q.  And looking at this, well, first off, what is this, quickly, what does this exhibit depict?

A.  Oh, it shows transfers of, you know, sort of conversions of digital currency to cash and those conversions deposited into a Website Tech's bank account.

Q.  There's a big jump not in April of 2015 but in July and August 2015, fair?

A.  That's right, yes.

Q.  Do you have an understanding of what was occurring with Backpage's business in July and August 20th --

MR. PANCHAPAKESAN:  It's been asked and answered on direct.

THE COURT:  Overruled.

THE WITNESS:  Around that time is when credit card companies no longer accepted credit card payments for Backpage transactions.

BY MR. STONE:

UNITED STATES DISTRICT COURT

Q.  In your review of the records, was it more the credit card
issues Backpage was happening -- that Backpage was experiencing
rather than any sale of the business that caused this uptick?

      MR. PANCHAPAKESAN:  Leading, Your Honor.

      THE COURT:  What was the objection?          11:14:08

      MR. PANCHAPAKESAN:  Leading.

      THE COURT:  Sustained.

BY MR. STONE:

Q.  So April 2015 there was a sale; correct?

A.  Yes.          11:14:16

Q.  July and August 2015 there's a jump in revenue?

A.  Yes.

Q.  And that related to what based on your review of the
records?

      MR. PANCHAPAKESAN:  Lacks foundation.          11:14:25

      THE COURT:  Overruled.

      THE WITNESS:  It was based upon the, you know, the
credit card companies no longer accepting credit card
transactions for Backpage, Backpage purchases and transactions.

BY MR. STONE:          11:14:51

Q.  Showing you what's admitted as Exhibit 1479.  There were
some questions from Mr. Panchapakesan about this page of the
flowchart; correct?

A.  Yes.

Q.  Just blow it up a little bit.  And your testimony was          11:15:08

something to the effect of, besides this money being

transferred from one bank account to the other, you don't have

any understanding of why it was transferred?

A.  Yeah, that's correct.

Q.  Mr. Panchapakesan asked you some questions about getting          11:15:28

into the defendants' heads or something like that?

          MR. PANCHAPAKESAN:  Argumentative.

          THE COURT:  Overruled.

BY MR. STONE:

Q.  Do you remember that -- do you remember him asking                11:15:38

questions about that?

A.  I think so, yeah.

Q.  But how you couldn't get into defendants' heads to

understand why something was done in terms of money transfers?

A.  That's correct, yeah, that's what I recall.                      11:15:49

Q.  That wasn't what you were asked to do, fair?

A.  Oh, yeah, no, I wasn't -- I wasn't asked to get in the

heads of the individuals.

Q.  Rather, what were you asked to do?

A.  I was asked to trace the funds from source to destination.       11:16:02

Q.  And whether those funds were, well, strike that.

          Your testimony is that all the funds that are shown on

this flowchart derive from where?

A.  From Backpage.com.

Q.  This is the next page, Cereus Properties, and the bank           11:16:30

there is Arizona Bank & Trust; correct?

A.  Yes, that's right.

Q.  Your understanding is that's an Arizona bank?

A.  Yes, that's my understanding.

Q.  Mr. Cambria asked you a few questions about this                    11:16:54

transaction or about this page and these transactions; right?

A.  Yes, that's right.

Q.  This specifically was a transaction in Counts 99 and 100

that went from a Johnson Bank, the IOLTA account, to a Primus

Trust Company in Hungary; correct?                                     11:17:13

A.  Yes, that's right.

Q.  And do you have an understanding if Johnson Bank has a

branch here in Arizona?

A.  Yes, I do.  I believe it's in Scottsdale.

Q.  Showing you what has been admitted as Exhibit 1481, and           11:17:38

there were some questions from Mr. Panchapakesan about this

part of Exhibit 1481; correct?

A.  Yes, that's right.

Q.  Did you analyze the money that's listed here for years

2013, 2014 and 2015?                                                  11:18:01

        MR. PANCHAPAKESAN:  Vague as to analyze.

        THE COURT:  I can't hear you.

        MR. PANCHAPAKESAN:  Vague as to analyze.

        THE COURT:  Sustained.

BY MR. STONE:                                                          11:18:09

Q.  Did you -- you prepared this document; correct?

A.  I did, yes.

Q.  When you prepared this document, did you review where this income came from?

A.  I did, yes.                                                           11:18:20

Q.  Do you have an understanding of where the majority of this income came from?

A.  I do, yes.

Q.  Where?

A.  Backpage.com.                                                        11:18:30

Q.  And when I say "majority," is that vast majority?

        MR. PANCHAPAKESAN:  Objection; lacks foundation.

        THE COURT:  Well, sustained.  You can lay some foundation.

        MR. STONE:  Thank you, Your Honor.                              11:18:45

BY MR. STONE:

Q.  When you say "majority," can you give a sense for what that means?

A.  Well, would it make sense for me to walk you through my logic for what I have done to that?                                     11:18:56

Q.  I don't think that's necessary, but you already testified that -- you can, if you would like to -- but you've already testified that the majority of this came from Backpage, and I want to get a sense for what that means.

A.  Well, what I did was I reviewed K-1, which are ownership            11:19:10

documents, and K-1 documents show ownership in income, and I also reviewed W-2s, which are employment income documents. When I reviewed those, they traced back to businesses and accounts that draw their income primarily from the Backpage.com website.

Q.  Thank you.

      MR. STONE:  No further questions, Your Honor.

      MR. CAMBRIA:  Your Honor, can I have recross on the new subject about the lady who didn't pay her taxes and clarify that?

      THE COURT:  Yes, limited to that.

RECROSS-EXAMINATION

BY MR. CAMBRIA:

Q.  Your example you gave us of your prior experience with the lady who didn't pay her taxes, do you recall that?

A.  Yes.

Q.  What happened is the FBAR gave you the information that she had an account overseas and how much money that was in there, and it was in her name and so on; correct?

A.  Yes.

Q.  It revealed that information, did it?

A.  Yes.

Q.  Right.  And then you used that to show that she didn't claim that money on her tax return in the United States and, therefore, she was charged with tax evasion; correct?

A.  No.  The case wasn't that simple, and I don't -- I recall
that the FBAR in and of itself was inaccurate after a more
thorough analysis.  So the FBAR existed.  I reviewed the FBAR
and I looked at additional income she was making, and I looked
at her activity relating to other bank accounts, and even then    11:21:05
I recall after an international request that she had
significantly more income or more assets held overseas than
what was revealed in the FBAR.

Q.  Okay.  But the FBAR helped you to get in the right
direction; in other words, it disclosed information about her    11:21:27
income that was not consistent with what she claimed; correct?

A.  Yes, that's right.

Q.  All right.  So it revealed as opposed to concealed
information, true?

A.  Well, it revealed some information.                           11:21:45

Q.  And that information you used or somebody used to prosecute
her for not paying her taxes; correct?

A.  Well, that information was used to help support my
analysis, and in the prosecution was broadly for false, filing
false tax returns.                                               11:22:12

Q.  But the bottom line is because the FBAR included, included
information about her financial transactions, you used that to
help your prosecution, correct 'cause it revealed information?

A.  Well, I can't recall exactly, but it revealed -- it
revealed inaccurate information.                                 11:22:37

Q.  But it still revealed information which you used or
somebody used to prosecute her?

        MR. STONE:  Objection; it's been asked and answered.

        THE COURT:  Sustained.

BY MR. CAMBRIA:                                          11:22:49

Q.  It revealed information, did it not?

        MR. STONE:  Same objection.

        THE COURT:  Sustained.

BY MR. CAMBRIA:

Q.  Did you use any information that was in the FBAR in     11:22:55
connection with eventually prosecuting her?

A.  At the end of the investigation I -- it wasn't necessary to
prosecute her.  She pled out.

Q.  Okay.  But you used that information to get her to the
point where she took the plea; right?  Let's put it this way --  11:23:17

A.  No.  No.

Q.  -- it supplied information, did it not, which you used or
somebody used?

A.  I think I recall that we didn't reveal the information
relating to the international accounts because she -- in     11:23:33
preparation for a possible trial in the event that she wouldn't
go through with her plea, so --

        THE COURT:  All right.  I think we are getting far
field, Mr. Cambria.

        MR. CAMBRIA:  All right.  Thank you.          11:23:50

THE COURT:  All right.  Is the witness excused from subpoena?

MR. STONE:  Yes, Your Honor.

THE COURT:  Any objection from defense?

MR. PANCHAPAKESAN:  No objection.                    11:23:59

THE COURT:  Sir, thank you for your testimony.  You're excused from subpoena.  You may step down.

Please call your next witness.

MS. PERLMETER:  The United States called Astrid Cervantes.                                           11:24:12

MR. BERRY:  Looks like Ms. Cervantes has gone to the restroom.  We can swap out.  I can do a different witness.

THE COURT:  That's fine.  Do you have another witness ready to go?  Who is that?

MR. BERRY:  United States called Naiomy Figueroa.   11:24:39

So our jurors are aware and counsel, we are going to go through 12:15 and we will take our hour lunch since we start a little bit late.

NAIOMY FIGUEROA,

(Witness sworn.)                                     11:25:23

DIRECT EXAMINATION

BY MR. BERRY:

Q.  Good morning, Naiomy.

A.  Good morning, Austin.

Q.  Would you please state your name for the record?  11:25:59

A.  Naiomy Figueroa.

Q.  Would you please spell for the jury your first name?

A.  N-A-I-O-M-Y.

Q.  Great.  Would you please spell for the jury your last name?

A.  F-I-G-U-E-R-O-A.                                    11:26:15

Q.  How old are you, Naiomy?

A.  I am 25 years old.

Q.  Do you have any children?

A.  Yes, I have three children.

Q.  And what are their ages?                            11:26:26

A.  I have a seven-year-old daughter, a two-year-old son and a
one-year-old daughter.

Q.  Do you work outside the home?

A.  No, I do not.

Q.  Are you married?                                    11:26:37

A.  No.

Q.  Are you in a long-term relationship?

A.  Yes, I am.

Q.  Has your partner traveled with you to Phoenix for this
occasion?                                               11:26:47

A.  Yes, he did.

Q.  What state do you live in?

A.  Massachusetts.

Q.  Do you know what Backpage.com is?

A.  Yes, I do.                                          11:26:57

Q.  When did you first become aware of Backpage?

A.  Approximately 2014.

Q.  How did you become aware of what Backpage was?

A.  I became aware when I seen my pimps use it to post my ads.

Q.  So you're saying that you were posted on Backpage?

A.  Yes.  Correct.

Q.  Okay.  What is Backpage to your understanding?

A.  To my understanding, Backpage is a website that is used for multiple things, but it was known for girls to use it to escort and to get trafficked.

Q.  And when you use the word "escort," what do you mean by that?

A.  I mean to exchange a sexual act for money or a gift.

Q.  And you mentioned that you were advertised on Backpage; correct?

A.  Correct.

Q.  What year or years were you advertised on Backpage?

A.  2014, I believe.

Q.  Were you -- where was your ad posted, what section on Backpage?

A.  It was posted on the escort section.

Q.  Were you involved with creating the ad?

A.  No, I never posted my own ads.

Q.  Who posted it of you?

A.  My pimps, Andy Pena, Hansel German, Enoc Ayuso, and Rafael.

Q.  Did you ever have an opportunity to see what your ad looked
like?

A.  Yes, I have's seen some of my ads.

Q.  When you mentioned that the escort was the exchange of sex
acts for money; correct?

A.  Correct.

Q.  Were you advertised in exchange for sex acts for money?

A.  Yes.

Q.  Were -- did those sex acts involve the use of condoms?

A.  Yes.

Q.  And what states were you advertised on Backpage?

A.  I can't remember every single one off of top of my head,
but I do know the fact it was Massachusetts, Maine, New
Hampshire and I believe New York.

Q.  And why were your ads posted on Backpage?

A.  So my pimps could make money off of me.

Q.  So you mentioned, you said that you were not involved with
the creation of the ad, do you know how they paid for the ad?

A.  Yes, I was seeing my pimps purchase one vanilla cards from
convenience stores or 7-Eleven.

Q.  So vanilla cards?

A.  Yes.

Q.  And you said that you did see your ads from time to time;
correct?

A.  Yes, I would see them when they were working on them.

Q.  Do you remember the types of words that they would use in your ads?

A.  Yes.

Q.  Could you explain to the jury just a few of those words that you recall?

11:30:47

A.  I remember "fetish friendly" and like "satisfying your cravings."

Q.  Okay.  Did you have an understanding as to why those words were used in relation to your ads?

A.  Yes, it was a way to like reel in more customers.

11:31:13

Q.  What kind of photos were used of you?

A.  Basically nude photos.

Q.  Completely nude?

A.  No, not completely nude.

Q.  Can you describe for the jury as best you can?

11:31:31

A.  Sometimes I would have lingerie or like pantyhose or some form of lingerie.

Q.  And what type of poses were you doing in those ads?

A.  Seductive poses.

Q.  How did you know what poses to do?

11:31:53

A.  Because my pimps would tell me what I had to do.

Q.  Where would the photos be taken?

A.  Mostly like in a hotel room or a hotel bathroom.

Q.  And who paid for those hotel rooms?

A.  It depended on which pimp was with me at the time, but for

11:32:14

the most part it was Andy Pena.

Q.  But always one of the pimps?

A.  Yes.

Q.  Never you?

A.  No, I wasn't old enough to get my own.                    11:32:26

Q.  Why were those kinds of photos that you said seductive

photos, seductive poses in lingerie, why were those kinds of

photos used in your ad?

A.  Because it would reel in more clients.

Q.  What name was used to advertise you?             11:32:51

A.  Emily.

Q.  Why was your real name not used?

A.  I guess so nobody would be aware that it was me.

Q.  After the ad was created and posted on Backpage, what would

happen next?                                                  11:33:16

A.  I started getting a lot of phone calls.

Q.  What about text messages?

A.  Yes, text messages too.

Q.  Who handled the calls?

A.  For the most part I handled the calls and my pimps would   11:33:29

handle the text messages.

Q.  Why -- why were you handling the calls and them the texts?

A.  Because it needed to be a female's voice on the phone.

Q.  And why was that?

A.  Because it would probably scare the johns away.           11:33:44

UNITED STATES DISTRICT COURT

Q.  Okay.  How soon after the ad posted would your phone start
to ring?

A.  It always changed, but usually within minutes.

Q.  When you say "minutes," can you give us an idea?

A.  Five, ten minutes.                                          11:34:07

Q.  At some point after you said phone starts ringing within
five to ten minutes, at some point did the calls taper off?

A.  Yes, they do.

Q.  What would you all do then?

A.  They would post another ad to get me on the top of the list   11:34:26
so that the calls keep coming in.

Q.  When you received these calls in response to the ad they
posted of you, help the jury understand just what does a
typical conversation go like there?

        MS. BERTRAND:  Objection, Your Honor, relevance, 403.    11:34:55

        THE COURT:  Overruled.  You may answer.

BY MR. BERRY:

Q.  You can answer.

A.  Sorry, can you repeat the question?

Q.  Yes.  Just a second.  When the call would come in, you said   11:35:04
you would answer the calls; correct?

A.  Correct.

Q.  Phone starts ringing, you take the calls; right?

A.  Yes.

Q.  Explain to the jury how a typical call goes.  I am not        11:35:14

asking you to remember verbatim every single call you ever had,

but just generally, how did this call go?

A.  So for every single call, first rule was to ask them if

they were affiliated with any type of law enforcement before

the conversation started, and then after that they would ask          11:35:30

like about my services, what the rates were, and, you know, if

they wanted to make an appointment or whatever, they would

just, you know, book the appointment.

Q.  Would they ask about your rates?

A.  They would -- sorry, what was that?                                11:35:47

Q.  Would they ask about the rates?

A.  Yes, they would.

Q.  What do you mean by that?

A.  Basically they would ask me like what are the prices per

hour or every half hour.                                               11:35:57

Q.  And is that the two typical time frames, hour or half hour?

A.  For the most part.

Q.  Are you okay?

A.  Yeah.

Q.  What is wrong?                                                     11:36:07

A.  My poppy popped.  It's like all over me.

        MR. BERRY:  Can we take a break?

        THE COURT:  There is some napkins or Kleenexes there.

I don't know if that will work for you.  Is there a trash can

beneath you?  Do you need additional paper towels or anything?        11:36:27

MR. BERRY:  Can she take a break?

THE COURT:  No, that's okay.  That's fine.  All right.
Let's have just about five-minute.  I don't know where the
closest restroom is.  Okay.  Ten minutes of a break.

Members of the jury, if you wish to retire to the jury      11:36:57
deliberation room, you may do so.  Why don't you do that.
Please all rise for the jury.

(Jury left the courtroom at 11:37 a.m.)

MR. BERRY:  Your Honor, with the jury outside the
presence, I want to note for the record what has just happened,   11:37:47
which is the witness is very nervous.  I told her she could
have something to fidget with her hands to keep her sort of
mind occupied or focused.  I don't know what she took up there.
It was some kind of an item that apparently exploded and gel
went everywhere on the floor.  It was all over her hands, and    11:38:06
that's why we have taken a break.

THE COURT:  I did see that she was juggling something
back and forth in her hands that looked like a ball or a small
toy, and so I did recognize that.  I thought it was a stuffed
animal of some sort.                                             11:38:22

MR. LINCENBERG:  Your Honor, while we have a break,
we'd like to note, I think the Court is aware it's a continuing
objection to the testimony designed to bring out discussion of
trafficking, which just occurred here again, designed to bring
out that the person was underage.  There's a pattern asking:    11:38:40

UNITED STATES DISTRICT COURT

How old are you today?  When were you trafficked?  So it all conjures up in the image of the jurors that the person was underage at the time.

Even ostensibly this discussion about how many children the person has seems to, you know, conjure up the image of whether these were kids from some spouse versus somebody that they slept with as a prostitute --

THE COURT:  Oh, no --

MR. LINCENBERG:  Hold on.  Hold on.

THE COURT:  No.  No.  No.  No.  You're getting far field with that type of argument, Mr. Lincenberg.

MR. LINCENBERG:  Let me finish.

THE COURT:  It's an improper characterization of the witness, which you should not be opining on with regard to that particular question and answer.

MR. LINCENBERG:  I am not going to ask her that question or answer.  I am just concerned about the speculation and what the relevance of it is.  First two points are more obvious.  As I noted, the third one is less obvious, but it's a concern, and I just wanted to note for the record the continuing objection.

THE COURT:  It's noted.  I've only heard her mention the word "trafficked" once, and I've only heard her testify that she was not old enough to pay for her ads, and I think the jury can do the math as all of us can with regard to these

witnesses and their age today and the time that they were
posted.  There's nothing that we can do about that.  They are
the facts.

And so your objection, however, your continuing
objection is noted.

11:40:19

All right.  Let's check on Ms. Figueroa.

MS. BERTRAND:  When Mr. Berry gets back, I have
another comment.  Your Honor, two-fold.  Actually, first, I
just wanted, and I made a 403 objection, I have some concerns
with this line of questioning that we're getting into the day

11:44:42

in the life, and that's a concern, but also I'd like to note,
and we already have her on the stand, I didn't have time to
object.  The United States sent us an e-mail yesterday
10:54 a.m. giving us the witness lineup for today.  Ms.
Figueroa wasn't on it, so we were scrambling to address this.

11:45:01

They had told us Ms. Figueroa was going to go, then they moved
her, so I'm just noting this is an ongoing issue and I am
making a record about it.

THE COURT:  I think we discussed about this morning,
so I am aware.

11:45:16

MS. BERTRAND:  Okay.

THE COURT:  I don't see at this juncture that we are
getting into anything related to the day in the life, so but
your objection is noted.  Let's bring her in.  As well, bring
the jury back.

11:45:30

Ma'am, you may resume your seat.

And rise for the jury, please.

(Jury is present at 11:46 a.m.)

THE COURT:  All right.  Please be seated.  Record will reflect the jury has returned.  Our witness is on the stand.

And you may proceed, Mr. Berry.

MR. BERRY:  Thank you, Your Honor.

BY MR. BERRY:

Q.  Thank you.  We are back, Naiomy.  Are you nervous?

A.  Yes, I am.

Q.  Is this a difficult topic to talk about?

A.  Yes.

Q.  When just before we broke we were talking about the rates being discussed on the phone, and you said we talked about hour and half hour; is that correct?

A.  Yes.

Q.  Are those the increments, the amount of time that would be discussed?

A.  Majority of the times, yes.

Q.  When you would have these phone calls with these potential clients, were you cautious about what you said on the phone?

A.  Yes.

Q.  Explain that to the jury.

A.  Like I had stated previously, you had to always ask if they were affiliated with any type of law enforcement, but you still

had to like be careful and use certain words like "roses" for money and stuff.

Q.  Where did most of these dates take place?

A.  Usually in a hotel room.

Q.  And when the individual got there to your hotel room, what's the first thing that would happen?

A.  We would have to ask them to touch us like somewhere like in the private parts to confirm that they were not a cop.

Q.  How long would you typically spend with an individual?

A.  Usually like half an hour, an hour.

Q.  And you mentioned earlier that during this hour, half hour, sex acts would occur?

A.  Yes.

Q.  And without getting graphic or detailed about what those acts were, do those acts always involve a condom?

A.  For the most part.

Q.  What percentage of the time would you say there was a condom versus not?

        MS. BERTRAND:  Your Honor, objection; relevance.

        THE COURT:  Sustained.

        MR. BERRY:  Your Honor, may I have a sidebar very briefly?

        THE COURT:  Very briefly.

(Sidebar)

        THE COURT:  Can I just mention, previously the court

reporters have alerted me to this concern, if there is side
conversations in the background that are going on, that it
makes it very difficult, so one at a time, okay?

MR. BERRY:  Your Honor, the issue with asking her
about condoms is because we want to be able to articulate for
the jury that these were sex acts that would qualify for the
prostitution act.  The defense has cross-examined several of
our witnesses about what constitutes a sex act.  For example,
stripping nude, not actually touching genitals, things like
that.  This is a person that's very nervous about testifying.
I don't think I have to ask her, "Did your genitals touch each
other," and get really graphic and gross with her.  It makes
her very uncomfortable.  If I simply ask her, "Was a condom
used, and what percentage of the time," the jury can make the
inference that condoms are used for largely one thing and one
thing only.

THE COURT:  You already asked the question previously
before we had the break.

MR. BERRY:  She now said it's not a hundred percent of
the time, so I wanted to clarify what percentage because now
that becomes relevant whether it was 50 percent, 20 percent or
90 percent.

MS. BERTRAND:  I don't see how any of this is relevant
as to whether or not any of the allegations set forth in the
counts of the indictment occurred and qualify as criminal acts.

This is a backdoor way to get in the day in the life and all kinds of other more details that have nothing to do with whether or not any of these defendants joined in a conspiracy to violate the Travel Act.  That's all this is.  And the fact that she's nervous is all the more reason to make this swift, but this is not a relevant line of questioning.

11:51:07

        MR. BERRY:  It's the opposite.  That's what I am trying to establish.

        THE COURT:  Well, the alternative is if Mr. Berry asks her, "Did you engage in sexual intercourse?  What amount of time was that?  Did you have oral sex?  Did you perform oral sex?"  So he either can ask the percentage of time used with a condom, or he can ask those two questions, and so that's how I will permit it to go forward.  All right.

11:51:25

(The following proceedings occurred in open court:)

11:51:48

BY MR. BERRY:

Q.  Okay.  Let's try this again.  You said a condom was used a vast majority or a majority of the time?

A.  Yes.

Q.  What percentage would you say a condom was used during the sex acts?

11:52:12

A.  About 90 percent.

Q.  When would the money change hands?

A.  Before the sexual act.

Q.  And then after the sex act occurred, what would happen

11:52:32

next?

A.   They would go.

Q.   Okay.  And what would you do with the money?

A.   I would hand it over to my pimps.

Q.   How much were you allowed to keep?                          11:52:49

A.   Nothing.

Q.   In February of 2014, did someone respond to your ad that

turned out to be a cop?

A.   Yes.

Q.   Where were you?                                             11:53:05

A.   I was in Salem, New Hampshire at the La Quinta Inn.

Q.   That's fine.  Thank you.  How long had you been there at

that particular motel?

A.   I can't say exactly how long, but I know it was no more

than a week.                                                    11:53:23

Q.   And you mentioned this Andy Pena, was he there with you?

A.   Yes, he was.

Q.   You said you were in different states, Massachusetts, New

Hampshire, New York?

A.   Yes.                                                       11:53:40

Q.   Who drove you from those locations?

A.   It always changed depending which pimp was with me, but for

the most part it was Andy Pena.

Q.   After this incident in February of 2014, were you ever

advertised on Backpage again?                                   11:53:58

A.  No.

Q.  After this incident in February of 2014, how much money did Andy Pena make off of you?

A.  Zero dollars.

Q.  After this incident in February 2014, how much money did Backpage make off of your advertisements?                    11:54:10

A.  Nothing.

        MS. BERTRAND:  Objection; calls for speculation.

        THE COURT:  Sustained.

BY MR. BERRY:                                                   11:54:22

Q.  No more ads were posted?

A.  No.

Q.  Are you familiar with the word "in-call"?

A.  Yes, ma'am [sic].

Q.  Explain that to the jury.                                   11:54:30

A.  In-call is when a john comes to you.

        MR. BERRY:  All right.  I'm going to -- so I'm going to show for the witness what's already in evidence as government's Exhibit 214.

BY MR. BERRY:                                                   11:54:49

Q.  Do you recognize this, Naiomy?

A.  Yes.

Q.  What is it?

A.  It's one of my ads.

Q.  And now I've zoomed in on the heading of it, would you     11:55:06

please read that for the jury?

A.   "Puerto Rican Mami in Walpole area in-calls 19."

Q.   What was the date on that?

A.   Wednesday, January 29, 2014.

Q.   Walpole, do you know where that was?                    11:55:28

A.   Yes.

Q.   Where?

A.   It's like near Dedham.  It's in Massachusetts.

Q.   And we see an e-mail address down here, whose e-mail was

that?                                                        11:55:44

A.   That was my old e-mail.

Q.   That was what?

A.   My old e-mail.

Q.   But was it you posting the ad?

A.   No.                                                     11:55:52

Q.   Who was using that?

A.   Andy Pena.

Q.   And now very quickly I want to go through these photos, who

is in these photos?

A.   That's me.                                              11:56:02

Q.   Is it hard for you to look at this ad?

A.   Yes.

Q.   Taking the photos down and we are just looking at the text.

Are you okay for a minute?  Do you need a minute?

A.   It's okay.                                              11:56:23

Q.  Would you please read this ad that says, "Hey, my name,"
whose the name in there?

A.  Emily.

Q.  Okay.  Again, did you create this ad?

A.  No.                                                          11:56:35

Q.  Scrolling down here to this section, do you recognize this
name?

A.  Yes.

Q.  Who is that?

A.  That's Andy Pena.                                           11:56:49

Q.  Do you recognize that address?

A.  My pimp.

Q.  Address?

A.  Yes.

Q.  What address is that?                                       11:56:55

A.  That was his address at the time.

Q.  He was the one posting your ad?

A.  Yes.

Q.  Very briefly, I'm going to show you 214a, who is in these
ads?  Who is in this ad?                                        11:57:17

A.  That's me.

Q.  Is that another one of your ads?

A.  Yes.

Q.  Are those the photos you talked about a moment ago that
were taken of you?                                             11:57:27

A.  Yes, those are.

Q.  Are you okay?

A.  Yeah, I am fine.

Q.  Did your ad help you get more calls from johns?

A.  Yes.                                                    11:57:43

Q.  How often would your ad get posted or reposted on Backpage?

A.  At least every hour or two at the very least.

Q.  Was every ad posted of you an offer of sex for money?

A.  Yes, it was.

Q.  Did you know a man named Nicholas Kristof?          11:58:12

A.  Yes, I do.

Q.  Who is he?

A.  He is a journalist.

        MR. LINCENBERG:  Objection; relevance.

        THE COURT:  Well, overruled.  I will let her answer    11:58:23
the question and determine whether or not it's relevant.  She
may answer.

        THE WITNESS:  Nicholas Kristof is a journalist from
the New York Time lines.

BY MR. BERRY:                                              11:58:37

Q.  Okay.  And how do you know him?

        MS. BERTRAND:  Objection; relevance; 403; prior
discussions.

        MR. BERRY:  Your Honor, the jury has heard evidence
about Mr. Kristof, and this links those things.         11:58:48

          THE COURT:  I will overrule the objection.

BY MR. BERRY:

Q.  Let me take a more narrow approach here.  You can answer

the question, but I will go a little more narrow.  Did

Mr. Kristof write anything in the New York Times about you?            11:59:05

          MS. BERTRAND:  Objection; relevance; hearsay.

          THE COURT:  Overruled.

          THE WITNESS:  Yes, he has.

BY MR. BERRY:

Q.  Was it about you being on Backpage?                                11:59:19

A.  Yes.

          MR. LINCENBERG:  Leading; relevance; hearsay.

          THE COURT:  Sustained as to leading.

          MR. BERRY:  I will ask it open-ended.

BY MR. BERRY:                                                          11:59:31

Q.  What was it about?

          MS. BERTRAND:  Objection; hearsay.

          MR. LINCENBERG:  And relevance.

          THE COURT:  I guess you can lay some foundation about

what she knew about the article, if she read and it so on, so         11:59:38

sustained as to relevance.

          MR. BERRY:  Sure.

BY MR. BERRY:

Q.  Do you recall there was a documentary that Mr. Kristof was

involved with as well?                                                11:59:53

          MS. BERTRAND:  Objection; leading; relevance.

          THE COURT:  Sustained.  Sustained as to leading.
Overruled as to relevance.

BY MR. BERRY:

Q.  In addition to what he wrote in the New York Times, are you          12:00:04
aware of anything else Mr. Kristof has done with regards to
Backpage and you?

          MS. BERTRAND:  Objection.

          MR. LINCENBERG:  Relevance.

          THE COURT:  Overruled; leading.          12:00:15

          THE WITNESS:  Can you ask that question in a different
form for me?

BY MR. BERRY:

Q.  Are you aware of whether Mr. Kristof was involved with
anything other than writing the New York Times article?          12:00:23

          MS. BERTRAND:  Objection; leading.

          THE COURT:  Overruled.

          THE WITNESS:  Yes, I do know that he was filming, was
filming to help girls who were on the run --

          MS. BERTRAND:  Objection.          12:00:35

          MR. LINCENBERG:  Goes beyond the scope, also
relevance.

          THE COURT:  Well, the answer may stand, but let's move
on.

          MR. BERRY:  Just one second, Your Honor.          12:00:47

THE COURT:  And I will overrule the objection.

BY MR. BERRY:

Q.  Did the documentary have anything to do with Backpage?

MS. BERTRAND:  Objection; relevance; hearsay; leading.

THE COURT:  Overruled.

12:01:19

THE WITNESS:  Yes.

BY MR. BERRY:

Q.  Did it have anything to do with you on Backpage?

MS. BERTRAND:  Same objections.

THE COURT:  Overruled.

12:01:27

THE WITNESS:  Yes.

BY MR. BERRY:

Q.  Did it -- was your mother featured in it?

MS. BERTRAND:  Objection; relevance; hearsay.

MR. EISENBERG:  Rule 403, Your Honor.

12:01:43

THE COURT:  I am going to sustain the objection as to relevance.

MR. BERRY:  Thank you, Your Honor.  Pass the witness. Hold on just a second.  Not pass.  Okay.

BY MR. BERRY:

12:01:58

Q.  So you talked about Mr. Pena didn't let you keep any of the money; correct?

A.  Correct.

Q.  Did he have any legitimate jobs, to your knowledge?

MR. LINCENBERG:  Relevance.

12:02:08

UNITED STATES DISTRICT COURT

THE COURT:  Overruled.

THE WITNESS:  Not that I was aware of.

MR. BERRY:  Thank you.  Pass the witness.

THE COURT:  Who is coming forward?  Ms. Bertrand.

MS. BERTRAND:  May I proceed?

THE COURT:  Yes.

CROSS-EXAMINATION

BY MS. BERTRAND:

Q.  Good morning, Ms. Figueroa.

A.  Good morning.

Q.  My name is Joy Bertrand.  I represent a woman named

Joye Vaught.  I don't believe we met, so I just wanted to

introduce myself.

      Ms. Figueroa, do you know whether or not any of the

photos that were placed in any of your ads were ever deleted by

Backpage?

A.  I am not 100 percent sure.

Q.  Do you know whether or not any of your ads were deleted?

A.  I am not sure.

      MS. BERTRAND:  Ms. Ellig, can you please pull up

Exhibit 214 and publish to the jury.  This has already been

admitted into evidence.

BY MS. BERTRAND:

Q.  Ms. Figueroa, do you see at the top there of the screen in

red?

A.  Yes.

Q.  It says, "This ad is not live."

A.  Yes.

Q.  "Status community removed," do you see that?

A.  Yes.                                                    12:03:33

Q.  Removed.  Excuse me.  Do you know what that means?

A.  It was taken down.

Q.  By Backpage?

A.  Yeah.

Q.  Yes.  Ms. Figueroa, there is some people sitting to my    12:03:44

left.  I am going to point them out to you and just ask if

their names sound familiar or if you've ever met them, okay?

A.  Okay.

Q.  Adam Padilla, have you ever met him?

A.  No.                                                     12:04:04

Q.  Name sound familiar?

A.  No.

Q.  Scott Spear?

A.  No.

Q.  Jed Brunst?                                             12:04:09

A.  No, ma'am.

Q.  Joye Vaught?

A.  No.

Q.  Michael Lacey?

A.  Nope.                                                   12:04:20

Q.  And was it your testimony, I just want to make sure you're clear, that the way you end up coming into contact with law enforcement is they responded to a Backpage ad?

A.  Correct.

Q.  And at least one of the people involved with you has now served five years in prison; correct?

A.  Correct.

Q.  Do you know whether or not Backpage provided any assistance in that prosecution?

A.  I'm not really sure.

        MS. BERTRAND:  Thank you, Your Honor.  I have nothing further.  Thank you, Ms. Figueroa.

                        CROSS-EXAMINATION

BY MR. CAMBRIA:

Q.  Good afternoon.

A.  Good afternoon.

Q.  Just a couple questions.  From the testimony that you gave this morning you indicated that you had an ad go up, but then you received a phone call, is that fair to say?

A.  Once the ad posted, I would receive phone calls and text messages.

Q.  And it was in the phone call that there was a discussion of some kind of sexual act for money?

A.  It was in both text messages and phone call.

Q.  I'm sorry.

A.  It was through both text messages and phone call.

Q.  Text messages and phone call?

A.  Yes.

Q.  The use of the phone -- using the phone is where the so-called agreement was made?

A.  Correct.

Q.  If anyone did in fact meet with you and exchange money for sex, where did that money go?

A.  It would go to my pimps.

Q.  Was any of that money paid to Backpage?

A.  I believe when I would post Backpage would get paid.

Q.  You paid for an ad; correct?

A.  Yes.

Q.  All right.  My question was if somebody came in, and I am just picking fantasy numbers here, somebody came in and they said:  Here's $500 for X, did any of that 500 go to Backpage?

A.  No.

        MR. CAMBRIA:  Thank you.

        THE COURT:  Mr. Eisenberg.

        MR. EISENBERG:  Thank you, Your Honor.

        Ms. Ellig, may we have Exhibit 212, please, again?

        THE COURT:  212 he asked for.

                    CROSS-EXAMINATION

BY MR EISENBERG:

Q.  Ma'am, I am going to have this shown to you again.

MR. BERRY:  Objection; this is not her ad.

THE COURT:  This was not the exhibit that was used.

MR. EISENBERG:  214, Your Honor.  I'm sorry.

BY MR EISENBERG:

Q.  Just to make sure I am sure, this is your ad, is it not, ma'am?    `12:07:30`

A.  Yes, it is.

Q.  And ma'am, your face is covered, isn't it?

A.  Partial of my face is covered.

Q.  Isn't it fair to say that in order to determine one's age,    `12:07:38`
the primary factor is what they look like in their face?

MR. BERRY:  Objection; calls for speculation.

THE COURT:  She can answer in her own opinion.

THE WITNESS:  I am sorry, can you re -- rephrase that
question for me.    `12:07:56`

BY MR EISENBERG:

Q.  Yes, ma'am.  What I am asking in order to determine the
relative age of a person, right, one would concentrate, a
person would concentrate on their face, not their body?

A.  I don't agree with that.    `12:08:10`

Q.  Well, what there shows that you're under 19 years old?

A.  I did not post that.  My pimp posted it.

Q.  I understand it that, ma'am, but looking at this, would you
agree this is a photograph; right?

A.  Yes.    `12:08:25`

Q.  Is there anything on that photograph that shows that you're under 18 years old?

A.  No.

        MR. EISENBERG:  Thank you.  That's all, Your Honor.

        THE COURT:  I see Mr. Feder.                          12:08:37

                      CROSS-EXAMINATION

BY MR. FEDER:

Q.  Hello.

A.  Hi.

Q.  You had no contact whatsoever with Backpage or anybody at   12:08:49
it, true?

A.  Sorry, can you re-ask that?

Q.  I said, you had no contact with anybody at Backpage or
anybody that worked there; right?

A.  No, sir.                                                   12:09:01

Q.  When there would be some kind of call to you or a text
because you and your pimps were careful, you would not discuss
even what kind of transaction you were hoping for on the phone;
right?

A.  Correct.                                                   12:09:21

Q.  It was only when that person, that potential customer came
to you in the hotel room that the actual transaction was
discussed in more detail; right?

A.  Yes, for the most part.

        MR. FEDER:  That's all I have.  Thanks.                12:09:46

                 UNITED STATES DISTRICT COURT

THE COURT:  I think the only one left is Mr. Lincenberg.

MR. LINCENBERG:  No, Your Honor.

THE COURT:  All right.  Mr. Berry.

REDIRECT EXAMINATION

12:09:55

BY MR. BERRY:

Q.  If addition to not knowing who Adam Padilla is, do you not know who Andrew Padilla is?

A.  No.

Q.  With regard to whether Backpage made any money you were asked if they made any money off of these sex act dates things that occurred; correct?

12:10:12

MR. CAMBRIA:  Your Honor, that misstates the question. The question was:  Did they split the money, made the money, there's a difference.

12:10:32

THE COURT:  Mr. Cambria, that was not the question either, so I will ask Mr. Berry to rephrase.

MR. BERRY:  Sure.

BY MR. BERRY:

Q.  The money that was made off of the sex acts you performed, where did that money go?

12:10:40

A.  It went to my pimps.

Q.  Did he have any other legitimate source of income?

A.  No.

Q.  How did he pay for the ads to be posted?

12:10:51

A.  With one vanilla cards.

Q.  Where did that money come from?

A.  That went to Backpage.

Q.  Where did it come from to buy the vanilla card?

A.  The money that they had from selling my body.                    12:11:03

        MR. BERRY:  No further questions, Your Honor.

        THE COURT:  May the witness be excused from subpoena?

        MR. BERRY:  Yes.

        THE COURT:  Is there an objection from defense?

        MR. CAMBRIA:  No.                                            12:11:15

        THE COURT:  Ma'am, you are excused from subpoena.  We

thank you for your testimony.  You may step down.  You are

excused.

        Members of the jury, I said we would go until a

quarter after the hour before we took our lunch break, but        12:11:25

obviously it seems a natural time to do so now.  We will be at

lunch for an hour.  I'd ask you to be prepared to come in

roughly ten after the hour give or take a few minutes.  And so

with that, just remember the admonition and please all rise for

the jury.                                                          12:11:45

                (Jury is not present.)

        THE COURT:  Let me just ask then who is the

government's next witness?

        MS. PERLMETER:  Next will be will be Astrid Cervantes.

        THE COURT:  And then after that?                            12:12:31

MS. PERLMETER:  Arshana Sanders.

MR. FEDER:  Persons not noticed to me that I have some information.

THE REPORTER:  Can't hear you.

MR. FEDER:  Arshana Sanders is the file we talked 12:12:45 about this morning, Your Honor, that was not noticed to me that I have some information on but not the entire file.

THE COURT:  And who else do you have?

MS. PERLMETER:  We also have Andrea Benson.  We have no objection to having her go before Ms. Sanders if Mr. Feder 12:13:06 needs additional time to prepare.  All of the witnesses that we are calling today were provided to the defense Friday evening along with the exhibits that we intend do show them.

THE COURT:  All right.  We can go with Ms. Cervantes, Ms. Benson and Ms. Sanders to give Mr. Feder the lunch hour to 12:13:23 go over the file, and that's how we will proceed.  All right. Let's stand in lunch recess.

     (Proceedings concluded at 12:13 p.m.)

## C E R T I F I C A T E

I, HILDA E. LOPEZ, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 18th day of October, 2023.

s/Hilda E. Lopez_____
HILDA E. LOPEZ, RMR, FCRR

UNITED STATES DISTRICT COURT