1

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | October 18, 2023 |
| Michael Lacey, et al. | ) | 1:15 p.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**TRIAL - DAY 20 - P.M. SESSION**

Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                      **A P P E A R A N C E S**

2

For the Government:
    UNITED STATES ATTORNEY'S OFFICE
3    By:  **Mr. Kevin M. Rapp, Esq.**
4          **Mr. Peter S. Kozinets, Esq.**
          **Mr. Andrew C. Stone, Esq.**
5          **Ms. Margaret Wu Perlmeter, Esq.**
    40 North Central Avenue, Suite 1200
6    Phoenix, Arizona 85004
    kevin.rapp@usdoj.gov
7    peter.kozinets@usdoj.gov
    andrew.stone@usdoj.gov
8    margaret.perlmeter@usdoj.gov

9  For the Government:
    UNITED STATES DEPARTMENT OF JUSTICE
10   By:  **Mr. Austin Berry, Esq.**
    1301 New York Avenue, NW, 11th Floor
11   Washington, DC 20005
    austin.berry2@usdoj.gov

12

For the Defendant Michael Lacey:
13   LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
    By:  **Mr. Paul J. Cambria, Jr., Esq.**
14   42 Delaware Avenue, Suite 120
    Buffalo, NY 14202
15   pcambria@lglaw.com

16

For the Defendant Scott Spear:
17   FEDER LAW OFFICE, P.A.
    By:  **Mr. Bruce S. Feder, Esq.**
18   2930 East Camelback Road, Suite 160
    Phoenix, AZ 85016
19   bf@federlawpa.com
    - and -
20   KESSLER LAW OFFICE
    By:  **Mr. Eric Walter Kessler, Esq.**
21   6720 N. Scottsdale Road, Suite 210
    Scottsdale, AZ 85253
22   eric.kesslerlaw@gmail.com

23

24

25

```
 1    For the Defendant John Brunst:
          BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
 2        LINCENBERG & RHOW, P.C.
          By:  Mr. Gopi K. Panchapakesan, Esq.
 3             Mr. Gary S. Lincenberg, Esq.
          1875 Century Park E, Suite 2300
 4        Los Angeles, CA 90067
          gpanchapakesan@birdmarella.com
 5        glincenberg@birdmarella.com

 6
      For the Defendant Andrew Padilla:
 7        DAVID EISENBERG, P.L.C.
          By:  Mr. David S. Eisenberg, Esq.
 8        3550 North Central Avenue, Suite 1155
          Phoenix, AZ 85012
 9        david@deisenbergplc.com

10
      For the Defendant Joye Vaught:
11        JOY BERTRAND, ESQ., L.L.C.
          By:  Ms. Joy M. Bertrand, Esq.
12        P.O. Box 2734
          Scottsdale, AZ 85252
13        joy@joybertrandlaw.com

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

**I N D E X**

| PLAINTIFF WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| BRADLEY MYLES (Cont.) | 6 | 7, 13 | 16 | |
| JOHN SHEHAN | 17 | 50, 66 75, 78 | 80 | |
| DANIEL JOHN HYER | 83 | | | |

**E X H I B I T S**

| EXHIBIT NO. | | PAGE: |
|---|---|---|
| 624 | Email from H. Nigam, "NCMEC John Shehan/ Backpage.com intro", 12/03/2010, USAO-BP-0000863 | 23 |
| 628 | Email from J Shehan to Spear, "Backpage MOUs", 12/16/2010, DOJ-BP-0002127668 | 25 |
| 652a | Redacted 652-a; PowerPoint presentation, "The Internet and Selling Sex", 03/01/2011, DOJ-BP-0004791132 - DOJ-BP-0004791163 | 32 |
| 171 | Letter from NCMEC to Moon, 06/06/2013 DOJ-BP-0004601955- DOJ-BP-0004601972 | 49 |
| 11 | Email from Hyer to Ferrer (with attachments), 06/04/2007 DOJ-BP-0001391283 | 105 |
| 11a | Attachment. Aggregating/Uploading Content. DOJ-BP-0001391284 | 105 |

<u>**P R O C E E D I N G S**</u>

     (Proceedings commence at 1:15 p.m.)

     THE COURT:  All right.  Please be seated.  And so we
have all counsel here, and there is no witness?  And so I've
looked at this exhibit, Mr. Rapp, and I think Mr. Cambria's
objections are notable.  The concern that I have is there's
additional what amounts to hearsay included in the letter.  It
relates to other exhibits that have already been introduced.
It lifts out quotes from, you know, various letters from the
theological seminary, the Attorney General's letters, talks
about being morally inappropriate and so on and so forth, and
so I'm not going to let you admit the letter through the
witness.

     You may certainly question him about, as you have, his
involvement in creating the letter, and we'll go from there.

     MR. RAPP:  Okay.  Yeah, that's fine.

     THE COURT:  Can we have the witness?  Did you want to
say something?

     MR. RAPP:  I only have a couple more questions in
light of the ruling, so...

     THE COURT:  I can't hear you, Mr. Rapp.

     MR. RAPP:  Sorry.  I only have a couple more
questions.

     THE COURT:  All right.  Thank you.

13:15:12

13:15:46

13:16:10

13:16:28

13:16:37

```
 1    BRADLEY MYLES

 2    (Previously sworn.)

 3             THE COURT:  All right.  Please be seated.  The record

 4    will reflect the presence of the jury.  The witness is present

 5    as well.                                                          13:20:25

 6             Mr. Rapp, you may continue.

 7             MR. RAPP:  Thank you.

 8                    CONTINUED DIRECT EXAMINATION

 9    BY MR. RAPP:

10    Q.  Mr. Myles, before we broke for lunch we were talking about   13:20:29

11    a letter that you were involved in on behalf of a number of

12    NGOs, do you recall that?

13    A.  Yes.

14    Q.  And were you significantly involved in the authorship of

15    this letter?                                                      13:20:49

16    A.  Yes, I was one of a group that helped to author it.

17    Q.  And who did the letter go to again?

18    A.  Jim Larkin.

19    Q.  And was the message that you were conveying to Mr. Larkin,

20    was it consistent with the recommendations that you made with     13:21:06

21    him and Mr. Spear during the meeting you had on March 1st?

22    A.  Yes.

23    Q.  And what was -- what's the upshot of the letter that you

24    were providing to Mr. Larkin, if you could just summarize it in

25    a few words?                                                      13:21:25
```

1    A.  That numerous antitrafficking NGOs I believed that the

2    adult section should be shut down.

3    Q.  And then circling back to the meeting, do you recall your

4    testimony about how you displayed an array of ads from

5    Backpage.com, at the conclusion of the meeting, what, if          13:21:41

6    anything, happened to those ads that you were showing to

7    Mr. Spear and Mr. Larkin?

8    A.  Mr. Larkin asked if he could keep some of the ads.

9    Q.  And did you allow him to do that?

10   A.  Yes.                                                          13:21:55

11   Q.  All right.

12          MR. RAPP:  I don't have anything further.  I will pass

13   the witness.

14          THE COURT:  Thank you.  Who is coming forward?

15   Mr. Cambria.                                                      13:22:03

16                        CROSS-EXAMINATION

17   BY MR. CAMBRIA:

18   Q.  Good afternoon.

19   A.  Good afternoon.

20   Q.  The -- you just indicated that the recommendation was that    13:22:14

21   the adult section be shut down?

22   A.  Yes.

23   Q.  Were you a participant in authoring a so-called time line

24   regarding combating various items that deal with sex?  Do you

25   recall 207 to 218, history of combating online, compiled by      13:22:52

1    Bradley Myles, Andrea Powell?

2    A.  Yes, a colleague and I worked on that.

3    Q.  And do you recall in, there are a number of entries there,

4    and do you recall one of them in this memo that you created,

5    it says, July 22, 2009, despite Craigslist exotic, sorry,                13:23:19

6    erotic services section?

7            MR. RAPP:  Judge, I will object.  He is reading now

8    from an exhibit that is not in evidence.

9            THE COURT:  Sustained.

10           MR. CAMBRIA:  Okay.                                               13:23:35

11   BY MR. CAMBRIA:

12   Q.  Do you recall at some time putting together this so-called

13   time line?

14   A.  Yes.

15   Q.  Do you recall, sir, that as a result of your research or          13:23:43

16   fact gathering you determined that when Craigslist closed down

17   their adult section, nevertheless there was like 12,000 entries

18   that dealt with sexual activity?

19           MR. RAPP:  Objection; relevance.

20           THE COURT:  Overruled.  He may answer if he recalls.       13:24:04

21   BY MR. CAMBRIA:

22   Q.  Do you recall?

23   A.  Can you clarify the question?

24   Q.  Yeah.  Do you recall a finding of the erotic services

25   section of Craigslist is closed down, but nevertheless 12,843       13:24:23

```
 1   ads are discovered anyway?

 2   A.  In another part of Craigslist?

 3   Q.  Yeah.

 4   A.  Yes, I recall that.

 5   Q.  Okay.  And you indicated that there are kind of two schools    13:24:36

 6   of thought.  There are the abolitionists that say, "Shut it

 7   down," true, yes?

 8         THE COURT:  You have to answer, talk.  There is no

 9   shake the head on that machine over there.

10         THE WITNESS:  Got it, yes.                                   13:24:52

11   BY MR. CAMBRIA:

12   Q.  And so there's the abolitionists that say, "Shut it down,"

13   and then there's the regulators that say, "Well, let's deal

14   with it," is that fair to say?

15   A.  I think both sides are trying to deal with it, but they       13:25:03

16   have different approaches.

17   Q.  What I meant was, the regulators who say, "Let's deal with

18   it" as opposed to, "Shut it down"?

19   A.  Yes.

20   Q.  All right.  And is one of the, on the regulator's side, one   13:25:13

21   of the considerations being the First Amendment free speech

22   ads?

23         MR. RAPP:  Objection; relevance.

24         MR. CAMBRIA:  The constitution is always relevant.

25         THE COURT:  Well, sustained.                                13:25:33
```

| | |
|---|---|
| 1 | BY MR. CAMBRIA: |
| 2 | Q.  Okay.  In -- |
| 3 | THE COURT:  Let me clarify, Mr. Cambria.  I sustained |
| 4 | as to the form of the question. |
| 5 | MR. CAMBRIA:  Oh, okay. |
| 6 | BY MR. CAMBRIA: |
| 7 | Q.  Was one, to your knowledge, was one of the considerations |
| 8 | by the regulators the impact, if any, of the First Amendment |
| 9 | free speech right? |
| 10 | MR. RAPP:  Objection; foundation. |
| 11 | THE COURT:  Well, you can lay some foundation.  I will |
| 12 | sustain that objection. |
| 13 | BY MR. CAMBRIA: |
| 14 | Q.  Are you familiar with the First Amendment? |
| 15 | A.  Yes. |
| 16 | Q.  Okay.  I see you're smiling.  And so my question then, |
| 17 | since you're familiar with the First Amendment, of the |
| 18 | so-called regulators, was the First Amendment aspect of it |
| 19 | considered by them, to your knowledge? |
| 20 | MR. RAPP:  Same objection as to foundation. |
| 21 | THE COURT:  Overruled. |
| 22 | THE WITNESS:  It's one of many considerations, yes. |
| 23 | BY MR. CAMBRIA: |
| 24 | Q.  All right.  Thank you.  With regard to, you've talked about |
| 25 | finding ads on various platforms, things that deal with sexual |

13:25:49
13:26:04
13:26:13
13:26:30
13:26:45

```
 1   exploitation one way or another, have you found similar
 2   evidence on Facebook?
 3              MR. RAPP:  Objection; relevance; foundation.
 4              THE COURT:  Sustained as to foundation.
 5   BY MR. CAMBRIA:                                            13:27:06
 6   Q.  You're familiar with Facebook, are you not?
 7   A.  Yes.
 8   Q.  And in your travels in the Polaris worlds and people you
 9   talk within Polaris, have you also found evidence of sexual
10   exploitation on Facebook?                                  13:27:22
11   A.  The --
12              MR. RAPP:  Objection; foundation, when, where?
13              THE COURT:  Yes, let's lay some more foundation,
14   Mr. Cambria.
15   BY MR. CAMBRIA:                                            13:27:33
16   Q.  At any time during your work with Polaris, did you
17   determine that?
18   A.  Yes.
19   Q.  And how about TikTok?
20              MR. RAPP:  Objection; relevance; foundation.    13:27:41
21   BY MR. CAMBRIA:
22   Q.  Same question --
23              THE COURT:  Well, let me sustain the objection first,
24   Mr. Cambria, and you can lay some foundation.
25   BY MR. CAMBRIA:                                            13:27:52
```

```
 1   Q.  Same considerations as Facebook, did you consider TikTok

 2   and whether or not it was also a platform used that way?

 3            MR. RAPP:  Same objection.

 4            THE COURT:  Sustained.

 5   BY MR. CAMBRIA:                                                  13:28:08

 6   Q.  With regard to Facebook, were you familiar with the fact

 7   that there were some 20 million reported instances regarding

 8   Facebook?

 9            MR. RAPP:  Objection, relevance, vague and foundation.

10            THE COURT:  I'll sustain as to foundation, and         13:28:27

11   vagueness.

12   BY MR. CAMBRIA:

13   Q.  As -- in connection with Polaris and collecting information

14   about various platforms that are being used for some kind of

15   sexual exploitation, you've indicated to us that Facebook was   13:28:44

16   one of them, are you familiar with the statistics there on an

17   annual basis?

18            MR. RAPP:  Same objection.

19            THE COURT:  Overruled.  He may answer if he's

20   familiar.                                                       13:29:00

21            THE WITNESS:  Can you describe which statistics?

22   BY MR. CAMBRIA:

23   Q.  Statistics of reports of sexual exploitation using

24   Facebook.

25   A.  Do you mean the reports to the CyberTipline on child sexual 13:29:09
```

```
 1    abuse material?
 2    BY MR. CAMBRIA:
 3    Q.  That or NCMEC?
 4    A.  Yes, I am aware.
 5    Q.  The number is in the millions, are they not?        13:29:18
 6    A.  Yes.
 7            MR. CAMBRIA:  That's all.  Thank you.
 8            THE COURT:  Ms. Bertrand.
 9            MS. BERTRAND:  Nothing.  Thank you.
10            THE COURT:  Mr. Lincenberg?                       13:29:27
11            MR. LINCENBERG:  No, Your Honor.
12            THE COURT:  Is there anyone else, Mr. Eisenberg?
13            MR. EISENBERG:  No, thank you, Your Honor.
14            THE COURT:  Mr. Feder?
15                        CROSS-EXAMINATION                     13:29:39
16    BY MR. FEDER:
17    Q.  Hi.
18    A.  Hi.
19    Q.  Did Polaris send a letter to Facebook to close it down?
20    A.  No.                                                  13:29:54
21            MR. RAPP:  Objection; relevance.
22            THE COURT:  Overruled.
23    BY MR. FEDER:
24    Q.  No?
25    A.  No.                                                  13:29:59
```

```
 1    Q.  Any other website that Polaris said, "Close down your

 2    site" --

 3            MR. RAPP:  Same objection, and then foundation.

 4    BY MR. FEDER:

 5    Q.  -- during your time at Polaris?                          13:30:06

 6            THE COURT:  Let me rule on the objection, Mr. Feder.

 7            MR. FEDER:  Sorry.

 8            THE COURT:  All right.  I am going to sustain the

 9    objection.

10    BY MR. FEDER:                                                13:30:14

11    Q.  During your time at Polaris, did Polaris, or you on behalf

12    of Polaris, send a letter or any kind of communication to any

13    other website saying, "Close down your site"?

14    A.  The characterization of letter is not to close down the

15    entire site.  It's to close down a particular part of it.    13:30:31

16    Q.  Right.  Right.

17    A.  We did, yes.

18    Q.  To who?

19    A.  Craigslist.

20    Q.  Anybody else?                                            13:30:39

21    A.  No.

22    Q.  Google?

23    A.  No.

24    Q.  Facebook?

25    A.  No.                                                      13:30:45
```

```
1    Q.  TikTok?

2    A.  No.

3    Q.  We could go on and on as to how many sites there are that

4    might have adult ads on them; right?

5              MR. RAPP:  Objection; foundation; relevance.          13:30:55

6              THE COURT:  Well, the form of the question, sustained.

7    BY MR. FEDER:

8    Q.  You're familiar with this area of adult ads, aren't

9    you?

10             THE COURT:  Well, I guess, Mr. Feder, it's the         13:31:04

11   characterization, "we can go on and on about" --

12             MR. FEDER:  Trying to cut it short.

13             THE COURT:  It's an improper question as to form, so

14   ask a new question.

15   BY MR. FEDER:                                                    13:31:15

16   Q.  No problem.  Thanks.  You're familiar with the many sites

17   that existed during the time that you were at Polaris that had

18   adult ads?

19   A.  Yes.

20   Q.  And there are many, many sites that did and do?            13:31:24

21   A.  Yes.

22   Q.  Did you send any letters requesting that they close down

23   their adult site other than Craigslist?

24             MR. RAPP:  Same objection.  Well, asked and answered.

25             THE COURT:  Sustained.                                 13:31:45
```

```
1            MR. FEDER:  That's all I have.  Thanks.

2            THE COURT:  All right.  Any redirect?

3            MR. RAPP:  Yes.

4                       REDIRECT EXAMINATION

5  BY MR. RAPP:                                              13:31:57

6  Q.  Mr. Myles, the websites that both defense counsel for

7  Mr. Lacey and defense counsel for Mr. Spear asked you about, do

8  you have any idea what their internal business model is?

9  A.  No.

10 Q.  With regard to Craigslist, did Craigslist shut down their   13:32:14

11 adult category?

12 A.  They did across the globe, yes.

13 Q.  Thank you.

14           MR. RAPP:  I don't have anything further.

15           THE COURT:  May the witness be excused from subpoena?  13:32:26

16 Mr. Rapp, may the witness be --

17           MR. RAPP:  Yes.  Sorry.

18           THE COURT:  Is there any objection from defense?

19           MR. CAMBRIA:  No, Your Honor.

20           THE COURT:  Sir, we thank you for your testimony.  You  13:32:38

21 are free to leave.

22           Call your next witness.

23           MR. RAPP:  United States called John Shehan.

24           THE COURT:  Sir, do please come forward and be sworn

25 by my courtroom deputy.                                    13:33:00
```

```
1    JOHN SHEHAN
2    (Witness Sworn.)
3                        DIRECT EXAMINATION
4    BY MR. RAPP:
5    Q.  Sir, could you state your full name spell?          13:33:33
6    A.  John Shehan, S-H-E-H-A-N.
7    Q.  Sir, for whom do you work?
8    A.  I work at the National Center for Missing and Exploited
9    Children.
10   Q.  How long have you worked there?                     13:33:48
11   A.  I've worked at the center for 23 years.
12   Q.  Can you tell the jury a little bit about your educational
13   background?
14   A.  Sure.  So I graduated from Radford University, it's in
15   Radford, Virginia, with a Bachelor of Science in December of  13:34:01
16   1999.
17   Q.  And then did you start with the national center following
18   graduation?
19   A.  I did.  I started at the National Center for Missing and
20   Exploited Children, also known as NCMEC, abbreviating that long  13:34:16
21   name, in February of 2000 as a call center specialist.
22   Q.  Let me back up a little bit, where do you live?
23   A.  I live in Alexandria, Virginia.
24   Q.  Are you married?
25   A.  I am.                                               13:34:29
```

1    Q.  And what does your wife do for a living?

2    A.  She also works at the National Center for Missing and

3    Exploited Children.

4    Q.  Have you explained to the jury what the National Center of

5    Missing and Exploited Children does?                            13:34:41

6    A.  Yes.  So our organization is a private nonprofit

7    organization that was created in 1984.  Our mission is to help

8    reunite families with missing children, to reduce child sexual

9    exploitation, and prevent child victimization.

10   Q.  Where is the National Center for Missing and Exploited      13:34:58

11   Children, or NCMEC, where is it located?

12   A.  In Alexandria, Virginia.

13   Q.  And can you explain to the jury, what type of divisions are

14   within the NCMEC?

15   A.  Sure.  So our organization we have little over 400          13:35:15

16   employees.  There are a number of different departments and

17   divisions, but primarily there are five main areas of work.

18   One would be focused on missing children, the other on

19   combating child sexual exploitation, the other would be

20   prevention, then training and outreach, and the last, fifth,    13:35:32

21   would be family advocacy, family services, family and victim

22   support.

23   Q.  I think you were about to tell us that you started in the

24   call center at NCMEC out of college; is that right?

25   A.  That's correct.                                             13:35:51

1   Q.  Can you explain to the jury what the call center is at

2   NCMEC?

3   A.  Sure.  So the call center, it's a bit of a hybrid between

4   missing and exploited.  If someone was to call into our toll

5   free hotline, 1-800-THE-LOST, it's staffed 24/7.  I was one of          13:36:03

6   those individuals that would answer the phone, so if someone

7   wanted to report that their child is missing, if they had a

8   lead or sighting related to a missing child, or they wanted to

9   report the sexual exploitation of children.  I was one of those

10  individuals answering the phone.          13:36:20

11  Q.  And since you've been there for 23 years, did you did you

12  move to another area after a certain time period with the call

13  center?

14  A.  Yes.

15  Q.  Where did you go?          13:36:33

16  A.  After about a year I transferred into -- it was at the time

17  called the exploited child unit as an analyst within the

18  CyberTipline.

19  Q.  And what did you do in that unit?

20  A.  As a CyberTipline analyst, I was reviewing leads,          13:36:46

21  information that was reported into the CyberTipline, whether

22  that was reported by someone calling into our toll free

23  hotline, or if it was submitted at cybertipline.org.  It was

24  reports related to the sexual exploitation of children.

25  Q.  And how long did you stay in that division, the          13:37:05

1   CyberTipline division?

2   A.   The CyberTipline is -- is under the umbrella of the

3   exploited child division, and I have been in that division ever

4   since.

5   Q.   What various roles have you had in that division?          13:37:18

6   A.   So I -- I went to the CyberTipline as an analyst in '01.

7   In 2003 I became a supervisor of the CyberTipline.  In 2005 I

8   was the program manager of the CyberTipline.  In 2010 I was the

9   director of the exploited child division where I oversaw both

10  the CyberTipline and our Child Victim Identification Program,    13:37:45

11  and then in 2015 I was promoted to the vice president of the

12  division, and then in 2022 I was promoted to senior vice

13  president.

14  Q.   And in that capacity as senior vice president, what is your

15  day-to-day role?                                                 13:38:02

16  A.   Well, it changes from day-to-day, but I oversee major

17  programs of work relating to combating the sexual exploitation

18  of children, both here in the United States and all across the

19  world.  I do a lot of outreach, whether it be to members of the

20  public, to media, testifying when necessary.  I work with        13:38:19

21  companies, companies that report to the CyberTipline, both

22  domestic and abroad, NGOs, law enforcement and other

23  nonprofits.

24        THE COURT:  Mr. Shehan, I am going to just ask you to

25  slow down just a little bit.  We have a court reporter that       13:38:35

```
1    needs to take down every single word, and you have a very fast

2    pace about you, so...

3              THE WITNESS:  Yes, ma'am.

4              THE COURT:  Be mindful of that okay.  Thank you.

5    BY MR. RAPP:                                                    13:38:47

6    Q.  Sir, during your time at NCMEC, did you see an emergence of

7    the Internet being involved in child exploitation?

8    A.  Yes.

9    Q.  When did you begin to see that become an issue?

10             MR. FEDER:  Object as to relevance, and prior orders  13:39:05

11   of the court regarding this issue.

12             THE COURT:  Overruled.

13             MR. FEDER:  May there be a continuing objection?

14             THE COURT:  Yes.

15             MR. FEDER:  Thanks.                                   13:39:14

16   BY MR. RAPP:

17   Q.  Do you need me to repeat that?

18   A.  No.  I would say that in my entire tenure within the

19   exploited child division I witnessed the evolution of this

20   issue of child exploitation year after year has grown just as   13:39:24

21   the Internet has.

22   Q.  All right.  In your various roles at NCMEC, did you become

23   familiar with a website known as Backpage.com?

24   A.  Yes.

25   Q.  Did there come a time in 2010 where representatives from    13:39:41
```

1    Backpage.com reached out to NCMEC?

2    A.  Yes.

3    Q.  Can you explain the circumstances under which that

4    occurred?

5    A.  Sure.  There were conversations taking place within senior          13:40:00

6    leadership at NCMEC.  Mr. Ernie Allen was our president and

7    CEO, he was having conversations with executives at Village

8    Voice Backpage as well as representatives on their behalf

9    related to child sexual exploitation issues on the platform.

10   Q.  All right.  Do you know if Mr. Allen, who you identified as      13:40:23

11   the president of NCMEC at the time, do you know if he reached

12   out to Backpage or Backpage reached out to him?

13   A.  I don't know exactly how it began.  The initial piece I am

14   not sure.

15   Q.  All right.  Fair enough.  But in any event, did you come to      13:40:41

16   learn that there were discussions with representatives from

17   Backpage about having some type of an in-person meeting?

18   A.  Yes.

19   Q.  And how is it that you became aware of that?

20   A.  Mr. Allen informed myself and others within the                  13:41:00

21   organization that a meeting was going to take place, and that

22   was after conversations he had been having with representatives

23   of within the company.

24   Q.  All right.  Let me -- I want to show you Exhibit 624, which

25   is not in evidence.                                                  13:41:21

1          MR. RAPP:  Just for the witness' eyes only.

2   BY MR. RAPP:

3   Q.  Do you see that on your screen, sir?

4   A.  Yes, I do.

5   Q.  Do you recognize this e-mail?                        13:41:37

6   A.  Yes, I do.

7   Q.  Okay.  How, sir, is it that you recognize this?

8   A.  This is an e-mail that was sent to me from Hemu, who was a

9   consultant on behalf of Backpage.

10  Q.  Were you familiar with Mr. Nigam, Hemu Nigam, prior to this  13:41:57

11  e-mail?

12  A.  Yes.

13  Q.  Who else is on this e-mail?

14  A.  Carl Ferrer is on the "to" line, as well as Scott Spear,

15  and then cc'd is Simirin Hooper, Jamie Schumacher as well.    13:42:12

16  Q.  And what is the subject matter of this e-mail?

17  A.  This was an introduction.

18          MR. RAPP:  Move to admit 624.

19          MR. CAMBRIA:  Objection; hearsay.

20          THE COURT:  Overruled.  It may be admitted.        13:42:30

21          THE WITNESS:  I think Mr. Shehan has a fast cadence so

22  what I'll ask you to do, Mr. Rapp, is just to pause after he

23  finishes his answer and then slowly start to ask your question.

24          MR. RAPP:  I will.

25      (Exhibit No. 624 was admitted.)                        13:42:54

1    BY MR. RAPP:

2    Q.  And so is this -- what is the purpose of this e-mail?

3    A.  This was the introductory e-mail where he was introducing

4    me to Scott and Carl, and beginning the process of where

5    historically Mr. Allen had asked and tasked me to work with          13:43:14

6    companies --

7              MR. CAMBRIA:  Object to the hearsay.

8              THE COURT:  Overruled.

9              THE WITNESS:  -- where I would work with companies to

10   review their platform and make recommendations on ways that          13:43:26

11   their site could be safer.  So this was the initial

12   introduction for that process.

13   BY MR. RAPP:

14   Q.  I'm now showing you Exhibit 628.

15             MR. RAPP:  Also for the witness' eyes only.              13:43:42

16   BY MR. RAPP:

17   Q.  Do you see that on the screen, sir?

18   A.  Yes.

19   Q.  And what is it?

20   A.  This is an e-mail that I am sending to -- to Mr. Spear with    13:43:59

21   the fully executed agreements that gave Backpage access to some

22   of our voluntary initiatives, which were hash values and a

23   daily list of active web pages that contained child sexual

24   abuse imagery.

25             MR. RAPP:  Move to admit 628 and publish, please.        13:44:25

```
1           MS. BERTRAND:  Objection; relevance; 401; 403 and

2    hearsay.

3           MR. CAMBRIA:  Yes, I agree.

4           MS. BERTRAND:  And foundation.

5           THE COURT:  Overruled.                        13:44:55

6           MR. RAPP:  Request permission to publish.

7           THE COURT:  It may be admitted.  It may be published.

8       (Exhibit No. 628 was admitted.)

9    BY MR. RAPP:

10   Q.  I'm not going to have you read this, but I think you were   13:45:06

11   sort of summarizing what -- what is your intent with respect to

12   Mr. Spear by sending him this e-mail?

13   A.  Yes.  So the intent was to provide him with the information

14   to access those services that we provided at the time.  Many

15   companies had voluntarily chosen to use those that information   13:45:26

16   to keep their site safer.

17   Q.  All right.  Now, we talked a few minutes ago about the, at

18   least the idea of an in-person meeting with some

19   representatives from Backpage, do you recall that?

20   A.  Yes.                                            13:45:47

21   Q.  And do you recall if a meeting was actually scheduled

22   between Backpage representatives?

23   A.  It was.

24   Q.  And when was -- when did that meeting occur?

25   A.  It was in March of 20 -- 2011.                  13:45:59
```

1    Q.  All right.  And in advance of that meeting, were you asked

2    to do anything in preparation for that meeting?

3    A.  Yes.

4    Q.  What is it that you were asked to do?

5    A.  I and a team of staff at NCMEC had compiled a PowerPoint       13:46:16

6    presentation to provide an overview of the trends we were

7    seeing on Backpage at the time related to missing children

8    cases and a site called The Erotic Review.

9    Q.  All right.  And why is it that you were assembling that

10   type of information for this particular meeting, why were you     13:46:43

11   doing that?

12   A.  The counterargument at the time was that Backpage, the

13   escort section, was for massages and escorts, and that child

14   sexual exploitation was not occurring on the platform, so we

15   wanted to assemble all the information related to what we were     13:47:04

16   seeing to help demonstrate that there was activity occurring.

17   Q.  And -- and you were going to convey this information to

18   representatives from Backpage?

19   A.  Yes.

20   Q.  All right.  And so did you put together with others a          13:47:18

21   PowerPoint for purposes of this meeting?

22   A.  Yes.

23   Q.  And so was there a meeting on March 1st of 2011?

24   A.  Yes.

25   Q.  And can you explain what your role, if any, was at that        13:47:38

1    meeting; in other words, just sort of walk us through what you

2    observed during that meeting or prior to the meeting and during

3    that meeting?

4    A.   Sure.  The meeting took place in the fifth floor conference

5    room of our headquarters that was located at 699 Prince Street.    13:48:06

6    The meeting had two parts.  There was a, I will call it closed

7    door meeting that took place with Mr. Allen, our president, and

8    CEO with --

9    Q.   Let me stop you there.  Other than Mr. Allen, was there any

10   other representative from NCMEC present during that meeting?      13:48:26

11   A.   Not in the room, no.

12   Q.   All right.  Okay.  And then what, if anything, happened?

13   A.   So I and other NCMEC staff were asked to report to the

14   fifth floor conference room and to be outside of the room and

15   to wait until the door opened to join the second half of that    13:48:47

16   meeting.

17   Q.   All right.  And while you were outside the door, what, if

18   anything, did you hear?

19   A.   I heard some very loud shouting.

20   Q.   All right.  Do you know what was said?                       13:49:01

21   A.   No.

22   Q.   Okay.

23   A.   I was close enough to hear the shouting, was uncomfortable

24   enough with what was transpiring to walk away from the room,

25   from the door, enough that I could still hear the shouting, but   13:49:17

```
 1   not enough to actually hear what was being said.

 2   Q.  All right.  And at some point thereafter did you actually

 3   go into the conference room?

 4   A.  Yes.

 5   Q.  And when you went into the conference room, do you recall        13:49:31

 6   who exactly was in the room?

 7   A.  Yes.

 8   Q.  Who was that?

 9   A.  When I walked into the fifth floor conference room, it was

10   a large wooden conference room, and to my left was Mr. Larkin      13:49:43

11   and Mr. Lacey, Mr. Spear, Mr. Ferrer, and then Mr. Nigam, and

12   then to my far right at the end of the table was Mr. Allen.

13   Q.  All right.  Is this the first time that you met with these

14   individuals in person?

15   A.  Yes.                                                            13:50:07

16   Q.  And was there some type of introduction between the

17   representatives from NCMEC and the representatives from

18   Backpage?

19   A.  Very brief names, but nothing that really stands out to me

20   as far as introductions.                                           13:50:22

21   Q.  I assume you sat down at some type of conference table?

22   A.  Yes.  I walked in and sat immediately in front at the

23   table.

24   Q.  All right.  And can you -- can you describe the atmosphere

25   in the room to the best of your recollection?                      13:50:40
```

```
 1   A.  Sure.  It was tense.  You certainly -- hearing what was
 2   transpiring outside and walking in, you could tell that that
 3   meeting was -- was tense, but you know, overall I felt like,
 4   one, I could hear Mr. Allen was one of the people who was
 5   speaking very loudly yelling, and then I felt that it was          13:51:03
 6   Mr. Lacey by his mannerisms --
 7           MR. CAMBRIA:  Objection.
 8           THE WITNESS:  -- by mannerisms, his --
 9           THE COURT:  Sustained.  Did I hear an objection?
10           MR. CAMBRIA:  Yes, I said I object to what he felt.        13:51:16
11           THE COURT:  Well, overruled.
12   BY MR. RAPP:
13   Q.  All right.  Let me just -- let's just unpack that a little
14   bit.  Did you -- while you -- when you sat down in the
15   conference room, did you have an opportunity to observe          13:51:28
16   Mr. Lacey?
17   A.  Yes.
18   Q.  Can you describe his demeanor to the best of your
19   recollection?
20   A.  He appeared agitated, disinterested, arms crossed away from   13:51:39
21   the table.  To me, I felt he was the person who was --
22           MR. CAMBRIA:  I object to that speculation, Your
23   Honor, ask that it be stricken.
24           THE COURT:  Sustained as to the last part of the
25   answer, and the jury will disregard after "To me, I felt."        13:51:54
```

```
 1   BY MR. RAPP:
 2   Q.  Can you, to the best of your recollection, can you describe
 3   his body language?
 4          MR. CAMBRIA:  Object to this, Your Honor, foundation.
 5   Expert in body language?                                    13:52:15
 6          THE COURT:  Well, he can testify as to what he
 7   observed, and so overruled.
 8          THE WITNESS:  He seemed upset.  His arms were crossed.
 9   Another time I remember seeing his hands on the table, his
10   knuckles, and saw the tattoos of hold fast.  Throughout the  13:52:31
11   entire meeting he seemed very disinterested and did not want to
12   be there.
13          MR. CAMBRIA:  I object to it and ask that it be
14   stricken.
15          THE COURT:  I can't hear you, Mr. Cambria.            13:52:42
16          MR. CAMBRIA:  I said that's objected to, Your Honor,
17   ask that it be stricken.  It's all speculative, all conclusory,
18   with no foundation.
19          THE COURT:  Overruled as to the foundational
20   objection, and --                                           13:53:00
21          MR. CAMBRIA:  Foundation in the sense of his
22   qualifications to make these judgments.
23          THE COURT:  Well, overruled as to that, Mr. Cambria.
24          So let's move forward, Mr. Rapp.
25   BY MR. RAPP:                                                 13:53:12
```

1   Q.  Can you just describe Mr. Lacey's facial expressions, for

2   example, during the course of the meeting?

3   A.  He appeared disinterested.  At times I felt like he was

4   angry --

5           MR. CAMBRIA:  Object to what he felt.                    13:53:28

6           THE WITNESS:  -- was angry.

7   BY MR. RAPP:

8   Q.  Yes, but what about --

9           THE COURT:  Well, I will sustain.  I've already --

10  I've already ordered that with regard to this witness he should   13:53:39

11  answer the question what he observed, and it, you know, I --

12  lets move on, Mr. Rapp.

13  BY MR. RAPP:

14  Q.  So at some point we've been talking about a PowerPoint that

15  you had prepared in advance of this meeting, at some point        13:54:00

16  during the meeting now that you were with Mr. Lacey, Mr. Spear,

17  Mr. Larkin and Mr. Ferrer, did you have -- was there an

18  opportunity for this PowerPoint to be presented?

19  A.  Yes.

20  Q.  And who from NCMEC was responsible for presenting the         13:54:25

21  actual substance of the PowerPoint to the Backpage

22  representative?

23  A.  It was myself and Carmen Baeza.

24  Q.  Can you just tell the jury who Carmen Baeza is?

25  A.  Carmen was the director of our case analysis division and     13:54:42

```
 1    led up -- eventually led up the team, the child sex trafficking

 2    team at NCMEC.

 3    Q.  So I am showing you United States 652a for the record.

 4          MR. RAPP:  This is for the witness' eyes only.

 5    BY MR. RAPP:                                             13:54:58

 6    Q.  Sir, do you recognize this exhibit?

 7    A.  Yes.

 8    Q.  And is this Exhibit 652a, what is it?

 9    A.  This is the PowerPoint that we had created for that

10    meeting.                                                 13:55:17

11    Q.  Is this the PowerPoint that you showed Mr. Lacey and

12    Mr. Spear and Mr. Larkin and Mr. Ferrer?

13    A.  Minus what is redacted, yes.

14    Q.  In fairness, are there certain things that are not in the

15    original PowerPoint that you displayed on March 1st of 2011?  13:55:35

16    A.  Yes.

17    Q.  But otherwise, is this the work product that you put

18    together?

19    A.  Yes.

20          MR. RAPP:  Move to admit 652a.                     13:55:47

21          MS. BERTRAND:  Objection; hearsay within hearsay.

22          MR. CAMBRIA:  And 403.

23          THE COURT:  Overruled as to each.  It may be admitted.

24    It may be published.

25          (Exhibit 652a was admitted.)                       13:56:08
```

BY MR. RAPP:

Q.  I'm showing you what is the title pages of 652a, can you just explain to the jury what they are seeing?

A.  You are looking at the opening slide for the presentation that we had provided to the Backpage executives.  We were outlining the issue as a whole, so we were talking about online classified ads, sites like Backpage and Craigslist, but we were also beginning to lay the foundation for what we wanted to discuss in the meeting more towards the provider review sites, so sites like The Erotic Review, and image indexing sites.  So there are sites that often host images that maybe aren't the actual website itself.  They are redirecting from other locations.  So we wanted to talk through ways that the site could keep the platform safer.

Q.  All right.  And let's go to 652a, page 2, and what message, if any, were you trying to convey to Mr. Lacey and Mr. Spear with this, with this slide?

A.  So we -- a couple slides from now there's some examples of connections between The Erotic Review and advertisements that were on Backpage, so this was just helping to lay the foundation that there are advertisements for The Erotic Review in the printed Village Voice.  So we were demonstrating the page, the time, the date of where we found those advertisements.

Q.  When you showed this slide to Mr. Spear, Mr. Lacey, did

13:56:24

13:56:47

13:57:04

13:57:33

13:57:47

1   they say anything with respect to this information?

2   A.  Not that I recall.

3   Q.  Now, let's look at 652a 3, can you explain to the jury what

4   this slide, what message you were trying to convey with this

5   slide?                                                          13:58:24

6   A.  What you're looking at here is an advertisement that was on

7   Backpage.  This advertisement is related to a confirmed missing

8   child case.  This was a child that was listed with NCMEC as

9   missing.  We had found her ad and also had found that there

10  were reviews on The Erotic Review dating back as far as 2006.   13:58:43

11  So not only did we know when she went missing at the time her

12  poster was listed with us, but also could date backwards based

13  on knowing her age the very first time she was ever rated or

14  reviewed on The Erotic Review.

15  Q.  And same question with respect to this slide, was there      13:59:05

16  any -- did they have any questions about this?

17  A.  No.

18  Q.  Now, looking at 652a, page 4, and we have seen similar

19  exhibits in the course of this trial, but can you explain to

20  the jury what this is?                                           13:59:32

21  A.  Yes.  This is the detailed view of The Erotic Review page

22  related to that advertisement that we just saw.  This part of

23  The Erotic Review we actually paid for a 30-day subscription to

24  be able to review the full details, and it gets quite explicit.

25  Q.  Why did you have to pay for the 30-day subscription?         13:59:58

A.  Because you wouldn't be able to read.  It's blurred out

where it gets into the services offered and the actual ratings.

You can't read those without the subscription, and we wanted to

gather as much information as possible in advance of this

meeting with the executives at Backpage to relay what we were          14:00:16

seeing.

Q.  All right.  And let's go to 652a, page 5.  Once again, we

have seen similar, so I won't have you read the entirety of

this, but what message are you trying to convey by this

particular slide to the Backpage representatives?                      14:00:40

A.  The message we were trying to convey was that it very

clearly that there's sex involved.  It's much more than

advertisements for escorts or massages.  These -- it's very,

very clear what individuals are rating and reviewing after

meeting with those people on Backpage.                                 14:00:57

Q.  So I am not going to have you read it, but do you see a

particular acronym in the section entitled "general details"

that you recognize?

A.  Yes.

Q.  What -- what is included in this general details section?          14:01:13

A.  It says:  GFE provider, so it stands for Girlfriend

Experience.

Q.  And then going down to what is entitled "The Juicy

Details," do you also see some acronyms down there that you

recognize?                                                             14:01:35

1    A.  I do.  Those are references to oral sex.

2    Q.  All right.  Now, can you explain the message down here, can

3    you explain to the jury what message you were trying to impart

4    to Mr. Spear and Mr. Lacey with this information here?

5    A.  Both the connection that's happening with The Erotic Review    14:01:59

6    and Backpage, the way these are playing out, and that there are

7    ways to identify this type of activity with this minor being

8    advertised more than a hundred times, she's on the platform, we

9    were leading into there are steps that could be taken to

10   prevent this from happening on the platform.                       14:02:22

11   Q.  And what type of steps could be implemented to prevent

12   something like this from happening that you conveyed either at

13   this meeting or some subsequent meeting to the Backpage

14   representatives?

15   A.  Well, certainly we highlighted that the connection should     14:02:36

16   be severed between The Erotic Review and Backpage because

17   individuals were very clearly outlining the activity that was

18   occurring.

19           Subsequently, we went into greater detail about the

20   ways that individuals post ads, so whether that was an IP        14:02:53

21   address that's used when someone logs in, or someone is paying

22   for the account, the advertisement itself.  There is details

23   that can be captured.  There are phone numbers that are listed

24   in these ads.  There are a number of ways that you could

25   data-mine and prevent future occurrences, as well as knowing     14:03:10

UNITED STATES DISTRICT COURT

1    your customer.

2    Q.  All right.  Let's go on to the next page, page 6, what is

3    this slide meant to convey?

4    A.  This was another example of a confirmed minor that was

5    being advertised at the time.  Part of this we were making our          14:03:30

6    way into the phone numbers being a unique identifier time and

7    time again.  If someone wants to reach out, they are using a

8    phone number, and we're also highlighting ways that individuals

9    were masking the request for financial payment.

10            So you would see here "50 Roses, 15-minute incall."          14:03:48

11   Roses was shorthand for dollars.

12   Q.  All right.  And in-call, what did that mean to you?

13   A.  They were willing to travel to those individuals.

14   Q.  All right.  Let's go on to the next page.  This is page 7,

15   for the record.  What does this slide convey to Mr. Lacey and          14:04:19

16   Mr. Spear?

17   A.  This again was another confirmed minor.  We were

18   highlighting the short term, the shorthand, Girlfriend

19   Experience in this, and then again some of the financial

20   payments and the way that they were potentially getting around          14:04:38

21   content moderation.

22   Q.  At this point did either Mr. Lacey or Mr. Spear ask any

23   questions?

24   A.  Not that I remember.

25   Q.  If they didn't ask any questions, did they volunteer any          14:04:49

1   information?

2   A.  No.

3   Q.  Let's go to 652, page 8.  And I will just highlight a

4   couple things in the interest of time.  What are you trying to

5   convey with this particular slide, sir?                          14:05:14

6   A.  So here you'll see the underline under the "see my awesome

7   reviews" and the arrow, we were highlighting and honing in on

8   how blatantly people were advertising The Erotic Review and how

9   you can find their reviews.

10  Q.  And then, okay, let's go to page 9, what does this slide     14:05:30

11  demonstrate?

12  A.  This was the review from the advertisement that you just

13  saw a moment ago, so we had pulled that again.  It was a

14  confirmed minor.  We wanted to share what we were seeing from

15  those connections.  She had pointed individuals towards that     14:05:57

16  advertisement, and this is -- this is what was there.

17  Q.  All right.  And similar to what I asked you on a previous

18  review, did you see references to sex acts contained within

19  either the general details or the juicy details?

20  A.  Yes.  Many of those you have highlighted are references to   14:06:20

21  oral sex.

22  Q.  And then going on to page, page 11, for the record, what

23  are you demonstrating with this slide?

24  A.  Here it was, we were demonstrating that not only were we

25  aware of advertisements with missing children, but there were    14:06:46

UNITED STATES DISTRICT COURT

1    also reports coming into our CyberTipline for members of the

2    public related to this type of activity as well.  So this was

3    from a report that had been submitted to the tip line.

4    Q.  Then do you also see a reference to The Erotic Review on

5    this -- on this slide?                                          14:07:09

6    A.  Yes.

7    Q.  And then going to page 12, is this, once again, is this

8    a -- does this correlate to the previous slide?

9    A.  Yes.  At the top it's a little hard to see, but the ad

10   website you can see St. Louis Backpage, and then as you scroll  14:07:41

11   down into the services offered it gets very graphic.

12   Q.  All right.  And I think you're correct.  It is difficult to

13   see, but is where I've highlighted, is that -- what -- is that

14   where the URL is for Backpage?

15   A.  Yes.  That URL at the time would have taken you to that     14:08:00

16   advertisement where that minor was.

17   Q.  Now, let's go to and how does this -- is this -- does this

18   correlate to the previous two slides?

19   A.  Yes, and it was a very graphic detail in the juicy detail

20   of the individual's experience with that minor.                14:08:24

21   Q.  And going to slide 14 of 652a, can you explain this slide

22   to the jury?

23   A.  Yes.  Part of what we were conveying was that the phone

24   numbers are often in every single advertisement, and we started

25   doing open source queries on those phone numbers to find --     14:08:50

```
1    Q.  Can I stop you?  Can you explain to the jury what an open

2    source query is?

3    A.  A Google search.  It's very easy, publicly available,

4    anyone can do, and found more advertisements with that phone

5    number.                                                         14:09:09

6    Q.  All right.  More advertisements in the same market or the

7    same city or in different cities?

8    A.  Different cities.

9    Q.  Then going to 652a, 15, can you explain, and I think you

10   were -- you started doing some of that, but can you explain    14:09:32

11   what you're trying to convey here with this?

12   A.  Yes.  So we had -- the previous slide you saw we were using

13   that phone number and using the public records, and a Google

14   search I found 23 additional advertisements that were on the

15   platform, and at times different images, different locations,  14:09:48

16   so we were trying to convey that there are ways to data-mine

17   based on some of those unique identifiers from the platform.

18   Q.  And then going to 652a, 16, what is this?  What message are

19   you trying to convey to Mr. Larkin and Mr. Spear, Mr. Ferrer

20   and Mr. Lacey?                                                  14:10:16

21   A.  Yeah, in this advertisement still, still honing in on the

22   phone number aspect, but also pointing out that often times

23   they are going to advertise on 18 to 20, but minors are on the

24   platform.  This again was a confirmed minor that we knew of and

25   I was conveying that information.                               14:10:33
```

Q.  And then 652a, 17, the end of your PowerPoint.  So at this

point how long had you been presenting this to the

representatives from Backpage?

A.  It was probably 15 to 20 minutes.

Q.  All right.  And after you showed this, did they, I know you    14:10:56

have testified that they didn't ask any questions necessarily

during the presentation of this, but after you're done, did

they ask you any questions?

A.  No.  There were no overall questions about the PowerPoint

or anything about our division.    14:11:14

Q.  All right.  So did you, during this meeting, did you

discuss with them after the presentation of the PowerPoint

anything that they could implement to reduce what you were

presenting during the PowerPoint?

A.  We had highlighted, I would say with a broad brush, the    14:11:40

different areas that they could focus on with the platform.

After the PowerPoint concluded, Mr. Allen took back over the

meeting and we ultimately had agreed to work together to combat

this issue moving forward.

Q.  All right.  And during this meeting you showed him a number    14:11:58

of slides that related to this review site, The Erotic Review,

did they volunteer during this meeting any relationship that

they might have with that site?

        MR. FEDER:  Objection; leading.  Leading.  This is

Bruce Feder.    14:12:21

UNITED STATES DISTRICT COURT

1          THE COURT:  Sustained.

2    BY MR. RAPP:

3    Q.  Did they say anything about The Erotic Review?

4    A.  No.

5    Q.  Did they give you any indication that they were familiar          14:12:27

6    with The Erotic Review before you presented this PowerPoint?

7    A.  No.

8    Q.  Was there some discussion either in this meeting or shortly

9    thereafter about the possibility of having follow-up meetings?

10   A.  Yes.          14:12:46

11   Q.  And what, sir, if any, was your role in any follow-up

12   meetings that you had with Backpage representatives?

13   A.  I participated in all of the follow-up meetings.  I also

14   helped to coordinate them with their representative Mr. Moon.

15   Q.  This meeting as you have testified, the in-person meeting,          14:13:05

16   took place on March 1st of 2011, can you approximately tell the

17   jury how many meetings you had with Backpage representatives

18   and for how long?

19   A.  Sure.  There were close to a dozen subsequent meetings that

20   took place over a period of about 18 months.          14:13:23

21   Q.  All right.  And so who from Backpage, who represented

22   Backpage at these meetings?

23   A.  Mr. Moon.

24   Q.  And was anybody else present?

25   A.  Mr. Ferrer was typically on the phone, at times in person,          14:13:42

```
 1   but Mr. Moon was the consistent representative.
 2   Q.  Okay.  During these meetings, did you make certain specific
 3   recommendations to Mr. Moon and Mr. Ferrer about what they
 4   could do to prevent some of the things that you demonstrated in
 5   this PowerPoint?                                              14:14:09
 6   A.  Yes.
 7   Q.  All right.  During the course of the meeting, can you
 8   identify the first thing that you told them that they should
 9   implement?
10   A.  Yes.                                                      14:14:22
11   Q.  What was that?
12   A.  It was the images.
13   Q.  What -- can you explain to the jury what you mean by that?
14   A.  Yes.  So the images are predominantly in those
15   advertisements.  We had recommended that they use hash value   14:14:32
16   technology.  It's a digital fingerprint image matching
17   technology that if they were to deem an ad or receive feedback
18   on an ad that involved a minor, they could bank those hash
19   values, those digital images, and ensure they were never used
20   again in the future, or at least flag it for their trust and   14:14:54
21   safety team.
22   Q.  What, if any, response did they give about implementing
23   that recommendation?
24   A.  I introduced them to representatives at Microsoft who had
25   created the PhotoDNA technology, and they had relayed that they  14:15:11
```

```
 1    were exploring it, eventually deciding not to move forward with

 2    PhotoDNA and potentially building their own.

 3    Q.  And with respect to building their own, what, if anything,

 4    do you know about them actually implementing that -- that

 5    strategy?                                                          14:15:34

 6         MR. FEDER:  Objection, calls for hearsay, speculation.

 7         THE COURT:  Overruled.  He can answer as to what, if

 8    anything, he knew.

 9         THE WITNESS:  During all of the meetings that I

10    attended with Mr. Moon, it never took place.                      14:15:46

11    BY MR. RAPP:

12    Q.  Was there a second strategy that, or recommendation,

13    rather, that you made to them that you recommend that they

14    implement?

15    A.  Yes.                                                          14:16:04

16    Q.  What was that?

17    A.  The phone numbers.

18    Q.  When you say "phone numbers," remind the jury what you mean

19    by that.

20    A.  In the advertisements, in the escort sections, there was      14:16:10

21    always a phone number.  That's how you would get in touch with

22    the person advertised in the page.  Using that phone number,

23    you could mine to see how many different postings are taking

24    place, how many different cities and location, and layer that

25    with the image analysis to really start to build towards          14:16:30
```

1  knowing your customer, knowing who is being advertised in those

2  ads.

3  Q.  During the meetings that you had, did they implement that

4  recommendation?

5  A.  Not that I'm aware of.                                    14:16:48

6  Q.  Was there a third recommendation that you made during this

7  series of meetings?

8  A.  Yes.

9  Q.  What was that?

10  A.  When individuals would post an ad on Backpage, they had to  14:16:59

11  pay a fee, they had to pay, and so they could use that

12  information to, again, know their customer.  In some cases

13  individuals were using prepaid gift cards.  Another scenario

14  there were actual credit cards that were being used.  That was

15  another opportunity to know the customer.                     14:17:22

16  Q.  All right.  And did they implement that?

17  A.  No.

18  Q.  Was one of the recommendations that you made, did it

19  involve age verification?

20  A.  Yes.                                                      14:17:37

21          THE COURT:  Mr. Rapp, can you move toward the mic?

22  Thank you.

23          MR. RAPP:  Sorry.

24  BY MR. RAPP:

25  Q.  Let me say that again.  Was one of the recommendations that  14:17:42

```
 1   you made was some type of implementation of age verification on

 2   their site?

 3   A.  Yes.  There was a company at the time called Aristotle that

 4   was in the age verification business, and so we recommended

 5   that they explore that and potentially implement it.          14:18:03

 6   Q.  All right.  I just want to show you something quickly.

 7        MR. RAPP:  This is for your eyes only and not seeking

 8   to admit it.  It is for the record.  It's --

 9        THE COURT:  I can't hear you, Mr. Rapp.

10   BY MR. RAPP:                                                  14:18:25

11   Q.  I am showing you Exhibit 2033, do you see that on the

12   screen?

13   A.  Yes.

14   Q.  And it's -- would you agree it's about three pages?

15   A.  Yes.                                                      14:18:42

16   Q.  Do you recognize it?

17   A.  Yes, I do.

18   Q.  How do you recognize it?

19   A.  This is a memo that Ernie Allen had drafted and sent to

20   himself after the meeting.                                    14:18:54

21   Q.  All right.  And was this memo -- is this a memo that was

22   maintained within NCMEC in some fashion?

23   A.  Yes.

24   Q.  And in the event somebody wanted these records, they could

25   request to have those records produced?                       14:19:13
```

```
 1    A.  Yes.

 2    Q.  And I think you've testified to this, but how do you know

 3    that this document was authored by Mr. Allen?

 4    A.  He had met with us after the meeting and had discussed all

 5    of these points, and he had mentioned that he was drafting          14:19:32

 6    those notes for himself.

 7    Q.  Is this document, is it written in the first person?

 8    A.  Yes.

 9    Q.  Did there -- that's all the questions I have for that on

10    that document.                                                      14:19:47

11          Did there come a time where you decided to suspend

12    meetings with Backpage representatives?

13    A.  Yes.

14    Q.  Do you know when that was?

15    A.  I don't know the exact date, but I -- it was about             14:20:03

16    18 months after we began those meetings.

17    Q.  Okay.  And why was that -- why did you suspend the meetings

18    with the Backpage representatives?

19    A.  It became very clear that all of the recommendations that

20    we were making were not going to be implemented.  The meetings      14:20:25

21    had turned into us rehashing the recommendations that we had

22    been making and getting updates on the number of reports that

23    they were submitting to the CyberTipline or the number of legal

24    processes that were coming in to them.

25    Q.  All right.  Did you view, after the 18 months of meetings,      14:20:45
```

```
 1   did you view Backpage as a partner with NCMEC in pursuing some
 2   of the issues that you had observed on the site?
 3   A.  No.
 4   Q.  Did you come to any conclusions about the sincerity of
 5   Backpage's efforts in trying to stop what you had demonstrated          14:21:15
 6   to them in this PowerPoint?
 7           MS. BERTRAND:  Objection; calls for speculation as to
 8   "sincerity."
 9           MR. FEDER:  Also, relevance.
10           THE COURT:  I will sustain as to relevance, Mr. Rapp.          14:21:28
11           MR. RAPP:  Very well.
12   BY MR. RAPP:
13   Q.  I want to now show you Exhibit 171.
14           MR. RAPP:  For the witness' eyes only.
15   BY MR. RAPP:                                                            14:21:38
16   Q.  Do you recognize this document?
17   A.  Yes, I do.
18   Q.  How is it, sir, that you recognize it?
19   A.  This was a memo that several of us at NCMEC helped to draft
20   for our CEO, Mr. Ryan, when we were severing the meetings, the         14:21:54
21   continued meetings between NCMEC and Backpage.  This is the
22   letter that Mr. Ryan hand delivered to Mr. Moon.
23   Q.  I think you talked about a Mr. Allen at the March 1st, 2011
24   meeting, he was the president of NCMEC at the time?
25   A.  Yes, he was.                                                       14:22:17
```

```
1    Q.  Is this Mr. Ryan, did he subsequently become and take

2    Mr. Allen's position as president?

3    A.  Yes.

4    Q.  And was he informed about your meetings and given updates

5    on the meetings you had with Mr. Moon and Mr. Ferrer?          14:22:33

6    A.  Yes.

7    Q.  Just so we're clear, what was your understanding of what

8    Mr. Moon's role, if any, was in Backpage?

9    A.  He was a consultant.

10   Q.  All right.  And that was your understanding?               14:22:47

11   A.  Yes.

12   Q.  And does this letter that you hand delivered to Mr. Moon,

13   does it detail a number of the recommendations that you made to

14   Backpage to implement?

15   A.  Yes.  It summarizes almost all of the recommendations we   14:23:08

16   had been making.

17            MR. RAPP:  Move to admit 171.

18            MS. BERTRAND:  Objection; hearsay; relevance.

19            MR. CAMBRIA:  And 403.

20            MS. BERTRAND:  Lack of foundation.                     14:23:24

21            THE COURT:  Overruled.  It may be admitted.  One

22   moment, Mr. Rapp.  Can I see the second page?

23            All right.  It may be admitted.  It may be published.

24            (Exhibit No. 171 was admitted.)

25   BY MR. RAPP:                                                   14:24:00
```

UNITED STATES DISTRICT COURT

```
1   Q.  So sir, I am not going to ask you, in the interest of time,
2   to read this entire letter, but can you to the best of your
3   ability --
4           THE COURT:  Can you speak into the microphone?
5           MR. RAPP:  I will to the best of my ability speak into   14:24:14
6   the microphone.
7           THE COURT:  Yes.
8   BY MR. RAPP:
9   Q.  Can you summarize -- you're familiar with this letter?
10  A.  I am.                                                        14:24:21
11  Q.  Can you give the jury sort of a summary of what message
12  that you were trying, or NCMEC rather was trying to convey to
13  Backpage at 18 months after you met with them in person?
14  A.  So this -- this letter was to summarize everything we had
15  been outlining related to those meetings, the ways that they    14:24:42
16  could take steps to prevent this activity from occurring, and
17  summarizing that we hadn't seen any steps towards implementing
18  the measures we had been outlining.
19  Q.  All right.
20          MR. RAPP:  I have nothing further, and I will pass       14:25:02
21  this witness.  Thank you.
22          THE COURT:  Who is going to cross-examine?
23  Mr. Cambria.
24                      CROSS-EXAMINATION
25  BY MR. CAMBRIA:                                                 14:25:07
```

1   Q.  Good afternoon.

2   A.  Hello.

3   Q.  You indicated that you had suggested including hash value

4   technology, and that had been rejected?

5   A.  Yes, sir.                                                14:25:47

6        MR. CAMBRIA:  Can we pull up -- let's see, I got to

7   coordinate the exhibit number, JS1, and 14 pages in.  JS1.

8   Thank you.

9   BY MR. CAMBRIA:

10  Q.  If you look at what we have as PCJS1 for record purposes,  14:27:21

11  there is an e-mail apparently in there from you, June 3rd,

12  2011, to Mr. Allen and others, I think it's about 14 pages in.

13  A.  Are you on the page that's marked NCMEC, four zeros, 4-9,

14  bottom right-hand corner?

15  Q.  No.  The top of the page it would have your name as sending  14:28:11

16  this on June 3rd of 2011.

17  A.  June 3rd.

18  Q.  You sent it to Mr. Allen and some others.

19  A.  NCMEC, four zeros, 5-1?

20  Q.  Yes.  If you go down to, there really aren't paragraphs   14:28:31

21  there, but when it starts with, "we were then provided," do you

22  see that?

23  A.  Yes.

24  Q.  All right.  Do you not indicate in this memo that you wrote

25  that included in the new steps was hash value technology?     14:28:49

A.  Yes, and as I had mentioned earlier with PhotoDNA.  So the

limitations with binary hash values is when someone uploads an

image on to a platform, and that image is compressed or altered

in any way, it completely changes the hash value, and so the

chances of actually getting a match are miniscule.  They are          14:29:21

incredibly reliable hash values, binary hash values, but that

is why Microsoft create PhotoDNA to overcome those limitations

where you'll see a little bit lower that we were talking about

that as a recommendation to using.

Q.  But what I showed you is their report to you that they were    14:29:40

in fact using hash value technology?

A.  It does say that.

Q.  Maybe a different one than you're talking about now, but

you say in this memo that in fact they were including, at your

suggestion, hash value technology to match images, true?          14:30:00

A.  It does say that they are using hash value technology.

Q.  Okay.  And that they were doing it two tier review system;

correct?

A.  That is what it says, yes.

Q.  And that they were banning nudity?                              14:30:14

A.  Yes.  At one point in time nudity was allowed.  That was a

change that they had made.

Q.  And that was a suggestion that was made by Mr. Allen, was

it not?

A.  It may have been.                                              14:30:26

Q.  And they followed that suggestion?

A.  They definitely had banned nudity.

Q.  And eventually they banned The Erotic Review also, did they not?

A.  They did take steps to make it more difficult to have that link.                                                                14:30:38

Q.  These were all recommendations that were made either by you or Mr. Allen and they adopted them, true?

A.  Yes.

Q.  Okay.  With regard to -- you said that at this meeting you had some examples of pictures and so on that you felt were inappropriate, do you recall that?                                            14:30:52

A.  We had confirmed minors.

Q.  Right.  But what you -- isn't it also true, however, that you had some other information about those minors more than what would just be depicted on the ad?                                       14:31:18

        MR. RAPP:  Objection; foundation.

        THE COURT:  Sustained.  You can lay some as to whatever information.

BY MR. CAMBRIA:                                                                                                                   14:31:38

Q.  You had more information than just the ad to detect those minors, did you not?

A.  Yes, from law enforcement that those were minors that had been recovered, yes.

Q.  So -- so that is different than simply being able to look                                                                     14:31:48

1  at the ad itself and making that judgement because you were

2  NCMEC and you had this other information from law enforcement,

3  you could put two and two together and get to that conclusion;

4  correct?

5  A.  Yes.  That's why we were outlining that there were ways we          14:32:05

6  could work together to disrupt this issue.

7  Q.  Right, but my point is that without that extra information

8  you couldn't make the connection yet just on the ad, true?

9  A.  Well, in fairness, if through our meetings with Carl and

10  Mr. Moon, certainly they relayed the number of legal processes      14:32:26

11  that they were receiving from law enforcement related to child

12  sexual exploitation, so they too could have obtained this

13  information directly.

14  Q.  But as to the examples that you showed them, you had that

15  information and it was -- there was no indication from them         14:32:42

16  that they had it?

17  A.  Not that I'm aware of.

18  Q.  All right.  So -- and you had a number of meetings with

19  Mr. Moon, did you not?

20  A.  Yes.                                                            14:32:56

21  Q.  And in those meetings, did he repeatedly ask you whether or

22  not --

23          MR. RAPP:  Objection, to the extent that this calls

24  for hearsay.

25          THE COURT:  Sustained.                                     14:33:09

1          MR. CAMBRIA:  I withdraw that, Your Honor.

2    BY MR. CAMBRIA:

3    Q.  Okay.  So you found out that they had banned nudity, they

4    did in fact use a hash value technology, they knocked out The

5    Erotic Review.  So far so good; correct?                    14:33:23

6    A.  Well, they had outlined that they were beginning to

7    implement hash value technology.  It had fallen off.  At no

8    point did they actually create a bank of imagery to be doing

9    comparisons against.  So they did explore hash value

10   technology, but did not grow the program into something that  14:33:40

11   would have actually been functional.

12   Q.  In your opinion; correct?

13   A.  In my opinion, yes.

14   Q.  All right.  And but the other suggestion, as far as taking

15   nudity off, taking out The Erotic Review and so on, they did  14:33:56

16   accept those?

17          MR. RAPP:  Objection; asked and answered.

18          THE COURT:  Sustained.

19   BY MR. CAMBRIA:

20   Q.  Okay.  Now, you spoke of GFE, Girlfriend Experience is what 14:34:03

21   it's been called here in the courtroom, do you agree with that?

22   A.  Yes.

23   Q.  Have you ever typed that into Facebook?

24          MR. RAPP:  Objection; relevance.

25          THE COURT:  Overruled.                                14:34:25

1          THE WITNESS:  No, I have not.

2     BY MR. CAMBRIA:

3     Q.  Have you ever typed in "female escort" into Facebook?

4          MR. RAPP:  Same objection.

5          THE COURT overruled.                              14:34:36

6          THE WITNESS:  No, I have not.

7     BY MR. CAMBRIA:

8     Q.  Have not.  Now, Facebook, as you know, I assume, made over

9     a million reports to NCMEC about activity involving sexual

10    activity; correct?                                     14:34:54

11    A.  They have submitted millions of reports regarding child

12    sexual exploitation.

13    Q.  Okay.  And they -- did they implement an end-to-end

14    encryption device?

15         MR. RAPP:  Objection; relevance and foundation.   14:35:15

16         THE COURT:  Well, he can lay some foundation.

17    Mr. Cambria, why don't you do that.

18    BY MR. CAMBRIA:

19    Q.  You know what that is; correct?

20    A.  End-to-end encryption, I do.                       14:35:24

21    Q.  Do you know whether or not Facebook implemented that?

22    A.  They have started to roll it out, yes.

23    Q.  And isn't it a fact that that is something that your

24    organization is against because it allows private

25    communications with minors?                            14:35:44

1              MR. RAPP:  Objection; foundation and relevance.

2              MR. CAMBRIA:  May I ask him if he is aware of it?

3              THE COURT:  Sustained as to foundation.

4    BY MR. CAMBRIA:

5    Q.  You know what it is.  You told us that.  So now I'm asking                14:35:56

6    you whether or not you know from your dealings with Facebook

7    whether or not they have end-to-end encryption?

8    A.  They are in the process of rolling out end-to-end

9    encryption on their Messenger product, and they are estimating

10   to have it done by the end of this year.                                      14:36:16

11   Q.  Isn't that something that people who are concerned with

12   traffic of minors are not in favor of?

13   A.  We at NCMEC are concerned about Facebook's rollout of

14   end-to-end encryption with Messenger as it relates to child

15   sexual abuse material, so child pornography images and videos.                14:36:39

16   82 percent of the reports that they submitted last year to our

17   CyberTipline involve Facebook Messenger.

18   Q.  And so that's a problem?

19   A.  There would be a great deal of child sexual exploitation

20   that could potentially go undetected if they don't have                       14:36:56

21   different ways of implementing some sort of safety measures.

22   Q.  Did you make some suggestions to them as to how to cure

23   that?

24              MR. RAPP:  Objection as to the relevance and

25   foundation of this line of questioning.                                       14:37:15

1          THE COURT:  Well, I guess if you could lay some

2     foundation about whether or not they met with Facebook, and

3     when, and so on and so forth, so that we could have some

4     context, Mr. Cambria.

5          MR. CAMBRIA:  I couldn't say it any better than that.          14:37:27

6     I agree.

7          THE COURT:  That's not your question, Mr. Cambria.

8          MR. CAMBRIA:  I adopt that question.

9     BY MR. CAMBRIA:

10    Q.  Do you understand what we're saying?  You understand what          14:37:37

11    it is, and so have you -- have you determined -- you've already

12    explained to us what you know about that with regard to

13    Backpage.  My question is, have you in any way discouraged them

14    from implementing something like that?

15          MR. RAPP:  Objection; relevance.          14:37:59

16          THE COURT:  Overruled.  He may answer.

17          THE WITNESS:  They know that our organization is

18    concerned about the child safety implications that may occur if

19    they roll out encryption on Facebook Messenger.

20    BY MR. CAMBRIA:          14:38:15

21    Q.  So millions of reports on Facebook, plus this encryption

22    situation, but you identified Facebook is one of your partners,

23    do you not?

24    A.  We work with a wide variety of companies.

25    Q.  But aren't these the partners, you have a little chart and          14:38:29

```
 1    it shows the companies that donate over a million dollars to

 2    your organization, and Facebook is one of them?

 3    A.  They are a financial contributor to our organization, yes.

 4    Q.  And you have them in a little display of your partners, one

 5    of your partners?                                               14:38:47

 6    A.  They are likely on our website somewhere, yes.

 7    Q.  And so now they are in a situation with millions of reports

 8    and encryption and so on, but they are still considered one of

 9    your partners?

10    A.  Yes.  We still want to find ways to protect children on     14:39:01

11    their platform even if they go to an encrypted service.

12    Q.  Even if you suggest it and they don't adopt it?

13    A.  Correct.

14    Q.  Do you recall at some time Mr. Moon suggesting that there

15    be some national standards that platforms could follow with     14:39:40

16    regard to postings and so on?

17    A.  I do recall Mr. Moon's interest in national standards, yes.

18    Q.  And was NCMEC asked to spearhead such a situation,

19    standards like that nationally?

20    A.  It was a suggestion that he had made to Mr. Allen and the    14:40:06

21    group of us meeting, yes.

22    Q.  And you did not do so; correct?

23    A.  Not that I'm aware of, no.

24    Q.  But you testified, did you not, before Congress that that

25    would be a great thing to do?                                   14:40:18
```

UNITED STATES DISTRICT COURT

1   A.  No, I did not.

2   Q.  No.  Okay.  Did you testify anywhere and suggest that there

3   be national standards?

4   A.  Not related to Mr. Moon's suggestion, no.

5   Q.  Okay.  Related to what with regard to national standards?    14:40:36

6   A.  I can't recall any national standards, but I do know that I

7   did not have any such activity related to Mr. Moon's

8   suggestion.

9   Q.  Mr. Moon made a suggestion about national standards.  You

10  agree with that; right?                                         14:40:51

11  A.  His was more related to online classified ads.  It was not

12  broad to the entire ecosystem of providers.  It was related to

13  online classified advertisers.

14  Q.  I'm sorry, I did ask a question.  I didn't follow up on it.

15  Did you say you'd ever put "GFE" into Facebook?                  14:41:12

16          MR. RAPP:  Objection; asked and answered.

17          THE COURT:  Sustained.  It was asked and answered.

18  BY MR. CAMBRIA:

19  Q.  How about TikTok, have you put it in TikTok?

20          MR. RAPP:  Same objection.                              14:41:23

21          THE COURT:  Sustained.

22          MR. CAMBRIA:  Okay.

23          THE COURT:  You got about two more minutes,

24  Mr. Cambria.

25          MR. CAMBRIA:  Until?                                    14:41:35

```
 1              THE COURT:  Our break.
 2              MR. CAMBRIA:  Oh, this will be a great time then.  Can
 3    we break now?
 4              THE COURT:  Let's plow ahead.  Unless you really --
 5              MR. CAMBRIA:  I was waiting for the trap door to go       14:41:46
 6    here or something.
 7              THE COURT:  All right.
 8              MR. CAMBRIA:  Actually, this would be a good place to
 9    stop, if you don't mind.
10              THE COURT:  Members of the jury, we will take our        14:41:56
11    afternoon break at this time.  Just remember the admonition.
12    You know we will take our standard 20-minute break.  Liliana
13    will come in and retrieve you likely about five minutes after
14    the hour.  And so with that, please all rise as the jury takes
15    its break.                                                         14:42:16
16                        (Jury is not present.)
17              THE COURT:  Let me just ask, as the witness leaves,
18    let me just ask Mr. Rapp, what is your -- what does your timing
19    look like for the rest of the afternoon?
20              MR. RAPP:  We are very much hoping to complete           14:43:04
21    Mr. Shehan today so he can get back on a plane, and then we
22    will roll into Mr. Hyer.
23              THE COURT:  Mr. Cambria, how much longer do you need
24    with this witness?  Do you anticipate --
25              MR. CAMBRIA:  I don't think more than about              14:43:18
```

```
 1    15 minutes.
 2              THE COURT:  Who else is going to examine this witness?
 3              MR. FEDER:  I may.
 4              THE COURT:  Sorry.  You may, Mr. Feder.
 5              MR. EISENBERG:  And myself.                    14:43:29
 6              THE COURT:  And Mr. Eisenberg and Ms. Bertrand.  Okay.
 7    Well, I guess we'll see how it goes.  All right.  We will stand
 8    at recess.
 9              (Recess was taken at 2:43 p.m.)
10         (Proceedings reconvened at 3:05 p.m.)                15:05:41
11              THE COURT:  All right.  Please be seated.  The record
12    will reflect the presence of the jury.  The witness is on the
13    stand.
14              Mr. Cambria, you may continue.
15              MR. CAMBRIA:  Thank you.                        15:06:05
16    BY MR. CAMBRIA:
17    Q.  Mr. Shehan, are you familiar with the 2021 report of the
18    United States Government Accountability Office --
19              MR. RAPP:  Objection; relevance.
20    BY MR. CAMBRIA:                                           15:06:17
21    Q.  -- entitled Trafficking Online Platforms and Federal
22    Prosecutions?
23              MR. RAPP:  Objection; relevance.
24              THE COURT:  Sustained.
25              MR. CAMBRIA:  I think it is relevant, Your Honor.  Can  15:06:27
```

```
 1    we have sidebar?
 2            THE COURT:  You can lay some foundation.
 3    BY MR. CAMBRIA:
 4    Q.  Well, are you familiar with a government report that
 5    comments on the -- on the fact that after Backpage was --     15:06:42
 6            MR. RAPP:  I object.  I am going to object to this.  I
 7    know where he is going.  Objection; relevance.
 8            THE COURT:  I'll sustain the objection.
 9            MR. CAMBRIA:  Can we have a sidebar, please?
10            THE COURT:  Yes.                                       15:07:11
11            MR. CAMBRIA:  Thank you.
12    (Sidebar)
13            MR. CAMBRIA:  Good.  I get to step up here.  I look
14    taller now.
15            THE COURT:  If you knew the question was going to draw  15:07:28
16    an objection, you should have done this without the jury
17    present, just so you know for future reference, Mr. Cambria.
18    Okay.  All right.  So now --
19            MR. CAMBRIA:  Here's the situation, I --
20            THE COURT:  What is the relevancy of this report?      15:07:46
21            MR. CAMBRIA:  First of all, it's a government agency.
22    The government is a party to this case, and the finding was
23    that after Backpage was shut down that it became more difficult
24    to discover and fight trafficking and other things, and to me
25    that is evidence of nonfacilitation by our clients because we   15:08:06
```

```
 1    were facilitating and now we're shut down.  You know, you
 2    wouldn't have this reaction, which is the government office now
 3    finds that when Backpage is closed, it's harder -- it's harder
 4    to make cases.  The things have gone offshore, so now process
 5    isn't available and so on.  All of that is the opposite of          15:08:38
 6    facilitation, indicating what impact we make on this subject
 7    area.
 8              THE COURT:  But I guess the question was after
 9    Backpage was shut down, you're introducing the document to show
10    what happened after 2018.  So that's -- the question then          15:08:59
11    becomes, how is that relevant to the charges in the indictment?
12              MR. CAMBRIA:  Because it shows that while we were
13    operating we were helping law enforcement.  That's how it's
14    relevant.
15              THE COURT:  Mr. Rapp.                                     15:09:13
16              MR. RAPP:  Judge, the argument is this:  We were
17    running a prostitution website and we complied with subpoenas
18    and that allowed us to help out law enforcement.
19              That's not a viable defense that they could use to the
20    Travel Act.  It's particularly irrelevant because the report      15:09:31
21    comes out in 2021, and so it is not relevant to the charges in
22    this indictment.
23              MR. CAMBRIA:  That could be your argument.
24              THE COURT:  Well, I'm going to limitedly allow it, the
25    question, because, you know, the offense has put forward in        15:09:51
```

1    theory that they were helping the law enforcement community,

2    and I think that at this juncture they are permitted to at

3    least ask the question.  I'm not going to let you delve into --

4    I am not going to let you delve into the report.  You can ask

5    the question if he's aware of the report, how was he aware, to        15:10:19

6    his awareness, what did it say?  You could ask it in that

7    leading way as you were on cross, but beyond that we're not

8    going to get into data and so on and so forth, the hearsay that

9    might be involved in the report, so that's how I'm going to

10   limit your scope.                                                      15:10:44

11           MR. CAMBRIA:  That's fine.  And this is a government

12   report.  The government is a party here.

13           THE COURT:  Fair enough.  Okay.  That's how we'll

14   proceed.

15   (The following took place in open court:)                             15:10:58

16           THE CLERK:  In the gallery during sidebar, if we could

17   keep conversation to a minimum so that the court reporter is

18   not competing with the noise, please.

19           THE COURT:  Thank you, Liliana.  All right.

20   Mr. Cambria, you may continue.                                        15:11:13

21           MR. CAMBRIA:  Thank you.

22   BY MR. CAMBRIA:

23   Q.  First of all, are you familiar with the United States

24   Government Accountability Office?

25   A.  Yes.                                                              15:11:25

```
1   Q.  Are you familiar with a 2021 report commenting on, since

2   Backpage closed law enforcement has been hampered?

3   A.  No, I'm not familiar with that.

4   Q.  Are you familiar with, since Backpage closed platforms have

5   moved overseas beyond the subpoena power?                          15:11:52

6          MR. RAPP:  Objection; relevance; foundation.

7          THE COURT:  Overruled.  He can answer if he's aware.

8          THE WITNESS:  I am not.

9   BY MR. CAMBRIA:

10  Q.  You're not.  All right.  Thank you.                            15:12:09

11         MR. CAMBRIA:  That's all I have.

12         THE COURT:  Ms. Bertrand.

13         MS. BERTRAND:  I think a couple of my colleagues are

14  going to go first and I will go last.

15         THE COURT:  Mr. Feder.                                      15:12:20

16         MR. FEDER:  I'll go.  Thanks.

17                        CROSS-EXAMINATION

18  BY MR. FEDER:

19  Q.  Would you bring up 624, please?  Do you remember this

20  exhibit, Mr. Shehan?                                               15:12:52

21  A.  Yes.

22  Q.  There are a couple other names on here that you have not

23  been mentioning.  Do you remember all these people that are on

24  this e-mail?

25  A.  I've never met the people on the cc line.  SPP Blue is the     15:13:06
```

```
 1    company that Mr. Nigam owned, so I imagine that that's an

 2    employee, and I don't know Jamie either.

 3    Q.  Mr. Nigam is or was on the board of NCMEC, isn't that true?

 4    A.  No, he was not.

 5    Q.  Are you sure about that?                           15:13:24

 6    A.  I don't believe he was.

 7    Q.  Okay.  And Mr. Nigam is also a former federal sex crimes

 8    prosecutor; right?

 9            MR. RAPP:  Objection; relevance.

10            THE COURT:  Sustained.                          15:13:36

11    BY MR. FEDER:

12    Q.  Mr. Nigam and Ms. Schumacher and Ms. Hooper were also in

13    this meeting that you're talking about; right?

14    A.  Mr. Nigam was.  I do not believe any of the cc individuals

15    were in the actual meeting at NCMEC.                   15:13:59

16    Q.  And the meeting that we're talking about is 1st of March,

17    the one in '11?

18    A.  Yes.

19    Q.  And he was there?

20    A.  Mr. Nigam was, yes.                                15:14:09

21    Q.  And SSR Blue, as you know, they are a consultant to help

22    websites do what they are supposed to do under the law;

23    correct?

24            MR. RAPP:  Objection; foundation.

25            THE COURT:  Sustained.  You can lay foundation. 15:14:23
```

BY MR. FEDER:

Q.  What is your understanding of SSR Blue?

A.  It was a company that Mr. Nigam had created.

Q.  And what did they do, if you know?

A.  I believe that they worked with companies to help keep
their sites safer, but beyond that I don't know the
intricacies.

Q.  Okay.  And Mr. Nigam, when you were showing him this
PowerPoint, I am assuming he didn't say anything either?

A.  No, he did not.

Q.  You were asked some questions on cross, Mr. Shehan, about
Facebook, do you remember those?

A.  Yes.

Q.  They are a supporter of NCMEC; right?

        MR. RAPP:  Objection; asked and answered.

        MR. FEDER:  Preface to a follow-up.

        THE COURT:  I will overrule, and you can answer the
question.

        THE WITNESS:  Yes, they are a supporter of NCMEC.

BY MR. FEDER:

Q.  They pay NCMEC a million dollars a year as a supporter?

        MR. RAPP:  Same objection.

        THE COURT:  Overruled.

        THE WITNESS:  They have made financial contribution at
times of a million dollars.  They do not provide that every

```
1    year.
2    BY MR. FEDER:
3    Q.  Well, how many years have they been providing a relatively
4    substantial amount of money to NCMEC?
5              MR. RAPP:  Objection.                              15:15:48
6    BY MR. FEDER:
7    Q.  To your knowledge.
8              MR. RAPP:  Objection; relevance.
9              THE COURT:  Sustained.
10             MR. FEDER:  Can you bring up Exhibit 652a?         15:16:00
11   BY MR. FEDER:
12   Q.  Mr. Shehan, you've testified that you made this PowerPoint
13   in order to show it to the folks that came to meet with you in
14   March of '11; right?
15   A.  Yes.                                                     15:16:30
16   Q.  And you discussed TER; right?
17   A.  Yes.
18   Q.  Anybody who's in your arena knows, has known about TER for
19   many years; correct?
20             MR. RAPP:  Objection; foundation.                 15:16:47
21             THE COURT:  Sustained.
22   BY MR. FEDER:
23   Q.  You've testified on direct with Mr. Rapp that you've been
24   with NCMEC since what year, 1999?
25   A.  2000.                                                    15:16:57
```

```
 1   Q.  Okay.  And have you known about TER since 2000?
 2   A.  No.
 3   Q.  When did you first become aware of them?
 4   A.  When I prepared this PowerPoint with other staff members.
 5   Q.  You never heard of TER before then?                        15:17:08
 6   A.  I had not.
 7   Q.  Okay.  You mentioned in your direct testimony, I believe,
 8   that there was -- at some time you had to get a VIP membership,
 9   and I think you testified you got a 30-day one in order to look
10   at what was really on TER; right?                              15:17:27
11   A.  Correct.
12   Q.  And that's something called a paywall?
13   A.  Yes.
14   Q.  So anybody that just goes to the TER site, at least in the
15   days when you were looking at it, they wouldn't see very much,  15:17:38
16   I mean, they wouldn't see the things that were shown to you on
17   that exhibit; correct?
18   A.  Portions of what was shown they would have.  The area such
19   as The Juicy Details they would not have.  You would have had
20   to have paid.                                                  15:17:53
21   Q.  They would not see the actual review, correct, unless they
22   had a VIP membership, true?
23   A.  No.  There were portions of the review that they could see
24   minus the paywall.
25   Q.  And in order to get a VIP membership, you got to pay money;  15:18:05
```

1    right?

2    A.  Yes.

3    Q.  Do you remember how much NCMEC had to pay for its 30-day

4    VIP membership?

5    A.  I do not.                                                    15:18:16

6    Q.  To your knowledge, at least since this was the first time

7    you had gone on TER, the paywall was there; right?

8    A.  Yes.

9    Q.  And have you -- and you said -- I think you said you went

10   on TER on a number of occasions after that; is that right?      15:18:34

11   A.  Only during that 30-day period.  That was the only time

12   we've had access and paid access to The Erotic Review.

13   Q.  Okay.  And how many times would you say you went to TER

14   during that 30-day period?

15   A.  Just enough to prepare this PowerPoint presentation.         15:18:48

16   Q.  I am looking for a number if you could give it to me.

17   A.  Perhaps a dozen times.

18   Q.  Every time you went the paywall was there; correct?

19   A.  We had access beyond the paywall because we had paid for

20   the 30-day subscription.                                        15:19:02

21   Q.  You have to give them your subscription number in order to

22   get beyond the paywall, true?

23   A.  Yes.  You have to log in to get past the subscription.

24   Q.  Other than reviews, there's a number of other things on

25   TER, weren't there?                                             15:19:16

1    A.   There may have been.   That was the portion that we were

2    specifically subscribing to The Erotic Review for.

3    Q.   You didn't see discussion boards and other things that have

4    nothing to do with escorts on there?

5    A.   That was the purpose of why we purchased access.   So no, I          15:19:29

6    did not explore The Erotic Review.

7    Q.   Okay.   I think this was a mistake on your part, but you

8    were asked a question about what in-call meant on page 6 of

9    this, could you bring that exhibit back up, please?   In-call

10   means the customer comes to the advertiser, right, not vice          15:20:00

11   versa?

12   A.   In-call, outcall, someone is willing to travel, whether or

13   not and how that will transpire.

14   Q.   In-call means to you that the customer comes to the

15   advertiser?                                                           15:20:16

16   A.   Correct.

17   Q.   Outcall is the opposite?

18   A.   They are willing to go out, yes.

19   Q.   Could you go to, I think it's page 5 of 652a.   See where it

20   says "general details"?                                              15:20:59

21   A.   Yes.

22   Q.   Could you highlight that, please, and see where it says,

23   "Many people on CL"?

24   A.   Yes.

25   Q.   That's Craigslist; right?                                       15:21:14

```
1    A.   That is shorthand for Craigslist.

2    Q.   Your understanding is many websites had connections to TER,

3    right, including Craigslist?

4    A.   At the time there were many different sites that were

5    linking with The Erotic Review, yes.                              15:21:30

6    Q.   And in order to -- if there's a link to Backpage or

7    Craigslist or anybody else, all there is is a link.  You

8    have -- the reader of Backpage or Craigslist or whoever has to

9    hit the link, and then the link, I will use my nontechnical

10   words, transports them to TER; right?                            15:21:50

11   A.   Yes.  There would be a hyperlink.  At one point there was a

12   hyperlink you could click on that would take you to The Erotic

13   Review from the Backpage ad.  At one point that was severed and

14   there was just the I.D. number that someone would have to copy

15   and paste and take to The Erotic Review to look it up.           15:22:08

16   Q.   They did more than that, didn't they, Mr. Shehan.  They

17   actually took TER itself, so just a number was there; right?

18   A.   There were efforts taken to eliminate the ease to the

19   access to The Erotic Review.

20   Q.   As a matter of fact, before the March 1st, 2011 meeting,    15:22:21

21   maybe at NCMEC's recommendation, maybe at Mr. Nigam's

22   recommendation, they had already severed their relationship

23   with TER --

24           MR. RAPP:  Objection as to foundation.

25   BY MR. FEDER:                                                    15:22:35
```

```
1    Q.  -- if you know?

2             THE COURT:  Sustained.

3    BY MR. FEDER:

4    Q.  Do you know that?

5    A.  I do not.                                              15:22:38

6             MR. RAPP:  Same objection.

7             THE COURT:  I sustained the objection.

8             MR. FEDER:  Could you bring up --

9    BY MR. FEDER:

10   Q.  During your testimony on this exhibit you said that you  15:23:04

11   wanted to see if there were other ads in regard to a certain

12   advertiser, right, do you remember that?

13   A.  Yes.

14   Q.  And you went to Google?

15   A.  Yes.                                                   15:23:16

16   Q.  And you typed in the phone number?

17   A.  Correct.

18   Q.  And when you were on the Google site, that phone number

19   brought up, I think you said 14 or, 14 or 15 ads?

20   A.  Yes.  It was very easy to find additional ads tied to one  15:23:31

21   phone number.

22   Q.  So you can find these same ads that appeared on Backpage on

23   Google?

24   A.  They were all Backpage ads being indexed by Google, but

25   yes, you could find them.                                 15:23:47
```

```
 1    Q.  If you and I went to Google as we sit here today and wanted
 2    to look up Backpage escort ads, they would come up; right?
 3    A.  I don't believe they are still indexed.
 4    Q.  How about for Facebook, do you think we would be able to
 5    find Facebook ads on Google as we sit here today for escorts?    15:24:01
 6            MR. RAPP:  Objection; relevance.
 7            THE COURT:  Sustained.
 8    BY MR. FEDER:
 9    Q.  You said there were a number of follow-up meetings with
10    Mr. Moon and Mr. Ferrer; right?                                  15:24:31
11    A.  Yes.
12    Q.  Mr. Moon is an attorney; correct?
13            MR. RAPP:  Objection; relevance.
14    BY MR. FEDER:
15    Q.  You identified him as a representative?                      15:24:42
16            THE COURT:  Well, sustained.
17            MR. FEDER:  I think that's it.  Thanks a lot.
18            THE COURT:  Mr. Eisenberg.
19                       CROSS-EXAMINATION
20    BY MR EISENBERG:                                                 15:25:17
21    Q.  Good afternoon, sir.
22    A.  Hello.
23    Q.  Mr. Shehan --
24            MR. EISENBERG:  Let's have 624 back up, if we may.
25    BY MR. EISENBERG:                                                15:25:28
```

1   Q.  And this is just as a point of reference.  When you see

2   that there, sir, you see that there is yet another name -- you

3   see there's another name there, sir, Mr. Ferrer, Carl Ferrer?

4   A.  Yes.

5   Q.  And this is something that was e-mailed to you by          15:25:53

6   Mr. Nigam; correct?

7   A.  Yes.

8   Q.  And you can see where he says, "Carl Ferrer who heads up

9   operations at Backpage"; right?

10  A.  Yes.                                                       15:26:06

11  Q.  And you came to meet Mr. Ferrer several times; correct?

12  A.  More of the meetings were on the phone than in person, but

13  yes.

14  Q.  Okay.  And you came to know that -- in fact, you came to

15  understand that he was a person who was in charge of operations  15:26:21

16  at Backpage; correct?

17  A.  Yes.

18  Q.  And in terms of operations at Backpage, how would you

19  define what it was that Mr. Ferrer was doing, for example, was

20  he helpful in terms of, or was he in charge in terms of ad      15:26:39

21  content, if you know?

22          MR. RAPP:  Objection; foundation.

23  BY MR EISENBERG:

24  Q.  If you know?

25          THE COURT:  He can answer if he knows.                 15:26:51

1          THE WITNESS:  I believe he oversaw the trust and

2     safety part of Backpage, as well as the legal compliance areas.

3     BY MR EISENBERG:

4     Q.  Okay.  By that, that would include the content with respect

5     to ads that are posted on Backpage; correct?                    15:27:05

6     A.  Yes.

7     Q.  Okay.  And he was also a person, I believe, that you looked

8     to for referrals from Backpage?

9     A.  Yes.  He was oversaw the reporting aspect from Backpage

10    into the CyberTipline.                                          15:27:25

11    Q.  Mr. Shehan, sorry, what kinds of reports was he making to

12    Backpage, sorry, was he making to NCMEC?

13    A.  He was making reports on behalf of Backpage, he and his

14    team, when they suspect child sex trafficking was occurring on

15    the platform.                                                   15:27:46

16    Q.  Sir, do you have any idea how many reports there were that

17    came in from Mr. Ferrer about that issue and his team?

18    A.  I don't know the exact number, but it was in the thousands.

19    Q.  Thousands.  Right.  And in fact, it got to the point where

20    NCMEC was, would you say overrun with those referrals?          15:27:59

21    A.  No.

22    Q.  You weren't?

23    A.  No.

24    Q.  They were helpful, though, weren't they?

25    A.  We certainly made every single one of those reports         15:28:07

```
 1    available to law enforcement for their independent review and

 2    possible investigation.

 3    Q.  Thank you.  CyberTip, that's a, is that a hotline that you

 4    all have, NCMEC has?

 5    A.  Yes.  Backpage operates the CyberTipline.                        15:28:24

 6    Q.  Were there reports then made by Mr. Ferrer and his crew to

 7    CyberTip?

 8    A.  Yes.  He made reports on behalf of Backpage into the

 9    CyberTipline.

10    Q.  The CyberTipline, I think that's probably what you were        15:28:37

11    testifying about before, is that the, let's say method or way

12    of operating in order to get those referrals out to law

13    enforcement?

14    A.  Yes.

15    Q.  Thank you, sir.                                                  15:28:52

16            MR. EISENBERG:  Thank you, Your Honor.

17            THE COURT:  Ms. Bertrand.

18                        CROSS-EXAMINATION

19    BY MS. BERTRAND:

20    Q.  Good afternoon, Mr. Shehan.                                      15:29:07

21    A.  Hello.

22    Q.  Good afternoon.  Do you know whether or not TER is still

23    operational today?

24    A.  I do not.

25    Q.  So NCMEC did not continue to monitor activity on TER?           15:29:20
```

1              MR. RAPP:  Objection; relevance.

2              THE COURT:  Overruled.

3              THE WITNESS:  No, we are not a proactive investigation

4    or investigative agency.  We are not law enforcement.  We

5    certainly made law enforcement and the Department of Justice          15:29:34

6    aware of what we knew, but, no, we did not monitor that

7    platform.

8    BY MS. BERTRAND:

9    Q.  And following up on what Mr. Eisenberg was just talking to

10   you about the CyberTipline information, the staff at Backpage         15:29:47

11   monitoring the CyberTipline, that was the moderation staff, if

12   you know?

13   A.  It should be, yes.

14   Q.  It should be.  Why do you say "should"?

15   A.  That's typically the portion of a company that is reporting       15:30:03

16   in.  I don't know if that's what they called them, if that is

17   who it was in fact.  Sometimes it's a legal department within

18   the company, but typically it is the trust and safety

19   department.

20   Q.  So if moderators were the people interfacing with the             15:30:15

21   CyberTipline for NCMEC, that would be appropriate; correct?

22   A.  Yes.

23   Q.  And do you know whether or not when moderators would send

24   these referrals to NCMEC CyberTipline if they also

25   cross-referenced with other ads they found on the cite?              15:30:36

```
1    A.  There were times, yes, that they would.

2    Q.  Do you know if they ever cross-referenced with other

3    websites and said:  Here, find this on another cite?

4    A.  I can't recall one specifically.  It could have, but I

5    don't know.                                                    15:30:53

6         MS. BERTRAND:  Thank you.  I have nothing further as

7    well.

8         THE COURT:  Mr. Lincenberg.

9         MR. LINCENBERG:  Nothing, Your Honor.

10        THE COURT:  Mr. Rapp.                                     15:30:58

11                    REDIRECT EXAMINATION

12   BY MR. RAPP:

13   Q.  Just a few questions, Mr. Shehan.  With regard to The

14   Erotic Review, there were questions about the links being

15   removed, do you remember that?                                 15:31:08

16   A.  Yes.

17   Q.  What, if anything, did you observe in 2011 going forward

18   with respect to The Erotic Review being referenced in any

19   Backpage postings?

20   A.  It morphed.  It changed.  Certainly the ability to directly  15:31:24

21   hyperlink was broken, was severed, but individuals still posted

22   the I.D. number, so it was still possible to find The Erotic

23   Review.

24   Q.  With respect to Mr. Nigam, how many meetings that you had

25   after the March 1st, 2011 meeting, how many meetings was        15:31:42
```

UNITED STATES DISTRICT COURT

1    Mr. Nigam, did he appear in person at those meetings?

2    A.  None.

3    Q.  How many of those meetings did he call in and appear

4    telephonically?

5    A.  None.                                                    15:31:58

6    Q.  How many meetings -- how many e-mails did you receive from

7    Mr. Nigam after March 1st of 2011 regarding issues with

8    Backpage?

9    A.  None that I can recall.

10   Q.  With respect to the Craigslist reference in one of these   15:32:14

11   TER reviews, what relationship, if any, do you know that

12   Craigslist has with The Erotic Review?

13          MS. BERTRAND:  Objection; calls for speculation, and

14   leading.

15          MR. CAMBRIA:  Foundation also.                        15:32:34

16          THE COURT:  He can answer if he knows, and then Mr.

17   Rapp can follow up.

18          THE WITNESS:  I don't know of any.

19   BY MR. RAPP:

20   Q.  You don't know if there is any type of formal business     15:32:41

21   relationship between Craigslist and The Erotic Review?

22   A.  No, I do not.

23          MS. BERTRAND:  Objection; leading.

24          THE COURT:  Well, overruled.  It's been asked,

25   Mr. Rapp.                                                     15:32:52

1    BY MR. RAPP:

2    Q.  In your 23 years at NCMEC, are you able to provide an

3    opinion as to comparing the platform Facebook with Backpage?

4            MS. BERTRAND:  Objection, Rule 16, not noticed as an

5    expert.                                                      15:33:11

6            MR. FEDER:  Beyond the scope, too.

7            THE COURT:  Overruled.  You may answer.

8            THE WITNESS:  They are very different platforms.

9    There are some similarities, I suppose, where Facebook has

10   dating, there is Marketplace.  So Backpage had an area where  15:33:25

11   you could sell things, but very, very different, Facebook

12   dating compared to the erotic section in Backpage.  Of course,

13   on Facebook there is the ability to create content, connect

14   with other individuals, very, very different.  That is a social

15   media platform compared to online classified ad site, very     15:33:45

16   different types of platforms, if you will.

17           MR. RAPP:  Thank you, sir.  I have nothing further.

18           THE COURT:  May the witness be released from subpoena?

19           MR. RAPP:  Yes.

20           THE COURT:  Any objection from defense?               15:34:00

21           MS. BERTRAND:  No.

22           THE COURT:  Thank you for your testimony.  You are

23   released from subpoena.  You may step down, and safe travels

24   home.

25           THE WITNESS:  Thank you, Your Honor.                  15:34:09

```
 1              THE COURT:  Call your next witness.
 2              MR. STONE:  United States calls Dan Hyer.
 3              THE COURT:  Can you give Liliana a moment to retrieve
 4    the exhibit from the witness stand?  Just stand there for a
 5    moment.  Thank you.                                          15:34:46
 6         Sir, please come forward and be sworn by my courtroom
 7    deputy.
 8    DANIEL JOHN HYER
 9    (Witness Sworn.)
10              THE COURT:  All right.  Mr. Stone, you may proceed   15:35:25
11    when you're ready.
12              MR. STONE:  Thank you, Your Honor.
13                      DIRECT EXAMINATION
14    BY MR. STONE:
15    Q.  Good afternoon, sir.                                     15:35:31
16    A.  Good afternoon.
17    Q.  Pull that mic closer to you so everyone can hear you.
18    Could you please introduce yourself to the jury?
19    A.  My name is Daniel John Hyer.
20    Q.  Would you spell last name?                               15:35:42
21    A.  Spelled H-Y-E-R.
22    Q.  Mr. Hyer, where do you live?
23    A.  I live in Dallas, Texas.
24    Q.  Sir, what do you do for a living?
25    A.  I am a finance and accounting recruiter.                 15:35:52
```

```
 1    Q.  What do you do as a finance and accounting recruiter?
 2    A.  I help people find jobs, and I help companies find people
 3    who are looking for jobs.
 4    Q.  Excuse me, how long have you worked at your current job?
 5    A.  Since June of 2018.                                          15:36:14
 6    Q.  Where did you work before?
 7    A.  I worked for a company that was known as Backpage.com.
 8    They also were known as Website Technologies, Village Voice
 9    Media, and early on the Dallas Observer and New Times.
10    Q.  You mentioned a number of different names, why is that?     15:36:35
11    A.  The company went through different permutations throughout
12    its -- throughout my time that I worked there.  Initially I was
13    with the Dallas Observer, and the Dallas Observer was part of a
14    newspaper group called New Times.  Eventually that became known
15    as Village Voice Media.                                         15:36:58
16          My job changed over time to where I started working
17    with Backpage.com and then Backpage.com's name from my
18    recollection changed to Website Technologies.
19    Q.  How long did you work for Backpage.com?
20    A.  It was approximately 20 years and three to four months.     15:37:23
21    Q.  When did you start working there?
22    A.  January of 1998.
23    Q.  And when you're saying you started working in January of
24    1998, was that for Backpage?
25    A.  No, that was for the Dallas Observer.                       15:37:46
```

1    Q.  At some point did you start working at Backpage.com?

2    A.  Yes.

3    Q.  When was that?

4    A.  It was around 2005-2006.

5    Q.  Okay.  And from that period forward, 2005 to 2006, when did          15:37:59

6    you stop working at Backpage?

7    A.  I stopped working for Backpage on April 6, 2018.

8    Q.  What happened on that day?

9    A.  The website was shut down.

10   Q.  All right.  Before we discuss your time at Backpage I want          15:38:16

11   you to explain to the jury briefly about your background, so I

12   will ask you a few questions about your background.

13   A.  Yes.

14   Q.  Where did you grow up?

15   A.  Eldridge, Iowa.                                                      15:38:32

16   Q.  Did you attend college?

17   A.  I did.

18   Q.  Where?

19   A.  At the time in Kirksville, Missouri, the college I attended

20   was called Northeast Missouri State University.  After I               15:38:41

21   graduated it became known as its current name, which is Truman

22   University.

23   Q.  Did you graduate?

24   A.  Yes.

25   Q.  What year?                                                          15:38:53

```
1    A.   1993.

2    Q.   And what did you study?

3    A.   I graduated with a Bachelor of Arts in liberal arts.

4    Q.   How old are you?

5    A.   I am 54.                                              15:39:06

6    Q.   All right.  So after college what did you do, stay in

7    Missouri?

8    A.   I did.  I played in a band for about a year, year and a

9    half, and then I started working with a company known as

10   Network Cable Corporation.  That went on for two to three    15:39:24

11   years.  I actually worked remotely upon moving to Dallas, Texas

12   in '95, '96.

13   Q.   Okay.  So you get out of college in '93, took a job and

14   then you moved to Dallas when?

15   A.   It was in '95 or '96.                                 15:39:44

16   Q.   Where did you move to Dallas?

17   A.   At the time there were bands that were popular that were

18   kind of coming out of Dallas, Tripping Daisy, Pantera, the

19   Toadies.  It seemed like a good idea.  I also growing up loved

20   the Dallas Cowboys and always thought Texas was cool.       15:40:08

21   Q.   So you moved to Dallas and you maintained the same job that

22   you had in Missouri?

23   A.   Yes, for a time.

24   Q.   For how long?

25   A.   It was about a year.  That eventually fizzled out.     15:40:20
```

```
 1    Q.  Okay.  What did you do next for employment?

 2    A.  I worked for a company known as Professional Client Group.

 3    Q.  And what did you -- well, let me ask you this:  How long

 4    did you work for Professional Client Group?

 5    A.  About a year, year and a half.                         15:40:38

 6    Q.  What did you do?

 7    A.  I set appointments I was an appointment setter for

 8    salespeople going out to sell things like insurance.

 9    Q.  Was it at this point that you got the job at the Dallas

10    Observer?                                                  15:40:55

11    A.  I got the job at the Dallas Observer in January of '98.

12    Q.  Okay.  Dallas Observer, what is it?

13    A.  The Dallas Observer is an alternative news weekly tabloid

14    format that comes out once a week.  The distinction would be

15    articles that are investigative journalism, long-form        15:41:18

16    journalism.  So rather than coming out once a day, it comes out

17    once a week.

18    Q.  And alternative weekly, is that how you described it?

19    A.  Alternative news weekly.

20    Q.  All right.  What was your job at the Dallas Observer?    15:41:38

21    A.  I was a classified account executive.

22    Q.  What does that mean?

23    A.  It's a salesperson.  It's just a nice way to say it.

24    Q.  And what were you selling?

25    A.  I was selling classified advertisements, employment      15:41:51
```

advertisements that had previously appeared or were appearing

in the Dallas Morning News, which is the daily paper in Dallas,

and talking to people who had posted those ads in the Dallas

Morning News about the benefit of running those ads in the

Dallas Observer.                                                     15:42:12

Q.  Okay.  Running the ads in the Dallas Observer, correct,

that's what you were trying -- that's what you were trying to

sell?

A.  Yes.

Q.  Do you have an understanding for how the Dallas Observer        15:42:22

made money?

A.  Well, advertising.

Q.  Where would the advertising -- strike that.

          Who hired you at the Dallas Observer?

A.  Carl Ferrer.                                                    15:42:41

Q.  What was his position?

A.  He was the classified director.

Q.  All right.  And you were -- you gave some explanation about

sort of the day-to-day activity, I think, for you at the Dallas

Observer.  Explain that a little bit more, please.                 15:43:01

A.  It was a lot of outbound phone calls.  So back then the

newspaper -- the Dallas Morning News would have a lot of pages

upon pages upon pages of classified ads specifically in

employment.  So I would simply look at an ad.  You could

identify the phone number, or there was a fax number in the ad     15:43:24

1  and you could look up that on Google and then call the company

2  and tell them who the Dallas Observer was and why it would

3  benefit them to run the ad in the Dallas Observer.

4  Q.  Were you trying to recruit the advertisers from the Dallas

5  Morning News to the Dallas Observer?                      15:43:44

6  A.  Yes.

7  Q.  What section were you typically working in?  Do you

8  understand my question?

9  A.  Yeah.  The section I most commonly worked in was

10  employment.  The other sections that from time to time ads   15:43:56

11  would come up in rentals, real estate, massage, and adult.

12  Q.  But the most time you spent was in the employment section?

13  A.  My specialty, if you could call it that, my expertise at

14  that time was employment.

15  Q.  Can you give a sense for what percentage of the time you   15:44:18

16  were spending in the employment section?

17  A.  I mean, at that time it was 95, maybe 99.

18  Q.  How long did you work at the Dallas Observer in the role

19  that you were hired into?

20  A.  So hired in '98, approximately '93, '94 I became the   15:44:41

21  classified director.

22  Q.  Do you mean 2003, 2004?

23  A.  Oh, sorry, yes, '98 and then 2003, 2004 was when I became

24  classified director.

25  Q.  And what was the classified director, what position was   15:44:58

1  that?

2  A.  Well, rather than my responsibility of generating ads and

3  getting them to come from a publication to our side to our

4  newspaper, I ran a team or a staff of anywhere from 15 to 25

5  employees whose jobs were to do that very thing.                    15:45:18

6  Q.  Was that the position that Carl Ferrer had when he hired

7  you?

8  A.  Yes.

9  Q.  Where did Mr. Ferrer go?

10  A.  He became what was called a national classified director.      15:45:30

11  I previously mentioned that the New Times newspaper group had

12  multiple locations, so he began helping try to replicate the

13  success that we had in Dallas and other newspaper markets in

14  which we had a publication.

15  Q.  Was Mr. Ferrer your boss when you first started working at      15:45:54

16  the Dallas Observer?

17  A.  Yes.

18  Q.  Did he remain your boss when you elevated to the classified

19  director, or did you have another boss?

20  A.  Kind of seemed like the higher I got, the more bosses I         15:46:05

21  got.  So he was a boss and then the publisher of the paper

22  became somebody that I reported to.

23  Q.  How long did you work as the classified director at the

24  Dallas Observer?

25  A.  It was two to three years.                                      15:46:27

```
 1   Q.  What did you do after that?
 2   A.  I started working for Backpage.
 3   Q.  How was the newspaper, the Dallas Observer, doing during
 4   this time that you were the classified director?
 5   A.  I mean, we were, I would say hemorrhaging revenues might be    15:46:41
 6   a way to put it.
 7   Q.  What does that mean, hemorrhaging revenues?
 8   A.  You know, we were losing revenue year over year, quarter
 9   over quarter.  It started at a slow slide, but it became
10   dramatic as you get into 2005 and 2006.                           15:47:03
11   Q.  Did you have a sense for why you were losing revenue at
12   such a rapid pace?
13   A.  I think we were all trying to see if there was -- speaking
14   from my perspective, there were different things that we
15   thought might be impacting it, but ultimately came to            15:47:21
16   understand that it was all going to the Internet.
17   Q.  What do you mean "all going to the Internet"?
18   A.  All of the classified advertising that we had formerly
19   been, formerly had in the back of the paper, that was all going
20   online, and most of it, a high percentage of it was going to     15:47:38
21   Craigslist.
22   Q.  What was Craigslist?
23   A.  Craigslist is a free classified website that operated in
24   all of the newspaper markets that we were in and a whole bunch
25   more.                                                            15:47:54
```

1    Q.  At some point did you come to learn that there was a

2    website that was being started called Backpage.com?

3    A.  Yes.

4    Q.  How did you learn it?

5    A.  Carl told me about it.                                      15:48:09

6    Q.  What did you understand Backpage to be?

7    A.  I mean, the philosophy it would be an alternative to

8    Craigslist.  It would be a competitor to Craigslist.

9    Q.  For classified ads?

10   A.  Yes.                                                        15:48:30

11   Q.  Who did you understand to have started Backpage?

12   A.  Carl Ferrer.

13   Q.  Did you have an understanding if he was doing it on his

14   own?

15   A.  I know there was a team, and I say "team," it could have    15:48:45

16   been two or three people initially in Phoenix.  At that time he

17   was operating in Phoenix, but he had a home in Dallas so I

18   would see him often, so I knew that it was him and a couple

19   other people.

20   Q.  Did he have financial support to start the website?        15:49:05

21   A.  Yes.

22   Q.  Yes was your answer?

23   A.  Yes.

24   Q.  Where did he have the financial support from?

25   A.  He had shared with me that Jim Larkin had given him $50,000 15:49:15

```
1   to see what he could do to try to start a website to compete
2   with Craigslist.
3   Q.  At this point in your career at the Dallas Observer, before
4   you moved over to Backpage, who was paying your checks, if you
5   remember, who was signing your checks?                            15:49:38
6   A.  It was the Dallas Observer.
7   Q.  And the Dallas Observer, was it under a larger company?
8   A.  Yeah, it was initially under the New Times, and then
9   eventually Village Voice.
10  Q.  And was that New Times and then eventually Village Voice,     15:49:53
11  was that the company that helped start Backpage as well?
12  A.  Yeah, Backpage was one of the products.
13  Q.  All right.  So let us move into the time when you've
14  transitioned, or you're transitioning from the Dallas Observer
15  into Backpage.com, okay, could you describe briefly how that      15:50:16
16  transition occurred?
17  A.  It was initially clunky, you know.  Trying to save a
18  drowning ship in print, it required a hundred percent of your
19  time, but over time I went from 10 percent of my time on
20  Backpage, 90 percent on the Dallas Observer, and the subsequent   15:50:44
21  year it was 25 percent print, 75 percent Backpage, and then
22  eventually 50 and 75, and then fully working for Backpage.
23  Q.  All right.  So let's -- I'm going to ask you questions then
24  after you fully transitioned to Backpage.
25  A.  Okay.                                                         15:51:06
```

1    Q.  When was that?

2    A.  It would have been 2008.

3    Q.  What were you doing for Backpage when you first started

4    working for Backpage?

5    A.  Similar to the onset of my job with the Dallas Observer, we          15:51:27

6    were -- I was -- my team was contacting users on Craigslist and

7    offering them the opportunity to post on Backpage.

8    Q.  Why were you doing that?

9    A.  It was a proven method that worked.  Craigslist was bar

10   none the biggest classified website in the country.  I think at        15:51:53

11   that time it was approximately number four, maybe number six in

12   the world.

13   Q.  When you say number four, number six in the world, what

14   does that mean?

15   A.  There's a site that's called -- that was called, I haven't         15:52:06

16   visited since 2018, there is a site called Alexa, not to be

17   confused with the Amazon thing, that would rank websites, and

18   Google would be like a number one, and maybe Yahoo is number

19   two and number three, and Craig was definitely in the top ten

20   at that time.                                                          15:52:29

21   Q.  So you were focusing on contacting users on Craigslist and

22   trying to get them to post ads on Backpage?

23   A.  Yes.

24   Q.  Was there a certain section that you focused on in

25   contacting Craigslist users?                                           15:52:42

A.  Yes.  The section on Craigslist was in the The Erotic

Review services section, and specifically it was the escorts

category.

Q.  Why did you choose the escort section of Craigslist to

contact users for Backpage?                                    15:52:58

A.  There were a lot of reasons.  The -- you know, some of them

would include, the advertisers would have their phone number in

the advertisement, so it was easy to contact them.  Another

reason would be that the advertisers were dependent upon their

phone ringing to be able to operate their business, so there    15:53:16

was -- they were very receptive to the opportunity to post a

free ad somewhere else.  There was repeat business.  Unlike an

employment ad, the concept, if you were running an employment

ad, you have a need to hire an accountant.  If you hire the

accountant, that need has subsided and you wouldn't need to     15:53:38

advertise until that accountant left.  But the escort ads, you

know, they needed repeat business.  They wanted their ads to

run everyday.

         And then my recollection and my understanding of the

Internet in 2006, 2007, 2008, was that the best way or the      15:53:55

easiest way or the least path to resistance to find, to get

users to come to your site was scantly clad or naked people.

Q.  Did the escort section on the erotic services part of

Craigslist include scantly clad and nearly naked women?

A.  Yes.                                                         15:54:23

Q.  And why was that important for Backpage to attempt to move
those users over to your website?

A.  Well, you know, we traditionally as a publication had
always had an adult section with those same types of
advertisers, and we were seeing them go from print in the          15:54:41
escort section to Craigslist in the escort section.  It was a
proven model, and it also -- we knew the revenue implications
of that based on the revenue that we had seen for years and
years.

Q.  Let me stop you there.  What do you mean "revenue           15:55:05
implications"?

A.  Money.  If you scale up the category of escorts, we already
had an adult section where we had an escort category in print,
so we knew that that was a vehicle with which we could grow
money on Backpage.                                                 15:55:25

Q.  Were those escort ads, did they cost money on Backpage?

A.  Yes.

Q.  Did other ads on Backpage cost money?

A.  No.

Q.  What was your first title when you moved over to Backpage,    15:55:40
if you had one?

A.  Might have been sales manager.  I don't specifically
remember.

Q.  Did that ultimately change, the title?

A.  Yes.                                                          15:55:52

1    Q.   What did it change to?

2    A.   Sales and marketing director.

3    Q.   All right.  I'm going to show you a few exhibits now.  The

4    first one I want to show you is already in evidence.  This is

5    Exhibit 10 in evidence.                                          15:56:24

6    A.   Can I move this around a little bit?

7    Q.   I don't know if it moves or not.  Are you having trouble

8    seeing it, sir?

9    A.   If I go like this.

10   Q.   I can zoom in.                                               15:56:38

11   A.   I got it.

12   Q.   Sir, you recognize this e-mail?

13   A.   Yes.

14   Q.   What is it?

15   A.   This is an e-mail that is itemizing topics that are going   15:56:51

16   to be discussed at a meeting that's going to happen in the next

17   couple of days.

18   Q.   Who is on the e-mail?

19   A.   I got myself, Carl Ferrer and Scott Spear.

20   Q.   Who is Scott Spear?                                         15:57:10

21   A.   Scott Spear, at that time I knew him to be the vice

22   president of Backpage and one of the executives of the company.

23   Q.   All right.  You mentioned before Carl Ferrer, and he was

24   your boss.  He hired you at the Dallas Observer; correct?

25   A.   Yes.                                                        15:57:30

Q.  He was someone that helped start Backpage; correct?

A.  Yes.

Q.  Where was he in the pecking order compared to Scott Spear?

A.  I knew Scott Spear to be his boss.

Q.  Scott Spear to be Carl Ferrer's boss?                          15:57:39

A.  Yes.

Q.  What is going on in this e-mail?

A.  We've been successful with some of the methods that I

mentioned about growing ads and revenues in Backpage in Dallas,

so we are talking about in this e-mail how we can replicate      15:58:00

that success in the other publications that we had across

Village Voice.

Q.  Is there attachment or attachments to this e-mail?

A.  There were four or five of them.

Q.  Let me show you one.  It's Exhibit 10a in evidence, was      15:58:13

this one of them, sir?

A.  Yes.

Q.  Do you know who wrote this document?

A.  I wrote part of it.

Q.  The top has a task one and it reads, "Create new content    15:58:38

aggregation positions in Dallas"; correct?

A.  Yes.

Q.  What is content aggregation?

A.  The term changed over time, but it would be a way to

describe the process that I mentioned at the Dallas Observer     15:58:59

where we were contacting users in the Dallas Morning News and

offering them the opportunity to post that ad in the Dallas

Observer, or when we were talking about, or I mentioned

contacting users who were on Craigslist in the escort section

and posting their ad on Backpage, so aggregation was a way to          15:59:19

describe that sales process.

Q.  Big difference between those two, according to your

testimony.  At the Dallas Observer you were contacting folks

who had employment ads; correct?

A.  Yes.                                                                15:59:34

Q.  And for Backpage, who were you contacting?

A.  Escorts.

Q.  Sir, when you say "escorts," what do you mean?

A.  Prostitutes.

Q.  All right.  I highlighted another section of this exhibit          15:59:48

number 9, and it reads:  Follow guidelines to secure content.

And 9 a then reads:  Do searches on Google, quote, erotic

services, your city name and area code, end quote.

          Did you write this?

A.  Yeah, Carl and I wrote part of this document, but I mean,          16:00:10

yeah, I am sure.  I don't know if I wrote that exact sentence

or that exact paragraph, but definitely helped and contributed

to this document.

Q.  You're familiar with this?

A.  Absolutely.                                                        16:00:23

```
1    Q.  So what does it mean to do a Google search for erotic

2    services, your city name and area code?

3    A.  We couldn't on an internal document say, "Go to Craigslist,

4    look at the erotic services section and call those users."  It

5    was kinds of a cover-your-behind tactic.                    16:00:41

6    Q.  Why couldn't you put it in an internal document what you

7    were doing?

8    A.  I think at this time, and a number of times, maybe three to

9    four times we got cease and desists from Craigslist for

10   contacting his users.                                       16:00:59

11   Q.  Okay.  So when it says "do searches on Google for erotic

12   services," what does that mean to you?

13   A.  So in the search, in the search bar on Google you put in

14   erotic services, Phoenix, and 602, and Google would return

15   results that would be numerous Craigslist ads, and at that time 16:01:22

16   you could get a pretty good snapshot of the entire ad that

17   Google would return, including the phone number, the city,

18   et cetera.

19   Q.  Was this a way then to search for Craigslist escort ads?

20   A.  Yes.                                                    16:01:44

21   Q.  All right.  9 b reads, "Call clients.  Ask them if they

22   have tried Backpage.com.  If not, post a free ad with an auto

23   repost for free for 6 weeks."

24        What does that mean?

25   A.  So you would see the ad on Craigslist, you would -- you    16:01:57
```

1   would call the advertiser and explain who we were and the

2   script there on c, point c.  And then once they give you the

3   permission, you post the free ad with an auto repost on

4   Backpage as though you were the user.

5   Q.  What does "auto repost" mean?                                    16:02:19

6   A.  It would cause an advertisement to go up to the top of the

7   listings at a duration that you designate it.

8   Q.  You mentioned the script that's in 9 c.

9   A.  Yes.

10  Q.  Was this something -- well, what was the point of including   16:02:32

11  the script?  What was the script?  Who was the script intended

12  for?

13  A.  The script would be intended for the other cities that we

14  were suggesting employ this tactic.

15  Q.  This is sort of laying out how to do this?                     16:02:48

16  A.  Yes.

17  Q.  And this script would be -- the script related to calling

18  someone who had an ad on Craigslist?

19  A.  Yes.

20  Q.  It reads, "Hi, I saw your ad on the internet.  Have you        16:03:03

21  ever tried posting it on backpage.com?  I can post your ad

22  today so that you can try out the site.  It costs you nothing.

23  I do all the work here.  Can I have your e-mail address

24  please?"

25           That was a script that was followed in 2007 at           16:03:18

1   Backpage for aggregation?

2   A.  Yes.

3   Q.  What was the -- what was the ultimate point for Backpage to

4   engage in this type of aggregation?

5   A.  I mean, on some level it was survival of the business

6   because it was not sustainable in print.  It was to try to grow

7   advertisers who would be able to turn into users who posted on

8   their own and become active posters of the site.  It would also

9   give us content for content consumer, people who look at the

10  ads to have something to look at.

11  Q.  What do you mean by "content"?

12  A.  Ads.

13  Q.  Was that -- was content, that concept, was that important

14  to Backpage?

15  A.  Yes.

16  Q.  Why?

17  A.  If you don't have content and somebody visits your website,

18  there is a very small chance that they would return to it.

19  Q.  Is it important when you're running a website to have a

20  user return to it?

21  A.  Yes.

22  Q.  How come?

23  A.  'Cause you can't survive as a website if people don't visit

24  it.

25  Q.  This process of content aggregation, was that under your

16:03:35

16:04:03

16:04:12

16:04:24

16:04:47

```
 1  purview?  Was that something that you ran when you were at
 2  Backpage?
 3  A.  Yes.
 4  Q.  Do you have employees?
 5  A.  Yes.                                                    16:05:00
 6  Q.  Would you estimate about how many employees you had that
 7  were working on content aggregation?
 8          MR. FEDER:  Objection as to time.
 9          THE COURT:  Sustained.
10  BY MR. STONE:                                               16:05:13
11  Q.  I believe that e-mail was 2007.  Let me ask you another
12  question first.
13          Did Backpage use content aggregation for a number of
14  years?
15  A.  Yes.                                                    16:05:25
16  Q.  Do you have an estimate, or do you know for how long?
17  A.  My recollection is that it went all the way through April
18  of 2018.
19  Q.  What about content aggregation when you were looking at The
20  Erotic Review on Craigslist and trying to contact those users, 16:05:46
21  same up all the way up to 2018?
22  A.  No.
23  Q.  When for that particular practice?
24  A.  That practice ended in September of 2010.
25  Q.  Why?                                                    16:05:59
```

A.  Because that is when Craigslist shuttered, shut down its

erotic services section in the United States.

Q.  All right.  So from the period when you started working,

2006, 2007 at Backpage, until 2010, would you estimate about

how many employees you had who were working on this content

aggregation?

A.  Yeah.  It peaked by 2010.  It would have been somewhere

between 30 to 50.

Q.  All right.  I am showing you for your eyes only what is

marked as Exhibit 11, which is not in evidence, sir.  Do you

see that on your screen?

A.  Yes.

Q.  Blow it up so that you can see it a little bit easier.  Do

you recognize that exhibit, sir?

A.  Yes.

Q.  What is it?

A.  This is an e-mail that I wrote to Carl Ferrer on June 4th,

2007, with an attachment of a PowerPoint that I had prepared

for an upcoming meeting with all the classified directors in

the company.

Q.  Let me show you the attachment, which is Exhibit 11a, is

that the attachment you prepared?

A.  Yes.

          MR. STONE:  Move to admit 11 and 11a.

          THE COURT:  Yes, it may be admitted.  It may be

1    published.

2         (Exhibit Nos. 11 and 11a were admitted.)

3    BY MR. STONE:

4    Q.  What is now on the jury screen is Exhibit 11a.  This is the

5    PowerPoint that you prepared.                                    16:07:31

6    A.  Yes.

7    Q.  The title is Vital Steps to Grow Backpage.com?

8    A.  Yes.

9    Q.  What is the date of this e-mail?  Let me go back to

10   Exhibit 11 so we can see the date.  What is the date, sir?       16:07:52

11   A.  2007.

12   Q.  Showing you Exhibit 11a, is this the first part of the

13   exhibit?

14   A.  Yes.

15   Q.  It reads, "Aggregating/Uploading Content - It's all about    16:08:11

16   Volume."

17            What did you mean when you wrote, "It's all about

18   Volume"?

19   A.  Well, we just discussed the content and the importance of

20   having content, so this is another way to say that not only do   16:08:25

21   you have to have content, but you have to have a lot of it for

22   a consumer of that content to have an incentive to come back to

23   the site and visit it over and over.

24   Q.  You write on the third, "Content gives the perception that

25   the site is worth using," what does that mean?                   16:08:45

UNITED STATES DISTRICT COURT

1   A.  Well, we were still in the infant stages as a website.  I

2   mentioned Craigslist was around number four to number six, and

3   to my recollection we weren't even in the top 10,000.

4   Q.  Are you referring to this Alexa rating you testified to

5   earlier?                                                          16:09:05

6   A.  Yes.

7   Q.  And -- okay.  So Backpage is not even in the top 10,000, so

8   what did that mean to you in terms of growing the website?

9   A.  We had a lot of ground to make up.

10  Q.  I highlighted the bottom portion of this exhibit where it    16:09:33

11  says, "Publisher Buy In"; is that right?

12  A.  Yes.

13  Q.  The first bullet point reads, "It is the future of our

14  business, and the time to fight the Craig war is now."

15          What does that mean?                                     16:09:44

16  A.  Well, it was in some ways the onset of and the beginning

17  stages of all of these classified ads moving to the Internet,

18  and Craig already had a very solid footing.  If we -- it was my

19  understanding, my philosophy strategy at the time that if we

20  did not take those steps to try to compete with him, somebody    16:10:11

21  else would.

22  Q.  Was content aggregation one of the techniques to try to

23  compete with Craig?

24  A.  Yes.

25  Q.  All right.  I am going to show you what has been admitted     16:10:27

1    into evidence as Exhibit 20.  Just focusing on the top portion

2    of this e-mail, do you see it, sir?

3    A.  Yes.

4    Q.  You recognize the individuals on the e-mail?

5    A.  Yes.                                                              16:10:52

6    Q.  There is Carl Ferrer, Scott Spear, you and a Kenny Stocker,

7    who is Kenny Stocker?

8    A.  Kenny Stocker was at that time the national classified

9    director.

10   Q.  The top portion here is an e-mail from you?                       16:11:06

11   A.  Yes.

12   Q.  Just go piece by piece here.  The e-mail went down, is that

13   an e-mail from Mr. Ferrer?

14   A.  Yes.

15   Q.  And he writes, "Most cities are good.  Some are not so            16:11:27

16   good.  I will copy Spear so he knows I am being nice."  He

17   talks about "deleting paid ads," do you have a recollection for

18   what Mr. Ferrer was referring to here?

19   A.  Yes.

20   Q.  And I've highlighted the middle portion of this exhibit          16:11:49

21   that reads:  Example of a paid ad deleted.  This ad posted

22   July 11th, 2007.  They paid $5.

23         Was this -- well, what is this?  What are we looking

24   at here?

25   A.  The top of the portion that you have highlighted says, it        16:12:05

UNITED STATES DISTRICT COURT

1    says:  Example of a paid ad that was deleted.

2            So the user had paid $5 and Minneapolis deleted the

3    ad.

4    Q.  On a web platform?

5    A.  Yes.                                                          16:12:25

6    Q.  On Backpage.com?

7    A.  Yes.

8    Q.  The ad reads, "Hi there.  I'm Julie and like no one you

9    have seen before.  I am one of the few how have the experience

10   to appreciate my encounters and truely enjoy myself with my     16:12:38

11   clients.  I am very discreet.  Just a call way for enjoyable

12   relaxing session.  I am offering both in and outcall right now.

13   Brooklyn center ios where I am located.  Call now for an

14   appointment before there booked.  A perfect GFE experience."

15   Has the name "Julie" and ten numbers there; right?             16:12:59

16   A.  Yes.

17   Q.  I want to ask you about a few things in this ad, is this an

18   escort ad?

19   A.  Yes.

20   Q.  When you say "escort" what do you mean?                     16:13:10

21   A.  Prostitute.

22   Q.  How do you know it's a prostitution ad?

23   A.  Well, there are terms such as the one that your cursor is

24   almost touching, "A perfect GFE experience."  GFE is a

25   prostitution acronym.  I guess GFE stands for Girlfriend        16:13:25

1  Experience.

2  Q.  What does that mean?

3  A.  That means in addition to engaging sexual intercourse the

4  escort will also kiss or tongue kiss or be affectionate in that

5  way.                                                              16:13:45

6  Q.  What about, "I am offering both in and outcall right now,"

7  does that mean anything to you?

8  A.  Yes.

9  Q.  What does it mean?

10 A.  Well, that's a term, "in-call" would mean that the escort   16:13:56

11 would allow people to come to her location, and "outcall" would

12 mean that she would go to somebody else's location.

13 Q.  All right.  Going down on this, or going further down on

14 this e-mail, I will highlight the second bullet point there.

15 This is an e-mail written by Mr. Ferrer; is that correct?        16:14:23

16 A.  Yes.

17 Q.  Mr. Ferrer writes, "It kills the sites SEO as in no traffic

18 from The Erotic Review."

19        So let me start with the last part of this point, do

20 you know what theeroticreview.com is?                            16:14:40

21 A.  Yes.

22 Q.  What is it?

23 A.  Theeroticreview.com is a website where people who patronize

24 escorts or use the services for escorts, johns, write in

25 graphic detail on a forum their experience of having used the    16:14:59

```
 1   services of a specific escort.
 2   Q.  You mentioned escort as it related to theeroticreview.com,
 3   what does that mean?
 4   A.  Prostitute.
 5   Q.  The first part of this statement says, "It kills the sites    16:15:16
 6   SEO," what does that stand for?
 7   A.  Search engine optimization.
 8   Q.  Do you have an understanding what Mr. Ferrer is talking
 9   about here?
10   A.  Yes.                                                          16:15:28
11   Q.  What is it?
12   A.  He's referring to if we don't receive traffic from The
13   Erotic Review that hurts us.
14   Q.  How does it hurt Backpage?
15   A.  Again, we were needing traffic.  We were in the infancy      16:15:42
16   stages of our business and wanting to have visits, people that
17   would come to Backpage and then come back and then come back
18   was very important.
19   Q.  The Erotic Review was an important part of that?
20   A.  Yes.                                                          16:15:59
21   Q.  Why?
22   A.  They were a relatively well-known site for people who used
23   the services of escorts.  Again, sometimes they were called
24   hobbyists or johns, but they -- they were a popular site, so if
25   somebody would see a link to Backpage from that website they     16:16:24
```

1   would be able to click on it and then come to Backpage, so it

2   was important.

3   Q.  Did Backpage have a relationship with The Erotic Review?

4   A.  Yes.

5   Q.  What was that?                                          16:16:37

6   A.  It was a reciprocal link relationship.

7   Q.  Okay.  And we probably will see some exhibits on that, but

8   generally what is a reciprocal link relationship?

9   A.  They will send us traffic and we will send them traffic.

10  Q.  And how exactly would you send each other traffic?      16:16:54

11  A.  In the form of a link or an URL.

12  Q.  Highlighting this last part Mr. Ferrer writes, "Why care?

13  Without The Erotic Review traffic, you might as well kiss any

14  growth in Minneapolis good bye."

15          What does that mean?                               16:17:17

16  A.  We were very reliant on that traffic or traffic that we

17  could get anywhere, and so if we -- and any of these markets,

18  in this case Minneapolis or Minnesota.Backpage.com didn't get

19  traffic from The Erotic Review, we were there was a possibility

20  some other site might be bigger there than us.             16:17:40

21  Q.  Was this reciprocal link relationship an important part to

22  the strategy of growing Backpage during these years?

23  A.  Yes.

24  Q.  Moving back up to the first bullet point Mr. Ferrer writes,

25  "Alan schedules ads for a week and then the ad expires.  Dallas   16:18:00

does not do this.  This is why Minneapolis flounders."

What is he referring to?

A.  There was some in fighting and some resistance from print

from classified directors, from account executives, against

Backpage because Backpage was free or super cheap, and if -- it          16:18:24

was seen as a competitor, and while other cities might have

resisted, Dallas didn't.

Q.  Who was in charge of Dallas?

A.  Me.

Q.  And what did you not to resist?                                       16:18:43

A.  I'm sorry.  I didn't hear or understand your question.

Q.  Yeah.  You had mentioned in your answer before that there

was some resistance to Backpage, and you said Dallas didn't.  I

am just wondering what -- what -- put it in a positive, what

did Dallas do to have success?                                           16:18:59

A.  We would run ads in the print product talking about

Backpage.  We, of course, had a team that we talked about

before.

Q.  Not to interrupt you, sir, but as related to this line

right here where it's talking about an ad expires.                       16:19:18

A.  Which line are you talking about?

Q.  "Alan schedules ads for a week and then the ad expires.

Dallas does not do this."

Do you have an understanding for what Mr. Ferrer is

talking about?                                                           16:19:32

A.  Yes.  So the purchase was made online for the ad to run and there was a way where classified account executive could go into our front end system and make the ad expire in a short amount of time.  If you didn't do that, the ad would run for 45 days and Alan is going in and causing it to expire after seven days.

Q.  And you in Dallas were not doing that?

A.  No, we were not doing that.

Q.  Was that helping Backpage grow?

A.  Yes.

Q.  Let me show you what has already been admitted into evidence as Exhibit 1851.  Sir, do you recognize this e-mail?

A.  Yes.

Q.  Who wrote it?

A.  This is an e-mail from Carl Ferrer.

Q.  And who is he writing the e-mail to?

A.  He is writing it to Michael Donhowe.

Q.  Who is Michael Donhowe?

A.  He was the classified director from the, forgive me, I am going to mispronounce this, Willamette Weekly.

Q.  I think you got it.  And Willamette Weekly, is that in Oregon?

A.  Yes.

Q.  He writes in the first part of this e-mail, Number 1, "Goal is to add 200 new escort users in the next 90 days."

1          What does that mean?

2   A.  This is, again, referring to the content.  The concepts or

3   the needing content, or needing users or advertisers.

4   Q.  And to add 200 new escort users, how would you do it?

5   A.  In the previous exhibit we talked about contacting          16:21:25

6   advertisers who were on Craigslist and offering them the

7   opportunity to post their ad on Backpage.

8   Q.  Using that script that we just saw?

9   A.  Yes.

10  Q.  What about this last line here, what does that mean?       16:21:41

11  A.  It's talking about the graphic text of blatant

12  prostitution.  We were philosophically -- we were trying to

13  not -- we didn't let staff aggregate that kind of ad.

14  Q.  Where it's overtly a prostitution ad?

15  A.  Where the ad contains sex for money.                        16:22:11

16  Q.  You testified before that the escort ads that you were

17  aggregating were prostitution ads?

18  A.  Yes.

19  Q.  You just couldn't be overt; is that right?

20  A.  Yes.                                                        16:22:29

21  Q.  The language in the ad.

22  A.  Yes.

23  Q.  I am highlighting the second portion of this e-mail, sir,

24  do you see that?

25  A.  Yes.                                                        16:22:50

1   Q.  And it has sources, what does that mean?

2   A.  In addition to The Erotic Review listed here is myredbook,

3   bigdoggie.net.

4   Q.  Do you know anything about myredbook.com?

5   A.  Myredbook.com was another escort forum or escort review          16:23:05

6   site.  It was more regional on the west coast.

7   Q.  Escort review sites are similar to The Erotic Review?

8   A.  Yes.

9   Q.  When you say "escort review site," what does that mean?

10  A.  Prostitution review site.                                        16:23:24

11  Q.  Bigdoggie.net, what about that website, did you ever look

12  at that website?

13  A.  I am sure I visited it, yes.

14  Q.  Do you have an understanding for what it is?

15  A.  Yeah, it's another escort or review site.                       16:23:35

16  Q.  Similar to myredbook and The Erotic Review?

17  A.  Yes.

18  Q.  All right.  And then on d it says:  Search string in

19  Google:  Site:  Portland.Craigslist.org, what is that about?

20  A.  This is an exact string of what you could put in the search     16:23:52

21  bar to only return ads that were on Craigslist in the erotic

22  services, the ERS, in the erotic services on Craigslist in

23  Portland that contained 503 so that the ad would have the phone

24  number.

25  Q.  So it's your understanding that this is a playbook on where     16:24:13

```
 1   you should look to get escort ads?

 2   A.  Yes.

 3   Q.  And this is an important part of how you help grow Backpage

 4   during these years?

 5   A.  Yes.                                              16:24:30

 6   Q.  Highlighting the third part, is this a script that was

 7   similar to the one we saw before?

 8   A.  Yes.

 9   Q.  Again, would this all fall under this content aggregation?

10   A.  Yes.                                              16:24:46

11   Q.  Sir, in these years, 2007, 2008, 2009, did you go on

12   Backpage.com and look at the website?

13   A.  Yes.

14   Q.  Did you review the ads in the escort section?

15   A.  Can you clarify what you mean by "review"?        16:25:15

16   Q.  Sure.  Did you happen to go on the website and look at ads

17   that were posted on Backpage escort section?

18   A.  Yes.

19   Q.  Did the ads look different in those early years, 2008,

20   2009 -- 2007, 2008, 2009 than in later years?         16:25:31

21   A.  Yes.

22   Q.  What was the difference?

23   A.  The language was more overtly prostitution in the early

24   years versus the later years.

25   Q.  All right.  So I'm going to show you what has been admitted 16:25:50
```

1   in evidence as Exhibit 2046, sir, do you recognize -- let's

2   just hold for a second so jury can see it.  Now, do you

3   recognize this exhibit?

4   A.  Yes.

5   Q.  What is it?                16:26:10

6   A.  This is a page from Dallas.Backpage.com/femaleescorts from,

7   looks like 2008, February 9th, I think.

8   Q.  How do you see that it's February 9th, 2008?

9   A.  Up on the Wayback Machine URL you can see 2008 and the 02

10   and then the 09.         16:26:34

11   Q.  Is there also a date listed?

12   A.  Yeah, it's a much easier way to be able to see it.

13   Q.  This is in what city?

14   A.  Dallas.

15   Q.  Your city?             16:26:47

16   A.  Yes.

17   Q.  Is this representative of how the escort section on

18   Backpage looked in February of 2008?

19   A.  It's a screenshot of it, yes.

20   Q.  So yes.  In looking at these ads on the first page, do you  16:27:00

21   see ads that have terms that are indicative of prostitution?

22   A.  Yes.

23   Q.  Can you point some out?

24   A.  The second one underneath Saturday, February 9th it says,

25   "GREEK 125" or 125.       16:27:24

```
 1    Q.   What does "GREEK" mean?

 2    A.   That means anal sex.

 3    Q.   Does 125 have any significance to you?

 4    A.   That's $125.

 5    Q.   For what?                                              16:27:41

 6    A.   Anal sex.

 7    Q.   Any others?

 8    A.   Let's see.  Right there.

 9    Q.   It also has the term "GREEK"?

10    A.   Yes.                                                   16:27:56

11    Q.   You mentioned "GFE" in a previous exhibit; correct?

12    A.   Yes.

13    Q.   Is that a term indicative of prostitution?

14    A.   Yes.

15    Q.   So that last one that I highlighted, "Wanna play today?  16:28:08

16    Available all day!!!!! GFE!!!!!!!."

17    A.   Yes.

18    Q.   What about here, are there ads -- let me ask you this:

19    These aren't the actual ads, are they?

20    A.   It's the headline of an ad that a user would click on to  16:28:24

21    then see the whole ad.

22    Q.   If this was February of 2008 and we were actually browsing

23    this web page, what would happen when we clicked one of these

24    links?

25    A.   It would go to that actual ad.                         16:28:41
```

1   Q.  Would there be -- what would be on the actual ad or what

2   could be on the actual ad?

3   A.  There would be photographs and you can see on the page here

4   they would be designated with a camera, meaning the ad had

5   photos and the camera icon, and then the text of what the          16:28:57

6   advertiser was offering.

7   Q.  Going back to the first page, just highlighting an ad over

8   here on the right-hand side, what is that?

9   A.  That's a sponsored ad.

10  Q.  What does that mean?                                           16:29:16

11  A.  It's a highlighted ad that stands out from the other ads,

12  kind of like an imprint.  There is a display ad with pictures

13  versus a line ad that just has text.

14  Q.  What do you have to do to get a sponsor ad on Backpage.com?

15  A.  It was more expensive.                                        16:29:36

16          THE COURT:  Mr. Stone, I think we are at our breaking

17  point for the afternoon.

18          MR. STONE:  Yes, Your Honor.

19          THE COURT:  Members of the jury, just remember the

20  admonition not to come to any conclusions to conduct any          16:29:46

21  research on your own or to discuss the matter amongst yourself

22  or with anyone else, and we'll just adjourn you for the evening

23  and expect you here so that we can resume at 9:00 a.m. sharply.

24          At this point, please all rise for the jury.

25          The witness may step down.                                16:30:03

1          (Jury is not present.)

2          THE COURT:  I want to clarify, there was a minute

3   entry issued last evening, so tomorrow I would like to at least

4   have your revised form of verdicts by 4:00 o'clock so that I

5   can review those, and then we will see how it goes tomorrow,                16:30:57

6   which is Thursday, with this witness.  Everyone appears to want

7   to cross-examine the witness, at least that's what my

8   recollection is, and then we'll go from there in terms of the

9   schedule.

10          Anything, Mr. Stone?                                                 16:31:18

11          MR. STONE:  Yes, Your Honor.  I just want to clarify

12   your thoughts on the verdict form.  You mentioned some

13   yesterday on the record that it didn't reference the state, and

14   you mentioned something about an exhibit, and we don't want to

15   file something that isn't what you had in mind, so we wanted         16:31:34

16   some clarification and see if you could get us some help how we

17   revise that.

18          THE COURT:  You're trying to get out of the work that

19   I wanted you to do for the Court.

20          MR. STONE:  Just a little additional help and we'll be   16:31:50

21   happy to do the work.

22          THE COURT:  Let me see what my notes reflect.  The

23   difficulty on my first review of the draft was that there is

24   verbiage in the very beginning as to each count, and some of

25   that language doesn't match up with the exhibits that were         16:32:09

introduced related to the counts.  So there's a bit of a

disconnect that I was having when I was looking at that.

MR. STONE:  Okay.

THE COURT:  And so how you choose to clean that up is

up to you.

In addition to that, you presented testimony about

where the ad occurred, and if you go back to the indictment it

mentions various states, but in your verdict form nowhere in

there does it reference the state placement of those ads.

Those were some of the thoughts that I had.  Certainly removing

any references to Mr. Larkin and beyond that I think it just

needs to be a little bit more clear because there's voluminous

exhibits that are going to be produced for the jury, and I want

to make sure that the verdict form is as clear and concise as

it can be for their use.

MR. STONE:  Would it be helpful to reference an

exhibit number in the verdict form for the ad?

THE COURT:  I thought that that might help, but let's

see what it looks like when you present it, so I am

anticipating that we'll probably have to go through a third

iteration, but I'd like to see what you produce, what the

defendants produce, and then we can go from there.

I will say that with regard to the counts after Count

52, I think the government's verdict form reads a little bit

more clearly, so I will just offer that.

1          All right.

2          MR. STONE:  Thank you.

3          THE COURT:  So you are all on the same page, I think

4    my law clerk went through our records and has provided to you

5    what we understand to be the last iteration of the form of        16:34:14

6    verdict.  Now, with regard to that, I am not going to take that

7    issue up at this time.

8          MR. STONE:  You mean jury instructions?

9          THE COURT:  Sorry, jury instructions, yes, I am not

10   going to take that up this week at all because the defendants     16:34:32

11   still have to present their case in chief.  I will give them

12   some latitude to do that and then we'll carve out whatever that

13   time that we need next week.

14         So I will ask you to predict for me, Mr. Stone, if we

15   begin at 9:00, how much longer do you anticipate your direct      16:34:53

16   will be with this witness?

17         MR. STONE:  About 90 minutes.

18         THE COURT:  Okay.  All right.  Fair enough.  Okay.

19   All right.  Anything further from the government?

20         MR. RAPP:  No, Your Honor.  Thank you.                       16:35:08

21         THE COURT:  Anything from the defense?  All right.  So

22   we will stand in adjournment.

23      (Proceedings concluded at 4:35 p.m.)

24

25

1

2

3

4                        **C E R T I F I C A T E**

5

6            I, HILDA E. LOPEZ, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9            I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14           DATED at Phoenix, Arizona, this 19th day of October,

15   2023.

16

17

18                              s/Hilda E. Lopez_____
19                              HILDA E. LOPEZ, RMR, FCRR

20

21

22

23

24

25