UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,      )
                               )
                Plaintiff,     )  NO. 2:18-cr-00422-DJH
v.                             )
                               )  Phoenix, Arizona
Michael Lacey, et al.,         )  October 20, 2023
                               )  9:01 a.m.
                Defendants.    )
_____)


**BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**


**JURY TRIAL DAY 22**


Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251


Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2   For the Plaintiff:
          UNITED STATES ATTORNEY'S OFFICE
 3        By:  Kevin M. Rapp, Esq.
               Andrew C. Stone, Esq.
 4             Peter Shawn Kozinets, Esq.
               Margaret Wu Perlmeter, Esq.
 5        40 North Central Avenue, Suite 1800
          Phoenix, Arizona 85004-4408
 6

 7   For the Defendant Michael Lacey:
          LIPTSUTZ GREEN SCIME CAMBRIA, LLP
 8        By:  Paul J. Cambria, Jr. Esq.
          42 Delaware Avenue, Suite 120
 9        Buffalo, New York  14202

10   For the Defendant Andrew Padilla:
          DAVID EISENBERG, PLC
11        By:  David S. Eisenberg, Esq.
          3550 North Central Avenue, Suite 1155
12        Phoenix, Arizona 85012

13   For the Defendant Scott Spear:
          KESSLER LAW OFFICE
14        By:  Eric Walter Kessler, Esq.
          6720 North Scottsdale Road, Suite 210
15        Scottsdale, Arizona 85253
          - and -
16        FEDER LAW OFFICE, PA
          By:  Bruce S. Feder, Esq.
17        2930 East Camelback Road, Suite 160
          Phoenix, Arizona 85016
18

19   For the Defendant John Brunst:
          BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
20        By: Gary S. Lincenberg, Esq.
               Gopi K. Panchapakesan, Esq.
21        1875 Century Park E, Suite 2300
          Los Angeles, California 90067
22

23   For the Defendant Joye Vaught:
          JOY BERTRAND, ESQ, LLC
24        By:  Joy Malby Bertrand, Esq.
          P.O. Box 2734
25        Scottsdale, Arizona 85252-2734
```

1

*I N D E X*

2

3  **GOVERNMENT WITNESS:**                                              **PAGE**

4  MEGAN LUNDSTROM
   Continued Direct Examination by Ms. Perlmeter...............5
5  Cross-Examination by Mr. Eisenberg.........................9

6  Rule 29 Motion...........................................19

7

8

9                              *EXHIBITS*

10  **EXHIBIT**                                                    **RECEIVED**

11  <u>NO.</u>      <u>DESCRIPTION</u>

12  2036a   Attachment: Backpage Ad dated 11/29/2012            5
               "New In Town … Bubbly Blonde … Lets Play-26"
13             USAO-BP-0034733

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2    (Whereupon the proceedings began at 9:01 a.m.)
 3              THE COURT:  Please be seated.  I believe all of our
 4    jurors are present so we will bring our jurors -- oh, let's
09:01a 5    have our witness come forward.
 6              MS. PERLMETER:  And, Your Honor, regarding the
 7    Exhibit 2036a, I did speak with a couple members of the
 8    defense yesterday afternoon about the redactions; and
 9    Mr. Feder informed me if I redacted the handwritten portions
09:01a 10    of the exhibit out, that he would not have an objection to it.
11              So what I would propose, if the Court is okay with
12    this, is if we keep the same exhibit number and I would just
13    remove the yellow sheet from the current version and place it
14    on the redacted version.  For the record, the redacted version
09:02a 15    will become the new 2036a.
16              THE COURT:  That's fine.
17              MS. PERLMETER:  Okay, thank you.
18              THE COURT:  All rise.
19              (Jury in at 9:03 a.m.)
09:03a 20              THE COURT:  Okay, please be seated.
21              Members of the Jury, welcome back.  The record will
22    reflect the presence of the witness and, Ms. Perlmeter, you
23    may continue.
24              MS. PERLMETER:  I'll wait for Mr. Feder to sit
09:04a 25    down.
```

1           CONTINUED DIRECT EXAMINATION

2   BY MS. PERLMETER:

3   Q.   Good morning, Ms. Lundstrom.

4   A.   Good morning.

09:04a 5   Q.   When we left off yesterday afternoon we had 26 -- 2036a

6   on the screen for your eyes only, and you had explained to us

7   that it is your Backpage ad?

8   A.   Yes.

9   Q.   And it was the very last Backpage ad that you posted for

09:04a 10   yourself?

11   A.   Yes.

12   Q.   Do you see the exhibit?

13   A.   Yes, I do.

14   Q.   Now, is the bottom part of the exhibit where the

09:04a 15   handwritten notes were made by the police officer, has that

16   been blacked out?

17   A.   Yes.

18   Q.   But other than that, is this still the same Backpage ad

19   you were looking at yesterday?

09:04a 20   A.   Yes.

21           MS. PERLMETER:  Move to admit Exhibit 2036a.

22           MR. EISENBERG:  No objection, Your Honor.

23           THE COURT:  2036a may be admitted and it may be

24   published.

09:05a 25           (Exhibit No. 2036a admitted in to Evidence.)

BY MS. PERLMETER:

Q.   Ms. Lundstrom, can you please tell us where this ad was posted and on what date that it was posted?

A.   So it was posted on Backpage in the adult entertainment section in the Rockies subsection in Colorado.

Q.   Now, what words in your ad suggest prostitution?

A.   So in addition to the subject line, the title, in this part "I'm here for only a couple days," "meeting some new friends," "love having fun," "never play games," and "we can get together" all suggest a commercial sex transaction.

Q.   Are you focusing or directing your attention to the higher end clientele you were telling us about yesterday afternoon?

A.   Yes.

Q.   And was this particular ad -- like were you in Vail, Colorado, at this time?

A.   Yes.

Q.   Now, Ms. Lundstrom, at this point in time in roughly 2012, how much were your clients paying to have sex with you?

A.   Generally in Vail around $500 an hour or more.

Q.   All right, thank you.  Now, I want to fast forward to 2015.  Was there a time where in 2015 you posted ads on the Backpage website?

A.   Yes, I did.

Q.   Okay.  Was that in conjunction with a speaking

```
 1  arrangement -- or a speaking engagement you had with a law
 2  enforcement group?
 3  A.   Yes, it was.
 4  Q.   And in what city and state was this meeting in?
 5  A.   Greeley, Colorado.
 6  Q.   Was part of your presentation to the law enforcement
 7  group, was that involving the posting of Backpage ads?
 8  A.   Yes.
 9  Q.   Could you please explain to the jury --
10        MR. EISENBERG:  Objection -- I'm sorry, ma'am.
11        Objection, Your Honor, relevance.
12        THE COURT:  Overruled.
13  BY MS. PERLMETER:
14  Q.   Could you please explain to the jury your posting of
15  Backpage ads in 2015?
16  A.   So in 2015 I had just started my organization that at the
17  time was Free Our Girls, and I wanted to demonstrate to local
18  law enforcement that prostitution was happening in our
19  relatively rural community even though you couldn't see it
20  like street prostitution, and so I set up a demonstration
21  using Backpage ads.
22  Q.   What did you use in this presentation?  Did you purchase
23  things in advance to demonstrate the posting of Backpage ads?
24  A.   Yes.
25        MR. EISENBERG:  Again, Your Honor, I'm sorry,
```

09:07a  5
09:07a 10
09:07a 15
09:07a 20
09:08a 25

          1   relevance.  This is an extension of something that's not

          2   contained within the charges.  It has nothing to do with the

          3   case.

          4           MS. PERLMETER:  Your Honor, this goes to Count 1.

09:08a    5           MR. EISENBERG:  Demonstrating to the police --

          6           THE COURT:  No, no more speaking about the objection

          7   yet.  Overruled.

          8           MS. PERLMETER:  Please continue.

          9           THE WITNESS:  So what I did was I went to a local

09:08a   10   grocery store and I purchased five or six prepaid Visa gift

         11   cards and then five or six disposable cell phones, and I

         12   registered all of those with fake names and addresses; and

         13   then I created one Backpage ad for each region in Colorado,

         14   and I paid for the ad with the prepaid gift card and used one

09:09a   15   of those prepaid cell phones for each ad and then I turned --

         16   I submitted all of those so that the ads went live and then

         17   demonstrated to police how quickly phone calls started coming

         18   in for those ads.

         19   BY MS. PERLMETER:

09:09a   20   Q.   Did you post the ads officially in front of the group

         21   that you were presenting before?

         22   A.   Yes, they witnessed the process.

         23   Q.   And how quickly after you posted each of the five or six

         24   ads did the burner phones begin to ring?

09:09a   25   A.   Less than five minutes.

1        MS. PERLMETER:  Your Honor, I have no further

2   questions for the witness.

3        THE COURT:  Who is coming forth to examine --

4        MR. EISENBERG:  I am, Your Honor.

09:09a  5                CROSS-EXAMINATION

6   BY MR. EISENBERG:

7   Q.   Good morning, Ms. Lundstrom.

8   A.   Good morning.

9   Q.   The ad that's in 2036a --

09:09a 10        MR. EISENBERG:  Could we get that back up on the

11   screen, ma'am.  I can see it over there.

12        Can you take away your computer?

13   BY MR. EISENBERG:

14   Q.   So there's a -- if you look over to the right in the

09:10a 15   column, it looks to me like there are two pictures, right?

16   A.   Yes.

17   Q.   Would you agree with me they're awfully hard to see at

18   this point?

19   A.   Yes.

09:10a 20   Q.   They're very dark and almost non-visible, right?

21   A.   Yes.

22   Q.   Okay.  When you made a picture or posted a picture in an

23   ad of yourself, you determined that you wanted to do tasteful

24   photographs when you put them in Backpage; is that correct?

09:10a 25   A.   Yes.

10

1    Q.   And that they didn't contain any nudity, right?

2    A.   Yes.

3    Q.   With respect to posting in Backpage, your ads did not

4    come back to you, if you will, either deleted or cancelled or

09:11a  5    anything of that nature; isn't that correct?

6    A.   Correct.

7    Q.   And the reason for that is that you looked like an adult;

8    is that right?

9    A.   I have no idea what the decision process was.

09:11a  10   Q.   Well, as far as you were concerned, the reason why they

11   didn't come back to you, I believe, is that you attributed

12   that to the fact that you were an adult and because there was

13   no nudity in your photos?

14          MS. PERLMETER:  Objection, compound question.

09:11a  15          MR. EISENBERG:  Okay.  One, you attributed --

16          THE COURT:  Sustained.

17   BY MR. EISENBERG:

18   Q.   You attributed the fact that you didn't get anything

19   rejected because there was no nudity in the photos, right?

09:11a  20   A.   I believe so, yes.

21   Q.   And, ma'am, if you look up on your ad right at the top

22   there, it says "Let's play - 26."  Do you see that?

23   A.   Uh-huh, yes.

24   Q.   You were actually -- at that time were you 26 years old?

09:12a  25   A.   No.

MEGAN LUNDSTROM - CONT'D DIRECT EXAMINATION BY MS. PERLMETER 11

1   Q.   You were 24?

2   A.   No.

3   Q.   Older?

4   A.   Older.

09:12a  5   Q.   How old?

6   A.   I believe I was 28 at the time.

7   Q.   Okay.  So, obviously, you were an adult?

8   A.   Yes.

9   Q.   Okay.  I think in your direct you said that when you

09:12a 10  first started posting on Backpage things were like the Wild

11  West?

12  A.   Yes.

13  Q.   Wild West.  And that is -- basically, what you were

14  saying is anything goes, is that the idea?

09:12a 15  A.   Yes.

16  Q.   And you first started posting in 2008; is that correct?

17  A.   Yes.

18  Q.   At that time when you first started posting, you were

19  able to post hours and rates, correct?

09:13a 20  A.   Yes.

21  Q.   And then there came a time when things changed, right?

22  A.   Yes.

23  Q.   And what the change was, rates were no longer allowed,

24  right?

09:13a 25  A.   Yes.

MEGAN LUNDSTROM - CONT'D DIRECT EXAMINATION BY MS. PERLMETER 12

1   Q.   And the way you knew that is how?

2   A.   Through websites like The Erotic Review.

3   Q.   You learned that rates being posted in Backpage were not

4   allowed; is that correct?

09:13a   5   A.   Yes.

6   Q.   And you also knew that you -- by that time you knew that

7   you shouldn't post sexually explicit pictures, right?

8   A.   Yes.

9   Q.   Or use terms that were descriptive of sex acts, correct?

09:13a   10   A.   Yes.

11   Q.   And the reason that you knew -- well, your ad would be

12   flagged and it would be rejected if you posted things like

13   that; is that correct?

14   A.   Correct.

09:13a   15   Q.   Okay.  Ma'am, do you know someone named Brad Myles?

16   A.   Yes, I do.

17   Q.   Who is he?

18   A.   He is the former CEO of Polaris.

19   Q.   And you're currently with Polaris?

09:14a   20   A.   As of January of this year, yes.

21   Q.   Okay.  Did you know that he testified here yesterday or

22   the day before?

23   A.   I was aware that he testified.

24   Q.   Did you and he talk about your testimony?

09:14a   25   A.   No.

| | |
|---|---|
| 1 | MR. EISENBERG:  Thank you, Your Honor. |
| 2 | THE COURT:  Ms. Perlmeter? |
| 3 | MS. PERLMETER:  Does anyone else from the defense -- |
| 4 | THE COURT:  Oh, I'm sorry, yes.  Thank you for the |
| 09:14a  5 | reminder.  Not enough coffee this morning. |
| 6 | Mr. Cambria? |
| 7 | MR. CAMBRIA:  No, Your Honor. |
| 8 | THE COURT:  Ms. Bertrand? |
| 9 | MS. BERTRAND:  No, thank you. |
| 09:14a 10 | THE COURT:  Mr. Lincenberg? |
| 11 | MR. LINCENBERG:  No, Your Honor. |
| 12 | THE COURT:  Mr. Kessler? |
| 13 | MR. KESSLER:  No, Your Honor. |
| 14 | THE COURT:  All right.  Ms. Perlmeter? |
| 09:14a 15 | MS. PERLMETER:  Thank you, your Honor.  We have no |
| 16 | redirect for the witness. |
| 17 | THE COURT:  May the witness be excused from |
| 18 | subpoena? |
| 19 | MS. PERLMETER:  Yes, please. |
| 09:14a 20 | THE COURT:  Any objection from defense? |
| 21 | MR. EISENBERG:  No, Your Honor. |
| 22 | THE COURT:  All right.  Ma'am, you are excused from |
| 23 | subpoena.  Thank you for your testimony.  You may step down |
| 24 | and be cautious of the stair right there, and you may leave |
| 09:15a 25 | the courtroom.  Thank you. |

UNITED STATES DISTRICT COURT

1          Call your next witness.

2          MS. PERLMETER:  Your Honor, at this time the United

3     States has completed its presentation of this case and we will

4     rest.

09:15a  5          THE COURT:  Okay.  Well, at this moment, Members of

6     the Jury, I'm going to have you go on a short break.  I'm

7     going to discuss some matters with the counsel.  I'll have

8     Liliana retrieve you in a few moments.

9          Simply because the Government has rested its case in

09:15a 10    chief does not mean that you should come to any conclusions.

11    We still have the defendants' case to proceed with, but in

12    that interim period just continue to keep an open mind and

13    don't discuss the matter.  Remember the admonition and I'll

14    have Liliana come and retrieve you in about 10, 15 minutes.

09:15a 15         Please all rise for the jury.

16         (Jury out at 9:15 a.m.)

17         THE COURT:  All right, please be seated.

18         At this point, let me ask whether or not there are

19    any motions that have been contemplated by defense counsel?

09:16a 20         What just happened there, Mr. Kessler?

21         MR. KESSLER:  I'm sorry, I just dropped. . .

22         THE COURT:  Okay, we'll have them retrieve it.

23         MR. PANCHAPAKESAN:  Your Honor, we intend to make a

24    Rule 29 motion.

09:17a 25         THE COURT:  And are you -- let me just ask in terms

1   of procedure, are you each going to individually make those

2   arguments?

3           MR. PANCHAPAKESAN:  I think the procedure -- at

4   least orally I plan to make a presentation, and then counsel

**09:17a** 5   will follow up.

6           THE COURT:  Okay.  What order -- have you determined

7   an order?

8           MR. PANCHAPAKESAN:  I'll likely go first and broadly

9   cover some joint issues.  And then, of course, if the Court at

**09:17a** 10   some point wants briefing, we'd be prepared to do that; but

11   after that I think Mr. Cambria or Mr. Feder would go next.

12           THE COURT:  All right.  So I'm trying to get a sense

13   of time here because, obviously -- I'd like to get a sense as

14   to how long your motion -- your oral motion is going to take,

**09:18a** 15   permit the Government to respond and, of course, permit a

16   reply and then I want to understand whether or not --

17   depending on how the motions are presented, whether you have a

18   witness available in the defense case in chief?

19           MS. BERTRAND:  Your Honor, I think we've been

**09:18a** 20   relying on the Court's instruction that we could bring our

21   witnesses in on Tuesday.

22           THE COURT:  Okay.  And so at this juncture, then, I

23   guess what I can do is have -- is there an objection to that

24   process?

**09:18a** 25           MR. RAPP:  Well, I don't think they -- I don't think

        1    they have witnesses here so we don't have an objection, no.

        2            THE COURT:  All right.  So at this point, then, I

        3    will bring the jury back in.  I will release them with the

        4    full admonition, inform them that we have to take up some

09:19a  5    legal issues in order for them to come back and begin fresh on

        6    Tuesday and that is how we will proceed and then I'll permit

        7    you -- I'll take a little bit of a break, and then I'll permit

        8    you to come forward with your motions.

        9            All right, let's go ahead and have the jury in.

09:19a 10            (Jury in at 9:21).

       11            THE COURT:  All rise for the jury.

       12            All right, please be seated.

       13            Members of the Jury, because we are at the end of

       14    the Government's case in chief, as I instructed you in the

09:22a 15    preliminary instructions, what will happen next is the

       16    defendants will have an opportunity to present their case in

       17    chief and then the Government will have an opportunity if they

       18    wish to bring in any what we call rebuttal case, and then once

       19    that occurs there will be further procedure; but at this

09:22a 20    juncture it's necessary for me and the lawyers to all meet and

       21    confer about some legal matters which will not involve you,

       22    and so what that means is I'm going to release you for the

       23    day, but I'm going to release you with the full admonition

       24    that I gave you at the outset of your service.

09:22a 25            And the reason that I'm going to do that with your

1    patience and your attention is because, as you know, you have

2    been diligently coming to court for now roughly five weeks and

3    so we want to make sure that we preserve the integrity of the

4    possible.

09:23a    5        And so I'm going to tell you to continue to keep an

6    open mind throughout the trial and do not decide what the

7    verdict should be until you and your fellow jurors have

8    completed your deliberation at the end of the case.  Because

9    you must decide this case based only on the evidence received

09:23a   10    in the case and on my instructions as to the law that applies,

11    you must not be exposed to any other information about the

12    case or to the issues it involves during the course of your

13    jury duty.

14        Thus, until the end of the case or unless I tell you

09:23a   15    otherwise, do not communicate with anyone in any way and do

16    not let anyone else communicate with you in any way about the

17    merits of the case or anything to do with it.

18        This restriction includes discussing the case in

19    person, in writing, by phone, tablet or computer or any other

09:24a   20    means via e-mail, via text messaging or any Internet chat

21    room, blog, website or application including, but not limited

22    to, Facebook, YouTube, X, Instagram, LinkedIn, Snapchat,

23    TikTok or any other forms of social media.

24        This restriction also applies to communicating with

09:24a   25    your fellow jurors until I give you the case for deliberation

         1    and it applies to communicating with everyone else, including

         2    your family members, your employer, the media or press, and

         3    the people involved in the trial.  Although you may notify

         4    your family and, again, your employers that you've been

09:24a   5    selected as a juror to hear this case and how long you expect

         6    the case to continue to go, if you are asked or approached in

         7    any way about your jury service or anything about this case,

         8    you must respond you have been ordered not to discuss this

         9    matter.  In addition, you must report the contact to the

09:25a  10    Court.

        11            Because you will receive all of the evidence and

        12    legal instruction you properly may consider to return a

        13    verdict, do not read, watch or listen to any news or media

        14    accounts or commentary about the case or anything to do with

09:25a  15    it.  Do not do any research such as consulting dictionaries,

        16    searching the Internet or using other reference materials, and

        17    do not make any investigation or in any other way try to learn

        18    about the case on your own.

        19            Do not visit or view any place discussed in this

09:25a  20    case, and do not use the Internet or any other resource to

        21    search for or view anyplace discussed during the trial.  Also,

        22    do not do any research about this case, the law or the people

        23    involved, including the parties, the witnesses or the lawyers

        24    until you have been excused as jurors.  If you happen to read

09:26a  25    or hear anything touching on this case in the media, turn away

         1    and report that to me as soon as possible.

         2           A juror who violates these restrictions jeopardizes

         3    the fairness of these proceedings and a mistrial could result

         4    that would require the entire process to start over.  If any

09:26a   5    juror is exposed to any outside information, please contact

         6    the Court immediately.

         7           With those instructions, again, do bear in mind that

         8    you are not to come to any conclusions and just simply enjoy

         9    the extended Friday early dismissal for yourselves, and I

09:26a  10    expect you to be present and return Tuesday morning so that

        11    you can take your seats promptly at 9:00 a.m.

        12           With that, I thank you for your attention this week,

        13    as well as all other weeks, and please all rise for the jury.

        14           Thank you for the goodies this morning.

09:27a  15           (Jury out at 9:27 a.m.)

        16           THE COURT:  Let's say we give you about a 15-minute

        17    break and we can return.

        18           (Recess taken at 9:27 a.m.)

        19           (Back on the record at 9:47 p.m.)

09:47a  20           THE COURT:  All right, we may proceed.

        21           MR. PANCHAPAKESAN:  Morning, Your Honor.

        22           THE COURT:  Good morning.

        23           MR. PANCHAPAKESAN:  So I'm going to make a

        24    presentation jointly on behalf of the defendants and then

09:47a  25    others may come up individually as well.

1          So I'm going to start with the Travel Act and the

2    fifty substantive charges Counts 2 through 51, and so we'll

3    start with the legal standard.

4          The Travel Act requires the Government to prove that

09:47a  5    a defendant intentionally promoted or intentionally

6    facilitated the promotion of business enterprises involved in

7    state law prostitution offenses, and it's a specific intent

8    crime.  The Court's held this at Docket 946 at Page 14.  The

9    *US v. Polizzi* case, P-o-l-i-z-z-i, for example, at 500 F.2d

09:48a 10    856, that notes the required intent under the Travel Act is

11    quote "specific intent to facilitate an activity which the

12    accused knew to be unlawful," under state law; and so there's

13    sort of two main aspects to this, Your Honor.

14          One is a specific intent to facilitate a business

09:48a 15    enterprise, and second is that the defendant must know that

16    the advertisement, one of the fifty ads, advertised a

17    transaction that's unlawful under state law; and the backdrop

18    here, Your Honor, is that the Travel Act, it is not a

19    generalized prostitution statute.  It's not even a

09:48a 20    facilitation of prostitution statute.

21          The key here, the critical link that the Government

22    has to prove and we don't think they've proven, is the intent

23    to promote a business enterprise involved in one of the fifty

24    advertisements, and so I'll start with this business

09:48a 25    enterprise element.

09:49a 1      What the Court's held -- and this is at Docket 946
2   at Pages 15 to 16, and this is in connection with a Motion to
3   Dismiss we brought as to the Travel Act charges, the Court
4   held, quote, "one cannot intend to promote/facilitate a
5   business enterprise one does not know exists," and so we can
6   start with that premise.

7      The alleged business enterprises here and the
8   testimony the Government's drawn out is that the individuals
9   who posted the ads or a pimp who posted the ad, for example,
09:49a 10  the Government's theory is that is the business enterprise.
11  That's why they've drawn out testimony about a pimp not having
12  other legitimate employment or someone posting multiple ads.

13     That's their theory.  That's the business
14  enterprise; and if the Court looks, for example, at Docket
09:49a 15  776, Pages 1 to 2, that was the Government's opposition to our
16  Motion to Dismiss the Travel Act, that lays out the
17  Government's theory of what a business enterprise is.

18     And to be clear, the business enterprise here is not
19  Backpage itself.  The business enterprise, it's what the
09:50a 20  Government claims are these individual prostitution
21  enterprises that have posted ads; and so when we focus on the
22  business enterprise, there's no evidence that any defendant,
23  including my client, Mr. Brunst, associated themselves in some
24  meaningful, specific, intentional way with any one of the
09:50a 25  individuals who testified, whether it's a woman who was

1    advertised or a pimp who advertised her.

2          And, for example, as to my client, Mr. Brunst, it's

3    not enough to say that Mr. Brunst was at a budget meeting and

4    the agenda mentioned The Erotic Review or that third parties

09:50a   5    advised him or others that there were prostitution ads on the

6    site, right.

7          That's generalized information about the nature of

8    the ads on the site, but the Travel Act does not criminalize

9    being on notice that there's prostitution being advertised on

09:51a   10   a website platform; but that's precisely the type of case the

11   Government's put on as the Travel Act.

12         So, for example, in *US v. Gibson Specialty*, it's a

13   Ninth Circuit case, 507 F.2d 446, that case which the Court

14   has cited before, involves the sale of gambling materials to

09:51a   15   known gambling outfits under the Travel Act case.

16         What the Court said there, the Ninth Circuit said

17   is, quote, "...the prosecutor must show that the manufacturer

18   in some significant manner associated himself with the

19   purchaser's criminal venture for the purpose of its

09:51a   20   advancement."

21         The Court goes on to say, "Were we not to define

22   intent in the Travel Act in this manner, the act would be

23   plagued by the very overexpansiveness which Congress sought to

24   rule out by inclusion of an express *mens rea* requirement," and

09:51a   25   that's particularly apt here because the overexpansiveness

UNITED STATES DISTRICT COURT

**09:52a** that Congress was concerned about is precisely the
overexpansiveness that you see in the Government's prosecution
where they're attempting to treat the Travel Act as this sort
of general intent, generalized notice statute as opposed to
showing that my client or the other defendants in some
specific, significant, meaningful way associated themselves
with a business enterprise.

Now, second, Your Honor, is this element that a
defendant must know one of the fifty ads involved in activity
**09:52a** that violates state law.

Now, there's multiple steps here, right.  There's an
advertisement.  There's a buyer and a seller that get
together.  They agree on a service for a fee, and then maybe
some sort of transaction is consummated.  There's no evidence
**09:52a** that Mr. Brunst or the other defendants knew ahead of time
that one of these fifty charged ads would, in fact, lead to a
prostitution transaction.

Now, for example, there's been law enforcement
officers who have testified that they didn't even have
**09:53a** probable cause under state law to arrest -- to make a
prostitution arrest on the face of an advertisement.

I believe one of the law enforcement officers
testified, it may have Mr. Murry or Mr. Griffen, that the
advertisement's, quote, "only the first step towards some sort
**09:53a** of prostitution investigation."

1           And so, in effect, what the Government's theory on

2      knowledge is here, Your Honor, is -- is they are pointing to

3      what resulted from an ad.  They're saying these ads resulted

4      in prostitution, but the focus for the purpose of the Travel

09:53a  5      Act has to be on what the defendant knew beforehand under the

6      defendant's ex-ante knowledge about whether an advertisement

7      would, in fact, lead to prostitution.

8           And that theory of prosecution, it runs a foul of

9      the First Amendment.  Mr. Cambria is going to spend a bit of

09:53a 10      time on that but, for example, you have the -- there's a case

11      out of the Second Circuit.  It's *Locust Valley.*  It's 868 F.3d

12      104.  What that case says is quote, "...the First Amendment

13      offers no protection to speech that proposes a commercial

14      transaction if consummation of that transaction would

09:54a 15      *necessarily* constitute an illegal act.  However, if, as here,

16      there are plausible ways to complete a proposed transaction

17      lawfully, speech proposing that transaction 'concerns lawful

18      activity' and is therefore protected commercial speech," and

19      that's precisely what we have here.

09:54a 20           For example, Ms. Beck, one of the women who

21      testified, she said on a couple of occasions that despite the

22      advertisement, one instance it led to, like, a legal massage,

23      in another instance it led to a walk; and so these are

24      examples that sort of highlight not only is there no evidence

09:54a 25      that a defendant knew ahead of time something would lead to

```
 1   prostitution, but there are even advertisements at issue with
 2   advertisers who testified where the ad itself led to something
 3   perfectly legal and there's no way for someone to predict
 4   ahead of time what might happen with an ad.
```
**09:55a**  5   Now, given the Government's presentation in that
```
 6   respect, they're likely to advance a theory of deliberate
 7   ignorance.  We see that from the proposed jury instructions,
 8   and so I'll deal with that briefly.
```
```
 9   First is, I'm not aware of a Ninth Circuit case in
```
**09:55a** 10   which this notion of deliberate ignorance has been adopted in
```
11   the context of a Travel Act case, that's one.
```
```
12   Two is deliberate ignorance is not a substitute for
13   intent.  It's not a substitute for the Government to prove
14   specific intent to facilitate a business enterprise.  The only
```
**09:55a** 15   context in which we should be having this discussion about
```
16   deliberate ignorance is in the context of whether a defendant
17   had knowledge regarding, you know, was one of the fifty ads
18   for prostitution.
```
```
19   And what the Ninth Circuit's held is that the only
```
**09:55a** 20   instance in which it's appropriate to give a deliberate
```
21   ignorance instruction for that framework to apply is where
22   there is evidence put on by the Government of a defendant's
23   willful ignorance.
```
```
24   So, for example, in US v. Alvarado, 838 F.2d 311 the
```
**09:56a** 25   Court says, quote, "In determining whether a *Jewell*

1    instruction," meaning a deliberate ignorance instruction, "is

2    appropriate in this case, the government must present evidence

3    supporting an inference that" defendants "purposely avoided

4    obtaining actual knowledge that the suitcase contained the

09:56a  5    cocaine."  The Court goes on to say, "If the evidence

6    indicates" the defendants" had either actual knowledge or

7    lacked any knowledge of the presence of the cocaine, then

8    giving the *Jewell* instruction was inappropriate."

9           So stepping back, first of all, this kind of

09:56a 10    highlights the classic example of where a deliberate ignorance

11    framework is appropriate.  It's where you have a drug mule and

12    they've sort of put their head in the sand regarding what

13    might be in some compartment, right, drugs or the like.

14    That -- that doesn't really fit in this case.  That's one.

09:56a 15           Two is the Government has not put on a theory of

16    prosecution that aligns with the notion of deliberate

17    ignorance.  In fact, their presentation's been the exact

18    opposite.  Their presentation has been everyone knows these

19    are ads for prostitution.  There's third parties who have been

09:57a 20    consistently telling you these are ads for prostitution, and

21    so there's no evidence that my client or any of the defendants

22    deliberately ignored what an ad might be for, let alone one of

23    the fifty ads; and so the Government hasn't met this

24    foundational predicate of, you know, the application of a

09:57a 25    deliberate ignorance framework in this case.

09:57a

            And then further, let's explore the framework of
deliberate ignorance that the Government wants to pursue here.
So their proposed instruction is that, quote, "The defendant
was aware of a high probability that the vast majority of
escort ads were for prostitution."  That's -- that's a
framework that they ask the Court to apply here; and that
instruction, that framework, I think, it highlights a problem
with this approach, right.

            So what does "vast majority" even mean, right?  Is
that 70 percent?  Is that 80 percent, right?  How do we play
that out?  Does that mean that these fifty ads my client's
never seen, do they fall with the majority?  Do they fall with
the minority?  What's a jury supposed to do with that?  Does
that mean 30 of the ads, 35 of the ads, 40 of the ads are for
prostitution?  It highlights that this is an unworkable
approach in the context of what's being charged here.

            In essence, this deliberate ignorance framework, it
would almost by fiat impute to my client or others that they
must have known a given ad was for prostitution without
establishing any kind of foundation that they were
deliberately ignorant as to what one of these ads was for.

            And so ultimately as to these Travel Act counts,
Your Honor, under Rule 29, no rational trier of fact could
find beyond a reasonable doubt the elements of, one, an intent
to facilitate a business enterprise tied to one of the fifty

09:58a

09:58a

09:58a

09:59a

1  ads or, two, actual knowledge that one of the fifty ads

2  involves a state law prostitution offense.

3          In that context it's worth noting briefly that my

4  client wasn't even charged in any of the Travel Act counts in

09:59a 5  the initial indictment, either the conspiracy count or the

6  Travel Act counts; and I think the Government's presentation,

7  frankly, illustrates why, that there's been no connection made

8  between him and any business enterprise or any ad that's at

9  issue.

09:59a 10         Now, briefly, I'll address the conspiracy count and

11  the Government's *Pinkerton* theory as to the Travel Act counts.

12  So I think the initial starting point here, again, is the law

13  of the case.  So in an order denying our Motion to Dismiss in

14  the Travel Act counts, the defendants raise concerns in

10:00a 15  connection with the conspiracy count that it alleged some sort

16  of boundless conspiracy to violate the Travel Act, meaning

17  some unknown, unlimited amount of advertisements.

18         What the Court said in response in denying the

19  motion was, quote, "Such a claim is simply untrue.  Defendants

10:00a 20  were not indicted for facilitating the amorphous notion of

21  prostitution.  They were indicted for facilitating via

22  publishing ads on fifty distinct occasions for prostitutes,

23  prostitution-related businesses or other groups were involved

24  in the business of prostitution."

10:00a 25         This is an order the Court issued -- Judge Brnovich

1    issued it in May of 2020.  This is the case that we've been

2    defending against, and so the law of the case is that the

3    conspiracy charge here is, in fact, tied.  It's specific to

4    the fifty charged ads.  It doesn't go beyond that.

10:00a  5            THE COURT:  That was related to a Motion to Dismiss

6    the indictment, wasn't it?

7            MR. PANCHAPAKESAN:  It was, Your Honor, yes.

8            THE COURT:  And so she was applying a different

9    standard in reviewing that --

10:01a 10            MR. PANCHAPAKESAN:  Well --

11            THE COURT:  -- as to each of those -- each of the

12    arguments on each of the counts.

13            MR. PANCHAPAKESAN:  The standard the Court was

14    applying dealt -- of course, the Court assumed the truth of

10:01a 15    the allegations; but I think what the Court said in terms of

16    the scope of the conspiracy count, I think that still holds

17    true, right.

18            Because in May 2020 the Court is telling the parties

19    that this is not a boundless conspiracy, that the case you

10:01a 20    defendants are defending against on the conspiracy is tied to

21    the fifty counts; and so that's the case that we've been

22    preparing for and defending against and so -- and that's the

23    law of the case and I think to expand it to --

24            THE COURT:  And how -- how is that different from

10:01a 25    the -- my recollection is the conspiracy is alleged to have

1    occurred and begun in roughly 2004 up to sometime in 2018.

2            How does that relate to the time frame?

3            MR. PANCHAPAKESAN:  I believe the charged counts,

4    the fifty counts start in, I think, September of 2013; and so

10:02a  5    in some sense there's a distinction between, on the one hand,

6    evidence that might be relevant to the conspiracy.

7            So, for example, the Government's put on evidence of

8    a budget meeting or something, right, in 2007 or 2008, which

9    might be relevant to this notion of an alleged conspiracy

10:02a 10    during that time frame; but in terms of an agreement to commit

11    a substantive crime, right, which is a requirement to show a

12    conspiracy, those substantive crimes -- those alleged

13    substantive crimes are the fifty Travel Act counts.

14            I don't think -- the Court has held they don't --

10:02a 15    they don't go beyond that into some unknown advertisements or

16    counts that, you know, we've never been put on notice of and

17    that the Court said we're not defending against.

18            And so a conspiracy requires -- it requires an

19    agreement, right, to engage in criminal activity.  It requires

10:03a 20    overt acts and it requires an intent to commit the substantive

21    crime, that crime here being one of the fifty Travel Act

22    counts.

23            THE COURT:  So let me just pose a hypothetical.

24    Let's assume that they had a conspiracy charge and then they

10:03a 25    allege Travel Act violations, but they weren't as descriptive

1    in terms of this particular ad on this particular day.

2            How would that change the argument?

3            MR. PANCHAPAKESAN:  Well, there's a couple

4    responses, Your Honor.  One is the conspiracy has to be

10:03a  5    bounded by something, right.  I don't think it's appropriate

6    to allege a criminal conspiracy that -- because over the

7    course '04 to '18 millions, right, of escort ads and it would

8    be impossible practically, right, to defend against an unknown

9    set of advertisements; and that's why the Court previously

10:04a  10    said the crime that is the alleged objective of this

11    conspiracy, the crimes of the fifty counts, that's one and

12    then --

13            THE COURT:  So -- so would it be any different, for

14    example, if the Government alleged on or about May 1st through

10:04a  15    May 31st of 2014 these advertisements for sex acts for money

16    were posted on Backpage?  Would that be any different?

17            MR. PANCHAPAKESAN:  Well, I mean, I think there

18    needs to be some specificity, right.  I don't think that an

19    indictment or the Government's presentation can sort of just

10:04a  20    vaguely be there may have been ads that were posted that could

21    have been for prostitution, right.

22            The Travel Act, which is the object of a conspiracy,

23    it requires proof of the advertisement of the business

24    enterprise, right, that the act led to prostitution, that

10:05a  25    someone knew it was for prostitution; and so that's, I think,

1    why the Court in its order bound it to those fifty ads,

2    because that's all that they've charged in that respect or

3    endeavored to prove.

4         If they put someone up, you know, NCMEC or whoever

10:05a  5    saying, "Yeah, I've looked at these ads broadly and our view

6    is they're for prostitution," that obviously doesn't come

7    close to establishing a Travel Act violation or conspiracy to

8    violate the Travel Act.

9         Now, under -- under *Pinkerton*, which I'll also

10:05a 10    address, a *Pinkerton* theory of liability requires, one, a

11    conspiracy, which in our view has not been established here.

12    Two, it requires that another alleged co-conspirator -- and I

13    imagine they're going to say that person is Carl Ferrer, that

14    he actually committed one of these substantive Travel Act

10:06a 15    violations; and then, three, it requires that the commission

16    of the offense is reasonably foreseeable.

17         And so, as the first point, the conspiracy, I think

18    we've made the argument there's not been a conspiracy

19    established here as to these fifty charged ads.

10:06a 20         Taking the second point, as to whether Mr. Ferrer,

21    for example, committed one of these fifty charged offenses,

22    there has been no evidence that Mr. Ferrer or any alleged

23    co-conspirator in some meaningful, intentional way associated

24    themselves with one of the advertisers or pimps or what have

10:06a 25    you who posted one of the fifty ads.

Now, the only communication I'm aware of that
Mr. Ferrer testified to is he -- there were communications
with one of the posters, Pamela Robinson, and so the
Government put in evidence use of an e-mail address.  It was
10:07a  carl@backpage.com, and this is on September 14th in the
afternoon.  It starts at Page 80 of the transcript.

So what the Government elicited was that there was
communications between Pamela Robinson -- she's the subject of
several of the fifty counts -- and this carl@backpage e-mail
10:07a  address, and the Government's questioning in this respect was
very careful.

The Government said, "What do you respond?" asking
Mr. Ferrer.  The next question is, "What does
carl@backpage.com respond?" and so what we elicited on
10:07a  cross-examination -- this is October 10th, the morning
transcript, Pages 103 to 104.

Carl Ferrer says, quote, "It really wasn't my e-mail
address."  He said others would use it.  He said it was this
sort of general Backpage marketing account that several people
10:07a  might use.  There's no evidence as to who actually sent those
e-mails, whether the person who sent those e-mails was part of
an alleged conspiracy.  There's been no testimony that every
marketing employee at Backpage is part of a conspiracy.

That hasn't been established, and so that's the only
10:08a  instance I'm aware of in which Mr. -- in which the Government

1   claims Mr. Ferrer might have had some direct communication

2   with one of the advertisers of the fifty ads; and even in that

3   instance, there is no competent evidence that he was the one

4   who was interacting with her.

10:08a   5        And then lastly in the context of *Pinkerton*, there's

6   -- there's due process constraints in terms of foreseeability.

7   So, for example, in *US v. Castenada* case, 9 F.3d 761, Court

8   says, "Several circuits, including this one, recognize that

9   due process constrains the application of *Pinkerton* where the

10:08a  10  relationship between the defendant and the substantive offense

11  is slight."

12        So, for example, as to my client, for example, just

13  because Mr. Brunst is aware there's a moderation function at

14  Backpage but he's not directly involved in it, the connection

10:09a  15  between that fact and one of the fifty ads is too slight.

16  These are fifty ads out of millions, right.  It's not

17  foreseeable to him, there's been no testimony in this respect,

18  that one of the fifty ads, for example, might be moderated in

19  some improper way, right, to facilitate prostitution.  There's

10:09a  20  multiple steps between what he knows and that potential fact

21  that haven't been established.

22        Now I'm going to turn to the money laundering

23  counts, Your Honor.  So I'll start with Counts 53 to 62 and

24  I'll come back to the conspiracy count later.  So these are --

10:09a  25  excuse me.  These are concealment money laundering charges in

1    Counts 53 to 62.  These are charged under 18 U.S.C.

2    1956(a)(1)(B)(i).

3          What that statute says is the transaction that's the

4    subject of the money laundering count.  It has to be designed,

10:10a  5    in whole or in part, to conceal or disguise the nature,

6    location, source, et cetera, of the proceeds; and the

7    operative word there is "designed."

8          And so what the record is on these transactions,

9    which are post April 2015 wire transfers from Website

10:10a  10   Technologies to Cereus Properties, the only testimony on the

11   record on these counts was from Carl Ferrer; and what Ferrer

12   said is that there was a sale of Backpage in April 2015.

13   There were two loan agreements.  The larger loan was on the

14   sale on the U.S. portion of Backpage.  The smaller loan was on

10:10a  15   the sale of the foreign business.

16          And so, for example, September 21st in the afternoon

17   at Page 91, starting at Line 1, Mr. Ferrer says, quote,

18   "Cereus Properties collected the interest and debt payments

19   from the 600 million dollar loan, referring to the sale.

10:11a  20          He goes on to say -- later on that same page he

21   says, "Payments would be made to Cereus Properties.  We made

22   those payments from US banks and European banks.  We would

23   make a payment on the interest or principal of the loan.  That

24   was for Europe" -- meaning the foreign -- foreign

10:11a  25   operations -- "and then interest payments for the loan in the

US."

And he goes on to say on Page 93 of that same day, September 21st in the afternoon.  He's asked, "What was the purpose to go from Ad Tech B.V. to Cereus?"

10:11a    His answer was, "It was to make interest and principal payments on the smaller note," meaning the sale of the foreign -- the foreign operation of Backpage.

So the only testimony on these transactions from Website Technologies to Cereus Properties, from Ad Tech B.V.

10:12a    to Cereus Properties is that there was a sale, the sale from Lacey, Larkin, Brunst and Spear of Backpage to Ferrer and that there were loan payments.

There has been no testimony whatsoever that the sale itself or that these loan payments were, quote, "designed" to

10:12a    conceal or designed to effectuate some kind of money laundering scheme.  The evidence, frankly, is to the opposite.

The evidence is that there's a documented transaction with loan agreements, lawyers on both sides, a major accounting firm.  BDO is involved.  There's forbearance

10:12a    agreements, and so all the evidence on this substantiates that this is a legitimate transaction.

For example, the loan agreements which are in evidence at Exhibits 5427 and 5459, the very top of the loan agreements they say "Sale of Backpage's US Operations" or Sale

10:12a    of Backpage's Foreign Operations."  That's the opposite of

```
 1   concealment.
 2           There's no concealment that there's a sale of
 3   Backpage or that a loan payment made from Ferrer to one of the
 4   sellers necessarily involves Backpage proceeds.  It's not
 5   enough for concealment money laundering to establish the mere
 6   movement of Backpage proceeds.  There has --
 7           THE COURT:  How does -- how does the creation of
 8   Website Technologies and Cereus Properties relate to your
 9   argument?
10           MR. PANCHAPAKESAN:  So Mr. Ferrer testified that
11   Cereus Properties received the payments from these loan
12   payments in connection with the sale.
13           THE COURT:  Well, my question more specifically is
14   the creation of these two entities.
15           MR. PANCHAPAKESAN:  So what the Government's going
16   to argue -- they're going to say -- you know, they're going to
17   say Website Technologies is a front or something, right, for
18   Backpage.
19           That's what they're gonna say; but if we focus on
20   the actual transaction, right, the transactions in these
21   counts, which is a transfer from Website Technologies to
22   Cereus Properties, the testimony is that there's a sale, it's
23   a loan payment, whatever they want to say about Website
24   Technologies and sometimes is a red herring because there's no
25   testimony that any of these specific transactions were
```

10:13a   (line 5)
10:13a   (line 10)
10:13a   (line 15)
10:13a   (line 20)
10:14a   (line 25)

1   designed to conceal anything from anyone.

2          So, for example, there's no testimony that the Bank

3   of Montreal or Arizona Bank and Trust, or whatever banks

4   they've mentioned, there's no testimony that it was -- this

10:14a   5   loan payment or this sale was designed to conceal it from

6   those banks, that these loan payments included Backpage

7   proceeds.  There's been no testimony to that effect as to

8   these specific transactions.

9          And so, for example, one case I think is guiding on

10:14a  10   this, it's a US Supreme Court case, it's *Cuellar v. US*,

11   C-u-e-l-l-a-r, 553 US 550, and what the Court says there is

12   that, quote, the statutory text makes clear, however, that a

13   conviction under this provision requires proof that the

14   purpose -- not merely the effect -- of the transportation was

10:15a  15   to conceal or disguise one of the elicited attributes.

16          The only testimony in the record about the purpose

17   of these transactions is that the purpose was to pay the

18   seller's loan payments for the sale of Backpage.  There's been

19   no testimony that the purpose of these transactions was to

10:15a  20   conceal, and it's not enough for the Government to say, well,

21   the effect or something may have been X, Y, Z, right.

22          They have to elicit testimony.  They need to have

23   direct evidence that the purpose of a loan payment on a sale

24   was to hide, was to conceal, to disguise that the source of

10:15a  25   the loan payments was from Backpage; and no one's saying that

 1   was concealed because it's open.  It's known that Backpage is

 2   being sold.  That's what the loan agreement says, that it's

 3   for the sale of Backpage.

 4          And so -- they're not saying it's a sale of some

10:16a  5   front or website technology -- on the loan agreement it says

 6   sale of Backpage, and that's not being concealed.

 7          Now, turning to Counts 63 to 68 which in turn --

 8   which concern international promotional money laundering

 9   that's 18 U.S.C. 1956(a)(2)(A), that statute requires the

10:16a 10   defendant acted with the intent to promote the carrying on of

11   some specified unlawful activity; and the key in connection

12   with Counts 63 to 68 is there has to be a specific intent to

13   promote.

14          So, for example, there's a case out of the Fifth

10:16a 15   Circuit, *US v. Brown*, 553 F.3d 768.  That case says, quote,

16   "The crime of money laundering promotion is aimed not at

17   maintaining the legitimate aspects of a business nor at

18   proscribing all expenditures of ill-gotten gains, but only at

19   transactions which funnel ill-gotten gains directly back to

10:17a 20   the criminal venture."

21          And so when we look at these counts, Counts 64

22   through 68, those two are loan payments on the sale.  So

23   Mr. Ferrer is asked September 21st in the afternoon, Page 93,

24   Lines 20 through 23, quote, "What was the purpose to go from

10:17a 25   Ad Tech B.V. to Cereus?"  His answer, quote, "It was to make

1  interest and principle payments on the smaller note," smaller

2  note referring to the sale of Backpage's foreign operations.

3            That's literally the only evidence in the record on

4  these transactions, and the purpose that Mr. Ferrer testified

10:17a  5  to is not a -- he didn't say this was to conceal or fool banks

6  or fool credit card companies.  He said the purpose was a loan

7  payment on a sale; and so not only does it fail to show an

8  intent to promote, it shows the opposite.

9            And, further, what the Court -- what the case law

10:18a  10  says is to promote, the money's got to be put back into the

11  criminal venture.  At most what this shows is money flowing

12  away from Backpage, to the sellers of Backpage.

13            There's no evidence in the record that Mr. Brunst or

14  Lacey or Spear took the money they received from the loan

10:18a  15  payments and then invested it back in Backpage or used it to

16  promote prostitution.  There's been no evidence of that, and

17  so at that level these counts fail as well.

18            Now, Count 63 is a little unique.  It's not a loan

19  payment, but it's a payment to a web developer.  That's what

10:18a  20  the Government alleges.  There's been no evidence on this

21  transaction.  I asked Quoc Thai about it.  He said he didn't

22  know what the purpose was.  I don't believe Ferrer testified

23  about Count 63 or what it was for or whether there was

24  promotion.  So there's no -- there's no evidentiary link there

10:19a  25  between that payment to a web developer and some sort of

 1    intent to promote a Travel Act violation.

 2            And then we shift to Counts 69 through 99, which

 3    are -- which are transactional money laundering.  So that

 4    statute is 18 U.S.C. 1957 and a requirement of transactional

10:19a   5    money laundering is that the property was, in fact, derived

 6    from some specified unlawful activity; and what the model jury

 7    instruction said, it says the property was, in fact, derived

 8    from -- in brackets it says "describe the specified unlawful

 9    activity alleged in the indictment."

10:19a   10            So it's -- it's got to be an SUA that the Government

11    alleges in the indictment, and what the predicate unlawful

12    activity -- alleged unlawful activity here is, is it's a

13    Travel Act violation.  It can't be a conspiracy, Your Honor,

14    right.  So if you look at 18 U.S.C. 1956(c)(7), if you also

10:20a   15    look at 18 U.S.C. 19611, those define what specified unlawful

16    activity is.

17            They include the Travel Act, but they don't include

18    a conspiracy, a general conspiracy or a conspiracy to violate

19    the Travel Act; and so necessarily what we're left with are

10:20a   20    the fifty charged ads in the indictment.

21            That just by default has to be the specified

22    unlawful activity that the Government alleges in the

23    indictment.  It can't go beyond that.  As a matter of what's

24    alleged in the indictment, it just is a matter of statutory

10:20a   25    interpretation.

1           And in our view, these counts, therefore, fail for

2    the same reason that the fifty Travel Acts counts fail because

3    if those fail, then there's no -- there's no predicate

4    specified unlawful activity.

10:21a  5           And then briefly as sort of an aside, there are a

6    handful of counts where my client is sort of named

7    secondarily, right.  So there may be some wire transfer from,

8    you know, Mr. Lacey or something to, like, a title company,

9    for example.  Those counts are, like, 69 through 70, 83

10:21a 10   through 84.  There's no -- there's been no evidence presented

11   as to why Mr. Brunst is included on those counts or what role,

12   if any, he may have had in the transfer.

13          Count 100 I'll let Mr. Cambria deal with as to

14   Mr. Lacey, and then lastly to address the money laundering

10:21a 15   conspiracy count.  There's -- there's no evidence here of an

16   agreement to commit money laundering in connection with these

17   -- these transactions.

18          And this notion that, well, you know, credit cards

19   might have terminated for reputational reasons or this

10:22a 20   testimony about allegedly circumventing credit card companies,

21   things of that nature, the Government has not made a

22   connection between that, that alleged conduct, and these

23   specific transactions; and what the record is on most of these

24   counts, I think like 37 of the 48 counts, as Ferrer testified,

10:22a 25   they're loan payments in connection with the sale and there's

1  been no connection made on the part of the Government between

2  those loan payments and what they will contend is some broader

3  effort to fool a bank or a credit card company.  That

4  evidentiary link is missing.

10:22a  5          And so I'll conclude by noting and I'll yield to

6  Mr. Cambria, as to my client, really, the state of the

7  evidence is that he might have been at a budget meeting or an

8  e-mail agenda says something like TER.  He might have been

9  copied on e-mails.  He might have been aware that credit card

10:23a 10  companies, banks, things of that nature, were canceling

11  Backpage for reputational reasons.

12          All of that does not come remotely close to

13  establishing on his behalf either a criminal intent to

14  facilitate business enterprises involved with fifty

10:23a 15  advertisements or to engage in money laundering in connection

16  with the legitimate sale of a business where Ferrer testified

17  the purpose of those transactions was to pay back the sellers;

18  and as to my client and, frankly, all these individuals, this

19  is a deeply misguided attempt to use a statute, the Travel

10:23a 20  Act, that requires specific intent as to particular business

21  enterprises, to expand that into something the statute was not

22  intended to cover.

23          THE COURT:  Let me ask you, in terms of the specific

24  intent requirement, is it or is it not sufficient to look at

10:24a 25  individual communications, conversations related to the

1  years-long allegation that what the primary purpose of the

2  Backpage was was to provide a platform to offer sex acts for

3  money?

4          So, in other words, if, as alleged by the

10:24a  5  Government, the individuals who ran the company, who were the

6  governing board of the company, understood that with the

7  shutdown of Craigslist suddenly their profits skyrocketed and

8  in looking at their finances the skyrocketed activity was

9  occurring in the escort section and if you have an argument or

10:25a  10  you have witness testimony or evidence about years' worth of

11  meetings and reviewing financials and so on and so forth, at

12  some point doesn't that accumulate to specific intent?

13          MR. PANCHAPAKESAN:  So I think the response, Your

14  Honor, is to go back to the text of the Travel Act.  The

10:25a  15  Travel Act is -- it does not criminalize knowledge.  It does

16  not criminalize -- let's say hypothetical you have knowledge

17  for ten years that there are prostitution ads that are

18  appearing on the site, right.  That's not what the statute

19  criminalizes.

10:26a  20          The statute criminalizes an intent to facilitate

21  specific business enterprises involved in prostitution

22  offenses under state law, and those business enterprises have

23  to be tied to these fifty ads; and so the broad knowledge,

24  right, if third parties are telling folks or Craigslist is

10:26a  25  shut down that there are prostitution ads that are appearing

on your site, there's a missing link between that and the

fifty substantive counts which concern individual ads,

individual advertisers, individual pimps, what have you.

There's a missing link there, and there's no

10:26a  evidence that my client or others knew or would have known

that those fifty ads, those fifty individuals, would engage in

a prostitution transaction; and that's how the Travel Act is

framed.  It's not a general notice statute.

THE COURT:  I guess under that argument, though,

10:26a  then it would seem highly unprobable that any business like --

a business like Village Voice or Backpage would ever find

themselves liable for a Travel Act violation like this.

MR. PANCHAPAKESAN:  Right, and that's a point --

THE COURT:  Because that would require each

10:27a  individual defendant to look at the ad and know what it was

about and that there was a prostitution ring that was involved

in advertising these -- these individual women.  Is that --

MR. PANCHAPAKESAN:  And that's our position, Your

Honor, is that just because the Government's brought this

10:27a  prosecution does not mean that there, therefore, needs to be

liability under the Travel Act.

They chose to bring it under the statute.  That does

not fit the facts of this case.  The Travel Act is not

intended to be used in fairness, Your Honor, in the way that

10:27a  you're describing it or the way that the Government's trying

1    to prosecute under it.

2          THE COURT:  How does that differ, though, in cases

3    related to gambling operations, for example?

4          MR. PACHAPAKESAN:  Right.  So the *Gibson* case, for

10:28a  5    example, right, what the Court said there is that the

6    manufacturer has to in some significant manner associate

7    himself with the purchaser's criminal venture; and so it

8    wasn't enough there that this company making -- I think it's

9    like pull tabs, some sort of old school gambling

10:28a 10   paraphernalia, it wasn't enough that they knew with certainty

11   that a criminal gambling operation would buy what they were

12   selling.

13         That wasn't enough under the Travel Act.  There has

14   to be specific intent.  There has to be evidence that the

10:28a 15   manufacturer of this gambling paraphernalia in some specific

16   way associated themselves with the person who was buying it.

17   It's not enough to just know, right, and that's the constraint

18   of the Travel Act; and, frankly, Your Honor, you heard a

19   little bit about this with the Senate PSI hearings.

10:29a 20         There's been laws that were passed FOSTA, SESTA,

21   that were passed to remedy the issue Your Honor is dressing,

22   but that's not the charge here.  Those aren't the statutes

23   they were charged under.  The Travel Act, frankly, just

24   doesn't fit the facts of this case; but that's the statute

10:29a 25   they chose to bring their charges under, and there may be laws

that address this sort of conduct, but it's not this law.

THE COURT:  All right, thank you.

Mr. Cambria, did I hear you're going next?

MR. CAMBRIA:  I heard that as well, Your Honor,
thank you.

I'd like to start off by distinguishing the
hypothetical that you asked about gambling cases.  Gambling
cases do not have a First Amendment overlay.  That's one of
the main differences.  Here we're dealing with speech, and as
a result of that there is a First Amendment overlay.

The other question that you asked was with regard to
the language of Judge Brnovich.  I think clearly what -- what
she did there was, first of all, define the criminal conduct
and that was the part about it's not just amorphous
prostitution, but it's a prostitution enterprise that was
conducted through these 50 ads.

Once she defined what the criminal conduct was, then
she moved to the motion that was actually in front of her,
which was that the indictment was insufficient; and she said,
"You alleged these facts.  They fit in to what I've defined as
the criminal conduct so it's sufficient."

That didn't change the fact that she ruled that in
this case the criminal conduct was as she defined it; and so
the other thing is, you have to ask yourself, what is the
relevance of the 50 -- 50 acts -- ads, if you will, that are

1    in the indictment unless they have some meaning to the case,

2    and the meaning to the case is that as Brnovich -- Judge

3    Brnovich said, the Government has to prove that these

4    so-called enterprises, if you will, were run by these 50 ads

10:31a   5    and there is no way that a person can be guilty of that unless

6    they know of the ads.

7         There has to be some proof that they know of these

8    specific ads.  Otherwise, we're in to this amorphous

9    prostitution that Judge Brnovich said they are not charged

10:32a   10   with and so that --

11        THE COURT:  Let me ask you this, Mr. Cambria:  There

12   was a witness, one of the organizational witnesses who

13   testified, for example, that they created this PowerPoint.

14   They listed ads from Backpage.  They put those PowerPoint

10:32a   15   slides directly in front of your client, and then would it be

16   sufficient then for the Government to have alleged that

17   particular ad that your client was then aware of?

18        MR. CAMBRIA:  No.

19        THE COURT:  And why not?

10:33a   20        MR. CAMBRIA:  Well, because there still has to be

21   some sort of aiding and abetting or some kind of action.  It

22   isn't simply a matter of here's something historically that we

23   claim was on a website.

24        This is to promote.  So you have to promote it and

10:33a   25   not just know that it's -- generally they say that it's there,

but that you did something that would promote it; and, of

course, we don't have that and, frankly, I don't remember who

was present at that particular meeting but, again, it wouldn't

be a pro-active thing on the part of the people there to

10:33a   simply merely be there and somebody says, "Here, look at this.

This is a historic ad."

The charge here is facilitating and promoting a

specific operation.  So you would have to do something going

forward.

10:34a   The other thing, Your Honor, is on the First

Amendment aspect of the case, we in the past had submitted to

the Court what we titled an objection to the Court's proposed

jury instructions and it talked about the First Amendment.  I

have another copy of that, and I'd like to hand it up as part

10:34a   of our argument here.

Before I move to that, however, I'd like to say

this:  Every charge in this indictment that requires the

element of concealment has not been supported, prima facie,

and Mr. Thai supplied the evidence that shows that that

10:34a   concealment was not supported.  I asked him specifically and

for the reason of having him say, "I had no problem finding

everything.  It was all in proper names.  There was no, you

know, fake names, fake companies or anything like that."

He said everything was readily available and I

10:35a   reviewed it; and not only that, but he did a chart and had all

the names and all the places and all the accounts and all the
rest of it.

If it was concealed, I don't know how he would
accomplish all that he accomplished; and I asked him
**10:35a** 5 specifically, was there anything hidden?  Was there anything
camouflaged, whatever?  No, not at all.  So there's no
concealment that has been -- that there was any proof of with
regard to any of these charges that have as a necessary
element concealment, including Count 100, which is my client's
**10:36a** 10 specific one on the trust.

Again, this memo, if we could resubmit it, there is
a First Amendment issue here and it's funny, you might recall
at the bench we talked about a certain issue and you said
well, I'm bound by the Ninth Amendment -- I'm sorry, the Ninth
**10:36a** 15 Circuit.  I got a little smile on my face because the Ninth
Circuit cases that we have in our memo demonstrate that the
proposed jury instruction and any argument in this case that
if the conduct is related to criminal activity, that it is not
protected by the First Amendment.

**10:36a** 20 Submitted case after case, Your Honor, that
absolutely refutes that.  The Ninth Circuit makes it
abundantly clear that the historic cases that they are talking
about and interpreting are *Hudson* and also *Pittsburgh* -- the
*Pittsburgh Press* case, and the Ninth Circuit said the ad
**10:37a** 25 necessarily has to be illegal on its face.  It isn't a matter

1   of it could relate to or a third party could use this

2   particular ad to submit a crime.  Necessarily on its face --

3              THE COURT:  Let me ask you, then, Mr. Cambria, just

4   for clarification procedurally, are you asking me to

10:37a  5   reconsider a prior ruling?

6              MR. CAMBRIA:  Well, you haven't instructed the jury

7   yet and, of course, we -- we believe at the whatever

8   appropriate time, if this is it, that the instruction of

9   "related to criminal activity" is clearly inconsistent with

10:37a  10   the Ninth Circuit.

11             So what I -- what I wanted to do was hand our memo

12   up again and it lays out our argument as to what these ads

13   have to have on their face and, frankly, we only had one such

14   ad in this indictment and then that -- and it was interesting,

10:38a  15   because then the police when they testified said, well, that

16   wouldn't be enough to go forward, you know, for an arrest.

17   That would be the first step kind of thing, but our position

18   has always been that the ad has to be -- has to necessarily

19   propose an illegal act on its face.

10:38a  20             If we think back to that *Pittsburgh Press* case,

21   there, of course, what they said was females only, males only

22   wanted kind of thing; and the Court said that was obvious on

23   its face it was illegal because it was gender specific and

24   that was discriminatory.

10:39a  25             And here we're saying that it isn't a matter of an

```
         1   ad leading to or maybe a third party's gonna use it for.  It

         2   has to say illegal activity on its face, and all those Ninth

         3   Circuit cases support that, Your Honor.  So that's why I'd

         4   like to submit this again so that you'd have the opportunity

10:39a   5   to, you know, at your pleasure consider it.

         6            THE COURT:  All right, thank you.

         7            MR. CAMBRIA:  Thank you.

         8            THE COURT:  Ms. Bertrand.

         9            MS. BERTRAND:  Good morning.

10:39a  10            THE COURT:  Good morning.

        11            MS. BERTRAND:  From the outset, my client has been

        12   uniquely situated in this case because she wasn't management.

        13   She -- I don't think there's any evidence she participated in

        14   any type of policy making and, in fact, she was hired to

10:40a  15   police the site and I don't believe that there's any -- that

        16   any rational trier of fact could find beyond a reasonable

        17   doubt that she knowingly joined any agreement to do anything

        18   illegal.

        19            She was hired with the understanding that she would

10:40a  20   keep illegal conduct from occurring on the site, and there's

        21   been no testimony to the contrary.  There's a bunch of e-mails

        22   that she's cc'd on where they talk about changes to the

        23   policies that we heard Dan Hyer say yesterday were a moving

        24   target; and she was the person at Backpage, along with the

10:40a  25   moderators, getting notices of this moving target sometimes on
```

a daily basis and scrambling to implement it.

There -- there's no evidence that she knew what Carl Ferrer and whoever else was doing.  Carl Ferrer couldn't even say the right name for her.  He called her Joyce, and when asked to identify her in court he struggled.  There's no evidence that he ever even met her, and I found it notable a couple moments ago when the Court was talking to, I think, Mr. Panchapakesan that the Court referenced evidence about the individuals who ran the company being at meetings with NGOs and government representatives.

Ms. Vaught was at none of those meetings.  There's no evidence that anything that was stated at those meetings, shared at that meetings trickled down to Ms. Vaught.

So while there might be these First Amendment concepts and really broad ideas about culpability here, Ms. Vaught's is much more simple.  She had no idea, none; and in a way, you know, almost used as a human shield by Ferrer and the moderators, and what's really notable is we heard from Ferrer and we heard from Hyer.

The moderators are in the trenches every day dealing with this craziness and the changes and looking for boobs one day and not the next, and these guys are overmarketing changing their work and undercutting the work they're doing just because someone calls up and says, "Hey, I'm mad you pulled my ad," or "You pulled my photo," and the moderators

1    didn't even know.  They had no idea this was going on.

2           So there's no evidence here Ms. Vaught signed up for

3    any of this; and, in fact, there's evidence of Ms. Vaught

4    saying to moderators, "Look, if you don't pay attention and

10:43a  5    you don't follow these rules and enforce this -- if you don't

6    police like we're telling you to police, you can be fired."

7           There's nothing, nothing that the Government has put

8    into this that shows she ever took this lightly or that she

9    was in any way intentionally ignorant.  She was facing it

10:44a 10    every day and fighting it.

11           So I -- I don't see how -- frankly, I don't see how

12    Ms. Vaught ended up here in the first place.  Maybe it was

13    pressure to cooperate that she's resisted because she has said

14    to me, "I'm not gonna lie to save my skin.  I didn't know."

10:44a 15           And I think the evidence has been consistent with

16    that, Judge.  She didn't know, and there's been nothing in the

17    government's case in chief to show that she knowingly joined

18    an agreement to commit any of the crimes listed in the

19    indictment.  The evidence shows the opposite.  Thank you.

10:44a 20           THE COURT:  Thank you.

21           Mr. Kessler.

22           MR. CAMBRIA:  Your Honor, I'm sorry, may I ad

23    something?  I got wrapped into the legal part of this, and I

24    did want to say that with regard to Mr. Lacey, they really

10:45a 25    haven't put him anyplace or doing anything.  They allege that

1    he made some money; but, you know, that's not a crime that I

2    know of, but they have no statements.  They have no meetings.

3    He's not anyplace.

4            In fact, the last witness said in the twelve years

10:45a  5    he worked at Backpage he never even met Mr. Lacey.  So I

6    submit that they have not carried their case with regard to

7    him at this stage.  Thank you.

8            THE COURT:  Thank you.

9            Mr. Feder.

10:45a 10    MR. FEDER:  Obviously I join in the comments that

11    have already been made, Judge, and I just bring a couple of

12    things to the Court's attention.

13            The evidence was that the Government's theory about

14    TER and aggregation and moderation and the phrases of GFE and

10:46a 15    those kinds of things, the testimony from their main

16    cooperators has been by the time of the first of the 50 ads

17    and obviously after that aggregation, at least as to adult,

18    was gone.  No longer in effect.  Moderation had been taken

19    over by Liz McDougall such that Mr. Spear, at least, and none

10:46a 20    of these other defendants were involved with that anymore.

21            That GFE had already been prohibited, that TER was

22    gone per Mr. Hemu Nigam and others, that they did at the

23    suggestion of some of these NGOs and the AGs.  Took out stuff

24    that they were asked to do voluntarily.  There was no

10:46a 25    regulation law at all that made them take it out.  Unless the

ad was overtly sex for money, these were all suggestions and,
I mean, to go to -- if this world, this law, this case is
gonna say that something is illegal because of suggested, then
we're -- we are really lost in this country and we're Iran and
10:47a  Afghanistan.

None of these ads are overtly sex for money except
Ms. Beck, and Ms. Beck's count was after Mr. Ferrer purchased
the Backpage and then you have the testimony to reiterate from
the police officers that even on that ad they didn't even have
10:47a  probable cause to make an arrest, much less the standard for
Rule 29.

There's been no testimony whatsoever that any of
these defendants, including Mr. Spear, knew of any of the 50
ads, contributed to any of the 50 ads, talked to any of the
10:48a  advertisers, et cetera; that they received any money from that
specific ad as to the money laundering counts.

And then as to Mr. Spear, I mean, again, his primary
role, according to the testimony, has been that he was trying
to regulate moderation, which as Mr. Hyer said yesterday, got
10:48a  stricter and stricter, more and more rigid to avoid -- not to
encourage, not to aid and abet, but to avoid sex for money ads
on the site.  That's what they were doing, to avoid any overt
sex for money ads.

And the Government can have their theory that that's
10:48a  somehow an effort to hide what they were doing.  Well, under

```
         1    Rule 29 they certainly have not proven that notwithstanding
         2    them saying -- Mr. Ferrer and Mr. Hyer saying, "Well, these
         3    are sex ads on their face," and their so-called victims
         4    claiming that these are sex ads on their face when all they
10:49a   5    have is suggestive words that are in every ad in every
         6    magazine in this country.  That's all I have, thanks.
         7              THE COURT:  I don't know what magazines you're
         8    reading, Mr. Feder, but in any event I appreciate the
         9    argument.
10:49a  10              MR. FEDER:  I'll bring you the Sunday *New York Times*
        11    magazine for the cosmetics and perfume.
        12              THE COURT:  All right.
        13              Mr. Eisenberg.
        14              MR. EISENBERG:  Thank you, Your Honor.
10:49a  15              May it please the Court.  I want to first start by
        16    going back to something that was said before by one of my
        17    colleagues that has to do with the specific intent concept and
        18    how it relates to *Pinkerton*.  *Pinkerton* is a theory of
        19    evidence, if you will, and how it can be applied in a jury's
10:50a  20    determination of guilt or innocence whereas specific intent is
        21    a much more higher level of law.  That is, it's an element.
        22              So when we're dealing with specific intent and we
        23    want to apply the *Pinkerton* theory to it, I have the following
        24    concerns:
10:50a  25              Now, my math may be wrong and I'm gonna say ahead of
```

```
 1    time that I'm gonna use the yard stick of 3,000,000 ads a year
 2    -- it may have been more -- and I'm gonna use the time frame
 3    running from Count 2 and it's Count 51, September 10, 2013,
 4    through February 6th, 2018, and by my count that's roughly
 5    four and a half years.
 6            So if over four and a half years times 3,000,000
 7    advertisements published in Backpage we have 13.5 million ads;
 8    and, again, I'll stand corrected if it's only 2,000,000 a
 9    year, whatever.  My point is that at that amount of
10    publication, how does one remotely conceptually extrapolate
11    using the Pinkerton theory to the idea that somebody has had
12    the specific intent to facilitate or promote the business of
13    prostitution on a specific ad?
14            You simply couldn't do it, and it allows the theory
15    to adulter -- not adulter -- well, it allows the theory to
16    overcome the element so that we're almost to the point of
17    dealing with an absurdity; and, of course, it applies to every
18    -- every defendant, including my client.
19            As to my client specifically, Your Honor, the
20    evidence shows that given his job for as long as he did it,
21    both Messrs. Ferrer and Hyer commented that it was a very
22    difficult job.  Neither one of them, they're co-conspirators
23    put on the stand to give whatever testimony they could with
24    respect to my client and others, said anything about the fact
25    -- or alleged fact that my client knowingly committed the act
```

10:51a (line 5)
10:51a (line 10)
10:52a (line 15)
10:52a (line 20)
10:52a (line 25)

of Travel Act prostitution or anything close to that, Your
Honor.

His job was just the opposite and, that is, not to
-- let me put it this way:  The rules changed.  The standards
changed, but he was not the person who was in charge of making
those standards and making those rules.  He had the thankless
job of trying to implement those rules to see that an ad would
be acceptable.

So in our terms if we are looking at this to say,
"Oh, yeah, but the ad is on its face an ad for prostitution,"
his intent and his job is to make sure those ads pass muster
by somebody above him, not his concept; and for what he got
paid in order to do this job, not only was it a thankless
task, but it was relatively -- I wouldn't say worthless with
respect to him.  He did have a job and he respected the job
that he had.

So how do you rationalize -- oh, I know what the
Government will say.  He had these, I think, e-mails in which
he said we are not to leave notes about knowing that this is
something from prostitution.

That can be looked at two ways.  We're here on a
beyond a reasonable doubt basis, and whether that means that
he's acknowledged prostitution in any ad or does it mean you
got to do your job and your job is to make sure that these
rules apply so that there is no, as far as we are concerned,

1    ad for prostitution in what we are doing as moderators.

2           Four hundred moderators at the most -- the highest

3    period of time, Judge, over -- well, I guess that might have

4    been the last couple of years, but most of the time it was

10:55a  5    really 100, perhaps 200 moderators.  Indeed, when it started,

6    there were only 40 people to do this thankless task; and I

7    think that ties us right back into the specific intent content

8    here.

9           How do you show that anybody, any moderator,

10:55a 10    irregardless of whether he's chief or not, and I could go on

11    and on about that but not for the purposes here, how did

12    anybody have any idea about any ad that goes through the queue

13    and gets moderated?

14           Judge, in my view, the Government has overcharged

10:55a 15    this case.  They've done it with all of us, but they've

16    particularly done it with the guy in the trench.

17           Thank you, Your Honor.

18           THE COURT:  Thank you, Mr. Eisenberg.

19           Who is coming forward from the Government?

10:56a 20           MR. KOZINETS:  I am, Your Honor.

21           THE COURT:  Just -- just to be clear, Mr. Cambria,

22    before I permit the Government to proceed, this objection is

23    related to our prior discussion on proposed instruction, and

24    for the Government's awareness it's Document 1657.  So I don't

10:56a 25    necessarily know that there needs to be a new response from

the Government.

MR. CAMBRIA:  Yeah, this is just our -- this is just all the First Amendment law that was in there so that's why I sent it up.

10:56a    THE COURT:  All right, thank you.

Mr. Kozinets.

MR. KOZINETS:  Thank you, Your Honor.

I think Your Honor hit the nail on the head with your question about the defendants' approach to the law here.

10:57a    Under their view, anybody who operated a website like Backpage knowing that their entire revenue generating business model was based on the sale of prostitution ads or other illegal goods or services, those people could never be held liable under the Travel Act unless they reviewed and saw every single

10:57a    ad that they posted or allowed to be posted.  That is not the law and it cannot be the law.

The notion that a website operator can simply hide behind the technology of how websites are run to avoid criminal liability is a theory that has been rejected in other

10:57a    cases, and I direct your court to *United States v. Ulbricht*, 31 F.Supp. 3d 540 from the Southern District of New York.

That involved the Silk Road case, a website where narcotics and other illegal goods and services were sold.  The website operator was successfully prosecuted.

10:58a    Now, he could not possibly have reviewed or seen

1  every single ad or overseen every single transaction that

2  transpired in the website, but the Court ruled that didn't

3  matter.  As long as he had the knowledge and intent to set up

4  a website that was designed to promote, facilitate, to create

10:58a  5  the sort of platform, that that -- that was enough.

6          And we've litigated these legal -- these sort of

7  preliminary legal issues almost ad nauseam over the

8  approximately six-year history of the case.  The same legal

9  arguments were made over and over again in multiple motions to

10:58a  10  dismiss, and I point the Court, for example, to Doc. 793 where

11  a lot of same time of intent and knowledge arguments were made

12  and the Court objected them.

13          On Page 16 of Doc. 793, for instance, the Court

14  discussed the *Michigan* case, 383 US at Page 503, which

10:59a  15  involved the level of intent required to prosecute an operator

16  of an adult bookstore; and the argument was made well, you

17  know, unless that proprietor had looked at every single book

18  in the bookstore, they can't be liable.  There's no liability

19  there, and the Supreme Court said no a scienter and intent

10:59a  20  requirement that shows that the defendants were, quote, "In

21  some manner aware of the character of the material they

22  attempted to distribute was sufficient," was enough.  That's

23  at Page 510 of that decision.

24          And in Doc. 793 the Court recognized that the

11:00a  25  Government's proposed mens rea standard, specific intent to

```
 1    promote or facilitate prostitution, is consistent with Gibson,
 2    Tavelman, Polizzi, the Ninth Circuit cases discussing the
 3    requirements of the Travel Act.  That's at page -- at Doc.
 4    793, Page 18.
11:00a  5           The Court went on to discuss that the alleged facts
 6    in the superseding indictment taken as true establish
 7    defendants have the specific intent to promote prostitution
 8    in violation of the Travel Act.  This is at Page 20 of that
 9    Doc. 793.  They conspired together to do so.  The conspiracy
11:00a 10   was successful and resulted in the 50 ads for prostitution
11    that make up the 50 counts of violating the Travel Act.
12           The Court also rejected this notion of kind of a
13    boundless conspiracy.  That's in Doc. 946.  And so when
14    counsel for Mr. Brunst first got up here, counsel referred to
11:01a 15   this case as reflecting that the Court held that specific
16    intent in the context of this case requires that the
17    defendants knew that they had this sort of knowledge about
18    each ad, and I refer the Court to page -- Pages 15 to 16.
19    That was Judge Brnovich kind of restating the defendants'
11:01a 20   argument.  It wasn't the holding of that order.
21           Instead, again, the Court referred back to its
22    earlier ruling -- this is Page 15 of Doc. 946 -- its finding
23    that the defendants had specific intent to promote or
24    facilitate an unlawful activity as charged in the indictment.
11:02a 25           And with respect to this -- this notion of
```

1    conspiracy being boundless, I think you need to look -- it's

2    important to look at the entire context of where that occurs

3    at Pages 13 and 14 of Doc. 946.

4            After going over the language that Mr. Brunst's

11:02a  5    counsel mentioned, the Court went on to say, quote, "Many of

6    the factual allegations place Defendants' roles at Backpage in

7    context and further illustrate this," the conspiracy.  To be

8    sure, the allegations certainly describe a course of conduct

9    where Defendants facilitated 'unlawful activity,' including

11:02a 10    numerous pimps, prostitutes and traffickers in violation of

11    the Travel Act.  They also certainly describe how these

12    various groups continuously engaged in prostitution, which

13    plausibly fits within the definition of a 'business

14    enterprise.'"

11:03a 15            The Court went on to say, When read in its entirety

16    and construed according to common sense, the Superseding

17    Indictment adequately alleges the underlying businesses

18    involved in prostitution that defendants intended to

19    facilitate and thereafter facilitated or attempted to

11:03a 20    facilitate.

21            And then the Court went on to conclude there that

22    the Superseding Indictment alleges a continuous course of

23    criminal conduct, the operation of Backpage, supported on

24    fifty distinct occasions.

11:03a 25            So, essentially, Your Honor, I think a lot of the

1    legal arguments that were just made have already been

2    considered by the Court and do not preclude -- or do not

3    support the arguments being made here.

4        The *Gibson Specialty* case is an interesting case

11:03a  5    that counsel also mentioned, and in that case the Court talked

6    about evidence showing that the manufacturer in some

7    significant manner associated themselves with their -- with

8    their customers, with the business enterprises that they were

9    charged with promoting or facilitating.

11:04a 10        And I think what is -- what is very telling here --

11    or very key to looking at that issue is the *People v. Lurie*

12    case from California State Court.  This is a case that we have

13    cited in the proposed jury instructions and sort of the legal

14    discussion supporting our position on the instructions and,

11:04a 15    basically, what that case stands for -- and this is at page --

16    at Doc. 1626-3, Page 22.

17        That case stands for the proposition that intent can

18    be inferred from knowledge in a variety of circumstances,

19    including those that fit within the evidence here, and those

11:04a 20    indicia of intent that have been well recognized here are

21    proof of inflated charges for the goods or services that are

22    tied to illegal activity, evidence of an unusual volume of

23    business with prostitutes, evidence that it demands to a high

24    proportion of the seller's total business, you know, and we

11:05a 25    have introduced a very large amount of evidence showing that

1    Backpage derived the lion's share of its revenues from

2    prostitution.

3              Also, evidence that the sale of these illegal goods

4    or services have become the dominant portion of the seller's

11:05a   5    business.  We've shown that here.

6              THE COURT:  Well, let me ask you with respect to the

7    second element of the Travel Act violations, the way that the

8    jury was instructed in the preliminary instructions relates to

9    the defendant performed or attempted to perform an act that

11:06a  10    did promote, manage, established, carry on or facilitate the

11    promotion, management, establishment or carrying on of a

12    business enterprise involving prostitution offenses.

13              Given that element of these Counts 2 through 51, is

14    it necessary then for the Government to put forward specific

11:06a  15    evidence related to the business enterprise as it relates to

16    the specific ads that are stated in each of those counts?

17              MR. KOZINETS:  So --

18              THE COURT:  Do you understand the question?

19              MR. KOZINETS:  I -- I'm not entirely sure.  Are you

11:06a  20    referring to just the evidence about the business

21    enterprise --

22              THE COURT:  Yes.

23              MR. KOZINETS:  -- reflected in the ads?

24              THE COURT:  Yes, and what I'm trying to understand

11:06a  25    is you've determined the count based on a particular ad on a

UNITED STATES DISTRICT COURT

```
 1   particular day.

 2           MR. KOZINETS:  Right.

 3           THE COURT:  And so what is the -- what is the

 4   necessity for the Government to put forward evidence related

 5   to a business enterprise to that particular charge?

 6           I don't know if that's any clearer.

 7           MR. KOZINETS:  I think that -- you know, as alleged

 8   under that second count, an act -- a subsequent act, you know,

 9   in furtherance of promoting or facilitating the promotion of

10   the business enterprise.

11           So there has to be proof of something, you know --

12   facilitation or promotion which we contend, you know, is

13   written all over the trial evidence that's been presented over

14   the last 21 days; but as Your Honor focused more not so much

15   on the defendants' act, but on the business enterprise being

16   promoted or facilitated?

17           THE COURT:  Yes.

18           MR. KOZINETS:  Well, we think there -- we've

19   litigated this to some extent and this was in Doc. 840, Motion

20   to Dismiss the Superseding Indictment with respect to this

21   issue, and the Court recognized in that -- I'm sorry, it's not

22   Doc. 840.  That was the CDA.  It was Doc. 946.

23           THE COURT:  946?

24           MR. KOZINETS:  946.  And the Court recognized that

25   that element -- it is -- it is part of the element, but
```

11:07a (lines 5)
11:07a (line 10)
11:07a (line 15)
11:08a (line 20)
11:08a (line 25)

there's a very, very low bar to putting forward evidence of a

business enterprise and the Court in a footnote in that

decision cited to -- give me a moment.  I might be able to

find it -- cited to a Fourth Circuit case.  This is Doc. 946

11:08a   at 1104 where just the discovery of a triple-beam balance

scale in the defendant's premises, that was enough indicia of

a continuous heroin selling enterprise, just that really small

amount of evidence, something to show that there was some sort

of continuous course of -- of conduct.

11:09a   That is what a business enterprise is under the

Travel Act, and we believe that the record here contains ample

direct and circumstantial evidence that each of these fifty

ads were tied to something that was more than just a sporadic

or occasional solicitation for prostitution, and I'd be happy

11:09a   to elaborate further if Your Honor would like on that.

THE COURT:  Can you move to -- with respect to the

remaining counts -- and, actually, I'd like to kind of get

your theory or what you believe the evidence is with regard

Count 63.  As Mr. Panchapakesan stated, that essentially money

11:10a   to a web developer is the allegation, how does that relate to

the substantive charge?

MR. KOZINETS:  Sure.  Thank you, Your Honor.

So on September 21st at about 3:18 p.m. Mr. Ferrer

did testify about this.  He talked about receiving fees from a

11:10a   company in India and how they were looking for non-adult

1    content that we could import to increase the ad count in our

2    categories that were not adult, and that's what this payment

3    in Count 63 was for.

4         And if Your Honor recalls -- so do you remember the

11:11a  5    exhibit -- I believe it was Exhibit 120 marketing presentation

6    that Mr. Brunst and Mr. Ferrer put together in 2011?

7         In that presentation, which showed that --

8         THE COURT:  Well, let me -- let me just generally

9    ask this question:  So is it your position that, essentially,

11:11a 10   then, any proceeds that were received from the operation of

11   Backpage at that time then -- because they were considered

12   illegal proceeds, then whatever was used with that money to

13   purchase then could be alleged?

14        MR. KOZINETS:  Absolutely, Your Honor.

11:11a 15   THE COURT:  That's the -- that's the position?

16        MR. KOZINETS:  Absolutely.  So -- go ahead.

17        So with respect to Count 63, which is charged as a

18   promotional money laundering transaction, the promotion was

19   the use of these Backpage derived funds to pay this website

11:12a 20   developer in India for the purpose of further promoting the

21   Backpage business.

22        So they would take those fund and then supply

23   Backpage with these fees, which Mr. Ferrer testified were just

24   sort of -- kind of computer-generated or

11:12a 25   automatically-generated sources of legitimate ads, you know,

1   trucking, employment, what have you, things that Backpage

2   wasn't actually in the process of selling to its own customers

3   but sort of imported almost fake content to make it appear

4   that Backpage's business was legitimate, that it really was

11:12a 5   another Craigslist, another very general purpose classic

6   advertising site that earned revenue from all kinds of ad

7   categories.

8           It was an effort to deceive and to mask the true

9   nature of the website, which was singularly focused on earning

11:13a 10  money from the sale of prostitution ads, and that's -- so this

11  Exhibit 120, we could look at it if Your Honor wants, we don't

12  have to, but that's -- that's the exhibit that shows that

13  approximately 94 percent of Backpage's revenue is from the

14  adult section.

11:13a 15          Mr. Ferrer testified -- and I think the exhibit

16  actually has another slide showing that about 80 percent of

17  that came from female escorts and when you ad body rubs and

18  the other escort categories, the percentage actually comes up

19  to 96 percent.  So 96 percent of the website's revenue is

11:13a 20  coming from the sale of prostitution ads and we've had witness

21  after witness after witness who's come here and testified

22  under oath right here that on Backpage when an ad was denoted

23  an escort ad, "escort" meant prostitution; and we've seen that

24  just in any number of overwhelming ways, and I could go

11:14a 25  through that chapter and verse, but I don't think we need to

1  because of the standard that applies here under Rule 29.

2       The sufficiency of the evidence standard is an

3  extraordinarily low one.  It's extraordinarily liberal in

4  terms of what is needed to present charges to the jury.

11:14a  5  Looking at the evidence in the light most favorable to the

6  Government, drawing all inferences in favor of the Government,

7  could any rational juror find guilt here?

8       It's under that -- we far exceed that standard here,

9  but that is what applies.

11:14a  10  THE COURT:  Let me ask you about -- there was a -- I

11  think Mr. Cambria is the one that raised this.  He suggests

12  that there is no evidence to -- well, there was no connection

13  between the loan payment and concealment, that essentially

14  there was no concealment that occurred.

11:15a  15  MR. KOZINETS:  So I think there are a few different

16  responses to that, Your Honor.

17       The first is that the entire sale was a sham, as

18  Mr. Ferrer testified to.  The sale itself was designed to

19  further distance the owners, three of the defendants here,

11:15a  20  from their connection to Backpage, put everything on paper in

21  Mr. Ferrer's name while they continued to reap all of the

22  profits.

23       Mr. Ferrer testified that these payments that he was

24  making, he was obligated to pay the owners eight million

11:15a  25  dollars a month under the so-called sale and loan agreements;

and he also testified that an elaborate web of companies were

created in connection with the sale, a whole chain of holding

companies on Mr. Ferrer's side and a whole chain of holding

companies on the defendants' side as well, Mr. Brunst,

11:16a   Mr. Spear and Mr. Lacey, to further distance the ultimate

owners from the business entities involved.  So the sale

itself had a deceptive purpose, a purpose of concealment.

Then we go into the entities that were used to make

these transactions.  Mr. Ferrer testified that Website

11:16a   Technologies itself was created to conceal the real source of

these funds, which was Backpage, which was 96 percent funded

by revenue from these prostitution ads.

So you have concealment with respect to this -- to

this money being funneled through Website Technologies.  Then

11:17a   you have concealment that it's being then paid to this Cereus

company, this holding company that is -- is not just created

for the purpose of taking in loan payments, but instead is

created for the purpose of taking in Backpage's revenues which

are coming in by way of loan payments, but taking Backpage's

11:17a   revenues and then using them to make -- to pay Backpage

obligations.

Carl Ferrer testified that the moment the money hit

Cereus' account there were distributions to the three owners

and a fourth owner and, in addition, Mr. Ferrer, and I believe

11:17a   even Mr. Quoc Thai testified, that Cereus also functioned as a

kind of payroll processing entity for Backpage.

So the money would go up to Cereus and then would come back out and be used to pay certain Backpage payroll expenses as well, and so these are all done in a way -- if one

11:18a wanted to not conceal or not disguise, why have the money go through all these different entities and kind of go through all these sort of transactional gymnastics, if you will, if there was any sort of purpose of being completely transparent?

We submit that the evidence here is more than

11:18a sufficient to show that the purpose was to conceal in whole or in part, or in part, as the statute says, and I don't know if -- okay, so then -- so does Your Honor have any other questions about that issue?

THE COURT:  Well, I do want to just ask you:  So the

11:18a *Pinkerton* theory that you're advancing, I just want you to tell me -- Mr. Panchapakesan also pointed out Count 69 through 70 and 82 through 84 as it relates to his client.

That's the theory that you're -- you've alleged the allegations against Mr. Brunst.  Is that -- do I get that

11:19a correctly?

MR. KOZINETS:  I think that's true as an alternative theory, but I don't think that's the whole -- the whole basis there.  I think the evidence shows that Mr. Brunst was the CFO of the entities that funneled the money involved in those

11:19a accounts and that he was one of two signatories, one of two

1  people connected to those accounts who had the authority to

2  make those transactions.  So we think there is a direct theory

3  of liability there.

4         Alternatively, there's a --

11:19a  5         THE COURT:  And those relate to the Ad Tech and the

6  Cereus Properties?

7         MR. KOZINETS:  Mr. Stone can address this with more

8  particularity.

9         MR. STONE:  Your Honor, two of those counts, 69 and

11:20a 10  70, relate to Camarillo, the company Camarillo Holdings.

11         THE COURT:  Ah, okay, okay.

12         MR. STONE:  And there was testimony and evidence

13  that Mr. Brunst was the CFO of Camarillo.

14         In addition, there was lots of testimony by

11:20a 15  Mr. Ferrer about Mr. Brunst' role post sale in terms of being

16  the bill collector for all of Backpage's proceeds that were

17  being funneled back to the owners and the individuals who sold

18  the company, lots of testimony by Mr. Ferrer about that.

19         The other counts in 69 through 99 where Mr. Brunst

11:20a 20  is charged relate to Cereus Properties where he's also the

21  CFO, according to the testimony and the evidence at trial, and

22  was one of two signatories on the bank account was Mr. Brunst

23  and Mr. Spear; but, again, there's ample evidence that it was

24  Mr. Brunst who was in charge of the banking transactions via

11:21a 25  all the e-mails with the banks and all the discussions he had

UNITED STATES DISTRICT COURT

1    with Mr. Ferrer and that came out in testimony from

2    Mr. Ferrer.

3            So those -- that's our theory on the Counts 69

4    through 99, which are all transactional money laundering

11:21a  5    counts.  The individuals who are charged either received the

6    transaction or, in Mr. Brunst's case, were the ones who made

7    the transaction happen that went to the individual.

8            THE COURT:  All right, thank you.

9            Anything further?

11:21a 10            MR. KOZINETS:  There were several points made about

11    the individual defendants and the sufficiency of the evidence

12    as to each of them.  I'd be happy to address any questions you

13    have about any of the specific defendants.

14            THE COURT:  I would like you to take a moment and

11:22a 15    respond to Ms. Bertrand, her argument with regard to her

16    client, and Mr. Eisenberg's with regard to his client.

17            What is the evidence as the Government sees it?

18            MR. KOZINETS:  Thank you, your Honor.

19            So Mr. Padilla and Mr. -- and Ms. Vaught ran the

11:22a 20    moderation department.  The moderation department was the

21    engine room of Backpage, particularly during the years covered

22    by the substantive counts here.

23            All of the prostitution ads ran through that

24    department or were supposed to have run through that

11:23a 25    department, and what we see in the trial evidence is e-mail

UNITED STATES DISTRICT COURT

after e-mail after e-mail showing that these two defendants
were managing that department, were instructing the employees
of that department and were actively engaged in this -- what
Mr. Ferrer described as making the ads look less obviously
11:23a   like prostitution ads, that being the purpose of the
moderation department during these years.

          And so, for instance, in Exhibit 56 we have an
e-mail from Mr. Padilla to Jeff Lyons on which Ms. Vaught is
copied.  This is from October 8th, 2010, where he says until
11:23a   further notice do not leave notes in user accounts because
this particular moderator, Mr. Lyons, left a note saying,
"Hey, I think this is a prostitution ad," and he was
instructed by the people running the moderation department,
"We're not going to say anything in writing about whether
11:24a   these are prostitution ads."

          Then we have e-mails, such as Exhibit 49, about
cleaning up the site as the Attorney Generals started to put
some pressure on Backpage and Mr. Padilla instructing that
only the "worst apples" quote/unquote should be affected.

11:24a   We have him disseminating e-mails about terms for
the strip out filter.  This is the filter that removed code
words, solid sex for money terms that the defendants had
identified and still allowed the ads to be published without
kind of interfering with the underlying purpose of the ads.

11:24a   Another example is Exhibit 1928 where Mr. Ferrer has

1    -- has said the terms GFE and PSE, which the Court has heard a

2    lot of about as being a prostitution -- prostitution terms,

3    those have to be removed; and Mr. Padilla says in response,

4    that will mean I have to edit -- you know, having to edit

11:25a 5    every ad on the site.  This is in October of 2010, knowledge

6    that these ads are prostitution ads.

7            And kind of -- the e-mails go on and on.  There was

8    one exhibit, 610, from the same time period where Mr. Padilla

9    is instructing the moderation staff, "No nudity below the

11:25a 10   waist."  "No crotch shots."  You know..."g-strings are okay."

11   "Boobs are okay."  A list of prices with no time increments

12   are okay, like 60, 80, 100, 120; and he's basically putting

13   the word out these are -- this is what we have to do to make

14   these ads less obviously prostitution ads.

11:26a 15           And then if Your Honor recalls, at the end of that

16   e-mail he says, Scott, defendant Mr. Spear, "Scott's really

17   pleased with the work we've been doing and he's giving us all

18   movie passes, if not this week, then next.  If you work from

19   home, we'll mail yours."

11:26a 20           There are more and more e-mails showing all of this.

21   Eventually we get to the e-mail Exhibit 647 regarding The

22   Erotic Review and this is an e-mail where Mr. Padilla -- well,

23   first of all, there is a lot of evidence in the record now

24   about The Erotic Review, about what it was, what it meant, how

11:26a 25   it showed that ads associated with The Erotic Review were

1    unquestionably for prostitution.

2           The defendants -- Mr. Lacey was confronted with this

3    evidence and Mr. Spear when they met with NCMEC in 2011.  The

4    *Wall Street Journal* wrote about it.  It came up in other media

11:27a  5    accounts, public officials, non-government organizations.

6    Internally the company and the defendants knew what this

7    purpose of The Erotic Review was.

8           So now we're getting to a point, though, where the

9    Attorneys General are putting pressure on Backpage and they're

11:27a  10    trying to make the site look less obviously like prostitution.

11           So Carl Ferrer testified that he discussed this with

12    Mr. Spear and they decided to unthread the needle by taking

13    out these hyperlinks to The Erotic Review and maybe taking out

14    the words TER but leaving in the ID numbers so people could

11:27a  15    look up the reviews on their own, and so Mr. Padilla is

16    instructed by Mr. Ferrer and he disseminates this message to

17    all of the moderation staff in Exhibit 647 and he says leaving

18    the ID number is okay.  "If you have any questions, please ask

19    me or Joye," defendant Vaught.

11:28a  20           And later on in March of 2016 in Exhibit 199

21    Mr. Padilla writes to the staff, and he says the term GFE is

22    now back.  We can start using that again.

23           So the defendant as to Mr. Padilla -- and this is

24    just a slice, a sampling, of the kinds of e-mails and

11:28a  25    discussions and meetings that Mr. Padilla was involved in that

1   showed that he was -- that he and Ms. Vaught were really the

2   ones who were the tip of the spear, if you will, in

3   implementing this strategy of making these ads look less like

4   prostitution.

11:29a  5          And as Mr. Ferrer and Mr. Hyer, other witnesses

6   testified at trial, this was really deliberate and intentional

7   effort to allow the continued promotion and facilitation of

8   prostitution and to assist Backpage's customers by helping

9   them continue to ply their wares, if you will, and to continue

11:29a 10   to use Backpage as this platform for doing that.

11          So with respect to Ms. Vaught, in particular, we

12   know that she was the second in command of the moderation

13   department -- and just to circle back, to take a step back,

14   one of the defendants today said something about Liz McDougall

11:29a 15   assuming control of the moderation department from 2012

16   onward.

17          That is not the case.  That is not consistent with

18   the trial testimony here.  Mr. Ferrer testified that

19   Ms. McDougall was, in his words, herself moderated by

11:30a 20   Backpage's owners.  She wasn't given all of the information

21   about revenue sources and other information about how the

22   company was being run and was essentially sidelined.

23          She wasn't involved in the day-to-day business

24   operations of the moderation department.  Instead, what we

11:30a 25   have is Mr. Padilla and Ms. Vaught, his second in command,

reporting directly to Carl Ferrer.  That's what the trial
evidence shows.

And Ms. Vaught in that position, helping to run the
moderation department, is copied on many of these e-mails that
**11:30a** we've just discussed involving Ms. Vaught and sends many of
her own e-mails.  A good example is Exhibit 646 referring --
and this is from February 18th, 2011.  It's called "Edit Lock
Out" where Ms. Vaught writes the whole moderation department
and cc's Mr. Padilla and says, "We are giving the users a
**11:31a** clean slate regarding editing rights.  Any ad that has
previously been locked out from editing, will have those
rights restored."

And if Your Honor recalls, lock out -- let me put it
this way:  After somebody posted an ad and it went up on
**11:31a** Backpage, that wasn't the end of the story.  The poster could
still go back in and edit their ad and change them after they
had been moderated.  That was testimony from Mr. Ferrer as
well; but what the moderators did was if there was somebody
that they thought was an egregious or repeat offender, they
**11:31a** could occasionally lock out, prevent the poster from editing
ads after they'd gone through moderation.

And what Ms. Vaught is saying here in this e-mail is
for those -- essentially, those worst offenders, we're going
to give them a clean slate.  We're going to start over with
**11:31a** them and "This time around," she says, "we should go easy on

certain types of violations," and -- and goes on to say that

blank pricing, "69" in the age field, breasts covered by hands

or arms and thongs riding a little too low shouldn't be

treated the same as something that says, you know, explicitly

11:32a  an offer for a blow job, for instance.  And then she says, "If

you aren't sure what this means please ask me or Andrew."  So

the two of them working together were -- were working to -- to

carry out this part of the conspiracy.

There are additional -- I mean, there were so many

11:32a  e-mails introduced that relate to this.  Ones that involve

Ms. Vaught also include Exhibits 103a and b, Exhibits 1697 and

1697a where Ms. Vaught goes through certain images and ads and

says these are okay, these are not okay; but upon looking at

them and showing them to the jury, one can see that all of the

11:33a  ads are -- fit within kind of the ads that have been

demonstrated to be ads for prostitution in the course of the

evidence that's been presented here.  The same thing with

Exhibit 1698 and 1698a.

In Exhibit 1219 Ms. Vaught writes, we've restored

11:33a  images that were deleted by the Avion crew.  That's an

offshore moderation crew, because these do not break the

rules; but, again, the ads, the images, fit clearly within,

you know, the other ads and images that we've been looking at

that witnesses have identified as being prostitution ads.

11:33a  In Exhibit 1816, this is from 2013, she's responding

1    to a moderator who took down an ad or wanted to report it and

2    she says, "I probably wouldn't have reported this one," and

3    the moderator tells her -- responds and says, "she looked

4    drugged and has bruises..."  That was really why I decided to

11:34a   5    slate it for reporting.  And Ms. Vaught responds, "She just

6    doesn't look under 18.  These are the kind of reports the cops

7    question us about.  I find them all the time, it's just

8    usually you who sends them."

9              So she's saying to this moderator, this isn't the

11:34a  10    kind of thing that we report up.

11             In Exhibit 1696, this is in 2011, she tells the

12    moderation staff, "We are going to start allowing users to

13    post the word prostate again.  If you have any questions let

14    me know.  Thank you.  Joye."

11:34a  15             In Exhibit 1909 Ms. Vaught is forwarded a lengthy

16    e-mail discussing Nicholas Kristof's documentary about the

17    victim, who actually is one of the victims who testified here,

18    Ms. Figueroa.  This was the -- a documentary that provided

19    further information and background.  He had been writing in

11:35a  20    the *New York Times* about prostitution occurring on Backpage.

21    This comes up to Ms. Vaught.  She is aware of that.

22             And then Exhibit 198 is an e-mail from Ms. Vaught to

23    the moderation staff also communicating that GFE, that very

24    well-known prostitution term, is now allowed back on the

11:35a  25    website.

1          So we think for purposes of Rule 29 and the

2     sufficiency of the evidence standard, drawing all the

3     inferences in favor of the Government that there is more than

4     enough to meet that very low threshold to get the charges

11:35a  5     involving Mr. Padilla and Ms. Vaught to the jury.

6          THE COURT:  All right, thank you.

7          Before I entertain any replies, I assume defense

8     wants to make replies, let's go ahead and take another

9     15-minute break.  After I hear those replies, I do want to

11:36a 10     take a moment to just ask some questions about each of your

11     proposed forms of verdict, and then we can adjourn for the

12     day.  All right, we'll stand in recess.

13          MR. LINCENBERG:  Your Honor, can I ask what time is

14     the Court anticipating adjourning for the day?

11:36a 15          THE COURT:  I don't know, it depends on how those

16     discussions go.

17          COURTROOM DEPUTY:  All rise.

18          (Recess taken at 11:36 a.m.)

19          COURTROOM DEPUTY:  All rise.

11:52a 20          (Back on the record at 11:52 a.m.)

21          THE COURT:  All right, please be seated.

22          At this point I will take up any reply by the

23     defendants.  Mr. Panchapakesan, yes.

24          MR. PANCHAPAKESAN:  Thank you, your Honor.

11:53a 25          So I'm going to start, I think, where the Court left

UNITED STATES DISTRICT COURT

1   off during my argument and Mr. Kozinets addressed this notion

2   of, well, if the Travel Act is not a mechanism to deal with

3   this sort of situation, then what is?

4              And I highlight for the Court that in 2018 there

11:53a   5   were laws passed.  FOSTA's one of them.  It allow states and

6   victims to fight on-line sex trafficking act and in connection

7   with that act -- for example, there was a report from the

8   committee on the judiciary from the House in connection with

9   that act and it talks about Backpage and Craigslist and how do

11:53a  10  we address this issue?

11             And what that report says is, quote:  Importantly,

12  current federal criminal law which is unaffected by the CDA

13  presently lacks proper prosecutorial tools to combat these

14  websites."

11:54a  15             At the end it says, in connection with the sex

16  trafficking statute -- the federal trafficking statute --

17  further, general knowledge that sex trafficking occurs on a

18  website will not suffice as a knowledge element and must be

19  proven as to a specific victim.

11:54a  20             And so our position is that the Travel Act requires

21  specific intent as to business enterprises.  It's not enough

22  to say, for example, as to my client, that a five percent

23  minority owner, a CFO of a business is criminally liable

24  because some user may have posted illegal content on the site.

11:54a  25             And while I'm not suggesting that Facebook and

Backpage are the same thing, the Government's presentation of

evidence as to my client to say, for example, "You were aware

these ads were on the site," it's really no different than

what the case would be against a CFO of any website platform,

11:54a  that you were aware of the types of content that was on the

site; and the missing link there is specific intent as to the

business enterprises, right, the fifty ads, the advertisers,

pimps, et cetera who are posting those ads.

Second is there was a lot of discussion about Docket

11:55a  946, which is the Court's prior order on a Motion to Dismiss.

What we're relying on this order to show -- and I didn't hear

any push back on this from the Government -- is that the

conspiracy count is limited to the fifty ads, right, because

that's what we've been on notice of; and I think what the

11:55a  Government said is, well, in that order in denying the Motion

to Dismiss the Court says, well, the indictment sufficiently

talks about things like super posters and William Mersey,

right, and these individuals that the Government claims were

affiliated with Backpage.

11:55a  The problem is that at trial as to my client,

Mr. Brunst, there's been no evidence that he was affiliated

with a super poster, for example, but he was in a conspiracy

with Mr. Mersey, who I think the Government's called Dollar

Bill.  There's no evidence that a super poster, for example,

11:56a  was responsible for one of the fifty ads.

1    So it's one thing for the Court to say, well,

2  looking at the allegations of the indictment, these types of

3  things might qualify as business enterprises.  It's another

4  thing at trial to establish the existence of the business

**11:56a** 5  enterprise, one, and, two, to show that my client, Mr. Brunst,

6  intended to facilitate those business enterprises and I

7  think -- Mr. Kozinets, he cited a California State case,

8  *People v. Lurie*, and I think it to some extent demonstrates

9  the Government's grasping at straws here, right.

**11:56a** 10    They don't site to a Ninth Circuit Travel Act case

11  that says, well, what's going on here is evidence of intent.

12  They site to an irrelevant State California -- California

13  State case on this notion of intent, which is -- it's not only

14  inapplicable here, but I think it demonstrates the problems in

**11:57a** 15  their case in terms of intent.

16    Now shifting to the money laundering counts, Count

17  63 was one of the counts that the Court referenced.  That was,

18  I think, a count dealing with a website developer and this is

19  one, of many instances, where Government counsel to some

**11:57a** 20  extent was sort of testifying in some extent -- to some

21  extent.

22    I didn't hear the Government cite testimony on this

23  specific transaction, about this transaction, what it was for,

24  what its purpose was.  I heard a reference to a PowerPoint and

**11:57a** 25  94 percent of the ads are for adult.

1    That doesn't come close as to this count or other

2    counts to establish what the specific purpose of it was; and

3    so, for example, in the US v. Brown case I cited in my initial

4    argument, the Fifth Circuit case, 186 F.3d 661, on promotional

11:58a    5    money laundering what the Court says is, quote, "The problem

6    with the government's position is that it ignores the intent

7    aspect of the promotion element.  Section 1956(a)(1)(A)(i) is

8    not satisfied by a showing that a financial transaction

9    involving the proceeds of specified unlawful activity merely

11:58a   10    promoted the carrying on of an unlawful activity.  The

11    provision has a specific intent element."

12    I think that's the element that's missing as to

13    these promotional counts.

14    And then lastly turning to the concealment money

11:58a   15    laundering counts, the Government's cases of these counts is

16    extraordinarily weak.  Mr. Kozinets in response to the

17    Government's -- in response to the Court's question said, "He

18    said the entire sale was a sham," right.

19    But the testimony, Your Honor, from Mr. Ferrer was

11:58a   20    the price was too high, the negotiations were unfair, the

21    interest rate was too high, the monthly payments were too

22    high.  At best, even construing that evidence in the

23    Government's favor, all Ferrer is saying is he thought the

24    sale was unfair, right.

11:59a   25    The undisputed testimony is that the purpose of

UNITED STATES DISTRICT COURT

these payments, they were payments on loans.  Even the

contemporaneous e-mails put in by the Government I think

towards the end of Mr. Ferrer's direct, like Exhibit 1214,

talks about, like, a default on the loan, right.

11:59a    So in these communications about these transfers,

the parties are talking about them in the context of a loan,

loan payments, forbearance on a loan.  There is no direct

evidence that any of these loan payments, these specific

transactions, were part of some effort to conceal or disguise

11:59a the source of the payments.

Now, Mr. Kozinets, I think, asked a question at the

end when we were talking about these counts.  He says quote --

why have money go through all these entities is basically what

he said.  That's not proof beyond a reasonable doubt.  It's

11:59a not enough for -- it's not enough for the Government to just

sort of pose the question.  Well, there's lots of entities

here and why have the money go through them?  That must be

concealment.  That's not direct evidence of concealment.

There's been no testimony from Ferrer or anyone else

12:00p that the sale structure itself, that the sale of Backpage was

set up intentionally in some sort of deceptive or disguising

manner.  That's not what the record is.

And so, for example, I think Mr. Kozinets cited some

testimony from Quoc Thai.  He's a former agent.  He said

12:00p something to the effect of, you know, Cereus Properties pays

UNITED STATES DISTRICT COURT

1    the bills of Backpage.

2          Cross-examination of Mr. Thai and he pretty clearly

3    stated multiple times he hasn't looked in to the purpose of

4    these transactions.  He doesn't know what these entities do.

**12:00p**  5    He said this repeatedly.  So he can't be the witness through

6    whom the Government is trying to establish the purpose of

7    these transactions and whether they were deceptive or

8    concealed something.  That had to have been through Ferrer,

9    and he didn't do that as to these transactions.

**12:01p** 10          And then, lastly, there's several transactional

11   money laundering counts where my client is sort of a secondary

12   defendant; and those counts, just for the record, are 69, 70,

13   78, 80 through 81, 83 through 84 and 86 through 93 and I think

14   the Government's argument there -- I think they said something

**12:01p** 15   to the effect of, you know, he's one of two signatories on the

16   account and that's the extent of their evidence.

17          They have no proof.  There's nothing in evidence

18   that he authorized these transactions or he signed something

19   effectuating these transactions.  It can't be the case that

**12:01p** 20   someone's responsible -- directly responsible for

21   transactional money laundering because they were one of two

22   signors on an account; and if that's the extent of their

23   evidence on that, and as I understand it is, then they've

24   clearly -- even construing that evidence in the Government's

**12:02p** 25   favor, no rational juror could find beyond a reasonable doubt

```
 1    that my client was responsible for -- for those -- those

 2    transactional money laundering counts.

 3              THE COURT:  Thank you.

 4              MR. PANCHAPAKESAN:  Thank you.

 5              THE COURT:  Mr. Cambria.

 6              MR. CAMBRIA:  At one point, Your Honor, Mr. Kozinets

 7    said, well, we can't have a situation where -- he says you're

 8    not saying that you have to be aware of every single ad.

 9              We didn't say that at all.  What we said was there

10    needs to be proof of knowledge of the fifty ads that are in

11    the Indictment.  Why are they in the Indictment, unless

12    they're giving us notice?  And Judge Brnovich in her prior

13    decisions made it clear that they were the vehicle that would

14    be used to, if you will, advance the so-called enterprises.

15    Well, you have to know about it.  I don't know why, but they

16    took those steps to try to prove at all that anybody knew

17    anything about any of these ads.

18              The other thing is this -- he cited the *Michigan*

19    case.  *Michigan's* an obscenity case, and it's certainly not a

20    specific intent Travel Act case.  It's apples and oranges here

21    as far as this is concerned.

22              And finally, you know, talking about lack of things,

23    with regard to Mr. Lacey, they don't have him doing any

24    affirmative act.  The only thing they talked about was that he

25    was at a meeting where there was shouting and red faces, and
```

The timestamps in the left margin: 12:02p at line 5, 12:02p at line 10, 12:03p at line 15, 12:03p at line 20, 12:03p at line 25.

1    they didn't even go in the meeting.  They just -- after it was

2    over.  There was nothing in there about signing anything,

3    about ordering anything.  It's just none of -- none of that

4    has occurred at all.

12:04p  5    So I submit that particularly with regard to the

6    fifty ads there had to be proof somewhere of knowledge of

7    these ads because they're the vehicle that supposedly is

8    advancing this enterprise.  Thank you.

9    THE COURT:  Thank you.

12:04p 10    Ms. Bertrand.

11    MS. BERTRAND:  The Government's burden remains

12    beyond a reasonable doubt and while this is simply -- you

13    know, at this phase in the case the -- all we have is the

14    Government's evidence.  They still have to prove beyond a

12:05p 15    reasonable doubt each element of the crimes alleged against

16    each of these defendants, and it is not enough to say there's

17    a reasonable inference if there is an alternative to that

18    reasonable inference.

19    So here, the Government cannot point to any evidence

12:05p 20    that Ms. Vaught knew about a conspiracy to violate the law.

21    They show she got hired to do a specific job, and Carl Ferrer

22    testified that she progressed in the organization because she

23    did that job so well.  She was careful.  She was detail

24    oriented.  She was hard working.  There's been nothing in this

12:06p 25    record that says "and she did it all with a wink and a nod."

1          In fact, there's nothing to show that these

2    moderators, thrown into a maelstrom of weird, knew that they

3    were doing anything other than trying to follow the law; and

4    the e-mails cited by the Government underscore that

**12:06p** 5    alternative inference, and if we have an alternative inference

6    they have not met their burden beyond a reasonable doubt.

7          And that alternative inference is that these e-mails

8    are coming in weekly, daily, several times a day saying this

9    is the new target, understanding the chaos that Ms. Vaught was

**12:07p** 10   trying to create order of.

11          There is nothing that shows that this woman did

12   anything other than try to follow the law in a very imperfect

13   situation, and that's underscored by the fact that the

14   evidence also shows she was helping law enforcement, and there

**12:07p** 15   is no evidence that shows she did anything in the vein of

16   plausible deniability.

17          She shows up and is helping law enforcement because

18   she thinks she is helping to fight crime, she's helping to

19   fight prostitution and it's more dastardly subsections.

**12:07p** 20          Ms. Vaught should not be here.  The Government's

21   evidence fails and supports this Court saying to Ms. Vaught,

22   "Today you can go home," and it doesn't mean that this Court

23   has to find anything other than the Government's case in chief

24   lacks the evidence to show beyond a reasonable doubt that this

**12:08p** 25   one woman, doing an impossible job, had anything but the

```
 1   intention to follow the law.  Thank you.
 2               THE COURT:  Thank you.
 3               Mr. Feder.
 4               MR. FEDER:  Two quick points, Your Honor.
```
12:08p 5   No. 1, in Document 699 there's a response to the
```
 6   Government's prior assertion about this Silk Road issue.
 7               Silk Road was a overt sales of cocaine that are not
 8   protected by the First Amendment versus what happened in this
 9   case, which is that there are no overt sex act ads, and it's
```
12:09p 10  the inverse and the argument by the Government just is apples
```
11   and oranges.  That's No. 1.
12               No. 2, while potentially unwelcome, the Government's
13   entire argument about moderation is in violation of Section
14   230 of the Communications Decency Act.  It's the entire
```
12:09p 15  purpose of that law as demonstrated by the -- Congress'
```
16   passing of SESTA and FOSTA, which at some point were
17   characterized as the anti-Backpage cases demonstrating that
18   the Travel Act does not apply to Backpage pre-SESTA and FOSTA
19   because you can't have general -- I mean, the Government wants
```
12:10p 20  this to be a general intent crime.  That's what they've been
```
21   doing since the inception of this prosecution, and it just
22   doesn't work.  It's not what the Travel Act is for.
23               THE COURT:  Mr. Eisenberg.
24               MR. EISENBERG:  Your Honor, this is what the
```
12:10p 25  Government's case consists of with respect to my client,

1   Mr. Padilla, a series of e-mails.

2         The e-mails themselves never say anything about

3   acknowledging prostitution, whether they are coming from

4   Mr. Ferrer or from my client.  What they say and what they

**12:10p**  5   address are standards.  No witnesses come before the Court to

6   say that in any particular e-mail it was discussed with

7   Mr. Padilla that what he was doing was covering up for

8   prostitution.

9         We don't have that evidence.  So we're left with the

**12:11p** 10   inference, if you will, from an e-mail about trying to clean

11   up a site that what was the problem is that the site was for

12   facilitating the business of promoting prostitution, and there

13   hasn't been any acknowledgment by a moderator.  There hasn't

14   been any acknowledgment by any other witness in this entire

**12:11p** 15   case that what was discussed in these e-mails was designed to

16   cover up prostitution.

17         The bottom line here is that my client was given

18   certain rules, regulations, if you will, standards, and those

19   are the ones that he is to apply in order to do his job.  So

**12:11p** 20   what are we left with?  No particular ad was ever associated

21   with any of these e-mails, and the only ads that we really

22   have in this case is no proof he's ever seen them before.  No

23   proof he had anything to do with them.

24         And if you put this in the context of trying to

**12:12p** 25   reject ads, delete pictures, take out bad words, that seems to

be, Your Honor, inconsistent with the idea that what he's

trying to do is to promote prostitution.  What he's trying to

do is take the concepts of standards and apply them as he is

told what those standards are.  He doesn't make those up.

**12:12p** Those are somebody else's standards.

So now we're saying with an ad we don't ever see,

because none of these e-mails relate to any specific ad that

we can find actually posted, he's contributing to facilitating

a prostitution.  We just don't -- you can't relate an e-mail

**12:13p** to anything specific in terms of an end result.  So you've got

e-mails going within the organization, but nothing actually

posted.

So even at its worst connotation if two individuals

or a group of moderators are being addressed with respect to

**12:13p** "These are the changes that we have to do," so even at its

worst concept doesn't ever -- doesn't actually result in

anything that the Government is able to show this is the

product of that discussion.  This is -- in other words, an ad

actually got published with respect to the new criteria.

**12:13p** My argument is, even if they could show that an ad

had been published, the intent of Mr. Padilla is the one --

the thing that is at issue; and if we're gonna be saying that

he can just disregard these standards or the standards mean

nothing to him, the rules mean nothing to him, he's just like

**12:14p** anybody else who would be viewing this, then we've got a

```
 1    discussion of -- it's just, "Well, I'm trying to follow what
 2    I've been told to do and am I wrong?  Here's my boss telling
 3    me this is what I'm supposed to do and this is what I'm
 4    supposed to apply."  What's the man to do?
```
**12:14p**  5            Thank you, Your Honor.
```
 6            THE COURT:  Thank you, Mr. Eisenberg.
 7            Well, counsel have given me a number of arguments,
 8    cited cases, statutes.  We've been through about four weeks of
 9    trial testimony and hundreds of exhibits, some of which were
```
**12:15p** 10    referenced in argument.  I'm going to take a look at those
```
11    arguments, the prior Court's orders that were referenced as
12    well and I will be reviewing those carefully, and so I'll take
13    the matter under advisement.
14            At this point I'd like to use the rest of our time,
```
**12:15p** 15    and depending how long you think it will go, I just want to
```
16    ask both sides whether or not you've had an opportunity to at
17    least review the proposed verdict forms.
18            Has the Government looked at the defendants'
19    proposed verdict form?
```
**12:15p** 20            MR. STONE:  Yes, your Honor.
```
21            THE COURT:  Have the defendants looked at the
22    Government's proposed verdict form?
23            MR. LINCENBERG:  Yes, your Honor.
24            THE COURT:  I'm sorry?
```
**12:16p** 25            MR. LINCENBERG:  Yes, Your Honor.

1          THE COURT:  All right.  So let me ask from the

2     defendants' perspective what, if any, objections do you have

3     to the Government's proposed form of verdict?

4          MR. LINCENBERG:  Your Honor, I would crystallize the

12:16p  5     differences into four quick points for the Court's

6     consideration.

7          First is that the Government's proposed verdict form

8     with regard to the Travel Act counts are somewhat

9     argumentative in the sense of trying to highlight the language

12:16p 10     that is the title of the ads and so forth.

11          The jury will be going through the counts.  I think

12     the defendants' proposed verdict form, which notes that the

13     exhibit relating to that count is specified, so the jury can

14     then look at -- if they're going through it one by one they

12:17p 15     can say, all right, Count 20, this is this ad, let's not take

16     one point out of the entirety of it and decide.  So we believe

17     ours is less argumentative and better.

18          The second point is the Government's -- in lining up

19     whether to find a defendant guilty or not guilty, the Court

12:17p 20     may notice that we put first not guilty and guilty second.

21     The Government puts guilty first and not guilty second.

22          We ask the Court to adopt ours because one is

23     presumed not guilty unless proven otherwise, and so that

24     should be the first point.

12:17p 25          The third is -- well, the third I actually covered

about the defendant's tying things to exhibit numbers.  So

it's really part of the first.

The third big point would then be we believe our

instructions better guard against an improper verdict.  For

12:18p   example, with regard to the money laundering counts where we

note that -- if you take as an example, picking any of them,

Count 58, we the jury unanimously find defendant either not

guilty or guilty of committing concealment money laundering in

connection with the June 30, 2016, transfer of three million

12:18p   dollars from Website Technologies to Cereus Properties, we

think it's a simple straightforward statement of the offense

and that's what it should be in the verdict form.

THE COURT:  Well, let me -- and this is one of the

things that I considered in asking you to revisit the verdict

12:19p   form.  I mean, in a -- in a case where you don't have a

speaking indictment that is over 100 pages or close to it,

normally I would have read the indictment to the jury at the

outset of the case, and in so doing then the Court would have

necessarily read the counts as they are listed and those

12:19p   counts, as they are listed, include the description of the

alleged ad.

And so the concern was here that the count in the

verdict form match the allegation.  So I understand that we

should not interfere with the fact-finding process of the jury

12:19p   and, you know, it is part of their responsibility to sift

1  through the, you know, thousands of exhibits; but given that,

2  what is -- is there any concern about adding the description,

3  at least part of it that is alleged in the indictment?

4        MR. LINCENBERG:  Yes.  Well, the concern is really

**12:20p** 5  what I just indicated, that it's somewhat argumentative.  The

6  fact that the indictment states it in an argumentative manner

7  and the parties will be arguing these points is one thing, but

8  a verdict form should be -- should guard against doing that

9  and the jury will have a sufficient relationship between the

**12:20p** 10  count number and the ad by the exhibit number and that way

11  they're voting based upon that ad if they -- if the Court --

12  depending upon if we get to these ads after Rule 29, and I

13  think that's a more straightforward way to do it.

14        THE COURT:  So let me ask you this question then:

**12:21p** 15  If I adopted your form of verdict as to the Travel Act, then

16  shouldn't I at least provide to the jury, at least in some

17  fashion, maybe Paragraph 201 through the remainder of the

18  listing of the Travel Act charge in the indictment?

19        So, for example, Page 50.  Because, otherwise, I

**12:21p** 20  think it becomes a very tedious task for the jury to

21  understand the charge, what they're asking to review if you

22  don't give them some context.

23        MR. LINCENBERG:  Well, the Court could do it that

24  way.  I think some Courts would do it that way.  I don't think

**12:21p** 25  there would be anything erroneous with doing it that way.  I

think that if the Court alternatively said, "Ladies and
Gentlemen, there's fifty Travel Act counts, 2 through 51, and
Count 2, for example, relates to an Exhibit 120, Count 3
relates to this and so forth," I think that encourages the
12:22p  jury to consider the ad that is at issue as opposed to
focusing on what the Government has chosen to include in the
Indictment in terms of the title of the ad.

THE COURT:  Okay.  I guess I -- maybe I'm just not
understanding the way that you're presenting it to me.

12:22p  So you would not have an objection, for example, if
I put forward to them in some modified fashion just in terms
of the volume of pages in the Indictment beginning at
Paragraph 201 of the Indictment, which are the alleged charges
relating to Travel Act.  They outline the count, the date and
12:23p  the description and giving that to them in addition to all of
the exhibits that are before them?

MR. LINCENBERG:  If what Your Honor is saying by
"giving it to them," in other words, reading that portion of
the indictment, is that what the Court is suggesting?

12:23p  THE COURT:  Well, no, I'm -- well, I guess we could
do it in that way.  I thought about just giving them that page
-- those pages related to the Travel Act, because it's
voluminous.  I guess my concern is it's voluminous.

It's -- each ad is very distinct as to date and so,
12:24p  I mean, I -- so what's your position with regard to that?

UNITED STATES DISTRICT COURT

1    MR. LINCENBERG:  Well, I think the preferable thing

2  to do would be to simply note the exhibit number that relates

3  to each count.

4        If the Court decides that the Court wants to give

12:24p  5  more, it should be done either in the form of the Court

6  reading those counts or the Court's suggestion about giving

7  those pages of the Indictment.  That's not our preference.  We

8  don't think it's the best; but, in any event, it shouldn't --

9  it shouldn't be in the verdict form.  The verdict form should

12:24p  10  simply relate the exhibit to the count.

11       THE COURT:  Okay.  Then -- then in looking at the

12  Government's form of verdict, you have no objection to the

13  iteration of the date, the exhibit number?  Your objection is

14  with the ad title --

12:25p  15       MR. LINCENBERG:  Yes.

16       THE COURT:  -- being included?

17       What about the state?

18       MR. LINCENBERG:  No objection to the state.

19       THE COURT:  All right.  And then you wanted to

12:25p  20  address the specific money laundering counts with regard to

21  the jury's -- excuse me, the Government's description?

22       MR. LINCENBERG:  Right, and my argument was -- was

23  brief.  The Government has -- the Government's proposed counts

24  are fairly vanilla.  It's not -- it's not objectionable.  We

12:25p  25  had suggested adding in a little more, in part because we have

1   these three different types of money laundering.  So ours had

2   a heading.

3              For example, when you got to international

4   promotional money laundering at Count 63, put a little

12:26p   5   heading, and we just put we the jury unanimously find

6   defendant so and so not guilty or guilty and we put of

7   committing international promotional money laundering in

8   connection with the March 4 transfer of, you know, such and

9   such money from US Bank to such and such.

12:26p   10             THE COURT:  Okay.  All right, thank you.

11             From the Government, yes.

12             MR. STONE:  Let's start with the easy part.  We

13   don't object if not guilty goes before guilty.  So consensus,

14   it's good to give.

12:26p   15             The issue with the Travel Act counts as defense has

16   them is that we need -- the jury would need something to

17   understand what ad is being referred to.  I mean, we have the

18   exhibit number, but there needs to be something, as Your Honor

19   I think understands, so that they know that that exhibit

12:27p   20   number for that ad goes to that particular count; and what we

21   suggested in our verdict form is to eliminate some of the

22   other language that's in the Indictment that I thought was

23   objectionable to the defense, which Your Honor is now

24   suggesting would go back with the jury, and just include the

12:27p   25   title of the ad.

1    I'm not sure Mr. Lincenberg had taken a look at the

2    Paragraph 201 and all the information that's included in those

3    ads.  If it goes back, that's fine with us but we thought that

4    that was objectionable; and so it would make more sense and

12:27p  5    certainly be easier for the jury when they go through this

6    verdict form just to have the ad title there, along with the

7    state and exhibit number, and they will be able to pull it up

8    and review it during their deliberations.

9    So no objection to the paragraph -- or the

12:27p  10   Superseding Indictment with Paragraph 201 going back, but I

11   really think it should be part of the verdict form so it's

12   easier for the jury.  We're trying to make it easier, not more

13   difficult.  They're already going to have to sift through

14   hundreds of exhibits.  So why would we make them have two

12:28p  15   separate documents that they need to refer to when they're

16   looking at -- when they're looking at verdict form and

17   deliberating.

18   The other, I think main issue, with the defendants'

19   proposed verdict form on the Travel Act counts is they give

12:28p  20   sort of like a partial jury instruction on each count where

21   they talk about violating the Travel Act, fine, in connection

22   with the advertisement found at exhibit blank on a certain

23   date, that's fine; but then they say by specifically intending

24   to promote or facilitate the promotion of a business

12:28p  25   enterprise involved in prostitution offenses.

UNITED STATES DISTRICT COURT

1     There's gonna be lots of jury instructions that they

2 need to refer to.  We shouldn't -- that's confusing to include

3 a partial jury instruction within the verdict form.  That

4 certainly should not remain.  I think other than that, we're

**12:29p** 5 fairly close.

6     The money laundering counts, I think we're even

7 closer.  Again, theirs is just wordier and I don't think we

8 need it.  They talk about on each count the fact that it's

9 committing concealment money laundering in connection with the

**12:29p** 10 transfer.  We have the headings -- the concealment money

11 laundering, for example, for Counts 53 through 62 and then

12 don't include the extra words on each count.

13     It's really not that big a deal, though.  I mean, I

14 think we're pretty close on the money laundering counts.  I

**12:29p** 15 just think ours esthetically looks a little better and that's

16 always helpful for the jury.

17     THE COURT:  Yes, I want to -- I want to point out --

18 let me have you look at the -- the actual description of the

19 allegation in each count includes wording that is now taken

**12:30p** 20 out by the Government.

21     So, for example, if you look at Count 2, it says

22 published ad depicting victim five.  And so the form of

23 verdict that they've proposed removes that type of language

24 and then -- but will give the jury what it is that they're

**12:30p** 25 examining as the allegation.

```
 1              So is there an objection to it in it that form?
 2              MR. LINCENBERG:  Well, first, I appreciate counsel's
 3    professionalism because I didn't have the Indictment up here
 4    with me when the Court was asking me about it; and he is
 5    correct, it would be something we would object to having the
 6    Indictment read or going back, particularly because it's
 7    discussing, quote, "victim," this person is a victim, so
 8    forth.
 9              With regard to -- so let me now answer the Court's
10    question directly.  With regard to the caption that they put
11    in, you know, my problem is -- well, let me take a step back.
12    I think it's being proposed this way because there's so many
13    ads and, obviously, we aren't the ones who brought the
14    indictment that makes this problematic because there's so many
15    different ads.  At the same time each count is something
16    that's important to each defendant and what the defendant is
17    -- what the jury is deciding on, if they do a count-by-count
18    review, is that ad and then whether the elements are made.
19              There's one other alternative that the Court could
20    do, if the Court goes with our verdict form, would be to send
21    a hard copy back of the fifty exhibits so that if the Court's
22    concerned about their inability or difficulty of matching
23    things --
24              THE COURT:  They are going to have those exhibits
25    that were introduced in hard copy --
```

The timestamps in the left margin: 12:30p (line 5), 12:30p (line 10), 12:31p (line 15), 12:31p (line 20), 12:31p (line 25).

UNITED STATES DISTRICT COURT

1          MR. LINCENBERG:  They are going to have hard copies

2    of them?

3          THE COURT:  -- and digital.

4          MR. LINCENBERG:  Okay, sorry.  So just to be clear,

12:32p  5    you have no objection to at least the exhibit number being

6    referenced?

7          MR. LINCENBERG:  Right.

8          THE COURT:  And you have no objection to the state

9    allegation?

12:32p  10         MR. LINCENBERG:  Right.

11         THE COURT:  You just have an objection to the

12    description even as modified from the Indictment?

13         MR. LINCENBERG:  Yes, your Honor.

14         THE COURT:  All right.

12:32p  15         All right.  Anything further, Mr. Stone?

16         MR. STONE:  Just that description is just the title.

17    I mean, we took just the title and we didn't even include --

18    sometimes there's little characters in the title.  We just did

19    the words in the title, something so that the jury understands

12:32p  20    when they're looking at the exhibit that this is the ad that

21    is Count 2, for example.

22         THE COURT:  Yes.

23         MR. STONE:  That's it.

24         THE COURT:  No, I understand.

12:32p  25         Is there -- well, I think what I'm inclined to do is

1    see how we go on Tuesday, how far we get, and then at that

2    point try to get a read from all parties as to a point in time

3    to finalize those final jury instructions.

4         I think we've circulated and I think my law clerk

**12:33p** 5    has circulated to you a Word version of the -- what we have

6    determined are the final proposed instructions and that should

7    have gone out today or, if not, it will.

8         And, again, here I don't want to re-examine anything

9    that I've already settled upon unless you can point to some

**12:33p** 10   reason that they should be changed.  If there's some legal

11   reason or evidence that was or was not presented that makes

12   you conclude that there should be a change in those

13   instructions, and that's how we should proceed.

14        You're standing there, Mr. Lincenberg.  Do you wish

**12:34p** 15   to be heard on something?

16        MR. LINCENBERG:  Yes.  Well, first, briefly, we'll

17   look at the Court's jury instructions.  My sense from talking

18   to defense counsel is we'll probably want to argue on about a

19   half a dozen, and we're going to submit a theory of the

**12:34p** 20   defense instruction for the Court's consideration as well.

21        I also wanted to just briefly note -- and I was

22   speaking with Government counsel at the break in terms of some

23   scheduling issues.

24        So the Court saw that we filed a brief this morning

**12:34p** 25   in connection with our client potentially testifying, and

1    government counsel wants to respond to that.  The Court -- the

2    Court set a time for them to respond by the close of business

3    on Monday.

4              THE COURT:  Yes.

12:34p  5      MR. LINCENBERG:  So first, I'd request that that be

6    close of business on Sunday so that we have a chance to review

7    that and potentially argue the point if the Court wants

8    argument on Tuesday; and part of the reason why I raise this

9    and part of the reason why we filed the brief is how the Court

12:35p  10   rules on what we've submitted is going to have a huge impact

11   on whether the trial continues with one or two days more of

12   testimony or two or three weeks more of testimony.

13             We submitted that brief.  Consultation with other

14   counsel, I know that that they're going through similar

12:35p  15   questions, for example, as to whether or not their clients may

16   testify and the like.

17             So if, for example, the Court rules against us and

18   says, "Mr. Lincenberg, you've raised this and I've decided I'm

19   not changing my ruling," we could be getting to argument -- I

12:36p  20   don't want to speak out of turn.  I know counsel are still

21   considering different witnesses and so forth, but we could be

22   getting to argument fairly quickly; and if not, the defense

23   may be scrambling in terms of all sorts of witnesses who may

24   have to then be brought into court or things like that.

12:36p  25             So there's an interest, I think on both sides, in

1  trying to address this sooner rather than later.  We

2  understand it can't be addressed Monday, the Court has a full

3  calendar; but even in terms of the briefing or getting a sense

4  from the Court, it's really going to make a big difference in

12:36p  5  scheduling.

6      THE COURT:  Well, why don't I do this:  Let me -- I

7  haven't looked at the motion so I don't know how detailed it

8  is.  I'm going to give the Government until 10:00 a.m. on

9  Monday to file its response, no reply.

12:37p 10      So disregard if my diligent courtroom deputy has

11  already sent out a directive.  So you'll have until 10:00 a.m.

12  on Monday to submit your response.

13      I would propose what we do then is we'll have our

14  jury administrator alert our jurors not to report until

12:37p 15  10:00 a.m. on Tuesday, and I'll expect you here at 9:00 a.m.

16  so we can address any of those legal issues because you ask

17  for five minutes and I find that usually turns in to 15 or 20

18  and I don't want to bring our jury in if we're going to do

19  that.

12:37p 20      So I'll have our jury administrator today reach out

21  to those jurors and tell them to report to be here by

22  10:00 a.m.  We'll take any argument related to that motion up

23  on Tuesday morning.

24      Now, because of the schedule as you've proposed, I

12:38p 25  would ask that you provide to the Court whatever your proposed

changes or new jury instructions or defense theory instruction

may be by close -- well, by the end of the day on Tuesday.

So I'll start looking at those and that way we're

not losing time.  If, in fact, it ends up being a shorter

**12:38p** week, then I'll have some time to review those changes,

consider them and hear argument and set some time for

argument.

All right, so Mr. Rapp.

MR. RAPP:  Yes, just briefly, Judge.  Just to

**12:38p** maximize the jury's time, we have assessed the defense

witnesses and we do not believe that those witnesses, at least

the ones slated for Tuesday, are going to take very long.

To put it mildly, we don't view them as -- some of

them -- we don't view them as defense witnesses and some we

**12:39p** feel are irrelevant and likely would not be allowed to

testify.

That being the case, that Tuesday could be a very

abbreviated day for the jury; and so I'm just wondering since

we are possibly resolving jury instructions in the morning and

**12:39p** let's say --

THE COURT:  Well, I'm not -- I'm not resolving jury

instructions in the morning on Tuesday.  I'm resolving the

pending motion that was filed last night or this morning --

MR. RAPP:  This morning.

**12:40p** THE COURT:  -- and my decision on that on Tuesday

1    morning is going to determine, I guess, what the ultimate

2    defense witnesses will look like for the remainder of the day.

3         That's -- so that's my understanding.  Am I

4    incorrect on that, Mr. Lincenberg?

12:40p   5         MR. LINCENBERG:  I don't know that it will affect

6    the remainder of the day.  The proposed witnesses on Tuesday

7    are not our witnesses so I can't speak to that, but it will

8    affect the trial.

9         MR. RAPP:  Okay.  I -- I was only -- I was

12:40p  10   suggesting that if we could resolve the jury instructions in

11   addition to that motion and let's say it's a very abbreviated

12   defense case in light of the Court's possible ruling on that

13   motion, and we have our own opinions on the defense witnesses

14   that have been proposed, it is possible that we could use --

12:40p  15   maximize the jury time and even start -- you know, I don't

16   want to be presumptuous about the Rule 29 motion, but we could

17   start closing arguments on Tuesday afternoon.

18        THE COURT:  Well, how -- how close are you at

19   sending to my chambers your proposed jury instructions?  I

12:41p  20   guess that's -- that's the question.

21        MR. LINCENBERG:  Well, I guess I'll speak.  I have

22   to talk to counsel, Your Honor, but the Court had indicated

23   asking us by the close of Tuesday.  We could probably get

24   something by the close of Monday.

12:41p  25        THE COURT:  Okay, why don't we do that.  Let's go by

the close of Monday.

Any objection to having the jury appear at 1:00?

MR. RAPP: Not from the United States.

MR. LINCENBERG: No objection.

12:41p MR. RAPP: On Tuesday?

THE COURT: On Tuesday.

I mean, I think at that point it will give me sufficient time then to resolve the pending motion and then give me time to also hear abbreviated argument on jury 12:42p instructions, especially if we've already entertained those arguments before; and I want you to be very concise as to why I should revisit any ruling in any prior decision I have made, although tentatively with regard to final instructions, because then what I anticipate would happen, then, is that the 12:42p jury would come in, take their seats at 1:00. We would go until 4:30; and depending on whatever the decisions are that the defendants and their counsel make, then my sense is we would push through then Wednesday and at least be at a point where we have the ability to only take maybe a couple of 12:43p breaks and finish up whatever the case may be.

You know, I -- I just -- I appreciate the fact that I don't like to waste the time of the jury in them waiting around and -- because we don't have our work done. So that's how we will proceed, unless there's any objection.

12:43p MR. PANCHAPAKESAN: Your Honor, I just had a quick

1    question.  The jury instructions we have, I think Christine

2    Ritland sent them Wednesday.  I didn't know if there is

3    something else we should be looking at in terms of final

4    instructions?

12:43p  5            THE COURT:  Oh, no, she's going to send you a Word

6    version of those.  Those were in PDF form.  So she'll send you

7    a Word version of those.

8            MR. LINCENBERG:  The only other comment, with regard

9    to the Court's consideration of the Rule 29, I mean, the Court

12:44p 10   took in a lot today; and if the Court wants any further

11   briefing on a specific point, we can try to turn that around

12   as soon as possible if the Court lets us know.

13           THE COURT:  I don't think further briefing at this

14   juncture's necessary.  You've given me a lot already and so --

12:44p 15   I appreciate the offer, though.

16           Mr. Rapp.

17           MR. RAPP:  Just a couple more points.

18           THE COURT:  Yes.

19           MR. RAPP:  One is, we do have five witnesses noticed

12:44p 20   by the defense for Tuesday.  We appreciate that.

21           If there are going to be additional witnesses for

22   Wednesday, we would like to get that by Sunday with their

23   corresponding exhibits.

24           The one witness that still is under subpoena and has

12:44p 25   not been excused is Carl Ferrer.  That is not one of the

```
 1   witnesses they have noticed us for Tuesday.  I just want to
 2   know what's going on with that.  He does have a lawyer, but he
 3   is under a cooperation plea.  I don't want there to be a
 4   delay.  I don't want to look up on Tuesday and the defense
 5   starts saying, "Hey, we want this witness back here," and we
 6   have to -- we have some obligation, I suppose, and we don't
 7   want to be scrambling to secure that witness for the defense.
 8   So I would like --
 9          THE COURT:  Well, because of the decisions that need
10   to be made, I'll give them until Tuesday morning to make that
11   determination and let you know about Mr. Ferrer.
12          MR. RAPP:  All right.  Very well, thank you.
13          THE COURT:  Anything further, Mr. Rapp?
14          MR. RAPP:  No, thank you.
15          THE COURT:  Mr. Cambria?
16          MR. CAMBRIA:  No.
17          THE COURT:  Ms. Bertrand?
18          MS. BERTRAND:  No, thank you.
19          THE COURT:  Mr. Lincenberg?
20          MR. LINCENBERG:  No, Your Honor.
21          THE COURT:  Mr. Feder?
22          MR. FEDER:  No.
23          THE COURT:  Mr. Eisenberg?
24          MR. EISENBERG:  No, Your Honor.
25          THE COURT:  All right.  Thank you, counsel.
```

The timestamps "12:45p" appear at lines 5, 10, 15, 20, and 25.

UNITED STATES DISTRICT COURT

1              We will stand in adjournment.

2              COURTROOM DEPUTY:  All rise.

3    *(Whereupon the proceedings concluded at 12:45 p.m.)*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

***REPORTER'S CERTIFICATION***

1

2

3          I, TERI VERES, do hereby certify that I am duly

4   appointed and qualified to act as Official Court Reporter for

5   the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages

7   constitute a full, true, and accurate transcript of all of

8   that portion of the proceedings contained herein, had in the

9   above-entitled cause on the date specified therein, and that

10  said transcript was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 20th of

12  October, 2023.

13
                                    ____s/Teri Veres____
14                                  TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT