UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,              )
                                       ) No. 2:18-cr-00422-DJH
                    Plaintiff,         )
                                       )
          vs.                          )
                                       ) Phoenix, Arizona
Michael Lacey, et al.,                 ) October 31, 2023
                                       ) 1:04 p.m.
                    Defendants.        )
_____         )


**BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE**


<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**JURY TRIAL - DAY 27**</u>

<u>**(P.M. SESSION)**</u>


Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

| | |
|---|---|
| 1 | **A P P E A R A N C E S** |
| 2 | For the Government: |
| | UNITED STATES ATTORNEY'S OFFICE |
| 3 | By:  **Mr. Kevin M. Rapp, Esq.** |
| | **Mr. Andrew C. Stone, Esq.** |
| 4 | **Mr. Peter Shawn Kozinets, Esq.** |
| | **Ms. Margaret Wu Perlmeter, Esq.** |
| 5 | 40 North Central Avenue, Suite 1800 |
| | Phoenix, Arizona  85004-4408 |
| 6 | kevin.rapp@usdoj.gov |
| | peter.kozinets@usdoj.gov |
| 7 | andrew.stone@usdoj.gov |
| | margaret.perlmeter@usdoj.gov |
| 8 | - and - |
| | UNITED STATES DEPARTMENT OF JUSTICE |
| 9 | By:  **Mr. Austin Berry, Esq.** |
| | 1301 New York Avenue NW, 11th Floor |
| 10 | Washington, DC  20005 |
| | austin.berry2@usdoj.gov |
| 11 | |
| | For the Defendant Michael Lacey: |
| 12 | LIPTSITZ GREEN SCIME CAMBRIA, LLP |
| | By:  **Mr. Paul J. Cambria, Esq.** |
| 13 | 42 Delaware Avenue, Suite 120 |
| | Buffalo, New York  14202 |
| 14 | pcambria@lglaw.com |
| 15 | For the Defendant Scott Spear: |
| | KESSLER LAW OFFICE |
| 16 | By: **Mr. Eric Walter Kessler, Esq.** |
| | 6720 North Scottsdale Road, Suite 210 |
| 17 | Scottsdale, Arizona  85253 |
| | eric.kesslerlaw@gmail.com |
| 18 | - and - |
| | FEDER LAW OFFICE, PA |
| 19 | By:  **Mr. Bruce S. Feder, Esq.** |
| | 2930 East Camelback Road, Suite 160 |
| 20 | Phoenix, Arizona  85016 |
| | bf@federlawpa.com |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1                    **A P P E A R A N C E S (Cont'd)**

2    For the Defendant John Brunst:
         BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
3        By:  **Mr. Gopi K. Panchapakesan, Esq.**
              **Mr. Gary S. Lincenberg, Esq.**
4        1875 Century Park E, Suite 2300
         Los Angeles, California  90067
5        gpanchapakesan@birdmarella.com
         glincenberg@birdmarella.com
6        aneuman@birdmarella.com

7    For the Defendant Andrew Padilla:
         DAVID EISENBERG, PLC
8        By:  **Mr. David S. Eisenberg, Esq.**
         3550 North Central Avenue, Suite 1155
9        Phoenix, Arizona  85012
         david@deisenbergplc.com

10

11   For the Defendant Joye Vaught:
         JOY BERTRAND, ESQ, LLC
         By:  **Ms. Joy Malby Bertrand, Esq**
12       P.O. Box 2734
         Scottsdale, Arizona  85252-2734
13       Joy@joybertrandlaw.com

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

**SUMMARY OF COURT PROCEEDINGS:**                                    **PAGE**

Closing Argument
    Defendant Spear                                                  5
    Defendant Padilla                                               48

**P R O C E E D I N G S**

1          THE COURTROOM DEPUTY:  All rise.

2     (Proceedings reconvene at 1:04 p.m.)

3          THE COURT:  All right.  Please be seated, and we will

4  retrieve the jury.                                                        01:04:24

5          All were -- excuse me.  All rise for the jury.

6     (Jury present at 1:05 p.m.)

7          THE COURT:  Please be seated.

8          All right.  The record will reflect the presence of

9  the jury.                                                                 01:05:52

10         Mr. Lincenberg, you may continue.

11         MR. LINCENBERG:  Thank you, Your Honor.

12         Testing.  Okay?

13         Ladies and gentlemen, I was going through these eight

14 factors that are in the jury instruction that the Court gives             01:06:05

15 you to guide you on assessing credibility.  And we were talking

16 about some examples with the first factor where Mr. Ferrer

17 testified about things that he did not have the opportunity to

18 hear and know about, and, yet, testified to it anyways because

19 this is one of the factors that the Court says you should look            01:06:28

20 at in judging his credibility.  So I gave you an example right

21 before lunch.

22         Here's a second example here.  And this is a bank

23 communication.  And, remember, Mr. Ferrer is talking about how

24 these banks were lied to.  And, yet, when I asked him a                    01:06:45

1  question about certain communications with the banks, this is

2  one example:

3       Did you understand that revenue from Backpage and

4  various newspapers was being used to repay loans from the banks

5  that had helped finance the purchase of the Village Voice                    01:07:00

6  newspaper?

7       He says, once again:  Way over my pay grade.

8       And this "way over my pay grade" was a little bit of a

9  mantra he had going in response to a few of the questions about

10  the banks.                                                                   01:07:13

11       And that's telling, because what he's saying is, I

12  don't know about communications with the banks.

13       Why?  Maybe he wasn't involved with them.  Maybe he

14  doesn't want to talk to them.  Maybe some of them were from

15  Mr. Brunst with the banks.  But you can't come to the jury and               01:07:26

16  say that we defrauded the bank when you don't know the history

17  of communications between the bank and when the government

18  doesn't call somebody from the bank to try to corroborate that.

19       Here's a third example.  Budget review.

20       QUESTION:  In preparing for your testimony, did you                     01:07:50

21  review any emails in which you're asking Mr. Brunst to review

22  any particular line item?

23       No.  That's above my pay grade.

24       Well, this is the heart of the government's case, that

25  these hour or two, or whatever they were, three-hour budget                  01:08:06

1    meetings once a year was when supposedly Mr. Brunst wasn't

2    advised of some of his marketing strategies.  And, yet, he's

3    saying:  I don't know what Brunst is reviewing.  I don't know

4    what line item.  That's above my pay grade.

5           That's a pretty big deal, this testimony, because       01:08:25

6    their case is that Brunst reviewed and approved line items.

7    There's no emails corroborating that.  And even his testimony

8    on cross-examination, he basically says:  I wouldn't know.

9           Disclosures to the banks.  We discussed this.  But you

10   can't guess as to what may have been disclosed to the banks.   01:08:51

11   You know, there was this -- you heard testimony about this

12   lengthy banking relationship with Bank of Montreal.  You saw

13   one email in 2010; one in 2015.  You know there's discussions

14   going on.

15          The prosecution really wants you to guess that certain   01:09:08

16   things weren't discussed with Bank of Montreal because they

17   called no witness from Bank of Montreal.  Mr. Ferrer said:  How

18   would I know?  It's above my pay grade.

19          Second factor that the government -- that the Court

20   instructs you that you can look at as guidance is memory.  Now,  01:09:24

21   we have a lot of instances in this trial where Mr. Ferrer

22   remembered these 12-year-old emails that the prosecutor wants

23   him to remember; forgets the emails that defense counsel asks

24   about.

25          Let me focus for a bit on this December 2007 budget       01:09:42

1  meeting, which was Exhibit 23.  And the prosecutor wanted to

2  pick out one or two line items and have Mr. Ferrer testify

3  about.

4        When you go back to the jury room, I would ask you to

5  look at this somewhat dense 23-page, single-spaced document                01:10:01

6  that is this budget and business plan.  It has pages that talk

7  about what the revenues are.  It has analysis of increased

8  expenses.  There's premium position sponsorship program

9  examples under that of a -- of a furniture warehouse, an adult

10  video company with -- with different potential ads.                        01:10:25

11        You may recall I went through all six of the examples

12  that were in this.  None of them dealt with anything involving

13  prostitution.  None of them even dealt with adult ads.

14        And there's talk about New York and L.A. employment

15  initiatives, developing a job posting and the like.  And, yet,            01:10:42

16  despite the fact that this lengthy document says nothing about

17  illegal prostitution ads or anything of the sort, Mr. Ferrer

18  testifies to the contrary.  He comes in on direct examination,

19  and he says:  Yeah, we discussed TER.  Brunst was all excited

20  during that budget meeting about the TER opportunity.                     01:11:06

21        Do you remember on cross-examination when I said to

22  him:  No.

23        You know, we're talking about a meeting 16 years ago.

24  I'll bet you don't remember anything that was discussed in this

25  meeting 16 years ago.                                                     01:11:23

1         I mean, who would?  This guy's living through meeting
2    after meeting, and, yet, he's got this perfect memory for the
3    prosecution.  And remember when I said in my question:  You
4    know, was Mr. Brunst, was this, yippee, I'm all excited?  You
5    must remember something.                                    `01:11:38`

6         He didn't recall any such conversation about TER.  He
7    didn't recall anything about there being some excitement.
8    Completely opposite testimony.  He had selective memory
9    enhancing things, embellishing things for the prosecution, and
10   the opposite was the case when you pressed him with what was   `01:11:55`
11   reasonable.

12        Another example is the December 2009 budget meeting.
13   Very lengthy document.  There's all sorts of stuff in here
14   about different national revenue and Google reviews and -- and
15   monthly plans and additional markets to look at and investment  `01:12:18`
16   in technology and the like.

17        Ultimately on page 26 of this, it talks about:  These
18   are the expenses.  This is the revenue that we project for the
19   next year.

20        Mr. Adams testified a little bit about this, because    `01:12:34`
21   on this document there's these little red entries about -- and
22   it has the name Jess or Scott, or whoever it might be, as to
23   who's dealing with these issues.  One -- one item's, for
24   example, legal strategy for 2010, parentheses, Scott.

25        Look through Exhibit 588.  You'll see that there's not   `01:12:57`

a single reference to Jed.  None of these points.  This is all
these different marketing points and different things that
people in the marketing department or others are looking at.
You'll see no reference to Mr. Brunst.

Then there's this agreement where the government `01:13:15`
bought Mr. Ferrer's testimony.  And you may recall my
cross-examination of Mr. Ferrer about this.  I'm going to spend
a little bit of time going through this under a couple of these
points, but for starters you may recall that when I brought out
this agreement, which they call a cooperation agreement in `01:13:37`
which the government is buying his testimony, he basically
played dumb in the first instance, as if he didn't know what I
was talking about.

And one of the questions I asked him is a question
where he forgets the most important agreement in his life.  Why `01:13:50`
does he do that?  Because he knows that the agreement proves
his bias.  It's not convenient for him to remember it or
discussing it.

And I would suggest to you that as he's sitting in
this courtroom, there is nothing more important to him or more `01:14:08`
on his mind than this agreement where if he pleases them, he
has a chance for probation and greater leniency.

And I asked him a question about, for example, as he
was, you know, squiggling away from me on his answers and, I
don't remember, I don't understand, it's complex, blah, blah, `01:14:29`

1  blah, I said:  Well, look, when you stood before the judge and

2  pled guilty, the judge specifically asked you if you understand

3  all the parts of the agreement; correct?

4       And he's looking at the transcript.  He knows what it

5  is.  And he says:  Well, I understand that that's what it says,    01:14:43

6  but I'm not really familiar with some of this language.

7       I said:  You know, sir, this is a pretty important

8  agreement; right?

9       Correct.

10       Selective memory.  Wanting to harm the defense; help    01:14:54

11  the government.

12       Another example is just little things.  Like you heard

13  all these foundation objections that the government's making

14  and the defense is making.  And what that means is that if

15  you're going to talk about an exhibit, you have to have some    01:15:11

16  firsthand knowledge of it.  He's being shown all of these

17  emails by the government that he's not on, and, yet, he

18  conveniently remembers it, even if he never saw it before.

19       I'm going to take one of many examples.  This was a

20  November 2015 email between Mr. Brunst and the BDO accountants.    01:15:29

21  On direct examination, the prosecutors asked him a question:

22  You're not on this email, but you understand what he's taking

23  about, so forth and so on?

24       And they move it into evidence because he's basically

25  saying, I'm familiar with it.    01:15:46

1              The opposite is true on defense.  When I asked him

2       about this, I said:  So, looking at this email that you

3       testified about, did you ever have conversations with

4       Mr. Brunst about the purpose of BDO's inquiry to him?

5              ANSWER:  I don't recall any conversation regarding the       `01:16:01`

6       purpose of this email.

7              Perfect memory for the defense [sic].  When I want to

8       explore it on the defense side, it's, I don't know nothing, I'm

9       not on this email, I don't remember anything.  Night and day.

10             Let's look at the third factor, manner while       `01:16:17`

11      testifying.  And I would suggest to you that Mr. Ferrer in his

12      testimony was argumentative, evasive, and blatantly pro

13      prosecution.  And, by the way, I'm not really here to discuss

14      Mr. Hyre's testimony, because he didn't say anything about

15      Mr. Brunst.  Mr. Feder has discussed it in some detail with you       `01:16:39`

16      this morning.  But whether or not Mr. Hyre was telling the

17      truth about anything, he at least was answering the questions

18      directly.  Complete night-and-day comparison -- oops.  That

19      wasn't good.  Complete night-and-day comparison between

20      Mr. Brunst -- or Mr. Ferrer and the other witnesses.  He       `01:17:02`

21      peppered his answers with argument.

22             For example, I asked him:  In July 2015, did you ever

23      state that Sheriff Dart's actions and termination of credit

24      card services harmed Backpage's effort to police and preclude

25      improper ads?       `01:17:23`

UNITED STATES DISTRICT COURT

1          Remember, there was this testimony about Backpage was

2    helping law enforcement, is what Dart doing can be harmful or

3    helpful, and Ferrer in the past said that Backpage is very

4    helpful.

5          Rather than just answering the question yes or no,          01:17:40

6    even though he's looking at his prior statements, he

7    immediately deflects.  He says:  Well, that sounds like the

8    company narrative.

9          Can't just answer a question.  Being argumentative.

10   Force the blame on others.                                        01:17:55

11         By the way, July 2015, who is the company?  He owns

12   the company.  It's his narrative.  He shifts the focus to

13   others wherever he can.

14         One small example, an email from this investment

15   banking firm, our discussion in 2011 about this work that the     01:18:13

16   investment banking firm was doing putting together a PowerPoint

17   to try to sell the company; right?  Duff and Phelps is emailing

18   Ferrer asking for information about your review of things, this

19   and that.

20         And he says:  I'm involved only because I'm working         01:18:31

21   for Mr. Brunst.

22         Can't just answer the question what he's doing.  It's

23   always got to take an extra jab.  And the extra jab is not

24   consistent with the evidence.

25         How do we know that?  Because Mr. Ferrer on direct          01:18:46

UNITED STATES DISTRICT COURT

1  examination had said who he works for.  I report to Scott

2  Spear.  He's my supervisor.  Mr. Larkin was the CEO of the

3  company.  He was Scott's supervisor.  I'd often work with both

4  Spear and Larkin on numerous activities around Backpage.

5          A little example with the subpoenas.  Just a simple          01:19:07

6  little question:  How would Backpage receive these subpoenas?

7          He says:  Well, they were faxed to Building B, and Jed

8  Brunst, Scott Spear, and Jim Larkin had offices in Building B.

9          It's like saying there's a subpoena faxed to the

10  courthouse, and, by the way, Judge So-and-So on the sixth floor          01:19:27

11  has an office in this courthouse.  Always trying to embellish

12  and add.

13          Now, I don't think it's a big deal whether somebody

14  saw a subpoena or not that's coming in, but he has to try to

15  take a jab.          01:19:43

16          The guy's in the same building where the subpoena was

17  faxed.

18          Here's an example where he deflects responsibility

19  just on the sale agreement.

20          QUESTION:  And this is an agreement that you entered          01:19:56

21  into with the sellers to buy the U.S. operations; right?

22          Simple yes-or-no question.

23          Well, I signed a lot of papers that were put in front

24  of me.

25          Example of even declarations that he's signing under          01:20:07

1    oath in prior proceedings.

2          Sir, is that your signature?

3          Well, I was asked to sign a dotted -- a lot of -- I

4    was asked to sign a declaration by my superiors.

5          As if whether or not he's telling the truth in it is          01:20:24

6    irrelevant.  He's signing a declaration under oath, but he's

7    saying:  Well, whatever was in it, it was -- it was -- it was

8    put in front of me to sign.

9          What does that say about what he's doing in this

10   courtroom where his bosses are now the prosecutors?          01:20:45

11         And this guy was just filled with programmed wording.

12   And that's why we spent some time going over the fact that he

13   had some 30 meetings with hundreds of hours of rehearsal with

14   the prosecutors.  This guy's not just walking into the

15   courtroom answering questions without going over a million          01:21:09

16   times what the questions are, what the prosecution is looking

17   for, and so forth.

18         You know, don't refer to them as escort ads.  Call

19   them prostitution ads.

20         He tried to do the same thing with Mr. Hyre, who he          01:21:25

21   had embedded in his mind these are always escort ads.

22   Mr. Stone would constantly have to go back:  Hey, those escort

23   ads are prostitution ads, and so forth.

24         It's just this programmed wording so it gets embedded

25   in the minds of the jurors.          01:21:41

1              Don't use Don Moon's name.  Remember on direct

2     examination there were three or four times he would say, well,

3     I spoke with an agent of the owners?

4              And you must have been wondering who he's referring to

5     as an agent of the owners.  Well, I -- I went into this in          01:21:58

6     cross-examination.  I said:  Sir, in all of your interviews,

7     you never once used this term "agent" that you were using

8     conveniently in your direct; right?

9              ANSWER:  The interviews?  Called him Don Moon.

10             This is no coincidence that he's up there using the       01:22:20

11    term "agent."  It's the prosecutor's wanting him to use the

12    word "agent" to keep the attention away from this independent

13    chairman of the board of the company.  Keep the attention on

14    Mr. Brunst, one of the other defendants.

15             It's a pretty big deal because it shows that there's a    01:22:42

16    game being played here.

17             And I said -- I said:  You know, you're giving all

18    this testimony about payment processing and suggesting that

19    Mr. Brunst is involved with you.  Sir, Mr. Moon you described

20    as your financial payment method therapist.                        01:22:59

21             Mr. Moon was his financial payment method therapist.

22    They're making this big deal about these payment processing

23    applications.  And then the entire direct examination,

24    eight days, do they bring that out and let you know that?  No.

25    They cover it up.  They deflect from it.  He's just an agent of    01:23:21

1    somebody else.

2           I asked him again:  And, now, in connection with

3    efforts to get payments processed, did you state that you had

4    endless discussions with Don Moon?

5           Probably.                                                01:23:40

6           It's right there, and he's looking at it.  He still

7    can't say yes.

8           But you heard all this testimony on direct about

9    payment processing.  Didn't you feel like you were misled when

10   you heard that the guy who is working with Ferrer on all of     01:23:53

11   this payment process stuff is the guy -- this guy, Don Moon,

12   the chairman of the board?  Not Mr. Brunst.  Mr. Brunst is

13   signing these UBOs where he has to, the -- the beneficial

14   owner's signature that's required, but he's not dealing with

15   this application process.                                       01:24:15

16          And then there's this programmed wording, quote,

17   "CFO Brunst."  And this was a little bit -- my colleague,

18   Mr. Rapp, who kept repeating this.  And he kept repeating it,

19   CFO Brunst, CFO Brunst, probably because in my opening

20   statement I stated to you my client was the CFO of Village      01:24:34

21   Voice Media holding company.  He was also listed as the CFO of

22   Backpage, but it was an unoperational position.

23          Well, they want to bring Mr. Brunst into their

24   conspiracy by calling him CFO Brunst of Backpage.

25          Let's explore that a little bit.  The one exhibit that   01:24:57

they looked to in this regard is a 2011 document prepared by an
investment bank in connection with the potential sale of
Backpage to a company called Craig Capital.  Now, this is a
lengthy document.  You can imagine you're putting something on
the market, a rather large company, you have an investment bank          01:25:21
doing all this work.  And the prosecutor inaccurately states
that Mr. Brunst prepared it.

        Well, let's look at what the document says.  The
document says this was prepared by Duff and Phelps with input
from the management of Backpage.  It's not Mr. Brunst who's               01:25:40
preparing it.  Is he involved with Duff and Phelps?  Yes.  He
is involved because he understands finance and there's a
potential sale.  He's not preparing this.  He wouldn't have the
information to prepare this.

        And on redirect Mr. Rapp mischaracterizes the                    01:26:06
post-transaction team.  So there's a little snippet here that
suggests that the post-transaction team could have as a CFO
Mr. Brunst.  This is a proposal.  Never gets sold to Craig
Capital, but that's the one document that he wants to go to
where it says post-transaction team, Jed Brunst.  That never             01:26:27
happens.  And he's probably listed there because it's calling
for a CFO, and Brunst on paper is that.  But he kind of
overplays this.

        Let's look at this CFO issue a little further.  Now,
you know, there's been some discussion of when this newspaper            01:26:54

UNITED STATES DISTRICT COURT

sale took place.  And there's not a lot in the documentation.
I noticed as Mr. Cambria was reviewing Exhibit 171 with you
there's one reference in there, for example, which identifies
it as early 2013, which is when I've been telling you it took
place based upon the evidence.  I think there's other          01:27:13
documents.  But Mr. Moon in his response is talking about the
sale of the company in 2013 in his letter that's in 2013.  It
took place in early 2013.

         And Backpage moves to Dallas.  And the charges, again,
are all in this 2013 to 2018 time period.  And the CFOs of     01:27:32
Backpage during that time period are a guy named Kopecky and a
guy named Gage.  Now, if you had only had the direct
examination of -- testimony of Carl Ferrer, you wouldn't know
that, because there's all this CFO Brunst, CFO Brunst stuff.
But what did the evidence show that came out?                  01:28:00

         First of all, let's look at what Ferrer said on
direct:  After the sale of the newspapers, January 2013, Brunst
is the CFO of Backpage and only Backpage.

         This is the answer that the prosecution wants.  Well,
what's the evidence?                                           01:28:17

         Sir, in 2013, Backpage hired Nathan Kopecky; correct?
And was Nathan Kopecky's title CFO of Backpage?

         Yes, it was.

         Mr. Gage, Ferrer on my cross-examination of him:  Sir,
did Mr. Gage then serve as the -- the question reads:  And did  01:28:39

1    he then serve as the CFO of Backpage -- Kopecky -- until

2    Mr. Gage later became CFO?

3           Yes, he did.

4           Did Mr. Gage become the CFO of Backpage after you

5    bought Backpage in 2015?                                          01:28:55

6           Yes, he did.

7           I mean, why hide this from you?  Why hide this from

8    you?  It's because they're trying to elevate some connection

9    where it doesn't exist.  But if it's relevant who the Back- --

10   CFO of Backpage was, the evidence shows there was no CFO of       01:29:13

11   Backpage before 2012.  It was a smaller company.  Mr. Brunst

12   was a CFO of the holding company.  And there are all these

13   different business units that would have budget meetings at the

14   end of the year.  They'd all take place the first couple

15   of weeks of December.  You're jamming in 18 meetings.  Can't be   01:29:34

16   going on that long.

17          His role, look at revenue and expenses.  And during

18   the entire time period of the indictment, the CFOs of Backpage,

19   Gage and Kopecky.  If that's important or if they want to

20   really challenge the position that they know I'm taking for my    01:29:55

21   cross-examination, there's an easy way to do it.  Bring Kopecky

22   or Gage into the courtroom.  They don't do that.

23          The fourth factor that the jury instruction discusses

24   that you can look at is Mr. Ferrer's interest in the outcome of

25   this case.  And this is an important factor because Mr. Ferrer   01:30:16

wants probation.  His liberty, nothing less than his liberty,

depends on pleasing the prosecutors.  And when you look at this

agreement to buy his testimony, the first thing you see is that

it's one-way cooperation with them.  Not with us.

The question:  Is there a section entitled          `01:30:42`

Cooperation?  Did this require you to cooperate with us --

It does not.

So, you know, we come into this courtroom.  We haven't

met with Ferrer.  He's met 30 times with the prosecution.  It's

a stacked deck.  He's required under the agreement not to       `01:31:01`

cooperate with all the parties to this litigation.  One way

only with the prosecution team.  And his goal is clearly to

avoid prison.  And that gets into a discussion I had with him

about the sentencing guidelines.

So you recall I discussed with him, and I went through    `01:31:25`

how the judge, when he took his guilty plea, went through that

there are these sentencing guidelines in the federal system,

and the sentencing guidelines are there to let the judge know

that when you go through different factors, this is the range

of prison time that you should get.  And if you want to get a   `01:31:44`

sentence below that range, one way to do it is for the

government to bring a motion under the section called 5K1.1.

Just a section of the guidelines.  And it says that if the

government brings that motion, then the judge can consider the

assistance.                                                    `01:32:14`

1           Let's look at some of the testimony regarding the

2     guidelines.

3           QUESTION:  And this reference to the guidelines, did

4     you understand that there's a law that sets forth guidelines to

5     guide a judge in sentencing an individual?                    01:32:26

6           ANSWER:  I don't really understand this.

7           Now, these guidelines are his lifeblood.  There's

8     nothing more important to him than getting a sentence below the

9     guidelines.  But he's not going to make it easy for me on

10    cross-examination.                                            01:32:42

11          So there's this false testimony:  I don't understand

12    this.

13          And we go on with the cross-examination:  And you

14    understand that under that provision the government has

15    discretion to make a motion?                                  01:32:56

16          Well, that's really complicated.  You know, I don't

17    understand it.

18          Let's go on.  We start going through the agreement

19    with him.

20          And look at the agreement.  And does it not state that 01:33:05

21    the prosecutors in their sole discretion would decide whether

22    to recommend leniency or not?

23          He's now reading it.

24          No, I -- oh, recommend.  Okay.

25          We go on because he then says:  Well, you're not       01:33:24

UNITED STATES DISTRICT COURT

1   reading the whole paragraph.

2         So I read the whole long paragraph.  Paragraph 3 talks

3   about if you breach this agreement what could happen.

4         If you breach this agreement to help the government --

5   these are the words of his bought testimony agreement -- that          01:33:42

6   the United States, in its sole and absolute discretion, can

7   declare any provision of this agreement null and void.

8         Think about how much pressure that puts on Ferrer to

9   please these guys.  He's cut this deal.  He wants leniency.

10  He's meeting with them wherever and whenever and however many          01:34:09

11  times they want.  He's changed his whole tune to fit this

12  narrative.  And he knows that if he crosses them, if he goes

13  sideways on them, they cannot only not recommend leniency, they

14  can blow up the agreement and they can prosecute him for as

15  many charges as they want and they can use his testimony               01:34:31

16  against him.

17        It's enormous pressure, an enormous interest that he

18  has in siding with the government and help them achieve the

19  outcome that they want.

20        And, ladies and gentlemen, the judge instructed you             01:34:49

21  that when you're dealing with a witness like Ferrer, who has

22  received favored treatment from the government, you should

23  consider the extent to which or whether his testimony may have

24  been influenced, it goes on, by his guilty plea and so forth,

25  and you should examine the testimony of Ferrer with greater           01:35:09

```
 1   caution than that of other witnesses.

 2        That's a jury instruction to guide you.  You don't

 3   deal with this guy like you would deal with any witness off the

 4   street, because he's receiving all of these enormous benefits.

 5   He has a big interest in pleasing them, in stretching          01:35:33

 6   testimony, in adding somebody into a meeting where they may not

 7   have been there, in talking about exhibits that he's not even

 8   on.

 9        And he has other motives here.  Some of them we

10   discussed.  His motive that the government allowed him to keep  01:35:50

11   mansions, which he says was bought with Backpage proceeds and

12   could have been forfeitable.  A couple of luxury cars.  A

13   speedboat.  Retirement account that all sorts of money that he

14   earned through Backpage went into.  All this money that -- that

15   he had so that he could pay the hundreds of thousands of        01:36:09

16   dollars to his attorneys with Backpage proceeds.

17        Pretty big incentive when you're deciding what to do

18   and what you're going to say and whether you want to keep this

19   agreement and keep pleasing them.  Keep a couple of mansions by

20   doing so?  Not a bad -- not a bad deal.  A lot of bias stems    01:36:28

21   from this.

22        And the fifth factor which the jury instruction says

23   you should look at is bias.  And here we know -- we've

24   discussed his motive to please his new bosses, which are the

25   prosecutors; motive to avoid charges for stealing money through 01:36:45
```

this side deal with his brother; and this bias because of this

need to blame others in order to validate his sense of self.

He wants to walk out of here with this idea that, I'm wearing

the white hat and I may have done all this, it might have been

my business, but, boy, other people made more money than I did,          01:37:12

so I got some people who I can cut a deal on and point the

finger at them, because the jury's likely to get wowed when

they see how much money the owners of the media holding company

made.

          And you see this -- if you get -- you get this feeling          01:37:28

of anger that comes through his testimony at the owners of the

companies.  If you want to interest the prosecutors, you sort

of have to claim that there's a bigger fish, somebody who's

wealthier that the jury might say, well, this guy made a lot of

money, so they should pay a price.          01:37:49

          I kind of wrap up his attitude as this whoa is me

attitude, that all of his testimony was that his actions at

Backpage were because of pressure put on him by others.

          I didn't pick my attorney.  It was thrown at me.  I

was handcuffed by my own greed.          01:38:13

          Loan agreement.  Purchase agreement.

          Well, I signed a lot of papers put in front of me.

          Whoa is me.

          I didn't sign this voluntarily.  It was shoved down my

throat.          01:38:25

1          The sixth point that as part of the jury instruction

2    to guide you in assessing Mr. Ferrer's credibility is whether

3    other evidence contradicted Ferrer's testimony.  So let's go

4    through some examples of how his own prior testimony

5    contradicted his testimony, how communications that he talks          01:38:46

6    about contradict him.  Some of the PowerPoints that we looked

7    at contradict him and how other witnesses called in this case

8    contradict him.

9          So impeachment example number 1 relating to prior

10   testimony.  This had to do with determining if there was a            01:39:04

11   prost- -- if something was a prostitution act.

12         QUESTION:  Can you describe the nature of the ads that

13   were posted in the female escort section between that time

14   period.

15         ANSWER:  For the prosecutors, they are prostitution            01:39:20

16   ads.

17         I don't know if you recall when Mr. Cambria brought up

18   on cross-examination Mr. Ferrer's prior sworn statement under

19   oath, same oath he took in this courtroom, where he said:  It

20   is impossible to determine what is an implicit offer for             01:39:38

21   commercial sex.

22         Two different answers by a guy who wants you to

23   believe that because he took an oath here he's telling the

24   truth.  Try to envision this guy when he's testifying under

25   oath at a different point, also trying to suggest he's telling        01:39:57

1      the truth.

2            For years this is what he told everybody, that it's

3      impossible to determine what is an implicit offer for

4      commercial sex.

5            Example number 2 has to deal with terminating credit          01:40:10

6      cards that would undercut help to the police.  I referred to

7      this a little earlier, where he kind of calls it a company

8      narrative.

9            The next question:  Is that a statement you made under

10     oath?                                                               01:40:26

11            Yes.

12            Well, when you volunteered that that was the company

13     narrative, did you do that to suggest that you could lie under

14     oath but it was just somebody else's fault?

15            No.                                                          01:40:38

16            He's never going to admit to lying under oath, even

17     though he's -- one or the other's going to be under oath or a

18     lie.  Of course, it's always no.

19            No, but it's not transparent.

20            We got into that mantra where it's not transparent.         01:40:49

21     You could have disclosed more.  Maybe it was technically

22     accurate, but it was not transparent.  You could have disclosed

23     more.

24            And these are examples of impeachment.  Impeachment

25     meaning you've shown somebody to give two different statements.    01:41:07

And one of the instructions from the judge was that you've

heard testimony that Carl Ferrer, a witness, made prior

statements under oath that were inconsistent with his testimony

at trial.  You may consider that.

You know, I remember the cross-examination, I think it    01:41:28

was by Ms. Perlmeter of this witness, Mr. Dougherty, that

Mr. Cambria called, this journalist, the guy with the ponytail,

where she was asking him about the steps he takes before

publishing a story.  And he said:  You know, I take my work

seriously.  I don't just come in and write a story unless it's    01:41:45

corroborated, unless I know that this is an unbiased witness

and -- or -- or there's a second person who's saying the same

thing.

And that makes sense.  And that's just writing an

article.  Here we're talking about the most important thing in    01:42:02

my client's life right now and the prosecution wanting you to

judge him on this uncorroborated testimony of Mr. Ferrer when

he's been impeached.

The persons called by the government to corroborate

Mr. Ferrer are zero.  Null and void.  There was nobody.    01:42:25

Let's look at impeachment example number 3.  This was

involving AMEX where I asked Mr. Ferrer on cross-examination:

Well, we actually attempted to not comply.

QUESTION:  Did you testify under oath that you did

your best to comply with Mickey Hansen's request?    01:42:45

1           We did it incrementally.

2           So he's coming in here saying, we were trying not to

3    comply with the conditions set forth by AMEX about not using

4    their credit card at some point for adult ads.

5           And when I confront him with his prior testimony under          01:43:04

6    oath, he still just can't admit that that was his testimony.

7    He said:  Well, we incrementally complied with Mr. Hansen.

8           It's impeachment.  Two different answers, both under

9    oath.

10          Fourth example has to do with this corporate                    01:43:22

11   structure, this testimony about the purpose of corporate

12   structures at the time of the 2015 sale.

13          And here Mr. Ferrer had an evolving story.  When first

14   interviewed by the government, he said that lawyers,

15   accountants, and consultants had set up the structures.  This         01:43:42

16   was documented in an interview memorandum in a trial, and he

17   tries to stretch it to include Mr. Brunst.  Not the most

18   important piece of testimony, but we see how he's stretching.

19          So let's go through what happened here.  So I'm

20   putting in front of him paragraph 138, the notes by the FBI          01:43:59

21   agent of one of his interviews where he testified that.

22          And I say:  The notes from the agents are consistent

23   with what you said under oath in this trial that DLA Piper --

24   which is the law firm -- BDA [sic], the accounting firm, and

25   CorpAcq, one of the consultants, worked with Mr. Brunst in           01:44:24

1    setting up the corporate structure?

2            And he says:  I believe so.

3            Well, what came out next?

4            Sir, when you looked at those notes in February of

5    2019 from your 2018 interview and you reviewed them, isn't it      01:44:36

6    true that you corrected that with the FBI agents and you took

7    out the words "worked with Brunst"?

8            I said:  Do you see that?

9            Yes, I see that.

10           So he first tells the government he worked with Brunst      01:44:55

11   on this.  He corrects.  He takes out "works with Brunst," but

12   he comes back in to court and said, I worked with Brunst on it,

13   even though he had corrected the interview on this.

14           Fifth example of impeachment, this testimony he gives

15   at the end, the last question I asked him on cross about lying     01:45:15

16   under oath.

17           I said:  Now, sir, you've testified for ten days here.

18   There's all this prior testimony that you've given.  Are you

19   coming before these members of the jury and telling them in

20   that all of these years and all of your testimony you've never     01:45:31

21   lied under oath?

22           He says:  Yes.

23           Because he's not going to admit that he lied under

24   oath, even if he has two completely contradictory statements

25   under oath at two different times.  This is the biggest lie        01:45:45

UNITED STATES DISTRICT COURT

1    that he's telling.  Different communications.

2           Let's talk about these Google Analytics

3    communications.  Now, the first thing to note is when you look

4    at these emails, they're not directed to Mr. Brunst.  Not

5    surprising, because he's not in the marketing department.  But         `01:46:05`

6    he's copied on them.  And so the way that Mr. Rapp would put

7    them up on the board was to highlight Mr. Brunst's name even

8    though it's just a copy.  It's not directed to him.  And none

9    of them are discussing prostitution.

10          And I asked him these questions, whether any of them,         `01:46:21`

11   whether there's emails about ads of prostitution.

12          No.  None are asking for feedback from Mr. Brunst.

13   None are discussing the nature of TER.  There's no

14   corroborating testimony.

15          But, yet, he gives this testimony:  There's no         `01:46:33`

16   corroborating communications or emails.

17          And he gives this testimony:  When did you discuss

18   with Mr. Brunst, sir, that list of referring sites?

19          Oh, I discussed it with Mr. Brunst in a meeting with

20   Mr. Larkin in a conference room, blah, blah, blah.         `01:46:48`

21          So you should ask yourself.  All right.  This lie,

22   you're saying it.  It's probably getting embedded in my brain.

23   Is there anything to corroborate it?

24          No witnesses corroborate this.  Are there any emails?

25   I just went through the three series of questions.  No emails         `01:47:06`

1    to corroborate it.  There's no corroboration for his testimony.

2          You know, there was this one interesting piece of

3    testimony about TER from Mr. Shehan, I think the guy involved

4    with NCMEC, who was asked about TER at the time of this 2011

5    meeting he had with, I think, Mr. Lacey.  And here's this guy          01:47:31

6    who lives in that world, and he's heard of TER but doesn't know

7    what it's about.

8          And I thought it was kind of a little telling point,

9    because if this guy, who lives in this world and is

10   investigating sites and so forth, doesn't know what it's about,       01:47:45

11   why would there be any discussion of exactly what is going on

12   between Ferrer and Brunst involving TER?

13         He doesn't need to discuss that with Brunst as part of

14   the budget meetings.  He's just looking for a sign-off on

15   expenses and projections.  It's not the type of marketing             01:48:04

16   detail you get into with a CFO.  No emails.  No emails with

17   Mr. Brunst discussing any Google Analytics reports, any

18   analysis of them or the like.

19         Did you ever receive an email provide an analysis for

20   Mr. Brunst?                                                           01:48:25

21         No.

22         The applications, these processing applications that

23   disclosed Backpage.  Now, remember, the whole testimony here is

24   that somebody's hiding Backpage from banks.  Let's look at what

25   the evidence was.                                                     01:48:42

1           Exhibit 6189.  Merchant application form for this

2    eMerchant payment process.  All over it you have disclosure of

3    Backpage.  You want to get ahold of somebody that -- what's the

4    website that it's -- that it's related to, Backpage.com.

5    Customer support, contact Backpage.  Email address,                    01:48:59

6    carlferrer@backpage.  Primary contact, Carl Ferrer at Backpage.

7    Techy, you have a technical issue, Joe Kaiping at Backpage.

8    Full disclosure.

9           Mr. Rapp in his closing argument discussed this, and

10   he said Jed Brunst prepared this payment processing                    01:49:19

11   application.  Now, frankly, I don't think it would matter who

12   prepared it, because there's -- it's not false.  It's

13   disclosing the thing that they're claiming is concealed.  But

14   it's also not accurate, and it's an exaggeration.

15          And I'm surprised that Mr. Rapp said it, because three          01:49:39

16   times I went through on cross-examination on this very topic

17   with Mr. Ferrer on cross.

18          Sir, you prepared some 30 applications over the course

19   of the years to payment processors?

20          I believe that's correct.                                       01:49:53

21          Let's look at January 2016.  And as part of this

22   effort, is Mr. Gage helping you to arrange payment processing?

23          He is.

24          Now, another question I asked him further about

25   payment processing, that he's involved with doing it with             01:50:06

1    Mr. Gage.  So if you look back at this payment processing

2    issue, you see that the testimony is contrary to what Mr. Rapp

3    is arguing.

4         Let's look at communications with the banks.  I'm

5    going to go through these quickly because I referenced these          01:50:22

6    earlier, but these are open communications between the banks.

7    And this one is with Scott Spear, and Mr. Brunst is copied on

8    it, and so forth.  But it's interesting to look at this email a

9    little closer because there was another one of these stretch

10   issues.  So -- or this email, this Exhibit 886.                       01:50:45

11        So 886 is one of these back-and-forths with Bank of

12   Montreal discussing information they're looking for involving

13   Website Technologies.  And it's an interesting email because it

14   starts with an email from Ilona Nicholls at Bank of Montreal

15   saying:  Jed, I need an update for the files.                         01:51:16

16        And then there's an email from Jed Brunst saying:

17   Send it over to Ferrer.  Carl, I was called by the bank.  Let

18   them know that, you know, we're now post-sale and Website

19   Technologies is owned by you, not by the holding company.

20        Pretty open.                                                     01:51:34

21        Ferrer writes back:  Here's a draft response.  Answer

22   is in blue below.

23        And Jed writes back:  Carl, here's my suggestion of

24   revisions.  Edit them however you see or ignore them

25   altogether.  Just my thoughts.                                        01:51:51

 1        By the way, does this sound like the wording of a guy
 2   that Ferrer describes as extremely aggressive?
 3        Here's some suggestions.  Edit them however you see or
 4   ignore them.  These are my thoughts.  Just provide the
 5   information to the bank.  Make sure the bank gets the          01:52:04
 6   information.
 7        And, yet, he testifies on direct that Brunst provides
 8   answers in blue.  Even though he writes, Ferrer writes:  Here's
 9   a draft response.  Answer's in blue.
10        It's coming from Ferrer.  So you have this               01:52:21
11   contradictory testimony.
12        And it's clear that he drafted it.  And here's where,
13   the clips that I just discussed with.  Ferrer answers in blue.
14        Carl, here's some suggestions.  Edit them or ignore
15   them.  Just my thoughts.                                      01:52:42
16        And then there was this Exhibit 130 -- 886 where
17   there's this discussion about these acquiring banks in Europe.
18   And Ferrer on direct gives his testimony that Jed changed the
19   information so it wasn't true.
20        And when you look -- when we looked at the -- the        01:53:06
21   differences, it was that -- it -- that originally Ferrer had
22   wrote that Borgun Bank was the acquirer.  And Jed said:  Well,
23   change it to its an acquiring bank because Bank Frick is also
24   an acquiring bank.
25        And somehow Ferrer's suggesting that this is             01:53:22

1    misleading.

2          And you can see on my screen here between the Borgun

3    Bank, the difference between what they write and then wires

4    from Lichtenstein, the difference from what they write.  Matter

5    of semantics.  What Jed is saying's a little more accurate.          01:53:38

6    Both are accurate enough, and, yet, somehow this is a

7    misrepresentation.

8          And you had on direct examination Mr. Ferrer saying:

9    Well, what's in here is accurate.  It's technically accurate in

10   terms of whether or not we have a customer, Univision.              01:53:57

11         And on cross I say this response:  And it -- this

12   response that Brunst wrote does suggest an affiliation with

13   Backpage.  It's listed right there.

14         Now, Brunst didn't write it, but even if he did, it's

15   basically admitting it's right there.  The affiliation between     01:54:15

16   the two companies is right there.

17         And did Website Technologies provide service to

18   Univision?

19         We did.

20         So the prosecution wants to say, but this is not full        01:54:26

21   disclosure because you could have said, well, they may be a

22   customer, but they're not as big of a customer as some other

23   customers.

24         Of course, that's not what the banks are asking for.

25   And, yet, this is their case.  Something that is accurate, but     01:54:41

you could have put in more information.  It would have made it
more transparent somehow.

          And so I asked him directly:  Did you advise the
government that they knew -- "they" being you and Backpage knew
you couldn't lie on the applications?                              01:55:01

          ANSWER:  We couldn't lie.  We knew we couldn't lie.

          So government wants you to believe that there's some
material misrepresentation being made, that there's some lie
that's told.  And, yet, on cross-examination, Ferrer comes
right out, as he had to, because we had prior statements from    01:55:23
him, that the most important thing is you never lie to the
banks.  And he said:  We didn't lie to the banks.

          Did you tell the government that you took care that
you were not providing false -- information that was false?

          Yes.                                                    01:55:38

          That's why when you look at his testimony, follow the
instruction and look at it with great caution.

          PowerPoints.  And I'll go through one example here,
this pie chart.  And on direct examination they're looking at
this Exhibit 1049, slide 6, and Ferrer says:  This is a lie      01:55:59
because there's this pie on the left side that has ads by
category.  Jobs, 47 percent.

          Well, he doesn't say that the information's false, but
he says:  But it's misleading because our revenue was adult
revenue.                                                          01:56:21

But on the very same page of the PowerPoint, there's a second pie chart that fully discloses that the adult entertainment comprises 91 percent of the revenue of the company.  So how's it a lie to note two pie charts on the same page?  One talks about whatever job sites, this and that, different hits.  The revenue's coming from adult.

So the testimony on this was:  Well, the pie chart was done in an attempt to create a veneer.

I mean, this pie chart is in a document that's internal being sent to Brunst.  So if you're creating a veneer, you're just creating a veneer, I guess, to deceive Mr. Brunst.  But it's not deceptive, in any event, because the adult category is right there.

And what -- on cross-examination:  Nobody's concealing that adult entertainment makes up the vast bulk of the company's transactions; right?

Correct.

Entity names.  They claim that the entity names were designed to conceal in the sale.  Only Ferrer says this.  You saw that there was full disclosure of the Backpage connection in that regard.

And I'm going to discuss two other witnesses here, I mean, Jess Adams and Dan Hyer, because they're the only two people who were called that even worked for Backpage who might even know Jed Brunst's name.

UNITED STATES DISTRICT COURT

1          Now, Ferrer on his direct examination tries to sort of

2     stretch it with Jess Adams.  Remember, Jess Adams reported to

3     Scott Spear.  His desk was right next to Scott Spear's, which

4     makes sense.  They were working together.

5          But he says:  Yeah, my direct supervisor, Scott, but I          01:58:24

6     think that -- I think that -- Ferrer says:  I think Jess is

7     also talking a lot with Brunst.

8          Well, that's not what Adams testified to.  There was

9     no conversation with Brunst at all in his entire testimony.

10         He didn't report to Brunst.  His boss was Spear.  And          01:58:44

11    Jess Adams didn't stretch to take potshots on -- like Ferrer.

12    You saw a contrast.  If there was an old email:  Hard to

13    remember.  It's been a long time ago.

14         I mean, it's amazing that we're -- the jury's getting

15    a case about conversations that supposedly took place 15 years          01:59:05

16    ago that nobody remembers.  Do you remember any conversation

17    you had in the course of millions of business conversations

18    from 15 years ago?

19         But put it in a report, put a guy on the stand, he

20    looks at an email, he starts saying, yeah, that's what this          01:59:22

21    means, and the like.

22         And Adams himself, despite being called by the

23    government, says:  I don't think I was doing anything illegal.

24         And Adams doesn't corroborate Ferrer that -- that

25    details of the Google Analytics reports were discussed with          01:59:40

1    Ferrer.  Here's his testimony.

2          So is your job to pull the data from Google Analytics?

3          Yes.

4          And then you would share it with others in the

5    company?                                                    01:59:51

6          Yes.

7          And who would you share it with?

8          Typically Ferrer and Spear.

9          Which makes sense.  They're dealing with, you know,

10   some of the marketing issues and the like.                  01:59:59

11         Budget meetings.  Ferrer says Spear, Larkin, and

12   Brunst prepared the budgets.  Adams says Spear, Adams, and

13   Ferrer prepared the budgets.

14         So while Jess Adams provided no testimony about

15   Mr. Brunst, he actually helps disprove some of what Mr. Ferrer   02:00:20

16   says.

17         Dan Hyer.  Again, Dan Hyer pled guilty here.  No

18   testimony at all regarding Jed Brunst.  And, actually, his

19   testimony was a helpful contrast to Ferrer because of Dan Hyer.

20   I don't know if he's telling the truth or not.  Wouldn't know   02:00:51

21   because it had nothing to do with my client.  But big contrast

22   to Ferrer in the way he answered questions.  And he contract --

23   also contradicted Ferrer on this Truckr, Petseekr, Postfastr

24   stuff where Ferrer testifies that this -- these are sites,

25   Petseekr, Postfastr:  We're trying to create a bunch of    02:01:11

1    different domains that people could purchase credits.

2           And Hyer says:  These are real businesses.

3           And, in fact, that's what Ferrer told Brunst, that

4    these were real businesses.

5           Isn't that what you told him?                          02:01:24

6           Yes.

7           Was that a lie?

8           No, it's not a lie.

9           Going on to the seventh factor.  And these are

10   shorter.                                                      02:01:36

11          I know I've been talking for quite a while going

12   through these factors.  And I apologize for getting into this

13   minutia of details in emails, but this is important to my

14   client.  It's the only way I can do it when they just put up a

15   snippet.  I need to show you the document overall and how what   02:01:52

16   they're saying is out of context or doesn't say what they say

17   it does.

18          So one example of the unreasonableness of the

19   testimony is something that I discussed before about Ferrer

20   saying that this -- this agreement, this purchase, was forced    02:02:05

21   on him.  And one of those code words, those programmed

22   statements was, I was just the nominal owner.

23          This guy who bought the company had complete

24   ownership, made the decision on his own to shut it down, who in

25   the agreements he's identified as the owner.  He bought it       02:02:23

1   after an opportunity to consult with legal, financial, other

2   professional adviors -- advisors.  Relied solely on his own

3   judgment and his advisors and bought the company.

4          So that comes to this jury instruction that

5   Mr. Cambria discussed with you regarding good faith, which is          02:02:46

6   also an important instruction -- instruction for you to keep in

7   mind regarding my client, because we start with the premise of

8   the jury instruction that all speech is presumptively protected

9   by the First Amendment.

10         You remember this is a business.  Adult ads were in          02:03:06

11  the newspapers as well.  It's been 20 years of a company sort

12  of in this challenged industry of dealing with adult ads.

13  Nothing's new here.  But there's different people in place who

14  perform different functions.

15         Exhibit 171, that Don Moon had written, is a person          02:03:27

16  who's the chairman of the board --

17         MR. RAPP:  Objection.  Misstates the evidence.

18         THE COURT:  Overruled.

19         MR. LINCENBERG:  -- and he tells you that popular

20  speech seldom needs First Amendment protection; right?          02:03:47

21         This is unpopular speech to a lot of people.  This is

22  where First Amendment protection is really needed.  And a

23  website hosting unpopular content that has been conscripted

24  into a you-must-know-your-customer policy of not allowing,

25  strictly forbidding anonymous speech, will be out of business          02:04:08

1    in short order.

2           The concept of anonymous speech, meaning these people

3    who are posting, is a bedrock First Amendment principle as old

4    as it is well-settled.  And there is no basis for qualifying

5    the level of First Amendment protection that should be applied        02:04:24

6    to the Internet.

7           Now, this is not in Mr. Brunst's sphere.  He's not the

8    one who is dealing with these issues.  Don Moon is dealing with

9    some of these issues.  Jim Larkin, as CEO of the company, is

10   dealing with that.  Other people are dealing with moderation or       02:04:41

11   running the business.

12          My client's dealing with the accounting and financial

13   documents.  And the government has the burden to prove beyond a

14   reasonable doubt that my client did not act in good faith.  I

15   don't have to prove that he did act in good faith.  They have         02:05:00

16   to prove the opposite.

17          And another part of the instruction that is important

18   to look at is the second part that I highlighted, that a person

19   who acts on a belief or an opinion honestly held is not

20   punishable under the charges in the indictment merely because         02:05:17

21   the belief or opinion turns out to be inaccurate, incorrect, or

22   wrong.

23          So if you believe that Ferrer had this veneer and he

24   was running this prostitution ad business like the prosecution

25   is saying but my client is acting in good faith that's not            02:05:37

being directed to him, others are dealing with the operational

issues, the marketing issues, the ad moderation, the legal

issues and the like, and my client's dealing with the banking

relationships, that whether or not he's right or wrong, if he

acts on an opinion honestly held, it's not punishable.                    02:05:58

        And so we get to the burden of proof overall.  And

some of my counsel have discussed this, and more counsel will

discuss it.  And so I'm not going to go through each stage,

which has been explained to you, other than to note how high of

a burden this is.  Because it's even above and beyond this          02:06:22

clear and convincing standard.

        Now, this is a pretty high standard.  It's a standard,

for example, that's applied if a State is, for example, trying

to terminate a parent's right to raise their own child.  They

have to meet this really high burden, clear and convincing, but      02:06:44

it's not nearly as high as proof beyond a reasonable doubt.

        Mr. Feder explained this in terms of whether you would

hesitate to act in one of the most important of one's affairs.

For me -- I think he gave the example of having a -- a surgical

operation.  For me, I think about if I had a relative on life          02:07:08

support and I had to decide whether to pull the plug.  Would I

do that based upon Carl Ferrer's uncorroborated testimony?

That's the standard you need to look at, whether you're going

to rely on Carl Ferrer to convict my client.

        So as you go back to deliberate, ladies and gentlemen,      02:07:28

1    I ask you to examine the testimony of Mr. Ferrer with great

2    caution.  Use these factors that the judge has instructed you

3    can be a guidepost to evaluating his testimony.

4            I've given you a number of examples.  I could talk for

5    two more hours, give you more examples.  I don't think you          02:07:54

6    could put up with me for that long.  But I think I've given you

7    a sufficient number of examples.  And you have a memory of this

8    guy to be able to judge his credibility.

9            And more than anything else, remember that the

10   government called 20 witnesses to -- to -- to -- in their case,     02:08:10

11   and not one of them stated anything inculpatory about

12   Mr. Brunst.  And they had the opportunity.  I laid out 35 who

13   were on the various emails.  Could have said they were

14   defrauded at the bank if that was true.  Called none of them.

15           Please don't rest a decision just because you don't         02:08:37

16   know what they would have testified to.  Please don't rest a

17   decision by just guessing or believing the testimony of this

18   bought witness.

19           When you look at the verdict form, you will see that

20   it has columns for not guilty or guilty.  Here's an example of      02:08:58

21   a couple of the counts dealing with the Travel Act.  I ask you

22   to check that verdict form in the not guilty column for

23   Mr. Brunst.

24           When you look at the money laundering counts, you'll

25   see the same column setup.  I ask you to check the box for not      02:09:15

1    guilty.

2           Ladies and gentlemen, there's no proof beyond a

3    reasonable doubt that my client committed some felony criminal

4    offense, because the source of the government's story is not

5    credible and is not corroborated.                              02:09:38

6           Now, this is going to be my last opportunity to speak

7    with you.  I will say I remember from my days when I sat at

8    that side of the table as a federal prosecutor that there was

9    nothing I enjoyed more than giving a rebuttal, because when you

10   stand up, the defense counsel cannot speak to contradict you.  02:09:59

11          And we have to rely on you to be applying these

12   factors in the jury instructions to remember.  And if Mr. Rapp

13   says, Lincenberg was wrong, that's not what the document said,

14   go back and look at the document.  Try to remember what I had

15   in my closing about the exhibits.  I didn't cover every single 02:10:25

16   exhibit.  I tried to cover both what Mr. Rapp covered and tried

17   to guess at what he might cover in his rebuttal and address the

18   points that were the main points of Ferrer's testimony.  But at

19   the end of the day, you're going to have to rely on these jury

20   instructions, your review of the evidence.                     02:10:47

21          And please do review some of these exhibits and your

22   common sense and your sense of justice.  And if you do so, I

23   believe that, based on the lack of any unbiased witness against

24   my client, that it will lead you to return the only verdict

25   which justice allows in this case and which evidence and their 02:11:15

```
 1    lack of evidence compels, and that's a verdict that Jed Brunst,
 2    my wonderful client, is not guilty of the charges that were
 3    leveled against him in this case.
 4            Thank you very much for your attention.
 5            THE COURT:  All right.  Members of the jury, we are, I      02:11:42
 6    think, at an appropriate time to take a stretch break and our
 7    afternoon break.  I know that a number of you wish to get out
 8    of here before 4:00 o'clock.  I think there are a number of
 9    activities that we've identified going on downtown, and so I
10    think it's appropriate that we try to at least leave the          02:12:02
11    courthouse no later than 4:00 o'clock.  And I think we can
12    accomplish that.  But until then, during your break, again just
13    remember the admonition.  We'll be back in about 20 minutes'
14    time.  I'll have Liliana come to get you.
15            Please all rise for the jury.                             02:12:18
16        (Jury not present at 2:12 p.m.)
17            THE COURT:  All right.  And you are going to go next,
18    Ms. Bertrand?
19            MS. BERTRAND:  No, ma'am.  Mr. Eisenberg is going
20    next.  And that's why I wanted to approach the Court outside      02:12:56
21    the presence of the jury.
22            My concern is that we'll get to a point where
23    Mr. Eisenberg will finish, but it won't be enough time for me
24    to go and finish my argument at the rate we're going.  So I --
25    I don't know if the Court just wants to plan on letting the       02:13:18
```

1    jury out after Mr. Eisenberg goes or wait to see, but I just

2    wanted to let the Court know that we're bumping up to me

3    getting in a position where I have to break up my argument, and

4    I'd rather not do that.  And they're anxious to get out.  I

5    also notice they're tired today.  The jury's anxious.                    02:13:36

6           THE COURT:  The -- Mr. Eisenberg, how -- how long do

7    you predict that you will take?

8           MR. EISENBERG:  Probably an hour, Your Honor.  I don't

9    think any more than that.

10          THE COURT:  Okay.  We'll go from there.  We'll see how    02:13:51

11   the time is.  But I certainly won't expect you to go into

12   five minutes' worth.  If it looks like we're around the 3:30

13   mark, 3:40 mark, then we'll let them go.

14          MS. BERTRAND:  Okay.  All right.  Thank you, Your

15   Honor.                                                                    02:14:06

16          THE COURT:  Thank you.

17      (Recess from 2:14 p.m. to 2:33 p.m.)

18          THE COURTROOM DEPUTY:  All rise.

19          THE COURT:  All right.  Please be seated.

20          And we will have the jury in.                                     02:34:28

21          All rise for the jury.

22      (Jury present at 2:37 p.m.)

23          THE COURT:  All right.  Please be seated.

24          Mr. Eisenberg, you may begin when ready.

25          MR. EISENBERG:  Thank you, Your Honor.                            02:38:25

```
 1              Mr. Padilla, colleagues, gentlemen and lady of the
 2    government counsel, jurors, good afternoon.  I have pleasure to
 3    represent Mr. Padilla in this case, and I'm going to ask you to
 4    consider all of the jury instructions.  They're all important,
 5    otherwise, of course, the Court wouldn't have given them to
 6    you.  But there are three or four that I think are particularly
 7    important with respect to my client.
 8              The first one is the requirement to prove specific
 9    intent.
10              If we could have the slide, ma'am.
11              Now, this one is part of the jury instructions, and
12    it's to prove a specific intent.  The government must establish
13    that, in my case, Mr. Padilla in some significant manner
14    associated himself with the purpose of promoting or
15    facilitating the promotion of any business enterprise involving
16    prostitution offenses that he knew to be unlawful at the time.
17              Let's keep that one in mind as I go through my
18    summation to you.
19              Here's the second one.  The government has the burden
20    of proof beyond a reasonable doubt that the defendant acted --
21    oh, all right.  Well, we have them switched.  It doesn't
22    matter.
23              The defendants do not have to prove innocence.  The
24    United States has the burden of proving every element of the
25    charge beyond a reasonable doubt.
```

02:38:46
02:39:03
02:39:22
02:39:44
02:39:56

1              And there is a jury instruction as to what that means.

2              And then the next one is specific -- oh, well.  I just

3    read that one.

4              The next one is -- I'll read this to you.  Here it is.

5    The government has the burden to prove beyond a reasonable        02:40:14

6    doubt that -- bless you -- that a defendant acted with criminal

7    intent -- criminal intent -- and did not act in good faith.

8              This is the good-faith instruction.  It is very

9    important here with respect to my client.  Good faith

10   encompasses a belief or opinion honestly held and an absence of  02:40:31

11   malice or ill will.  If the defendant carries out his actions

12   in good faith, there is no criminal intent.  A person who acts

13   on a belief or on an opinion honestly held is not punishable

14   under the charges in the indictment merely because the belief

15   or opinion turns out to be inaccurate, incorrect, or wrong.  If  02:40:57

16   the government fails to meet its burden to prove a defendant

17   lacked good faith, you must return a not guilty verdict.

18             Now, I'm going to start off my summation with a number

19   of reasons, a number of -- you could call them arguments, but I

20   would just call them points -- reasons why Andrew Padilla is     02:41:20

21   not guilty.  The first one has to do with his job.

22             His job was to moderate ads in conformance with

23   standards and rules set by others.  And the important thing

24   here is -- well, there are two of them.

25             Too close to this.  I have Mr. Cambria's disease.      02:41:39

1    Sorry.

2            One is -- one of the two things is standards and

3    rules.  So, as you've probably heard throughout this case,

4    there are certain rules that were set.  This is how you're

5    going to do moderation.  And they were set not by -- here's the        02:42:01

6    second part -- Mr. Padilla, but they were set by other people.

7            So let me go into that one right now.  First of all,

8    his intent must be analyzed in the context of what his job was.

9    And I know the government is going to rely on inferences that

10   can be taken from what other people said about, and                     02:42:27

11   specifically, well, one might be Mr. Ferrer.

12           But did you notice that Mr. Ferrer never said that he

13   had any inkling of what Mr. Padilla was going on in his mind

14   when it came to intent?  Because intent is a self-centered

15   thing.  So when someone says he had the intent to do this or to        02:42:49

16   do that, which Mr. Ferrer never said, it's not really quite

17   right.  What has to be the determination from you all is that

18   it was Mr. Padilla's intent to do whatever he is charged with.

19           So, now, it's impossible to get inside somebody's

20   head, but you can tell his intent by how he conducted himself.         02:43:12

21   And his intent was never to promote the business of

22   prostitution.

23           Let's put this in context.  Over a period of time --

24   and it varies.  It depends on who you are listening to -- there

25   were millions of ads that came through Backpage's Internet,           02:43:33

1    Backpage's website.  At most -- and it depends, again, on who

2    you're listening to -- there were probably 100 moderators,

3    maybe more like 50, within Phoenix and ultimately Dallas.  Then

4    there were some abroad.

5            So if you did the math, as we tried to do -- I don't          02:43:55

6    think we were too successful.  But if you divide number of

7    moderators into number of ads, whatever you come out with is a

8    lot of ads per moderator.

9            So let's take the context and put it into practice.

10   If you have all of these ads going through the queues -- and          02:44:11

11   we'll get to in a minute how those queues operated -- you can

12   imagine how much time any moderator was able to spend on an ad.

13           Is that the moderator's fault?  No, it isn't.  The

14   moderators are just working their job.  If there's a fault --

15   and I'm not saying there's a fault with anybody.  It's just          02:44:33

16   that that was the volume of ads.

17           So if you're going to put standards and rules with

18   respect to volume of ads, you could only imagine how difficult

19   that must have been.  That's for the moderators.  Think of what

20   it was like for Mr. Padilla, how difficult it was for him to          02:44:49

21   oversee all this stuff, back and forth, back and forth, back

22   and forth, ad after ad after ad after ad.  And how many times

23   does the proof show he was awake in the middle of the night?

24   And I'll get to that in a moment.

25           One thing is pretty sure, though.  Mr. Padilla and the          02:45:07

moderators didn't write any ad, didn't conceive of any ad,

didn't add to any ad.  Rule 1 in this business, of the rules

and standards set by Mr. Ferrer and others, was take out the

content.  Do not add to it.  Because if you add to it, then

you're creating.

02:45:34

It's kind of a negative job, but that's the nature of

the job.  Take away; don't add.  Rule 1.

Rule 2, or however you want to count the rules, is the

moderators weren't in charge of defining prostitution.  Their

job was not to define what it meant.  Their job was to take

02:45:56

words away, take photos away, but not to define prostitution.

They didn't have a job that would require them to make a value

judgment.

So before I go any further, I should tell you what the

proof doesn't show.  My client didn't engage in aggregation.

02:46:21

He didn't engage in the recruitment of super posters.  He

didn't engage in The Erotic Review.  What he did with respect

to The Erotic Review, if anything, is to help cut links to The

Erotic Review.  That is more of a -- not a thought-type job.

And I -- I don't mean to disrespect my client.  It was simply a

02:46:45

job in which he would administer and manage and take away the

links because that's what he was told to do.

If you think about it in the context of what he did

with respect to law enforcement, you would ask yourself this

very question:  If he intended to promote the business or the

02:47:04

1    enterprise of prostitution, he wouldn't cooperate with law

2    enforcement, he wouldn't cooperate with subpoenas, he would not

3    be available at night, he would not produce data which helped

4    law enforcement lead -- lead to arrests of -- of, perhaps, the

5    very poster that was named in a post, he wouldn't attend          02:47:27

6    training with law enforcement, nor would Ms. Vaught.

7          And why cooperate?  Ask yourself this question:  Why

8    cooperate if the very people who are having oversight over

9    prostitution are looking at you every day?  Why would you do

10   that?  You would just as soon go away and hide.                  02:47:48

11         But that wasn't the case, and I submit that's another

12   way you can tell what his intent was.  His intent was not to do

13   anything other than his job, however you want to define it.

14   That was his job, and it was defined, however, by others.

15         Content.  And -- and this has been said by many of us,    02:48:10

16   many of defense counsel.  Content itself is not clearly

17   prostitution.  In other words, you can't tell from the ad

18   itself.  You heard about Dr. Mehlman-Orozco and her opinion.

19   Another person who gave their opinion about that was Grant

20   Snyder.  He's their retired Minneapolis Police Department       02:48:34

21   commander.  He said you can't arrest on an ad alone.

22         He's not the only law enforcement officer who said

23   that.  And the reason why, this is important, is because the

24   ads themselves cannot be determined to be prostitution-type

25   ads.                                                             02:48:53

1          This is getting a little bit away from my client's

2    position in terms of what he was doing, but it's important to

3    reinforce this from the point of view of a man in law

4    enforcement for over 20 years.

5          He said:  First and foremost, we were looking for any          02:49:06

6    indication that would give us a reason to think that this ad

7    involved prostitution.  The ads tended to not provide direct

8    evidence of that.

9          Okay.  So I think I've set the background, and in a

10   minute I'll get to some emails with respect to what was going    02:49:23

11   on.  And I know you all are probably really tired of looking at

12   emails.  But it's my turn to show you emails, so I'm going to

13   show you some emails.

14         Secondly, the standards and rules constantly changed.

15   You will see in some of these emails where it says -- bless      02:49:36

16   you -- there's a new standard or a new rule.  And applying that

17   standard was central to no sex for money.  That was a constant.

18   No photos that were sexually explicit.  That was a constant.

19   But in between these two requirements, things moved this way

20   and that way and up and down because he was told there are       02:50:03

21   different types of requirements, different types of standards,

22   different types of rules.

23         What's the man to do?  He applies the rules to the

24   best of his ability.  His intention is to do his job.  His

25   intention is to combine -- or comply with the rules as set down  02:50:20

1    by him -- I mean for him by Mr. Ferrer and others.

2            You will note through any of these -- not through any

3    of these emails, not through any part of the proof in this case

4    does he ever write any rule.  And I -- again, I don't mean to

5    demean my client, but that's not his job.  His job was an                   02:50:40

6    administrator, not a rule writer.

7            There were two types of administration to be followed

8    by the moderators:  One is automatic filters.  And, actually,

9    that's like a machine looking at a rule -- I'm sorry -- not a

10   rule, but an ad.  The only thing a machine can tell about an ad            02:51:00

11   is the language.  If the language was bad, the ad went out.  It

12   was either banned or removed, or whatever, or different

13   iterations of what could happen.  But an automatic filter can't

14   see a photo.

15           Now the humans come in.  The humans are looking for                02:51:17

16   both language and photos.  And if the photo is bad, they take

17   it out.  They would also review for age.

18           So let's go to some of these emails.  The first one is

19   588.  Now, this actually isn't an email, but it sets the

20   context for the ever-expanding role of moderation in Backpage.             02:51:41

21           If we go to slide 18, ma'am.

22           Right.  Ad personnel.  Top bullet there under add

23   personnel, it says:  Increase monitor staff to a full 24/7

24   operation.

25           And that's exactly what it became.  There were people              02:52:03

working at home as well as on-site 24 hours a day.  Now, it's
not Mr. Padilla's problem that there's so many -- well, it's
not -- he didn't cause there to be so many ads put into the
queue, but that's what he was dealt with.  That's what he was
left with.  That's what he had to do.                          02:52:20

        If we go to slide 20.

        Here's some more information that's important about
what happens in the Phoenix operation.  Andrew Padilla, he's
operations and abuse manager.  Major projects include -- let's
go down to adult moderators.  Days, nights, and weekend leads.  02:52:38

        Moderation is 60 percent of Phoenix total personnel.
That's a lot of responsibility.  And there underneath you see
from quarter 1 to quarter 2, increases in personnel.  And it
even talks about outsourcing to the Philippines.  It doesn't
mention here outsourcing to India, but they outsourced to two  02:53:01
different countries because they had so many ads.

        If we go to slide 22, we see more specifically with
regard -- respect to adult moderation:  Set and maintain our
own standards, parentheses, the Playboy standard.  Sexy and
erotic.  Not sex, lewd and lascivious.                         02:53:26

        Okay.  Playboy standard.  Lots of testimony about
Playboy.  I won't go into that.  But if it's a Playboy standard
and that's what he's supposed to follow and that's what the
moderators are supposed to follow, then whether it gets beyond
that or within that, there were degrees of separation from the 02:53:41

1    Playboy standard, but not by much.  Keep the site quality

2    consistent with these goals.

3           January 1, 2010, full implementation.  Goal is ads

4    live after 15 minutes.

5           Let's go to 581.                                    02:54:00

6           581.  Now, these are multiple paragraph-type emails,

7    so I'm going to try to cut down to the basics of it.

8           If you look at under adult content abatement, there's

9    different phases of this.  And this is -- I believe it's from

10   Mr. Ferrer.  And he says:  We want to remove sex act pics.    02:54:25

11          And, oh, by the way, this is May 29th, 2009 -- or

12   May 25th, 2009.  Fairly early on in the process.  In fact, it

13   isn't even emailed to Mr. Padilla.

14          There's no technical solution that cannot be easily

15   bypassed by a creative user.                                  02:54:44

16          Well, that's true, as we have seen.  But that may be

17   Mr. Padilla's problem, but it isn't his cause.  He's trying to

18   fix it the best way he can.

19          We can, however, build technical solutions to improve

20   efficiency.                                                   02:55:00

21          And that's what they tried to do.

22          Phoenix needs time to hire additional staff and the

23   equipment in order to take on this task, so our approach will

24   need to be a series of phases.

25          And the phases are listed underneath.  And I won't     02:55:14

belabor this, because I know you've seen it before.

Phase 1, however:  Remove ads and escorts violating terms of use.

It talks about markets.

Phase 2 is on page 2.  Phoenix hires five people and eventually ten.     `02:55:28`

Phase 3.  Let's go down to any new adult ad is sent to a global queue.  And underneath:  Ads tagged as yes for sex image term will not appear in the escort queue.  Setting up a rules-based way whereby the monitors can operate.     `02:55:49`

And then up -- up above that, there's a needs analysis.  And Mr. Ferrer, I believe, it is, is -- talks about staff required, 21 people.

Mr. Spear at the top says:  Is the 21 additional employees or total employees Phoenix at the end of the process?     `02:56:10`
That would be -- that would be -- that would tie to the additional -- the ten additional, which is a workable solution.

So getting the go-ahead in order to hire the staff.

Let's go to 585.

This is now we're setting common terms and code words     `02:56:29`
resulting in a post being removed, November 19, 2019.  This is from Mr. Spear to Mr. Ferrer.

If you go to 585a, we'll see those words, terms, and code words.  And, as you all have probably seen throughout this trial, these words got changed.  They had misspellings, and     `02:56:53`

they had to deal with that.  Not misspellings.

Contra-spellings.  Additional spellings.  Spellings based on a

derivation.  And we'll get to that in a moment.  But here we

have rules, terms, things to be followed.

         Let's go to 49.                                        02:57:09

         In 49, now Mr. Padilla comes into the picture.  This

is September the 1st, 2010.  Now we're in '10.  Excuse me.  New

moderation rules.

         It talks about Scott having a meeting with us today,

and he's pushing me hard to get the site as clean as possible    02:57:32

in the next seven days.  I'm empowering the Phoenix staff to

start deleting ads when the violations are extreme and repeat

offenses.  When we delete ads, we're going to send an email

from sales.

         Sales is Mr. Hyre.                                     02:57:49

         When we ban a user, we need to ban the stick for at

least 30 days.

         Okay.  This is what he's getting from somebody above

him.  He is trying to enact this rule, moderation rule.

         When we delete from the queue, we will use delete and  02:58:06

notify.  We'll do everything to notify the users so it's not a

total snub, et cetera.

         Mr. Ferrer testified with respect to this particular

exhibit in April of 2010, so this is a little bit before

September.  He says:  I'm going to say we had at least          02:58:22

1    20 moderators, but we had thousands of ads posted in many

2    markets, so -- and so we're just not getting to them all.

3            Later -- a little bit later he said:  And repeat

4    offenses means that it's very blatant sex for money and they

5    keep reposting it over and over despite the ad being either          02:58:42

6    edited or removed.

7            Well, that's what the moderator did, but somebody

8    comes back and reposts it.  That is not the fault of

9    Mr. Padilla.  That's just the way that system was working.

10           So it becomes a repeat -- repeat offense.  That's what       02:58:56

11   Mr. Ferrer said.

12           So we're just going to delete their -- their ads

13   instead of editing their ads.  That's going to be no more

14   graces if you're a frequent violator.  When we delete, we will

15   delete and notify.                                                    02:59:12

16           Well, then Andrew Padilla's proposing to ban the

17   uner -- user, and so forth.

18           Then he said later on -- I'm sorry.  Not him.  This is

19   what Mr. Hyre said in his testimony when he was asked about

20   this particular email:  The moderation rules were changing all       02:59:28

21   the time; isn't that true?

22           That was my question.

23           ANSWER:  Yes.

24           And the moderation rule changes came from, well,

25   Mr. Ferrer; right?                                                    02:59:38

1          Yeah, Ferrer and above.

2          QUESTION:  But Mr. Ferrer also had consultation with

3    other people.

4          You said from above; correct?

5          Yes.                                                    02:59:47

6          Do you know who some of the people were that

7    Mr. Ferrer consulted with?

8          ANSWER:  Yes.

9          Was one of them Ms. McDougall, whom you've heard

10   about?                                                        02:59:59

11         ANSWER:  Yes.

12         Other people got involved in consultation with respect

13   to the rules.

14         Let's go to Exhibit 918.

15         Exhibit 918.  I think this came up earlier today,       03:00:12

16   perhaps through Mr. Feder, but -- and I hate to repeat what

17   somebody else has said, but I have to just because it's here in

18   my book.

19         So what happens is on September the 5th, 2010, we have

20   a list of equipment -- I'm sorry -- September the 5th that     03:00:31

21   Mr. Ferrer has written:  Hey, Scott, cap request below.  Please

22   email me approval.

23         And here is what he's seeking.  After he has consulted

24   with Mr. Padilla, in effect:  What do you need in order to do

25   them in moderation?                                            03:00:49

1          And, by the way, none of these -- in none of these

2     emails do you ever see anybody say, hey, this is for

3     prostitution.  We need to cover this up; so, therefore, we're

4     going to do it this way.

5          Not in one email is there any indication that any of          03:01:00

6     this is done to disguise prostitution.  I know what Mr. Ferrer

7     said from the witness stand, but you know he never said that

8     that's something that he, Mr. Ferrer, discussed with my client.

9          These ads are for prostitution.  He never said that.

10         Neither did Mr. Hyre.  If there's anybody in this case          03:01:20

11    that could possibly put the finger on my client, it would be

12    Mr. Ferrer, and he never did.

13         And, you know, if you listen to Mr. Ferrer and watched

14    him, I think -- you're the judge, but, you know, human

15    tuition -- and human intuition, I guess, says, I don't think he   03:01:40

16    wanted -- this is my opinion -- he wanted to implicate my

17    client.

18         MR. RAPP:  Objection.  That's an improper argument.

19         MR. EISENBERG:  Well --

20         THE COURT:  Well --

21         MR. EISENBERG:  All right.  I'm just talking about

22    body language of the witness.

23         THE COURT:  Sustained.  It's for the jury to

24    determine.

25         MR. EISENBERG:  All right.  Thank you.                         03:02:01

1          So here's a -- here's the equipment.  And you can see

2    underneath that he needs personnel, equipment, and so forth.

3          And then Mr. Ferrer testified that the go get them

4    from Mr. Spear was:  Go ahead and order the equipment.  And

5    tell Andrew he can hire the additional personnel.                    03:02:20

6          He went on to say this, too:  We continue to reduce

7    the amount of nudity in light of letters from Attorneys

8    General.  As revenue goes up, BP hires more moderators from

9    everywhere.  As changes come out of Building B, we would then

10   hand them, those changes, to Andrew Padilla, and he would              03:02:38

11   implement.

12         Let's go to 51.

13         Now we're in September 2010.  At 12:30 in the morning,

14   12:31 a.m., this is what Mr. Padilla writes in response to

15   Mr. Ferrer, who had sent him an email a few days before.              03:03:02

16   Mr. Ferrer's email says:  Andrew, could you add to the banned

17   list items and the attached Word document.

18         And he says -- Mr. Padilla says:  Carl, my additions

19   are at the end of your list.  These additional terms are

20   currently filtered in their common forms and removed                  03:03:20

21   manually -- manually in their variations.

22         It's the only way you could do it.  You could turn

23   Greek with an E around to look like a 3, or whatever else you

24   want to do with that word.  You just couldn't possibly automate

25   to look for that word in its very -- various iterations.  So,         03:03:39

1      human, you got to sit there and look at this.  Tough job.

2              And then if you look at -- I think this is 51a.  Here

3      is the list of terms.  There are 39 terms.  You don't have to

4      count them.  I counted them.  But if you want to count them,

5      you could.

6              Anyway, the following terms, service, and code words

7      are not allowed in the adult escort category on Backpage.com as

8      they imply a sex-for-money transaction or relationship, which

9      is a violation of Backpage.com's terms of use.

10             Now, this comes from my client.  Posts containing

11     these terms will be removed.  Continued use of these terms by a

12     poster will result in that person being banned from using this

13     site.

14             And then Mr. Ferrer was asked:  Now, is this an

15     internal document?

16             Now, this is an internal document, isn't it?

17             And he says:  Yes.

18             So we're not trying to impress the Attorneys Generals

19     or NCMEC or anybody else.  This is an internal document, isn't

20     it?

21             Yes.

22             So it's not being sent to whomever out there who's a

23     third party.  This is something that Mr. Padilla writes in

24     terms of what should be banned.

25             And the second page of this, he talks about creative

1    spellings.

2         For the terms above, which are too numerous to include

3    in any lists, but these terms, however they may be spelled,

4    would be considered off limits, and so forth.

5         Oh, also, this list may be amended from time to time.    03:05:17

6    There's no way to be -- meant to be a limitation.

7         Let's go to Exhibit 600.

8         600 is a very long email, and I'm going to try to just

9    get the essence of it.  It is an email that has to do with

10   El Camino.  And if you look at the back pages, and you need to    03:05:47

11   do that, you'll see it's trying to -- Mr. Ferrer's trying to

12   set up a relationship with El Camino.

13        And then he says on page 3 down at the bottom -- this

14   is September 30th, 2010.  There he talks about steps left.  And

15   then down at the bottom he talks about modifying the queue.  We    03:06:10

16   don't need to go into that, but he says Andrew is working on

17   this.

18        The next post has to do with queues involving images

19   and text standards.  And this is -- goes on to page 2.  But to

20   try to just summarize it, page 2 talks about text standards.    03:06:33

21        Please -- and this is what he's telling El Camino.

22        Please spell and -- ads with texts that suggest sex

23   for money.  Often they will use code words or misspelled words.

24        And then up above it's fail for various terms.

25        And then on images is on page 1, and it talks about    03:06:53

nudes for men and women and this is an evolving standard.

Okay.  Mr. Padilla says up at the top:  It looks good to me, as he is writing this at 6:08 in the morning.

Mr. Ferrer was asked:  All right.  But fair to say that these bullet points describe what it is that is allowed in images?                                                                      03:07:16

Yes.  That's the Scott Spear Playboy standard to, you know, you could be nude but no close-up of genitalia, and so forth.

So in terms of the standard that he was giving from the witness stand, it's the Playboy standard.  Okay?  Playboy       03:07:30 standard.

Let's go to 59.  This is a new rule, an email involving new rules.  This comes from Mr. Padilla. October 16th, 2010.  9:05 in the evening.  Subject:  New       03:07:51 moderation standards.  All.  And it -- the to, those are moderators, how many of them there are.

Perhaps indefinitely, and certainly over the next four days, we will intensify our efforts in cleaning escorts, and so on and so forth.  This intensification will come in the       03:08:13 form of extra staff and overtime but, most importantly, stricter standards for language and in ads.  I still like to avoid deleting ads when possible.  But if an ad makes a clear reference to sex for money or an image displays a sex act, don't hesitate in deleting it.                                                03:08:36

1          In case of lesser violations -- I just skipped down --

2    editing should be sufficient.

3          Later on in that same paragraph, he says:  We're still

4    allowing HBO type nudity.

5          HBO type nudity.  Okay.                                    03:08:49

6          Let's go to 58.  The one I just read, that pertained

7    to new rules, 58.

8          This has to do with image guideline PowerPoint, a list

9    of banned terms.  Again, October -- well, October the 17th at

10   12:11 in the morning.  Mr. Padilla's hard at work.             03:09:26

11         Some of you have already received this presentation

12   and so forth.  For the sides -- slides that you say fail, you

13   shouldn't actually use the fail button.  Whether in the cure or

14   in natural -- manual review, rather, images that fit fail

15   criteria should be removed.                                    03:09:42

16         And he goes on to describe what he thinks the

17   moderator should do.

18         With respect to this particular Exhibit Number 58,

19   Mr. Ferrer said:  The reference -- the reference to images

20   aside, it's the language in ads that's really killing us with  03:10:07

21   the Attorneys General.

22         Images are almost an afterthought that pertains to

23   what Mr. Padilla has written.  It means sex-act-for-money

24   terms.  There are just too many appearing in ads.

25         Okay.  So the system is overwhelmed.  It's breaking     03:10:23

UNITED STATES DISTRICT COURT

1    down in some cases.  In some cases.  Now, that's not the fault

2    of the moderators as they are sitting there watching this stuff

3    go by day after day.  And if it gets through -- and in a

4    minute, I will talk to you about the ones that didn't get

5    through.  But Mr. Padilla's job is to try to oversee this as          03:10:41

6    best he can.

7         If you go to 58c, you'll see -- 58c, you will see a

8    lot of terms that are descriptive of a sex act according to

9    what Mr. Ferrer was saying.  These are to be banned.

10         Let's move to 604.                                              03:11:01

11         604.  Mr. Padilla, October the 18th at 5:12.  He's

12   responding to a message that was apparently forwarded to him by

13   Hemanshu Nigam.  He is the man with the Internet safety people.

14   And Mr. Nigam says:  I am finding way too quickly prostitution

15   ads at the top of the list.                                          03:11:32

16         Now, the government made a big deal out of this one

17   because there's a swear word up there that it's from

18   Mr. Padilla.  There's two swear words, at the beginning and at

19   the end.  He says in the middle, which is what I'll talk about:

20   I deleted the ad, purged the cache, and let the staff know not       03:11:47

21   to allow this.

22         Okay.  In response to questioning put to Mr. Ferrer,

23   I'm -- let's see -- Mr. Padilla responds at the top.  He does

24   respond.  And then the question went on, and I asked him about

25   what the first word and last word meant in this email.               03:12:12

UNITED STATES DISTRICT COURT

1          Yeah, he's angry.

2          I asked:  And but he's angry, isn't he?

3          Yeah, he's angry or deeply disappointed.

4          I asked:  In fact, he's got the same type of wording

5     at the very end of it, meaning that word.  There's another word     03:12:30

6     that he uses.  You don't -- you needn't repeat it.

7          Okay.  I agree.  He's angry.

8          How would you interpret that in terms of what he's

9     saying?

10         Well, the standards are continually changing.  There's     03:12:41

11    a lot of ads being posted.  And we have a policy that is very

12    customer friendly.

13         Now, whether it's customer friendly or not or whether

14    we're trying to make sure that these ads get reposted by their

15    posters is not Mr. Padilla's fault.  It's not his rule, and     03:12:57

16    it's not his plan.  That's somebody else.  He's just trying to

17    do his job.

18         Is he saying that what he's done is directed his staff

19    and the other moderators to not allow this type of

20    advertisement to get through?  Basically that is -- that's it,     03:13:14

21    isn't it?

22         ANSWER:  Yes.

23         If we go to 61.

24         61 is from -- well, at the top of it, it's from

25    Mr. Hyre -- I'm sorry.  Yes, it is from Mr. Hyre.  And this is     03:13:28

here just because it appears to have an update with respect to

what's going on with the moderation process.

And down at the bottom there's a recommendation under

adult jobs.  And it comments:  The legal content removed is

usually money for sex act.  The content is pretty clean after          03:13:52

removing the pics.

Okay.  Somebody internally within Backpage is saying

it's pretty clean after removing the pics.  This doesn't go to

the Attorney Generals.  This doesn't go to NCMEC.  This doesn't

go to any police department.  This is internal.  And the               03:14:08

opinion is it's pretty clean after remove -- we removed the

pics.

Let's go to 201.

201 is from Mr. Ferrer.  And it starts off:  We need

to have the guidelines on the queue to help them train.  No           03:14:33

doubt these standards will change.  See -- see the attached

mock.

Okay.  Under adult jobs, this is a list of what is not

allowed and what is allowed.  Under personals, what's not

allowed and what is allowed.  Under adults, the same thing.            03:14:50

In response to the questioning about this one,

number 201, Mr. Ferrer said:  There's been so many changes.  I

want some agreement that this is what we're going to have

Andrew communicate to the moderators because it's confusing.

We're using a third-party company -- and I think he meant -- he        03:15:11

1   was referring to Mr. Nigam's company.

2          I wanted this information to appear on top of the

3   queue.  Here's the standard.  Moderation developed a way for

4   staff to know what images to ban or remove.

5          No mention here in his testimony that we all knew or,          03:15:27

6   rather, we were all promoting prostitution.

7          Mr. Hyre was asked about this.

8          Do you recall what training Mr. Ferrer is referring

9   to?

10         ANSWER:  Yes.  There were training to -- there -- I          03:15:41

11  guess:  They were training to adhere to our ever-changing --

12  ever-changing standards, which was constant.

13         QUESTION:  In other words, training.  Training

14  sessions would go on and on and on.  Very repetitive --

15  repetitive?                                                          03:15:59

16         ANSWER:  Yes.

17         QUESTION:  Because you need to educate the moderators

18  in what they should be following; correct?

19         Yes.

20         QUESTION:  And they were taking directions from in          03:16:09

21  this case -- well, whatever the training said, they were

22  supposed to follow it; correct?

23         ANSWER:  Yes.

24         And that would include Mr. Padilla?

25         ANSWER:  Yes.                                                03:16:19

1          No, and -- but everybody knew what this was all about.

2     That wasn't in the testimony.  Nobody's testimony.

3          609.  October 27th at 1:46 in the morning.  This is

4     just an update.  It has to do with, I think, India.  Yeah.

5          I told India to hire 22 people.  They're expanding          03:16:39

6     offshore.

7          But he does say down in the middle down there:  We're

8     changing our content standards tomorrow.

9          And it talks about genitalia pics and so forth.

10         Another change.  Got to keep up.          03:16:50

11         The second page really describes what's going on.

12     About halfway down it says:  Anyway, it's absolute hell.  I

13     need to continue to invest heavily in moderation technology,

14     and I need your help.

15         Let's go to 62.          03:17:05

16         New rules here.  Again, Mr. Hyre.  This has to do with

17     October the 27th of 2010.  And I'm trying to take this in

18     order.  If you go to the second page, there is a reference

19     to -- from, it looks like, from Mr. Hyre -- Mr. Ferrer to

20     Mr. Hyre, courtesy copied Mr. Padilla.  And it talks about          03:17:31

21     pricing for legal adult services must be at a minimum.  Do not

22     post obscene images, and so forth.

23         Mr. Padilla responds at the top of that page and over

24     on the first page:  This means no nudity between the waist;

25     right?          03:17:48

1          And the only question is, if you go up to the

2    Mr. Hyre, is:  When is the launch official date to start

3    implementation of new standards?

4          New standards.

5          And at the top, Mr. Padilla says:  I told Monita she          03:18:00

6    could start enforcing the rules issued in the queues, and my

7    crew is going to do the same.

8          Mr. Hyre was asked about this.  Somewhere in -- in

9    this there was a language about a frequent offender.

10   Something -- he said:  That's somebody that violated our terms    03:18:18

11   of use over and over again.

12         Then asked:  So that person, what happens in that

13   case?  Are they totally banned?

14         And then he says:  The way I read this is that the ad

15   would be removed.                                                 03:18:31

16         Because they keep posting a repeating image, the

17   offending image, a violating image over and over again as a

18   constant problem that the moderators faced.

19         Let's go to 1586.  This is from Mr. Padilla.  New

20   rules.  Back- -- the subject matter says new guidelines in        03:18:51

21   adult.  Underneath:  We've been messing around with listing

22   guidelines in the queue since last night.  If the language

23   isn't finalized yet, regardless of what we specifically wind up

24   saying there -- of saying there, here are some new rules.

25         And he lists it.                                            03:19:11

UNITED STATES DISTRICT COURT

03:19:33
03:19:56
03:20:14
03:20:34
03:20:51

1        You can move forward enforcing these changes

2    immediately.  I'll have more instructions.

3        Okay.  Mr. Ferrer was asked about this, and he said:

4    I was involved in some respect with these guidelines.

5        He also said:  Scott Spear and I were told by

6    advisors, but didn't define who they were, that anything under

7    an hour was suggestive of a quickie and it had to come out.

8        Number 73 -- and I'm almost done.  Here we are,

9    November 17th, 2010, from Mr. Ferrer to Mr. Padilla.

10       The consensus is that we took a big step in the right

11   direction.  Content looks great.  Our goal is to tame the

12   content down even further while keeping good content and users.

13       Nothing in this email about ensuring that we're

14   promoting prostitution.

15       I read that.  Okay.

16       Items I agreed to implement.  More banned terms,

17   removal of ads that had to do with pregnancy.  He talks about

18   pricing.  He talks about move to 500 characters max.  He talks

19   about banning certain things, like nipples and kill TER links.

20       And when Mr. Ferrer was asked about this, he was asked

21   what did it mean about -- there's a reference in here to

22   frequently asked questions.  And Mr. Ferrer said:  They could

23   self-sensor.  They wouldn't have to contact support.  They

24   could read and see these terms are allowed.  These terms are

25   not allowed, and then they could create their ads accordingly.

1          Well, of course, he's saying that.  And he doesn't

2    amend it by saying, but they got around it constantly, at least

3    not at this particular questioning that -- that I was asking

4    him.  But, in fact, that is what was happening.

5          Then he was asked about 500 characters max.                   03:21:07

6          We really found that the longer the ad, the more

7    likely a prostitute might use terms that were not allowed in

8    the female escorts category.

9          So they're trying to actually curtail the bad words.

10   Kill TER links.                                                     03:21:24

11         He says that:  So on January 1st, we'll kill those

12   links, meaning we'll just run a script through every single ad

13   and we'll just strip it out.

14         Now, there was some effort by the government to show

15   that Mr. Padilla had a connection with TER.  He didn't.  He        03:21:39

16   wasn't involved in soliciting TER.  He wasn't involved in

17   putting anything about TER in any ad.  The only way that he was

18   involved with TER was to take the links out.  That was it.  And

19   that's an administrative effort on his part.  Nothing to do

20   with any kind of policy.                                           03:22:00

21         Let's go to big policy changes.  This is November

22   the 18th at 10:21 p.m. from Mr. Padilla, who is -- this

23   actually relates back to what I just referred to.

24         Effective immediately, no nipples.  Pixilation or

25   blurring are not okay.  Maxim is a good example of what is          03:22:19

 1   still allowed on our site.

 2           Maxim is a magazine that had to do with whatever, but

 3   it was a published magazine.

 4           Big change number 2.  If you find an add for

 5   prescort -- escort, delete it.                                    `03:22:34`

 6           If we go to 90.  This is from Mr. Hyre.  It has to do

 7   with El Camino.  If you look down at the bottom, there's a

 8   reference to:  Looks good to me.  I -- I want to get the

 9   moderators -- this is something from Mr. Padilla.

10           Started on a new image policy as soon as possible, but    `03:22:59`

11   I noticed in your notes that you want to modify the posting

12   rules.  I'm not sure -- the next column, the next paragraph --

13   I'm not sure we need to wait necessarily.  The posting rules

14   currently say no nudity, and our new approach is just really to

15   follow up -- that up to the letter.                               `03:23:19`

16           And up above:  We may not be able to update the rules

17   this afternoon, but then there are notice -- underneath notice,

18   do not post, do not post, pricing's for legal, and so forth,

19   and ads can be a maximum blank.

20           Let's go to 1612b.                                        `03:23:41`

21           Here it's from Andrew Padilla.  And it's a summary in

22   which Mr. Ferrer says:  Andrew's summary below, I think it's

23   good.  And it's entitled Stricter Guidelines For Nudity,

24   January 2011.  And in this stricter guidelines for nudity,

25   which is on the next page, it will be all.  Backpage will be     `03:24:05`

increasing their restrictions on images in adult categories

effective immediately.  The latest changes apply specifically

to bare breasts, butt, cleavage, and so forth.

        Down at the bottom:  If, however, you run into ads

that endanger a minor in any way, community remove the ad and          03:24:21

send the ad URL to Joye.  Community remove this.  Moderators,

you can remove it.

        In response to this, Mr. Ferrer said:  The standards

are continually changes -- continually changing.  This is a

huge change.  I mean, there's no way we're going to delete tens          03:24:39

of thousands of ads.  So we're very customer service friendly.

We're simply going to take out the images that don't meet the

new standard.  Andrew is implementing the company mandate, the

directive.

        Not Andrew's.  The company mandate.  It comes up from          03:24:55

up on high.

        You know, don't throw the baby out with the water.

Make these changes in a graduated way.

        638, January 22, 2011.  This says:  Our guidelines are

vague but at least easy to remember.  If she looks under 18,          03:25:12

report it.  If in doubt, report it.

        And underneath Hemu, which is Nigam:  Hemu gave us a

dozen code words of underage users.

        93.  This is from the lady whose moniker is Licks

Alot.  And this was shown by the government.  This is an ad --          03:25:44

UNITED STATES DISTRICT COURT

this is -- this is one of those indicators where an ad got

removed.  Got removed.  Moderation worked.  Because if you look

at the page 3, here it says:  Hi there, Carl.  I'm Samantha,

and so forth.  I have an ad under your escort section.  And

whenever I repost it, someone from Backpage is always --

someone from Backpage is always removing my butt pic.  And,

truthfully, there's absolutely nothing wrong with it -- she

goes on to say -- but somebody is removing that picture.

        And then Mr. Ferrer writes back to the lady, and he

says:  The moderators are human.

        They certainly are.  They make mistakes.  A lot of

them apparently, from what we've seen, tend to let ads go

through.  Either they don't pick it up or they get tired, or

for whatever reason the ad gets through.

        Our crazy Internet safety experts do not want any

genitalia showing up around the thong.

        Okay.  That's what he's saying to her.

        Licks Alot goes back -- or comes back a few days

later, and she says:  Can someone explain to me exactly what is

wrong with your moderator staff?  I posted an ad under

Fort Worth escorts.  It had four pics at 6:58 p.m.; a face, a

body, and two backside pics.  I just checked it, and your staff

has removed all four pics.

        Well, moderation has worked.

        And Mr. Hyre was asked with respect to this, and then

03:26:05

03:26:27

03:26:43

03:26:59

03:27:15

UNITED STATES DISTRICT COURT

what he's saying, meaning Mr. Ferrer, is:  Moderators are

human; correct?

          And Mr. -- Mr. Hyre says:  Yes.

          And he's -- and then -- and then the question is:  And

they are, aren't they?                                    03:27:32

          ANSWER:  Yes.

          And they make mistakes all the time?

          I don't know about all the time, but they do make

mistakes.

          Okay.  And that's because the standards -- the        03:27:39

standards are changing; right?

          ANSWER:  Yes.

          And sometimes it's hard to implement the standards

with respect particularly to pictures; right?

          ANSWER:  Yes.                                    03:27:50

          203.  August the 31st at 10:30 p.m. on -- in 2011.

This has to do with a list that Hemu apparently passed on.

Somehow it got to my client.  And he says:  I'm going to take

anything good that I can from the Hemu list.  You copy it, and

then I'll go through our filters.  I'm going to include      03:28:15

misspellings for all of the solid sex for money.

          So he is just following what Hemu Nigam has asked him

to do, and he's going to do it.

          Next, 129.  This is Andrew, October the 21st, 2001, to

Monita Mohan.  Here's another indicia of Mr. Padilla's pique,  03:28:41

1    if you will, in terms of trying to run moderation.

2           Hi Monita.  This morning one of our third-party

3    watchdog groups pointed this ad out to Carl.  It's one of the

4    most egregious oversights I've ever seen a moderator make.

5    Clearly even the most poorly trained moderator would recognize          03:29:07

6    this ad contains nudity.  So this must be a case of an employee

7    who doesn't care or an employee who is rushing through their

8    work.  I imagine it could also be an example of someone who

9    doesn't understand how to properly remove an ad.  In a perfect

10   world, our second-tier moderation would have caught this, but          03:29:23

11   we're spread pretty thin on the weekends.  It's extremely

12   unfortunate that a third-party company brought this ad -- or

13   caught this ad and brought it to Carl's attention.  Let me know

14   what action you take to remedy the issue with at20, which is

15   the moderator in India.                                                 03:29:43

16          725 is also from Mr. Padilla, April the 5th.  Now

17   we're in 2012 at 10:30 in the evening:  Moderation reminder, an

18   update, attaches a list of 120 adult terms that are banned on

19   the site.  These are -- these are terms that we consider

20   egregious and violations of our terms of use.                          03:30:06

21          Skipping down:  The attached list is automatically

22   filtered, and a user attempting to post an ad with any of these

23   terms receives an error message during the posting process.  We

24   don't want these terms on our site.

25          This is internal, not to the Attorney General, or              03:30:23

1   whomever.  You'll see examples in the list where a term is

2   spelled several ways.  We're only scratching the surface in all

3   the possible spelling variations.  If you see a misspelling of

4   any of these terms that gets around our filters, delete the ad

5   in its entirety -- he puts in bold.  Don't edit the text or          03:30:41

6   remove any pics.

7          Go to the attachment, 725b.  There's 122 terms that

8   have variations.

9          1829 is nearly the same thing from Mr. Padilla.  April

10  the 23rd, 2012, at 11:13 p.m.:  Caught up on filters.            03:31:06

11         Look at 1839a, and you will see a whole list of

12  things.  And I'm not sure it really -- oh, good.  It does show

13  up on your monitor.

14         According to what Mr. Ferrer said:  H -- which is, I

15  think, column H.  This is the most important column, H.  It's     03:31:25

16  the forbidden.  It's the message.  That's the custom message.

17  If we get this one, they attempt to submit an ad.  Those are

18  all variations of GFE, and they will be stripped from the ad

19  when posted.

20         Finally, 1138.  Another updated terms, new rules from       03:31:40

21  Mr. Padilla, September 25th, 6:18 p.m.

22         And if you go to 1138a, you will see updated terms.

23         I don't know how many changes there are.  I tried to

24  count them, but I got on to something else.  But, in any event,

25  it's safe to say there are changes in these terms, these          03:32:09

standards, all the way through Mr. Padilla's term -- term at
Backpage.  What's he supposed to do?  Follow those terms.

          Now, the government had an email, number 56.  This is
from Andrew Padilla to Jeff Lyons.  And in this email the
government says -- this apparently -- or argue -- its argument          03:32:38
is that Mr. Padilla is talking about prostitution:
Prostitution is in our ads, and so forth.

          Here's what he says.  And let's take this into
context.

          Backpage, and you in particular, cannot determine if          03:32:52
any user on the site -- I think it should be -- is involved in
prostitution.  Leaving notes on our site that imply that we're
aware of prostitution or in any position to define it is enough
to lose -- lose your job over.  Backpage, and you in
particular, cannot determine if any user on the site is          03:33:13
involved in prostitution.

          You know who said that?  Not only Ms. Orozco, but
Commander Retired Snyder, as well as several other policemen.

          So what he is saying here is simply that you cannot
determine on the basis of an ad whether it's for prostitution          03:33:34
or not.

          Down below, there was not one mention of prostitution
in the PowerPoint presentation.  That was a presentation
designed to create a standard for what images are allowed and
not allowed on the site.          03:33:51

1          That's what he's trying to do.  It's not an

2    acknowledgment of prostitution.  It's a -- an acknowledgment of

3    what our job is in order to avoid issues with respect to

4    prostitution.

5          Now I'm going to go back and start on another theme.          03:34:06

6          I will be done, Your Honor.

7          Just a little bit about the work atmosphere that

8    moderators had.

9          This was done by my colleague, Ms. Bertrand.  And she

10   was asking Ms. Hyre -- Mr. Hyre about this.          03:34:33

11         Moderation was set up in large part to moderate this

12   onslaught of new ads coming in; correct?

13         Yes.

14         Is it your understanding that moderation at Backpage

15   was a separate division from marketing at Backpage?          03:34:47

16         Yes.

17         Do you know whether or not moderators were trained to

18   give preference to super posters?

19         I would say I know they were trained not to give

20   preference to anybody.          03:35:00

21         Do you know whether or not moderators had a financial

22   incentive to allow an ad to get through?

23         ANSWER:  I would say I know they did not receive a

24   financial incentive to let an ad go through.

25         QUESTION:  They were just hourly workers; right?          03:35:14

 1              Yes.

 2              And they weren't paid on how many ads posted that they

 3    reviewed; right?

 4              No.  I don't think so.

 5              And that's certainly true of my client.  His bonus had      03:35:24

 6    nothing to do with numbers of ads.  His bonus was a set amount.

 7              THE COURT REPORTER:  A set amount?  I'm sorry.

 8              MR. EISENBERG:  Set amount.

 9              There were no quotas, was the question from

10    Ms. Bertrand.                                                         03:35:43

11              ANSWER:  I don't remember or know of any quotas that

12    were given.

13              Another question:  Were you present at training where

14    moderators were told that they had to be extremely careful with

15    their work?                                                           03:35:53

16              ANSWER:  Yes.

17              QUESTION:  By 2017, would you estimate was the

18    moderation budget in Backpage -- there was a whole discussion

19    of that.  I won't go into it because I think the mathematics

20    were a bit skewed.  Tried, but we didn't get through on that.        03:36:09

21              QUESTION:  And that doesn't include training for

22    moderators; correct?

23              Yeah.  That's a management concept.  There are a lot

24    of man-hours that you put in and the managers that report --

25    that report to you put in to help management manage that.  And       03:36:25

UNITED STATES DISTRICT COURT

1   that's a number that is -- as a manager you can see you're just

2   never going to try to calculate because there's no way.  I

3   mean, how do you calculate every waking moment that you're

4   ready to train somebody if you need to?  That's a big

5   investment -- was the question -- fair?                           03:36:42

6            ANSWER:  Yes.

7            It seems like, please correct me if I'm wrong, the

8   moderators did not have a lot of discretion in their work.  Is

9   that fair?

10           ANSWER:  I mean, it wasn't -- we -- we tried to make   03:36:54

11  it black and white.  The rules just kept changing.

12           So they did -- so did -- so did they have -- oh,

13  question.

14           So did they have a creative input on, oh, I think I'll

15  let this one go through and I won't let this one go through?    03:37:10

16           No.  There was a line, but the line was always moving.

17           It was a moving target, was the question, for the

18  moderators?

19           ANSWER:  Yes.

20           QUESTION:  In your opinion, was it a demanding job to   03:37:19

21  be a moderator at Backpage?

22           ANSWER:  Yes.

23           It required a great deal of attention, correct, to do

24  it right?

25           Yes.                                                    03:37:29

1          Attention to detail?

2          Yes.

3          And you had to look at a lot of material day in and

4    day out; correct?

5          Yes.                                                      03:37:36

6          Did you ever hear moderators complain about the

7    difficulty of this work?

8          ANSWER:  Yes.

9          The next slide that I had was moderator -- moderation

10   worked.  Ads of blocked words were stripped and photos were    03:37:47

11   deleted.  And you know that because the posters who came in so

12   testified.

13         Megan Lundstrom.  She wanted to post tasteful ads on

14   Backpage.  No ad was rejected because there was no nudity in

15   the photos, or at least early on.                              03:38:04

16         Then she said:  At first it was like Wild West.  You

17   could post hours and rates, but things changed.  Rates and

18   sexually explicit photos were not allowed.  Terms describing

19   sex acts, not allowed.

20         She knew her ad would be flagged and rejected if she     03:38:20

21   posted things like that.  So it must have worked, at least

22   partially.

23         Breahannah Leary.  Photos were removed, but sometimes

24   it appeared in another ad.  It was either removed and it went

25   back in.  She tried it again, and she got through it.  She said 03:38:33

UNITED STATES DISTRICT COURT

later -- later in her testimony she said one-half of her ads were changed.

Anya Beck.  At times Backpage rejected her ads.  She received an email saying she needed to change things to be reposted.                                                                          03:38:49

Quote, "It was either words that I used, like specific words, or a picture was too graphic."

She also testified that something was wrong with her ad when she wasn't receiving calls.

Andrea Benson said some photos she put in an ad                      03:38:59 initially were not posted.  Words were switched or removed.

Jordan Thurman.  At times she noticed changes to her ad after it went online.  She had ads taken down, and then she would repost those ads.

Grant Snyder, when he was posting ads:  Many of the                      03:39:16 ads if they were too explicit, if there was any excess nudity, or if we made reference to age, the ads would no post -- would not post.  Ads would be blocked.  Reposting ads by removing problematic language, which was often a guess.  Sometimes I wasn't sure in most cases what was causing it.                      03:39:37

Okay.  Another argument here about moderators is there was no incentive to promote or facilitate business enterprise for prostitution.  My client was salary.  His income was not based on an ownership.  He didn't get a percentage of a bonus based on ads.  The man worked late at night and in the morning.                      03:40:01

1   Some 50 ads apparently got through, according to the

2   government.  No evidence that he ever saw them, that he ever

3   met a poster, that he ever talked to a poster.  No evidence

4   that he was involved with -- with anything that pertained to

5   NCMEC, the Seattle mayor, the Polaris meeting, or any of that.    03:40:20

6        So in finality, finally, he acted in good faith.

7   There was no evidence that anybody accused him of promoting

8   prostitution.  It never came out of Mr. Ferrer's testimony or

9   Mr. Hyre's testimony.  There was no discussion they claim.

10   They did not claim any discussion with Mr. Padilla that he had    03:40:49

11   an intent to be complicit with them.

12        None of these emails, and certainly none of the

13   testimony, went to the point of being a wink, wink, nod, nod.

14   There just wasn't any of that.

15        They never told him not to be accommodating to law    03:41:04

16   enforcement -- enforcement.  No moderator came in and testified

17   with respect to what was going on at Backpage.  No attaboy ad.

18   No attaboy ad.  I -- I've forgotten how many have been

19   stipulated into evidence, but there are dozens.  None of those

20   ads, if you care to take a look at them, have anything about,    03:41:30

21   you guys are committing prostitution.  None of them have that.

22        You think the law enforcement people -- law

23   enforcement, you're in charge of enforcing the law.  What are

24   you guys doing here over at Backpage?

25        Now, maybe they wanted to use Backpage.  That's their    03:41:45

UNITED STATES DISTRICT COURT

business.  But the pep -- point is they never gave notice to
any moderator, the people who were doing subpoenas, like my
client.  They never gave notice, you're doing prostitution.

My client relied on Nigam -- Ms. McDougall, Mr. Nigam,
Liz McDougall, and Steve Suskin.                                    03:42:09

Mr. Snyder testified about Backpage, and this also
shows how the act -- he -- he, Mr. Padilla, acted in good
faith.  There were numerous telephone calls and email contacts
with Backpage.  The phone calls in the early stages were to
figure out why our ads weren't being posted.  Later on, if     03:42:30
there was an exigent -- exigent circumstance or he needed a
response right away because there was a problem, perhaps a
problem with safety, he wanted to know such things as did the
poster have an email account, another phone number, an IP
address, he would contact Mr. Ferrer at the beginning.         03:42:50

But Mr. Ferrer was, according to Mr. Grant, pretty
unresponsive.  But he did get ahold of Ms. McDougall on several
occasions, as well as Andrew Padilla, as well as Joye Vaught.

In the process, the returns from Backpage became more
efficient.  They provided faster and had more information.  It  03:43:10
turned out to be useful.

With respect to Mr. Padilla, Mr. Grant -- Mr. Snyder
said:  He was responsive to the -- our needs.  It was typically
after hours, in the evenings, sometimes late at night.  The
information that he supplied came in very fast.                 03:43:28

1          Virtually the same thing with Ms. Vaught, except he

2     also testified that he met her in New Orleans at a conference.

3          So here are Backpage people going to the police at a

4     conference, and this was the International Association of Human

5     Trafficking.  According to Mr. Snyder, he said:  We were            03:43:46

6     excited and interested that a representative for Backpage was

7     available to answer our questions.

8          So is this the guilty going into the mouth, into a --

9     the lion's den, or were these people doing what they thought

10    was the right thing to do?                                         03:44:02

11         Ms. McDougall.  He testified about her.  She helped us

12    identify those areas where we could be more collaborative.  She

13    was helpful, also primarily interested in what specifically we

14    were looking for.

15         In 2016, she came to Minneapolis.  There was a meeting       03:44:18

16    with Mr. Snyder, then with the police department, and HSI, Home

17    Security agent, a couple of local investigators at the

18    U.S. Attorney's Office.  The discussion was collaboration.

19    Ongoing collaboration.  How can Backpage help to give law

20    enforcement a better return?                                      03:44:39

21         According to Mr. Snyder, it was very helpful, and so

22    forth.

23         He said in the end on redirect:  Backpage was a good

24    resource, expeditious in their responses, complete in giving us

25    what we requested.                                                03:44:53

1          So, ladies and gentlemen, I -- I leave this to you.

2     What should Mr. Padilla expect?  The government argued to you

3     that it expects a guilty verdict from the jury.

4          Now, that might have been just a -- not -- not

5     intended the way it came out.  If it meant that because it is          03:45:15

6     the government, the proof it has presented makes the defendants

7     guilty because it was the government who presented it, that's

8     not correct.  You are the determiners, and you are not to be

9     guided by anything other than what you hear in terms of

10    evidence in this Court.                                              03:45:35

11         All the parties, all of us request that you follow the

12    jury instructions that apply to the evidence and perform your

13    duties fairly and impartially.  That's the essence of jury

14    service.

15         I'm not here to preach, but I'm here to tell you that          03:45:50

16    that is a really good theme and rule of thumb for you all to

17    follow.  And when you do, if you remember the good-faith

18    instruction and some of the other things, when you apply those

19    instructions to the evidence as I have discussed with you, they

20    show that Mr. Padilla acted in his role as an operation manager     03:46:10

21    in the good-faith belief that what he was doing was consistent

22    with the law, and he wasn't doing anything illegal at all.

23         Not guilty.

24         Thank you.

25         THE COURT:  Thank you, Mr. Eisenberg.                          03:46:26

1          Members of the jury, as I promised, we would adjourn

2     before 4:00 o'clock, and I think it would be unfair to have

3     Ms. Bertrand begin her closing and only get through

4     five minutes of it.  And, again, here, too, we have yet to hear

5     from Ms. Bertrand.  And then, as I mentioned, if they wish to,          03:46:47

6     the government has a final rebuttal close that they may make.

7          And so, again, because we have not officially handed

8     the matter over to you for deliberations, you are to continue

9     to adhere to the admonition not to come to any conclusions or

10    to discuss or research the matters that are involved in this          03:47:06

11    case, simply to continue to keep your open mind until it is

12    time to deliberate.

13         And so I hope that everyone makes it home safely.  I

14    hope everyone has a pleasant evening.  Whether or not you

15    participate with children or grandchildren, I do hope it's a          03:47:25

16    safe one.

17         And so at this time we will have the jury be excused,

18    and so please all rise for the jury.

19         Oh, and be present for 9:00 a.m. tomorrow.

20    (Jury not present at 3:47 p.m.)          03:47:41

21         THE COURT:  And, again, please, for those of you who

22    are present in the courtroom, do stay so that the jury can

23    leave the building without interruption.

24         And be ready to proceed at 9:00 a.m., Ms. Bertrand.

25         MS. BERTRAND:  Yes, I will.  I'm out of suits after          03:48:24

1    tomorrow, so I have to go tomorrow.

2           THE COURT:  Liliana, do we want to check the battery

3    in that mic?  I think --

4           THE COURTROOM DEPUTY:  I'll replace it.

5           THE COURT:  Yes.  Okay.  Thank you.                    03:48:35

6        (Proceedings adjourn at 3:48 p.m.)

7                         ---oOo---

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                    **C E R T I F I C A T E**

6

7            I, CATHY J. TAYLOR, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10           I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15           DATED at Phoenix, Arizona, this 31st day of October,

16   2023.

17

18

19                            /s/ Cathy J. Taylor
20                            Cathy J. Taylor, RMR, CRR, CRC

21

22

23

24

25

UNITED STATES DISTRICT COURT