1

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | November 1, 2023 |
| Michael Lacey, et al. | ) | 9:01 a.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**TRIAL - DAY 28 - A.M. SESSION**

Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2

    For the Government:
3        UNITED STATES ATTORNEY'S OFFICE
         By:  **Mr. Kevin M. Rapp, Esq.**
4              **Mr. Peter S. Kozinets, Esq.**
               **Mr. Andrew C. Stone, Esq.**
5              **Ms. Margaret Wu Perlmeter, Esq.**
         40 North Central Avenue, Suite 1200
6        Phoenix, Arizona 85004
         kevin.rapp@usdoj.gov
7        peter.kozinets@usdoj.gov
         andrew.stone@usdoj.gov
8        margaret.perlmeter@usdoj.gov

9    For the Government:
         UNITED STATES DEPARTMENT OF JUSTICE
10       By:  **Mr. Austin Berry, Esq.**
         1301 New York Avenue, NW, 11th Floor
11       Washington, DC 20005
         austin.berry2@usdoj.gov

12

    For the Defendant Michael Lacey:
13       LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
         By:  **Mr. Paul J. Cambria, Jr., Esq.**
14       42 Delaware Avenue, Suite 120
         Buffalo, NY 14202
15       pcambria@lglaw.com

16

    For the Defendant Scott Spear:
17       FEDER LAW OFFICE, P.A.
         By:  **Mr. Bruce S. Feder, Esq.**
18       2930 East Camelback Road, Suite 160
         Phoenix, AZ 85016
19       bf@federlawpa.com
         - and -
20       KESSLER LAW OFFICE
         By:  **Mr. Eric Walter Kessler, Esq.**
21       6720 N. Scottsdale Road, Suite 210
         Scottsdale, AZ 85253
22       eric.kesslerlaw@gmail.com

23

24

25

```
 1   For the Defendant John Brunst:
         BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
 2       LINCENBERG & RHOW, P.C.
         By:  Mr. Gopi K. Panchapakesan, Esq.
 3            Mr. Gary S. Lincenberg, Esq.
         1875 Century Park E, Suite 2300
 4       Los Angeles, CA 90067
         gpanchapakesan@birdmarella.com
 5       glincenberg@birdmarella.com

 6
     For the Defendant Andrew Padilla:
 7       DAVID EISENBERG, P.L.C.
         By:  Mr. David S. Eisenberg, Esq.
 8       3550 North Central Avenue, Suite 1155
         Phoenix, AZ 85012
 9       david@deisenbergplc.com

10
     For the Defendant Joye Vaught:
11       JOY BERTRAND, ESQ., L.L.C.
         By:  Ms. Joy M. Bertrand, Esq.
12       P.O. Box 2734
         Scottsdale, AZ 85252
13       joy@joybertrandlaw.com

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1                      **P R O C E E D I N G S**

2

3    (Proceedings commence at 9:01 a.m.)

4    (Juror No. 7 is present via Zoom)

5              THE COURT:  Good morning.  Please be seated.          09:01:22

6              MS. BERTRAND:  Good morning.

7              THE COURT:  Well, we have another juror, Juror No. 7

8    has tested positive for COVID.  We have -- we have also, and I

9    will just tell you that we have a number of jurors who are not

10   feeling all that well, but the remainder of the jurors have     09:01:54

11   shown up.

12             Juror No. 7 has indicated her ability to appear by

13   Zoom.  We're prepared to have that happen, and what I would

14   suggest is the following process:  That we conclude with the

15   closing arguments today, and that we, however, not have the     09:02:22

16   jury begin deliberations until next week.  We can select the

17   alternate jurors before we leave today.  That way if Juror No.

18   7 happens to be chosen as an alternate, then that would, I

19   think, cure some of the potential issue.

20             Now, thinking about this a little bit clearer, if she  09:03:05

21   is selected, then there's no reason that they couldn't begin

22   their deliberations today.  If she remains on the panel, then

23   they wouldn't begin their deliberations until Tuesday.

24             MS. BERTRAND:  May I have a moment -- may we have an

25   opportunity to talk?                                            09:03:30

1          THE COURT:  In any event, that's how I propose that we

2    continue.  I don't think at this point it's a good idea to

3    release another.  That would only leave one alternate.  And so

4    in any event, I do intend to finish with the summation

5    arguments today.                                                    09:03:56

6          MS. BERTRAND:  Okay.

7          THE COURT:  All right.  So --

8          MS. BERTRAND:  May counsel have an opportunity to

9    talk?

10          THE COURT:  Yes, you may have an opportunity to           09:04:04

11    discuss this.  I'll give you about, you know, ten minutes, and

12    then I'll come back in and we'll have to then test the

13    equipment and make sure her equipment is available.  But in any

14    event, I think that my sense is that if we have two jurors who

15    have tested positive for COVID, I feel certain that we, and we    09:04:32

16    have some individuals who are not feeling all that well, my

17    sense is it's probably the foregone conclusion that we have

18    more than one or more than two I should say that have this.

19          I'll let you meet and confer and I will be back in ten

20    minutes.                                                          09:04:55

21          MR. LINCENBERG:  Before we meet and confer, does the

22    Court have any information about the condition of Juror No. 7?

23    So when we were talking about the other juror, for example, the

24    Court gathered some information, the juror was foggy and so

25    forth, does the Court have any information about that juror's    09:05:11

1    symptoms?

2         THE COURT:  The only information I have is she's been

3    willing to continue and participate.  All of the jurors have

4    been very attentive.  This is the juror who sits second to the

5    last chair at the very back row.                                    09:05:27

6         MR. LINCENBERG:  Was she the juror who was wearing the

7    mask yesterday?

8         THE COURT:  Yes, she was wearing a mask yesterday, as

9    was the juror next to her, I think, because she was not feeling

10   well.                                                               09:05:40

11        So in any event, I'll let you meet and confer.

12        MS. BERTRAND:  Thank you, Your Honor.

13        COURTROOM DEPUTY:  All rise.

14     (Court took a recess at 9:05 a.m.)

15     (Proceedings reconvened at 9:16 a.m.)                             09:16:11

16        THE COURT:  Please be seated, and I'll hear from the

17   government first and then whomever wishes to speak on behalf of

18   the defendants.

19        MS. PERLMETER:  Your Honor, it is the United States'

20   strong preference is to have Juror No. 7 participate.  In          09:16:27

21   hearing the closing arguments today, we ask that she be then

22   designated as Alternate No. 2 so that if the Court needs to

23   call her back at least she will have heard all of the case as

24   well as all of the arguments.  That is our strong preference

25   because we would like the jury to have the ability to begin        09:16:48

UNITED STATES DISTRICT COURT

1    their deliberations as soon as possible.

2          Once the case has been submitted to them, they will be

3    able to choose their own schedule and begin deliberations this

4    afternoon, if they wish.

5          In the alternative, Your Honor, we ask that Juror                    09:17:06

6    No. 7 be stricken for her illness.

7          Finally, Your Honor, we just wanted to note that Rule

8    23(B)(3) does allow the Court to allow 11 jurors to return a

9    verdict even without stipulation by the parties if the Court

10   finds that there's good cause to excuse a juror so that we              09:17:30

11   could go down to as few as 11.

12         THE COURT:  All right.  Who wishes to go from the

13   defendants?

14         MR. FEDER:  Short straws appear to be my own.  We

15   would ask that the Court treat this juror the same way the             09:17:46

16   Court treated the last juror and strike her.  I mean, it would

17   be inconsistent not to do that.

18         THE COURT:  Well --

19         MR. FEDER:  There is all kinds of logistical issues

20   about the ability to deliberate.  We're not going to agree at          09:18:02

21   least to remote deliberations.

22         THE COURT:  I never suggested that.

23         MR. FEDER:  That's our position.  If the Court -- I

24   mean, the Court has gotten rid of two other people.  This

25   should be the same.                                                    09:18:21

```
 1            THE COURT:  Well, I'm going to have Juror No. 7 appear
 2   remotely for the remainder of the closing summation.  I think
 3   it's a better approach than to release the entire jury once the
 4   government's rebuttal is complete.  I'll give them the
 5   admonition and have them return on Tuesday morning, and then       09:18:49
 6   I'll remind them of a couple of logistical juror instructions,
 7   select the alternates at that time, and let them begin their
 8   deliberations then.  That way, because now we know that we have
 9   COVID present in the jury deliberation room, they are in a --
10   it's not a large room by any means.                                09:19:19
11            And as I mentioned, and I think some of you saw that
12   there are a couple of them that have been blowing their noses
13   and so on and so forth, and I think for them to get better is
14   the best course of action so that they are all clear-minded.
15   And if by chance someone else has COVID, then they would be        09:19:41
16   within that quarantine period.  And so that's how we would -- I
17   think we should proceed.
18            MR. RAPP:  Can I just inquire, Judge, is there a
19   reason why they couldn't come back on Monday?  Obviously the
20   Court I realize is handling their own calendar, but it seems       09:20:01
21   like they could commence deliberations on that day.  I didn't
22   know if the Court was taking into account a five-day quarantine
23   time period or, because next week is a short week because of
24   the Friday holiday.
25            THE COURT:  Well, I mean, the difficulty there is they    09:20:19
```

1   signed up for Tuesday through half day Friday, and so I know

2   that there are a number of jurors who are reporting to work on

3   Monday, and so that -- I think that's the better course so that

4   they would not begin their deliberations until Tuesday.

5        MR. BERRY:  Is there a concern, Your Honor, about

6   delaying deliberations until next week given that we only have

7   this jury until the 9th and we still have forfeiture as opposed

8   to trying to encourage the deliberations to begin sooner rather

9   than later?

10       THE COURT:  There's multiple concerns.  You know, I

11  I'll be very honest with you, I mean, these are -- we delayed a

12  week for COVID.  We obviously have had jurors not show up on

13  time and so on and so forth, but, you know, we can't predict

14  when these sorts of things are going to occur, and I certainly

15  don't want to force the jurors to be in a situation where they

16  now know that there's the presence of COVID amongst them, that

17  they have been exposed and now they are continuing to have that

18  exposure in the deliberation room.  I have a sense that they

19  probably all be very relieved if they could leave and attend to

20  their own health concerns.

21       MS. BERTRAND:  And that raises two points, if I may be

22  heard, Your Honor.  The first is I have concerns about being

23  exposed to people that may have COVID.  I mean, we had one go

24  down yesterday.  We are going to lose one today.  That leaves,

25  what are we down to, 13.  I have concerns.  I have a family

09:20:45

09:20:59

09:21:27

09:21:56

09:22:15

UNITED STATES DISTRICT COURT

1    member that takes methotrexate, which is an immune-suppressing

2    drug, and I have concerns about asking these poor folks to come

3    in here and sit all morning next to each other listening to

4    closings when they want to get home and deal with their health,

5    and they are already not feeling well.                          09:22:45

6         We noticed juror, I think it's 12, yesterday couldn't

7    keep his eyes open.  I mean, maybe that's our fault, but it

8    also could be he's sick.  So I think that's -- and in terms of

9    when this trial ends, my understanding is we screened this jury

10   sitting here, not the first set of questionnaires that went    09:23:03

11   out, but we screened this jury to be able to go until

12   November 17th if that ended up being necessary.  So I don't

13   think that time can be a concern.  But even if it was a

14   paramount concern, the bigger concern is the health and

15   well-being of both these jurors and every person sitting in     09:23:19

16   this courtroom.

17        That's the concerns I want to raise with the Court,

18   and I guess that would prompt us to say, do we want to close

19   next week?  Of all people to say this, I am the last person to

20   say I want to wait some more, but I also don't want these folks  09:23:41

21   sitting here glaring at us angry that they have to sit here and

22   listen to this when they want to get home and get away from the

23   cootie pool.

24        THE COURT:  Well, they've been very attentive despite

25   their various health issues, and I don't think that sitting     09:24:06

1   through two additional summations will push them over the edge.

2   I don't think so.  They've been very diligent and attentive,

3   and I certainly know that they are the type of jury that if

4   they wanted to go home, they would have let my courtroom deputy

5   know that, and any single one of them would, and so I do think          09:24:35

6   it's the better course to -- well, let me -- Mr. Feder, you

7   didn't address this additional position that the government put

8   forward regarding designating Juror No. 7 as an alternate.

9           MS. BERTRAND:  I can address that, Your Honor.

10          THE COURT:  Yes.                                                09:25:08

11          MS. BERTRAND:  I think the defense decided we object

12   to that too; that this should be treated consistent with the

13   other two jurors who have been sent home and with no -- using

14   this juror as one of the alternates or anything like that.

15   This juror goes home or the jury stays, and we prefer the juror        09:25:28

16   jus go home, or be home and stay home and be excused.

17          THE COURT:  Well, you know, to that point, those were

18   different circumstances, and even yesterday was a different

19   circumstance.  We had no idea that this was going to occur,

20   that we would have the diminishing alternate jury pool, and            09:25:43

21   they -- the release of the prior juror we were trying to

22   accommodate her, but apparently the juror was released over the

23   request or at the request of the defense counsel.

24          And so I think this is the way that we're going to

25   proceed.  We'll have our Juror No. 7 view the last two                 09:26:16

1    remaining arguments.  I will release the jury with the

2    admonition, and then bring them back on Tuesday, remind them of

3    a couple of housekeeping jury instructions, select the

4    alternates, and then have them begin the deliberation.

5             I'm going to put aside for the moment the forfeiture          09:26:50

6    issue because I'd like to set aside time because I have some

7    questions about that, and so that's how we will proceed.  We

8    will need some time to set up that equipment, get it tested,

9    make sure that she's able to connect and hear everyone, and

10   that should take us roughly ten minutes or so.  We have our IT        09:27:19

11   person here available.

12             MR. STONE:  Your Honor, when are you thinking about

13   setting aside time to discuss forfeiture issues?

14             THE COURT:  Tomorrow.  I will have you back tomorrow.

15   I need to look at a couple of items, so just -- I just received       09:27:34

16   your briefing yesterday, so we'll do that tomorrow.  All right.

17   So we will test that equipment.  That will take us about, like

18   I said, ten or so minutes to get her situated and then bring

19   the jury in.

20             (Recess was taken at 9:28 a.m.)                             09:28:00

21        (Proceedings reconvened at 9:57 a.m.)

22             THE COURT:  All right.  Please be seated.  And we'll

23   have the jury in.

24   (Jury is present.)

25   (Juror No. 7 appears by Zoom.)                                        09:59:09

1          THE COURT:  All right.  Please be seated.  And welcome

2    back, members of the jury.  As you can see, we are being joined

3    virtually by one of your members.  That is so we can continue

4    on without too much interruption.  After the summation argument

5    I will describe to you how it is we are going to proceed for          09:59:32

6    the remainder of the trial.

7          With all that said, I want to just make sure that our

8    juror who is appearing virtually you can hear me.  Thumbs up.

9    Okay.  Thank you.

10          All right.  Ms. Bertrand, you may proceed.                    09:59:50

11          MS. BERTRAND:  Thank you, Your Honor.

12          Good morning.  Nothing is more frightening than a

13    prosecutor stating that they have the right or entitlement to a

14    jury, a guilty verdict.  And combined with the fact that this

15    particular prosecution seeks to turn the First Amendment on its     10:00:18

16    head, this prosecution gives me chills and not in the fun,

17    spooky Halloween way.

18          History has taught us that crusades are incredibly

19    dangerous.  They wrap up in even the most well-intentioned

20    innocent people, and this trial is the result of an                 10:00:41

21    antiprostitution crusade.  Powerful politicians and religious

22    leaders would accept nothing less than Backpage's complete

23    shutdown despite them being on notice that their efforts

24    offended the First Amendment.  Make no mistake about it, some

25    of the most powerful politicians in the country leaned hard on      10:01:10

```
 1   Backpage.
 2             Ms. Ellig, can you please show Exhibit 902?  Please go
 3   to the signature page of 902.
 4             Richard Blumenthal, now Senator Blumenthal;
 5   Tom Corbin; Chris Koster; Jim Hood; Lisa Madigan, Attorney        10:01:42
 6   General of Illinois.
 7             And Ms. Ellig, can you please show the jury
 8   Exhibit 52?  Could you please show the signature pages?
 9             We have more on this one, Richard Blumenthal;
10   Joseph R. Biden the III.                                          10:02:07
11             On the next page, Ms. Ellig.
12             More powerful people, Greg Abbott, Attorney General of
13   Texas.  And in addition to these powerful people, we have NCMEC
14   pushing their agenda on Backpage; we have Polaris; the Auburn
15   Theological Seminary, and ultimately you heard some back and      10:02:41
16   forth, the United States senate.
17             And Backpage's response to these demands is set out in
18   Exhibit 171 after the letter from NCMEC is Backpage's response.
19   In essence it's this:  First Amendment protections for
20   platforms of speech, for publishers, are different from what      10:03:06
21   they are for regular people.  And here Backpage starts as part
22   of a newspaper.  There's a reason why we call the press the
23   Fourth Estate in the United States, because the press has a
24   critical role in telling the people what they need to know
25   about their government, in giving them the ability to be          10:03:31
```

educated, reasonable rational voters so that they can

participate in this democracy.

          And as part of that, Backpage could not adopt the

demands of the powerful and elite, at least not wholesale

because that violated the First Amendment.  And what I mean by

that is, and you have an instruction about the First Amendment

protecting speech.  Speech on these platforms is presumed

protected.  The only time the government can start to regulate

it is when it is the speech on the page is explicitly,

patently, obviously for criminal conduct, and that means as you

look at it, not once you meet the person who wrote it and they

tell you all about themselves and how they got that point.

From the reader looking at it, does it explicitly propose a

crime?

          And I fully expect -- I am sorry, this mic is goofy,

Your Honor.

          I fully expect the government to get up in their

rebuttal close and say something like to the effect of:  Well,

you can't tell all these coded language.  Obviously --

obviously, folks, this was criminal conduct.  Well, you know,

we've heard this whole "You can tell about women" many times

before.

          When I was a little girl I didn't have red shoes.  I

didn't buy my first pair of red shoes until I was in my 30s

because I was raised that only whores wore red shoes.  So it's

1   actually kind of an act of rebellion for me to get my first

2   pair.  As you can see, I've given them a lot of use, but that's

3   not enough.  And you know what else is not enough is what every

4   one of these law enforcement officers got up and told you, it's

5   not enough to look at an ad.  You can't tell.  So we have no          10:06:00

6   idea what is going to happen with that transaction if a

7   transaction occurs.

8          And you can't tell because she's provocatively dressed

9   or because she uses, to the extent it's even a she, provocative

10  language.  All that is facially legal for the publisher.  You        10:06:23

11  want to go after the speaker and look into it more.  You think

12  it's a good lead, have at it.  We'll help you, but don't come

13  to a publisher and tell us to sensor our speech.  That's where

14  we draw the line.

15         In fact, the government didn't want you to hear, I            10:06:47

16  jumped up and down in Mr. Cambria's argument, Backpage did

17  respond to NCMEC and said, "We'll work with you.  We want to

18  work with you.  Let's develop national standards for these

19  platforms.  So it's not just us doing it.  Everyone knows what

20  the deal is, TikTok, Facebook, back in the day MySpace.  Today       10:07:08

21  that would include Pinterest, OnlyFans, Amazon.  We'll work

22  with you, but we have to draw the line at what the First

23  Amendment prohibits.

24         But that wasn't enough for the abolitionists.  It was

25  their way or the highway.                                            10:07:39

1          Ms. Ellig, can you move the PowerPoint to slide two?

2          During voir dire, and at a couple moments during this

3    trial you've been asked two critical questions, almost a

4    mantra.  Can you be fair and impartial and can you follow the

5    law?  And you all have said repeatedly, yes.  Stop asking me.          10:07:59

6    Yes.  To be clear, when you are asked, "Can you follow the

7    law?"  That doesn't mean, can you do what the government tells

8    you to do.  It means, can you follow the law as it is

9    instructed to you to include insisting that this government,

10   this prosecution, prove their case beyond a reasonable doubt?          10:08:32

11   It is an incredibly high standard, and it's high standard on

12   purpose.

13         Whenever you can say in this case, well, for all we

14   know, it could maybe have been different from what the

15   prosecutor says, I submit to you that's reasonable doubt.  If          10:08:57

16   you can say it without abandoning reason, without abandoning

17   your rational thought.  The prosecution has to rule out every

18   one of those for all "we knows."

19         Ms. Ellig, can you move the PowerPoint slide three?

20         Here's the instruction.  Not going to read it to you.           10:09:24

21   You can read it.  What this means in simple terms is a

22   reasonable doubt is a juror using reason or logic could believe

23   the doubt might be true.  And each of you must accept a

24   reasonable doubt until logic rules it out.  There must be no

25   logical way for the reasonable doubt to exist.                         10:09:55

And size, I mentioned this in my opening, size doesn't count.  Reasonable doubt doesn't mean moderate doubt.  It doesn't mean we can all come to a consensus about this.  It means any doubt that is reasonable.  A tiny doubt based on reason is still reasonable doubt.  It's about logic; not weight.  A featherweight doubt is a reasonable doubt; a featherweight O-ring blew the space shuttle Challenger; a World Series can be won by an inch; an election by a single vote.  A firm belief is not even enough to convict when accompanied by reasonable doubt.

Here's an example.  I will give you two examples while we talk this morning, and here's the first one.  When my stepson was a little guy, he loved Halloween.  Now he is too cool to talk to us, but when he was little he loved Halloween.  And I've lived in my neighborhood for a long time; knew my neighbors.  We had keys to each other's houses, knew each other's pets.  So when he was little, he would last half a block down and half block back and he is done.  He wants to eat his candy.  I knew everybody.  I trusted them.  They trusted me with their kids.  So when he brought his basket home, "You can have three.  You can have three pieces, buddy."

But as he got bigger, his range of trick-or-treating got wider, and all of a sudden we are going around the block. I don't know who moved into that rental down the street. That's an airbnb now.  God help us.  Buddy, I need to look

10:10:19

10:10:49

10:11:04

10:11:22

10:11:41

through your candy before you can have some.  I need to be

sure, because at that point I had a reasonable doubt.  I don't

know who these people are.  I don't know if I can trust them.

I don't know that the candy is sick, so let me check and then

you can have your three pieces.                          10:12:06

The judge has given you long instructions.  And

here -- we're here to determine the government's case.  The

prosecutor's case is on trial to determine if they can overcome

reasonable doubt, and I suggest to you that the instructions

from the Court lead you to reasonable doubt.            10:12:35

Ms. Ellig, can you please advance to slide four?

First let's talk about cooperators.  You get two

separate instructions about cooperating witnesses.

Would you please move to PowerPoint slide five?

You heard evidence that Carl Ferrer, a witness, made   10:12:54

prior statements under oath that contradicted his testimony

here.  It's up to you to decide how much weight to give that.

Well, I suggest that your first reasonable doubt is that

instruction.  At some point he's lied.  You say two things that

contradict themselves under oath, that's a lie.  Which lie it   10:13:32

is?  I don't know, but I can tell you it's a problem, and it

shows us that we cannot trust a word that comes out of

Carl Ferrer's face.  That is reasonable doubt.

When it is the witness that this prosecution had up

talking to us for three weeks, four weeks, the witness that    10:13:55

1    this government has bet the farm on lied.  So for all we know,

2    this was a lie.

3          Would you please move to PowerPoint slide six,

4    Ms. Ellig?

5          In evaluating the testimony of Mr. Ferrer and                    10:14:22

6    Mr. Hyer, consider the extent to which their testimony may have

7    been influenced by other parties.  And who are those other

8    parties?  The United States Government.

9          For all we know, Carl Ferrer had 500 million reasons

10   to lie to you.  Let's remember, he bought Backpage for over          10:14:48

11   $500 million.  He owed $500 million to the seller.  It was a

12   seller-financed sale.  The government comes along after

13   Carl Ferrer ran Backpage into the ground, barely could make

14   payroll, which he didn't tell his employees about either, and

15   says:  We'll cut you a deal.  Not only will we give you some        10:15:20

16   leniency with your sentencing, but your money can go into your

17   attorney's trust account.  And in addition to keeping a bunch

18   of stuff -- I apologize for this, I don't know, whatever -- you

19   get to keep a bunch of stuff and you get to keep the money, and

20   at the end of the case, just give the money to the government.      10:15:42

21   Getting you off the hook with the sellers.

22          And when it comes to Ms. Vaught, for all we know the

23   guy never met her.  Let's remember, when he was testifying he

24   couldn't even say her name correctly.  He called her Joyce.

25   When asked to pick her out in the courtroom, let the record         10:16:16

UNITED STATES DISTRICT COURT

1   reflect I am blonde, somewhat, Ms. Vaught, also blonde, was

2   sitting next to me, he looked to me like he was using more the

3   powers of deductive reasoning --

4           MR. RAPP:  Objection; improper argument.

5           THE COURT:  And I will overrule the objection, and the    10:16:39

6   jury will use their recollection of what occurred.

7           MS. BERTRAND:  He was guessing.  There are only two

8   women sitting back there and we are both blonde.  So for all we

9   know, Ms. Vaught wasn't involved in any of Carl Ferrer's

10  shenanigans to the extent shenanigans occurred.               10:17:01

11          Please advance to slide seven of the PowerPoint.

12          The Court's conspiracy instructions also lead you to

13  reasonable doubt.

14          Would you please move to slide eight?

15          An agreement between two or more persons to commit at    10:17:24

16  least one Travel Act offense.  To be clear, you have to all

17  agree as to each defendant sitting behind me that each one of

18  them knowingly joined this agreement, this agreement to break

19  the law.  You can conspire to throw someone a surprise birthday

20  party.  That's not a crime.  This conspiracy requires an        10:17:48

21  agreement to break the law and that each person joined it in

22  the first place, knew it was going on and said, "Put me in."

23          As to Ms. Vaught, the prosecution's case has

24  reasonable doubt.  For all we know, there was no agreement.

25  And for all we know, this has all come in from Carl Ferrer      10:18:28

1    trying to save his skin.  For all we know, the millions of

2    dollars Backpage invested in moderation shows he didn't agree

3    to anything of the kind, especially the moderators.

4         This moderation was designed to undercut the same

5    conspiracy Ferrer says occurred, and how do we know that?  We          10:19:02

6    got the moderators going through the ads at various times by

7    different methods catching a bad act, catching one of the bad

8    actors, pulling the ad.  And then who fixes it?  Not

9    moderation.  Moderation doesn't get the complaints.  Sales and

10   marketing does.  You heard that from Dan Hyer.  The two do not         10:19:30

11   meet.

12        So the moderators are over here and, yes, there is a

13   lot of work.  I believe the prosecution referred to it as the

14   engine room of Backpage.  I think it's fair to say it was a

15   sweatshop.  I don't know if I would say it's the engine room of        10:19:50

16   this company.  This group of people doing this nearly

17   impossible job, doing their imperfect best to do what they

18   understood allowed Backpage to function legally.  Whatever they

19   are doing over in marketing is on Carl.

20        Reasonable doubt six, excuse me, four.  This is a               10:20:16

21   four.  Carl Ferrer displayed his FBI award in his office.  That

22   came from Carl.  It would certainly be reasonable, rational for

23   one of his subordinates working in moderation to think they

24   must be on the up and up.  Carl got an award signed by Robert.

25        Would you please advance to slide nine, Ms. Ellig?            10:21:12

1    Oh, sorry next one, slide ten.

2           The defendant became a member of the conspiracy

3    knowing that at least one of his objects intended to help

4    accomplish it.  Reasonable doubt seven, excuse me, six.

5    Reasonable doubt, next one.  They haven't ruled out the          10:21:38

6    possibility that Ms. Vaught joined this company understanding

7    her job was to police the Backpage adult section for illegal

8    sex-for-money ads, for patently illegal ads, in opposition to

9    the promotion of any criminal conduct.

10          Let's remember, Ms. Vaught is hired as part of this        10:22:03

11   wave of moderators when the big Craigslist -- Craigslist -- I

12   don't know what you want to call it -- exodus was occurring.

13   There is nothing in this record that shows there wasn't any

14   side deals, any wink of an eye, go through and go through all

15   this litany of ads everyday to promote anything improper or       10:22:34

16   illegal.  There's no indication that when she was hired they

17   are like, this is what you're going to do, but we all know what

18   is really going on.  None of that.  And Ms. Vaught was so

19   diligent about her job, answering emergencies for the police,

20   assisting in the response to 20,000 subpoenas, getting thank      10:22:59

21   you's -- Backpage getting thank you's for helping.

22          It is rational.  It is reasonable to believe that

23   Ms. Vaught didn't join any criminal conspiracy, and they

24   certainly can't rule out that Ms. Vaught took a job placing the

25   site seriously.                                                   10:23:30

1          Ms. Ellig, can you show Exhibit 6257.  Here's an

2     example.  Colleen is one of the moderators.  And Ms. Vaught

3     comes in, is looking on April 3rd, 2014, reviewing Colleen's

4     work and saying, "You're missing stuff.  Slow down.  Pay

5     attention.  This is the kind of thing that gets someone fired."  `10:24:05`

6     And that's consistent with Dan Hyer saying no one got fired

7     because they edited, not edited, moderated too many ads.  There

8     is no incentives for the moderators to do anything but strictly

9     follow the rules they were given.

10          If you can show 6258, please.  `10:24:34`

11          This has been going on with Colleen for a while.  This

12     is two months earlier, or a month and a half earlier, "Colleen,

13     finding some pretty bad violations in the ads you approved.

14     Not the ones you knocked out, the ones you approved.  Please

15     slow down and read carefully.  There is not much room for  `10:24:55`

16     mistakes." Does that sound like someone is like, Colleen, let

17     whatever goes through go through.  You know what we're all here

18     for?  Not at all.  She is threatening to fire someone for

19     missing illegal ads.

20          Please show the 1217 exhibit.  `10:25:16`

21          And here you have Mr. Padilla saying, hey, "great job

22     catching bad stuff," and not "great job letting bad stuff in."

23     If you look down about three-quarters of the way down the page,

24     "Please congratulate the crew for me.  I think they are doing a

25     tremendous job keeping up with the volume," which we know was  `10:25:47`

1    huge, "and removing the bad guys."  That's directly counter to,

2    "Hey, we all know what is really going on, couple get through

3    here and there, makes the user happy."  Not at all.  They're

4    focused on catching the bad guys, at least in moderation.  So

5    reasonable doubt six is, for all we know moderation thought          10:26:16

6    they were hunting bad guys.

7           Reasonable doubt seven, we'll get to in a minute.

8           Would you please -- let me back up.  I apologize.  And

9    we know Ms. Vaught helped law enforcement.  Confirmed he saw

10   her at a convention.  I mean, this starts to really stretch,        10:26:54

11   this idea that they are hiding in plain sight when you're

12   sending your moderators to law enforcement conventions to tell

13   them how they do their job, and the prosecution here hasn't

14   ruled out the possibility.  Ms. Vaught believed that she was

15   helping them.                                                       10:27:19

16          You heard Jeff Adams say, I believe, one of the most

17   rewarding parts of his job was working in moderation and

18   assisting law enforcement.  That is directly contrary to

19   someone whose knowingly joined a conspiracy to violate the law.

20   So reasonable doubt seven is she helped law enforcement.  Well,     10:27:37

21   we will get to that in a minute.

22          Ms. Ellig, could you please advance to the next slide?

23   Thank you.  And the next one, please.

24          My colleagues have touched on this here.  It's really

25   important for Ms. Vaught.  It's not enough that she said -- she     10:28:11

1   may have said, we already know she did that, that she discussed

2   matters of common interest like moderating, how we are going to

3   moderate, the new rules that we must follow, these rules

4   changing sometimes on a daily basis, rules coming from Internet

5   security and safety experts like Hemanshu Nigam.  It's not        10:28:35

6   enough, and yet that's exactly what underlies the prosecution's

7   theory about Ms. Vaught of, well, she was there; she must have

8   known.  Clearly she is part of this.

9           It's not clear at all because reasonable doubt eight

10  is, what plan do they say Ms. Vaught joined?  And we haven't      10:29:00

11  ruled out the possibility there was no plan.

12          And reasonable doubt 11, sorry, my numbers are off.

13  Reasonable doubt nine, all this assumes that Ferrer had

14  concocted a plan, and that is a big "if."  This whole story of

15  a plan and a conspiracy comes after the Feds arrest him and      10:29:38

16  charge him, not during, especially not as it pertains to

17  Ms. Vaught.

18          So there is a rational possibility, a very real

19  possibility, that Ferrer, if he did have some plan, never told

20  the moderators about it.  He left them in the dark.  He used     10:30:02

21  them.  It's consistent with Dan Hyer saying moderation and

22  marketing were kept separately and that marketing can undo the

23  work of the moderators.

24          Would you move to slide 12, please?

25          Ms. Vaught has to be shown to have directly conspired    10:30:38

with someone else in the conspiracy to carry out as to one of

the objects.  Which object?  She's going to this sweatshop

everyday trying to stay on top, playing whack-a-ball all day

with these people trying to cheat the system, trying to violate

the Terms of Use, trying to get around the rules.                    10:31:06

          Slide 13, please.  And then Ms. Vaught had no reason

to know that the other conspirators were involved with those

whom the defendant directly conspired; in other words, she had

to know she was joining the same conspiracy as everybody else

is alleged to have joined, and that's true for each one that     10:31:42

they got to prove.  So if there is other things going on and

other plans and schemes, we all have to agree on what the

scheme was and each one of these defendants joined it, and to

me that is a big doubt.

          So reasonable doubt, what are we on, ten, is for all    10:32:01

we know, Ms. Vaught didn't join anything.

          And you know, they make a big deal about what gets

through and the mistakes.  And in reality is, and you heard

this story from everybody, moderation is not perfect.  It's a

human process, and you got moderators coming in doing their      10:32:35

imperfect best everyday with a nearly impossible job.  And we

note Ms. Vaught not only did her job in good faith, she did it

well, and we can't rule out the possibility Ms. Vaught was

doing it in good faith 'cause she believed in what she was

doing was righteous.                                              10:32:56

1        And imagine the level of perfection being demanded by

2    the government in this case.  By my count, you are going to

3    receive seven pages of instructions on what prostitution means

4    in each state, and that's before the prosecution asks you to

5    infer what might go on in Nevada, a state where prostitution is          10:33:22

6    legal in some areas.  We can't assume.  We cannot assume.  We

7    cannot presume, we cannot infer that what goes on in Nevada

8    isn't a legal part of Nevada.  We can't.

9        Let's talk about some of the other states.  I will

10    compare four states and how different their instructions are.          10:33:46

11        Can you please show slide 14, Ms. Ellig?

12        This is Alabama.  Part of prostitution requires a

13    natural or unnatural sex act or deviant sexual intercourse.

14    Again, all right, I don't know.  You get instructions on this,

15    but that's a lot to guess about from the face of an ad.                10:34:11

16        Could you please move to slide 15, Ms. Ellig?

17        Here's Louisiana.  Indiscriminate sexual intercourse.

18    So if you're discriminating about who you have sexual

19    intercourse for money, it's okay.  I don't know from looking at

20    this.  I am not licensed in Louisiana, but you can tell you            10:34:33

21    from the face of an ad, it would be impossible if someone was

22    going to engage in indiscriminate sexual intercourse.  And

23    you'll notice even the definitions of "sexual intercourse" vary

24    from state to state.

25        Would you please show slide 16?                                    10:34:51

UNITED STATES DISTRICT COURT

1          Arkansas.  It counts in Arkansas if you just touch

2     people through their clothes.  How are you supposed to tell

3     that from an ad, from the face of an ad if you're the

4     moderator?  You can't.

5          Could you please show slide 17?                         10:35:10

6          Arizona includes this one, which fascinates me,

7     sadomasochistic abuse.  It's one of the ways they can prove

8     prostitution.  It means flagellation or torture by or on a

9     person who is nude or clad in undergarments, whatever those are

10    going to be, or in revealing or bizarre costume.  Who decides  10:35:33

11    that?

12         What if it happened yesterday, who then is the arbiter

13    of what is the bizarre costume?  I saw everything from a

14    Tyrannosaurus Rex to a little old lady last night

15    trick-or-treating.  We don't know, and we certainly don't know  10:35:53

16    from the face of an ad what is going to happen behind the ad.

17    You certainly don't know as a moderator, and there is no

18    evidence that the moderators ever received instructions like

19    you're getting.  None at all.

20         MR. RAPP:  Objection; this is not in the jury            10:36:16

21    instructions.

22         MS. BERTRAND:  Arizona is not?  Okay.  We will move

23    on.  I thought this was included in the instructions.  I pulled

24    it out of the instructions.

25         THE COURT:  I recall reading something to this effect    10:36:28

1    to the jury, so --

2              MS. BERTRAND:  We will move on.

3              THE COURT:  Thank you.

4              MS. BERTRAND:  This is for Ms. Vaught, maybe the most

5    important reasonable doubt that you have.  Government must          10:36:44

6    show -- this prosecution must show that this defendant had a

7    reason to believe that whatever benefits she might get from

8    this conspiracy, that we don't think she joined, probably were

9    dependent upon the success of the entire enterprise; that she

10   wins if they win.                                                   10:37:08

11             And here your next reasonable doubt that they cannot

12   counter, is she had nothing to gain from this.  She started at

13   Backpage making $13 an hour along with her fellow $13 an hour

14   moderators.  She worked her way up because she was careful and

15   conscientious, and detail oriented.  That was Ferrer's words.      10:37:38

16   And by the time Backpage was shut down nine years later, she

17   made less than one-tenth of what Carl Ferrer made between his

18   salary and his side hustle.

19             What in God's name did she have to gain from joining

20   this?  I submit to you that they cannot rule out nothing.          10:38:05

21             In fact, your last reasonable doubt as to Ms. Vaught

22   is that the opposite was true for her, and you see that by the

23   way she talks to the moderators, "Your job is on the line if

24   you screw this up.  If you don't catch these illegal ads that

25   we are trying and spending millions of dollars each year trying    10:38:36

1   to catch, you're fired."

2          So after the government is done talking to you, you're

3   going to go deliberate.  The Court is going to tell you how we

4   are going to do that given COVID concerns, but I'm going to ask

5   you to consider this with deliberations:  Reasonable          10:39:09

6   conclusions can contradict.  Each of you have a different world

7   experience that affects your reason and your rational thinking.

8   That's why we have jurors and not one person decide cases like

9   this.  So people are going to weigh the evidence differently.

10  If another juror's best efforts to persuade you do not take    10:39:37

11  away your reasonable doubts, you can't convict.  If the whole

12  group says guilty and you have reasonable doubt, you can't

13  convict.  That's your sworn oath.

14         And if any other juror threatens you to vote guilty

15  and you are uncomfortable with that, tell the judge.  It's that 10:40:00

16  important.  In fact, you can stick to your doubt even if you

17  can't put your finger on it 'cause this is just wrong.  It's

18  not enough.  All you need is there is not enough evidence to

19  prove I am wrong about there being a reasonable doubt.  They

20  haven't ruled it out.  It's possible.  And if it's your honest  10:40:26

21  belief, you have a right and duty not to compromise it away.

22         And your colleagues are allowed only to show you that

23  your honest belief is wrong, not to bully you or push you in

24  any way to change your mind.  Deliberations are not bullying

25  sessions.  You're jurors; not politicians.  When you have an    10:40:53

honest belief that there might be, just might be a reasonable

doubt, you're required to stand your ground.  This might be the

most powerful you are in public life ever.

        And just as important, don't try to get another juror

to convict in spite of his or her honest belief.  Part of what

happens in deliberation that's so important and gets overlooked

so much is mutual respect, in talking to each other one on one

from a place of honesty and from the heart, and that can't

happen if one group is going to bully another.

        And if you think that a reasonable doubt is based on

logic, then a reasonable doubt exists.  Even if you don't share

it, even if your logic is different, 'cause you cannot convict

when a reasonable doubt exists.  You have the right as a juror

to go home after this trial ends knowing that you've been on a

jury that followed the oath you personally took to obey the

law, especially this law about reasonable doubt.  You must not

give it up to please anybody else, them, us, the Court, public

opinion.  Your honest belief in this context is sacred under

the law.

        And to be clear, we're the people.  The government is

not the people here.  When we created the United States, we

didn't transform ourselves into the government of the United

States.  We created a government entirely separate from the

people.  There's no use of the word "people."  The Declaration

of Independence or the constitution makes the people the

1    government.  Quite the opposite.

2         To the Founders, the government and the people were

3    potential antagonists.  That's why the Founders gave us

4    protections, the Bill of Rights; First Amendment, big one;

5    Second Amendment; Third Amendment we don't talk a lot about now          10:43:23

6    in modern times, but that prohibited the government from

7    quartering troops in your home without your consent.  As you

8    can imagine in 1776, they found that particularly rude and

9    really important.  Fourth Amendment, search and seizure, limits

10   government conduct; Fifth Amendment, due process; Sixth          10:43:42

11   Amendment that governs criminal cases, all limit the

12   government's power and the government's reach, all place the

13   constitution between you and the prosecution.

14        The entire purpose of criminal trials is to protect

15   people from the government, not from ourselves, and sometimes          10:44:09

16   we forget that.  So let me remind you that this all -- this

17   whole American experiment starts with objection to taxation

18   without representation, and we fought and won our freedom

19   because Brittain, England was not governing us with fairness.

20   There were constant executions, jails were full.  And in fact,          10:44:37

21   so many people were going to jail from England, they set up the

22   state of Georgia to be like Australia, to be a prisoner state.

23   They didn't have room to keep them all.  And that was a

24   wholesale attack on the citizens and their civil liberties.

25   That's why we had the revolution.          10:45:03

1          And since then throughout our history we have

2    thousands of men and now women dying in defense of those

3    constitutional protections.  They are not to be taken lightly.

4    They are not technicalities.  And one of those protections

5    guarantees that the defense doesn't have to prove anything in a          10:45:24

6    criminal matter.  I wouldn't have done this, but I could have

7    said, I don't think the Court would allow it, I could have said

8    after we opened in early September:  I am going to go out of

9    town.  I will be back.  Come in today and they are like, yeah,

10   they haven't proven it.  We didn't do that.  I have no burden,          10:45:45

11   zero, standing here, nor do my colleagues.

12          In fact, what you see with each of these defendants,

13   including Joye Vaught, is people cloaked in the armor and

14   bulletproof vest of the constitution.  They have had that

15   protection throughout this trial and beyond it if your verdict          10:46:10

16   is not guilty, and those protections don't come off unless you

17   the jury take them off with a guilty verdict.

18          We don't know why things happen, but somehow against

19   all odds you're the ones chosen to be here and who have been

20   here for two months, and it seems random of all the people in          10:46:31

21   Maricopa County and beyond you end up here, but it's not a

22   coincidence.  It's not a coincidence that you made it through

23   voir dire; that you sat through this trial with such patience,

24   and I can hazard a guess none of you came here thinking, super,

25   I get to be on a jury.  I think only trial lawyers think that          10:46:57

1    way, but you did.  And I don't know why it worked out that way,

2    but I've watched you all through this trial.  I watched how

3    carefully you've paid attention and your concern day after day

4    about total strangers.  That's not what people do a lot of in

5    our culture.  It's not too often that people come together from          10:47:19

6    a place of caring and obligation.

7         And now you're called to be a protector of our

8    constitutional rights.  The presumption of innocence does not

9    evaporate when the evidence closes.  The government doesn't get

10   any inferences.  They don't have a right to a verdict, and for          10:47:45

11   those of you who believe the prosecution cannot rule out any of

12   the reasonable doubts that I've listed, and you may have your

13   own, you might have plenty others, now is the time for you to

14   hold fast to your convictions.

15        I am going to show you one final slide please, slide          10:48:08

16   19.  Ms. Ellig, slide 19.  Maybe.  I think we're having a --

17   sorry.  Thank you.

18        Throughout this trial I thought a lot about

19   George Orwell's writings.  He warned us about government

20   overreach, and the cynicism of this prosecution echoes this.          10:48:42

21   Here, what is up is down; the First Amendment is protected,

22   except it's not; what is disclosed is concealed; helping law

23   enforcement with 20,000 subpoenas, law enforcement conferences,

24   late night and early morning phone calls is not evidence of

25   joining a criminal conspiracy.          10:49:13

1          I will leave you with one final example.  In the, it

2     was in the '80s, some of you might be too young to remember

3     this, but there were probably ten people, I am estimating right

4     now, who were poisoned and died by Tylenol.  And they

5     investigated and found out that someone had poisoned some of          10:49:44

6     the Tylenol pills.  And so Tylenol did the right thing and

7     recalled all the Tylenol.  Just send it in.  No questions

8     asked.  We can't risk any of these.  We don't know what's been

9     poisoned; just send it all back.  So here's what I'm asking you

10    to think about.  You've heard a lot of metaphors of reasonable     10:50:09

11    doubt, but I will leave you with this one.

12         Imagine it's a few years after the recall, and if your

13    household is like mine and sometimes lets things go out of

14    expiration in the medicine cabinet, and your beloved isn't

15    feeling well.  It's late at night, stores are closed, and you     10:50:27

16    get up and look for something to give your beloved and you find

17    the Tylenol in the medicine cabinet.  You don't know what lot

18    it is.  You're not quite sure where you bought it.  You don't

19    even know how many of these Tylenol capsules of the millions of

20    Tylenol capsules are poisoned ended up in what bottle.  Can you    10:50:52

21    take this Tylenol back to your beloved and say, "Here, honey,

22    this will make you feel better"?

23         My friends, that's reasonable doubt, and I ask you to

24    vote not guilty not only on behalf of Ms. Vaught, but on behalf

25    of each of the defendants here.  Thank you.                        10:51:19

1          THE COURT:  Thank you, Ms. Bertrand.  Members of the

2     jury, and Juror No. 7, we are going to take a brief break and

3     that is to permit the government to switch out the computer.

4     Since we do have a virtual appearance of one of the jurors, we

5     need to switch gears and so on and so forth, and so we'll take          10:51:42

6     approximately a 15-minute break.  And again, just remember the

7     admonition not to come to any conclusions nor to discuss the

8     matter.

9          Juror No. 7, you may blank out your camera for the

10    duration and then we'll have you back in in about 15 minutes.          10:52:02

11         Please all rise for the jury.

12         (A recess was taken at 10:52 a.m.)

13       (Proceedings reconvened at 11:10 a.m.)

14         THE COURT:  All right.  Please be seated.  Do we have

15    Juror No. 7 on ready to come in?  All right.  Yes, there she          11:10:46

16    is, and we'll have the jury in.

17                    (Jury is present)

18         THE COURT:  All rise for the jury.  All right.  Please

19    be seated.  The record will reflect Juror No. 7 remotely, and

20    the jurors are present.          11:12:25

21         MR. BERRY:  Thank you, Your Honor, may it please the

22    Court, counsel.  Ladies and gentlemen of the jury, there are

23    two sides to Backpage, what the defendants wanted you to

24    believe and what the evidence actually shows.  Each defendant

25    had a specific role in the conspiracy.  Everyone was a          11:12:45

1    necessary piece to the puzzle.

2            As the Court has explained to you, this is the United

3    States' last opportunity to stand before you and explain to you

4    our theory of the case.  That's because we have the burden of

5    proof.  You've heard defense attorneys argue in front of you        11:13:07

6    now for about seven hours.  I'm going to respond to that and I

7    am going to try to do it in under an hour, so I want to zoom

8    out and talk to you about our theory of the case and some of

9    their defenses.  My vow to you is to not show you another

10   e-mail.  We're going to talk about this case in a different way     11:13:28

11   today.  So let's zoom out and talk about these charges.

12           There is a lot of evidence in the charges, but the

13   case is actually quite simple.  There are 51 counts focused on

14   how the defendants promoted prostitution, and there are 49

15   counts focused on how the defendants engaged in money              11:13:49

16   laundering of the illegal profits they made from promoting

17   prostitution.  All five defendants are charged in Counts 1

18   through 51.  We'll talk about the money laundering charges a

19   little bit later.

20           You have this chart up here.  It's on the slide now as      11:14:08

21   well.  We've printed it for you, so I am not going to spend a

22   ton of time on the slide, and I told you I am not going to show

23   you a bunch of e-mails.  What we have done with this chart is

24   to distill the case down into just a handful of exhibits that

25   we believe are the core exhibits that show each defendants'         11:14:30

UNITED STATES DISTRICT COURT

1    knowledge of prostitution in this case.

2            I encourage you to write these exhibit numbers down.

3    They are going to be up here on this poster board throughout

4    the entirety of my presentation.  Keep in mind also that this

5    presentation and the one Mr. Rapp gave the other day will not         11:14:50

6    be available to you.

7            As I go through this, if there is anything that you

8    think will be helpful to you in your deliberations, I encourage

9    you to jot that down as we're going.  We're going to talk about

10   some specific jury instructions and I'm going to point out some        11:15:08

11   the page numbers on which you'll find it.

12           I don't expect to you write the instruction down, but

13   keep in mind you're not going to have all of the jury

14   instructions.  I don't know if you still have them today after

15   she read them the other day.  You'll have one copy of those           11:15:25

16   jury instructions that will help guide you in your

17   deliberation.  The chart is going to be up here the whole time

18   so if you don't get it from that slide, it will still be up

19   here for you.

20           What I want to talk about is the general defense               11:15:39

21   arguments.  They did it in seven hours.  I will try to do it in

22   under an hour, and I think I can do that because they touched

23   on a lot of the same things.  One of the things that they said

24   is, "Ladies and gentlemen of the jury, it's not illegal to make

25   money."  We're going to talk about that defense.                      11:15:55

UNITED STATES DISTRICT COURT

1          They talked about the defense of "I didn't know."

2    There is no sex act for money language on the face of the ad.

3    If you can't arrest, then you can't convict.  There is no

4    knowledge of any of these 50 specific ads.  We're going to talk

5    about that argument.                                          11:16:13

6          We're going to talk about what I refer to as the "But,

7    mom" defense.  "But, mom."  I will explain that to you and

8    we'll talk about that.

9          We're going to talk about the "It wasn't me" defense.

10         Finally, we're going to talk about good faith.  This     11:16:27

11   is the roadmap for where we are going to go for the next hour.

12         Let's start.  The defendants say, "Hey, it's not

13   illegal in the United States of America to make money."  We

14   haven't charged them with that.  There is no federal statute

15   that says it's illegal to make hundreds of millions of dollars. 11:16:46

16   That is not the charge.  That is not the crime.  They are not

17   charged with making money.  They are charged with how they made

18   money.  Money was the object of the conspiracy.  They are

19   charged with how they made money, and that was off the backs of

20   people engaged in illegal prostitution business enterprises.    11:17:07

21   So that defense is handled.

22         Let's talk about one that's going to take a little bit

23   more time, the "I didn't know" defense.  I want to point your

24   attention to a few instructions as we go along the way.  Like I

25   said, you might want to jot down the page number.  You're not   11:17:28

going to write down the entire instruction, but when you get

back there, I think the instructions that I point out to you

are going to be helpful to you in guiding your deliberations.

One of them says, "If you find an ad proposes an illegal

transaction, it is not protected by the First Amendment."          11:17:46

On that same page as part of that instruction it says,

"The First Amendment does not protect speech that proposes an

illegal transaction."  That's the question.  Does it propose an

illegal transaction?

Now, you may recall in opening statements and then, as    11:18:01

predicted, Mr. Feder also brought it up in closing arguments,

he talked about that example of, "Ladies and gentlemen of the

jury," he got up here in opening statements back in August now,

September, he said, "You know, one-night stand for a hundred

dollars, you're just not going to know.  You're just not going   11:18:20

to know whether these ads are sex ads for money."  Ladies and

gentlemen, here is an example of a nightstand for under a

hundred dollars.  Does this look anything like what we have

presented to you as being posted in the female escort section

of Backpage?  I submit to you the answer to that is clearly no,   11:18:39

because context matters.

You also heard him talk about, "Put it in the hole for

a hundred dollars."  This is the closest example I could come

up with on short notice.  Here some funny T-shirts that people

have done with similar type language.  Does that look anything   11:18:57

1    like these ads?  The answer is obviously no.  We are not

2    putting up ads like that that are clearly ambiguous in that way

3    because context matters.  And for purposes of the record, I am

4    showing Exhibit 223 that is in evidence.

5         Here's the language from that ad.  Now, because          11:19:19

6    context matters, right, the defense is arguing, this language

7    is not a sex-act-for-money language on the face of it.  Well,

8    what if it said the very language Mr. Feder talked about, what

9    if it said, "You can put it in my hole" as opposed to those

10   funny T-shirt version that have a golf ball and cornhole game   11:19:45

11   on it?  Doesn't context matter?  Depending on the context, the

12   phrasing can mean something very different.  And in the context

13   that we presented these ads to you, it is clear and obvious

14   what they were for.

15        So let's go back to that.  Keep in mind that when         11:20:00

16   you're deliberating, this is a very formal environment; right?

17   I wear a suit and tie everyday.  We stand up here and speak.

18   We answer to the judge.  You're not allowed to speak.  We're

19   talking up here, very formal.  We stand when you come in.

20   There is so much formality here, but please keep in mind when   11:20:18

21   you go back in the deliberation room, reason and common sense

22   are not checked at the door.  That doesn't go out the window

23   just because we're formal in here.

24        You may recall in opening statement Ms. Bertrand

25   talked about that Arizona statute.  She talked about a          11:20:35

1  different part of the Arizona statute today, but in opening

2  statement she talked about a particular Arizona statute and she

3  talked about the very specific language in that statute.  And I

4  submit to you that if this ad had that language, which I have

5  now put in there.  This is not from the ad.  This is me        11:20:56

6  manipulating it from the language she used from the Arizona

7  statute that says, "In exchange for money, I agree to let you

8  fondle and manipulate any part of my genitals, anus or breast

9  or penetrate into the vulva or anus."

10         This is the first and only time that the guy from        11:21:21

11  Texas has been told to slow, so I'll take it.

12         I submit to you that if it had this specific language,

13  the exact statutory language from the Arizona statute, the

14  defense would still argue there is no sex-act-for-money

15  language in here.  You don't have to be so literal.  You don't   11:21:40

16  have to be so literal.  They knew that this site was replete

17  with these ads, and they used coded language like GFE, which is

18  in this one, Greek, boococky.  It's the name of the game, the

19  coded language.  They knew the codes were sex for money and

20  they knew the codes were endless.  They knew the only way to    11:22:01

21  actually prevent the promotion of prostitution enterprises was

22  to do one thing, shut the site down, but they didn't want to do

23  that because of the object of the conspiracy, which was to make

24  money.

25         I want to turn your attention to page 5.  Page 5 is      11:22:20

UNITED STATES DISTRICT COURT

1    part of the reasonable doubt standard, and it says, "It is not

2    required that the government prove guilt beyond all possible

3    doubt." And I submit to you that that's what the defense is

4    essentially arguing to you in one form or another; that we need

5    to prove it to this level that is beyond all possible doubt.            11:22:43

6    So keep this instruction in mind as you're evaluating the

7    evidence based upon reason and common sense.

8          Page 8 it says, "You are to consider both direct and

9    circumstantial evidence.  Either can be used to prove any

10   fact." So circumstantial evidence is one of those things that I        11:23:04

11   think people who are not lawyers often have an idea about.

12   It's important for you to set that idea aside and make sure you

13   listen to the Court's instructions on this.  So circumstantial

14   evidence is evidence that can be direct and circumstantial, and

15   in the next slide I will show you it says that they are equal          11:23:24

16   in weight.  So let's talk about what is the difference between

17   direct and circumstantial evidence.

18         Direct evidence is like this:  You leave here at the

19   end of the day.  You've been inside all day, you walk outside

20   and you see it's raining, okay.  That is direct evidence.  You         11:23:41

21   have seen it has rained.  Circumstantial evidence is you're

22   sitting in here, you've been sitting here all day, somebody

23   walks in the back door.  They walk in the back door and they

24   have an umbrella, and they shake the umbrella off and they push

25   water off.  Their hair looks a little bit damp, and you now           11:23:58

1    have circumstantial evidence that it's raining or just recently

2    rained just outside.

3          The Court tells you on page 8, further continuing on,

4    that "The law makes no distinction between weight to be given

5    to either direct or circumstantial evidence." They are of equal          11:24:18

6    weight, and that's important to keep in mind as the defense

7    says, "Well, on the face of the ad we just don't know."  The

8    circumstantial evidence is very clear and obvious.

9          Mr. Eisenberg talked about in his closing argument

10   about Grant Snyder saying that the ads did not provide direct          11:24:37

11   evidence of prostitution.  You may remember him talking about

12   that.  Well, remember he said it was suggestive, and so did

13   their expert.  That is essentially circumstantial evidence.

14   They are saying, "Yeah, it looks like prostitution."  It is

15   circumstantial evidence of prostitution.          11:24:54

16          MS. BERTRAND:  Objection; misstates the law.

17          THE COURT:  Overruled.

18          MR. BERRY:  As we're continuing on talking about

19   "didn't know," right, we're still in the category of the

20   defendants didn't know, one of the things I think you want to          11:25:12

21   focus on is in those e-mails that are listed here in the chart

22   that you've seen ad nauseam.  You've seen statements from each

23   of these defendants in one form or another.

24          For example, you have Mr. Brunst in Exhibit 120

25   talking about the plausible deniability.  Remember that's the          11:25:29

UNITED STATES DISTRICT COURT

```
 1   presentation that he helps author and he travels around the
 2   country in an effort to sell Backpage in around 2011, I think,
 3   and in there he talks about how, "Look, we have a general
 4   classifieds ad site.  We have buy, sell, trade, we have jobs,
 5   we have tons of ads, a small number of our ads are over here in      11:25:54
 6   this adult escort category.  That gives us plausible
 7   deniability."
 8           MR. LINCENBERG:  Your Honor, I object.  This
 9   completely misstates the testimony.
10           THE COURT:  Well, overruled.  And again, members of      11:26:07
11   the jury, it is your memory that controls in terms of what the
12   testimony and evidence is so far, and these are only summation
13   arguments of counsel, which are not evidence.
14           Continue.
15           MR. BERRY:  Thank you, Your Honor.  So plausible      11:26:24
16   deniability, because even though 94 percent of that company is
17   making money off escort ads, off prostitution ads, he says,
18   "Look, we got all these other ads.  That gives us plausible
19   deniability."  That's the two sides of Backpage I started with,
20   which is what they want you to know and what was really true.      11:26:44
21           Keep in mind the sale of Backpage to Carl Ferrer was a
22   giant exercise in plausible deniability.  It was an intentional
23   attempt to create that extra layer.  Remember Mr. Cambria
24   talked about being a layer away?  That's trying to create that
25   extra layer, that extra plausible deniability.      11:27:05
```

1          Now, let's pause here on Mr. Brunst for just a second.

2    You heard some back and forth essentially between Mr. Rapp,

3    Mr. Lincenberg about what Mr. Brunst's role was.  You heard

4    Mr. Lincenberg refer to him as a nonoperational CFO, whatever

5    that means.  You've heard him refer to as a bill collector, a          11:27:31

6    bag man.  Ladies and gentlemen, I am telling you, you can call

7    him bananas.  It doesn't matter what you call him.  What

8    matters is that he made millions off of Backpage.  94 percent

9    of Backpage revenue was from prostitution ads.  There was no

10   other evidence of other income for Brunst after they sell the          11:27:51

11   newspapers in January of 2013.

12          Think of it like this:  Can you imagine that a

13   6 percent owner of the Diamondbacks is sitting up in his

14   executive suite, and he looks down at this beautiful green

15   field and he sees nine guys go out on the field, and you see          11:28:12

16   thousands of people paying to come and watch them and he

17   doesn't know that he owns a baseball team?  Come on.

18          Another statement, Ms. Vaught.  Ms. Vaught, you saw on

19   that e-mail where she is reprimanding some of the moderators.

20   Remember that?  This is part of the distraction strategy.  They          11:28:36

21   respond to law enforcement subpoenas.  They say, "Here's the

22   stuff you asked for."  And oh, by the way, because the police

23   dog's nose is long and straight and only points in one

24   direction, they want to give it a little nudge.  They want to

25   give law enforcement's nose a little nudge and push it to other          11:28:53

1   sites.  "These other sites, they have these links too,

2   Mr. Officer.  But, hey, don't tell them about the Evil Empire,

3   the Naked City, because we own those too."  That is evidence of

4   what they are doing is illegal.  That is her knowledge that

5   there is prostitution on that site.                          11:29:16

6         Then you have Mr. Lacey, and he uses the oldest

7   profession, his own words, in a column that he's writing.

8   That's his acknowledgment that this site is about prostitution.

9         You have Mr. Spear in an e-mail talking about how they

10  struck a deal with TER, and everyone knows at this point what   11:29:35

11  The Erotic Review is about, reviews of prostitution.

12        And then you have Mr. Padilla, the companionship

13  e-mail.  Do you recall that was an e-mail where -- this is an

14  important point too to think about.  Remember the defense is:

15  I am just a guy.  I am just a little guy here.  I don't have   11:29:54

16  any control over policy and procedure.

17        Remember that e-mail?  That e-mail is about him

18  talking, debating, philosophizing about whether we should allow

19  the word "lactate" in the filter.  Should we allow "lactate" to

20  be in ads, because, you know, if someone is lactating, then   11:30:14

21  there is arguably an exchange of bodily fluids, and our whole

22  theory of the case, our plausible deniability is that this site

23  is really just about companionship.  Can we really make that

24  companionship argument if we allow an exchange of bodily fluids

25  like lactating, because what is the next step after that?   11:30:36

1   Something more obviously sex related.

2          Next the defendants talked about, well, you've heard

3   all these cops say, "If you can't arrest on this ad, well, then

4   you can't convict."  Ladies and gentlemen, that's a false

5   comparison, an absolutely false comparison that they have been        11:30:54

6   loving pushing on you.  Look at the instructions on page 39.

7   The instructions on page 39 say very clearly, "The United

8   States does not have to prove that the referenced states' laws

9   were actually violated, only that each defendant had the intent

10  to promote a prostitution business."  It is not necessary for        11:31:18

11  us to show that each one of those states' laws were actually

12  violated.

13         What else do you have, though, to show that those laws

14  were violated and that they were in fact promoting

15  prostitution?  We brought before you multiple witnesses.  We         11:31:38

16  brought you police officers and the victims who testified:

17  Hey, every single time, every single time when the individuals,

18  the women who testified said they posted an ad, something

19  happened.  And every time one of the cops made a call,

20  something happened.                                                   11:32:00

21         And you saw that as an example in the CNN documentary.

22  And what was that?  All you had to do was go to Backpage

23  because they had cornered the market on prostitution

24  advertisement, go to the female escort section and post your

25  ad, and just make it look generally like the other ads.  And         11:32:17

what happens?  The phone start ringing within minutes.  Every

single witness that came forward said the same thing, within

minutes, and that's what you saw.

(Playing video, not taken down by the

Court Reporter.)                                        11:32:58

MR. BERRY:  Next, the defendants argue, well, they had

new knowledge of these specific 50 ads.  Ladies and gentlemen,

these ads are just a sample.  We're not going to charge them

with a million counts based upon the millions of ads.  That's

why there's a conspiracy charge covering the statute, covering    11:33:16

the 14-year life of the conspiracy.  What I'm not -- what I'm

not going to show you is a jury instruction says we must prove

that any defendant had specific knowledge of these particular

ads because it isn't in there.  We don't have to do that.  You

won't see that instruction.                                       11:33:41

Page 30 of the instructions says, "Each defendant in

some significant manner associated himself or herself with the

purpose of promoting or facilitating the promotion of any

business enterprise involving prostitution."  That's on

page 30.  You may recall Mr. Lincenberg said, "You don't become   11:34:01

a conspirator merely by associating with other conspirators."

That's true, but that's not what happened here.

We didn't -- he brought two of his friends in here.

They clearly associated with him.  We didn't charge his friends

who merely associated with a conspirator.  We didn't charge       11:34:20

UNITED STATES DISTRICT COURT

1    Mr. Lacey's friends that he paid $5,000 to who testified here.

2    We didn't charge them because they associated with Mr. Lacey.

3    We didn't charge Mr. Becker because he associated with

4    Mr. Lacey.  All of them associated with a conspirator.  But

5    what this instruction makes clear is that the if the defendant

6    associated himself with the purpose of promoting any business

7    enterprise involving prostitution, then he is guilty.

8            Page 30 helps you to understand what it means to

9    "promote" or "facilitate the promotion of," because we have

10   been throwing those phrases around.  It's in the statute.  The

11   instructions help you understand it.  What does it mean?  It

12   means helping someone commit a prostitution offense, and that's

13   what Backpage did.

14           You saw victims and police officers who came in here

15   and explained to you how it helped.  By creating a marketplace,

16   creating a forum where those ads could be posted, it helped

17   promote someone else committing a prostitution offense.  All

18   right.  So we've dealt with "I didn't know."

19           Now we have -- we will deal with this one very

20   quickly.  This is what I call the "But, mom" defense.  This is

21   the one where, think about it, if you have kids, if one of your

22   kids is doing some wrong thing, and you look at them and you

23   go, "Hey, knock that off."  And they go, "But mom, but dad,

24   he's doing it too."  That's the defense here; right?  You've

25   heard them talk about, well, Facebook, TikTok, Google, all

1    these other things.  That is not what you're here about to

2    evaluate and decide.  You are here to evaluate and decide the

3    facts in this case and this case only.

4            You also saw this false equivalency argument in

5    Mr. Cambria's cross-examination of Issac Luria.  He says,          11:36:14

6    "Priests molest children, so why are you not taking out a full

7    page ad in the New York Times against them?  You're only doing

8    it against Backpage."  It's an intent to distract you from

9    focusing on the wrong thing these defendants did.  One person

10   who committed a crime versus an entire business that committed     11:36:36

11   the same crime over and over again everyday for 14 years.

12           Then we have the "It wasn't me" defense.  You've got

13   the owner defendants, Lacey, Spear and Brunst, up on top

14   saying, "I am not down in the trenches.  I don't know what's

15   going on."  And then you have Padilla and Vaught underneath        11:37:05

16   going, "I am just a guy.  I am just a woman.  I am just working

17   here."  Who are they pointing at?  They are consistently

18   pointing to Carl Ferrer.

19           Carl Ferrer has come in here and he sat before you for

20   days, and we're going to talk about his testimony.  And he sat     11:37:21

21   there, he accepted responsibility for his actions, and he sat

22   here and he gave his testimony and he was cross-examined by

23   five defense attorneys about that.

24           So I want you to think about page 27 of the jury

25   instructions when you're thinking about this "It wasn't me"        11:37:39

UNITED STATES DISTRICT COURT

1    defense.  It says, "The Travel Act offense fell within the

2    scope of the unlawful agreement and could reasonably have been

3    foreseen to be a necessary or natural consequence of the

4    unlawful agreement." To the extent they are pointing at

5    Carl Ferrer and all the things he did, isn't it a natural          11:37:57

6    consequence of the agreement to have Backpage post these ads

7    that he would do what he did, and that links them to the chain

8    and makes them culpable as well?

9            Again, we did not charge every person who ever worked

10   at Backpage.  We charged the ones sitting over here who were      11:38:18

11   actively involved in making it an ongoing venture.  They were

12   each a necessary and important piece of the puzzle.

13           Page 26 of the jury instructions I also want you to

14   focus on and be aware of.  It says, "It is not a defense that a

15   person's participation in the conspiracy was minor or for a       11:38:41

16   short period of time." Now, you've heard at least three of them

17   get up here and say that you could arguably say they all made a

18   similar argument.  This applies to Vaught just as much as it

19   applies to Lacey or Brunst.  Remember, they are claiming to be

20   distant, minor, a layer away.  All of them were integral,         11:39:05

21   invested and intent on making this venture and conspiracy

22   successful.

23           And how was success defined?  The object of the

24   conspiracy was money, dollars.  And how did they make it?

25   94 percent of those dollars came from the female escort           11:39:25

1    section, which was prostitution.  What was the goal of anyone

2    who posted in the escort section?  Make the phone ring.

3            Mr. Rapp used the metaphor of an engine room.  That's

4    where Padilla and Vaught were.  Think of Backpage like a ship,

5    all right, it's a ship.  You might want to call it the Titanic,          11:39:48

6    it has gone down, but it's like a ship.  They aren't on top

7    steering, Padilla and Vaught aren't on top steering, but they

8    can feel the rough seas.  They know about the CNN

9    documentaries.  How can you work in a company and not be aware

10   that a major news organization has produced and aired a                  11:40:07

11   40-minute documentary about all the things your company is

12   doing wrong and not be aware of it?  They can feel the rough

13   seas.  They know about that.  They know about the Attorney

14   Generals letters, and they know they are not on solid ground.

15           Then you have the captains of the ship, Lacey, Brunst,            11:40:24

16   Spear.  They are not in the engine room.  They are not down

17   there picking and choosing, "lactate" and "companion" and

18   "BBBJ," and all of those things, but they can feel the rough

19   seas too.  They can see the rocky shores, they can feel the

20   icebergs and see the sharks circling.  They know about all the           11:40:47

21   things people are saying about Backpage.

22           So when you're thinking about that, just because they

23   might appear minor as compared to one person or another doesn't

24   mean that you don't -- you can't find them guilty.

25           Page 21 is sort of the bookend to that, and it says,             11:41:03

1    "The punishment provided by law for this crime is for the Court

2    to decide." Each defendant played an important role in the

3    conspiracy, and even those who played a minor role are still

4    subject to accountability under the law.  That was the previous

5    instruction I showed you.  Punishment is not for you to

6    consider.  It will be decided by her Honor.  So that gets rid

7    of "But, mom" and "It wasn't me" and it leaves us with "good

8    faith."

9         Page 47 talked to you about good faith.  I think each

10    of the defense attorneys mentioned it in some capacity or

11    another.  Good faith is defined as encompassing a belief or

12    opinion honestly held in an absence of malice or ill will.

13    What evidence do you have of each of the defendants' honestly-

14    held belief or opinion?  I submit to you, you don't have any

15    evidence.

16         Let's talk about what evidence there is that

17    demonstrates a lack of good faith, which is the government's

18    burden here.  First, you have them claiming, "Well, moderation,

19    that shows our good faith.  We were trying.  It was a tough

20    job, but we were really, really trying."

21         When I think of moderation, I think of a game called

22    Taboo.  It's a card game I play with my kids.  And if you've

23    never played it, it's pretty simple.  You have a card, you have

24    a word on it, and then you have five other words.  You're not

25    allowed to say that word.  Let's say the word is "baseball."

11:41:22

11:41:42

11:42:07

11:42:25

11:42:43

That's the card I am looking at.  You're my partner and I am

trying to get you to say the word "baseball."  I can't say the

word "baseball" and I can't say five other words like "sport"

or "pastime" or "pitcher" or "hitter," something like that.

Can't say that word.  Can't say those other words, but I still

need you to say "baseball."

          So I come up with other words.  I think I can get you

to say it.  Maybe I say "Dbacks," "World Series," "Rangers."

Do you think you can figure out what that means?  Do you think

you can figure out what it is I'm trying to get you to say?

That's what moderation was.  It's take away these words over

here, but we've already cornered the market on prostitution

advertising.  So if we take away some of these words and we let

them put these kinds of pictures and these other kinds of

words, I think they are going to get it.

          They are going to bring people together.  The

marketplace has been created by them and they know that.

Moderation is a game.  It's a joke.  It is not good faith.

          Another piece of evidence of lack of good faith is

that whole distraction of law enforcement that I talked about

when I talked about the Evil Empire, Naked City link e-mail

that Ms. Vaught sent.  That attempt to distract law

enforcement, the long nose of the police dog, that is not good

faith.  That is them pushing away, distracting from them in

what they are doing in the 20,000 subpoenas that they received

over and over and over again telling them, "You have

prostitution on this site."

Next you have them hiring the Internet safety

consultant.  Do you remember Hemu?  They hired this guy.  He

gives them all this advice, tells them, "Here is how you can

help this out."  What do they do?  Put him on the shelf.  Why?

Because his most important suggestions that might have actually

accomplished something, and might have actually eliminated

prostitution advertising on their website would also do what?

It would reduce the object of the conspiracy, which was to make

money.

Same thing for the NGO suggestions.  They run all over

the country meeting with these NGO saying, "Oh, I really want

to hear your thoughts and feelings about this."  What do they

do?  They ignore it because it's really just a game.  It's just

a stall tactic.  It is malice and ill will.  It is a lack of

good faith about what they are doing.  They don't actually care

what the suggestions are.  They just want to keep making money.

It's basically the same dang thing as the slow dance with the

Attorney Generals, which is a line item in their budget.  How

can we slow dance the Attorney Generals?

Then you have this FBI award in 2011.  Well, this is

just the greatest evidence of good faith to them.  All right.

2011, you saw witness after witness say, "Did you know anything

about the relationship with The Erotic Review?  Did you know

1   anything about their aggregation policy?"

2          "No.  No.  No.  No.  No."

3          Do you seriously think that the FBI who handed out

4   this little certificate in 2011 understood the internal aspects

5   of this company?  They didn't.  It took until 2018 for us to

6   figure that out and put it together, and that's why we're here

7   now.

8          Another piece of evidence of the lack of good faith is

9   remember they are a legitimate company right up until they

10  start doing what?  They are like, "Well, we sent out e-mails

11  and things are heating up.  The AGs are circling.  Maybe we

12  should just stop regular e-mails and start using Proton Mail,"

13  because they know what they are doing is wrong, and they are

14  trying to reduce the ability to see the evidence of that.  I

15  submit to you that that is evidence of a lack of good faith.

16         Similarly, and perhaps most compellingly is the very

17  issue of The Erotic Review.  That is front and center of this

18  case to show lack of good faith.  They didn't tell anybody

19  about that.  I think you heard Mr. Ferrer testify the first

20  time he ever mentioned the relationship, and that's what is

21  important.  They want to make this big deal about, you think

22  the FBI, the most sophisticated law enforcement agency known to

23  mankind, didn't know about this website?  Of course they knew

24  about the website.  What they didn't know about was Backpage

25  was hiding, the other side of Backpage that they didn't want

11:46:03

11:46:27

11:46:47

11:47:08

11:47:26

1    you to see, which is the relationship, the internal formal

2    intentional relationship with this website that they were

3    creating, and that shows they had lack of good faith and that

4    they intentionally knew about the prostitution.

5           Other evidence of a lack of good faith, keep in mind,          11:47:42

6    is all of the shell companies and all of the movement around

7    the world, all of these different companies that are created in

8    different places.  You heard Mr. Lincenberg argue that banks

9    knew Backpage was affiliated with Website Tech and Ad Tech and

10   Camarillo and Medalist, but it took an investigation by the          11:48:02

11   criminal investigations division of the IRS to unpack all of

12   these complicated shell companies.

13          You saw absurd charts of companies.  Why is that

14   necessary?  Remember, for the first eight years of Backpage's

15   existence, Backpage was on the name of the bank account.  The        11:48:23

16   US Bank shut them down.  What did they start doing?  Well,

17   we're toxic, so what are we going to do?  And for the rest of

18   the life of the company they were engaged in financial

19   gymnastics opening shell company after shell company, from

20   Curacao to China.  That is not good faith.                           11:48:45

21          More importantly, that is precisely what it means to

22   conceal or disguise as the money laundering instructions tell

23   you.

24          Now, let's talk about some of the defense witnesses.

25   You have two character witnesses for Spear come in.  We ask          11:49:02

them, "What do you know about Backpage?"  He answered,

"Nothing."  This goes to the issue of, what do you know, what

evidence is there in the record about what these defendants'

good faith is?  Their honestly-held belief or opinion.

Remember that jury instruction?  What do you actually have in

the record that you can point to?  He brought in two witnesses,

and both of them said, "I don't know.  Never really talked to

him about it."

How does your nearest and dearest, one of the guys who

has gone to three of your weddings, how do you not know what

his business is?  I submit to you it's because he didn't want

to talk about it because he knew what it was about and he

wasn't interested in sharing those details.

Same for Mr. Lacey.  Two former employees.  They each

got $5,000 checks, and both of them said, "I didn't really have

any knowledge of Backpage."

First of all, why not call a couple employees that

maybe you didn't throw $5,000 out?  And two, why not call

employees that know something about you and your company?  He

didn't.

Same with his witness Mr. Becker.  Remember that

attorney testified he would not have done it knowing what he

knows now.  And remember Mr. Becker talked about his own

accounts were shut down for his dealings with Mr. Lacey because

he was so toxic, because Backpage was so toxic.  That's why

1   they were creating numerous shell companies in different

2   countries.

3           And then don't forget the expert Dr. Mehlman-Orozco,

4   the person who can't answer a straight yes or no question.

5   She -- it's basically her testimony that this website was a          11:50:53

6   hundred million dollar business based upon fake ads.  She

7   cannot be taken seriously, ladies and gentlemen.  She says she

8   doesn't know whether they were real ads or not, but you know.

9   You know because you heard the witnesses get on the stand and

10  say, people like Naiomy, Breahannah and Anya, and they told you    11:51:16

11  what they did for money.  You know that those were not fake

12  ads.

13          And finally, you have their witness Mr. Snyder, former

14  Minneapolis police officer, who is basically like the police

15  officers we brought before you who said, "I worked a lot of        11:51:37

16  Backpage cases.  They were all sex trafficking.  That's where

17  we went to make those kinds of cases."

18          Now, sticking with good faith for a moment here.

19  Page 43 of the jury instructions talks about Count 100.  You

20  heard Mr. Cambria argue this issue in some detail, and the         11:51:55

21  instruction tells you that if he knew the transportation was

22  designed, in whole or in part, to conceal or disguise, then he

23  can be found guilty.  Remember the evidence that that

24  transaction, he takes -- he tells his attorney to:  Take 16 and

25  a half million dollars from your account, don't have my name on    11:52:20

1    it 'cause I am toxic, send that 16 and a half million to

2    Hungary, don't put it in my account over there either, put it

3    in another name, and do it on January 3rd --

4           MR. CAMBRIA:  Object to that, Your Honor, that is not

5    the evidence.                                                    11:52:35

6           THE COURT:  Well, the jury is the determinator of the

7    evidence at this juncture.  And again, what counsel say is not

8    evidence, but the objection is noted.

9           MR. BERRY:  This happens on January 3rd, 2017.  You

10   have two primary pieces of evidence about that.  Exhibit 1, I    11:52:52

11   didn't put it on the chart.  If you remember that one,

12   Exhibit 1 and the testimony of Lin Howard, the banker, the lady

13   that came in and testified that she had a similar conversation

14   to the e-mail where he is saying, "I want to hide some money

15   from the government."                                            11:53:11

16          Now, that happens in January of 2017, and you'll

17   recall the testimony evidence that there was some other stuff

18   happening around that time, and that was the Senate

19   investigation was going on, but some other stuff had been going

20   on for a long time, right, the investigation had been going on   11:53:26

21   for quite a while, including the CNN documentary, the New York

22   Times column, things like that.

23          Mr. Lacey had something rattling in his ears as well.

24   He had all of those pieces of evidence, notice letting him know

25   that things are getting rough.  Things are heating up, in the    11:53:47

1    words of Mr. Brunst at one point.  And then he gets indicted in

2    April of 2018 and he goes on August of 2018, 18 months after

3    the crime has been committed.  The crime is complete on

4    January 3rd, 2017.  That's when you have to find that he had

5    the intent to transport this money designed in whole or in part        11:54:11

6    to conceal or disguise it.

7         But 18 months later, several months after he is

8    indicted, he says, "Hey, government, here's this little FBAR

9    thing.  By the way, I stuck 16 and a half million dollars over

10   in Hungary.  I've told you about it now," after the crime is           11:54:28

11   complete.

12        Let's balance the defense witnesses against the

13   prosecution witnesses.  You have insiders, Carl Ferrer,

14   Dan Hyer, and Jess Adams.  Let's talk about Carl Ferrer for a

15   second here.  Ladies and gentlemen, we are not asking you --           11:54:49

16   the defense got up here and made arguments about reasonable

17   doubt and reliance on a witness, and the most important is, and

18   they used some pretty outrageous examples.  We are not asking

19   you to look at Mr. Ferrer and say, if he told you that nana had

20   cancer and you got to amputate her limbs and cut out organs,           11:55:12

21   then you need to believe him.  That is not what we are saying,

22   ladies and gentlemen.  That's not what we are asking you.

23        First of all, Mr. Ferrer is not a doctor.  But you

24   know what he is?  A Ph.D. in prostitution advertising.  He is

25   an expert in what he got up here to talk about, and that you           11:55:29

1    can rely upon and believe.

2            We also brought you outsiders.  We built the wall.  We

3    started with the foundation of Carl Ferrer and we added witness

4    after witness after witness, brick after brick, and built the

5    wall that builds the house that contains this case and this          11:55:47

6    prosecution.  We brought you John Shehan from NCMEC, Brad Myles

7    from Polaris, Issac Luria from Auburn, the AMEX guy, and Lin

8    Howard from the bank.  We brought you multiple police officers

9    who all say essentially the same thing about what Backpage was

10   really about, and we brought you victims like Breahannah,           11:56:06

11   Naiomy, Anya, Astrid, Jessika, Jordan, Megan or Shanna who was

12   the sister of Cynthia, and Andrea.

13           Page 9 of the jury instructions.  People often forget

14   things or make mistakes in what they remember.  Again, you have

15   to use reason and common sense when you're deliberating.  It        11:56:28

16   was a 14-year conspiracy in which thousands of e-mails were

17   sent by and to Carl Ferrer.  The instructions tell you to

18   consider his testimony carefully and to look at the fact that

19   he's entered into a plea agreement.  We are not scared of that.

20   You should.  Keep in mind that he was trying to be reasonable.      11:56:46

21   Look at how he was cooperating.

22           Several times you heard him say in answers to

23   questions both from the prosecution and the defense, "I am not

24   sure."  If he didn't know, he didn't know, and he said that.

25   Sometimes he would say something, and you might recall he will      11:57:04

say, "Actually, would you mind if I corrected my testimony?"
He was trying to be conscientious.  You got to observe him for
days.  It wasn't like a 30-minute witness, right, he was up
there for days, and you got to observe his demeanor and assess
his credibility with your own eyes.

11:57:22

You also have the victims.  The victims corroborated
with the ads, corroborated what they said.  The ads were for
prostitution, and they know because they were in the rooms
engaging in those sex acts for money.

You heard the police officers, and they corroborated

11:57:38

what Mr. Ferrer said.  They used countless investigation that
used Backpage that turned out to be prostitution.  You heard
from Dan Hyer and Jess Adams, they corroborated.  You saw 400
plus exhibits.  We didn't just put up a guy we pulled off the
street and said, "Hey, go point the finger at all these people

11:57:55

over here.  Here's what to say."  We anchored his testimony in
the exhibits.  It was built on the foundation of those
exhibits, and you have that to rely upon as corroboration.

You heard the defendants' own words in those e-mails.
You didn't hear a challenge to the authenticity of some of

11:58:13

those exhibits where their clients are saying something.  They
are not saying this is a made up e-mail; this is a bogus
e-mail.  They might have objected and didn't want it to come
in, but you don't have to consider it.  They didn't say, "Hey,
this isn't my client.  I don't know who this guy named Jed is.

11:58:30

1    I don't know who this guy Lacey is."

2         Then I submit to you that in their cross-examination

3    of Mr. Ferrer, they also corroborated his statements.  Did you

4    notice how many times they got him to authenticate their

5    exhibits?  How many times they got him to say, "Isn't it true        11:58:46

6    that this was what was going on?"  They know he's a Ph.D. in

7    prostitution advertising because he was one of them.

8         Now, one of the arguments that Mr. Cambria made, both

9    in opening and closing is, "Hey, my guy, he's just an old time

10   newspaper guy."  Just an old time -- "There is a wall.  There        11:59:08

11   is a wall between the business side of the newspapers and the

12   editorial side, and my guy, he is on the editorial side, just

13   an old time newspaper guy."  Keep in mind, even if you buy

14   that, you can't buy that after January of 2013.  Why?  Because

15   then in January of 2013, Mr. Lacey and the other owner              11:59:29

16   defendants sold all of their newspaper interests, sold them

17   all.

18        Note that Counts 2 through 51, the prostitution ads,

19   all take place after the sale of the newspaper.  When all of

20   those defendants, all of the owner defendants are exclusively        11:59:50

21   focused on Backpage, they are not distracted by all the 18

22   newspapers anymore.  They are focused on Backpage.  It's a

23   little silly to suggest that they didn't know what Backpage was

24   about from 2004 to 2012, but it is absolutely preposterous to

25   claim that once they sell the newspapers.                            12:00:12

You heard zero evidence of any other source of income for these men.  And remember, even Mr. Lacey's own witness comes in here and we cross-examine him and we point out how he posted on Facebook once, they traded that legacy of newspapers in for a chase for gold derived from prostitution.  That's not our witness.  That's his witness.

Ladies and gentlemen, that old time newspaper guy went away in 2013 because he chased gold that was derived from prostitution on Backpage.

Page 25 of the instruction says, "An overt act does not itself have to be unlawful.  The United States is not required to prove that the defendant personally did one of the overt acts." Here is the time line that shows some of those overt acts.  Remember, it doesn't have to be an illegal event.  An e-mail is an overt act, and we have shown you countless exhibits where each defendant committed an overt act, and more than one overt act, e-mails they sent in furtherance of making Backpage successful.

Mr. Cambria used the analogy of a person who owns stock in General Motors.  Remember that?  Where he says, "Look, my guy, he is just like somebody who owns stock in General Motors.  He doesn't know what's going on."  Mr. Cambria suggested that Lacey was like that, yet he's the individual who met with all of the NGOs, authored that Backpage understood document about oldest profession, and he's defending Backpage

1    publicly.  He's the captain of the ship.  His bank accounts are

2    getting shut down, as Becker testified, and he knows what's

3    going on.

4         All right.  I said we would get to money laundering.

5    We are here.  We are getting close to the end.  Money                    12:02:16

6    laundering is very simple, although it doesn't always work that

7    way.  Counts 53 to 62 are concealment money laundering.  It's

8    shown through the use of numerous shell companies that they

9    didn't need for the first eight years of Backpage's existence.

10        Count 63, there was that evidence that this was a          12:02:40

11   payment to a web developer in India to help develop nonadult

12   feeds, to help bolster that plausible deniability:  Hey, let's

13   get that developer and bring us a bunch of nonadult stuff so we

14   look like we are a general classifieds site.  Concealment isn't

15   necessary on Count 63.  And $10,000 threshold is also not          12:03:02

16   necessary.  I think that's the smallest one.  I think that's

17   like the 6000 dollar payment.  Keep in mind, you don't have to

18   show the 10,000 of concealment on those counts there, 63

19   through 68.

20        64 through 68 are international promotional money          12:03:19

21   laundering.  That's the money moving from Europe back to the

22   United States and put back into the Backpage business for

23   payroll purposes.  That's promoting the business.  That is

24   the --

25        MR. LINCENBERG:  Objection; there's zero evidence of          12:03:36

1    that.

2            THE COURT:  Overruled, Mr. Lincenberg, and the jury

3    will use its memory of what the evidence is.

4            MR. BERRY:  Counts 69 to 99 are the transactional

5    money laundering, and there are various defendants that you see          12:03:48

6    in the chart here.  I didn't put each one because sometimes

7    it's two of them; sometimes there's one of them, and you'll see

8    that in the verdict sheet as you go to deliberate.

9            All you need to show there is a monetary transaction

10   that involves $10,000 or more of Backpage money, and all of the          12:04:03

11   evidence that you have about that comes in the form of

12   Quoc Thai's testimony, and it's all summarized very neatly in

13   Exhibit 1479.  1479 is the one with those charts, those

14   flowcharts of not Backpage company, shell company name, money

15   movement to another company, shell company, that's also not             12:04:26

16   Backpage, but it's all Backpage money.

17           All right.  Page 2 of the instruction says, "Do not

18   allow yourself to be influenced by personal likes or dislikes,

19   sympathy, prejudice, fear, public opinion, or biases."  Ladies

20   and gentlemen, this is not a case about personalities, but it           12:04:49

21   is about people.  You can like defendant Lacey newsman legacy;

22   you can like his attorney, Mr. Cambria.  I like him.  But that

23   should not affect your evaluation of the evidence.

24           As I said in the beginning, there are two sides to

25   Backpage, the one the defendants wanted the world to believe,          12:05:11

1    which they vigorously attempted to put out there for many

2    years, but then there's the inside of Backpage, which has been

3    revealed to you through the exhibits and testimony over the

4    course of this trial.

5         This case is not about money.  This case is about          12:05:30

6    people.  It's about defendants for sure, but it's also about

7    Jordan and Cynthia, Astrid, and the others.

8         Ladies and gentlemen, actions have consequences, and

9    this is the 50 ads in about 50 seconds.

10        Ladies and gentlemen, this is your opportunity to hold     12:06:29

11   these defendants accountable for the consequences of their

12   actions.  We ask that you find them guilty.  Thank you.

13        THE COURT:  All right.  Thank you, Mr. Berry.

14        Members of the jury, you've been through quite a lot

15   in a relatively short period of time when the parties rested    12:06:48

16   their case last week, and I read you voluminous instructions,

17   and we have now had an instance where we've had to release a

18   juror because of illness and we do now have a juror appearing

19   remotely for the same purpose.

20        I know that there are one or more of you who also are       12:07:14

21   not feeling 100 percent and we want to ensure that everyone

22   when they receive the case for official deliberations receive

23   it when they are feeling at their best, and so I have decided

24   at this juncture to recess the trial and to resume on Tuesday

25   morning when everyone will have hopefully an opportunity to      12:07:43

take care of their health, take care of anyone who has any sort

of illness.  It's flu season, of course, and we want to make

sure that you're all at your very best when we hand you the

case.

There are some technical things that need to occur,

not additional arguments, be assured, not additional

instructions, but I do want to remind you of a couple of

instructions before I hand you the case for deliberation.  And

since we are not at that point yet, I'm going to remind you of

the admonition.

It's critically important at this juncture that you

adhere to the admonition not to discuss the case, not to

conduct any research, not to discuss the case amongst your

family, your coworkers, amongst one another.  And you may, of

course, tell your coworkers, your employers, your family, that

the jury is -- the trial is suspended for the duration of the

week and that you are expected to return on Tuesday morning at

9:00 a.m.  You may tell them the schedule.  You may not tell

them anything about the case, however.  You may not, again,

come to conclusions.  You can't come to conclusions because you

don't have the instructions before you, and so please adhere to

the admonition.

I want to remind you that we've been at this, and you

know better than I, that you've been at this daily for a number

of weeks, and should any juror come into contact with any

1    information, anyone who gives you information, though it might

2    not be solicited, to report that contact immediately to the

3    Court.  I need to be aware of it, and at this juncture it's

4    very critical that we not jeopardize the proceedings because we

5    could end up having to start all over again.                    12:09:54

6         With that, I will expect you all to be here at

7    9:00 a.m. promptly.  I'll have you in.  Again, we'll provide

8    you with just some limited instruction and information and we

9    will proceed in that way.

10        All right.  Now, with that, we will adjourn our           12:10:17

11   jurors, and please all rise as the jury leaves.

12        And Juror No. 7, you may disconnect.

13                    (Jury is not present.)

14        THE COURT:  All right.  Please be seated again.  Those

15   in the gallery, I ask you to remain just so that the jury can    12:10:58

16   leave uninterrupted from the building.

17        Let me just place on the record, I was correct in my

18   memory, Mr. Rapp, the statement that Ms. Bertrand put up was

19   indeed on page 32 of the instructions, so I just want to make

20   the record clear with regard to that.                           12:11:23

21        With regard to the issue of the forfeiture proceeding,

22   why don't we reconvene tomorrow at 10:00.  Again, I'm getting

23   through your briefing with regard to that.  I want to look at a

24   couple other matters.  I understand Mr. Panchapakesan is taking

25   that issue on for the defense.  I'll permit him to appear       12:11:47

UNITED STATES DISTRICT COURT

1  remotely.  We have the Zoom link now capacity, so we'll use

2  that in that way.

3          Is there anything further to be taken up by the

4  government?

5          MR. KESSLER:  Your Honor, sorry --                    12:12:02

6          MR. STONE:  No, Your Honor.

7          THE COURT:  All right.  Mr. Kessler.

8          MR. KESSLER:  I did not want to interrupt Mr. Berry's

9  closing rebuttal, but I want to make a record of Mr. Spear's

10  objection to a couple of things.                             12:12:26

11          In discussing the character witnesses that the defense

12  called, Mr. Berry posited the question to the jury, why don't

13  they call somebody who knows something about, you know, the

14  defendants' involvement with Backpage, or something to that

15  effect.  I am paraphrasing.  It is improper for the prosecutor  12:12:54

16  to comment on any defendants' failure to call any witness.  We

17  don't have an obligation to present any witnesses, but if we

18  present some, that doesn't open the door to the government

19  suggesting that we should have called others.  Like the

20  government often says, the door doesn't swing both ways.      12:13:26

21          Additionally, that constitutes burden shifting, it

22  violates the defendants' Fifth Amendment rights, and there was

23  an additional comment that amounted to balancing the witnesses,

24  which is improper, where Mr. Berry pointed out how many

25  witnesses in how many different fields the government called to  12:13:57

1    testify and, look, the defense only called a smaller number.

2    That also violates the prohibition of the Fifth Amendment,

3    violates the government's burden of proof requirement, and is

4    improper burden shifting.

5           THE COURT:  Mr. Berry, do you wish to respond?          12:14:33

6           MR. BERRY:  Sure.  I don't think that that's quite

7    right what he's characterized.  I don't think I commented at

8    all about the number of witnesses and tried to balance that.

9    What I was trying to do was balance the quality and content of

10   what was presented.  The jury is certainly allowed, and it's    12:14:52

11   okay to let them know, "Hey, here's what they put up and here's

12   what we put up, and you can evaluate the content of that and

13   how it was corroborated."  That was in the context of me

14   talking about all of the witnesses that corroborated what

15   Mr. Ferrer said, which was a response to all of the defendants  12:15:11

16   castigating Mr.  Ferrer's veracity and truth.

17          About the issue of why didn't they call another

18   witness, that was not intended to say, "Hey, they should have

19   called anyone."  It was saying, if you're going to call this

20   person, why isn't it someone who knows something about what     12:15:34

21   this trial is about?  And that was the intent of what I was

22   saying.  The record will show what the record shows about what

23   I said about that, but that was certainly what I was trying to

24   articulate for the jury is why these two witnesses, who didn't

25   know anything about Backpage in the context of good faith, and  12:15:51

1    what do you have in the record that evaluates that you can rely

2    upon to evaluate their belief or honestly-held opinion

3    regarding good faith?

4           I was careful not to articulate or suggest that they

5    needed to testify because they didn't need to.  That's obvious.        12:16:09

6    I can't say that.  But once they put up two witnesses to say,

7    "This is my guy; I know Mr. Spear," I think it was okay for me

8    to comment on why is it that those are the two people that they

9    called that don't know anything about Mr. Spear's involvement

10   with Backpage, and that was certainly my intent.                       12:16:28

11          THE COURT:  All right.  I will take a look at the

12   transcript of the argument and I'll make whatever -- if I need

13   to make a ruling, do that tomorrow in advance of our

14   discussions about the forfeiture issue.

15          MR. LINCENBERG:  Your Honor, I know there is a record          12:16:51

16   that an objection by one is for all, but I want to make clear

17   that we join in that objection.

18          THE COURT:  Certainly.

19          MS. BERTRAND:  Same for Ms. Vaught.

20          THE COURT:  And you might have noticed that I created          12:17:01

21   a new word for the -- they are the determinator, at a

22   presidential moment, I think, and you can quote me on that.

23   All right.

24          MR. FEDER:  One other thing to make a record.  The

25   closing brings to mind the Motion to Dismiss the unbounded            12:17:19

1    conspiracy, and we just note that for the record, that they

2    opened it up to multiple conspiracies, which the Court did not

3    give an instruction on.

4         In addition, Mr. Berry seemed to have tried to

5    disconnect the requirement that the ad, the overt acts connect          12:17:35

6    with 52 ads, not to any ad that was on Backpage.

7         THE COURT:  Well, my recollection, and I haven't

8    changed it based on the arguments, is that it's a continuing

9    conspiracy.  It just occurred in certain year time span, but

10   that it is not multiple conspiracies, and so I'll look at that          12:18:02

11   again and see if I come to some other determination, but your

12   argument is noted.

13        MR. CAMBRIA:  One other thing, Your Honor, please.

14   Since the jury has not started deliberating, we would renew our

15   objections to the charge and suggestions or request a charge,           12:18:22

16   but I note particularly we had asked that the First Amendment

17   instruction indicate that the "ad must necessarily propose an

18   illegal transaction," and in the rebuttal remarks here we had a

19   reference to "proposes an illegal transaction," which I think

20   is the -- is an example of why we wanted it to be clear that it         12:18:52

21   necessarily had to propose an illegal transaction on its face

22   statement -- state an illegal transaction on its face, and I'd

23   simply use the words that the government chose out of the

24   instructions as given about "proposes."

25        THE COURT:  The jury has orally instructed, and that              12:19:22

1    is the instruction that they have been given.  And not only the

2    government, but defense counsel have referred to that First

3    Amendment instruction as it was given.  And so though your

4    objection is noted and your request is noted, I am not going to

5    change the instructions because they have been given, orally    12:19:41

6    albeit, and because counsel have used them.

7           And so in any event, is there anything more?

8           MS. BERTRAND:  Your Honor --

9           THE COURT:  All right.

10          MS. BERTRAND:  Your Honor, if I may, I will be very    12:19:57

11    quick, I just wanted to note for the record that Ms. Vaught's

12    Motion for Judgment of Acquittal the Court is pending, I just

13    want to make sure we're still on track with that, and also ask

14    that Ms. Vaught be excused from tomorrow's proceedings

15    regarding forfeiture.  She is not party to the forfeiture    12:20:16

16    matter.

17          THE COURT:  If you're waiving her presence, then

18    that's fine.  I will take that waiver.

19          MS. BERTRAND:  I would ask my presence be waived as

20    well.  There is not interest that Ms. Vaught has with the    12:20:27

21    forfeiture part of it.

22          THE COURT:  Well, let me check with the government

23    because while the indictment outlines the forfeiture, I don't

24    know specifically what properties and what assets belong to

25    whom, and so I want to make sure that that is your    12:20:45

1    understanding.

2         MS. BERTRAND:  Well, let's clean that up now because I

3    have been in this case for four years and I never understood

4    there to be an allegation against Ms. Vaught.

5         THE COURT:  Yes, it is important that we do so.          12:21:00

6         MR. STONE:  That's correct, Your Honor, the forfeiture

7    would just be against the three owners, Defendants Lacey, Spear

8    and Brunst.

9         THE COURT:  All right.  She may be excused and you may

10   be excused.                                                   12:21:10

11        MS. BERTRAND:  Okay.  Mr. Padilla and his lawyer may

12   want the same request.  I don't know.

13        MR. EISENBERG:  Well, Your Honor, there is a demand

14   for forfeiture pertaining to a property in which my client has

15   resided.  Now, listening to counsel here, maybe I have read    12:21:24

16   that wrong but --

17        THE COURT:  Well, they should know better than I, and

18   so maybe you need to get together with Mr. Stone and figure out

19   where that allegation came from or where it lays.  It's

20   critically important.                                         12:21:50

21        MR. STONE:  Yes, Your Honor, we will clear that up and

22   what we will do is we will submit this week a proposed form of

23   verdict for the forfeiture.  That will need to change depending

24   to the counts that the jury comes back on for conviction, but

25   we can submit that so that everybody understands this is what   12:22:09

```
 1   it will look like if, for example, the jury convicted on all
 2   100 counts.
 3           THE COURT:  In any event, whatever it is that your
 4   understanding is, if you're not part of the proceeding,
 5   Mr. Eisenberg, your client is not, then I would see no reason      12:22:26
 6   why you would have to appear.
 7           MR. EISENBERG:  I'll let your court know, Your Honor,
 8   through your e-mail.
 9           THE COURT:  Thank you.  I appreciate that.  All right.
10           MR. LINCENBERG:  Your Honor --                              12:22:40
11           MR. EISENBERG:  Excuse me, sorry, Mr. Lincenberg.  I
12   think we all have Rule 29 motions for judgment.
13           THE COURT:  I am very well aware.
14           MR. EISENBERG:  I thank you.
15           MR. LINCENBERG:  Your Honor, may Mr. Brunst also            12:22:54
16   appear remotely for tomorrow's hearing?
17           THE COURT:  He can appear, I think, telephonically.
18           MR. LINCENBERG:  Telephonically.
19           THE COURT:  We'll have a line set up for that.  We can
20   do that, Liliana.                                                  12:23:06
21           Mr. Panchapakesan, if we're able to, I would prefer
22   him to be here remotely by video.  All right.
23           All right.  If there is nothing further, then we are
24   adjourned.
25           (Proceedings concluded at 12:23 p.m.)                      12:23:19
```

1

2

3

4                        **C E R T I F I C A T E**

5

6          I, HILDA E. LOPEZ, do hereby certify that I am duly

7   appointed and qualified to act as Official Court Reporter for

8   the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10  a full, true, and accurate transcript of all of that portion of

11  the proceedings contained herein, had in the above-entitled

12  cause on the date specified therein, and that said transcript

13  was prepared under my direction and control.

14         DATED at Phoenix, Arizona, this 2nd day of November,

15  2023.

16

17

18

                             s/Hilda E. Lopez_____
19                           HILDA E. LOPEZ, RMR, FCRR

20

21

22

23

24

25