Exhibit 2

NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK (Cal. State Bar No. 149886)
Assistant United States Attorney
Chief, Asset Forfeiture Section
JOHN J. KUCERA (Cal. Bar No. 274184)
DAN G. BOYLE (Cal. Bar No. Pending)
Assistant United States Attorneys
Asset Forfeiture Section
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-3391/2426
    Facsimile:  (213) 894-0142
    E-mail:  John.Kucera@usdoj.gov
         Daniel.Boyle2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| UNITED STATES OF AMERICA, | Lead Case No. CV 18-8420 RGK (PJWx) |
|---|---|
|     Plaintiff, | |
|            v. | **FIRST AMENDED CONSOLIDATED MASTER VERIFIED COMPLAINT FOR FORFEITURE** |
| $1,546,076.35 IN BANK FUNDS SEIZED FROM REPUBLIC BANK OF ARIZONA ACCOUNT '1889, ET AL., | 18 U.S.C. §§ 981(a)(1)(A) & (C) |
|     Defendants. | [U.S.P.I.S.] |

//

//

PERSONS AND ENTITIES ................................................ 6

    A.   Defendants ................................................. 6

NATURE OF THE ACTION AND CLAIMS FOR RELIEF ......................... 23

JURISDICTION AND VENUE ............................................. 24

II.  The Formation and Evolution of Backpage ...................... 27

III. The Sources and Manipulation of Backpage Criminal Proceeds ... 29

    A.   Backpage Promotion of Prostitution and Sex Trafficking .. 29

    B.   Payments for Advertising on Backpage .................... 38

    C.   Bank Accounts Funded with Proceeds Traceable to SUA,
        Involved in Money Laundering, or Both ................... 43

    D.   Bases for Forfeiture .................................... 45

IV.  Assets Representing, Traceable To, and Involved In
    Specified Unlawful Activity ................................. 46

    A.   Account 1 (Prosperity '7188 Funds) ..................... 46

CEREUS PROPERTIES ASSETS ........................................... 47

    B.   Account 2 (Compass '3873 Funds) ........................ 47

    C.   Account 3 (Compass '4862 Funds) ........................ 48

MICHAEL LACEY ASSETS ............................................... 49

    D.   Account 4 (FFS&L of SR '3620 Funds) .................... 49

    E.   Accounts 5-10 (RBA '2485, '1897, '3126, '8316, '8324,
        and '8332) ............................................. 49

    F.   Account 11 (SFFCU '4S10 Funds) ......................... 50

    G.   Account 12 (IOLTA '4139) ............................... 50

    H.   The Sebastopol Property ................................ 51

    I.   San Francisco, California Property 1 .................... 52

    J.   San Francisco Property 2 ............................... 52

    K.   San Francisco Property 3 ............................... 53

    L.   Sedona Property ........................................ 54

M.   Paradise Valley Property 2 ............................. 54

JAMES LARKIN ASSETS ............................................. 55

N.   Accounts 13, 16, 17, AND 18 (RBA '1889, '2592, '8103, '8162, AND '8189) ....................................... 55

O.   Accounts 19 AND 20 (PCTC ACCOUNT '0012 FUNDS, PERKINS COIE '0012) .................................................. 56

P.   Account 21 (ACF '2020) ................................. 57

Q.   Accounts 22 And 23 (BA '8225 and '7054) ................ 57

R.   Saint Helena Property .................................. 58

S.   Chicago Property ....................................... 58

T.   Paradise Valley Property 1 ............................. 59

U.   Paradise Valley Property 2 ....**Error! Bookmark not defined.**

JOHN BRUNST ASSETS ............................................. 59

V.   Account 24 (COMPASS BANK '3825) ........................ 59

W.   Account 25, 26, 27, 28, 29, 30 (AB '6878, '4954, '7892, '7889, '7888 AND '6485) ........................... 60

SCOTT SPEAR ASSETS ............................................. 61

X.   Accounts 31, 32, AND 33 (NBA '0178, '0151, and '3645) .... 61

Y.   Account 34 (Live Oak Bank Account '6910) ............... 61

Z.   Account 35 and 36 (Ascensus Broker Services '4301 and '8001) ............................................... 62

PRIMUS TRUST ASSETS ........................................... 62

AA.  Account 37 (K&H Bank Account '1210) .................... 62

AD TECH BV ASSETS ............................................. 63

BB.  Accounts 56, 57, and 58 (Fio Bank '5803, '5801, and '5805) ................................................... 63

CC.  Accounts 47, 48, 49 and 50 (BF Accounts 'K000 K, 'K000 U, 'K000 E, and 'K001 K) ............................... 64

GOLD LEAF SRO FUNDS HELD AT FIO BANK ........................... 64

DD.  Account 38, 39, and 30 (Fio Bank '2226, '2231, and

3

        '2230) ............................................. 64

PROTECCTIO SRO FUNDS HELD AT FIO BANK ........................... 65

    EE.   Accounts 41, 42, and 43 (Fio Bank '4194, '4196, and
        '4198) ......................................... 65

VARICOK SRO FUNDS HELD AT FIO BANK .............................. 65

    FF.   Accounts 44, 45, and 46 (Fio Bank '8083, '8086, and
        '8080) ......................................... 65

PROCOP SERVICES BV FUNDS HELD AT KNAB BANK ...................... 66

    GG.   Account 51 (KB '7664) ................................. 66

GULIETTA GROUP BV FUNDS HELD AT RABO BANK ....................... 66

    HH.   Accounts 52 and 53 (RB '2452 and '4721) ................ 66

CASHFLOWS EUROPE LTD FUNDS HELD FOR GULIETTA GROUP B.V.,
    UNIVERSADS B.V., PROCOPSERVICES B.V. and PROTECCIO SRO ....... 67

    II.   Account 55 (SP '1262) ................................. 67

    JJ.   Account 54 (LHVP '4431) ............................... 68

BACKPAGE-CONTROLLED DOMAIN NAMES ................................. 68

    KK.   ASCIO/WMB Inc Domain Names ............................ 68

    LL.   SURRENDERED DOMAIN NAMES .............................. 70

BACKPAGE SURRENDERED ASSETS ..................................... 80

    MM.   ASSETS BACKPAGE SURRENDERED TO THE GOVERNMENT .......... 80

    NN.   BACKPAGE ASSETS SURRENDERED TO THE GOVERNMENT BY
        OTHERS ................................................ 83

    OO.   BACKPAGE FUNDS PREVIOUSLY HELD AT DAVIS WRIGHT
        TREMAINE .............................................. 83

FUNDS HELD AT USAA SAVINGS BANK FOR THE BENEFIT OF MICHAEL LACEY .. 84

    PP.   Accounts 59, 60, 61, and 62 (USAA '2155, '2058, '2171,
        and, 1507) ............................................ 84

**FIRST CLAIM FOR RELIEF** ....................................... 86

(18 U.S.C. § 981(a)(1)(C)) ...................................... 86

**SECOND CLAIM FOR RELIEF** ...................................... 87

(18 U.S.C. § 981(a)(1)(A)) ......................................... 87

**THIRD CLAIM FOR RELIEF** ........................................ 87

(18 U.S.C. § 981(a)(1)(A)) ......................................... 87

VERIFICATION ..................................................... 90

The United States of America brings this first amended consolidated master complaint against the above-captioned asset(s) and alleges as follows:

### PERSONS AND ENTITIES

1. The plaintiff is the United States of America ("plaintiff" or the "government").

2. Plaintiff previously filed verified complaints seeking the civil forfeiture of the following assets (collectively, the "Defendant Assets").

**A. Defendants[1]**

3. $689,884.48 in bank funds seized from First Federal Savings & Loan of San Rafael Account No. '3620 ("FFS&L of SR '3620 Funds" or "Account 4"), held in the name of Michael Lacey ("Lacey"). Lacey and Jill Anderson ("Anderson") have filed claims in member case number CV 18-8579 RGK (PJWx).

4. $515,899.85 in bank funds seized from Republic Bank of Arizona Account No. '2485 ("RBA '2485 Funds" or "Account 5"), held in the name of Michael Lacey. Lacey and Anderson have filed claims in member case number CV 18-8579 RGK (PJWx).

5. $500,000.00 in bank funds seized from Republic Bank of Arizona Account No. '3126 ("RBA '3126 Funds" or "Account 7") held in the name of Michael Lacey. Lacey and Anderson have filed claims in member case number CV 18-8579 RGK (PJWx).

6. $601,827.10 in bank funds seized from Republic Bank of

---

[1] Pursuant to the Court's Order dated December 18, 2019, the defendant assets from the member cases are described in this consolidated complaint. The original case number and claimant or claimants are identified in the description of each defendant in the instant consolidated complaint.

6

Arizona CDARS[2] Account No. '8316 held in the name of Michael Lacey ("RBA '8316 Funds" or "Account 8").  Lacey and Anderson have filed claims in member case number CV 18-8579 RGK (PJWx).

7.   $302,177.57 in bank funds seized from Republic of Bank of Arizona CDARS Account No. '8324 held in the name of Michael Lacey ("RBA '8324 Funds" or "Account 9"). Lacey and Anderson have filed claims in member case number CV 18-8579 RGK (PJWx).

8.   $305,127.89 in bank funds seized from Republic Bank of Arizona CDARS Account No. '8332 ("RBA '8332 Funds" or "Account 10") held in the name of Michael Lacey. Lacey and Anderson have filed claims in member case number CV 18-8579 RGK (PJWx).

9.   $484,745.72 in bank funds seized from SF Fire Credit Union Account No. '4S10 ("SFFCU '4S10 Funds" or "Account 11"), held in the name of Michael G. Lacey and Jean K. Warren.  Lacey and Anderson have filed claims in member case number CV 18-8579 RGK (PJWx).

10.   $2,412,785.47 in bank funds seized from Money Gram having originated from Midfirst Bank Account No. '4139 ("IOLTA[3] '4139" or Account 12) held in the name of attorney, ""J.B."" for the benefit of Michael Lacey.  Lacey, Anderson, and John R. Becker have filed claims in member case number CV 18-8579 RGK (PJWx).

11.   All right and title to the real property located in Sebastopol, California titled in the name of Finca Manzana for Sebastopol, LLC ("Sebastopol Property"), APN 076-100-0008-000, including all appurtenances, improvements, and attachments thereon,

---

[2] CDARS is a program that allows a depositor to spread funds across several banks in order to maintain account balances below the Federal Deposit Insurance Corporation's insurance limits at any particular bank.

[3] An "IOLTA" is an acronym for Interest on Lawyer Trust Account.

as well as all leases, rents, and profits derived therefrom. [4] Lacey, Anderson, and Finca Manzana for Sebastopol, LLC. have filed claims in member case number CV 18-8730 RGK (PJWx).

12. All right and title to the real property located in San Francisco, California titled in the name of Lacey and Alyson Talley ("San Francisco Property 1"), APN Lot 057, Block 008, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom. Lacey, Anderson, and Alyson Talley have filed claims in member case number CV 18-8723 RGK (PJWx).

13. All right and title to the real property located in San Francisco, California titled in the name of Casa Bahia for San Francisco, LLC. ("San Francisco Property 2"), APN Lot 029, Block 0563, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom. Casa Bahia, LLC., Lacey, and Anderson have filed claims in member case number CV 18-8551 RGK (PJWx).

14. All right and title to the real property located in San Francisco, California titled in the name of Michael Lacey ("San Francisco Property 3"), APN Lot 008, Block 0097, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom. Lacey and Anderson have filed claims in member case number CV 18-8763 RGK (PJWx).

15. All right and title to the real property located in Sedona, Arizona titled in the name of Creek Hideaway, LLC ("Sedona Property"), APN 405-06-001B, including all appurtenances,

---

[4] Pursuant to Local Rule 5.2-1, only the city and state of residence addresses are set forth in this Complaint

improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom. Lacey, Creek Hideaway, LLC., and Anderson have filed claims in member case number CV 18-8556 RGK (PJWx).

16. All right and title to the real property located in Paradise Valley, Arizona titled in the name of Lacey ("Paradise Valley Property 2"), APN 164-05-122, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom. Lacey and Anderson have filed claims in member case number CV 18-8555 RGK (PJWx).

17. $1,546,076.35 in bank funds seized from Republic Bank of Arizona Account No. '1889 ("RBA '1889 Funds" or "Account 13") held in the name of James Larkin ("Larkin"). Larkin and Margaret Larkin ("M. Larkin") have filed claims in member case number CV 18-8420 RGK (PJWx).

18. $1,001,731.18 in bank funds seized from Republic Bank of Arizona Account No. '2592 ("RBA '2592 Funds" or "Account 14") held in the name of James "Jed" Larkin. Larkin and M. Larkin have filed claims in member case number CV 18-8420.

19. $501,248.14 in bank funds seized from Republic Bank of Arizona Account No. '8103 ("RBA '8103 Funds" or "Account 16") held in the name of John Larkin ("J. Larkin"). Larkin and M. Larkin have filed claims in member case number CV 18-8420 RGK (PJWx).

20. $251,436.93 in bank funds seized from Republic Bank of Arizona Account No. '8162 ("RBA '8162 Funds" or "Account 17") held in the name of James Larkin. Larkin and M. Larkin have filed claims in member case number CV 18-8420 RGK (PJWx).

21. $253,639.96 in bank funds seized from Republic Bank of

Arizona Account '8189 ("RBA '8189 Funds" or "Account 18") held in the name of James A. Larkin. Larkin and M. Larkin have filed a claim in member case number CV 18-8420 RGK (PJWx).

22. $621,832.06 in bank funds seized from Perkins Coie Trust Company Account No. '0012 ("PCTC '0012 Funds" or "Account 19") held in the name of Margaret G. Larkin. Larkin, M. Larkin, Coyoacan Family Trust ("CFT") and Ocotillo Family Trust ("OFT") have filed claims in member case number CV 18-8420 RGK (PJWx).

23. Approximately $9,882,828.72 in securities and/or investment funds seized from Perkins Coie Trust Company Account No. '0012 ("PCTC Investment Funds" or "Account 20") held in the name of Margaret G. Larkin. Larkin, M. Larkin, CFT and OFT have filed claims in member case number CV 18-8420 RGK (PJWx).

24. Approximately $34,149,280.00 in securities and/or investment funds seized from Acacia Conservation Fund LP Account No. '2020 ("ACF Funds" or "Account 21"), held in the name of the Ocotillo Family Trust. Larkin, M. Larkin, CFT and OFT have filed claims in member case number CV 18-8420 RGK (PJWx).

25. $278.73 in bank funds seized from Bank of America Account No. '8225 ("BA '8225 Funds" or "Account 22") held in the name of Troy C. Larkin ("T. Larkin"). Larkin filed a claim in member case number CV 18-8420 RGK (PJWx).

26. $1,038.42 in bank funds seized from Bank of America Account No. '7054 ("BA '7054 Funds" or "Account 23") held in the name of Ramon Larkin ("R. Larkin"). Larkin filed a claim in member case number CV 18-8420 RGK (PJWx).

27. All right and title to the real property located in Paradise Valley, Arizona titled in the name of James Larkin

("Paradise Valley Property 1"), APN 173-11-006C, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom. Larkin, M. Larkin, and OFT have filed claims in member case number CV 18-8764 RGK (PJWx).

28. All right and title to the real property located in Saint Helena, California ("Saint Helena Property") titled in the name of James Larkin and Margaret Larkin, Trustees for Ocotillo Family Trust, APN 030-050-028-000, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom. Larkin, M. Larkin, and OFT have filed claims in member case number CV 18-8760 RGK (PJWx).

29. All right and title to the real property located in Chicago, Illinois titled in the name of John C. Larkin ("J.C. Larkin"), Margaret Larkin and James Larkin ("Chicago Property"), APN 20-14-201-079-1054, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom. Larkin and M. Larkin have filed claims in member case number CV 18-8759 RGK (PJWx).

30. $359,527.06 in bank funds seized from BBVA Compass Bank Account No. '3825 ("Compass '3825 Funds" or "Account 24") held in the name of the John Brunst Family Trust ("BFT"). The BFT, John Brunst ("Brunst") and Mary Ann Brunst ("M.A. Brunst") have filed claims in member case number CV 18-8568 RGK (PJWx).

31. Approximately $5,848,729.00 in securities and/or investment funds seized from Alliance Bernstein L.P. Account No. '6878 ("AB '6878 Funds" or "Account 25") held in the name of the John Brunst Family Trust. The BFT, Brunst and M.A. Brunst have filed claims in member case number CV 18-8568 RGK (PJWx).

11

32.   Approximately $372,878.00 in securities and/or investment funds seized from Alliance Bernstein L.P. Account No. '4954 ("AB '4954 Funds" or "Account 26") held in the name of the Brunst Family Trust.  The BFT, Brunst and M.A. Brunst have filed claims in member case number CV 18-8568 RGK (PJWx).

33.   Approximately $342,596.00 in securities and/or investment funds seized from Alliance Bernstein Account L.P. Account No. '7982 ("AB '7982 Funds" or "Account 27") held in the name of the Brunst Family Trust.  The BFT, Brunst and M.A. Brunst have filed claims in member case number CV 18-8568 RGK (PJWx).

34.   Approximately $306,277.00 in securities and/or investment funds Seized from Alliance Bernstein L.P. Account No. '7889 ("AB '7889 Funds" or "Account 28") held in the name of the Brunst Family Trust.  The BFT, Brunst and M.A. Brunst have filed claims in member case number CV 18-8568 RGK (PJWx).

35.   Approximately $275,328.00 in securities and/or investment funds seized from Alliance Bernstein L.P. Account No. '7888 ("AB '7888 Funds" or "Account 29") held in the name of the Brunst Family Trust.  The BFT, Brunst and M.A. Brunst have filed claims in member case number CV 18-8568 RGK (PJWx).

36.   Approximately $527,624.00 in securities and/or investment funds seized from Alliance Bernstein L.P. Account No. '6485 ("AB '6485 Funds" or "Account 30") held in the name of the Brunst Family Trust.  The BFT, Brunst and M.A. Brunst have filed claims in member case number CV 18-8568 RGK (PJWx).

37.   $404,374.12 in bank funds seized From National Bank of Arizona Account No. '0178 ("NBA '0178 Funds" or "Account 31") held in the name of Scott Spear ("Spear").  Spear and Natasha Spear ("N.

1   Spear") filed a claim in member case number CV 18-8423 RGK (PJWx).

2       38.  $1,925.80 in bank funds seized from National Bank of

3   Arizona Account No. '0151 ("NBA '0151 Funds" or "Account 32"), held

4   in the name of Scott and Ellona Spear ("E. Spear").  Spear and N.

5   Spear filed a claim in member case number CV 18-8423 RGK (PJWx).

6       39.  $613,573.28 in bank funds seized from National Bank of

7   Arizona Account No. '3645 ("NBA '3645 Funds" or "Account 33"), held

8   in the name of Scott G. Spear and Ellona Spear Family Trust.  Spear

9   and N. Spear filed a claim in member case number CV 18-8423 RGK

10  (PJWx).

11      40.  $260,283.40 in bank funds seized from Live Oak Bank Account

12  No. '6910 ("LOB '6910 Funds" or "Account 34"), held in the name of

13  Scott Gary Spear and Ellona Spear Family Trust.  Spear and N. Spear

14  filed a claim in member case number CV 18-8423 RGK (PJWx).

15      41.  $64,552.82 in bank funds seized from Ascensus Broker Dealer

16  Services Account No. '4301 ("ABS '4301 Funds" or "Account 35"), held

17  in the name of Natasha Spear.  Spear and N. Spear have filed claims

18  in member case number CV 18-8423 RGK (PJWx).

19      42.  $56,902.99 in bank funds seized from or frozen in Ascensus

20  Broker Services Account No. '8001 ("ABS '8001 Funds" or "Account

21  36"), held in the name of Natasha Spear.  Spear and N. Spear have

22  filed claims in member case number CV 18-8423 RGK (PJWx).

23      43.  Approximately $16,500,000.00 in bank funds seized from K&H

24  Account No. '1210 ("K&H '1210 Funds" or "Account 37"), held in the

25  name of Primus Trust.  Lacey and Anderson have filed claims in member

26  case number CV 18-8565 RGK (PJWx).

27      44.  Approximately 1,680,028.85 EUR in bank funds seized from

28  FIO Banka (Czech Republic) Account No. '2226 ("FIO '2226 Funds" or

"Account 38"), held in the name of Gold Leaf SRO.  Medalist Holding, Inc. ("Medalist"); Leeward Holdings, LLC ("Leeward"); Camarillo Holdings, LLC ("Camarillo"); Vermillion Holdings, LLC ("Vermillion"); Cereus Properties, LLC ("Cereus"); Shearwater Investments, LLC ("Shearwater"); Broadway Capital Corp., LLC ("Broadway"); Larkin, Troy Larkin ("T. Larkin"); Ramon Larkin ("R. Larkin"); Spear, Lacey, and Brunst have filed claims in member case number CV 18-8569 RGK (PJWx).

45.  Approximately 60.98 GDP in bank funds seized from FIO Banka (Czech Republic) Account No. '2231 ("FIO '2231 Funds" or "Account 39"), held in the name of Gold Leaf SRO.  Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8569 RGK (PJWx).

46.  Approximately $72.87 in bank funds seized from FIO Banka (Czech Republic) Account No. '2230 ("FIO '2230 Funds" or "Account 40"), held in the name of Gold Leaf SRO.  Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8569 RGK (PJWx).

47.  Approximately 3,213,937.82 EUR in bank funds seized from FIO Banka (Czech Republic) Account No. '4194 ("FIO '4194 Funds" or "Account 41"), held in the name of Protecctio SRO. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8577 RGK (PJWx).

48.  Approximately $52.90 in bank funds seized from FIO Banka (Czech Republic) Account No. '4196 ("FIO '4196 Funds" or "Account

14

42"), held in the name of Protecctio SRO. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8577 RGK (PJWx).

49.   Approximately 52.65 GDP in bank funds seized from FIO Banka Account No. '4198 ("FIO '4198 Funds" or "Account 43") held in the name of Protecctio SRO. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8577 RGK (PJWx).

50.   Approximately 605,976.95 EUR in bank funds seized from FIO Banka (Czech Republic) Account No. '8083 ("FIO '8083 Funds" or "Account 44") held in the name of Varicok Company SRO. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8747 RGK (PJWx).

51.   Approximately 458.99 GDP in bank funds seized from FIO Banka (Czech Republic) Account No. '8086 ("Fio '8086 Funds" or "Account 45"), held in the name of the Varicok Company SRO. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8747 RGK (PJWx).

52.   Approximately $48.10 in bank funds seized from FIO Banka (Czech Republic) Account No. '8080 ("Fio '8080 Funds" or "Account 46"), held in the name of the Varicok Company SRO. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8747 RGK (PJWx).

53. An unknown amount of bank funds on deposit in Bank Frick (Liechtenstein) Account No. '000K ("BF '000K Funds" or "Account 47"), held in the name of Ad Tech BV. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8570 RGK (PJWx).

54. An unknown amount of bank funds on deposit in Bank Frick (Liechtenstein) Account No. '000U ("BF '000U Funds" or "Account 48"), held in the name of Ad Tech BV. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8570 RGK (PJWx).

55. An unknown amount of bank funds on deposit in Bank Frick (Liechtenstein) Account No. '000E ("BF '000E Funds" or "Account 49"), held in the name of Ad Tech BV. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8570 RGK (PJWx).

56. An unknown amount of bank funds on deposit in Bank Frick (Liechtenstein) Account No. '001K ("BF '001K Funds" or "Account 50"), held in the name of Ad Tech BV. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8570 RGK (PJWx).

57. An unknown amount of bank funds on deposit in Knab Bank (Netherlands) Account No. '7664 ("KB '7664 Funds" or "Account 51"), held in the name of Procop Services BV. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T.

Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8748 RGK (PJWx).

58. An unknown amount of bank funds on deposit in Rabo Bank (Netherlands) Account No. '2452 ("RB '2452 Funds" or "Account 52"), held in the name of the Gulietta Group BV. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8749 RGK (PJWx).

59. An unknown amount of bank funds on deposit in Rabo Bank (Netherlands) Account No. '4721 ("RB '4721 Funds" or "Account 53"), held in the name of the UniversAds BV. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8750 RGK (PJWx).

60. An unknown amount of bank funds on deposit in LHV Pank (Estonia) Account No. '4431 ("LHVP '4431 Funds" or "Account 54"), held in the name of Olist OU ("OU"). Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8754 RGK (PJWx).

61. Approximately 747,664.15 GBP seized from SAXO Payments (United Kingdom) Account No. '1262 ("SP '1262 Funds" or "Account 55"), held in the name of the Cashflows Europe Limited ("Cashflows"). Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8753 RGK (PJWx).

62. Domain names associated with Backpage.com, and all rights and privileges associated therewith. Medalist, Leeward, Camarillo,

Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8592 RGK (PJWx).

63. $699,940.00 in bank funds seized from ING Bank (Netherlands) Account No. '7684 ("ING '7684 Funds") held in the name of Payment Solutions BV. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8588 RGK (PJWx).

64. $106,988.41 in bank funds seized from ING Bank (Netherlands) Account No. '2071 ("ING '2071 Funds") held in the name of Payment Solutions BV. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8588 RGK (PJWx).

65. $499,910.01 in bank funds seized from US Bank Account No. '0239 ("US Bank '0239 Funds") held in the name of Affordable Bail Bonds, LLC. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8588 RGK (PJWx).

66. $50,000.00 in bank funds seized from Enterprise Bank and Trust Account No. '7177 ("EBT '7177 Funds") held in the name of Global Trading Solutions, LLC. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8588 RGK (PJWx).

67. $1,876.36 in bank funds seized from ING Bank (Netherlands) Account No. '2071 ("ING '2071 Funds") held in the name of Payment

Solutions BV. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8588 RGK (PJWx).

68. $50,357.35 in bank funds seized from ING Bank (Netherlands) Account No. '7684 ("ING '7684 Funds") held in the name of Payment Solutions BV. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8588 RGK (PJWx).

69. $248,970.00 in bank funds seized from Citibank NA Account No. '0457 ("Citibank NA '0457 Funds") held in the name of Paul Hastings, LLP. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8588 RGK (PJWx).

70. $52,500.00 in bank funds seized from Enterprise Bank and Trust Account No. '7177 ("EBT '7177 Funds") held in the name of Global Trading Solutions, LLC. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8588 RGK (PJWx).

71. $65,000.00 in bank funds seized from Enterprise Bank and Trust Account No. '7177 ("EBT '7177 Funds") held in the name of Global Trading Solutions, LLC. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8588 RGK (PJWx).

72. $5,534.54 in bank funds seized from Enterprise Bank and Trust Account '7177 ("EBT '7177 Funds") held in the name of Global Trading Solutions, LLC. Medalist, Leeward, Camarillo, Vermillion,

Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8588 RGK (PJWx).

73. $40,000.00 in bank funds seized from Enterprise Bank and Trust Account No. '7177 held in the name of Global Trading Solutions, LLC. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8588 RGK (PJWx).

74. Approximately 6 Bitcoins surrendered on or about April 6, 2018, from a Backpage controlled wallet.

75. Approximately 404.99984122 Bitcoins surrendered on or about April 6, 2018, from a Backpage controlled wallet.

76. Approximately 199.99995716 Bitcoins surrendered on or about April 6, 2018, from a Backpage controlled wallet.

77. Approximately 173.97319 Bitcoins surrendered on or about April 26, 2018, from a Backpage controlled wallet.

78. Approximately 411.00019 Bitcoins seized on or about April 13, 2018, from a Backpage controlled wallet.

79. Approximately 2.00069333 Bitcoins surrendered on or about May 7, 2018, from a Backpage controlled wallet.

80. Approximately 136.6544695 Bitcoins surrendered on or about June 15, 2018, from a Backpage controlled wallet.

81. Approximately 2,673.59306905 Bitcoin Cash surrendered on or about April 26, 2018, from a Backpage controlled wallet.

82. Approximately 55.50826185 Bitcoin Cash surrendered on or about May 3, 2018, from a Backpage controlled wallet.

83. Approximately 73.62522241 Bitcoin Cash surrendered on or about June 15, 2018, from a Backpage controlled wallet.

84.   Approximately 16,310.79413202 Litecoins surrendered on or about April 26, 2018, from a Backpage controlled wallet.

85.   Approximately 783.9735116 Litecoins surrendered on or about June 15, 2018, from a Backpage controlled wallet.

86.   Approximately 509.81904619 Bitcoin Gold surrendered on or about June 21, 2018, from a Backpage controlled wallet.

87.   Approximately 2.70447488 Bitcoins seized from Bitstamp Account No. '0831. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Lacey, Larkin, T. Larkin, R. Larkin, and Spear have filed a claim in member case number CV 19-9949 RGK (PJWx).

88.   Approximately 3.54986077 Bitcoin Cash seized from Bitstamp Account No. '0831. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Lacey, Larkin, T. Larkin, R. Larkin, and Spear have filed a claim in member case number CV 19-9949 RGK (PJWx).

89.   $518,172.92 in bank funds seized from Wells Fargo Bank Account No. '4455 ("BofA '4455 Funds" or "Account 66") held in the name of Cardquiry, Inc.  Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, and Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst filed a claim in member case number CV 19-7048 RGK (PJWx).

90.   $1,412,085.94 in bank funds seized from USAA Savings Account No. '2155 ("USAA '2155 Funds" or "Account 59") held in the name of Anne Hawkins ("Hawkins").  Kathleen D. Larkin ("K. Larkin"), John C. Larkin ("J.C. Larkin"), Quinn M. Larkin ("Q. Larkin"), and Hawkins have filed claims in member case number CV 19-7032 RGK (PJWx).

91.   $1,502,927.74 in bank funds seized from USAA Savings Account No. '2058 ("USAA '2058 Funds" or "Account 60") held in the

name of Anne Hawkins.  K. Larkin, J.C. Larkin, Q. Larkin, and Hawkins have filed claims in member case number CV 19-7032 RGK (PJWx).

92.  $1,453,008.51 in bank funds seized from USAA Savings Account No. '2171 ("USAA '2171 Funds" or "Account 61") held in the name of Anne Hawkins.  K. Larkin, J.C. Larkin, Q. Larkin, and Hawkins have filed claims in member case number CV 19-7032 RGK (PJWx).

93.  $1,422,147.37 in bank funds seized from USAA Savings Account No. '1507 ("USAA '1507 Funds" or "Account 62") held in the name of Anne Hawkins.  K. Larkin, J.C. Larkin, Q. Larkin, and Hawkins have filed claims in member case number CV 19-7032 RGK (PJWx).

94.  $182,182.50 in bank funds seized from Amro Bank N.V. (Netherlands) Account No. '6352 ("Amro '6352 Funds" or "Account 63") held in the name of Ad Tech BV with Stichting Zencotrust.  Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 19-7039 RGK (PJWx).

95.  $23,175.00 in bank funds seized from Plains Capital Bank Account No. '3939 ("Plains Capital '3939 Funds" or "Account 64") held in the name of Scheef & Stone, LLP.  Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 19-7039 RGK (PJWx).

96.  $11,802.76 in bank funds seized from Citibank Account No. '6973 ("Citibank '6973 Funds" or "Account 65") held in the name of Schiff Hardin LLP.  Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Larkin, T. Larkin, R. Larkin, Spear, and Lacey have filed claims in member case number CV 19-7044 RGK (PJWx).

97.  $3,374,918.61 in bank funds seized from Prosperity Bank

Account No. '7188 ("Prosperity '7188 Funds" or "Account 1") held in the name of Posting Solutions, LLC. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Lacey, and Brunst have filed claims in member case number CV 18-8578 RGK (PJWx).

98. $5,462,027.17 in bank funds seized from BBVA Compass Bank Account No. '3873 ("Compass '3873 Funds" or "Account 2"), held in the name of Cereus Properties, LLC., an entity owned or controlled by Scott Spear. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8566 RGK (PJWx).

99. $407,686.14 in bank funds seized from BBVA Compass Bank Account No. '4862 ("Compass '4862 Funds" or "Account 3") held in the name of Cereus Properties, LLC. Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed a claim in member case number CV 18-8566 RGK (PJWx).

**NATURE OF THE ACTION AND CLAIMS FOR RELIEF**

100. This is a civil action *in rem* to forfeit assets derived from or traceable to proceeds of one or more crimes defined as "specified unlawful activity," or "SUA"; and/or involved in one or more conspiracies to launder money, internationally launder money for promotion of one or more SUA, and/or financial transactions involving illicit proceeds. The property sought for forfeiture is located in the United States and abroad, including the Country of Hungary, the Czech Republic, the Principality of Liechtenstein, and the Kingdom of the Netherlands.

101. The Defendant Assets represent property derived from or

traceable to proceeds of multiple knowing violations of federal laws constituting SUA (18 U.S.C. § 1956(c)(7)(A)), including 18 U.S.C. §§ 1591 (Sex Trafficking of Children) and 1952 (Interstate and Foreign Travel in Aid of Racketeering Enterprise).  The Defendant Assets are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

102. Further, the Defendant Assets represent property involved in or traceable to one or more transactions or attempted transactions in violation of:

a. 18 U.S.C. § 1956(a)(1)(B)(i) (Money Laundering for Concealment) and a conspiracy to commit such offenses, in violation of 18 U.S.C. § 1956(h);

b. 18 U.S.C. § 1956(a)(2) (International Money Laundering for Promotion) and a conspiracy to commit such offenses, in violation of 18 U.S.C. § 1956(h); and

c. 18 U.S.C. § 1957 (Monetary Transactions with Proceeds of SUA) and a conspiracy to commit such offenses, in violation of 18 U.S.C. § 1956(h).

The Defendant Assets are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## JURISDICTION AND VENUE

103. This civil forfeiture action is brought pursuant to 18 U.S.C. § 981(a)(1).

104. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1345 and 1355.

105. Venue lies in this district pursuant to 28 U.S.C. §§ 1355(b)(1)(A) or 1355(b)(2) because acts and omissions giving rise to the forfeiture took place in the Central District of California

1  and/or 28 U.S.C. § 1395(b), because certain of the Defendant Assets

2  are located in the Central District of California.

3  **INDIVIDUALS AND ENTITIES**

4  106. Backpage.com, LLC, ("Backpage") incorporated in Delaware in

5  2004, was an internet-based company that allowed customers to post

6  on-line classified advertisements. These advertisements were posted

7  in a variety of categories, including adult, automotive, community,

8  dating, jobs, local places, musicians, rentals and services. Prior

9  to its closure by federal law enforcement authorities in April 2018,

10  Backpage was visited by 75 to 100 million unique internet visitors

11  per month.

12  107. Between 2004 and April 2018, Backpage realized annual

13  profits of tens of millions of dollars from adult advertisements.

14  Historically, the adult category, where Backpage advertisers posted

15  sex trafficking ads, made up less than ten percent of all the

16  website's advertisements. However, those ads generated more than 90

17  percent of Backpage's revenue.

18  108. Lacey was a co-creator of Backpage.com. Lacey was

19  responsible for the website's policies and strategic direction, and

20  he maintained significant control over the website during the

21  relevant period described in this complaint. Even after purportedly

22  selling his interest in Backpage in 2015, Lacey continued to receive

23  tens of millions of dollars in Backpage-related distributions.

24  109. Larkin was a co-creator of Backpage.com. Larkin was

25  responsible for the website's policies and strategic direction, and

26  he maintained significant control over the website during the

27  relevant period described in this complaint. Even after purportedly

28  selling his interest in Backpage in 2015, Larkin continued to receive

1   tens of millions of dollars in Backpage-related distributions.

2       110. Carl Ferrer ("Ferrer"), though not an original owner, was a

3   co-creator and one of the original officers of Backpage, having

4   initially served as Backpage's vice-president, and later as CEO.

5   Ferrer is also the CEO of several Backpage-related entities in the

6   Netherlands, including "Website Technologies," "Amstel River

7   Holdings," and "Ad Tech BV."

8       111. Brunst was a minority owner of Backpage who owned 5.67

9   percent of the company at the time of its inception.  Brunst served

10  as the Chief Financial Officer of Backpage and several of Backpage's

11  parent companies.

12      112. Spear was a minority owner of Backpage who owned 4.09

13  percent of the company at the time of its inception.  Spear served as

14  Executive Vice President of one of Backpage's parent companies.

15      113. "M.G." had no formal position at Backpage, but was the

16  President, Chief Executive Officer, Treasurer, and Secretary of

17  Posting Solutions LLC, a wholly owned Backpage subsidiary with a

18  principal place of business in Dallas, Texas ("Posting Solutions"),

19  which accepted payments from Backpage advertisers.  M.G. was also the

20  Chief Financial Officer of Website Technologies, and directed and

21  controlled many of the international and domestic financial

22  transactions of Backpage and its related entities.

23      114. Daniel Hyer ("Hyer") served as Backpage's Sales and

24  Marketing Director.  He remained an account signatory for numerous

25  Backpage-controlled entities, including Website Technologies, until

26  Backpage's closure.

27      115. Andrew Padilla ("Padilla") served as Backpage's Operations

28  Manager.

1     116. Joye Vaught ("Vaught") served as Backpage's assistant

2 Operations Manager.

3     117. Lacey, Larkin, Ferrer, Brunst, Spear, M.G., Hyer, Padilla,

4 and Vaught are referred to collectively herein as "Backpage

5 Operators."

6                    **EVIDENCE SUPPORTING FORFEITURE**

7 **II.  The Formation and Evolution of Backpage**

8     118. Lacey and Larkin were the founders of the *Phoenix New*

9 *Times*, an alternative newspaper based in Arizona.  Lacey and Larkin

10 subsequently acquired several other alternative newspapers that they

11 operated through an entity called Village Voice Media Holdings

12 ("VVMH").  Spear served as VVMH's Executive Vice President and Brunst

13 served as VVMH's Chief Financial Officer.

14     119. As far back as the 1980's, VVMH publications routinely

15 included ads for prostitution.

16     120. By 2000, the popularity of the website www.craigslist.com

17 ("Craigslist"), which offered free classified ads that included

18 prostitution ads, began to disrupt VVMH's business, which depended on

19 classified advertising revenue.

20     121. Lacey and Larkin, assisted by Ferrer, sought to address

21 this disruption by creating Backpage, which would compete directly

22 with Craigslist.  As stated in an internal Backpage document, "[I]n

23 2004, in response to the Craigslist threat that was decimating daily

24 newspapers, VVMH launched its own online classified site,

25 Backpage.com, named after the back page of VVMH's print publication."

26     122. From 2004 until 2015, Lacey and Larkin bore primary

27 responsibility for Backpage's policies and strategic direction.  In

28 2015, Lacey and Larkin purported to sell to Ferrer all or

1  substantially all of their respective interests in Backpage.  In

2  fact, Lacey and Larkin retained significant control over Backpage,

3  and both continued to receive millions of dollars of annual

4  distributions of Backpage revenue after the purported sale.

5      123. From its inception, most of Backpage's earnings represented

6  the proceeds of illegal activity, specifically prostitution and sex

7  trafficking, including child sex trafficking.  By 2015, the major

8  credit card companies were refusing to process payments to or for

9  Backpage, and banks were closing Backpage's accounts out of concern

10  the accounts were being used for illegal purposes.

11      124. In response to these measures, the Backpage Operators

12  initiated and pursued a wide variety of money laundering strategies

13  and techniques designed, in part, to conceal the source and location

14  of the revenues generated by Backpage ads, including ads for human

15  trafficking and illegal prostitution.  These strategies included: (a)

16  instructing customers to send checks and money orders to a Post

17  Office box, funneling those funds into bank accounts held in the

18  names of entities with no apparent connection to Backpage, and then

19  giving customers a corresponding "credit" to purchase Backpage ads;

20  (b) accepting Backpage proceeds through foreign bank accounts and

21  thereafter redirecting the funds to Backpage Operators in the U.S.

22  and abroad, or transferring the funds back to domestic bank accounts

23  (to conceal the nature, source, location, ownership and control of

24  those funds and promote Backpage's ongoing illegal operations); and

25  (c) converting customers payments and the proceeds of Backpage's

26  illegal business into and out of digital currency.[5]

27

28      [5] Digital currency (also known as crypto-currency) is generally
defined as an electronic-sourced unit of value that can be used as a
*(footnote cont'd on next page)*

**III. The Sources and Manipulation of Backpage Criminal Proceeds**

    **A.    Backpage Promotion of Prostitution and Sex Trafficking**

    125. Numerous Backpage ads were used to sell minors for sex and forcibly traffic adult women for sex. Among the pimps and sex traffickers who used Backpage to advertise their victims were many who were later convicted of sex trafficking offenses. For example,

    a.    During 2014 and 2015, a pimp sold S.F., a minor girl, for sex. The pimp advertised S.F. on Backpage's "Escort" section in the Los Angeles area of California and in Arizona. The ad contained phrases such as "New In Town" and "Sexy Dark Asian Bombshell with a Nice & Tight {Booty}." The ad selling S.F. on Backpage included multiple pictures showing her legs, stomach, shoulders and buttocks. The pimp who placed the ad was ultimately arrested, convicted on state sex trafficking charges, and sentenced to 196 years imprisonment.

    b.    During 2014 and 2015, the same pimp sold A.C., a minor girl, for sex. In November 2014, at the age of 17, A.C. was first sold for sex through a Backpage ad using phrases such as "NEW IN TOWN," "sexy sweet," and "sweet like honey but super hot like fire." The Backpage ad selling A.C. included pictures of her showing her legs, stomach, shoulder, and buttocks, and posed in sexually provocative positions.

    c.    Between November and December 2015, a pimp drove two women and four minor girls (T.S., S.L., K.O., and R.W.) from Columbus, Ohio

---

substitute for fiat currency (*i.e.*, currency created and regulated by a sovereign government). It exists entirely on the Internet and is not stored in any physical form. It is not issued by any government, bank, or company, but is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Bitcoin, Bitcoin Cash and Litecoin are types of crypto-currency.

to a hotel in St. Charles, Missouri.  The next day, the pimp told the girls to post ads on Backpage.com.  Some of the girls took calls and engaged in paid sex acts with Backpage customers who responded to the ads.  The ads the girls posted included pictures of them on a bed showing their buttocks.  Another image featured a naked girl's body pressed against a mirror.  Other pictures appeared more mundane, such as images of girls posing clothed in front of a mirror.  However, these ads used phrases like "I'm sweet as a treat maybe even sweeter" and "not a lot need to be said. my pic are 100% real."  In 2017, this pimp was convicted of Federal sex trafficking charges and sentenced to 300 months in prison.

d.    In or around 2010, in Washington, J.S., a minor girl, was sold for sex through the use of Backpage ads.  J.S.'s pimp drafted the ads, which contained words and phrases such as, "W'E'L'L_W'O'R'T'H_I'T***^***150HR" and "IT WONT TAKE LONG AT ALL." The ads included pictures of J.S. in provocative positions showing her breasts and buttocks.  On March 29, 2011, the pimp who sold J.S. for sex was sentenced to over 26 years' imprisonment on Federal charges related to sex trafficking.

e.    Between 2011 and 2016, a female victim, D.O., who was between the ages of 14 and 19 during those years, was sold for sex through Backpage ads.  D.O.'s female pimp instructed D.O. that Backpage was the safest place to advertise because Backpage did not require age verification.  D.O.'s Backpage ads included words and phrases that were indicative of prostitution, such as "roses" (money) and "back door" (anal sex).  Some of the customers who responded to D.O.'s Backpage ads forced D.O. to perform sexual acts at gunpoint, choked her to the point of having seizures, and gang-raped her.

126. Plaintiff alleges that all levels of Backpage management, including the Backpage Operators, were aware of Backpage's role in promoting criminal activity.  For example:

a.  On September 21, 2010, a group of state attorneys general ("AG") wrote a letter to Backpage observing that "ads for prostitution-including ads trafficking children-are rampant on the site," and arguing that "[b]ecause Backpage cannot, or will not, adequately screen these ads, it should stop accepting them altogether."  The state AGs acknowledged that this step would cause Backpage to, "lose the considerable revenue generated by the adult services ads," but stated that "no amount of money can justify the scourge of illegal prostitution, and the misery of the women and children who will continue to be victimized in the marketplace provided by Backpage."

b.  Also in mid-September 2010, Ferrer wrote an email explaining that Backpage was unwilling to delete ads that included terms indicative of prostitution because doing so would "piss[] off a lot of users who will migrate elsewhere," and force Backpage to refund those customers' fees.

c.  In January 2017, the U.S. Senate Subcommittee on Permanent Investigations ("Subcommittee") conducted a lengthy investigation into sex trafficking and Backpage, resulting in a 50-page report entitled "Backpage.com's Knowing Facilitation of Online Sex Trafficking."  The report concluded, among other things, that virtually all of Backpage's "adult" ads were actually solicitations for illegal prostitution services and that "Backpage [] maintained a practice of altering ads before publication by deleting words, phrases, and images indicative of criminality, including child sex

31

trafficking . . . .  Those practices served to sanitize the content
of innumerable advertisements for illegal transactions-even as
Backpage represented to the public and the courts that it merely
hosted content others had created."  In response to the
Subcommittee's report, Backpage purported to shut down the "adult"
section of its website.  However, a review of several thousand
Backpage ads demonstrated that the prostitution ads simply migrated
to other sections of the website, where they remained accessible
until the site was forced to shut down.

d.   On August 5, 2011, Backpage received a letter from the
mayor of Seattle.  This letter warned, "Seattle Police have
identified an alarming number of juvenile prostitutes advertised on
Backpage.com since January 2010," and explained that Backpage was
dissimilar from other companies whose products and services are
"occasionally or incidentally" utilized by criminals because "[y]our
company is in the business of selling sex ads" and "your services are
a direct vehicle for prostitution."  The letter recommended that
Backpage require in-person age verification for all of the "escorts"
depicted in its ads.  Backpage never instituted an in-person age
verification requirement.

127. Backpage instituted and maintained policies and procedures
designed to cultivate and sustain its promotion of sex trafficking
and prostitution, but which "sanitized" some of the language Backpage
customers used to advertise in order to make the advertising of sex
trafficking less overt.  Backpage referred to this practice as
"moderation."  For example:

a.   In April 2008, Ferrer wrote an email explaining that,
although he (Ferrer) was "under pressure to clean up Phoenix's adult

content," he was unwilling to delete prostitution ads because doing so "would put us in a very uncompetitive position with craig[slist]" and result in "lost pageviews and revenue."  Ferrer instructed Backpage's technical staff to edit the wording of such ads by removing particular terms that were indicative of prostitution, but allow the remainder of the ad to be featured on Backpage's website.

b.   On October 8, 2010, a Backpage manager sent an email to certain Backpage employees and managers threatening to fire any Backpage employee who acknowledged, in writing, that a customer was advertising prostitution:  "Leaving notes on our site that imply that we're aware of prostitution, or in any position to define it, is enough to lose your job over. . . .  This isn't open for discussion. If you don't agree with what I'm saying completely, you need to find another job."

c.   On October 16, 2010, the same Backpage manager sent an email to a large group of Backpage employees that contained two attachments providing guidance on how to "moderate" ads.  The first was a PowerPoint presentation that displayed a series of 38 nude and partially-nude photographs, some of which depicted graphic sex acts. Next to each picture was an instruction as to whether it should be approved or disapproved by a Backpage moderator.  These instructions included "Approve.  Nude rear shots are okay as long the model is not exposing her anus or genitalia." and "Approve.  Rear shot okay. Transparent wet panties okay."  The second attachment was an Excel spreadsheet identifying 50 terms (all of which were indicative of prostitution) that should be "stripped" from ads before publication. The Backpage manager concluded the email by stating, "[I]t's the language in ads that's really killing us with the Attorneys General.

33

1    Images are almost an afterthought to them."

2         d.   On October 16, 2010, the same Backpage manager sent an
3    internal email explaining, "I'd like to still avoid Deleting ads when
4    possible;" "we're still allowing phrases with nuance;" and "[i]n the
5    case of lesser violations, editing should be sufficient."

6         e.   On October 25, 2010, Ferrer sent an email to Padilla
7    acknowledging that the "[i]llegal content removed" through Backpage's
8    moderation processes was "usually money for sex act."  This email
9    also explained that, after the "sex act pics are removed," the "ad
10   text may stay."

11        f.   On October 27, 2010, a different Backpage manager sent an
12   internal email stating that Backpage was "editing 70 to 80%" of the
13   ads it received from customers.

14        g.   On June 7, 2011, Ferrer received an inquiry from a law
15   enforcement official about a particular ad that included the term
16   "amber alert."  In response, Ferrer acknowledged this might be "some
17   kind of bizarre new code word for an under aged person."  Ferrer then
18   forwarded this exchange to a Backpage manager and instructed that the
19   term "amber alert" be added to Backpage's "strip out" list.

20        h.   On August 31, 2011, Backpage managers exchanged emails in
21   which they discussed a list of 100 "solid sex for money terms."
22   Later emails indicate that this list of terms changed but, in
23   general, the list prohibited use of certain terms that Backpage
24   management and employees closely identified with the obvious
25   promotion of sex trafficking and prostitution.

26        i.   One Backpage manager acknowledged in the August 31, 2011
27   email exchange that a large proportion of the ads originally
28   submitted by Backpage's customers contained text and pictures that

                                      34

were indicative of sex trafficking.  Nevertheless, Backpage published those ads after editing them to appear less obvious in promoting illegal activity.  Backpage sex trafficking ads adapted to Backpage's moderation policy by using "phrases with nuance" when promoting sex trafficking.  Following the implementation of "moderation," Backpage's list of prohibited terms changed and evolved over time to adjust to Backpage advertisers' use of new code words to promote prostitution.  In other words, once a code word or phrase not previously associated with sex-for-money became too familiar, or was deemed too closely associated with certain sex trafficking activities in the Backpage community of advertisers, Backpage's "moderation" policy would be adapted by adding such words or phrases to the "blocked" list or risk being too obvious in its promotion.

128. Plaintiff alleges that Backpage's policy of "moderation" only caused ads explicitly promoting sex trafficking to become more coded and implicit in the ads' purpose.

a.   Well over half of the Backpage classified ads in various Backpage categories used terms and phrases (including "massage," "dating," "escort" and others) that are consistent with sex trafficking and prostitution.  These terms and phrases included, "roses" (money, *e.g.*, "150 roses/half hour"), "in-call" (where the customer goes to the prostitute's location), "outcall" (where the prostitute goes to the customer's location), "GFE" (girlfriend experience), and "PSE" (porn star experience).

b.   Other Backpage ads used language that was mostly free of coded language, but included sexually provocative images.  The sexually suggestive images included in these ads were typical of ads for prostitution.  For example, one such ad posted in Backpage's Los

35

1    Angeles dating section depicted images of a woman on a bed with her

2    buttocks presented in a sexual manner; another included a picture of

3    a woman's cleavage; others included pictures of women posing in

4    sexual positions wearing lingerie and pictures of a woman bending

5    over, revealing her naked buttocks.

6         c.    Backpage's policy of moderation had the effect of causing

7    and allowing otherwise neutral or innocuous terms to be understood

8    within the Backpage community as coded language for sex trafficking

9    and prostitution.  Because of the evolving use of coded terms, a

10   reader of such ads who was familiar with the particular vocabulary

11   used in Backpage "adult" ads could readily identify coded terms and

12   images indicating an ad for prostitution, while an uninitiated reader

13   may not understand these terms at all, or at least not as being

14   associated with sex-for-money.

15        129.  Almost all "adult"-type Backpage ads listed phone numbers

16   or emails that a potential customer could use to make contact with

17   the advertiser.  Comparing a sample of phone numbers and emails found

18   within Backpage ads with phone numbers and emails that were

19   frequently included in the memo sections of checks that Backpage

20   advertisers use to pay Backpage for ads, revealed that the same

21   numbers and/or email addresses appeared in multiple Backpage ads as

22   contact information.  For example:

23        a.    A $25 USPS Money Order purchased on June 15, 2017, in

24   Duarte, California, made payable to "Posting Solutions PO BOX 802426,

25   Dallas, TX," and thereafter deposited into Account 1, bore a notation

26   listing a phone number and the words "Dulce Latina."  A search of

27   Backpage ads showed almost 800 advertisements listing the same phone

28   number.

b. A $20 USPS Money Order purchased in Sacramento, California, and later deposited into Account 1, bore a notation listing a phone number and the words "love my lips." A search of Backpage ads revealed almost 1300 advertisements listing the same phone number.

c. A $150 Wells Fargo Bank Money Order, purchased in Arizona, and made payable to "Posting Solutions," bore an email address and the words, "red hot stuff." The same email address was found to be associated with advertisements on several female escort websites that directed customers to contact an Arizona phone number ending in 2397. A search of Backpage.com for this phone number revealed approximately 760 ads that included this phone number. These Backpage ads included images indicative of prostitution. For example, one such ad posted on Backpage's "massage" section included sexual images such as a woman lying on a bed wearing lingerie and a woman laying naked on her stomach. One of the ads described, "Pampering provider | Body Rub Massage | Body Shampoo | Body Scrub | 4 hands | Walk ins or appointment." Legal massage advertisements do not typically depict sexual images. This advertisement depicted sexual images and included terms like "4 hands," which is coded language describing a massage given to a customer by two women. Such advertisements are indicative of prostitution.

130. The Backpage ads that shared the same phone number or email address typically also included sexually suggestive images of different women. Such ads are consistent with ads posted by pimps or prostitution agencies that are using the same phone number or email to advertise different women (or girls) to prospective prostitution clients.

**B.   Payments for Advertising on Backpage**

131. In order to post an ad on Backpage, an advertiser had to pay Backpage by one of several methods, including check, cash, and, until about 2015, credit card payments processed through U.S. credit card payment processors.  The proceeds from these ads, the vast majority of which were sexually explicit in nature, would then be deposited into various Backpage owned or controlled bank accounts. For example, Backpage's U.S. Bank account '1165, originated in or about April 2010, received several million dollars from the revenue generated from the sale of ads, including ads promoting the trafficking of minors and illegal prostitution.

132. However, in or around 2015, following negative publicity associated with Backpage, some of the major credit card companies enacted what Backpage Operators termed a "blockade."  Essentially, these companies refused to process credit card payments directed to Backpage.  In order to circumvent the blockade, Ferrer and other Backpage Operators set up agreements with foreign persons and partners to "franchise" websites for the sole purpose of accepting credit card payments outside of the United States, with the funds being funneled to Backpage.

133. Also in or around 2015, in response to the blockade, Backpage designed a mechanism to allow advertisers to buy Backpage "credits," which could be accomplished in several ways, including:

a.   Mailing gift cards, checks, or money orders to "Posting Solutions" at a P.O. Box in Dallas, Texas;

b.   Using a credit card to buy credits through a third-party credit card payment processor;

c.   Paying with digital currency (specifically, Backpage

38

1   accepted Bitcoin, Bitcoin Cash, Litecoin, and Ethereum).  If the

2   advertiser selected this option, Backpage provided a digital currency

3   wallet address where the advertiser could send the electronic

4   transfer of the digital currency; and

5        d.   Paying with currency through a third party payment

6   processor.  Once the third-party payment processor received the

7   currency, it would convert it to digital currency and then

8   electronically transfer that digital currency to a Backpage digital

9   currency wallet.

10       134. Digital Currency was processed through the defendant

11   accounts in the following way:

12       a.   When Backpage received digital currency, it would aggregate

13   the digital currency and transfer it to a third-party exchanger like

14   GoCoin;[6]

15       b.   In exchange for the digital currency, the exchanger would

16   transfer U.S. dollars from its foreign bank account(s) into Backpage

17   operating accounts in the United States or elsewhere.  The exchanger

18   could then sell its Bitcoin on various Bitcoin markets.

19       135. Bitcoin payments for ads have resulted in the trafficking

20   of minors for sex.  For example:

21       a.   On September 6, 2015, a Bitcoin account associated with the

22   owner of the email address later convicted of having trafficked

23   minors for sex paid Backpage about $4 worth of Bitcoin in order to

24   post an ad promoting the trafficking of certain victims in Palm

25   _____

26       [6] GoCoin is a digital currency exchanger that converts Bitcoin
    and another digital currency into fiat currency, like the U.S. Dollar
27   or the Euro.  GoCoin is owned by Manx Broadcasting Corporation, based
    in the Isle of Man.  GoCoin has offices in Singapore and Santa
28   Monica, California, and GoCoin holds bank accounts in several
    countries, most or all of which are outside the United States.

Springs, California.

b.　On September 15, 2015, an email from the same email address owner indicated a payment to Backpage of about $8 worth of Bitcoin in order to "Fund Account"[7] for palmsprings.backpage.com.

c.　On October 6, 2015, the same email address owner paid Backpage about $1 worth of Bitcoin to "Fund Account" on palmsprings.backpage.com.

d.　On October 30, 2015, a Bitcoin account associated with the owner of the email address who trafficked minors for sex paid Backpage about $1 worth of Bitcoin in order to post an ad promoting the trafficking of certain victims in Columbus, Ohio.

e.　On November 2, 2015, this same email address owner paid Backpage about $1 worth of Bitcoin to "Move Ad to Top of Listings" in the Columbus, Ohio Backpage ads; and

f.　On November 21, 2015, this same email address owner paid Backpage about $1 worth of Bitcoin to Backpage for credit for that email owner's Backpage ad account.

136. Plaintiff contends that five to ten percent of the ads posted on Backpage.com were placed within the Central District of California (including Los Angeles and Orange Counties). Between January 10 and February 3, 2016, approximately 500,000 ads were posted on Backpage.com and paid for with Bitcoin, for which Backpage received over $3,840,000 in revenue. Of these approximately 500,000 ads, approximately 28,400 were posted only in LosAngeles.Backpage.com, Ventura.Backpage.com, SanLuisObispo.Backpage.com, OrangeCounty.Backpage.com, and

---

[7] The email address owner provided Bitcoin to Backpage as a "Fund Account" payment, that is, payment to Backpage as credit to be used later to pay for Backpage ads.

SanGabrielValley.Backpage.com.  These specific ads generated approximately $184,479 in revenue.

137. When an advertiser (or "poster") purchased an ad for prostitution using digital currency, the payment to Backpage (and certain subsequent expenditures) proceeded in the following manner:

a.  A poster would choose a payment method online (*e.g.*, through Bitcoin payments);

b.  If the poster did not already have Bitcoin, the Backpage website would direct the poster to a third-party exchanger to buy Bitcoin;

c.  Backpage would then provide the poster with a wallet address to send a specific amount of Bitcoin;

d.  In return for sending the required payment, the poster would receive credit that could be used to post ads on Backpage.

e.  Backpage would sell the Bitcoin to a third party exchanger, frequently GoCoin, in batches generally valued in hundreds of thousands of dollars, in order to convert the Bitcoin into U.S. or foreign flat currency, which GoCoin generally, if not always, would hold in foreign bank accounts;

f.  GoCoin would then wire funds from foreign accounts to either (1) Backpage controlled foreign accounts; or (2) Backpage controlled operating accounts in the United States;

g.  These accounts were held and controlled by Backpage Operators in the names of entities controlled by Backpage, including Ad Tech BV, Posting Solutions, Website Technologies, and Cereus Properties;

h.  The funds derived from these foreign transactions would be used by Backpage to pay service providers, like Verizon in Los

Angeles, or transferred to Backpage Operators' accounts and accounts
held in their family members' names; and

    i.   For example:

       a.   In March 2015, Ad Tech BV, a Netherlands based
company, listing Ferrer as CEO and M.G. as CFO, opened a bank account
in the Netherlands (the "Netherlands Account").  M.G. is the
President, CEO, Treasurer and Secretary of Posting Solutions.  From
March 2015 through November 2017, the Netherlands Account received
millions of dollars from Binary Trading SG PTE, Limited ("Binary
Trading").  On April 4, 2017, M.G. sent an email to employees of the
bank that maintained the Netherlands Account.  The email explained:

> Binary Capital is our trading partner, they hold money in
> trust for Go Coin [sic].  Rather than incurring 3 sets of
> wire fees which make our transactions unprofitable, they
> act as our agent and disburse payments directly from our
> trust account to our merchant.

       b.   For the period of September 4 through November 23,
2015, Backpage advertisers used Bitcoin to purchase about 1,000,000
"adult" ads from Backpage.  Backpage then sold those Bitcoin to
GoCoin for approximately $8.6 million.  Included among the Bitcoin
sold to GoCoin during this period were payments that pimps made to
Backpage in order to purchase ads to promote child prostitution.

       c.   For the period of December 14, 2015, through August
30, 2016, in approximately 154 wires, GoCoin accounts held in
Slovakia (the "Slovakia Account") and Singapore (the "Singapore
Account") transferred a total of approximately $26,100,235.83 to
Branch Banking & Trust account '2008, in Plano, Texas, owned by
Website Technology ("Website Tech Account '2008").  On January 15,
2016, the Website Tech Account '2008 transferred $189,571 to Verizon

in Los Angeles, California, in payment for Backpage internet services.

d. Between January 21 and August 31, 2016, Website Tech Account '2008 sent approximately 27 wire transfers totaling approximately $48,000,000 to Arizona Bank & Trust account number '6211, belonging to Cereus Properties LLC, which is owned or controlled by Spear, Backpage, and/or other Backpage Operators.

**C. Bank Accounts Funded with Proceeds Traceable to SUA, Involved in Money Laundering, or Both**

138. Between December 14, 2015, and February 9, 2017, a coordinated series of wire transfers were completed transferring criminal proceeds from Backpage-controlled bank accounts to four separate bank accounts at the USAA Savings Bank. All the USAA Savings Bank accounts were held in the name of different living trusts with the common factor of Hawkins being one of the Trustees on all four accounts. Hawkins is the sister-in-law of Larkin.

139. Criminal proceeds deposited with a company doing business for GoCoin initiated wire transfers of the criminal proceeds from the Slovakia account to Website Tech Account '2008 in the United States.

140. Website Tech Account '2008 then initiated wire transfer of the criminal proceeds to Arizona Bank & Trust Account number '6211 ("AZBT '6211"), belonging to Cereus Properties LLC.

141. On January 4, 2017, AZBT '6211 initiated four wires:

a. $33,591.34 to Charles Schwab account '6039 held in the name of Oaxaca Living Trust with Kathleen D. Larkin as the sole beneficiary ("Schwab '6039");

b. $33,591.34 to Charles Schwab account '9083, held in the name of Puebla Living trust with Rose L. Larkin as the sole

beneficiary (Schwab '9083');

c.    $33,591.34 to Charles Schwab account '7249, held in the name of Cuernavaca Living Trust with Quinn M. Larkin as the sole beneficiary ("Schwab '8628"); and

d.    $33,591.34 to Charles Schwab account '8628, held in the name of Chiapas Living trust with John C. Larkin as the sole beneficiary ("Schwab '8628").

142. Several days after the criminal proceeds were deposited into the four Charles Schwab accounts, they were then transferred to four AZBT accounts.

a.    On January 10, 2017 Schwab '6039 wired $840,692.69 to Arizona Bank & Trust account '3835, held in the name of Oaxaca Living Trust UTA with Lacey and Hawkins as the Trustees and Kathleen Dewhurst Larkin as the beneficiary ("AZBT '3835");

b.    On January 11, 2017 Schwab '9083 wired $840,672.72 to Arizona Bank & Trust account '3864 held in the name of Puebla Living Trust UTA with Lacey and Hawkins as the Trustees and Rose Lyons Larkin as the beneficiary ("AZBT '3864");

c.    On January 12, 2017 Schwab '7249 wired $840,672.70 to Arizona Bank & Trust account '3859 held in the name of Cuernavaca Living Trust UTA with Lacey and Hawkins as the Trustees and Quinn McCarthy Larkin as the beneficiary ("AZBT '3859"); and

d.    And on January 10, 2017 Schwab '8628 wired $840,672.70 to Arizona Bank & Trust account '3840 held in the name of Chiapas Living Trust UTA with Lacey and Hawkins as the Trustees and John Carey Larkin as the beneficiary ("AZBT '3840").

143. On January 11, 2018, and in addition to the previous wire transfers, AZBT '6211 transferred $33,591.34 to each of the Living

44

1   Trust accounts, AZBT '3835, AZBT '3864, AZBT '3859, and AZBT '3840.

2       144. On February 9, 2017, the four Oaxaca Living Trust account,

3   AZBT '3835, AZBT '3864, AZBT '3859, and AZBT '3840, wire transferred

4   approximately $874,330 to:

5       a.   USAA Savings Account '2155 ("USAA '2155" or "Account 59");

6       b.   USAA Savings Account '2058 ("USAA '2058" OR "Account 60");

7       c.   USAA Savings Account '2171 ("USAA '2171" or Account 61");

8   and

9       d.   USAA Savings Account '1507 ("USAA '1507" or Account 62").[8]

10      **D.   Bases for Forfeiture**

11      145. The Defendant Assets constitute, and are derived from,

12  proceeds traceable to one or more violations of 18 U.S.C. §§ 1591

13  (Sex Trafficking of Children), and/or 1952 (Interstate and Foreign

14  Travel in Aid of Racketeering Enterprise), each of which is SUA under

15  18 U.S.C. § 1956(c)(7)(A), and a conspiracy to commit such offenses.

16      146. The Defendant Assets were involved in, and are traceable to

17  property involved in, one or more transactions or attempted

18  transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and a

19  conspiracy to commit such offenses, in violation of 18 U.S.C.

20  § 1956(h).  Specifically, the Defendant Assets were involved in and

21  are traceable to property involved in one or more financial

22  transactions, attempted transactions, or a conspiracy to conduct or

23  attempt to conduct such transactions involving the proceeds of

24  specified unlawful activity, that is, 18 U.S.C. §§ 1591 and 1952, and

25  were designed in whole or in part to conceal or disguise the nature,

26

27      [8] Accounts 59, 60, 60, and 62, are all held in the name of Anne
    Hawkins, a sister-in-law to Larkin, and were funded with proceeds
28  alleged to have been traceable to SUA, involved in money laundering,
    or both.

location, source, ownership or control of the proceeds of the SUA in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

147. The Defendant Assets were involved in, and are traceable to property involved in, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1957, or a conspiracy to commit such offenses, in violation of 18 U.S.C. § 1956(h). Specifically, the Defendant Assets were involved in and are traceable to property involved in one or more financial transactions, attempted transactions, or a conspiracy to conduct or attempt to conduct such transactions in criminally derived property of a value greater than $10,000 that was derived from SUA, that is, 18 U.S.C. §§ 1591 and 1952.

## IV. Assets Representing, Traceable To, and Involved In Specified Unlawful Activity

### A. Account 1 (Prosperity '7188 Funds)

148. On February 15, 2017, Posting Solutions opened Account 1. M.G. is the sole signatory on the account (as described above, Posting Solutions is wholly owned by and controlled by Backpage).

149. The application for the P.O. Box identifies the renter of the box as "Website Technologies, LLC/Backpage.com." Listed on the Application were the names of several Backpage Operators, including Ferrer.

150. Between August 1 and September 1, 2017, Account 1 received more than $2,781,750 in wire transfers from foreign banks. For example:

a. On or about August 16, 2017, Binary Trading wired $535,500 from an account in Singapore into Account 1;

b. On or about August 17, 2017, Binary Trading wired $528,500

46

1  from a Singapore account into Account 1; and

2      c.  On or about August 30, 2017, a company named Trilix PTE LTD

3  ("Trilex"), listing the same Singapore address as Binary Trading and

4  GoCoin, sent four wire transfers from the Singapore account into

5  Account 1, ranging from $385,450 to $492,250, totaling approximately

6  $1,717,750.

7      151. Plaintiff alleges that a substantial percentage of outgoing

8  payments from Account 1 have been payments for the operation of

9  Backpage.com.  For example, between July and October 2017, funds were

10 wired from Account 1, as following:

11     a.  $570,530 to Verizon Digital Media Services in Los Angeles

12 for services related to the Backpage.com website; and

13     b.  $1,497 to "Backupify," a company that provided data backup

14 services for Backpage.

15                 **CEREUS PROPERTIES ASSETS**

16     **B.**    **Account 2 (Compass '3873 Funds)**

17     152. Account 2 was held in the name of Cereus Properties LLC.,

18 and Spear was the sole signatory.  This account was funded in part

19 with transfers from Account 1, which funds are alleged to have been

20 traceable to SUA, involved in money laundering, or both, and was used

21 as a funnel account to pay Backpage Operators.  On average, during

22 each month of 2017, several hundred thousand dollars were transferred

23 from Account 1 to Account 2.  For example:

24     a.  On August 31, 2017, Account 1 sent a wire transfer totaling

25 $487,491.45 to Account 2;

26     b.  On September 15, 2017, Account 1 sent a wire transfer

27 totaling $91,672.67 to Account 2; and

28     c.  On October 2, 2017, Account 1 sent a wire transfer totaling

1    $471,766 to Account 2.

2         153. Funds from Account 2 were also used to promote and
3    facilitate prostitution.  For example:

4         a.   On December 2, 2016, the Netherlands Account transferred
5    $324,055.85 to Account 2;

6         b.   On December 8, 2016, the Netherlands Account transferred
7    $499,970.00 to Account 2;

8         c.   On December 27, 2016, the Netherlands Account transferred
9    $199,970.00 to Account 2; and

10        d.   From March to December 2017, Account 2 paid over $9,000 to
11   "Cox Communications," an internet services company that Backpage used
12   to facilitate its internet presence and promote its sale of
13   prostitution advertising.

14        **C.   Account 3 (Compass '4862 Funds)**

15        154. Account 3, held in the name of Cereus Properties, was
16   funded with transfers from foreign and domestic banks, which funds
17   were traceable to SUA, involved in money laundering, or both,
18   including funds transferred from the Netherlands Account through one
19   of the Backpage Operators' go-between accounts[9] (Wells Fargo Bank
20   account '9863 ("Account '9863")), and eventually funneled into
21   Account 3.

---

27        [9] A "go-between" (*a.k.a.*, a "pass-through") is an account set up
28   for the main purpose of transferring funds from one or more bank
     accounts to various other bank accounts, frequently as an attempt to
     further conceal the true source and nature of the funds.

**MICHAEL LACEY ASSETS**[10]

**D.   Account 4 (FFS&L of SR '3620 Funds)**

155. Account 4, held in the name of Lacey, was funded with transfers from foreign and domestic banks, which funds were traceable to SUA, involved in money laundering, or both.  On October 2, 2017, Account 24 (which was itself funded with transfers from foreign and domestic banks with proceeds traceable to SUA, involved in money laundering, or both), transferred $297,795 into Account 4, as further described below.

**E.   Accounts 5, 7-10 (RBA '2485, '3126, '8316, '8324, and '8332)**

156. Accounts 5 and 7, each held in the name of Lacey, were funded with transfers from foreign and domestic banks, which funds were traceable to SUA, involved in money laundering, or both. Backpage Operators used Accounts 5 and 7 as pass-through accounts.

a.   On May 31, 2017, Account 2 transferred approximately $676,808.04 into Account 5;

b.   Between September 20, 2017 and December 8, 2017, Account '9863 transferred approximately $944,729.25 among seven transaction into Account 3.

c.   On December 13, 2017, Account 3 transferred approximately $428,645.09 into Account 5.

d.   On March 16, 2018, Account 3 transferred approximately $212,066.52 into Account 5.

e.   On April 6, 2018, Lacey personally went into the Republic

---

[10] On March 20, 2020, pursuant to a stipulation, this Court entered a consent judgment returning approximately $450,376.48 to Michael Lacey and Jill Anderson (*see* ECF No. 99, 2:18-cv-06742-RGK-PJW).  As a result, those funds are not included in this Amended Consolidated Complaint.

Bank of Arizona, withdrew $500,000 from Account 5, and then used that $500,000 as the initial deposit to open Account 7; and

    f.  On October 2, 2017, Account 2 made two transfers:

        i.  $297,795.54 transferred to Account 4; and

        ii.  $694,856.25 wired to Account 11.

    g.  On or about February 15, 2018, Lacey drafted two $600,000 checks (totaling $1.2 million). One check was drawn from Account 11, and the second was drawn from Account 4. These two checks were used to fund Accounts 8, 9, and 10, respectively, with $600,000.00, $300,000.00, and $300,000.00.

**F.    Account 11 (SFFCU '4S10 Funds)**

157. Account 11 is held in the name of Lacey and an individual listed in the Credit Union's records as Lacey's employee and bookkeeper. Account 11 was funded with proceeds alleged to have been traceable to SUA, involved in money laundering, or both.

    a.  On February 2, 2018, Account 2 (which then contained funds traceable to SUA, involved in money laundering, or both) transferred $734,602.70 into Account 11.

**G.    Account 12 (IOLTA '4139)**

158. Account 12 was an IOLTA held for the benefit of Lacey, and was funded with proceeds traceable to SUA, involved in money laundering, or both.

159. On January 4, 2017, the Singapore Account wired $489,500 into a Posting Solutions controlled account held at Veritex Bank (the "Veritex Account"). On January 20, 2017, the Singapore Account directed two additional wires, for $358,150 and $470,150 respectively, into the Veritex Account. In total, the Singapore Account transferred $1,317,800 into the Veritex Account.

a.   On or about February 23, 2017, the Veritex Account directed two payments to Account 2, a wire of $443,014, and a check for $27,887.41;

b.   Between March 30 and September 14, 2017, Account 2 sent five wires totaling $4,058.063.65 to Account 12; and

c.   In July 2018, Account 12 was closed and a cashier's check totaling $2,412,785.47 was issued to Lacey's Annuity Fund, held at Account 12.

### H.   The Sebastopol Property

160. The Sebastopol Property was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both.

161. In a series of transactions in December 2016, illicit proceeds from the Netherlands Account would pass-through Account 2, eventually ending up in Account 11.  Additionally, between July and October 2017, additional illicit proceeds from the Singapore Account were passed-through Account 1 to Account 2, and eventually transferred to Account 11.  On or about October 10, 2017, over $10,000 of funds from Account 11 were used to support and maintain the Sebastopol Property.

162. On February 11, 2016, a grant deed, instrument number 2016010019 of the Sonoma County official records, transferred the Sebastopol Property to Lacey.  Thereafter, on April 24, 2017, for no consideration, Lacey transferred title of the Sebastopol Property to his Delaware limited liability company, Sebastopol, LLC.  As noted in the grant deed:

> "There was no consideration for this transfer.  This is a transfer between an individual or individuals and a legal entity or between legal entities that results solely in a

change in the method of holding title and in which
proportional ownership inters in the realty remain the
same. . ."

163. On October 10, 2017, Lacey issued a $12,956.25 check from
Account 11 to Sonoma County Tax Collector. The notation on this wire
was "2043 Pleasant Hill Dr Sebastopol."

**I. San Francisco, California Property 1**

164. San Francisco Property 1 was purchased and maintained, in
whole or in part, using funds traceable to SUA, involved in money
laundering, or both.

165. In order to acquire San Francisco Property 1, Lacey used
funds transferred through the Singapore Account, the Website Tech
Account '2008, and Cereus Properties accounts, as well as annuity
accounts that Lacey controlled, as follows:

a. Illicit proceeds were deposited into the Singapore Account,
passed-through Account 1, then passed-through Account 2 and
transferred to Account 11. Thereafter, funds from Account 11 were
used to support and maintain San Francisco Property 1;

b. On May 18, 2016, a grant deed recorded as instrument number
2016-K245482-00 in the San Francisco County official records,
transferred San Francisco Property 1 to Lacey and his female partner;
and

c. Thereafter, on October 10, 2017, over $10,000 in funds from
Account 11 were used to purchase or maintain San Francisco Property 1.

**J. San Francisco Property 2**

166. San Francisco Property 2 was purchased and maintained, in
whole or in part, using funds traceable to SUA, involved in money
laundering, or both.

167. During the period of December 14 through December 29, 2015,

52

as GoCoin's partial payment for the Bitcoin Backpage sold it during the period of September 4 through November 23, 2015, the Slovakia Account wired over $1,250,000 to Website Tech Account '2008.

168. After December 14, 2015, Website Tech Account '2008 then transferred funds via multiple pass-through accounts controlled by Lacey and other Backpage Operators, which, as of June 21, 2016, resulted in approximately $5,400,000 ending up in Arizona Bank & Trust account '1793, controlled by Lacey ("AB&T Account '1793").

169. On June 27, 2016, AB&T Account '1793 wired $397,500.00 to Fidelity National Title Company. The notation on this wire was "XXX(Earnest Money)XXXXXX." On July 20, 2016, AB&T Account '1793 wired $12,859,152.57 to Fidelity National Title Company. The notation on this wire was "XX(Balance of Property)XXXXX."

170. Casa Bahia for San Francisco, LLC, a Delaware limited liability company, was the entity used to take title to the San Francisco Property 2, and is owned by Lacey. On July 21, 2016, by grant deed, San Francisco Property 2 was transferred to Lacey. On June 21, 2017, by grant deed and for no consideration, Lacey transferred San Francisco Property 2 to Casa Bahia for San Francisco, LLC, a Delaware limited liability company, as evidenced by instrument number 2017-K466276099 recorded in the San Francisco County official records. As noted in the grant deed:

> There was no consideration for this transfer. This is a transfer between an individual or individuals and a legal entity or between legal entities that results solely in a change in the method of holding title and in which proportional ownership inters in the realty remain the same. . .

**K. San Francisco Property 3**

171. San Francisco Property 3 was purchased and maintained, in

whole or in part, using funds traceable to SUA, involved in money laundering, or both.

172. Beginning in February 2013, illicit funds from Backpage's U.S. Bank account '1165 passed-through various Backpage or Backpage Operators accounts, eventually ending up in BMO Harris account '5263, owned or controlled by Lacey.  In May 2015, over $10,000 of funds from BMO Harris account '5263 was used to purchase or maintain San Francisco Property 3.

**L.  Sedona Property**

173. The Sedona Property was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both.

174. In October 2017, Account 2 wired approximately $297,795 to Account 4.  On November 13, 2018, $6,725.54 from Account 4 was used to support or maintain the Sedona Property.

**M.  Paradise Valley Property 2**

175. Paradise Valley Property 2 was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both.

176. In 2005, for approximately $1,500,000, Lacey purchased the Paradise Valley Property 2.  In 2010, the Paradise Valley Property was used as collateral for a $1 million loan (the "2010 Loan").  Beginning no later than January 2012, illicit proceeds were used to service the debt on the 2010 Loan.  Specifically:

a.  Between February 4 and June 6, 2013, through a series of wire transfers, Backpage's U.S. Bank account '1165 transferred approximately $41,500,000 to BMO Harris Bank account '5263; and

b.  Between March 2013, and January 2016, through a series of

1  periodic transactions, approximately $174,749.39 from BMO Harris Bank

2  account '5263 was used to service the debt on the 2010 Loan.

**JAMES LARKIN ASSETS**[11]

3

4  **N.    Accounts 13, 15, 16, 17, AND 18 (RBA '1889, '2592, '8103,**
       **'8162, AND '8189)**

5      177. Account 13, held in the name of Larkin, was funded with

6  proceeds alleged to have been traceable to SUA, involved in money

7  laundering, or both.

8      a.    On July 6, 2017, Account 2 transferred $971,651.51 into

9  Account 13; and

10     b.    On July 28, 2017, Account 13 transferred $400,000 into

11 Account 14.

12     178. Account 15 is held in the name of Larkin.

13     a.    From March 2015 through November 2017, the Netherlands

14 Account received several millions of dollars in criminal proceeds

15 from Binary Trading;

16     b.    On December 2, 2016, the Netherlands Account transferred

17 $324,055.85 to Account 2;

18     c.    On December 8, 2016, the Netherlands Account transferred

19 $499,970.00 to Account 2;

20     d.    On December 27, 2016, the Netherlands Account transferred

21 $199,970.00 to Account 2, which account then transferred funds

22 through Account '9863 and into Account 3; and

23     e.    On December 13, 2017, Account 3 transferred $406,211.10 to

24 Account 15.

25     179. Account 16, 17, and 18 are CDARS Accounts held in the name

26

27     [11] On January 13, 2020, pursuant to a stipulation, this Court
     entered a consent judgment returning approximately $206,163.88 to
28   James Larkin (*see* ECF No. 65, 2:18-cv-8420-RGK-PJW).  As a result,
     those funds are not included in this Amended Consolidated Complaint.

of Larkin.

a.   On July 28, 2017, Account 13 transferred $400,000 into Account 14; and

b.   On or about February 8, 2018, $1 million in funds from Account 14 was used to fund Account 16 (which received $500,000), Account 17 (which received $250,000), and Account 18 (which received $250,000).

**O.   Accounts 19 AND 20 (PCTC ACCOUNT '0012 FUNDS, PERKINS COIE '0012)**

180. Account 19 is held in the name of Larkin's spouse, M. Larkin, and was funded with proceeds traceable to SUA, involved in money laundering, or both.

a.   On December 31, 2015, Website Tech Account '2008 transferred $811,424 to the Slovakia Account;

b.   On January 11, 2016, the Slovakia Account transferred approximately $1,300,000 to Charles Schwab account '4693, held in the name of Larkin ("Charles Schwab Account '4693");

c.   On January 14, 2016, Charles Schwab Account '4693 transferred approximately $13,500,000 to Northern Trust Company account '9562 (under the name "Ocotillo Family Trust," owned and controlled by Larkin and Margaret Larkin);

d.   In July 21, 2017, Account '9562 transferred $6,014,000 to Morgan Stanley account '1673 (held in the name of Larkin and Margaret Larkin);

e.   In or about November 2017, Morgan Stanley elected to terminate its business relationship with Larkin;

f.   On November 30, 2017, all the funds then held in Morgan Stanley account '1673 (about $10,000,000) were transferred to Account

19; and

g.   Some of the funds in Account 19 were used to purchase bonds and/or securities, which were held in Account 20.

**P.   Account 21 (ACF '2020)**

181. Account 21 contains securities and investment vehicles held in the name of Ocotillo Family Trust, which is owned and controlled by Larkin and his spouse, and was funded with proceeds traceable to SUA, involved in money laundering, or both.

a.   During the period of March 23 through March 31, 2016, Website Tech Account '2008 sent three wire transfers totaling $3,694,813.60 to Arizona Bank & Trust account number '6211, belonging to Cereus Properties ("Account '6211");

b.   During the period of April 1, 2016, through July 1, 2016, Account '6211 sent five wire transfers totaling $5,750,294 to Charles Schwab Account '4693;

c.   On July 1, 2016, Charles Schwab Account '4693 transferred $15,000,000 to Account 21;

d.   During the period of August 2, 2016, through October 6, 2016, Account '6211 sent six wire transfers totaling $9,550,315 to Charles Schwab Account '4693;

e.   On January 3, 2017, Charles Schwab Account '4693 transferred $2,500,000 to Account 21; and

f.   On January 4, 2017, Charles Schwab Account '4693 transferred $2,500,000 Account 21.

**Q.   Accounts 22 And 23 (BA '8225 and '7054)**

182. Account 22 is held in the name of one of Larkin's children, T. Larkin, and was used in furtherance of the money laundering scheme described herein, and in an attempt to further conceal or disguise

the nature, location, source, ownership or control of the criminal proceeds.

183. On February 2, 2018, Account 2 wire transferred $28,337 into Account 22.

184. Account 23 is held in the name of R. Larkin.  On February 2, 2018, Account 2 wire transferred $28,337 into Account 23.

**R.    Saint Helena Property**

185. The Saint Helena Property was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both.

186. Between February 4 and June 6, 2013, approximately $41,500,000 in illicit funds were transferred to Camarillo Holdings LLC, BMO Harris Bank account '7172.  On October 2, 2013, BMO Harris Bank account '7172 wired $26,130.64 to Larkin's BMO Harris Bank account '3110.  Thereafter, on November 3, 2016, over $10,000 of funds from BMO Harris Bank account '7172 were used to purchase or maintain the Saint Helena Property.

**S.    Chicago Property**

187. The Chicago Property was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both.

188. Illicit funds originating from Backpage's U.S. Bank account '1165 were passed-through accounts owned or controlled by Backpage or Backpage Operators, and ended up in BMO Harris Bank account '3110. Thereafter, on October 2, 2015, BMO Harris Bank account '3110 transferred $138,000 to Chicago Title and Trust Company as payment towards the purchase of the Chicago Property.

1        T.   **Paradise Valley Property 1**

2        189. Paradise Valley Property 1 was purchased and maintained, in

3   whole or in part, using funds traceable to SUA, involved in money

4   laundering, or both.

5        190. Approximately $41.5 million in illicit funds from

6   Backpage's U.S. Bank account '1165 passed through various Backpage or

7   Backpage Operators' accounts.  Following these various transfers,

8   eventually, on October 2, 2013, a total of approximately $26,130.64

9   was transferred into BMO Harris account '3110, owned or controlled by

10  Larkin.  Thereafter, on December 11, 2014, BMO Harris Bank account

11  '3110 paid $46,957.28 to maintain the Paradise Valley property 1.

12       U.   **Paradise Valley Property 2**

13       191. Paradise Valley Property 2 was purchased and maintained, in

14  whole or in part, using funds traceable to SUA, involved in money

15  laundering, or both.

16       192. Illicit funds originating from Backpage's U.S. Bank account

17  '1165 were passed-through accounts owned or controlled by Backpage or

18  Backpage Operators, and ended up in BMO Harris Bank account '3110,

19  from which account over $10,000 was paid to maintain Paradise Valley

20  Property 2.

21                          **JOHN BRUNST ASSETS**

22       V.   **Account 24 (COMPASS BANK '3825)**

23       193. Account 24 is held in the name of Brunst, and was used in

24  furtherance of the money laundering scheme described herein, and in

25  an attempt to further conceal or disguise the nature, location,

26  source, ownership or control of the proceeds of SUA.

27       194. On February 2, 2018, Account 2 wire transferred $135,956.59

28  into Account 24.

1    **W. Account 25, 26, 27, 28, 29, 30 (AB '6878, '4954, '7892,**

2       **'7889, '7888 AND '6485)**

3    195. Accounts 25, 26, 27, 28, 29, and 30 are held in the name of

4 the "Brunst Family Trust."  Brunst and his wife are the sole trustees

5 for these accounts, which were funded with proceeds traceable to SUA,

6 involved in money laundering, or both.

7    a. On December 31, 2015, Website Tech Account '2008

8 transferred $811,424 to Account '6211;

9    b. On December 6, 2016, Account '6211 transferred $161,459 to

10 Wells Fargo Bank account '4891, belonging to Brunst ("Account

11 '4891");

12    c. On January 4, 2017, Account '6211 transferred another

13 $298,841 to Account '4891;

14    d. On January 5, 2017, Account '4891 transferred $300,000 to

15 Wells Fargo Bank account '7474, belonging to the Brunst Family Trust

16 ("Account '7474").

17    e. On May 19, 2017, Account '7474 transferred approximately

18 $1,500,000 into Account 25;

19    f. On May 23, 2017, Account 25 transferred approximately

20 $350,000 to Account 26;

21    g. On June 7, 2017, Account 25 transferred approximately

22 $1,340,000 to Account '0582;

23    h. On September 13, 2017, Account '0582 transferred

24 approximately $581,000 to Account 27;

25    i. On September 13, 2017, Account '0582 transferred

26 approximately $250,000 to Account 28;

27    j. On September 13, 2017, Account '0582 transferred

28 approximately $250,000 to Account 29; and

1  k. On September 15, 2017, Account '0582 transferred

2 approximately $500,000 to Account 30.

3        **SCOTT SPEAR ASSETS**

4  **X. Accounts 31, 32, AND 33 (NBA '0178, '0151, and '3645)**

5  196. Accounts 31 and 32 are held in the name of Spear, which

6 accounts were funded with proceeds traceable to SUA, involved in

7 money laundering, or both.  Account 33 is held in trust for the

8 benefit of Spear and certain of his family members, which account was

9 funded with proceeds traceable to SUA, involved in money laundering,

10 or both.  In furtherance of the money laundering scheme, and in an

11 attempt to further conceal the true nature of the criminal proceeds,

12 go-between accounts served to funnel money from one account to

13 another.

14  a. Between January 21 and August 31, 2016, Website Tech

15 Account '2008 sent approximately 27 wire transfers totaling

16 approximately $48,000,000 to Account '6211;

17  b. Between March 1, 2016, and July 1, 2016, Account '6211

18 transferred $892,426 into Account 31;

19  c. On September 14, 2017, Account 2 wire transferred

20 $50,162.05 into Account 31;

21  d. On October 12, 2017, Account 31 transferred approximately

22 $21,500 into Account 32; and

23  e. On January 5, 2018, Account 31 transferred approximately

24 $600,000 into Account 33.

25  **Y. Account 34 (Live Oak Bank Account '6910)**

26  197. Account 34 is held in the name of Spear, and was funded

27 with proceeds traceable to SUA, involved in money laundering, or

28 both.

198. On or about March 16, 2016, as an opening deposit, Account 31 transferred $250,000 into Account 34.

**Z.   Account 35 and 36 (Ascensus Broker Services '4301 and '8001)**

199. Accounts 35 and 36 are held in the name of N. Spear, Spear's adult daughter, and were funded with proceeds traceable to SUA, involved in money laundering, or both.

a.   On February 23, 2017, Account 31 transferred approximately $50,000 into Account 35; and

b.   On the February 23, 2017, Account 31 transferred $50,000 into Account 36.

**PRIMUS TRUST ASSETS**

**AA.      Account 37 (K&H Bank Account '1210)**

200. Account 37 is located in Hungary, and held in the name of Primus Trust Company for the benefit of Lacey. In furtherance of the money laundering scheme, Account 37 was funded with proceeds traceable to SUA, involved in money laundering, or both.

201. The tracing of this account involves numerous banks and bank accounts, both foreign and domestic.  The accounts include: Website Tech Account '2008; Account '6211; Arizona Bank & Trust annuity trust account numbers '1967, '1972, '1986, '1991, and '2014, all held in Lacey's name ("AZBT Annuity Accounts"); and Johnson Financial account '9992, held in an IOLTA, with Lacey as the sole beneficiary.

a.   Between December 14, 2015, and January 15, 2016, the Slovakia Account sent approximately 26 wire transfers totaling over $2,500,000 to Website Tech Account '2008 in the United States;

b.   On January 15, 2016, Website Tech Account '2008 transferred $189,571 to Verizon in Los Angeles, California, in payment for

Backpage internet services, which served, in whole or in part, to promote sex trafficking and illegal prostitution;

c. Between January 21 and August 31, 2016, Website Tech Account '2008 sent approximately 27 wire transfers totaling approximately $48,000,000 to Account '6211;

d. Between April 1 and October 6, 2016, in approximately 12 wires, Account '6211 sent over $18,000,000 to the AZBT Annuity Trust Accounts;

e. On December 29, 2016, in five wires, the AZBT Annuity Trusts Accounts sent approximately $16,500,000 to Johnson Financial account '9992; and

f. On January 3, 2017, Johnson Financial account '9992 transferred $16,500,000 to Account 37.

## AD TECH BV ASSETS

**BB. Accounts 56, 57, and 58 (Fio Bank '5803, '5801, and '5805)**

202. Accounts 56, 57, and 58 are located in the Czech Republic and held in the name of Ad Tech BV, identifying Ferrer as the ultimate beneficial owner, which accounts were funded with proceeds traceable to SUA, involved in money laundering, or both.

203. Account 56, 57, and 58 were set up and maintained to receive payments for Backpage ads, that is, for "accounts receivable." Merchant processors would accept credit card payments and Bitcoin from Backpage advertisers as credit to place ads for prostitution and other services. The merchant processors would then transfer these funds to accounts set up to receive such payments, specifically including Accounts 56, 57, and 58. All funds contained within Accounts 56, 57, and 58 are traceable to SUA and involved in money laundering.

**CC.   Accounts 47, 48, 49 and 50 (BF Accounts '000K, '000U, '000 , and '001K)**

204. Accounts 47, 48, 49, and 50 are located in Principality of Liechtenstein, and held for the benefit of Ferrer, which accounts were funded with proceeds traceable to SUA, involved in money laundering, or both.

205. Accounts 47, 48, 49, and 50 were set up and maintained to receive payments for Backpage ads, that is, for "accounts receivable."  Merchant processors would accept credit card payments and Bitcoin from Backpage advertisers as credit to place ads for prostitution and other services.  The merchant processors would then transfer these funds to accounts set up to receive such payments, specifically including Accounts 47, 48, 49, and 50.  All funds contained within Accounts 47, 48, 49, and 50 are traceable to SUA and involved in money laundering.

**GOLD LEAF SRO FUNDS HELD AT FIO BANK**

**DD.   Account 38, 39, and 40 (Fio Bank '2226, '2231, and '2230)**

206. Accounts 38, 39, and 40 are located in the Czech Republic, and held for the benefit of Backpage by a third party entity named, "Gold Leaf SRO."  Accounts 38, 39, and 40 were funded with proceeds traceable to SUA, involved in money laundering, or both.

207. Accounts 38, 39, and 40 were created outside the United States with the intention of avoiding the "blockade" of Backpage set up by U.S. credit card companies that refused to process Backpage receipts following negative press associated with Backpage. Approximately 99.5% of the payments into these accounts were to be transferred to accounts held by Ad Tech BV, a Backpage controlled company located in the Netherlands, after which transfer, the funds

1  could be directed for the benefit of Backpage or Backpage Operators

2  in the U.S. or abroad.  All funds contained within Accounts 38, 39,

3  and 40 are traceable to SUA and involved in money laundering.

4              **PROTECCTIO SRO FUNDS HELD AT FIO BANK**

5         **EE.  Accounts 41, 42, and 43 (Fio Bank '4194, '4196, and '4198)**

6         208. Accounts 41, 42, and 43 are located in the Czech Republic,

7  and held for the benefit of Backpage by a third party entity named,

8  "Protecctio SRO."  Accounts 41, 42, and 43 were funded with proceeds

9  traceable to SUA, involved in money laundering, or both.

10        209. Accounts 41, 42, and 43 were created outside the United

11 States with the intention of avoiding the "blockade" of Backpage set

12 up by U.S. credit card companies that refused to process Backpage

13 receipts following negative press associated with Backpage.

14 Approximately 99.5% of the payments into these accounts were to be

15 transferred to accounts held by Ad Tech BV, a Backpage controlled

16 company located in the Netherlands, after which transfer the funds

17 could be directed for the benefit of Backpage or Backpage Operators

18 in the U.S. or abroad.  All funds contained within Accounts 41, 42,

19 and 43 are traceable to SUA and involved in money laundering.

20            **VARICOK SRO FUNDS HELD AT FIO BANK**

21        **FF.  Accounts 44, 45, and 46 (Fio Bank '8083, '8086, and '8080)**

22        210. Accounts 44, 45, and 46 are located in the Czech Republic,

23 and held in the name of Varicok Company SRO.  Accounts 44, 45, and 46

24 were funded with proceeds traceable to SUA, involved in money

25 laundering, or both.

26        211. Accounts 44, 45, and 46 were created outside the United

27 States with the intention of avoiding the "blockade" of Backpage set

28 up by U.S. credit card companies that refused to process Backpage

1    receipts following negative press associated with Backpage.

2    Approximately 99.5% of the payments into these accounts were to be

3    transferred to accounts held by Ad Tech BV, a Backpage controlled

4    company located in the Netherlands, after which transfer, the funds

5    could be directed for the benefit of Backpage or Backpage Operators

6    in the U.S. or abroad.  All funds contained within Accounts 44, 45,

7    and 46 are traceable to SUA and involved in money laundering.

8              **PROCOP SERVICES BV FUNDS HELD AT KNAB BANK**

9        **GG.  Account 51 (KB '7664)**

10       212. Account 51 is located in the Kingdom of the Netherlands,

11   and held for the benefit of Backpage by a third party entity named,

12   "Procop Services BV."  Account 51 was funded with proceeds traceable

13   to SUA, involved in money laundering, or both.

14       213.  Account 51 was created outside the United States with the

15   intention of avoiding the "blockade" of Backpage set up by U.S.

16   credit card companies that refused to process Backpage receipts

17   following negative press associated with Backpage.  Approximately

18   99.5% of the payments into Accounts 51 was to be transferred to

19   accounts held by Ad Tech BV, a Backpage controlled company located in

20   the Netherlands, after which transfer, the funds could be directed

21   for the benefit of Backpage or Backpage Operators in the U.S. or

22   abroad.  All funds contained within Account 51 are traceable to SUA

23   and involved in money laundering.

24              **GULIETTA GROUP BV FUNDS HELD AT RABO BANK**

25       **HH.  Accounts 52 and 53 (RB '2452 and '4721)**

26       214. Accounts 52 and 53 are located in the Kingdom of the

27   Netherlands and held for the benefit of Backpage by a third party

28   entity named, "Gulietta Group BV."  Accounts 52 and 53 were funded

                                    66

1  with proceeds traceable to SUA, involved in money laundering, or

2  both.

3      215. Accounts 52 and 53 were created outside the United States

4  with the intention of avoiding the "blockade" of Backpage set up by

5  U.S. credit card companies that refused to process Backpage receipts

6  following negative press associated with Backpage.  Approximately

7  99.5% of the payments into these accounts were to be transferred to

8  accounts held by Ad Tech BV, a Backpage controlled company located in

9  the Netherlands, after which transfer, the funds could be directed

10  for the benefit of Backpage or Backpage Operators in the U.S. or

11  abroad.  All funds contained within Accounts 52 and 53 are traceable

12  to SUA and involved in money laundering.

13  **CASHFLOWS EUROPE LTD FUNDS HELD FOR GULIETTA GROUP B.V., UNIVERSADS**

14  **B.V., PROCOPSERVICES B.V. and PROTECCIO SRO**

15      **II.  Account 55 (SP '1262)**

16      216. Account 55 is located in the United Kingdom and held by a

17  third party entity, "Cashflows Europe Limited" ("Cashflows").

18  Although Backpage is the ultimate beneficiary of Account 55,

19  Cashflows acts first as an entity holding this account for the

20  benefit of Gulietta Group B.V., Universads B.V., Procop Services

21  B.V., and Proteccio SRO, each of which company is owned or controlled

22  by Backpage.  Account 55 was funded with proceeds traceable to SUA,

23  involved in money laundering, or both.

24      217. Account 55 was created outside the United States with the

25  intention of avoiding the "blockade" of Backpage set up by U.S.

26  credit card companies that refused to process Backpage receipts

27  following negative press associated with Backpage.  Approximately

28  99.5% of the payments into Accounts 55 was to be transferred to

accounts held by Ad Tech BV, a Backpage controlled company located in the Netherlands, after which transfer, the funds could be directed for the benefit of Backpage or Backpage Operators in the U.S. or abroad. All funds contained within Account 55 are traceable to SUA and involved in money laundering.

**JJ. Account 54 (LHVP '4431)**

218. Account 54 is an account maintained in the Republic of Estonia, held in the name of Olist OU for the benefit of Backpage. Account 54 was funded with proceeds traceable to SUA, involved in money laundering, or both.

219. Account 54 was created outside the United States with the intention of avoiding the "blockade" of Backpage set up by U.S. credit card companies that refused to process Backpage receipts following negative press associated with Backpage. Approximately 99.5% of the payments into Accounts 54 was to be transferred to accounts held by Ad Tech BV, a Backpage controlled company located in the Netherlands, after which transfer, the funds could be directed for the benefit of Backpage or Backpage Operators in the U.S. or abroad. All funds contained within Account 54 are traceable to SUA and involved in money laundering.

**BACKPAGE-CONTROLLED DOMAIN NAMES**

**KK. ASCIO/WMB Inc Domain Names**

220. Until recently, Backpage controlled numerous domain names, which have since been seized by the government pursuant to a seizure warrant issued in this district (the "Seized Domains").[12]

221. The Seized Domains are registered by "ASCIO TECHNOLOGIES INC" DBA "NETNAMES," a domain registrar that manages the reservation

---

[12] 18-MJ-00711

of internet domain names.  A domain registrar serves to ensure that a registered domain name, like each of the Seized Domains, is not double sold.

222. Additionally, a domain registration will allow the owner of the domain to direct internet traffic to a company's webserver.  The Seized Domains were found to have been acquired and maintained with funds traceable to the money laundering scheme described herein, specifically with funds from Account 1, and the Seized Domains were the mechanism Backpage used to promote the prostitution and sex trafficking activity.

223. The following domains constitute and are derived from proceeds traceable to SUA, involved in money laundering, or both:

a. atlantabackpage.com

b. backpage.be

c. backpage.com

d. backpage.com.br

e. backpage.cz

f. backpage.dk

g. backpage.ee

h. backpage.es

i. backpage.fi

j. backpage.fr

k. backpage.gr

l. backpage.hu

m. backpage.ie

n. backpage.it

o. backpage.lt

p. backpage.mx

1        q.    backpage.net

2        r.    backpage.no

3        s.    backpage.pl

4        t.    backpage.pt

5        u.    backpage.ro

6        v.    backpage.si

7        w.    backpage.sk

8        x.    backpage.us

9        y.    backpage-insider.com

10       z.    bestofbackpage.com

11      aa.   bestofbigcity.com

12      bb.   bigcity.com

13      cc.   chicagobackpage.com

14      dd.   denverbackpage.com

15      ee.   newyorkbackpage.com

16      ff.   phoenixbackpage.com

17      gg.   sandiegobackpage.com

18      hh.   seattlebackpage.com

19      ii.   tampabackpage.com

20      **LL.   SURRENDERED DOMAIN NAMES**

21      224. Until recently, Backpage also controlled numerous domain

22 names that Backpage has since surrendered (pursuant to its guilty

23 plea on April 5, 2018, in the District of Arizona).

24      225. The following websites were purchased and/or maintained, in

25 whole or in part, with proceeds traceable to SUA, involved in money

26 laundering, or both:

27      a.    admoderation.com (Versio)

28      b.    admoderators.com (Versio)

```
1       c.   adnet.ws (NetNames)

2       d.   adplace24.com (Versio)

3       e.   adplaces24.com (Versio)

4       f.   adpost24.com (Versio)

5       g.   adpost24.cz (GoDaddy)

6       h.   adquick365.com (Versio)

7       i.   adreputation.com (NetNames)

8       j.   ads-posted-mp.com (Versio)

9       k.   adsplace24.com (Versio)

10      l.   adspot24.com (Versio)

11      m.   adspots24.com (Versio)

12      n.   adsspot24.com (Versio)

13      o.   adtechbv.co.nl (NetNames)

14      p.   adtechbv.com (NetNames)

15      q.   adtechbv.nl (NetNames)

16      r.   advert-ep.com (Versio)

17      s.   adverts-mp.com (Versio)

18      t.   axme.com (GoDaddy)

19      u.   back0age.com (NetNames)

20      v.   backpa.ge (NetNames)

21      w.   backpaee.com (NetNames)

22      x.   backpage-insider.com (NetNames)

23      y.   backpage.adult (NetNames)

24      z.   backpage.ae (NetNames)

25      aa.  backpage.at (NetNames)

26      bb.  backpage.ax (NetNames)

27      cc.  backpage.be (NetNames)

28      dd.  backpage.bg (European domains)
```

1    ee.  backpage.bg (NetNames)

2    ff.  backpage.ca (NetNames)

3    gg.  backpage.cl (NetNames)

4    hh.  backpage.cn (European domains)

5    ii.  backpage.cn (NetNames)

6    jj.  backpage.co.id (NetNames)

7    kk.  backpage.co.nl (European domains)

8    ll.  backpage.co.nl (NetNames)

9    mm.  backpage.co.nz (NetNames)

10   nn.  backpage.co.uk (NetNames)

11   oo.  backpage.co.ve (NetNames)

12   pp.  backpage.co.za (NetNames)

13   qq.  backpage.com (NetNames)

14   rr.  backpage.com.ar (NetNames)

15   ss.  backpage.com.au (NetNames)

16   tt.  backpage.com.ph (NetNames)

17   uu.  backpage.cz (NetNames)

18   vv.  backpage.dk (NetNames)

19   ww.  backpage.ec (NetNames)

20   xx.  backpage.ee (European domains)

21   yy.  backpage.ee (NetNames)

22   zz.  backpage.es (NetNames)

23   aaa. backpage.fi (European domains)

24   bbb. backpage.fi (NetNames)

25   ccc. backpage.fr (European domains)

26   ddd. backpage.fr (NetNames)

27   eee. backpage.gr (European domains)

28   fff. backpage.gr (NetNames)

1    ggg. backpage.hk (European domains)

2    hhh. backpage.hk (NetNames)

3    iii. backpage.hu (European domains)

4    jjj. backpage.hu (NetNames)

5    kkk. backpage.ie (NetNames)

6    lll. backpage.in (NetNames)

7    mmm. backpage.it (NetNames)

8    nnn. backpage.jp (NetNames)

9    ooo. backpage.kr (NetNames)

10   ppp. backpage.lt (NetNames)

11   qqq. backpage.lv (European domains)

12   rrr. backpage.lv (NetNames)

13   sss. backpage.me (NetNames)

14   ttt. backpage.mx (NetNames)

15   uuu. backpage.my (NetNames)

16   vvv. backpage.net (NetNames)

17   www. backpage.nl (NetNames)

18   xxx. backpage.no (European domains)

19   yyy. backpage.no (NetNames)

20   zzz. backpage.nz (NetNames)

21   aaaa.    backpage.pe (NetNames)

22   bbbb.    backpage.ph (NetNames)

23   cccc.    backpage.pk (NetNames)

24   dddd.    backpage.pl (NetNames)

25   eeee.    backpage.porn (NetNames)

26   ffff.    backpage.pt (NetNames)

27   gggg.    backpage.ro (European domains)

28   hhhh.    backpage.ro (NetNames)

Case 2:18-cr-00422-DJH Document 1966-2 Filed 11/18/22 Page 75 of 91

| 1 | iiii. | backpage.se (NetNames) |
|---|---|---|
| 2 | jjjj. | backpage.sex (NetNames) |
| 3 | kkkk. | backpage.sg (NetNames) |
| 4 | llll. | backpage.si (European domains) |
| 5 | mmmm. | backpage.si (NetNames) |
| 6 | nnnn. | backpage.sk (European domains) |
| 7 | oooo. | backpage.sk (NetNames) |
| 8 | pppp. | backpage.sucks (NetNames) |
| 9 | qqqq. | backpage.tw (NetNames) |
| 10 | rrrr. | backpage.uk (NetNames) |
| 11 | ssss. | backpage.uk.com (NetNames) |
| 12 | tttt. | backpage.us (NetNames) |
| 13 | uuuu. | backpage.vn (NetNames) |
| 14 | vvvv. | backpage.xxx (NetNames) |
| 15 | wwww. | backpage.xyz (NetNames) |
| 16 | xxxx. | backpagecompimp.com (NetNames) |
| 17 | yyyy. | backpagecompimps.com (NetNames) |
| 18 | zzzz. | backpagepimp.com (NetNames) |
| 19 | aaaaa. | backpagepimps.com (NetNames) |
| 20 | bbbbb. | backpagg.com (NetNames) |
| 21 | ccccc. | backpagm.com (NetNames) |
| 22 | ddddd. | backpagu.com (NetNames) |
| 23 | eeeee. | backpaoe.com (NetNames) |
| 24 | fffff. | backpawe.com (NetNames) |
| 25 | ggggg. | backqage.com (NetNames) |
| 26 | hhhhh. | backrage.com (NetNames) |
| 27 | iiiii. | backxage.com (NetNames) |
| 28 | jjjjj. | bakkpage.com (NetNames) |

| 1 | kkkkk. | bcklistings.com (NetNames) |
| 2 | lllll. | bestofbackpage.com (NetNames) |
| 3 | mmmmm. | bestofbigcity.com (NetNames) |
| 4 | nnnnn. | bickpage.com (NetNames) |
| 5 | ooooo. | bigcity.com (NetNames) |
| 6 | ppppp. | bpclassified.com (NetNames) |
| 7 | qqqqq. | bpclassifieds.com (NetNames) |
| 8 | rrrrr. | carlferrer.com (NetNames) |
| 9 | sssss. | clasificadosymas.com (NetNames) |
| 10 | ttttt. | clasificadosymas.net (NetNames) |
| 11 | uuuuu. | clasificadosymas.org (NetNames) |
| 12 | vvvvv. | classifiedsolutions.co.uk (NetNames) |
| 13 | wwwww. | classifiedsolutions.net (NetNames) |
| 14 | xxxxx. | classyadultads.com (Versio) |
| 15 | yyyyy. | columbusbackpage.com (NetNames) |
| 16 | zzzzz. | connecticutbackpage.com (NetNames) |
| 17 | aaaaaa. | cracker.co.id (NetNames) |
| 18 | bbbbbb. | cracker.com (NetNames) |
| 19 | cccccc. | cracker.com.au (NetNames) |
| 20 | dddddd. | cracker.id (NetNames) |
| 21 | eeeeee. | cracker.net.au (NetNames) |
| 22 | ffffff. | crackers.com.au (NetNames) |
| 23 | gggggg. | crackers.net.au (NetNames) |
| 24 | hhhhhh. | ctbackpage.com (NetNames) |
| 25 | iiiiii. | dallasbackpage.com (NetNames) |
| 26 | jjjjjj. | denverbackpage.com (NetNames) |
| 27 | kkkkkk. | easypost123.com (Versio) |
| 28 | llllll. | easyposts123.com (Versio) |

75

```
 1        mmmmmm.    emais.com.pt (NetNames)

 2        nnnnnn.    evilempire.com (NetNames)

 3        oooooo.    ezpost123.com (Versio)

 4        pppppp.    fackpage.com (NetNames)

 5        qqqqqq.    fastadboard.com (Versio)

 6        rrrrrr.    guliettagroup.nl (Versio)

 7        ssssss.    htpp.org (NetNames)

 8        tttttt.    ichold.com (NetNames)

 9        uuuuuu.    internetspeechfoundation.com (nameisp)

10        vvvvvv.    internetspeechfoundation.org (nameisp)

11        wwwwww.    loads2drive.com (NetNames)

12        xxxxxx.    loadstodrive.com (NetNames)

13        yyyyyy.    loadtodrive.com (NetNames)

14        zzzzzz.    losangelesbackpage.com (NetNames)

15        aaaaaaa.   mediafilecloud.com (NetNames)

16        bbbbbbb.   miamibackpage.com (NetNames)

17        ccccccc.   minneapolisbackpage.com (NetNames)

18        ddddddd.   mobileposting.com (Versio)

19        eeeeeee.   mobilepostings.com (Versio)

20        fffffff.   mobilepostlist.com (Versio)

21        ggggggg.   mobilposting.com (Versio)

22        hhhhhhh.   naked.city (NetNames)

23        iiiiiii.   nakedcity.com (NetNames)

24        jjjjjjj.   newyorkbackpage.com (NetNames)

25        kkkkkkk.   paidbyhour.com (NetNames)

26        lllllll.   petseekr.com (NetNames)

27        mmmmmmm.   petsfindr.com (NetNames)

28        nnnnnnn.   phoenixbackpage.com (NetNames)
```

1         oooooooo.  posteasy123.com (Versio)

2         ppppppp.  postfaster.com (NetNames)

3         qqqqqqq.  postfastly.com (NetNames)

4         rrrrrrr.  postfastr.com (NetNames)

5         sssssss.  postonlinewith.com (Versio)

6         ttttttt.  postonlinewith.me (Versio)

7         uuuuuuu.  postseasy123.com (Versio)

8         vvvvvvv.  postsol.com (GoDaddy)

9         wwwwwww.  postszone24.com (Versio)

10        xxxxxxx.  postzone24.com (Versio)

11        yyyyyyy.  postzones24.com (Versio)

12        zzzzzzz.  rentseekr.com (NetNames)

13        aaaaaaaa.  results911.com (NetNames)

14        bbbbbbbb.  sandiegobackpage.com (NetNames)

15        cccccccc.  sanfranciscobackpage.com (NetNames)

16        dddddddd.  seattlebackpage.com (NetNames)

17        eeeeeeee.  sellyostuffonline.com (Versio)

18        ffffffff.  sfbackpage.com (NetNames)

19        gggggggg.  simplepost24.com (Versio)

20        hhhhhhhh.  simpleposts24.com (Versio)

21        iiiiiiii.  svc.ws (NetNames)

22        jjjjjjjj.  truckrjobs.com (NetNames)

23        kkkkkkkk.  ugctechgroup.com (NetNames)

24        llllllll.  universads.nl (Versio)

25        mmmmmmmm.  villagevoicepimps.com (GoDaddy)

26        nnnnnnnn.  websitetechnologies.co.uk (NetNames)

27        oooooooo.  websitetechnologies.com (NetNames)

28        pppppppp.  websitetechnologies.net (NetNames)

```
 1          qqqqqqqq. websitetechnologies.nl (NetNames)

 2          rrrrrrrr. websitetechnologies.org (NetNames)

 3          ssssssss. weprocessmoney.com (GoDaddy)

 4          tttttttt. wst.ws (NetNames)

 5          uuuuuuuu. xn--yms-fla.com (NetNames)

 6          vvvvvvvv. ymas.ar.com (European domains)

 7          wwwwwwww. ymas.br.com (European domains)

 8          xxxxxxxx. ymas.br.com (NetNames)

 9          yyyyyyyy. ymas.bz (European domains)

10          zzzzzzzz. ymas.bz (NetNames)

11          aaaaaaaaa.    ymas.cl (European domains)

12          bbbbbbbbb.    ymas.cl (NetNames)

13          ccccccccc.    ymas.co.bz (European domains)

14          ddddddddd.    ymas.co.bz (NetNames)

15          eeeeeeeee.    ymas.co.cr (European domains)

16          fffffffff.    ymas.co.cr (NetNames)

17          ggggggggg.    ymas.co.ni (European domains)

18          hhhhhhhhh.    ymas.co.ni (NetNames)

19          iiiiiiiii.    ymas.co.ve (European domains)

20          jjjjjjjjj.    ymas.co.ve (NetNames)

21          kkkkkkkkk.    ymas.com (NetNames)

22          lllllllll.    ymas.com.br (European domains)

23          mmmmmmmmm.    ymas.com.br (NetNames)

24          nnnnnnnnn.    ymas.com.bz (European domains)

25          ooooooooo.    ymas.com.bz (NetNames)

26          ppppppppp.    ymas.com.co (European domains)

27          qqqqqqqqq.    ymas.com.co (NetNames)

28          rrrrrrrrr.    ymas.com.do (European domains)
```

```
 1      sssssssss.      ymas.com.do (NetNames)
 2      ttttttttt.      ymas.com.ec (European domains)
 3      uuuuuuuuu.      ymas.com.ec (NetNames)
 4      vvvvvvvvv.      ymas.com.es (European domains)
 5      wwwwwwwww.      ymas.com.es (NetNames)
 6      xxxxxxxxx.      ymas.com.gt (European domains)
 7      yyyyyyyyy.      ymas.com.gt (NetNames)
 8      zzzzzzzzz.      ymas.com.hn (European domains)
 9      aaaaaaaaaa.     ymas.com.hn (NetNames)
10      bbbbbbbbbb.     ymas.com.mx  (NetNames)
11      cccccccccc.     ymas.com.ni (European domains)
12      dddddddddd.     ymas.com.ni (NetNames)
13      eeeeeeeeee.     ymas.com.pe (European domains)
14      ffffffffff.     ymas.com.pe (NetNames)
15      gggggggggg.     ymas.com.pr (European domains)
16      hhhhhhhhhh.     ymas.com.pr (NetNames)
17      iiiiiiiiii.     ymas.com.pt  (NetNames)
18      jjjjjjjjjj.     ymas.com.uy (European domains)
19      kkkkkkkkkk.     ymas.com.uy (NetNames)
20      llllllllll.     ymas.com.ve (European domains)
21      mmmmmmmmmm.     ymas.com.ve (NetNames)
22      nnnnnnnnnn.     ymas.cr (European domains)
23      oooooooooo.     ymas.cr (NetNames)
24      pppppppppp.     ymas.do (European domains)
25      qqqqqqqqqq.     ymas.do (NetNames)
26      rrrrrrrrrr.     ymas.ec (European domains)
27      ssssssssss.     ymas.ec (NetNames)
28      tttttttttt.     ymas.es (European domains)
```

| | |
|---|---|
| uuuuuuuuuu. | ymas.es (NetNames) |
| vvvvvvvvvv. | ymas.org (NetNames) |
| wwwwwwwwww. | ymas.pe (European domains) |
| xxxxxxxxxx. | ymas.pe (NetNames) |
| yyyyyyyyyy. | ymas.pt (NetNames) |
| zzzzzzzzzz. | ymas.us (European domains) |
| aaaaaaaaaa. | ymas.us (NetNames) |
| bbbbbbbbbb. | ymas.uy (European domains) |
| cccccccccc. | ymas.uy (NetNames) |
| dddddddddd. | ymas.uy.com (European domains) |

### BACKPAGE SURRENDERED ASSETS

**MM. ASSETS BACKPAGE SURRENDERED TO THE GOVERNMENT**

226. On or about May 8, 2018, all of the funds, digital currencies, and other property listed in this subsection were transferred into the United States Postal Inspection Service ("USPIS") holding bank account, Bitcoin wallet, Bitcoin Cash wallet, Litecoin wallet, and Bitcoin Gold wallet. These Surrendered Assets constitute and are derived from proceeds traceable to SUA, involved in money laundering, or both.

227. On May 8, 2018, within the Stipulation for Preliminary Order of Forfeiture, CR18-465-PHX-SPL, Ferrer, in his capacity as CEO of Backpage, stipulated that the following bank funds, securities, or other assets were criminally derived proceeds of Backpage's illegal activity, involved in money laundering transactions, or both, and as such, were forfeitable property:

a. $699,940.00 wire transferred from ING Bank account '7684, held in the name of Payment Solutions BV;

b. $106,988.41 wire transferred from ING Bank account '2071,

1   held in the name of Payment Solutions BV;

2       c.   $499,910.01 wire transferred from US Bank account '0239,

3   held in the name of Affordable Bail Bonds LLC;

4       d.   $50,000.00 wire transferred from Enterprise Bank and Trust

5   account '7177, held in the name of Global Trading Solutions LLC;

6       e.   $1,876.36 wire transferred from ING Bank account '2071,

7   held in the name of Payment Solutions BV;

8       f.   $699,940.00 wire transferred from ING Bank account '7684,

9   held in the name of Payment Solutions BV;

10      g.   $248,970.00 wire transferred from Citibank NA, account

11  '0457, held in the name of Paul Hastings LLP;

12      h.   $52,500.00 wire transferred from Enterprise Bank and Trust

13  account '7177, held in the name of Global Trading Solutions LLC;

14      i.   $65,000.00 wire transferred from Enterprise Bank and Trust

15  account '7177, held in the name of Global Trading Solutions LLC;

16      j.   $5,534.54 wire transferred from Enterprise Bank and Trust

17  account '7177, held in the name of Global Trading Solutions LLC; and

18      k.   $40,000.00  wire transferred from Crypto Capital;

19      l.   6 Bitcoin transferred from a Backpage controlled wallet;

20      m.   199.99995716 Bitcoin transferred from a Backpage controlled

21  wallet;

22      n.   404.99984122 Bitcoin transferred from a Backpage controlled

23  wallet;

24      o.   173.97319 Bitcoin transferred from a Backpage controlled

25  wallet;

26      p.   411.00019 Bitcoin transferred from a Backpage controlled

27  wallet;

28      q.   2.00069333 Bitcoin transferred from a Backpage controlled

wallet;

    r.   136.6544695 Bitcoin transferred from a Backpage controlled wallet;

    s.   2,673.59306905 Bitcoin Cash transferred from a Backpage controlled wallet;

    t.   55.5 Bitcoin Cash transferred from a Backpage controlled wallet;

    u.   73.62522241 Bitcoin Cash transferred from a Backpage controlled wallet;

    v.   16,310.79413202 Litecoin transferred from a Backpage controlled wallet;

    w.   783.9735116 Litecoin transferred from a Backpage controlled wallet; and

    x.   509.81904619 Bitcoin Gold transferred from a Backpage controlled wallet.

228. Backpage surrendered to a USPIS holding bank account the following assets that constitute and are derived from proceeds traceable to SUA, involved in money laundering, or both:

    a.   On or about October 30, 2018, approximately $182,182.50 previously held in the name of 'Ad Tech BV' at Amro Bank N.V. Account '6352 ("Amro '6352 Funds" or "Account 63");

    b.   On or about December 11, 2018, approximately $518,172.92 previously held in the name of 'Cardquiry' at Wells Fargo Bank Account '4455 ("WF '4455 Funds" or "Account 66"); and

    c.   On or about January 8, 2019, approximately $11,802.76 previously held for the benefit of Backpage and related entities by the law firm 'Schiff Hardin LLP' at Citibank Account '6937 ("Citibank '6973 Funds" or "Account 65").

1    **NN.   BACKPAGE ASSETS SURRENDERED TO THE GOVERNMENT BY OTHERS**

2    229. On or about November 13, 2018, the holder of Plains Capital

3    Account '3921 agreed to and did wire $23,175 to the USPIS holding

4    account.  The holder of Plains Capital Account '3921 agreed to wire,

5    and did wire, these funds to the government in lieu of the government

6    executing a seizure warrant on these funds, which funds constitute

7    and are derived from proceeds traceable to SUA, involved in money

8    laundering, or both.

9    230. On or about June 11, 2019, Ferrer agreed to and did

10   transfer to USPIS cryptocurrency holding wallets the following

11   cryptocurrency, previously held in Bitstamp Account Number '0831,

12   which cryptocurrency Ferrer stipulated was the criminally derived

13   proceeds of Backpage's illegal activity, involved in money laundering

14   transactions, or both, and as such, are forfeitable property:

15   a.   Approximately 2.70447488 Bitcoin, previously held in the

16   name of Carl Ferrer and Postfastr, LLC; and

17   b.   Approximately 3.54986007 Bitcoin Cash, previously held in

18   the name of Carl Ferrer and Postfastr, LLC.

19   **OO.   BACKPAGE FUNDS PREVIOUSLY HELD AT DAVIS WRIGHT TREMAINE**

20   231. On August 13, 2018, Davis Wright Tremaine initiated a wire

21   transfer of $3,713,121.03 from Bank of America account '3414, held in

22   the name of Davis Wright Tremaine, LLP into the government holding

23   account.

24   a.   Between January 13 and January 20, 2017, a GoCoin account

25   wire transferred $1,318,800 to the Veritex Account;

26   b.   On June 22, 2017, the Veritex Account wire transferred

27   $1,000,000 into Account 27;

28   c.   On April 27, 2017, the Netherlands Account wire transferred

83

1   $2,500,000 to Account 27;

2       d.   On April 28, 2017, the Netherlands Account wire transferred
3   $2,500,000 to Account 27;

4       e.   On May 24, 2017, Account 1 wire transferred $500,000 into
5   Account 27;

6       f.   On September 13, 2017, Account 1 wire transferred
7   $1,000,000 into Account 27;

8       g.   On September 27, 2017, the Netherlands Account wire
9   transferred about $778,802.96 into Account 27; and

10      h.   On October 20, 2017, Account 1 wire transferred $500,000
11  into Account 27.

12  **FUNDS HELD AT USAA SAVINGS BANK FOR THE BENEFIT OF MICHAEL LACEY**

13      **PP.   Accounts 59, 60, 61, and 62 (USAA '2155, '2058, '2171, and,
           1507)**

14  232. Accounts 59, 60, 60, and 62, are all held in the name of
15  Anne Hawkins, a sister-in-law to Larkin, and were funded with
16  proceeds alleged to have been traceable to SUA, involved in money
17  laundering, or both.

18  233. Between December 14, 2015, and February 9, 2017, a company
19  doing business for GoCoin initiated approximately 39 wire transfers
20  totaling approximately $3,959,557.78 in criminal proceeds from the
21  Slovakia Account to Website Tech Account '2008, in the United States.

22  234. Between January 21, 2016, and August 31, 2016, Website Tech
23  Account '2008 initiated approximately 27 wire transfers totaling
24  approximately $48 million to Arizona Bank & Trust account number
25  '6211 ("AZBT '6211"), belonging to Cereus Properties LLC, which is
26  owned or controlled by Spear, Backpage, and or other Backpage
27  Operators.

28  235. On January 4, 2017, AZBT '6211 initiated four wires:

a.    $33,591.34 to Charles Schwab account '6039, held in the name of Oaxaca Living Trust with Kathleen D. Larkin as the sole beneficiary ("Schwab '6039");

b.    $33,591.34 to Charles Schwab account '9083, held in the name of Puebla Living trust with Rose L. Larkin as the sole beneficiary (Schwab '9083");

c.    $33,591.34 to Charles Schwab account '7249, held in the name of Cuernavaca Living Trust with Quinn M. Larkin as the sole beneficiary ("Schwab '8628"); and

d.    $33,591.34 to Charles Schwab account '8628, held in the name of Chiapas Living trust with John C. Larkin as the sole beneficiary ("Schwab '8628").

236. Several days after the wire transfers from AZBT '6211 to the four Charles Schwab accounts, funds were wire transferred to four AZBT accounts.

a.    On January 10, 2017, Schwab '6039 wired $840,692.69 to Arizona Bank & Trust account '3835, held in the name of Oaxaca Living Trust UTA with Lacey and Hawkins as the Trustees and Kathleen Dewhurst Larkin as the beneficiary ("AZBT '3835");

b.    On January 11, 2017, Schwab '9083 wired $840,672.72 to Arizona Bank & Trust account '3864 held in the name of Puebla Living Trust UTA with Lacey and Hawkins as the Trustees and Rose Lyons Larkin as the beneficiary ("AZBT '3864");

c.    On January 12, 2017, Schwab '7249 wired $840,672.70 to Arizona Bank & Trust account '3859 held in the name of Cuernavaca Living Trust UTA with Lacey and Hawkins as the Trustees and Quinn McCarthy Larkin as the beneficiary ("AZBT '3859"); and

d.    On January 10, 2017, Schwab '8628 wired $840,672.70 to

Arizona Bank & Trust account '3840 held in the name of Chiapas Living Trust UTA with Lacey and Hawkins as the Trustees and John Carey Larkin as the beneficiary ("AZBT '3840").

237. On January 11, 2018, and in addition to the previous wire transfers, AZBT '6211 transferred $33,591.34 to each of the Living Trust accounts, AZBT '3835, AZBT '3864, AZBT '3859, and AZBT '3840.

238. On February 9, 2017, the four Oaxaca Living Trust accounts, AZBT '3835, AZBT '3864, AZBT '3859, and AZBT '3840, wire transferred approximately $874,330 to Accounts 59, 60, 61, and 62.  More specifically:

a.  On February 9, 2017, AZBT '3835 wired $874,334.26 to Account 59;

b.  On February 9, 2017, AZBT '3864 wired $874,332.68 to Account 60;

c.  On February 9, 2017, AZBT '3835 wired $874,331.01 to Account 61; and

d.  On February 9, 2017, AZBT '3835 wired $874,334.27 to Account 62.

### FIRST CLAIM FOR RELIEF

(18 U.S.C. § 981(a)(1)(C))

239. Based on the facts set out above, Plaintiff alleges that the Defendant Assets constitute, and are derived from, proceeds traceable to one or more violations of Title 18, United States Code, Sections 1591 (Sex Trafficking of Children) and 1952 (Interstate and Foreign Travel in Aid of Racketeering Enterprise), each of which is a specified unlawful activity under 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv) and 1956(c)(7)(D), and a conspiracy to commit such offenses.  The Defendant Assets are therefore subject to forfeiture

86

to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF

(18 U.S.C. § 981(a)(1)(A))

240. Based on the facts set out above, Plaintiff alleges that the Defendant Assets were involved in, and are traceable to, property involved in one or more transactions or attempted transactions in violation of section 18 U.S.C. § 1957, and a conspiracy to commit such offenses, in violation of section 18 U.S.C. § 1956(h). Specifically, the Defendant Assets were involved in and are traceable to property involved in one or more financial transactions, attempted transactions, and a conspiracy to conduct or attempt to conduct such transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activities, to wit, violations of Title 18, United States Code, Sections 1591 (Sex Trafficking of Children) and 1952 (Interstate and Foreign Travel in Aid of Racketeering Enterprise), each of which is a specified unlawful activity under 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv) and 1956(c)(7)(D), and a conspiracy to commit such offenses. The Defendant Assets are therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## THIRD CLAIM FOR RELIEF

(18 U.S.C. § 981(a)(1)(A))

241. Based on the facts set out above, Plaintiff alleges that the Defendant Assets were involved in, and are traceable to property involved in, one or more transactions or attempted transactions in violation of section 18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering), (a)(2) (International Money Laundering), and a conspiracy to commit such offenses, in violation of section 18 U.S.C.

§ 1956(h).  Specifically, the Defendant Assets were involved in and are traceable to property involved in one or more financial transactions, attempted transactions, and a conspiracy to conduct or attempt to conduct such transactions involving the proceeds of specified unlawful activity, to wit, violations of Title 18, United States Code, Sections 1591 (Sex Trafficking of Children) and 1952 (Interstate and Foreign Travel in Aid of Racketeering Enterprise), each of which is a specified unlawful activity under 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv) and 1956(c)(7)(D), and a conspiracy to commit such offenses.  The Defendant Assets are therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

///

///

///

WHEREFORE, plaintiff United States of America prays:

(a)  That due process issue to enforce the forfeiture of the Defendant Assets;

(b)  That due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c)  That this Court decree forfeiture of the Defendant Assets to the United States of America for disposition according to law; and

(d)  For such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: June 1, 2020

NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section


_____*/s/Dan G. Boyle*_____
JOHN J. KUCERA
DANIEL G. BOYLE
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**VERIFICATION**

I, Lyndon A Versoza, hereby declare that:

1.    I am a United States Postal Inspector with the United States Postal Inspection Service.  I am the case agent for the civil forfeiture action entitled *United States of America v. $1,546,076.35 in Bank Funds Seized From Republic Bank of Arizona Account '1889, et al.*

2.    The Consolidated Master Verified Complaint encompasses all of the previously filed member complaints and assets into the lead complaint.

3.    I have read the above Consolidated Master Verified Complaint for Forfeiture and know its contents, which is based upon my own personal knowledge and reports provided to me by other agents.

4.    Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 1, 2020, in Los Angeles, California.

_____
LYNDON A VERSOZA
U.S. Postal Inspector
United States Postal Inspection
Service