# Exhibit 8

# "ASSET TRACING MASTER DOCUMENT DRAFT" COMPARED WITH PREVIOUSLY DISCLOSED DOCUMENTS

| "ASSET TRACING MASTER DOCUMENT DRAFT" | PREVIOUSLY DISCLOSED DOCUMENTS |
|---|---|
| 1. On February 15, 2017, Posting Solutions LLC, located at 13601 Preston Rd., Ste. 801E, Dallas, Texas 75240, opened Prosperity Bank account number '7188. "M.G.", the President, Chief Executive Officer, Treasurer and Secretary of Posting Solutions LLC is the sole signatory on the account. Posting Solutions LLC is a company owned by and controlled by Backpage. | 36(a). On February 15, 2017, Posting Solutions LLC, located at 13601 Preston Rd., Ste. 801E, Dallas, Texas 75240, opened Prosperity Bank account number 216887188 (Seized Account 1, which lists Gage as the sole signatory on the account).<br><br>(Versoza Affidavit, 4/26/2018 Bates No. DOJ-BP-0004598397-DOJ-BP-0004598524, attached as Exhibit 1, at ¶ 36(a).)<br><br>36(b). Gage is the President, Chief Executive Officer, Treasurer and Secretary of Posting Solutions LLC.<br><br>(Ex. 1 at ¶ 36(b).)<br><br>137(g). These accounts were held and controlled by Backpage Operators in the names of entities controlled by Backpage, including Ad Tech BV, Posting Solutions, Website Technologies, and Cereus Properties.<br><br>(First Amended Consolidated Master Verified Complaint for Forfeiture, filed June 1, 2020, Case No. CV-18-8420-RGK, Central District California, attached as Exhibit 2, at ¶ 137(g).) |
| 2. Posting Solutions' application for the USPS Dallas, Texas P.O. BOX, lists the box being registered to "Website Technologies, LLC/Backpage.com." Also listed on the P.O. BOX Application were the names of several Backpage Operators, including FERRER. | 35. From my review of Posting Solutions' application for the USPS Dallas, Texas P.O. BOX, I learned that it was registered to "Website Technologies, LC/Backpage.com." Also listed on the P.O. BOX Application were the names of several Backpage Operators, including Ferrer.<br><br>(Ex. 1 at ¶ 35.) |
| 3. Records of wire transfers from countries outside the United States deposited into the Prosperity Account '7188 for the period of August 1 through September 1, 2017, shows | 38. I have reviewed records of wire transfers from countries outside the United States deposited into the Seized Account 1. Just for the period of August 1 through September 1, 2017, Seized Account 1 received over $2.7 |

| | |
|---|---|
| this account received over $2,781,750 in wire transfers from outside the United States.  For example:<br><br>A. On or about August 16, 2017, a company called "Binary Trading SG PTE LTD" ("Binary Trading") wired $535,500 from an account in Singapore into Prosperity Account '7188.  Binary Trading is a company used by GoCoin.<br><br>B. On or about August 17, 2017, Binary Trading wired another $528,500 from a Singapore account into Prosperity Account '7188.<br><br>C. On or about August 30, 2017, a company named Trilix PTE LTD ("Trilex"), listing the same Singapore address as Binary Trading and GoCoin, in four wires ranging from $385,450 to $492,250, sent approximately $1,717,750 from a Singapore account into Prosperity Account '7188.  Memo lines from these wires list "GC" or "GC FOR INTERNET SERVICES."  The government understands "GC" to mean GoCoin. | million in wire transfers from outside the United States. For example:<br><br>A. On or about August 16, 2017, a company called "Binary Trading SG PTE LTD" ("Binary Trading") wired $535,500 from an account in Singapore into Seized Account 1. Based on my review of records related to this transaction, Binary Trading is a name used by GoCoin.<br><br>B. On or about August 17, 2017, Binary Trading wiredvanother $528,500 from a Singapore account into Seized Account 1.<br><br>C. On or about August 30, 2017, a company named "TRILIX PTE LTD," listing the same Singapore address as BinaryTrading and GoCoin, in four wires ranging from $385,450 to $492,250, sent approximately $1,717,750 from a Singapore account into Seized Account 1. Memo lines from these wires list "GC" or "GC FOR INTERNET SERVICES." I understand "GC" to mean GoCoin.<br><br>(Ex. 1 at ¶¶ 38(a)-(c).) |
| 4. A substantial percentage of outgoing payments from Prosperity Account '7188 are payments for the operation of Backpage.com.  For example, between July and October, 2017, Prosperity Account '7188 wired $572,027 to pay for the following:<br><br>A. Between July and October 2017, Prosperity Account '7188 wired $570,530 to Verizon Digital Media Services in Los Angeles for a service for the Backpage.com website.<br><br>B. On August 18, 2017, Prosperity Account '7188 wired $1,497 to | 39. I have reviewed outgoing payments from Seized Account 1 and found that substantial percentages of these payments are for the operation of Backpage.com. For example, between July and October, 2017, Seized Account 1 wired over $1.1 million to pay for the following:<br><br>A. Between July and October 2017, Seized Account 1 wired $570,530 to Verizon Digital Media Services in Los Angeles.<br><br>F. On August 18, 2017, Seized Account 1 wired $1,497 and $6,984, |

| | |
|---|---|
| "Backupify," a company that provided data backup for Backpage. | respectively, to two separate data backup companies for Backpage's on-line data backup.<br><br>(Ex. 1 at ¶ 39(a) & (f).) |
| 5. Compass Bank account '3873 is owned by Cereus Properties LLC, identifying SPEAR as the sole signatory. This account was funded with transfers from Prosperity Account '7188. It is used as a funnel account to pay Backpage Operators with funds from the SUA. On average, during each month of 2017, Prosperity Account '7188 transferred several hundred thousand dollars into Compass Bank account '3873. For example: | 40. From my review of bank documents, I have learned that Seized Account 2A is a Compass Bank business bank account owned by "Cereus Properties LLC," identifying Spear as the sole signatory. My review revealed that this account was funded with transfers from Seized Account 1. On average, during each month of 2017, Seized Account 1 transferred several hundred thousand dollars into Seized Account 2A. For example: |
|   A. On August 31, 2017, Prosperity Account '7188 sent a wire transfer totaling $487,491.45 to Compass Bank account '3873. | c. On August 31, 2017, Seized Account 1 sent a wire transfer totaling $487,491.45 to SU Seized Account 2A. |
|   B. On September 15, 2017, Prosperity Account '7188 sent a wire transfer totaling $91,672.67 to Compass Bank account '3873. | d. On September 15, 2017, Seized Account 1 sent a wire transfer totaling $91,672.67 to Seized Account 2A. |
|   C. On October 2, 2017, Prosperity Account '7188 sent a wire transfer totaling $471,766 to Compass Bank account '3873. | e. On October 2, 2017, Seized Account 1 sent a wire transfer totaling $471,766 to Seized Account 2A.<br><br>(Ex. 1 at ¶¶ 40(c)-(e).) |
| 6. Compass Bank Account number '3825 is held in the name of Brunst. This account was funded with transfers from Compass Bank Account '3873. | 193. Account 24 is held in the name of Brunst, and was used in furtherance of the money laundering scheme described herein, and in an attempt to further conceal or disguise the nature, location, source, ownership or control of the proceeds of SUA.<br><br>(Ex. 2 at ¶ 193.) |
| 7. On February 2, 2018, Cereus Properties Compass Bank account '3873 wired transferred $135,956.59 into Seized Account 2B. | 194. On February 2, 2018, Account 2 wire transferred $135,956.59 into Account 24.<br><br>(Ex. 2 at ¶ 194.) |
| 8. National Bank of Arizona accounts '0178, '0151, and '3645 are held in the name of SPEAR. In furtherance of their money | 37. $404,374.12 in bank funds seized From National Bank of Arizona Account No. '0178 ("NBA '0178 Funds" or "Account 31") held |

| | |
|---|---|
| laundering scheme, and in an attempt to further conceal the true nature of the money, Backpage Operators used these accounts as go-betweens to funnel money from one account to another. | in the name of Scott Spear ("Spear"). Spear and Natasha Spear ("N. Spear") filed a claim in member case number CV 18-8423 RGK (PJWx).<br><br>38. $1,925.80 in bank funds seized from National Bank of Arizona Account No. '0151 ("NBA '0151 Funds" or "Account 32"), held in the name of Scott and Ellona Spear ("E. Spear"). Spear and N. Spear filed a claim in member case number CV 18-8423 RGK (PJWx).<br><br>39. $613,573.28 in bank funds seized from National Bank of Arizona Account No. '3645 ("NBA '3645 Funds" or "Account 33"), held in the name of Scott G. Spear and Ellona Spear Family Trust. Spear and N. Spear filed a claim in member case number CV 18-8423 RGK (PJWx).<br><br>(Ex. 2 at ¶¶ 37-39.) |
| 9.  The tracing involved numerous accounts including: Branch Banking & Trust account number '2008, belonging to Website Technologies; Arizona Bank & Trust account number '6211 belonging to Cereus Properties, and a GoCoin account in Slovakia. | 45. I have reviewed records for Seized Account 3A as well as the following accounts: Branch Banking & Trust account number 1440001712008, belonging to Website Technologies (as detailed above, a Backpage controlled entity), held in Arizona ("BBT Account"); Arizona Bank & Trust account number 9361116211 belonging to Cereus Properties, held in Arizona ("AZBT Account") From this review, I learned the following: |
| A.  Between December 14, 2015, and January 15, 2016, in approximately 26 wires, a GoCoin account in Slovakia transferred over $2.5 million to Branch Banking & Trust account number '2008 in the United States.<br>B.   On January 15, 2016, Branch Banking & Trust account number '2008 wired $189,571 to Verizon in Los Angeles, California, in payment for Backpage internet services.<br>C.  Between January 21, 2016, and August 31, 2016, in approximately 27 wires, | a.   Between December 14, 2015, and January 15, 2016, in approximately 26 wires, a GoCoin account in Slovakia transferred over $2.5 million to the BBT Account in the United States.<br>b.   On January 15, 2016, the BBT account wired $189,571 to Verizon in Los Angeles, California, in payment for Backpage internet services.<br>c.   Between January 21, 2016, and August 31, 2016, in approximately 27 |

| | |
|---|---|
| Branch Banking & Trust account number '2008 transferred approximately $48 million to Arizona Bank & Trust account number '6211.<br>D. Between March 1, 2016, and July 1, 2016, Arizona Bank & Trust account number '6211 wired $892,426 into National Bank of Arizona account '0178. | wires, the BBT Account transferred approximately $48 million to the AZBT Account.<br>d. Between March 1, 2016, and July 1, 2016, the AZBT Account wired $892,426 into Seized Account 3A.<br>(Ex. 1 at ¶¶ 45(a)-(d).) |
| E. On September 14, 2017, Compass Bank account '3873 wired $50,162.05 into National Bank of Arizona account '0178.<br>F. On October 12, 2017, National Bank of Arizona account '0178 wired approximately $21,500 into National Bank of Arizona account '0151.<br>G. On January 5, 2018, National Bank of Arizona account '0178 wired approximately $600,000 into National Bank of Arizona account '3645. | 46.<br>a. On September 14, 2017, Seized Account 2A wired $50,162.05 into Seized Account 3A.<br>b. On October 12, 2017, Seized Account 3A wired approximately $21,500 into SUBJ Seized Account 3B.<br>c. On January 5, 2018, Seized Account 3A wired approximately $600,000 into Seized Account 3C.<br>(Ex. 1 at ¶¶ 46(a)-(c).) |
| 10.  The Live Oak Bank account '6910 is held in the name of SPEAR. | 40.  $260,283.40 in bank funds seized from Live Oak Bank Account No. '6910 ("LOB '6910 Funds" or "Account 34"), held in the name of Scott Gary Spear and Ellona Spear Family Trust. Spear and N. Spear filed a claim in member case number CV 18-8423 RGK (PJWx).<br>(Ex. 2 at ¶ 40.) |
| 11. On or about March 16, 2016, National Bank of Arizona account '0178 transferred $250,000 into Live Oak Bank '6910 in the name of Scott Spear as an opening deposit. On March 20, 2018, Live Oak Bank confirmed that these funds have remained in Live Oak Bank account '6910 since the account was opened. | 48. From my review of the records for Seized Account 4 (belonging to Spear), I learned that on or about March 16, 2016, Seized Account 3A transferred $250,000 into Seized Account 4 as an opening deposit. On March 20, 2018, Live Oak Bank confirmed that these funds have remained in Seized Account 4 since the account was opened.<br>(Versoza Affidavit, 10/31/2018 Bates No. DOJ-BP-0004719085-DOJ-BP-0004719327, attached as Exhibit 3, at ¶ 48.) |
| 12.  Ascensus Broker Services '4301 (5A) and '8001 (5B) are held in the name of | 199. Accounts 35 and 36 are held in the name of N. Spear, Spear's adult daughter, and were funded with proceeds traceable to |

| | |
|---|---|
| Natasha Spear, Scott Spear's adult daughter.<br><br>a.  On February 23, 2017, National Bank of Arizona account '0178 wired approximately $50,000 into Ascensus Broker Services account '4301.<br>b.  On the February 23, 2017, National Bank of Arizona account '0178 wired $50,000 into Ascensus Broker Services account '8001. | SUA, involved in money laundering, or both.<br><br>a.  On February 23, 2017, Account 31 transferred approximately $50,000 into Account 35; and<br><br>b.  On the February 23, 2017, Account 31 transferred $50,000 into Account 36.<br><br>(Ex. 2 at ¶ 199(a)-(b).) |
| 13.  First Federal Savings & Loan of San Rafael account '3620 is held in the name of Michael LACEY.  In furtherance of their money laundering scheme, and in an attempt to further conceal the true nature of the money, Backpage Operators used this account as a go-between[1] funneling money from one account to another.<br>a.  On October 2, 2017, Compass Bank account '3825 owned by Cereus Properties, wired approximately $297,795 into First Federal Savings & Loan of San Rafael account '3620. | 155. Account 4, held in the name of Lacey, was funded with transfers from foreign and domestic banks, which funds were traceable to SUA, involved in money laundering, or both. On October 2, 2017, Account 24 (which was itself funded with transfers from foreign and domestic banks with proceeds traceable to SUA, involved in money laundering, or both), transferred $297,795 into Account 4, as further described below.<br><br>(Ex. 2 at ¶ 155.) |
| 14. Republic Bank of Arizona account '1889 is held in the name of LARKIN. In furtherance of their money laundering scheme, and in an attempt to further conceal the true nature of the money, Backpage Operators used this account as a go-between funneling money from one account to another.  Republic Bank of Arizona account '2592 is held in the name of James LARKIN<br><br>a.  On July 6, 2017, Compass Bank account '3873 wired $971,651.51 into Republic Bank of Arizona account '1889.<br>b.  On July 28, 2017, Republic Bank of Arizona account '1889 wired $400,000 into Republic Bank of | 17. $1,546,076.35 in bank funds seized from Republic Bank of Arizona Account No. '1889 ("RBA '1889 Funds" or "Account 13") held in the name of James Larkin ("Larkin"). Larkin and Margaret Larkin ("M. Larkin") have filed claims in member case number CV 18-8420 RGK (PJWx).<br><br>177. Account 13, held in the name of Larkin, was funded with proceeds alleged to have been traceable to SUA, involved in money laundering, or both.<br><br>a.  On July 6, 2017, Account 2 transferred $971,651.51 into Account 13; and<br><br>b.  On July 28, 2017, Account 13 transferred $400,000 into Account 14. |

| | |
|---|---|
| Arizona account '2592. | (Ex. 2 at ¶¶ 17, 177.) |
| 15. Republic Bank of Arizona account '8103 is a CDARS held in the name of James LARKIN, Value: $500,000.00.  Republic Bank of Arizona account '8162 is a CDARS held in the name of James LARKIN, Value: $250,000.00. Republic Bank of Arizona account '8189 is a CDARS held in the name of James LARKIN, Value: $250,000.00. | 10(g). SUBJECT ACCOUNT 16G: Republic Bank of Arizona account number 1021078103 is a CDARS account held in the name of Larkin.<br><br>10(h). SUBJECT ACCOUNT 16H: Republic Bank of Arizona account number 1021078162 is a CDARS account held in the name of Larkin.<br><br>10(i). SUBJECT ACCOUNT 16I: Republic Bank of Arizona account number 1021078189 is a CDARS account held in the name of Larkin.<br><br>(Ex. 1 at ¶¶ 10(g)-(i).)<br><br>19. $501,248.14 in bank funds seized from Republic Bank of Arizona Account No. '8103 ("RBA '8103 Funds" or "Account 16") held in the name of John Larkin ("J. Larkin"). Larkin and M. Larkin have filed claims in member case number CV 18-8420 RGK (PJWx).<br><br>20. $251,436.93 in bank funds seized from Republic Bank of Arizona Account No. '8162 ("RBA '8162 Funds" or "Account 17") held in the name of James Larkin. Larkin and M. Larkin have filed claims in member case number CV 18-8420 RGK (PJWx).<br><br>21. $253,639.96 in bank funds seized from Republic Bank of Arizona Account '8189 ("RBA '8189 Funds" or "Account 18") held in the name of James A. Larkin. Larkin and M. Larkin have filed a claim in member case number CV 18-8420 RGK (PJWx).<br><br>(Ex. 2 at ¶¶ 19-21.) |
| 16. Republic Bank of Arizona account '2485 is held in the name of LACEY. In furtherance of their money laundering scheme, and in an attempt to further | 10(a). SUBJECT ACCOUNT 16A: Republic Bank of Arizona account number 11402485 is a money market account held in the name of Lacey. |

7

conceal the true nature of the money, Backpage Operators used this account as a go-between funneling money from one account to another. Republic Bank of Arizona account '3126 is held in the name of LACEY. Republic Bank of Arizona account '1897 is held in the name of LACEY. In furtherance of their money laundering scheme, and in an attempt to further conceal the true nature of the money, Backpage Operators used these account as a go-between funneling money from one account to another.

a.  On December 2, 2016, the Foreign Account in the Netherlands wired $324,055.85 to Compass Bank account '3873.

b.  On December 8, 2016, the Netherland Account wired $499,970.00 to Compass Bank account '3873.

c.  On December 27, 2016, the Foreign Account wired $199,970.00 to Compass Bank account '3873.

d.  From March through December 2017, Compass Bank account '3873 paid over $9,000 to "Cox Communications," an internet services company that Backpage uses to facilitate its internet presence and promote its sale of prostitution advertising.

e.  On May 31, 2017, Compass Bank account '3873 wired approximately $676,808.04 into Republic Bank of Arizona account '2485.

f.  On June 30, 2017 Republic Bank of Arizona account '2485 transferred $600,000 to Republic Bank of Arizona account '1897. On April 16, 2018, LACEY personally went into the Republic Bank of Arizona, withdrew $500,000 from Republic Bank of Arizona

10(b). SUBJECT ACCOUNT 16B: Republic Bank of Arizona account number 11101897 is a checking account held in the name of Lacey.

10(c). SUBJECT ACCOUNT 16C: Republic Bank of Arizona account number 11003126 is an account held in the name of Lacey.

(Ex. 1 at ¶¶ 10(a)-(c).)

153. Funds from Account 2 were also used to promote and facilitate prostitution. For example:

a. On December 2, 2016, the Netherlands Account transferred $324,055.85 to Account 2;

b. On December 8, 2016, the Netherlands Account transferred $499,970.00 to Account 2;

c. On December 27, 2016, the Netherlands Account transferred $199,970.00 to Account 2;

d. From March to December 2017, Account 2 paid over $9,000 to "Cox Communications," an internet services company that Backpage used to facilitate its internet presence and promote its sale of prostitution advertising.

156. Accounts 5 and 7, each held in the name of Lacey, were funded with transfers from foreign and domestic banks, which funds were traceable to SUA, involved in money laundering, or both. Backpage Operators used Accounts 5 and 7 as pass-through accounts.

a. On May 31, 2017, Account 2 transferred approximately $676,808.04 into Account 5;

(Ex. 2 at ¶¶ 153, 156.)

17(b). On June 30, 2017 SUBJECT ACCOUNT 16A transferred $600,000 to SUBJECT ACCOUNT 16B.

17(c). On April 16, 2018, Lacey personally went into the Republic Bank of Arizona, withdrew $500,000 from SUBJECT

| | |
|---|---|
| account '2485 and opened Republic Bank of Arizona account '3126 with an initial deposit of the $500,000 he had just withdrawn from Republic Bank of Arizona account '2485. | ACCOUNT 16A and opened SUBJECT ACCOUNT 16C with an initial deposit of the $500,000 he had just withdrawn from SUBJECT ACCOUNT 16A.<br><br>(Ex. 1 at ¶¶ 17(b)(c).) |
| 17. Republic Bank of Arizona account '8103 is a CDARS held in the name of James LARKIN, Value: $500,000.00.  Republic Bank of Arizona account '8162 is a CDARS held in the name of James LARKIN, Value: $250,000.00. Republic Bank of Arizona account '8189 is a CDARS held in the name of James LARKIN, Value: $250,000.00. | 10(g). SUBJECT ACCOUNT 16G: Republic Bank of Arizona account number 1021078103 is a CDARS account held in the name of Larkin.<br>10(h). SUBJECT ACCOUNT 16H: Republic Bank of Arizona account number 1021078162 is a CDARS account held in the name of Larkin.<br>10(i). SUBJECT ACCOUNT 16I: Republic Bank of Arizona account number 1021078189 is a CDARS account held in the name of Larkin.<br><br>(Ex. 1 at ¶¶ 10(g)-(i).) |
|     a.  On July 28, 2017, Republic Bank of Arizona account '1889 wired $400,000 into Republic Bank of Arizona account '2592.<br>    b.  On or about February 8, 2018, LARKIN wrote a check from $1 million drawn from Republic Bank of Arizona account '2592. This check was paid to Republic Bank of Arizona and was used to fund LARKIN's CDARS accounts; Republic Bank of Arizona account '8103 (which received $500,000), Republic Bank of Arizona account '8162 (which received $250,000), and Republic Bank of Arizona account '8189 (which received $250,000). | 177(b). On July 28, 2017, Account 13 transferred $400,000 into Account 14.<br><br>179(b). On or about February 8, 2018, $1 million in funds from Account 14 was used to fund Account 16 (which received $500,000), Account 17 (which received $250,000), and Account 18 (which received $250,000).<br><br>(Ex. 2 at ¶¶ 177(b), 179(b).) |
| 18. Republic Bank of Arizona account '8316 is a Certificate of Deposit Account Registry Service ("CDARS") and is held in the name of LACEY. Republic Bank of Arizona account '8324 is a Certificate of Deposit Account Registry Service ("CDARS") and is held in the name of | 10(d). SUBJECT ACCOUNT 16D: Republic Bank of Arizona account number 1021078316 is a Certificate of Deposit Account Registry Service ("CDARS") account held in the name of Lacey. |

| | |
|---|---|
| LACEY. Republic Bank of Arizona account '8332 is a Certificate of Deposit Account Registry Service ("CDARS") and is held in the name of LACEY. In furtherance of their money laundering scheme, and in an attempt to further conceal the true nature of the money, Backpage Operators used this account as a go-between funneling money from one account to another. | e. SUBJECT ACCOUNT 16E: Republic Bank of Arizona account number 1021078324 is a CDARS account held in the name of Lacey.<br>f. SUBJECT ACCOUNT 16F: Republic Bank of Arizona account number 1021078332 is a CDARS account held in the name of Lacey.<br><br>(Ex. 1 at ¶¶ 10(d)-(f).)<br><br>Accounts 5, 7-10 (RBA '2485, '3126, '8316, '8324, and '8332)<br>156. Accounts 5 and 7, each held in the name of Lacey, were funded with transfers from foreign and domestic banks, which funds were traceable to SUA, involved in money laundering, or both. Backpage Operators used Accounts 5 and 7 as pass-through accounts. |
| a.  On October 2, 2017 Cereus Properties at Compass Bank account '3873 wired two wires to LACEY controlled accounts:<br>  i.  $694,856.25 was wired to LACEY's San Francisco Fire Credit Union account '2523<br>  ii.  297,795.54 was wired to LACEY's First Federal Savings & Loan of San Rafael account '3620.<br>b.  On or about February 15, 2018, LACEY drafted two checks totaling $1.2 million, which he split between three of his "CDARS" accounts at Republic Bank of Arizona: '8316, '8324 and '8332.  The first check was drawn from First Federal Savings & Loan of San Rafael account '3620 in the amount of $600,000.  The second check was drawn from San Francisco Fire Credit Union account '2523, also in the amount of $600,000.  The combination of these two checks totaling $1.2 million. Republic Bank of Arizona account '8316 received $600,000. | 156(f). On October 2, 2017, Account 2 made two transfers:<br>  i.  $297,795.54 transferred to Account 4; and<br>  ii.  $694,856.25 wired to Account 11.<br><br>156(g). On or about February 15, 2018, Lacey drafted two $600,000 checks (totaling $1.2 million). One check was drawn from Account 11, and the second was drawn from Account 4. These two checks were used to fund Accounts 8, 9, and 10, respectively, with $600,000.00, $300,000.00, and $300,000.00.<br><br>(Ex. 2 at ¶¶ 156.) |

| | |
|---|---|
| 19. The Bank of America account '8225 is held in the name of Troy Larkin. | 182. Account 22 is held in the name of one of Larkin's children, T. Larkin, and was used in furtherance of the money laundering scheme described herein, and in an attempt to further conceal or disguise the nature, location, source, ownership or control of the criminal proceeds. |
|    a.  On February 2, 2018, Compass Bank account '3873 wired $28,337 into Bank of America account '8225. | 183. On February 2, 2018, Account 2 wire transferred $28,337 into Account 22.<br><br>(Ex. 2 at ¶¶ 182-183.) |
| 20. The Bank of America account '7054 is held in the name of Ramon Larkin.<br>   a.  On February 2, 2018, Compass Bank account '3873 wired $28,337 into Bank of America account '7054. | 184. Account 23 is held in the name of R. Larkin. On February 2, 2018, Account 2 wire transferred $28,337 into Account 23.<br><br>(Ex. 2 at ¶ 184.) |
| 21. The Bank of America account '9342 is held in the name of Daniel Hyer and Melissa Deeann Row-Hyer.<br>   a.  On August 2 and August 8, 2017, Prosperity Account bank '7188 wired $33,700 and $44,000, respectively, to S&W Payroll, a company Backpage uses to pay its employees.<br>   b.  Between August 11, 2017, and December 1, 2017, S&W Payroll wired a total of $207,125.81 into Bank of America account '9342. | 53. From my review of Seized Account 1, BC, and 8D, I learned the following:<br><br>   a.  On August 2 and August 8, 2017, Seized Account 1 wired $33,700 and $44,000, respectively, to S&W Payroll, a company Backpage uses to pay its employees.<br>   b.  Between August 11, 2017, and December 1, 2017, S&W Payroll wired a total of $207,125.81 into Seized Account BC.<br><br>(Ex. 1 at ¶ 53.) |
| 22. The Bank of America account '9342 is held in the name of Daniel Hyer.<br>   a.  Between November 3, 2017, and December 8, 2017, Bank of America account '9342 wired $57,500 into Bank of America account '0071. | 52(c). Between November 3, 2017, and December 8, 2017, Seized Account BC wired $57,500 into Seized Account 8D.<br><br>(Ex. 1 at ¶ 52(c).) |
| 23. The San Francisco Fire Credit Union account '2523 was held in the name of Michael LACEY and Jean K. Warren.<br>   a.  On February 2, 2018, Compass Bank account '3873 wired $734,603.70 into San Francisco Fire Credit Union account '2523. | 54. From my review of the records for Seized Account 2A, 2B, and 9, I learned that on February 2, 2018, Seized Account 2A wired $734,603.70 into Seized Account 9.<br><br>(Ex. 1 at ¶ 54.) |

| | |
|---|---|
| 24. The Green Bank accounts '4831 and '4293 were held in the name of FERRER.<br>  a. On August 8, 2017, Prosperity Account bank '7188 wired $62,000 into Green Bank account '4832.<br>  b. On December 8, 2017, Seized Account 12A wired $20,000 into Green Bank account '4293. | 58. From my review of financial records for Seized Account 1, 12A, and 12B, I learned the following:<br>a. On August 8, 2017, Seized Account 1 wired $62,000 into Seized Account 12A.<br>59. On December 8, 2017, Seized Account 12A wired $20,000 into Seized Account 12B.<br><br>(Ex. 1 at ¶ 58-59.) |
| 25. Perkins Coie Trust Company account number '0012 held in the name of Margaret LARKIN, LARKIN'S spouse. In furtherance of their money laundering scheme, and in an attempt to further conceal the true nature of the money, Backpage Operators used this account in a series of transfer between payments made for the SUA and other accounts. | 61. "I have reviewed records for Seized Account 14 as well as the following accounts: the BBT Account; the AZBT Account; Charles Schwab account number 49074693 in the name of Larkin ("Schwab Account"); Northern Trust Company account number 2389562 under the name "Ocotillo Family Trust," belonging to James Larkin" ("Northern Trust Account"); and Morgan Stanley account number 237-061673 belonging to James Larkin and his wife, Margaret Larkin (the "Morgan Stanley Account"). Additionally, I have reviewed GoCoin transactions related to certain ads posted on Backpage, specifically including ads that related to child victims A.C., S.F., T.S., S.L., K.O., and R.W. (previously described in paragraph 26, above). Finally, I reviewed emails associated with the email addresses used to post some of the ads promoting the trafficking of A.C., S.F., T.S., S.L., K.O., and R.W."<br><br>(Ex. 1 at ¶ 61.) |
| 26. The different accounts involved in this tracing include: Branch Banking & Trust account number '2008, belonging to Website Technologies; Arizona Bank & Trust account number '6211 belonging to Cereus Properties, Charles Schwab account number '4693 in the name of LARKIN; Northern Trust Company account number '9562 under the name "Ocotillo Family Trust," belonging to James LARKIN"; and Morgan Stanley account number '1673 belonging to James LARKIN and his wife, Margaret | 61. "I have reviewed records for Seized Account 14 as well as the following accounts: the BBT Account; the AZBT Account; Charles Schwab account number 49074693 in the name of Larkin ("Schwab Account"); Northern Trust Company account number 2389562 under the name "Ocotillo Family Trust," belonging to James Larkin" ("Northern Trust Account"); and Morgan Stanley account number 237-061673 belonging to James Larkin and his wife, Margaret Larkin (the "Morgan Stanley Account"). Additionally, I have reviewed |

| | |
|---|---|
| LARKIN; and GoCoin transactions related to certain ads posted on Backpage, specifically including ads that related to child victims A.C., S.F., T.S., S.L., K.O., and R.W. | GoCoin transactions related to certain ads posted on Backpage, specifically including ads that related to child victims A.C., S.F., T.S., S.L., K.O., and R.W. (previously described in paragraph 26, above) . Finally, I reviewed emails associated with the email addresses used to post some of the ads promoting the trafficking of A.C., S.F., T.S., S.L., K.O., and R.W." |
| a. On September 6, 2015, a bitcoin account associated with the owner of the email address who trafficked A.C. and S.F. paid Backpage about $4 worth of bitcoin in order to post an ad promoting the trafficking of those victims in Palm Springs, California. | a.  On September 6, 2015, a bitcoin account associated with the owner of the email address who trafficked A.C. and S.F. paid Backpage about $4 worth of bitcoin in order to post an ad promoting the trafficking of those victims in Palm Springs, California. |
| b. On September 15, 2015, an email from the same email address owner indicated a payment to Backpage of about $8 worth of bitcoin in order to "Fund Account"[2] for palmsprings.backpage.com. | b. On September 15, 2015, an email from the same email address owner indicated a payment to Backpage of about $8 worth of bitcoin in order to "Fund Account" for palmsprings.backpage.com. Based on information I have learned through this investigation, I believe that to "Fund Account" means that the email address owner provided bitcoin to Backpage as payment for credit to be used at a later time to pay for Backpage ads. |
| c. On October 6, 2015, the same email address owner paid Backpage about $1 worth of bitcoin to "Fund Account" on palmsprings.backpage.com.<br>d. On October 30, 2015, a bitcoin account associated with the owner of the email address who trafficked T.S., S.L., K.O., and R.W. paid Backpage about $1 worth of bitcoin in order to post an ad promoting the trafficking of those victims in Columbus, Ohio.<br>e. On November 2, 2015, this same email address owner paid Backpage about $1 | c. On October 6, 2015, the same email address owner paid Backpage about $1 worth of bitcoin to "Fund Account" on palmsprings.backpage.com.<br>d. On October 30, 2015, a bitcoin account associated with the owner of the email address who trafficked T.S., S.L., K.O., and R.W. paid Backpage about $1 worth of bitcoin in order to post an ad promoting the trafficking of those victims in Columbus, Ohio.<br>e. On November 2, 2015, this same email address owner paid Backpage about $1 |

| | |
|---|---|
| worth of bitcoin to "Move Ad to Top of Listings" in the Columbus, Ohio Backpage ads. | worth of bitcoin to "Move Ad to Top of Listings" in the Columbus, Ohio Backpage ads. |
| f.  On November 21, 2015, this same email address owner paid Backpage about $1 worth of bitcoin to Backpage for credit for that email owner's Backpage ad account. | f.  On November 21, 2015, this same email address owner paid Backpage about $1 worth of bitcoin to Backpage for credit for that email owner's Backpage ad account. |
| g.  During the period of September 4, 2015, and November 23, 2015, Backpage advertisers used bitcoin to purchase about 1,000,000 "adult" ads from Backpage. Backpage then sold that bitcoin to GoCoin for approximately $8.6 million.  Included among the bitcoin sold to GoCoin during this period were the six payments the pimps made to Backpage to purchase ads to promote child prostitution. | g.  During the period of September 4, 2015, and November 23, 2015, Backpage advertisers used bitcoin to purchase about 1,000,000 "adult" ads from Backpage. Backpage then sold that bitcoin to GoCoin for approximately $8.6 million. Included among the bitcoin sold to GoCoin during this period were the six payments the pimps made to Backpage to purchase ads to promote child prostitution. |
| h.  During the period of December 14, 2015, through December 29, 2015, a GoCoin account held in Slovakia wired over $1.25 million to Branch Banking & Trust account '2008 in the United States. The $1.25 million represented GoCoin's partial payment to Backpage for the bitcoin Backpage sold to GoCoin during the period of September 4, 2015, through November 23, 2015. | h.  During the period of December 14, 2015, through December 29, 2015, a GoCoin account held in Slovakia wired over $1.25 million to the BBT Account in the United States. Based on my review of GoCoin's financial records and GoCoin's pattern of payments to Backpage for bitcoin sales, I believe that this $1.25 million represented GoCoin's partial payment to Backpage for the bitcoin Backpage sold to GoCoin during the period of September 4, 2015, through November 23, 2015. |
| i.  On December 31, 2015, Branch Banking & Trust account '2008 wired $811,424 to Arizona Bank & Trust account '6211. | i.  On December 31, 2015, the BBT Account wired $811,424 to the AZBT Account. |
| j.  On January 11, 2016, Arizona Bank & Trust account '6211 wired approximately $1.3 million to Charles Schwab account '4693. | j.  On January 11, 2016 the AZBT Account wired approximately $1.3 million to the Schwab Account. |
| k.  On January 14, 2016, Charles Schwab account '4693 wired approximately $13.5 million to the Northern Trust Account. | k.  On January 14, 2016, the Schwab Account wired approximately $13.5 million to the Northern Trust Account. |
| l.  In July 21, 2017, Northern Trust Company account '9562 wired $6.014 million to Morgan Stanley account '1673. | l.  In July 21, 2017, the Northern Trust Account wired $6.014 million to the Morgan Stanley Account. |

| | |
|---|---|
| m. In or about November 2017, Morgan Stanley elected to terminate its business relationship with LARKIN. | m. In or about November 2017, Morgan Stanley elected to terminate its business relationship with Larkin. |
| n. Following this, on November 30, 2017, LARKIN wired all the funds then held Morgan Stanley account '1673, about $10 million dollars, to Perkins Coie Trust Company account number '0012. | n. Following this, on November 30, 2017, Larkin wired all the funds then held the Morgan Stanley Account, about $10 million dollars, to Seized Account 14. |
| o. Some of the funds in Perkins Coie Trust Company account number '0012 were used, among other things, to purchase bonds and/or securities, which assets remain held in Perkins Coie Trust Company account number '0012. | o. Some of the funds in Seized Account 14 were used, among other things, to purchase bonds and/or securities, which assets remain held in Seized Account 14.<br><br>(Ex. 1 at ¶¶ 61.) |
| 27. Alliance Bernstein accounts '6878, '4954, '7892, '7889, '7888 '0582, and '6485 are held in the name of the "BRUNST Family Trust." BRUNST and his wife, Mary BRUNST, are the sole trustees for these accounts. In furtherance of their money laundering scheme, and in an attempt to further conceal the true nature of the money, Backpage Operators used this account as a go-between funneling money from one account to another. | 62. I have reviewed records for Seized Account 15 as well as the following accounts: the BBT; the AZBT Account; Wells Fargo Bank Account number 6324184891, belonging to John Brunst ("WFB Account - 891"); and Wells Fargo Bank Account number 00007910147474, belonging to the Brunst Family Trust ("WFB Account -474"). Additionally, I have reviewed GoCoin transactions related to certain ads posted on Backpage, specifically including ads that related to child victims A.C., S.F., T.S., S.L., K.O., and R.W. (previously described in paragraph 26, above.) Finally, I reviewed emails associated with the email addresses used to post some of the ads promoting the trafficking of A.C., S.F., T.S., S.L., K.O., and R.W. From this review I observed the following: |
| a. During the period between September 4, 2015, and November 23, 2015, Backpage advertisers used bitcoin to purchase about 1,000,000 "adult" ads from Backpage. Backpage then sold that bitcoin to GoCoin for approximately $8.6 million. Included among the bitcoin sold to GoCoin during this period were the six payments the pimps made to Backpage to purchase ads to promote child prostitution. | g. During the period of September 4, 2015, and November 23, 2015, Backpage advertisers used bitcoin to purchase about 1,000,000 "adult" ads from Backpage. Backpage then sold that bitcoin to GoCoin for approximately $8.6 million. Included among the bitcoin sold to GoCoin during this period were the six payments the pimps made to Backpage to purchase ads to promote child prostitution. |
| b. During the period of December 14, 2015, through December 29, 2015, a GoCoin account held in Slovakia wired over $1.25 | h. During the period of December 14, 2015, through December 29, 2015, a GoCoin account held in Slovakia wired over $1.25 |

million to Branch Banking & Trust account '2008 Account belonging to Website Technologies in the United States which represented GoCoin's partial payment to Backpage for the bitcoin Backpage sold to GoCoin during the period of September 4, 2015, through November 23, 2015.

c.  On December 31, 2015, the Branch Banking & Trust account '2008 wired $811,424 to Arizona Bank & Trust account '6211 belonging to Cereus Properties.

d.  On December 6, 2016, Arizona Bank & Trust account '6211 wired $161,459 to Wells Fargo Bank account '4891, belonging to BRUNST.

e.  On January 4, 2017, Arizona Bank & Trust account '6211 wired another $258,841 to Wells Fargo Bank account '4891.

f.  On January 5, 2017, Wells Fargo Bank account '4891 transferred $300,000 to Wells Fargo Bank account '7474 belonging to the BRUNST Family Trust.

g.  On May 19, 2017, Wells Fargo Bank account '7474 wired about $1.5 million into Alliance Bernstein account '6878.

h.  On May 23, 2017, Alliance Bernstein account '6878 transferred about $350,000 to Alliance Bernstein account '6878.

i.  On June 7, 2017, Alliance Bernstein account '6878 transferred about $1.34 million to Alliance Bernstein account '6878.

j.  On September 13, 2017, Alliance Bernstein account '6878 transferred about $581,000 to Alliance Bernstein account '7892.

k.  On September 13, 2017, Alliance Bernstein account '6878 transferred about $250,000 to Alliance Bernstein account '7889.

l.  On September 13, 2017, Alliance Bernstein account '6878 transferred about

million to the BBT Account in the United States. Based on my review of GoCoin's financial records and GoCoin's pattern of payments to Backpage for bitcoin sales, I believe that this $1.25 million represented GoCoin's partial payment to Backpage for the bitcoin Backpage sold to GoCoin during the period of September 4, 2015, through November 23, 2015.

i.  On December 31, 2015, the BBT Account wired $811,424 to the AZBT Account.

j.  On December 6, 2016 the AZBT Account wired $161,459 to the WFB Account - 891.

k.  On January 4, 2017, the AZBT Account wired another $258,841 to the WFB Account -891.

l.  On January 5, 2017, the WFB Account transferred $300,000 to WFB Account - 474.

m. On May 19, 2017 the WFB Account -474 wired about $1.5 million into Seized Account 15A.

n.  On May 23, 2017 Seized Account 15A transferred about $350,000 to Seized Account 15B.

o.  On June 7, 2017, Seized Account 15A transferred about $1.34 million to Seized Account 15C.

p.  On September 13, 2017, Seized Account 15C transferred about $581,000 to Seized Account 15D.

q.  On September 13, 2017, Seized Account 15C transferred about $250,000 to Seized Account 15E.

r.  On September 13, 2017, Seized Account 15C transferred about $250,000 to Seized

| | |
|---|---|
| $250,000 to Alliance Bernstein account '7888.<br><br>m. On September 15, 2017, Alliance Bernstein account '6878 transferred about $500,000 to Alliance Bernstein account '6485. | Account 15F.<br><br>s. On September 15, 2017, Seized Account 15C transferred about $500,000 to Seized Account 15G.<br><br>(Ex. 1 at ¶¶ 62.) |
| 28. K&H Bank account '1210 is located in Hungary, and held in the name of Primus Trust Company ("Binghampton Trust") for the benefit of LACEY. In furtherance of their money laundering scheme, and in an attempt to further conceal the true nature of the money, Backpage Operators used this account as a go-between funneling money from one account to another. | 64. I have reviewed records for SUBJECT ACCOUNT 17 as well as the following accounts: the BBT Account; the AZBT Account; Arizona Bank & Trust annuity trust account numbers 9361121967, 9361121972, 9361121986, 9361121991, and 9361122014, all held in Lacey's name ("AZBT Annuity Accounts"); and Johnson Financial account number 1000879992 held in an IOLTA with Lacey as the sole beneficiary. From this review, I learned the following:<br><br>(Ex. 1 at ¶ 64.) |
| 29. The tracing of this account involves numerous banks and bank accounts both foreign and domestic.  The accounts include: Branch Banking & Trust account '2008, belonging to Website Technologies; Arizona Bank & Trust account '6211 belonging to Cereus Properties; Arizona Bank & Trust annuity trust account numbers '1967, '1972, '1986, '1991, and '2014, all held in LACEY's name ("AZBT Annuity Accounts"); and Johnson Financial account '9992 held in an IOLTA with LACEY as the sole beneficiary.<br><br>a. Between December 14, 2015, and January 15, 2016, in approximately 26 wires, a GoCoin account in Slovakia transferred over $2.5 million to Branch Banking & Trust account '2008 in the United States.<br><br>b. On January 15, 2016, Branch Banking & Trust account '2008 wired $189,571 to Verizon in Los Angeles, California, in payment for Backpage internet services. | 64. I have reviewed records for SUBJECT ACCOUNT 17 as well as the following accounts: the BBT Account; the AZBT Account; Arizona Bank & Trust annuity trust account numbers 9361121967, 9361121972, 9361121986, 9361121991, and 9361122014, all held in Lacey's name ("AZBT Annuity Accounts"); and Johnson Financial account number 1000879992 held in an IOLTA with Lacey as the sole beneficiary. From this review, I learned the following:<br><br>a. Between December 14, 2015, and January 15, 2016, in approximately 26 wires, a GoCoin account in Slovakia transferred over $2.5 million to the BBT Account in the United States.<br><br>b. On January 15, 2016, the BBT account wired $189,571 to Verizon in Los Angeles, California, in payment for Backpage internet services. |

| | |
|---|---|
| c. Between January 21, 2016, and August 31, 2016, in approximately 27 wires, Branch Banking & Trust account '2008 transferred approximately $48 million to Arizona Bank & Trust account '6211.<br><br>d. Between April 1, through October 6, 2016, in approximately 12 transactions, Arizona Bank & Trust account '6211 transferred over $18 million to the AZBT Annuity Trust Accounts.<br><br>e. On December 29, 2016, LACEY's AZBT Annuity Trusts Accounts sent five wires totaling $16.5 million to Johnson Financial account '9992.<br><br>f. On January 3, 2017, Johnson Financial account '9992 wired the $16.5 million to K&H Bank account '1210 in Hungary. | c. Between January 21, 2016, and August 31, 2016, in approximately 27 wires, the BBT Account transferred approximately $48 million to the AZBT Account.<br><br>d. Between April 1, 2016, through October 6, 2016, in approximately 12 transactions, the AZBT Account transferred over $18 million to the AZBT Annuity Trust Accounts.<br><br>e. On December 29, 2016, Lacey's AZBT Annuity Trusts Accounts sent five wires totaling $16.5 million to the Johnson Financial Bank Account.<br><br>f. On January 3, 2017, the Johnson Financial Account wired the $16.5 million to the SUBJECT ACCOUNT 17 in Hungary.<br><br>(Ex. 1 at ¶ 64.) |
| 30. Fio Bank accounts '5803, '5801, and '5805 are located in the Czech Republic, and held in the name of Ad Tech BV, with FERRER as the ultimate beneficial owner. According to FERRER, all funds in these accounts are the criminally derived proceeds of ads promoting prostitution. | 66(a). SUBJECT ACCOUNTS 18A, 18B, 18C are accounts owned by Ad Tech BV and controlled by Backpage. According to Ferrer, all funds in this account are the criminally derived proceeds of ads promoting prostitution. According to Ferrer, SUBJECT ACCOUNTS 18A, 18B, and 18C are accounts receivable bank accounts. Payment processors and merchant processors would take credit card payments, and payments such as bitcoin payments from Backpage customers for prostitution and other ads, and would transfer these funds to accounts such as SUBJECT ACCOUNTS 18A, 18B and 18C. Per his plea agreement and his cooperation, Ferrer has agreed to surrender these funds and/or securities to the United States.<br><br>(Ex. 1 at ¶ 66.) |
| 31. Fio Bank accounts '5803, '5801, and '5805 are accounts receivable accounts. As such, Payment processors and merchant processors would take credit card payments, and payments such as bitcoin payments from Backpage customers for prostitution and other ads, and would transfer these funds to accounts | 66(a). SUBJECT ACCOUNTS 18A, 18B, 18C are accounts owned by Ad Tech BV and controlled by Backpage. According to Ferrer, all funds in this account are the criminally derived proceeds of ads promoting prostitution. According to Ferrer, SUBJECT ACCOUNTS 18A, 18B, and 18C are accounts receivable bank accounts. Payment |

| | |
|---|---|
| such as Fio Bank accounts '5803, '5801, and '5805. | processors and merchant processors would take credit card payments, and payments such as bitcoin payments from Backpage customers for prostitution and other ads, and would transfer these funds to accounts such as SUBJECT ACCOUNTS 18A, 18B and 18C. Per his plea agreement and his cooperation, Ferrer has agreed to surrender these funds and/or securities to the United States.<br><br>(Ex. 1 at ¶ 66.) |
| i. On May 8, 2018, within the Stipulation for Preliminary Order of Forfeiture, CR18-465-PHX-SPL, FERRER as CEO of Backpage.com, stipulated that any and all bank funds, securities, or other assets on deposit or seized from these accounts are forfeitable property. | Doc. 21 – CR18-465-PHX; Stipulation for Preliminary Order of Forfeiture |
| 32.  Fio Bank accounts '2226,'2231, '2230 are located in the Czech Republic, and held in the name of Gold Leaf SRO.  All funds and securities in these accounts are held for Backpage.com by a third party, Gold Leaf SRO. According to FERRER and the Service Level Agreement ("SLA") between Ad Tech BV, a Backpage owned company and Gold Leaf SRO, the funds and/or securities in these accounts are the criminally derived proceeds of Backpage ads, including ads promoting prostitution. | 10(n). SUBJECT ACCOUNT 18D: Fio Bank, in the Czech Republic, account number CZ7020100000002001002226, is an account held in the name of Gold Leaf SRO. All funds and securities in this account are held for Backpage.com by a third party, Gold Leaf SRO.<br><br>10(o). SUBJECT ACCOUNT 18E: Fio Bank, in the Czech Republic, account number CZ7620100000002101002231, is an account held in the name of Gold Leaf SRO. All funds and securities in this account are held for Backpage.com by a third party, Gold Leaf SRO.<br><br>10(p). SUBJECT ACCOUNT 18F: Fio Bank, in the Czech Republic, account number CZ8520100000002501002230, is an account held in the name of Gold Leaf SRO. All funds and securities in this account are held for Backpage.com by a third party, Gold Leaf SRO.<br><br>(Ex. 1 at ¶ 10.) |

| | |
|---|---|
| | 66(b). SUBJECT ACCOUNTS 18D, 18E, and 18F are accounts held by a third party, Gold Leaf SRO. According to Ferrer and Service Level Agreements ("SLA") between Ad Tech BV, a Backpage owned company and Gold Leaf SRO, which I have reviewed, the funds and/or securities in these accounts are the criminally derived proceeds of Backpage ads, including ads promoting prostitution.<br><br>(Ex. 1 at ¶ 66.) |
| **33.** The SLAs state that 99.5% of the net proceeds are to be paid to Ad Tech BV, which is owned by Backpage.  According to FERRER, the arrangement between Gold Leaf, SRO, and Backpage was put into place to evade what he called a "blockade by credit card companies." FERRER explained that beginning around 2015, U.S. credit card companies such as MasterCard and Visa refused to process credit card payments for Backpage due to the negative press surrounding sex trafficking and prostitution content on Backpage. | 66(b). The SLAs state that 99.5% of the net proceeds are to be paid to Ad Tech BV, which is owned by Backpage. According to Ferrer, the arrangement between Gold Leaf, SRO, and Backpage was put into place to evade what he called a "blockade by credit card companies." Ferrer explained that beginning around 2015, U.S. credit card companies such as MasterCard and Visa refused to process credit card payments for Backpage due to the negative press surrounding sex trafficking and prostitution content on Backpage.<br><br>(Ex 1 at ¶ 66.) |
| 34.  As one of the ways around this "blockade," Backpage Operators set up agreements with foreign persons and partners to "franchise" websites for the sole purpose of accepting credit card payments. | 66(b). As one of the ways around this "blockade," Backpage Operators set up agreements with foreign persons and partners to "franchise" websites for the sole purpose of accepting credit card payments.<br><br>(Ex 1 at ¶ 66.) |
| 35.  According to FERRER, this use of foreign third-parties and foreign accounts allowed Backpage to continue to accept credit card payments for prostitution ads while concealing from the credit card companies that the payments were for Backpage ads. | 66(b). According to Ferrer, this use of foreign third parties and foreign accounts allowed Backpage to continue to accept credit card payments for prostitution ads while concealing from the credit card companies that the payments were for Backpage ads.<br><br>(Ex 1 at ¶ 66.) |
| 36.  FERRER said that Gold Leaf SRO existed for the sole purpose of funneling to Backpage accounts otherwise prohibited credit card payments for Backpage ads.  FERRER explained that | 66(b). Ferrer said that Gold Leaf SRO existed for the sole purpose of funneling to Backpage accounts otherwise prohibited credit card payments for Backpage ads. Ferrer explained that these accounts are owned by Backpage |

| | |
|---|---|
| these accounts are owned by Backpage and are not co-mingled with other funds, and are therefore subject to seizure and forfeiture to the United States. | and are not co-mingled with other funds, and are therefore subject to seizure and forfeiture to the United States.<br><br>(Ex 1 at ¶ 66.) |
| i. On May 8, 2018, within the Stipulation for Preliminary Order of Forfeiture, CR18-465-PHX-SPL, FERRER as CEO of Backpage.com, stipulated that any and all bank funds, securities, or other assets on deposit or seized from these accounts are forfeitable property. | Document 21 CR18-465-PHX-SPL |
| 37. Fio Bank accounts '4194, '4196 and '4198 are located in the Czech Republic, and held in the name of Protecttio SRO. All funds and securities in these accounts are held for Backpage.com by a third party, Protecctio SRO. According to FERRER and the Service Level Agreement ("SLA") between Protecctio, a Backpage owned company and Protecctio SRO, the funds and/or securities in these accounts are the criminally derived proceeds of Backpage ads, including ads promoting prostitution. | 66(c). SUBJECT ACCOUNTS 18G, 18H, and 18I are accounts held by a third party, Protecttio SRO. According to Ferrer and an agreement between Protecttio SRO and Ad Tech BV, which I have reviewed, the arrangements between these entities are essentially the same as the Gold Leaf SRO arrangement. This business arrangement existed for the sole purpose of allowing purchasers of prostitution ads to purchase ads on Backpage websites while evading the credit card company blockade. Ferrer explained that these accounts are owned by Backpage and are not co-mingled with other funds and/or securities, and are therefore subject to seizure and forfeiture to the United States.<br><br>(Ex 1 at ¶ 66.) |
| 38. The SLAs state that 99.5% of the net proceeds are to be paid to Ad Tech BV, which is owned by Backpage.  According to FERRER, the arrangement between Protecctio SRO, and Backpage was put into place to evade what he called a "blockade by credit card companies." FERRER explained that beginning around 2015, U.S. credit card companies such as MasterCard and Visa refused to process credit card payments for Backpage due to the negative press surrounding sex trafficking and prostitution content on Backpage. | 66(b). The SLAs state that 99.5% of the net proceeds are to be paid to Ad Tech BV, which is owned by Backpage. According to Ferrer, the arrangement between Gold Leaf, SRO, and Backpage was put into place to evade what he called a "blockade by credit card companies." Ferrer explained that beginning around 2015, U.S. credit card companies such as MasterCard and Visa refused to process credit card payments for Backpage due to the negative press surrounding sex trafficking and prostitution content on Backpage. |

| | |
|---|---|
| | (Ex 1 at ¶ 66.) |
| 39.  As one of the ways around this "blockade," Backpage Operators set up agreements with foreign persons and partners to "franchise" websites for the sole purpose of accepting credit card payments. | 66(b). As one of the ways around this "blockade," Backpage Operators set up agreements with foreign persons and partners to "franchise" websites for the sole purpose of accepting credit card payments.<br><br>(Ex 1 at ¶ 66.) |
| 40.  According to FERRER, this use of foreign third-parties and foreign accounts allowed Backpage to continue to accept credit card payments for prostitution ads while concealing from the credit card companies that the payments were for Backpage ads. | 66(b). According to Ferrer, this use of foreign thirdparties and foreign accounts allowed Backpage to continue to accept credit card payments for prostitution ads while concealing from the credit card companies that the payments were for Backpage ads.<br><br>(Ex 1 at ¶ 66.) |
| 41.  FERRER said that Protecctio SRO existed for the sole purpose of allowing purchasers of prostitution ads to purchase ads on Backpage websites while evading the credit card company blockade. FERRER explained that these accounts are owned by Backpage and are not co-mingled with other funds, and are therefore subject to seizure and forfeiture to the United States. | 66(c). According to Ferrer…Protecttio SRO. This business arrangement existed for the sole purpose of allowing purchasers of prostitution ads to purchase ads on Backpage websites will evading the credit card company blockade.  Ferrer explained that these accounts are owned by Backpage and are not co-mingled with other funds, and are therefore subject to seizure and forfeiture to the United States.<br><br>(Ex 1 at ¶ 66.) |
| i.  On May 8, 2018, within the Stipulation for Preliminary Order of Forfeiture, CR18-465-PHX-SPL, FERRER as CEO of Backpage.com, stipulated that any and all bank funds, securities, or other assets on deposit or seized from these accounts is forfeitable property. | Doc. 21, Preliminary Order of Forfeiture, CR18-465-PHX-SPL |
| 42.  Fio Bank accounts '8083, '8086, and '8080 are located in the Czech Republic, and held in the name of Varicok Company SRO.  All funds and securities in these accounts are held for Backpage.com by a third party, Varicok Company SRO. | 10(t). SUBJECT ACCOUNT 18J: Fio Bank, in the Czech Republic, account number CZ4820100000002801118083, is an account held in the name of Varicok Company SRO. All funds and securities in this account are held for Backpage.com by a third party, Varicok Company SRO. |

| | u. SUBJECT ACCOUNT 18K: Fio Bank, in the Czech Republic, account number CZ2020100000002701118086, is an account held in the name of Varicok Company SRO. All funds and securities in this account are held for Backpage.com by a third party, Varicok Company SRO. v. SUBJECT ACCOUNT 18L: Fio Bank, in the Czech Republic, account number CZ7620100000002901118080, is an account held in the name of Varicok Company SRO. All funds and securities in this account are held for Backpage.com by a third party, Varicok Company SRO. (Ex. 1 at 10(t)-(v).) |
|---|---|
| According to FERRER and the Service Level Agreement ("SLA") between Varicok Company SRO, a Backpage owned company and Varicok Company SRO, the funds and/or securities in these accounts are the criminally derived proceeds of Backpage ads, including ads promoting prostitution. | 66(d). According to Ferrer, and an agreement between Varicok SRO and Ad Tech BV…[t]his business arrangement existed for the sole purpose of allowing purchasers of prostitution ads to purchase ads on Backpage websites while evading the credit card company blockage. (Ex. 1 at ¶ 66.) |
| 43.     The SLAs state that 99.5% of the net proceeds are to be paid to Ad Tech BV, which is owned by Backpage. According to FERRER, the arrangement between Varicok Company SRO, and Backpage was put into place to evade what he called a "blockade by credit card companies." FERRER explained that beginning around 2015, U.S. credit card companies such as MasterCard and Visa refused to process credit card payments for Backpage due to the negative press surrounding sex trafficking and prostitution content on Backpage. | 66(b). The SLAs state that 99.5% of the net proceeds are to be paid to Ad Tech BV, which is owned by Backpage. 66(d). According to Ferrer, and an agreement between Varicok SRO and Ad Tech BV…[t]his business arrangement existed for the sole purpose of allowing purchasers of prostitution ads to purchase ads on Backpage websites while evading the credit card company blockage. 66(b). Ferrer explained that beginning around 2015, U.S. credit card companies such as MasterCard and Visa refused to process credit card payments for Backpage due to the negative press surrounding sex trafficking and prostitution content on Backpage. (Ex. 1 at ¶ 66.) |

| | |
|---|---|
| 44.     As one of the ways around this "blockade," Backpage Operators set up agreements with foreign persons and partners to "franchise" websites for the sole purpose of accepting credit card payments. | 66(b). As one of the ways around this "blockade," Backpage Operators set up agreements with foreign persons and partners to "franchise" websites for the sole purpose of accepting credit card payments.<br><br>(Ex. 1 at ¶ 66.) |
| 45.     According to FERRER, this use of foreign third-parties and foreign accounts allowed Backpage to continue to accept credit card payments for prostitution ads while concealing from the credit card companies that the payments were for Backpage ads. | 66(b). According to Ferrer, this use of foreign third-parties and foreign accounts allowed Backpage to continue to accept credit card payments for prostitution ads while concealing from the credit card companies that the payments were for Backpage ads.<br><br>(Ex. 1 at ¶ 66.) |
| 46.     FERRER said that Varicok Company SRO existed for the sole purpose of allowing purchasers of prostitution ads to purchase ads on Backpage websites while evading the credit card company blockade. | 66(d). According to Ferrer, and an agreement between Varicok SRO and Ad Tech BV…[t]his business arrangement existed for the sole purpose of allowing purchasers of prostitution ads to purchase ads on Backpage websites while evading the credit card company blockade. |
| FERRER explained that these accounts are owned by Backpage and are not co-mingled with other funds, and are therefore subject to seizure and forfeiture to the United States. | 66(d). Ferrer explained that these accounts are owned by Backpage and are not co-mingled with other funds, and are therefore subject to seizure and forfeiture to the United States.<br><br>(Ex. 1 at ¶ 66.) |
| On May 8, 2018, within the Stipulation for Preliminary Order of Forfeiture, CR18-465-PHX-SPL, FERRER as CEO of Backpage.com, stipulated that any and all bank funds, securities, or other assets on deposit or seized from these accounts is forfeitable property. | Doc. 21, Preliminary Order of Forfeiture, CR18-465-PHX-SPL |
| 47.     Bank Frick accounts 'K000 K, 'K000 U, 'K000 E, and 'K001 E are located in Principality of Liechtenstein, and held in the name of Ad Tech BV, and FERRER is the ultimate beneficial owner. | 10(w). SUBJECT ACCOUNT 19A: Bank Frick, located in Liechtenstein, account number LI09 0881 1060 7717 K000 K, is an account held in the name of Ad Tech BV, and Ferrer is the ultimate beneficial owner.<br><br>x. SUBJECT ACCOUNT 19B: Bank Frick, in |

| | |
|---|---|
| | Liechtenstein, account number LI30 0881 1060 7717 K000 U, is an account held in the name of Ad Tech BV, and Ferrer is the ultimate beneficial owner.<br><br>y. SUBJECT ACCOUNT 19C: Bank Frick, in Liechtenstein, account number LI74 0881 1060 7717 K000 E, is an account held in the name of Ad Tech BV, and Ferrer is the ultimate beneficial owner.<br><br>z. SUBJECT ACCOUNT 19D: Bank Frick, in Liechtenstein, account number LI90 0881 1060 7717 K00l E, is an account held in the name of Ad Tech BV, and Ferrer is the ultimate beneficial owner.<br><br>(Ex. 1 at ¶ 10(w)-(z).) |
| According to FERRER these are accounts receivable banking accounts. | 67(a). According to Ferrer, SUBJECT ACCOUNTS 19A, 19B, 19C and 19D are accounts receivable banking accounts.<br><br>(Ex. 1 at ¶ 67.) |
| 48.     Payment processors and merchant processors would take credit card payments, and payments such as bitcoin payments from Backpage customers for prostitution and other ads, and would transfer these funds to Bank Frick accounts 'K000 K, 'K000 U, 'K000 E, and 'K001 E. | 67(a) Payment processors and merchant processors would take credit card payments, and payments such as bitcoin payments from Backpage customers for prostitution and other ads, and would transfer these funds to accounts such as SUBJECT ACCOUNTS 19A, 19B, 19C and 19D.<br><br>(Ex. 1 at 67.) |
| 49.     These accounts contain funds and/or securities that are criminally derived and are subject to forfeiture.  FERRER and Backpage has agreed to surrender these funds and/or securities as they are criminally derived. | 67(a). These accounts contain funds and/or securities that are criminally derived and are subject to forfeiture.  Ferrer and Backpage has agreed to surrender these funds and/or securities as they are criminally derived.<br><br>(Ex. 1 at 67.) |
| 50.     Knab Bank account '2452 is located in Kingdom of the Netherlands, and held in the name of Procop Services BV.  All funds and securities in this account are held for Backpage.com by Procop Services BV.  According to FERRER and the Service Level | 68(b). SUBJECT ACCOUNT 20 at Knab Bank in the Netherlands is an account held by a third party, Procop Services BV. According to Ferrer the arrangement is essentially the same as the Gold Leaf SRO and Protecttio SRO, as described with respect to SUBJECT |

| | |
|---|---|
| Agreement ("SLA") between Procop Services BV, a Backpage owned company and Procop Services BV, the funds and/or securities in these accounts are the criminally derived proceeds of Backpage ads, including ads promoting prostitution. | ACCOUNTS 19. This business arrangement existed for the sole purpose of allowing purchasers of prostitution ads to purchase ads on Backpage websites while evading the credit card company blockade. Ferrer explained that these accounts are owned by Backpage and are not co-mingled with other funds and/or securities, and are therefore subject to seizure and forfeiture to the United States.<br><br>(Ex. 3 at ¶ 68(b).) |
| 51.     The SLAs state that 99.5% of the net proceeds are to be paid to Ad Tech BV, which is owned by Backpage.  According to FERRER, the arrangement between Procop Services BV, and Backpage was put into place to evade what he called a "blockade by credit card companies."  FERRER explained that beginning around 2015, U.S. credit card companies such as MasterCard and Visa refused to process credit card payments for Backpage due to the negative press surrounding sex trafficking and prostitution content on Backpage. | 75. All four SLAs state that 99.5% of the net proceeds are to be paid to Ad Tech BV, which is owned by Backpage . According to Ferrer, the arrangements between these Entities , and Backpage were put into place to avoid what Ferrer described as , "a blockade [of Backpage] by credit card companies ." Ferrer explained that beginning around 2015 , U. S. credit card companies such as MasterCard and Visa refused to process credit card payments for Backpage due to the negative press surrounding sex trafficking and prostitution content on Backpage.<br><br>(Ex. 3 at ¶ 75.) |
| 52.     As one of the ways around this "blockade," Backpage Operators set up agreements with foreign persons and partners to "franchise" websites for the sole purpose of accepting credit card payments. | 75. As a way around this "blockade," Backpage Operators set up agreements with foreign persons and partners to "franchise" websites for the sole purpose of accepting credit card payments.<br><br>(Ex. 3 at ¶ 75.) |
| 53.     According to FERRER, this use of foreign third-parties and foreign accounts allowed Backpage to continue to accept credit card payments for prostitution ads while concealing from the credit card companies that the payments were for Backpage ads. | 75. According to Ferrer, this use of foreign third-parties and foreign accounts allowed Backpage to continue to accept credit card payments for prostitution ads while concealing from the credit card companies that the payments were for Backpage ads . Ferrer said that the Entities existed for the sole purpose of funneling to Backpage accounts otherwise prohibited credit card payments for Backpage ads. Ferrer |

| | explained that these funds are owned by Backpage and are not comingled with other funds.<br><br>(Ex. 3 at ¶ 75.) |
|---|---|
| 54.      FERRER said that Procop Services BV existed for the sole purpose of allowing purchasers of prostitution ads to purchase ads on Backpage websites while evading the credit card company blockade.  FERRER explained that these accounts are owned by Backpage and are not co-mingled with other funds, and are therefore subject to seizure and forfeiture to the United States. | 75. According to Ferrer and the four separate SLAs between (1) Ad Tech BV, a Backpage owned company, and Guilietta Group B. V.; (2) Backpage and Procop Services B. V.; (3) Backpage and Universe Ads B. V.; and (4) Backpage and Proteccio SRO, all of which I have reviewed , the funds and/or securities held by these entities are the criminally derived proceeds of Backpage ads, including ads promoting prostitution. All four SLAs state that 99.5% of the net proceeds are to be paid to Ad Tech BV, which is owned by Backpage. According to Ferrer, the arrangements between these Entities, and Backpage were put into place to avoid what Ferrer described as, "a blockade [of Backpage] by credit card companies ." Ferrer explained that beginning around 2015, U. S. credit card companies such as MasterCard and Visa refused to process credit card payments for Backpage due to the negative press surrounding sex trafficking and prostitution content on Backpage. As a way around this "blockade," Backpage Operators set up agreements with foreign persons and partners to "franchise" websites for the sole purpose of accepting credit card payments. According to Ferrer, this use of foreign third-parties and foreign accounts allowed Backpage to continue to accept credit card payments for prostitution ads while concealing from the credit card companies that the payments were for Backpage ads. Ferrer said that the Entities existed for the sole purpose of funneling to Backpage accounts otherwise prohibited credit card payments for Backpage ads. Ferrer explained that these funds are owned by Backpage and are not comingled with other funds.<br><br>(Ex. 3 at ¶ 75.) |

| | |
|---|---|
| 55.   According to FERRER and business agreements, Rabo Bank Account '2452 is an account in the Netherlands held in the name of Gulietta Group BV.  The funds and/or securities in this account are derived from selling advertisements online, most of which are for prostitution advertisements.  The SLAs state that 99.5% of the net proceeds are to be paid to Ad Tech BV which is owned by Backpage. | 69(a). SUBJECT ACCOUNT 21A is an account in the Netherlands held in the name of Gulietta Group BV. According to Ferrer and the SLA, the funds and/or securities in this account are derived from selling advertisements online, most of which are for prostitution advertisements. The SLAs state that 99.5% of the net proceeds are to be paid to Ad Tech BV which is owned by Backpage.<br><br>(Ex. 1 at ¶ 69(a).) |
| 56.   According to FERRER, the arrangement between Guilietta Group BV, and Backpage was put into place to evade what he called a "blockade by credit card companies."  FERRER explained that beginning around 2015, U.S. credit card companies such as MasterCard and Visa refused to process credit card payments for Backpage due to the negative press surrounding sex trafficking and prostitution content on Backpage. | 69(a). According to Ferrer, the arrangement between Guilietta Group BV and Ad Tech BV (Backpage) was put into place to evade the same credit card "blockade" described in with regard to SUBJECT ACCOUNTS 18D, 18E, and 18F. Ferrer explained that these accounts are owned by Backpage and are not co-mingled with other funds and/or securities, and are therefore subject to seizure and forfeiture to the United States.<br><br>(Ex. 1 at ¶ 69(a).) |
| 57.   As one of the ways around this "blockade," Backpage Operators set up agreements with foreign persons and partners to "franchise" websites for the sole purpose of accepting credit card payments. | 66(b). As one of the ways around this "blockade," Backpage Operators set up agreements with foreign persons and partners to "franchise" websites for the sole purpose of accepting credit card payments.<br><br>(Ex. 1 at ¶ 66(b).) |
| 58.   This use of foreign third-parties and foreign accounts allowed Backpage to continue to accept credit card payments for prostitution ads while concealing from the credit card companies that the payments were for Backpage ads. | 66(b). According to Ferrer, this use of foreign third-parties and foreign accounts allowed Backpage to continue to accept credit card payments for prostitution ads while concealing from the credit card companies that the payments were for Backpage ads.<br><br>(Ex. 1 at ¶ 66(b).) |
| 59.   Rabo Bank account '4721 is an account in the Netherlands held in the name of UniversAds BV.  According to Ferrer and the SLA between the companies, the funds and/or securities in this account are derived from selling advertisements online, most of which are for prostitution | 10(cc). SUBJECT ACCOUNT 21B: Rabo Bank, in the Netherlands, account number NL64RABO0307604721, is an account held in the name of UniversAds BV. All funds and securities in this account are held for Backpage.com by UniversAds BV. |

| | |
|---|---|
| advertisements.  The Service Level Agreements state that 99.5% of the net proceeds are to be paid to Ad Tech BV which is owned by Backpage. | (Ex. 1 at ¶ 10(cc).)<br><br>69(b). According to Ferrer, the arrangement between UniversAds BV and Ad Tech BV or Backpage was put into place to evade the same credit card blockade described above. Ferrer explained that these accounts are owned by Backpage and are not co-mingled with other funds and/or securities, and are therefore subject to seizure and forfeiture to the United States.<br><br>(Ex. 1 at ¶ 69(b).)<br><br>66(b). The SLAs state that 99.5% of the net proceeds are to be paid to Ad Tech BV, which is owned by Backpage.<br><br>(Ex. 1 at ¶ 66(b).) |
| 60.     According to Ferrer, the arrangement between UniversAds BV and Ad Tech BV or Backpage was put into place to evade the same credit card blockade described above.  Ferrer explained that these accounts are owned by Backpage and are not co-mingled with other funds and/or securities, and are therefore subject to seizure and forfeiture to the United States. | 69(b). According to Ferrer, the arrangement between UniversAds BV and Ad Tech BV or Backpage was put into place to evade the same credit card blockade described above. Ferrer explained that these accounts are owned by Backpage and are not co-mingled with other funds and/or securities, and are therefore subject to seizure and forfeiture to the United States.<br><br>(Ex. 1 at ¶ 69(b).) |
| 61.     Acacia Conservation Fund LP account '0112 are investment funds held in the name of Ocotillo Family Trust.  Ocotillo Family Trust is owned by JAMES and Margaret LARKIN.  In furtherance of their money laundering scheme, and in an attempt to further conceal the true nature of the money, Backpage Operators used these accounts as go-betweens to funnel money from one account to another.<br><br>a.     The tracing involved numerous accounts including: Branch Banking & Trust account number '2008, held in the name of Website Technologies; Arizona Bank & Trust account number '6211 held in the name of | 23. Approximately $9,882,828.72 in securities and/or investment funds seized from Perkins Coie Trust Company Account No. '0012 ("PCTC Investment Funds" or "Account 20") held in the name of Margaret G. Larkin. Larkin, M. Larkin, CFT and OFT have filed claims in member case number CV 18-8420 RGK (PJWx).<br><br>24. Approximately $34,149,280.00 in securities and/or investment funds seized from Acacia Conservation Fund LP Account No. '2020 ("ACF Funds" or "Account 21"), held in the name of the Ocotillo Family Trust. Larkin, M. Larkin, CFT and OFT have filed |

Cereus Properties; Charles Schwab account number '4693 held in the name of JAMES LARKIN; and Pershing, LLC Account number '1121 held in the name of Acacia Conservation Fund; and GoCoin transactions related to certain ads posted on Backpage, specifically including ads that related to child victims A.C., S.F., T.S., S.L., K.O., and R.W.

claims in member case number CV 18-8420 RGK (PJWx).

(Ex. 2 at ¶¶23-24.)

b.      On September 6, 2015, a bitcoin account associated with the owner of the email address who trafficked A.C. and S.F. paid Backpage about $4 worth of bitcoin in order to post an ad promoting the trafficking of those victims in Palm Springs, California.

63(a). On September 6, 2015, a Bitcoin account associated with the owner of the email address who trafficked A.C. and S.F. paid Backpage about $4 worth of bitcoin in order to post an ad promoting the trafficking of those victims in Palm Springs, California.

c.      On September 15, 2015, an email from the same email address owner indicated a payment to Backpage of about $8 worth of bitcoin in order to "Fund Account"  for palmsprings.backpage.com.

63(b). On September 15, 2015, an email from the same email address owner indicated a payment to Backpage of about $8 worth of Bitcoin in order to "Fund Account"  for palmsprings.backpage.com.

d.      On October 6, 2015, the same email address owner paid Backpage about $1 worth of bitcoin to "Fund Account" on palmsprings.backpage.com.

63(c). On October 6, 2015, the same email address owner paid Backpage about $1 worth of Bitcoin to "Fund Account" on palmsprings.backpage.com.

e.      On October 30, 2015, a bitcoin account associated with the owner of the email address who trafficked T.S., S.L., K.O., and R.W. paid Backpage about $1 worth of bitcoin in order to post an ad promoting the trafficking of those victims in Columbus, Ohio.

63(d). On October 30, 2015, a bitcoin account associated with the owner of the email address who trafficked T.S., S.L., K.O., and R.W. paid Backpage about $1 worth of Bitcoin in order to post an ad promoting the trafficking of those victims in Columbus, Ohio.

f.      On November 2, 2015, this same email address owner paid Backpage about $1 worth of bitcoin to "Move Ad to Top of Listings" in the Columbus, Ohio Backpage ads.

63(e). On November 2, 2015, this same email address owner paid Backpage about $1 worth of bitcoin to "Move Ad to Top of Listings" in the Columbus, Ohio Backpage ads.

(Ex 3 at ¶ 63(a)-(g).)

g.      On November 21, 2015, this same email address owner paid Backpage about $1 worth of bitcoin to Backpage for credit for that email owner's Backpage ad account.

63(f). On November 21, 2015, this same email address owner paid Backpage about $1 worth of bitcoin to Backpage for credit for that email owner's Backpage ad account.

| | |
|---|---|
| h.      During the period of September 4, 2015, and November 23, 2015, Backpage advertisers used bitcoin to purchase about 1,000,000 "adult" ads from Backpage. Backpage then sold that bitcoin to GoCoin for approximately $8.6 million.  Included among the bitcoin sold to GoCoin during this period were the six payments the pimps made to Backpage to purchase ads to promote child prostitution. | 63(g). During the period of September 4, 2015, and November 23, 2015, Backpage advertisers used bitcoin to purchase about 1,000,000 "adult" ads from Backpage. Backpage then sold that bitcoin to GoCoin for approximately $8.6 million.  Included among the bitcoin sold to GoCoin during this period were the six payments the pimps made to Backpage to purchase ads to promote child prostitution.<br><br>(Ex 3 at ¶ 63(f)-(g).) |
| i.      During the period of March 23, 2016, through March 31, 2016, in three transactions, Branch Banking and Trust Bank account '2008 wired $3,694,813.60 to the Arizona Bank and Trust Account '6211. | 181(a). During the period of March 23 through March 31, 2016, Website Tech Account '2008 sent three wire transfers totaling $3,694,813.60 to Arizona Bank and Trust account number '6211, belonging to Cereus Properties ("Account '6211"). |
| j.      During the period of April 1, 2016, through July 1, 2016, in five transactions, the Arizona Bank and Trust Account '6211 wired $5,750,294 to LARKIN's Charles Schwab account '4693. | 181(b).  During the period of April 1, 2016, through July 1, 2016, Account '6211 sent five wire transfers totaling $5,750,294 to Charles Schwab account '4693. |
| k.      On July 1, 2016, the Charles Schwab account '4693 wired $15 million to the Acacia Conservation Fund, LP account '0112. | 181(c). On July 1, 2016, Charles Schwab Account '4693 transferred $15,000,000 to Account 21. |
| l.      During the period of August 2, 2016, through October 6, 2016, in six transactions, the Arizona Bank and Trust Account '6211 wired $9,550,315 to LARKIN's Charles Schwab account '4693. | 181(d). During the period of August 2, 2016, through October 6, 2016, Account '6211 sent six wire transfers totaling $9,550,315 to Charles Schwab Account '4693. |
| m.      On January 3, 2017, the Charles Schwab account '4693 wired $2.5 million to the Acacia Conservation Fund, LP account '0112. | 181(e). On January 3, 2017, Charles Schwab account '4693 transferred $2,500,000 to Account 21. |
| n.      On January 4, 2017, the Charles Schwab account '4693 wired $2.5 million to the Acacia Conservation Fund, LP account '0112. | 181(f). On January 4, 2017, Charles Schwab account '4693 transferred $2,500,000 to Account 21.<br><br>(Ex 2 at ¶¶ 181(a)-(f).) |

| | |
|---|---|
| | 72. I have reviewed records for Seized Account 22 as well as the following accounts: Branch Banking & Trust account number [-2008], belonging to Website Technologies; …. Arizona Bank & Trust account number [-6211] belonging to Cereus Properties; … Charles Schwab account number [-4693] belonging to James Larkin…; and Pershing, LLC Account number  [-1121] belonging to Acacia Conservation Fund… Additionally, I have reviewed GoCoin transactions related to certain ads posted on Backpage, specifically including ads that related to child victims A.C., S.F., T.S., S.L., K.O., and R.W.<br><br>(Ex 3 at ¶ 72.) |
| 62.      Saxo Payments account number 00011262 is a United Kingdom-based account held in the name of Cashflows Europe Limited ("Cashflows").  Cashflows is holding these funds for the benefit of Gulietta Group B.V., Universads B.V, Procop Services B.V., and Proteccio SRO, each of which company is a Backpage owned or controlled entity.  United Kingdom law enforcement officials have restrained the funds held by these four companies and consolidated them into this Saxo Payments account. | 74. From my review of these SLAs , financial records related to Restrained Account 23, and records and statements provided by Ferrer and U. K. Law Enforcement, I understand that Restrained Account 23 contains funds consolidated by U.K. Law Enforcement and a payment processing company called Cashflows Europe Limited. This account contains funds from three separate entities that U.K. Law Enforcement restrained following the indictments and information charging Backpage and its operators .<br><br>That is, Restrained Account 23 contains funds from (1) Gulieta Group B. V.; (2) Procop Services B. V.; {3) Universads B.V.; and ( 4) Proteccio SRO , (collectively referred to as , the "Entities") .<br><br>(Ex. 3 at ¶ 74.) |
| 63.      On April 5, 2018, pursuant to a plea agreement in the District of Arizona, FERRER plead guilty to a single-count information charging him with a violation of 18 U.S.C. § 371, conspiracy to violate 18 U.S.C. §§ 1952 (the Travel Act) and 1956 (money laundering).  As part of his plea agreement, FERRER agreed to "take all steps within his power to forfeit to the United States all corporate assets and other property | Plea agreement in *United States v. Ferrer,* CR-18-464-PHX-DJH.  DOJ-BP-0004899878.  Defense Trial Exhibit 5994-2; *see also*, CR-18-465-PHX-DJH, United States v. Backpage.com, LLC; Website Technologies, LLC; Posting Solutions LLC; AdTech BV; and UCG Tech Group BV ("the Entities") (Doc. 8-2 through 8-7.) |

| | |
|---|---|
| owned or controlled by Website Technologies, LLC, which own and operates the Backpage website, as well as corporate assets and other property owned or controlled by Backpage.com, LLC, Posting Solutions LLC, Amstel River Holdings, LLC, Ad Tech BV, and UGC Tech Group CV." <br><br> That same day, also in the District of Arizona, Backpage.com, LLC and related entities plead guilty to 18 U.S.C. § 1956(h) (money laundering conspiracy). | |
| 64.    Saxo Payments account '1262 contains funds from (1) Gulieta Group B.V.; (2) Procop Services B.V.; (3) Universads B.V.; and (4) Protecctio SRO, (collectively referred to as, the "Entities"): | 61. Approximately 747,664.15 GBP seized from SAXO Payments (United Kingdom) Account No. '1262 ("SP '1262 Funds" or "Account 55"), held in the name of the Cashflows Europe Limited ("Cashflows"). Medalist, Leeward, Camarillo, Vermillion, Cereus, Shearwater, Broadway, Larkin, T. Larkin, R. Larkin, Spear, Lacey, and Brunst have filed claims in member case number CV 18-8753 RGK (PJWx). <br><br> Account 55 is located in the United Kingdom and held by a third party entity, "Cashflows Europe Limited" ("Cashflows").  Although Backpage is the ultimate beneficiary of Account 55, Cashflows acts first as an entity holding this account for the benefit of Gulietta Group B.V., Universads B.V., Procop Services B.V., and Proteccio SRO, each of which company is owned or controlled by Backpage. <br><br> (Ex. 2 at ¶¶ 61, 216.) |
| 65.    According to FERRER and the four separate SLAs between (1) Ad Tech BV, a Backpage owned company, and Guilietta Group B.V.; (2) Backpage and Procop Services B.V.; (3) Backpage and Universe Ads B.V.; and (4) Backpage and Protecctio SRO, the funds and/or securities held by these entities are the criminally derived proceeds of Backpage ads, including ads promoting prostitution.  All four SLAs state that 99.5% | 75. According to Ferrer and the four separate SLAs between (1) Ad Tech BV, a Backpage owned company, and Guilietta Group B.V.; (2) Backpage and Procop Services B.V.; (3) Backpage and Universe Ads B.V.; and (4) Backpage and Protecctio SRO, all of which I have reviewed, the funds and/or securities held by these entities are the criminally derived proceeds of Backpage ads, including ads promoting prostitution.  All four SLAs |

| | |
|---|---|
| of the net proceeds are to be paid to Ad Tech BV, which is owned by Backpage. According to FERRER, the arrangements between these Entities, and Backpage were put into place to avoid what FERRER described as, "a blockade [of Backpage] by credit card companies." FERRER explained that beginning around 2015, U.S. credit card companies such as MasterCard and Visa refused to process credit card payments for Backpage due to the negative press surrounding sex trafficking and prostitution content on Backpage. As a way around this "blockade," Backpage Operators set up agreements with foreign persons and partners to "franchise" websites for the sole purpose of accepting credit card payments. According to FERRER, this use of foreign third-parties and foreign accounts allowed Backpage to continue to accept credit card payments for prostitution ads while concealing from the credit card companies that the payments were for Backpage ads. FERRER said that the Entities existed for the sole purpose of funneling to Backpage accounts otherwise prohibited credit card payments for Backpage ads. FERRER explained that these funds are owned by Backpage and are not co-mingled with other funds, and the funds held in Saxo Payments account '1262 are therefore subject to seizure and forfeiture to the United States. | state that 99.5% of the net proceeds are to be paid to Ad Tech BV, which is owned by Backpage. According to Ferrer, the arrangements between these Entities, and Backpage were put into place to avoid what Ferrer described as, "a blockade [of Backpage] by credit card companies." Ferrer explained that beginning around 2015, U.S. credit card companies such as MasterCard and Visa refused to process credit card payments for Backpage due to the negative press surrounding sex trafficking and prostitution content on Backpage. As a way around this "blockade," Backpage Operators set up agreements with foreign persons and partners to "franchise" websites for the sole purpose of accepting credit card payments. According to Ferrer, this use of foreign third-parties and foreign accounts allowed Backpage to continue to accept credit card payments for prostitution ads while concealing from the credit card companies that the payments were for Backpage ads. Ferrer said that the Entities existed for the sole purpose of funneling to Backpage accounts otherwise prohibited credit card payments for Backpage ads. Ferrer explained that these funds are owned by Backpage and are not co-mingled with other funds.<br><br>(Ex. 3 at ¶ 75.) |
| 66.     Restrained Account 24 is an account maintained in the Republic of Estonia, held in the name of Olist OU. The funds and/or securities in this account are derived from selling advertisements online, most of which ads are for prostitution advertisements. The SLAs state that 99.5% of the net proceeds are to be paid to Ad Tech BV, which is owned by Backpage. The arrangement between Olist OU and Ad Tech BV (Backpage) was put into place to avoid the same credit card "blockade" described in relation to Saxo Payments account '1262. These accounts are owned by Backpage and are not co-mingled with other funds and/or securities. | 76. I learned that Restrained Account 24 is an account maintained in the Republic of Estonia, held in the name of Olist OU. According to Ferrer and the SLAs, the funds and/or securities in this account are derived from selling advertisements online, most of which ads are for prostitution advertisements. The SLAs state that 99.5% of the net proceeds are to be paid to Ad Tech BV, which is owned by Backpage. According to Ferrer, the arrangement between Olist OU and Ad Tech BV (Backpage) was put into place to avoid the same credit card "blockade" described in relation to Restrained Accounts 23. Ferrer explained that these accounts are owned by |

| | |
|---|---|
| | Backpage and are not co-mingled with other funds and/or securities.<br><br>(Ex. 3 at ¶ 76.) |
| 67.     The Compass Bank account was opened in the name of Cereus Properties: | 152. Account 2 is Compass '3873 Funds and is a Cereus Properties Asset. |
| a.     On December 2, 2016, the Foreign Account in the Liechtenstein wired $324,055.85 to Compass Bank account '3873. | 153(a).  On December 2, 2016, the Netherlands Account transferred $324,055.85 to Account 2 |
| b.     On December 8, 2016, the Foreign Account wired $499,970.00 to Compass Bank account '3873. | 153(b).  On December 8, 2016, the Netherlands Account transferred $499,970.00 to Account 2. |
| c.     On December 27, 2016, the Foreign Account wired $199,970.00 to Compass Bank account '3873. | 153(c).  On December 27, 2016, the Netherlands Account transferred $199,970.00 to Account 2.<br><br>(Ex. 2 at ¶¶ 152, 153.) |
| d.     On September 19, 2017, Compass Bank account '3873 wired $83,063 to Wells Fargo Bank account '9863. | 77(d). On September 19, 2017, Seized Account 2A wired $83,063 to Wells Fargo Bank account -9863.<br><br>42. Seized Account 2A is a Compass Bank business account owned by "Cereus Properties LLC."<br><br>(Ex. 3. at ¶¶ 77, 42.) |
| e.     Between September 20, 2017, and December 8, 2017, in a total of seven wire transfers, Wells Fargo Bank account -9863 sent a combined total of $944,729.25 to Compass Bank account '4862. | 156(b). Between September 20, 2017 and December 8, 2017, Account '9863 transferred approximately $944,729.25 among seven transactions into Account 3.<br><br>(Ex. 2 at ¶ 156(b).) |
| f.     On December 13, 2017, Compass Bank account '4862 wired $406,211.10 to Republic Bank of Arizona account 1938. | 178(e). On December 13, 2017, Account 3 transferred $406, 211.10 to Account 15.<br><br>(Ex. 2 at ¶ 178(e).) |
| 68. The Midfirst Bank account was held in the name of John Becker's IOLTA for MICHAEL LACEY. | 158. Account 12 was an IOLTA held for the benefit of Lacey, and was funded with proceeds traceable to SUA, involved in money laundering, or both. |

| | |
|---|---|
| a. On January 4, 2017, GoCoin's Singapore account wired $489,500 into Account -1462, and on January 20, 2017, GoCoin's Singapore account directed two additional wires, for $358,150 and $470,150, respectively, into Account -1462 (totaling $1,317,800 wired from GoCoin's Singapore account into Account -1462). | 159. On January 4, 2017, the Singapore Account wired $489,500 into a Posting Solutions controlled account held at Veritex Bank (the "Veritex Account"). On January 20, 2017, the Singapore Account directed two additional wires, for $358,150 and $470,150 respectively, into the Veritex Account. In total, the Singapore Account transferred $1,317,800 into the Veritex Account. |
| b. On or about February 23, 2017, Account -1462 sent two payments, a wire of $443,014 and a check for $27,887.41 to Compass Bank account '3873. | a. On or about February 23, 2017, the Veritex Account directed two payments to Account 2, a wire of $443,014, and a check for $27,887.41; |
| c. Between March 30, 2017, and September 14, 2017, Compass Bank account '3873 sent five wires totaling $4,058.063.65 to Midfirst Bank account '4139. | b. Between March 30 and September 14, 2017, Account 2 sent five wires totaling $4,058.063.65 to Account 12; and |
| d. In July 2018, Midfirst Bank account '4139 was closed and a cashier's check totaling $2,412,785.47 was issued to Michael Lacey's Annuity Fund held by his attorney. As of the date of this affidavit, this check has not been negotiated. | c. In July 2018, Account 12 was closed and a cashier's check totaling $2,412,785.47 was issued to Lacey's Annuity Fund, held at Account 12.<br><br>(Ex. 2 at ¶¶ 158-159.) |
| 69.      Backpage, until recently, controlled numerous domain names that have since been seized by the government pursuant to a seizure warrant issued in this district. | 9(d). Backpage, until recently, controlled numerous domain names that have since been seized by the government pursuant to a seizure warrant issued in this district in case no. CR. Misc. 2:18-MJ-00711. |
| 70.      The Seized Domains are registered by "ASCIO TECHNOLOGIES INC" DBA "NETNAMES," a domain registrar that manages the reservation of internet domain names. A domain registrar serves to ensure that a registered domain name, like each of the Seized Domains, is not double sold. | The Seized Domains are registered by "ASCIO TECHNOLOGIES INC" DBA "NETNAMES," a domain registrar that manages the reservation of internet domain names. A domain registrar serves to ensure that a registered domain name, like each of the Seized Domains, is not double sold. |
| 71.      Additionally, a domain registration will allow the owner of the domain to direct internet traffic to a company's webserver. The Seized Domains were found to have been acquired and maintained with funds traceable | Additionally, a domain registration will allow the owner of the domain to direct internet traffic to a company's webserver. The Seized Domains were found to have been acquired |

| | |
|---|---|
| to the money laundering scheme described herein, specifically with funds from Prosperity Bank account '7188, and the Seized Domains were the mechanism Backpage used to promote the prostitution and sex trafficking activity. | and maintained with funds traceable to the money laundering scheme described herein, specifically with funds from an account seized pursuant to a separate seizure warrant in case no. CR. Misc. 2:18-MJ-00721, and the Seized Domains were the mechanism Backpage used to promote the prostitution and sex trafficking activity described below.<br><br>(Ex. 3 at ¶9(d).) |
| 72.    The following domains constitute and are derived from proceeds traceable to one or more violations of 18 U.S.C. § 156(g), 18 U.S.C. § 156(a)(2), and 18 U.S.C. § 1957:<br><br>73.    atlantabackpage.com<br>74.    backpage.be<br>75.    backpage.com<br>76.    backpage.com.br<br>77.    backpage.cz<br>78.    backpage.dk<br>79.    backpage.ee<br>80.    backpage.es<br>81.    backpage.fi<br>82.    backpage.fr<br>83.    backpage.gr<br>84.    backpage.hu<br>85.    backpage.ie<br>86.    backpage.it<br>87.    backpage.lt<br>88.    backpage.mx | 223. The following domains constitute and are derived from proceeds traceable to SUA, involved in money laundering, or both:<br><br>a. atlantabackpage.com<br>b. backpage.be<br>c. backpage.com<br>d. backpage.com.br<br>e. backpage.cz<br>f. backpage.dk<br>g. backpage.ee<br>h. backpage.es<br>i. backpage.fi<br>j. backpage.fr<br>k. backpage.gr<br>l. backpage.hu<br>m. backpage.ie<br>n. backpage.it<br>o. backpage.lt<br>p. backpage.mx<br><br>(Ex. 2 at ¶ 223.) |
| 89.    backpage.net<br>90.    backpage.no<br>91.    backpage.pl<br>92.    backpage.pt<br>93.    backpage.ro<br>94.    backpage.si<br>95.    backpage.sk<br>96.    backpage.us<br>97.    backpage-insider.com<br>98.    bestofbackpage.com<br>99.    bestofbigcity.com<br>100.    bigcity.com<br>101.    chicagobackpage.com | q. backpage.net<br>r. backpage.no<br>s. backpage.pl<br>t. backpage.pt<br>u. backpage.ro<br>v. backpage.si<br>w. backpage.sk<br>x. backpage.us<br>y. backpage-insider.com<br>z. bestofbackpage.com<br>aa. bestofbigcity.com<br>bb. bigcity.com<br>cc. chicagobackpage.com |

| | |
|---|---|
| 102.    denverbackpage.com<br>103.    newyorkbackpage.com<br>104.    phoenixbackpage.com<br>105.    sandiegobackpage.com<br>106.    seattlebackpage.com<br>107.    tampabackpage.com | dd. denverbackpage.com<br>ee. newyorkbackpage.com<br>ff. phoenixbackpage.com<br>gg. sandiegobackpage.com<br>hh. seattlebackpage.com<br>ii. tampabackpage.com<br><br>(Ex. 2 at ¶ 223.) |
| [2043 Pleasant Hill Rd, Sebastopol, CA 95472]<br><br>108.    Michael LACEY knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from SUA activity in violation of 18 U.S.C. § 1957. | [The Sebastopol Property]<br><br>160. The Sebastopol Property was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both. |
| 109.    As set forth below, financial transactions involving illicit proceeds were deposited in GoCoin (Singapore) which were then moved through the Posting Solutions Prosperity Bank account, then moved through the Cereus Properties Compass Bank account, then moved to the San Francisco Fire Credit Union account '2523 controlled by Michael LACEY. | 161. In a series of transactions in December 2016, illicit proceeds from the Netherlands Account would pass-through Account 2, eventually ending up in Account 11. Additionally, between July and October 2017, additional illicit proceeds from the Singapore Account were passed-through Account 1 to Account 2, and eventually transferred to Account 11. On or about October 10, 2017, over $10,000 of funds from Account 11 were used to support and maintain the Sebastopol Property.<br><br>(Ex. 2 at ¶¶ 160-161.) |
| 110.    Additional financial transactions involving illicit proceeds were deposited in Ad Tech BV Bank Frick account (XXXX) which were then moved through the Cereus Properties Compass Bank account, then moved to the San Francisco Fire Credit Union account '2523 controlled by Michael LACEY.  LACEY issued a check from his San Francisco Fire Credit Union account '2523 to the Sonoma County Tax Collector. | 157. Account 11 is held in the name of Lacey and an individual listed in the Credit Union's records as Lacey's employee and bookkeeper. Account 11 was funded with proceeds alleged to have been traceable to SUA, involved in money laundering, or both.<br>a. On February 2, 2018, Account 2 (which then contained funds traceable to SUA, involved in money laundering, or both) transferred $734,602.70 into Account 11.<br><br>(Ex. 2 at ¶ 157.) |
| 111.    As noted above, on October 10, 2017, LACEY issued a check for $12,956.25 to | 163. On October 10, 2017, Lacey issued a $12,956.25 check from Account 11 to |

| | |
|---|---|
| Sonoma County Tax Collector.  The notation on this wire was "2043 Pleasant Hill Dr Sebastopol". | Sonoma County Tax Collector. The notation on this wire was "2043 Pleasant Hill Dr Sebastopol."<br><br>(Ex. 2 at ¶ 163.) |
| 112.    Finca Manzana for Sebastopol, LLC, a Delaware limited liability company, which was the entity used to take title to SEBASTOPOL, CALIFORNIA PROPERTY, is owned by Michael LACEY.  On February 11, 2016, Deborah Chalsty transferred by grant deed, as instrument number 2016010019 of the Sonoma County official records, SEBASTOPOL, CALIFORNIA PROPERTY to Michael LACEY, an unmarried man.  On April 24, 2017, Michael LACEY, for no consideration, transferred by grant deed, as instrument number 2017031052 of the Sonoma County official records, SEBASTOPOL, CALIFORNIA PROPERTY to Finca Manzana for Sebastopol, LLC. As noted in the grant deed:<br><br>"There was no consideration for this transfer. This is a transfer between an individual or individuals and a legal entity or between legal entities that results solely in a change in the method of holding title and in which proportional ownership inters in the realty remain the same. . ." | 162. On February 11, 2016, a grant deed, instrument number 2016010019 of the Sonoma County official records, transferred the Sebastopol Property to Lacey. Thereafter, on April 24, 2017, for no consideration, Lacey transferred title of the Sebastopol Property to his Delaware limited liability company, Sebastopol, LLC. As noted in the grant deed:<br><br>"There was no consideration for this transfer. This is a transfer between an individual or individuals and a legal entity or between legal entities that results solely in a change in the method of holding title and in which proportional ownership inters in the realty remain the same. . ."<br><br>(Ex. 2 at ¶ 162.) |
| 113.    LACEY used funds that had been moved through GoCoin and Ad Tech BV, through Posting Solution and Cereus Properties accounts, to an account controlled by himself, to acquire or maintain the real property known as 2043 Pleasant Hill Rd. | 157. Account 11 is held in the name of Lacey and an individual listed in the Credit Union's records as Lacey's employee and bookkeeper. Account 11 was funded with proceeds alleged to have been traceable to SUA, involved in money laundering, or both.<br><br>a. On February 2, 2018, Account 2 (which then contained funds traceable to SUA, involved in money laundering, or both) transferred $734,602.70 into Account 11.<br><br>163. On October 10, 2017, Lacey issued a $12,956.25 check from Account 11 to |

| | Sonoma County Tax Collector. The notation on this wire was "2043 Pleasant Hill Dr Sebastopol."<br><br>(Ex. 2, page 52, at ¶¶ 157, 163.) |
|---|---|
| [343 Presidio Ave, San Francisco, CA 94115]<br><br>114. Michael LACEY knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from SUA activity in violation of 18 U.S.C. § 1957. | [San Francisco, California Property 1]<br><br>164. San Francisco Property 1 was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both.<br><br>(Ex. 2 at ¶ 164.) |
| 115.    As set forth below, financial transactions involving illicit proceeds were deposited in GoCoin (Singapore) which were then moved through the Posting Solutions Prosperity Bank account, then moved through the Cereus Properties Compass Bank account, then moved to the San Francisco Fire Credit Union account '2523 controlled by Michael LACEY. | 165. In order to acquire San Francisco Property 1, Lacey used funds transferred through the Singapore Account, the Website Tech Account '2008, and Cereus Properties accounts, as well as annuity accounts that Lacey controlled, as follows:<br><br>a. Illicit proceeds were deposited into the Singapore Account, passed-through Account 1, then passed-through Account 2 and transferred to Account 11. Thereafter, funds from Account 11 were used to support and maintain San Francisco Property 1;<br><br>(Ex. 2 at ¶ 165.) |
| 116.    Additional financial transactions involving illicit proceeds were deposited in Ad Tech BV Bank Frick account (XXXX) which were then moved through the Cereus Properties Compass Bank account, then moved to the San Francisco Fire Credit Union account '2523 controlled by Michael LACEY.  Lacey issued a check from his San Francisco Fire Credit Union account to pay the San Francisco Tax Collector. | 165(a). Illicit proceeds were deposited into the Singapore Account, passed-through Account 1, then passed-through Account 2 and transferred to Account 11. Thereafter, funds from Account 11 were used to support and maintain San Francisco Property 1;<br><br>(Ex. 2 at ¶ 165(a).) |
| 117.    As noted above, on October 10, 2017, LACEY issued a check for $15,053.08 to San Francisco Tax Collector.  The notation on this wire was "343 Presidio". | 165(c). Thereafter, on October 10, 2017, over $10,000 in funds from Account 11 were used to purchase or maintain San Francisco Property 1.<br><br>(Ex. 2 at ¶ 165(c).) |

| | |
|---|---|
| 118.    On May 18, 2016, David H. Berg, Trustee and Geraldine B Berg, Trustee of The Berg Family Trust, dated August 15, 2005 transferred by grant deed, as instrument number 2016-K245482-00 of the San Francisco County official records, 343 Presidio Ave, to Michael G. LACEY, a single man and Alyson Talley, a single woman, as joint tenants with right of survivorship. | 165(b). On May 18, 2016, a grant deed recorded as instrument number 2016-K245482-00 in the San Francisco County official records, transferred San Francisco Property 1 to Lacey and his female partner;<br><br>(Ex. 2 at ¶ 165(b).) |
| 119.    LACEY used funds that had been moved through GoCoin and Ad Tech BV, through Cereus Properties accounts, to accounts controlled by himself, to acquire or maintain the real property known as SAN<br><br>120. FRANCISCO, CALIFORNIA PROPERTY 1. | 165(a). Illicit proceeds were deposited into the Singapore Account, passed-through Account 1, then passed-through Account 2 and transferred to Account 11. Thereafter, funds from Account 11 were used to support and maintain San Francisco Property 1;<br><br>(Ex. 2 at ¶ 165(a).) |
| [2755 Fillmore St, San Francisco, CA 94123]<br><br>121.    Michael LACEY knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from SUA activity in violation of 18 U.S.C. § 1957. | [San Francisco Property 2]<br><br>166. San Francisco Property 2 was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both.<br><br>(Ex. 2 at ¶ 166.) |
| 122.    As set forth below, financial transactions involving illicit proceeds were deposited in GoCoin (Slovakia) which was then moved through the Website Technologies Branch Banking & Trust account, then moved through Cereus Properties Arizona Bank & Trust account, then moved through multiple Annuity trust accounts controlled by LACEY, then moved to Arizona Bank & Trust account '1793 controlled by LACEY.  Funds from LACEY's Arizona Bank & Trust account '1793 were then wire transferred to Fidelity National Title Company. | 167. During the period of December 14 through December 29, 2015, as GoCoin's partial payment for the Bitcoin Backpage sold it during the period of September 4 through November 23, 2015, the Slovakia Account wired over $1,250,000 to Website Tech Account '2008.<br><br>168. After December 14, 2015, Website Tech Account '2008 then transferred funds via multiple pass-through accounts controlled by Lacey and other Backpage Operators, which, as of June 21, 2016, resulted in approximately $5,400,000 ending up in Arizona Bank & Trust account '1793, controlled by Lacey ("AB&T Account '1793").<br><br>(Ex. 2 at ¶ 167-168.) |
| 123.    As noted above, on June 27, 2016, LACEY wired, or caused to be wired, $397,500.00 to Fidelity National Title | 169. On June 27, 2016, AB&T Account '1793 wired $397,500.00 to Fidelity National Title Company. The notation on this wire was |

| | |
|---|---|
| Company. The notation on this wire was "XXX(Earnest Money)XXXXXX". On July 20, 2016, LACEY wired, or caused to be wired, $12,859,152.57 to Fidelity National Title Company. The notation on this wire was "XX(Balance of Property)XXXXX". | "XXX(Earnest Money)XXXXXX." On July 20, 2016, AB&T Account '1793 wired $12,859,152.57 to Fidelity National Title Company. The notation on this wire was "XX(Balance of Property)XXXXX." <br><br> (Ex. 2 at ¶ 167-169.) |
| 124.    Casa Bahia for San Francisco, LLC, a Delaware limited liability company, which was the entity used to take title to SAN FRANCISCO, CALIFORNIA PROPERTY 2, is owned by Michael LACEY ("XXX"). On July 21, 2016, Hui Li and Ying Lan Li transferred by grant deed, as instrument number 2016-K291371-00 of the San Francisco County official records, 2755 Fillmore St to Michael G. LACEY, an unmarried man. On June 21, 2017, Michael G. LACEY, for no consideration, transferred by grant deed, as instrument number 2017-K466276099 of the San Francisco County official records, SAN FRANCISCO, CALIFORNIA PROPERTY 2 to Casa Bahai for San Francisco, LLC, a Delaware limited liability company. As noted in the grant deed: <br><br> "There was no consideration for this transfer. This is a transfer between an individual or individuals and a legal entity or between legal entities that results solely in a change in the method of holding title and in which proportional ownership inters in the realty remain the same. . ." | 170. Casa Bahia for San Francisco, LLC, a Delaware limited liability company, was the entity used to take title to the San Francisco Property 2, and is owned by Lacey. On July 21, 2016, by grant deed, San Francisco Property 2 was transferred to Lacey. On June 21, 2017, by grant deed and for no consideration, Lacey transferred San Francisco Property 2 to Casa Bahia for San Francisco, LLC, a Delaware limited liability company, as evidenced by instrument number 2017-K466276099 recorded in the San Francisco County official records. As noted in the grant deed: <br><br> There was no consideration for this transfer. This is a transfer between an individual or individuals and a legal entity or between legal entities that results solely in a change in the method of holding title and in which proportional ownership inters in the realty remain the same. . . <br><br> (Ex. 2 at ¶ 170.) |
| 125.    LACEY used funds that had been moved through GoCoin, Website Technologies and Cereus Properties accounts, as well as annuity accounts controlled by himself, to acquire the real property known as 2755 Fillmore St. | 166. San Francisco Property 2 was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both. <br><br> 167. During the period of December 14 through December 29, 2015, as GoCoin's partial payment for the Bitcoin Backpage sold it during |

| | |
|---|---|
| | the period of September 4 through November 23, 2015, the Slovakia Account wired over $1,250,000 to Website Tech Account '2008.<br><br>168. After December 14, 2015, Website Tech Account '2008 then transferred funds via multiple pass-through accounts controlled by Lacey and other Backpage Operators, which, as of June 21, 2016, resulted in approximately $5,400,000 ending up in Arizona Bank & Trust account '1793, controlled by Lacey ("AB&T Account '1793").<br><br>(Ex. 2 at ¶¶ 166-168.) |
| **D.      1100 Union St. #700, San Francisco, CA 94109**<br><br>126.     Michael LACEY, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from SUA activity in violation of 18 U.S.C. § 1957. | **K. San Francisco Property 3**<br><br>171. San Francisco Property 3 was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both.<br><br>172. Beginning in February 2013, illicit funds from Backpage's U.S. Bank account '1165 passed-through various Backpage or Backpage Operators accounts, eventually ending up in BMO Harris account '5263, owned or controlled by Lacey. In May 2015, over $10,000 of funds from BMO Harris account '5263 was used to purchase or maintain San Francisco Property 3.<br><br>(Ex. 2 at ¶¶ 171-72.) |
| 127.     As set forth below, funds originating from Backpage's U.S. Bank account '1165 was moved through the Camarillo Holdings LLC, BMO Harris Bank account, then moved to LACEY's BMO Harris account '5263. LACEY's BMO Harris account '5263 paid a check to a contractor for repairs to the 1100 Union St. #700. In detail: | |

| | |
|---|---|
| a.      Between February 4, 2013 and February 11, 2013, over a series of wire transfers, Backpage.com U.S. Bank account wired about $3.2 million to Camarillo Holdings LLC BMO Harris Bank account '7172. | 186. Between February 4 and June 6, 2013, approximately $41,500,000 in illicit funds were transferred to Camarillo Holdings LLC, BMO Harris Bank account '7172.<br><br>(Ex. 2 at ¶ 186.) |
| b.      On February 15, 2013, Camarillo Holdings LLC BMO Harris Bank account '7172 wire transferred $395,513.85 to LACEY's BMO Harris Bank account '5263. | DOJ-BP-0004951056 page 226. |
| c.      On May 12, 2015, LACEY using funds from his BMO Harris Bank account '5263, paid an $11,027.37 check to a contractor for water damage repair for 1100 Union St. #700. | DOJ-BP-0004951056 page 197. |
| **E.  493 Zinfandel Lane, Saint Helena, CA 94574** | **R. Saint Helena Property** |
| 128.     James LARKIN, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from SUA activity in violation of 18 U.S.C. § 1957. | 185. The Saint Helena Property was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both. |
| 129.     As set forth below, financial transactions involving illicit proceeds were deposited in from Backpage's U.S. Bank account '1165, then moved to the Camarillo Holdings LLC BMO Harris Bank account 7172, then moved to JAMES LARKIN's BMO Harris Bank account '3110.  These illicit funds were then used to pay for appraisal for 493 Zinfandel Lane: | |
| a.      From February 4, 2013 through June 6, 2013, a foreign account wire transferred $41.5 million Camarillo Holdings LLC, BMO Harris Bank account '7172. | 186. Between February 4 and June 6, 2013, approximately $41,500,000 in illicit funds were transferred to Camarillo Holdings LLC, BMO Harris Bank account '7172. |

| | |
|---|---|
| b.    On October 2, 2013, BMO Harris Bank account '7172 wired $26,130.64 to JAMES LARKIN's BMO Harris Bank account '3110. | On October 2, 2013, BMO Harris Bank account '7172 wired $26,130.64 to Larkin's BMO Harris Bank account '3110. |
| c.    On November 3, 2016, LARKIN paid a check to an appraiser company.  Annotated on the memo line: "Zinfandel Appraisal 2015" | Thereafter, on November 3, 2016, over $10,000 of funds from BMO Harris Bank account '7172 were used to purchase or maintain the Saint Helena Property.<br><br>(Ex. 2 at ¶¶ 185-86.) |
| **F.  1308 E. 56th Street, 2, Chicago, IL 60637** | **S. Chicago Property** |
| 130.    James LARKIN, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from SUA activity in violation of 18 U.S.C. § 1957. | 187. The Chicago Property was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both. |
| 131.    As set forth below, funds originating from Backpage's U.S. Bank account '1165, was moved through the Camarillo Holdings LLC, BMO Harris Bank account, then moved to LARKIN's BMO Harris account '3110. Funds from LARKIN's BMO Harris account '3110 were then wire transferred to Chicago Title for 1308 E. 56th Street, 2.  Specifically: | 188. Illicit funds originating from Backpage's U.S. Bank account '1165 were passed-through accounts owned or controlled by Backpage or Backpage Operators, and ended up in BMO Harris Bank account '3110. |
| a.    Between February 4, 2013 and June 6, 2013, over a series of wire transfers, Backpage.com U.S. Bank account wired about $41.5 million to Camarillo Holdings LLC BMO Harris Bank account '7172. | |
| b.    On October 2, 2013, Camarillo Holdings LLC BMO Harris Bank account '7172 wire transferred $26,130.64 to LARKIN's BMO Harris Bank account '3110. | |
| c.    On October 2, 2015, LARKIN's BMO Harris Bank account '3110 wired $138,000 to Chicago | Thereafter, on October 2, 2015, BMO Harris Bank account '3110 transferred $138,000 to |

| | |
|---|---|
| Title and Trust Company as payment for the purchase of 1308 E. 56th Street, 2. | Chicago Title and Trust Company as payment towards the purchase of the Chicago Property.<br><br>(Ex. 2 at ¶¶ 187-88.) |
| **G. 10647 N. State Route 89A, Sedona, AZ 86336** | **L. Sedona Property.** |
| 132.    Michael LACEY knowingly engaged and attempted to engage in a monetary transaction through a place outside the United States to a place in the United States with the intent to promote the carrying on of a specified unlawful activity in violation of 18 U.S.C. § 1956(a)(2)(A). | 173. The Sedona Property was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both. |
| 133.    As set forth below, financial transactions involving illicit proceeds were deposited into Cereus Properties Compass Bank, which was then moved through Michael LACEY's First Federal Savings and Loan of San Rafael account '3620.  Funds from LACEY's Arizona Bank & Trust account '1793 were then paid to the Coconino County Treasurer for tax obligations for 10647 N. State Route 89A. In detail: | 65(a). On December 2, 2016, the Foreign Account (first described in paragraph 42, above) wired $324,055.85 to Seized Account 2A (Compass Bank account - 3873).<br><br>b. On December 8, 2016, the Foreign Account wired $499,970.00 to Seized Account 2A.<br><br>c. On December 27, 2016, the Foreign Account wired $199,970.00 to Seized Account 2A . |
|     a.    Between December 2, 2016 and December 30, 2016, a foreign account wire transferred $1,023,995.95 into Cereus Properties Compass Bank account '3873. | d. From March through December 2017 , Seized Account 2A paid over $9,000 to " Cox Communications," an internet services company that provides voice-over-internet phone and cable services… |
|     b.    Between March 3, 2017 and June 9, 2017, Cereus Properties Compass Bank account '3873 paid about $4,000 of these funds to "Cox Communications," an internet services company that provides voice-over-internet phone and cable services. | (Ex. 3 at ¶ 65(a)-(d).) |
|     c.    On October 2, 2017, Compass Bank account '3825 owned by Cereus Properties, wired approximately | 174. In October 2017, Account 2 wired approximately $297,795 to Account 4.[3] |

---

[3] "Account 2 (Compass '3873 Funds)" is more fully described in Ex. 2 at ¶¶ 152-53. "Account 4 (FFS&L of SR '3620 Funds)" is more fully described in Ex. 2 at ¶ 155.

| | |
|---|---|
| $297,795 into First Federal Savings & Loan of San Rafael account '3620.<br><br>d.      On November 13, 2018, LACEY issued a check from First Federal Savings & Loan of San Rafael account '3620 to the Coconino County Treasurer for tax obligations for 10647 N. State Route 89A. | On November 13, 2018, $6,725.54 from Account 4 was used to support or maintain the Sedona Property.<br><br>(Ex. 2 at 54 ¶¶ 173-74.) |
| **H. 5555 North Casa Blanca Drive, Paradise Valley, AZ 85253**<br><br>134.     James LARKIN, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from SUA activity in violation of 18 U.S.C. § 1957.<br><br>135.     As set forth below, funds originating from Backpage's U.S. Bank account '1165 was moved through the Camarillo Holdings LLC, BMO Harris Bank account, then moved to LARKIN's BMO Harris account '3110. Funds from LARKIN's BMO Harris account '3110 were then paid to a landscape and gardening service.  In detail:<br><br>a.      Between February 4, 2013 and June 6, 2013, over a series of wire transfers, Backpage.com U.S. Bank account wired about $41.5 million to Camarillo Holdings LLC BMO Harris Bank account '7172.<br><br>b.      On October 2, 2013, Camarillo Holdings LLC BMO Harris Bank account '7172 wire transferred $26,130.64 to LARKIN's BMO Harris Bank account '3110.<br><br>c.      On December 11, 2014, LARKIN issued a $46,987.28 check from the BMO Harris Bank account '3110 to a lawn and garden service | **T. Paradise Valley Property 1**<br><br>189. Paradise Valley Property 1 was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both.<br><br>190. Approximately $41.5 million in illicit funds from Backpage's U.S. Bank account '1165 passed through various Backpage or Backpage Operators' accounts.<br><br><br><br><br><br>Following these various transfers, eventually, on October 2, 2013, a total of approximately $26,130.64 was transferred into BMO Harris account '3110, owned or controlled by Larkin.<br><br>Thereafter, on December 11, 2014, BMO Harris Bank account '3110 paid $46,957.28 to maintain the Paradise Valley property 1.<br><br>(Ex. 2 at ¶¶ 189-90.) |

| | |
|---|---|
| company for landscape service for 5555 North Casa Blanca Drive. | |
| **I. LACEY PURCHASES THE PARADISE VALLEY, ARIZONA PROPERTY 2 USING PROCEEDS TRANSACTIONAL MONEY LAUNDERING**<br><br>136. Michael LACEY knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from SUA activity in violation of 18 U.S.C. § 1957.<br>As set forth below, financial transactions involving illicit proceeds were deposited ==(TRACING TO BE COMPLETED ON MONDAY)==[4] | **U. Paradise Valley Property 2**<br><br>191. Paradise Valley Property 2 was purchased and maintained, in whole or in part, using funds traceable to SUA, involved in money laundering, or both.<br><br>192. Illicit funds originating from Backpage's U.S. Bank account '1165 were passed-through accounts owned or controlled by Backpage or Backpage Operators, and ended up in BMO Harris Bank account '3110, from which account over $10,000 was paid to maintain Paradise Valley Property 2.<br><br>(Ex. 2 at ¶¶ 191-92.) |
| 137. Michael LACEY, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from SUA activity in violation of 18 U.S.C. § 1957. | 167. On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and HYER, and others known and unknown to the grand jury, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity involving that the transaction was designed. in whole and in part to conceal and disguise the nature, the location: the source, the ownership, and the control of the proceeds of the specified unlawful activity.<br><br>(Ex. 1 at ¶ 167.) |
| 138. As set forth below, funds originating from Backpage's U.S. Bank account '1165 was moved through the Camarillo Holdings | 173. Beginning in February 2013, illicit funds from Backpage's U.S. Bank account '1165 passed-through various Backpage or |

[4] This parenthetical note in green highlighting was in the tracing document, further evidencing that this document was in draft form.

| | |
|---|---|
| LLC, BMO Harris Bank account, then moved to LACEY's BMO Harris account '5263. Funds from LACEY's BMO Harris account '5263 were then used to purchase 3304 E. Stella Lane.  In detail:<br><br>138(a): Between February 4, 2013 and June 6, 2013, over a series of wire transfers, Backpage.com U.S. Bank account wired about $41.5 million to Camarillo Holdings LLC BMO Harris Bank account '7172.<br><br>138(b): Between March 15, 2014 and September 18, 2014, Camarillo Holdings LLC BMO Harris Bank account '7172 wire transferred $11,489,258.12 to LACEY's BMO Harris Bank account '5263.<br><br>138(c): On March 11, 2015, LACEY wire transferred $50,000 from his BMO Harris Bank account '5263 to Clear Title Agency as earnest money deposit for the purchase of the 3304 E. Stella Lane.<br><br>138(d): On March 30, 2015, LACEY wire transferred $774,379.46 from his BMO Harris Bank account '5263 to Clear Title Agency to complete the purchase of 3304 E. Stella Lane. | Backpage Operators accounts, eventually ending up in BMO Harris account '5263, owned or controlled by Lacey.")<br><br>186. Between February 4 and June 6, 2013, approximately $41,500,000 in illicit funds were transferred to Camarillo Holdings LLC, BMO Harris Bank account '7172. On October 2, 2013, BMO Harris Bank account '7172 wired $26,130.64 to Larkin's BMO Harris Bank account '3110.<br><br>172. Beginning in February 2013, illicit funds from Backpage's U.S. Bank account '1165 passed-through various Backpage or Backpage Operators accounts, eventually ending up in BMO Harris account '5263, owned or controlled by Lacey.<br><br>(Ex. 2 at ¶¶ 173, 172, 186.) |
| 139. Michael LACEY, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from SUA activity in violation of 18 U.S.C. § 1957. | 167. On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and HYER, and others known and unknown to the grand jury, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity involving that the transaction was designed. in whole and in part to conceal and disguise the nature, the location: the source, the ownership, and the control of the proceeds of the specified unlawful activity. |

| | (Ex. 1 at ¶ 167.) |
|---|---|
| 140. As set forth below, funds originating from Backpage's U.S. Bank account '1165 was moved through the Camarillo Holdings LLC, BMO Harris Bank account, then moved to LACEY's BMO Harris account '5263. Funds from LACEY's BMO Harris account '5263 were then wire transferred to an Interest on Lawyers Trust Account ("IOLTA") for his attorney who further wired funds to purchase 6300 N. 33rd Street, 6314 N. 33rd Street, 3308 E. Stella Lane, and 3311 E. Stella Lane. In detail: | 186. Between February 4 and June 6, 2013, approximately $41,500,000 in illicit funds were transferred to Camarillo Holdings LLC, BMO Harris Bank account '7172. On October 2, 2013, BMO Harris Bank account '7172 wired $26,130.64 to Larkin's BMO Harris Bank account '3110. |
| 140(a): Between February 4, 2013 and February 11, 2013, over a series of wire transfers, Backpage.com U.S. Bank account '1165, wired about $3.2 million to Camarillo Holdings LLC BMO Harris Bank account '7172. | 172. Beginning in February 2013, illicit funds from Backpage's U.S. Bank account '1165 passed-through various Backpage or Backpage Operators accounts, eventually ending up in BMO Harris account '5263, owned or controlled by Lacey. |
| 140(b): On February 15, 2013, Camarillo Holdings LLC BMO Harris Bank account '7172 wire transferred $395,513.85 to LACEY's BMO Harris Bank account '5263. | 176(a). Between February 4 and June 6, 2013, through a series of wire transfers, Backpage's U.S. Bank account '1165 transferred approximately $41,500,000 to BMO Harris Bank account '5263.<br><br>(Ex. 2 at ¶ 186, 172, 176.) |
| 140(c): On May 12, 2015, LACEY wire transferred or caused a wire transfer from his BMO Harris Bank account '5263, $3,350,000 to a his attorney's IOLTA account. | |
| 140(d): On May 12, 2015, the IOLTA paid $100,000 to "Thomas Title & Escrow" for the purchase of 6300 N. 33rd Street, 6314 N. 33rd Street, 3308 E. Stella Lane, and 3311 E. Stella Lane. | |
| 140(e): On May 26, 2015, the IOLTA paid $3,143,132.25 to "Thomas Title & Escrow" for the payoff of the PARADISE VALLEY PROPERTIES 4, 5, 6, and 7 | |
| 141. Daniel HYER knowingly engaged and attempted to engage in a monetary transaction with funds derived from violations of 18 U.S.C. § 1952. | 167. On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and HYER, and others |

| | known and unknown to the grand jury, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity involving that the transaction was designed. in whole and in part to conceal and disguise the nature, the location: the source, the ownership, and the control of the proceeds of the specified unlawful activity.<br><br>(Ex. 1 at ¶ 167.) |
|---|---|
| 142. As set forth below, funds originating from Backpage controlled Website Technologies payroll account.  The payroll service company then deposited the funds into DANIEL HYER's Bank of America account '9342.  These funds were then used to pay the mortgage on HYER's property, 7006 San Mateo Blvd Apt 214.  For example:<br><br>142(a): On February 14, 2014, Website Technologies, a Backpage controlled entity, through their payroll company deposited $5,379.09 to DANIEL HYER's Bank of America account '9342.<br><br>142(b): On February 28, 2014, Website Technologies, a Backpage controlled entity, through their payroll company deposited $5,798.88 to DANIEL HYER's Bank of America account '9342. | DOJ-BP-0005031377 page 419 |
| 142(c): On March 3, 2014, HYER paid the mortgage for the DALLAS PROPERTY with funds from the Bank of America account '9342 | DOJ-BP-0005031377 page 421 |
| 143. JAMES LARKIN knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from SUA activity in violation of 18 U.S.C. § 1957. | 167. On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and HYER, and others known and unknown to the grand jury, knowing that the property involved in a |

| | |
|---|---|
| | financial transaction represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity involving that the transaction was designed. in whole and in part to conceal and disguise the nature, the location: the source, the ownership, and the control of the proceeds of the specified unlawful activity")<br><br>(Ex. 1 at ¶ 167.) |
| 144. As set forth below, funds originating from Website Technologies (Backpage) Branch Banking and Trust account '2008 was moved through Cereus Properties Arizona Bank & Trust account '6211, which them moved through JAMES LARKIN's Charles Schwab account '4693, then Northern Trust Account '9562, held by the Ocotillo Family Trust which is owned by LARKIN.  These funds were then used to purchase and upgrade 14, rue Saint Guillaurme.<br><br>144(a): On December 31, 2015, Website Technologies' Branch Banking & Trust account '2008 wired $811,424 to Arizona Bank & Trust account '6211.<br><br>144(b): On January 11, 2016, Arizona Bank & Trust account '6211 wired approximately $1.3 million to Charles Schwab account '4693.<br><br>144(c): On January 14, 2016, Charles Schwab account '4693 wired approximately $13.5 million to the Northern Trust account '9562.<br><br>144(d): On February 9 2016, LARKIN wire transferred or caused a wire transfer of $3,357,878.91 from his Charles Schwab account '4693 to SCP Bonnart a real estate company in Paris, France.<br><br>144(e): On February 16, 2016, LARKIN wire transferred or caused a wire transfer of | *See* SI Count 87 (alleging Oct, 6, 2016 transfer of $1,206,356.00 from Cereus Properties (x6211) to Charles Schwab (x4693)<br><br>137(d). Between January 21 and August 31, 2016, Website Tech  Account '2008 sent approximately 27 wire transfers totaling approximately $48,000,000 to Arizona Bank & Trust account number '6211, belonging to Cereus Properties LLC, which is owned or controlled by Spear, Backpage, and/or other Backpage Operators.")<br><br>180(c)-(d). On January 14, 2016, Charles Schwab Account '4693 transferred approximately $13,500,000 to Northern Trust Company account '9562 (under the name "Ocotillo Family Trust," owned and controlled by Larkin and Margaret Larkin) … In July 21, 2017, Account '9562 transferred $6,014,000 to Morgan Stanley account '1673 (held in the name of Larkin and Margaret Larkin).<br><br>(Ex. 2 at ¶ 137, 180.) |

| | |
|---|---|
| $36,752 from his Charles Schwab account '4693 to A+B Kasha Designs, a real estate design company in Paris, France. The wire annotations for this wire referenced an invoice for the renovation of 14, rue Saint Guillaurme | |
| 145. John BRUNST knowingly engaged and attempted to engage in a monetary transaction through a place outside the United States to a place in the United States with the intent to promote the carrying on of a specified unlawful activity in violation of 18 U.S.C. § 1956(a)(2)(A). | 167. On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and HYER, and others known and unknown to the grand jury, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity involving that the transaction was designed. in whole and in part to conceal and disguise the nature, the location: the source, the ownership, and the control of the proceeds of the specified unlawful activity.<br><br>(Ex. 1 at ¶ 167.) |
| 146. As set forth below, financial transactions involving illicit proceeds were deposited in GoCoin (Slovakia) which was then moved through the Website Technologies Branch Banking & Trust account '2008. These international funds were used to promote the SUA, then moved through Cereus Properties Arizona Bank & Trust account '6211, then moved through John BRUNST's Wells Fargo Bank account '4891. Funds from John BRUNST's Wells Fargo Bank account '4891 was used to pay the County Treasurer for tax obligations for 3353 Red Robin Road. In detail:<br><br>146(a): ˍNational Bank of Arizona accounts '0178, '0151, and '3645 are held in the name of SPEAR. In furtherance of their money laundering scheme, and in an attempt to further conceal the true nature of the money, Backpage Operators used these accounts as | 45(a). Between December 14, 2015, and January 15, 2016, in approximately 26 wires, a GoCoin in Slovakia transferred over $2.5 million to the BBT Account in the United States.")<br><br>234. Between January 21, 2016, and August 31, 2016, Website Tech Account '2008 initiated approximately 27 wire transfers totaling approximately $48 million to Arizona Bank & Trust account number '6211 ("AZBT '6211"), belonging to Cereus Properties LLC, which is owned or controlled by Spear, Backpage, and or other Backpage Operators.<br><br>196. Accounts 31, 32, AND 33 (NBA '0178, '0151, and '3645)… Accounts 31 and 32 are held in the name of Spear, which accounts were funded with proceeds traceable to SUA, involved in money laundering, or both. Account 33 is held in trust for the benefit of |

| | |
|---|---|
| go-betweens to funnel money from one account to another. | Spear and certain of his family members, which account was funded with proceeds traceable to SUA, involved in money laundering, or both. In furtherance of the money laundering scheme, and in an attempt to further conceal the true nature of the criminal proceeds, go-between accounts served to funnel money from one account to another.<br><br>(Ex. 1 at ¶¶ 45, 234, 196.) |
| 147. The tracing involved numerous accounts including: Branch Banking & Trust account number '2008, belonging to Website Technologies; Arizona Bank & Trust account number '6211 belonging to Cereus Properties, and a GoCoin account in Slovakia.<br><br>147(a): Between December 14, 2015, and January 15, 2016, in approximately 26 wires, a GoCoin account in Slovakia transferred $2,523,475.60 to Branch Banking & Trust account number '2008 in the United States.<br><br>147(b): On January 15, 2016, Branch Banking & Trust account number '2008 wired $189,571 to Verizon in Los Angeles, California, in payment for Backpage internet services.<br><br>147(c): Between March 23, 2016 and March 31, 2016, in three wire transfers, Branch Banking & Trust account number '2008 transferred approximately $3,694,813.60 to Arizona Bank & Trust account number '6211.<br><br>147(d): On January 4, 2017 Arizona Bank & Trust account '6211 wired $298,941 to JOHN BRUNST's Wells Fargo Bank account '4891.<br><br>147(e): On January 31, 2017, BRUNST, using funds from his Wells Fargo Bank account '4891 paid $3,773.25 to the Navajo County Treasurer for tax obligations for the PINETOP PROPERTY. | 45(a). Between December 14, 2015, and January 15, 2016, in approximately 26 wires, a GoCoin account in Slovakia transferred over $2.5 million to the BBT Account in the United States.")<br><br>234. Between January 21, 2016, and August 31, 2016, Website Tech Account '2008 initiated approximately 27 wire transfers totaling approximately $48 million to Arizona Bank & Trust account number '6211 ("AZBT '6211"), belonging to Cereus Properties LLC, which is owned or controlled by Spear, Backpage, and or other Backpage Operators.")<br><br>195(b)-(c). On December 6, 2016, Account '6211 transferred $161,459 to Wells Fargo Bank account '4891, belonging to Brunst ("Account '4891")… On January 4, 2017, Account '6211 transferred another $298,841 to Account '4891")<br><br>(Ex. 1 at ¶¶ 45, 234, 195.) |

| | |
|---|---|
| 147(f): On October 3, 2017, BRUNST, using funds from his Wells Fargo Bank account '4891 paid $4,125.92 to the Navajo County Treasurer for tax obligations for 3353 Red Robin Road.<br><br>147(g): On February 12, 2017, BRUNST, using funds from his Wells Fargo Bank account '4891 paid $4,125.92 to the Navajo County Treasurer for tax obligations for 3353 Red Robin Road. | |
| 148.    Michael LACEY, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from SUA activity in violation of 18 U.S.C. § 1957. | 13. Title 18 U.S.C. § 1957 prohibits a party from knowingly engaging in a monetary transaction in excess of $10,000 with property that is criminally derived from some SUA.<br><br>(Ex. 3 at ¶ 13.) |
| 149.    As set forth below, financial transactions involving illicit proceeds were deposited in GoCoin (Singapore) which were then moved through the Posting Solutions Veritex Bank account '1462, then moved through the Cereus Properties Compass Bank account '3873, then moved to his attorney's IOLTA account at MidFirst Bank account '4139.  Funds from MidFirst Bank account '4139 was used to purchase the PHOENIX PROPERTY 1. | 78. From my review of financial records for Account – 1462 (as described in Paragraph 51 above, Account - 1462 is the Posting Solutions ' Veritex Bank account} , Seized Account 2A and SUBJECT ACCOUNT 26 , I learned the following: |
|    a.   Between January 13, 2017 and January 20, 2017, GoCoin (Singapore) wired $1,318,800 to Posting Solutions Veritex Bank account '1462 | a. On January 4, 2017, GoCoin's Singapore account wired $489,500 into Account -1462, and on January 20, 2017, GoCoin's Singapore account directed two additional wires, for $358,150 and $470,150, respectively, into Account – 1462 (totaling $1,317,800 wired from GoCoin' s Singapore account into Account - 1462) |
|    b.   On or about February 23, 2017, Veritex Bank account '1462 sent two payments, a wire of $443,014 and a check for $27,887.41 to Cereus Properties Compass Bank account '3873. | b. On or about February 23, 2017, Account - 1462 sent two payments, a wire of $443,014 and a check for $27,887.41 to Seized Account 2A. |
|    c.   Between March 30, 2017, and September 14, 2017, Cereus Properties Compass Bank account '3873 sent five wires totaling $4,058.063.65 to the | c. Between March 30, 2017, and September 14, 2017, Seized Account '2A sent five wires totaling $4,058,063.65 to SUBJECT ACCOUNT 26. |

| | |
|---|---|
| attorney's IOLTA for MICHAEL LACEY at MidFirst Bank account '4139.<br>d.  On January 3, 2018, LACEY, through his attorney, used funds from the MidFirst Bank IOLTA account '4139 to purchase 2416 N. Foote Dr. | (Ex. 3 at ¶ 78(a-c).)<br><br>Bates No. DOJ-BP-0005062516. |
| 150.    John BRUNST knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from SUA activity in violation of 18 U.S.C. § 1957. | 13. Title 18 U.S.C. § 1957 prohibits a party from knowingly engaging in a monetary transaction in excess of $10,000 with property that is criminally derived from some SUA.<br><br>(Ex. 3 at ¶ 13.) |
| 151.    As set forth below, financial transactions involving illicit proceeds from a Backpage controlled Ad Tech BV foreign account, were deposited into Cereus Properties Compass Bank '3873, which was then moved through BRUNST's Compass Bank Account '3825.  Funds from BRUNST's Compass Bank Account '3825 were then paid to Equity Title Agency Inc. for the purchase of 4931 E. White Gates Drive.<br>a.  Between December 2, 2016 and December 30, 2016, a foreign account wire transferred $1,023,995.95 into Cereus Properties Compass Bank account '3873. | 65. From my review of financial records related to Seized Accounts 2A, 6, 7B, and 9, and Seized Accounts 16A, 16B, 16C, 16D, 16E, 16F, 16G, 16H, and 161 , I learned the following:<br><br>a.      On December 2, 2016, the Foreign Account (first described in paragraph 42, above) wired $324,055.85 to Seized Account 2A (Compass Bank account - 3873).<br>b.      On December 8, 2016, the Foreign Account wired $499,970.00 to Seized Account 2A.<br>c.      On December 27, 2016, the Foreign Account wired $199,970.00 to Seized Account 2A.<br><br>(Ex. 3 at ¶ 65(a-c).)<br><br>**Account 24 (COMPASS BANK '3825)**<br>193. Account 24 is held in the name of Brunst, and was used in furtherance of the money laundering scheme described herein, and in<br>an attempt to further conceal or disguise the nature, location, source, ownership or control of the proceeds of SUA.<br><br>194. On February 2, 2018, Account 2 wire transferred $135,956.59 into Account 24. |

| | |
|---|---|
| | (Ex. 2 at ¶¶ 193-194.) |
| b.  On November 3, 2017, Cereus Properties Compass Bank account '3873 transferred $73,648.03 to BRUNST's Compass Bank Account '3825. | Bates No. DOJ-BP-0005044473 at pg. 770. |
| c.  On December 22, 2017, BRUNST wire transferred or caused a wire transfer of $1.6 million from his Compass Bank account '3825 to Equity Title Agency Inc. for the purchase of 4931 E. White Gates Drive. | Bates No. DOJ-BP-0005060535. |
| 152.    JOHN BRUNST knowingly engaged and attempted to engage in a monetary transaction through a place outside the United States to a place in the United States with the intent to promote the carrying on of a specified unlawful activity in violation of 18 U.S.C. § 1956(a)(2)(A). | 195. Accounts 25, 26, 27, 28, 29, and 30 are held in the name of the "Brunst Family Trust." Brunst and his wife are the sole trustees for these accounts, which were funded with proceeds traceable to SUA, involved in money laundering, or both.<br><br>(Ex. 2 at ¶ 195.) |
| 153.    As set forth below, financial transactions involving illicit proceeds were deposited in GoCoin (Slovakia) which was then moved through the Website Technologies Branch Banking & Trust account '2008, then moved through Cereus Properties Arizona Bank & Trust account '6211, which is a funnel account.  These funds were then then used to promote pay tax obligations, then moved through John BRUNST's Wells Fargo Bank account '4891.  Funds from John BRUNST's Wells Fargo Bank account '4891 was used to pay the Maricopa County Treasurer for tax obligations for 5830 E. Calle Del Media (Medio):<br>a.  The tracing involved numerous accounts including: Branch Banking & Trust account number '2008, belonging to Website Technologies; Arizona Bank & Trust account number '6211 belonging to Cereus Properties, and a GoCoin account in Slovakia.<br>b.  Between December 14, 2015, and | 195(a). On December 31, 2015, Website Tech Account '2008 transferred $811,424 to Account '6211;<br><br>b. On December 6, 2016, Account '6211 transferred $161,459 to Wells Fargo Bank account '4891, belonging to Brunst ("Account '4891");<br><br>c. On January 4, 2017, Account '6211 transferred another $298,841 to Account '4891;<br><br>(Ex. 2 at ¶ 195(a-c).) |

| | |
|---|---|
| December 29, 2015, in approximately 13 wire transfers, a GoCoin account in Slovakia transferred $1,251,179.97 to Branch Banking & Trust account number '2008 in the United States.<br>c. On December 31, 2015, Branch Banking & Trust account number '2008 transferred approximately $811,424.07 to Arizona Bank & Trust account number '6211.<br>d. On January 21, 2016, LACEY promoted his business by paying $43,013.76 to the Internal Revenue Service for business tax obligations.<br>e. Between January 26, 2016 and January 28, 2016, Arizona Bank & Trust account '6211 wired $166,367.10 to JOHN BRUNST's Wells Fargo Bank account '4891.<br>f. On September 23, 2016, BRUNST, using funds from his Wells Fargo Bank account '4891 paid $5,959.42 to the Maricopa County Treasurer for tax obligations for 5830 E. Calle Del Media (Medio).<br>g. On January 31, 2017, BRUNST, using funds from his Wells Fargo Bank account '4891 paid $5,959.42 to the Maricopa County Treasurer for tax obligations for 5830 E. Calle Del Media (Medio). | Bates No. DOJ-BP-0004905513; Bates No. DOJ-BP-0004905522<br><br><br>Bates No. DOJ-BP-0005041374. |
| 154.    SCOTT SPEAR knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from SUA activity in violation of 18 U.S.C. § 1957. | 240. Based on the facts set out above, Plaintiff alleges that the Defendant Assets were involved in, and are traceable to, property involved in one or more transactions or attempted transactions in violation of section 18 U.S.C. § 1957, and a conspiracy to commit such offenses, in violation of section 18 U.S.C. §1956(h).<br><br>(Ex. 2 at ¶ 240.)<br><br>196. Accounts 31 and 32 are held in the name of Spear, which accounts were funded with proceeds traceable to SUA, involved in money laundering, or both. Account 33 is |

|  | held in trust for the benefit of Spear and certain of his family members, which account was funded with proceeds traceable to SUA, involved in money laundering, or both. In furtherance of the money laundering scheme, and in an attempt to further conceal the true nature of the criminal proceeds, go-between accounts served to funnel money from one account to another.<br><br>(Ex. 2 at ¶ 196.) |
|---|---|
| 155.    As set forth below, financial transactions involving illicit proceeds from a Backpage controlled Ad Tech BV foreign account, were deposited into Cereus Properties Compass Bank '3873, which was then moved through SPEAR's National Bank of Arizona account '0178, then to SPEAR's National Bank of Arizona account '0151. Funds from SPEAR's National Bank of Arizona account were used to pay for upgrades to 5751 N. 77th Place, Scottsdale, AZ 85250.<br>a.    Between December 2, 2016 and December 30, 2016, a foreign account wire transferred $1,023,995.95 into Cereus Properties Compass Bank account '3873.<br>b.    On September 14, 2017, Cereus Properties Compass Bank account '3873 transferred $50,162.05 to SPEAR's National Bank of Arizona account '0178.<br>c.    On October 12, 2017, Cereus Properties Compass Bank account '3873 transferred $50,162.05 to SPEAR's National Bank of Arizona account '0178.<br>d.    On December 3, 2017 SPEAR paid $11,925 to a wine cellar installation company for the installation of a wine cellar into 5751 N. 77th Place. | 65. From my review of financial records related to Seized Accounts 2A, 6, 7B, and 9, and Seized Accounts 16A, 16B, 16C, 16D, 16E, 16F, 16G, 16H, and 161, I learned the following:<br>a.   On December 2, 2016, the Foreign Account (first described in paragraph 42, above) wired $324,055.85 to Seized Account 2A (Compass Bank account - 3873).<br>b.   On December 8, 2016, the Foreign Account wired $499,970.00 to Seized Account 2A.<br>c.   On December 27, 2016, the Foreign Account wired $199,970.00 to Seized Account 2A.<br><br>(Ex. 3 at ¶ 65(a-c).)<br><br>On September 14, 2017, Account 2 wire transferred $50,162.05 into Account 31.<br><br>(Ex. 2 at ¶ 196(c).)<br><br>DOJ-BP-0005042955; Bates No. DOJ-BP-0005046060) |
| 156.    SCOTT SPEAR knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from SUA activity in violation of 18 U.S.C. § 1957. | 196. Accounts 31 and 32 are held in the name of Spear, which accounts were funded with proceeds traceable to SUA, involved in money laundering, or both. Account 33 is held in trust for the benefit of Spear and certain of his family members, which account |

| | |
|---|---|
| | was funded with proceeds traceable to SUA, involved in money laundering, or both. In furtherance of the money laundering scheme, and in an attempt to further conceal the true nature of the criminal proceeds,go-between accounts served to funnel money from one account to another.<br><br>(Ex. 2 at ¶ 196.) |
| 157.    As set forth below, financial transactions involving illicit proceeds were deposited in GoCoin (Slovakia) which was then moved through the Website Technologies Branch Banking & Trust account '2008, then moved through Cereus Properties Arizona Bank & Trust account '6211, which then moved through SPEAR's National Bank of Arizona account '0178, and '8441.  Funds from SPEAR's National Bank of Arizona account '8441 was used to purchase 8604 E. San Ardo Dr:<br>a. Between December 14, 2015, and January 29, 2016, in approximately 39 wire transfers, a GoCoin account in Slovakia transferred $3,959,557.78 to a Backpage controlled Branch Banking & Trust account number '2008 in the United States.<br>b. Between February 2, 2016 and February 29, 2016, in five wire transfers, Branch Banking & Trust account number '2008 transferred approximately $6,622,954.08 to Arizona Bank & Trust account number '6211.<br>c. On January 4, 2017 Arizona Bank & Trust account '6211 wired $313,168.00 to SPEAR's National Bank of Arizona account '0178.<br>d. On April 18, 2016 SPEAR, transferred 283,332.93 from his National Bank of Arizona account '0178 to his National Bank of Arizona account '8441.<br>e. On April 19, 2016, SPEAR wire transferred or caused a wire transfer of $283,332.93 from his National Bank of Arizona account '8441 to Security Title | 45. I have reviewed records for Seized Account 3A as well as the following accounts: Branch Banking & Trust account number 1440001712008, belonging to Website Technologies (as detailed above, a Backpage controlled entity), held in Arizona ("BBT Account"); Arizona Bank & Trust account number 9361116211 belonging to Cereus Properties, held in Arizona ("AZBT Account") From this review, I learned the following:<br><br>a. Between December 14, 2015, and January 15, 2016, in approximately 26 wires, a GoCoin account in Slovakia transferred over $2.5 million to the BBT Account in the United States.<br>b. On January 15, 2016, the BBT account wired $189,571 to Verizon in Los Angeles, California, in payment for Backpage internet services.<br>c. Between January 21, 2016, and August 31, 2016, in approximately 27 wires, the BBT Account transferred approximately $48 million to the AZBT Account.<br>d. Between March 1, 2016, and July 1, 2016, the AZBT Account wired $892,426 into Seized Account 3A.<br><br>46. According to records for Seized Account 3A, 3B, and 3C:<br>On September 14, 2017, Seized Account 2A wired $50,162.05 into Seized Account 3A.<br><br>(Ex. 1 at ¶¶ 45-46.) |

| | |
|---|---|
| Escrow to purchase 8604 E. San Ardo Dr. | Paragraph C corresponds to Bates No. DOJ-BP-0005034093 page 439<br><br>Paragraphs D & E correspond to Bates No. DOJ-BP-0005060537 |