# Exhibit 3 – Part A

# United States District Court

_____CENTRAL_____ DISTRICT OF _____CALIFORNIA_____

**In the Matter of the Seizure of**
(Address or Brief description of property or premises to be seized)

UP TO AND INCLUDING \$5,279,173.07
HELD IN BANK OF THE WEST
ACCOUNT #035-171363

**AMENDED
APPLICATION AND AFFIDAVIT
FOR SEIZURE WARRANT**

**CASE NUMBER:** 2:18-MJ-2872

**I, LYNDON A. VERSOZA, being duly sworn, depose and say:**

**I am a United States Postal Inspector with the United States Postal Inspection Service, and I have reason to believe that in the Central District of _____CALIFORNIA_____**
**there is now concealed a certain person or property, namely** (describe the person or property to be seized)

Up to and including \$5,279,173.07 held in Bank of the West Account #035-171363

**which is** (state one or more bases for seizure under United States Code)

subject to seizure and forfeiture under 18 U.S.C. § 981 (a)(1)(A) and (C)

**concerning a violations of Title** 18 **United States Code, Sections** 1952(a)(3)(A) and (b), 1956 and 1957.

**The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:**

**Continued on the attached sheet and made a part hereof.** X **Yes** _ **No**

/S/

**Signature of Affiant**

**Sworn to before me, and subscribed in my presence**

10/31/18

**Date**

Los Angeles, California

**City and State**

**Hon. ROZELLA A. OLIVER, U.S. Magistrate Judge**
**Name and Title of Judicial Officer**

**Signature of Judicial Officer**

John Kucera: smb

DOJ-BP-0004719085

## **AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT**

I, Lyndon A. Versoza, being duly sworn, hereby depose and state
as follows:

### **I.   TRAINING AND EXPERIENCE**

1.   I am a United States Postal Inspector employed by the
United States Postal Inspection Service ("USPIS"), Los Angeles
Division, in Los Angeles, California, where I have served since
June 2005.  Currently, I am responsible for investigating
criminal violations of money laundering and structuring laws,
such as when United States Postal Service ("USPS") Money Orders
or the United States Mail are used as a means to launder or
structure funds.  During my career as a Postal Inspector, I have
participated in or investigated financial violations including
money laundering, darknet investigations, digital currency
investigations, structuring, bank, wire and mail fraud, and
identity theft.  In addition, I have received both formal and
informal training from USPIS and other agencies regarding money
laundering and financial crimes.  For approximately five years
prior to investigating money laundering, I was assigned to
investigate child exploitation and sex trafficking.  In that
assignment, I worked both independently and in a task force
where I led and participated in investigations related to crimes
involving the exploitation of children and sex trafficking.

DOJ-BP-0004719086

2.    Prior to my service as a U.S. Postal Inspector, I
attended the University of Southern California in Los Angeles,
where, in 2001, I received a bachelor's degree.  While in
college, I was the website administrator for a non-profit media
company in Los Angeles where, among other things, I learned
about domain names, domain name servers, and remote hosting.
Following college, from 2002 to 2005, I served as a law
enforcement officer with the U.S. Immigration and Naturalization
Service, which later became U.S. Customs and Border Protection.
There, among other things, I worked on cases involving human
smuggling and international sex trafficking.

3.    I am familiar with the facts and circumstances
described herein.  This affidavit is based upon my personal
involvement in this investigation, my training and experience,
and information obtained from various law enforcement personnel
and witnesses, including information that has been reported to
me either directly or indirectly.  This affidavit does not
purport to set forth my complete knowledge or understanding of
the facts related to this investigation.  Unless specifically
indicated otherwise, all conversations and statements described
in this affidavit are related in substance and part only.  All
figures, times, and calculations set forth herein are
approximate.

- 2 -

DOJ-BP-0004719087

## II. SUMMARY AND PURPOSE OF AFFIDAVIT

4. This affidavit is made in support of applications for warrants to seize all funds held in certain SUBJECT ACCOUNTS[1] (identified specifically below at paragraph 10), all owned, controlled, or held for the benefit of "Backpage.com" (referred to herein as "Backpage"), associated entities, and their owners and operators.

A. Background

5. This case is being investigated by the USPIS, the Federal Bureau of Investigation and the Internal Revenue Service-Criminal Investigation, with assistance from the Los Angeles Joint Regional Intelligence Center.

6. The focus of the investigation has been on violations by Backpage, its associated entities, and their owners and operators, of Title 18, United States Code, Sections 1591(a), 1952(a)(3)(A) and (b)(i)(1) (Interstate and Foreign Travel in Aid of Racketeering Enterprise); and Title 18 U.S.C. §§ 1956 and 1957, (Money Laundering).

7. From speaking with other agents in this investigation,

---

[1] The numbering of the SUBJECT ACCOUNTS picks up from prior warrant applications for different accounts, the contents of which have already been seized or restrained following seizure warrants issued in this District. See 18-MJ-711; 18-MJ-712; 18-MJ-713; 18-MJ-715; 18-MJ-716; 18-MJ-178; 18-MJ-720; 18-MJ-721; 18-MJ-722; 18-MJ-723; 18-MJ-724; 18-MJ-751; 18-MJ-752; 18-MJ-797; 18-MJ-798; 18-MJ-996; 18-MJ-1863; and 18-MJ-1864.

DOJ-BP-0004719068

and reviewing emails, internal documents, and other records
related to this investigation, I know the following:

a. Backpage.com, LLC, incorporated in Delaware in
2004, is an internet-based company that allows customers to post
on-line classified advertisements. These advertisements include
sections dedicated to a variety of matters, including adult,
automotive, community, dating, jobs, local places, musicians,
rentals and services. Backpage receives between 75 million to
100 million unique internet visitors per month.

b. Backpage realizes profits in the tens of millions
of dollars per year from adult advertisement. Historically,
adult ads, where Backpage advertisers post sex trafficking ads,
constitute less than ten percent of all advertisements posted on
the website. However, the adult ads generate over 90 percent of
Backpage's revenue. In short, Backpage derives almost all its
revenue and profits from adult service ads, including
advertising for sex trafficking.[2]

---

[2] According to Backpage accounting records, for the period May 1
to May 31, 2014, over 90% of Backpage's revenues derived from
what they characterized as "adult entertainment." Backpage's
internal documents suggest that this 90% figure has been
consistent since its 2004 inception.

- 4 -

DOJ-BP-0004719089

c. In or about 2004, operators Michael Lacey ("Lacey"), James Larkin ("Larkin"), and Carl Ferrer ("Ferrer") created Backpage. There were also two minority owners; John Brunst ("Brunst"), who owned 5.67 percent; and Scott Spear ("Spear"), who owned 4.09 percent. From 2004 until 2015, Lacey and Larkin oversaw the website's policies and strategic direction. In 2015, Lacy and Larkin purportedly sold all or substantially all of their interests in Backpage to Ferrer.[3] However Lacey and Larkin retained significant control over the website, and both Lacey and Larkin continue to receive tens of millions of dollars of annual distributions of Backpage revenue.

d. While not an original owner, Ferrer was one of the original officers of Backpage, having initially served as Backpage's vice-president, and later as CEO. Ferrer is also the CEO of several Backpage related entities in the Netherlands, including "Website Technologies," "Amstel River Holdings," and

---

For example, between October 6, 2014, and May 31, 2015, Backpage grossed almost $105 million from advertising "adult entertainment." During this same period, Backpage grossed only $1.6 million from all other advertisements combined. Assuming that Backpage has accurately estimated that 90% of its revenues are generated from "adult" and "escort" ads, Backpage has generated as much as $500 million in prostitution-related revenue since 2004.

[3] From my review of financial records related to Ferrer's 2015 agreement to purchase Backpage, it appears that, through a series of loans from other Backpage Operators to be repaid by Ferrer, Ferrer agreed to purchase Backpage for approximately $400 million.

- 5 -

DOJ-BP-0004719090

"Ad Tech BV."

       e.    Michael Thomas Gage ("Gage") has no formal
position at Backpage, but is the President, Chief Executive
Officer, Treasurer, and Secretary of another Backpage controlled
entity, "Posting Solutions," a wholly owned subsidiary of
Backpage that receives payments from Backpage advertisers.
According to his social media profile, Gage is also the Chief
Financial Officer of Website Technologies.  Based on emails he
has sent and wire transfer information, Gage appears to control
much of the international and domestic financial transactions of
Backpage and its related entities.

       f.    Daniel Hyer ("Hyer") at one time was the Sales
and Marketing Director of Backpage.  He remains an account
signatory for Backpage controlled entities, including Website
Technologies.

      8.    Throughout this affidavit, the individuals identified
in paragraphs 7(c) through (f), along with others not named in
this affidavit, are collectively referred to as the "Backpage
Operators."

      9.    Based on a review of publicly available materials
obtained in the course of the investigation, and my review of
the Backpage website, I have learned the following:

       a.    The majority of the paid advertisements on the
Backpage website relate to prostitution activities in violation

- 6 -

DOJ-BP-0004719091

of 18 U.S.C. §§ 1591 and 1952.

      b.    As further described below, Backpage itself, as
well as its operators, who are in control of the SUBJECT
ACCOUNTS (as defined below), is in the business of promoting the
trafficking of children and adults for sex.  Sex trafficking of
adults is a violation of 18 U.S.C. § 1952, and sex trafficking
of children is a violation of 18 U.S.C. 1591, each of which
statutes is a Specified Unlawful activity ("SUA") within the
meaning of federal law. (see 18 U.S.C. § 1956(c)(7)(A),
identifying as an SUA certain "racketeering activity" as defined
in 18 U.S.C. § 1961(a)).

      c.    The SUBJECT ACCOUNTS are located both inside and
outside the United States.  The domestic accounts have received
wire transfers from places outside of the United States or have
received funds traceable to wire transfers from places outside
of the United States, which funds Backpage has used to promote
sex trafficking, in violation of 18 U.S.C. § 1956(a)(2)(A)
(International Money Laundering).  Some of the SUBJECT ACCOUNTS
have received transfers or deposits in excess of $10,000
traceable to the SUA, in violation of 18 U.S.C. § 1957 (Money
Laundering Spending Statute).

      d.    Backpage, until recently, controlled numerous
domain names that have since been seized by the government
pursuant to a seizure warrant issued in this district in case

- 7 -

DOJ-BP-0004719092

no. CR. Misc. 2:18-MJ-00711.[4]   The Seized Domains are registered by "ASCIO TECHNOLOGIES INC" DBA "NETNAMES," a domain registrar that manages the reservation of internet domain names.   A domain registrar serves to ensure that a registered domain name, like each of the Seized Domains, is not double sold.   Additionally, a domain registration will allow the owner of the domain to direct internet traffic to a company's webserver.   The Seized Domains were found to have been acquired and maintained with funds traceable to the money laundering scheme described herein, specifically with funds from an account seized pursuant to a separate seizure warrant in case no. CR. Misc. 2:18-MJ-00721, and the Seized Domains were the mechanism Backpage used to promote the prostitution and sex trafficking activity described below.

---

[4] On March 28, 2018, the Honorable Patrick J. Walsh, United States Magistrate Judge for the Central District of California, issued seizure warrants for certain Backpage owned or controlled domain names (see 18-MJ-00711).   On April 6, 2018, pursuant to that warrant, Backpage.com was seized and ceased operations. The domain names seized pursuant to that warrant are referred to herein as the "seized domains."

- 8 -

DOJ-BP-0004719093

B. SUBJECT ACCOUNTS[5]

10.   This affidavit is offered in support of applications

for warrants to seize funds and securities held in the following

U.S. bank accounts (hereinafter referred to as the "SUBJECT

ACCOUNTS").   SUBJECT ACCOUNTS 28 through 42 are "Interest on

Lawyers Trust Accounts" ("IOLTAs"), ostensibly holding funds for

possible future legal services Backpage might need.   According

to Ferrer, in anticipation of future legal services and in the

event of government seizure of Backpage-held bank accounts,

Backpage provided retainer funds for law firms to access when

legal services would arise.   Ferrer has stated that the funds in

these accounts were obtained from Backpage ad sales, most of

which was for prostitution.   I have confirmed through my own

review of Backpage internal banking records that the funds

originated from Backpage.   As described below in paragraph 35,

as part of Backpage and Ferrer's plea agreement, they have

agreed to surrender all Backpage assets.   According to Backpage

and Ferrer, the assets held in these IOLTAs are proceeds of

criminal activity and should be forfeited to the government.

---

[5] Following the initial seizure warrant of March 28, 2018,
additional seizures have been issued in this District.   In order
to maintain consistency with prior numbered related seized
subject accounts, the SUBJECT ACCOUNTS described herein begin at
SUBJECT ACCOUNT 28.   For a complete description of the related
seizure warrants, including date of issue, account number and
the issuing Magistrate Judge, please see Attachment A.

- 9 -

a.   SUBJECT ACCOUNT 28:   Bank of the West account 035-171363 is an IOLTA held in the name of Rusing Lopez & Lizardi PLLC.   Based on my conversations with Ferrer and my review of banking records, I believe that Backpage or Backpage-controlled entities are the beneficiaries of this account.   As further described and traced in this affidavit, $5,279,173.07 of funds from this account are criminally derived proceeds from Backpage.

b.   SUBJECT ACCOUNT 29: Wells Fargo account 2000608102052 is an IOLTA held in the name of Copeland, Franco, Screws & Gill, PA Trust Account.   Based on my conversations with Ferrer and my review of banking records, I believe that Backpage or Backpage-controlled entities are the beneficiaries of this account.   As further described and traced in this affidavit, $100,000 of funds from this account are criminally derived proceeds from Backpage.

c.   SUBJECT ACCOUNT 30: SunTrust Bank account 1000144637906 is an IOLTA held in the name of David B. Smith, PLLC IOLTA Account.   Based on my conversations with Ferrer and my review of banking records, I believe that Backpage or Backpage-controlled entities are the beneficiaries of this account.   As further described and traced in this affidavit, $10,000 of funds from this account are criminally derived proceeds from Backpage.

- 10 -

DOJ-BP-0004719095

d.   SUBJECT ACCOUNT 31: Citibank account 205027287 is
an IOLTA held in the name of Keker Van Nest & Peters.  Based on
my conversations with Ferrer and my review of banking records, I
believe that Backpage or Backpage-controlled entities are the
beneficiaries of this account.  As further described and traced
in this affidavit, $500,000 of funds from this account are
criminally derived proceeds from Backpage.

e.   SUBJECT ACCOUNT 32: Citibank account 30525705 is
an IOLTA held in the name of McDermott Will and Emery LLP.
Based on my conversations with Ferrer and my review of banking
records, I believe that Backpage or Backpage-controlled entities
are the beneficiaries of this account.  As further described and
traced in this affidavit, $100,000 of funds from this account
are criminally derived proceeds from Backpage.

f.   SUBJECT ACCOUNT 33: Citibank account 1255464039
is an IOLTA held in the name of Prince Lobel Tye, LLP.  Based on
my conversations with Ferrer and my review of banking records, I
believe that Backpage or Backpage-controlled entities are the
beneficiaries of this account.  As further described and traced
in this affidavit, $100,000 of funds from this account are
criminally derived proceeds from Backpage.

g.   SUBJECT ACCOUNT 34: US Bank account 153555921235
is an IOLTA held in the name of Perkins Coie LLP.  Based on my
conversations with Ferrer and my review of banking records, I

- 11 -

DOJ-BP-0004719096

believe that Backpage or Backpage-controlled entities are the beneficiaries of this account. As further described and traced in this affidavit, $2,167,704.86 of funds from this account are criminally derived proceeds from Backpage.

      h.   SUBJECT ACCOUNT 35: US Bank account 100-06-06952 is an IOLTA held in the name of Thompson Coburn. Based on my conversations with Ferrer and my review of banking records, I believe that Backpage or Backpage-controlled entities are the beneficiaries of this account. As further described and traced in this affidavit, $100,000 of funds from this account are criminally derived proceeds from Backpage.

      i.   SUBJECT ACCOUNT 36A: JP Morgan Chase bank account 211909285 is an IOLTA held in the name of Piccarreta Davis Keenan Fidel PC. Based on my conversations with Ferrer and my review of banking records, I believe that Backpage or Backpage-controlled entities are the beneficiaries of this account. As further described and traced in this affidavit, $10,000 of funds from this account are criminally derived proceeds from Backpage.

      j.   SUBJECT ACCOUNT 36B: Grand Point bank account 2503985 is an IOLTA held in the name of Piccarreta Davis Keenan Fidel PC. Based on my conversations with Ferrer and my review of banking records, I believe that Backpage or Backpage-controlled entities are the beneficiaries of this account. As further described and traced in this affidavit, $740,000 of

- 12 -

DOJ-BP-0004719097

funds from this account are criminally derived proceeds from Backpage.

k.    SUBJECT ACCOUNT 37: JP Morgan Chase bank account 851844381 is an IOLTA held in the name of Lawrence G Walters, P.A.  Based on my conversations with Ferrer and my review of banking records, I believe that Backpage or Backpage-controlled entities are the beneficiaries of this account.  As further described and traced in this affidavit, $100,000 of funds from this account are criminally derived proceeds from Backpage.

l.    SUBJECT ACCOUNT 38: JP Morgan Chase bank account 100079698 is an IOLTA held in the name of Akin Gump Strauss Hauer & Feld, LLP.  Based on my conversations with Ferrer and my review of banking records, I believe that Backpage or Backpage-controlled entities are the beneficiaries of this account.  As further described and traced in this affidavit, $250,000 of funds from this account are criminally derived proceeds from Backpage.

m.    SUBJECT ACCOUNT 39: Plains Capital bank account 3100033921 is an IOLTA held in the name of Scheef & Stone, LLP. Based on my conversations with Ferrer and my review of banking records, I believe that Backpage or Backpage-controlled entities are the beneficiaries of this account.  As further described and traced in this affidavit, $25,000 of funds from this account are criminally derived proceeds from Backpage.

- 13 -

DOJ-BP-0004719098

n. SUBJECT ACCOUNT 40: JP Morgan Chase bank account 616275397 is an IOLTA held in the name of Wayne B. Giampietro, LLC. Based on my conversations with Ferrer and my review of banking records, I believe that Backpage or Backpage-controlled entities are the beneficiaries of this account. As further described and traced in this affidavit, $100,000 of funds from this account are criminally derived proceeds from Backpage.

o. SUBJECT ACCOUNT 41A: Alliance Bank of Arizona account 8010597402 is an IOLTA held in the name of Mitchell Stein Carey, PC. Based on my conversations with Ferrer and my review of banking records, I believe that Backpage or Backpage-controlled entities are the beneficiaries of this account. As further described and traced in this affidavit, $100,000 of funds from this account are criminally derived proceeds from Backpage.

p. SUBJECT ACCOUNT 41B: Alliance Bank of Arizona account 8010596206 is an IOLTA held in the name of Mitchell Stein Carey, PC. Based on my conversations with Ferrer and my review of banking records, I believe that Backpage or Backpage-controlled entities are the beneficiaries of this account. As further described and traced in this affidavit, $100,000 of funds from this account are criminally derived proceeds from Backpage.

q. SUBJECT ACCOUNT 42: Western Alliance Bank account

- 14 -

8011386979 is an IOLTA held in the name of Karp & Weiss, P.C. Based on my conversations with Ferrer and my review of banking records, I believe that Backpage or Backpage-controlled entities are the beneficiaries of this account. As further described and traced in this affidavit, $250,000 of funds from this account are criminally derived proceeds from Backpage.

      r.    SUBJECT ACCOUNT 43A: USAA Savings Bank account 0213582155 is an account held in the name of Oaxaca Trust. The trustee of this account is a family member of LARKIN. Funds in this account originated from money earned from Backpage Ad sales and flowed through several layers of LARKIN-owned accounts.

      s.    SUBJECT ACCOUNT 43B: USAA Savings Bank account 0213582058 is an account held in the name of Oaxaca Trust. The trustee of this account is a family member of LARKIN. Funds in this account originated from money earned from Backpage Ad sales and flowed through several layers of LARKIN-owned accounts.

      t.    SUBJECT ACCOUNT 43C: USAA Savings Bank account 0213582171 is an account held in the name of Oaxaca Trust. The trustee of this account is a family member of LARKIN. Funds in this account originated from money earned from Backpage Ad sales and flowed through several layers of LARKIN-owned accounts.

      u.    SUBJECT ACCOUNT 43D: USAA Savings Bank account 0213581507 is an account held in the name of Oaxaca Trust. The trustee of this account is a family member of LARKIN. Funds in

- 15 -

DOJ-BP-0004719100

this account originated from money earned from Backpage Ad sales
and flowed through several layers of LARKIN-owned accounts.

     v.  SUBJECT ACCOUNT 44:  Texas Bank and Trust account
596620 is an account held in the name of Bristol Staffing, LLC.
Based on my conversations with Ferrer, attorneys representing
Bristol Staffing, and my review of banking records, as further
described and traced in this affidavit, $745,111.89 of funds
from this account are criminally derived proceeds from Backpage.

## III. **APPLICABLE LAW**

    11.  There is probable cause to believe that funds and/or
securities on deposit in the SUBJECT ACCOUNTS are subject to
seizure and forfeiture by the United States under the following
provisions:

    w.  18 U.S.C. § 981(a)(1)(A), because the funds and/or
securities are involved in, and traceable to, one or more
transactions or attempted transactions in violation of 18 U.S.C.
§ 1956(h) (Conspiracy to Launder Money), 18 U.S.C. § 1956(a)(2)
(International Money Laundering for Promotion), and 18 U.S.C. §
1957 (Financial Transactions Involving Illicit Proceeds).
Pursuant to 18 U.S.C. § 981(a)(1)(A), any property involved in a
transaction, or attempted transaction, in violation of 18 U.S.C.
§§ 1956 or 1957, or any property traceable to such property, is
subject to forfeiture to the United States; and

    x.  18 U.S.C. § 981(a)(1)(C), because the funds and/or

DOJ-BP-0004719101

securities constitute and are derived from proceeds traceable to
one or more violations of 18 U.S.C. § 1956(h), 18 U.S.C. §
1956(a)(2), and 18 U.S.C. § 1957.

12.   A protective order under 21 U.S.C. § 853(e) may not be
sufficient to assure the availability of the property for
forfeiture because there is reason to believe that the property
is under the control of the targets of this investigation, who
cannot reasonably be relied upon to abide by an order to
maintain the property in substantially the same condition as it
is at the present time in order to ensure that it will be
available for forfeiture.   Specifically, illicit funds are
routinely moved among several related accounts and certain
individuals who maintain control of the accounts are able to
move funds among other bank accounts within their control.
Thus, I request a seizure warrant issued pursuant to 21 U.S.C. §
853(f) (as incorporated by 18 U.S.C. § 982(b) and 28 U.S.C. §
2461(c)).

13.   Title 18 U.S.C. § 1956 prohibits, among other things,
financial transactions involving the proceeds of SUAs --
committed or attempted (1) with the intent to promote further
predicate offenses; (2) with the intent to evade taxation; (3)
knowing the transaction is designed to conceal the source,
location, ownership or control of the proceeds; or (4) knowing
the transaction is designed to avoid anti-laundering financial

- 17 -

reporting requirements.  18 U.S.C. § 1956(h) prohibits two or more parties agreeing to accomplish the unlawful purpose of money laundering.

14.  Title 18 U.S.C. § 1957 prohibits a party from knowingly engaging in a monetary transaction in excess of \$10,000 with property that is criminally derived from some SUA.

15.  Title 18 U.S.C. § 1956(a)(2) (International Money Laundering for Promotion) makes it a crime to transport, transmit, or transfer, or attempt to transport, transmit, or transfer, monetary instruments or funds (including funds that are not criminal proceeds) from the United States to or through a place outside the United States, or to the United States from or through a place outside the United States, with the intent to promote some SUA, as that term is defined in 18 U.S.C. § 1956(c)(7).

16.  The "Travel Act," 18 U.S.C. § 1952(a), an SUA, prohibits, in part, the use of the mail or any facility in interstate or foreign commerce with the intent to otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity, by any person who thereafter performs or attempts to perform an act to promote, manage, establish, carry on, or facilitate the promotion, management, establishment and carrying on of such unlawful activity.  "Unlawful Activity," as

- 18 -

defined in 18 U.S.C. § 1952(b), includes prostitution offenses

in violation of the laws of the state in which such acts are

committed or in violation of the laws the United States.

Prostitution is illegal in the State of California.   (*See, e.g.*,

Cal. Penal Code § 647(b).)

17.   Sex trafficking of juveniles or any person by means of

force, fraud or coercion, is a violation of 18 U.S.C. § 1591, an

SUA.

## IV.   DIGITAL CURRENCY/BITCOIN

18.   Digital currency (also known as crypto-currency) is

generally defined as an electronic-sourced unit of value that

can be used as a substitute for fiat currency (*i.e.*, currency

created and regulated by a sovereign government).   It exists

entirely on the Internet and is not stored in any physical form.

It is not issued by any government, bank, or company, but is

instead generated and controlled through computer software

operating on a decentralized peer-to-peer network.   Digital

currency is not illegal in the United States and may be used for

legitimate financial transactions.   However, it is often used to

conduct illegal transactions, such as the sale of controlled

substance, or as in this investigation, to purchase ads to

promote prostitution.

19.   Bitcoin is a type of digital currency accepted by

Backpage.   Bitcoin payments are recorded on a public ledger that

- 19 -

DOJ-BP-0004719104

is maintained by peer-to-peer verification, and is thus not maintained by a single administrator or entity.   Individuals can acquire Bitcoin either by "mining" them or purchasing Bitcoin from other individuals.   An individual can "mine" Bitcoin by allowing his/her computing power to verify and record the Bitcoin payments into a public ledger.   Individuals are rewarded for this by being given newly created Bitcoin.   Bitcoin can be bought and sold in fractions.

        20.   Backpage also accepts other digital currencies, including Litecoin, Bitcoin Cash, and Ether.   Sometimes called "alt-coins," because they are alternatives to Bitcoin, these digital currencies were created after Bitcoin to address perceived weaknesses or problems with Bitcoin technology.   Based on my review of Backpage transactions, the majority of Backpage's digital currency transactions are in Bitcoin.

        21.   An individual can send and receive Bitcoin through peer-to-peer digital transactions or by using a third-party broker.   Such transactions can be done on any type of computer, including laptop computers and smart phones.

        22.   Digital currency is generally stored in digital "wallets," which essentially store the access codes that allows individuals to conduct digital currency transactions on the public ledger.   To access digital currency on the public ledger, an individual must use a public address (or "public key") and a

- 20 -

DOJ-BP-0004719105

private address (or "private key"). The public address can be

analogized to a bank account number, while the private key is

like a password used to access an online account.

23.    Even though the public addresses of those engaging in

Bitcoin transactions are recorded on the public ledger, the true

identities of the individuals or entities behind the public

addresses are not.  If, however, an individual or entity is

linked to a public address, it would be possible to determine

what transactions were conducted by that individual or entity.

For these reasons, digital currency transactions are described

as "pseudonymous," meaning they are partially anonymous.

## V.    STATEMENT OF PROBABLE CAUSE

### C.    Buying a Backpage Ad

24.    In February 2018, I visited Backpage.com and, posing

as an advertising purchaser, engaged in the regular process of

posting an ad in the Backpage "Dating" section, which is one of

the places on Backpage.com where prostitution ads are commonly

found.  Through this process, I learned the following:

a.    A person looking to post an advertisement on

Backpage (an "advertiser") must first create an account.  Once

an account is created, the advertiser clicks on a link called

"Post an ad," which will then toggle certain categories

regarding where the ad should be posted (e.g., "Los Angeles,"

"Riverside," etc.) and under what category the ad should appear

- 21 -

DOJ-BP-0004719106

(e.g., "Dating," "Adult," etc.).  The advertiser also has the

option to post pictures and videos.  In the adult sections,

opting to post in more than one geographical area, or opting to

post more frequently occurring ads will increase the

advertisement price.  Currently, Backpage.com charges $5 per ad

posted in the adult sections.  In some of the non-adult and non-

dating sections I checked, there was no charge at all to post an

ad.

            b.    Once an advertiser selects the desired options,

he or she is required to enter a phone number, a link to a

social media page (such as Facebook), and an email address.  The

Backpage website claims to verify the advertiser's phone number

before he or she can continue on to actually purchasing an ad.

            c.    In order to pay for Backpage ads, an advertiser

must first buy "credits."  Backpage offers several ways for an

advertiser to acquire credits:

            i.    A Backpage advertiser may mail gift cards,

checks, and money orders to "Posting Solutions" at a P.O. Box in

Dallas, Texas (as further described below, this P.O. Box is

DOJ-BP-0004719107

associated with Posting Solutions and Seized Account 1).[6]

ii.    Backpage directly accepts credit card payment through a third-party credit card payment processor.

iii.    Backpage also accepts several types of digital currency (specifically, Backpage accepts Bitcoin, Bitcoin Cash, Litecoin, and Ethereum). If the advertiser selects this option, Backpage provides a digital currency wallet address where the advertiser can send the electronic transfer of the digital currency.

iv.    Backpage also accepts cash, but only through third party payment processors. Based on information gathered during this investigation, I believe that once the third-party payment processor receives cash, it converts the cash into digital currency and then electronically transfers that digital currency to a Backpage digital currency wallet.

25. Digital Currency is processed through the subject accounts in the following way:

---

[6] I have reviewed the cash purchase of USPS money orders subsequently directed to this P.O. Box. Between September 2014 and June 2016, several millions of dollars in money orders were purchased in what appears to have been structured transactions (i.e., transactions carried out in a manner intended to avoid certain reporting requirements that USPS maintains for money order purchases greater than $3000). Based on my review, hundreds of these money orders include email addresses with words consistent with prostitution, such as "sex" or "sexy."

- 23 -

DOJ-BP-0004719108

            y.   When Backpage receives digital currency, it will

aggregate the digital currency and then transfer it to a third-

party exchanger like GoCoin.[7]

            z.   In exchange for the digital currency, the exchanger

transfers U.S. dollars from its foreign bank accounts into

Backpage operating accounts, such as Seized Account 1.   The

exchanger, if it so elects, may then sell its Bitcoin on various

Bitcoin markets.

      26.   I reviewed records obtained from GoCoin.   From this

review, I estimate that between 5 to 10 percent of the ads posted

on Backpage.com are ads within the Central District of California

(including Los Angeles and Orange Counties).   For example, between

January 10 and February 3, 2016, approximately 500,000 ads were

posted on Backpage.com and paid for with Bitcoin, for which

Backpage received over $3,840,000 in revenue.   Of these

approximately 500,000 ads, approximately 28,400 were posted only

in LosAngeles.Backpage.com, Ventura.Backpage.com,

SanLuisObispo.Backpage.com, OrangeCounty.Backpage.com, and

SanGabrielValley.Backpage.com.   These specific ads generated

---

[7] GoCoin is a digital currency exchanger that converts Bitcoin,
Litecoin and another digital currency into fiat currency, like
the U.S. Dollar or the Euro.   GoCoin is owned by Manx
Broadcasting Corporation, based in the Isle of Man.   GoCoin has
offices in Singapore and Santa Monica, California and appears to
hold bank accounts in several countries outside the United
States.

                              - 24 -

DOJ-BP-0004719109

approximately \$184,479 in revenue.

D.   Backpage Promotion of Prostitution and Sex Trafficking

27.  I have reviewed several Backpage ads that were used to
sell minors for sex and forcibly traffic adult women for sex.  I
have also reviewed the criminal records of certain of the pimps
and sex traffickers, most of whom were convicted after having used
Backpage to advertise their victims.  From this review, I learned
the following:

a.   Between 2014 and 2015, a pimp sold S.F., a minor
girl, for sex.  The pimp advertised S.F. on Backpage's "Escort"
section in the Los Angeles area of California and in Arizona.  The
ad contained phrases such as "New In Town" and "Sexy Dark Asian
Bombshell with a Nice & Tight {Booty}."  The ad selling S.F. on
Backpage included multiple pictures showing her legs, stomach,
shoulders and buttocks.  Later, the pimp was arrested and
convicted on state sex trafficking charges, and sentenced to 196
years imprisonment.

b.   Between 2014 and 2015, the same pimp sold A.C., a
minor girl, for sex.  In November 2014, at the age of 17, A.C. was
first sold for sex through a Backpage ad using phrases such as
"NEW IN TOWN," "sexy sweet," and "sweet like honey but super hot
like fire."  The Backpage ad selling A.C. included pictures of her
showing her legs, stomach, shoulder, and buttocks, and posed her
in sexually provocative positions.

- 25 -

DOJ-BP-0004719110

c.   Between November 2015 and December 2015, in a
different incident, a pimp drove two women and four minor girls
(T.S., S.L., K.O., and R.W.) from Columbus, Ohio to a hotel in St.
Charles, Missouri.  The next day, the pimp told the girls to post
ads on Backpage.com.  Some of the girls took calls and engaged in
paid sex acts with Backpage customers who responded to the ads.
The ads the girls posted included pictures of them sitting on the
bed showing their buttocks.  Another image I saw was of a naked
girl's body pressed against a mirror.  Other pictures appeared
more mundane, such as images of girls posing clothed in front of a
mirror.  However, these ads used phrases like "I'm sweet as a
treat maybe even sweeter" and "not a lot need to be said. my pic
are 100% real."  In 2017, this pimp was convicted on sex
trafficking charges and a federal court sentenced him to 300
months in prison.

d.   In or around 2010, in Washington, J.S., a minor
girl, was sold for sex through the use of Backpage ads.  J.S.'s
pimp drafted the ads that were placed on Backpage ad containing
words and phrases such as, "W'E'L'L_W'O'R'T'H_I'T***^***150HR" and
"IT WONT TAKE LONG AT ALL."  The ads also included pictures of
J.S. in provocative positions showing her breasts and buttocks.
On March 29, 2011, the pimp who sold J.S. for sex was sentenced to
over 26 years imprisonment on charges related to sex trafficking.

e.   Between in or around 2011 and 2016, a female

- 26 -

DOJ-BP-0004719111

victim, D.O., who was between the ages of 14 and 19 during those
years, was sold for sex through Backpage ads. D.O.'s female pimp
instructed D.O. that Backpage was the safest place to advertise
because Backpage did not require age verification. D.O.'s
Backpage ads included words and phrases that were indicative of
prostitution, such as "roses" (money) and "back door" (anal sex).
Some of the customers who responded to D.O.'s Backpage ads forced
D.O. to perform sexual acts at gunpoint, choked her to the point
of having seizures, and gang-raped her.[8]

    28.   I have reviewed documents and reports from multiple
state and government agencies and authorities regarding Backpage's
promotion of sex trafficking and prostitution. From these

_____

[8] Using these examples, I also reviewed financial transactions
for some of these ads. Using email addresses and other
identifiers associated with the Backpage ads, I reviewed GoCoin
records for some of these transactions. From these records, I
found bitcoin payments associated with the email addresses used
to post the ads, which transactions were processed by GoCoin.
For example, in the case involving victims S.F. and A.C.
(described in paragraphs 27(a) and (b) of this affidavit)
prosecuted in Arizona, the bitcoin payments for these ads were
made in November and October 2015.   In the case involving T.S.,
S.L., K.O., and R.W. (described in paragraph 27(c) of this
affidavit) prosecuted in Missouri, the bitcoin payments were
made in October and November 2015.   As described in paragraph 45
of the incorporated affidavit, between December 2015 and June
2016, over 130 wires from Slovakia from GoCoin, totaling over
$16.8 million was sent to a Website Technologies account at
Branch Bank & Trust Company account number 1440001712008.
Between December 2015 and October 2016, 32 wires totaling $48
million were sent from the BBT Account to a Cereus Properties
Account 9361116211 at Arizona Bank and Trust, which made its way
into 11 accounts named in prior seizure warrants.

- 27 -

DOJ-BP-0004719112

reports, and from my review of internal Backpage correspondence following Backpage management receiving these reports, I am aware that all levels of Backpage management are aware of Backpage's role in promoting criminal activity. For example:

a. On September 21, 2010, a group of state attorneys general wrote a letter to Backpage observing that "ads for prostitution—including ads trafficking children—are rampant on the site," and arguing that "[b]ecause Backpage cannot, or will not, adequately screen these ads, it should stop accepting them altogether." The state AGs acknowledged that this step would cause Backpage to, "lose the considerable revenue generated by the adult services ads," but stated that "no amount of money can justify the scourge of illegal prostitution, and the misery of the women and children who will continue to be victimized in the marketplace provided by backpage."

b. Following this letter, on September 25, 2010, Ferrer wrote an email explaining that Backpage was unwilling to delete ads that included terms indicative of prostitution because doing so would "piss[] off a lot of users who will migrate elsewhere" and force Backpage to refund those customers' fees.

c. In January 2017, the U.S. Senate Subcommittee on Permanent Investigations ("Subcommittee") conducted a lengthy investigation into sex trafficking and Backpage. I have reviewed the Subcommittee's 50-page report entitled "Backpage.com's Knowing

- 28 -

DOJ-BP-0004719113

Facilitation of Online Sex Trafficking."  This report concluded, among other things, that virtually all of Backpage's "adult" ads are actually solicitations for illegal prostitution services and that "Backpage has maintained a practice of altering ads before publication by deleting words, phrases, and images indicative of criminality, including child sex trafficking . . . .  Those practices served to sanitize the content of innumerable advertisements for illegal transactions—even as Backpage represented to the public and the courts that it merely hosted content others had created."  In response to the Subcommittee's report, Backpage purported to shut down the "adult" section of its website.  However, based on my review of several thousands of Backpage ads, I believe that the prostitution ads simply migrated to other sections of the website, where they remain to this day.

d.   On August 5, 2011, Backpage received a letter from the mayor of Seattle.  This letter warned, "Seattle Police have identified an alarming number of juvenile prostitutes advertised on Backpage.com since January 2010," and explained that Backpage was dissimilar from other companies whose products and services are "occasionally or incidentally" utilized by criminals because "[y]our company is in the business of selling sex ads" and "your services are a direct vehicle for prostitution."  The letter also recommended that Backpage require in-person age verification for all of the "escorts" depicted in its ads.  Based on knowledge

- 29 -

DOJ-BP-0004719114

gained through this investigation, I do not believe that Backpage
has ever instituted an in-person age verification.

29.   I have reviewed internal documents, emails, and
correspondence among Backpage employees and management.   From
those emails I have learned that Backpage has instituted policies
and procedures designed to maintain its promotion of sex
trafficking and prostitution, but which "sanitize" some of the
language Backpage customers use to advertise in order to make the
advertising of sex trafficking less overt.   From my review of
Backpage documents, I know that Backpage refers to this practice
as "moderation."   For example:

  a.   In April 2008, Ferrer wrote an email explaining
that, although he was "under pressure to clean up phoenix's adult
content," he was unwilling to delete prostitution ads because
doing so "would put us in a very uncompetitive position with
craig[slist]"[9] and result in "lost pageviews and revenue."   Thus,
Ferrer instructed Backpage's technical staff to edit the wording
of such ads by removing particular terms that were indicative of
prostitution, and then allow the remainder of the ad to be
featured on Backpage's website.

  b.   On October 8, 2010, a Backpage manager sent an

_____

[9] Craigslist is a competing internet based advertising company
that features classified ads.

DOJ-BP-0004719115

email threatening to fire any Backpage employee who acknowledged, in writing, that a customer was advertising prostitution: "Leaving notes on our site that imply that we're aware of prostitution, or in any position to define it, is enough to lose your job over. . . . This isn't open for discussion. If you don't agree with what I'm saying completely, you need to find another job."

        c.    On October 16, 2010, the same Backpage manager again sent an email to a large group of Backpage employees that contained two attachments providing guidance on how to "moderate" ads. The first was a PowerPoint presentation that displayed a series of 38 nude and partially-nude photographs, some of which depicted graphic sex acts. Next to each picture was an instruction as to whether it should be approved or disapproved by a Backpage moderator. These instructions included "Approve. Nude rear shots are okay as long the model is not exposing her anus or genitalia." and "Approve. Rear shot okay. Transparent wet panties okay." The second was an Excel spreadsheet identifying 50 terms (all of which were indicative of prostitution) that should be "stripped" from ads before publication. The Backpage manager concluded the email by stating, "[I]t's the language in ads that's really killing us with the Attorneys General. Images are almost an afterthought to them."

        d.    On October 16, 2010, the same Backpage manager sent

DOJ-BP-0004719116

a separate internal email explaining, "I'd like to still avoid Deleting ads when possible," that "we're still allowing phrases with nuance," and that "[i]n the case of lesser violations, editing should be sufficient."

  e.  On October 25, 2010, Ferrer sent an email acknowledging that the "[i]llegal content removed" through Backpage's moderation processes was "usually money for sex act." This email also explained that, after the "sex act pics are removed," the "ad text may stay."

  f.  On October 27, 2010, a different Backpage manager sent an internal email stating that Backpage was "editing 70 to 80%" of the ads it received from customers.

  g.  On June 7, 2011, Ferrer received an inquiry from a law enforcement official about a particular ad that included the term "amber alert." In response, Ferrer acknowledged this might be "some kind of bizarre new code word for an under aged person." Ferrer then forwarded this exchange to a Backpage manager and instructed that the term "amber alert" be added to Backpage's "strip out" list. I believe that this email indicates that Backpage did not require all future ads involving this particular coded term for the prostitution of a child to be blocked from Backpage, but merely required that such ads be edited before publication.

  h.  On August 31, 2011, Backpage managers exchanged

- 32 -

DOJ-BP-0004719117

emails in which they discussed a list of 100 "solid sex for money terms." Later emails indicate that this list of terms would change but, in general, the list prohibited use of certain terms that Backpage management and employees too closely identified with the obvious promotion of sex trafficking and prostitution.

       i.   Based on knowledge gained during this investigation and my training and experience, I believe that this manager acknowledged that a large proportion of the ads originally submitted by Backpage's customers contained text and pictures that were indicative of sex trafficking. Nevertheless, Backpage would still publish those ads after editing them to appear less obvious in promoting illegal activity. Using the words the Backpage manager used in the email described in paragraph 28(d) above, I believe that Backpage sex trafficking ads have adapted to Backpage's moderation policy by using "phrases with nuance" when promoting sex trafficking. Also, based on knowledge gained during this investigation, and my training and experience, I believe that, following the implementation of "moderation," Backpage's list of prohibited terms needed to change and evolve to adjust to the reality of Backpage advertisers' use of new code words to promote prostitution. That is, once a coded word or phrase not previously associated with sex-for-money would become too familiar and associated with certain sex trafficking activities in the Backpage community of advertisers, Backpage's "moderation" policy

- 33 -

DOJ-BP-0004719118

would need to adapt by adding such words or phrases to the
"blocked" list or risk being too obvious in its promotion.

    30.  Based on my review of several thousand Backpage ads and
internal Backpage documents and correspondence, I believe that
Backpage's policy of "moderation" only caused ads explicitly
promoting sex trafficking to become more coded and implicit in the
ads' purpose.  I have reviewed several thousand Backpage ads
posted in the various "adult" categories of Backpage (including
"massage," "dating," "escort" and others).  From this review, I
learned the following:

         a.  Well over half of the Backpage classified ads in
these categories use terms and phrases that, in my training and
experience, I believe to be consistent with sex trafficking and
prostitution.  These terms and phrases include, "roses" (money,
e.g., "150 roses/half hour"), "in-call" (where the customer goes
to the prostitute's location), "outcall" (where the prostitute
goes to the customer's location), "GFE" (girlfriend experience),
and "PSE" (porn star experience).

         b.  Other Backpage ads use language that can be mostly
free of coded language, but that include sexually provocative
pictures.  In my training and experience, the sexually suggestive
images included in these ads are typical of ads for prostitution.
For example, one such ad posted in Backpage's Los Angeles dating
section depicted images of a woman on a bed with her buttocks

                              - 34 -

DOJ-BP-0004719119

presented in a sexual manner; another included a picture of a
woman's cleavage; others included pictures of women posing in
sexual positions wearing lingerie and pictures of a woman bending
over revealing her naked buttocks.

    c. Based on knowledge gained through this
investigation, and my training and experience, I believe that
Backpage's policy of moderation has had its intended effect.
Moderation has caused and allowed otherwise neutral or innocuous
terms to be understood within the Backpage community as coded
language for sex trafficking and prostitution. Because of this
evolving use of coded terms, a reader of such ads who is familiar
with the particular vocabulary used in Backpage "adult" ads may
readily identify coded terms and images indicating an ad for
prostitution, while an uninitiated reader may not understand these
terms at all, or at least not as being associated with sex-for-
money.

  31. Notwithstanding many Backpage advertisements' use of
seemingly innocuous language in promoting prostitution, based on
my conversations with law enforcement officers around the country
and from my review of law enforcement officers' statements and
reports regarding Backpage, I believe that the majority of
Backpage ads that appear in the traditionally "adult" categories
(such as "escort," "massage," or "body rubs") are actually
advertisements promoting sex trafficking or prostitution. For

- 35 -

DOJ-BP-0004719120

example, in August 2015, the Detective-Sergeant in charge of the

Seattle Police Department's Vice/High Risk Victims Unit and Human

Trafficking Task Force made a sworn statement that provided, in

pertinent part,

> Since 2014, the Seattle Police Department has made arrests
> that include hundreds of related charges, such as charges
> for patronizing a prostitute/sexual exploitation, hundreds
> of charges for prostitution, dozens of charges [of]
> Promoting Prostitution, up to 100 charges for Commercial
> Sexual Abuse against a Minor and have investigated dozens
> of rape reports involving victims who are prostitutes and
> one murder of a prostitute. As a result of hundreds of
> investigations, the Seattle Police Department Vice/High
> Risk Victims Unit has found that Backpage.com has become
> the primary web site in Seattle/Washington State for those
> looking to solicit a prostitute, post prostitution ads or
> traffic prostitutes and minors.

> Vice/High Risk Victims Unit Detectives also make use of
> this site to respond to ads posted under the 'escorts' and
> 'body rubs' categories posing as male customers and
> successfully arrest females and males who charge
> undercover operatives money in exchange for sex.  To date,
> no Detective within the Seattle Police Department's
> Vice/High Risk Victims Unit has ever found a legitimate
> 'escort', (person who charges simply for companionship
> with no offer of sex) or 'masseuse', (person offering
> legitimate and licensed massage therapy rather than sex)
> while responding to ads placed in these categories on
> Backpage.com.

> As stated previously, every time the Seattle Police
> Department Vice/High Risk Victims Unit has responded to an
> ad in the adult section of Backpage.com, we have found
> that the ad was a posting for illegal activity.  The
> Seattle Police Department Vice/High Risk Victims Unit has
> not once found that the individual posting or responding
> to one of our decoy ads in the adult section of
> Backpage.com was in fact seeking any type of innocent,
> legal activity. In my professional experience, the adult
> section of Backpage.com not only contains ads for illegal
> activity, including prostitution, solicitation and
> trafficking, but it is a primary source for such ads and

DOJ-BP-0004719121

   is well known for that purpose in the sex trafficking
   industry in the city of Seattle and State of Washington.

Additionally, in August 2015, the Sergeant Detective who is

Commander of the Human Trafficking Unit ("HTU") for the Boston,

Massachusetts Police Department made a sworn statement that

provided, in pertinent part,

   Since 2009, the [HTU] has made numerous arrests that
   include enticement of a minor into prostitution, sex
   trafficking of a minor, sex trafficking of an adult,
   forcible rape . . . and sex for a fee for soliciting a
   prostitute.

   As a result of investigations, the HTU has found that
   Backpage.com is the go-to Web site in Boston for those
   looking to solicit a prostitute, post prostitution ads,
   and recruit and traffic young women and minors.   The
   detectives have been able to identify numerous would-be
   exploiters by setting up decoy ads and responding to ads
   on the site.   The have arrested pimps, traffickers and
   buyers who facilitate prostitution and fuel the harmful
   and violent sex trade.   Backpage.com is the number one
   site that detectives go to in order to look for underage
   girls who are on the run and are being commercially
   sexually exploited by pimps.

   Since 2010, the HTU has arrested over 100 buyers of sex of
   both adults and minors through Backpage.com ads
   exclusively in hotel stings.

   Since 2013, 12 individuals have been charged in federal
   court for sex trafficking of both minors and adults.   In
   all these aforementioned cases, Backpage.com played a
   pivotal role in facilitating these crimes.

   Detectives of the HTU often get tips about illegal
   activity concerning ads posted on the escort, adult and
   massage sections of Backpage.com.   In almost every case
   detectives have found that in fact there was illegal
   activity which resulted in fines, arrests, or further
   investigations of sex trafficking.

   Therefore, in my professional experience as a law

DOJ-BP-0004719122

enforcement officer for over thirty years, the adult
section of Backpage.com not only contains ads for illegal
activity, including prostitution, solicitation and
trafficking, but it is also the primary source for such
ads and well known for that purpose in the sex trafficking
industry in Boston, Massachusetts. Backpage.com's adult
section provides a vehicle and anonymity for its users who
exploit and traffic young women and girls.  . . . It is my
humble opinion that the adult section of Backpage.com
serves no legitimate service and nearly all the cases we
find associated with it involve pimp controlled
prostitution.

32.  Almost all "adult"-type Backpage ads list phone numbers

or emails for a potential customer to use to make contact with the

advertiser.  I have compared a sample of phone numbers and emails

found within Backpage ads with phone numbers and emails that

frequently are included in the memo section of some of the checks

that Backpage advertisers use to pay Backpage for those ads.  From

my review, I have found that very often the same number and/or

email appears in multiple Backpage ads as the contact information

to make an appointment.  For example:

        a.  A $25 USPS Money Order purchased on June 15, 2017,

in Duarte, California, made payable to "Posting Solutions PO BOX

802426, Dallas, TX," and thereafter deposited into a Seized

Account, included writing on the money order listing a phone

number and the words "Dulce Latina."  From a search of Backpage

ads, I found almost 800 advertisements listing the same phone

number found on the $25 USPS Money Order.

        b.  A $20 USPS Money Order purchased in Sacramento,

- 38 -

DOJ-BP-0004719123

California, and later deposited into a Seized Account, included writing listing a phone number and the words "love my lips." From a search of Backpage ads, I found almost 1300 advertisements listing the same phone number found on the $20 USPS Money Order.

    c. A $150 Wells Fargo Bank Money Order, purchased in Arizona, and made payable to "Posting Solutions," included an email and the words, "red hot stuff". From an internet search of the email address listed on this $150 money order, I found advertisements on several female escort websites that directed customers to contact an Arizona phone number ending in 2397. I then searched Backpage.com records for this phone number and found approximately 760 ads that included this same phone number. My review of these Backpage ads revealed images indicative of prostitution. For example, one such ad posted on Backpage's "massage" section included sexual images such as a woman lying on a bed wearing lingerie and a woman laying naked on her stomach. One of the ads describes, "Pampering provider | Body Rub Massage | Body Shampoo | Body Scrub | 4 hands | Walk ins or appointment." From my training and experience, I know that legal massage advertisements do not typically depict sexual images. This advertisement depicted sexual images and included terms like "4 hands," which I know to be coded language describing a massage given to a customer by two women. Such advertisements are often indicative of prostitution.

DOJ-BP-0004719124

33. Despite the fact that several thousand Backpage ads
shared the exact same phone number or email address to contact the
advertiser, these same ads included sexually suggestive images of
hundreds of *different* women. Based on my training and experience,
multiple different women do not share the same email address or
phone number when posting ads for dating. Rather, in my training
and experience, such ads are consistent with ads posted by pimps
or prostitution agencies that are using the same phone number or
email to advertise several different women (or girls) to
prospective prostitution clients.

34. On March 28, 2018, in the District of Arizona, a grand
jury returned a 93 count indictment charging certain Backpage
Operators with criminal violations of 18 U.S.C. § 371
(Conspiracy), § 1952 (Travel Act—Facilitation of Prostitution), §
1956 (Money Laundering), § 1957 (Financial Transactions Involving
Illicit Proceeds), and including Forfeiture Allegations pursuant
to 18 U.S.C. §§ 981 and 982 (seeking criminal forfeiture of, among
other assets, the Seized Accounts and the Seized Domains).

35. On July 25, 2018, also in the District of Arizona, a
grand jury returned a 100 count "First Superseding Indictment"
charging certain Backpage Operators with additional criminal
violations of 18 U.S.C. § 371 (Conspiracy), § 1952 (Travel Act—
Facilitation of Prostitution), § 1956 (Money Laundering), § 1957
(Financial Transactions Involving Illicit Proceeds), and including

- 40 -

DOJ-BP-0004719125

Forfeiture Allegations pursuant to 18 U.S.C. §§ 981 and 982
(seeking criminal forfeiture of, among other assets, the Seized
Accounts and the Seized Domains). Additionally, the grand jury
made specific findings of probable cause for forfeitability of all
the Seized and Restrained Accounts[10] listed in previously
submitted warrant affidavits. A copy of the "First Superseding
Indictment" is attached hereto (as Attachment C) and incorporated
herein as though fully set forth.

E. THE SEIZED ACCOUNTS AND SUBJECT ACCOUNTS

1. SUBJECT ACCOUNT 28

36. On April 5, 2018, pursuant to a plea agreement in the
District of Arizona, Ferrer plead guilty to a single-count
information charging him with a violation of 18 U.S.C. § 371,
conspiracy to violate 18 U.S.C. §§ 1952 (the Travel Act), and
1956 (money laundering). As part of his plea agreement, Ferrer
agreed to "take all steps within his power to forfeit to the
United States all corporate assets and other property owned or
controlled by Website Technologies, LLC, which owns and operates
the Backpage website, as well as corporate assets and other

---

[10] Because of the extensive movement of money by the Backpage
operators, attached and incorporated as Attachment B is a copy
of the most recently previously obtained warrant application
(referred to as Seized Accounts 1 through 17, 22 and 25 through
27; or Restrained Accounts 18 through 21B, 23 and 24), herein
collectively referred to as the "Seized Accounts."

- 41 -

DOJ-BP-0004719126

property owned or controlled by Backpage.com, LLC, Posting Solutions LLC, Amstel River Holdings, LLC, Ad Tech BV, and UGC Tech Group CV." That same day, also in the District of Arizona, Backpage.com, LLC and related entities plead guilty to 18 U.S.C. § 1956(h) (money laundering conspiracy).

37.   From speaking with Ferrer and reviewing financial records, I learned that SUBJECT ACCOUNT 28 is an IOLTA account held in the name of the law firm Rusing Lopez and Lizardi PLLC. Based on my conversations with Ferrer, I believe that Backpage or Backpage-controlled entities are the beneficiaries of this account. This account has received $5,279,173.07 in criminal proceeds for prepayment of future legal services. These funds are owned by Backpage, but held by RLL and are subject to forfeiture.

38.   Based upon my review of the financial records relating to SUBJECT ACCOUNT 28, Seized Account 1, and the Foreign Account, I learned that in total, SUBJECT ACCOUNT 28 received $5,279,173.07 in Backpage funds:

a.   On May 5, 2017, SUBJECT ACCOUNT 28 received a $499,970 wire from the Foreign Account.

b.   On June 2, 2017, SUBJECT ACCOUNT 28 received a $1 million wire from the Foreign Account.

c.   On September 18, 2017, SUBJECT ACCOUNT 28 received a $1 million wire from the Foreign Account.

- 42 -

        d.   On October 3, 2017, SUBJECT ACCOUNT 28 received a
$779,203.07 wire from the Foreign Account.

        e.   On November 6, 2017, SUBJECT ACCOUNT 28 received
a $500,000 wire from Seized Account 1.

        f.   On January 9, 2018, SUBJECT ACCOUNT 28 received a
$750,000 wire from Seized Account 1.

        g.   On January 19, 2018, SUBJECT ACCOUNT 28 received
a $750,000 wire from Seized Account 1.

    39.  An analysis of the banking statements and the wire
transfers for SUBJECT ACCOUNT 28 show that the funds have
remained in this IOLTA since they were transferred.



**DIAGRAM FOR SUBJECT ACCOUNT 28**

## 2. SUBJECT ACCOUNT 29

    40.  From speaking with Ferrer and reviewing financial
records, I learned that SUBJECT ACCOUNT 29 is an IOLTA account
held in the name of the law firm Copeland, Franco, Screws & Gill.

- 43 -

DOJ-BP-0004719128

41.   Based on my conversations with Ferrer and review of
bank records, I believe that Backpage or Backpage-controlled
entities are the beneficiaries of this account.  This account
has received $100,000 in criminal proceeds for prepayment of
future legal services.  These funds are owned by Backpage, but
held by Copeland, Franco, Screws & Gill, and are subject to
forfeiture.

42.   Based upon my review of the financial records from
Backpage, and Veritex Account ending in -1462, held in the name
of Posting Solutions ("Veritex Account -1462"), I learned the
following:

    a.   On March 28, 2017, Backpage wired $25,000 from
their Veritex Account -1462 to SUBJECT ACCOUNT 29.

    b.   On May 9, 2017, Backpage wired $75,000 from their
Veritex Account -1462 to SUBJECT ACCOUNT 29.



3/28/2017 - $25,000
5/9/2017 - $75,000

POSTING SOLUTIONS
30021462
VERITEX BANK

COPELAND FRANCO SCREWS GILL PA
2000608102052
WELLS FARGO BANK N A
SUBJECT ACCOUNT 29

**DIAGRAM FROM SUBJECT ACCOUNT 29**

3. SUBJECT ACCOUNT 30

43.   From  speaking  with  Ferrer  and  reviewing  financial

- 44 -

DOJ-BP-0004719129

records, I learned that SUBJECT ACCOUNT 30 is an IOLTA account
held in the name of the law firm, David B. Smith, PLLC.  Based on
my conversations with Ferrer, I believe that Backpage or Backpage-
controlled entities are the beneficiaries of this account.  This
account has received $10,000 in criminal proceeds as prepayment of
future legal services.  These funds are owned by Backpage but held
by David B. Smith, PLLC, and are subject to forfeiture.

44.  Based upon my review of the financial records from
Backpage and Veritex Account -1462, held in the name of Posting
Solutions, I learned the following:

a.  On March 28, 2017, Backpage wired $10,000 from
their Veritex Account -1462 to SUBJECT ACCOUNT 30.



POSTING SOLUTIONS
30021462
VERITEX BANK

3/28/2017 - $10,000

DAVID B. SMITH, PLLC
IOLTA ACCOUNT
1000144637906
SUNTRUST BANK
SUBJECT ACCOUNT 30

**DIAGRAM FOR SUBJECT ACCOUNT 30**

4. SUBJECT ACCOUNT 31

45.  From speaking with Ferrer and reviewing financial
records, I learned that SUBJECT ACCOUNT 31 is an IOLTA account

- 45 -

DOJ-BP-0004719130

held in the name of the law firm Keker, Van Nest & Peters.  Based
on my conversations with Ferrer, I believe that Backpage or
Backpage-controlled entities are the beneficiaries of this
account.  This account has received $500,000 in criminal proceeds
as prepayment of future legal services.  These funds are owned by
Backpage, but held by Keker, Van Nest & Peters, and are subject to
forfeiture.

46.  Based upon my review of the financial records from
Backpage, and Seized Account 1, I learned the following:

a.  On September 14, 2017, Backpage wired $500,000
from Seized Account 1 to SUBJECT ACCOUNT 31.



POSTING SOLUTIONS
'7188
PROSPERITY BANK
Seized Account 1

9/14/2017
$500,000

KEKER VAN NESS & PETERS
'7287
CITIBANK
SUBJECT ACCOUNT 31

**DIAGRAM FOR SUBJECT ACCOUNT 31**

5. SUBJECT ACCOUNT 32

47.  From speaking with Ferrer and reviewing financial
records, I learned that SUBJECT ACCOUNT 32 is an IOLTA account
held in the name of the law firm McDermott Will & Emery.  Based on
my conversations with Ferrer, I believe that Backpage or Backpage-
controlled entities are the beneficiaries of this account.  This
account has received $100,000 of criminal proceeds for prepayment

- 46 -

DOJ-BP-0004719131

of future legal services. These funds are owned by Backpage, but
held by McDermott Will & Emery, and are subject to forfeiture.

48.   Based upon my review of the financial records from
Backpage and Veritex Account -1462, held in the name of Posting
Solutions, I learned the following:

a.   On May 9, 2017, Backpage wired $100,000 from
their Veritex Account -1462 to SUBJECT ACCOUNT 32.



POSTING SOLUTIONS                          MCDERMOTT WILL AND EMERY LLP
30021462                                   30525705
VERITEX BANK                               CITIBANK N A

5/9/2017 - $100,000

**DIAGRAM FOR SUBJECT ACCOUNT 32**

### 6. SUBJECT ACCOUNT 33

49.   From speaking with Ferrer and reviewing financial
records, I learned that SUBJECT ACCOUNT 33 is an IOLTA account
held in the name of the law firm Prince Lobel Tye, LLP.  Based on
my conversations with Ferrer, I believe that Backpage or Backpage-
controlled entities are the beneficiaries of this account.  This
account has received $100,000 of criminal proceeds as prepayment
of future legal services.  These funds are owned by Backpage, but
held by Prince Lobel Tye, LLP, and are subject to forfeiture.

50.   Based upon my review of the financial records from
Backpage and Veritex Account -1462, held in the name of Posting
Solutions, I learned the following:

- 47 -

DOJ-BP-0004719132

a.   On June 22, 2017, Backpage wired $100,000 from

their Veritex Account -1462 to SUBJECT ACCOUNT 33.



POSTING SOLUTIONS
30021462
VERITEX BANK

—————6/22/2017 - $100,000—————➤

PRINCE LOBEL TYE LLP
1255464039
CITIBANK N A
SUBJECT ACCOUNT 33

**DIAGRAM FOR SUBJECT ACCOUNT 33**

### 7. SUBJECT ACCOUNT 34

51.  From speaking with Ferrer and reviewing financial
records, I learned that SUBJECT ACCOUNT 34 is an IOLTA account
held in the name of the law firm Perkins Coie, LLP.  Based on my
conversations with Ferrer, I believe that Backpage or Backpage-
controlled entities are the beneficiaries of this account.  This
account has received $2,167,704.86 in criminal proceeds as
prepayment of future legal services.  These funds are owned by
Backpage, but held by Perkins Coie, LLP, and are subject to
forfeiture.

52.  Based upon my review of the financial records from
Backpage, Seized Account 1, and the Foreign Account, I learned
that SUBJECT ACCOUNT 34 has received $3,250,000 from Backpage.

DOJ-BP-0004719133

Specifically, SUBJECT ACCOUNT 34 received the following
transactions:

a.    On May 9, 2017, Backpage wired $500,000 from one
of their foreign-held accounts, held in the name of Ad Tech BV,
to SUBJECT ACCOUNT 34.

b.    On June 1, 2017, Backpage wired $500,000 from one
of their foreign-held accounts, held in the name of Ad Tech BV,
to SUBJECT ACCOUNT 34.

c.    On July 7, 2017, Backpage wired $1,500,000 from
one of their foreign-held accounts, held in the name of Ad Tech
BV, to SUBJECT ACCOUNT 34.

d.    On August 23, 2017, Backpage wired $750,000
through one of their foreign-held accounts to SUBJECT ACCOUNT
34.

53.   Based on Backpage internal accounting that I have
reviewed, $1,082,295.14 of these funds have been spent.
$2,167,704.86 in proceeds remain in this account and is subject
to forfeiture.

- 49 -



**DIAGRAM FOR SUBJECT ACCOUNT 34**

8. SUBJECT ACCOUNT 35

54. From speaking with Ferrer and reviewing financial records, I learned that SUBJECT ACCOUNT 35 is an IOLTA account held in the name of the law firm Thompson Coburn, LLP. Based on my conversations with Ferrer, I believe that Backpage or Backpage-controlled entities are the beneficiaries of this account. This account has received $100,000 in criminal proceeds as prepayment for future legal services. These funds are owned by Backpage, but held by Thompson Coburn, LLP, and are subject to forfeiture.

55. Based upon my review of the financial records from Backpage and Seized Account 1, I learned that SUBJECT ACCOUNT 35 has been funded via the following transactions:

a. On December 14, 2017, Backpage wired $100,000 from Seized Account 1 to SUBJECT ACCOUNT 35.

- 50 -

DOJ-BP-0004719135



12/14/2017 - $100,000 →

POSTING SOLUTIONS
216887188
PROSPERITY BANK

THOMPSON COBURN LLP
100-06-06952
US BANK
SUBJECT ACCOUNT 35

**DIAGRAM FOR SUBJECT ACCOUNT 35**

9. SUBJECT ACCOUNT 36A

56. From speaking with Ferrer and reviewing financial records, I learned that SUBJECT ACCOUNT 36A is an IOLTA account held in the name of the law firm Piccarreta Davis Keenan Fidel, PC at JP Morgan Chase Bank. Based on my conversations with Ferrer, I believe that Backpage or Backpage-controlled entities are the beneficiaries of this account. This account has received $10,000 in criminal proceeds as prepayment of future legal services. These funds are owned by Backpage, but held by Piccarreta Davis Keenan Fidel, PC, and are subject to forfeiture.

57. Based upon my review of the financial records from Backpage and Veritex Account -1462, I learned that SUBJECT ACCOUNT 36A has received the following funds from Backpage:

- 51 -

DOJ-BP-0004719136

a.    On March 8, 2017, Backpage wired $10,000 from

their Veritex Account -1462 to SUBJECT ACCOUNT 36A.



POSTING SOLUTIONS
30021462
VERITEX BANK

——————3/8/2017 - $10,000——————➤

PICCARRETA DAVIS KEENAN FIDEL PC
211909285
JP MORGAN CHASE BANK NA
SUBJECT ACCOUNT 36A

**DIAGRAM FOR SUBJECT ACCOUNT 36A**

10.    SUBJECT ACCOUNT 36B

58.  From  speaking  with  Ferrer  and  reviewing  financial

records,  I  learned  that  SUBJECT  ACCOUNT  36A  is  another  IOLTA

account  held  in  the  name  of  the  law  firm  Piccarreta  Davis  Keenan

Fidel,  PC  at  Grand  Point  Bank.   Based  on  my  conversations  with

Ferrer,  I  believe  that  Backpage  or  Backpage-controlled  entities

are  the  beneficiaries  of  this  account.   This  account  has  received

$740,000  in  criminal  proceeds  as  prepayment  of  future  legal

services.   These  funds  are  owned  by  Backpage,  but  held  by

Piccarreta  Davis  Keenan  Fidel,  PC,  and  are  subject  to  forfeiture.

59.  Based upon my review of the financial records from

Backpage and Seized Account 1, I learned that SUBJECT ACCOUNT

36B has received the following funds from Backpage:

a.    On April 3, 2017, Backpage wired $250,000 from

Seized Account 1 to SUBJECT ACCOUNT 36B.

- 52 -

DOJ-BP-0004719137

b.      On May 2, 2017, Backpage wired $490,000 from

Seized Account 1 to SUBJECT ACCOUNT 36B.



POSTING SOLUTIONS
216887188
PROSPERITY BANK

4/3/2017 - $250,000
5/2/2017 - $490,000

PICCARRETA DAVIS KEENAN FIDEL PC
250-398-5
GRANDPOINT BANK
SUBJECT ACCOUNT 36B

### DIAGRAM FOR SUBJECT ACCOUNT 36B

11.     SUBJECT ACCOUNT 37

60. From speaking with Ferrer and reviewing financial records, I learned that SUBJECT ACCOUNT 37 is an IOLTA account held in the name of the law firm Lawrence G. Walters, P.A., at JP Morgan Chase Bank. Based on my conversations with Ferrer, and employees at JP Morgan Chase Bank, I believe that Backpage or Backpage-controlled entities are the beneficiaries of this account. This account has received $100,000 in criminal proceeds as prepayment of future legal services. These funds are owned by Backpage, but held by Lawrence G. Walters, P.A., and are subject to forfeiture.

61. Based upon my review of the financial records from Backpage and Veritex Account -1462, I learned that SUBJECT ACCOUNT 37 has received the following funds from Backpage:

- 53 -

DOJ-BP-0004719138

a.   On March 7, 2017, Backpage wired $10,000 from

their Veritex Account -1462 to SUBJECT ACCOUNT 37.

b.   On May 9, 2017, Backpage wired $90,000 from their

Veritex Account -1462 to SUBJECT ACCOUNT 37.



POSTING SOLUTIONS
30021462
VERITEX BANK

3/7/2017 - $10,000
5/9/2017 - $90,000

LAWRENCE G WALTERS PA IOLTA TRUST
851844381
JP MORGAN CHASE BANK NA
SUBJECT ACCOUNT 37

**DIAGRAM FOR SUBJECT ACCOUNT 37**

12.   SUBJECT ACCOUNT 38

62.   From speaking with Ferrer and reviewing financial

records, I learned that SUBJECT ACCOUNT 38 is an IOLTA account

held in the name of the law firm Akin Gump Strauss Hauer & Feld,

LLP, at JP Morgan Chase Bank.   Based on my conversations with

Ferrer, and employees at JP Morgan Chase Bank, I believe that

Backpage or Backpage-controlled entities are the beneficiaries of

this account.   This account has received $250,000 in criminal

proceeds as prepayment of future legal services.   These funds are

owned by Backpage, but held by Akin Gump Strauss Hauer & Feld,

LLP, and are subject to forfeiture.

63.   Based upon my review of the financial records from

Backpage, Veritex Account -1462, and Seized Account 1, I learned

- 54 -

DOJ-BP-0004719139

that SUBJECT ACCOUNT 38 has received the following funds from

Backpage:

a.    On March 29, 2017, Backpage wired $150,000 from

Seized Account 1 to SUBJECT ACCOUNT 38.

b.    On April 25, 2017, Backpage wired $50,000 from

their Veritex Account -1462 to SUBJECT ACCOUNT 38.

c.    On May 9, 2017, Backpage wired $50,000 from their

Veritex Account -1462 to SUBJECT ACCOUNT 38.



**DIAGRAM FOR SUBJECT ACCOUNT 38**

13.    SUBJECT ACCOUNT 39

64.  From speaking with Ferrer and reviewing financial

records, I learned that SUBJECT ACCOUNT 39 is an IOLTA account

held in the name of the law firm Scheef & Stone, LLP, at Plains

Capital Bank.  Based on my conversations with Ferrer, and Plains

- 55 -

Capital Bank employees, I believe that Backpage or Backpage-
controlled entities are the beneficiaries of this account. This
account has received $25,000 in criminal proceeds as prepayment of
future legal services. These funds are owned by Backpage, but
held by Scheef & Stone, LLP, and are subject to forfeiture.

65. Based upon my review of the financial records from
Backpage and Seized Account 1, I learned that SUBJECT ACCOUNT 39
has received the following funds from Backpage:

a. On November 9, 2017, Backpage wired $25,000 from
Seized Account 1 to SUBJECT ACCOUNT 39.



**POSTING SOLUTIONS**
**216887188**
**PROSPERITY BANK**

**Scheef & Stone LLP**
**3100033921**
**Plains Capital Bank**
**SUBJECT ACCOUNT 39**

**DIAGRAM FOR SUBJECT ACCOUNT 39**

14.  SUBJECT ACCOUNT 40

66. From speaking with Ferrer and reviewing financial
records, I learned that SUBJECT ACCOUNT 40 is an IOLTA account
held in the name of the law firm Wayne B. Giampietro, LLC, at JP
Morgan Chase Bank. Based on my conversations with Ferrer and JP
Morgan Chase Bank employees, I believe that Backpage or Backpage-

- 56 -

DOJ-BP-0004719141

controlled entities are the beneficiaries of this account.   This

account has received $100,000 in criminal proceeds as prepayment

of future legal services.   These funds are owned by Backpage, but

held by Wayne B. Giampietro, LLC, and are subject to forfeiture.

67.   Based upon my review of the financial records from

Backpage and Seized Account 1, I learned that SUBJECT ACCOUNT 40

has received the following funds from Backpage:

a.   On December 19, 2017, Backpage wired $100,000

from Seized Account 1 to SUBJECT ACCOUNT 40.



**POSTING SOLUTIONS**
**216887188**
**PROSPERITY BANK**

**WAYNED B GIAMPIETRO LLC**
**616275397**
**JP Morgan Chase Bank**
**SUBJECT ACCOUNT 40**

**DIAGRAM FOR SUBJECT ACCOUNT 40**

15.   SUBJECT ACCOUNT 41A

68.   From  speaking  with  Ferrer  and  reviewing  financial

records, I learned that SUBJECT ACCOUNT 41A is an IOLTA account

held in the name of the law firm Mitchell Stein Carey, PC, at

Alliance Bank of Arizona, account number ending in -97402.   Based

on my conversations with Ferrer and employees of Alliance Bank of

Arizona, I believe that Backpage or Backpage-controlled entities

are the beneficiaries of this account.   This account has received

- 57 -

DOJ-BP-0004719142

$100,000 in criminal proceeds as prepayment of future legal services. These funds are owned by Backpage, but held by Mitchell Stein Carey, PC, and are subject to forfeiture.

69.   Based upon my review of the financial records from Backpage and Veritex Account -1462, I learned that SUBJECT ACCOUNT 41A has received the following funds from Backpage:

a.   On May 3, 2017, Backpage wired $100,000 from Veritex Account -1462 to SUBJECT ACCOUNT 41A.



POSTING SOLUTIONS
30021462
VERITEX BANK

———5/3/2017 - $100,000———➤

MITCHELL STEIN CAREY, PC
XXXXX97402
ALLIANCE BANK OF ARIZONA
SUBJECT ACCOUNT 41A

**DIAGRAM FOR SUBJECT ACCOUNT 41A**

### 16.   SUBJECT ACCOUNT 41B

70.   From speaking with Ferrer and reviewing financial records, I learned that SUBJECT ACCOUNT 41B is another IOLTA account held in the name of the law firm Mitchell Stein Carey, PC, at Alliance Bank of Arizona, account number ending in -96206. Based on my conversations with Ferrer and employees of Alliance Bank of Arizona, I believe that Backpage or Backpage-controlled entities are the beneficiaries of this account. This account has received $100,000 in criminal proceeds as prepayment of future

- 58 -

DOJ-BP-0004719143

legal services.   These funds are owned by Backpage, but held by
Mitchell Stein Carey, PC, and are subject to forfeiture.

71.   Based upon my review of the financial records from
Backpage and Seized Account 1, I learned that SUBJECT ACCOUNT
41B has received the following funds from Backpage:

a.   December 14, 2017, Backpage wired $100,000 from
Seized Account 1 to SUBJECT ACCOUNT 41B.



POSTING SOLUTIONS
216887188
PROSPERITY BANK
—————————12/14/2017 - $100,000—————————>

MITCHELL STEIN CAREY, PC
8010596206
ALLIANCE BANK OF ARIZONA
SUBJECT ACCOUNT 41B

**DIAGRAM FOR SUBJECT ACCOUNT 41A**

17.   SUBJECT ACCOUNT 42

72.   From speaking with Ferrer and reviewing financial
records, I learned that SUBJECT ACCOUNT 42 is an IOLTA account
held in the name of the law firm Karp & Weiss, PC, at Western
Alliance Bank.   Based on my conversations with Ferrer and Western
Alliance Bank employees, I believe that Backpage or Backpage-
controlled entities are the beneficiaries of this account.   This
account has received $250,000 in criminal proceeds as prepayment
of future legal services.   These funds are owned by Backpage, but
held by Karp & Weiss, PC, and are subject to forfeiture.

- 59 -

DOJ-BP-0004719144

73.    Based upon my review of the financial records from
Backpage and Seized Account 1, I learned that SUBJECT ACCOUNT 42
has received the following funds from Backpage:

a.    On March 29, 2017, Backpage wired $250,000 from
Seized Account 1 to SUBJECT ACCOUNT 42.



POSTING SOLUTIONS
216887188
PROSPERITY BANK

———3/29/2017 - $250,000———➤

Karp & Weiss, P.C.
8011386979
Western Alliance Bank
SUBJECT ACCOUNT 42

**DIAGRAM FOR SUBJECT ACCOUNT 42**

18.    SUBJECT ACCOUNTS 43A, 43B, 43C, and 43D

74.    I have reviewed records for SUBJECT ACCOUNTS 43A, 43B,
43C, and 43D, as well as the following accounts:  Branch Banking
& Trust account number 1440001712008, belonging to Website
Technologies (as detailed above, a Backpage-controlled entity),
held in Arizona ("BB&T Account"); and Arizona Bank & Trust
account number 9361116211 belonging to Cereus Properties, held
in Arizona ("AZBT -6211").  I also reviewed Charles Schwab
accounts 8524-6039 ("Schwab -6039"), 3698-9083 ("Schwab -9083"),
4821-7249 ("Schwab -7249"), and 6971-8623 ("Schwab -8623"), all
at Citibank, and all held in the name of Oaxaca Living Trust,

- 60 -

DOJ-BP-0004719145

with LARKIN as the grantor, and LACEY and a LARKIN relative as

the trustees, and LARKIN's daughter as the beneficiary. I also

reviewed Arizona Bank and Trust Accounts 9361153835 ("AZBT -

3835"), 9361153864 ("AZBT -3864"), 9361153859 ("AZBT -3859"),

and 9361153840 ("AZBT -3840"), all held in the name of Oaxaca

Living Trust with LACEY and a LARKIN relative as the trustees,

and LARKIN's family as the beneficiaries.  From my review, I

learned the following:

      a.   Between December 14, 2015, and January 29, 2016,

in approximately 39 wires, a company doing business for GoCoin

transferred about $3,959,557.78 in criminal proceeds (see

paragraphs ____ *supra*) from an account held in Slovakia to the

BBT Account in the United States.

      b.   Between January 21, 2016, and August 31, 2016, in

approximately 27 wires, the BBT Account transferred

approximately $48 million to AZBT -6211.

      c.   On January 4, 2017, AZBT -6211 initiated four

wires:

         i.   $33,591.34 to Schwab -6039;

        ii.   $33,591.34 to Schwab -9083;

       iii.   $33,591.34 to Schwab -7249; and

        iv.   $33,591.34 to Schwab -8628.

      d.   A few days later, these funds were moved to AZBT

Accounts:

- 61 -

DOJ-BP-0004719146

        i.      On January 10, 2017 Schwab -6039 wired
               $840,692.69 to AZBT -3835;

        ii.     On January 10, 2017 Schwab -8628 wired
               $840,672.70 to AZBT -3840;

       iii.    On January 11, 2017 Schwab -9083 wired
               $840,692.72 to AZBT -3864;

        iv.    And On January 12, 2017 Schwab -7249 wired
               $840,692.70 to AZBT -3859;

      e.    Additionally, on January 11, 2017, the AZBT -6211
transferred $33,591.34 to each of the four Oaxaca Living Trust
accounts, AZBT -3835, AZBT -3840, AZBT -3864, and AZBT -3859.

      f.    Less than one month later, on February 9, 2017,
the four Oaxaca Living Trust accounts, AZBT -3835, AZBT -3840,
AZBT -3864, and AZBT -3859 wired approximately $874,330 to the
SUBJECT ACCOUNTS 43A, 43B, 43C, and 43D.  More specifically:

        i. On February 9, 2017, AZBT -3835 wired $874,334.26
          to SUBJECT ACCOUNT 43A.

        ii. On February 9, 2017, AZBT -3864 wired $874,332.68
          to SUBJECT ACCOUNT 43B.

       iii. On February 9, 2017, AZBT -3835 wired $874,331.01
          to SUBJECT ACCOUNT 43C.

        iv. On February 9, 2017, AZBT -3835 wired $874,334.27
          to SUBJECT ACCOUNT 43D.

DOJ-BP-0004719147



**DIAGRAM FOR SUBJECT ACCOUNTS 43A, 43B, 43C, and 43D**

121.   In summary, as described above and depicted in the

diagram, funds which originated from Backpage and passed through

several layers of funnel accounts were ultimately deposited into

SUBJECT ACCOUNTS 43A, 43B, 43C and 43D.

19.   SUBJECT ACCOUNT 44

75.   On April 5, 2018, pursuant to a plea agreement in the

District of Arizona, Ferrer plead guilty to a single-count

information charging him with a violation of 18 U.S.C. § 371,

- 63 -

DOJ-BP-0004719148

conspiracy to violate 18 U.S.C. §§ 1952 (the Travel Act), and
1956 (money laundering).  As part of his plea agreement, Ferrer
agreed to "take all steps within his power to forfeit to the
United States all corporate assets and other property owned or
controlled by Website Technologies, LLC, which own and operates
the Backpage website, as well as corporate assets and other
property owned or controlled by Backpage.com, LLC, Posting
Solutions LLC, Amstel River Holdings, LLC, Ad Tech BV, and UGC
Tech Group CV."  That same day, also in the District of Arizona,
Backpage.com, LLC and related entities plead guilty to 18 U.S.C.
§ 1956(h) (money laundering conspiracy).

76.  From speaking with Ferrer and reviewing financial
records, I learned that SUBJECT ACCOUNT 44 is held in the name
of Bristol Staffing, LLC. Based on my conversations with Ferrer,
Bristol Staffing is a Human Resource company retained by
Backpage for Human Resource Services for Backpage and their
employees.  According to an accounting report provided by
Bristol Staffing attorneys, which I have reviewed, at the time
Backpage was seized by the government, Bristol Staffing had
$1,464,000 on deposit.  The report stated, "In Late April, after
having terminated all employees, Bristol paid the final payroll
and severance to the now angry employees.  The disbursements
totaled $718,888.11… leaving $745,111.89 to be applied as
directed by the contract."

- 64 -

## VI. CONCLUSION

77. For the reasons stated above, there is probable cause to believe that funds and/or securities on deposit in the SUBJECT ACCOUNTS are subject to seizure and forfeiture by the United States under the following provisions:

    a.   18 U.S.C. § 981(a)(1)(A), because the funds and/or securities are involved in, and traceable to, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(h) (Conspiracy to Launder Money), 18 U.S.C. § 1956(a)(2) (International Money Laundering for Promotion), and 18 U.S.C. § 1957 (Financial Transactions Involving Illicit Proceeds). Pursuant to 18 U.S.C. § 981(a)(1)(A), any property involved in a transaction, or attempted transaction, in violation of 18 U.S.C. §§ 1956 or 1957, or any property traceable to such property, is subject to forfeiture to the United States; and

    b.   18 U.S.C. § 981(a)(1)(C), because the funds and/or securities constitute and are derived from proceeds traceable to one or more violations of 18 U.S.C. § 1956(h), 18 U.S.C. § 1956(a)(2), and 18 U.S.C. § 1957.

78. Further, a protective order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture because there is reason to believe that the property is under the control of the targets of this

- 65 -

DOJ-BP-0004719150

investigation, who cannot reasonably be relied upon to abide by
an order to maintain the property in substantially the same
condition as it is at the present time in order to ensure that
it will be available for forfeiture. Specifically, illicit
funds are routinely moved among several related accounts and
certain individuals who maintain control of the accounts are
able to move funds among other bank accounts within their
control. Thus, I request a seizure warrant issued pursuant to
21 U.S.C. § 853(f) (as incorporated by 18 U.S.C. § 982(b) and 28
U.S.C. § 2461(c)) for the following SUBJECT ACCOUNTS:

    a.   Up to $5,279,173.07 in Bank of the West account
035-171363;

    b.   Up to $100,000 in Wells Fargo Bank account
2000608102052;

    c.   Up to $10,000 in SunTrust Bank account
100144637906;

    d.   Up to $500,000 in Citibank account 205027287;

    e.   Up to $100,000 in Citibank account 30525705;

    f.   Up to $100,000 in Citibank account 1255464039;

    g.   Up to $2,167,704.86 in US Bank account
153555921235;

    h.   Up to $100,000 in US Bank account 100-06-06952;

    i.   Up to $10,000 in JP Morgan Chase account
211909285;

- 66 -

DOJ-BP-0004719151

j. Up to $740,000 in Grand Point Bank account
2503985;

k. Up to $100,000 in JP Morgan Chase account
851844381;

l. Up to $250,000 in JP Morgan Chase account
100079698

m. Up to $25,000 in Plains Capital account
3100033921;

n. Up to $100,000 in JP Morgan Chase account
616275397;

o. Up to $100,000 in alliance Bank of Arizona
account 801059742;

p. Up to $100,000 in alliance Bank of Arizona
account 8010596206;

q. Up to $250,000 in Western Alliance account
8011386979;

r. Any and All Funds in USAA Saving Bank account
0213582188;

s. Any and All Funds in USAA Saving Bank account
0213582058;

t. Any and All Funds in USAA Saving Bank account
0213582171

u. Any and All Funds in USAA Saving Bank account
0213581508; and

- 67 -

DOJ-BP-0004719152

v.      Up to $745,111.89 in Texas Bank account

111923238.

/S/
_____
Lyndon Versoza
U.S. Postal Inspector

Subscribed to and sworn to me
this 31st day of October, 2018

Rozella a. Ol
_____
United States Magistrate Judge

- 68 -

DOJ-BP-0004719153

| BANK NAME<br>JUDGE | WARRANT NUMBER<br>DATE SIGNED | ACCOUNTS |
|---|---|---|
| Ascio<br>Judge Walsh | 18-MJ-711<br>3/28/18 | *Domains on Attachment A* |
| Ascensus Broker Dealer Service,<br>Inc.<br>Judge Walsh | 18-MJ-712<br>3/28/18 | *367726943-01*<br>*'5280-01* |
| Prosperity Bank<br>Judge Walsh | 18-MJ-721<br>3/28/18 | *216887188* |
| Compass Bank<br>Judge Walsh | 18-MJ-715<br>3/28/18 | *6738453873*<br>*6745023825* |
| Bank of America, N.A.<br>Judge Walsh | 18-MJ-713<br>3/28/18 | *1294879342*<br>*488039130071*<br>*483072278225*<br>*5091387054* |
| National Bank of Arizona<br>Judge Walsh | 18-MJ-719<br>3/28/18 | *0045000151*<br>*0045000178*<br>*0046003645*<br>*SDB-005007224* |
| San Francisco Fire Credit Union<br>Judge Walsh | 18-MJ-723<br>3/28/18 | *75600050642523* |
| Live Oak Bank<br>Judge Walsh | 18-MJ-718<br>3/28/18 | *66910* |
| First Federal Savings & Loan of<br>San Rafael<br>Judge Walsh | 18-MJ-716<br>3/28/18 | *51103620* |
| Plains Capital<br>Judge Walsh | 18-MJ-720<br>3/28/18 | *5501801098* |
| Ally Bank<br>Judge Walsh | 18-MJ-724<br>3/28/18 | *2153056292* |
| Branch Banking and Trust<br>Judge Walsh | 18-MJ-751<br>3/28/18 | *1440001710218* |
| Green Bank<br>Judge Walsh | 18-MJ-752<br>3/28/18 | *3094832*<br>*5501194293* |

ATTACHMENT A

DOJ-BP-0004719154

| BANK NAME<br>JUDGE | WARRANT NUMBER<br>DATE SIGNED | ACCOUNTS |
|---|---|---|
| Republic Bank of AZ<br>Judge Walsh | 18-MJ-722<br>3/28/18 | *11101889*<br>*11402592*<br>*11101938*<br>*11002912*<br>*11402500* |
| Republic Bank of AZ<br>Judge McDermott | 18-MJ-996<br>4/26/18 | *11402485*<br>*11101897*<br>*11003126*<br>*1021078316*<br>*1021078324*<br>*1021078332*<br>*1021078103*<br>*1021078162*<br>*1021078189* |
| Perkins Coie<br>Judge Walsh | 18-MJ-797<br>4/9/18 | *54000770012* |
| Alliance Bernstein<br>Judge Walsh | 18-MJ-798<br>4/4/18 | *888-96878*<br>*079-64954*<br>*036-50582*<br>*036-57892*<br>*036-57889*<br>*036-57888*<br>*079-66485* |
| K&H Bank (Hungary)<br>Judge McDermott | 18-MJ-997<br>4/26/18 | *HU63104010935052676785761210* |
| Fio Bank (Czech Republic)<br>Judge McDermott | 18-MJ-998<br>4/26/18 | *CZ9020100000002300995803;*<br>*CZ1220100000002000995801;*<br>*CZ7120100000002600995805;*<br>*CZ7020100000002001002226;*<br>*CZ7620100000002101002231;*<br>*CZ8520100000002501002230;*<br>*CZ4620100000002000914194;*<br>*CZ2720100000002300914196;*<br>*CZ0820100000002600914198;*<br>*CZ4820100000002801118083;*<br>*CZ2020100000002701118086;*<br>*CZ7620100000002901118080* |
| Bank Frick (Liechtenstein)<br>Judge McDermott | 18-MJ-999<br>4/26/18 | *LI09 0881 1060 7717 K000 K*<br>*LI30 0881 1060 7717 K000 U*<br>*LI74 0881 1060 7717 K000 E*<br>*LI90 0881 1060 7717 K001 E* |

ATTACHMENT A

DOJ-BP-0004719155

| BANK NAME JUDGE | WARRANT NUMBER DATE SIGNED | ACCOUNTS |
|---|---|---|
| Knab Bank (Netherlands) Judge McDermott | 18-MJ-1000 4/26/18 | *NL15KNAB0255357664* |
| Rabo (Netherlands) Judge McDermott | 18-MJ-1001 4/26/18 | *NL44RABO0307182452 NL64RABO0307604721* |
| Acacia Conservation Funds Judge Rosenbluth | 18-MJ-01427 6/4/18 | *'2020* |
| Saxo Payments Judge Rosenbluth | 18-MJ-01428 6/4/18 | *'1262* |
| LHV Pank Judge Rosenbluth | 18-MJ-1433 6/4/18 | *EE417700771002634431* |
| BBVA Compass Bank Judge Oliver | 18-MJ-1863 7/19/18 | *6745314862* |
| MoneyGram Judge Choolijian | 18-MJ-2030 8/7/18 | *Previously held at MidFirst bank #8061024139 and used to purchase un-negotiated MoneyGram cashier's check #317503* |
| Bank of America IOLTA Judge Choolijian | 18-MJ-2031 8/7/18 | *$8,778,802.96 from account #500331414* |

ATTACHMENT A

DOJ-BP-0004719156

# United States District Court

____CENTRAL____    DISTRICT OF    ____CALIFORNIA____

**In the Matter of the Seizure of**
(Address or Brief description of property or premises to be seized)

**AMENDED
SEIZURE WARRANT**

UP TO AND INCLUDING $8,778,802.96 HELD
IN BANK OF AMERICA IOLTA ACCOUNT
#50033414

**CASE NUMBER:** 2:18-MJ-02031

TO: ___United States Postal Inspection Service___ (USPIS)_ and any Authorized Officer of the United States, Affidavit(s) having been made before me by _POSTAL INSPECTOR LYNDON VERSOZA_ who has reason to believe that in the Central District of California and elsewhere there is now certain property which is subject to forfeiture to the United States, namely (describe the property to be seized)

Up to and including $8,778,802.96 held in Bank of America IOLTA account #50033414

**which is** (state one or more bases for seizure under United States Code)

subject to seizure and forfeiture under  18 U.S.C. § 981(a)(1)(A) and (C)

**concerning a violation of Title __18__ United States Code, Sections _1591, 1952, 1956, and 1957_.**

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the property so described is subject to seizure and that grounds exist for the issuance of this seizure warrant.

_Bank of America_ is ordered to deliver said funds immediately and forthwith upon presentation of this warrant to the law enforcement agent serving the warrant, in the form of a cashier's check made payable to the United States Marshal Service.

YOU ARE HEREBY COMMANDED to seize within 14 days the property specified, serving this warrant and making the seizure in the daytime - 6:00 A.M. to 10:00 P.M., leaving a copy of this warrant and receipt for the property seized, and prepare a written inventory of the property seized and promptly return this warrant to the undersigned judicial officer as required by law.

_8/7/18 at 2:19 p.m._
Date and Time Issued

_Los Angeles, California_
City and State

**Hon., Jacqueline Chooljian, U.S. Magistrate Judge**
Name and Title of Judicial Officer

Signature of Judicial Officer

John Kucera/smb

ATTACHMENT B

Case 2:19-cr-00422-DEJ-E Document 1968-1 *Filed 11/13/23 Page 75 of 76 Page 74 of
136 Page ID #:498
Case 2:18-mj-02031-DUT   SEALED* Document 5-1 *SEALED   Filed 08/07/18   Page 1 of
121   Page ID #:325

# United States District Court

**CENTRAL**          **DISTRICT OF**          **CALIFORNIA**

**In the Matter of the Seizure of**
(Address or Brief description of property or premises to be seized)

UP TO AND INCLUDING $8,778,802.96
HELD IN BANK OF AMERICA IOLTA
ACCOUNT #50033414

**AMENDED
APPLICATION AND AFFIDAVIT
FOR SEIZURE WARRANT**

**CASE NUMBER:**  2:18-MJ-02031

> **FILED**
> CLERK, U.S. DISTRICT COURT
>
> Aug 7, 2018
>
> CENTRAL DISTRICT OF CALIFORNIA
> BY:     kh     DEPUTY

**I, LYNDON VERSOZA**, being duly sworn, depose and say:

I am a United States Postal Inspector with the United States Postal Inspection Service, and I have reason to believe that in the  **CENTRAL**  district of  **CALIFORNIA**  and elsewhere there is now concealed a certain person or property, namely (describe the person or property to be seized)

Up to and including $8,778,802.96 held in Bank of America IOLTA account #50033414

**which is** (state one or more bases for seizure under United States Code)

subject to seizure and forfeiture under 18 U.S.C. § 981(a)(1)(A) and (C)

concerning a violations of Title  18  United States Code, Sections 1591, 1952, 1956 and 1957.

The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:

Continued on the attached sheet and made a part hereof.    X  Yes __ No

/s/

**Signature of Affiant**

Sworn to before me, and subscribed in my presence

August 7, 2018

**Date**

Hon. Jacqueline Chooljian U.S. Magistrate Judge
**Name and Title of Judicial Officer**

John Kucera:smb

Los Angeles, California

**City and State**

/s/

**Signature of Judicial Officer**

ATTACHMENT B

DOJ-BP-0004719158

Case 2:19-mj-02487-DUTY Document 1968-1 *SEALED* 11/13/23 Page 76 of 76 Page 75 of
Case 2:18-mj-02031-DUTY *SEALED* Document 5-1 *SEALED* Filed 08/07/18 Page 2 of
121 Page ID #:326
136 Page ID #:499

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Lyndon A. Versoza, being duly sworn, hereby depose and state
as follows:

### I. TRAINING AND EXPERIENCE

1. I am a United States Postal Inspector employed by the
United States Postal Inspection Service ("USPIS"), Los Angeles
Division, in Los Angeles, California, where I have served since
June 2005. Currently, I am responsible for investigating
criminal violations of money laundering and structuring laws,
such as when United States Postal Service ("USPS") Money Orders
or the United States Mail are used as a means to launder or
structure funds. During my career as a Postal Inspector, I have
participated in or investigated financial violations including
money laundering, darknet investigations, digital currency
investigations, structuring, bank, wire and mail fraud, and
identity theft. In addition, I have received both formal and
informal training from USPIS and other agencies regarding money
laundering and financial crimes. For approximately five years
prior to investigating money laundering, I was assigned to
investigate child exploitation and sex trafficking. In that
assignment, I worked both independently and in a task force
where I led and participated in investigations related to crimes
involving the exploitation of children and sex trafficking.

ATTACHMENT B

DOJ-BP-0004719159