**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | November 14, 2023 |
| Michael Lacey, et al. | ) | 9:45 a.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**TRIAL - DAY 32 - A.M. SESSION**

**(JUROR QUESTION/EVIDENTIARY HEARING)**

Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Government:
    UNITED STATES ATTORNEY'S OFFICE
    By:  **Mr. Kevin M. Rapp, Esq.**
        **Mr. Peter S. Kozinets, Esq.**
        **Mr. Andrew C. Stone, Esq.**
        **Ms. Margaret Wu Perlmeter, Esq.**
        **Mr. Daniel Boyle, Esq.**
    40 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
    kevin.rapp@usdoj.gov
    peter.kozinets@usdoj.gov
    andrew.stone@usdoj.gov
    margaret.perlmeter@usdoj.gov

For the Government:
    UNITED STATES DEPARTMENT OF JUSTICE
    By:  **Mr. Austin Berry, Esq.**
    1301 New York Avenue, NW, 11th Floor
    Washington, DC 20005
    austin.berry2@usdoj.gov

For the Defendant Michael Lacey:
    LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
    By:  **Mr. Paul J. Cambria, Jr., Esq.**
    42 Delaware Avenue, Suite 120
    Buffalo, NY 14202
    pcambria@lglaw.com

For the Defendant Scott Spear:
    FEDER LAW OFFICE, P.A.
    By:  **Mr. Bruce S. Feder, Esq.**
    2930 East Camelback Road, Suite 160
    Phoenix, AZ 85016
    bf@federlawpa.com
    - and -
    KESSLER LAW OFFICE
    By:  **Mr. Eric Walter Kessler, Esq.**
    6720 N. Scottsdale Road, Suite 210
    Scottsdale, AZ 85253
    eric.kesslerlaw@gmail.com

For the Defendant John Brunst:
    BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
    LINCENBERG & RHOW, P.C.
    By:  **Mr. Gopi K. Panchapakesan, Esq.**
    1875 Century Park E, Suite 2300
    Los Angeles, CA 90067
    gpanchapakesan@birdmarella.com
    glincenberg@birdmarella.com


For the Defendant Andrew Padilla:
    DAVID EISENBERG, P.L.C.
    By:  **Mr. David S. Eisenberg, Esq.**
    3550 North Central Avenue, Suite 1155
    Phoenix, AZ 85012
    david@deisenbergplc.com


For the Defendant Joye Vaught:
    JOY BERTRAND, ESQ., L.L.C.
    By:  **Ms. Joy M. Bertrand, Esq.**
    P.O. Box 2734
    Scottsdale, AZ 85252
    joy@joybertrandlaw.com


<u>**I N D E X**</u>

| <u>**PLAINTIFF WITNESS:**</u> | <u>**DIRECT**</u> | <u>**CROSS**</u> | <u>**REDIRECT**</u> | <u>**RECROSS**</u> |
|---|---|---|---|---|
| QUOC THAI | 35 | | | |
| By the Court | 45 | 47 | | |

1              **P R O C E E D I N G S**

2

3          (Proceedings commence at 9:45 a.m.)

4          THE COURT:  Please be seated.

5          (All counsel present except for Mr. Kessler and

6     Mr. Berry.)

7          THE COURT:  All right.  Do we have all clients

8     present?  All defendants are present; all counsel.

9          COURTROOM DEPUTY:  I don't see Mr. Kessler.

10         MR. FEDER:  Mr. Kessler just called me, but I haven't

11    had a chance to call him back.  Yesterday he indicated he would

12    be in another court situation until 10:30.

13         THE COURT:  Can you speak into the microphone?

14         MR. FEDER:  Mr. Kessler just called me.  I am not sure

15    if he is going to be able to make it.  We talked last night.

16    He said he would be busy on something else until 10:30.

17         THE COURT:  All right.  All counsel, all defendants

18    are present.  Government's counsel is present.  We do have a

19    question from the jury.  My law clerk has provided you a copy

20    of it.  The question is dated today.  It reads:

21         "If a defendant is found not guilty in charge #1, but

22    found guilty in charges #2-51, can the defendant be charged in

23    counts # 2-51."

24         The second question is, or statement is:

25         "The question was a concern due to page #27 lines

UNITED STATES DISTRICT COURT

1  10-11.  Please provide clarity if allowed," or "permitted."

2  And it's signed Juror 15.

3         Page 27 is the *Pinkerton* instruction, and I'm assuming

4  they are referring to the second element that, "Second, that

5  person was a member of the conspiracy charged in Count 1 of the       09:48:11

6  indictment."  The -- obviously the question probably meant to

7  ask, "Can the defendant be convicted in Counts 2 through 51?"

8  And that's the way that I intend to read it.  The obvious

9  answer is yes, and I'm inclined only just to indicate that as

10 the answer.                                                          09:48:45

11        I also considered referring them back to page 16,

12 which is related to the separate crime as charged in each

13 count.

14        I'll let you mull that over.  Does the government wish

15 to give me their thoughts?                                           09:49:06

16        MR. STONE:  Yes, Your Honor, I think "Yes" is the

17 perfectly fine answer here.  It is the correct answer.

18 *Pinkerton*, my ability, is a separate theory of liability for

19 the jury to consider with these defendants in these charges.

20 The only other suggestion that we came up with was to point the      09:49:23

21 jury to page 30, which is the instruction on the Travel Act.

22 Defendants are charged in Counts 2 through 51, and it has the

23 elements there on what the jury would need to find has been

24 proven beyond a reasonable doubt to find any of the individual

25 defendants guilty of Counts 2 through 51.  But "Yes" is clearly      09:49:49

1   the answer here, Your Honor.  Thank you.

2           THE COURT:  Thank you.  Who wishes to be heard from

3   the defense?

4           MR. EISENBERG:  I'll go first, Your Honor.  Thank you.

5           I disagree respectfully, Your Honor, with just simply       09:50:02

6   saying, "Yes."  To me, the answer to this is found in the two

7   lines that the jury has quoted or, well, the note quotes, which

8   is 10 and 11, and it says, "Second, that person was a member of

9   the conspiracy."

10          So this is a bit, I wouldn't say, convoluted, but I        09:50:26

11   don't think the answer can merely be "Yes."  I think we ought

12   to be -- to be referring them back to the very lines that they

13   are apparently concerned with, and that is, you have to be, or

14   whoever the defendant is, has to be a member of the conspiracy

15   charged in Count 1.                                                09:50:47

16          And with respect to the Travel Act, that's on page 30,

17   that Mr. Stone referenced.  If -- to me, there again, on line

18   12, there's a reference to proving specific intent, and it

19   says:  The government must establish that each defendant in

20   some significant manner associated himself or herself, so on      09:51:11

21   and so forth, and that really carries it back to the conspiracy

22   charge.

23          But I don't think that's really the relevant part

24   here.  The relevant part is that very jury instruction they are

25   quoting.  And I think to say "Yes" is not right, Your Honor,      09:51:31

```
1    respectfully.

2         THE COURT:  And it's not right why?  I guess I am

3    missing that point.

4         MR. EISENBERG:  Because there is an element in there

5    saying that person was a member of the conspiracy.  So if they    09:51:47

6    find a person was not a member of the conspiracy as charged in

7    Count 1, then there is no -- that second element cannot be

8    fulfilled and, therefore, Counts 2 through 51 are not -- not a

9    part of the approach that they can take with respect to finding

10   a defendant or defendants guilty.  You have to be a member of    09:52:16

11   the conspiracy as charged in Count 1.

12        MR. LINCENBERG:  Your Honor, I would just add one

13   point.

14        THE COURT:  Well, if you look at the first and second

15   elements taken together, I think the answer is "Yes."  It's not    09:53:53

16   a prohibited conclusion certainly.

17        MR. EISENBERG:  If -- may I speak, Your Honor?

18        THE COURT:  Yes.

19        MR. EISENBERG:  Fourth element says, "A defendant was

20   a member of the same conspiracy at the time the Travel Act was    09:54:34

21   committed."

22        Now, that would appear to me to be that the defendant

23   under consideration, whether it is whomever of our clients is

24   under consideration, that also underscores the idea that the

25   defendant or a defendant was a member of the same conspiracy.    09:54:53
```

1    So I think it's unescapable.  You have to be a member of the

2    conspiracy to be convicted, found to be a member of the

3    conspiracy before you can be found to be convicted of one of

4    the substantive acts in 2 through 51.

5            MR. STONE:  Your Honor, if I may.                    09:55:15

6            THE COURT:  Yes.

7            MR. STONE:  That's only if they are moving down the

8    *Pinkerton* theory of liability.  That's a separate theory.

9    Instruction 30 and, you know, goes through, let's see, page 38,

10   the Travel Act, is the Travel Act instruction.  And certainly  09:55:34

11   if the question was:  If defendant is found guilty in charge

12   one, must he be found guilty in charges 2 through 51?  I mean,

13   the answer is no.  It's a separate evaluation for each count.

14   And the jury's determination as to Count 1 for one defendant

15   does not necessarily affect their decisions for Counts 2       09:56:00

16   through 51.

17            (Mr. Kessler is present.)

18            THE COURT:  And that's the way that I read the

19   instructions and the superseding indictment, and the jury

20   instructions with respect to each of the counts being          09:56:18

21   separately considered.  That's how I have always read those

22   instructions.  And so I still believe the appropriate answer is

23   "Yes," and certainly I can refer them back to the Travel Act

24   elements, as well as the separate charge per separate defendant

25   requiring separate consideration.                              09:56:57

1          I think all of those things taken together would add

2    the most clarity.  I'm not whetted to providing them the Travel

3    Act instruction.  I think actually it's essential that they

4    understand that each count is a separate considered count.

5          Yes, Mr. Lincenberg.                                          09:57:31

6          MR. LINCENBERG:  Thank you, Your Honor.  Your Honor, I

7    think there's a second argument that supports what

8    Mr. Eisenberg is saying, which is that if a jury were to find

9    somebody not guilty on Count 1 and guilty on Count 2, it would

10   create an inconsistent verdict because of the way the           09:57:45

11   government presented this case.  So the government did not put

12   on any evidence that --

13         THE COURT:  Well, let me get to the point of the

14   answer.  You're making an argument that probably can be made

15   later, but I'm only dealing with getting the jury the answer.   09:58:03

16         MR. LINCENBERG:  Well, I'm --

17         THE COURT:  Unless you have something to offer in that

18   regard.

19         MR. LINCENBERG:  Well, my argument is in support of

20   Mr. Eisenberg's position that the Court should not direct the   09:58:16

21   jury's attention to page 16 or 30 because doing so presumes

22   that they could reach an inconsistent verdict because the proof

23   did not involve, for example, my client having seen any ads or

24   anything.  It's based on a *Pinkerton* liability theory.

25         THE COURT:  Well, that ship has sailed in terms of        09:58:43

UNITED STATES DISTRICT COURT

1    what the jury has in front of them.  They have the

2    instructions.

3            MR. LINCENBERG:  Right.

4            THE COURT:  And so I don't necessarily find it harmful

5    for them to be redirected to those particular instructions that    09:58:53

6    tell them that they are to consider a separate charge per

7    separate defendant.  It's basically what they've been told to

8    do.

9            All right.  Anything further?

10           MR. FEDER:  Judge, I don't think the Court can or         09:59:12

11   anybody else can presume to say that charges in Counts 2

12   through 51 meant to say "convicted."  I think we have to tell

13   them that we can't understand the question or can't answer it,

14   or be consistent with what Mr. Eisenberg has said.  I don't

15   think it's proper.                                                 09:59:33

16           THE COURT:  Well, you can't have it both ways,

17   Mr. Feder.

18           MR. FEDER:  It's not proper to make an assumption on

19   what a question means by essentially changing the word that you

20   think they intended and then improperly focusing on other         09:59:44

21   instructions that follow that new interpretation.

22           THE COURT:  Well, then under that interpretation my

23   answer would be "Yes," reading it clearly, "Can the defendant

24   be charged in Counts 2 through 51?"  Yes, and indeed they are.

25           MR. FEDER:  The "charged" changes the -- the "charge"     10:00:05

1   in the second question changes the question, the first

2   question, to make it incomprehensible.

3           THE COURT:  It's not incomprehensible, Mr. Feder.

4           MR. FEDER:  Okay.  Objection made.

5           (Mr. Berry is present.)                          10:00:19

6           THE COURT:  All right.  So my inclination then --

7           MS. BERTRAND:  Your Honor, I'd like to be heard.  It

8   will be short.  My suggestion would be not to answer yes or no

9   because this question is -- we are filling in what we don't

10  know with what we think we know, but we may be wrong.  I would   10:00:35

11  suggest the Court, instead of answering yes or no, simply refer

12  the jury to specific instructions, such as the *Pinkerton*

13  instruction and the specific Travel Act instruction.  I think

14  that avoids us getting into any speculation about what's going

15  on.  It is -- the referral back to the instructions is a proper  10:00:57

16  statement of law.

17          And if they have another question, they can ask us.

18  But I think if we're going to do anything, it has to be simply

19  send them back to the instructions and not give them an

20  affirmative yes or no answer on something that is ultimately    10:01:14

21  their decision.

22          THE COURT:  Well, they already have the *Pinkerton*

23  instruction in mind in asking the question, so what I'm

24  inclined to do then is I will simply refer them back to jury

25  instructions at page 16 as well as the Travel Act instruction   10:01:50

1    at page 30, and that's how we will resolve that.

2           MR. STONE:  Your Honor, just a point of clarification,

3    are you going to answer the question "Yes" and then point them

4    to those instructions?

5           THE COURT:  No.                                          10:02:16

6           MR. STONE:  Okay.  'Cause I think your first

7    inclination is the correct one.  This is a clear question with

8    a clear answer, and they are asking for clarity, and I do think

9    "Yes" would help them here.  The instructions suggests that

10   each count is a separate consideration.  And it is clear, as   10:02:32

11   the defendants, if the shoe were on the other foot here, would

12   certainly be arguing that the answer should be "Yes" if it was

13   the other way.  So I think it really should be "Yes," and then

14   point them to the instructions.  That's our position.

15          THE COURT:  Well, on reconsideration, I do think        10:02:51

16   that's appropriate because there is a question that starts with

17   "Can," and the instructions clearly permit them to make that

18   decision.  And so I will answer the question to begin with,

19   "Yes."  And then refer them back to jury instructions at

20   page 16 and 30.  And that's how it will be resolved.          10:03:16

21          All right.  Can --

22          MR. EISENBERG:  Your Honor, I am sorry, I do have a

23   question in how this was phrased by the juror.  He or she says,

24   "Can the defendant be charged in Counts 2-51?"  And perhaps

25   what that person meant is found guilty.  Charged, yes, I       10:03:41

suppose you could be charged, but this is where I think we are

confused.  We don't really know what No. 15 meant by that.  And

they are charged in -- everyone is charged in Counts 2 through

51.

THE COURT:  Well, as I said before, I interpreted it    10:04:06

to mean convicted.

MR. EISENBERG:  And I understand that, Your Honor.

THE COURT:  And the answer, either way, would be the

same, "Yes."

MR. EISENBERG:  Well, I would tend to agree with       10:04:27

Ms. Bertrand.  We don't want to send a signal to them in terms

of what they should be considering or doing or emphasizing

anything in any way, and I think that by saying, "Yes," that

puts them down the road towards conviction.

THE COURT:  In any event, because it's a responsive    10:04:55

answer to the question and because I think the answer, either

way, whether or not it be phrased "charged" or "convicted"

would be yes, it's a straightforward answer, something which

they are seeking.  And so I will again respond:  Yes.  I refer

you to -- I refer you back to jury instructions on page 16 and   10:05:32

30.

All right.  Anything further from the government?

MR. STONE:  No, Your Honor.

THE COURT:  Anything further from defense?

MR. EISENBERG:  Not from me, Your Honor.  Thank you.   10:05:56

1        MR. FEDER:  Over our objection -- I assume this is

2   noted over our objection that you're answering this?

3        THE COURT:  You made a record.  Yes, Mr. Feder, all of

4   the objections are on the transcript.

5        MR. STONE:  Are we adjourned?                    10:06:19

6        THE COURT:  Yes.

7        Just to clarify, this afternoons proceedings are going

8   to be in my courtroom upstairs.

9        (Recess was taken at 10:06 a.m.)

10       (Proceedings commence at 2:50 p.m.)              14:50:55

11       THE COURT:  Please be seated.  We have all counsel

12  present from defense counsel.  Where are they?  No one is here.

13  Well, now the record will reflect the presence of defense

14  counsel.  Government's counsel are all present as well.

15       We have provided to you two questions that the jury  14:52:05

16  submitted.  In my review of the first question, which I will

17  refer to is the question on concealment.  I also did some

18  research in terms of Ninth Circuit precedent, and there wasn't

19  any single sort of definition of concealment that I could find

20  that would be of any sort of use or clarity.  I provided to  14:52:41

21  you, therefore, a Black's Law Dictionary definition of

22  concealment as well as a Webster's dictionary definition of

23  concealment.  They seem to be the same.

24       MR. CAMBRIA:  I have one.

25       MR. LINCENBERG:  I haven't seen that, Your Honor.  14:53:03

1          THE COURT:  You haven't seen what?

2          MR. LINCENBERG:  Your Honor indicated that you

3     provided us a Black's Law Dictionary definition.

4          THE COURT:  Somebody has seen it.

5          MR. CAMBRIA:  I haven't seen it.                    14:53:15

6          MS. BERTRAND:  I think it was a misunderstanding where

7     the source was.

8          MR. LINCENBERG:  I just didn't get a copy of this.

9          THE COURT:  Well, in any event, you have a Black's Law

10    definition and a Webster definition.  They seem to be the same.   14:53:43

11    What I'm inclined to do is answer the question relating to the

12    Black's Law Dictionary term of concealment, "The act of

13    preventing disclosure or refraining from disclosing."

14         MS. BERTRAND:  I only have the Black's Law Dictionary

15    printout.  That's what I received from the Court's clerk and    14:54:31

16    handed out to my colleagues, and the proposed Allen charge.

17         THE COURT:  I will read to you the Webster's

18    dictionary definition, "To prevent disclosure or recognition

19    of."  I'll read it again, "To prevent disclosure or recognition

20    of."                                                      14:54:54

21         Mr. Berry.

22         MR. BERRY:  Yes, Your Honor.  Sounds like what Your

23    Honor is suggesting is from the Black's Law just number one up

24    until it says:  Especially.

25         That's what you're suggesting?                       14:55:23

1          THE COURT:  Yes.

2          MR. BERRY:  Okay.  Yes, our suggestion was going to be

3     to go with Webster's, the first one, just because it was the

4     simplest, but I thought as much as I liked Mr. Garner, I was a

5     little bit worried about getting all of them, but I think the          14:55:40

6     one that you're suggesting is a simplified version of that, and

7     would be sufficient for the jury and would have no objection to

8     that being the instruction.

9          MR. LINCENBERG:  Your Honor, the defense apologizes,

10    but we haven't considered this.  We now have it.  I am getting          14:55:57

11    handed one copy, but we just haven't looked at this.

12          THE COURT:  At what?

13          MR. LINCENBERG:  At the Court's proposed definitions,

14    and we'd like a little time to review it and compare it to the

15    jury instructions and so forth.          14:56:15

16          THE COURT:  There is no jury instructions that defines

17    concealment.  That's the dilemma.  So they are asking for some

18    guidance on what "concealment" means.  So that's the question.

19    So look at the definition.  The -- they are very short.  Take a

20    moment to look at them.          14:56:33

21          MR. LINCENBERG:  I think we should discuss this.

22    Well, and Your Honor -- I think we should discuss it.

23          MS. BERTRAND:  Your Honor, may I make a suggestion?

24          THE COURT:  Yes.  Sorry.

25          MS. BERTRAND:  That's all right.  My suggestion would          14:57:05

1  be this:  Perhaps we could address the Allen charge issue while

2  my colleagues look at the concealment language so we make the

3  most of our time.  I think the more urgent question seems to be

4  the deadlock jury issue.

5       THE COURT:  I'm happy to do that.  My inclination,                    14:57:29

6  because of the detailed statement of Juror No. 15, and I'll

7  read the question for the record, "It is unfortunate that we

8  have been in deliberations for days now and I feel that

9  people's personal feelings, emotions & what if opinions have

10  brought us to a standstill.  There has only been (1) charge    14:58:03

11  that we have finally gotten all members of the jury to agree

12  on.  I feel that this has become a hung jury & we were not able

13  to perform our required duties as jurors."

14       It's signed actually by Juror No. 15 and 3.

15       MR. LINCENBERG:  13.                                          14:58:25

16       THE COURT:  Sorry, No. 13, yes.  My inclination is to

17  give them the Allen charge, and the only modification to the

18  Allen charge that I would give them is to delineate, it begins,

19  "Members of the jury, you have advised that you've been unable

20  to agree upon a verdict," and I would insert, "on one or more    14:58:49

21  counts in this case."  I would then include a pluralized

22  "verdicts" in the second sentence, or the, I guess it would be

23  the first sentence of the first paragraph.  I would insert, "on

24  one or more counts" at the end of that paragraph after

25  "verdicts," and that's the only modification that I would make.    14:59:18

1          All right.  I will hear from the government.

2          MR. BERRY:  Yes, Your Honor.  On the Allen charge, it

3    appears that the current Ninth Circuit Model instruction on

4    that is 6.25, and it has a little bit different language than

5    what Your Honor is proposing here, and we --                    14:59:37

6          THE COURT:  I went into my historic Way Back Machine

7    for this.

8          MR. BERRY:  I suspect there might have been a bench

9    book that might have been in the past knowing how this works.

10   Yes, it's very similar.  I don't want to suggest that what      14:59:53

11   you've proposed is completely off base, but we would just

12   encourage the Court and request that the Court utilize the most

13   current Model instruction from the Ninth Circuit, which is 6.25

14   called Deadlocked Jury.

15         THE COURT:  I'll have to get my --                        15:00:16

16         MS. BERTRAND:  Would the Court like a copy?

17         THE COURT:  Yes.  This is 6.25.

18         MS. BERTRAND:  Yes, ma'am.

19         THE COURT:  Yes.

20         MS. BERTRAND:  Mr. Berry, sorry, I should have showed     15:00:36

21   that to you before I gave it to the Court.

22         MR. BERRY:  I got it right here.  Thank you.

23         THE COURT:  Apparently they omitted the "equally

24   honest and conscientious juror" language.

25         MR. BERRY:  I noticed that, Judge.                        15:01:44

1      THE COURT:  We will have to explore that further.  In

2  any event, is there an objection to giving the 6.25, Deadlocked

3  Jury, with the modification that I outlined indicating one or

4  more counts?

5      MR. LINCENBERG:  Yes, Your Honor.  Your Honor, the                    15:01:58

6  commentary to 6.25 notes that the Court should not give an

7  Allen charge, it's inappropriate, where holdouts know or

8  believe that their identity is known to the Court, and it cites

9  to the case of U.S. vs. *Williams*, 547 F.3d 1187, Ninth Circuit

10  2008.  Here we have a note in which it is signed by Jurors 15       15:02:25

11  and 13.  And if Jurors 15 and 13, for example, are the

12  holdouts, then this is going to have an unduly coercive effect.

13      And the law, if the Court looks at the commentary, and

14  doesn't have to be black and white that it's absolutely clear

15  who the jurors are, but if the -- if they could interpret the    15:02:58

16  charge, quoting from Williams, if they could interpret the

17  charge as directed at them, then the instruction should not be

18  given.

19      I would also note a couple of other reasons why the

20  Allen charge is not appropriate here.  Second argument is that   15:03:18

21  the jurors give pretty direct and strong language that they

22  have a hung jury, and it's their wording, and I think that that

23  would also suggest a coercive effect of an Allen charge.

24  Jurors have advised the Court where they stand.  Judge is

25  saying, in the way they would view it as, I am not buying that;  15:03:42

1    I am not accepting that.

2         Third, I think that where the note -- the note also

3    suggests potential juror misconduct.  The juror is noting that

4    there are jurors in the room who are using "what if" opinions

5    and so forth, which would be inappropriate.                    15:04:05

6         And fourth, in this case where the jurors have lived

7    with this case for 12 weeks, they have deliberated now 14 days,

8    it's some 13 days since they finished closing, they know this

9    case, they've had it for a long time, and I think we should

10   respect the note that they have been deadlocked on all counts  15:04:24

11   but one.

12        THE COURT:  I don't know how you arrive at a

13   conclusion of holdouts or coerciveness from the note.  I think

14   that's a bit of a stretch.  And the commentary also instructs

15   the Court to look at the instructions in total, the duration of 15:05:08

16   the trial, the duration of time that they have been

17   deliberating, and they've been deliberating since last Tuesday

18   from 9:00 roughly to 4:30, although they left a little bit

19   early on Thursday, and we had a holiday on Friday.  They

20   returned again this morning.  We had the question.             15:05:35

21        Their questions have been thoughtful to this point,

22   and so I don't know how you arrive at this conclusion that

23   there is the indicia of coerciveness.  I don't find that to be

24   present on the face of the note.  And to be silent in the face

25   of this note, I think would not help them in their             15:06:03

UNITED STATES DISTRICT COURT

1   deliberations.  I think it is appropriate at this juncture to

2   give them the charge.

3         Sorry, Mr. Berry, I didn't give you an opportunity.

4         MR. BERRY:  You made my point for me.  I would just

5   put a few things on the record here.  I think Mr. Lincenberg is

6   certainly making some inferential leaps by suggesting that we

7   know that 15 and 13 are the holdouts.  It could just as easily

8   be that 15 and 13, you know, very much in favor one direction

9   and that there's some others that they can't seem to persuade

10  that are the holdouts.  There is absolutely nothing from the

11  face of this that would give this Court or any other any

12  indication that we know the identity of the holdout jurors, and

13  so *Williams* is completely inapplicable in that regard.

14        MR. LINCENBERG:  Well, I would just respond with this:

15  We don't know that they are the holdouts.  We don't even know

16  who the foreperson is.  Our guess is probably No. 2 since we

17  now had two notes from No. 2.  But if 15 and 13 are the

18  holdouts, and I think there's reasons to suspect that since

19  they jointly signed on to this note, they are going to

20  interpret the Allen charge as being directed at them, and this

21  is what I think the Ninth Circuit in cases like *Williams* are

22  concerned about is the coercive effect.

23        THE COURT:  All right.  I will give the Allen charge.

24  And let's move to the second note.  I've heard the government's

25  position.  They have agreed to give the Black's Law Dictionary,

15:06:27

15:06:45

15:07:04

15:07:26

15:07:54

1    "The act of preventing disclosure or refraining from

2    disclosing."  What is the collective agreement of the

3    defendants, if there's one?  Ms. Bertrand.

4         MS. BERTRAND:  Your Honor, I don't know that I'm the

5    proper person to comment on concealment because my client is        15:08:23

6    not contained in those charges.

7         THE COURT:  Point taken.

8         MR. LINCENBERG:  Your Honor, I would just ask for five

9    minutes to look at this because we just didn't have them.  It's

10   an important instruction.  I understand the Court is looking at    15:08:38

11   dictionary definitions.  Mr. Eisenberg passed me, you know, for

12   example, the instructions which talk about concealing and

13   disguising.  I'm not sure if it's appropriate to be giving a

14   definition of one versus the other.  We just need a few minutes

15   to look at this.                                                    15:09:03

16        THE COURT:  I am not going to include a definition of

17   "disguising."  It's not in the note.

18        MR. LINCENBERG:  No.  I'm just saying the Court

19   said --

20        THE COURT:  I'll give you ten minutes, Mr. Lincenberg.        15:09:12

21   You and your counsel can move out into the hallway or into the

22   conference room to discuss it.  We have a jury who is waiting

23   and we have other matters to attend to, so move forward,

24   please.

25        MR. LINCENBERG:  Thank you, Your Honor.                        15:09:27

1          (Recess was taken at 3:09 p.m.)

2       (Proceedings reconvened at 3:16 p.m.)

3          THE COURT:  All right.  The record will reflect the

4    return of defense counsel.  Let me read into the record the

5    jury questionnaire as it pertains to concealment.  The question

6    reads:  "Can we get a definition for concealment as it relates

7    to charges 53-62?"  And it is signed by Juror No. 2.  So what

8    position does the defense take?

9          MR. CAMBRIA:  Your Honor, we think that the -- on the

10   Black's Law Dictionary one, the bottom, the bottom phrase where

11   it says, "The affirmative suppression or hiding, with the

12   intent to deceive or defraud, of a material fact or

13   circumstance that one is legally bound to reveal."  I cut out

14   the language "(or sometimes morally,) I cut that part off, and

15   so that's what we would suggest.  We think it's simple.  This

16   is a specific intent crime.  It seems that this definition

17   would be an appropriate one.  So it would be, "The affirmative

18   suppression or hiding, with the intent to deceive or defraud,

19   of a material fact or circumstance that one is legally bound to

20   reveal."

21         MR. BERRY:  Your Honor, if I could respond.

22         THE COURT:  Yes.  That's the definition of fraudulent

23   concealment per the Black's Law notation.

24         Yes, Mr. Berry.

25         MR. BERRY:  Yeah, you're spot on.  So those bottom

1    definitions are sort of expounding on the idea of concealment

2    itself into various forms of concealment, and they've picked

3    the one that they find to be favorable to them.

4         I would point the Court and note for the record that

5    there are a couple of cases here in this circuit that support          15:18:12

6    what Your Honor is suggesting that we use.  They actually use

7    the Black's Law Dictionary definition.  One is in re:  Lockwood

8    at 2007 Westlaw, 754 1005.  It's a bankruptcy appellate

9    decision in the Ninth Circuit from August of 2007, and it uses

10   the definition Your Honor is suggesting.                               15:18:38

11        Then there's a second decision from the Southern

12   District of California in a published decision, *United States*

13   *vs. Nunez* 419 F.Supp.2d 1258, pincite 1263, and that is, as I

14   said, the Southern District of California from 2005.  Both of

15   those use the definition from Black's Law and specifically cite        15:19:03

16   to Black's Law for defining the term "conceal" or

17   "concealment."

18        And so we think that what Your Honor is suggesting by

19   saying, "The act of preventing disclosure or refraining from

20   disclosing" is the simpler and more used definition in terms of        15:19:19

21   cases in this circuit on that issue.

22        MR. CAMBRIA:  I think if you're going to use that, it

23   should include all the language that's in there.

24        MR. FEDER:  Those are money laundry cases, Mr. Berry?

25        THE COURT:  I don't know what -- what was that                    15:19:38

1    question?

2            MR. BERRY:  Mr. Feder is interrogating me.

3            MR. FEDER:  Asking if these are money laundering cases

4    versus other type of cases.

5            THE COURT:  Who are you directing the question to?        15:19:47

6            MR. FEDER:  To Mr. Berry.  We don't have the cases.

7            THE COURT:  I think he mentioned one was a bankruptcy

8    fraud case.  What was the nature of the case?

9            MR. BERRY:  I honestly don't know, Your Honor.  I

10   could figure it out quick.                                        15:20:00

11           MR. CAMBRIA:  If you were going to use number one, I

12   would suggest that it include all the language of number one.

13           MR. BERRY:  Sorry, Your Honor.

14           THE COURT:  In response, when you say "all of the

15   language in number one," all the language in one includes "the    15:20:11

16   injurious or intentional suppression or nondisclosure of facts

17   that one is obligated to reveal."  Is that what you're

18   suggesting, Mr. Cambria?

19           MR. CAMBRIA:  Can I have a minute?

20           THE COURT:  Yes.                                          15:20:33

21           MR. BERRY:  Your Honor, *Nunez*, my quick read of it is

22   a bankruptcy fraud and money laundering case.  The District

23   Court dismissed money laundering charges and the government

24   moved for reconsideration, and so this was the Court assessing

25   issues related to that.                                           15:20:52

1          THE COURT:  All right.  Well --

2          MR. CAMBRIA:  The answer is yes.  We think it should

3     include all the language that's listed under number one.

4          THE COURT:  And I will let you have the final word,

5     Mr. Berry, as to that.                                          15:21:24

6          MR. BERRY:  Sure.  So I think that the "especially"

7     part would be inappropriate to give to the jury here.  The

8     insurance definition under three would also be inappropriate to

9     give to this jury.  That's not what this case is about.  I

10    think if you want to give half here, you could read, "The act   15:21:43

11    of preventing disclosure or refraining from disclosing," or

12    "The act of removing from sight or notice."  That would be a

13    more fulsome definition that would give the defense a little

14    bit of what they are asking without giving sort of

15    inappropriate definitions that are irrelevant or not related to  15:22:06

16    this case.

17         MR. LINCENBERG:  But that leaves out, Your Honor, that

18    one is obliged to reveal, and the reason why the Black's Law

19    definitions are better is because they are looking at legal

20    situations as to whether one has a duty to reveal that.  And we  15:22:22

21    think that's important and relevant here because the

22    government's case, Mr. Ferrer's testimony, was a lot of, these

23    were accurate, but they could have included more.

24         THE COURT:  Well, what I'm inclined to do is I'm going

25    to give the concealment definition, "The act of preventing      15:22:44

1    disclosure or refraining from disclosing" as the answer.

2          I will also proceed to the 6.25 instruction with the

3    modifications I made.  So we will reconvene in the ceremonial

4    courtroom at quarter to the hour.

5          While I have all parties here and on the record                 15:23:10

6    relating to this afternoon's hearing, which is now delayed, I

7    have this Motion to Preclude from the government, and indeed

8    the motion relates to AUSA Stone and Boyle.  And quite frankly,

9    I was shocked to see their names listed on a defense witness

10   list.  Understanding that there's rules and obligations that        15:23:34

11   anybody who calls an Assistant U.S. Attorney to testify, these

12   are frankly officers of the court.  There's not a necessity to

13   list them on a witness list.  The Court can question them as it

14   does in all matters and proceedings.  What they say on the

15   record is an avowal to the Court, and so I frankly don't even       15:23:58

16   see the necessity to having filed this motion.  It should never

17   have had to happen.

18         In any event, they will, in the hearing this

19   afternoon, answer a couple of questions from myself, and so I

20   actually will deny the motion as moot in my point.                  15:24:27

21         And so we will reconvene in the ceremonial courtroom

22   and then we will come back here and at least try to begin the

23   proceedings.  It's going to take some reorganization.  We'll

24   bring the jury up.

25         MS. BERTRAND:  To instruct them on 6.25?                      15:25:38

1          THE COURT:  Yes, as well as provide them -- yes.

2          MS. BERTRAND:  So we stay here?

3          THE COURT:  Yes.

4          (Recess was taken at 3:25 p.m.)

5      (Proceedings reconvened at 3:41 p.m.)                    15:41:29

6          THE COURT:  Please be seated.  And let's bring in the

7   jury.

8                      (Jury is present)

9          THE COURT:  All right.  Please be seated.  Members of

10  the jury, I welcome you to what is my courtroom.            15:43:15

11         You have reported that you have been unable to reach a

12  unanimous verdict on one or more counts in this case.  I've

13  decided to suggest a few additional thoughts to you:

14         As jurors, you have a duty to discuss the case with

15  one another and to deliberate in an effort to reach a unanimous  15:43:41

16  verdict if each of you can do so without violating your

17  individual judgement and conscience.  Each of you must decide

18  the case for yourself, but only after you consider the evidence

19  impartially with your fellow jurors.  During your

20  deliberations, you should not hesitate to re-examine your own   15:44:04

21  views and change your opinion if you become persuaded that it

22  is wrong.  You should not, however, change an honest belief as

23  to the weight or effect solely because of the opinions of your

24  fellow jurors or for the mere purpose of returning a verdict on

25  one or more counts.                                         15:44:27

1    I also remind you that in your deliberations you are

2  to consider the instructions that I have given you as a whole.

3  You should not single out any part of any instruction,

4  including this one, and ignore others.  They are all equally

5  important.                                                      15:44:47

6    What I have just said is not meant to rush you or to

7  pressure you into agreeing on a verdict.  Take as much time as

8  you need to discuss things.  There is no hurry.

9    I ask that you now return to the jury room and

10 continue your deliberations with these additional comments in  15:45:05

11 mind.

12    Please all rise for the jury.  Christine will escort

13 you back.

14                    (Jury is not present.)

15    THE COURT:  Please be seated.                               15:45:45

16    MR. LINCENBERG:  Your Honor, can I comment on the

17 instruction that the court just gave?

18    THE COURT:  Yes.

19    MR. LINCENBERG:  I thought Mr. Berry had noted that

20 the Court suggested instruction had been modified in 2023, and  15:45:57

21 I thought the Court was going to give the current instruction.

22 The Court included in what the Court stated to the jury the

23 part about what I have said is not meant to rush you.  And

24 unless I'm wrong, maybe I'm wrong, I thought that was in the

25 old instruction.                                                15:46:22

```
 1              THE COURT:  I read 6.25 as it is revised with the
 2    modification of --
 3              MR. LINCENBERG:  Okay.
 4              THE COURT:  -- one or more counts.
 5              MR. LINCENBERG:  Sorry.  You're correct.          15:46:37
 6              THE COURT:  All right.  Now, let's proceed to the
 7    hearing.  And I, in my view -- and I will put on the record
 8    that Christine will be delivering the definition of
 9    "concealment" to the jury -- this is a very narrow focused
10    hearing.                                                    15:47:07
11              The question before the Court is whether or not the
12    information that was provided to defense counsel last week,
13    what we listed as Exhibit A, whether it's Jencks material.  And
14    so what I want is some information or testimony about whether
15    or not this falls under the definition of definition of       15:47:36
16    statement under Jencks, and a statement by a testifying
17    witness, and the only individuals that are contemplated here
18    are Quoc Thai and Carl Ferrer.
19              Second, whether it was adopted or approved by
20    Quoc Thai as an agent of the government.  I think there is a   15:48:00
21    subquestion about whether or not it was intended as a final
22    report.  Did Quoc Thai rely on this document, Exhibit A, and
23    what's included in it, for his testimony?  And I also want to
24    understand whether there are portions of it or background
25    material from which it is derived that was given over in       15:48:34
```

discovery.  It's a very narrow inquiry.  And I am going to

confine counsel to those points because that's the only

question before the Court.

        The other question along those lines is whether or not

it constitutes Brady or Giglio material.  So I want some

testimony or examination about whether or not the information

in here is exculpatory or favorable, and I want pincites to the

pages where you think it's favorable information, or whether

it's impeachment material.  There was some indication that

there was potential impeachment.

        Certainly I'm going to look at, and I've already been

told about how the production was made, but I will certainly

examine whether or not this was a willful suppression, or if it

was, or portions of it or background from it, has been produced

as the government indicated last week.

        But really what I want to know in this analysis

regarding Brady is what part of it is exculpatory?  What part

of it is favorable?  And so that's how I intend to proceed.  I

certainly am interested because on the second page of this

exhibit, the communication by Mr. Quoc Thai in the second line

it says, "I wanted to share with you the latest draft of the

tracing document that Lyndon and I put together years ago."

        So there's an inference that he had a hand in creating

the document.  So I want to know whether or not, therefore,

it's an adoption by him of what's in the document.  And I also

1   am interested in the qualifier "years ago."  How has the

2   document changed, if it's changed?  And so those are the

3   questions that I'm interested in.

4         There's a reference in the defendants' motion

5   regarding Prosperity Bank account, and there's an indication          15:51:11

6   about Posting Solutions LLC.  I'm interested, Mr. Stone, in

7   where that was in the testimony, how that came about, and so

8   that's how we will proceed.  And so really the question is, I

9   think, because Mr. Quoc Thai was the testifying agent, I need

10  to hear from him, his involvement in the development of this,          15:51:46

11  whether he adopted it and whether he relied on it in his

12  testimony.

13        MR. STONE:  Here's what I would recommend, Your Honor:

14  Mr. Thai is here.  I recommend, even though it's the

15  defendants' motion, we would put Quoc Thai on first and examine        15:51:58

16  him in the areas that you suggest, and so we would do that and

17  then, of course, the defense could cross-examine him.

18        MR. LINCENBERG:  We disagree.  This is our motion.  We

19  are the movant.  We should be able to examine Mr. Thai first,

20  Your Honor.                                                           15:52:15

21        THE COURT:  Well, it's an inquiry that's now in the

22  Court's hands, and I think procedurally it makes sense to lay

23  that foundation first and then you can examine him, and so

24  that's how we will proceed.

25        MR. STONE:  Other thing, Your Honor, I just want to be          15:52:27

UNITED STATES DISTRICT COURT

1   clear on this, really the most important exhibit that we

2   attached yesterday was Exhibit 8.  I don't know if Your Honor

3   has had an opportunity to go through it.

4           THE COURT:  I have not.  I have not go through all of

5   these exhibits.                                          15:52:47

6           MR. STONE:  It's a lot of papers and it's about

7   26 hours ago that it was filed.

8           THE COURT:  It's a small tree is what it is.  All

9   right.  I have Exhibit 8 before me, and you may --

10          MR. STONE:  So Exhibit 8, I think, really goes, well,  15:53:01

11  Exhibit 8 is most important for all of these because it goes to

12  prejudice, but it certainly goes to Brady and Giglio.  On the

13  left column, Your Honor, are all of the paragraphs that were

14  included in the document that was produced, the document that

15  was attached to Quoc Thai's e-mail on October 23rd.  On the   15:53:19

16  right is language from previously-disclosed documents of which

17  we attached three.  Two of them are civil seizure, I'm sorry,

18  seizure affidavits that were signed by Lyndon Versoza.  One of

19  them was the, sorry, the civil seizure complaint out of CDC A

20  that was filed in 2020, and which the defense attorneys for the  15:53:46

21  who represent the money laundering count defendants here have

22  appeared.

23          And we went through paragraph by paragraph to show

24  that the information that was disclosed on that document that

25  was attached to Mr. Thai's e-mail has already been produced in  15:54:03

15:54:24
15:54:47
15:54:58
15:55:14
15:55:29

1   many instances verbatim.  And so this is -- and it was produced

2   in discovery with respect to the affidavits, and complaint, of

3   course, was filed on the public record.  So this goes through

4   the entire document, and I would say all of the Brady

5   allegations in defense's motion are included here and are

6   almost word for word included in something that's already been

7   disclosed.  So there is no Brady and no Giglio violations

8   because all of this information was previously disclosed.

9          Then --

10          THE COURT:  Let me ask Mr. Lincenberg, who seems to be

11   the person who is leading the counsel on this, have you

12   received Exhibit 8?

13          MR. LINCENBERG:  Yes, we have, Your Honor.

14          THE COURT:  Have you examined it closely with regard

15   to the discovery that was produced?

16          MR. LINCENBERG:  Somewhat.  It's lengthy.  There is a

17   lot of back and forth.  I certainly looked at it with respect

18   to, for example, the parts involving Mr. Brunst.  We think

19   Exhibit 8 is irrelevant to the point.

20          THE COURT:  Well, then why are we here?

21          MR. LINCENBERG:  We're here -- what do you mean why

22   we're here?  Exhibit 8 --

23          THE COURT:  Did you say -- sorry, there is an 8?

24          MR. LINCENBERG:  Exhibit 8.  What Mr. Stone just noted

25   as Exhibit 8 is irrelevant.  Mr. Stone's point is to say, hey,

```
 1   you guys --
 2            THE COURT:  You can make your summation argument.
 3            MR. LINCENBERG:  Just responding to his argument.
 4            THE COURT:  Well, you can make it in summation.  I am
 5   more interested in the time, and we have a witness, and I can      15:55:41
 6   continue your summation for tomorrow, but I was just inquiring
 7   whether or not you saw Exhibit 8.
 8            MR. LINCENBERG:  Yes, I did.
 9            THE COURT:  All right.  Let's bring the witness in.
10            All right.  Mr. Quoc Thai, for the necessity of this      15:56:06
11   hearing, I'm going to have you sworn in.  Please come forward
12   and be sworn.
13   QUOC THAI,
14   (Witness Sworn.)
15            THE COURT:  Mr. Stone, you may proceed when ready.        15:57:03
16            MR. STONE:  Liliana, am I connected here?
17                        DIRECT EXAMINATION
18   BY MR. STONE:
19   Q.  Good afternoon, sir.
20   A.  Good afternoon.                                                15:57:34
21   Q.  Do you remember sending an e-mail on October 23rd, 2023
22   that relates to this case?
23   A.  Yes.
24   Q.  In that e-mail you attached a document?
25   A.  Yes.                                                           15:57:48
```

```
 1   Q.  Are you familiar with that document?

 2   A.  Yes.

 3   Q.  How are you familiar with it?

 4   A.  It was a document that Inspector Versoza produced and, you

 5   know, wrote, and I assisted.                          15:58:05

 6   Q.  Okay.  You said you assisted, what does that mean?

 7   A.  I helped formulate -- adjust some formatting, basically

 8   cosmetic changes.

 9   Q.  What do you mean by "formatting"?

10   A.  Oh, I helped to put together a table of contents and adjust  15:58:22

11   some of the indentations and margins and stuff.

12   Q.  Did you write any of that document?

13   A.  No.

14   Q.  Do you understand what the purpose of that document was?

15   A.  I do.                                              15:58:40

16   Q.  What was it?

17   A.  To identify the assets for asset forfeiture.

18   Q.  Do you know if that document was a final product?

19   A.  It was not a final product.

20   Q.  What do you mean?                                  15:58:53

21   A.  It was a draft of the ongoing work that was being done by

22   Inspector Versoza.

23           MR. STONE:  Liliana, could you try?

24           COURTROOM DEPUTY:  Yes.

25   BY MR. STONE:                                         15:59:16
```

1   Q.  All right.  And you just testified that the document wasn't

2   a final product?

3   A.  That's right.

4        MR. LINCENBERG:  Your Honor, we've marked this

5   document as Exhibit 6267 for purposes of this hearing and a

6   potential forfeiture trial.  If we want, we can refer to it by

7   that number.

8        MR. STONE:  We marked it as well.  I haven't gotten to

9   that yet.

10        THE COURT:  And I marked it as the original Exhibit A.

11   I think we will adopt my Exhibit A.  It's easier to refer to.

12   But thank you for the notation as to your exhibit number.

13        MR. STONE:  Liliana, could you take it off?  Could you

14   take it off?

15        Liliana, you can put that back on.

16   BY MR. STONE:

17   Q.  Okay.  It wasn't a final document, and what was -- what was

18   it for?

19   A.  It was just meant to be a sort of repository of our

20   information and our tracing work relating to the assets.

21   Q.  Do you have an understanding for what Inspector Versoza was

22   going to use the document for?

23   A.  It was the basis for some of his seizure warrants for the

24   assets.

25   Q.  You have this draft in your possession, the draft meaning

15:59:28

15:59:52

16:00:45

16:00:57

16:01:14

1   this Exhibit A, is it in your possession?

2   A.  Yes.

3   Q.  We're looking at an e-mail that we marked for

4   identification as Exhibit 4, and this is the e-mail that you

5   were testifying to earlier?                                16:01:44

6   A.  Yes.

7   Q.  You wrote, "but I wanted to share with you the latest draft

8   of the tracing document that Lyndon and I put together years

9   ago," do you see that?

10  A.  Yeah.                                                  16:01:56

11  Q.  What does that mean?

12  A.  It was just -- when I say "put together," I mean Lyndon

13  wrote it and I helped to format it, and so we collaborated in

14  that way, but it was a document that was written in the past by

15  Lyndon and I helped to organize it.                       16:02:10

16  Q.  And "organize it" means what?

17  A.  Just to make sure that, you know, all the -- it was

18  basically to put together the table of contents, which is, you

19  know, cosmetic in nature.

20  Q.  And so organize, but through a table of comments to make it  16:02:31

21  easier for use?

22  A.  Yeah, easier to access, easier to review.

23  Q.  Do you have in your possession different versions of this

24  document?

25  A.  I do, yeah.                                            16:02:46

Q.  Do you have an understanding of how many versions you have?

A.  I think about seven or eight.

Q.  This one that's attached, is this the latest version, is this the last version that you have in your possession?

A.  This is the last version I have in my possession.                    16:03:02

Q.  Do you have an understanding that Inspector Versoza may have versions as well?

A.  I think he does, yeah.

Q.  And you also sent an e-mail to the prosecution attaching an earlier version of this document in 2019; is that correct?        16:03:21

A.  Yes, that's correct.

Q.  And this is marked for identification as Exhibit 12, and that's your e-mail down there?

A.  It is, yes.

Q.  "Hello Andrew.  Jane, Lyndon and I previously put together    16:03:44 flow charts and notes for the seizure warrants."

        Who is Lyndon?

A.  Lyndon is Inspector Versoza.

Q.  The inspector who wrote this document?

A.  Yes.                                                                  16:03:57

Q.  This draft?

A.  Yes.

Q.  Who is Jane?

A.  Jane is an analyst at the JRIC, the Joint Regional Intelligence Center.                                                  16:04:05

1    Q.  Again, I think you used similar language, "put together,"

2    what does that mean?

3    A.  You know, we collaborated in putting, like combining our

4    efforts to put together this document.

5    Q.  And what was your role in putting it together?                16:04:20

6    A.  My role was primarily just reviewing the documents for any

7    kind of grammatical issues and organizing the table of contents

8    and other things.

9    Q.  You also wrote in this e-mail, "I thought those items would

10   be good to use as a basis for the summary charts," what do you    16:04:41

11   mean by summary charts?

12   A.  Summary charts, my thinking was they would be future charts

13   used for trial and other things.

14   Q.  And this is in 2019?

15   A.  Yes.                                                          16:04:53

16   Q.  Do you have an understanding -- what was your role in the

17   investigation, in this investigation, compared to Inspector

18   Versoza's role?

19   A.  Well, my role was focused on building out and proving up

20   the money laundering charges, charges 53 through 100.             16:05:08

21   Q.  What about Inspector Versoza?

22   A.  He was primarily focused on the asset forfeiture.

23   Q.  This draft document that you attached, what did that refer

24   to or what did that relate to?

25   A.  It was related to the asset forfeiture.                       16:05:23

Q.  You write here, "but I wanted to format that material to
whatever you think would flow best," my question was, did you
actually use this draft document as a basis for the summary
charts?

A.  No, I didn't.                                          16:05:42

Q.  What did you use instead?

A.  I went back and used the source material and built it up
from scratch, and then I identified the records I used and put
it into my own Master Table Excel spreadsheet.

Q.  You see this spreadsheet I put on your screen, this is     16:05:59
identified as Exhibit 10a on the government's exhibit list?

A.  Yes.

Q.  What is this document?

A.  This identifies the source documents and the sort of
underlying records that support all the flowcharts that I      16:06:34
created for the trial.

Q.  Okay.  This is a document you created?

A.  Yes.

Q.  And this is a document that Exhibit 10 reflects was
e-mailed to the defense counsel on February 11th, 2020.  What  16:06:47
are we looking at?  Just take us through what we are looking at
with this document, if you could?

A.  Okay.  So I wanted to organize everything as thoroughly as
I could, and so I initially started with the main tab, and that
tab identifies all the charges identified in the indictment,   16:07:09

```
1    and then it identified the specific transactions.  If I could

2    find a send and receive record for that transaction, and then

3    it identifies the file name that came in from the subpoena

4    records, and then the page number in which that specific item

5    was located and the type of item it was.                          16:07:31

6              So for example, here with the BBT records, we find

7    that there's a signature card of Website Tech on page 1 and 2,

8    we have the bank statements which is, you know, a summary of

9    the bank records on pages 180, 181, and then we have the

10   specific item, which is the wire transfer on page 1274 of that   16:07:54

11   particular file.

12             I then subsequently identified the subpoena number

13   that I drew that file from, as well as the location of that

14   record on Relativity.

15   Q.  And you did this for each money laundering count?            16:08:09

16   A.  Yes, I did.  I went back and for Counts 53 through 100 I

17   would batch the counts together and then further sort of

18   identified and supported all of the supporting transactions

19   that flowed through to the identified count.

20   Q.  And then at the bottom here the counts are broken into       16:08:36

21   clumps?

22   A.  Yes, that's right.  That's right.

23   Q.  And that has similar information in the spreadsheet?

24   A.  Yes, that's right.

25   Q.  And you used this spreadsheet as the basis to prepare your   16:08:50
```

1    summary exhibits, which you testified at trial about; correct?

2    A.  Yes, that's right.

3    Q.  You testified that you didn't rely on Exhibit A, the draft

4    document for your trial testimony, why not?

5    A.  It wasn't thorough enough for my purposes, and it just -- I       16:09:20

6    was focused on the money laundering charges, and that was kind

7    of an asset forfeiture document.

8    Q.  And who was heading up the investigation in the asset

9    forfeiture?

10   A.  Inspector Versoza.                                                 16:09:36

11   Q.  After your trial testimony in this trial several weeks ago,

12   did you begin to prep for asset your asset forfeiture

13   testimony, or your potential asset forfeiture testimony?

14   A.  Yes, that's right.

15   Q.  And when you sent that e-mail in October and attached the          16:10:03

16   draft asset forfeiture document, why did you -- why were you

17   referencing that at that time?

18   A.  Because that was the most recent version that I had of that

19   document.

20   Q.  And there's been -- we have talked about the e-mail you            16:10:23

21   sent in 2019 and the e-mail you sent in 2023, and those

22   attached different versions of the same document; is that

23   right?

24   A.  Yes.

25   Q.  And do you know if there were any changes that you made            16:10:38

```
 1   from the version that you had in 2019 to the version in 2023?
 2   A.  The only change that I made was a notation at the front
 3   page of it that changed the date that said "latest version" and
 4   the new date, which was a date in 2021.
 5   Q.  When did you do that?                                    16:10:59
 6   A.  Around November of 2021 after the first trial.
 7   Q.  After the mistrial?
 8   A.  Yeah.
 9   Q.  Why did you make that change from the version?
10   A.  I was preparing to leave my work in the government and I   16:11:13
11   wanted to make sure that I notated to myself which version was
12   the latest version to reference back for myself in the event
13   that I would need to testify again.
14   Q.  Did you make any changes between November 2021 and October
15   of 2023 to that document?                                    16:11:34
16   A.  No.  No.
17   Q.  And did you rely on that when you were working to prepare
18   for your trial testimony?
19   A.  No.
20   Q.  Which document did you rely on?                          16:11:45
21   A.  This document here, my Master Table.
22          THE COURT:  Was that Exhibit 10a, is that what that
23   is?
24          MR. STONE:  Yes, Your Honor 10a, and I think we,
25   because it's too difficult to print out a spreadsheet, we have  16:12:08
```

1    it on a CD.

2            THE COURT:  Yes, I received it.  Thank you.

3    BY MR. STONE:

4    Q.  On Exhibit A, which was the draft document that you've

5    testified about, did you make any substantive changes to that          16:12:32

6    document?

7    A.  No.  No.

8    Q.  Did you review all the language that Inspector Versoza put

9    in to ensure that it was all correct?

10   A.  No.  I just reviewed it for grammatical errors and any kind         16:12:53

11   of flow issues.  I didn't go back into the record to review the

12   specific statements made in the record.

13   Q.  So if there's some sort of misstatement in there, you

14   wouldn't have known about it?

15   A.  No.                                                                 16:13:11

16           MR. STONE:  That's all I have, Your Honor, unless Your

17   Honor has questions.  I was hoping to address everything you

18   said at the beginning of the hearing.

19                          EXAMINATION

20   BY THE COURT:                                                           16:13:24

21   Q.  I am -- if you know, because obviously there was another

22   individual involved, Mr. Versoza, in this e-mail communication

23   from you to Mr. Boyle and Mr. Stone is copied, I wanted just to

24   get clarification, it says, "but I wanted to share with you the

25   latest draft of the tracing document." When you say "the latest        16:13:58

1    draft," what's your understanding of that time frame?

2    A.  It was the -- I had previous drafts and it was my version

3    of the latest draft that I had.  There, you know, there was a

4    universe of other drafts, and I just wanted to specifically

5    identify that that was the latest draft that I had.                    16:14:31

6            MR. STONE:  Could I ask a follow-up question, Your

7    Honor?

8    BY THE COURT:

9    Q.  Yes.  I am just curious about -- and that's, I guess, and I

10   will ask you this question, is that what you mean when you             16:14:49

11   referenced "that Lyndon and I put together years ago"?

12   A.  Uh-huh.  Yes, ma'am.

13   Q.  If you know, do you know whether or not this what, we're

14   referring to as Exhibit A, what is called the Asset Tracing

15   Master Document Draft, was this -- was the content of it, to          16:15:20

16   your knowledge, if you know again, was it incorporated into any

17   other affidavits or warrants?

18   A.  I don't know, Your Honor.

19           THE COURT:  All right.

20           Yes, Mr. Stone, you had more.                                  16:15:39

21                   CONTINUED DIRECT EXAMINATION

22   BY MR. STONE:

23   Q.  You testified that you had sent this similar document to

24   prosecutors in 2019; correct?

25   A.  Yes.                                                               16:15:50

1   Q.  And the only difference between the version in 2019 and the

2   version you sent in 2023, I believe, was you just changed the

3   date; is that correct?

4   A.  Yes, that's correct.

5           MR. STONE:  Nothing further, Your Honor.                16:16:01

6           THE COURT:  All right.  I am assuming Mr. Lincenberg.

7           MR. LINCENBERG:  Yes, Your Honor.

8           I was discussing with Mr. Stone because we heard from

9   the Court yesterday, we're working off of hard copies.  If the

10  Court or Mr. Thai wants to view one of the exhibits on the       16:16:40

11  screen, I was suggesting if the government wanted to put it up,

12  we could do that, otherwise we'll work off the hard copies.

13          THE COURT:  Does he have hard copies in front of him?

14          MR. LINCENBERG:  We supplied the copies of our

15  exhibits, and I think that he should.                           16:16:58

16          THE COURT:  There are files before him.

17          MR. LINCENBERG:  Okay.  Hi, Mr. Thai.

18                      CROSS-EXAMINATION

19  BY MR. LINCENBERG:

20  Q.  Mr. Thai, you testified a moment ago that you sent the copy  16:17:12

21  of Exhibit A, the 2021 report, to Mr. Stone when you began

22  prepping for the asset forfeiture testimony; is that right?

23  A.  That's right.

24  Q.  So you understood that you would be given that testimony,

25  not Mr. Versoza; is that right?                                 16:17:35

1  A.  That's right.

2  Q.  And did you understand that there was a relationship

3  between the money laundering counts and the asset forfeiture

4  claims?

5  A.  I mean, yeah.                                              16:17:50

6  Q.  Okay.  And when you sent the report to Mr. Stone, you had

7  reviewed it; correct?

8  A.  Yeah.

9  Q.  And when you reviewed it, you believed that it was accurate

10  as far as you understood; correct?                            16:18:10

11  A.  I reviewed it, but I, you know, didn't review it deeply.

12  Q.  And the goal was for you and Mr. Stone to be able to work

13  with each other in anticipation of further testimony, which you

14  would be giving, which would translate if there were

15  convictions on the forfeiture counts on the money laundering    16:18:31

16  counts into potential forfeitures; correct?

17  A.  Yes.

18  Q.  And when you mentioned that there was only one change from

19  the earlier versions, and as far as you understand, the

20  November 2021 report, which is Exhibit A for purposes of this   16:18:48

21  hearing, is the last final copy of that report; correct?

22  A.  That's the last filed copy of the report that I have in my

23  possession.

24  Q.  Okay.  Did anybody ever at the time that you sent it to

25  Mr. Stone, did anybody ever correct you on that?               16:19:06

1    A.   No.

2    Q.   Okay.  And now, looking at the e-mails for a moment that

3    you sent over, so first you in 2019 sent an e-mail which I

4    believe the government has marked as Exhibit 12, the defense

5    has marked as 6270, so this is a 2019 e-mail, do you have it in          16:19:34

6    front of you?  I will read from it.  You should be okay, but if

7    you want to look at it, it's the government's Exhibit 12 there.

8    A.   Twelve.  Okay.

9    Q.   So this is an e-mail that you sent to Mr. Stone in 2019

10   where you say, "Jane, Lyndon and I previously put together flow          16:19:54

11   charts and notes for the seizure warrants."

12        Do you see that?

13   A.   Yes.

14   Q.   Is that true that you had previously put together

15   flowcharts and notes for the seizure warrants?                          16:20:10

16   A.   Yes.

17   Q.   And that related to the earlier version which sounds like

18   it's fairly identical to what's now Exhibit A; correct?

19   A.   Yes.

20   Q.   All right.  And then in 2023 in what the government has             16:20:25

21   marked as -- well, I am not sure if they had a different note

22   on it.  It may be part of Exhibit A.  It's the e-mail

23   transmitting the report, you write to Mr. Stone, "I wanted to

24   share with you the latest draft of the tracing document that

25   Lyndon and I put together years ago."                                   16:20:55

1          Do you see that?

2   A.  I don't know which one it is, but I recall it, yes.

3   Q.  All right.  Well, we also had marked that.

4          MR. STONE:  It's Exhibit 4.

5          MR. LINCENBERG:  We also marked it as 6266.  Do you          16:21:10

6   have those documents?  Okay.

7   BY MR. LINCENBERG:

8   Q.  And is that true what you wrote that this was a document

9   that you and Lyndon put together years ago?

10  A.  Yes.                                                          16:21:31

11  Q.  Now, I want to take a look at -- well, let me go back and

12  focus on a couple of things that the Court was asking about.

13  First, sir, we've marked as 6269 a transcript of your trial

14  testimony, and you may or may not need to look along as I go

15  through a few points on it, but I want to make sure I have it   16:22:11

16  handy there.

17         So let me just ask as a general matter, sir, during

18  your testimony, do you recall testifying that you were the one

19  who identified key individuals and key accounts, and that you,

20  that you knew had funds that you were interested in             16:22:28

21  investigating?

22  A.  Yes.

23  Q.  All right.  And that you were the one who was trying to

24  link those accounts through transactions across the various

25  accounts, do you recall that?                                   16:22:41

A.  Yes.

Q.  And that you were the one who ran searches through the various accounts; correct?

A.  Yes.

Q.  And that work you did, running searches through the various accounts, is work that showed up in both the Exhibit A as well as Exhibit 1479, which was your trial summary charts; right?

16:22:52

A.  So that is incorrect.  My work, when it came to running searches, started after I worked on preparing the financial documents received through subpoenas, I reorganized them according to subpoenas, sent them through, and made sure that they had 902(11) certifications.  I then sent them up to Relativity, reorganized them with regard to the, you know, like the text capture.

16:23:23

Q.  Right.

16:23:47

A.  And from there I built up my Master Table.  So that work was separate from Mr. Versoza, Inspector Versoza's work, which was primarily focused on asset forfeiture.

Q.  I understand that, but the subpoenas and the documents that you got from the subpoenas and looking at the different transfers was work that made its way into both reports; right?

16:24:03

A.  No.  No, because Inspector Versoza and I started with receiving the records from the various financial institutions. Inspector Versoza had his own version, and then because I was tasked with the job of certifying the 902(11)s, I copied and

16:24:27

1  made sure that I had my version.  And from that version I

2  reorganized it and I drew from the reorganized version that was

3  uploaded into Relativity.  That allowed for me to reference it

4  in the Master Table and allowed for me to identify the Bates

5  number on Relativity, which I also identified on the table.       16:24:49

6  Q.  Did you ensure that the work you were doing was consistent

7  with what was in Exhibit A?

8  A.  What?  Say again.

9  Q.  Did you ensure that the work that you were doing in tracing

10  through the accounts was consistent with what was in Exhibit A,   16:25:02

11  which is the 2021 tracing of assets document?

12  A.  No.

13  Q.  Completely independent?

14  A.  Independent.

15  Q.  Okay.  And so when you also testified that you were the one   16:25:12

16  who reviewed the financial records and made connections between

17  the various accounts and identified key financial transactions,

18  it's your testimony that there were two people who

19  independently did the same thing?

20  A.  Yes.                                                          16:25:29

21  Q.  And were you working with Inspector Versoza during the time

22  period when the report was being prepared on those matters?

23  A.  The report, are you referring to the Master Table or your

24  Exhibit A?

25  Q.  Exhibit A.                                                    16:25:46

A.   No.  He -- at the time Inspector Versoza and Analyst Jane

Chung, they were -- they had been on the case for quite a few

months, and I was just transitioning in initially with

reviewing the bitcoin records, but in that -- at that time when

these, this Exhibit A was being produced, I was acquiring

records for them by, you know, they would identify accounts

that they needed.  I would write the subpoenas, I would reach

out to the banks, serve up those subpoenas, acquire those

records, digitize them, and provide Inspector Versoza with

those records.

           So Inspector Versoza was working on the asset

forfeiture matters separate from me at the time.  You know,

later on as I was working on the, you know, the counts relating

to the money laundering charges, I did what I said earlier that

I did, which was absorbed the body of money laundering records,

then reorganized them, Bates stamped them, uploaded them.  And

from that body, I reviewed -- so there were two separate bodies

of records.  They come from the same source.  But because I

reorganized them, I drew from my own because it was easier for

me to keep track of them.

Q.   So why did you send to Mr. Stone last month a copy of the

Exhibit A in anticipation of your testimony?

A.   Because it was the most convenient summary of financial

records relating to the asset forfeiture.

Q.   All right.  And the asset forfeiture was also related to

1    the money laundering; right?

2    A.  Yeah, I guess.

3    Q.  And Exhibit A was a document that you had fully reviewed

4    and understood it to be accurate as best you knew; correct?

5    A.  Well, see, that was a starting point for me.          16:27:56

6    Q.  Let me just ask; is that correct?

7    A.  So can you ask that again?

8    Q.  Did you ever point out any errors to Inspector Versoza in

9    Exhibit A?

10   A.  No, I didn't identify errors.                         16:28:12

11   Q.  Now, in -- let's take a look at Exhibit A.  So in Exhibit A

12   on page 1, for example, it talks about tracing for Prosperity

13   Bank account, and in connection with the tracing for Prosperity

14   Bank account, first you see in the first paragraph it notes

15   that the president, CEO and sole signatory of the account was   16:28:42

16   Michael Gage, do you see that?

17   A.  So let me just make sure.  Your reference to Exhibit A is

18   my item number 12 on my records?

19   Q.  It's --

20   A.  Exhibit 12.                                           16:28:58

21   Q.  It's what we're referring to as Exhibit A.

22   A.  I want to stay --

23   Q.  Government's Exhibit 5.  Do you have that?  It's also

24   defense 6267.

25   A.  Give me a second.  Exhibit 5, yes.                    16:29:17

1   Q.  Okay.  So focusing on -- let's focus on pages 1 and 2 for

2   the moment, tracing for Prosperity, and this was an account,

3   bank account involving for Posting Solutions; right?

4   A.  Yes, it appears that way, yes.

5   Q.  And it notes that M.G., Michael Gage, was the sole          16:29:47

6   signatory and president, do you see that?

7   A.  Yeah, I see it.

8   Q.  And that the Posting Solutions listed Backpage for the P.O.

9   Box application and listed the names of several of the Backpage

10  operators, including Ferrer, do you see that?                   16:30:08

11  A.  Yes.

12  Q.  And then it talks about records of wire transfers from

13  countries outside of the U.S. deposited into that account;

14  right?

15  A.  Yes.                                                        16:30:19

16  Q.  And so did you understand that there were actually foreign

17  wires being used to come into a Backpage affiliated entity,

18  Posting Solutions?

19  A.  You know, when I reviewed -- I separately reviewed the

20  Prosperity Bank account records and I did not focus on like     16:30:37

21  these international wires.

22  Q.  Well, let me ask you, did you focus on paragraph four on

23  page 2 where it says, "A substantial percentage of outgoing

24  payments from Prosperity account '7188 are payments for the

25  operation of Backpage"?                                         16:30:58

1  A.  One of the things I was trying to tell you earlier was

2  that --

3  Q.  Let me ask you if you focused on that?

4  A.  No, I didn't.

5  Q.  Do you recall testifying at trial that the Cereus          16:31:07

6  Properties account was used, appeared to be an entity used to

7  pay the various payroll expenses relating to Backpage, and I am

8  looking at what we have marked as 6269, page 136, the

9  transcript, but I can read it to you.

10  A.  Sure.                                                      16:31:32

11  Q.  "Cereus Properties appears to be an entity used to pay the

12  various payroll expenses of the -- of the activity relating to

13  the Backpage.com."

14  A.  Yeah.

15  Q.  And in fact, you understood, because you had, in your      16:31:41

16  words, at least reviewed the Exhibit A that the -- that the

17  account that was being used to pay some of these Backpage

18  operating expenses was a Posting Solutions Prosperity account;

19  right?

20  A.  Well, no, when it came to looking at the Cereus bank        16:32:03

21  accounts, I identified incoming transfers from Website Tech and

22  other similar spots and I noticed almost immediate outgoing

23  payments to the Backpage owners, and --

24  Q.  You mean to the Cereus owners?

25  A.  Well, to the defendants, yeah.  And I thought its function  16:32:22

1   seemed primarily as a payroll account.  And so I didn't rely on

2   this at all.  I concluded that based on just looking at the

3   financial records that that was functionally a payroll, you

4   know, entity.

5   Q.  Well, payroll for Cereus maybe, but not for Backpage;          16:32:45

6   right?

7   A.  Well, no, because like, you know, Website Tech money comes

8   in, Cereus money goes out.  I think the records show that the

9   funds come from Backpage.com, so...

10  Q.  Well, let me ask you this --                                   16:33:01

11       THE COURT:  Well, let me stop you there,

12  Mr. Lincenberg.  I want to remind you not to go too far afield.

13  The question before the Court is whether or not this is a

14  statement of the witness, whether it was adopted or approved by

15  him, whether it was material that he relied upon for his         16:33:20

16  testimony.  And what I've seen in the last couple of questions

17  that you've asked related to the document, he's struggling to

18  answer because he's not the author and he didn't create it.  So

19  I don't necessarily find that to be useful in my inquiry.

20       So if you would focus your questions related to the         16:33:43

21  Jencks question, that would be helpful.

22       MR. LINCENBERG:  Sure, but his statements in his

23  e-mails is that he did co-create it.  One of the things --

24       THE COURT:  His statement under oath in testimony is

25  that he formatted it and he --                                    16:33:58

1           MR. LINCENBERG:  Right.

2           THE COURT:  -- put some cosmetic changes to it.

3     That's what I'm basing my directive on.

4           MR. LINCENBERG:  We understand that his testimony is

5     different from the e-mails, but one of the areas the Court          16:34:10

6     asked us to look into was relating to whether there's

7     exculpatory or favorable or impeachment materials, and so the

8     reason why I am going into this area is this is one area in

9     which a prior report we believe was, as he stated in his

10    e-mails, prepared by Mr. Thai and Mr. Versoza.  But whether        16:34:34

11    it's that he prepared it, either way, he adopts it.  He's

12    sending it to Mr. Stone for use in the forfeiture part of the

13    case.

14          THE COURT:  Well, maybe --

15          MR. LINCENBERG:  There is contradictory information in        16:34:51

16    here from his testimony at trial.

17          THE COURT:  Well, maybe it's an issue of this is not

18    the appropriate witness to question about that.  Because if

19    you're going about it in terms of the document that he didn't

20    prepare, that he only cosmetically did some work on, and that      16:35:07

21    he had not seen since November of whenever it was, 2021, I

22    don't think it's a good use of time to question this witness

23    with regard to what might be or may not be exculpatory

24    information in an exhibit that he didn't prepare, nor did he

25    rely upon.  So perhaps this is a question of this is not the       16:35:35

1    appropriate witness.

2         MR. LINCENBERG:  The Court has apparently concluded

3    that he didn't prepare it.  We accept his e-mails that he was

4    one of the people who prepared it, and we accept his testimony

5    that he reviewed it and found no mistakes in it and sent it          16:35:50

6    over to the prosecutor to use in helping to prepare his

7    testimony, and we think that makes it Jencks material.

8         I will, if the Court doesn't want me to go through

9    further differences between his testimony and the report to

10   show why this is important impeachment material and                  16:36:10

11   exculpatory, I can pass and just argue that later.

12        THE COURT:  Well, again, I am not foreclosing you from

13   bringing that forward.  I don't think this is the appropriate

14   witness in which to do so with this exhibit, because of the --

15   and I will agree with you, Mr. Lincenberg, what I've heard so        16:36:34

16   far is that he didn't adopt this Exhibit A.  He didn't rely

17   upon it in preparing for his testimony.  He in fact is

18   unfamiliar with some of the paragraphs in here that you've

19   questioned him about that further bolsters his testimony under

20   oath that he didn't rely on it, nor did he prepare for it, and      16:36:56

21   there were apparently two individuals who were tasked with two

22   very distinct things.

23        While they may have some overlap, it appears that this

24   Mr. Versoza was doing his own investigation and doing his own

25   linkages separate and apart from Mr. Quoc Thai here.                 16:37:23

1          So I think if you wish to explore further, if there's

2     exculpatory material in here that is inconsistent with what was

3     in the record at trial, then I think you should probably call

4     somebody else.

5          MR. LINCENBERG:  Well, one of the government's                16:37:44

6     argument as to why this is not Jencks material, and I looking

7     at page 9 of the government's brief, they say:  Second, the

8     draft didn't relate to Mr. Thai's trial testimony.  Did not

9     relate to the money laundering counts that he testified about

10    at trial.                                                          16:38:02

11         And so what I did to prepare for this hearing, Your

12    Honor, in response, was to go through and find many parts of

13    Exhibit A which related to his trial testimony, and so it's

14    Mr. Thai who gave the trial testimony and it relates to that.

15    If the Court doesn't want me to use Mr. Thai, ask him the         16:38:25

16    questions which point out those differences, then that's --

17    then the Court can indicate as much, but that is something that

18    I was intending to do is go through why the government's

19    argument is incorrect through Mr. Thai's testimony about what

20    he testified to.                                                  16:38:49

21         I'll give the Court just one example that's pretty

22    obvious.  Take, for example, Count 100 --

23         THE COURT:  Well, let's be very clear about what the

24    government said.  You only took a portion of it, and I am

25    looking at page 9.  "The document as evidenced by its use         16:39:05

UNITED STATES DISTRICT COURT

1    exclusively in supporting the seizure warrants and civil

2    forfeiture complaint did not relate to the money laundering

3    counts." That's a different sentence than what you just said,

4    so let's be very clear in terms of the record and the

5    pleadings.                                                      16:39:28

6         MR. LINCENBERG:  Well, the point that the Court added

7    doesn't change the statement that the draft -- that the

8    government is saying the draft didn't relate to Thai's trial

9    testimony, period.  That's the first sentence.  That's what I

10   quoted for the Court, and that is incorrect.  And there's       16:39:45

11   numerous examples of Exhibit A relating to Mr. Thai's trial

12   testimony.

13        THE COURT:  Well, you listed those examples, some of

14   them in your motion, but I will say this:  That in my view it

15   blurs the lines.  This is, of course, a money laundering        16:40:08

16   indictment.  There are assets that are being traced for

17   potential seizure, but the question here is, again, I think we

18   all agree that all of this information was related to the

19   investigation that led to the charges in the superseding

20   indictment relating to money laundering, ultimately relating to 16:40:37

21   the complaints of seizing of assets.

22        However, here too, as Mr. Thai has just testified, he

23   did not rely on the information here.  He relied on what they

24   call a master document that he provided and that he was shown.

25   And so that's, I guess that's to me the fine point.             16:41:04

1        MR. LINCENBERG:  Well, look, with all due respect to

2    Mr. Thai, if the Court seems to be reaching the conclusion

3    different from common sense, in my opinion, respectfully, and

4    different from what he puts in his e-mails --

5        THE COURT:  Mr. Lincenberg, you try my patience on                16:41:25

6    numerous occasions.  I have never, ever in my career on the

7    bench been told I defy common sense, and I take umbrage.  And

8    your reputation goes beyond these four walls.  You understand

9    that?  And at some point I may ask Mr. Panchapakesan to take

10   over your representation as lead counsel or co-counsel.               16:41:55

11       And I ask for silence in the courtroom.

12       MR. CAMBRIA:  I didn't say anything.  I didn't say

13   anything.

14       THE COURT:  You will demean yourself as a professional

15   in my courtroom.  And I know you take umbrage with my rulings,       16:42:15

16   everyone does on both sides from time to time, but do not

17   disrespect the Court in that way.  It's not becoming,

18   Mr. Lincenberg, of a person of your caliber in litigation.

19       MR. LINCENBERG:  Your Honor, I do not mean any

20   disrespect to the Court, and I apologize for that.  I am making     16:42:40

21   an argument on common sense as counsel to my client, that

22   common sense would suggest that when -- when IRS agents are

23   working up a case dealing with money laundering and forfeiture

24   and they are working together, and Mr. Thai is sending e-mails

25   accurately stating that this is a document we prepared              16:43:08

 1    together, and Mr. Thai is present as part of Ferrer interviews.

 2    A lot of work went into this investigation.  Respectfully, my

 3    view is that as a matter of common sense, we know that they are

 4    working together; they are sharing information; they are

 5    relying on it; they are putting together reports.  Mr. Thai is          16:43:29

 6    sending over.

 7            I apologize to the Court.  This has been a vigorously

 8    fought case.  I know that the Court has not appreciated some of

 9    my arguments and so forth, and I apologize for that, but I do

10    think I should be able to just make an argument of what I                16:43:50

11    believe common sense would show here, and that's all I'm trying

12    to do.  I apologize for any disrespect that my comments have

13    shown to the Court.

14            THE COURT:  Do you wish to question the witness

15    further?                                                                 16:44:11

16            MR. LINCENBERG:  Yes.  Before going further, if the

17    Court doesn't want me to be going through with this witness

18    further examples of inconsistencies between testimony in

19    Exhibit A, if the Court doesn't believe this is the appropriate

20    witness, then I won't pursue that further.                              16:44:30

21            THE COURT:  I don't find it to be a useful time

22    exercise.  Again, the reasons being, this witness under oath

23    indicates he did not draft the document.  He formatted it and

24    he did not rely on it in his testimony.  He's going to struggle

25    to look at the paragraphs, as he's done a few moments ago, not          16:45:02

understanding and not even knowing what those paragraphs are

about.  It's not a valuable use of my time.  It's not going to

aid in my decision.

So if you have another witness that you wish to pursue

this avenue of questioning, I would suggest we do that,

Mr. Lincenberg, and I can make time for you to do that

tomorrow.

MR. LINCENBERG:  Okay.  I think, Your Honor, I have

completed the examination of this witness.  Thank you.

THE COURT:  Who will be the witness that you would

call tomorrow?

MR. LINCENBERG:  Well, I need to discuss it with

counsel.  What we did is, I believe Mr. Cambria is going to

deal with Mr. Ferrer; Mr. Feder was going to deal with

Mr. Versoza, if we called him.

And so the Court's aware, we did not -- we put

Mr. Stone and Mr. Boyle on the witness list not because we

intended to call them, but because in light of the Court's

inquiry, and we were -- we weren't sure what the Court was

going to inquire about and we wanted to make sure that they

were in court so if the Court had questions for them.  We did

not intend to put them under oath.

THE COURT:  Well, I won't comment any further.  I

think my fuse is at an end, but it really defies

professionalism when you can't pick up the phone or e-mail

1  Mr. Stone and Mr. Boyle and say, "Hey, are you going to be

2  there," rather than putting them on a public witness list.

3        In any event, my chambers will be in contact with you.

4  I have a hearing tomorrow morning, I believe, at 9:30, and we

5  can resume after had hearing is complete.  So I would just ask    16:46:50

6  counsel to be prepared, have your witnesses prepared to be here

7  at least by -- we will pick up at 11:00 tomorrow.

8        MR. STONE:  For the record, we don't have any further

9  witnesses.

10        THE COURT:  All right.  Thank you.    16:47:26

11        Sir, you may step down.

12        MR. BERRY:  Your Honor, could I ask if it would be

13  okay if I appeared telephonically tomorrow for any hearing or

14  questions from the jury?  If it's inconvenient to the Court, I

15  understand.  Obviously my colleagues are perfectly capable, but    16:47:42

16  I won't be here tomorrow.  I'd like to attend in whatever

17  format the Court would allow.

18        THE COURT:  We will try to find a Zoom link.  My sense

19  is we'll be here in the morning and will be otherwise down in

20  the SPC.    16:48:01

21        MR. BERRY:  Even if it's just the phone, whatever is

22  most convenient for the Court.

23        THE COURT:  We will stand at recess.

24        MS. BERTRAND:  11:00 here tomorrow?

25        THE COURT:  Yes.    16:48:14

UNITED STATES DISTRICT COURT

1          (Proceedings concluded at 4:48 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1

2

3                        C E R T I F I C A T E

4

5          I, HILDA E. LOPEZ, do hereby certify that I am duly

6   appointed and qualified to act as Official Court Reporter for

7   the United States District Court for the District of Arizona.

8          I FURTHER CERTIFY that the foregoing pages constitute

9   a full, true, and accurate transcript of all of that portion of

10  the proceedings contained herein, had in the above-entitled

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control.

13         DATED at Phoenix, Arizona, this 15th day of November,

14  2023.

15

16

17                              s/Hilda E. Lopez_____

18                              HILDA E. LOPEZ, RMR, FCRR

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT