Paul J. Cambria, Jr. (NY Bar No.1430909, admitted *pro hac vice*)
Erin McCampbell Paris (NY Bar No. 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:   (716) 855-1580
pcambria@lglaw.com
emccampbell@lglaw.com
*Attorneys for Michael Lacey*

Gary S. Lincenberg (CA Bar No. 123058, *admitted pro hac vice*)
Ariel A. Neuman (CA Bar No. 241594, *admitted pro hac vice*)
Gopi K. Panchapakesan (CA Bar No. 279856, *admitted pro hac vice*)
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW PC
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110
glincenberg@birdmarella.com
aneuman@birdmarella.com
gpanchapakesan@birdmarella.com
*Attorneys for John Brunst*

Additional counsel listed on next page

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>vs.<br><br>Michael Lacey, *et al.*,<br><br>                    Defendants. | NO. CR-18-00422-PHX-DJH<br><br>**DEFENDANTS' MOTION FOR A NEW TRIAL** |

Eric Kessler
KESSLER LAW GROUP
6720 N. Scottsdale Rd., Suite 210
Scottsdale, AZ  85253
Telephone: (480) 644-0093
eric@kesslerlawgroup.com
*Attorney for Scott Spear*

Bruce Feder (AZ Bar No. 004832)
FEDER LAW OFFICE PA
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: (602) 257-0135
bf@federlawpa.com
*Attorney for Scott Spear*

Defendants Michael Lacey, Scott Spear, and John Brunst move, under Fed. R. Crim. P. 33, for the Court to vacate their convictions and grant a new trial if the Court does not grant their motions for a judgment of acquittal on all counts.  For the reasons set forth below, the interests of justice require a new trial.

**1.    The Court Should Grant a New Trial Based on the Grounds Advanced in Defendants' Rule 29 Motions If Those Motions Are Not Granted.**

Defendants incorporate by reference the factual and legal bases for relief advanced in their Motions for Judgments of Acquittal, as if set forth here in full.  If the Court does not grant those motions, the bases asserted in them also justify the granting of a new trial.

**2.    The Court Should Grant a New Trial (or Dismiss) Based on the Government's Failure to Make Disclosures Required by the Jencks Act and by *Brady*.**

Defendants seek a new trial based on multiple failures by the government to timely disclose materials to the defense as required both by the Jencks Act, 18 U.S.C. § 3500, and by the requirements of *Brady v. Maryland*, 373 U.S. 83 (1963).  Defendants focus on two discrete failures:  1) the government's failure to timely disclose Carl Ferrer's emails with its case agent, Lyndon Versoza, which the government disclosed to the defense only after the jury in this case was deliberating; and 2) the government's failure to disclose the factual information the government developed during its investigation of Backpage.com in the Western District of Washington in 2012-2013 (the "WDWA Investigation"), which, among other things, undermines, if not contradicts, the government's trial positions that "anyone could tell" from looking at the adult ads that ran on Backpage.com that those ads were associated with illegal conduct and that Backpage's moderation practices showed criminal intent.

With respect to the first failure, Defendants incorporate by reference the factual and legal bases for relief advanced in the Supplement to Defendants' Motion to Dismiss or to Strike Testimony, and Request for a Hearing Due to the Government's Jencks and Brady Violations (Doc. 1972), and the reply.  To the extent that the indictment is not dismissed, those same arguments support this request for a new trial.

With respect to the second failure, throughout the presentation of its case, the government advanced the narrative that "anyone could tell" that most adult ads on Backpage related to prostitution, just by looking at the ads.  The government presented significant testimony and other evidence to that effect, such as exhibit 52 (expressing the opinion that "blatant prostitution ads are rampant" on Backpage) and exhibit 119 ("[i]t does not require forensic training to understand that these advertisements are for prostitution"), as well as so-called not-for-the-truth "notice" evidence from financial institutions, credit card companies, and non-profit organizations.  From its opening[1] to both of its closings,[2] the government repeatedly exhorted the jury to conclude that *all* Backpage adult ads related to prostitution *because they look like they do.*

The government has steadfastly refused, despite repeated requests from and motions by the defense, to produce nearly all the factual information developed during the WDWA Investigation, a federal investigation that took place right in the middle of the alleged conspiracy and did not result in a prosecution of Backpage or its owners.  The government has claimed that the WDWA Investigation is irrelevant to this case, but the government elicited testimony from its cooperating witness at trial that Backpage.com was under "pressure" from the WDWA Investigation, so used the investigation as a sword at trial while

---

[1]  08/31/23 p.m. Tr. at 147:10-11 ("the evidence is going to show that the Adult section was for prostitution ads").

[2]  11/01/23 a.m. Tr. at 45:9-15 ("Mr. Eisenberg talked about in his closing argument about Grant Snyder saying that the ads did not provide direct evidence of prostitution.  You may remember him talking about that.  Well, remember he said it was suggestive, and so did their expert.  That is essentially circumstantial evidence.  They are saying, 'Yeah, it looks like prostitution.'  It is circumstantial evidence of prostitution."); 11/01/23 a.m. Tr. at 61:3-8 ("And then don't forget the expert Dr. Mehlman-Orozco, the person who can't answer a straight yes or no question…. She cannot be taken seriously, ladies and gentlemen.  She says she doesn't know whether they were real ads or not, but you know."); 10/27/23 a.m. Tr. at 10:21-11:2 ("And you can look at her postings.  Look at a few – at least one of them.  You will see all the indicators of prostitution… [T]hey have this term that you see in a lot of these things because this is trying to give them, you know, some type of plausible deniability and smoke out law enforcement.  This is not an offer for prostitution.  All donations are for my time and companionship only.  We saw that in some form in a lot of the postings.  It's nonsense, though; right?  This is really for prostitution.").

seeking to shield disclosures relating to that investigation.[3]  Defendants believe the WDWA Investigation determined that, even though many people who saw Backpage.com adult ads might conclude the ads related to prostitution, their conclusions would be unsound because so many activities involving sex and money are *lawful*, even if those activities might look like prostitution to an average person. That determination seriously undermined one of the core tenets of the government's case and would have been both exculpatory and impeaching at trial.  Defendants also believe the WDWA Investigation determined that Backpage.com's moderation practices were consistent with industry standards.  That determination undermines another core tenet of the government's case, that Backpage.com's moderation program was designed to facilitate prostitution, and would have been both exculpatory and impeaching at trial.

When the Court first stepped into this case, it declined to dismiss this case based on the government's failure to produce these materials, saying that the government's case was "in its infancy" when the issue arose in the previous trial, and that the "materiality of the documents ha[d] not been established."  Doc. 1444 at 14:8-16.  The Court "decline[d] to make a ruling as to the relevancy or materiality of the WDWA documents *at th[at] juncture*." *Id.* (emphasis added).  Having now seen the entirety of the government's case, the Court should have little difficulty seeing how the information the government has withheld from the defense would be both relevant and material to the defense, particularly given the low bar for materiality under *Brady*:  "materiality is a low threshold; it is satisfied so long as the information . . . *would have helped to prepare a defense*." *United States v. Soto-Zuniga*, 837 F.3d 992, 1003 (9th Cir. 2016) (emphasis added).  The government's refusal to produce to the defense these plainly exculpatory and impeaching materials warrants, at a minimum, at new trial, if not the granting of the defense's previous motion to dismiss with prejudice based on the government's failure to provide these materials before the first trial.  (Docs. 1355, 1410).

---

[3]  "Q. And in 2012, if you know, were you experiencing any pressure regarding the website? A. Yes, there was another prostitution investigation of the site."  09/13/23 am Tr. at 80:5-8.

**3.      The Court Should Grant a New Trial Because the Government Elicited False or Misleading Testimony from Carl Ferrer.**

If a prosecutor elicits false or misleading testimony from a trial witness about a material fact, the defendant has been denied due process of law, requiring reversal of his conviction. *Alcorta v. Texas*, 355 U.S. 28, 31 (1957) (a prosecutor's elicitation of testimony that "gave the jury the false impression" about a material fact "was not accorded due process of law," requiring the reversal of the conviction). "A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the [prosecutor] has the responsibility and duty to correct what he knows to be false and elicit the truth….That the prosecutor's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair." *Napue v. Illinois*, 360 U.S. 264, 269-270 (1959); *accord Brown v. Borg*, 951 F.2d 1011, 1015 (9th Cir. 1991) ("prosecutor had a duty not to mislead the jury" by presenting testimony "in such a way as to suggest the opposite of what she alone knew to be true;" by violating this duty, she "pervert[ed] the adversarial system and endanger[ed] its ability to produce just results," which required the conviction to "be overturned unless the misconduct can be proven to be harmless beyond a reasonable doubt").

> To establish a constitutional violation requiring reversal under *Napue*:
> a defendant must show: (1) testimony or evidence presented at trial was
> actually false or misleading; (2) the government knew or should have known
> that it was false; and (3) the testimony was material, meaning there is a
> reasonable likelihood that the false testimony *could* have affected the judgment
> of the jury.

*United States v. Kabov*, 2023 U.S. App. LEXIS 18214, at *2 (9th Cir. July 18, 2023) (emphasis in original; internal quote marks omitted). "Mere speculation is insufficient to establish a claim under Napue.  There must be something in the prosecutor's questioning, or the answers given, that may be construed to reflect an intention by the prosecutor to mislead the jury." *United States v. Renzi*, 2013 U.S. Dist. LEXIS 202881, at *13 (D. Ariz. Oct. 25, 2013) (cleaned up; internal citation omitted). "Although *Napue* does not create a per se rule of reversal, [the Ninth Circuit] has gone so far as to say that if it is established that the

4

government knowingly permitted the introduction of false testimony reversal is virtually automatic." *Sivak v. Hardison*, 658 F.3d 898, 912 (9th Cir. 2011) (cleaned up).

One thing that was glaringly absent from the government's case was evidence that Messrs. Lacey, Spear, or Brunst had any contemporaneous knowledge about any of the charged ads or took any action connected to the publication of any charged ad. The only evidence that the government presented to try to connect any Defendant or even any purported co-conspirator to any of charged ads or the persons posting them related to Pamela Robinson—notably the testimony the government elicited from Carl Ferrer about "his" emails with Ms. Robinson. 09/14/23 p.m. Tr. at 79:7-102:8. The prosecution asked Mr. Ferrer: "did you have e-mail exchanges with somebody by the name of Pamela Robinson?" Mr. Ferrer answered: "Yes." *Id.* at 79:7-9. The government then asked Mr. Ferrer numerous questions about exhibits 162, 162-a, 163-165, and 168, which were a series of emails between Pamela Robinson and "Carl" or "carl@backpage.com." Those questions were intended to convey the false impression that Carl Ferrer was one of the parties to these emails, while both the prosecutor and the witness knew that he was not and, therefore, generally referred in their questions and answers to emails to and from an email address—carl@backpage.com—rather than by referring to emails to and from Mr. Ferrer. The following examples are illustrative:

> Q. So looking at Page 2 of 162, what question is Pamela Robinson asking Carl at carl@backpage.com?
> A. She's asking, "can i use the promo code to get a discount on my escort ads?"
> Q. And what do you respond? What does carl@backpage.com respond?
> A. "Yes. It will work in any category. Carl."
> 09/14/23 p.m. Tr. at 80:24-81:5.

> Q. All right. Then let's go to Exhibit 164 for the witness' eyes only. Now, Exhibit 164, is this also a continuation of an exchange between you and Pam—or carl@backpage and Pamela Robinson?
> A. Yes.
> 09/14/23 p.m. Tr. at 88:19-23.

Q. What is this?  Can you tell us what -- what is this in effort -- or what are
you saying here to Pamela Robinson?
A. So Pamela Robinson, she received a marketing e-mail from
carl@backpage.com and it had her last post on 2010 March 27th in the
category of biz ops.
09/14/23 p.m. Tr. at 89:4-8.

Q. Now, what does carl@backpage.com tell her?
A. "Hi, you should be able to edit now.  Please let us know if you are still
having trouble."
Q. All right.  What is she—what is she talking about here in this e-mail
exchange?  We're now—we started in 2010.  Now we're in 2012, right?
A. Yes.
Q. All right. What is -- what is she saying here to you?
A. She's concerned about an article that broke in Seattle about the possible
addition of—
09/14/23 p.m. Tr. at 90:15-24.

After the government left the jury with the impression for nearly a month that Mr.
Ferrer had been directly exchanging emails in 2010, 2011, and 2012 with Pamela Robison,
whose ads accounted for ten of the fifty charged ads, Mr. Ferrer was confronted about his
testimony on cross-examination and admitted:  "It really wasn't my email address."
10/10/23 a.m. Tr. at 104:10.  Mr. Ferrer then admitted that emails to the
carl@backpage.com address went to his staff and that the emails from that address to Ms.
Robinson could have been written by any of several members of his staff.  10/10/23 a.m.
Tr. at 104:11-24.

There can be no doubt that Mr. Ferrer's testimony was false (or at least highly
misleading), that the prosecutor knew it was false (or at least highly misleading), and that the
testimony was material.  As to the first point, Mr. Ferrer admitted on cross-examination that
the emails to and from the carl@backpage.com email address were received by and
responded to by his staff, not by him, contrary to his testimony on direct examination.  As to
the second point, this is a textbook case of there being "something in the prosecutor's
questioning, or the answers given, that may be construed to reflect an intention by the
prosecutor to mislead the jury."  *Renzi*, 2013 U.S. Dist. LEXIS 202881, at *13.[4]

---

[4]  The prosecutor's questions to Mr. Ferrer were so far from norm, and forced, that the
prosecutor kept saying "you," and then quickly correcting himself to say

As to materiality, there can be no question that the false or misleading testimony the prosecutor elicited from Mr. Ferrer could have affected the judgment of the jury.  First, Pamela Robinson's ads were ten of the fifty charged ads (eight of the seventeen substantive Travel Act convictions).  Second, Mr. Ferrer's false testimony about emails with Pamela Robinson was the principal means the government used to try to link the Defendants to any of the charged ads, if only through Mr. Ferrer, their purported co-conspirator.  Finally, the same prosecutor who elicited the false testimony from Mr. Ferrer on direct went on to exploit Ferrer's false testimony in his closing argument, as if Ferrer had never recanted:

> You remember this bit of testimony with Mr. Ferrer.  He talked about this email exchange.  There's a number of email exchanges between a woman by the name of Pamela Robinson.  Her email address is clprovider@yahoo.com. This is one of the emails.  This is Exhibit 164.  She says:  I don't do this because I want to. I do it because I have to…. You also know from the email exchange she had problems with them deleting her posts -- her picture.

10/27/23 a.m. Tr. at 10:5-14.  Given the weakness of the government's case and the lack of evidence to tie any defendant or any purported co-conspirator to any charged ad, Mr. Ferrer's false testimony unquestionably could have affected the judgment of the jury. Because the government purposely elicited false or misleading testimony at trial, on a material point, reversal is warranted as "virtually automatic." *Sivak*, 658 F.3d at 912.

**4.     The Court Should Grant a New Trial Because the Government Repeatedly Made Improper Arguments in its Opening and Closings.**

**A.     The Government Improperly Urged the Jury to Convict Defendants of Conspiracy Based on a Legally Insufficient Object.**

As discussed in Mr. Brunst's Rule 29 motion, the government exhorted the jury to convict on conspiracy under Count 1 arguing the object of the conspiracy was to "make money," which is not a federal crime:

---

"carl@backpage.com."  On one occasion, the prosecutor failed to use "carl@backpage.com," but the witness then used the email address in his response in an apparent attempt to cover for the prosecutor.

> Defendant [sic] became members of the conspiracy knowing of at least one of
> its objects and intending to help accomplishment -- accomplish it.  What is the
> object in this case?  Well, one of the object [sic] is to make money.  And they
> did.

10/27/23 a.m. Tr. at 6:22-23.  Because there is no way to know now whether the jury
followed the prosecutor's exhortation and convicted Spear and Brunst based on this legally
insufficient object, at a minimum a new trial is warranted if the Court does not acquit.
Because Defendants' motion to dismiss Count 1 for stating the same legally insufficient
object remains pending (Doc. 1744), a more appropriate outcome would be to dismiss
Count 1 for the reasons set forth in the motion to dismiss, as a sanction for the government
urging the jury to convict Defendants on patently legally insufficient grounds, or both.

**B.    The Government Improperly Urged the Jury to Convict Defendants of
Conspiracy Based on an Impermissible Boundless Conspiracy.**

In 2019, Defendants moved to dismiss Count 1 because it improperly charged a
boundless conspiracy to promote prostitution in general.  *See*, *e.g.*, Doc. 798 at 3-6.  The
Court denied Defendants' motion, holding:

> Defendants' suggestion that the SI improperly indicts a 'boundless conspiracy
> to facilitate prostitution in general,' (Reply at 4), however, mischaracterizes the
> charges against them.  Such a claim is simply untrue.  They were not indicted
> for facilitating the amorphous notion of 'prostitution.'  They were indicted for
> facilitating (via publishing ads) on fifty distinct occasions where prostitutes,
> prostitution-related businesses, or other groups were involved in the business
> of prostitution.

Doc. 946 at 13:17-22.

Moreover, Defendants repeatedly objected to the government's proposed jury
instructions on related grounds—that the government's instructions suggested that any
person who posted an ad on Backpage.com could be a member of the conspiracy, but such a
boundless conspiracy was legally impermissible because it necessarily would amount to
multiple conspiracies, not one conspiracy:

> Such a boundless conspiracy also would be a classic hub and spoke conspiracy
> lacking a rim, which the Supreme Court held impermissible in *Kotteakos v.*
> *United States*, 328 U.S. 750, 754–55 (1946) ("[T]he pattern was 'that of separate
> spokes meeting at a common center,' though we may add without the rim of

8

the wheel to enclose the spokes."); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002) ("A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction . . . . In *Kotteakos*, the Supreme Court made clear that a rimless wheel conspiracy is not a single, general conspiracy but instead amounts to multiple conspiracies between the common defendant and each of the other defendants.").

Doc. 1626-3 at 64-65, 72, 77.

In its closing, the government ignored both this Court's ruling on Defendants' motion to dismiss and the law cited in Defendants' objections to the government's proposed jury instructions, and told the jury it could convict Defendants of the boundless conspiracy the Court previously held had not been charged:

> Three elements to conspiracy. There was an agreement between two or more persons to commit violations of the Travel Act. That's all we need, is two people. But you know from the testimony and the evidence that there were more than two. There's [sic] these five defendants. There's Mr. Ferrer. Mr. Hyer. There's Mr. Adams. There's even Dollar Bill, Mr. Mersey. There's David Elms, who was running The Erotic Review. Those were the conspirators. Then every pimp who posted on Backpage.com and used the money to run their criminal—their—their small criminal enterprise of prostitution, they are your conspirators.

10/27/23 a.m. Tr. at 6:8-18.

Because the government asked the jury to convict the Defendants in its closing based on a legally impermissible boundless conspiracy, the Court should reconsider its denial of Defendants' prior motion to dismiss Count 1, dismiss Count 1, and vacate the convictions for violating Count 1. Alternatively, because there is no way to know now whether the jury followed the prosecutor's exhortation and convicted Messrs. Spear and Brunst based on the legally impermissible boundless conspiracy, at a minimum a new trial is warranted if the Court does not dismiss or acquit on Count 1.

**C.      The Government Improperly Urged the Jury to Convict Defendants of "Promoting Prostitution."**

From the start of its opening statement to the end of its rebuttal closing, the government repeatedly conflated promoting a specific business enterprise involving

9

prostitution offenses with "promoting prostitution," telling the jury repeatedly that the

Defendants could be convicted for "promoting prostitution."[5]  For example:

> "The evidence at trial will show how defendants used three different strategies
> to market and promote prostitution…" 08/31/23 p.m. Tr. at 146:18-19.

> "The charges for these five defendants, they're all charged with promoting
> prostitution…". 08/31/23 p.m. Tr. at 147:24-25.

> "At the end of the trial, you will be asked to deliberate on whether or not
> these five individual defendants are guilty or not guilty of promoting
> prostitution.  Three of the defendants are also charged with money laundering
> offenses, money laundering meaning when they get the proceeds from the
> promotions of—from the promoting prostitution, what they did with it."
> 08/31/23 p.m. Tr. at 148:6-13.

> "These defendants promoted prostitution when they built up the website…".
> 08/31/23 p.m. Tr. at 173:12-13.

> "What's the evidence in this case? What is the evidence that Backpage
> promoted prostitution?  Well, who did you hear from? You heard the
> testimony of Carl Ferrer and Dan Hyer and Jess Adams, all insiders of
> Backpage."  10/26/23 p.m. Tr. at 52:24-53:2.

> "The defendants' own words in the form of their own  internal emails
> demonstrate that three knew they were running a prostitution website and
> they were promoting prostitution."  10/26/23 p.m. Tr. at 53:18-20.

> "Mr. Ferrer…estimated that they received 20,000 subpoenas…Isn't that just
> evidence enough, frankly, that they were running a criminal enterprise that was
> facilitating and promoting prostitution, just the mere fact that they are getting
> these subpoenas?"  10/26/23 p.m. Tr. at 83:9-15.

> "There is a lot of evidence in the charges, but the case is actually quite simple.
> There are 51 counts focused on how the defendants promoted prostitution,
> and there are 49 counts focused on how the defendants engaged in money
> laundering of the illegal profits they made from promoting prostitution."
> 11/01/23 p.m. Tr. at 38:12-17.

---

[5]  The government's repeated claims in its opening and each closing could not have been
inadvertent, given the Court's ruling that Defendants:  "were not indicted for facilitating the
amorphous notion of 'prostitution.'  They were indicted for facilitating (via publishing ads)
on fifty distinct occasions where prostitutes, prostitution-related businesses, or other groups
were involved in the business of prostitution."  Doc. 946 at 13:17-22.

"What else do you have, though, to show that those laws were violated and that they were in fact promoting prostitution?  We brought before you multiple witnesses."  11/01/23 p.m. Tr. at 49:13-15.

"Promoting prostitution" is not a federal crime, but the prosecutors told the jury repeatedly that they could convict Defendants for "promoting prostitution."

The government also told the jury in the rebuttal closing that promoting prostitution "means helping someone commit a prostitution offense, and that's what Backpage did" (11/01/23 p.m. Tr. at 51:12-13), but the law plainly does not permit Defendants to be convicted of either substantive Travel Act offenses or conspiracy to violate the Travel Act simply because the Backpage.com website helped someone commit a prostitution offense. Because the government presented absolutely no evidence that any Defendant knew anything about any of the charged ads, or knew anything about any person who posted or who was featured in any of the charged ads, or took any action connected to the publication of any of the charged ads, Mr. Spear's substantive Travel Act convictions and Messrs. Spear's and Brunst's conspiracy convictions are far more likely to have resulted from the government repeatedly telling the jury that they could be convicted if Backpage.com "promoted prostitution" rather than the jury having found that either Messrs. Spear or Brunst did something to help publish an ad with the specific intent to facilitate a business enterprise they knew to be involved in prostitution offenses.  Indeed, there was no such evidence even as to Mr. Ferrer with respect to the fifty charged ads—except for the false testimony the government elicited from him regarding Pamela Robinson.

**D.     The Government Improperly and Repeatedly Told the Jury It Could Convict Defendants Without a Showing of Specific Intent.**

In its closing, the government repeatedly implied that the jury could convict Defendants without need to find the specific intent required for violations of the statutes.  It did not do so using those words, but by repeatedly telling the jury that it could convict on grounds that were utterly lacking in specific intent.

For example, the government told the jury that Carl Ferrer's testimony that Backpage received thousands of subpoenas over the years was, standing alone, sufficient for the jury to

convict the Defendants of the fifty-one charges relating to the Travel Act: "Isn't that just evidence enough, frankly, that they were running a criminal enterprise that was facilitating and promoting prostitution, *just the mere fact that they are getting these subpoenas*?"  10/26/23 p.m. Tr. at 83:9-15 (emphasis added).  There was absolutely no basis in fact or in law to support that outlandish and outrageous claim, which not only bypassed any requirement to prove specific intent, but also required no subsequent overt act.

In the rebuttal closing, the government doubled down—telling the jury it had absolutely no obligation to prove that any Defendant had any knowledge of any of the charged ads:

> Next, the defendants argue, well, they had [no] knowledge of these specific 50 ads.  Ladies and gentlemen, these ads are just a sample.  We're not going to charge them with a million counts based upon the millions of ads.  That's why there's a conspiracy charge covering the statute, covering the 14-year life of the conspiracy.  What I'm not -- what I'm not going to show you is a jury instruction says we must prove that any defendant had specific knowledge of these particular ads because it isn't in there.  We don't have to do that.

11/01/23 a.m. Tr. at 50:6-14.  Here, the government not only told the jury that it did not need to find specific intent, but the government gratuitously added the highly inflammatory and prejudicial suggestion that it could have charged Defendants with "a million counts," but only was asking the jury to convict them of a modest fifty counts—which by itself justifies a new trial.  *See United States v. Ballard*, 727 F. App'x 6, 10 (2d Cir. 2018) (vacating convictions because trial court should have granted a new trial under Fed. R. Crim. P. 33 due to improper prosecutorial summation comments suggesting that incriminating evidence had not been put before the jury).  As the government introduced no evidence that any of those millions of ads proposed an illegal transaction, and thus the jury was obligated to presume that Backpage.com's publication of those ads was protected by the First Amendment, the government's suggestion to the jury that Defendants could have been charged with a "million counts" was highly improper.

Responding to the argument of Mr. Brunst's counsel that Brunst was not involved in the operations of Backpage.com (and thus could not have had the specific intent to violate

the Travel Act), the government told the jury that what mattered was not what Mr. Brunst's

role was, but that he made a lot of money—again telling the jury to ignore the need to find

specific intent:

> You heard some back and forth essentially between Mr. Rapp, Mr. Lincenberg
> about what Mr. Brunst's role was.  You heard Mr. Lincenberg refer to him as a
> nonoperational CFO, whatever that means. You've heard him refer to as a bill
> collector, a bag man. Ladies and gentlemen, I am telling you, you can call him
> bananas.  It doesn't matter what you call him. What matters is that he made
> millions off of Backpage.

11/01/23 a.m. Tr. at 47:1-8.

It is no wonder that the jurors were confused about how to apply the Court's

instructions, since the government repeatedly told the jury that it should convict Defendants

on grounds that the instructions did not allow, like making money, receiving subpoenas, or

the millions of purported counts that the government did not charge.  These are just a few

examples of the government trying to induce the jury to disregard the Court's instructions

and convict the Defendants regardless of the law, which it appears the jury ultimately did.

The government's repeated statements to the jury that it could convict Defendants on

factually and legally insufficient grounds was highly prejudicial and warrants a new trial.

**E.      The Government Improperly Exhorted The Jury To Convict Defendants
Based On Backpage.com's Publication of Ads Protected by the First
Amendment.**

Defendants incorporate by reference the First Amendment argument set forth in Mr.

Spear's Rule 29 motion as a basis for a new trial and supplement that argument with the

following.  Throughout the trial, the government elicited evidence, most of which was

admitted under the not for the truth hearsay exception, of politicians, clergy, representatives

of non-governmental organizations, and reporters claiming that Backpage.com adult

advertisements were associated with illegal activity and calling for Backpage.com to either

cease publishing adult advertisements or to shut down the website altogether.  But those

calls for Backpage.com to stop publishing were made on political, religious, moral, and other

grounds—not legal grounds.  The government told the jury in the closing that "[t]hey know

about the Attorney Generals letters, and they know they are not on solid ground"
(11//01/23 a.m. Tr. at 54:13-14), but that was not true, as the National Association of
Attorneys' General letters admitted at trial claimed that many Backpage.com ads *related to
illegal activity* but the N.A.A.G. letters *never* claimed that Backpage was engaged in unlawful
conduct for publishing such ads.  Nor did the N.A.A.G. letters claim that Backpage.com's
publication of those ads was unprotected by the First Amendment.[6]  To the contrary, in its
letter calling on Backpage.com to shut down its adult services section, N.A.A.G. justified its
call on moral, not legal, grounds, saying:  "We too, call on backpage to listen, to care, and
respond now by shutting down the adult services section of its website.  It is the right thing
to do to protect innocent women and children."  Exhibit 52.  The government's
introduction of prodigious amounts of evidence, both testimonial and documentary, of calls
for the shutdown of Backpage.com on political, religious, moral, and other grounds—not
because Backpage.com's publication of adult advertising was unprotected by the First
Amendment and subject to criminal sanction—was highly prejudicial to Defendants and of
no relevance to the jury's determination under the Court's jury instructions of whether "an
ad propose[d] an illegal transaction" and, therefore, was "not protected by the First
Amendment."  Doc. 1998 at 48.  Instead, the government's evidence and its argument to the
jury in closing that the jury could convict Defendants because they did not shut down the
website was yet another call for the jury to ignore the Court's jury instructions, by failing to
apply the presumption that Backpage's publication of adult ads was protected by the First
Amendment unless the government proved that "an ad propose[d] an illegal transaction."
*Id.*

5.   **The Court Should Grant a New Trial Because the Government Used Evidence
     Admitted Under the Not for the Truth Hearsay Exception For Its Truth,
     Making That Evidence Impermissible Hearsay.**

---

[6]  Moreover, as the government well knows, Backpage.com's response letters to N.A.A.G.
expressly asserted that its publication of such ads was First Amendment protected and
N.A.A.G. never responded asserting a contrary opinion.  See the government's exhibits 487
and 820a, which the government did not move into evidence, attached hereto as Ex. A, B.

During the trial, the Court, at the government's request, admitted a large amount of evidence as non-hearsay because the government said it was offering the evidence not for its truth, but only to prove notice.  The government then proceeded to use that evidence for its truth throughout the trial, including in its closing arguments.  For example, in its closing the government told the jury that the Defendants "know about the Attorney Generals letters, and they know they are not on solid ground."  11//01/23 a.m. Tr. at 54:13-14.  This is just one of many examples of "not for the truth" evidence being argued for the truth, *i.e.*, as the government claimed that Defendants were not on "solid ground" meant the N.A.A.G. letters were evidence of legal wrongdoing.  As another example, the government argued in its closing that the clip from the CNN documentary showed that Backpage.com had "cornered the market on prostitution advertisement" and "all you had to do was go to Backpage" and post an ad and the "phone started ringing in minutes."  *Id.* at 49:21-50:1. The government's repeated claims that all the adult ads on Backpage.com were prostitution ads, and that nearly all of Backpage.com's revenues were from prostitution ads, were backstopped with not for the truth evidence that was used for the truth—which was just inadmissible hearsay.

**5.      The Court Should Grant a New Trial Because the Significant Changes in the Jury Instructions Just Before Closing Arguments Commenced Were Highly Prejudicial to the Defense.**

In advance of the trial, the government and the defense submitted their proposed jury instructions, with the defense requesting instructions that the First Amendment protected Backpage.com's publication of adult speech "unless the transaction proposed in the ad necessarily would be an illegal act" (Doc. 1626-3 at 161), citing, among other authorities, *Valle Del Sol Inc. v. Whiting*, 709 F3d 808, 822 (9th Cir. 2013).  Defendants also requested an instruction that, "to satisfy the specific intent requirements of the Travel Act, the government must prove beyond a reasonable doubt, for each Count, that each defendant in some significant manner associated himself or herself with a particular business enterprise associated with the ad charged in that Count with the intent to promote, or facilitate the

promotion of, the prostitution offenses committed by that business enterprise" (Doc. 1626-3 at 47), citing, among other authorities, *United States v. Hansen*, 599 U.S. 762 (2023).  Before the trial commenced, the Court provided the parties with its proposed jury instructions, which rejected these two instructions proposed by Defendants, but included a First Amendment instruction saying, among other things, that:  "the First Amendment does not protect speech relating to illegal activity."

While disagreeing with the Court's decisions regarding these instructions, Defendants nonetheless prepared to try their case in accordance with them.  Given these instructions, Defendants were effectively precluded from mounting a First Amendment defense, which was mentioned only in passing in one defense opening and in the presentation of evidence during the trial.  Defendants likewise were unable to mount the specific intent defense they had intended—an aiding and abetting defense—whether in their openings or through eliciting evidence during the trial.

On the morning before closing arguments commenced, the Court made material alterations to the jury instructions, including changing the First Amendment jury instruction so that it no longer read "the First Amendment does not protect speech relating to illegal activity" but instead said "the First Amendment does not protect speech that proposes an illegal transaction."  Doc. 1998 at 48.  The Court also modified the Travel Act jury instruction to include language saying:  "To prove specific intent, the government must establish that each defendant in some significant manner associated himself or herself with the purpose of promoting or facilitating the promotion of any business enterprise involving prostitution offenses that the defendant knew to be unlawful under state law."  Each of these changes was dramatic from the standpoint of the defense case.

While the defense welcomed these modifications to the jury instructions (while still believing they were legally insufficient), these last-minute changes nonetheless severely prejudiced the defense for three reasons.  First, the defense was unable make use of the instructions in their openings, in shaping the testimony that was elicited on cross-examination, or in assessing the witnesses they would call in the defense case.  The Court's

original First Amendment instruction, for example, would have dramatically undermined the effectiveness of an advice of counsel defense, while the instruction ultimately given would have allowed for a viable advice of counsel defense. Second, because the defense learned of these instructions on the cusp of closings, some defense counsel had no ability to adjust their closing arguments to account for the changes, particularly Mr. Cambria. But even those counsel who had a few days to adjust could not comb through 4,500 pages of transcripts to look for testimony that was not helpful under the original instructions but would have been helpful under the final instructions. Third, and critically, during the trial the Court admitted large quantities of evidence that was highly prejudicial to the defense that arguably could have been relevant under a "speech relating to illegal activity" standard, but which would not have been relevant under the "speech that proposes an illegal transaction" standard. The defense objected to all this evidence, but its objections were overruled. If the defense had known the case would go to the jury under the "speech that proposes an illegal transaction" standard, the defense would have had much stronger arguments to exclude most, if not all, of the "notice" evidence, which could have dramatically altered the evidence admitted.

**6.      The Court Should Grant a New Trial Because the Jury Instructions Provided Inadequate Guidance to the Jury and Allowed the Jury to Convict on Legally Invalid Grounds—Which the Government Repeatedly Urged the Jury to Do.**

Even with the Court's modifications to the jury instructions after the close of evidence, the instructions still suffered from three significant flaws.

First, the Court's First Amendment instruction included the correct legal standard— "the First Amendment does not protect speech that proposes an illegal transaction"—but the instruction failed to tell the jury how those words have been interpreted by the Ninth Circuit and other courts. As set forth in Mr. Spear's Rule 29 motion and in the authorities supporting Defendants' proposed jury instructions (Doc. 1626-3 at 161-164), whether a particular instance of speech is protected must be evaluated from the content of the speech alone and speech is presumptively protected unless it proposes a transaction would *necessarily* constitute an illegal act. The failure to provide such guidance to the jury resulted in the jury

convicting Mr. Spear on numerous Travel Act counts, even though the publication of the ads underlying those counts were protected by the First Amendment because, as a matter of law, the ads did not propose transactions that would necessarily constitute an illegal act (and nine of the ads expressly disclaimed being solicitations of prostitution—exhibits 216-a, 504-511).  Moreover, the lack of guidance also allowed the government to turn the law on its head, telling the jury that it could determine that a facially lawful ad saying "this is not an offer of prostitution" "is really for prostitution" and that contrary claims were "nonsense." 10/27/23 a.m. Tr. at 10:21-11:2.

Second, although the Court added language looking somewhat like an aiding and abetting instruction to the Travel Act instruction, that language not only varied materially from the pertinent Ninth Circuit law, but it greatly eroded what was required for the jury to find specific intent, as it required the jury to find not that a defendant associated himself with a specific criminal enterprise with the intent of promoting it, but with the "purpose" of promoting "any business enterprise involving prostitution offenses."  In *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974), the Ninth Circuit held that a conviction under the Travel Act requires the prosecutor to "show that the [defendant] in some significant manner associated himself *with the purchaser's criminal venture* for the purpose of its advancement") (emphasis added).  The Court's instruction only required the prosecution to show that Defendants "in some significant manner associated himself or herself with the purpose of promoting or facilitating the promotion of any business enterprise involving prostitution offenses that the defendant knew to be unlawful under state law" (Doc. 1998 at 30), which would allow conviction based on an intent to promote "the amorphous notion of 'prostitution'" (Doc. 946 at 13:17-22) and based on an intent "to promote/facilitate a business enterprise one does not know exists" (*Id.* at 15:26-16:1), both of which are inconsistent with this Court's prior rulings, as well as with the holding of the Ninth Circuit in *Gibson* and the Supreme Court in *Hansen*.

Finally, the Court overruled Defendants' objection to having just one Travel Act instruction for fifty separate Travel Act counts and also rejected Defendants' proposed

18

Travel Act jury instruction that made clear that the government had to prove that each Defendant had the specific intent to facilitate the prostitution offenses of the specific business enterprise associated with the charged ad for that count.  The instruction given to the jury improperly allowed it to mix and match the elements among all the Travel Act counts, to find that an intent to promote "any" business enterprise, even if unconnected to a count, allowed the jury to convict as to that count, and to find specific intent through proof of general intent.  And that is exactly what the government told the jury it could do in its closing:  "But what this instruction makes clear is that the if the defendant associated himself with the purpose of promoting any business enterprise involving prostitution, then he is guilty."  11/01/23 a.m. Tr. at 51:4-7.

Because of these flaws in the jury instructions, the jury could have (and likely did) convict Defendants for crimes based on Backpage's publication of ads that were protected by the First Amendment and without finding every required element of the applicable offense.  Because it is not possible to determine whether the jury convicted on a legally valid or a legally invalid basis, the verdict cannot stand.  *Keating v. Hood*, 191 F.3d 1053, 1062 (9th Cir. 1999) ("The fundamental rule that applies when a jury delivers a general verdict that may rest either on a legally valid or legally invalid ground is clear: the verdict may not stand when there is no way to determine its basis.").  Because the jury instructions allowed the jury verdicts in this case to rest on legally invalid bases, the Court should order a new trial.

RESPECTFULLY SUBMITTED this 4th day of December, 2023,

Paul J. Cambria, Jr.
Erin McCampbell Paris
LIPSITZ GREEN SCIME CAMBRIA LLP

By:     /s/ Paul J. Cambria, Jr.
Paul J. Cambria, Jr.
Attorneys for Michael Lacey

*Pursuant to the District's Electronic Case Filing Administrative Policies and Procedures Manual (Jan. 2020) § II (C) (3), Paul J. Cambria hereby attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content, and have authorized its filing.*

Gary S. Lincenberg
Gopi K. Panchapakesan
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.

By:    /s/ Gary Lincenberg
       Gary Lincenberg
       Attorneys for John Brunst


Eric W. Kessler
KESSLER LAW OFFICE

By:    /s/ Eric W. Kessler
       Eric W. Kessler
       Attorneys for Scott Spear

Bruce Feder
FEDER LAW OFFICE, P.A.

By:    /s/ Bruce Feder
       Bruce Feder
       Attorneys for Scott Spear


On December 4, 2023, a PDF version of this document was
filed with Clerk of the Court using the CM/ECF System
for filing and for Transmittal of a Notice of Electronic
Filing to the to the CM/ECF registrants who have
entered their appearance as counsel of record