GARY M. RESTAINO
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

DAN G. BOYLE (N.Y. Bar No. 5216825, daniel.boyle2@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1400
Los Angeles, CA 90012
Telephone (213) 894-2426

NICOLE M. ARGENTIERI
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

AUSTIN M. BERRY (Texas Bar No. 24062615, austin.berry2@usdoj.gov)
U.S. Department of Justice
Child Exploitation and Obscenity Section
1301 New York Avenue, NW, 11th Floor
Washington, D.C. 20005
Telephone (202) 412-4136
*Attorneys for Plaintiff*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-18-422-PHX-DJH |
| Plaintiff, | **UNITED STATES' RESPONSE TO DEFENDANT BRUNST'S SUPPLEMENTAL BRIEF IN SUPPORT OF RULE 29 MOTION (Doc. 2007)** |
| v. | |
| Michael Lacey, et al., | |
| Defendants. | |

## SUMMARY OF ARGUMENT

Defendant Brunst's Rule 29 Motion should be denied. Brunst's Supplemental Brief in Support of Rule 29 Motion (Doc. 2007 ("Supp.")) does nothing to bolster his argument. Defendant fails to show that when the evidence is viewed in the light most favorable to the United States, it was inadequate to allow *any* rational juror to find the essential elements of the crimes beyond a reasonable doubt. The trial evidence demonstrated that Brunst played a pivotal role in both the Travel Act and money laundering conspiracies. In addition, the evidence supports Brunst's convictions for the substantive money laundering counts alleged against him. His convictions should remain.

## FACTUAL BACKGROUND

### I.   Brunst Owned and Served as Backpage's Chief Financial Officer

Brunst owned Backpage.com (Backpage), along with Michael Lacey, Jim Larkin, and Scott Spear. 9/12/23 p.m. Tr. at 11:23-12:5, 78:25-79:1. Brunst served as Backpage's Chief Financial Officer (CFO) of Backpage's parent company. Ex. 5.

In 2013, 2014, and 2015, the great majority of Brunst's income—over $6,000,000, $10,000,000, and $3,800,000, respectively—came from Backpage. 10/13/23 a.m. Tr. at 127:7-133:14; Ex. 1481.

### II.   Brunst Understood, and Approved of, the Marketing Strategies that Accelerated Backpage's Growth

Brunst's co-conspirators—Spear and Ferrer—quickly recognized that Female Escorts was the most profitable category in Backpage's Adult section, and that Female Escorts meant "hooker ads." 9/12/23 p.m. Tr. at 90:12-91:22; Exs. 1056, 1056a; *see* Ex. 1057. They focused on growing escort advertising because, based on their experience, they "knew the revenue implications": "Money." 10/18/23 p.m. Tr. at 96:1-15; 10/18/23 p.m. Tr. at 95:4-96:19. Unlike a job ad, where the need to advertise ends after a position is filled, escorts "needed repeat business" and wanted to advertise "everyday." 10/18/23 p.m. Tr. at 95:8-18.

**A.     Content Aggregation**

To expand escort ads, Spear directed the roll-out of Backpage's "content aggregation" marketing strategy, "which was internal code for stealing ads from Craigslist"—primarily "their Erotic Services" ads. 9/12/23 p.m. Tr. at 26:16-24. Spear and Ferrer presented aggregation to Brunst and Larkin as a strategy to meet growth goals in 2009. 9/13/23 p.m. Tr. at 42:16-43:11. Brunst approved this strategy and permitted the company to hire staff to execute it. 9/12/23 p.m. Tr. at 30:6-12; *id*. at 89:1-90:1-7 (discussing plan to "seed the site, the Female Escorts category, with 200 independent escorts").

**B.     The Erotic Review**

Brunst was aware, and approved of, Backpage's partnership with The Erotic Review or TER, a prostitution review website where "Johns" (purchasers of sex from prostitutes) provided "[t]he price of the services and a description of the sexual services along with a description of the escort[.]" 9/12/23 p.m. Tr. at 32:1-6; *see* 9/13/23 a.m. Tr. at 21:21-27:5. As Ferrer testified, this partnership "was the secret sauce": "[B]y having a relationship with The Erotic Review, we could make those ads that we stole from Craigslist, we could make their phone numbers ring." 9/12/23 p.m. Tr. at 31:11-16. *See id*. at 41:23-25 (TER was a reason why "Backpage became the default choice" when Craigslist shut its Adult section).

Brunst attended annual budget meetings where other employees presented Backpage's financial forecast for the coming year. 10/10/23 p.m. Tr. at 130:4-132:11. In the 2008 budget plan, the overview included the following language, "we struck a deal with TheEroticReview.com, TER, with reciprocal links it created huge brand awareness in this niche industry and increased page views from TER by 120,000 per day." Ex. 23 at 3; 9/13/23 a.m. Tr. at 70:10-73:20. *See also* 9/13/23 p.m. Tr. at 43:12-44:1; Exs. 19, 20. In addition to hyper-linking Backpage ads to TER prostitution reviews (and vice-versa), *see* 10/10/23 p.m. Tr. at 134:20-136:9, the TER relationship included a "banner ad exchange program" where each website featured banner ads for the other. 9/12/23 p.m. Tr. at 35:18-37:2.

In 2009, the budget plan that Brunst received included additional information about TER. That budget plan stated both that "TER – [has] high page view per referral" and "[w]e have made a special buy with TER in terms of high quality referrals." Ex. 24a.

For years, Brunst, Spear, and Larkin regularly received Google Analytics reports showing that The Erotic Review was the number one source of non-search engine referrals to Backpage. 9/12/23 p.m. Tr. at 35:6-12, 41:1-7; 9/13/23 a.m. Tr. at 21:21-27:5; 9/13/23 p.m. Tr. at 46:16-47:21, 49:4-22, 50:6-9; 9/19/23 p.m. Tr. at 12:22-15:16, 88:4-9; *see, e.g.*, Exs. 19, 986, 986a, 1151, 1151a, 1919, 1919a, 1924, 1926.

Backpage paid TER $4,000 per month for years as part of this relationship. 9/12/23 p.m. Tr. at 35:18-37:2. Ferrer submitted the invoices to Spear and Brunst for approval. 9/13/23 p.m. Tr. at 27:17-28:6; *id*. at 35:11-12.

### C.    Moderation and Outside Scrutiny

Backpage began sanitizing the site of certain "terms [that] made the ads more obvious prostitution[.]" 9/12/23 p.m. Tr. at 60:8-10, 60:15-17. As Ferrer testified, "we started removing those words from the ad but not deleting the ad." 9/12/23 p.m. Tr. at 60:17-18. Brunst, along with Spear and Larkin, approved budget increases for these types of moderation practices. 9/13/23 p.m. Tr. at 106:21-107:2.

Backpage also started receiving thousands of prostitution investigation subpoenas. *See, e.g.*, 9/13/23 a.m. Tr. at 62:16-25. In April 2010, responding to a Lacey email asking "is there any evidence of child trafficking anywhere?," Spear replied: "We have had subpoenas that deal with this exact issue. . . . We get a ton of subpoenas that we comply with on a daily basis." Ex. 804. Spear and Brunst approved hiring staff to handle the subpoenas. 9/13/23 a.m. Tr. at 62:11-15, 63:11-21, 65:4-9.

In late 2010, Backpage learned CNN was planning an exposé about the site. 9/14/23 a.m. Tr. at 80:20-21. Backpage management watched and discussed the CNN report in early 2011. 9/15/23 a.m. Tr. at 43:15-44:7. It showed CNN's Amber Lyon posting an ad of herself on Backpage's escorts section, using text from a Backpage ad selling a 12-year-old girl. Ex. 1052b1. When Lyon posted, her phone "start[ed] ringing off the hook."

9/15/23 a.m. Tr. at 59:16-23. Brunst, Lacey, and Spear tried to stop CNN from rebroadcasting the story. 9/15/23 a.m. Tr. at 60:10-62:13.

In 2012, Brunst wrote to Backpage's corporate investors that "the Backpage pressure has reached red hot." Ex. 2042. Near the end of 2012, Larkin, Brunst, and Spear asked Ferrer to provide a comparison of revenue growth by sections from October 2010 to November 2012. 9/20/23 a.m. Tr. at 64:6-66:1; Exs. 355, 355b. The comparison showed huge growth in Adult compared to all other sections, which Ferrer attributed to the company's moderation strategy. 9/20/23 a.m. Tr. at 65:19-20. *See id.* at 65:23-66:1.

## III.  Brunst's PowerPoint Presentation Demonstrated Particular Knowledge About Backpage's Business Practices

In 2011, Brunst asked Ferrer to help in creating a presentation to give to Backpage's potential buyers. 9/19/23 p.m. Tr. at 15:17-16:6. Brunst headed efforts to sell the website, which included creating a PowerPoint to present to prospective buyers. 9/19/23 p.m. Tr. at 16:4-16:6, 17:11-18:2. That PowerPoint included a slide on revenue, which showed that nearly 80% of Backpage's revenue derived from the Female Escorts section and over 94% of the revenue was generated from the Adult category. Ex. 120 at 15, 17. Brunst received other internal documents that demonstrated the same revenue split. Exs. 355, 355b. Brunst understood that Backpage made nearly all of its revenue from the Female Escorts section.

The PowerPoint presentation Brunt created also included the following statement: "Maintaining a vibrant general purpose classifieds site strengthens Backpage's defensible market position in the Adult category: Creates mainstream environment for site participants and allows *'plausible deniability'* for exposure." Ex. 120 at 17 (emphasis added). "Plausible deniability" was a key selling point Brunst used in attempting to offload the website, though his efforts ultimately proved unsuccessful.

## IV.  As Backpage Grew Toxic, Banking Became the Primary Focus

In 2013, Brunst continued to serve as Backpage's CFO. 9/20/23 p.m. Tr. at 13:9-14:1. But Brunst avoided using a "backpage.com" email address because of "reputational risk"— Backpage's name had become toxic. 9/20/23 p.m. Tr. at 14:2-9. That toxicity

triggered a banking crisis: other internal issues were put "on the back burner" "[b]ecause the barn is on fire[.]" 9/20/23 p.m. Tr. at 47:23-48:7. From 2013 forward, the company's "entire focus . . . is banking, is trying to get payments, ways for users to be able to pay for ads and then find treasury banking solutions." 9/20/23 p.m. Tr. at 29:7-16.

In 2013, Backpage's U.S.-based credit card processor, Litle, announced it was dropping Backpage. 9/12/23 p.m. Tr. at 69:17-70:8. Ferrer then "worked] closely" with Brunst, Spear, and Larkin "to secure credit card processing from Europe." 9/20/23 p.m. Tr. at 14:22-15:7. When Chase Bank informed Backpage that it "was no longer accepting transactions from Backpage.com, due to their involvement in human trafficking," Ex. 173, Backpage responded by directing Chase credit card purchasers to EMP (e-Merchant Pay), a European processor that would "use a different billing descriptor that won't say Backpage.com on it." 9/20/23 p.m. Tr. at 21:7-22; Ex. 173; *see also* Ex. 1110.

In September 2013, Ferrer wrote Brunst and Spear about Netcash, a Cyprus-based credit card processor. 9/20/23 p.m. Tr. at 13:3-8; Ex. 1092. In October 2013, Ferrer exchanged emails with Brunst, copying Larkin and Spear, about getting the CCBill contract signed, and Ferrer's discussions with "JetPay" regarding other banking solutions. 9/20/23 p.m. Tr. at 31:12-37:23; Ex. 752.

In November 2013, Ferrer sent Larkin, Brunst, and Spear a consultant's recommendations on credit card transactions. 9/20/23 p.m. Tr. at 37:24-40:13; Ex. 175. The recommendations included using names, internet addresses, and billing descriptors that don't include "Backpage." 9/20/23 p.m. Tr. at 38:24-42:22. Backpage's executives started "open[ing] up holding companies with innocuous names like Classified Solutions, Payment Solutions, just general-sounding companies that you don't know really—they don't say Backpage." 9/20/23 p.m. Tr. at 15:12-23; 10/10/23 p.m. Tr. at 74:13-14.

The recommendations also included "load balancing across many banks with different billing descriptors"; as Ferrer explained, this meant "adding a lot of banks" and "distributing . . . transactions" to stay below thresholds that would otherwise trigger reviews by Mastercard and Visa. 9/20/23 p.m. Tr. at 38:10-23. Backpage accordingly used

Classified Solutions (in England) for credit card processing with EMP (in Bulgaria), and spread payments from EMP across other banks including Borgun (in Iceland) and Bank Frick (in Liechtenstein). 9/20/23 p.m. Tr. at 43:18-44:6; 9/21/23 p.m. at 76:3; Ex. 6189.

### A.    Creation of Website Technologies

Backpage's dealings with U.S.-based financial institutions continued to deteriorate. This deterioration caused Brunst, among others, to create a separate "shell company" named Website Technologies, so they could open bank accounts under a name other than "Backpage." 9/21/23 p.m. Tr. at 89:8-10 (Website Technologies was a "very generic sounding company that we could open bank accounts with"); *see also* 9/20/23 p.m. Tr. at 28:19-26 ("We needed a name other than Backpage . . . . Brunst asked me for names and I suggested Website Technologies and that's the name we ended up using."). When US Bank gave notice in April 2014 of dropping the company, Brunst wrote Spear, Ferrer and others that "[w]e will move all banking under Website Technologies at BMO." 9/20/23 p.m. Tr. at 72:5-73:4; Exs. 178, 178a. Also in April 2014, Ferrer updated Brunst and Spear that Chase had "figured . . . out" that Backpage had temporarily succeeded in allowing customers to use Chase credit cards for adult ads by using "a different billing descriptor," "so we just have to change again." Ex. 1120; 9/20/23 p.m. Tr. at 90:17-24, 91:25-92:4. Brunst also was cognizant about ensuring that the name Website Technologies didn't become affiliated with Backpage. *See* Trial Ex. 177 (When asked by Ferrer and employee Joe Kaiping whether they could replace their "backpage.com" email addresses with "websitetechnologies.com," Brunst replied: "We need to think this thru or all the work to separate it from BP will be lost."); *see also* 9/20/23 p.m. Tr. at 71:17-72:4 ("[Brunst] set up Website Technologies to handle payroll, 401(k) and to do leases so he wants to ensure that its reputation is protected, not affiliated with Backpage.").

The money that flowed through Website Technologies derived primarily "from postings in the female escorts section" on Backpage and, Ferrer testified that Website Technologies and Backpage were "the same company." 9/21/23 P.M. Tr. at 90:16-22 & 11:23-12:4.

1

**B.     Credit Card Armageddon**

2     After Visa, Mastercard, and American Express dropped Backpage by mid-2015, the

3    sellers, represented by Brunst, assisted Backpage in trying to obtain credit card processing.

4    9/12/23 p.m. Tr. at 81:7-16. Brunst "was involved in the financial problems the company

5    was having and wanted to understand the revenue that was coming in and what our options

6    were for banking and when we might, you know, get the reserves coming from these other

7    credit card processors[.]" 9/12/23 p.m. Tr. at 81:23-82:3. Ferrer or Backpage's then-CFO

8    had contact with Brunst "[a] minimum of a few times a week" from July 2015 going

9    forward. 9/12/23 p.m. Tr. at 82:4-8.

10     Brunst helped find alternative methods for receiving money from the pimps and

11    prostitutes who advertised on Backpage, which included turning to cryptocurrency. Ex.

12    897; 9/21/23 p.m. Tr. at 78:19-79:19; 93:24-94:20. After the credit cards stopped working

13    with Backpage, the amount of revenue the company received through cryptocurrency

14    proliferated. Ex. 1545. Within 18 months, Backpage went from receiving under $15,000 a

15    month from cryptocurrency (Feb. 2015) to receiving over $3.5 million (May 2016). Ex.

16    1545. When the banks and the credit card companies stopped doing business with

17    Backpage, Brunst led the charge in finding other ways to keep the revenue flowing.

18                                  **ARGUMENT**

19     Brunst moves under Rule 29 for an acquittal for all 34 counts in which the jury

20    found him guilty. But to overturn the jury's verdicts, Brunst must overcome the steep

21    hurdle of showing that the evidence—"'view[ed] . . . in the light most favorable to the

22    prosecution'"—could not have allowed "'*any* rational trier of fact'" to find that the ads

23    proposed illegal transactions. *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir.

24    2010) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). As documented

25    below, Brunst fails to do so under this liberal standard.

26

27

28

I.     **The Evidence Supports Brunst's Count 1 Conviction**

    A.     **The United States' Argument About the "Object" of Defendants' Conspiracy Was Appropriate**

The Ninth Circuit defines a conspiracy as "a combination of two or more persons to accomplish some unlawful purpose, *or some lawful purpose by unlawful means*." *United States v. Caplan*, 633 F.2d 534, 542 (9th Cir. 1980) (emphasis added). The conspiracy alleged against Defendants in the Superseding Indictment adhered to this definition. Doc. 230 at ¶ 197. The United States then argued this point to the jury during closings. 10/27/23 p.m. Tr. at 6:8-7:12. "There was an agreement between two or more persons to commit violations of the Travel Act. . . . Defendant became members of the conspiracy knowing of at least one of its objects and intending to help accomplish it. What is the object in this case?  Well, one of the objects is to make money. And they did." 10/27/23 p.m. Tr. at 6:8-23. And, "[t]here is no federal statute that says it's illegal to make hundreds of millions of dollars. That's not the charge. That is not the crime. They are not charged with making money. . . . They are charged with how they made money, and that was off the backs of people engaged in illegal prostitution business enterprises." 11/1/23 p.m. Tr. at 40:12-21; *see also* Ninth Circuit Model Crim. J. Instructions 11.1 (word "illegal" not listed before "objects").

The United States' allegations in the Superseding Indictment and subsequent argument to the jury were both entirely appropriate. The Court has already recognized this fact. During oral arguments for finalizing the jury instructions, the Court ruled:

> Again, I think we had this argument early on in the case, and I went back and looked at what was argued it appears to me that under the *[C]aplan* case, the additional guidance there is that a conspiracy is defined as a combination of two or more persons to accomplish some unlawful purpose or some lawful purpose by unlaw means.  And so because of that, I think it is not necessary to include "illegal."

10/26/23 a.m. Tr. at 18:20-19:1.

The Court's position is entirely correct. Defendant's cited cases are distinguishable

and don't change the Court's previous conclusion. In *United States v. Manarite*, 44 F.3d 1407 (1995), the Ninth Circuit overturned the conspiracy conviction because the United States had alleged multiple objects, but the jury used a general verdict form, "which gave no indication of which object or objects formed the basis of their decision." *Id.* at 1413. The Ninth Circuit found that two of the alleged objects—wire fraud and mail fraud—were defective as a matter of law. *Id.* While other objects of the conspiracy would have been legally sufficient to support the conviction, the jury's use of the general verdict form made that determination impossible. *Id.* Here, the only object alleged—and argued by the United States—was to make money through an agreement to violate the Travel Act. Doc. 230 at ¶ 197; 10/27/23 p.m. Tr. at 6:8-23. Brunst also cites the unreported *United States v. Johnson,* 44 F. App'x 752 (9th Cir. 2002), which is equally unpersuasive. That case is similar to *Manarite* in that the United States alleged a conspiracy with multiple objects, including an object that wasn't a federal offense. *Id.* at 754. The jury returned a general verdict form that didn't allow for determining the object relied upon by the jury. *Id.* Again, these facts aren't present here because the conspiracy to violate the Travel Act only had one object—to make money through the promotion of business enterprises involving prostitution offenses. Doc. 1998 at 24, 43.

**B.     Trial Evidence Supported the Jury's Conclusion that Brunst Was Guilty of Conspiracy to Violate the Travel Act**

A rational juror, when viewing the evidence in the light most favorable to the United States, could certainly find Brunst guilty of conspiracy to violate the Travel Act. The facts as described at trial (and partially recounted above) demonstrate his intent, knowledge, and understanding of Backpage's business practices, including the reciprocal link relationship with TER, aggregation, and moderation. *See supra*. Brunst conspired to promote business enterprises that posted millions of ads on Backpage which, in turn, helped line his pockets, including over $20 million in a three-year period. Ex. 1481.

Brunst asserts the Travel Act conspiracy in Count 1 is cabined by the 50 ads charged in the substantive Travel Act counts, Counts 2-51. *See* Supp. at 6. Not so. The United States

could have charged Count 1 without charging any substantive Travel Act counts; Counts 2-51 merely reflect examples of the scores of such violations the resulted for Defendants' operation of Backpage. As the Court has repeatedly recognized, Count 1 alleges a 14-year conspiracy spanning 2004 to 2018, and conduct before 2013 is clearly relevant to the charge. Doc. 1643 at 4 ("[T]he Court has already clarified that the Government may introduce proof of the entirety of the scope of the conspiracy."); Doc. 1643 at 6 ("[T]he Court already found that facts that pre-date the 2013 allegations were relevant as evidence demonstrating 'furtherance of the charged conspiracy.'"); 10/26/23 a.m. Tr. at 24:25-25:1 (recognizing that the indictment charges a conspiracy from 2004-2018).

Based on Brunst's mischaracterization of Judge Brnovich's Order, he then attempts to argue that the United States failed to establish that he was in a conspiracy to violate the Travel Act vis-à-vis the 50 charged ads. Supp. at 7. But Brunst, as Defendants have throughout this case, takes a hyper-restrictive view of the evidence. Brunst focuses on the purported dearth of granular evidence that relates to these specific ads, rather than understanding the broader sweep of Defendants' policies and strategies. As this Court has already recognized, the facts in the Superseding Indictment "establish defendants had the specific intent to promote prostitution in violation of the Travel Act." Doc. 793 at 20. At trial, the United States established these facts and the jury found that evidence persuasive to convict Brunst. Under the liberal *Jackson/Nevils* standard, Brunst's motion fails.

## II.     Evidence Supports Brunst's Money Laundering Convictions.

### A.     Jury Appropriately Found Brunst Guilty of Concealment Money Laundering (Counts 53-62)

#### 1.     Travel Act Violations

Brunst's argument that he must be acquitted of the concealment money laundering counts (53-62) because "there is no specified unlawful activity that the jury could have found" is wrong. The money laundering counts don't need to be tied to a charged substantive count. Indeed, the Court has found that even if the Travel Act counts were dismissed, the money laundering counts would survive. Doc. 946 at 17 ("even *if* the Travel

Act violations were inadequately plead, which they are not, and were the only foundation for the money laundering charges, the money laundering counts would still survive").

This argument is also contrary to controlling case law. *United States v. Lazarenko*, 564 F.3d 1026, 1033–34 (9th Cir. 2009) (government need not allege all the elements of the specified unlawful activity when bringing money laundering charges); *see also United States v. Golb*, 69 F.3d 1417, 1429 (9th Cir. 1995) (same); *United States v. Yagman*, 2007 WL 9724388, at *20 (C.D. Cal. May 3, 2007) (collecting cases); *United States v. Cherry*, 330 F.3d 658, 667 (4th Cir. 2003) ("It is clear that a defendant may be convicted of money laundering even if she is not a party to, much less convicted of, the specified unlawful activity."); *United States v. Richard*, 234 F.3d 763, 766-69 (1st Cir. 2000) (money laundering conviction "does not require proof that the defendant committed the specified predicate offense"); *United States v. Martinelli*, 454 F.3d 1300, 1312 (11th Cir. 2006) ("It is by now abundantly clear that in a money laundering case (or in a money laundering conspiracy case), the defendant need not actually commit the alleged specified unlawful activity."); *United States v. Awada*, 425 F.3d 522, 525 (8th Cir. 2005) ("[T]here is absolutely no requirement that a money laundering defendant also be involved in the underlying crime."); *United States v. Mankarious*, 151 F.3d 694, 703 (7th Cir. 1998) (rejecting "the defendants' argument that the district court's dismissal of the mail fraud counts mandates the reversal of the money laundering convictions"); *United States v. Kennedy*, 64 F.3d 1465, 1479-80 (10th Cir. 1995) (affirming money laundering convictions despite acquittal of specified unlawful activity).

Brunst's arguments that (a) he wasn't convicted of any substantive Travel Act counts; (b) Defendant Spear's convictions pre-dated transactions identified in Counts 53-62; and (c) there are no substantive Travel Act counts alleged that match the dates for the concealment money laundering counts are all red herrings. These facts matter not. Again, the Court has already addressed this particular issue:

> For instance, the first money laundering statute that Defendants are indicted under does not require the Government to allege or prove the underlying

offenses. *See* 18 U.S.C. § 1956(c)(1) ("the term 'knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity' means that the person knew the property involved in the transaction represented proceeds from some form, *though not necessarily which form*, of activity that constitutes a felony." (emphasis added)). The same thing goes for the other money laundering statute. *See* 18 U.S.C. § 1957(c) ("In a prosecution for an offense under this section, the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity.").

Doc. 946 at 17 (emphasis in original).

The United States could have charged Brunst—along with his co-defendants—strictly with money laundering crimes without charging the specified unlawful activity. *Awada*, 425 F.3d at 525 ("[T]here is absolutely no requirement that a money laundering defendant also be involved in the underlying crime.") What the United States needed to prove to support the concealment money laundering counts is accurately described by Brunst: "[T]he government must prove that (1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of unlawful activity; (3) the defendant knew that the proceeds were from unlawful activity; and (4) the defendant knew 'that the transaction [was] designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.'" Supp. at 8 (citing *United States v. Wilkes*, 662 F.3d 524, 545 (9th Cir. 2011)). The evidence that Brunst knew that (a) Backpage primarily derived its revenue from promotion of business enterprises that posted prostitution advertisements, and (b) each of the transactions at issue in Counts 53-62 included Backpage revenue are beyond dispute. *See supra* Factual Background.

### 2. Transactions in Counts 53-62 Were Designed to Conceal

The ten financial transactions that constitute the concealment money laundering counts (53-62) were all designed to conceal. First, Ninth Circuit case law makes clear that a transaction need not have been particularly complicated, or involve multiple steps, to support a concealment money laundering conviction. *See, e.g., United States v. Twitchell*,

69 F. App'x 892, 894 (9th Cir. 2003) ("On one of the money laundering counts, the jury also found Twitchell guilty of concealing or disguising bank fraud, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), by transferring money from his business account at the bank into private investment accounts at the brokerage house. A reasonable jury could have found that the deposits of proceeds from the bank fraud into brokerage accounts were made to disguise or conceal the proceeds."); *United States v. Sun*, 673 F. App'x 729, 733 (9th Cir. 2016) (affirming a money laundering conviction where "[v]iewing the evidence in the light most favorable to the prosecution, a rational jury could find that Sun deposited the illegal cash proceeds from his medical practice into his personal bank account, rather than his business account, with the purpose "to conceal or disguise the nature [or] . . . the source" of the proceeds."); *United States v. Kellum*, 119 F. App'x 32, 34 (9th Cir. 2004) (affirming concealment money laundering conviction where the defendant purchased a Wells Fargo cashier's check with a manual check drawn on a Fidelity account; "[A] rational jury could find on the government's evidence that by purchasing the Wells Fargo cashier's check, Kellum helped to conceal the Fidelity account as the source of his fraudulently-obtained assets, making it harder for federal investigators to discover the existence of the Fidelity account."); *United States v. Huy Chi Luong*, 468 F. App'x 710, 712 (9th Cir. 2012) ("A rational jury could also conclude that Luong intended to conceal the source, ownership, or control of the $5,000 he paid toward the mortgage of a piece of real property.").

Second, each of the transactions in Counts 53-62 involved transfers from Website Technologies to Cereus Properties. Doc. 230 at 56-57. Brunst set-up Website Technologies, a "shell company" with a "very generic sounding" name that "we could open bank accounts with." 9/21/23 p.m. Tr. at 89:8-10. Brunst and his co-defendants created Website Technologies to conceal Backpage's revenue in bank accounts held by a differently named entity. (Trial Ex. 1481, annual revenue for years 2015-18.)

After the Backpage revenue flowed through Website Technologies it then was moved to Cereus Properties. Trial Ex. 1479 at 1-10. Defendants Lacey, Brunst, and Spear (along with Jim Larkin) owned Cereus Properties. 9/21/23 p.m. Tr. at 90:23-25. The source

of the money that flowed from Website Technologies to Cereus Properties was the prostitution ads posted on Backpage. 9/21/23 p.m. Tr. at 91:16-17.

Backpage revenue that flowed from Website Technologies to Cereus Properties is sufficient to demonstrate a design "to conceal, in part, the nature, the location, the source, the ownership, or the control of the proceeds." *Wilkes*, 662 F.3d at 545. Indeed, the Ninth Circuit has affirmed convictions with less compelling evidence. *Twitchell*, 69 F. App'x at 894 ("A reasonable jury could have found that the deposits of proceeds from the bank fraud into brokerage accounts were made to disguise or conceal the proceeds."); *Sun*, 673 F. App'x at 733 (affirming a money laundering conviction where "[v]iewing the evidence in the light most favorable to the prosecution, a rational jury could find that Sun deposited the illegal cash proceeds from his medical practice into his personal bank account, rather than his business account, with the purpose "to conceal or disguise the nature [or] . . . the source" of the proceeds."). Brunst's convictions for concealment money laundering should stand.

**B.      Jury Appropriately Found Brunst Guilty of Promotional Money Laundering (Counts 64-68)**

A rational juror, viewing the evidence in the light most favorable to the United States, could find that Brunst promoted Travel Act violations through each of these five transactions. Brunst relies on an out-of-circuit case to argue that promotional money laundering is aimed "only at transactions which funnel ill-gotten gains directly back into the criminal venture." Supp. at 11 (citing *United States v. Brown*, 553 F.3d 768, 786 (5th Cir. 2008). That's wrong. Under controlling Ninth Circuit law, promotional money laundering does *not* require "plowing back" gains into the criminal enterprise. *United States v. Montoya*, 945 F.2d 1068, 1076 (9th Cir. 1991); *Manarite*, 44 F.3d at 1416.

In *Montoya*, the Ninth Circuit concluded that depositing a single check arising from a bribery transaction was sufficient to sustain a promotional money laundering conviction. 945 F.2d at 1076. The defendant's money laundering conviction arose from depositing a $3,000 check from a fictitious FBI front company, proceeds derived from a bribe, to his personal checking account. *Id.* The defendant argued that the deposit was not intended to

promote the carrying on of specified unlawful activity because "there was no ongoing criminal venture" and "the activity had been completed upon receipt of the check from the undercover FBI Agent." *Id.* The *Montoya* Court rejected this argument, finding that the defendant "could not have made use of the funds without depositing the check." *Id.* As a result, it found that there was "sufficient evidence from which the jury could find beyond a reasonable doubt that the deposit of the check amounts to an 'intent to promote the carrying on of' the specified unlawful activity, in this case the bribery, within the meaning of section 1956(a)(1)(A)(i)." *Id.*

*Manarite*, a case cited approvingly by Brunst, further developed *Montoya*'s holding. The *Manarite* defendants were prosecuted for a casino-chip cashing scheme and argued that "intent 'to promote the carrying on' of the illegal activity can *only* be found when the proceeds are 'plowed back' into the activity." 44 F.3d at 1410, 1416 (emphasis in original). They argued that because "none of the cash was plowed back into the . . . scheme" and they instead "simply distributed the cash, pocketing their share," they did not promote the carrying on of illegal activity. *Id.* The court rejected this view, noting that the "chip-skimming scheme could not benefit its participants unless the chips were cashed. A rational jury could conclude that the Manarites cashed the chips with the intent to promote the chip-skimming scheme. 'Plowing back' of the gains into the enterprise is not necessary." *Id.*

These two cases have been invoked in many Ninth Circuit decisions that stand for the proposition that criminal proceeds need not be "plowed back" into the illegal activity to constitute promotional money laundering. *See, e.g.*, *United States v. Barragan*, 263 F.3d 919, 923 (9th Cir. 2001) (*"We have explicitly rejected the view 'that intent 'to promote the carrying on' of the illegal activity can *only* be found when the proceeds are 'plowed back' into the activity.' Rather, we have consistently held that a jury may infer intent to promote the illegal activity from evidence that illicit proceeds have been transferred."); *Twitchell*, 69 F. App'x at 894 ("[Defendant's] actions in removing funds from the bank he defrauded to a separate brokerage firm clearly promoted and furthered the underlying bank fraud."); *United States v. Baker*, 63 F.3d 1478, 1494 (9th Cir. 1995) ("The government

presented abundant evidence of payments Baker made to the Clinkenbeards for the purchase of contraband cigarettes. Baker could not have continued the illegal trafficking without paying his cigarette suppliers.").

The evidence at trial comfortably clears the elements for finding Brunst guilty of promotional money laundering. First, former federal agent Quoc Thai testified that Cereus Properties was a "payroll company" that primarily paid Lacey, Larkin, Brunst, and Spear, but also other Backpage employees. 10/13/23 a.m. Tr. at 136:14-20; 137:11-15. Sending money derived from the criminal activity, *i.e.*, promotion of business enterprises involving prostitution offenses, to pay Backpage employees qualifies as promotion under the statute.

Second, even without former agent Thai's testimony about Defendants using Cereus Properties to help pay Backpage employees, the jury could have "infer[ed] intent to promote the illegal activity from evidence that illicit proceeds have been transferred." *Barragan*, 263 F.3d at 923. The evidence is clear that money flowing to Cereus Properties was used to transfer Backpage funds to Defendants Lacey, Brunst, and Spear. 9/21/23 p.m. Tr. at 90:23-25; 91:16-17. Thai testified that after money was transferred to Cereus Properties it would be sent to Lacey, Brunst, Spear, and Larkin "almost immediately." 10/13/23 a.m. Tr. 136:24-137:10. Under the rule in *Montoya* and *Manarite* that evidence is sufficient to support Defendants' convictions for promotional money laundering.

**C.   Evidence Supports Brunst's Convictions for Transactional Money Laundering**

For the reasons stated above, there is ample evidence proving that the money Brunst transferred in Counts 69-70, 78-84, and 86-93 was all derived from Travel Act violations. Further, with respect to the money sent by Camarillo Holdings and Cereus Properties; Brunst served as the CFO for both entities. 10/13/23 a.m. Tr. at 136:21-23; 153:13-23. Brunst was also a signatory on the Cereus Properties' bank account ('6211) that was involved in most of the transactions at issue in the money laundering counts. 10/17/23 a.m. Tr. at 20; Trial. Ex. 1479. A bank account signatory can "make payments on the account," "initiate wires," and "transfer money." 10/17/23 a.m. Tr. at 20-21. Accordingly, Lacey

would not have received the criminal proceeds in Counts 69-70 and 83-84 without Brunst sending him the money. Viewing the evidence in the light most favorable to the United States, a rational juror could have found Brunst guilty of these four charges.

### D.    Brunst's Rule 29 Motion Fails for Count 52

The jury found Brunst guilty of every single money laundering count alleged against him. Doc. 1978. The facts, as discussed above and during the United States' oral argument at the Rule 29 motion, show how a rational juror could find Brunst guilty. For example, Brunst orchestrated the creation of Website Technologies, a "shell company" that existed for the sole purpose of permitting Backpage revenue to continue to flow. Without Brunst, Defendants could not have continued to reap the benefits of their criminal scheme. Under the liberal *Jackson/Nevils* standard, Brunst's motion fails.

### III.   The Court's *Allen* Instruction Was Appropriate

The Court's reading of the *Allen* instruction was permissible and appropriate, and the Court should deny Brunst's request to interview or serve targeted interrogatories on the jurors. Supp. at 17. Brunst's argument is misleading. Supp. at 17. What Brunst omits from his discussion is the fact that an *Allen* instruction *may* become coercive, "if the judge knew which jurors were the holdouts and each holdout juror knew that the judge knew he was a holdout." *United States v. Williams*, 547 F.3d 1187, 1205 (9th Cir. 2008) (citing *United States v. Sae-Chua*, 725 F.2d 530, 532 (9th Cir. 1984)). That wasn't the case here. Assuming there were holdouts, neither the Court nor counsel knew who they were. Communications with the jurors after the fact won't change what the Court knew about the jurors' identities and respective positions at the time, which is the critical point addressed in *Williams*.

### CONCLUSION

Defendant Brunst's Rule 29 motion should be denied.

Respectfully submitted this 22nd day of December, 2023.

GARY M. RESTAINO
United States Attorney
District of Arizona

NICOLE M. ARGENTIERI
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

*s/Andrew C. Stone*
KEVIN M. RAPP
MARGARET PERLMETER
PETER KOZINETS
ANDREW STONE
DANIEL BOYLE
Assistant U.S. Attorneys

AUSTIN M. BERRY
Trial Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Daniel Parke*

- 18 -