1  Paul J. Cambria, Jr. (NY Bar No.1430909, admitted *pro hac vice*)
   Erin McCampbell Paris (NY Bar No. 4480166, admitted *pro hac vice*)
2  LIPSITZ GREEN SCIME CAMBRIA LLP
3  42 Delaware Avenue, Suite 120
   Buffalo, New York 14202
4  Telephone: (716) 849-1333
   Facsimile:  (716) 855-1580
5  pcambria@lglaw.com
6  emccampbell@lglaw.com
   *Attorneys for Michael Lacey*
7
   Gary S. Lincenberg (CA Bar No. 123058, *admitted pro hac vice*)
8  Ariel A. Neuman (CA Bar No. 241594, *admitted pro hac vice*)
9  Gopi K. Panchapakesan (CA Bar No. 279856, *admitted pro hac vice*)
   BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
10 DROOKS, LINCENBERG & RHOW PC
11 1875 Century Park East, 23rd Floor
   Los Angeles, California 90067-2561
12 Telephone: (310) 201-2100
   Facsimile: (310) 201-2110
13 glincenberg@birdmarella.com
   aneuman@birdmarella.com
14 gpanchapakesan@birdmarella.com
15 *Attorneys for John Brunst*

16 Additional counsel listed on next page

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | NO. CR-18-00422-PHX-DJH |
| Plaintiff, | **REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR A NEW TRIAL** |
| vs. | |
| Michael Lacey, *et al.*, | **(Oral Argument Requested)** |
| Defendants. | |

Eric Kessler
KESSLER LAW GROUP
6720 N. Scottsdale Rd., Suite 210
Scottsdale, AZ  85253
Telephone: (480) 644-0093
eric@kesslerlawgroup.com
*Attorney for Scott Spear*

Bruce Feder (AZ Bar No. 004832)
FEDER LAW OFFICE PA
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: (602) 257-0135
bf@federlawpa.com
*Attorney for Scott Spear*

Defendants Michael Lacey, Scott Spear, and John Brunst file this reply in support of their motion for a new trial under Fed. R. Crim. Pro. 33.

**1.  The Government's Failure to Make Required Disclosures.**

The government says its inexplicable (and unexplained) failure to timely produce Carl Ferrer's emails with Lyndon Versoza does not justify a new trial, claiming the disclosures related *only* to the forfeiture phase and were not material. But evidence showing the government allowed Ferrer to use a four million dollar retainer to defend himself in civil and criminal actions over the last nearly six years was an enormous and largely undisclosed benefit provided by the government to Ferrer that Defendants could have used on cross-examination to show Ferrer's bias and interest in the case. Defendants knew that Ferrer had a retainer and was permitted to use it, but had no idea of the magnitude of the retainer or that it vastly exceeded the amounts previously disclosed, until *after* the government's untimely disclosure (which occurred despite Defendants' numerous pre-trial demands for disclosure of all benefits given to Ferrer.) Defendants would have taken a very different approach to questioning Ferrer about the retainer if they'd known its size—but they had no idea because of the government's disclosure failure. Ferrer may not have prepared the spreadsheet tallying the various retainers, but, given his obligation to fully and truthfully disclose information to the government, his forwarding of that spreadsheet to the government adopted the statement.

The government's arguments with respect to the Western District of Washington investigation are duplicitous, at best. The government claims Defendants merely "speculate about what that investigation 'determined,' and assert, without support, that unspecified materials from the investigation are 'plainly exculpatory and impeaching.'" Doc. 2022 at 2:1-3. As the government well-knows, as early in this case it produced two memos to the defense that summarized the factual findings of that investigation. Judge Logan ultimately allowed the government to "claw back" the memos as inadvertently produced work product and, *at the government's request*, also prohibited the defense from using information from the memos at trial or in these proceedings. Docs. 343 at 16:19-22 and 449-1 at 7. Defendants and their counsel have complied with the order, but are familiar with the memos from before the claw back. Judge

Logan decided that the memos themselves did not constitute *Brady* or *Gigilio* material that would supersede any claim of attorney work product privilege,[1] but Judge Logan *never* ruled that the factual materials underlying the memos, which are the subject of this motion, were not *Brady* or *Giglio* material. *Id.* at 4. Likewise, after the mistrial, this Court "decline[d] to make a ruling as to the relevancy or materiality of the WDWA documents at th[at] juncture" (Doc. 1444 at 14:8-11), but this Court also has never addressed whether the factual materials underlying the memos are *Brady* or *Giglio* material.

The government claims an "avalanche of additional evidence that emerged after the investigation" (Doc. 2022 at 2:10-15), making the factual information in the memos non-exculpatory and immaterial, but the factual information summarized in the memos contradicts the testimony of numerous government witnesses, particularly Ferrer, *and* the government's closing argument on key issues. Indeed, the government pointed to the WDWA investigation during Ferrer's testimony as "notice" evidence regarding the content on the site; that testimony alone renders the factual material underlying the investigation relevant. 09/13/23 AM Tr. at 80:5-8 (referencing a 2012 prostitution investigation). Given Judge Logan's order, Defendants provided no specifics in their new trial motion, nor will they do so here, but the government filed the memos under seal with a collection of the documents it sought to claw back, so the memos are readily available for the Court's review to assess whether the factual information the government has refused to disclose is material, exculpatory, and relevant in light of the case the Government put on at trial.

**2.   The Government Elicited False/Misleading Testimony from Carl Ferrer.**

The government doubles down on its trial misconduct and makes the inconceivable claim that Carl Ferrer personally exchanged emails with Pamela Robinson. Before addressing the specifics of the testimony, it will be helpful to recount Ferrer's testimony relating to the

---

[1] Judge Logan ruled before the memos were published by news media on the Internet. Elizabeth Nolan Brown, *Secret Memos Show the Government Has Been Lying About Backpage All Along*, Reason.com (Aug. 26, 2019), https://reason.com/2019/08/26/secret-memos-show-the-government-has-been-lying-about-backpage/. The fact that the memos are freely available on the Internet undermines any claim the government might assert to keep the factual portions of the memos themselves secret. *Cf. United States v. Sanmina Corp. & Subsidiaries*, 968 F.3d 1107, 1125 (9th Cir. 2020).

4

carl@backpage.com address. Ferrer testified that carl@backpage.com was *not* his email address, but an email address used for marketing. 10/10/23 Tr. at 104:6-10. Once a quarter, Ferrer would write an email that would be sent to "hundreds of thousands" of inactive Backpage users in an attempt to have them post more ads. 9/14/23 p.m. Tr. at 89:9-18; 89:23-90:6; 97:5-10. The emails would be sent as bulk email to a list of email addresses Ferrer pulled from Backpage's database. 9/14/23 p.m. Tr. at 89:9-14; 97:2-4. Any emails responding to carl@backpage.com went not to Ferrer, but to his staff. 10/10/23 Tr. at 104:3-23. Ferrer's staff sometimes would bring emails to the carl@backpage.com email address to his "attention if they needed some help" and emails from the carl@backpage.com email address could have been "responded to by several people." *Id.*

The government claims Ferrer testified that he personally exchanged these emails with Pamela Robinson and that he remembered doing so,[2] but the government's characterization of Ferrer's testimony simply cannot be squared either with the prosecutor's questions to Ferrer or Ferrer's responses, which make clear that Ferrer was not a party to those email exchanges. In Exhibit A, Defendants have juxtaposed the government's characterization of Ferrer's testimony with his actual testimony, highlighting the key testimony and comment on it. The transcript excerpts in **Exhibit A** demonstrate several things. First, most, but not all, of the references to email exchanges between Robinson and the carl@backpage.com email address (rather than with Ferrer/you) came from the prosecutor—demonstrating that he was aware that carl@backpage.com was not Ferrer's email address. (In contrast, over the course of several thousand pages of the prosecutor's examination of Ferrer, he never once asked Ferrer a question about an email from or to Ferrer's personal email addresses using the email address instead of using Ferrer's name or a personal pronoun.) Second, on several occasions the prosecutor started to ask a question saying "you," but then switched to saying "carl@backpage.com," demonstrating that the awkward phrasing of those questions was intentional. Likewise, on two occasions, Ferrer pivoted after the prosecutor asked a question using "you" (rather than "carl@backpage.com")

---

[2] Ferrer testified that he remembered the emails, but plainly testified he remembered drafting the template emails that a bulk email provider used to send to hundreds of thousands of emails to inactive users each quarter—not the emails to Robinson in particular.

and answered using "carl@backpage.com" or by saying the email was "another marketing email." That strongly suggests that the prosecutor and Ferrer had coordinated this testimony before the trial. Third, the prosecutor's tortured questions and awkward use of the carl@backpage.com email address point to the conclusion that the prosecutor sought to convey the misimpression that Ferrer was personally involved in these email exchanges, while leaving plausible deniability to a charge that he was knowingly eliciting false or misleading testimony. If Ferrer personally received Robinson's emails and personally prepared the responses, what possible explanation could there be for the manner in which this examination was conducted? Ferrer could have testified that the emails came into his staff, that his staff brought them to him, that he prepared the responses, and his staff sent the responses he prepared—but there was no such testimony, on direct or redirect.

This is not a case where Ferrer simply testified inconsistently. This is a case where the government knowingly elicited testimony that was at least misleading on an issue that could have affected the judgment of the jury. That is a constitutional violation requiring reversal. *United States v. Kabov*, 2023 U.S. App. LEXIS 18214, at *2 (9th Cir. July 18, 2023). The government tries to downplay the serious nature of its misconduct, but the lengthy and legally erroneous arguments it advances cannot change the fact that Ferrer's misleading testimony was central to the government's case.

**3.     The Government Repeatedly Made Improper Arguments.**

    **A.     Convicting Based on a Legally Insufficient Conspiracy Object.**

The government now argues that the "conspiracy to violate the Travel Act had only one object—to make money through the promotion of business enterprises involving prostitution offenses" (Doc. 2019 at. 9:14:17), but the indictment said just that "[t]he object of the conspiracy was to obtain money" (Doc. 230, ¶ 197) and the government told the jury the conspiracy had multiple objects, but one object was "to make money. And they did." 10/27/23 a.m. Tr. at 6:22-23. The government subsequently said in rebuttal summation that Defendants "are not charged with making money," but with making money "off the backs of people engaged in illegal prostitution enterprises." 11/1/23 Tr. at 40:12-21. That too missed the mark, as "making money

off the backs of off the backs of people engaged in illegal prostitution enterprises" also is not a federal crime. Count 1 of the Superseding Indictment is legally deficient and should be dismissed; alternatively, as the government twice told the jury it could convict Defendants of conspiracy on legally insufficient grounds, the Court should grant a new trial.

**B.  Convicting Based on an Impermissible Boundless Conspiracy.**

The government now claims for the first time that it charged a "chain" conspiracy, not a "hub and spoke" conspiracy, saying that solves the deficiencies raised by Defendants. Not so. The conspiracy claimed by the government, allegedly involving Defendants, Ferrer, Hyer, other Backpage.com employees, David Elms, Dollar Bill, and every pimp or prostitute who ever posted an ad on Backpage.com, hardly can be described as a single "chain." Just as a single hub and spoke conspiracy would fail here due to the lack of a rim connecting the spokes, the government's proposed single chain conspiracy fails because David Elms, Dollar Bill, and every pimp or prostitute who ever posted an ad on Backpage.com were not all interdependent *and* because their activities were not part of a unified scheme, whether among themselves, Backpage.com, or Defendants, much less all of them.

> The essential element of a chain conspiracy—allowing persons unknown to each other and never before in contact to be jointly prosecuted as coconspirators—is interdependence. The scheme which is the object of the conspiracy must depend on the successful operation of each link in the chain…. The rationale falls apart, however, where the remote members of the alleged conspiracy are not truly interdependent or where the various activities sought to be tied together cannot reasonably be said to constitute a unified scheme.

*United States v. Elliott*, 571 F.2d 880, 901 (5th Cir. 1978). The chain conspiracy rationale "applies only insofar as the alleged agreement has a common end or single unified purpose." *Id.*; *cf. United States v. Eubanks*, 591 F.2d 513 (9th Cir. 1979) (trial court erred in failing to provide jury instructions on multiple conspiracies in drug distribution case where government alleged a single chain conspiracy). Just as the government presented no evidence of any rim connecting the spokes for a hub and spoke conspiracy, it presented no evidence of a unified chain with all alleged conspirators interdependent upon the others and constituting part of one unified scheme.

**C.  Convicting for "Promoting Prostitution."**

7

If the government put on a case establishing Defendants intentionally took actions to cause the publication of each of the fifty charged ads with actual knowledge that the persons posting them were engaged in prostitution offenses, its repeated claims that the jury could convict Defendants for "promoting prostitution" might be an error requiring no remedy, but the government did no such thing. Rather, knowing that it could not put on such a case, from the start of the trial until the very end, the government told the jury that Defendants were charged with and guilty of "promoting prostitution" and that the jury should convict them on that basis. In the absence of any evidence showing Defendants' knowledge of the charged ads or Defendants' intent to facilitate the business enterprises allegedly associated with those ads (and with the government disclaiming any obligation to prove either), the jury seemingly accepted the government's suggestion to convict Defendants for operating the website despite knowing people used it commit prostitution offenses, which is not a crime.

### D. Telling the Jury It Could Convict Without a Showing of Specific Intent.

The government says the Court should presume the jury followed the jury instructions, citing *United States v Reyes*, 660 F.3d 454, 462 (9th Cir. 2011). There generally is a presumption that a jury followed the trial court's instructions, but the presumption applied in *Reyes* because the court found "the evidence the Government presented was not false" and the defense "failed to show that the Government made any false or misleading statements." *Id.* at 463 and 468. The Court should not apply the usual presumption here, because the government both elicited testimony that was at least misleading and made numerous inaccurate or misleading statements to the jury, including telling the jury it could convict on legally insufficient grounds:

> The prosecutor's job isn't just to win, but to win fairly, staying well within the rules. It is improper for the government to present to the jury statements or inferences it knows to be false or has very strong reason to doubt. It … is decidedly improper for the government to propound inferences that it knows to be false, or has very strong reason to doubt, particularly when it refuses to acknowledge the error afterwards to either the trial court or this court and instead offers far-fetched explanations of its actions. Faithful adherence to these principles is particularly important because *a prosecutor's opinion carries with it the imprimatur of the Government and making false or misleading assertions may induce the jury to trust the Government's judgment rather than its own view of the evidence*.

*Reyes*, 660 F.3d at 62 (emphasis added).

8

The government says direct evidence of wrongful intent is rarely available and claims "intent may be inferred from circumstantial evidence," citing *United States v. Kirst*, 54 F.4th 610, 623 (9th Cir. 2022), but the government's argument misses the mark. First, in *Kirst* the *only* evidence the defendant intended to obstruct an investigation under 18 U.S.C. § 1505 by his own false statements was in his head. Here the government had two cooperators at the center of the supposed fourteen-year conspiracy, who testified for weeks about minutiae from numerous meetings, phone calls, and emails over those fourteen years, but provided *no* direct evidence of an agreement to violate the law or of an intention to facilitate the unlawful prostitution businesses associated with ads underlying the Travel Act counts. Indeed, the government presented no such evidence even as to its cooperators (precluding *Pinkerton* liability). The government's failure to present direct evidence of specific intent was not because the evidence was not available to the government, but because it did not exist.

The government was obligated to prove that each Defendant had the specific intent to facilitate the specific, unlawful business enterprise associated with each Travel Act count. The government not only failed to present any such evidence, but, in its final summation, expressly disclaimed any obligation to establish even that any Defendant had any knowledge of the fifty charged ads, pointing instead to "the millions of ads."[3] 11/01/23 a.m. Tr. at 50:6-14. The government essentially claims that it can prove specific intent by establishing general intent—that is, a general intent to facilitate (or at least indifference towards) prostitution through the operation of Backpage.com—but the Ninth Circuit's decision in *Gibson* shows that is insufficient. *United States v. Gibson*, 507 F.2d 446, 450-51 (9th Cir. 1975).

In *Gibson*, the defendant out-of-state manufacturers sold to distributors in Montana gambling implements (punchboards and pulltabs) the government alleged were unlawful for anyone to possess in Montana. In affirming the dismissal of the charges, the Ninth Circuit assumed the defendants knew the text of the pertinent Montana statutes *and* the accuracy of the

---

[3] The government also failed to present any evidence of the critical element of a Travel Act violation that a Defendant "performed an act that did promote or facilitate the promotion, of any business enterprise involving prostitution offenses, specifically, by publishing on Backpage.com the ads listed in Counts 2-51 of the indictment." Doc. 1998 at 30:9-11.

9

government's construction of the statutes. *Id.* at 451. Several things are notable about the Ninth Circuit's ruling. First, the Ninth Circuit said that its "research has revealed no cases where a remote seller, uninvolved in an actual gambling operation, has been successfully tried and convicted under the travel act." *Id.* at n.9. Defendants believe *Gibson* remains the only reported Travel Act decision in which the defendants were not principals in the underlying criminal enterprise, excepting this prosecution.[4] Second, the Ninth Circuit rejected the notion that the government could establish specific intent by proving that the defendants sold punchboards and pulltabs to Montana residents knowing that the purchasers of those implements would violate Montana law just by possessing the punchboards and pulltabs (here, the analogue would be Backpage.com selling ads to persons it *knew* were committing prostitution offenses). The Court held that Travel Act's specific intent requirement meant the government "must show that the manufacturer in some significant manner associated himself with *the purchaser's criminal venture* for the purpose of its advancement," because any lesser standard would cause the Travel Act "be plagued by the very overexpansiveness which Congress sought to rule out by inclusion of an express mens rea requirement." *Id.* at 449 (emphasis added). The Ninth Circuit remarked that it was "as likely as not that a vendor similar to the defendants in this proceeding is totally indifferent to the actions of his purchaser," while also commenting that "the prosecution has baldly conceded in two of the stipulations that the defendants have no financial interest in or control over the Montana distributorships to which the punchboards and pulltabs were sold." *Id.* at 450 and n.8. The defendants in *Gibson* arguably intended to facilitate unlawful *gambling*, as they repeatedly sold punchboards and pulltabs to people whose mere possession of those implements was a gambling offense, but the Ninth Circuit held that was insufficient to establish that they made those sales *with the intent to advance their purchasers' illegal businesses*.[5]

---

[4] The government asserts that Ninth Circuit decisions after *Gibson* have construed the Travel Act to require only "specific intent to promote or facilitate prostitution" (Doc. 2022 at 16:18-26), but those subsequent cases involved the prosecution of defendants who were *principals* in the underlying offenses (*e.g.*, pimps, madams, or prostitutes involved in prostitution offenses), so those defendants *necessarily* had associated themselves with the criminal ventures for the purpose of their advancement. Here, the government has not alleged, much less proved, that Defendants were principals in any prostitution crimes.

[5] The government's citation to *United States v. Ulbricht*, 31 F. Supp. 3d 540, 556 (S.D.N.Y. 2014), is entirely inapposite, as that case fits squarely within both the First Amendment exception

The government may have substantial leeway in argument, but that leeway did not extend to repeatedly urging the jury to convict Defendants on legally insufficient grounds. Defendants complain not about "oratorical flourish," but inaccurate or misleading assertions aimed at convincing the jury to convict Defendants on grounds not allowed by the law.

### E. Convicting for Publishing Ads Protected by the First Amendment.

The government defends its "not on solid ground" comment, but fails to address the constitutional problems with urging the jury to convict Defendants because Backpage.com published adult ads associated with prostitution (including based on ads not introduced in evidence at trial), with urging the jury to convict Defendants for failing to shut down the Backpage.com adult section after repeated demands to do so, with urging the jury to convict Defendants for failing to shut down Backpage.com despite knowing that ads used code words and the supply of code words was unlimited, etc.—all untethered from proof that specific ads proposed illegal transactions and in complete disregard of the constitutional presumption that Backpage.com's publication of ads was protected by the First Amendment unless the government proved otherwise. Prosecutor Rapp repeatedly argued in his closing that the failure to shutter the Backpage adult section after notice of prostitution was grounds for a conviction, without a single mention of the First Amendment or its requirements. Defendants incorporate by reference Mr. Spear's reply supporting his Rule 29 motion.

### 4. The Government Improperly Used Not for the Truth Evidence.

The government admits its improper use of the inflammatory Amber Lyons video in its closing, while downplaying that misconduct saying the video "tracked" other testimony, but the government's misuse of the Amber Lyons video was a drop in the bucket. The government used the N.A.A.G. letters, the David Vigilante letter, the letters from banks, the Seattle police department reports, the letter from Maryland law enforcement, the AIM Group press release, an

---

recognized in *Pittsburgh Press* and the specific intent framework set out in *Gibson*. Ulbricht's website had facially unlawful categories inviting ads for the sale of narcotics, and thousands of ads proposing facially unlawful sales of narcotics, and he participated in those illegal drug sales by acting as an escrow agent and taking an 8-15% commission on every narcotics sale. *United States v. Ulbricht*, 13-mj-02328 (S.D.N.Y.), Sealed Complaint, Doc. 1. The government's citation to plea agreements is even more far-fetched, as the government's charges were not tested in court and pleas have no precedential value.

11

email from the Wall Street Journal, a New York Times article, a New Times article, and numerous TER reviews for their truth, with *virtually all* argued for their truth during closings. The inadmissible hearsay was highly prejudicial, requiring a new trial.

**5. The Prejudicial Timing of Material Changes to the Jury Instruction.**

The government seeks to trivialize the impact that the dramatic shift in two foundational jury instructions had on the defense. The issue was not just the defense's inability to account for the changes in the closings, but its inability to structure its openings, to cross-examine the government's witnesses, and to select and present defense witnesses based on the law given to the jury. The defense would have put on a very different case if the Court's proposed jury instructions last summer had not undermined several key defense theories. The government says notice evidence remained "salient" under the final First Amendment instruction, but Judge Brnovich's pre-trial rulings on notice evidence directly conflicted with the Court's final First Amendment instruction.

**6. Inadequate Jury Instructions Allowed Conviction on Invalid Grounds.**

As discussed above, the government's arguments on specific intent are without merit. While *United States v Hansen*, 599 U.S. 762 (2023), dealt with an unrelated statute, the pertinent holding addressed general principles of statutory construction for statutes using criminal terms of art. As such, *Hansen's* holding, and interpretation of "facilitate," apply squarely to the Travel Act, compelling the same construction of the Travel Act as in *Gibson*. Finally, the government's claim that the jury instructions did not allow the jury to "mix and match" elements, etc. is belied by the jury's verdict and the government's argument that Defendants can be convicted of the Travel Act counts absent knowledge of the ads or the advertisers and absent proof of any overt act by a Defendant relating to the publication of a charged ad. Defendants also adopt the arguments in Scott Spear's reply in support of his Rule 29 motion.

RESPECTFULLY SUBMITTED this 16th day of January, 2024.

          Paul J. Cambria, Jr.
          Erin McCampbell Paris
          LIPSITZ GREEN SCIME CAMBRIA LLP

          By:    /s/ Paul J. Cambria, Jr.
                      Paul J. Cambria, Jr.
                      Attorneys for Michael Lacey

*Pursuant to the District's Electronic Case Filing Administrative Policies and Procedures Manual (Jan. 2020) § II (C) (3), Paul J. Cambria hereby attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content, and have authorized its filing.*

          Gary S. Lincenberg
          Gopi K. Panchapakesan
          BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
          DROOKS, LINCENBERG & RHOW, P.C.

          By:    /s/ Gary Lincenberg
                      Gary Lincenberg
                      Attorneys for John Brunst

Eric W. Kessler
KESSLER LAW OFFICE

          By:    /s/ Eric W. Kessler
                      Eric W. Kessler
                      Attorneys for Scott Spear

Bruce Feder
FEDER LAW OFFICE, P.A.

          By:    /s/ Bruce Feder
                      Bruce Feder
                      Attorneys for Scott Spear

On January 16, 2024, a PDF version of this document was
filed with Clerk of the Court using the CM/ECF System
for filing and for Transmittal of a Notice of Electronic
Filing to the to the CM/ECF registrants who have
entered their appearance as counsel of record