Paul J. Cambria, Jr. (NY Bar No.1430909, admitted *pro hac vice*)
Erin E. McCampbell Paris (NY Bar No. 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:   (716) 855-1580
pcambria@lglaw.com
emccampbell@lglaw.com
*Attorneys for Michael Lacey*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | NO. CR-18-00422-PHX-SMB |
| Plaintiff, | |
| vs. | **DEFENDANT MICHAEL LACEY'S REPLY IN FURTHER SUPPORT OF SUPPLEMENT TO RULE 29 MOTION CONCERNING COUNT 100** |
| Michael Lacey, *et al.*, | |
| Defendants. | (Oral argument requested) |

Michael Lacey ("Lacey"), by and through his undersigned counsel, files the instant reply in further support of his Rule 29 Motion Concerning Count 100, and Rule 29 Supplement (Doc. 2004). In its Response (Doc. 2020), the government has not provided this Court with a single case that affirms a concealment money laundering conviction (domestic or international) with facts like this case; namely: (1) a defendant who repeatedly stated his intent to file all disclosure forms with the federal government related to the funds, pay taxes on the funds at issue, and avoid tax shelters of any kind; (2) a defendant who timely filed the required disclosure forms, which identified the attributes of the funds at issue (his relationship to the funds, their location, the amount, etc.); (3) a

defendant who sought the advice of an attorney on how to stabilize banking and who was advised by the attorney to explore an offshore trust; (4) a defendant who relied on two attorneys to form and execute an offshore trust; (5) documentation of the purposes of forming the trust that have nothing to do with concealment; and, most damaging to the government's case, (6) a government witness who testified that he was able to follow each and every transaction with ease because the bank accounts were held in the proper names of parties at issue. (*See* Doc. 2004.) The Response does not provide a single case with facts remotely comparable to Count 100 because there was no concealment here, intended or actual, but instead, mere money spending, which court after court has held is not money laundering and, thus, not illegal. This Court should acquit Lacey of his conviction for Count 100 because the proof is insufficient as a matter of law.

## ARGUMENT

**I.     There is no proof of intent to conceal.**

The government's only purported evidence of intent to conceal is evidence of nothing at all. Lacey's stated interest in placing funds where government parties could not "access" those funds does not, as the government claims, establish his intent to conceal. The word "access" does not mean the same thing as the word "conceal," just like "hide" does not mean the same thing as "possess." The government has provided zero authority for the analytical leap it asks this Court to take. Critically, this Court defined "concealment" for the jury as "the act of preventing disclosure or refraining from disclosing." (Dkt. 1999 at 4.) The word "access" is defined as "freedom or ability to obtain or make use of something." *See* Websters-Miriam Dictionary, available at https://www.merriam-webster.com/dictionary/access (last visited on Jan. 5, 20245). Nothing in the definition of "access" provides any implication – let evidence – of "concealment."

More importantly, Mr. Lacey's statement about "access" cannot be read in a vacuum. The testimony and exhibits admitted at trial demonstrate that, while Mr. Lacey was concerned about the government interfering with his ability to bank or taking possession of his assets, , he never expressed an intent to hide his assets from the government. Instead, Lin Howard testified that Lacey said that "he wanted to make it clear that **he wasn't looking to avoid paying taxes, that he had a BDO**

2

1. ***he directed [sic] to make sure that all taxes were paid and no tax shelters were taken***." (10/12/13 P.M. Tr. at 11.) That testimony was consistent with Lacey's own words as documented in an email: "I think I am ready to move forward with the visit to the Los Angeles lawyer you recommended who has expertise in off-shore. [T]o revisit for just a moment, ***I am not interested in any tax avoidance***." (Ex. 1 (emphasis added).) Even Lin Howard testified that she did not understand Mr. Lacey to be asking her for help concealing or hiding anything. (Day 17 P.M. at 16, 22.) Thus, even if "access" could be read in isolation to mean "conceal," Lacey nonetheless identified many steps he intended to take to disclose the funds at issue to the government, and he followed through with those intended disclosures. (*See* Exs. 5541, 5545, 5546; Day 19 AM Tr. at 63; Day 23 PM Tr. at 81.)

    The government's second claim as to proof of intent to conceal is equally unavailing. Unable to distance itself from the ***overwhelming evidence of intent to disclose, followed by actual disclosure***, the government claims that the flow of the funds from Backpage (a company then owned and controlled by Ferrer) to Website Technologies (a company also then owned and controlled by Ferrer) and then to Cereus Properties (a company co-owned by Lacey) that occurred prior to the funds ever reaching Lacey's bank accounts is proof of intent to conceal. Here, again, the government's evidence is proof of nothing.

    First, the government's own authority – *United States v. Wilkes*, 662 F.3d 524 (9th Cir. 2011) – demonstrates that these transactions are not relevant. As the Ninth Circuit recognized, an essential element of concealment money laundering conviction is proof that "the defendant conducted or attempted to conduct a financial transaction"—and the only transaction relevant to Count 100 is the transfer from Becker's trust account to Lacey's Hungary trust. *Id.* at 545. This element is required because the "money laundering statute criminalizes behavior ***that masks the relationship between an individual and his illegally obtained proceeds***." *Id.* (quoting *United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007)). Critically, the Ninth Circuit did not begin its analysis of proof of Wilkes' intent to conceal until the funds at issue were put in possession of Wilkes. *See Wilkes*, 662 F.3d at 547 (discussing financial transactions after Wilkes had control of the funds at

3

issue). The transactions that preceded the deposit of the funds into an account controlled by Wilkes were not considered. *See id.* As a result, the only proof that is relevant to Lacey's intent is what he did with the funds once they were deposited into his accounts – and as discussed throughout – his transactions were both easy to follow *and* timely disclosed to the government.

Moreover, the transactions the government now seeks to loop in – transfers from Backpage to Website Technologies and then to Cereus Properties – involve transfers made by companies controlled by Ferrer after he purchased Backpage. Those transactions not only are not relevant to Count 100, but there was no proof that Lacey was involved with those transfers or was even *aware* of those transfers, so those transfers could have no bearing on Lacey's intent. In addition to the government's lack of proof on this requisite element, there is significant proof that, as a general matter, Lacey had nothing to do with Backpage's operations even before Ferrer bought Backpage.com. Several witnesses testified that Lacey had nothing to do with the business side of any of the companies because there was a wall between the business and editorial side of their media company, like most media companies. (Day 24 A.M. at 46-50; 97-98.) The government's lead witness, Ferrer, testified that Lacey was a "layer away" from Backpage, and Hyer, a top Backpage employee, never interacted with Lacey the entire time Backpage operated. (Day 13 A.M. Tr. at 11; 10/19/23 Tr. P.M. at 112.) Lacey could not have intended to conceal something about which he had no knowledge, so the government's failure to prove Lacey's knowledge of or involvement with the transactions that preceded the deposit of funds into his accounts renders those transactions irrelevant to the issue of Lacey's intent.

Additionally, the financial transactions at issue in *Wilkes* are readily distinguishable from the transactions in this case. In that case, Wilkes was convicted of domestic concealment money laundering (among other convictions), for concealing the payoff of a Congressman's second mortgage, as part of a greater bribery conspiracy. *See Wilkes*, 662 F.3d at 530. Although the Ninth Circuit summarized the facts concerning proof of concealment in its opinion, the government's appellate brief provided a more detailed discussion of the proof of intent to conceal, which demonstrates that the proof of intent in *Wilkes* was far different than what the government cobbled

4

together here. (*See* Brief for United States submitted on Mar. 14, 2011 in *United States v. Wilkes*, Ninth Circuit Case no. 08-50063 attached hereto as Exhibit A.)

As relevant, Wilkes and a colleague, Wade, bribed a Congressman to give government contracts to their companies. During the conspiracy, the Congressman obtained two mortgages on a home that he wanted paid off by Wilkes and Wade. (Ex. at 21-22.) Wade paid off the first mortgage; however, Wilkes failed to pay off the second mortgage as quickly as the Congressman had requested. (*Id.* at 22.) Wilkes began to undertake efforts to pay off the mortgage on May 6, 2004, which took over a week, including: (1) Wilkes depositing funds derived from the bribery conspiracy into a company he controlled, ADCS, Inc.; (2) Wilkes transferring that money to another company he controlled, WBR Equities; and (3) Wilkes then transferring the money to Parkview Financial Inc., a company controlled by Thomas Kontogiannis. (*Id.*; *see also id.* at 23 n.13.) But that is not where the story ends. Before Wilkes began this series of transfers, Kontogiannis, through Parkview Financial Inc., paid off the second mortgage, which was held by a company with no association with Wilkes or Kontogiannis. (*Id.* at 23 n.13.) As such, there was no way to connect the dollars that paid off the mortgage to the dollars Wilkes obtained from his criminal scheme, because the mortgage was paid off before Wilkes made the final transfer to Parkview Financial, Inc.

In contrast with *Wilkes*, the proof at trial here showed that the money flowed from one account to another in sequential order with proper account names for each account holder. (Day 19 AM Tr. at 62, Ex. 1479.) Further, the only third party who was involved was Lacey's lawyer, Becker, who on his own initiative, consolidated Lacey's five grantor trust accounts into his IOLTA, where the funds were held in an account for Lacey's benefit, and then transferred to a trust Lacey formed. Becker did not use his own funds to fund the trust only thento be reimbursed by Lacey, like Kontogiannis in the *Wilkes* case, who used funds from a corporation he controlled to pay off the Congressman's mortgage who was then reimbursed by Wilkes. Instead, Becker used Lacey's funds that came directly from bank accounts that bore Lacey's name. The transactions followed a normal sequential order with no break in Lacey's association or control of the funds – a material distinction between this case and the *Wilkes* case – that the government tries

5

to ignore.

Another critical set of facts absent from *Wilkes* is the **overwhelming evidence of intent to disclose and actual disclosure of the attributes of the funds**. Prior to forming and funding the trust, Lacey told a bank employee and his lawyer that he wanted to pay taxes on the assets, and avoid tax shelters of any kind, meaning, he intended to tell the government about the offshore trust by declaring it on his tax returns and paying any taxes due. Then, a few weeks after the trust was funded, on February 21, 2017 – **more than a year before he was indicted** – Lacey asked Becker about who would be filing the disclosure forms with the government (Exs. 1, 6264), again, demonstrating Lacey's intent to disclose and directly negating any intent to conceal. The government makes much out of the fact that the first FBAR was not filed until 18 months after the funds were sent to Hungary – but that claim ignores the fact that the initial FBAR was not due until April 14, 2018, and that Lacey's lawyers, on their own initiative and not at the request of Lacey, sought the short automatic extension available to all filers. (10/24/13 P.M. Tr. at 132:4-6 ("Mr. Becker, did Mr. Lacey ever ask that there be an extension for the filing of the FBAR? A. No.")).

Lacey has timely filed the requisite disclosure forms each year. The disclosure is not de minimis, as the government claims, but instead, identifies the attributes of the funds – the very facts that the government claims that Lacey has concealed from the government. The FBARs tell the government that he is the taxpayer associated with the funds, the amount of the funds, the location of the funds, and additionally provide a copy of the trust, which itself identifies all relevant parties. (Exs. 5541, 5545, 5546.) Indeed, there is no concealment money laundering case involving substantive disclosures like here cited by the government or located through research.

There is another important distinction between *Wilkes* and this case. *Wilkes* involved **domestic** concealment money laundering. Lacey was convicted of **international** concealment money laundering. The only transaction that occurred at Lacey's direction that provided a basis for charging him with **international** concealment money laundering was the transfer that Becker made from his IOLTA account to the trust account in Hungary, for which there is no proof of intent to conceal or concealment of any kind. If the government believed, as it now claims, that the transfers

6

from Backpage to Website Technologies and then Website Technologies to Cereus Properties and then Cereus Properties to Lacey's grantor trust bank accounts were proof of concealment, the government could have charged Lacey with domestic concealment money laundering. Instead, the government charged him with transactional money laundering for those transfers (for which the jury rendered no verdict).

**II.    There is no proof of intent to conceal, in part.**

The government's next claim is that, even if there was proof of intent to accomplish some other objective – like stabilizing Lacey's banking and the formation of a trust for the benefit of Lacey's sons – there still is proof of intent to conceal, **in part**, which is sufficient proof to establish the intent element. Here, again, there is no proof to support the government's claim.

First, the record demonstrates that there was no concealment in part. The government's own witness killed this argument when he testified that the accounts bore the names of the relevant party and that he was able to follow each transaction with ease. (Day 19 AM Tr. at 62, *see also* Ex. 1479.) On top of this testimony, the proof at trial demonstrated an intent to disclose and actual disclosure. None of these facts provide support for the government's concealment-in-part claim and, as discussed above, depriving the government of access to a bank account is not the same thing as concealing the bank account, even in part.

Second, the cases that the government cited for its concealment-in-part claim are readily distinguishable. For example, in *United States v. Singh*, 995 F.3d 1069 (9th Cir. 2021), the defendant transferred funds through an alternative "money transferring network" called "hawala" that was "designed to transfer funds from point to point" with no "record keeping" or "government oversight." *Id.* at 1073. On top of that, the defendant used additional "secrecy" techniques such as switching out Sim cards, using burner phones, using code words at transfers, and putting serial numbers on dollar bills to verify the recipient of each transaction. *See id.* at 1074. Nothing about that case is at all similar to the standardized banking transfers at issue here.

In *United States v. Abouammo*, 2022 WL 17584238 (N.D. Cal. Dec. 12, 2022), the defendant opened an account in Lebanon under his father's name, directed funds to be deposited to that

7

account, and then directed funds to be transferred from that account to his account below the reporting amount and with the subject line "family fund." *See id.* at *16-17. *United States v. Huy Chi Luong*, 468 F. App'x 710 (9th Cir. 2012), also involved extensive evidence of intent to conceal. The defendant had a third-party purchase teller's checks to make payments on a home that was titled in his parents' name, but which the defendant, in reality, actually owned. Again, none of that deception is present here. In *United States v. Chang*, 2020 WL 5702131 (N.D. Cal. Sept. 24, 2020), the defendant created two entities with names that sounded similar to the name of his church and then used those entities to siphon donations intended for the church for his personal gain. In doing so, among other things, he used identification of another church member to create one of the bank accounts through which he moved the funds that correlated to the concealment money laundering charges. None of the deception like these cases is present here.

Notably, *United States v. Sun*, 673 F. App'x 729 (9th Cir. 2016), **supports acquittal on Count 100**. In that case, the defendant put "illegal cash proceeds from his medical practice into his personal bank account, rather than his business account" and told investigators that he did so to "avoid reporting [the funds] to the IRS." *Id.* at 733. The opposite is true here. Lacey directed Becker to engage in a transaction that he was advised and knew would trigger a disclosure to the federal government, he stated that he intended to make the disclosure, he directed his lawyers to make the disclosure, and he has been making the disclosure ever since.

Finally, *United States v. Twitchell*, 69 F. App'x 892 (9th Cir. 2003), provides too little of a factual discussion to be helpful and, in any event, is an unreported case that pre-dates the Supreme Court's seminal case on concealment, *Cuellar v. United States*, 553 U.S. 550 (2008). Similarly, *United States v. Kellum*, 119 F. App'x 32 (9th Cir. 2004), is another unreported case that pre-dates *Cuellar*. It involves a defendant who used ill-gotten gains to purchase a cashier's check and the proof was that this transaction made it harder for the government to discover the origin of the funds. *Kellum* stands in stark contrast with this case where the government's witness testified that the transactions were easy to follow. (Day 19 AM Tr. at 62, *see also* Ex. 1479.)

8

**III.     The transactions at issue were open and obvious.**

The government's claim that the "transactions were not 'open and obvious'" is at odds with the testimony of the government's own witness, Quoc Thai. Indeed, Thai testified that all of the accounts had accurate names for the account holders and he could trace the funds from account to account, even with respect to the use of Becker's IOLTA account because an attorney IOLTA account is "an account held in the name of a client . . . [b]y an attorney." (Day 19 AM Tr. at 62, 64-65; *see also* Ex. 1479.) Because the funds were associated with Lacey before and after the transfer to Hungary, and the transactions were easy to follow, the transactions were open and obvious.

**IV.     There is no proof that Lacey knew that the trust was funded with proceeds.**

There is no conviction that establishes that Lacey had knowledge that the funds at issue were proceeds of specified unlawful activity in the form of Travel Act violations for the facilitation of prostitution business enterprises. As a preliminary matter, ***the jury reached no verdict as to Lacey on conspiracy or any Travel Act count***. The jury's finding of guilt as to other defendants does not establish ***Lacey's*** knowledge about anything.

Furthermore, as has been litigated in this case, and as this Court instructed the jury, the First Amendment presumption for protected expression is at issue here. Lacey, like any other person, is entitled to presume that third-party speech is protected expression unless he has information that a particular ad was an ad for prostitution services as opposed to an ad for lawful sexual services such as stripping, sensual massage, etc. There is no proof that Lacey believed anything other than that the speech at issue – the publication of third-party ads – was protected expression.

The evidence the government points to as proof of his knowledge is, again, is not proof of anything. For example, Lacey's authoring of the draft article entitled, Backpage Understood, shows that he believed that Backpage had extensive technology in place to keep ads proposing illegal transactions off the website. (Ex. 113A.) To the extent that article can be read to suggest that Lacey somehow had knowledge of ads proposing illegal transactions on the website, Ferrer quickly dispelled that notion, advising Lacey that "***I do not have prostitution ads***." (Ex. 115B.)

The remainder of the government's proof of knowledge is episodic/anecdotal opinions

9

about ads from elected officials, religious leaders, and journalists opining that anybody can tell that the ads were prostitution ads.  This anyone-can-tell evidence was contradicted by law enforcement witnesses who testified that ads did not provide probable cause to make an arrest, including one who testified even the one charged ad that arguably was an express offer of sex for money did not provide probable cause for an arrest.  (Day 17 P.M. 117-18 (Det. Murray testifying no probable cause to arrest based solely on ad saying "80 for head, 120 for hooking up without head, 150 for hooking up with head.").)  This anyone-can-tell evidence was further contradicted by an expert who testified that it is impossible to know from the face of an ad whether the poster was engaged in prostitution and, further, it is statistically impossible to know what percentage of ads on Backpage were associated with prostitution.  (Day 24 P.M. 43-44, 48-53, 87-96.) This testimony came from an expert who responded to ads and met in person with people who posted ads (unlike Ferrer, who testified he had never done so). (*Id.*)  Further, counsel for Backpage expressed the unequivocal view that Backpage was a lawful platform for the publication of third-party ads concerning adult entertainment.  (Ex. 171.)

Finally, even if all that evidence was to be disregarded, the government's own proof demonstrated that no less than 6% of revenue originated from non-adult ad categories as to which the government admits the ads were lawful.  (Ex. 1480).  Because the government did no tracing of the funds at issue in Count 100, there was no evidence that the funds Lacey transferred to Hungary were criminal proceeds, as opposed to revenues from the publication of unquestionably lawful non-adult ads (which the government's evidence proved accounted for at least 6% of Backpage.com revenues) or from adult ads the jury was required to assume were constitutionally protected.  The government had the burden to prove that the funds transferred to the Hungarian trust were criminal proceeds, but, as Thai conceded, he did not do an ad-by-ad analysis and had no idea if any particular revenue to Backpage was tied to the publication of a constitutionally unprotected ad.  (Day 19 AM at 44-48, 54.)  That concession is fatal to the government's claim that the transfer constituted criminal proceeds and to Lacey's knowledge of proceeds.

RESPECTFULLY SUBMITTED this 18th day of January, 2024,

                                Paul J. Cambria, Jr.
                                Erin McCampbell Paris
                                LIPSITZ GREEN SCIME CAMBRIA LLP

                      By:    <u>/s/ Paul J. Cambria, Jr.</u>
                                Paul J. Cambria, Jr.
                                Attorneys for Michael Lacey

On January 18, 2024, a PDF version of this document was filed with Clerk of the Court using the CM/ECF System for filing and for Transmittal Of a Notice of Electronic Filing to the Following CM/ECF registrants:

Kevin Rapp, kevin.rapp@usdoj.gov
Peter Kozinets, peter.kozinets@usdoj.gov
Daniel Boyle, daniel.boyle2@usdoj.gov
Margaret Perlmeter, margaret.perlmeter@usdoj.gov
Andrew Stone, andrew.stone@usdoj.gov
Austin Maxwell Berry, austin.berry2@usdoj.gov