C.A. Nos. 08-50063/08-50164

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee/Cross-Appellant,

v.

BRENT ROGER WILKES,

Defendant-Appellant/Cross-Appellee.

_____

Appeal from the United States District Court
for the Southern District of California
Honorable Larry A. Burns, District Judge

BRIEF FOR APPELLEE UNITED STATES

LAURA E. DUFFY
United States Attorney

BRUCE R. CASTETTER
Assistant U.S. Attorney
Chief, Appellate Section
Criminal Division

VALERIE H. CHU
JASON A. FORGE
PHILLIP L. B. HALPERN
Assistant U.S. Attorneys

880 Front Street, Room 6293
San Diego, CA 92101-8893
Telephone: (619) 557-7463

Attorneys for Plaintiff-Appellee
United States of America

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES     vii

| | | |
|---|---|---|
| I | QUESTIONS PRESENTED | 1 |
| II | JURISDICTION | 2 |

A.    BASIS FOR SUBJECT MATTER JURISDICTION IN THE DISTRICT COURT    2

B.    BASIS FOR JURISDICTION IN THE COURT OF APPEALS    3

C.    THE NOTICE OF APPEAL WAS TIMELY    3

D.    BAIL STATUS    3

III    STATEMENT OF THE CASE    3

A.    PRIOR PROCEEDINGS    3

B.    STATEMENT OF THE FACTS    4

     1.    The Trial    4

         a.    Mr. Wilkes Goes to Washington    4

         b.    The Beginning of an Ugly Friendship    5

             (1)    Meals    6

             (2)    Trips    6

             (3)    Money    7

         c.    Cunningham Acts on Wilkes's Behalf    9

         d.    ADCS Program and the Panama Project    10

             (1)    Paul Behrens    10

             (2)    Gary Jones    12

## TOPICAL INDEX (Continued)

|  |  |  | Page |
|---|---|---|---|
| (3) | Lou Kratz |  | 14 |
| (4) | David Oliver |  | 16 |
| (5) | William Berl |  | 17 |
| e. | Global Infrastructure Data Capture Program |  | 18 |
| f. | Equipment |  | 19 |
| g. | Wade Ups the Ante |  | 20 |
| h. | Wilkes Pays off of Cunningham's Mortgage |  | 21 |
| I. | Wilkes's Defense |  | 23 |
| (1) | Jury Nullification |  | 23 |
| (2) | Admit Nothing. Deny Everything. Make Counter-Accusations. |  | 24 |
| a) | Wilkes Denies Bribing Cunningham With $100,000 Payment |  | 25 |
| b) | Wilkes Denies Bribing Cunningham With $525,000 Transfer |  | 26 |
| c) | Wilkes Denies Threatening Anyone's Job |  | 27 |
| d) | Wilkes Denies Plying Cunningham With Prostitutes |  | 28 |
| e) | "Deny Everything" Really Meant *Everything* |  | 29 |
| 2. | Wilkes's Preparation Time |  | 30 |
| 3. | Correcting the Record |  | 32 |
| a. | Wilkes's Request to Immunize Witnesses |  | 33 |

ii

TOPICAL INDEX (Continued)

|  |  |  |  | Page |
|---|---|---|---|---|
|  | b. | The Hattier Affidavit |  | 34 |
|  | c. | Wade's FEC Case |  | 35 |
| IV | SUMMARY OF ARGUMENT |  |  | 37 |
|  | 1. | Failure to Immunize One Defense Witness |  | 37 |
|  | 2. | Alleged Brady/Giglio Violations |  | 38 |
|  | 3. | Prosecutorial Misconduct |  | 38 |
|  | 4. | Requests for Continuance |  | 38 |
|  | 5. | Honest Services Fraud |  | 39 |
|  | 6. | Money Laundering |  | 39 |
|  | 7. | Grand Jury Proceedings |  | 39 |
|  | 8. | Forfeiture |  | 39 |
| V | ARGUMENT |  |  | 40 |
|  | A. | WILKES WAS NOT ENTITLED TO COMPELLED USE IMMUNITY |  | 40 |
|  | 1. | Standard of Review |  | 40 |
|  | 2. | Wilkes Was Not Entitled to Compel Use Immunity for Williams |  | 40 |
|  |  | a. | Wilkes Misrepresents the Number of Immunized Witnesses | 41 |
|  |  | b. | Wilkes Failed to Provide a Valid Offer of Proof | 42 |
|  |  | c. | There Was No Distortion of the Fact-Finding Process | 42 |

iii

<u>TOPICAL INDEX</u> (Continued)

|  |  |  | Page |
|---|---|---|---|
| (1) | No Contradiction at ER 2045 | | 43 |
| (2) | No Contradiction at ER 2050-54 | | 43 |
| (3) | No Contradiction at ER 2059-60 | | 44 |
| (4) | No Contradiction at ER 2079-80 | | 45 |
| (5) | Nothing Incriminating at ER 2094 | | 45 |
| (6) | No Contradiction at ER 2062-63 | | 46 |
| (7) | No Contradiction at ER 2150-54 and Corroborated by Wilkes | | 47 |
| (8) | No Contradiction About "Obtaining Prostitutes" | | 47 |

| B. | THERE WERE NO <u>BRADY</u>/<u>GIGLIO</u> VIOLATIONS | | 49 |
|---|---|---|---|
| | 1. | Standard of Review | 49 |
| | 2. | Wilkes Fails to Identify any Withheld Impeachment Evidence as to Combs | 49 |
| | 3. | Fails to Identify any New Impeachment Information as to Wade | 50 |
| | | a. The CA Did Not Reflect any Undisclosed Misconduct | 50 |
| | | b. Wade's Retention of Millions in Gains Was Well-Established | 51 |
| | | c. The CA *Undermined* Wilkes's Impeachment of Wade | 52 |

| C. | THERE WAS NO PROSECUTORIAL MISCONDUCT | | 53 |
|---|---|---|---|
| | 1. | Standard of Review | 53 |

## TOPICAL INDEX (Continued)

Page

2. The District Court Did Plainly Err When It Did Not *Sua Sponte* Stop Government Counsel From Fairly Replying to Wilkes's Arguments ..... 54

    a. Wilkes Expressly Invited Government Counsel to Answer Why Cunningham Was Not Called as a Witness ..... 55

3. There Was No Vouching ..... 56

4. There Was No Burden Shifting ..... 58

5. There Was No Attempt to Appeal to Jurors' Passions or Prejudices ..... 59

D. WILKES HAD AMPLE TIME TO PREPARE, INCLUDING MID-TRIAL RECESSES ..... 62

1. Standard of Review ..... 62

2. Wilkes Was Neither Unreasonably Nor Arbitrarily Denied a Continuance ..... 63

    a. Kratz and Jones ..... 64

    b. Lifset ..... 65

    c. Collins ..... 65

    d. Wade ..... 66

    e. Combs ..... 66

E. THE ONLY HONEST SERVICES THEORIES ADVANCED AT TRIAL WERE THOSE UPHELD IN SKILLING ..... 68

1. Standard of Review ..... 68

2. Wilkes's Bribery Conviction Forecloses His Skilling Argument ..... 68

## TOPICAL INDEX (Continued)

Page

F. WILKES'S CONVICTION FOR CONCEALMENT MONEY LAUNDERING DOES NOT PRESENT A MERGER PROBLEM ................................ 70

   1. Standard of Review ................................ 70

   2. The Purpose of Traditional Money Laundering Is Concealment ................................ 71

   3. The Risks Presented in Promotion Cases Are Not Presented Here ................................ 71

G. THE VERDICTS AT TRIAL RENDER HARMLESS ANY ERRORS IN THE GRAND JURY ................................ 74

   1. Standard of Review ................................ 74

   2. Wilkes's Grand Jury Arguments ................................ 74

H. WILKES FAILED TO REQUEST A JURY DETERMINATION OF FORFEITURE ................................ 75

VI CONCLUSION ................................ 76

CERTIFICATE OF COMPLIANCE

STATEMENT OF RELATED CASES

CERTIFICATE OF SERVICE

vi

TABLE OF AUTHORITIES

<u>Cases</u>                                                              <u>Page</u>

<u>Armant v. Marquez</u>,
    772 F.2d 552 (9th Cir. 1985)                              63

<u>Cuellar v. United States</u>,
    553 U.S. 550 (2008)                                    70, 73

<u>Giglio v. United States</u>,
    405 U.S. 150 (1972)                          1, 38, 49, 50

<u>Lawn v. United States</u>,
    355 U.S. 339 (1958)                                    55, 57

<u>Libretti v. United States</u>,
    516 U.S. 29 (1995)                                        75

<u>Morris v. Slappy</u>,
    461 U.S. 1 (1983)                                      62, 63

<u>Neder v. United States</u>,
    527 U.S. 1 (1999)                                      68, 69

<u>Skilling v. United States</u>,
    130 S. Ct. 2896 (2010)                       2, 39, 68, 69

<u>Slagle v. Bagley</u>,
    457 F.3d 501 (6th Cir. 2006)                              62

<u>Strickler v. Greene</u>,
    527 U.S. 263 (1999)                                    49, 53

<u>United States v. Caruto</u>,
    627 F.3d 759 (9th Cir. 2010)                          74, 75

<u>United States v. Gage</u>,
    2009 WL 2700322 (9th Cir. 2009)(unpublished)          41, 46

<u>United States v. Garrett</u>,
    179 F.3d 1143 (9th Cir. 1999)                             62

TABLE OF AUTHORITIES (Continued)

|  | Page |
|---|---|
| United States v. Gordon, | |
| 844 F.2d 1397 (9th Cir.1988) | 52 |
| United States v. Henderson, | |
| 241 F.3d 638 (9th Cir. 2000) | 54 |
| United States v. Hively, | |
| 437 F.3d 752 (8th Cir. 2006) | 76 |
| United States v. Jennings, | |
| 160 F.3d 1006 (4th Cir. 1998) | 69 |
| United States v. Kincaid-Chauncey, | |
| 556 F.3d 923 (9th Cir. 2009) | 69 |
| United States v. Kloehn, | |
| 620 F.3d 1122 (9th Cir. 2010) | 63 |
| United States v. Manning, | |
| 56 F.3d 1188 (9th Cir. 1995) | 49 |
| United States v. Molina, | |
| 934 F.2d 1440 (9th Cir. 1991) | 59 |
| United States v. Moreland, | |
| 622 F.3d 1147 (9th Cir. 2010) | 58, 70, 73 |
| United States v. Navarro, | |
| 608 F.3d 529 (9th Cir.), cert. denied, 131 S. Ct. 960 (2010) | 39, 74, 75 |
| United States v. Necoechea, | |
| 986 F.2d 1273 (9th Cir. 1993) | 57, 58 |
| United States v. Olano, | |
| 507 U.S. 725 (1993) | 53 |
| United States v. Parker, | |
| 364 F.3d 934 (8th Cir. 2004) | 70 |
| United States v. Regan, | |
| 2009 WL 1185666 (9th Cir. 2009) (unpublished) | 40, 48 |

TABLE OF AUTHORITIES (Continued)

|  | Page |
|---|---|
| United States v. Santos,<br>553 U.S. 507 (2008) | 2, 39, 72, 73 |
| United States v. Sayetsitty,<br>107 F.3d 1405 (9th Cir. 1997) | 54 |
| United States v. Si,<br>343 F.3d 1116 (9th Cir. 2003) | 53 |
| United States v. Sine,<br>493 F.3d 1021 (9th Cir. 2007) | 53, 54 |
| United States v. Solivan,<br>937 F.2d 1146 (6th Cir. 1991) | 61 |
| United States v. Straub,<br>538 F.3d 1147 (9th Cir. 2008) | 40, 41, 42, 43, 46, 48 |
| United States v. Sudikoff,<br>36 F. Supp. 2d 1196 (C.D. Cal. 1999) | 50 |
| United States v. Van Alstyne,<br>584 F.3d 803 (2009) | 2, 72, 73 |
| United States v. Wexler,<br>79 F.2d 526 (2d Cir. 1935) | 54 |
| United States v. Woodley,<br>9 F.3d 774 (9th Cir. 1993) | 49 |
| United States v. Wright,<br>625 F.3d 583 (9th Cir. 2010) | 53, 54, 62 |
| United States v. Young,<br>470 U.S. 1 (1985) | 54, 55 |
| Weatherford v. Bursey,<br>429 U.S. 545 (1977) | 49 |

TABLE OF AUTHORITIES (Continued)

|  | Page |
|---|---|
| **Statutes** | |
| 18 U.S.C. § 201 | 2, 69 |
| 18 U.S.C. § 371 | 2 |
| 18 U.S.C. § 1343 | 2, 4 |
| 18 U.S.C. § 1346 | 2, 68 |
| 18 U.S.C. § 1955 | 72 |
| 18 U.S.C. § 1956(a)(1)(A)(i) | 72, 73, 74 |
| 18 U.S.C. § 1956(a)(1)(B)(i) | 2, 70, 71, 73, 74 |
| 18 U.S.C. § 3161(c)(1) | 63 |
| 18 U.S.C. § 3231 | 3 |
| 28 U.S.C. § 1291 | 3 |
| **Rules** | |
| Fed. R. App. P. 4(b) | 3 |
| Fed. R. Crim. P. 6(e) | 74 |
| Fed. R. Crim. P. 12(b)(3)(a) | 75 |
| Fed. R. Crim. P. 32(b)(4) | 75 |

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | C.A. Nos. 08-50063/08-50164 |
| Plaintiff-Appellee, | D.C. No. 07cr330-LAB |
| v. | |
| BRENT ROGER WILKES, | |
| Defendant-Appellant. | |

I

## QUESTIONS PRESENTED

1.     Did the district court abuse its discretion by refusing to compel use immunity after Wilkes failed to proffer to the Government any immunized testimony that his proposed witness would have contradicted?

2.     Where Wilkes argued that the Government had "bought" a cooperating witness's testimony by not fining him, did Brady or Giglio require disclosure of a fine imposed after the witness testified, and if so, is it sufficient that Wilkes learned of the fine in time to request to reopen the case to admit it into evidence, but declined to do so?

3.     Did the district court plainly err by not sua sponte interrupting rebuttal arguments that Wilkes had invited in his closing argument?

4.     Did the district court abuse its wide discretion in scheduling Wilkes's trial, where three years later, Wilkes still has not identified any evidence that would have helped him at trial?

5.    Does Wilkes's conviction for substantive bribery render moot his argument under Skilling v. United States, 130 S. Ct. 2896 (2010), which expressly approved of bribery as a basis for honest services fraud liability?

6.    Does Wilkes's conviction for *concealment* money-laundering render moot his argument under United States v. Santos, 553 U.S. 507 (2008) and United States v. Van Alstyne, 584 F.3d 803 (2009), which were expressly limited to *promotional* money-laundering transactions that are essential to the underlying unlawful activity?

7.    Are Wilkes's alleged non-structural defects in grand jury proceedings rendered moot by the jury's verdict at trial?

8.    Was Wilkes, like all other defendants, required to request a jury determination of forfeiture allegations?

II

JURISDICTION

A.    BASIS FOR SUBJECT MATTER JURISDICTION IN THE DISTRICT COURT

On November 5, 2007, a jury found Brent Roger Wilkes ("Wilkes") guilty of one count of conspiracy (18 U.S.C. § 371), ten counts of honest services wire fraud (18 U.S.C. §§ 1343 and 1346), one count of bribery (18 U.S.C. § 201), and one count of money laundering (18 U.S.C. § 1956(a)(1)(B)(I)), all related to Wilkes's decade-long scheme to bribe and corrupt Congressman Randall "Duke" Cunningham.

[CR 152; ER 162-98.][1] On February 19, 2008, the district court sentenced Wilkes to a term of 144 months' custody followed by three years of supervised release. [ER 2-8.] The district court had original jurisdiction under 18 U.S.C. § 3231.

B.    BASIS FOR JURISDICTION IN THE COURT OF APPEALS

This Court has jurisdiction over timely appeals from final judgments of the district courts under 28 U.S.C. § 1291. The judgment against Wilkes is a final order subject to appeal under 28 U.S.C. § 1291.

C.    THE NOTICE OF APPEAL WAS TIMELY

Rule 4(b) of the Federal Rules of Appellate Procedure requires that a notice of appeal in a criminal case be filed within 10 days of the entry of the judgment. The judgment in this case was entered on February 19, 2008. [ER 2-8.] Wilkes timely filed his Notice of Appeal on February 19, 2008. [ER 1.]

D.    BAIL STATUS

Wilkes is out of custody on bail pending this appeal. [AOB 2.][2]

III

STATEMENT OF THE CASE

A.    PRIOR PROCEEDINGS

On February 13, 2007, a federal grand jury returned a 25-count Indictment against Wilkes. [CR 1.] On February 14, 2007, Wilkes was arraigned on the

---

[1]    "CR" refers to the Clerk's Record. "ER" refers to Appellant Wilkes's Excerpts of Record.

[2]    "AOB" refers to Appellant Wilkes's Opening Brief.

3

Indictment. [CR 6.] On May 10, 2007, a federal grand jury returned a 25-count Superseding Indictment against Wilkes. [CR 47.] On May 14, 2007, Wilkes was arraigned on the Superseding Indictment. [CR 48.]

Wilkes's jury trial commenced on October 3, 2007. [CR 116.] Wilkes's trial spanned approximately four weeks, with the jury's deliberations beginning on Wednesday, October 31, 2007. [CR 145.] On Monday, November 5, 2007, the jury found Wilkes guilty of all counts. [CR 151.]

Wilkes was sentenced on February 19, 2008. [CR 229.]

B.     STATEMENT OF THE FACTS

    1.     The Trial

        a.     Mr. Wilkes Goes to Washington

*"He Was Meeting with the Congressm[e]n to Try to Get Money Appropriated for the Programs."* [ER 1066 (Wilkes's sales strategy)]

Wilkes began the 1990's as an accountant in San Diego, and he ended the decade as a powerful defense contractor backed by a powerful Congressman. Wilkes, a San Diego native [ER 2497], was an accountant by training and experience. [ER 2498-99.] Although he had no background in computers or graphics, in 1993, he became a lobbyist for a software company called Audre. [ER 1049-53.] Audre was based in San Diego and sold systems for converting paper documents into electronic images. [ER 1051-53.]

As Audre's lobbyist, Wilkes began meeting with members of Congress to sell Audre's document conversion system to government agencies. [Id.] In late 1994, Wilkes sought additional funds for the coming year from Audre's CEO. [ER 1055-

56.] Wilkes, however, claimed not to know what he was going to do with the money, and when pressed for an explanation by his boss, Wilkes quit on the spot. [ER 1055-59.]

Wilkes then started his own company, ADCS, Inc., naming it after the federal government's Automated Document Conversion System Program ("ADCS Program"). [ER 1063.] From ADCS, Inc.'s inception, Wilkes traveled from San Diego to Washington D.C. for weekly meetings with Congressmen Duncan Hunter and Randy "Duke" Cunningham ("Cunningham"), as part of his sales efforts. [ER 1066, 1074.] The purpose of these meetings was to get money appropriated for the ADCS Program. [ER 1066, 1074.]

### b.    The Beginning of an Ugly Friendship

*"He's Not the Brightest Congressman Up There, And We Can Work With Him."*
[ER 1073 (Wilkes's opinion of Cunningham)]

In 1997, Cunningham was appointed to the House Appropriations Committee, which had the power to add money (i.e., earmarks) to the President's budget. [ER 908, 910, 912.] At the time, Cunningham was warned that this appointment would lead to "a lot of new best friends that would show up on his doorstep." [ER 912.] Even among these new best friends, Wilkes stood out. [ER 913-15.] Wilkes viewed Cunningham's appointment as an opportunity. [ER 1073.] He regarded Cunningham as not very bright and someone he could influence. [ER 1073.] Wilkes would soon begin using a series of increasingly valuable benefits to convince Cunningham to appropriate tens of millions of dollars to benefit ADCS, Inc.

5

(1)  <u>Meals</u>

*"To Solicit His Support for ADCS's Programs"*  [ER 1599 (Why Wilkes bought
Cunningham expensive meals)]

Initially, Wilkes purchased Cunningham's support with tens of thousands of
dollars of meals.  Wilkes (along with his protégé Mitch Wade) bought these meals
"[t]o solicit [Cunningham's] favor in support of our funding requests."  [ER 1596,
1599, 1625, 1632.]  The site of many of the meals was the Capital Grille, a high-end
steakhouse located six blocks from Capitol Hill.  [ER 1037-38, 1040.]  Prior to 2007
(when Wilkes was indicted), the Capital Grille's patrons were mainly lobbyists,
Senators, and Congressmen.  [ER 1039-40.]  Throughout the history of this D.C.
landmark, no one treated a Member of Congress to more meals than Wilkes and Wade
bought for Congressman Cunningham.  [ER 1037, 1042.]  By the end of 2002, Wilkes
had spent over $150,000 on hundreds of meals with Cunningham at the Capital Grille
and other restaurants.  [ER 2067.]  Wilkes's largess, however, was not limited to
meals.

(2)  <u>Trips</u>

*"To Show Their Appreciation to Key Governmental Figures Who Assist Them in
Governmental Contracts"*  [SER 11 (Why Wilkes took Cunningham on an
expensive vacation)]

Wilkes also treated Cunningham to trips, such as a 1999 trip to the Four
Seasons Hotel in Las Vegas.  [ER 1596-97, 2108, 2110; SER 22.][3/]  In addition to
Cunningham and his Chief of Staff Trey Hardin, this trip included a government

_____

[3/]     "SER" refers to the Government's Supplemental Excerpts of Record.

program manager for an ADCS, Inc. project.  [ER 2110-11.]  Wilkes wanted to impress the program manager by having a powerful congressman in tow.  [ER 2110-11.]  Wilkes entertained lavishly, spending $4,000 on a single dinner during this trip.  [ER 2111.]

In 2001 and 2002, Wilkes treated Cunningham to annual vacations at the Cour D'Alene Resort  in Idaho, which included golfing, boating, and shooting.  [ER 2115-16]  Wilkes paid for everything.  [ER 2118-22.]  The resort's booking records for these trips memorialized Wilkes's purpose:

> COMMENTS:  Brent Wilkes is the President of ADCS.  This group he is bringing in is very important to the future well-being of his company.  He has very high expectations.  This is the third time they have returned to the resort.

> PURPOSE OF THE MEETING:  To show their appreciation to key governmental figures who assist them in governmental contracts.

[SER 11.]  Wilkes did not stop with expensive meals and vacations.  Next up: money.

### (3)   Money

*"Confidential:  For Mr. Wilkes eyes only."*  [ER 1826-27, 1831 (Notation on envelope with records of Wilkes's payments of Cunningham's boat mortgage)]

In May 2000, Wilkes devised a plan to give Cunningham over $100,000, disguised as payments for Wilkes's purchase of the "Kelly C" (the houseboat on which Cunningham lived while in Washington).  On May 1, 2000, Wilkes wrote checks to Cunningham for $30,000 and $70,000.  [SER 24-26.]  In the memo line of each check, Wilkes indicated that the money was for a "Boat D[eposit]."  [SER 24-26.]  Wilkes, who lived in San Diego, drew both checks on a personal bank account that he had opened in Washington, D.C.  [SER 24-29.]  Wilkes funded the checks

using money from a foreign bank account that he had deposited a few weeks earlier. [SER 29.] For his part, Cunningham had his personal assistant draw up a sales contract for the Kelly C, but expressly directed her not to tell anyone about the transaction – the only time the congressman had sworn her to secrecy about any of his business.[4] [ER 1011-12.]

Even with this cover story in place, Wilkes and Cunningham concealed the entire transaction. Wilkes never told his accountants about the $100,000 payment.[5] [ER 1822-23.] Likewise, Cunningham failed to tell his closest advisors. [ER 929, 2846, 2855.] As this was never intended to be a legitimate sale, Wilkes had never expressed any interest in buying the Kelly C and none of Wilkes's business or personal financial statements contained any mention of the Kelly C as an asset.[6] [ER 1613, 1821-24, 1926-27, 2074-75.]

Consistent with their charade, Cunningham never transferred title of the Kelly C to Wilkes. [ER 2730.] Cunningham continued to live on the houseboat;

---

[4] Even after warning her not to tell anyone about this transaction, Cunningham still concealed from her the $100,000 payment he had already received from Wilkes. [ER 1034.]

[5] In contrast, Wilkes, a CPA, was meticulous in telling his own accountants about assets such as paintball guns, diving gear, cameras, and his wife's clothing. [ER 1895-97, 1926.]

[6] In contrast, a schedule of ADCS, Inc.'s loans and leases included such items as a $60,000 Land Rover that Wilkes purchased for his wife in late 1999, a Ford Excursion he purchased in February 2000, and a BMW used by his nephew, but it did not include the Kelly C. [ER 2738-39, SER 33-35.]

Wilkes never lived on it. [ER 2757-58.]  And of course, Cunningham never returned any of the money.  [ER 2795.]

Years later, federal agents seized from Wilkes's personal assistant's office an envelope marked "Confidential: For Mr. Wilkes eyes only."  [ER 1826-27, 1831.] This envelope contained records related to several payments Wilkes made toward Cunningham's mortgage on the Kelly C. [SER 30-32.]

### c. Cunningham Acts on Wilkes's Behalf

*"He would give him a script, 'talking points.'"* [ER 2017 (Wilkes's nephew on how Wilkes controlled Cunningham)]

In return for the benefits he gave Cunningham, Wilkes received tens of millions of dollars in government contracts. [ER 1632-33; SER 113.]  For years, Cunningham was the principal reason Wilkes was able to obtain appropriations, including money for the ADCS Program and the Global Infrastructure Data Capture ("GIDC") Program.[7/]  [ER 1589-90, 1593, 1595, 1598, 1599, 1611-12, 1617, 1620-28, 1638, 1644-45.]  When government employees raised legitimate concerns regarding performance, pricing, and equipment, Wilkes used Cunningham to pressure, threaten, and replace those who resisted his demands for payments and government contracts. [ER 1582-88, 1595, 1602-03, 1609, 1618-19.]

The second employee Wilkes hired, his nephew Joel Combs [ER 1064], learned from Wilkes that ADCS Inc.'s entire business relied upon Cunningham's earmarks.

---

[7/]  Both the ADCS and GIDC Programs were government-funded programs for converting documents into electronic form. [ER 1204-05, 1443, 1452, 1522-23, 1551, 1723.]

[ER 2017.]  The Congressman also helped Wilkes if he encountered problems on a specific project.  If there was a problem, Cunningham was the solution.  [Id.]  Cunningham would deliver whatever was needed, including arranging meetings, writing letters, and even making scripted phone calls.  [Id.]  Wilkes was so certain that Cunningham would deliver defense department appropriations that the vanity plate on Wilkes's Hummer read "MIPR ME," which meant, "Pay me" or "Show me the money."[8/] [ER 2021-22.]  Wilkes's confidence was well-placed.

### d.   ADCS Program and the Panama Project

*"Well, He Said I Was Going to Get a Phone Call."* [ER 1144 (Wilkes threat to Paul Behrens when he refused to pay ADCS, Inc.)]

#### (1)   Paul Behrens

In 1998, Cunningham's support began paying dividends when ADCS, Inc. received a government contract to scan documents in Panama (the "Panama Project") for the Department of Defense ("DOD").[9/] [ER 1070-71.]  The contract was awarded despite the fact that ADCS, Inc. had never completed a large-scale scanning project, did not have the equipment to handle a large-scale scanning project, and lacked trained personnel to complete such a project.  [ER 1070-71, 2040-41.]  The DOD's

---

[8/]    A "MIPR" is a Military Inter-departmental Purchase Request – essentially a purchase order from the DOD.  [ER 2019-20.]

[9/]    The Panama Project was also known as "F.I.R.E.S." (Facilities Infrastructure and Engineering System Program).  [ER 1580, 1589-90.]  ADCS, Inc. was actually the subcontractor for the Panama Project, but the prime contractor's role was purely administrative and ADCS, Inc. was responsible for 100% of the work.  [ER 1117.]

Technical Representative for the Panama Project, Paul Behrens, was responsible for monitoring performance, reviewing invoices, and paying invoices. [ER 1114-17.]

After receiving this contract, Wilkes regularly billed the government for poor work, work never done, and equipment he supposedly bought for the government. [ER 1130-39.] When Behrens dared question him, Wilkes warned him that Congressman Cunningham had a high interest in the project, and that it would hurt Behrens' career if he failed to pay what Wilkes wanted. [ER 1139.] In a career spanning hundreds of defense contracts, this was the only time Behrens had encountered a defense contractor who used a United States Congressman to pressure payment. [ER 1140.]

This was no idle threat. Cunningham repeatedly pressured Behrens in multiple phone calls. [ER 1141.] The scene for the first such call was straight off a Hollywood set: Wilkes invited Behrens to his suite at the Watergate Hotel. [Id.] A woman escorted Behrens to a room where he could see the outline of Wilkes's silhouette, as he puffed on a cigar from an overstuffed leather chair. [ER 1142.] Wilkes requested immediate payment of a million dollars. [ER 1143.] When Behrens said he would not pay Wilkes for work not performed or unverified equipment, Wilkes announced that Behrens was going to receive a phone call. [ER 1143-44.] Wilkes's cellular phone then rang, and he passed his phone to Behrens without answering. [ER 1144.] Behrens answered and was greeted by Congressmen Cunningham, who declared "that it was critical to our national security that progress keep moving on the Panama effort." [ER 1145.]

11

This was the first time Behrens had ever spoken to a Congressman. [ER 1145.] It would not be the last. In subsequent calls to Behrens, Cunningham continued to invoke national security to pressure him to "do whatever it took to keep progress moving" on the Panama Project. [ER 1146-47.] In the face of this unprecedented pressure, Behrens left the Panama Project at his first opportunity. [ER 1147-48.]

(2)   <u>Gary Jones</u>

*"'I Don't Think You Know Who You're Dealing With.'"* [ER 1226 (Wilkes's threat to Gary Jones when Jones refused to pay Wilkes's invoices immediately).]

Wilkes employed similar tactics with Gary Jones, the man responsible for managing the government's ADCS Program, which included the Panama Project. [ER 1204, 1222-23.] Once Jones became aware of the problems with the Panama Project, he called for a project review. [ER 1223.] On November 18, 1998, Wilkes arrived in Jones's office for the review and promptly threw a stack of invoices at Jones from across a table, sending them "all over the place and onto the floor." [ER 1224.] As Wilkes did this, he announced, "We just need to get these paid." [ER 1225.]

Jones had never experienced such behavior from a contractor. [ER 1225.] When Jones presented Wilkes with a list of concerns about the Panama Project, Wilkes warned, "I don't think you know who you're dealing with." [ER 1226.] Wilkes announced that he had a meeting later that same day with Congressman Cunningham. [<u>Id.</u>] When Jones retrieved Wilkes's scattered invoices, he informed Wilkes that they appeared fraudulent. [ER 1227.] Wilkes got "pretty heated." [ER 1228.] He told Jones that he had invested a lot of time and effort into getting the

ADCS Program earmark and "expected part of that funding." [ER 1228-29.] Wilkes then left. [ER 1229.]

Later that day, Congressman Cunningham called Jones. [Id.] When Cunningham inquired about the program review with ADCS, Inc., Jones informed him of the fraudulent invoices. [ER 1230.] Cunningham thanked Jones and hung up. [ER 1230.]

As Wilkes was staking his claim to the funds earmarked for the ADCS Program, Jones was assembling a team to determine which contractors actually deserved to receive funds for future projects within the ADCS Program. [ER 1206-10.] Jones's team established procedures for the submission, selection, and funding of projects. [ER 1213-14.] Pursuant to these procedures, in 1998, the armed services submitted approximately 100 different projects vying for $45 million of fiscal year 1999 ADCS Program funds. [ER 1216-21.]

By February 1, 1999, Jones' team had selected 14 projects for funding. [ER 1222, 1232.] All of these document-conversion projects were for military weapons systems. [ER 1222.] The Panama Project – scanning blueprints of buildings within the Panama Canal Zone – did not fit within that theme, and no projects associated with Wilkes or ADCS, Inc. were among the 100 submitted for consideration. [ER 1222, 1232, 1315, 1381.]

Nevertheless, almost two months after the selection process had ended, Wilkes submitted a project for ADCS Program funds. [ER 1234.] Even though all of the funds had already been allocated, due to Cunningham's pressure, Jones and his boss,

Assistant Deputy Under-Secretary of Defense Lou Kratz, met with Wilkes. [ER 1235-37.] Wilkes told Jones and Kratz that he expected to receive a piece of the ADCS Program funding because he had invested time in getting the earmark for those funds. [ER 1236.] This was not the last time the Assistant Deputy Under-Secretary of Defense would hear from Wilkes.

### (3) Lou Kratz

*"Fund the F'ing Program."* [ER 1328 (Cunningham's orders to Lou Kratz regarding Wilkes's unnecessary non-weapons system project)]

Kratz, who had joined the Department of Defense in 1998, had oversight responsibility for the ADCS Program. [ER 1302-03.] Kratz had numerous conversations with Wilkes, in which Wilkes consistently referred to the ADCS Program money as "his" money because he had obtained the appropriation through Congressman Cunningham. [ER 1313-14.]

Kratz also had multiple unpleasant conversations with the Congressman after it was determined that Wilkes's Panama Project was not going to receive any fiscal year 1999 ADCS Program funds. For example, in one such encounter, Cunningham was very demanding, and told Kratz to "'Fund the f'ing program.'" [ER 1316-17.]

One evening, Kratz joined Cunningham and Wilkes for dinner at the Capital Grille. [ER 1317-18.] During that dinner, Cunningham asked Kratz to pay Wilkes's outstanding invoices and to fund Wilkes's request for $30 million in ADCS Program funds for a follow-on to the Panama Project (the "NGIC" Program) in 1999. [ER 1319.] After that dinner Cunningham continued to pressure Kratz. [ER 1320.]

Funding the Panama Project was inconsistent with the selection process that Kratz and Jones had developed. [ER 1321.] Nevertheless, in order to appease Cunningham, Kratz recommended that they steer several million dollars to the Panama Project and Wilkes. [ER 1320-21.] Kratz's boss, the Principal Deputy Under-Secretary of Defense, David Oliver, accepted Kratz's recommendation. [ER 1321.] Still, Cunningham was not appeased, and he increased the pressure. [Id.] During one particular call in July 1999, Cunningham demanded an additional $10 million dollars for the Panama Project (NGIC Program), and told Kratz that he would go over his head directly to the Principal Under-Secretary of Defense if Kratz failed to give in. [ER 1322.] Cunningham's statements during this call tracked "talking points" that Wilkes had scripted for this particular call to Kratz. [ER 1321-22, 1590-91.] In the face of this increasing pressure, Kratz relented and Wilkes ultimately received the $10 million he sought. [ER 1320-21, 1324-25, 1365, 1369-72.]

The following year, Cunningham took the pressure to a new level to obtain still more ADCS Program funds for Wilkes. [ER 1325-26.] In March of 2000, Cunningham announced from the floor of the House of Representatives that Kratz was incompetent and should be removed from office. [ER 1327.] Cunningham next called Kratz in Belgium (where Kratz was working with NATO ) and repeated his refrain to "'Fund the f'ing program.'" [ER 1327-28.] Although Wilkes's project was once again inconsistent with the ADCS Program criteria, in order to appease Cunningham, Kratz caved in and recommended $18 million for Wilkes's Panama Project in 2000. [ER 1328.]

(4)  <u>David Oliver</u>

*"It was not high enough on the list."* [ER 1289 (Why Wilkes's non-weapons system project would not have received money without Cunningham's involvement)]

Kratz's boss, David Oliver, was  a 36-year veteran with the Navy who retired as an Admiral. [ER 1283.]  At the time Cunningham was exerting pressure and influence for Wilkes, Oliver was a politically appointed Principal Deputy Under-Secretary with the DOD responsible for administering a $100 billion budget. [ER 1285.]  Given the scope of his responsibilities, it was extremely uncommon for Oliver to be involved in individual program allocations, such as the ones Cunningham sought for Wilkes.  [ER 1285-86.]  Nevertheless, Cunningham or his staff contacted Oliver several times during the 1999-2000 time frame to discuss the Panama Project. [ER 1286.] Ultimately, Oliver made the decisions to allocate more money to ADCS, Inc.  [ER 1288-91.]  Oliver did so because Cunningham had the right to weigh in on expenditures of appropriated funds and because Cunningham was a member of two of the three committees "that are terribly important to the Department of Defense with respect to getting funding and approval." [ER 1288.]  But for Cunningham's intervention, Wilkes would not have received those ADCS Program funds. [ER 1289.]

(5)   <u>William Berl</u>

*"[T]o call up and essentially advocate for a redirection of some of that money to ADCS, Inc."*  [ER 1363 (Cunningham's marching orders to Berl)]

Cunningham's former congressional staffer, William Berl, confirmed that Cunningham was one of the principal House members involved in obtaining an earmark for the ADCS Program. [ER 1351.] Cunningham did so on behalf of ADCS, Inc. [ER 1352.]  While it is common for Members of Congress to advocate for earmarks that benefit their constituents, it is rare for a Congressman to do what Cunningham did:  tell the DOD to fund a program with a particular contractor and "try to cram it down their throat."[10/]  [ER 1390.]

Nevertheless, after the ADCS Program earmark was made, Cunningham directed Berl (against Berl's advice) to advocate that ADCS Program funds be redirected to ADCS, Inc. [ER 1356, 1363.]  Specifically, Cunningham told him to contact Jones, Kratz, and Oliver to get funding for Wilkes.  [ER 1363.]  Berl confirmed that Cunningham's personal advocacy included delivering the talking points scripted by Wilkes and Wade.  [ER 1364-65; SER 39-40.]  Once again, Cunningham did so against Berl's advice.[11/] [ER 1364-65.]

---

[10/]   Of course, Berl also confirmed that it is wrong for a Congressman to sponsor an earmark in return for something of value from the contractor. [ER 1405.]

[11/]   In his contacts with Wilkes, Berl noted that Wilkes exhibited a sense of entitlement to ADCS Program funds.  [ER 1362.]

e.   Global Infrastructure Data Capture Program

*"Mr. Cunningham suggested that he would be satisfied if the company in California were used for that hardware procurement and that would satisfy his having been upset previously over the issues that caused the threat to get Ms. Roby fired."*  [ER 1534 (how Roy Reed assuaged Cunningham's anger)]

By the year 2000, Wilkes and Cunningham began seeking funding for document conversion through the GIDC Program.   [ER 1467, 1551, 1610-11; SER 41-42.]  Roy Reed (while working for the Director of Counter-Intelligence under the Assistant Secretary of Defense) became embroiled in a GIDC conflict after his boss, Cheryl Roby, had redirected $4 million from a Wilkes scanning project to another use.  [ER 1530.]  Acting on Wilkes's behalf, Mitch Wade responded by threatening to have Roby fired.  [ER 1530.]  Cunningham got involved, and as a result of the political fallout from the threats to Roby – described as a "hot political potato" – Reed caved to Cunningham's pressure by diverting to Wilkes $4 million from counter-terrorism funds.  [ER 1530-32; 1534; SER 43-44.]

In 2002, Reed's counter-terrorism group received a $4 million congressional earmark.  [ER 1537.]  Reed recognized that these funds were not designated for any of his projects and allocated $3.2 of the $4 million to Wilkes's company – but only after obtaining Cunningham's permission to use the remaining $800,000 for another project.  [ER 1537-39.]

### f.    Equipment

*"I was concerned that the organization was going to be at risk yet again from another phone call from Congressman Cunningham."*  [ER 1547 (Reed's reason for approving payment for incompatible equipment)]

Emboldened by Cunningham's willingness to pressure DOD employees to accept whatever they delivered, Wilkes and Wade shifted their focus from contracts for document scanning to contracts to supply equipment and software.  The supply contracts enabled him (and Wade) to reap higher profits by simply marking up – by as much as 600% – the prices for off-the-shelf equipment.  [ER 1625-27.]

Despite the higher profit margins on the supply contracts, Wilkes (and Wade) failed to deliver what was requested by the government.  For example, in 2003, Roy Reed's group at the Office of the Secretary of Defense ("OSD") received a $6.3 million earmark, which he used to order 70 pieces of computer equipment from Wilkes and Wade. [ER 1539-40, 1546.]  When the delivery arrived, Reed discovered that it contained only 1 of the 70 requested items.  [ER 1546.]  The remainder of the delivery consisted of equipment that Reed could not utilize as it was not compatible with his computer system. [ER 1543-45.]  In what he acknowledged "wasn't [his] finest hour," Reed signed off on the useless equipment – resulting in a $6.1 million payment to Wilkes and Wade.  [ER 1546-47, 1653-54.]  In explaining this decision, Reed admitted he that he did not want to risk another phone call from Congressman Cunningham, a fear he had been living with for more than two years.  [ER 1547.]  From that $6.1 million sale, Wilkes and Wade netted approximately $5 million in profits.  [ER 1651, 1657.]

### g.    Wade Ups the Ante

*"Mitch was upping the ante."*  [ER 2130 (Wilkes's reaction to increased competition from his protégé)]

Although Wilkes received the lion's share of the $6.1 million OSD contract, by this time, Wade had managed to insert his company, MZM, Inc., in place of ADCS, Inc. as the prime contractor.  [ER 1646, 1648.]  Wade had lived in the D.C. Metropolitan area his entire life and worked for the government for years, but had never met a Member of Congress until he began working for Wilkes in 1998.  [ER 1579-80.]  By 2001, Wade was following in Wilkes's path and cultivating his own relationship with Cunningham.  [ER 1633-34.]

At first, Wade merely treated Cunningham to dinners.  In October 2001, that changed when Cunningham asked Wade for $50,000.  [ER 1634-35.]  Wade agreed, but refused to write a check directly to the Congressmen.  [ER1636.]  At Cunningham's suggestion, Wade made out the check to "Coastal Capital Corporation," which then issued a $50,000 check to Cunningham.  [ER 1636, 1954.]  After receiving this bribe, Cunningham put in an appropriations request for MZM, Inc. – something that Cunningham had never before done for Wade.  [ER 1639.]

This payment was the first of many bribes that Wade provided to Cunningham.  Wade continued paying off Cunningham with such items as antique furniture and a $140,000 yacht.  [ER 1637-40.]  In turn, Cunningham made additional appropriations requests for MZM, Inc.[12/]  [ER 1663-64.]

---

[12/]    Wade also continued working for Wilkes to get millions of dollars in
(continued...)

By Summer 2003, Wilkes could see that his earmarks were getting smaller, while Wade's were getting bigger.  [ER 2129-30.]  In Wilkes's words, "Mitch was upping the ante" with Cunningham by taking him to the Capital Grille without Wilkes or Combs and by buying him furniture.  [ER 2130.]  In August 2003, Wilkes responded by upping the ante himself by taking Cunningham on a lavish Hawaiian vacation.  Wilkes and Cunningham stayed in the Hapuna Suite, an 8,000-square-foot ocean-front estate that is the "crown jewel" of the Mauna Kea Resort.  [ER 2131; SER 45-46.]  But Wilkes changed more than the venue for the Congressman's annual trip – he also changed the entertainment.  In addition to more conventional diversions such as fine dining, golf, and scuba diving, Wilkes treated the Congressman to two evenings with prostitutes.  [ER 2140-46; SER 47-55.]  Cunningham returned the favor one month later when he earmarked $16 million for Wilkes and Wade as part of the GIDC Program. [SER 58-59.]  In 2004, Cunningham listed GDIC as one of his two top priorities.  [ER 1466-70; SER 56-59.]

h.    Wilkes Pays off of Cunningham's Mortgage

*"Duke was demanding from Brent that he transfer $500,000 immediately to John Michael."*  [ER 1672 (Conversation between Cunningham and Wilkes)]

In 2004, Cunningham again delivered millions of dollars in appropriations for Wilkes and Wade's benefit.  [ER 1663-64.]  Wilkes would again receive millions of dollars in profits from another $6 million contract for mostly off-the-shelf equipment,

---

[12/]    (...continued)
additional earmarks from Cunningham that were destined for ADCS, Inc.  [ER 1644-45.]

21

but those profits would cost Wilkes more than a weekend of debauchery. [ER 1667-70.] By this time, Wade's "upping of the ante" had enabled Cunningham to purchase a $2.6 million estate in Rancho Santa Fe, California. [ER 1659-61, 1619.] Even with over $700,000 in bribes provided by Wade, Cunningham still needed two mortgages to purchase the estate. [ER 1956-57.] Cunningham's price for the 2004 fiscal year appropriations was for Wilkes and Wade to pay off his two mortgages. [ER 1661-62, 1670-72.]

Wade played his part by paying $500,000 toward Cunningham's first mortgage. [ER 1677-80.] Cunningham's second mortgage payments, however, went unpaid for several months due to Wilkes's failure to pay off the mortgage as quickly as the Congressmen expected. [ER 1672, 1962.] Wilkes explained to Cunningham that his delay was the result of Wade's failure to pay him $6 million from their latest equipment contract. [ER 1670-72.]

On May 6, 2004, Wade issued a $5,970,000 check to ADCS, Inc. [ER 1677.] Wilkes deposited this check into an ADCS, Inc. account. [ER 1851; SER 80.] He then transferred $525,000 of the money to another of his accounts, WBR Equities. [ER 1851.] He then wired the $525,000 from WBR Equities to Parkview Financial, Inc. [ER 1851; SER 79.] Wilkes completed all of these transactions in less than a week. [ER 1850-51; SER 79-80.] In what can only be described as a bewildering

22

array of complicated financial transactions among multiple companies, Wilkes's

$525,000 wire was used to satisfy Cunningham's second mortgage.[13]

### i.    Jury Nullification

### (1)    Jury Nullification

> *"[T]hey want to create a conspiracy, and they want to create bribery for things that are not only the way Washington works, it's the things that are perfectly acceptable."* [ER 882 (Wilkes's opening statement)]

Wilkes's primary defense strategy, beginning with his opening statement, was

to invite jury nullification by essentially arguing that different rules apply to

Washington than apply to the rest of the country:

---

[13]    Parkview Financial (the recipient of Wilkes final $525,000 wire transfer) was an entity associated with Thomas Kontogiannis. [ER 1949.] Kontogiannis was heavily involved with Coastal Capital Corporation – a mortgage company and the same entity that Cunningham had used to conceal Wade's $50,000 bribe back in 2001. [ER 1636, 1949, 1954.] It was Coastal that originally issued the first and second mortgages for Cunningham's Rancho Santa Fe estate, using a warehouse line of credit to fund them. [ER 1956-57, 1960-62.]

Wilkes's delay in paying off Cunningham's second mortgage (due to Wade's failure to send him the outstanding $5.97 million payment) caused the mortgage to stay on Coastal's warehouse line for too long. [ER 1960.] Rather than carry Cunningham's second mortgage indefinitely on their books, Kontogiannis (on May 6, 2004) used other funds to remove Cunningham's balance from Coastal's warehouse line. [ER 1965-73.]

At the time his mortgage was removed from Coastal's books, Cunningham's balance was $502,538.75. [ER 1972-73.] This amount (plus $22,000 that Cunningham had already paid on his second mortgage) meant that $524,538.75 was needed to satisfy Cunningham's second mortgage and reimburse him for his out-of-pocket expenses. [ER 1972-73; SER 76-77.]

One of the quotes that . . . stuck in my memory was "it is not shocking what's illegal in Washington. It is shocking what's legal in Washington."

And I almost entirely, as I am listening to this opening statement, it was as if they want to create a conspiracy, and they want to create bribery for things that are not only the way Washington works, it's the things that are perfectly acceptable.

[ER 882.]

"The way Washington works" was a refrain Wilkes's counsel used throughout trial. [ER 1045, 1273-74, 1281-82, 1297-98, 1380, 1385-86, 1392-93.] In his closing argument, Wilkes's counsel repeatedly invoked this phrase [e.g., ER 2959, 2965, 2966], including the following: "They (Government counsel) don't want to listen. They have no desire to listen. In the face of showing them that there is evidence, in the face of showing them how Washington works, they still don't want to hear it." [ER 2963.]

> (2) Admit Nothing. Deny Everything. Make Counter-Accusations.

"'*Admit nothing. Deny everything. Make counter-accusations.*'" [ER 2657 (Wilkes recalling a saying within the CIA that was "kind of" a joke)]

Wilkes's secondary strategy was to testify and deny nearly all of the testimony and evidence, including objective evidence.

a)  Wilkes Denies Bribing Cunningham With
$100,000 Payment

*"I'd been onboard the boat many times when it was used as a hospitality device. . . . It also moved. . . . In addition to a residence and an office, it was a recreational device. . . . I do have young children.  In addition to all that, I could also save money."* [ER 2725-26 (Wilkes on why he wanted to purchase Cunningham's houseboat)]

Wilkes attempted to explain away the $100,000 he gave Cunningham as a down payment for the purchase of Cunningham's houseboat, the Kelly C. [ER 2728.] Wilkes claimed that the Kelly C was to serve as both an office and living quarters, which would cut expenses when he was on the east coast.  [ER 2725.]  Yet, he had never said or done anything to indicate that he wanted to reduce his expenses when he was on the east coast.  [ER 1613-14.]  Instead, he stayed in very nice hotel suites, dined at expensive restaurants, and was chauffeured around the District in a limousine. [ER 1078, 1614, 2073-74.]

In the year 2000 alone, ADCS, Inc. paid on the order of $1 million for Wilkes's private jet flights to Washington D.C.  [ER 1833-34.]  Unlike the corporate accounts Wilkes used to pay for his suite at the Westin Hotel, Wilkes used his personal account to make the $100,000 payment to Cunningham.  [ER 2726-27.]  Moreover,  ADCS, Inc.'s financial statements, including a schedule of loans and leases, did not include the Kelly C. [ER 1613, 1821-24, 1926-27, 2074-75; SER 33-35.] Likewise, Wilkes's claim that he had disclosed the $100,000 to Cunningham's former Chiefs of Staff was directly refuted by the former Chiefs of Staff.  [ER 929-30, 2846-47.]  His claim of openness was also belied by the testimony of others from whom Wilkes and Cunningham concealed this information and the manner in which Wilkes stored the

25

records related to this money.  [ER 1034; 1822-23, 1926-27; 1613; 1827; SER 30-32 (manilla envelope marked "Confidential Mr. Wilkes Eyes Only").]

Despite paying Cunningham $100,000 and paying Cunningham's mortgage on the Kelly C for months in late 2000 and early 2001, Wilkes had to admit that he never moved on to the Kelly C.  [ER 2758-59, 2761.]  Instead, he did Cunningham a "favor" by allowing him to stay on the Kelly C.  [ER 2758.]  Wilkes admitted that throughout the time that Cunningham had this money, Wilkes continued to use Cunningham to contact people in the DOD, such as Lou Kratz and Gary Jones, "on our behalf and usually at our request" and to obtain earmarks. [ER 2764-65.]  Wilkes conceded that his company received about $16 million in DOD contracts in the year 2000 alone.  [ER 2777.]  Although Wilkes claimed to have sought help from a number of other Congressmen over the years, he admitted that he never made any mortgage payments for anyone but Cunningham and that he never gave $100,000 to anyone but Cunningham.  [ER 2818.]

> b)    Wilkes Denies Bribing Cunningham With
>        $525,000 Transfer

*"Duke Cunningham called me . . . and explained . . . he was going to do me a favor."* [ER 2578 (Wilkes on why he sent Parkview Financial $525,000)]

Wilkes attempted to explain away the $525,000 wire to Parkview as a mortgage-based investment bearing a 9% return that he had learned about from Cunningham.  [ER 2577-78, 2586.]  He claimed that he would regularly raise the status of the investment with his accountants. [ER 2583.]  That claim, however, was directly refuted by ADCS, Inc. in-house accountant Mark Couillard.  Couillard

testified that the accounting staff had to repeatedly ask Wilkes about the transaction. [SER 234-37.] In fact, the accounting staff was never able to properly record the transaction on ADCS, Inc.'s books, as Wilkes never provided the supporting documentation. [Id.] Wilkes had sent this money at a time when ADCS, Inc.'s cash flow was so tight, it was borrowing money from employees and Wilkes's children's college fund to make payroll [ER 1861-63], yet Wilkes stonewalled them for so long that his accountants eventually gave up their pursuit of an explanation. [SER 237.]

c)      Wilkes Denies Threatening Anyone's Job

*"[M]y interest wasn't in affecting people's jobs."* [ER 2692 (Wilkes's testimony)]

Wilkes denied trying to have Behrens removed from the Panama Project, testifying, "I don't recall asking [Kratz] to remove [Behrens]. I recall asking him to weigh in and repair the program. But my interest wasn't in affecting people's jobs." [ER 2692.] Wilkes's testimony, however, was directly contradicted by both Wade [ER 1585-88] and Behrens. [ER 1139-46.] Wilkes specifically told Behrens that it "wouldn't be favorable" to his career to be "obstructionist" – i.e., to get between Wilkes and "his money." [ER 1139, 1135.]

Similarly, Wilkes denied ever trying to use Cunningham to remove ADCS Program Manager Gary Jones, claiming "I have no idea what you're talking about" and "I have no recollection of trying to do anything to Gary Jones." [ER 2658-60.] Wilkes's testimony was directly contradicted by his own fax to Cunningham, which directed that the first order of business to be "undertaken immediately" was having "Gary Jones removed as Program Manager." [ER 2660-2664; SER 36-37.]

27

### d)  Wilkes Denies Plying Cunningham With Prostitutes

*"I got out* [of the hot tub] *and went and got a couple of water bottles and a couple ice packs and went up to my room."* [ER 2604 (Wilkes's testimony)]

Wilkes described the 8,000 square foot ocean-front Hawaiian estate that he rented in August 2003 as a "bungalow type of a deal." [ER 2602.]  He claimed that Cunningham stayed with them because Cunningham had a recent knee surgery and Combs "thought it would just be easier from a transport point of view . . . ." [ER 2602-03.]

Wilkes denied obtaining prostitutes for himself and Cunningham, claiming that he was suffering from sciatica while golfing and diving in Hawaii.  Wilkes explained that he had joined Cunningham in the hot tub because some unnamed person suggested it might help his back.  [ER 2603-04, 2792-93.]  According to Wilkes, Combs had arranged a "massage" – for Wilkes and Cunningham – and "eventually two girls showed up, women."  [ER 2604.]  Because a massage would not help his sciatica, when one of the women "kind of slithered over the side in her swimsuit," [ER 2792], "[he] got out and went and got a couple of water bottles and a couple ice packs and went up to [his] room."  [ER 2604.]

One of those women was Donna Rozetta.  She testified that in August 2003 she was working for the Centerfolds of Hawaii escort service.  [ER 2295.]  After she and another woman arrived at Wilkes's Hapuna Suite, a younger man brought them to two older men in a hot tub, who asked the women to get naked and join them, which the

28

women did. [ER 2298.] After about 20-30 minutes in the hot tub, Rozetta and
Congressman Cunningham went upstairs and had sex. [ER 2300-01.][14]

Tammy MacFadden was the other woman from Centerfolds of Hawaii on that
August night. [ER 2308-09.] She was being paid $200 per hour (the service billed
her out at $300 per hour). [ER 2308-09.] MacFadden testified that there were two
men in a hot tub and that after about 15-20 minutes, Rozetta went upstairs with one
of them (Cunningham) and she went upstairs with the other (Wilkes).[15] [ER 2312-
13.] MacFadden stayed with Wilkes for a little over an hour and received a tip.
[ER 2313.] She returned the next night with a different woman and her payment was
handled the same as the first night. [ER 2313.]

e)    "Deny Everything" Really Meant *Everything*

*"I got stuck with the check by Mitch Wade when he walked out and wouldn't pay
it after he ordered a $3,800 bottle of wine."* [ER 2653 (Wilkes's testimony)]

Wilkes's denials extended to relatively minor benefits he gave Cunningham.
Regarding the trip to Las Vegas, even after being confronted with credit card records
from his American Express account, Wilkes denied knowing that Combs had used
Wilkes's company's credit card to pay for Cunningham's flight – although they all
took the same flight. [ER 2654-55.] According to Wilkes, the $4,043 bill for a single
dinner in Vegas was Wade's fault for ordering a $3,800 bottle of wine. [ER 2653.]

_____

[14]     Since neither prostitute learned the true names of the men, Cunningham
was identified by the witness from a photograph. [ER 2299-2300.]

[15]     Although McFadden did not specifically identify Wilkes as the other
man in the hot tub with Cunningham, Wilkes admitted it was him. [ER 2792.]

If true, Wilkes's testimony would have meant that the dinner would have been a modest $200 but for a single bottle of wine that Wade had ordered. [ER 2653.] But Wilkes's testimony was not true, as demonstrated by an itemized receipt from the restaurant reflecting an unsurprisingly expensive meal. Introduced in rebuttal, the receipt revealed that the party ordered four bottles of wine (priced between $290 and $1,050), not one $3,800 bottle. [SER 81-83.]

> *"He [Cunningham] never went out and shot the machine guns."* [ER 2595 (Wilkes's testimony)]

Regarding one of the Wilkes-sponsored trips to the Coeur d'Alene Resort, Wilkes flatly denied Combs' testimony that Cunningham was among their group for a machine-gun-shooting activity, asserting that Cunningham had "never" joined them in shooting machine guns. [ER 2117-19, 2594-95.] In rebuttal, however, shooting range instructor Robert Smith testified that he remembered Cunningham, and that Cunningham did, in fact, join Wilkes for the machine-gun shooting at Coeur d'Alene. [SER 262.] Smith also introduced a business record confirming that fact. [SER 263, 84.]

### 2. Wilkes's Preparation Time

The original indictment against Wilkes was returned on February 13, 2007. [SER 114-55.][16] On April 11, 2007 and May 10, 2007, the Government provided Wilkes with indexes of documents available in discovery. [SER 157.] At a May 14, 2007 motion hearing, the parties discussed at length the voluminous discovery in the

---

[16] A Superseding Indictment was returned on May 10, 2007, but it did not change any of the charges or allegations against Wilkes. [ER 741.]

case. [SER 159-61.] With that volume of discovery in mind, Wilkes agreed to a September 18, 2007 trial date. [SER 165.] Based on that commitment to a September 18, 2007 trial, the Government produced <u>Jencks</u> materials by the end of May 2007. [SER 166-69.]

On August 20, 2007, after the court had gone "to great effort and expense to send out an 18-page questionnaire" and time-screen a jury, Wilkes asked to continue the trial to October 23, 2007. [SER 172-74, 182-83.] He did not object when other defense counsels' schedules called for a new date of October 2, 2007. [SER 179.] Wilkes's later eve-of-trial requests to continue were accommodated by selecting the jury on October 3, 2007, and then waiting another week (until October 9, 2007) for Wilkes's opening statement and the presentation of evidence. [ER 740, 819.]

Once the trial started, the court continued to accommodate Wilkes. On Friday, October 12, Government counsel reported that it anticipated the Government would rest its case the following Thursday, October 18, 2007. [ER 1719.] Wilkes raised no objection when the district instructed him to have his witnesses ready. [ER 1719.] The following Thursday, Wilkes called one witness whose testimony ended before 11:00 a.m. [ER 2373-74.] Wilkes then asked the court to break for the rest of the day – and week – so he and a member of his defense team would have time to review documents that were in the Government's possession. [SER 185-86.]

Once again, the court accommodated Wilkes, the trial was recessed, and the Government agreed to make all documents available to the defense team that Friday and throughout the weekend. [SER 185-86.] Wilkes did not dispute the court's

31

statement that this break would answer his request for a continuance and that he would "have plenty of time" to prepare. [SER 186.] Indeed, Wilkes completed his review of documents by 2:20 p.m. the next day, Friday, October 19, 2007. At that time, counsel informed the FBI that they would not be reviewing any documents that weekend, and they never returned. [ER 3610.] This was true even though the break in the trial wound up extending to an entire week due to fires in San Diego. [ER 2455-57.] While those fires were battled, the court's concern for Wilkes extended to facilitating Wilkes's access to U.S. Marshals so that they could drive Wilkes to his home in order to retrieve any needed documents. [SER 188.]

### 3.   Correcting the Record

Wilkes's Opening Brief is so replete with embellishments and outright misrepresentations of the record below that correcting all of them would consume the Government's Answering Brief.[17] Some, such as those addressed below, are integral

---

[17] For example, at AOB 17, Wilkes asserts that, "All [Jones, Oliver, and Kratz] agreed that Congresspersons regularly 'pressured' government officials on behalf of constituent-companies. ER:1281-1282, 1297." In truth, each witness testified to the uniqueness of the pressure from, or contact with, Cunningham regarding Wilkes. [ER 1279, 1298-99, 1329.]

At AOB 19, Wilkes asserts that "Collins didn't recall discussing prior payments [for the Kelly C] with Wilkes, ER:927," as if Collins may have simply forgotten. In truth, when Collins was asked whether there had been such a discussion, he answered, "There was none at all." [ER 927.]

At AOB 30, Wilkes asserts that Combs "changed his story" at trial. In support of this contention, Wilkes invites the reader to "*Compare* ER 2245 (when asked about absence of cell phone record, to call prostitutes, said must've used hotel phone to call
(continued...)

to Wilkes's arguments. Others are props in Wilkes's Potemkin portrayal of an unfair trial that bears little resemblance to reality.

### a.    Wilkes's Request to Immunize Witnesses

Wilkes never filed a motion to compel the Government to immunize any witnesses. Instead, his counsel made a verbal request on October 26, 2007, just before Wilkes supposedly wanted to call the witnesses. [ER 2460.] The two witnesses for whom Wilkes wanted to compel immunity were Michael Mack and Michael Williams. [ER 2460.] Whether Wilkes actually intended to call these witnesses – as opposed to simply trying to create an issue for appeal – is questionable: when the Government agreed to immunize Mack [ER 2468-70], Wilkes opted not to call him as a witness. [ER 2835.]

As to Williams, Wilkes did not provide an offer of proof to the Government (or even Williams' counsel) regarding the alleged witness's purported testimony. [ER 2475.] The only actual proffer was from Williams' counsel, who indicated simply that "[h]is position generally is that he has committed no crime." [ER 2472.] As the record below confirms, however, not a single witness, let alone one whose testimony was immunized, testified that Williams had committed a crime and the Government did not argue that he had.

---

17/    (...continued)
service); *with* ER:2291 (said cell phone again)." [AOB 30.] In truth, Combs' cell phone records did, in fact, reflect calls to the escort service. [ER 2289-90.] Wilkes's counsel, however, concealed from Combs the portion of his cell phone records reflecting the calls. [ER 2289-91.]

Against this backdrop, Wilkes's brief misrepresents that the Government immunized the trial testimony of "most," "virtually all," and "every prosecution witness, except ministerial ones . . . ." [AOB 42, 48, 37.] In truth, the Government called 29 witnesses at Wilkes's trial. [SER 189-90, 266, 268.] Of these 29 witnesses, the Government immunized the testimony of only 3. [ER 3599.] Wilkes also represents that specific witnesses testified under grants of immunity when, in fact, they did not. Wilkes asserts that "Kratz, Jones, and Behrens were immunized as was Collins . . . ." [AOB 49.] In truth, however, the Government did not immunize Kratz, Jones, Behrens, or Collins. [ER 3599.] Wilkes represents that "the two prostitutes testified with immunity. ER:2294-2314." [AOB 30.] In truth, neither woman's testimony was immunized. [ER 3599.] Despite Wilkes's citation to ER 2294-2314, which spans the entirety of the women's testimony, there is not a single reference to either having been given immunity. [ER 2294-2314.] Likewise, Wilkes asserts that "Reed falsely denied being granted immunity." [AOB 24 n.19.] In truth, Reed's testimony was not immunized. [ER 1549-50.]

### b.    The Hattier Affidavit

Wilkes's third Opening Brief removed the false accusation that the Government had failed to disclose the affidavit of FBI Special Agent Maurice Hattier, Jr. [See Wilkes's Unopposed Motion to File Amended Opening Brief.] Nevertheless, Wilkes continues to misrepresent facts concerning the Hattier affidavit. Contrary to Wilkes's representations [AOB 61, 63], the Hattier affidavit described evidence that

Wilkes paid off Cunningham's second mortgage and Wade paid off his first. [ER 307-09.]

     c.    Wade's FEC Case

On June 21, 2005, over two years before Wilkes's trial began, the Citizens for Responsibility and Ethics ("CREW") filed with the Federal Election Commission ("FEC") and publicly released a complaint alleging that Wade had violated campaign finance laws. See *Crew Files FEC Complaint Against MZM, Inc.*, citizensforethics.org, http://www.citizensforethics.org/node/19099. In February 2006, Wade pled guilty to a four-count Information charging Conspiracy (two counts), Use of Interstate Facilities to Promote Bribery, and Election Fraud. [SER 85-111.] Under Wade's plea agreement, he faced a maximum sentence of 20 years' imprisonment. [SER 85.]

The Information to which Wade pled guilty alleged, inter alia, a corruption conspiracy in which Wade gave Cunningham hundreds of thousands of dollars in benefits and Wade's company, MZM, received $150 million in DOD contracts. [SER 94.] At Wilkes's trial, the Government introduced into evidence Wade's actual plea agreement and the underlying Information. [ER 1569-70, 1778.]

More than a week after Wade testified at trial, he entered into a Conciliation Agreement ("CA") with the FEC that resolved CREW's complaint with a $1 million fine. [ER 3613.][18/] Contrary to Wilkes's argument [AOB 56], nothing in the CA

_____

    [18/]    Wilkes claims that "there is indication that [prosecutors] encouraged the FEC to not release the settlement until after Wade testified." [AOB 57.] This claim
(continued...)

resolved or limited Wade's criminal liability nor did the CA in any way foreclose or limit Wade's potential term of imprisonment for any criminal violations.  [ER 3612-13.]

Also contrary to Wilkes's argument [AOB 56], the factual basis for the FEC's "analysis" was expressly based on the following sources:  published newspaper articles, Cunningham's publicly available plea agreement, Wade's plea agreement, the Information to which Wade had pled guilty prior to Wilkes's trial, and publicly filed disclosure reports with the FEC that revealed the identities of the individuals who had been described anonymously in Wade's Information.  [ER 3522-28.]  For example, the illegal contributions listed in the FEC's analysis are expressly identified as those that had been "described in the Wade plea agreement" [ER 3527, 3528], which the Government introduced into evidence at Wilkes's trial.  [ER 1778.]

Wade's CA was publicly released on October 31, 2007 [ER 3613], when Wilkes's jury started deliberating.  Wilkes learned of the CA that day, but did not ask to reopen the case to admit this evidence.  [SER 251.]  The next day, November 1, 2007, the district court addressed the issue and concluded that Wilkes was "better off [without the jury learning of the CA] because [Wade] left the stand with everyone having the impression that he has done these things up to this point with impunity, the 20 million dollars.  You pointed out many times and ably he is out on an O.R.  No

---

18/      (...continued)
is objectively false inasmuch as there was no settlement when Wade testified on October 12, 2007.  [SER 190.]  He did not enter into the CA until October 23, 2007.  [ER 3535.]  Moreover, the CA's imposition of a fine – 11 days after Wade testified – *undermined* Wilkes's cross-examination of Wade.

restrictions on him." [SER 254.] Wilkes did not disagree with the district court. [SER 255.] In fact, the district court expressly asked if Wilkes wanted the court to do "<u>anything</u>," and Wilkes's counsel said not at that time. [SER 255 (emphasis added).] The district court then again inquired whether Wilkes wanted a "[m]istrial or <u>anything</u>?" [SER 255 (emphasis added).] Again, Wilkes's counsel said no. [<u>Id.</u>]

IV

## SUMMARY OF ARGUMENT

As the district court observed, the Government proved Wilkes's guilt with an "avalanche of evidence against him." [SER 221.] Unable to overcome the evidence against him, Wilkes resorts to misrepresenting it.

1.    <u>Failure to Immunize One Defense Witness</u>

Wilkes's argument for compelled use immunity is primarily based on his false assertion that specific witnesses were immunized at trial when they were not. Stripped of these witnesses, Wilkes's argument boils down to his claim that one witness (Williams) would have directly contradicted the testimony of one immunized witness (Joel Combs). Wilkes failed to provide a valid proffer of Williams' testimony, and the portions of Combs' testimony that Wilkes identifies either do not conflict with Wilkes's position or they concern conversations involving only Combs and Wilkes. Because Wilkes could, and did, testify – often not refuting Combs' testimony regarding those conversations – there was no distortion of the fact-finding process here.

2.    <u>Alleged Brady/Giglio Violations</u>

Wilkes alleges <u>Brady</u>/<u>Giglio</u> violations based on the Government's supposed failure to turnover evidence regarding Combs and Wade.  But Wilkes's argument relies on evidence that either contained no impeachment information or no new impeachment information.  As to Combs, Wilkes fails to even identify any information that should have been disclosed.  The information about Wade, a fine imposed after he testified, would have *contradicted* Wilkes's argument at trial that the Government had "bought" Wade's testimony by <u>not</u> fining him, as demonstrated by Wilkes's decision not to ask to reopen his case to present the information.

3.    <u>Prosecutorial Misconduct</u>

Wilkes contends that a handful of arguments – to which there were no objections at trial – amount to prosecutorial misconduct.  Most of these arguments, such as arguing that the jury must choose between two competing versions of the facts, have been expressly approved by this Court.  Wilkes attempts to make others more sinister by omitting both the arguments to which the Government was responding and the Government's express references to the jury instructions.  None of these invited replies come close to plain error in a case that spans 2,500 pages of transcript, and in which the evidence overwhelmingly established Wilkes's guilt.

4.    <u>Requests for Continuance</u>

The trial court's repeated accommodations of Wilkes's preparation needs included two mid-trial breaks.  Wilkes chose to stop reviewing documents long before the second of these two breaks ended, and, three years after his trial, Wilkes

still cannot identify a single piece of helpful evidence that additional time would have enabled him to use. The district court did not abuse its wide discretion in scheduling his trial.

5.    Honest Services Fraud

Wilkes's conviction for substantive bribery defeats his argument under Skilling v. United States, 130 S.Ct. 2896 (2010) , which expressly approved bribery as one of two valid bases for honest services fraud liability.

6.    Money Laundering

Because Wilkes was convicted of traditional concealment money laundering, his case does not present the kind of merger problem addressed in United States v. Santos, 553 U.S. 507 (2008).

7.    Grand Jury Proceedings

Wilkes's unsubstantiated claimed defects in the grand jury proceedings are rendered moot by the trial jury's verdict.  United States v. Navarro, 608 F.3d 529, 538-40 (9th Cir. 2010), cert. denied, 131 S. Ct. 960 (2010).

8.    Forfeiture

Wilkes failed to request a jury determination of forfeiture, and therefore waived such a determination.

V

## ARGUMENT

A. WILKES WAS NOT ENTITLED TO COMPELLED USE IMMUNITY

### 1. Standard of Review

A district court's refusal to compel use immunity is a mixed question of law and fact that this Court reviews de novo. United States v. Straub, 538 F.3d 1147, 1156 (9th Cir. 2008).

### 2. Wilkes Was Not Entitled to Compel Use Immunity for Williams

Wilkes's entire compelled immunity argument is based on a single case and an inaccurate recitation of the record below. The lone case upon which Wilkes relies, Straub, held that for a defendant to compel use immunity, he must show, *inter alia,* that "the prosecution granted immunity to a government witness in order to obtain that witness's testimony, but denied immunity to a defense witness whose testimony would have directly contradicted that of the government witness, with the effect of so distorting the fact-finding process that the defendant was denied his due process right to a fundamentally fair trial." 538 F.3d at 1162.

In the years since Straub, this Court has confirmed that this is a "narrow test," and that it is a defendant's burden to establish not only a "direct conflict" with an immunized witness's testimony, but also to establish "why they could not have obtained evidence from other sources to demonstrate or at least bolster much of the exonerating information they wished to extract from" their proposed witness. United States v. Regan, 2009 WL 1185666 *1 (9th Cir. 2009) (unpublished); see also

40

United States v. Gage, 2009 WL 2700322 *1 (9th Cir. 2009) (unpublished) ("Direct contradiction means more than just different subjective interpretations of the same facts."). A defendant who fails to submit an offer of proof regarding a proposed witness's testimony fails to meet even the threshold burden of establishing relevance. Regan, 2009 WL 1185666 *1.

> a.   Wilkes Misrepresents the Number of Immunized Witnesses

Straub was an appeal from a trial in which "eleven of the twelve government witnesses received some kind of immunity or other benefits." 538 F.3d at 1152. Trying to draw a closer connection between his case and Straub, Wilkes inaccurately represents that the Government immunized the trial testimony of "most," "virtually all," and "every prosecution witness, except ministerial ones . . . ." [AOB 42, 48, 37.] A review of the record, however, reveals that only 3 of the Government's 29 witnesses at Wilkes's trial testified under grant of immunity (Combs, Arnold Borromeo, and Max Kane). [ER 3599; SER 189-90.]

In Straub, the defendant was charged with shooting a man during an attempted robbery. 538 F.3d at 1149. The Government immunized the lone witness who could both "place Straub at the scene" and "put the gun in Straub's hand." 538 F.3d at 1149-50. Wilkes attempts to create a similarity between his case and Straub by proclaiming that seven specific witnesses who provided devastating testimony against him were immunized for trial. In truth, they were not. [AOB 24 n.19, 30, 49; ER 3599.]

41

### b.  Wilkes Failed to Provide a Valid Offer of Proof

In <u>Straub</u>, the defense made its proffer of the proposed witness's testimony in the presence of the witness's counsel and counsel for the Government.  538 F.3d at 1150.  Here, Wilkes provided a proffer for witness Mack, and the Government responded by agreeing to immunize Mack's testimony.  Wilkes, however, then decided not to call Mack, raising the possibility that the entire exercise was an attempt to create an issue for appeal.  Wilkes avoided the "risk" that the Government would also agree to immunize Williams by not providing the Government, or Williams' attorney, with a proffer of Williams' testimony.  [AOB 47 n.39.]  Wilkes did this over the Government's objection, and under such circumstances, his *ex parte* proffer to the district was meaningless because there was no reason to believe Williams would have testified as Wilkes proffered.[19]

### c.  There Was No Distortion of the Fact-Finding Process

In <u>Straub</u>, the openly shared defense proffer identified a specific answer from the government's immunized witness (Adams) that the proposed defense witness (Baumann) would directly refute:  "'did you have a conversation with [Baumann] at a bar in the winter of 2003 in which you admitted to him that you had just shot a man?' Adams responded, 'No, I didn't.'"  538 F.3d at 1150.  The proffered testimony of Baumann was that he would testify that "he saw [Adams] at one of the night clubs . . . and [Adams] . . . said, 'I just shot a man.'"  <u>Id</u>.  Significantly, Straub was being

---

[19]    Wilkes has asked this Court to perpetuate his *ex parte* litigation of this issue, and the Government continues to oppose his avoidance of the adversarial process.  [AOB 47 n.39.]

charged with shooting a man and Adams was the <u>only</u> witness "who could place Straub at the scene, and the only witness who could put the gun in Straub's hand." 538 F.3d at 1149-50.

It is hard to imagine a more direct contradiction on a more material point than one that would raise the very real possibility that the Government's sole purported eyewitness was actually the perpetrator. No such contradiction exists here.

Wilkes identifies eight portions of Combs' testimony that Williams would have supposedly refuted. [AOB 47 (citing ER 2045, 2050-54, 2060, 2063, 2079-80, 2094, 2150-54, 2214-16).] In stark contrast to <u>Straub</u>, however, a review of Combs' actual testimony reveals that it falls within one or more of the following categories: it does not differ from what Williams would have said; it pertains to conversations between Wilkes and Combs that did not involve Williams; or it could have been contradicted without implicating Williams' Fifth Amendment rights.

### (1)    No Contradiction at ER 2045

"Contrary to Combs testimony, *see* ER:2045, Williams, not Combs, managed the Panama Project. Sidebar:36-37." [AOB 47.]    Wilkes's assertion does not contradict Combs' actual testimony, which was that "I was out of [the Panama Project] after Mike Williams was hired," and that at that point "[Williams] was then the project manager, yes." [ER 2215-16.]

### (2)    No Contradiction at ER 2050-54

At ER 2050-54, Combs testified about a return on investment analysis that he had prepared at Wilkes's direction [ER 2051], that he told Wilkes that he had given

it his best effort [ER 2052], that he submitted it to the government at Wilkes's direction [ER 2054], and that the Government's representatives immediately resisted paying for the analysis. [ER 2054.] There is no reason to believe that Williams was a party to the conversation between Wilkes and Combs that Combs described. Moreover, during Wilkes's own testimony, Wilkes confirmed that he had reviewed Combs' draft return-on-investment plan, that it was submitted to the Government, and that he demanded payment on it. [ER 2684-85.]

### (3)  No Contradiction at ER 2059-60

At ER 2059-60, Combs testified about a conversation with Wilkes during which Wilkes instructed him to submit an invoice for work that had not been done. [ER 2059.] Because Williams was not a party to this discussion between uncle (Wilkes) and nephew (Combs), he could not refute what was said during it. At no point in Wilkes's own testimony did he deny that he and Combs had such a discussion. Moreover, Behrens, a witness whose testimony was not immunized, testified about suspicions his office had that Wilkes's company was billing for work that had not been performed [ER 1130], about his confirmation that Wilkes's company had billed for work that had not been performed [ER 1131-32], and about a time when Wilkes had Cunningham call him after he had told Wilkes that he could not pay invoices for work that had not been performed. [ER 1143.][20]

---

[20]  Wilkes's own counsel seemed to embrace the fact that Wilkes's company had billed for work it had not performed: "[under] a firm fixed-price contract it doesn't matter whether the work has been performed when there is a payment requested; is that correct?" [ER 1172.] Answer: "No, that's incorrect." [ER 1172.]

### (4)   No Contradiction at ER 2079-80

At ER 2079-80, Combs testified about a conversation that he had with Cunningham during which Cunningham said he needed a computer and a subsequent conversation with Wilkes during which Wilkes told him to get Cunningham a computer out of the inventory of equipment for which Wilkes's company had billed the government. [ER 2079-80.] Because Williams was not a party to either of these conversations, he could not refute that they occurred. Of the other actual participants in these conversations, Wilkes could have called Cunningham, but did not, and at no point during Wilkes's own testimony did he deny that the conversation Combs described had occurred.

### (5)   Nothing Incriminating at ER 2094

At ER 2094 is the only portion of Combs' testimony that Williams could have refuted: that Williams had taken a computer cart from ADCS, Inc.'s office to Cunningham. [ER 2094.] While it is highly unlikely that Wilkes's *ex parte* proffer included a specific denial of this testimony, if it had, Williams would not have needed to be immunized to deny it. In this regard, Combs did not testify that Williams participated in bribing Cunningham, just that Williams delivered the cart. [Id. at 2094.] Combs did not testify that Williams was a party to any sort of communication in which any illicit purpose for this delivery was discussed. [Id. at 2094.] So even if Combs mistook Williams as the delivery person for this cart, and there is absolutely nothing in the record indicating that he did, that could not possibly

have had "the effect of so distorting the fact-finding process that [Wilkes] was denied his due process right to a fundamentally fair trial." Straub, 538 F.3d at 1162.

(6)　No Contradiction at ER 2062-63

Next, Wilkes asserts "Williams would've testified that Combs was 'going off on his own,'[21]/ Sidebar:36, contradicting Combs' testimony that he did everything at Wilkes's direction. *See, e.g.,* ER:2063, 2079, 2150-2154 (overbilling and billing for inferior hardware, obtaining prostitutes)." [AOB 47.] First, even if Williams would have provided vague testimony that Combs occasionally, or even regularly, was "going off on his own," this is the type of subjective impression testimony that does not rise to the level of direct contradiction. Gage, 2009 WL 2700322 *1. And second, such generalized testimony by Williams would not directly refute Combs' testimony that Wilkes directed him on the specific occasions identified in Wilkes's brief.

At ER 2062-63, Combs testified that Wilkes told him to double the price of the equipment for which they were invoicing the government. [ER 2062-63.] Williams was not a party to that conversation, and at no point during his testimony did Wilkes deny he and Combs had such a conversation.

---

[21]/　Wilkes's use of quotation marks belies what he is quoting:　his own counsel's *ex parte* hypothetical proffer, not a proffer from Williams or Williams' counsel.

46

(7)    No Contradiction at ER 2150-54, and Corroborated by Wilkes

At ER 2150-54, Combs described a conversation with Wilkes during which Wilkes instructed Combs to purchase "Cintera" equipment for the government because it was cheaper, despite a Bill of Materials that called for "Clarion" equipment. [Id..] Because Williams was not a party to this conversation, he could not refute that it occurred. During his testimony, Wilkes denied that he tried to furnish cheaper equipment to the government, but he acknowledged having to purchase "Clarion" equipment to replace what he had initially provided – Wilkes blamed this mishap on a "miscommunication between [Combs] and [Wade]." [ER 2610-11.]

(8)    No Contradiction About "Obtaining Prostitutes"

Despite Wilkes's parenthetical reference to "obtaining prostitutes" [AOB 47] as something Williams could have directly refuted, none of the actual portions of Combs' testimony that Wilkes cites concern the prostitutes that Wilkes provided for himself and Cunningham while they were vacationing in Hawaii. Although no fewer than five witnesses testified about those evenings, including Wilkes himself, no one mentioned that Williams was present. Therefore, Williams could not have refuted Combs' testimony about those evenings. Moreover, the Government offered to immunize Mack, who was unquestionably present for the trip to Hawaii [ER 2464-65] and for the visit from the prostitutes [ER 2302-04], which likely explains why Wilkes opted not to call him as a witness.

47

As has been shown, the refusal to immunize Williams did not distort the fact-finding process in any way whatsoever, let alone to such an extent as to deny Wilkes a fundamentally fair trial. In <u>Regan</u>, one of the reasons this Court held that the defendants were not entitled to compelled immunity was because they had failed to explain why they could not have refuted the immunized testimony with other sources of evidence available to them. 2009 WL 1185666 *1. Here, Wilkes expressly conceded that he was a firsthand witness to all of the events at issue and that he could provide evidence through his own testimony. [ER 2491.] Wilkes then proceeded to testify and, for the most part, he did not deny that he and Combs had the conversations that Combs described in his testimony.

In other words, both participants in the conversations at issue testified at Wilkes's trial. And their testimony was not contradictory. This is the opposite of the situation presented in <u>Straub</u>, where the Government immunized one of the participants in a conversation that went to the heart of the shooting charges in the case, but refused to immunize the other. Under these circumstances, the district court properly declined to compel the Government to immunize Williams. See <u>Regan</u>, 2009 WL 1185666 *1 (no error in failing to compel immunity where defendants "failed to demonstrate that [witness's] proffered testimony would have directly contradicted an immunized Government witness's testimony").

48

B.     THERE WERE NO BRADY/GIGLIO VIOLATIONS

"There are three components of a true <u>Brady</u> violation:  The evidence at issue must be favorable to the accused [ ]; that evidence must have been suppressed [ ]; and prejudice must have ensued."  <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999). <u>Brady</u> is not a pretrial discovery device.  <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559-60 (1977).  In order to be discoverable under <u>Brady</u>, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching. . . ."  <u>Strickler</u>, 527 U.S. at 282 (1999).  "[S]trictly speaking, there is never a real '<u>Brady</u> violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."  <u>Strickler</u>, 527 U.S. at 281.

    1.     Standard of Review

Alleged <u>Brady</u> violations are reviewed de novo.  <u>United States v. Manning</u>, 56 F.3d 1188, 1197 (9th Cir. 1995) (citing <u>United States v. Woodley</u>, 9 F.3d 774, 777 (9th Cir. 1993)).

    2.     Wilkes Fails to Identify any Withheld Impeachment Evidence as to
           Combs

Wilkes asserts that "<u>Giglio v. United States</u>, 405 U.S. 150 (1972), required disclosure of Combs' 'proffer' sessions, not merely his FBI interviews."  [AOB 55.] The Government's obligations under <u>Brady</u> and <u>Giglio</u> pertain to information and evidence, regardless of how the Government learns of it.  Contrary to Wilkes's argument, there is no special constitutional mandate to disclose all "proffers,"

49

irrespective of whether the proffers contain information subject to disclosure under Brady or Giglio.[22/]

Wilkes has failed to allege, let alone establish, that any of "Combs' 'proffer' sessions" generated any Brady or Giglio information that was not already disclosed to Wilkes in the many reports, affidavits, and grand jury transcripts that the Government produced in this case. Having failed to identify any undisclosed Brady or Giglio information, Wilkes cannot possibly establish prejudice.

     3.     Wilkes Fails to Identify any New Impeachment Information as to Wade

          a.     The CA Did Not Reflect any Undisclosed Misconduct

The CA, upon which Wilkes bases his entire argument, did not reflect a single instance of misconduct that was not included within Wade's testimony at trial or Wade's plea agreement and charging Information – both of which the Government introduced at trial. In fact, the CA was expressly and primarily based on these documents. Contrary to Wilkes's unsupported claims, nothing in the CA resolved or limited Wade's criminal liability nor did the CA in any way foreclose or limit Wade's potential term of imprisonment for any criminal violations.

---

[22/]     Wilkes's citation to United States v. Sudikoff, 36 F. Supp. 2d 1196 (C.D. Cal. 1999) is misplaced. Sudikoff was neither an appeal nor a motion for post-trial relief. Rather, it concerned a discovery dispute. Wilkes never sought discovery of the kind of information at issue in Sudikoff (nor was he entitled to it).

b.    <u>Wade's Retention of Millions in Gains Was Well Established</u>

Wilkes claims that the fact that Wade had the financial wherewithal to pay a $1 million fine was "fertile ground for cross-examination denied to Wilkes." [AOB 57.] But the record demonstrates that the Government elicited from Wade extensive testimony that he had made a great deal of money from his crimes: tens of millions of dollars in appropriations for his own benefit [ER 1664, 1680]; hundreds of thousands of dollars annually from Wilkes [ER 1598, 1623, 1627, 1639, 1644]; and enough to afford over $2 million in bribes for Cunningham [ER 1681.]

Seizing on this evidence of Wade's ill-gotten gains, Wilkes thoroughly attempted to reap from this evidence the impression that the Government had effectively bought Wade's testimony by <u>not</u> fining him or forfeiting any of his proceeds. [ER 1735; 1742-43, 1769 (no lien or forfeiture of $20 million from sale of business; ER 1736 (no request for fine in plea agreement).] Wilkes returned to this theme in closing argument: "He (Wade) hasn't paid a dime. They didn't ask a quarter from him to show up to court." [ER 2946.] "Why does Mitch Wade say it? Well, Mitch Wade's no dummy. . . . <u>He hasn't paid a dime</u>. He's got a full expectation that if he gets them what they want, if <u>his paymasters</u> get what they want, which is a conviction against Brent Wilkes, that he's not going to do any time. That's his expectation." [ER 2947 (emphasis added).]

As demonstrated above, Wilkes's own attorney exploited the evidence showing that Wade retained millions of dollars in ill-gotten gains. In other words, before the CA even existed, Wade's wherewithal to pay a $1 million fine had been clearly

51

established.  In fact, Wade, whose plea agreement provided that he had received over $150 million in government contracts, acknowledged that the Government could still pursue all of that money:

> Q:    Mr. Wade, do you have an understanding as to whether the government is restricted in any way in terms of the amount it's going after in the form of a fine any or all of the money you made from the government by virtue of this conspiracy?
>
> A:    No. It's my understanding that they're not restricted. It's very daunting.

[ER 1780.]

### c.    The CA *Undermined* Wilkes's Impeachment of Wade

In addition to being factually redundant to the evidence at trial, Wilkes's argument regarding the CA is logically inconsistent with his argument at trial, which explains why Wilkes did not ask to re-open his case after learning of the CA.  Wilkes answered no when expressly asked whether, in light of the CA, he wanted a "[m]istrial or anything?" [SER 255.]  Cf., United States v. Gordon, 844 F.2d 1397, 1403 (9th Cir.1988) (no Brady violation even though Brady material produced after government witness had testified because defense had opportunity to recall witness).  Moreover, Wilkes did not contest the district court's determination that he was better off that the jury was not aware of the CA and its attendant fine.[23/]  Wilkes's argument

---

[23/]    In fact, when he learned of the CA, the only argument Wilkes made as to its relevance was not the contradictory argument he urges on appeal.  Rather, Wilkes contended that he wanted to use the CA's supposed reference to Wade's volatile personality.  [SER 253.]  The district court indicated that portion of the CA was not likely to be admissible.  [SER 251-53.]  Moreover, the Government was
(continued...)

at trial that Government "paymasters" had bought Wade's testimony by not fining him would have been torpedoed by evidence that the FEC fined Wade $1 million. Because the CA was not favorable to Wilkes, in that it was neither exculpatory nor impeaching, there was no obligation to disclose it and it could not have possibly, let alone probably, produced a different verdict. Strickler, 527 U.S. at 282 (1999); see also United States v. Si, 343 F.3d 1116, 1123 (9th Cir. 2003) (withheld impeachment evidence is immaterial where "the impeachment evidence that was disclosed was much more substantial than the withheld evidence").

C.     THERE WAS NO PROSECUTORIAL MISCONDUCT

1.     Standard of Review

Wilkes did not object at trial to any of the Government's arguments that he challenges on appeal. Review, therefore, is for plain error. United States v. Wright, 625 F.3d 583, 610 (9th Cir. 2010).

The most fundamental component of a plain-error determination is whether there was an error that was "clear" or "obvious." United States v. Olano, 507 U.S. 725, 734 (1993). Under the plain error standard, this Court "may reverse only if the error is 'plain' and . . . affect[s] substantial rights.'" United States v. Sine, 493 F.3d 1021, 1038 (9th Cir. 2007) (quoting Olano, 507 U.S. at 732 (additional citation and internal quotations omitted)) (emphasis and alterations in original). Even an obvious error will not be deemed to affect substantial rights unless a defendant shows a

---

23/     (...continued)
completely unaware that the CA contained any references to Wade's volatile personality. [SER 253.]

"reasonable probability" that the jury would have acquitted him absent the error.
Sine, 493 F.3d at 1041.

    2.    The District Court Did Plainly Err When It Did Not Sua Sponte Stop Government Counsel From Fairly Replying to Wilkes's Arguments

In order to obtain a reversal based on prosecutorial misconduct, a defendant "must establish both misconduct and prejudice." Wright, 625 F.3d at 609-10. Prosecutors and defense lawyers are given "wide latitude" in closing arguments. United States v. Sayetsitty, 107 F.3d 1405, 1409 (9th Cir. 1997). "Prosecutors have considerable leeway to strike 'hard blows' based on the evidence and all reasonable inferences from the evidence." United States v. Henderson, 241 F.3d 638, 652 (9th Cir. 2000). "'It is impossible to expect that a criminal trial shall be conducted without some showing of feeling: the stakes are high, and the participants are inevitably charged with emotion.'" United States v. Young, 470 U.S. 1, 10 n.8 (1985) (quoting Learned Hand in United States v. Wexler, 79 F.2d 526, 529-30 (2d Cir. 1935)).

In Young, the Supreme Court explained the importance of examining rebuttal arguments in the context of the arguments that they rebut:

> [Even][ i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. Instead, as Lawn teaches, the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly. In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant.

470 U.S. at 11-12.

Decades before the opinion in <u>Young</u>, the Supreme Court staked out the doctrine of "invited reply." In <u>Lawn v. United States</u>, 355 U.S. 339 (1958), the defense counsel's closing argument attacked the government for persecuting the defendants. He contended that the prosecution was instituted in bad faith, and he called the government's key witnesses perjurers. <u>Id.</u> at 315. In response, the prosecutor argued, "We vouch for [the witnesses] because we think they are telling the truth." <u>Id.</u> at 323 n.15. The Supreme Court held that defense counsel's argument "clearly invited the reply which [he] now attacks." <u>Id.</u> And after citing the trial judge's cautionary instruction regarding cooperating witnesses, the Court concluded that "the foregoing shows *clearly* that there is *no merit* to [defendant's] contention" that the prosecutor's argument deprived him of a fair trial. <u>Id.</u> (emphasis added).

      a.    Wilkes Expressly Invited Government Counsel to Answer Why <u>Cunningham Was Not Called as a Witness</u>

Taking Wilkes's arguments in order, it is apparent why his counsel did not object at trial. Regarding the comments concerning the decision not to call Cunningham, Wilkes fails to acknowledge his clear invitation for the government's response: "Why didn't they put Congressman Cunningham on? . . . <u>They can say what they want.</u> The fact that they didn't call him speaks volumes about the fact that they didn't believe him." [ER 2996-97 (emphasis added); <u>see also</u> ER 2951.] In response, Government counsel simply argued the following natural inferences:

> We're not going to put the most corrupt politician on the witness stand and give him a chance to get a break in his sentence.
>
> [Defense counsel] told you time and again "if somebody gets up on the witness stand and they've pled guilty, the government's going to file a

> Rule 35 motion. At least that's what the defendants who would do that would be expecting or hoping." We're not going to do that. We don't need to do that. <u>We've proved he's guilty beyond a reasonable doubt without putting the most corrupt politician on the stand</u>.

[ER 3017-18 (emphasis added).]

Because the Government had proved Wilkes's guilt without calling Cunningham as a witness, there was no reason to tempt a witness as corrupt as Cunningham with the chance to get a break in his sentence. Wilkes, however, contends that this inferential argument was false. [AOB 59, 61.] Wilkes is wrong. The Government has never used Cunningham as a witness in any proceeding. [SER 206]. In fact, one of the reasons the Government did not call Cunningham at trial was because prosecutors did not trust him to refrain from fabricating testimony that he believed would <u>help</u> the prosecution (and thus enhance his chances for a reduced sentence). [SER 206.][24] There was no plain error in allowing the Government to argue this natural inference, which was consistent with the underlying facts.

### 3. There Was No Vouching

Throughout his closing argument, Wilkes's counsel repeatedly offered his personal opinion that Government witnesses had lied, Wilkes had told the truth, and

---

[24] Although years before Wilkes's trial, the Government had recommended a two-level Guidelines' reduction for Cunningham's substantial assistance, that assistance was limited to waiving protections under the Speech or Debate Clause and making consensually-recorded phone calls to Tommy Kontogiannis – i.e., nothing requiring Cunningham's testimony. [SER 206.]

that prosecutors had lied, were "misleading you" and "didn't want to hear the truth." [ER 2941, 2955, 2957, 2962, 2963, 2975, 2977, 2983, 2988, 2992.]

Although the foregoing arguments invited a much stronger reply than did the argument in <u>Lawn</u>, the Government did not go nearly as far as the Supreme Court and this Court permit. Instead, the Government asked a rhetorical question, which is far short of vouching. See, e.g., <u>United States v. Necoechea</u>, 986 F.2d 1273, 1245 (9th Cir. 1993) (not improper vouching where prosecutor stated "why ladies and gentlemen, if [the witness] is lying, isn't she doing a better job of it? I submit to you . . . that she's not lying. I submit to you that she's telling the truth").

Here, the actual rebuttal argument about which Wilkes complains was "do you think, ladies and gentlemen, over a dozen witnesses with absolutely no dog in this fight got up on the witness stand and lied to you?" [ER 3004.] Contrary to Wilkes's argument, the Government's argument was also entirely consistent with the evidence. The Government called 29 witnesses at trial, and only one of them testified pursuant to a plea agreement (Wade) and three under a grant of immunity (Combs, Kane, and Borromeo), leaving over <u>two</u>-dozen witnesses fairly described as having no "dog in this fight."[25/]

---

[25/]    Contrary to vouching for Combs' credibility, Government counsel simply repeated to the jurors what they had already heard about an immunized witness's obligation. [ER 3019 ("He can get up there and say whatever he wants so long as it's the truth. That is the only obligation with immunity. That doesn't force him to say anything that helps us or hurts his uncle. It obligates him to tell the truth.")] This is exactly what the evidence demonstrated:

(continued...)

57

4. There Was No Burden Shifting

Wilkes next asserts that Government counsel engaged in burden shifting by stating, in reference to Wilkes's testimony, "You have to believe that preposterous charade to believe he's not guilty." [AOB 60.] This remark fell well within the bounds of proper argument that this Court has established. In United States v. Moreland, 622 F.3d 1147, 1162-63 (9th Cir. 2010), this Court considered a challenge to the following argument:

> So when you're assessing credibility, look at who got up on that stand and answered questions straight-forwardly, and look who tried to duck and weave. And once you conclude they're not credible, case is over.

(emphasis added). This Court acknowledged that the prosecution had reviewed the legal elements of what the jury would have to find in order to convict the defendant and held this "isolated moment" was "neither improper nor did it affect [the defendant's] substantial rights." Id. at 1163.

By the time Government counsel uttered the isolated remark at issue here, the Government had devoted what amounted to four *pages* of transcript during closing argument explaining the Government's burden of proof in order for the jury to find Wilkes guilty. [ER 2923-26.] As in Moreland, this remark was not improper.

---

25/ (...continued)

Q: You know they're not going to file any charges on you because you've got immunity?

A: It's only predicated on the truth.

[ER 2188.] See, e.g., Necocechea, 986 F.2d at 1280 (declining to deem erroneous prosecutor's reference to truthfulness provision in plea agreement.).

"Even worse," Wilkes asserts, Government counsel argued that jurors had to choose between the testimony of Government witnesses and Wilkes's directly contradictory testimony.  [AOB 60.]  This too was proper.  See United States v. Molina, 934 F.2d 1440, 1445 (9th Cir. 1991) ("In a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue, that one of the two sides is lying.").

### 5. There Was No Attempt to Appeal to Jurors' Passions or Prejudices

Wilkes next attacks what he characterizes as an improper appeal to juror's passions and prejudices.  [AOB 60-61.]  Once again, none of the arguments about which Wilkes complains drew a single objection at trial and they were all in response to Wilkes repeatedly inviting the jury to nullify the law by creating special standards to accommodate the "way Washington works."  Wilkes's closing argument went so far in appealing to his San Diego jury's sympathies as to imply some sort of connection between the prosecution of Wilkes's corrupt pursuit of earmarks and an attack on a system necessary to enable San Diego to recover from the fires that had ravaged it during Wilkes's trial:

> Earmarks are the way that Congressmen get their constituents money. I can assure you that here in San Diego, one of the earmarks that would be for fiscal year 2008 will clearly be for rebuilding this area and for bringing money back. One of the reasons that you declare a federal disaster is you get FEMA funds, number one. But you also have the local Congressman who's going to use that earmark to get funds here.

[ER 2985.] This argument built upon Wilkes's testimony that "[e]armarks are money for new programs that create jobs and better jobs. Earmarks are money for after-school programs and lunch programs. Earmarks are clinics and hospitals, extensions

of roads.  They're equipment for first responders, firemen and policemen. And that's what earmarks are." [ER 2672.]

The apparent purpose of this not-so-subtle tactic was to create the impression that a vote to convict Wilkes would somehow be a vote against "the way Washington works" and prevent the rebuilding of San Diego, put people out of work, leave kids uneducated and hungry, neglect sick people, and imperil emergency and law enforcement personnel.  In response, the Government's argument implored the jurors to focus on the Court's instructions, the proof, and to avoid any imaginary exceptions. Rather than acknowledge Government counsel's repeated references to the jury instructions, Wilkes excised them from his quotations.  Wilkes quotes from ER 3005 two parts of the Government's argument [AOB 42], but uses ellipses to excise an intervening direct reference to the Court's instructions (Wilkes excised the underlined portion below):

> If paying prostitutes to sleep with a Congressman with whom you have business going on is not cheating us out of our rights to that Congressman's honest services, then our rights mean nothing. They're worth nothing. <u>But you know, ladies and gentlemen, from the instructions our rights do exist</u>. They do mean something. You will vindicate those rights here.

[ER 3005 (emphasis added).]  In other words, Government counsel's argument expressly sought to focus the jurors on the instructions, rather than mere argument or passions.  This was again the case later in Government counsel's argument:  "let me tell you something else about this 'everyone else was doing this [defense].'  You're not going to see an 'everyone else is doing it' exception <u>in the jury instructions</u>. That's because it doesn't exist." [ER 3009 (emphasis added).]

60

Again, contrary to Wilkes's argument, Government counsel's final remarks asked the jury to find Wilkes guilty not based on their passions, but rather expressly because, "[we've] proved it to you." [ER 3021.] The reference to "our money" was a shorthand reference to what the Government had proved: Wilkes obtained public funds, and used those funds to corrupt Cunningham, as had been methodically explained earlier in the argument with respect to Wilkes's biggest bribe: the $525,000 payoff of Cunningham's second mortgage. [ER 3013-16.]

The Government recognizes in hindsight that the better practice would have been, and certainly will be in the future, to use the word "public" instead of "our" when referring to the right to honest services or to public funds used or "kicked back" to commit crimes. Nevertheless, the context and substance of these rebuttal arguments, including express references to the jury instructions, make clear that their purpose was to rebut the defense's scare tactics and to encourage the jury to apply the law, rather than nullify it. Contrary to Wilkes's argument [AOB 62], this is nothing like the situation presented in United States v. Solivan, 937 F.2d 1146, 1148-49 (6th Cir. 1991) where the "send a message" argument had absolutely no connection to the jury instructions, the evidence in the case, or any argument that the defendant had advanced. In fact, Solivan observed that "[u]nless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible." Id. at 1151 (emphasis added).

The two isolated remarks here, in a trial that spanned over 2,500 pages of transcripts, were likely not even a distant memory to jurors who rendered their verdict

61

several days, including an intervening weekend, after they were uttered.  See, e.g., Slagle v. Bagley, 457 F.3d 501, 527 (6th Cir. 2006) ("fifteen [improper] comments were not extensive during this trial that comprises over 1000 pages of trial transcript, and therefore the prosecution's misconduct was not so pronounced and persistent that it permeate[d] the entire atmosphere of the trial or so gross as probably to prejudice the defendant") (emphasis added) (internal quotation omitted).  In addition, throughout trial, the Court repeatedly instructed the jury that comments by counsel are not evidence.  [See, e.g., SER 238; 239; 240 ("Remember -- this should be engra[v]ed in the front of your foreheads now -- things that the lawyers say are not evidence."); 241; 242; and 243.]  This same admonishment was also included in the jury instructions sent into the jury room. [ER 123.]  See, e.g., Wright, 625 F.3d at 613 (improper statements rendered harmless by court's instruction that arguments by lawyers are not evidence).  Finally, as presented above, and expressly acknowledged by the trial judge, the Government presented an "avalanche of evidence against Mr. Wilkes."  [SER 221.]

## D.    WILKES HAD AMPLE TIME TO PREPARE, INCLUDING MID-TRIAL RECESSES

### 1.    Standard of Review

This Court reviews denials of motions for trial continuances for abuse of discretion.  United States v. Garrett, 179 F.3d 1143, 1144-45 (9th Cir. 1999).  "'[O]nly an unreasoning and arbitrary insistence upon the expeditiousness in the face of a justifiable request for delay'" warrants reversal.  Id. (quoting Morris v. Slappy, 461 U.S. 1, 11-12 (1983) (internal quotations omitted)).

62

2.    Wilkes Was Neither Unreasonably Nor Arbitrarily Denied a Continuance

In this case, the court ensured that Wilkes had ample time to prepare his defense, including breaks *during* trial amounting to 14 days – 20 percent of the total time within which the Speedy Trial Act requires trials to commence.  18 U.S.C. § 3161(c)(1).

In light of the many moving parts that comprise a trial, "broad discretion must be granted trial courts on matters of continuances." Morris, 461 U.S. at 12.  Four factors are assessed to determine whether a denial was unreasoned and arbitrary: (1) diligence in preparing; (2) utility (likelihood of achieving purpose of continuance); (3) inconvenience; and (4) prejudice.  United States v. Kloehn, 620 F.3d 1122, 1127 (9th Cir. 2010).  "'At a minimum, however, in order to succeed, [a defendant] must show some prejudice from the court's denial.'" Id. at 1127 (quoting Armant v. Marquez, 772 F.2d 552, 557 (9th Cir. 1985)).

Wilkes cannot show diligence because he chose not to avail himself of six extra days the court granted him to his review documents during trial.  [ER 3610; SER 188, 238-39.]  Likewise, it would have been extremely inconvenient to continue Wilkes's trial because the district court had gone "to great effort and expense to send out an 18-page questionnaire" and time-screen a jury.  [SER 179, 182-83.]  Also, the Government had to arrange the appearances of over two-dozen witnesses.

Most importantly, three years after his trial, Wilkes still cannot identify a single piece of evidence that additional time would have enabled him to use to his benefit.  As such Wilkes fails to establish both utility and the indispensable fourth factor:

prejudice.  Wilkes identifies five categories of documents that he claims he did not have time to review and resulted in prejudice to his defense.  Wilkes's description of these documents, however, perpetuates his pattern of obscuring the record.  Though tedious, a review of the documents in each of Wilkes's five categories confirms that none would have helped Wilkes's defense.  In fact, several of them were marked and/or admitted as <u>defense</u> exhibits at trial.

### a.    Kratz and Jones

The first category of documents Wilkes identifies consists of two Inspector General Reports that purportedly relate to Kratz and Jones' testimony about Cunningham's pressure and Wilkes's work and conduct.  [AOB 71.]  Wilkes asserts that the first report "<u>concluded</u>: 'Congressional influence was not an issue regarding the Project FIRES funding.'  ER:3092."  [AOB 71 (emphasis added).]  The Inspector General report contains no such conclusion.  [ER 3091-94.]  Its conclusions, set forth two pages later, begins "**Conclusion:**  Project FIRES was not selected and approved as part of the normal FY 99 ADCS selection and approval processes" and ends, "This unapproved project received $9.77M, more than any other single project."  [ER 3094 (emphasis in original).][26]  The second document is a report with which Wilkes was so familiar he marked it as a defense exhibit at trial, but chose not to offer into

---

[26]    The portion of the report Wilkes's brief portrays as a conclusion was actually a statement that the report attributed to Kratz, which he denied having made when he testified before the grand jury – the transcript of which the Government provided to Wilkes months before trial.  [ER 3590.]

evidence. [AOB 71; ER 3095-96; SER 223.] As is apparent, neither of these documents provides any support whatsoever for Wilkes's argument.

### b. Lifset

Cunningham staffer Nancy Lifset testified that from 1999 through 2005, Cunningham gave an inordinate amount of attention – and appropriations – to Wilkes and, later, to Wade. [ER 1418-20.] Wilkes contends that his next category of documents contradicts this testimony. [AOB 71-72.] Wilkes bases his argument on five documents that are iterations of Cunningham's funding requests for Fiscal Year 2004 ("FY04"). [AOB 72 (citing ER 3099-3101).] What Wilkes fails to point out is that Cunningham's final list of appropriations priorities was reflected in a different document. This final list of appropriations, in fact, confirms that Cunningham's top two FY04 priorities were programs designed to benefit Wade and Wilkes. [ER 1465-67; 1646-47; 1751; SER 56.]

### c. Collins

Wilkes contends that his next category of documents show that "Collins, as a lobbyist, obtained similar funding [as did Wilkes] via Cunningham for his client/companies. ER:3136-3149, 3184-3204, 3098-3133, 3165, 3169, 3177, 3181." [AOB 72.] To support this argument, Wilkes resorts to literally dumping random documents into the record, which bear no connection whatsoever to his contention (for example, ER 3165, 3169, 3177, and 3181 consist of emails between Wilkes, Combs, and others).

      d.   Wade

Wilkes contends that his next category of documents undermines Wade's testimony that "Cunningham alone obtained ADCS, Inc.'s contracts, and that he and Wilkes devised a plan where Wilkes wasn't going to do document conversion but was going to be his subcontractor in a fraudulent scheme. ER:1625-1626." [AOB 72.] In truth, Wade testified not that Cunningham alone got contracts for ADCS, Inc., but that the Congressman "help[ed]" Wilkes and Wade obtain contracts and appropriations. [ER 1625.] Likewise, Wade testified that he and Wilkes discussed a change of focus that consisted "primarily moving from scanning to buying hardware and software." [ER 1625.] Wilkes's contention that unidentified internal emails (which are not among the excerpts Wilkes cites) "demonstrate readiness to do document-conversion work" simply does not conflict with Wade's testimony. As such, none of these documents would have had any impact on the outcome of Wilkes's trial.

      e.   Combs

Wilkes claims that the final category of documents would have contradicted Combs' testimony that ADCS, Inc. "sold unnecessary software to DOD, wasn't capable of doing the Panama project, and overbilled the government, but got away with it because of Cunningham." [AOB 73 (no citations to record in original).] Combs did not testify that all of the software Wilkes sold to the DOD was unnecessary. Rather, he stated, "Some were very receptive to it. Some were not so.

66

They didn't have an immediate need for it." [ER 2023.]  Nothing in the documents Wilkes identifies contradicts that testimony.

Likewise, even if Combs had testified that ADCS, Inc. "wasn't capable of doing the Panama project," which he did not, nothing in the documents Wilkes identifies would contradict such a statement – virtually all of the documents concern VPmax software sales from 1996-1998 and unrelated government contracts. [ER 3251-63, 3443-61, 3463-85.]  Most importantly, the fact that Wilkes marked and/or introduced several of these documents as defense exhibits at trial forecloses Wilkes's claim that he was prejudiced because he could not review them.  [ER 3443 (marked as Defense Exhibit XX at trial), 3448-56 (marked as Defense Exhibit FF at trial), 3467-85 (admitted as Defense Exhibit K at trial (ER 2181-83)); SER 223-24.]

The moment Wilkes completed his document review – with over six days remaining in a recess taken to accommodate his request to review documents – he absolved the district court of any abuse of discretion regarding the scheduling of his trial.  That is why Wilkes's argument does not begin to approach, let alone meet, his burden of establishing that the district court's scheduling was unreasonable and arbitrary.  Wilkes has failed to satisfy any of the four applicable factors, and his failure to establish prejudice is laid bare by his reliance on documents that he actually marked and/or admitted into evidence at trial.  No court in any circuit, in any century, has ever condemned a trial court for not affording a defendant sufficient time to review his own marked exhibits.  Three years after his trial, that is what Wilkes asks of this Court.

E.  THE ONLY HONEST SERVICES THEORIES ADVANCED AT TRIAL WERE THOSE UPHELD IN SKILLING

    1.  Standard of Review

In light of Skilling, the honest services fraud jury instruction upon which the parties had agreed [ER 2883] was overly broad.  Because the jury's general verdict may have rested on a legally impermissible basis, harmless-error review applies.  Skilling, 130 S. Ct. at 2934.  In other words, "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?"  Neder v. United States, 527 U.S. 1, 18 (1999).

    2.  Wilkes's Bribery Conviction Forecloses His Skilling Argument

In Skilling, the Supreme Court upheld the constitutionality of the honest services fraud statute, and held that "there is no doubt that Congress intended § 1346 to reach *at least* bribes and kickbacks."  130 S. Ct. at 2931 (emphasis in original).  To avoid due process concerns, however, the Court limited § 1346 to these two bases.  Id.

Although the jury instruction here was overly broad, the description of honest services fraud included when "the official acts or makes his decision based on the official's own personal interest, such as accepting a bribe or taking a kickback . . . ."  [ER 2883.]  Thus, the court's instruction encompassed the bribery and kickback bases for liability that Skilling approved.  More importantly, these were the only bases the Government advanced at trial.  [See, e.g., ER 1632-33 (contracts "in return" for benefits); 2070 (support for earmarks "in return" for benefits); 2919-23 (Wilkes's actions "motivated by an intent to get something back"); 3004; 3004-05; 3010; 1672-

75; 2161; 2916-18).]  In fact, throughout the entire trial, the phrase "conflict of interest," a basis of liability that <u>Skilling</u> overruled, was used only once – in the jury instructions.  [ER 2883.]  The Government never argued this basis of liability.

Most importantly, the jury convicted Wilkes of a separate substantive count of bribery, 18 U.S.C. § 201, which he does not specifically challenge.  As alleged, and proved, Wilkes bribed Cunningham "[b]eginning no later that September 1996, and continuing through about August 2005."  [ER 197.]<u>27/</u>  The honest services scheme ran for a parallel period:  "Beginning on a date unknown to the Grand Jury, and continuing through on or about August 12, 2005."  [ER 194.]  The only distinction between the two crimes was the requisites use of interstate wires for the honest services scheme, which Wilkes does not dispute.  The jury's verdict on the bribery count, therefore, confirms beyond any doubt whatsoever that Wilkes's jury would have convicted him of honest services fraud if the court's definition was limited to the bribery basis that <u>Skilling</u> expressly approved.  Therefore, the district court's use of an overly broad definition here was harmless because it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error."  <u>Neder</u>, 527 U.S. at 18.

---

<u>27/</u>      See, e.g., <u>United States v. Kincaid-Chauncey</u>, 556 F.3d 923, 943 (9th Cir. 2009) (bribery violation's requisite quid pro quo satisfied by "'a course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor'" (quoting <u>United States v. Jennings</u>, 160 F.3d 1006, 1014 (4th Cir. 1998)) (footnote and additional citations omitted).

## F.    WILKES'S CONVICTION FOR CONCEALMENT MONEY LAUNDERING DOES NOT PRESENT A MERGER PROBLEM

### 1.    Standard of Review

Because Wilkes did not object to the district court's jury instructions, the lack of a definition of "proceeds" is reviewed for plain error. Moreland, 622 F.3d at 1166. There was no error here, let alone one that is plain.

### 2.    The Purpose of Traditional Money Laundering Is Concealment

As the Supreme Court recognizes, "taking steps to make funds appear legitimate is the common meaning of the term 'money laundering.'" Cuellar v. United States, 553 U.S. 550, 558 (2008) (citing American Heritage Dictionary 992 (4th ed. 2000)). The Court embraced the following definition of "money laundering": "'[t]he act of transferring illegally obtained money through legitimate people or accounts so that its original source cannot be traced.'" Id. (quoting Black's Law Dictionary 1027 (8th ed. 2004)). See also United States v. Parker, 364 F.3d 934, 948 (8th Cir. 2004) (§ 1956(a)(1)(A)(i)'s "promotion" prohibition "is different from traditional money laundering because the criminalized act is the reinvestment of illegal proceeds rather than the concealment of those proceeds [prohibited under § 1956(a)(1)(B)(i)].")

Wilkes was convicted of traditional money laundering: a financial transaction "designed in whole or in part . . . to conceal or disguise the nature, . . . source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i); [ER 2, 144, 198.] The charged transaction – the last of a series of transactions to conceal Wilkes's $525,000 bribe to Cunningham – demonstrated

classic money laundering. Cunningham's second mortgage was held by Coastal, and to fund its $525,000 payoff, Wilkes needed the proceeds from one of his and Wade's corruptly obtained contracts (for which Wade was the prime contractor). On May 6, 2004, Wade issued a $5,970,000 check, to ADCS, Inc. [ER 1677.] Wilkes had this check deposited into an ADCS, Inc. account. [ER 1849-51.] At that point, Wilkes could have sent $525,000 to Cunningham or Coastal directly. Instead, he transferred the $525,000 to another of his accounts, WBR Equities. [ER 1851.][28/] At that point, Wilkes could have sent the $525,000 to Cunningham or Coastal Capital directly. Instead, he wired the $525,000 wired from WBR Equities to Parkview Financial, Inc. [ER 1851; SER 79.] In the meantime, Parkview Financial and Coastal had engaged in a series of transactions of their own, which provided additional buffers between the corrupt contract and the payoff of Cunningham's mortgage. Concealing this connection was the dominant, indeed the only, purpose of these multi-layered transactions.[29/]

### 3.   The Risks Presented in Promotion Cases Are Not Presented Here

Although Wilkes was convicted of traditional "concealment" money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), the three cases upon which he bases his argument all charged non-traditional "promotion" money laundering under 18 U.S.C.

---

[28/]     There is no question that the $525,000 that Wilkes transferred was "proceeds" of the corrupt contract because ADCS, Inc. had only $175,000 in cash prior to the deposit of the $5,970,000 check from the contract. [SER 247.]

[29/]     The purpose was the same as Wade's $50,000 check written to Coastal – to avoid a direct, traceable trail to Cunningham. [ER 1636.]

§ 1956(a)(1)(A)(i). [AOB 82-88 (citing <u>United States v. Santos</u>, 553 U.S. 507 (2008), <u>United States v. Van Alstyne</u>, 584 F.3d 803 (2009), and <u>Moreland</u>). In the non-traditional "promotion" context, there is a very real risk of a "merger problem" – that is, situations where a broad definition of "proceeds" would turn nearly every commission of a specified unlawful activity into a simultaneous money laundering violation. <u>Van Alstyne</u>, 584 F.3d at 810 (citing <u>Santos</u>, 128 S. Ct. 2026-27).

In <u>Santos</u>, a plurality of the Supreme Court would not define "proceeds" as "receipts" where doing so would transform an illegal-lottery operation's routine and direct payments to runners, collectors, and winners into simultaneous money laundering violations, significantly increasing the penalty for operating the lottery based on nothing more than the simplest of transactions inherent to running such an operation. 553 U.S. at 528. In so holding, the plurality rejected a definition of proceeds that would render it impossible to violate 18 U.S.C. § 1955 without also violating 18 U.S.C. § 1956(a)(1)(A)(I). <u>Id.</u> at 517. Although <u>Santos</u> was expressly limited to gambling enterprises, in <u>Van Alstyne</u>, this Court announced a more universal standard: "'proceeds' means 'profits' where viewing 'proceeds' as 'receipts' would present a 'merger' problem of the kind that troubled the plurality and concurrence in <u>Santos</u>." 584 F.3d at 814. Thus, this Court distinguished between routine and direct lulling payments to investors – specific transactions that were inherent to perpetuating the scheme – versus a payment to refund an investor's money, a transaction that was not so inherent. The Court concluded that the former presented a merger problem and required "profits" while the latter did not present a

merger problem and required only "receipts." 584 F.3d at 814-15. All three of these transactions were charged as violations of 18 U.S.C. § 1956(a)(1)(A)(I), as was true of the reversed counts of conviction in <u>Moreland</u>, 604 F.3d at 1077, which involved payments of sales commissions.

It appears that no Court has ever applied <u>Santos</u> to reverse a conviction for traditional "concealment" money laundering under 18 U.S.C. § 1956(a)(1)(B)(i). This disparity is no surprise. "Promotion" is essentially synonymous with "perpetuation," so it stands to reason that financial transactions necessary to perpetuate an unlawful activity would necessarily promote the unlawful activity. Hence, the risk of a "merger problem." On the other hand, there is no reason why a financial transaction necessary to perpetuate an unlawful activity would necessarily be designed to conceal the nature or source of the funds involved in the transaction.

Nowhere is the foregoing point made more clear than here, where Wilkes perpetuated his corruption scheme for years without engaging in a financial transaction that was "designed in whole or in part . . . to conceal or disguise the nature, . . . source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). As the Supreme Court confirmed in <u>Cuellar</u>, which it decided in the same term as <u>Santos</u>, the requisite "design" in a "concealment" is significant because the "statutory text makes clear . . . that a conviction under this provision requires proof that the <u>purpose</u> – <u>not merely the effect</u> – of the transportation was to conceal or disguise a listed attribute." 553 U.S. at 567(emphasis added). Here, only after Wilkes added this extra layer of criminal

73

conduct and purpose, through use of transfers from ADCS, Inc. to WBR Equities to

Parkview Financial, Inc., did he violate 18 U.S.C. § 1956(a)(1)(B)(i).  That is what

the Government charged, and that is what it proved.  That extra layer of criminality

avoids any sort of merger problem, let alone one that is plain or obvious.

## G.   THE VERDICTS AT TRIAL RENDER HARMLESS ANY ERRORS IN THE GRAND JURY

### 1.   Standard of Review

This Court reviews de novo a district court's denial of a motion to dismiss an

indictment due to alleged errors in grand jury proceedings.   United States v. Caruto,

627 F.3d 759, 762 (9th Cir. 2010).

### 2.   Wilkes's Grand Jury Arguments

Wilkes argues two categories of errors in the grand jury proceedings that led

to his indictment:  (1) violations of Federal Rule of Criminal Procedure 6(e)

[AOB 57-58]; and (2) that the grand jury was improperly charged at the time it was

sworn. [AOB 88-91.]  Regarding the first of these arguments, Wilkes has never

substantiated his most serious claim, that someone showed a reporter a draft copy of

his Indictment, which has never been corroborated by a single reporter.  In any event,

grand jury leaks are the kind of non-structural errors that are rendered harmless by the

trial jury's verdict.  See Navarro, 608 F.3d at 538-40 (structural errors limited to a

"'very narrow class of cases," including complete denial of counsel and racial

74

discrimination in grand jury selection (quoting and citing <u>Neder v. United States</u>, 527 U.S. 1 (1999))).[30/]

As for Wilkes's second argument, it was untimely inasmuch as Wilkes did not raise it until after his trial ended. [ER 232; CR 170.] <u>See</u> Fed. R. Crim. P. 12(b)(3)(a) (motions alleging a defect in instituting the prosecution must be raised before trial). In addition, three months after Wilkes filed the third version of his opening brief, this Court rejected the very same challenges to the grand jury charge that Wilkes belatedly raises here. <u>Caruto</u>, 627 F.3d at 765-68. Moreover, in <u>Navarro</u>, this Court expressly held that an erroneous grand jury charge is a non-structural error that is rendered harmless by a trial jury's guilty verdicts. 608 F.3d 529, 538-40.

## H. WILKES FAILED TO REQUEST A JURY DETERMINATION OF FORFEITURE

Finally, Wilkes complains that the trial court violated his right to a jury determination of forfeiture. [AOB 91.] There is no constitutional right to a jury determination of criminal forfeiture. <u>Libretti v. United States</u>, 516 U.S. 29, at 38-41 (1995). Federal Rule of Criminal Procedure 32.2(b)(4), however, creates a statutory right to a jury determination "[u]pon a party's request." By its terms, this statutory right applies only when a party has made a timely request. Here, neither party requested a jury determination of forfeiture. [SER 226-27, 230-33.] Therefore, the

---

[30/]    The Government does not downplay the importance of grand jury secrecy or the significance of any violations of that secrecy. But such violations should not be a windfall to defendants such as Wilkes, whose right to a fair trial was completely unaffected by the alleged violations here. [SER 245-46 (none of Wilkes's trial jurors had been exposed to *any* pre-indictment information).]

district court was the proper arbiter for this issue. <u>See, e.g.</u>, <u>United States v. Hively</u>, 437 F.3d 752, 763 (8th Cir. 2006) (defendant waived right to challenge judge determination of forfeiture by failing to request jury determination).

VI

<u>CONCLUSION</u>

The Court should affirm Wilkes's conviction.

Dated: March 14, 2011         Respectfully submitted,

LAURA E. DUFFY
United States Attorney

BRUCE R. CASTETTER
Assistant U.S. Attorney
Chief, Appellate Section
Criminal Division

<u>s/Jason A. Forge</u>
JASON A. FORGE
Assistant U. S. Attorney

VALERIE H. CHU
Assistant U. S. Attorney

PHILLIP L. B. HALPERN
Assistant U. S. Attorney

Attorneys for Plaintiff-Appellee
United States of America

76

C.A. Nos. 08-50063/08-50164

<u>CERTIFICATE OF COMPLIANCE</u>

I certify that:

Pursuant to Fed. R. App. P. 32(a)(7)(c) and 9th Cir. R. 32-1, the attached answering brief is:

<u>XX</u>    Proportionately spaced, has a typeface of 14 points or more and contains <u>18,941</u> words (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words; reply briefs must not exceed 7,000 words), or is:

___    Monospaced, has 10.5 or fewer characters per inch and contains 4,675 words or _____ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words or 1,300 lines of text; reply briefs must not exceed 7,000 words or 650 lines of text).


<u>March 14, 2011</u>              <u>s/Jason A. Forge</u>_____
DATE                        JASON A. FORGE
                            Assistant U.S. Attorney

C.A. Nos. 08-50063/08-50164

## STATEMENT OF RELATED CASES

Counsel for the United States is not aware of any related cases which should be considered with this matter.