1   **WO**

2

3

4

5   **IN THE UNITED STATES DISTRICT COURT**

6   **FOR THE DISTRICT OF ARIZONA**

7

8   United States of America,                          No. CR-18-00422-001-PHX-DJH

9                    Plaintiff,                        **ORDER**

10  v.

11  Michael Lacey, et al.,

12                   Defendants.

13

14         A three-month Jury Trial in this matter commenced on August 29, 2023.
15  (Doc. 1741).   At the close of the Government's case, Defendants orally moved for a
16  judgment of acquittal on all charges under Federal Rule of Criminal Procedure 29 ("Rule
17  29").  (Doc. 1903 at 19–93).  The Court exercised its discretion under Rule 29(b) to reserve
18  its ruling until after the Jury returned its verdict.  (Doc. 1852).

19         On November 16, 2023, the Jury returned a verdict that found Defendant Michael
20  Lacey ("Mr. Lacey") guilty of one count of International Concealment Money Laundering
21  (Count 100)[1] and not guilty of one count of International Promotional Money Laundering
22  (Count 63).  (Doc. 1978).  The Jury did not reach a verdict on the remaining counts against
23  Mr. Lacey, which consisted of charges of Conspiracy to Commit Travel Act violations
24  (Count 1); Travel Act violations (Counts 2–51); Conspiracy to Commit Money Laundering
25  (Count 52); Domestic Concealment of Money Laundering (Counts 53–62); International
26  Promotional Money Laundering (Counts 64–68); and Transactional Money Laundering
27  (Counts 69, 70, 81, 83–84, 86, 88–92 and 94–99).  (*See* Docs. 1978; 1981).

28  _____
    [1] All "Count" references are to the Superseding Indictment (Doc. 230).

The Jury found Defendant Scott Spear ("Mr. Spear") guilty of Conspiracy to Commit Travel Act violations (Count 1); the Travel Act violations alleged in Counts 2–18; Conspiracy to Commit Money Laundering (Count 52); Domestic Concealment of Money Laundering (Counts 53–62); and Transactional Money Laundering (Counts 71–78, 85, and 93). He was found not guilty as to the Travel Act violations alleged in Counts 19–51, and the money laundering counts alleged in Counts 63–68.

Defendant John Brunst ("Mr. Brunst") was found guilty of Conspiracy to Commit Travel Act violations (Count 1); Conspiracy to Commit Money Laundering (Count 52); domestic Concealment Money Laundering (Counts 53–62), International Promotional Money Laundering (Counts 64–68); and Transactional Money Laundering (Counts 78–84, 86–93). He was found not guilty of all the Travel Act violations alleged in Counts 2–51, and of one count of International Promotional Money Laundering (Count 63).

Defendants Andrew Padilla ("Mr. Padilla") and Joye Vaught ("Ms. Vaught") were acquitted on all charges in the Superseding Indictment.[2]

Following the verdict, Messrs. Lacey, Brunst, and Spear (collectively, "Defendants") asked to supplement their oral Rule 29 Motions, which the Court granted. Those supplemental motions are now fully briefed.[3] Defendants have also jointly filed a Motion for New Trial (Doc. 2009) under Federal Rule of Criminal Procedure 33 ("Rule 33"), which is also fully briefed.[4]

The Court now issues its ruling.[5]

/ / /

---

[2] In light of their acquittal, Mr. Padilla and Ms. Vaught's oral Rule 29 motions are denied as moot.

[3] Each Defendant joined in their co-Defendant's Supplemental Motion. The briefing on Mr. Lacey's Supplemental Rule 29 Motion is at Docs. 2004; 2020; 2033; the briefing on Mr. Spear's Supplemental Rule 29 Motion is at Docs. 2006; 2021; 2030; and the briefing on Mr. Brunst's Supplemental Rule 29 Motion is at Docs. 2007; 2019; 2029.

[4] The Government's Response is at Doc. 2022 and the Defendants' Reply is at Doc. 2031.

[5] Defendants each request oral argument on their Motions. The Court finds that further oral argument will not aid the Court's decisional process. *See e.g., Partridge v. Reich,* 141 F.3d 920, 926 (9th Cir. 1998); *Lake at Las Vegas Investors Group, Inc. v. Pacific. Dev. Malibu Corp.,* 933 F.2d 724, 729 (9th Cir. 1991).

# I.    BACKGROUND[6]

Considered in the light most favorable to the Government, its proof at trial established the following:

Launched in 2004 in Phoenix, Arizona, Backpage.com ("Backpage") was an online website offering classified ads for a variety of goods and services.  (Trial Tr., Doc. 1786 at 6:6–11).  Defendants owned Backpage with Mr. James Larkin ("Mr. Larkin")[7] from its inception in 2004 until the website was sold to Mr. Carl Ferrer ("Mr. Ferrer") in April of 2015.  (Trial Tr., Doc. 1786 at 11:23–12:5; 78:25–79:1; Trial Ex. 5).  Defendants had leadership roles in Backpage's parent company Village Voice Media ("Village Voice") during that time: Mr. Lacey served as Chief Editorial Officer; Mr. Brunst served as Chief Financial Officer ("CFO"); and Mr. Spear was an Executive Vice President ("VP").  (Trial Ex. 5).  Mr. Larkin was the Chief Executive Officer ("CEO").  (*Id.*)  From 2004 to 2018, Mr. Ferrer was a project manager at Backpage, then became a sales and marketing director of Backpage.  (Trial Tr., Doc. 1786 at 5:25–6:1; 16:4–9).  Mr. Spear was Mr. Ferrer's immediate supervisor.  (*Id.* at 10:5–20).  Mr. Ferrer testified that Messrs. Spear, Larkin and Brunst were his superiors.  (*Id.* at 35).

Mr. Ferrer testified that Backpage was started as a competitor to Craigslist, an online advertising site that "was eroding into the revenue of [Village Voice] newspapers."  (Trial Tr., Doc. 1786 at 25:24–25).  To generate revenue, Backpage initially decided that it would only charge for "Adult" ads.  (*Id.* at 26:10–11).  The Adult section on Backpage contained the categories "Female Escorts"; "Male Escorts"; "Transsexual Escorts"; "Body Rubs"; "Adult Jobs"; and "Phone and Web."  (*Id.* at 6:18–20).  Mr. Ferrer characterized the ads in the Female Escort section of Backpage between 2004 and 2009 as prostitution ads.  (*Id.* at 7:10–12).  These types of ads were profitable because escorts "needed repeat business" so they would often post their ads every day.  (Trial Tr., Doc. 1900 at 96:1–15;

---

[6] The Court's review of the trial evidence was significantly hampered by the fact that neither the Government nor Defendants provided specific citations to the Court's docket in their briefings.

[7] Mr. Larkin's death preceded the commencement of trial.

95:4–96:19).

Messrs. Spear and Ferrer soon realized that Backpage's "Female Escort" section was by far the most profitable section, and so they focused Backpage's growth efforts accordingly. (Trial Tr., Doc. 1786 at 90:12–91:22; Trial Exs. 1056, 1056a, 1057; Trial Tr., Doc. 1900 at 96:1–15). After Craigslist closed its Adult section in 2010, Backpage experienced exponential growth in "revenue from online prostitution ads." (Trial Tr., Doc. 1793 at 35:23–36:9). From 2010 through 2012, Backpage's Adult section yielded $138,850,097.36 compared to $208,658.90 from its non-Adult sections, i.e., a 94.2% difference in profits. (Trial Ex. 1480).

Mr. Ferrer testified at length about Defendants' involvement in the marketing strategies used to grow and/or maintain Backpage's Female Escort section; Defendants' efforts to fend off outside groups' attempts to shut Backpage down; as well as the Defendants' knowledge of Backpage's business practices, Backpage's banking issues, and the sale of Backpage to Mr. Ferrer in 2015.

### A.    "Content Aggregation"

Mr. Ferrer stated that Mr. Spear directed the roll-out of Backpage's "content aggregation" marketing strategy in the early years of Backpage. (Trial Tr., Doc. 1786 at 26:16–24). "Content aggregation" was considered the "internal code for stealing ads from Craigslist"—and more specifically, primarily stealing ads from Craiglist's "Erotic Services" section. (*Id.*) This strategy required staff to identify an Adult escort ad on Craigslist and repost it on Backpage in hopes that the original posters and any responding users would start paying to post ads on Backpage instead of Craigslist. (*Id.* at 27:3–14). Mr. Spear and Mr. Ferrer presented the idea to Mr. Brunst as a strategy to meet growth goals in 2009 because Mr. Brunst's approval was needed to fund the staffing needed to execute this strategy. (Trial Tr., Doc. 1792 at 42:16–43:11; Trial Tr., Doc. 1786 at 30:6–12 and 89:1-90:1–7 (discussing plan to "seed the site, the Female Escorts category, with 200 independent escorts")). Mr. Brunst approved the budget plan and Mr. Spear authorized Mr. Ferrer to use the strategy "in every major metro market in the U.S." (Trial Tr., Doc.

1786 at 29:24–25; Trial Tr., Doc. 1791 at 16:18–20:9; Trial Exs. 10 and 10a).  Around 2010, when Craigslist dropped its Adult section, this type of content aggregation strategy was no longer necessary because Backpage then had "the monopoly" on Adult ads.  (Trial Tr., Doc. 1786 at 20–23).

### B.    Backpage's Relationship with "The Erotic Review"

The "secret sauce" to increasing Backpage's adult ad revenue, as characterized by Mr. Ferrer, was a hyperlink exchange agreement Backpage had with The Erotic Review ("TER"), a prostitution review website described as "Yelp for prostitution."  (Trial Tr., Doc. 1786 at 7) ("Johns who frequent prostitutes . . . post reviews in TER").  Starting around 2006 or 2007, when a person posted a review of their experience on TER, TER would include a link to the ad on Backpage, and vice versa.  (Trial Tr., Doc. 1786 at 32:22–33:7; 39:12–15; Trial Tr., Doc. 1853 at 134:20–136:9).  Under increasing pressure from outside groups to remove links to the TER, Backpage ceased including the hyperlinks in their Adult ads in 2011 or 2012, but still allowed posters to include their TER "ID number." (Trial Tr., Doc. 1786 at 39:22–24; 40:7–10).  TER ID numbers remained on Backpage ads through 2017.  (*Id.* at 40:15).  The TER relationship with Backpage also included a "banner ad exchange program" where each website featured banner-like ads for the other on their respective websites.  (*Id.* at 35:18–37:2).  For years, Backpage paid TER $4,000 per month as part of this relationship.  (*Id.*)

There was evidence showing Messrs. Spear and Brunst were aware of the nature and importance of Backpage's relationship with TER.  Mr. Ferrer discussed the importance of TER referral traffic with Messrs. Spear and Brunst.  (Trial Tr., Doc. 1786 at 41:1–6). Mr. Spear was an author of the 2008 budget plan that was presented to Messrs. Larkin and Brunst detailing the TER partnership.  That plan noted that Backpage had "struck a deal with TheEroticReview.com, TER, with reciprocal links it created huge brand awareness in this niche industry and increased page views from TER by 120,000 per day."  (Trial Ex. 23 at 3; Trial Tr., Doc. 1791 at 70:10–73:20; Trial Tr., Doc. 1972 at 43:12–44:1; Trial Exs. 19, 20).  Mr. Ferrer also submitted TER invoices to Messrs. Spear and Brunst for approval.

1   (Trial Tr., Doc. 1792 at 27:17–28:6, 35:11–12).  Mr. Spear signed the checks for these

2   payments.  (Trial Tr., Doc. 1853 at 142:13–143:5).  Mr. Spear closely tracked the

3   relationship with TER and according to Mr. Ferrer, Mr. Spear understood that "the traffic

4   from The Erotic Review was very, very important for Backpage's success."  (Trial Tr.,

5   Doc. 1792 at 65:5–24, 84:24–85:4).

6        Mr. Ferrer also testified that Messrs. Spear, Brunst, and Larkin regularly received

7   Google Analytics reports showing TER as the number one source of non-search engine

8   referrals to Backpage.  (Trial Tr., Doc. 1786 at 35:6–12, 41:1–7; Trial Tr., Doc. 1791 at

9   21:21–27:5; Trial Exs. 19, 986, 986a, 1151, 1151a, 1919, 1919a, 1924, 1926).

10        **C.**     **"Super Posters"**

11        Backpage also developed an affiliate program with what Mr. Ferrer described as

12   bulk prostitution advertisers, or "super posters." These super posters would have

13   "thousands of prostitution ads that they could bring to the site." (Trial Tr., Doc. 1786 at

14   41:8–19).  Messrs. Larkin and Spear sent Mr. Ferrer to New York City to meet with several

15   of these posters in person.  (*Id*. at 41:20–42:23).  In exchange for posting their ads on

16   Backpage, Backpage gave these super posters VIP treatment, including access to managers

17   like Mr. Ferrer who could provide them advice on how to tailor their ads for Backpage.

18   (Trial Tr., Doc. 1786 at 46:23–47:4).

19        **D.**     **Efforts to Moderate Explicit Ad Content**

20        Mr. Ferrer also testified extensively about Backpage's efforts to moderate ads that

21   otherwise contained sexual content or express offers for prostitution.  He told the Jury that

22   these efforts started as early as 2006 with a PowerPoint prepared by Mr. Spear that aimed

23   at getting rid of ad images depicting sex acts, like "a woman giving a man oral sex."  (Trial

24   Tr., Doc. 1786 at 58:2–19 (stating that Mr. Spear coined a standard of "between Hustler

25   and Playboy . . .  [t]hat meant sex act pics needed to go and you could still have full nudity

26   but couldn't have extreme closeups of genitalia"), 65:1).  The removal of such images,

27   however, did not mean the whole ad was removed or that the user was blocked from posting

28   on Backpage.  (*Id.* at 59:3–6, 60:7, 66:7–10).  "[T]he moderation department's main

priority was to not ban prostitution advertisers but to provide tools and mechanisms to coach them.  It was about growing revenue and not removing illegal content." (Trial Tr., Doc. 1824 at 25:18–21).  Mr. Spear would direct Mr. Ferrer to scrub ads to edit and remove sex act images and sex act language. (Trial Tr., Doc. 1792 at 9–11).  Mr. Ferrer told TER that Mr. Spear wanted the ads to be "less escort-ish", meaning that if the ads looked less like prostitution they could maintain credibility.  (Trial Tr., Doc. 1792 at 60–61; Trial Ex. 574).  Mr. Ferrer explained that "[w]e wanted to keep that veneer of credibility of being like a Craigslist even though we were entirely -- almost entirely prostitution head-based revenue." (Trial Tr., Doc. 1792 at 60:25–61:2).

Backpage also began sanitizing the site of certain "terms [that] made the ads more obvious prostitution[.]"  (Trial Tr., Doc. 1786 at 60:8–10, 60:15–17).  For example, the terms "incall and outcall" were terms associated with prostitution and indicated whether the prostitute would come to the customer, or the customer would go to the prostitute. (Trial Tr., Doc. 1923 at 60).  Mr. Ferrer testified that they "started removing those words from the ad but not deleting the ad."  (*Id.* at 60:17–18).  Mr. Spear was responsible for Backpage's terms of use, which he continually modified.  (Trial Tr., Doc. 1791 at 14:15-21).  He also continued to approve changes to moderation guidelines.  (Trial Tr., Doc. 1808 at 92:10–19; Trial Ex. 1612b; Trial Tr., Doc. 1810 at 98:14–19; Trial Exs. 725, 725b).  Mr. Ferrer said Mr. Spear approved changes to the terms and images that were allowed and sent Mr. Ferrer specific emails with ads "that need to be cleaned up, edited."  (Trial Tr., Doc. 1791 at 92:71–0; Trial Tr., Doc. 1792 at 10:2–8).  Messrs. Spear and Ferrer also had knowledge of specific terms that needed to be changed, for example, changing "Greek" to "G-R-3-3-K" (Trial Tr., Doc. 1972 at 85–88; Trial Exs. 585, 585a); "hooker" to "Female Escort" (Trial Tr., Doc. 1786 at 90–91; Trial Exs. 1056 and 1056a); and using the term "roses" for "cash" (Trial Tr., Doc. 1793 at 13–14).  Mr. Ferrer would alert Mr. Spear when local papers raised concerns about terms used in Backpage ads, or when advertisers complained that their ads were being removed for including coded terms.  (Trial Tr., Doc. 1791 at 27–35; Trial Ex. 2).  Mr. Spear was alerted to these issues because he was Mr. Ferrer's boss and had the ability to resolve the conflict.  (*Id.*)

Mr. Ferrer testified that ad content moderation became increasingly challenging as they had to clean up ads in various markets, like South Carolina, where they were under scrutiny.  (Trial Tr., Doc. 1792 at 73–75; Trial Ex. 579).  Ultimately, Mr. Spear decided to hire a company called El Camino to assist with ad clean-up efforts.  (Trial Tr., Doc. 1793 at 86–87).   Messrs. Spear, Larkin, and Brunst approved the needed budget increases for content moderation, with Mr. Spear responding to one such request with: "Approved.  Go get em."  (Trial Tr., Doc. 1792 at 106:21–107:2; Trial Tr., Doc. 1793 at 31:13).  Near the end of 2012, Messrs. Larkin, Brunst, and Spear asked Mr. Ferrer to provide a comparison of revenue growth by sections from October 2010 to November 2012.  (Trial Tr., Doc. 1811 at 64:6–66:1; Trial Exs. 355, 355b).  The comparison showed huge growth in Adult compared to all other sections, which Mr. Ferrer attributed to Backpage's moderation strategy.  (Trial Tr., Doc. 1811 at 65:19–20; 65:23–66:1).

In 2012, Backpage hired attorney Elizabeth McDougall to supervise content moderation of Backpage ads.[8]  Despite her role, Mr. Ferrer said "she was sidelined a good portion" of the time.  (Trial Tr., Doc. 1831 at 59:17–60:7; 60:9–10).

### E.   Responses to Public and Law Enforcement Concerns

Following the shutdown of the Adult escort ads on Craigslist and subsequent migration of ads to Backpage in 2010 and after several State Attorneys Generals ("AGs") began criticizing Backpage's "rampant" prostitution advertising, Backpage started receiving thousands of prostitution investigation subpoenas.  (*See, e.g.*, Trial Tr., Doc. 1791 at 62:16–25; Trial Tr., Doc. 1786 at 47:9–49:12; Trial Ex. 52).  Messrs. Spear, Ferrer, and Larkin had "watched Craigslist be attacked by the Attorneys General and were very concerned that [they were] next[.]"  (Trial Tr., Doc. 1786 at 48:18–25, 49:7–15).

The number of subpoenas became so plentiful that Messrs. Spear and Brunst approved hiring staff to respond to them.  (Trial Tr., Doc. 1791 at 62:11–15, 63:11–21, 65:4–9).  Mr. Lacey became aware that Backpage was receiving such subpoenas and in April 2010, he asked Mr. Spear whether there was evidence of child trafficking on the site.

---

[8] Defendants refused to waive the attorney-client privilege regarding their communications with Ms. McDougall.

1    Mr. Spear replied that: "[w]e have had subpoenas that deal with this exact issue. . . . We

2    get a ton of subpoenas that we comply with on a daily basis."  (Trial Ex. 804).

3         Mr. Ferrer testified that they discussed a "slow dance strategy with the Attorney

4    Generals" that Mr. Ferrer described as giving the AGs "very, very little but creat[ing] the

5    impression that we're doing something," without harming revenue.  (Trial Tr., Doc. 1792

6    at 93:9–22, 94:1–4).  To gain the AGs' "blessing," Messrs. Larkin and Spear directed Mr.

7    Ferrer to "not throw the baby out with the bathwater" and "implement the changes

8    gradually, [so] we won't lose revenue[.]"  (Trial Tr., Doc. 1795 at 25:20–26:7; Trial Ex.

9    1021; Trial Tr., Doc. 1809 at 30:3–4).  Mr. Ferrer continued to meet with Messrs. Larkin

10   and Spear about these changes, communicated the results to staff, and solicited further

11   changes "to get approved by [Mr. Spear]."  (Trial Tr., Doc. 1808 at 20:11–14, 22:11–12;

12   Trial Exs. 73, 610).

13        In late 2010, Backpage learned CNN was planning an exposé on Backpage.  (Trial

14   Tr., Doc. 1793 at 80:20–21).  It showed CNN reporter Amber Lyon posting an ad of herself

15   on Backpage's Escorts section, using text from an old Backpage ad offering a 12-year-old

16   girl for sex.  (Trial Ex. 1052b1).  When Lyon posted her ad, her phone immediately

17   "start[ed] ringing off the hook." (Trial Tr., Doc. 1808 at 59:16–23).  Messrs. Lacey, Spear,

18   and Brunst tried to stop rebroadcasts of the story.  (Id. at 60:10–62:13).  Backpage

19   management watched and discussed the CNN report in early 2011.  (Id. at 43:15–44:7).

20        Following the broadcast, Backpage faced more pressure to remove any references

21   to TER.  (Trial Tr., Doc. 1808 at 82:7–16).  By January 2011, Messrs. Spear and Ferrer

22   agreed that moderators should remove "TER links in ads," though they still allowed "users

23   to put [in] TER IDs (just no live links)."  (Trial Tr., Doc. 1808 at 24:10–19; 82; Trial. Exs.

24   73, 647).  Mr. Ferrer testified that removing the links would not hurt revenue because the

25   johns responding to Backpage prostitution ads knew "that when it says 'highly reviewed'

26   and then an ID number that [TER] is the place to go" to look for the advertiser's review.

27   (Trial Tr., Doc. 1808 at 25:12–19).

28        Backpage also hired internet safety experts, who recommended screening ads

bought with prepaid cards because this was an "indicator [of] a potential trafficking ad." (Trial Tr., Doc. 1809 at 36:2–8). Messrs. Spear, Larkin, and Ferrer rejected that change, because "up to 70 percent of our transactions came from prepaid cards[.]" (*Id.* at 36:9–19). They also ignored recommendations to completely remove ads visited from TER. (*Id.* at 37:13–38:11).

### F.    Backpage's Banking Problems

By 2012, U.S. financial institutions were dropping Backpage as a customer due to its reputation for hosting ads that were resulting in prostitution and human trafficking. (Trial Ex. 2042). In 2013, Backpage was dropped by its U.S.-based credit card processor, Litle. (Trial Tr., Doc. 1786 at 69:17–70:8). That same year, Chase Bank informed Backpage that it "was no longer accepting transactions from Backpage.com, due to their involvement in human trafficking." (Trial Ex. 173). The banks' refusal to do business with Backpage meant Backpage had to expend tremendous efforts in finding ways for users to pay for ads. (Trial Tr., Doc. 1812 at 29:7–16). One example that proved successful was Backpage's acceptance of the cash for credit Vanilla Visa card which enabled anonymous payment for ads. (Trial Tr., Doc 1786 at 75–76).

Mr. Ferrer testified that he worked closely with Messrs. Brunst, Spear, and Larkin during this time "to secure credit card processing from Europe." (Trial Tr., Doc. 1812 at 14:22–15:7). For example, after Chase Bank stopped accepting Backpage transactions, Backpage directed Chase credit card purchasers to e-Merchant Pay ("EMP"), a European processor that would "use a different billing descriptor that won't say Backpage.com on it." (Trial Tr., Doc. 1812 at 21:7–22; Trial Exs. 173; 1110). In September 2013, Mr. Ferrer wrote Messrs. Brunst and Spear about using Netcash, a Cyprus-based credit card processor. (Trial Tr., Doc. 1812 at 13:3–8; Trial Ex. 1092). In October 2013, Mr. Ferrer exchanged emails with Mr. Brunst, copying Messrs. Larkin and Spear, about getting the CCBill contract signed, and Mr. Ferrer's discussions with "JetPay" regarding other banking solutions that would enable users to pay for Backpage ads. (Trial Tr., Doc. 1812 at 31:12–37:23; Trial Ex. 752).

Backpage also sought the assistance of an outside consultant.  In November 2013, Mr. Ferrer sent Messrs. Larkin, Brunst, and Spear the consultant's recommendations on credit card transactions.  (Trial Tr., Doc. 1812 at 37:24–40:13; Trial Ex. 175).  Those recommendations included using names, internet addresses, and billing descriptors that would not include the name "Backpage."  (Trial Tr., Doc. 1812 at 38:24–42:22; Trial Ex. 175).  The recommendations also included "load balancing across many banks with different billing descriptors." (*Id.* at 38:10–23; Trial Ex. 175).  Mr. Ferrer explained that this meant "adding a lot of banks" and "distributing . . . transactions" to stay below thresholds that would otherwise trigger reviews by Mastercard and Visa.  (Trial Tr., Doc. 1812 at 38:10–23).  In implementing these recommendations, Backpage formed an entity called Classified Solutions in England that could do credit card processing with EMP in Bulgaria; it then spread payments from EMP across other banks including Borgun in Iceland and Bank Frick in Liechtenstein.  (*Id.* at 43:18–44:6; Trial Tr., Doc. 1814 at 76:3; Trial Ex. 6189).  Mr. Brunst, who continued to serve as Backpage's CFO, avoided using a "backpage.com" email address because of the "reputational risk" of being associated with Backpage.  (Trial Tr., Doc. 1812 at 14:2–9; 13:9–14:1).  Indeed, when a Backpage employee asked Mr. Brunst whether they could replace their "backpage.com" email addresses with "websitetechnologies.com," Mr. Brunst replied: "We need to think this thru or all the work to separate it from BP will be lost."  (Trial Ex. 177).

Backpage executives also "opened up holding companies with innocuous names like Classified Solutions, Payment Solutions, just general-sounding companies" that did not say Backpage.  (Trial Tr., Doc. 1812 at 15:12–23; Trial Tr., Doc. 1853 at 74:13–14).  Mr. Ferrer testified that Mr. Brunst created a separate "shell company" called Website Technologies, for the purpose of opening bank accounts under a name that was not Backpage.  (Trial Tr., Doc. 1814 at 89:8–10; *see also* Trial Tr., Doc. 1812 at 28:19–26 ("We needed a name other than Backpage . . . . Brunst asked me for names and I suggested Website Technologies and that's the name we ended up using."); Trial Tr., Doc. 1812 at 71:17–72:4 ("[Brunst] set up Website Technologies to handle payroll, 401(k) and to do

leases so he wants to ensure that its reputation is protected, not affiliated with Backpage."); Trial Tr., Doc. 1814 at 89:8–10 ("Posting Solutions was another shell company similar to, like, Website Technologies, very generic sounding company that we could open bank accounts with."). The money that flowed through Website Technologies, which Mr. Ferrer described as "the same company" as Backpage, derived "from postings in the Female Escorts section primarily." (Trial Tr., Doc. 1814 at 90:16–22; 11:23–12:4; *see also* Trial Tr., Doc. 1923 at 138 (Mr. Thai confirming that Website Technologies held Backpage.com revenue)).

When US Bank gave notice in April 2014 that it was dropping Backpage, Mr. Brunst informed Messrs. Spear, Ferrer, and others that Backpage would be moving "all banking under Website Technologies at BMO." (Trial Tr., Doc. 1812 at 72:5–73:4; Trial Exs. 178, 178a). That same month, Mr. Ferrer emailed Messrs. Brunst and Spear to tell them that Chase had "figured . . . out" that Backpage had temporarily succeeded in allowing customers to use Chase credit cards for adult ads by using "a different billing descriptor," "so we just have to change again." (Trial Ex. 1120; Trial Tr., Doc. 1812 at 90:17–24, 91:25–92:4).

### G. Sale of Backpage to Mr. Ferrer in 2015

As early as 2011, the Backpage owners were looking to sell the website, efforts that were led by Mr. Brunst. (Trial Tr., Doc. 1810 at 16:4–16:6, 17:11–18:2). Mr. Brunst asked Mr. Ferrer to help create a PowerPoint presentation to give to Backpage's potential buyers. (Trial Tr., Doc. 1810 at 15:17–16:6). That PowerPoint included a slide on revenue, which showed that nearly 80% of Backpage's revenue derived from the Female Escorts section and over 94% of the revenue was generated from the Adult category. (Trial Exs. 120 at 15, 17). Mr. Ferrer testified that "[i]n order to sell the site, we couldn't sell it as a prostitution review site so we had to make it look and sound like a general classified site." (Trial Tr., Doc. 1810 at 21:23–25). The PowerPoint presentation Brunst created and presented to buyers contained the statement that: "[m]aintaining a vibrant general purpose classifieds site strengthens Backpage's defensible market position in the Adult category:

1   Creates mainstream environment for site participants and allows 'plausible deniability' for

2   exposure." (Trial Ex. 120 at 17).  The Defendants discussed not sharing information of the

3   "prostitution ad marketing activities" with potential buyers.  (Trial Tr. Doc. 1786 at 76–

4   77).  These early attempts to sell Backpage were ultimately unsuccessful.

5        Mr. Ferrer testified that Backpage revenue from 2014 through 2015 was annually

6   around $150 to $160 million.  (Trial Tr., Doc. 1786 at 80:10–17).  In April 2015, Messrs.

7   Lacey, Larkin, Brunst, and Spear sold Backpage to Mr. Ferrer for approximately $600

8   million.  (Trial Tr., Doc. 1814 at 15:21; Trial Tr., Doc. 1923 at 130:19–21).  The sale

9   consisted of two loan agreements: a larger loan representing the sale of the U.S. portion of

10  Backpage (Trial Ex. 5427) and a smaller loan representing the sale of the foreign portion

11  of Backpage (Trial Ex. 5459).  Cereus Properties, a company owned by Messrs. Lacey,

12  Larkin, Brunst, and Spear, collected the interest and debt payments from the $600 million

13  loan. (Trial Tr., Doc. 1814 at 90:24–91:3).  Mr. Ferrer testified that the source of the money

14  that went to Cereus Properties "was the prostitution ads posted on Backpage."  (*Id.* at

15  91:16–17).

16       Mr. Ferrer testified that the sale of Backpage was intended to distance the

17  Defendants from Backpage's business of selling illegal ads for prostitution.  But Mr. Ferrer

18  also testified that even after the sale, both Messrs. Brunst and Spear stayed involved in the

19  business of Backpage.   For example, after Visa, Mastercard, and American Express

20  dropped Backpage in the middle of 2015, Mr. Brunst assisted Backpage in trying to obtain

21  credit card processing.  (Trial Tr., Doc. 1786 at 81:7–16).  Mr. Ferrer testified that Mr.

22  Brunst "was involved in the financial problems the company was having and wanted to

23  understand the revenue that was coming in and what our options were for banking and

24  when we might, you know, get the reserves coming from these other credit card

25  processors[.]" (*Id.* at 81:2–82:3).  Either Mr. Ferrer or Backpage's CFO had contact with

26  Mr. Brunst "[a] minimum of a few times a week" from July 2015 going forward.  (Trial

27  Tr., Doc. 1786 at 82:4–8).  Mr. Brunst also helped find alternative methods for receiving

28  money from posters on Backpage, including receiving payment by cryptocurrency.  (Trial

Ex. 897; Trial Tr., Doc. 1814 at 78:19–79:19; 93:24–94:20).    Evidence showed that in January 2015, revenue from cryptocurrency amounted to $35,540.68, but by May 2016, it had reached a high of $3,564,376.24.  (Trial Ex. 1545).

### H.    Money Transfers and Transactions

Starting in 2015, the year that Backpage was sold to Mr. Ferrer, revenue from Backpage was split between Backpage, Website Technologies, and Ad Tech BV, a company registered in the Netherlands.  (Trial Tr. Doc. 1923 at 129–30; Trial Ex. 1481). Following the sale, and until the Backpage website was shut down by the federal government in 2018, revenue from Backpage was only sent to and divided between Website Technologies and Ad Tech BV.  (Trial Tr., Doc. 1923 at 131:23–132:1).

Mr. Ferrer testified that following the 2015 sale, Backpage proceeds going to Website Technologies derived "from postings in the Female Escort section primarily." (Trial Tr., Doc. 1814 at 90:20–22).  The Government's financial expert Quoc Thai ("Mr. Thai") described how money "relating to funds from Backpage.com and through the various entities ultimately land[ed] in the accounts of the defendants."  (Trial Tr., Doc. 1923 at 135:6-8).  Mr. Thai did not provide testimony as to the purpose of the transfers. His testimony, along with Mr. Ferrer's, formed much of the basis of the money laundering counts against the Defendants.

### 1.    18 U.S.C. § 1956 Charges: Counts 53–62 and 64–68

Mr. Thai testified that the transfers in Counts 53–62 for concealment money laundering against Messrs. Lacey, Brunst, and Spear were made from a Website Technologies bank account to a bank account held by Cereus Properties at Arizona Bank & Trust.  (Trial Tr., Doc. 1923 at 136–138; Trial Ex. 1479).  He said the transfers in these Counts occurred between the three-month period of May 18, 2016, and August 16, 2016, and totaled close to $17 million.  (*Id.*)  Cereus Properties "collected the interest and debt payments from the $600 million loan" from the sale of Backpage.  (Trial Tr., Doc. 1814 at 91:2–3).  Mr. Ferrer testified that the source of the monies paid to Cereus Properties "was

the prostitution ads posted on Backpage and/or Cracker.[9]"  (Trial Tr., Doc. 1814 at 90:3–7; 90:20–22; 91:16–17).  Mr. Thai testified that between December 31, 2015, to August 31, 2016, Website Technologies transferred a total of $39,249,211.37 to Cereus Properties. (Trial Tr., Doc. 1923 at 148:22; Trial Ex. 1691).

Mr. Thai testified that the transfers in Counts 64–68 against Messrs. Lacey and Brunst for international promotional money laundering were made from a Netherlands bank account of Ad Tech B.V. to a bank account held by Cereus Properties.   (Trial Tr., Doc. 1928 at 150–51; Trial Ex. 1479).  These transfers occurred between August 5, 2016, and November 15, 2016, and totaled approximately $11.3 million.  (*Id.*)

### 2.    18 U.S.C. § 1957 Charges: Counts 69–99

### a.    Camarillo Holdings Transfers

Counts 69–77, and 85 charge Defendants with transactional money laundering related to transfers made from an entity called Camarillo Holdings, LLC ("Camarillo Holdings").  Mr. Thai testified that Camarillo Holdings was an entity owed by Defendants that would receive funds derived from Backpage to pay "the various owners and the various payroll responsibilities of, you know, the Backpage.com as a whole."  (Trial Tr., Doc. 1923 at 153:13–18; Trial Tr., Doc. 1898 at 15:2–3).  Mr. Brunst was the CFO of Camarillo Holdings.  (*Id.* at 153:23).   The evidence showed that between February 4 and 25, 2013, $6.5 million was transferred from a US Bank account held by Backpage.com to a BMO Harris Bank account held by Camarillo Holdings.  (Trial Ex. 1479).  Mr. Thai stated that between February 4, 2013, and June 9, 2014, transfers from this Backpage.com account to Camarillo Holdings amounted to approximately $99 million.  (Trial Tr., Doc. 1898 at 12:6–7).  All of these funds were Backpage proceeds.  (*Id.* at 12:8–9).

The specific transfers at issue in Counts 69–77, and 85 are transfers Messrs. Lacey and Spear made out of their personal bank accounts after receiving deposits from Camarillo Holdings.

---

[9] Mr. Ferrer testified that Cracker was a classified Australian site "that like Backpage, was predominantly prostitution."  (Trial Tr., Doc. 1813 at 24–25).

Counts 69 and 70 are against Messrs. Lacey and Brunst (presumedly because there was evidence that Mr. Brunst was CFO of Camarillo Holdings and a signor on that entity's bank account). Trial evidence showed that on May 17, 2013, and August 30, 2013, Camarillo Holdings transferred $10,194.87 to Mr. Lacey's Bank of America account and $3,0171,687.50 to Mr. Lacey's BMO Harris Bank account, respectively. (Trial Ex. 1479). Mr. Lacey subsequently transferred a check in the amount of $30,000.00 out of his Bank of America account and a cashier's check in the amount of $62,491.47 from his BMO Harris account to Stewart Title. (Trial Ex. 1479). Mr. Lacey's transfers to Stewart Title are the bases for Counts 69 and 70.

Counts 71–77 and 85 are against Mr. Spear. Trial evidence showed that between April 12, 2013, and June 11, 2014, in over 13 transactions, Camarillo Holdings transferred $2,672,770.54 to Spear's account at National Bank of Arizona. (Trial Ex. 1479). Mr. Thai testified that between April 12, 2013, to November 2, 2015, Camarillo Holdings transferred a total of $6,279,188.53 to Spear's account at National Bank of America. (Trial Tr., Doc. 1898 at 16–17; Trial Ex. 1689). The transfers forming the basis of Counts 71–77 were made between June 11, 2014, and December 1, 2015, out of Mr. Spear's National Bank of Arizona account. Count 71 is a $300,000.00 transfer to the Scott G. Spear & Ellona Spear Family Trust; Count 72 is a $200,000.00 transfer to Scott G. Spear TD Ameritrade; Count 73 is a $1,000,000.00 transfer to UBS Financial Services; Count 74 is a $250,000.00 transfer to Lincoln National Life; Count 75 is a $50,000.00 transfer to Industrial Property Trust; Count 76 is a $300,000.00 transfer to Ally Bank; and Count 77 is a $200,000.00 transfer to Wells Fargo Advisors. (Trial Ex. 1479). Count 85 relates to a July 22, 2016, $50,000.00 transfer from Mr. Spear's National Bank of Arizona account to a Strategic Storage Trust II, Inc. (*Id.*)

### b. Cereus Properties Transfers

Counts 78–84 and 85–93 charge Messrs. Lacey, Brunst, and Spear with transactional money laundering related to transfers made from Cereus Properties. Mr. Brunst was Cereus Properties' CFO and was a signatory on its bank accounts. (Trial Tr.,

Doc. 1898 at 20:8–25; 21:1–4).  Mr. Thai testified that Cereus Properties obtained all of its funds from Website Technologies, which in turn obtained all of its funds from Backpage proceeds.  (*Id.* at 19:22–25).

Counts 78–84 and 85–93 stem from transfers Cereus Properties made to bank accounts owned by Defendants and Mr. Larkin.  Mr. Thai testified that between January 11, 2016, and January 4, 2017, Cereus Properties transferred a total of $22,941,500.83 to Mr. Spear's National Bank of America account.  (Trial Ex. 1690; Trial Tr., Doc. 1898 at 19:13–15).  His review also showed that during the same period, Cereus Properties transferred a total of $30,353,596.20 to Mr. Lacey's accounts at Arizona Bank and Trust. (Trial Ex. 1693; Trial Tr. Doc. 1898 at 23; Trial Ex. 1479).

Counts 78 and 93 are against Messrs. Spear and Brunst.  Mr. Thai testified that Cereus Properties transferred $133,045.00 to Spear's National Bank of America account on January 11, 2016 (Count 78), and another $141,444.00 on October 6, 2016 (Count 93). (Trial Exs. 1479, 1690; Trial Tr., Doc. 1898 at 20; 29:6–9).

Counts 79, 80, 82, 87 are against Mr. Brunst.  Evidence showed that in the first month of 2016, Website Technologies had transferred $3,126,033.07 to Cereus Properties. (Trial Exs. 1479; 1691; Trial Tr., Doc. 1898 at 21:8).  On January 26, 2016, Cereus Properties transferred $101,974.00 to Mr. Brunst's account at Wells Fargo Bank (Count 79) and on April 1, 2016, it transferred another $220,944.00 ) (Count 82).  (Trial Ex. 1479; Trial Tr., Doc. 1898 at 21:7–10).  Counts 80 and 87 relate to a $1,507,944.00 transfer on February 3, 2016, and a $1,206,356.00 transfer on October 6, 2016, from Cereus Properties to the accounts of Mr. Larkin.  (Trial Ex. 1479).

Counts 81, 86, 88, 89, 90, 91, and 92 are against Messrs. Lacey and Brunst.  They reflect transfers from Cereus Properties to various accounts of Mr. Lacey at Bank of America, Wells Fargo, and Arizona Bank and Trust between March 1, 2016, and October 6, 2016.  (Trial Ex. 1479; Trial Tr. Doc. 1898 at 22; 27–29).

Counts 83 and 84 are against Messrs. Lacey and Brunst.  They reflect transfers from Mr. Lacey's Arizona Bank and Trust account to Fidelity National Title Company.  (Trial

Ex. 1479).  The first transfer on June 27, 2016, for $397,500.00, was earnest money on a property Mr. Lacey purchased in San Francisco.  (Trial Ex. 1479; Trial Tr., Doc. 1898 at 25).  The second transfer on July 20, 2016, for $12,859,152.57, was the balance on the property.  (*Id.*)  Mr. Thai testified that these funds, like others, traced back to transfers that Website Technologies made to Cereus Properties, and Cereus Properties subsequently transferred to Mr. Lacey.  (Trial Tr., Doc. 1898 at 26:3–5).

### 3. 18 U.S.C. §§ 1956 and 1957 Charges Against Mr. Lacey: Counts 94–100

Counts 94–99 consist of five wire transfers made on January 29, 2016, each in the amount of $3.3 million, from Mr. Lacey's five annuity trust accounts at Arizona Bank and Trust to an IOLTA[10] account held by Mr. Lacey's attorney's firm at Johnson Bank.  On January 3, 2017, Mr. Lacey, through his attorney, transferred $16.5 million from the IOLTA account at Arizona Johnson Bank to a Primus Trust Company in Hungary for the benefit of Mr. Lacey at a Hungarian bank, K& H Bank.  (Trial Tr., Doc. 1898 at 30:10–12).  This transfer forms the basis of Count 100.

## II. DEFENDANTS' RULE 29 MOTIONS

Rule 29 obligates the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.  Fed. R. Crim. P. 29(a), (c).  However, "[t]he hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high."  *United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010).  "When evaluating a sufficiency challenge, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Singh*, 995 F.3d 1069, 1075 (9th Cir. 2021) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  In so considering, the court "must bear in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw

---

[10] An IOLTA is an "Interest on Lawyers' Trust Account" which is a non-interest-bearing account a lawyer holds on behalf of a client for services not yet performed.

reasonable inferences from proven facts." *United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977) (internal quotation marks and citation omitted). Stated differently, "the government does not need to rebut all reasonable interpretations of the evidence that would establish the defendant's innocence, or 'rule out every hypothesis except that of guilt beyond a reasonable doubt.'" *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (quoting *Jackson*, 443 U.S. at 326). "[A]ny conflicts in the evidence are to be resolved in favor of the jury's verdict." *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1201–02 (9th Cir. 2000).

Defendants' Rule 29 Motions challenge the sufficiency of evidence on all the Counts on which they were charged and/or found guilty. They also make various legal challenges to their convictions. The Court will address each Count in turn.

### A.      Conspiracy to Facilitate the Promotion of Prostitution (Count 1)

The Jury found Messrs. Spear and Brunst guilty of conspiracy to commit Travel Act violations under 18 U.S.C. § 371 but did not reach a verdict on this charge as to Mr. Lacey. "To prove a conspiracy under 18 U.S.C. § 371, the government must establish: (1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime." *United States v. Kaplan*, 836 F.3d 1199, 1212 (9th Cir. 2016) (citation and internal quotation marks omitted).

The Government's theory for this count was that between 2004–2018, there was an agreement among the Defendants to facilitate the promotion of prostitution businesses by posting their sex for money ads on Backpage, as charged in the Travel Act Counts; that each Defendant became a member of the conspiracy knowing of at least one of its objects— "to make money"—and intending to help accomplish it; and that one of the members of the conspiracy performed at least one overt act on or after March 28, 2013, for the purpose of carrying out the conspiracy. (Doc. 1998 at 24).

Defendants argue that they are entitled to judgments of acquittal on Count 1. They contend the Government did not establish the existence of a conspiracy specifically related

1    to the ads charged in Counts 2–51.  (Doc. 2007 at 6–8).  Defendants also argue that they

2    cannot be guilty of conspiracy to violate the Travel Act because the alleged purpose of the

3    charged conspiracy—to make money—is entirely lawful and it is impossible to tell if the

4    Jury convicted Messrs. Spear and Brunst on a legally permissible object of the conspiracy.

5    (*Id.* at 9–10).

6                    **1.      Agreement to Publish One of the 50 Travel Act Ads**

7            Defendants first argue that the Government failed to show there was a specific

8    agreement to commit the substantive crimes tied to the 50 Travel Act ads charged in Counts

9    2–51.  (Doc. 1903 at 30; Doc. 2007 at 11).  They state it is not sufficient for the Government

10   to vaguely proffer there may have been ads that were posted between 2013 and 2018 that

11   could have been for prostitution.  (Doc. 1903 at 31).

12          Defendants' proffered standard for a specific, detailed agreement tied to the 50 ads

13   is too stringent.  The Superseding Indictment alleged that the Defendants conspired to

14   facilitate prostitution in violation of the Travel Act.  (Doc. 230 at 49).  Unlike the

15   substantive Travel Act counts, the conspiracy allegations were not specifically tied to the

16   50 ads.  To establish the conspiracy, the Government had to show there was an agreement

17   to facilitate the promotion of prostitution businesses by posting sex for money ads on

18   Backpage.  (*Id.*)

19          Viewing the evidence in the light most favorable to the Government, the Court finds

20   there is sufficient evidence supporting the existence of an agreement among the

21   Defendants, as framed by the Government, to work together toward the goal of making

22   money by helping prostitution posters make their ads look less obviously like prostitution

23   ads.  The Government argued that this collective effort was a "deliberate and intentional

24   effort to allow the continued promotion and facilitation of prostitution and to assist

25   Backpage's customers by helping them . . . use Backpage as a platform for doing that."

26   (Doc. 1903 at 79).

27          "An agreement to commit a crime can be explicit or tacit, and can be proved by

28   direct or circumstantial evidence, including inferences from circumstantial evidence."

- 20 -

*Kaplan*, 836 F.3d at 1212 (quotation marks and citation omitted); *see also United States v. Gonzalez*, 906 F.3d 784, 792 (9th Cir. 2018) (noting that a tacit agreement is sufficient for a conspiracy conviction).  "[I]t is sufficient if the conspirators knew or had reason to know of the scope of the conspiracy and that their own benefits depended on the success of the venture." *United States v. Montgomery*, 384 F.3d 1050, 1062 (9th Cir. 2004) (citing *United States v. Romero*, 282 F.3d 683, 687 (9th Cir. 2002)).  "Typically, the inference of an overall agreement is drawn from proof of a single objective, or from proof that the key participants and the method of operation remained constant throughout the conspiracy." *United States v. Duran*, 189 F.3d 1071, 1080 (9th Cir. 1999) (internal citations omitted).

Here, the alleged objective of the conspiracy was to make money through the unlawful means of posting prostitution ads for prostitution businesses.  At trial, the Government offered evidence that Messrs. Lacey, Spear, and Brunst knew the demand for Adult ads was especially high in proportion to Backpage's total business; that Backpage derived the majority of its revenues from its Female Escort section—ads Mr. Ferrer characterized as prostitution ads; and that the sale of ads that led to prostitution offenses became the dominant portion of Backpage's business.

There was also evidence that each of these Defendants were on notice by law enforcement, State Attorneys General, non-profits, and the media that a portion of Backpage's escort ads were in fact leading to prostitution offenses.  *Direct Sales Co. v. United States*, 319 U.S. 703, 707 (1943) (where the manufacturer had sold quantities of morphine to the physician "*so frequently* and *over so long a period* it must have known he . . . was therefore distributing the drug illegally").[11]  Mr. Ferrer further testified that this

---

[11] Noting that an overt act in furtherance of a conspiracy must occur within the applicable statute of limitations, Mr. Spear argues that "the substantial majority" of evidence was improperly considered because it occurred before March 28, 2013.  (Doc. 2006 at 13).  *See also Grunewald v. United States*, 353 U.S. 391, 396–97 (1957).  The Jury was properly instructed to consider whether "one of the members of the conspiracy performed at least one overt act on or after March 28, 2013, for the purpose of carrying out the conspiracy." (Doc. 1989 at 24).  This does not mean, however, that the Jury improperly considered facts related to the existence of the conspiracy that occurred prior to March 28, 2013, which was alleged to have spanned from 2004 to 2018.  (*See* Doc. 1643 at 4 ("[T]he Court has already clarified that the Government may introduce proof of the entirety of the scope of the conspiracy.")).

knowledge resulted in the "slow dance" strategy of pretending to work with law enforcement by responding to subpoenas while simultaneously modifying Backpages moderation practices to ensure it could continue to be used as a prostitution advertisement platform. (Trial Tr., Doc. 1792 at 93–94). Evidence was also offered that suggested Defendants' structured Backpage in a way to ensure the majority of its revenues were derived from prostitution ads to their financial benefit. (Trial Tr., Doc. 1903 at 65–66).

With regard to Mr. Brunst, Mr. Ferrer testified that he and Mr. Spear presented their content aggregation marketing strategy to Mr. Brunst and had to obtain Mr. Brunst's approval for the budget needed to staff the plan. (Trial Tr., Doc. 1792 at 42:16–43:11; Trial Tr., Doc. 1791 at 20:6–13). Mr. Brunst argues that his participation in Backpage's annual budget meetings is insufficient proof of his agreement to violate the Travel Act. But the Supreme Court has stated that a defendant's stake in making the profits which he knew could come only from its encouragement of illicit operations evinces "informed and interested cooperation, stimulation, instigation." *Direct Sales Co.*, 319 U.S. at 713. Again, the Government offered evidence that the sale of Backpage ads that ultimately led to prostitution offenses became the dominant portion of Backpage's business, and Mr. Brunst's participation in structuring Backpage to maintain its longevity and maximize profits from these sales was sufficient.

With regard to Mr. Spear, the Government offered evidence showing Mr. Spear knew that removing certain words and replacing them with certain coded words and phrases made escort ads less susceptible to appearing like blatant prostitution ads. The Government also adduced evidence showing that Messrs. Ferrer, Spear, and Brunst internally knew the purpose of TER and knew that Adult escort ads published on Backpage were linked to the reviews on TER for an illegal purpose—namely, prostitution. (Trial Tr., Doc. 1903 at 78). Mr. Ferrer testified to discussing TER with Mr. Spear, and they decided to remove the hyperlinks and "the words TER but leav[e] in the ID numbers so people could look up the reviews on their own." (*Id.*) This directive was disseminated to moderation staff, evidence that showed that Mr. Spear joined in the conspiracy to make its

accomplishment possible.  (Trial Ex. 647).

> When the evidence discloses such a system, working in prolonged cooperation with a physician's unlawful purpose to supply him with his stock in trade for his illicit enterprise, there is no legal obstacle to finding that the supplier not only knows and acquiesces, but joins both mind and hand with him to make its accomplishment possible.  The step from knowledge to intent and agreement may be taken.  There is more than suspicion, more than knowledge, acquiescence, carelessness, indifference, lack of concern.  There is informed and interested cooperation, stimulation, instigation.  And there is also a 'stake in the venture' which, even if it may not be essential, is not irrelevant to the question of conspiracy.

*Direct Sales*, 319 at 713.

The evidence for Mr. Lacey is more attenuated but meets the low threshold on a Rule 29 motion.  The Government introduced testimony and evidence that by 2009, Mr. Lacey's newspaper enterprises were economically declining while Backpage's adult section revenues were exploding.  (Trial Tr., Doc. 1792 at 44).  Mr. Ferrer testified that Mr. Lacey was a 'hands on" editor whose New Times paper ran a detailed story about the TER's "prostitution reviews."  (Trial Tr., Doc. 1792 at 51–57; Trial Ex. 573a).  As early as 2010, Mr. Lacey was notified by a group of State Attorneys General that "blatant prostitution ads are rampant" on Backpage and they requested that Backpage take down the "adult services portion of Backpage."  (Trial Ex. 52).  As owner and CEO of Backpage's parent company, Village Voice, Mr. Lacey was routinely confronted by non-governmental agencies ("NGOs") including the Auburn Theological Seminary, POLARIS, and the National Center for Missing and Exploited Children, who alleged that Backpage was a platform for prostitution ads.  An NGO witness who testified at trial recalled that when Mr. Lacey was confronted with these allegations, he essentially stated "consenting adults can do what consenting adults want to do" leaving an impression that he knew prostitution was occurring on Backpage "and that it was legitimate." (Trial Tr., Doc. 1921 at 65:20–25; 67:21–22).  News outlets, including the New York Times, also ran stories on Backpage's Adult section, and Mr. Lacey watched the Amber Lyon expose on CNN.  (Trial Ex. 633).  Taken together, there is sufficient evidence from which a reasonable juror could

find that Mr. Lacey was aware of and implicitly agreed to the conspiracy's alleged objective to make money by providing a platform for prostitutes and prostitution businesses to post prostitution ads on Backpage.

The Court finds there is sufficient evidence that Messrs. Lacey, Brunst, Spear and Ferrer joined the conspiracy of making Backpage's Adult section profitable by developing and sustaining a platform where prostitutes and prostitution enterprises could advertise sex for money, including in states where prostitution is illegal. Those efforts helped the advertisers make ads look less obviously like offers for prostitution. They also developed a facade of aiding law enforcement in investigating prostitution through responding to subpoenas. Even so, there is sufficient evidence that the sale of ad space leading to prostitution offenses was the primary focus of Backpage's business and each Defendant reaped substantial financial benefit from knowingly providing Backpage's service.

### 2.        Object of the Conspiracy

Messrs. Spear and Brunst argue, as they did during trial, that their conspiracy convictions cannot stand because the Government improperly argued to the Jury that one of the objects of the conspiracy was to make money, which is an entirely lawful object. (Doc. 2007 at 9).[12]  They argue that "a federal conspiracy conviction [cannot] be upheld when non-federal offenses as well as federal offenses were submitted to the jury as objects of the conspiracy, and it [is] impossible to determine on which basis the jury convicted." (Doc. 2007 at 9 citing *United States v. Croft*, 124 F.3d 1109, 1115 (9th Cir. 1997)).

The Court rejects the Defendants' improper object argument, again. As discussed with the parties while finalizing jury instructions on this point, in the Ninth Circuit, a conspiracy is a "combination of two or more persons to accomplish some unlawful purpose, *or some lawful purpose by unlawful means*." *United States v. Caplan*, 633 F.3d 534, 542 (9th Cir. 1980) (emphasis added). In its closing arguments, the Government clarified for the Jury that the crime here was not merely making money and stated that Defendants crime was *how* they made that money: "off the backs of people engaged in

---

[12] Defendants make the same argument in their Rule 33 Motions for New Trial, as discussed *infra*.

illegal prostitution business enterprises." (Trial Tr., Doc. 1961 at 40:12–21). Moreover, the only object alleged here was to make money through an agreement to violate the Travel Act. *Cf. United States v. Manarite*, 44 F.3d 1407 (9th Cir. 1995) (overturning a conspiracy conviction where two of the underlying objects alleged were insufficient as a matter of law and the general verdict form used by the jury made it impossible for court to determine which object or objects formed the basis of their decision); *United States v. Johnson*, 44 F. App'x 752 (9th Cir. 2002) (same). There is no basis to Defendants' argument that both federal and non-federal offenses were submitted to the Jury as objects of the conspiracy.

### B.      Sufficiency of Travel Act Charges (Counts 2–51)

Mr. Spear was found guilty of committing the Travel Act violations charged in Counts 2–18; Mr. Brunst was acquitted on Counts 2–51; and the Jury could not reach a decision as to Mr. Lacey on Counts 2–51. Both Messrs. Spear and Lacey argue the Court must enter a judgment of acquittal on the Travel Act charges, Mr. Spear with regard to 2–18 and Mr. Lacey with regard to 2–51.

The Travel Act makes it a federal offense for a person to use a facility in interstate commerce with the intent to promote or facilitate the promotion of an unlawful activity— here, facilitating the promotion of prostitution. 18 U.S.C. § 1952(a)(3). To convict, the Government had the burden of showing that Messrs. Spear and Lacey (1) used Backpage.com; (2) with intent to facilitate the promotion of prostitution businesses; and (3) did a subsequent overt act in furtherance of that unlawful activity, by, for example, publishing the prostitution ad or editing the ad to make it look less like an ad for prostitution. *United States v. Tavelman*, 650 F.2d 1133, 1138 (9th Cir. 1981).

Before assessing the sufficiency of evidence arguments made as to these counts, the Court will address the First Amendment legal arguments Messrs. Spear and Lacey make with regard to the Travel Act Counts.

### 1.      First Amendment Protections of the Backpage Ads

Defendants argue that the Government failed to establish that any of the 50 ads charged in the Superseding Indictment were not protected by the First Amendment. Mr.

Spear specifically asserts that the Government failed, as a matter of law, to show that Backpage's publication of the Ads in Counts 2–18 were unprotected by the First Amendment. (Doc. 2006 at 5). Mr. Lacey similarly asserts that the Government "failed to overcome the presumption that the ads were 50 instances of protected expression." (Doc. 2004 at 13). Mr. Lacey states that "even if he had been involved with Backpage's operation . . . its operations understood that the operation of a platform for third-party speech and the third-party speech itself was First Amendment protected." (*Id.*) He orally posited that any Jury instruction on the First Amendment would have to draw a distinction from the ad creator and the third-party publisher. (Trial Tr., Doc. 1931 at 69).

Prior to trial, the Court considered Defendants' similar First Amendment arguments. In so doing, the Court iterated that the First Amendment does not protect "offers to engage in illegal transactions." (Doc. 793 at 14 *citing United States v. Williams*, 553 U.S. 285, 297 (2008)). Applying the requisite pre-trial standards of review, the Court found, as to the ads in Counts 2–51, that "the factual allegations in the [Superseding Indictment] are sufficient to show the ads were for prostitution" and "[p]rostitution ads are ads for illegal transactions." (*Id.* at 11; 14). Therefore, facts existed to support that the ads were not First Amendment protected. (*Id.*) The Court will not second-guess its prior and consistently held rulings, rulings that well informed the Defendants on this issue.

However, the Court did conclude that at trial the Government still bore the burden to prove to the fact finder that the ads were for an illegal purpose, and therefore unprotected. At the conclusion of trial, the Court observed that the parties had fully briefed their respective positions on the First Amendment Jury Instruction. The Court determined that the Government's theory was that the Defendants all knew that the ads were sex for money ads, so it held "based on the totality of the case [as] presented in court to this jury" that it would give them a modified First Amendment instruction. (Doc. 1931 at 64–73). The Jury was provided the following instruction:

> All speech is presumptively protected by the First Amendment to the United States Constitution. However, the First Amendment does not protect speech

that proposes an illegal transaction.  Prostitution is illegal in 49 states and most of Nevada.  It is the government's burden to establish that each of the ads alleged in this case is an ad for prostitution and not for another purpose such as an ad for escort, dating or massage services.  If you find that an ad proposes an illegal transaction, it is not protected by the First Amendment.

(Doc. 1998 at 48).

Though Defendants say they do not wish to "relitigate" the Court's instruction, they essentially argue that the ads are protected by the First Amendment because they were for lawful escort services and that use of "coded words" did not revert them into facially unlawful prostitution ads.   (Doc. 2030 at 4–5).   On consideration of the evidence, particularly the victims' testimony that (1) their ads were what the Government purported them to be; (2) all of the ads used at least some language the Government established was indicative of prostitution; (3) ads 3, 6–11, and 18 were posted by a person known to be a prostitute by Mr. Ferrer; and (4) the photos in the ads initially submitted in Counts 4, 5, 12, 13, 15, 16, and 17 were removed or otherwise moderated by Backpage, the Court finds sufficient evidence for the Jury to find that these were offers of sex for money ads.  Given the Jury's verdict as to Mr. Spear, they apparently found that each of the 18 ads were in fact ads for prostitution and not for some other purpose such as a lawful escort ad.[13]  Thus, applying the instruction, they necessarily found that the ads in Counts 2–18 were unprotected speech.

Reviewing the evidence in comparison to the holding in *Pittsburgh Press v Pitt, Comm. on Human Relations*, 413 U.S, 376, 377–80 (1973) does not change the Court's analysis here because Mr. Ferrer and several victims and witnesses who created or helped to create each ad in the Superseding Indictment testified that they were posting sex for money ads on Backpage.  (*See e.g.*, Trial Tr., Doc. 1786 at 7) (testimony from Mr. Ferrer that the ads posted on Backpage from 2004 through 2009 were "prostitution ads"); Trial Tr., Doc. 1922 at 76 (testimony from victim in Count 23 ad that ads posted in Los Angeles area in 2015 were posted "to get customers or to get people to pay for sex"); Trial Tr., Doc.

---

[13] The Court will not speculate about whether the Jury concluded that the ads in counts 19 – 50 were First Amendment protected.

1920 at 124, 131 (testimony from victim that she posted on Backpage from 2012 through 2015 for the purpose of selling "acts of prostitution"); *see also infra* Section III.B.2, (testimony from victims that their ads were posted to offer sex for money).  There is sufficient evidence for a reasonable juror to find that each Superseding Indictment ad was illegal and therefore not protected by the First Amendment.  Consequently, the Defendants' Motion for Acquittal based on First Amendment grounds is denied.

## 2.    Sufficiency of Evidence to Support the Travel Act Counts (Counts 2–51)

The Jury was instructed that to find the Defendants guilty of a Travel Act offense, they would have to find each of the following elements beyond a reasonable doubt:

> First, the defendant used any facility in interstate commerce with the specific intent to promote or facilitate the promotion of any business enterprise involving prostitution offenses in violation of the laws of the State in which they are committed (as specified below[14]), and

> Second, after doing so the defendant performed an act that did promote or facilitate the promotion, of any business enterprise involving prostitution offenses, specifically, by publishing on Backpage.com the ads listed in Counts 2–51 of the indictment.

(Doc. 1998 at 30).  This instruction went on to explain:

> To prove specific intent, the government must establish that each defendant in some significant manner associated himself or herself with the purpose of promoting or facilitating the promotion of any business enterprise involving prostitution offenses that the defendant knew to be unlawful under state law.

> In the context of this Travel Act case, the terms to "promote" or "facilitate the promotion of" means intentionally helping someone else commit a prostitution offense in violation of state law.

> The phrase "Business enterprise," means a continuous course of criminal conduct, that is, engaging or planning to engage in two or more violations of law, rather than a sporadic, casual, individual, or isolated violation. . . .

---

[14] The Jury Instructions provided the relevant state law for each Travel Act Count alleged.

(*Id.* at 30).

The Government also advanced a theory of liability for the Travel Act counts under *Pinkerton v. United States*, 328 U.S. 640 (1946). *Pinkerton* liability is "a judicially-created rule that makes a conspirator criminally liable for the substantive offenses committed by a co-conspirator when they are reasonably foreseeable and committed in furtherance of the conspiracy." *United States v. Long*, 301 F.3d 1095, 1103 (9th Cir. 2002). In that regard, the Jury Instructions explained:

> Each member of the conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy. If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.
>
> Therefore, you may find a defendant guilty of committing a Travel Act crime as charged in Counts 2–51 of the indictment if the United States has proved each of the following elements beyond a reasonable doubt:
>
> First, a member of the conspiracy committed a Travel Act offense alleged in one of the Counts;
>
> Second, that person was a member of the conspiracy charged in Count 1 of the indictment;
>
> Third, the person committed the Travel Act offense in furtherance of the conspiracy;
>
> Fourth, a defendant was a member of the same conspiracy at the time the Travel Act offense was committed; and
>
> Fifth, that the Travel Act offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

(Doc. 1998 at 27).

Messrs. Spear and Lacey argue there is an insufficiency of evidence showing their personal association with the prostitution businesses that posted the ads. They argue that there was no testimony or exhibit that shows that they ever had any contact with the advertisers in these ads; ever saw or knew the content of any of the ads before they were published; moderated the ad; or knew an ad was associated with a super poster. (Doc. 2006 at 3). They also point out that none of the ads in Counts 2–18 contain TER links or even a TER number. (*Id.*) Mr. Spear asserts that there is only evidence of TER association in the

1   charged ads *after* Mr. Ferrer purchased Backpage in 2015.[15]   Therefore, Mr. Spear asserts

2   that his convictions are legally unsupported.

3   　　　　As explained by the jury instructions, to show that Messrs. Spear and Lacey violated

4   the Travel Act by selling and publishing prostitution ads on Backpage, the Government

5   was required to establish that Messrs. Spear and Lacey "in some significant manner

6   associated" themselves with the ad poster's prostitution business enterprise.  (Doc. 1998 at

7   30); *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974).  Thus, unlike

8   conspiracy to violate the Travel Act, to convict on a Travel Act charge, the Government

9   had to show that Defendants—or one of their co-conspirators—in some significant manner

10   associated themselves with the prostitution businesses that posted the ads in each Count.

11   　　　　With regards to Mr. Spear, the Government points to his work in overseeing

12   Backpage's growth and development, and the strategies he helped implement to ensure the

13   adult escort section of Backpage flourished.  It argues that "[w]hen the pimps and

14   prostitutes who posted the ads in Counts 2–18 used Backpage to advertise their illegal

15   commercial services, they utilized a website tailored-made to promote, and facilitate the

16   promotion of, prostitution enterprises like theirs."  (Doc. 2021 at 16).  Viewing the

17   testimony and evidence in a light most favorable to the Government, the Court agrees that

18   Mr. Spear's role in making Backpage a platform from which prostitution could be

19   advertised is sufficient to establish his specific intent to facilitate the promotion of the

20   prostitution businesses posting the ads in Counts 2–18.   Evidence sufficiently shows that

21   Mr. Spear, in the interest of making money, directly helped develop moderation and editing

22   policies that facilitated the promotion of prostitution and allowed Backpage to continue to

23   accept payment from pimps, traffickers, and prostitutes for posting the illegal ads.  The

24   Court also finds, as detailed below, that there was sufficient evidence adduced that Mr.

25   Ferrer, a co-conspirator, also significantly associated himself with and helped promote the

26   poster's enterprises such that his acts in relation to the ads in Counts 2–18 were fairly

27

28   ――――――――――
[15] The ads in Counts 2–18 are dated from September 10, 2013, to April, 2015, just before the sale of Backpage to Mr. Ferrer.  The ads in Counts 19–51 post-date the sale of Backpage to Mr. Ferrer.  No Defendant was found guilty of Counts 19–51.

attributed to Mr. Spear under a *Pinkerton* theory of liability.

With regard to Mr. Lacey, the Court finds there is an insufficiency of trial evidence supporting a direct theory of liability for any of the Travel Act charges brought against him.  Specifically, the Government did not put forth sufficient evidence of Mr. Lacey's specific intent to facilitate the promotion of the posters or prostitution businesses comprising Counts 2 through 51, as that *mens rea* is defined by the Ninth Circuit.  Though the Government put forth some evidence that Mr. Lacey had knowledge that Backpage's Adult section evolved into an on-line prostitution advertising platform operating in states that outlaw prostitution and that he extraordinarily benefited financially therefrom, there was no evidence that he was involved with developing or overseeing Backpage's moderation or aggregation practices for the ads in Counts 2–51.[16]  Among other evidence, the Government's evidence of Mr. Lacey's reaction to an arrest of a Backpage user (*see* Trial Ex. 940 ("[a]re the perps different than the rest of Backpage?"), and his stated support for legalized prostitution, among other evidence, suggests he knew of Backpage's intended purpose.  (Trial Ex. 1911b).  Indeed, the Government's argument that Mr. Lacey's wealth depended on the success of Backpage's Adult section was clearly established.  This evidence may suffice for the conspiracy count but a conviction on a Travel Act count requires more.  *See Gibson*, 507 F.2d at 449 ("Were we not to define intent in the travel act in this manner, the act would be plagued by the very overexpansiveness which Congress sought to rule out by inclusion of an express *mens rea* requirement.").  (*See also* Doc. 1998 at 30).  The Government offered no evidence or testimony that Mr. Lacey exerted control over the advertisers in Counts 2–51 or how they published their ads.  *Gibson*, 507 F.2d at 450 (dismissing Travel Act counts where prosecution conceded that defendant manufacturers of gambling paraphernalia had "no financial interest in or control over the Montana distributorships to which the [gambling paraphernalia] were sold").  To the

---

[16] Without much more, the Government's brief largely tracks the Superseding Indictment's allegations in which Mr. Lacey is referenced in the "Knowledge And Facilitation of Prostitution" paragraphs related to his broad knowledge that Backpage had a reputation as an on-line prostitution advertisement platform.  (*See* Doc. 230 at ¶¶ 89; 97; 106, 107; 121; 126).

contrary, the evidence showed that Mr. Lacey was rarely pulled into the business side of Village Voice or the day-to-day operations of Backpage, and unlike Messrs. Spear and Ferrer, he had no occasion to review or perfect ads or coach the advertisers how to successfully code sex act terms so they could appear on Backpage's Adult section.

Though the Court finds that there was insufficient evidence of Mr. Lacey's intent, the Court will nonetheless deny his Motion as to Counts 2–18 because there was sufficient evidence under *Pinkerton*, as described below, for a rational juror to find him guilty through the acts of one of his co-conspirators, namely Mr. Ferrer and Mr. Spear.

### a.    Commission of Travel Act Violation in Count 2

The Jury convicted Mr. Spear of violating the Travel Act in Count 2 of the Superseding Indictment but did not reach a verdict as to Mr. Lacey on this Count.  Count 2 alleges that the Defendants used Backpage.com to post a prostitution ad on September 10, 2013, in Massachusetts.  (Doc. 230 at 50).  Prostitution is illegal in Massachusetts. (Doc. 1998 at 31).

Brian Griffin, a Sergeant with the Northborough Police Department ("Sgt. Griffin"), testified that in September 2013 he was alerted to suspicious circumstances of two females loitering around a hotel room.  (Trial Tr., Doc. 1923 at 62–70).  Believing that they may be involved in prostitution, Sgt. Griffin went to Backpage.com[17] and found an ad depicting one of the females.  (Trial Tr., Doc. 1923 at 64–65; Trial Exs. 212, 212a).  This ad is the subject of Count 2.  Sgt. Griffin called the ad number and made an appointment to see "Destinee," to pay her for oral sex.  (Trial Tr., Doc. 1923 at 66).  Upon entering the hotel room, Sgt. Griffin observed a male "John" in the bathroom and learned that he paid for the hotel room in exchange for sex.  (*Id.* at 70).   Based on this testimony, there is sufficient evidence from which a reasonable juror could find that the ad in Count 2 was a sex for money ad on Backpage posted in violation of Massachusetts law.

There is also sufficient evidence for a reasonable juror to find that the moderation

---

[17] Backpage.com was known in various Massachusetts law enforcement communities as "a new place . . . to go to investigate these crimes."  (Trial Tr., Doc. 1923 at 52–53).

efforts taken by Messrs. Ferrer and Spear evince sufficient association with the poster and amounted to the Travel Act offense alleged in Count 2.  Viewing the ads used by Sgt. Griffin (Trial Exs. 212 and 212a), Mr. Ferrer identified them as Backpage.com ads that would have been viewable on a mobile phone.  (Trial Tr., Doc. 1812 at 52:2–3 ("This is the time when we were moving to a mobile phone experience so the page is built for a mobile phone view."); 68:17–69:3).[18]  The ad read: "Our dazzling smile & stunning personality will keep you coming back for more.  We keep ourselves well manicured, hygienically correct & always classy!  Doin incalls and outcalls.  2 girl for 1 or 2 girl special.  Call or text us five0eight-nine33-eight52one."  (Trial Tr., Doc. 1812 at 57; Trial Ex. 212).  Observing that the telephone number was spelled out in the ad, Mr. Ferrer testified that in the moderation process, they learned that if a prior user was banned, the user would revert to spelling out a telephone number to avoid the ad being rejected.  (*Id.* at 58:9–12).  The Court finds that this testimony sufficiently establishes that Messrs. Ferrer and Spear, through their moderation development and oversight, committed the Travel Act offense alleged in Count 2 by helping to facilitate and promote the advertiser's business.

### b.   Commission of Travel Act Violations in Counts 3, 6–11, 18

The Jury convicted Mr. Spear of violating the Travel Act in Counts 3, 6–11 and 18 of the Superseding Indictment but did not reach a verdict as to Mr. Lacey.  The ads in these Counts were posted by a woman named Pamela Robinson ("Ms. Robinson").  Each Count alleges that the Defendants helped Ms. Robinson post prostitution ads on Backpage in Washington on January 27, 2014 (Count 3), February 6, 2014 (Count 6), April 20, 2013 (Count 7), May 7, 2014 (Count 8), May 31, 2014 (Count 9), July 1, 2014 (Count 10), August 19, 2014 (Count 11), and February 26, 2015 (Count 18).  (Doc. 230 at 50–51).

---

[18] Mr. Ferrer testified that he "worked with [a man] in Dallas to design this look . . . I approved the wire frames and then we launched this mobile view of postings." (*Id.* at 51-52:15–17).  He further testified about changes that were made to enable better viewing of the ads' texts and images for mobile phones versus desktop ads which include a large Backpage.com logo.  (*Id.* at 52–53).  Mr. Ferrer identified the ads' features that he approved, that he is familiar with how it all looks because at that time they were trying to increase their "page views and mobile and it went to nearly 90 percent."  (*Id.* at 53:20–54:5).

1    Prostitution is illegal in Washington.  (Doc. 1998 at 31).

2          Mr. Ferrer testified that he communicated with Ms. Robinson from 2010 through

3    2018 using his email address carl@Backpage.com.  (Trial Tr., Doc. 1795 at 79).  Ferrer

4    identified each ad set forth in Trial Exhibits 504–513 that are listed in Counts 3, 6–11, 18,

5    and 25–26 as Ms. Robinson's Backpage ads.  (*Id.* at 79–87; Trial Exs. 162 –165; 168, 504–

6    511).  He testified that he believed Ms. Robinson was engaged in prostitution and solicited

7    her services by posting ads on Backpage.  (Trial Tr., Doc. 1795 at 79–81).  He explained

8    how he provided Ms. Robinson with a "promo code" for discounts on escort ads, and that

9    he restored her editing rights so she could post ads on Backpage for prostitution.  (*Id.* at

10   81, 87).  He also testified to his personal knowledge of her ads posted on Backpage from

11   2014 to 2015, and that she threatened to complain to the Better Business Bureau because

12   her ads were being rejected.  (*Id.* at 105–08).  Ferrer described the ads' rejection as part of

13   Backpage's moderation process.  (*Id.* at 87–88).

14         Mr. Ferrer's testimony undermines the Defendants' contention that there is no

15   evidence that he was personally interacting with Ms. Robinson.  (*See* Doc. 1867 at 103–

16   04).  Mr. Ferrer testified that he communicated directly with Ms. Robinson through his

17   email address at Backpage.  The Jury must have found this testimony credible.  The

18   Defendants' argument that this and other Backpage ads are not Travel Act violations

19   because they may or may not have resulted in sex acts for money is also unconvincing

20   because each state statute makes "offers" to engage in sex illegal.  Therefore, the Court

21   finds that there is sufficient evidence from which a reasonable juror could find that Mr.

22   Ferrer and co-conspirator Mr. Spear, violated the Travel Act as alleged in Counts 3, 6–11,

23   and 18.

24             **c.      Commission of Travel Act Violations in Counts 4 and 5**

25         The Jury convicted Mr. Spear of committing Travel Act offenses in Counts 4 and 5

26   but did not reach a verdict as to Mr. Lacey on these Counts.  Count 4 is a Backpage ad

27   posted on January 29, 2014, and Count 5 is a Backpage ad posted on January 31, 2014.

28   (Doc. 230 at 50).  Both ads were posted on Backpage.com in Massachusetts, where

- 34 -

prostitution is illegal.

Naiomy Figueroa ("Ms. Figueroa") identified the ads from Counts 4 and 5 (Trial Exs. 214 and 214a, respectively) as ads her pimp posted of her on Backpage.  (Trial Tr., Doc. 1898 at 96–98).  Ms. Figueroa testified that she became familiar with Backpage when she saw her pimp use it to post her ads.  (*Id.* at 82).  She believed Backpage was a website "for girls to use [] to escort and to get trafficked."  (*Id.*)  According to her, "escort" meant "to exchange a sexual act for money or a gift."  (*Id.*)  She testified that she would not create her ads, that her pimp created and posted them.  (*Id.*)  She understood that she was advertised for sex acts for money "so my pimps could make money off of me."  (*Id.* at 83).  She testified that she saw her pimps purchase "vanilla cards" from convenience stores and use them to purchase her ads.  (*Id.*)  Ms. Figueroa testified that her ads included terms like "fetish friendly" and "satisfying your cravings" and included photos of her in lingerie, pantyhose and in seductive poses.  (*Id.* at 84).  Photos for the ads would be taken in hotel rooms paid for by pimps because she was not old enough to pay.  (*Id.* at 85).  Once posted, she said her phone would ring within minutes.  (*Id.* at 86).  When the calls tapered off, "they would post another ad to get me to the top of the list so that the calls keep coming in." (*Id.*)  The caller would ask "what are the prices per hour." (*Id.* at 87).  In discussing rates, she would use words like "roses" as a code word for money.  (*Id.* at 92).  She was also familiar with the term "in-call" as "when the john comes to you."  (*Id.* at 96).  She testified that upon meeting, she would "ask them to touch us somewhere like in the private parts to confirm that they were not a cop."  (*Id.* at 92).  Ms. Figueroa testified that every ad posted of her was an offer of sex for money.  (*Id.* at 99).  She testified that she would not keep the money but that the pimps would.  (*Id.* at 94–95).  This evidence is sufficient to show that the ads in Counts 4 and 5 were ads for prostitution.

Mr. Ferrer identified Trial Exhibit 214 from Count 4 "as the administrative view of a posting in the Boston Escort Section of Backpage." (Trial Tr. Doc. 1812 at 60:3–8).  He explained that the "administrative view" would show "the email address, the payment information, and other information gathered in even what we called Object Editor.  It's all

1    kind of an internal printout of an ad in admin view." (*Id.*)  He explained that the page

2    showed transactions and customer data as well as various customer invoices. (*Id*. at 61:3–

3    25).[19]  From this data, he testified that one page of exhibit 214 was "an image that was

4    deleted.  And in this administrative view, an administrator could restore or remove that

5    image and then hit 'updates.'" (*Id*. at 61:24 to 62:1).  From the administrative view, he

6    could tell the transaction was ultimately approved. (*Id.*)  Mr. Ferrer similarly testified that

7    the data in Trial Exhibit 214a from Count 5 showed that an image had been deleted. (*Id.*

8    at 63:1–10).[20]

9         The Court finds that this testimony sufficiently establishes that Messrs. Ferrer and

10   Spear, through their moderation development and oversight of Ms. Figueroa's ads,

11   committed the Travel Act offenses alleged in Counts 4 and 5.

12                   **d.      Commission of Travel Act in Counts 12, 13, 14 and 15**

13        Count 12 is a California Backpage ad posted on November 23, 2014, and Count 13

14   is a California Backpage ad posted on January 29, 2015. (Doc. 230 at 51).  Prostitution is

15   illegal in California. (Doc. 1998 at 32).  Count 14 is an Arizona Backpage ad posted on

16   January 31, 2015, and Count 15 is an Arizona Backpage ad posted on January 31, 2015.

17   (Doc. 230 at 51).  Prostitution is illegal in Arizona. (Doc. 1998 at 32).

18        Astrid Cervantes ("Ms. Cervantes") testified that she was advertised for an

19   "exchange of money for sex acts" on Backpage.com from November 2014 through January

20   2015 in Oceanside, San Diego, and other places in California and in Phoenix. (Trial Tr.,

---

21   [19]   In distinguishing Trial Exhibits 212 and 212a (the ads in Count 2) from exhibit 214
22   (Count 4), Mr. Ferrer explained that Trial Exhibit "212a was a view from a mobile phone.
     [Trial Exhibit 214] would be viewed -- from a desktop computer that was looking at the ad
23   with somebody having admin access at Backpage and then making a PDF of that data." (*Id*. at 60:12–15).

24   [20] Mr. Ferrer also stated that he was familiar with the postings in Trial Exhibits 214 and
25   214a because "the person posted in this ad was in a Nicholas Kristof column in the 'New York Times.'" (Trial Tr. Doc. 1812 at 65:1–2).  Mr. Ferrer testified that the New York
26   Times article "discussed how a juvenile was prostituted and then how they were able to recover this juvenile by finding the person on Backpage." (*Id*. at 65:18–20).  Ferrer said
27   that after he received an email from a producer at Dateline he went to find the records of the victim in the story "so we [could] do our standard operating procedure of when was the
28   ad posted, by who, what payment data was gathered." (*Id*. at 67:3–7).  He said that data would also tell him whether they had sent NCMEC a report. (*Id.*)

Doc. 1897 at 30–38).  Ms. Cervantes identified herself and a woman called "Storm" in the ads associated with Counts 12–15.  (*Id*. at 32–35, 47–48).[21]  She said Storm was part of a group she was in that was "being trafficked" by a man she referred to as "L.G." (*Id*.)  She testified that L.G. was her pimp and that L.G. and a woman named Star, another girl that was being trafficked by L.G., would create and post her ads on Backpage.  (*Id*. at 32–33).  Ms. Cervantes testified that L.G. and Star took pictures of her in lingerie and then used those photos in her Backpage ads.  (*Id*. at 33–34).  Ms. Cervantes said L.G. would post her ad using his cell phone.  (*Id*. at 34).  Upon the ad being posted, "clients"—meaning "the men that would want to exchange money for sex"—would call and text for sex.  (*Id*. at 35).  After engaging in sexual intercourse with the client, Ms. Cervantes would text L.G. and he would arrive and retrieve the money.  (*Id*. at 37–39).  Ms. Cervantes testified that she did not observe L.G. to have a job other than being a pimp.  (*Id*. at 45).  Ms. Cervantes testified that L.G. thought they could make a lot of money during the Super Bowl so she, L.G., Storm, and Star traveled from California to Arizona in January.  (*Id*. at 37-38).  She testified that L.G. or Star provided the car, and once in Arizona, L.G. purchased a hotel room and Storm began writing her Backpage ad profile.  (*Id*. at 41).  Ms. Cervantes had a few "dates" while in Phoenix.  Eventually, she and Storm agreed to meet a customer who requested "a two-girl special."  (*Id*. at 43).  The customer ended up being an undercover police officer.  After that, Ms. Cervantes stopped working for L.G.  (*Id*. at 54).

Viewing Trial Exhibits 217 and 217a, Mr. Ferrer identified each as Backpage ads, the market they were posted in, and as examples of "somebody who is posting in two different markets."  (Doc. 1813 at 25:14–15).  Mr. Ferrer said he could tell Trial Exhibit 217 was printed out by an administrator, and that it contained a deleted image.  (Doc. 1813

---

[21] Ms. Cervantes identified herself in Trial Exhibits 215 and 215a, which are respectively the January 31, 2015, Backpage ad posted in Phoenix, Arizona associated with Count 14 (Trial Tr., Doc. 1897 at 47–48); and the November 23, 2014, ad posted on Backpage.com in San Diego, California that is associated with Count 12.  (*Id*. at 47).  She testified that her acquaintance "Storm" is the person in the ad at Trial Exhibit 217a, the January 29, 2015, Backpage ad posted in Inland Empire, California that is associated with Count 13 (*id*. at 46), and in Trial Exhibit 217, the January 31, 2015, Backpage ad posted in Phoenix, Arizona that is associated with Count 15.  (*Id*. at 46–47).

at 22:24–23:2).  Mr. Ferrer explained that the options of "Keep deleted," "Restore," and "Removed" displayed on the exhibit meant the administrator/moderator had the "option to…update the ad and restore it, or [] update it and permanently remove it.  Right now the ad is deleted, but it could be restored."  (*Id.* at 23:20–25).  Mr. Ferrer said he thought the image of Storm was violative of Backpage policies because it was "too much of a butt shot . . ."  (*Id.* at 24:3).

The titles of the ads in Trial Exhibits 215 and 215a read "New In Town," a term that NGOs like NCMEC and Polaris told Defendants were indicative of prostitution and trafficking.  (*Id.* at 21–24).  Mr. Ferrer described exhibit 215 as a Backpage ad that you could view on a mobile device that had "been created into a pdf with admin access."  (*Id.* at 17).  He said the exhibit included "object editor data" and that he could tell from the exhibit that an image from the ad had been deleted again, "because "it's just too much of a butt shot on a hotel bed mattress."  (*Id.* at 19).

There is sufficient evidence and testimony from which a reasonable juror could find that the ads depicted in Counts 12 through 15 are Backpage.com ads advertising sex acts for money in violation of California and Arizona state laws, and that Messrs. Ferrer and Spear facilitated the promotion of prostitution ads through their moderation efforts.

### e.    Commission of Travel Act Violations in Count 16 and 17

Counts 16 and 17 allege that prostitution ads were posted on Backpage in Colorado on February 4 and 18, 2015, respectively.  (Doc. 230 at 51).  Prostitution is illegal in Colorado.  (Doc. 1998 at 33–34).

Breahannah Leary ("Ms. Leary") testified that she posted herself on Backpage.com in Denver, Colorado from approximately 2012 through 2015.  (Trial Tr., Doc. 1920 at 122–24).  She copied and pasted other ads and used the "lingo" on Backpage.com to create her own ads.  (*Id.*)  She testified that her ad would often appear differently than as she originally posted; that sometimes her picture was removed, or the ad would be pushed to the bottom and require her to repost it so it would go to the top.  (*Id.* at 124).  She stated that even when her picture was removed, the rest of the ad's content would remain.  (*Id.* at 125).

Once posted, she said her telephone would ring and she would "go and have dates with the gentlemen" which she said meant "acts of prostitution." (*Id.*).

In January 2015, Ms. Leary began to work for Brock Franklin ("Mr. Franklin"), who wanted to post her on Backpage.com. (*Id*. at 128–29). When she arrived at his home, she observed other women living there. (*Id.*). Mr. Franklin and "one of his girls" Isis, took photos of her in a hotel room in Denver where she posed in various positions wearing lingerie. (*Id*. at 131). She testified that for the four to five months she was involved with Franklin, she engaged in daily acts of prostitution for him and that he only permitted her to perform acts of oral sex. (*Id*. at 132–34). Once she received money for the act, it would be immediately handed over to Franklin. (*Id.*). Ms. Leary identified herself in Trial Exhibit 216 as the photos that were taken of her the first night she moved in with Franklin. (*Id*. at 138). She stated that the ad was posted on February 4, 2015, in Denver. (*Id.*). She also identified herself in Trial Exhibit 216a as an ad posted in Ft. Collins, Colorado on February 18, 2015. She testified that both advertisements lead to acts of prostitution. (*Id.*).

Based on direct and circumstantial evidence about how Ms. Leary's ads were moderated e.g., photos being deleted, terms removed, her ad moved to the bottom—there is sufficient evidence for a rational juror to find Messrs. Spear's and Ferrer's implementation of their moderation policies resulted in the Travel Act violations alleged in Counts 16 and 17.

In sum, there is sufficient evidence that Messrs. Ferrer and Spear committed the Travel Act charges in Counts 2–18 via their moderation efforts.

### f.    *Pinkerton* Liability and the Travel Act Counts 2–18

Citing *United States v. Castaneda*, Defendants argue "that due process constrains the application of *Pinkerton* where the relationship between the defendant and the substantive offense is slight." 9 F.3d 761 (9th Cir. 1993), *overruled by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000). Messrs. Lacey and Spear maintain that, although they were aware of the moderation function at Backpage, they were not directly involved in the moderation practices, and the connection between that fact and Mr. Ferrer's acts in

facilitating the publication of these ads is too slight for *Pinkerton* to apply.  In other words, Defendants assert that the Travel Act offenses in the Superseding Indictment are just a few examples out of millions of ads published by Backpage, and it is not reasonably foreseeable to Defendants that the publication of a specific ad might be moderated in some improper way to facilitate prostitution.  (Doc. 1903 at 34).

But the question is not whether it is reasonably foreseeable that Messrs. Lacey or Spear knew a specific Travel Act ad would occur among millions of other ads.  The question is whether publication of the Travel Act ads "could reasonably have been foreseen to be a necessary or natural consequence *of the unlawful agreement*." *Pinkerton*, 328 U.S. at 647–48 (emphasis added); *Alvarez-Valenzuela*, 231 F.3d at 1202.  As mentioned, the unlawful agreement among the Defendants and Mr. Ferrer as identified by the Government is making Backpage ads look less obviously like prostitution to continue profiting off of ads for illegal sex acts.  So, the question is whether it was reasonably foreseeable that Messrs. Ferrer, Spear, or other members of the conspiracy, would help an advertiser of prostitution post an ad for prostitution in Backpage by moderating an ad.  The evidence supports that conclusion for Counts 2–18.  As discussed, sufficient evidence was adduced showing each Defendant knew that prostitution was occurring through Backpage ads, and that the vast majority of Backpage's revenue came from prostitution ads.  It is reasonable that a member of the conspiracy would have foreseen (indeed, expected), another member to take steps to further their unlawful agreement—for example, to moderate submitted prostitution ads or "slow dance" responses to law enforcement subpoenas to make it look like Backpage was not publishing prostitution ads so Defendants could continue to profit from that illegal revenue.

### g.    Travel Act Violations in Counts 19–51

The Government put forth sufficient evidence that the Backpage ads in Counts 19–51 were prostitution ads violating the associated state laws.  However, Messrs Spear, Brunst, Padilla, and Ms. Vaught were acquitted of these Counts.  In so finding, the Jury necessarily concluded that no Defendant committed a Travel Act violation related to each

Count, nor did *Pinkerton* liability attach to any Defendant through a co-conspirator's act. Notably, each ad in Counts 19–51 post-dates the sale of Backpage from its owners to Mr. Ferrer.   Considering the evidence and testimony, the Court finds that there is an insufficiency of evidence showing any acts by Mr. Ferrer, or any other co-conspirator, taken *after* the sale of Backpage was a reasonably foreseeably consequence of the unlawful agreement.   The evidence accords with the Jury's likely conclusion that the sale of Backpage to Mr. Ferrer was a break in the conspiracy's agreement to violate the Travel Act.  At best, the Government's evidence showed that Mr. Ferrer used Backpage's profits after the sale of Backpage to satisfy the loans he assumed for Backpage's purchase.   For that reason, the Court finds that there is insufficient evidence to convict Mr. Lacey of Counts 19–51, even under a *Pinkerton* theory of liability.  The Court will therefore grant Mr. Lacey's motion for acquittal of the Travel Act violations alleged in Counts 19–51.

### C.    Money Laundering Counts

Defendants were charged with conspiracy to commit money laundering (Count 52), money laundering under 18 U.S.C. § 1956, relating to the laundering of monetary instruments (Counts 53–68, 100), and money laundering under 18 U.S.C. § 1957, relating to engaging in monetary transactions in property derived from specified unlawful activity (Counts 69–99).   They challenge the sufficiency of the evidence supporting the charges on which the Jury found them guilty.  The Court will first assess the Defendants' arguments regarding the substantive money laundering counts and then will address the conspiracy to commit money laundering count.

### 1.    Money Laundering Counts Under 18 U.S.C. § 1956

"18 U.S.C. § 1956 prohibits specified transfers of money derived from unlawful activities.  Subsection (a)(1) makes it unlawful to engage in certain financial transactions, while subsection (a)(2) criminalizes certain kinds of transportation." *Regalado Cuellar v. United States*, 553 U.S. 550, 557 (2008) ("*Cuellar*").  Defendants here were charged under both Subsections.[22]  Counts 53–62 charge violations of Subsection 1956(a)(1)(B)(i), aimed

---

[22] Unless where otherwise noted, all Section and Subsection references are to Chapter 18 of the United States Code.

1  at financial transactions that are intended to conceal the source of illegal proceeds. Counts

2  63–68 charged violations of Subsection 1956(a)(1)(A)(i), which prohibits transporting

3  funds internationally for the purpose of promoting specified unlawful activities. Count 100

4  against Mr. Lacey charged a violation of Subsection 1956(a)(2)(B)(i), which prohibits

5  transporting funds internationally that are intended to conceal the source of illegal

6  proceeds.

7
8       **a.    Counts 53–62: Transactional Concealment Money Laundering under Subsection 1956(a)(1)(B)(i) (Messrs. Lacey, Brunst & Spear)**
9

10      Defendants were charged in Counts 53–62 with money laundering under Subsection

11  1956(a)(1)(B)(1). The Superseding Indictment states that Website Technologies

12  transferred the funds in these transactions to Cereus Properties; that Defendants knew the

13  funds represented proceeds of some form of unlawful activity; and that Defendants made

14  the transfers in whole or in part to conceal the source of the proceeds of the unlawful

15  activity. (Doc. 230 ¶¶ 204–205).

16      At trial, it was established that after 2016, Backpage proceeds were collected and

17  divided between Website Technologies and Ad Tech B.V., a company registered in the

18  Netherlands. (Trial Ex. 1479). Mr. Thai testified that the transfers from Website

19  Technologies in Counts 53–62 all occurred between the three-month period of May 18,

20  2016, and August 16, 2016, and totaled close to $17 million. (Trial Tr., Doc. 1923 at 136–

21  138; Trial Ex. 1479). Each transfer was made from a Website Technologies bank account

22  at Branch Banking & Trust to a bank account held by Cereus Properties at Arizona Bank

23  & Trust. (Trial Tr., Doc. 1923 at 136–138; Trial Ex. 1479). Mr. Thai and Mr. Ferrer both

24  testified that Cereus Properties "collected the interest and debt payments from the $600

25  million loan" from the sale of Backpage, and that Defendants were owners of Cereus

26  Properties. (Trial Tr., Doc. 1814 at 91:2–3).

27      Subsection 1956(a)(1)(B)(i) states in pertinent part:

28      (a)(1) Whoever, knowing that the property involved in a financial transaction

represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
(B) knowing that the transaction is designed in whole or in part—
. . .
(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity
shall be sentenced to a fine. . . or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(B)(i).  *See also United States v. Wilkes*, 662 F.3d 524, 545 (9th Cir. 2011) (holding that "[t]o convict a person for money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), the government must prove that (1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of unlawful activity; (3) the defendant knew that the proceeds were from unlawful activity; and (4) the defendant knew 'that the transaction [was] designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.'") (internal citations omitted)).

Defendants argue the Government's evidence was insufficient in showing (1) the funds in these transfers were proceeds of Travel Act violations; and (2) they had an intent to conceal the nature or source of the funds.

### i. Specified Unlawful Activity

Defendants first argue that a judgment of acquittal is warranted on Counts 53–62 because the Government did not provide sufficient evidence showing the funds at issue were the proceeds of any prostitution ad sales during the timeframe of these Counts. (Doc. 2007 at 14).  The Government says this argument is a red herring.  It argues Ninth Circuit law is clear that a defendant may be convicted of money laundering even if the defendant is not charged or convicted of the underlying specified unlawful activity. (Doc. 2019 at 12).

The Court agrees with the Government.  A defendant need not actually be convicted of the specified unlawful activity—what here would be Travel Act offenses—before a money laundering conviction can be had under Section 1956(a)(1)(B)(i).  *See e.g.*, *United*

1    *States v. Golb*, 69 F.3d 1417, 1422 (9th Cir. 1995).   In fact, even if evidence of the

2    underlying activity is insufficient to convict a defendant, where there is evidence from

3    which a jury could infer the source of the funds was from the underlying unlawful activity,

4    a Section 1956(a)(1)(B)(i) conviction can stand.   *Id.*   This was precisely the case in *United*

5    *States v. Golb*, where the Ninth Circuit Court of Appeals affirmed the convictions for

6    money laundering where there was evidence from which a jury could have inferred that the

7    source of laundered proceeds was illegitimate—even though the jury found that the same

8    evidence was insufficient to convict the defendant for the actual "specified unlawful

9    activity." *Id.  See also United States v. Blackman*, 904 F.2d 1250, 1257 (8th Cir. 1990)

10   (affirming conviction where the jury could infer that the funds came from the "specified

11   unlawful activity"); *United States v. Mankarious*, 151 F.3d 694, 702 (7th Cir. 1998)

12   (affirming conviction and noting "money laundering statute does not require the

13   government to trace the laundered proceeds to a specific predicate offense"); *United States*

14   *v. Yagman*, 2007 WL 9724388, at *20 (C.D. Cal. May 3, 2007) (noting out-of-circuit case

15   law standing for the same).

16        Defendants have also objected to the time difference between the Travel Act Counts

17   on which Mr. Spear was convicted and the first transaction in Court 53.  The Travel Act

18   ads in Counts 2–18 are dated September 10, 2013, to February 26, 2015.  The transactions

19   in Counts 53–62 are dated May 18, 2016, to August 31, 2016.   The Court finds the time

20   difference here immaterial.  The Jury need not necessarily have found that it was the Travel

21   Act violations alleged in Counts 2–18 that specifically created the unlawful proceeds.  The

22   federal money laundering statute criminalizes transactions in proceeds, not the transactions

23   that create the proceeds. *Wilkes*, 662 F.3d at 545; *see also United States v. Garcia*, 37 F.3d

24   1359, 1365 (9th Cir. 1994) (finding that under Section 1956, "due to the fungibility of

25   money, it is sufficient [to] prove that the funds in question came from an account in which

26   tainted proceeds were commingled with other funds").

27        The requirements under Section 1956 are that Defendants knew the proceeds

28   derived from unlawful activity and that the proceeds "in fact" derived from unlawful

activity.   18 U.S.C. § 1956(a)(1).  This accords with what the Jury was instructed.  (*See* Doc. 1998 at 41 (stating that the Government had to prove beyond a reasonable doubt for each of these counts that "the defendant conducted a financial transaction involving property that represented the proceeds of a violation or violations of the Travel Act").

Although the Government did not trace the funds in Counts 53–62 to particular Travel Act violations—i.e., sale proceeds from the sale of particular prostitution ads—there was sufficient evidence from which a jury could infer that the funds were proceeds from Backpage's sales of sex-for-money ads and that Defendants or their conspirators knew they were proceeds from sex-for-money ads.  As has been discussed, evidence relating to Defendants' knowledge that Backpage sold prostitution ads was more than sufficiently adduced.  Mr. Ferrer told the Jury that following the 2015 sale, the ultimate source of the monies paid to Cereus Properties from Website Technologies "was the prostitution ads posted on Backpage and/or Cracker."  (Trial Tr., Doc. 1814 at 90:3–7; 90:20–22; 91:16–17).  Mr. Thai explained the movement of these funds: from Backpage ad sales to Website Technologies to Cereus Properties.  A rational jury could have concluded that the funds transferred in Counts 53–62 were proceeds from Backpage's sale of illegal prostitution ads.

### ii.    Intent to Conceal

Defendants also argue that there was insufficient evidence of their intent to conceal the source of these transactions to convict them of these charges.  Defendants maintain that "[t]here was no testimony that the sale of Backpage and associated loan was consummated for the *purpose* of concealing from financial institutions the source of the funds." (Doc. 2007 at 16).

"[A] conviction under this provision requires proof that the purpose—not merely effect—of the transportation was to conceal or disguise a listed attribute."  *Cuellar*, 553 U.S. at 567.[23]  "In other words, that a transaction is structured to hide its source is not enough.  The government must prove that the transaction had the purpose of concealing

---

[23]  The Subsection at issue in *Cuellar* concerned concealment under the statute's transportation prong(A)(2)(B)(ii), however, various circuit courts of appeal have applied *Cuellar* to cases involving concealment under the statute's transaction prong (A)(1)(B)(i). *See Singh*, 995 F.3d at 1075 (collecting cases).

the source." *Singh*, 995 F.3d at 1075.  "Where a defendant takes no steps to disguise or conceal the source or destination of the funds, leaving an easy-to-follow trail in moving money around, those transactions conspicuously lack the 'convoluted' character associated with money laundering." *Wilkes*, 662 F.3d at 545–46 (cleaned up).  *See also United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007) ("The money laundering statute criminalizes behavior that masks the relationship between an individual and his illegally obtained proceeds; it has no application to the transparent division or deposit of those proceeds.").  The Eleventh Circuit has opined the following:

> Evidence to consider in determining whether a transaction was designed to conceal includes, among other things: statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.

*United States v. Johnson*, 440 F.3d 1286, 1291 (11th Cir. 2006) (cleaned up).  "Another important consideration is whether the money is better concealed or concealable after the transaction than before."  *Id.* (internal quotation omitted).

Defendants argue that the only testimony as to these transactions came from Mr. Ferrer, who testified that these transfers were loan payments in connection with the sale of Backpage.  (Doc. 2007 at 16).  They say the sale and loan documents were prepared by attorneys and accountants and clearly reference the sale of Backpage, not a "shell" company.  (Trial Exs. 5427, 5364).  They say that witness testimony simply asserting that the transactions in these counts "involve" Backpage proceeds is insufficient to prove concealment.  (Doc. 2029 at 10).

The Court disagrees.  Mr. Ferrer testified that Mr. Brunst formed Website Technologies as a shell company with the purpose of concealing that the proceeds going to Website Technologies was revenue from the sale of Backpage ads.  (Trial Tr., Doc. 1814 at 89:8–10; Trial Ex. 1481).  He also testified that the primary source of money that flowed from Backpage ads was revenue from prostitution ads and that Defendants owned the

recipient entity Cereus Properties. (Trial Tr., Doc. 1814 at 91:16–17). From this evidence, a rational jury could infer that the purpose of the transactions, at least in part, was to conceal that the source of the proceeds flowing through Website Technologies to Cereus were illegal proceeds of prostitution ads sold on Backpage. *See Golb*, 69 F.3d at 1423–24 (noting that jury did not have to accept defendant's explanation that "the convoluted payment methods were only used to avoid Colombian currency exportation laws," and not to conceal the source of the funds).

Defendants' requests for judgment of acquittal on Counts 53–62 are denied.

### b. Counts 64–68: International Promotional Money Laundering Under Subsection 1956(a)(2)(A) (Messrs. Lacey and Brunst)

Messrs. Lacey and Brunst were charged with violation of international promotional money laundering in Counts 64–68. Mr. Brunst was convicted of each charge and no verdict was returned on Mr. Lacey.

To satisfy the requirements of Subsection 1956(a)(2)(A), evidence must establish that a defendant or co-conspirator transferred funds internationally with "the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A). At trial, it was established that Ad Tech B.V. made these transfers from its Netherlands bank account to Cereus Properties' Arizona Bank & Trust account between August 5, 2016, and November 15, 2016, and that they totaled approximately $11.3 million. (Trial Tr., Doc. 1928 at 150–51; Trial Ex. 1479). Defendants argue that there is insufficient evidence of their intent to promote Travel Act violations from which a jury could convict on these Counts. The Court again disagrees.

A jury may infer intent to promote the illegal activity from evidence that illicit proceeds have been transferred. *United States v. Barragan,* 263 F.3d 919 (9th Cir. 2001) (noting that in the Ninth Circuit, government is not required to prove that a defendant reinvested illegal proceeds into the illegal enterprise to show intent to promote). For example, courts have found sufficient intent to promote where evidence showed that funds were distributed to co-conspirators, *Manarite*, 44 F.3d at 1415–16 (holding that evidence

that defendants distributed proceeds from illegal chip-cashing scheme was sufficient to support conviction for money laundering because the "scheme could not benefit its participants unless the chips were cashed"); were used to pay persons integral to the success of the illegal activity, *United States v. Baker*, 63 F.3d 1478, 1494 (9th Cir. 1995) (finding evidence that defendant made payments to suppliers of contraband cigarettes was evidence of intent to promote on grounds that the defendant "could not have continued the illegal trafficking without paying his. . . suppliers"); and even where the defendant simply deposited a check in his own bank account, *United States v. Montoya*, 945 F.2d 1068, 1076 (9th Cir. 1991), *rev'd on other grounds, McCormick v. United States*, 500 U.S. 257 (1991) (holding that depositing a check in a bank account evidenced an intent to promote on the grounds that defendant could only make use of the funds if he deposited the check).

Here, Mr. Thai testified that Ad Tech B.V. received revenue from Backpage following the April 2015 sale of Backpage to Ferrer.   (Trial Tr., Doc. 1923 at 129: 4–17; Trial Ex. 1481).   The transfers at issue show Ad Tech B.V. sending funds to Cereus Properties, funds that then "almost immediately" went to Defendants. (Trial Tr., Doc. 1923 at 136–37).   The Court finds that these transfers sufficiently evidence Defendants' intent to promote the carrying on of Travel Act offenses.   Construing the evidence in the light most favorable to the prosecution, the Jury could have divined an intent to promote the Travel Act offenses from Ad Tech B.V.'s deposit of funds into Cereus Properties' account. *Mararite*, 44 F.3d at 1415.   A rational jury could also have concluded that Mr. Ferrer, as the co-conspirator in control of Ad Tech B.V., could not have continued selling prostitution ads on Backpage without making these payments to Cereus Properties, which was owned by Defendants.   *Baker*, 63 F.3d at 1494.[24]   Defendants' requests for judgments of acquittal on Counts 64–68 are denied.

/ / /

/ / /

---

[24] This reasoning applies whether or not Cereus Properties was used for Backpage payroll purposes or solely functioned to collect the balance and interest on the loan.

### c.   Count 100: International Concealment Money Laundering Under Section 1956(a)(2)(B)(i) (Mr. Lacey)

Mr. Lacey was convicted of international concealment money laundering in Count 100.  The Superseding Indictment states that on January 3, 2017, Mr. Lacey transferred $16.5 million from his Johnson Bank of Arizona account to a Primus Trust Co./K&H Bank in Hungary.  (Doc. 230 ¶¶ 210–11).   It alleges that Mr. Lacey knew the funds represented proceeds of some form of unlawful activity; and that he made the transfer in whole or in part to conceal the source of the proceeds of the unlawful activity.  (*Id.* ¶ 211).

Section 1956(a)(2)(B)(i) provides in relevant part,

> (2) Whoever transports or attempts to transport a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
> . . .
> (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that the transportation, transmission, or transfer is designed in whole or in part - -
> . . .
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; . . .
> shall be sentenced to a fine of $500,000 or twice the value of the monetary instrument or funds involved in the transportation, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(2)(B)(i); *United States v. Monroe*, 943 F.2d 1007, 1015 (9th Cir. 1991).

The evidence at trial showed that upon receiving his share of the loan payments to Cereus Properties, Mr. Lacey put his funds into five (5) two-year annuity trusts that he controlled.[25]   In July 2016, Mr. Lacey sent a letter to his attorney John Becker ("Mr. Becker") asking Mr. Becker to connect him with another attorney "who has expertise in off-shore." (Trial Ex. 1).  The letter stated, "to revisit for just a moment, I am not interested in any tax avoidance, I just want to put some assets in place where litigious parties,

---

[25] These transfers for the basis of Counts 94–99.

including government parties, cannot access my accounts." (*Id.*)   Then, sometime in November 2016, Mr. Lacey met with bank officer Lin Howard at Arizona Bank & Trust, seeking advice on how assets were seized and could be protected.   (Trial Tr., Doc. 1925 at 11:1–7).   During that meeting, which Ms. Howard testified made her "very uncomfortable," Mr. Lacey made it clear that he was not looking to avoid paying taxes on the assets but was looking to move some assets "offshore in order to protect them from government seizure." (*Id.* at 15:10–11; 11:11–13).   After this exchange, Arizona Bank & Trust ceased doing business with Mr. Lacey. (*Id.*).

Mr. Lacey's five (5) annuity trusts were ultimately consolidated into Mr. Becker's IOLTA account and on January 3, 2017, Mr. Lacey, through Becker, transferred $16.5 million from the IOLTA account at Arizona Johnson Bank to Primus Trust Company/K&H Bank in Hungary to create a trust for the benefit of Mr. Lacey's two sons.   (Trial Ex. 1479). Thereafter, Mr. Becker, on behalf of Mr. Lacey, timely filed with the United States government a "Foreign Bank Account Report," or "FBAR" related to the Hungary account, but only after obtaining extension of time for Mr. Lacey to do so.

As with Counts 53–62, Mr. Lacey argues that there was insufficient evidence at trial to show (1) he actually concealed or intended to conceal any attribute of the funds at issue in Count 100; or (2) that he knew the funds at issue were the proceeds of specified unlawful activity.   (Doc. 2004 at 2).   The Court will address each argument in turn.

### i.   Concealment

Mr. Lacey argues that there was insufficient evidence that his international transfer was designed to conceal that the source of the funds were illegal proceeds of prostitution ads.   He compares his case to that of the drug courier in *Cuellar*.   In that case, Mr. Cuellar was charged with international concealment money laundering after authorities discovered him transporting $81,000 of drug proceeds into Mexico.   *Id*. at 552.   The funds were found in a secret compartment of his car, covered in plastic bags and animal hair.   *Id*.   The Supreme Court agreed that this evidence showed Mr. Cuellar intended to conceal the money *to transport it* into Mexico but held that that evidence was insufficient to uphold

1    Mr. Cuellar's concealment conviction because it did not show that it was his ultimate

2    purpose to conceal an attribute of the funds.  *Id.*  The Court found the evidence showed

3    Mr. Cuellar's ultimate purpose was to "compensate the leaders of the operation," not to

4    conceal its source.  *Id.* at 566 (explaining "*how* one moves the money is distinct from *why*

5    one moves the money").  *See also id.* ("The evidence suggested that the secretive aspects

6    of the transportation were employed to *facilitate* the transportation . . . , but not necessarily

7    that secrecy was the *purpose* of the transportation.").

8         Mr. Lacey argues that his international transfer to the Hungarian account similarly

9    had no concealment purpose.  He says the purpose of the transfer was to put the funds "into

10   a bank that would not close the account thereby causing further banking instability, and to

11   fund a trust that had been created for Mr. Lacey's sons." (Doc. 2004 at 8).  He further

12   argues that his stated interest in placing funds where government entities could not access

13   them does not evidence an intent to conceal the source of the funds because the word

14   "access" does not mean the same thing as to "conceal," and the Government has pointed

15   to no authority supporting this "analytical leap."  (Doc. 2033 at 2).  He points out that the

16   Court defined "concealment" for the Jury as "the act of preventing disclosure or refraining

17   from disclosing."  (Doc. 1999 at 4).  He says his transactions relating to Count 100 were

18   entirely "open and obvious," showing only an intent to disclose the attributes of the

19   transfer.  For support, he points out that all the bank accounts at issue clearly belonged to

20   him because he was the owner or the beneficiary of each of them; that Mr. Thai confirmed

21   as much when he testified that he could follow each transaction with ease due to the names

22   on the accounts; and that the existence of the Hungarian account, its location, value, and

23   associated taxpayer (Mr. Lacey), were timely reported to the United States government via

24   a required "FBAR."  (*Id.* at 6).  He says that his statements to Mr. Becker and Ms. Howard

25   that he had no interest in seeking a tax shelter in moving his assets off-shore further reflect

26   an intention to disclose the attributes of the funds, not to conceal them.

27        Although Mr. Lacey raises some plausible characterizations of the trial evidence,

28   the Court ultimately disagrees that a rational juror could not have found the purpose of his

- 51 -

international transfer was to conceal the source of the funds.  The money laundering statute is violated if the transaction in question is "designed in whole or *in part*" to conceal.  18 U.S.C. § 1956(a)(2)(B)(i) (emphasis added).  Unlike in *Cuellar*, the Government provided sufficient evidence to show that the purpose of Mr. Lacey's transfers to the Hungary account, at least in part, was to conceal that the true source of the funds stemmed from sales of Backpage prostitution ads.

The Jury could possibly have divined this intent from Mr. Lacey's statements to his attorney and Ms. Howard that he wanted to put his assets somewhere the government "could not access them."  Though the Government has not provided the Court with a case in which a defendant's intent to shield assets from government seizure amounted to concealment under Subsection 1956(a)(2)(B)(i), the Court nonetheless finds that a rational Jury could have interpreted Mr. Lacey's statements to mean that he thought the international transfer would further conceal the origin of the funds and thus prevent the government from accessing them.  The Court rejects Mr. Lacey's suggestion that this is an improper analytical leap to make.

Moreover, the jurors could have also been persuaded by the fact that Mr. Lacey's transfer to Hungary was the last transfer in a series of unusual transactions that had the effect of distancing the funds from Backpage proceeds.  In *United States v. Wilkes*, the defendant was convicted of bribery for making payments to a congressman in exchange for government contracts and transactional money laundering concealment under § 1956(a)(1)(B)(i).  662 F.3d at 547.  In upholding the defendant's conviction, the Ninth Circuit noted that certain transactions that "provided additional buffers between the corrupt contract and the [payoffs]" were evidence of intent to conceal the source of the funds because these transactions were "convoluted" and not "simple transactions."  *Compare id. with Adefehinti*, 510 F.3d at 323 (finding no evidence of intent to conceal where a fraudulent check was negotiated at a bank and most of the proceeds "were either cashed or went directly into accounts in the name of defendants or their associates without passing through any other person's account").

As in *Wilke*, the Government here provided evidence of similar "buffer" transactions that a rational jury could have found were indicative of an intent to conceal the source of the funds.  Specifically, there was evidence showing that Mr. Lacey and his alleged co-conspirators created Website Technologies and Cereus Properties to insulate those entities from the tainted Backpage proceeds.  The Government's expert witness showed how these funds flowed through these entities before being distributed to Mr. Lacey, who then sent the funds to five separate annuity trusts he controlled.  From there, Mr. Lacey wired the funds in the trusts to Mr. Becker, who consolidated the money into his IOLTA account before transferring it to Hungary to create a trust for the benefit of Mr. Lacey's two sons.  Even though the Government's expert testified that he could follow the trail of funds with relevant ease, there is enough here to suggest that these transfers, including the one charged in Court 100, were not the type of "simple transactions" that fall outside of the money laundering statute.  *Accord United States v. Chang*, 2020 WL 5702131, * (N.D. Cal. Sept. 24, 2020) (denying defendant's Rule 29 motion where the Government introduced evidence that transfers of improperly solicited donations were made to an illegitimate enterprise entity in order to conceal that defendant used the money on personal expenses).  *See also United States v. Tekle*, 329 F.3d 1108, 1113–14 (9th Cir. 2003) (rejecting the defendant's argument "that the government did not prove that he intended to conceal the illegal nature of [drug trafficking] funds because the 'transactions in question were open, notorious, and did not disguise defendant's identity'" as "[t]he necessary concealment. . . is that of the source of the funds, not the identity of the money-launderer"). And though the FBAR that Mr. Lacey filed suggests that he intended to pay his taxes on the funds therein, the filing does not necessarily negate the fact that the transfer concealed the source of the funds more than it did before the funds were transferred. *Johnson*, 440 F.3d at 1291.  Based on these facts, a rational jury could have found that the purpose of Mr. Lacey's Hungary transfer was at least in part to conceal that the funds found their source in the proceeds of illegal Backpage prostitution ads.

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

###### ii.   Knowledge

Mr. Lacey also says the Government adduced insufficient evidence that he knew "the funds at issue were proceeds of specified unlawful activity in the form of Travel Act violations for the facilitation of prostitution business enterprises." (Doc. 2033 at 9). Not so. The Court finds that there was substantial evidence from which a rational juror could have inferred Mr. Lacey's knowledge that the funds were proceeds from Backpage prostitution advertisements.

First, the Government provided sufficient evidence from which a juror could infer that Mr. Lacey knew Backpage sold ads for prostitution. As has been discussed, *supra*, such evidence included Mr. Lacey's article on Backpage's business practice, in which he writes that Backpage is providing "the oldest profession in the world" with transparency (Trial Ex. 113a) and his public statement that he believed "in legalized prostitution" (Trial Ex. 1911b). The Government also introduced evidence of statements made during meetings Mr. Lacey and the other owners of Backpage had with NCMEC. During that meeting, NCMEC representatives presented Mr. Lacey and others with Backpage ads from the Adult escort section that contained links to TER. This evidence could have led a rational juror to infer that Mr. Lacey was aware that all or some of the Adult escort ads on Backpage were illegal sex for money ads. *See Singh*, 995 F.3d at 1075. In doing so, the Jury could have also found that the ads were not deserving of any First Amendment protections that may otherwise have insulated Mr. Lacey from liability.

Second, as described above, testimony from Messers. Ferrer and Thai provided sufficient evidence from which the Jury could have concluded that the funds at issue in Count 100 came from Backpage's prostitution ads. Mr. Lacey argues his statement to his lawyer that the source of the funds was revenue from the sale of Backpage "cannot be equated with knowledge that the funds at issue were the proceeds of specified unlawful activity, meaning the proceeds from one of the 50 charged ads." (Doc. 2004 at 11). But again, there is also no requirement that the Government must show that Mr. Lacey had knowledge that the funds that were transferred were proceeds from the specific 50 ads

charged.  Where there is evidence from which a jury could infer the source of the funds was from violations of the Travel Act—here, in the form of selling sex for money ads, Mr. Lacey's Subsection 1956(a)(1)(B)(i) conviction can stand.

Defendants' Motions for a Judgment of Acquittal on the Section 1956 Counts are denied.

## 2.    Money Laundering Counts Under 18 U.S.C. § 1957

Defendants argue that judgments of acquittal should enter in their favor on the Section 1957 Counts because the prosecution failed to prove that any alleged laundered money in Counts 69–99 "derived from specified unlawful activity"—in this case, violations of the Travel Act.  (Doc. 2007 at 18).  All of the transfers at issue in Counts 69–99 are alleged to derive from unlawful Backpage proceeds.

"A conviction for money laundering under 18 U.S.C. § 1957 requires the government to show: (1) the defendant knowingly engaged in a monetary transaction; (2) he knew the transaction involved criminal[ly derived] property; (3) the property's value exceeded $10,000; and (4) the property was derived from a specified unlawful activity." *United States v. Roger*, 321 F.3d 1226, 1229 (9th Cir. 2003).[26]  The statute defines "criminally derived property" as "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2).  "In a prosecution for an offense under this section, the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity." *Id.* § 1957(c).  Indeed, the "statute applies to the most open, above-board transaction." *United States v. Rutgard*, 116 F.3d 1270, 1291 (9th Cir. 1997).

Unlike Section 1956 charges, the Ninth Circuit imposes a tracing requirement in Section 1957 cases due to Section 1957's potentially broad reach.  Under this view, the prosecution can succeed on a Section 1957 charge in one of three ways: (1) by establishing that the entire business from which the funds derived was an illegal enterprise; (2) by showing that a deposit of at least $10,000 of criminally derived proceeds were made into

---

[26] Travel Act violations qualify as "specified unlawful activity." 18 U.S.C. § 1957(f)(3); 18 U.S.C. § 1956(c)(7)(A); 18 U.S.C. § 1961(1).

defendant's account; or (3) in the case of a withdrawal transaction, by showing that all of the funds were transferred out of the account. *Rutgard*, 116 F.3d at 1292; *United States v. Yagman*, 502 F.Supp.2d 1084 (C.D. Cal. Aug. 17, 2007). In contrast to other circuits, the Ninth Circuit rejects the presumption that proof that some criminally derived funds exist in an account means that a subsequent transfer of funds out of that account involves those criminally derived funds. *Rutgard*, 116 F.3d at 1292–93 (explaining that "[t]he statute does not create a presumption that any transfer of cash in an account tainted by the presence of a small amount of fraudulent proceeds must be a transfer of these proceeds . . . and [t]o create such a presumption in order to sustain a conviction under § 1957 would be to multiply many times the power of that draconian law").

Here, the Government's theory was that *all* proceeds from Backpage were criminally derived from Defendants' Travel Act violations, and thus *all* subsequent transfers stemming from Backpage and/or Website Technologies and Ad Tech B.V. were unlawful under Section 1957.[27] The Government did not, however, provide sufficient evidence at trial that every ad sold on Backpage.com prior to these transfers was a Travel Act violation such that a rational jury could have traced the funds back to a criminally-derived source. Even the fact that the Government offered evidence showing that the majority of Backpage's revenue—at times up to 96%—stemmed from sales of ads posted in the Adult Escort section of Backpage is insufficient to sustain these convictions. A nearly identical argument was unsuccessfully advanced in *United States v. Hanley*, 190 F.3d 1017, 1024, 1025–26 (9th Cir. 1999), *superseded in part by* U.S.S.G. § 2S1.1 (2001) (rejecting the government's argument that the tracing requirement was satisfied where the

---

[27] The Court asked Government counsel to clarify this point during oral argument on the Rule 29 Motions:

**Court:** So is it your position that, essentially then, any proceeds that were received from the operation of Backpage at that time then - - because they were considered illegals proceeds, then whatever was used with that money to purchase then could be alleged?
**Mr. Kozinets:** Absolutely, Your Honor.
**Court:** That's the – that's the position?
**Mr. Kozinets:** Absolutely.

(Doc. 1903 at 69).

government had proven that the great majority of the funds in the account were criminally derived funds). And because the Government made no attempt to trace the proceeds that derived from a particular Travel Act violation or violations, it cannot be said that a rational jury could have concluded "beyond mere speculation" that at least $10,000 of criminally derived proceeds were transferred to Defendants in any of the Section 1957 charges. *Yagman*, 502 F.Supp.2d at 1089.

Because Counts 69–99 all suffer from this evidentiary deficiency, the Court will enter judgments of acquittal on each of these charges.

### 3.     Conspiracy to Commit Money Laundering (Count 52)

To convict an offender of money laundering conspiracy under Subsection 1956(h), the government must prove the following elements beyond a reasonable doubt: (1) there was an agreement to commit money laundering; (2) the defendant knew the objective of the agreement; and (3) the defendant joined the agreement with the intent to further its unlawful purpose. *United States v. Jaimez*, 45 F.4th 1118, 1124 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1038 (2023). Here, the object of the alleged conspiracy was to commit the substantive money laundering offenses alleged in the Superseding Indictment. (Doc. 230 ¶ 203(a)–(e)).

Defendants reiterate many of the arguments they made relating to the alleged deficiency of evidence supporting the substantive money laundering offense to argue they are entitled to a judgment to acquittal on the conspiracy to commit money laundering charge. (*See* Doc. 2007 at 20–21). They also argue there was insufficient evidence of an agreement to launder money as alleged. As discussed above, the Court finds that there is sufficient evidence to convict Defendants on all of the Section 1956 money laundering charges. As explained, *supra*, the Government was not required to "link" a particular Travel Act violation to a violation of Section 1956 in order for those charges to stand. *See e.g.*, *Golb*, 69 F.3d at 1422 (stating that a defendant need not actually be convicted of the underlying specified unlawful activity for a money laundering conviction to stand where there is evidence from which a jury could have inferred that the source of laundered

proceeds was illegitimate).

Moreover, a rationale juror could have inferred that Defendants agreed to form entities and structure the sale of Backpage to distance themselves from the unlawful proceeds stemming from Backpage's sale of prostitution ads, i.e., violations of the Travel Act by facilitating the promotion of prostitution. *Kaplan*, 836 F.3d at 1212 (holding that an agreement "can be proved by direct or circumstantial evidence, including inferences from circumstantial evidence").

The Court will therefore deny Defendants' request to enter a judgment of acquittal on Count 52.

## III.   DEFENDANTS' RULE 33 MOTION FOR NEW TRIAL[28]

Defendants have also filed a joint Motion for a New Trial.  Rule 33 permits the Court to vacate a judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a).  Although a court's power to grant a motion for a new trial is "much broader than its power to grant a motion for judgment of acquittal," it may not grant the motion unless it finds that "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict" such that "a serious miscarriage of justice may have occurred."  *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000) (citation omitted); *United States v. Alston*, 974 F.2d 1206, 1211–12 (9th Cir. 1992).  The "burden of justifying a new trial rests with the defendant." *United States v. Saya*, 101 F.Supp.2d 1304, 1307 (D. Haw. 1999) (citing *United States v. Shaffer*, 789 F.2d 682, 687 (9th Cir. 1986)).   "[T]he government bears the burden of proving beyond a reasonable doubt that an error was harmless."  *United States v. Benamor*, 925 F.3d 1159, 1166 (9th Cir. 2019) (citation omitted).  In general, motions for new trial "are not favored by the courts and should be viewed with great caution." *United States v. Rush*, 749 F.2d 1369, 1371 (9th Cir. 1984) (internal quotation omitted).

The Court will review Defendants' arguments in turn.

---

[28] The Court notes that the parties, again, omit record support for their assertions, and quite often mischaracterize the record testimony.  The Court declines to scour the months-long trial record or years long case docket to find support for their unsupported assertions.

**A**.      **Jencks &** *Brady* **Violations**

Making some of the same arguments that they did in their unsuccessful post-trial Motions to Dismiss (Docs. 1958; 1967; 1972), Defendants first argue that a new trial is warranted because the Government failed to make timely disclosures to the Defendants as required by the Jencks Act, 18 U.S.C. § 3500, and *Brady v. Maryland*, 373 U.S. 83 (1963) ("*Brady*").[29]   They argue the Government failed to timely produce (1) emails between Mr. Ferrer and government witness postal inspector Lyndon Versoza; and (2) documents disclosing "the factual information the government developed during its investigation of Backpage.com in Western District of Washington in 2012–2013 [(the "WDWA Investigation")]."  (Doc. 2009 at 3).

### 1.      Mr. Ferrer's Emails to Lyndon Versoza

The Court's February 7, 2024, Order denying Defendants' Motion to Dismiss (Doc. 2042) addressed certain of Mr. Ferrer's emails, finding that they were "signed or otherwise approved or adopted" by him and therefore qualified as Jencks material under 18 U.S.C. § 3500(e).  (*Id*. at 8).  However, the Court also determined that the Government's late disclosure did not warrant dismissal of the case or striking Mr. Ferrer's testimony because the material had been previously disclosed.  (*Id*. at 9).  Defendants do not advance any new grounds in their Rule 33 Motion.   Thus, for the reasons stated in its February 7, 2024, Order, the Defendants' Motion for a New Trial based on these grounds is denied.

### 2.      Presumed *Brady* Information From the 2012–13 WDWA Investigation of Backpage

Defendants next argue the Government failed "to produce nearly all the factual information developed during the WDWA Investigation . . . [which] did not result in a prosecution of Backpage or its owners."  (Doc 2009 at 2).  The Government responds that this argument "speculate[s] about what that investigation 'determined' and assert[s], without support that unspecified materials from the investigation are plainly exculpatory

---

[29] The Defendants asserted this argument without benefit of the Court's February 7, 2024, Order (Doc. 2042) and the Court incorporates its findings from that Order because their arguments are mostly duplicative.

and impeaching" and that Defendants have already litigated and lost this argument. (Doc. 2022 at 3).

The Defendants' Motion is indeed based on speculative findings of the WDWA Investigation and the reasons why it did not result in a prosecution of Backpage or its owners. Defendants speculate that the WDWA Investigation included potential *Brady* material because it likely determined that "though many people who saw Backpage.com adult ads might conclude the ads related to prostitution, their conclusions would be unsound because so many activities involving sex and money are lawful;" and because "Backpage.com's moderation practices were consistent with industry standards." (Doc. 2009 at 5). They do not cite to any record evidence or testimony to support these claims. Nonetheless, they accuse the Government of failing to produce this material under *Brady* and say this failure warrants a new trial. (Doc. 2009 at 5 ("[T]he government's refusal to produce to the defense *these plainly exculpatory and impeaching materials* warrants, at minimum, a new trial.") (emphasis added)).

As best as the Court can glean, Defendants assert that they were prejudiced by the non-production because in their absence they were unable to adequately defend against Mr. Ferrer's statement at trial that in 2012 Backpage was experiencing "pressure" due to "another prostitution investigation of the site." (Trial Tr., Doc. 1971 at 80:5–8; *see* Doc. 2009 at 4 (arguing that when the Government elicited this statement it "used the investigation as a sword at trial while seeking to shield disclosures relating to that investigation")). They argue that, without the WDWA disclosure, they were hampered from offering that the WDWA Investigation exonerated Backpage and its owners from illegality. (*See* Doc. 2009 at 4–5).

From the outset of the case, Defendants have strenuously litigated the Government's discovery production relating to the WDWA Investigation. In addressing Defendants' November 1, 2021, Motion to Dismiss the Superseding Indictment (Doc. 1355), this Court reviewed their assertion that the Government failed to produce exculpatory evidence related to the WDWA investigation. (*See* Doc. 1444 (the Court's December 29, 2021

1    Order)).   Earlier, in Defendants' September 9, 2021, Motion to Compel (Doc. 1281),

2    Defendants sought an order compelling the Government to produce all materials from its

3    WDWA investigation that were relied upon when its attorneys concluded that there was no

4    evidence of criminality and asserting that they sought all evidence from the investigation,

5    noting that it is likely exculpatory.  (*Id.* at 6).  This Court found that these same arguments

6    had been previously considered and ruled upon.   Two previously-assigned courts had

7    already found "[i]t is clear to the Court that the investigation that took place in the Western

8    District of Washington is wholly separate from the criminal case before the Court . . . and

9    [t]he Defendants have failed to demonstrate how the mental impressions and legal analyses

10   from attorneys that are not involved in this case could potentially be considered exculpatory

11   evidence."  (*See* Doc. 1444 (citing Doc. 449)).   Those courts also found that the attorney

12   memos were irrelevant to the indictment and proceedings in *this* criminal case.  That the

13   Court has now heard the case in its totality does not give it reason to change these rulings

14   or grant Defendants a new trial based on alleged *Brady* violations.

15          During the trial, the Court permitted the Government to introduce testimony of the

16   Defendants' knowledge that Backpage was being used to promote prostitution.   For

17   example, Mr. Ferrer was allowed to testify that several NGOs repeatedly informed

18   Defendants that their website was selling girls and women for money and that Backpage

19   was receiving thousands of subpoenas relating to prostitution and trafficking on Backpage.

20   Mr. Ferrer's brief statement that Backpage and its owners were "pressured" was another

21   example of testimony that suggested Defendants knew their website was facilitating the

22   promotion of prostitution.   Defendants, in turn, had ample opportunity to solicit testimony

23   from the Government and their witnesses about whether the Travel Act counts were

24   actually offers of sex for money or that the Defendants were on notice that they were sex

25   for money ads.   Indeed, the Defendants' own expert witness, Dr. Kimberly Mehlman

26   Orozco, testified that no one could be certain that any ad, irrespective of where it was

27   posted, is an actual sex for money ad.  Trial Tr., Doc. 1930 at 50:12–20.  The Defendants

28   have not convinced this Court (or any other, previously-assigned court) that the presumed

1   *Brady* material from the WDWA Investigation would have been material to the issues at

2   trial, could have been used to impeach witnesses, or that a new trial would likely have

3   resulted in acquittal.   *United States v. Kulczyk,* 931 F.2d 542, 548 (9th Cir. 1991).

4   Defendant's Rule 33 Motion is therefore denied on that basis.

5          **B.      Mr. Ferrer's Testimony Relating to Ms. Robinson**

6          Defendants next argue that they are entitled to a new trial because the Government

7   "elicited false or misleading testimony from Carl Ferrer" relating to his communications

8   with Ms. Robinson, the poster in ads from Counts 3, 6–11, and 18.  (Doc.  2009 at 6); *see*

9   *also supra* Section II.B(2)(b) ("Commission of Travel Act Violations in Counts 3, 6–11,

10  18").  When, as here, a defendant asserts a new trial is warranted because the prosecution

11  used perjured testimony, additional standards apply.  If the perjury was used knowingly

12  the conviction "must be set aside if there is any reasonable likelihood that the false

13  testimony could have [a]ffected the judgment of the jury." *United States v. Young,* 17 F.3d

14  1201, 1203 (9th Cir. 1994) (quoting *United States v. Agurs,* 427 U.S. 97, 103 (1976)).  If

15  the defendants cannot show that the Government knowingly used false testimony, then the

16  conviction will be set aside "if there is a reasonable probability that, had the evidence been

17  disclosed to the defense, the result of the proceeding would have been different." *United*

18  *States v. Endicott,* 869 F.2d 452, 455 (9th Cir. 1989) (citing *United States v. Bagley,* 473

19  U.S. 667, 682 (1985)).

20         Upon review of the record, the Court does not find evidence that Mr. Ferrer's

21  testimony about his communications with Ms. Robinson were false or misleading.  The

22  Government introduced hundreds of exhibits and testimony through Ferrer about his email

23  communications.  Mr. Ferrer testified that he used several email addresses including

24  carl.ferrer@backpage.com and carl@backpage.com.  Mr. Ferrer testified that he recalled

25  having email exchanges with Ms. Robinson using carl@backpage.com "from 2010–2018"

26  and that "there were a lot of emails."  (Trial Tr., Doc. 1795 at 79).

27         Defendants say a new trial is required because Mr. Ferrer stated on cross-

28  examination that carl@backpage.com "really wasn't my email address."   From this

1  statement they conclude that his testimony that he communicated with Ms. Robinson

2  through that email address "was false (or at least highly misleading)." (Doc. 2009 at 8).

3  They contend "Mr. Ferrer admitted on cross-examination that the emails to and from the

4  carl@backpage.com email address were *received by and responded to by his staff, not by*

5  *him*, contrary to his testimony on direct examination." (Doc. 2009 at 8) (emphasis added).

6      These contentions are unsupported by the record and conveniently ignore other

7  testimony Mr. Ferrer gave about his communications. The Court's scrutiny of Mr. Ferrer's

8  testimony fails to find a statement that Mr. Ferrer did not respond to emails sent to

9  carl@backpage.com. The record reflects that Mr. Ferrer acknowledged his *primary* email

10  address was carl.ferrer@backpage.com, but that he also received emails at

11  carl@backpage.com. (*See* Trial Tr., Doc. 1867 at 106–07). Though Mr. Ferrer testified

12  he used carl@backpage.com primarily for marketing and that others also used it, he also

13  testified that "they would often bring emails to my attention if they needed help with it."

14  (Doc. 1867 at 104). Significantly, Mr. Ferrer recognized certain email exchanges as emails

15  that he personally responded to. For example, when asked whether Trial Exhibit 163 was

16  "also an e-mail exchange between you and Pamela Robinson?" he answered "Yes, it is."

17  (Trial Tr., Doc. 1795 at 86). He further acknowledged that Trial Exhibit 164 was a

18  responsive email he drafted to Ms. Robinson, and that he had to have Mr. Spear approve it

19  before he sent it because the email addressed Backpage's safety and security

20  enhancements, decisions he said were at Mr. Spear's pay grade. (*Id.* at 89–90).

21      Based on these circumstances, the Court does not find that Mr. Ferrer's testimony

22  recalling eight years of email exchanges between carl@backpage.com and Ms. Robinson

23  was perjury. The Defendants merely anchor their Rule 33 Motion to Mr. Ferrer's

24  acknowledgment that others had access to that email address. Without more, the Court

25  cannot find that this one statement "could have affected the judgment of the jury" in

26  convicting Mr. Spear on Counts 3, 6–11, and 18. Thus, Defendants Rule 33 Motion is

27  denied on this basis.

28  / / /

1       **C.      The Government's Opening and Closing Statements**

2            Defendants next argue they are entitled to a new trial because "the the Government

3   repeatedly made improper arguments in its opening and closing statements."

4   (Doc. 2009 at 9).  They claim the Government improperly urged the Jury to convict them

5   on improper grounds including: (1) on a legally insufficient object of conspiracy, that is

6   "to make money;"[30] (2) an impermissible boundless conspiracy; (3) on the grounds of

7   "promoting prostitution" (where statute only proscribes facilitating the promotion of

8   prostitution);  (4) without a showing of specific intent, and (5) because it improperly

9   "exhorted" the Jury to convict Defendants on publication of ads protected by the First

10  Amendment.  (*Id*. at 9–16).  Defendants also argue that the Government improperly

11  referenced evidence in its closing argument that was admitted under hearsay exceptions for

12  truth of the matter.

13           As an initial matter, the Court notes that the Jury was instructed that

14  "statements . . . and arguments by the lawyers are not evidence."  (Doc. 1998 at 7).  The

15  Jury was clearly instructed on the substantive Conspiracy count and on the meaning of

16  "promote" or "facilitate the promotion of" as those terms are defined in the Travel Act.

17  (*Id*. at 24–25, 30).  Without new and/or material evidence to the contrary, a jury is regularly

18  presumed to accept the law as stated by the court, not as stated by counsel.  *See United*

19  *States v. Rodrigues*, 159 F.3d 439, 451 (9th Cir. 1998).  So, this Court presumes that the

20  Jury adhered to its instructions, rather than the attorneys' arguments, in its decisional

21  process.

22           Nonetheless, a criminal conviction can be overturned based on a prosecutor's

23  comments if they affected the fundamental fairness of the trial.  *United States v. Young,*

24  470 U.S. 1, 11 (1985).  A "trial Judge has broad discretion in controlling closing argument,

25  and improprieties in counsel's arguments to the jury do not constitute reversible error

26  unless they are so gross as probably to prejudice the defendant, and the prejudice has not

27  been neutralized by the trial judge." *United States v. Navarro,* 608 F.3d 529, 535–36 (9th

28  _____

[30] This is the same argument asserted in their Rule 29 Motions.  To the extent previously discussed, the Court incorporates its related findings for purposes of their Rule 33 Motion.

Cir. 2010) (internal quotations and citations omitted).  Furthermore, it is not misconduct for the Government to argue reasonable inferences based on the record.  *See United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993).

### 1.    Legally Insufficient Object of the Conspiracy

As they did in their Rule 29 Motions, Defendants maintain the Government improperly told the Jury it was enough to convict Defendants of conspiracy to commit the Travel Act when the prosecutor stated that the object of the conspiracy was to make money, which Defendants contend is a legally insufficient object on which to convict for conspiracy.  (Trial Tr., Doc. 1933 at 6–7).[31]  The Court has repeatedly addressed and rejected this argument.  The Ninth Circuit recognized that the object of a conspiracy can be to accomplish an unlawful purpose, or a "lawful purpose by unlawful means." *Caplan*, 633 F.3d at 542.  In its rebuttal closing argument, the Government clarified this point for the Jury:

> The defendants say, "Hey, it's not illegal in the United States of America to make money." We haven't charged them with that.  There is no federal statute that says it's illegal to make hundreds of millions of dollars.  That is not the charge.  That is not the crime.  They are not charged with making money.  They are charged with *how* they made money.  Money was the object of the conspiracy. They are charged with *how* they made money, and that was off the backs of people engaged in illegal prostitution business enterprises.

(Trial Tr., Doc. 1961 at 40:12–20) (emphasis added).  The Government's rebuttal demonstrates that it did not ask the Jury to convict on a legally insufficient object of conspiracy.

### 2.    Boundless Conspiracy

The Court need not address Defendants' boundless conspiracy argument because nothing in the Government's summation supports that claim.  In reminding the Jury of the evidence supporting each Travel Act count, the Government adhered to the Court's prior orders    that    Defendants    were    not    "indicted    for    the    amorphous    notion    of

---

[31] The record does not reflect that any Defendant objected to the Government's statement.

'prostitution' . . . they were indicted for facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-related business, or other groups were involved in the business of prostitution." (Doc. 946 at 13).

### 3.    Promoting Prostitution and Specific Intent

The Court rejects Defendants' arguments that the Government urged the Jury to convict them on the grounds of promoting prostitution and without a showing of specific intent.  Defendants identify statements made by the Government during opening and closing arguments that they say inferred the Jury could convict Defendants on promoting prostitution as opposed to facilitating the promotion of prostitution.  However, the Court will not hold the Government to a standard that requires the prosecutors to quote the language of the Travel Act each time they refer to it.  As discussed, the Jury was properly instructed on the elements of the Travel Act.  (Doc. 1998 at 30).  The same is true with regard to the legal definition of specific intent.  (*Id.*)  The Jury is presumed to follow the Court's instructions, including that they apply the law as given to them.  (*Id.* at 2).

### 4.    Reference to Evidence Admitted Under Exceptions to Hearsay

Defendants next argue a new trial is warranted because the Government improperly told the Jury during its closing that (1) Defendants "know about the Attorneys Generals letters, and they know they are not on solid ground;" and (2) that the CNN documentary showed that Backpage had "cornered the market on prostitution advertisement" and "all you had to do was go to Backpage.com and post an ad and the phone started ringing in minutes." (Doc. 1009 at 17).  Defendants say in doing so, the Government improperly referenced evidence "for the truth"—e.g., "that all the adult ads on Backpage.com were prostitution ads, and that nearly all of the Backpage.com's revenues were from prostitution ads"—when at trial, the State Attorneys General letters and CNN documentary were only admitted to prove Defendants were on notice that Backpage posted ads for prostitution. (*Id.*)[32]

---

[32] Defendants also state that the Government used "that evidence for its truth throughout the trial . . ." (Doc. 2009 at 17).  However, Defendants offer no trial record citation for this assertion, so the Court declines to consider it.

1          Upon review of the record, the Court rejects this kitchen sink argument.   As

2   acknowledged, the Government sought the admission of the AG letters and the CNN

3   documentary to show that Defendants were aware of Backpage's prostitution ad platform.

4   Relevant evidence is admissible so long as it is "probative of the proposition it is offered

5   to prove, and . . . the proposition to be proved must be one that is of consequence to the

6   determination of the action" and the Government is permitted to argue reasonable

7   inferences based on the record.   *Necoechea*, 986 F.2d at 1276; *United States v. Click*, 807

8   F.2d 847, 850 (9th Cir. 1989).   The Government introduced evidence, including co-

9   conspirator statements, to show Defendants' knowledge or absence of mistake that sex for

10   money ads were being posted on Backpage.   There was nothing grossly prejudicial about

11   the Government's closing references to these categories of evidence, especially considering

12   the Court's instructions and admonishment that attorneys' arguments are not evidence.

13          Indeed, the Jury's mixed verdict supports an inference that they adhered to the Jury

14   Instructions by applying the evidence and testimony to the law.   The Court finds nothing

15   in the Government's closing argument affected the fundamental fairness of the Defendants'

16   trial.   The Court denies the Defendants' Rule 33 Motion on these grounds.

17          **D.    Jury Instruction Changes**

18          Defendants next argue that they should receive a new trial because the Court, after

19   receiving briefing from the parties, made modifications to two of the Jury Instructions prior

20   to closing arguments.   Though Defendants "welcomed" the changes, they claim the

21   changes "severely prejudiced" them in three ways, namely because (1) they were unable

22   to make use of the instructions in their opening statements; (2) they were unable to shape

23   testimony elicited on cross-examination; and (3) they were unable to assess the witnesses

24   they would call in the defense case.   (Doc. 2009 at 17–19).   The Court is not persuaded.

25          **1.    First Amendment Jury Instruction**

26          Prior to trial, the Court approved a First Amendment-related jury instruction that

27   stated in part that "the First Amendment does not protect speech relating to illegal activity."

28   (*Id*. at 18).   After the close of evidence, but prior to closing arguments, the parties were

allowed to argue their positions as to certain Jury Instructions. With regard to the First Amendment instruction, the Court replaced the statement that "the First Amendment does not protect speech relating to illegal activity," with a sentence that read, "[i]f you find that an ad proposes an illegal transaction, it is not protected by the First Amendment." (Doc. 1998 at 48).[33]

Defendants first argue, without explanation, that "the instruction ultimately given would have allowed for a viable advice of counsel defense" at trial. (Doc. 2009 at 19). Whether Defendants could raise an advice of counsel defense was an issue that was litigated extensively and *ad nauseum* in pre-trial motions, on the eve of trial, and again at various points during trial. The Court told Defendants, in no uncertain terms, that the defense was theirs to raise if they could first meet the four preconditions laid out in *United States v. McLennan*, 563 F.2d 943, 946 (9th Cir. 1977). (*See* e.g., Doc. 1643 at 12–13 (stating that "to the extent [Defendants] intended to raise this argument, whether in opening statement, closing argument, or their case in chief, they must first proffer a showing of all four factors.")).[34] Defendants steadfastly refused to waive the attorney-client privilege with regards to their communications. (Doc. 1643 at 12–13). The Defendants *never* attempted to clear the *McLennan* hurdles, so they cannot now claim prejudice over their own inaction by somehow placing blame on changes to the First Amendment Jury Instruction.

In an equally unspecific manner, Defendants also argue that the Court admitted

---

[33] The complete Jury Instruction states:

All speech is presumptively protected by the First Amendment to the United States Constitution. However, the First Amendment does not protect speech that proposes an illegal transaction. Prostitution is illegal in 49 states and most of Nevada. It is the government's burden to establish that each of the ads alleged in this case is an ad for prostitution and not for another purpose such as an ad for an escort, dating or massage service. If you find that an ad proposes an illegal transaction, it is not protected by the First Amendment.

(Doc. 1998 at 48).

[34] The factors include: (1) they made a complete disclosure to counsel; (2) they requested counsel's advice as to the legality of the contemplated action; (3) they received advice that it was legal; and (4) they relied in good faith on the advice. 563 F.2d at 946.

"large quantities of evidence that was highly prejudicial to the defense that arguably could have been relevant under a 'speech relating to illegal activity' standard, but which would not have been under the "speech that poses an illegal transaction" standard. (Doc. 2009 at 19).  They say that if they knew the case would go to the Jury under "speech that proposes an illegal transaction" standard, they would have "had much stronger arguments to exclude most, if not all, of the 'notice' evidence," which they say "could have dramatically altered the evidence admitted." (*Id*.)  Defendants entirely fail to specify what "notice" evidence they say would not have been admitted.  They also say they "objected to all of this evidence," but do not give a description or record citations to support their contention.  (*Id*.)  The Court refuses to sift through the lengthy trial record and make guesses on Defendants' behalf.  The Court does note that Mr. Spear, in closing, asserted "[t]hese ads are not on their face anywhere close to being prostitution ads.  You've heard the witnesses tell you that." (Trial Tr., Doc. 1959 at 16).[35]  But in sum, Defendants have not met their Rule 33 burden.

### 2.    Travel Act Jury Instruction

Defendants also claim they were prejudiced because the Court did not provide the Jury with the following instructions:

> [T]o satisfy the specific intent requirements of the Travel Act, the government must prove beyond a reasonable doubt, for each Count, that each defendant in some significant manner associated himself or herself with the particular business enterprise associated with the ad charged in that Count with the intent to promote, or facilitate the promotion of, the prostitution offenses committed by that business enterprise.

(Doc. 2009 at 1718).  Instead, the Court instructed the Jury as follows:

> To prove specific intent, the government must establish that each defendant in some significant manner associated himself or herself with the purpose of promoting or facilitating the promotion of any business enterprise involving prostitution offenses that the defendant knew to be unlawful under state law.

---

[35] Notably, Defendants omit reference to the Jury being instructed that they can apply the direct and circumstantial evidence instruction to determine if each ad was protected by the First Amendment.

(Doc. 1998 at 30).

First, the Defendants argue that, had the Court settled on their proposed instruction, they would have been able to "mount the specific intent defense they intended – an aiding and abetting defense – whether in their openings or through eliciting evidence during the trial."  (Doc. 2009 at 18).  Here too, Defendants do not explain why they were prevented from mounting an aiding and abetting defense under the Court's instruction, and the Court will not attempt to define their argument.  So, again, the Court cannot make a prejudice determination.

Defendants further assert that they learned of these two changes "on the cusp of closing" and so they had no time to prepare.  Not so.  As the Government points out, the closing statements took place over the course of several days—October 27 through November 2, 2023—due to juror circumstances and to enable the defense counsel to prepare.   Moreover, Mr. Lacey's counsel sought and received his preferred First Amendment jury modification so he cannot now fain prejudice.  The Court is not persuaded that these assertions suggest that "a serious miscarriage of justice may have occurred."  *Alston*, 974 F.2d at 1211–12.  The Defendants have not met their burden of demonstrating that standard is met and thus, a new trial will not be granted on this basis. *Endicott*, 869 F.2d at 454.

**E.**      **Insufficient First Amendment and Travel Act Jury Instructions**

Defendants next assert that, though the First Amendment instruction "included the correct legal standard," more was needed.  Relating to the Travel Act instruction, they claim that "although the Court added language looking somewhat like an aiding and abetting instruction" that language materially "eroded what was required for the jury to find specific intent."  (Doc. 2009 at 20).   They urge that these flaws require a new trial.

A Rule 33 motion may be granted for failure to give proper jury instructions.  However, an instructional error does not automatically warrant a new trial because a defendant must show that the error affects substantial rights.  *See* Fed. R. Crim. P. 52(a); *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020).  "[A]n error in misdescribing

or omitting an element of the offense in a jury instruction is harmless if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *United States v. Thongsy*, 577 F.3d 1036, 1043 (9th Cir. 2009) (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)).  When applying this standard, a court should consider "the jury instructions and the trial record as a whole."  *United States v. Espino*, 892 F.3d 1048, 1053 (9th Cir. 2018).  Where the evidence actually presented at trial and "other language in the jury instructions" assures the court that the jury could not have based its verdict on the erroneous language in the instruction, the Ninth Circuit has found the error to be harmless. *Miller*, 953 F.3d at 1103; *see also Espino*, 892 F.3d at 1053; *United States v. Perez*, 116 F.3d 840, 847 (9th Cir. 1997) ("Even though an element of the offense is not specifically mentioned [in the jury instructions], it remains possible the jury made the necessary finding.").

### 1.      First Amendment Jury Instruction

With regard to the First Amendment instruction, the Defendants would have preferred the Court to have told the Jury that "the speech must be evaluated from the content of the speech alone, and speech is presumptively protected unless it proposes a transaction [sic] would necessarily constitute an illegal act."  (Doc. 2009 at 19).  Because the Jury was not told as much, they say Mr. Spear was convicted on Travel Act counts "even though the publication of the ads underlying those counts were protected by the First Amendment."  (*Id.* at 20).  But when viewing the Court's instruction in light of the entire trial record, the Court disagrees.  As discussed *supra* in Section II.B of this Order, co-conspirators and law enforcement witnesses understood the terms in the Government's Travel Act ad exhibits to be sex for money ads because the ads were accompanied by photos of barely clad females and because they included coded terms like "roses", "GFE" (girl-friend experience), "in-call and out-call," "clean," "hygienic" and "G-R-3-3-K."  Moreover, each victim/witness that testified identified her ad and stated that the ads were sex for money ads.  So, an instruction stating "the speech must be evaluated from the content of the speech alone" would not have altered Mr. Spear's outcome.  Therefore, a

1   new trial on these grounds is not warranted.

2           **2.**        **Travel Act Jury Instruction**

3         Finally, the Court's Travel Act instruction adhered to the Ninth Circuit's precedent.

4   The instructions clearly stated that to show that Messrs. Spear and Lacey violated the

5   Travel Act by selling and publishing prostitution ads on Backpage, the Government was

6   required to establish that Messrs. Spear and Lacey "in some significant manner associated"

7   themselves with the prostitution business seeking to post an ad on Backpage.  (Doc. 1998

8   at 30); *see also Gibson Specialty Co.*, 507 F.2d at 449 (requiring the government to show

9   each defendant "had specific intent to promote, manage, establish, carry on or facilitate

10   one of the prohibited activities"); *United States v. Polizzi*, 500 F.2nd 856, 876–77 (9th Cir.

11   1974) (stating the required *mens rea* under the Travel Act is the "specific intent to facilitate

12   an activity which the accused knew to be unlawful under state law").  Given the Court's

13   adherence to this Circuit's precedent, it is hard to see how the jury instructions

14   misdescribed or omitted an element of the offense, such that a rational jury would have

15   acquitted a defendant absent the error.

16         Having considered each argument advanced in the Defendants' Rule 33 Motion for

17   a New Trial, the Court is not persuaded that a serious miscarriage of justice may have

18   occurred.  Accordingly, the Rule 33 Motion is denied.

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

**IV.     CONCLUSION**

In conclusion, after viewing the record in the light most favorable to the Government, the Court finds there is insufficient of evidence to support convictions under Counts 19–51 as to Mr. Lacey and Counts 66–99 as to Messrs. Lacey, Brunst, and Spear. The Court will issue judgments of acquittal for those Counts.  In all other respects, Defendants' Rule 29 Motions are denied.  Moreover, the Court does not find cause to grant a new trial for any of the reasons stated in Defendants' Rule 33 Motion.  That Motion will be denied in its entirety.

Accordingly,

**IT IS ORDERED** that Defendants' Oral and Supplemental Rule 29 Motions (Docs. 2004; 2006; 2007) are **granted in part and denied in part**.  The Clerk is directed to issue Judgments of Acquittal for Defendant Michael Lacey on Counts 19–51 and 66–70, 81, 83–84, 86, 88–92 and 94–99; for Defendant John Brunst on Counts 66–68, 78–84, 86–93; and for Defendant Scott Spear on Counts 71–78, 85 and 93.  In all other respects, the Motions are **denied**.

**IT IS FURTHER ORDERED** that Defendants' Rule 33 Motion for New Trial (Doc. 2009) is **denied** as stated herein.

Dated this 23rd day of April, 2024.

_____
Honorable Diane J. Humetewa
United States District Judge