Paul J. Cambria, Jr. (NY Bar No.1430909, admitted *pro hac vice*)
Erin E. McCampbell Paris (NY Bar No. 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:   (716) 855-1580
pcambria@lglaw.com
emccampbell@lglaw.com
*Attorneys for Michael Lacey*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| United States of America, | NO. CR-18-00422-PHX-SMB |
|---|---|
| Plaintiff, | **DEFENDANT MICHAEL LACEY'S OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT** |
| vs. | |
| Michael Lacey, *et al.*, | (Oral argument requested) |
| Defendants. | |

Defendant Michael Lacey, by and through his undersigned counsel, files the instant Objections to Presentence Investigation Report filed on June 4, 2024 (Doc. 2099) ("PSR"). As detailed below, the PSR is riddled with misstatements of fact and half-truths. Further, the PSR both acknowledges that it cannot use acquitted or unresolved conduct to calculate Mr. Lacey's Guidelines range (PSR ¶ 161), but then does just that (*id.* ¶¶ 162-66).

The PSR demonstrates why sentencing a defendant for one count of conviction when the defendant has dozens of unresolved charges is fraught with risk (if permitted at all). The PSR presents an expansive, one-sided and materially inaccurate narrative of the conduct underlying the numerous unresolved charges. The narrative is told in this fashion because, as the PSR acknowledges, the narrative came directly from the prosecutors and case agents, who face no consequences for discussing the unresolved conduct, in stark contrast to Mr. Lacey, who must remain silent to preserve his defenses at the third trial. Moreover, the PSR proposes to count the purported conduct underlying the unresolved charges towards his Guidelines range, which not only could result in Mr. Lacey being sentenced to a longer term on Count 100 now, even if he ultimately is acquitted on all the unresolved charges, but the very same conduct also could result in additional time imposed later, if he was to be convicted of any of the unresolved counts at his third trial.

**I.     Objections to Errors in Discussion of the Acquitted and Unresolved Counts**

Ninety-nine percent of the discussion of the "Offense" concerns the acquitted or unresolved counts (*see* PSR at 2-36), even though the PSR acknowledges that, with respect to the outstanding counts, the PSR should not use that conduct "because guilt has not been established." (*Id.* ¶ 161.) Equally troubling, this improper discussion of the acquitted and unresolved conduct is riddled with obvious misstatements of fact on issues both minor and material:

- Spear was convicted of Counts 52-62 in addition to the listed counts. (PSR at 2.)
- Larkin did not "pass[] away." (*Id.* ¶ 7.) He committed suicide.
- Spear was convicted of Counts 2-18, 52-62 in addition to the listed counts. (*Id.* ¶ 8.)
- The August 6, 2024 trial is no longer on the calendar. (*Id.* ¶ 11.)
- Backpage did not "advertise[] prostitution." (*Id.* ¶ 14.) Instead, it allowed third-parties to create and post ads to the website on a wide variety of topics, such as music, real estate, cars, jobs, rentals, and as relevant here, adult entertainment, such as escorts, massage, and dating. (Ex. 1480.) In fact, Ferrer specifically advised Lacey, in writing that Backpage "do[es] not have prostitution ads." (Ex. 115b at 9.) Another government witness testified that escorting is a lawful, licensed activity, "different"

2

from prostitution.  (Day 20 A.M. 10/18/2023 Tr. at 38.)  Further, Ferrer conceded that escort ads ran on other websites such as Twitter, Instagram, Facebook, and YellowPages.com.  (Day 15 A.M. 10/10/2023 Tr. at 75-76, 87.)

- Lacey **never** "oversaw the website's policies and strategic direction." (*Id.* ¶ 14.)  This material misrepresentation of the proof at trial will be addressed below.

- Lacey never held an ownership interest in Backpage *per se*.  (*Id.* ¶ 15.)  Instead, his ownership interest was limited to his interest in the holding or parent company through which he and Larkin operated a newspaper conglomerate, ultimately operating as Village Voice Media Holdings.  (Ex. 5; Day 4 P.M. 9/12/2023 Tr. 8 (Ferrer testified that Mr. Lacey was one of the owners of "New Times" or "Village Voice Media.").)  Backpage was one of 18 subsidiaries of that company.  (Day 13 A.M. 9/27/2023 Tr. at 96-97.)  After the holding company sold the newspapers in 2013 to the papers' long-term management, through a seller-financed transaction, Lacey held an interest in a parent company that, through its subsidiary Cereus Properties LLC, collected rent on commercial real estate, collected payments from the sale of the newspapers, and owned several subsidiaries, including Backpage.com LLC.  After the holding company sold Backpage to Ferrer in 2015, Cereus also collected payments from Ferrer/Backpage under the terms of the seller-financed sale of Backpage to Ferrer and the entities he owned and controlled.

- Like Lacey, Spear never held an ownership interest in Backpage *per se*.  (*Id.* ¶ 16.)
- Like Lacey, Brunst never held an ownership interest in Backpage *per se*.  (*Id.* ¶ 17.)
- Starting in 2015, Ferrer was the actual owner of Backpage, not the "nominal" owner.  (*Id.* ¶ 18.)  Ferrer purchased Backpage through a seller-financed transaction, just as the newspaper editors had purchased the newspapers in 2013.  Ferrer demonstrated that he had absolute control over the website when he conceded that he, alone, decided to shut down the website, without consulting or informing Lacey, Larkin, Brunst or Spear of his decision.  (Day 13 P.M. 9/27/2023 Tr. at 95.)

3

- There was no proof that Lacey was "aware most of the adult and escort ads . . . were ads for prostitution and took steps to intentionally facilitate this illegal activity." (*Id.* ¶ 20.)  Nor was there competent proof that "most of the adult and escort ads . . . were ads for prostitution."  Mr. Lacey's objection to the claim that he was involved with the running of Backpage will be addressed below.  With respect to his awareness of the ads, the only proof of Lacey's knowledge as to prostitution ads published on the website was anecdotal, after-publication information, including the non-expert opinions of elected officials, religious leaders, etc., that prostitution ads were published on the website.  This purported "notice" evidence was countered at trial by the testimony of the government's own witnesses--law enforcement officers who testified that Backpage ads did not provide probable cause to make an arrest (*e.g.*, Day 18 A.M. 10/13/2023 Tr. at 89; Day 23 P.M. 10/24/2023 Tr. at 21-22).  That testimony proved that Backpage ads did not establish even "a probability or substantial chance of criminal activity," much less provide "an actual showing of such activity," *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018), and stood in stark contrast to the claims of elected officials and religious leaders that Backpage ads obviously were proposals of unlawful activity.  Ferrer testified that he was advised by a law enforcement expert who specialized in child-safety issues that he could not make a determination as to whether an ad involved a child based on the face of the ad, alone.  (Day 13 A.M. 9/27/2023 Tr. at 22.)  Ferrer also testified that you would not know from the face of an ad whether the person in the ad was the person who had created the ad.  (*Id.* at 38-39.)  That testimony was corroborated by law enforcement witnesses who testified about creating fake ads as part of investigations and who testified that fake photos could be used.  (*E.g.*, Day 19 P.M. 10/17/2023 Tr. at 138; Day 18 A.M. 10/13/2023 Tr. at 88; *see also* Day 13 A.M. 9/27/2023 Tr. at 46.)  Ferrer also testified that Backpage staff could not know whether the person in an ad was underage because you could not tell from an ad alone, and staff "[didn't]

4

meet the [website] users." (Day 15 A.M. 10/10/2023 Tr. at 57-58.) A qualified expert criminologist with expertise in commercial sex and sex trafficking testified unequivocally that there was no way to know, based on an ad, alone, whether the ad was associated with illegal prostitution. (*E.g.*, Day 24 P.M. 10/25/2023 Tr. at 50-53.) Because no one could know, from the face of an ad, alone, the intent of the creator of the ad, Lacey, an individual who co-owned a company that owned Backpage cannot have knowledge of the illegality of any particular ad, among tens of millions of ads, as demonstrated in the letter Backpage's counsel, Don Moon, sent to NCMEC. (Ex. 172.)

- Lacey's draft editorial about transparency in prostitution and cooperation with law enforcement to root out wrongdoing on the website was not an admission by Lacey that he was participating in a conspiracy to facilitate prostitution (*id.* ¶ 22), but instead, indicated he thought that Backpage was assisting law enforcement. Moreover, in reviewing Lacey's draft, Ferrer advised Lacey, "I do not have prostitution ads." (Ex. 115b at 9.)

- Lacey was not involved with any financial issues concerning the business side of the entities and, thus, was not involved either in purported strategies to launder money or in the execution of any of those purported strategies. (PSR ¶ 24.) There was no proof at trial, whatsoever, of his involvement with any of these issues. To the contrary, Ferrer testified that Lacey did not attend any quarterly meetings or any banker meetings. (Day 13 A.M. 9/27/2023 Tr. at 11-12.)

- Lacey was not involved with the decision to acquire newspapers in any particular city. (*Id.* ¶ 28.) Critically, his role as Editor-in-Chief was limited to oversight of the writers for the newspapers (Ex. 6243; Day 24 A.M. 10/25/2023 Tr. at 46-47 (testifying about Lacey's role as Editor-in-Chief)), as addressed more fully below. However, once the company opened a newspaper in a new city, Lacey went to that city to meet with writers and to hire writers.

- Lacey and his colleagues did not decide to sell the newspapers to "focus on Backpage." (*Id.* ¶ 30.) Instead, because the newspapers had received negative media attention due to their association with Backpage, a decision was made to sell the newspapers to their long-term management in a seller-financed transaction to make sure that the newspapers could continue to operate and avoid staff layoffs.

- Lacey's sons had no ownership interest in Medalist. (*Id.* ¶ 30.) Rather, it was Larkin's sons who had ownership interests.

- As discussed above, Lacey and his colleagues did not "purport[]" to sell Backpage to Ferrer in 2015 (*id.* ¶ 31), they did sell Backpage to Ferrer in 2015. Just like the sale of the newspapers to their long-term editors, they sold Backpage through a seller-financed transaction. After the point of sale, Lacey had no interest in any entity that owned Backpage. He had an interest in an entity that received loan payments from Ferrer under the terms of the loans.

- Lacey never had "operational control over Backpage" (*id.* ¶ 32), as discussed below. The terms of the sale discussed in this paragraph are standard terms for seller-financed transactions.

- The proof at trial did not establish that Lacey's "codefendants were aware the overwhelming majority of the website's 'adult' and 'escort' ads actually were ads for prostitution." (*Id.* ¶ 34.) Further, Mr. Lacey had no involvement with aggregation, reciprocal link or superposter relationships, or moderation. Mr. Lacey's objections incorporate by reference the objections of Brunst and Spear on these issues.

- The discussion of the purported evidence of "notice" is incomplete and materially misleading. (*Id.* ¶¶ 65, 67, 70, 77, 80, 83, 90, 92, 96, 104, 106107, 109, 111-16, 120.) This purported evidence falls into three categories: (1) information about isolated instances of third-party misuse of the website which were brought to light after publication of an ad; (2) internal efforts to prevent misuse of the site while at the same time, seeking to preserve the right of law-abiding website users to communicate

6

about lawful topics such as escorting, massage, dating, bondage, domination, and sadomasochistic practices; and (3) communications with outside parties, such as elected officials, religious leaders, non-profits concerning their opinions about the website's purported content. In contrast, as set forth more fully in Mr. Lacey's Motion to Admit (Doc. 1886), in spite of these claims, he had a good faith belief in the lawfulness of Backpage's operations.

- o Mr. Lacey's long-term business partner, James Larkin, who was in charge of the business side of their company, under which Backpage fell (Ex. 6243), had assured Mr. Lacey on multiple occasions that he had sought advice from the best lawyers in the country on internet safety and speech issues, that they were following that advice, and that the operation of Backpage was lawful, and, in fact, protected by the First Amendment. (Doc. 1886 at 2-3.)
- o Mr. Lacey understood, from judicial opinions, that Backpage was a First Amendment protected platform for the publication of third-party speech, with First Amendment rights of its own, even if it was determined, after publication, that some (or even many) instances of third-party speech related to illegal conduct, such as prostitution or sex trafficking. *See, e.g.*, *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231-38 (7th Cir. 2015); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1275-84 (W.D. Wash. 2012).
- o A website operator's internal policies on third-party speech aimed at preventing misuse of a website – commonly referred to as moderation – is a lawful activity akin to an editor editing an article. *See Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 20-24 (1st Cir. 2016) ("[A] website operator's decisions in structuring its website and posting requirements are publisher functions" including "choices that Backpage has made about the posting standards for advertisements—for example, rules about which terms are permitted or not permitted in a posting, the

7

lack of controls on the display of phone numbers, the option to anonymize e-mail addresses, the stripping of metadata from photographs uploaded to the website, the website's reaction after a forbidden term is entered into an advertisement, and Backpage's acceptance of anonymous payments."). Moderation is commonplace on the internet. *See id.* at 18-20 (discussing opinions recognizing publisher protections for moderation). Most websites have policies on nudity, words that cannot be used, images, etc., *see, e.g.*, Instagram Community Guidelines, available at: https://help.instagram.com/477434105621119?ref =igtos&helpref=faq_content (last visited 6/18/2024). Backpage was no different. More importantly here, Mr. Lacey had nothing to do with the day-to-day operation of Backpage, as demonstrated by the government's witnesses and exhibits.

- o With respect to communications from elected officials, religious leaders, non-profits, and media outlets, the PSR fails to acknowledge that, in each instance, an attorney for Backpage reviewed the allegations made against Backpage and responded to those allegations, never wavering on the view that the operation of Backpage was lawful and its publication of the user generated content was protected by the First Amendment and Section 230. (*See* Ex. 172 (admitted); *e.g.*, Exs. 5013, 5019 (excluded).)
- o These views were embraced by every federal court to analyze Backpage's operations (including in actions premised on allegations of facilitation of child-sex trafficking and prostitution). *See, e.g.*, *Dart*, 807 F.3d at 231-38; *Jane Doe No. 1*, 817 F.3d at 20-24; *McKenna*, 881 F. Supp. 2d at 1275-84; *see also* Exs. 5025, 5324 (precluded from admission), *see also* Ex. 5909 (excluded)).
- o These views were in accordance with the views of DOJ, itself. (Doc. 1886 at 5-7.)

8

- Further, there was no proof at trial that the estimated $500 million earned by Backpage was proceeds of unlawful activity. (*Id.*) This Court has already found that the government presented no proof as to tracing. (Doc. 2063 at 55-57.) Indeed, the government's own exhibit disproves the claim that all funds earned were the proceeds of crime. (Ex. 1479.). Moreover, viewed in the light most favorable to the government, the government's exhibits established that the ads related to Mr. Spear's Travel Act convictions generated $175.00 in gross revenues (and the government failed to establish that any defendant or even Mr. Ferrer had any knowledge whatsoever of those ads). The government's attempt to bootstrap that $175.00 into $500,000,000.00 of unlawful proceeds simply ignores the First Amendment's constitutional presumptions.
- Mr. Lacey incorporates by reference the objections of Brunst concerning the discussion of money laundering activities.
- Lacey's family did not receive distributions of the loan payments from Ferrer. (PSR ¶ 137.) Instead, it was allegedly Larkin's children who received those payments.
- Again, there is no proof to support the claim that there was $500 million in proceeds from specified unlawful activity. (*Id.* ¶ 140.) Instead, this Court has already found that the government did not "provide sufficient evidence at trial that every ad sold on Backpage.com prior to these transfers was a Travel Act violation." (Doc. 2063 at 56.) Further, the Seventh Circuit has recognized several categories of ads for lawful sexual activities, such as fetishism, strip tease, and BDSM, explaining that "[t]here is no estimate of how many ads in Backpage's adult section promote illegal activity; **we just gave examples of some that do not**." *Dart*, 807 F.3d at 234 (emphasis added).

## II.  Objections to Errors in Discussion of the Crime of Conviction

The ***one paragraph*** in 34 pages of single-space text that actually addresses the crime of conviction – Paragraph 25 – presented an incomplete and materially misleading discussion of the

9

proof at trial. First, Paragraph 25 references an email communication between Mr. Lacey and his attorney, John Becker, and testimony from a banker about a conversation she had with Mr. Lacey. (PSR ¶ 25.) But, Paragraph 25 failed to mention that, during the course of those very same conversations, Mr. Lacey also made it clear that he intended to pay taxes on the trust and, in fact, had orders in place with an accounting firm to pay taxes – i.e., inform the government about the asset through, at a minimum, payment of taxes. The full text of the quoted passages is relevant to analysis of Mr. Lacey's culpability (and directly undercuts any claim that he intended to conceal the attributes of the funds against the government):

- "[I] think I am ready to move forward with the visit to the Los Angeles lawyer you mentioned who has expertise in off-shore. ***[T]o revisit for just a moment, [I] am not interested in any tax avoidance.*** I just want to put some assets in place where litigious parties, including government parties, can not [sic] access my accounts." (Ex. 1 (emphasis added).)

- The banker's testimony was that Lacey "wanted to make it clear that ***he wasn't looking to avoid paying taxes, that he had a BDO [sic] he directed to make sure that all taxes were paid and no tax shelters were taken.***" (10/12/13 P.M. Tr. at 11 (emphasis added).) Further, the banker did not understand Mr. Lacey to be asking her for advice about concealing or hiding anything. (*Id.* at 16, 22.)

In addition to his stated intent to pay taxes prior to creation of the trust, after creation of the trust, Mr. Lacey wrote to Mr. Becker, asking whether he or the other lawyer "do the ***reporting to govt (sic) on money that was moved?***" by filing of the form commonly referred to as an "FBAR." (Ex. 6264.) (The government's own financial expert testified that people file FBARs "[t]o report the existence of a foreign bank account" to the federal government. (Day 19 Tr. at 63.)). Mr. Becker responded that the other lawyer and his accountants would prepare the FBAR. (Ex. 6264.)

Second, another glaring omission from Paragraph 25, is that it is undisputed that Mr. Lacey timely filed his FBARs each year, wherein each year he informed the government about the attributes of the funds (location, amount, affiliated tax payer) – the very details he purportedly concealed from the government. (Ex. 5541, 5545, 5546.)

10

Third, Paragraph 25 failed to acknowledge that the government's own financial expert testified that all of the names on the accounts involved with this transaction were associated with Mr. Lacey, that no fictitious names or entities were used, and that the expert followed the flow of funds with ease. (Day 19 A.M. at 62-65.) Mr. Lacey's transparent relationship with the funds was documented in the government's own exhibit, Exhibit 1479, again, omitted from discussion in Paragraph 25.

Fourth, the idea of a foreign trust did not originate with Mr. Lacey. Instead, when meeting with his long-term estate planning lawyer, Mr. Becker, Mr. Lacey mentioned that banks had been closing his accounts due to reputational concerns, and Mr. Becker suggested that a foreign trust would be a solution. (Day 23 Tr. at 67.) Mr. Becker suggested that they meet with a Lost Angeles lawyer who specialized in foreign trusts. (*Id.* at 68-69.) These lawyers created a trust in Hungary for the benefit of Mr. Lacey's sons that was funded with distributions Mr. Lacey received from Medalist from the sale of Backpage to an entity controlled by Ferrer. (*Id.* at 69, 117; Ex. 5516.) Mr. Becker handled the wiring of the funds that he held for Mr. Lacey in his IOLTA trust account. Any assessment of Mr. Lacey's culpability should have mentioned that the idea of the trust, the formation of the trust, and the funding of the trust was in the province of two experienced lawyers.

Fifth, this transfer of funds occurred on January 3, 2017 (Ex. 1479) – nearly two years after Backpage was sold to Ferrer. Paragraph 25 failed to mention that there are no Travel Act convictions after the date of the sale of Backpage to Ferrer, and that this Court has already ruled that the "evidence accords with the Jury's likely conclusion that the sale of Backpage to Mr. Ferrer was a break in the conspiracy's agreement to violate the Travel Act." (Doc. 2063 at 41.) Further, Paragraph 25 failed to mention that this Court has already ruled that the government failed to prove that every ad on Backpage was a Travel Act violation and failed to trace the funds at issue to violations of the Travel Act. (*Id.* at 40-41, 56-57.) As a result of this "evidentiary deficiency," this Court dismissed Counts 94-99 against Mr. Lacey (among other counts). Critically, the funds at issue in Counts 94-99 are the very same funds that were wired to Hungary to fund the trust at issue in Count 100. If, as this Court ruled, "it cannot be said that a rational jury could have concluded

11

'beyond mere speculation' that at least $10,000 of criminally derived proceeds were transferred" in connection with Counts 94-99 (*id.* at 57), it is hard to understand how Mr. Lacey would have had the requisite intent and, here, culpability, necessary to punish him for Count 100.

Finally, although the PSR mentions that Mr. Lacey was facing state criminal charges in California, and was aware of the grand jury investigation in this matter, the PSR fails to mention two important details relevant to Mr. Lacey's state of mind at the time of the transfer. The California criminal case was the second criminal complaint California brought against him. The first criminal complaint was dismissed outright as incompatible with the First Amendment and Section 230. The second complaint – which was pending at the time of the transfer of funds – was a copycat of the dismissed complaint and the California Superior Court subsequently dismissed all the prostitution-related charges in that second complaint, with only unrelated bank fraud charges remaining. (*See* Exs. 5025, 5324 (precluded from admission).) Moreover, the grand jury investigation in this case was not Mr. Lacey's first. In 2012, the federal government empaneled a grand jury to investigate Backpage in the Western District of Washington, which included testimony from numerous Backpage employees and several subpoenas for records. The presiding judge quashed the government's subpoenas for records, criticizing the government for "ignoring" the First Amendment rights of both Backpage *and* its users in pursuing its "novel vicarious liability theory." (Ex. 5909 at 17, 19-20.) This lack of proof of criminal intent aligned with statements of D.O.J. officials. (Ex. 1886 at 5-7.) Simply put, the existence of the California charges and the Arizona grand jury investigation as to Mr. Lacey's state of mind should be viewed in context, and the PSR's omission of that context is materially misleading.

### III. Objections to the unfounded claim that Lacey was a Leader, Organizer, or Founder of Backpage

Throughout the PSR, Mr. Lacey is described as a "creat[or]" or "founder" or "organizer" of Backpage (PSR ¶¶ 14, 26-27, 141, 196), as well as someone who "oversaw" its policies and had "operational control" over Backpage (*id.* ¶¶ 14, 32.) This description contravenes the trial evidence.

12

Lacey was not a "creat[or]" of Backpage. When asked "[w]hose idea was it to create Backpage.com?," Ferrer testified that the idea originated with him and Mr. Larkin. (Day 4 P.M. 9/12/2023 Tr. at 23.) Then, after he and Larkin had discussed the idea, Ferrer testified that he "had meetings with Larkin where we made the determination that I should take that project on." (*Id.*) The earliest email that can attribute knowledge of Backpage's existence to Mr. Lacey is dated April 28, 2010—six years *after* Backpage's creation in 2004. (Ex. 804.)

With respect to oversight of Backpage, Ferrer testified that he "understood [Lacey] was involved in the editorial side of the company and his other partner, Jim Larkin, ran more of the sales and marketing." (Day 4 P.M. 9/12/2023 Tr. at 8; *see also* Day 5 P.M. 9/13/2023 (Ferrer testified that Lacey was on the "editorial" side of the company, not the "business side.").) Backpage fell under the business side of the company, under Mr. Larkin's supervision. (Ex. 6243.) In media organizations, like Village Voice Media Holdings, these two divisions – the revenue generating business side and content creating editorial side – do not "mix[]." (Day 24 A.M. 10/25/2023 Tr. at 49-50, 97.) Mr. Lacey did not attend the quarterly meetings or the banking meetings. (Day 13 A.M. 9/27/2023 Tr. at 11-12.) Writers and editors reported to Mr. Lacey. (Ex. 6243; Day 13 P.M. 9/27/2023 at 5.) He was, in Ferrer's words, a "layer away" from the operation of Backpage. (Day 13 A.M. 9/27/2023 Tr. at 11.) Lacey's lack of involvement was corroborated by another member of Backpage's senior management, Dan Hyer, who testified that, in his thirteen years working at Backpage he never met Mr. Lacey. (10/19/23 P.M. Tr. at 112.)

Lacey knew so little about operations that he had to ask questions about basic operational issues. (Ex. 637 (Lacey asking about NCMEC reporting); Ex. 668 (Ferrer advising Lacey on age verification software); 804 (Lacey asking Spear whether there is any evidence of trafficking on the site); Day 13 A.M. 9/27/2023 Tr. at 36-38.) Ferrer testified that, at times, he would "send an explanation answering Lacey's questions." (Day 7 A.M. 9/15/2023 Tr. at 47, 49 (advising on NCMEC reporting), 50-51 (answering questions about moderation).)

The PSR claims that Ferrer, "on occasion," took direction from Mr. Lacey. (PSR ¶ 142.) There was no testimony from Ferrer or anyone to this effect.

13

**IV.     Objections to the inclusion of victim impact statements**

The PSR includes an extensive discussion of victim impact statements.  (PSR ¶¶ 144-156.) Mr. Lacey objects to the inclusion of this information because there are no victims of his crime of conviction – international concealment money laundering – as discussed below.  Additionally, Mr. Lacey joins in the objections of Brunst and Spear to inclusion of these victim impact statements, which concern his unresolved counts.

**V.      Objections to Guidelines Calculations**

**A.      Objections to Base Offense Level Calculation**

The PSR's base offense level of 28 is incorrect.  As discussed below, the base offense level is no greater than eight because the value of the dollars transferred cannot be used to increase his offense level from the base offense level for money laundering, which is 8.  The PSR correctly uses Guideline §2S1.1(a)(2), and correctly notes at ¶ 161, that neither acquitted conduct nor the conduct underlying those counts still awaiting trial should be used in calculating the Guidelines.  However, in direct contradiction of § 161, the PSR reaches its base offense level calculation by increasing the base offense level (8) by the amount of the acquitted funds (the $16.5 million transferred), even though those funds have already been acquitted twice (first through acquittals of Counts 94-98, and then a second time through acquittal of Count 99) (*See* Doc. 2063 at 55-57.)

Counts 94 through 99 charged Mr. Lacey with violating 18 U.S.C. § 1957(a),[1] which precludes engaging in monetary transactions involving "criminally derived property of greater than $10,000 and is derived from specified unlawful activity."  For its part, citing the exact same international wire transfer identified in Count 99, Count 100 charged Mr. Lacey with violating 18 U.S.C. § 1956(a)(2)(B)(i), which precludes the concealment of "proceeds of a specified unlawful

---

[1] Counts 94 through 98 pertained to five wires of $3.3 million each, totaling to $16.5 million, from Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992). Count 99 pertained to a single wire totaling the $16.5 million from Counts 94 through 98 from Johnson Bank (x9992) to Primus Trust Co./K&H Bank (Hungary). Count 100 pertained to the exact same funds and the exact same transaction as Count 99, i.e., a wire totaling $16.5 million (from Counts 94 through 98) from Johnson Bank (x9992) to Primus Trust Co./L&H Bank (Hungary).  (Doc. 1978 at 44.)

14

activity." (*See* Ex. 1479 (showing counts 99 and 100 pertaining to the same wire).) As a result, there is an irreconcilable contradiction. For sentencing purposes Mr. Lacey cannot both be culpable and not culpable of wiring $16.5 million derived from a specified unlawful activity. Here, the conduct underlying acquitted Counts 94 through 99 and convicted Count 100 is identical and was effectively charged identically. To enhance Mr. Lacey's base offense level by the $16.5 million wire when sentencing on Count 100 is to necessarily render a nullity his acquittals on Counts 94 through 99. Had Count 100 involved, for example, a transfer of $20 million with the extra $3.5 million coming from some other source unrelated to any acquittals, this Court could increase his base offense level by the unrelated $3.5 million. But here, it is the exact same funds that have been acquitted in Counts 94-99, and the exact same transfer acquitted on Count 99, and as a result, those funds and that wire cannot be considered relevant conduct. In other words, the $16.5 million wire transfer from Johnson Bank (x9992) to Primus Trust Co./L&H Bank (Hungary) cannot be used in the calculation of Mr. Lacey's Guidelines' advisory sentencing range because it is wholly and exclusively based on acquitted conduct.

In that regard, with respect to acquitted conduct, the U.S. Sentencing Commission recently amended the definition of relevant conduct to exclude "conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction." USSG §1B1.3(c) (effective Nov. 1, 2024). As the Commission further explains in new Application Note 10 to USSG §1B1.3, "[t]here may be cases in which certain conduct underlies both an acquitted charge and the instant offense of conviction. In those cases, the court is in the best position to determine whether such overlapping conduct establishes, in whole or in part, the instant offense of conviction and therefore qualifies as relevant conduct."

Whether any of the conduct underlying acquitted Counts 94 through 99 overlap with convicted Count 100 should be analyzed similar to the closely analogous issue of double-counting under the Guidelines. Double counting occurs where the same conduct is used to support different sentencing enhancements. So-called double counting is impermissible unless the two enhancements

15

capture distinct harms. For example, "where a defendant is convicted of transporting stolen firearms as well as being a felon in possession of firearms for the same act of possession, it would be double counting to apply an enhancement for stolen firearms to the felon in possession count." *United States v. Duckro*, 466 F.3d 438, 445 (6th Cir. 2006). The existence of distinct harms thus determines whether there is impermissible double counting or not. *United States v. Basa*, 817 F.3d 645, 650 (9th Cir. 2016) (affirming the application of two enhancements based on same conduct that "take account of separate offense characteristics").

Here, Count 100 does not capture a distinct harm from acquitted Counts 94 through 99. Counts 94 through 99, after all, are fundamentally premised on the allegation that the $16.5 million was derived from a specified unlawful activity, which the acquittals have refuted. (Doc. 2063 at 55-57.) Because Count 100 does not capture a distinct harm, the $16.5 million wire cannot be considered relevant conduct. Therefore, the base offense level is no greater than 8.

**B.    Objections to Leadership Enhancement**

The PSR adds four points on the basis that Mr. Lacey was "one of the organizers and leaders of the 14-year conspiracy," "[s]pecifically, he had 45% ownership interests in Backpage, exercised decision-making authority, and was involved at the inception of the website." (PSR ¶ 166.) Further, "[h]e was aware of the strategies used to conceal prostitution on the website and he directed others in the conspiracy." (*Id.*)

The proof at trial is the opposite of what the PSR claims here. Indeed, as this Court has already found, Mr. Lacey's role was "attenuated," and he was "rarely pulled into the business side of Village Voice or the day-to-day operations of Backpage." (Doc. 2063 at 23, 32.) The PSR supports this enhancement simply by stating that Mr. Lacey "had 45% ownership interests in Backpage, exercised decision-making authority, and was involved at the inception of the website. Lacey, as majority owner, profited the greatest amount. He was aware of the strategies used to conceal prostitution on the website and he directed others in the conspiracy." But these facts do not support a role adjustment. Indeed, the PSR never indicates what "others" Mr. Lacey directed. If they were not themselves criminally culpable, any direction to them is irrelevant. Thus, Mr. Lacey was not an

16

"organizer, leader, manager, or supervisor of one or more other participants" as required by this enhancement. USSG §3B1.1, comment. (n.2).

More importantly, this four-point enhancement has nothing to do with his count of conviction, but, instead, is **based entirely on the unresolved counts**, including the unresolved conspiracy counts, in direct violation of the PSR's own imperative that it would not rely on that conduct in calculating Mr. Lacey's offense level. (*See* PSR ¶ 161.)

### C. Objections to sophisticated money laundering enhancement

Quac Thai testified that he followed the transactions with ease. No fictitious names were used, and Lacey was affiliated with all relevant accounts. (Day 19 A.M. 10/17/2023 Tr. at 62-63 *see also* Ex. 1479.) At bottom, there was nothing "complex or intricate . . . pertaining to the execution or concealment" of the offense conduct. It was a simple wire transfer.

## VI. Objections to Restitution

The PSR erroneously claims that restitution is mandated under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A ("MVRA"). Under the express terms of the MVRA, there must be "an identifiable victim" who has "suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B). The victim must be the "victim of the offense," 18 U.S.C. § 3663A(a)(1), meaning a party "directly and proximately harmed as a result" of the crime of conviction. 18 U.S.C. § 3663A(a)(2).

Here, the PSR does not identify any victim of Mr. Lacey's sole crime of conviction – international concealment money laundering. No party has "suffered a physical injury or pecuniary loss" as a result of the transfer of funds from the United States to Hungary. Indeed, as the Ninth Circuit has explained, as a general matter, money laundering tends to be a "[v]ictimless" crime. *See United States v. Lopez*, 104 F.3d 1149, 1150 (9th Cir. 1997). In the rare instances where the Ninth Circuit has approved of restitution under the MVRA for money laundering crimes, it has done so because the offense at issue "infring[ed] on a victim's property interest" such that the money laundering, itself, caused an identifiable victim a "pecuniary loss." *E.g.*, *United States v. Luis*, 765 F.3d 1061, 1065-66 (9th Cir. 2014). That scenario is not present here and

the PSR makes no attempt to establish it.  Even if the government could somehow claim that it was the victim, it was not deprived of a "pecuniary loss" and had no "property interest" in the transferred funds.  Instead, its claimed harm is a deprivation of information about the attributes of the funds (which the proof at trial demonstrates simply was not true).  But even if the deprivation of this information actually had occurred, a lack of information about the attributes of the funds is not a "pecuniary loss," which is a prerequisite to restitution for a money laundering conviction.

**VII.   Objections to Remainder of PSR**

There are 34 pending counts, which the PSR does not identify at Paragraph. 177.

All charges were dismissed against Mr. Lacey referenced in Paragraphs 178, 180.  All charges except for bank fraud (listed as money laundering) were dismissed against Mr. Lacey in Paragraph 181.  Those charges are outstanding at this time.

Mr. Lacey's objections to Paragraph 196 are detailed above under Point III.

The following bank accounts are not Mr. Lacey's:  Compass Bank x3873; FIO Accts. x2226, x4194, x8083; Prosperity Bank x7188; ING Bank x7684; Amro Bank x6352; Citbank x6973; Wells Fargo x4455.  The assets listed as "Other Assets" in Paragraph 200 do not accurately reflect the current exact balances and Mr. Lacey can provided updated information if needed.

There is no basis to impose the costs of prosecution on Mr. Lacey (¶ 211.)  Mr. Lacey's crime of conviction is not one of the crimes that provides for these costs.  *See* U.S.S.G. 5E1.5.

Mr. Lacey maintains the objections to the misstatements as to his role and to the unresolved conduct as set forth above, which is equally applicable to the misstatements found in the sentencing recommendation beginning on Page 50 of the PSR.

Computer monitoring is not appropriate here, when Mr. Lacey's crime of conviction is money laundering.  (PSR p. 52, 54 ¶ 3.)

Mr. Lacey objects to the condition prohibiting him from having contact with his co-defendants.  (PSR p. 52, 55 ¶ 8.)  There are many reasons why they need to continue to communicate.  For example, there are litigation and joint-defense agreement issues involved.  They co-own Cereus Properties with ongoing obligations necessitating contact with each other.

Mr. Lacey objects to the requirement that he maintain full-time employment (PSR p. 53), in light of the fact that he is nearly 76 years old.

Mr. Lacey objects to disclosure of his financial information to the U.S. Attorney's Office. (PSR p. 55 ¶ 4.) Because he has 34 outstanding counts, any revelation of information pertaining to his financial information will provide the government with access to experts and attorneys' consulted which will telegraph his litigation strategy to the government. Mr. Lacey does not object to providing this information to Probation, as he has throughout this case.

## **CONCLUSION**

For all these reasons, Mr. Lacey respectfully requests that this Court amend the PSR to reflect the objections stated herein. The PSR is lengthy and complicated. Counsel has endeavored to address the voluminous issues and errors. Mr. Lacey, by and through counsel, will provide any supplemental information to Probation or the Court upon request.

RESPECTFULLY SUBMITTED this 20th day of June, 2024,

                    Paul J. Cambria, Jr.
                    Erin McCampbell Paris
                    LIPSITZ GREEN SCIME CAMBRIA LLP

                    By:   /s/ Paul J. Cambria, Jr.
                            Paul J. Cambria, Jr.
                            Attorneys for Michael Lacey

1. On June 20, 2024, a PDF version
2. of this document was filed with
3. Clerk of the Court using the CM/ECF
   System for filing and for Transmittal
4. Of a Notice of Electronic Filing to the
5. Following CM/ECF registrants:

6. Kevin Rapp, kevin.rapp@usdoj.gov
7. Peter Kozinets, peter.kozinets@usdoj.gov
8. Daniel Boyle, daniel.boyle2@usdoj.gov
   Margaret Perlmeter, margaret.perlmeter@usdoj.gov
9. Andrew Stone, andrew.stone@usdoj.gov
10. Austin Maxwell Berry, austin.berry2@usdoj.gov