Paul J. Cambria, Jr. (NY Bar No.1430909, admitted *pro hac vice*)
Erin E. McCampbell Paris (NY Bar No. 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:   (716) 855-1580
pcambria@lglaw.com
emccampbell@lglaw.com
*Attorneys for Michael Lacey*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>Michael Lacey, *et al.*,<br><br>　　　　　　　Defendants. | NO. CR-18-00422-PHX-DJH<br><br>**DEFENDANT MICHAEL LACEY'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT DATED JULY 29, 2024**<br><br>(Oral argument requested) |

　　　　Defendant Michael Lacey, by and through his undersigned counsel, objects to the Presentence Investigation Report dated July 29, 2024 ("PSR") (Doc. 2121). Because the PSR is largely identical to the Presentence Investigation Report dated June 4, 2023 (the "June PSR") (Doc. 2099), with slightly different paragraph numbering, Mr. Lacey hereby supplements his Objections to the June PSR (Doc. 2101). Where there are material differences between the PSR and the June PSR, Mr. Lacey withdraws portions of his earlier objections and will rely instead on his objections herein. For clarity, Mr. Lacey has attached a redlined version of his earlier objections, in which the withdrawn portions are stricken through and the remaining objections that are maintained and applicable to the PSR are updated so that paragraph references tie to the current PSR. (*See* Redlined Objections to June PSR, attached as Ex. A, and hereby incorporated by reference.)

# BACKGROUND

In his objections to the June PSR (Doc. 2101), Mr. Lacey generally objected to misstatements of the record, both material and minor, and to Probation's improper use of acquitted conduct in calculating an advisory sentence of 188-235 months, particularly after saying it had "consulted with the U.S. Sentencing Commission to calculate Lacey's offense level" and "[u]pon advice from the Commission" would use neither "acquitted conduct" nor "conduct related to the counts pending trial" to calculate the advisory sentence. (June PSR ¶ 161.). Although saying in the June PSR that it would not use acquitted conduct in its calculations, Probation nonetheless proceeded to use acquitted conduct to calculate the sentencing range.

Section 2S1.1 of the Sentencing Guidelines Manual (the "Guidelines") provides two options for calculating the advisory range for the laundering of monetary instruments: (1) use of the underlying offense conduct; or (2) use of the loss table found in USSG § 2B1.1. Probation rejected the first option, saying the "underlying offense from which the laundered funds were derived has not been proven," so relying on that conduct would have violated the Commission's advice not to use unresolved conduct. (*Id.* ¶ 162.) Probation instead said it would use the "base offense level" for money laundering, which is 8, "plus the offense level from the table in USSG § 2B1.1 corresponding to the value of the laundered funds." (*Id.* ¶ 162.) Probation then used the $16.5 million that was transferred in Count 100 to increase Mr. Lacey's base offense level from 8 to 28 (with other enhancements bringing the total offense level to 36).[1] The problem with increasing the base offense level from 8 to 28 was that the $16.5 million Probation used to increase Mr. Lacey's base offense level had been ***acquitted – twice***. (Doc. 2101 at 14-16.)[2] As a result, the base offense

---

[1] As discussed below, Mr. Lacey objected to and maintains his objections to the two-level increase for specific offense characteristics, two-level increase for sophisticated laundering, and the four-level increase for leadership as contradicted by the record. (Doc. 2101 at 16-17.)

[2] Further, although the unresolved conduct was to play no role in the Guidelines calculation, 99% of the discussion of the "offense" in the June PSR was discussion of the unresolved conduct. (*See* June PSR at 2-36.)

2

level should have been set at 8.  *See* USSG §2S1.1(a)(2).³

On June 28, 2024, Probation wrote to all counsel indicating that it intended to seek an extension of the July 9, 2024, sentencing date to enable Probation to "*properly address and consider all objections* and responses to the reports in this case," and that Probation was *diligently working to consider and respond to all objections*."  On July 29, 2024, Probation issued its new PSR, which is remarkable for many reasons.

First, the PSR does not address Mr. Lacey's objections – the stated basis for requesting the extension – so the actual purpose for extension is unclear.

Second, Probation appears to agree that this PSR is a do-over that was necessary because Probation reviewed the Judgment of Acquittal and determined that its recommendations should be revised to comport with this Court's order on the Rule 29 motion (or at least the portion of this Court's rulings that Probation has decided are acceptable) (PSR at 61), but this Court's order was issued more than a month before the June PSR was submitted, and was specifically referenced in the June 2024 PSR, wherein Probation appears to have accepted each of this Court's rulings.  (*See* June PSR ¶¶ 8-10.)  This explanation raises more questions than it answers.

Third, the PSR pivots from use of the loss table method for calculating Mr. Lacey's sentence to use of the underlying conduct method.  Probation provides no explanation for why it has changed course, particularly because Probation's use of the loss table method in the June PSR was based on advice that Probation sought from the U.S. Sentencing Commission concerning the complexity of Mr. Lacey's sentence.  (June PSR ¶ 161.)  But, even if this Court were to accept this about-face on the method of calculation (which clearly is against the advice of the Commission), Probation's application of the underlying conduct method here is inconsistent with both this Court's rulings and

---

³ Appendix A to the U.S. Sentencing Guidelines directs courts to use USSG §2S1.1 for violations of 18 U.S.C. § 1956(a)(2)(B)(i).  Section 2S1.1(a)(2) assigns a base offense level of "8 plus the number of offense levels from the [loss] table in §2B1.1" to the offense conduct. If when, as here, there are no amount of laundered funds attributable to the defendant's relevant conduct, the base offense level remains 8.

the proof adduced at trial. It is factually impossible for the funds at issue in Count 100 to be derived from the ads associated with Mr. Lacey's co-defendant's convictions.

Fourth, the PSR maintains that restitution is mandatory for Count 100, even though that claim defies well-settled Ninth Circuit rulings on restitution in money laundering cases. (*See* Ex. A at 17 (citing *United States v. Luis*, 765 F.3d 1061, 1065-66 (9th Cir. 2014)).)

Fifth, Probation has rejected some of this Court's rulings, as well as advice Probation sought from the U.S. Sentencing Commission pertaining to Mr. Lacey's acquitted and unresolved conduct.

At a minimum, the fact that Probation sought guidance from the Commission and advanced one theory for sentencing in accordance with that advice, and then abandoned that theory just two months later, undercuts any deference to be afforded Probation's recommendation. This is a complex case with complex issues. Nonetheless, adherence to a few simple sentencing principles will ensure a sentence that is not embedded with clear legal error. As discussed below, this Court should exclude consideration of acquitted and unresolved conduct, regardless of the method used to calculate this stand-alone money laundering conviction. As a result, the base offense level is 8. Regardless of methodology, Mr. Lacey maintains his objections to the enhancements to this base offense level as previously stated, as well as his objections to the misstatements of the record, and objects to sentencing errors new to this version of the PSR.

## **OBJECTIONS**

**I.     Mr. Lacey maintains his objections to the misstatements of the record.**

For the reasons set forth in Mr. Lacey's objections to the June PSR, the PSR remains full of factual errors. The description of the offense (PSR at 5-37) remains virtually unchanged from the June PSR, other than corrections to non-material issues and the addition of victim impact information not included in the June 2024 PSR.

**II.     Mr. Lacey objects to the new methodology for calculating his advisory Guidelines range, which is premised on convictions of co-defendants on counts outstanding as to Mr. Lacey and victims with no connection to the funds transfer in Count 100.**

As discussed below, Mr. Lacey objects to Probation's change in the method of calculating Mr. Lacey's money laundering conviction. Probation has changed from calculating his sentence based on the loss table to calculating his sentence based on underlying conduct. (*Compare* June PSR ¶ 162; *with* PSR ¶ 168.) Probation's analysis is wrong for three reasons. First, Probation is not using Mr. Lacey's underlying conduct, but, instead, Probation is seeking to increase his stand-alone money laundering conviction based on the convictions of his co-defendant, which is not permitted under the Guidelines. Second, those very same convictions are unresolved as to Mr. Lacey which presents a Fifth Amendment/Double Jeopardy violation and contravenes the Commission's advice. Third, it is factually impossible for the funds at issue in Count 100 to be derived from ad revenue generated by the publication of the ads connected to those convictions.

**A.     There is no basis to use a co-defendant's convictions as "underlying conduct" to calculate the advisory Guidelines range for Count 100.**

Mr. Lacey was not convicted of the counts for conspiracy to commit Travel Act or money laundering violations. He was convicted of a stand-alone money laundering count. His transfer of funds from the United States to Hungary was planned and executed by lawyers with no input from or knowledge of his co-defendants.

Accordingly, Mr. Lacey objects to the use of §2S1.1(a)(1) at ¶ 168. As Application Note 2(B) to §2S1.1 provides: "In order for subsection (a)(1) to apply, the defendant must have committed the underlying offense or be accountable for the underlying offense under §1B1.3(a)(1)(A). The fact that the defendant was involved in laundering criminally derived funds after the commission of the underlying offense, without additional involvement in the underlying offense, does not establish that the defendant committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused the underlying offense." Thus, §2S1.1(a)(1) does not apply here. *See, e.g., United States v. Diaz-Menera*, 60 F.4th 1289, 1296-1297 (10th Cir. 2023) ("[W]here a jury convicted a defendant of money laundering but acquitted him of the underlying drug conspiracy, we noted that the defendant's base

5

offense level was properly calculated under § 2S1.1(a)(2) because the defendant did not commit the underlying offense (drug trafficking) for which the moneys were laundered" (cleaned up)). Thus, Mr. Lacey's advisory sentencing range may only be calculated pursuant to §2S1.1(a)(2).

Moreover, sentencing theories on joint liability simply do not apply here. Under the Guidelines, courts calculate the Guidelines' advisory sentencing range by reference to the defendant's relevant conduct. Relevant conduct is defined as

> all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and . . . all acts and omissions of others that were—
> (i)  within the scope of the jointly undertaken criminal activity,
> (ii) in furtherance of that criminal activity, and
> (iii) reasonably foreseeable in connection with that criminal activity; that occurred ***during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense***.

USSG §1B1.3(a)(1) (emphasis added). Thus, the "offense of conviction" anchors and limits what may constitute relevant conduct even in the cases of jointly undertaken criminal activity, *i.e.*, the acts and omissions of others. *Id.* at n.3. Here, the proof at trial indicates that the only people involved with "preparation for" Count 100 are Mr. Lacey's lawyers. Similarly, although Mr. Lacey has extensively briefed the lack of concealment or avoidance of detection, and those arguments are incorporated herein by reference (*see* Docs. 2004, 2033), to the extent there is any consideration of avoidance of detection or responsibility, that conduct, too, was limited to Mr. Lacey's lawyers. That leaves this Court with consideration only of co-defendant conduct that "occurred during the commission of the [defendant's] offense of conviction" that was within the "scope of the jointly undertaken criminal activity." Again, the proof at trial shows that no co-defendant was involved with Count 100 in any way.

In addition to this lack of proof, it is important to keep in mind the critical distinction between criminal liability for a conspiracy under the *Pinkerton* doctrine,[4] and culpability of the defendant for the conduct of others for purposes of sentencing:

---

[4] Under *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946), a defendant may be held liable for a substantive offense committed by a co-conspirator when (a) the offense occurred

6

> Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the "jointly undertaken criminal activity" is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), **_the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement)_**. In doing so, the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others. Accordingly, the accountability of the defendant for the acts of others is limited by the scope of his or her agreement to jointly undertake the particular criminal activity. Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B).

USSG §1B1.3, comment. (n.3(B)) (emphasis added). It has been the view of the U.S. Sentencing Commission since the inception of the Guidelines that the conduct of others for which the defendant is accountable is intended to be "***significantly narrower*** than the conduct embraced by the law of conspiracy." William W. Wilkins, Jr. & John R. Steer, *Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines*, 41 S.C. L. Rev. 495, 510-511 (1990) (emphasis added); *see also United States v. Davison*, 761 F.3d 683, 686 (7th Cir. 2014) ("Conspiracy liability, as defined in *Pinkerton* . . . is generally much broader than jointly undertaken criminal activity under § 1B1.3.") (cleaned up); *United States v. Okayfor*, 996 F.2d 116, 120 (6th Cir. 1993) ("[T]he scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy.") (cleaned up).

As a result, for sentencing, "[e]ach conspirator is responsible ***only*** for the activities that fell within the scope of his particular agreement with the conspirators, and reasonably foreseeable behavior in furtherance of that particular agreement." *United States v. Riley*, 335 F.3d 919, 928 (9th Cir. 2003) (emphasis added). Conduct outside the scope of a defendant's "particular agreement" is not relevant conduct, even if known and foreseeable, and constitutes reversible error to so include.

---

within the course of the conspiracy, (b) was within the scope of the agreement, and (c) could reasonably have been foreseen as a natural consequence of the unlawful agreement.

*See, e.g.*, *United States v. Kauwe*, 755 F. App'x. 661, 663 (9th Cir. 2019) (vacating sentence and remanding in drug distribution case where court incorrectly included in relevant conduct drug amounts that the defendant had not agreed to distribute even though he was aware of the same).

Here, even if the government had presented evidence establishing that a co-defendant was somehow involved in the transfer at issue in Count 100 – and it did not – the use of Spears' Travel Act convictions as underlying conduct still would be impermissible because the PSR does not cite to any "particular agreement" between Mr. Lacey and the co-defendants ***with respect to Mr. Lacey's offense of conviction***. This is especially so with respect to any alleged offense conduct occurring after 2015 when Backpage was sold to Ferrer. That Mr. Lacey may have been named in unresolved conspiracy counts is of no moment. He was only convicted of a single count, which necessarily limits the scope of his relevant conduct and, again, there is no evidence of any agreement of Mr. Lacey's arising out of his offense of conviction that overlaps with any of the co-defendants' relevant conduct.

### B. Probation is improperly using Mr. Lacey's unresolved conduct.

It is equally troubling that the Commission specifically advised Probation against using unresolved conduct in calculating Mr. Lacey's sentence, which Probation adopted in its June PSR, (June PSR ¶¶ 161-62), but now includes to increase Mr. Lacey's base offense level from 8 to 35. Although Mr. Lacey's co-defendant was convicted of Counts 2, 4, 5, 10, 12, and 14, the jury reached no verdict as to Mr. Lacey on those very same Counts, and the government has stated its intent to retry him on those unresolved counts. If he is convicted on any of those counts at the retrial, and his sentence here has been increased in any way based on those counts, he will be punished ***twice*** in violation of the Double Jeopardy Clause. *See North Carolina v. Pearce*, 395 U.S. 711, 719 (1969) (recognizing that the Double Jeopardy Clause protects "against multiple punishments for the same offense"). This would be a Fifth Amendment violation.

Moreover, this use of unresolved conduct turns the presumption of innocence on its head. This is not an instance where a defendant is convicted of some counts, the jury hung on others, and

8

1 the government does not intend to retry the defendant, such that the use of that conduct at
2 sentencing would have no impact on a defendant's fair trial rights. Here, if this Court finds sufficient
3 evidence to hold Mr. Lacey accountable for Counts 2, 4, 5, 10, 12, and 14 during this sentencing on
4 money laundering, how can Mr. Lacey possibly get a fair retrial on those counts? There is no basis
5 to inject this complexity and legal error into a sentencing on a stand-alone money laundering
6 conviction.

      **C.**    **The PSR improperly assumes both that Backpage's publication of all adult ads was unprotected by the First Amendment and that all revenues from adult ads were derived from criminal proceeds.**

"All speech, press, and associational relationships are presumptively protected by the First Amendment; the burden rests on the Government to establish that *the particular expressions* or relationships are outside its reach." *Bursey v. United States*, 466 F.2d 1059, 1081–82 (9th Cir. 1972) (emphasis added). The government has not met that exacting standard here. And this Court has already held:

> The Government did not, however, provide sufficient evidence at trial that every ad sold on Backpage.com prior to these transfers was a Travel Act violation such that a rational jury could have traced the funds back to a criminally-derived source. Even the fact that the Government offered evidence showing that the majority of Backpage's revenue—at times up to 96%—stemmed from sales of ads posted in the Adult Escort section of Backpage is insufficient to sustain these convictions.

(Doc. 2063 at 56.) Disregarding both the Ninth Circuit's constitutional imperative and the Court's holding, the PSR improperly assumed that all revenues Backpage earned from the publication of adult ads derived from criminal activity:

> [T]he Government offered evidence showing the majority of Backpage's revenue, at times up to 96%, stemmed from the sales of ads posted in the Adult Escort section of Backpage. Based on this, the funds themselves were derived from criminal activity.

(Doc. 2121 at ¶ 166.) The PSR then asserted that, "based on a preponderance of the evidence, Counts 66 through 99 qualify as jointly undertaken criminal activity that was within the scope of the activity, in furtherance of the activity, and reasonably foreseeable within connection of the activity."

9

*Id.* Regardless of whether originating with the prosecution, its cooperator, or Probation, conjecture that all Backpage's adult ads were associated with unlawful activities and conjecture that payments for all those ads were derived from criminal activity is constitutionally deficient and cannot meet the government's burdens. *See Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 392 (2000) ("We have never accepted mere conjecture as adequate to carry a First Amendment burden.").

> **D. There is no basis to claim that the funds at issue in Count 100 were "derived" from revenue related to the ads published in Counts 2, 4, 5, 10, 12, or 14.**

The PSR's use of Scott Spear's Travel Act convictions as the conduct "underlying" Mr. Lacey's money laundering conviction for Count 100 is improper. Probation correctly said that "the base offense level is determined by the offense level for ***the underlying offense from which the laundered funds were derived***." (PSR ¶¶ 168 (emphasis added), 196 ("The underlying offense level ***from which the laundered funds were derived*** was determined by the pseudo counts." (emphasis added)). But Probation misapplied this principle here.

The funds at issue in Count 100 originated from a bank account held by Website Technologies. (Trial Ex. 1479.) Website Technologies transferred out the funds at issue during the time period December 31, 2015 – March 31, 2016. (*Id.*) Thus, these funds are derived from loan payments Ferrer made to Cereus Properties (that ultimately reached Mr. Lacey's bank accounts) for ads published 8-11 months ***after the sale of Backpage*** to Ferrer. (*Id.*) Yet, in recommending that this Court increase Mr. Lacey's base offense level from 8 to 35, Probation relied exclusively on ads that were published ***prior to*** the sale of Backpage (during the time period January 29, 2014 – January 31, 2015). (PSR ¶¶ 169-95.) The government has not shown, and cannot show, that the funds at issue in Count 100 were derived from pre-sale ads. Quoc Thai conceded that he did not trace any of the funds to any particular ad. (Day 19 A.M. Tr. at 45.) Setting aside the lack of tracing (and the resulting constitutional problems created by presuming the publication of ads to have been unprotected without proof that was so), it is undisputed that the funds at issue in Count 100 were derived entirely from distributions Mr. Lacey received ***after*** the sale of Backpage to Ferrer (Trial Ex.

10

1479; Day 10 P.M. Tr. at 91; Day 23 P.M. Tr. at 117; *see also* Doc. 2063 ("At best, the Government's evidence showed that Mr. Ferrer used Backpage's profits after the sale of Backpage to satisfy the loans he assumed for Backpage's purchase")), which Ferrer would have earned from the publication of ads after he purchased Backpage. As a result, there is no basis for Probation to claim that the $16.5 million was derived from the underlying offenses it has identified (Counts 2, 4, 5, 10, 12, and 14) because those counts pertain to ads that were published before the sale of Backpage. Moreover, the Court should note that the PSR is silent with respect to the revenues purportedly generated by the publication of the ads associated with Counts 2, 4, 5, 10, 12, and 14. That likely is because the government presented no evidence that Backpage received any revenues for the ads associated with Counts 2 or 10 and, viewed most favorably for the government, the government's evidence showed the ads associated with Counts 4, 5, 12, and 14 generated revenues of just $115.00.

Simply put, there is nothing in the record to support the claim that the funds at issue in Count 100 derived from the publication of ***any*** pre-sale ads, let alone the ads associated with Counts 2, 4, 5, 10, 12, and 14.

Additionally, there is no basis to claim that ads published after the sale of Backpage constitute the underlying conduct for Count 100. This Court has already ruled that the conspiracy to facilitate Travel Act violations ended at the time of the sale, in April 2015. (Doc. 2063 at 40-41.) Probation agreed with this ruling. (PSR ¶ 162.) This Court has acquitted all defendants on all Travel Act counts that post-date the sale of Backpage to Ferrer, both for theories of direct liability and *Pinkerton* liability. (Doc. 2063 at 40-41.) Again, Probation agreed with this ruling, stating that "Counts 19 through 51 do not qualify as jointly undertaken activity that was within the scope of the activity as it is not reasonably foreseeable in connection with the criminal activity." (PSR ¶ 162.) Thus, there is no underlying conduct for the period that post-dates the sale of Backpage that could be used in calculating Mr. Lacey's base offense level for a money laundering transaction that occurred on January 3, 2017. As a result, Mr. Lacey's base offense level is 8, not 35.

Finally, Mr. Lacey maintains his objections to enhancements to his base offense level, for leadership and sophistication. (*See* Ex. A at 12-13, 16-17.) The stated bases for sophistication

11

(PSR ¶ 198) and leadership (PSR ¶¶ 173, 180, 187, 200) are contradicted by the proof at trial. As discussed in the Objections to the June PSR, there is nothing sophisticated about the wire of funds at issue in Count 100. (*See* Ex. A at 17.) No fictitious account names were used. (*See id.*) The wire at issue transferred funds from one account associated with Mr. Lacey to another, and the government's own expert was easily able to follow the transfer. (*See id.*) This transfer does not involve any crypto currency or shell companies. (Trial Ex. 1479.) Further, Mr. Lacey had nothing to do with the business side of the company, including financial issues. (*See* Ex. A at 5.) He did not attend a single quarterly meeting or any banker meetings. (*Id.*)

With respect to his leadership enhancement, there is nothing in the record to support this specious claim. (Ex. A at 12-13, 16-17.)

Mr. Lacey objects to Probation's new enhancements based on specific offense characteristics. (PSR ¶¶ 170-71, 177-78, 184-85.) There was no use of a computer in the commission of Count 100, nor was commercial sex involved in the wire at issue in Count 100. Indeed, there is no agreement between Mr. Lacey, Ferrer, or any other defendant to engage in these activities, which means those activities are not relevant conduct here. *See* USSG §1B1.3, cmt. n.3(B). Again, this is particularly important here because the funds Mr. Lacey transferred were from post-sale loan payments funded with post-sale ads, but the conduct Probation identified occurred prior to the sale.

### III. Mr. Lacey objects to the PSR's double counting, use of enhancements for both the loss table method and the underlying conduct method, and straight mathematical errors.

The calculation of the advisory Guidelines range is flawed for at least two additional reasons. First, the PSR double counts the four-point leadership enhancement. Second, the leadership enhancement does not apply in any event.

The PSR seeks to enhance the sentence by four levels for Mr. Lacey's purported leadership role in the pseudo victim section (PSR ¶¶ 173, 180, 187), and then enhance it again for that very same leadership role after having performed an upward adjustment for multiple groups. (PSR ¶¶ 194, 200.) The law is clear that Probation cannot double count.

12

"Impermissible double counting occurs when a court applies a provision of the Guidelines that takes into account conduct or harm that has already been fully taken into account by application of another provision of the Guidelines." *United States v. Harrington*, 946 F.3d 485, 487 (9th Cir. 2019); *United States v. Dick*, 245 F. Supp. 2d 322, 325 (D. Mass. 2003) ("[T]he grouping rules generally aim to avoid the double counting of sentencing factors that might result from calculating a guideline range separately for every count of conviction.").

Here, the PSR first applies a role adjustment to each of the three pseudo counts A1, A2, and A3, which constitute the conduct purportedly underlying the money laundering conviction. (PSR ¶¶ 173, 180, 187). The PSR then applies +3 for the three groups to arrive at "Combined Adjusted Offense Level" of 35. (PSR ¶¶ 192-195.) The PSR then goes back to §2S1.1(a)(1) and inserts that Combined Adjusted Offense Level as the base offense level for §2S1.1(a)(1). (PSR ¶ 196.) The problem is that the PSR overlooks Application Note 2(C) to §2S1.1, which states that when, as here, one is calculating the Guideline under 2S1.1(a)(1), "application of any Chapter Three adjustment shall be determined based on the offense covered by this guideline (*i.e.*, the laundering of criminally derived funds) ***and not on the underlying offense from which the laundered funds were derived***." U.S.S.G. § 2S1.1(a)(1) App. n. 2(C) (emphasis added). Consequently, the first application of the role adjustment to the conduct underlying the money laundering conviction (PSR ¶¶ 173, 180, 187) is prohibited by Application Note 2(C).

In any event, the leadership role does not apply. As just noted, it is to be applied only to the actual offense of conviction; here "the laundering of criminally derived funds." Indeed, for a role adjustment to apply, "the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants," *i.e.*, "a person who is criminally responsible for the ***commission of the offense***." USSG §2S1.1, comment. n.1 and 2 (emphasis added). The PSR states that Mr. Lacey is eligible for this adjustment because "he had 45% ownership interest in Backpage, exercised decision-making authority, and was involved since the inception of the website." (PSR ¶ 200.) But that conduct has nothing to do with ***his offense***

13

*of conviction* and cannot constitute conduct relevant *to his offense of conviction*. He was convicted (solely) of engaging in a single monetary transaction in 2017, long after he sold his interest in Backpage and approximately two years after the purported conspiracy ended. The conduct cited by the PSR simply is not relevant conduct to his offense of conviction. Accordingly, as he did not lead, manage, or supervise at least one other criminally responsible individually in the single financial transaction for which he was convicted, the role adjustment does not apply.

Third, there is a mathematical error. Paragraph 189 should total 32, not 40.

### IV. Probation errs in claiming there are victims of Count 100 and that the Court may award restitution based on Count 100.

The PSR identifies numerous persons claimed to be victims of Count 100 entitled to restitution. While some of those persons may have been the victims of criminal acts committed by persons unconnected to Mr. Lacey, they were not victims of the concealment money laundering offense of which Mr. Lacey was convicted. As set out in Mr. Lacey's objections to the June PSR, money laundering typically is a victimless crime, the Ninth Circuit has narrowly construed the term "victim" when awarding restitution for money laundering offenses, and the PSR does nothing to establish that there were any victims of Count 100 under the controlling standard. (Ex. A at 17-18.)

In cases awarding restitution for money laundering, the monetary transfers typically are transfers of the proceeds of fraud or sums received on account of bribery, which both result in identifiable losses to the identifiable victims of those crimes – meaning people who had a property interest in the funds at issue and who suffered a pecuniary loss associated with the transfer. In contrast, none of the people associated with ads published to Backpage were "directly and proximately harmed" by Mr. Lacey's movement of the funds at issue in Count 100, which occurred long after the ads at issue were published and long after the crimes the PSR discusses were committed (nearly two years to more than three years). Nor did those persons have any interest in the funds Mr. Lacey transferred or suffer a pecuniary loss from his transfer. As a result, none of the persons the PSR identifies as entitled to restitution could qualify as a victim of Count 100 under the

14

controlling Ninth Circuit precedent cited in Mr. Lacey's Objections to the June PSR. (Ex. A at 17-18.) The same is true in other circuits. *See United States v. Kendre*, 486 F. App'x 271, 275 (3d Cir. 2012) (the victim of a money laundering conviction is a person whose "loss was caused, both directly and proximately, by [defendant's] *movement of money*" (emphasis added)); *see also United States v. Paradis*, 219 F.3d 22, 25 (1st Cir. 2000) ("Because there is no evidence of identifiable victims who suffered harm as a result of [defendant's] money laundering, the restitution order must be vacated.").

**V.   Mr. Lacey objects to Probation's rejection of this Court's rulings and the U.S. Sentencing Commission's advice.**

In acquitting the defendants of Counts 69-99, this Court ruled, as a matter of law, that there was insufficient proof of those charges. (Doc. 2063 at 55-57.) In the June PSR, Probation respected that ruling, in the sense that it did not object in any way to this Court's ruling on those Counts and embraced those rulings at part of its analysis. (June PSR ¶¶ 8-10.) Similarly, Probation sought advice from the U.S. Sentencing Commission on the complex issues presented by Mr. Lacey's conviction, and affirmatively stated that it would not use acquitted or unresolved conduct based on that advice. (June PSR ¶ 161.) As the Court is aware, the Commission recently promulgated an amendment to the Guidelines expressly excluding acquitted conduct from the definition of relevant conduct. In paragraph 166, and elsewhere, Probation now says it will disregard this Court's findings on acquittals for Counts 69-99. Probation has offered no explanation for why it has disregarded this Court's rulings, or the Commission's advice concerning acquitted and unresolved conduct, even though Probation accepted those rulings and that advice as dispositive in its June PSR.

But, even if this Court entertains Probation's unexplained about-face, as noted above, none of the conduct encompassed by Counts 66-99 constitutes relevant conduct as to Mr. Lacey. That conduct was not part of any particular agreement arising out of Mr. Lacey's offense of conviction.

**VI.   Mr. Lacey objects to inclusion of the attached victim impact information as well as to his inclusion in any sentencing hearing involving alleged victims.**

As set forth above, there are no victims of Count 100. Consequently, Mr. Lacey objects to inclusion of victim impact information in the PSR as well as victim impact information attached to

the PSR. Additionally, Mr. Lacey objects to including him in any sentencing hearing that involves statements from alleged victims because that testimony may taint his sentencing on a stand-alone money laundering conviction for which there are no victims.

### VII. Miscellaneous Objections

Mr. Lacey objects the PSR's finding that Mr. Lacey is ineligible for probation. (PSR ¶ 241.) The PSR erroneously calculated the advisory sentence which resulted in Mr. Lacey erroneously falling under Zone D of the Sentencing Table.

Mr. Lacey objects to the lack of information about the charges discussed in Paragraph 214. All charges were dismissed, as set forth in the certified disposition of that case, attached as Exhibit B.

Mr. Lacey objects to the lack of information about the counts discussed in Paragraph 215. All charges related to pimping were once again dismissed. The only charges remaining relate to money laundering. The certified records available in that case are attached as Exhibit C.

Finally, the PSR wrongly states that charges were filed against Mr. Lacey in Paragraph 212. As set forth in his counsel's affidavit, attached as Exhibit D, no charges were filed.

### VIII. Joinder in co-defendants' objections

To the extent that the objections of Mr. Lacey's co-defendants are relevant to his PSR, he joins in their objections and incorporates them by reference herein.

### **CONCLUSION**

For all these reasons, Mr. Lacey respectfully requests that the PSR be modified to properly reflect the facts and the law. The PSR is lengthy and complicated. Counsel has endeavored to address the voluminous issues and errors. Mr. Lacey, by and through counsel, will provide any supplemental information to Probation or the Court upon request.

RESPECTFULLY SUBMITTED this 12th day of August, 2024,

                              Paul J. Cambria, Jr.
                              Erin McCampbell Paris
                              LIPSITZ GREEN SCIME CAMBRIA LLP

By:   <u>/s/ Paul J. Cambria, Jr.</u>
       Paul J. Cambria, Jr.
       Attorneys for Michael Lacey

On August 12, 2024, a PDF version of this document was filed with Clerk of the Court using the CM/ECF System for filing and for Transmittal Of a Notice of Electronic Filing to the Following CM/ECF registrants:

Kevin Rapp, kevin.rapp@usdoj.gov
Peter Kozinets, peter.kozinets@usdoj.gov
Daniel Boyle, daniel.boyle2@usdoj.gov
Margaret Perlmeter, margaret.perlmeter@usdoj.gov
Andrew Stone, andrew.stone@usdoj.gov
Austin Maxwell Berry, austin.berry2@usdoj.gov