

# Superior Court of California
# County of Sacramento

720 Ninth Street
Sacramento CA 95814

This letter is confirmation that the annexed instrument (inclusive) is a Correct copy of the original on file in the Sacramento Superior Court file.

Sacramento Superior Court in and for the County of Sacramento, State of California.

CASE NAME **LACEY, MICHAEL GERARD**

CASE NUMBER **16FE019224**

ATTEST CERTIFIED DATE **8/09/2024**

BY _____ DEPUTY CLERK
A. MORAN

TOTAL NUMBER OF PAGES **17**

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SACRAMENTO
MINUTE ORDER - HEADER/PROCEEDINGS

DEFENDANT NAME
LACEY MICHAEL GERARD

```
                                        DEF    XREF           CASE
                                        2    5094013    16FE019224 SUP
```

CUSTODY STATUS: BOND
DOB: 07/30/1948
LEA: ATTORNEY GENERAL'S OFFICE - SACRAMENTO                DATE FILED: 10/06/2016
BAIL SET:      $250,000.00                                ARREST #: 09976108-01
BAIL POSTED: $250,000.00
                                                          BOND #: T500-50585625

PROSECUTOR:
                                        DEFENSE: ARGUEDUS, CHRIS
                                              TYPE: RET


SECTION(S) VIOLATED:

                              (CT 1)   PC  182(A)(1)


************************************************************************
| DATE | JUDGE | DEPT | REL | CSR | PROCEEDINGS |
|******|***************|****|****|****|*************************************|
| 111616 | BOWMAN | 61 | B | 0667 | Demurrer |
| 01:35 | | | | | See Attached Formal Mgd M.O. 13 |
| 2 9 16 | MICHAEL G. BOWMAN | 61 | N/A | N/P | Court's Final Ruling on Demurrer; |
| | | | | | Demurrer GTD; Future Court |
| | | | | | DATES VACATED; BOND EXON |
| | | | | | A Discharged; |

DO NOT FILE ANY DOCUMENTS EXCEPT OUTSTANDING WARRANTS ON TOP OF THIS

JICR0420/CR61A - PAGE 01



FILED/ENDORSED

DEC 1 3 2016

By A. Mick, Deputy Clerk

1
2
3
4
5
6            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
7                    **COUNTY OF SACRAMENTO**
8
9    THE PEOPLE OF THE                    **Case No. 16FE019224**
10   STATE OF CALIFORNIA,
                                          **ORDER CONFIRMING**
11                    Plaintiff,          **DISMISSAL**
12           vs.
13   CARL FERRER, MICHAEL
     GERARD LACEY, JAMES
14   ANTHONY LARKIN,
15                    Defendants.
16           Based upon this Court's ruling of December 9, 2016 granting the demurrer of
17   the defendants and exonerating bail, the Court hereby confirms that this case is and
18   was dismissed on December 9, 2016.
19           IT IS SO ORDERED
20
21   Dated: 12/13/16
22                                        HON. MICHAEL G. BOWMAN
                                          Judge of the Superior Court
23
24
25
26
27
28
     ────────────────────────────────────────────
                    ORDER FOR RETURN OF PASSPORTS

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF SACRAMENTO**

**DATE:**       December 9, 2016                    **DEPARTMENT:**  61
**JUDGE:**      Michael Bowman                      **CLERK:**       D. Rios Sr.
**REPORTER:** N/A                                   **BAILIFF:**     N/A

People of the State of California                   **CASE NO.** 16FE019224

**Vs.**

Carl Ferrer et al,
Defendants



**Nature of Proceedings:**     **COURT'S FINAL RULING ON DEMURRER**

### Introduction

Defendants face charges for their respective roles in owning and operating an online classified advertisement website. Allegedly, through third party use of this website, women and young girls were sexually exploited. The Attorney General seeks to hold the Defendants criminally liable for the victimization of these women. The People of the State of California have a strong and legitimate interest in combating human trafficking by all available legal means. Moreover, any rational mind would concur that the selling of minors for the purpose of sex is particularly horrifying and the government has a right and a duty to protect these most vulnerable victims.

The State's legitimate interest is not absolute, however, and must be constrained by the interests and protections of the First Amendment to the U.S. Constitution. In that vein, the United States Congress has created the Communications Decency Act under 47 USC section 230 ("herein CDA"). The CDA forecloses suit against an online publisher when that suit is based on speech provided by a third party. (47 USC §230 (c) (1) and (e) (3).) By enacting the CDA, Congress struck a balance in favor of free speech by providing for both a foreclosure from prosecution and an affirmative defense at trial for those who are deemed an internet service provider.

In fact, this Court garners strength for its ruling from the legislative history (or lack thereof). The CDA was created in direct response to a legal decision holding an online publisher strictly liable for defamatory statements posted by third parties. (*See Stratton Oakmont v. Prodigy Servs. Co.*, 1995 N.Y. Misc. LEXIS 229.) Since the creation of the CDA, several courts have construed the CDA's immunity provision broadly, such that close cases are resolved in favor of immunity. (*Fair Housing Council of San*

*Fernando Valley v. Roommates.com LLC* (9th Cir. 2008) 521 F.3d 1157, 1170-1171.)  Congress has had ample opportunity to statutorily modify the immunity provision if it disagrees with prevailing judicial application of this provision.  Congress has not done so, and the current legal framework binds this Court.

The key question in this case is not whether speech in furtherance with human trafficking is protected free speech: clearly it is not.  The issue to resolve is whether the Defendants should be entitled to immunity under the CDA for providing a forum for third party speech, or whether the defendants have crossed the line of merely providing a forum for speech to become actual creators of speech, and thus not entitled to immunity under the CDA.

## Background

Backpage.com is one of the largest on-line classified advertisement services, through which users may post advertisements in a variety of categories.  Posting an advertisement in the "Adult Services" category requires a fee.  Through various levels of involvement with Backpage.com, Defendants find themselves facing criminal charges regarding certain advertisements placed in the "Adult Services" category.  Carl Ferrer, Michael Lacey and James Larkin currently face a charge of conspiracy to pimp, and Ferrer faces multiple additional charges of pimping and pimping of a minor.

The allegations are that Defendants conspired to create and organize a website that allows sex trafficking to take place.  The People assert that Defendants created such a site, knowing that prostitutes and/or pimps use the site to advertise prostitution, and Defendants did so with the intent to derive support and maintenance from the prostitution resulting from the advertisements.  The People allege that Defendants' plan has come to fruition and that they have derived financial support and maintenance from the prostitution resulting from the advertisements third parties pay Backpage.com to place. Allegedly, Defendants have also derived support from prostitution resulting from content "created" by Defendants themselves when they took content from the third party advertisements originally placed on Backpage.com and posted new advertisements on EvilEmpire.com and BigCity.com – sites also created and maintained by Defendant Ferrer.

On October 19, 2016, Defendants filed a demurrer to the felony complaint against them. Against the backdrop of unsuccessful attempts by the California and other state Attorneys General to shut down adult online advertising, the Defendants argue that the instant prosecution cannot go forward.

Defendants claim that the complaint and prosecution are: barred by the First Amendment, legally deficient under Section 230 of the Communications Decency Act ("CDA"), and devoid of any facts that constitute public offenses under the criminal statutes.

On November 16, 2016, this Court issued a tentative ruling on the matter, but allowed additional briefing.  Both parties have filed additional arguments in response to the tentative ruling.

## Court's legal analysis and ruling

### 1.    Complaint states facts that constitute public offenses

The Defendants argue that the court should grant the demurrer because the Complaint fails to allege any public offense.  Rather, Defendants maintain, the People are pursuing a theory of prosecution based on allegations that third parties posted content allegedly relating to unlawful conduct.  Defendant Ferrer also claims that the pimping charges against him are deficient because there is nothing to connect Ferrer to any of the advertisements associated with the nine victims. (Def. 24-25)  All the defendants allege that the complaint's conspiracy charge is deficient because it does not address several elements of conspiracy. (Def. 25-26)  The People claim that the complaint expressly alleges that Defendant Ferrer "knowingly and repeatedly took the earnings of victims engaged in prostitution because his livelihood depended on it." (Opp. 18)  As to the conspiracy between all the defendants, the People assert that the complaint expressly alleges they conspired together to commit pimping for the purpose of further enriching themselves. (Opp. 19)  The People maintain that level of specificity is all that is required to provide notice under Penal Code section 952. (Opp. 18-20)  The People argue that Defendants' assertion that the complaint does not adequately state facts that constitute public offenses belies confusion between civil and criminal pleading requirements. (Opp. 20)  As stated below, the key issue here is whether Defendants are able to claim immunity under the CDA.  Such ability to claim liability would not necessarily render the complaint deficient.  The charging instrument however, is sufficient in this case.

### 2.    Defendants Challenge is Appropriately Raised in a Demurrer

The People claim that a demurrer is not the appropriate vehicle in which to raise a defense of immunity under the CDA.  Rather, the People contend that such immunity may only be raised as an affirmative defense.  This Court disagrees.

A demurrer to a criminal complaint lies only to challenge the sufficiency of the pleading and raises only issues of law. (Pen. Code, § 1004; *People v. McConnell* (1890) 82 Cal. 620; *People v. Biane* (2013) 58 Cal.4th 381, 388.)  A defendant may demur only on delineated statutory grounds. (Pen. Code, § 1004; *People v. Saffell* (1946) 74 Cal.App.2d supp. 967, 972.)  These include the ability to challenge the accusatory pleading on the ground that the pleading includes information that would be a bar to

prosecution. (Pen. Code, § 1004(5). *See also People v. Goodman* (2014) 225 Cal.App.4th 950, 956.) The language of the CDA itself states, "No cause of action may be brought and no liability will may be imposed under any State or local law that is inconsistent with this section." (47 U.S.C. §230 (e) (3) (emphasis added).) This statutory language clearly demonstrates a legislative intent to provide both a bar to prosecution and an affirmative defense at trial

Stated more succinctly "...close cases, we believe, must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged--or at least tacitly assented to--the illegality of third parties." Fair Housing. Council v. Roommates.com, LLC, 521 F.3d 1157, 1174, 2008 U.S. App. LEXIS 7066, *45, 36 Media L. Rep. 1545 (9th Cir. Cal. 2008 (emphasis added).

### 3.     The First Amendment is implicated

Defendants contend that the First Amendment bars prosecution, as the People are seeking to prosecute individuals for the act of publishing third party content. However, the instant charges are not based on an overt attempt to criminalize the act of publication, and traditional First Amendment analysis is not required here. That is not to say that the First Amendment is not implicated. As noted, the protections afforded by the First Amendment were the motivating factors behind the enactment of the CDA. Congress expressly intended to relieve online publishers from liability for publishing third-party speech. (47 U.S.C. § 230) Thus, the relevant question in this case is whether, and to what extent, Defendants' activities entitle them to protection of their First Amendment rights through the immunity provision of the CDA.

#### a.     Immunity Under the Communications Decency Act
The CDA provides immunity for online publishers and distributors of content generated by third parties. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 39.) Protection from the CDA is broken down into three parts. Conduct is shielded if the defendant (1) is a provider or user of an interactive computer service; (2) that the plaintiff seeks to treat as a publisher or speaker; (3) of information provided by another information content provider. (*Fields v. Twitter, Inc.* (2016 U.S. Dist. LEXIS 105768, *8; *Doe v. Backpage.com LLC* (2016) 817 F.3d 12, 19; 47 U.S.C. §230.) "There has been near-universal agreement that section 230 should not be construed grudgingly." (*Doe, supra,* 817 F.3d at 118 [citations omitted].)

The second component is the instant source of dispute. Defendants assert that Backpage.com is an internet service provider that merely allows third parties to publish their content, and the instant prosecution seeks to impermissibly treat them as the speaker. The People respond that the CDA does not

protect those who knowingly commit their own crimes on the internet. The People assert that Defendants should be viewed as content providers, and not entitled to immunity under the CDA.

### b.    Content provision versus editorial functions

To determine whether defendant faces a claim that seeks to treat the defendant as a publisher or speaker of information provided by a third party, "'courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker'." (*Fields, supra*, 2016 U.S. Dist. LEXIS 105768, *10, *quoting Barnes v. Yahoo!, Inc.* 570 F.3d 1096, 1101-02.) Moreover, because distributors are included in the publisher category, distributors are also entitled to protection under the CDA. After all, publication includes every repetition and distribution of material. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 45.) Under the CDA, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune." (*Fair Housing Council of San Fernando Valley v. Rommates.com, LLC,* (9th Cir. 2008) 521 F.3d 1157, 1170-1171.) The Ninth Circuit has recognized that although "there will always be close cases where a clever lawyer could argue that something the website operator did encouraged the illegality...Such close cases must be resolved in favor of immunity..." (*Id* at 1174.)

Although the People acknowledge that third parties provided the content for the original advertisements placed on Backpage.com, the prosecution asserts that Defendants developed the content on BigCity.com and EvilEmpire.com by deliberately manipulating that original content to generate the advertisements placed on BigCity and EvilEmpire. The People assert that Defendants created "fake profiles" when "Backpage staff took images and information from Backpage escort ads and used them to create dating profiles on BigCity.com." (Ex 1, p2)  In support of this claim, the People refer to an internal Backpage email that states "The content will be pre-populated with millions of images from backpage where we hope to extract two words of the title, the phone number, and age of the person. The images will need to be processed to where we crop an area most likely to give us a wholesome image." (Ex A) Backpage also added new information, "in line with the alleged purpose of the profile." This information was not taken from the original Backpage ad, and required staff to choose one of the following: "Interested in Men," "Interested in Women," or "Interested in Everyone." (Ex 1, p4)  There were no links to the original Backpage ad and Defendants hoped to pitch BigCity as a dating site to Backpage.com escort users.

The People also allege that "Defendants took images and information from Backpage escort ads and used them to create a phone directory for female escorts on EvilEmpire.com." (Ex 1, p3) Customers could contact the escort directly from the number listed on EvilEmpire or through a link to original Backpage ad. The People acknowledge that the escort phone directory used "much of the same data that was selected to create a BigCity profile that was generated for that Backage escort user." (Ex 1, p5) However, EvilEmpire provides no opportunity for users to sign up, modify or contribute to entries. (Ex 1, p5)

In support of its claim that these actions constituted content creation, the People rely on *People v. Bollaert* (2016) 248 Cal.App.4th 699. In *Bollaert*, the defendant was convicted of extortion and unlawful use of personal identifying information. He set up two websites: a revenge porn site and a site which victims of the former could utilize to have their information removed, for a fee. To use the revenge porn site, defendant designed "required fields" that required a user seeking to post a photo of another person to input that other person's full name, age, location and Facebook link. Bollaert had the only user account; he looked at every single post and decided what would get posted, placed watermarks on each photographs to discourage re-posting by third parties, and kept a spreadsheet recording every post. Bollaert would not post pictures that he considered "garbage" which included those that did not include nude persons. (*Id* at 706) At trial, the jury rejected defendant's assertion that he was immunized as a service provider under the CDA.

On appeal, the Fourth District affirmed the conviction. The court noted that the immunity under the CDA was limited to interactive computer services that do not retain or acquire personal information with the intent to defraud, or that do not act as content providers. (*Id*. at 709-710.) In Bollaert's case, the evidence showed that he designed the revenge porn site specifically for the purpose of eliciting nude photos and private information of others. Bollaert then used that personal information for his own purposes, *i.e.*, for display on his website, to gain advertising income and to obtain payments from his removal website. The court found there was sufficient evidence that Bollaert retained the personal information with the intent to defraud the victims.

The court also rejected defendant's claim that he was entitled to immunity under the CDA because the evidence demonstrated he was a content provider. The court determined that Bollaert's affirmative acts in designing the website to require users to provide content that violated other persons' privacy did not entitle him to immunity under the CDA. The court based its conclusion and reasoning on the Ninth Circuit's *Roommates* decision, which also involved a website that was "designed to solicit" content that was unlawful. These acts were not neutral, but rather "materially contributed to the illegality of the content" such that the defendant became a content provider. (*Bollaert, supra*, 248 Cal.App. 4th at 721.)

Defendants here contend that *Bollaert* is distinguishable from the instant case because in that case, the defendant Bollaert *required* the entry of unlawful information by the user, which fell into the narrow exception to immunity recognized by *Roommates*. (Def. Supp. 3) In contrast, Defendants argue, Backpage.com does not require users to enter unlawful information. This Court agrees with the Defendants.

In *Fair Housing v. Roommates.com* (9th Cir. 2008) 521 F.3d 1157, the defendant ran a website for the purposes of matching potential roommates together. In order to utilize the website, participants

6

were required to answer a series of questions regarding a user's sex, sexual orientation and whether they will bring children to the household. Paid subscriptions provided access to detailed preferences from potential roommates. (*Id* at 1161-1162) The Fair Housing Councils of two cities sued Roommates, and alleged a violation of the Fair Housing Act and California housing discrimination laws. The Councils alleged that the website was acting as a housing broker in ways that it could not lawfully do off-line. (*Id* at 162.) The district court granted Roommate's motion to dismiss based on immunity provided by the CDA. The Ninth Circuit reversed.

The Ninth Circuit found that by creating the questions and choice of answers that a real estate broker was legally prohibited from asking and then requiring subscribers to answer them, Roommate became an information content provider and not immune under the CDA. (*Id* at 1164.) The court contrasted Roommate's impermissible behavior, where it both elicited the allegedly illegal content and made aggressive use of it in conducting its business, with permissible utilization of a neutral classification tool or search engine that does nothing to enhance the illegality of the content. (*Id* at 1172.)

Here, there are no allegations that Backpage required a third-party user to provide any protected information when the original ad is placed. As the information posted on EvilEmpire and BigCity is mostly taken from the original ad, Defendants did not "design to solicit" protected content as a condition to placing the ad. In fact, according to the exhibits attached by the People, Backpage moderators were instructed to look for offending material and remove it. (AG Supp. 6, Ex 9)

The People argue that Defendants actively "manipulated" the content provided by third parties so that they could profit from activity resulting from the ad placement. In light of the People's acknowledgement that the substance of the ads came from the original ad placed on Backpage, the only "manipulation" would be in the act of extracting the content from the original ad and/or from the act of physically posting the extracted content on a new site. This is not prohibited activity. Indeed, it generally falls within the scope of protected editorial functions. (*See Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12, 20-21 [service providers' decisions on website structure, rules for posting and reposting are protected publisher functions] and *Fields v. Twitter, Inc.* (N.D. Cal 2016), 2016 U.S. Dist. Lexis 105768, *21 [protected publishing activity included decisions about what third party content may be posted or reposted online].) (*See also Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398-408-409 [Sixth Circuit adopting the "material contribution test" and determining that within the context of web hosting, a service provider must require third-parties to enter unlawful or actionable content to be deemed a content provider].

Undeterred, the People assert that content was created when one piece of information was added to BigCity profiles. In generating a BigCity ad, Backpage staff was required to choose "Interested in Men," "Interested in Women," and "Interested in Everyone." This information was not taken from the original Backpage ad. Yet, as Defendants note, the People acknowledge that these headings were "in line" with

the purpose of each profile. (Def. Supp. 4, fn3)  This creation of a headline "in line" with the content of the ad was not a material contribution to the offensive nature of the material.  (*See Phan v. Pham* (2010) 182 Cal.App.4th 323 [holding when Defendant's own acts material contribute to the illegality of the material, immunity under the CDA will be lost]. *See also Kimzey v. Yelp! Inc* (9th Cir 2016) 836 F.3d 1263, 1270 (Court found the service provider's creation and addition of a star rating system was best characterized as the kind of "neutral tool" operating on "voluntary inputs" determined to be permissible in *Roommates*.)

The People also accuse Defendants of creating "fake profiles" for BigCity postings, similar to *Anthony v. Yahoo! Inc* (N.D. Cal. 2006) 421 F.Supp.2d 1257.  In that case, Plaintiffs belonged to an online dating service through Yahoo.  Plaintiffs alleged that Yahoo created false profiles and sent those false and expired profiles to them as enticement to renew their dating service subscription.  The court refused Yahoo's claim of immunity under the CDA at the dismissal stage.  The court stated that the allegations that Yahoo created false profiles were sufficient to allow the case to go forward.

Here, the People have acknowledged that the content posted on EvilEmpire and BigCity were taken directly from the original Backpage ad.  This is different than the allegation in *Anthony* that Yahoo created a profile for a person who did not exist and represented to others that the fictitious person in the profile was available to date.

The People maintain Backpage created content similar to in *J.S. v. Vill. Voice Media Holdings, LLC* (2015) 184 Wn.2d 95J.S.  In that case, advertisements featuring three minor girls were posted online on a site owned by Backpage.  These girls became victims of sex trafficking and brought suit against Backpage. Backpage moved to dismiss the case on the basis of immunity provided by the CDA.  The Washington Supreme Court refused to grant the motion to dismiss.  (*Id* at 98-99.)  The *J.S.* court stated that the case turned on whether Backpage merely hosted the advertisements or helped develop the content of those advertisements.  (*Id* at 101)

Applying the applicable state standard for a motion to dismiss, the *J.S.* court found that the plaintiffs alleged facts that, if proved true, would show that Backpage did more than simply maintain neutral policies prohibiting or limiting certain content.  Specifically, those allegations included that Backpage intentionally developed its website to require information that allows and encourages illegal trafficking of underage girls, developed content requirements that it knows will allow solicitors to evade law enforcement and that Backpage knows that the foregoing content requirements are a fraud and ruse actually aimed at helping pimps and prostitutes.  (*Id* at 102.)  The *J.S.* court found that it did not appear beyond a reasonable doubt that no facts existed that would justify relief, and denied Backpage's motion to dismiss.  (*Id* at 103.)

Here, the People allege that Defendants "created" content and are not entitled to immunity. However, on the face of the allegations, Defendants have, at most, republished material that was created by a third party. The People allege that the content was taken from ads placed by Backpage Escort users and posted onto EvilEmpire.com. The declaration in support of Defendants' arrest warrant states that the ads placed in EvilEmpire.com were "essentially identical" to the ads placed by the third party on Backpage.com and that EvilEmpire was an "additional platform for Backpage Escort ads." This demonstrates republication, not content creation. Republication is entitled to immunity under the CDA. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 63.)

Finally, the People assert that the Defendants' acts of pulling information from the original Backpage ad "constituted more than the mere reposting of information with 'slight' modifications." (AG Supp. 5) The People assert that when posting on BigCity, Backpage staff deleted all text, and converted the ad into a dating profile, contrary to the intent of the original ad poster. Yet, reposting content created by a third party is immune from liability for the offensive content under the CDA. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 63.) The act of reformatting original content to be placed on another site is also a traditionally protected editorial function. (*See Fair Housing Council of San Fernando Valley v. Roommates.com LLC* (9th Cir. 2008) 521 F.3d 1157, 1170-1171 [under the CDA, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune."].) Finally, assuming that the People's assertion is true; that the ad went from expressing intent to advertise prostitution to express a desire to "date," the People are essentially complaining that Backpage staff scrubbed[1] the original ad, removing any hint of illegality. (AG Supp. 5-6) If this was the alleged content "manipulation," the content was modified from being illegal to legal. Surely the AG is not seeking to hold Defendants liable for posting a legal ad; this behavior is exactly the type of "good Samaritan" behavior that the CDA encourages through the grant of immunity.

The People's overall theory is that Backpage knew prostitution ads were placed on its main site and, in response, created two additional websites with the goal of encouraging that prostitution through increased ad placement. There are at least two problems with this theory. First, online publishers are not subject to notice liability. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 45-46; *See also Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398, 407-408 [explaining that immunity under the CDA bars notice liability in an effort to maintain the robust nature of the internet and encourage self-regulation].)   Next, both the People's "encouragement theory" and suggestion that by reposting the ads, Defendants are ratifying the content of the original ad, thereby becoming a content provider themselves, have been rejected by the courts. (*Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398,

---

[1] The internal Backpage email attached by the AG states, "The content [of BigCity] will be pre-populated with millions of images from backpage where we hope to extract two words of the title, the phone number, and age of the person. The images will need to b processed to where we crop an area most likely to give us a wholesome image." (Ex A)

413-414 [under the encouragement or ratification theory, service providers would be liable for inviting and commenting on illegal or actionable content, which impermissibly inflates the meaning of "development" to the point of eclipsing immunity from publisher-liability established by Congress]; *Ascentive LLC v. Opinion Corp.* (EDNY 2011) 842 F. Supp.2d 450, 476 [inviting postings then altering the way postings are displayed is not content development]; *Roommates, supra*, 521 F.3d at 1174 [encouragement, enhancement by implication or development by inference is protected conduct under the CDA]; *Black v. Google Inc* (N.D. Cal 2010) 2010 U.S. Dist. LEXIS 82905, *8 [even if defendants "sponsored or endorsed" an allegedly defamatory comment posted by a user, "the fact remains that Plaintiffs seek to hold it liable for content generated by a third-party" and defendants are entitled to immunity under the CDA].)

This Court finds *Kimzey v. Yelp! Inc* (9th Cir 2016) 836 F.3d 1263 helpful. Plaintiff Kimzey complained about offensive content in a negative business review posted on Yelp! and sought to hold Yelp! liable. Kimzey alleged that Yelp! Found the review on another website, reposted the offensive review on Yelp! and then republished the review as an advertisement or promotion on Google, all in an effort to increase online traffic to Yelp!. Kimzey's theory was that by repeatedly reposting the "found" review for Yelp!'s own use, Yelp! developed the content. (*Id* at 1267) The Ninth Circuit rejected Kimzey's "artful skirting of the CDA's safe harbor provision." (*Id* at 1266.)

The Ninth Circuit noted that Kimzey never specifically alleged that Yelp! authored the content of the statements posted. Instead, the allegations were that Yelp! adopted the statements from another website and transformed them into its own stylized promotions. The court determined that the allegations were insufficient to avoid immunity under the CDA. (*Id* at 1268) The court also rejected Kimzey's "convoluted" theory that Yelp! transformed the review into its own advertisement with the creation and addition of a star rating system that accompanied the promotion. Although this characterization had "superficial appeal" for the court, the court found that accepting the theory would extend the concept of "content provider" too far and would render the CDA's immunity provision meaningless. (*Id* at 1269.) The court stated that "Nothing in the text of the CDA indicates that immunity turns on how many times an interactive computer service publishes 'information provided by another information content provider.'" (*Ibid.*)

In short, courts have repeatedly held that an online service provider is protected whether he publishes third-party content for the first time, or republishes it for the nth time. To find the source of the liability for the unlawful or actionable content, one must trace the pedigree of the statement. (*Kimzey, supra,* 836 F.3d at 1268-1269; *Jones, supra,* 755 F.3d at 408-409; *Doe v. Friendfinder Network, Inc*, 540 F.Supp.2d 288, 295-296.)

### 4.   Removal from Protection under the CDA

#### a.   Victims' Intellectual Property Rights

The People assert that the CDA does not apply because Defendants violated the victims' rights of publicity when Defendants used the victims' likenesses posted in Backpage ads and used them either on BigCity or EvilEmpire sites without the victim's knowledge. In support, the People cite to *Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12. (AG Supp. 9) In that case, plaintiffs brought claims against Backpage alleging an unauthorized use of a person's picture. Plaintiffs alleged that by garnering advertising revenues from advertisements placed by their traffickers, Backpage profited from the unauthorized use of the plaintiffs' photographs. The plaintiffs alleged that Backpage's use of their images cannot be written off as incidental because their pictures were "the centerpieces of commercial advertisements." (*Id* at 27.) The court found that although Backpage profited from the sale of advertisements, "it is not the entity that benefits from the misappropriation." Rather, the party who benefits from the misappropriation is the person who placed the original ad. The court stated "Matters might be different if Backpage had used the pictures to advertise its own services..." (*Ibid.*)

The People assert that the "matters [that] might be different" are present here, when Defendants used pictures and text from Backpage ads to generate new ads on two additional websites. In response, Defendants call attention to the fact that users posting on Backpage.com accept the website's Terms of Use, in which they assign all intellectual property rights and agree that their photos and content may be reposted. (Def. Supp. 10)

The right of publicity derives from the right of privacy. Generally, the right of privacy protects an individual's peace and quiet. The right of publicity, in turn, protects an economic interest a person has in the value of his identity. These privacy rights are personal. (*Hill v. National Collegiate Athletic Assn* (1994) 7 Cal.4th 1, 24.) Thus, the prosecutor does not have standing to assert this right on behalf of the victims. It is on that crucial fact that sets this case apart from *Doe v. Friendfinder Network Inc* (2008) 540 F.Supp. 2d 288, 304. (See AG Supp. 9) *Friendfinder* involved a civil plaintiff seeking damages for the violation of her right to publicity after an unknown person created a profile on her behalf, without her knowledge or consent, and *Friendfinder* used portions of that profile as advertisements to increase the profitability of their business. The court found the allegations sufficient to survive a motion to dismiss. (*Ibid.*)

The People lack standing to assert this right. Moreover, existing case law indicates that these additional advertisements are permissible attempts at search engine optimization in an effort to increase the visibility of the information provided by the third party. (*See Asia Econ. Inst. V. Xcentric Ventures LLC* (C.D. Cal. 2011) 2011 U.S. Dist. LEXIS 145380, *19 [increasing the prominence of a page in internet searches do not amount to "creation or development of information"].) Indeed, the very purpose behind

the third party's placing the ad on Backpage was to provide accessibility to the public on a large scale. (*Cf Ibid* [the purpose of consumer reports is to provide accessibility to the public on a grand scale and "increasing the visibility of a statement is not tantamount to altering its message"].)

### b. Prosecution for pimping under Penal Code section 266H

The People maintain that Defendants' actions were not neutral, and they instead took an active role to further prostitution and seek to hold Defendants responsible for their own misconduct, not for the speech of others. "This is not a case against Backpage, a website; it is a case against three individual defendants who used multiple platforms to commercially sexually exploit vulnerable women and children." (AG, Supp 2)

This Court finds it difficult to see any illegal behavior outside of the reliance upon the content of speech created by others. The whiff of illegality is detected only when considering the alleged content of the statements contained in the ads. Indeed, the theory of prosecution requires the presumption that illegal content was contained in the ads, *i.e.*, that the ads were explicitly for prostitution. Under the prosecution's theory, Defendants would become liable at the point where information provided from third parties was transferred to the additional two websites because, according to the People, Defendants transferred the information intentionally to help to facilitate prostitution. (When prostitution transactions took place as a result of the ads, more ads would be placed.) Yet, the general actions required (absent consideration of speech content) to repost the ads would not be illegal. Thus, the prosecution depends on consideration of speech provided by a third party.

### i. Theory that Defendant's derived financial support from prostitution

The People maintain that Defendants may be prosecuted under the theory is that defendants derived support from the earnings of another's act of prostitution. (*See McNulty, supra,* 202 Cal.App.3d at 630 [stating the two theories of prosecution for pimping].) The People assert that the allegations are that the Defendants "knowingly derived support from prostitution earnings, *i.e.*, profited from prostitution" when they created EvilEmpire to improve Backpage's search results (search engine optimization) and created BigCity to expand Backpage's share of "online commercial sex market" and profits. The People maintain that pimping will be shown when the People demonstrate that Defendants acquired income from prostitution resulting from advertisements placed in Backpage.com. The People assert that Defendants agreed upon a business model to maximize the receipt of prostitution earnings and committed many overt acts in furtherance of this objective. (Opp. 3)

In support, the People cite *People v. Grant* (2011) 195 Cal.App.4th 107. *Grant* discusses a distinction between financial support received by the prostitute (illegal) and funds paid by the prostitute for services rendered or other purposes (legal). The appellate court made clear that "the statutory prohibition does not preclude a person from accepting a known prostitute's funds gained from the

prostitute's lawful activities or for purposes other than the person's support and maintenance." (*Id* at 116. *See also Allen v. Stratton* (C.D.Cal. 2006) 428 F.Supp.2d 1064, 1072, fn 7 [a natural reading of the pimping statute does not apply to an individual who provides a legitimate professional service to a prostitute even if paid with proceeds earned from prostitution, the service provider derives support from his own services]; *People v. Reitzke* (1913) 21 Cal.App.740, 742 [a legitimate defense to pimping is that a prostitute loaned the defendant money for the purpose of going into the saloon business, or for any other purpose except the purpose of being supported or maintained by the prostitute].)

Here, there is no dispute that Backpage charged money for the placement of advertisements. Does this qualify as services rendered for legal purposes? Given the services provided by the online publisher, the answer to that question is yes. Providing a forum for online publishing is a recognized legal purpose that is generally provided immunity under the CDA. This immunity has been extended by the courts to apply to functions traditionally associated with publishing decisions, such as accepting payment for services and editing. (*See e.g., Fields, supra*, 2016 U.S. Dist. LEXIS 105768, *11-12 [Twitter immune against claims that it provided ISIS material support through use of its services because protected publishing activity included decisions about: what third party content may be posted online; monitoring, screening, and deletion of content; and whether to prevent posting].) In fact, the People acknowledge that the mere act of accepting money for postings is permissible. (Opp. 9) The case law is clear that, as discussed above, immunity is removed when the service provider affirmatively acts to create the offensive content.

This Court draws support for its conclusion from cases in other jurisdictions. In *Doe*, for example, the plaintiffs alleged that, beginning at age 15, they were trafficked through advertisements on Backpage.com and Backpage profited from their victimization. The plaintiffs filed suit against Backpage.com for violating the Trafficking Victims Protection Reauthorization Act ("TVPRA") which prohibits knowingly benefitting financially from sex trafficking. (*Doe, supra*, 817 F.3d at 15.) Plaintiffs' theory was that Backpage engaged in a course of conduct designed to facilitate sex traffickers' efforts to advertise their victims on the website by only charging for posts made in the "Adult Entertainment" section, and allowing users to pay an additional fee for "Sponsored Ads," which increased the number of times the advertisement appeared. (*Id.* at 17.) Plaintiffs also alleged that Backpage tailored its posting requirements to make trafficking easier by not blocking repeated attempts to post and by allowing users to pay anonymously through prepaid credit cards or digital currencies. (*Id* at 16.)

Backpage moved to dismiss the suit under Federal Rule of Civil Procedure 12(b) (6). The district court granted the motion and found that the CDA provided immunity from the claims. On review, the First Circuit Court of Appeals affirmed the district court's ruling. The First Circuit rejected the plaintiffs' assertion that Backpage participated in an affirmative course of conduct and actual participation in sex trafficking. The court noted that the challenged were traditional publisher functions, and thus immune from suit under the CDA. (*Id.* at 20) The court also noted that the plaintiffs were harmed when they were

trafficked through the advertisements. Without the content of those advertisements – which was created by a third party - there would be no harm. (*Id.* at 20.) The court dismissed the plaintiffs' assertion that Backpage's decisions about what measures to implement demonstrate a deliberate attempt to make sex trafficking easier. The court stated, "Whatever Backpage's motivations, those motivations do not alter the fact that the complaint premises liability on the decisions that Backpage is making as a publisher with respect to third-party content." (*Id* at 21.) The court went on to state "even if we assume, for argument's sake, that Backpage's conduct amounts to 'participation in a [sex trafficking] venture' – a phrase that no published opinion has yet interpreted – the TVPRA claims as pleaded premise that participation on Backpage's actions as a publisher or speaker of third-party content. The strictures of section 230(c) foreclose such suits." (*Ibid.*) The First Circuit specifically held that "claims that a website facilitates illegal conduct through its posting rules necessarily treat the website as a publisher or speaker of content provided by third parties and, thus, are precluded by section 230(c)(1)." (*Id.* at 22.)

Similarly, in *M.A. ex rel. P.D. v. Village Voice Media Holdings, LLC* (E.D. Mo. 2011) 809 F.Supp.2d 1041, the plaintiff sought to hold Backpage responsible for her victimization through sex trafficking that took place as a result of advertisements placed on Backpage.com. The plaintiff alleged that Backpage accepted a fee for such advertisements, knew that advertisements were for prostitution and "created information" by hosting a search engine, providing instructions for increased visibility of advertisements and allowed for anonymous payment. (*M.A., supra*, 809 F.Supp.2d at 1044.) The court granted the Defendant's motion to dismiss on the basis that the CDA provided immunity. The court reasoned that there was no allegation that Backpage was responsible for the actual development of any portion of the content of the advertisements or specifically encouraged the development of the offensive nature. (*Id* at 1052.) (See also Opp. 21; Def. 21-22)

Even in viewing the offer of proof of the evidence most favorable to the Attorney Generals office, this case is very similar to the above cases. As alleged here, the prostitution took place as a result of an advertisement placed by a third party. Backpage's decision to charge money to allow a third party to post content, as well as any decisions regarding posting rules, search engines and information on how a user can increase ad visibility are all traditional publishing decisions and are generally immunized under the CDA. In short, the victimization resulted from the third party's placement of the ad, not because Backpage profiting from the ad placement.

## Conclusion

The First Amendment "makes the individual, not government, the keeper of his tastes, beliefs, and ideas." *Paris Adult Theater I v. Slaton* (1973) 413 US 49, 73 (Douglas, J., dissenting). At the same time, the Court understands the importance and urgency in waging war against sexual exploitation. Regardless of

the grave potential for harm that may result in the exercise of this article of faith, Congress has precluded liability for online publishers for the action of publishing third party speech and thus provided for both a foreclosure from prosecution and an affirmative defense at trial. **Congress has spoken on this matter and it is for Congress, not this Court, to revisit.**

**Court's ruling:**

Defendants' demurrer is GRANTED.
Defendants' request for judicial notice is DENIED.
Further court dates are vacated.
Bond is exonerated for each Defendant.

Dated: 12/9/16

**Honorable Michael G. Bowman**
**Judge of the Superior Court of California**
**County of Sacramento**