GARY M. RESTAINO
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
JOSEPH BOZDECH (CA Bar No. 303453, Joseph.Bozdech@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

NICOLE M. ARGENTIERI
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

AUSTIN M. BERRY (Texas Bar No. 24062615, austin.berry2@usdoj.gov)
U.S. Department of Justice
Child Exploitation and Obscenity Section
1301 New York Avenue, NW, 11th Floor
Washington, D.C. 20005
Telephone (202) 412-4136
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-18-422-PHX-DJH |
| Plaintiff, | **UNITED STATES' CONSOLIDATED SENTENCING MEMORANDUM** |
| v. | **Sentencing Hearing:** |
| 1. Michael Lacey,<br>3. Scott Spear, and<br>4. John Brunst, | **August 27-28, 2024, 9:30 a.m.** |
| Defendants. | |

*"I am valuable, and my life does matter and it is time that people stop profiting off of our pain and vulnerabilities.  We paid for it countless times and people like these defendants have the ability to give us a hand up but instead they exploited us."*

**Backpage sex-trafficking victim C.T.[1]**

The United States recommends that each Defendant be sentenced to 240 months in custody, followed by three years of supervised release, and, in accord with the U.S. Pretrial Services recommendation, be remanded into custody to begin serving their sentence.[2] The United States also asks that the Court set a restitution hearing for a later date[3] to determine the loss to the victims that are subject to the superseding indictment who have requested restitution.

Defendants' criminal conduct is extraordinary in its magnitude and gravity of harm. For 14 years, Defendants owned, operated, and profited from one of the internet's largest and longest-running criminal enterprises. Backpage became notorious as the internet's leading place to advertise and shop for illegal prostitution. Defendants served in executive leadership roles at Backpage or its parent/owner entities. Each Defendant earned millions of dollars while being fully aware of the driving force behind their financial windfall: prostitution advertising. From 2004 until their arrests in 2018, when Backpage was shut down, Defendants reaped enormous profits from a criminal enterprise that promoted prostitution and masqueraded as a legitimate classified advertising business.  And after Backpage cornered the market for online prostitution advertising, the company's reputation grew so toxic that its banks and credit card processors started dropping Backpage—leading Defendants to use phony websites, offshore bank accounts, and shell companies to keep the company's revenues flowing. Motivated by greed, Defendants' hubris had devastating

---

[1] (SEALED EXH 1 at 12)

[2] (Doc. 2126)

[3] The Court may hold a restitution hearing up to 90 days after sentencing pursuant to 18 U.S.C. § 3664(d)(5).

consequences for countless individuals. Child sex trafficking proliferated on the site and was the unfortunate collateral damage that Defendants unapologetically accepted as they believed in legalized adult prostitution despite it being illegal in 49 states. (*See* Doc. 2107 at 4-7, 9-11, 18-20.)[4]

In 2012, Defendants abandoned any pretense of maintaining a media empire of alternative newspapers to embrace a website that generated nearly all of its revenue from female prostitution. Defendants also ignored repeated notice that Backpage and The Erotic Review—a prostitution review website—were in a symbiotic and strategic relationship. In particular, Lacey has claimed that he did not know about this relationship because he was uninvolved in day-to-day operations. However, he cannot plausibly claim ignorance after NCMEC representatives confronted him in person in March 2011 with several examples of Backpage ads that advertised sex-trafficked minors who were then reviewed on The Erotic Review.[5] At the same meeting, Lacey acknowledged the presence of prostitution ads on the website, which he also acknowledged, either explicitly or implicitly, at numerous other meetings with various non-governmental organizations and law enforcement representatives.

The United States is unaware of any mitigating circumstances. Just the opposite: Defendants made a calculated decision to pursue a livelihood built on prostitution ads, and maintained that path, year after year, supporting a succession of criminal users of their website. Following the verdicts, Defendants, by their statements to the USPO, have shown neither remorse nor a full appreciation of the gravity of the conduct for which a jury found them guilty. (Brunst PSR ¶ 28, Lacey PSR ¶ 224, and Spear PSR ¶ 300) Their failure to accept responsibility, being utterly tone deaf to their convictions, the victim testimony, and

---

[4] Trial Ex. 1911 (Lacey: "Jim and I believe in legalized prostitution and spend millions trying to keep underage off site. Not perfect, by any means.").

[5] Trial Tr., Doc. 1809 at 10:24-13:4; Trial Tr., Doc. 1900 at 28:2-12; Trial Ex. 652a.

victim impact statements, combined with their cynical attempts to rationalize the existence of Backpage, further support a substantial sentence.

I.   <u>Procedural History</u>

After a three-month trial, the jury found each Defendant guilty of at least one count. Brunst presently stands convicted of Counts 1, 52-62, and 64-68; Spear of Counts 1-18 and 52-62; and Lacey of Count 100. (Docs. 1978 and 2081.)

The Presentence Report (PSR) calculations result in a Total Offense Level of 43 and a Criminal History Category 1 for each Defendant. (Doc. 2121, Lacey PSR ¶ 237; Doc. 2119, Brunst PSR ¶ 226; Doc. 2120, Spear PSR ¶ 315.)[6]

The PSR calculates a Guidelines term of imprisonment for Lacey of 240 months. (Lacey PSR ¶ 237.) For Brunst, the Guidelines sentence is 3,420 months (the total of the statutory maximum sentences for each count of conviction). (Brunst PSR ¶ 226 and *id.* at 52.) And for Spear, the Guidelines recommend 3,720 months. (Spear PSR ¶ 315; *id*. at 65.)

Probation recommends different sentences for each Defendant. The PSR recommends a 240-month custodial sentence for Lacey, and the United States joins in that request. (Lacey PSR at 55.) The PSR recommends sentences of 540 months and 1,080 months for Brunst and Spear, respectively. (Brunst PSR at 52; Spear PSR at 65.) For the reasons discussed herein, the United States submits that 240 months is a fair and just sentence that is sufficient but not greater than necessary to punish each Defendant for his crimes, promote respect for the law, deter these Defendants and others from committing similar crimes in the future, and avoid unwarranted sentencing disparities, as 18 U.S.C. § 3553(a) requires.

---

[6] Unless otherwise noted, cites to "Lacey PSR" refer to Doc. 2121; cites to "Brunst PSR" refer to Doc. 2119; and cites to Spear PSR refer to Doc. 2120. The United States' Consolidated Response to Defendants' PSR Objections calculates a different Total Offense Level for Defendants.

II.   <u>The Offense Conduct</u>

The PSRs, the Court's April 23, 2024, Order (Doc. 2063), and the United States' recent brief (Doc. 2107) detail the offense conduct—including each Defendant's ownership and management roles in Backpage. The United States will not recite the trial evidence here, but notes there was ample evidence demonstrating each Defendant's knowledge of Backpage's prostitution advertising. (*See* Lacey PSR ¶¶ 13-138; Brunst PSR ¶¶ 11-137; Spear PSR ¶¶ 11-136.) Indeed, throughout the 14-year conspiracy, Defendants received overwhelming notice that their website had become synonymous with prostitution, including: prostitution-investigation subpoenas; correspondence from the National Association of Attorneys' General (*e.g.*, Trial Ex. 119 (8/31/10 letter from NAAG to Backpage identifying Backpage as a "hub" for prostitution and trafficking)); news reports (*e.g.*, Trial Ex. 1610 (10/19/20 AIM Group article, "Backpage replaces Craigslist as prostitution-ad leader"); Trial Exs. 1989, 1043, 1065, 1802, 1053 (Nicholas Kristof columns published in the New York Times in 2012 and later) (not admitted); Trial Exs. 1054 and 1055 (Anderson Cooper 360 broadcasts on CNN in 2011 and 2012) (not admitted)); and brand analysis studies (*e.g.*, Trial Ex. 823a at 1 ("Media and Digital Brand Analysis" prepared and paid for by Backpage by Greenberg Quinlan Rosner ("Over the past several years Backpage.com has become nearly synonymous with prostitution and illegal activity")) (not admitted)).

In addition, each Defendant would have known of the U.S. Senate investigation, which culminated in January 2017 with a 50-page report and an 800-page appendix. The report, BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING, detailed Backpage's "moderation" as a strategy to "sanitize"—but still profit from—prostitution ads. Trial Ex. 1587 at 1-3, 16-36 (not admitted).[7] And each Defendant would have known

---

[7]   The Senate Report and Appendix remain publicly available: https://www.hsgac.senate.gov/imo/media/doc/Backpage%20Report%202017.01.10%20FINAL.pdf; https://www.hsgac.senate.gov/imo/media/doc/Final%20Appendix%202017.01.09.pdf.

of the substantial legal fees paid to defend against numerous lawsuits brought by underage trafficking victims, the U.S. Senate's subpoenas for Backpage documents, and the grand jury investigation in this case. (*See, e.g.*, Doc. 2107-2.) These many forms of notice confirmed what Defendants already knew and intended—that their website, Backpage, would grow into the country's leading online marketplace for prostitution solicitations, generating a king's ransom of profits for themselves without regard for the harm they perpetrated on the many children and vulnerable women who were trafficked more frequently and efficiently thanks to Backpage's facilitation. (*See, e.g.*, Doc. 2107 at 12-14.)

III.  Discussion

The United States respectfully submits that sentencing each Defendant to a 240-month custodial sentence is reasonable and appropriate under 18 U.S.C. § 3553(a), particularly given the nature and circumstances of their individual and collective criminal activity, their role and personal history, and the need for both general and specific deterrence.

A.  Nature and Circumstances of the Offenses, § 3553(a)(1)

This Court is familiar with the facts, having presided over a three-month trial and issued numerous pretrial, trial, and post-trial orders. After surveying the trial evidence regarding each of the three convicted Defendants, the Court recently concluded:

> The Court finds there is sufficient evidence that Messrs. Lacey, Brunst, Spear and Ferrer joined the conspiracy of making Backpage's Adult section profitable by developing and sustaining a platform where prostitutes and prostitution enterprises could advertise sex for money, including in states where prostitution is illegal. Those efforts helped the advertisers make ads look less obviously like offers for prostitution. They also developed a façade of aiding law enforcement in investigating prostitution through responding to subpoenas. Even so, there is sufficient evidence that the sale of ad space leading to prostitution offenses was the primary focus of Backpage's business and each Defendant reaped substantial financial benefit from knowingly providing Backpage's service.

(Doc. 2063 at 24.)

As the Court knows from the victim impact statements (VIS) submitted to the Court, both those who were trafficked on Backpage and their families suffered from stress, anxiety, and depression, which have led to various physical and emotional harms, and, in some cases, devastating financial consequences. (*See, e.g.*, Brunst PSR ¶¶ 143-156 and VIS.)

Each Defendant's years-long involvement in the conspiracy was not the product of an aberrant act or temporary moral lapse. Defendants enriched themselves from the proceeds of Backpage, which generated nearly a half-billion dollars in prostitution advertising revenue. (*See* Doc. 2107 at 2-8; Lacey PSR ¶¶ 120, 139; Brunst PSR ¶¶ 119, 138; Spear PSR ¶¶ 118, 137.) The nature, scope, and duration of this criminal activity weigh heavily in favor of a 240-month sentence.

## B. History and Characteristics of Defendant, § 3553(a)(1)

Each Defendant's history and characteristics supports a significant sentence. Each of their backgrounds provides no mitigation or excuse for their conduct. For 14 years, Defendants engaged in criminal activity to obtain millions of dollars in compensation while concealing the true nature of the website from law enforcement, elected officials, and the media. Defendants were the chief beneficiaries of this protracted criminal enterprise, which was built on the backs of vulnerable adults and children who were bought and sold for sex. In sum, their crimes are not the product of dire financial circumstances, passion or impulse, or a momentary lapse of judgment. On the contrary, their crimes were calculated, deliberate, and with considerable thought and discussion.

Unlike so many others who come before this Court at sentencing, each Defendant enjoyed virtually every advantage during his adult life. (*See*, e.g., Brunst PSR ¶¶ 214-224 (summarizing Brunst's financial success, significant support network, and stable employment and education); Spear PSR ¶¶ 297-313 (noting "a good childhood absent of abuse or neglect," a close relationship with his sister, college education, and financial success earning $200,000 per year at the New Times before Backpage); Lacey PSR ¶¶ 217-235 (noting "a close relationship with both siblings with whom he maintains weekly

contact," a close relationship with his ex-wife, and significant professional success as the owner and editor of 17 newspapers, reaping financial success from work that he considered his "passion").) While some defendants certainly deserve consideration from a sentencing court for the obstacles they have overcome and the regrettable criminal motivations they adopt, the Defendants here do not.

Notwithstanding these many advantages in life, each Defendant engaged in protracted criminal activity to satisfy his own greed. Defendants engineered a complicated network of shell companies, deceptive websites, and bank accounts to keep a vast prostitution advertising enterprise afloat. That Defendants participated in this criminal activity despite their background as successful businessmen in otherwise legitimate enterprises is deeply troubling. They were motivated by nothing more than greed, long abandoning any journalistic principles. In sum, they clearly had other avenues to continue to earn an honest (and lucrative) living without breaking the law yet chose to orchestrate a sophisticated and lengthy criminal conspiracy to profit by exploiting others.

Among the many claims Defendants may make at sentencing is that they are first-time offenders. Each Defendant is in Criminal History Category I, but that categorization is incomplete and misleading. Their true criminal history includes 14 years as the owners, operators, and beneficiaries of a long-running criminal enterprise. In general, it is an accurate assessment that the criminal history category is intended to illustrate how many times a person was put on notice that they had broken the law yet continued to engage in new criminal conduct. But each Defendant was notified, expressly and from myriad sources, that Backpage was a marketplace for prostitution, sex trafficking, and child sex trafficking. Moreover, Defendants learned that their criminal marketplace became a meeting location for victims and their murderers. Nevertheless, Defendants ignored these voices, modified operations to avoid detection, and continued their course every day for 14 years. Thus, the criminal history category in the PSR grossly understates their true level of criminality. Their significant role in protracted criminal activity justifies a 240-month sentence.

B.   <u>Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense, § 3553(a)(2)(A)</u>

This Court should send a clear message to the community that operating a website soliciting illegal activity like prostitution is serious and deserving of significant punishment. Statements from those trafficked in this prosecution provide additional support for the argument that a significant custodial sentence is needed to promote respect for the law. Because of Defendants' actions, those trafficked on Backpage are now at an increased risk of falling prey to alcohol abuse, illicit drug use, adolescent pregnancy, and suicide. Research in this area is startling and demonstrates the need for a significant punishment.

In the late 1990s, the Kaiser Permanente San Diego Health Appraisal Clinic, a primary care clinic where more than 50,000 adult members of an HMO receive medical examinations, began a study to examine the long-term relationship between Adverse Childhood Experiences (ACEs) and a variety of health behaviors and health outcomes in adulthood. First, they took a survey of adults who were members of the Kaiser HMO to determine the number of ACEs experienced. An ACE was defined to include an experience occurring to the adult before the age of 18 such as verbal abuse, physical abuse, contact sexual abuse, a battered mother, household substance abuse, household mental illness, incarcerated household members, and parental separation or divorce. The survey data was collected in 1995 through 1997.

In early 2009, using the National Death Index mortality data, researchers analyzed how many of the 17,337 original survey respondents were deceased 10 years after the survey. The results were startling. "People with six or more ACEs died nearly 20 years earlier on average than those without ACEs." David W. Brown, et al, *Adverse Childhood Experiences and the Risk of Premature Mortality*, 37 American Journal of Preventive Medicine 389-96 (2009). In other words, if a person in the control group lived to 79.1 years old, that same person will only live to age 60.6 years old if she experienced six or more ACEs before the age of 18.

As this Court is aware, Backpage advertised sex trafficking of minors. Those minors have also made clear that they were forced to have sex for money multiple times per day at the hands of violent pimps and traffickers. Examples of such statements are included below.

While the VIS submitted to the Court evidence the profound harm that Defendants perpetrated and facilitated, it is also important to remember those trafficked on Backpage who *cannot* make statements because they were murdered by someone who found them on Backpage. Defendants were aware of the various murders facilitated by their creation of a marketplace where individuals could congregate for illegal sex trade. Indeed, Defendant Spear callously and flippantly responded to a report about increased traffic to the site, after news of murders in Detroit that were facilitated through Backpage, by exclaiming, "Talk about pent up demand! I am sure the Detroit story has impacted traffic as well." (Trial Ex. 986, 986a).[8]

Below are selected quotes from various VISs in this case (emphasis added):

- "She was taken by the hands of someone that used the platform provided by **Backpage**[9] that ultimately contributed to her premature death, and the impact on our lives has been unmeasurable." (SEALED EXH 1 at 9 of 65)

- "**Backpage** not only provided a venue for this kind of criminal activity, but it was proven they also coached those who used their site to hide such activity all in the name of revenue." (*Id.* at 9)

- "I cry when I am alone, I pray when needed and not a day goes by that I do

---

[8] Detroit is an obvious reference to the quadruple murder of four victims in December 2011—all posted on Backpage.

[9] The United States anticipates that Defendants will continue to lay blame for harm to victims at the feet of the pimps alone. These victim impact statements make clear that the victims themselves and their family members strongly believe that the blame should also be placed on Backpage (and thus Defendants Lacey, Spear, and Brunst as the principals) as the entity that facilitated their victimization every bit as much as the pimps.

not think about my daughter and what life would look like if she were still with us." (*Id.*)

- "[I have c]ontinuous issues with depression and a deep sense of hopelessness due to being trafficked online. I have also dealt with a lot of shame and anxiety from having my photos shared through and even copied from other people online and used." (*Id.* at 10)

- "Instead of making plans to meet for lunch, we were making funeral plans. Instead of a candlelit dinner with my husband, we were having a candlelight vigil for [Victim]... All this horror and sadness because she was murdered by a predator that she met on **Backpage**." (*Id.* at 14)

- "I can't imagine the fear she was going through when she realized the danger she was in. Without the outlet of **Backpage** and the false sense of security she thought she had by trusting that website, my daughter would still be living!!" (*Id.*)

- "Because of that **horrid website** and the murderer who used that page to prey on my daughter, our worlds have forever changed." (*Id.*)

- "I can only hope that the defendants think about the victims who were abused, mistreated and/or murdered due to their reckless greed in continuing to run that website." (*Id.*)

- "Because of your **website** and the murderer who used your page to prey on my daughter, our worlds have forever changed…I mostly hope that you think about the tears and the love in this courtroom for the victims who were abused, mistreated and/or murdered due to your reckless greed in continuing to run **Backpage**." (*Id.* at 19)

- "The justice system gave you many chances at living in the free world by allowing you to dance around the constitution. You took those opportunities to allow corruption, hurt and victimization of other young girls and their families." (*Id.*)

- "**Backpage** [in contrast to Craigslist] opened up a whole new world for my traffickers. They were able to post with or without assistance and edit their ads to

not get flagged and taken down. The calls became astronomical. Usually, within a few minutes, the night was full." (*Id*. at 23)

- "During my time being trafficked through **Backpage** I was impregnated and placed a baby up for adoption. I lost my apartment, my job, dropped out of community college classes and lost my tuition. I went to the hospital about 6 times and had countless visits at the clinic. I spent 6 years in counseling, was hospitalized in mental hospitals for PTSD and anxiety and depression." (*Id*.)

- "My now 13 year old daughter still remembers seeing me gang raped, spent years apart from her mother while I was recovering from the trauma, and spent 6 years in counseling herself." (*Id*.)

- "I hope those at **Backpage** pay for their sins. I hope they understand what their page and their decisions has done to thousands and thousands. I hope they think of it every day and feel the grief and sorrow of their actions." (*Id*.)

- "The scales of justice should be pounding at the doors of these precedent, perpetrators of this sinister network, that have damaged, ruined, and wrecked lives in their illegal goals of greed and exploitation!" (*Id*. at 24)

- "**Backpage**.com has negatively impacted the lives of so many people, including trafficking victims and their families. No other [entity] has been responsible for facilitating prostitution on such a massive scale. The negative impacts that me and my family have faced are enough to warrant a lengthy and harsh sentence, but there are so many more identified and unidentified victims impacted by the actions of the defend[a]nts." (*Id*. at 27)

- "I was still in shock & denial that my sister was killed. The moment I saw her I screamed, broke down and realized this is a nightmare. I kissed her on the forehead, she had some abrasions on her face, her mouth was open just enough for me to see her beautiful teeth chipped. Half of her nails were ripped off and when we moved her arm it looked like it was hanging on by a string. That was one of the worst days

of my life, to know all the pain she went through. I knew she put up a big fight and didn't want to leave her family behind." (*Id.* at 32)

- "She had goals and dreams that all children have, but all her dreams were stolen from her the day she was introduced to **Backpage**.com. She was preyed upon and exploited by adults who sold her as if she was a piece of clothing until the day of her murder." (*Id.* at 38)

- "The days following her death were a blur, other than having to identify her body and signing her death certificate. I don't even remember how she looked in her casket before I had to bury her body forever. I couldn't process what happened to her but what I did know is I would not rest until everyone was held accountable for their part in my baby's murder: [Individual-1] for introducing her to [Pimp] knowing he trafficked young girls, [Pimp] for selling her and driving her to meet her person who murdered her, [Murderer] for murdering an innocent girl who was forced to do unimaginable things, and **Backpage**.com for not only knowingly allowing this to continue on their site but also teaching the "pimps" how to traffic girls by having their moderators catch key words like "new" or "girl" to not alarm the FBI of their wrongdoing." (*Id.* at 39)

In addition, many of the VISs expressed the punishment they seek from this Court:

- "The maximum or close to it as possible. People in their situation are often times never held responsible for what they have done. Simply because people deem us as inhuman or unimportant. But I am valuable and my life does matter and it is time that people stop profiting off of our pain and vulnerabilities. We paid for it countless times and people like these defendants have the ability to give us a hand up but instead they exploited us." (*Id.* at 12)

- "Life – Their website caused so much death and irreversible damage and they not only turned a blind eye, they continued to cover it up and continue to make it ok for misconduct to continue." (*Id.* at 18)

- "Life in prison due to their negligence to monitor and screen inappropriate and illegal usage of their website. This led to the heinous murder of my daughter." (*Id*. at 22)

- "The defendant(s) should receive at least 20 years per count. Due to their selfishness and greed, my baby's life was taken, the life that I USED to know was taken. These defendants failed as men, and as human beings. They made billions of dollars killing our youth and stealing dreams of families… I'm asking they be put away for the rest of their lives. Their actions have led to numerous deaths, and they need to be held accountable for the suffering they've caused." (*Id*. at 40)

- "Those men knew what they were allowing, and not only that but they actively helped to facilitate it. I think they should have the maximum sentence possible and they should never be allowed access to the internet, to own a business, or to be around children since they have thoroughly demonstrated their complete disregard for human beings as long as they profited." (*Id*. at 47)

Each person who submitted a VIS expended precious emotional energy to relive the trauma once again so that this Court could get a small glimpse at the horrors they endured. They each stand as a representative of the thousands trafficked on Backpage who had the same horrible experiences, but cannot use their own voices, either because of shame, self-preservation, insecurity, or death. The survivors who wrote statements and testified at trial are beacons to the world, standing in plain view, on high ground, and shining light on the human cost of Defendants' intentional and greedy actions. These statements provide additional support that a significant custodial sentence is needed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

D.    The Need to Afford Deterrence and Protect the Public, § 3553(a)(2)(B)-(C)

Numerous corporate executives, like Lacey, Brunst, and Spear, are accorded tremendous trust by the public and their employees and consumers. Imposing a significant term of imprisonment in this case will serve to deter other executives who are tempted to breach that trust to enrich themselves by operating a criminal enterprise like Backpage.

General deterrence is particularly important in hybrid white collar cases like this, because would-be offenders need to be put on notice that there are severe consequences for engaging in this type of criminal conduct. *See, e.g.*, *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (cleaned up); *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (addressing the need for general deterrence for those who might otherwise feel that some white-collar crimes are "game[s] worth playing"); *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) (General deterrence is a "crucial factor in sentencing decisions for economic" crimes.).

Defendants' conduct was deliberate, sophisticated, planned, unfolded over 14 years, and generated a half-billion dollars of revenue by exploiting others. Given the financial incentives for criminals, like Defendants, to engage in similar schemes, a substantial sentence is necessary to adequately deter others from committing similar extraordinarily lucrative crimes.

The need for adequate deterrence is even greater here given the difficulty in detecting the sophisticated money laundering schemes perpetrated by Defendants, and the numerous steps Defendants took to prevent being caught. For example, Defendants insisted on using methods of communication, like Proton Mail, that were fully encrypted, located abroad, and had enhanced security features. *See* https://proton.me/mail ("Keep your conversations private with Proton Mail, an encrypted email service based in Switzerland.") (last visited Aug. 8, 2024); Trial Tr., Doc. 1814 at 83:22-84:7; Doc. 1824 at 50:14-16 (discussing Defendants' switch to Proton Mail). As Ferrer explained at trial, Defendants expressed a preference for using services like Proton Mail and using email addresses that did not indicate they worked for Backpage. (Trial Tr., Doc. 1814 at 83:22-84:7; Doc. 1824 at 50:14-16; *see also* Trial Ex. 177.)

On top of encrypted email platforms, Defendants also attempted to mask communications as "attorney client privilege" by simply putting "confidential attorney

client privilege" in the subject line or electing to have a phone call to avoid memorializing incriminating conversations. Scott Spear directed Lacey and others (including public relation firms) to adhere to the protocol to mask incriminating emails, so they were protected by an attorney client privilege, or resort to phone calls.[10] Larkin put Spear's strategy to use when he sent an email to Lacey, Spear, and Ferrer regarding a misleading email to mollify a Village Voice investor (Bill Egan) in the wake of negative publicity and ended the email stating, "I have cc'ed Steve Suskin our in house counsel to protect this email."[11]

Specific deterrence also counsels in favor of a 240-month sentence. Each Defendant is of advanced age,[12] but each remains capable of engaging in similar conduct once released and none of the Defendants appear to acknowledge their wrongdoing here. Rather than acknowledging their leadership roles and the impact of their website on others, Defendants do not appear to take seriously the gravity of their crimes of conviction. Even after a jury verdict, this Court cannot be confident that any Defendant will be deterred from future crimes unless he receives a significant sentence. Defendants persisted in operating and growing their prostitution advertising website in the face of a steady drumbeat of notice from myriad sources that they were publishing solicitations selling adults and children for sex. Worse, they often minimized the volume of illegal conduct on their website, or simply claimed the numbers were insignificant. (Trial Exs. 912, 1827).[13] When all else failed, they blamed others through false equivalences.[14] The only thing that ultimately stopped Defendants was their arrests. Thus, this Court cannot expect that a light sentence will have

---

[10] Trial Ex. 936.

[11] Trial Ex. 602.

[12] Brunst is 72; Spear is 73; and Lacey is 76.

[13] Trial Exs. 912, 1827.

[14] Trial Exs. 1827, 714a.

any deterrent effect on Defendants or their would-be successors. A 240-month sentence is necessary for both specific and general deterrence.

Specific deterrence is particularly needed because Defendants went to extraordinary lengths to obscure the true nature of their website and its prostitution marketing strategies, and because they've taken no responsibility for their actions. For example, Lacey and Spear requested meetings with NGOs and representatives from the U.S. Department of Justice in which they said nothing about Backpage's prior business partnership with The Erotic Review and ongoing referrals from that website; kept quiet about past practices of content aggregation and super-posters commissions; and knew that moderation was a sham that didn't deter prostitution postings. Whenever Defendants were confronted with evidence of child sex trafficking on Backpage, they employed a strategy that rivals that of an Organized Crime family by taking the tact of "whatever you say, just say nothing." And through attorneys or other representatives, they misled elected officials, state and federal judges, prosecutors, civil litigants, and others about their business practices. They did the same in media interviews and correspondence with anti-trafficking organizations.

For example, Lacey and Spear's silence was deafening when NCMEC challenged them about the true nature of Backpage. At a March 1, 2011, meeting, NCMEC representatives presented several Backpage executives, including Lacey and Spear, with several PowerPoint slides that showed missing children who were advertised on Backpage and rated on The Erotic Review.[15] Lacey and Spear sat idle during this meeting when confronted with this profitable and calculated relationship that exploited child sex trafficking victims. (*See* Doc. 2020, Resp. at 15-16.) Spear had approved payments for a banner-ad exchange program and a cross-linkage relationship with TER years before, and Backpage executives continued to allow TER ID numbers in Backpage ads through 2017. (*See* Doc. 2019, Resp. at 2-3; Doc. 2021, Resp. at 2-3; Doc. 2063 at 5-6.)[16] Similarly, in

---

[15] Trial Ex 652.

[16] *See* Trial Exs. 541, 541(a), 567,575,575a, 1946, 1946a.

meetings with the Auburn Theological Seminary and POLARIS, Defendants never disclosed Backpage's internal prostitution marketing strategies. (*See* Doc. 2021, Resp. at 6; Doc. 2020, Resp. at 15.)

In two meetings with U.S. Department of Justice officials in Washington D.C., neither Backpage's representatives (Lacey, Larkin, and Ferrer) nor their attorneys disclosed these strategies. On May 19, 2011, less than three months after the meeting with NCMEC and POLARIS, Lacey, Larkin, and Ferrer met with Deputy Assistant Attorney General Kenneth Blanco at Backpage's request. During that meeting, they exhibited a PowerPoint riddled with omissions and misrepresentations about Backpage's true business model.[17] In 2012, they deployed two attorneys (Ed McNally and Elizabeth McDougall) for interviews by Anderson Cooper on "AC360," knowing that they wouldn't disclose Backpage's prostitution marketing strategies and would misrepresent the true nature of the site.

Four years later, in November 2015, five attorneys representing Backpage met with high level representatives of the Department of Justice.[18] For a second time, Defendants' representatives misrepresented the true nature of the site after knowing for years, based on monthly Google Analytics reports, that the vast majority of Backpage's non-search-engine referral traffic came from The Erotic Review and other prostitution review sites. This fact was concealed during these meetings.

For Brunst's part, he persists in his stale claim that he was not involved in the day-to-day activities of Backpage or privy to the details of these various meetings because he was conspicuously absent from the discussions and not endorsed on incriminating emails, etc. (*See e.g.* Doc. 2023, p. 5) He rehashes his erroneous claim of good faith reliance on court decisions and non-privileged attorney advice. (*Id.*) In the final analysis of his conduct, Brunst cannot plausibly make this claim, because, among other things, the jury

---

[17] *See* Trial Exs. 841 and 841(a) (not admitted).

[18] *See* Ex. A; FBI 302 authored by FBI Special Agent Goodhue, dated 10/26/15.

resoundingly rejected this assertion by convicting him of more counts than any other Defendant. Brunst was the well-paid CFO of a criminal enterprise who cannot now credibly claim he did not deign to watch the various exposés on CNN (AC 360 broadcast featuring the Detroit quadruple murder and "Selling the Girl Next Door") even though he would have approved expenditures for attorneys and public relation firms, brand analysis reports, and settlements with underage trafficking victims.

In sum, Lacey, Spear, and Brunst knew that not only were they misleading numerous organizations, including leading anti-trafficking NGOs and state and federal law enforcement officials, about the true nature of their business model, they also knew that they were using their attorneys in furtherance of their campaign of deception and obfuscation.

Two courts have now sanctioned Backpage or Backpage representatives for false and misleading statements about the company's business practices made during litigation. A Washington state court imposed $100,000 in sanctions against Lacey for, among other things, making claims that the court found untruthful: "Another one that the Court can consider in regard to bad faith is procedural bad faith and that is vexatious conduct during the course of litigation, wasting private and judicial resources, making claims that, months later, were found to be untruthful." (*See* Doc. 197, Ex. B, p. 64-65.)

And while Defendants often cite *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015), as an example of how they have been victorious in past cases—including in their recent filings here (Doc. 2101 at 7)—the district court made a remarkable u-turn on remand: it dismissed *Dart* and imposed $250,000 in sanctions on Backpage.com, LLC for perpetuating a fraud on the court about the company's business practices, including its prostitution marketing strategies. (*See* Doc. 516-1 at 2-9; *see also* Doc. 446-1 at 14-35.)

This nearly decade-long campaign of misrepresentation and subterfuge carried out by a platoon of Backpage attorneys and spokespeople should be imputed to Lacey, Spear, and Brunst. Recently, in *United States v. Menendez*, Doc. 473, the court allowed the prosecution to introduce PowerPoint slides that were presented to the prosecution *pre-*

*indictment* to demonstrate that Senator Menendez knew his counsel was misleading government officials. As the government successfully argued, "'[T]he relationship between a lawyer and client is one of agent and principal,' *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 58 (2d Cir. 2016) (quoting *In re Artha Management, Inc*., 91 F.3d 326, 328 (2d Cir. 1996)), and so when certain statements are made that 'in all probability had to have been confirmed by the defendant,' *United States v. McKean*, 738 F.2d 26, 33 (2d Cir. 1984), the jury is permitted to infer the client's role in an attorney's statement. That is the case with the redacted and excerpted slide deck[.]" *United States v. Menendez,* 23-CR-490 (SHS) (S.D.N.Y. Jun. 17, 2024), Doc. 473. *See also, e.g., United States v. Ahmed*, 2006 WL 3210037, at *2, *4-5 (D. Mass. Aug. 3, 2006) (finding admissible statements from defense counsel's preindictment attorney proffer and a chart presented during that proffer; the chart and conversations were from a "specific meeting set up where the defendant, through his counsel, elected to make a formal presentation of facts which had been gathered specifically by the defense for the purpose of presenting evidence to the government"). So too here: the numerous misstatements and omissions made by the lawyers for Defendant's website should be imputed to Defendants here.

Defendants' most egregious strategy of deception came in the wake of the murder of four victims who posted on Backpage in December 2011. A "john" had ordered four women on Backpage in the space of 72 hours, during which he strangled all four of them and left their bodies in the trunks of abandoned vehicles in downtown Detroit.[19] Defendants (Lacey in particular), through a team of consultants and lawyers, urged the Detroit Police Department (DPD) to pursue a list of other websites instead, even though many of those sites were likely aggregating (copying) content from Backpage. (Lacey PSR ¶¶ 110-113) Lacey edited press releases that failed to acknowledge Backpage's internal prostitution marketing strategies and Backpage's market dominance over online prostitution

---

[19]   https://www.dailymail.co.uk/news/article-2079002/Backpage-Killer-hunted-escorts-dead-cars-week-posting-online-ads.html.

advertising in the United States.[20] With Lacey's urging, Backpage representatives fed the police information that deflected blame from Backpage—while a serial killer was still at large—in the hopes that DPD would either walk back or water down the statements made in their December 26, 2011 press conference warning the public of the dangers of using Backpage to engage in illegal activity. When the DPD police did not do this, Backpage issued its own misleading press release containing this alternative list of websites.[21]

Based on the foregoing, any sentence less than 20 years would send the wrong message to others who might emulate Backpage's conduct. It would essentially discount the U.S. Sentencing Guidelines that includes specific enhancements (*e.g.*, USSG §§ 2G1.3, 3B1.1(a)) for the activity that Defendants engaged in. A substantial sentence is needed to deter others from pursuing similar highly lucrative and exploitative criminal schemes.

E.  The Need to Avoid Unwarranted Sentence Disparities, § 3553(a)(6)

The requested 240-month sentence is consistent with sentences for other defendants who operated similar prostitution websites. For example, in *United States v. Martono,* the defendant was sentenced to 96 months in prison for owning and operating the prostitution website CityXGuide.com.[22] Martono employed the same strategies used by Backpage to conceal revenue (*e.g.*, bitcoin, gift cards, revenue funneled through a network of personal and business accounts). *Id*. But Martono's situation is distinguishable from Defendants' because his prostitution website only operated for a year, rather than 14 years, and made a fraction of the revenue that Backpage generated ($21 million vs. $500 million). *Id.* And unlike Defendants, Martono accepted responsibility and pleaded guilty. *See United States v. Webster*, 102 F.4th 471, 490 (D.C. Cir. 2024) ("Defendants who go to trial are not

---

[20] Trial Exs. 704, 704a.

[21] Trial Exs. 136, 959, 972 (not admitted).

[22]    https://www.justice.gov/usao-ndtx/pr/cityxguide-owner-sentenced-8-years-prison-reckless-disregard-sex-trafficking

'similarly situated' to those who plead guilty, and therefore 'the disparity in their treatment' is generally permissible.").

The United States has been unable to locate any truly comparable cases reflecting the same amount of money laundered in this case ($500 million), the harms facilitated by Defendants' laundering (adult and child sex trafficking, murders, prostitution, and other crimes), the prolonged duration of the offenses (14 years), or the technological sophistication and obfuscation involved in Defendants' scheme, not to mention Defendants' refusal to accept responsibility for their actions.

Although not a precise comparator, the sentencing of Ross Ulbricht for operating the Silk Road website provides an instructive example. Silk Road operated for less than three years, and it processed approximately $183 million in drug transactions and other illicit sales. *See United States v. Ulbricht*, 31 F. Supp. 3d 540, 556 (S.D.N.Y. 2014) (describing Ulbricht's website as a platform "for selling and purchasing narcotics and malicious software"). Ulbricht was convicted at trial on multiple counts, including drug trafficking offenses, aggravated identity theft, and money laundering conspiracy. He was sentenced to the statutory maximum on each count, including two life sentences for the drug offenses and a statutory maximum sentence of 20 years for money laundering conspiracy. *United States v. Ulbricht*, S.D.N.Y. No. 14-cr-68 (KBF), Doc. 269 (Judgment).

In pronouncing her sentence, Judge Forrest noted the scale of Silk Road as a "worldwide criminal drug enterprise with a massive geographic scope" that "posed serious danger to public health and to our communities." *United States v. Ulbricht*, Doc. 277 (5/29/14 Sentencing Hr'g Tr.), at 66. She repeatedly emphasized the calculated and deliberate nature of Ulbricht's scheme to operate Silk Road. *Id.* at 65-66 ("The nature and circumstances of the crime can be summed up as a planned, comprehensive, and deliberate scheme to do that which was unlawful . . . ."); 69 ("You spent several years very carefully planning the site and designing carefully considered methods of avoiding legal detection both for yourself, for your vendors, and for your customers, and you sought in all of these ways to put yourself above the law."); 75. And she underscored the importance of general

deterrence in such a novel and high-profile case. *Id.* at 86-87 ("This is a case in which general deterrence plays a particularly important role. . . . What you did was unprecedented and in breaking that ground as the first person you sit here as the defendant now today having to pay the consequences of that. . . . For those of you considering stepping into your shoes, carrying some flag, some misguided flag, or doing something similar, they need to understand very clearly and without equivocation that if you break the law this way there will be very, very severe consequences.").

Like Silk Road, Defendants' website—Backpage.com—became a massive online marketplace for illegal activity. Each of the considerations Judge Forrest discussed—including the scale of the harm caused, the deliberation involved in carrying out the scheme, lack of remorse, and the need to deter others from similar unlawful conduct—applies with equal if not greater force here.

Given Defendants' positions as owners of Backpage, and the ways in which they furthered Backpage's money laundering activities, a sentence of 240 months would not raise an unwarranted disparity, as it would fall substantially below the Guidelines ranges calculated in the PSRs for Spear and Brunst and the Probation Office's sentencing recommendation for them.

Lacey, Spear, and Brunst deserve the same sentence because they were each integral to the successful operation of Backpage for 14 years. While their individual roles were different, with Spear in the engine room, Lacey at the ship's wheel, and Brunst moving between the two ensuring the website had the necessary fuel in the form of money, they were all deeply invested in keeping the ship afloat because it was not just their livelihood, but their golden ticket to join the ranks of the wealthiest of the wealthy.

In 2012, with the sale of 17 alternative newspapers, Defendants abandoned any pretense that they were interested in alternative newspapers or investigative journalism—and instead enthusiastically became purveyors of a prostitution website operating in more than 400 U.S. cities. Trial Tr., Doc. 1812 at 47:20-22 and Doc. 1830 at 50:18-19. There is no reasonably comparable case to serve as a benchmark for these Defendants because no

judge has ever encountered defendants like Lacey, Spear and Brunst. There has never been a prosecution of a prostitution advertising website on the scale of Backpage, in terms of longevity, economic windfall, or human carnage. This case will serve as a blueprint that others will be judged against. The United States asks this Court to create the benchmark with these significant facts in mind.

VI.     Restitution and Fines

Consistent with a settlement agreement in a separate forfeiture action that is now pending approval by the United States Deputy Attorney General (*see* Doc. 2104), the United States is not seeking any criminal fines against Defendants, or criminal forfeiture in this action of any Defendant's interest in any assets subject to forfeiture, or a money judgment of forfeiture equivalent to such an amount.[23] If the Deputy Attorney General declines to approve the settlement, the government will promptly alert the Court and file an amended position.

The government respectfully submits that a restitution hearing be set for a later date to accurately determine the loss to the victims identified in the Superseding Indictment. (Lacey PSR at 56.)

CONCLUSION

For the foregoing reasons, the United States respectfully submits that each Defendant should be sentenced to 240 months in custody, followed by three years' supervised release, with restitution in an amount to be determined at a future hearing.

Respectfully submitted this 19th day of August, 2024.

GARY M. RESTAINO
United States Attorney

---

[23] *United States v. $1,546,076.35 in Bank Funds Seized from Republic Bank of Arizona Account '1889, et al.*, No. CV 18-08420-RGK (C.D. Cal.); Doc. 2104.

District of Arizona

NICOLE M. ARGENTIERI
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

*s/ Kevin M. Rapp*
KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
JOSEPH BOZDECH
Assistant U.S. Attorneys

AUSTIN M. BERRY
Trial Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Daniel Parke*