Paul J. Cambria, Jr. (NY Bar No.1430909, admitted *pro hac vice*)
Erin E. McCampbell Paris (NY Bar No. 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:  (716) 855-1580
pcambria@lglaw.com
emccampbell@lglaw.com
*Attorneys for Michael Lacey*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>        Plaintiff,<br><br>vs.<br><br>Michael Lacey, *et al.*,<br><br>        Defendants. | NO. CR-18-00422-PHX-DJH<br><br>**DEFENDANT MICHAEL LACEY'S SENTENCING MEMORANDUM AND MOTION FOR A DOWNWARD DEPARTURE**<br><br>(Oral argument requested) |

Defendant Michael Lacey, by and through his undersigned counsel, files the instant Sentencing Memorandum and Motion for a Downward Departure.

## PRELIMINARY STATEMENT

This case has not been an ordinary case and Michael Lacey, known as Mike or just Lacey, is not an ordinary defendant. Michael's s sole felony conviction was incurred at age 75 – for a financial crime that he purportedly committed upon the idea and advice of two credentialed lawyers, wherein all reporting rules were followed. Michael is incredibly principled, courageous, and generous. Above

all else, he has, through his actions and words, demonstrated an unflinching commitment and drive to do what is right when others have taken the easy or safe road. It you look at the crime of conviction – he made sure everyone knew that he wanted to pay taxes and avoid tax shelters of any kind if he pursued the foreign trust. That strict adherence to doing what is right has been part of his life, at every stage, as detailed below. He has written stories that put his life and liberty in jeopardy because he believed the public had the right to know about those stories. He spent a lifetime fighting for First Amendment rights because he knows that the suppression of speech leads to the erosion of other fundamental liberties. He has never turned a blind eye to a friend, family member, or cause in need of his support. He was a leader and mentor to young writers across the country, hiring, teaching, and inspiring writers from all walks of life. He got married and raised two sons who have grown into exemplary young adults. He did all of this and more, having overcome a childhood that no one would wish upon anyone.

There is a strong basis for leniency here as discussed in greater detail below. The people who Michael has helped and stood by over the years – family, friends, former writers and editors, community leaders – ask this Court to impose a sentence that reflects the person they know.

## MICHAEL'S HISTORY AND CHARACTERISTICS

**I.      Michael's history is one of triumph over adversity.**

### A.      Michael's childhood was traumatizing.

Michael was born into a working-class family that frequently relocated, even during the school year. His father, Bernard, was a construction worker. His mother, Helen, was a house cleaner and then became a nurse. He has two younger siblings, a brother, Edward, and a sister, Mary. His family lived in trailer parks and other temporary housing, ultimately settling in Newark, New Jersey around age 10. (Lacey Childhood Photographs, **Ex. A**.) Michael's parents were alcoholics and likely had undiagnosed mental illness. They drank every night and as the drinking wore on, became violent, with each other, and towards their children. Police were regularly called to their home. Sometimes a parent would be arrested and taken away. Once, his mother showed up drunk to his

school, a Catholic school, got into a fight with the headmaster, and was arrested and taken away in handcuffs. As a result, he was asked to find a new school.

The earliest memory Mr. Lacey has of his father hitting him is also one of the saddest. When Michael was five, he was beat up at school by a third-grader, nearly double his size. When his father found out that he lost a fight, he flew into a fit of rage, beat Michael with a belt, and tossed him outside their trailer. As a child, Michael did not understand that the trauma he suffered was unusual. He went about life doing his best to avoid triggering violence from his parents, even though just about anything could provoke them.

He had a grandmother who tried to provide him and his siblings with support. She lived in the projects, herself, and money was tight, but she sent them clothing. Michael can still remember opening the box and being disappointed with the clothing she had selected for him. He began working odd jobs at a young age, such as shoveling snow and running errands for a caterer. One of his favorite jobs was delivering newspapers. He tried to save the money he earned, but his parents frequently took his money for their bills.

## B.     Michael was a bright, creative, and hard-working student.

Notwithstanding the physical, mental, and emotional abuse he suffered at home, Michael was a great student. From a young age, he enjoyed writing and would write plays in his spare time. In high school, he was a National Merit Finalist – the only one in his school. He was courted by Princeton. When he went for a visit, he could not believe the beauty of the campus – he had never seen such a place. Upon return, his father told him to "get over himself." There was no money for college. He would join his father in construction and they would likely move to Arizona where construction jobs were plentiful. Michael did not know any better, and stopped thinking about Princeton or any other college. By chance, a college counselor at his high school sought him out towards the end of his senior year to congratulate him on becoming a National Merit Finalist and to find out which college he had picked. When he explained that there was no money for school, she was taken aback. She did some research, submitted an application to Arizona State University for him, and he was admitted.

When it became time to move to Arizona to begin college, his parents decided to stay in Newark, which meant he would be on his own.  He packed a bag and took a plane by himself from Newark to Phoenix.  His only contact in Arizona was a friend of his grandmother's.  He arrived with her name and address on a scrap of paper, and nothing more.

### C. Michael's early adulthood was traumatizing.

Michael's parents died in a murder-suicide when he was in his twenties.  The police determined that one of his parents had turned on the gas in their trailer, they fell asleep, and froze to death.  As the oldest child, the funeral arrangements fell to him.  He had so little money that the funeral director told him that his parents would need to be buried in cardboard coffins.  The funeral director reassured him that no one would notice because the funeral home could drape decorative fabric over the coffins to disguise the cardboard during the funeral.  Michael buried his parents and did his best to make peace with his childhood.  Decades later, in an effort to make peace with the memory of his father, Michael had the words "HOLD FAST" tattooed on his fingers, just like his father.  It means, "you can count on me, I'm steady."  Through one obstacle after another, Michael has been steady for his family, friends, colleagues, and community.

### D. Michael built a first-class media organization in Arizona from nothing.

In 1970, Michael left college to begin an alternative newspaper in Phoenix called the *New Times* with fellow Arizona State University students.  The newspaper began by covering Vietnam War protesters, a topic that no mainstream media organizations had covered.  On one of his first assignments, he witnessed one of his subjects, a counter-protestor, walk up to a protestor, and punch the protestor in the face, dropping him to the ground.  The counter-protester then returned to Michael to finish his interview, as if nothing happened.  Michael realized that investigating and covering topics and people ignored by mainstream media would give his readers colorful stories that needed to be told, and provide voices to the marginalized.

Michael and his colleagues had no professional training or experience but believed they could change the world, one story at a time, through long-form (magazine style) investigative journalism.  They offered their newspaper for free to ensure that anyone could read it, regardless of financial

status.  Shortly after inception, James Larkin joined the newspaper.  (*See* Photograph, **Ex. B**.)  At that time, it was published weekly, but was unprofitable.  During the early years, Jim Larkin kept a night job at the Nantucket Lobster Trap restaurant and Michael donated blood twice a week to raise funds for the newspaper.  As a former movie critic, Francine Hardaway, Ph.D., noted in her letter, the newspaper initially paid her only in movie tickets, which it received for free from theaters.  The newspaper had no organizational structure and barely scraped by.  After significant and unsustainable financial strain, both Lacey and Larkin left the newspaper.  Michael's blood donations were not a business plan.

### E.      "Separation of church and state" allowed the newspaper to thrive.

Years later, Michael and Jim met and discussed the importance of publishing hard-hitting stories and the positive reform that investigative journalism could bring.  They decided to return to the newspaper, but to run it in a more formal manner, with predefined roles.  Larkin would oversee the business side of the company, and Michael would oversee the writers and editors.  This made sense to Michael because writing had always been one of his strengths, whereas organization skills and business plans were not.  The guy who tried to fund a newspaper by donating blood was free to focus on what he was good at – writing and editing.  This divide between business and editorial is common in media organizations, and is referred to as the "separation of church and state."  Within this structure, Michael could not tell Larkin how to generate revenue, or how to manage the company's finances, litigation, intellectual property, real estate acquisitions, payroll expenses, etc.  Conversely, Larkin could not tell Michael what the newspapers would (or would not) publish.  Michael had complete journalistic freedom in the newspapers, and Larkin had complete freedom to run the business, including all advertising.  Numerous former writers and editors have submitted letters indicating that this separation was impenetrable and that the journalists flourished under this arrangement.

Over time, their newspaper began breaking national stories.  The *New Times* made national headlines based on its participation in the investigation and reporting on the car-bomb killing of an *Arizona Republic* reporter, Don Bolles – reporting the *Arizona Republic* declined to publish (likely due

to concerns over attacking Arizona's power brokers). Michael's willingness to cut against the current in the name of truth-telling became a *New Times* staple.

By the 1980s, the newspapers began winning national journalism awards. They expanded beyond Phoenix, acquiring newspapers in sixteen other cities, including New York's Village Voice. All told, Michael's newspapers won over 3800 journalism awards, including one Pulitzer, five Pulitzer finalists, 39 Livingston Awards, 67 James Beard Foundation Journalism Awards, 39 Investigative Writers and Editors Awards, and numerous H.L. Mencken Awards. Michael personally received dozens of awards for articles he had authored or co-authored.[1] A summary of the articles and awards from the period 2006-2011 demonstrates their commitment to covering people and events to engage society in important discussions. (*See* Awards Summary, **Ex. C**.)

Although this record is impressive, it is the positive impact that Lacey's and Larkin's journalism had on the communities where they published that is their true achievement, as detailed in letter after letter. As discussed more fully below, former writers and community leaders have talked about the impact the newspapers have had on racial injustices, on dismantling public corruption, and on abusive tactics of the powerful, such as a law firm illegally obtaining litigants' personal information. In many instances, the *New Times* was ahead of its time, and its stories resulted in the beginnings of national dialogues on important topics.[2]

---

[1]     For example, he received the H.L. Mencken Award in 1987 for his article entitled, *Braving the Border*, which brought attention to the dangers that immigrants face when attempting to cross the border. A 2010 series entitled, *Amongst U.S.*, detailing the struggles and contributions of Latino immigrants won the Aronson Award for Social Justice Journalism. In 2011, he won a Clarion Award for an article entitled, *What's Mom Worth?*, having uncovered information about the death of an insulin-dependent diabetic mother who died a painful death while held in the Maricopa County prison. She was repeatedly denied her requests for insulin because prison staff carelessly dismissed her pleas as those of a drug addict.

[2]     In 1991, an article entitled *Bush's Crack War: The Arizona Illusion*, showed that the "war on crack" actually ended up targeting low-level pot users, and this article began a dialogue on the flaws of the "War on Drugs," which has since led to sentencing amendments, among other much needed reforms. In the 1990s, *New Times* writer John Dougherty's extensive coverage of Arizona Governor J. Fife Symington's questionable behavior predated his prosecution and resignation. In 2003, the newspapers broke the story of sexual assaults of female cadets at the Air Force Academy. This story

Moreover, the journalists that Michael trained have continued to effect positive change. In using the investigation and writing techniques he learned from Michael, former writer Ben Westhoff was the first journalist to infiltrate a Chinese fentanyl laboratory, breaking such a significant story that he has gone on to become an advisor to Congress and the White House on the opioid crisis. Laura Miller, a former writer, states that Michael had "spent his entire lifetime holding politicians, police, bureaucrats, business icons and assorted fraudsters accountable for their actions, and he made it clear to all of us who worked for him the importance of doing so." She "learned that lesson so well that it prompted me to run for elected office," serving two terms on the Dallas City Council and two terms as the Mayor of Dallas.

### D. Michael empowered his employees.

Every former writer and editor who has submitted a letter has expressed admiration for Michael, their former boss. He had a hands-on approach to management, flying around the country to meet with them regularly. He taught them to investigate, write, and edit. No topic or person was off limits. He instilled in them the confidence to investigate and write about powerful people, and backed them up when the powerful people came after them, as they frequently did. As Susan Goldsmith, a writer he hired in 1996 wrote: "Mike advocated for women and minority journalists in a way I have never experienced anywhere else and he pushed us to do great work because he believed in us, as journalists, and we felt it, every day."

In addition to his time and mentoring, the newspapers invested in their writers financially. The writers had salaries and benefits. They were able to buy homes, use their healthcare to cover unforeseen medical expenses, and send their children to college. As Pete Kotz explained, this was in contrast with the norm for newspapers at the time, where editors were seeking to make a 30% profit, and set employee salaries artificially low to make that profit.

---

began a national dialogue about cadet safety and led to increased scrutiny of sex-assaults in military academies. In 2006, the newspaper ran a groundbreaking story about sexual abuse in polygamist compounds, which spurned national media coverage, movies, and books. In 2008, the newspaper revealed that a serial killer was operating in Los Angeles and the police had withheld that information from the public. These stories are just examples.

### E. Michael has a loving and close relationship with his family.

Michael has a loving and close relationship with his family. In 1980, Michael married Kathleen Ferris, an Arizona lawyer, and then-Director of the Arizona Department of Water Resources. Although they are divorced, they have remained close friends. They have two sons, Colin and Roarke, whom they raised in Arizona. (*See* Family Photograph, **Ex. D**.) Michael was a hands on dad. Some of their favorite memories are cooking pozole from scratch together, going to museums, and traveling. He supported them in their academic endeavors and was a role model for them. Michael sees them regularly and understands the impact that his conviction and sentence will have on them. Both boys have attended numerous hearings over the years as well as portions of his trial. Even though they are divorced, Mrs. Ferris described Michael as a devoted father, a generous man who gave freely to others, and a highly principled person.

Additionally, Michael is close with his brother and sister. His brother, Edward, lives in Arizona, and his sister, Mary, lives in New York. They regularly speak and visit. Both his brother and his sister attended his trial to support him.

## II. Michael's personal characteristics demonstrate he is a man of integrity.

### A. The newspapers were borne out of the desire to uncover wrongdoing and inform the public about important issues and events not otherwise covered to bring systemic change through transparency.

The *New Times* began as a collective of college students who were eager to give voices to the unheard. They covered the Vietnam War protesters, who previously had not received media coverage and whose views had been silenced by lack of coverage. Vietnam veteran and former Arizona Senate majority leader Alfredo Gutierrez noted in his letter that, over time, Michael's coverage led to mainstream media coverage, and mainstream media coverage led to elected officials beginning a dialogue on whether a perpetual war in Viet Nam was in the Nation's best interest. Mr. Gutierrez saw what Michael knew, that giving voices to the unheard could change society for the better. Michael and his staff used the skills they gained from

covering the protesters to investigate public corruption, corporate malfeasance, and racial injustices, such as the mistreatment of migrants in Arizona, among other things.

**B.    Michael's life is one of self-sacrifice for preservation of free speech.**

Michael is a principled person who has fought one First Amendment battle after another to publish hard-hitting investigative stories, even when powerful people wanted him silenced. Both at trial and in letters of support, Michael has been described as a "First Amendment warrior." An overview of the battles Michael fought alongside his writers is best summarized by writer John Dougherty, who joined Michael's staff in 1993:

> I wrote hundreds of stories ranging from complex investigations into government corruption, public subsidies in stadium construction projects, child rape in polygamous communities, malfeasance in public universities, a murder committed by a college football star and brutal police abuse that resulted in multiple deaths of inmates. The foundation for my stories always relied on the First Amendment and the Arizona Public Records Law. I filed hundreds of requests for public records under these laws. Extracting this information was not an easy task. It took time, money and most of all commitment to find the truth no matter the cost.
>
> Mike Lacey provided unflinching support to do this work. . . . This can be a lonely fight. Under Mike's leadership, we embraced the seminal publisher Joseph Pulitzer's call to arms: "A newspaper should have no friends."
>
> Which means a newspaper like Phoenix New Times had plenty of enemies. Our targets responded with force. Threats, litigation, intimidation, unfounded police investigations, smear campaigns, and refusal to abide by the federal and state public records law were routine. And we stared them down, no matter the financial cost to the paper, or the threat of retribution from those who could call on law enforcement and prosecutors to retaliate for stories those in power would rather keep quiet.
>
> At no time did Mike Lacey ever consider surrendering to strong-arm tactics. Never. And neither did I and many other reporters and editors who had the opportunity, privilege and responsibility to work with Mike. Our overarching goal was to serve the public interest. Period.

> Mike will never flinch from his commitment to the First Amendment. He is a man of integrity. His determination is etched into his knuckles: "Hold Fast."

Indeed, threats, retribution, lawsuits, and grand jury investigations were the normal response from the subjects of their articles, as told by writer after writer. Most notably, Lacey and Larkin were arrested in the middle of the night and jailed for publishing an article about Sheriff Arpaio. Michael understood that they were in the crosshairs of law enforcement, but he refused to back down when threatened with prosecution because he believed the article at issue was protected expression, important for the public discourse, and the newspaper had the right to publish it. In an *en banc* ruling, the Ninth Circuit recognized that Maricopa County had violated the First Amendment, *see Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012) (en banc). Michael's courageous stand against corruption and emphatic defense of First Amendment rights received national media coverage. *See* Carr, D., New York Times, *A Knock in the Night in the Arizona* (May 12, 2008), available at: https://www.nytimes.com/2008/05/12/business/media/12carr.html. True to his character, Michael used this unsettling event as a learning lesson with his sons. As his son Colin writes:

> He was arrested by Arpaio in 2007 for a story he wrote and published about the rights of his readers being violated. After the arrest, he pulled me aside to explain the importance of his actions. My dad told me that he had to stand up for what was right; he had to stand up for his readers. He knew he was going to be arrested for what he published and he did not run.

## C. Michael has made Arizona a better place through visionary journalism.

As told in numerous letters of support, Michael's form of journalism had a positive impact on every city where they published. As writer Bruce Rushton, wrote: "Because of Mr. Lacey's work, it became harder for those in power to afflict the powerless, more difficult to excuse the inexcusable. He took great risks for righteous causes, particularly when writing about the Maricopa County sheriff's office." Similarly, the Rev. Oscar S. Tillman, a former President of the N.A.A.C.P. in Phoenix wrote about the impact Michael's journalism had on racial injustices, indicating that, during his leadership of the N.A.A.C.P.:

> [T]he city of Phoenix and Maricopa County were riddled with gang violence, racial violence and allegations of police brutality. We were blocked in all our efforts to address these problems by the sheriff, the police chief and other officials. We even had numerous complaints about the care being received by veterans at the VA facility in Phoenix. Despite marches and demonstrations, no one wanted to talk, until Mr. Lacey and the New Times investigative reporters started exposing what was going on and their work was picked up by the national press. Despite death threats, bombing attempts to Mr. Lacey and myself, Mr. Lacey stood with the NAACP and continued to print the truth. Eventually with intervention by the Justice Department and Mr. Lacey's continued involvement, slowly things began to change. The VA Director was replaced, and veterans received better care.

Patrick Cantelme, Sr., a retired Captain of the Phoenix Fire Department and former head of the Phoenix Firefighters Union explained that it was Michael's influential coverage of the proposal to change the election for Phoenix City Council seats from at-large to district-based that finally resulted in election by popular vote in Phoenix. In the almost 50 years that Mr. Cantelme has known Michael, he notes that, "[w]hether it was a fight against racism, anti-union practices, support for women's rights or against 'gay bashing' Lacey and the New Times led the fight." This impact occurred everywhere that Michael had writers.

### D. Michael is a person of character.

In one letter after another, people who have known Michael for decades have said they could and would testify to his solid character. His immediate subordinate, Andy Van De Voorde, has stated that "in my 40 years of knowing the man, and standing next to him through many difficult circumstances, I never saw him do a wrong thing." Others have found it impossible to believe that he was convicted of anything because of his steadfast commitment to doing what is right. Mrs. Ferris, his ex-wife has said that:

> Michael is courageous. Where others might crumble, he stands up to injustice, to unfairness, and for what is right. From the early days of the *New Times,* when he covered and wrote about the protests following the killings of four students at Kent State, he has never wavered in his defense of the basic freedoms our country guarantees.

### E.     Michael is not motivated by money or greed and never has been.

Michael is not motivated by money or greed and never has been. Although he earned substantial wealth from his ownership share in the newspaper business, his financial success was somewhat by happenstance. In the early days, when Michael was donating blood to help fund the *New Times*, the arrival of Larkin and his business acumen shifted the newspapers from a fledgling Arizona newspaper to a profitable national conglomerate. As Ms. Ferris has indicated, Michael could not balance a check book. If financial success accompanied Michael's journalism, so be it, but wealth was not his focus then or now.

As a young man in his early twenties, he chose to live in a near state of poverty to begin and build a newspaper because he believed in the importance of investigative journalism and felt sacrifice on his part was worth it. He supported the newspaper by donating blood. At first, he was only allowed to donate blood once per week; however, due to a breakthrough in blood collection technology, he was eventually able to donate twice per week, which gave his struggling newspaper twice the lifeline. He could have pursued any number of other jobs which would have afforded him the ability to pay bills without donating blood twice a week, but he chose journalism because he believed that exposing corruption, bringing light to unheard voices, and holding powerful people accountable was his calling.

The newspapers were offered to the public for free because they did not want anyone to be unable to read their stories based on their financial status. To make their papers available to the widest possible readership, they earned revenue through selling advertising space, including classified ads. As the newspapers became more and more successful, they continued to choose journalism over financial concerns. Michael published articles that drove away Fortune 500 companies and their large advertising budgets because he would not compromise on principle. If a story was newsworthy, the newspapers would publish it regardless of any impact on the company's bottom line. As Laura Miller, a former writer has indicated, Michael even authorized her to write an article about a man who was scamming women who responded

to his dating ads – ads that had been published on the back pages of the newspaper in Dallas – knowing full well that the story would reflect poorly on their classified ads section. No one, not even the company itself, was safe from its journalists.

Michael was generous with his self-built wealth. He donated to organizations dedicated to fighting injustice, such as the Arizona A.C.L.U. He created and funded a program to encourage minority college students to pursue careers in journalism. When he and Larkin obtained a $3.75 million settlement from Maricopa County after their illegal arrest and detention, they donated the money from the settlement to an organization they created, called the Frontera Fund, to help marginalized minority populations overcome poverty and racial injustice. These mentions are only a handful of the many charitable and generous donations Michael made over the years. He bought homes for friends. He paid for college for his siblings' children and daycare for their children. He paid for college for other people he encountered who showed promise, but did not have the means to pay on their own. He is known for helping any employee or friend who had fallen on hard times.

### F.    Michael is elderly and has medical issues.

Michael is of advanced age. He is 76. He has high blood pressure, high cholesterol, coronary artery disease, and obstructive sleep apnea. He takes medication for these illnesses. He must swim or ride a stationary bicycle to keep his weight and medical issues in balance.

## 18 U.S.C. § 3553(a) SUPPORTS SUBSTANTIAL LENIENCE FOR MICHAEL

### I.    The nature and circumstances of the offense strongly support leniency.

The context for the international concealment money laundering conviction is critical. This is not a case where the defendant went off on his own to hide an asset. Instead, in the years that preceded the international wire transfer at issue, federal law enforcement officers had visited his banks and suggested to those banks that it would be bad for their reputation to have him as a client, which then resulted in the banks terminating their relationship with him. This occurred when there were no charges pending. While visiting his long-time trusts-and-estates lawyer, John Becker, on an unrelated matter, Michael mentioned his inability to

maintain banking. In response, Becker suggested that a foreign bank might stabilize his banking, and suggested that they meet with another lawyer who specialized in offshore assets. That lawyer suggested a bank in Hungary and the creation of a trust for the benefit of his sons. This history of the origins of the wire transfer is critical to an assessment of his culpability.

The entire transaction was papered and executed by counsel. Michael did not hide anything from his counsel, explaining to them that the funds at issue were from the sale of Backpage. As his counsel, Becker, explained at trial, he believed and still believes the transaction to be fully lawful. There was no intent to conceal, and no actual concealment, but rather, an intent to disclose and actual disclosure. (*See* Docs. 2004, 2033, 2101.) Furthermore, there is no proof that Michael "knew . . . represented the proceeds of some form of unlawful activity," *Cuellar v. United States*, 553 U.S. 550, 561 (2008), as required for such a conviction, when this Court has already acquitted those same funds twice, and also ruled that the conspiracy to violate the Travel Act ended with the sale of Backpage to Ferrer, and that there was no proof to sustain direct or *Pinkerton* liability for anyone, Ferrer included, after the sale, for Travel Act violations. (Doc. 2063 at 40-41, 55-57.)

The conduct pertaining to the unresolved counts should not be considered because if Michael's sentence for Count 100 is increased based on that conduct and, if there should be any convictions pertaining to that conduct at a third trial, he would be punished twice for the same conduct, in violation of the Double Jeopardy Clause. *See North Carolina v. Pearce*, 395 U.S. 711, 719 (1969) (recognizing that the Double Jeopardy Clause protects "against multiple punishments for the same offense"). But even if that conduct were considered, at best, Michael is guilty of being misled into believing that Backpage operated lawfully – which is not a crime – but instead a defense to the unresolved charges. In good faith, Michael relied on the advice of others. Backpage's business was the sale of classified advertising space and was created on the business side of the company, over which Michael had no control or involvement. As this Court has already found, his involvement with Backpage was

14

"attenuated" and he was only occasionally approached by people on the business side of the company about business matters. (Doc. 2063.)

Because he was not involved with Backpage, he did not have any first-hand knowledge and needed to ask questions. When he had questions about Backpage, he raised his concerns with Jim Larkin, who repeatedly assured him that Backpage had retained the best lawyers on internet free speech and safety and Backpage was following that advice. Michael had no reason to doubt Larkin because Larkin had managed the business-side of the newspaper company for decades, never once doing a dishonest thing. Michael also asked questions of Carl Ferrer and others involved with Backpage, all of whom assured him that everything was being done properly, that they were assisting law enforcement to catch the people misusing the website, and that they had processes in place to prevent misuse of the website. On several occasions, Ferrer testified under oath as a witness for the federal government – testifying that the classified ads website did everything it could to prevent misuse, that the website prohibited ads for illegal services and had computer programs and employees to prevent the posting of such ads, that he had no way of knowing whether anything posted in any ad was true, that website users sometimes lie in ads, and that he could make no assumptions about a website user based on the user's email address (even if the address is "youngpimpin86@gmail.com").

As has been discussed in other submissions (Docs. 1803, 1879, 1886 (incorporated herein by reference)), Michael was comforted in his reliance on Larkin and Ferrer because Backpage won one judicial victory after another, and counsel for Backpage wrote letters to various third parties, staking out the position that Backpage had the right to publish adult advertising and its users had the right to post that advertising, based both on the First Amendment and Section 230. He also knew that sitting DOJ officials said it would only be a crime for a website to allow users to post ads if the website was actively conspiring with website users – something Ferrer had testified, under oath, that Backpage did not do. He knew that a sitting-Attorney General informed the former head of NCMEC that the DOJ

could not prosecute Backpage because it would be impossible to establish the heightened level of specific intent necessary for prosecution.

Indeed, this view was so well-established that Congress twice passed legislative "fixes" aimed at giving prosecutors a statute with a *lesser* mens rea than required under existing laws (such as the Travel Act) to allow them to prosecute Backpage. The indictment here issued shortly before the enactment of the second law, which the Ninth Circuit now has interpreted as requiring a mens rea well *above* what the government advocated for under the Travel Act.[3]

Michael knew from his decades as a publisher that advocacy groups and even law enforcement would target the publishers of unwanted speech, regardless of its protection by the First Amendment. The attention Backpage's adult content attracted appeared to be no different. Michael was walled off from the business side of the newspaper company, but had repeatedly received assurances from his long-term partner that, after seeking advice from top-tier lawyers from reputable national law firms, the company was operating in conformance with the law. He also knew the person in charge of Backpage (Ferrer) had been testifying under oath as a witness for federal prosecutors and had received commendation after commendation from law enforcement thanking him for his assistance, including from the F.B.I. Director. In that light, his decisions were rational and principled. In the end, if all of this proved to be wrong, if Ferrer was hiding misdeeds from Larkin, if Larkin's assurances to Michael were premised on information later found to be faulty, and, if, on top of that, the advice of dozens of internet safety and free speech attorneys was wrong, Michael could not have known because he had no independent involvement with Backpage such that he could

---

[3]   *Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137, 1145 (9th Cir. 2022) ("[T]he defendant must have actually 'engaged in some aspect of the sex trafficking.' The statute does not target those that merely 'turn a blind eye to the source of their [revenue].' And knowingly benefitting from participation in such a venture requires actual knowledge and 'a causal relationship between affirmative conduct furthering the sex trafficking venture and receipt of a benefit.'"). Likewise, the district court in D.C. held that the *mens rea* under the first "fix" would require the publication of an ad with "actual knowledge" that was for trafficking. *Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96, 109 (D.D.C. 2016).

have uncovered any of these variances from what he was told. As Dr. Hardaway noted, Michael barely understood the internet, and is so disconnected from the modern world that he rarely carries a cell phone.

## II. Michael's personal history and characteristics strongly support leniency.

At 76 years old, Michael is a first-time felony offender. He comes before this Court as an exceptional defendant. Rather than a life of crime, Michael has led a life dedicated to fighting for First Amendment rights, bettering his community, and mentoring and helping others. He had a profoundly positive impact on his employees, as indicated in letter after letter. His employees have gone on to impact their communities through investigative journalism that forces change. He is not someone who got arrested and suddenly decided to do good deeds to have something positive to discuss at sentencing. He is a principled person who has spent his lifetime unearthing wrong-doing, and writing about it, even if doing so placed him at risk for harassment, arrest, civil suits, or death threats. (Lacey Office Photo, **Ex. E.**) He is a self-made millionaire who has generously given to people and causes. He has taken financial hits to stay true to his principles. He has gone to jail to stay true to his principles. It makes no sense that he would intentionally involve himself in criminality at this late stage in his life. Each of these things supports leniency.

Moreover, his age and the impact that his B.O.P. classification would have on his health and life expectancy support leniency. As Jan Perdue, a former high-level B.O.P. official has indicated, he is unlikely to be sent to a federal prison camp even though his crime of conviction is solely a financial crime because the PSR incessantly discusses child-sex trafficking. (*See* J. Perdue Aff., **Ex. F**.) He will be classified as a sex offender which will place him at risk within the general population. In light of his age and lack of experience in prison, he would be the target for exploitation. (*Id.* ¶ 16.) Whether kept in general population or in solitary confinement, he is not expected to live even four years. (*Id.* at ¶ 35.) As a result, any sentence of incarceration, other than at a half-way home or home confinement, would be a death sentence for Michael.

### III.     Michael has been punished.

Michael has lived under a federal indictment since April 2018.  For much of this time period, he wore an electronic ankle monitor.  Because nearly all of his funds and assets were seized regardless of origins, even though he had earned substantial wealth prior to creation of Backpage, he has struggled to pay bills the entire time this case has been pending.  His financial instability is detailed in his PSR and has been an immense strain on him.  His sons have lived with the stress of a parent under indictment, as have all of Michael's family and friends.  The stress of the indictment contributed to the end of his current marriage.

But none of this matters in comparison to the loss of his dearest friend, Jim Larkin, who could no longer handle the stress of this case and killed himself.  Then, and now, Michael continues to mourn the loss of his 50-plus-year friend and partner.  Days after the funeral, this trial began.  For the first time in his career, Michael was in a courtroom without Jim.  In one First Amendment battle after another, they had been side-by-side.  This time, Michael was alone.  Although the sudden and tragic loss of his friend made it difficult to be present and focused at trial, he was comforted by what Jim said to him the day before he killed himself – a fact that was borne out by the proof at trial – "Mike, you'll be ok.  You didn't have anything to do with Backpage."

### IV.     Incarceration is not necessary to afford adequate deterrence or to protect the public.

Incarceration is not necessary to protect the public.  There was no victim of the financial crime for which Michael was convicted.  But even if the Court considers the unresolved conduct, which it should not, the thing that made him a purported threat to public safety – the Backpage website – was taken down more than six years ago.  As a result, incarceration is not needed to protect the public from him.  In fact, he has been considered such a low threat to public safety that he has been out on bail for more than six years.  He has been authorized to travel outside Arizona many times, including after his conviction, for weeks at a time.  He has not committed any crimes, he followed the rules, and he passed his drug tests.  Indeed, this Court decreased his pretrial conditions by ordering the removal of his electronic ankle monitor more than a year ago.

Incarceration is not necessary to afford adequate deterrence. This is Michael's first felony conviction and the proof at trial demonstrated that he did not intend to commit a crime, but, instead, followed the advice of counsel so as to provide him with banking stability.

## V. Section 3553(a)(6) supports a downward variance from the Guidelines.

As Mr. Allenbaugh, a lawyer who previously worked for the Sentencing Commission and currently holds the title of Chief Research Officer for SentencingStats.com, Inc., has indicated, Probation's recommended sentence would result in a gross disparity between Mr. Lacey and comparable defendants. (*See* M. Allenbaugh Aff., **Ex. G**.) His base offense level should be calculated as no greater than 10, which yields an advisory Guidelines range of 6-12 months. Of comparable defendants (offense level 10, primary Guideline § 2S1.1), only 23% were given a sentence of incarceration (with 77% receiving a sentence other than incarceration) and, of those defendants, the average length of the sentence imposed was ten months. (*Id.* at ¶¶ 7-13.)

## VI. Just punishment and respect for the law are not served by a lengthy term of incarceration.

In letter after letter, former writers and editors, family and friends have asked this Court for mercy for Michael. Given all of the circumstances discussed herein, a lengthy term of incarceration would not foster respect for the law or serve as just punishment.

## <u>DEFENSE RECOMMENDATION</u>

For all these reasons, Michael Lacey respectfully requests a sentence of probation. First, as discussed in his Objections to the PSR (Doc. 2101, 2124), incorporated herein by reference, Michael's base offense level is no greater than 10. A base offense level of 10 leads to a Guidelines range of 6-12 months, with 77% of the defendants with this conviction and offense level receiving a non-custodial sentence.

Second, this Court should not include acquitted or unresolved conduct in sentencing Michael, for all the reasons stated herein and in the PSR Objections (Docs. 2101, 2124.)

Third, even if this Court were to consider the unresolved conduct, this Court has already recognized that Michael's involvement with Backpage (and for that matter, the entire business side of the newspaper company) was "attenuated" at best, with Ferrer testifying that Michael was a "layer away" from Backpage. Payments made to Michael reflect his ownership interest in a company where his role was to oversee the writers and his pay was comparable to the amount received by Larkin and his sons (both of whom had minor interests).

Fourth, Michael is a remarkable person who overcame a traumatic childhood and has lived a principled life. He moved across the country by himself at 18. A few years later he started a newspaper that ultimately grew into a nationwide conglomerate breaking one story after another. It should be clear to this Court that his journalism and his training of his writers has had a positive impact on Arizona and elsewhere.

Probation is requested. If probation is declined, he requests house arrest. If house arrest is declined, he requests a term of incarceration at a halfway house. If his request for a halfway house is declined, he requests that this Court impose a term of incarceration with the recommendation to place him in a camp. To do so, this Court will need to make that recommendation on the record and state on the record that he was convicted of a financial crime and not a sex crime. Otherwise, Michael is likely to be classified as a sex offender and be housed at a federal low or medium security facility, at great risk to his personal safety and health. At Michael's age, with a life expectancy of no more than four years, and the serious risk to safety he faces in custody, a sentence of incarceration essentially would be a death sentence based on this first felony conviction.

RESPECTFULLY SUBMITTED this 19th day of August, 2024,

Paul J. Cambria, Jr.
Erin McCampbell Paris
LIPSITZ GREEN SCIME CAMBRIA LLP

By: /s/ Paul J. Cambria, Jr.
    Paul J. Cambria, Jr.
    Attorneys for Michael Lacey

On August 19, 2024, a PDF version
of this document was filed with
Clerk of the Court using the CM/ECF
System for filing and for Transmittal
Of a Notice of Electronic Filing to the
Following CM/ECF registrants:

Kevin Rapp, kevin.rapp@usdoj.gov
Peter Kozinets, peter.kozinets@usdoj.gov
Margaret Perlmeter, margaret.perlmeter@usdoj.gov
Austin Maxwell Berry, austin.berry2@usdoj.gov