1

2
Paul J. Cambria, Jr. (NY Bar No.1430909, admitted *pro hac vice*)
Erin E. McCampbell Paris (NY Bar No. 4480166, admitted *pro hac vice*)

3
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120

4
Buffalo, New York 14202
Telephone: (716) 849-1333

5
Facsimile:   (716) 855-1580

6
pcambria@lglaw.com
emccampbell@lglaw.com

7
*Attorneys for Michael Lacey*

8

9
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

10

11
United States of America,                          NO. CR-18-00422-PHX-DJH

12
                          Plaintiff,            **DEFENDANT MICHAEL LACEY'S**
                                                **RESPONSE TO THE UNITED**
13
vs.                                             **STATES' CONSOLIDATED**
                                                **SENTENCING MEMORANDUM**
14
Michael Lacey, *et al.*,

15
                          Defendants.              (Oral argument requested)

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant Michael Lacey, by and through his undersigned counsel, files this response to the government's consolidated sentencing memorandum.    The government's sentencing memorandum says nothing about the sole charge for which Mr. Lacey was convicted in connection with his lawyer's wire transfer of funds to Hungary, international concealment money laundering, nor does it address any facts related to the wire transfer underlying his conviction.  Instead, the government's sentencing memorandum discusses, at length, crimes committed by persons unknown and unrelated to Mr. Lacey and the victims of those crimes, and, to a lesser extent, crimes as to which Mr. Lacey has been charged but not convicted.  The Court should reject the government's call for the Court to consider these unrelated crimes and unresolved charges when sentencing Mr. Lacey for his one count of conviction, which is an invitation to serious error, including constitutional error.  The Court should likewise reject the governments' request that it ignore bedrock First Amendment principles when sentencing Mr. Lacey, another invitation to constitutional error.

## ARGUMENT

**I.** **Mr. Lacey's international concealment money laundering conviction had no "crime victims," other than the United States.**

The term "crime victim" means "a person ***directly and proximately harmed*** as a result of the commission of a Federal offense." 18 U.S.C. § 3711(e)(2)(A) (emphasis added). "The requirement that a crime victim be 'directly and proximately harmed' encompasses the traditional 'but for' and proximate cause analyses." *In re McNulty*, 597 F.3d 344, 350 (6th Cir. 2010); *accord United States v. Avila*, 2012 U.S. Dist. LEXIS 5286, at \*5 (D. Ariz. Jan. 18, 2012) (same).  Direct harm "requires proof 'that a particular loss would not have occurred but for the conduct underlying the offense of conviction;" proximate harm "requires proof that 'the causal connection between the conduct and the loss is not too attenuated (either factually or temporally)." *United States v. Rudolph*, 2023 U.S. Dist. LEXIS 69426, at \*3 (D. Colo. Apr. 20,

2023).[1]  Moreover, when determining who is the victim of a crime, the court "must (1) look to the offense of conviction, based **solely** on facts reflected in the jury verdict or admitted by the defendant; and then (2) determine, **based on those facts**, whether any person or persons were 'directly and proximately harmed as a result of the commission of [**that**] Federal offense.'" *McNulty*, 597 F.3d at 351 (emphasis added; brackets in original).[2]  The government's sentencing memorandum and the presentence investigation report posit many supposed victims of Mr. Lacey's international concealment money laundering conviction, but, for numerous reasons, no plausible case can be made under 18 U.S.C. § 3711(e)(2)(A) that these are "crime victims" of the crime of conviction.  Therefore, none of the posited victims should be permitted to be heard at Mr. Lacey's sentencing, nor should the Court consider any of their victim impact statements or letters.

First, none of the posited victims were directly harmed by Mr. Lacey's transfer of funds or his purported concealment of the transfer, nor have they claimed to have been harmed by his transfer of funds or by his purported concealment of the transfer in their victim impact statements.  None of the posited victims has been or currently is a creditor of Mr. Lacey who could have been harmed by the transfer.  The government suggests that Mr. Lacey's transfer might someday impair a future creditor's ability to collect its debt, but seven and a half years have passed since the transfer and there are no such creditors whose rights have been impaired and whether there ever will be any is sheer speculation, at best.

---

[1]    *See also United States v. Swor*, 728 F.3d 971, 974 (9th Cir. 2013) (because a victim must be directly and proximately harmed, restitution may be awarded under the 18 U.S.C. § 3663A "only for losses for which the defendant's conduct was an actual and proximate cause;" by itself, "'[b]ut for' cause is insufficient").

[2]    *Accord In re Lang*, 2018 U.S. App. LEXIS 10741, at *2-3 (6th Cir. Apr. 26, 2018) (same); *see also Rudolph*, 2018 U.S. App. LEXIS 10741, at *2-3 (government's failure to present evidence at trial establishing that movants were the victims of the defendant's mail fraud precluded the court from extrapolating an intent to defraud movants from the jury's verdict or finding that movants suffered a loss directly or proximately caused by the mail fraud).

3

1      Second, there is no basis to suggest that any of the harms or losses claimed by the

2  posited victims would not have occurred *but for* the conduct underlying the offense of

3  conviction, whether that conduct was Mr. Lacey's transfer of funds or his purported

4  concealment of the transfer.  Indeed, all the conduct leading to the claimed losses occurred

5  *before* the transfer and in most cases many years before the transfer.  Mr. Lacey's transfer was

6  on January 3, 2017.  E.S. claims to have been harmed in 2009-2013; C.T. in 2009-2011; M.L.

7  in 2009-2012; the survivors of C.M. in 2012; J.R. in 2013; and the survivors of A.G. and C.W.

8  in 2015 and of D.R. in 2016.  If Mr. Lacey had not made the transfer in January 2017, all of

9  the harms that are alleged to have occurred in 2009 – 2016 would have occurred—because

10  they already had occurred.  None of the posited victims have claimed, or could claim, that the

11  acts of prostitution, sex trafficking, or violence that underlie the harms and losses they assert

12  would not have happened if Mr. Lacey had not transferred funds abroad in 2017 or had not

13  purportedly concealed the transfer.  Therefore, while the posited victims may be victims of

14  the crimes of other parties, they are not victims of the crime of conviction.  *See Avila*, 2012

15  U.S. Dist. LEXIS 5286, at *8. (survivors of murder victim were not crime victims in a case

16  charging dealing in firearms without a license, possession with intent to distribute marijuana,

17  possessing a firearm in furtherance of a drug trafficking offense, making false statements in

18  connection with the acquisition of a firearm, and money laundering, even though their relative

19  was killed with "one of the many guns a Defendant in the case purchased by making a false

20  statement," because the survivors did not present "sufficient facts to create 'but for' causation

21  between the crimes charged in the indictment and the harm that they suffered" and the court

22  could not "conclude that but for Defendant's charged false statement, Brian Terry would not

23  be deceased").

24      Third, neither Mr. Lacey's transfer of funds in 2017 nor his purported concealment of

25  that transfer was a proximate cause of the claimed harmed or losses, as there was no "causal

26  connection" between that transfer or its purported concealment and the acts of prostitution,

27  sex trafficking, or violence that led to the harms and losses claimed by the posited victims.

28                                                    4

1    The conduct causing these harms and losses not only occurred *before* the transfer, but, in nearly

2    all cases, was substantially attenuated temporally from the transfer (as much as eight years

3    earlier).  Moreover, the conduct causing the harms and losses was not just attenuated factually

4    from the transfer and its purported concealment, but was completely unrelated to the transfer.

5          Fourth, the Court must assess whether the posited victims were directly and

6    proximately harmed by Mr. Lacey's crime of conviction "based **solely** on facts reflected in the

7    jury verdict," *McNulty*, 597 F.3d at 351, but, with just two exceptions, the government

8    presented absolutely **no** evidence at trial relating to the posited victims (including E.S., C.T.,

9    J.R., and the survivors of C.M., A.G., and D.R.).  Even as to the two exceptions (M.L. and a

10   survivor of C.W.), the evidence presented was sparse and provides no basis for the Court to

11   determine that Mr. Lacey's crime of conviction caused the harms or losses claimed by M.L. or

12   the survivors of C.W.  Moreover, the government presented no evidence at trial by which the

13   Court could trace any of the funds Mr. Lacey transferred to the posited victims, a necessary

14   condition to establish that they were victims of the crime of conviction.  *See United States v.*

15   *Guerrero*, 2021 U.S. Dist. LEXIS 116186, at *43 (N.D. Ill. June 22, 2021) (rejecting contention

16   that claimant was a victim of defendant's money laundering conviction because he was unable

17   to identify evidence tracing the funds stolen from him to the laundered funds and, therefore,

18   could not show he was directly and proximately harmed by the crime of conviction).

19   **II.     Purported victims of crimes for which Mr. Lacey has not been convicted are not**

20   **"crime victims" for purposes of his sentencing.**

21         The government asks this Court to increase Mr. Lacey's sentence for his one count of

22   conviction based on the statements of purported victims of wrongdoing by Mr. Lacey unrelated to

23   his crime of conviction, but doing so "would be constitutionally improper and would be a flagrant

24   violation of Mr. [Lacey's] due process rights." *United States v. McMahan*, 2011 U.S. Dist. LEXIS

25   162710, at *9 (C.D. Cal. Nov. 16, 2011).  In *McMahan*, ten persons sought to intervene in the case

26   as crime victims, with the aim of being heard at the defendant's sentencing.  They did not purport

27   to be victims of the defendant's crime of conviction, but of other crimes as to which he had not

28                                                    5

1   been charged or convicted.  The court rejected the proposed intervenors' contention that they were

2   "crime victims" under 18 U.S.C. § 3771(e), holding that interpreting the CVRA's definition of

3   "crime victim" to include victims of crimes other than the crime of conviction would "raise a

4   multitude of constitutional problems," including, but not limited to, "not being charged by

5   indictment," not being "provided with an advance opportunity to know the charges," the evidence

6   being "evaluated by a judge and not a jury" and "evaluated under a clear and convincing evidence

7   or preponderance of the evidence standard," and the inability "to cross-examine the interveners (sic)

8   because 'a defendant has no due process right to cross examine witnesses who supply information

9   relied on in sentencing.'" *Id.* at \*8.  The government seeks to do here what the court in *McMahan*

10  rejected and this Court should not permit it do so.

11       The Court also should not consider Mr. Lacey's alleged conduct relating to the unresolved

12  counts because, if Mr. Lacey was to be subsequently tried and convicted on any of the unresolved

13  counts, he would be punished twice for the same conduct in violation of the Double Jeopardy

14  Clause.  *See North Carolina v. Pearce*, 395 U.S. 711, 719 (1969) (recognizing that the Double Jeopardy

15  Clause protects "against multiple punishments for the same offense").  This concern is not merely

16  hypothetical , as the government has stated that the "United States intends to retry Defendant

17  Lacey."  (Doc. 2035 at 5.)

18  **III.    Neither Mr. Lacey's conviction, nor those of Messrs. Brunst and Spear, alter the First**

19  **Amendment presumption of protection or the government's burden to prove otherwise.**

20       In its sentencing memorandum, the government implies that the Court may presume that

21  Backpage.com's publication of **all** adult advertising was unprotected and that **all** of Backpage.com's

22  revenues were unlawful proceeds.  Not so.  Even if the government proved at trial that a few dozen

23  adult classified ads Backpage.com published were unprotected, the constitutional presumption of

24  protection continues to apply to all the other ads Backpage.com published and the revenues from

25  those ads.  *See Bursey v. United States*, 466 F.2d 1059, 1081–82 (9th Cir. 1972).  Just as in *Bursey*, here:

26       [t]he Government's argument takes as its premise the conclusion to be proved:  The
        expressions and associational relationships in issue are not protected by the First
27       Amendment.  This argument implies that there is a presumption of nonprotection

28                                                6

applied to the expressions and associations involved in this case and that the witnesses are obliged to overcome it before they can rely on the First Amendment. The Government has it backwards. All speech, press, and associational relationships are presumptively protected by the First Amendment; the burden rests on the Government to establish that **the particular expressions or relationships** are outside its reach.

*Id.* (emphasis added). The presence of some unprotected content on a website does not render the remaining content on the website is unprotected, nor does it alter the presumptive protection of the First Amendment. *See Backpage.com, LLC v. Dart*, 807 F.3d 229, 234 (7th Cir. 2015); *Free Speech Coal., Inc. v. Rokita*, __ F.Supp.3d __, 2024 U.S. Dist. LEXIS 114208, at *32-33 (S.D. Ind. June 28, 2024).

In *Dart*, Cook County Sheriff Tom Dart threatened MasterCard and VISA with legal sanctions if they did not discontinue processing credit cards for Backpage.com. "since the ads might be for illegal sex-related products or services, such as prostitution." *Dart*, 807 F.3d at 230. Sheriff Dart defended his conduct by claiming that escort advertising was not protected by the First Amendment. Judge Richard Posner, writing for the Seventh Circuit, held that Sheriff Dart's conduct violated the First Amendment unless there was "no constitutionally protected speech in the ads on Backpage's website:"

> Nor is Sheriff Dart on solid ground in suggesting that *everything* in the adult section of Backpage's website is criminal, violent, or exploitive. Fetishism? Phone sex? Performances by striptease artists? (Vulgar is not violent.) One ad in the category "dom & fetish" is for the services of a "professional dominatrix"—a woman who is paid to whip or otherwise humiliate a customer in order to arouse him sexually. It's not obvious that such conduct endangers women or children or violates any laws, including laws against prostitution. The district judge remarked "that the majority of the advertisements [in Backpage's adult section] are for sex"—but a majority is not all, and not all advertisements for sex are advertisements for illegal sex. … Backpage is the plaintiff, and its only remedy is an injunction against the sheriff's violating its First Amendment rights."

*Id.* at 231, 234, 238 (emphasis and brackets in original; internal citations omitted).[3]

---

[3] The government's statements about sanctions in its sentencing memorandum are highly misleading. First, the sanctions motions in both cases were filed **after** the indictment issued, when Ferrer was a cooperator, and **after** Ferrer subsequently failed to respond to each motion. As such, the sanctions were not awarded in an adversary proceeding, but in a default proceeding. Second, both sanction awards were premised on statements made by **Ferrer**, the government's cooperator, and **all** of Ferrer's statements at issue were made **after** the April 2015 sale of Backpage.com to him. Contrary to the government's implication in its sentencing memorandum, the sanctions were not premised on anything said or done by Mr. Lacey, who

1    Similarly, in *Free Speech Coalition*, the Indiana Attorney General argued that the state's age

2    verification law did not violate the First Amendment rights of the Pornhub because its websites

3    contained obscene content, making the websites inherently obscene and unprotected.  *Free Speech*

4    *Coal.*, __ F.Supp.3d __, 2024 U.S. Dist. LEXIS 114208, at *32.  The district court in Indiana was

5    unpersuaded:

6        In [the Attorney General's] view, because the Plaintiffs' websites have obscene
         pornography and have names suggesting they contain obscene content, the websites
7        themselves are obscene *in toto*.  The court rejects that argument…  The website is a
         publisher, akin to the defendant in *Ginzburg*, not an obscene material like a magazine.
8        The videos on the website are equivalent to the obscene magazine in *Ginzburg*….
         The website itself cannot be obscene any more than defendant Ginzburg himself
9        was obscene.  Instead, the materials (*i.e*, the videos and images on the website or the
         articles and magazines Ginzburg sold) are the focus of the analysis.  And these
10       websites contain a substantial amount of non-obscene material."

11   *Id.* at 32-33.  The court preliminarily enjoined the age verification statute on First Amendment

12   overbreadth grounds notwithstanding the unprotected obscene content on the websites.  *Id.* at *49.

13       As in *Dart* and *Free Speech Coalition*, the Court's determination that the government proved at

14   trial that a handful ads published by Backpage.com were unprotected by the First Amendment does

15   nothing to alter the constitutional presumption of protection applicable to all of the **other** content

16   on Backpage.com, and the revenues from all that content, which remains presumptively protected

17   unless and until the government proves that each other "particular expression" (on Backpage.com,

18   an ad) was outside of the reach of the First Amendment's protections.  *Bursey*, 466 F.2d at 1081–82.

19   The ads underlying Mr. Spear's Travel Act convictions collectively generated just over $100.00 of

20   revenue for Backpage.com and the First Amendment bars the government's effort to leverage that

21   $100.00 of revenue into $500,000,000.00 of criminal proceeds.

22   **IV.    Mr. Lacey acted with a good faith belief that Backpage.com's publication of adult**

23   **advertising was lawful and protected by the First Amendment.**

24

25   was not a party to the *Dart* litigation and whose only statements in the other litigation were to

26   assert his Fifth Amendment rights to make no statements.  As noted in Mr. Brunst's response
     to the government's sentencing memorandum, the government's suggestion that the *Dart*

27   decision lacks vitality due to the sanction award against Backpage has no merit.

28                                                 8

The government's sentencing memorandum is replete with claims that Mr. Lacey was "on notice" that Backpage.com's adult advertising included ads associated with prostitution and that various parties, including the National Association of Attorneys General ("NAAG"), had called on Backpage.com to discontinue publishing adult advertising.  The government painted a very one-sided picture at trial, however, and there is a critical difference between claims that Backpage.com **should** discontinue adult advertising and claims that Backpage.com's continued publication of adult advertising would be **unlawful**.  The government did **not** establish that Mr. Lacey had good cause to believe that Backpage's publication of adult advertising was **unlawful**.  Instead, in good faith, he believed it to be lawful, even if some of those advertising on the website were engaged in illegal activities.

NAAG sent many letters to Backpage.com, including some asking that Backpage.com cease publishing adult advertising, but **none** of those letters claimed that Backpage.com was violating federal law by publishing adult ads.  Indeed, despite claiming that Backpage.com users were posting "illegal content," NAAG did not contend that Backpage.com's publication of that content was unlawful.  Moreover, Mr. Lacey's good faith was supported by the non-privileged response letters that Backpage.com's various counsel sent to NAAG, which the jury was precluded from seeing, two of which asserted that Backpage.com's publication of adult advertising was protected by both Section 230 and the First Amendment (and to which NAAG did not respond to contend otherwise). (Exs. A, B.)  Mr. Lacey's good faith also was supported by various non-privileged memoranda written by counsel to Backpage or Messrs. Larkin and Lacey that were provided to parties seeking to censor adult content.  *See* Spear Sentencing Memorandum, Doc. 2138-4 at 4-18 (Moon memorandum to NCMEC) (admitted into evidence as Exh. 171) and 2138-5 at 1-31 (Sableman memorandum), which Mr. Lacey incorporates by reference.

Mr. Lacey's good faith also was based on the statements of numerous public intellectuals who made statements in support of the legality of Backpage.com's operations and against those who sought to censor adult advertising.  For example, just days after the State of California filed a criminal complaint against Messrs. Lacey, Larkin, and Ferrer, Noah Feldman, the Felix Frankfurter Professor

of Law at Harvard Law School and a noted constitutional scholar whose emphasis is free speech, published an editorial on Bloomberg News lambasting California, saying its prosecution had "seriously breached the constitutional wall meant to protect the free press." *Publisher of Sex-Tra cking Ads Isn't the Criminal*, Noah Feldman, Bloomberg News, Oct. 10, 2016 (https://www.bloomberg.com/opinion/articles/2016-10-10/publisher-of-sex-trafficking-ads-isn-t-the-criminal) (Exh. C).  Professor Feldman rejected California's claim that Backpage's publication of adult ads was unlawful, saying the "criminal complaint [was] a fairly astonishing document" and that Backpage's publication of adult ads was protected by the First Amendment:

> But, of course, the ads in Backpage don't literally say that a minor is being tra   cked for sex any more than other escort ads expressly state that they are for paid sex.  The di erence matters.  The First Amendment doesn't protect speech that directly solicits criminal behavior.  But it does protect speech that might lead to criminal behavior, and also might not.  That's crucial, because lots of speech could potentially lead people who meet each other to agree on a criminal course of conduct.  Free speech law requires that government censorship not go so far as to chill lawful speech in order to punish some unlawful speech.

*Id.*

Similarly, Mr. Lacey obviously was aware of the U.S. Senate subcommittee investigation and hearing, but he also was aware of the searing criticisms of that committee, including the following from the DKT Liberty Project, a non-profit public interest organization dedicated to promoting individual civil liberties and free speech:

> The Senate Permanent Subcommittee on Investigations has been engaged in an unconstitutional and blatant attempt to crush Backpage.com, a website that carries classified ads, by pretending to seek information it doesn't need when it is actually using the power of the federal government to be prosecutor, judge, and jury–all rolled into one.  The DKT Liberty Project objects to the PSI's staging what amount to "show trials" akin to those we expect to see in countries like China and Russia.  Such tactics by this Subcommittee were pioneered during the Cold War by Senator Joseph McCarthy, and it is a sad day to see their return.  This hearing is the culmination of years of coercive efforts by various members of Congress and government officials at state and local levels to close Backpage.com, despite numerous court decisions upholding the website's First Amendment rights, including its right to run ads on legal sexual activity.

*Statement by the DKT Liberty Project on the Backpage.com Senate Proceedings*, January 10, 2017 (https://dktlibertyproject.org/2017/01/10/statement-by-the-dkt-liberty-project-on-the-backpage-com-senate-proceedings/).  (Exh. D.)

Mr. Lacey's good faith also was grounded in decisions of numerous federal courts, each of which held that the First Amendment protected Backpage.com's publication of adult advertising—even if some of that adult advertising was associated with (or even proposed) illegal activity.  *E.g.,* *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012) ("It is true that '[o]ffers to engage in illegal transactions are categorically excluded from First Amendment protection' … [but] SB 6251 prohibits not only 'offers' to engage in commercial sex acts, but also the direct and indirect publication, dissemination, and display of such offers.  **The third-party publication of offers to engage in illegal transactions does not fall within 'well-defined and narrowly limited classes of speech' that fall outside of First Amendment protection**.") (emphasis added).[4]

The Court's determination that Mr. Lacey could not present evidence at trial regarding the foregoing non-privileged response letters and memoranda, absent a privilege waiver, or regarding the court decisions does not mean that the Court should not consider these letters, memoranda, and decisions for purposes of sentencing.  (The government's claim otherwise is belied by its packing of its sentencing memorandum with both unadmitted and precluded materials.)  The Court may disagree with the opinions expressed in the materials referenced above, or even just believe them to be wrong as a matter of law, but Mr. Lacey's decisions regarding Backpage.com were heavily informed by them and he reasonably relied on the opinions of a noted Harvard constitutional law

---

[4] *Backpage.com, LLC v. Hoffman*, Case No. 13–cv–03952 (DMC)(JAD), 2013 WL 4502097 (D.N.J. Aug. 20, 2013) (striking down, under First Amendment, state statute criminalizing advertisements "that would appear to a reasonable person to be for the purpose of engaging in what would be a commercial sex act…with a minor" and rejecting state's claim that the statute "regulates illegal advertisements…not protected by the First Amendment" because "[d]escribing criminal conduct as anything that is 'implicit' is inherently vague, because it means '[n]ot directly expressed [and] existing [only] inferentially' and 'fails to clearly mark the boundary between what is permissible and impermissible'"); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013) (similar); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d at 1277 (similar).

1   professor, the Seventh Circuit Court of Appeals, various district courts, and reputable public

2   intellectuals—even if they all were wrong about the law or how it would or would not apply to

3   Backpage.com.  Likewise, it was reasonable for Mr. Lacey to disregard the opinions of Nicholas

4   Kristoff, Anderson Cooper, and the rest of the cacophony calling for Backpage.com to cease

5   publishing adult ads in the face of these more compelling contrary opinions.

6   **V.      Backpage.com is not comparable to either Silk Road or CityXGuide.**

7          The government suggests that Backpage.com was similar to the Silk Road and CityXGuide

8   websites.  That's simply not true.  Silk Road and CityXGuide each was a website where most of the

9   content proposed facially unlawful transactions.  Silk Road's website had categories for narcotics

10   that were always unlawful to buy, sell, or possess.  Silk Road did not sell advertising space for a

11   nominal cost, like Backpage.com, but served as an escrow agent and took a healthy percentage every

12   sale as a commission—so was directly involved in and profited from each illegal transaction.

13   CityXGuide nominally offered escort advertising, but the website provided tick boxes for its

14   advertisers to identify the specific sex acts in which they would engage, as well as a nearby space to

15   list the cost to engage in those sex acts—meaning most ads proposed express sex for money

16   transactions.  Those websites were nothing like Backpage, which never permitted offers of facially

17   unlawful products or conduct on its website and no federal courts ever held that Silk Road or

18   CityXGuide could publish offers to engage in facially unlawful transactions with the protection of

19   the First Amendment.  Because those cases involved materially different facts, the sentences in those

20   cases provide no guideposts for the sentences here.

21   **VI.      Mr. Lacey sold his interest in Backpage.com long before his arrest.**

22          The government claims in its sentencing memorandum that the "only thing that stopped

23   Defendants was their arrest," saying a heavy sentence will be needed to deter future lawbreaking by

24   Defendants.  Doc. 2129 at 16/20-21.  As the government knows, however, Mr. Lacey and his

25   colleagues commenced seeking to divest themselves of Backpage.com more than a decade ago and

26   did so in April 2015, when they sold the site to Ferrer.  And it was Ferrer who owned and operated

27

28                                                    12

1    the site when the government seized it.  Ferrer could have walked away from the site at any time,

2    with no personal responsibility for the unpaid debt, but Ferrer chose not to do so.

3    **VII.    There is no basis for restitution concerning Count 100.**

4         As Mr. Lacey has already briefed, and incorporated herein by reference, there is no basis for

5    restitution under controlling Ninth Circuit precedent for his sole crime of conviction – international

6    money laundering – because there are no victims.  (Docs. 2101, 2124.)  But even if this Court were

7    to consider restitution, Mr. Lacey has agreed to forfeit millions as part of the settlement of the civil

8    forfeiture action pending in the C.D.C.A., as well as his interest in approximately $160 million in

9    corporate assets.   This Court should take into consideration Mr. Lacey's forfeited assets in

10   determining an appropriate sentence for this financial crime.

11   **VIII.   A sentence of probation is warranted here.**

12        As discussed in detail in Mr. Lacey's Sentencing Memorandum, attachments, and letters of

13   support (Doc. 2133), incorporated herein by reference, a sentence of probation is consistent with

14   the goals to be served at sentencing, and is appropriate here.  There are many reasons why this Court

15   should decline the government's invitation to impose a term of incarceration, much less a lengthy

16   term of incarceration.

17        First, prodded by the government, Probation used the wrong sentencing method, creating

18   an artificially high Guidelines range, to make the government's request for 240 months appear to be

19   a major concession.  Under Guideline 2S1.1, Mr. Lacey should be sentenced with a base offense

20   level of 10 under the loss table method.  (Doc. 2101.)  Instead, Probation and the government

21   advocate for use of the underlying conduct method, taking his base offense level from 10 to 43—

22   **but there is no underlying conduct here**.  The funds at issue not only derived from the

23   publication of post-sale ads, but the government failed to trace any of the funds to specific ads the

24   government proved were unprotected by the First Amendment.  (Tr. Ex. 1479.)  Mr. Lacey has not

25   been convicted of conspiracy, but nonetheless this Court has ruled, and Probation has concurred,

26   that the conspiracy alleged by the government ended upon the sale, so there is no way to hold

27   anyone, including Ferrer, liable for post-sale Travel Act violations, either through direct or *Pinkerton*

28                                                      13

1    liability.  As a result, this Court can only use the loss table method, which results in a base offense

2    level of 10, making the government's request for 240 months far out of bounds.

3            There are many other reasons why Probation's calculation under the underlying conduct

4    method – even if this Court were to use that improper method in calculating the Guidelines range

5    – is riddled with clear error, as stated more fully in Mr. Lacey's Objections and the Objections and

6    Sentencing Response of John Brunst (Docs. 2124, 2123, 2152), incorporated by reference.  In short:

7            • The government improperly asks for sentencing for child-sex trafficking as the

8               underlying offense, rather than misdemeanor prostitution, which improperly

9               increases the base offense level from 14 to 28.

10           • There is nothing in the record to support the claim that the conduct at issue in Mr.

11              Spear's counts of conviction – that occurred years before the wire transfer on

12              January 3, 2017 – can in any way be described as within the scope of reasonably

13              foreseeable behavior as to Count 100.

14           • There is double counting, and unsupported enhancements.

15           • Anything in excess of a base offense level of 10 can only be calculated by use of

16              acquitted and/or unresolved conduct, which would inject clear legal error into Mr.

17              Lacey's sentencing.  The new Guideline prohibit use of acquitted conduct, as

18              Probation was advised by the Sentencing Commission, and the use of unresolved

19              conduct violates the Double Jeopardy and Due Process Clauses, in addition to

20              contradicting the advice the Commission provided on Mr. Lacey's sentence.

21           Second, age plays a huge consideration in sentencing an elderly defendant.  The data plainly

22   shows that defendants 70 and over consistently receive sentences well below their Guidelines range.

23   *See* Exh. E.

24           Third, the government has drawn logical leaps unsupported by the record in an effort to

25   smear Mr. Lacey.  Many of these errors are incorporated in the PSRs and subject to extensive

26   objections.  (*See* 2101, 2124.)  The government's newest smears are unfounded and are too plentiful

27   to be addressed herein.  But, for example, Mr. Lacey was not the steering "the ship's wheel," (Doc.

28                                                    14

1   2129 at 23), but instead, was a "layer away" from the operation of Backpage.  Indeed, this Court has

2   already found, Mr. Lacey was rarely involved with business issues.

3          A NCMEC official showing Mr. Lacey an ads with TER numbers on them would not have

4   meant much of anything to Mr. Lacey, and he certainly had no idea that Ferrer was in

5   communication with TER.  There is no proof that NCMEC, Ferrer, or anyone informed Mr. Lacey

6   about the relationship between those two websites and details like these, about business operations,

7   were outside of Mr. Lacey's department – editorial.  Mr. Lacey certainly has no capability to "engag[e]

8   in similar conduct once released."  (Doc. 2129 at 16.)  This claim would be laughable if the

9   consequences here were not so serious.  As Dr. Hardaway stated in her letter of support, Mr. Lacey

10   rarely carries a cellular phone and understands nothing about the technology at issue in operating a

11   website.  He would be incapable of undertaking any action to create a new website.

12          Finally, there is no proof that Mr. Lacey had any idea that content on other websites had

13   been copied from Backpage, whether in the context of the Detroit murders or in any other context.

14   That detail, again, was within Mr. Ferrer's scope of employment, not Mr. Lacey's.  Mr. Lacey edited

15   press releases to include mention of those other websites because he understood them to be just

16   that – other websites.

17          It is clear that the government's tactic here is to try to impute knowledge to Mr. Lacey, that

18   he did not have, and that is not supported in any manner by the record.  Since its inception, this case

19   has been and continues to be a representation of the government's kitchen-sink approach to

20   conviction by smearing people with conduct of unknown and unrelated parties of the most

21   prejudicial kind.  The facts in this case matter.  The Court's acceptance of the government's version

22   of the facts here will only lead to additional errors.  In the words of Ferrer, Mr. Lacey was a "layer

23   away" from Backpage.  The government's attempt to taint him with the brush of everything that

24   was purportedly wrong with Backpage is inconsistent with the trial testimony.  The testimony was

25   that Mr. Lacey was not involved with the banking meetings.  No one from editorial was involved

26   with the business side in any way.  It was so well-understood and followed that it was known as

27   separation of church and state.  Indeed, a senior executive, Daniel Hyer, who worked exclusively for

28                         15

Backpage for 13 or the 14 years of the purported conspiracy, never even met Mr. Lacey. Mr. Lacey was an editor and a writer. And nothing more.

### **CONCLUSION**

For all these reasons, and the reasons stated in Mr. Lacey's Sentencing Memorandum and Objections, Mr. Lacey respectfully requests a sentence of probation.

RESPECTFULLY SUBMITTED this 24th day of August, 2024,


Paul J. Cambria, Jr.
Erin McCampbell Paris
LIPSITZ GREEN SCIME CAMBRIA LLP

By:     /s/ Paul J. Cambria, Jr.
        Paul J. Cambria, Jr.
        Attorneys for Michael Lacey


On August 24, 2024, a PDF version
of this document was filed with
Clerk of the Court using the CM/ECF
System for filing and for Transmittal
Of a Notice of Electronic Filing to the
Following CM/ECF registrants:

Kevin Rapp, kevin.rapp@usdoj.gov
Peter Kozinets, peter.kozinets@usdoj.gov
Margaret Perlmeter, margaret.perlmeter@usdoj.gov
Austin Maxwell Berry, austin.berry2@usdoj.gov