1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

9

United States of America,

10

Plaintiff,

11

v.

12

Michael Lacey, et al.,

13

Defendants.

No. CR-18-00422-001-PHX-DJH

**ORDER**

14

15    The Court, having considered the objections filed by Defendant Lacey (Docs. 2101,

16    2114, 2124),[1] Brunst (Doc. 2123) and Spear (Doc. 2125) to their respective Presentence

17    Investigation Reports ("PSR"), and the Government's responses to the same (Docs. 2107,

18    2137), herein rules on the following objections. The remaining objections as to each

19    Defendant shall be ruled on at the sentencing hearings, set to take place on August 27, 2024

20    and August 28, 2024.[2]

21    **1.     Objection to the Application of the Two-Level Enhancement Under**
22    **U.S.S.G. 2S1.(b)(3) for a Sophisticated Money Laundering Scheme.**

23    Section 2S1.1(b)(1) provides "[i]f . . . the offense involved sophisticated laundering

24    _____

[1] Defendant Lacey's original objections to his initial PSR were filed on June 20, 2024 (Doc.
25    2101).  He subsequently amended those and withdrew the original objections on July 10,
      2024 (Doc. 2114).  His final objections were filed on August 12, 2024 (Doc. 2124),
26    however, make repeated reference by incorporation to the original objections at Doc.
      2101.  Whenever possible, the Court will simply reference Defendant Lacey's final
27    objections (Doc. 2124), which incorporate by reference prior objections.

28    [2] Each of these matters have been fully briefed and thoroughly reviewed by the Court to
      make additional oral argument superfluous.

increase by 2 levels." The application note states "sophisticated laundering" means complex or intricate offense conduct pertaining to the execution *or* concealment of the [underlying] offense." (emphasis added). *United States v. Augare*, 800 F.3d 1173 (9th Cir. 2015) is instructive on when to apply this enhancement. There, the court describes that a money laundering scheme's repetitive and coordinated conduct, though not necessarily complex, can suffice for the enhancement. *Id.* at 1175–76. *See also States v. Tanke*, 743 F.3d 1296, 1307 (9th Cir. 2014) (finding that the "sophisticated means" enhancement was justified where defendant engaged in "dozens of various acts," including falsifying invoices and checks to conceal payments); *United States v. Jennings*, 711 F.3d 1144, 1146 (9th Cir. 2013) (upholding a "sophisticated means" enhancement for using a bank account with a deceptive name to conceal income and stating that conduct need not involve "highly complex schemes or exhibit exceptional brilliance" to warrant the enhancement); *United States v. Horob*, 735 F.3d 866, 872 (9th Cir. 2013) (per curium) (applying the "sophisticated means" enhancement, in part, because the defendant falsified documents and left a "complicated and fabricated" paper trail that made it hard to uncover his fraud) (citations omitted). The totality of the circumstances is essentially considered, not necessarily the complexity of it. *Augare*, 800 F.3d at 1175.

Defendants object, primarily because they say there was no complexity involved and their money movements were transparent. Defendant Lacey says that the Government's witness on the financial crimes "testified that he followed the transactions with ease," that no fictitious names were used, and that he could tell that Lacey was affiliated with all of the accounts he reviewed. (Doc. 2124 at 12). Defendant Brunst similarly argues that this proposed enhancement is "belied by the trial record," which he says showed that the sale of Backpage was "structured by highly respected lawyers and accountants" and done in a manner that is "a typical, property corporate transaction" and that there is no evidence the loan payments on the sale were structured to promote violations of the Travel Act. (Doc. 2123 at 13). He also says merchants terminated their association with Backpage not because of illegal conduct, but because of reputational

1    reasons. (*Id.*)  Defendant Spear objects on the grounds that the "PSR does not cite to any
2    specific conduct of Mr. Spear's that indicates his scope of his any [sic] agreement to engage
3    in jointly undertaken criminal activity encompassed such contact." (Doc. 2125 at 14).[3]

4        The Government points out that 2S1.1(b)(3), Application Notes defines
5    "Sophisticated laundering" as "complex or intricate offense conduct that "typically
6    involves the use of—(i) fictitious entities; (ii) shell corporations; (iii) two or more levels
7    (i.e., layering) of transactions, transportation, transfers, or transmissions, involving
8    criminally derived funds that were intended to appear legitimate; or (iv) offshore financial
9    accounts." It states that the record here contains nearly all these characteristics, noting that
10   Defendants started using shell companies as early as 2012, including Website Technologies
11   to obscure that payments were going to Backpage. (Doc. 2107 at 15). The Government
12   says Defendant Brunst created Website Technologies for the purpose of opening bank
13   accounts in a name that was not Backpage and took special care to ensure the two were
14   separate entities, though in actuality, they were one and the same. (*Id.*; Doc. 2063 at 11).
15   Defendants similarly began funneling Backpage transactions through European shell
16   companies and banks to obscure the fact that that the underlying transactions involved
17   payments to Backpage. (Doc. 2107 at 15). The Government says that the loan payments
18   on the sale of Backpage from Ad Tech B.V. to Cereus Properties "almost immediately"
19   went to Defendants and that the fact that the sale was structured by lawyers "misses the
20   point" because they "lacked the information that [Defendants] had—that the sale of
21   prostitution ads 'was the primary focus of Backpage's business and each Defendants
22   repeated substantial financial benefit from knowingly providing Backpage's service."
23   (Doc. 2107 at 17).

24       The Court finds that the totality of the circumstances supports applying the two-
25   level enhancement as to each Defendant. Regarding Defendant Lacey, a jury determined
26   that he committed International Concealment Money Laundering. (Doc. 1978 at 44). The

---

[3] Spear also joins in on Brunst' objection but as the PSR notes, Brunst' objection is specific to his conduct. Nonetheless, in ruling on the objection, the Court considers the totality of the circumstances as to Spear.

evidence supported a determination that his stated desire to hide his accounts from the government and his receipt of funds from Cereus Properties and fund transfers to a Hungarian account, was in part, done to conceal the source of Backpage income.  Though not complex, acting to conceal his source of funds warrants the enhancement.  Defendant Lacey's objection is therefore overruled.

Likewise, as to Brunst, and Spear, the jury convicted each of Conspiracy to Commit Money Laundering and Concealment Money Laundering.  (*Id.* at 26–27).  The evidence showed that they were each aware that the origin of the funds was from Backpage's sex-for-money-ads and they took steps to conceal the funds by funneling them into Website Technologies and Ad Tech B.V., both registered in the Netherlands.  Funds were then transferred into Cereus Properties, owned by Brunst and Spear.  The jury heard testimony that their intent was to conceal the funds because they knew its ultimate source was illegally derived from Backpage ads.  The Court is not persuaded by Brunst's reassertion of "advice of counsel" explanation as addressed, *ad nauseam* in this case.

Defendant Brunst's and Spear's objections to the two-level enhancement for "sophisticated money laundering scheme" is overruled.

### 2. Objections to the 4-level Enhancement for Role as a Leader or Organizer Under U.S.S.G. § 3B1.1(a)

Section 3B1.1(a) applies an "Aggravating Role" adjustment "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels."  During the relevant time, Backpage had several owners with various executive management roles, including Defendants Lacey, Brunst, and Spear.

Defendant Lacey objects to this enhancement, citing the Court's prior statement that his involvement was "attenuated" and that he was rarely pulled into the business side of Backpage's operation.  (Doc. 2101 at 16-17). The Defendant misapplies the Court's findings which relate to the standards for a judgment of acquittal.  He further refutes that he "was aware of the strategies used to conceal prostitution on the website and he directed

others in the conspiracy." (*Id.*)  Lastly, Defendant Lacey states that this enhancement does not relate to any count of conviction and so, it must not apply.  The Government asserts that the evidence shows otherwise.

Brunst asserts that he had no role in the daily management of the business, "including the company's marketing strategies, reviewing of ads, and dealings with [NGOs][.]" (Doc. 2123 at 14).  The Government asserts that "Brunst, as an equity owner of Backpage, was part of the control group of owner/executives that ran the company for more than a decade-and that made millions of dollars as a result[.]" (Doc. 2137 at 18).

Spear asserts that there is no evidence that "[he] supervised five or more criminally culpable individuals, or that the scope of the undertaken criminal activity was otherwise extensive."  (Doc. 2102 at 10). The Government asserts that "Spears leadership and organizational role in both the development of Backpage into a prostitution advertising powerhouse and the laundering of Backpage's proceeds" evince his role as an organizer or leader.  (Doc. 2137 at 10).

Though Defendant Lacey argues he had no "ownership interest in Backpage, *per se*" and that his only interests lied in its holding company, the evidence showed otherwise. (Doc. 2124-1 at 3).  The trial evidence showed that Mr. Lacey had a leadership role in Backpage's parent company, Village Voice Media, during which time he was the Chief Editorial Officer.  (Doc. 2063 at 3).  As stated in the PSR, Lacey had a 45 percent interest in Backpage and the records of his financial wealth during the time Backpage was it was in operation, supports this. Though he did not supervise moderators or the daily on-line operation, he was certainly abreast of major decisions impacting Backpage's operation, its finances, and its reputation as a prostitution website.   Indeed, his leadership is evident by his role as Backpage's biggest defender and spokesperson before the public, NGOs, and the U.S. Congress. Testimony and evidence showed that he asserted, proudly, that Backpage was bringing transparency to the oldest profession in the world.  There is clear and convincing evidence to support the sentencing enhancement as to Defendant Lacey.

The Court has already observed that Defendants Brunst and Spear held leadership

and organizational roles for Backpages' operation. (Doc. 2063 at 3). The trial evidence showed that Brunst was the Chief Financial Officer of the multi-million-dollar enterprise who had a hands-on managerial role in determining how to market it and who developed its financing strategies. He supervised and worked with Spear, Ferrer, and others in finding new financing for Backpage's operation when local credit companies ceased working with it. (*Id.* at 10–11). Importantly, Brunst sought out international financing to keep Backpage afloat when other domestic financial banks had abandoned it. (*Id.* at 11–12). Brunst approved the budget needed to grow the moderation staff, then directed by Spear and his subordinates to moderate Backpage's content.

Spear, though supervised by Brunst, also coordinated a massive number of moderators on how to minimize the appearance that Backpage was a prostitution service network. Spear supervised Ferrer and others in moderation of ads placed on the website. He directed moderators on how to scrub ads to appear more like escort ads rather than ads for sex. He also approved changes to the terms and images that were allowed to be posted. (*Id.* at 7). He authored budget plans and made presentations to Larkin and Brunst on how to grow Backpage's profitability, including its relationship with TER. (*Id.* at 4–5). Essentially, Brunst and Spear held decision making roles between themselves and others and ensured employees followed their direction to keep Backpage afloat. Co-Defendant Ferrer's testimony corroborates the leadership roles of each Defendant, including the direction he took from them. Lacey, Brunst and Spear each had significant stakes in the profits generated by Backpage. Their respective leadership and organizational roles ensured its continued operation. The Defendant Lacey, Brunst and Spear' respective objections regarding the 4-level enhancement for their roles as a Leader or Organizer under U.S.S.G. § 3B1.1(a) are thus overruled.

### 3. Objection to not Applying the Zero-Point Offender Two-Level Reduction Under U.S.S.G. § 4C1.1

Defendant Brunst and Spear assert that they are eligible for a two-level reduction in their sentencing guideline calculation because they have no prior countable criminal

histories.  (Doc. 2123 at 15); (Doc. 2102 at 10).[4]  The Government disagrees.

USSG 4C1.1 instructs the Court to decrease the offense level determined under Chapters Two and Three by two levels except where a defendant is subject to "an adjustment under  3A1.1 (Aggravating Role)." 4C1.1(10).  Having determined that Defendants Brunst and Spear qualify for an aggravating role adjustment, they do not qualify for the two-level reduction for having no prior criminal convictions.  Their respective objections to not receiving the two-point reductions are denied.

**4.      Objections to the Court's Consideration of Restitution[5]**

Defendant Lacey objects to the PSR's assessment that he is responsible for victim restitution because his "sole crime of conviction - - international concealment money laundering" does not qualify for restitution as no victim suffered an injury of pecuniary loss therefrom. (Docs. 2101 at 17; 2124-1 at 17).  The Government asserts that his count of conviction was supported by evidence that Count 100's money laundering conviction involved proceeds traceable to Backpage's operation through Website Technologies and Cereus Properties.  (Doc. 2137 at 22).  All the Defendants assert that a Travel Act or money laundering violation does not meet the mandatory restitution requirements of 18 U.S.C. § 3663A therefore he is not required to pay restitution to any crime victim.  (Doc. 2123 at 19-20; Doc. 2102 at 10).  Defendant Brunst alternatively asserts that if restitution was applicable, the Government cannot meet its burden of establishing the amount of restitution owed each victim by a preponderance of the evidence.  (Doc. 2123 at 20).

The Government points out that under the "MVRA or VWPA, a victim is defined as "a person directly and proximately harmed as a result of the commission of an offense." *See* 18 U.S.C. §§ 3663(a)(2), 3663A(a)(2). The Government states that any victim advertised on Backpage in violation of a Travel Act charge during the conspiracy and who was directly and proximately harmed because of that, qualifies as a victim under 18 U.S.C. § 3663A(2) because the harm was "direct and foreseeable." (*Id*.)  The Government

---

[4]  The Court is not aware that Defendant Lacey made or joined in this objection. Nonetheless, the same analysis would apply.
[5]  The Court's ruling necessarily overrules the Defendants respective objection to use and consideration of the submitted victim impact statements.

asserts that during the conspiracy to commit Travel Act offenses, victims, including non-adults, were coerced into performing sex acts for money, resulting in lasting emotional traumas. Lacey, Brunst, Spear, and others continued to financially benefit from Backpage's operation knowing that it was a sex for money ads platform. The evidence showed they began to conceal this source of income due to its reputation as a prostitution website.

The Court agrees. The available victim impact statement show that residual effects from being advertised on Backpage has had lasting emotional impacts requiring various forms of counseling and therapies. Letters from counselors and therapist corroborate the psychological impact of their clients once advertised on Backpage. The Court also agrees with the Defendants that the Government bears the burden to show, by a preponderance of evidence, the amount of restitution owed to each victim. Accordingly, the Court will order a restitution hearing be held no later than 60 days after the sentencing hearings.[6] Defendant Lacey, Brunst's and Spear's objection regarding restitution are otherwise overruled.

### 5. Objections to the Two-Level Enhancement Under U.S.S.G. § 2G1.3(b)(3) for Use of a Computer or Interactive Computer Service

Defendants also object to the application of a two-level enhancement for the use of a computer or interactive computer service. Section 2G1.3(b)(3) provides "[i]f the offense involved the use of a computer or an interactive computer service to . . . entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with [a] minor, increase by 2 levels."

Defendant Lacey objects because "there was no use of a computer in the commission of Count 100." (Doc. 2124 at 12). He further states that the funds he transferred related to this count of conviction were from "post-sale" loan payments funded by post sale ads. (*Id.*) Defendant Brunst objects to the PSR's application of the use of an interactive computer service enhancement on the grounds that § 2G1.3 (Promoting a Commercial Sex Act with a Minor) does not apply, "as those enhancements are not

---

[6] The parties shall meet and confer and provide the Court with their proposed dates for a restitution hearing.

included in § 2G1.1" [Promoting a Commercial Sex Act] (Doc. 2123 at 12). Defendant Spear similarly says he was not convicted "of any offense covered" by § 2G1.1. (Doc. 2125 at 13–14).

The Government encourages the Court to reject these objections. Regarding Defendant Lacey, the Government says, "Probation properly applied §2G1.3. . .because the ads that Backpage published that sold minors for sex involved the use of computers and related to commercial sex" and that Lacey knew that Backpage's profits came partly form ads that sold minors. (Doc. 2137 at 28).[7] The Court agrees. Regarding Brunst, the Government asserts that his Conspiracy to Committee Travel Act violations supports the guidelines application. The Court agrees. Regarding Spear, the Government points out that Spear was convicted of 18 Travel Act-related counts and § 2G.1.1 covers those offenses of conviction. It says that these " ' involved the use of a computer or an interactive computer service' to offer or solicit prostitution with minors. They also 'involved a commercial sex act'—that's precisely what Backpage's prostitution ads marketed." (*Id.* at 10). The Court agrees.

There is clear and convincing evidence that Defendant Lacey's source of concealed funds derived from the operation of Backpage, a computer generated platform. Regardless of when he sold his interests to Ferrer, Backpage operated in the same way before and after that sale. Thus, the loan repayments derived from its source.

A jury determined, beyond a reasonable doubt that Backpage was established to provide an on-line sex-for-money platform in violation of state laws making prostitution illegal. There was clear and convincing evidence in the trial record that many minors were advertised on Backpage, indeed, several witnesses testified to their age at the time of trial, evincing they were minors when advertised. Defendants were repeatedly made aware that minors were being advertised on Backpage by law enforcement agencies, State Attorneys General, and NGOs. Nonetheless, the Defendants found ways to try to conceal its intended

---

[7] The Government states that "Alternatively, if the Court agrees with Lacey that his sentence should be calculated using the Loss Table, then the Court should apply the calculations set forth at 11, supra." (*Id.*)

use through flimsy moderation schemes. Defendants Lacey, Brunst, and Spear each purposely acted to keep the computer platform viable as it was their greatest source of financial gain.   There is clear and convincing evidence warranting the sentencing enhancement under § 2G1.3(b)((3) for Defendants Lacey, Brunst and Spear.   Their respective objections are overruled.

**6.    Objections Related to Probation Eligibility**

Defendants Lacey, Brunst and Spear object to their PSRs' reference that they are ineligible for a probationary sentence. The PSRs, however, correctly state that a defendant whose sentencing guideline range is in Zone D of the Sentencing Table is not eligible to receive a sentence of probation.  *See* 18 U.S.C § 3561(a)(3) and U.S.S.G. § 5B1.1.  So, should each Defendants' sentencing guideline range fall within Zone D, the PSRs correctly state that he is not probation eligible. The Defendants' respective objections as they relate to probation eligibility are therefore overruled.

Dated this 25th day of August, 2024.

Honorable Diane J. Humetewa
United States District Judge